UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>RED RIVER TALC LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 24-90505 (CML) |

**DEBTOR'S STATEMENT REGARDING FILING OF CHAPTER 11 CASE**

In this chapter 11 case, Red River Talc LLC (the "Debtor")[2] seeks confirmation of a consensual prepackaged plan of reorganization, as recently amended (the "Amended Plan"), that is supported by over **83%** of the claimants.[3] The solicitation establishes that the Amended Plan has the requisite statutory support of the current claimants (over 75%); the Amended Plan also has the support of the plaintiff firms that represent the accepting current claimants as well as the support of the representative proposed to serve as the Court-appointed fiduciary for future

---

[1] The last four digits of the Debtor's taxpayer identification number are 8508. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

[2] The Debtor is an indirect subsidiary of Johnson & Johnson ("J&J"). Its immediate predecessors are LLT Management LLC ("LLT"), f/k/a LTL Management LLC, and Johnson & Johnson Holdco (NA) Inc. ("Holdco"). References to the Debtor herein include, as applicable, the Debtor and these immediate predecessors. LLT filed two previous bankruptcy cases that were dismissed by the United States Bankruptcy Court for the District of New Jersey.

[3] The Debtor has filed the Amended Plan, titled the *Amended Prepackaged Chapter 11 Plan of Reorganization of the Debtor,* and the *Disclosure Statement for Prepackaged Chapter 11 Plan of Reorganization of the Debtor* (the "Disclosure Statement") contemporaneously herewith. Capitalized terms used but not defined herein have the meanings given to them in the Amended Plan. A comprehensive description of the Debtor, its history, its assets and liabilities and the events leading to the commencement of the chapter 11 case can be found in the Disclosure Statement and in the declaration of John K. Kim (the "Kim First Day Declaration").

claimants (the "FCR").[4]  The Debtor respectfully submits that the Amended Plan should be confirmed.

The overwhelming support for the Amended Plan affirms the representations of counsel for the substantial majority of claimants, who have consistently voiced their and their clients' support for a consensual bankruptcy resolution first proposed by LLT in its second bankruptcy filing in April 2023.  Although that case was dismissed, the then-presiding bankruptcy judge lauded the "remarkable progress" the parties had made toward a "viable global settlement" that is "fair, efficient and expeditious," and "strongly encouraged" the parties to continue to "pursue a global resolution" through a chapter 11 plan "in a context other than this current bankruptcy case."  That is exactly what the parties did.  The terms of the Amended Plan are the result of extensive negotiations among those counsel; counsel that previously opposed the initial proposed plan of reorganization (the "Initial Plan"); the FCR; and representatives of the Debtor and J&J.  Together, these parties have reached agreement on a plan of reorganization that will fairly, equitably and promptly satisfy talc claims in full.

The substantial support for the Amended Plan has been achieved notwithstanding the all-out, multi-front attack launched by a limited number of economically-conflicted plaintiff firms, led by Beasley Allen Law Firm ("Beasley Allen"); an attack designed to subvert the vote and thwart any consensual bankruptcy resolution.  These firms maintain leadership positions in the pending talc multi-district litigation (the "MDL") and, in those roles, stand to recover for themselves (but not their clients) up to 12% of the aggregate amount of any resolution in the MDL.  While benefitting the firms, that levy on any resolution through the MDL would reduce

---

[4] The FCR continues to support the Amended Plan, with the understanding that the FCR has not approved the Confidential Memorandum of Understanding & Agreement Regarding Talc Bankruptcy Plan Support between J&J, the Debtor, and The Smith Law Firm PLLC.

the recovery for the claimants; hence the conflict. Beasley Allen—and in particular its partner Andy Birchfield—has been the most vocal opponent of any resolution in bankruptcy, steadfastly maintaining that Beasley Allen would not support any bankruptcy resolution regardless of its terms, the level of support received from the claimants and their law firms, or the strong encouragement to reach a chapter 11 resolution expressed by the bankruptcy judge who oversaw LLT's prior chapter 11 cases.

At the end of the solicitation period for the Initial Plan, these objecting firms asked the Debtor to delay its bankruptcy filing to afford the parties additional time to negotiate a resolution of the firms' ongoing objections. The Debtor agreed, and over the course of the succeeding weeks, the Debtor and J&J made a series of offers proposing to contribute significant incremental consideration to reach an accord. Every offer was rejected, however, and the impasse between the parties continued.

The Smith Law Firm (the "Smith Firm") then approached the Debtor and J&J. The Smith Firm had brought the first talc trial against the Company in 2013 and had, as part of the opposition group led by Beasley Allen, actively opposed LLT's prior bankruptcy proposals. The Smith Firm advised that it represented, through a joint venture agreement with Beasley Allen, approximately 11,000 claimants, almost all of whose claims had been listed as "no" votes in a master ballot submitted by Beasley Allen. Although Birchfield certified in that master ballot that he was submitting the claimants' votes based on their "informed consent," the Smith Firm disclosed to the Debtor and J&J that Birchfield had not obtained such consent, a fact Birchfield had conceded to Allen Smith of the Smith Firm. Moreover, the list of claimants for whom Birchfield submitted "no" votes based on a certification of alleged "informed consent" included claimants who were represented by another law firm. These claimants have since signed

declarations attesting that they had no recollection of ever having been contacted by Beasley Allen, that they had no recollection of ever having been asked by Beasley Allen how they wanted to vote and that they had, in fact, voted to accept the Initial Plan. Beasley Allen's master ballot was invalid.

The Debtor and J&J thereafter engaged in extensive negotiations with the Smith Firm to resolve the firm's objections to the Initial Plan. Following these negotiations, an agreement was reached with the Smith Firm that afforded substantial incremental consideration for the claimants. This agreement was then memorialized in a *Confidential Memorandum of Understanding & Agreement Regarding Talc Bankruptcy Plan Support*. Among other things, the agreement provides, subject to specified terms and conditions, that:

- The Debtor will pay an additional **$1.1 billion** under the Amended Plan to a trust (the "Talc Personal Injury Trust") to fund talc claims subject to the individual review process described in the Trust Distribution Procedures;

- J&J will contribute **$650 million** outside the Amended Plan into a qualified settlement fund (the "QSF") for use in resolving any common benefit fund claims arising from the MDL, which, if determined to apply to a bankruptcy resolution, would have been charged against claimant recoveries; and

- To expedite payments to claimants, the Amended Plan will become effective, and the funding of and payments by the Talc Personal Injury Trust will begin, even if an appeal to the United States Supreme Court has been sought and remains pending.

As a result of this agreement, the substantial majority of the clients jointly represented by the Smith Firm and Beasley Allen have now voted to accept the Amended Plan.[5] Although Beasley Allen and other MDL leadership firms participated in these negotiations as well, they declined to accept the resolution to which the Smith Firm agreed and continue to oppose the

---

[5] It is important to note that the prior purported "no" votes of these claimants (included in the Beasley Allen master ballot), unlike the votes submitted by the Smith Firm, were submitted before agreement was reached on the terms of the Amended Plan.

Amended Plan even as amended by this resolution with the Smith Firm.[6] At this point, it is not clear who, if anyone, Beasley Allen represents given that virtually all its clients have now voted to accept the Amended Plan.

The extensive support for the Amended Plan extends beyond the terms of the plan itself. It also includes support for the prepetition restructuring of LLT, implemented through a Texas divisional merger, which resulted in the formation of the Debtor. And it includes support for filing this case in Texas. Both the details of the restructuring and the Debtor's intention to file this chapter 11 case in Texas were described in the Disclosure Statement the Debtor sent to claimants as part of the solicitation process.

During the prior bankruptcies of LLT, it became clear that ovarian and gynecological cancer claimants desired a resolution of their claims in bankruptcy that would result in the establishment of a trust to promptly and cost-effectively pay their claims, while other claimants, including mesothelioma claimants and governmental entities, preferred to litigate or otherwise resolve their claims in other forums. To address these differing points of view and alleviate the ovarian and gynecological cancer claimants' concern that the Amended Plan could be jeopardized or delayed by opposition from claimants who opposed a bankruptcy resolution, LLT engaged in a divisional merger, the primary purpose of which was to separate the liability for ovarian and gynecological cancer claims from other talc-related claims. This was accomplished by allocating all ovarian and gynecological cancer claims to the Debtor, and allocating mesothelioma, governmental unit and certain other claims to another newly created entity. As a result of this restructuring, claimant groups that wished to pursue their claims outside of

---

[6] Because the agreement on the Amended Plan was reached relatively recently, it is possible that other plaintiff firms, including MDL leadership firms, and their clients will now support the Amended Plan.

bankruptcy could continue to do so, while ovarian and gynecological cancer claimants, who overwhelmingly support the Amended Plan, could pursue a resolution of their claims through this chapter 11 case.

With respect to the filing of this case in this Court, LLT was heavily criticized for changing its domicile from Texas to a different state after having been formed as a Texas entity pursuant to a Texas divisional merger.  Here, the Debtor, which was likewise created by a Texas divisional merger, has made no changes in its domicile; it started as, and has always been, a Texas entity.  Second, the Third Circuit and the bankruptcy judge who presided over the prior bankruptcy cases both recognized, in their opinions dismissing the prior bankruptcy cases, that a bankruptcy resolution of claims could still be achieved in a different setting.  In the view of the Debtor, which is supported by the acceptances of the Amended Plan by the substantial majority of claimants and the FCR's approval of the Amended Plan, this Court represents that appropriate, different setting.

The Amended Plan proposes to establish the Talc Personal Injury Trust to process and pay "Channeled Talc Personal Injury Claims," which generally include all claims and demands asserted against the Debtor, J&J or any other Protected Party alleging injury from ovarian cancer and other gynecological cancers.[7]  The Talc Personal Injury Trust will be funded by a stream of payments in the aggregate amount of approximately $9 billion payable over 25 years.

This proposed level of funding for the Amended Plan constitutes one of the largest settlements ever reached in a mass tort bankruptcy case, including cases where, unlike here, the

---

[7]  The Amended Plan does not resolve and will not affect:  (i) claims and demands alleging injury from mesothelioma or lung cancer; (ii) claims and demands of governmental entities; and (iii) Canadian claims and demands. All holders of claims against the Debtor other than Channeled Talc Personal Injury Claims will be unimpaired by the Amended Plan because the Amended Plan does not modify their legal, equitable, or contractual rights, other than by curing defaults and reinstating maturities.

alleged liability was not disputed by the debtor. Although the Debtor and J&J are committed to the Amended Plan and to funding the Talc Personal Injury Trust, they continue to believe that talc claims against them have no valid scientific basis. Among other things, JOHNSON'S® Baby Powder and Shower to Shower never contained asbestos, and the safety of cosmetic-grade talc has been confirmed by dozens of peer-reviewed studies and multiple regulatory and scientific bodies for decades. Nevertheless, the Debtor and J&J have been inundated with tens of thousands of talc claims, subject to unpredictable and wildly divergent compensatory and punitive damage awards, and burdened by substantial and increasing defense costs.

Indeed, the cost of defending and paying talc claims, by itself, caused the income of the former Johnson & Johnson Consumer, Inc. ("JJCI"), the Debtor's predecessor that at the time had responsibility for all talc claims, to swing from a $2.1 billion profit in 2019 to a $1.1 billion loss in 2020. The adverse financial impact of the talc litigation would have established the good faith basis of a JJCI bankruptcy filing, under any applicable dismissal standard, as early as 2021. Despite this financial impact, to prepare for a consensual bankruptcy resolution, JJCI first implemented a divisional merger that resulted in the talc claimants having access to more assets than would have been available if JJCI had filed for bankruptcy.

Absent a chapter 11 resolution, the talc litigation would continue for decades, at great expense to the Debtor but with no benefit to claimants. In that regard, in the decades that the ovarian cancer talc claims have been pending, the Debtor, its predecessors, and J&J have suffered only one adverse ovarian cancer verdict that was not overturned on appeal; in every other case that proceeded to trial, the plaintiff received **nothing**. In contrast, the Amended Plan assures claimants an efficient, equitable and certain pathway to promptly resolve their claims and receive a recovery. At the same time, consummation of the Amended Plan would permit the

Debtor and J&J to focus their attention on their businesses, enabling them to continue developing, manufacturing and distributing lifesaving therapies and devices. As further described in the Kim First Day Declaration, J&J is a global innovator and leader in public health and has been at the forefront of healthcare innovation for over 130 years. Only through bankruptcy can the claimants and the Debtor achieve a permanent resolution of both the massive number of current ovarian and gynecological cancer claims as well as all projected future claims in a manner that not only is fair and equitable to all parties but, importantly, involved extensive negotiations with, and review and approval by, representatives of the claimants.

To ensure the fair and equitable resolution of claims, the Amended Plan includes the Trust Distribution Procedures that set forth in detail the methodology for processing and evaluating claims. These procedures use characteristics relevant to the valuation of similar talc claims in the tort system and were the product of extensive, arm's-length negotiations with claimant representatives. Unlike the results claimants have experienced in the tort system, holders of the Channeled Talc Personal Injury Claims that meet the requisite criteria under the Trust Distribution Procedures would receive substantial recoveries from the Talc Personal Injury Trust. Based on available data as well as information provided by plaintiffs' counsel, the Debtor anticipates that holders of pending ovarian cancer claims that qualify for payment under the Trust Distribution Procedures would receive an average recovery of between $50,000 and $250,000, with the more likely average value being between $75,000 and $175,000. In stark contrast, in the 17 ovarian cancer trials that proceeded to verdict against the Debtor and J&J in the tort system, plaintiffs prevailed in only one; all the other claimants received nothing. And, at the rate at which the cases have been tried to date, it would take decades to try just the pending ovarian cases, depriving most claimants of even the opportunity to obtain a recovery.

Claimant recoveries under the Trust Distribution Procedures are likewise projected to exceed settlements the Debtor and J&J paid to claimants prepetition.  The historical per claimant recovery net of administrative costs for ovarian cancer under prepetition settlements with the Debtor and J&J was $50,000 to $80,000.  In sum, the Amended Plan's proposed treatment of the Channeled Talc Personal Injury Claims would satisfy such claims in full and provide prompt, certain and more substantial recoveries than claimants could achieve through continued litigation in the tort system.  As evidenced by the vote, the vast majority of claimants agree.

At the same time the Debtor and J&J were negotiating the terms of the Amended Plan with plaintiffs' counsel and the FCR, the Debtor and J&J engaged in negotiations with their former talc suppliers, Imerys and Cyprus, both of which are debtors in pending chapter 11 proceedings in the District of Delaware (Judge Silverstein), and the Court-appointed claimant representatives in those cases.  These negotiations sought to resolve, among other things, talc-related claims Imerys and Cyprus were asserting against the Debtor and J&J, including indemnity claims as well as extra contractual claims for breach of those purported indemnities, and indemnity claims the Debtor and J&J were asserting against Imerys and Cyprus.  All these claims were the subject of adversary proceedings commenced in the Imerys/Cyprus bankruptcy cases. After months of hard-fought negotiations, a settlement was reached with the debtors and the claimant representatives, subject to bankruptcy court approval.  A motion has been filed with the Delaware bankruptcy court, and a hearing on the motion is scheduled for September 25, 2024.  If approved and consummated, the settlement is expected to increase recoveries to holders of the Channeled Talc Personal Injury Claims.  Moreover, the settlement has cleared a path for Imerys and Cyprus to confirm a plan and emerge from bankruptcy after more than five years.  In

that regard, a hearing on the disclosure statement is now set for October 28, 2024 and the confirmation hearing is set for March 17-19, 2025.

Despite the Amended Plan's myriad benefits for all claimants, the small consortium of ovarian cancer claimant counsel, led by Beasley Allen, continues to oppose any bankruptcy resolution of the talc claims. These firms and, in particular, Beasley Allen have employed a variety of "scorched earth" tactics to derail a consensual bankruptcy resolution since the first bankruptcy filing, including misleading media blitzes, frivolous lawsuits, and repeated mischaracterizations of the terms of the Initial Plan. They have done so notwithstanding that none of these firms has ever secured any recovery for their clients outside of bankruptcy, either through a successful verdict or by settlement. Although the rationale for these actions is unclear, these firms have their own financial interests, which are potentially substantial.

Birchfield testified in a deposition taken in LLT's chapter 11 case filed in 2023 that, if the LLT bankruptcy resolution went forward, the MDL steering committee, of which Beasley Allen is a member, stood to lose the ability to control a share of the trust funding through the MDL common benefit fund.[8] Pursuant to the MDL's case management order, 8% to 12% of gross talc settlement amounts for clients of participating counsel must be deposited into the common benefit fund, and that money is then to be allocated to the firms that performed common benefit work. See *Case Management Order No.* 7(A), MDL No. 16-02738 [Dkt 14741]. As a result, with respect to the approximately $9 billion proposed trust funding in the Amended Plan, Beasley Allen could lose its share of hundreds of millions of dollars that would go into the common benefit fund if the money were part of a settlement in the MDL.[9] And these common

---

[8] See Birchfield Dep. at 18:8-25, 2023 Chapter 11 Case.
[9] Birchfield Dep. at 21:7-13.

benefit fund payments would be on top of the 40% contingency fee the firm charges to its clients directly.[10]

As described above, J&J has agreed, under certain circumstances, to fund $650 million into a QSF for use in paying common benefit fund amounts that, if determined to apply to the settlement memorialized in the Amended Plan, would be charged against claimant recoveries. Although this commitment by J&J eliminates the risk that these firms will not receive any common benefit fees as a result of the claimants' desire to resolve their claims through this bankruptcy case, the firms still have the potential of earning even larger common benefit fees (up to 12% of approximately $9 billion) if a settlement of the magnitude reflected in the Amended Plan were achieved in the MDL.[11]

As part of their efforts to derail the Initial Plan, this group of firms filed a frivolous fraudulent conveyance class action in the United States District Court for the District of New Jersey seeking to avoid two transactions that occurred years earlier in connection with LLT's earlier bankruptcy filings plus an unrelated corporate transaction.  Weeks later, they filed an emergency motion for a preliminary injunction seeking, among other things, to prevent the Debtor from filing for bankruptcy outside of New Jersey, relief that was completely untethered to the causes of action and prayers for relief in the complaint.  The District Court denied the motion, and the Third Circuit denied a motion for stay pending appeal, which sought the exact same injunctive relief.

---

[10]   Birchfield Dep. at 28:9-11.

[11]   A settlement resolving all current and future claims cannot be achieved in the MDL, where common benefit fees would ordinarily be payable, or otherwise outside of bankruptcy due to, among other things, the alleged long latency period of ovarian cancer and the unknown—and unascertainable—identities of future claimants.

These same counsel also spearheaded a public smear campaign designed to deprive the talc claimants of the opportunity to determine for themselves whether to accept the prepackaged plan. This campaign has relied on both direct media blitzes in opposition to the plan, as well as negative "headlines" manufactured by these firms based on their own aggressive litigation tactics. This two-pronged approach has allowed Beasley Allen and others to continuously push an anti-plan narrative throughout the solicitation process.

When these firms filed the fraudulent transfer class action complaint, they immediately broadcast the complaint to the public through their press releases.[12] When, three weeks after that, the firms sought the preliminary injunction that would enjoin LLT or the Debtor from filing for bankruptcy in any district other than New Jersey, the firms once again immediately broadcast these efforts, all of which occurred during the solicitation period.[13]

On July 22, 2024, just four days before the voting deadline, these opposing firms issued a press release urging claimants to vote "no" on the plan.[14] The press release featured a variety of inaccurate or unsubstantiated assertions, including that certain opposing law firms believed "there is an ongoing effort to attract approvals for J&J's third attempt at bankruptcy from those without a documented and diagnosed claim of ovarian cancer."[15] The press release further insinuated that J&J was submitting the allegedly false claims. *Id*. ("J&J is aware that the

---

[12] See, e.g., Press Release, *Plaintiffs in J&J Talc Cancer Litigation File Class Action Complaint for Fraudulent Conveyance* (May 22, 2024), available at https://levinlaw.com/newsroom/talc-cancer-plaintiffs-file-class-action-complaintagainst-johnson-and-johnson-for-fraudulent-conveyance.

[13] See, e.g., Bailey Glasser Press Release, *Motion for Temporary Restraining Order Filed in Lawsuit Against Johnson & Johnson* (June 12, 2024), available at https://www.baileyglasser.com/news-motion-for-temporary-restraining-order-filedin-suit-against-johnson-and-johnson.

[14] See, e.g., Press Release, *Lawyers for Ovarian Cancer Victims Urge NO Vote on J&J's Latest Bankruptcy Plan* (July 22, 2024), available at https://app.reorg.com/print/wires-multi/669e81c6cccc41ff2e8b4dbb/DESC.

[15] Ironically, Beasley Allen submitted "no" votes on behalf of about 5,000 individuals who do not claim to have ovarian cancer, the largest voting block of non-ovarian cancer claimants submitted by any firm.

thousands of fantasy cases they are submitting to bankruptcy make it almost impossible for actual injured clients to recover."). The press release cited no evidence to support this bold assertion. This release also blatantly, and incorrectly, claimed that the plan "take[s] away all rights to a jury trial," which is belied by the fact that the Trust Distribution Procedures expressly provide for jury trial opt-out rights. *See* Trust Distribution Procedures § 6.1.3. Finally, the press release asserted that this chapter 11 case was a "scheme with direct parallels" to *Purdue*, completely ignoring the asbestos and section 524(g) overlay that distinguishes this case and the Amended Plan from *Purdue* as well as the fact that the Amended Plan satisfies Channeled Talc Personal Injury Claims in full. All these statements are clearly debunked by even a cursory review of the plan and solicitation materials but were nevertheless pushed out to the public by Beasley Allen and other members of its opposition group to needlessly stoke suspicion and confusion among claimants as the voting deadline approached.

And this self-interested, unjustified opposition continued through and was manifested in the submission of false voting certifications. Firms in this group, including Beasley Allen, misrepresented that they received informed consent from their clients to vote "no" when in fact they had received no such consent. In addition to Birchfield's apparent admission that he did not obtain "informed consent" from his clients for their purported "no" votes, there are hundreds of instances where these firms submitted "no" votes on behalf of individuals who are deceased and have no appointed estate representative, and also submitted "no" votes that are irreconcilable with master ballots submitted by other firms and, in some instances, ballots submitted by the claimants themselves.

But despite this opposition group's strident efforts to prevent a consensual bankruptcy resolution, the Debtor, through extensive, months-long negotiations, including multiple phases of

mediation, has been able to negotiate and formulate a plan that addresses claimants' concerns and demands and provides fair and equitable treatment to all current and future claimants. The Debtor respectfully submits that the Amended Plan, which is the culmination of months of effort by the Debtor, J&J and representatives of the claimants, should be confirmed by this Court.

The Debtor intends to proceed expeditiously in this case so that the Talc Personal Injury Trust contemplated by the Amended Plan can begin processing and paying claims as soon as possible. Although the Debtor and J&J fully expect that this small opposing counsel group will continue its efforts to prevent any bankruptcy resolution, including potentially by moving to transfer venue and filing a motion to dismiss this case, it is important to note that all aspects of the process leading up to this filing have been disclosed in the Disclosure Statement, in negotiations with plaintiffs' counsel, through public pronouncements, and now in first day filings with this Court. This information included details on the corporate restructuring that preceded this filing, the funding arrangements for the Debtor that went into effect upon the filing, and the Debtor's intention to commence this case in bankruptcy court in Texas. Plaintiffs' counsel representing the substantial majority of current claimants supported each of these steps and even urged LLT and J&J to take them, and the voting results coupled with the support of the FCR affirm the widespread claimant support for these and other aspects of the process.

This bankruptcy case provides the only pathway through which the Debtor, J&J and the claimants can effectuate the agreement they painstakingly negotiated and memorialized in the Amended Plan. The Debtor submits that the Amended Plan satisfies all applicable requirements of the Bankruptcy Code, including section 524(g), and is in the best interests of all parties, including the claimants alleged to be represented by the opposition group. That the vast majority

of claimants agree is evidenced by the vote, the support of the plaintiff firms that represent the claimants who voted to accept the Amended Plan, and the approval of the FCR.

The Amended Plan should be confirmed.

[*Remainder of Page Intentionally Left Blank*]

Dated: September 20, 2024
Houston, Texas

Respectfully submitted,

*/s/ John F. Higgins*
John F. Higgins (TX 09597500)
M. Shane Johnson (TX 24083263)
Megan Young-John (TX 24088700)
James A. Keefe (TX 24122842)
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 228-1331
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
jkeefe@porterhedges.com

Gregory M. Gordon (TX 08435300)
Dan B. Prieto (TX 24048744)
Amanda Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com

- and –

Brad B. Erens (IL 06206864)
Caitlin K. Cahow (IL 6317676)
(Admission *pro hac vice* pending)
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, Illinois 60606
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
bberens@jonesday.com
ccahow@jonesday.com

PROPOSED ATTORNEYS FOR DEBTOR

## Certificate of Service

       I certify that on September 20, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtor's claims, noticing, and solicitation agent.

                                                 */s/ John F. Higgins*
                                                 John F. Higgins