**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC LLC,[1] | Case No. 24-90505 (CML) |
| Debtor. | |

**DECLARATION OF JOHN K. KIM IN SUPPORT OF**
**CHAPTER 11 CASE AND CERTAIN FIRST DAY PLEADINGS**

John K. Kim, being first duly sworn, deposes and states as follows:

1.      I am the Chief Legal Officer of Red River Talc LLC, a Texas limited liability company (the "Debtor") and the debtor in the above-captioned chapter 11 case (this "Chapter 11 Case").  I have held this position with the Debtor since its formation on August 19, 2024.

2.      I am employed by Johnson & Johnson Services, Inc. ("J&J Services"), a non-debtor affiliate of the Debtor and a subsidiary of the Debtor's ultimate non-debtor parent company, Johnson & Johnson ("J&J").

3.      Prior to my role as the Chief Legal Officer of the Debtor, I was the Chief Legal Officer of the Debtor's predecessor, LLT Management LLC, a Texas limited liability company, which was formerly LTL Management LLC, a North Carolina limited liability company ("LLT" or "LTL").  I served in that role from LLT's formation, on October 12, 2021, through August 19, 2024, the date on which LLT ceased to exist and the Debtor was created.  In that role, I was responsible for, among other things, overseeing talc litigation, including in

---

[1]      The last four digits of the Debtor's taxpayer identification number are 8508.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

connection with LLT's bankruptcy cases, which were commenced on October 14, 2021 and April 4, 2023, respectively.

4.      Prior to my role as Chief Legal Officer of LLT, I served as J&J's Assistant General Counsel, Practice Group Lead for the Product Liability Litigation Group.  In that role, I was responsible for product liability litigation globally.  I began my employment with J&J and its affiliates in 2001 as a Senior Counsel in the Litigation Group, handling a variety of cases ranging from commercial disputes and international arbitrations to product liability litigation.

5.      Prior to my employment with J&J and its affiliates, I was associated with the law firm of Simpson Thacher & Bartlett in its Litigation Group from 1989 to 2001.  There, I handled a number of complex litigation engagements, including bankruptcy proceedings, anti-trust disputes, insurance coverage arbitrations and securities actions.

6.      I earned a Juris Doctor degree from Fordham University School of Law in 1989 and a Bachelor of Arts degree from Tufts University in 1985.

7.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code, as well as certain motions and other pleadings (collectively, the "First Day Pleadings").  The relief requested by the First Day Pleadings is supported in part by this declaration and also by a declaration of the Debtor's Chief Restructuring Officer, filed contemporaneously herewith.

8.      Prior to the Petition Date, the Debtor solicited votes on the *Prepackaged Chapter 11 Plan of Reorganization of the Debtor* (the "Initial Plan"), which was attached as Exhibit A to the *Disclosure Statement for Prepackaged Chapter 11 Plan of Reorganization of the*

NAI-1541219394

*Debtor* (the "Disclosure Statement").[2]  As I will describe below, the Initial Plan subsequently

was amended (the "Amended Plan") to, among other things, increase the funding of the trust by

$1.1 billion pursuant to an agreement[3] reached with The Smith Law Firm (the "Smith Firm").[4]

The solicitation demonstrates that the Amended Plan has the requisite statutory support of the

current claimants because over 83% of the claimants voted to accept the Initial Plan.  The

representative proposed to serve as the Court-appointed fiduciary for future claimants

(the "FCR") also continues to support the Amended Plan, with the understanding that the FCR

has not approved the Memorandum of Understanding between J&J, the Debtor and The Smith

Law Firm PLLC.  I believe the Amended Plan, if consummated, will fairly, equitably and

promptly satisfy the Channeled Talc Personal Injury Claims[5] in full and is, therefore, in the best

interest of the Debtor's estate.

9.      The Debtor intends to promptly seek Court approval of the adequacy of

the Disclosure Statement and the prepetition solicitation procedures in respect of the Initial Plan.

The Debtor also intends to seek confirmation of the Amended Plan as soon as practicable; it

currently anticipates seeking to schedule a hearing on confirmation of the Amended Plan for

early next year.

10.      The Amended Plan proposes to establish a trust (the "Talc Personal Injury

Trust") to process and pay "Channeled Talc Personal Injury Claims," which generally include all

---

[2]      The Debtor intends to file a motion seeking approval of (i) the adequacy of the Disclosure Statement and (ii) the solicitation and tabulation procedures for the Initial Plan in the near term.

[3]      A copy of the *Confidential Memorandum of Understanding & Agreement Regarding Talc Bankruptcy Plan Support* (the "Memorandum of Understanding") is attached hereto as Annex A.

[4]      On the Petition Date, the Debtor filed the Amended Plan and a redline marked to show the changes made to the Initial Plan.

[5]      Capitalized terms used herein but not otherwise defined have the meanings given to them in the Amended Plan.

NAI-1541219394

claims and demands asserted against the Debtor, J&J or any other Protected Party alleging injury from ovarian cancer and other gynecological cancers.[6]  Under the Amended Plan, the Talc Personal Injury Trust will be funded by a stream of payments in the aggregate amount of approximately $9 billion payable over 25 years.  I understand that the proposed level of funding for the Amended Plan constitutes one of the largest settlements ever reached in a mass tort product liability case, including cases where, unlike here, the alleged liability was not disputed by the company.

11.     Although the Debtor and J&J are committed to the Amended Plan and to funding the trust, they continue to believe that talc claims against them have no valid scientific basis.  Among other things, JOHNSON'S® Baby Powder and Shower to Shower never contained asbestos, and the safety of cosmetic-grade talc has been confirmed by dozens of peer reviewed studies and multiple regulatory and scientific bodies for decades.  Nevertheless, the Debtor and J&J have been inundated with tens of thousands of talc claims, subject to unpredictable and wildly divergent compensatory and punitive damage awards, and burdened by substantial and increasing defense costs.

12.     To ensure the fair and equitable resolution of claims, the Amended Plan includes Trust Distribution Procedures that set forth in detail the methodology for processing and evaluating claims.  These procedures use characteristics relevant to the valuation of similar talc claims in the tort system and were the product of extensive, arms-length negotiations with claimant representatives.  Unlike the results claimants have experienced in the tort system,

---

[6]     The Amended Plan does not resolve and will not affect:  (a) claims and demands alleging injury from mesothelioma or lung cancer; (b) claims and demands of governmental entities; and (c) Canadian claims and demands.  All holders of claims against the Debtor other than Channeled Talc Personal Injury Claims will be unimpaired by the Amended Plan because the Amended Plan does not modify their legal, equitable, or contractual rights, other than by curing defaults and reinstating maturities.

NAI-1541219394

holders of Channeled Talc Personal Injury Claims that meet the requisite criteria under the Trust Distribution Procedures would receive substantial recoveries from the Talc Personal Injury Trust.

13.     Under the Amended Plan, based on available data as well as information provided by plaintiffs' counsel, the Debtor anticipates that holders of pending ovarian cancer claims that qualify for payment under the Trust Distribution Procedures would receive an average recovery of between $50,000 and $250,000, with the more likely average value being between $75,000 and $175,000.  In stark contrast, in the 17 ovarian cancer trials that proceeded to verdict in the tort system, plaintiffs prevailed in only one; all the other claimants received nothing.  And, at the rate at which the cases have been tried to date, it would take decades to try just the pending ovarian cases, depriving most claimants of even the opportunity to obtain a recovery.

14.     Claimant recoveries under the Trust Distribution Procedures are likewise projected to exceed settlements the Debtor's predecessors and J&J paid to claimants prepetition. The historical per claimant recovery net of administrative costs for ovarian cancer under prepetition settlements with the Debtor's predecessors and J&J was $50,000 to $80,000.  In sum, the Amended Plan's proposed treatment of the Channeled Talc Personal Injury Claims would provide prompt, certain and more substantial recoveries than claimants could achieve through continued litigation in the tort system.

15.     The Debtor also intends to take steps to accelerate the processing of claims so that the Talc Personal Injury Trust contemplated by the Amended Plan can begin evaluating and paying claims as soon as the Amended Plan becomes effective.

16.     I submit this Declaration in support of certain of the First Day Pleadings and to provide information about the Debtor, its decision to commence this Chapter 11 Case and

its objectives for this case.  As the Chief Legal Officer, I am familiar with the Debtor's

day-to-day operations, assets, financial condition, business affairs and books and records.

Except as otherwise indicated, all facts and statements set forth in this Declaration are based

upon:  (a) my personal knowledge; (b) information supplied to me by other members of the

Debtor's management, professionals or employees; (c) my review of relevant documents; and/or

(d) my opinion based upon my experience and knowledge of the Debtor's assets, liabilities and

financial condition.  If called upon to testify, I could and would testify to the facts and opinions

set forth herein.

17.     Section I of this Declaration provides an overview of the Debtor's history

and corporate structure.  Section II describes the relevant litigation history.  Section III describes

the bankruptcy cases of LTL.  Section IV describes circumstances surrounding the

commencement of this case, as well as the Debtor's objectives for this case.

## I.      THE DEBTOR'S HISTORY AND CORPORATE STRUCTURE

### A.      The Debtor's Predecessors and Related Restructurings

18.     The Debtor traces its roots back to Johnson & Johnson Baby Products

Company ("J&J Baby Products"), a New Jersey company incorporated in 1970 as a wholly

owned subsidiary of J&J.

19.     J&J, a New Jersey company incorporated in 1887, first began selling

JOHNSON'S® Baby Powder in 1894, launching its baby care line of products.  In 1972, J&J

established a formal operating division for its baby products business, which included

JOHNSON'S® Baby Powder.

20.     In 1978, consistent with J&J's policy of decentralizing its business, J&J

transferred all its assets and liabilities associated with the baby products division to J&J Baby

Products.  This was part of a larger restructuring of J&J that included the transfer of assets and

liabilities of seven principal operating divisions to wholly owned subsidiaries.  To effectuate the transaction, J&J and J&J Baby Products entered into an *Agreement for Transfer of Assets and Bill of Sale*, effective January 1, 1979 (the "1979 Agreement"),[7] pursuant to which J&J transferred all assets and liabilities associated with the baby products division to J&J Baby Products.  As part of the transfer, J&J Baby Products agreed to indemnify J&J for all claims relating to the baby products business, including the talc powder products.  Following the 1979 Agreement, J&J no longer manufactured or sold baby products, including JOHNSON'S® Baby Powder.

21.      In 1981, J&J Baby Products transferred all its assets, except those assets allocated to its diaper programs, to Omni Education Corporation ("Omni"), a wholly owned subsidiary of J&J Baby Products.  In turn, Omni assumed all liabilities of J&J Baby Products except those liabilities related to its diaper program.  Immediately following the transaction, J&J Baby Products merged into another subsidiary of J&J and was renamed Personal Products Company, and Omni changed its name to Johnson & Johnson Baby Products Company.[8]

22.      In 1988, Johnson & Johnson Baby Products Company transferred all its assets in respect of its baby products business to Johnson & Johnson Dental Products Company, which assumed all of its liabilities and was renamed Johnson & Johnson Consumer Products, Inc.

23.      In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to Johnson and Johnson Consumer Companies, Inc. ("J&J Consumer Companies").

---

[7]      A copy of the 1979 Agreement is attached hereto as Annex B.

[8]      In 1989, Personal Products Company changed its name to McNeil-PPC, Inc.

24.     In 2015, J&J Consumer Companies merged with and into an affiliate, which then merged into McNeil-PPC, Inc.  The resulting entity was renamed Johnson & Johnson Consumer Inc. (including all former names and historical forms, "Old JJCI").

25.     Following these intercompany transactions, Old JJCI became responsible for all claims alleging that JOHNSON'S® Baby Powder and other talc-containing products cause cancer or other diseases.  Old JJCI also was obligated to indemnify J&J for all claims relating to the talc products.

26.     Old JJCI also became responsible for all claims alleging that Shower to Shower products, which contained talc, cause cancer or other diseases.  Before J&J's decentralization, Shower to Shower products were marketed by a division of J&J, the Johnson & Johnson Domestic Operating Company division.  Consistent with J&J's decentralization efforts and its transition to a holding company, effective January 1, 1978, J&J transferred all assets and liabilities related to Shower to Shower products to Personal Products Company, a wholly owned subsidiary of J&J, and Personal Products Company thereafter assumed operational responsibility for the Shower to Shower products.

27.     The operational responsibilities, liabilities and assets related to Shower to Shower products were transferred from Personal Products Company to Johnson & Johnson Baby Products Company by early 1987.

28.     In 2012, Old JJCI sold the assets and liabilities related to certain products, including the Shower to Shower products, to Valeant Pharmaceuticals International, Inc. ("Valeant").  Thereafter, in 2019, Old JJCI and Valeant (now known as Bausch Health Companies Inc. ("Bausch")) entered into an indemnification agreement.  Pursuant to that indemnification agreement, Old JJCI agreed to indemnify Valeant for any liability arising from

NAI-1541219394

Shower to Shower products and for certain other regulatory actions arising out of the manufacture, use or sale of Shower to Shower products, as set forth more fully in the agreement.

**B.**    **The 2021 Corporate Restructuring**

29.    In 2021, Old JJCI implemented a corporate restructuring (the "2021 Corporate Restructuring"), which was completed on October 12, 2021.  The 2021 Corporate Restructuring was effectuated through a series of steps, including a divisional merger under the Texas Business Organizations Code (the "TBOC").  As a result of that restructuring, two new entities were created:  (a) Johnson & Johnson Consumer Inc. ("New JJCI"); and (b) LTL.  LTL was allocated certain of Old JJCI's assets[9] and became solely responsible for Old JJCI's liabilities arising from talc-related claims against it (other than claims for which the exclusive remedy is provided under a workers' compensation statute or similar laws), and the defense of those claims.  New JJCI was allocated all other assets of Old JJCI and became solely responsible for all other liabilities of Old JJCI.

30.    A key component of the 2021 Corporate Restructuring was a funding agreement between LTL, on the one hand, and J&J and New JJCI on the other (the "2021 Funding Agreement").  The primary purpose of the 2021 Funding Agreement was to facilitate the resolution of talc-related claims through a chapter 11 filing by LTL.  The 2021 Funding Agreement obligated New JJCI and J&J, on a joint and several basis, to provide funding, up to the full value of New JJCI, for, among other things, (a) the administrative costs of LTL's chapter 11 case and (b) a trust that would satisfy current and future talc claims, in both situations to the extent that any cash distributions received by LTL from its wholly owned subsidiary

---

[9]    The assets allocated to LTL are described in detail in section 2.7 of the Disclosure Statement.

Royalty A&M LLC ("Royalty A&M") were insufficient to pay such costs and further, in the case of the funding of a trust, LTL's other assets were insufficient to provide that funding.

31.     As I will discuss in more detail below, after the completion of the 2021 Corporate Restructuring, LTL commenced a chapter 11 case in the Western District of North Carolina on October 14, 2021, In re LTL Mgmt. LLC, No. 21-30589, which case ultimately was transferred to the District of New Jersey (the "2021 Chapter 11 Case") and subsequently commenced a second chapter 11 case on April 4, 2023 in the District of New Jersey, In re LTL Mgmt. LLC, No. 23-12825 (the "2023 Chapter 11 Case" and, together with the 2021 Chapter 11 Case, the "LTL Chapter 11 Cases").

**C.     New JJCI/Holdco**

32.     New JJCI's business following the 2021 Corporate Restructuring included the manufacture and sale of a broad range of products used in the baby care, beauty, oral care, wound care and women's health care fields, as well as over-the-counter pharmaceutical products (collectively, the "Consumer Business").

33.     In November 2021, J&J announced its plans to accelerate innovation, serve patients and consumers and unlock value through the separation of the Consumer Business.

34.     Thereafter, in December 2022, New JJCI changed its name to Johnson & Johnson Holdco (NA) Inc. ("Holdco"), and in early January 2023, Holdco transferred its Consumer Business assets to its parent entity.  Consistent with J&J's November 2021 announcement, in August 2023, J&J reported that the Consumer Business had been separated into Kenvue Inc. ("Kenvue"), a new company in which J&J retained a 9.5% interest.

**D.     The 2024 Corporate Restructuring**

35.     On August 19, 2024, a corporate restructuring (the "2024 Corporate Restructuring") was completed.  The 2024 Corporate Restructuring was integral to the Initial

NAI-1541219394

Plan and is critical to the expeditious implementation of the Amended Plan.  As evidenced by the results of the solicitation, the substantial majority of ovarian and gynecological cancer claimants want to resolve their claims in bankruptcy pursuant to a plan of reorganization that would establish a trust to promptly and efficiently satisfy their claims.  Other claimants, including mesothelioma claimants and governmental entities, however, prefer to litigate or otherwise resolve their claims in other forums.  To address these differing points of view and alleviate the ovarian and gynecological cancer claimants' concern that the Amended Plan could be jeopardized or delayed by claimants who oppose a bankruptcy resolution, LLT engaged in the 2024 Corporate Restructuring, the primary purpose of which was to separate the liability for ovarian and gynecological cancer claims from other talc-related claims.  This was accomplished by allocating all Channeled Talc Personal Injury Claims to the Debtor, and allocating mesothelioma, governmental unit and certain other claims to Pecos River Talc LLC .  As a result of this restructuring, claimant groups that wished to pursue their claims outside of bankruptcy could continue to do so, while ovarian and gynecological cancer claimants, who overwhelmingly support the Amended Plan, could pursue a resolution of their claims through this Chapter 11 Case.  The 2024 Corporate Restructuring was addressed as part of the negotiations with the Ad Hoc Committee of Supporting Counsel regarding the terms of the Initial Plan.  In addition, the details of the 2024 Corporate Restructuring were described in the Disclosure Statement the Debtor sent to talc claimants as part of the solicitation process.

36.     The 2024 Corporate Restructuring was implemented through a series of steps, including:  (a) the conversion of Holdco from a New Jersey corporation to a Texas limited liability company named J&J Holdco (NA) LLC ("Holdco (Texas)"); (b) the merger of LLT with

-11-

and into Holdco (Texas), with Holdco (Texas) as the surviving entity and LLT ceasing to exist; and (c) a divisional merger of Holdco (Texas) under the TBOC.[10]

37.     As a result of the restructuring:  Holdco (Texas) ceased to exist and the following three new Texas limited liability companies were created, among which the liabilities and assets of Holdco (Texas) were allocated:

a.  The Debtor, which was allocated all talc-related liabilities that will be resolved by the Amended Plan (the "Debtor Talc Related Liabilities") and specified assets;

b.  Pecos River Talc LLC ("Pecos River"), which was allocated (i) all direct talc personal injury claims alleging that the relevant injured or deceased individual was exposed to talc or the product or material containing talc, as applicable, in Canada or resided in Canada at the time such direct talc personal injury claim was filed, brought, threatened or pursued in any court in Canada; (ii) all talc-related claims asserted or assertable by or on behalf of any governmental unit under any federal, state, international or foreign consumer or employee protection rule, statute or regulation; (iii) all direct talc personal injury claims alleging that the relevant injured or deceased individual developed mesothelioma or lung cancer (and not ovarian cancer, gynecological cancer, or any other disease) in connection with such individual's use of talc or a product or material containing talc; and (iv) all indirect talc personal injury claims in respect of any of the foregoing (with the exception of such indirect claims held by any of the Imerys/Cyprus Parties); and

c.  New Holdco (Texas) LLC, which was allocated all other liabilities and assets.

---

[10]     Prior to the 2024 Corporate Restructuring, in December 2023, LTL converted into a Texas limited liability company and changed its name to LLT.

NAI-1541219394

38.     After the divisional merger, New Holdco (Texas) merged with and into J&J Intermediate Holding Corp., a New Jersey Corporation (New Holdco (Texas) ceased to exist).  J&J Intermediate Holding Corp., the surviving entity, was then renamed Johnson & Johnson Holdco (NA) Inc. ("New Holdco").

**E.     The Debtor**

39.     The Debtor is responsible for all Channeled Talc Personal Injury Claims and was formed to effectuate the terms of the Amended Plan.  The Debtor also oversees the operations of its wholly owned subsidiary, Royalty A&M, a Texas limited liability company.  Royalty A&M owns a portfolio of royalty revenue streams, including royalty revenue streams based on third-party sales of LACTAID®, MYLANTA® / MYLICON®, ROGAINE®, and TENA® products as well as certain products marketed by CLOROX®, ECOLAB®, ESSITY®, and SPARTAN®.  This portfolio includes a synthetic royalty arrangement in Texas with Kiron Capital LLC, a private equity firm, through its indirect subsidiary Confidas Health System.  Royalty A&M reviews profitable royalty opportunities in the healthcare industry and seeks to grow its business by reinvesting the income from existing royalty revenue streams into both the acquisition of additional external royalty revenue streams, financings to third parties secured by similar royalty streams, and synthetic royalty investments secured by similar future royalty streams.

40.     The Debtor also has cash, interests as payee under funding agreements, which I describe in more detail below, and certain insurance coverage rights.

**F.     New Holdco**

41.     New Holdco is the direct parent of the Debtor and Pecos River.  New Holdco is a holding company with ownership interests in various subsidiaries.  The most substantial of New Holdco's ownership interests are held through its wholly owned subsidiary

-13-

Apsis SAS (France) ("Apsis").  Apsis owns (through its wholly owned subsidiary Johnson &

Johnson Holding GmbH (Germany)) a 36.1% ownership interest in GH Biotech Holdings

Limited (Ireland) ("GH Biotech").  GH Biotech holds ownership interests, either directly or

through wholly owned subsidiaries, in four entities, Janssen Sciences Ireland Unlimited

Company, Janssen Irish Finance Unlimited Company, C Consumer Products Denmark ApS, and

Impulse Dynamics (71% interest).  Apsis also owns, either directly or indirectly, interests in

various limited risk distributors (which distribute J&J products in foreign countries), a

German-based subsidiary that manufactures 3D-printed titanium interbody implants for spinal

fusion surgery, and various other subsidiaries.

        42.     In addition to the funding agreements with the Debtor described below, a

key component of the 2024 Corporate Restructuring was a funding agreement between New

Holdco and Pecos River.  The funding agreement obligates New Holdco to provide funding to

Pecos River to (i) pay any and all costs and expenses of Pecos River incurred in the ordinary

course, (ii) satisfy (a) the liabilities of Pecos River in respect of Mesothelioma/Lung Cancer Talc

Claims established by a judgment of a court of competent jurisdiction or final settlement thereof

and (b) any ancillary costs and expenses of Pecos River associated with such

Mesothelioma/Lung Cancer Talc Claims and any litigation thereof, including the costs of any

appeals, and (iii) maintain a specified minimum amount of cash on hand, all on the terms and

subject to the conditions set forth therein.  A copy of the funding agreement (without its

Schedule 2 that includes confidential bank account information) is attached as Annex C hereto.

The value of New Holdco's cash, anticipated annual dividends, and equity interests is about

$30 billion

43.     A chart depicting the Debtor's corporate structure is attached hereto as

Annex D.

**G.     J&J**

44.     The Debtor's ultimate parent company, J&J, is a holding company that

through its operating subsidiaries conducts business in virtually all countries in the world,

focused primarily on products related to human health and well-being.  J&J is a global innovator

and leader in public health and has been at the forefront of healthcare innovation for over

130 years.  That innovation includes novel oncology, immunology and cardiology products.

**H.     Financing Arrangements**

45.     The Debtor is party to two funding agreements with New Holdco, which

were key components of the 2024 Corporate Restructuring.  These funding agreements were

subsequently amended and restated to facilitate the Debtor's funding obligations under the

Amended Plan, and became effective immediately upon the commencement of this Chapter 11

Case.  As described more fully below, these funding agreements provide funding to the Debtor

for use by the Debtor to:  (a) fund the Talc Personal Injury Trust or, if the Amended Plan does

not become effective and this Chapter 11 Case is dismissed, pay the Debtor Talc Related

Liabilities established by judgment of a court of competent jurisdiction or a final settlement and

to pay the Debtor Talc Related Liabilities established under any Master Settlement Agreement

(this funding agreement, as amended or otherwise modified, is referred to herein as

the "Indemnity Cost Funding Agreement");[11] and (b) pay any and all costs and expenses of the

Debtor incurred during the pendency of this Chapter 11 Case, including the cost of administering

---

[11]     A copy of the Indemnity Cost Funding Agreement (without its Schedule 2 that includes confidential bank account information) and a redline to the version of the agreement attached as Exhibit B to the Disclosure Statement are attached hereto as Annexes E and F.

NAI-1541219394

it, as well as certain other costs and expenses, including (i) costs and expenses after this Chapter 11 Case has been closed or, if applicable, dismissed and (ii) distributions or cash payments to be made by the Debtor pursuant to the Amended Plan (other than contributions to the Talc Personal Injury Trust) (this funding agreement, as amended or otherwise modified, is referred to herein as the "Expense Funding Agreement"[12] and together with the Indemnity Cost Funding Agreement, the "2024 Funding Agreements").  Certain key provisions of the 2024 Funding Agreements are described below:

46.    Indemnity Cost Funding Agreement.  Pursuant to the Indemnity Cost Funding Agreement, New Holdco is obligated to provide funding if the Amended Plan becomes effective subject to the following limits:

- $2,250,000,000 in the aggregate prior to the first anniversary of the Petition Date, as applicable;

- $4,250,000,000 in the aggregate prior to the second anniversary of the Petition Date, as applicable;

- $4,990,000,000 in the aggregate prior to the third anniversary of the Petition Date, as applicable;

- $5,730,000,000 in the aggregate prior to the seventh anniversary of the Petition Date, as applicable;

- $6,217,500,000 in the aggregate prior to the 12th anniversary of the Petition Date, as applicable;

- $6,700,500,000 in the aggregate prior to the 17th anniversary of the Petition Date, as applicable;

- $7,183,500,000 in the aggregate prior to the 22nd anniversary of the Petition Date, as applicable;

---

[12]    A copy of the Expense Funding Agreement (without its Schedule 2 that includes confidential bank account information) and a redline to the version of the agreement attached as Exhibit C to the Disclosure Statement are attached hereto as Annexes G and H.

- $7,666,500,000 in the aggregate prior to the 25th anniversary of the Petition Date, as applicable; or

- $8,148,000,000 in the aggregate on or after the 25th anniversary of the Petition Date, as applicable.

These cumulative funding limits will be increased by $250,000,000 on the first anniversary of the Amended Plan's Effective Date, and by $600,000,000 on the second anniversary of the Amended Plan's Effective Date. Funding used by the Debtor to pay the Debtor Talc Related Liabilities under any Master Settlement Agreement would not be subject to, and would not count against, such funding limits. If the Amended Plan becomes effective, the foregoing numbers would be increased by the cumulative amount of interest accrued in accordance with the terms of the Amended Plan on amounts delivered or to be delivered to the Talc Personal Injury Trust pursuant to the Amended Plan.

47.     _Expense Funding Agreement._  Pursuant to the Expense Funding Agreement, New Holdco is obligated to provide funding to the Debtor for use by the Debtor to, among other things:  (a) pay any and all costs and expenses of the Debtor incurred during the pendency of this Chapter 11 Case, including the costs of administering it; (b) pay any and all costs and expenses of the Debtor incurred in the normal course at any time after this Chapter 11 Case has been closed or, if applicable, dismissed, including, in the case of dismissal, any attorneys' or experts' fees and expenses, and other ancillary costs and expenses, of the Debtor under the Expense Funding Agreement associated with the defense or settlement of any actual or threatened litigation or appeals in connection with the Debtor Talc Related Liabilities; (c) pay any and all distributions or cash payments to be made by the Debtor pursuant to the Amended Plan (other than contributions to the Talc Personal Injury Trust ), whether to be made during the pendency of this Chapter 11 Case or at any time after this Chapter 11 Case has been closed; and (d) maintain funding of at least $5,000,000.  Unlike its obligations under the Indemnity Cost

Funding Agreement, New Holdco's funding obligations under the Expense Funding Agreement are not subject to any funding limits.

48.     Funding is not available under the Expense Funding Agreement for the payment of the Debtor Talc Related Liabilities contemplated to be funded under the Indemnity Cost Funding Agreement, and vice versa.

I.     **Other Agreements**

49.     As part of the 2024 Corporate Restructuring, the Debtor also was allocated:  (a) the existing services agreement (the "Services Agreement") between LLT and J&J Services; (b) the existing services agreement between LLT and Royalty A&M (the "Royalty A&M Services Agreement"); (c) the existing secondment agreement between LLT and I J&J Services (the "Secondment Agreement"); and (d) the existing engagement letter for Accordion Partners, LLC ("Accordion"), dated July 19, 2024, executed by LLT and Accordion (the "CRO Engagement Letter").  These agreements ensure that the Debtor and Royalty A&M have access to services they need to effectively operate their businesses, as well as the requisite professionals.

50.     In particular, pursuant to the Services Agreement, J&J Services provides the Debtor with certain corporate and administrative services, including treasury and procurement, corporate finance, accounting, human resources, information technology, legal, risk management, tax and other support services.  Similarly, pursuant to the Royalty A&M Services Agreement, the Debtor provides management support services to Royalty A&M. Pursuant to the Secondment Agreement, J&J Services seconds to the Debtor certain of its employees, including the Debtor's Chief Legal Officer, on a full-time basis to manage the Debtor's business.  Finally, the CRO Engagement Letter provided for the engagement of John Bittner as Chief Restructuring Officer for LLT, and now the Debtor, and for the retention of Accordion as restructuring financial advisor to the Debtor.  Pursuant to the CRO Engagement

-18-

Letter, Mr. Bittner serves as the Debtor's Chief Restructuring Officer and Mr. Bittner and Accordion provide restructuring advisory and support services, including assisting in the preparation for and filing of this Chapter 11 Case.

## II.    LITIGATION HISTORY

### A.    Overview

51.    This Chapter 11 Case has been precipitated by the filing of thousands of cosmetic talc lawsuits against LLT, Old JJCI and J&J.  The Debtor believes that these claims have no valid scientific basis, as Old JJCI's talc products never contained asbestos, and the safety of cosmetic-grade talc has been confirmed by dozens of peer-reviewed studies and multiple regulatory and scientific bodies for decades.  Nevertheless, the number of claims continued to increase, and the Debtor anticipates that, absent a chapter 11 resolution, the litigation and its associated burdens would continue for decades more.

52.    Cosmetic talc litigation against LTL, Old JJCI and J&J focused primarily on JOHNSON'S® Baby Powder, with plaintiffs historically asserting two types of claims: (a) claims alleging ovarian cancer arising as a result of talc exposure, i.e., ovarian cancer claims, and (b) claims alleging respiratory cancers or other asbestos-related diseases arising as a result of talc exposure, i.e., mesothelioma claims.  As of the filing of the 2021 Chapter 11 Case, there were approximately 40,000 pending lawsuits asserting ovarian and other gynecological cancers and approximately 470 pending lawsuits asserting mesothelioma claims against LTL.  As of June 3, 2024, based on available information, the number of filed and unfiled current claims against LLT had increased to approximately 85,000.  As of the Petition Date, there are more than 60,000 plaintiffs asserting ovarian or other gynecological cancer claims against the Debtor in jurisdictions across the country, including more than 57,000 plaintiffs with claims pending in the MDL (defined and described below), more than 2,800 plaintiffs with claims pending in the MCL

-19-

(defined and discussed below) and more than 2,200 with claims pending in individual actions around the United States.

      **B.**      **General Cosmetic Talc Litigation and Its Associated Costs and Burdens**

      53.    <u>Decades of Studies and Testing</u>.  Questions regarding whether JOHNSON'S® Baby Powder contained asbestos and whether use of cosmetic talcum powder could cause ovarian cancer were raised as early as the 1970s and 1980s, respectively.  Such allegations have been investigated by the Food & Drug Administration (the "<u>FDA</u>"), among others, and found to be unsupported by fact or science.

      54.    Over the past four decades, at least 33 case-control studies examined a potential association between perineal talc use and ovarian cancer have been published.  While the case-control studies are inconsistent as to the finding of a statistically significant positive association, not one of the authors of the case-control studies that reported an "association" took the position that its findings establish causation.

      55.    To date, the FDA has not concluded, based on its review of the scientific literature, that there is a causal relationship between talc and ovarian cancer, and has not recommended that consumers generally avoid talcum powder products.  Other public health authorities that have evaluated the scientific literature relating to talc also have not concluded that the existing evidence demonstrates that perineal exposure to talc causes ovarian cancer.[13]

---

[13]    On July 5, 2024, the International Agency for Research on Cancer ("<u>IARC</u>") reclassified talc as "probably carcinogenic."  Press Release No. 352, Int'l Agency for Research on Cancer, IARC Monographs Evaluate the Carcinogenicity of Talc and Acrylonitrile (July 5, 2024) (the "<u>IARC Press Release</u>").  However, like other studies, the IARC Press Release acknowledges that this designation was not based on causal findings and that cancer risks may vary depending on the extent and type of use. See IARC Press Release, 4.  Furthermore, based on the information published in connection with the announcement, the decision to reclassify was not based on new or novel science and the Debtor therefore believes the IARC's decision to reclassify is materially flawed for numerous reasons.

56. In addition, there have been decades of testing by J&J and Old JJCI to establish product safety. The approach to such testing has been state of the art, exceeding regulatory and industry standards. The talc testing program begins with selective mining—carefully chosen and vetted sources for talc—and continues with layers of quality assurance testing at every point in the manufacturing and production chain, up to the moment of bottling. The program relies on industry experts to ensure testing protocols are implemented at each stage of the process with a high level of precision and integrity. Because of this, sourcing and testing exceed industry standards, and dozens of government institutions, independent laboratories, and major universities that studied and tested J&J's/Old JJCI's talc for decades time and again have declared it free from asbestos.

57. Cosmetic Talc Litigation. Prior to 2010, only a small number of isolated cases involving cosmetic talc had been filed against Old JJCI and J&J. These cases alleged a range of claims, including talcosis due to substantial misuse of JOHNSON'S® Baby Powder, mesothelioma, dermatitis and rashes. The number of claims began to increase significantly after the Berg (2013) and Fox (2016) trials. Berg v. Johnson & Johnson, filed in December 2009, was the first case alleging ovarian cancer as a result of genital exposure to Old JJCI's cosmetic talc-based products. The jury found for the plaintiff, but awarded no damages. By the end of 2015, there were over 1,300 ovarian cancer lawsuits filed against Old JJCI and J&J.

58. In February 2016, the first St. Louis, Missouri ovarian cancer case, Fox, went to trial. The jury awarded the plaintiff $72 million dollars. While ultimately overturned on appeal, the verdict sparked interest on the part of plaintiff lawyers. Five more cases were tried in that venue over the next year and a half, resulting in plaintiff verdicts totaling more than $235

NAI-1541219394

million dollars (in addition to a defense verdict and a mistrial).  All of those verdicts

subsequently were reversed on appeal.

59.     <u>Costs and Burdens of Cosmetic Talc Litigation.</u>  Although JOHNSON'S®

Baby Powder has been safely used by hundreds of millions of people worldwide for over 125

years, on May 19, 2020, Old JJCI announced it would permanently discontinue its line of

talc-based JOHNSON'S® Baby Powder in the U.S. and Canada and, on August 11, 2022, the

company announced the discontinuation of such sales globally.  These decisions were based on

business considerations, including lack of sales due to misinformation about the safety of

talc-based JOHNSON'S® Baby Powder.

60.     Prior to the filing of the 2021 Chapter 11 Case, roughly 1,300 ovarian

cancer and over 250 mesothelioma cases were dismissed without payment, and Old JJCI

achieved 16 key defense verdicts, including in four trials in 2021 alone.  Old JJCI also succeeded

in obtaining reversals of many plaintiff verdicts on appeal.  Despite these results, Old JJCI was

also subject to a number of plaintiff verdicts involving unpredictable and wildly divergent

compensatory and punitive damages awards.

61.     Notably, all of the ovarian cancer plaintiff verdicts to date have been

reversed on appeal with the exception of one case known as <u>Ingham</u>.  Although the verdict in

<u>Ingham</u> was reversed in part and reduced, the total damages award was still $2.243 billion.  The

St. Louis, Missouri trial court had permitted the consolidation of 22 ovarian cancer plaintiffs, 17

of whom were nonresidents, for a single trial.  The jury found defendants Old JJCI and J&J

liable for every claim.  The jury awarded compensatory damages in the aggregate amount of

$550 million and punitive damages in the aggregate amount $4.1 billion.  On appeal, the punitive damages award was later reduced to $1.6 billion.

62.     Prior to the commencement of the 2021 Chapter 11 Case, Old JJCI incurred nearly $1 billion in defending personal injury lawsuits relating to alleged talc exposure, nearly all of which was spent in only the five years prior to the 2021 Chapter 11 Case.  In the months prior to the filing of the 2021 Chapter 11 Case, Old JJCI was paying anywhere from $10 million to $20 million in defense costs on a monthly basis.  In addition to these costs, Old JJCI paid approximately $3.5 billion in indemnity costs in connection with settlements and verdicts.

63.     The cosmetic talc litigation was anticipated to continue for decades more and grow, as were the extraordinary costs of defending and resolving tens of thousands of expected claims.  Indeed, plaintiff experts had begun to allege extended latency periods for ovarian cancer allegedly caused by asbestos exposure.

64.     At the time of the filing of the 2021 Chapter 11 Case on October 14, 2021, there were approximately 40,000 ovarian and other gynecological cancer cases pending against LTL, including approximately 36,000 cases pending in the MDL[14] and more than 3,800 cases in multiple state court jurisdictions across the country.  As of the filing of the 2021 Chapter 11 Case, Old JJCI had been served with over 12,300 ovarian cancer complaints in just the first ten and a half months of 2021.[15]  As of the Petition Date, there are over 60,000 plaintiffs asserting ovarian or other gynecological cancer claims against the Debtor in jurisdictions across the

---

[14]     In re Johnson & Johnson Talcum Powder Products Mktg., Sales Practices and Products Litig., No. 3:16-md-02738 (MAS) (RLS) (D.N.J.).

[15]     In addition to the ovarian cancer claims, more than 470 mesothelioma cases were pending against LTL as of the filing of the 2021 Chapter 11 Case.  Those claims, like the ovarian cancer claims, spanned the U.S. with cases pending in states in every region of the country.

NAI-1541219394

country, including more than 57,000 plaintiffs with claims pending in the MDL, over 2,800

plaintiffs with claims pending in the MCL and over 2,200 with claims pending in individual

actions around the United States.

C.     **The Multidistrict Litigation**

65.     On October 4, 2016, the U.S. Judicial Panel on Multidistrict Litigation

(the "MDL Panel") ordered that pending and future personal injury or wrongful death actions in

federal courts alleging that plaintiffs or their decedents developed ovarian cancer from the use of

JOHNSON'S® Baby Powder and Shower to Shower body powder be transferred and centralized

in the United States District Court for the District of New Jersey, Trenton Division.  In addition

to individual actions pending in federal district courts around the country, two consumer class

actions alleging that JOHNSON'S® Baby Powder and Shower to Shower body powder products

were marketed for use without disclosure of talc's alleged carcinogenic properties were included

in the MDL.

66.     The MDL Panel assigned U.S. District Judge Freda Wolfson as presiding

judge for the MDL.  Judge Wolfson designated U.S. Magistrate Judge Lois Goodman to assist

her in the MDL.  The cases were consolidated to:  (a) reduce or eliminate duplicative discovery;

(b) prevent inconsistent pretrial rulings on discovery and privilege issues; (c) prevent

inconsistent rulings on Daubert motion practice; and (d) conserve the resources of the parties,

their counsel, and the federal judiciary in these actions.  Additionally, there are common factual

issues in these cases related to the alleged risk of cancer posed by talc and talc-based body

powders, whether the defendants knew or should have known of this alleged risk and whether

defendants provided adequate instructions and warnings with respect to these products.

67.     After the creation of the MDL and its assignment to Judge Wolfson, she

ordered a hearing at which all parties could present their summary views of the medical and

-24-

scientific issues related to the MDL, as well as evidence as to whether talc-based body powder products could cause or contribute to ovarian cancer.  That hearing was held on January 26, 2017.  Judge Wolfson subsequently ordered full briefing by the parties on the threshold <u>Daubert</u> issue of whether reliable and sufficient scientific and medical evidence exists on the issue of causation.  Judge Wolfson set an evidentiary hearing on that issue that ran from July 22 to July 31, 2019, with plaintiffs presenting five witnesses and J&J presenting three witnesses.  At the conclusion of the hearing, the Judge requested final <u>Daubert</u> briefing from all parties which was submitted on October 7, 2019.  On April 27, 2020, Judge Wolfson rendered her <u>Daubert</u> decision on the opinions offered by these witnesses, granting in part and denying in part J&J's motion to exclude opinions of plaintiffs' five witnesses and denying plaintiffs' motion to exclude the opinions of J&J's three experts.  <u>See</u> <u>In re Johnson & Johnson Talcum Powder Products Mktg., Sales Practices and Products Litig.</u>, No. 3:16-md-02738 (MAS) (RLS) (D.N.J. April 27, 2020).

68.    Following Judge Wolfson's retirement in January 2023, on January 31, 2023, the MDL was reassigned to Judge Michael Shipp.  On March 27, 2024, over objection from the PSC, the MDL court ruled that given the emergence of new and highly relevant science, recent changes to Federal Rule of Evidence 702 and certain limitations of the previous <u>Daubert</u> order, the court would hear new, full scale <u>Daubert</u> expert challenges.  The Debtor filed six separate <u>Daubert</u> motions in the MDL that implicate every expert witness put forward by the PSC on multiple grounds.  Briefing on the <u>Daubert</u> issues was completed on August 22, 2024.

69.    Broad scale factual discovery and other motion practice also is underway in the MDL.  This included a motion to show cause in which LLT sought disqualification of

-25-

Beasley Allen, a member of the PSC, from representing claimants in the MDL or, at the very least, from maintaining a position on the PSC.

70.     The Beasley Allen mass tort team is led by attorney Andy Birchfield, who opposed LLT's efforts to reach a full, equitable and final resolution of the talc claims through bankruptcy.  After the dismissal of the 2023 Chapter 11 Case, LLT discovered activities that LLT asserted meant that Mr. Birchfield collaborated with an attorney who formerly represented LLT and J&J on the same matters and involving the same issues that the attorney had previously worked on for LLT and J&J.  LLT and J&J alleged that this collaboration was and is a direct violation of the ethical duties of both Mr. Birchfield and the former attorney for LLT and J&J. LLT therefore moved to disqualify Beasley Allen from continuing to serve on the PSC in order to protect the integrity of the MDL.  Hearings on the disqualification of Beasley Allen were conducted on March 25, 2024, April 10, 2024, and May 3, 2024.  The parties filed post-hearing briefs on May 17, 2024 and reply briefs on May 24, 2024.  Subsequently, the New Jersey Superior Court denied a similar disqualification motion on July 19, 2024,[16] and, on that same day, the MDL court ordered the parties to submit supplemental briefing by July 29, 2024 with replies due August 5, 2024, on why the MDL court should not adopt the state court's ruling.  On September 20, 2024, J&J filed a second motion to remove Beasley Allen from the PSC**.**  The MDL court has not yet ruled on the disqualification motion or the second motion to remove.

71.     A case management order has been entered in the MDL, pursuant to which 8% to 12% of gross talc settlement amounts for clients of participating counsel must be deposited in the common benefit fund, and that money is then to be allocated to the firms that

---

[16]     In re Talc Based Prods. Lit., MCL No. 300, Consol. Dkt. No. ATL-L-2648-15 (N.J. Sup. Ct. July 19, 2024).

NAI-1541219394

performed common benefit work.  See *Case Management Order No. 7(A)*, MDL No. 16-02738 [Dkt 14741].  Common benefit fund payments would be in addition to the 40% contingency fee a firm charges to its clients directly.[17]  Beasley Allen partner Andy Birchfield testified in a deposition taken in LTL's chapter 11 case filed in 2023 that, if the LTL bankruptcy resolution went forward, the PSC, of which Beasley Allen is a member, would lose the ability to control a share of the trust funding through the MDL common benefit fund.[18]

### D.    The MCL

72.    On May 19, 2015, the defendants in the talcum powder products cases currently pending in Atlantic and Bergen counties in New Jersey submitted an application for centralized management of the cases.  At the time of the application, there were 103 pending cases in New Jersey involving claims of more than 156 plaintiffs.  The Supreme Court of New Jersey entered an order dated October 20, 2015 designating the cases as part of a multicounty litigation in Atlantic County, styled In re Talc Based Prods. Lit., MCL No. 300 (N.J. Sup. Ct. Oct. 20, 2015) (the "MCL"), for centralized case management purposes.  Similar to the MDL, broad scale factual discovery and other motions practice has been underway.  Currently, the claims of over 2,800 plaintiffs are pending in the MCL.

### E.    Class Action Complaints

73.    On May 22, 2024, five individuals, both individually and on behalf of a proposed class, commenced a putative class action, styled Love, D.D.S. v. LLT Mgmt. LLC, No. 3:24-cv-06320-MAS-RLS (D.N.J. May 22, 2024), against, among others, LLT, J&J, Holdco and certain of their officers and directors in the New Jersey District Court (the "Fraudulent

---

[17]    Birchfield Dep. at 28:9-11, 2023 Chapter 11 Case.

[18]    See id. at 18:8-25.

NAI-1541219394

Transfer Action"). The Fraudulent Transfer Action was allocated to the Debtor in the 2024 Corporate Restructuring.

74. The complaint in the Fraudulent Transfer Action alleges ten causes of action that generally seek to avoid: (a) the 2021 Corporate Restructuring; (b) the termination of the 2021 Funding Agreement; and (c) the separation of J&J's consumer health division into Kenvue. on the basis that these transactions were actual fraudulent transfers. The proposed class includes all persons who, as of August 11, 2023, either had a pending lawsuit alleging an ovarian cancer or mesothelioma personal injury claim caused by asbestos or other contaminants in J&J talcum powder products or had executed a retainer agreement with a lawyer or law firm to pursue such a claim. LLT, and now the Debtor, J&J, Holdco and the other defendants dispute the allegations in the Fraudulent Transfer Action and have moved for dismissal of the complaint. The New Jersey District Court has not yet ruled on the motion to dismiss. The tort claimants are represented by the following law firms: (a) Beasley Allen; (b) Levin, Papantonio, Rafferty, Proctor, Buchanan, O'Brien, Barr, Mougey, P.A.; (c) Bailey Glasser LLP; (d) Golomb Legal; (e) Aschraft & Gerel, LLP; and (f) Burns Charest LLP.

75. In addition, on June 17, 2024, three individuals, both individually and on behalf of a proposed class, commenced a putative class action, styled Bynum v. LLT Management LLC, No. 3:24-cv-07065-MAS-RLS (D.N.J June 17, 2024) (the "Medical Monitoring Action"), against LLT, J&J, Holdco and certain of their affiliates and other entities in the New Jersey District Court. The Medical Monitoring Action was allocated to the Debtor in the 2024 Corporate Restructuring. The Medical Monitoring Action seeks damages on behalf of a subclass of future claimants who were exposed to cosmetic talc products but have not yet been diagnosed with cancer. The plaintiffs also seek to recover the costs of medical monitoring for

NAI-1541219394

potential future claimants.  The plaintiffs are represented by the following law firms, four of which represent the plaintiffs in the Fraudulent Transfer Action:  (a) Anapol Weiss; (b) Levin, Papantonio, Rafferty, Proctor, Buchanan, O'Brien, Barr, Mougey, P.A.; (c) Levin Sedran & Berman; (d) Beasley Allen; (e) Aschraft & Gerel, LLP; and (f) Burns Charest LLP.  The Debtor, J&J and the other defendants dispute the allegations in the Bynum Class Action Complaint and have moved for dismissal of the complaint.  As of the Petition Date, the plaintiffs were required to file a response to the defendants' motion to dismiss or an amended complaint by September 26, 2024.[19]

### F.     Certain Settlements

76.     Since 2020, Old JJCI and more recently LLT have reached resolutions with several plaintiff law firms representing ovarian cancer and gynecological cancer claims, settling approximately 21,700 ovarian cancer and gynecological cancer claims for a total of approximately $1.426 billion, at an average of approximately $65,600 per qualifying claim. Allocation of settlement values among all but about 30 of the claimants was or will be established by a neutral third-party special master, based on criteria either similar to or the same as those set forth in the Trust Distribution Procedures.

### G.     Retailers and Third-Party Indemnities

77.     Old JJCI and LLT had relationships with various retailers who sold Old JJCI's talc-containing products (collectively, the "Retailers").  Old JJCI agreed to indemnify the Retailers for claims related to the sale of Old JJCI's talc-containing products, and these contractual indemnities were allocated to LLT in the 2021 Corporate Restructuring.  Following the 2021 Corporate Restructuring, LLT entered into indemnification agreements with various

---

[19]     See *Stipulation to Extend Time to Respond to Mot. to Dismiss*, Bynum v. LLT Management LLC, No. 3:24-cv-07065-MAS-RLS (D.N.J Aug. 30, 2024) [Dkt. 13].

-29-

Retailers.  Except as described below with respect to Tender Agreements (defined below), all such contractual indemnities with Retailers were allocated to the Debtor in the 2024 Corporate Restructuring.  As part of the 2024 Corporate Restructuring, Pecos River agreed to indemnify the Debtor from and against any indemnification claims asserted against the Debtor in respect of liabilities allocated to Pecos River.

78.     Claims asserted against the Retailers for their sale of Old JJCI products are virtually identical to the claims asserted against Old JJCI and LLT, and to the extent in respect of the Debtor Talc Related Liabilities, the Debtor.  I believe these claims against the Retailers are generally brought to defeat removal to federal court based on diversity jurisdiction and the Retailers are often dismissed before trial without payment.

79.     Old JJCI and LLT periodically accepted from the Retailers tenders of talc-related claims related to the sale of its products.  When a Retailer was sued on a claim related to Old JJCI's talc-containing products, the Retailer would notify Old JJCI, LLT and the Debtor by submitting a tender request.  Old JJCI, LLT and/or the Debtor would then determine whether to accept the Retailer's tender of its defense and indemnify the Retailer pursuant to a tender agreement (each, a "Tender Agreement").  Since the commencement of the talc-related litigation, Old JJCI and LLT have agreed to indemnify and assume the defense of more than 1,180 talc-related claims against the Retailers pursuant to Tender Agreements.  Tender Agreements in respect of the Debtor Talc Related Liabilities were allocated to the Debtor in the 2024 Corporate Restructuring.[20]

---

[20]     Likewise, Tender Agreements in respect of liabilities allocated to Pecos River were allocated to Pecos River.

NAI-1541219394

80.      In addition, Old JJCI agreed to indemnify certain other transaction counterparties for liability arising from talc-containing products sold by Old JJCI.  For example, in 2005, Old JJCI entered into an asset purchase agreement with Pharma Tech Industries, Inc. ("PTI" and subsequently PTI Royston, LLC) pursuant to which Old JJCI sold a manufacturing plant (where various products, including certain talc-containing products, were bottled) to PTI, which continued to operate the facility and manufacture certain talc products until early 2020.  In connection with the asset sale, Old JJCI and PTI entered into a manufacturing and supply agreement, which was subsequently amended and restated.  Under the manufacturing and supply agreement, Old JJCI agreed to indemnify, and did indemnify, PTI and its affiliates for certain claims related to talc products.  The claims against PTI are generally identical to and based on the claims against Old JJCI, LLT and to the extent in respect of Debtor Talc Related Liabilities, the Debtor.

81.      Further, as noted above, pursuant to an indemnification agreement, Old JJCI agreed to indemnify Valeant (now Bausch) and its affiliates (including Bausch Health Americas, Inc. f/k/a Valeant Pharmaceuticals International and Bausch Health US, LLC f/k/a Valeant Pharmaceuticals North America LLC f/k/a Valeant Pharmaceuticals North America) for personal injury and products liability actions arising from alleged exposure to "Shower to Shower" products and for certain other regulatory actions arising out of the manufacture, use or sale of "Shower to Shower" products, as set forth more fully in the agreement.[21]  The claims against Valeant (now Bausch) are generally identical to the claims asserted against Old JJCI, LLT and to the extent in respect of Debtor Talc Related Liabilities, the Debtor.

---

[21]      It is my understanding that "Shower to Shower" products sold in the U.S. and Canada no longer include talc.  Like Johnson's Baby Powder, Johnson's Medicated Powder sold in the U.S. and Canada no longer contains talc as of 2020.

-31-

82.     Like the contractual indemnities of retailers described above, these contractual indemnities of transaction counterparties also were allocated to the Debtor in the 2024 Corporate Restructuring, and Pecos River likewise agreed to indemnify the Debtor from and against any indemnification claims asserted against the Debtor in respect of liabilities allocated to Pecos River.

H.     **Chapter 11 Cases of Talc Suppliers and Proposed Settlement With Them**

83.     Background.  In 1989, J&J sold its talc mining business to Cyprus Mines Corporation by means of the sale of stock of Windsor Minerals Inc. ("Windsor").  From 1989 to 2011, Old JJCI entered into certain agreements (the "Imerys/Cyprus Agreements") to purchase talc from Windsor and certain other Imerys/Cyprus Parties.  Certain of the Imerys/Cyprus Agreements included indemnity provisions, with some running in favor of the applicable Imerys/Cyprus Parties and others running in favor of Old JJCI.  For example, under one of the Imerys/Cyprus Agreements, Old JJCI agreed to indemnify an Imerys/Cyprus Party for certain product liability claims brought against such party arising out of the sale of cosmetic talc products manufactured by Windsor prior to 1989, as well as for talc the Imerys/Cyprus Party sold to Old JJCI from 1989-2000.  Under the same agreement, an Imerys/Cyprus Party agreed to indemnify Old JJCI for (a) damages, losses, costs, and expenses arising from (i) talc provided by the Imerys/Cyprus Party not meeting specifications provided by Old JJCI or (ii) the Imerys/Cyprus Party failing to sample or test talc in accordance with the agreement and (b) all liabilities arising out of any violation of law by the Imerys/Cyprus Party.

84.     The Imerys Bankruptcy.  In February 2019, certain of the Imerys/Cyprus Parties—Imerys Talc America, Inc. (Old JJCI's talc supplier) and two of its affiliates, Imerys Talc Vermont, Inc. and Imerys Talc Canada, Inc. (collectively, "Imerys")—filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

District of Delaware (the "Imerys Bankruptcy"). Imerys has potential liability for personal injury claims arising from exposure to talc it sold to customers, including Old JJCI. In the Imerys Bankruptcy, Imerys has contended that (a) it has claims against Old JJCI and J&J for indemnification under certain of the Imerys/Cyprus Agreements and (b) it is entitled to proceeds of certain insurance policies issued to J&J or its past or present affiliates (collectively, the "J&J Policies"). These claims are alleged to be in the billions of dollars.

85. In July 2021, Imerys Talc America, Inc. and Imerys Talc Vermont, Inc. filed an adversary proceeding against Old JJCI and J&J in the Imerys Bankruptcy seeking declaratory judgments with respect to the indemnification obligations allegedly owed by Old JJCI and J&J to Imerys. Old JJCI and J&J thereafter filed a motion to dismiss the adversary proceeding. In October 2021, LTL filed a notice of bankruptcy filing and stay of proceedings clarifying that the automatic stay arising upon the filing of the 2021 Chapter 11 Case applied to this adversary proceeding. No further activity has taken place in this adversary proceeding since then.

86. In May 2020, Imerys, its parent Imerys S.A., the tort claimants' committee and the future claimants' representative (collectively, the "Imerys Plan Proponents") filed a plan of reorganization and a related disclosure statement (as amended or modified, the "Imerys Plan"). The Imerys Plan Proponents subsequently filed numerous amendments to the Imerys Plan and disclosure statement. A hearing on the Imerys Plan Proponent's disclosure statement was held in January 2021, and the court entered an order approving the disclosure statement, permitting Imerys to proceed with soliciting votes on the Imerys Plan.

87. In March 2021, Old JJCI and J&J voted to reject the Imerys Plan and opted out of the consensual releases in the Imerys Plan. In April 2021, the Imerys Plan

NAI-1541219394

Proponents announced that the Imerys Plan had received the requisite number of accepting votes to confirm the plan.  Old JJCI and J&J challenged certain portions of the vote based on improprieties that had been discovered and sought to disqualify those votes.  In October 2021, the Imerys bankruptcy court issued a ruling deeming thousands of votes as withdrawn.  In October 2021, Imerys cancelled the confirmation hearing on the Imerys Plan.  In January 2024, Imerys subsequently proposed a further amended version of the Imerys Plan.

88.     J&J and LTL opposed the Imerys Plan, including the plan proposed in January 2024, because, they believed the plan misrepresented the value of talc claims against the Imerys/Cyprus Parties and was an improper effort by the Imerys/Cyprus Parties to artificially inflate J&J's and LTL's alleged liability for those claims under the indemnities.  The Imerys Bankruptcy remains pending.

89.     The Cyprus Bankruptcy.  Cyprus Mines Corporation and its parent company (together, "Cyprus"), which had owned certain Imerys talc mines, filed in the Imerys Bankruptcy an adversary proceeding against Old JJCI, J&J, Imerys Talc America, Inc. and Imerys Talc Vermont, Inc. seeking a declaration of indemnity rights under certain contractual agreements.  Old JJCI and J&J denied that any indemnification was owed, and filed a motion to dismiss the adversary complaint.  In February 2021, Cyprus Mines Corporation filed its own voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Cyprus Bankruptcy") and filed a disclosure statement and plan of reorganization.  In October 2021, LTL filed a notice of bankruptcy filing and stay of proceedings clarifying that the automatic stay arising upon the filing of the 2021 Chapter 11 Case applied to the Cyprus adversary proceeding.  In January 2024, Cyprus filed an amended plan (the "Cyprus Plan").  The Cyprus chapter 11 case remains pending, and no further

-34-

activity has taken place in the Cyprus adversary proceeding since the filing of the 2021

Chapter 11 Case.

90.     <u>Imerys/Cyprus Settlement Agreement.</u>  Beginning in early 2024, J&J,

Holdco and LLT engaged in discussions with representatives of Imerys Talc America, Inc. and

certain affiliates, Cyprus and the future claimants' representatives and the tort claimants'

committees appointed in the Imerys Bankruptcy and the Cyprus Bankruptcy, respectively, to

resolve the parties' disputes, including (a) the existence and scope of the parties' rights and

obligations under the Imerys/Cyprus Agreements, and claims the parties may have against each

other related to those agreements or otherwise related to the supply of talc, (b) Imerys' and

Cyprus's respective rights to proceeds under the J&J Policies and (c) the reservations and

objections of J&J and LLT to the Imerys Plan and Cyprus Plan.  After months of negotiations,

the parties reached agreement on the terms of a settlement that was detailed in that certain

Settlement Agreement and Release (the "<u>Imerys/Cyprus Settlement Agreement</u>"), which was

allocated to the Debtor in the 2024 Corporate Restructuring.  The Imerys/Cyprus Settlement

Agreement provides a path for Imerys and Cyprus to confirm a plan and emerge from

bankruptcy after more than five years in chapter 11.

91.     On July 13, 2024, Imerys and Cyprus filed a joint motion seeking to

approve the Imerys/Cyprus Settlement Agreement and certain related relief (the "<u>Imerys/Cyprus</u>

<u>Settlement Approval Motion</u>") in their respective chapter 11 cases.[22]  The Imerys/Cyprus

Settlement Agreement contemplates, among other things:  (a) a settlement payment from the

---

[22]     A copy of the Imerys/Cyprus Settlement is attached as Exhibit A to the Imerys/Cyprus Settlement Approval
Motion.  See *Joint Motion of the Imerys Debtors and the Cyprus Debtor for an Order (I) Approving the
Settlement Agreement Between the Imerys Debtors, the Cyprus Debtor, Johnson & Johnson, and the Other
Parties Thereto, and (II) Approving the Sale of Certain Rights*, <u>In re Imerys Talc America, Inc.</u>,
No. 19-10289 (LSS) (Bankr. D. Del. Jul. 17, 2024) [Dkt. 6376].

Debtor or J&J in the aggregate amount of $225 million; (b) a contribution of the first $200 million and 50% of the next $160 million of insurance proceeds recovered under the J&J Policies (subject to an aggregate capped guarantee of $280 million and certain other limitations); and (c) certain other insurance proceeds. [23] In sum, if approved, the Imerys/Cyprus Settlement Agreement will yield settlement proceeds to the Imerys and Cyprus estates of at least $505 million for the benefit of current and future talc claimants no later than December 31, 2025.

92.     The payments under the Imerys/Cyprus Settlement Agreement will be made only after the "Trigger Date" has occurred—namely, the Imerys and Cyprus bankruptcy court has entered an order approving the Imerys/Cyprus Settlement Agreement and a certification has been filed with the court evidencing requisite claimant approval of the Imerys Plan and the Cyprus Plan.  The releases under the Imerys/Cyprus Settlement Agreement would become effective upon the payment of (a) the initial payment by the Debtor or J&J and (b) $167,000,000 of insurance payments and certain other insurance proceeds that may have been received.  The Imerys/Cyprus Settlement Agreement does not prohibit talc claimants from pursuing claims, if any, against the Debtor or J&J.  The settlement, if consummated, will result in additional recoveries to holders of the Channeled Talc Personal Injury Claims that also have asserted or could assert claims against one or more of the Imerys/Cyprus Parties.[24]

I.     **The Debtor's Insurance Coverage and Related Litigation**

93.     The Debtor believes it has insurance coverage for its talc-related liability. In particular, the Debtor has access to certain primary and excess liability insurance policies that

---

[23]   The description of the Imerys/Cyprus Settlement Agreement herein is qualified in its entirety by the terms of the Imerys/Cyprus Settlement Agreement, and in the event of any inconsistency between the description herein and the terms of the Imerys/Cyprus Settlement Agreement, the Imerys/ Cyprus Settlement Agreement governs.

[24]   If the Imerys/Cyprus Settlement Agreement is approved, the Debtor intends to promptly seek to assume it so that the Debtor may perform the Debtor's obligations thereunder.

NAI-1541219394

Case 24-90505   Document 17   Filed in TXSB on 09/20/24   Page 37 of 56

cover, among other things, defense and/or indemnity costs related to talc bodily injury claims, subject to the terms of the policies.[25]  The currently available limits of solvent primary and excess insurance policies issued to J&J by third-party insurers that potentially cover talc-related liabilities total approximately $1.25 billion.

94.     Prior to the 2021 Chapter 11 Case, J&J and Old JJCI tendered talc-related claims to their third-party insurers.  To date, none of those insurers has acknowledged its coverage obligations, defended Old JJCI, LLT or J&J, paid any costs of defense, or indemnified J&J, Old JJCI or LLT for settlements or judgments, although certain insurers have entered into confidential settlement agreements with LLT and J&J to resolve their coverage obligations .  Instead, the third-party insurers have asserted coverage defenses.

95.     In May 2019, certain of the Debtor's third party insurers filed a lawsuit against Old JJCI and J&J, and their captive insurance affiliate, Middlesex Insurance Company ("Middlesex"), in the Superior Court of Middlesex County (Docket No. MID-L-003563-19) (the "NJ Coverage Action"), seeking a declaratory judgment regarding the parties' respective obligations under the plaintiff insurers' policies including, in particular, the plaintiff insurers' duties to pay defense and indemnity costs to, among other things, Old JJCI.  The insurer plaintiffs filed a Second Amended Complaint on June 22, 2020.  J&J, Old JJCI and Middlesex filed answers to the Second Amended Complaint on July 31, 2020, and asserted counterclaims, as well as cross-claims against certain defendants.  Aetna Casualty and Surety Company ("Travelers")[26] and certain other insurers filed cross-claims against J&J, Old JJCI and

---

[25]     The policies that cover the Debtor were issued to J&J as the named insured.  Those policies cover the period when Old JJCI was operated as a business unit or division of J&J, as well as during the period when Old JJCI was a subsidiary of J&J.

[26]     Aetna Casualty and Surety Company is now part of Travelers Insurance Company.

-37-

NAI-1541219394

Middlesex, to which J&J, Old JJCI and Middlesex responded later in 2020.  The NJ Coverage

Action remains pending.

96.     After arms-length negotiations between certain of the third-party insurers,

in May 2024 the parties entered into confidential settlement agreements and releases whereby

certain insurers agreed to pay certain confidential amounts to J&J to purchase all of J&J's and

LLT's right, title and interest in and to the policies free and clear of any interest of any person.

Upon the receipt of the confidential amounts from those certain insurers as set forth in each of

these settlement agreements, the applicable parties have agreed to release each other from and

against all:  (a) liability for certain talc personal injury claims; (b) claims relating to the policies,

including any claims arising from any of J&J's and LLT's actual or alleged obligations to actual

or alleged indemnitees and distributors; and (c) extra-contractual claims.  One condition to

certain of the settlement agreements is that the Amended Plan be consistent with their terms.

Further, within seven days after the effective date of the settlement agreements, the settling

insurers and J&J will file a stipulation for the dismissal of their claims.

### III.     LLT'S CHAPTER 11 CASES

#### A.     The 2021 Chapter 11 Case

97.     LTL commenced the 2021 Chapter 11 Case on October 14, 2021 by filing

a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States

Bankruptcy Court for the Western District of North Carolina (the "NC Bankruptcy Court").  On

November 16, 2021, the NC Bankruptcy Court entered an order transferring the 2021 Chapter 11

Case to the District of New Jersey, which referred the case to the United States Bankruptcy

Court for the District of New Jersey (the "NJ Bankruptcy Court").

98.     Dismissal Motions.  After transfer, the official committee of talc claimants

(the "2021 TCC") and two plaintiff law firms moved to dismiss the 2021 Chapter 11 Case on

NAI-1541219394

grounds that the case was not filed in good faith.  LTL opposed these motions, arguing, among

other things, that its bankruptcy filing was proper because seeking to equitably resolve mass tort

claims constitutes a valid bankruptcy purpose.

99.    On February 25, 2022, the NJ Bankruptcy Court issued an opinion

denying the motions to dismiss [2021 Chapter 11 Case, Dkt. 1572] (the "Dismissal Opinion"),[27]

finding that filing a chapter 11 case with the goal of addressing current and future personal injury

talc claims to preserve corporate value is unquestionably a proper purpose under the Bankruptcy

Code and, further, the prospect of continued, costly talc-related litigation supported the need to

consider a bankruptcy filing.

100.    Various parties filed notices of appeal, as well as motions for certification

of direct appeal to the Third Circuit.  On April 4, 2022, the NJ Bankruptcy Court entered an

order certifying direct appeal of the order to the Third Circuit.  The Third Circuit granted the

petitions for direct appeal on May 11, 2022, and the parties briefed the issues and argued the

matters before the Third Circuit on September 19, 2022.  The Third Circuit decision on the

dismissal motions is further discussed below.

101.    Mediation.  In March 2022, the NJ Bankruptcy Court entered an order,

which was amended in May 2022, referring LTL and its affiliates, the representatives of current

claimants, and Ms. Randi S. Ellis, the future claimants' representative appointed in the 2021

Chapter 11 Case (the "2021 FCR") to mediation.  Pursuant to the order, the court appointed

co-mediators to mediate a comprehensive resolution of issues in the case, including a chapter 11

plan and all matters related to the estimation and plan treatment of personal injury claims against

---

[27]    On March 2, 2022, the Court entered an order denying the motions to dismiss [2021 Chapter 11 Case,
Dkt. 1603] (the "Dismissal Order").

NAI-1541219394

the estate related to talc or talc-containing products.  In May 2022, various additional parties, including insurers, class action plaintiffs, Canadian representatives and the ad hoc committee of states holding consumer protection claims were referred to mediation.

102.    By order of the NJ Bankruptcy Court dated March 23, 2023, the appointment of each of the mediators was terminated.  Despite the efforts of the mediators and the various constituents, at the time of the termination of their appointment, no agreement had yet been reached on the terms of a plan to consensually resolve the 2021 Chapter 11 Case.

### B.     Third Circuit Panel Opinion Dismissing the 2021 Chapter 11 Case

103.    On January 30, 2023, a panel of the Third Circuit issued an opinion directing the NJ Bankruptcy Court to dismiss the 2021 Chapter 11 Case.  See In re LTL Mgmt., LLC, 58 F.4th 738 (3d Cir. 2023) as amended by 64 F.4th 84 (3d Cir. 2023) (the "Third Circuit Panel Opinion").  In its decision, the Third Circuit held that debtors are required to establish that they are in "imminent financial distress" to maintain a bankruptcy case.  While the Third Circuit recognized that LTL "inherited massive liabilities" and faced "thousands" of future claims, it evaluated LTL's ability to "call on assets to fund them." Id. at 94, 109.  The Third Circuit found LTL held "reliable" funding rights from "highly creditworthy counterparties:" Holdco and its "cashflowing brands" and, "[m]ost important," "LTL's direct access to J&J's exceptionally strong balance sheet." Id. at 106.  Given those rights, the Third Circuit found LTL "highly solvent," with "access to cash to meet comfortably its liabilities as they came due for the foreseeable future." Id. at 108.  The Third Circuit panel acknowledged the "apparent irony" that, by providing the funding backstop to place beyond dispute LTL's ability to fund a chapter 11 plan, J&J had made LTL too financially able for chapter 11. Id. at 110-11; see id. at 111 ("Put another way, the bigger a backstop a parent company provides a subsidiary, the less fit that subsidiary is to file.").

-40-

104.    On February 13, 2023, LTL filed a petition for rehearing and rehearing <u>en</u> <u>banc</u> with the Third Circuit.  On March 22, 2023, the Third Circuit entered an order denying LTL's petition for rehearing.  That same day, LTL filed a motion seeking a stay of the Third Circuit's mandate pending appeal to the United States Supreme Court.  The Third Circuit entered an order denying the stay motion on March 31, 2023, and, on the same day, issued its mandate directing the NJ Bankruptcy Court to dismiss the 2021 Chapter 11 Case.  The NJ Bankruptcy Court subsequently entered an order dismissing the 2021 Chapter 11 Case on April 4, 2023.[28]

C.    <u>Dismissal of the 2021 Chapter 11 Case and New Financing Agreements</u>

105.    A component of the 2021 Corporate Restructuring described above was the funding agreement between LTL, as payee, and New JJCI and J&J, as payors (the "<u>2021</u> <u>Funding Agreement</u>").  On April 4, 2023, prior to LTL's filing of the 2023 Chapter 11 Case, LTL, J&J and Holdco entered into new financing arrangements.  Pursuant to these arrangements, the 2021 Funding Agreement was terminated, and the parties, in substitution therefor, agreed to enter into two new agreements:  (a) Holdco and LTL entered into a new funding agreement (the "<u>2023 Funding Agreement</u>") and (b) LTL, Holdco and J&J entered into a separate support agreement (the "<u>2023 J&J Support Agreement</u>").

106.    The 2023 Funding Agreement was similar to the 2021 Funding Agreement, except that J&J was not a payor thereunder.  It imposed no repayment obligation on LTL and was not a loan.  It obligated Holdco to provide funding to LTL to pay for costs and expenses incurred in the normal course of its business:  (a) at any time when there is no bankruptcy case; and (b) during the pendency of any chapter 11 case filed by LTL, including costs of administration, in both situations to the extent that any cash distributions received by

---

[28]    <u>See</u> 2021 Chapter 11 Case Dkt. 3938.

LTL from Royalty A&M were insufficient to pay those costs and expenses.  In addition, the 2023 Funding Agreement required Holdco to fund amounts necessary:  (a) to satisfy LTL's talc-related liabilities at any time when there was no bankruptcy case; and (b) in the event of a chapter 11 filing by LTL, to provide the funding for a trust created pursuant to a plan of reorganization for LTL that contained the terms agreed to in the plan support agreements, in both situations to the extent that any cash distributions received by LTL from Royalty A&M were insufficient to pay such costs and expenses and further, in the case of the funding of a trust, LTL's other assets were insufficient to provide that funding.[29]

107.     The effectiveness of the 2023 J&J Support Agreement was conditioned upon entry of an order approving such agreement by the NJ Bankruptcy Court.  Such an order was never sought or obtained and, as a result, the 2023 J&J Support Agreement never became effective.  If the 2023 J&J Support Agreement had become effective, it would have been operative only in the 2023 Chapter 11 Case and would have obligated J&J to provide the trust funding Holdco was required to provide under the 2023 Funding Agreement under a supported plan, but only if Holdco failed to provide that funding.  In return, Holdco would have been obligated to reimburse J&J for any amounts it paid to the trust on Holdco's behalf, and any amounts that were not reimbursed by Holdco would have been deemed to be financed with a loan from J&J to Holdco.  LTL had the right to enforce J&J's obligation under the 2023 J&J

---

[29]     In addition, the value of Holdco's assets upon execution of the 2023 Funding Agreement was approximately half of the value of New JJCI's assets upon execution of the 2021 Funding Agreement.  In January 2023, as part of a transaction announced long before the filing of the 2021 Chapter 11 Case, Holdco transferred its Consumer Business assets to its parent entity, as described above.

NAI-1541219394

Support Agreement.  However, as noted above, approval of the 2023 J&J Support Agreement by the NJ Bankruptcy Court was never sought or obtained in the 2023 Chapter 11 Case.

> ### D.     The 2023 Chapter 11 Case

108.     Following the Third Circuit's decision to dismiss the 2021 Chapter 11 Case, and with the assistance of the mediators and the encouragement of the NJ Bankruptcy Court, negotiations continued between LTL, J&J and various plaintiff law firms.  Those negotiations ultimately culminated in an agreement with thousands of claimants on a broad outline of terms for a plan of reorganization, including financial terms, that, if confirmed and consummated, would fully resolve all the Debtor's liability for talc-related claims.  That agreement was memorialized in a series of plan support agreements with plaintiff law firms who represented tens of thousands of talc claimants (together, the "Ad Hoc Committee of Supporting Counsel").

109.     In view of the substantial support of the Ad Hoc Committee of Supporting Counsel and other parties, on April 4, 2023, LTL commenced a second chapter 11 case in the NJ Bankruptcy Court (the "2023 Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The U.S. Trustee promptly appointed 11 creditors to an official committee of talc claimants in the 2023 Chapter 11 Case (the "2023 TCC").  Thereafter, on May 18, 2023, the NJ Bankruptcy Court entered an order appointing Ms. Ellis as future claimants' representative in the 2023 Chapter 11 Case (the "2023 FCR").  On May 8, 2023, the NJ Bankruptcy Court entered an order appointing Gary Russo and Eric Green as co-mediators and establishing mediation procedures.

110.     Plan and Disclosure Statement.  In accordance with the plan support agreements, LTL filed a chapter 11 plan of reorganization (the "2023 Plan") and corresponding disclosure statement on May 15, 2023 and an amended plan and disclosure statement on June 26,

-43-

2023.  As amended, the 2023 Plan sought to implement the settlement memorialized in the plan support agreements by, among other things, providing for the creation and funding of a trust to pay all current and future cosmetic talc claims asserted against LTL.

111.    The 2023 Plan, among other things, provided for the establishment of a trust funded in the amount of $8.9 billion on a net present value basis to resolve and pay all current and future talc related claims (including talc-related claims not covered by the current Amended Plan).  That trust would have contained three sub-trusts for the payment of talc-related claims:  (a) one for all talc-related claims that are governmental unit claims; (b) a second for claims held by certain third-party payors, including health insurers, that asserted direct claims against LTL and its affiliates and liens or subrogation claims against proceeds to be received by current talc claimants under the 2023 Plan; and (c) a third for all other talc-related claims, which would have included all personal injury claims, including ovarian cancer, mesothelioma, lung cancer, and Canadian claims.  The proposed trust funding was to be allocated among the three sub-trusts.

112.    On July 11, 2023, LTL filed a motion to, among other things:  (a) approve the disclosure statement; (b) approve notice procedures related to the disclosure statement; and (c) approve solicitation and tabulation procedures related to the plan.  The NJ Bankruptcy Court's subsequent dismissal of the case rendered moot further proceedings related to the plan and disclosure statement filed in the 2023 Chapter 11 Case.

113.    <u>Motions to Dismiss and Dismissal Order.</u>  In April and May 2023, the 2023 TCC and various other parties filed motions to dismiss the 2023 Chapter 11 Case.  The NJ Bankruptcy Court held a four-day hearing on the dismissal motions from June 27, 2023 through June 30, 2023.

114.    On July 28, 2023, the NJ Bankruptcy Court issued an opinion granting the motions to dismiss.  See In re LTL Mgmt., LLC, 652 B.R. 433 (Bankr. D.N.J. 2023).  Based on "the evidentiary record fixed at trial," the NJ Bankruptcy Court felt "constrained" to dismiss the 2023 Chapter 11 Case because the record did "not establish sufficient 'imminent' or 'immediate' financial distress to satisfy the criteria enunciated by the Third Circuit in" its Third Circuit Panel Opinion.  Id. at 436.  The NJ Bankruptcy Court recognized that the Third Circuit's novel requirement of "immediate," "imminent," and "apparent" financial distress can be viewed "as being somewhat at odds with a pro-active approach to trouble," prohibiting a putative debtor from seeking bankruptcy relief until it "sees flames."  Id. at 444.  The NJ Bankruptcy Court further recognized that a "wait and see approach," from a financial restructuring perspective, "often gives rise to serious risks and increased costs that may threaten the viability of the business."  Id.  In addition, the NJ Bankruptcy Court found that there was "nothing speculative about the fact [LTL] faces substantial liability," even if the eventual cost to defend and resolve talc claims was unknown.  Id. at 444-45.  Yet, "[g]iven the Circuit's focus on immediacy and certainty," the NJ Bankruptcy Court "abide[d] by" the Third Circuit Panel Opinion and concluded that LTL lacked financial distress to avail itself to bankruptcy relief "at this time."  Id. at 448.

115.    However, the NJ Bankruptcy Court remained optimistic about the possibility of a global settlement, and "strongly encouraged" the parties to build on the "remarkable progress" towards a viable global settlement already achieved during the 2023 Chapter 11 Case due to the "dogged efforts" of the negotiating parties.  Id. at 455.  The NJ Bankruptcy Court further noted that it saw "no reason why this type of settlement cannot be pursued in a context other than this current bankruptcy case, such as part of the pending Imerys

-45-

chapter 11 bankruptcy proceeding in Delaware." Id. (citing Third Circuit Panel Opinion at 108.

On August 11, 2023, the NJ Bankruptcy Court entered an order dismissing the 2023 Chapter 11

Case (the "2023 Dismissal Order").

116.    Appeal of Dismissal Order.  On August 24, 2023, and September 5, 2023,

respectively, LTL and the Ad Hoc Committee of Supporting Counsel each filed a notice of

appeal of the 2023 Dismissal Order.  On September 20, 2023, the NJ Bankruptcy Court entered

an order certifying the 2023 Dismissal Order for direct appeal, and, on October 20, 2023, the

Third Circuit accepted the direct appeals.  On July 25, 2024, the Third Circuit issued a non-

precedential opinion affirming the NJ Bankruptcy Court's ruling.  See In re LTL Mgmt. LLC,

Nos. 23-2971, 23-2972 (3d Cir.).

## IV.    EVENTS LEADING TO THE COMMENCEMENT OF THIS CASE AND THE DEBTOR'S OBJECTIVES FOR ITS CHAPTER 11 REORGANIZATION

### A.    Negotiations and Support for the Amended Plan

117.    The terms of the Initial Plan were the result of extensive negotiations, over

the course of several months, among counsel representing the substantial majority of claimants

asserting ovarian cancer-related talc claims;[30] the prepetition FCR,[31] and representatives of LLT

and J&J.

---

[30]    Such counsel were initially members of the Ad Hoc Committee of Supporting Counsel, and later included other counsel that initially opposed the Initial Plan.  To support the Ad Hoc Committee of Support Counsel's efforts to achieve settlement, LLT agreed to reimburse certain fees and expenses of the Ad Hoc Committee of Supporting Counsel, including the reasonable and documented fees and expenses of its counsel, pursuant to the terms of an expense reimbursement agreement.

[31]    LLT determined that Ms. Ellis's knowledge and experience made her ideally suited to serve as the prepetition FCR in connection with a potential prepackaged plan of reorganization for LLT.  Ms. Ellis agreed to serve as the prepetition FCR.  In that role, Ms. Ellis retained various professionals to assist her in exercising her fiduciary duties, namely counsel, an estimation expert and a financial advisor.  To support the efforts of Ms. Ellis to achieve settlement, LLT agreed to reimburse certain of Ms. Ellis' expenses, including the reasonable and documented fees and expenses of Ms. Ellis' counsel and other professionals. The Debtor is seeking the Court's approval of the appointment of Ms. Ellis as the FCR in this Chapter 11 Case.

NAI-1541219394

118.     Throughout the process, LLT responded to various information requests and addressed input from the Ad Hoc Committee of Supporting Counsel on the terms of the Initial Plan.  The Ad Hoc Committee of Supporting Counsel also was informed of and supported the 2024 Corporate Restructuring, entry into the 2024 Funding Agreements and the Debtor's filing of this Chapter 11 Case in the Southern District of Texas.  In fact, the Ad Hoc Committee of Supporting Counsel advocated that this Chapter 11 Case be commenced in this venue.

119.     The prepetition FCR and her professionals also engaged in discussions with LLT, J&J, the Ad Hoc Committee of Supporting Counsel and their respective counsel regarding issues related to the Initial Plan, the Amended Plan and the talc litigation.  LLT and the Ad Hoc Committee of Supporting Counsel provided, as applicable, relevant documents and responses to various requests for information from Ms. Ellis and her professionals.  LLT also addressed input from the Ad Hoc Committee of Supporting Counsel and Ms. Ellis and their respective counsel on terms of the Initial Plan and the Amended Plan.

120.     The parties' discussions ultimately culminated in the Initial Plan, and subsequently, following further discussions and developments described below, the Amended Plan.  The Amended Plan is supported by the Ad Hoc Committee of Supporting Counsel and the vast majority of claimants, as confirmed by the successful vote in favor of the Amended Plan.[32] The FCR also continues to support the Amended Plan, with the understanding that the FCR has not approved the Memorandum of Understanding.

---

[32]     The results of the vote are described in greater detail in a declaration to be filed by the Debtor's claims and solicitation agent.

-47-

**B.      Plan Solicitation and Voting Results**

121.    On June 3, 2024 (the "Solicitation Date"), LLT began to solicit votes to accept or reject the Initial Plan on behalf of the Debtor from holders of Channeled Talc Personal Injury Claims in Class 4 of the Initial Plan, the only class of claims affected by the Initial Plan and entitled to vote on its terms.  Likewise, on September 17, 2024, the Debtor solicited the vote of New Holdco, the sole holder of Equity Interests in the Debtor, to accept or reject the Initial Plan.  The Initial Plan and its solicitation was supported by the members of the Ad Hoc Committee of Supporting Counsel and the FCR.

122.    The substantial support for the Amended Plan has been achieved notwithstanding multiple efforts to disparage the Initial Plan by a limited number of financially-conflicted plaintiff law firms, led by Beasley Allen.  These attacks appeared designed to undermine the vote and frustrate any consensual bankruptcy resolution.  These firms maintain leadership positions in the pending MDL and, in those roles, stand to recover for themselves (but not their clients) up to 12% of the aggregate amount of any resolution in the MDL. While benefitting the firms, that levy on any resolution through the MDL would reduce the recovery for the claimants.  Beasley Allen—and in particular its partner Andy Birchfield—has been the most vocal opponent of any resolution in bankruptcy, consistently maintaining that Beasley Allen would not support any bankruptcy resolution regardless of its terms, the level of support received from the claimants and their law firms, or the strong encouragement to reach a chapter 11 resolution expressed by the bankruptcy judge who oversaw the LTL Chapter 11 Cases.

123.    As part of their efforts to derail the Initial Plan, this group of firms also filed a frivolous fraudulent conveyance class action complaint in the United States District Court for the District of New Jersey (the "New Jersey District Court") seeking to avoid two transactions that occurred years earlier in connection with the LLT Chapter 11 Cases plus an

-48-

unrelated corporate transaction.  Weeks later, they filed an emergency motion for a preliminary injunction seeking, among other things, to prevent the Debtor from filing for bankruptcy outside of New Jersey, relief that was untethered to the causes of action and prayers for relief in the complaint.  The New Jersey District Court denied the motion, and the United States Court of Appeals for the Third Circuit (the "<u>Third Circuit</u>") denied a similar motion for stay pending appeal, which sought the same injunctive relief.

124.     These same counsel also have spearheaded a public campaign throughout the solicitation process designed to deprive talc claimants of the opportunity to determine for themselves whether to accept the Initial Plan.  This campaign has relied on both direct media blitzes in opposition to the Initial Plan, as well as negative "headlines" manufactured by these firms based on their own aggressive litigation tactics.  This two-pronged approach allowed Beasley Allen and others to continuously push an anti-Plan narrative throughout the solicitation process.

125.     On July 22, 2024, just four days before the voting deadline, these opposing firms issued a press release urging claimants to vote "no" on the plan.   The press release featured a variety of inaccurate or unsubstantiated assertions.  And this opposition continued through the submission of false voting certifications.  Firms in this group, including Beasley Allen, misrepresented that they received informed consent from their clients to vote "no" when in fact they had received no such consent.  In addition to an apparent admission by Birchfield (further discussed below) that he did not obtain "informed consent" from his clients for their purported "no" votes, there are hundreds of instances where these firms submitted "no" votes on behalf of individuals who are deceased and have no appointed estate representative, and

NAI-1541219394

also submitted "no" votes that are irreconcilable with master ballots submitted by other firms and, in some instances, ballots submitted by the claimants themselves.

126.    Despite the efforts of these plaintiff firms, the Debtor, through extensive, months-long negotiations, including multiple phases of mediation, has been able to negotiate and formulate a plan that I believe addresses claimants' concerns and demands and provides fair and equitable treatment to all current and future claimants.

127.    At the end of the solicitation period for the Initial Plan, these objecting firms asked that the Debtor delay its bankruptcy filing to provide the parties more time to negotiate a resolution of the firms' pending objections.  The Debtor agreed, and over the course of the succeeding weeks, the Debtor and J&J made a series of offers proposing to contribute significant incremental consideration to reach an agreement.  Nonetheless, every offer was rejected.

128.    The Smith Firm then approached the Debtor and J&J.  The Smith Firm had brought the first talc trial against the Company in 2013 and had, as part of the opposition group led by Beasley Allen, actively opposed LTL's prior bankruptcy proposals.  The Smith Firm advised that it represented, through a joint venture agreement with Beasley Allen, approximately 11,000 claimants, almost all of whose claims had been listed as "no" votes in a master ballot submitted by Beasley Allen.  Although Birchfield certified in that master ballot that he was submitting the claimants' votes based on their "informed consent," the Smith Firm disclosed to the Debtor and J&J that Birchfield had not obtained such consent, a fact Birchfield had conceded to Allen Smith of the Smith Firm.  And the list of claimants for whom Birchfield submitted "no" votes based on a certification of alleged "informed consent" included claimants who were represented by another law firm.  These claimants have since signed declarations

-50-

attesting that they had no recollection of ever having been contacted by Beasley Allen, that they had no recollection of ever having been asked by Beasley Allen how they wanted to vote and that they had, in fact, voted to accept the Initial Plan

129.    The Debtor and J&J thereafter engaged in extensive negotiations with the Smith Firm to resolve the firm's objections to the Initial Plan.  Following these negotiations, an agreement was reached with the Smith Firm and memorialized in the Memorandum of Understanding.

130.    As a result of the Memorandum of Understanding, which has been incorporated into the Amended Plan to the extent applicable, the substantial majority of the clients jointly represented by the Smith Firm and Beasley Allen have now voted to accept the Amended Plan.  Although Beasley Allen and other MDL leadership firms participated in these negotiations as well, they declined to accept the resolution to which the Smith Firm agreed and continue to oppose the Amended Plan even as amended by this resolution with the Smith Firm. At this point, it is not clear who, if anyone, Beasley Allen represents given that virtually all its clients have now voted to accept the Amended Plan.

C.    **The Memorandum of Understanding**[33]

131.    The Memorandum of Understanding provides, subject to specified terms and conditions, as follows:

a.    The Debtor will pay an additional **$1.1 billion** under the Amended Plan to the Talc Personal Injury Trust to fund talc claims subject to Individual Claim Review under the Trust Distribution Procedures.  This amount would be funded as follows:

- $250 million within 60 days of the Effective Date;

---

[33]    The information below is a summary only.  To the extent of any inconsistency with the terms of the Memorandum of Understanding, the Memorandum of Understanding governs.

NAI-1541219394

- $250 million on the first anniversary of the Effective Date; and

- $600 million on the second anniversary of the Effective Date.

The factors relevant to a claimant's eligibility to receive funds as part of the individual review process, and to determine the amount that would be distributed to a claimant as part of that process, will be determined by the Smith Firm in coordination with the Ad Hoc Committee of Supporting Counsel at a later date following the filing of the Amended Plan.  After accounting for this additional $1.1 billion in funding, the total cash contributions to be made to the Talc Personal Injury Trust under the Amended Plan would be approximately $9.0 billion.

      **b.**     J&J will contribute **$650 million** outside of the Amended Plan into a QSF for use in resolving any common benefit fund claims arising from the MDL, which, if determined to apply to a bankruptcy resolution, would have been charged against claimant recoveries.  This contribution is subject to certain conditions, including that *Case Management Order No. 7(A)* is withdrawn with prejudice and that the Amended Plan is confirmed by final order.

      c.     To expedite payments to claimants in the event of appeals from the order confirming the Amended Plan, the Amended Plan will become effective, and, accordingly, the funding of and payments by the Talc Personal Injury Trust will begin, even if an appeal to the United States Supreme Court has been sought and remains pending.  To further expedite payments to claimants, within 60 days of the filing of the Amended Plan, Archer Systems LLC ("Archer") would begin review and processing Talc Personal Injury Claims submitted to it, in a manner consistent with the Trust Distribution Procedures.  Archer would process claims in accordance with the Trust Distribution Procedures subject to, if the Amended Plan becomes

-52-

effective, the approval of the trustees of the Talc Personal Injury Trust; no payments would be made until the Amended Plan becomes effective.[34]

       d.     If, at any time prior to the earlier to occur of (a) the latest to occur of (i) the date that is seventy five (75) days after the Confirmation Date, (ii) the date that is two hundred fifty (250) days after the date on which the Talc Personal Injury Trust first begins to accept the submission of Channeled Talc Personal Injury Claims in accordance with the Trust Distribution Procedures, and (iii) the date that is one hundred ten (110) days after the Talc Trustees will have delivered the Claims Submission Report (as such term defined in the Talc Personal Injury Trust Agreement) to the Debtor and J&J, and (b) the Effective Date, the Debtor (with the consent of J&J) may revoke and withdraw the Amended Plan for any of the following reasons:  (1) fewer than 95% of the Smith Firm's claimants submitted their claims and releases to the Talc Personal Injury Trust; (2) fewer than 95% of all claimants submitted their claims and releases to the Talc Personal Injury Trust; or (3) certain parties object to the Amended Plan, including appealing the order confirming the Amended Plan to the Fifth Circuit Court of Appeals.

       e.     If the Effective Date does not occur because the Fifth Circuit Court of Appeals vacates the Confirmation Order, the Debtor and J&J have agreed that, in certain circumstances, the resolution of the current Channeling Talc Personal Injury Claims under the Amended Plan may be converted to a private, non-bankruptcy mass tort resolution program. Instead of funding the Talc Personal Injury Trust, a QSF would be funded with $4.975 billion plus an additional $880 million in individual review funds (rather than the $1.1 billion in funds under the Amended Plan).  In addition, any common benefit fund funding would be reduced to

---

[34]     The Debtor intends to seek authority to compensate Archer for these services in the near term.

$520 million.  Talc claimants would submit claims to the QSF subject to a master settlement agreement, and claims would be satisfied subject to certain terms and conditions.

   D.   **The Amended Plan**

   132.   The Amended Plan proposes to establish the Talc Personal Injury Trust to process and pay "Channeled Talc Personal Injury Claims," which generally include all claims and demands asserted against the Debtor, J&J or any other Protected Party alleging injury from ovarian cancer and other gynecological cancers.[35]  Under the Amended Plan, the Talc Personal Injury Trust will be funded by a stream of payments in the aggregate amount of approximately $9 billion payable over 25 years.

   133.   A channeling injunction will be issued as part of the Amended Plan that will enjoin holders of Channeled Talc Personal Injury Claims pursuing any Channeled Talc Personal Injury Claim against a Protected Party, unless otherwise provided in the Trust Distribution Procedures.  The Protected Parties include J&J, other non-debtor affiliates of the Debtor, certain retailers, indemnified parties and other parties, as indicated in the Amended Plan and its schedules.

   134.   To ensure the fair and equitable resolution of claims, the Amended Plan, includes Trust Distribution Procedures that set forth in detail the methodology for processing and evaluating claims.  These procedures use characteristics relevant to the valuation of similar talc claims in the tort system, including, for example, the claimant's (a) age at diagnosis, (b) stage and subtype of cancer, (c) duration of product use, (d) frequency of use and elapsed time since

---

[35]   The Amended Plan does not resolve and will not affect:  (a) claims and demands alleging injury from mesothelioma or lung cancer; (b) claims and demands of governmental entities; and (c) Canadian claims and demands.  All holders of claims against the Debtor other than Channeled Talc Personal Injury Claims will be unimpaired by the Amended Plan because the Amended Plan does not modify their legal, equitable, or contractual rights, other than by curing defaults and reinstating maturities.

last use, and (e) other risk factors, and were the product of extensive, arms-length negotiations with claimant representatives.  The Amended Plan also provides for an additional $1.1 billion in funding solely to process and pay the Channeled Talc Personal Injury Claims processed by the Talc Personal Injury Trust under the Individual Review Process (as defined in the Trust Distribution Procedures).  The factors relevant to a claimant's eligibility to receive funds as part of the Individual Review Process, and to determine the amount that would be distributed to a claimant as part of that process, are subject to the agreement of the Smith Firm, the Ad Hoc Committee of Supporting Counsel and the FCR.

135.    Finally, as noted above, the Amended Plan will become effective, and funding of and payments by the Talc Personal Injury Trust will begin, even if an appeal to the United States Supreme Court has been sought and remains pending.

**E.    The Decision to File This Chapter 11 Case**

136.    The filing of this Chapter 11 Case to implement the consensual resolution memorialized in the Amended Plan has the support of tens of thousands of claimants—evidenced by the vast support for the Amended Plan despite the efforts of certain plaintiff firms to delay or block it.

137.    In view of the substantial support for the Amended Plan, and taking into account the excessive cost, burden, uncertainty and anticipated decades-long duration of the Debtor's talc litigation, the Debtor determined that commencing this Chapter 11 Case in this Court was prudent, necessary and in the best interests of all constituents.  The Debtor believes, as does J&J, that the Amended Plan presents the best opportunity to finally and comprehensively resolve all current and future ovarian cancer and other gynecological cancer claims against it. This Chapter 11 Case provides the only pathway through which the Debtor, J&J and the

-55-

claimants can effectuate the agreement they painstakingly negotiated and memorialized in the Amended Plan.

F.     **The Debtor's Objectives for This Chapter 11 Case**

138.   The Debtor's overriding goal in this Chapter 11 Case is to obtain confirmation of and ultimately consummate the Amended Plan as soon as reasonably practicable.

139.   I believe the Amended Plan satisfies all applicable requirements of the Bankruptcy Code, including section 524(g), and is in the best interests of all parties, including the claimants alleged to be represented by the opposition group.  I respectfully submit that the Amended Plan should be confirmed.

Dated:  September 20, 2024                    */s/ John K. Kim*
                                              John K. Kim