## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Red River Talc LLC, | Case No: 24-90505 (CML) |
| Debtor. | |

Gregory M. Gordon (TX 08435300)
Dan B. Prieto (TX 24048744)
Amanda Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com

Brad B. Erens (IL 06206864)
Caitlin K. Cahow (IL 6317676)
JONES DAY
110 N. Wacker Drive, Suite 4800
Chicago, Illinois 60606
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
bberens@jonesday.com
ccahow@jonesday.com

PROPOSED ATTORNEYS FOR DEBTOR

## <u>AMENDED PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF THE DEBTOR</u>

VOTES TO ACCEPT OR REJECT THE PLAN HAVE BEEN SOLICITED BY LLT MANAGEMENT LLC, ON BEHALF OF THE DEBTOR, CONSISTENT WITH SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. THE PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. AS A RESULT OF THE SOLICITATION OF VOTES, THE REQUISITE ACCEPTANCE OF THE PLAN HAS BEEN OBTAINED. THE DEBTOR HAS FILED A PETITION FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND IS SUBMITTING THE DISCLOSURE STATEMENT AND THE PLAN TO THE BANKRUPTCY COURT FOR APPROVAL.

THE PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF AN INJUNCTION PURSUANT TO SECTION 524(g), SECTION 1123(b)(6), AND/OR SECTION 105(a) OF THE BANKRUPTCY CODE THAT WILL CHANNEL ALL TALC PERSONAL INJURY CLAIMS AGAINST THE DEBTOR AND THE PROTECTED PARTIES (AS DEFINED HEREIN) IN CLASS 4 TO A TRUST, AS WELL AS OTHER INJUNCTIONS DESCRIBED IN <u>ARTICLE XI</u> OF THE PLAN.

# TABLE OF CONTENTS

**Page**

ARTICLE I       DEFINITIONS AND RULES OF INTERPRETATION ................................ 1

    1.1    Terms ........................................................................................................... 1
    1.2    Interpretation; Application of Definitions; Rules of Construction; and
          Computation of Time .................................................................................. 23
    1.3    Availability of Plan and Exhibits ............................................................... 23
    1.4    Ancillary Documents .................................................................................. 23

ARTICLE II      TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY
               TAX CLAIMS ........................................................................................... 24

    2.1    Administrative Claims ................................................................................ 24
    2.2    Fee Claims .................................................................................................. 25
    2.3    Payment of Statutory Fees .......................................................................... 25
    2.4    Allowed Priority Tax Claims ...................................................................... 25

ARTICLE III     TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ................. 25

    3.1    Claims and Interests Classified ................................................................... 25
    3.2    Treatment and Classification of Claims and Interests ................................ 26
    3.3    Debtor's Rights with Respect to Unimpaired Claims ................................ 28
    3.4    Elimination of Vacant Classes .................................................................... 28

ARTICLE IV     THE TALC PERSONAL INJURY TRUST ................................................ 28

    4.1    Establishment ............................................................................................. 28
    4.2    Purpose ....................................................................................................... 29
    4.3    Initial Talc Trustees ................................................................................... 29
    4.4    Initial Talc Trust Advisory Committee and FCR ....................................... 29
    4.5    Initial Talc Trust Administrators ................................................................ 30
    4.6    Advancement of Expenses Prior to the Effective Date ............................... 31
    4.7    Trust Distribution Procedures .................................................................... 31
    4.8    Assumption of Liability for Talc Personal Injury Claims .................................. 31
    4.9    Contribution of Certain Assets .................................................................... 33
    4.10   Payment of Talc Personal Injury Trust Expenses ...................................... 36
    4.11   Treatment of Remainder Assets ................................................................. 36
    4.12   Dissolution ................................................................................................. 36
    4.13   Funds and Investment Guidelines .............................................................. 36
    4.14   Compliance with QSF Regulations ............................................................ 36
    4.15   Cooperation Agreement .............................................................................. 37
    4.16   Indemnification and Reimbursement of the Protected Parties ............................ 37
    4.17   Exculpation of the Protected Parties .......................................................... 37

i

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| ARTICLE V | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................................................. | 38 |
| 5.1 | General Treatment ...................................................... | 38 |
| 5.2 | Assumption and Assignment ........................................ | 38 |
| 5.3 | Approval of Assumptions and Assignments and Related Procedures ................. | 38 |
| 5.4 | Payments Related to Assumption ................................. | 40 |
| 5.5 | Executory Contracts and Unexpired Leases to Be Rejected and Rejection Procedures ................................................. | 40 |
| 5.6 | Claims Based on Rejection .......................................... | 41 |
| 5.7 | Contracts and Leases Entered Into After the Petition Date ......... | 41 |
| 5.8 | Reservation of Rights ................................................. | 42 |
| 5.9 | Imerys/Cyprus Matters ............................................... | 42 |
| 5.10 | Talc Insurance Assets ................................................ | 43 |
| 5.11 | Master Settlement Agreements .................................. | 43 |
| ARTICLE VI | DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF NON-TALC CLAIMS ................................................................. | 44 |
| 6.1 | Distributions ............................................................. | 44 |
| 6.2 | Timing and Calculation of Amounts to be Distributed ......... | 44 |
| 6.3 | Designation of Disbursing Agent ................................. | 44 |
| 6.4 | Rights and Powers of Disbursing Agent ........................ | 44 |
| 6.5 | Distributions on Account of Claims Allowed After the Effective Date ............. | 45 |
| 6.6 | Delivery of Distributions and Undeliverable or Unclaimed Distributions .......... | 45 |
| 6.7 | Time Bar to Cash Payments ........................................ | 46 |
| 6.8 | Record Date for Holders of Claims .............................. | 46 |
| 6.9 | Compliance with Tax Requirements and Allocations ......... | 46 |
| 6.10 | Transfers of Claims ................................................... | 47 |
| 6.11 | Setoffs .................................................................... | 47 |
| ARTICLE VII | RESOLUTION OF DISPUTED NON-TALC CLAIMS .......... | 47 |
| 7.1 | Disputed Non-Talc Claims .......................................... | 47 |
| 7.2 | Rights of Debtor and Reorganized Debtor ..................... | 48 |
| 7.3 | Proofs of Claim Not Required ...................................... | 48 |
| 7.4 | No Distributions Pending Allowance ............................ | 48 |
| 7.5 | Distributions on Account of Disputed Claims ................. | 48 |
| ARTICLE VIII | CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN .............................. | 49 |
| 8.1 | Conditions Precedent to the Confirmation of the Plan ....... | 49 |
| 8.2 | Conditions Precedent to the Effective Date of the Plan ...... | 54 |
| 8.3 | Waiver of Conditions Precedent .................................. | 55 |
| 8.4 | Notice of Effective Date ............................................. | 56 |

ii

# TABLE OF CONTENTS

**Page**

8.5     Effect of Nonoccurrence of Conditions Precedent to the Effective Date of the Plan.................................................................................................. 56

ARTICLE IX     MEANS FOR IMPLEMENTATION OF THE PLAN................................ 56

9.1     General .............................................................................................. 56
9.2     Operations of the Debtor Prior to the Effective Date ......................... 56
9.3     Articles of Organization and Operating Agreement ........................... 56
9.4     Corporate Action.............................................................................. 57
9.5     Authority of Officers........................................................................ 57
9.6     Post-Effective Date Governance; Continued Existence of the Reorganized Debtor .............................................................................................. 57
9.7     Arrangements of the Reorganized Debtor with Managers, Officers, and Employees........................................................................................ 57
9.8     Good Faith Compromise and Settlement........................................... 58
9.9     Resolution of Channeled Talc Personal Injury Claims....................... 58
9.10     Cash for Cash Contributions, Distributions, and Other Payments Pursuant to the Plan......................................................................................... 58
9.11     Modification of the Plan ................................................................... 58
9.12     Revocation or Withdrawal of the Plan............................................... 59
9.13     Certain Technical Modifications........................................................ 60

ARTICLE X     EFFECT OF CONFIRMATION ............................................................. 60

10.1     Preservation of Rights of Action by the Debtor and the Reorganized Debtor .............................................................................................. 60
10.2     Imerys/Cyprus Matters...................................................................... 61
10.3     Talc Insurance Assets ....................................................................... 63
10.4     Preservation of Rights of Action by the Talc Personal Injury Trust.... 65
10.5     Terms of Injunctions and Automatic Stay ......................................... 66
10.6     The FCR and the TCC ...................................................................... 66
10.7     No Effect on United States Trustee ................................................... 66
10.8     Binding Effect.................................................................................. 66

ARTICLE XI     DISCHARGE, RELEASES, INJUNCTIONS, AND EXCULPATION ....... 67

11.1     Discharge and Injunctions................................................................. 67
11.2     Releases............................................................................................ 67
11.3     Channeling Injunction and Insurance Entity Injunction ..................... 70
11.4     Exculpation ...................................................................................... 75
11.5     Disallowed Claims ........................................................................... 76
11.6     No Successor Liability ...................................................................... 76
11.7     Corporate Indemnities ...................................................................... 76
11.8     Independent Legal Significance of Individual Provisions ................... 77

# TABLE OF CONTENTS

**Page**

ARTICLE XII    JURISDICTION OF BANKRUPTCY COURT ............................................. 77

12.1    Jurisdiction ................................................................................................ 77
12.2    Specific Purposes ...................................................................................... 77
12.3    District Court Jurisdiction ......................................................................... 79
12.4    Reservation of Rights ................................................................................ 79
12.5    Compromises of Controversies ................................................................. 79

ARTICLE XIII    MISCELLANEOUS PROVISIONS ........................................................... 80

13.1    Closing of Chapter 11 Case ...................................................................... 80
13.2    Timing of Distributions or Actions ........................................................... 80
13.3    Governing Law .......................................................................................... 80
13.4    Entire Agreement ...................................................................................... 80
13.5    Notices to the Debtor and Reorganized Debtor ....................................... 80
13.6    Post-Effective Date Notices by the Reorganized Debtor ......................... 81
13.7    Inconsistencies .......................................................................................... 82
13.8    Withholding of Taxes ................................................................................ 82
13.9    Transfer Taxes ........................................................................................... 82
13.10    Successors and Assigns ........................................................................... 82
13.11    Duty to Cooperate ................................................................................... 82
13.12    Effective Date Actions Simultaneous ..................................................... 82
13.13    Plan Supplements .................................................................................... 82

## EXHIBITS AND SCHEDULES TO PLAN

Exhibit A          Amended Articles of Organization of the Reorganized Debtor

Exhibit B          Amended Operating Agreement of the Reorganized Debtor

Exhibit C          Cash Contributions

Exhibit D          Cash Contributions Guarantee

Exhibit E          Cooperation Agreement

Exhibit F          Retained Rights of Action

Exhibit G          Talc Insurance Policies

Exhibit H          Talc Personal Injury Trust Agreement

Exhibit I          Talc PI Note

Exhibit J          Talc PI Pledge Agreement

Exhibit K          Trust Distribution Procedures

Exhibit L          Executory Contracts and Unexpired Leases to Be Rejected

Schedule 1         Debtor Corporate Parties

Schedule 2         Imerys/Cyprus Parties

Schedule 3         Retailers and Indemnified Parties

NAI-1539839717

*Reference is made to the Disclosure Statement for a discussion of, among other things, the history, business, results of operations, and assets of the Debtor, and risks associated with the Plan. The Disclosure Statement also provides a summary of the key terms of the Plan. YOU ARE URGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT WITH CARE IN EVALUATING HOW THE PLAN WILL AFFECT YOUR CLAIM(S) BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.*

*Amendments to the Plan since the date of the Disclosure Statement have made the Plan more favorable for holders of Talc Personal Injury Claims and would not reasonably be expected to alter the vote of any such holder who has voted to accept the Plan.*

*Nothing in the Plan or the other Plan Documents constitutes an admission by the Debtor as to the existence, merits, or amount of the Debtor's actual present or future liability on account of any Claim or demand (including any Talc Personal Injury Demand) except to the extent that such liability is specifically provided for in the Plan or the other Plan Documents in accordance with the Confirmation Order effective as of the Effective Date.*

# ARTICLE I
## DEFINITIONS AND RULES OF INTERPRETATION

1.1    <u>Terms</u>.  The capitalized terms used herein have the respective meanings set forth below.  Any term that is not otherwise defined in this <u>Section 1.1</u>, but that is defined elsewhere in the Plan or in the Bankruptcy Code or Bankruptcy Rules, shall have the meaning given to that term in the Plan, the Bankruptcy Code, or Bankruptcy Rules, as applicable.  For the avoidance of doubt, the uncapitalized terms "affiliate," "claim," "demand," "entity," "governmental unit," and "lien" have the meanings given to them in sections 101(2), 101(5), 524(g)(5), 101(15), 101(27), and 101(37) of the Bankruptcy Code, respectively.

1.1.1    "**2021 Chapter 11 Case**" means the chapter 11 case of LLT that was commenced on October 14, 2021, and subsequently dismissed on April 4, 2023.

1.1.2    "**2021 Corporate Restructuring**" means, collectively, the transactions comprising the corporate restructuring of Old JJCI that was completed on October 12, 2021, as part of which (a) Old JJCI ceased to exist and (b) LLT and Holdco were formed.

1.1.3    "**2023 Chapter 11 Case**" means the chapter 11 case of LLT that was commenced on April 4, 2023, and subsequently dismissed on August 11, 2023.

1.1.4    "**2023 Conversion**" means the conversion of LLT from a North Carolina limited liability company to a Texas limited liability company that occurred on December 29, 2023.

1.1.5    "**2023 Funding Agreement Modifications**" means the transactions contemplated by that certain Termination and Substitution Agreement, dated April 4, 2023, executed by J&J, Holdco, and LLT.

1.1.6    "**Acceptance and Release**" means the document pursuant to which the holder of a compensable Channeled Talc Personal Injury Claim accepts an offer from the

Talc Personal Injury Trust for payment of such Channeled Talc Personal Injury Claim and provides releases, including releases of the Reorganized Debtor, J&J, the other Debtor Corporate Parties, and the other Protected Parties, required as a condition of such payment pursuant to the Trust Distribution Procedures, which document shall be in form and substance acceptable to the Debtor and J&J.

1.1.7    "**Administrative Claim**" means any Claim for any cost or expense of administration of the Chapter 11 Case under section 503(b) of the Bankruptcy Code, including:  (a) any actual and necessary post-petition cost or expense of preserving the Estate or operating the business of the Debtor; (b) Cure Amount Claims; (c) post-petition costs, indebtedness or contractual obligations duly and validly incurred or assumed by the Debtor in the ordinary course of business; (d) any Fee Claim, including any Claim for compensation or reimbursement of expenses of Professionals to the extent allowed by the Bankruptcy Court under sections 327, 328, 330(a), 331, or 503(b) of the Bankruptcy Code or the provisions of the Plan; and (e) any fee or charge assessed against the Estate under 28 U.S.C. § 1930(6).

1.1.8    "**Administrative Claims Bar Date**" means the applicable deadline for filing requests for payment of Administrative Claims (other than Fee Claims and Cure Amount Claims) and shall be the Business Day that is sixty (60) days after the Effective Date.

1.1.9    "**Adverse SCOTUS Ruling**" means, in the event that the United States Court of Appeals for the Fifth Circuit fully affirms the Confirmation Order, a petition for certiorari is timely filed with the United States Supreme Court with respect to such affirmation of the Confirmation Order, and the United States Supreme Court grants such petition for certiorari, any ruling by the United States Supreme Court that does not fully affirm the Confirmation Order and is determined by the Reorganized Debtor and J&J, in their sole discretion, to be adverse to the intents, purposes, or effects of the Plan or Confirmation Order.

1.1.10    "**Affiliate**" means, with respect to any specified entity:  (a) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified entity; or (b) any other Person that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by, or is under common control with the specified entity. As used in clause (b) of the prior sentence, "control" shall include the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified entity (whether through the ownership of equity, by contract or otherwise).

1.1.11    "**AHC of Supporting Counsel**" means the Ad Hoc Committee of Supporting Counsel, including (a) Andrews & Thornton, Attorneys At Law, a Law Corporation, (b) Pulaski Kherkher, PLLC, (c) Watts Law Firm LLP, (d) OnderLaw, LLC, (e) Nachawati Law Group, PLLC, (f) Aylstock, Witkin, Kreis & Overholtz PLLC, and (g) Slater Slater Schulman LLP, formed to advance the common interests of the law firms representing certain holders of Channeled Talc Personal Injury Claims.

2

1.1.12    "**Allowed**" means, as to any Non-Talc Claim or Interest, that such Non-Talc Claim or Interest is (a) expressly allowed under the Plan, (b) not Disputed, (c) either allowed or determined by a Final Order of a court of competent jurisdiction, or (d) agreed to by the Debtor or Reorganized Debtor and the holder of such Claim or Interest; *provided*, *however*, that, notwithstanding the foregoing, the Allowed amount of Non-Talc Claims shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable.

1.1.13    "**Allowed Amount**" means, with respect to any Non-Talc Claim, the amount for which that Claim is Allowed, denominated in U.S. dollars.

1.1.14    "**Amended Articles of Organization**" means the amended and restated articles of organization of the Reorganized Debtor, in substantially the form of Exhibit A.

1.1.15    "**Amended Charter Documents**" means, collectively, the Amended Articles of Organization and the Amended Operating Agreement.

1.1.16    "**Amended Operating Agreement**" means the amended and restated operating agreement of the Reorganized Debtor, in substantially the form of Exhibit B.

1.1.17    "**Bankruptcy Code**" means title 11 of the United States Code, as in effect on the Petition Date or thereafter amended with retroactive applicability to the Chapter 11 Case.

1.1.18    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Case or, to the extent of the withdrawal of the reference under section 157 of title 28 of the United States Code, the District Court.

1.1.19    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any local rules of the Bankruptcy Court, as in effect on the Petition Date, together with any and all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Case.

1.1.20    "**Business Day**" means any day other than a Saturday, a Sunday, or any other day on which banking institutions in Dallas, Texas, are authorized or required by law or executive order to close.

1.1.21    "**Bynum Proceeding**" means the legal proceedings commenced by the class action complaint filed on June 17, 2024, in the United States District Court for the District of New Jersey, Case Number 3:24-cv-07065, by Joni S. Bynum, Robin Coburn, and James Coburn, both individually and on behalf of a proposed class, against, among others, LLT and J&J, and all claims, causes of action, and requests for relief asserted therein.

3

1.1.22    "**Cash**" means lawful currency of the United States of America and its equivalents.

1.1.23    "**Cash Contributions**" means Cash to be delivered to the Talc Personal Injury Trust in the amounts and on the dates set forth on Exhibit C.

1.1.24    "**Cash Contributions Guarantee**" means the guarantee, in substantially the form of Exhibit D, to be executed and delivered by J&J and New Holdco for the benefit of the Talc Personal Injury Trust, pursuant to which each of J&J and New Holdco will guarantee the timely delivery of the Cash Contributions.

1.1.25    "**Channeled Indirect Talc Personal Injury Claims**" means all Indirect Talc Personal Injury Claims that are not Defense Cost Claims.

1.1.26    "**Channeled Talc Personal Injury Claims**" means all Talc Personal Injury Claims that are not Defense Cost Claims, including (a) Ovarian/Gynecological Talc Personal Injury Claims and (b) Other Disease Talc Personal Injury Claims.

1.1.27    "**Channeling Injunction**" means the permanent injunction provided for in Section 11.3.1 with respect to Channeled Talc Personal Injury Claims to be issued pursuant to the Confirmation Order.

1.1.28    "**Chapter 11 Case**" means the chapter 11 case of the Debtor pending in the Bankruptcy Court.

1.1.29    "**Claim**" shall have the meaning ascribed to such term in section 101(5) of the Bankruptcy Code as it pertains to "claims" against the Debtor.

1.1.30    "**Claims Agent**" means Epiq Corporate Restructuring, LLC.

1.1.31    "**Class**" means a category of holders of Claims or Interests described in Article III.

1.1.32    "**Clerk**" means the clerk of the Bankruptcy Court.

1.1.33    "**Compensation Procedures Order**" means any order of the Bankruptcy Court establishing procedures for interim compensation and reimbursement and expenses of Retained Professionals.

1.1.34    "**Confirmation**" means the entry of the Confirmation Order on the docket of the District Court.

1.1.35    "**Confirmation Date**" means the date on which the District Court enters the Confirmation Order on its docket.

1.1.36    "**Confirmation Hearing**" means, collectively, the hearing or hearings held by the Bankruptcy Court or the District Court on Confirmation of the Plan, as such hearing or hearings may be continued from time to time.

4

1.1.37    "**Confirmation Order**" means:  (a) the order of the Bankruptcy Court and the District Court acting jointly or (b) the order of the District Court affirming an order entered separately by the Bankruptcy Court; in either case, which order confirms the Plan pursuant to section 1129 of the Bankruptcy Code.

1.1.38    "**Contribution Claim**" means any and all rights of a Talc Insurance Company that is not a Settling Talc Insurance Company, whether legal, equitable, contractual, or otherwise, of contribution, indemnity, reimbursement, subrogation, or other similar claims directly or indirectly arising out of or in any way relating to such insurer's payment of loss on behalf of the Debtor in connection with any Channeled Talc Personal Injury Claim.

1.1.39    "**Cooperation Agreement**" means a Cooperation Agreement among the Reorganized Debtor, J&J, the Talc Personal Injury Trust, and the Custodians in substantially the form of Exhibit E.

1.1.40    "**Cure Amount Claim**" means a Claim based on the Debtor's defaults pursuant to an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtor under section 365 of the Bankruptcy Code (but, if the provisions of Section 4.9.3 and Section 5.9.1 are applicable, excluding any Claim arising out of an alleged breach, default, or violation under any Imerys/Cyprus Agreement whether or not such agreement is determined by court order to be an Executory Contract).

1.1.41    "**Custodians**" has the meaning set forth in the Cooperation Agreement.

1.1.42    "**Cyprus**" means Cyprus Mines Corporation.

1.1.43    "**Date of First Diagnosis**" means, with respect to a Direct Talc Personal Injury Claim, the date on which the relevant injured or deceased individual received the original pathologic diagnosis for Ovarian Cancer or Gynecological Cancer alleged to have been caused by her use of products containing talcum powder that were formulated, manufactured, distributed, and/or sold by the Debtor and/or any Debtor Corporate Party, including Johnson's Baby Powder and Johnson & Johnson's Shower to Shower.

1.1.44    "**Debtor**" means Red River Talc LLC, a Texas limited liability company and a successor to Old JJCI and LLT.

1.1.45    "**Debtor Corporate Parties**" means J&J and all of its current and former Affiliates, including all Persons listed on Schedule 1, other than (a) the Debtor and (b) as applicable, Imerys, Cyprus, and their respective Affiliates.

1.1.46    "**Defense Cost Claim**" means any Indirect Talc Personal Injury Claim to the extent in respect of legal fees or other out-of-pocket costs incurred in connection with the defense of claims.  For the avoidance of doubt, if the provisions of Section 4.9.3 and Section 5.9.1 are applicable, Defense Cost Claims include any such Indirect Talc Personal Injury Claims of the Imerys/Cyprus Parties under any Imerys/Cyprus Agreement or otherwise.

NAI-1539839717

1.1.47 "**Direct Talc Personal Injury Claim**" means a Talc Personal Injury Claim that is asserted by or on behalf of: (a) an injured individual; (b) the estate, legal counsel, relative, assignee, or other representative of an injured or deceased individual; or (c) an individual who claims injury or damages as a result of the death or injury of another individual caused by talc or a product or material containing talc. For the avoidance of doubt, Direct Talc Personal Injury Claims include claims and demands for: (i) loss of consortium; (ii) loss of companionship, services, or society; or (iii) wrongful death.

1.1.48 "**Disallowed**" means, as to any Non-Talc Claim, that such Non-Talc Claim is denied, dismissed, expunged, overruled, or disallowed in whole or in part (but solely to the extent of the disallowance) by Final Order or under the Plan.

1.1.49 "**Disbursing Agent**" means the Reorganized Debtor, or such other Person or Persons chosen by the Debtor or the Reorganized Debtor to make or facilitate Distributions pursuant to the Plan.

1.1.50 "**Discharge Injunction**" means the injunction issued in accordance with sections 524 and 1141 of the Bankruptcy Code and contained in <u>Section 11.1.2</u>.

1.1.51 "**Disclosure Statement**" means the *Disclosure Statement for Prepackaged Chapter 11 Plan of Reorganization of the Debtor*, dated June 3, 2024, used by LLT to solicit votes to accept or reject the Plan for and on behalf of the Debtor, including all exhibits and schedules thereto, as such disclosure statement may be amended, modified, or supplemented from time to time.

1.1.52 "**Disputed**" means, as to any Non-Talc Claim (or any portion thereof), that such Non-Talc Claim (or portion thereof) is not Allowed or Disallowed pursuant to the Plan or a Final Order of the Bankruptcy Court, or is contingent or unliquidated.

1.1.53 "**Distributions**" means Cash, property, or interest in property to be paid or delivered hereunder to holders of Allowed Non-Talc Claims under the terms of the Plan.

1.1.54 "**Distribution Date**" means the date which is as soon as reasonably practicable after (a) the Effective Date or (b) in the case of any Non-Talc Claim (other than a Reinstated Non-Talc Claim) that is not yet Allowed as of the Effective Date, the date such Non-Talc Claim becomes Allowed.

1.1.55 "**Distribution Record Date**" means the record date for determining an entitlement to receive Distributions under the Plan on account of Allowed Non-Talc Claims (other than Reinstated Non-Talc Claims), which shall be the Confirmation Date.

1.1.56 "**District Court**" means the United States District Court for the [●] District of Texas.

1.1.57 "**Docket**" means the docket in the Chapter 11 Case maintained by the Clerk.

1.1.58    "**Effective Date**" means the Business Day upon which all of the conditions precedent to the occurrence of the Effective Date contained in Section 8.2 have been satisfied or waived pursuant to Section 8.3.

1.1.59    "**Encumbrance**" means, with respect to any property (whether real or personal, tangible or intangible), any mortgage, lien, pledge, charge, security interest, assignment or encumbrance of any kind or nature in respect of such property (including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction) to secure payment of a debt or performance of an obligation.

1.1.60    "**Equity Interests in the Debtor**" means the Interests issued by the Debtor.

1.1.61    "**Estate**" means the estate created in the Chapter 11 Case under section 541 of the Bankruptcy Code.

1.1.62    "**Exculpated Parties**" means, collectively, (a) the Debtor's officers and managers who served at any time, whether before, on, or after the Petition Date, prior to the Effective Date of the Plan (each solely in their capacity as such); (b) the Debtor; (c) the TCC and each of the members thereof, solely in his or her capacity as such; (d) the FCR, solely in her capacity as such; (e) the Retained Professionals; (f) solely as to conduct found by a court of competent jurisdiction to have been undertaken while acting as a fiduciary of the Debtor or the Estate, the employees of the Debtor or other individuals providing similar services to the Debtor (other than the Debtor's officers and managers), and the employees of the Retained Professionals, each solely in their capacities as such; and (g) counsel to the individual members of the TCC, each solely in their capacity as such; *provided*, *however* that the Bankruptcy Court is not determining the fiduciary status of any employees of the Debtor or other individuals providing similar services to the Debtor (other than the Debtor's officers and managers), or any employees of any of the Retained Professionals or counsel to the individual members of the TCC. Nothing herein shall shift the burden of the employees of the Debtor or other individuals providing similar services to the Debtor (other than the Debtor's officers and managers), and the employees of the Retained Professionals or counsel to the individual members of the TCC, to establish that they were fiduciaries of the Debtor or the Estate prior to the Effective Date of the Plan.

1.1.63    "**Exculpation Injunction**" means the injunction described in Section 11.6.1.

1.1.64    "**Executory Contract**" means any executory contract as to which the Debtor is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.1.65    "**Existing Direct Claims**" means all Channeled Talc Personal Injury Claims that are Direct Talc Personal Injury Claims with a Date of First Diagnosis prior to the Petition Date.

1.1.66    "**Expense Funding Agreement**" means that certain Second Amended and Restated Funding Agreement, dated September 19, 2024, by and between New Holdco, as payor, and the Debtor, as payee, pursuant to which New Holdco is obligated to provide funds for the payment by Debtor or the Reorganized Debtor of, among other things, costs and expenses incurred during the pendency of the Chapter 11 Case, including the costs of administering the Chapter 11 Case, on and subject to the terms thereof, as the same is amended or amended and restated from time to time.

1.1.67    "**FCR**" means Randi S. Ellis (or any Bankruptcy Court-appointed successor), in her capacity as the legal representative for any and all persons who may assert Talc Personal Injury Demands in the future, but who are currently unknown.  "FCR" stands for Future Claimants' Representative.

1.1.68    "**Fee Claim**" means any Claim of:  (a) a Professional for allowance of compensation and reimbursement of costs and expenses; or (b) a member of the TCC for reimbursement of costs and expenses, in each case incurred in the Chapter 11 Case on or before the Effective Date.

1.1.69    "**Final Confirmation Order**" means a Confirmation Order which has not been reversed, vacated, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or, if an appeal, new trial, reargument, or rehearing thereof has been sought, such Confirmation Order shall have been fully affirmed by the United States Court of Appeals for the Fifth Circuit or a new trial, reargument, or rehearing shall have been denied with prejudice or resulted in no modification of such Confirmation Order or has otherwise been dismissed with prejudice, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that (a) a petition for certiorari timely filed with the United States Supreme Court with respect to such affirmation of the Confirmation Order shall not cause such Confirmation Order to not be a Final Confirmation Order and (b) the possibility that a motion pursuant to section 1144 of the Bankruptcy Code or any analogous rule under the Bankruptcy Rules may be filed with respect to such Confirmation Order shall not cause such Confirmation Order to not be a Final Confirmation Order.

1.1.70    "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, vacated, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or, if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which the order or judgment was appealed or certiorari shall have been denied or a new trial, reargument, or rehearing shall have been denied with prejudice or resulted in no modification of such order or judgment or has otherwise been dismissed with prejudice, and the time to take any further appeal, petition for certiorari, or move for a new

8

trial, reargument, or rehearing shall have expired; *provided*, *however*, that the possibility that a motion pursuant to section 1144 of the Bankruptcy Code or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order to not be a Final Order.

1.1.71    "**Funding Agreements**" means, collectively, the Expense Funding Agreement and the Indemnity Funding Agreement.

1.1.72    "**Gynecological Cancer**" means any cancer of the female gynecologic tract that is not an Ovarian Cancer.

1.1.73    "**Holdco**" means the former Texas limited liability company named J&J Holdco (NA) LLC, which, as part of the Prepetition Corporate Restructuring, (a) was converted from a New Jersey corporation to a Texas limited liability company and, in connection therewith, changed its name from Johnson & Johnson Holdco (NA) Inc. to J&J Holdco (NA) LLC and (b) following such conversion, ceased to exist pursuant to a divisional merger thereof, including all names and historical forms thereof.

1.1.74    "**Imerys**" means Imerys Talc America, Inc.

1.1.75    "**Imerys/Cyprus Agreements**" means those contracts and/or agreements setting forth certain Imerys/Cyprus Related Rights, including as applicable: (a) that certain Agreement between Cyprus Mines Corporation and Johnson & Johnson, dated as of January 6, 1989; (b) that certain Talc Supply Agreement between Windsor Minerals Inc. and Johnson & Johnson Baby Products Company, a division of Johnson & Johnson Consumer Products, Inc., dated as of January 6, 1989; (c) that certain Supply Agreement between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of April 15, 2001; (d) that certain Material Purchase Agreement between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2010; and (e) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2011.

1.1.76    "**Imerys/Cyprus Defenses**" means any and all rights and defenses that any Imerys/Cyprus Party may have under any Imerys/Cyprus Agreement or applicable law with respect to a claim for contribution, reimbursement, subrogation, or indemnification in respect of Channeled Talc Personal Injury Claims, but Imerys/Cyprus Defenses do not include (a) any defense that the Plan or any other Plan Document does not comply with the Bankruptcy Code or (b) any defense that the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.3, or any other action contemplated by Section 4.9.3, is prohibited by the Imerys/Cyprus Agreements or applicable non-bankruptcy law.

1.1.77    "**Imerys/Cyprus Parties**" means all Persons listed on Schedule 2.

1.1.78    "**Imerys/Cyprus Related Rights**" means any and all rights of contribution, reimbursement, subrogation, or indemnification that the Debtor, the Reorganized Debtor, or J&J has against any Imerys/Cyprus Party in respect of Channeled

Talc Personal Injury Claims under any Imerys/Cyprus Agreement or any applicable law or order or otherwise.

1.1.79    "**Imerys/Cyprus Settlement**" means the settlement and release of disputes between LLT (or the Debtor as successor to LLT) and J&J, on the one hand, and Imerys, Cyprus, and their respective Affiliates, on the other hand, pursuant to the Imerys/Cyprus Settlement Agreement.

1.1.80    "**Imerys/Cyprus Settlement Agreement**" means the Settlement Agreement and Release, dated as of July 13, 2024, by and among the Debtor (as successor to LLT and Holdco), J&J, and Imerys, Cyprus, and their respective Affiliates that are parties thereto, as the same may be amended or amended and restated from time to time.

1.1.81    "**Imerys/Cyprus Settlement Closing Date**" means the date, if any, on which the Imerys/Cyprus Settlement is consummated and becomes fully effective.

1.1.82    "**Imerys/Cyprus Settlement Termination Date**" means the date, if any, on which the Imerys/Cyprus Settlement Agreement is terminated in accordance with its terms.

1.1.83    "**Impaired**" means, as to any Claim, Class of Claims, or Interest, that such Claim, Class of Claims, or Interest is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.1.84    "**Indemnity Cost Funding Agreement**" means that certain Second Amended and Restated Funding Agreement, dated September 19, 2024, by and between New Holdco, as payor, and the Debtor, as payee, pursuant to which New Holdco is obligated to provide funds for the payment by the Debtor or Reorganized Debtor of, among other things, the Cash Contributions pursuant to the Plan, on and subject to the terms thereof, as the same may be amended or amended and restated from time to time.

1.1.85    "**Indirect Talc Personal Injury Claim**" means a Talc Personal Injury Claim for contribution, reimbursement, subrogation, or indemnity (as those terms are defined by applicable non-bankruptcy law of the relevant jurisdiction), whether contractual or implied by law, and any other indirect Talc Personal Injury Claim, whether in the nature of or sounding in contract, tort, warranty, or other theory of law.  For the avoidance of doubt: (a) if the provisions of Section 4.9.3 and Section 5.9.1 are applicable, Indirect Talc Personal Injury Clams include any Talc Personal Injury Claim of any Imerys/Cyprus Party for contribution, reimbursement, subrogation, or indemnity under any Imerys/Cyprus Agreement or any applicable law or order or otherwise and any Talc Personal Injury Claim by any Imerys/Cyprus Party for any damages, including incidental, consequential, or indirect damages (including lost benefits, loss of enterprise value, diminution in value, or loss of goodwill), under or in connection with any Imerys/Cyprus Agreement or any applicable law or order, whether based on an alleged breach, default, or violation thereof or any other legal theory (which shall include any Claim for cure arising out of any alleged breach, default, or violation under any Imerys/Cyprus Agreement at the time such Imerys/Cyprus Agreement is assumed by the Debtor under section 365 of the Bankruptcy

10

Code); and (b) Indirect Talc Personal Injury Claims do not include (i) any Direct Talc Personal Injury Claim, regardless of whether such claim is seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs or damages, or any legal, equitable, or other relief whatsoever, including pursuant to a settlement, judgment, or verdict, or (ii) if the provisions of <u>Section 4.9.3</u> and <u>Section 5.9.1</u> are applicable, any claim against any Imerys/Cyprus Party based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights.

1.1.86    "**<u>Injunctions</u>**" means the Discharge Injunction, the Channeling Injunction, the Insurance Entity Injunction, the Release Injunction, the Exculpation Injunction, and any other injunctions entered by the Bankruptcy Court or the District Court in connection with Confirmation of the Plan.

1.1.87    "**<u>Insurance Entity Injunction</u>**" means the injunction described in <u>Section 11.3.2</u>.

1.1.88    "**<u>Intercompany Claim</u>**" means any Claim (including Claims related to setoff rights) held against the Debtor by any Affiliate of the Debtor.

1.1.89    "**<u>Interest</u>**" means the rights of any holder of the equity of the Debtor and the rights of any Person to purchase or demand the issuance of any equity of the Debtor, including:  (a) redemption, conversion, exchange, voting, participation, and distribution rights; (b) liquidation preferences; and (c) any option and warrant rights.

1.1.90    "**<u>Internal Revenue Code</u>**" means title 26 of the United States Code, 26 U.S.C. §§ 1 *et seq.*, as in effect on the Petition Date, together with all amendments, modifications, and replacements of the foregoing as the same may exist on any relevant date to the extent applicable to the Chapter 11 Case.

1.1.91    "**<u>IRS</u>**" means the Internal Revenue Service of the United States of America.

1.1.92    "**<u>J&J</u>**" means Johnson & Johnson, a New Jersey corporation.

1.1.93    "**<u>Judgment Claim</u>**" means any Direct Talc Personal Injury Claim that has been adjudicated in state or federal court and resulted in the entry prior to the Effective Date of a judgment in favor of the holder of such Direct Talc Personal Injury Claim, whether such judgment was final and non-appealable or remained subject to appeal as of the Effective Date.

1.1.94    "**<u>LLT</u>**" means the former Texas limited liability company named LLT Management LLC, which, as part of the Prepetition Corporate Restructuring, ceased to exist pursuant to a merger thereof with and into Holdco, with Holdco as the surviving entity, including all names and historical forms thereof.

1.1.95    "**<u>Love Proceeding</u>**" means the legal proceedings commenced by the class action complaint filed on May 22, 2024, in the United States District Court for the District of New Jersey, Case Number 3:24-cv-06320, by Rebecca Love, D.D.S., Sharon

Murphy, William A. Henry, Alishia Gayle Davis, and Brandi Carl, both individually and on behalf of a proposed class, against, among others, LLT and J&J, and all claims, causes of action, and requests for relief asserted therein.

1.1.96    "**Lung Cancer**" means a primary lung cancer (i.e., a lung cancer that originates in the lungs and is unrelated to any previous cancer as opposed to a lung cancer that has spread to the lungs from another part of the body).

1.1.97    "**Master Settlement Agreement Claims**" means Direct Talc Personal Injury Claims that are entitled to be considered for settlement and, if such Direct Talc Personal Injury Claims qualify for settlement, settled under the Master Settlement Agreements.

1.1.98    "**Master Settlement Agreements**" means those certain master settlement agreements, dated on or before the Petition Date, executed by LLT, J&J, and law firms representing certain holders of Talc Personal Injury Claims, pursuant to which Talc Personal Injury Claims may be considered for settlement and, if such Talc Personal Injury Claims qualify for settlement, settled, as such agreements may have been and may be amended, modified, or supplemented pursuant to the terms thereof.

1.1.99    "**Mesothelioma**" means the type of cancer that develops from the mesothelium, i.e., the thin layer of tissue that covers certain internal organs including the pleural, peritoneal, and pericardial cavities.

1.1.100    "**New Holdco**" means Johnson & Johnson Holdco (NA) Inc. (formerly named J&J Intermediate Holding Corp.), a New Jersey corporation that was formed as part of the Prepetition Corporate Restructuring and owns 100% of the membership interests in the Debtor as a result of the Prepetition Corporate Restructuring.

1.1.101    "**Non-Talc Claim**" means any Claim that is not a Talc Personal Injury Claim.

1.1.102    "**Old JJCI**" means the former Texas limited liability company named Chenango Zero LLC, which, as part of the 2021 Corporate Restructuring, (a) was the surviving entity in a merger with Johnson & Johnson Consumer Inc., a New Jersey corporation, and (b) following such merger, ceased to exist pursuant to a divisional merger thereof, including all names and historical forms thereof.

1.1.103    "**Ordinary Course Professionals Order**" means any order of the Bankruptcy Court authorizing the retention and compensation of Professionals utilized by the Debtor in the ordinary course of business.

1.1.104    "**Other Disease Talc Personal Injury Claim**" means any Direct Talc Personal Injury Claim that alleges that the relevant injured or deceased individual developed a disease other than Mesothelioma, Lung Cancer, Ovarian Cancer, or Gynecological Cancer (and not Mesothelioma, Lung Cancer, Ovarian Cancer, or Gynecological Cancer) in connection with such individual's use of talc or a product or material containing talc.

NAI-1539839717

1.1.105   "**Ovarian Cancer**" means epithelial cancer that originates in the ovaries, fallopian tubes, and/or peritoneum, with: (a) serious, endometrioid, clear cell, or undifferentiated subtype; or (b) a mixture of subtypes that includes one or more of the subtypes specified in the immediately preceding clause (a).

1.1.106   "**Ovarian/Gynecological Cancer Talc Personal Injury Claim**" means any Direct Talc Personal Injury Claim that alleges that the relevant injured or deceased individual developed Ovarian Cancer or Gynecological Cancer (and not Mesothelioma, Lung Cancer, or any other disease) in connection with such individual's use of talc or a product or material containing talc.

1.1.107   "**Person**" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit, or other entity.

1.1.108   "**Petition Date**" means the date on which the Debtor files its petition for relief under chapter 11 of the Bankruptcy Code commencing the Chapter 11 Case.

1.1.109   "**Plan**" means this *Amended Prepackaged Chapter 11 Plan of Reorganization of the Debtor*, as the same may be amended or modified from time to time pursuant to section 1127 of the Bankruptcy Code.

1.1.110   "**Plan Documents**" means the Plan, the Disclosure Statement, and all of the exhibits and schedules attached to any of the foregoing (including, for the avoidance of doubt, the Talc Personal Injury Trust Documents and the Cooperation Agreement).

1.1.111   "**Plan Supplement**" means any documents or forms of documents related to the Plan that have been delivered to the parties to which the Disclosure Statement was delivered, each of which shall be in form and substance reasonably acceptable to LLT and J&J, as such documents or forms of documents may be amended, modified, or supplemented before the Effective Date. Any Plan Supplement will be distributed to the same parties and in the same manner as the Disclosure Statement at least twenty-eight (28) days prior to the deadline for the submission of votes on the Plan. A copy of any Plan Supplement will also be available for review on the Claims Agent's website free of charge at https://dm.epiq11.com/redrivertalc.

1.1.112   "**Postpetition Interest**" means, for the period following the Petition Date: (a) interest at the rate set forth in the contract or other applicable document between the holder of a Claim and the Debtor giving rise to such holder's Claim, but excluding, for the avoidance of doubt, interest at any default rate; (b) if no such rate exists, interest at the federal judgment rate; or (c) such interest, if any, as otherwise agreed to by the holder of a Claim and the Debtor.

1.1.113   "**Prepetition Corporate Restructuring**" means, collectively, the transactions comprising the corporate restructuring of LLT and Holdco that was undertaken and completed on August 19, 2024, as part of which (a) LLT and Holdco ceased to exist and (b) the Debtor and New Holdco were formed.

13

1.1.114    "**Priority Non-Tax Claim**" means any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

1.1.115    "**Priority Tax Claim**" means any Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

1.1.116    "**Professional**" means any Person retained or to be compensated pursuant to sections 327, 328, 330, 363(b), 503(b), 524(g)(4)(B)(i), or 1103 of the Bankruptcy Code, including any professional retained by the TCC or the FCR.

1.1.117    "**Proof of Claim**" means any proof of claim filed with the Bankruptcy Court or the Claims Agent pursuant to section 501 of the Bankruptcy Code and Bankruptcy Rules 3001 or 3002 that asserts a Claim against the Debtor.

1.1.118    "**Protected Party**" means any and all of the following:

(a)    the Debtor and its Representatives;

(b)    the Reorganized Debtor and its Representatives;

(c)    the Debtor Corporate Parties and their respective Representatives;

(d)    the Settling Talc Insurance Companies;

(e)    any and all Persons listed on Schedule 3, each of which is a third-party retailer that sold Old JJCI's talc-containing products or a third party to which the Debtor has contractual indemnification obligations relating to Old JJCI's talc-containing products;

(f)    if (i) the Imerys/Cyprus Settlement Agreement has not been fully executed prior to or on the Effective Date, (ii) the Imerys/Cyprus Settlement Agreement has been fully executed prior to or on the Effective Date and the Imerys/Cyprus Settlement Termination Date has occurred prior to or on the Effective Date, or (iii) the Imerys/Cyprus Settlement Agreement has been fully executed prior to or on the Effective Date and neither the Imerys/Cyprus Settlement Termination Date nor the Imerys/Cyprus Settlement Closing Date has occurred prior to or on the Effective Date, the Imerys/Cyprus Parties; *provided*, *however*, that, in the case of clause (iii), only so long as the Imerys/Cyprus Settlement Closing Date has not occurred;

(g)    Persons that, pursuant to the Plan or on or after the Effective Date, become a direct or indirect transferee of, or successor to, any assets of the Debtor or the Reorganized Debtor, or the Talc Personal Injury Trust, but only to the extent that liability is asserted to exist by reason of such Person becoming such a transferee or successor;

(h)    Persons that, pursuant to the Plan or on or after the Effective Date, make a loan to the Debtor or the Reorganized Debtor, or the Talc Personal Injury Trust, or to a successor to, or transferee of, any assets of the Debtor or the Reorganized Debtor, or

NAI-1539839717

the Talc Personal Injury Trust, but only to the extent that liability is asserted to exist by reason of it becoming such a lender; and

(i)      Persons that are alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the Debtor or the Reorganized Debtor, or the Talc Personal Injury Trust, to the extent that such alleged liability arises by reason of one or more of the following:

(i)      such Person's ownership of a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of a Debtor or Reorganized Debtor, or a predecessor in interest of a Debtor or Reorganized Debtor (including Old JJCI);

(ii)      such Person's involvement in the management of the Debtor or the Reorganized Debtor or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI);

(iii)      such Person's service as an officer, manager, or employee of the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), or a Person that owns or at any time has owned a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI); and

(iv)      such Person's involvement in a transaction changing the corporate structure (including the 2021 Corporate Restructuring and the Prepetition Corporate Restructuring), or in a loan or other financial transaction affecting the financial condition, of the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), or a Person that owns or at any time has owned a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), including (A) involvement in providing financing (debt or equity) or advice to a Person involved in such a transaction or (B) acquiring or selling a financial interest in any Person as a part of such transaction.

1.1.119      "**Recovery Actions**" means, collectively and individually, preference actions, fraudulent conveyance actions, and other claims or causes of action under sections 510, 544, 547, 548, 549, 550, and 553(b) of the Bankruptcy Code and other similar state law claims and causes of action.

1.1.120    "**Reinstated**" or "**Reinstatement**" means, with respect to Claims and Interests, the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

1.1.121    "**Reinstated Non-Talc Claims**" means, collectively, all Secured Claims, Unsecured Claims, and Intercompany Claims.

1.1.122    "**Release Injunction**" means the injunction described in Section 11.2.3.

1.1.123    "**Released Parties**" means each of:  (a) the Debtor; (b) the Reorganized Debtor; (c) the Debtor Corporate Parties; and (d) to the fullest extent permitted by applicable law, with respect to each of the foregoing Persons in clauses (a)-(c), each such Person's Representatives.

1.1.124    "**Releasing Claim Holder**" means a holder of a Channeled Talc Personal Injury Claim.

1.1.125    "**Reorganized Debtor**" means the Debtor on and after the Effective Date.

1.1.126    "**Reorganized Debtor Payment Default**" means the failure by the Reorganized Debtor to pay when due any amount owed under the Talc PI Note.

1.1.127    "**Reorganized Debtor Payment Event of Default**" means a Reorganized Debtor Payment Default that is not remedied within thirty (30) days after the Reorganized Debtor has received written notice of such Reorganized Debtor Payment Default from the Talc Personal Injury Trust.

1.1.128    "**Representatives**" means, with respect to any Person, such Person's current and former:  (a) officers, directors, managers, employees, agents, and nominees; and (b) financial advisors, attorneys, accountants, investment bankers, consultants, experts, and other professionals; in each case solely in their capacity as such.

1.1.129    "**Retained Professionals**" means the professionals retained in the Chapter 11 Case by the Debtor, the TCC, or the FCR, including financial advisors, attorneys, accountants, investment bankers, and consultants.

1.1.130    "**Retained Rights of Action**" means any claims, demands, rights, and causes of action that the Debtor or its Estate may hold against any Person that are not transferred or assigned under the Plan to the Talc Personal Injury Trust, including: (a) any Recovery Actions; (b) any right of contribution, reimbursement, subrogation, or indemnification, or similar rights, that the Debtor has against any Person in respect of Talc Personal Injury Claims under contract or applicable law (other than, if the provisions of Section 4.9.3 and Section 5.9.1 are applicable, the Imerys/Cyprus Related Rights); and (c) the causes of action listed or described on Exhibit F.

1.1.131    "**Schedules**" means any schedules of assets and liabilities and statements of financial affairs of the Debtor filed on the Docket in accordance with

16

section 521 of the Bankruptcy Code, as any such schedules and statements may be amended or supplemented from time to time.

1.1.132    "**Secondment Agreement**" means that certain Amended and Restated Secondment Agreement, dated as of October 12, 2021, executed by LLT and Johnson & Johnson Services, Inc., a New Jersey corporation.

1.1.133    "**Secured Claim**" means a Claim, or any portion thereof:  (a) secured by a lien on property in which the Estate has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order, to the extent of the value of the creditor's interest in the Estate's interest in such property as determined pursuant to section 506(a) of the Bankruptcy Code; (b) subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the amount subject to setoff as determined pursuant to section 506(a) of the Bankruptcy Code; or (c) Allowed as secured pursuant to the Plan or any Final Order as a secured Claim.

1.1.134    "**Settled Talc Insurance Policy**" means any Talc Insurance Policy as to which the Talc Insurance Rights thereunder have been released pursuant to a Talc Insurance Settlement Agreement.

1.1.135    "**Settling Talc Insurance Company**" means, solely with respect to Settled Talc Insurance Policies:

(a)    any Talc Insurance Company that contributes funds, proceeds, or other consideration in respect of Channeled Talc Personal Injury Claims and is designated, with the consent of the Debtor, in the Confirmation Order as a Settling Talc Insurance Company, which shall include the Specified Settling Insurers; and

(b)    any Talc Insurance Company that contributes funds, proceeds, or other consideration in respect of Channeled Talc Personal Injury Claims and is designated as a Settling Talc Insurance Company by the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its subrogee having the exclusive right to negotiate and enter into Talc Insurance Settlement Agreements) on or after the Effective Date; *provided*, *however*, that any addition to the list of Protected Parties on or after the Effective Date does not become effective until entry of a Final Order approving the addition.

1.1.136    "**Specified Insurance Settlement Agreements**" means those certain Confidential Settlement and Release Agreements dated May [●], 2024, by and among J&J and related parties, including LLT, on the one hand, and the Specified Settling Insurers, on the other hand.

1.1.137    "**Specified Settling Insurers**" means, collectively, AIG Europe S.A. (as successor in interest to L'Union Atlantique d'Assurances S.A.), AIG Property Casualty Company (f/k/a Birmingham Fire Insurance Company of Pennsylvania), AIU Insurance Company, American International Surplus Lines Insurance Company, Granite State Insurance Company, Lexington Insurance Company, The Insurance Company of the State of Pennsylvania, National Union Fire Insurance Company of Pittsburgh, Pa, New Hampshire Insurance Company, Wellfleet New York Insurance Company (f/k/a Atlanta

17

International Insurance Company, as successor in interest to Drake Insurance Company), Starr Indemnity Liability Company (as successor in interest to Republic Insurance Company), Safety National Casualty Corporation f/k/a Safety Mutual Casualty Corporation, Berkshire Hathaway Specialty Insurance Co. (formerly known as Stonewall Insurance Co.), The Continental Insurance Company (for itself and as successor to certain policies issued by London Guarantee and Accident Company of New York and Harbor Insurance Company), ASR Schadeverzekering N.V. (as successor in interest to Assurantiekoor Van Wijk & Co.), Rheinland Versicherungen (as successor in interest only to the subscriptions of the former Dutch Company Rheinland Verzekeringen), and N.V. Schadeverzekeringsmaatschappij Maas Lloyd (individually and as successor in interest to policies subscribed in favor of J&J by N.V. Rotterdamse Assurantiekas,  n/k/a De Ark), each solely in its capacity as a party to the Specified Insurance Settlement Agreements.

1.1.138    "**Talc In-Place Insurance Coverage**" means all of the Talc Insurance Rights under any Talc Insurance Policy that is not a Settled Talc Insurance Policy, including the right to payment or reimbursement of liability, indemnity, or defense costs incurred on or after the Effective Date arising out of or in any way relating to Channeled Talc Personal Injury Claims (other than Master Settlement Agreement Claims and Judgment Claims).

1.1.139    "**Talc Insurance Action**" means any claim, cause of action, or right of the Debtor under the laws of any jurisdiction against any Talc Insurance Company with respect to any Channeled Talc Personal Injury Claim (other than Master Settlement Agreement Claims and Judgment Claims) based on, arising out of, or in any way relating to:  (a) any such Talc Insurance Company's failure to provide coverage or otherwise pay in respect of Talc In-Place Insurance Coverage; (b) the refusal of any Talc Insurance Company to compromise and settle any such Channeled Talc Personal Injury Claim under or pursuant to any Talc Insurance Policy; (c) the interpretation or enforcement of the terms of any Talc Insurance Policy with respect to any such Channeled Talc Personal Injury Claim; (d) any conduct by a Talc Insurance Company constituting "bad faith," conduct that could give rise to extra-contractual damages, or other wrongful conduct under applicable law, in each case with respect to any such Channeled Talc Personal Injury Claim; or (e) any other dispute under, arising out of, or in any way relating to Talc In-Place Insurance Coverage or other Talc Insurance Rights.  Notwithstanding the foregoing, and for the avoidance of doubt, Talc Insurance Action shall not include any claim, cause of action, or right of the Debtor under the laws of any jurisdiction against any Talc Insurance Company with respect to amounts expended prior to the Effective Date.

1.1.140    "**Talc Insurance Assets**" means (a) all Talc In-Place Insurance Coverage, (b) all Talc Insurance Actions, (c) all Talc Insurance Recoveries, and (d) all Talc Insurance Settlement Agreements entered into after the Effective Date.  Notwithstanding the foregoing, and for the avoidance of doubt, Talc Insurance Assets do not include Talc Insurance Policies themselves, any rights to coverage held by any entity other than the Debtor, any rights to coverage under Talc Insurance Policies for amounts expended prior to the Effective Date, or any rights under Talc Insurance Policies that are not related to the Debtor's coverage or rights to coverage for Channeled Talc Personal Injury Claims (excluding Master Settlement Agreement Claims and Judgment Claims).

18

1.1.141    "**Talc Insurance Company**" means any insurance company, insurance syndicate, coverholder, insurance broker or syndicate insurance broker, guaranty association, or any other Person that may have liability under a Talc Insurance Policy.

1.1.142    "**Talc Insurance Policy**" means any insurance policy, currently or previously in effect at any time on or before the Effective Date, as to which the Debtor has rights as an insured, additional insured, successor, beneficiary, or otherwise, solely to the extent such policy provides the Debtor with coverage or a right to coverage for Channeled Talc Personal Injury Claims (other than Master Settlement Agreement Claims and Judgment Claims), including the policies listed on Exhibit G.  For the avoidance of doubt, Talc Insurance Policies shall not include any policy providing reinsurance to any Settling Talc Insurance Company.

1.1.143    "**Talc Insurance Recoveries**" means (a) the right to receive proceeds of Talc In-Place Insurance Coverage (including any receivables), (b) the right to receive the proceeds or benefits of any Talc Insurance Action, and (c) the right to receive amounts payable pursuant to any Talc Insurance Settlement Agreement, in each case, except in respect of amounts expended prior to the Effective Date.

1.1.144    "**Talc Insurance Rights**" means all rights of the Debtor to make claims under the Talc Insurance Policies with respect to Channeled Talc Personal Injury Claims (other than Master Settlement Agreement Claims and Judgment Claims).  Notwithstanding the foregoing, and for the avoidance of doubt, Talc Insurance Rights do not include rights of the Debtor to make claims under the Talc Insurance Policies for amounts expended prior to the Effective Date.

1.1.145    "**Talc Insurance Settlement Agreement**" means any settlement agreement, or that portion of any settlement agreement, pursuant to which Talc Insurance Rights are released, including the Specified Insurance Settlement Agreements.

1.1.146    "**Talc Insurer Coverage Defense**" means all rights and defenses that any Talc Insurance Company may have under any Talc Insurance Policy and applicable law with respect to a claim seeking insurance coverage for a Channeled Talc Personal Injury Claim (other than a Master Settlement Agreement Claim or Judgment Claim) or to a Talc Insurance Action, but Talc Insurer Coverage Defenses do not include:  (a) any defense that the Plan or any other Plan Document does not comply with the Bankruptcy Code; or (b) any defense that the transfer and assignment of the Talc Insurance Assets to the Talc Personal Injury Trust pursuant to Section 4.9.4, or any other action contemplated by Section 4.9.4, is prohibited by the Talc Insurance Policies or applicable non-bankruptcy law.

1.1.147    "**Talc Personal Injury Claim**" means any claim or Talc Personal Injury Demand against the Debtor, LLT, Old JJCI, or any other Protected Party, whether known or unknown, including with respect to any manner of alleged bodily injury, death, sickness, disease, emotional distress, fear of cancer, medical monitoring, or any other alleged personal injuries (whether physical, emotional, or otherwise), directly or indirectly arising out of or in any way relating to the presence of or exposure to talc or talc-containing

products based on the alleged pre-Effective Date acts or omissions of the Debtor, LLT, Old JJCI, or any other Person, but, in the case of such acts or omissions of Old JJCI or any other Person (other than the Debtor) only to the extent the Debtor has, or is alleged to have, liability for LLT's, Old JJCI's, or such other Person's conduct, whether by operation of the law, by assumption of such liability from LLT, Old JJCI, or such other Person, by agreement to indemnify, defend, or hold harmless LLT, Old JJCI, or such other Person from and against such liability, or otherwise.  For the avoidance of doubt, Talc Personal Injury Claims include: (a) all such claims and Talc Personal Injury Demands directly or indirectly arising out of or in any way relating to (i) any talc or talc-containing products previously mined, processed, manufactured, designed, marketed, fabricated, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, and/or in any other way made available by the Debtor or any other Person, (ii) any talc or talc-containing materials present at any premises owned, leased, occupied, or operated by any Person, or (iii) any talc in any way connected to the Debtor alleged to contain asbestos or other contaminant; (b) all such claims and Talc Personal Injury Demands, whether (i) in tort, contract, warranty, restitution, conspiracy, guarantee, or any other theory of law, equity, or admiralty, whether brought, threatened, or pursued in any United States court or other court anywhere in the world, (ii) liquidated or unliquidated, fixed or contingent, direct or indirect, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, now existing or hereafter arising, in law, equity, or otherwise (including under piercing the corporate veil, agency, alter ego, successor liability, fraudulent conveyance, conspiracy, enterprise liability, market share, joint venture, or any other legal or equitable theory), (iii) seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs, fees, injunctive, or similar relief, or any other measure of damages, (iv) seeking any legal, equitable, or other relief of any kind whatsoever, or (v) held by Persons residing within the United States or in a foreign jurisdiction; (c) all such claims and Talc Personal Injury Demands that have been resolved or are subject to resolution pursuant to any agreement or that are based on a judgment or verdict; (d) all such claims and Talc Personal Injury Demands for compensatory damages (such as, without limitation, loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages; and (e) Indirect Talc Personal Injury Claims.  Notwithstanding the foregoing, Talc Personal Injury Claims do not include:  (A) any claim or demand by any present or former employee of a predecessor or Affiliate of the Debtor for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer; (B) any claim or demand that (I) alleges that the relevant injured or deceased individual was exposed to talc or the product or material containing talc, as applicable, in Canada or resided in Canada at the time such Direct Talc Personal Injury Claim is filed or (II) was brought, threatened, or pursued in any court in Canada; (C) any claim or demand asserted or assertable by or on behalf of any governmental unit under any federal, state, international, or foreign consumer or employee protection rule, statute, or regulation; or (D) any claim or demand that alleges that the relevant injured or deceased individual developed Mesothelioma or Lung Cancer (and not Ovarian Cancer, Gynecological Cancer, or any other disease) in connection with such individual's use of talc or a product or material containing talc; in each case, other

20

than any such claim that is an Indirect Talc Personal Injury Claim of an Imerys/Cyprus Party.  In addition, notwithstanding the foregoing, Talc Personal Injury Claims do not include any claim or demand that a Settling Talc Insurance Company may have against its reinsurers and/or retrocessionaires in their capacities as such, and nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect the ability of a Settling Talc Insurance Company to assert any such claim or demand against its reinsurers and/or retrocessionaires in their capacities as such.

1.1.148    "**Talc Personal Injury Demand**" means a demand for payment, present or future, against the Debtor or any other Protected Party that:  (a) is in respect of an injury that manifests after the Effective Date; and (b) would have otherwise been a Claim that is a Talc Personal Injury Claim if such injury had manifested on or before the Effective Date.

1.1.149    "**Talc Personal Injury Trust**" means the Red River Talc Personal Injury Trust established pursuant to the Talc Personal Injury Trust Agreement.

1.1.150    "**Talc Personal Injury Trust Agreement**" means that certain trust agreement, substantially in the form of Exhibit H.

1.1.151    "**Talc Personal Injury Trust Defenses**" means all defenses, cross-claims, offsets, and recoupments regarding Channeled Talc Personal Injury Claims that the Debtor, the Reorganized Debtor, or J&J has (or would have had absent the assumption by the Talc Personal Injury Trust of liabilities, obligations, and responsibilities for the Channeled Talc Personal Injury Claims as contemplated by Section 4.7.1) against any Person under applicable law; *provided*, *however*, that the Talc Personal Injury Trust Defenses shall not include:  (a) any defenses, cross-claims, offsets, or recoupments against any Protected Party or any Talc Insurance Company; (b) any Retained Rights of Action, or (c) if the provisions of Section 4.9.3 and Section 5.9.1 are applicable, any Imerys/Cyprus Related Rights.

1.1.152    "**Talc Personal Injury Trust Documents**" means the Talc Personal Injury Trust Agreement, the Trust Distribution Procedures, and all other agreements, instruments, and documents governing the establishment, administration, and operation of the Talc Personal Injury Trust, which shall be substantially in the form set forth as exhibits hereto or in a Plan Supplement, as they may be amended or modified from time to time in accordance with their terms and the Plan.

1.1.153    "**Talc Personal Injury Trust Expenses**" means any liabilities, costs, or expenses incurred by, imposed upon, or in respect of the Channeled Talc Personal Injury Trust once established (except for payments to holders of Talc Personal Injury Claims on account of such Claims).  Talc Personal Injury Trust Expenses shall also expressly include the reasonable documented costs and expenses incurred by the Debtor, the Reorganized Debtor, or any Debtor Corporate Party in taking any action on behalf of or at the direction of the Talc Personal Injury Trust, if any.

1.1.154     "**Talc PI Note**" means the note to be executed and delivered by the Reorganized Debtor in favor of the Talc Personal Injury Trust, in substantially the form of Exhibit I, in the principal amount of $400,000,000.00.

1.1.155     "**Talc PI Pledge**" means the pledge by New Holdco of all of the membership interests of the Reorganized Debtor pursuant to the Talc PI Pledge Agreement.

1.1.156     "**Talc PI Pledge Agreement**" means the Pledge Agreement, substantially in the form of Exhibit J, to be executed and delivered by New Holdco pursuant to which the Talc PI Pledge will be granted as security for payment of the Talc PI Note.

1.1.157     "**Talc Trust Advisory Committee**" means the committee appointed and serving in accordance with Section 4.4, and having the powers, duties, and obligations set forth in the Talc Personal Injury Trust Agreement.

1.1.158     "**Talc Trust Advisory Committee Member**" means any member of the Talc Trust Advisory Committee.

1.1.159     "**Talc Trust Claims Administrator**" means:  (a) the Person who, pursuant to Section 4.5.1, is appointed by the Bankruptcy Court to serve as the initial claims administrator of the Talc Personal Injury Trust; or (b) any Person who is subsequently appointed to serve in such capacity pursuant to the terms of the Talc Personal Injury Trust Agreement.

1.1.160     "**Talc Trust Liens Resolution Administrator**" means:  (a) the Person who, pursuant to Section 4.5.2, is appointed by the Bankruptcy Court to serve as the initial liens resolution administrator of the Talc Personal Injury Trust; or (b) any Person who is subsequently appointed to serve in such capacity pursuant to the terms of the Talc Personal Injury Trust Agreement.

1.1.161     "**Talc Trustee**" means:  (a) any individual who, pursuant to Section 4.3, is appointed by the Bankruptcy Court to serve as an initial trustee of the Talc Personal Injury Trust; or (b) any individual who is subsequently appointed to serve in such capacity pursuant to the terms of the Talc Personal Injury Trust Agreement.

1.1.162     "**TCC**" means any official committee of talc claimants appointed in the Chapter 11 Case, as such committee is reconstituted from time to time.

1.1.163     "**Trust Distribution Procedures**" means the Talc Personal Injury Trust Distribution Procedures, substantially in the form of Exhibit K.

1.1.164     "**Trust Expense Advancement Order**" means the order of the Bankruptcy Court authorizing the Debtor, prior to the Effective Date, to advance Cash that would otherwise be delivered to the Talc Personal Injury Trust on the Effective Date pursuant to Section 4.9.1(a) in order to enable set-up and claims processing work to be undertaken in advance of the Effective Date, so as to allow the Talc Personal Injury Trust to make payments in respect of compensable Channeled Talc Personal Injury Claims as

NAI-1539839717

soon as possible after the Effective Date, which order shall be in form and substance reasonably acceptable to the Debtor, J&J, the AHC of Supporting Counsel, and the FCR.

1.1.165    "**Unexpired Lease**" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.1.166    "**Unimpaired**" means, as to any Claim or Class of Claims, that such Claim or Class of Claims is not Impaired under the Plan.

1.1.167    "**United States Trustee**" means the United States Trustee appointed under section 581 of title 28 of the United States Code to serve in the Southern District of Texas.

1.1.168    "**Unsecured Claim**" means a Claim against the Debtor that is not an Administrative Claim, a Channeled Talc Personal Injury Claim, a Cure Amount Claim, an Intercompany Claim, a Priority Non-Tax Claim, a Priority Tax Claim, or a Secured Claim. For the avoidance of doubt, Unsecured Claims include Defense Cost Claims.

1.2    Interpretation; Application of Definitions; Rules of Construction; and Computation of Time.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender will include the masculine, feminine, and neuter.  Unless otherwise specified, all Article, Section, Exhibit, or Schedule references in the Plan are to the respective article or section of, or schedule or exhibit to, the Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar meaning refer to the Plan as a whole and not to any particular article, section, subsection, or clause contained in the Plan.  The rules of construction contained in section 102 of the Bankruptcy Code will apply to the construction of the Plan.  Unless otherwise stated herein, all references to dollars mean U.S. dollars.  In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) will apply.  The words "including" or "includes" shall be without limitation.

1.3    Availability of Plan and Exhibits.  The plan and all exhibits and schedules to the Plan will be available following their filing with the Bankruptcy Court on (a) the Court's website: www.ecf.txsb.uscourts.gov, and (b) the website maintained by the Claims Agent at https://dm.epiq11.com/case/redrivertalc.

1.4    Ancillary Documents.  Each of the exhibits and schedules to the Plan (including the Talc Personal Injury Trust Agreement, the Trust Distribution Procedures, and the Cooperation Agreement), the Disclosure Statement and supplements thereto, and the exhibits and schedules to the Disclosure Statement and the supplements thereto are an integral part of the Plan, and are hereby incorporated by reference and made a part of the Plan.

## ARTICLE II
## TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

2.1     Administrative Claims.

2.1.1     Allowed Administrative Claims.  Holders of Allowed Administrative Claims (other than Fee Claims, which are governed by Section 2.2, and Cure Amount Claims, which are governed by Section 5.4), shall receive Cash equal to the unpaid portion of such Allowed Administrative Claims on the Distribution Date, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims, or such other amounts and on such other terms as may be agreed to by the holders of such Claims and the Debtor or the Reorganized Debtor, as the case may be; *provided*, *however*, that: (a) Allowed Administrative Claims representing liabilities incurred on or after the Petition Date in the ordinary course of business by the Debtor shall be paid by the Debtor or the Reorganized Debtor, as the case may be, in accordance with the terms and conditions of the particular transactions and agreements relating to such liabilities without any further action by the holders of such Claims or further approval of the Bankruptcy Court; and (b) holders of such Administrative Claims shall not be required to comply with the requirements set forth in Section 2.1.2.

2.1.2     Administrative Claims Bar Date.  Except as otherwise provided in this Article II, requests for payment of Administrative Claims (other than Fee Claims and Cure Amount Claims) must be filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order no later than sixty (60) days after the Effective Date.  Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against, as applicable, the Debtor or the Reorganized Debtor, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be filed and served on the Reorganized Debtor and the requesting party, as applicable, no later than ninety (90) days after the Effective Date, unless otherwise authorized by the Bankruptcy Rules or Bankruptcy Court.   Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order, including all Administrative Claims expressly Allowed under the Plan.

2.1.3     Disputed Administrative Claims.  If and to the extent that there are Disputed Administrative Claims, any such Disputed Administrative Claims, other than Fee Claims and Cure Amount Claims which shall be resolved pursuant to the provisions of Section 2.2 and Article V, as appliable, shall be resolved pursuant to the provisions set forth in Article VII.  Distributions on account of any such Disputed Administrative Claims other than Fee Claims and Cure Amount Claims shall be made pursuant to the provisions set forth in Article VI.

NAI-1539839717

2.2     <u>Fee Claims</u>.

    2.2.1     All (a) final fee requests for compensation or reimbursement of Fee Claims pursuant to section 327, 328, 329, 330, 331, 363(b), 503(b), or 1103 of the Bankruptcy Code for services rendered to the Debtor, the TCC, or the FCR, (b) Fee Claims of members of the TCC for reimbursement of expenses, and (c) requests or Claims under section 503(b)(4) of the Bankruptcy Code, must be filed and served on the Reorganized Debtor and other parties required to be served by the Compensation Procedures Order no later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Any objections to a final Fee Claim or any requests or claims under section 503(b)(4) of the Bankruptcy Code must be filed no later than twenty (20) days after the filing of such Claim.  The terms of the Compensation Procedures Order shall govern the allowance and payment of any final Fee Claims submitted in accordance with this <u>Section 2.2</u>.

    2.2.2     The amount of the Fee Claims owing to the Professionals on and after the Effective Date shall be paid by the Reorganized Debtor in Cash to such Professionals as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order.  Upon the Effective Date, any requirement that Professionals and Ordinary Course Professionals of the Reorganized Debtor comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Compensation Procedures Order, or the Ordinary Course Professionals Order in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtor may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

2.3     <u>Payment of Statutory Fees</u>.  All fees payable under section 1930 of title 28 of the United States Code, as determined at the Confirmation Hearing by the Bankruptcy Court or the District Court, as applicable, shall be paid on or before the Effective Date.  The Reorganized Debtor shall pay all such fees that arise after the Effective Date, but before the closing of the Chapter 11 Case, and shall comply with all applicable statutory reporting requirements.

2.4     <u>Allowed Priority Tax Claims</u>.  On the Distribution Date, holders of Allowed Priority Tax Claims shall receive Cash equal to the amount of such Allowed Priority Tax Claims, plus Postpetition Interest, if any, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims unless the holder of such Claim agrees to an alternative treatment. Notwithstanding the provisions of this <u>Section 2.4</u>, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the holder for actual pecuniary loss shall be treated as a Class 3 Claim, and the holder (other than as the holder of a Class 3 Claim) may not assess or attempt to collect such penalty from the Reorganized Debtor or its property.

<h1 style="text-align:center">ARTICLE III<br>TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS</h1>

3.1     <u>Claims and Interests Classified</u>.  For purposes of organization, voting, and all Plan confirmation matters, all Claims (other than Administrative Claims and Priority Tax Claims)

25

against and Equity Interests in the Debtor are classified as set forth in this <u>Article III</u>.   In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described in <u>Article II</u>, have not been classified and are excluded from the following Classes.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest falls within the description of such Class, and is classified in another Class or Classes to the extent that any remainder of the Claim or Interest falls within the description of such other Class or Classes.  Notwithstanding anything to the contrary contained in the Plan, no Distribution shall be made on account of any Non-Talc Claim that is not an Allowed Claim for distribution purposes.

3.2    <u>Treatment and Classification of Claims and Interests</u>.  For purposes of all Plan confirmation matters, including voting on, Confirmation of, and Distributions under, the Plan, all Claims (other than Administrative Claims and Priority Tax Claims, which are not classified) against and Equity Interests in the Debtor shall be classified and treated in the manner set forth below.

| <u>Class</u> | <u>Designation</u> | <u>Treatment</u> | <u>Entitlement to Vote</u> | <u>Estimated Recovery</u> |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | Reinstated |
| 3 | Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | Reinstated |
| 4 | Channeled Talc Personal Injury Claims | Impaired | Entitled to Vote to Accept or Reject | 100% |
| 5 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | Reinstated |
| 6 | Equity Interests in the Debtor | Impaired | Entitled to Vote to Accept or Reject | Reinstated Subject to Talc PI Pledge |

3.2.1    **Class 1 – Priority Non-Tax Claims**

(a)    Classification:   Class 1 consists of all Priority Non-Tax Claims against the Debtor.

26

(b)     Treatment:  On the Distribution Date, each holder of an Allowed Class 1 Priority Non-Tax Claim shall receive Cash equal to the Allowed Amount of such Priority Non-Tax Claim plus Postpetition Interest thereon, unless the holder of such Claim, agrees to less favorable treatment.

(c)     Voting:  Class 1 is Unimpaired, and each holder of a Claim in Class 1 is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. No holder of a Claim in Class 1 is entitled to vote to accept or reject the Plan.

### 3.2.2     **Class 2 – Secured Claims**

(a)     Classification:  Class 2 consists of all Secured Claims against the Debtor.

(b)     Treatment:  On the Effective Date, each Claim in Class 2 shall be Reinstated.

(c)     Voting:  Class 2 is Unimpaired, and each holder of a Claim in Class 2 is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. No holder of a Claim in Class 2 is entitled to vote to accept or reject the Plan.

### 3.2.3     **Class 3 – Unsecured Claims**

(a)     Classification:  Class 3 consists of all Unsecured Claims, including Defense Cost Claims, against the Debtor.

(b)     Treatment:  On the Effective Date, each Claim in Class 3 shall be Reinstated.

(c)     Voting:  Class 3 is Unimpaired, and each holder of a Claim in Class 3 is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. No holder of a Claim in Class 3 is entitled to vote to accept or reject the Plan.

### 3.2.4     **Class 4 – Channeled Talc Personal Injury Claims**

(a)     Classification:  Class 4 consists of all Channeled Talc Personal Injury Claims, including Channeled Indirect Talc Personal Injury Claims.

(b)     Treatment:  On the Effective Date, liability for all Channeled Talc Personal Injury Claims, including Channeled Indirect Talc Personal Injury Claims, shall be channeled to and assumed by the Talc Personal Injury Trust without further act or deed and shall be resolved in accordance with the Talc Personal Injury Trust Documents.  Pursuant to the Plan and Trust Distribution Procedures, each holder of a Channeled Talc Personal Injury Claim shall have its Channeled Talc Personal Injury Claim permanently channeled to the Talc Personal Injury Trust, and such Channeled Talc Personal Injury Claim shall thereafter be resolved in accordance with the Talc Personal Injury Trust Documents.

NAI-1539839717

(c)      Voting:  Class 4 is Impaired, and holders of Claims in Class 4 are entitled to vote to accept or reject the Plan in accordance with the voting procedures described in the Disclosure Statement.

3.2.5      **Class 5 – Intercompany Claims**

(a)      Classification:  Class 5 consists of all Intercompany Claims.

(b)      Treatment:  On the Effective Date, each Claim in Class 5 shall be Reinstated.

(c)      Voting:  Class 5 is Unimpaired, and each holder of a Claim in Class 5 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No holder of a Claim in Class 5 is entitled to accept or reject the Plan.

3.2.6      **Class 6 – Equity Interests in the Debtor**

(a)      Classification:  Class 6 consists of all Equity Interests in the Debtor.

(b)      Treatment:  On the Effective Date, Equity Interests in the Debtor shall be Reinstated, and the holder of such Interests shall retain such Interests, subject to the Talc PI Pledge.

(c)      Voting:  Class 6 is Impaired, and each holder of an Equity Interest in the Debtor in Class 6 is entitled to vote to accept or reject the Plan.

3.3      Debtor's Rights with Respect to Unimpaired Claims.  Nothing under the Plan shall affect the rights of the Debtor or the Reorganized Debtor with respect to any Unimpaired Claims, including all rights with respect to legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.4      Elimination of Vacant Classes.  Any Class of Claims against or Interests in the Debtor that, as of the commencement of the Confirmation Hearing, do not have at least one holder of a Claim or Interest that is Allowed in an amount greater than $0.00 for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**ARTICLE IV**
**THE TALC PERSONAL INJURY TRUST**

4.1      Establishment.  Prior to or on the Effective Date, the Talc Personal Injury Trust shall be created in accordance with the Plan Documents.  The Talc Personal Injury Trust shall be a "qualified settlement fund" within the meaning of the treasury regulations issued under Section 468B of the Internal Revenue Code.

28

4.2     Purpose.  The purposes of the Talc Personal Injury Trust shall be to assume all Channeled Talc Personal Injury Claims and, among other things, to:  (a) preserve, hold, manage, and maximize the assets of the Talc Personal Injury Trust; and (b) direct the processing, liquidation, and, if appropriate, payment of all compensable Channeled Talc Personal Injury Claims in accordance with the Plan, the Confirmation Order, and the Talc Personal Injury Trust Documents.  The Talc Personal Injury Trust will resolve Channeled Talc Personal Injury Claims in accordance with the Plan, the Confirmation Order, and the Talc Personal Injury Trust Documents in such a way that holders of Channeled Talc Personal Injury Claims are treated fairly and equitably, and otherwise comply in all respects with the requirements of a trust set forth in section 524(g)(2)(B)(i) of the Bankruptcy Code.  In the event of a conflict between the terms or provisions of the Plan and the Confirmation Order, on the one hand, and the Talc Personal Injury Trust Documents, on the other hand, the terms or provisions of the Plan and the Confirmation Order shall control.  In the event of a conflict between the terms and provisions of the Plan, on the one hand, and the Confirmation Order, on the other hand, the terms or provisions of the Confirmation Order shall control.

4.3     Initial Talc Trustees.  There shall be two initial Talc Trustees.  The initial Talc Trustees of the Talc Personal Injury Trust shall be the individuals identified as such in Exhibit H. All successor Talc Trustees shall be appointed in accordance with the terms of the Talc Personal Injury Trust Agreement.  For purposes of performing his or her duties and fulfilling his or her obligations under the Plan, the Confirmation Order, and the Talc Personal Injury Trust Agreement, each Talc Trustee shall be deemed to be (and the Confirmation Order shall provide that he or she is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.  A Talc Trustee shall be designated as the "administrator" of the Talc Personal Injury Trust as such term is used in Treasury Regulation Section 1.468B-2(k)(3).

4.4     Initial Talc Trust Advisory Committee and FCR.

4.4.1     Initial Talc Trust Advisory Committee.  The Talc Trust Advisory Committee shall be established pursuant to the Talc Personal Injury Trust Agreement.  The initial Talc Trust Advisory Committee Members shall be the individuals identified as such in Exhibit H.  Each of the Talc Trust Advisory Committee Members shall serve in accordance with the terms and provisions of the Talc Personal Injury Trust Agreement. Successor Talc Trust Advisory Committee Members shall be appointed in accordance with the terms and provisions of the Talc Personal Injury Trust Agreement.  For purposes of performing his or her duties and fulfilling his or her obligations under the Plan, the Confirmation Order, and the Talc Personal Injury Trust Agreement, each Talc Trust Advisory Committee Member shall be deemed to be (and the Confirmation Order shall provide that he or she is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.  Without the written consent of a majority of the members of the AHC of Supporting Counsel, the Debtor and J&J will not, and will cause the Debtor Corporate Parties not to, take any action in the Chapter 11 Case that seeks to cause the initial Talc Trust Advisory Committee to be comprised of individuals other than those appointed by the law firms identified and described in Exhibit H (Talc Personal Injury Trust Agreement) to the Plan attached to the Plan Supplement dated June 28, 2024, as entitled to make such appointments.  If, notwithstanding the foregoing, the initial Talc Trust Advisory Committee would be comprised of individuals other than those appointed by the law firms

29

identified and described in <u>Exhibit H</u> (Talc Personal Injury Trust Agreement) to the Plan attached to the Plan Supplement dated June 28, 2024, as entitled to make such appointments, as a result of action taken in the Chapter 11 Case by the Debtor, J&J, or any other Debtor Corporate Party seeking, without the written consent of a majority of the members of the AHC of Supporting Counsel, to cause the initial Talc Trust Advisory Committee to be comprised of individuals other than those appointed by the law firms identified and described in <u>Exhibit H</u> (Talc Personal Injury Trust Agreement) to the Plan attached to the Plan Supplement dated June 28, 2024, as entitled to make such appointments, the Debtor shall be required to resolicit votes with respect to the Plan with a disclosure statement reflecting that the initial Talc Trust Advisory Committee is to be comprised of such other individuals.

4.4.2    <u>Initial FCR</u>.  The Talc Personal Injury Trust Agreement shall provide for the continuation of an FCR to represent any and all persons who may assert Talc Personal Injury Demands in the future, but who are currently unknown.  The initial FCR under the Talc Personal Injury Trust Agreement shall be Randi S. Ellis.  The FCR under the Talc Personal Injury Trust shall serve in accordance with the terms and provisions of the Talc Personal Injury Trust Agreement.  Any successor FCR under the Talc Personal Injury Trust shall be appointed in accordance with the terms and provisions of the Talc Personal Injury Trust Agreement.  For purposes of performing his or her duties and fulfilling his or her obligations under the Plan, the Confirmation Order, and the Talc Personal Injury Trust Agreement, the FCR under the Talc Personal Injury Trust shall be deemed to be (and the Confirmation Order shall provide that he or she is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.

4.5    <u>Initial Talc Trust Administrators</u>.

4.5.1    <u>Initial Talc Trust Claims Administrator</u>.  The initial Talc Trust Claims Administrator of the Talc Personal Injury Trust shall be the Person identified as such in <u>Exhibit H</u>.  All successor Talc Trust Claims Administrators shall be appointed in accordance with the terms and provisions of the Talc Personal Injury Trust Agreement. For purposes of performing its duties and fulfilling its obligations under the Plan, the Confirmation Order, and the Talc Personal Injury Trust Agreement, the Talc Trust Claims Administrator shall be deemed to be (and the Confirmation Order shall provide that it is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.

4.5.2    <u>Initial Talc Trust Liens Resolution Administrator</u>.  The initial Talc Trust Liens Resolution Administrator of the Talc Personal Injury Trust shall be the Person identified as such in <u>Exhibit H</u>.  All successor Talc Trust Liens Resolution Administrators shall be appointed in accordance with the terms and provisions of the Talc Personal Injury Trust Agreement.  For purposes of performing its duties and fulfilling its obligations under the Plan, the Confirmation Order, and the Talc Personal Injury Trust Agreement, the Talc Trust Lien Resolution Administrator shall be deemed to be (and the Confirmation Order shall provide that it is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.

NAI-1539839717

4.6     Advancement of Expenses Prior to the Effective Date.  The Debtor will seek entry of the Trust Expense Advancement Order on or prior to the Confirmation Date.  Subject to, and in accordance with, the Trust Expense Advancement Order, prior to the Effective Date, the Debtor will advance Cash otherwise to be delivered to the Talc Personal Injury Trust on the Effective Date pursuant to Section 4.9.1(a) in order to enable set-up and claims processing work to be undertaken in advance of the Effective Date, so as to allow the Talc Personal Injury Trust to make payments in respect of compensable Channeled Talc Personal Injury Claims as soon as possible after the Effective Date.

4.7     Trust Distribution Procedures.

4.7.1     General.  Prior to or on the Effective Date, the Talc Personal Injury Trust shall implement the Trust Distribution Procedures in accordance with the terms of the Talc Personal Injury Trust Agreement.  From and after the Effective Date, the Talc Trustees shall have the authority to modify or amend the Trust Distribution Procedures solely in accordance with the terms and provisions thereof and of the Talc Personal Injury Trust Agreement.

4.7.2     Channeled Talc Personal Injury Claims.  The Trust Distribution Procedures shall include procedures for processing, evaluating, valuing, resolving, and paying (as appropriate) Channeled Talc Personal Injury Claims, including Channeled Indirect Talc Personal Injury Claims.

4.8     Assumption of Liability for Talc Personal Injury Claims.

4.8.1     Assumption of Liability Generally.  In consideration for the assets delivered, transferred, and assigned to the Talc Personal Injury Trust pursuant to this Article IV, and in furtherance of the purposes of the Plan, the Confirmation Order, and the Talc Personal Injury Trust, on the Effective Date, subject to Section 4.8.4(a), the Talc Personal Injury Trust shall assume all liabilities, obligations, and responsibilities, financial or otherwise, of the Reorganized Debtor, J&J, and the other Protected Parties for all Channeled Talc Personal Injury Claims, including Channeled Indirect Talc Personal Injury Claims.  This assumption shall not affect:  (a) the application of the Discharge Injunction and the Channeling Injunction to the Reorganized Debtor, J&J, and the other Protected Parties; (b) any Talc Insurance Company's obligation under any Talc Insurance Policy; or (c) if the provisions of Section 4.9.3 and Section 5.9.1 are applicable, the Imerys/Cyprus Related Rights.  From and after the Effective Date, other than with respect to obligations to fund the Trust as set forth in the Plan, the Reorganized Debtor, J&J, and the other Protected Parties shall have no liability, obligation, or responsibility, financial or otherwise, for any Channeled Talc Personal Injury Claim, including any Channeled Indirect Talc Personal Injury Claim.

4.8.2     Defenses.  Upon the assumption by the Talc Personal Injury Trust of liabilities, obligations, and responsibilities for Channeled Talc Personal Injury Claims as contemplated by Section 4.8.1, subject to Section 4.8.4(b), the Reorganized Debtor and J&J shall transfer and assign the Talc Personal Injury Trust Defenses to the Talc Personal Injury Trust.  The transfer and assignment of the Talc Personal Injury Trust Defenses to

31

the Talc Personal Injury Trust pursuant to this <u>Section 4.8.2</u> shall not impair, affect, alter, or modify the right of any Person against whom the Talc Personal Injury Trust may exercise Talc Personal Injury Trust Defenses to assert each and every defense or basis for claim reduction such Person could have asserted against the Debtor or J&J prior to the Effective Date; *provided*, *however*, for the avoidance of doubt, that no such Person may assert, as a defense or basis for claim reduction, that the Plan or any of the other Plan Documents does not comply with the Bankruptcy Code or that the transfer and assignment of the Talc Personal Injury Trust Defenses to the Talc Personal Injury Trust pursuant to this <u>Section 4.8.2</u>, or any other action contemplated by this <u>Section 4.8.2</u>, is prohibited by applicable non-bankruptcy law.

4.8.3     <u>Enforcement of Defenses and Other Related Rights</u>.  From and after the Effective Date:  (a) the Talc Personal Injury Trust shall have control over the Talc Personal Injury Trust Defenses and the Talc Personal Injury Trust shall thereby become the estate representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with the exclusive right to enforce each of the Talc Personal Injury Trust Defenses; (b) subject to <u>Section 4.8.4(b)</u>, the proceeds of the recoveries on any of the Talc Personal Injury Trust Defenses shall be delivered to and become the property of the Talc Personal Injury Trust; and (c) the Talc Personal Injury Trust shall have the right to enforce the Plan and any of the other Plan Documents (including the Cooperation Agreement) according to their respective terms.  Notwithstanding the provisions of <u>Section 4.8.2</u> and this <u>Section 4.8.3</u>: (i) the Talc Personal Injury Trust shall have no rights against the Reorganized Debtor, J&J, or the other Protected Parties except to enforce the Plan and the other Plan Documents; (ii) the Talc Personal Injury Trust Defenses transferred and assigned to the Talc Personal Injury Trust shall not include any claims fully and finally released, enjoined, compromised, or settled pursuant to the Plan; and (iii) for the avoidance of doubt, the Talc Personal Injury Trust Defenses transferred and assigned to the Talc Personal Injury Trust shall not include any rights of the Reorganized Debtor, J&J, or the other Protected Parties arising under the Channeling Injunction or any of the other Injunctions.

4.8.4     <u>Common Benefit Fund</u>.

(a)     Notwithstanding anything to the contrary contained in the Plan, neither the Debtor nor the Reorganized Debtor shall have any right or obligation under Case Management Order No. 7(A) entered by the United States District Court for the District of New Jersey in the multidistrict litigation *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*, Civil Action No. 3:16-md-02738, to withhold any amounts from payments made by it under the Plan or any other Plan Document to or for the benefit of the Talc Personal Injury Trust to account for any common benefit assessments thereunder or to make any payment to the common benefit fund account established pursuant thereto.

(b)     The Talc Personal Injury Trust Agreement and the Trust Distribution Procedures shall provide that the Talc Trustees are not authorized to pay, and shall not pay, any common benefit fees or expenses from the Talc Personal Injury Trust, and shall take no action with respect to the common benefit fund established pursuant to that certain Case Management Order No. 7(A) entered by the United States District Court

NAI-1539839717

for the District of New Jersey in the multidistrict litigation *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*, Civil Action No. 3:16-md-02738, in each case without the written consent of the FCR and a supermajority of the Talc Trust Advisory Committee (consisting of not less than 66% of all Talc Trust Advisory Committee Members).

4.9     Contribution of Certain Assets.

     4.9.1     Cash Contributions.

          (a)     The Reorganized Debtor shall deliver, or cause to be delivered, to the Talc Personal Injury Trust Cash Contributions in accordance with Exhibit C.

          (b)     All Cash Contributions to be made by the Reorganized Debtor pursuant to the Plan and the Talc Personal Injury Trust Documents shall be funded by the Reorganized Debtor.  All Cash necessary for the Reorganized Debtor to fund such Cash Contributions pursuant to the Plan and the Talc Personal Injury Trust Documents shall be obtained through:  (a) the Reorganized Debtor's Cash balances; (b) the Indemnity Funding Agreement; or (c) such other means of financing or funding as determined by the board of managers of the Reorganized Debtor.

          (c)     On the Effective Date, J&J and New Holdco shall execute and deliver to the Talc Personal Injury Trust the Cash Contributions Guarantee.  For the avoidance of doubt, nothing contained in this Section 4.9.1 shall in any way affect the obligations of J&J and New Holdco under the Cash Contributions Guarantee.

     4.9.2     Talc PI Note and Related Talc PI Pledge.

          (a)     On the Effective Date:  (i) the Reorganized Debtor shall execute and deliver to the Talc Personal Injury Trust the Talc PI Note; and (ii) New Holdco shall execute and deliver to the Talc Personal Injury Trust the Talc PI Pledge Agreement.

          (b)     The Talc PI Note shall:  (i) bear no interest; (ii) mature on the later of (A) the seventh anniversary of the Petition Date and (B) the first anniversary of the Effective Date; (iii) be secured by the Talc PI Pledge; and (iv) provide for payment in full of the principal amount of the PI Talc Note on or before its maturity date.

          (c)     A Reorganized Debtor Payment Event of Default shall not provide a basis for the Talc Personal Injury Trust or any other Person to contend that a material breach of the Plan has occurred or that any Protected Party is no longer entitled to the protections provided to such Protected Party pursuant to the Plan, including the protections of the Channeling Injunction and related indemnification by the Talc Personal Injury Trust. If a Reorganized Debtor Payment Event of Default occurs, the Talc Personal Injury Trust may, upon five (5) days' written notice to the Reorganized Debtor and New Holdco, foreclose upon the Talc PI Pledge.

NAI-1539839717

4.9.3    Imerys/Cyprus Related Rights.  The following provisions shall apply if the Imerys/Cyprus Settlement Termination Date occurs, whether prior to, on, or following the Effective Date:

(a)    On the Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date, the Reorganized Debtor and J&J shall transfer and assign to the Talc Personal Injury Trust the Imerys/Cyprus Related Rights.  The transfer and assignment of the Imerys/Cyprus Related Rights to the Talc Personal Injury Trust pursuant to this Section 4.9.3 shall not impair, alter, or modify the right of any Imerys/Cyprus Party against whom the Talc Personal Injury Trust may exercise the Imerys/Cyprus Related Rights to assert each and every defense or basis for claim reduction such Person could have asserted against the Debtor and J&J prior to the Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date; provided, however, for the avoidance of doubt, that no such Person may assert, as a defense or basis for claim reduction, that the Plan or any of the other Plan Documents does not comply with the Bankruptcy Code or that the transfer and assignment of the Imerys/Cyprus Related Rights to the Talc Personal Injury Trust pursuant to this Section 4.9.3, or any other action contemplated by this Section 4.9.3, is prohibited by applicable non-bankruptcy law.

(b)    From and after the Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date:  (a) the Talc Personal Injury Trust shall have control over the Imerys/Cyprus Related Rights and the Talc Personal Injury Trust shall be the estate representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with the exclusive right to enforce the Imerys/Cyprus Related Rights; and (b) the proceeds of the recoveries on any Imerys/Cyprus Related Rights shall be delivered to and become the property of the Talc Personal Injury Trust.

(c)    From and after the Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date:  (i) the Reorganized Debtor, J&J, and the Talc Trustees shall cooperate and use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things that are reasonably necessary or appropriate to effectuate the transfer and assignment of the Imerys/Cyprus Related Rights to the Talc Personal Injury Trust in accordance with this Section 4.9.3; and (ii) without limiting the generality of the foregoing clause (i), the Reorganized Debtor and J&J shall provide, or make available to, the Talc Personal Injury Trust copies of the Imerys/Cyprus Agreements and other information within the possession and control of the Reorganized Debtor and J&J in accordance with the terms and provisions of the Cooperation Agreement.  Pursuant to the Plan and the Confirmation Order, to the extent the Reorganized Debtor or J&J provides to the Talc Personal Injury Trust privileged information pursuant to the terms and provisions of this Section 4.9.3 or the Cooperation Agreement, such provision of information shall not result in the destruction or waiver of any applicable privileges pertaining to such information.

4.9.4    Talc Insurance Assets.

(a)    Subject to the provisions of this Section 4.9.4 and the Cooperation Agreement, on the Effective Date, the Reorganized Debtor shall transfer and assign to the

NAI-1539839717

Talc Personal Injury Trust the Talc Insurance Assets; *provided*, *however*, that, for the avoidance of doubt, the Reorganized Debtor shall not transfer and assign to the Talc Personal Injury Trust, and shall retain, (i) all proceeds of Talc In-Place Insurance Coverage received by the Debtor on or prior to the Effective Date and all rights to Talc-In-Place Insurance Coverage for amounts expended prior to the Effective Date, (ii) all proceeds or benefits of any Talc Insurance Action received by the Debtor on or prior to the Effective Date and all rights to proceeds or benefits of any Talc Insurance Action for amounts expended prior to the Effective Date, and (iii) all amounts payable pursuant to any Talc Insurance Settlement Agreement received by the Debtor on or prior to the Effective Date and all amounts payable pursuant to any Talc Insurance Settlement Agreement for amounts expended prior to the Effective Date.

(b)     From and after the Effective Date, in consideration of the Reorganized Debtor's obligations under Section 4.9.1, Section 4.9.2, and, if applicable, Section 4.9.3:  (i) the Reorganized Debtor, as the subrogee of the Talc Personal Injury Trust, shall have the exclusive right (A) to pursue and resolve any Talc In-Place Insurance Coverage, (B) to pursue and resolve any Talc Insurance Action, (C) to pursue and obtain any Talc Insurance Recoveries, and (D) to negotiate and enter into any Talc Insurance Settlement Agreement; and (ii) any of the following received by the Talc Personal Injury Trust shall be delivered to, and retained by, the Reorganized Debtor, and may thereafter be used by the Reorganized Debtor as it may determine in its sole discretion:  (A) all proceeds of Talc In-Place Insurance Coverage; (B) all proceeds or benefits of any Talc Insurance Action; and (C) all amounts payable pursuant to any Talc Insurance Settlement Agreement. Subject to the provisions of the Cooperation Agreement, the Reorganized Debtor shall pay, and bear sole responsibility with respect to the payment of, all costs and expenses, including attorneys' fees and expenses and other out-of-pocket fees and expenses, incurred by the Reorganized Debtor acting as subrogee of the Talc Personal Injury Trust pursuant to this Section 4.9.4(b).  For the avoidance of doubt, nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect any rights that any Debtor Corporate Party may have under any Talc Insurance Policy or Talc Insurance Settlement Agreement.

(c)     From and after the Effective Date:  (i) the Reorganized Debtor, J&J, and the Talc Trustee shall cooperate and use their respective commercially reasonably efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things that are reasonably necessary or appropriate to effectuate the transfer and assignment of the Talc Insurance Assets to the Talc Personal Injury Trust in accordance with, and subject to the terms and provisions of, this Section 4.9.4; and (ii) the Talc Personal Injury Trust shall provide, or make available to, the Reorganized Debtor and J&J information within the possession and control of the Talc Personal Injury Trust in accordance with the terms and provisions of the Cooperation Agreement and shall cooperate with the Reorganized Debtor and J&J and use commercially reasonable efforts to effectuate the terms and provisions of this Section 4.9.4.  Pursuant to the Plan and the Confirmation Order, to the extent the Reorganized Debtor or J&J provides to the Talc Personal Injury Trust privileged information pursuant to the terms and provisions of this Section 4.9.4 or the Cooperation Agreement, such provision of information shall not result in the destruction or waiver of any applicable privileges pertaining to such information.

NAI-1539839717

(d)      If, notwithstanding the provisions of the Plan and Confirmation Order, the transfer and assignment of any Talc Insurance Asset is determined by any court of competent jurisdiction to be invalid under, or to violate the provisions of, any Talc Insurance Policy, then, notwithstanding anything to the contrary in the Plan, solely with respect to such Talc Insurance Asset:  (i) the Reorganized Debtor will be deemed to have retained such Talc Insurance Asset; and (ii) each provision of the Plan that provides or contemplates that the Talc Personal Injury Trust shall act through the Reorganized Debtor, or that the Reorganized Debtor shall act, as the subrogee of the Talc Personal Injury Trust with respect to such Talc Insurance Asset shall be deemed to instead provide or contemplate that the Reorganized Debtor will act for the benefit of the Talc Personal Injury Trust with respect to such Talc Insurance Asset.  For the avoidance of doubt, nothing in this Section 4.9.4(d) shall affect clause (ii) of Section 4.9.4(b).

4.10      Payment of Talc Personal Injury Trust Expenses.  Subject to Section 4.6, Section 4.9.4(b), and the terms and provisions of the Cooperation Agreement, (a) the Talc Personal Injury Trust shall pay all Talc Personal Injury Trust Expenses from the assets of the Talc Personal Injury Trust and (b) the Talc Personal Injury Trust shall bear sole responsibility with respect to the payment of the Talc Personal Injury Trust Expenses.  Subject to Section 4.6, Section 4.9.4(b), and the terms and provisions of the Cooperation Agreement, the Talc Personal Injury Trust shall promptly pay all reasonable and documented Talc Personal Injury Trust Expenses incurred by the Reorganized Debtor or any Debtor Corporate Party for any and all liabilities, costs, or expenses as a result of taking action on behalf of or at the direction of the Talc Personal Injury Trust.

4.11      Treatment of Remainder Assets.  To the extent there are any assets remaining in the Talc Personal Injury Trust at such time as the Talc Personal Injury Trust is dissolved in accordance with the terms and provisions of the Talc Personal Injury Trust Agreement, such remaining assets shall be transferred to a charity or charities selected by Talc Trustees in accordance with the terms and provisions of the Talc Personal Injury Trust Agreement.

4.12      Dissolution.  The Talc Personal Injury Trust shall be dissolved upon satisfaction of the purposes of the Talc Personal Injury Trust in accordance with the terms and provisions of the Talc Personal Injury Trust Agreement.  Upon dissolution of the Talc Personal Injury Trust, the Talc Trustees, the Talc Trust Advisory Committee Members, the FCR under the Talc Personal Injury Trust Agreement, the Talc Trust Claims Administrator, and the Talc Trust Liens Resolution Administrator shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Case.

4.13      Funds and Investment Guidelines.  All monies held in the Talc Personal Injury Trust shall be invested, subject to the investment limitations and provisions enumerated in the Talc Personal Injury Trust Agreement.

4.14      Compliance with QSF Regulations.  The Debtor and the Reorganized Debtor shall take all actions required of them as "transferor," and the designated Talc Trustee shall take all actions required of him or her as "administrator," with respect to the Talc Personal Injury Trust pursuant to treasury regulations promulgated under section 468B of the Internal Revenue Code. Pursuant to such treasury regulations, the Talc Trustee designated as "administrator" shall be responsible for all tax reporting and withholding requirements in respect of distributions made

from the Talc Personal Injury Trust.  Any issue of interpretation of the Plan, the Confirmation Order, the Talc Personal Injury Trust Agreement, or any other Talc Personal Injury Trust Document shall be resolved in favor of an interpretation that conforms to the requirements of section 468B of the Internal Revenue Code and the treasury regulations promulgated thereunder.

4.15    Cooperation Agreement.  On the earlier of the Confirmation Date and the date of the entry of the Trust Expense Advancement Order, the Reorganized Debtor, J&J, the Custodians, and the Talc Personal Injury Trust shall enter into the Cooperation Agreement.  The provision of information by the Reorganized Debtor or J&J to the Talc Personal Injury Trust pursuant to the Cooperation Agreement shall not result in the destruction or waiver of any applicable privileges pertaining to such information.

4.16    Indemnification and Reimbursement of the Protected Parties.  From and after the Effective Date, the Talc Personal Injury Trust shall indemnify, defend, and hold harmless, to the fullest extent permitted by applicable law, each of the Reorganized Debtor and the other Protected Parties (other than, if the provisions of Section 4.9.3 and Section 5.9.1 are applicable, the Imerys/Cyprus Parties for claims based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights) from and against any and all claims, demands, disputes, suits, damages, remedies, losses, awards, judgments, settlements, liabilities, expenses, costs, fees (including attorneys' fees), and other charges whatsoever suffered or incurred by it subsequent to the Effective Date arising out of or in any way relating to any Channeled Talc Personal Injury Claim.  Without limiting the generality of the foregoing, from and after the Effective Date, the Talc Personal Injury Trust shall promptly reimburse each Protected Party (other than, if the provisions of Section 4.9.3 and Section 5.9.1 are applicable, the Imerys/Cyprus Parties for claims based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights) for any and all out-of-pocket damages, remedies, losses, awards, judgments, liabilities, expenses, costs, fees (including attorneys' fees), and other charges whatsoever actually incurred by such Protected Party subsequent to the Effective Date attributable to the defense of any Channeled Talc Personal Injury Claim in the event that the holder of such Channeled Talc Personal Injury Claim seeks to hold such Protected Party liable for such Channeled Talc Personal Injury Claim in violation of the Plan and the Channeling Injunction.  For the avoidance of doubt, notwithstanding the foregoing, the Talc Personal Injury Trust shall have no obligation to indemnify, defend, or hold harmless, or reimburse any out-of-pocket liabilities, expenses, costs, fees (including attorneys' fees), or other charges incurred by, the Reorganized Debtor or J&J in connection with the performance of their obligations under the Master Settlement Agreements.

4.17    Exculpation of the Protected Parties.  None of the Protected Parties shall have or incur any liability to any Person for any act or omission taken or to be taken in connection with, arising out of, or in any way relating to the administration or operation of the Talc Personal Injury Trust, including:  (a) the management of the assets of the Talc Personal Injury Trust; and (b) the processing, liquidation, and payment of Channeled Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents.

NAI-1539839717

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

5.1 <u>General Treatment</u>.  Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the Debtor or the Reorganized Debtor shall assume each of its Executory Contracts and Unexpired Leases other than those listed on <u>Exhibit L</u>; *provided*, *however*, that the Debtor reserves the right, at any time prior to the Effective Date, to amend <u>Exhibit L</u> to:  (a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its assumption pursuant hereto; or (b) add any Executory Contract or Unexpired Lease to <u>Exhibit L</u>, thus providing for its rejection pursuant to <u>Section 5.5</u>.  The Debtor shall provide notice of any amendments to <u>Exhibit L</u> to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Chapter 11 Case.  Nothing herein shall constitute an admission by the Debtor or the Reorganized Debtor that any contract or lease is an Executory Contract or Unexpired Lease or that the Debtor or the Reorganized Debtor has any liability thereunder.

5.2 <u>Assumption and Assignment</u>.

5.2.1 <u>Assumption</u>.  Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated, or is rejected or repudiated under the Plan.

5.2.2 <u>Postpetition Amendments</u>.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

5.2.3 <u>Assignment</u>.  Each assumed Executory Contract or Unexpired Lease shall be a contract or lease of the Reorganized Debtor unless an assignee is identified in accordance with the procedures in <u>Section 5.3</u>.

5.3 <u>Approval of Assumptions and Assignments and Related Procedures</u>.

5.3.1 <u>Effect of Assumption</u>.  Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

5.3.2     Approval and Related Procedures.   The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions described in Section 5.1, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.  The procedures for assumption or assumption and assignment of an Executory Contract or Unexpired Lease are as follows:

(a)     After the entry of the Confirmation Order, the Debtor shall serve upon each party to an Executory Contract or Unexpired Lease being assumed pursuant to the Plan notice of:  (i) the contract or lease being assumed or assumed and assigned and, if applicable, any assignee; (ii) the Cure Amount Claim, if any, that the Debtor believes would be payable in connection with such assumption; and (iii) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the amount of the proposed Cure Amount Claim.

(b)     Any Person wishing to object to (i) the proposed assumption or assumption and assignment of an Executory Contract or Unexpired Lease under the Plan or (ii) the proposed amount of the related Cure Amount Claim must file and serve on counsel to the Debtor or the Reorganized Debtor a written objection setting forth the basis for the objection within twenty (20) days of service of the notice described in Section 5.3.2(a).

(c)     If no objection to the proposed assumption or assumption and assignment or the proposed amount of the Cure Amount Claim is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease: (i) the proposed assumption or assumption and assignment of the Executory Contract or Unexpired Lease shall be approved in accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court; and (ii) the Cure Amount Claim identified by the Debtor in the notice shall be fixed and shall be paid in accordance with the Plan on or after the Effective Date, without further action of the Bankruptcy Court, to the appropriate contract or lease party identified on the notice.

(d)     If an objection to the proposed assumption or assumption and assignment or the proposed amount of the Cure Amount Claim is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtor or the Reorganized Debtor, as applicable, and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

(e)     If an objection to the proposed assumption or assumption and assignment or the proposed amount of the Cure Amount Claim is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection:  (i) the Debtor or the Reorganized Debtor, as applicable, may file a reply to such objection no later than thirty (30) days after the filing and service of such objection and ask the Bankruptcy Court to schedule a hearing on the particular objection and the related reply at an appropriate time; or (ii) the Debtor or the Reorganized Debtor, as applicable, may designate the Executory Contract or Unexpired

Lease underlying such objection for rejection pursuant to <u>Section 5.5</u> and amend <u>Exhibit L</u> accordingly.

5.4     <u>Payments Related to Assumption</u>.

5.4.1     <u>Payment Options</u>.  To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor or the Reorganized Debtor assuming such contract or lease, or the assignee of the Debtor or the Reorganized Debtor, if any: (a) by payment of the Cure Amount Claim in Cash on the Effective Date or as promptly as reasonably practicable after the Cure Amount Claim is allowed; or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease.

5.4.2     <u>Disputes</u>.  Pursuant to section 365(b)(2)(D) of the Bankruptcy Code, no Cure Amount Claim shall be allowed for a penalty rate or other form of default rate of interest.  If there is a dispute regarding (a) the amount of any Cure Amount Claim, (b) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

5.5     <u>Executory Contracts and Unexpired Leases to Be Rejected and Rejection Procedures</u>.

5.5.1     <u>Rejection Generally</u>.  On the Effective Date, each Executory Contract and Unexpired Lease listed on <u>Exhibit L</u> shall be rejected pursuant to section 365 of the Bankruptcy Code.  Each contract and lease listed on <u>Exhibit L</u> shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease.  Listing a contract or lease on <u>Exhibit L</u> shall not constitute an admission by the Debtor or the Reorganized Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that the Debtor or the Reorganized Debtor has any liability thereunder.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

5.5.2     <u>Rejection Procedures</u>.  The procedures for rejection of an Executory Contract or Unexpired Lease are as follows:

(a)     After the entry of the Confirmation Order, the Debtor shall serve upon each party to an Executory Contract or Unexpired Lease being rejected pursuant to the Plan notice of such proposed rejection.  For the avoidance of doubt, additional notices may be served upon any amendment to <u>Exhibit L</u> (including pursuant to <u>Section 5.3.2(e)</u>).

(b)     Any Person wishing to object to the proposed rejection of an Executory Contract or Unexpired Lease under the Plan must file and serve on counsel to

the Debtor or the Reorganized Debtor a written objection setting forth the basis for the objection within twenty (20) days of service of the notice described in Section 5.5.2(a).

(c)     If no objection to the proposed rejection is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the proposed rejection of the applicable Executory Contract or Unexpired Lease shall be approved in accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court.

(d)     If an objection to the proposed rejection is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtor or the Reorganized Debtor, as applicable, and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

(e)     If an objection to the proposed rejection is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection, the Debtor or the Reorganized Debtor, as applicable, may file a reply to such objection no later than thirty (30) days after the filing and service of such objection and ask the Bankruptcy Court to schedule a hearing on the particular objection and the related reply at an appropriate time.

5.6     Claims Based on Rejection.

5.6.1     Proof of Claim Required.  If the rejection or deemed rejection of an Executory Contract or Unexpired Lease by the Debtor results in damages to the other party or parties to such Executory Contract or Unexpired Lease, a Claim for such damages shall be automatically disallowed and forever barred from assertion, and unenforceable, against the Debtor, the Reorganized Debtor, any assignee, or their properties, whether by way of setoff, recoupment, or otherwise, without the need for any objection, any further notice, or any action, order, or approval of the Bankruptcy Court, unless a Proof of Claim is filed with the Claims Agent and served upon counsel for the Debtor or the Reorganized Debtor by the later of (a) thirty (30) days after service of the notice described in Section 5.5.2(a) and (b) thirty (30) days after service of notice of entry of a Final Order rejecting such Executory Contract or Unexpired Lease, which notice, in each case, will set forth such deadline.  If a Proof of Claim is filed in accordance with this Section 5.6.1, any objections to such Proof of Claim shall be filed with the Bankruptcy Court and served upon the holder of such Non-Talc Claim no later than thirty (30) days after the filing of such Proof of Claim, unless extended by order of the Bankruptcy Court prior to the expiration of such period.

5.6.2     Classification of Claims.  Claims arising from the rejection of an Executory Contract or Unexpired Lease shall be classified as Class 3 Unsecured Claims and shall be treated in accordance with Section 3.2.3; *provided*, *however*, that all Claims arising from rejection or deemed rejection of an Executory Contract or Unexpired Lease shall be deemed Disputed.

5.7     Contracts and Leases Entered Into After the Petition Date.  Notwithstanding any other provision of the Plan, contracts and leases entered into after the Petition Date by the Debtor,

41

including any Executory Contracts and Unexpired Leases assumed by the Debtor, shall be performed by the Debtor or the Reorganized Debtor in accordance with the terms and conditions of such contracts and leases in the ordinary course of its business. Accordingly, such contracts and leases and other obligations (including any assumed Executory Contracts and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

5.8     Reservation of Rights.   Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on Exhibit L, or anything contained in the Plan or any Plan Supplement, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtor, or any assignee has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor, the Reorganized Debtor, or any assignee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

5.9     Imerys/Cyprus Matters.

5.9.1     Imerys/Cyprus Agreements.   If the Imerys/Cyprus Settlement Termination Date occurs, whether prior to, on, or following the Effective Date, the foregoing provisions of this Article V shall not apply to the Imerys/Cyprus Agreements and instead the following provisions shall apply thereto:

(a)     To the extent that the Imerys/Cyprus Agreements are considered to be executory contracts, the Plan shall constitute a motion to assume and assign the Imerys/Cyprus Agreements to the Talc Personal Injury Trust (in order to effect the transfer and assignment of the Imerys/Cyprus Related Rights thereunder in accordance with Section 4.9.3) and, subject to the occurrence of the Effective Date and the Imerys/Cyprus Settlement Termination Date, the entry of the Confirmation Order shall constitute approval of such assumption and assignment pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that such assumption and assignment is in the best interest of the Debtor, the Debtor's Estate, and all parties in interest in the Chapter 11 Case.

(b)     Unless otherwise determined by a Final Order entered by the Bankruptcy Court prior to the Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date, no payments are required to cure any defaults of the Debtor existing as of the Effective Date with respect to any Imerys/Cyprus Agreements and the Cash Contributions delivered to the Talc Personal Injury Trust by or on behalf of the Reorganized Debtor shall be deemed to satisfy in full any Claim arising out of any alleged breach, default, or violation under the Imerys/Cyprus Agreements.

(c)     The Imerys/Cyprus Agreements shall be transferred by the Reorganized Debtor and J&J to the Talc Personal Injury Trust as of the Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date to effect the transfer and assignment of the Imerys/Cyprus Related Rights under such agreements in accordance with Section 4.9.3.

NAI-1539839717

5.9.2     Imerys/Cyprus Settlement Agreement.  If the Imerys/Cyprus Settlement Agreement has been executed prior to or on the Effective Date and the Imerys/Cyprus Settlement Closing Date occurs, whether prior to, on, or following the Effective Date, the following provisions shall apply:

(a)     Notwithstanding any other provision of this Plan, the Plan shall constitute a motion to assume the Imerys/Cyprus Settlement Agreement, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute: (i) approval of such assumption pursuant to Section 365(a) of the Bankruptcy Code; and (ii) a finding by the Bankruptcy Court that such assumption is in the best interest of the Debtor, the Debtor's Estate, and all parties in interest in the Chapter 11 Case.

(b)     Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtor with respect to the Imerys/Cyprus Settlement Agreement.

5.10     Talc Insurance Assets.   Notwithstanding any other provision of this Plan, this Article V shall not apply to the Talc Insurance Assets.  To the extent that the Talc Insurance Assets are considered to be executory contracts, the Plan shall constitute a motion to assume and assign the Talc Insurance Assets to the Talc Personal Injury Trust in accordance with Section 4.9.4, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption and assignment pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that such assumption and assignment is in the best interest of the Debtor, the Debtor's Estate, and all parties in interest in the Chapter 11 Case.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtor existing as of the Effective Date with respect to any Talc Insurance Asset.  The Talc Insurance Assets shall be assigned by the Reorganized Debtor to the Talc Personal Injury Trust in accordance with Section 4.9.4 as of the Effective Date.

5.11     Master Settlement Agreements.   Notwithstanding any other provision of this Plan, the Plan shall constitute a motion to assume the Master Settlement Agreements and any settlement or other agreements entered into in accordance with the terms thereof, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute:  (a) approval of such assumption pursuant to Section 365(a) of the Bankruptcy Code; and (b) a finding by the Bankruptcy Court that such assumption is in the best interest of the Debtor, the Debtor's Estate, and all parties in interest in the Chapter 11 Case.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtor existing as of the Effective Date with respect to any Master Settlement Agreement or any settlement or other agreement entered into in accordance with the terms of any Master Settlement Agreement.

NAI-1539839717

**ARTICLE VI**
**DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF NON-TALC CLAIMS**

6.1     <u>Distributions</u>.  Distributions on account of Allowed Non-Talc Claims (other than Reinstated Non-Talc Claims) shall be made on or after the Distribution Date as provided in this Article VI.  This Article VI shall not apply to Talc Personal Injury Claims or Reinstated Non-Talc Claims.  All Channeled Talc Personal Injury Claims shall be liquidated and, as appropriate, paid, or otherwise resolved, by the Talc Personal Injury Trust pursuant to and in accordance with the Talc Personal Injury Trust Documents.  All Reinstated Non-Talc Claims shall be Reinstated.

6.2     <u>Timing and Calculation of Amounts to be Distributed</u>.

6.2.1     <u>General</u>.  On the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each holder of an Allowed Non-Talc Claim shall receive the full amount of the Distribution that the Plan provides for such Allowed Claim in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Any Distribution to be made pursuant to the Plan shall be deemed to have been timely made if made within sixty (60) days after the time therefor specified in the Plan.  No interest shall accrue or be paid with respect to any Distribution as a consequence of such Distribution not having been made on the Effective Date.

6.2.2     <u>Disputed Non-Talc Claims</u>.  If and to the extent that there are Disputed Non-Talc Claims, Distributions on account of any such Disputed Non-Talc Claims shall be made pursuant to the provisions set forth in this <u>Article VI</u>.

6.3     <u>Designation of Disbursing Agent</u>.  All Distributions under the Plan shall be made by the Disbursing Agent.

6.4     <u>Rights and Powers of Disbursing Agent</u>.

6.4.1     <u>General</u>.  The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

6.4.2     <u>Fees and Expenses</u>.  Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtor.

6.5     Distributions on Account of Claims Allowed After the Effective Date. Notwithstanding any other provision of the Plan, no Distributions shall be made under the Plan on account of any Disputed Non-Talc Claim, unless and until such Disputed Non-Talc Claim becomes an Allowed Non-Talc Claim.  Distributions made after the Effective Date to holders of Disputed Non-Talc Claims that are not Allowed Non-Talc Claims as of the Effective Date but which later become Allowed Non-Talc Claims shall be made as if such Claim had been an Allowed Claim on the Effective Date.  Except as otherwise may be agreed to by the Debtor or the Reorganized Debtor, on the one hand, and the holder of a Disputed Non-Talc Claim, on the other hand, and notwithstanding any provision otherwise in the Plan, no partial payments and no partial Distributions shall be made with respect to any Disputed Non-Talc Claim until all Disputed Non-Talc Claims held by the holder of such Disputed Non-Talc Claim have become Allowed Non-Talc Claims or have otherwise been resolved by settlement or Final Order.

6.6     Delivery of Distributions and Undeliverable or Unclaimed Distributions.

6.6.1     Delivery of Distributions to Holders of Non-Talc Claims.  Distributions to holders of Allowed Non-Talc Claims shall be made to holders of record as of the Distribution Record Date by the Disbursing Agent: (a) to the signatory set forth on any of the Proof of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the Debtor has been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; or (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address.

6.6.2     Full Benefit of Distributions.  Distributions under the Plan on account of Non-Talc Claims shall not be subject to levy, garnishment, attachment, or similar legal process, so that each holder of an Allowed Non-Talc Claim shall have and receive the benefit of the Distributions in the manner set forth in the Plan.  None of the Debtor, the Reorganized Debtor, or the applicable Disbursing Agent shall incur any liability whatsoever on account of any Distributions under the Plan except where such Distributions are found by Final Order to have been made with gross negligence, willful misconduct, or fraud.

6.6.3     Undeliverable Distributions and Unclaimed Property.  In the event that any Distribution to any holder of an Allowed Non-Talc Claim is returned as undeliverable, no further Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such Distribution shall be made as soon as practicable after such Distribution has become deliverable to such holder without interest; *provided*, *however*, that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of three (3) months from the applicable Distribution Date.  After such date, all "unclaimed property" or interests in property in respect of the Reorganized Debtor shall revert to the Reorganized Debtor, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.  The claim of any holder to such property or interest in property shall be discharged and forever barred.  Nothing contained

45

in the Plan shall require the Debtor, the Reorganized Debtor, or the Disbursing Agent to attempt to locate any holder of an Allowed Claim.

6.7     Time Bar to Cash Payments.  Checks issued by the Disbursing Agent in respect of Allowed Non-Talc Claims shall be null and void if not cashed within one hundred and eighty (180) days of the date of issuance thereof.  The holder of the Allowed Non-Talc Claim with respect to which such check originally was issued may make a request for re-issuance of any check directly to the Disbursing Agent; *provided*, *however*, that any such request for re-issuance of a check shall be made on or before the twelve (12)-month anniversary of the Distribution Date.  After such date, all Non-Talc Claims in respect of void checks shall be discharged and forever barred.

6.8     Record Date for Holders of Claims.  Except as otherwise provided in an order of the Bankruptcy Court that is not subject to any stay, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001, on or prior to the Distribution Record Date, shall be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.  If there is any dispute regarding the identity of the Person entitled to receive a Distribution in respect of a Claim under the Plan, no Distribution need be made in respect of such Claim until such dispute has been resolved.

6.9     Compliance with Tax Requirements and Allocations.

6.9.1     General.  In connection with the Plan and all Distributions hereunder, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any federal, state, or local taxing authority, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under the Plan if necessary to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions including tax certification forms, or establishing any other reasonable mechanisms it believes are necessary or appropriate.  To the extent that any Claim holder fails to submit appropriate tax certification forms required by a Disbursing Agent or to comply with any other mechanism established by a Disbursing Agent to comply with such withholding and reporting requirements, such Claim holder's Distribution may, in such Disbursing Agent's reasonable discretion, be deemed "unclaimed property" subject to Section 6.6.3.

6.9.2     Tax Withholding.  Without limiting the generality of the foregoing, in accordance with the Internal Revenue Code's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to Distributions made pursuant to the Plan, unless the holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact; or (b) provides at the applicable Disbursing Agent's request a completed IRS Form W-9 (or substitute therefor) on which the holder includes a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer

is not subject to backup withholding because of a failure to report all dividend and interest income. Among other things, to receive any Postpetition Interest, if requested by a Disbursing Agent, a holder of an Allowed Claim shall be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding. Non-U.S. Allowed Claim holders may be required by the applicable Disbursing Agent to provide a completed IRS Form W-8BEN or W-8BEN-E, as applicable (or other applicable Form W-8 or successor form) to establish an exemption from or a treaty-reduced rate of withholding on interest distributed pursuant to the Plan. Unless a Disbursing Agent, in its discretion, determines otherwise, no Distributions on account of Postpetition Interest shall be made to a holder of an Allowed Claim until such time as the holder of such Claim establishes exemption from withholding or provides the applicable IRS Form.

6.9.3    <u>Obligations of Distribution Recipients</u>.   Notwithstanding any other provision of the Plan, each Person receiving a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental unit on account of such Distribution, including income, withholding, and other tax obligations.

6.9.4    <u>Tax Allocations</u>.   For tax purposes, Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

6.10    <u>Transfers of Claims</u>.   In the event that the holder of any Non-Talc Claim shall transfer such Claim after the Distribution Record Date, it shall immediately advise the Reorganized Debtor in writing of such transfer and file a notice of the transfer with the Bankruptcy Court. The Reorganized Debtor shall be entitled to assume that no transfer of any Claim has been made by any holder unless and until written notice of a transfer has been actually received by the Reorganized Debtor. Each transferee of any Non-Talc Claim shall take such Claim subject to the provisions of the Plan, and, except as provided in a notice of transfer, the Reorganized Debtor shall be entitled to assume conclusively that the transferee named in any notice of transfer shall thereafter be vested with all rights and powers of the transferor of such Claim.

6.11    <u>Setoffs</u>.   The Debtor and the Reorganized Debtor may, pursuant to the applicable provisions of the Bankruptcy Code, or applicable non-bankruptcy law, set off against any applicable Allowed Claim (before any Distribution is made on account of such Claim) any and all claims, rights, causes of action, debts, or liabilities of any nature that the Debtor or the Reorganized Debtor may hold against the holder of such Allowed Claim; *provided*, *however*, that the failure to effect such a setoff shall not constitute a waiver or release of any such claims, rights, causes of action, debts, or liabilities.

**ARTICLE VII**
**RESOLUTION OF DISPUTED NON-TALC CLAIMS**

7.1    <u>Disputed Non-Talc Claims</u>.   This <u>Article VII</u> shall apply to all Disputed Non-Talc Claims. This <u>Article VII</u> shall not apply to Talc Personal Injury Claims. All Channeled Talc

47

Personal Injury Claims shall be resolved by the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents.

7.2     Rights of Debtor and Reorganized Debtor .

7.2.1     Right to Litigate.  Prior to the Effective Date, the Debtor, and on and after the Effective Date, the Reorganized Debtor, shall have the right to:  (i) file objections to Non-Talc Claims that have not already been Allowed by Final Order, agreement, or the Plan; and (ii) litigate any Disputed Non-Talc Claim either in the Bankruptcy Court or in any court of competent jurisdiction.

7.2.2     No Approval or Notice Required Generally.  Notwithstanding any prior order of the Bankruptcy Court, other than with respect to Fee Claims, prior to the Effective Date, the Debtor, and on and after the Effective Date, the Reorganized Debtor,  shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Disputed Claims and to compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court.

7.3     Proofs of Claim Not Required.

7.3.1     Resolution of Claims.   Notwithstanding section 502(a) of the Bankruptcy Code, and except as otherwise set forth in the Plan, holders of Non-Talc Claims (other than Administrative Expense Claims and Claims arising from the rejection of Executory Contracts or Unexpired Leases) need not file Proofs of Claim with the Bankruptcy Court and shall not be subject to any claims-resolution process in the Bankruptcy Court in connection with their Claims.  The Reorganized Debtor and the holders of such Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims as if the Chapter 11 Case had not been commenced.

7.3.2     Deemed Withdrawal of Claims.  Except for Proofs of Claim in respect of Administrative Claims and Claims arising from the rejection of Executory Contracts or Unexpired Leases, upon the Effective Date, any filed Non-Talc Claim, regardless of the time of filing, and including Claims filed after the Effective Date, shall be deemed withdrawn without prejudice to (i) the treatment of such Claim in the Plan; and (ii) each holder's rights under this Section 7.3.2 to assert their Claims in any proper forum as though the Chapter 11 Case had not been commenced.

7.4     No Distributions Pending Allowance.  No Distributions or other consideration shall be paid with respect to any Claim that is a Disputed Claim unless and until all objections to such Disputed Claim are resolved by agreement or Final Order and such Disputed Claim becomes an Allowed Claim.

7.5     Distributions on Account of Disputed Claims.  At such time as determined to be practicable by the Reorganized Debtor, the Disbursing Agent will make Distributions on account of any Disputed Claim that has become Allowed.  Such Distributions will be made pursuant to the applicable provisions of Article VI; *provided*, *however*, that Distributions on account of Allowed Fee Claims shall be made as provided in Article II.

48

**ARTICLE VIII**
**CONDITIONS PRECEDENT TO CONFIRMATION**
**AND CONSUMMATION OF THE PLAN**

8.1     <u>Conditions Precedent to the Confirmation of the Plan</u>.  Confirmation of the Plan shall not occur unless each of the following conditions has been satisfied or waived pursuant to <u>Section 8.3</u>:

(a)     The Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the Debtor, J&J, the AHC of Supporting Counsel, and the FCR approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

(b)     Class 4 shall have voted in requisite numbers and amounts in favor of the Plan as required by sections 524(g), 1126, and 1129 of the Bankruptcy Code.

(c)     The Plan and, if applicable, any Plan Supplements, including any schedules, documents, supplements, and exhibits thereto, shall be (i) in form and substance reasonably acceptable to the Debtor, J&J, the AHC of Supporting Counsel, and the FCR and (ii) consistent with section 524(g) of the Bankruptcy Code, as applicable.

(d)     The Confirmation Order shall:

(i)     have been entered;

(ii)     be in form and substance reasonably acceptable to the Debtor, J&J, the AHC of Supporting Counsel, and the FCR; and

(iii)     provide for the Injunctions in form and substance reasonably acceptable to the Debtor, J&J, the AHC of Supporting Counsel, and the FCR.

(e)     The Bankruptcy Court and the District Court acting jointly or the Bankruptcy Court acting separately but affirmed by the District Court shall have made the following findings, each of which shall be contained in the Confirmation Order:

(i)     The Channeling Injunction and the Insurance Entity Injunction are to be implemented in connection with the Plan and the Talc Personal Injury Trust.

(ii)     (A) As of the Effective Date, the Talc Personal Injury Trust shall assume all liability and responsibility, financial and otherwise, for all Channeled Talc Personal Injury Claims and (B) subject to the delivery, transfer, or assignment, as applicable, to the Talc Personal Injury Trust of the Cash Contributions, Talc PI Note, Talc Pledge Agreement, Imerys/Cyprus Related Rights (if the provisions of <u>Section 4.9.3</u> and <u>Section 5.9.1</u> are applicable), and Talc Insurance Assets pursuant to <u>Section 4.9</u>, from and after the Effective Date, no Protected Party (other

49

than, if the provisions of <u>Section 4.9.3</u> and <u>Section 5.9.1</u> are applicable, any Imerys/Cyprus Party for claims based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights, as applicable) shall have any liability or responsibility, financial or otherwise, for any Channeled Talc Personal Injury Claims.

(iii)     As of the Petition Date, the Debtor (as a successor to LLT and Old JJCI) had been named as a defendant in personal injury or wrongful death actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.

(iv)     The Talc Personal Injury Trust shall be funded in whole or in part by securities of the Reorganized Debtor and by the obligation of the Reorganized Debtor to make future payments.

(v)     The Talc Personal Injury Trust, by the exercise of rights granted under the Plan, would be entitled to own, if specified contingencies occur, a majority of the voting shares of the Reorganized Debtor.

(vi)     The Talc Personal Injury Trust shall use its assets or income to pay Channeled Talc Personal Injury Claims, including Talc Personal Injury Demands.

(vii)     As to Talc Personal Injury Demands:

(A)     The Debtor is likely to be subject to substantial future Talc Personal Injury Demands for payment arising out of the same or similar conduct or events that gave rise to the Talc Personal Injury Claims that are addressed by the Channeling Injunction and the Insurance Entity Injunction.

(B)     The actual amounts, numbers, and timing of future Talc Personal Injury Demands cannot be determined.

(C)     Pursuit of Talc Personal Injury Demands outside the procedures prescribed by the Plan and the Plan Documents, including the Trust Distribution Procedures, is likely to threaten the Plan's purpose to deal equitably with Talc Personal Injury Claims and Talc Personal Injury Demands.

(viii)     The terms of the Channeling Injunction and the Insurance Entity Injunction, including any provisions barring actions against third parties pursuant to section 524(g)(4)(A) of the Bankruptcy Code, are set out in the Plan and in the Disclosure Statement.

(ix)     The Plan establishes a separate class of the claimants whose claims are to be addressed by the Talc Personal Injury Trust which class has voted, by at least 75% of those voting, to accept the Plan.

NAI-1539839717

(x)      Pursuant to court orders or otherwise, the Talc Personal Injury Trust shall operate through mechanisms, such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Channeled Talc Personal Injury Claims, or other comparable mechanisms, that provide reasonable assurance that the Talc Personal Injury Trust shall value, and be in a financial position to pay, Channeled Talc Personal Injury Claims, including Talc Personal Injury Demands, that involve similar claims in substantially the same manner.

(xi)      Each Protected Party is:

(A)      identifiable from the terms of the Channeling Injunction and the Insurance Entity Injunction by name or as part of an identifiable group and is or may be alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the Debtor to the extent that such alleged liability arises by reason of one or more of the following:

(I)      such Person's ownership of a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI);

(II)      such Person's involvement in the management of the Debtor or the Reorganized Debtor or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI);

(III)      such Person's service as an officer, director, manager, or employee of the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), or a Person that owns or at any time has owned a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI);

(IV)      such Person's provision of insurance to the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), or a Person that owns or at any time has owned a financial interest in the Debtor or the Reorganized Debtor, a

51

past or present affiliate of the Debtor or the Reorganized Debtor, or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI); or

(V)    such Person's involvement in a transaction changing the corporate structure (including the 2021 Corporate Restructuring and the Prepetition Corporate Restructuring), or in a loan or other financial transaction affecting the financial condition, of the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), or any Person that owns or at any time has owned a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), including (1) involvement in providing financing (debt or equity) or advice to a Person involved in such a transaction or (2) acquiring or selling a financial interest in any Person as part of such transaction; and/or

(B)    otherwise entitled to the Channeling Injunction pursuant to section 1123(b)(6) and/or section 105(a) of the Bankruptcy Code.

(xii)    The FCR was appointed as part of the proceedings leading to issuance of the Channeling Injunction and the Insurance Entity Injunction for the purpose of protecting the rights of all Persons, whether known or unknown, that might subsequently assert, directly or indirectly, against the Debtor a Talc Personal Injury Demand that is addressed in the Channeling Injunction and the Insurance Entity Injunction and channeled to the Talc Personal Injury Trust.

(xiii)    Identifying each Protected Party (by name or as part of an identifiable group, as applicable) in the Channeling Injunction and the Insurance Entity Injunction is fair and equitable with respect to individuals that might assert Talc Personal Injury Demands against each such Protected Party, in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by or on behalf of any such Protected Party.

(xiv)    The Plan and the Plan Documents comply with section 524(g) of the Bankruptcy Code in all respects, and the Talc Personal Injury Trust Documents are fully consistent with the Plan.

(xv)    The Plan, including the Channeling Injunction and the Insurance Entity Injunction, and the other Plan Documents are a fair,

equitable, and reasonable resolution of the liability of the Debtor for the Channeled Talc Personal Injury Claims, including Talc Personal Injury Demands that are Channeled Talc Personal Injury Claims.

(xvi)     The FCR has adequately and completely fulfilled her duties, responsibilities, and obligations as the representative for any and all persons who may assert Talc Personal Injury Demands in the future, but who are currently unknown, in accordance with section 524(g) of the Bankruptcy Code.

(xvii)    Adequate and sufficient notice of the Plan and the Confirmation Hearing, as well as all deadlines for objecting to the Plan, has been given to:  (A) all known creditors and holders of Interests; (B) parties that requested notice in accordance with Bankruptcy Rule 2002 (including the TCC and the FCR); (C) all parties to Unexpired Leases and Executory Contracts with the Debtor; (D) all taxing authorities listed on the Debtor's Schedules or in the Debtor's Claims database; (E) the Department of the Treasury by service upon the District Director of the IRS; (F) state attorneys general and state departments of revenue for states in which the Debtor has conducted business; and (G) the Securities and Exchange Commission; in each case, (I) in accordance with the solicitation procedures governing such service and (II) in substantial compliance with Bankruptcy Rules 2002(b), 3017, and 3020(b).   Such transmittal and service were adequate and sufficient to bind, among other parties, each holder of a Channeled Talc Personal Injury Claim, and each party represented by the FCR, and no other or further notice is or shall be required.

(xviii)   Each holder of a Channeled Talc Personal Injury Claim and each party represented by the TCC or the FCR has been afforded due process based on the notice referenced in clause (xvii) above, the appointment of the TCC and the FCR, and the Plan's compliance with section 524(g) of the Bankruptcy Code.

(xix)     If the provisions of Section 4.9.3 and Section 5.9.1 are applicable, the Bankruptcy Code authorizes the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.3, and from and after the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust, no Imerys/Cyprus Party may assert under any Imerys/Cyprus Agreement or otherwise (i) any defense that the Plan or any other Plan Document does not comply with the Bankruptcy Code or (ii) any defense that the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.3, or any other action contemplated by Section 4.9.3, is prohibited by any Imerys/Cyprus Agreement or by applicable non-bankruptcy law.

NAI-1539839717

(xx)    The Bankruptcy Code authorizes the transfer and assignment of the Talc Insurance Assets by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to <u>Section 4.9.4</u>, and from and after the transfer and assignment of the Talc Insurance Assets to the Talc Personal Injury Trust pursuant to <u>Section 4.9.4</u>, no Talc Insurance Company may assert under any Talc Insurance Policy or Talc Insurance Settlement Agreement (i) any defense that the Plan or any other Plan Document does not comply with the Bankruptcy Code or (ii) any defense that the transfer and assignment of the Talc Insurance Assets by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to <u>Section 4.9.4</u>, or any other action contemplated by <u>Section 4.9.4</u>, is prohibited by any Talc Insurance Policy or Talc Insurance Settlement Agreement or by applicable non-bankruptcy law.

(xxi)    Neither the Plan nor any other Plan Document, including the Trust Distribution Procedures, creates any right or obligation under Case Management Order No. 7(A) entered by the United States District Court for the District of New Jersey in the multidistrict litigation *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*, Civil Action No. 3:16-md-02738, that would permit or require the Debtor or the Reorganized Debtor to withhold any amounts from payments made by it under the Plan or any other Plan Document to or for the benefit of the Talc Personal Injury Trust to account for any common benefit assessments thereunder or to make any payment to the common benefit fund account established pursuant thereto.

(f)    The Bankruptcy Court and the District Court, as required, shall have entered an order approving the Channeling Injunction and the Insurance Entity Injunction, which order may be included in the Confirmation Order and which order shall be in form and substance reasonably acceptable to the Debtor, J&J, the AHC of Supporting Counsel, and the FCR.

8.2    <u>Conditions Precedent to the Effective Date of the Plan</u>.  Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan shall not occur unless and until each of the following conditions has been satisfied or waived pursuant to <u>Section 8.3</u>:

(a)    The Confirmation Order in form and substance reasonably acceptable to the Debtor, J&J, the AHC of Supporting Counsel, and the FCR shall have been entered, and shall have become a Final Confirmation Order.

(b)    The Confirmation Order shall approve the Channeling Injunction and the Insurance Entity Injunction and authorize the Debtor and the Reorganized Debtor to implement the Plan, in form and substance reasonably acceptable to the Debtor, J&J, the AHC of Supporting Counsel, and the FCR, and shall have become a Final Confirmation Order.

(c)     The Confirmation Order, the Channeling Injunction, and the Insurance Entity Injunction shall be in full force and effect, and no order shall be in effect staying or enjoining the implementation or enforcement of the Plan, the Confirmation Order, the Channeling Injunction, or the Insurance Entity Injunction.

(d)     The Talc Personal Injury Trust Defenses, Cash Contribution (to the extent payable on the Effective Date), Talc PI Note, Talc PI Pledge Agreement, Imerys/Cyprus Related Rights (if the provisions of Section 4.9.3 and Section 5.9.1 are applicable), and Trust Insurance Assets shall, simultaneously with the occurrence of the Effective Date or as otherwise provided herein, be delivered, transferred, and assigned, as applicable, to the Talc Personal Injury Trust in accordance with Article IV.

(e)     The Talc Personal Injury Trust Agreement (and related documents) and the other applicable Plan Documents (including those attached to any Plan Supplement) necessary or appropriate to implement the Plan shall have been executed, delivered, and, where applicable, filed with the appropriate governmental units in form and substance reasonably acceptable to the Debtor, J&J, the AHC of Supporting Counsel, and the FCR, and shall be fully enforceable in accordance with their terms.

(f)     The fees of the United States Trustee then owed by the Debtor shall have been paid in full.

(g)     The latest of the following dates shall have occurred:  (i) the date that is seventy five (75) days after the Confirmation Date; (ii) the date that is two hundred fifty (250) days after the date on which the Talc Personal Injury Trust first begins to accept the submission of Talc Personal Injury Claims in accordance with the Trust Distribution Procedures; and (iii) the date that is one hundred ten (110) days after the Talc Trustees shall have delivered the Claims Submission Report (as such term defined in the Talc Personal Injury Trust Agreement) to the Debtor and J&J.

The Effective Date shall occur as of 12:01 a.m., prevailing Central Time, on the date that the Debtor or Reorganized Debtor files a notice with the Bankruptcy Court stating that the Effective Date has occurred because each of the conditions to the Effective Date has been satisfied or waived pursuant to Section 8.3.

8.3     Waiver of Conditions Precedent.  To the greatest extent permitted by law, each of the conditions precedent in this Article VIII may be waived or modified, in whole or in part, by the Debtor (with the consent of (a) in the event such waiver or modification affects the rights of J&J expressly contained herein, J&J, (b) in the event such waiver or modification affects the rights of the AHC of Supporting Counsel expressly contained herein, the AHC of Supporting Counsel, and (c) in the event such waiver or modification affects the rights of the FCR expressly contained herein, the FCR).  Any waiver or modification of a condition precedent under this Section 8.3 may be effected at any time, without notice, without leave or order of the Bankruptcy Court or District Court, and without any other formal action.  Confirmation and the Effective Date shall occur irrespective of whether any Claims allowance process or related litigation has been completed.

NAI-1539839717

8.4     Notice of Effective Date.  The Debtor shall file with the Bankruptcy Court the notice contemplated by Section 8.2 within five (5) Business Days after each of the conditions precedent to the Effective Date of the Plan set forth therein has been satisfied or waived pursuant to Section 8.3.

8.5     Effect of Nonoccurrence of Conditions Precedent to the Effective Date of the Plan. If any of the conditions precedent to the Effective Date of the Plan set forth in Section 8.2 has not been satisfied or duly waived in accordance with Section 8.3, then, upon motion by the Debtor made before the time that each of such conditions precedent has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order shall be vacated by the Bankruptcy Court; *provided*, *however*, that, notwithstanding the filing of such motion, the Confirmation Order may not be vacated if each of the conditions precedent set forth in Section 8.2 is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion.  If at any time after the Effective Date, the Reorganized Debtor (with the consent of J&J) elects to revoke or withdraw the Plan as contemplated by Section 9.12, then, upon notice by the Reorganized Debtor to the Bankruptcy Court, the Confirmation Order shall be vacated by the Bankruptcy Court.  If the Confirmation Order is vacated pursuant to this Section 8.5:  (a) the Plan shall be null and void in all respects, including with respect to the discharge of Claims; and (b) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interest in, the Debtor or (ii) prejudice in any manner the rights, including any claims or defenses, of the Debtor or any other Person; *provided*, *however*, that any completed and executed Acceptance and Release that is then binding on a holder of a Talc Personal Injury Claim in accordance with its terms shall continue to be binding thereon in accordance with its terms.

# ARTICLE IX
## MEANS FOR IMPLEMENTATION OF THE PLAN

9.1     General.  On or after the Confirmation Date, the Debtor shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary or appropriate to achieve the Effective Date and enable the Reorganized Debtor to implement effectively the provisions of the Plan, the Talc Personal Injury Trust Documents, and the Confirmation Order, including the creation of the Talc Personal Injury Trust and the preparations for the delivery, transfer, and assignment of assets to the Talc Personal Injury Trust pursuant to Article IV.

9.2     Operations of the Debtor Prior to the Effective Date.  The Debtor shall continue to operate as debtor and debtor-in-possession through and until the Effective Date.

9.3     Articles of Organization and Operating Agreement.  From and after the Effective Date, the Reorganized Debtor shall be governed pursuant to the Amended Charter Documents. The Amended Articles of Organization and the Amended Operating Agreement shall contain such provisions as are necessary to satisfy the provisions of the Plan and, to the extent necessary to prohibit the issuance of non-voting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the Amended Charter Documents after the Effective Date, as permitted by applicable law.

9.4     <u>Corporate Action</u>.  On the Effective Date, the matters under the Plan involving or requiring corporate action of the Debtor or Reorganized Debtor, including actions requiring a vote of the board of managers and execution of all documentation incident to the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers or managers of the Debtor or Reorganized Debtor.

9.5     <u>Authority of Officers</u>.  Each officer of the Debtor and the Reorganized Debtor shall be authorized and empowered to execute, deliver, file, or record such contracts, instruments, releases, and other agreements and documents and take such other actions as may be necessary or appropriate to effect and implement the provisions of the Plan.  The secretary or any assistant secretary of the Debtor or the Reorganized Debtor shall be authorized to certify or attest to any of the actions taken pursuant to this <u>Section 9.5</u>.

9.6     <u>Post-Effective Date Governance; Continued Existence of the Reorganized Debtor</u>.

9.6.1     <u>General</u>.  The Reorganized Debtor shall continue its existence as a separate entity after the Effective Date, with all the powers thereof, pursuant to the applicable law in the jurisdiction in which the Reorganized Debtor is formed and pursuant to the Amended Charter Documents and any other formation documents in effect following the Effective Date, and such documents are deemed to be adopted pursuant to the Plan and require no further action or approval.

9.6.2     <u>Officers and Managers</u>.  On the Effective Date, the officers and managers of the Reorganized Debtor then in office shall continue to serve in such capacities, subject to the terms of the Amended Charter Documents and any other formation document in effect following the Effective Date.

9.6.3     <u>Property and Operations</u>.  On the Effective Date, all property of the Debtor's Estate other than the assets delivered, transferred, or assigned to the Talc Personal Injury Trust pursuant to <u>Article IV</u>, including any property acquired by the Debtor or the Reorganized Debtor pursuant to the Plan, shall vest in the Reorganized Debtor, free and clear of all Claims, interests, liens, other Encumbrances, and liabilities of any kind except as otherwise expressly provided herein.  On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any claims, interests, or Retained Rights of Action, without supervision or approval by the Bankruptcy Court, or notice to any other Person, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

9.7     <u>Arrangements of the Reorganized Debtor with Managers, Officers, and Employees</u>.  As of the Effective Date, the Reorganized Debtor shall be authorized to:  (a) maintain, amend, or revise existing indemnification and other arrangements with its active and retired managers and officers, subject to the terms and conditions of any such agreement, or enter into new indemnification and other arrangements with its active and retired managers and officers; and (b) maintain, amend, cancel, or revise the Secondment Agreement or enter into new employee secondment arrangements with its Affiliates; all as determined by the board of managers of the Reorganized Debtor.

9.8    Good Faith Compromise and Settlement.  The Plan, the other Plan Documents, and the Confirmation Order constitute a good faith compromise and settlement of claims and controversies based on the unique circumstances of this Chapter 11 Case, and none of the foregoing documents, the Disclosure Statement, or any other papers filed in furtherance of Plan Confirmation, nor any drafts of such documents, may be offered into evidence or deemed as an admission in any context whatsoever beyond the purposes of the Plan, in any other litigation or proceeding, except as necessary, and as admissible in such context, to enforce their terms before the Bankruptcy Court or any other court of competent jurisdiction.

9.9    Resolution of Channeled Talc Personal Injury Claims.  Channeled Talc Personal Injury Claims shall be channeled to and resolved by the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents, subject to:  (a) the right of any Talc Insurance Company to raise any valid Talc Insurer Coverage Defense in response to any claim, cause of action, or right asserted by the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its subrogee having the exclusive right (i) to pursue and resolve any Talc In-Place Insurance Coverage, (ii) to pursue and resolve any Talc Insurance Action, (iii) to pursue and obtain any Talc Insurance Recoveries, and (iv) to negotiate and enter into any Talc Insurance Settlement Agreement) in respect of any Talc Insurance Assets; and (b) if the provisions of Section 4.9.3 and Section 5.9.1 are applicable, the right of any Imerys/Cyprus Party to raise any valid Imerys/Cyprus Defense in response to any claim, cause of action, or right asserted by the Talc Personal Injury Trust in respect of any Imerys/Cyprus Related Rights.

9.10    Cash for Cash Contributions, Distributions, and Other Payments Pursuant to the Plan.  All Cash for the payment of Cash Contributions, Distributions, and other Cash payments to be made by the Reorganized Debtor pursuant to the Plan and the Talc Personal Injury Trust Documents shall be funded by the Reorganized Debtor.  All Cash necessary for the Reorganized Debtor to fund the payment of such Cash Contributions, Distributions, and other Cash payments pursuant to the Plan and the Talc Personal Injury Trust Documents shall be obtained through: (a) the Reorganized Debtor's Cash balances; (b) the Funding Agreements; or (c) such other means of financing or funding as determined by the board of managers of the Reorganized Debtor.  On the Effective Date, J&J and Holdco shall execute and deliver to the Talc Personal Injury Trust the Cash Contributions Guarantee as provided in Section 4.9.1(c).  For the avoidance of doubt, nothing contained in this Section 9.10 shall in any way affect the obligations of J&J and Holdco under the Cash Contributions Guarantee.

9.11    Modification of the Plan.

(a)    To the extent permissible under section 1127 of the Bankruptcy Code, at any time prior to substantial consummation of the Plan, any proposed amendments to or modifications of the Plan under section 1127 of the Bankruptcy Code or as otherwise permitted by law may be submitted by the Debtor (with the consent of (a) J&J, (b) solely to the extent that any proposed amendments to or modifications of the Plan materially negatively affect the rights of the AHC of Supporting Counsel expressly contained herein, the AHC of Supporting Counsel, and (c) solely to the extent that any proposed amendments to or modifications of the Plan materially negatively affect the rights of the FCR expressly contained herein, the FCR), without additional disclosure pursuant to section 1125 of the Bankruptcy Code, unless section 1127 of the Bankruptcy Code requires additional disclosure.  In addition, and without limiting the generality of the

58

foregoing, prior to the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, to the extent permissible under section 1127 of the Bankruptcy Code; *provided*, *however*, that such technical adjustments and modifications do not adversely affect in a material way the rights or protections of the Protected Parties or the treatment of holders of Claims or Interests under the Plan.

(b)     To the extent permissible under section 1127(b) of the Bankruptcy Code, following substantial consummation of the Plan, the Reorganized Debtor may remedy any defects or omissions or reconcile any inconsistencies in the Plan Documents for the purpose of implementing the Plan in such manner as may be necessary or appropriate to carry out the purposes and intent of the Plan.

(c)     From and after the Effective Date, any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented pursuant to this <u>Section 9.11</u>, unless the Bankruptcy Court rules otherwise.

9.12   <u>Revocation or Withdrawal of the Plan</u>.  The Debtor reserves the right to revoke and withdraw the Plan (with the consent of J&J) at any time before its substantial consummation. Without limiting the generality of the foregoing, and for the avoidance of doubt, at any time prior to the earlier to occur of (a) the latest to occur of (i) the date that is seventy five (75) days after the Confirmation Date, (ii) the date that is two hundred fifty (250) days after the date on which the Talc Personal Injury Trust first begins to accept the submission of Channeled Talc Personal Injury Claims in accordance with the Trust Distribution Procedures, and (iii) the date that is one hundred ten (110) days after the Talc Trustees shall have delivered the Claims Submission Report (as such term defined in the Talc Personal Injury Trust Agreement) to the Debtor and J&J; and (b) the Effective Date, the Debtor (with the consent of J&J) may revoke and withdraw the Plan for any of the following reasons:  (A) the Claims Submission Report (as such term is defined in the Talc Personal Injury Trust Agreement) shows that fewer than ninety five percent (95%) of all holders of Existing Direct Claims represented by The Smith Law Firm, PLLC who timely submitted their respective Existing Direct Claims to the Talc Personal Injury Trust included a properly completed and executed Acceptance and Release as part of their submission; (B) the Claims Submission Report (as such term is defined in the Talc Personal Injury Trust Agreement) shows that fewer than ninety five percent (95%) of all holders of Existing Direct Claims who timely submitted their respective Existing Direct Claims to the Talc Personal Injury Trust included a properly completed and executed Acceptance and Release as part of their submission; or (C) the United States Trustee or any association or organization advocating on behalf of attorneys who regularly represent personal injury claimants opposes any motion of, or any court order sought by, the Debtor, seeks to have any court order that has been granted in favor of the Debtor reversed, vacated, stayed, modified, or amended, or appeals, seeks certiorari, or moves for a new trial, reargument, or rehearing with respect to any such court order.  The Debtor reserves the right to revoke and withdraw the Plan (with the consent of J&J) after substantial consummation of the Plan if there is an Adverse SCOTUS Ruling.  If the Debtor revokes or withdraws the Plan, the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor, or any other Person, or to prejudice in any manner the rights of the Debtor, or any other Person, in any further proceedings involving the Debtor; *provided*, *however*, that any completed and executed Acceptance and Release then binding on a holder of a Talc Personal Injury Claim in accordance with its terms shall continue to be binding

59

thereon in accordance with its terms.  For the avoidance of doubt, unless and until the Plan is confirmed and the Effective Date occurs, the Plan will have no force or effect.

9.13    Certain Technical Modifications.  Prior to the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, to the extent permissible under section 1127 of the Bankruptcy Code; *provided, however*, that such technical adjustments and modifications do not adversely affect in a material way the rights or protections of the Protected Parties or the treatment of holders of Claims or Interests under the Plan.

## ARTICLE X
## EFFECT OF CONFIRMATION

10.1    Preservation of Rights of Action by the Debtor and the Reorganized Debtor.

10.1.1    Retained Rights of Action.  The Reorganized Debtor shall retain and may enforce, prosecute or settle, and shall have the sole right to enforce, prosecute or settle, the Retained Rights of Action.  The Reorganized Debtor or its successors may pursue or resolve such Retained Rights of Action, as appropriate in accordance with the best interests of the Reorganized Debtor or its successors holding such Retained Rights of Action.  The Reorganized Debtor's rights under this Section 10.1.1 shall be preserved notwithstanding the occurrence of the Effective Date.

10.1.2    Reservation of Rights.  No Person may rely on the absence of a specific reference in the Plan, any Plan Supplement, or the Disclosure Statement to any Retained Rights of Action against them as any indication that the Reorganized Debtor will not pursue the Retained Rights of Action.  The Reorganized Debtor expressly reserves all rights to prosecute any and all Retained Rights of Action.  Unless any of the Retained Rights of Action against a Person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all such Retained Rights of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Retained Rights of Action as a consequence of the Confirmation of the Plan.

10.1.3    Retained Defenses.  Without limiting the generality of the foregoing, upon the Effective Date, except as expressly provided in Article IV with respect to Talc Personal Injury Trust Defenses, Imerys/Cyprus Related Rights (if the provisions of Section 4.9.3 and Section 5.9.1 are applicable), and Talc Insurance Assets, the Reorganized Debtor shall retain and enforce all defenses and counterclaims to all Claims that were or could have been asserted against the Debtor or its Estate, including setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code.

10.1.4    No Approval Required.  On or after the Effective Date, subject to Article IV with respect to Talc Personal Injury Trust Defenses, Imerys/Cyprus Related Rights (if the provisions of Section 4.9.3 and Section 5.9.1 are applicable), and Talc Insurance Assets, the Reorganized Debtor may pursue, settle, or withdraw, without

Bankruptcy Court approval, claims, rights, or causes of action as it determines in accordance with its best interests.

10.2    Imerys/Cyprus Matters.

     10.2.1    Imerys/Cyprus Related Rights.  If the provisions of Section 4.9.3 and Section 5.9.1 are applicable, the provisions of this Section 10.2.1 shall apply to all Persons (including the Imerys/Cyprus Parties):

     (a)    Preservation of Imerys/Cyprus Related Rights.  All Imerys/Cyprus Related Rights, and all claims, causes of action, and rights in respect thereof, shall be preserved notwithstanding anything to the contrary contained in the Plan or the Confirmation Order.  For the avoidance of doubt, nothing in the Plan or the Confirmation Order shall discharge, settle, release, enjoin, or otherwise impair any claim against any Imerys/Cyprus Party based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights.

     (b)    Actions in Respect of Imerys/Cyprus Related Rights From and After the Effective Date.

     (i)    Upon the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.3 on the Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date, the Imerys/Cyprus Related Rights shall exclusively vest in the Talc Personal Injury Trust in accordance with section 1123(a)(5)(B) of the Bankruptcy Code.

     (ii)    From and after the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.3 on the Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date, the Talc Personal Injury Trust shall retain the Imerys/Cyprus Related Rights, and all claims, causes of action, and rights in respect thereof, as the appointed estate representative in accordance with section 1123(b)(3)(B) of the Bankruptcy Court.

     (iii)    From and after the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.3 on the Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date, the Talc Personal Injury Trust shall have the exclusive right to pursue and resolve the Imerys/Cyprus Related Rights.

     (c)    No Impairment of Rights or Obligations of Imerys/Cyprus Parties.

     (i)    Nothing contained in the Plan, the Plan Documents, or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing,

altering, supplementing, changing, expanding, decreasing, or modifying the rights or obligations of any Imerys/Cyprus Party or the Debtor or any Debtor Corporate Party arising out of or under any Imerys/Cyprus Agreement.  For all issues relating to indemnity rights of the Debtor, including the venue and choice-of-law rules for resolving disputes relating thereto, the provisions, terms, conditions, and limitations of the Imerys/Cyprus Agreements shall control.  For the avoidance of doubt, nothing contained in the Plan, the Plan Documents, or the Confirmation Order shall operate to require any Imerys/Cyprus Party to indemnify or pay the liability of any other Protected Party that it would not have been required to pay in the absence of the Plan, or to impose any requirement for an Imerys/Cyprus Party to mount the defense of any claim, indemnify any claim, or otherwise undertake any action that an Imerys/Cyprus Party would not have been required to take in the absence of the Plan.

(ii)    The Plan, the Plan Documents, the Confirmation Order, and all proceedings, determinations, and findings in, of, or by the Bankruptcy Court are neutral with respect to, and have no effect on, the rights, defenses, and obligations of the Debtor, the Debtor Corporate Parties, the Imerys/Cyprus Parties, and the Talc Personal Injury Trust under the Imerys/Cyprus Agreements.  Nothing in the Chapter 11 Case shall be construed otherwise or be used as evidence to support or suggest a construction to the contrary.

(d)    Plan Binding on Imerys/Cyprus Parties.  The Plan, the Plan Documents, and the Confirmation Order shall be binding on the Imerys/Cyprus Parties; *provided*, *however*, that, except as provided in Section 10.2.1(e), none of (a) the Bankruptcy Court's approval of the Plan or the Plan Documents, (b) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (c) any estimation or valuation of Talc Personal Injury Claims, either individually or in the aggregate (including any agreement as to the valuation of Talc Personal Injury Claims) in the Chapter 11 Case shall, with respect to the Imerys/Cyprus Parties, constitute a trial or hearing on the merits or an adjudication, judgment, finding, conclusion, or other determination, or be used as evidence of or suggestion regarding the rights and obligations of any Imerys/Cyprus Party under any Imerys/Cyprus Agreement.

(e)    Issues Actually Litigated by Imerys/Cyprus Parties.  Nothing in this Section 10.2.1 is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against the Imerys/Cyprus Parties with respect to any issue that is actually litigated by any of them as part of its objections, if any, to Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by any Imerys/Cyprus Party in connection with or related to Confirmation of the Plan; *provided*, *however*, that any Plan objection that an Imerys/Cyprus Party withdraws prior to the conclusion of the Confirmation Hearing (or a finding that an Imerys/Cyprus Party lacks standing to litigate or is otherwise unable to or chooses not to litigate at or before the Confirmation Hearing) shall be deemed not to have been actually litigated.  The resolution of any related objection raised by other parties and any related

62

findings or determinations (other than those contemplated by Section 8.1(e)(xix)) shall not be offered for evidentiary purposes nor be binding on any Imerys/Cyprus Party in any way or otherwise prejudice, impair, or affect (under principles of preclusion, waiver, estoppel, or otherwise) an Imerys/Cyprus Party's legal, equitable, or contractual rights or obligations. No Imerys/Cyprus Party shall be bound, prejudiced, impaired, or affected (under principles of preclusion, waiver, estoppel, or otherwise) by the fact that an Imerys/Cyprus Party withdrew, chose to withdraw, or did not press any objection or argument before or after Confirmation.

10.2.2     Imerys/Cyprus Settlement. If the Imerys/Cyprus Settlement Closing Date occurs, whether prior to, on, or following the Effective Date, nothing in the Plan or any other Plan Document will prevent a holder of a Channeled Talc Personal Injury Claim from recovering from both (a) the Talc Personal Injury Trust in respect of his, her, or its Channeled Talc Personal Injury Claim and (b) any trust established pursuant to any plan of reorganization that becomes effective in any chapter 11 case of Imerys, Cyprus, or any of their respective Affiliates (or the estates thereof) in respect of talc-related personal injury claims against Imerys, Cyprus, and/or any of their respective Affiliates, so long as the Imerys/Cyprus Settlement (including the releases contemplated thereby) is effective and, in the case of recovery from a trust established pursuant to any such plan of reorganization, such plan of reorganization is consistent with the Imerys/Cyprus Settlement (including the releases contemplated thereby).

10.3     Talc Insurance Assets. The provisions of this Section 10.3 shall apply to all Persons (including all Talc Insurance Companies).

10.3.1     Preservation of Talc Insurance Assets. All Talc Insurance Assets, and all claims, causes of action, and rights in respect thereof, shall be preserved notwithstanding anything to the contrary contained in the Plan or the Confirmation Order. For the avoidance of doubt, nothing in the Plan or the Confirmation Order shall discharge, settle, release, enjoin, or otherwise impair any claim against any Talc Insurance Company based on, arising out of, or in any way relating to the Talc Insurance Assets.

10.3.2     Actions in Respect of Talc Insurance Assets From and After the Effective Date.

(a)     Upon the transfer and assignment of the Talc Insurance Assets by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.4 on the Effective Date, subject to the provisions of Section 4.9.4 and the Cooperation Agreement, the Talc Insurance Assets shall exclusively vest in the Talc Personal Injury Trust in accordance with section 1123(a)(5)(B) of the Bankruptcy Code;

(b)     From and after the transfer and assignment of the Talc Insurance Assets by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.4 on the Effective Date, subject to the provisions of Section 4.9.4 and the Cooperation Agreement, the Talc Personal Injury Trust shall retain the Talc Insurance Assets, and all claims, causes of action, and rights in respect thereof, as the appointed estate representative in accordance with section 1123(b)(3)(B) of the Bankruptcy Court; and

(c)     From and after the transfer and assignment of the Talc Insurance Assets by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.4 on the Effective Date, pursuant to the provisions of Section 4.9.4 and the Cooperation Agreement:  (i) the Reorganized Debtor, as the subrogee of the Talc Personal Injury Trust, shall have the exclusive right (A) to pursue and resolve any Talc In-Place Insurance Coverage, (B) to pursue and resolve any Talc Insurance Action, (C) to pursue and obtain any Talc Insurance Recoveries, and (D) to negotiate and enter into any Talc Insurance Settlement Agreement; and (ii) any of the following received by the Talc Personal Injury Trust shall be delivered to, and retained by, the Reorganized Debtor:  (A) all proceeds of Talc In-Place Insurance Coverage; (B) all proceeds or benefits of any Talc Insurance Action; and (C) all amounts payable pursuant to any Talc Insurance Settlement Agreement.  For the avoidance of doubt, nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect any rights that any Debtor Corporate Party may have under any Talc Insurance Policy or Talc Insurance Settlement Agreement.

10.3.3     No Impairment of Rights or Obligations of Talc Insurance Companies.

(a)     Except as provided in any Talc Insurance Settlement Agreement or in Section 11.2.1, nothing contained in the Plan, the Plan Documents, or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the rights or obligations of any Talc Insurance Company or the Debtor arising out of or under any Talc Insurance Policy.  For all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Talc Insurance Policies or Talc Insurance Settlement Agreements shall control.  For the avoidance of doubt, nothing contained in the Plan, the Plan Documents, or the Confirmation Order shall operate to require any Talc Insurance Company to indemnify or pay the liability of any Protected Party that it would not have been required to pay in the absence of the Plan.

(b)     The Plan, the Plan Documents, the Confirmation Order, and all proceedings, determinations, and findings in, of, or by the Bankruptcy Court are neutral with respect to, and have no effect on, the rights, defenses, and obligations of the Debtor, the Talc Insurance Companies, and the Talc Personal Injury Trust under the Talc Insurance Policies.  Nothing in the Chapter 11 Case shall be construed otherwise or be used as evidence to support or suggest a construction to the contrary.

10.3.4     Plan Binding on Talc Insurance Companies.  The Plan, the Plan Documents, and the Confirmation Order shall be binding on the Talc Insurance Companies; provided, however, that, except as provided in Section 10.3.6, none of (a) the Bankruptcy Court's approval of the Plan or the Plan Documents, (b) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (c) any estimation or valuation of Talc Personal Injury Claims, either individually or in the aggregate (including any agreement as to the valuation of Talc Personal Injury Claims) in the Chapter 11 Case shall, with respect to any Talc Insurance Company, constitute a trial or hearing on the merits or an adjudication, judgment, finding, conclusion, or other determination, or be used

NAI-1539839717

as evidence of or suggestion regarding the rights and obligations of any Talc Insurance Company under any Talc Insurance Policy.

10.3.5   <u>Plan Protections of Settling Talc Insurance Companies</u>.  No provision of the Plan, other than those provisions contained in the applicable Injunctions set forth in <u>Article XI</u>, shall be interpreted to affect or limit the protections afforded to any Settling Talc Insurance Company by the Channeling Injunction or the Insurance Entity Injunction.

10.3.6   <u>Issues Actually Litigated by the Talc Insurance Companies</u>.  Nothing in this <u>Section 10.3</u> is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Talc Insurance Company with respect to any issue that is actually litigated by such Talc Insurance Company as part of its objections, if any, to Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by such Talc Insurance Company in conjunction with or related to Confirmation of the Plan; *provided*, *however*, that any Plan objection that a Talc Insurance Company withdraws prior to the conclusion of the Confirmation Hearing (or a finding that a Talc Insurance Company lacks standing to litigate or is otherwise unable to or chooses not to litigate at or before the Confirmation Hearing) shall be deemed not to have been actually litigated.  The resolution of any related objection raised by other parties and any related findings or determinations (other than those contemplated by <u>Section 8.1(e)(xx)</u>) shall not be offered for evidentiary purposes nor be binding on any Talc Insurance Company in any way or otherwise prejudice, impair, or affect (under principles of preclusion, waiver, estoppel, or otherwise) a Talc Insurance Company's legal, equitable, or contractual rights or obligations.  No Talc Insurance Company shall be bound, prejudiced, impaired, or affected (under principles of preclusion, waiver, estoppel, or otherwise) by the fact that a Talc Insurance Company withdrew, chose to withdraw, or did not press any objection or argument before or after Confirmation.

10.4   <u>Preservation of Rights of Action by the Talc Personal Injury Trust</u>.  As of the Effective Date, the Talc Personal Injury Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Talc Personal Injury Trust, including Channeled Talc Personal Injury Claims and Talc Personal Injury Trust Defenses.  Without limiting the foregoing, on and after the Effective Date, the Talc Personal Injury Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all such actions in the name of either the Debtor or the Reorganized Debtor, if deemed necessary or appropriate by the Talc Personal Injury Trust.  The Talc Personal Injury Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to the Effective Date arising out of or in any way relating to any such legal action or other proceeding.  This <u>Section 10.4</u> shall not apply to legal actions and other proceedings related to (a) if the provisions of <u>Section 4.9.3</u> and <u>Section 5.9.1</u> are applicable, the Imerys/Cyprus Related Rights, which shall be pursued, resolved, and settled in accordance with the provisions of <u>Section 4.9.3</u> and <u>Section 10.2.1</u>, or (b) the Talc Insurance Assets, which shall be pursued, resolved, and settled in accordance with the provisions of <u>Section 4.9.3</u> and <u>Section 10.3</u>.

10.5     Terms of Injunctions and Automatic Stay.

10.5.1     General.  Any and all injunctions and/or automatic stays provided for in or in connection with the Chapter 11 Case, whether pursuant to sections 105, 362, or any other provision of the Bankruptcy Code, Bankruptcy Rules, or other applicable law in existence immediately prior to the Confirmation Date, shall remain in full force and effect until the Injunctions become effective pursuant to a Final Order, and shall continue to remain in full force and effect thereafter as and to the extent provided by the Plan, the Confirmation Order, or by their own terms.  In addition, on and after Confirmation, the Debtor may seek such further orders as the Debtor deems necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

10.5.2     Effectiveness.  Each of the Injunctions contained in the Plan or the Confirmation Order shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan or the Confirmation Order.

10.6     The FCR and the TCC.

10.6.1     General.  The FCR and the TCC shall continue in their official capacities until the Effective Date.  The Debtor shall pay the reasonable fees and expenses incurred by the FCR and the TCC through the Effective Date, in accordance with the Compensation Procedures Order and the terms of the Plan, including Section 2.2.

10.6.2     Dissolution.  On the Effective Date, the TCC shall dissolve, and the members of such committee shall be released and discharged from all duties and obligations arising from or related to the Chapter 11 Case.  Similarly, on the Effective Date, the FCR shall be deemed released and discharged from all duties and obligations from or related to the Chapter 11 Case.  The Professionals retained by the TCC and the members thereof or by the FCR shall not be entitled to assert any Fee Claim for any services rendered or expenses incurred after the Effective Date, except for services rendered and expenses incurred in connection with any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed and served after the Effective Date pursuant to Section 2.2.

10.7     No Effect on United States Trustee.  Nothing in this Section 10 shall limit or otherwise affect the rights of the United States Trustee under section 502 of the Bankruptcy Code or otherwise to object to Claims or requests for allowance of Fee Claims and other Administrative Claims.

10.8     Binding Effect.  Subject to Section 10.2 and Section 10.3, as of the Effective Date, the Plan, the Plan Documents, and the Confirmation Order shall be binding on the Debtor, the Reorganized Debtor, the Talc Personal Injury Trust, any and all holders of Claims against or Interests in the Debtor (regardless of whether such Claim or Interest is Impaired and regardless of whether such holder voted to accept the Plan), and any and all other Persons that are affected in any manner by the Plan.

66

## ARTICLE XI
## DISCHARGE, RELEASES, INJUNCTIONS, AND EXCULPATION

11.1    <u>Discharge and Injunctions</u>.

      11.1.1    <u>Discharge of Claims Against the Debtor</u>.  As of the Effective Date, Confirmation of the Plan shall afford the Debtor a discharge to the fullest extent permitted by Bankruptcy Code sections 524 and 1141(d)(1).

      **11.1.2    <u>Discharge Injunction</u>.  From and after the Effective Date, to the maximum extent permitted under applicable law, all Persons that hold, have held, or may hold a Claim, demand, or other debt or liability that is discharged are permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims, demands, debts, or liabilities:  (i) commencing or continuing any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, or their respective property; (ii) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, or their respective property; (iii) creating, perfecting, or enforcing any lien or other Encumbrance of any kind against the Debtor, the Reorganized Debtor, or their respective property; and (iv) commencing or continuing any judicial or administrative proceeding, in any forum and in any place in the world, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.  The foregoing injunction shall extend to the successors of the Debtor (including the Reorganized Debtor) and their respective properties and interests in property.  The discharge provided in this <u>Section 11.1</u> shall void any judgment obtained against the Debtor or any successor of the Debtor (including the Reorganized Debtor) at any time, to the extent that such judgment relates to a discharged Claim or demand.  Notwithstanding the foregoing, nothing in this <u>Section 11.1</u> shall impair the rights of holders of Judgment Claims to seek to enforce and collect on the judgments on which such Judgment Claims are based, including through the defense or prosecution of appellate litigation related thereto.**

11.2    **<u>Releases</u>.**

      **11.2.1    <u>Releases by the Debtor and Its Estate</u>.  As of the Effective Date, for good and valuable consideration (including services provided before and during the Chapter 11 Case to facilitate the implementation of the Talc Personal Injury Trust), the adequacy of which is hereby confirmed, the Reorganized Debtor, the Debtor Corporate Parties, and the respective Representatives of the Debtor, the Reorganized Debtor, and the Debtor Corporate Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, by the Debtor and the Estate from any and all claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, causes of action, liens, remedies, losses, contributions, indemnities, costs, liabilities, fees (including attorneys' fees) and expenses whatsoever, including any indirect claims asserted or assertable on behalf**

NAI-1539839717

of the Debtor or the Estate (including any Recovery Actions), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtor or the Estate would have been legally entitled to assert in its own right, or on behalf of the holder of any Claim or Interest or other Person, based on, arising out of, or in any way relating to, in whole or in part, the Debtor (as it existed prior to or after the Petition Date), the 2021 Corporate Restructuring, the 2021 Chapter 11 Case, the 2023 Chapter 11 Case, the 2023 Conversion, the 2023 Funding Agreement Modifications, the Prepetition Corporate Restructuring, the Estate, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions (including the exercise of any common law or contractual rights of setoff or recoupment at any time on or prior to the Effective Date) between the Debtor, on the one hand, and the Reorganized Debtor, any Debtor Corporate Party, or any Representative of the Debtor, the Reorganized Debtor, or any Debtor Corporate Party, on the other hand, the sale or distribution of assets by Holdco in connection with the separation of J&J's consumer health business into a new company named Kenvue, Inc., the Love Proceeding, the Bynum Proceeding, the restructuring of any Claim or Interest before or during the Chapter 11 Case, the negotiation, formulation, preparation, or implementation of, or the solicitation of votes with respect to, the Plan, or any other act or omission related to the Disclosure Statement, the Plan, or any related agreement, instrument, or document or any of the foregoing.  Notwithstanding the foregoing, claims or causes of action against the Reorganized Debtor, any Debtor Corporate Party, or any Representative of the Debtor, the Reorganized Debtor, or any Debtor Corporate Party arising out of or relating to any act or omission of such Person prior to the Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted a criminal act, actual fraud, gross negligence, or willful misconduct, including findings after the Effective Date, are not released pursuant to this <u>Section 11.2.1</u>; *provided*, *however*, that (i) no Person may commence or pursue any such claim or cause of action without the Bankruptcy Court (A) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim and (B) specifically authorizing such Person to bring such claim or cause of action and (ii) to the fullest extent permitted by law, the Bankruptcy Court shall have sole and exclusive jurisdiction to adjudicate the underlying colorable claim or cause of action.  For the avoidance of doubt, nothing contained in this <u>Section 11.2.1</u> shall release or otherwise affect the obligations of any Person to be performed from and after the Effective Date under any Funding Agreement, the Cash Contributions Guarantee, or any other Plan Document to which it is a party.  The Reorganized Debtor, and any other entity that continues the Debtor's business after the Effective Date, shall be bound, to the same extent the Debtor and the Estate are bound, by the releases set forth in this <u>Section 11.2.1</u>.

NAI-1539839717

11.2.2     <u>Releases by Holders of Claims</u>.  **As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties before and during the Chapter 11 Case to facilitate the implementation of the Talc Personal Injury Trust, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, by the Releasing Claim Holders from any and all claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, causes of action, liens, remedies, losses, contributions, indemnities, costs, liabilities, fees (including attorneys' fees), and expenses whatsoever, including any indirect claims asserted or assertable on behalf of the Debtor or the Estate (including any Recovery Actions), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons or parties claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the holder of any Claim or Interest or other Person, based on, arising out of, or in any way relating to, in whole or in part, the Debtor (as it existed prior to or after the Petition Date), the 2021 Corporate Restructuring, the 2021 Chapter 11 Case, the 2023 Chapter 11 Case, the 2023 Conversion, the 2023 Funding Agreement Modifications, the Prepetition Corporate Restructuring, the Estate, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions (including the exercise of any common law or contractual rights of setoff or recoupment at any time on or prior to the Effective Date) between the Debtor, on the one hand, and any other Released Party, on the other hand, the restructuring of any Claim or Interest before or during the Chapter 11 Case, the sale or distribution of assets by Holdco in connection with the separation of J&J's consumer health business into a new company named Kenvue, Inc., the Love Proceeding, the Bynum Proceeding, the negotiation, formulation, preparation, or implementation of, or the solicitation of votes with respect to, the Plan, or any other act or omission related to the Disclosure Statement, the Plan, or any related agreement, instrument, or document or any of the foregoing.  Notwithstanding the foregoing:  (a) claims or causes of action against a Released Party arising out of or relating to any act or omission of such Released Party prior to the Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted a criminal act, actual fraud, gross negligence, or willful misconduct, including findings after the Effective Date, are not released pursuant to this <u>Section 11.2.2</u>;** *provided*, *however*, **that (i) no Person, without regard to whether such Person is a Releasing Claim Holder, may commence or pursue any such claim or cause of**

action without the Bankruptcy Court (A) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim and (B) specifically authorizing such Person to bring such claim or cause of action and (ii) to the fullest extent permitted by law, the Bankruptcy Court shall have sole and exclusive jurisdiction to adjudicate the underlying colorable claim or cause of action; (b) holders of Master Settlement Agreement Claims shall not release their rights to have such Master Settlement Agreement Claims considered for settlement and, if such Master Settlement Agreement Claims qualify for settlement, settled under the Master Settlement Agreements; and (c) holders of Judgment Claims shall not release their rights to seek to enforce and collect on the judgments on which such Judgment Claims are based, including through the defense or prosecution of appellate litigation related thereto.  For the avoidance of doubt, nothing contained in this <u>Section 11.2.2</u> shall release or otherwise affect the obligations of any Person to be performed from and after the Effective Date under any Funding Agreement, the Cash Contributions Guarantee, or any other Plan Document to which it is a party.

      11.2.3     <u>Injunction Related to Releases</u>.  The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, indirectly, or otherwise, of any claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action, and liabilities released pursuant to this <u>Section 11.2</u>.

11.3    <u>Channeling Injunction and Insurance Entity Injunction</u>.  In order to supplement the injunctive effect of the Discharge Injunction, and pursuant to section 524(g), section 1123(b)(6), and/or section 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following permanent injunctions to take effect as of the Effective Date.

      11.3.1     <u>Channeling Injunction</u>.

         (a)     To preserve and promote the settlements contemplated by and provided for in the Plan and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court and the District Court under section 524(g), section 1123(b)(6), and/or section 105(a) of the Bankruptcy Code, notwithstanding anything to the contrary contained in the Plan, (i) the sole recourse of any holder of a Channeled Talc Personal Injury Claim against a Protected Party (on account of such Channeled Talc Personal Injury Claim) shall be to and against the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents and (ii) such holder shall have no right whatsoever at any time to assert its Channeled Talc Personal Injury Claim against any Protected Party or any property or interest in property of any Protected Party.  On and after the Effective Date, all holders of Channeled Talc Personal Injury Claims shall be permanently and forever stayed, restrained, barred, and enjoined from taking any action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment, satisfaction, or recovery of, on, or with respect to any Channeled Talc Personal Injury Claim against a Protected Party other than from the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents, including:

70

(i)  commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party or any property or interests in property of any Protected Party;

(ii)  enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against any Protected Party or any property or interests in property of any Protected Party;

(iii)  creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any lien of any kind against any Protected Party or any property or interests in property of any Protected Party;

(iv)  asserting, implementing, or effectuating any setoff, recoupment, right of contribution, reimbursement, subrogation, or indemnification, or similar right of any kind, in any manner, directly or indirectly, against any obligation due to any Protected Party or against any property or interests in property of any Protected Party; and

(v)  taking any act in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Plan Documents, or the Talc Personal Injury Trust Documents or with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Talc Personal Injury Trust, except in conformity and compliance with the Talc Personal Injury Trust Documents.

(b)  Notwithstanding anything to the contrary in Section 11.3.1(a), this Channeling Injunction shall not impair:

(i)  the rights of holders of Channeled Talc Personal Injury Claims to assert such Talc Personal Injury Claims solely against the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents;

(ii)  the rights of holders of Channeled Talc Personal Injury Claims to assert such claims against anyone other than a Protected Party;

(iii)  the rights of holders of Master Settlement Agreement Claims to have such Master Settlement Agreement Claims considered for settlement and, if such Master Settlement Agreement Claims

qualify for settlement, settled under the Master Settlement Agreements, so long as such holder has not (A) previously received payment in respect of such Master Settlement Agreement Claim from the Talc Personal Injury Trust or (B) submitted such Master Settlement Agreement Claim to the Talc Personal Injury Trust under the Trust Distribution Procedures (unless such Master Settlement Agreement Claim has been properly withdrawn in accordance with the Trust Distribution Procedures and has not thereafter been resubmitted to the Talc Personal Injury Trust under the Trust Distribution Procedures);

      (iv)    the rights of holders of Judgment Claims to seek to enforce and collect on the judgments on which such Judgment Claims are based, including through the defense or prosecution of appellate litigation related thereto;

      (v)    the rights of all Persons to assert any claim, debt, obligation, cause of action, or liability for payment of Talc Personal Injury Trust Expenses solely against the Talc Personal Injury Trust; or

      (vi)    the Talc Personal Injury Trust from enforcing its rights explicitly provided to it under the Plan and the Talc Personal Injury Trust Documents, including, if the provisions of <u>Section 4.9.3</u> and <u>Section 5.9.1</u> are applicable, the Imerys/Cyprus Related Rights.

      (c)    There shall be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.

      (d)    Nothing in the Plan or the Talc Personal Injury Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction issued in connection with the Plan or the Talc Personal Injury Trust's assumption of all liability with respect to Talc Personal Injury Claims.

      (e)    The Debtor's compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

      (f)    Any Protected Party may enforce the Channeling Injunction as a defense to any Claim brought against such Protected Party that is enjoined under the Plan as to such Protected Party and may seek to enforce such injunction in a court of competent jurisdiction.

      (g)    If a Talc Insurance Company that is not a Settling Talc Insurance Company asserts that it has Contribution Claims against a Settling Talc Insurance Company: (i) such Contribution Claims may be asserted as a defense or counterclaim against the Talc Personal Injury Trust in any Talc Insurance Action

NAI-1539839717

involving such Talc Insurance Company, and the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its subrogee having the exclusive right to pursue and resolve any Talc Insurance Action) may assert the legal or equitable rights (if any) of the Settling Talc Insurance Company; and (ii) to the extent such Contribution Claims are determined to be valid, the liability (if any) of such Talc Insurance Company to the Talc Personal Injury Trust shall be reduced by the amount of such Contribution Claims.

11.3.2    **Insurance Entity Injunction.**

(a)    **In order to protect and preserve the Talc Insurance Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court, the Bankruptcy Court shall issue the Insurance Entity Injunction;** *provided*, *however*, **that the Insurance Entity Injunction is not issued for the benefit of any Talc Insurance Company, and no Talc Insurance Company is a third-party beneficiary of the Insurance Entity Injunction, except as otherwise specifically provided in any Talc Insurance Settlement Agreement.**

(b)    **Subject to the provisions of** <u>Section 11.3.1</u> **and this** <u>Section 11.3.2</u>**, all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any claim, demand, or cause of action against any Talc Insurance Company based on, arising out of, or in any way relating to any Channeled Talc Personal Injury Claim, whenever and wherever arising or asserted, whether in the United States of America or anywhere else in the world, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim, demand, or cause of action including:**

(i)    **commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such claim, demand, or cause of action against any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action;**

(ii)    **enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action;**

(iii)    **creating, perfecting, or enforcing in any manner, directly or indirectly, any Encumbrance against any Talc Insurance**

73

Company, or the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action; and

(iv)  asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action;

*provided*, *however,* that:  (A) the injunction set forth in this <u>Section 11.3.2(b)</u> shall not impair in any way (I) any actions pursued by the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its subrogee) against any Talc Insurance Company, (II) the rights of the Debtor or the Reorganized Debtor against any Talc Insurance Company with respect to amounts expended prior to the Effective Date, or (III) the rights of any co-insured of the Debtor (1) with respect to any Talc Insurance Policy or Talc Insurance Settlement Agreement against any Talc Insurance Company or (2) as specified under any Final Order of the Bankruptcy Court approving a Talc Insurance Settlement Agreement; and (B) the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its subrogee) shall have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the injunction set forth in this <u>Section 11.3.2(b)</u> with respect to any Talc Insurance Company upon express written notice to such Talc Insurance Company, except that the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its subrogee) shall not have any authority to terminate, reduce, or limit the scope of the injunction herein with respect to any Settling Talc Insurance Company so long as, but only to the extent that, such Settling Talc Insurance Company complies fully with its obligations under any applicable Talc Insurance Settlement Agreement.

(c)  Notwithstanding anything to the contrary above, this Insurance Entity Injunction shall not enjoin:

(i)  the rights of all Persons to the treatment accorded them under the Plan, as applicable, including the rights of holders of Channeled Talc Personal Injury Claims to assert such Claims, as applicable, in accordance with the Talc Personal Injury Trust Documents;

(ii)  the rights of all Persons to assert any claim, debt, obligation, cause of action, or liability for payment of Talc Personal Injury Trust Expenses solely against the Talc Personal Injury Trust;

(iii)  the rights of the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its subrogee) (A) to pursue and resolve any Talc In-Place Insurance Coverage, (B) to pursue and resolve any Talc Insurance Action, (C) to pursue and obtain any Talc Insurance Recoveries, and (D) to negotiate and enter into any Talc Insurance Settlement Agreement; or

74

(iv)    the rights of any Talc Insurance Company to assert any claim, debt, obligation, cause of action, or liability for payment against any other Talc Insurance Company that is not a Settling Talc Insurance Company, or as otherwise specifically provided in any Talc Insurance Settlement Agreement.

(d)    **For the avoidance of doubt, nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect any rights that any Debtor Corporate Party may have under any Talc Insurance Policy or Talc Insurance Settlement Agreement.**

11.4    <u>Exculpation</u>.

11.4.1    <u>Exculpation of Certain Parties</u>.  **None of the Exculpated Parties shall have or incur any liability to any Person for any act or omission taken or to be taken, whether before, on, or after the Petition Date through and including the Effective Date in connection with, arising out of, or in any way relating to:  (a) the Prepetition Corporate Restructuring or the Chapter 11 Case; (b) the negotiation, formulation, and preparation of the Plan and the other Plan Documents (including the Disclosure Statement), and any of the terms and/or settlements and compromises reflected in the Plan and the other Plan Documents, and the releases and Injunctions contained in the Plan; (c) the pursuit of Confirmation of the Plan (including the solicitation of votes with respect to the Plan); (d) the administration, consummation, and implementation of the Plan or the property to be distributed under the Plan or the Trust Distribution Procedures; or (e) the management or operation of the Debtor (except for any liability that results primarily from such Exculpated Party's criminal acts, actual fraud, willful misconduct, or gross negligence as determined by a Final Order).  No Person may commence or pursue any claim or cause of action seeking to impose on any Exculpated Party liability for any such act or omission that results primarily from such Exculpated Party's criminal acts, actual fraud, willful misconduct, or gross negligence without the Bankruptcy Court (i) first determining, after notice and hearing, that such claim or cause of action represents a colorable claim and (ii) specifically authorizing such Person to bring such claim or cause of action, and to the fullest extent permitted by law, the Bankruptcy Court shall have sole and exclusive jurisdiction to adjudicate the underlying colorable claim or cause of action.  In all respects, each Exculpated Party shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Case, the Plan, the Plan Documents, and the administration of each of them.  Without limiting the generality of the foregoing, the Exculpated Parties shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.**

11.4.2    <u>Injunction Related to Exculpation</u>.  **The Confirmation Order shall permanently enjoin all Persons from taking any action against any Exculpated Party for the purpose of, directly or indirectly, receiving payment of, on, or with respect to any liability from which the Exculpated Parties are exculpated pursuant to this <u>Section 11.4</u>.**

11.5    <u>Disallowed Claims</u>.    On and after the Effective Date, the Debtor and the Reorganized Debtor shall have no liability or obligation on a Disallowed Claim, and any order disallowing a Claim which is not a Final Order as of the Effective Date solely because of a Person's right to move for reconsideration of such Final Order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall, nevertheless, become and be deemed to be a Final Order on the Effective Date.    The Confirmation Order shall constitute a Final Order:    (a) disallowing all Claims (other than Talc Personal Injury Claims) to the extent such Claims are not allowable under any provision of Section 502 of the Bankruptcy Code, including time-barred Claims and Claims for unmatured interest; and (b) disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages, or any other damages not constituting compensatory damages.

11.6    <u>No Successor Liability</u>.    The Reorganized Debtor does not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify any Person, or otherwise have any responsibility for any liabilities or obligations of the Debtor arising out of  or in any way relating to the operations of or assets of the Debtor, whether arising prior to, on, or after the Effective Date. None of the Reorganized Debtor, the other Protected Parties, and the Talc Personal Injury Trust is, or shall be deemed to be, a successor to the Debtor by reason of any theory of law or equity (except as otherwise provided in <u>Article IV</u>), and none shall have any successor or transferee liability of any kind or character; *provided*, *however*, the Reorganized Debtor and the Talc Personal Injury Trust shall assume and remain liable for their respective obligations specified in the Plan and the Confirmation Order.

11.7    <u>Corporate Indemnities</u>.

11.7.1    <u>Prepetition Indemnification and Reimbursement Obligations</u>.    The obligations of the Debtor to indemnify and reimburse Persons who are or were managers, officers, or employees of the Debtor on the Petition Date or at any time thereafter through the Effective Date, against and for any obligations pursuant to the articles of organization or operating agreement of the Debtor, applicable state or non-bankruptcy law, or specific agreement, or any combination of the foregoing, (a) shall survive Confirmation of the Plan and remain unaffected thereby, (b) are assumed by the Debtor, and (c) shall not be discharged under Section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on, or after the Petition Date.

11.7.2    <u>Plan Indemnity</u>.    In addition to the matters set forth above and not by way of limitation thereof, the Debtor shall indemnify, defend, and hold harmless all Persons who are or were managers or officers of the Debtor on the Petition Date or at any time thereafter through the Effective Date on account of and with respect to any claim, cause of action, liability, judgment, settlement, cost, or expense (including attorney's fees) on account of claims or causes of action threatened or asserted by any third party against such managers or officers that seek contribution, indemnity, equitable indemnity, or any similar claim, based upon or as the result of the assertion of primary claims against such third party by any representative of the Debtor's Estate.

11.7.3    <u>Limitation on Indemnification</u>.    Notwithstanding anything to the contrary set forth in the Plan or elsewhere, the Debtor and the Reorganized Debtor, as applicable, shall not be obligated to indemnify, defend, or hold harmless any Person for any claim, cause of action, liability, judgment, settlement, cost, or expense that results primarily from:  (a) such Person's bad faith, gross negligence, or willful misconduct; or (b) a Talc Personal Injury Claim.

11.8    <u>Independent Legal Significance of Individual Provisions</u>.    For the avoidance of doubt, each of <u>Sections 11.1</u> through <u>11.8</u> is legally independent from the other such Sections and the validity and effect of any such Section is not dependent upon, will not be affected in any manner by, and will not be interpreted or construed by reference to any other such Section.  By way of illustration and not limitation, the releases set forth in <u>Section 11.2</u> are independent from, will not be affected in any manner by, and will not be interpreted or construed by reference to the Channeling Injunction set forth in <u>Section 11.4</u>.

**ARTICLE XII**
**JURISDICTION OF BANKRUPTCY COURT**

12.1    <u>Jurisdiction</u>.  Subject to <u>Section 12.3</u>, the Bankruptcy Court shall retain the fullest and most extensive exclusive jurisdiction that is permissible (and to the extent not permitted, non-exclusive jurisdiction), including the jurisdiction necessary to ensure that the purposes and intent of the Plan are carried out.  The Bankruptcy Court shall retain exclusive jurisdiction (and to the extent not permitted, non-exclusive jurisdiction) to hear and determine all Claims against the Debtor and all other causes of action which may exist on behalf of the Debtor; *provided*, *however*, that this Section 12.1 shall not apply to adjudication or enforcement of any Talc Insurance Action.

12.2    <u>Specific Purposes</u>.  Subject to <u>Section 12.3</u>, in furtherance to the foregoing, the Bankruptcy Court shall retain exclusive jurisdiction (and to the extent not permitted, non-exclusive jurisdiction) for each of the following specific purposes after Confirmation of the Plan:

(a)    to modify the Plan after Confirmation, pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

(b)    to correct any defect, cure any omission, reconcile any inconsistency, or make any other necessary changes or modifications in or to the Plan, the Talc Personal Injury Trust Agreement, or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(c)    to assure the performance by the Talc Personal Injury Trust and the Disbursing Agent of their respective obligations under the Plan including hearing and determining any motions or contested matters that may arise between or among the Talc Trustees, the Talc Trust Advisory Committee, and/or the FCR in connection with the administration of the Talc Personal Injury Trust and/or the Trust Distribution Procedures;

(d)    to enforce and interpret the terms and conditions of the Plan, the other Plan Documents, and the Talc Personal Injury Trust Agreement; to enter such orders or judgments, including injunctions (i) as are necessary to enforce the title, rights, and powers of the Reorganized Debtor and the Talc Personal Injury Trust and (ii) as are

77

necessary to enable holders of Claims to pursue their rights against any Person that may be liable therefor pursuant to applicable law or otherwise;

(e)     to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits, and similar or related matters, including contested matters arising on account of transactions contemplated by the Plan, or relating to the period of administration of the Chapter 11 Case;

(f)     to hear and determine all applications for compensation of Professionals and reimbursement of expenses under sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code;

(g)     to hear and determine any causes of action arising during the period from the Petition Date through the Effective Date, or in any way related to the Plan or the transactions contemplated hereby;

(h)     to adjudicate any Retained Rights of Action that are retained by the Reorganized Debtor hereunder, including any Recovery Actions and the causes of action listed or described on Exhibit F;

(i)     to resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor or the Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

(j)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(k)     to determine the allowance and/or disallowance of any Non-Talc Claims, including Administrative Claims, against the Debtor or the Estate, including any objections to any such Non-Talc Claims, and the compromise and settlement of any Non-Talc Claim, including Administrative Claims, against the Debtor or the Estate;

(l)     to determine all questions and disputes regarding title to the assets of the Debtor or the Estate, or the Talc Personal Injury Trust;

(m)     to issue such orders as may be necessary for the addition of any Settling Talc Insurance Company as a Protected Party;

(n)     to hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Case;

(o)     to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Case, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Case, any bar date established in the Chapter 11 Case, in

each case, for the purpose of determining whether a Claim is discharged hereunder or for any other purpose;

        (p)    to enter in aid of implementation of the Plan such orders as are necessary, including the implementation and enforcement of the releases and the Injunctions described herein; and

        (q)    to enter and implement such orders as may be necessary or appropriate if any aspect of the Plan, the Talc Personal Injury Trust, or the Confirmation Order is, for any reason or in any respect, determined by a court to be inconsistent with, violative of, or insufficient to satisfy any of the terms, conditions, or other duties associated with any Talc Insurance Policy; *provided, however*, that: (i) such orders shall not impair any Talc Insurer Coverage Defense or the rights, claims, or defenses, if any, of any Talc Insurance Company that are set forth or provided for in the Plan, the Plan Documents, the Confirmation Order, or any other Final Orders entered in the Chapter 11 Case; (ii) this provision does not, in and of itself, grant the Bankruptcy Court jurisdiction to hear and decide disputes arising out of or relating to any Talc Insurance Policy; and (iii) all interested parties, including any Talc Insurance Company, reserve the right to oppose or object to any such motion or order seeking such relief.

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the foregoing matters, the reference to the "Bankruptcy Court" in this Article shall be deemed to be replaced by the "District Court." Notwithstanding anything to the contrary in this Article 12, the resolution of Talc Personal Injury Claims, and the forum in which such resolution will occur, shall be governed by and in accordance with the provisions of Section 3.2.4 and Article IV and the Talc Personal Injury Trust Documents.

    12.3    District Court Jurisdiction. The District Court shall, without regard to the amount in controversy, retain exclusive jurisdiction after entry of the Confirmation Order to hear and determine any motion to enforce the Channeling Injunction, and shall be deemed to have withdrawn the reference to the Bankruptcy Court for such purpose.

    12.4    Reservation of Rights. Nothing contained in the Plan shall (i) constitute a waiver of any claim, right, or cause of action that the Debtor, the Reorganized Debtor, or the Talc Personal Injury Trust, as the case may be, may hold against the insurer under any policy of insurance or insurance agreement, except to the extent the insurer is a Settling Insurance Company; or (ii) limit the assertion, applicability, or effect of any Talc Insurer Coverage Defense.

    12.5    Compromises of Controversies. From and after the Effective Date, the Reorganized Debtor and/or the Talc Personal Injury Trust, as appropriate based on assets and liabilities retained or owed by each respectively, shall be authorized to compromise controversies in their discretion in a manner not inconsistent with the terms of the Plan, without notice to any other party or approval of or notice to the Bankruptcy Court.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

13.1    Closing of Chapter 11 Case.  The Reorganized Debtor shall, promptly after the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

13.2    Timing of Distributions or Actions.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

13.3    Governing Law.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), or an instrument, agreement, or other document executed under the Plan provides otherwise, the rights, duties, and obligations arising under the Plan, and the instruments, agreements, and other documents executed in connection with the Plan, shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Texas without giving effect to the principles of conflicts of law thereof.

13.4    Entire Agreement.  The Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions, negotiations, understandings, and documents.  No Person shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for in the Plan or the other Plan Documents or as may hereafter be agreed to by the affected parties in writing.

13.5    Notices to the Debtor and Reorganized Debtor.  All notices, requests, and demands required or permitted to be provided to the Debtor or the Reorganized Debtor under the Plan, in order to be effective, shall be in writing, and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, to the addresses set forth below:

**PROPOSED COUNSEL FOR THE DEBTOR:**

JONES DAY
Gregory M. Gordon, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
E-mail:    gmgordon@jonesday.com
               dbprieto@jonesday.com
               asrush@jonesday.com

NAI-1539839717

-and-


JONES DAY
Brad B. Erens
Caitlin K. Cahow
110 N. Wacker Drive
Chicago, Illinois  60606
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
E-mail:    bberens@jonesday.com
              ccahow@jonesday.com

**COUNSEL FOR JOHNSON & JOHNSON**

WHITE & CASE LLP
Jessica C. Lauria
Gregory Starner
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
E-mail: jessica.lauria@whitecase.com
            gstarner@whitecase.com


-and-

WHITE & CASE LLP
Matthew E. Linder
Laura E. Baccash
111 S. Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
E-mail: mlinder@whitecase.com
            laura.baccash@whitecase.com

     13.6    <u>Post-Effective Date Notices by the Reorganized Debtor</u>.  After the occurrence of the Effective Date, the Reorganized Debtor has authority to send a notice to any Person providing that to continue to receive documents pursuant to the Bankruptcy Rule 2002, such Person must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, *however*, that the United States Trustee need not file such a renewed request and shall continue to receive documents without any further actions being necessary.  After the occurrence of the Effective Date, the Reorganized Debtor is authorized to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to the United States Trustee and those Persons that have filed such renewed requests.

NAI-1539839717

13.7    <u>Inconsistencies</u>.   To the extent the Plan is inconsistent with the Disclosure Statement or other Plan Documents, the provisions of the Plan shall be controlling.  To the extent the Plan is inconsistent with the Confirmation Order, the provisions of the Confirmation Order shall be controlling.

13.8    <u>Withholding of Taxes</u>.  The Disbursing Agent, the Talc Personal Injury Trust, or any other applicable withholding agent, as applicable, shall withhold from any assets or property distributed under the Plan any assets or property which must be withheld for foreign, federal, state, and local taxes payable with respect thereto or payable by the Person entitled to such assets to the extent required by applicable law.

13.9    <u>Transfer Taxes</u>.  Pursuant to Section 1146 of the Bankruptcy Code, and to the fullest extent permitted by law, no stamp tax, transfer tax, filing fee, sales or use tax, or other similar tax shall be imposed or assessed by any taxing authority on account of (a) the transfer of any assets or property pursuant to the Plan; or (b) the making or delivery of an instrument of transfer under the Plan.  The appropriate state or local government officials or agents shall be directed to forego the collection of any such tax and to accept for filing or recordation of any of the foregoing instruments or other documents without the payment of any such tax.

13.10    <u>Successors and Assigns</u>.   The rights, duties, and obligations of any Person under the Plan, the Plan Documents, and the Confirmation Order shall be binding upon, and shall inure to the benefit of, the successors, assigns, heirs, executors, legal representatives, and estates of such Person.

13.11    <u>Duty to Cooperate</u>.   Nothing in the Plan, the other Plan Documents, or the Confirmation Order shall relieve (by way of injunction or otherwise) any Person that is or claims to be entitled to indemnity under a Talc Insurance Policy from any duty to cooperate that may be required by any such insurance policy or under applicable law with respect to the defense and/or settlement of any Claim for which coverage is sought under such Talc Insurance Policy.

13.12    <u>Effective Date Actions Simultaneous</u>.  Unless the Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date shall take place and be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

13.13    <u>Plan Supplements</u>.  Any and all exhibits, lists, or schedules referred to herein but not attached to the Plan shall be contained in a Plan Supplement, and each Plan Supplement is incorporated into and is part of the Plan as if set forth in full herein.  Each Plan Supplement will be distributed to the same parties and in the same manner as the Disclosure Statement at least twenty-eight (28) days prior to the deadline for the submission of votes on the Plan and will also be available at the website maintained by the Claims Agent (https://dm.epiq11.com/redrivertalc).

NAI-1539839717

Dated:  September 20, 2024

Respectfully submitted,

RED RIVER TALC LLC

/s/ *John Bittner*
John Bittner
Chief Restructuring Officer