**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | )    Chapter 11 |
| | ) |
| RED RIVER TALC, LLC,[1] | )    Case No. 24-90505 (CML) |
| | ) |
|            Debtor. | ) |
| | ) |

**MOTION OF THE COALITION OF COUNSEL FOR**
**JUSTICE FOR TALC CLAIMANTS TO TRANSFER VENUE**

TO THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

> **If you object to the relief requested, you must respond in writing. Unless
> otherwise directed by the Court, you must file your response
> electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days
> from the date this motion was filed. If you do not have electronic filing
> privileges, you must file a written objection that is actually received by
> the clerk within twenty-one days from the date this motion was filed.
> Otherwise, the Court may treat the pleading as unopposed and grant the
> relief requested.**

The Coalition of Counsel for Justice for Talc Claimants (the "<u>Coalition</u>"),[2] by and through

its undersigned counsel, respectfully submits this motion (the "<u>Motion</u>") seeking the entry of an

order, substantially in the form attached hereto as **Exhibit A** (the "<u>Proposed Order</u>"), pursuant to

28 U.S.C. § 1412 and Rule 1014(a)(1) of the Federal Rules of Bankruptcy Procedure

(the "<u>Bankruptcy Rules</u>"), to transfer venue of the above-captioned chapter 11 case (the "<u>Case</u>")

---

[1]    The last four digits of the debtor's federal tax identification number are 8508.  The Debtor's address
is 501 George Street, New Brunswick, NJ 08933.

[2]    The Coalition includes Ashcraft & Gerel, LLP; Beasley Allen Crow Methvin Portis & Miles, PC;
Golomb Legal, PC; Levin Sedran & Berman, LLP; Levin, Papantonio, Rafferty, Proctor, Buchanan,
O'Brien, Barr, Mougey, PA; and Robinson Calcagnie, Inc.

of Red River Talc LLC (the "<u>Debtor</u>" or "<u>Red River</u>") to the District of New Jersey.[3]  In support

of the Motion, the Coalition respectfully states as follows:[4]

## <u>PRELIMINARY STATEMENT</u>

1.      For the past 3 years Johnson & Johnson ("<u>J&J</u>") has been trying to use the

bankruptcy of a hand-crafted subsidiary to resolve the liabilities it has incurred for alleged deaths

and injuries caused by use of its talc-products, Johnson's Baby Powder and Shower to Shower.

J&J has sought, and continues to seek, to do so without subjecting its assets, business operations

or dividend payments to bankruptcy—precisely what the U.S. Supreme Court recently ruled in

*Harrington v Purdue Pharma LLP* is required in order to obtain the ultimate bankruptcy benefit

of a discharge of liabilities.  603 U.S. —, 144 S.Ct. 2071 (2024).[5]

2.      This Case replicates many of the tactics previously used by J&J to commence its

first bankruptcy case,[6] including relevant to this Motion, forming a corporation within a favored

district for the sole purpose of anchoring a bankruptcy filing within that district.  Forum shopping,

and more specifically establishing an artificial venue (twice over), should not be condoned.

---

[3]     The Coalition acknowledges the motion to transfer venue filed by the United States Trustee (the "<u>UST Motion to Transfer Venue</u>") in the case currently pending before the Bankruptcy Court for the District of New Jersey. *See Notice of Motion to Transfer Venue and Request for Stay Pending Before the United States Bankruptcy for the District of New Jersey*, Dkt. No. 35.  As set forth herein, the Coalition is in accord with the United States Trustee that this case should be transferred to New Jersey and will defer to the Courts regarding how to address the motions seeking similar relief filed in separate courts.

[4]     Copies of certain of the documents cited to herein are attached as exhibits to the Declaration of Sunni P. Beville in Support of the Coalition Statement, filed contemporaneously herewith (the "<u>Beville Decl.</u>").

[5]     In *Purdue*, the U.S. Supreme Court held that "[a] debtor can win a discharge of its debts if it proceeds with honesty *and* places virtually all of its assets on the table for its creditors." *Purdue*, 603 U.S. at __ (slip op., at p.1) (emphasis added).  "Without securing the consent of those affected or placing anything approaching their total assets on the table for their creditors," an equity owner of a bankrupt debtor cannot seek and win "an order extinguishing vast numbers of existing and potential claims." *Id.*

[6]     The first bankruptcy case, Case No. 21-30589-MBK (Bankr. D.N.J.), shall be referred to as LTL 1.0. The second bankruptcy case, Case No. 23-12825-MBK (Bankr. D.N.J.) shall be referred to as LTL 2.0.

3.      Consider that prior to the first bankruptcy, J&J converted a New Jersey subsidiary, Johnson & Johnson Consumer Inc. ("Old JJCI") into a Texas entity specifically to take advantage of Texas's divisive merger statute.  J&J then orchestrated the divisive merger to form LTL Management LLC ("LTL") to hold Old JJCI's talc liabilities and none of Old JJCI's consumer business assets (estimated at the time to be worth at least $61 billion).

4.      J&J then converted LTL into a North Carolina company and, two days later, had it file in the U.S. Bankruptcy Court for the Western District of North Carolina (the "NC Bankruptcy Court") to take advantage of what J&J then thought was more favorable Fourth Circuit law.

5.      The NC Bankruptcy Court was unwilling to entertain J&J's obvious and blatant "forum shopping" and attempt to "creat[e] a venue" and sent J&J's newly created subsidiary to New Jersey where J&J is headquartered and where the MDL[7] has been pending since 2017. *See Order Transferring Case to the District of New Jersey* (the "Venue Transfer Order"), *In re LTL Mgmt., LLC*, Case No. 21-30589 (Bankr. W.D.N.C), Dkt. No. 416 (Beville Decl. Ex. 33) at 10.

6.      The NC Bankruptcy Court undertook a substantial analysis of forum shopping and found, among other things, that "the Debtor is trying to manufacture venue and is attempting to outsmart the purpose of the statute" and that "the ***Debtor is not just forum shopping; the Debtor is manufacturing forum and creating a venue to file bankruptcy*.**" *Id.* (emphasis added). The NC Bankruptcy Court understood that the real party in interest was not LTL, a fake debtor that had no business to reorganize, but J&J, which was attempting to abuse the bankruptcy system by

---

[7]      *See In re: J&J Talcum Powder Marketing, Sales Practices, and Products Litigation*, MDL 2738 (D.N.J) (the "MDL").  New Jersey was J&J's forum of choice until the Court began ruling against it.  *See, e.g.*, *In re Johnson & Johnson*, 509 F. Supp. 3d 116, 135-162 (D.N.J. 2019) (holding admissible the following opinions of the plaintiffs' experts:  (i) there is a link between use of talcum powder and ovarian cancer, (ii) the use of talc could cause inflammation and oxidative stress, (iii) talc products contained asbestos, (iv) talc users were exposed to asbestos, and (v) general causation between the use of talc products and ovarian cancer).

seeking a discharge of its own independent tort liability—*i.e.*, relief that is well outside the scope of section 524(g) and well beyond relief that can be granted post-*Purdue*.

7.      The NC Bankruptcy Court's rationale is doubly warranted here.  J&J's blatant forum shopping has become even more audacious in its quest to find a venue willing to entertain its litigation tactics and efforts to force a settlement on women suffering from ovarian cancer.

8.      For over two and a half years, J&J, through LTL, sought to resolve its talc liabilities in two separate bankruptcy cases in the NJ Bankruptcy Court.  Both of those bankruptcy cases were dismissed, with the United States Court of Appeals for the Third Circuit (the "Third Circuit") now twice having found that the bankruptcy cases were filed in bad faith.[8]  Not willing to accept this result, J&J is now once again seeking to find a new forum that—in the face of two bad faith dismissals elsewhere—is nevertheless amenable to J&J's third attempt to resolve its talc liabilities in a manner acceptable to it.

9.      Even if J&J's blatant forum shopping alone were not sufficient grounds to conclude that, in the interests of justice, this case should be transferred to the jurisdiction that has presided over the last two bankruptcy cases, then this case should be transferred for the convenience of the parties.  As the NC Bankruptcy Court found: "the Debtor's strong connections to New Jersey; New Jersey's proximity to relevant witnesses, creditors and other interested parties; and the MDL's potential aid in any possible administration of the estate support transferring venue to the District of New Jersey for the convenience of the parties."  Venue Transfer Order, at p. 8.  The same can and should be found here.

---

[8]      In LTL 1.0, the NJ Bankruptcy Court denied creditors' motions to dismiss the bankruptcy case of LTL 1.0 and the Third Circuit on appeal reversed the decision, finding that the bankruptcy should be dismissed as a bad faith filing because of lack of financial distress.  *LTL Mgmt., LLC*, 58 F.4th 738 (3d Cir. 2023).  In LTL 2.0, the NJ Bankruptcy Court dismissed the bankruptcy filing and the Third Circuit, on appeal, affirmed.  Case Nos. 23-2971 and 23-2972, consolidated under lead No. 23-2971 (3d Cir.), Dkt. No. 107 (Beville Decl. Ex. 14).

10.     Despite J&J's efforts to create a bankruptcy entity with roots in Texas, the Debtor's connection to New Jersey remains strong.  J&J, which ultimately controls the Debtor and this Case, remains headquartered in New Jersey, and the Debtor's officers and employees, including the Chief Legal Officer, continue to work in New Jersey.  Most of the same witnesses for the Debtor from its first and second bankruptcy cases that would be potential witnesses here for its third bankruptcy case continue to work in New Jersey.  Moreover, most talc cases against J&J and the Debtor continue to be pending before the District of New Jersey in the MDL with thousands of other personal injury cases filed in the state courts of New Jersey.

11.     In contrast, the Debtor's only "connection" to Texas is its Certificate of Formation on which the ink has barely dried—*i.e.*, a "connection" manufactured by J&J to hide from or run from the Third Circuit and the New Jersey Bankruptcy Court.  The Debtor has no assets, no employees, and no operations in Texas.  But J&J, and the Ad Hoc Group of Supporting Counsel (the "Supporting Counsel Group") willing to support J&J's bad faith bankruptcy[9], believe that Texas is the optimal venue to achieve the sole objective of the Debtor's bankruptcy case—to obtain a discharge of J&J's independent talc liabilities and obtain protections for parties that J&J is required to indemnify.

12.     While J&J formed the Debtor in Texas to satisfy the technical requirements of the Bankruptcy Code, its manufactured venue fails to comport with the integrity of the Bankruptcy Code.  The Coalition respectfully asserts that this Case should be transferred to the District of New Jersey both in the interests of justice and for the convenience of the parties pursuant to 28 U.S.C. § 1412.

---

9   The Coalition notes that the Supporting Counsel Group largely represent 'claimants' who have never been compensated in the tort system for their alleged, non-ovarian cancer injuries.

## JURISDICTION

13.     This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory authority for the relief requested is 28 U.S.C. § 1412, Bankruptcy Rule 1014, and Rule 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas (the "Local Rules").

## BACKGROUND

### A.     First Corporate Restructuring Under Texas Law

14.     In 1979, J&J transferred its baby products business to a wholly-owned subsidiary. Thereafter, through a series of intercompany transactions, the assets and liabilities of J&J's baby products business were ultimately transferred to J&J's consumer products affiliate, Old JJCI.  *LTL Mgmt.*, 64 F.4th 84, 93 (3d Cir. 2023).

15.     Many years later and just days before the debtor's first bankruptcy was commenced, J&J and Old JJCI undertook a multi-phased restructuring to address the mass tort liability associated with J&J's talc-related products, relying upon the Texas divisive merger statute.[10]  As the Third Circuit characterized, the "restructuring was designed as a series of reorganizational steps with the divisional merger at center."  64 F.4th at 95.

16.     The goal of the transactions was to create a special purpose vehicle into which Old JJCI would dump all its talc-related liabilities (but *not* the independent talc liability of J&J, which is substantial), along with a smidgen of operating assets, preparatory to that special purpose vehicle filing for bankruptcy protection.  The divisive merger only affected Old JJCI's liabilities; J&J's

---

[10]     *See Texas Business Organizations Code*, § 10.008.  In short, pursuant to the divisive merger transaction, Old JJCI was dissolved after its valuable business assets were transferred into a newly-formed entity that ultimately became New JJCI while its talc liabilities were transferred into a newly-formed entity that became known as LTL.

own direct liabilities were never assigned to any other party. J&J remains the **key** defendant in talc litigation and has been found liable for talc-related injuries based on its own conduct.[11]

17.     In furtherance of the divisive merger, Old JJCI formed Royalty A&M ("Royalty") in the State of North Carolina just days before the commencement of LTL 1.0. Old JJCI organized Royalty as a direct subsidiary and the totality of Royalty's "operations"—to the extent that they can even be called "operations"—consists of no more than collecting royalty streams based on third-party sales and potentially reinvesting the income to acquire new third-party royalty streams.[12]

18.     Shortly after Royalty was formed, Old JJCI was converted into a Texas limited liability company to permit its access to the restructuring tools in the Texas divisive merger statute.[13] The following day, Old JJCI formed Chenango One LLC ("Chenango One") in Texas and transferred to it all Old JJCI's talc-related liabilities and certain intangible assets related thereto (*e.g.*, contracts, records, and privileges associated with Old JJCI's talcum powder business).[14]

19.     Simultaneously, Old JJCI organized another Texas entity, which immediately thereafter merged into a New Jersey corporation, called Johnson & Johnson Consumer, Inc. ("New JJCI"), to which Old JJCI's assets and other liabilities were assigned.

---

[11]    In finding J&J directly liable, Courts have made the following findings of fact: (a) J&J's own conduct was "significantly reprehensible," (b) J&J had "discussed the presence of asbestos in [its] talc in internal memoranda for several decades," (c) J&J had "avoided adopting more accurate measures for detecting asbestos and influenced the industry to do the same," (d) J&J had "attempted to discredit … scientists" who published "studies unfavorable" to its talc products, (e) J&J chose not to "eliminate talc" from its products and use "cornstarch instead because it would be more costly to do so," and (f) J&J "knew of the asbestos dangers in" its talc products "when they were sold to the public." *See Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 721 (Mo. Ct. App. 2020).

[12]    *See Declaration of John K. Kim in Support of Chapter 11 Case and Certain First Day Pleadings,* Case No. 24-90505, Dkt. No. 17 (the "Red River First Day Declaration"), at ¶ 39.

[13]    *See Declaration of John K. Kim in Support of First Day Pleadings*, Case No. 21-30589, Dkt. No. 5 ("LTL 1.0 First Day Declaration") at ¶ 23 (Beville Decl. Ex. 40).

[14]    *See id.* at ¶¶ 18, 24.

20.     Notwithstanding its use of the Texas divisive merger statute to ringfence its talc liabilities, J&J eschewed a bankruptcy filing in Texas, and instead, re-domiciled Chenango One in North Carolina as a limited liability company under the new name of "LTL Management LLC." Even if J&J had directed LTL to file for bankruptcy in Texas, it would have made no difference. Each of J&J's manufactured bankruptcy cases—LTL 1.0, LTL 2.0, and now Red River (or LTL 3.0) have always been about obtaining a discharge of J&J's own talc liability.

**B.      First Bankruptcy Filing in North Carolina, Transferred
          to New Jersey: Case No. 21-30589 (Bankr. D.N.J.) ("LTL 1.0")**

21.     On October 14, 2021 (just two days after LTL's creation), LTL filed for bankruptcy in North Carolina—the site, at least as viewed by J&J at that time, of a more favorable venue.

22.     While the NC Bankruptcy Court observed that "venue is arguably proper in this judicial district since the Debtor was a North Carolina entity on the filing date, if only for two days," due to the Debtor's apparent lack of connection to North Carolina, as well as the Court's own judicial resources, it entered an *Order to Appear and Show Cause Why Venue Should Not be Transferred to Another District* (the "Show Cause Order") on October 26, 2021, requiring the newly created Debtor to show cause why the case should not be transferred to a different venue. Case No. 21-30589 (W.D.N.C.) at Dkt. No. 208. The Show Cause Order also permitted other parties to file their own motions and responses.

23.     After conducting an evidentiary hearing, the NC Bankruptcy Court entered an order providing a short-term, 60-day preliminary injunction and entered the Venue Transfer Order, transferring the case to the District of New Jersey.

24.     In determining to transfer venue to New Jersey, the NC Bankruptcy Court relied on the following, among other, facts:

- The Debtor operates out of New Jersey, with a principal place of business and mailing address in New Brunswick, NJ.

- The employees seconded to the Debtor by a J&J entity, including most of the potential witnesses for the Debtor, including the Debtor's Chief Legal Officer, continue to work in New Jersey.

- J&J entities provide the Debtor with, among other things, accounting services, human resources, tax support, and most notably, office space and other facilities located in New Jersey.

- The Debtor's assets involve no operation of business in North Carolina (nor in Texas).

- The Debtor's only liabilities arise from talc-related claims, including approximately 35,000 (now 57,000) ovarian cancer cases then pending in the MDL.  While the claimants may reside in states throughout the country, most of the cases are still currently pending in New Jersey and the plaintiffs and their professionals are accustomed to appearing in New Jersey.  The panel chose New Jersey as the forum for the MDL because it was determined to be convenient and accessible for all the parties involved.

- Certain of the Debtor's third-party insurers filed a lawsuit against Old JJCI and J&J in the New Jersey Superior Court of Middlesex County in May 2019 (Docket No. MID-L-003563-19) (the "New Jersey Coverage Action").  The insurers seek declaratory judgment regarding their respective obligations under each of their insurance policies.

- Imerys Talc America Inc., and its affiliates ("Imerys") and Cyprus Mines Corporation ("Cyprus") are in separate, factually intertwined bankruptcy cases pending in the District of Delaware.  The Debtor seeks to implement a proposed settlement with Imerys and Cyprus pursuant to the prepackaged Plan filed in this bankruptcy case.

Venue Transfer Order, pp. 2–6.

25.    Notably, the NC Bankruptcy Court opined that LTL's short existence indicated it was "purely for the purposes of filing bankruptcy" and that "[s]etting up a company with the sole intent of filing bankruptcy in a certain district cannot be 'the thing which the [venue] statute intended.'"  Venue Transfer Order, at p. 9 (quoting *In re Patriot Coal Corp.*, 482 B.R. 718, 745 (Bankr. S.D.N.Y. 2012).  Thus, the NC Bankruptcy Court rejected LTL's attempt to "manufacture venue" and found that LTL's assets were "all created to effectuate a bankruptcy filing and have no other business purpose."  Venue Transfer Order, at pp. 9-10; *LTL Mgmt.*, 64 F.4th at 97-98.

9

26.     Once in New Jersey, the Official Committee of Talc Claimants appointed in LTL 1.0, along with multiple other talc claimant groups, filed motions to dismiss LTL 1.0 for cause pursuant to section 1112(b) (collectively, the "LTL 1.0 Dismissal Motions").

27.     The NJ Bankruptcy Court conducted a five-day combined hearing (February 14-18, 2022) on a supplemental preliminary injunction motion filed by the Debtor and on the LTL 1.0 Dismissal Motions (the "First MTD Trial").  On March 2, 2022, the NJ Bankruptcy Court entered orders granting the supplemental preliminary injunction motion (the "LTL 1.0 PI Order") and denying the LTL 1.0 Dismissal Motions (the "LTL 1.0 MTD Order").  Those orders were timely appealed and certified for direct appeal to the Third Circuit.

28.     On January 30, 2023, the Third Circuit issued an opinion reversing the LTL 1.0 MTD Order.  *LTL Mgmt., LLC*, 58 F.4th 738 (3d Cir. 2023).  The Third Circuit "start[ed] and stay[ed] with good faith," holding that LTL was not in financial distress and that "[g]ood intentions," such as the desire to "comprehensively resolve litigation," "do not suffice alone."  *Id.* at 746.[15]  The Third Circuit denied LTL's subsequent request for rehearing *en banc* and motion to stay the mandate pending the filing of a petition for certiorari with the United States Supreme Court.  None of the Third Circuit judges voted in favor of either request.

29.     On March 31, 2023, the Third Circuit issued a certified judgment remanding the case to this Court with the instruction to dismiss LTL's petition.  Consistent with the Third Circuit's instructions, the NJ Bankruptcy Court entered an order dismissing LTL 1.0 and vacating the LTL 1.0 PI Order on April 4, 2023. (the "LTL 1.0 Dismissal Order").

---

[15]    On March 30, 2023, the Third Circuit issued an amended opinion clarifying certain portions of its January 30th opinion.  In particular, the Third Circuit amended its earlier opinion to emphasize "the theme LTL proclaimed in this case from day one: it can pay current and future talc claimants in full." *LTL Mgmt.*, 64 F.4th at 109.

C.    **Second Corporate Restructuring**

30.    In anticipation of a potential second bankruptcy filing, and without notice to the NJ Bankruptcy Court, the Third Circuit, the Official Committee of Talc Claimants appointed at that time, or the United States Trustee, the Debtor and J&J restructured their relationship prior to the issuance of the Third Circuit's mandate to dismiss LTL 1.0. *See In re LTL Mgmt., LLC*, 652 B.R. 433, 438-40 (Bankr. D.N.J. 2023) (the "LTL 2.0 Dismissal Opinion").

31.    In December 2022, New JJCI was renamed Johnson & Johnson HoldCo (NA) Inc. ("HoldCo").   In early January 2023, HoldCo transferred its "cash-flowing" consumer-health business and famous brands that had "underpinned" the 2021 Funding Agreement (valued by J&J in September 2021 at approximately $42.5 billion) to its parent, Janssen Pharmaceuticals, Inc. ("Janssen").   That transfer was in connection with a previously announced spin-off and initial public offering of the consumer business to another new entity, called Kenvue, Inc. ("Kenvue").[16]

32.    On the same day the LTL 1.0 case was dismissed, LTL terminated the existing Funding Agreement, and entered into three new agreements, including a new funding agreement. *First*, LTL executed a Termination and Substitution Agreement with HoldCo and J&J to terminate the 2021 Funding Agreement.   *Second*, LTL executed a new funding agreement (the "2023 Funding Agreement") with HoldCo, which obligated HoldCo to provide funding to LTL for talc liabilities and other costs in the normal course of business.   *Third*, LTL executed a Support

---

[16]   Plaintiffs have successfully sued Kenvue and plaintiffs have found Kenvue liable under the doctrine of successor liability as the successor to Old JJCI.   *See* Beville Decl. Ex. 34 (Verdict Form & Jury Instructions).   The impact of these transaction is that Kenvue now holds the talc liability that was once held by Old JJCI prior to the divisional merger.   Tort victims impacted by similar divisive mergers conducted under Texas law have been permitted to hold the company that ultimately received the operating assets liable under state law doctrines of successor liability.   *See, e.g.*, *Kelly v. Corizon Health Inc.*, No. 2:22-cv-10589, 2022 WL 16575763 (E.D. Mich. Nov. 1, 2022) (holding tort victims impacted by a divisional merger conducted under Texas law can hold the company that receives the operating assets liable under state law doctrines of successor liability); *Jackson v. Corizon Health Inc.*, 2:19-cv-13382, 2022 WL 16575691 (E.D. Mich. Nov. 1, 2022) (same).

Agreement with J&J and HoldCo, for J&J to provide a funding backstop only upon the confirmation of a Chapter 11 Plan with terms acceptable to J&J.

33.     The purpose of these transactions was to create a basis upon which J&J could argue that LTL was in financial distress and eligible to be a debtor in bankruptcy so that LTL could seek to confirm a plan that released or discharged J&J of J&J's own, independent talc liability and prevent J&J's victims from having access to the civil justice system.

**D.     Second Bankruptcy Filing in New Jersey:**
        **Case No. 23-12825 (Bankr. D.N.J.) ("LTL 2.0")**

34.     Two hours and eleven minutes after the entry of the LTL 1.0 Dismissal Order, LTL filed its second bankruptcy petition on April 4, 2023, this time in New Jersey.

35.     Starting on April 24, 2023, several motions to dismiss LTL's second bankruptcy petition were filed (collectively, the "LTL 2.0 Dismissal Motions"), including by the Official Committee of Talc Claimants appointed in LTL 2.0.  In all, ten separate dismissal motions were filed, including from the Office of the United States Trustee.  Only LTL and the Ad Hoc Group of Supporting Counsel  opposed the LTL 2.0 Dismissal Motions.

36.     The NJ Bankruptcy Court conducted a four-day hearing on the LTL 2.0 Dismissal Motions (June 27-30, 2023).  On July 28, 2023, the NJ Bankruptcy Court issued its *Memorandum Opinion* wherein it provided a thorough analysis, guided by the Third Circuit's decision to dismiss LTL 1.0, and found that "LTL's petition was not filed in good faith because it lacks imminent and apparent financial distress under applicable standards."  *LTL 2.0 Dismissal Opinion*, 652 B.R. at 452.  On August 11, 2023, the NJ Bankruptcy Court entered its order dismissing LTL's second bankruptcy petition consistent with the Memorandum Opinion (the "LTL 2.0 Dismissal Order").

37.     LTL and the Supporting Counsel Group appealed the LTL 2.0 Dismissal Order and on September 20, 2023, the NJ Bankruptcy Court entered an order certifying a direct appeal to the

Third Circuit.  On July 25, 2024, the Third Circuit issued an opinion, without argument, affirming

the dismissal of LTL 2.0 "for want of good faith." Case Nos. 23-2971 and 23-2972, consolidated

under lead No. 23-2971 (3d Cir.), Dkt. No. 107 (Beville Decl. Ex. 14].

      **E.**      **Third Corporate Restructuring ("LTL 3.0")**

      38.      While the appeal of the LTL 2.0 Dismissal Order was still pending, J&J continued

to implement further corporate restructuring maneuvers in an effort to lay the foundation for venue

of the instant bankruptcy case.

      39.      By application, dated December 19, 2023, CT Corporation System filed an

"Application for Reservation of an Entity Name" with the Office of the Secretary of State of Texas

requesting the reservation of the entity name "LLT Management LLC."

      40.      On December 29, 2023, LTL filed an "Articles of Conversion to a Foreign Entity"

(the "Articles of Conversion") with the Department of the Secretary of State for the State of North

Carolina.  Beville Decl. Ex. 17 (Articles of Conversion to a Foreign Entity).

      41.      According to the Articles of Conversion, LTL sought to convert itself from a

domestic limited liability company to a foreign limited liability company pursuant to the General

Statutes of North Carolina (the "NC Stat.").  LTL renamed itself as "LLT Management LLC" and

re-domesticated to the State of Texas.  *See* Articles of Conversion.

      42.      Significantly, notwithstanding its newfound status as a Texas entity, North Carolina

law makes plainly clear that LTL and LLT are the same entity with no changes in liabilities.  NC

Stat. § 57D-9-33.  In sum, the NC Stat. § 57D-9-33 provides, in pertinent part, that:

> •      the converting LLC (*i.e.*, LTL) ceases its prior form of organization and
>       continues in existence as the surviving entity (i.e., LLT)[17];

---

17   *See* NC Stat. § 57D-9-33(a)(1).

- title to all of the converting LLC's (*i.e.*, LTL) real estate and other property continues to be vested in the surviving entity (i.e., LLT)[18];

- all liabilities of the converting LLC (*i.e.*, LTL) continue as liabilities of the surviving entity (*i.e.*, LLT)[19];

- proceedings by or against the converting LLC (*i.e.*, LTL) remain pending by or against the surviving entity (*i.e.*, LLT)[20]; and

- conversion does not affect the liability or absence of liability of any interest owner of the converting LLC for any acts, omissions, or obligations of the converting LLC (*i.e.*, LTL) made or incurred prior to the effectiveness of the conversion.[21]

43.     Yet J&J did not stop with the creation of LLT.  The conversion simply set the stage for yet another restructuring and a third bankruptcy filing.

44.     The Debtor here, Red River Talc LLC, was created one month ago.[22]  The Debtor entity did not exist in its current form at the time J&J publicly announced its plan to file a third bankruptcy.  Nor did it exist when J&J (through LLT) solicited votes on the prepackaged Plan sought to be confirmed and implemented by this bankruptcy filing.

45.     Only after the solicitation process was completed and J&J determined to make a third attempt at bankruptcy, did J&J undertake a further series of corporate restructuring transactions resulting in HoldCo (a New Jersey corporation) becoming New HoldCo (a New Jersey corporation) that wholly owns both the newly-created Debtor entity, Red River Talc (a Texas limited liability company) that holds the so-called gynecological cancer talc liabilities, and Pecos River Talc (a Texas limited liability company) ("PRT"), a newly formed entity that holds other

---

[18]   *See* NC Stat. § 57D-9-33(a)(2).

[19]   *See* NC Stat. § 57D-9-33(a)(3).

[20]   *See* NC Stat. § 57D-9-33(a)(4).

[21]   *See* NC Stat. § 57D-9-33(b).

[22]   *See* Certificate of Merger of J&J HoldCo (NA) LLC filed on August 19, 2024 at Document No. 1394129700002 (Beville Decl. Ex. 32).

talc liabilities, including mesothelioma and the claims of states' attorneys general.[23]   Janssen Pharma now owns 100% of the equity interests in New HoldCo, and New HoldCo owns 100% of the equity interests in each of the Debtor and PRT.

> F.     **The Debtor's Connections All Lead Back to New Jersey**

46.     As set forth above, this is all a shell game.  The Debtor's connections to New Jersey have long been and continue to be substantial and, notwithstanding the series of corporate restructurings intended to manufacture a purported presence in Texas, nothing has materially changed since LTL 1.0 to suggest there is another forum more appropriate than New Jersey to oversee J&J's *third* bankruptcy case.

> 1.     **"Operations" and Decision-Makers Are Located in New Jersey**

47.     The Debtor's so-called "operations" continue to be performed by Johnson and Johnson Services, Inc., a New Jersey company ("J&J Services"), on the Debtor's behalf.[24]   The LTL 1.0 First Day Declaration provides that:

> [t]o ensure that the Debtor has access to services it needs to effectively operate its business, in connection with the 2021 Corporate Restructuring, the Debtor entered into a [sic] services agreements (the "Services Agreements") with J&J Services. Pursuant to the Services Agreement, J&J Services has agreed to provide the Debtor with certain corporate and administrative services, including treasury and procurement, corporate finance, accounting, human resources, information technology, legal, risk management, tax and other support services. In addition, the Debtor and J&J Services entered into a secondment agreement pursuant to which J&J Services has agreed to second to the Debtor certain of its employees, including the Debtor's Chief Legal Officer, on a full-time basis to manage the Debtor's business.

*LTL 1.0 First Day Declaration*, at ¶ 29.

---

[23]   *Id.; see also* Red River First Day Declaration, ¶¶ 37-38.

[24]   *See* Red River First Day Declaration, ¶ 49.

48.     As part of its services, J&J Services provides access to office space and other facilities for use by the Debtor.  Specifically, the Services Agreement between the Debtor and J&J Services states:

> Office Space and Access to Shared Facilities: Rental of office space and access to shared facilities for (i) the Provider employees seconded to Recipient pursuant to the Secondment Agreement, dated as of the date hereof, between Provider and Recipient, and (ii) any directors, managers, officers, employees and consultants of Recipient or its subsidiaries. Includes building, grounds and site infrastructure and all utilities and services provided to the offices, including, without limitation, electricity, telephone service and internet service, printers and facilities such as meeting rooms, cafeterias, fitness facilities and parking at the following locations:
>
> - One Johnson & Johnson Plaza, New Brunswick, NJ 08933
> - 410 George Street, New Brunswick, NJ 08933
> - 501 George Street, New Brunswick, NJ 08933

Amended & Restated Services Agreement, Ex. A.

49.     Royalty entered into a similar services agreement with J&J Services (collectively, the "Services Agreements"), pursuant to which J&J Services agreed to provide certain corporate and administrative services.  LTL 1.0 First Day Declaration, at ¶ 20.  Accordingly, by the Debtor's own acknowledgement, whatever purported "operations" it may have are all run out of New Jersey. This was reiterated at the October 22, 2021, hearing in which Mr. Kim was cross-examined about his First Day Declaration, during which time it became clear that the Debtor had little if any connections to North Carolina, but, rather, had significant connections to New Jersey[25]:

    a.     For approximately twenty-one years prior to becoming the Debtor's Chief Legal Officer on October 12, 2021, Mr. Kim was employed by J&J, in New Brunswick, New Jersey.  Mr. Kim was head lawyer for product liability at J&J before being seconded to the Debtor (through J&J Services).  *Oct. 22 Hearing Tr.*, at 43:16–44:8, 46:16–47:6.

    b.     Mr. Kim currently lives in New Jersey.  *Id.* at 44:12–18.

---

[25]   Transcript, October 22, 2021 Hearing in LTL 1.0 (Beville Decl. Ex.45).

c.   The Debtor has its office address is in New Brunswick, New Jersey. *Id.* at 45:2–8*; see also Petition*, at p. 1.

d.   The Debtor's two other officers—President, Bob Wuesthoff and Chief Financial Officer, Richard Dickinson—never worked in North Carolina, but, rather, worked for J&J based in New Jersey. *Oct. 22 Hearing Tr.*, at 45:9–46:12.

e.   J&J has been based in East Brunswick, New Jersey since it was formed in 1887.  J&J was the corporate parent of Old JJCI, a company that was based in Skillman, New Jersey. *Id.* at 48:4–15, 49:25–50:2.

50.   According to Mr. Kim, the Debtor's only assets are (1) cash; (2) interests as payee under the 2024 Funding Agreements with New Holdco; (3) the equity interests in Royalty; and (4) certain insurance coverage rights. *Red River First Day Declaration*, at ¶ 39 - 40.  None of these assets are geographically connected to the Debtor's chosen venue.  None of the Debtor's assets involve operation of a business in Texas or elsewhere.  With the Debtor's offices located in New Jersey and with no physical location whatsoever in Texas, all books, records, and relevant contracts are presumably located in New Jersey.

## 2.   The MDL is Pending in New Jersey

51.   Importantly, most of the litigation pending against J&J, which is precisely what brought the Debtor (and its predecessor LTL) to file for bankruptcy, is based in New Jersey.  It cannot be overlooked that this bankruptcy has one and only one purpose:  secure a discharge of J&J's independent talc liability *for all time*.

52.   As of July 2024, approximately 62,000 ovarian cancer cases were pending against J&J, including approximately 57,000 cases pending in a federal multi-district litigation in New Jersey, approximately 3,200 cases in New Jersey state court and approximately 1,800 cases in multiple state court jurisdictions across the country.  There is no evidence of any cases pending in Texas state court, much less a significant number.

53.     The MDL has been pending in the United States District Court for the District of New Jersey for nearly 8 years.  The venue of the MDL was not accidental.

54.     In fact, it was J&J and Old JJCI that proposed New Jersey as the appropriate venue to consolidate and litigate the federal actions.  *See* Transfer Order ("Defendants Johnson & Johnson, Johnson & Johnson Consumer Companies, Inc., Imerys Talc America, Inc., and Personal Care Products Council propose centralization in either the District of New Jersey or the Western District of Oklahoma.").[26]  The United States Judicial Panel on Multidistrict Litigation agreed, concluding:

> [T]he District of New Jersey . . . [is an] appropriate transferee district in this litigation.  The district is a convenient and accessible forum for this nationwide litigation, and is located in close proximity to a large number of state court actions pending in New Jersey and other jurisdictions on the East Coast of the United States.

*Transfer Order*, p. 3.

55.     For many years, J&J preferred to litigate the talc-related claims in the MDL in New Jersey.  For example, in 2020, J&J sought to modify the automatic stay in the *Imerys* bankruptcy case in the United States Bankruptcy Court for the District of Delaware, so that it could be allowed to continue to litigate the talc claims outside of bankruptcy, including those in the MDL in New Jersey.[27]  In touting the benefits of its requested relief, J&J argued that talc claimants:

> would have their day in court in their chosen forums and be afforded the opportunity to be paid in full to the extent the J&J Talc Claims are adjudicated to have merit or are otherwise settled.  The only conceivable reason claimants might oppose the requested relief is that they believe their claims will be treated better in these chapter

---

26  Beville Decl. Ex. 42.

27  *See Johnson &Johnson's Motion Pursuant to 11 U.S.C. § 362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rule 4001-1 For Entry of Order Modifying Automatic Stay to Permit J&J to Send Notice Assuming Defense of Certain Talc Claims and to Implement Talc Protocol, In re Imerys Talc America, Inc.*, Case No. 19-10289-LSS (Bankr. D. Del. Mar. 20, 2020), Dkt. No. 1567 (the "*Imerys* Stay Relief Motion") (Beville Decl. Ex. 43).

11 cases than being fully unimpaired and adjudicated outside of bankruptcy on their merits.

*Id.* at ¶ 48.

56.     However, in 2021, J&J's preference to continue litigating the talc cases changed. Instead of litigating in the tort system, J&J decided that it wanted to attempt to use the bankruptcy system to evade its tort liability.  Thereafter, LTL was concocted to implement the grander strategy of manufacturing venue in North Carolina for the purpose of the bankruptcy efforts.

### 3.     Other New Jersey Litigation

57.     While the MDL represents the most significant number of cases, there are thousands of others pending around the country, including approximately 3,200 cases filed in New Jersey state courts.  In addition to the pending personal injury claims against J&J, several other talc-related lawsuits are pending in New Jersey.

58.     In May of 2019, certain of the Debtor's third-party insurers filed the New Jersey Coverage Action, seeking a declaratory judgment regarding the insurers' obligation to pay defense and indemnity costs.  The insurer plaintiffs filed a Second Amended Complaint on June 22, 2020. Answers and asserted counterclaims and cross-claims were filed on July 31, 2020.  Additional cross-claims were filed, and answered, in 2020.  *See Red River First Day Declaration*, ¶ 95.

59.     On May 22, 2024, five plaintiffs filed a proposed class action lawsuit in the New Jersey federal court on behalf of women whose pending cases against J&J were delayed as a result of an alleged strategy by J&J to engage in repeated fraudulent transfers and serial bad faith bankruptcy filings.  *Love et al. v. LTL Management Inc., et al.*, Case No. 3:24-cv-06320 (D. N.J.).

60.     On June 17, 2024, a proposed class action was filed in New Jersey federal court seeking damages and medical monitoring on behalf of women who have been diagnosed with cancer, or might develop it in the future, allegedly as a result of the use of J&J talc products.

*Bynum, et al. v LLT Management LLC, et al.*, Case No. 3:24-cv-07065 (D. N.J.).  The proposed

class could include thousands of women, but would not include the more than 62,000 people who

had already filed personal injury lawsuits against J&J.

## ARGUMENT

61.     Pursuant to 28 U.S.C. § 1412, even if venue is proper, a district court may transfer

a bankruptcy case to another district in the interests of justice or for the convenience of the

parties.[28]  Here, this Court should exercise its discretion and transfer venue of this Case to the

District of New Jersey.

62.     Each of the two prongs of analysis—"in the interests of justice" or "for the

convenience of the parties"—constitutes an independent ground for transferring venue.[29]  The

decision to transfer venue is within a court's discretion according to an "an individualized, case-

by-case consideration of convenience and fairness."[30]

63.     Although courts may give some weight to the original choice of venue, the Fifth

Circuit has cautioned that a debtor's choice of venue should not be given "undue weight."  *In re*

*Volkswagen of Am., Inc.*, 545 F.3d 304, 309 (5th Cir. 2008).  In that regard, "[t]here is no litmus

test or set of hard and fast rules that offer precise guidance for transfer of venue, and the bankruptcy

---

[28]   28 U.S.C. § 1412; Fed. R. Bankr. P. 1014(a) (same); *see also In re ERG Intermediate Holdings*, LLC, 15-31858, 2015 WL 6521607, at *4 (Bankr. N.D. Tex. Oct. 27, 2015) ("Even if venue is technically proper, courts may still exercise their discretion to transfer a case to another District in the interest of justice or for the convenience of the parties."); *In re Amazing Energy MS, LLC*, 2020 WL 4730890, at *7 (Bankr. S.D. Miss. June 25, 2020) (same); *In re Dunmore Homes, Inc.* 380 B.R. 663, 670 (Bankr. S.D.N.Y. 2008) (noting that transfer under § 1412 is discretionary).

[29]   *Commonwealth of Puerto Rico v Commonwealth Oil Refining Co. (In re Commonwealth Oil Refining Co.)* ("*CORCO*"), 596 F.2d 1239, 1241 (5th Cir. 1979); *In re Enron Corp.*, 274 B.R. 327, 342 (Bankr. S.D.N.Y. 2002).

[30]   *Gulf States Exploration Co. v Manville Forest Prod. Corp. (In re Manville Forest Prod. Corp.)*, 896 F.2d 1384, 1391 (2d Cir. 1990); *In re Cox Operating, LLC*, 652 B.R. 49, 55 (Bankr. E.D. La. 2023); *In re Patriot Coal Corp.*, 482 B.R. 718, 739 (Bankr. S.D.N.Y. 2012).

courts are left to a case-by-case determination based upon all relevant factors." *In re New Luxury Motors, LLC*, 2010 WL 817204, at *3 (Bankr. S.D. Tex. March 4, 2010).

64.     While the interest of justice and the parties' convenience are independent grounds for transfer, courts generally apply a number of overlapping factors to determine their applicability to a particular case. *See CORCO*, 596 F.2d at 1247; *ERG Intermediate*, 2015 WL 6521607, at *5 (*citing CORCO*); *In re Bestwall LLC*, 605 B.R. 43, 51–53 (Bankr. W.D.N.C. 2019) (applying multi-factor tests for each ground under § 1412). The factors are not weighted equally in each case, however, and overarching, independent concerns may justify transfer. *Id.*

65.     The facts here weigh heavily in favor of transferring venue on each of the independent grounds of § 1412. The Debtor's blatant forum shopping, overwhelming connections to New Jersey that trace back more than a century, contrived links to Texas, and the purposeful creation of venue, overcome any presumption that the Debtor's venue selection of Texas is appropriate, and support transfer of venue to the District of New Jersey. *See, e.g.*, *Patriot Coal*, 482 B.R. at 744 (notwithstanding creditor support for venue, court did not allow debtor's venue choice to stand because it would be an affront to the integrity of the bankruptcy system). The Coalition respectfully states that, in the interests of justice and for the convenience of the parties, venue should be transferred to New Jersey.

### A.     The Interests of Justice Warrant Transfer of Venue to New Jersey

66.     Courts widely treat the interests of justice standard as "a broad and flexible standard that is applied based on the facts and circumstances of each case." *In re Enron Corp.*, 274 B.R. 327, 342 (Bankr. S.D.N.Y. 2002); *see ERG Intermediate*, 2015 WL 6521607, at *6; *Amazing Energy*, 2020 WL 4730890, at *8; *New Luxury Motors*, 2010 WL 817204, at *3.

67.     Notably, courts have noted that it is "appropriate to add as an additional relevant factor, though it may rarely be applicable, ***the integrity of the Bankruptcy Court system.***"  *In re Cox Operating, LLC*, 652 B.R. 49, 57 (Bankr. E.D. La. 2023) (emphasis added); *Patriot Coal*, 482 B.R. at 739 (quoting *In re Éclair Bakery Ltd.*, 255 B.R. 121, 142 (Bankr. S.D.N.Y. 2000).

68.     Courts find that forum shopping often warrants transfer of venue in the interests of justice.  *Id.*; *see also In re Abacus Broadcasting Corp.*, 154 B.R. 682, 686 (Bankr. W.D. Tex. 1993) (noting that courts are "quick to discern the evil [of forum shopping] in all its disguises.").  In comments apropos to the facts here, the *Abacus Broadcasting* bankruptcy court noted:

> In bankruptcy, too often the tactic is masked by pious pronouncements about the debtor's "right" to select the most advantageous of several possible forums, in order to advance the prospects for reorganization.  That rationale, however, should in the usual instance, be taken with several grains of salt.  Too many corporations with familiar household names are operating in bankruptcy under the name of some obscure subsidiary whose venue happens to coincide with either the debtor's or the debtor's lawyers' perception of the most favorable judicial forum in which to operate. This tactic is not simply unfair to the creditors of these estates.  It is also unfair to the judges.

*Id.* at 686-87.

69.     The concerns raised by forum shopping are especially warranted, where, as here, a debtor has manufactured circumstances to create venue within a district.  *See* LTL 1.0, *Venue Transfer Order*, at 10; *Patriot Coal*, 482 B.R. at 746; *In re Éclair Bakery Ltd.*, 255 B.R. 121, 142 (Bankr. S.D.N.Y. 2000).  The NC Bankruptcy Court's decision to transfer venue of LTL 1.0 and the *Patriot Coal* case are especially instructive here.

70.     In *Patriot Coal*, two subsidiaries of Patriot Coal Corporation were formed under New York law and listed New York as the domicile but neither subsidiary had any employees, business operations or offices in New York.  After the two subsidiaries filed for bankruptcy relief in the Southern District of New York, 96 other subsidiaries filed in that district.

71.     Even though venue was technically proper in New York under 28 U.S.C. § 1408(2), the bankruptcy court concluded that deferring to the debtors' choice of venue "would elevate form over substance in a way that would be an affront to the purpose of the bankruptcy venue statute and the integrity of the bankruptcy system." *Patriot Coal*, 482 B.R. at 744 (citing *In re Éclair Bakery Ltd.*, 255 B.R. 121, 142 (Bankr. S.D.N.Y. 2000)).

72.     The *Patriot Coal* court noted there is an important distinction between debtors "creat[ing] facts to fit the statute" versus "taking advantage of the facts as they existed before the [d]ebtors embarked on their path to a chapter 11 filing." *Id*. at 746.  The court determined that Patriot Coal formed the two New York subsidiaries solely to comply with venue requirements and thus created facts to satisfy statutory requirements.  "Permitting the Debtors' cases to remain in this District under these circumstances would all but render the venue statute meaningless.  It would allow potential corporate debtors to choose what they view as the optimal venue for their bankruptcy cases and, in preparation for filing chapter 11, incorporate an affiliate in that location for purposes of satisfying section 1408." *Id*. at 746.  That is exactly what J&J did here.

73.     Similarly, in the *Éclair Bakery* chapter 11 case, the court considered the "more abstract measures of the 'interests of justice.'" *Éclair Bakery*, 255 B.R. at 142.  The court noted:

> Where, as here, a case is filed in one district where virtually all of the events leading up to the case took place in proceedings before a judge in another district; where files and exhibits are likely to be more readily available in the other district; and where a judge in the other district considered matters relevant to this case as recently as four weeks prior to the filing here, principles of judicial efficiency and comity for the first district lead the Court to conclude that it is better for this case too to be heard there, or at least as much of it as practical.

*Id.*

74.     Such concerns are even more deep-rooted where a debtor is manufacturing venue to avoid another district.  *Id.*; *Patriot Coal*, 482 B.R. at 742.

> The Court has found as a fact that this case was filed in the Southern
> District for "forum shopping" to try out the Southern District, after
> repeated unfavorable rulings, and a restrictive order, in the Eastern
> District. The interests of justice require that this Court not reward
> such an effort. This Court believes it appropriate to add as an
> additional relevant factor, though it may rarely be applicable, the
> integrity of the Bankruptcy Court system.

*Id.*

75.     Guided by the findings in *Éclair Bakery* and *Patriot Coal*, in LTL 1.0 the NC Bankruptcy Court similarly found the manufacturing of venue to be an important consideration. Venue Transfer Order, pp. 9-10 (emphasizing that LTL was not just forum shopping, but was "manufacturing forum and creating a venue to file a bankruptcy").

76.     The NC Bankruptcy Court, in comparing LTL 1.0 to other mass tort cases filed in that district, found that LTL's "short existence indicates that the Debtor subjected itself to the laws of North Carolina purely for the purposes of filing bankruptcy." The NC Bankruptcy Court added that "[s]etting up a company with the sole intent of filing bankruptcy in a certain district cannot be 'the thing which the [venue] statute intended.'" Venue Transfer Order, at p. 9 (quoting *Patriot Coal*, 482 B.R. at 745). This Court is presented with the same set of circumstances that warranted transferring venue in LTL 1.0 and *Patriot Coal*.

77.     A venue transfer is even more warranted now than it was in LTL 1.0 when the NC Bankruptcy Court transferred venue to the NJ Bankruptcy Court. The optics of this case represent a brazen attempt of forum shopping.

78.     The NJ Bankruptcy Court to which the NC Bankruptcy Court transferred LTL 1.0 dismissed the case after the Third Circuit reversed the NJ Bankruptcy Court's decision denying the creditors' motions to dismiss. Then, following LTL's immediate re-filing of its second bankruptcy case, the NJ Bankruptcy Court, bound by Third Circuit precedent, again dismissed the LTL 2.0 bankruptcy case. Determined to push its plan through in a bankruptcy forum, and not

24

dissuaded by two bankruptcy dismissals, J&J changed LTL's name to LLT and, in a second divisive merger, created Red River—each entity assigned a subset of LLT's talc liabilities—and is attempting its third mass tort bankruptcy in this Court.

79.     Imagine if an individual debtor attempted anything like this.  J&J is obviously running away from Courts that have refused to do its bidding.  This is the very essence of forum shopping, which undermines public confidence in our judicial system by creating the appearance that wealthy, solvent, Fortune 50 companies like J&J can operate by a different set of rules.  J&J believes that it can choose which Court hears its case until it finds one willing to grant it a discharge of its independent talc liability.  There is no other way to look at this.  To allow this kind of gamesmanship would not just undermine the interests of justice element of § 1412 but would irreparably damage the integrity of the bankruptcy system.

80.     But forum shopping/manufacturing venue is not the only factor supporting transfer of venue.  The interests of justice standard can also be satisfied on other grounds.  Courts examine a variety of additional factors such as:

(i)     promoting the economic and efficient administration of the bankruptcy estate;

(ii)    promoting judicial economy;

(iii)   timeliness; and

(iv)    fairness.

*See In re BDRC Lofts, Ltd.*, No. 12-11559, 2013 WL 395129, at *2 (Bankr. W.D. Tex. Jan. 31, 2013); *ERG Intermediate*, 2015 WL 6521607, at *7; *see also In re Crosby Nat'l Golf Club, LLC*, 534 B.R. 888, 890-91 (Bankr. N.D. Tex. 2015) (noting a state's interest in having local controversies decided within its borders as another factor considered); *In re Enron*, 274 B.R. 327,

349 (Bankr. S.D.N.Y. 2002) (finding the "considerations involved with the interest of justice are intertwined with the economic and efficient administration of the estate").

81.     Principal among these factors is the first, which also appears among the factors relevant to the convenience standard—the promotion of economic and efficient administration of the bankruptcy estate.  *See Dunmore*, 380 B.R. at 672.

82.     This factor entails a number of considerations, including the location of potential financing, the location of a debtor's key decision-makers, and the expense of the parties.  *See, e.g.*, *id.* at 673.  As explained above, each of these weighs in favor of transfer to New Jersey.  Debtor's offices are in New Jersey; its employees and officers are seconded to it by J&J and primarily live and work in New Jersey; the principal place of business for the entities providing financing is in New Jersey, its books and records (to the extent any exist) appear to be in New Jersey.  In short, New Jersey is the nerve center for the Debtor.

83.     Additionally, both the Debtor's predecessors and its creditors have invested substantial time and resources in New Jersey in connection with the prior bankruptcy cases, the MDL and state court actions pending there.  In addition to the MDL and thousands of state court actions in New Jersey, the New Jersey Coverage Action and two proposed class actions have been filed in New Jersey.  New Jersey clearly has been, and remains, the hub of litigation activity.

84.     Likewise, the District and Bankruptcy Courts of New Jersey are very familiar with the underlying claims and the fact that this bankruptcy is still in its early stages also eliminates concerns about delay, expense, and the transferee court's "learning curve."

85.     Chief Bankruptcy Court Judge Kaplan of the NJ Bankruptcy Court has now presided over two of the Debtor's bankruptcy filings and is well-versed in the J&J corporate transactions, financing arrangements and talc-related bankruptcy claims, as well as being quite

familiar with the witnesses and other parties in the Case.  If, as the Debtor will surely argue, facts have changed to make this third bankruptcy filing permissible under the standard set by the Third Circuit, the NJ Bankruptcy Court is well-suited to hear such arguments.

86.    Similarly, as the MDL has been pending for 8 years, the New Jersey District Court has extensive involvement in the talc litigation and is familiar with the myriad of expert testimony, scientific data, and other evidentiary issues.  The District Court rendered a *Daubert* decision on April 27, 2020.  Since the dismissal of LTL 2.0, the District Court has actively managed the MDL and has re-engaged on discovery, including to order additional discovery and briefing to consider certain *Daubert* issues.  Indeed, transferring this Case to New Jersey would better promote judicial efficiency as that State has, for years, been deeply entrenched in all facets of this Case and is well-attuned to the demands of the Case.

**B.    Convenience of the Parties Warrants Transfer of Venue to New Jersey**

87.    The sheer volume of the connections of the parties-in-interest to New Jersey is overwhelming.  In stark contrast, there are virtually no connections among these parties—the Debtor included—to Texas.  These facts militate in favor of transfer in the context of the convenience of the parties.

88.    To determine whether transfer is appropriate for the convenience of the parties, this Court and others have relied on the factors set forth in the Fifth Circuit's decision in *CORCO*, which include:

    (i)     the proximity of creditors of every kind to the court;

    (ii)    the proximity of the Debtor to the court;

    (iii)   the proximity of the witnesses necessary to the administration of the estate;

    (iv)    the location of the assets;

    (v)     the economic administration of the estate; and

(vi)    the necessity for ancillary administration if a liquidation should occur.

*CORCO*, 596 F.2d at 1247.

89.    Aside from its Texas incorporation, the Debtor has no business or asset presence in Texas.  In contrast, New Jersey is the location with a host of meaningful connections to the Debtor (much like it had with the Debtor's predecessor LTL in LTL 1.0 and LTL 2.0).  New Jersey is its nerve center.  The Debtor's principal place of business is located in New Jersey.   Mr. Kim works in the State.  And while the Debtor has none of its own employees, those employees seconded to the Debtor under the Services Agreement are from J&J Services, which is based in New Jersey. Moreover, the Services Agreement also provides access to office space for the Debtor—*in New Jersey*.

90.    Even the Debtor's assets are closely connected to New Jersey.  Like the Debtor, Royalty's operations are run out of New Jersey.  More significantly, the Debtor's largest asset— the Funding Agreement—is with entities headquartered in New Jersey.  *See In re Mainline Contracting, Inc.*, 2009 WL 3785568, at *2 (Bankr. E.D.N.C. 2009) (concluding that location of intangible personal property is situs of account debtor or party with obligation to perform).

91.    In weighing the convenience of New Jersey in this Case, it is critical to consider the "business" of this Debtor, or lack thereof.  The Debtor (as it was when it was called LTL) is a shell, existing solely to defend against talc related lawsuits, to act as a shield to its parents, and to be the entity subjected to the Bankruptcy Code.  Thus, the Debtor's "business" exists wherever the Debtor is in litigation, which for many years has been New Jersey, J&J's home state.[31]

92.    Just as the Debtor is most closely connected to New Jersey, so too are its creditors. There are approximately 57,000 plaintiffs in the MDL that has been pending in New Jersey for the

---

[31]    J&J was founded in New Jersey in 1886—almost 140 years ago.

last 8 years.  Indeed, not only did J&J and Old JJCI request New Jersey as an appropriate forum for the MDL, but the Judicial Panel on Multidistrict litigation has already concluded that New Jersey was "convenient and accessible" for the parties involved in the MDL—by and large the same parties involved in this Case.  Moreover, if this Case were transferred, the Bankruptcy Court and the District Court in New Jersey could easily coordinate issues of exclusive and concurrent jurisdiction and, if allowed, facilitate a claims estimation process.  Indeed, that was the case before with LTL 1.0 and LTL 2.0 when both were pending in New Jersey.

93.     In contrast to the nearly 60,000 cases pending in New Jersey, there are only approximately 2,000 cases pending in other jurisdictions.  There is no evidence of any cases pending in Texas state court, much less a significant number of cases.

94.     In view of these considerations, New Jersey is a preferable venue for the creditors. The Debtor touts the "insistence of creditors" to file in this venue.  But most of the law firms that support J&J's third bankruptcy case represent holders of non-compensable claims—claims that are unenforceable under applicable law and cannot be treated as allowed claims under the Bankruptcy Code for purposes of voting or distribution.  Further, the prepackaged Plan did not even commit to filing in any particular venue, and the supposed support of creditors really means the support of the few law firms that signed on to the so-called "prepackaged" Plan before it was solicited—largely the same law firms that supported the Debtor in LTL 2.0, which was dismissed. The actual creditors in these cases have expressed no opinion on venue.

95.     Moreover, while Courts do consider the support of economic parties-in-interest, such factor's weight is limited where there is no evidence "of substantial, let alone 'catastrophic,' economic consequences of moving the cases in the form of increased costs of administration and thus lower economic recoveries to stakeholders."  *Patriot Coal*, 482 B.R. at 748 (transferring

venue where there was "vast creditor support" for the debtor's choice of venue due to lack of economic harm caused by transfer and to uphold integrity of the bankruptcy system); *contrast with In re Houghton Mifflin Harcourt Publ'g Co.* 474 B.R. 122, 124 (Bankr. S.D.N.Y. 2012) (declining to transfer venue in light of 'unanimous creditor support').

96.     Participating in a bankruptcy in the District of New Jersey would enable meaningful creditor participation—and be far more sensible and cost effective—than doing so here, where neither the creditors nor the Debtor have connections of any consequence.

97.     Ultimately, because of the New Jersey connections by both the Debtor and the litigation underlying this bankruptcy filing, transferring this Case to the District of New Jersey would not simply shift the burden from one constituency to another, but would benefit all stakeholders in this Case. *Cf. Great Am. Resources, Inc.*, 85 B.R. 444, 445–46 (Bankr. N.D. Ohio 1988) ("The statutory term 'for the convenience of the parties' under Sec. 1412 and its predecessors has been held to mean that venue decisions should not merely shift the inconvenience from one party to another.").

98.     Accordingly, transfer of venue is additionally appropriate on the separate grounds that it is for the convenience of the parties.

## <u>CONCLUSION</u>

99.     For the foregoing reasons, the facts and circumstances satisfy the standards under § 1412 for transfer based either on the interests of justice or the convenience of the parties. Accordingly, the Coalition respectfully requests that venue of this Case be transferred to the District of New Jersey, where venue is proper, and grant such other and further relief as the Court deems just and proper.

Dated:    Dallas, Texas
          September 21, 2024

**Stutzman, Bromberg, Esserman & Plifka, P.C.**

      */s/ Sander L. Esserman*

Sander L. Esserman
State Bar No. 06671500
Peter C. D'Apice
State Bar No. 05377783
2323 Bryan Street, Ste. 2200
Dallas, TX 75201-2689
Telephone: (214) 969-4900
Facsimile:  (214) 969-4999
Email:  esserman@sbep-law.com
        dapice@sbep-law.com

**BROWN RUDNICK LLP**
David J. Molton (*pro hac vice* pending)
Jeffrey L. Jonas (*pro hac vice* pending)
Eric R. Goodman (*pro hac vice* pending)
Gerard T. Cicero (*pro hac vice* pending)
Susan Sieger-Grimm (*pro hac vice* pending)
Seven Times Square
New York, NY 10036
Telephone:     (212) 209-4800
Email:  dmolton@brownrudnick.com
        jjonas@brownrudnick.com
        egoodman@brownrudnick.com
        gcicero@brownrudnick.com
        ssieger-grimm@brownrudnick.com

-AND-

**OTTERBOURG P.C.**
Melanie L. Cyganowski (*pro hac vice* pending)
Adam C. Silverstein (*pro hac vice* pending)
Sunni P. Beville (*pro hac vice* pending)
Jennifer S. Feeney (*pro hac vice* pending)
230 Park Avenue
New York, New York 10169-0075
(212) 661-9100
mycganowski@otterbourg.com
asilverstein@otterbourg.com
sbeville@otterbourg.com
jfeeney@otterbourg.com

*Co-Counsel for Coalition of Counsel for Justice for Talc Claimants*

31

**CERTIFICATE OF SERVICE**

I certify that on September 21, 2024, I caused a true and correct copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Peter C. D'Apice*
Peter C. D'Apice