## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC LLC,[1] | Case No. 24-90505 (CML) |
| Debtor. | |

### DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING (I) ADEQUACY OF DISCLOSURE STATEMENT, (II) SOLICITATION PACKAGES AND PROCEDURES EMPLOYED FOR THE SOLICITATION AND TABULATION OF VOTES ON THE DEBTOR'S PREPACKAGED PLAN OF REORGANIZATION AND (III) NOTICE OF NON-VOTING STATUS

> **If you object to the relief requested, you must respond in writing. Unless otherwise directed by the court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the court may treat the pleading as unopposed and grant the relief requested.**

The above-captioned debtor (the "Debtor") respectfully states as follows in support of this motion (this "Motion"):

### RELIEF REQUESTED

1.    The Debtor seeks the entry of an order substantially in the form submitted herewith (the "Proposed Order") approving:

   (a)    the adequacy of the *Disclosure Statement for Prepackaged Chapter 11 Plan of Reorganization of the Debtor*, dated June 3, 2024 (including all exhibits thereto, the "Disclosure Statement");

   (b)    the procedures (the "Solicitation Procedures") that were used to solicit votes to accept or reject the *Prepackaged Chapter 11 Plan of Reorganization of the Debtor*, dated June 3, 2024 (as amended, modified and supplemented from time to time through the

---

[1]    The last four digits of the Debtor's taxpayer identification number are 8508.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

Claimant Voting Deadline (as defined below), the "<u>Initial Plan</u>"),[2] and related materials, including, among other things, the forms of ballot and the other solicitation materials served upon parties entitled to vote on the Initial Plan (the "<u>Solicitation Packages</u>");

(c)    the procedures that were used for tabulating votes to accept or reject the Initial Plan (the "<u>Tabulation Procedures</u>" and, together with the Solicitation Procedures, the "<u>Solicitation and Tabulation Procedures</u>"); and

(d)    the proposed form and manner of service of the notice of non-voting status to be distributed to holders of Claims in unimpaired classes not entitled to vote on the Initial Plan (the "<u>Notice of Non-Voting Status</u>").

2.    In support of the relief requested herein, the Debtor incorporates by reference:  (a) the *Declaration of John K. Kim in Support of Chapter 11 Case and Certain First Day Pleadings* (the "<u>First Day Declaration</u>"); (b) the *Declaration of Stephenie Kjontvedt of Epiq Corporate Restructuring, LLC, Regarding the Solicitation and Tabulation of Ballots Cast on the Prepackaged Chapter 11 Plan of Reorganization of the Debtor* (the "<u>Voting Declaration</u>"); and (c) the *Declaration of Shannon R. Wheatman, Ph.D. in Support of Supplemental Notice Plan* (the "<u>Supplemental Notice Declaration</u>"), each of which was filed concurrently herewith.

## <u>JURISDICTION AND VENUE</u>

3.    This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The Debtor is authorized to continue to manage its property and operate its business as a debtor in possession pursuant to sections 1107(a) and 1108 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

---

[2]    Capitalized terms not otherwise defined herein have the meanings given to them in the Initial Plan or the Disclosure Statement, as applicable.

4.      The Debtor confirms its consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.      The bases for the relief requested herein are:  sections 105(a), 524(g), 1125, 1126 and 1128 of title 11 of the Bankruptcy Code; Rules 2002, 3016, 3017, 3018, 3020 and 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and Rules 2002-1 and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "Local Rules").

## BACKGROUND

### I.      Solicitation of the Initial Plan

6.      On September 20, 2024 (the "Petition Date"), the Debtor commenced this reorganization case (this "Chapter 11 Case")[3] by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor's objective in this Chapter 11 Case is to obtain confirmation of the Amended Plan, which is a prepackaged plan of reorganization containing terms accepted before the Petition Date by the vast majority of holders of Channeled Talc Personal Injury Claims[4]—the only claims affected by the Amended Plan's terms. Comprehensive descriptions of the Debtor, its history, its assets and liabilities and the events

---

[3]      On the Petition Date, the Debtor filed the *Amended Prepackaged Chapter 11 Plan of Reorganization of the Debtor* in the Chapter 11 Case [Dkt. 24] (as it may be amended, modified and supplemented from time to time the "Amended Plan").

[4]      Under the Initial Plan and the Amended Plan, Channeled Talc Personal Injury Claims includes all current and future claims and demands arising from ovarian and gynecological cancer but expressly excludes claims and demands alleging injury from mesothelioma or lung cancer, claims and demands of governmental entities and Canadian claims and demands, which liabilities were not allocated to the Debtor in the prepetition corporate restructuring described in the First Day Declaration (the "2024 Corporate Restructuring").  See First Day Decl. n.35.

leading to the commencement of this Chapter 11 Case can be found in the Disclosure Statement and in the First Day Declaration.

7.      Prior to the Petition Date, the Debtor's predecessor, LLT Management LLC ("LLT"), the former Johnson & Johnson Holdco (NA) Inc. (f/k/a Johnson & Johnson Consumer Inc.) ("Old Holdco") and Johnson & Johnson ("J&J" and, collectively with LLT and Old Holdco, the "Company") engaged in discussions with representatives of holders of the vast majority of Channeled Talc Personal Injury Claims concerning potential alternatives for equitably and permanently resolving that liability.  Those discussions resulted in the Initial Plan and the Amended Plan.  The Amended Plan finally and comprehensively resolves all current and future ovarian cancer and other gynecological cancer claims pertaining to JOHNSON'S® Baby Powder and Shower to Shower products, and, among other things, provides for the establishment of a trust (the "Talc Personal Injury Trust") to process and pay Channeled Talc Personal Injury Claims.  Under the Amended Plan, the Talc Personal Injury Trust will be funded by a stream of payments totaling approximately $9 billion over the next 25 years.

8.      As described in more detail in the Disclosure Statement, under the terms of the Initial Plan and the Amended Plan, Class 4 Channeled Talc Personal Injury Claims will be permanently channeled to the Talc Personal Injury Trust by the injunctions provided for in Section 11.3 (collectively, the "Channeling Injunction").  The Talc Personal Injury Trust Assets will be used to resolve Channeled Talc Personal Injury Claims in accordance with the Trust Distribution Procedures attached as Exhibit K to the Initial Plan and the Amended Plan and the other Talc Personal Injury Trust Documents.  The Trust Distribution Procedures establish (a) the process by which the Talc Personal Injury Trust will review Channeled Talc Personal Injury Claims and (b) a methodology for their resolution and liquidation.

9.     There are seven Classes of Claims and Interests under the Initial Plan and the Amended Plan, in accordance with section 1126 of the Bankruptcy Code.  Holders of Channeled Talc Personal Injury Claims in Class 4 and Equity Interests in the Debtor in Class 7 (together, the "Voting Classes") are Impaired and, thus, were entitled to vote to accept or reject the Initial Plan.  See Voting Decl., ¶ 4.  Holders of Claims in Classes 1, 2, 3, 5 and 6 (collectively, the "Non-Voting Classes") were not entitled to vote on the Initial Plan because they are Unimpaired and are therefore presumed to accept the Initial Plan.[5]

10.     A 60-day period for holders of Channeled Talc Personal Injury Claims to vote on the Debtor's prepackaged Plan (the "Solicitation Period") began on June 3, 2024 (the "Solicitation Date") and concluded on July 26, 2024 (the "Claimant Voting Deadline").[6] In accordance with the Solicitation Procedures described below, votes of holders of Channeled Talc Personal Injury Claims could be submitted directly by the claimants themselves, or by their counsel, who were permitted to cast the votes of their clients on master ballots (the "Master Ballots"), either with such clients' informed consent or under the authority of a valid power of attorney.

11.     Although the terms of the Initial Plan received substantial support from plaintiff firms, certain firms, comprised primarily of firms in leadership positions in the pending talc multi-district litigation (the "MDL"), including the Beasley Allen Law Firm ("Beasley Allen"), continued to raise concerns and indicate that they opposed any bankruptcy resolution of talc claims.  As a result, during the Solicitation Period and extending beyond the Claimant

---

[5]     Administrative Claims and Priority Tax Claims (together, the "Unclassified Claims") are unclassified under the Initial Plan and the Amended Plan and also are Unimpaired.

[6]     Ballots from holders of Equity Interests in the Debtor in Class 7 were required to be received by September 19, 2024, at 4:00 p.m. (prevailing Central Time) (the "Equity Voting Deadline" and, together with the Claimant Voting Deadline, the "Voting Deadlines").

Voting Deadline, LLT (and then the Debtor) and J&J continued to engage in extensive negotiations with the firms, including The Smith Law Firm PLLC (the "Smith Firm")—which represents over 11,000 claimants who, through a master ballot submitted by Beasley Allen,[7] initially voted against the Initial Plan—to resolve these firms' objections to the Initial Plan.

12. After these further negotiations, an agreement was reached with the Smith Firm and memorialized in a *Confidential Memorandum of Understanding & Agreement Regarding Talc Bankruptcy Plan Support*, which is incorporated into the Amended Plan. Among other things, the agreement provides, subject to specified terms and conditions, that:

> The Debtor will pay an additional **$1.1 billion** under the Amended Plan to the Talc Personal Injury Trust to fund talc claims subject to the individual review process described under the Trust Distribution Procedures;
>
> J&J will contribute **$650 million** outside the Amended Plan into a qualified settlement fund (the "QSF") for use in resolving any common benefit fund claims arising from the MDL; and
>
> To expedite payments to claimants in the event of appeals from the order confirming the Amended Plan, the Amended Plan will become effective and, the funding of and payments by the Talc Personal Injury Trust will begin, even if an appeal to the United States Supreme Court has been sought and remains pending.

13. As a result of this agreement, which is incorporated into the Amended Plan, the substantial majority of the clients jointly represented by the Smith Firm and Beasley Allen have now changed their votes to accept the Initial Plan, as amended by the Amended Plan.[8] The Debtor's proposed solicitation agent, Epiq Corporate Restructuring, LLC (the "Solicitation Agent"), has tabulated claimants' votes in accordance with the Tabulation Procedures. Upon

---

[7]    The Debtor understands that the Smith Firm and Beasley Allen are co-counsel for these claimants.

[8]    Although Beasley Allen and other MDL leadership firms participated in these negotiations as well, they declined to accept the resolution to which the Smith Firm agreed and continue to oppose the Amended Plan even as amended by this resolution with the Smith Firm.  At this point, it is not clear who, if anyone, Beasley Allen represents given that virtually all its clients have now voted to accept the Amended Plan.

completion of the tabulation process, the Solicitation Agent has confirmed that 83.4% of holders

of Channeled Talc Personal Injury Claims (77,998 of 93,552 valid votes cast) have now voted in

favor of the Initial Plan, as amended by the Amended Plan, comfortably satisfying the

requirements of sections 524(g) and 1129 of the Bankruptcy Code.  In addition, prior to the

Petition Date, the Debtor solicited the vote of its parent, Johnson & Johnson Holdco (NA) Inc.

(f/k/a J&J Intermediate Holding Corp.) ("New Holdco"), the holder of all Equity Interests in the

Debtor, and received New Holdco's accepting vote.

**II.     The Debtor Anticipates that Confirmation in this Chapter 11 Case Will Occur Promptly Following Successful Votes on the Chapter 11 Plans of the Imerys/Cyprus Debtors.**

14.     In parallel to formulation of the Amended Plan, LLT and J&J successfully

negotiated a settlement (the "Imerys/Cyprus Settlement") with representatives of Imerys Talc

America, Inc. and its affiliated debtors (collectively, "Imerys") as well as Cyprus Mines

Corporation ("Cyprus" and, together with Imerys, the "Imerys/Cyprus Debtors") and its parent

and the future claimants' representatives and tort claimants' committees appointed in the

Imerys/Cyprus Debtors' respective chapter 11 cases (Nos. 19-10289 (LSS) and 21-10398 (LSS))

(together, the "Imerys/Cyprus Cases"), which are pending in the United States Bankruptcy Court

for the District of Delaware (the "Delaware Bankruptcy Court").  The Imerys/Cyprus Debtors

agree that the Imerys/Cyprus Settlement will, if approved and consummated:  (a) yield settlement

proceeds to the Imerys/Cyprus Debtors' estates of at least $505 million for the benefit of current

and future talc claimants no later than December 31, 2025, according to the Imerys/Cyprus

Debtors; and (b) result in additional recoveries to holders of the Channeled Talc Personal Injury

Claims in this Chapter 11 Case that also have asserted or could assert claims against one or more

of the Imerys/Cyprus Parties.[9]  Moreover, in addition to facilitating the resolution of this

Chapter 11 Case, the Imerys/Cyprus Settlement will, upon approval by the Delaware Bankruptcy

Court, pave the way for the Imerys/Cyprus Debtors to successfully resolve their chapter 11 cases,

certain of which have been pending since 2019.  See id.

15.     In the course of negotiations regarding the Imerys/Cyprus Settlement, LLT

agreed on behalf of the Debtor that no objection deadline would occur with respect to

confirmation of the Amended Plan in this Chapter 11 Case until successful votes on the

chapter 11 plans in the Imerys/Cyprus Cases have been certified.  Hearings to consider approval

of Imerys's and Cyprus's disclosure statements currently are scheduled to occur on October 24

and October 28, 2024, respectively.  If the disclosure statement and proposed solicitation are

approved, it is anticipated that Imerys and Cyprus would file the voting certification by January

3, 2025.

16.     In light of its commitment not to schedule an objection deadline with

respect to confirmation of the Amended Plan until a successful vote has been certified in the

Imerys/Cyprus Cases, the Debtor is not seeking to schedule a hearing on confirmation of the

Amended Plan at this time.  Instead, by this Motion, the Debtor seeks an order approving (i) the

adequacy of the Disclosure Statement, (ii) the Solicitation and Tabulation Procedures and

(iii) the form and manner of service of the Notice of Non-Voting Status.  The Debtor respectfully

submits that the requested relief is authorized under the Bankruptcy Code and appropriate in

light of the pending Imerys/Cyprus Settlement.

---

[9]     See *Joint Mot. of the Imerys Debtors and the Cyprus Debtor for an Order (I) Approving the Settlement Agreement Between the Imerys Debtors, the Cyprus Debtor, Johnson & Johnson, and the Other Parties Thereto, and (II) Approving the Sale of Certain Rights*, In re Imerys Talc Am., Inc., No. 19-10289 (LSS) (Bankr. D. Del. July 13, 2024) [Dkt. 6376], ¶ 3.

## BASIS FOR RELIEF REQUESTED

**I.      Approval of the Disclosure Statement as Containing Adequate Information**

17.      Section 1125(g) of the Bankruptcy Code permits a debtor to solicit acceptance or rejection of a plan from a holder of a claim or interest prior to the commencement of a chapter 11 case, if such solicitation otherwise complies with applicable non-bankruptcy law. 11 U.S.C. § 1125(g).  Additionally, section 1126(b) of the Bankruptcy Code deems a holder of a claim or interest that has accepted or rejected the plan prior to the commencement of a chapter 11 case to have accepted or rejected the plan, as applicable, without need for a court-approved disclosure statement, if:  (a) the solicitation complied with applicable non-bankruptcy law, including generally applicable federal and state securities laws or regulations, or (b) if no such laws exist, the solicited holders received "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code.  11 U.S.C. § 1126(b).

18.      Here, there is no applicable non-bankruptcy law that governed the prepetition solicitation of votes to accept or reject the Initial Plan.  To be approved, therefore, the holders of claims and interests entitled to vote on the Initial Plan must have been provided with "adequate information," as defined in section 1125(a).  11 U.S.C. § 1126(b)(2).

19.      "'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan."  11 U.S.C. § 1125(a)(1). "[I]n determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information."  Id.

20.     The primary purpose of a disclosure statement is to provide all material information that claimants and interest holders affected by a proposed plan need to make an informed decision on whether to vote to accept or reject a plan.  See, e.g., Century Glove, Inc. v. First Am. Bank of N.Y., 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote."); In re Shea, Ltd., 545 B.R. 529, 538 n.6 (Bankr. S.D. Tex. 2016) ("The purpose of a disclosure statement is to provide adequate information to creditors in order to allow them to make informed judgments about the proposed plan.").

21.     A court has broad discretion in determining what constitutes "adequate information" for the purpose of section 1125 of the Bankruptcy Code.  See, e.g., Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop.), 150 F.3d 503, 518 (5th Cir. 1998) ("[I]n determining what constitutes 'adequate information' with respect to a particular disclosure statement, 'both the kind and form of information are left essentially to the judicial discretion of the court . . . the information required will necessarily be governed by the circumstances of the case.'") (quoting S. Rep. No. 95- 989, at 121 (1978)), cert. denied, 119 S. Ct. 2019 (1999); Eubanks v. F.D.I.C., 977 F.2d 166, 169 n.2 (5th Cir. 1992) ("A determination as to the adequacy of the contents of a disclosure statement necessarily depends upon the facts and circumstances of each case."); Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.), 844 F.2d 1142, 1157 (5th Cir. 1988) (what constitutes adequate information is "subjective," "made on a case-by-case basis" and "largely in the discretion of the bankruptcy court"). Congress intended that courts exercise their grant of discretion to tailor disclosures made in connection with a chapter 11 plan while recognizing the broad range of businesses in which debtors engage and the circumstances accompanying chapter 11 cases.  See In re Rodriguez Gas

& Oil Servs., Inc., No. 08-50152, 2008 WL 4533687, at *1 (Bankr. S.D. Tex. Oct. 2, 2008) ("'adequacy' of information is a determination that is relative both to the entity (e.g. complexity/amount of assets being reorganized or liquidated) and to the sophistication of the creditors."); see also H.R. Rep. No. 595, at 408-09 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6185-86.  Accordingly, a court's determination of the adequacy of information in a disclosure statement must occur on a case-by-case basis, focusing on the unique facts and circumstances of each case.  See S. Rep. No. 95-989, at 121 (1978), as reprinted in 1978 U.S.C.C.A.N, 5787, 5907 (stating that "the information required will necessarily be governed by the circumstances of the case.").

22.     Here, the Disclosure Statement contains ample information for holders of Class 4 Channeled Talc Personal Injury Claims and Class 7 Equity Interests in the Debtor—the only Voting Classes—to make an informed decision about the Initial Plan, as well as sufficient information for other stakeholders to consider the Initial Plan.  That information includes the following, among other things.

(a)     Overview of the Initial Plan:  Article I of the Disclosure Statement contains, among other things (i) a detailed summary of the classification and treatment of Claims and Interests under the Initial Plan, (ii) a description of the Channeling Injunction and (iii) a description of assets that will be contributed to the Talc Personal Injury Trust.

(b)     Corporate and Litigation History of the Debtor:  Articles II and III of the Disclosure Statement contain important background information, including discussions of the history of talc litigation against the Debtor's predecessors and the Protected Parties, the prior corporate restructurings and chapter 11 cases of LTL and the negotiations and settlements following dismissal of LTL's 2023 Chapter 11 Case.

(c)     Structure and Assets of LLT and the 2024 Corporate Restructuring:  Article IV of the Disclosure Statement describes (i) LLT's structure and assets as of the commencement of solicitation and (ii) the 2024 Corporate Restructuring by which

LLT merged into a new entity that conducted a divisional merger resulting in the formation of the Debtor.

(d)   <u>Anticipated Events During this Chapter 11 Case</u>:  Article V of the Disclosure Statement provided parties with a summary of certain key events that were anticipated, as of solicitation, to occur in this Chapter 11 Case.

(e)   <u>Summary of the Initial Plan and the Trust Distribution Procedures</u>: Articles VI and VII of the Disclosure Statement contain a summary of key terms of the Initial Plan and a detailed description of the means for its implementation, including, in Article VII, a description of the Talc Personal Injury Trust into which Channeled Talc Personal Injury Claims will be channeled and the procedures for the review and liquidation of such Claims for purposes of providing distributions to eligible claimants.

(f)   <u>Solicitation and Tabulation Procedures and Confirmation Requirements</u>:  Articles IX and X of the Disclosure Statement summarize the processes employed to solicit and tabulate votes on the Initial Plan as well as certain key confirmation requirements.

(g)   <u>Risk Factors</u>:  Article VIII of the Disclosure Statement discusses certain risk factors that may affect the Initial Plan.

(h)   <u>Summary of Release, Injunction and Exculpation Provisions</u>:  In accordance with Bankruptcy Rule 3016(c), Article 7.10 of the Disclosure Statement describes in specific and conspicuous language certain releases, the Channeling Injunction and related injunctions that are essential components of the Initial Plan.

(i)   <u>Certain Federal Income Tax Consequences of the Plan</u>:  Article XI of the Disclosure Statement discusses certain U.S. federal income tax law consequences of the Initial Plan.

Ex. 5 (Disclosure Statement), 1-139.

23.     The information provided in the Disclosure Statement is sufficiently detailed and contains adequate information to allow Holders of Claims in the Voting Classes to make an informed decision regarding whether to vote to accept or reject the Initial Plan.  <u>See</u> <u>id.</u> Accordingly, the Debtor respectfully submits that the Disclosure Statement provides "adequate information" within the meaning of sections 1125(a) and 1126(b) of the Bankruptcy Code and, therefore, should be approved.

24.     In addition, Bankruptcy Rule 3016(c) provides that, "[i]f a plan provides for an injunction against conduct not otherwise enjoined under the Code, the plan and disclosure statement shall describe in specific and conspicuous language (bold, italic or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction." Fed. R. Bankr. P. 3016(c).  In accordance with Bankruptcy Rule 3016(c), section 6.11 of the Disclosure Statement describes in bold type the injunction, exculpation and release provisions contained in Article XI of the Initial Plan, which, together with the Notice of Non-Voting Status, provides sufficient notice thereof to all holders of Claims and Interests and other parties in interest.  Ex. 6 (Initial Plan), 64-73.

## II.     Approval of the Solicitation Procedures

25.     Beginning on June 3, 2024, the Solicitation Agent distributed Solicitation Packages, including an appropriate form of ballot (a "Ballot"), to the holders of Channeled Talc Personal Injury Claims.  In particular the Solicitation Agent distributed:

(a)     a Solicitation Package with a Master Ballot in the form attached as **Exhibit 2** to the Voting Declaration to each law firm (a "Plaintiff Firm") that, according to LLT's books and records, represents holders of Channeled Talc Personal Injury Claims, including all Plaintiff Firms known to represent holders of Channeled Talc Personal Injury Claims other than Channeled Indirect Talc Personal Injury Claims (collectively, "Channeled Direct Talc Personal Injury Claims");

(b)     a Solicitation Package with a Ballot in the form attached as **Exhibit 8** to the Voting Declaration (a "Direct Ballot") to all known holders of a Channeled Direct Talc Personal Injury Claim not represented by a Plaintiff Firm according to LLT's books and records; and

(c)     a Solicitation Package with a Ballot in the form attached as **Exhibit 9** to the Voting Declaration (an "Indirect Ballot") to all known holders of Channeled Indirect Talc Personal Injury Claims or their counsel.

Voting Decl., ¶ 9.

26.     Thereafter, the Solicitation Agent distributed more than 58,000 additional Solicitation Packages pursuant to requests from claimants or their counsel, including as provided for in the instructions to the Master Ballot.  Id. ¶ 10-11.  In addition, on September 17, 2024, the Solicitation Agent provided a Solicitation Package with a Ballot in the form attached as **Exhibit 12** to the Voting Declaration (an "Equity Ballot") to New Holdco, an entity formed pursuant to the 2024 Corporate Restructuring described in the First Day Declaration that is the sole holder of all Equity Interests in the Debtor.  See id. ¶ 12.

27.     On June 28, 2024, four weeks before the Claimant Voting Deadline, the Solicitation Agent served the Notice of Plan Supplement (the "Plan Supplement") on all Plaintiff Firms and more than 57,000 individual claimants.  Id. ¶ 9(d).  The Plan Supplement contained: (a) a copy of the Cooperation Agreement (Exhibit E to the Initial Plan); (b) the Debtor's Retained Rights of Action (Exhibit F to the Initial Plan); (c) redline changed pages showing revisions made to the Initial Plan; (d) redline changed pages showing revisions made to the Talc Personal Injury Trust Agreement (Exhibit H to the Initial Plan); (e) redline changed pages showing changes made to the Trust Distribution Procedures (Exhibit K to the Initial Plan); (f) redline changed pages showing changes made to the Schedule of Debtor Corporate Parties (Schedule 1 to the Initial Plan).  Id. ¶ 8.

28.     The Solicitation Agent completed soliciting votes to accept or reject the Initial Plan from holders of Channeled Talc Personal Injury Claims and Equity Interests in the Debtor prior to the Petition Date in accordance with sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.  See Voting Decl., ¶ 10-12.  As described herein, the prepetition solicitation process resulted in a total of 93,522 valid votes on the Initial Plan and acceptance of the Initial  Plan, as amended by the Amended Plan, by 83.4% of voting holders of

Channeled Talc Personal Injury Claims in Class 4, as well as 100% of Equity Interests in the

Debtor in Class 7.  See Ex. 20 (Tabulation Summary).

>### A.    *The Voting Record Dates*

29.    Bankruptcy Rule 3018(b) provides, in relevant part, that, in the context of

a prepetition solicitation, the holders of record of the applicable claims against and interests in a

debtor entitled to receive ballots and related solicitation materials are to be determined "on the

date specified in the solicitation."  Fed. R. Bankr. P. 3018(b).  Here, the Disclosure Statement

and the Ballots complied with Bankruptcy Rule 3018(b) and clearly identified June 3, 2024

(the "Claimant Voting Record Date"), the date that solicitation commenced, as the date for

determining which holders of Channeled Talc Personal Injury Claims were entitled to vote to

accept or reject the Initial Plan.  See, e.g., Ex. 5 (Disclosure Statement), § 9.1;[10] see also Voting

Decl., ¶ 6.  In addition, Article IX of the Disclosure Statement provides that following the

Debtor's formation pursuant to the 2024 Corporate Restructuring, the Debtor would distribute a

Ballot to each holder of an Equity Interest in the Debtor as of the appropriate record date

(the "Equity Voting Record Date" and, together with the Claimant Voting Record Date,

the "Voting Record Dates").  Ex. 5 (Disclosure Statement), § 9.1.  The Solicitation Package

provided to New Holdco, the sole holder of Equity Interests in the Debtor, clearly identified

September 17, 2024 as the Equity Voting Record Date.  See Ex. 11.  Accordingly, the Debtor

requests that the Court approve the Voting Record Dates set forth above.

>### B.    *The Contents of the Solicitation Packages*

30.    Bankruptcy Rule 3017(d) specifies the materials that must be provided to

holders of claims and interests for the purpose of soliciting their votes to accept or reject a

---

[10]    Except as otherwise stated, any reference in this Motion to an exhibit signifies the applicable exhibit to the Voting Declaration.

chapter 11 plan (including, among other things, a plan, disclosure statement, notice of the applicable voting deadline and a ballot, as applicable).  Fed. R. Bankr. P. 3017(d).

31.    Consistent with the requirements of Bankruptcy Rule 3017(d), the Solicitation Agent solicited acceptances of the Initial Plan from holders of Channeled Talc Personal Injury Claims by disseminating the Solicitation Package beginning on the Solicitation Date.  The Solicitation Package consisted of:

(a)    a cover letter (the "Cover Letter") in the form attached as **Exhibit 1** to the Voting Declaration describing the contents of the Solicitation Package and any enclosed USB flash drive, and instructions for obtaining (free of charge) printed copies of the materials provided in electronic format;[11]

(b)    the Disclosure Statement with all exhibits, including the Initial Plan and its exhibits;

(c)    a copy of the appropriate Ballot and voting instructions for the same, as described below;

(d)    if applicable, a pre-addressed, postage prepaid return envelope for completed ballots; and

(e)    letters from (i) LLT and (ii) the AHC of Supporting Counsel in the forms attached as **Exhibit 3** and **Exhibit 4** to the Voting Declaration, respectively, recommending acceptance of the Initial Plan.

See Voting Decl., ¶ 8.

32.    As a cost-saving measure, Solicitation Packages included a flash drive containing electronic copies of certain documents contained therein.  See id.  The distribution of solicitation materials using flash drives is common in this jurisdiction and others.[12]  And in any

---

[11]    For the sole holder of Equity Interests in the Debtor, the Debtor modified the Cover Letter to the form attached as **Exhibit 11** to the Voting Declaration identifying the Equity Voting Record Date and the Equity Voting Deadline.  See id.

[12]    See, e.g., In re Robertshaw US Holding Corp., No. 24-90052-CML (Bankr. S.D. Tex. June 21, 2024) [Dkt. 676] (permitting solicitation package to be distributed using flash drive); In re Diamond Sports Group, LLC, No. 23-90116-CML (Bankr. S.D. Tex. April 17, 2024) [Dkt. 1977] (same); In re Instant Brands Acquisition Holdings, Inc., No. 23-90716-MI (Bankr. S.D. Tex. Jan. 11, 2024) [Dkt. 924] (approving distribution of solicitation packages through electronic means); In re Diamondback Indus., Inc.,

event, the Cover Letter stated that any party that preferred to receive any of the materials in the Solicitation Package in paper format could contact the Solicitation Agent and request, free of charge, paper copies of the materials previously received in electronic format.  See Ex. 1 (Cover Letter).  The Disclosure Statement, Initial Plan and related exhibits have also been available free of charge on the Document Website since the commencement of solicitation.

    **C.**    ***The Forms of Ballot***

    33.    Bankruptcy Rule 3017(d) requires that debtors mail a form of ballot to "creditors and equity security holders entitled to vote on the plan."  Fed. R. Bankr. P. 3017(d). The Solicitation Agent distributed Ballots to holders of Claims and Interests in the Voting Classes substantially in the forms attached as **<u>Exhibits 2, 8, 9 and 12</u>** to the Voting Declaration, as discussed above.  The forms of Ballot were based on Official Form No. 314, but were modified to address the particular aspects of this Chapter 11 Case and to include certain information that LLT, on behalf of the Debtor, believed to be relevant and appropriate for holders of Claims and Interests in the Voting Classes to consider.

    34.    The Solicitation Agent distributed a Master Ballot to each Plaintiff Firm. See Voting Decl., ¶ 9(a).  The form of Master Ballot included an exhibit in Microsoft Excel format (the "<u>Master Ballot Exhibit</u>") on which the applicable Plaintiff Firm could record the votes on the Initial Plan of each of its clients holding Channeled Direct Talc Personal Injury Claims (collectively, the "<u>Clients</u>"), subject to certain certifications being made by the Plaintiff Firm, as described below (the "<u>Master Ballot Solicitation Method</u>").  See Ex. 7 (Master Ballot Exhibit).

---

No. 20-41504-ELM (Bankr. N.D. Tex. Oct. 21, 2020) [Dkt. 575-1] (permitting solicitation package to be distributed via USB Flash Drive); <u>In re Dougherty's Holdings, Inc.,</u> No. 19-32841-hdh (Bankr. N.D. Tex. Feb. 21, 2020) [Dkt. 165] (same); <u>In re PHI, Inc.,</u> No. 30923-hdh11 (Bankr. N.D. Tex. June 24, 2019) [Dkt. 718] (same).

35.     Where LLT's books and records did not associate a Plaintiff Firm with the known holder of a Channeled Direct Talc Personal Injury Claim (or where the applicable Plaintiff Firm informed the Solicitation Agent that it declined to employ the Master Ballot Solicitation Method for some or all of its Clients), the Solicitation Agent distributed a Solicitation Package containing a Direct Ballot to the holders of such Channeled Direct Talc Personal Injury Claims.  See Voting Decl., ¶ 8, 9(b), 11.  In addition, the Solicitation Agent distributed Solicitation Packages containing Indirect Ballots to the holders of Channeled Indirect Talc Personal Injury Claims and a Solicitation Package containing an Equity Ballot to New Holdco, as the holder of all Equity Interests in the Debtor.  See id. ¶ 8, 9(c), 12.

36.     The forms of Ballot contained appropriate certifications consistent with ballots used in other mass tort chapter 11 cases.  See Exs. 2 (Master Ballot), 8 (Direct Ballot), 9 (Indirect Ballot), 11 (Equity Ballot).  The Master Ballots included certifications concerning the applicable Plaintiff Firm's:  (a) solicitation, collection, recording and submission of votes of holders of Channeled Talc Personal Injury Claims (or the exercising of a valid power of attorney to vote on behalf of such holders); and (b) reasonable belief as to the validity of the Channeled Talc Personal Injury Claims asserted therein.  Ex. 2, § 3.  In addition, both the Direct Ballots and the Master Ballots included appropriate questions regarding the type of disease asserted by the applicable claimants and their alleged use of one or more talc-containing products formulated, manufactured, distributed, and/or sold by the Debtor and/or any Debtor Corporate Party.  See Ex. 2 (Master Ballot), § 2, Ex. 7 (Master Ballot Exhibit), Ex. 8 (Direct Ballot), § 3.

37.     Accordingly, the Debtor submits that the proposed forms of Ballot substantially comply with Bankruptcy Rule 3017(d) while accounting for the particular circumstances of this Chapter 11 Case and should be approved.

**D.      The Master Ballot and Direct Ballot Solicitation Methods for Clients of Plaintiff Firms**

38.      The Solicitation Packages distributed to Plaintiff Firms included a Master Ballot and template Master Ballot Exhibit.  Each Master Ballot included instructions to each Plaintiff Firm concerning how to complete the Ballot on behalf of its Clients pursuant to the Master Ballot Solicitation Method or, in the alternative, the process for requesting that the votes of such Plaintiff Firm's Clients be solicited using Direct Ballots (the "Direct Ballot Solicitation Method").  See Ex. 2 (Master Ballot), 3.  Any Plaintiff Firm that elected to use the Direct Ballot Solicitation Method for some or all of its Clients was required, by no later than June 20, 2024, to request that the Solicitation Agent either (a) distribute Solicitation Packages with Direct Ballots to such Clients or (b) provide the Plaintiff Firm with any requested Solicitation Packages and Direct Ballots to distribute to such Clients itself.  Id.  In addition, Plaintiff Firms electing to use the Direct Ballot Solicitation Method for some or all of their Clients were required to submit to the Solicitation Agent a list (the "Client List") containing the name and last four digits of the social security number of each such Client (to the extent that such Client had a social security number, and if no social security number was available, the month, date and year of birth for each such Client) and the personal home address of each such Client.  See id. (Master Ballot Instructions) § 4.  If any Plaintiff Firm submitted an instruction for solicitation of any of its Clients using the Direct Solicitation Method but failed to timely provide the Solicitation Agent with a Client List containing the required information, the Solicitation Agent distributed Solicitation Packages to the affected Clients as soon as practicable after the receipt of such information.  See id.

39.      Plaintiff Firms could use the Master Ballot Solicitation Method to (a) record and procedurally cast the votes of their Clients who provided their informed consent

-19-

with respect to such vote under applicable law or (b) vote on behalf of Clients who had executed a valid power of attorney authorizing such Plaintiff Firm to do so.  See id. (Master Ballot Instructions) § 2.  If a Plaintiff Firm elected to record and submit the votes of some or all of its Clients using the Master Ballot Solicitation Method, the Plaintiff Firm was also required to certify that it had either (a) provided a Solicitation Package to each such Client or (b) requested that the Solicitation Agent serve Solicitation Packages (with or without a Ballot) on such Clients. See id. (Master Ballot), § 3.

40.     The Solicitation Agent served the Solicitation Packages in accordance with Plaintiff Firms' requests.  Voting Decl., ¶ 10-11.  If a Firm did not contact the Solicitation Agent by June 20, 2024, with instructions that the Solicitation Agent solicit the votes of its Clients on the Initial Plan using the Direct Ballot Solicitation Method, the Plaintiff Firm was deemed to have agreed to record and submit votes on the Initial Plan from its Clients according to the Master Ballot Solicitation Method.

41.     The noticing of claimants through their counsel and the authorized voting on a plan of reorganization through such counsel are both conventional practices in mass tort chapter 11 cases and should be approved here.  See, e.g., In re Honx, Inc., No. 22-90035-MI (Bankr. S.D. Tex. July 14, 2023) [Dkt. 890] (approving prepetition solicitation of claimants' votes through their counsel); In re Asarco LLC, No. 05-21207 (Bankr. S.D. Tex. July 2, 2009) [Dkt. 11884] (same); In re Maremont Corp., 601 B.R. 1 (Bankr. D. Del. 2019) (same); In re PG&E Corp., No. 19-30088 (DM) (Bankr. N.D. Cal. Mar. 17, 2020) [Dkt. 6340] (permitting noticing to claimants through their counsel); In re Boy Scouts of Am., No. 20-10343 (LSS) (Bankr. D. Del. Sept. 30, 2021) [Dkt. 6438] (same); In re Imerys Talc Am., Inc., No. 19-10289 (LSS) (Bankr. D. Del. Jan. 27, 2021) [Dkt. 2863] (same); In re Oakfabco, Inc., No. 15-27062

(JBS) (Bankr. N.D. Ill. Jan. 15, 2019) [Dkt. 771] (same); In re Duro Dyne, 18-27963 (MBK)

(Bankr. D.N.J. Nov. 20, 2018) [Dkt. 287] (same); In re Yarway Corp., No. 13-11025 (BLS)

(Bankr. D. Del. Jan. 27, 2015) [Dkt. 756] (same).

      **E.**      ***The Use of the E-Ballot Portal***

      42.      The Debtor permitted (and, with respect to Master Ballots, required) all

Ballots of holders of Channeled Talc Personal Injury Claims to be submitted via electronic,

online transmissions, solely through a customized online balloting portal (the "E-Ballot Portal")

on the Document Website.  The encrypted Ballot data and audit trail created by such electronic

submission became part of the record of any Ballot submitted through the E-Ballot Portal, and

the electronic signature of the applicable claimant or Plaintiff Firm was deemed to be

immediately legally valid and effective.  Ballots other than Master Ballots could also be returned

to the Solicitation Agent by first class mail, overnight delivery or hand courier.  All Ballots were

required to be returned by the applicable Voting Deadline.

      **F.**      ***The Procedures for Undeliverable Solicitation Packages***

      43.      Solicitation Packages were mailed to the holders of Channeled Talc

Personal Injury Claims and Equity Interests in the Debtor, or their counsel, if known, at the most

current address maintained by the Debtor in its books and records as of the applicable Voting

Record Date.  If a Solicitation Package was returned as undeliverable at least seven business

days before the applicable Voting Deadline, the Solicitation Agent utilized its customary practice

for handling re-mails and employed reasonable efforts to resend such mailing only once

(provided that the United States Post Office included a forwarding address).  To the extent that

any notices sent in connection with the prepetition solicitation of the Initial Plan were returned as

undeliverable (with no forwarding address), the Debtor requests that neither it nor the

Solicitation Agent be required to send notices in connection with the Chapter 11 Case to such parties, unless the Solicitation Agent is provided with an accurate address for such Person.

### G.     *The Supplemental Notice Plan*

44.     In addition to the service of the Solicitation Packages described above, LLT disseminated notice of the solicitation of votes on the Initial Plan in connection with a potential bankruptcy filing through various media sources pursuant to a supplemental notice plan (the "Supplemental Notice Plan") that was developed by Signal Interactive Media LLC, as described in the Supplemental Notice Declaration.  See Supp. Notice Decl. ¶ 16-71. The Supplemental Notice Plan cost approximately $9 million.  See id. ¶ 5.  It was multi-faceted, and consisted of advertising via radio, newspapers, consumer magazines, television, internet banners, paid internet search listings and social media.  See id. ¶ 31-68.  The campaign ran from June 10, 2024 to July 12, 2024, which was two weeks prior to the Claimant Voting Deadline. See id. ¶ 34.  The Supplemental Notice Plan was used to ensure the broadest, yet most targeted and efficient, publication-noticing program practicable, and is consistent with noticing plans that have been approved by courts in other chapter 11 cases involving large numbers of claimants. See id. ¶ 73.[13]

---

[13]     See In re Kaiser Gypsum Co., No. 16-31602 (JCW) (Bankr. W.D.N.C. Oct. 23, 2019) [Dkts. 1267, 1875] (approving notice plan for unknown asbestos claimants that included publishing notice in numerous consumer print publications, along with banner advertisements on major online advertising networks and social media platforms); In re Garlock Sealing Techs. LLC, No. 10-31607 (Bankr. W.D.N.C. Apr. 10, 2015) [Dkts. 4387, 4542] (approving notice plan for unknown asbestos claimants that utilized printed publication notices in multiple consumer and legal publications and television advertisements, both tailored to reach the specific unknown claimants at hand); In re the Flintkote Co., No. 04-11300 (MFW) (Bankr. D. Del. Feb. 17, 2015) [Dkts. 8710, 8768] (approving notice plan that included banner advertisement on popular internet sites, a nationwide distribution of a press release utilizing the internet, newspapers, radio and television and outreach to associations and unions that unknown claimants are likely to be members of); In re Specialty Prods. Holding Corp., No. 10-11780 (PJW) (Bankr. D. Del. Oct. 21, 2014) [Dkts. 5057-10, 5112] (approving notice plan that included a general publication notice in national newspapers and on the internet, a national press release and targeted mail outreach to relevant interested parties).

45.     The Supplemental Notice Plan provided notice in English and Spanish, reaching an estimated 95.8% of women 50 years of age and older (representing 83.9% of all holders of Channeled Talc Personal Injury Claims) with an estimated frequency of 6.1 times and 85.3% of women 18 years of age and older (representing 99.9% of all holders of Channeled Talc Personal Injury Claims) with an estimated frequency of 4.1 times.  See Supp. Notice Decl. ¶ 60.

46.     The combination of reach and frequency of the target audiences in the prepetition solicitation of the Initial Plan compares favorably to other bankruptcy and class action cases that involved noticing programs for unknown claimants.  See id. ¶ 61 (collecting cases).

### H.     *Solicitation was Conducted in a Reasonable and Appropriate Manner*

47.     For a prepetition acceptance or rejection of a chapter 11 plan to be valid, Bankruptcy Rule 3018(b) requires that:  (a) the plan be "transmitted to substantially all creditors and equity security holders of the same class;" (b) a reasonable amount of time be "prescribed for such creditors and equity security holders to accept or reject the plan;" and (c) the solicitation be "in compliance with § 1126 of the [Bankruptcy] Code."  Fed. R. Bankr. P. 3018(b). As discussed above, section 1126(b) required the Debtor to provide "adequate information, as defined in section 1125(a)."  11 U.S.C. § 1126(b).

48.     The distribution of the Solicitation Packages according to the procedures described above, together with the Supplemental Notice Plan, provided adequate notice of the Initial Plan and the Claimant Voting Deadline to all known holders of Channeled Talc Personal Injury Claims or their counsel and to substantially all unknown potential claimants and therefore ensured that substantially all claimants in Class 4 received notice of the Initial Plan and the ability to submit their votes by the Claimant Voting Deadline.  The Debtor transmitted the Solicitation Packages to all known holders of Channeled Talc Personal Injury Claims, either

directly or through their counsel.  Each of the Ballots, the voting instructions therein, the

Disclosure Statement and the Supplemental Notice Plan adequately informed each holder of a

Channeled Talc Personal Injury Claims or their counsel of record that votes were required to be

actually received by the Solicitation Agent on or before the Claimant Voting Deadline—60 days

after the Solicitation Date—to be counted.  The Supplemental Notice Plan provided potential

unknown claimants with at least two weeks and potentially up to seven weeks to submit a vote

by the Claimant Voting Deadline.  The 60-day period afforded holders of Channeled Talc

Personal Injury Claims to submit a vote on the Initial Plan, and the four week period after service

of the Plan Supplement, were reasonable and appropriate under the circumstances of this

Chapter 11 Case and consistent with or greater than the voting periods that have been approved

in other mass tort cases.[14]

49.    In addition, the distribution of a Solicitation Package to New Holdco, as

the sole holder of all Equity Interests in the Debtor as of the Equity Voting Record Date

constituted adequate notice of the Initial Plan and the Equity Voting Deadline.  The Equity Ballot

and the voting instructions therein adequately informed New Holdco that votes were required to

be actually received by the Solicitation Agent on or before the Equity Voting Deadline, and New

Holdco indeed voted in favor of the Initial Plan, as amended by the Amended Plan, by that date.

---

[14]    See, e.g., In re Insys Therapeutics, Inc., No. 19-11292 (Bankr. D. Del. Dec. 4, 2019) [Dkt. 952] (mass tort case approving 28-day solicitation period); In re Oakfabco, Inc., No. 15-27062 (Bankr. N.D. Ill. Jan. 15, 2019) [Dkt. 771] (asbestos-related case approving 42-day solicitation period); In re Duro Dyne, No. 18-27963 (Bankr. D.N.J. Nov. 20, 2018) [Dkt. 287] (asbestos-related case approving 62-day solicitation period); In re Yarway Corp., No. 13-11025 (Bankr. D. Del. Jan. 27, 2015) [Dkt. 756] (asbestos-related case approving 46-day solicitation period); In re Specialty Prods. Holding Corp., No. 10-11780 (Bankr. D. Del. Oct. 21, 2014) [Dkt. 5112] (asbestos-related case approving 35-day solicitation period); In re Diocese of Camden, No. 20-21257 (Bankr. D.N.J. April 6, 2022) [Dkt. 1447] (mass tort case approving 33-day solicitation period); In re Madison Square Boys and Girls Club, No. 22-10910 (Bankr. S.D.N.Y Apr. 28, 2023) [Dkt. 461] (mass tort case approving 41-day solicitation period); In re Imerys Talc Am., Inc., No. 19-10289 (Bankr. D. Del. Jan. 27, 2021) [Dkt. 2863] (mass tort case approving 52-day solicitation period); In re PG&E Corp., No. 19-30088 (Bankr. N.D. Cal. Mar. 17, 2020) [Dkt. 6340] (mass tort case approving 45-day solicitation period); In re Boy Scouts of Am., No. 20-10343 (Bankr. D. Del. Sep. 30, 2021) [Dkt. 6438] (mass tort case approving 60-day solicitation period); and In re TK Holdings Inc. No. 17-11375 (Bankr. D. Del. Jan. 5, 2018) [Dkt. 1639] (mass tort case approving 28-day solicitation period).

50.     The Solicitation Packages provided all holders of Claims and Interests in the Voting Classes with a copy of the Disclosure Statement, the Initial Plan and an appropriate form of Ballot that included detailed instructions on the process for submitting Ballots by the Voting Deadline and certain procedures the Solicitation Agent would employ in tabulating votes on the Initial Plan (other than with respect to certain Solicitation Packages sent to individual claimants whose counsel used the Master Ballot Solicitation Method).  Following the initial solicitation, from June 18, 2024 through September 11, 2024, in response to requests from Plaintiff Firms and individual claimants, an additional 58,376 Solicitation Packages were provided to claimants, including 26,427 Solicitation Packages with Direct Ballots and 31,949 Solicitation Packages without a ballot for information only, for parties voting on a Plaintiff Firm's Master Ballot.  See Voting Decl. ¶ 11.  In addition, the Solicitation Agent provided Master Ballot Solicitation Packages via next business day service or email to approximately 10 additional Plaintiff Firms after the Solicitation Date, presumably in part as a result of the Supplemental Notice Plan and the publicity surrounding solicitation.  See id. ¶ 10, Exs. 17, 18. Accordingly, the Debtor submits that the Solicitation Procedures fully complied with the requirements of section 1126(b) of the Bankruptcy Code.

51.     The Solicitation Procedures afforded all known and substantially all unknown claimants holding Claims and Interests in the Voting Classes with a full and fair opportunity to accept or reject the Initial Plan by the applicable Voting Deadline and provided them with adequate information to make an informed decision in doing so.  Accordingly, the Debtor submits that the Solicitation Procedures complied with the relevant provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules and should be approved.

III.     **Approval of the Tabulation Procedures**

A.     *Allowance of Talc Personal Injury Claims Solely for Voting Purposes in the Amount of $1.00 Per Claimant*

52.     Section 1126(c) of the Bankruptcy Code provides in part that "[a] class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . ." 11 U.S.C. § 1126(c).  In addition, section 524(g) of the Bankruptcy Code requires that "as part of the process of seeking confirmation of such plan [the court must determine that] a separate class or classes of claimants whose claims are to be addressed by a trust described in [section 524(g)(2)(B)(i)] is established and votes by at least 75 percent of those voting, in favor of the plan." 11 U.S.C. § 524(g)(2)(B)(ii)(IV).

53.     Bankruptcy Rule 3018(a) provides that the "court after notice and hearing may temporarily allow [any] claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan."  Pursuant to Bankruptcy Rule 3018(a), the Debtor treated Channeled Talc Personal Injury Claims in Class 4 as allowed in the amount of $1.00 in the aggregate per claimant for the limited purpose of voting on the Initial Plan.  That value will not be binding on the Debtor, the Talc Personal Injury Trust, the holder of any Channeled Talc Personal Injury Claim or any other party for any purpose other than voting to accept or reject the Initial Plan.

54.     The proposed allowance of Channeled Talc Personal Injury Claims solely for voting purposes preserves claimants' rights to vote on the Initial Plan while reflecting that their claims are unliquidated in a way that gives adequate consideration to the particular circumstances of the Chapter 11 Case, reflects a fair and appropriate scheme for voting on the Initial Plan and is consistent with similar chapter 11 cases.  Moreover, allowing Channeled Talc

Personal Injury Claims in the amount of $1.00 in the aggregate per claimant for purposes of voting eliminates the need to make any individual or class-wide determination, whether by estimation or otherwise, regarding the amount of Channeled Talc Personal Injury Claims, a process that would be complex, burdensome, and impracticable under the circumstances.

55.     The temporary allowance of each Channeled Talc Personal Injury Claim in the amount of $1.00 solely for purposes of voting on the Initial Plan does not interfere with the numerosity requirement of section 524(g) of the Bankruptcy Code.  See 11 U.S.C. § 524(g)(2)(B)(ii)(IV).  Moreover, satisfying section 524(g) would be impracticable unless each Channeled Talc Personal Injury Claim is temporarily allowed in the amount of $1.00 because any other approach likely would require that Claims be separately classified by disease type and category, in line with available recoveries under the Trust Distribution Procedures.

56.     Courts presiding over numerous other mass tort bankruptcy cases have allowed claims in the amount of $1.00 solely for voting on plans of reorganization in the manner proposed by the Debtor.  See, e.g., In re Honx, Inc., No. 22-90035 (MI) (Bankr. S.D. Tex. July 14, 2023) [Dkt. 890]; In re Boy Scouts of Am., No. 20-10343 (LSS) (Bankr. D. Del. Sept. 30, 2021) [Dkt. 6438]; In re Mallinckrodt PLC, No. 20-12522 (JTD) (Bankr. D. Del. June 17, 2021) [Dkt. 2911]; In re Imerys Talc Am., Inc., No. 19-10289 (LSS), (Bankr. D. Del. Jan. 27, 2021) [Dkt. 2863]; In re United Gilsonite Laboratories, No. 11-02032 (RNO), (Bankr. M.D. Pa. Sept. 30, 2014) [Dkt. 2014]; In re PG&E Corp., No. 19-30088 (JD) (Bankr. N.D. Cal. March 17, 2020) [Dkt. 6340]; In re TK Holdings Inc., No. 17-11375 (BLS) (Bankr. D. Del. Jan. 5, 2018) [Dkt. 1639]; In re USA Gymnastics, No. 18-09108 (RLM) (Bankr. S.D. Ind. Oct. 26, 2021) [Dkt. 1659]; In re the Budd Company, No. 14-11873 (JBS) (Bankr. N.D. Ill.

May 6, 2016) [Dkt. 1811]; see also In re Johns-Manville Corp., 843 F.2d 636, 646-48 (2d Cir. 1987).

**B.**   *Other Procedures for Vote Tabulation*

57.   The Solicitation Agent tabulated the votes to accept or reject the Initial Plan based on the Ballots that the Solicitation Agent actually received by the applicable Voting Deadline, except that the Solicitation Agent, in consultation with LLT or the Debtor, as applicable, accepted, after the Claimant Voting Deadline, (a) corrected Master Ballots from certain Plaintiff Firms and (b) a Master Ballot from the Smith Firm amending certain votes cast on the Master Ballot received from Beasley Allen.  The Solicitation Agent, in consultation with LLT (or the Debtor) and J&J, identified certain circumstances in which a vote reflected on a Ballot was not counted.  Those circumstances included Ballots where:

(a)   The Ballot was submitted by or on behalf of a Person who was not entitled to vote;

(b)   The Ballot was not completed and submitted to the Solicitation Agent consistent with the instructions included with the Ballot;

(c)   With respect to Master Ballots, the Master Ballot Exhibit did not conform to the template provided with the Master Ballot, including the formatting of each field included in the Master Ballot Exhibit template;

(d)   The Ballot was not duly and timely submitted by the E-Ballot Portal on the Solicitation Agent's website or, with respect to Ballots other than Master Ballots, (i) first class mail, (ii) overnight courier or (iii) hand delivery so that it is actually received by the Solicitation Agent by the applicable Voting Deadline, unless LLT or the Debtor granted an extension of the Voting Deadline with respect to such Ballot;

(e)   The Ballot did not designate either acceptance or rejection—or designated both acceptance and rejection—of the Initial Plan for any Channeled Talc Personal Injury Claim (including with respect to any single Channeled Talc Personal Injury Claim identified on the Master Ballot Exhibit accompanying a Master Ballot);

(f) The Ballot indicated partial rejection and partial acceptance of the Initial Plan;

(g) The Ballot was transmitted electronically to the Solicitation Agent by any means other than submission through the E-Ballot Portal (such as via facsimile or e-mail transmission);

(h) The Ballot was illegible or contained insufficient information to permit the identification of any claimant reflected thereon;

(i) The ballot was submitted in an incorrect form for the applicable Claim;

(j) The Ballot was returned to the Solicitation Agent but was unsigned, provided, however, for the avoidance of doubt, that a Ballot that was properly submitted electronically via the E-Ballot Portal on the Document Website was deemed to contain an original signature; and

(k) The Ballot was incomplete, including, without limitation, failure of the holder of the Channeled Talc Personal Injury Claim or their authorized representative (i) to make the required certifications, or (ii) to provide the required identifying information.

58. The Solicitation Agent also followed general voting procedures and made standard assumptions in tabulating the Ballots. Those procedures and assumptions included the following.

(a) The Solicitation Agent had the discretion, but not the obligation, to contact voters to cure any defects in Ballots or not to count defective Ballots. As disclosed in the Voting Declaration, following the Claimant Voting Deadline, the Solicitation Agent contacted eight Plaintiff Firms that had submitted incomplete Master Ballots to provide them with an opportunity to amend and resubmit their Ballots, and each such Plaintiff Firm did indeed submit an amended Master Ballot. See Voting Decl. n.4.

(b) A claimant who submitted a valid Ballot was permitted to withdraw his, her or its vote; provided, however, that neither LLT nor the Debtor was obligated to recognize any withdrawal, revocation or change of any vote received after the Claimant Voting Deadline; and provided, further that Plaintiff Firms were permitted to withdraw valid votes of Clients submitted on a Master Ballot only if (i) such Master Ballot was submitted by such Plaintiff Firm pursuant to a power of attorney or (ii) the Plaintiff

Firm obtained such Client's informed consent to withdraw their vote.  As set forth above, after the Claimant Voting Deadline, the Debtor authorized the Solicitation Agent to recognize the changed votes of the claimants reflected in the Master Ballot submitted by the Smith Firm.

(c)     Any holder of a Channeled Talc Personal Injury Claim who submitted a properly completed superseding Ballot or withdrawal of a Ballot on or before the Claimant Voting Deadline was presumed to have sufficient cause, within the meaning of Bankruptcy Rule 3018(a), to change or withdraw such claimant's acceptance or rejection of the Initial Plan.

(d)     If the Solicitation Agent received more than one Ballot from the same holder of a Channeled Talc Personal Injury Claim (or from the same authorized representative representing the same holder of a Channeled Talc Personal Injury Claim) for the same Channeled Talc Personal Injury Claim, in the absence of contrary information establishing which ballot is valid as of the Claimant Voting Deadline (or such later date as may be agreed by LLT or the Debtor), the last-executed, otherwise valid Ballot that is received before the Claimant Voting Deadline was the Ballot that was counted.

(e)     If the Solicitation Agent received one or more Ballots from the holder of a Channeled Talc Personal Injury Claim **and also** from someone purporting to be their authorized representative, the Ballot received from the holder of the Channeled Talc Personal Injury Claim was the Ballot that was counted, regardless of when it is received so long as it was received before the Claimant Voting Deadline (or such later date as may have been agreed to by LLT or the Debtor), and the vote of the purported authorized representative was not counted.  For the avoidance of doubt, any timely and otherwise valid Direct Ballot received on account of a Channeled Talc Personal Injury Claim superseded any Master Ballot submitted on account of such Channeled Talc Personal Injury Claim at any time and was the vote that was counted.

(f)     If the Solicitation Agent received Ballots from different holders purporting to hold the same Claim or Interest, in the absence of contrary information establishing which holder held such Claim as of the Claimant Voting Deadline, such Ballots were not counted.

(g)     If the same holder of a Channeled Talc Personal Injury Claim appeared on more than one Master Ballot, the Solicitation Agent exercised reasonable efforts to coordinate with the respective Plaintiff Firms to cure the discrepancy.  If the discrepancy was not

cured, the vote for the holder appearing on more than one Master Ballot was counted only once and only if such Ballots were consistent with respect to acceptance or rejection of the Initial Plan.  In the event that such votes are not consistent, none of the votes were counted.

59.     The Solicitation Agent date-stamped all Ballots when received (Ballots received on the day of the Voting Deadlines were date and time stamped).  The Solicitation Agent proposes to retain originals of all Ballots for a period of two years after the closing of the Chapter 11 Case, unless otherwise ordered by the Bankruptcy Court.

60.     The Debtor submits that the Tabulation Procedures are reasonable under the circumstances of this Chapter 11 Case and should be approved.  The proposed Tabulation Procedures provide for an orderly and logical method for tabulating the Ballots received from holders of Channeled Talc Personal Injury Claims and are consistent with the voting procedures adopted for claims in other mass tort chapter 11 cases.  Accordingly, the Debtor requests that the Court approve the Tabulation Procedures.

## IV.     Approval of the Notice of Non-Voting Status

61.     Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if:  (a) their contractual rights are unimpaired by the proposed plan, in which case they are conclusively presumed to accept the proposed plan; or (b) they will receive no property under the plan, in which case they are deemed to reject the proposed plan. 11 U.S.C. § 1126(f)-(g).

62.     Bankruptcy Rule 3017(d) permits a bankruptcy court to order that a debtor's plan and disclosure statement need not be mailed to unimpaired classes.  In lieu thereof, a bankruptcy court may order that "notice that the class is designated in the plan as unimpaired and notice of the name and address of the person from whom the plan or summary of the plan and disclosure statement may be obtained upon request," as well as "notice of the time fixed for

filing objections to and the hearing on confirmation" be mailed to such classes.  Fed. R. Bankr. P. 3017(d).

63.     Claims in the Non-Voting Classes (i.e., Classes 1, 2, 3, 5 and 6) and Unclassified Claims are unimpaired under the Initial Plan and the Amended Plan and thus are presumed to accept in accordance with section 1126(f) of the Bankruptcy Code.  See 11 U.S.C. § 1126(f).  Accordingly, votes on the Initial Plan of the holders of Claims in the Non-Voting Classes were not solicited.  Instead, the Debtor proposes that, once the deadline for filing objections to confirmation of the Amended Plan has been established, the Solicitation Agent will send holders of Claims in the Non-Voting Classes a Notice of Non-Voting Status substantially in the form attached as **Annex A** to the Proposed Order.

64.     The Debtor requests that the Court approve the form of the Notice of Non-Voting Status, which informs recipients of their status as holders or potential holders of Claims in the Non-Voting Classes or Unclassified Claims, and identifies the treatment of the Non-Voting Classes designated under the Initial Plan and the Amended Plan.  The Notice of Non-Voting Status also sets forth the deadline for objecting to confirmation of the Amended Plan and provides information to counterparties to the Debtor's Executory Contracts and Unexpired Leases, all of which are being assumed under the Amended Plan.

65.     In light of the purpose of the Notice of Non-Voting Status pursuant to Bankruptcy Rule 3017(d) to, among other things, provide notice of the time fixed for filing objections to and the hearing on confirmation of the Amended Plan, the Debtor further requests that the Court approve the Debtor's service of the Notice of Non-Voting Status on all known holders of Claims in the Non-Voting Classes and Unclassified Claims and all counterparties to Executory Contracts and Unexpired Leases with the Debtor promptly upon the establishment of

the deadline to object to confirmation of the Amended Plan and the date for the hearing on confirmation of the Amended Plan.

### Notice

66.     Notice of this Motion has been provided to:  (a) the United States Trustee for the Southern District of Texas; (b) the top law firms representing talc claimants against the Debtor, as identified in the Debtor's chapter 11 petition; (c) pro se claimants as identified in the Initial Plan solicitation process; (d) counsel to the Debtor's non-debtor affiliates, New Holdco and J&J; (e) the proposed legal representative for future talc claimants and her counsel; (f) counsel to the AHC of Supporting Counsel; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtor respectfully submits that no other or further notice need be provided.

WHEREFORE, the Debtor respectfully requests that the Court (i) enter the Proposed Order approving the Disclosure Statement, Solicitation and Tabulation Procedures and Notice of Non-Voting Status and granting the related relief requested herein; and (ii) grant such other and further relief to the Debtor as the Court may deem just and proper.

[*Remainder of Page Intentionally Left Blank*]

Dated:  September 21, 2024

Respectfully submitted,

*/s/ John F. Higgins*
John F. Higgins (TX 09597500)
M. Shane Johnson (TX 24083263)
Megan Young-John (TX 24088700)
James A. Keefe (TX 24122842)
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile:  (713) 228-1331
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
jkeefe@porterhedges.com

Gregory M. Gordon (TX 08435300)
Dan B. Prieto (TX 24048744)
Amanda Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone:  (214) 220-3939
Facsimile:   (214) 969-5100
gmgordon@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com

- and –

Brad B. Erens (IL 06206864)
Caitlin K. Cahow (IL 6317676)
(Admission pro hac vice pending)
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, Illinois 60606
Telephone:  (312) 782-3939
Facsimile:   (312) 782-8585
bberens@jonesday.com
ccahow@jonesday.com

PROPOSED ATTORNEYS FOR DEBTOR

## <u>Certificate of Service</u>

I certify that on September 21, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtor's claims, noticing, and solicitation agent.

*/s/ John F. Higgins*
John F. Higgins

NAI-1540688559