**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|   |   |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC LLC,[1] | Case No. 24-90505 (CML) |
| Debtor. | |

## DEBTOR'S OPPOSITION TO THE MOTIONS TO TRANSFER VENUE

(Related to Docket Nos. 43, 139, 172, 173)

Red River Talc LLC ("Red River" or the "Debtor") files this Opposition to the *Motion of the Coalition of Counsel for Justice for Talc Claimants to Transfer Venue* [Dkt. 43] (the "Coalition Motion") and the *United States Trustee's Motion to Transfer Venue Pursuant to 28 U.S.C. § 1412* [Dkt. 139] (the "UST Motion" and, together with the Coalition Motion, the "Motions"). In support, Red River also submits the *Declaration of John K. Kim in Support of the Debtor's Opposition to the Motions to Transfer Venue* (the "Kim Decl."), filed contemporaneously herewith, and incorporates by reference herein the *Declaration of John K. Kim in Support of Chapter 11 Case and Certain First Day Pleadings*, [Dkt. 17] (the "Kim First Day Decl.").

## PRELIMINARY STATEMENT

In this chapter 11 case, Red River seeks confirmation of a consensual prepackaged plan of reorganization (as recently amended, the "Plan") supported by at least *83%* of current claimants and the prepetition future claimants' representative. By virtue of the materials that

---

[1]     The last four digits of the Debtor's taxpayer identification number are 8508. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

solicited that support, including a Disclosure Statement that explicitly contemplated a Texas bankruptcy filing, it is clear that the overwhelming majority of claimants support Red River's decision to file the prepackaged bankruptcy in this District. And the number of current claimants in Texas is ***thirteen times*** the number of New Jersey-domiciled claimants.

In addition to the claimant support for and residence in this venue, Red River is—and has been since its formation—a Texas company, domiciled in Texas and with principal assets in Texas. Red River's wholly owned subsidiary is a Texas limited liability company with operations in Texas, including an investment in a Texas hospital system. Red River's Chief Restructuring Officer resides in Texas, and Red River's bankruptcy counsel are based in Texas. Red River was formed by a divisional merger effectuated under Texas law. As a result, Red River is a different entity with materially different claimants than its predecessor entities.[2] And unlike those predecessors, Red River has not filed for bankruptcy in any other venue. As Judge Kaplan of the New Jersey Bankruptcy Court stated on September 24, 2024, in refusing to grant a motion to transfer this case to New Jersey, "we have here clearly different debtors, and we have different parties involved here" than were involved in the bankruptcy cases in New Jersey.

Unsurprisingly, therefore, none of the Movants dispute that venue is proper in this Court under 11 U.S.C. § 1408. Nor can there be any dispute that a debtor's choice of venue is entitled to great weight and deference. As decisions denying venue transfer motions filed in this District and elsewhere confirm, that is particularly true where, as here, the debtor's choice of venue is overwhelmingly supported by the claimants and their representatives. Movants—the UST and a small cadre of financially conflicted law firms supposedly representing the interests of a small

---

[2]     By the divisional merger, Red River was assigned the ovarian and gynecological talc claims of its predecessor entity, LLT, while all other claims—including the mesothelioma claims and government claims—were assigned to another entity, Pecos River Talc LLC, a Texas limited liability company ("PRT").

fraction of current claimants—cannot cite any decision transferring the venue of a bankruptcy case under circumstances remotely resembling this case.

Movants fail to carry the "heavy burden" they bear to justify transfer in the interest of justice or for the convenience of the parties under 11 U.S.C. § 1412, particularly considering the Fifth Circuit Court of Appeals' admonition to exercise caution in transferring cases filed in a proper venue. As case after case confirms, the interest of justice does not warrant transferring a case from a venue supported by the overwhelming majority of creditors. Of the over 200 firms that submitted master ballots on behalf of talc claimants, just seven[3] firms have moved to transfer venue.[4]

As *Barretts Minerals* recently reiterated, the "main concern" implicated by the "interest of justice" inquiry is "ensuring that the rights of the asbestos litigation claimants are properly adjudicated, and their claims properly administered." *Order of Motion to Transfer Venue*, *In re Barretts Minerals Inc.*, No. 23-90794 [Dkt. 413] at 7 (Bankr. S.D. Tex. Dec. 7, 2023) (the "Slip Opinion"). Like the asbestos mass tort in *Barretts Minerals*, this Court is well-qualified and able to ensure the asbestos claims that are subject of the Red River case are properly adjudicated and administered. Movants provide no basis to suggest otherwise. Nor is it valid to assert, as Movants do, that Judge Kaplan of the New Jersey bankruptcy court can more economically or efficiently administer this prepackaged case. Because the prior LTL bankruptcies did not meaningfully advance past dismissal, Judge Kaplan never addressed the issues that the Coalition itself has flagged as being central in this Chapter 11 Case, such as the adequacy of the

---

[3]      The Coalition is comprised of six law firms, and on October 1, 2024, the Barnes Law Group, LLC filed joinders to the Motions [Dkts. 172-73].

[4]      This Court has ruled that the validity of the voting results would not be addressed in connection with the Motions. Assuming the results reflected in Epiq's certification are valid, however, one of those firms remarkably purports to represent claimants that submitted direct ballots from claimants predominantly in favor of the plan.

solicitation, the validity of the votes cast, the extent to which claims against non-debtors such as Johnson & Johnson ("J&J") can be subject to a channeling injunction under section 524(g) of the Bankruptcy Code, and other confirmation issues.

Movants lean hard into arguments of alleged forum shopping, implying—wholly without support—that Red River was required to file bankruptcy in New Jersey by some unidentified law or by a decision made in the now-dismissed case of Red River's predecessor in interest. Movants fail to explain why the interest of justice dictates that a prepackaged bankruptcy overwhelmingly supported by tens of thousands of claimants all across the country—including thousands of claimants in Texas—must be transferred to New Jersey, especially when 83% of such claimants voted to accept a plan knowing that it would be presented for confirmation by a Texas entity in a Texas bankruptcy court, and thirteen times more claimants reside in Texas than New Jersey. It is broadly recognized (and demonstrated by a plain read of 28 U.S.C. §1408) that Congress gave debtors options on where to file bankruptcy. Red River and its predecessor evaluated those options and, consistent with their fiduciary duties to stakeholders, chose a venue that maximized the prospects for successful resolution of talc liability per the terms of the Plan — a choice that was ratified by the overwhelming support of impacted claimants. This includes the Ad Hoc Committee of Supporting Counsel, which repeatedly made clear during prepetition negotiations that it preferred and supported a filing in the state of Texas. Red River's and its predecessor's decision to choose Texas over the venue purportedly preferred by the small cadre of law firms steadfastly opposed to the Plan is neither "manipulative" nor "abusive" forum shopping, as Movants suggest. *See, e.g.*, *In re ERG Intermediate Holdings, LLC*, 2015 WL 6531607, *7 (Bankr. N.D. Tex. Oct. 27, 2015) (denying motion to transfer venue, reasoning that the debtors,

NAI-1540670946

"in the exercise of their fiduciary duties," chose a venue that "provided the best opportunity to maximize value for all interested stakeholders").

Nor does Red River's choice of forum threaten the "integrity of the bankruptcy system." The decisions in the prior LTL bankruptcies—both as to venue transfer and dismissal—involved a different case, a debtor with different assets and liabilities, featured different facts and circumstances, and presented issues markedly different than those posed in this prepackaged bankruptcy.  For these reasons, on September 24, Judge Kaplan rejected the UST's argument that "law of the case" mandates a transfer from Texas to New Jersey.  Indeed, the Coalition's brief acknowledges that LTL could have properly (and safe from forum-shopping charges) filed its chapter 11 cases **in Texas**.  *See* Coalition Mot. ¶ 20 (stating J&J "eschewed" filing LTL in Texas and instead re-domiciled and filed in North Carolina).  The same must be true for Red River. Like LTL, Red River is and has always been organized under Texas law as a result of using the Texas divisional merger statute for what the Coalition recognizes were "restructuring" (not forum-shopping) purposes.  *Id.* ¶ 18.  None of the cases cited by Movants to support their forum-shopping contentions bear any resemblance to the facts and circumstances here.  Tellingly, Movants decline to meaningfully delve into the underlying facts of any of those cases.  The Debtor will.

Movants' arguments as to the convenience of the parties fare no better.  The most important of the "*CORCO*" factors—the economic administration of the state—does not favor transfer, including for reasons already mentioned.  Courts recognize that in large chapter 11 cases with creditors and counsel spread across the country—as is the case here—one venue is not likely to be more convenient over another.  Documents pertinent to this bankruptcy are readily

NAI-1540670946

available electronically, and the fact that nearly 200 attorneys, claimants, experts, and others attended the first day hearing shows that interested parties can participate and be heard here.

In any event, the location of claimants, counsel, and other important parties favors venue in Texas.  Claimants are spread across the country and have overwhelmingly expressed their support for proceeding here.  The location of claimants' litigation counsel, a relevant factor cited in Judge Isgur's recent venue decision in *Barretts Minerals*, strongly favors Texas.  Nine of the Top 30 plaintiff law firms with the most significant representations of talc claimants are based in Texas.  *See Notice of Filing of List of Top 30 Law Firms with the Most Significant Representations of Parties with Ovarian and Gynecological-Cancer Talc Claims Against the Debtor*, [Dkt. 174], at Ex. A (the "Top 30 List").  Collectively, these Texas-based firms represent over 35,000 claimants and some 38% of the votes solicited in connection with the Plan.  Kim Decl. ¶ 12.  No New Jersey firm is in the Top 30.  Red River's lead bankruptcy counsel and Chief Restructuring Officer reside in Texas.  The proposed future claimants' representative resides in Houston.  Even the key member of the Coalition spearheading opposition to the Plan, Alabama-based attorney Andy Birchfield of Beasley Allen, lives closer to Texas than to New Jersey.

Movants' arguments as to the convenience of the parties consist of incorrect factual assertions and an inventory of supposed connections to New Jersey meaningless to the venue transfer analysis.  Contrary to Movants' assertions, Red River's assets—its equity ownership of a Texas-based subsidiary and rights under Funding Agreements governed by Texas law—are connected to Texas.  The Coalition spends several paragraphs on how Johnson & Johnson Services, Inc. provides administrative services (accounting, tax, human resources, etc.) to the Debtor without explaining why this matters to the convenience of the parties analysis; it doesn't.

NAI-1540670946

*See, e.g., Barretts Minerals*, Slip Op. at 5 ("The concern is with the corporation's employees who must appear in court, not with the employees who are on the production line.") (internal citation omitted).  Movants then suggest that some 57,000 claims are "pending" in the New Jersey-based multi-district litigation proceeding (the "MDL").  That ignores that the MDL is stayed as to the Debtor during this bankruptcy and that those individual cases are only "pending" in the MDL temporarily for pretrial purposes and, at the claimants' urging, will be transferred back to their home districts across the country.

In sum, Movants provide no compelling reasons to transfer this case to the District of New Jersey.  Consistent with controlling law, the Court should defer to the forum selected by the Debtor and supported by the overwhelming majority of interested stakeholders.  The Motions should be denied.

## **FACTUAL BACKGROUND**[5]

### A.    **Events Leading To Solicitation Of The Plan**

Red River filed for bankruptcy protection because it faces tens of thousands of current and future ovarian and gynecological claims that, absent consensual resolution, would take decades to resolve.  Kim Decl. ¶ 10.  While many of the current claims have been subsumed in the MDL for pretrial purposes, the MDL does not pose a viable path to a global resolution because of due process concerns and the difficulty posed by future claims with latent injuries. And the MDL is, by its nature, a slow and cumbersome process; nearly 8 years after its creation, a second round of *Daubert* briefing only recently concluded on August 22, 2024.  No global settlement of the ovarian and gynecological cancer claims through the MDL is in sight, because a

---

[5]     A more fulsome recitation of Red River's history, including its predecessors' corporate history, talc litigation, and the prior bankruptcy cases can be found in the *Disclosure Statement for Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [Dkt. 25] (the "Disclosure Statement").

NAI-1540670946

settlement outside of bankruptcy cannot address the future claims that are inherent in an asbestos

mass tort.  Kim Decl. ¶ 15.  And if the MDL does not result in the dismissal of all pending

claims following *Daubert*, the cases will be sent back to the states where the claimants reside for

trial, which will add decades to their resolution.

Individuals asserting claims against Red River hail from all corners of the United States.

Kim First Day Decl. ¶ 52.  Given the nationwide distribution of the talc products at issue, states

with the largest populations naturally have the highest number of claimants.  Kim Decl. ¶ 11.

For example, claimants from Texas make up an estimated 8.2% of claims, while New Jersey

accounts for 0.6% of claims.  *Id.* ¶ 12.  The distribution of claimants in the MDL is also reflected

below.  *Id.* ¶ 13.

| State of Residence of MDL Plaintiffs | | |
|---|---|---|
| Rank | State of residence | Percent of plaintiffs |
| 1 | California | 9.0% |
| 2 | Texas | 8.2% |
| 3 | Florida | 7.1% |
| 4 | New York | 5.5% |
| 5 | Ohio | 4.3% |
| 6 | Pennsylvania | 4.2% |
| 7 | Illinois | 4.1% |
| 8 | Georgia | 3.9% |
| 9 | North Carolina | 3.6% |
| 10 | Tennessee | 3.3% |
| 36 | New Jersey | 0.6% |

The Debtor's predecessor**s** have prevailed in all ovarian trials since 2013, with one

exception[6]–ultimately achieving 16 defense verdicts, including in four trials in 2021 alone.  Kim

First Day Decl. ¶ 60, 128.  To date, none of the Coalition law firms has collected any recoveries

---

[6]   In *Ingham*, the St. Louis, Missouri trial court permitted the consolidation of 22 ovarian cancer plaintiffs for a single trial in St. Louis, despite the fact that 17 of the plaintiffs were nonresidents and plaintiffs submitted claims implicating the laws of 12 different states.  The jury awarded compensatory damages in the aggregate amount of $550 million and punitive damages in the aggregate amount $4.1 billion. On appeal, the punitive damages award was later reduced to $1.6 billion.  Kim First Day Decl. ¶ 61.

for claimants, and the two most recent cases tried by the Coalition law firms resulted in defense verdicts.

However, due to the overwhelming number of claims, and after considering the cost, burden, uncertainty, and anticipated duration of this cosmetic talc litigation, Red River's predecessor, LTL Management LLC ("LTL") pursued two bankruptcy filings in an attempt to negotiate a global, equitable, and final resolution of all pending talc claims against it.  *See* Discl. Stmt. at 1.  LTL's bankruptcies were ultimately dismissed due to an alleged lack of "immediate" financial distress, as imposed by the Third Circuit in LTL's first bankruptcy case, which overturned the bankruptcy court's decision not to dismiss that case.  *See id*. at 21-24; *infra* at note 11.  Following dismissal and based on a direction by Judge Kaplan, LTL and Johnson & Johnson ("J&J") continued to work towards a global resolution, negotiating extensively with counsel to tens of thousands of talc claimants (together, the "Ad Hoc Committee of Supporting Counsel") over the next several months.  *See* Discl. Stmt. at 25-26.

B.     **Solicitation of the Plan**

On May 1, 2024, J&J and LLT[7] announced that a broad consensus on a global resolution of certain talc claims through a plan of reorganization had been reached.  *See* Discl. Stmt. at 26. This global resolution is captured in the Plan, which would create an approximately $9 billion trust to promptly process and resolve all present and future ovarian cancer and other gynecological cancer claims, as well as provide another $650 million for a qualified settlement fund for use in resolving common benefit fund claims arising from the MDL (which, if determined to apply to bankruptcy resolution, would have been charged against claimant

---

[7]        In December 2023, LTL changed its state of formation to Texas and its name to LLT Management LLC ("LLT"), as the LTL name was already taken in the state of Texas.

NAI-1540670946

recoveries).  Kim First Day Decl. ¶¶ 131-32.  The Plan is materially different from proposals advanced in the prior LTL bankruptcies.  As described below, there is substantial support for a bankruptcy resolution of such claims.  *See* Discl. Stmt. at 2.  The Plan does not resolve and will not affect the following claims, all of which were part of the prior LTL bankruptcies:  (i) claims and demands alleging injury from mesothelioma or lung cancer; (ii) claims and demands of governmental entities; and (iii) Canadian claims and demands.  *Id.* at 2.  All of these claims were allocated to PRT as part of the corporate restructuring (discussed below).  Kim First Day Decl. ¶ 132 n.35.

The $9 billion in funding for the Plan constitutes one of the largest settlements ever reached in a mass tort product liability case, including cases where, unlike here, the alleged liability was not disputed by the company.  The Plan was the subject of extensive, multi-month negotiations among numerous parties, including the Ad Hoc Committee of Supporting Counsel and, later, the prepetition future claimants' representative (the "FCR").  *Id.* ¶¶ 8, 134.

Two critical components of the Plan, as determined by these negotiations among the parties, were that, if sufficient votes were obtained:  (i) a prepetition corporate restructuring of LLT (the "Prepetition Corporate Restructuring") would occur and (ii) any bankruptcy undertaken by the newly created entity would occur in Texas.  *See* Discl. Stmt. at 2-3.  The Disclosure Statement explicitly reflects that negotiated reality.  *See id.* at iv ("At the current time, representatives of the claimants have requested that the Debtor's chapter 11 case be filed in Texas . . . ."); *id.* ("Once formed, the Debtor may file for bankruptcy in a Texas bankruptcy court or another appropriate venue.").  Throughout the negotiations, the Ad Hoc Committee of Supporting Counsel repeatedly made clear to J&J, LLT, and Red River that they preferred and supported a filing in the state of Texas.  Kim Decl. ¶ 17.  The Ad Hoc Committee of Supporting

-10-

Counsel reiterated its preference at the recent hearing on the UST's motion to transfer venue under Bankruptcy Rule 1014(b).  *See* Tr. of Sept. 24, 2024 Hr'g held in *In re LTL Management LLC*, No. 23-12825 (Bankr. D.N.J.), at 19:25-20:2 ("[O]ur view is we all have our right to be heard, and that should happen in Texas.").[8]

The Plan and Disclosure Statement were published on June 3, 2024, when the seven-and-a-half week solicitation process commenced.  Certain additional or revised solicitation-related documents were published on June 28, 2024.  The solicitation process involved distributing to claimants, or their counsel, over 58,000 solicitation packages.  *Declaration of Stephenie Kjontvedt of Epiq Corporate Restructuring, LLC, Regarding the Solicitation and Tabulation of Ballots Cast on the Prepackaged Chapter 11 Plan of Reorganization of the Debtor*, ¶ 11 [Dkt. 47] (the "Kjontvedt Decl.").  These solicitation packages included, among other things, the Disclosure Statement, the Plan, and either a master ballot for counsel to vote on behalf of their clients should they have authority to do so, or an individual direct ballot for unrepresented claimants or for claimant's whose counsel requested a direct voting process for their clients.  *Id.* at 3-4.  Given the geographic distribution of claimants, LLT also engaged Signal Interactive Media to conduct a nearly $9 million media campaign, which included advertising nationwide via radio, newspapers, consumer magazines, television, internet banners, paid internet search listings, and social media.  *Declaration of Shannon R. Wheatman, Ph.D., in Support of (I) Supplemental Notice Plan and (II) Report on Implementation of Supplemental Notice Plan*, ¶ 5 [Dkt. 48].

At the end of the solicitation period, certain firms opposed to the Plan asked that Red River pause the count and delay certification of votes to provide the parties more time to

---

[8]     A copy of this transcript is attached as Exhibit C to the UST Motion.

NAI-1540670946

negotiate a resolution of their objections.  Kim First Day Decl. ¶ 127.  Red River agreed to do so, as authorized by the solicitation procedure, and over the course of the succeeding weeks, Red River and J&J made a series of offers proposing to contribute significant incremental consideration to reach an agreement.  *Id.*  Nonetheless, every offer was rejected.  *Id.*

The Smith Law Firm PLLC (the "Smith Firm"), led by attorney Allen Smith, then approached Red River and J&J.  *Id.* ¶ 128.  The Smith Firm had brought the first talc trial against the company in 2013 and had, as part of the opposition group led by Beasley Allen, actively opposed LTL's prior bankruptcy proposals.  *Id.*  The Smith Firm advised that it represented, through a joint venture agreement with Beasley Allen, approximately 11,000 claimants.  *Id.* Smith stated that he was amenable to negotiating a resolution on behalf of the clients that involved the contribution of additional consideration.

Red River and J&J thereafter engaged in extensive negotiations with the Smith Firm to resolve the firm's objections to the initial Plan.  *Id.* ¶ 129.  Following these negotiations, an agreement was reached with the Smith Firm and memorialized in the Memorandum of Understanding.  *Id.*  As a result of the Memorandum of Understanding, which has been incorporated into the amended Plan to the extent applicable, the substantial majority of the clients jointly represented by the Smith Firm have now voted to accept the amended Plan.  *Id.* ¶ 130.  Although Beasley Allen and other MDL leadership firms participated in these negotiations as well, they declined to accept the resolution to which the Smith Firm agreed and continue to oppose the amended Plan.  *Id.*

-12-

After the solicitation period had ended, the claims, balloting, and noticing agent tabulated over 93,000 votes and ultimately determined that an overwhelming majority, 83%, of claimants had voted to accept the Plan.  *See* Kjontvedt Decl. Ex. 20.[9]

### C.   The Prepetition Corporate Restructuring

During and subsequent to the prior LTL bankruptcies, it became clear that most ovarian and gynecological cancer claimants and their counsel supported a prompt, fair, and efficient resolution of their claims in bankruptcy, while other claimants (or, more likely, their counsel) holding mesothelioma or governmental claims, preferred to litigate or otherwise resolve their claims in other forums.  To address these differing points of view and satisfy the ovarian and gynecological cancer claimants' desire to effectuate a smooth Plan process, LLT contemplated undertaking a prepetition corporate restructuring, which was addressed as part of Plan negotiations with the Ad Hoc Committee of Supporting Counsel and prepetition FCR.  Kim First Day Decl. ¶ 118.  A description of the potential restructuring was also included in the Disclosure Statement sent to claimants during the solicitation process.  *See* Discl. Stmt. § 4.2.

On August 19, 2024, LLT engaged in a Prepetition Corporate Restructuring.  Kim First Day Decl. ¶ 35.  The Prepetition Corporate Restructuring was implemented through a series of steps, including: (a) the conversion of Johnson & Johnson Holdco (NA) Inc. from a New Jersey corporation to a Texas limited liability company named J&J Holdco (NA) LLC ("Holdco (Texas)"); (b) the merger of LLT with and into Holdco (Texas), with Holdco (Texas) as the surviving entity and LLT ceasing to exist; and (c) a divisional merger of Holdco (Texas) under

---

[9]   While the Coalition has already repeatedly accused Red River of "stuffing the ballot box" to engineer a vote in favor of the Plan by including both ovarian cancer and non-ovarian cancer claims in that total, more than 82% of ovarian cancer claimants accepted the Plan.  Kim Decl. ¶ 18.

NAI-1540670946

Texas corporate statutes.  *Id.* ¶ 36.  A more fulsome description of the prepetition restructuring can be found in the Disclosure Statement.

As a result of the Prepetition Corporate Restructuring, which involved one Texas-based entity dividing into three Texas-based entities, Red River was formed as a Texas limited liability company, and became responsible for talc claims that would be resolved pursuant to the Plan. *Id.* ¶¶ 35, 37.  Red River's two principal assets are: (i) its wholly owned subsidiary, Royalty A&M LLC ("Royalty A&M"), which is a Texas limited liability company that owns a portfolio of royalty revenue streams, and (ii) two funding agreements, the Debtor Indemnity Cost Funding Agreement and the Debtor Expense Funding Agreement (together, the "Funding Agreements"), which are both governed by Texas law.  *Id.* ¶ 39.

> ### D.    The Bankruptcy Filing and Postpetition Events

Following the Prepetition Corporate Restructuring, Red River filed a voluntary petition for chapter 11 relief with this Court on September 20, 2024 (the "Petition Date").  *See Voluntary Petition for Non-Individuals Filing for Bankruptcy* [Dkt. 1].  On September 21, 2024, Red River filed a motion requesting the entry of an order approving, among other things, the adequacy of the Disclosure Statement.  *See* [Dkt. 46].  Although this is a complex mass tort case (with a vocal minority of opposing counsel), Red River believes that prompt confirmation of the Plan—as is typical in prepackaged bankruptcy cases—is possible, and that a confirmation hearing could be scheduled by early next year.  Kim First Day Decl. ¶ 9.

On the Petition Date, the UST for Regions 3 and 9 filed a motion on the docket of the second LTL bankruptcy case, which was dismissed over a year ago, requesting that the New Jersey bankruptcy court transfer venue of this Chapter 11 Case from this Court to New Jersey. *See Motion of the United States Trustee for an Order Pursuant to Fed. R. Bankr. P. 1014(b) Transferring Venue of Subsequently Filed Case to the District of New Jersey*, *In re LTL Mgmt.*

-14-

*LLC*, No. 23-12825 [Dkt. 1856] (Bankr. D. N.J. Sept. 20, 2024) (the "NJ Transfer Request").  On

September 24, 2024, the New Jersey bankruptcy court denied the NJ Transfer Request, noting

that "while the Court has observed law of the case doctrine and applied it in previous cases, I

don't think it's appropriate in different cases.  And we have here clearly different debtors, and

we have different parties involved here."  *See* Tr. of Sept. 24, 2024 Hr'g held in *In re LTL*

*Management LLC*, No. 23-12825 (Bankr. D.N.J), at 42:4-8 (attached as Exhibit C to UST

Motion).

On September 21, 2024, the Coalition filed the Coalition Motion.  The Coalition is

comprised of counsel from six economically conflicted law firms, and is comprised of lawyers

that have vehemently opposed the notion of using bankruptcy to resolve the Debtor's talc

liability, irrespective of venue.  These firms maintain leadership positions in the pending MDL

and, in those roles, stand to recover for themselves (but not their clients) up to 12% of the

aggregate amount of any resolution in the MDL.  Kim First Day Decl. ¶ 71.  While benefitting

the firms, that levy on any resolution through the MDL would reduce recovery for the claimants,

thereby creating a conflict.  Furthermore, counsel for these firms have never successfully won a

talc trial against Red River (or its predecessors).  The Coalition Motion is merely their latest

attempt to derail the proposed Plan (in an attempt to capture the generous attorney's fees they

would receive via the MDL).  On September 26, 2024, the UST for the Southern District of

Texas filed the UST Motion.

## LEGAL STANDARD

28 U.S.C. § 1408 generally provides that "a case under title 11 may be commenced in the

district court for the district – (1) in which the domicile, residence, principal place of business in

the United States, or principal assets in the United States, of the person or entity that is the

NAI-1540670946

subject of such case have been located . . . ."  28 U.S.C. § 1408; *see also In re Victorville Aerospace, LLC*, 2008 WL 5482785, at *2 (Bankr. S.D. Tex. Dec. 9, 2008).  Section 1408 is written in the disjunctive, and thus, a debtor need only establish one of the four criteria for its choice of venue to be proper.  *See In re Cox Operating, LLC*, 652 B.R. 49, 54 (Bankr. E.D. La. 2023) ("The bankruptcy venue statute is crafted in the disjunctive, providing four independent, alternative grounds for proper venue.").

A court may transfer a chapter 11 bankruptcy case to another district if it finds transfer is "in the interest of justice or for the convenience of the parties."  28 U.S.C. § 1412.  Fed. R. Bankr. P. 1014(a)(1) similarly provides for transfer in the interest of justice or for the convenience of the parties.  Transfer is discretionary, not mandatory.  *In re Harnischfeger Indus., Inc.*, 246 B.R. 421, 436 n.42 (Bankr. N.D. Ala. 2000) ("Transfer of venue pursuant to § 1412 requires a case-by-case analysis that is subject to broad discretion of the court.").  The movant bears the burden of proof in a venue transfer motion.  *See In re Enron Corp.*, 274 B.R. 327, 342 (Bankr. S.D.N.Y. 2002).

## **ARGUMENT**

## I.    **VENUE IS PROPER IN THIS COURT.**

Venue of Red River's bankruptcy case is proper in the Southern District of Texas: (1) Red River is domiciled in Texas and (2) Red River's principal assets are located in Texas. Notably, Movants do not dispute that venue is proper before this Court pursuant to 28 U.S.C. § 1408.

### A.    **Red River Is Domiciled In Texas.**

"In the case of a business entity, the state where it was organized is generally its domicile or residence."  *In re Crosby Nat'l Golf Club, LLC*, 534 B.R. 888, 890 (Bankr. N.D. Tex. 2015); *ERG Intermediate Holdings*, 2015 WL 6521607, at *4 ("In the case of a business entity, the state

NAI-1540670946

where it is organized is generally its domicile.").  An entity that is formed under a state's laws "is domiciled in the entire state for purposes of section 1408(1) and may file a case under the Bankruptcy Code in any District in that state."  *ERG Intermediate Holdings*, 2015 WL 6521607, at *11-12.

Here, as a result of the Prepetition Corporate Restructuring, Red River was formed as a limited liability company organized under Texas law.  Kim First Day Decl. ¶ 37.  Thus, Red River is domiciled in Texas.  *See In re Bestwall LLC*, 605 B.R. 43, 52 (Bankr. W.D.N.C. 2019) (denying a motion to transfer venue where the debtor was a limited liability company organized under North Carolina law).  The Coalition concedes this point.  *See* Coalition Mot. ¶ 11 (acknowledging that Red River has a Texas Certificate of Formation).

Further, to the extent relevant, LLT was also formed under Texas law, and had been organized under Texas law for more than 180 days prior to Red River's bankruptcy filing.  Kim First Day Decl. ¶ 3; Discl. Stmt. at 2 ("In December 2023, LTL changed its state of formation to Texas and its name to LLT.").  PRT and J&J Holdco (NA) LLC, which were created concurrently with Red River pursuant to the Prepetition Corporate Restructuring, were also formed and domiciled in Texas.  Kim First Day Decl. ¶ 37.

## B.  Red River's Principal Assets Are Located In Texas.

The Coalition asserts that "the Debtor has no assets, no employees, and no operations in Texas."  *See* Coalition Mot. ¶ 11.  But Red River's Chief Restructuring Officer is located in Dallas, Texas.  *See Debtor's Application For Entry Of An Order (I) Authorizing It To (A) Retain And Employ Accordion Partners, LLC And (B) Designate John Bittner As Chief Restructuring Officer Effective As Of The Petition Date And (II) Granting Related Relief* [Dkt. 28] ¶ 10.  Red River's principal assets are its equity interest in its subsidiary, Royalty A&M, and its rights

NAI-1540670946

under the Funding Agreements, all of which are located in Texas, which is sufficient to establish venue for purposes of section 1408.  Kim First Day Decl. ¶ 39.

Royalty A&M is a limited liability company that owns a portfolio of royalty revenue streams, including royalty revenue streams based on third-party sales of certain products.  *Id.* This portfolio includes a synthetic royalty arrangement in Texas.  Kim Decl. ¶ 9.  Such arrangement was entered into with Kiron Capital LLC, a private equity firm, through its indirect subsidiary Confidas Health System, LLC, following substantial due diligence conducted in Texas by Royalty A&M.  *Id.*  The investment in Kiron Capital's Confidas Health System includes multiple Texas surgical hospitals in the Dallas, Texas metro area and a license with Dallas-based US Migraine that services patients primarily resident in Texas.  *Id*.  It is expected that Royalty A&M will generate approximately $45 million in undiscounted cash flow in the next 5-8 years from this arrangement.  *Id.*  Additionally, Royalty A&M is currently evaluating another Texas- based investment arrangement with Kiron Capital, LLC that will potentially generate an additional $30-34 million in revenue over the coming 5-8 years.  *Id.*  The book value of Royalty A&M, net of dividends earned, as of September 30, 2024, is $328.4 million.  *Id.*  As of the Petition Date, Royalty A&M has approximately $64.5 million in cash on hand.  *Id*.

Royalty A&M is a Texas limited liability company, and has been in existence in Texas for nearly a year.  Kim Decl. ¶ 9.  Under Texas law, "[a] membership interest in a limited liability company is personal property."  *See* TEX. BUS. ORGS. § 101.106(a).  Courts have found that a membership interest in a limited liability company, which is intangible property, is located "where the LLC is formed."  *JPMorgan Chase Bank, N.A. v. McClure*, 393 P.3d 955, 959 (Colo. 2017); *Koh v. Inno-Pacific Holdings, Ltd.*, 54 P.3d 1270, 1271-72 (Wash. 2002); *SE Prop. Holdings, LLC v. Green*, 2020 WL 9396383, at * 6 (S.D. Ala. Sept. 1, 2020) (collecting cases).

-18-

Red River holds the equity of Royalty A&M which, as a wholly owned subsidiary, is a key asset of Red River and is indisputably located in Texas.  Kim First Day Decl. ¶ 39.

The Funding Agreements, which are additional principal assets of Red River, are also in Texas.  These Funding Agreements are the source of funding for the approximately $9 billion trust proposed pursuant to the Plan, in addition to all professional fees and related expenses attendant to the Chapter 11 Case.  Discl. Stmt. at 39-41.  Further, the Funding Agreements are both "governed and construed in accordance with the laws of the State of Texas."  *See Annex E to Kim's First Day Declaration, Second Amended and Restated Indemnity Cost Funding Agreement* at 11; *Annex F to Kim's First Day Declaration, Second Amended and Restated Expense Funding Agreement* at 11.  Under Texas law, the venue of a contract is where the contract was made, performed, or breached.  *See In re Red Dot Building Systems, Inc.*, 504 S.W.3d 320, 323 (Tex. 2016).  As a result, because Texas law governs the Funding Agreements and would control in the event of any related dispute, venue for the Funding Agreements is in Texas.

## II.    THE INTEREST OF JUSTICE DOES NOT WARRANT TRANSFER.

The interest of justice prong of 28 U.S.C. § 1412 is "a broad and flexible standard that is applied based on the facts and circumstances of each case."  *In re Enron Corp.*, 284 B.R. 376, 403 (Bankr. S.D.N.Y. 2002).  As *Barretts Minerals* recently reiterated, the "main concern" implicated by this "interest of justice" inquiry is "ensuring that the rights of the asbestos litigation claimants are properly adjudicated, and their claims properly administered."  Slip Op. at 7.  When determining whether transferring venue is in the interest of justice, courts generally consider the (a) economics of estate administration; (b) presumption in favor of the 'home court'; (c) judicial efficiency; (d) ability to receive a fair trial; (e) the state's interest in having local controversies decided within its borders, by those familiar with its laws; (f) enforceability of any

-19-

judgment rendered; and (g) debtor's original choice of forum.  *See In re Parson*, 2021 WL
4206462, at *2-3 (Bankr. N.D. Tex. Sept. 15, 2021).

> **A.     The Court Should Defer To Red River's Decision To File in Texas,
> Particularly Because That Decision is Supported by the Overwhelming
> Majority of Claimants.**

A "debtor's selection of a proper venue is entitled to great weight and deference in
change of venue motions."  *ERG Intermediate Holdings*, 2015 WL 6531607, at *4; *accord In re
Enron Corp.*, 274 B.R. at 342 ("A debtor's choice of forum is entitled to great weight where
venue is proper."); *Barretts Minerals*, Slip. Op. at 4 (movants' "'good cause' burden reflects the
appropriate deference to which the plaintiff's choice of venue is entitled").[10]  "The Fifth Circuit
Court of Appeals has directed courts in its Circuit to exercise caution in transferring cases filed
in a proper venue."  *ERG Intermediate Holdings* (citing *In re Commonwealth Oil Ref. Co., Inc.)*,
596 F.2d 1239, 1241 (5th Cir. 1979).

Deference to Red River's choice of forum is reinforced by the overwhelming support
from talc claimants for a Plan which specifically contemplated a Texas bankruptcy filing.  *See
supra* at 9-10.  As the Coalition acknowledges (*see* Coalition Mot. ¶ 95), courts consider
significant creditor support for a particular venue as an important factor in a venue transfer
analysis.  *See In re Caesars Entertainment Operating Company, Inc.*, No. 15-10047, Jan. 27,
2015 Hr'rg Tr. 98:5-9 [Dkt. 222] ("[S]urely creditors' views bear on the Court's assessment of
the convenience to the parties and the interest of justice."); *In re Enron*, 274 B.R. at 345-46
(considering extent of creditor support in venue transfer analysis); *In re 641 Associates, Ltd.*,
1991 WL 66743, at *1 (Bankr. E.D. Pa. Apr. 25, 1991) (characterizing creditors' agreement to

---

[10]     *See also In re AmeriFirst Financial, Inc.*, 2023 WL 7029873, at *4 (Bankr. D. Del. Oct. 25, 2023)
("[C]ourts afford great weight to the debtor's selection of venue."); *In re Bestwall LLC*, 605 B.R. 43, 51
(Bankr. W.D.N.C. 2019) (same); *In re Caesars Entertainment Operating Co., Inc.*, 2015 WL 495259, at *5
(Bankr. D. Del. Feb. 2, 2015) ("Debtor's choice of forum is entitled to sufficient deference").

NAI-1540670946

debtor's choice of venue as "very significant"); *In re NRG Energy, Inc.*, 294 B.R. 71, 73 (Bankr. D. Minn. 2003) (abstaining and dismissing involuntary petition where prospective debtor was preparing to file a case in another, "less connected" jurisdiction with significant creditor support).[11]

In *ERG Intermediate Holdings*, multiple oil and gas debtors signed a restructuring support agreement in which large creditors agreed to provide debtor-in-possession financing and the debtors agreed to file their chapter 11 cases in the Northern District of Texas.  *See* 2015 WL 6521607 at *3.  The unsecured creditors committee moved to transfer the cases to alternative venues, arguing that the debtors' choice of venue had been "unduly influenced" by the creditors. *Id.* at *7.  In declining the transfer motion, the court rejected the notion that creditor support for the debtor's chosen venue somehow supported transfer, reasoning that the "Debtors are relying heavily upon [the supporting creditors] for the success of these Cases."  *Id.*

This Court, in *Sorrento Therapeutics*, reached a similar conclusion.  There, an inactive, wholly owned subsidiary of the debtor transferred $60,000 to a bank in Houston and, a few days later, opened a Houston PO box.[12]  A day after the transfer, the debtor and its parent affiliate filed bankruptcy in this District.  *Id.* at 107:19-24.  Some three months after the Court confirmed an amended joint plan of liquidation, the UST and a lone, *pro se* party in interest, filed motions to transfer the case to another district, arguing that venue was improper.  The Court denied the

---

[11]    *See also In re Bos. St. Assocs. Ltd. P'ship*, 1990 WL 792, at *2 (Bankr. E.D. Pa. Jan. 5, 1990) (focusing on significant creditor support in its decision to not transfer); *In re PacificCo Inc.*, No. 23-10470 (PB) (Bankr. S.D.N.Y. Apr. 28, 2023) Hr'g Tr. 17:19-24 (emphasizing court's strong agreement with concern "about the consequences that would flow" from transferring a case despite overwhelming creditor support); *In re Boca Dev. Assoc*, 18 B.R. 648, 654 (Bankr. S.D.N.Y. 1982) (holding that "the factors involving the proximity of the court to most of the creditors are not significant here, since the creditors' committee and a majority of the creditors have voiced their support in favor of the debtor's choice of venue").

[12]    *See* Tr. of Hr'g Held March 11, 2024 [Dkt. 2049] at 205:2–23, *In re: Sorrento Therapeutics Inc*, [Dkt. 2049] No. 23-90085 (Bankr. S. D. Tex. Mar. 11, 2024) (Lopez, J).

motions, finding venue was proper in this District and noting that the "[i]nterest of justice mandates that [the case] stays here" because "the case was confirmed by the overwhelming majority of Creditors." *Id.* at 216:6-217:9.

In *In re Houghton Mifflin Harcourt Pub. Co.*, the court held that, ***even where venue was found to be improper*** under 11 U.S.C. § 1408, creditor support in a prepackaged case for a particular venue weighed against transferring venue. 474 B.R. 122 (Bankr. S.D.N.Y. 2012). The court instead found it appropriate to retain jurisdiction long enough for the plan, which was supported by the vast majority of creditors, to reach confirmation. *See id.* at 125. The court was persuaded that "transfer would be destructive to creditor interests, to the great expense and inconvenience of the parties (especially creditors), and the exact opposite of the interests of justice." *Id.* at 137.

Here, the fact that an overwhelming number of claimants support venue in this Court highlights that keeping the case here is in the best interest of claimants and, likewise, in the interest of justice. And, like in *ERG*, the fact that the vast majority of claimants here supported a bankruptcy filing in Texas should reinforce, rather than undermine, the validity of the Texas filing. The venue preferences of Red River and the overwhelming majority of its creditors should be given deference.

Rather than grapple with this reality, the Coalition simply misrepresents the facts. It boldly declares, without support or citation, that "most of the law firms that support J&J's third bankruptcy case represent holders of non-compensable claims—claims that are unenforceable under applicable law and cannot be treated as allowed claims under the Bankruptcy Code for purposes of voting or distribution." Coalition Mot. ¶ 94. The certified results of the vote, however, show that over ***82%*** of ovarian cancer claimants—the claims the Coalition says ***are***

valid—voted to **accept** the proposed plan.  Kim Decl. ¶ 18.  The Coalition, by contrast, consists

of just six of the more than 200 law firms that purport to represent holders (and interests) of talc

claims.  *Id.*  And at least one of those firms, Robinson Calcagnie Robinson, had many more

claimants that voted to accept the Plan than reject it.  *Id.*

This Court should not allow a vocal, conflicted minority of law firms to derail the Plan

and Red River's valid, and broadly supported, choice of venue.  That would not promote the

interest of justice.

      **B.**     **Neither the Economic and Efficient Administration of the Estate Nor Judicial Efficiency Favor Transfer.**

Neither the economic and efficient administration of the estate, nor judicial efficiency,

favor New Jersey over Texas.  As in *Barretts Minerals*, the "main concern" in this case is

"ensuring that the rights of the asbestos litigation claimants are properly adjudicated, and their

claims are properly administered."  Slip. Op. at 7.  Neither the Coalition nor the UST has

provided any reason to believe that this Court cannot accomplish that goal.

Nor do judicial efficiency, or "learning curve," considerations support transfer.  Movants

assert that Judge Kaplan is better situated to administer this case given prior experience in the

LTL bankruptcies.  *See* Coalition Mot. ¶¶ 84-85 (noting familiarity with "the J&J corporate

transactions, financing arrangements, and talc-related bankruptcy claims" and is "quite familiar

with the witnesses and other parties to the case").  But due to extensive litigation related to

dismissal—which resulted in appellate litigation that froze progress in the underlying bankruptcy

case—neither bankruptcy case progressed meaningfully towards confirmation.

As a result, Judge Kaplan neither considered nor adjudicated many of the issues that the

Coalition itself has told the Court throughout its filings to date will be central to **this** case.  These

include, most prominently, "potentially innumerable" voting issues; the Coalition's stated

intention to seek disallowance of "non-compensable, non-ovarian cancer claims for voting purposes;" whether the Plan's proposed compensation to talc claimants is fair and equitable; and other alleged confirmation issues.  *See, e.g.*, *Initial Statement of the Coalition of Counsel for Justice for Talc Claimants Regarding Chapter 11 Case*, [Dkt. 41], at 2, 19, 25-26 ("What Happens Next?"); *Motion of the Coalition of Counsel for Justice for Talc Claimants to Dismiss the Chapter 11 Case Pursuant to 11 U.S.C. § 1112(b)*, [Dkt. 44], at ¶¶ 6-10.

The Coalition points to the pendency of the MDL for the past eight years, noting that the "New Jersey District Court has extensive involvement in the talc litigation and is familiar with the myriad of expert testimony, scientific data, and other evidentiary issues."  Coalition Mot. ¶ 86.  It vaguely asserts that transfer to New Jersey "would promote judicial efficiency as that State has, for years, been deeply entrenched in all facets of this Case and well-attuned to the demands of the Case."  *Id.*  But the Coalition makes no claim, nor could it, that the District Court has dealt with or considered any of the aforementioned voting, confirmation, and other bankruptcy issues the Coalition signals will predominate this prepackaged bankruptcy case.

Nor does the Coalition's suggestion that the New Jersey bankruptcy and district courts could coordinate to "facilitate an estimation process," *id.* ¶ 92—a ground previously cited under very different circumstances by the North Carolina bankruptcy court in ordering transfer in the prior LTL bankruptcy (the "NC Transfer Order") (*see infra* at 42)—support transfer on judicial efficiency grounds.  This case seeks confirmation of a prepackaged Plan supported by the vast majority of ovarian and gynecological claimants.  There is no need here for an estimation process of the type seen in some section 524(g) asbestos bankruptcies.

Similarly, Movants' reference to "Other New Jersey Litigation," such as the 2019 insurance coverage action (the "NJ Coverage Action") *see* Coalition Mot. ¶¶ 57-60; UST Mot.

NAI-1540670946

¶ 28, does not support transfer on interest of justice, judicial efficiency, or convenience of the parties grounds.  The NJ Coverage Action has no impact on the potential funding of the trust proposed by the Plan and is currently stayed as to Red River by virtue of the automatic stay.  Likewise, the pendency of the *Love* fraudulent transfer and *Bynum* medical monitoring class actions in the District of New Jersey provide no grounds for transfer.  Both actions—recently filed by the same firms comprising the Coalition in an effort to undermine this bankruptcy (and perhaps support venue transfer arguments)—are frivolous, have not advanced beyond the filing of complaints, and are subject to pending motions to dismiss.  And they are stayed by the filing of this bankruptcy in any event.  There is no judicial efficiency or convenience to the parties gained by transferring this case to New Jersey on account of any of these matters.

Nor does the pendency of the *Imerys* and *Cyprus* bankruptcies in the Third Circuit—also cited by the North Carolina bankruptcy court three years ago in support of transfer on convenience of the parties grounds—support transfer.  As discussed in the *Debtor's Statement Regarding Filing of Chapter 11 Case* [Dkt. 3], the proposed Plan incorporates a settlement that resolves, among other things, the talc-related indemnity claims among Red River, J&J, Imerys, and Cyprus, which were hotly disputed at the time of the NC Transfer Order.  The settlement agreement and the Plan have cleared the path for Imerys and Cyprus to confirm a plan and emerge from bankruptcy after more than five years.

### C.    Red River's Decision To File in Texas Was Consistent With its Fiduciary Duties To All Stakeholders.

Movants criticize Red River's choice of venue as forum shopping that threatens "the integrity of the bankruptcy system."  UST Mot. at 2; Coalition Mot. ¶ 11.  As a threshold matter, Movants cite nothing to support what is implicit in their motion:  that Red River was constrained to file for bankruptcy in the District of New Jersey.  The law imposes no such limitation.

NAI-1540670946

Congress intentionally provided debtors with flexibility on where they can file bankruptcy. *See* 28 U.S.C. § 1408 (disjunctive standard providing four different criteria to establish venue for a bankruptcy case); 1 COLLIER ON BANKRUPTCY ¶ 4.02 (16th ed. 2023) ("[T]he statute allows many possible locations where an entity or individual may file for bankruptcy protection") (citing *In re AnthymTV Co.*, 650 B.R. 261, 276 (Bankr. D.S.C. 2023)); *see also Broady v. Harvey (In re Broady)*, 43 C.B.C.2d 1782, 247 B.R. 470, 472 (B.A.P. 8th Cir. 2000). It is not uncommon for debtors to have multiple options on where to file. *See Barretts Minerals*, Slip Op. at 1 (noting Southern District of Texas is "at least one of the proper venues for this case under § 1408"). Red River filed in one of those permissible venues. *See* Section I, *supra*.

Red River's choice of venue was motivated by multiple factors, including input from creditors and a shared belief that filing in Texas supported a successful reorganization. Kim Decl. ¶ 16. And Red River's consideration of the venue preferences of the vast majority of stakeholders and creditors is entirely consistent with its fiduciary duties to those parties, who explicitly stated during Plan negotiations that they desired a Texas bankruptcy filing. Movants fail to explain why Red River should have selected—much less was required to select—a venue purportedly preferred by a relatively small band of economically conflicted counsel who supposedly represent a small minority of talc claimants opposed to the Plan. *See Cox Operating*, 652 B.R. at 59 ("[I]t is not in the interest of justice merely to swap one party's perceived home field advantage for another.") (internal citation omitted).

Red River's venue considerations are neither novel nor improper. As the court noted in *ERG Intermediate Holdings*:

> When a proper venue is chosen and no abuse can be shown, there is no forum
> shopping in the pejorative sense. Rather, the Debtors considered their options for

-26-

> where to file these Cases and chose to file in Dallas because they determined, **_in the exercise of their fiduciary duties_**, that it provided the best opportunity to **_maximize value for all interested stakeholders_**.

2015 WL 6521607, at *7.

Likewise, in *Caesars*, the court recognized the role that venue selection could have on the prospects of a successful reorganization. *See In re Caesars Ent. Operating Co., Inc.*, 2015 Bankr. LEXIS 314 at *20-21 (Bankr. D. Del Feb. 2, 2015). There, the court had to decide the proper forum for certain voluntary and involuntary cases of affiliates of Caesars Entertainment Corporation. *Id.* at *8-9. The debtor noted that it selected Illinois in part because of "favorable legal precedents in the Seventh Circuit regarding the assumption of executory contracts and third-party releases." *Id.* at *11-12. The court ultimately transferred the cases to Illinois, the debtor's preferred forum, noting that its venue determination "ultimately turns on Rule 1014(b)'s interest of justice prong." *Id.* at *19. The court specifically noted that "[t]he Debtor [] demonstrated that its decision to file in the Illinois Court rather than this Court was premised on their analysis of different applications of the law in the judicial circuits in which this Court and the Illinois Court operate and that those differences could benefit the Debtor's reorganization efforts." *Id.* at *27-28. The court further noted that even though "[w]ether the debtor's is correct in its analysis [of Seventh Circuit precedent] remains to be seen," this was "sufficient justification for its choice of forum." *Id.* at *27-28. The court did not find that the debtor threatened the "integrity of the bankruptcy system" by choosing a jurisdiction with a more predictable interpretation and application of the law.

Aside from the fact that the lawyers in the Coalition believe that **_they_** (as contrasted to talc claimants) would benefit from a transfer to New Jersey, the Coalition lawyers cannot explain why the existence of a minority dismissal standard in the Third Circuit should trump the venue preference of the vast majority of talc claimants—who are located in every jurisdiction in this

-27-

country.  This Court, and the Fifth Circuit, apply their own good faith standard based on the

Bankruptcy Code, and this Court is capable of applying that standard to this Chapter 11 Case.[13]

     None of the various assertions that Movants' advance to support their forum-shopping

charge withstands scrutiny.

     *First*, the Coalition claims that J&J has engaged in "blatant" and "audacious" forum

shopping in an effort to "force a settlement" on claimants.  Coalition Mot. ¶ 4.  That is plainly

false.  The Ad Hoc Committee of Supporting Counsel and the FCR support a bankruptcy filing

---

[13]    The Third Circuit is the only appellate court with a good faith filing standard that explicitly requires a debtor to demonstrate "imminent" or "immediate" financial distress at the time the bankruptcy petition is filed.  In the Fifth Circuit, "[c]ourts employ a totality-of-the-circumstances test in making the determination, which involves 'an on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities.'" *Matter of Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986) (citation omitted)).  The same is true in the Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, and D.C. circuits, none of which include any financial-distress gating requirement, much less require showing of "imminent" or "immediate" financial distress.  *See In re Lee*, 467 B.R. 906, 917 (B.A.P. 6th Cir. 2012) (a "fact-specific and flexible determination that must be made on a case-by-case basis by looking to a totality of the circumstances"); *In re Aearo Techs. LLC*, No. 22-02890-JJG-11, 2023 WL 3938436, at *11 (Bankr. S.D. Ind. June 9, 2023) (collecting Seventh Circuit cases and finding that "none of these cases explicitly hold that financial distress is a requirement of good faith"); *In re Wigley*, 557 B.R. 671, 675 (B.A.P. 8th Cir. 2016) ("[C]ourts consider the totality of the circumstances, including the court's evaluation of the debtor's financial condition, motives, and the local financial realities.") (citation omitted); *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994) (bad faith "depends on an amalgam of factors and not upon a specific fact"); *In re Muth*, 514 B.R. 719 (10th Cir. BAP (Colo.) 2014) (bad faith determined by "totality of the circumstances"); *In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984) ("[C]ourts may consider any factors that demonstrate an intent to abuse the judicial process and the purposes of the reorganization provisions, particularly factors that show that the petition was filed to delay or frustrate the legitimate efforts of secured creditors to enforce their rights."); *In re Franklin Mortg. & Inv. Co., Inc.*, 143 B.R. 295, 299 (Bankr. D.D.C. 1992) ("Nor is there any single factor that will necessarily lead to a finding of bad faith.  The court must look to the totality of all the facts and circumstances in making this determination.").  The First Circuit has declined to find that a lack of "good faith" constitutes cause for dismissal.  *See La Trinidad Elderly LP SE*, 627 B.R. 779, 799 (B.A.P. 1st Cir. 2021).  In both the Second and Fourth Circuits, dismissal on grounds of bad faith require a showing of both subjective bad faith and objective futility.  *See In re Rubin Fam. Irrevocable Stock Tr.*, No. 13-72193-DTE, 2013 WL 6155606, at *10 (Bankr. E.D.N.Y. Nov. 21, 2013); *In re Bestwall LLC*, 71 F.4th 168, 182 (4th Cir. 2023) (addressing the Third Circuit's decision in *LTL* and noting that Fourth Circuit "applies a more comprehensive standard to a request for dismissal of a bankruptcy petition for lack of good faith; that is, the complaining party must show both 'subjective bad faith' and the 'objective futility of any possible reorganization.'").  As two leading bankruptcy scholars have noted, "[t]his idea that financial distress requires a significant risk of insolvency is new. . . A rigid insolvency requirement is like waiting until a house has burned down to call the fire department.  Even the less rigid 'significant-risk-of-insolvency' test adopted by the Third Circuit would create uncertainty and litigation about whether filing is appropriate any time a debtor files before it has become insolvent."  Anthony J. Casey & Joshua C. Macey, *In Defense of Chapter 11 for Mass Torts*, 90 U. CHI. L. REV. 973, 1021 (2023).

NAI-1540670946

in Texas.  Kim Decl. ¶ 17.  In fact, the Disclosure Statement explained Red River's intent to file

in Texas if it obtained the requisite votes in favor of the Plan.  *See* Discl. Stmt. at 2-3.  The fact

that an overwhelming majority of claimants **support** the Plan and voted to accept the Plan

reflects their approval of a filing in Texas.

     *Second*, as discussed above, Movants' reliance on the NC Transfer Order does not

support transfer of venue here.  That order cited to the fact that LTL was re-domiciled ***from***

***Texas*** to North Carolina two days before LTL's bankruptcy filing ***in North Carolina***.  *See In re*

*LTL Mgmt. LLC*, No. 21-30589, 2021 WL 5343945, at *6 (Bankr. W.D.N.C. Nov. 16, 2021)

("Such a short existence indicates that the Debtor subjected itself to the laws of North Carolina

purely for the purpose of filing bankruptcy.").  The Coalition acknowledges that LTL properly,

and free of forum-shopping charges, could have filed ***in Texas***:

> Notwithstanding its use of the Texas divisive merger statute to
> ringfence its talc liabilities, ***J&J eschewed a bankruptcy filing in***
> ***Texas***, and instead, re-domiciled Chenango One in North Carolina
> as a limited liability company under the new name of "LTL
> Management LLC.

Coalition Mot. ¶ 8 (emphasis added).  This notion that "more natural jurisdictions were

eschewed" in the first LTL bankruptcy was echoed by at least one plaintiff's firm who noted in

their motion arguing that venue should be transferred to New Jersey that "having reincorporated

in Texas and exploited that state's divisional merger statute, the Debtor could have stayed in

Texas (which also has a robust bankruptcy bench and is where the Debtor's bankruptcy counsel

is located) for its chapter 11 case."  *Response of Aylstock, Witkin, Kreis & Overholtz, PLLC to*

*Order to Show Cause Why Venue Should Not Be Transferred to Another District and Joinder in*

*Certain Related Filings*, *In re LTL Mgmt. LLC*, No. 21-30589 [Dkt. 346] ¶ 2 (Bankr. W.D.N.C.

Nov. 5, 2021).

NAI-1540670946

The same should also be true for Red River, which has made no changes in its domicile. It started as, and has always been, a Texas entity.  Red River was created using the same Texas divisional merger statute, *Texas Business Organizations Code*, § 10.008, that was used in the 2021 corporate restructuring that created LTL.  The Coalition acknowledges that J&J sought to use the "restructuring tools in the Texas divisive merger statute," Coalition Mot. ¶ 18, effectively conceding that the establishment of Red River in Texas was did not "manufacture venue."[14]

*Third*, there is no basis to assert that Red River's filing in Texas serves to "evade" or "sidestep" the prior rulings of the New Jersey Bankruptcy Court or the Third Circuit by "relitigating the same dispute in a different court."  UST Mot. ¶ 18.  The case does not involve the "same dispute" previously adjudicated in the prior LTL dismissal proceedings.  Rather, as further described in Section IV, *infra*, this case involves a different debtor, with different assets and liabilities, and the "totality of the circumstances" that led to the filing of this prepackaged case, supported by an overwhelming majority of claimants, are very different from the prior proceedings.  *See Little Creek*, 779 F.2d at 1072 ("Courts employ a totality-of-the-circumstances test in making the determination, which involves 'an on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities.'").

*Fourth*, the Coalition's suggestion that "J&J believes it can choose which Court hears its case until it finds one willing to grant it a discharge of its independent talc liability," Coalition Mot. ¶ 49, is baseless.  The Coalition identifies no difference of authority across the relevant

---

[14]     Even the North Carolina bankruptcy court, in ordering a transfer of venue in *LTL*, did not consider its finding that LTL was "trying to manufacture venue" to be dispositive in deciding whether to transfer view.  Rather, the court found the "more dispositive factor" to be that "there is a more appropriate venue for the administration of the estate."  2021 WL 5343945, at *6.  For the reasons discussed above, New Jersey does not provide a more appropriate venue in this prepackaged case filed more than three years later.

-30-

circuits on that issue under section 524(g).  That would not warrant transfer in any event.  *See Caesars*, 2015 Bankr. LEXIS 314 at *27-28.

*Finally*, the cases cited in support of Movants' forum-shopping averments highlight the distinction between abusive, collection-dodging or judgment-evading behavior versus a choice of venue grounded in fiduciary duties and a consideration of what is best for stakeholders.[15]  None of those cases bear any resemblance to the facts and circumstances here, where Red River is not avoiding post-judgment collections, and is actually trying to resolve (and pay) its claims by effectuating a settlement that has the consent of the vast majority of its claimants.

The Coalition cites to *In re Abacus Broadcasting Corp.* as support for the proposition that "[c]ourts find that forum shopping often warrants transfer of venue in the interests of justice."[16] Coalition Mot. ¶ 68 (citing to 154 B.R. 682, 686 (Bankr. W.D. Tex. 1993)).  There, Abacus purchased radio stations from the estates of two Utah-based debtors and subsequently defaulted on its obligations under the purchase agreements.  *See Abacus*, 154 B.R. at 683.  After the Utah bankruptcy court issued a foreclosure order against it, Abacus filed for bankruptcy in Texas.  *Id.* The Texas bankruptcy court granted the Utah chapter 7 trustee's motion to transfer the case to Utah, noting that Abacus was being "[p]ursued by a chapter 7 trustee with obvious limitations on his resources."  *Id.*  The Texas court was also motivated to transfer the case based on the inability of the debtor's employees to attend hearings, as they were all located in Utah, and the judge's

---

[15]    In *Certa Dose*, cited by the UST, the court did not actually find evidence of forum shopping but instead denied a venue transfer motion.  *In re Certa Dose, Inc.,* 2021 WL 5177376 (Bankr. S.D.N.Y. Nov. 4, 2021).

[16]    The UST cites *In re Lazaro* for the same proposition.  *See* UST Mot. ¶ 15 (citing 128 B.R. 168, 174 (Bankr. W.D. Tex. 1991)).  However, while the *Lazaro* court mentions the words "forum-shopping" in passing in a single sentence (the same sentence cited by the UST), it neither defines it, finds it, nor discusses it at length. 128 B.R. at 174.  Further, the bankruptcy court exercised its discretion to deny transfer of *Lazaro*, even where **venue was technically improper**, because Texas was a more convenient venue for the parties.  *See* 128 B.R. at 169.

NAI-1540670946

own discomfort with the fact that he had "no earthly idea what the Salt Lake City [broadcasting] market is like." *Id.* These facts are readily distinguishable from this Chapter 11 Case on a variety of grounds, including that the movant in *Abacus* was a chapter 7 trustee who demonstrated that it would be difficult to travel to hearings in Texas. From a forum-shopping perspective, it is notable that Abacus was not searching for a forum that would maximize its chances at reorganizational success with massive creditor support. Instead, it filed bankruptcy in a remote forum to frustrate the collection efforts of a specific creditor.

A similar desire to avoid foreclosure was at play in the Coalition's next case, *In re Eclair Bakery Ltd.*, which was essentially a two-party dispute between a landlord and a bakery-tenant where the tenant had filed multiple bankruptcy cases in an attempt to avoid eviction proceedings. 255 B.R. 121, 125 (Bankr. S.D.N.Y. 2000). For example, the very same day that the landlord was authorized by a state court to proceed with eviction against the bakery, the bakery created a new entity and filed for bankruptcy the following day. *Id.* Indeed, it did so despite a prior bankruptcy court order barring its predecessor from "filing for any relief under any chapter or provision of the Bankruptcy Code for two years in this district or any other district of the United States." *Id.*[17]

*In re Barrington Spring House, LLC* also involved flagrant judgment evasion and, accordingly, is wholly inapposite to the facts here. 509 B.R. 587, 606 (Bankr. S.D. Ohio 2014). In *Barrington*, the bankruptcy filing in question came in the midst of an "extraordinarily acrimonious and hostile" two-party dispute between the individual debtor and his former

---

[17] An additional case cited by the UST to support its forum-shopping argument, *Steeley*, also features an individual debtor attempting to avoid foreclosure, and is therefore distinguishable. UST. Mot. ¶ 20. In *Steeley*, the debtor filed her sixth chapter 13 bankruptcy petition while an "enforceable in rem order" that would have allowed foreclosure on her home was pending in another district. *In re Steeley*, 243 B.R. 421, 435 (Bankr. N.D. Ala. 1999).

NAI-1540670946

business venture partners, which featured everything from an alleged knife attack to sanctions and contempt orders. *Id.* at 593-94. Among other things, the individual debtor had violated a state court order forbidding encumbrance of certain disputed property by apparently executing a mortgage on the property, keeping all proceeds for himself, and then allowing the property to fall into foreclosure. *Id.* at 594-95.[18] In addition, after another court found that the debtor had materially violated several other court orders, "would be subject to arrest and possible criminal prosecution if he failed to comply with the court's latest order," and scheduled a future hearing on such matters, the debtor filed for bankruptcy the day before the hearing. *Id.*

Movants' final citation is to *Patriot Coal*, where venue was transferred from New York to Missouri after the court found that two debtor-affiliates were created in New York "solely" to comply with statutory venue requirements and serve as a hook to justify filing the entire Patriot Coal family in New York bankruptcy court. *See* Coalition Mot. ¶72; *citing In re Patriot Coal Corp.*, 482 B.R. 718 (Bankr. S.D.N.Y. 2012). There is no similar fact pattern here, because, as an initial matter, Red River was not created solely to satisfy venue in Texas and drag its various non-debtor affiliates into the Texas bankruptcy court. Rather, Red River is the sole debtor; it was formed and remains as a Texas entity pursuant to Texas law, and its creation was one of a series of steps to effectuate the Plan, which has the support of the majority of claimants and the FCR, and is designed to fairly and equitably satisfy its current and future talc claims.

In addition, at least one bankruptcy court, in the *Bestwall* case, has previously considered the relevance of *Patriot Coal* in the mass tort, "Texas Two-Step" context. *See In re Bestwall LLC*, 605 B.R, 52-53 (Bankr. W.D.N.C. 2019). It declined to transfer venue of the case, finding

---

[18]    This behavior resulted in the scheduling of a hearing to show cause why the debtor should not be held in indirect criminal contempt. *Id.* The debtor filed for bankruptcy before the date of such hearing.

NAI-1540670946

critical differences between the shell entity in *Patriot Coal* and the *Bestwall* Texas Two Step-debtor.  In particular, the *Bestwall* bankruptcy court found that the debtor, which was: (a) created by a divisional merger, (b) had been allocated its asbestos liability by virtue of that restructuring, and (c) had access to funding via a funding agreement, was not a shell company because it had substantial assets, which created important legal consequences to selecting a state to govern the entities' formation.  *Bestwall*, 605 B.R. at 52.  Specifically, by organizing in North Carolina the *Bestwall* debtor had subjected itself to the laws of the state; impacted its fiduciary obligations and indemnification and exculpation standards of its officers and directors; was required to pay franchise taxes to North Carolina; and submitted itself to oversight by North Carolina governmental authorities.  *Id.*  These considerations all equally apply to Red River and, in addition, Red River, unlike the entities in *Patriot Coal*, is a critical vehicle for the Plan, which has significant claimant support.

## III.    THE CONVENIENCE OF THE PARTIES DOES NOT FAVOR TRANSFER.

A "heavy burden of proof rests on the moving party to demonstrate that the balance of convenience clearly weighs in [the movant's] favor."  *In re Dunmore Homes, Inc.*, 380 B.R. 663, 670 (Bankr. S.D.N.Y. 2008) (citation omitted); *Barretts Minerals*, Slip Op. at 4 (movant must "clearly demonstrate" transfer is for the convenience of the parties and in the interest of justice).

In assessing the convenience of the parties, the Fifth Circuit has directed courts to evaluate six factors:

> (1) the proximity of creditors of every kind to the Court; (2) the proximity of the bankrupt [debtor] to the Court; (3) the proximity of the witnesses necessary to the administration of the estate; (4) the location of the assets; (5) the economic administration of the estate; and (6) the necessity for ancillary administration if bankruptcy [*i.e.*, liquidation] should result.

*Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co. (In re Commonwealth Oil Refining Co.)*, 596 F.2d 1239, 1241 (5th Cir. 1979) ("CORCO").  The venue transfer decision is

a matter for the Court's discretion and depends upon "an individualized, case-by-case consideration of convenience and fairness." *Gulf States Expl. Co. v. Manville Forest Prods. Corp., (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1391 (2d Cir. 1990).

A.    **The Economic and Efficient Administration of the Estate Does Not Warrant Transfer.**

Of the *CORCO* factors, the "most important consideration is whether the requested transfer would promote the economic and efficient administration of the estate." *CORCO*, 596 F.2d at 1247. For all of the reasons discussed above, the economic and efficient administration of this prepackaged bankruptcy does not favor transferring this case to the District of New Jersey. *See supra* Section II.B.

Moreover, courts have recognized that in large chapter 11 cases with a nationwide scope, the debtor's choice of forum will not likely materially inconvenience the relevant stakeholders versus an alternative jurisdiction. For example, in *Caesars*, the court noted the "geographical diversity of creditors," that the debtors' and creditors' professionals were "located throughout the United States," that the debtor's "books and records are electronically accessible from anywhere in the United States," and that "the distribution of the [debtor's] business does not strongly favor this Court over the Illinois Court, or *vice versa*." 2015 WL 495259 at *6. The court further remarked that "in this day of law firms with multiple offices across the nation, convenient and accessible airports, electronic access to information and court dockets and every lawyer's fingertips, … both this Court and the Illinois Court are convenient forums for purposes of the *CORCO* analysis." *Id.* Similarly, in *Enron*, the court found that the *CORCO* factors "take on less importance in a case where a debtor has assets in various locations" and involves a "large multifaceted national and international" corporate debtor with "creditors and stockholders across the United States." 274 B.R. at 347-48.

Likewise, courts have found that, in cases involving what is primarily a holding company with largely intangible assets and asbestos liabilities—as is the case here—the debtor's choice of venue will not likely result in materially inconveniencing parties as compared to another jurisdiction.  *In re Bestwall LLC*, No. 17-31795 (LTB) [Dkt. 767] Hr'g Tr. at 18:9-12 (Bankr. W.D.N.C. Jan. 24, 2019) ("The fact that the debtor is a holding company weighs against transferring the case in the interest of justice because it's not an operating company with employees, vendors, customers, and other tangible assets in a separate location.") (attached as Kim Decl., Ex. A); *In re Kaiser Gypsum Company, Inc.*, No. 16-31602 (JCW) [Dkt. 261] Hr'g Tr. at 98:19-99:2 (Bankr. W.D.N.C. Nov. 22, 2016) ("[W]hen you get over to the other side of this on *forum non conveniens*, given the nature of what we're doing here with intangible assets, companies that don't have active employee constituencies, and the like, venue, in my mind, becomes a lot more optional in the sense that one place is not inherently more favorable than the others.") (attached as Kim Decl., Ex. B).

As to the convenience of the parties, this case is similar to *Caesars*, *Enron*, *Bestwall*, and *Kaiser Gypsum*.  As discussed in greater detail below, putative creditors and counsel are spread throughout the United States.  Relevant documents and other materials are readily accessible electronically.  Under the District's complex case procedures, all hearings are presumptively hybrid hearings, where attendance may be in person or virtual.  *See Procedures for Complex Cases in the Southern District of Texas*, ¶ 21.  Indeed, the Court conducted a lengthy first day hearing virtually, which was attended by nearly 200 counsel, claimants, experts, the legal press, and others, without complication.  And, as in *Bestwall* and *Kaiser Gypsum*, Red River faces asbestos claims throughout the country and has no employees, vendors, customers, or tangible

assets in a separate location.  Proceeding in this case in "one place is not inherently more favorable than the others."  *Kaiser Gypsum*, Hr'g Tr. at 98:19-99:2.

> **B.      The Location of Creditors, Counsel, and Other Relevant Parties Does Not Favor Transfer.**

The location of claimants and their counsel does not favor transferring this case to the District of New Jersey.  As detailed above, claimants are spread throughout the country and there are thousands more claimants residing in Texas than in New Jersey.  Kim Decl. ¶ 14.  *See Barretts Minerals*, Slip Op. at 4-5 (noting "Texas has a greater distribution of asbestos litigants" than Montana, the alternative venue).  Furthermore, as previously highlighted in Section II, *supra*, considering the convenience of the parties necessitates evaluating the desires of the parties in interest in this case.  *See In re Land Stewards, L.C.*, 293 B.R. 364, 370 (Bankr. E.D. Va. 2002) (significant creditor support for a particular venue relevant to *CORCO* analysis); *In re Walston AirBusiness, Inc.*, 26 B.R. 955 (1983) (same).  Here, the overwhelming majority of claimants support Red River's chosen venue.

In evaluating convenience of the parties, *Barretts Minerals* noted the location of the law firms representing asbestos claimants, finding that four were located in Texas while none were located in Montana.  Here, Red River's amended top law firms list indicates that nine of the Top 30 law firms representing talc claimants— Burns Charest, Duncan Stubbs, Johnson Law Group, Nachawati Law Group, McDonald Worley, Pulaski Kherkher PLLC, Trammell PC, Watts Guerra LLP and Williams Kherkher Hart—are located in Texas.[19]  *See* Top 30 List.  These

---

[19]     The Top 30 law firms represent nearly 92% of the votes submitted in connection with solicitation of the Plan.  Kim Decl. ¶ 12.  Apart from the nine firms in Texas, other Top 30 firms included four from New York, two each from California, Florida, Illinois and Pennsylvania and one each from Alabama, the District of Columbia, Georgia, Minnesota, Missouri, Mississippi, South Carolina, Virginia and West Virginia.  None were located in New Jersey.  *See* Top 30 List.

-37-

Texas-based firms collectively represent over 35,000 claimants, some 38% of the votes solicited in this case.  Kim Decl. ¶ 12.  No New Jersey-based firm makes the Top 30.

There are other parties with critical roles in this bankruptcy with ties to Texas.  Red River's two lead counsel, Greg Gordon and Dan Prieto, reside in Dallas.  John Bittner, Red River's Chief Restructuring Officer, is also located in Dallas.  Randi S. Ellis, the FCR in the prior LTL bankruptcies and the proposed FCR in this case, is located in Houston.  Even Andy Birchfield, the Montgomery, Alabama-based attorney from Beasley Allen spearheading the Coalition and opposition to the Plan, resides much closer to Houston than Trenton, New Jersey.

### C. Movants' Arguments Fail To Carry Their Burden to Show Transfer is Warranted.

Movants' arguments as to the convenience of the parties amount to little more than an inventory of putatively "overwhelming" connections to New Jersey that, in context, lack any significance to the venue transfer analysis.  Coalition Mot. ¶ 87; *see also id.* ¶¶ 88-94.

*First*, the Coalition argues that Red River "has no business or asset presence in Texas."  Coalition Mot. ¶ 89; *id.* ¶ 50 (claiming Red River's assets are not "geographically connected" to Texas).  As discussed above, courts correctly reason that the location of intangible assets in cases like this one are of minimal relevance to the venue analysis.  *See Bestwall*, Hr'g Tr. at 18:9-12; *Kaiser Gypsum*, Hr'g Tr. at 98:19-99:2; *see also Barretts Minerals*, Slip. Op. 6 ("This case was brought to address the financial implications of asbestos tort litigation.  The location of BMI's operating assets is unlikely to have any impact on achieving that objective.").  In any event, also as detailed above, Red River's primary assets are located in Texas.  Royalty A&M is a Texas-based limited liability company with royalty streams derived from a Texas healthcare business, and the Funding Agreements are governed by Texas law.  *Supra,* Section I.B.

-38-

*Second*, the Coalition devotes several paragraphs to discussing how Johnson & Johnson Services, Inc. ("J&J Services"), a New Jersey corporation, performs administrative services (treasury, finance and accounting, tax procurement, human resources, and the like) for the Debtor and its subsidiary, Royalty A&M, and how J&J Services provides "office space and other facilities for use by the Debtor." Coalition Mot. ¶¶ 47-49, 89. How this demonstrates that New Jersey is more convenient to venue is left unsaid; in point of fact, it has nothing to do with the convenience of the parties involved in this case. *See Barretts Minerals*, Slip Op. at 5 ("With respect to the proximity of the Debtor factor, '[t]he concern is with the corporation's employees who must appear in court, not with the employees who are on the production line.'" (quoting *CORCO*, 569 F.2d at 1248)).

The Coalition identifies just a single Debtor witness, John Kim, Red River's Chief Legal Officer, located in New Jersey who might be called as a witness in these proceedings. But the Coalition's written submissions and oral presentations to the Court to date indicate that the confirmation issues this Court will have to evaluate are largely legal issues or factual issues associated with the solicitation and voting process. These involve law firms and other parties which, predominantly, are not located in or near New Jersey, but are in fact closer to this District. *See supra* at 4-5. In any event, like many other witnesses on behalf of debtors in many other complex chapter 11 cases, Mr. Kim will appear and provide live testimony before this Court on behalf of Red River, as warranted, and his state of residence will not impede his testimony.

*Third*, Movants suggest that 57,000 ovarian and gynecological cancer claims are "pending"—and thus "located"—in the New Jersey-based federal MDL. Coalition Mot. ¶ 92. Of course, these claims are "pending" in the MDL only for pretrial purposes and eventually

NAI-1540670946

would be remanded for trial in their home districts, where claimants reside.  In fact, the

Plaintiffs' Steering Committee in the MDL has "urged" the court to do just that "at the earliest

opportunity."  *See* MDL Sept. 6, 2023 Hr'g Tr. at 19:11-17 (attached as Kim Decl., Ex.C).  In

any event, the MDL is stayed as to the Debtor and will be resolved by this case if the Plan is

confirmed and consummated.  Either way, apart from stating that counsel are "accustomed" and

"have developed a familiarity with litigating in New Jersey," Coalition Mot. ¶ 24, UST Mot.

¶ 28, Movants fail to explain how the pendency of the MDL in New Jersey makes it more

convenient to relevant parties for this bankruptcy case to be pending in New Jersey over Texas.[20]

Movants have failed to "clearly demonstrate" that New Jersey is more convenient.

## IV.    COLLATERAL ESTOPPEL DOES NOT APPLY.

The UST (and only the UST) portrays the NC Transfer Order as a proclamation that New

Jersey is a superior venue to any other federal bankruptcy forum for any bankruptcy case filed by

any successor to LTL.  UST Mot. at 12.  The UST begins its argument with the false predicate

that "[i]ssue preclusion is no hyper-technical tool."  UST Mot. at 12.  The Supreme Court

disagrees.  In *Taylor v. Sturgell*, it reinforced that "[i]n this area of the law, … 'crisp rules with

sharp corners' are preferable."  553 U.S. 880, 901 (2008) (quoting *Bittinger v. Tecumseh Prod.*

*Co.*, 123 F.3d 877, 881 (6th Cir. 1997)).

Collateral estoppel applies "only if: (1) the issue at stake is identical to the one involved

in the earlier action; (2) the issue was actually litigated in the prior action; ***and*** (3) the

determination of the issue in the prior action was a necessary part of the judgment in that action."

---

[20]    The best Movants can muster is the notion that the New Jersey district and bankruptcy courts can "facilitate a claims estimation process" and the incorrect suggestion that the courts did so when the prior LTL bankruptcies were pending in New Jersey.  *Compare* Coalition Mot. ¶ 92 *with* Kim Decl. ¶ 15 (unaware of any coordination across the New Jersey district courts relating to estimation or matters).  As noted above, the prepackaged, already solicited nature of this case eliminates the need for the type of estimation process seen in some other asbestos bankruptcies.

*Amberson v. McAllen (Matter of Amberson)*, 73 F.4th 348, 351 (5th Cir. 2023) (citations

omitted).  The NC Transfer Order involved a distinct debtor in a different jurisdiction resolving

different questions than those relevant here on the basis of different sets of underlying facts.

For issues to be sufficiently similar for issue preclusion purposes, "both the facts and the

legal standard used to assess them must be identical," *Dexon Computer, Inc. v. Cisco Sys's Inc.*,

2023 WL 2941414, at *14 (E.D. Tex. Feb. 7, 2023), so that the issues presented in the

subsequent litigation are "in substance the same as those resolved" in the first.  *Nat'l Med.*

*Imaging, LLC v. Ashland Funding LLC*, 648 F. App'x 251, 256 (3d Cir. 2016).  "Changes in

facts essential to the judgment will render collateral estoppel inapplicable in a subsequent action

raising the same issues."  *Montana v. United States*, 440 U.S. 147, 153-54 (1979).  The reason is

straightforward: "[e]vents that occur" subsequent to the first action "often give rise to new

material operative facts that in themselves, or taken in conjunction with the antecedent facts,

create a new claim to relief."  *Lucky Brand*, 590 U.S. at 415 (cleaned up).

Most obviously, the NC Transfer Order involved a different debtor and different parties

than is the case here.  Contrary to what the UST asserts, there is no "LTL/Red River."  UST Mot.

at 10.  Rather, as Judge Kaplan noted while dismissing the UST's Transfer Request, "we have

here clearly different debtors, and we have different parties involved here."  *See* Tr. of Sept. 24,

2024 Hr'g held in *In re LTL Management LLC*, No. 23-12825 (Bankr. D. N.J), at 42:6-8

(attached as Exhibit C to UST Motion).  Red River was created on August 19, 2024 as a result of

the Prepetition Corporate Restructuring.  It has assets and liabilities distinct from those formerly

allocated to LTL.  It is responsible for ovarian and gynecological cancer related talc claims, but

has no responsibility for other talc-related claims for which LTL formerly was responsible, such

as mesothelioma claims, government-related claims, and Canadian claims.  Red River is party to

NAI-1540670946

different funding arrangements than the funding arrangements to which LTL was formerly a party.

The Fifth Circuit has declined to apply issue preclusion on multiple occasions where there has been a change in factual circumstances between the first and second action. *See*, *e.g.*, *Baby Dolls Topless Saloons, Inc. v. City of Dallas, Tex.*, 295 F.3d 471, 479 (5th Cir. 2002) (holding that city was not collaterally estopped from arguing the constitutionality of its ordinance, notwithstanding the fact that a similar ordinance had been held unconstitutional in a previous case, where, following the first ruling, city held public hearings, conducted and reviewed studies, and took public comments on the proposed amendments before issuing the ordinance); *Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l Inc.*, 951 F.2d 684, 690 (5th Cir. 1992) (holding that prior state court decision regarding appropriation of the term "pig sandwich" did not collaterally estop plaintiff from arguing that the term had since acquired a secondary meaning for trademark infringement purposes).

The NC Transfer Order was a fact-intensive inquiry conducted in November 2021 that weighed the interest of justice and convenience of the parties as between a **North Carolina** and New Jersey venue.  The NC Transfer Opinion did not, and could not, analyze either the propriety of the venue of the **Red River** bankruptcy in Texas (because it did not exist and no filing had been made in Texas), or whether the bankruptcy case of a non-existent debtor that had not filed in Texas should be transferred from **Texas** to New Jersey.  In fact, as the UST readily admits, "the question of Texas venue was not specifically considered in the North Carolina venue decision."  UST Mot. at 13.  This admission, plus the fact that LTL sought to resolve all talc-related liability, while Red River only seeks resolution of ovarian and gynecological-cancer related talc liabilities and intends to do so using a prepackaged plan, distinguish these issues and

-42-

render issue preclusion inapplicable.  *See Dexon Computer, Inc.*, 2023 WL 2941414, at *14 (requiring that facts be "identical").  Nonetheless, as detailed below, there are several additional factual differences between the filing upon which the NC Transfer Order is based and Red River's filing that render issue preclusion inapplicable.

For example, as discussed above, in the course of transferring LTL's venue, the NC Transfer Order pointed to LTL's original formation in Texas and then subsequent conversion into a North Carolina limited liability company just prior to its North Carolina bankruptcy filing, noting that "[s]etting up a company with the sole intent of filing bankruptcy in a certain district cannot be the thing which the [venue] statute intended."  NC Transfer Order at 9 (citation omitted).[21]  Here, however, Red River was originally, and remains, formed in Texas, and was created not solely to "create venue," but to pursue resolution of talc liabilities with the support of claimants.

Moreover, the NC Transfer Order relied heavily on the MDL in New Jersey as a primary motivating factor in transferring LTL to New Jersey, on the basis that the MDL could assist with estimation of claims.  *See* NC Transfer Order at 2-3.  However, as discussed above, the MDL has little, if any, relevance to Red River's case because the prepackaged Plan eliminates the need for the type of estimation envisioned by the North Carolina bankruptcy court in the first LTL bankruptcy.  *See supra* at Section II.B.  Similarly, as already discussed herein, the NC Transfer Order's reliance on the proximity of the NJ Coverage Action and Imerys/Cyprus bankruptcies is not relevant for purposes of the analysis here.  *See supra* at Section II.B.  The NJ Coverage Action, which was in any case a minor feature of the NC Transfer Order, is currently stayed as to

---

[21]   The Coalition's assertion that the "NC Bankruptcy Court understood that the real party in interest was not LTL, a fake debtor that had no business to reorganize, but J&J, which was attempting to abuse the bankruptcy system by seeking a discharge of its own independent tort liability," Coalition Mot. ¶ 6, is belied by the NC Transfer Order, which contains no such finding.

Red River by virtue of the automatic stay and has no effect on the funding of the proposed trust. Because the Debtor has settled its disputes with Imerys and Cyprus, they no longer provide any basis to transfer the venue of this case to New Jersey.

Most importantly, Red River filed for bankruptcy only after a substantial majority of its talc claimants voted in favor of the Plan to be filed in Texas.  This circumstance was not even remotely before the North Carolina bankruptcy court when it issued the NC Transfer Order.

In sum, Red River's bankruptcy filing is predicated upon numerous new and materially different facts that did not exist when Judge Whitley issued the NC Transfer Order.  Judge Kaplan was correct in remarking at the September 24, 2024 hearing on the UST's Bankruptcy Rule 1014(b) motion that the "law of the case doctrine," or issue preclusion, is inapplicable here. Tr. of Sept. 24, 2024 Hr'g held in *In re LTL Management LLC*, No. 23-12825 (Bankr. D.N.J), at 42:4-8 (attached as Exhibit C to UST Motion).

## CONCLUSION

For the foregoing reasons, the Court should deny the motions to transfer this Chapter 11 Case to the District of New Jersey.

-44-

Dated:  October 2, 2024
Houston, Texas

Respectfully submitted,

*/s/ John F. Higgins*
John F. Higgins (TX 09597500)
M. Shane Johnson (TX 24083263)
Megan Young-John (TX 24088700)
James A. Keefe (TX 24122842)
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
jkeefe@porterhedges.com

Gregory M. Gordon (TX 08435300)
Dan B. Prieto (TX 24048744)
Amanda Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone:  (214) 220-3939
gmgordon@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com

- and –

Brad B. Erens (IL 06206864)
Caitlin K. Cahow (IL 6317676)
(Admitted *pro hac vice*)
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, Illinois 60606
Telephone:  (312) 782-3939
bberens@jonesday.com
ccahow@jonesday.com

-and-

Allison M. Brown (NY 4195400)
(Admitted *pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Manhattan West
New York, New York 10001
Telephone:  (212) 735-3222
allison.brown@skadden.com

PROPOSED ATTORNEYS FOR DEBTOR

NAI-1540670946

**<u>Certificate of Service</u>**

I certify that on October 2, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtor's claims, noticing, and solicitation agent.

*/s/ John F. Higgins*
John F. Higgins