**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC LLC,[1] | Case No. 24-90505 (CML) |
| Debtor. |  |

**MOTION OF THE COALITION OF COUNSEL FOR**
**JUSTICE FOR TALC CLAIMANTS FOR ENTRY OF AN**
**ORDER DESIGNATING VOTES PURSUANT TO 11 U.S.C. § 1126(e)**

> **THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING. REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

The Coalition of Counsel for Justice for Talc Claimants (the "Coalition"),[2] by and through

its counsel, respectfully submits this motion (the "Motion") seeking entry of an order substantially

in the form attached hereto as **Exhibit A** (the "Order"), pursuant to sections 105(a) and 1126(e) of

the Bankruptcy Code designating the votes of all alleged claimants who voted in favor of the

---

[1]    The last four digits of the Debtor's federal tax identification number are 8508. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

[2]    The Coalition includes Ashcraft & Gerel, LLP; Beasley Allen Crow Methvin Portis & Miles, PC; Golomb Legal, PC; Levin Sedran & Berman, LLP; Levin, Papantonio, Proctor, Buchanan, O'Brien, Barr, Mougey, PA; and Robinson Calcagnie, Inc.

*Prepackaged Chapter 11 Plan of Reorganization of the Debtor* (the "Plan"),[3] and to disallow such votes for purposes of determining whether the requirements of section 524(g)(2)(B)(ii)(IV)(bb) (acceptance by 75% in number) and section 1126(c) (acceptance by two-thirds in amount) have been satisfied.[4]

## DISCOVERY

1.      The Coalition reserves the right to conduct discovery in connection with this contested matter in accordance with Bankruptcy Rule 9014(c) and to supplement this Motion upon the completion of discovery.  Subject to the foregoing, and in support of this Motion, the Coalition respectfully states as follows:

## INTRODUCTION

2.      The Disclosure Statement contains false and misleading information and omits material information regarding the Plan.  Section 1126(e) of the Bankruptcy Code provides for the designation of votes that are "not solicited" in "accordance with the provisions of" the Bankruptcy Code, including the requirement that a plan be solicited after the disclosure of "adequate information" to claimants who are eligible to vote.  *See* 11 U.S.C. §§ 1126(e), 1126(b) & 1125(a). Here, J&J failed to provide "adequate information" in its pre-filing Disclosure Statement.  This means that *all* votes in favor of J&J's plan must be designated.

3.      Soliciting votes using false and misleading information is itself fatal to any bankruptcy case where votes are solicited prior to filing and before a Court has approved a

---

[3]     Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the *Prepackaged Chapter 11 Plan of Reorganization of the Debtor* (the "Plan").

[4]     The Coalition has moved to dismiss this bankruptcy on the ground that the Debtor's case was filed in bad faith.  Until such time as this case is dismissed, and with a complete reservation of its rights to continue to seek dismissal of this case and all other appropriate relief, the Coalition proceeds to participate in this bad faith bankruptcy to ensure that its constituents' rights are protected, most importantly, with respect to any effort to confirm a plan that forever denies claimants the right and ability to seek and receive fair and equitable compensation in Courts from J&J and other non-debtors.

disclosure statement as containing adequate information.  But J&J's bad faith goes beyond soliciting votes using false and misleading information.

4.      To create the *illusion* of creditor support, J&J solicited and procured votes in favor of its Plan from holders of **non-compensable** "claims."  These "claims" are known by J&J (and the law firms that represent the claimants) to be non-compensable in the tort system—*i.e.*, they are "claims" that could not survive a motion for summary judgment, and they are "claims" for which J&J has refused to pay anything outside of bankruptcy.  That is to say that J&J and the supporting law firms essentially agree that there is no scientific support for these "claims"—*i.e.*, they do not give rise to a "right to payment," and they are "unenforceable" under "applicable law." *See* 11 U.S.C. § 101(5)(A); 11 U.S.C. § 502(b)(1).

5.      They are not "claims" in any traditional bankruptcy sense.  If reflected in a filed proof of claim and subject to an objection, these "claims" would be disallowed for all purposes, including for purposes of voting and distribution.  Yet, most of the alleged support for J&J's Plan comes from holders of non-compensable talc claims, many of whom have been promised $1,500 for their votes.  Additional support for J&J's Plan comes largely from holders of Settled Claims (defined below) who may have no economic interest in this case at all.

6.      In the Disclosure Statement, the Debtor asserts that "[a]s of the filing of the 2021 Chapter 11 Case, there were approximately **40,000** pending lawsuits asserting ovarian cancer claims" against LTL."  Disclosure Statement at § 2.2(a) (emphasis added).[5]

---

[5]    The Disclosure Statement is inaccurate—there are unfiled cases that are legitimate ovarian cancer claims and there are a substantial number of filed cases that would likely not meet the qualifying criteria.  However, taking the Disclosure Statement's 40,000 number at face value, this suggests that 53,522 claimants (or more) who voted on the Plan likely hold non-compensable claims.

7.     But the Voting Declaration, the Debtor asserts that **93,522** claimants voted on its Plan.  *See* Voting Declaration (Dkt. No. 47) at 1060 of 1062.[6]  But if there are only **40,000** talc claims involving ovarian cancer, and **93,522** claimants voted on J&J's Plan, a logical question is: what is the basis for the **53,522** claims that appeared since J&J's first manufactured bankruptcy case?  Where did J&J find tens of thousands of "claimants" willing to support its objectives?

8.     The answer appears to be from holders of non-compensable Gynecological Claims (defined below) and holders of Settled Claims (defined below).

9.     J&J has been careful not to disclose any information regarding the claimant who alleged voted in favor of its Plan.  Upon information and belief, more than half of the claimants who voted on J&J's Plan hold non-compensable claims, and more than half the alleged claimants who voted to accept J&J's Plan do not hold compensable claims.

10.     To get to 75%, J&J went out and effectively bought votes.  J&J agreed to pay claimants with non-compensable claims Gynecological Claims $1,500 to vote in favor of a Plan that strips the holders of Ovarian Claims of their legal, equitable, and Constitutional right to seek compensation from J&J for their injuries.

11.     The terms of the Debtor's Funding Agreement also suggest that law firms that have already "settled" their clients' claims (and will cause their clients to vote in favor of the Plan) will still get paid even if J&J's latest scheme is challenged and thrown out of Court (the "Settled Claims").  *See* Disclosure Statement at § 4.2(f)(2)(i).  These claimants get to "vote" on the Plan, but they do not appear to have an economic interest in the case.

---

[6]    The Voting Declaration misstates the actual voting results.  *See* Dkt. No. 257.  Less than 75% of the claimants who voted on the Plan voted to accept it.  *Id.*  The number of claimants who voted to accept the Plan appears to be approximately 66,564 and not the 77,998 stated in the Voting Declaration.  *Id.*

12.     The Bankruptcy Code does not permit this.  Section 1126(e) of the Bankruptcy Code authorizes a Court, on request of a party in interest, and after notice and a hearing, to designate or disallow the vote of a claimant "whose acceptance or rejection of such plan was not in good faith," or where the vote was "not solicited or procured in good faith" and in accordance with the provisions of title 11.  11 U.S.C. § 1126(e).  Here, the votes of alleged claimants who voted in favor of J&J's Plan must be designated and disallowed for purposes of determining whether the requirements of sections 524(g) and 1126(c) have been met for three reasons.

13.     ***First***, it is bad faith for a holder of a non-compensable claim to appear in a bankruptcy case, effectively demand a payoff, and then vote in favor of a Plan based upon a willingness of the Debtor to acquiesce to that demand.  Claimants who hold Gynecological Claims should not be offering to help J&J strip women who hold Ovarian Claims of their legal, equitable, and Constitutionals rights in exchange for a $1,500 payoff.  Likewise, claimants who have already settled and have no economic stake in this case should not be appearing and offering to aid J&J in its unlawful objective.

14.     ***Second***, it is bad faith for J&J to solicit votes from claimants who hold non-compensable claims or who have not suffered any injury.  And it is bad faith to solicit votes from parties that have in substance already settled their claims and are assured of payment.  J&J is trying to use a rigged election to strip dying women of their legal, equitable, and Constitutional right to seek fair and just compensation from J&J.  The Bankruptcy Code, including section 524(g), was never designed to permit anything like this to happen.[7]

---

[7]   If the Bankruptcy Code and the Bankruptcy Rules are followed here, and all claim holders are required to file proofs of claim that can be the subject of an objection under section 502(b), the Gynecological Claims will likely be disallowed as unenforceable under applicable law for purposes of voting **and** distribution.  If this occurs, J&J will have misled the claimants who voted in favor of J&J's Plan based on the belief that they would get $1,500 payment for doing so.

15.     ***Third***, it is bad faith for J&J to solicit votes using false and misleading information. J&J solicited votes by using false and misleading information regarding the state of litigation in the tort system, likely claim recoveries, analysis performed by plan supporters, and the overall impact and intended effect of plan confirmation.  It follows that all affirmative votes in favor of J&J's Plan should be designated and disallowed for voting purposes.

16.     For these reasons, and the other reasons set forth in the Coalition's first day pleadings, there is ample cause here for the Court to designate votes.  If the Court were to grant such relief, this case would effectively end since J&J could not claim to enjoy the support of over 75% of the talc claimants whose claims are to be addressed by the plan trust.

17.     J&J's third bankruptcy case fails for a host of reasons, including the fact that it manufactured yet another made-for-bankruptcy entity in a feeble and shameful attempt to abuse the bankruptcy system and seek a discharge of its own, independent tort liability.  But this Court need only hold that a claimant must hold a real claim to vote to put an end to J&J's third bankruptcy case.  By this Motion, the Coalition seeks this relief.

## BACKGROUND

18.     There are three types of talc claims that are compensable:  Mesothelioma Claims, Lung Cancer Claims, and Ovarian Claims.  Mesothelioma Claims are personal injury talc claims involving mesothelioma—*i.e.*, a type of cancer caused by exposure to asbestos that develops in the thin layer of tissue that covers many of the internal organs, including the lining of the lungs and chest wall, abdomen, heart, and testes.  This is what is referred to as a "Mesothelioma Claim."

19.     Mesothelioma is caused by exposure to asbestos, including (as has been found by juries) exposure to J&J's talc products.  Since 2018, J&J has suffered multiple defeats in the tort system when it comes to Mesothelioma Claims—*see*, *e.g.*, Anderson ($22.75 million), Leavitt ($29

million), Schmitz ($12 million), Barden ($787 million for 4 plaintiffs, including $750 million in punitive damages), Cabibi ($12 million), Moure-Cabrera ($6.22 million), Prudencio ($25.5 million), Johnson ($27.5 million), Valadez ($18.8 million), Garcia ($45 million), and Lee ($260 million). Eleven straight juries have found J&J liable for mesothelioma caused by its talc products, including recent verdicts in California,[8] Illinois,[9] and Oregon.[10]

20.     In addition, on August 15, 2024, a jury found J&J liable for Lung Cancer caused by its talc products.[11]  The jury awarded the plaintiff—Michael Perry and his family—$32.6 million in compensatory damages and another $30.7 million in punitive damages.  Testimony at the trial showed that J&J knew as early as 1970 that its talc-based products contained asbestos, but kept the product on the market, recalling it only after FDA testing in 2019 found asbestos in a sample.

21.     But Mesothelioma Claims and Lung Cancer Claims are **not** part of this bankruptcy case.  After J&J's second bankruptcy case was dismissed for cause, J&J settled with a substantial number of claimants who assert Mesothelioma Claims.  J&J settled them outside of bankruptcy.

22.     Red River, J&J's newest made-for-bankruptcy entity, was structured to exclude Mesothelioma Claims and Lung Cancer Claims.  *See* Plan at § 1.1.135 (excluding Mesothelioma

---

[8]    Brendan Pierson, *J&J must pay $18.8 million to California Cancer Patient in Baby Powder Suit*, Reuters, July 18, 2023, https://www.reuters.com/legal/jj-must-pay-188-mln-california-cancer-patient-baby-powder-suit-2023-07-18/.  *See* Beville Decl. [Dkt. No. 42] at Ex. 36.

[9]    Cailey Gleeson, *Court Orders Johnson & Johnson and Kenvue to pay $45 million in Talcum Baby Powder Lawsuit*, Apr. 22, 2024, https://www.forbes.com/sites/caileygleeson/2024/04/20/court-orders-johnson--johnson-and-kenvue-to-pay-45-million-in-talcum-baby-powder-lawsuit/.  *See* Beville Decl. [Dkt. No. 42] at Ex. 35.

[10]   Brendan Pierson, *J&J must pay $260 million in latest talc trial, Oregon jury says*, Reuters, June 4, 2024, https://www.reuters.com/legal/jj-must-pay-260-million-latest-talc-trial-oregon-jury-says-2024-06-04/.  *See* Beville Decl. [Dkt. No. 42] at Ex. 37.

[11]   BeLynn Hollers, *South Carolina Jury Awards $63.4 Million to Johnson & Johnson Asbestos Victim*, Business Wire August 15, 2024, https://www.businesswire.com/news/home/20240815967067/en/South-Carolina-Jury-Awards-63.4-Million-to-Johnson-Johnson-Asbestos-Victim.  *See* Beville Decl. [Dkt. No. 42] at Ex. 38.

Claims and Lung Cancer Claims from the definition of Talc Personal Injury Claim). J&J apparently reached the decision that it must settle these claims outside of bankruptcy—at values that reflect **consensual** settlements with claimants and at values that exceed the values J&J attempted to force them to accept in its prior bankruptcies.

23.     Ovarian Claims are personal injury talc claims involving epithelial ovarian cancer, fallopian tube cancer, or primary peritoneal cancer.[12] This is what is referred to as an "Ovarian Claim." Ovarian Claims are talc claims that have been found to have a clear link to regular or routine application of J&J's Baby Powder and/or Shower to Shower to the genital area by females. These are talc claims that Courts have found have scientific support sufficient to get past summary judgment and for submission to a jury for consideration.[13] And these are talc claims for which J&J has been held liable in the tort system and which J&J has settled outside of bankruptcy.[14]

---

[12]   The scientific literature describes, and it is generally understood, that epithelial ovarian cancer, fallopian tube cancer and primary peritoneal cancer all fall within the same category of cancer (*i.e.*, epithelial ovarian cancer) and share the same pathogenesis. *See* Levanon, et al., *New Insights Into the Pathogenesis of Serous Ovarian Cancer and Its Clinical Impact.* J CLIN ONCOL 26:5284-5293 (2008). A causal connection between the genital application of talcum powder and epithelial ovarian cancer is supported for the following histologic subtypes: serous, endometrioid, clear cell, undifferentiated, mixed, serous borderline and endometrioid borderline.

[13]   *See In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Litigation*, 509 F. Supp. 3d 116, 181 (D. N.J. Apr. 27, 2020). The *Daubert* briefing in the MDL proceeding focused solely on ovarian cancer. Plaintiffs' experts specifically limited their opinions to epithelial ovarian cancer, which added strength to their scientific conclusions. J&J did not substantively discuss non-ovarian gynecological cancers, except to assert that talc "does not" cause "vaginal, cervical, [or] endometrial cancer." *Defendants' Memorandum of Law in Support of Motion to Exclude Plaintiffs' Experts' General Causation Opinions*, No. 3:16-md-02738-FLW, Doc. 9736, at 88 (D.N.J.).

[14]   *See Ingham v. Johnson & Johnson*, 608 S.W.3d 663 (Mo. App. 2020), *cert. denied*, 141 S. Ct. 2716 (2021) (highest Missouri state court sustaining $2.2 billion judgment against J&J and JJCI for 22 women alleging ovarian cancer claims, finding J&J "engaged in reprehensible conduct of its own."); *see also Echeverria v. Johnson & Johnson (Johnson & Johnson Talcum Powder Cases)*, 37 Cal. App. 5th 292 (Cal. Ct. App. 2019) (holding there is "substantial evidence to support" the jury's findings of general and specific causation (as against JJCI) and for compensatory damages from JJCI arising out of its breach of its duty to warn customers of the risk of ovarian cancer from use of its talc products); *accord Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Litigation*, 509 F. Supp. 3d at 181. Other state-court appellate cases upholding talc claims have similarly addressed ovarian cancer specifically. *E.g.*, *Carl v. Johnson & Johnson*, 464 N.J. Super 446, 475, 237 A.3d 308, 326 (App. Div. 2020).

24.     J&J's problem is that most women who hold Ovarian Claims do not want to be forced to accept the *de minimis* settlement payments that J&J is offering to pay them under this Plan.  They do not consent.  These women want to be able to decide for themselves whether to settle or litigate.  And these women require reasonable values to settle—values that far exceed the values J&J attempted to pay them in its prior bankruptcies and values that far exceed the values J&J is trying to force upon them in its third bankruptcy case.

25.     Rather than settling outside of bankruptcy, as J&J obviously could do, J&J decided to orchestrate a third bankruptcy that targets women who hold Ovarian Claims.  To garner support for its Plan, J&J embarked on a multi-part strategy.

26.     ***First***, J&J decided to focus on obtaining votes in favor of its plan from holders of Gynecological Claims.  Gynecological Claims are personal injury talc claims involving mucinous ovarian cancer, borderline mucinous ovarian cancers, endometrial cancer, uterine cancer, vaginal cancer, cervical cancer, germ cell ovarian cancer, small cell ovarian cancer, stromal ovarian cancer, vulvar cancer, metastatic cancer from any non-qualifying primary cancer, and benign pathology.  This is what is referred to as a "<u>Gynecological Claim</u>."

27.     Gynecological Claims are talc claims that to date have ***not*** been found to have a link to regular or routine application of J&J's Baby Powder and/or Shower to Shower to the genital area by females.  Courts have yet to find scientific support sufficient for Gynecological Claims to get past summary judgment and for submission to a jury for consideration.  These are claims that lack a scientific linkage to talc and for which J&J has not previously paid a judgment or settlement.

28.     To induce support from women who hold Gynecological Claims, J&J's Plan offers the promise of a $1,500 payment.  Under the Trust Distributions Procedures or "<u>TDPs</u>," which set forth an ***alternative*** claims allowance scheme relative to claims allowance scheme embodied in

section 502(b) of the Bankruptcy Code, Gynecological Claims will be paid $1,500 based on the "Quickpay Review Process." *See* TDPs at § 5.5.

29.     The "Quickpay Review Process" boils down to sending the Trust a document stating that the alleged claimant used J&J's talc products and was diagnosed with some type of "Gynecological Cancer," which submission is likely to receive little scrutiny in the name of "efficiency." *Id.* at § 4.6.6.  The Trust can justifiably not scrutinize these claims if doing so would cost the Trust more than the $1,500 payment.  The term "Gynecological Cancer" is defined to mean ***any*** cancer of the female gynecologic tract that is not Ovarian Cancer.  Plan at § 1.1.66.

30.     The number of women, current and future, who are eligible for a Quickpay under the TDPs is vast—approximately 4.6 to 4.8 million.  And the barrier to validation is low—*i.e.*, the claimant only needs to assert that she used J&J's talc products.

31.     Even if only half of the eligible claimants seek a Quickpay, the Trust would need to reserve between $3.45 billion to $3.6 billion of trust funding.  This means that after paying administrative claims, there will be approximately $3.7 billion (on a nominal basis) remaining to pay present and future Ovarian Claims.  The Plan, thus, places substantial value in the pockets of holders of non-compensable claims ***if and only if*** they help J&J confirm its Plan to forever silence the voices of women who contracted Ovarian Cancer due to exposure to J&J's talc products.

32.     ***Second***, J&J appears to have entered into various Master Settlement Agreements with law firms that have pledged to support J&J's bankruptcy scheme that guarantees the clients of those firms a recovery regardless of whether J&J's scheme is successful.

33.     The terms of the  New Funding Agreement suggests that certain law firms who have already "settled" their clients' claims (and will cause their clients to vote in favor of the Plan) will still get paid even if J&J's latest scheme is challenged and thrown out of Court.  *See* Disclosure

Statement at § 4.2(f)(2)(i).  Holders of the Settled Claims get to "vote" on the Plan, but they do not appear to have an economic interest in the case.

34.     In addition, the law firms that have pledged their support for J&J's third bankruptcy scheme will be rewarded with positions on the Trust Advisor Committee (the "<u>TAC</u>"), which is the governing body that will oversee the plan trust.

35.     Eight of the "Supporting Law Firms" that comprise the "Ad Hoc Committee of Supporting Counsel" each get to appoint one of the ten members of the TAC.  *See* Disclosure Statement, Ex. H, at § 5.1.  This effectively gives the settling law firms, acting as the "TAC," the ability to control how their own clients' claims are evaluated and paid.

36.     ***Third***, for good measure, J&J also solicited and is attempting to count affirmative votes cast by individuals who are not even sick or who do not have cancer.  J&J's Plan definitions bring within the definition of "Channeled Talc Personal Injury Claim" any "disease" alleged to be connected to the usage of J&J's talc products and a claim based on the "fear of cancer."[15]  Eligible voters include anyone who used J&J's talc products in the past who is afraid that someday he or she may develop cancer as a result.  They do not have to be sick.

37.     Under J&J's Plan and Trust Distribution Procedures, holders of talc claims based on the "fear of cancer," or claims based on diseases other than gynecological cancers are not entitled to receive any distribution.  J&J nonetheless treats these "claimants" as "yes" votes

---

[15]   *See* Disclosure Statement at § 9.1 (anyone who holds a "Channeled Talc Personal Injury Claim" can vote); Plan at § 1.1.23 (the definition of "Channeled Talc Personal Injury Claim" includes "Ovarian/Gynecological Talc Personal Injury Claims" and "Other Disease Talc Personal Injury Claims."); Plan at § 1.1.98 (definition of "Other Disease Talc Personal Injury Claim" includes any disease "other than Mesothelioma, Lung Cancer, Ovarian Cancer, or Gynecological Cancer" connected to the "use of talc"); Plan at § 1.1.141 (definition of "Talc Personal Injury Claim" includes a claim based on the "fear of cancer").

regardless of whether they understood that by voting "yes" they were essentially forfeiting whatever rights they have may to seek a recovery from J&J.

38.     **_Fourth_**, J&J did not solicit votes in accordance with the Bankruptcy Code.  Rather, J&J solicited votes using false and misleading information.

39.     The Disclosure Statement and supporting letters J&J used to solicit votes on its plan falsely told victims that "talc lawsuits against Old JJCI and J&J … have no valid scientific basis," that "Old JJCI's talc products never contained asbestos," and that "the safety of cosmetic-grade talc has been confirmed by dozens of peer-reviewed studies and multiple regulatory and scientific bodies for decades."  Disclosure Statement at § 2.2(a).  But each of these assertions is false.

40.     Court have uniformly found causation evidence linking exposure to J&J's talc products to ovarian cancer sufficiently reliable to submit to juries.  Multiple scientific studies have shown that J&J's talc products contained asbestos.

41.     In over 30 case-control studies, 10 meta-analyses, 3 pooled studies, and 3 prospective cohort studies since the 1980s investigating the link between talcum powder and ovarian cancer, all but 2 demonstrated an increased risk of ovarian cancer with the perineal or genital application of talcum powder.  A study published in May 2024 in the *Journal of Clinical Oncology* involving 50,884 women found that exposure to talc products during their 20s and 30s nearly double the risk of ovarian cancer.[16]

42.     And regulatory bodies have also found that J&J's talc products are not safe.  In December 2018, Health Canada, the public department of the Government of Canada,

---

[16]   Katie M O'Brien et al., *Intimate Care Products and Incidence of Hormone-Related Cancers: A Quantitative Bias Analysis*, J. OF CLINICAL ONCOLOGY, May 2024 (Beville Decl. [Dkt. No. 42] at Ex. 3).

preliminarily concluded that there was a consistent and statistically significant link between talcum powder and ovarian cancer. Despite fierce J&J lobbying, this conclusion was reaffirmed in 2021.

43.     In July 2024, a working group within the International Agency for the Research on Cancer (IARC) reclassified talc as a probable carcinogen based in part on the "strong mechanistic evidence that talc exhibits key characteristics of carcinogens, including inducing chronic inflammation and altering cell proliferation, cell death, or nutrient supply."[17] This classification was for talc only. Talc containing asbestos remains a known human carcinogen for ovarian cancer in accordance with IARC 2012.

44.     After telling victims that they have no hope of recovering in the civil justice system (which is false), J&J's sale pitch turns to promising riches and rewards if people vote "yes." J&J's solicitation materials tell claimants that their recoveries "under the Plan would **substantially exceed** recoveries claimants received in litigation in the tort system" because J&J has "prevailed" in 16 of 17 cases, and the average recovery for an Ovarian Claim under the Plan will likely be "between **$75,000 and $150,000**." LLT June 3, 2024 Letter (emphasis in original).

45.     But this is also false. The truth is that the average recovery for an Ovarian Claim will **not** be "between $75,000 and $150,000." Because of the "Quickpay" system, there will only be approximately $3.7 billion to pay the current and future Ovarian Claims. The average payment on account of an Ovarian Claim will be far less than advertised by J&J and its supporters.

46.     After promising riches and rewards if claimants vote "yes," J&J alleges that various plan supporters, including law firms and the Future Claimants' Representative herself, support the Plan, have "independently" or "separately" reviewed it, and reached the conclusion that it is "in

---

[17]   *See Carcinogenicity of Talc and Acrylonitrile*, The Lancet (July 5, 2024) (Beville Decl. [Dkt. No. 42] at Ex. 41) ("The Working Group also noted that contamination of talc products with asbestos has been documented and that industry standards used to assess talc in cosmetic and pharmaceutical products have often not been sufficiently sensitive to rule out contamination with asbestos. . . . .").

the best interest" of current and future claimants.  *See* LLT June 3, 2024 Letter.  Under J&J's marketing ploy, the plan supporters function like endorsements—*i.e.*, J&J's Plan must be great, otherwise why would these parties endorse it?

47.    But J&J offered no disclosure as to what "independently" or "separately" reviewed entailed.  The reality is most of J&J's plan supporters are strangers to talc litigation.

48.    There is no evidence that they conducted any meaningful independent review or separate analysis.  If the plan supporters did not perform any independent analysis (and simply adopted J&J's analysis as their own), that fact should have been disclosed.  And if they did perform their own analysis, the details of their investigation should have been disclosed as well.

49.    Finally, the Disclosure Statement failed to clearly inform women that if J&J's Plan is confirmed, women with Ovarian Claims will forever lose their right to appear, be heard, and seek just compensation from J&J and the other Protected Parties in the civil justice system.

50.    Rather, the Disclosure Statement attempts to soft-peddle on this topic by stating, "If the Plan is confirmed, claimants holding Channeled Talc Personal Injury Claims would no longer be required, nor generally permitted, to litigate their claims in the tort system."[18]  But the Plan does not "generally permit" women with compensable claims to sue J&J in the tort system.  It bars them from suing J&J based on injuries and death that J&J caused.

## JURISDICTION AND VENUE

51.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a) and 1126(e) of the Bankruptcy Code.

---

[18]    *See* Disclosure Statement at iv.

## RELIEF REQUESTED

52.     By this Motion, the Coalition seeks an order, pursuant to sections 105(a) and 1126(e) of the Bankruptcy Code, designating the votes of all holders of alleged claims who voted in favor of the Plan.

## ARGUMENT

53.     Pursuant to section 1126(e), the Court may designate (*i.e.*, disallow for purposes of determining whether the requisite number and amount of claims has accepted a proposed plan) any entity whose acceptance of the plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.[19]

54.     The Bankruptcy Code does not define "good faith" in connection with voting or vote solicitation.[20] However, Courts have held that the concept of good faith "is intended to allow courts to utilize their gut feelings":

> Sometimes a bankruptcy judge's nose tells him/her that something doesn't smell right and further inquiry is warranted . . . Sometimes, a bankruptcy judge's stomach may turn, when he/she is preparing to sign a particular judgment or order.  This queasiness is reflective of the judge's sense that for some, perhaps inarticulable, reason, it just isn't right to grant the relief requested. . . . In short, the reading of the law should be tempered by the judge's sense of equity-what is just in the circumstances of the case.

*In re Dow Corning Corp.*, 244 B.R. 673, 676 (Bankr. E.D. Mich. 1999) (quoting *In re Timko*, No. 87-09318 (Bankr. E.D. Mich. July 22, 1988) (unpublished)).

55.     While not exclusive, Courts have recognized two types of obvious bad faith when determining whether to designate votes under section 1126(e):  (1) the claim holder attempts to

---

[19]     *See* 11 U.S.C. § 1126(e); *Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, 97 (3d Cir. 1988) (Section 1126(e) "grants the bankruptcy court discretion to sanction any conduct that taints the voting process, whether it violates a specific provision or is in 'bad faith.'").

[20]     *See In re Dune Deck Owners Corp.*, 175 B.R. 839, 844 (Bankr. S.D.N.Y. 1995).

extract or extort a personal advantage not available to other creditors in its class, and (2) the creditor has an ulterior motive, such as to procure some collateral or competitive advantage that does not relate to its claim.[21]  If the claimant votes to approve or reject a plan to further an interest unrelated to the treatment of its claim against the debtor in the bankruptcy, such ulterior motive subjects the creditor's vote to disallowance.[22]

56.     Section 1126(e) allows courts to designate a vote because of solicitation or any other conduct that taints or defiles the voting process or is in bad faith.[23]  Courts have held that purchases of a creditor's claim or its vote to accept or reject a plan may constitute bad faith solicitation, meriting vote designation.[24]  Courts frequently find bad faith where the entity purchasing the claim or vote is a proponent of the plan.[25]  And Courts have rejected attempts by

---

[21]  *Dune Deck*, 175 B.R. at 844; *see In re Landing Assocs., Ltd*., 157 B.R. 791, 807 (Bankr. W.D. Tex. 1993) ("[O]ne who casts a vote with the 'ulterior purpose' of exacting for oneself an undue advantage can have that vote subjected to designation.") (internal citation omitted).

[22]  *Landing Assocs*., 157 B.R. at 807 ("[W]hen the voting process is being used as a device with which to accomplish some ulterior purpose, out of keeping with the purpose of the reorganization process itself, and only incidentally related to the creditor's status *qua* creditor, section 1126(e) is rightly invoked."); *accord Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (In re Figter Ltd.)*, 118 F.3d 635, 639 (9th Cir. 1997) ("It is always necessary to keep in mind the difference between a creditor's interest as a creditor and a motive which is ulterior to the purpose of protecting a creditor's interest."); *Dune Deck*, 175 B.R. at 845 ("[W]here the record contains evidence that the creditor has voted without regard to the treatment of its claim, but instead, to achieve some benefit or goal inconsistent with interests of the estate and its creditors, the Court must inquire into those motives in order to preserve the integrity of the Chapter 11 process.").

[23]  *See In re Gilbert*, 104 B.R. 206, 214 (Bankr. W.D. Mo. 1989) (citing *Century Glove*, 860 F.2d at 97).

[24]  *See, e.g.*, *In re Featherworks Corp.*, 36 B.R. 460, 463 (E.D.N.Y. 1984) (purchase of a vote constitutes bad faith solicitation); *In re Wiston XXIV Ltd. P'ship*, 153 B.R. 322, 324-26 (D. Kan. 1993) (where secured creditor agreed to forgive $80,000 in improper transfers and pay a creditor $150,000 to release its unlikely and suspect remaining rights in equipment, contingent upon creditor voting against plan confirmation, this constituted bad faith solicitation).

[25]  *See, e.g.*, *In re Applegate Property, Ltd*., 133 B.R. 827 (W.D. Tex. 1991) (finding bad faith; claim purchases resulted in discrimination in favor of those creditors whose interests were purchased because they were paid in full immediately, well prior to confirmation of the plan); *In re Allegheny Int'l, Inc*., 118 B.R. 282, 296 (Bankr. W.D. Pa. 1990) (plan proponent's strategic purchases of exactly enough claims to block confirmation of competing plan and advance the proponent's position "is not acceptable and constitutes at least bad faith, if not an unlawful act, in the pursuit of confirmation of its plan"); *see also* James F. Queenan, Jr. et al., *Chapter 11 Theory and Practice* § 30.25 (1994) ("A party who is a

---

insiders of the debtor to pay claimants in order to secure the votes necessary for approval of a debtor's plan.[26]  For the reasons described below, all votes cast by the holders of alleged claims who voted in favor of the Plan should be designated pursuant to section 1126(e).

### I.     The Votes of Holders of Gynecological Claims and Settled Claims in Favor of J&J's Plan Were Cast in Bad Faith

57.     The votes of holders of Gynecological Claims and Settled Claims in favor of the Plan should be designated pursuant to section 1126(e) of the Bankruptcy Code because they were not cast in good faith.  Gynecological Claims are not "claims" in any traditional bankruptcy sense. There is no scientific support for these claims.  They do not give rise to a "right to payment," and they are "unenforceable" under "applicable law."  *See* 11 U.S.C. § 101(5)(A); 11 U.S.C. § 502(b)(1).  If reflected in a filed proof of claim and subject to an objection, these "claims" would be disallowed for all purposes, including for purposes of voting and distribution.

58.     Since Gynecological Claims are not compensable claims, it follows that the holders of Gynecological Claims acted with non-creditor purpose or an ulterior motive.  Every law firm that represents holders of non-compensable Gynecological Claims knew that J&J has not and will not settle with them outside of a bankruptcy settlement that forever silences women who hold

---

plan proponent should be prohibited from purchasing claims because of the inconsistency between the payments made in the purchases and the payments proposed under the plan.").

[26]  *See*, *e.g*., *In re Machne Menachem, Inc*., 2007 WL 1157015, at *2 (3d Cir. Apr. 19, 2007) (affirming denial of confirmation where an insider of the debtor had purchased four claims in order to secure acceptance of the debtor's plan); *Zentak GBV Fund IV, LLC v. Vesper*, 2001 WL 1032217, at *246-47 (6th Cir. Aug. 29, 2001) (insider's purchase of claims was in bad faith and votes were appropriately designated); *In re Holly Knoll P'ship*, 167 B.R. 381, 389 (Bankr. E.D. Pa. 1994) (insider of the debtor acted in bad faith where it purchased claim, not to protect its rights as a creditor, but rather to ensure confirmation of the plan); *Applegate*, 133 B.R. at 835 (insider's purchase of claims against the debtor in order to block competing plan and ensure confirmability of own plan "cannot, as a matter of law, be in good faith."); *see also Figter*, 118 F.3d at 639 ("[W]hen the debtor had claims against itself purchased by an insider or affiliate for the purpose of blocking a plan, or fostering one, that was seen as a badge of bad faith.").

compensable Ovarian Claims. Every law firm that represents holders of non-compensable Gynecological Claims knew the requirements of section 524(g).

59. It is bad faith for a holder of a non-compensable Gynecological Claim to engage in a bankruptcy case, demand a payoff (*i.e.*, pay me $1,500 even though I do not hold a compensable claim), and then vote in favor of a Plan based upon a willingness of the Debtor to acquiesce to that demand so that J&J can seek a discharge of its own independent talc liability and attempt to bind holders of Ovarian Claims to inferior recoveries relative to what they can recover in the tort system. Claimants who hold Gynecological Claims should not be offering to help J&J strip women who hold Ovarian Claims of their legal, equitable, and Constitutionals rights in exchange for a $1,500 pay off.

60. Likewise, claimants who have already settled and have no economic stake are complicit in efforts to aid J&J in its unlawful objective. Section 1126(e) permits the Court to look at the substance of the Master Settlement Agreements, the newest Funding Agreement, and the legal entity that is "Red River" and determine if parties to these agreements should be permitted to vote on J&J's Plan. If they have no economic interest in this case, there is no reason why their votes should not be designated.

61. It is bad faith for anyone who has not suffered an injury and does not hold a compensable Ovarian Claim to vote on J&J's Plan. The acceptance of J&J's Plan by such parties was not in good faith, and their votes should be designated pursuant to section 1126(e).

## II.     J&J's Conduct Is Tantamount to Vote Purchasing

62. J&J's conduct is tantamount to vote purchasing, which further supports the designation of votes cast in favor of J&J's Plan. J&J is offering to pay $1,500 for each Gynecological Claim even though J&J knows that the holders of Gynecological Claims would

receive nothing under the Code's claims allowance provisions.  And law firms that represent such claims and have pledged their support for J&J's plan will be rewarded with positions on the TAC.

63.     J&J may argue that it did not attempt to "buy" any votes—as the holders of non-compensable claims at all times allegedly remained "free" to vote in whatever manner they deemed appropriate—such a position is wholly untenable.  When determining whether payment or a promise of payment is intended to purchase a claimant's vote, Courts look beyond the contested or alleged intent of the parties to determine their true purpose.  *See*, *e.g.*, *Featherworks*, 36 B.R. at 463; *Wiston*, 153 B.R. at 324-26.

64.     Here, the bargained for consideration for J&J's payments under the Plan is the rights of women with compensable claims (current and future) to appear, be heard, and seek compensation from J&J for their injuries in the civil justice system.  Their rights are being monetized so that holders of non-compensable claims can be paid.

65.     If J&J wanted to pay off all the holders of Gynecological Claims who voted in favor of the Plan, it could do so outside of bankruptcy by simply writing a check.  It would likely cost far less for J&J to do so relative to the amount J&J spent settling with holders of Mesothelioma Claims after its second bankruptcy case was dismissed.

66.     But J&J's payment to the holders of Gynecological Claims is expressly conditioned on the entry of a final, non-appealable order granting J&J and thousands of other parties a discharge of their talc liability.  *See* Plan at § 8.2.  Soliciting votes in this manner is bad faith.  Given how Red River was constructed, it was bad faith for J&J to have solicited votes from anyone who had not suffered an injury and who does not hold a compensable Ovarian Claim.

### III.    J&J Did Not Solicit Votes in Good Faith

67.    Section 1126(e) provides for the designation of votes that are "not solicited" in "accordance with the provisions of" the Bankruptcy Code.  11 U.S.C. § 1126(e).  Pursuant to Section 1126(b), a holder of a claim that has accepted the plan before the commencement of the case is deemed to have accepted such plan only if "such acceptance . . . was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title." *See* 11 U.S.C. § 1126(b); *see also* Fed. R. Bankr. P. 3018(b).

68.    Section 1125(a)(1) defines "adequate information" to require "information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan."  *See* 11 U.S.C. § 1125(a)(1).

69.    Where a prepetition solicitation of a creditor's vote provides insufficient information to the creditor, it fails to satisfy section 1126(b).  *See*, *e.g.*, *In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*, 177 B.R. 684, 689-90 (Bankr. D. Colo. 1995).  And the failure to satisfy section 1126(b) is grounds to designate votes under section 1126(e).

70.    Here, J&J's prepetition solicitation of votes not only failed to provide adequate information, but J&J sought to affirmatively mislead claimants.

71.    Claimants could have read the Disclosure Statement and supporting letters and reached the conclusions that (1) all talc lawsuits against J&J "have no valid scientific basis," (2) J&J's talc products "never contained asbestos," (3) the "safety of cosmetic grade talc" has been confirmed by "regulatory and scientific bodies," (4) the recoveries available under the Plan "substantially exceed" recoveries available in the tort system, (5) J&J has prevailed on the merits

20

in "16 of the last 17 cases" to go to trial, (6) the average recovery for an Ovarian Claims under the Plan will be between "$75,000 and $150,000," and (7) the plan supporters conducted an independent and separate analysis and reached the conclusion that the Plan is "in the best interest" of current and future claimants.  *See* Disclosure Statement at §§ 1.1(c) & 2.2; LLT June 3, 2024 Letter.

72. ***But none of this is true***.  Any claimant who reviewed the Disclosure Statement or the supporting letters and reached any one of these conclusions was misled, which means that their votes in favor of the Plan should be designated under section 1126(e).

73. **Ovarian Claims Against J&J Have a Valid Scientific Basis**.  In fact, this is the reason why J&J orchestrated two failed bankruptcy cases and this third bankruptcy case.  J&J is terrified of the fact that its talc products contained asbestos, and that asbestos causes ovarian cancer (as well as mesothelioma).  Courts have uniformly found causation evidence linking exposure to J&J's talc products to ovarian cancer sufficiently reliable to submit to juries.  J&J has spent a fortune on bankruptcy professionals and keeps orchestrating one fraudulent bankruptcy case after another in a desperate attempt to avoid the civil justice system.

74. **J&J's Talc Products Did Contain Asbestos**.  This is why J&J has lost case after case in the tort system, including recent verdicts in California, Illinois, Oregon, and South Carolina.  Mesothelioma is only caused by exposure to asbestos.  Every time J&J loses a case involving mesothelioma and lung cancer, it does so because of the overwhelming evidence that J&J's talc products contained ***asbestos***.

75. **Regulatory and Scientific Bodies Have Found that Cosmetic Talc Is Not Safe**.  A study published in May 2024 in the *Journal of Clinical Oncology* involving 50,884 women found that exposure to talc products increases the risk of ovarian cancer, and in many instances

nearly doubles the risk.[27]   Regulatory agencies have reached the same conclusion,[28] as have other scientists.[29]   There is a reason why J&J has discontinued the sale of talc products—they are dangerous, and they can cause death.

76.   **The Recoveries Available under J&J's Plan Are Substantially Less Than the Recoveries Available in the Tort System**.  No company has ever filed for bankruptcy because it wanted to pay tort victims more money.  To believe that J&J is the first and only exception to this statement is delusional.  J&J is trying to use a manufactured bankruptcy case to force the women it poisoned to accept *de minimis* payments—far less than the compensation they would receive outside of bankruptcy where their consent is required for settlement.

77.   This Court need look no further than the failed bankruptcy attempted by 3M in 2022.   Facing significant liability for its sale of defective earplugs, 3M placed one of its subsidiaries into bankruptcy and attempted to consummate a global settlement that would have discharged 3M of its own tort liability.   3M asserted that the $1 billion settlement that it was offering to pay was "only" possible if consummated inside of a bankruptcy proceeding.[30]

78.   But after its subsidiary's bankruptcy case was dismissed for cause, *see In re Aearo Techs., LLC*, Case No. 22-02890-JJG-11, 2023 WL 3938436 (Bankr. S.D. Ind. June 9, 2023), 3M quickly settled for $6 billion outside of bankruptcy.   Not only did this prove that 3M's

---

[27]   *See* Katie M. O'Brien, *et al., Intimate Care Products and Incidence of Hormone-Related Cancers: A Quantitative Bias Analysis*, J. CLIN. ONCOLOGY (2024) (Beville Decl. [Dkt. No. 42] at Ex. 3).

[28]   *See* Screening Assessment, Environmental and Climate Change Canada, Apr. 2021, at 36; *supra* ¶ 43.

[29]   *See* Penninkilampi et al., *Perineal Talc Use and Ovarian Cancer: A Systemic Review and Meta-Analysis*, 29 Epidemology 41 (2018); Berge, et al., *Genital Use of Talc and Risk of Ovarian Cancer: A Meta-Analysis*, 27 European J. Cancer Prev. 248 (2018); Taher et al., *Critical Review of the Association between Perineal Use of Talc Powder and Risk of Ovarian Cancer*, 90 Reproductive Toxicology 88 (2019); O'Brien et al., *Association of Powder Use in the Genital Area with Risk of Ovarian Cancer*, 323 JAMA 49 (2020); O'Brien et al., Supplementary Online Content (2020).

[30]   *See In re Aearo Techs. LLC*, Case No. 22-02890-JJG-11 (Bankr. S.D. Ind. July 26, 2022) (Dkt. No. 12) (Informational Brief of Aearo Technologies LLC at Section V).

representations about how settlement was "only" possible in bankruptcy were false, but it also showed the magnitude of the discount 3M hoped to achieve—*i.e.*, $5 billion—by leveraging the tools available in bankruptcy to suppress the value of valid tort claims.

79.     J&J knows that the recoveries available under its Plan are substantially less than the recoveries available in the tort system.  The purpose of this bankruptcy case is for J&J—a wealthy and highly solvent Fortune 50 company—to resolve its own tort liability for a fraction of the amount it should pay in the civil justice system.

80.     **J&J Has Not Prevailed on the Merits in 16 of the Last 17 Cases**.  J&J has lost on the merits in recent cases but managed to get several verdicts reversed on appeal on procedural grounds.  The tide has turned against J&J.  Juries have seen the evidence regarding ***when*** J&J first knew that its products contained asbestos, and the steps taken by J&J to ***conceal*** this information from regulators and the public.  J&J is afraid to face the women it harmed because it knows that it will not prevail any longer.  Companies that believe that they can prevail on the merits do not orchestrate fraudulent transfers, create fake debtors, and file serial bad faith bankruptcy cases.

81.     **The Average Recovery for an Ovarian Claim Is Less Than Advertised**.  The average recovery advertised by J&J is mathematically impossible.  Any woman who contracts a gynecological cancer and is willing to sign a declaration stating that she was exposed to J&J's talc products is eligible for a $1,500 payment under J&J's Plan.  Given the number of current and future claimants who qualify for this award, J&J's payments (to be made over the next 25 years) do not provide funding sufficient to reach the $75,000 to $150,000 promised by J&J for holders of Ovarian Claims.

82.     **There Is No Evidence that the Plan Supporters Conducted Any Independent or Separate Analysis**.  Rather, all indications are that they simply agreed to support J&J's Plan

(based on J&J's "analysis") so long as their clients get paid and/or they reap the benefits of participating in the trust as members of the TAC or the Future Claimants' Representative.

83.     Would a woman who was presented with complete and accurate information vote to accept J&J's Plan?  Even if she had a non-ovarian gynecological claim, would she knowingly collect a check for $1,500 if it meant that other women suffering or dying from cancer would be silenced and deprived of their legal, equitable, and Constitutional rights?  J&J's orchestrated disclosure of false and misleading facts coupled with the egregious solicitation scheme deprives the right of every individual to claim protection of the laws whenever she receives an injury.  J&J has no right to deprive women of their rights.  The votes in favor of J&J's Plan must be designated.

## NOTICE

84.     Notice of this Motion has been served on:  (a) the U.S. Trustee; (b) counsel to the Debtor; and (c) all persons who have formally appeared in this chapter 11 case and requested service pursuant to Bankruptcy Rule 2002.  Considering the nature of the relief requested herein, the Coalition respectfully submits that no other or further notice need be provided.

## NO PRIOR REQUEST

85.     No prior request for the relief sought in this Motion has been made to this or any other Court in connection with this case.

## CONCLUSION

86.     **WHEREFORE**, based on the foregoing, the Coalition respectfully requests that the Court grant the Motion and grant such other and further relief as the Court deems necessary and appropriate.

Dated:  October 15, 2024

Respectfully submitted,

**STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, PC**

/s/ *Sander L. Esserman*
Sander L. Esserman
State Bar No. 06671500
Peter C. D'Apice
State Bar No. 05377783
2323 Bryan Street, Ste. 2200
Dallas, TX 75201-2689
Telephone:     (214) 969-4900
Facsimile:     (214) 969-4999
Email:          esserman@sbep-law.com
                    dapice@sbep-law.com

-AND-

**BROWN RUDNICK LLP**

David J. Molton (*pro hac vice*)
Jeffrey L. Jonas (*pro hac vice*)
Eric R. Goodman (*pro hac vice*)
Gerard T. Cicero (*pro hac vice*)
Susan Sieger-Grimm (*pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone:     (212) 209-4800
Facsimile:     (212) 209-4801
Email:          dmolton@brownrudnick.com
                    jjonas@brownrudnick.com
                    egoodman@brownrudnick.com
                    gcicero @brownrudnick.com
                    ssieger-grimm@brownrudnick.com

-AND-

**OTTERBOURG P.C.**

Melanie L. Cyganowski (*pro hac vice*)
Adam C. Silverstein (*pro hac vice*)
Sunni P. Beville (*pro hac vice*)
Jennifer S. Feeney (*pro hac vice*)
230 Park Avenue
New York, NY 10169
Telephone:     (212) 661-9100
Facsimile:     (212) 682-6104

Email:          mcyganowski@otterbourg.com
                asilverstein@ otterbourg.com
                sbeville@ otterbourg.com
                jfeeney@ otterbourg.com

**CO-COUNSEL FOR THE COALITION OF
COUNSEL FOR JUSTICE FOR TALC
CLAIMANTS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 15, 2024, I caused a true and correct copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Peter C. D'Apice*
Peter C. D'Apice