**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC LLC,[1] | Case No. 24-90505 (CML) |
| Debtor. | |

**MOTION OF THE COALITION OF COUNSEL FOR JUSTICE**
**FOR TALC CLAIMANTS FOR ENTRY OF AN ORDER REINSTATING**
**VOTES IMPROPERLY MODIFIED BY THE SMITH LAW FIRM PLLC**

> **THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.  UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.  REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

The Coalition of Counsel for Justice for Talc Claimants (the "Coalition"),[2] by and through

its counsel, respectfully submits this motion (the "Motion") seeking entry of an order substantially

in the form attached hereto as **Exhibit A** (the "Order") reinstating votes improperly modified by

the Smith Law Firm PLLC (the "Smith Firm") pursuant to sections 105(a) and 1126(a) of the

---

[1]   The last four digits of the Debtor's federal tax identification number are 8508.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

[2]   The Coalition includes Ashcraft & Gerel, LLP; Beasley Allen Crow Methvin Portis & Miles, PC; Golomb Legal, PC; Levin Sedran & Berman, LLP; Levin, Papantonio, Proctor, Buchanan, O'Brien, Barr, Mougey, PA; and Robinson Calcagnie, Inc.

Bankruptcy Code and Bankruptcy Rule 3018(a), or in the alternative, designating the votes improperly cast by Smith Firm pursuant to section 1126(e) of the Bankruptcy Code.[3]

## DISCOVERY

1.      The Coalition reserves the right to conduct discovery in connection with this contested matter in accordance with Bankruptcy Rule 9014(c) and to supplement this Motion upon the completion of discovery.  Subject to the foregoing, and in support of this Motion, the Coalition respectfully states as follows:

## INTRODUCTION

2.      J&J and LTL solicited votes for the Debtor's *Prepackaged Chapter 11 Plan of Reorganization of the Debtor* (the "Plan").  The solicitation had a July 26, 2024, voting deadline (the "Voting Deadline").  When the Voting Deadline passed, the solicitation failed to achieve the 75% affirmative threshold required for a channeling injunction under section 524(g) of the Bankruptcy Code,[4] even assuming that holders of non-compensable claims are entitled to vote in this case.[5]

---

[3]     The Coalition has moved to dismiss this bankruptcy on the ground that the Debtor's case was filed in bad faith.  Until such time as this case is dismissed, and with a complete reservation of its rights to continue to seek dismissal of this case and all other appropriate relief, the Coalition proceeds to participate in this bad faith bankruptcy to ensure that its constituents' rights are protected, most importantly, with respect to any effort to confirm a plan that forever denies claimants the right and ability to seek and receive fair and equitable compensation in Courts from J&J and other non-debtors.

[4]     **Exhibit B**, attached hereto, shows the calculation of the voting results as of the July 26, 2024 Voting Deadline using the numbers disclosed in the *Declaration of Stephanie Kjontvedt of Epiq Corporate Restructuring, LLC, Regarding the Solicitation and Tabulation of Ballots Case on the Prepackaged Chapter 11 Plan of Reorganization of the Debtor* (Dkt. No. 47) (the "Voting Declaration").

[5]     Epiq contends that 83%—or 77,998 out of 93,522—of the current claimants voted to "accept" the Plan. *See* Voting Declaration at 1060 of 1062.  But according to the Disclosure Statement, "[a]s of the filing of the 2021 Chapter 11 Case, there were approximately 40,000 pending lawsuits asserting ovarian cancer claims … against LTL."  Disclosure Statement (Dkt. No. 25-2) at § 2.2(a).  Because the Debtor has no liability for talc claims involving mesothelioma or lung cancer, the only compensable claims in this case involve ovarian cancer.  The Disclosure Statement is inaccurate—there are unfiled cases that are legitimate ovarian cancer claims and there are a substantial number of filed cases that would likely not meet the qualifying criteria.  However, taking the Disclosure Statement's 40,000 number at face value, this suggests that 53,522 claimants (or more) who voted on the Plan likely hold non-compensable

3.      Rather than accept that there was simply not adequate support for the low-ball plan is was proposing, J&J instead decided to manipulate the voting result.  Specifically, after losing the vote, J&J offered to put the Smith Firm in charge of a $650 million fund to pay attorneys' fees (outside of bankruptcy) in exchange for the Smith Firm taking actions to modify the votes of over 11,434 claimants[6] without their informed consent.  In response to this offer, the Smith Firm submitted a Master Ballot without client consent that purported to change the votes of these claimants *en masse*.

4.      The Voting Declaration shows that Epiq, the balloting agent, after receiving a fraudulent Master Ballot from the Smith Firm, changed 11,434 votes from "reject" to "accept."[7] Epiq did so in violation of J&J's own voting procedures.  This change ostensibly placed J&J over the 75% threshold for the first time.  Following Epiq's decision to change the votes, J&J placed Red River into bankruptcy and claimed to have the support of 83% of the claimants.  *See* Dkt. No. 3 at p. 1.

5.      The problem is that the Voting Declaration does not reflect the actual votes that were cast or the will of the women who voted on J&J's Plan.  The Voting Report falsely represents that women who fundamentally reject J&J's Plan to deprive them of their legal and equitable rights actually accept it.  The purpose of this Motion is to remedy J&J's, Epiq's, and the Smith Firm's misconduct and to restore the votes of 11,434 women who reject J&J's Plan as such votes were cast prior to the Voting Deadline.

---

claims—claims that if reflected in a timely filed proof of claim and subject to objection under section 502(b) would be disallowed for voting purposes in this case.

[6]     *See Confidential Memorandum of Understanding & Agreement Regarding Talc Bankruptcy Plan Support* (Dkt. No. 17-1) (the "MOU") at § II, attached as Annex A to the *Declaration of John K. Kim in Support of Chapter 11 Case and Certain First Day Pleadings* filed on September 20, 2024.

[7]     Epiq's retention is the subject of an objection in this case.  *See* Dkt. No. 257.

## BACKGROUND

### A.    J&J's Voting Procedures for Master Ballots

6.    On June 3, 2024,[8] J&J adopted voting procedures.  This was before J&J began soliciting votes on its Plan.  *See* Disclosure Statement (Dkt. No. 25-2) at § 9.5(d), at pp. 132-135.

7.    These procedures provide for the use of "Master Ballots"—*i.e.*, a ballot submitted by a law firm that records the votes of each of its clients.  *Id.* at 132.  These procedures also provide instructions on what happens if there are conflicting Master Ballots.  *Id.* at 134-135.

8.    Under these instructions, if a claimant appears on more than one Master Ballot, Epiq was required to "exercise reasonable efforts to coordinate with the respective firms to cure the discrepancy." *Id.* at 134.  If the discrepancy could not be cured, then the vote for the claimant appearing on more than one Master Ballot "will be counted only once and only if the votes are consistent with respect to acceptance or rejection of the Plan." *Id.* at 134-135.

9.    If the votes are inconsistent, then "none of the votes will be counted." *Id.* at 135. These procedures were not only set forth in the Disclosure Statement, but they were also included in the solicitation packages provided to claimants.[9]

### B.    11,434 Beasley Allen Clients Vote to Reject J&J's Plan

10.    Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. ("Beasley Allen") submitted a Master Ballot to Epiq prior to the July 26, 2024 Voting Deadline.  *Id.* at Ex. 1.  Beasley Allen's Master Ballot included 11,503 claimants, of which 69 voted to "accept" the Plan and **11,434** voted to "reject" the Plan.  *Id.* at ¶ 2.

11.    Beasley Allen is a leader in talc litigation and is a member of the plaintiffs' executive committee in Multidistrict Litigation (MDL) established *In re: J&J Talcum Powder*

---

[8]    *See* Dkt. No. 46 at ¶ 1(a).

[9]    *See Decl. of Andy D. Birchfield* (Dkt. No. 257 at Ex. C) at Ex. 1, p. 23 (Annex C, § 4.g.).

*Marketing, Sales Practices, and Products Litigation*, MDL 2738 (the "<u>MDL</u>") in the United States District Court for the District of New Jersey.  Beasley Allen opposed J&J's Plan as of the July 26, 2024 Voting Deadline.

  **C.**  <u>**Less Than 75% of the Claimants Voted to Accept the Plan**</u>

  12.  As of the Voting Deadline, J&J was below the 75% threshold.  *See* Exhibit B.  As of that date, 26,958 of the claimants who cast a vote voted to "reject" J&J's Plan, placing J&J below the threshold required by section 524(g) of the Bankruptcy Code.  *Id.*

  13.  At that point, J&J could have resolved all of its talc liability outside of bankruptcy, as it did after the dismissal of its LTL 2.0 bankruptcy case with substantially all its talc related mesothelioma liability and all of the talc related consumer fraud claims, and as it most recently did with the ovarian claims of the Arnold & Itkin firm, which J&J perceived to have a blocking position with respect to the confirming of J&J's proposed section 524(g) plan.  J&J has always been able to pay all current and future claims in full without a bankruptcy settlement.  But J&J did not follow that path.

  **D.**  **J&J Offers the Smith Firm Financial Benefits Paid**
     **Outside of Bankruptcy to Submit a Master Ballot and Change Votes**

  14.  Beasley Allen had a joint venture agreement with the Smith Firm.  However, the Smith Firm is not, and has never been, the primary contact point for the clients.

  15.  During J&J's first two bankruptcy cases, LTL 1.0 and LTL. 2.0, J&J did not consider the Smith Firm as having the authority to vote for or solicit votes from Beasley Allen's clients.  *See* Beville Decl. (Dkt. No. 42) at Exs. 50-53.

  16.  But J&J saw an opportunity to advance its plans to disenfranchise talc victims and keep their votes against the Plan from being counted.  On July 17, 2024, just before the Voting Deadline, J&J publicly alleged in the MDL that the Smith Firm has borrowed heavily from

litigation funders and may now owe as much as $240 million.[10]   Based on this filing, J&J apparently perceived the Smith Firm to be in financial distress.

17.     After the Voting Deadline passed and J&J failed to garner the votes for its third bankruptcy, J&J entered into negotiations with the Smith Firm.  The product of these negotiations was a *Memorandum of Understanding* (*see* Dkt. No. 17-1, defined above as the "MOU").  The MOU is not dated, but the Coalition's understanding is that it was entered into on or about September 8, 2024.

18.     According to the terms of the MOU, on or before September 16th, the Smith Firm was required to request that Epiq change "**at least 95%**" of the votes cast by the "[Smith Firm's] 11,983 Claimants" from reject to accept.  *See* MOU at § II.A.1.a (emphasis added).  Tellingly, the number of votes to "reject" J&J's Plan reflected in the Master Ballot submitted by Beasley Allen (11,434) divided by 11,983 is approximately **95%**.

19.     The eight (8) day period between September 8th and September 16th was, in and of itself, an unreasonably short period of time for the Smith Firm to obtain the authorization of 11,434 claimants to change their vote.[11]   And this short time was further shortened by the Smith Firm's actions in trying to coerce talc victims to change their votes, principally via e-mail on two-day's negative notice (when e-mail was available) and also by Federal Express on one day's or less notice, as discussed below.

20.     The MOU, however, provides substantial benefits to the Smith Firm if a plan is confirmed that discharges J&J of all its talc liability, including its independent and direct talc

---

[10]   *See In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:16-md-02738-MAS-RLS (D. N.J. June 17, 20-24) at Dkt. No. 32827, pp. 9-10 (J&J asserted that the Smith Firm's litigation funding loan may be as high as $240 million).

[11]   *See In re Southland Corp*., 124 B.R. 211, 226-27 (Bankr. N.D. Tex. 1991) (finding that 13 days between solicitation materials and the deadline to vote on the plan was "unreasonably short").

liability.  *See* MOU at § II.  Those benefits include, *inter alia*, a provision that J&J will cease its pursuit of discovery regarding the Smith Firm's litigation funding (*id.* at § II.K.2) and a provision providing the Smith Firm with effective control over a $650 million common benefit attorneys' fees fund to be set up outside of the bankruptcy case (*id.* at § II.C).[12]

21.     The MOU also called for other material modifications to the initial Plan.  *See* MOU at § II.  These modifications include, *inter alia*, the creation of a $1.1 billion "Individual Review Fund" to make bonus payments to certain talc claimants who meet the criteria determined by the Smith Firm in coordination with the Ad Hoc Committee of Supporting Counsel (the "AHC").  *Id.* at § II.C.  While the Smith Firm's and the AHC's bankruptcy counsel are on J&J's payroll, it is not clear whether J&J itself will play a role in determining how these bonus payments are allocated.

**E.     The Smith Firm Changes 11,434 Votes After
         Providing Clients with Two-Days' (or Less) Negative Notice**

22.     On September 11, 2024, a few days after signing the MOU, the Smith Firm sent a letter by e-mail and Federal Express to Beasley Allen's clients who had previously voted to reject J&J's Plan and informed them that the Smith Firm had negotiated a settlement with J&J and that it intended to change their votes to "accept" unless they asked the Smith Firm to not change their

---

[12]   The existence of a common benefit payment in an MDL does not impact the contingency fee owed by a tort victim.  The funds received by a tort victim are typically net the contingency fee owed to her chosen counsel.  A common benefit assessment is not a contingency fee.  Rather, it is akin to a tax on the contingency fee owed to law firms that do not shoulder the full costs associated with MDL.  This tax is paid by law firms out of the contingency fees that they earn, and those funds are then allocated to compensate the law firms whose work generated the settlement.

For example, if a client has executed a 40% contingent fee agreement and the common benefit order provides for 8% for common benefit fees, then the 40% that the client agreed to pay for services rendered would be allocated 32% to the private attorney representing the client and 8% to the common benefit fee account.  The client does not pay anything more than the agreed upon contingent fee percentage for the representation.  The common benefit order provides for how the total contingent fee percentage is allocated between the client's private counsel and the common benefit fee account.

vote by September 13, 2024, *i.e.*, two days after the e-mail was sent to clients and less than one day after clients received the letter via Federal Express.[13]

23.     Mr. Smiths e-mail contained material misrepresentations regarding the MOU and the impact that it would have on claimant recoveries.[14]  But even putting this aside, the plan that the Smith Firm solicited was **not** the Plan J&J had sent out to talc victims in June.  Simply put, the Smith Firm provided talc claimants two day's (or less) negative notice to change a vote on a plan that did not exist (and that they had never seen) based on an e-mail that contained material misrepresentations regarding the terms of the new plan.

24.     Between September 11th and September 13th, certain Beasley Allen clients who received this email instructed the Smith Firm to not change their votes.  *See*, *e.g.*, Dkt. No. 257 at Ex. D, ¶ 2.  Federal Express tracking reports show that clients who received Mr. Smith's letter via Federal Express had approximately twelve (12) hours to open the package, review its contents, log on to a computer, and tell Mr. Smith not to change their votes.  *See* Dkt. No. 257 at Ex. E, ¶ 2 & Ex. 2; Dkt. No. 257 at Ex. F, ¶ 2 & Ex. 2.  The Coalition submits that many claimants who received

---

[13]   *See Decl. of Tracy Birdsong* (Dkt. No. 257 at Ex. D) at Ex. 1, p. 5 ("Please vote by **September 13, 2024**.  If you choose not to vote, I will submit your vote for approval of the new Plan in my power as attorney authorized to prosecute your case.") (emphasis in original); *Decl. of Carolyn E. Colquitt* (Dkt. No. 257 at Ex. E) at Ex. 1, p. 5 (same); *Decl. of Rebecca Troquille* (Dkt. No. 257 at Ex. F) at Ex. 1, p. 5 (same).

[14]   For example, in his e-mail, Mr. Smith made the following representations regarding the common benefit assessment:

> No Liability of Talc Personal Injury Trust to Pay "Common Benefit" Taxes:  Although common benefit taxes for fees and costs are normally taken from a claimant's settlement, J&J has agreed to pay these directly, separate from the Trust awards, but subject to certain additional conditions set forth in the MOU.  This means that Trust awards may not be subject to an additional tax imposed by MDL leadership and the MDL court.  This means more money in your pocket if settlement is awarded.

But a common benefit tax for fees is not taken from the portion of a settlement that is paid to the claimant.  J&J's agreement to pay $650 million outside of the bankruptcy does not mean that trust awards will not be subject to contingency fees owed to law firms.

the Smith e-mail were likely confused by it, may not have even known who Mr. Smith is, and did

not understand how the Smith Firm could purport to have the authority to change their votes.

**F.**      **Epiq Fails to Confer with Beasley Allen**

25.      On September 17, 2024, the Smith Firm submitted a Master Ballot to Epiq.[15]  This

Master Ballot purported to change the votes of clients previously submitted by Beasley Allen based

on the Smith Firm's two-day's (or less) negative notice e-mail and/or Federal Express letter.  *Id.*[16]

26.      In response to this competing Master Ballot, however, Epiq did not request a meet

and confer with Beasley Allen or comply with J&J's own protocol regarding voting matters as set

forth on pages 134 to 135 of the Disclosure Statement.  *See* Dkt. No. 256, Ex. C at ¶ 5.

27.      After Beasley Allen submitted its Master Ballot and prior to the Petition Date,

neither Epiq nor J&J contacted Beasley Allen to notify Beasley Allen that Beasley Allen's Master

Ballot contained discrepancies, was improper, or would not be counted as submitted.  *Id*.

28.      Epiq did not attempt to confer with Beasley Allen even though Beasley Allen wrote

to Epiq regarding this matter on or about August 28, 2024.  *Id.*  On or about August 28, 2024,

having been alerted to the possibility that the Smith Firm may try to change the votes of Beasley

Allen's clients, Beasley Allen sent a letter to Epiq and informed Epiq that "[a]ny attempt by any

firm or party other than Beasley Allen to change the votes of any of [its] clients is **unauthorized**

**and submitted without proper authority**."  *Id.* at Ex. 1 (emphasis added).

29.      In testimony offered before the Bankruptcy Court on September 23, 2024, Mr. John

Kim, Red River's Chief Legal Officer, indicated that J&J's intent as of the Voting Deadline was

---

[15]    *See* Voting Declaration at pp. 6-7, fn. 4 ("Additionally, on September 17, 2024, The Smith Law Firm, PLLC submitted a Master Ballot (the 'Smith Master Ballot') amending certain votes previously submitted on a Master Ballot from Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. and a Master Ballot from Golomb Legal.").

[16]    All rights regarding the Smith Firm's conduct purporting to garner client authority on two-day's (or less) negative notice and J&J's aiding and abetting that conduct are reserved.

to not count the Master Ballot submitted by Beasley Allen based on J&J's own determination that the votes reflected therein were "invalid at that time." *See* Sept. 23, 2024 Hr'g Tr. at 93:2-8.

30.     After Mr. Kim offered this testimony, the Coalition's counsel asked Mr. Kim if the Debtor received "a tabulation of votes from Epiq" so that it knew where it stood "as of the close of the initial solicitation period." *Id*. at 93:20-25.  Mr. Kim did not answer this question.  To date, J&J has not explained how it could refuse to count the Master Ballot submitted by Beasley Allen and, at the same time, count or credit the Master Ballots submitted by other law firms.

31.     Nonetheless, in response to the Smith Master Ballot, Epiq—acting contrary to J&J's own voting protocol—either changed 11,434 votes from "reject" to "accept," or eliminated 11,434 votes to "reject" the Plan.[17]  No relief was sought from any Court before Epiq changed the votes, as required by Bankruptcy Rule 3018(a).[18]  Thus, in tabulating the votes for its report issued on Saturday, September 21, 2024, Epiq, apparently acting at J&J's direction and control, disregarded approximately 11,434 votes to "reject" J&J's Plan.  To date, Epiq has failed to produce the voting report or the data upon which the Voting Declaration is based.

---

[17]     *See* Voting Declaration at 1062 of 1062 ("11,986" votes were changed as being "[s]uperseded by a later ballot."); MOU at § II.A.1.a ("J&J's obligation to fulfill any of the requirements set forth herein is expressly conditioned on each of the following conditions precedent being satisfied in full:  Supporting Counsel requesting on or before September 16, 2024 that Epiq Global—the solicitation agent for the Plan—accept a change of vote for Supporting Counsel's 11,983 Claimants, such that at least 95% of each Supporting Counsel's Claimant inventory votes in favor of the Plan").

[18]     *See* Fed. R. Bankr. P. 3018(a) ("For cause shown, the **court** after notice and hearing may permit a creditor or equity security holder to change or withdraw an acceptance or rejection.") (emphasis added); *In re Piece Goods Shops Co., L.P.*, 188 B.R. 778, 795 (Bankr. M.D.N.C. 1995) (explaining that "[b]allots, once cast, may *not be changed or withdrawn without the Court's permission*, for cause shown, after notice and hearing in accordance with Bankruptcy Rule 3018."  And thus, because "[n]o party has sought the Court's permission to change any ballot on the Plan . . . the amended ballots will not be counted.") (emphasis added); *In re MCorp Fin., Inc.*, 137 B.R. 237, 238 (Bankr. S.D. Tex. 1992) (finding that "[v]ote changing is the exception, not the rule[]," and "[c]hanges should only be permitted in exceptional circumstances.") (citing *In re Featherworks Corp.,* 36 B.R. 460, 462 (E.D.N.Y.1984) and *In re Jartran,* 44 B.R. 331 (Bankr. N.D. Ill. 1984)).

**G.      Epiq's Decision to Change the Votes Enabled J&J to Allege that
It Enjoys the Support of Over 75% of the Claimants Who Voted on the Plan**

32.      Epiq's decision to change 11,434 votes from "reject" to "accept," or to eliminate

11,434 votes to "reject" the Plan, caused the acceptance rate, **for the first time**, to exceed the 75%

threshold.  *See* Exhibit B.  As of the Voting Deadline, approximately **26,958** claimants voted to

reject J&J's Plan.  *Id*.  Had all these votes been properly accepted and counted per J&J's own

tabulation procedures, the acceptance rate as of the Voting Deadline **was less than 75%**.  *Id.*

33.      Curiously, although several weeks passed after the July 26th Voting Deadline and

the formation of Red River on August 19, 2024, Epiq did not certify the votes until after it changed

11,434 votes to "reject" the Plan to votes to "accept" the Plan without notice to Beasley Allen.

Only after Epiq changed the vote count did J&J direct Red River to file for bankruptcy in the

Southern District of Texas.

34.      After filing for bankruptcy, the Debtor asserted that its bankruptcy case enjoys the

support of approximately **83%** of the claimants.  *See* Dkt. No. 3 at p. 1 (the Plan "is supported by

over **83%** of the claimants.") (emphasis in original).  The Debtor could not make this assertion but

for the deal struck between J&J and the Smith Firm.

## JURISDICTION AND VENUE

35.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334.

This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein

are sections 105(a), 1126(a) and 1126(e) of the Bankruptcy Code and Bankruptcy Rule 3018(a).

## RELIEF REQUESTED

36.      By this Motion, the Coalition seeks an order, reinstating votes improperly modified

by the Smith Firm pursuant to sections 105(a) and 1126(a) of the Bankruptcy Code and Bankruptcy

Rule 3018(a), or in the alternative, designating the votes improperly cast by Smith Firm pursuant to section 1126(e) of the Bankruptcy Code.

## **ARGUMENT**

### I.       The Votes Improperly Modified by J&J, Epiq, and the Smith Firm Must be Reinstated as Originally Cast Prior to the Voting Deadline

37.      The votes improperly modified by J&J, Epiq, and the Smith Firm must be reinstated.  As a threshold matter, claimants vote, not a law firm that is in financial distress. Section 1126(a) of the Bankruptcy Code clearly indicates that "[t]he holder of a claim or interest allowed under section 502 of this title may accept or reject a plan."  11 U.S.C. § 1126(a).

38.      Once votes are cast, no one has authority to change a vote without leave from the Bankruptcy Court.[19]  The Bankruptcy Court in *MCorp* explains that "[a] change of vote may not occur as a matter of right.  This is to avoid the possibility of an entity's changing its vote based upon consideration or promises outside of the plan.  Vote changing is the exception, not the rule."[20] This rule applies regardless of whether the voting period has expired.[21]

39.      For an attorney to cast a ballot to accept or reject a plan, the attorney must have authority to represent the claimant and be authorized by the claimant to cast a ballot on his or her

---

[19]   *See* Fed. R. Bankr. P. 3018(a) ("For cause shown, the **court** after notice and hearing may permit a creditor or equity security holder to change or withdraw an acceptance or rejection.") (emphasis added); *In re Piece Goods Shops Co., L.P.*, 188 B.R. 778, 795 (Bankr. M.D.N.C. 1995) (explaining that "[b]allots, once cast, may *not be changed or withdrawn without the Court's permission*, for cause shown, after notice and hearing in accordance with Bankruptcy Rule 3018." And thus, because "[n]o party has sought the Court's permission to change any ballot on the Plan . . . the amended ballots will not be counted.") (emphasis added).

[20]   *In re MCorp Fin., Inc.*, 137 B.R. 237, 238 (Bankr. S.D. Tex. 1992) (finding that "[v]ote changing is the exception, not the rule[]," and "[c]hanges should only be permitted in exceptional circumstances.") (citing *In re Featherworks Corp.*, 36 B.R. 460, 462 (E.D.N.Y.1984) and *In re Jartran*, 44 B.R. 331 (Bankr. N.D. Ill. 1984)).

[21]   *See MCorp*, 137 B.R. at 238 (explaining that "[s]ubdivision (a) was specifically amended to allow the court to permit a creditor or equity security holder to change or withdraw an acceptance or rejection for cause shown whether or not the time fixed for voting has expired.").

behalf.[22]   Consistent with applicable rules of professional conduct, as well as an attorney's fiduciary obligations to his or her clients, an attorney cannot take affirmative actions to modify the votes of his or her clients in a chapter 11 case without first obtaining their informed consent.

40.    Here, the Smith Firm purported to modify the votes of Beasley Allen's clients after the July 26, 2024 Voting Deadline.  The Smith Firm did ***not*** obtain the informed consent of such clients prior to taking affirmative actions to modify their votes.  Two days' negative notice was insufficient.[23]   Further, the Smith Firm made material misrepresentations in its client communication.  Anyone who changed their vote on the Plan was likely misled.

41.    The Smith Firm took these actions "based upon consideration or promises outside of the plan"—specially, J&J's offer to fund a $650 million QSF fund supporting law firms. *MCorp*, 137 B.R. at 238.  Epiq modified the voting report without evidence that the Smith Firm had the authority to modify the votes.  This occurred without leave of a Bankruptcy Court since J&J's solicitation process has occurred in the shadows, far away from Court oversight.

42.    Reinstating the votes as originally cast is the appropriate remedy.  If the votes are eliminated due to J&J's, Epiq's and Mr. Smith's misconduct, J&J will still benefit.  Reducing the number of votes to reject the Plan would increase the percentage of votes to accept the Plan even if there are no additional votes to accept the Plan.  J&J's maneuvers will have the effect of gaming the system in this regard by decreasing the percentage of claimants who said "no" to J&J's Plan.

---

[22]    *See*, *e.g.*, *In re Southland Corp.*, 124 B.R. 211, 226-27 (Bankr. N.D. Tex. 1991) (requiring for every ballot to contain "a provision for the certification by the party casting the ballot to accept or reject the plan, that, said [i] party has the *authority* to represent another entity or party, [ii] with the name of the party represented, and further, [iii] that the person voting has been authorized to cast that ballot accepting or rejecting the Plan.") (emphasis in original).

[23]    *See*, *e.g.*, *Southland*, 124 B.R. at 227 (finding that 13 days between solicitation materials and the deadline to vote on the plan was unreasonably short, and as a result, the court invalidated all votes).

43.     This may have been J&J's play the entire time—*i.e.*, inducing Mr. Smith to take improper actions by offering him a substantial financial reward (with the knowledge that the Smith Firm is in financial distress) so that J&J could knock out the votes cast by Beasley Allen's clients. The votes improperly modified by J&J and the Smith Firm must be reinstated.

## II.     Alternatively, the Votes Improperly Case by the Smith Firm Must be Designated

44.     Assuming, *arguendo*, that the Court will not reinstate the votes to reject J&J's plan, then the votes improperly cast by Smith Firm must be designated pursuant to section 1126(e) of the Bankruptcy Code.  Pursuant to section 1126(e), the Court may designate any entity whose acceptance of the plan was not in good faith or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.[24]  The Bankruptcy Code does not define "good faith" in connection with voting or vote solicitation.[25]  However, Courts have held that the concept of good faith "is intended to allow courts to utilize their gut feelings":

> Sometimes a bankruptcy judge's nose tells him/her that something doesn't smell right and further inquiry is warranted . . . Sometimes, a bankruptcy judge's stomach may turn, when he/she is preparing to sign a particular judgment or order.  This queasiness is reflective of the judge's sense that for some, perhaps inarticulable, reason, it just isn't right to grant the relief requested. . . . In short, the reading of the law should be tempered by the judge's sense of equity-what is just in the circumstances of the case.

*In re Dow Corning Corp.*, 244 B.R. 673, 676 (Bankr. E.D. Mich. 1999) (quoting *In re Timko*, No. 87-09318 (Bankr. E.D. Mich. July 22, 1988) (unpublished)).

45.     While not exclusive, Courts have recognized two types of obvious bad faith when determining whether to designate votes under section 1126(e):  (1) the claim holder attempts to

---

[24]     *See* 11 U.S.C. § 1126(e); *Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, 97 (3d Cir. 1988) (Section 1126(e) "grants the bankruptcy court discretion to sanction any conduct that taints the voting process, whether it violates a specific provision or is in 'bad faith.'").

[25]     *See In re Dune Deck Owners Corp.*, 175 B.R. 839, 844 (Bankr. S.D.N.Y. 1995).

extract or extort a personal advantage not available to other creditors in its class, and (2) the creditor has an ulterior motive, such as to procure some collateral or competitive advantage that does not relate to its claim.[26]  If the claimant votes to approve or reject a plan to further an interest unrelated to the treatment of its claim against the debtor in the bankruptcy, such ulterior motive subjects the creditor's vote to disallowance.[27]

46.    Section 1126(e) allows courts to designate a vote because of solicitation or any other conduct that taints or defiles the voting process or is in bad faith.[28]  Courts have held that purchases of a creditor's claim or its vote to accept or reject a plan may constitute bad faith solicitation, meriting vote designation.[29]  Courts frequently find bad faith where the entity purchasing the claim or vote is a proponent of the plan.[30]  And Courts have rejected attempts by

---

[26]  *Dune Deck*, 175 B.R. at 844; *see In re Landing Assocs., Ltd*., 157 B.R. 791, 807 (Bankr. W.D. Tex. 1993) ("[O]ne who casts a vote with the 'ulterior purpose' of exacting for oneself an undue advantage can have that vote subjected to designation.") (internal citation omitted).

[27]  *Landing Assocs*., 157 B.R. at 807 ("[W]hen the voting process is being used as a device with which to accomplish some ulterior purpose, out of keeping with the purpose of the reorganization process itself, and only incidentally related to the creditor's status *qua* creditor, section 1126(e) is rightly invoked."); *accord Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (In re Figter Ltd.)*, 118 F.3d 635, 639 (9th Cir. 1997) ("It is always necessary to keep in mind the difference between a creditor's interest as a creditor and a motive which is ulterior to the purpose of protecting a creditor's interest."); *Dune Deck*, 175 B.R. at 845 ("[W]here the record contains evidence that the creditor has voted without regard to the treatment of its claim, but instead, to achieve some benefit or goal inconsistent with interests of the estate and its creditors, the Court must inquire into those motives in order to preserve the integrity of the Chapter 11 process.").

[28]  *See In re Gilbert*, 104 B.R. 206, 214 (Bankr. W.D. Mo. 1989) (citing *Century Glove*, 860 F.2d at 97).

[29]  *See, e.g.*, *In re Featherworks Corp.*, 36 B.R. 460, 463 (E.D.N.Y. 1984) (purchase of a vote constitutes bad faith solicitation); *In re Wiston XXIV Ltd. P'ship*, 153 B.R. 322, 324-26 (D. Kan. 1993) (where secured creditor agreed to forgive $80,000 in improper transfers and pay a creditor $150,000 to release its unlikely and suspect remaining rights in equipment, contingent upon creditor voting against plan confirmation, this constituted bad faith solicitation).

[30]  *See, e.g.*, *In re Applegate Property, Ltd*., 133 B.R. 827 (W.D. Tex. 1991) (finding bad faith; claim purchases resulted in discrimination in favor of those creditors whose interests were purchased because they were paid in full immediately, well prior to confirmation of the plan); *In re Allegheny Int'l, Inc*., 118 B.R. 282, 296 (Bankr. W.D. Pa. 1990) (plan proponent's strategic purchases of exactly enough claims to block confirmation of competing plan and advance the proponent's position "is not acceptable and constitutes at least bad faith, if not an unlawful act, in the pursuit of confirmation of its plan"); *see also* James F. Queenan, Jr. et al., *Chapter 11 Theory and Practice* § 30.25 (1994) ("A party who is a

insiders of the debtor to pay claimants in order to secure the votes necessary for approval of a debtor's plan.[31]  For the reasons described below, all votes cast by the holders of alleged claims who voted in favor of the plan should be designated pursuant to section 1126(e).

### A.    The Smith Firm Votes in Favor of J&J's Plan Were Cast in Bad Faith

47.    The votes cast by the Smith Firm in favor of J&J's Plan were cast in bad faith.  The Smith Firm did not have authority to change the votes.  Nor did Mr. Smith obtain the informed consent of the claimants.  Such conduct, standing alone, constitutes bad faith.

### B.    J&J's Conduct Is Tantamount to Vote Purchasing

48.    J&J's conduct is tantamount to vote purchasing, which further supports the designation of votes.  $650 million of the new consideration would not be paid to the plan trust but would be paid by J&J to a fund outside the plan controlled by the Smith Law Firm.  MOU at § II.C.  The MOU states that "J&J also agrees to cease its pursuit of discovery regarding litigation financing" as it relates to Mr. Smith and the Smith Firm.  *Id.* at § II.K.2.

49.    J&J is free to settle with claimants outside of bankruptcy.  In fact, J&J can afford to settle ***all*** talc claims—current and future—outside of a bankruptcy proceeding.  But J&J is not

---

plan proponent should be prohibited from purchasing claims because of the inconsistency between the payments made in the purchases and the payments proposed under the plan.").

[31]    *See*, *e.g.*, *In re Machne Menachem, Inc.*, 2007 WL 1157015, at *2 (3d Cir. Apr. 19, 2007) (affirming denial of confirmation where an insider of the debtor had purchased four claims in order to secure acceptance of the debtor's plan); *Zentak GBV Fund IV, LLC v. Vesper*, 2001 WL 1032217, at *246-47 (6th Cir. Aug. 29, 2001) (insider's purchase of claims was in bad faith and votes were appropriately designated); *In re Holly Knoll P'ship*, 167 B.R. 381, 389 (Bankr. E.D. Pa. 1994) (insider of the debtor acted in bad faith where it purchased claim, not to protect its rights as a creditor, but rather to ensure confirmation of the plan); *Applegate*, 133 B.R. at 835 (insider's purchase of claims against the debtor in order to block competing plan and ensure confirmability of own plan "cannot, as a matter of law, be in good faith."); *see also Figter*, 118 F.3d at 639 ("[W]hen the debtor had claims against itself purchased by an insider or affiliate for the purpose of blocking a plan, or fostering one, that was seen as a badge of bad faith.").

free to cut side deals and then turn around and use the votes cast by favored parties to support its plan.  This is the exact type of conduct that the Bankruptcy Code does not permit.

    **C.**    **<u>J&J Did Not Solicit Votes in Good Faith</u>**

    50.    Finally, the votes cast in favor of J&J's Plan must be designated because J&J solicitated votes using false and misleading information.  This issue pervades all "yes" votes in favor of the plan since no plan can be solicited based on false and misleading information.

    51.    Section 1126(e) provides for the designation of votes that are "not solicited" in "accordance with the provisions of" the Bankruptcy Code.  11 U.S.C. § 1126(e).  Pursuant to Section 1126(b), a holder of a claim that has accepted the plan before the commencement of the case is deemed to have accepted such plan only if "such acceptance . . . was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title." *See* 11 U.S.C. § 1126(b); *see also* Fed. R. Bankr. P. 3018(b).

    52.    Section 1125(a)(1) defines "adequate information" to require "information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan."  *See* 11 U.S.C. § 1125(a)(1).

    53.    Where a prepetition solicitation of a creditor's vote provides insufficient information to the creditor, it fails to satisfy section 1126(b).  *See*, *e.g.*, *In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*, 177 B.R. 684, 689-90 (Bankr. D. Colo. 1995).  And the failure to satisfy section 1126(b) is grounds to designate votes under section 1126(e).

    54.    Here, J&J's solicitation of votes not only failed to provide adequate information, but J&J sought to affirmatively mislead claimants.

55.     Claimants could have read the Disclosure Statement and supporting letters and reached the conclusions that (1) all talc lawsuits against J&J "have no valid scientific basis," (2) J&J's talc products "never contained asbestos," (3) the "safety of cosmetic grade talc" has been confirmed by "regulatory and scientific bodies," (4) the recoveries available under the Plan "substantially exceed" recoveries available in the tort system, (5) J&J has prevailed on the merits in "16 of the last 17 cases" to go to trial, (6) the average recovery for an Ovarian Claims under the Plan will be between "$75,000 and $150,000," and (7) the plan supporters conducted an independent and separate analysis and reached the conclusion that the Plan is "in the best interest" of current and future claimants.  *See* Disclosure Statement at §§ 1.1(c) & 2.2; LLT June 3, 2024 Letter.

56.     ***But none of this is true***.  Any claimant who reviewed the Disclosure Statement or the supporting letters and reached any one of these conclusions was misled, which means that their votes in favor of the Plan should be designated under section 1126(e).

57.     **Ovarian Claims Against J&J Have a Valid Scientific Basis**.  In fact, this is the reason why J&J orchestrated two failed bankruptcy cases and this third bankruptcy case.  J&J is terrified of the fact that its talc products contained asbestos, and that asbestos causes ovarian cancer (as well as mesothelioma).  Courts have uniformly found causation evidence linking exposure to J&J's talc products to ovarian cancer sufficiently reliable to submit to juries.  J&J has spent a fortune on bankruptcy professionals and keeps orchestrating one fraudulent bankruptcy case after another in a desperate attempt to avoid the civil justice system.

58.     **J&J's Talc Products Did Contain Asbestos**.  This is why J&J has lost case after case in the tort system, including recent verdicts in California, Illinois, Oregon, and South Carolina.  Mesothelioma is only caused by exposure to asbestos.  Every time J&J loses a case

18

involving mesothelioma and lung cancer, it does so because of the overwhelming evidence that J&J's talc products contained *asbestos*.

59.     **Regulatory and Scientific Bodies Have Found that Cosmetic Talc Is Not Safe**. A study published in May 2024 in the *Journal of Clinical Oncology* involving 50,884 women found that exposure to talc products increases the risk of ovarian cancer, and in many instances nearly doubles the risk.[32]  Regulatory agencies have reached the same conclusion,[33] as have other scientists.[34]  There is a reason why J&J has discontinued the sale of talc products—they are dangerous, and they can cause death.

60.     **The Recoveries Available under J&J's Plan Are Substantially Less Than the Recoveries Available in the Tort System**.  No company has ever filed for bankruptcy because it wanted to pay tort victims more money.  To believe that J&J is the first and only exception to this statement is delusional.  J&J is trying to use a manufactured bankruptcy case to force the women it poisoned to accept *de minimis* payments—far less than the compensation they would receive outside of bankruptcy where their consent is required for settlement.

61.     This Court need look no further than the failed bankruptcy attempted by 3M in 2022.  Facing significant liability for its sale of defective earplugs, 3M placed one of its subsidiaries into bankruptcy and attempted to consummate a global settlement that would have

---

[32]   *See* Katie M. O'Brien, *et al., Intimate Care Products and Incidence of Hormone-Related Cancers: A Quantitative Bias Analysis*, J. CLIN. ONCOLOGY (2024) (Beville Decl. [Dkt. No. 42] at Ex. 3).

[33]   *See* Screening Assessment, Environmental and Climate Change Canada, Apr. 2021, at 36.

[34]   *See* Penninkilampi et al., *Perineal Talc Use and Ovarian Cancer: A Systemic Review and Meta-Analysis*, 29 Epidemology 41 (2018); Berge, et al., *Genital Use of Talc and Risk of Ovarian Cancer: A Meta-Analysis*, 27 European J. Cancer Prev. 248 (2018); Taher et al., *Critical Review of the Association between Perineal Use of Talc Powder and Risk of Ovarian Cancer*, 90 Reproductive Toxicology 88 (2019); O'Brien et al., *Association of Powder Use in the Genital Area with Risk of Ovarian Cancer*, 323 JAMA 49 (2020); O'Brien et al., Supplementary Online Content (2020).

discharged 3M of its own tort liability.  3M asserted that the $1 billion settlement that it was offering to pay was "only" possible if consummated inside of a bankruptcy proceeding.[35]

62.     But after its subsidiary's bankruptcy case was dismissed for cause, *see In re Aearo Techs., LLC*, Case No. 22-02890-JJG-11, 2023 WL 3938436 (Bankr. S.D. Ind. June 9, 2023), 3M quickly settled for $6 billion outside of bankruptcy.  Not only did this prove that 3M's representations about how settlement was "only" possible in bankruptcy were false, but it also showed the magnitude of the discount 3M hoped to achieve—*i.e.*, $5 billion—by leveraging the tools available in bankruptcy to suppress the value of valid tort claims.

63.     J&J knows that the recoveries available under its Plan are substantially less than the recoveries available in the tort system.  The purpose of this bankruptcy case is for J&J—a wealthy and highly solvent Fortune 50 company—to resolve its own tort liability for a fraction of the amount it should pay in the civil justice system.

64.     **J&J Has Not Prevailed on the Merits in 16 of the Last 17 Cases**.  J&J has lost on the merits in recent cases but managed to get several verdicts reversed on appeal on procedural grounds.  The tide has turned against J&J.  Juries have seen the evidence regarding ***when*** J&J first knew that its products contained asbestos, and the steps taken by J&J to ***conceal*** this information from regulators and the public.  J&J is afraid to face the women it harmed because it knows that it will not prevail any longer.  Companies that believe that they can prevail on the merits do not orchestrate fraudulent transfers, create fake debtors, and file serial bad faith bankruptcy cases.

65.     **The Average Recovery for an Ovarian Claim Is Less Than Advertised**.  The average recovery advertised by J&J is mathematically impossible.  Any woman who contracts a

---

[35]  *See In re Aearo Techs. LLC*, Case No. 22-02890-JJG-11 (Bankr. S.D. Ind. July 26, 2022) (Dkt. No. 12) (Informational Brief of Aearo Technologies LLC at Section V).

gynecological cancer and is willing to sign a declaration stating that she was exposed to J&J's talc products is eligible for a $1,500 payment under J&J's Plan.  Given the number of current and future claimants who qualify for this award, J&J's payments (to be made over the next 25 years) do not provide funding sufficient to reach the $75,000 to $150,000 promised by J&J for holders of Ovarian Claims.

66.     **There Is No Evidence that the Plan Supporters Conducted Any Independent or Separate Analysis**.  Rather, all indications are that they simply agreed to support J&J's Plan (based on J&J's "analysis") so long as their clients get paid and/or they reap the benefits of participating in the trust as members of the TAC or the Future Claimants' Representative.

67.     Or, in the case of the Smith Firm, so that it can enjoy the compensation that J&J is seemingly offering to pay and advantages that J&J has explicitly agreed to provide (control over the $650 million common benefit fund and no further discovery of litigation financing) to gain its support.  But, regardless of what Mr. Smith did, it does not change the fact that J&J solicited votes using false and misleading information.  Thus, all votes cast in favor of the Plan, whether by Mr. Smith or anyone else, must be designated.

## NOTICE

68.     Notice of this Motion has been served on:  (a) the U.S. Trustee; (b) counsel to the Debtor; and (c) all persons who have formally appeared in this chapter 11 case and requested service pursuant to Bankruptcy Rule 2002.  Considering the nature of the relief requested herein, the Coalition respectfully submits that no other or further notice need be provided.

## NO PRIOR REQUEST

69.     No prior request for the relief sought in this Motion has been made to this or any other Court in connection with this case.

## CONCLUSION

70.    **WHEREFORE**, based on the foregoing, the Coalition respectfully requests that the Court grant the Motion and grant such other and further relief as the Court deems necessary and appropriate.

Dated:  October 15, 2024                    Respectfully submitted,

STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, PC

/s/ *Sander L. Esserman*
Sander L. Esserman
State Bar No. 06671500
Peter C. D'Apice
State Bar No. 05377783
2323 Bryan Street, Ste. 2200
Dallas, TX 75201-2689
Telephone:    (214) 969-4900
Facsimile:     (214) 969-4999
Email:          esserman@sbep-law.com
                     dapice@sbep-law.com

-AND-

BROWN RUDNICK LLP

David J. Molton (*pro hac vice*)
Jeffrey L. Jonas (*pro hac vice*)
Eric R. Goodman (*pro hac vice*)
Gerard T. Cicero (*pro hac vice*)
Susan Sieger-Grimm (*pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone:    (212) 209-4800
Facsimile:     (212) 209-4801
Email:          dmolton@brownrudnick.com
                     jjonas@brownrudnick.com
                     egoodman@brownrudnick.com
                     gcicero @brownrudnick.com
                     ssieger-grimm@brownrudnick.com

-AND-

**OTTERBOURG P.C.**

Melanie L. Cyganowski (*pro hac vice*)
Adam C. Silverstein (*pro hac vice*)
Sunni P. Beville (*pro hac vice*)
Jennifer S. Feeney (*pro hac vice*)
230 Park Avenue
New York, NY 10169
Telephone:      (212) 661-9100
Facsimile:      (212) 682-6104
Email:           mcyganowski@otterbourg.com
                 asilverstein@ otterbourg.com
                 sbeville@ otterbourg.com
                 jfeeney@ otterbourg.com

**CO-COUNSEL FOR THE COALITION OF
COUNSEL FOR JUSTICE FOR TALC
CLAIMANTS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 15, 2024, I caused a true and correct copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Peter C. D'Apice*
Peter C. D'Apice