**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC LLC,[1] | Case No. 24-90505 (CML) |
| Debtor. | Re Dkt. No. 46 |

**OBJECTION OF THE COALITION OF**
**COUNSEL FOR JUSTICE FOR TALC CLAIMANTS TO THE**
**DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING**
**(I) ADEQUACY OF DISCLOSURE STATEMENT, (II) SOLICITATION**
**PACKAGES AND PROCEDURES EMPLOYED FOR THE SOLICITATION**
**AND TABULATION OF VOTES ON THE DEBTOR'S PREPACKAGED PLAN**
**OF REORGANIZATION AND (III) NOTICE OF NON-VOTING STATUS**

---

[1]    The last four digits of the Debtor's federal tax identification number are 8508.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 09833.

## <u>TABLE OF CONTENTS</u>

DISCOVERY ...................................................................................................................................1

PRELIMINARY STATEMENT ........................................................................................................1

LEGAL AND FACTUAL BACKGROUND .....................................................................................11

I.      Lessons Learned in Prior Asbestos Bankruptcy Cases .......................................................12

II.     The Texas Two-Step Strategy ............................................................................................13

III.    J&J's Talc Problem .............................................................................................................16

IV.     J&J's Talc Litigation History .............................................................................................20

V.      J&J's Failed Bankruptcy Attempts .....................................................................................26

VI.     Events Leading to J&J's Third Bankruptcy ........................................................................29

VII.    The Third Bankruptcy—Setting the Stage ..........................................................................32

VIII.   J&J's Decision to Target Women Who Have Ovarian Cancer .............................................33

IX.     Creating a Debtor that Is Allegedly in Financial Distress ..................................................39

X.      J&J's Plan to Discharge Its Independent Talc Liability ......................................................42

        A.      All Talc Claims Channeled to a Trust ....................................................... 42

        B.      Trust Funding Is Capped ........................................................................... 45

        C.      Trust Distribution Procedures ................................................................... 46

        D.      Trust Governance ...................................................................................... 49

        E.      Plan Releases and Exculpation Clause ...................................................... 51

XI.     The Disclosure Statement ...................................................................................................52

        A.      Failure to Disclose Deprivation of Rights ................................................. 52

        B.      J&J's False Narrative Regarding Science and Safety ................................. 53

        C.      J&J's False Narrative Regarding Likey Recoveries ................................... 60

        D.      J&J's Misleading Narrative Regarding Plan Supporters ............................ 61

XII.    J&J's Proposed Solicitation Procedures .............................................................................63

XIII.   J&J's Proposed Tabulation Procedures ...............................................................................66

XIV.    Epiq Files a False Voting Report ........................................................................................67

        A.      J&J's Voting Procedures for Master Ballots .............................................. 68

        B.      11,434 Beasley Allen Clients Vote to Reject J&J's Plan ........................... 69

        C.      Less Than 75% of the Claimants Voted to Accept the Plan ....................... 69

D.    J&J Offers the Smith Firm Financial Benefits Paid Outside of Bankruptcy to Submit a Master Ballot and Change Votes .......................................................... 70

E.    The Smith Firm Changes 11,434 Votes After Providing Clients with Two-Day's (or Less) Negative Notice ................................................................. 72

F.    Epiq Fails to Confer with Beasley Allen ................................................ 73

G.    Epiq's Decision to Change the Votes Enabled J&J to Allege that It Enjoys the Support of Over 75% of the Claimants Who Voted on the Plan ........................ 74

XV.    J&J's Notice Program ............................................................................75

XVI.   Solicitation Was Not Conducted in a Reasonable Manner .................................76

ARGUMENT ..........................................................................................................77

I.     The Disclosure Statement Is False and Misleading ........................................79

    A.    The Disclosure Statement Omits Material Information Regarding the Plan ........ 79

    B.    The Disclosure Statement Omits Material Information on J&J's Litigation History and the Presence of Asbestos in J&J's Talc Products ............................................ 80

    C.    The Disclosure Statement Contains Materially Misleading  Information Regarding Claimant Recoveries ...................................................................... 81

    D.    The Disclosure Statement Contains Inadequate Disclosure Regarding the Plan Supporters .................................................................................. 81

    E.    Inadequate Disclosure Regarding Estate Causes of Action .................................. 82

II.    The Debtor's Plan Is Patently Unconfirmable ..................................................83

    A.    The J&J Discharge Is Unlawful .............................................................. 83

        1.    J&J Cannot Obtain a Discharge Outside of Section 524(g) ..................... 83

        2.    Section 524(g) Cannot be Used to Discharge J&J's Independent Talc Liability .......................................................................... 83

        3.    Section 524(g) Cannot be Used to Discharge Kenvue............................. 87

        4.    Section 524(g) Cannot Be Used to Discharge Retailers .......................... 89

        5.    Section 524(g) Cannot Be Used to Channel Future Claims in this Case.. 91

        6.    Section 524(g) Cannot Be Used to Channel Claims When There Is No Reorganization ...................................................................... 92

        7.    Section 524(g) Cannot Be Used to Grant J&J a Discharge Because J&J Did Not Get Sufficient Votes in Support of Its Plan ............................... 93

        8.    Section 524(g) Is Unconstitutional If It Permits the J&J Discharge......... 95

    B.    The Debtor's Plan Was Filed in Bad Faith ...................................................... 100

        1.    The Debtor Has No Going Concern to Preserve or Reorganize ............. 100

        2.    This Case Does Not Maximize Value for Creditors ............................. 101

3.     Seeking a Release or Discharge for a Non-Debtor Is an Improper and Bad Faith Use of Bankruptcy ..................................................................... 106

4.     J&J Manipulated the Voting Process .................................................... 110

5.     J&J's Serial Bankruptcy Filings and the Debtor's Creation Through Fraud Shows Bad Faith ................................................................................. 112

6.     The Debtor's Plan Violates the Seventh Amendment and Title 28 ........ 114

C.     The Proposed Classification Violates Section 1122(a) ........................................ 115

D.     The Proposed Treatment of Talc Claims Violates Section 1123(a)(4) .............. 117

E.     The Plan Violates the Absolute Priority Rule ...................................................... 123

F.     Any Proposed Bankruptcy Rule 9019 Settlement Would Be Unfair and Inequitable ............................................................................................................ 124

G.     The Plan Violates the Best Interests of Creditors Test ...................................... 126

III.    J&J'S Solicitation and Tabulation Procedures are Unlawful .......................................... 127

A.     J&J's Solicitation Procedures Are Unlawful ...................................................... 127

1.     Non-Compensable Claims Should Not be Permitted to Vote ................ 127

2.     Settled Claims Should Not be Permitted to Vote .................................. 131

3.     Claimants Must Receive Adequate Information Prior to Voting ........... 132

B.     J&J's Tabulation Procedures Are Unlawful ...................................................... 133

1.     One Dollar Equals One Vote Violates Section 1126(c)'s Two-Third in Amount Test ......................................................................................... 133

2.     One Dollar Equals One Vote Violates the Numerosity Requirements of Sections 524(g) and 1126(c) of the Code ................................................ 137

3.     This Court Must Estimate Talc Claims for Voting Purposes ................ 139

IV.    J&J Cannot Show Compliance With Bankruptcy Rule 3018(b) .................................... 141

V.    J&J's Notice Program Was Insufficient ........................................................................ 144

A.     J&J Must Provide Actual Notice to Known Claimants ...................................... 145

B.     J&J's Publication Notice Was Deficient .............................................................. 148

CONCLUSION ............................................................................................................................. 149

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 15375 Mem'l Corp.*,
589 F.3d 605 (3d Cir. 2009)........................................................................100, 102, 103, 105

*In re 216 W. 18 Owner LLC*,
No. 11-15110 (SMB), 2012 WL 2871838 (Bankr. S.D.N.Y. July 10, 2012).......................142

*In re A.H. Robins Co.*,
880 F.2d 694 (4th Cir. 1989) ...............................................................................................134

*In re Adelphia Commc'ns Corp.*,
544 F.3d 420 (2d. Cir. 2008)................................................................................................117

*In re Aearo Techs., LLC*,
Case No. 22-02890-JJG-11, 2023 WL 3938436 (Bankr. S.D. Ind. June 9,
2023) ......................................................................................................................................105

*In re Aegerion Pharm., Inc.*,
605 B.R. 22 (Bankr. S.D.N.Y. 2019)....................................................................................117

*Alabama v. Bozeman*,
533 U.S. 146 (2001)..............................................................................................................130

*Alesco Preferred Funding VIII, Ltd. v. ACP RE, Ltd.*,
74 Misc. 3d 1230(A), 164 N.Y.S. 3d 808 (N.Y. Sup. Ct., N.Y. Cty. Apr. 11,
2022), *aff'd* 209 A.D.3d 558 (1st Dep't 2022) .....................................................................87

*In re Am. Capital Equip., LLC*,
688 F.3d 145 (3d Cir. 2012)...................................................................................................79

*In re Antelope Technologies, Inc.*,
431 Fed. Appx. 272 (5th Cir. June 24, 2011) ..............................................................101, 104

*In re Antelope Techs., Inc.*,
No. 07-31159-H3-11, 2010 WL 2901017 (S.D. Tex. July 21, 2010)...................101, 102, 104

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ..............................................................................121

*Bader v. Johnson & Johnson*,
303 Cal. Rptr. 3d 162 (Cal. Ct. App. 2022) ...........................................................................25

*In re Baker*,
    839 F.3d 1189 (9th Cir. 2016) ........................................................................128

*Banco Popular N. Am. v. Gandi*,
    876 A.2d 253 (N.J. 2005)................................................................................14

*Bank of N.Y. Tr. Co. v. 9 Official Unsecured Creditors' Comm. (In re Pac.*
    *Lumber Co.)*,
    584 F.3d 229 (5th Cir. 2009) ..........................................................................83

*In re Beltrami Enters., Inc.*,
    191 B.R. 303 (Bankr. M.D. Pa. 1995) ...........................................................78

*Berg v. Johnson & Johnson*,
    940 F. Supp. 2d 983 (D.S.D. 2013) ...............................................................21

*In re Bestwall LLC*,
    Case No. 17-31795 (LTB) (W.D.N.C) ...........................................................15

*In re Beyond.com Corp.*,
    289 B.R. 138 (Bankr. N.D. Cal. 2003) ..........................................................79

*Bittner v. Borne Chem. Co.*,
    691 F.2d 134 (3d Cir. 1982)..................................................................139, 140

*Blanchette v. Connecticut Gen. Ins. Corp.*,
    419 U.S. 102 (1974).........................................................................................99

*In re Brass Corp.*,
    194 B.R. 420 (Bankr. E.D. Tex. 1996) ..........................................................79

*Brown Bark III, L.P. v. Haver*,
    219 Cal. App. 4th 809, 162 Cal. Rptr. 3d 9 (Cal. Ct. App. 2013) ................87

*Butner v. United States*,
    440 U.S. 48 (1979)..........................................................................................88

*In re Buttonwood Partners, Ltd.*,
    111 B.R. 57 (Bankr. S.D.N.Y. 1990).............................................................119

*Matter of Cajun Elec. Power Co-op, Inc.*,
    150 F.3d 503 (5th Cir. 1998) ..........................................................................77

*Carl v. Johnson & Johnson*,
    464 N.J. Super 446, 237 A.3d 308 (App. Div. 2020) ................................34, 58, 59

*In re Casse*,
    198 F.3d 327 (2d Cir. 1999)..........................................................................112

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
860 F.2d 94 (3d Cir. 1988) ......................................................................... *passim*

*Chamber v. Baltimore & O.R. Co.*,
207 U.S. 142 (1907) ........................................................................ 80, 99, 100

*Chemetron Corp. v. Jones*,
72 F.3d 341 (3d Cir. 1995) ......................................... 144, 145, 146, 147

*In re Civitella*,
14 B.R. 151 (Bankr. E.D. Pa. 1981) ......................................................... 78

*Cohen v. TIC Fin. Sys. (In re Ampace Corp.)*,
279 B.R. 145 (Bankr. D. Del. 2002) ......................................................... 78

*In re Coho Resources, Inc.*,
345 F.3d 338 (5th Cir. 2003) ..................................................................... 83

*Columbia State Bank v. Invicta Law Group PLLC*,
402 P.3d 330 (Wash. Ct. App. 2017) ....................................................... 87

*In re Combustion Eng'g, Inc.*,
391 F.3d 190 (3d Cir. 2004) ........................................... 84, 86, 113, 138

*In re Commonwealth of Puerto Rico*,
No. 17-03283 (Bankr. D. Puerto Rico) ................................................. 143

*In re Continental Airlines Corp.*,
60 B.R. 903 (Bankr. S.D. Tex. 1986) ..................................................... 139

*In re Cranberry Hill Assocs. Ltd. P'ship*,
150 B.R. 289 (Bankr. D. Mass. 1993) ................................................... 121

*Crandall v. Nevada*,
73 U.S. 35 (1867) ....................................................................................... 96

*In re D&G Constr. Dean Gonzalez, LLC*,
635 B.R. 232 (Bankr. E.D.N.Y. 2021) ................................................... 112

*Dallas Cabana, Inc. v. Hyatt Corp.*,
441 F.2d 865 (5th Cir. 1971) ..................................................................... 95

*In re Denby-Peterson*,
941 F.3d 115 (3d Cir. 2019) ................................................................... 131

*In re Divine Ripe, L.L.C.*,
554 B.R. 395 (Bankr. S.D. Tex. 2016) ..................................................... 78

*In re Dow Corning Corp.*,
244 B.R. 634 (Bankr. E.D. Mich. 1999), *aff'd*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002)....................................116

*In re Dow Corning Corp.*,
244 B.R. 678 (Bankr. E.D. Mich. 1999) ..........................................................118

*In re Eastgate Tower Hotel Assocs., L.P.*,
No. 12-13539 (SCC), 2012 WL 5128145 (Bankr. S.D.N.Y. Aug. 20, 2012)........142

*Echeverria v. Johnson & Johnson (Johnson & Johnson Talcum Powder Cases)*,
37 Cal. App. 5th 292 (Cal. Ct. App. 2019) .............................................................34

*Matter of Edgeworth*,
993 F.2d 51 (5th Cir. 1993) ...................................................................................83

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974)...........................................................................144, 146, 148

*In re Eisenbarth*,
77 B.R. 228 (Bankr. D. N.D. 1987) .......................................................................121

*In re El Comandante Mgmt. Co.*,
359 B.R. 410 (Bankr. D. P.R. 2006) ......................................................................79

*Matter of Elmwood Dev. Co.*,
964 F.2d 508 (5th Cir. 1992) ................................................................................112

*In re Emoral, Inc.*,
740 F.3d 875 (3d Cir. 2014)...........................................................................87, 88

*In re Energy Future Holdings Corp.*,
522 B.R. 520 (Bankr. D. Del. 2015) ....................................................................128

*Erie R.R. Co. v. Tompkins*,
306 U.S. 103 (1938).................................................................................................88

*Fabricators Inc. v. Tech. Fabricators, Inc. (In re Fabricators, Inc.)*,
926 F.2d 1458 (5th Cir. 1991) .............................................................................123

*In re Fairchild Aircraft Corp.*,
128 B.R. 976 (Bankr. W.D. Tex. 1991) ..................................................................92

*In re Farley, Inc.*,
146 B.R. 748 (Bankr. N.D. Ill. 1992) ...................................................................139

*Featherston v. Katchko & Sons Constr. Servs., Inc.*,
244 A.3d 621 (Conn. App. Ct. 2020)......................................................................87

iv

*In re Fed.-Mogul Global Inc.*,
  684 F.3d 355 (3d Cir. 2012)..................................................................93, 122

*In re Federal Press Co.*,
  116 B.R. 650 (Bankr. N.D. Ind. 1989)...................................................139

*Feld v. Zale Corp.*,
  62 F.3d 746 (5th Cir. 1995) .......................................................................83

*In re Felicity Assocs., Inc.*,
  197 B.R. 12 (Bankr. D. R.I. 1996).............................................................79

*Matter of Fernstrom Storage and Van Co.*,
  938 F.2d 732 (7th Cir. 1991) ...................................................................128

*In re Ferretti*,
  128 B.R. 16 (Bankr. D. N.H. 1991) ...........................................................78

*In re FINOVA Grp., Inc.*,
  304 B.R. 630 (D. Del. 2004).....................................................................120

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*,
  554 U.S. 33 (2008)...........................................................................100, 101

*Matter of Foster Mortg. Corp.*,
  68 F.3d 914 (5th Cir. 1995) ...................................................123, 124, 125

*In re FTX Trading Ltd.*,
  91 F.4th 148 (3d Cir. 2024) .....................................................................130

*In re G-I Holdings, Inc.*,
  323 B.R. 583 (Bankr. D.N.J. 2005) ..........................................................140

*In re G-I Holdings Inc.*,
  420 B.R. 216 (D. N.J. 2009) .....................................................................116

*Getintent USA, Inc. v. Sileo, LLC*,
  No. 650980/2019, 2019 WL 4962549 (N.Y. Sup. Ct., N.Y. Cty. Oct. 8, 2019) ....................87

*Granfinanciera, S.A. v. Nordberg*,
  492 U.S. 33 (1989)....................................................................................114

*In re Greystone III Joint Venture*,
  102 B.R. 560 (Bankr. W.D. Tex. 1989), *aff'd*, 127 B.R. 138 (W.D. Tex.
  1990), *rev'd on other grounds*, 995 F.2d 1275 (5th Cir. 1991) .............................118

*Hall v. Nat'l Gypsum Co.*,
  105 F.3d 225 (5th Cir. 1997) .....................................................................83

*Hanover Nat'l Bank v. Moyses*,
  186 U.S. 181 (1902)............................................................................................99

*Harrington v. Purdue Pharma L.P.*,
  603 U.S. ---, 144 S.Ct. 2071 (2024).................................................... *passim*

*Ingham v. Johnson & Johnson*,
  608 S.W.3d 663 (Mo. Ct. App. 2020)................................................ *passim*

*Ins. Corp. of Ir. Ldt. v. Compagnie des Bauxites de Guinee*,
  456 U.S. 694 (1982)..........................................................................................113

*Jackson v. Corizon Health Inc.*,
  2:19-cv-13382, 2022 WL 16575691 (E.D. Mich. Nov. 1, 2022) .....................14, 88

*In re Johns-Manville Corp.*,
  843 F.2d 636 (2d Cir. 1987)........................................................98, 133, 134

*In re Johnson & Johnson*,
  509 F. Supp. 3d 116 (D.N.J. 2019) ..........................................22, 30, 34

*In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices,*
  *and Products Liability Litigation*,
  Case No. 3:16-md-02738-MAS-RLS (D. N.J. June 17, 2-24).................................34

*Johnson & Johnson v. Ingham*,
  141 S.Ct. 2716 (2021).......................................................................................23

*In re Joint E. & S. Dist. Asbestos Litig.*,
  982 F.2d 721 (2d Cir. 1992).............................................................................120

*In re Jordan*,
  598 B.R. 396 (Bankr. E.D. La. 2019) ............................................................112

*Kelly v. Corizon Health Inc.*,
  No. 2:22-cv-10589, 2022 WL 16575763 (E.D. Mich. Nov. 1, 2022)..............14, 88

*Kingdomware Techs. Inc. v. U.S.*,
  579 U.S. 162 (2016).........................................................................................130

*Kuehner v. Irving Tr. Co.*,
  299 U.S. 445 (1937)............................................................................................96

*Lamar, Archer & Cofrin, LLP v. Appling*,
  138 S.Ct. 1752 (2018).......................................................................................128

*In re Latin*,
  No. EC-08-1082, 2009 WL 7751424 (B.A.P. 9th Cir. Feb. 11, 2009).................129

*Logan v. Zimmerman Brush Co.*,
 455 U.S. 422 (1982)............................................................................................95

*In re LOOP 76, LLC*,
 465 B.R. 525 (9th Cir. BAP 2012), *judgment aff'd*, 578 Fed. Appx. 644 (9th
 Cir. 2014) ........................................................................................................116

*In re LTL Mgmt., LLC*,
 637 B.R. 396 (Bankr. D.N.J. 2022) ...................................................................27

*In re LTL Mgmt., LLC*,
 64 F.4th 84 (3d Cir. 2023) ........................................................................ *passim*

*In re LTL Mgmt., LLC*,
 652 B.R. 433 (Bankr. D.N.J. 2003), *aff'd*, 2024 WL 3540467 (3d Cir. July 25,
 2024) ..................................................................................................................28

*In re LTL Mgmt., LLC*,
 No. 23-2971, 2024 WL 3540467 (3d Cir. July 25, 2024)..............................28, 112

*In re Mahoney Hawkes, LLP*,
 289 B.R. 285 (Bankr. D. Mass. 2002) ...............................................................79

*In re Main St. AC, Inc.*,
 223 B.R. 771 (Bankr. N.D. Cal. 1999) ...............................................................79

*In re Mansaray-Ruffin*,
 530 F.3d 239 (3d Cir. 2008)..............................................................................145

*Marbury v. Madison*,
 5 U.S. 137 (1803).................................................................................................96

*In re Market Square Inn, Inc.*,
 162 B.R. 64 (Bankr. W.D. Pa. 1994) ..................................................................79

*Martin v. Wilks*,
 490 U.S. 755 (1989).......................................................................................98, 99

*In re Maya Const. Co.*,
 78 F.3d 1395 (9th Cir. 1996) ............................................................................144

*McConnell v. Federal Election Commission*,
 540 U.S. 93 (2003)............................................................................................114

*In re MCorp Fin., Inc.*,
 137 B.R. 237 (Bankr. S.D. Tex. 1992) ...............................................................94

*In re Merchants Mortg. & Tr. Corp., LLC*,
   No. 11-39455-MER, 2010 WL 11819478 (Bankr. D. Colo. Oct. 22, 2010) ........................142

*Mercury Cap. Corp. v. Milford Conn. Assocs., L.P.*,
   354 B.R. 1 (D. Conn. 2006) ..................................................................................126

*In re Monroe Well Serv., Inc.*,
   80 B.R. 324 (Bankr. E.D. Pa. 1987) ......................................................................79

*In re Motors Liquidation Co.*,
   829 F.3d 135 (2d Cir. 2016) ...........................................................................145, 146, 148

*Mozingo v. Correct Mfg. Corp.*,
   752 F.2d 168 (5th Cir. 1985) ................................................................................88

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) ..............................................................................44, 144, 148

*Official Comm. of Asbestos Personal Injury Claimants v. DBMP LLC*,
   No. 21-03023-JCW (Bankr. W.D.N.C. July 7, 2022) ..............................14, 16, 54

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
   848 F.2d 414 (3d Cir. 1988) ................................................................................78

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999) ...........................................................................................96

*PacifiCorp & Van Cott Bagley Cornwall & McCarthy v. W.R. Grace*,
   No. 05-764, 2006 WL 2375371 (D. Del. Aug. 16, 2006) ....................................144

*In re Parson*,
   632 B.R. 613 (Bankr. N.D. Tex. 2021) ..............................................................112

*In re Pecht*,
   57 B.R. 137 (Bankr. E.D. Va. 1986) ....................................................................79

*Pennbank v. Winters (In re Winters)*,
   99 B.R. 658 (Bankr. W.D. Pa. 1989) ..................................................................118

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ...........................................................................................95

*In re Phoenix Petroleum Co.*,
   278 B.R. 385 (Bankr. E.D. Pa. 2001) ..................................................................79

*In re Piece Goods Shops Co., L.P.*,
   188 B.R. 778 (Bankr. M.D.N.C. 1995) ................................................................94

*Piedmont Assocs. v. Cigna Prop. & Cas. Ins. Co.*,
132 B.R. 75 (N.D. Ga. 1991) ............................................... 121

*In re Quigley Co.*,
437 B.R. 102 (Bankr. S.D.N.Y. 2010) ................................... 110, 126, 131

*In re Quigley Co.*,
676 F.3d 45 (2d Cir. 2012) ................................................. 83, 84

*In re Quigley Company, Inc.*,
377 B.R. 110 (Bankr. S.D.N.Y. 2007) ................................... *passim*

*In re Quigley*,
346 B.R. 647 (Bankr. S.D.N.Y. 2006) ................................... 134, 135

*R.F.C. v. Denver & R.G.W.R. Co.*,
328 U.S. 495 (1946) ......................................................... 96

*In re Ralph Lauren Womenswear, Inc.*,
197 B.R. 771 (Bankr. S.D.N.Y. 1996) ................................... 139

*Ransom v. FIA Card Servs., N.A.*,
562 U.S. 61 (2011) ........................................................... 128

*In re Reddy Ice Holdings, Inc.*,
No. 12-32349, 2012 WL 2166170 (Bankr. N.D. Tex. Mar. 8, 2012) .................. 142

*In re Reg'l Care Servs. Corp.*,
No. 16-1213, 2017 WL 2871751 (B.A.P. 9th Cir. July 5, 2017) .................. 144

*In re Rest. Dev. Grp., Inc.*,
397 B.R. 891 (Bankr. N.D. Ill. 2008) ................................... 14

*In re Rivers End Apartments, Ltd.*,
167 B.R. 470 (Bankr. S.D. Ohio 1994) ................................. 119

*Robbins v. Physicians for Women's Health, LLC*,
90 A.3d 925 (Conn. 2014) ................................................. 87

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
81 F.3d 355 (3d Cir. 1996) ................................................. 78

*In re Scioto Valley Mortg. Co.*,
88 B.R. 168 (Bankr. S.D. Ohio 1988) ................................... 78

*In re Silberkraus*,
253 B.R. 890 (Bankr. C.D. Cal. 2000) ................................. 79

*In re SM 104 Ltd.*,
    160 B.R. 202 (Bankr. S.D. Fla. 1993) ................................................................116

*In re SMTC Mfg. of Texas*,
    421 B.R. 251 (Bankr. W.D. Tex. 2009) ..............................................................14

*In re South Beach Securities, Inc.*,
    606 F.3d 366 (7th Cir. 2010) ............................................................................113

*In re Southland Corp.*,
    124 B.R. 211 (Bankr. N.D. Tex. 1991) ..............................................................94

*In re Stanley Hotel, Inc.*,
    13 B.R. 926 (Bankr. D. Colo. 1981) ..................................................................77

*In re Stern*,
    70 B.R. 472 (Bankr. E.D. Pa. 1987) ................................................................128

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) ............................................................................130

*Thornwood, Inc. v. Jenner & Block*,
    344 Ill. App. 3d 15, 799 N.E.2d 756 (1st Dist. 2003) ........................................15

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ..........................................................................................91

*Travelers Indem. Co. v. Bailey*,
    557 U.S. 137 (2009) ..........................................................................................84

*Tulsa Prof'l Collection Serv., Inc. v. Pope*,
    485 U.S. 478 (1988) ........................................................................................144

*In re U.S. Truck Co.*,
    800 F.2d 581 (6th Cir. 1986) ..........................................................................119

*U.S. v. Jon-T Chemicals, Inc.*,
    768 F.2d 686 (5th Cir. 1985) ............................................................................14

*U.S. v. Miller*,
    317 U.S. 369 (1943) ..........................................................................................97

*In re United Gilsonite Labs*,
    No. 11-02032 (RNO), (Bankr. M.D. Pa. Sept. 30, 2014) ..................................133

*In re United Marine, Inc.*,
    197 B.R. 942 (Bankr. S.D. Fla. 1996) ..............................................................118

x

*In re USA Gymnastics*,
No. 18- 09108 (RLM) (Bankr. S.D. Ind. Oct. 26, 2021) .....................................................133

*In re Valrico Square Ltd. P'ship*,
113 B.R. 794 (Bankr. S.D. Fla. 1990) ..................................................................................79

*In re W.R. Grace & Co.*,
475 B.R. 34 (Bankr. D. Del. 2012) ..............................................................................117, 120

*In re W.R. Grace & Co.*,
729 F.3d 311 (3d Cir. 2013)...............................................................................................120

*In re Washington Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ..................................................................................126

*West v. Am. Tel. & Tel. Co.*,
311 U.S. 223 (1940)..............................................................................................................88

*In re Wetdog, LLC*,
518 B.R. 126 (Bankr. S.D. Ga. 2014) .................................................................................117

*Matter of Woodbrook Associates*,
19 F.3d 312 (7th Cir. 1994) ...............................................................................................116

*In re Xerium Techs., Inc.*,
No. 10-11031 (KJC), 2010 WL 3313079 (Bankr. D. Del. May 12, 2010)..........................142

*In re Zamora-Quezada*,
622 B.R. 865 (Bankr. S.D. Tex. 2017) ...............................................................................100

*In re Zamost*,
7 B.R. 859 (Bankr. S.D. Cal. 1980) .....................................................................................92

*In re Zenith Elecs. Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999) .......................................................................................78

*In re Ziemann*,
No. 11-05-11276, 2008 WL 312474 (Bankr. D. N.M. Feb. 1, 2008)...................................118

## Statutes

11 U.S.C. 502(b) ..................................................................................................................64

11 U.S.C. § 365(c)(2)............................................................................................................15

11 U.S.C. § 502(a) ................................................................................................130, 131, 137

11 U.S.C. § 502(b) ..............................................................................................................130

11 U.S.C. § 502(b)(1) ........................................................................................93, 127

11 U.S.C. § 502(c) ............................................................................................137, 139

11 U.S.C. § 524(e) ..............................................................................................83, 109

11 U.S.C. § 524(g) .................................................................................................. *passim*

11 U.S.C. § 727(a)(1) ...................................................................................................92

11 U.S.C. § 1124(1) ....................................................................................................142

11 U.S.C. § 1126(c) ................................................................................................ *passim*

11 U.S.C. § 1126(f) ....................................................................................................142

11 U.S.C. § 1126(g) ...................................................................................................116

11 U.S.C. § 1129(a)(3)..................................................................................100, 111, 112

11 U.S.C. § 1129(b) ................................................................................................ *passim*

11 U.S.C. § 1129(b)(1) ...............................................................................................117

11 U.S.C. § 1129(b)(1) & (2)......................................................................................117

11 U.S.C. § 1129(b)(2)(B)...................................................................................123, 124

11 U.S.C. § 1141(d)(1) .................................................................................................92

11 U.S.C. § 1141(d)(3) .................................................................................................92

18 U.S.C. § 152(a)(6) ...................................................................................................95

28 U.S.C. § 1359...........................................................................................................113

28 U.S.C. § 1411...........................................................................................................114

**Other Authorities**

Adam J. Levitin, *The Constitutional Problem of Nondebtor Releases in
    Bankruptcy*, 91 FORDHAM L. REV. 429, 440 (2022) ......................................92, 95. 98

Andrew M. Troop *et al.*, *The Mechanics of Prepacks:  What Happens Pre-
    Petition, and How to Make It Stick Post-Petition*, 071714-ABL-CLE 123, ABI
    Northeast Bankruptcy Conference (July 17-20, 2014) ........................................142

BeLynn Hollers, *South Carolina Jury Awards $63.4 Million to Johnson &
    Johnson Asbestos Victim*, Business Wire August 15, 2024 ...................................36

Berge, et al., *Genital Use of Talc and Risk of Ovarian Cancer: A Meta-Analysis*,
27 European J. Cancer Prev. 248 (2018) ................................................................54

Brendan Pierson, *J&J must pay $18.8 million to California Cancer Patient in Baby Powder Suit*, Reuters, July 18, 2023 ...........................................6, 24, 36

Brendan Pierson, *J&J must pay $260 million in latest talc trial, Oregon jury says*,
Reuters, June 4, 2024 ...............................................................................6, 24, 36

19 C.J.S. Corporations § 901 (2023)........................................................................87

FDA News Release, *Baby Powder Manufacturer Voluntarily Recalls Products for Asbestos*..................................................................................................................56

4 Fed. Proc. Forms § 9.188 (2024) ........................................................................142

Fed. R. Bankr. P. 3003(c)(2).................................................................127, 128, 129, 130

Fed. R. Bankr. P. 3003(c)(3).........................................................................128, 129

Fed. R. Bankr. P. 3017(d) .......................................................................................141

Fed. R. Bankr. P. 3017(e) .......................................................................................141

Fed. R. Bankr. P. 3018(a) .........................................................................................94

Fed. R. Bankr. P. 3018(b) .......................................................................................141

Fed. R. Bankr. P. 5005...........................................................................................142

Federal Rule of Evidence 702..................................................................................53

Girion, Lisa¸ *Johnson & Johnson Knew for Decades that Asbestos Lurked in Its Baby Powder*, Reuters, Dec. 14, 2018 ......................................................................59

H.R. Rep. No. 95-595, 384 (1977)............................................................................92

Katie M. O'Brien, *et al., Intimate Care Products and Incidence of Hormone-Related Cancers: A Quantitative Bias Analysis*, J. Clin. Oncology (2024) ...........19

*Journal of Occupational and Environmental Medicine*, Vol. 62, No. 1 (Jan. 2020)....................55

*'Junk' Claims,* CreditSlips.org, April 26, 2024, *at* https://www.creditslips.org/creditslips/2024/04/stuffing-the-chapter-11-ballot-box-with-junk-claims.html........................................................................................4

Levanon, et al., *New Insights Into the Pathogenesis of Serous Ovarian Cancer and Its Clinical Impact.* J Clin Oncol 26:5284-5293 (2008)................................33

O'Brien et al., *Association of Powder Use in the Genital Area with Risk of Ovarian Cancer*, 323 JAMA 49 (2020)......................................................................54

O'Brien KM, Wentzensen N, Ogunsina K, Weinberg CR, D'Aloisio AA, Edwards JK, Sandler DP. *Intimate Care Products and Incidence of Hormone-Related Cancers: A Quantitative Bias Analysis*...........................................................55

Penninkilampi et al., *Perineal Talc Use and Ovarian Cancer: A Systemic Review and Meta-Analysis* ...............................................................................................54

Restatement (Second) of Torts § 400...........................................................................85, 86

S. Rep. No. 95-989, 130 (1978) ............................................................................................92

Taher et al., *Critical Review of the Association between Perineal Use of Talc Powder and Risk of Ovarian Cancer*, 90 Reproductive Toxicology 88 (2019) .....................54

*Talcum Baby Powder Lawsuit*, Apr. 22, 2024, https://www.forbes.com/sites/caileygleeson/2024/04/20/court-orders-johnson--johnson-and-kenvue-to-pay-45-million-in-talcum-baby-powder-lawsuit/....................6, 24, 36

Theresa S. Emory, MD, John C. Maddox, MD, and Richard L. Kradin, MD, AM. J. IND. MED. (2020) ..............................................................................................55

US News, J&J Settles Talcum Powder Lawsuits from States for $700 Million, available at https://www.usnews.com/news/health-news/articles/2024-06-13/j-j-settles-talcum-powder-lawsuits-from-states-for-700-million#:~:text=THURSDAY%2C%20June%2013%2C%202024%20(,a%20heightened%20risk%20for%20cancer ................................................................51

The Coalition of Counsel for Justice for Talc Claimants (the "Coalition"),[2] by and through its undersigned counsel, respectfully submits this Objection (the "Objection") to Debtor's motion (Dkt. No. 46) (the "Motion")[3] for entry of an order approving (I) adequacy of the *Disclosure Statement for Prepackaged Chapter 11 Plan of Reorganization of the Debtor*, dated June 3, 2024 (Dkt. No. 25-2) (the "Disclosure Statement"), (II) Solicitation Packages and Solicitation Procedures employed for the solicitation and tabulation of votes on the *Prepackaged Chapter 11 Plan of Reorganization of the Debtor* (Dkt. No. 24) (the "Plan"), and (III) notice of non-voting status.

## **DISCOVERY**

1.     The Coalition reserves the right to conduct discovery in connection with this contested matter in accordance with Bankruptcy Rule 9014(c) and to supplement this Objection upon the completion of discovery.  The Coalition asserts that discovery will show, *inter alia*, that the Plan does not enjoy the support of over 75% of the current claimants who are eligible to vote under the Bankruptcy Code and the Bankruptcy Rules and that this case was filed for an improper purpose.  Subject to the foregoing, and in support of this Objection, the Coalition respectfully states as follows:

## **PRELIMINARY STATEMENT**

2.     We begin with the words of the United States Supreme Court:  "Confining ourselves to the question presented, we hold only that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks

---

[2]     The Coalition includes Ashcraft & Gerel, LLP; Beasley Allen Crow Methvin Portis & Miles, PC; Golomb Legal, PC; Levin Sedran & Berman, LLP; Levin, Papantonio, Proctor, Buchanan, O'Brien, Barr, Mougey, PA; and Robinson Calcagnie, Inc.

[3]     Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Disclosure Statement.

to discharge claims against a nondebtor without the consent of affected claimants." *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 2088, 219 L. Ed. 2d 721 (2024).

3.      As will become evident throughout this Objection, this bankruptcy is a prime example of an attempt to do what the Supreme Court prohibits—all for the benefit of Johnson & Johnson ("J&J"), one of the wealthiest conglomerate businesses in the United States, which has now three times devised schemes attempting to give itself a bankruptcy discharge without ever committing itself, its assets or the totality of its liabilities to the scrutiny of a Bankruptcy Court.

4.      J&J's scheme began with the formation of Red River Talc LLC ("Red River" or the "Debtor"), now the Debtor before this Court, as an entity within J&J's control, set up solely for the purpose of taking on a selected portion of J&J's talc problems—the women who suffer and die from ovarian cancers caused by J&J's talc products.[4]  But J&J was not content to have Red River address just those claims for which there is scientific evidence of the harm J&J caused and hid from sick and dying women.  Rather, so as to try to overcome their true victims' opposition to this never-ending tactic and to force inadequate settlement on them, J&J added to Red River's portfolio those women who suffer with other gynecological issues that are not caused by J&J's talc products.  J&J promised each member of this latter group of women, for which J&J had never before even recognized as holding claims, $1,500 each for participating in this bankruptcy as supporting creditors.

5.      To further this devious manipulation and effort to minimize the true sums that J&J should be paying to ovarian cancer claimants, J&J set up Red River, "negotiated" a "settlement" with Red River's predecessor LLT Management LLC ("LLT") (another of J&J's controlled

---

[4]      J&J set up another contrived company, Pecos River Talc ("Pecos") to hold other talc liability such as liability involving mesothelioma and certain governmental and Canadian claims.

subsidiaries in the chain that led to Red River) that would forever rid J&J of the obligation to recognize and pay the women it harmed, had LLT put together a plan for a non-existent entity, eventually formed that entity as Red River, and had Red River file this bankruptcy. Hence, we now turn to facts and issues that led to this Objection.

6.     It is important to note that just like the two prior bankruptcy cases, J&J invented this Debtor, which has no business to reorganize and nothing to gain from fulsome negotiations with its creditors. This case has been filed by a fabricated Debtor in an effort to allow the real party in interest, J&J, to evade liability for the harms it caused to tens of thousands of women from its carcinogenic talc products. The nominal Debtor entity was created and immediately saddled with the talc liabilities of a J&J affiliate shortly before it filed for bankruptcy. This case is really about J&J, which is attempting for the third time to gain the benefits of bankruptcy—a stay of litigation and ultimately a discharge of its own talc liability—without ever filing for bankruptcy itself. Red River is but a beard for one of the world's wealthiest companies, seeking to escape liability on the cheap.

7.     J&J set up Red River's case to enable J&J to obtain bankruptcy benefits without paying the bankruptcy price, namely undergoing the scrutiny of the bankruptcy system, subjecting itself to the requirements of Court approval for transactions outside of the ordinary course of business, and making all its assets available for distribution to creditors. Instead, J&J is attempting to piggyback on Red River's bankruptcy to impose interminable delay on the women it has harmed, preventing them from having their lawsuits heard before juries of their peers or settling their claims in amounts that fairly compensate them for the suffering they endured at the hand of J&J.

8.     Delay itself benefits J&J. J&J can lie back, avoid paying judgments, and continue its normal business operations while Red River sits in bankruptcy. Delay also provides J&J with

3

negotiating leverage that it hopes will force its victims to accept a lowball settlement. J&J can afford to sit and wait; women who are dying of ovarian cancer and facing medical bills, funeral costs, and lost income for their families cannot. J&J's entire game is about "delay to underpay." So far, J&J has successfully delayed its day of doom through these bankruptcy contrivances—thrown out by Courts twice before—and now resurrected for the third time.

9.      For J&J's ploy to work, it must convince this Court to let this case move forward. To that end, J&J is attempting to make it appear as if it has substantial support for a so-called "pre-packaged" bankruptcy plan, daring the Court to defy the will of a supposed and equally contrived supermajority of talc victims. As part of this ploy, J&J is seeking the approval of a Disclosure Statement, as well as the Solicitation Procedures and Tabulation Procedures.

10.     But the supposed "supermajority" is largely comprised of "non-compensable" claims for various non-ovarian gynecological cancers.[5] These are claims for which J&J has never paid a cent in either a judgment or settlement, as there is no scientific evidence linking these non-ovarian gynecological cancers to talc. J&J bought the votes of claimants with non-compensable claims by promising plaintiffs' attorneys with large non-compensable "inventories" $1,500 Quickpay payments in exchange for supporting its Plan. If this case proceeds, the Coalition, which represents claimants with compensable ovarian cancer claims, intends to challenge the allowance of these non-compensable non-ovarian gynecological claims for voting purposes.

11.     In this Objection, however, the Coalition underscores that the Disclosure Statement is itself patently inadequate. J&J (and not the Debtor, which did not even exist at the time of the solicitation) has solicited votes using a Disclosure Statement that is false and misleading and which

---

[5]     One prominent bankruptcy scholar has termed this maneuver "Stuffing the Chapter 11 Ballot Box with 'Junk' Claims." Adam Levitin, *Stuffing the Chapter 11 Ballot Box with 'Junk' Claims,* CreditSlips.org, April 26, 2024, *at* https://www.creditslips.org/creditslips/2024/04/stuffing-the-chapter-11-ballot-box-with-junk-claims.html.

describes a Plan that includes relief that is well beyond the outermost bounds of section 524(g) and that this Court cannot grant under the Supreme Court's recent ruling in *Purdue*.

12.     J&J has also used Solicitation Procedures designed to prevent women from knowing that their rights are being taken away from them.  Even if the relief sought by J&J could be granted, which it cannot, this Court cannot approve or count votes solicited using unlawful procedures and cannot approve a Disclosure Statement that contains false and misleading information.

13.     The solicitation process was deficient in at least six ways, four of which specifically establish major inadequacies in the Disclosure Statement.

14.     *First*, the Disclosure Statement lacks adequate information to enable a talc victim to make an informed judgment about the Plan because it fails to highlight and properly disclose that women will forever lose their right to sue J&J for its independent and direct liability for their injuries if the Plan is confirmed over their objection and without their consent.

15.     *Second*, the Disclosure Statement provides a materially false and misleading portrayal of J&J's talc liability, its experience in the tort system, and its likelihood of success in the tort system.  Contrary to J&J's portrayal, Courts have uniformly found causation evidence linking exposure to J&J's talc products to ovarian cancer sufficiently reliable to submit to juries.

16.     These findings reflect decades of epidemiological studies considering the association between the routine application of J&J's talcum powder products to the female genital area and ovarian cancer.  In 2018, following a six-week jury trial, J&J was found liable and ordered to pay $2.11 billion in damages to 22 women who suffered or died from ovarian cancer.

17.     This verdict was upheld through appeal to the Supreme Court of Missouri and the United States Supreme Court.  The evidence continues to mount:  a study published in May 2024

in the *Journal of Clinical Oncology* involving 50,884 women found that exposure to talc products during their 20s and 30s nearly doubles the risk of ovarian cancer.[6]

18.     Additionally, eleven successive juries have now found J&J liable for mesothelioma caused by its talc products, including recent verdicts in California,[7] Illinois,[8] and Oregon.[9] Exposure to asbestos is universally recognized as the predominant cause of mesothelioma and the **only** cause as applicable to J&J.[10]   In finding J&J liable in each of these cases, juries have necessarily found that J&J's talc products contained asbestos.

19.     These findings are relevant to cases involving ovarian cancer, particularly as the U.S. Environmental Protection Agency recognized in 2022 that asbestos also causes ovarian cancer.   As more evidence accumulates showing that J&J's talc products contain asbestos and causes ovarian cancer in their own right, J&J faces greater litigation risk in each successive ovarian cancer case.   But these and other relevant facts are omitted or buried in the Disclosure Statement

---

[6]     Katie M O'Brien et al., *Intimate Care Products and Incidence of Hormone-Related Cancers: A Quantitative Bias Analysis*, J. of Clinical Oncology, May 2024.  *See* Beville Decl. [Dkt. No. 42] at Ex. 3.

[7]     Brendan Pierson, *J&J must pay $18.8 million to California Cancer Patient in Baby Powder Suit*, Reuters, July 18, 2023, https://www.reuters.com/legal/jj-must-pay-188-mln-california-cancer-patient-baby-powder-suit-2023-07-18/.  *See* Beville Decl. [Dkt. No. 42] at Ex. 36.

[8]     Cailey Gleeson, *Court Orders Johnson & Johnson and Kenvue to pay $45 million in Talcum Baby Powder Lawsuit*, Apr. 22, 2024, https://www.forbes.com/sites/caileygleeson/2024/04/20/court-orders-johnson--johnson-and-kenvue-to-pay-45-million-in-talcum-baby-powder-lawsuit/.  *See* Beville Decl. [Dkt. No. 42] at Ex. 35.

[9]     Brendan Pierson, *J&J must pay $260 million in latest talc trial, Oregon jury says*, Reuters, June 4, 2024, https://www.reuters.com/legal/jj-must-pay-260-million-latest-talc-trial-oregon-jury-says-2024-06-04/. *See* Beville Decl. [Dkt. No. 42] at Ex. 37.

[10]    Although exposure to radiation can cause mesothelioma and genetic factors can increase the risk of developing the disease, as applicable to this case exposure to asbestos is the **only** cause of mesothelioma. *See, e.g.*, Mesothelioma Causes, Risks and Prevention, (Penn Medicine Abramson Cancer Center), https://www.pennmedicine.org/cancer/types-of-cancer/mesothelioma/causes-risks-prevention#:~:text=What%20Causes%20Mesothelioma%3F,Your%20workplace%20or%20environment.

to hide the litigation risks that J&J faces and portend a bleak, but false future for claimants to manipulate them into capitulation.

20.     **Third**, the solicitation materials J&J used to solicit votes state that women will receive payments on account of their talc claims that are mathematically impossible.  The Debtor claims that "holders of qualifying ovarian cancer claims would likely receive an average recovery of between **$75,000 and $150,000** on each claim."  LLT June 3, 2024 Letter.

21.     But given the number of current and future claims that qualify for the $1,500 Quickpay payment, holders of ovarian cancer claims will not receive an average recovery of between $75,000 and $150,000 on each claim at the level of funding provided in this Plan.

22.     J&J's cash contributions, which will be paid over the next **25 years**, do not provide for sufficient funding to reach these values.  J&J solicited votes using false and misleading information about the claimants' expected recoveries.  For women facing debilitating disease and death from exposure to J&J's talc products and the substantial costs associated with medical care, inability to earn wages and other family needs, what they will recover for their injuries is perhaps the most material information they want and need in the Disclosure Statement and Plan.  At bottom, women were lied to about what they can expect under the Plan.  Their "consent" and "vote," if it were actually given, was procured through omission and fraud.

23.     **Fourth**, J&J's Plan is patently unconfirmable.  J&J and its spun-off former subsidiary, Kenvue, both have independent talc liability, distinct from Red River's and certainly not derivative of it.  J&J has itself engaged in tortious conduct toward women.  The independent talc liability of J&J and Kenvue cannot be channeled, discharged, or released by a Court, including under section 524(g) of the Bankruptcy Code.  Yet J&J's Plan provides for non-consensual releases of their direct, independent liability.

24.     Thus, the "final order" that J&J demands as a prerequisite to funding is an impossibility.  Further, if section 524(g) of the Bankruptcy Code offered such protections here, it would violate the Fifth Amendment's prohibition on uncompensated takings of property.  The Debtor is asking this Court to enter an order that would take talc claimants' right to sue non-debtor J&J and Kenvue for their injuries.  That right is a type of property, namely a chose in action, and under the Fifth Amendment, which controls over the Bankruptcy Code, a federal court cannot deprive the talc claimants of it without just compensation and meaningful notice.

25.     J&J's transgressions do not end with its Disclosure Statement.  J&J is orchestrating a vote under which holders of non-compensable claims would be entitled to drown out the voices of holders of claims found to be compensable in the tort system.

26.     Having solicited votes using false and misleading formation, J&J is seeking to overweight the value of non-compensable claims by using a one dollar equals one vote regime.  While this system has been used in other cases that are distinguishable, the Bankruptcy Code and case law dictate that such a scheme cannot be used here.  The values accorded to each talc claim must reflect the values accorded to such claims in the tort system (taking prevailing science into consideration) and the claimants' economic interest in the Debtor's estate.  Only holders of compensable claims should be permitted to vote as there are no damages for which the Debtor is liable to holders of non-compensable claims.

27.     *Fifth*, even after stuffing the ballot box with non-compensable claims, J&J did not clear the 75% threshold required by section 524(g) of the Bankruptcy Code when voting closed.  J&J manipulated the voting results and converted approximately 11,434 votes to "reject" the Plan to votes to "accept" the Plan **after** the July 26, 2024 voting deadline.  This conversion was done without the consent of the claimants who voted and, in many instances, without their knowledge.

28.     The Voting Declaration (Dkt. No. 47) is false and does **not** accurately reflect the votes that were cast.  If Epiq had complied with J&J's own voting procedures, the tabulation report filed by Epiq would show that J&J's Plan does not enjoy the support of 75% or more of the claimants who submitted votes.  J&J's assertion that its Plan enjoys the support of more than 75% of the claimants who voted is not true.

29.     ***Finally***, J&J's notice program was deficient.  Even though the Debtor and J&J have multiple ways to identify current talc claimants, actual notice was not provided to all holders of known claimants.  Because they did not receive notice, claimants are not aware that the Debtor seeks to release thousands of parties and the breadth and scope of these releases, alone, require actual notice to the victims whose rights will be taken away if J&J's Plan is confirmed.  J&J's notice program did not provide for the required notice, relying instead on a media campaign.  As a result, many parties who were readily identifiable from LLT and J&J's own records could readily have received actual notice.  Instead, they received, at best, constructive notice—if they received any notice at all.

30.     Given these and other defects, it is not surprising that J&J is seeking to jam parties into a compressed timeline designed to prejudice parties' rights to conduct discovery and present evidence of J&J's fraud and self-dealing, particularly as it pertains to the vote.  But there is no reason for the Court to limit discovery and prevent parties from showing that J&J's Plan does not enjoy the support of a supermajority of claimants.  The Debtor has no operations or employees.

31.     The Debtor is a made-for-bankruptcy shell entity designed by one of the wealthiest companies in the world to leverage bankruptcy as a litigation tactic to extinguish fundamental legal rights that the Bankruptcy Code was never intended to take away.  The Court and the thousands

of women impacted by this bankruptcy do not need to be rushed by J&J's illegal attempt to remove liabilities from its own books for the benefit of its shareholders.

32.     In fact, there are several fundamental issues that must be determined before the Court even considers the Disclosure Statement or the Plan:

> **Motion to Dismiss (Dkt. No. 44)**.  Is this third bankruptcy a legitimate filing, or should this case, too, be dismissed as a bad faith filing, especially in circumstances where the U.S. Supreme Court's decision in *Purdue* prohibits the very relief J&J is seeking?  Is there any point to permitting J&J's latest made-for-bankruptcy entity to be in bankruptcy at all (let alone the many years that other Texas Two-Step cases are spending in bankruptcy), when the discharge that J&J demands cannot be granted under the Bankruptcy Code and violates the Fifth Amendment?

> **Motion to Designate Votes (Dkt. No. 265)**.  If, *arguendo*, there is a good faith basis for J&J's third bankruptcy, what is the effect on ballot counts regarding the votes solicited by J&J using false and misleading information?  *See* 11 U.S.C. §§ 1126(e), 1125(a) & 1126(b).  Can claimants with non-compensable claims (*i.e.*, claims that are unenforceable under applicable law), or whose claims were settled prior to the bankruptcy, vote on J&J's plan?  *See* 11 U.S.C. §§ 101(5)(A) & 502(b).  And should the votes cast by claimants be counted?  If J&J is forced to count the votes correctly, then J&J's efforts to absolve itself of talc liability fails out of the gate because J&J did not clear the 75% threshold under section 524(g).  The failure to garner 75% of the votes applies even if holders of non-compensable claims are permitted to vote.

> **Motion for a Bar Date (Dkt. No. 264)**.  If, *arguendo*, J&J is permitted to proceed in bankruptcy and is required to re-solicit votes using a disclosure statement that contains adequate information, should claimants be required to file proofs of claim before they vote, as the Bankruptcy Rules contemplate?  *See* Fed. R. Bankr. P. 3003(c)(2) ("any creditor who fails" to timely file a proof of claim "shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution.").  A bar date is critical here given the existing voting irregularities and the need to vet claims that the Debtor and J&J insist are disputed, contingent, and unliquidated.  It must be remembered that to this day, J&J insists that its talc products are safe and free from asbestos, denying all liability for the serious harms exposure to those products have caused, and despite jury verdicts, expert analysis and studies to the contrary.  And, given the broad scope of the discharge sought by J&J, what notice must be provided of a claims bar date for personal injury and wrongful death claims?

**Motion for Estimation for Voting Purposes (Dkt. No. 267)**.  And, once the claims pool of current claimants is defined, what weight for voting purposes should be given to the various categories of talc claims that J&J is seeking to discharge?  Wrongful death claims involving ovarian cancer cannot be accorded the same weight as a claim of someone who has no illness, or someone whose claim is not compensable in the tort system. *See* 11 U.S.C. § 502(c).  The Court would need to develop an appropriate discovery schedule for an estimation proceeding.

33.     It is only ***after*** the Motion to Dismiss is decided (*i.e.*, whether J&J's third bankruptcy case be dismissed for "cause"), ***after*** a bar date has passed, ***after*** a Court has ruled on the estimation issues presented by J&J's Plan (*i.e.*, ***who*** can vote and ***with what*** weight), and ***after*** a reasonable and sober calculation of what actual recoveries can be expected for current and future claimants *(i.e.*, what does this Plan mean to each voter), that a disclosure statement could be properly considered.  J&J's request to schedule a hearing on its Disclosure Statement puts the proverbial cart before the horse.  Creditors have the right to information that has not been provided to date.  An appropriate case schedule should consider the relief requested by the Coalition before considering the adequacy of the Disclosure Statement.

34.     J&J's Motion reflects a calculated attempt to push this case forward by presenting it as a legitimate, run-of-the mill pre-packaged bankruptcy.  It is not.  Nothing of this nature has been attempted before and should not be permitted now.  As set forth in detail herein, well-established bankruptcy principles give the Court the tools to consider the needs and views of all constituent parties, and the conventional application of those principles and use of those tools requires the denial of the relief sought by the Debtor in the Motion.

## LEGAL AND FACTUAL BACKGROUND

35.     J&J's bankruptcy ploy reflects an ongoing effort by wealthy companies to use bankruptcy to resolve their own tort liability for amounts of their own choosing.  J&J's scheme to use the bankruptcy of a fabricated subsidiary as a "litigation tactic" designed to create delay and

11

leverage is the epitome of bad faith. This Objection deals with the Disclosure Statement, Solicitation and Tabulation Procedures, and J&J's failure to provide adequate notice.

36.     The Coalition has filed a motion to dismiss this case. Yet, in evaluating whether to move forward on the Debtor's timeline and whether to approve the Disclosure Statement and the solicitation and tabulation procedures and deficient notice program as J&J demands, it is necessary to understand how they fit into J&J's scheme to abuse the bankruptcy system. The starting place for this is to review the lessons provided by prior bankruptcy cases involving asbestos.

## I.    LESSONS LEARNED IN PRIOR ASBESTOS BANKRUPTCY CASES

37.     Section 524(g) permits companies facing asbestos liability to resolve current and future claims in bankruptcy through the mechanisms of a channeling injunction that directs all asbestos claims *against the debtor* to recover solely from a newly created trust funded by the debtor and potentially certain other parties.

38.     The channeling injunction may also extend to a limited group of non-debtors based on their *derivative* liability tied to specific statutory requirements; it cannot extend to any independent liability of these non-debtors. *See infra* at ¶¶ II.A.2. Any channeling injunction under section 524(g) requires the support of a supermajority of asbestos claimants.

39.     Companies with business operations that have filed for bankruptcy due to asbestos liability have often spent years in bankruptcy. *See*, *e.g.*, *In re Garlock Sealing Techs., LLC*, Case No. 10-BK-31607 (Bankr. W.D.N.C.) (debtor exited bankruptcy after seven years). Section 524(g) creates a dynamic that is both beneficial and problematic for companies with asbestos liability.

40.     On the one hand, while the company is in bankruptcy, it typically does not pay any defenses costs, settlements, or judgments due to the automatic stay. Thus, while the company is in bankruptcy, no victims are paid. Many victims have died waiting for asbestos bankruptcy cases

to end.  A company with asbestos liability may view its time in bankruptcy as beneficial (*i.e.*, a significant cost savings), while victims view it as harmful (*i.e.*, justice delayed is justice denied).

41.     On the other hand, real companies, with operating assets and employees, need to reorganize.  They cannot and do not want to stay in bankruptcy forever.  The waiting game can only go on for so long.  Eventually, to exit bankruptcy, the company must reach a deal that the plaintiffs with valid claims think is fair and equitable to confirm a plan that resolves current and future asbestos liabilities in a manner consistent with section 524(g).

42.     Of course, a company with asbestos liability (like J&J) would prefer to get the benefits of a multi-year litigation holiday without also being pressured to reach a deal acceptable to the plaintiffs.  Any company with asbestos or other mass tort liability would prefer to use bankruptcy to enjoin litigation against it if it could also avoid subjecting itself to the onus of being a debtor in bankruptcy.  The Holy Grail that companies with mass tort liability using the Texas Two-Step have long sought is the ability to avail themselves of the benefits of a bankruptcy without suffering any of the burdens of bankruptcy.  This is what J&J's bankruptcy strategy attempts to accomplish.

## II.     THE TEXAS TWO-STEP STRATEGY

43.     J&J's strategy is to get the benefits of bankruptcy without the pressure to reach a fair and equitable deal with its victims.  J&J is attempting to avoid the dynamic created by section 524(g) by fabricating a non-operating debtor that has no need to enter or exit bankruptcy.

44.     J&J's planned structure was not designed to facilitate a reorganization or any legitimate bankruptcy purpose for this non-operating debtor.  Rather, it was designed to create a situation where tort victims are trapped in an interminable bankruptcy with the aim of forcing them to accept whatever terms J&J dictates.

45.     The method J&J has used to implement its strategy is the so-called "Texas Two-Step"—*i.e.*, a divisive merger under Texas law that splits a company into a GoodCo, assigned the valuable operating assets, and a non-operating BadCo, assigned the disfavored liabilities, followed by a bankruptcy filing by BadCo.  This sort of divisional merger bears the hallmarks of a fraudulent transfer, stripping out the assets and leaving creditors to pursue an empty shell company.

46.     The Texas divisive merger statute, however, does not sanction fraud.  The Texas statute does not "abridge any right or rights of any creditor under existing law." Tex. Bus. Org. Code § 10.901.  When a party undertakes a "divisional merger" that is fraudulent, creditors can assert an array of rights and remedies under state law.

47.     These rights and remedies include, *inter alia*, fraudulent transfer claims,[11] the use of the doctrine of successor liability to hold the company that is a mere continuation of the tortfeasor's business fully liable for the tort claims,[12] and the use of the alter ego doctrine to hold the parent liable for the tort claims (in cases where the parent was not already independently liable for such claims).[13]  Legal advisors, directors and officers can also be sued for aiding and abetting the fraud.[14]

---

[11]  *See*, *e.g.*, *Official Comm. of Asbestos Personal Injury Claimants v. DBMP LLC*, No. 21-03023-JCW (Bankr. W.D.N.C. July 7, 2022), Hr'g Tr. (Beville Decl. [Dkt. No. 42] at Ex. 39) at 23-25 (finding that it would be "contrary to all Anglo-American notions of fraudulent conveyance law" for the victims of a fraudulent divisional merger conducted under Texas law to have "no recourse" against the entity that received the operating assets).

[12]  *See*, *e.g.*, *Kelly v. Corizon Health Inc.*, No. 2:22-cv-10589, 2022 WL 16575763 (E.D. Mich. Nov. 1, 2022) (holding tort victims impacted by a fraudulent divisional merger conducted under Texas law can hold the company that receives the operating assets liable under state law doctrines of successor liability); *Jackson v. Corizon Health Inc.*, 2:19-cv-13382, 2022 WL 16575691 (E.D. Mich. Nov. 1, 2022) (same).

[13]  *See*, *e.g.*, *U.S. v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 691-92 (5th Cir. 1985); *In re SMTC Mfg. of Texas*, 421 B.R. 251, 321 (Bankr. W.D. Tex. 2009).

[14]  *See*, *e.g.*, *In re Rest. Dev. Grp., Inc.*, 397 B.R. 891, 894 (Bankr. N.D. Ill. 2008) (denying motion to dismiss a claim against former attorneys of a restaurant company who allegedly engaged in a scheme to defraud the company's creditors); *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2005) (finding creditors may bring claims against one who assists another in executing a fraudulent transfer);

48.     The Texas Two-Step's solution to the risk of the challenges to the divisional merger fraud is for the GoodCo to provide a funding agreement to the BadCo equal to the value of the assets that were assigned to the GoodCo.  When creditors assert that the divisional merger was fraudulent, the debtor points to the funding agreement and says that no one was harmed because the full value of the assets that were taken is still available to pay claims.  Tellingly, no funding agreement in a Texas Two-Step case has ever been enforced over the payor's objection.

49.     Some funding agreements have been drafted so that if the payor loses control over the payee (or cannot prevent the payee from settling tort claims that trigger the payor's obligation to fund), then the payor is excused from performing its obligations.[15]  In other words, the funding agreement is "as good as gold" whenever parties need to face a Court and proclaim that no fraud occurred.  But the funding agreement suddenly becomes a nullity—*i.e.*, an unenforceable financial accommodation[16]—whenever parties attempt to enforce it against the payor.

50.     The Texas Two-Step was first deployed in the Western District of North Carolina— the same Court that oversaw the *Garlock* bankruptcy.  And it has been remarkably successful in achieving the objective of creating lethal delay.

51.     The *Bestwall* case, another Texas Two-Step, was filed on November 2, 2017.  *In re Bestwall LLC*, Case No. 17-31795 (LTB) (W.D.N.C).  The primary objective was to halt asbestos litigation against Georgia-Pacific—a global producer of paper products that was not insolvent. The Court entered an injunction preventing litigation against Georgia-Pacific and its non-debtor affiliates from going forward during Bestwall's bankruptcy.

---

*Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 799 N.E.2d 756 (1st Dist. 2003) (refusing to dismiss claim against a law firm for aiding and abetting a client's fraudulent scheme).

[15]   *See In re Aearo Techs., LLC*, Case No. 23-02890-JJG (Bankr. S.D. Ind. July 26, 2022) (Dkt. No. 11 at Ex. B).

[16]   *See* 11 U.S.C. § 365(c)(2).

52.     Since Bestwall filed for bankruptcy, Georgia-Pacific has not paid any judgments or settlements or needed to incur defense costs.  Bestwall, a non-operating company like Red River, has had no reason to exit bankruptcy and has now been in bankruptcy for nearly 7 years and counting.  The primary objective of Bestwall's case, like J&J's objective here, is to secure a discharge of Georgia-Pacific's tort liability even though Georgia-Pacific is not a debtor.  It has nothing to do with reorganizing a going concern.  It is nothing more than a litigation tactic designed to deprive victims of their Constitutional rights while keeping all the leverage in the hands of the debtor and its parent.

## III.     J&J'S TALC PROBLEM

53.     What J&J does not disclose in its Disclosure Statement is that like Georgia Pacific, J&J has long been searching for a way to halt litigation against it in the civil justice system.  J&J has known, since *at least* the 1950s, that its mined talc was contaminated with asbestos.  Testing conducted by J&J in 1957 showed that its talcum powder contained tremolite—one of six kinds of materials commonly referred to as ***asbestos***.

54.     Tremolite and other forms of asbestos are carcinogens—largely because of the physical shape of the fibers, which damage cells and inhibit cell processes in ways that cause cancer.  Asbestos is very durable and can remain inside the human body for years before disease becomes evident.

55.     Talc and asbestos are naturally occurring minerals that have been mined in similar regions.  Talc mines have employed procedures for screening for asbestos, but no mining or beneficiation methods can remove asbestos present in talc ore no matter how exacting the process.  There is no safe level of asbestos exposure.

56.     By 1969, J&J was aware of the health risks of asbestos in its talc products.  But rather than take the risks of talcum powder seriously, J&J elected to hide its understanding of those risks from the public and engaged in a strategic campaign to obstruct scientific investigation.

57.     In the 1970s, J&J knew of multiple tests from at least three different laboratories that had detected asbestos in its talc products.  In 1976, when the U.S. Food and Drug Administration (FDA) was weighing limits on asbestos in talc products, J&J assured the FDA that no asbestos was "detected in any sample" of talc produced between December 1972 and October 1976.  But this statement was inaccurate and misleading.

58.     J&J decided the solution to its asbestos problem was to adopt "testing practices" incapable of identifying asbestos.  J&J lobbied the FDA to use x-ray scanning techniques that J&J knew were incapable of detecting 1% or less asbestos contamination.  This meant that talc powder, which contained asbestos but less than 1%, would always pass the test—*i.e.*, no asbestos would be ***detected***—so J&J, in turn, could claim that the testing revealed no asbestos.

59.     But this did not change the fact that there was asbestos.  At some point in the late 1980s, J&J decided to spin off or sell its talc mines.  J&J jettisoned Windsor Materials, its Vermont talc mining subsidiary.  The agreements that documented this transaction contain indemnification provisions reflecting the early beginnings of J&J's legal strategy.

60.     J&J was trying to put distance between itself and the mines that produced talc.  Despite having jettisoned its ownership of the mines, J&J continued to purchase talc and sell talc-based baby powder in the United States and Canada until 2020.  J&J did not discontinue selling its talc-based baby powder globally until 2023.  Concealing asbestos in talc products, rather, just meant that J&J's customers continued to use those products, oblivious to the health risks.

61.     As a result of asbestos contamination in J&J's products, numerous people whose **_only_** exposure to asbestos was through J&J's baby powder have developed the "signature cancer" of mesothelioma.   Asbestos exposure is a known and accepted cause of mesothelioma. Mesothelioma has a long latency period, measured in decades, before the disease is detected. Asbestos exposure in childhood is disproportionately significant and J&J's Baby Powder was intended and actually used on babies.   J&J's ongoing liability for mesothelioma claims is substantial.

62.     Mesothelioma is not the only disease that exposure to J&J's talc has caused.  As a result of asbestos contamination and the presence of other carcinogens in J&J's products, numerous women have developed ovarian cancer.  Talc particles were identified deep in ovarian tissue in 1971, and by the early 1970s doctors were raising awareness regarding environmental toxins like talc as a factor in ovarian cancer.

63.     In 2010, the International Agency for Research on Cancer, an authority on determining the classification of substances as carcinogenic, concluded that studies from around the world showed an increased risk of ovarian cancer in women who used talc in the perineal area.

64.     Research has demonstrated that particles like talc can translocate from the exterior genital area to the ovaries in women:  in other words, the contaminated talc that J&J marketed to women would be absorbed into their ovaries over time.  Asbestos contamination introduced in this way does not break down in the body and accumulates in the ovaries similarly to how asbestos accumulates in the lungs:  **_permanently_**.

65.     And the record continues to develop.  In 2012, the International Agency for the Research on Cancer concluded that exposure to all types of asbestos and talc containing asbestiform fibers can cause ovarian cancer.  The National Cancer Institute has concluded that

exposure to asbestos can cause ovarian cancer.   On May 6, 2022, the U.S. Environmental Protection Agency recognized that asbestos causes ovarian cancer.

66.     On May 15, 2024, a cohort study conducted by researchers from the National Institute of Health and published in the Journal of Clinical Oncology involving approximately 51,000 women overall and hundreds of women with ovarian cancer concluded that there was a nearly doubling of the risk of epithelial ovarian cancer among those women who used talc for greater than or equal to two decades or used during their 20s or 30s.  These results were consistent with the positive association demonstrated between the genital use of talc and ovarian cancer in prior studies.  *See* Katie M. O'Brien, *et al., Intimate Care Products and Incidence of Hormone-Related Cancers: A Quantitative Bias Analysis*, J. CLIN. ONCOLOGY (2024) ("O'Brien 2024") (Beville Decl. [Dkt. No. 42] at Ex. 3).

67.     In featuring this article, the National Institute of Environmental Health Sciences (NIH) noted that O'Brien 2024 provided "compelling evidence that genital talc use is associated with an increased risk of ovarian cancer" particularly among frequent and longer erm users.[17]  In 2023 and again in 2024, the Environmental Protection Agency (EPA) concluded that talc deposits have been shown to contain asbestos and asbestos can cause ovarian cancer.[18]  In 2022, the Ovarian Cancer Association Consortium (OCAC) consisting of top research hospitals around the world described genital exposure to talc powders "a well-established risk factor."[19]

---

[17]   NIH/NEIHS Environmental Factor, *Genital Talc use May Be Linked to Increased Risk of Ovarian Cancer*. (June 2024) https://factor.niehs.nih.gov/2024/6/science-highlights/talc-use.

[18]   *See* 88 Fed. Reg. 47782, 47790 (July 25, 2023) (to be codified at 40 C.F.R. pt. 704); 89 Fed. Reg. 21970, 21970 & 21973 (2024).

[19]   Phung, M, et al, *Effects of Risk Factors for Ovarian Cancer in Women with and without Endometriosis, 118 Fertility and Sterility,* 960 (Nov 2022).

68.    Just months ago, in July 2024, International Agency for Research on Cancer (IARC) reclassified talc that contains no asbestos fibers as a probable carcinogen based in part on the "strong mechanistic evidence that talc exhibits key characteristics of carcinogens, including inducing chronic inflammation and altering cell proliferation, cell death, or nutrient supply." Stayner *et al., Carcinogenicity of Talc and Acrylonitrile*, The Lancet (July 5, 2024) (Beville Decl. [Dkt. No. 42] at Ex. 41).

69.    This classification was for ***talc by itself***.  Talc containing asbestos has been and remains a known human carcinogen for ovarian cancer.  In fact, IARC further noted that talcum powders have been shown to contain asbestos and that the asbestos screening methods employed by the cosmetics industry has not been sufficiently sensitive to find asbestos in talc products.  This follows Health Canada's (the Canadian analog to the FDA) finding talc to be a cause of ovarian cancer in its final assessment in 2021.  *See infra* at ¶ 89.

## IV.    J&J'S TALC LITIGATION HISTORY

70.    It was long suspected that talc caused mesothelioma and ovarian cancer.  As companies that sold asbestos products like W.R. Grace, Quigley (a subsidiary of Pfizer), Combustion Engineering, Federal-Mogul, and Johns Manville, exited the market, the rates of cancers caused by asbestos exposure did not drop as some had expected.  People were still being exposed to asbestos, but the source of exposure was less obvious.

71.    Lawsuits alleging that J&J talcum powder caused cancer began as early as 1997. But the claimants had a problem:  J&J had suppressed its knowledge that its talc contained asbestos from the public.  One consequence of keeping this information from the public sphere was that J&J also suppressed scientific inquiry into the dangerous nature of its products.  In this respect, J&J's victims faced the same challenges encountered by victims of the tobacco industry—whose playbook J&J eagerly emulated.

72.     The first crack in the dam was a case in South Dakota, *Berg v. Johnson & Johnson*, 940 F. Supp. 2d 983 (D.S.D. 2013), where a jury reached the first verdict holding J&J liable for causing ovarian cancer in 2013.  *Berg* ultimately awarded the plaintiff no damages—her cancer was in remission at the time—but its determination of J&J's liability was a watershed event.

73.     Public awareness of J&J's conduct and the asbestos contamination in its talc products led to a significant increase in claims filed against J&J.  Subsequent trials went to verdict. Juries heard the evidence and found J&J liable.  For example, in 2016, a jury awarded the estate of Ms. Jacqueline Fox (a deceased ovarian cancer victim) $72 million for her ovarian cancer and found that the cancer was caused by exposure to J&J's talc products.

74.     This verdict was later overturned due to a jurisdictional issue—a Missouri appellate court held that an intervening Supreme Court case divested the Missouri trial court of personal jurisdiction over the dispute.  This jurisdictional issue also led to other successful plaintiff verdicts being overturned on procedural grounds.  The story does not end there.

75.     As it does in the Disclosure Statement, J&J likes to tout its record of "winning" cases, but it almost always omits the material fact that juries awarded claimants verdicts and that those successful verdicts were overturned on procedural grounds and not on substantive merits.

76.     J&J chooses to ignore these juries who heard the scientific and medical evidence, found J&J directly liable, and concluded that exposure to J&J's talc products causes cancer— indeed, some of the most aggressive and deadly cancers that humans face.  These cases remain pending and are awaiting retrial.

77.     In 2017, the Judicial Panel on Multidistrict Litigation (JPML) established *In re: J&J Talcum Powder Marketing, Sales Practices, and Products Litigation*, MDL 2738 (the "MDL").  New Jersey was the preferred venue J&J requested for the MDL and the MDL was

established there.  Thousands of cases alleging that J&J's talcum powder products cause ovarian cancer were transferred to Chief Judge Wolfson of the District of New Jersey for pretrial purposes.

78.     Judge Wolfson granted J&J's request for bifurcation of the proceedings to resolve the threshold issue of general causation; specifically, is there reliable evidence that genital exposure to talc can cause ovarian cancer?  The answer to that question is "yes."

79.     Following a process spanning several years, both parties provided evidence regarding whether there is reliable evidence that J&J's talc products cause *ovarian cancer*.  The *Daubert* briefing in the MDL proceeding focused *solely* on ovarian cancer.  Plaintiffs' experts' opinion testimony focused on epithelial ovarian cancer.

80.     Although the science provides the link between J&J's talc and ovarian cancer, to date no evidence linking non-ovarian gynecological cancers to J&J's talc products has been offered or developed at trial in state or federal courts.

81.     On April 27, 2020, Judge Wolfson issued a comprehensive 141-page opinion finding that the plaintiffs' causation evidence linking exposure to J&J's talc products to ovarian cancer is sufficiently reliable and admissible and scheduled the first bellwether trials for April 2022.  *In re Johnson & Johnson*, 509 F. Supp. 3d 116 (D.N.J. 2019).

82.     This opinion addressed the totality of the evidence presented by both parties and considered decades of epidemiological studies considering the association between the routine application of J&J's talcum powder products to the female genital area and ovarian cancer.

83.     Judge Wolfson concluded that plaintiffs' causation experts' methodology satisfied the *Daubert* standard for admissibility based on the experts' application of the "Bradford Hill" factors, the foundational epidemiologic process for establishing a causal inference endorsed by the Federal Judicial Center's *Reference Manual on Scientific Evidence*.  It is significant that there has

been no trial or appellate court that has precluded the admissibility of general causation testimony in the talcum powder cases.

84.     In June of 2018, the *Ingham v. Johnson & Johnson* trial was submitted to the jury. This case sought compensatory damages for 22 plaintiffs who suffered from or who died from ovarian cancer.  Following a six-week trial, the jury found for the plaintiffs.  J&J was held accountable and directly liable for damages.  The jury awarded each plaintiff $25 million in compensatory damages and $4.14 billion in punitive damages.  J&J appealed this decision but lost.

85.     On June 23, 2020, the Missouri Court of Appeals rejected J&J's efforts to overturn the jury's finding that talcum powder caused ovarian cancer.  *See Ingham v. Johnson & Johnson*, 608 S.W.3d 663 (Mo. Ct. App. 2020).  The Court of Appeals found that certain plaintiffs suffered from a jurisdictional defect (*i.e.*, J&J's favorite way of "winning" cases), but it upheld the compensatory damages and substantially upheld the punitive damages for the remaining plaintiffs.

86.     The Appellate Court in *Ingham* rendered these findings:  (a) J&J's own conduct was "significantly reprehensible," (b) J&J had "discussed the presence of asbestos in [its] talc in internal memoranda for several decades," (c) J&J had "avoided adopting more accurate measures for detecting asbestos and influenced the industry to do the same," (d) J&J had "attempted to discredit … scientists" who published "studies unfavorable" to its talc products, (e) J&J chose not to "eliminate talc" from its products and use "cornstarch instead because it would be more costly to do so," and (f) J&J "knew of the asbestos dangers in" its talc products "when they were sold to the public."  *Id.* at 721.  J&J's efforts to convince the Missouri Supreme Court to reverse failed. On June 1, 2021, the U.S. Supreme Court denied review of the *Ingham* decision.  *See Johnson & Johnson v. Ingham*, 141 S.Ct. 2716 (2021).

87.      As the asbestos contamination of J&J's baby powder became clear, mesothelioma victims continued winning their cases against J&J as well.  In April 2018, a New Jersey jury awarded Stephen and Kendra Lanzo a total of $117 million in compensation for the mesothelioma its products caused Stephen Lanzo—including $80 million in punitive damages.  Although the Lanzo case was later overturned on appeal and remanded for a new trial, it began a string of courtroom losses by J&J with respect to mesothelioma victims.

88.      Eleven successive juries have found J&J liable for mesothelioma caused by its products, including recent verdicts in California,[20] Illinois,[21] and Oregon.[22]  In these cases, the theories of liability have largely focused on J&J and its own independent conduct.

89.      These legal decisions did not occur in a vacuum.  In December 2018, Health Canada, the regulatory equivalent to the Food and Drug Association (FDA) for the Government of Canada, disseminated a draft report concluding that there was a consistent and statistically significant association between talcum powder and ovarian cancer, indicative of a causal relationship.  Despite fierce J&J lobbying, the draft assessment was finalized in 2021 concluding that based on the totality of the evidence presented, which included review and consideration of expert reports prepared by both J&J and the plaintiffs, the results were indicative of a causal relationship.

---

[20]    Brendan Pierson, *J&J must pay $18.8 million to California Cancer Patient in Baby Powder Suit*, Reuters, July 18, 2023, https://www.reuters.com/legal/jj-must-pay-188-mln-california-cancer-patient-baby-powder-suit-2023-07-18/.  *See* Beville Decl. [Dkt. No. 42] at Ex. 36.

[21]    Cailey Gleeson, *Court Orders Johnson & Johnson and Kenvue to pay $45 million in Talcum Baby Powder Lawsuit*, Apr. 22, 2024, https://www.forbes.com/sites/caileygleeson/2024/04/20/court-orders-johnson--johnson-and-kenvue-to-pay-45-million-in-talcum-baby-powder-lawsuit/.  *See* Beville Decl. [Dkt. No. 42] at Ex. 35.

[22]    Brendan Pierson, *J&J must pay $260 million in latest talc trial, Oregon jury says*, Reuters, June 4, 2024, https://www.reuters.com/legal/jj-must-pay-260-million-latest-talc-trial-oregon-jury-says-2024-06-04/.  *See* Beville Decl. [Dkt. No. 42] at Ex. 37.

90.     Further, in 2019, the FDA conducted more testing, specifically on J&J baby powder.  One bottle of baby powder was found to be contaminated with both asbestos and talc fibers—just as plaintiffs' experts had contended for years.  Rather than accept responsibility for its actions, J&J resorted to destroying evidence.  In 2022, a California appellate court affirmed the trial court's adverse inference instruction against J&J for spoliation of key evidence.  *Bader v. Johnson & Johnson*, 303 Cal. Rptr. 3d 162 (Cal. Ct. App. 2022).   Nonetheless, the Court determined that, notwithstanding any destruction of evidence, there was still abundant evidence that J&J's talc contained asbestos.

91.     Following the dismissal of J&J's second bankruptcy case in August 2023, the MDL Court ordered that the parties may file *Daubert* challenges in anticipation of December 2024 bellwether trials.  In permitting *Daubert* challenges, however, the MDL Judge made it clear that he did not intended to supplant the MDL Court's 2020 order finding that there was reliable evidence supporting the causal link between Johnson's Baby powder and epithelial ovarian cancer

92.     Rather, the MDL Court made clear that the parties were limited to showing how "new science is shown to directly contradict or challenge" that 2020 decision.[23]  As set forth in this this brief and as described in the PSC's Opposition to Defendants' Motion to exclude Plaintiffs' General Causation Opinions, (ECF 33129, filed Aug. 22, 2024), both the post-2020 studies (*e.g.* O'Brien 2024) and the reports of National and International Scientific Organizations (*e.g.* EPA, NIH, IARC and Health Canada) support—and strengthen—the causal claim.  Not surprisingly, J&J filed this case **_before_** the MDL Court could rule on the *Daubert* issue.

---

[23]     *See*, Order, *In re Johnson & Johnson*, Apr. 30, 2024 (ECF 32133) at p. 3 (D.N.J) (Shipp, J).

## V.  J&J'S FAILED BANKRUPTCY ATTEMPTS

93.     Back in 2021, with the tide of talc litigation turning against it, J&J hired Jones Day—the creator of the Two-Step bankruptcy strategy and the firm that represents Georgia-Pacific a/k/a Bestwall.  Following Jones Day's advice, J&J decided to move forward with its own Texas Two-Step.

94.     J&J caused Johnson & Johnson Consumer, Inc. ("JJCI" or "Old JJCI"), a New Jersey operating subsidiary of J&J that has produced J&J's talc products, Johnson's Baby Powder and Shower to Shower, since 1979,[24] to move to Texas and undertake a divisional merger.  *In re LTL Mgmt., LLC* ("LTL I"), 64 F.4th 84, 93, 94 n.1 (3d Cir. 2023).

95.     In the divisional merger, Old JJCI split into a GoodCo ("New JJCI") and a BadCo, LTL Management, LLC ("LTL").  New JJCI was assigned JJCI's entire consumer healthcare business (worth at least $61 billion), while LTL was assigned JJCI's talc liabilities and a funding agreement with J&J and New JJCI that *purported* to make the entire value of JJCI (at least $61 billion) available to LTL to pay talc claims, with J&J as the primary payor.

96.     Through the divisional merger, J&J stripped JJCI, which by then had been named as a defendant (along with J&J) in thousands of talc lawsuits, of assets worth at least $61 billion, making the first step of the bankruptcy strategy arguably the largest fraudulent transfer in United States history.  In contrast, the Sackler family and Bernie Madoff were accused of taking $11 billion and $20 billion, respectively.

97.     Critically, LTL was never assigned any of J&J's own, independent talc liabilities as part of the divisional merger; it only assumed the talc liabilities of Old JJCI, which are distinct from those of J&J.  Following the divisional merger, New JJCI moved back to New Jersey and

---

[24]   Prior to 1979, J&J produced the talc products itself, and its name has been on the products for the entire time they have been sold.

continued to operate the consumer healthcare business as normal under the JJCI name, until it was later funneled to a company called Kenvue, Inc. ("Kenvue"), which operates this business to this day. *See* Beville Decl. [Dkt. No. 42] at Ex. 8. Immediately after the divisional merger, LTL moved to North Carolina and filed for bankruptcy in the Western District of North Carolina.

98.    Once in bankruptcy, LTL moved for an injunction to prevent talc litigation from going forward against J&J—an injunction that it claimed was essential. From its first day in bankruptcy, LTL's objective was to obtain a release and discharge of J&J's own independent talc liability, not merely to deal with the talc liabilities of Old JJCI that had been assigned to it. But LTL's first bankruptcy case did not go according to J&J's plan.

99.    **_First_**, the United States Bankruptcy Court for the Western District of North Carolina ordered LTL's first bankruptcy case moved to the District of New Jersey after finding that LTL had used the Texas Two Step to improperly manufacture venue in North Carolina.[25]

100.    **_Second_**, the United States Bankruptcy Court for the District of New Jersey took at face value LTL's representations that the Funding Agreement made JJCI's market value (at least $61 billion) available to pay talc claims. *In re LTL Mgmt., LLC*, 637 B.R. 396, 423 (Bankr. D.N.J. 2022). The New Jersey Bankruptcy Court also took at face value LTL's representations that such funding was available under a creditor plan that did not release or discharge J&J from its talc liability.[26]

---

[25]    *See Order Transferring Case to the District of New Jersey* (Beville Decl. [Dkt. No. 42] at Ex. 33) at 10 (finding that "the Debtor is trying to manufacture venue and is attempting to outsmart the purpose of the statute" and that "the Debtor is not just forum shopping; the Debtor is manufacturing forum and creating a venue to file bankruptcy.").

[26]    *Id.* at 424 (finding that the resources available under the Funding Agreement were "available upon confirmation of a plan—whether or not the plan is acceptable to J&J or New JJCI, and whether or not the plan offers payors protections under § 524(g).")

101.     ***Third***, the United States Court of Appeals for the Third Circuit also credited LTL's representations about the Funding Agreement, finding that it was equivalent to an "ATM" that made over $61 billion available to pay talc claims on demand.  *In re LTL Mgmt., LLC*, 64 F.4th 84, 109 (3d Cir. 2023).

102.     The Third Circuit decided to "take J&J and LTL at their word" and held that LTL was not in financial distress and, therefore, could not show that LTL's bankruptcy petition served "a valid bankruptcy purpose and was filed in good faith under Code § 1112(b)."  *Id.* at 109-110. LTL's first bankruptcy was a failure from J&J's perspective.

103.     In response to the Third Circuit's ruling, J&J determined that the mistake it had made was providing LTL with an overly generous Funding Agreement, such that LTL was not financially distressed.  Not to be deterred, as soon as its first bankruptcy was dismissed, J&J and LTL replaced the $61 billion Funding Agreement with a new set of agreements worth approximately $30 billion and then LTL immediately re-filed for bankruptcy.

104.     J&J's second bankruptcy scheme also did not work out as planned.  The tort claimants' committee moved to dismiss LTL's second bankruptcy filing for lack of good faith. This time the New Jersey Bankruptcy Court found cause for dismissal.  *See In re LTL Mgmt., LLC*, 652 B.R. 433 (Bankr. D.N.J. 2003), *aff'd*, 2024 WL 3540467 (3d Cir. July 25, 2024).

105.     Even after giving away close to $31 billion in alleged funding to pay talc claims, LTL still could not show that it was in financial distress.  *Id*. at 456.  After LTL was thrown out of Bankruptcy Court a second time, all stays and injunctions terminated, and the talc victims' access to the civil justice system was restored.  The Third Circuit affirmed the New Jersey Bankruptcy Court's ruling on July 25, 2024.  *See In re LTL Mgmt., LLC*, No. 23-2971, 2024 WL 3540467 (3d Cir. July 25, 2024).

## VI.    EVENTS LEADING TO J&J'S THIRD BANKRUPTCY

106.    Prior to 2023, the law firms involved in talc litigation were well known.  In 2017 the Joint Panel on Multidistrict Litigation established a multidistrict litigation, *In re: J&J Talcum Powder Marketing, Sales Practices, and Products Litigation*, MDL 2738 (the "MDL").

107.    The MDL has Court-appointed leadership to represent the interests of women suffering or who had died from ovarian cancer due to their talcum powder exposure.  Leadership has remained aligned with the hundreds of firms representing women with ovarian cancer, zealously prosecuting these cases in the MDL for almost eight years.

108.    At the time of the first bankruptcy, the MDL was on the verge of trial with its first ovarian cancer case.  After J&J's second bankruptcy was dismissed in August 2023, the MDL Court reset a trial schedule that would have seen the first federal bellwether trial start in December 2024.  Through the filing of this third bankruptcy, J&J derailed that trial.

109.    Law firms that historically specialize in representing claimants with mesothelioma were also aligned with law firms that represent claimants with ovarian cancer.  Every successful verdict against J&J and JJCI—whether involving ovarian cancer or mesothelioma—laid bare the fact that J&J's talc products contained the presence of asbestos and could cause both mesothelioma and ovarian cancer.

110.    During the late stages of LTL's first bankruptcy a new group of law firms emerged (the "Supporting Law Firms").[27]  Prior to 2023, some of the Supporting Law Firms had never filed a single talc lawsuit against J&J or any of its affiliates.  Nor had these firms participated in a single proceeding in the MDL over its eight-year history, including the *Daubert* proceedings where the

---

[27]    The term "Supporting Law Firms" refers to the law firms that have aligned themselves with J&J. Several Supporting Law Firms are identified in Section 5.1 of Exhibit H to the Disclosure Statement.

general causation issues addressing talc exposure and ovarian cancer were heard and considered and expert opinions were held admissible.[28]

111.    Many of the Supporting Law Firms set out to sign up as many "talc claimants" as possible regardless of their illness.  Most of their clients hold non-ovarian gynecological cancer claims ("Gynecological Claims") for which there is presently no expert evidence that could be presented to a jury on the issue of causation.  These claims are "non-compensable."

112.    The claimant may have suffered an injury, but she has no legal basis to connect it to talc, much less to seek compensation from J&J or Red River.  This contrasts with the holders of ovarian cancer claims ("Ovarian Claims"), who have won multi-billion-dollar judgments against J&J and its affiliates after jury trials.  *See Ingham v. Johnson & Johnson*, 608 S.W.3d 663 (Mo. Ct. App. 2020), *cert. denied*, *Johnson & Johnson v. Ingham*, 141 S.Ct. 2716 (2021).

113.    There is no doubt as to why the Supporting Law Firms want to represent holders of non-compensable claims or why they would spend funds amassing large inventories of those claims.  Their motivation is purely financial and is key to understanding J&J's third bankruptcy attempt.  Holders of non-compensable claims, and the law firms that represent them, have a clear interest in facilitating a settlement ***in bankruptcy***.

114.    ***Outside of bankruptcy***, their claims have no value.  If they litigate now, they will lose because they cannot come forward with evidence showing a causal link between the non-ovarian gynecological cancers and exposure to J&J's talc products—*i.e.*, this evidence does not exist.  As J&J's lawyer, James Murdica, testified, J&J has been steadfast in its unwillingness to

---

[28]    *In re Johnson & Johnson*, 509 F. Supp. 3d 116, 135-162 (D.N.J. 2019) (holding admissible the following opinions of the plaintiffs' experts:  (i) there is a link between use of talcum powder and ovarian cancer, (ii) the use of talc could cause inflammation and oxidative stress, (iii) talc products contained asbestos, (iv) talc users were exposed to asbestos, and (v) general causation between the use of talc products and ovarian cancer).

pay anything to settle their claims outside of bankruptcy.[29]  The law firms that decided to invest in J&J's bankruptcy scheme have always needed a path to payment that avoids the civil justice system.  From J&J's perspective, this was a positive development.

115.    At first glance, a tortfeasor would seem to have little incentive to settle with someone whose claim is unenforceable.  But to launch its third bankruptcy, J&J needed votes to secure its ability to put a newly concocted subsidiary into bankruptcy and try to force a release of J&J's independent tort liability on objecting talc victims who hold legitimate, compensable claims.

116.    Hence, the basis of the bargain—*i.e.*, garnering support for its illicit efforts from non-compensable claims offers substantial value to J&J.  The flood of non-compensable claims provided J&J with the very partner that it needs to make a third run at bankruptcy.

117.    The Supporting Law Firms need a bankruptcy settlement designed to pay non-compensable claims with minimal scrutiny so they can collect their contingency fees.  The ideal settlement process would be one that they control—*i.e.*, they will select the trustee or appoint themselves to the trust advisory committee.  Thus, J&J can assert the appearance of claimant support for its third bankruptcy case in exchange for paying non-compensable claims.

118.    A deal was struck.  J&J proposed a plan that would enable the Supporting Law Firms to monetize the negative value, non-compensable claims.  There would be no need to file cases.  There would be no need to try any individual cases.

119.    The firms could simply present their claims (with little evidentiary support beyond a simple declaration) to their chosen trustee (who, conveniently, they would oversee) and get paid.

---

[29]    *See* LTL 2.0 Jun. 28, 2023 Hr'g Tr. (Beville Decl. [Dkt. No. 42] at Ex. 2) at 111:13-111:17 ("Johnson and Johnson never knowingly paid on a claim for a non-ovarian gynecological cancer.").  Upon information and belief, J&J settled ovarian cancer claims between the dismissal of LTL 2.0 and the filing of this case.  J&J knows how to settle current claims, but simply chooses not to do so outside of its bankruptcy mousetrap.

The settlement and plan structure would enable holders of non-compensable claims to be paid (albeit at low amounts per individual)[30] and thereby ensure that the law firms that represent them receive a contingency fee payment for a claim that otherwise had negative value.

120.    With the support of these "creditors," J&J could claim that it enjoys the support of most talc claimants and use that to push the Court to allow the bankruptcy case to proceed.  J&J's plan effectively tries to leverage the support of holders of non-compensable claims to silence the holders of compensable, scientifically supported Ovarian Claims.

121.    The *quid pro quo* is that holders of non-compensable claims get paid and J&J uses their "votes" to extinguish the compensable claims (current and future) by forcing them to accept the settlement J&J wants—*i.e.,* no more civil justice system, no more verdicts, and no more Article III judges and state court judges permitting experts to testify, and no payments that approach fair value for ovarian cancers.  Most of the "votes" cast in favor of J&J's Plan were cast by holders of non-compensable claims.

## VII.    THE THIRD BANKRUPTCY—SETTING THE STAGE

122.    With its alliance with the "Supporting Law Firms" formed, J&J set to work on laying the foundation for its third bankruptcy filing.  This is the case that J&J has now filed before this Court, far away from New Jersey and the Third Circuit.  As discussed below, there are three components to this case that are different from the first two cases.

123.    ***First***, J&J changed its tack and made the strategic decision to focus on women—specifically women who have ovarian cancer.  J&J eliminated all mesothelioma claims from this case and also took the governmental claims off the table so that state attorneys general would not

---

[30]    While each individual payment to the holder of a non-compensable claim is low (*i.e.*, $1,500), the cumulative amount is substantial (particularly when future claims are taken into account).

meddle in its plans.  The legal, equitable, and Constitutional rights that J&J seeks to eviscerate are (or were) held entirely by women.

124.     **Second**, J&J had to create a debtor that it could argue was in financial distress.  J&J could not risk another Court taking it at its word.  J&J had to manufacture a new debtor that did not have access to an ATM-style funding agreement.  This case was preceded by a set of new transactions that, *inter alia*, are avoidable as fraudulent transfers and which give rise to claims for breach of fiduciary duty and aiding and abetting fraud.

125.     **Third**, J&J had to convince women to vote in favor of its Plan without clearly telling them what the Plan would do to them and their legal rights.  Women who allegedly voted for J&J's Plan are entitled to know what J&J is doing in this case and information to show how much evidence exists that J&J's talc products cause ovarian cancer.

## VIII.   J&J'S DECISION TO TARGET WOMEN WHO HAVE OVARIAN CANCER

126.     J&J's first two bankruptcy cases attempted to resolve all talc claims for all time.  Recognizing that such a plan would never garner sufficient votes, J&J changed strategy.  J&J took steps, prepetition, to eliminate everything but ovarian cancer claims and to add supposed other gynecological claims that have no scientific relationship to J&J.  Thus, this bankruptcy case focuses on eliminating talc claims asserted by women who have ovarian cancer.  To understand how this works, it is helpful to discuss the universe of talc claims asserted against J&J.

127.     **Ovarian Cancer Claims**.  The first category of talc claims are personal injury and wrongful death claims involving epithelial ovarian cancer, fallopian tube cancer, or primary peritoneal cancer.[31]  This is what is referred to as an "Ovarian Claim."

---

[31]   The scientific literature describes, and it is generally understood, that epithelial ovarian cancer, fallopian tube cancer and primary peritoneal cancer all fall within the same category of cancer (*i.e.*, epithelial ovarian cancer) and share the same pathogenesis.  *See* Levanon, et al., *New Insights Into the Pathogenesis of Serous Ovarian Cancer and Its Clinical Impact.* J Clin Oncol 26:5284-5293 (2008).

128.    Ovarian Claims are talc claims that have been found to have a ***clear link*** to regular or routine application of J&J's Baby Powder and/or Shower to Shower to the genital area by females.  These are talc claims that Courts have found have scientific support sufficient to get past summary judgment and for submission to a jury for consideration.[32]  Scientific and regulatory authorities have further supported the causal link between talcum powder use and these cancers.[33] And these are talc claims for which J&J has been held liable in the tort system or has settled in the tort system.[34]

129.    **Gynecological Claims**.  Another category of talc claims are personal injury claims involving "gynecological cancers," including mucinous ovarian cancer, borderline mucinous ovarian cancers, endometrial cancer, uterine cancer, vaginal cancer, cervical cancer, germ cell ovarian cancer, small cell ovarian cancer, stromal ovarian cancer, vulvar cancer, metastatic cancer

---

A causal connection between the genital application of talcum powder and epithelial ovarian cancer is supported for the following histologic subtypes:  serous, endometrioid, clear cell, undifferentiated, mixed, serous borderline and endometrioid borderline.

[32]    *See In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Litigation*, 509 F. Supp. 3d 116, 181 (D. N.J. Apr. 27, 2020).  The *Daubert* briefing in the MDL proceeding focused solely on ovarian cancer.  Plaintiffs' experts specifically limited their opinions to epithelial ovarian cancer, which added strength to their scientific conclusions.  J&J did not substantively discuss non-ovarian gynecological cancers, except to assert that talc "does not" cause "vaginal, cervical, [or] endometrial cancer." *Defendants' Memorandum of Law in Support of Motion to Exclude Plaintiffs' Experts' General Causation Opinions*, No. 3:16-md-02738-FLW, Doc. 9736, at 88 (D.N.J.).

[33]    *See*, *e.g.*, Stayner, et al., *Carcinogenicity of Talc and Acrylonitrile*, Lancet, Vol 25, Issue 8, p. 96203 (Aug. 2024) (International Agency for Research on Cancer finds that talcum powder alone is a probable ovarian carcinogen and that talcum powder with asbestos is carcinogenic); Heath Canada, Screening Assessment Talc (April 2021) (Genital application of talc is a cause of ovarian cancer).

[34]    *See Ingham v. Johnson & Johnson*, 608 S.W.3d 663 (Mo. App. 2020), *cert. denied*, 141 S. Ct. 2716 (2021) (highest Missouri state court sustaining $2.2 billion judgment against J&J and JJCI for 22 women alleging ovarian cancer claims, finding J&J "engaged in reprehensible conduct of its own."); *see also Echeverria v. Johnson & Johnson (Johnson & Johnson Talcum Powder Cases)*, 37 Cal. App. 5th 292 (Cal. Ct. App. 2019) (holding there is "substantial evidence to support" the jury's findings of general and specific causation (as against JJCI) and for compensatory damages from JJCI arising out of its breach of its duty to warn customers of the risk of ovarian cancer from use of its talc products); *accord Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Litigation*, 509 F. Supp. 3d at 181.  Other state-court appellate cases upholding talc claims have similarly addressed ovarian cancer specifically.  *E.g.*, *Carl v. Johnson & Johnson*, 464 N.J. Super 446, 475, 237 A.3d 308, 326 (App. Div. 2020).

from any non-qualifying primary cancer, and benign pathology. This is what is referred to as a "Gynecological Claim."

130.    Gynecological Claims are talc claims that to date have ***not*** been found to have a link to regular or routine application of J&J's Baby Powder and/or Shower to Shower to the genital area by females. Courts have yet to find scientific support sufficient for Gynecological Claims to get past summary judgment and for submission to a jury for consideration. These are claims that lack a scientific linkage to talc and for which J&J has not previously paid a judgment or settlement.

131.    **Mesothelioma Claims**. Another category of talc claims are personal injury claims involving mesothelioma—*i.e.*, a type of cancer caused by exposure to asbestos that develops in the thin layer of tissue that covers many of the internal organs, including the lining of the lungs and chest wall, abdomen, heart, and testes. This is what is referred to as a "Mesothelioma Claim."

132.    Mesothelioma is fatal. And, like Ovarian Cancer, it is a horrific disease. Mesothelioma is caused by exposure to asbestos, including (as has been found by juries) exposure to J&J's talc products. Since 2018, J&J has suffered multiple defeats in the tort system when it comes to Mesothelioma Claims—*see, e.g.*, Anderson ($22.75 million), Leavitt ($29 million), Schmitz ($12 million), Barden ($787 million for 4 plaintiffs, including $750 million in punitive damages), Cabibi ($12 million), Moure-Cabrera ($6.22 million), Prudencio ($25.5 million), Johnson ($27.5 million), Valadez ($18.8 million), Garcia ($45 million), and Lee ($260 million).

133.    J&J's litigation strategy of denying that its talc products contained asbestos has become untenable. Recently the International Agency of Research on Cancer acknowledged that "asbestos has been reported in … talc products as a contaminant" and "industry standards used to assess talc based cosmetic and pharmaceutical products have often been insensitive to rule out

asbestos contamination.[35]  Eleven straight juries have found J&J liable for mesothelioma caused by its talc products, including recent verdicts in California,[36] Illinois,[37] and Oregon.[38] Mesothelioma Claims—like the Ovarian Claims described above—are compensable.

134.    In addition, on August 15, 2024, a jury found J&J liable for Lung Cancer caused by its talc products.[39]  The jury awarded the plaintiff—Michael Perry and his family—$32.6 million in compensatory damages and another $30.7 million in punitive damages.  Testimony at the trial showed that J&J knew as early as 1970 that its talc-based products contained asbestos, but kept the product on the market, recalling it only after FDA testing in 2019 found asbestos in a sample.  Lung Cancer Claims may also be compensable.

135.    **Governmental Claims**.  J&J's sale of talc products has also resulted in consumer protection claims asserted by governmental units (the "Governmental Talc Claims").

136.    In June 2014, the Mississippi Attorney General filed a complaint against J&J and Old JJCI alleging that they violated the Mississippi Consumer Protection Act by failing to disclose health risks associated with use of talc.  *See LTL Mgmt. LLC v. State of New Mexico, et al.*, Case No. 22-01231-MBK, Dkt. No. 2-3.  In January 2020, the State of New Mexico filed a consumer

---

[35]    *See* Stayner, et al., *Carcinogenicity of Talc and Acrylonitrile*, Lancet, Vol 25, Issue 8, p. 96203 (Aug. 2024).

[36]    Brendan Pierson, *J&J must pay $18.8 million to California Cancer Patient in Baby Powder Suit*, Reuters, July 18, 2023, https://www.reuters.com/legal/jj-must-pay-188-mln-california-cancer-patient-baby-powder-suit-2023-07-18/.  *See* Beville Decl. [Dkt. No. 42] at Ex. 36.

[37]    Cailey Gleeson, *Court Orders Johnson & Johnson and Kenvue to pay $45 million in Talcum Baby Powder Lawsuit*, Apr. 22, 2024, https://www.forbes.com/sites/caileygleeson/2024/04/20/court-orders-johnson--johnson-and-kenvue-to-pay-45-million-in-talcum-baby-powder-lawsuit/.  *See* Beville Decl. [Dkt. No. 42] at Ex. 35.

[38]    Brendan Pierson, *J&J must pay $260 million in latest talc trial, Oregon jury says*, Reuters, June 4, 2024, https://www.reuters.com/legal/jj-must-pay-260-million-latest-talc-trial-oregon-jury-says-2024-06-04/.  *See* Beville Decl. [Dkt. No. 42] at Ex. 37.

[39]    BeLynn Hollers, *South Carolina Jury Awards $63.4 Million to Johnson & Johnson Asbestos Victim*, Business Wire August 15, 2024, https://www.businesswire.com/news/home/20240815967067/en/South-Carolina-Jury-Awards-63.4-Million-to-Johnson-Johnson-Asbestos-Victim.  *See* Beville Decl. [Dkt. No. 42] at Ex. 38.

protection case against J&J and certain other defendants alleging that they deceptively marketed talc products by making misrepresentations about the safety of the products.  *Id.* at Dkt. No 2-2.

137.    Further, forty-one states and the District of Columbia commenced a joint investigation into J&J's marketing of talc products.  And five states issued Civil Investigative Demands seeking documents and other information.  Upon information and belief, the consumer protection claims on behalf of these governmental entities have been resolved outside of bankruptcy.

138.    **Third Party Payor Talc Claims**.  Third party payor claims are claims asserted by governmental units, insurance companies, health maintenance organizations, employers or other entities that paid for medical services to treat individuals injured on account of talc-related injuries, including Ovarian Cancer and Mesothelioma (the "Third Party Payor Talc Claims").  LTL asserted in its second bankruptcy case that third party payors hold direct claims against LTL and its affiliates, as well as liens and subrogation claims against proceeds to be received by current and future talc claimants for medical costs.

139.    **Canadian Claims**.  Multiple class action lawsuits, certified and uncertified, exist in Canada as well as individual actions.  These are collectively referred to as "Canadian Claims."

140.    The Canadian civil litigation process and governing law, including in respect of class actions, has significant nuanced differences to that of the United States.  A class action may be commenced in any common law province and can be brought on behalf of class members in that province or across multiple regions in Canada.  It is therefore common to see separate class actions launched in multiple jurisdictions against the same defendant for the same claims.

141.    Unlike the United States, Canada does not have a "multidistrict litigation" system to consolidate these cases.  Class actions can proceed in multiple jurisdictions simultaneously and

the cases will not necessarily be consolidated. They may proceed at different speeds and for different relief. This has the greatest impact for class actions commenced in the French-speaking province of Québec, which has a different legal and procedural regime than the rest of Canada. Québec has a civil law, rather than a common law system.

142.    Aggregation of damages is allowed under provincial class action legislation that allows the Canadian court to determine monetary damages at a class-wide level based on the total monetary damage caused by the defendant's wrongdoing. An individual class member's entitlement to a share of the aggregate award is left to be determined later through a claims process. Class-members may "opt-out" to pursue individual actions. Due to the nature and stage of the various Canadian Claims, the universe of direct Canadian talc claims is presently unknown.

143.    **Talc Supplier Claims**. The Debtor also faces liability for claims asserted by third-party suppliers who mined and sold talc to J&J and its affiliates (referred to as "Talc Supplier Claims"). Talc Supplier Claims include claims for damages for breach of contract—namely, the failure to honor obligations to indemnify for talc claims. The clearest example are the claims that have already been asserted in the *Imerys* and *Cyprus* bankruptcy cases. J&J recently resolved indemnity claims held by *Imerys* and *Cyprus* and the Delaware Bankruptcy Court has preliminarily approved the joint settlement.

144.    In addition to the Ovarian Claims, the Mesothelioma Claims, the Gynecological Claims, the Governmental Talc Claims, the Third Party Payor Talc Claims, the Canadian Claims, and the Talc Supplier Claims, various distributors and retailers may assert talc claims against the Debtor as well, including claims for indemnification and contribution. These distributors include companies like Walmart and Target, which sold J&J's talc products.

145.    Prior iterations of J&J's scheme have attempted to channel the Ovarian Claims, the Mesothelioma Claims, the Gynecological Claims, the Governmental Talc Claims, the Third Party Payor Talc Claims, the Canadian Claims, and the Talc Supplier Claims to a single, limited fund, and enjoin the holders of such claims from seeking compensation from J&J and other non-debtor parties in the civil justice system.

146.    J&J evidently decided that this was too ambitious.  In constructing Red River, J&J built a new debtor with a more limited focus.  J&J excluded Mesothelioma Claims and talc claims involving Lung Cancer, Governmental Talc Claims, and the Canadian Claims.

147.    The definition of "Talc Personal Injury Claim" found in J&J's new Plan is excessively broad and includes every conceivable claim related directly or indirectly to the sale of J&J's talc products *other than* Mesothelioma Claims and talc claims involving Lung Cancer, Governmental Talc Claims, and the Canadian Claims.  At least for now, holders of these talc claims, which include claims other than those held by women, get a pass.  J&J's definition expressly includes current and future Ovarian Claims and Gynecological Claims—*i.e.*, talc claims held solely by women.

## IX.    CREATING A DEBTOR THAT IS ALLEGEDLY IN FINANCIAL DISTRESS

148.    J&J's third bankruptcy could only work if it could engineer a debtor that would be in financial distress.  J&J started with the entity once known as LTL—*i.e.*, the entity that was ejected from bankruptcy twice before Courts in the Third Circuit.

149.    In December 2023, LTL moved to Texas and changed its name to LLT Management LLC ("LLT").  At this time LLT still had access to the 2023 Funding Agreement which meant that it was not in financial distress.  This meant that LLT was ineligible for bankruptcy under the New Jersey Bankruptcy Court's ruling.  But J&J had a solution.

150.     Before J&J caused this case to be filed, J&J stripped LLT of its rights under that Funding Agreement.   In July 2024, after allegedly securing "claimant" support to file a third bankruptcy case, J&J undertook various transactions that culminated in the disappearance of LLT and the creation of several new J&J entities, including the Debtor or "Red River Talc LLC" and Pecos River Talc LLC ("Pecos").

151.     Formally (or so J&J claims and wishes), these transactions split LLT's talc liability between the Debtor and Pecos and caused the "ATM"-stye Funding Agreement to vanish so that the Debtor would not have access to the billions of dollars LLT was once promised.

152.     The Debtor was allocated LLT's **_domestic_** talc liability for ovarian cancer, gynecological cancers, and all other talc-related diseases **_other than_** mesothelioma and lung cancer.   Pecos was allocated the talc liability for mesothelioma and lung cancer.

153.     The Debtor was allocated some _de minimis_ assets so that it could claim to not be an empty shell—even though it is essentially an empty shell with no business to reorganize in any respect.   And the Debtor and Pecos were provided with new Funding Agreements.

154.     The Debtor's new Funding Agreement is limited—as it must be to support J&J's argument that it finally created a made-for-bankruptcy entity that is in financial distress.   Under the Debtor's new Funding Agreement, the Debtor has access to funding in chapter 11 to fund the Trust if the Plan is confirmed and survives appeals.   _See_ Disclosure Statement at § 4.2(f).

155.     If the Plan is **_not_** confirmed and this case is dismissed, the new Funding Agreement still provides funding for the Debtor to pay talc liabilities established under certain Master Settlement Agreements—presumably so that certain law firms who have already "settled" their clients' claims (and will cause their clients to vote in favor of the Plan) can still get paid if J&J's

latest scheme is challenged and J&J is thrown out of Court (again).  *Id.* at § 4.2(f)(2)(i).  These claimants should not get to "vote" under J&J's scheme when they have no skin in the game.

156.    The Debtor was provided with an "Expense Funding Agreement" to cover the costs of administering its new case.  *Id.* at § 4.2(f)(2)(ii).  This enables the "Debtor" to pay J&J's army of attorneys—*i.e.*, the law firms that have been representing J&J's interests the entire time.

157.    Pecos's Funding Agreement, in contrast, is not "subject to any funding limits."  *Id.* at § 4.2(f)(2)(iii).  Although, this could change if J&J decides to take a run at using a fourth bankruptcy to keep holders of talc claims involving mesothelioma and lung cancer from having access to the civil justice system—*i.e.*, the most likely outcome if this case is successful.

158.    Although not discussed in the Disclosure Statement, the 2024 transactions that led to the Debtor's creation gave rise to a host of causes of action.  Recall that J&J started with a company with over $61 billion in assets—*i.e.*, Old JJCI.

159.    J&J, by its own admission, caused those assets to be transferred to Kenvue, created and eliminated multiple Funding Agreements, caused LTL to file and re-file for bankruptcy, merged and de-merged several entities, until it arrived at a new entity—*i.e.*, Red River—it contends now holds Old JJCI's talc liability for every imaginable domestic talc claim (other than claims involving mesothelioma and lung cancer), current and future.

160.    If Red River is in financial distress, then the 2024 transactions can be avoided as fraudulent transfers, and the 2023 Funding Agreement (as well as the 2021 Funding Agreement) can be restored.  The directors and officers that approved the 2024 transactions (as well as the prior divisional mergers) can be sued for breaching their fiduciary duties.  And the advisors who orchestrated all of this can be sued for aiding and abetting the fraud.  But unwinding the 2024 transactions would not serve J&J's objectives.

41

## X.     J&J'S PLAN TO DISCHARGE ITS INDEPENDENT TALC LIABILITY

161.     On June 3, 2024, J&J publicly disclosed its Plan—literally made a draft chapter 11 plan publicly available—to achieve J&J's objective to discharge J&J (and over one thousand additional Protected Parties) of talc-related liability.  J&J's Plan would channel the Ovarian Claims, the Gynecological Claims, and other talc-related claims to a Trust for payment and, at the same time, it would bar current and future claimants from pursuing J&J and others in the tort system (*i.e.*, the "J&J Discharge").

### A.     ALL TALC CLAIMS CHANNELED TO A TRUST

162.     The Plan has numerous defined terms, which themselves use defined terms and reference schedules and exhibits.  Some of the definitions occupy nearly a page (single-spaced). But the basic concept is that J&J gets a discharge—broader than the discharge J&J could get if it filed for bankruptcy itself.

163.     The "Channeling Injunction" discharges J&J—and over one thousand "Protected Parties"—of the "Channeled Talc Personal Injury Claims."  *See* Plan at § 11.3.  Channeled Talc Personal Injury Claims is defined to include "Talc Personal Injury Claims,"[40] including Ovarian Claims, Gynecological Claims, and "Other Disease Talc Personal Injury Claims."  *Id*. at § 1.1.13.

---

[40]    "Talc Personal Injury Claim" means any claim or Talc Personal Injury Demand against the Debtor, LLT, Old JJCI, or any other Protected Party, whether known or unknown, including with respect to any manner of alleged bodily injury, death, sickness, disease, emotional distress, fear of cancer, medical monitoring, or any other alleged personal injuries (whether physical, emotional, or otherwise), directly or indirectly arising out of or in any way relating to the presence of or exposure to talc or talc-containing products based on the alleged pre-Effective Date acts or omissions of the Debtor, LLT, Old JJCI, or any other Person but, in the case of such acts or omissions of Old JJCI or any other Person (other than the Debtor) only to the extent the Debtor has, or is alleged to have, liability for LLT's, Old JJCI's, or such other Person's conduct, whether by operation of the law, by assumption of such liability from LLT, Old JJCI, or such other Person, by agreement to indemnify, defend, or hold harmless LLT, Old JJCI, or such other Person from and against such liability, or otherwise. For the avoidance of doubt, Talc Personal Injury Claims include: (a) all such claims and Talc Personal Injury Demands directly or indirectly arising out of or in any way relating to (i) any talc or talc-containing products previously mined, processed, manufactured, designed, marketed, fabricated, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed,

164.    Through its definitions, the Plan employs a broad definition to capture all claims against J&J or any of the Protected Parties (including those for which a Protected Party has independent liability) that have anything to do with talc (excluding Mesothelioma Claims and claims involving Lung Cancer).  The definition is so broad, it picks up someone who alleges

---

and/or in any other way made available by the Debtor or any other Person, (ii) any talc or talc-containing materials present at any premises owned, leased, occupied, or operated by any Person, or (iii) any talc in any way connected to the Debtor alleged to contain asbestos or other contaminant; (b) all such claims and Talc Personal Injury Demands, whether (i) in tort, contract, warranty, restitution, conspiracy, guarantee, or any other theory of law, equity, or admiralty, whether brought, threatened, or pursued in any United States court or other court anywhere in the world, (ii) liquidated or unliquidated, fixed or contingent, direct or indirect, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, now existing or hereafter arising, in law, equity, or otherwise (including under piercing the corporate veil, agency, alter ego, successor liability, fraudulent conveyance, conspiracy, enterprise liability, market share, joint venture, or any other legal or equitable theory), (iii) seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs, fees, injunctive, or similar relief, or any other measure of damages, (iv) seeking any legal, equitable, or other relief of any kind whatsoever, or (v) held by Persons residing within the United States or in a foreign jurisdiction; (c) all such claims and Talc Personal Injury Demands that have been resolved or are subject to resolution pursuant to any agreement or that are based on a judgment or verdict; (d) all such claims and Talc Personal Injury Demands for compensatory damages (such as, without limitation, loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages; and (e) Indirect Talc Personal Injury Claims. Notwithstanding the foregoing, Talc Personal Injury Claims do not include: (A) any claim or demand by any present or former employee of a predecessor or Affiliate of the Debtor for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer; (B) any claim or demand that (I) alleges that the relevant injured or deceased individual was exposed to talc or the product or material containing talc, as applicable, in Canada or resided in Canada at the time such Direct Talc Personal Injury Claim is filed or (II) was brought, threatened, or pursued in any court in Canada; (C) any claim or demand asserted or assertable by or on behalf of any governmental unit under any federal, state, international, or foreign consumer or employee protection rule, statute, or regulation; or (D) any claim or demand that alleges that the relevant injured or deceased individual developed Mesothelioma or Lung Cancer (and not Ovarian Cancer, Gynecological Cancer, or any other disease) in connection with such individual's use of talc or a product or material containing talc; in each case, other than any such claim that is an Indirect Talc Personal Injury Claim of an Imerys/Cyprus Party.  In addition, notwithstanding the foregoing, Talc Personal Injury Claims do not include any claim or demand that a Settling Talc Insurance Company may have against its reinsurers and/or retrocessionaires in their capacities as such, and nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect the ability of a Settling Talc Insurance Company to assert any such claim or demand against its reinsurers and/or retrocessionaires in their capacities as such.

exposure to J&J's talc products, presently has **_no illness and no symptoms whatsoever_**, but is simply afraid that he or she could someday develop cancer as a result. *Id*. at § 1.1.141.

165.    The term "Protected Party" in Section 1.1.112 of the Plan is also expansive and incorporates multiple defined terms and schedules and ultimately encompasses every potential party that anyone could ever conceive of holding liable for J&J's talc products, including parties like Walmart, Walgreens, and Target.

166.    There is no downside for J&J to using these broad definitions.  The dollar amount J&J is obligated to pay to compensate all Channeled Talc Personal Injury Claims will not increase beyond $7 billion on a net present value basis (paid over 25 years) no matter how many claims are filed or asserted against the Trust.  From J&J's perspective, the broader the definition the better.

167.    Under the Plan, every claim deemed to be a "Channeled Talc Personal Injury Claim" will be permanently channeled to the "Talc Personal Injury Trust" (or the "Trust") on the Effective Date regardless of the claim's merit or whether the Trust will even pay the claim.  Like Red River, the Trust has no business other than to manage talc claims.

168.    The Trust must also "indemnify, defend, and hold harmless, to the fullest extent permitted by applicable law" J&J and all other Protected Parties for or from all "Channeled Talc Personal Injury Claims." *See* Plan at § 4.16.  If a claimant were to somehow get around the Channeling Injunction, J&J could force the Trust to defend it and pay the claim.

169.    J&J gets the benefit of this indemnity—as well as all the benefits of the Channeling Injunction—on the Effective Date even though it will not fully fund the settlement for 25 years. J&J gets the J&J Discharge without actually paying for it on the Effective Date.  The talc victims who will be prohibited from suing J&J will bear all the risk that J&J will actually pay as and when payments are due.  Given J&J's historical efforts to avoid paying ovarian cancer claims at all, and

its constant denials of liability, that risk is untoward.  J&J has no obligation to insure its victims against that risk—no bond posted, no irrevocable letter of credit, no certificate of deposit, no annuity—nothing.[41]

170.    The Trust must process all claims channeled to it.  The expense of doing so, as well as all costs and expenses related to operating the Trust and any expenses related to the Trust's obligation to indemnify the Protected Parties, will be paid from the Trust corpus.  While the Debtor is responsible for paying Trust expenses prior to the Effective Date, all such expenses will be deducted from the initial cash contribution to be made to the Trust on the Effective Date.[42]

### B.    TRUST FUNDING IS CAPPED

171.    As noted above, regardless of the number of claims channeled to the Trust, J&J is only obligated to fund the Trust with payments totaling $7 billion on a net present value basis (paid over 25 years).  The Trust will not be created or funded until the Effective Date.

172.    The Effective Date will not occur until an order confirming the Plan has become final and non-appealable.  *See* Plan at § 8.2.  Given the relief sought by J&J, it is likely that there will be substantial litigation involving the Plan and there will not be a final, non-appealable order confirming the plan for years (if ever).

173.    As a point of comparison, Purdue Pharma filed for bankruptcy on September 15, 2019, and the Supreme Court vacated the order confirming its plan and approving the "Sackler Discharge" on June 27, 2024—*i.e.*, 4 years, 9 months, and 12 days later.  Even if the Effective Date occurs the Trust will not be fully funded until the 25th anniversary of the Effective Date.

---

[41]   J&J has the financial ability to a pay these claims.  The issue is that J&J prefers not to do so.

[42]   *Id*. at Ex. C (cash on Effective Date "reduced" by "Cash advanced" in accordance with the "Trust Expense Advancement Order prior to the Effective Date.").  The Trust Expense Advancement Order enables the Trust to start reviewing claims before the Effective Date and, as discussed below, enables the Trustees to start paying their preferred and affiliated companies even before the Effective Date.  *Id.* at § 4.6.

Most women who are currently suffering from ovarian cancer caused by exposure to J&J's talc products will be dead by that date.

### C.   **TRUST DISTRIBUTION PROCEDURES**

174.    Once funded, the Trust will ***not*** be set up to pay claims based on the same values those claims would enjoy in the tort system.  The Plan includes Trust Distribution Procedures or "TDPs"[43] designed to create an ***alternative*** claims allowance process to the one set forth in the Bankruptcy Code.  Under this scheme, a substantial portion of the funds will be used to pay ***non-compensable*** claims and not Ovarian Claims.

175.    Under the TDPs, Gynecological Claims will be paid $1,500 based on the "Quickpay Review Process."  *See* TDPs at § 5.5.  This amount effectively acknowledges the fact that both J&J and the Supporting Law Firms know that these claims are non-compensable.  Claims for "Other Disease Talc Personal Injury Claims" appear to get nothing (even though they are channeled), thereby protecting J&J in the event future illnesses are linked to its talc products.

176.    The "Quickpay Review Process" boils down to sending the Trust a document stating that the alleged claimant used J&J's talc products and was diagnosed with some type of "Gynecological Cancer," which submission is likely to receive little scrutiny in the name of "efficiency."  *Id.* at § 4.6.6.  The Trust likely will assert that it justifiably need not scrutinize these claims if doing so would cost the Trust more than the $1,500 payment.  The term "Gynecological Cancer" is defined to mean ***any*** cancer of the female gynecologic tract that is not Ovarian Cancer.  Plan at § 1.1.66.

177.    The number of women, current and future, who are eligible for a Quickpay under the TDPs is vast—approximately 4.6 million to 4.8 million.  And the barrier to validation is low—

---

[43]   The TDPs are attached to the Disclosure Statement as Exhibit K.  Citations herein to the "TDPs" are to Exhibit K of the Disclosure Statement.

*i.e.*, the claimant needs to assert only that she used J&J's talc products.  If every one of these claims is paid, there will be nothing left for the Ovarian Claims.  Even if only half of the eligible claimants seek a Quickpay, the Trust would need to reserve between $3.45 billion to $3.6 billion of trust funding.  This means that after paying administrative claims, there will be approximately $3.7 billion (on a nominal basis) and not $7 billion remaining to pay present and future Ovarian Claims.

178.    This is disparate treatment at its core.  Gynecological Claims can be paid as "Quickpay" claims and, therefore, will be paid $1,500 based on a claim that is non-compensable in the tort system.  The effective payment percentage for Gynecological Claims is over 100% of what they would recover but for this bankruptcy.  Ovarian Claims, in contrast, are paid a far lower payment percentage, although this fact is obscured by the "points system" that the TDPs use to ostensibly "value" such claims.  As noted, claims alleging other diseases are channeled but paid nothing.

179.    As an effort to avoid telling each ovarian cancer claimant what she will actually recover and what value the Debtor and J&J attribute to her claim, the TDPs do not assign Ovarian Claims **dollar** values, but rather **point** values.  *See* TDPs at § 5.3.  Subject to a system of adjustments to account for age at diagnosis, length of use of J&J's talc products, medical risk factors (*e.g.*, family history or a BRCA 1 or BRCA 2 diagnosis), and other factors, each Ovarian Class will receive a point valuation.  *Id.*  A woman who contracts Ovarian Cancer at the age of 44, for example, could be awarded 1,200 points.  *Id.*  ***Points do not have any intrinsic cash value***.

180.    To satisfy section 524(g), the Trust must pay present and future Ovarian Claims in the same manner.  In J&J's Plan, each point award merely translates into an entitlement to a *pro rata* share of the $3.7 billion that is left over after the Gynecological Claims are paid under the "Quickpay" system.  The average payment on account of an Ovarian Claim will be far less than

advertised by J&J and its supporters and there is no information in the Disclosure Statement or elsewhere that enables anyone to calculate what a distribution on any Ovarian Claim will be.

181.     The TDP effectively eliminates a claimant's right to a jury trial.  A claimant who has exhausted her rights within the TDPs may pursue litigation against the Trust—not J&J or any other Protected Party—after notifying the Trust of her intention to seek "judicial review" and paying the Trust a fee of either $2,500 or $10,000, depending on the conditions specified. *See* TDPs at § 6.1.3.

182.     Yet, a claimant who prevails fully against the Trust nonetheless will be limited to a distribution of the Maximum Value of her Claim as determined under the TPDs.  Even more appalling is the claimant who prevails in the litigation but receives a judgment lower than the Trust's last offer.  That claimant will have the Allowed Judgment Amount of her claim reduced on a dollar-for-dollar basis by all costs incurred by the Trust up to the Allowed Judgment Amount (with no credit for the initial fee paid by the claimant to the Trust for the privilege of accessing the tort system).  This creates a system where there is no upside to litigating against the Trust, and a claimant could forfeit her entire award by exercising her watered down right to appear in a Court and contest the Trust's determination of her claim.  All this despite the loss of the right to sue the true tortfeasors in a court of competent jurisdiction before a jury of her peers.

183.     The Trustees can change the Cash Value of a Point in consultation with the Trust Advisory Committee, the FCR, and J&J.  *See* TDPs at § 7.6.2.  The TDP allows the Trustees to suspend the normal order of payments or temporarily limit or suspend payments altogether.  *Id*. Suspension of payments is highly likely here, where claims will be submitted but funding will not be available as and when claims are reviewed but only on set schedules over 25 years.

184.    Buried at the end of the TDPs and the Disclosure Statement is an acknowledgement that there is no guarantee of any level of payment to women who suffer from Ovarian Cancer.[44] This acknowledgement stands in sharp contrast to J&J's solicitation materials.  LLT June 3, 2024 Letter (the average recovery for an Ovarian Claim will likely be "between **$75,000 and $150,000**.").  When J&J wanted votes, it did not advertise that there is "no guarantee" that holders of valid Ovarian Claims will get paid anything.  It just told voters—and more precisely, their lawyers—what J&J wanted them to hear regardless of the truth.

D.    **TRUST GOVERNANCE**

185.    The Supporting Law Firms designed the Trust's governance so that they control the Trust and the claims allowance process.  This occurs in two ways.

186.    *First*, eight of the "Supporting Law Firms" that comprise the "Ad Hoc Committee of Supporting Counsel," which is represented by Paul Hastings LLP, each get to appoint one of the ten members of the Trust Advisory Committee (the "TAC").  *See* Disclosure Statement, Ex. H, at § 5.1.  If a Talc Claimants' Committee (the "TCC") is appointed in the case, the TCC will get to appoint the two minority members of the TAC.  *Id.*

187.    The TAC is the governing body that will oversee the Trust.  The TAC will have consent rights over all material decisions, and it is entitled to consult on all general matters.  *Id.* at §§ 2.2(e), (f) & 5.2.  The TAC has consent rights and, therefore, governance over any changes to claims administration and resolution.  *See id.* at § 2.2(f)(ii).  This gives the Settling Law Firms, acting as the "TAC," the ability to control how their own clients' claims are evaluated and paid.[45]

---

44    *See* TDPs at § 7.6.2 (there is "no guarantee of any specific level of payment" to women who suffer from Ovarian Cancer); Disclosure Statement at § 8.6 ("There can be no certainty as to the precise amounts that will be distributed by the Talc Personal Injury Trust in any particular time period or when Channeled Talc Personal Injury Claims will be resolved by the Talc Personal Injury Trust.").

45    *See id.* at § 2.2(f)(ii)(A) (treatment of previously resolved claims), (B) (Claims submission Procedures, including the Claim Submission Requirements), (C) (the Preliminary Evaluation Criteria), (D) (the

188.     **Second**, while not expressed, the Supporting Law Firms and J&J get to select the two Trustees—*i.e.*, Scott Freeman and Fouad Kurdi—who enjoy terms of either four or five years. *See* Disclosure Statement, Ex. H at § 4.2.  On major decisions, including those noted above, the Trustees **cannot** act independently from the TAC.

189.     No TCC members, dissenting talc victims, or non-supporting law firms will have any input.  Law firms that represent large numbers of holders of Ovarian Claims who do not support the Plan are locked out and do not get a seat at the table.  This is the price that they pay for standing by their clients and refusing to bow down to J&J.

190.     The Trust Agreement includes a provision regarding the independence of the Trustees, but the limits of that governance provision are striking.  *See id*. at § 4.9.  Notably absent is any provision prohibiting connections or financial ties with any of the Ad Hoc Committee law firms, or prohibiting a Trustee from awarding lucrative Trust contracts to companies he owns.

191.     One of the Trustees, Scott Freeman is a founder and Chief Executive Chairman of Archer Systems, LLC.[46]  Archer Systems, LLC is the initial Talc Trust Claims Administrator. *See* Disclosure Statement, Ex. H at § 4.8(b).  Archer Systems, LLC is also the initial Talc Trust Liens Resolution Administrator.  *See id*., Ex. H at § 4.8(c).  Mr. Freeman's companies stand to profit handsomely by serving in these roles under Mr. Freeman's supervision (as Trustee). Mr. Freeman can begin paying himself even before there is an Effective Date.

---

Expedited Review Process, including the Expedited Review Criteria), (E) (the Individual Review Process, including the Individual Review Criteria), (F) (the Quickpay Review Process, including the Quickpay Review Criteria), (G) (the Maximum Value), (H) (the Cash Value of a Point), (I) (the forms of Acceptance and Release), (J) (the first-in-first-out processing procedures), (K) (the first-in-first-out payment procedures).

[46]  *See*   https://www.prnewswire.com/news-releases/archer-announces-robby-avery-as-ceo-301290077. html.

192.    The other Trustee, Mr. Kurdi, is no stranger to J&J.  Upon information and belief, Mr. Kurdi served as J&J's mediator in its settlement of its talc liability owed to U.S. State governments.[47]  Mr. Kurdi has also participated in several unsuccessful mediations involving J&J's talc liability.

E.    **PLAN RELEASES AND EXCULPATION CLAUSE**

193.    The Plan provides releases to the Debtor, the Reorganized Debtor, J&J and all of its current and former affiliates—more than 500 J&J companies, the vast majority of which have never been named in any talc-related litigation—as well as each of those companies' current and former officers, directors, managers, employees, agents, nominees, financial advisors, attorneys, accountants, investment bankers, consultants, experts, and other professionals.

194.    The scope of the releases and injunctions granted to the Protected Parties is breath-takingly broad.  *See* Plan at §§ 11.3 & 11.4.  The Plan provides that the order confirming the Plan will permanently enjoin the commencement or prosecution of all actions related to the Protected Parties.  Whatever Constitutional right women who suffered physical injury or death due to exposure to J&J's talc products had to appear, be heard, and seek compensation in the civil justice system from the Protected Parties is taken from them.  *Id*. at § 11.4.  ***They are forever silenced***.  Even those women who do not support the Plan are involuntarily included in these releases and injunctions with no relief accorded.

195.    Under the Plan, J&J, and its current and former affiliates (and each of those companies' current and former officers, directors, managers, employees, agents, nominees, financial advisors, attorneys, accountants, investment bankers, consultants, experts, and other

---

[47]    *See* US News, J&J Settles Talcum Powder Lawsuits from States for $700 Million, available at https://www.usnews.com/news/health-news/articles/2024-06-13/j-j-settles-talcum-powder-lawsuits-from-states-for-700-million#:~:text=THURSDAY%2C%20June%2013%2C%202024%20(,a%20heightened%20risk%20for%20cancer.

professionals) are released from their independent talc-related liability for all time and to all women.

196.     The Trust must indemnify, defend, and hold harmless, to the fullest extent permitted by applicable law, each of the Reorganized Debtor, J&J, and the Protected Parties.  The Trust's indemnification obligation under the Plan is so excessive that it does ***not*** exclude criminal acts or gross misconduct.

197.     The Plan also includes a broad exculpation clause.  *See* Plan at §§ 4.17 & 11.4.  The only carve outs from the exculpation clause are for liability that results from "criminal acts, actual fraud, willful misconduct, or gross negligence" as determined by a final, non-appealable order.  *Id.* at § 11.4.1.  While the Plan provides only minimal recoveries for holders of Ovarian Claims, J&J, Kenvue, and every one of their affiliated companies get to walk away from a significant and unprecedented portion of their own, direct talc liability ***for all time***.

## XI.     THE DISCLOSURE STATEMENT

198.     In the Motion, the Debtor asks the Court to approve the Disclosure Statement as containing adequate information.  *See* Motion at ¶¶ 17-24.  But the Disclosure Statement is deficient in content and contains false information.  The Disclosure Statement should not be approved.

### A.     FAILURE TO DISCLOSE DEPRIVATION OF RIGHTS

199.     ***First***, the Disclosure Statement does not clearly inform women that they are forever losing their right to appear, be heard, and seek just compensation from J&J and the other Protected Parties in the civil justice system.  To understand this fact, the reader must piece together various Plan definitions and the sections that describe the "Channeling Injunction."  Nowhere is there a short, plain statement easily understandable by people who are not bankruptcy scholars or professionals that tells women exactly what they are losing under J&J's Plan.

200.    Nowhere does the Disclosure Statement clearly state that women who have Ovarian Cancer and who hold tort claims against J&J based on J&J's own, independent conduct, are losing their legal, equitable, and Constitutional rights to appear, be heard, and seek compensation from J&J for their injuries in the civil justice system.

201.    Rather, the Disclosure Statement attempts to soft-peddle on this topic by stating, "If the Plan is confirmed, claimants holding Channeled Talc Personal Injury Claims would no longer be required, nor generally permitted, to litigate their claims in the tort system."  Disclosure Statement at iv.  But the Plan does not "generally permit" women to sue J&J in the tort system.  It bars them from suing J&J altogether and forever based on injuries and death that J&J caused.

## B.    J&J'S FALSE NARRATIVE REGARDING SCIENCE AND SAFETY

202.    **Second**, the Disclosure Statement offers a false narrative regarding the science and the safety of J&J's talc products.  It is a marketing piece by which J&J hopes to convince women that they cannot recover in the tort system and that they can only recover under J&J's Plan.

203.    The Disclosure Statement and supporting letters tell victims that J&J believes the "talc lawsuits against Old JJCI and J&J … have **no valid scientific basis**," that "Old JJCI's talc products **never contained asbestos**," and that "the **safety** of cosmetic-grade talc has been confirmed by dozens of peer-reviewed studies and multiple regulatory and scientific bodies for decades."  Disclosure Statement at § 2.2(a) (emphasis added).  This statement is demonstrably false.

204.    The Disclosure Statement glides over the **litigation history** and picks and chooses purported new science.[48]  In its letter in support of confirmation, J&J states that in "over ten years

---

[48]    *See id.* at § 2.3 (characterizing the new *Daubert* proceeding in the MDL as based on the "emergence of new and highly relevant science, recent changes to Federal Rule of Evidence 702 . . . [and thereby implicating] every expert witness put forward by the PSC on multiple different grounds.").

of litigation, only 17 ovarian cancer cases have gone to trial" and that "LLT and J&J have prevailed in 16 of the 17 cases, with plaintiffs in those 16 cases receiving no money."  LLT June 3, 2024 Letter.  J&J further proclaims that "[b]ased on the litigation history of ovarian cancer claims that has occurred to date … you would likely receive no recovery on your claim."  *Id*.  But the Disclosure Statement is misleading and deliberately and does not tell the whole story.

205.   **Scientific Basis, Asbestos, and Safety**.  In over 30 case-control studies, 10 meta-analyses, 3 pooled studies, and 3 prospective cohort studies since the 1980s investigating the link between talcum powder and ovarian cancer, all but two established a demonstrated and increased risk of ovarian cancer with the perineal or genital application of talcum powder.  Indeed, the most recent cohort study conducted by NIH scientists fully supported an association between talc and was consistent with previous studies.  The NIH has itself called this recent evidence compelling.

206.   As set forth herein, newer studies have confirmed the link between talc use and ovarian cancer.  A 2018 meta-analysis that included 24 case-control (13,421 cases) and three cohort (890 cases) studies, found that any perineal talcum powder use was associated with an increased risk of ovarian cancer.[49]  Two meta-analyses and pooled studies in 2020 include similar findings.[50]

207.   A 2020 peer-reviewed article, titled "*Mesothelioma Associated with the Use of Cosmetic Talc*," concluded that exposure to asbestos-contaminated talcum powders can cause

---

[49]   *See* Penninkilampi et al., *Perineal Talc Use and Ovarian Cancer: A Systemic Review and Meta-Analysis*, 29 Epidemiology 41 (2018).

[50]   *See* Berge, et al., *Genital Use of Talc and Risk of Ovarian Cancer: A Meta-Analysis*, 27 European J. Cancer Prev. 248 (2018); Taher et al., *Critical Review of the Association between Perineal Use of Talc Powder and Risk of Ovarian Cancer*, 90 Reproductive Toxicology 88 (2019); O'Brien et al., *Association of Powder Use in the Genital Area with Risk of Ovarian Cancer*, 323 JAMA 49 (2020); O'Brien et al., Supplementary Online Content (2020).

mesothelioma.[51]   Another published peer-reviewed article, titled "*Malignant Mesothelioma Following Repeated Exposures to Cosmetic Talc*," likewise concluded that exposure to talc-based products caused mesothelioma in the study subjects.[52]

208.   Using samples from the 1960s through the early 2000s, Drs. William Longo and Mark Rigler found that 68% of the samples of Johnson's Baby Powder and Shower to Shower were positive for amphibole asbestos and 98% of the samples contained fibrous talc.

209.   But ***none*** of this is disclosed alongside the Disclosure Statement's blatant falsehood that "for decades time and again testing has declared Johnson & Johnson's baby powder free from asbestos."  *See* Disclosure Statement at § 2.2(b).  Nor is it disclosed that the studies J&J relies on were commissioned by J&J and not by independent agencies with no bias in the outcome.

210.   In a groundbreaking study published in May of this year, the authors state that their "findings are robust, showing a consistent association between genital talc use and ovarian cancer."[53]  This study and its findings are omitted from and ***not*** disclosed anywhere in the Disclosure Statement, not even alongside the section titled "*Decades of Studies and Testing*."

211.   Instead, J&J falsely states that the Ovarian Claims "have no valid scientific basis, as Old JJCI's talc products never contained asbestos, and the safety of cosmetic-grade talc has been confirmed by dozens of peer-reviewed studies and multiple regulatory and scientific bodies for decades."  Disclosure Statement at § 2.2(a).

---

[51]   *See Journal of Occupational and Environmental Medicine*, Vol. 62, No. 1 (Jan. 2020).

[52]   Theresa S. Emory, MD, John C. Maddox, MD, and Richard L. Kradin, MD, AM. J. IND. MED., 63: 484-489 (2020).

[53]   O'Brien KM, Wentzensen N, Ogunsina K, Weinberg CR, D'Aloisio AA, Edwards JK, Sandler DP. *Intimate Care Products and Incidence of Hormone-Related Cancers: A Quantitative Bias Analysis*. J Clin Oncol. 2024 May 15.

212.    The U.S. and Canadian governments' findings and positions are either omitted or deceptively provided.   In December 2018, Health Canada, the public department of the Government of Canada, preliminarily concluded that:   "Available human studies . . . indicate a consistent and statistically significant positive association between perineal exposure to talc and ovarian cancer.  Further, available data are ***indicative of a causal effect***."[54]

213.    In response, J&J submitted a 255-page review of the data and several countervailing expert reports, and its scientists lobbied Health Canada on numerous occasions.  In addition to submitting its 255-page review, J&J sent Health Canada the expert reports that its lawyers submitted in the MDL.  Not only did Health Canada reaffirm its preliminary conclusions, but it also addressed—and rejected—the reasoning employed by J&J's litigation experts.  It found that:

> Overall there is a high degree of consistency in the epidemiological studies across several decades conducted in different parts of the world.  Although there are uncertainties related to bias, there is confidence in the robustness of the available database for use in characterizing ovarian cancer risk attributed to talc exposure.  ***Furthermore, the available data are indicative of a causal relationship***.[55]

214.    Despite Health Canada's clear indication of causation, J&J misleadingly claims that "not one of the authors of the case-control studies that reported an 'association' took the position that its findings establish causation."  Disclosure Statement at § 2.2(b).

215.    In 2019, the U.S. Food and Drug Administration tested two bottles of Johnson's Baby Powder.[56]  It found one bottle to be contaminated with asbestos and talc fibers.[57]  Despite J&J's continual, belied assertion that its products contain no asbestos fibers, this finding led to

---

[54]    Draft Screening Assessment, Environment and Climate Change Canada, Health Canada, Dec. 2018 at 28 (emphasis added).

[55]    Screening Assessment, Environmental and Climate Change Canada, Apr. 2021, at 36 (emphasis added).

[56]    FDA News Release, *Baby Powder Manufacturer Voluntarily Recalls Products for Asbestos*, Oct. 18, 2019.

[57]    *See* AMA Analytical Services, Inc., Certificate of Analysis, dated October 11, 2019.

J&J's recall of 33,000 bottles of its Baby Powder.  But the Disclosure Statement makes no mention of this FDA testing and consequent recall.[58]

216.    J&J misleadingly touts its "decades of testing by J&J and Old JJCI to establish product safety" to support its false claim that J&J products "never contained asbestos."  Disclosure Statement at § 2.2(b).  The Disclosure statement misleadingly claims that "[t]he approach to such testing has been state of the art, exceeding regulatory and industry standards" and that "[t]he program relies on industry experts to ensure testing protocols are implemented at each stage of the process with a high level of precision and integrity."  *Id*.

217.    But J&J fails to disclose that the FDA as recently as 2019 found asbestos in J&J's baby powder.  J&J also fails to disclose that in 2020 the Missouri Court of Appeals affirmed a finding of fact that there was "substantial evidence presented by the Plaintiffs that [J&J] discussed the presence of asbestos in [its] talc in internal memoranda for several decades."  *See Ingham*, 608 S.W.3d at 721.  And J&J does not disclose that the testing procedures lobbied for and employed by J&J were ***designed*** to fail to detect the asbestos that J&J knew was present in its talc products.

218.    Taken as a whole, the Disclosure Statement does not truthfully describe the state of the science—including the most recent developments and findings of agencies' like NIH, EPA Heath Canada and IARC—or the unanimous view of both State and Federal Courts that there is reliable evidence to support the causal link between talc and epithelial ovarian cancer.

219.    Today, J&J no longer sells talcum powder consumer products in the United States or Canada.  J&J announced that it was ceasing selling talc-based powder globally at the close of

---

[58]    *See* Disclosure Statement at § 2.2(a) ("[J&J]'s talc products never contained asbestos[.]"); § 2.2(b) ("Questions regarding whether JOHNSON'S Baby Power contained asbestos and whether use of cosmetic talcum powder could cause ovarian cancer were raised as early as the 1970s and 1980s, respectively. Such allegations have been investigated by the Food & Drug Administration (the "FDA"), among others, and found to be unsupported by fact or science.").

last year.  The Disclosure Statement misleadingly does not mention the asbestos recall and FDA testing as being a factor in discontinuing talc sales.[59]

220.    **Litigation History**.  Putting aside the MDL, Judges and Juries across the country have disagreed with J&J and found J&J liable for talc-caused cancers.  But none of this is disclosed in the Disclosure Statement.

221.    In 2020, the Appellate Division of the Superior Court of New Jersey issued an opinion in *Carl v. Johnson & Johnson*,[60] where the trial judge excluded plaintiffs' expert causation testimony.  In a unanimous 36-page opinion, the Appellate Division reversed the exclusion order, holding that "plaintiffs' experts adhered to methodologies generally followed by experts in the field, and relied upon studies and information generally considered an acceptable basis for inclusion in the formulation of expert opinions.  Suppression of their testimony was an abuse of discretion."[61]  The case has yet to be tried but when it is, plaintiffs' experts will testify about the linkage between J&J's talc and women's cancers.

222.    In June 2020, the Missouri Court of Appeals considered the sufficiency of expert opinion testimony linking talc-based products and ovarian cancer.[62]  There, too, J&J argued that plaintiffs' general causation theory was "contrary to the overwhelming scientific consensus" that talcum powder products do not cause ovarian cancer.[63]  The Missouri Court of Appeals rejected

---

[59]    *See* Disclosure Statement at § 2.2(d) ("Although JOHNSON'S Baby Powder has been safely used by hundreds of millions of people worldwide for over 125 years, on May 19, 2020, the Company announced it would permanently discontinue its line of talc-based JOHNSON'S Baby Powder in the U.S. and Canada and, on August 11, 2022, it announced the discontinuation of such sales globally. These decisions were based on business considerations, including lack of sales due to misinformation about the safety of the Company's talc-based JOHNSON'S Baby Powder.").

[60]    237 A.3d 308, 311 (N.J. App. Div. 2020), *cert. denied*, 244 A.3d 270 (N.J. 2021).

[61]    *Id.* at 344.

[62]    *See Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 709-714 (Mo. App. 2020).

[63]    *Id.* at 711.

J&J's position.[64]  In other words, J&J lost and J&J's talc victims proved that J&J was responsible for their illnesses and damages.

223.    It is true that, for decades, J&J kept documents that disclosed its knowledge of the dangers of talc from litigants and the public.  In that time, J&J was successful defending talc-related lawsuits.  But that has changed.  Only in the recent years leading up to J&J's bankruptcy litigation tactic, however, was J&J compelled—for the first time—to produce particularly sensitive documents in litigation discovery.[65]

224.    These documents showed that, from at least 1971 to the early 2000s, J&J **knew** its talc-based products sometimes tested positive for carcinogens, that it was concerned with the issue, and that it intentionally failed to warn regulators or the public of the carcinogenic nature of its talcum powder products.  *Id*.  Again, there are no disclosures in the Disclosure Statement regarding this proof of knowing concealment by J&J.

225.    The Disclosure Statement omits or misrepresents the verdict history of ovarian cancer claimants.  In many instances verdicts were returned for plaintiffs—*e.g.*, the plaintiffs won on the merits, but the verdicts were overturned on appeal on jurisdictional grounds following a Supreme Court decision.  Those cases will be tried again.  And, as noted above, J&J has lost case after case in the tort system since its second bankruptcy case was tossed out by Judge Kaplan. Juries have found, based on the evidence presented to them, that J&J's talc products contained asbestos and caused fatal illnesses.

226.    While the Disclosure Statement does disclose J&J's loss in the *Ingham* case, it does not disclose the extent of the findings made in that case.  In 2020, the Missouri Appeals Court

---

[64]  *Id.* at 714.

[65]  *See* Girion, Lisa¸ *Johnson & Johnson Knew for Decades that Asbestos Lurked in Its Baby Powder*, Reuters, Dec. 14, 2018.

affirmed the punitive damages award of $1.6 billion against J&J and in so doing found that (a) J&J's own conduct was "significantly reprehensible," (b) J&J had "discussed the presence of asbestos in [its] talc in internal memoranda for several decades," (c) J&J had "avoided adopting more accurate measures for detecting asbestos and influenced the industry to do the same," (d) J&J had "attempted to discredit … scientists" who published "studies unfavorable" to its talc products, (e) J&J chose not to "eliminate talc" from its products and use "cornstarch instead because it would be more costly to do so," and (f) J&J "knew of the asbestos dangers in" its talc products "when they were sold to the public." *Ingham*, 608 S.W.3d at 721.

227. The Disclosure Statement, in comparison, merely states that "[o]n appeal, the punitive damages award was reduced to $1.6 billion." Disclosure Statement at § 2.2(b). Clearly this lack of information shades the disclosure to favor J&J when the reality does anything but.

## C.    J&J'S FALSE NARRATIVE REGARDING LIKEY RECOVERIES

228. *Third*, after telling victims that they have no hope of recovering in the civil justice system (which is false), J&J's sales pitch turns to promising riches and rewards if people vote "yes."

229. J&J's solicitation materials tell claimants that their recoveries "under the Plan would **substantially exceed** recoveries claimants received in litigation in the tort system" because J&J has "prevailed" in 16 of 17 cases, and the average recovery for an Ovarian Claim under the Plan will likely be "between **$75,000 and $150,000**." LLT June 3, 2024 Letter (emphasis in original or supplied by J&J itself). J&J even goes so far as falsely claiming that "all Channeled Talc Personal Injury Claims will be paid *in full* under the Plan."

230. If this were true, a shareholder could logically ask: why are J&J's directors and officers giving away $75,000 to $150,000 to holders of talc claims when those claims allegedly have no scientific support and litigating against J&J means that the plaintiffs almost always lose?

60

Conversely, if a woman's real damages exceed $150,000 how is limiting her distribution to $150,000 "payment in full"?

231.    If claimants' recoveries are substantially lower in the tort system, then J&J's directors and officers should rationally prefer to be in the tort system and may have a fiduciary duty to pay **_nothing_**.  If J&J could be believed, its bankruptcy strategy boils down to:  "all talc claims are invalid!" therefore, "we must pay the claim holders more than they could ever hope to recover in the tort system!"  No legal training is necessary to see that this does not make any sense and that J&J's Disclosure Statement says what J&J wants people to believe regardless of the truth.

232.    The truth is that the average recovery for an Ovarian Claim will **_not_** be "between $75,000 and $150,000."  Because of the "Quickpay" system, there may only be approximately $3.7 billion to pay all current and future Ovarian Claims.  The average payment on account of an Ovarian Claim will be far less than advertised by J&J and its supporters.  What J&J means by full payment under the Plan is that J&J will pay what J&J wants to pay and nothing more.

### D.    J&J'S MISLEADING NARRATIVE REGARDING PLAN SUPPORTERS

233.    **_Fourth_**, after promising riches and rewards if claimants vote "yes," J&J alleges that various plan supporters, including law firms and the Future Claimants' Representative herself, support the Plan, have "independently" or "separately" reviewed it, and reached the conclusion that it is "in the best interest" of current and future claimants.  *See* LLT June 3, 2024 Letter.

234.    From the very beginning, the Disclosure Statement falsely represents how the Plan came to be.  It asserts, untruthfully, that the Plan was developed "with the support of counsel representing a majority of the ovarian cancer claimants."  Disclosure Statement at § 1.1(a).  While the Supporting Law Firms may represent a majority of the **_non-compensable_** Gynecological Claims, the Supporting Law Firms do not represent a majority of the **_compensable_** Ovarian Claims.

235.     Under J&J's marketing ploy, the plan supporters function like endorsements—*i.e.*, J&J's Plan must be great, otherwise why would these parties endorse it?  But the Disclosure Statement contains no disclosures whatsoever as to what analysis was undertaken by these alleged plan supporters.

236.     To have adequate information, women should have a basis on which to form their own opinions about the Plan.  The Disclosure Statement should include, at a minimum, the following:  [1] the identities and qualifications of any medical experts, epidemiologists, or statisticians hired by the plan supporters, including the Future Claimants' Representative; [2] a description of the work they did (including whether they tested J&J's Baby Powder for asbestos and whether they calculated the number of future claims); [3] a summary of their reports, and [4] a description of the methodologies they used, and a statement as to how their conclusions from differed or comported with J&J's conclusions that there is no asbestos in J&J's talc products, that tale products are safe for personal hygiene use, and that the projected claim values are reasonable.

237.     A party could not reach an ***informed*** conclusion that a plan is or is not in the "best interests" of current and future claimants without performing ***some*** analysis.  The inference that J&J wants claimants to draw from its solicitation materials is that parties (other than those being paid by J&J) have reviewed data, scientific studies, and other analyses, and reached the conclusion that Plan confirmation is in the best interests of current and future claimants.  But each claimant is entitled to sufficient information to make that determination on her own.

238.     Absent a full disclosure as to what "independently" or "separately" reviewed entailed, this narrative is also misleading.  The reality is most of J&J's plan supporters are strangers to talc litigation.  Tellingly, the Ad Hoc Committee of Supporting Counsel's solicitation letter

dated June 3, 2024, does **not** purport to offer an independent assessment of what the "average recovery" will be for holders of Ovarian Claims.

239.    Instead, this ad hoc group refers to and quotes from Article 1.1(c) of the Disclosure Statement—*i.e.*, "between $50,000 and $200,000, with an average recovery between $75,000 and $150,000 being more likely." There is no analysis of how these numbers were created and nothing "independent" is offered in support.

240.    If the plan supporters did not perform any independent analyses (and simply adopted J&J's analysis as their own), that fact must be disclosed. If they did perform their own analyses, the details of their investigations must be disclosed as well. And if they do not represent a majority of the ovarian cancer claimants, that crucial fact must be disclosed. The Disclosure Statement for a Plan that relies heavily on the alleged support from the Supporting Law Firms does not provide information sufficient for voters to evaluate the credibility of and motive behind J&J's plan supporters and is, therefore, inadequate.

## XII.    <u>J&J'S PROPOSED SOLICITATION PROCEDURES</u>

241.    If claimants were provided with adequate information, many claimants with **compensable** claims in the tort system would not vote to accept J&J's Plan. This is where J&J's Solicitation Procedures factor into the equation.

242.    In most cases, the Court sets a bar date for filing proofs of claim. The debtor then provides notice to claimants of the bar date. This notice can take several forms.

243.    Known creditors are entitled to receive actual notice, which can take the form of a direct mailing. To provide notice to other, unknown creditors, the debtor can provide publication notice, which usually takes the form of a robust media campaign.

244.    Claimants then file proofs of claim setting forth the factual basis for their right to payment. These claims are filed under penalty of perjury in accordance with Official Form 410.

After the bar date has passed, the Court sets a voting record date, which fixes the population of claimants entitled to vote.

245.     In sum, when the Bankruptcy Rules are followed, claimants file proofs of claim well before any voting record date is set and months after the debtor implements a robust notice campaign.  Voting is restricted to claimants who filed proofs of claim under penalty of perjury, setting forth the bases for their right to payment—*i.e.*, proofs of claim to which other parties in interest can object if they believe that the claim is invalid and does not give rise to a right to payment that is "enforceable" under "applicable law."  *See* 11 U.S.C. 502(b).  Claimants do not vote until after they received and have an opportunity to review a disclosure statement that has been approved by a Court as containing adequate information.

246.     J&J's procedures do not align with the Bankruptcy Rules.  J&J has invented a set of procedures designed to evade the safeguards set forth in the Bankruptcy Rules.

247.     **First**, voting is not restricted to claimants who hold compensable or cognizable claims.  Anyone who holds a "Channeled Talc Personal Injury Claim" can vote.  *See* Disclosure Statement at § 9.1.  This definition includes holders of "Ovarian/Gynecological Talc Personal Injury Claims" and "Other Disease Talc Personal Injury Claims."  Plan at § 1.1.23.

248.     The definitions for these terms bring within the definition of Channeled Talc Personal Injury Claim any "disease" alleged to be connected to the usage of J&J's talc products (*i.e.*, it does ***not*** have to be cancer) (*id.* at § 1.1.98), and a claim based on the "fear of cancer" (*i.e.*, the claimants do ***not*** have to be sick or even anticipate that they will ever be sick, but only fear that they may get an unspecified type of cancer that may or may not be related to J&J's talc) (*id.* at § 1.1.141).  Eligible voters include anyone who used J&J's talc products in the past who is

afraid that someday he or she may develop cancer as a result.  Even the concept of a contingent claim does not go so far as to encompass what this strategy offers.

249.  **Second**, these "voters" are not voting based on any materials that have been approved by a Court as containing "adequate information."  Most voters are directed to websites where J&J's false propaganda pieces are posted telling claimants that their recoveries "under the Plan would **substantially exceed** recoveries claimants received in litigation in the tort system" because J&J has "prevailed" in 16 of 17 cases, and the average recovery for an Ovarian Claim will likely be "between **$75,000 and $150,000**."  LLT June 3, 2024 Letter (emphasis in original).

250.  **Third**, many of the "voters" may not even exist and/or may not have claims that are even eligible for the $1,500 "Quickpay."  J&J's procedures permit the Supporting Law Firms to complete "Master Ballots" where they record the votes of their alleged clients.  These clients can include anyone who falls within the definition of "Channeled Talc Personal Injury Claim"— *i.e.*, someone afraid that he or she may develop cancer.

251.  To include a client on a Master Ballot, the firm need only have a reasonable belief that the client has used one or more J&J talc product.  There is no requirement that the client sign anything under penalty of perjury or make a submission equivalent to the filing of a proof of claim.

252.  If the alleged claimant asserts that she has Ovarian Cancer or Gynecological Cancer or "there is an affirmative response to the ***other Disease/Use Questions***" and the Ballot is properly executed, the Debtor "will ***not object*** to the claim for voting purposes only."  Disclosure Statement § 9.1 (emphasis added).  It is to J&J's benefit that none of the votes are scrutinized and so the Debtor ignores its obligation to consider only *valid* claims.  Yet the Debtor will not object on the merits of these non-compensable claims, setting up a structure where they will be paid through the Trust even though the Debtor has no liability for them.

253.    Under their Solicitation Procedures, J&J and the Debtor apparently believe that they could satisfy section 524(g) without the affirmative vote of a single holder of an Ovarian Claim or any claimant who has a claim that is enforceable against the Debtor under applicable law. It is with the acceptance of "75% in number of Channeled Talc Personal Injury Claims" who vote on the Plan that the Debtor contends it can satisfy section 524(g).  *Id*. at § 9.4.  The idea that section 524(g) could be satisfied by the votes of claimants with non-compensable claims is far and away beyond the scope of what Congress envisioned.

## XIII.    J&J'S PROPOSED TABULATION PROCEDURES

254.    But section 524(g) is not the sole issue.  To argue that Class 4 is an accepting class, J&J also needs creditors who hold at least "two-thirds in amount" of the "allowed claims" in Class 4 to vote to accept the Plan.  11 U.S.C. § 1126(c).  J&J cannot satisfy this requirement if the amount of each talc claim is determined under applicable law or in the tort system.

255.    To address this issue, the Debtor proposes to estimate all talc claims at $1.00 for voting purposes.  *See* Motion at ¶¶ 52-56; Disclosure Statement at § 9.5(b).  When the Debtor's claims agent goes to calculate whether the 2/3rds requirement in section 1126(c) has been met, all talc claimants—whether compensable in the tort system or not—will be weighted the same.

256.    To illustrate this point, under the Debtor's tabulation procedures, the vote of a holder of a Gynecological Claim such as one for cervical cancer which has no value against talc defendants in the tort system would be weighted the same—*i.e.*, $1.00—as the vote of a holder of an Ovarian Claim that the tort system may value at over $25 million.  Under J&J's math, a $25 million verdict equals $1.00.  Someone who is merely afraid of getting cancer from exposure to J&J's products would also vote at the $1.00 amount.  J&J's Plan makes fear of a disease which may never happen equal in value to claims of real cancer victims who are dying or have died.

257.     The $1.00 per vote makes it impossible to know whether the 2/3rds in amount of the allowed claims that vote has been satisfied.  In fact, there is not information in the Disclosure Statement at all regarding what the actual value of the Ovarian Claims really is.  And J&J's assertion that each holder of an Ovarian Claim will receive between $75,000 and $150,000 cannot be substituted as a value because there is no information as to how J&J came up with those exceedingly low distribution amounts.  They are clearly not based on medical costs, which often exceed those amounts, or on lost income or pain and suffering or on loss of consortium (which are not even factored into the Plan) or punitive damages as allowed in some states.

258.     J&J wants to stuff the ballot box with ballots submitted by law firms representing non-compensable claims and then use those votes to argue that most "claimants" support J&J's Plan.  This is nothing more than a blatant effort to strip holders of valid, compensable claims of their Constitutional rights.  But even if, *arguendo*, the numerosity factor of section 1126(c) and section 524(g) were met, the requirement that 2/3rds in amount of allowed claims vote to support the Plan clearly is not met by the contrivance of a $1.00 vote per claim.

## XIV.   EPIQ FILES A FALSE VOTING REPORT

259.     Even after stuffing the ballot box with non-compensable claims, J&J still did not clear the 75% threshold required by section 524(g) of the Bankruptcy Code.  The Voting Declaration filed by Epiq Corporate Restructuring ("Epiq") is inaccurate.  If Epiq had counted all the votes timely submitted as of the July 26, 2024 voting deadline (the "Voting Deadline"), Epiq could not have certified that J&J cleared the 75% threshold required by section 524(g).

260.     Rather, although it is unclear how far below the 75% threshold J&J was as of the Voting Deadline, the acceptance percentage was less than 75%.  *See* Dkt. No. 257 at Ex. B.  At this point, J&J could have decided to resolve all its talc liability outside of bankruptcy, as it did after the dismissal of its LTL 2.0 case with substantially all its talc related mesothelioma liability

and all its talc related consumer fraud claims that were being run or could have been run by the States.  J&J has always been able to pay all current and future claims in full without a bankruptcy settlement.

261.    Epiq is in the business, *inter alia*, of sending out, tabulating and certifying votes on bankruptcy plans.  Yet in this case, it delayed certification of the votes by eight weeks after the voting deadline.  In tabulating the votes for its report issued on Saturday, September 21, 2024, Epiq, acting at J&J's direction and control, disregarded approximately 11,434 votes to reject J&J's Plan and may have counted in their place approximately 11,434 votes to accept J&J's Plan from a competing Master Ballot delivered weeks after the Voting Deadline.  *See* Voting Declaration; Dkt. No. 257 at Ex. B.  This, in turn, made it possible for J&J and the Debtor to contend that they have the support of 83% of the claimants who voted.  *See* Dkt. No. 3 at p. 1.

262.    But J&J failed to achieve this level of support for its Plan.  Rather, after the Voting Deadline past, J&J set out to manipulate the vote and worked with Epiq to change votes from "reject" to "accept" in contravention of J&J's own voting procedures and contrary to the will of women who voted to reject the Plan and oppose the Plan to this day.

### A.    <u>J&J'S VOTING PROCEDURES FOR MASTER BALLOTS</u>

263.    On June 3, 2024,[66] J&J adopted voting procedures.  This was before J&J began soliciting votes on its Plan.  *See* Disclosure Statement (Dkt. No. 25-2) at § 9.5(d), at pp. 132-135.  These procedures provide for the use of "Master Ballots"—*i.e.*, a ballot submitted by a law firm that records the votes of each of its clients.  *Id.* at 132.  These procedures also provide instructions on what happens if there are conflicting Master Ballots.  *Id.* at 134-135.

---

[66]    *See* Dkt. No. 46 at ¶ 1(a).

264.    Under these instructions, if a claimant appears on more than one Master Ballot, Epiq was required to "exercise reasonable efforts to coordinate with the respective firms to cure the discrepancy." *Id.* at 134.  If the discrepancy could not be cured, then the vote for the claimant appearing on more than one Master Ballot "will be counted only once and only if the votes are consistent with respect to acceptance or rejection of the Plan." *Id.* at 134-135.

265.    If the votes are inconsistent, then "none of the votes will be counted." *Id.* at 135. These procedures were not only set forth in the Disclosure Statement, but they were also included in the solicitation packages provided to claimants.[67]

### B.    11,434 BEASLEY ALLEN CLIENTS VOTE TO REJECT J&J'S PLAN

266.    Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. ("Beasley Allen") submitted a Master Ballot to Epiq prior to the July 26, 2024 Voting Deadline.  *Id.* at Ex. 1.  Beasley Allen's Master Ballot included 11,503 claimants, of which 69 voted to "accept" the Plan and **11,434** voted to "reject" the Plan.  *Id.* at ¶ 2.

267.    Beasley Allen is a leader in talc litigation and is a member of the plaintiffs' executive committee in Multidistrict Litigation (MDL) established *In re: J&J Talcum Powder Marketing, Sales Practices, and Products Litigation*, MDL 2738 (the "MDL") in the United States District Court for the District of New Jersey.  Beasley Allen opposed J&J's Plan as of the July 26, 2024 Voting Deadline.

### C.    LESS THAN 75% OF THE
### CLAIMANTS VOTED TO ACCEPT THE PLAN

268.    As of the Voting Deadline, J&J was below the 75% threshold.  *See* Dkt. No. 257 at Ex. B.  As of that date, 26,958 of the claimants who cast a vote voted to "reject" J&J's Plan, placing J&J below the threshold required by section 524(g) of the Bankruptcy Code.  *Id.*

---

[67]    *See Decl. of Andy D. Birchfield* (Dkt. No. 257 at Ex. B) at Ex. 1, p. 23 (Annex C, § 4.g.).

269.    At that point, J&J had a choice.  J&J could have resolved all of its talc liability outside of bankruptcy, as it did after the dismissal of its LTL 2.0 bankruptcy case with substantially all its talc related mesothelioma liability and all of the talc related consumer fraud claims, and as it most recently did with the ovarian claims of the Arnold & Itkin firm, which J&J perceived to have a blocking position with respect to the confirming of J&J's proposed section 524(g) plan. J&J has always been able to pay all current and future claims in full without a bankruptcy settlement.  But J&J did not follow that path.

### D.    J&J OFFERS THE SMITH FIRM FINANCIAL BENEFITS PAID OUTSIDE OF BANKRUPTCY TO SUBMIT A MASTER BALLOT AND CHANGE VOTES

270.    Beasley Allen had a joint venture agreement with the Smith Firm.  However, the Smith Firm is not, and has never been, the primary contact point for the clients.  During J&J's first two bankruptcy cases, LTL 1.0 and LTL. 2.0, J&J did not consider the Smith Firm as having the authority to vote for or solicit votes from Beasley Allen's clients.  *See* Beville Decl. [Dkt. No. 42] at Exs. 50-53.

271.    But J&J saw an opportunity to advance its plans to disenfranchise talc victims and keep their votes against the Plan from being counted.  On July 17, 2024, just before the Voting Deadline, J&J publicly alleged in the MDL that the Smith Firm has borrowed heavily from litigation funders and may now owe as much as $240 million.[68]  Based on this filing, J&J apparently perceived the Smith Firm to be in financial distress.

272.    After the Voting Deadline passed and J&J failed to garner the votes for its third bankruptcy, J&J entered into negotiations with the Smith Firm.  The product of these negotiations

---

[68]    *See In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:16-md-02738-MAS-RLS (D. N.J. June 17, 20-24) at Dkt. No. 32827, pp. 9-10 (J&J asserted that the Smith Firm's litigation funding loan may be as high as $240 million).

was a *Memorandum of Understanding* (*see* Dkt. No. 17-1, defined above as the "<u>MOU</u>").  The MOU is not dated, but the Coalition's understanding is that it was entered into on or about September 8, 2024.

273.    According to the terms of the MOU, on or before September 16th, the Smith Firm was required to request that Epiq change "**<u>at least 95%</u>**" of the votes cast by the "[Smith Firm's] 11,983 Claimants" from reject to accept.  *See* MOU at § II.A.1.a (emphasis added).  Tellingly, the number of votes to "reject" J&J's Plan reflected in the Master Ballot submitted by Beasley Allen (11,434) divided by 11,983 is approximately **<u>95%</u>**.

274.    The eight (8) day period between September 8th and September 16th was, in and of itself, an unreasonably short period of time for the Smith Firm to obtain the authorization of 11,434 claimants to change their vote.[69]  And this short time was further shortened by the Smith Firm's actions in trying to coerce talc victims to change their votes, principally via e-mail on two-day's negative notice (when e-mail was available) and also by Federal Express on one day's or less notice, as discussed below.

275.    The MOU, however, provides substantial benefits to the Smith Firm if a plan is confirmed that discharges J&J of all its talc liability, including its independent and direct talc liability.  *See* MOU at § II.  Those benefits include, *inter alia*, a provision that J&J will cease its pursuit of discovery regarding the Smith Firm's litigation funding (*id.* at § II.K.2) and a provision providing the Smith Firm with effective control over a $650 million common benefit attorneys' fees fund to be set up outside of the bankruptcy case (*id.* at § II.C).  The MOU also called for other material modifications to the initial Plan.  *See* MOU at § II.

---

[69]    *See In re Southland Corp.*, 124 B.R. 211, 226-27 (Bankr. N.D. Tex. 1991) (finding that 13 days between solicitation materials and the deadline to vote on the plan was "unreasonably short").

E.      THE SMITH FIRM CHANGES 11,434
        VOTES AFTER PROVIDING CLIENTS
        <u>WITH TWO-DAY'S (OR LESS) NEGATIVE NOTICE</u>

276.    On September 11, 2024, a few days after signing the MOU, the Smith Firm sent a letter by e-mail and Federal Express to Beasley Allen's clients who had previously voted to reject J&J's Plan and informed them that the Smith Firm had negotiated a settlement with J&J and that it intended to change their votes to "accept" unless they asked the Smith Firm to not change their vote by September 13, 2024, *i.e.*, two days after the e-mail was sent to clients and less than one day after clients received the letter via Federal Express.[70]

277.    Yet the plan that the Smith Firm solicited was **<u>not</u>** the Plan J&J had sent out to talc victims in June.  Simply put, the Smith Firm provided these talc claimants two day's (or less) negative notice to change a vote on a plan that did not exist and that they had never seen before.

278.    Between September 11th and September 13th, certain Beasley Allen clients who received this email instructed the Smith Firm to not change their votes.  *See*, *e.g.*, Dkt. No. 257 at Ex. D, ¶ 2.  Federal Express tracking reports show that clients who received Mr. Smith's letter via Federal Express had approximately twelve (12) hours to open the package, review its contents, log on to a computer, and tell Mr. Smith not to change their votes.  *See* Dkt. No. 257 at Ex. E, ¶ 2 & Ex. 2; Dkt. No. 257 at Ex. F, ¶ 2 & Ex. 2.  The Coalition submits that many claimants who received the Smith e-mail were likely confused by it, may not have even known who Mr. Smith is, and did not understand how the Smith Firm could purport to have the authority to change their votes.

---

[70]    *See Decl. of Tracy Birdsong* (Dkt. No. 257 at Ex. D) at Ex. 1, p. 5 ("Please vote by **September 13, 2024**.  If you choose not to vote, I will submit your vote for approval of the new Plan in my power as attorney authorized to prosecute your case.") (emphasis in original); *Decl. of Carolyn E. Colquitt* (Dkt. No. 257 at Ex. E) at Ex. 1, p. 5 (same); *Decl. of Rebecca Troquille* (Dkt. No. 257 at Ex. F) at Ex. 1, p. 5 (same).

F.     **EPIQ FAILS TO CONFER WITH BEASLEY ALLEN**

279.    On September 17, 2024, the Smith Firm submitted a Master Ballot to Epiq.[71]  This Master Ballot purported to change the votes of clients previously submitted by Beasley Allen based on the Smith Firm's two-day's (or less) negative notice e-mail and/or Federal Express letter.  *Id.*[72]

280.    In response to this competing Master Ballot, however, Epiq did not request a meet and confer with Beasley Allen or comply with J&J's own protocol regarding voting matters as set forth on pages 134 to 135 of the Disclosure Statement.  *See* Dkt. No. 256, Ex. C at ¶ 5.

281.    After Beasley Allen submitted its Master Ballot and prior to the Petition Date, neither Epiq nor J&J contacted Beasley Allen to notify Beasley Allen that Beasley Allen's Master Ballot contained discrepancies, was improper, or would not be counted as submitted.  *Id*.

282.    Epiq did not attempt to confer with Beasley Allen even though Beasley Allen wrote to Epiq regarding this matter on or about August 28, 2024.  *Id.*  On or about August 28, 2024, having been alerted to the possibility that the Smith Firm may try to change the votes of Beasley Allen's clients, Beasley Allen sent a letter to Epiq and informed Epiq that "[a]ny attempt by any firm or party other than Beasley Allen to change the votes of any of [its] clients is unauthorized and submitted without proper authority."  *Id.* at Ex. 1.

283.    In testimony offered before the Bankruptcy Court on September 23, 2024, Mr. John Kim, Red River's Chief Legal Officer, indicated that J&J's intent as of the Voting Deadline was to not count the Master Ballot submitted by Beasley Allen based on J&J's own determination that the votes reflected therein were "invalid at that time."  *See* Sept. 23, 2024 Hr'g Tr. at 93:2-8.

---

[71]   *See* Voting Declaration at pp. 6-7, fn. 4 ("Additionally, on September 17, 2024, The Smith Law Firm, PLLC submitted a Master Ballot (the '<u>Smith Master Ballot</u>') amending certain votes previously submitted on a Master Ballot from Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. and a Master Ballot from Golomb Legal.").

[72]   All rights regarding the Smith Firm's conduct purporting to garner client authority on two-day's (or less) negative notice and J&J's aiding and abetting that conduct are reserved.

284.     After Mr. Kim offered this testimony, the Coalition's counsel asked Mr. Kim if the Debtor received "a tabulation of votes from Epiq" so that it knew where it stood "as of the close of the initial solicitation period." *Id*. at 93:20-25.  Mr. Kim did not answer this question.  To date, J&J has not explained how it could refuse to count the Master Ballot submitted by Beasley Allen and, at the same time, count or credit the Master Ballots submitted by other law firms.

285.     Nonetheless, in response to the Smith Master Ballot, Epiq—acting contrary to J&J's own voting protocol—either changed 11,434 votes from "reject" to "accept," or eliminated 11,434 votes to "reject" the Plan.[73]  No relief was sought from any Court before Epiq changed the votes, as required by Bankruptcy Rule 3018(a).  Thus, in tabulating the votes for its report issued on Saturday, September 21, 2024, Epiq, apparently acting at J&J's direction and control, disregarded approximately 11,434 votes to "reject" J&J's Plan.  To date, Epiq has failed to produce the voting report or the data upon which the Voting Declaration is based.

### G.     EPIQ'S DECISION TO CHANGE THE VOTES ENABLED J&J TO ALLEGE THAT IT ENJOYS THE SUPPORT OF OVER 75% OF THE CLAIMANTS WHO VOTED ON THE PLAN

286.     Epiq's decision to change 11,434 votes from "reject" to "accept," or to eliminate 11,434 votes to "reject" the Plan, caused the acceptance rate, for the first time, to exceed the 75% threshold.  *See* Dkt. No. 257 at Ex. B.  As of the Voting Deadline, approximately 26,958 claimants voted to reject J&J's Plan.  *Id*.  Had all these votes been properly accepted and counted per J&J's own tabulation procedures, the acceptance rate as of the Voting Deadline was less than 75%.  *Id*.

---

[73]    *See* Voting Declaration at 1062 of 1062 ("11,986" votes were changed as being "[s]uperseded by a later ballot."); MOU at § II.A.1.a ("J&J's obligation to fulfill any of the requirements set forth herein is expressly conditioned on each of the following conditions precedent being satisfied in full:  Supporting Counsel requesting on or before September 16, 2024 that Epiq Global—the solicitation agent for the Plan—accept a change of vote for Supporting Counsel's 11,983 Claimants, such that at least 95% of each Supporting Counsel's Claimant inventory votes in favor of the Plan").

287.    Curiously, although several weeks passed after the July 26th Voting Deadline and the formation of Red River on August 19, 2024, Epiq did not certify the votes until after it changed 11,434 votes to "reject" the Plan to votes to "accept" the Plan without notice to Beasley Allen. Only after Epiq changed the vote count did J&J direct Red River to file for bankruptcy in the Southern District of Texas.

288.    After filing for bankruptcy, the Debtor asserted that its bankruptcy case enjoys the support of approximately **83%** of the claimants.  *See* Dkt. No. 3 at p. 1 (the Plan "is supported by over **83%** of the claimants.") (emphasis in original).  But for Epiq's decision change the votes in response to a fraudulent Master Ballot, J&J could not have commenced its third bankruptcy case with the claim that J&J enjoys the support of 83% of the claimants, let alone the required 75% or more of the claimants.  *Id.*  And this is just the tip of the iceberg.  *See* Dkt. No. 257 at Ex. G (*Affidavit of Shannon Blair-Tulloss Regarding Investigation of Talc Claim Ballot Issuance*).

289.    The Voting Declaration is false and misleading.  Most holders of compensable claims do not support J&J's Plan.  The only way J&J and the Debtor can assert that 83.4% of the holders of Channeled Talc Personal Injury Claim voted in favor of the Plan was literally based on counting improperly changed ballots with Epiq representing that thousands of claimants who voted to "reject" the Plan and vehemently oppose it actually voted to "accept" it.  Until discovery is completed, this is no basis for the Court to approve the Tabulation Procedures or accept Epiq's certification of the vote based on Epiq's false report.

## XV.    **J&J'S NOTICE PROGRAM**

290.    In the Motion, the Debtor also asks the Court to approve J&J's notice program. *See* Motion at ¶¶ 43-46.  J&J's notice program had two parts.

291.    *First*, J&J claims that it provided direct notice to talc claimants who are represented by counsel.  *Id.* at ¶ 43.  But J&J did *not* seek to put the documents in the hands of talc claimants

who may have counsel representing them.  Rather, J&J provided notice to the law firms that already support its Plan.  This procedure is calculated and designed to have Supporting Law Firms serve as the gatekeeper of information for their clients and to prevent their clients from having access to the information presented in this Objection.

292.    J&J did **not** seek to provide actual notice to known claimants beyond this. Retailers—including retailers that will be treated as "Protected Parties" under J&J's Plan and would receive a discharge of liability for their sale of J&J's products—typically keep records through loyalty programs or otherwise of their customers and their purchases.

293.    These retailers typically retain contact confirmation, *e.g.*, email, telephone numbers, and addresses of their customers that participate in such programs.  J&J has admitted to such by seeking to introduce retailer loyalty records at trial.  Those records could be utilized to provide direct notice to known claimants.  But J&J apparently did not obtain or use any such information to provide actual notice to known claimants.

294.    **Second**, J&J's notice program centered around a media campaign, which is described in the Motion as the "Supplemental Notice Plan."  Motion at ¶¶ 44-46.  But this campaign was comprised of advertisements that repeated J&J's false talking points.  The clear intent was to mislead.  Despite J&J's ostrich-like view falsely touted as part of its solicitation, J&J's products did contain asbestos and cause cancer.

## XVI.    SOLICITATION WAS NOT CONDUCTED IN A REASONABLE MANNER

295.    Finally, in the Motion, the Debtor also asks the Court to find that J&J's solicitation was conducted in a reasonable manner and in accordance with Bankruptcy Rule 3018(b).  Motion at ¶ 47.  But J&J did not comply with Bankruptcy Rule 3018(b).  The Plan was not transmitted to substantially all creditors whose rights are impaired by the Plan.  The period J&J prescribed for talc claimants to vote (approximately two months or sixty days) was too short under the

circumstances.  J&J solicited votes using false and misleading information.  And J&J changed over 11,400 votes after the Voting Deadline without Court authority and in violation of its own, published procedures.

296.    It is difficult to evaluate any aspect of J&J's scheme and conclude that it satisfies the Bankruptcy Code or the requirements of applicable law.  The Disclosure Statement does not provide adequate information.  The Plan is patently unconfirmable.  The Debtor's solicitation and tabulation procedures are unlawful.  J&J manipulated the vote count and the voting report.  The Debtor's proposed notice plan fails to satisfy basic due process requirements.  Talc claimants with valid claims—current and future—will not receive fair compensation.  The Motion should be denied.

## **ARGUMENT**

297.    Section 1125(b) of the Bankruptcy Code requires a plan proponent to furnish creditors with "a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information" to solicit acceptances or rejections of a proposed chapter 11 plan.  11 U.S.C. § 1125(b).

298.    "Adequate information" is defined in the Bankruptcy Code as:  "Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan[.]"  *Id.* at § 1125(a)(1).

299.    The purpose of a disclosure statement is "to inform…claimants, as fully as possible, about the probable financial results of acceptance or rejection of a particular plan."[74]  Courts have

---

[74]    *In re Stanley Hotel, Inc.*, 13 B.R. 926, 929 (Bankr. D. Colo. 1981); *see also Matter of Cajun Elec. Power Co-op, Inc.*, 150 F.3d 503, 518 (5th Cir. 1998) (requirements of adequate information are

emphasized the importance of adequate disclosure, given the reliance creditors and bankruptcy courts place on disclosure statements.[75]   A disclosure statement must contain, at a minimum, "adequate information" concerning "all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan."[76]

300.   Courts have recognized that a disclosure statement cannot be approved if the plan to which it relates is not confirmable on its face:

> We find the reasoning of these many courts to be persuasive, and hold that a bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable.

---

governed by the "circumstances of the case."); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988) (Congress intended the disclosure statement "to be the primary source of information upon which creditors and shareholders could rely in making an informed judgment about a plan of reorganization."); *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D. N.H. 1991) (A proposed disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution.").

[75]   *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"); *see also Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) ("[D]isclosure requirements are crucial to the effective functioning of the federal bankruptcy system [because] creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan . . . .").

[76]   *See In re Beltrami Enters., Inc.*, 191 B.R. 303, 304 (Bankr. M.D. Pa. 1995) (citation omitted); *see also In re Divine Ripe, L.L.C.*, 554 B.R. 395, 413 (Bankr. S.D. Tex. 2016) (refusing to approve disclosure statement based on lack of adequate information); *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) (stating that section 1125 "seeks to guarantee a minimum amount of information to the creditor asked for its vote"); *Cohen v. TIC Fin. Sys. (In re Ampace Corp.)*, 279 B.R. 145, 157 n.26 (Bankr. D. Del. 2002) ("Section 1125 governs the contents of a disclosure statement and provides that acceptance or rejection of a plan may not be solicited until each holder of a claim or interest receives the plan or a summary thereof, 'and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.'"); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 98 (Bankr. D. Del. 1999) (stating that a disclosure statement "need only contain adequate information for those entitled to vote"); *In re Civitella*, 14 B.R. 151, 152 (Bankr. E.D. Pa. 1981) ("The disclosure statement must contain adequate information in order for it to be approved by the Court.").

*In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) (citations and internal quotations omitted).[77]   In such circumstances, a disclosure statement may not be approved, as approving it would impose unnecessary costs and expenses associated with solicitation.[78]

## I.  THE DISCLOSURE STATEMENT IS FALSE AND MISLEADING

301.   By its Motion, the Debtor seeks a determination that J&J's Disclosure Statement contained adequate information.  Motion at ¶¶ 17-24.

302.   But the Disclosure Statement contains false and misleading information and should not be approved.  The Debtor should not be permitted to confirm a Plan based on a Disclosure Statement that did not provide adequate information, and in many instances, provided false and misleading information or failed to provide any disclosure at all on material issues.

### A.  THE DISCLOSURE STATEMENT OMITS MATERIAL INFORMATION REGARDING THE PLAN

303.   The most material aspect of the Plan is that if it is confirmed and goes effective, women who have Ovarian Cancer and who hold tort claims against J&J based on J&J's own, independent conduct, will lose their legal, equitable, and Constitutional rights to appear, be heard, and seek compensation from J&J for their injuries in the civil justice system.

---

[77]   *Accord In re Quigley Company, Inc.*, 377 B.R. 110 (Bankr. S.D.N.Y. 2007); *In re El Comandante Mgmt. Co.*, 359 B.R. 410, 415 (Bankr. D. P.R. 2006); *In re Beyond.com Corp.*, 289 B.R. 138 (Bankr. N.D. Cal. 2003); *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 294 (Bankr. D. Mass. 2002); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001); *In re Silberkraus*, 253 B.R. 890, 899 (Bankr. C.D. Cal. 2000); *In re Main St. AC, Inc.*, 223 B.R. 771, 775 (Bankr. N.D. Cal. 1999); *In re Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996); *In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D. R.I. 1996); *In re Market Square Inn, Inc.*, 162 B.R. 64 (Bankr. W.D. Pa. 1994); *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987).

[78]   *See In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) (declining to subject estate to expense of soliciting votes for unconfirmable plan); *In re Valrico Square Ltd. P'ship*, 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990) ("Soliciting votes and seeking court approval on a clearly fruitless venture is a waste of the time of the Court and the parties.").

304.    The lack of disclosure on this issue is fatal.  "The right to sue and defend in the courts … lies at the foundation of orderly government."  *Chamber v. Baltimore & O.R. Co.*, 207 U.S. 142, 148 (1907). "It is one of the highest and most essential privileges of citizenship," particularly when the lawsuit involves the death of a citizen.  *Id.*

305.    If women are to be denied their fundamental rights, the Disclosure Statement must, at a minimum, explain that the right to appear, be heard, and seek just compensation for injuries caused by J&J is a fundamental right and that the Plan is taking such right from victims.  This issue should not be buried in definitions or discussed obliquely.  If women are to be silenced and their rights stripped from them, this fact should be clearly acknowledged so that the true brutality of J&J's Plan is clearly understood by claimants.

## B.    THE DISCLOSURE STATEMENT OMITS MATERIAL INFORMATION ON J&J'S LITIGATION HISTORY AND THE PRESENCE OF ASBESTOS IN J&J'S TALC PRODUCTS

306.    The lack of disclosure on J&J's litigation history is also fatal.  *See* Disclosure Statement at § 2.  The purpose of a disclosure statement is to provide adequate, truthful information.  If J&J's tortured side of the story is to be included, the other side—namely the one found persuasive by scientists, Judges, and Juries must be included as well.

307.    The reality is that J&J faces substantial liability for Ovarian Claims in the civil justice system.  J&J's effort to use a document that purports to be a "Disclosure Statement" to convince women that their claims are invalid is beyond the pale.  The point of disclosure in bankruptcy is to provide truthful, accurate and adequate information that a claimant can evaluate in submitting her vote.  A debtor should never be permitted to solicit votes on a plan using false propaganda and misleading and inaccurate information.  J&J's failure to include an accurate accounting of its litigation history and the presence of asbestos in its talc products is a fundamental flaw that means that the Disclosure Statement does not include adequate information.

### C.   THE DISCLOSURE STATEMENT
### CONTAINS MATERIALLY MISLEADING
### INFORMATION REGARDING CLAIMANT RECOVERIES

308.   Likewise, the lack of disclosure, or rather the false disclosure, on the average recovery that holders of Ovarian Claims will receive is also fatal.  *See* Disclosure Statement at § 1.1(c).  A disclosure statement is not a place where J&J gets to make up values that are not mathematically plausible.  Inducing someone to vote in favor of a plan by promising them between "$75,000 and $150,000," when it is known that such payments will not be made is improper.  Adequate information does not include information that is false and misleading.

309.   Further, J&J's Plan and Trust Agreement provide significant power to the Future Claimants' Representative who has a consent right over the establishment and change of the value of a "point," effectively allowing him/her to unilaterally reserve amounts for future claimants.  *See* Trust Agreement at § 2.2(f).  The Disclosure Statement, however, does not provide any disclosure whatsoever as to the Future Claimants' Representative's intentions with respect to such reserves.  Billions of dollars can be shifted from present claimants to future claimants under the Trust Agreement, by these provisions, obliterating any purported value promise.  The omission of this direct disclosure renders the Disclosure Statement misleading.

### D.   THE DISCLOSURE STATEMENT CONTAINS INADEQUATE
### DISCLOSURE REGARDING THE PLAN SUPPORTERS

310.   The Disclosure Statement also contains outright misrepresentations regarding the claimants represented by the Supporting Law Firms.  *See* Disclosure Statement at § 1.1(a).  The Disclosure Statement suffers from a lack of disclosure regarding the alleged "independent" and "separate" analysis undertaken by plan supporters.  With such a representation included in the document, claimants are entitled to know what, if any, independent analysis the Ad Hoc

Committee of Supporting Counsel and the proposed Future Claimants' Representative did and on which they relied prior to deciding that the Plan is in the claimants' best interest.

311.    If the plan supporters did not perform any independent analysis (and adopted J&J's analysis as their own), that fact must be disclosed so that claimants can properly weigh their endorsements.  And if they did perform their own analysis, the details of their investigation must be disclosed as well.  The Disclosure Statement does not provide information sufficient for voters to evaluate the basis behind the J&J's plan supporters' acceptance of J&J's scheme and is, therefore, inadequate.

### E.    INADEQUATE DISCLOSURE REGARDING ESTATE CAUSES OF ACTION

312.    The Debtor has not included *any* details in the Disclosure Statement relating to estate causes of action or "Retained Rights of Action" that the Reorganized Debtor is purporting to retain subject to its sole right to settle those estate cause of action post-confirmation.[79]

313.    The Debtor and J&J have a clear motive in not including any details regarding the avoidance claims and causes of action that arise from the 2024 transactions they are attempting to block under the Plan.  If the Debtor is in financial distress, the Debtor and J&J engaged in obvious fraudulent transfers and the Debtor's directors and officers breached their fiduciary duties.  At minimum, the factual allegations surrounding these causes of action should be disclosed.  Likewise, the Debtor should be required to explain why it is effectively abandoning causes of action worth tens of billions of dollars for no consideration.

---

[79]    *See* Plan at § 1.1.124 (Retained Rights of Action include avoidance claims and other similar state law claims and causes of action); § 10.1 ("The Reorganized Debtor shall retain and may enforce, prosecute and settle, and shall have the sole right to enforce, prosecute or settle, the Retained Rights of Action.").

## II.   THE DEBTOR'S PLAN IS PATENTLY UNCONFIRMABLE

314.   The Disclosure Statement should not be approved for another reason:  it describes a plan that is patently unconfirmable.  Likewise, confirmation of the Plan should be denied because the Plan violates multiple provisions of the Bankruptcy Code and is unconstitutional.

### A.   THE J&J DISCHARGE IS UNLAWFUL

315.   The J&J Discharge is unlawful and cannot be approved.

#### 1.   J&J Cannot Obtain a Discharge Outside of Section 524(g)

316.   J&J cannot obtain a discharge or its equivalent outside a section 524(g) injunction. Fifth Circuit case law dating back over 30 years holds that a non-debtor is not entitled to a discharge under section 524(e), which provides that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e).  *See Bank of N.Y. Tr. Co. v. 9 Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009); *In re Coho Resources, Inc.*, 345 F.3d 338, 342 (5th Cir. 2003); *Hall v. Nat'l Gypsum Co.*, 105 F.3d 225, 229 (5th Cir. 1997); *Feld v. Zale Corp.*, 62 F.3d 746 (5th Cir. 1995); *Matter of Edgeworth*, 993 F.2d 51, 53–54 (5th Cir. 1993).

317.   The Fifth Circuit has always been a hostile jurisdiction to parties seeking nonconsensual non-debtor releases.  Fifth Circuit case law is not going to change considering the Supreme Court's ruling in *Purdue*, which confirmed that the Fifth Circuit's longstanding interpretation of the Bankruptcy Code on this issue is and has always been correct.  144 S.Ct. 2071.

#### 2.   Section 524(g) Cannot be Used to Discharge J&J's Independent Talc Liability

318.   A section 524(g) injunction cannot be used to discharge or resolve J&J's or Kenvue's independent talc liability.  *See In re Quigley Co.*, 676 F.3d 45, 60 (2d Cir. 2012) (holding claims against non-debtor based on presence of its name and logo on the debtor's products based

on "apparent manufacturer" theory of liability fell outside the scope of section 524(g)); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 233 (3d Cir. 2004) (sections 105(a) and 524(g) do not authorize a channeling injunction over independent, non-derivative third-party actions against non-debtors); *see also Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 147 (2009) (the "Court of Appeal" understood that "§ 524(g)" was "not intended to reach non-derivative claims").

319.    Section 524(g) has no effect on the independent liability of a non-debtor that does not and cannot receive a discharge in a bankruptcy of another entity. J&J cannot obtain the release or discharge it demands, which means that there will never be a "final order" in this case that triggers J&J's obligation to pay.

320.    Section 524(g)(4)(A)(ii)—which is the part of section 524(g) that authorizes a Court to enjoin asbestos claims against non-debtor third parties—provides that the third party must be "alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor," and the "alleged liability of such third party" must "arise by reason of" one of the requirements enumerated in subsections (I) through (IV). 11 U.S.C. § 524(g)(4)(A)(ii).

321.    Courts have interpreted the phrase "claims against[] or demands on the debtor" to mean that the non-debtor third-party's liability must be ***derivative*** of the debtor's liability and ***not independent*** of the debtor's liability.[80]   When non-debtor parties, including those within the debtor's corporate family, face liability based on their own ***independent conduct*** they cannot obtain a discharge of such liability under section 524(g).   To obtain a discharge of its own independent asbestos liability, a company must commence its own bankruptcy proceeding.

---

[80]    *See Quigley*, 676 F.3d at 60 (holding claims against non-debtor relying on presence of its name and logo on the debtor's products based on "apparent manufacturer" theory of liability fell outside the scope of section 524(g)); *Combustion Eng'g*, 391 F.3d at 233 (sections 105(a) and 524(g) do not authorize a channeling injunction over independent, non-derivative third-party actions against non-debtors).

322.     The Second Circuit's decision in *Quigley* illustrates this point.   In *Quigley*, a subsidiary of Pfizer that made an asbestos product called "Insulag" filed for bankruptcy and tried to confirm a plan that discharged Pfizer of its asbestos liability.   Insulag was "used as an insulator in high heat environments."   *Id.* at 47.   The product, which was marketed using Pfizer's "name, logo, and trademark," contained asbestos.   *Id.*

323.     Plaintiffs filed asbestos-related suits against Quigley and Pfizer.   The lawsuits against Pfizer sought to hold Pfizer liable in connection with products containing asbestos and manufactured by Quigley under an "apparent manufacturer" theory of liability as set out in the Restatement (Second) of Torts § 400.   The lawsuits alleged that "Pfizer's logo appeared on Quigley's advertising and the packages of Quigley's asbestos-containing products."   *Id.*

324.     Under the Restatement (Second) of Torts § 400, "[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer."   *Id.* (quotations omitted).   The plaintiffs argued that Pfizer could be held liable for the asbestos claims "based on Pfizer's own conduct in permitting its label to be affixed to Quigley products containing asbestos and to the Quigley advertising."   *Id.*

325.     In response to this litigation, Pfizer directed Quigley to file for bankruptcy and propose a chapter 11 plan that included a section 524(g) injunction.   Pfizer, like J&J, was simply too wealthy and solvent to qualify for bankruptcy.   Pfizer tried to get the benefit of a chapter 11 discharge through Quigley's bankruptcy case.   The issue was whether section 524(g) could be used to bar the asbestos claims against Pfizer when Pfizer was not a debtor.   The answer was "no."

326.     The Second Circuit analyzed section 524(g)(4)(A)(ii), which is the part of section 524(g) that authorizes a Court to enjoin asbestos claims against non-debtor third parties.   *Id.* at 59.   Pfizer tried to fit its asbestos liability into section 524(g)(4)(A)(ii)(I)—liability arising

by reasons of "the third party's ownership of a financial interest in the debtor, a part or present affiliate of the debtor, or a predecessor in interest of the debtor." *Id*.

327.    Pfizer argued that its liability fell within this subsection because "but for" its ownership of Quigley, its name and logo would not have been used on the asbestos-containing products. *Id*.   In rejecting this argument, the Second Circuit found that Pfizer's liability as an "apparent manufacturer" under § 400 hinged on the presence of its name and logo on the products. *Id.* at 60.  Pfizer's ownership of Quigley was "legally irrelevant." *Id*.  Rather, what got Pfizer into trouble was its ***own*** conduct—namely, the fact that it permitted its name and logo to be used on the products that contained asbestos and placed consumers at risk of bodily injury and death.

328.    Since Johnson's Baby Powder hit the market in 1894, every bottle ever sold has included Johnson's name, logo, and/or trademark.  If Quigley could not be used as a vehicle to obtain a discharge for Pfizer, Red River cannot be used as a vehicle to obtain a discharge for J&J.

329.    Further, as explained above, the claims against J&J go well beyond the use of its name, logo, and trademarks.  J&J is alleged to have knowingly sold products used on women that contained asbestos and affirmatively taken actions to suppress information regarding the risk of developing fatal cancers from using its talc products.  When juries find J&J liable, and award punitive damages based on J&J's outrageous and malicious conduct, they are doing so based on J&J's own, independent conduct.  Those claims and jury determinations do not involve liability that is derivative of the Debtor.

330.    The Second Circuit's ruling in *Quigley* was not unique.  The Third Circuit reached essentially the same conclusion in *In re Combustion Engineering, Inc.*, 391 F.3d 190, 233 (3d Cir. 2004), when it held that sections 105(a) and 524(g) do not authorize a channeling injunction over independent, non-derivative third-party actions against non-debtors.

331.     Since section 524(g) was enacted, no Court of Appeals has suggested that section 524(g) can be used to channel the independent, non-derivative liability of a non-debtor to a trust.   There is no reason why or basis for any Court to reach a different conclusion. Section 524(g) was never intended to channel the independent, non-derivative liability, particularly of wealthy, solvent non-debtor entities.

### 3.     Section 524(g) Cannot be Used to Discharge Kenvue

332.     Kenvue's talc liability is also outside the scope of section 524(g)(4)(A)(ii).[81] Kenvue is alleged to be liable as the successor to Old JJCI based on the doctrine of successor liability.  Successor liability is not a cause of action.  It cannot be asserted by or on behalf of a company whose operating assets were transferred to a successor entity.[82]

---

[81]   J&J agreed to indemnify Kenvue for talc claims.  Thus, if Kenvue cannot get a discharge, J&J cannot get a full discharge, which is why J&J will not provide any funding for a trust in this case unless Kenvue, along with other parties to whom J&J may owe an obligation to indemnify, are released.

[82]   *See, e.g.*, *Robbins v. Physicians for Women's Health, LLC*, 90 A.3d 925 (Conn. 2014) ("[W]hile successor liability may give a party an alternative entity from whom to recover, the doctrine does not convert the claim to an in rem action running against the property being sold.  Nor does the claim have an existence independent of the underlying liability of the entity that sold the assets."); *Alesco Preferred Funding VIII, Ltd. v. ACP RE, Ltd.*, 74 Misc. 3d 1230(A), 164 N.Y.S. 3d 808 (N.Y. Sup. Ct., N.Y. Cty. Apr. 11, 2022) ("alter-ego and successor liability claims" cannot be "maintained as separate and distinct causes of action in New York"), *aff'd* 209 A.D.3d 558 (1st Dep't 2022); *Featherston v. Katchko & Sons Constr. Servs., Inc.*, 244 A.3d 621, 733 (Conn. App. Ct. 2020) ("Successor liability is a theory of liability to be alleged in support of a claim rather than raised as an independent claim."); *Getintent USA, Inc. v. Sileo, LLC*, No. 650980/2019, 2019 WL 4962549, at *3 (N.Y. Sup. Ct., N.Y. Cty. Oct. 8, 2019) ("The third cause of action for successor liability is also dismissed … as successor liability does not constitute an independent cause of action but is merely a theory of recovery on an underlying liability"); *Columbia State Bank v. Invicta Law Group PLLC*, 402 P.3d 330, 332 (Wash. Ct. App. 2017) ("a claim for successor liability follows an underlying cause of action" and "merely exists to extend 'the liability on that cause of action to a corporation that would not otherwise be liable.'"); *Brown Bark III, L.P. v. Haver*, 219 Cal. App. 4th 809, 823, 162 Cal. Rptr. 3d 9, 20 (Cal. Ct. App. 2013) ("[S]uccessor liability is not a separate claim independent of Brown Bark's breach of contract claims.  To the contrary, successor liability is an equitable doctrine that applies when a purchasing corporation is merely a continuation of the selling corporation or the asset sale was fraudulently entered to escape debts and liabilities."); 19 C.J.S. CORPORATIONS § 901 (2023) ("Successor liability does not create a new cause of action against the purchaser of a corporate predecessor so much as it transfers the liability of the predecessor to the purchaser."); *but see In re Emoral, Inc.*, 740 F.3d 875, 880-82 (3d Cir. 2014) (applying New York law and holding that successor liability is a "cause of action" as opposed to "an *equitable remedy*").  Since *Emoral* was decided in 2014, New York courts have held that successor liability is a remedy and is not a cause of action.  *See Alesco*, 164 N.Y.S. 3d 808; *Getintent USA*, 2019

333.    Rather, successor liability is an equitable remedy or theory of liability that enables claimants (who themselves suffered an injury) to recover from a successor "when the successor may be considered a mere continuation of the predecessor" or "when the transaction was fraudulent." *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985).  The cause of action is the underlying tort claims held by the claimant.  State law simply makes the successor liable for the tort claim when certain conditions are met.

334.    Here, Kenvue checks the "mere continuation" or "fraudulent transaction" box.  The doctrine of successor liability extends whatever talc liability Old JJCI had prior to the divisional merger to Kenvue.  This issue was recently litigated in a lawsuit in Illinois where the jury found Kenvue responsible for 70% of the damages.[83]

335.    It is important to recognize that LTL and/or Red River do not have claims against Kenvue based on the doctrine of successor liability.[84]  Nor is Kenvue's talc liability derivative of LTL's or Red River's talc liability.  Properly understood, the doctrine of successor liability is an equitable remedy that makes Kenvue liable to talc victims because Kenvue is a mere continuation

---

[83]   WL 4962549.  To the extent that *Emoral* was based on an *Erie* guess, the Third Circuit guessed wrong. If *Emoral* were decided today, the Third Circuit could not reach the conclusion that it did and claim to be following applicable New York state law under section 541(a).

[83]   *See* Beville Decl. [Dkt. No. 42] at Ex. 34 (Verdict Form & Jury Instructions) ("We, the jury, find for Stephanie Salcedo, as Administrator of the Estate of Theresa Garcia, deceased, against the following defendant or defendants:  Johnson & Johnson  YES; LLT Management LLC  NO; Johnson & Johnson Holdco (NA) Inc. (Successor)  YES; ***Kenvue, Inc. (Successor)  YES***. ….  Assuming that 100% represents the total combined legal responsibility of all entities that proximately caused Theresa Garcia's injury and death, we find the percentage of legal responsibility attributable to each as follows: Johnson & Johnson  15%; LLT Management LLC  0%; Johnson & Johnson Holdco (NA) Inc.  15%; ***Kenvue, Inc.  70%***") (emphasis supplied); *accord Kelly*, 2022 WL 16575763; *Jackson*, 2022 WL 16575691.

[84]   A debtor can only assert a cause of action under section 541(a) if the cause of action was one that the debtor could have asserted on its own behalf as of the commencement of the case under applicable state law.  *See Butner v. United States*, 440 U.S. 48, 55 (1979); *Matters of Educators Grp. Health Trust*, 25 F.3d 1281, 1284 (5th Cir. 1994).  State law is determined by rulings made by state courts.  *See West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940); *Erie R.R. Co. v. Tompkins*, 306 U.S. 103 (1938).

of the company that was once called "JJCI" or "Old JJCI."[85]  Red River has no successor.  All talc

claims against Kenvue fall outside the scope of section 524(g)(4)(A)(ii).[86]

### 4. Section 524(g) Cannot Be Used to Discharge Retailers

336.    Section 524(g) does not include any provision that could be interpreted to permit

the Court to enter an injunction in favor of hundreds of retailers or other Protected Parties.

Section 524(g)(4)(A)(ii) provides as follows:

> [A]n injunction [under 11 U.S.C. § 524(g)] may bar any action directed against a
> third party who is identifiable from the terms of such injunction (by name or as part
> of an identifiable group) and is alleged to be directly or indirectly liable for the
> conduct of, claims against, or demands on the debtor to the extent such alleged
> liability of such third party arises by reason of—
>
> > (I)    the third party's ownership of a financial interest in the debtor, a past
> > or present affiliate of the debtor, or a predecessor in interest of the
> > debtor;
> >
> > (II)   the third party's involvement in the management of the debtor or a
> > predecessor in interest of the debtor, or service as an officer, director
> > or employee of the debtor or a related party;
> >
> > (III)  the third party's provision of insurance to the debtor or a related
> > party; or
> >
> > (IV)   the third party's involvement in a transaction changing the corporate
> > structure, or in a loan or other financial transaction affecting the
> > financial condition, of the debtor or a related party, including but not
> > limited to—
> >
> > > (aa)   involvement in providing financing (debt or equity), or
> > > advice to an entity involved in such a transaction; or

---

[85]    J&J structured the initial divisive merger in such a way that Old JJCI "ceased to exist."  *See* Beville
Decl. [Dkt. No. 42] at Ex. 40 (Decl. of John K. Kim) at ¶ 16.  Old JJCI is not and has never been a
debtor.  Red River has no successors.

[86]    Even if Kenvue could somehow show that its talc liability is derivative of Red River's talc liability, it
could not show that such liability "arises by reason of" the requirements set forth in subsections I
through IV of section 524(g)(4)(A)(ii).  Kenvue (I) has never owned a financial interest in Red River,
a past or present affiliate of Red River, or a predecessor in interest of Red River; (II) it was not involved
in the management of Red River or a predecessor in interest of Red River; (III) it has not provided
insurance to Red River; and (IV) it was not involved in any transaction changing the corporate structure
of Red River or a related party.

(bb)   acquiring or selling a financial interest in an entity as part of such a transaction.

337.   An injunction under section 524(g) may bar an action against a third party only when **[(1)]** that party is alleged to be liable "for the conduct of, claims against, or demands on" the debtor **and [(2)]** to the extent that such liability arises "by reason of" one of the four relationships between the third party and the debtor enumerated in subsections (I) through (IV).

338.   **Subsection I** of the statute refers to liability that arises by reason of the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor.  None of the retailers are alleged to have an ownership interest in Red River or any of its past or present affiliates, or predecessors in interest.

339.   **Subsection II** refers to liability that arises by reason of the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party.  None of the retailers are alleged to have been involved in the management of Red River or a predecessor in interest.

340.   **Subsection III** refers to liability that arises by reason of the third party's provision of insurance to the debtor or a related party.  None of the retailers are alleged to have provided insurance to the debtor or a related party.  If anything, J&J is alleged to have provided an indemnity to the retailers and must cover their talc losses stemming from the sale of J&J's products.

341.   **Subsection IV** refers to liability that arises by reason of the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party.  This subsection includes liability that arises by reason of the third party's involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction or acquiring or selling a financial interest in an entity as part of such a transaction.

342.     None of the retailers are alleged to have undertaken any of these types of activities. Nor have the vast majority of the Protected Parties under the Plan.  Given the Supreme Court's ruling in *Purdue*, there is no provision in the Code that could be invoked to support discharging the thousands of Protected Parties for conduct that falls well outside the scope of subsections (I) through (IV).  Simply put, there is no statutory basis for the discharge J&J demands.

### 5.     Section 524(g) Cannot Be Used to Channel Future Claims in this Case

343.     Pursuit of future talc claims against J&J would not threaten the Plan's purpose to deal equitably with talc claims against the Debtor.

344.     Section 524(g)(2)(B)(ii) requires, inter alia, as a condition to the entry of an injunction channeling future claims that the Court determine that the pursuit of such future claims "outside the procedures prescribed by such plan is likely to threaten the plan's purpose to ***deal equitably*** with claims and future demands."  11 U.S.C. § 524(g)(2)(B)(ii) (emphasis added).

345.     But the Plan here does not deal equitably with future claims.  The TDPs do not provide for an equitable allocation of trust assets.  The lion's share of the settlement is used to pay non-compensable claims.  Future demands involving Ovarian Claims are not treated equitably.

346.     Further, the limited fund created under J&J's Plan is not based on J&J's assets (which are sufficient to pay all talc claims in full as they arise in the future), but on an amount determined by J&J.  Women who hold future claims are having their voices silenced before they get a cancer diagnosis.  J&J's Plan denies these women whose injuries manifest long in the future their right to appear and be heard in Court and affords them no right to seek compensation from the Fortune 50 company that poisoned them.

347.     Granting such relief goes well beyond the jurisdiction of a federal court, which only has authority under Article III of the Constitution to decide legal questions only in the course of resolving "cases" or "controversies."  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021);

Adam J. Levitin, *The Constitutional Problem of Nondebtor Releases in Bankruptcy*, 91 FORDHAM L. REV. 429, 443 (2022) ("Article III's limitations on federal court jurisdiction to actual 'cases' and 'controversies' means that federal courts lack jurisdiction to address creditors' unripened claims against nondebtors … They do not have jurisdiction over future claims that might be brought against nondebtors.").

### 6.   Section 524(g) Cannot Be Used to Channel Claims When There Is No Reorganization

348.   Section 524(g)(1)(A) requires, *inter alia*, that the injunction issue in connection with an order "confirming a plan of reorganization." 11 U.S.C. § 524(g)(1)(A). Chapter 11 draws a distinction between a plan of reorganization and a plan of liquidation. *See* 11 U.S.C. § 1141(d)(1). When a corporate debtor is liquidated and ceases to engage in business, it does not reorganize and is not eligible for a discharge. *See* 11 U.S.C. § 1141(d)(3); 11 U.S.C. § 727(a)(1).

349.   Red River has no business to reorganize, is compelled to give substantially all its assets to a trust and, as a non-individual, would not get a discharge under chapter 7. Red River is not entitled to a discharge. Without a discharge, Red River cannot be entitled to a section 524(g) injunction, nor can J&J and the thousands of other entities J&J includes in its Plan.

350.   The heart of the equitable authority of Bankruptcy Courts, as Justice Douglas taught in *Pepper v. Litton*, is "that substance will not give way to form." 308 U.S. 295, 305 (1939). Here, Red River is in substance a corporate shell—*i.e.*, a contrived entity loaded with talc claims that has no need to reorganize and no need for a discharge itself.[87] In **substance**, it exists in bankruptcy

---

[87]   Section 1141(d)(3) is designed to prevent trafficking in corporate shells. *See* H.R. Rep. No. 95-595, 384 (1977); S. Rep. No. 95-989, 130 (1978); *In re Fairchild Aircraft Corp.*, 128 B.R. 976, 982 (Bankr. W.D. Tex. 1991) (stating that "by freighting the [corporate] shell with all the claims, so that any claims or portions of claims not paid by the liquidation will attach to the shell … [the corporate shell becomes] much less attractive for use in starting up another enterprise"); *In re Zamost*, 7 B.R. 859 (Bankr. S.D. Cal. 1980) (explaining that, once a corporation's assets are liquidated, it is not necessary to provide it with a discharge).

only to pursue a discharge for J&J and its plan does not call for a "reorganization" in any traditional

sense.  This makes the issuance of any injunction under section 524(g) improper *per se*.

### 7.    Section 524(g) Cannot Be Used to Grant J&J a Discharge <u>Because J&J Did Not Get Sufficient Votes in Support of Its Plan</u>

351.    The J&J Discharge cannot be approved under section 524(g) because J&J did not

get the votes.  Section 524(g) requires, as a condition to the issuance of an injunction, that the

debtor obtain the support of 75% of the "class or classes of the claimants whose claims are to be

addressed by the trust" under the plan.  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

352.    Section 524(g) does not contain any cramdown mechanism that permits a debtor to

confirm a plan that includes a channeling injunction in the absence of overwhelming claimant

support.  *See In re Fed.-Mogul Global Inc.*, 684 F.3d 355, 361 (3d Cir. 2012) (discussing the

absence of a cramdown provision for § 524(g)).

353.    Here, J&J failed to obtain the required level of claimant support.  Less than 75% of

the holders of Ovarian Claims voted to accept the Plan.  *See* Dkt. No. 257 at Ex. B.  In response,

J&J tries to count the votes cast by holders of non-compensable claims.  But someone whose claim

is "unenforceable" under "applicable law," should not get to vote.  *See* 11 U.S.C. § 502(b)(1).  J&J

cannot satisfy the 75% requirement by using non-compensable, made-for-bankruptcy claims.

Further, discovery may show that many of the claimants who allegedly voted in favor of J&J's

Plan may not even exist.

354.    In addition, the Debtor relies on a false Voting Declaration that does not accurately

report the votes that were cast on the Plan.  The tabulation report set forth in the Voting Declaration

failed to properly reflect approximately 11,434 votes to reject the Plan.  If the votes cast on J&J's

Plan had been counted and were reflected in the Voting Declaration, the acceptance percentage

would be below 75%.  *See* Dkt. No. 257 at Ex. B.  In fact, to assert that it has the votes, J&J appears to have engaged in fraud or vote rigging.

355.    After the July 26, 2024 voting deadline, J&J, without first seeking relief from the Court as required by Bankruptcy Rule 3018(a),[88] changed the votes of approximately 11,434 claimants represented by the Beasley Allen firm based on a Master Ballot submitted by Beasley Allen's co-counsel, the Smith Law.[89]  But the Smith Firm did not have client authority to submit a Master Ballot and change the votes.  *See* Dkt. No. 257 at Exs. C, D & E.  Two days' negative notice is not adequate to obtain informed consent and modify votes on a chapter 11 plan.  *See In re Southland Corp.*, 124 B.R. 211, 226-27 (Bankr. N.D. Tex. 1991) (finding that 13 days between solicitation materials and the deadline to vote on the plan was "unreasonably short").

356.    Further, the Smith Firm's decision to submit a Master Ballot without client approval or consent occurred in response to financial benefits offered by J&J, as set forth in the *Memorandum of Understanding* with the Smith Firm.  *See* Dkt. No. 17-1 (the "MOU").  J&J appears to have offered money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11—specifically, the

---

[88]    The Bankruptcy Rules require relief from a Bankruptcy Court before votes can be changed.  *See* Fed. R. Bankr. P. 3018(a) ("For cause shown, the court after notice and hearing may permit a creditor or equity security holder to change or withdraw an acceptance or rejection."); *In re Piece Goods Shops Co., L.P.*, 188 B.R. 778, 795 (Bankr. M.D.N.C. 1995) (explaining that "[b]allots, once cast, may *not be changed or withdrawn without the Court's permission*, for cause shown, after notice and hearing in accordance with Bankruptcy Rule 3018."  And thus, because "[n]o party has sought the Court's permission to change any ballot on the Plan . . . the amended ballots will not be counted.") (emphasis added); *In re MCorp Fin., Inc.*, 137 B.R. 237, 238 (Bankr. S.D. Tex. 1992) (finding that "[v]ote changing is the exception, not the rule[]," and "[c]hanges should only be permitted in exceptional circumstances.") (citing *In re Featherworks Corp.,* 36 B.R. 460, 462 (E.D.N.Y.1984) and *In re Jartran,* 44 B.R. 331 (Bankr. N.D. Ill. 1984)).

[89]    *See* Voting Declaration at pp. 6-7, fn. 4 ("Additionally, on September 17, 2024, The Smith Law Firm, PLLC submitted a Master Ballot (the 'Smith Master Ballot') amending certain votes previously submitted on a Master Ballot from Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. and a Master Ballot from Golomb Legal."); *Id.* at 1062 of 1062 (11,986 votes were changed as being "[s]uperseded by a later ballot.").

payments promised by J&J to the Smith Firm outside of J&J's Plan to change votes without client authority or consent.

357.    It is not just that J&J's Plan is fundamentally designed to strip dying women of their right to appear, be heard, and seek just compensation for their injuries, but J&J literally refused to count the votes of dying women who did vote to reject J&J's Plan so that J&J could falsely claim that it obtained the support of 75% of the talc claimants who voted on the Plan.

### 8.    Section 524(g) Is Unconstitutional If It Permits the J&J Discharge

358.    Assuming, *arguendo*, that this Court finds that section 524(g) can be used to discharge J&J, Kenvue, and the Retailers of their talc liability and that holders of non-compensable claims can vote, section 524(g) must be declared unconstitutional.

359.    The Fifth Amendment provides that "[n]o person" shall be "deprived" of "property" without "due process of law" and "without just compensation."  U.S. Const. amend. V.[90]  A cause of action is a property right protected by the Fifth Amendment and the Fourteenth Amendment.[91]

---

[90]    The Fourteenth Amendment also provides that "[n]o state" shall "deprive any person" of "property[]" without due process of law."  *Id.* at amend. XIV.

[91]    *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 807, 813 (1985) (a "chose in action is a constitutionally recognized property interest possessed by each of the plaintiffs"); *Dallas Cabana, Inc. v. Hyatt Corp.*, 441 F.2d 865, 868, n.9 (5th Cir. 1971) ("A 'cause of action' is an asset or a property right of the individual to whom it belongs."); *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) ("[A] cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause.") (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)); Adam J. Levitin, *The Constitutional Problem of Nondebtor Releases in Bankruptcy*, 91 FORDHAM L. REV. 429, 440 (2022) ("Nonconsensual nondebtor releases are inconsistent with … due process requirements.  Creditors who have direct claims against nondebtors have property interests:  their direct claims are 'choses in action.'  Like other types of property interests, these choses in action are protected by the Due Process Clause.").

360.     Indeed, to protect the right to sue, every citizen of the United States is entitled to free access to its judicial tribunals in every State of the Union."[92]  This makes sense because no right, whether a property right or liberty right, has meaning if it cannot be judicially enforced.[93]

361.     It follows that a cause of action asserted by an ovarian cancer claimant against J&J and Kenvue to recover damages for the personal injury and/or wrongful death (*i.e.*, the ultimate deprivation of liberty) suffered by her constitutes a property right protected by the Fifth Amendment that includes the right to access our judicial tribunals, appear and be heard therein, and seek appropriate relief.

362.     Due process in bankruptcy requires that when a party receives a discharge of its liabilities, that party's assets must be distributed in a manner that is "consonant with a ***fair***, ***reasonable***, and ***equitable*** distribution of those assets."[94]  Our bankruptcy laws have never allowed a party to receive a discharge unless creditors receive the ***full*** value of the debtor-estate's non-exempt assets, and they share that value on a ***fair*** basis.[95]

---

[92]    *Slaughter-House Cases*, 83 U.S. 36, 79 (1873) (Every citizen "has the right of free access to … courts of justice in the several States."); *Crandall v. Nevada*, 73 U.S. 35, 48 (1867) ("[E]very citizen of the United States … is entitled to free access … to its judicial tribunals."); *see Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999) ("[O]ne is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he [or she] has not been made a party by service of process …, it being 'our deeply-rooted historic tradition that everyone should have his [or her] own day in court.'") (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940) and *Martin v. Wilks*, 490 U.S. 755, 762 (1989)).

[93]    *See Marbury v. Madison*, 5 U.S. 137, 163 (1803) ("[I]t is settled and invariable principle in the laws of England, that every right, when withheld, must have a remedy, and every injury its proper redress.").

[94]    *Kuehner v. Irving Tr. Co.*, 299 U.S. 445, 452 (1937) (emphasis added); *see R.F.C. v. Denver & R.G.W.R. Co.*, 328 U.S. 495, 533 (1946) ("[T]he provisions for confirmation by the courts over the creditors' objection are within the bankruptcy powers of Congress … so long as the creditor gets all the value of his lien and his share of any free assets.").

[95]    *See Purdue*, 144 S.Ct. at 2086 ("Every bankruptcy law … from 1800 until 1978 [has] generally reserved the benefits of discharge to the debtor who offered a 'fair and full surrender of [its] property.") (quoting *Sturges v. Crowninshield*, 4 Wheat. 122, 176 (1819), and citing *Central Va. Community College v. Katz*, 546 U. S. 356, 363–364 (2006); Bankruptcy Act of 1800, §5, 2 Stat. 23 (repealed 1803); Act of Aug. 19, 1841, §3, 5 Stat. 442–443 (repealed 1843); Act of Mar. 2, 1867, §§11, 29, 14 Stat. 521, 531–532 (repealed 1878); Bankruptcy Act of 1898, §§7, 14, 30 Stat. 548, 550 (repealed 1978)).

363.     Here, J&J's plan does not provide for a "fair and full" surrender of J&J's property. *Purdue*, 144 S.Ct. at 2086.  J&J—a non-debtor—is proposing to receive a discharge, retain billions in value for itself and its shareholders, while its creditors are paid a tiny fraction of the value of their claims against J&J and its non-debtor affiliates.

364.     The funds J&J is proposing to contribute over the course of the next 25 years (assuming a "final order" is entered) will be disproportionately paid to holders of non-compensable claims under TDPs that are designed to circumvent the Code's priority and distribution scheme. This is not an "equitable distribution"—non-compensable claims should not diminish the funds available to pay ovarian cancer claimants.

365.     The concept of "fairness" reflected in the Bankruptcy Code also implies that objecting creditors should be paid in full before equity holders "receive or retain" any property and that the plan not "discriminate unfairly" with respect to each class of claims.  11 U.S.C. § 1129(b).  Yet Red River will retain its non-operating existence and J&J will retain all its assets while being relieved of its obligations for its own talc liabilities.

366.     Further, just compensation requires that a party losing her property must receive a valuation of the property being taken and compensation that is equal to the value being lost.[96]  But under J&J's plan, creditors will not be permitted to test the value of their claims against J&J.

367.     There is no valuation process included and, therefore, no mechanism to determine if ovarian cancer claimants will be "put in as good position pecuniarily" as they would have occupied if their causes of action were not taken from them.  *Id.*

---

[96]   *See U.S. v. Miller*, 317 U.S. 369, 374 (1943) (noting in the context of condemnation of property:  "[Just] compensation means the full and perfect equivalent in money of the property taken.  The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken.").

368.     The lynchpin of J&J's plan is that talc claimants will be paid far less than they can recover in actions against J&J while being barred from pursuing their claims against J&J in the civil justice system.  Their rights are being taken from them without any determination of the value of those rights.  This is neither fair nor reasonable.

369.     Further, J&J is paying in settlement billions *less* than it removed from JJCI and ***less*** than the full value of J&J, just like the Sacklers with Purdue.  For claimants with claims against both J&J and JJCI, it is possible that J&J is paying ***nothing*** as it is obligated to cover only payments that Red River cannot pay on its own.  This contrived mechanism comes from a Fortune 50 company that could pay all these claims in full, now.  Yet, J&J will only allow Red River to make a partial payment to creditors over the next 25 years.  Property rights are being taken without any meaningful form of notice,[97] and literally nothing is being provided in the form of compensation.

370.     The due process violation is more profound for future claimants.  Unlike in *Johns-Manville* and other mass tort cases, J&J has not conceded liability.  The history of judgments against J&J is just now being written.  "[T]he Court and stockholders" do not have "the benefit of data from 15 years of tort litigation [by the tortfeasor]" from which claim values can be ascertained.  *See LTL Mgmt.*, 64 F.3d at 103 n. 13.  Future claimants may enjoy the benefit of new scientific studies providing further support for a causal connection between their disease and exposure to J&J's talc products.

371.     What is being taken from them under J&J's plan is unconscionable.  In J&J's perfect world—*i.e.*, the world that J&J's plan seeks to impose—a future claimant who can definitively prove ten years from now that her life was cut short by J&J's products may be handed

---

[97]     *See Martin*, 490 U.S. at 762; Levitin, 91 FORDHAM L. REV. at 439-440 ("Notice alone is not sufficient due process.  Due process also prohibits parties from being deprived of property without getting their proverbial 'day in court' in some form.").

a check for a paltry amount and told that she has no right to seek justice or compensation from J&J before any Court.  This is inequitable.

372.    The policy that J&J seeks to write through its bankruptcy maneuvers is that J&J gets to decide how much it pays for the harms that it caused.  And that women who say "no" and refuse to consent to this must be enjoined.  But this is not the civil justice system—at least not the one contemplated by the Constitution.  This is a company that caused serious injury and death to women with ovarian cancer and is not itself even standing in the Bankruptcy Court but, through Red River's filing, seeks to reap bankruptcy's benefits.

373.    If section 524(g) is read to permit such an unlawful taking of property rights, then that section is unconstitutional.  This Court need not reach this Constitutional issue to find that J&J's Plan cannot be confirmed.  Interpretations of statutes that render them unconstitutional should be disfavored.[98]  This Court need only follow established Supreme Court and Circuit case law to find that the J&J Discharge is unlawful.

374.    But if section 524(g) does permit an unlawful taking here, it is section 524(g) that must yield.  The United States has a "deep-rooted historic tradition that everyone should have his own day in court."  *Martin*, 490 U.S. at 762.  Fundamental rights are protected in bankruptcy. *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 192 (1902) (Congress may "prescribe … regulations concerning discharge in bankruptcy" that are compatible with "fundamental law").

375.    "The right to sue and defend in the courts … lies at the foundation of orderly government."  *Chamber v. Baltimore & O.R. Co*., 207 U.S. 142, 148 (1907).  "It is one of the highest and most essential privileges of citizenship," particularly when the lawsuit involves the

---

[98]    *See Blanchette v. Connecticut Gen. Ins. Corp*., 419 U.S. 102, 134 (1974) ("[W]hen a statute is ambiguous, construction should go in the direction of constitutional policy.") (quotation omitted).

death of a citizen. *Id*. This is not a right that J&J, or Congress by enacting section 524(g), has the power to take away.

### B.   THE DEBTOR'S PLAN WAS FILED IN BAD FAITH

376.   Under 11 U.S.C. § 1129(a)(3), a plan must be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3); see *Little Creek*, 779 F.2d at 1071 ("Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings.").

377.   Bankruptcy has two "twin objectives[:] 'preserving going concerns and maximizing property available to satisfy creditors.'" *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 50 (2008) (quoting 203 *North LaSalle*, 526 U.S. at 453 (1999)).

378.   Obtaining relief for a non-debtor entity is not a legitimate use of bankruptcy. All the more so when the relief would "permanently and forever" foreclose current and future tort claimants from recovering from a wealthy, Fortune 50, triple A-rated company that has not and will not place "virtually all its assets on the table for its creditors." *See Purdue*, 144 S.Ct at 2078. Here, the Debtor cannot show any legitimate objective for being in chapter 11; its Chapter 11 Case is undertaken solely for the benefit of non-debtor J&J and its non-debtor affiliates.

### 1.   The Debtor Has No Going Concern to Preserve or Reorganize

379.   *First*, the Debtor has no "going concerns" to preserve. *Fla. Dep't of Revenue*, 554 U.S. at 50; *see In re 15375 Mem'l Corp.*, 589 F.3d 605, 619 (3d Cir. 2009) (finding the debtor did not maintain a going concern where it had no employees, office, or business other than the handling of certain litigation); *In re Zamora-Quezada*, 622 B.R. 865, 885-86 (Bankr. S.D. Tex. 2017) (debtor ineligible for Chapter 11 where, among other things, debtor's "few assets," "virtually no income," and lack of additional business prospects raised the question of "what is [the] Debtor being rehabilitated for").

380.     Red River is not an operating entity, but a liability dump specially created to serve as a bankruptcy vehicle.  The Debtor conducts no operations.  It has no employees, office, or business.  Instead, it merely holds a limited royalty stream and a funding agreement that have no synergistic going-concern value.  Its sole function is to handle talc claims in bankruptcy.  This Debtor cannot credibly contend that it is in bankruptcy to preserve a going concern.

### 2.     This Case Does Not Maximize Value for Creditors

381.     *Second*, maximizing value for creditors is another key objective of chapter 11, but this Chapter 11 Case does nothing to maximize value for creditors.  *Fla. Dep't of Revenue*, 554 U.S. at 50.  To the contrary, it is nothing other than a litigation tactic designed to suppress the value of valid claims.  Two cases—one from the Fifth Circuit and one from the Third Circuit (where J&J's first and second bankruptcy cases were filed)—illustrate this point.

382.     The **first** case is *In re Antelope Technologies, Inc*., 431 Fed. Appx. 272, 275 (5th Cir. June 24, 2011).  In *Antelope*, the company's management and insiders, who were defendants in a shareholder derivative lawsuit, placed the company into bankruptcy so that the company could assert that the lawsuit was an asset owned by the company in bankruptcy.  *In re Antelope Techs., Inc.*, No. 07-31159-H3-11, 2010 WL 2901017, at *9 (S.D. Tex. July 21, 2010).

383.     The company, acting at the defendants' direction and control, then proposed a chapter 11 plan that conveniently released the derivative claims.  431 Fed. App'x at 273.  The Bankruptcy Court confirmed the company's plan, which then went effective and was fully implemented.  *Id*.  On appeal, the District Court "vacated the [confirmation] order" and held that the chapter 11 petition was filed as a litigation tactic—*i.e.*, a scheme to gain control over the litigation against the insiders—and, therefore, was not "filed in good faith."  *Id.*

384.     On remand, the Bankruptcy Court dismissed the case as not having been "filed in good faith" based on, *inter alia*, the "terms of the proposed plan," which provided the litigation

targets with releases. *Id.* The Bankruptcy Court went so far as to describe the scheme to control

the litigation and release the defendants as "illegal" and "unethical." *Antelope*, 2010 WL 2901017,

at \*5. When bankruptcy is used for this purpose, value for creditors is destroyed and is not

maximized.

385. The **second** case is *In re 15375 Memorial Corp.*, 589 F.3d 605 (3d Cir. 2009),

which involved a similar fact pattern, except the parties who controlled the debtor were trying to

use bankruptcy to thwart litigation involving alter ego claims rather than a derivative lawsuit.

386. In *Memorial*, the debtors' insiders and affiliates faced "alter ego claims" arising

from their operation of oil wells, which caused pollutants to enter and contaminate drinking water.

*Id.* at 612. To thwart this litigation, the debtors' parent caused the non-operating debtors to file

for bankruptcy. Once in bankruptcy, the debtors asserted that "any alter ego claims" against their

insiders and affiliates were "property of their estate" and could not be asserted by the plaintiffs

who were injured by the affiliates' and insiders' misconduct. *Id.* at 614. The plaintiff moved to

dismiss the debtors' cases for lack of good faith, but the Bankruptcy Court refused to do so. *Id.* at

616.

387. To support its decision to keep the cases, the Bankruptcy Court referred to (a) the

benefits of the "automatic stay," (b) the ability of bankruptcy to "centralize" claims into a single

"forum," (c) establishing a "bar date to set the number of claims," (d) the ability to create a "known

universe of claims," (e) the ability to test whether the plaintiffs had "any legally cognizable

claim[s]," (f) the ability to "analyze potentially applicable insurance policies," (g) the fact that

certain insurance policies "may respond" to claims, (h) the ability to commence "substantive

communications with insurers," (i) the ability to negotiate and propose a settlement of estate claims

against insiders (at an amount the insiders were willing to pay), (j) the ability to formulate a plan, and (k) the ability to "continue to manage and search for assets." *Id*. at 620.

388.     Although, on its face, this looked like an "extensive list of activities," the District Court and the Third Circuit both held that the Bankruptcy Court erred in failing to dismiss the cases for lack of good faith. *Id*.  The problem was that neither the Bankruptcy Court nor the debtors could explain how any of these itemized activities ***maximized value*** for creditors "that would otherwise be unavailable to creditors outside of bankruptcy." *Id*.

389.     Regarding the use of bankruptcy to attempt to settle estate claims against insiders, the Third Circuit found that the debtors' decision-maker clearly "lacked an incentive to vigorously negotiate" on the debtors' behalf against the defendants/insiders—*i.e.*, the alter ego claims had more value in the hands of the plaintiff (who believed in its claims) than in the hands of debtors who were controlled by the defendants.  *Id*. at 624.

390.     The Third Circuit found that if the debtors and their affiliates "had their way," then the plaintiff "would be left without any opportunity to litigate its alter ego claims" against the non-debtor affiliates/insiders and, "conveniently, for the [affiliates/insiders]," the debtors "would not bring the claims because they do not believe the claims have value." *Id*. at 626.

391.     The Third Circuit faulted the Bankruptcy Court for failing to consider the obvious fact that the debtors were "*primarily concerned*" with protecting their affiliates and insiders and not "*[d]ebtors]*." *Id*. at 624 (emphasis in original).  The Third Circuit held that the debtors' petitions "were filed primarily as a litigation tactic" so that its affiliates and insiders could "avoid liability" in civil litigation and, therefore, did not serve "a valid bankruptcy purpose" by preserving a going concern or maximizing the value of the debtors' estates. *Id*. at 619.

392.     As with this Chapter 11 Case, the debtors in *Antelope* and *Memorial*, were controlled by non-debtor affiliates or insiders that were trying to use the bankruptcy of a shell company to thwart litigation against themselves.  The only difference with this Chapter 11 Case is that the debtors in *Antelope* and *Memorial* could argue that the causes of action asserted against the non-debtor affiliates and insiders were estate claims.  Here, the talc claims against J&J and Kenvue are not estate causes of action.  *See supra* II.A.3.  They are independent claims asserted by individuals injured or killed by exposure to J&J's talc products and are available to creditors outside of this Chapter 11 Case.

393.     This distinction does not change the fact that in either circumstance using bankruptcy to thwart litigation against non-debtor parties does nothing to maximize value for creditors.  As in *Memorial*, if Red River and J&J have their way, then current and future talc claimants will be left without any opportunity to litigate their talc claims against J&J and its non-debtor affiliates and insiders.  Conveniently for J&J, these talc claimants would be forced to settle based exclusively on J&J's views about the merits of their claims.

394.     As the Bankruptcy Court in *Antelope* clearly understood on remand, these schemes to control litigation against and release non-debtor defendants are "unethical."  *Antelope*, 2010 WL 2901017, at *5.  After the Bankruptcy Court dismissed the case, the parties who masterminded this failed scheme appealed to the Fifth Circuit and argued that it was improper for the District Court and the Bankruptcy Court to have disturbed the terms of "[a] fully-implemented plan of reorganization" under the "equitable mootness" doctrine.  431 Fed. App'x at 274.

395.     But the Fifth Circuit rejected this argument.  *Id.*  The Fifth Circuit held that there "is a compelling interest in refusing to apply equitable mootness" where, as here, "the petition was not filed in good faith."  *Id.*  Not even a confirmation order and a fully implemented plan can shield

parties who use bankruptcy to gain leverage in pending litigation from justice and accountability—which is why J&J will not pay a penny to any trust unless and until a final, non-appealable order is entered in this case discharging it of its independent talc liability.[99]

396.     It is easy to see why manufactured bankruptcies like this one do not maximize value for creditors "that would otherwise be unavailable to creditors outside of bankruptcy." *Memorial*, 589 F.3d at 620.  When 3M attempted a similar maneuver in 2022, seeking to piggyback on the bankruptcy of its non-operating subsidiary, Aearo Technologies, it asserted that a $1 billion settlement of mass tort claims was "only" possible inside of bankruptcy.[100]

397.     But after the subsidiary's bankruptcy case was dismissed for cause, *see In re Aearo Techs., LLC*, Case No. 22-02890-JJG-11, 2023 WL 3938436 (Bankr. S.D. Ind. June 9, 2023), 3M quickly settled for $6 billion outside of bankruptcy.

398.     And here, prior to filing this bankruptcy and in refusing to increase the amount it would pay to talc claimants in two prior bankruptcies, J&J was adamant that the number it would pay over 25 years was the most it would ever pay.  Yet, based on the "negotiations" with the Smith Firm, that number increased by over one billion dollars.  J&J has been caught in its own lie. Ovarian cancer victims understand that J&J can afford much more to compensate them for the reprehensible harm J&J has caused them, and that their only path to recovering fair compensation is outside of a bankruptcy case manufactured by J&J to harm them.

399.     Only the holders of non-compensable claims who are unlikely to see any recoveries in the tort system can plausibly argue that they will receive maximum value through this

---

[99]     *See* Plan at § 1.1.63 (definition of "Final Order"), § 4.1 ("Talc Personal Injury Trust" established on the "Effective Date"), § 4.9 (Contribution of Certain Assets), and § 8.2 ("Conditions Precedent to the Effective Date of the Plan" include the "Confirmation Order" becoming a "Final Order").

[100]    *See In re Aearo Techs. LLC*, Case No. 22-02890-JJG-11 (Bankr. S.D. Ind. July 26, 2022) (Dkt. No. 12) (Informational Brief of Aearo Technologies LLC at Section V).

bankruptcy.  It is true that $1,500 per non-compensable claim here exceeds the $0.00 they can recover in the tort system.  However, claims for which a debtor owes no compensation are not allowable as they are not enforceable against the debtor.  Thus, the holders of non-compensable claims are not entitled to reap a windfall in bankruptcy, particularly when doing so means that holders of compensable claims will be foreclosed from attaining reasonable compensation for their injuries.  This case is nothing more than a litigation tactic designed to suppress the values of legitimate, compensable claims.

### 3. Seeking a Release or Discharge for a Non-Debtor Is an Improper and Bad Faith Use of Bankruptcy

400.    ***Third***, filing for bankruptcy to obtain a release or discharge for a solvent Fortune 50 company is a patently improper use of bankruptcy that reflects a lack of good faith.  That has long been the case in the Fifth Circuit, but it is now unquestionably the law of the land in the wake of the Supreme Court's decision in *Purdue*.  *See Purdue*, 144 S.Ct. 2071.

401.    J&J's attempt to use bankruptcy to evade its independent talc liability closely resembles the playbook that the Sackler family followed with Purdue.  J&J's plan is in many respects more offensive than the plan and settlement in *Purdue*.  Critically, J&J is brazenly attempting this scheme in a Circuit that has never permitted non-consensual non-debtor releases, and this effort comes after the Supreme Court's *Purdue* decision, which prohibits non-consensual non-debtor releases.  Attempting to use bankruptcy for a clearly prohibited purpose is the very essence of a bad faith bankruptcy filing.  The parallels between J&J's scheme and Purdue are striking.

402.    Purdue "sits at the center of [the opioid epidemic]."  *Id*. at 2074.  Its signature product—"OxyContin"—was "the most prescribed brand-name narcotic medication" in the United States.  *Id*. at 2078.  "The company's success propelled [its owners,] the Sacklers[,] onto

the lists 'of the top twenty wealthiest families in America,' with an estimated net worth of $14 billion." *Id*.

403.    Similarly, J&J sits at the center of talc litigation, which aims to address the harm caused by J&J's decision to knowingly sell consumer products contaminated with asbestos and causing cancer.  The scent of its signature product—J&J's Baby Powder—is associated with newborn babies in the United States and globally.  J&J's success and brand recognition provided the Johnson family with generational wealth (estimated to exceed $16 billion).

404.    Purdue came under "scrutiny" for "misbranding OxyContin."  *Id*.  "Thousands of civil lawsuits followed as individuals, families, and governments within and outside the United States sought damages from Purdue and the Sacklers for injuries allegedly caused by their deceptive marketing practices."  *Id*.  In response, the Sacklers removed "approximately $11 billion" from Purdue, leaving it in a "weakened financial" state.  *Id*. at 2079.

405.    J&J also came under scrutiny for misbranding its talc products.  Thousands of civil lawsuits followed as individuals, families, and governments within and outside the United States sought damages from J&J for injuries allegedly caused by J&J's deceptive marketing practices. In response, J&J removed over $61 billion in operating assets from JJCI, transferred the assets that generate income from recognizable brands such as Tylenol® to newly formed Kenvue, formed a shell subsidiary and gave it the talc liabilities, and then placed the shell company into bankruptcy.

406.    Despite being named as defendants in hundreds of lawsuits, the Sacklers refused to file for bankruptcy themselves, but sought to piggyback on Purdue's bankruptcy filing.  Thus, Purdue proposed a plan keyed to a settlement with the Sacklers that was contingent upon a release that would bar current and future third-party claims against the Sacklers, including "claims for fraud and willful misconduct."  *Id*.

407.    That release—effectively a discharge—"would not just prevent suits against [Purdue's] officers and directors but would run in favor of hundreds, if not thousands, of Sackler family members and entities under their control." *Id*.  In return, the Sacklers promised to return $6 billion (or 54% of the money they took from Purdue) through payments spread out over 10 years. *Id*.  This created a path for individual victims to recover between $3,500 and $48,000. *Id*.

408.    Likewise, J&J has refused to file for bankruptcy itself, and instead sought to piggyback on a made-for-bankruptcy debtor entity.  J&J then directed the debtor it controls to propose a plan and a settlement with it contingent upon a release that would bar current and future talc claims against J&J, including claims for fraud and willful misconduct.

409.    That release—effectively a discharge—would not just prevent suits against J&J and its officers and directors but would run in favor of thousands of other parties.  Under J&J's plan, the term "Protected Parties" is defined to include, *inter alia*, all the "Debtor Corporate Parties" listed on Schedule 1 and their respective Representatives, and a long list of retailers and other persons listed on Schedule 3.  *See* Plan at §§ 1.1.40 & 1.1.108.  Even Walmart Inc. and Target Corporation will get a release without making any contribution to the estate.

410.    In return, J&J promised to pay $7 billion on a net present value basis (less than 11% of the $61 billion in assets taken from JJCI alone and less than 2% of J&J's net worth) through payments spread out over 25 years.  Through this path, individual victims suffering from ovarian cancer will recover only a small fraction of their damages.

411.    Purdue solicited votes on its proposed plan. *Purdue*, 144 S.Ct. at 2079.  "Thousands of opioid victims voted against the plan," and "many pleaded with the bankruptcy court not to wipe out their claims against the Sacklers without their consent." *Id*.  But the *Purdue* Bankruptcy

Court decided that it had the power to bar them from asserting claims against the Sacklers in the civil justice system to facilitate the settlement negotiated by the Sacklers. *Id*. at 2080.

412.    J&J claims to have solicited votes on its proposed Plan, although it did so without using a Court-approved disclosure statement.  Thousands of talc claimants with compensable claims voted against the Plan and now urge this Court not to permit J&J to wipe out their claims against J&J without their consent.  J&J wants this Court to steamroll its victims through a hurry-up bankruptcy and forever enjoin and bar them from seeking compensation from J&J and Kenvue in the civil justice system.

413.    The Supreme Court reversed the confirmation of the *Purdue* plan, holding that the release of the Sacklers was unauthorized.  The Supreme Court said "no" to the Sackler discharge. The Supreme Court found, consistent with long-standing Fifth Circuit precedent, that "a discharge operates only for the benefit of the debtor against its creditors and 'does not affect the liability of any other entity.'  § 524(e)." *Id*. at 2081.

414.    The Sacklers did not file "for bankruptcy" and did not place "virtually all their assets on the table for distribution to creditors," and yet they sought what essentially amounted "to a discharge" that would "permanently and forever" foreclose opioid claims against them "without the consent of those affected." *Id*.  J&J now seeks exactly what the Supreme Court ruled the Sacklers could not get.

415.    The Supreme Court held that the Bankruptcy Code does not authorize such a discharge for non-debtors or suggest that the opioid claims could be "bargained away without the consent of those affected, as if the claims were somehow Purdue's own property." *Id*. at 2084. Nonetheless, this is J&J's goal.

416.     The Supreme Court found that while "bankruptcy law may serve to address some collective-action problems," it does not provide "a bankruptcy court with a roving commission to resolve all such problems that happen its way, blind to the role other mechanisms (legislation, class actions, multi-district litigation, consensual settlements, among others) play in addressing them." *Id*.  The Supreme Court refused to permit a bankruptcy discharge to extinguish claims for wrongful death and fraud asserted by the victims against the Sacklers in a case where the Sacklers had "not agreed to place anything approaching their full assets on the table for opioid victims."  *Id.* at 2085.

417.     The outcome in *Purdue* controls in this Chapter 11 Case.  J&J has not filed for bankruptcy.  J&J has not placed virtually all its assets on the table for distribution to talc claimants.  Yet it seeks what essentially amounts to a discharge that would permanently and forever foreclose talc claims against it without the consent of those affected.  *Purdue* prohibits this Court from granting non-debtor J&J a release or discharge that extinguishes its own liability for bodily injury, wrongful death and fraud asserted by the talc claimants.

418.     J&J's bankruptcy scheme is not only a perversion of the bankruptcy system, but it is simply not viable after the Supreme Court's *Purdue* decision.  Attempting to use the bankruptcy system for such a patently forbidden purpose is a lack of good faith.  Until J&J decides to file for bankruptcy itself, it must deal with its talc liability through other mechanisms, such as the MDL and consensual settlements.  Seeking a release or discharge for a non-debtor for its own liability is not a proper objective of a chapter 11 case.  This Court must find that the Plan was filed in bad faith.

### 4.     <u>J&J Manipulated the Voting Process</u>

419.     Bad faith here is further shown by J&J's manipulation of the voting process. *See In re Quigley Co*., 437 B.R. 102, 127-129 (Bankr. S.D.N.Y. 2010).

420.    In *Quigley*, the Court held that the plan violated section 1129(a)(3) and was proposed in bad faith where the debtor's parent (Pfizer) "manipulated the voting process" by buying votes so that it (Pfizer) could get the benefit of a channeling injunction.  *Id.* at 125-126.

421.    To accomplish this, Pfizer deviated from its "historical approach" to settling asbestos claims asserted against it and the debtor (Quigley) and entered into a series of master settlement agreements with law firms that, in exchange for what was essentially a guaranteed payment from Pfizer, agreed to flood the vote with acceptances using "Master Ballots." *Id*. at 128.

422.    The Bankruptcy Court found that the bankruptcy was Quigley's "in name only," that Pfizer was providing the "bulk of the plan funding," was the "principal beneficiary of the channeling injunction," and had "conceived" of the "global strategy." *Id.* at 126-127.

423.    As in *Quigley*, this bankruptcy is the Debtor's "in name only," J&J (the Debtor's ultimate parent) is providing all the plan funding, is the principal beneficiary of the channeling injunction, and conceived and implemented the global strategy before "Red River" was even formed.

424.    To accomplish this, J&J deviated from its historical practice of not settling Gynecological Claims (since they are not compensable or supported by science) and entered into a series of Master Settlement Agreements with law firms that, in exchange for what is a guaranteed payment from J&J, agreed to flood the vote with acceptances using master ballots.

425.    J&J manipulated the voting process by buying votes so that J&J can get a discharge of its independent liability and an injunction.  J&J agreed to pay the Smith Firm tens of millions of dollars outside of the Plan in exchange for the submission of a fraudulent Master Ballot.

426.    As in *Quigley*, the vote here is "tainted." *Id.* at 129.  Vote rigging and buying off holders of non-compensable claims that are not supported by science is bad faith and violates

section 1129(a)(3) of the Bankruptcy Code.  Women who hold compensable claims and say "no," should not be treated as the bargained for consideration underlying a settlement that enables law firms that represent holders of non-compensable claims to profit at their expense.

427.    Law firms that represent holders of compensable claims reject the Plan.  The reason is obvious:  the values that will flow to their clients are too low, and the loss of legal rights is too great.  J&J cannot deprive women who say "no" of their legal rights—forcing a settlement on them that they unequivocally reject—through a tainted and corrupt vote.  This is bad faith under section 1129(a)(3).

### 5.    J&J's Serial Bankruptcy Filings and the Debtor's Creation Through Fraud Shows Bad Faith

428.    J&J's contrived bankruptcy cases have already been dismissed twice for lack of financial distress.[101]  J&J—or the made-for-bankruptcy entity through which J&J has sought to obtain a discharge of its liabilities—is now a serial filer of bad faith cases, which is another fact that shows abuse and a lack of good faith.  *See Matter of Elmwood Dev. Co.*, 964 F.2d 508, 513 (5th Cir. 1992) ("serial chapter 11 petition" properly dismissed as not filed in "good faith").[102]

429.    To address its prior dismissals for lack of financial distress, J&J caused the termination of the Funding Agreements that ostensibly kept LTL from staying in bankruptcy, and

---

[101]    *See In re LTL Mgmt., LLC*, No. 23-2971, 2024 WL 3540467, at *2 (3d Cir. July 25, 2024) (good faith and a valid bankruptcy purpose require a "debtor in financial distress"); *In re LTL Mgmt., LLC*, 64 F.4th 84, 111 (3d Cir. 2023) (chapter 11 is "only for entities facing financing distress.").

[102]    *In re Parson*, 632 B.R. 613, 617 (Bankr. N.D. Tex. 2021) (the debtor's history with "creditors prior to bankruptcy is also particularly instructive" with regard to the debtor's motives and the "Court's analysis on dismissal."); *In re Jordan*, 598 B.R. 396, 406–07 (Bankr. E.D. La. 2019) ("While a debtor's serial filings do not necessarily constitute bad faith, a debtor's prepetition conduct, including his conduct in prior cases, is a valid consideration in determining a debtor's good faith in filing a subsequent case."); *see also In re Casse*, 198 F.3d 327, 342 (2d Cir. 1999) (having dismissed prior chapter 11 case on basis of the debtor's bad faith serial filings, the Bankruptcy Court was justified in treating the debtor's subsequent chapter 11 filings as void ab initio); *In re D&G Constr. Dean Gonzalez, LLC*, 635 B.R. 232, 240 (Bankr. E.D.N.Y. 2021) ("serial filers" of "bad faith" bankruptcy proceedings can be barred from re-filing cases and obtaining the benefit of the automatic stay).

penned a new Funding Agreement that provides funding to facilitate the new settlement. J&J's position is essentially that if its "made-for-bankruptcy entity" was not in financial distress beforehand, it is now.

430. But if the Debtor in this Chapter 11 Case is in financial distress, such distress must be a function of fraud and coercive manipulation of a subsidiary by its parent. J&J cannot manufacture jurisdiction or financial distress by committing fraud. If that were the case, any solvent company seeking to use bankruptcy to enjoin tort claims in litigation could do so by fraudulently transferring its assets on the eve of a bankruptcy filing.

431. Such machinations run afoul of the fundamental principle that "no action of the parties can confer subject-matter jurisdiction upon a federal court." *Ins. Corp. of Ir. Ldt. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). Efforts to manufacture federal subject-matter jurisdiction are prohibited by statute. 28 U.S.C. § 1359. A debtor cannot create subject matter jurisdiction by agreement. *See Combustion Eng'g*, 391 F.3d at 238.

432. So too, a debtor cannot overcome lack of genuine financial distress by self-inflicting financial distress. *See LTL Mgmt.*, 64 F.4th at 110. As the Seventh Circuit held in *In re South Beach Securities, Inc.*, 606 F.3d 366 (7th Cir. 2010), "[t]he public has an interest in limiting the use of bankruptcy for the purposes for which it was intended" and not "as a vehicle by which solvent firms" can avoid their debts. *Id.* at 371. The "object of bankruptcy is to adjust the rights of creditors of a ***bankrupt company***," and not "to allow a solvent company" to try to lighten its own burdens. *Id.* (emphasis added).

433. If Red River and/or J&J take the position that they ***finally did it***—*i.e.*, they finally created a debtor that is in financial distress—then the obvious remedy is to unwind the fraudulent surrender of the Funding Agreements and the transactions that created such distress or simply

dismiss this case so that the claimants here can pursue their recoveries from J&J and Kenvue unimpaired by J&J's latest bankruptcy machination.

434.   The solution is not to reward a party so craven that it would attempt to circumvent rulings made by the Third Circuit and the New Jersey Bankruptcy Court by destroying assets and then running to a new Court (in a different Circuit) in hopes of finding a more sympathetic ear. J&J's Plan cannot be viewed as having been proposed in good faith under these circumstances.

<h3 style="text-align:center">6.   <u>The Debtor's Plan Violates the Seventh Amendment and Title 28</u></h3>

435.   The Plan also violates the Seventh Amendment and 28 U.S.C. § 1411 and, therefore, has been proposed by means forbidden by law.  The Seventh Amendment provides:  "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."  Const. amd. 7.  "If the right is legal in nature, then it carries with it the Seventh Amendment's guarantee of a jury trial." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 55 (1989).

436.   28 U.S.C. § 1411 provides:  "Except as provided in subsection (b) of this section, this chapter and title 11 ***do not affect*** any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a ***personal injury or wrongful death tort claim***."  28 U.S.C. § 1411 (emphasis added).

437.   A "right" that cannot be exercised is no right at all.  As Justice Scalia wrote in *McConnell v. Federal Election Commission*, 540 U.S. 93, 252 (2003):  "What good is the right to print books without a right to buy works from authors?  Or the right to publish newspapers without the right to pay deliverymen?  The right to speak would be largely ineffective if it did not include the right to engage in financial transactions that are the incidents of its exercise."  Likewise, what

114

good is a victim's right to a trial by jury in personal injury or wrongful death claim against J&J if the victim cannot recover the amount awarded by the jury?

438.    Under the Plan, if a claimant were to exercise his or her right to a jury trial under the TDPs, he or she would be forced to litigate against the Trust (and not against solvent J&J) and the damages would be capped at an amount determined by J&J.

439.    Instead of asserting a claim against solvent J&J and collecting on the award from solvent J&J, the claimant would receive "points" and a reduced recovery based on the amount that J&J is willing to pay.  The legal rights that would follow from a trial by jury in a personal injury or wrongful death claim against J&J would *not* be available to the talc claimant under the Plan. Under the Plan, the right to a jury trial is not only *affected*, but it is abrogated.

440.    This is not a case where the real beneficiary of the injunction is insolvent and the tools available under the Bankruptcy Code are being used to maximize the value of a limited fund for current and future asbestos claimants.  J&J is not in financial distress and could easily afford to pay all talc claims in full, including all future jury verdicts.  The sole purpose of this case is to deny claimants with the right to hold J&J responsible in the tort system and try their claims against J&J before a jury.  Title 28 of the United States Code does not give a Court the ability to deny tort victims the right to exercise their state law right to a jury trial against a solvent non-debtor.

## C.    THE PROPOSED CLASSIFICATION VIOLATES SECTION 1122(A)

441.    The Debtor's proposed classification scheme violates section 1122(a) of the Bankruptcy Code.  Section 1122(a) precludes placing claims together in single class when the legal rights are not substantially similar.  11 U.S.C. § 1122(a).  Here, there is an obvious dissimilarity— holders of Gynecological Claims do not have a legal right to recover from the Debtor or J&J whereas holders of Ovarian Claims do have a legal right to recover from the Debtor or J&J.

442.    Courts have permitted allowable tort claims to be placed into a single class in other cases.  *See*, *e.g.*, *In re G-I Holdings Inc.*, 420 B.R. 216, 258 (D. N.J. 2009); *In re Dow Corning Corp.*, 244 B.R. 634, 647 (Bankr. E.D. Mich. 1999), *aff'd*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002).

443.    Some tort claims had higher values due to the damages suffered by the claimants.  But they were all legally cognizable.  Here, not all holders of talc clams that the Debtor wants to vote on its Plan have legally cognizable claims.  This difference in legal rights mandates separate classification.[103]  It is difficult to postulate a greater difference in legal rights between a claimant who has no legal right to recover and one that does have such legal right.  On this basis alone, the Debtor's classification scheme fails.

444.    At a minimum, Ovarian Claims (*i.e.*, legally cognizable claims that are entitled to an unknown distribution under the Plan) (Class 4A), Gynecological Claims (*i.e.*, legally **non**-cognizable claims that are entitled to a $1,500 distribution under the Plan) (Class 4B), and talc claims involving "other diseases" or "fear of cancer" (*i.e.*, legally **non**-cognizable claims that are **not** entitled to any distribution under the Plan) (Class 4C) should be placed into three separate classes under the Plan.[104]

---

[103]    *See*, *e.g.*, *Matter of Woodbrook Associates*, 19 F.3d 312, 319 (7th Cir. 1994) (disparities between "legal rights" of claims precludes claims from being classified together under section 1122(a)); *In re LOOP 76, LLC*, 465 B.R. 525, 536 (9th Cir. BAP 2012) (to ascertain whether claims are "substantially similar" the court must evaluate the "kind, species, or character of each category of claims"), *judgment aff'd*, 578 Fed. Appx. 644 (9th Cir. 2014); *In re SM 104 Ltd.*, 160 B.R. 202, 219 (Bankr. S.D. Fla. 1993) (difference in "legal rights" of claims means that they "*cannot* be classified together") (emphasis in original).

[104]    Under this classification scheme, Class 4C would be deemed to reject the Plan under section 1126(g), and such claims could not be channeled under section 524(g) under any circumstances.  11 U.S.C. § 1126(g) ("a class is deemed to not have accepted the plan if such plan provides that the claims … of such class do not entitle the holders of such claims … to receive or retain any property under the plan on account of such claims"); 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) (class must accept the plan by "at least 75 percent of those voting").  This follows as a matter of law, logic, and common sense.  A debtor should not be permitted to channel an entire class of claims into a brick wall under section 524(g).  If

116

### D.      THE PROPOSED TREATMENT OF
###          TALC CLAIMS VIOLATES SECTION 1123(A)(4)

445.     The Debtor's proposed classification scheme violates section 1123(a)(4) of the Bankruptcy Code.  Section 1123(a)(4) mandates that each claim in a particular class receive the same treatment.  11 U.S.C. § 1123(a)(4).  This statute serves a key function.

446.     When an impaired class votes to reject a plan, the plan cannot be confirmed unless, among other things, the plan proponent shows that the plan does not "discriminate unfairly" and the plan is "fair and equitable" with respect to such class.  11 U.S.C. § 1129(b)(1).

447.     Members of an impaired rejecting class get the benefit of the protections afforded by section 1129(b).  If a plan proposed to pay 99% of the value of the tort claims in one class, and 5% of the value of the torts claims in another class, the disfavored class could respond by voting to reject the plan by the threshold set forth in section 1126(c).  In this situation, the plan proponent would have to prove that the plan did not "discriminate unfairly"—a challenging task given the different payment percentages—and that the plan was "fair and equitable"—also a challenging task if equity retained value under the plan.  *See* 11 U.S.C. § 1129(b)(1) & (2).

448.     Members of an impaired accepting class, however, generally do not get the benefit of the protections afforded by section 1129(b).[105]  Given this, a plan proponent that wanted to skirt

---

permitted, J&J's classification scheme would essentially provide J&J with a **free** discharge for an entire class—*i.e.*, all claimants in Class 4C would be channeled to a trust, but J&J would not be required to provide any trust funding to pay such claims.

[105]   *See In re Adelphia Commc'ns Corp.*, 544 F.3d 420, 426 (2d. Cir. 2008) ("[A] plan need not satisfy the Absolute Priority Rule so long as any class adversely affected by the variation accepts the plan[.]"); *In re Aegerion Pharm., Inc.*, 605 B.R. 22, 32-33 (Bankr. S.D.N.Y. 2019) ("'Unfair discrimination' and 'fair and equitable' requirements of … section [1129(b)(1)] apply 'with respect to each class of claims or interests that is impaired, and has not accepted, the plan.' … Here, of course, the impaired class in which the former officers and directors have been placed has accepted the plan, so section 1129(b)(1) does not apply."); *In re Wetdog, LLC*, 518 B.R. 126, 139-40 (Bankr. S.D. Ga. 2014) (finding argument that the "absolute priority rule" applied "completely without merit" because the only class of unsecured claims voted to accept the plan making the "fair and equitable requirement of § 1129(b)" inapplicable); *In re W.R. Grace & Co.*, 475 B.R. 34, 174-75 (Bankr. D. Del. 2012) ("It is a well-known legal rule in Chapter 11 reorganization litigation that under § 1129(b), a finding that a plan is 'fair and equitable' is

section 1129(b)—either because the plan proponent wanted to reinstate equity or could not show that the proposed discrimination is fair—could put all tort claims into a single class and create a system under which the favored sub-group was paid 99% of the value of its claims and the disfavored sub-group was paid 5% of the value of its claims.

449.    If the favored sub-group greatly outnumbered the disfavored sub-group and voted to accept the plan—a likely response to the favorable treatment—the plan proponent could then argue that the class "accepted" the plan under section 1126(c) and that the plan proponent did not have to satisfy section 1129(b) as a result.  Section 1123(a)(4) prevents this from happening.  If a plan proponent were to attempt such machinations, the plan would fail under section 1123(a)(4).

450.    As the Circuit Court found in *In re AOV Industries, Inc.*, "the most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members."  792 F.2d 1140, 1152 (D.C. Cir. 1986).  Section 1123(a)(4) prevents a plan from discriminating ***within a class***—*i.e.*, once claims are placed into a class, the plan must provide for the same payment percentage to members of that class.

---

required only in the context of a cramdown."  Therefore, "the absolute priority rule" does not come into play unless "an entire class of impaired creditors had voted against confirmation of the plan."); *In re Ziemann*, No. 11-05-11276, 2008 WL 312474, at *3 (Bankr. D. N.M. Feb. 1, 2008) ("In other words, the absolute priority rule only arises in cramdown situations."); *In re Dow Corning Corp.*, 244 B.R. 678, 693 (Bankr. E.D. Mich. 1999) ("Under § 1129(b), a finding that a plan is 'fair and equitable' is required only in the context of a cramdown"); *In re United Marine, Inc.*, 197 B.R. 942, 948 (Bankr. S.D. Fla. 1996) ("The absolute priority rule is a component of the 'fair and equitable' requirement of § 1129(b), which only comes into play if there is a rejecting class. … A lone dissenter in an accepting class, such as Guardian is here, cannot invoke the absolute priority rule."); *Pennbank v. Winters (In re Winters)*, 99 B.R. 658, 663 (Bankr. W.D. Pa. 1989) (noting that the absolute priority rule is only applicable "when the proponent of the plan seeks to 'cram-down' the plan under the alternative confirmation standard contained in § 1129(b) on a class that is impaired and has rejected the plan."); *In re Greystone III Joint Venture*, 102 B.R. 560, 574 (Bankr. W.D. Tex. 1989), *aff'd*, 127 B.R. 138 (W.D. Tex. 1990), *rev'd on other grounds*, 995 F.2d 1275 (5th Cir. 1991) ("Absolute priority is preserved as a prerequisite to confirmation only in the narrow circumstance of 'cram-down,' or confirmation over the objection of a dissenting class of creditors, and then only from the dissenting class down.") (*citing* 11 U.S.C. § 1129(b)(2)(B) and H.R. Rep. No. 595, 95th Cong, 1st Sess. 413 (1977)).

451.    Discrimination within a class is more offensive than discrimination between classes.  Discrimination between classes is not impermissible *per se*.  *See*, *e.g.*, *In re Rivers End Apartments, Ltd.*, 167 B.R. 470, 487-88 (Bankr. S.D. Ohio 1994).

452.    It is possible for a plan proponent to propose different treatment as between two classes and confirm a plan over the non-acceptance of the disfavored class by showing that the discrimination is fair and that the plan is fair and equitable.  *See*, *e.g.*, *In re U.S. Truck Co.*, 800 F.2d 581, 587 (6th Cir. 1986); *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990).  But proposing different treatment within a class is fatal.

453.    For this reason, the Bankruptcy Code favors debtors that are honest and transparent about their intention to discriminate between different groups of claimants.  Discrimination that is transparent could result in acceptance—*i.e.*, each impaired class could decide to vote in favor of the plan notwithstanding the proposed discrimination if afforded the opportunity to do so—or a Court could nonetheless rule that the proposed discrimination is fair and equitable under the circumstances.  But once discrimination is baked into how a plan treats members of a single class, the Code violation can only be cured by a new vote on a plan that complies with the Code.

454.    This Plan discriminates between members in a single class.  Under the Plan, talc claims are placed into a single class—*i.e.*, Class 4.  However, the treatment afforded to the various sub-groups varies significantly.  Once the TDPs are factored into the equation, it is also obvious that Ovarian Claims and Gynecological Claims are treated differently.  The discrimination is accomplished by assigning point values to Ovarian Claims that are well below the value of such claims in the tort system and then making distribution on account of such "points" that result in inferior and *de minimis* recoveries.

455.     Claimants asserting Ovarian Claims will receive an inferior recovery relative to claimants asserting Gynecological Claims, which mandates separate classification.  *See In re W.R. Grace & Co.*, 729 F.3d 311, 329-30 (3d Cir. 2013) (holding part of the proposed TDPs that discriminated between Canadian and U.S. property damage claims by according the former with an inferior recovery relative to the latter was permissible ***because*** Canadian and U.S. property damage claims were "classified in separate classes" and section 1124(a)(4) only requires that a plan provide for the same treatment for each claim or interest of a particular class.").[106]

456.     Of course, section 1123(a)(4) does not require equality of payment to claimants within a single class.  *See, e.g.*, *W.R. Grace*, 729 F.3d at 327; *In re FINOVA Grp., Inc.*, 304 B.R. 630, 637 (D. Del. 2004) (finding that section 1123(a)(4) does not require parties to receive equal payment under a reorganization plan).  Equality of payment and equality of treatment (which is typically expressed in terms of the payment percentage) are obviously not the same thing.

457.     If the TDPs assigned point values that mirrored tort system values, high value claims would receive higher payments and non-compensable claims would receive no payments at all.  But this is not how J&J's Plan works.  J&J's Plan mandates recoveries that differ materially from amounts that would be paid in the tort system.[107]

458.     Here, J&J's Plan is designed to keep holders of Ovarian Claims from being paid amounts that a jury awards and from being allocated a portion of J&J's limited fund based on such amounts.  J&J effectuates this by using different payment percentages.  The difference in payment

---

[106]   Even the debtors in *W.R. Grace* understood that once they crossed the line of providing one group of claimants with a superior recovery to another group of claimants, separate classification was mandatory, and the conversation shifted to whether both classes voted to accept the plan (notwithstanding the disparate treatment) and/or whether the proposed discrimination was fair.

[107]   *See W.R. Grace*, 729 F.3d at 327 (asbestos claimants would receive the "same treatment" if they were all permitted to present their claims to a jury and were all paid whatever amounts the jury awarded, until funds were no longer available") (following *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 749 (2d Cir. 1992)).

percentage here—5% versus 100%+—is more extreme than recovery percentages found to constitute "unfair discrimination" under section 1129(b).[108]

459.    As the Court explained in *Piedmont Associates*, allowing discrimination of this magnitude would permit a debtor to "[buy] off the small creditors in order to control the small creditor's vote" and impose a plan upon large creditors who have "far more liability at stake."  132 B.R. at 78 fn. 5.  Here, J&J is effectively buying off holders of Gynecological Claims so that it can impose an unfair settlement on holders of Ovarian Claims who have far more liability at stake.

460.    The Debtor cannot circumvent the Code's requirements by placing talc claims in a single class and affording different groups different treatment within such class.  This would obliterate the protections afforded to claimants in sections 1129(a)(4) and 1129(b).  Notwithstanding J&J's efforts to mask it, the Plan effectuates the most conspicuous inequality that section 1123(a)(4) prohibits.

461.    J&J's motives are obvious.  Gynecological Claims—*i.e.*, the preferred subgroup—are great in number.  By providing this sub-group with favorable treatment—*i.e.*, a payment percentage well north of 100%—J&J hopes to obtain the numerical support necessary to satisfy sections 524(g) and 1126(c).  The victims of the intra-class discrimination (*i.e.*, holders of Ovarian

---

[108]    *See Piedmont Assocs. v. Cigna Prop. & Cas. Ins. Co.*, 132 B.R. 75, 22 (N.D. Ga. 1991) (plan unfairly discriminated where class of unsecured creditors would be paid 85-90% of their outstanding claims and other class of unsecured creditors would be paid 5% of their claims); *In re Cranberry Hill Assocs. Ltd. P'ship*, 150 B.R. 289, 290–91 (Bankr. D. Mass. 1993) (plan unfairly discriminated where class of unsecured creditors paid in full [100%] at confirmation while deficiency claim paid in the present value range of 50% since bulk of claim would not be paid for nine years; former payment risk free, latter far from certain); *In re Eisenbarth*, 77 B.R. 228, 235-36 (Bankr. D. N.D. 1987) (plan unfairly discriminated where class of unsecured creditors would be paid in full [100%] and other class of unsecured creditors would be paid 10% of their claims); *see also In re Aztec Co.*, 107 B.R. 585, 19 (Bankr. M.D. Tenn. 1989) (plan unfairly discriminated where class of unsecured creditors would be paid in full [100%] and other class of unsecured creditors would be paid a 3% dividend).

Claims) are less likely to support the Plan since they are the ones receiving the less favorable treatment.

462.     If the Debtor placed these sub-groups in separate classes, the Debtor would be in a bind.  Given the proposed treatment, a separate class comprised of Ovarian Claims would reject the plan or not approve it by the 75% threshold.  While section 1129(b) affords a plan proponent with the ability to cram down on an impaired rejecting class in a non-asbestos case, section 524(g) contains no workaround for the 75% threshold required to confirm a plan that channels asbestos claims and provides protections to certain non-debtors.  *Fed.-Mogul*, 684 F.3d at 361.  The Debtor cannot confirm its desired plan unless all impaired classes whose claims will be addressed by the Trust vote to accept its plan by at least 75% in number.

463.     But J&J has refused to pay more money.  Devising a plan that would provide equal treatment to Ovarian Claims and Gynecological Claims would substantially drop the payments to Gynecological Claims, leaving J&J with little or no claimant support.  J&J's solution is to engineer TDPs that allocate substantial value to Gynecological Claims.  The Debtor is trying to bind holders of Ovarian Claims to inferior recoveries (less than 5%) by providing holders of Gynecological Claims with superior recoveries (100%+).  The Bankruptcy Code does not permit this.

464.     And, of course, J&J will not fund any plan unless and until there is a final, non-appealable order discharging it of its independent talc liability for all time.  If this Court were to confirm the Plan notwithstanding the discrimination taking place within Class 4, and the Fifth Circuit were to reverse, the Plan would be void.  The Debtor would have to resolicit its Plan and either eliminate the discrimination within Class 4 or propose a plan that separately classified talc claims based on the differences in treatment.  All the while, J&J will have enjoyed the benefit of multiple years of delay, which of course is the entire point of J&J's bankruptcy strategy.

## E.   THE PLAN VIOLATES THE ABSOLUTE PRIORITY RULE

465.   Assuming that Ovarian Claims are properly placed in their own class, the Plan cannot satisfy the absolute priority rule set forth in 11 U.S.C. § 1129(b)(2)(B).  Under the Plan, the Reorganized Debtor retains substantial value.  *See* Plan at § 10.1.1.

466.   Specifically, the Reorganized Debtor will retain and enjoy the sole right to enforce, prosecute, and settle the "Retained Rights of Action," which includes the "Recovery Action"— *i.e.*, the avoidance actions—and claims that can be asserted against J&J, the Debtor's officers, and directors for breach of fiduciary duty, and other parties for aiding and abetting fraudulent transfers that preceded the filing of this case.

467.   In most cases, debtors recognize the conflict they face in trying to sue affiliates and insiders.  Creditors' committees regularly receive Court approval to undertake those actions in lieu of the debtor.  But here, the Debtor—beholden to J&J and bound by a Plan that it had zero input in creating—intends to keep those actions and not to subject its decisions to Court scrutiny or approval.  It is not difficult to understand that this Debtor will never pursue claims to recover billions of dollars lost to its creditors through J&J's fraudulent transfers and coercive tactics.

468.   Rather than attempt to settle these causes of action in its bankruptcy case or recognize that a creditors' committee is the appropriate entity to undertake them, the Debtor sidesteps the heightened scrutiny that such a settlement would face[109] and instead is electing to keep these causes of action for itself so it can presumably "settle" them post-confirmation without the need for Court approval.  When an impaired class rejects a plan, the Debtor cannot retain

---

[109]   *See Matter of Foster Mortg. Corp.*, 68 F.3d 914, 919 (5th Cir. 1995) ("[C]ourt's scrutiny must be great when the settlement is between insiders and an overwhelming majority of creditors in interest oppose such settlement of claims."); *Fabricators Inc. v. Tech. Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991) (dealings between a debtor and an insider are to be "rigorously scrutinized by the courts.").

property of any value unless it can demonstrate that the holders of claims in such class will be paid in full.  11 U.S.C. § 1129(b)(2)(B).

### F.   ANY PROPOSED BANKRUPTCY RULE 9019 SETTLEMENT WOULD BE UNFAIR AND INEQUITABLE

469.    J&J cannot remedy the section 1129(b)(2)(B) violation by orchestrating an insider settlement to cover its tracks.  Such a settlement would violate Bankruptcy Rule 9019.

470.    When considering a settlement under Rule 9019, Courts apply various factors to ensure that the settlement is fair, equitable, and in the interest of the estate and creditors.  The Fifth Circuit has applied a three-part test:

> (1)    the probability of success in the litigation, with due consideration for the uncertainty in fact and law,
>
> (2)    the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and
>
> (3)    all other factors bearing on the wisdom of the compromise.

*Matter of Foster Mortg.*, 68 F.3d at 919.  Any settlement that attempted to extinguish the causes of action that arise from the creation of Red River could not pass this test.

471.    ***First***, LLT, prior to being transformed into Red River, was not in financial distress and was not eligible to be in chapter 11.  The transaction that led to the creation of Red River was a blatant and obvious fraudulent transfer.  On facts already of record, the probability of success on the merits is as close to 100% as one could get.

472.    ***Second***, the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay, do not support the settlements.  The face value of the fraudulent transfer claims, the claims for breach of fiduciary duty, and the claims for aiding and abetting fraud are worth at least $20 billion based on the alleged cancellation of the 2023 Funding Agreement.  If the divisional merger itself is avoided, or if the termination of the 2023 Funding Agreement is

undone and the 2021 Funding Agreement is the operative one, Red River would have access to at least $61 billion.  The only challenge presented here is that J&J is a litigation target and J&J controls the Debtor, which J&J will never permit to exercise its avoidance powers in this context. This is no basis to approve an insider settlement in this context.

473.   **_Third_**, other factors bearing on the wisdom of the compromise do not support the proposed settlements.  The other factors to be considered include "the paramount interest of creditors with proper deference to their reasonable views" and "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion."  _Foster Mortg._, 68 F.3d at 917-18.  The settlement here is an insider deal that is anything but the product of arms-length bargaining and that most of the affected Ovarian Claimants oppose.

474.   But the fact which this Court should accord the most weight is what the Debtor truly is.  The Debtor is a shill for J&J, a fabricated entity whose only purpose is to deal with talc claims in a manner seen fit by J&J.  The Debtor has no business to reorganize.  This case is not about saving jobs.  The Debtor is a Potemkin Village controlled by non-debtor parties that are seeking a discharge of their own liability without subjecting themselves to a bankruptcy proceeding.  This is as abusive an effort to pervert the bankruptcy system as one can imagine.

475.   J&J is a company enjoying huge profits for decades, much of which came from selling a product that contained asbestos.  Women and children who used that product without knowing its toxicity are dead.  Faced with litigation for its misconduct, after hiding evidence for decades, J&J now faces litigation in the civil justice system where it is now losing trial after trial. Rather than settle outside of bankruptcy, J&J transferred over $61 billion in assets to a new company called Kenvue and orchestrates multiple bad faith bankruptcy filings.

476.    After getting kicked out of bankruptcy *twice*, J&J cuts a deal with law firms that represent holders of Gynecological Claims hoping to enrich themselves at the expense of women who have Ovarian Cancer and who want to exercise their fundamental legal rights in the civil justice system.   J&J then orchestrated a third bankruptcy case predicated on abuses of the Bankruptcy Code and the Bankruptcy Rules.

477.    And, as a part of that third case, the Debtor now asks the Court to approve insider settlements designed to absolve it of liability for the fraud and abuse of process that it orchestrated. But this Court need not be pulled into J&J's machinations.   The moment the Supporting Law Firms inked their deal with J&J to deprive tort victims of their rights to sue and recover appropriate compensation from J&J, there was no path to confirming a chapter 11 plan.

### G.    THE PLAN VIOLATES THE BEST INTERESTS OF CREDITORS TEST

478.    Since the Plan is proposing to release third parties, the "best interests of creditors test" requires the inclusion of the asset values of such non-debtor third parties.   *See Quigley*, 437 B.R. at 146 ("The confirmation of the … Plan and discharge of Pfizer will affect the dissenting Non-Settling Claimants because they would 'retain' their right to sue Pfizer if Quigley were liquidated under chapter 7.   As the parties recognize, the … question is whether I should consider the value of these … claims in deciding whether the Fourth Plan is in the 'best interest' of the dissenting Non-Settling Claimants.   I conclude that I must.").[110]

---

[110]  *Accord Mercury Cap. Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (D. Conn. 2006) (section 1129(a)(7) inquiry requires bankruptcy court to consider on remand whether creditor would be less secured under plan that provided for releases of non-debtor guarantors than it would in a chapter 7 liquidation where it would continue to receive the benefit of the guarantees); *In re Washington Mut., Inc.*, 442 B.R. 314, 359-60 (Bankr. D. Del. 2011) ("In a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation.").

479.     Here, the confirmation of the Plan and the J&J Discharge will affect dissenting claimants because they would retain their right to sue J&J (and the Protected Parties) if the Debtor were liquidated under chapter 7.  Claimants with compensable claims will recover more if this case is dismissed or converted to chapter 7 because J&J has independent liability and can afford to pay all talc claims in full as they are liquidated.  The plan violates section 1129(a)(7) and cannot be confirmed on this basis alone.

## III.   J&J'S SOLICITATION AND TABULATION PROCEDURES ARE UNLAWFUL

480.     The Debtor's proposed Solicitation and Tabulation Procedures are unlawful and should not be approved by the Court.

### A.   J&J'S SOLICITATION PROCEDURES ARE UNLAWFUL

481.     The Solicitation Procedures used by J&J to solicit votes on the Plan violate the Bankruptcy Rules and should not be approved.

#### 1.   Non-Compensable Claims Should Not be Permitted to Vote

482.     J&J's procedures violate the Bankruptcy Rules because they permit non-compensable claims to vote.  Even though J&J attempts to convince the Court that its prepackaged Plan should be confirmed, there is no equivalent in the solicitation that comports with bankruptcy or applicable non-bankruptcy law.  In bankruptcy, only claimants who have filed a proof of claim or who are scheduled in the debtor's schedules and not required to file a claim are permitted to vote on a plan.  *See* Fed. R. Bankr. P. 3003(c)(2).  Only "allowed claims" count for purposes of determining class acceptance under section 1126(c).  11 U.S.C. § 1126(c).  And only claims that are enforceable "against the debtor" under "applicable law" can be allowed.  11 U.S.C. § 502(b)(1).  The holders of Gynecological Claims can prove no damages related to the use of J&J's talc products and have no right to payment under applicable law.  Thus, they cannot vote.

483.     To comport with the voting requirements of the Bankruptcy Code, the solicitation had to provide an equivalent process to what is required in bankruptcy.  It did not.

484.     Bankruptcy Rule 3003(c)(3) provides:  "The court **shall** fix and for cause shown may extend the time within which proofs of claim or interest may be filed."  Fed. R. Bankr. P. 3003(c)(3) (emphasis added).  Bankruptcy Rule 3003(c)(2) provides:  "Any creditor or equity security holder whose claim or interest is not scheduled or scheduled as disputed, contingent, or unliquidated **shall** file a proof of claim or interest within the time prescribed by subdivision (c)(3) of this rule; any creditor who fails to do so **shall not** be treated as a creditor with respect to such claim for the purposes of **voting** and distribution."  Fed. R. Bankr. P. 3003(c)(2) (emphasis added).

485.     Courts interpreting Bankruptcy Rule 3003(c)(3) have found that the use of the word "shall," as opposed to "may," in reference to the fixing of the time within which proofs of claim may be filed means that establishing a claims bar date is mandatory.  *See In re Energy Future Holdings Corp.*, 522 B.R. 520, 538 (Bankr. D. Del. 2015) (analyzing Bankruptcy Rule 3003 and holding that the establishment of bar date for asbestos claims is not discretionary with the Court but is mandatory given the plain language of Bankruptcy Rule 3003(c)(3)).[111]

486.     A proof of claim serves an important notice function and alerts the Court, other creditors, as well as the debtor, to claims against the estate.[112]  Likewise, it follows that filing a

---

[111] The Court's analysis in *Energy Future Holdings* accords with recent Supreme Court decisions interpreting the Bankruptcy Code.  *See, e.g.*, *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S.Ct. 1752, 1759 (2018) ("Our interpretation of the Bankruptcy Code starts 'where all such inquiries must begin: with the language of the statute itself.'") (quotation omitted); *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) ("Our interpretation of the Bankruptcy Code starts 'where all such inquiries must begin: with the language of the statute itself.'") (quotation omitted).

[112] *In re Baker*, 839 F.3d 1189, 1195 (9th Cir. 2016) ("The proof of claim plays the important role of alert[ing] the court, trustee, and other creditors, as well as the debtor, to claims against the estate,' and the creditor's intention to enforce the claims."); *Matter of Fernstrom Storage and Van Co.*, 938 F.2d 732, 734 (7th Cir. 1991) ("The purpose of the proof of claim is to alert the court, trustee, and other creditors, as well as the debtor, to claims against the estate"); *In re Stern*, 70 B.R. 472, 476 (Bankr.

proof of claim is also mandatory for tort claimants to vote on a plan.  *Compare* Fed. R. Bankr. P. 3003(c)(3) (the Court "shall fix" a deadline for filing proofs of claim) *with* Fed. R. Bankr. P. 3003(c)(2) (any creditor who fails to timely file a proof of claim "shall not be treated as a creditor with respect to such claim for the purposes of voting").

487.    Compliance with the Bankruptcy Rules serves an important function.  **First**, a proof of claim must provide "enough details so as to provide a defendant and the court with *a fair idea of the basis of the complaint and the legal grounds claimed for recovery*."[113]  In this case, each proof of claim should enable the Debtor and other parties in interest to have a clear understanding of the alleged injury—*i.e.*, the alleged disease and whether there is any scientific link between such disease and exposure to J&J's talc products.

488.    **Second**, Official Form 410 requires claimants to sign the proof of claim under penalty of perjury.  A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.  18 U.S.C. §§ 152, 157, and 3571.  Likewise, Official Form 410 requires the person completing the proof of claim to sign and date it in accordance with Bankruptcy Rule 9011(b).  There are consequences for individuals who file fraudulent claims, and there are consequences for law firms that sign proofs of claim without conducting a reasonable inquiry into the allegations and other factual contentions set forth in the proof of claim.

489.    **Third**, and critical here, filing a proof of claim affords other claimants and parties in interest with an opportunity to object.  In most genuine "pre-packs," the plan consummates a deleveraging transaction under which bond debt is converted to equity.  Bond debt is typically not

---

E.D. Pa. 1987) ("The purpose of the filing requirement is to alert the court, the trustee and other creditors, as well as the debtor, to a particular claim.").

[113]  *In re Latin*, No. EC-08-1082, 2009 WL 7751424, at *5 (B.A.P. 9th Cir. Feb. 11, 2009) (quoting *In re Acequia, Inc.*, 34 F.3d 800, 814 (9th Cir. 1994)) (emphasis in original).

scheduled as "disputed, contingent, or unliquidated," which means that the holders of such debt are not required to file a proof of claim under Bankruptcy Rule 3003(c)(2).

490.    But J&J's plan does ***not*** involve an agreement reached with a supermajority of bondholders.  Rather, J&J claims to have reached an agreement with tort claimants whose claims are "disputed, contingent, and unliquidated."  Fed. R. Bankr. P. 3003(c)(2).  Such tort claimants are required to file proofs of claim, subject to the right of other "creditor[s]" and other "part[ies] in interest" to object to such claims.  *See* 11 U.S.C. § 502(a).

491.    Here, J&J seeks to bypass the rules and permit the law firms who have pledged their allegiance to J&J to vote ***non-compensable*** and ***unfiled*** claims.  J&J's procedures are not an acceptable substitute for the normal vetting process.  J&J's procedures boil down to letting any law firm willing to support J&J's scheme to vote tens of thousands of unvetted claims held by individuals whose illness have no scientifically proven connection to talc exposure or who are not even sick (but simply fear that they may get cancer in the future).

492.    Further, there was no mechanism in the Solicitation Procedures for creditors and parties in interest to challenge these improper votes.  Under J&J's scheme, individuals who have not filed a proof of claim under penalty of perjury (or anything remotely equivalent thereto) can vote ***without*** their claims being subject to objection on the grounds that their claims are "unenforceable" against the Debtor under "applicable law."  11 U.S.C. § 502(b).

493.    But the word "shall" in Bankruptcy Rule 3003(c) is not ambiguous and connotes a requirement.[114]  Compliance with this requirement is critical here.  Absent compliance, holders of

---

[114]   *See Kingdomware Techs. Inc. v. U.S.*, 579 U.S. 162, 171 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); *Alabama v. Bozeman*, 533 U.S. 146, 153 (2001) ("The word 'shall' is ordinarily 'the language of command.") (quotation omitted); *Texas v. United States*, 40 F.4th 205, 225 (5th Cir. 2022) ("'shall' typically represents mandatory language"); *accord In re FTX Trading Ltd.*, 91 F.4th 148, 153 (3d Cir. 2024) ("The meaning of the word 'shall' is

compensable claims will be denied the opportunity to object to non-compensable claims and seek to have such claims disallowed for voting purposes. *See* 11 U.S.C. § 502(a).

494.    The fact that J&J would propose the Solicitation Procedures it did in a case that it knew would face substantial scrutiny reflects J&J's intention to stuff the ballot box with claims that the Bankruptcy Code and the Bankruptcy Rules accord zero weight, and then sit back and obtain as much delay as possible while parties dispute the very essence of the Disclosure Statement, the Plan, and the talc claims that J&J is attempting to trap in bankruptcy.

## 2.    Settled Claims Should Not be Permitted to Vote

495.    Claims that have already been settled under a Master Settlement Agreement (and are guaranteed payment by J&J even if the Plan is not confirmed) should not be permitted to vote. In weighing claims for voting purposes, a Court must account for each claimant's true economic stake in the estate. *See Quigley*, 437 B.R. at 119.

496.    For example, in *Quigley*, the debtor's parent (Pfizer) entered into prepetition settlement agreements with law firms purporting to represent 175,000 clients with asbestos claims against Pfizer and its subsidiary (Quigley). *Id*. at 115.  Under these settlement agreements, Pfizer agreed to pay a settlement amount.  *Id*. at 116.  So that claimants who settled could nonetheless vote on Quigley's plan, the agreements afforded the settling parties with a "stub claim" against Quigley.  *Id*. at 118.  But 90% of this "stub claim" was subordinated—settling claimants would only receive 10% of the payment otherwise due from the proposed section 524(g) trust.  *Id.*

497.    To account for the settling claimants' true economic stake in the proposed trust (which was proposed to assume the estate's liability for the asbestos claims), the Court "concluded that the votes of the [s]ettling [c]laimants should to be valued at 10% of the TDP scheduled values."

---

not ambiguous.  It is a 'word of command.'"); *In re Denby-Peterson*, 941 F.3d 115, 130-31 (3d Cir. 2019) ("the word 'shall' strongly suggests that turnover is mandatory").

*Id*. at 119.  The Court refused to ignore the fact that the settling claimants' true source of payment was Pfizer and not the proposed plan trust.  *See id.*

498.     Applying the same rationale here, any claim that has already been "settled" and is now effectively guaranteed payment under a Master Settlement Agreement should be disallowed or valued at zero dollars for voting purposes.  If the Plan is not confirmed and this case is dismissed, the law firms who have already "settled" their clients' claims (and will cause their clients to vote in favor of the Plan) will still be paid.  Disclosure Statement at § 4.2(f)(2)(i).  Thus, those claimants have no economic stake in this bankruptcy.

499.     The settling law firms know that J&J's scheme is unlikely to work.  Based on that knowledge, they eliminated the risk—*i.e.*, they are 0% dependent upon J&J's section 524(g) trust for payment.  It follows that their votes must be valued at 0% for voting purposes.  Otherwise, claimants who have settled with J&J—and have zero financial stake in the outcome of this case— could "vote" and those "votes" could then be used by J&J to strip women who refuse to settle at a price acceptable to J&J of their legal, equitable, and Constitutional rights.

### 3.     Claimants Must Receive Adequate Information Prior to Voting

500.     J&J's Solicitation Procedures also make a mockery of the requirement that a Disclosure Statement contain adequate information.  J&J's Solicitation Procedures are designed so that the Supporting Law Firms can cast their clients' votes without the clients ever being apprised of how the confirmation of J&J's Plan will impact their rights.

501.     A Supporting Law Firm, for example, could send clients a text message with a link to J&J's website and advise the client that unless she directs otherwise, the law firm will include her on its list of clients voting to accept the Plan.  There would be no indication that the claimant understood at any level what she was supporting.

### B.     J&J'S TABULATION PROCEDURES ARE UNLAWFUL

502.    The Debtor's proposed Tabulation Procedures by which all talc claims are estimated at $1.00 for voting purposes—*i.e.*, $1.00 equals one vote for all talc claims—is not permissible in this case.  The vote required for acceptance by Class 4 is two-thirds in amount and 75% in number of Talc Personal Injury Claims.  The Debtor proposes a fiction of "one dollar equals one vote" to effectively excise the 2/3-in-amount acceptance requirement.

#### 1.     One Dollar Equals One Vote Violates
#### Section 1126(c)'s Two-Third in Amount Test

503.    Section 1126(c) sets forth the requirements for acceptance of the Plan by a class of claims.  A class has accepted the Plan only if (a) at least two thirds in amount and (b) more than one half in number of the creditors that voted accepted the Plan.  *See* 11 U.S.C. § 1126(c).  The Debtor's proposal rewrites the Bankruptcy Code by removing the two thirds in amount requirement, converting section 1126(c) to a one-half in number test.

504.    Nothing in the applicable Bankruptcy Code provisions, Bankruptcy Rules, or case law permits the Debtor to arbitrarily set ***valid*** and ***invalid*** claims at $1.00 for voting purposes over the objection of affected creditors and an official committee.  The cases that the Debtor could point to on this issue have little in common with these chapter 11 cases.[115]

505.    None of these cases hold that the Debtor's procedure is consistent with section 1126 of the Bankruptcy Code.  In *PG&E*, the Court expressly allowed the claims of two tort claimants

---

[115]  *See, e.g.*, *In re Johns-Manville Corp.*, 843 F.2d 636, 646-48 (2d Cir. 1987); *In re Boy Scouts of Am.* [Dkt. No. 6438]; *In re Mallinckrodt PLC*, No. 20-12522 (JTD) (Bankr. D. Del. June 17, 2021) [Dkt. No. 2911]; *In re Imerys Talc Am., Inc.* [Dkt. No. 2863]; *In re United Gilsonite Labs*, No. 11-02032 (RNO), (Bankr. M.D. Pa. Sept. 30, 2014) [Dkt. No. 2014]; *In re PG&E Corp.*, No. 19-30088 (DM) (Bankr. Mar. 17, 2020) [Dkt. No. 6340]; *In re TK Holdings Inc*., No. 17-11375 (BLS) (Bankr. D. Del. Jan. 5, 2018) [Dkt. No. 1639]; *In re USA Gymnastics*, No. 18- 09108 (RLM) (Bankr. S.D. Ind. Oct. 26, 2021) [Dkt. No. 1659]; *In re the Budd Co.*, No. 14-11873 (JBS) (Bankr. N.D. Ill. May 6, 2016) [Dkt. No. 1811].

that objected to the solicitation procedures—Adventist Health System and AT&T Corporation—in substantially higher amounts to account for substantive differences in the asserted amounts of their claims and the claims held by other tort claimants.  *PG&E*, Dkt. 6340 at ¶ 6.k.  The *PG&E* Court did not allow all tort claims in the amount of $1.00 for voting purposes.

506.    The Courts in *Johns-Manville* and *A.H. Robins* declined to address the section 1126(c) issue, finding that, given the acceptance of the plan by the affected creditors, the temporary-allowance procedure was "harmless error."[116]   Other decisions—where Courts have grappled with this issue—recognize that the Debtor's proposed procedures are improper.

507.    In *In re Quigley*, 346 B.R. 647 (Bankr. S.D.N.Y. 2006), the Court explored the potential injustice of estimating different claims at the same low value for voting purposes.  The *Quigley* debtor and its parent company entered into a number of prepetition settlements with asbestos-exposure claimants, which information was used to assign amounts to claims based on the particular type of asbestos-related illnesses—which they called "impairments."  The debtor proposed to calculate plan acceptances by estimating and temporarily allowing each asbestos-exposure claim at $1.00.

508.    However, certain asbestos exposure claimants and the tort claimants' committee objected, arguing that the debtor should use a methodology based on the relative values of a creditors' asbestos-related impairment.  While the plan was accepted by 85% of the claimants, the ballots still allowed creditors to identify their applicable impairments.  The debtor then used this

---

[116]   *See In re A.H. Robins Co.*, 880 F.2d 694, 698 (4th Cir. 1989) ("We do not decide whether the district court's voting procedure violated § 1126(c) because, in view of the outcome of the vote, the challenged procedure was at most harmless error."); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 647 (2d Cir. 1988) ("We need not decide whether the special Class-4 voting procedures violate the Code because, in view of the outcome of the vote, the alleged irregularities were at most harmless error.").

mechanism to demonstrate that using either a claim amount or an impairment-based methodology would not change the outcome of the vote.

509.     The *Quigley* Court observed that the use of the debtor's "$1.00 per vote" procedure would be at most "harmless error."  Nevertheless, the court still agreed with the objectors and declined to estimate the claims at $1.00, ***instead weighing the votes in accordance with the values assigned to the particular impairment under the plan***.  *Quigley*, 346 B.R. at 649.

510.     The Court found that estimation for voting purposes should ensure that voting power is commensurate with a claimant's economic interests in the case and that, in Quigley's case, the impairment-based method prevents smaller claims from disenfranchising those with greater impairments.  *Id.* at 654.

511.     According to the *Quigley* Court, "[i]t appears, then, that the $1.00 per vote method can be used when support is overwhelming and a different voting method will not change the result.  Where the harmless error rule cannot be applied, another approach may be necessary.  The alternative is to weigh each vote based on the nature and impairment of each claimant's injury.  ***This method more accurately aligns the voting strength with the ultimate claim value and prevents the holders of relatively small claims from disenfranchising the more severely impaired who hold larger claims***. . . . In addition, this approach fulfills the expectations of the claimants since their votes are presumably cast, in part, based upon the amount the creditors expect to receive from the Trust."  *Id.* at 654-55 (internal citations omitted) (emphasis added).

512.     The court in *Lloyd E. Mitchell*, a mass-tort case with approximately 19,000 creditors holding asbestos-exposure claims, came to the same result.  373 B.R. 416, 428 (Bankr. D. Md. 2007).  In *Mitchell*, the debtor and creditors' committee proposed to estimate and temporarily allow asbestos-exposure claims at $1.00 for voting purposes.

513.     The court observed that "[s]eriously-injured claimants [may] object [to the estimation of their claims at $1.00] because their claims are to be allowed for voting purposes in the same amount as claimants whose injuries have not yet manifested.  ***In these types of plans, the "one dollar/one vote" procedures are questionable.***" 373 B.R. at 427 (emphasis added).

514.     The *Mitchell* court generally agreed with *Quigley's* "wait-and-see" approach.  The proposed ballot included information that would allow the parties to revisit the issue after voting closed if the competing methodologies produced different results.[117]

515.     Here, the Debtor's procedures are not harmless.  The Debtor is attempting to confirm a plan that strips holders of Ovarian Claims of their legal rights using the votes of holders of non-compensable claims.  A one dollar per vote scheme under these circumstances would obliterate section 1126(c)'s requirement that at least two-thirds in amount vote to accept the plan for the class to constitute an accepting class.

516.     The Debtor cannot presume that the Plan will be accepted by an overwhelming percentage of holders of Ovarian Claims.  J&J achieved settlements with law firms that represent a large number of Gynecological Claims.  But this simply shows the extent to which J&J and the Debtor are willing to go to override the Bankruptcy Code's voting requirements.  Nothing in the case law permits the Debtor to write out of the Code the voting thresholds and other requirements for the Plan's acceptance and confirmation.[118]

---

[117]  *See id.* at 428 ("If, however, a situation were to arise in which the actual vote of the Class 3 claimants could be subject to mathematical challenge, the Joint Proponents have a contingency plan.  There is language at page 7 of each master ballot providing that each master ballot shall include an attachment with a designation of disease category for each holder of an Unliquidated Asbestos Claim.  Using this information, if the Court later determines that it is necessary, a calculation pursuant to § 1126(c) of the Bankruptcy Code could be performed.").

[118]  *See* 11 U.S.C. § 1126(c) (providing for acceptance of a plan by a class of creditors if more than half in number and two-thirds in amount of voting creditors accept the plan); *id.* at § 1129(a)(8) (requiring that each class of impaired claims has accepted the plan); *id.* at § 1129(b) (permitting "cram down" where, among other things, at least one impaired class has voted to accept the plan).

517.     While there is precedent for allowing the "one dollar per vote" procedure under different circumstances, the Debtor has presented no support for the procedure where claimants object, the proposed procedure would effectively disenfranchise holders of compensable claims, and an alternative methodology could easily be developed that accords proper weight to claims based on tort system values.  Given J&J's attempt to manipulate the vote and discriminate against holders of compensable claims, this Court must conduct an estimation proceeding under section 502(c) before the Debtor can be allowed to solicit votes on its Plan.

**2.     One Dollar Equals One Vote Violates the Numerosity Requirements of Sections 524(g) and 1126(c) of the Code**

518.     J&J's attempt to orchestrate a sham vote cannot be squared with section 524(g) or section 1126(c) of the Bankruptcy Code.  Section 1126(c) provides that at least 50 percent of the number of "allowed claims" of a class must vote to accept the plan for the class to be an accepting class.  Section 524(g) increases this threshold to 75 percent by providing that at least 75 percent of the "class or classes of the claimants whose claims are to be addressed by the trust" must vote "in favor of the plan" for the plan to include a section 524(g) injunction.  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).  The Debtor's proposal rewrites these provisions by permitting the Debtor to satisfy them using invalid or non-compensable claims to reach the 50%/75% threshold.

519.     Section 1126(c) refers to the "number of allowed claims."  11 U.S.C. § 1126(c).  For a claim to be "deemed allowed," a proof of claim must be "filed under section 501" and not subject to objection.  11 U.S.C. § 502(a).  Here, the Debtor disputes the talc claims and no proofs of claim have been filed.  No bar date has been set.  There are no talc claims that are "allowed claims" at this point in the Debtor's case.

520.     Section 524(g) refers to a "class or classes of the claimants."  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).  Section 1126(c) refers to claims "held by creditors."  11 U.S.C.

§ 1126(c). A creditor is the holder of a "claim." The holders of Gynecological Claims are not creditors since, if their "claims" were reflected in a filed proof of claim and subject to an objection, they would be disallowed for all purposes, including for purposes of voting and distribution.

521. Simply put, these claims do not count under sections 1126(c) or 524(g). The Debtor cannot satisfy sections 1126(c) or 524(g) by pretending that Gynecological Claims are valid, agreeing to pay anyone that claims to hold such a claim $1,500, and then according all claims, including the valid, compensable Ovarian Claims, one dollar for voting purposes to satisfy the 50%/75% voting requirement.

522. In *Combustion Engineering, Inc.*, 391 F.3d 190, 239 (3d Cir. 2004), the Third Circuit remanded for further record development where a two-trust structure could have potentially favored claimants to one trust over claimants to the other. The record before the Third Circuit raised concerns about certain pre-petition settlements that led to the creation of a $400 million trust for the payment of claims. *Id.* at 240–42.

523. Creditors who drew on the trust retained a "stub claim" that allowed them to vote on the plan, which included a section 524(g) injunction. *Id.* at 201. The Circuit found that the creation of stub claims may have the result of artificially gerrymandering classes called upon to vote on a plan, adding claimants to the class who have already received more than they would have under the plan and thus have little incentive to scrutinize it before voting. *Id.* at 243–44.

524. Likewise, the holders of Gynecological Claims have little incentive to scrutinize the Plan before voting other than to confirm that they will get $1,500 on account of a claim that has no value outside of this case. To call this "gerrymandering" would be overly generous. Gerrymandering involves the manipulation of boundaries or grouping of real voters to favor one party or class. Here, J&J has resorted to creating voters and then grouping them together with

holders of compensable Ovarian Claims.  Sections 1126(c) and 524(g) does not permit a plan to include an injunction based on what any objective observer would consider to be a sham vote.

3.    <b><u>This Court Must Estimate Talc Claims for Voting Purposes</u></b>

525.    This Court cannot presume that every talc claim has the same value, which is what the $1.00 per vote imposes.  Talc claims are not a uniform group as there are variations of ovarian cancers that distinguish categories of disease.  The appropriate course of action here is not to accord all talc claims at a value of $1.00 for voting purposes, as the Debtor proposes, but to estimate the categories of talc claims under section 502(c) for voting purposes consistent with their values in the tort system.

526.    Section 502(c) is the appropriate vehicle to address voting issues in connection with plan classification and voting.[119]  In *Bittner*, the Court estimated a stockholder's claims at zero for voting purposes based on the stockholder's "chances of ultimately succeeding in the state court action" due to the uncertainties surrounding the claim and "probability of success" on the merits. 691 F.2d at 137.  The Third Circuit found that this was necessary to ensure that stockholders did

---

[119]  11 U.S.C. § 502(c) ("There shall be estimated for purpose of allowance under this section – (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . .."); *see Bittner v. Borne Chem. Co.*, 691 F.2d 134, 137 & fn. 9 (3d Cir. 1982) (affirming court's estimation of stockholders' claims for "voting" purposes "at zero, and temporarily disallowing them until final resolution of the state action"); *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996) (holding "[t]he estimation of [former chief executive officer's] claim for voting purposes does not entail consideration on the merits of all the issues in dispute respecting that claim. … This being but an estimation hearing, my findings of fact will not have any preclusive effect upon the ultimate disposition of [former chief executive officer's] claim); *In re Farley, Inc.*, 146 B.R. 748, 756 (Bankr. N.D. Ill. 1992) (estimating personal injury claims "for the purpose of voting and determining plan feasibility" and finding that "final determination sought by debtor" was not" within the purview of [28 U.S.C.] § 157(b)(2)(B)"); *In re Federal Press Co.*, 116 B.R. 650, 653 (Bankr. N.D. Ind. 1989) (estimating personal injury tort claims "for purposes of voting on the debtor's plan of reorganization, and not for the purpose of determining the debtor's ultimate liability for the claim or the amount of the claim for purposes of distribution."); *In re Continental Airlines Corp.*, 60 B.R. 903, 906 (Bankr. S.D. Tex. 1986) (estimating claim "at zero for voting purposes" pending liquidation "through subsequent proceedings, independent of [the] reorganization [proceeding].").

not wield undue influence and exercise a "controlling[] voice in the reorganization proceeding." *Id.* The temporary disallowance of the claim for voting purposes was not a "final adjudication of the state court action." *Id.* But it was necessary for the Court to avoid undue delay in the reorganization and was consistent with "the Chapter 11 concerns of speed and simplicity." *Id.*

527.    Here, as in *Bittner*, it would be inappropriate to permit holders of Gynecological Claims to wield undue influence over this case. There are obvious fault lines along which the Court can determine the proper "weight" to be given to categories of talc claims.

528.    *First*, there are talc claims supported by expert reports that survived *Daubert* challenges in the tort system, where Courts have found sufficient scientific evidence to support such claims on a general causative basis between the illness and talc exposure to proceed to a jury. *Second*, there are talc claims that have resulted in jury awards and findings of liability against J&J. *Third*, there are talc claims that J&J elected to settle in the tort system.

529.    Applying these three factors, Ovarian Claims should be entitled to vote on J&J's Plan. Conversely, Gynecological Claims and claims involving other diseases should be disallowed for voting purposes. This Court could make a threshold finding that such claims are not sustainable as a matter of law and disallow such claims for voting purposes. *See In re G-I Holdings, Inc.*, 323 B.R. 583 (Bankr. D.N.J. 2005) (considering the limits of estimation on the disallowance of claims).

530.    Accordingly, and for the reasons set forth in the *Motion of the Coalition of Counsel for Justice for Talc Claimants for Entry of an Order (I) Authorizing an Estimation of Current Talc Claims for Voting Purposes, and (II) Establishing Procedures and Schedule for Estimation Proceedings* (Dkt. No. 267), the Court must estimate the talc claims for voting purposes before it should consider whether to approve the Disclosure Statement and Solicitation and Tabulation Procedures.

## IV.   **J&J CANNOT SHOW COMPLIANCE WITH BANKRUPTCY RULE 3018(B)**

531.   Neither J&J nor the Debtor can show compliance with Bankruptcy Rule 3018(b). Sometimes, the term "pre-pack" is used loosely to describe pre-filing negotiations with creditors. This can result in "restructuring support agreements," where claimants agree to support a plan so long as it contains certain terms.  In this context, the debtor does ***not*** solicit votes until after it files for bankruptcy and its disclosure statement is approved.  That is not this case.

532.   The term "pre-pack," in the bankruptcy sense, refers to the pre-filing solicitation of votes.  The Bankruptcy Rules speak to this issue.  Bankruptcy Rule 3018(b) provides:

> A holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Code shall not be deemed to have accepted or rejected the plan if the court finds after notice and hearing that the plan was not transmitted to ***substantially all creditors*** and equity security holders of the same class, that an ***unreasonably short time*** was prescribed for such creditors and equity security holders to accept or reject the plan, or that the ***solicitation was not in compliance with § 1126(b) of the Code***.

Fed. R. Bank. P. 3018(b) (emphasis added).

533.   Thus, the plan proponent must prove that (1) the plan was "transmitted" to "substantially all creditors" in each impaired class entitled to vote, (2) the voting period was not an "unreasonably short time" under the circumstances, and (3) the solicitation materials contained "adequate information."  Neither the Debtor (which had nothing to do with the solicitation as it did not exist at the time) nor J&J can show any of these things.

534.   ***First***, the Plan was not "transmitted to substantially all creditors" whose rights are impaired by the Plan.  *Id.*  Bankruptcy Rule 3018(b) requires transmittal.[120]  Transmittal requires

---

[120]   *Compare* Fed. R. Bankr. P. 3018(b) ("plan" must be "transmitted" to "all creditors" entitled to vote); *with* Fed. R. Bankr. P. 3017(d) (debtor "shall mail to all creditors" a copy of the disclosure statement and "shall transmit" a copy to the United States trustee); Fed. R. Bankr. P. 3017(e) (court must consider procedures for "transmitting" the disclosure statement to "holders of stock, bonds, debentures, notes, and other securities").

mail or delivery, including delivery by courier.[121]  A debtor does not "transmit" a plan by running

advertisements at 2:00AM or by providing notice by publication.

535.    In most pre-packs, the plan provides for the reinstatement of trade and employee

claims so that they are unimpaired.[122]  This solves the transmittal issue.  The debtor does not have

to transmit the plan to these claimants since unimpaired classes of claims are not entitled to vote.[123]

And in most prepacks, the plan is solicited by the debtor that then files for bankruptcy.

536.    Here, J&J's Plan definitions bring within the scope of impaired, channeled claims

a claim asserted by anyone who ever used J&J's talc products and is afraid that he or she may

---

[121]  *See* Fed. R. Bankr. P. 5005 Advisory Cm. Note Subdivision (b)(1) ("Transmittal of papers to the United States trustee may be accomplished by **mail** or **delivery**, including **delivery by courier**, and the technical requirements for service of process are not applicable.") (emphasis added); 4 FED. PROC. FORMS § 9.188 (2024) ("The complaints, motions, applications, objections, and other papers required to be transmitted to the United States trustee by the Federal Rules of Bankruptcy Procedure **must be mailed** or **delivered** to an office of the United States trustee, or to another place designed by the United States trustee, in the district where the case is pending") (emphasis added)*; see also In re 216 W. 18 Owner LLC*, No. 11-15110 (SMB), 2012 WL 2871838, at *1 (Bankr. S.D.N.Y. July 10, 2012) (approving prepack solicitation under Rule 3018(b) where transmittal was made via overnight mail); *In re Eastgate Tower Hotel Assocs., L.P.*, No. 12-13539 (SCC), 2012 WL 5128145, at *1 (Bankr. S.D.N.Y. Aug. 20, 2012) (approving prepack solicitation under Rule 3018(b) where transmittal was made via overnight mail and with additional email copy); *In re Xerium Techs., Inc.*, No. 10-11031 (KJC), 2010 WL 3313079, at *3 (Bankr. D. Del. May 12, 2010) (approving prepack solicitation under Rule 3018(b) where transmittal was made via hand delivery and/or Fedex priority mail); *In re Merchants Mortg. & Tr. Corp., LLC*, No. 11-39455-MER, 2010 WL 11819478, at *3 (Bankr. D. Colo. Oct. 22, 2010) (approving prepack solicitation under Rule 3018(b) where transmittal was made by first class mail); *In re Reddy Ice Holdings, Inc.*, No. 12-32349, 2012 WL 2166170, at *2–3 (Bankr. N.D. Tex. Mar. 8, 2012) (approving prepack solicitation under Rule 3018(b) where transmittal was made by overnight courier or hand delivery and electronic mail to all banks, brokers, and other nominees who then distributed it to the beneficial owners).

[122]  Andrew M. Troop *et al.*, *The Mechanics of Prepacks:  What Happens Pre-Petition, and How to Make It Stick Post-Petition*, 071714-ABL-CLE 123, ABI Northeast Bankruptcy Conference (July 17-20, 2014) ("[P]repacks generally involve plans where the company's trade, employee and other creditors are left 'unimpaired'—either because that debt is all isolated in an operating subsidiary, or because the company's operations themselves do not require restructuring.  Since there creditors are left unimpaired, their votes need not be solicited for approval of the plan.  They are deemed to accept the plan.").

[123]  *See* 11 U.S.C. § 1126(f) ("a class that is not impaired under a plan" is "conclusively presumed to have accepted the plan"); 11 U.S.C. § 1124(1) (a "class of claims" is unimpaired if the plan does not alter the "legal, equitable, and contractual rights" of the claimants).

develop cancer at some point in the future. And they include every woman with a gynecological cancer who ever used J&J's talc products. J&J did not mail or deliver—and practically speaking could not have mailed or delivered—a copy of its Plan to substantially all claimants entitled to vote. Further, to the extent that the Plan was transmitted to certain parties, those parties could not have been "creditors" of Red River. Red River did not exist when J&J solicited the votes.

537.   **Second**, the period J&J prescribed for talc claimants to vote (approximately two months or sixty days) was too short under the circumstances. In most mass tort cases, Courts typically provide tort claimants with at least eighty to one hundred- and seventy-days' notice.[124] Given the large number of women whose rights would be taken from them if J&J's Plan is confirmed, the period for soliciting votes should be no less than one hundred and fifty (150) days.

538.   **Third**, as explained above, J&J solicited votes using false and misleading information, which violates section 1126(b) of the Bankruptcy Code. The requirement that claimants receive adequate information cannot be circumvented by soliciting votes prior to the petition date. Rather, the party soliciting the votes proceeds at its own peril and must resolicit votes if any aspect of its solicitation materials is found to be deficient.

539.   The Debtor and J&J likely understand that they cannot show compliance with Bankruptcy Rule 3018(b). But this accords with J&J's strategy.

540.   The objective of the "vote" is to firmly anchor Red River in bankruptcy and enjoin litigation against J&J. J&J wants to be able to argue that it orchestrated the filing because "the

---

[124] *See*, *e.g.*, *Boy Scouts*, No. 20-10358 (LSS) (Bankr. D. Del.) (174 days after notice for abuse and general claims); *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del.) (137 days after notice for asbestos claims); *In re Commonwealth of Puerto Rico*, No. 17-03283 (Bankr. D. Puerto Rico) (123 days after notice, which was extended from original deadline of 92 days for general claims); *PG&E Corp.*, No. 19-30088 (Bankr. N.D. Cal.) (176 days after notice (extended for fire victim claims)); *In re Purdue Pharma*, No. 19-23649 (148 days after notice and extended an additional 30 days); *In re TK Holdings, Inc.*, No. 17-11375 (Bankr. D. Del.) (82 days after notice, inclusive of a supplemental extension, for personal injury, wrongful death, or property damage that resulted from defective airbag inflator).

claimants demanded it!"  Claimants, of course, demanded no such thing.  The purpose for this untoward assertion by J&J is to use the "votes" as cover for the goals of J&J has expressed in two prior bankruptcies as well as this one.  Whether those "votes" can be counted under Bankruptcy Rule 3018(b) is immaterial to J&J's goal.  The "win" J&J seeks here (if confirmation is not attained in its desired rush) is delay, delay, and more delay.

## V.     J&J'S NOTICE PROGRAM WAS INSUFFICIENT

541.    J&J's notice program was insufficient.  To determine the adequacy of notice to a creditor, the case law distinguishes between "known" and "unknown" creditors.[125]

542.    Generally, a known creditor is a creditor whose identity is either known or is "reasonably ascertainable by the debtor."[126]  Customers with whom a debtor has a "direct relationship" are generally considered known creditors.[127]  For unknown creditors, constructive notice by publication typically satisfies the requirements of due process.[128]

543.    When actual or constructive notice is required, a "process which is a mere gesture is not due process."  *Mullane*, 339 U.S. at 315.  "[N]otice must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974).

---

[125]  *See In re Maya Const. Co.*, 78 F.3d 1395, 1399 (9th Cir. 1996) (due process requires formal notice to known contingent creditors); *In re Reg'l Care Servs. Corp.*, No. 16-1213, 2017 WL 2871751, at *6 (B.A.P. 9th Cir. July 5, 2017) ("It is a fundamental principle of due process that known creditors of a debtor are entitled to actual service of a claims bar date before their claims can be extinguished") (citation omitted).

[126]  *See Tulsa Prof'l Collection Serv., Inc. v. Pope*, 485 U.S. 478, 490 (1988).

[127]  *See PacifiCorp & Van Cott Bagley Cornwall & McCarthy v. W.R. Grace*, No. 05-764, 2006 WL 2375371, at *4 (D. Del. Aug. 16, 2006).

[128]  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 317 (1950) (publication is acceptable where it is not "reasonably possible or practicable to give more adequate warning," whereas when names and addresses are available, notice must be mailed); *Chemetron Corp. v. Jones*, 72 F.3d 341, 348–49 (3d Cir. 1995) ("Publication in national newspapers is regularly deemed sufficient notice to unknown creditors, especially where supplemented, as here, with notice in papers of general circulation in locations where the debtor is conducting business.").

The level of notice due to a party is "highly dependent on the context;" thus, a "process that may be constitutionally sufficient in one setting may be insufficient in another." *In re Mansaray-Ruffin*, 530 F.3d 239 (3d Cir. 2008).

### A.      J&J MUST PROVIDE ACTUAL NOTICE TO KNOWN CLAIMANTS

544.      J&J cannot rely exclusively on a media campaign.  The Third Circuit's decision in *Chemetron Corp. v. Jones*, 72 F.3d 341 (3d Cir. 1995) and the Second Circuit's decision in *In re Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016), show that J&J must also provide actual notice to claimants who are identifiable through a diligent search.

545.      *Chemetron* involved personal injury claims arising from exposure to toxic chemicals.  72 F.3d 341.  The claimants—individuals who visited or occupied houses near the debtor's nuclear waste dump—relocated from the region years before the bankruptcy.  The "vast majority of the claimants" were "not property owners, but guests" who visited houses near the waste dump.  *Id.* at 348.  The claimants sued the reorganized debtor nearly four years after the bar date and argued that the bankruptcy discharge did not apply because they were "known claimants" who did not receive actual notice of the claims bar date.  *Id.* at 345.

546.      In rejecting this argument, the Third Circuit's decision turned on whether the claimants were "known" creditors—*i.e.*, "claimants who are identifiable through a diligent search."  *Id.* at 347  The Third Circuit rejected the position that the "reasonably ascertainable standard requires *only* an examination of the debtors' books and records, without an analysis of the specific facts of each case."  *Id.* at 347 n.2 (emphasis in original).  Examining the totality of the facts before it, the Third Circuit determined that the claimants were not reasonably ascertainable because:  (a) the "geographic area" affected was "unclear"; and (b) all potentially relevant title searches still would not have revealed the identity of claimants, many of whom "merely visited houses in the vicinity of the sites at some point in the distant past."  *Id.* at 347-48.

547.     *Motors Liquidation* involved personal injury and product liability claims arising GM's use of defective ignition switches.  829 F.3d 135 (2d Cir. 2016).  The claimants sought to hold "New GM"—the purchaser of GM's assets—liable for the ignition switch claims.  *Id.* at 143. New GM argued that the claims were barred by the "free and clear" language in the sale order.  *Id.*

548.     In rejecting this argument, the Second Circuit found that the debtor's knowledge of the ignition defect in its cars necessarily meant that it knew "the identify of a significant number of affected owners."  *Id.* at 159.  This meant that the ignition claimants were known creditors entitled to actual notice, not mere publication notice.  *Id.*  The Second Circuit likened the adoption of New GM's position to "reward[ing] debtors who conceal claims against potential creditors." *Id.* at 160.

549.     Under *Chemetron* and *Motors Liquidation*, J&J must perform a diligent search that takes the fact before the Court into account and provide actual notice to individuals who are identifiable as a result of that search.  Context, or the unique facts of this case, is critical.

550.     The parties who would be discharged of talc liability under the Plan go beyond J&J. Under *Eisen*, all "interested parties" whose rights would be impacted if the Plan is confirmed must be taken into account.  417 U.S. at 174.  Simply put, notice must mirror the relief sought and the rights that would be impacted.  The specific facts of this case require an analysis of the claimants who are identifiable through a diligent search by each of the Protected Parties.  Under *Chemetron*, this diligent search must go beyond a simple examination of J&J's books and records.

551.     But J&J has not made any disclosures regarding the identity of talc claimants that are known to the Protected Parties.  The term "Protected Parties" is defined to include, among others, all the J&J Corporate Parties and all retailers that sold J&J's talc products.

552.    If these parties can identify a significant number of claimants who purchased J&J's talc products, such claimants are "known claimants" under *Chemetron*.  The Motion contains no information as to what steps J&J has taken to obtain customer lists or other identifying information from the Protected Parties.  J&J cannot complain that it would be burdensome for it to obtain such lists or other identifying information from the Protected Parties and use such lists to provide actual notice to individuals who purchased J&J's toxic products when the Plan tries to absolve the Protected Parties from their liability to talc claimants.

553.    *First*, the Debtor cannot credibly complain about the number of Protected Parties and, therefore, the scope of the inquiry.  The Debtor, as the plan proponent, could limit who qualifies as a Protected Party based on such party's willingness to provide the Debtor or J&J with information regarding the identities of parties who purchased J&J's talc products.  Or the Debtor or J&J could request such information from the Protected Parties.  If the Debtor is intent on including retailers who refused to provide such information as a Protected Party, the Debtor could seek discovery consistent with Bankruptcy Rule 2004.

554.    *Second*, J&J cannot credibly contend that it should not be required to seek information from the Protected Parties or provide actual notice to claimants who are known by such Protected Parties.  J&J decided to file a plan that impairs the legal rights of claimants who hold Ovarian Claims against non-debtor third parties.  J&J did not have to propose such a plan.

555.    If J&J is going to go forward with a plan that bars tort victims from seeking fair and equitable compensation from solvent non-debtor third parties, then it must be required to provide actual notice to claimants who are known.  The scope of the relief sought informs what a diligent search involves, and which claimants are known claimants.

556.   **Third**, J&J cannot credibly contend that there are no known claimants.  Companies like Target, Walmart and Walgreens maintain customer lists that can be used to mail coupons to shoppers based on their spending habits.  Such lists could be used to provide actual notice to individuals who purchased J&J's talc products at those stores, just like GM could have provided actual notice to individuals who purchased cars containing defective ignition switches in *Motors Liquidation*.  If such customer lists do not exist (which is inconceivable for retail businesses), J&J should certify that it sought and was unable to obtain this information from any relevant sources.

557.   **Fourth**, J&J cannot contend that the number of known claimants is too large to provide actual notice.  The number of known claimants is not relevant under *Mullane* or *Eisen*.  If a claimant is known, then the claimant must receive actual notice.  J&J made the decision to market and sell products containing asbestos to consumers for decades.  If the consequence of J&J's conduct is that a substantial number of claimants are entitled to receive actual notice, this consequence was entirely of J&J's own making.

## B.   J&J'S PUBLICATION NOTICE WAS DEFICIENT

558.   Assuming, *arguendo*, that J&J's notice program, which relies almost exclusively on publication notice, could be adequate under these circumstances, J&J's media plan was inadequate.  J&J's advertisements were propaganda pieces that offered a false and misleading portrayal of the settlement and the validity of the Ovarian Claims against J&J.  The clear intent is to mislead claimants.  J&J's products did contain asbestos and caused cancer.

559.   What J&J's notice fails to say is as much a problem as the misleading and false information it does provide.  J&J's notices failed to inform claimants, among other things, that current and future claimant will be forced to accept nuisance value settlements based on the amount that J&J is willing to pay, and that talc claimants recover substantially more under virtually every

alternative to the Plan, including in the civil justice system where women are afforded the right to appear, be heard, and seek compensation for their injuries.

560.    Women suffering from ovarian cancer or the families of unfortunate women who have died have rights.  Those rights include the right to seek justice and compensation in a civil court for injuries sustained.  Our Courts exist to provide a forum where such rights can be exercised.  This is not an aspiration.  It is the foundation of civil justice.

561.    J&J and the Supporting Law Firms should not prevail under law or equity. Endorsing J&J's bankruptcy manipulations would fundamentally undermine the integrity of the bankruptcy system and the civil justice system by providing a roadmap for corporations and wealthy individuals to avoid mass-tort liability.  Bankruptcy relief is for companies in genuine financial distress.  It is not a weapon to inflict harm on dying and injured women.

## CONCLUSION

The Supreme Court's ruling in *Purdue* forecloses the relief sought by J&J.  This Court has an opportunity to protect the bankruptcy system from fraud and abuse.  The Court should deny the Motion and grant the Coalition such other and further relief as the Court deems just and proper.

Dated:  October 15, 2024                    Respectfully submitted,

                                        **STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, PC**

                                        /s/ *Sander L. Esserman*
                                        Sander L. Esserman
                                        State Bar No. 06671500
                                        Peter C. D'Apice
                                        State Bar No. 05377783
                                        2323 Bryan Street, Ste. 2200
                                        Dallas, TX 75201-2689
                                        Telephone:      (214) 969-4900
                                        Facsimile:       (214) 969-4999
                                        Email:           esserman@sbep-law.com
                                                         dapice@sbep-law.com

-AND-

**BROWN RUDNICK LLP**

David J. Molton (*pro hac vice*)
Jeffrey L. Jonas (*pro hac vice*)
Eric R. Goodman (*pro hac vice*)
Gerard T. Cicero (*pro hac vice*)
Susan Sieger-Grimm (*pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone:      (212) 209-4800
Facsimile:      (212) 209-4801
Email:          dmolton@brownrudnick.com
                jjonas@brownrudnick.com
                egoodman@brownrudnick.com
                gcicero @brownrudnick.com
                ssieger-grimm@brownrudnick.com

-AND-

**OTTERBOURG P.C.**

Melanie L. Cyganowski (*pro hac vice*)
Adam C. Silverstein (*pro hac vice*)
Sunni P. Beville (*pro hac vice*)
Jennifer S. Feeney (*pro hac vice*)
230 Park Avenue
New York, NY 10169
Telephone:      (212) 661-9100
Facsimile:      (212) 682-6104
Email:          mcyganowski@otterbourg.com
                asilverstein@ otterbourg.com
                sbeville@ otterbourg.com
                jfeeney@ otterbourg.com

**CO-COUNSEL FOR THE COALITION OF
COUNSEL FOR JUSTICE FOR TALC
CLAIMANTS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 15, 2024, I caused a true and correct copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Peter C. D'Apice*
Peter C. D'Apice