### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| _____ | : Case No. 24-90505 (CML) |
| In re: | : |
| | : Chapter 11 |
| RED RIVER TALC, LLC,[1] | : |
| | : |
| Debtor. | : |
| | : |
| _____ | : |

### MOTION OF THE UNITED STATES TRUSTEE TO DISMISS CASE
### UNDER 11 U.S.C. § 1112(B)

*********************************************************************************

**BLR 9013 NOTICE: THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.  UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

*********************************************************************************

TO THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE:

Kevin M. Epstein, the United States Trustee for Regions 6 and 7 (the "U.S. Trustee"), by

his undersigned counsel, and in furtherance of his duties pursuant to 28 U.S.C. §§ 586(a)(3), (5),

and (8), respectfully moves to dismiss the above-captioned chapter 11 case of debtor Red River

---

[1] The last four digits of the Debtor's taxpayer identification number are 8508.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

Talc, LLC (the "Debtor") for cause under 11 U.S.C. § 1112(b), and respectfully represents as follows:

## PRELIMINARY STATEMENT

For the third time in as many years, the Johnson & Johnson Company ("J&J"), the ultimate parent of the Debtor, seeks to use the bankruptcy process to immunize itself from billions of dollars of personal injury liability without actually subjecting itself to bankruptcy.  As in the previous cases, which were both eventually dismissed for bad faith, J&J has followed a strategy of creating a new subsidiary, assigning that subsidiary billions of dollars of tort liabilities but few productive assets, and then causing that subsidiary to file for chapter 11 protection, with the ultimate goal of securing a nonconsensual third party release that would effectively discharge J&J as well as the debtor—despite a recent decision of the Supreme Court that  expressly prohibits such relief.  Although its basic strategy is unchanged, J&J has caused this case to be filed under the name of a new shell entity and in a different district, all in an apparent effort to evade the bad faith findings entered in the previous cases.

Taken as a whole, J&J's tactics are a textbook example of bad faith.   The Debtor itself has no need for bankruptcy relief and it had no valid restructuring purpose when it filed its bankruptcy petition.  Furthermore, there is no legitimate purpose in allowing the Debtor to remain in bankruptcy while it pursues a futile strategy, designed to benefit a non-debtor, J&J, that cannot lead to a confirmable plan of reorganization.  Cause exists to dismiss this case under 11 U.S.C. § 1112(b).

## JURISDICTION AND STANDING

1.      The United States Bankruptcy Court for the Southern District of Texas has jurisdiction over this Motion under 28 U.S.C. § 157, 28 U.S.C. § 1334, and the standing order of

reference.  This is a core proceeding. 28 U.S.C. § 157(b)(2)(A).  Venue for this contested matter is proper under 28 U.S.C. §§ 1408 and 1409.

2.       Under 28 U.S.C. § 586(a)(3), the U.S. Trustee is charged with administrative oversight of bankruptcy cases in this District. Such oversight is part of the "U.S. Trustee's overarching responsibility to enforce the laws as written by Congress and interpreted by the courts." *United States Trustee v. Columbia Gas Systems, Inc. (In re Columbia Gas Systems, Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that the U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest).

## FACTUAL BACKGROUND

### A.  First Attempt: the 2021 LTL Case

3.       This case, like its predecessors, was filed as a response to tens of thousands of lawsuits alleging personal injuries caused by talc in certain consumer products manufactured or sold by J&J and its affiliates.  Many of these lawsuits have been based on an alleged link between talc exposure and ovarian cancer, a theory vigorously disputed by J&J.  Other lawsuits have alleged that J&J's talc products were contaminated with mesothelioma-causing asbestos, an allegation that J&J also has denied.  *See generally In re LTL Mgmt., LLC,* 64 F.4th 84, 92 (3d Cir. 2023) (*"LTL I"*).  As of October 2021, approximately 36,000 ovarian cancer claims were pending against J&J and its affiliates in a multi-district litigation pending in the District of New Jersey (the "MDL"), and approximately 3,800 ovarian cancer cases were pending in various state courts, along with approximately 470 mesothelioma cases.  *See* Disclosure Statement for Prepackaged Chapter 11 Plan of Reorganization of the Debtor [ECF No. 25] (the "Disclosure Statement") at 14.

4.     Before October 2021, J&J and its affiliates paid approximately $3.5 billion in indemnity payments relating to talc, as well as between $10 million and $20 million in monthly defense costs.  *See* Declaration of John K. Kim in Support of Chapter 11 Case and Certain First Day Pleadings [ECF No. 17] (the "Kim Declaration") at 23.

5.     Faced with these liabilities, in 2021 J&J turned to a novel and controversial restructuring tactic known as the Texas divisional merger, or more pejoratively as the "Texas Two-Step."  *See LTL I*, 64 F.4th at 96.  Under the most typical version of this strategy (which was followed in most respects by J&J), an entity facing significant tort liabilities domesticates itself in Texas, then undergoes a "divisional merger" under Tex. Bus. Orgs. Code Ann. §§ 1.002(55)(A) and 10.001-10.902.  In such a merger—which is effectively the antithesis of a traditional merger—a single entity splits into two or more new entities, between which are allocated both the assets and the liabilities of the original entity.  For tort defendants, this often results in the creation of a "GoodCo," which is assigned the company's productive assets and trade obligations but not its tort liabilities, and a "BadCo," which assumes the tort liabilities but few or no assets.  In order to balance these liabilities, the BadCo is usually made the beneficiary of a contract in which the GoodCo or its affiliates agrees to indemnify the BadCo for any tort judgments or costs it may be required to pay.

6.     As the second step of the Texas Two-Step, the BadCo is placed in chapter 11 bankruptcy.  Because the BadCo will not have sufficient assets of its own to satisfy its tort creditors, the GoodCo (or its affiliates) will usually agree to pay the administrative costs of the bankruptcy case and to make a fixed contribution to a trust that will be established for the benefit of the BadCo's creditors.  But these contributions will come at a price.  As consideration for its funding of the plan, the GoodCo will typically require the BadCo debtor to seek another

controversial form of relief: a compulsory release and injunction that would permanently shield the GoodCo and other protected parties from tort claims.

7.     From the perspective of the GoodCo and its affiliates, the Texas Two-Step strategy has numerous advantages.  Most importantly, because of the non-debtor release, the GoodCo will enjoy most of the benefits of a bankruptcy discharge, but without the need to file its own bankruptcy or subject itself and its assets to court supervision.  By fixing its contribution to the trust, the GoodCo can effectively cap the defendants' tort liability, either through negotiation or through a contested estimation proceeding (which will usually be conducted in a forum of the GoodCo's choosing).  And because the releases are nonconsensual, they can be imposed even against objecting holdout creditors if there are enough votes to confirm a plan.  *See generally* Brubaker, *Assessing the Legitimacy of the "Texas Two-Step" Mass-Tort Bankruptcy*, 42 No. 8 Bankruptcy Law Letter NL 1 (August 2022).

8.     The strategy adopted by J&J in 2021 closely follows this pattern.  After domesticating its consumer division ("Old JJCI") in Texas, J&J caused Old JJCI to undergo a divisional merger on October 21, 2021.  The resulting BadCo, which would be named LTL Management, LLC ("LTL"), was assigned Old JJCI's talc and mesothelioma liabilities;[2] the GoodCo, initially named Johnson & Johnson Consumer Inc. ("New JJCI"), received Old JJCI's operational assets.  *See* Kim Decl. at 9.

9.     A key part of this transaction was the execution of a funding agreement (the "2021 Funding Agreement"), which the Third Circuit would later liken to "an ATM disguised as

---

[2] Through a series of intercompany transaction beginning in 1979, Old JJCI had been assigned all assets and liabilities associated with J&J's baby products division.  The Debtor has represented that as a result of those transactions, Old JJCI "became responsible for all claims alleging that . . . talc-containing products cause cancer or other diseases."  Kim Decl. at 8.

a contract." *LTL I,* 64 F.4th at 109.  Under this agreement, LTL had a right to payment in cash from J&J and New JJCI in an amount up to the value of New JJCI, which was estimated to be approximately $61.5 billion as of 2021.  *Id.* at 97.  The purposes for which this funding could be used varied depending on whether LTL was or was not a bankruptcy debtor.  Outside of bankruptcy, the 2021 Funding Agreement would be used to pay LTL's talc-related costs and operating expenses, *id.,* while in bankruptcy, it could be used to fund the administrative expenses of the bankruptcy case as well as any trust that would eventually be created to pay the claims of talc claimants.  *Id.* at 96-97.

10.     Following the 2021 divisional merger, LTL converted itself into a North Carolina limited liability, and on October 14, 2021—just days after it had been formed—LTL filed a voluntary chapter 11 petition in the United States Bankruptcy Court for the Western District of North Carolina.  LTL's choice of North Carolina as a venue was not accidental: as of 2021, that court was the venue of several other mass tort bankruptcies that had used the Texas Two-Step strategy and had successfully fended off motions to dismiss.  LTL's decision to seek North Carolina as a venue may also have been motivated by favorable Fourth Circuit law on the standards for a motion to dismiss, under which the movant is required to demonstrate both objective futility and subjective bad faith before a chapter 11 case can be dismissed.  *See Carolin Corp. v. Miller*, 886 F.2d 693, 700-01 (4th Cir. 1989).

11.     The first setback to LTL and J&J's strategy came in November 2021, when the North Carolina bankruptcy judge ordered venue of LTL's chapter 11 case transferred to the District of New Jersey.  *See In re LTL Management, LLC*, Case No. 21-30589, 2021 WL 5343945, 2021 Bankr. LEXIS 3155 (Bankr. W.D.N.C. Nov. 16, 2021).  The North Carolina court based its decision not only on the parties' superior connections to New Jersey, which was

6

the corporate headquarters of J&J as well as the district in which many of the parties had already been litigating in the MDL, but also on its conclusion that LTL had been engaged in forum shopping, since it lacked any meaningful connection with North Carolina and had seemingly chosen that forum only in order to take advantage of favorable circuit law.  *See* 2021 WL 5343945 at *6.

12.     Shortly after the case was transferred to New Jersey, motions to dismiss were filed by the Official Committee of Talc Claimants and other parties.  Following a five-day trial, the bankruptcy court denied the motions to dismiss.  That order was subsequently taken up by the Third Circuit on direct appeal, and on January 30, 2023, the Third Circuit reversed the bankruptcy court and ordered LTL's first bankruptcy case dismissed for bad faith.

13.     In reaching this decision, the Third Circuit did not consider every argument for dismissal that had been raised below but limited its analysis to a single question: whether LTL's bankruptcy petition "serve[d] a valid bankruptcy purpose."  *LTL I*, 64 F.4th at 101.  Under the Third Circuit's analysis, this test did not require LTL to demonstrate insolvency, but it did require LTL to demonstrate, at a minimum, that it was in "financial distress."  *Id.*  ("a debtor who does not suffer from financial distress cannot demonstrate its Chapter 11 petition serves a valid bankruptcy purpose supporting good faith").  And in order to show "financial distress," it was necessary for LTL to show more than that there was an "attenuated possibility . . . that [it] may have to file for bankruptcy in the future."  Rather, good faith requires that its distress must be "immediate."  *Id.* at 102 (internal quotation omitted).

14.     The Third Circuit concluded that any argument that LTL was in financial distress was "untenable," noting LTL's right to draw upon up to $61.5 billion under the 2001 Funding Agreement.  *Id.* at 106.  In addition, the Third Circuit found that there was no evidence in the

record that LTL would ever be unable to pay its obligations as they came due, particularly given its lack of actual business operations. *LTL I*, 64 F.4th at 106, 108. As result, the Third Circuit held that LTL's bankruptcy petition lacked a valid purpose, reversed the bankruptcy court's decision, and remanded the case with instructions to dismiss.

### B. Second Attempt: the 2023 LTL Case

15.     LTL would respond to the Third Circuit's bad faith holding with what can only be described as more bad faith. In the winter of 2023, J&J, LTL, and New JJCI entered into a series of what LTL euphemistically referred to as "new financing arrangements." These "new financing arrangements" responded to the Third Circuit's lack of "financial distress" finding by severely eroding the value of LTL's contractual rights against its affiliates. Kim Decl. at 41. First, New JJCI transferred its consumer business assets to its parent entity, which later spun those assets off into a new company, Kenvue. *See id.* at 10. Although LTL itself does not appear to have been a party to this transaction, New JJCI's transfer of approximately half of its value had the effect of nullifying a key provision of the 2021 Funding Agreement, a provision which allowed LTL to benefit from any increase in value of New JJCI and therefore have more funds to pay creditors.

16.     J&J and LTL next turned to the 2021 Funding Agreement itself. Through a Termination and Substitution Agreement (the "T&S Agreement"), LTL agreed to cancel the 2021 Funding Agreement and *voluntarily* relinquish its principal asset—its rights to more than $61.5 billion from its affiliates—which was to be replaced with a similar, but far less valuable, agreement (the "2023 Funding Agreement."). *See id.* at 41-42. Specifically, while under the 2021 Funding Agreement, J&J and New JJCI were each jointly and severally liable to LTL for an amount that could never be less than $61.5 billion, J&J was no longer a primary obligor, its

balance sheet was no longer available to LTL, and LTL's right to payment was now effectively limited to the much-reduced value of New JJCI following the transfer of its consumer business.

17.     No business rationale was ever given for these transactions, which had the effect of severely eroding the value of LTL's most significant asset and reducing the funding that would be available to it both inside and outside of bankruptcy.  Rather, the only conceivable purpose of these transactions was to manufacture "financial distress" for LTL in a future chapter 11 case.

18.     LTL's second chapter 11 case was filed in New Jersey on April 4, 2023, less than two hours after the bankruptcy court dismissed its first case.  Motions to dismiss were promptly filed by numerous parties, including the U.S. Trustee, and after another multiday trial, the bankruptcy court dismissed the case for bad faith, relying on the financial distress standard announced by the Third Circuit in LTL's first case.  *In re LTL Mgmt., LLC* ("*LTL II*"), 652 B.R. 433 (Bankr. D.N.J. 2023).  The bankruptcy court's dismissal order was again appealed to the Third Circuit, and on July 25, 2024, the Third Circuit affirmed the dismissal.  *In re LTL Mgmt.,* 2024 WL 3540467 (3d Cir. July 25, 2024) ("*LTL III*").  In that decision, the Third Circuit elaborated on its earlier decision, stating that "financial distress" could be evidenced by a variety of factors such as insolvency, cash flow difficulty, employee problems, customer or vendor credit risk concerns, or similar matters.  However, the Third Circuit agreed that LTL had still failed to show "apparent" financial distress.  Importantly, the Third Circuit also rejected LTL's contention that a lack of financial distress could be overcome by a showing of creditor support. *LTL III*, 2024 WL 3540467 at *4 (citing *LTL II*, 652 B.R. at 451-52).

19.     Despite the dismissal of the LTL's second bankruptcy case, that case has remained open in the New Jersey Bankruptcy Court.  Litigation relating to the second LTL case

also continues in two class actions filed by talc claimants against LTL, J&J, and various individuals that are currently pending in New Jersey federal court. *See* Kim Decl. at 28.

20.     On October 11, 2024, the Debtor filed an application in the Supreme Court— substituting for LTL as "the corporate successor to LTL Management LLC as relevant to this bankruptcy proceeding."—to extend the deadline for a petition for writ of certiorari seeking review of the Third Circuit's *LTL III* decision.  Application for an Extension of Time to File a Petition for Writ of Certiorari to the United States Court of Appeals for the Third Circuit (the "Certiorari Extension Application"), *Red River Talc v. Ad Hoc C'tee*, No. 24A373 (U.S. Oct. 11. 2024).

### C.  Third Attempt: Red River Talc

21.     Even while LTL pursued its appeal of the dismissal of its second case, J&J began preparation of a third talc-related chapter 11 case, which was to be filed in a new district with a restyled subsidiary as its vehicle.   In December 2023, LTL renamed itself LLT Management, LLC and changed its state of formation to Texas.  *See* Discl. St. at 2.  On May 1, 2024, J&J announced its intention to file a third chapter 11 petition on behalf of the Debtor, a yet-to-be-formed successor to LTL, and began solicitation of a prepackaged plan of reorganization to its creditors (the "Proposed Plan").  *See id*. at 26.

22.     J&J has also continued to pursue settlements with law firms representing holders of talc personal injury claims.  As of the petition date, the Debtor represents that it has entered into settlements (the "Master Settlement Agreements") with law firms who purport to represent 21,700 individual claimants, for a total settlement of approximately $1.426 billion.  Eligible claimants who settle their claims under a Master Settlement Agreement will not be paid from the trust to be established under the Proposed Plan.  *See id.* at 11.

10

23.     Six months before J&J announced the prepetition solicitation of the Debtor's

Proposed Plan, on October 23, 2023, LTL engaged Randi Ellis as the purported representative

for the interests of future claimants in a third LTL chapter 11 case (the "Prepetition FCR").  *See*

Discl. St. at 25.  Ms. Ellis served in a similar capacity in each of LTL's first two chapter 11

cases.

24.     On or about August 19, 2024, LTL underwent a further series of internal

corporate transactions (the "2024 Divisional Merger").  In simplified form, these transactions

consisted of the merger of LTL into Holdco (the successor entity of New JJCI, out of which LTL

originally had been separated in the 2021 Divisional Merger), and a subsequent division of

Holdco into three entities: (i) Pecos River Talc LLC ("Pecos"), which was assigned LTL's

mesothelioma and lung cancer liabilities, along with certain other talc-claims that are intended to

be resolved outside this case; (ii) the Debtor, which was assigned LTL's other talc-related

liabilities; and (iii) New Holdco, which was allocated all other assets and liabilities.  *See* Kim

Decl. at 11-12.

25.     In practical terms, the Debtor that emerged from the 2024 Divisional Merger

differs from LTL in two major respects.  First, because of the liabilities assigned to Pecos, the

Debtor has a slightly smaller and more homogenous pool of tort claimants than did LTL.

Second, it does not face claims based on the cancers that are most strongly associated with

asbestos exposure.

26.     In addition, because of the preceding merger between LTL and Holdco, who were

respectively the beneficiary and the sole remaining payor under the 2023 Funding Agreement,

the Debtor asserts that the 2023 Funding Agreement has terminated.  *See id*. at 36.  In its place,

the Debtor became the beneficiary of two new funding agreements with New Holdco

11

(collectively, the "2024 Funding Agreement").  Similar to its previous iterations, the 2024 Funding Agreement obligates New Holdco to pay the administrative expenses of the Debtor's bankruptcy case and to fund the talc personal injury trust to be funded under the Debtor's plan in an amount capped at $7.898 billion over 25 years, or $6.475 billion on a net present value basis. *See* Discl. St. 2.  This represents a reduction of approximately $2.425 billion in net present value compared to the funding that was available to LTL under the 2023 Funding Agreement.  *See id.* at 23.  The 2024 Funding Agreement also obligates New Holdco to reimburse the Debtor for its expenses and for talc-related judgments, and settlements outside of bankruptcy, subject to the same funding limits that govern New Holdco's proposed contribution to the personal injury trust that would be created under the Proposed Plan.  *See* Discl. St. Exhibits B, C.

### D.  This Chapter 11 Case

27.     On September 20, 2024, the Debtor filed a voluntary chapter 11 petition in this Court.  Concurrently with its petition, the Debtor filed its Disclosure Statement and the Proposed Plan.

28.     No Committee has yet been appointed in these cases.

### E.  The Proposed Plan

### (i)     Structure of the Proposed Plan

29.     The Proposed Plan is based on the creation of a trust for the payment of the Debtor's talc personal injury liabilities (the "Talc PI Trust"), which will be principally funded by J&J and/or New Holdco in return for certain non-debtor releases that are required to be included in the confirmation order.  *See* Proposed Plan Art. 4.   This strategy is in most respects identical to the strategy pursued by LTL in its two prior cases.

30.     The Proposed Plan contains a single impaired class of creditors, consisting of talc claimants whose claims will be channeled to the Talc PI Trust.  The Debtor proposes that each claim in this class be assigned a value of $1 for voting purposes, regardless of the injury or type of cancer alleged.  All other creditors are designated as unimpaired and presumed to accept the plan.  *See* Discl. St. at 6-7.

31.     The Debtors assert that their prepetition solicitation has resulted in acceptance of the Plan by 83% of voting talc claimants.  See ECF No. 46 at 7.  This characterization of the voting results is vigorously disputed by certain parties, who note that the Debtor's tabulation reflects both (i) what they characterize as an invalid and untimely reversal of certain votes after the end of the voting period and (ii) the inclusion of votes on behalf of non-compensable claims.  *See* Initial Statement of Coalition of Counsel for Justice for Talc Claimants Regarding Chapter 11 Case at 22-24 [ECF No. 41].

**(ii)     Non-debtor Releases in the Proposed Plan**

32.     The Proposed Plan contains nonconsensual releases by creditors of claims against J&J and other non-debtors.  In each case, the consent of the affected creditors to the non-debtor release has not been sought, nor does the Proposed Plan utilize procedures by which a creditor may opt out of the releases.

33.     The first of these non-debtor releases is a channeling injunction that will be issued in connection with the creation of the Talc PI Trust (the "Channeling Injunction").  Under the Channeling Injunction, talc claimants (other than claimants who are subject to a Master Settlement Agreement) will be required to seek recovery from the Talc PI Trust alone and will be permanently enjoined from proceeding on those claims against the Debtor, J&J, and numerous "Protected Parties" identified or described in the Proposed Plan.  *See* Proposed Plan. at § 11.3.1.

By contrast, the Debtor's Master Settlement Agreements will be assumed as executory contracts, and claimants eligible to be paid under the Master Settlement Agreements may elect to be paid under those agreements rather than through the Talc PI Trust.  *See* Proposed Plan § 5.11.

34.    The "Protected Parties" against whom claims will be released under the Channeling Injunction include approximately 450 named entities that are listed on the schedules to the Proposed Plan, as well as numerous unidentified individuals and entities who are "Representatives" of the Debtor or its affiliates.  *See* Proposed Plan § 1.1.112.  Among those who are expressly included as Protected Parties are J&J, its current affiliates, its former affiliates, and various retailers who sold products manufactured by J&J and who may have contractual indemnification rights against J&J relating to those products.  *See id.* at § 1.1.112(e) and Schedules 1, 3.  The Protected Parties also include all persons and entities (who are not otherwise specified or individually identified) whose liability arises out of any of several specified relationships with the Debtor.  *See* Proposed Plan § 1.1.112(i).[3]

35.    In addition to the Channeling Injunction, the Proposed Plan also includes a broad nonconsensual release applicable to all "Holders of Claims."  Proposed Plan § 11.2.2 (the "General Release").  Under that release, the "Released Parties" (defined as the Debtor, J&J, its affiliates, and their employees and professionals) will be released from all claims "in any way

---

[3] Subsection (i) of the definition of "Protected Party" includes persons within the Channeling Injunction whose liability arises because of their ownership of the Debtor or an affiliate, their involvement in the management of the Debtor, their service as an officer or employee of the Debtor, or their involvement in a financial transaction involving the Debtor (which is further specifically defined to include transactions involving LTL in 2021 and 2023).  Subsection (i) loosely tracks the statutory criteria for determining whether a non-debtor is eligible for a release in a section 524(g) asbestos plan.  *See* 11 U.S.C. § 524(g)(4)(A)(ii).  Notably, these limitations on the type of liabilities that may be released apply only to the Protected Parties listed in subjection (i), and not to the other Protected Parties listed in subsections (a)-(h).

relating to . . . the Debtor (as it existed prior to or after the Petition Date)," specifically including the corporate transactions that are the subject of the LTL Class Action. Claims that are the subject of the General Release are <u>not</u> channeled to the PI Trust but are to be released for seemingly no consideration, apart from the "service of the Released Parties before and during the Chapter 11 Case." The General Release is binding not only on talc claimants, but also on all other classes of creditors and interest holders, including those that are not permitted to vote on the Proposed Plan. The General Release is also subject to a gatekeeping provision, under which no "Person" (a defined term which is not limited to creditors or interest holders, but also includes individuals and entities who are not parties to this case) may pursue any claim against the Released Parties in any forum unless they have received prior approval from this Court.

### (iii)   The Talc PI Trust

36.     The terms of the proposed Talc PI Trust are set forth in the Red River Talc Personal Injury Trust Agreement, attached to the Proposed Plan as Exhibit H (the "<u>PI Trust Agreement</u>"). The PI Trust Agreement provides, among other things, that the Talc PI Trust will be overseen by Ms. Ellis in her capacity as FCR, as well as a Trust Advisory Committee, at least five of whose members will be the designees of certain law firms named in the agreement. The Talc PI Trust will review claims and award payments based on the Trust Distribution Procedures (the "<u>TDP</u>"), attached as Exhibit K to the Proposed Plan. Under the TDPs, settlement awards for ovarian cancers will be based on a point system reflecting the claimant's age, diagnosis, and exposure history. *See* TDP at 106-112. Although the Debtor predicts that most ovarian cancer claims will be paid between $50,000 and $200,000 per claim, the actual formula for amounts to be paid has not yet been set and may not be determined until after the claim submission deadline

for the PI Trust.  *See* TDP at 117.  For non-ovarian cancers, the TDP proposes a flat award of $1,500 per claim.  *Id.*

## ARGUMENT

### A. Statutory Basis.

37.     Section 1112(b)(1) of the Bankruptcy Code provides:

Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).

38.     On a motion to dismiss, the U.S. Trustee, as the movant, bears the burden of establishing a prima facie case that cause for dismissal exists at which point the burden shifts to the debtor.  *In re National Rifle Ass'n,* 628 B.R. 262, 270 (Bankr. N.D. Tex. 2021) (citations omitted); *In re Sherwood Enters., Inc.*, 112 B.R. 165, 170-71 (Bankr. S.D. Tex. 1989), *judgment entered* (Bankr. S.D. Tex. Jan. 27, 1989).

39.     The Fifth Circuit has consistently recognized that lack of good faith may be cause for dismissal.  *Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072-73 (5th Cir. 1986) (defining "cause" as lack of good faith in the context of a motion to lift stay); *see also In re Humble Place Joint Venture*, 936 F.2d 814, 816-17 (5th Cir. 1991) (relying on *Little Creek* when holding that "cause" includes lack of good faith when dismissing a case).  This requirement "protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons . . . available only to those debtors and creditors with clean hands."  *Little Creek,* 779 F.2d at 1072.

40.     Cause for dismissal under section 1112(b) also exists where the chapter 11 case is futile and there is no prospect that the debtor will be able to reorganize its operations or propose a confirmable plan.  *See Timbers of Inwood Forest Assocs., Ltd*., 808 F.2d 363, 373 (5th Cir. 1987) (en banc), *aff'd*, 484 U.S. 365 (1988) (holding that "[w]hen there is no reasonable likelihood that the statutory objective of reorganization can be realized… it is incumbent upon the bankruptcy judge to effectuate the provisions of the Bankruptcy Code for the protection of the creditors"); *Little Creek*, 779 F.2d 1068, 1073 (5th Cir. 1986) (holding that "[r]esort to the protection of the bankruptcy laws is not proper" where "there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation").

41.     In this case, cause exists for dismissal under section 1112(b) both because the Debtor's case has been filed in bad faith, and because the Debtor cannot file a confirmable plan consistent with its announced reorganization objectives.

**B.  This Case Should Be Dismissed Because It Was Not Filed in Good Faith**

**1.  The Debtor Has Not Demonstrated Changed Circumstances Sufficient to Justify a Successive Chapter 11 Filing.**

42.     Although it involves a nominally different debtor, the Debtor's case is in all relevant respects a repackaged version of the two dismissed *LTL* cases, which J&J has now caused to be filed in a different circuit in hopes of relitigating the issue of bad faith.  This Court should not permit J&J and the Debtor to evade the rulings of another federal court in this manner.

43.     Although there is no per se rule against a debtor (or, as in this case, a successor entity possessed of virtually the same assets and liabilities) filing serial bankruptcy petitions, the filing of serial petitions has been described as a "hallmark of bad faith."  *In re Northtown Realty Co., L.P.,* 215 B.R. 906, 914 (Bankr. E.D.N.Y. 1998); *see also In re Felberman,* 196 B.R. 678,

681 (Bankr. S.D.N.Y. 1995) (noting that "[s]erial filings are a badge of bad faith") (citation omitted). As a result, when a second chapter 11 petition is filed shortly after the conclusion of an earlier case, "the good faith inquiry must focus on whether the second petition was filed to contradict the initial bankruptcy proceedings." *In re Elmwood Dev. Co.*, 964 F.2d 508, 511 (5th Cir. 1992).

44.     In the Fifth Circuit, when a debtor has filed a serial bankruptcy petition, it bears the burden of demonstrating changed circumstances that would justify the second filing. *See Elmwood*, 964 F.2d at 511 (requiring debtor in serial chapter 11 case to demonstrate "unanticipated changed circumstances" justifying second filing); *In re Triumph Christian Ctr., Inc.*, 493 B.R. 479, 489 (Bankr. S.D. Tex. 2013) (holding that debtor bears burden of proof on demonstrating an unanticipated change in circumstances and noting that subsequent filings "have only been permitted in very unusual, almost extraordinary, factual situations").

45.     In this case, the Debtor's case presents the same underlying facts, legal issues, and strategy as did the two *LTL* cases. With the exception of some excluded asbestos claims, the Debtor has substantially the same assets and liabilities as LTL and nearly all creditors in this case would also have been creditors in the prior *LTL* cases. Although the Debtor asserts that its Proposed Plan "differs materially" from the strategy LTL pursued in its first two cases because it excludes mesothelioma and lung cancer claims and because it was solicited pre-petition, Discl. St. at 2, neither of those facts played any role in the analysis of the Third Circuit's two dismissal decisions. Rather, the only changed factor that would seem to be of any relevance to the Third Circuit's financial distress test is the change from the $8.9 billion funding commitment under the 2023 Funding Agreement to the $7.9 billion available under the 2024 Funding Agreement. However, that reduction in funding must be balanced against the $1.426 billion in claims that

have been resolved through the Master Settlement Agreements (and which will no longer need to be paid through the PI Trust) as well as whatever portion of the original $8.9 billion would have been attributable to excluded mesothelioma and lung cancer claims.  Considering these circumstances, the Debtor is now arguably even <u>less</u> financially distressed than was LTL in its 2023 Case, which would hardly support an opposite result under the Third Circuit's analysis.

**2. The Third Circuit's Findings of Bad Faith Are Issue Preclusive as to the Debtor**

46.     The *LTL II* bankruptcy decision was based on federal question jurisdiction, so this court applies federal choice of law when assessing its preclusive effect in this case.  *Taylor v. Sturgell,* 553 U.S. 880, 891 (2008).  Preclusion is assessed as a matter of law.  Res judicata encompasses both claim preclusion—sometimes referred to as true res judicata—and issue preclusion—collateral estoppel.  *Id.* at 892 & n.5; *Snow Ingredients, Inc. v. SnoWizard, Inc*., 833 F.3d 512, 521 (5th Cir. 2016) (citations omitted) (distinguishing concept of broad res judicata from claim preclusion as true res judicata).  Res judicata, whether for claim or issue preclusion, is determined as a matter of law.  *Snow Ingredients*, 833 F.3d at 521.

47.     Claim preclusion involves a "common nucleus of facts," and issues that could have been decided but which were not raised may be merged into or barred by a prior judgment. The Fifth Circuit requires four elements to establish federal claim preclusion:

     a.  The parties must be identical.  The Fifth Circuit has recognized a successor-in-interest as an identical party, and parties in privity are considered identical, so claim preclusion could apply to Red River, LLC as LTL Management, LLC's successor.  *Meza v. General Battery Corp.*, 908 F. 1262, 1266 (5th Cir. 1990);

     b.  The prior judgment must be from a court of competent jurisdiction;

     c.  There was final judgment, decided on the merits; and

     d.   The earlier case and the current case involve the same cause of action.

*Ries v. Paige (In re Paige)*, 610 F.3d. 865, 872-73 (5th Cir. 2010) (setting forth claim preclusion elements and applying them to hold that trustee's cause of action barred by prior determination in same bankruptcy case).

     48.    Issue preclusion requires actual litigation of an issue.  Under the doctrine of issue preclusion, or collateral estoppel, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980).  In the Fifth Circuit, issue preclusion applies when four factors are established:

     a.   The issue at stake was identical to the one involved in the prior litigation;

     b.   The issue was actually litigated in the prior litigation;

     c.   The determination of the issue in the prior litigation has been a critical and necessary part of the judgment in that earlier action; and

     d.   Solely in the context of applying issue preclusion in the offense context, determining whether issue preclusion would be unfair due to special circumstances.

*In re Westmoreland Coal Co.,* 968 F.3d 526, 532 & n.6 (5th Cir. 2020) (citations omitted) (applying Fifth Circuit standards and holding that federal coal retirement litigation did not preclude plan modification under 11 U.S.C. § 1114).

     49.    Mutuality is a requirement for issue preclusion.  Mutuality is established when a party is a successor in interest, and the Debtor admitted that it was LTL's successor in the Certiorari Extension Motion, which was filed a day after the venue hearing.  *See In re Vanguard Nat. Res., LLC*, 624 B.R. 400, 417 (Bankr. S.D. Tex. 2020) (issue preclusion applicable to

successor of previous litigant).  Moreover, notwithstanding that the Court found at the venue hearing that Red River and LTL have different corporate and capital structures, *See* Transcript of Hearing held October 10, 2024, Venue Tr. 204: 9-13, mutuality for issue preclusion still can exist because the Supreme Court has recognized six non-party exceptions where issue preclusion controls.  *Taylor,* 553 U.S. at 894-95.  At least three of these exceptions apply here.  First, as evidenced by the solicitation process, reverse merger, and property transfers, LTL and the Debtor have a legal relationship involving the same interests and property.  Second, given their integrated ownership and historical connection, LTL adequately represented the Debtor's interests in the prior case.  Third, "a nonparty is bound by a judgment if she 'assume[d] control' over the litigation in which that judgment was rendered." *Id.* at 95.  The Debtor has assumed the *LTL III* appeal.

50.     Issue preclusion does not apply when a circuit split exists or when the highest court has not decided an important, novel issue.  *Westmoreland Coal*, 968 F.3d at 532.  These exceptions preserve evolution of legal standards through different courts analyses.  *Id.*

51.     Turning to the application of these tests, although the Fifth Circuit's *Elmwood* decision does not expressly discuss preclusion, it essentially follows a preclusion analysis.  When the debtor in a subsequent case is the same, a bankruptcy court decided the dismissal of the prior case on the merits and entered a final dismissal order, and when the debtor in the subsequent bankruptcy failed to meet the burden to evidence a change in circumstances, the bankruptcy court appropriately dismissed the new case.  *Elmwood Dev. Co.*, 964 F.2d at 511 (5th Cir. 1992).  The Fifth Circuit held that the bankruptcy court properly declined to conduct an evidentiary hearing before the dismissal because any alleged changed circumstances did not change the outcome.  *Id.*  This ruling is analogous to a claim preclusion determination under the

Fifth Circuit's objective standard for good faith, and the Fifth Circuit affirmed the issue being determined as a matter of law without an evidentiary hearing.

52.     When some of the facts have changed and some have not, issue preclusion is the appropriate standard.  Here, the Debtor argues changed circumstances through the new name, the different, improved finances, the excision of mesothelioma and asbestos claims, and the purported distinguishable standard for bad faith in the Third Circuit.  But issue preclusion controls much of this Court's decision.

53.     Even if the serial nature of the Debtor's petition does not by itself warrant dismissal, the Debtor cannot use this case to relitigate the Third Circuit's bad faith determination.  Here, issue preclusion applies both to the Third Circuit's determination that LTL was not in financial distress, as well as to its broader holding that LTL lacked a valid bankruptcy purpose and that its petition had not been filed in good faith.  Lack of good faith has been in the ultimate issue of fact decided in the two prior Third Circuit dismissals.  All facts relevant to the Third Circuit's decision are unchanged, other than the specific amount of funding available under the Funding Agreement and the payment or settlement of certain claims (which, as noted above, now even more strongly supports the Third Circuit's findings).  The issue of bad faith was actually litigated in both *LTL* cases, and in both cases bad faith was a critical and necessary element for the dismissal of those cases.  And although the corporate identity of the Debtor has changed, issue preclusion applies with equal force regardless of whether the Debtor and LTL are deemed to be the same company, or merely affiliates of one another.

54.     Finally, during its venue argument in this Court, the Debtor previewed that it intended to advocate that issue preclusion does not apply because divergent legal standards purportedly exist in the Third and Fifth Circuits and the Supreme Court has not decided the

issue.  The Debtor argued that in the *LTL I and III* opinions the Third Circuit created a "unique imminent financial distress standard of law" and it therefore suggested that the case should remain in Texas because the Fifth Circuit might not adopt the "financial distress" standard.  Tr. 159: 6-7. The Debtor is wrong.  Both the Fifth Circuit and the Third Circuit require good faith to support a bankruptcy case, and they both consider financial distress as a factual determination evidencing lack of good faith.

55.     The Debtor also ignores that the Third Circuit relied on Fifth Circuit precedent when it affirmed the dismissal of LTL's second case.  In *LTL I,* the Third Circuit explained, "[o]ur confidence in the conclusion that financial distress is vital to good faith is reinforced by the central role it plays in other courts' inquiries."  *LTL I,* 64 F.4th at 103.  As support for this conclusion, the Third Circuit quoted the Fifth Circuit's seminal *Little Creek* decision's "on-the-spot evaluation of the debtor's *financial condition*, motives, and the *local financial realities*." *Id.* at 103, n.14 (quoting *Little Creek Dev. Co. v. Commonw. Mortg. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir. 1986) (emphasis added)).

56.     Beyond *Little Creek*, other decisions in this circuit confirm the standard is the same.  *See, e.g., Antelope Techs., Inc. v. Lowe (In re Antelope Techs, Inc.),* 431 F. App'x 272 (5th Cir. 2011) (per curiam) (affirming dismissal for cause based on finding that "the purpose of the petition was not primarily to reorganize or respond to financial crisis but instead was to gain unfair advantage in the shareholder derivative action"); *National Rifle Ass'n,* 628 B.R. 262, 281-82 (evaluating financial realities under *Little Creek* and dismissing case for lack of good faith because debtor lacked financial need and was using bankruptcy as a litigation tactic).  Thus, there is no split of authority.

57.     The standard of lack of good faith is the same in the Third Circuit and the Fifth Circuit.  The factors supporting a finding of lack of good faith are the same.  And here those factors control.

**3.  In the Alternative, the Debtor's Petition was in Bad Faith Because it Lacks a Valid Restructuring Purpose.**

58.     Even if this Court permits the Debtor to relitigate the issue of bad faith, the outcome should be the same.  The facts and circumstances of this case demonstrate that the Debtor lacks the valid restructuring purpose necessary to seek chapter 11 relief, and this case should be dismissed as a result.

59.     Although the Debtor appears to have selected a venue in the Fifth Circuit in an effort to avoid the precedential effect of the two Third Circuit *LTL* decisions, the Third Circuit and Fifth Circuit standards for bad faith are not materially different from one another.  Both circuits have held that a bankruptcy petition is filed in bad faith where the debtor lacks a valid restructuring purpose.  *See Krueger v. Torres (In re Krueger)*, 812 F.3d 365, 370-71 (5th Cir. 2016) (citations omitted) (in the chapter 7 context, holding that petitions that "that simply serve no legitimate bankruptcy purpose" should be dismissed for bad faith); *In re SGL Carbon Corp.*, 200 F.3d 154, 163 (3d Cir. 1999) (bankruptcy petition must have "valid reorganizational purpose").

60.     In *LTL I*, and again in *LTL III*, the Third Circuit held that LTL's lack of a valid reorganizational purpose could be inferred from its lack of financial distress.  *LTL I,* 64 F.4th at 101, *LTL III*, 2024 U.S. App. Lexis at *15.  That holding is consistent with the standard applied by courts in the Fifth Circuit, which have held that "financial difficulty" is a prerequisite for bankruptcy relief.  *See In re Roman Cath. Church of Archdiocese of New Orleans,* 632 B.R. 593, 600 (Bankr. E.D. La. 2021) (holding that a chapter 11 debtor "must, at least, face such financial

difficulty that, if it did not file at that time, it could anticipate the need to file in the future")
(internal quotation omitted); *In re Ozcelebi*, 639 B.R. 365, 397 (Bankr. S.D. Tex. 2022) (same).

61.     Regardless of whether the test is phrased as "financial distress" or "financial
difficulty," the Debtor cannot meet this requirement, for the same reasons discussed in *LTL I, II,*
and *III.*  In *LTL I*, the Third Circuit noted that through its Funding Agreement, LTL had access to
a virtual "ATM disguised as a contract" that negated any financial distress that LTL might
experience as a result of its talc liabilities.  *LTL I,* 64 F.4th at 109.  In *LTL II*, after extensive
consideration of the evidence, the New Jersey bankruptcy court concluded that LTL could not
demonstrate that it was in danger of exhausting its funding.  *LTL II,* 652 B.R. at 448.  There is no
indication that the facts on which the *LTL II* court based its finding—and the Third Circuit
affirmed in *LTL III*—have changed in the Debtor's favor.  If anything, the settlement of over a
billion dollars in claims through the MSA process and the allocation of mesothelioma and lung
cancer claims to Pecos River when balanced against a funding agreement only slightly less
generous than that in *LTL II* suggests that the Debtor may be even less financially distressed now
than LTL was in 2023.

62.     Other facts in this case further support a determination of bad faith.  *See In re
M.A.R. Designs & Constr., Inc.,* 653 B.R. 843, 865 (Bankr. S.D. Tex. 2023) (noting that bad faith
conduct "can include prepetition bad-faith conduct, post-petition bad faith conduct, or petitions
that serve no legitimate bankruptcy purpose").  The Debtor has minimal employees and
operations and was created for the specific purpose of serving as a bankruptcy vehicle.  The
Debtor's chapter 11 petition is not in response to any crisis in the Debtor's own business
operations, but was filed to advantage a non-debtor, J&J, in its long-running mass tort litigation.
And even in the limited time the Debtor has been in bankruptcy, it has changed factual positions

to gain legal advantages.  In response to the United States Trustee's motion filed in LTL's pending case to transfer venue of this case, the Debtor asserted that "Red River is not LTL nor is it an affiliate of LTL, which does not exist and did not exist when Red River commenced its chapter 11 case." *Red River Talc's Consolidated Objection to the United States Trustee's Applications for Orders Shortening Time to Hear the Motion to Transfer Venue and (II) the Motion to Stay Proceedings*, Dkt. No. 1862, p. 3, Case No. 23-12384 (Bankr. D.N.J.).  To this Court, the Debtor represented that it was "a different entity" and that LTL was a "predecessor" but a "distinct debtor." *Debtor's Opposition to the Motions to Transfer Venue,* Dkt. No. 183, pp. 2, 41.  Yet the day after this Court held its hearing and ruled that venue should not be transferred to the New Jersey Court, the Debtor filed its Certiorari Extension Application as the applicant and "the corporate successor to LTL Management LLC as relevant to this [LTL] bankruptcy proceeding."  Certiorari Extension Application.  Obtaining an advantage in litigation, however, is not a valid bankruptcy purpose, particularly when it is done for the benefit of a non-debtor.  *See Antelope Tech. v. Lowe*, 431 Fed. App'x 272 (5th Cir. 2011) (per curiam) (affirming dismissal for lack of good faith when purpose was not to reorganize or address a financial concern but to gain an unfair advantage over shareholder derivative litigation); *In re National Rifle Ass'n,* 628 B.R. 262 (Bankr. N.D. Tex. 2021) (dismissing the case for lack of good faith because debtor lacked a financial purpose); *In re Leslie*, No. 98-35386-H3-11, 1999 Bankr. LEXIS 2113, at *5 (Bankr. S.D. Tex. Feb. 11, 1999) (finding, in the totality of circumstances, that case lacked a financial purpose and was commenced for the primary purpose of gaining an unfair advantage in a litigation).

63.     The facts supporting dismissal of the LTL cases remain unchanged, and new facts only bolster the cause for dismissal.  This case should be dismissed for lack of good faith.

**C. Under the Supreme Court's *Purdue* Decision, the Proposed Plan is Unconfirmable as a Matter of Law and It Is Unlikely That Any Confirmable Plan Will Be Filed in the Future**

64.     Cause for dismissal also exists under 11 U.S.C. § 1112(b) because the Proposed Plan is not confirmable, there is no realistic possibility that this case will result in a confirmable plan of reorganization and allowing it to remain in bankruptcy will do little more than waste resources and unfairly delay creditors.   *See* 11 U.S.C. § 1112(b)(4)(A); *Timbers*, 808 F.2d at 373.

65.     In this case, the cornerstone of the Debtor's Proposed Plan is the series of injunctions and nonconsensual releases that will have the effect of permanently discharging the talc liabilities of J&J, its affiliates, and numerous other non-debtor parties.   These releases form a central part of the Debtor's announced strategy to use the chapter 11 process to "finally and comprehensively resolve all current and future ovarian cancer and other gynecological cancer claims" against both itself as well as non-debtor J&J.   Kim Decl. 55-56.   The viability of this case, therefore, hinges entirely on the viability of the nonconsensual non-debtor releases sought in the Proposed Plan.

66.     But to a considerable extent, those releases are now barred by the Supreme Court's recent decision in *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024).   In *Purdue*, a case that was decided shortly after LTL began solicitation of the Debtor's Proposed Plan, the Supreme Court reversed a lower court decision approving a plan that purported to release tort claims against various non-debtors and held that nonconsensual third-party releases are not permitted under the United States Bankruptcy Code unless they are based on a specific statutory authorization.   *Purdue*, 144 S. Ct. at 2082-88 (2024).   In so ruling, the Court rejected the concept of the bankruptcy court as a "roving commission" empowered to solve all problems

in mass tort litigation, *id.* at 2084, and held that any power to affect claims between non-debtors could exist only if Congress had "sa[id] so expressly 'somewhere in the [c]ode itself.'" *Id.* at 2086 (quoting *Dewsnup v. Timm*, 502 U.S. 410, 420 (1992)).

67.    In the case of the Proposed Plan, the section 11.3.1 Channeling Injunction and the section 11.2.2 General Release each purport to release claims of third parties against non-debtors without the consent of those claimants and must therefore be evaluated against the rule established by *Purdue.*  The Proposed Plan identifies three sources of authority for those releases: sections 105(a), 1123(b)(6), and 524(g) of the Bankruptcy Code. *See* Proposed Plan § 10.2.  Under *Purdue*, however, the first two of these provisions cannot serve as the basis for a nonconsensual non-debtor release.  The Supreme Court rejected section 1123(b)(6) of the Bankruptcy Code, which deals with the permissible content of plans, as inapplicable, since it construed that section as pertaining to debtor-creditor relations only and not (as the dissent would have held) to a generalized authorization to include any provision not specifically prohibited elsewhere. *Purdue*, 144 S.Ct. at 283-84.  Nor could the releases be authorized under section 105(a) of the Bankruptcy Code, which the Court found serves only to carry out authorities expressly conferred elsewhere in the Bankruptcy Code and does not authorize relief that is independent of any other provision. *Id.* at 2082 n.2.

68.    This leaves section 524(g). *Purdue* noted the existence of a single "notable exception" (not applicable in *Purdue* itself) where Congress had authorized a limited form of non-debtor injunctions.  That exception is found in section 524(g) of the Bankruptcy Code—a provision which, as *Purdue* cautioned, is available for "asbestos-related bankruptcies—*and only for such bankruptcies.*" *Id.* at 2085 (emphasis added).  But although that provision may be

28

available to the Debtor on a limited basis, it does not support injunctions and releases of the breadth and scope set forth in the Proposed Plan.

69.     Section 524(g) is a special provision of the Bankruptcy Code created by Congress to provide "supplemental injunctive relief for an insolvent debtor facing the unique problems and complexities associated with asbestos liability." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 234 (3d Cir. 2004).  That provision may only be invoked by a debtor which, at the time of bankruptcy, has been named as a defendant in actions "seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos." *See* 11 U.S.C. § 524(g)(2)(B)(i)(I).  Even where it is applicable, section 524(g) does not provide a freestanding authority for debtors to extinguish third party claims.  In addition to numerous other requirements, such claims may be enjoined only if they are channeled to a trust that has been specially established to pay them. *See id.* at (B)(i)(I)-(IV).  Section 524(g) also places strict limits on the types of non-debtors against whom claims may be enjoined.  A section 524(g) injunction may not be used to relieve non-debtor parties of their own independent liabilities that do not arise from the conduct of the debtor.  *See Combustion Eng'g,* 391 F.3d at 233 (holding that section 524(g) does "not authorize a channeling injunction over the independent, non-derivative third-party actions against non-debtors").  And even for derivative claims, section 524(g) does not authorize an injunction over third party claims unless the liability arises as the legal consequence of one of four specified types of relationships.[4]  *See* 11 U.S.C. § 524(g)(4)(A)(ii), *In re Quigley Co., Inc.*, 676 F.3d 45,

---

[4] 11 U.S.C. § 524(g)(4)(A)(ii) provides:

(ii)     Notwithstanding the provisions of section 524(e), such an injunction may bar any action directed against a third party who is identifiable from the terms of such injunction (by

60 (2d Cir. 2012) (holding that section 524(g) could not be used to shield debtor's owner from claims that were based on owner's own actions and were not "legal consequence" of ownership).

70.     At confirmation, the Debtor will bear the burden of proving that it is eligible for a section 524(g) injunction, including by showing that this is an asbestos-related case within the meaning of subsection (2)(B)(i), notwithstanding the allocation of LTL's most strongly asbestos-associated liabilities to Pecos River.  But even if the Debtor meets this burden, section 524(g) does not provide authority for the breadth of the releases the Proposed Plan seeks.  In particular, because section 524(g) pertains only to claims that are channeled, it is inapplicable to the General Release, under which third party claims will be extinguished outright and not channeled to any trust.  Nor does section 524(g) authorize the full range of releases set forth in the Channeling Injunction, which is not necessarily limited to claims alleging asbestos exposure and which is also not limited to derivative liabilities that arise as a legal consequence of one of the relationships specified in section 524(g)(4)(A)(ii).  Rather, the broad scope of that injunction

---

name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of—

(I)     the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;

(II)    the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

(III)   the third party's provision of insurance to the debtor or a related party; or

(IV)    the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to—
(aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or
(bb) acquiring or selling a financial interest in an entity as part of such a transaction.

includes claims unrelated to asbestos or asbestos-containing products, claims for which J&J and others would be directly liable, as well as direct claims against unrelated third parties such as retailers.

71.     Because sections 105 and 1123 of the Bankruptcy Code cannot be used to support nonconsensual non-debtor injunctions under *Purdue*, and because the Proposed Plan includes releases not authorized by section 524(g), the Proposed Plan as currently drafted is not confirmable.  But it is not clear that the Debtor would be willing or even able to propose a plan that cures these defects.  Although the current version of the Proposed Plan has been amended relative to the version originally circulated in May, those amendments do not address or attempt to reconcile the Proposed Plan with *Purdue.*  And although it may be possible to craft an alternative version of the Channeling Injunction that complies with the limitations of section 524(g), such a modified form of the injunction would not give J&J and others the global immunity that this case is designed to achieve.  For these reasons alone, this case is unlikely to result in a confirmable plan.

[Space Intentionally Blank]

WHEREFORE, for the foregoing reasons, the U.S. Trustee respectfully requests that the Court dismiss the above-captioned chapter 11 case and grant such other and further relief that is deemed just and equitable.

Dated: October 21, 2024

Respectfully Submitted,
KEVIN M. EPSTEIN
UNITED STATES TRUSTEE

By:    */s/ Jayson B. Ruff*
Jayson B. Ruff
Trial Attorney
Michigan Bar No. P69893
515 Rusk, Suite 3516
Houston, Texas   77002
(713) 718-4662
jayson.b.ruff@usdoj.gov

and

Linda Richenderfer
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491 (Phone)
linda.richenderfer@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by electronic means via ECF transmission to all Pacer System participants in these bankruptcy cases, on the 21st day of October 2024.

*/s/ Jayson B. Ruff*
Jayson B. Ruff