**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC LLC,[1] | Case No. 24-90505 (CML) |
| Debtor. | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER CONFIRMING THE**
**RESULTS OF VOTING ON THE PREPACKAGED PLAN OF REORGANIZATION**

> **If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

The above-captioned debtor (the "Debtor") moves the Court for the entry of an order confirming the results of the prepetition vote on the *Prepackaged Plan of Reorganization of the Debtor* (the "Initial Plan").[2]  In support of this Motion, the Debtor respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.     In this chapter 11 case (this "Chapter 11 Case"), the Debtor seeks confirmation of the Amended Plan that is supported by over 83% of the talc claimants and provides compensation to claimants of approximately $10 billion.[3]  The Debtor respectfully

---

[1]     The last four digits of the Debtor's taxpayer identification number are 8508.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

[2]     The Initial Plan [Dkt. 25-1] was amended by the *Amended Prepackaged Plan of Reorganization of the Debtor* [Dkt. 24] (the "Amended Plan").

[3]     The historic $10 billion settlement is comprised of an approximately $9.5 billion funding of a talc trust fund within this bankruptcy, with an additional $650 million paid into a qualified settlement fund for use in resolving any common benefit fund claims arising from pending talc multi-district litigation (the "MDL") that, if determined to apply to a bankruptcy resolution, would have been charged against claimant

submits that the will of the vast majority of the claimants—well in excess of the threshold 75% vote required by statute—should be respected and the Amended Plan, which provides the only means by which claimants may receive a timely and equitable recovery, should be confirmed.

2.      The substantial support for this historic resolution has been achieved notwithstanding the all-out, multi-front attack launched by six economically-conflicted plaintiff firms, led by the Beasley Allen Law Firm ("Beasley Allen"), designed to subvert the vote and thwart any consensual bankruptcy resolution.  These firms, which now call themselves the "Coalition of Counsel for Justice for Talc Claimants" (the "Coalition"), maintain leadership positions in the MDL and, in those roles, stand to recover for themselves (but not their clients) up to 12% of the aggregate amount of any resolution in the MDL.  While benefitting the firms, the levy on any resolution through the MDL would reduce the recovery for the claimants. Beasley Allen—and in particular its partner Andy Birchfield—has been the most vocal opponent of any resolution in bankruptcy, steadfastly maintaining that Beasley Allen would not support any bankruptcy resolution regardless of its terms, the level of support received from the claimants and their law firms, or the strong encouragement to reach a chapter 11 resolution expressed by the bankruptcy judge who oversaw LLT Management LLC's ("LLT") prior chapter 11 cases.

3.      As a result of the extensive notice provided to known and unknown talc claimants as part of the prepetition solicitation process for the Initial Plan, more than 93,500 votes were submitted to Epiq Corporate Restructuring, LLC ("Epiq"), the Debtor's claims,

---

recoveries.  While the Coalition suggests the common benefit fund is "akin to a tax" on law firms outside MDL leadership, Dkt. 266 ¶ 20 fn. 12, it does not dispute that, by paying $650 million in common benefit funds to a qualified settlement trust *in addition* to the $9.5 billion trust contribution, the resolution being offered in this case would pay more to claimants than would a $10 billion settlement implemented in the MDL.

noticing and solicitation agent, pursuant to the solicitation and tabulation procedures.  The voting results reflect that the overwhelming majority—83.4 %—of voting claimants support the plan. The following table sets forth Epiq's final tabulation of votes on the plan.

| Voting Class | Number of Accepting Votes | Accepting Vote Percentage | Number of Rejecting Votes | Rejecting Vote Percentage | Total |
|---|---|---|---|---|---|
| **Class 4 – Channeled Talc Personal Injury Claims** | **77,998** | **83.40%** | **15,524** | **16.60%** | **93,522** |
| **Class 7 – Equity Interests in the Debtor** | **1** | **100.00%** | **0** | **0.00%** | **1** |

Supplemental Voting Decl. ¶ 6.

4.     Promptly following the commencement of this Chapter 11 Case, the Debtor filed a motion [Dkt. 46] (the "Disclosure Statement Motion") seeking approval of the adequacy of the Debtor's Disclosure Statement and the procedures established for the solicitation and tabulation of votes on the Initial Plan (respectively, the "Solicitation Procedures" and the "Tabulation Procedures").

5.     Without any factual basis, since the inception of this Chapter 11 Case, the Coalition has made repeated and unfounded allegations of "shenanigans" and vote manipulation that it claims occurred during the tabulation of votes on the Initial Plan.  Contrary to the Coalition's unsupported speculation, the solicitation and tabulation of votes were conducted in accordance with the Solicitation Procedures and the Tabulation Procedures.  Furthermore, in actuality, it was Beasley Allen, among other Coalition members, who attempted to thwart the claimants' will during the solicitation process by falsely certifying that it had obtained informed consent to submit votes against the Initial Plan from claimants who did not provide consent and indeed voted to accept the Initial Plan.

NAI-1541588243

6.      To solicit votes, LLT on behalf of the Debtor sent master ballots to plaintiff law firms instructing that they could vote for or against the Initial Plan on behalf of their clients only if they certified under oath that (i) their clients gave their informed consent, or (ii) they had a power of attorney to vote on their clients' behalf.  Beasley Allen elected the first option, certifying that it had obtained the informed consent of more than 11,000 claimants to "reject" the Initial Plan.  That certification was false.  As the sworn affidavits attached to the Supplemental Kim Declaration show, Beasley Allen purported to vote against the Initial Plan contrary to claimants' wishes and without their consent.  Those claimants "voted in favor of the Plan" through their counsel of choice, and, indeed, "have no recollection of ever receiving any direct contact from Beasley Allen regarding the Plan, or asking [them] how [they] would like to vote."  In addition, Beasley Allen falsely certified it obtained the informed consent from deceased claimants (with no estate representative) and from claimants with dismissed claims.

7.      Despite Beasley Allen's own improper actions, Beasley Allen and the Coalition assert that the Debtor manufactured support for the Initial Plan by permitting non-ovarian, gynecological and related-cancer claimants to vote.  See Dkt. 265.  Beasley Allen represents to this Court, as it has done before the MDL court, that such claims are non-compensable and worthless.  But in its master ballot, Beasley Allen submitted votes against the Initial Plan on behalf of about 5,000 claimants who assert non-ovarian, gynecological and related-cancers, and subsequently attested that it represents these claimants in its Rule 2019 statement [Dkt. 243].  Beasley Allen has not explained how it can argue that its own clients' claims have no value and should be disallowed, notwithstanding that these claims would receive payments under the Plan.

-4-

8.      In truth, claimants have long asserted non-ovarian, gynecological and related claims against the Debtor.  The only difference between such claims advanced by Beasley Allen and those of the other firms is that Beasley Allen never obtained a tolling agreement for those claims that it voted and are now time-barred under applicable law.  Its failure to do so, and repeated assertions that such claims are non-compensable and worthless, raise serious questions regarding its compliance with its ethical obligations to such claimants it purports to represents.  Neither Beasley Allen nor the rest of the Coalition firms have any legitimate objection to addressing non-ovarian, gynecological claims under the Amended Plan.

9.      In the end, the Coalition's myriad objections to the certified voting results distill to the simple proposition that Epiq (and this Court) should have accepted Beasley Allen's false master ballot, without addressing its many evident deficiencies, and certified the vote as of July 26, 2024 (the initial deadline for receiving ballots).  But that position is both absurd and contrary to the Solicitation Procedures and the Tabulation Procedures.

10.     First, the procedures made clear that the vote would ***not*** be reported on July 26, 2024, because Epiq required additional time to review the ballots, including for purposes of determining whether votes were duplicative or inconsistent.  It is that process that revealed Beasley Allen's false certification.  Beasley Allen certified that it had obtained the informed consent of its clients to oppose the Initial Plan when in fact it had obtained no such consent.  The Beasley Allen master ballot should not be counted.

11.     Second, the plain terms of the Tabulation Procedures authorized the Debtor or LLT to extend the voting deadline. The Debtor did so at the request of the firms that now comprise the Coalition.  At the end of the solicitation period for the Initial Plan, these objecting firms asked the Debtor to delay its bankruptcy filing and to pause the vote certification

NAI-1541588243

to afford the parties additional time to negotiate a resolution of the firms' ongoing objections to the Initial Plan.  The Debtor agreed, and over the course of the succeeding weeks, the Debtor and J&J made a series of offers proposing to contribute significant incremental consideration to reach an accord.  Every offer was rejected, however, and the impasse between the parties continued.

12.     The Smith Law Firm (the "Smith Firm") then approached the Debtor and J&J.  The Smith Firm had brought the first talc trial against the company in 2013 and had, as part of the opposition group led by Beasley Allen, actively opposed LLT's prior bankruptcy proposals.  The Smith Firm advised that it represented, through a joint venture agreement with Beasley Allen, approximately 11,000 claimants, almost all of whose claims had been listed as "no" votes in a master ballot submitted by Beasley Allen—which by this juncture had been shown to be false.  The Debtor and Johnson & Johnson thereafter engaged in extensive negotiations with the Smith Law Firm to resolve the firm's objections to the Initial Plan.  Following these negotiations, an agreement was reached with the Smith Firm and memorialized in the Memorandum of Understanding (as defined below).  As a result of the Memorandum of Understanding, which has been incorporated into the Amended Plan to the extent applicable, the substantial majority of the clients jointly represented by the Smith Firm and Beasley Allen have now voted to accept the Amended Plan.  Unlike the master ballot submitted by Beasley Allen, the master ballot submitted by the Smith Firm fully complies with the Solicitation Procedures and the Tabulation Procedures.  Indeed, the Smith Firm's master ballot is valid under various provisions of the Tabulation Procedures.  Thus, the Coalition's reliance on Beasley Allen's false certification in a last-ditch effort to thwart the vote should fail.

13.     The Debtor files this Motion to address the Coalition's repeated, unsupported attacks on the vote and to resolve any disputed voting issues based on the evidence.

-6-

Confirming the results of vote—which the Coalition's baseless filings to date argue is a key dispute in this case—will facilitate prompt confirmation of the Amended Plan. Accordingly, the Debtor submits that the relief sought by this Motion is in the best interests of claimants.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The Debtor is authorized to continue to manage its property and operate its business as a debtor in possession pursuant to sections 1107(a) and 1108 of title 11 of the United States Code (the "Bankruptcy Code").

15.     The Debtor confirms its consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

16.     The bases for the relief requested herein are sections 1126 and 105(a) of the Bankruptcy Code.

## RELIEF REQUESTED

17.     Pursuant to sections 1126 and 105(a) of the Bankruptcy Code, the Debtor seeks the entry of an order, substantially in the form submitted herewith (the "Proposed Order"), confirming the results of the prepetition vote on the Initial Plan.[4] In support of the relief requested herein, the Debtor incorporates by reference: (a) the *Declaration of John K. Kim in Support of Chapter 11 Case and Certain First Day Pleadings* [Dkt. 17] (the "First Day Declaration"); (b) the *Supplemental Declaration of John K. Kim in Support of the Debtor's*

---

[4]     Capitalized terms not otherwise defined herein have the meanings given to them in the Disclosure Statement Motion.

NAI-1541588243

*Motion for Entry of an Order Confirming the Results of the Voting on the Prepackaged Plan of Reorganization*, filed contemporaneously herewith (the "Supplemental Kim Declaration"); (c) the *Declaration of Stephenie Kjontvedt of Epiq Corporate Restructuring, LLC, Regarding the Solicitation and Tabulation of Ballots Cast on the Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [Dkt. 47] (the "Voting Declaration"); and (d) the *Supplemental Declaration of Stephenie Kjontvedt of Epiq Corporate Restructuring, LLC, Regarding the Solicitation and Tabulation of Ballots Cast on the Prepackaged Chapter 11 Plan of Reorganization of the Debtor*, filed contemporaneously  herewith (the "Supplemental Voting Declaration").

## BACKGROUND

18.     On September 20, 2024 (the "Petition Date"), the Debtor commenced this Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor's objective in this Chapter 11 Case is to obtain confirmation of the Amended Plan, which is a prepackaged plan of reorganization containing terms supported by the vast majority of holders of Channeled Talc Personal Injury Claims—the only claims affected by the Amended Plan's terms.  Comprehensive descriptions of the Debtor, its history, its assets and liabilities and the events leading to the commencement of this Chapter 11 Case can be found in the Disclosure Statement and in the First Day Declaration.

19.     Prior to the Petition Date, the Debtor solicited votes on the Initial Plan, as described in the Voting Declaration and in accordance with the Solicitation Procedures described in the Disclosure Statement Motion.  See Voting Decl. ¶¶ 8-17.  The solicitation process and the Supplemental Notice Plan achieved their purpose of providing the broadest practicable notice of the terms of the Initial Plan and the general voting deadline of July 26, 2024 at 4:00 p.m. (prevailing Central Time) (the "General Voting Deadline") to known and unknown holders of

Channeled Talc Personal Injury Claims.  As a result, pursuant to the Solicitation Procedures, Epiq received a gross total of 109,688 asserted Class 4 votes, without regard to whether such votes were valid, invalid or duplicative and whether asserted through a Master Ballot, a Direct Ballot or an Indirect Ballot, as described in the Disclosure Statement Motion.  Supp. Voting Decl. ¶ 6.

## I.     The Tabulation of Votes on the Initial Plan and the Exclusion of Certain Votes

20.     Substantially all of the ballots received (representing 89,996 votes or more than 92% of the total votes submitted by the General Voting Deadline) were submitted during the last 48 hours immediately prior to the General Voting Deadline.  Supp. Voting Decl. ¶ 6. Thus, the material portion of Epiq's tabulation of votes began promptly following the General Voting Deadline.  Id. ¶ 7.

21.     In tabulating votes, Epiq ultimately excluded a total of 16,174 votes in accordance with the Tabulation Procedures (collectively, the "Excluded Votes").  See Voting Decl., Ex. 21.  Further detail regarding the categories of Excluded Votes is provided below.

### A.     Facially Defective Ballots

22.     Epiq identified and excluded a total of 468 votes cast on ballots that were defective on their face under the Tabulation Procedures.  Supp. Voting Decl. ¶ 9.  Examples of facially defective ballots include ballots that were unsigned, illegible or not submitted on the proper form.  Id.  In addition, facially defective ballots included ballots that did not indicate a vote to accept or reject the Initial Plan with respect to a claimant, or that indicated votes to both accept and reject, and ballots that provided neither the last four digits of the claimant's social

NAI-1541588243

security number, nor their date of birth.[5]  Id.  Further examples of facial defects are set forth in Section 3 of the Tabulation Procedures.

### B.    Duplicative Ballots

23.    The Tabulation Procedures contemplate that superseded and duplicative votes would be tabulated in various ways depending on the nature of the ballots on which they were asserted and whether the votes were consistent or inconsistent with each other.  Supp. Voting Decl. ¶ 10.  In accordance with the Tabulation Procedures, Epiq excluded the following superseded or duplicative votes:

> (a)    72 votes on Direct Ballots were excluded because they were superseded by later Direct Ballots received from the same claimant;
>
> (b)    2,729 votes on Master Ballots were excluded because they were duplicative or superseded by (i) votes submitted on a valid Direct Ballot by the General Voting Deadline or (ii) consistent votes submitted on another Master Ballot; and
>
> (c)    1,425 votes on Master Ballots were excluded as inconsistent votes because they were asserted on behalf of a claimant with respect to whom one or more other law firms submitted a conflicting vote on a Master Ballot.  In such circumstances, if all such duplicative votes to accept or reject were consistent, one vote only was counted with respect to such claimant.  If the duplicative votes were inconsistent with respect to a single claimant, then Epiq referred the votes to LLT or the Debtor for potential resolution, and no such vote was counted unless the inconsistency was fully resolved across all affected Master Ballots.[6]

---

[5]    As disclosed in the Voting Declaration, following the General Voting Deadline, four law firms submitted Master Ballots with incomplete information for their clients on the applicable Master Ballot Spreadsheet, and another four law firms submitted Master Ballot Spreadsheets that were not legible.  See Voting Decl. n.4.  Epiq contacted these eight firms for corrections, and they each provided Epiq with an amended Master Ballot Spreadsheet following the General Voting Deadline, each of which was accepted by LLT on behalf of the Debtor.  See id.

[6]    212 such inconsistent votes were ultimately rendered consistent and resolved by the Smith Law Firm's Master Ballot, as described below.

NAI-1541588243

Id.  The identification and elimination of duplicative votes in accordance with the Tabulation procedures was a deliberate and time-consuming process that resulted in the exclusion of a total of 4,226 votes that were duplicative of votes cast on other ballots.[7]

## II.   False Voting Certifications by Beasley Allen and Other Coalition Law Firms

24.     On the General Voting Deadline, Epiq received a master ballot from Beasley Allen.  Id. ¶ 11.  Consistent with Beasley Allen's staunch opposition to resolving the talc claims through bankruptcy, its ballot represents that the majority of its clients voted against the Initial Plan.  See id. Ex. A (Beasley Allen Master Ballot), at 4.  In particular, Beasley Allen's master ballot purported to vote the Channeled Talc Personal Injury Claims of 11,434 claimants to reject the Initial Plan and 69 claimants to accept the Initial Plan.  Id.

25.     Beasley Allen's master ballot was executed by Andy D. Birchfield, Jr. See Beasley Allen Master Ballot at 7.  In casting those votes, Birchfield certified under penalty of perjury that he "obtained authority to procedurally cast such Client's vote," and that "[e]ach such Client has indicated his or her informed consent with respect to such vote."  Id. at 6-7.  That certification was false.

26.     To date, 21 plaintiffs who voted *for* the plan through their "counsel of choice," have certified that Beasley Allen falsely cast ballots against the Initial Plan on their behalf without their consent.[8]  Supp. Kim Decl. ¶ 10; see also First Day Decl. ¶ 128.  These claimants further explain that they "never directed Beasley Allen to cast a ballot on [their] behalf

---

[7]     This total is in addition to 11,480 votes reflected on the Master Ballot submitted by Beasley Allen and 483 votes reflected on the Master Ballot submitted by Golomb Legal, PC ("Golomb Legal"), which were excluded for the reasons described below.

[8]     Copies of those affidavits are attached as Exhibit A to the Supplemental Kim Declaration.  They contain (1) certifications by plaintiffs who voted for the Initial Plan, but for whom Beasley Allen attempted to cast a vote against the Initial Plan; and (2) copies of the ballots their chosen counsel submitted in favor of the Initial Plan at the plaintiffs' direction.  Birthdays and the first five digits of social security numbers are redacted, along with their street addresses, email addresses, and phone numbers.

NAI-1541588243

against the Plan," and that "the vote cast by Beasley Allen without [their] consent does not

reflect [their] wishes." Supp. Kim Decl., Ex. A. To be clear, this is not just about 21 claimants.

Rather, law firms supporting the Plan reached out to clients who had instructed those firms to

vote in favor of the plan, but for whom Beasley Allen had submitted votes to reject the plan.

***Every single client*** with this situation confirmed that Beasley Allen's vote on their behalf was

false.

27.     In addition to the apparent absence of claimed informed consent, the

Debtor's analysis revealed hundreds of instances where objecting firms apparently submitted

rejecting votes on behalf of individuals who are deceased and have no appointed estate

representative. First Day Decl. ¶ 125; see also infra ¶¶ 47-49.

## III.     Further Negotiations With Objecting Law Firms and the Tabulation Pause

28.     The untabulated voting data that Epiq received following the General

Voting Deadline made clear that there was widespread support for the Initial Plan among holders

of Channeled Talc Personal Injury Claims, notwithstanding the voting improprieties by some

objecting law firms. Supp. Kim Decl. ¶ 15. At the end of the solicitation period for the Initial

Plan, these objecting firms asked that the Debtor delay its bankruptcy filing and pause the voting

certification to provide the parties time to negotiate a resolution of their objections to the Initial

Plan. First Day Decl. ¶ 127. The Debtor agreed in the hope of negotiating a global resolution

with all objecting firms. Id.

29.     Negotiations with Beasley Allen, the Smith Firm and other objecting law

firms continued for several weeks. Id. During the course of the parties' negotiations, the Debtor

and J&J made a series of offers proposing to contribute significant incremental consideration to

reach an agreement. First Day Decl. ¶ 127. Every offer was eventually rejected, however. Id.

NAI-1541588243

30.     The Smith Firm then approached the Debtor and J&J.  First Day Decl. ¶ 128.  The Smith Firm had brought the first talc trial in 2013 and had, as part of the opposition group led by Beasley Allen, actively opposed LTL's prior bankruptcy proposals.  Id.  Allen Smith, the Smith Firm's principal, advised the Debtor that the Smith Firm represented, through a joint venture agreement with Beasley Allen, approximately 11,000 claimants, almost all of whose claims had been listed as "no" votes in Beasley Allen's Master Ballot.  Id.  Smith also informed the Debtor that Birchfield had conceded to him that Birchfield had indeed not obtained the informed consent of claimants, as he certified in the Beasley Allen Master Ballot.  Id.

31.     The Debtor and J&J engaged in extensive negotiations with the Smith Firm to resolve the firm's objections to the Initial Plan.  First Day Decl. at ¶ 129.  Following these negotiations, an agreement was reached with the Smith Firm, which included, among other things, an additional $1.1 billion to be contributed by the Debtor into the Talc Personal Injury Trust to fund talc claims subject to Individual Claim Review (as such terms are defined in the Amended Plan).  Id. at ¶ 131.  The agreement was memorialized in a memorandum of understanding among the parties (the "Memorandum of Understanding"), and its terms have been incorporated into the Amended Plan to the extent applicable.  Id. at ¶ 130.  Although Beasley Allen and other objecting law firms participated in the negotiations as well, they declined to accept the resolution to which the Smith Firm agreed and continue to oppose the Debtor's chapter 11 plan, even as amended by the terms of the resolution with the Smith Firm. Id.

32.     The Smith Firm certified to the Debtor that it possessed authority to vote the claims of those claimants pursuant to valid powers of attorney under the "Option B Certification" alternative provided for in the Master Ballots.  Supp. Kim Decl. ¶ 17.  A copy

-13-

of Smith's certification is attached as <u>Exhibit D</u> to the Supplemental Kim Declaration.

On September 16, 2024, the Smith Firm submitted its Master Ballot through the customized

online balloting portal that Epiq established at the beginning of the solicitation period for the

submission of all ballots.  Supp. Voting Decl. ¶ 16.  The Master Ballot Spreadsheet that

accompanied the Smith Firm's Master Ballot reflected votes on behalf of:  (a) 11,480 of the

11,503 claimants identified on Beasley Allen's Master Ballot; (b) 483 of the 786 claimants

identified on the Master Ballot submitted by Coalition member, Golomb Legal; and (c) 91

claimants with respect to whom no ballot was previously submitted.  <u>Id.</u>

   33. The Debtor promptly reviewed the Smith Firm's Master Ballot and, on

September 17, 2024, the Debtor instructed Epiq to incorporate the votes reflected on the Master

Ballot into its tabulation, superseding the applicable votes submitted on the Beasley Allen and

Golomb Legal Master Ballots, as applicable, pursuant to the Debtor's authority under the

Tabulation Procedures, including its authority to recognize changed or superseding votes and to

extend the Voting Deadline with respect to any claimant.  Supp. Kim Decl. ¶ 18; Supp. Voting

Decl. ¶ 17.

   34. Epiq complied with the Debtor's instructions to incorporate the Smith

Firm's Master Ballot and finalized its voting tabulation following receipt of New Holdco's ballot

(as discussed below).  In connection therewith, Epiq determined that 83.4% of holders of

Channeled Talc Personal Injury Claims and 100.00% of holders of Equity Interests in the Debtor

had voted to accept the Initial Plan, as amended in accordance with the terms of the

Memorandum of Understanding.  Supp. Voting Decl. ¶ 6.

NAI-1541588243

IV.     **The Equity Vote**

35.     As described in the Disclosure Statement Motion, the Debtor established: (a) September 17, 2024 as the record date by which the Debtor determined the holder of Equity Interests in the Debtor that was entitled to vote, which was Johnson & Johnson Holdco (NA) Inc. (f/k/a J&J Intermediate Holding Corp.) ("New Holdco"); and (b) September 19, 2024, at 4:00 p.m. (prevailing Central Time) as the deadline for receipt of New Holdco's ballot (the "Equity Voting Deadline").  See Voting Decl. Exs. 11, 12.  Epiq distributed a Solicitation Package and ballot to New Holdco on September 17, 2024, and New Holdco submitted its accepting vote by the Equity Voting Deadline.  See Voting Decl. ¶ 12.

## BASIS FOR RELIEF REQUESTED

I.      **The Voting Results Should Be Confirmed**

36.     Section 1126(b) of the Bankruptcy Code provides that the holder of a claim or interest may accept or reject a chapter 11 plan before the case is commenced if, "the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation" or, if there is no such law, rule or regulation, "such acceptance or rejection was solicited after disclosure to such holder of adequate information . . . ."  11 U.S.C. § 1126(b).

37.     Section 1126(c) of the Bankruptcy Code provides that "[a] class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class . . . ."  11 U.S.C. § 1126(c).  Further, section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

-15-

38.     To confirm a chapter 11 plan, the court must determine that, among other things, "[w]ith respect to each class of claims and interests—(A) such class has accepted the plan; or (B) such class is not impaired under the plan."  11 U.S.C. § 1129(a)(8).  If the requirements of section 1129(a)(8) of the Bankruptcy Code are not met, then the cramdown provisions of section 1129(b) are triggered.  See 11 U.S.C. § 1129(b)(1).  In addition, section 524(g) of the Bankruptcy Code provides that, to confirm a plan involving an injunction channeling claims to an asbestos trust "a separate class or classes of the claimants whose claims are to be addressed by [such] a trust . . . is established and votes, by at least 75 percent of those voting, in favor of the plan."  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

39.     Confirming the voting results will resolve a key dispute in this Chapter 11 Case.  While it has no basis for its allegations, since the inception of this Chapter 11 Case the Coalition has called into question the propriety of the voting results.  The record will demonstrate that the vote, as tabulated by Epiq, is accurate.  Accordingly, the Court should enter an order confirming the result of the vote.

**A.     The Smith Firm's Master Ballot Complies with the Tabulation Procedures**

40.     The master ballot submitted by the Smith Firm is valid and proper pursuant to the Tabulation Procedures.  As authorized by several provisions of the master ballot and Tabulation Procedure, the Debtor extended the Voting Deadline, first when the Coalition firms requested a pause of the vote tabulation to permit additional time for a potential resolution of those firms' opposition to the Initial Plan, and then for the Smith Firm's clients as they were negotiating improvements to the plan of reorganization.  Master Ballot, 2, 7; Tabulation Procedures 3(d), 4(d).  Supp. Kim Decl. ¶¶ 16-17.  After extensive negotiations with the Smith Firm, the parties reached agreement on the terms of the Memorandum of Understanding, which

NAI-1541588243

resulted in significant incremental consideration for claimants under the Amended Plan.  First

Day Decl. ¶¶ 129-130

       41.     The Smith Firm's master ballot was timely and constituted a properly

completely superseding ballot changing the votes of the clients on the Initial Plan, as amended,

pursuant to Paragraph 4(c) of the Tabulation Procedures, which provides:

> Any holder of a Channeled Talc Personal Injury Claim who submits a ***properly completed superseding ballot or withdrawal of a ballot on or before the Voting Deadline*** will be presumed to have sufficient cause, within the meaning of Bankruptcy Rule 3018(a), ***to change*** or withdraw ***such claimant's or interest holder's acceptance or rejection of the Plan***.

Tabulation Procedure 4(c) (emphasis added).

       42.     The Smith Firm's master ballot is also valid under Paragraph 4(d), which

provides as follows:

> If the Solicitation Agent receives *more than one ballot from the same holder of a Channeled Talc Personal Injury Claim* (**or from the same authorized representative representing the same holder of a Channeled Talc Personal Injury Claim**) for the same Channeled Talc Personal Injury Claim, in the absence of contrary information establishing which ballot is valid as of the Voting Deadline (***or such later date as may be agreed by LLT or the Debtor***), ***the last-executed, otherwise valid ballot that is received before the Voting Deadline shall be the ballot that is counted***. Multiple Master Ballots may be completed and delivered to the Solicitation Agent.

 Tabulation Procedure 4(d) (emphasis added).  Because the Smith Firm was a party to joint

venture agreement with Beasley Allen, it was the same authorized representative to the same

clients listed on the Smith Firm's master ballot.  Furthermore, the Smith Firm's master ballot

was received on September 16, 2024, before the Voting Deadline as extended by the Debtor, and

was the last-executed valid ballot.  Thus, under Paragraph 4(d), Epiq had to count the votes

contained in the Smith Firm's Master Ballot under the Tabulation Procedures.

NAI-1541588243

43.     Finally, even if the Voting Deadline had not been extended, the Smith Firm's Master Ballot was valid under Paragraph 4(b) of the Tabulation Procedures.  Pursuant to Paragraph 4(b), a claimant may change their votes after the Voting Deadline but only if LLT or the Debtor recognized such change of vote received after the Voting Deadline.  See Tabulation Procedures 4(b).  The Smith Firm provided a declaration to the Debtor certifying that it had authority to vote on behalf of its clients.  Supp. Kim Decl. ¶ 17; Id., Ex. D.  The Debtor accepted the Smith Firm's master ballot and directed Epiq to accept it.  Id. at ¶ 18.

**B.     Beasley Allen's Master Ballot Was False**

44.     Because the Smith Firm's master ballot is valid, it superseded the same votes cast by Beasley Allen's master ballot.  But even if Beasley Allen's master ballot had not been superseded, it would not have been accepted because it was false.  There are numerous reasons to conclude that Beasley Allen did not, in fact, obtain "informed consent" from its clients when the firm submitted an "Option A Certification" to support their authority to vote on those clients' behalf.

45.     "'Informed consent' denotes the agreement by a person to a proposed course of action after the lawyer has communicated adequate information and explanation about the material risks and reasonably available alternatives to the proposed course of conduct."  ABA Model Rule of Professional Conduct, Rule 1.0 (Terminology).  Absent some conduct on behalf of the client from which consent may be inferred, informed requires an "affirmative response the client."[9]  A lawyer cannot "assume consent from the client's or other person's silence."  Id.; see

---

[9]     See ABA Model Rule of Professional Conduct, Rule 1.0 Terminology – Comment 7 ("Obtaining informed consent will usually require an affirmative response by the client or other person.  In general, a lawyer may not assume consent from a client's or other person's silence.  Consent may be inferred, however, from the conduct of a client or other person who has reasonably adequate information about the matter. …").

also In re Green, No. 14-11458, 2014 WL 3724986, at *4 (Bankr. W.D. La. July 23, 2014) (noting that the Fifth Circuit recognizes the Model Rules as the "national standard").

### 1.   Inconsistent Votes

46.    As noted above, 21 plaintiffs who voted for the plan have certified that Beasley Allen falsely cast ballots against the Initial Plan on their behalf without their consent. Supp. Kim Decl. ¶ 10.  Every single plaintiff who was asked about an inconsistent vote in Beasley Allen's master ballot stated that the vote reflected in that master ballot putatively on their behalf, was incorrect and not authorized.

### 2.   Votes Cast on Behalf of Deceased Claimants

47.    In addition, based on its investigation to date, the Debtor has learned that Beasley Allen cast some **183** votes on behalf of deceased claimants for which the firm had never filed a claim in the tort system.  Supp. Kim Decl. ¶ 11.  The Debtor is confident that Beasley Allen did not obtain "informed consent" from these deceased individuals or any applicable estate representatives, but instead simply cast rejecting votes on behalf of any such individuals without any contact.  Supp. Kim Decl. ¶ 11.  If the decedents had legally authorized representatives, the master ballot presumably would have reflected the names of those individuals; it did not.  Supp. Kim Decl. ¶ 11.

48.    Beasley Allen also submitted at least another 63 votes on behalf of deceased claimants for which the firm had filed claims in the MDL, but where no estate representative has been identified or substitute party established.  Supp. Kim Decl. ¶ 12. Pursuant to Case Management Order 9 entered in the MDL on September 1, 2023, counsel for deceased plaintiffs were required, within 180 days, to either (1) file and serve a motion to substitute a proper party or (2) file and serve a notice explaining why a proper party could not be

NAI-1541588243

substituted.  See Supp. Kim Decl., Ex. B, Case Management Order 9 – Status of Deceased

Plaintiffs ("CMO 9").[10]

49.    Beasley Allen has filed with the MDL court over 400 notices of an

inability to substitute (a "NOIS") for claims in which the injured party became deceased.  Supp.

Kim Decl. ¶ 13.  An example of such a notice is attached as Exhibit C to the Supplemental Kim

Declaration.  The notices indicate that, since the decedent's death, counsel has been working to

identify next of kin or an authorized representative but has not yet been successful.  See id.  In 63

of those cases, the Debtor's investigation indicates that, at the time its master ballot was

submitted on July 26, 2024, Beasley Allen had not yet either filed an amended complaint with a

substituted party or located an established representative through the probate process.  See id.  In

short, there was no party from whom Beasley Allen could have received informed consent.

### 3.    Votes Cast on Behalf of Dismissed Claimants

50.    There is yet another reason to harbor suspicions about whether Beasley

Allen actually contacted its clients and obtained informed consents for their votes.  Beasley

Allen's master ballot includes votes—all rejecting the Initial Plan—on behalf of claimants whose

claims had already been dismissed in the tort system.  See Supp. Kim Decl. ¶ 14.  Once again,

each vote was accompanied by a "Option A Certification."  It is difficult to comprehend how

---

[10]    CMO 9 effectively modifies Federal Rule 25(a)(1), which provides for a dismissal of a claim if substitution
of party is not made within 90 days following a statement of death of a party.  See McKenna v. Pacific Rail
Serv., 32 F.3d 820, 836 (3d Cir. 1994) ("After the suggestion of death is filed, a 90-day countdown begins.
Within 90 days, some other party or the executor or administrator of the deceased must move for
substitution … , or the deceased's case will be dismissed.").

-20-

Beasley Allen actually received informed consent from claimants whose claims had already been dismissed in the tort system.

## NOTICE

51.     Notice of this Motion has been provided to:  (a) the Office of the United States Trustee; (b) the top law firms representing talc claimants against the Debtor; (c) pro se claimants as identified in the Initial Plan solicitation process; (d) counsel to the Debtor's non-debtor affiliates, Johnson & Johnson Holdco (NA) Inc. and Johnson & Johnson; (e) the proposed legal representative for future talc claimants and their counsel; (f) counsel to the Ad Hoc Committee of Supporting Counsel; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtor respectfully submits that no other or further notice need be provided.

WHEREFORE, the Debtor respectfully requests that the Court:  (i) enter the Proposed Order; and (ii) grant such other and further relief to the Debtor as the Court may deem just and proper.

[*Remainder of Page Intentionally Left Blank*]

NAI-1541588243

Dated:  October 21, 2024
Houston, Texas

Respectfully submitted,

*/s/ John F. Higgins*
John F. Higgins (TX 09597500)
M. Shane Johnson (TX 24083263)
Megan Young-John (TX 24088700)
James A. Keefe (TX 24122842)
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile:  (713) 228-1331
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
jkeefe@porterhedges.com

Gregory M. Gordon (TX 08435300)
Dan B. Prieto (TX 24048744)
Amanda Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone:  (214) 220-3939
Facsimile:   (214) 969-5100
gmgordon@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com

- and –

Brad B. Erens (IL 06206864)
Caitlin K. Cahow (IL 6317676)
(Admitted *pro hac vice*)
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, Illinois 60606
Telephone:  (312) 782-3939
Facsimile:   (312) 782-8585
bberens@jonesday.com
ccahow@jonesday.com

PROPOSED ATTORNEYS FOR DEBTOR

-22-

**<u>Certificate of Service</u>**

I certify that on October 21, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtor's claims, noticing, and solicitation agent.

<u>*/s/ John F. Higgins*</u>
John F. Higgins

NAI-1541588243