IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>**RED RIVER TALC, LLC,**[1]<br><br>Debtor. | **Chapter 11**<br><br>**Case No. 24-90505 (CML)** |

**U.S. Trustee's Consolidated Objection to Debtor's Motion for an Order Approving Disclosure Statement and Solicitation Procedures (ECF No. 46) and Motion for Entry of an Order Confirming the Results of Voting on the Prepackaged Plan of Reorganization (ECF No. 305)**

TO THE HONORABLE CHRISTOPHER M. LOPEZ,
U.S. BANKRUPTCY JUDGE:

   Kevin M. Epstein, the United States Trustee for Region 7 (the "U.S. Trustee"), objects to the Debtor's Motion for Entry of an Order Approving (i) Adequacy of Disclosure Statement, (ii) Solicitation Packages and Procedures Employed for the Solicitation and Tabulation of Votes on the Debtor's Prepackaged Plan of Reorganization and (iii) Notice of Non-Voting Status [ECF No. 46] (the "Disclosure Statement Motion") and the Motion for Entry of an Order Confirming the Results of Voting on the Prepackaged Plan of Reorganization [ECF No. 305] (the "Certification Motion") and respectfully states:

---

[1]   The last four digits of the Debtor's taxpayer identification number are 8508.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

**Preliminary Statement**

1. This case seeks impermissible relief through impermissible means. As discussed elsewhere by the U.S. Trustee,[2] this case was filed was not because of any financial need on the part of the Debtor, but is instead for the sole benefit of a nondebtor, J&J, which seeks to leverage the chapter 11 process to obtain a discharge of its own liabilities and to force tort victims into a global settlement that many of them have so far been unwilling to enter into outside of bankruptcy. J&J has structured this case as a prepackaged bankruptcy and seeks confirmation of the Proposed Plan based on a deficient Disclosure Statement that was distributed to creditors more than five months ago, at a time when the Debtor itself did not yet exist. And when the initial round of balloting failed to return a sufficient number of acceptances, J&J continued to solicit creditors (in violation of its own protocols) and directed its claims agent to substitute or disallow ballots until a different result had been reached.

2. The Debtor and J&J now request that the Court retroactively approve this flawed voting and solicitation process. The Court should decline to do so, for the following reasons:

**First**, the prepetition solicitation conducted by J&J was ineffective under Bankruptcy Rule 3018 because it was conducted on behalf of a non-existent debtor, and the plan solicited by J&J differs materially from the Proposed Plan for which the Debtor now seeks approval, including allowing J&J and/or the Debtor to walk away from their obligations under the Proposed Plan while keeping claimants bound to the third-party releases;

---

[2] *See* Motion of the United States Trustee to Dismiss Case Under 11 U.S.C. § 1112(b) [ECF No. 299]. In the interests of brevity, the U.S. Trustee incorporates the statement of facts and defined terms set forth in his Motion to Dismiss (the "Motion to Dismiss").

**Second**, the Disclosure Statement does not contain adequate information within the meaning of 11 U.S.C. § 1125(a)(1), in particular by failing to explain the assumptions on which it bases its projections of the distributions to creditors, failing to disclose that the AHC is receiving payment from J&J to cover its fees and expenses related to its efforts in support of the Plan, as well as by failing to disclose or justify the lack of safeguards that may potentially dilute the recoveries of legitimate creditors in favor of non-meritorious claims;

**Third**, because the Proposed Plan is unconfirmable on its face, approval of the Disclosure Statement will be futile and would needlessly delay creditors and increase the costs of this case; and

**Fourth**, the Court should deny the Debtor's motion to certify the results of the voting on its Proposed Plan, because the tabulation appears to reflect an untimely change of votes outside of the procedures prescribed by the Debtor and includes votes from ineligible creditors. In addition, the Debtor's vote tabulation should not be certified unless the Debtor fully explains its ballot reconciliation and disallowance process, which appears to have disproportionately targeted ballots that rejected the Proposed Plan.

3. For each of these reasons, and without prejudice to the U.S. Trustee's pending Motion to Dismiss, the Disclosure Statement Motion and the Certification Motion should be denied.

## Discussion

I. **The Proposed Plan Was Not Properly Solicited**

    a. **Section 1126(b) and Rule 3018 Do Not Permit Solicitation of a Proposed Plan on Behalf of a Nonexistent Debtor.**

4. Although section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018 permit a debtor to solicit prepackaged plans to creditors and interest holders before the commencement of a bankruptcy case, no provision of the Bankruptcy Code or Bankruptcy Rules permits the Court to approve votes or disclosure statements that were solicited on behalf of a nonexistent debtor.

5. In this case, the Disclosure Statement was circulated to various parties beginning on June 6, 2024, with a voting deadline on July 26, 2024. *See* Declaration of Stephanie Kjontvedt Regarding the Solicitation and Tabulation of Ballots [ECF No. 47] at ¶¶ 9, 14 ("Kjontvedt Decl. I"). However, it was not until August 19, 2024—nearly four weeks after the conclusion of the voting period—that the Debtor was created through the 2024 Corporate Restructuring. *See* Declaration of John K. Kim in Support of Chapter 11 Case [ECF No. 17] at ¶¶ 35-37 ("Kim Decl."). The Debtor has taken the position during this case that the 2024 Corporate Restructuring created an entirely new entity, and that the Debtor is not identical with any of its predecessors. *See*, *e.g.*, Debtor's Opposition to Motions to Transfer Venue [ECF No. 183] (stating that the Debtor "did not exist" during earlier LTL bankruptcy proceedings). But if this is so, the solicitation of the Proposed Plan was ineffective. The Proposed Plan could not have been accepted by the holders of claims or interests in the Debtor in June and July of 2024, because at that time, there was no Debtor, and no such claims or interests could have existed. Rather, under the Debtor's own theory, the creditors to whom the Proposed Plan was solicited were creditors of an entirely different entity, which is not the subject of this chapter 11 case.

6. The Bankruptcy Code and the rules governing prepackaged plans presume an actual debtor that is in existence at the time of voting. Under section 1126 of the Bankruptcy Code, an entity may vote on a plan only if it is the holder or a claim or interest in the debtor. 11 U.S.C. §

1126(a). *See In re Greystone III Joint Venture*, 995 F.2d 1274, 1281 (5th Cir. 1991) (stating that entities that did not hold provable claims against debtor were not entitled to vote on plan of reorganization), *modified on reh'g,* (5th Cir. 1992) (per curiam) (withdrawing new value exception holding but maintaining cited discussion). Rule 3018 provides that the holders of securities may vote on plans only if they were a holder as of the applicable record date, which would necessarily occur before the actual voting date. *See* Fed. R. Bankr. P. 3018(a), (b). Ballots solicited in a prepackaged plan must also conform substantially to the official form, which includes a certification by the voting creditor that he or she holds a claim against the Debtor. *See* Fed. R. Bankr. P. 3018(c), Official Bankruptcy Form 314. But in no case can a creditor vote on a plan or have its vote solicited before the debtor has been created and the creditor actually has a claim against such debtor, as was done here.

    b. **The Proposed Plan Has Been Materially Altered from the Version Solicited to Creditors.**

        i. <u>The Revised Version of the Proposed Plan Includes Material Amendments that Detrimentally Affect the Rights of Creditors.</u>

7. Because of J&J's decision to solicit this case prepetition, the version of the Disclosure Statement that was solicited to and voted on by creditors is now months old, and the terms and legal circumstances of the Proposed Plan have since changed in a manner that is materially detrimental to the claimants who voted on that version of the Proposed Plan. 11 U.S.C. §1127(a); Fed. R. Bankr. P. 3019(a); s*ee In re Am.-CV Station Group., Inc.,* 56 F.4th 1302, 1309 (11th Cir. 2023) (holding that where a plan is modified after voting, resolicitation is necessary if the plan modification materially and adversely changes the treatment of claims); *In re Am. Solar King*, 90 B.R. 808, 824-26 (detailing factors relevant to materiality analysis and holding that miniscule impact on equity distribution was not material when voting was not challenged).

8.      The current version of the Proposed Plan reflects several material changes relative to the version that was solicited to creditors before the Petition Date.  *See* generally Notice of Filing of Redlines of Amended Plan (ECF No. 26).  But although the Debtor characterizes these amendments as changes which only operate to improve the treatment of creditors, a number of these changes to the Proposed Plan either restrict the rights of creditors or may operate to reduce their recoveries.  In particular, revised Articles VIII and IX of the Proposed Plan now expand the right of J&J and/or the Debtor to walk away from their obligations under the Proposed Plan if various conditions are met, including certain adverse appellate rulings or the refusal of claimants to execute supplemental third-party releases under the Trust Distribution Procedures.  *See* Proposed Plan ¶¶ 8.5, 9.12; Red River Talc Personal Injury Trust Agreement ¶ 7.3.  Should J&J or the Debtor walk away from their obligations, however, creditors would <u>not</u> be permitted to withdraw the third party releases they would have been required to execute as part of their claim submission to the Talc PI Trust, and those creditors would be at risk of having irrevocably released their claims in return for no distribution at all.  *See* Proposed Plan ¶ 8.5.

9.      The Trust Distribution Procedures that were solicited as part of the Proposed Plan have also been amended to include an apparent placeholder which purports to give certain law firms, in conjunction with the FCR, the right to unilaterally change the criteria for compensable claims under the TDP.  *See* TDP ¶ 4.65(B) ("A Confirmed Claim evaluated under the Individual Review Process shall become an Allowed Claim if it satisfies … [insert such additional criteria as are mutually agreed to by The Smith Law Firm, PLLC, the Ad Hoc Committee of Supporting Counsel, and the FCR]").  A similar placeholder, regarding the inclusion of additional as-of-yet unspecified medical criteria for the payment of claims, was added to paragraph 5.4 of the TDP.

10. These amendments are both material and potentially highly detrimental to the majority of the talc claimants who voted on the Proposed Plan. Apart from the discriminatory intent of the amended provisions regarding claims allowance—which are presumably intended to ensure that the Trust will pay otherwise non-compensable claims to claimants represented by certain favored firms, but only those firms—those amendments on their face allow for an almost unlimited expansion of the class of claimants eligible to receive payment, based on criteria that the Proposed Plan does not even disclose. And because the funding of the Proposed Plan is fixed, this potential expansion of the claims pool is prejudicial to all currently compensable claimants whose claims are now at an increased risk of dilution.

11. The amendments to the Trust Distribution Procedures also introduce a new and highly coercive form of a third-party nondebtor release. Under revised paragraph 7.2.2, any claimant wishing to accept a payment from the trust must first execute an "Acceptance and Release," which effectively requires those claimants to grant a broad release of numerous third parties as a condition to exercise their rights under the Proposed Plan. This release is far broader than even the third-party releases imposed under the Proposed Plan, since that release is intended to apply to claims relating to talc products not manufactured by J&J. *See* TDP ¶ 7.2.1 (Acceptance and Release shall be a release of all clams "to the extent any such claims arise from or are related to the alleged use of or other exposure to talc or talc-containing products, including J&J Talc Products") (emphasis added). And as noted, this release will also remain enforceable even if J&J withdraws from its own obligations under the Proposed Plan.

12. The Debtor does not discuss or explain these changes to the treatment of creditors under the Proposed Plan, but instead broadly asserts that these changes were a net positive for creditors, and therefore would not have affected any votes, because J&J also increased its funding

commitment. *See* Proposed Plan at vi ("Amendments to the Plan since the date of the Disclosure Statement have made the Plan more favorable for holders of Talc Personal Injury Claims and would not reasonably be expected to alter the vote of any such holder who has voted to accept the Plan"). But the Court should not blindly assume that all creditors would adopt J&J's calculus. In particular, holders of non-ovarian cancer claims will continue to receive a fixed distribution under the TDP, and the inclusion of additional funding would not affect their recovery. Other claimants may reasonably conclude that the increase in J&J's total funding is outweighed by risk of dilution through the relaxation of the TDP's claim eligibility requirements. And still other claimants may conclude that J&J's proposed funding increase is insufficient compensation for the erosion of their rights against third parties, or for the risk that J&J itself will exercise its option to refuse to perform its commitments. These are matters that creditors should be permitted to consider when choosing to accept or reject a plan, and they were not given an opportunity to do so here.

13. Furthermore, unlike the facts of *American Solar King*, the voting process has been challenged. *See* Objection of the Coalition of Counsel for Justice for Talc Claimants to the Debtor's Motion for Entry of an Order Approving (I) Adequacy of Disclosure Statement, (II) Solicitation Packages and Procedures Employed for the Solicitation and Tabulation of Votes on the Debtor's Prepackaged Plan of Reorganization and (III) Notice of Non-Voting Status, ECF No.268, ¶¶270-78. Claimants who voted prior to or on the voting deadline did so unaware of the changes to the voting process that J&J implemented thereafter to obtain a 75% accepting class.

14. As set forth in the Certification Motion, 12,054 votes were submitted by the Smith Firm on September 16, 2024.[3] The next day the Debtor instructed Epiq to incorporate the votes

---

[3] The votes were made up of: (a) 11,480 of the 11,503 claimants identified on Beasley Allen's Master Ballot; (b) 483 of the 786 claimants identified on the Master Ballot submitted by Coalition

and supersede the applicable votes submitted by the Beasley Allen and the Golomb Firm. The Smith Firm Master Ballot was accompanied by a Memorandum of Understanding, pursuant to which the Smith Firm continues to receive payment of its legal fees by J&J.  Disclosure of these events are material because they impact voters' overall perception of whether J&J has made its best efforts through this plan and because it impacts their perception about possible motivations. Further, payment of the Smith Firm's legal fees by J&J bestows a greater recovery on members of class 4 represented by that that firm, therefore treating class members differently.  Such disclosures could impact voters' perceptions about the fairness of the process, about J&J's good faith, and about J&J's best efforts to pay under the Plan.  11 U.S.C. §1125.  Knowing that more funds were available – both to law firms and to specific categories of talc creditors – impacts the creditors' analysis of their treatment under Class 4.  While creditors with the largest harm and largest claims might agree to share a certain way up to a certain point, the addition of funds may change their treatment materially by failing to increase the allocation to them.  This is an impermissible, material modification requiring a new vote.

        ii. <u>The Proposed Plan Does Not Reflect Developments in Governing Law.</u>

15.    In addition, there have been material changes in controlling law since the Disclosure Statement was first solicited.  On June 27, 2024—three weeks after the Disclosure Statement was distributed to creditors and one month before the voting deadline—the Supreme Court issued its decision in *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024).  As set out at greater length in The U.S. Trustee's pending Motion to Dismiss, the *Purdue* decision precludes the ability of nondebtors to obtain compulsory third-party releases through bankruptcy

---

member, Golomb Legal; and (c) 91claimants with respect to whom no ballot was previously submitted.

plans unless authorized by 11 U.S.C. § 524(g). In particular, it holds that neither sections 105 nor 1123 of the Bankruptcy Code provides authority for such releases. *Id.* at 283-84. But while the Disclosure Statement repeatedly referenced sections 105 and 1123 as the purported legal basis for the broad releases to be imposed by the Proposed Plan,[4] *see* Disc. St. at 5, 53, 73, the Debtor never corrected or supplemented the Disclosure Statement to inform creditors that one of its principal legal theories was no longer viable. *See In re McGrew,* 60 B.R. 276, 279 (Bankr. W.D. Ark. 1986) (refusing to approve disclosure statement that, among other things, misstated requirements for plan confirmation). Because of this omission, creditors may have voted on the Proposed Plan under the incorrect belief that they had no ability to retain their separate claims against J&J and other third parties, and they also may have been unaware of the heightened probability that confirmation would be denied or overturned on appeal due to *Purdue*. Under these circumstances, the failure to discuss the effect of the *Purdue* decision in the Disclosure Statement was materially misleading.

## II. The Disclosure Statement Does Not Contain Adequate Information

16. Section 1125(b) of the Bankruptcy Code states that the proponent of a plan may not solicit its acceptance unless there is transmitted to creditors "the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing by the court as containing adequate information." 11 U.S.C. § 1125(b).

17. Section 1125(a) defines "adequate information" as "information of a kind and in sufficient detail to enable such hypothetical, reasonable investor to make an informed judgment about the plan. The Court has discretion to determine whether, on a case-by-case basis, a disclosure

---

[4] The Plan also seeks releases based on section 524(g) of the Bankruptcy Code, a form of relief that is unaffected by *Purdue*. As discussed in the U.S. Trustee's Motion to Dismiss, however, that section applies to only a narrow subcategory of claims and not the entire range of third-party claims to be released under the Plan. *See* Mot. to Dismiss at ¶¶ 69-70.

statement contains "adequate information." *See Mabey v. Sw. Elec. Power Co.* (*In re Cajun Elec. Power Coop., Inc.*), 150 F.3d 503, 518 (5th Cir. 1998). In evaluating whether a disclosure statement contains adequate information, a court "shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information." 11 U.S.C. § 1125(a)(1); *see also In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir.1988) (stating "[t]he determination of what is adequate information is subjective and made on a case-by-case basis. This determination is largely within the discretion of the bankruptcy court"). The standard applied by the Fifth Circuit in *Texas Extrusion* was whether the information contained in the disclosure statement "was adequate to enable a reasonable creditor to make an informed decision about the Plan." *In re Tex. Extrusion Corp.*, 844 F.2d at 1157.

### a. The TDPs Do Not Contain Information Sufficient for Claimants to Evaluate Their Treatment Under the Trust.

18. Although the Disclosure Statement informs ovarian cancer claimants that they may expect an average recovery of between $50,000 and $200,000 per claim, the assumptions behind this statement are not explained. Disc. St. at 4. Rather, under the proposed TDPs, the payments to holders of ovarian-cancer related claims are not based on a fixed value, but on a complex points system. *See* TDP ¶ 5.3.

19. Because the total funding of the Trust will be fixed, actual payments to ovarian cancer claimants will necessarily be based on the total number of similar claims that are received, as well as the number of non-ovarian gynecological claims (which are to be paid on a fixed rather than a points basis) that are received by the trust. Other than the Debtor's own unsubstantiated conclusions, the Disclosure Statement offers ovarian cancer claimants no projections and no other

information on which they can calculate the expected cash value of their scores (and thus the actual amount at which their claims will be valued under the Proposed Plan). The Disclosure Statement should provide Talc Claimants adequate information for such claimants to be able to determine what recovery they can expect to receive under Proposed Plan.

    **b. The Disclosure Statement Does Not Explain or Justify the Debtor's Decision to Allow Compensation for Claims that Would Otherwise be Considered Non-Compensable.**

20. The Disclosure Statement also does not fully explain or justify the fact that payments to creditors under the TDPs may be diluted by the allowance of claims that are not compensable in the tort system. In particular, the TDPs provide that for purposes determining whether an unfiled claim is time-barred, "[t]he applicable federal or state statutes of limitations shall be deemed to have begun running as of May 19, 2020." TDP ¶ 4.4.2(B). The effect of this provision appears to be to treat claims that arose prior to 2020 as timely <u>even if they would have been barred by the actual statute of limitations available to the claimant</u>.

21. The Debtor does not explain why it is seeking to allow these non-compensable claims to receive distributions from the Trust to the detriment of holders of compensable claims or how it is a proper exercise of the Debtor's fiduciary duty to maximize values for the benefit of the stakeholders of its estate. *See Commodity Futures Trading Commr. v. Weintraub*, 471 U.S. 343, 345, 105 S. Ct. 1986, 1989 (1985) (noting "[t]he trustee is accountable for all property received, under 11 U.S.C.S. §§ 704(2) and 1106(a)(1) and has the duty to maximize the value of the estate" and referencing 11 U.S.C. § 704(1) and case law); 11 U.S.C. §1107(a) (imposing specified duties, including 1106(a)(1), on debtors-in-possession).

    **c. The Disclosure Statement does not Disclose Connections Between J&J and the Ad Hoc Committee of Supporting Counsel Who Wrote a Letter in Support of**

**the Proposed Plan, Who Receive Compensation From J&J, and Who Pursuant to the Proposed Plan are Given Seats on the Trust Advisory Committee.**

22. The Ad Hoc Committee of Supporting Counsel ("AHC") and its efforts in support of the Proposed Plan are being funded by J&J.[5]

23. Pursuant to the Talc Personal Injury Trust Agreement, the AHC members are also slated to be the initial members of the Trust Advisory Committee. *See* Trust ECF No. 25-1 at pp. 188-189.

24. Included with the solicitation package for the plan that was sent to claimants was a letter of support from the AHC recommending acceptance of the Proposed Plan. *See* Proposed Plan at Art. 9.1(d).

25. Despite the fact that the AHC is receiving payment from J&J to cover its fees and expenses related to its efforts in support of the Proposed Plan, the details regarding this funding arrangement and the connections between the AHC and J&J are found nowhere in the Disclosure Statement.

26. The Disclosure Statement should disclose connections between J&J and the AHC, identify which firms receive compensation from J&J, and who pursuant to the Proposed Plan are given seats on the trust advisory committee.

    **d. The Disclosure Statement Contains Insufficient Information Regarding Excluded Claims That Were Assigned to Pecos River Talc LLC as Evidenced by Votes Received for the Debtor's Proposed Plan from Some Mesothelioma Claimants.**

---

[5] Declaration of John Kim in Support of First Day Pleadings ECF No. 30 (the "Kim Declaration") at p. 46 footnote 30.

27. According to the voting report shared by the Debtor with the U.S. Trustee, certain votes were received from claimants who identified themselves as mesothelioma (including peritoneal mesothelioma) claimants.

28. The Debtor has represented to this Court that the Debtor's predecessor, LLT Management LLC ("LLT"), engaged in a "2024 Corporate Restructuring" with the primary purpose of separating the liability for ovarian and gynecological cancer claims from other talc-related claims. The Debtor claims this was accomplished by allocating all ovarian and gynecological cancer claims to the Debtor, and allocating mesothelioma, governmental unit and certain other claims to Pecos River Talc LLC. The Debtor further represented to this Court that as a result of that restructuring, mesothelioma, governmental unit and certain other claimant groups that wished to pursue their claims outside of bankruptcy could continue to do so, while ovarian and gynecological cancer claimants could pursue a resolution of their claims through the Proposed Plan.[6]

29. The fact that the Debtor's Proposed Plan is receiving votes from mesothelioma claimants demonstrates that the Disclosure Statement has not provided clear and adequate information on what types of claims the Proposed Plan seeks to treat and what types of claims are being excluded from the Proposed Plan.

30. The Disclosure Statement should provide better disclosure of the types of claims entitled to vote on the Proposed Plan and the types of claims entitled to recovery under the Proposed Plan.

   e. **The Disclosure Statement Contains Insufficient Information Regarding Estate Claims Against J&J or Any Other Parties**

---

[6] See Kim Declaration at pp. 10-11 ¶ 35.

31. The Disclosure Statement provides no details concerning estate causes of action that are to be retained by the Debtor under the Proposed Plan along with its sole right to settle those estate causes of action post-confirmation.

32. Any recoveries from such causes of action would ordinarily be for the benefit of the Debtor's estate and could potentially increase the recoveries that claimants might expect to receive from the Debtor's estate. However, those causes of are not being transferred to the Trust and are instead being retained by the Debtor. Given that no information concerning these claims is provided in the Disclosure Statement, parties have no idea concerning what analysis if any the Debtor conducted concerning such claims, who the estate may have claims against, or the potential value of such claims in comparison to the amounts proposed to be funded into a Trust.

33. The Disclosure Statement should provide details concerning estate causes of action that are to be retained by the Debtor under the Proposed Plan along with any analysis the Debtor conducted concerning such claims, including who the estate may have claims against, or the potential value of such claims in comparison to the amounts proposed to be funded into a Trust. If the Debtor has performed no analysis of estate causes of action, then it should also disclose that fact and provide an explanation of why no such analysis was undertaken.

### III. The Court Should Deny Approval of the Disclosure Statement Because It Describes a Proposed Plan That Is Patently Unconfirmable

34. It is "well accepted that a court may disapprove of a disclosure statement ... if the plan could not possibly be confirmed." *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) (internal quotation omitted); *see also In re Timbers of Inwood Forest Assocs., Ltd.,* 808 F.2d 363, 373 (5th Cir.1987) (en banc) (holding that "[w]hen there is no reasonable likelihood that the statutory objective of reorganization can be realized… it is incumbent upon the bankruptcy judge

to effectuate the provisions of the Bankruptcy Code for the protection of the creditors"), *aff'd,* 484 U.S. 365 (1988).  In this case, the Proposed Plan is unconfirmable on its face because it calls for numerous impermissible third-party releases, including releases of: (i) claims unrelated to asbestos exposure; (ii) claims that will not be channeled to the Talc PI Trust; (iii) claims that are based on the direct conduct of J&J and other releasees; and (iv) claims against retailers and other unaffiliated indemnitees.  *See* Proposed Plan ¶¶ 11.3.1, 12.2.2.  These fall outside the narrow category of claims that may be the subject of a section 524(g) injunction.  *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 234 (3d Cir. 2004) (section 524(g) did not authorize injunction affecting claim based on direct liability of released party); *In re Quigley Co., Inc.*, 676 F.3d 45, 60 (2d Cir. 2012) (section 524(g) could not be used to enjoin claim not based on one of the legal relationships specified in that section).  And under *Purdue*, no provision of the Bankruptcy Code other than section 524(g) authorizes a nonconsensual third-party release.  *See Purdue*, 144 S.Ct. at 2085.  As a result, the Proposed Plan is patently unconfirmable, and the Disclosure Statement should not be approved.

**IV.     The Court Should Not Certify The Voting Results**

35.     In the event that this Court does not dismiss this case outright, it should require the Debtor to resolicit votes on any amended plan of reorganization because of the deficiencies in its prepetition solicitation and Disclosure Statement.  For the same reasons, the Court should not certify the results of the voting previously conducted, which was based on a flawed process and materially incomplete disclosures.

36.     In addition, there remain substantial unanswered questions regarding the vote itself, including (among other things) the standards the Debtor employed when disallowing certain votes, the enforceability of the master ballots submitted on behalf of certain firms, the treatment of post-deadline vote changes, whether the vote tabulation includes ballots by claimants not entitled to

receive a distribution under the Proposed Plan (including ballots by mesothelioma claimants, ballot by non-cancer claimants, or ballots by claimants with facially invalid claims). The U.S. Trustee understands that discovery will be necessary on these issues, and as a result, it is also premature for the Court to certify any voting results until that discovery has been concluded. The U.S. Trustee further reserves his right to supplement this Objection based on that discovery as to any voting-related issues.

WHEREFORE the U.S. Trustee requests that the Court enter orders denying approval of the Disclosure Statement and the Certification Motion and granting such other relief as is just.

Dated: November 6, 2024

Respectfully Submitted,

KEVIN M. EPSTEIN
UNITED STATES TRUSTEE

By:  /s/ *Jayson B. Ruff*
Jayson B. Ruff
Trial Attorney
Michigan Bar No. P69893
515 Rusk, Suite 3516
Houston, Texas  77002
(713) 718-4662
jayson.b.ruff@usdoj.gov

and

Linda Richenderfer
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491 (Phone)
linda.richenderfer@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served by electronic means via ECF transmission to all Pacer System participants in these bankruptcy cases, on the 6th day of November 2024.

                                                                        */s/ Jayson B. Ruff*
                                                                          Jayson B. Ruff