## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC LLC,[1] | Case No. 24-90505 (CML) |
| Debtor. | Re Dkt. No. 305 |

## OBJECTION OF THE COALITION OF COUNSEL
## FOR JUSTICE FOR TALC CLAIMANTS TO DEBTOR'S
## MOTION FOR ENTRY OF AN ORDER CONFIRMING THE RESULTS
## OF VOTING ON THE PREPACKAGED PLAN OF REORGANIZATION

The Coalition of Counsel for Justice for Talc Claimants (the "Coalition"), hereby objects (the "Objection") to the *Debtor's Motion for Entry of an Order Confirming the Results of Voting on the Prepackaged Plan of Reorganization* (Dkt. No. 305) (the "Motion") filed by Red River Talc LLC (the "Debtor"). In support of this Objection, the Coalition respectfully states as follows.

## INTRODUCTION

1.      By its Motion, the Debtor asks the Court to confirm the alleged results of the voting on Johnson & Johnson's ("J&J") *Prepackaged Chapter 11 Plan of Reorganization of the Debtor* (the "Plan"). If the Plan is confirmed, women with claims against J&J—based on J&J's own independent conduct—would have no right to appear, to be heard, and to seek just compensation for their injuries from one of the wealthiest companies in the United States.

2.      The Motion ignores this reality and instead focuses on J&J's favorite target: Beasley Allen, a law firm that has drawn J&J's ire for daring to hold its ground against J&J's relentless and baseless attacks. In the Motion, the Debtor frames the question of whether to certify

---

[1]    The last four digits of the Debtor's federal tax identification number are 8508. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

the vote by juxtaposing the votes submitted by Coalition firms (focusing on Beasley Allen) with the late votes submitted by the Smith Firm, and interpreting its own tabulation procedures in a manner that can only support J&J's desired outcome.  As set forth below, the Smith Firm's Master Ballot changed the votes of women who continue to reject the Plan and did so without their consent.  On this basis alone, the vote is suspect and cannot be certified.  But this is not the only problem.

3.      The Motion is an exercise in misdirection.  There are a multitude of other reasons why the vote cannot be certified that have nothing to do with Beasley Allen or the Smith Firm. This case is unusual in that J&J is attempting to confirm a plan involving disputed, contingent, and unliquidated tort claims using votes solicited pre-filing in the absence of a Court-approved disclosure statement and solicitation procedures that comply with the Bankruptcy Code.  The nature of the claims at issue in this case is driving the bitter discord among parties, providing a prime example of why mass tort claims should not be addressed by a pre-packaged plan process.

4.      Red River, a debtor entity that J&J recently manufactured to have no operating business, no employees, and nothing other than liability for certain talc claims, exists solely to obtain a discharge of J&J's own independent and direct talc liability.  But J&J's pre-pack strategy cannot be reconciled with the Bankruptcy Code and the Bankruptcy Rules.  To confirm a plan based on the pre-filing solicitation of votes, several things must occur.

5.      **First**, the debtor must show the plan was "transmitted to substantially all creditors" in each impaired class entitled to vote.  *See* Fed. R. Bankr. P. 3018(b).  Here, the Debtor did not exist at the time of solicitation.  This means that the Debtor must show that J&J transmitted the Plan to substantially all talc claimants, as J&J defines such claimants in the Plan.

6. J&J's definition of "Channeled Talc Personal Injury Claims" assigned to "Class 4" under the Plan—*i.e.*, the claimants who will be barred from asserting claims against J&J in the civil justice system if J&J's Plan is confirmed—is so broad that it picks up anyone who was exposed to J&J's talc products, presently has no illness, but is afraid that he or she could someday develop cancer as a result. Plan at § 1.1.141. Someone who used, administered, or was exposed to J&J's talc products a ***single time*** and has no manifestations of any injury beyond anxiety, falls within J&J's definition of a current talc claimant. This definition likely covers a large portion of the United States population.

7. But the Debtor has admitted that transmitting the Plan to this population is an "impossible" task. *See* Dkt. No. 298; Oct. 21, 2024 Hr'g Tr. at 13:15-25. This alone means that the Court cannot certify the vote as requested. The Court cannot certify the pre-filing vote based on J&J's pre-filing solicitation unless it finds that J&J transmitted the Plan to substantially all talc claimants *as so defined by the Plan itself*. *See* Fed. R. Bankr. P. 3018(b).

8. **<u>Second</u>**, the debtor must show that adequate disclosure was provided to all claimants entitled to vote on the Plan. *See* 11 U.S.C. §§ 1125 & 1126(b); Fed. R. Bankr. P. 3018(b). For a case to be confirmed based on a pre-filing solicitation, the disclosure statement used to solicit votes pre-filing cannot contain false and misleading information.

9. A pre-pack is not a vehicle for a debtor to mislead claimants, provide them with false and incomplete information, and then count their votes as if they were provided with adequate information and a Court-approved disclosure statement.

10. Here, the Debtor did not exist at the time of solicitation. This means that the Debtor must show that J&J solicited votes using a Disclosure Statement that contains adequate information and not one that contains false and misleading information.

11.     As set forth in the Coalition's objection to the approval of the Disclosure Statement (*see* Dkt. No. 268) and the Coalition's motion to designate votes (*see* Dkt. No. 265), J&J did not do this.  Rather, J&J solicited votes using a Disclosure Statement that contains materially false and misleading information.  This alone means that the vote cannot be certified.  The Court cannot certify the pre-filing vote based on J&J's pre-filing solicitation unless it first reviews the Disclosure Statement and finds that it contains adequate information.

12.     **Third**, the debtor must show that the votes it solicited can be counted under the Bankruptcy Code for the purpose of determining class acceptance.

13.     When determining class acceptance, the Bankruptcy Court can only count the votes of holders of "allowed" claims.  *See* 11 U.S.C. §§ 1126(a) & 1126(c).  Tort claims that are disputed cannot be considered allowed claims for voting purposes unless and until they are reflected in a timely filed proof of claim.  *See* 11 U.S.C. §§ 501 & 502(a); Fed. R. Bankr. P. 3003(c)(2).

14.     In most pre-packs, the debtor asks a defined universe of debt holders to vote pre-filing.  The debt at issue is not disputed, contingent, or unliquidated.  Allowance is not an issue.  This means that when such debt holders vote to accept a plan before the commencement of a case, the Court can count those votes as votes to accept the plan after the commencement of the case so long as the Court finds that the other requirements of Bankruptcy Rule 3018(b) are satisfied.

15.     But here allowance is a major issue.  J&J is trying to circumvent the Bankruptcy Code and the Bankruptcy Rules by counting the votes of un-vetted and un-filed claims asserted by claimants who may not exist, who may not have an illness that is linked to talc exposure, or who may have no illness at all.  No talc claims have been filed and deemed allowed under the Code.  Thus, the Court cannot count any of the votes for the purpose of determining class acceptance.

16.     Other than proclaiming that its Plan enjoys overwhelming claimant support, the Debtor offers little to support this assertion.  Ovarian cancer is a rare disease and only a fraction of the women who are diagnosed with ovarian cancer each year claim to have consistently used J&J's talc products.  Law firms that voted over ten thousand claims in support of the Plan have, prior to J&J's bankruptcy cases, never filed a single talc lawsuit against J&J or any other party.  Some have not filed a single talc lawsuit against J&J or the Debtor or any of the Protected Parties to this day.

17.     Counting un-vetted and un-filed claims here would inequitably dilute the votes of women who hold compensable ovarian cancer claims and deny them the opportunity to appear and object to non-compensable claims.  J&J's attempt to certify the vote without first complying with the procedures set forth in the Bankruptcy Code and the Bankruptcy Rules cannot be done.  Every creditor has a right to object to every claim.  Depriving women with compensable claims with the ability to exercise that right and, at the same time, confirming a plan that bars them from seeking just compensation from non-debtor J&J, is inconsistent with due process.

18.     Moreover, voters with non-compensable claims (*e.g.*, fear of cancer) who voted in favor of the Plan expected—based on J&J's solicitation materials—that they would receive some compensation under the Plan.  J&J knew that they would not be eligible to participate in any distribution under the Plan, and yet J&J collected and counted those votes, nonetheless.

19.     **Fourth**, the debtor must show that "two-thirds in amount" of the "allowed claims" in an impaired class voted to accept the Plan.  *See* 11 U.S.C. § 1126(c).  Class acceptance is not just a question of how many claimants voted to accept the plan, but it is also a question of the value of such claims.  But the Debtor's tabulation procedures circumvent this requirement by attempting to weigh all talc claims the same.

20.     Someone who has no illness, but merely alleges fear from exposure to J&J's talc products cannot be given equal voting power as a woman who trusted J&J's talc products as part of her personal care regime and is now dying of ovarian cancer.  Certifying the vote here is not just a question of ensuring that only those who hold compensable claims have their votes counted, it is also a question of how votes should be weighed for the purposes of determining class acceptance under section 1126 of the Bankruptcy Code.

21.     The Coalition has specifically objected to this aspect of the Debtor's tabulation procedures and has filed a motion to estimate claims for voting purposes.  *See* Dkt. Nos. 267 & 268.  Here, the Motion seeks the entry of any order confirming that the Debtor has achieved class acceptance under section 1126 and section 524(g).  But the Court cannot grant this relief until it *first* resolves how votes will be weighed for the purpose of determining class acceptance.  The Court cannot certify the vote until it decides how to weigh each vote.

22.     **Fifth**, assuming that each of the foregoing disputes is resolved in the Debtor's favor—*i.e.*, the Debtor proves that J&J "transmitted" the Plan to substantially all talc claimants, that the Disclosure Statement contains "adequate information," that un-vetted and un-filed claims can be allowed and counted for the purpose of determining class acceptance, and that all talc claims can be accorded the same weight regardless of the alleged injury and merits of each claim—then the Debtor will have to confront the Smith Firm's master ballot.

23.     On this issue, the Debtor contends that the "Smith Firm's master ballot was timely and constituted a properly completed superseding ballot" under J&J's tabulation procedures. Motion at ¶ 41.  But the Debtor fails to address the fact that the Smith Firm did not have authority to submit a master ballot in the first instance.  The issue is that the Smith Firm provided claimants

with two days' (or less) negative notice and then changed the votes of nearly 12,000 voters from "reject" to "accept."

24.      Since the Debtor first made the voting report available to a select number of parties in this case, 100 women have now come forward to directly contest the Debtor's assertion that they voted to accept the Plan.  *See* Dkt. Nos. 399-407.  These women voted to reject the Plan, yet J&J, the Debtor, and Epiq contend that they support the Plan.

25.      These are women suffering from serious and terminal diseases who should be able to rely on this Bankruptcy Court to treat them fairly and not offer a refuge for J&J's attempt to claim that they support J&J's Plan to strip them of their legal, equitable, and Constitutional rights. The Court cannot certify a vote that does not reflect the will of the voters.  On this basis alone, the Motion must be denied.

26.      **<u>Finally</u>**, if the Court reaches the conclusion that it can certify the votes, the Court must then address yet another question:  which plan did claimants vote to approve?  The Plan on which J&J solicited votes prior to the voting deadline, and the Plan as contemplated by the *Memorandum of Understanding* (Dkt. No. 17-1, the "<u>MOU</u>") are not the same and provide for materially different treatment for current and future claims.

27.      In addition to placing the Smith Firm in charge of a $650 million fund to pay attorneys' fees outside of bankruptcy, the MOU purports to shift $500 million from future claimants to current claimants (*see* MOU at § II.B.1) and creates a new Individual Review Fund (*see* MOU at § II.D).  But J&J's Future Claimants' Representative has not signed off on the $500 million shift.  *See* Dkt. No. 17-1 at fn. 5.  And the criteria that will be used to allocate funds to the beneficiaries of this fund have yet to be developed or disclosed to claimants.  On its face, it appears that claimants in Class 4 will not be treated the same—some may receive a bonus, but some may

not.  Even if the Court finds that these modifications do not reduce the payments that claimants who previously voted to accept the Plan will receive, such modifications offend sections 1123(a)(4) and 1127(a), which means that the Debtor must re-solicit votes on the Plan.

## BACKGROUND

28.     The relief sought in the Motion is duplicative of the relief sought by the Debtor in its Solicitation Motion.[2]  The Coalition has already filed an objection to the Solicitation Motion, which objection sets forth relevant background information.  *See* Dkt. No. 268 (the "Disclosure Statement Objection").[3]  Rather than restating that background information here, the Coalition incorporates it herein by reference.

## ARGUMENT

**I.      J&J Failed to Transmit the Plan to Substantially All Talc Claimants**

29.     J&J did not transmit the Plan to substantially all talc claimants entitled to vote. Asking claimants to vote on a plan before the commencement of a case, ***by itself***, does not mean that votes cast by such claimants can be counted or approved after the commencement of a case. Bankruptcy Rule 3018(b) requires the Debtor to show, and the Court to find, that the plan was "transmitted to substantially all creditors" in each impaired class.  Fed. R. Bankr. P. 3018(b).

30.     This makes logical sense.  A debtor cannot transmit a plan to subset of claimants in a class, ask them to vote on the plan, and then turn around and argue that the overwhelming majority of claimants in the class voted to accept the plan.  Class acceptance, as a percentage, is

---

[2]   *See Debtor's Motion for Entry of an Order Approving (I) Adequacy of Disclosure Statement, (II) Solicitation Packages and Procedures Employed for the Solicitation and Tabulation of Votes on the Debtor's Prepackaged Plan of Reorganization and (III) Notice of Non-Voting Status* (Dkt. No. 46) (the "Solicitation Motion").

[3]   Capitalized terms used but not otherwise defined herein have the meanings given to them in the Disclosure Statement Objection.

expressed in terms of a fraction, the numerator of which is number of claimants who voted to accept the plan and the denominator of which is the total number of voters.

31. To claim class acceptance based on a pre-filing solicitation, the debtor must show that it transmitted the plan to substantially all eligible voters so that the voting results accurately reflect the will of the substantial majority of class claimants. If this was not required, a debtor could manufacture a high acceptance rate by limiting plan transmittal to a portion of the claimants most likely to vote to accept the plan.

32. Rule 3018(b) goes beyond providing mere notice to eligible voters. Rather, it requires transmittal.[4] A debtor does not "transmit" a plan by providing notice by publication. Instead, transmittal requires mail or delivery, including delivery by courier.[5]

---

[4]  *Compare* Fed. R. Bankr. P. 3018(b) ("plan" must be "transmitted" to "all creditors" entitled to vote); *with* Fed. R. Bankr. P. 3017(d) (debtor "shall mail to all creditors" a copy of the disclosure statement and "shall transmit" a copy to the United States trustee; Fed. R. Bankr. P. 3017(e) (court must consider procedures for "transmitting" the disclosure statement to "holders of stock, bonds, debentures, notes, and other securities").

[5]  *See* Fed. R. Bankr. P. 5005 Advisory Cm. Note Subdivision (b)(1) ("Transmittal of papers to the United States trustee may be accomplished by **mail** or **delivery**, including **delivery** **by** **courier**, and the technical requirements for service of process are not applicable.") (emphasis added); 4 FED. PROC. FORMS § 9.188 (2024) ("The complaints, motions, applications, objections, and other papers required to be transmitted to the United States trustee by the Federal Rules of Bankruptcy Procedure **must** **be** **mailed** or **delivered** to an office of the United States trustee, or to another place designed by the United States trustee, in the district where the case is pending") (emphasis added)*; see also In re 216 W. 18 Owner LLC*, No. 11-15110 (SMB), 2012 WL 2871838, at *1 (Bankr. S.D.N.Y. July 10, 2012) (approving prepack solicitation under Rule 3018(b) where transmittal was made via overnight mail); *In re Eastgate Tower Hotel Assocs., L.P.*, No. 12-13539 (SCC), 2012 WL 5128145, at *1 (Bankr. S.D.N.Y. Aug. 20, 2012) (approving prepack solicitation under Rule 3018(b) where transmittal was made via overnight mail and with additional email copy); *In re Xerium Techs., Inc.*, No. 10-11031 (KJC), 2010 WL 3313079, at *3 (Bankr. D. Del. May 12, 2010) (approving prepack solicitation under Rule 3018(b) where transmittal was made via hand delivery and/or Fedex priority mail); *In re Merchants Mortg. & Tr. Corp., LLC*, No. 11-39455-MER, 2010 WL 11819478, at *3 (Bankr. D. Colo. Oct. 22, 2010) (approving prepack solicitation under Rule 3018(b) where transmittal was made by first class mail); *In re Reddy Ice Holdings, Inc.*, No. 12-32349, 2012 WL 2166170, at *2–3 (Bankr. N.D. Tex. Mar. 8, 2012) (approving prepack solicitation under Rule 3018(b) where transmittal was made by overnight courier or hand delivery and electronic mail to all banks, brokers, and other nominees who then distributed it to the beneficial owners).

33.     This also makes logical sense.  In most pre-packaged bankruptcy cases, the debtor engages in a deleveraging transaction where a defined universe of holders of bond, debentures, or notes exchange their debt for equity in the reorganized company.  These are often sophisticated parties that negotiate for their treatment and constitute a defined group to which a plan can be transmitted and voted on prior to the commencement of the case.

34.     Classes of claims that are more difficult to define, including a class that includes trade and employee claims, are typically left unimpaired in a prepack.[6]  This solves the transmittal issue.  The debtor does not have to transmit the plan to these claimants since unimpaired classes of claims are not entitled to vote on plan confirmation.[7]

35.     For this Court to count any votes solicited by J&J prior to the commencement of the Debtor's case, the Court must first determine whether J&J transmitted the Plan to substantially all claimants entitled to vote on the Plan.  The starting point to addressing this issue is:  what is the universe of talc claimants whose rights are being impaired and are included within Class 4?

36.     J&J answers this question in the Plan.  The "Channeling Injunction" in the Plan discharges J&J—and over one thousand "Protected Parties"—of the "Channeled Talc Personal Injury Claims."  *See* Plan at § 11.3.  Channeled Talc Personal Injury Claims is defined to include "Talc Personal Injury Claims," including Ovarian Claims, Gynecological Claims, and "Other Disease Talc Personal Injury Claims."  *Id.* at § 1.1.13.

---

[6]     Andrew M. Troop *et al.*, *The Mechanics of Prepacks:  What Happens Pre-Petition, and How to Make It Stick Post-Petition*, 071714-ABL-CLE 123, ABI Northeast Bankruptcy Conference (July 17-20, 2014) ("[P]repacks generally involve plans where the company's trade, employee and other creditors are left 'unimpaired'—either because that debt is all isolated in an operating subsidiary, or because the company's operations themselves do not require restructuring.  Since the creditors are left unimpaired, their votes need not be solicited for approval of the plan.  They are deemed to accept the plan.").

[7]     *See* 11 U.S.C. § 1126(f) ("a class that is not impaired under a plan" is "conclusively presumed to have accepted the plan"); 11 U.S.C. § 1124(1) (a "class of claims" is unimpaired if the plan does not alter the "legal, equitable, and contractual rights" of the claimants).

37.     **Ovarian Cancer Claims**.  The rights of holders of Ovarian Claims are impaired. Under the Plan, their claims are channeled to a trust, which will then assign their claims "points" which "points" have no intrinsic value and may or may not result in a payment that exceeds medical liens.  These claimants will lose the right to appear, to be heard, and to seek just compensation from J&J in the civil justice system where J&J can rightfully be expected to pay their claims in full, including awards of punitive and exemplary damages.

38.     **Gynecological Cancer Claims**.  The rights of holders of Gynecological Claims are also impaired.  Under the Plan, their claims are channeled to the same trust, which will then pay them $1,500.  While there is presently no scientific connection between exposure to J&J's talc products and most gynecological cancers, it is possible that such a connection may be established in the future, or these individuals later develop ovarian cancer.

39.     Should that occur, the Plan provides that these claimants will also have no right to appear, to be heard, and to seek just compensation from J&J in the civil justice system.  This is a reason why women who hold Gynecological Claims voted to reject the Plan notwithstanding the promise of a $1,500 payment if they voted to accept the Plan.

40.     **Other Diseases**.  The rights of holders of claims involving other diseases are also impaired.  Under the Plan, their claims are channeled to a brick wall.  They get nothing.

41.     If permitted by this Court, J&J's classification scheme, which places all talc claims into a single class, would essentially provide J&J with a free discharge for all talc claims involving other diseases.  All such claims are channeled to the same trust, but J&J is not required to provide any trust funding to pay such claims.  If properly classified, these claimants would be deemed to reject the Plan and their claims could not be channeled under section 524(g).  *See* 11 U.S.C. § 1126(g) ("a class is deemed to not have accepted the plan if such plan provides that the claims

… of such class do not entitle the holders of such claims … to receive or retain any property under the plan on account of such claims"); 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) (class must accept the plan by "at least 75 percent of those voting").

42.     Since J&J has defined Class 4 to include all these claims—*i.e.*, ovarian cancer ***plus***, gynecological cancer ***plus*** other disease—the next question the Court must consider is:  how many claimants hold these types of claim?  The answer is a significant portion of the U.S. population.

43.     Ovarian cancer is a rare disease.  In the Disclosure Statement, the Debtor asserts that "[a]s of the filing of the 2021 Chapter 11 Case, there were approximately 40,000 pending lawsuits asserting ovarian cancer claims … against LTL."  Disclosure Statement at § 2.2(a). Ovarian cancer claims, by themselves, do not translate into millions of potential voters.

44.     But Class 4 includes all claims involving any gynecological cancer regardless of whether there is any scientific link between the disease and talc exposure.  The barrier to validation for these claims under the Plan's Trust Distribution Procedures is low—the claimant needs to only assert that she used J&J's talc products to be eligible to receive a $1,500 payment.

45.     And J&J's definitions bring within the definition of Channeled Talc Personal Injury Claim ***any*** disease alleged to be connected to the usage of J&J's talc products (*i.e.*, it does ***not*** have to be cancer) (Plan at § 1.1.98), as well as claims based on the "fear of cancer" (*i.e.*, the claimants do ***not*** have to be sick or even anticipate that they will ever be sick, but only fear that they may get an unspecified type of cancer that may or may not be related to J&J's talc) (*id.* at § 1.1.141).

46.     When J&J refers to the discharge of its independent talc liability ***for all time***, J&J means that no one will ever be able to seek to recover damages from it in the civil justice system for any claim involving talc other than claims involving mesothelioma and lung cancer and other claims that are carved out of the Plan definitions and were not allocated to Red River by J&J.

47.     With J&J's goal in mind, and the universe of impaired claimants defined by J&J, the question becomes whether J&J transmitted the Plan to substantially all these claimants.  The answer is that it did not.  As the Debtor recently explained to the Court, and as set forth in the Solicitation Motion, J&J **argues** that it provided "notice to counsel to all known claimants" and that J&J spent "$9 million" on a "notice plan developed by Signal Interactive Media LLC" that consisted of advertisements "via radio, newspapers, consumer magazines, television, internet banners, paid internet search listings, and social media."  Dkt. No. 298.

48.     But notice is not the same thing as transmittal.  Bankruptcy Rule 3018(b) provides: "A holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Code shall not be deemed to have accepted or rejected the plan if the court finds after **notice** and hearing that the plan was not **transmitted** to substantially all creditors and equity security holders of the same class."  Fed. R. Bankr. P. 3018(b).

49.     J&J and the Debtor attempt to re-write Bankruptcy Rule 3018(b) to provide:  A holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Code shall not be deemed to have accepted or rejected the plan if the court finds after **notice** and hearing that **[constructive] notice of** the plan was not ~~**transmitted**~~ **given** to substantially all creditors and equity security holders of the same class.

50.     Bankruptcy Rule 3018(b) uses the term "notice."  This term is used simply in reference to the hearing before the Bankruptcy Court to determine if the plan was *transmitted* to substantially all creditors in the class.  Bankruptcy Rule 3018(b) uses the term "transmitted."  This term is used in reference to the debtor's obligation to provide a copy of the plan and other documents necessary for an informed vote to substantially all creditors in the class.

51.     However, even if the Debtor is permitted to re-write Bankruptcy Rule 3018(b) to suit J&J's objectives here, the Debtor cannot show that J&J provided proper notice.  Proper notice depends on the circumstance of the case.[8]  Here, the Debtor seeks to confirm a plan that discharges J&J and over one thousand "Protected Parties" of all "Channeled Talc Personal Injury Claims," including claims involving their own direct and independent liability.

52.     If the Debtor is going to seek a discharge for J&J and over one thousand Protected Parties, then the question is:  what is proper notice when that type of relief is sought?

53.     To determine the adequacy of notice to a creditor, the case law distinguishes between "known" and "unknown" creditors.[9]  Generally, a known creditor is a creditor whose identity is either known or is "reasonably ascertainable by the debtor."[10]  This makes logical sense. If the debtor is to obtain a discharge of its debts, then the debtor must provide notice to known creditors whose rights will be impaired if its discharge is to be approved.

54.     But the Debtor here has no need for a discharge.  This is not the purpose of this case.  The Debtor has no operating business.  The Debtor is a litigation vehicle.  The facts and circumstances of this case are that the Debtor is seeking a discharge for J&J and over one thousand Protected Parties.  This is a critical fact in determining the adequacy of notice.

---

[8]     *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974) ("[N]otice must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."); *In re Mansaray-Ruffin*, 530 F.3d 239 (3d Cir. 2008) (finding that the level of notice due to a party is "highly dependent on the context;" thus, a "process that may be constitutionally sufficient in one setting may be insufficient in another.").

[9]     *See In re Maya Const. Co.*, 78 F.3d 1395, 1399 (9th Cir. 1996) (due process requires formal notice to known contingent creditors); *In re Reg'l Care Servs. Corp.*, No. 16-1213, 2017 WL 2871751, at *6 (B.A.P. 9th Cir. July 5, 2017) ("It is a fundamental principle of due process that known creditors of a debtor are entitled to actual notice of a claims bar date before their claims can be extinguished") (citation omitted).

[10]    *See Tulsa Prof'l Collection Serv., Inc. v. Pope*, 485 U.S. 478, 490 (1988).

55.     The scope of the discharge sought informs who must receive notice and in what form.  If a talc claimant holds a talc claim against Walmart, and Walmart is to receive a discharge under a plan that bars such claimant from seeking just compensation from Walmart in the civil justice system—*i.e.*, such right is being taken away—then that claimant must receive notice.

56.     But herein lies the problem for J&J:  customers with whom a debtor has a "direct relationship" are generally considered known creditors.[11]  Customers with whom Walmart has a direct relationship are known creditors of Walmart and, therefore, are entitled to receive ***actual*** notice, not publication notice, if their claims against Walmart are to be discharged.  J&J and other Protected Parties maintain customer lists.  Yet such lists were **not** utilized by J&J to provide actual notice.  Instead, J&J seeks to satisfy Bankruptcy Rule 3018(b) through a media campaign.

57.     The premise of J&J's so-called "prepack" is that it can satisfy Rule 3018(b)'s requirement that the plan be ***transmitted*** to substantially all impacted claimants by ***publication notice***.  But this is not what the Bankruptcy Rule 3018(b) requires.

58.     The Debtor's likely response is that if actual notice and/or transmitted notice is required here, then a prepack is impossible.  But the response to this argument is simple:  that is correct.  Votes on the Plan that J&J has proposed cannot be solicited prior to the commencement of the case because compliance with Bankruptcy Rule 3018(b) in a mass tort case of this nature is impossible.

---

[11]     *See PacifiCorp & Van Cott Bagley Cornwall & McCarthy v. W.R. Grace*, No. 05-764, 2006 WL 2375371, at *4 (D. Del. Aug. 16, 2006); *accord Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 317 (1950) (publication is acceptable where it is not "reasonably possible or practicable to give more adequate warning," whereas when names and addresses are available, notice must be mailed); *In re Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016) (holders of ignition claims entitled to actual notice where the debtor would identify them through a reasonable search of its records).

## II.    **J&J Solicited Votes Using False and Misleading Information**

59.    The Motion, in its quest to certify the vote, also bypasses the requirement that votes be solicited based on adequate information.  Bankruptcy Rule 3018(b) provides that pre-filing solicitation comply with section 1126 of the Code.  *See* Fed. R. Bankr. P. 3018(b) (pre-filing solicitation must be "in compliance with § 1126 of the Code").

60.    Pursuant to section 1126(b), a holder of a claim that has accepted the plan before the commencement of the case is deemed to have accepted such plan only if "such acceptance . . . was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title."  11 U.S.C. § 1126(b).

61.    Section 1125(a)(1) defines "adequate information" to require "information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan."  *See* 11 U.S.C. § 1125(a)(1).

62.    Here, J&J's prepetition solicitation of votes not only failed to provide adequate information, but J&J sought to affirmatively mislead claimants.

63.    Claimants could have read the Disclosure Statement and supporting letters and reached the conclusions that (1) all talc lawsuits against J&J "have no valid scientific basis," (2) J&J's talc products "never contained asbestos," (3) the "safety of cosmetic grade talc" has been confirmed by "regulatory and scientific bodies," (4) the recoveries available under the Plan "substantially exceed" recoveries available in the tort system, (5) J&J has prevailed on the merits in "16 of the last 17 cases" to go to trial, (6) the average recovery for an Ovarian Claims under the Plan will be between "$75,000 and $150,000," and (7) the plan supporters conducted an

independent and separate analysis and reached the conclusion that the Plan is "in the best interest" of current and future claimants. *See* Disclosure Statement at §§ 1.1(c) & 2.2; LLT June 3, 2024 Letter. ***But none of this is true***. Any claimant who reviewed the Disclosure Statement or the supporting letters and reached any one of these conclusions was misled, which means that their votes in favor of the Plan cannot be certified or approved by this Court.

64. **Ovarian Cancer Claims Against J&J Have a Valid Scientific Basis**. In fact, this is the reason why J&J orchestrated two failed bankruptcy cases and this third bankruptcy case. J&J is terrified of the fact that its talc products contained asbestos, and that asbestos causes ovarian cancer. Courts have uniformly found causation evidence linking exposure to J&J's talc products to ovarian cancer sufficiently reliable to submit to juries. J&J has spent a fortune on bankruptcy professionals and keeps orchestrating one fraudulent bankruptcy case after another in a desperate attempt to avoid the civil justice system.

65. **J&J's Talc Products Did Contain Asbestos**. This is why J&J has lost case after case in the tort system, including recent verdicts in California,[12] Illinois,[13] Oregon,[14] and South Carolina.[15] Mesothelioma is only caused by exposure to asbestos. Every time J&J loses a case

---

[12]   Brendan Pierson, *J&J must pay $18.8 million to California Cancer Patient in Baby Powder Suit*, Reuters, July 18, 2023, https://www.reuters.com/legal/jj-must-pay-188-mln-california-cancer-patient-baby-powder-suit-2023-07-18/. *See* Beville Decl. [Dkt. No. 42] at Ex. 36.

[13]   Cailey Gleeson, *Court Orders Johnson & Johnson and Kenvue to pay $45 million in Talcum Baby Powder Lawsuit*, Apr. 22, 2024, https://www.forbes.com/sites/caileygleeson/2024/04/20/court-orders-johnson--johnson-and-kenvue-to-pay-45-million-in-talcum-baby-powder-lawsuit/. *See* Beville Decl. [Dkt. No. 42] at Ex. 35.

[14]   Brendan Pierson, *J&J must pay $260 million in latest talc trial, Oregon jury says*, Reuters, June 4, 2024, https://www.reuters.com/legal/jj-must-pay-260-million-latest-talc-trial-oregon-jury-says-2024-06-04/. *See* Beville Decl. [Dkt. No. 42] at Ex. 37.

[15]   BeLynn Hollers, *South Carolina Jury Awards $63.4 Million to Johnson & Johnson Asbestos Victim*, Business Wire August 15, 2024, https://www.businesswire.com/news/home/20240815967067/en/South-Carolina-Jury-Awards-63.4-Million-to-Johnson-Johnson-Asbestos-Victim. *See* Beville Decl. [Dkt. No. 42] at Ex. 38.

involving mesothelioma and lung cancer, it does so because of the evidence submitted to and received by the relevant jury proved that J&J's talc products contained **asbestos**.

66.     **Regulatory and Scientific Bodies Have Found that Cosmetic Talc Is Not Safe**. A study published in May 2024 in the *Journal of Clinical Oncology* involving 50,884 women found that exposure to talc products increases the risk of ovarian cancer, and in many instances nearly doubles the risk.[16]  Regulatory agencies have reached the conclusion that the genital use of talcum powder can cause ovarian cancer,[17] as have other scientists.[18]  There is a reason why J&J has discontinued the sale of talc products—they are dangerous, and they can and do cause death.

67.     **The Recoveries Available under J&J's Plan Are Substantially Less Than the Recoveries Available in the Tort System**.  No company has ever filed for bankruptcy because it wanted to pay tort victims more money.  To believe that J&J is the first and only exception to this statement is delusional.  J&J is trying to use a manufactured bankruptcy case to force the women it caused harm to accept *de minimis* payments—far less than the compensation they would receive outside of bankruptcy where their consent is required for settlement.

68.     This Court need look no further than the failed bankruptcy attempted by 3M in 2022.  Facing significant liability for its sale of defective earplugs, 3M placed one of its subsidiaries into bankruptcy and attempted to consummate a global settlement that would have

---

[16]    *See* Katie M. O'Brien, *et al., Intimate Care Products and Incidence of Hormone-Related Cancers: A Quantitative Bias Analysis*, J. CLIN. ONCOLOGY (2024) (Beville Decl. [Dkt. No. 42] at Ex. 3).

[17]    *See* Screening Assessment, Environmental and Climate Change Canada, Apr. 2021, at 36.

[18]    *See* Penninkilampi et al., *Perineal Talc Use and Ovarian Cancer: A Systemic Review and Meta-Analysis*, 29 Epidemiology 41 (2018); Berge, et al., *Genital Use of Talc and Risk of Ovarian Cancer: A Meta-Analysis*, 27 European J. Cancer Prev. 248 (2018); Taher et al., *Critical Review of the Association between Perineal Use of Talc Powder and Risk of Ovarian Cancer*, 90 Reproductive Toxicology 88 (2019); O'Brien et al., *Association of Powder Use in the Genital Area with Risk of Ovarian Cancer*, 323 JAMA 49 (2020); O'Brien et al., Supplementary Online Content (2020).

18

discharged 3M of its own tort liability. 3M asserted that the $1 billion settlement that it was offering to pay was "only" possible if consummated inside of a bankruptcy proceeding.[19]

69.     But after its subsidiary's bankruptcy case was dismissed for cause, *see In re Aearo Techs., LLC*, Case No. 22-02890-JJG-11, 2023 WL 3938436 (Bankr. S.D. Ind. June 9, 2023), 3M quickly settled for $6 billion outside of bankruptcy. Not only did this prove that 3M's representations about how settlement was "only" possible in bankruptcy were false, but it also showed the magnitude of the discount 3M hoped to achieve—*i.e.*, $5 billion—by leveraging the tools available in bankruptcy to suppress the value of valid tort claims.

70.     J&J knows that the recoveries available under its Plan are substantially less than the recoveries available in the tort system. The purpose of this bankruptcy case is for J&J—a wealthy and highly solvent Fortune 50 company—to resolve its own tort liability for a fraction of the amount it should pay in the civil justice system.

71.     J&J's Plan is also based on the fallacy that "finality" is required for settlement. Under the Plan (even as modified by the MOU, *see infra* ¶ 176), J&J has no obligation to fund any trust unless and until a final, non-appealable order is entered in this case discharging it of 100% its liability for Ovarian Claims, Gynecological Claims, and talc claims involving other diseases.[20] Given J&J's self-imposed requirement for settlement, the Debtor is likely to argue that unless J&J gets its discharge, then claimants will be harmed because J&J has determined that settlement is only possible in bankruptcy. This argument is unsound.

---

[19]    *See In re Aearo Techs. LLC*, Case No. 22-02890-JJG-11 (Bankr. S.D. Ind. July 26, 2022) (Dkt. No. 12) (Informational Brief of Aearo Technologies LLC at Section V).

[20]    *See* Plan at § 1.1.63 (definition of "Final Order"), § 4.1 ("Talc Personal Injury Trust" established on the "Effective Date"), § 4.9 (Contribution of Certain Assets), and § 8.2 ("Conditions Precedent to the Effective Date of the Plan" include the "Confirmation Order" becoming a "Final Order").

72.     A critical lesson learned in bankruptcy cases involving tort claims is that pursuing non-consensual releases (*i.e.*, 100% finality) can cause great harm to tort claimants and, at the same time, benefit the parties that seek such release.

73.     For example, the debtor in *Purdue* spent over four years attempting to confirm a plan that sought to deprive tort claimants of their right to seek recovery from various non-debtor parties, including the Sackler family, in the civil justice system.  During this time, no tort claimants were paid and the Sacklers retained all the monies that they offered to settle in bankruptcy.

74.     That plan was rejected by the Supreme Court.  *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 2088, 219 L. Ed. 2d 721 (2024).  The pursuit of non-consensual releases, and the Bankruptcy Court's willingness to support that pursuit (which was done with the best of intentions), did nothing other than delay payments to tort victims by years and enriched the parties who were alleged to cause harm.  What *Purdue* shows is that making settlement payments contingent upon the denial of legal rights is not good for anyone other than the tortfeasor.

75.     This is a reason why tortfeasors like J&J prefer bankruptcy.  They can attempt to settle their liability at a small fraction of the amount they would otherwise pay.  And they can defer payment to tort claimants while litigation takes place *for years* over the legality of the releases.  Given this dynamic, claimants are far more likely to be paid once the bankruptcy ends.[21]

---

[21]   As noted above, after 3M's manufactured bankruptcy case was dismissed as a bad faith filing, 3M settled in the MDL for six times the amount it was offering to pay tort claimants under a bankruptcy settlement.  If the bankruptcy case had not been dismissed, it is doubtful that any tort claimants would be paid as of today.  Likewise, after J&J's second manufactured bankruptcy case was dismissed as a bad faith filing, J&J settled approximately 95% of the current mesothelioma claims and governmental claims outside of bankruptcy for values that greatly exceeded the values offered in the bankruptcy case.  Again, absent dismissal, almost all these claimants would be unpaid as of today.  It is not just that the recoveries available under the Plan are substantially less than recoveries available in the tort system, but the recoveries available in the tort system are far more likely to occur in the near term if the Debtor's case is dismissed.

76.     __J&J Has Not Prevailed on the Merits in 16 of the Last 17 Cases__.  J&J has lost

on the merits in recent cases but managed to get several verdicts reversed on appeal on

procedural/jurisdictional grounds.  The tide may be turning against J&J.  Juries have seen the

evidence regarding **when** J&J first knew that its products contained asbestos, and the steps taken

by J&J to **conceal** this information from regulators and the public.  J&J orchestrated this third

bankruptcy case in anticipation of an MDL bellwether trial scheduled to begin in December 2024.

Companies that believe that they can prevail on the merits do not orchestrate fraudulent transfers,

create fake debtors, and file serial bad faith bankruptcy cases.

77.     __The Average Recovery for an Ovarian Cancer Claim Is Less Than Advertised__.

The average recovery advertised by J&J is mathematically impossible.  Any woman who contracts

a gynecological cancer and is willing to sign a declaration stating that she was exposed to J&J's

talc products is eligible for a $1,500 payment under J&J's Plan.  Given the number of current and

future claimants who qualify for this award, J&J's payments (to be made over the next 25 years)

do not provide funding sufficient to reach the $75,000 to $150,000 promised by J&J for holders

of Ovarian Claims.

78.     __There Is No Evidence that the Plan Supporters Conducted Any Independent__
__or Separate Analysis__.  Rather, all indications are that they simply agreed to support J&J's Plan

(based on J&J's "analysis") so long as their clients get paid and/or they reap the benefits of

participating in the trust as members of the Trust Advisory Committee or the Future Claimants'

Representative.

79.     This Court should ask the question:  what is stopping J&J and the Plan supporters

from settling tens of thousands of cases on economic terms on which they have already agreed

outside of bankruptcy?  After LTL 2.0 was dismissed, J&J had no problem settling with

governmental claimants and 95% of the mesothelioma claimants outside of bankruptcy.[22]   The answer is that J&J would not be able to weaponize those women's or their lawyer's choice to settle at this dollar amount against the women unwilling to settle and to bind them to a channeling injunction.   But that begs the question:  is J&J entitled to that weapon given its lack of financial distress and its unwillingness to subject itself to this Court's jurisdiction as a debtor?   The answer must be "no" as explained in the Coalition's motion to dismiss.  *See* Dkt. No. 44.

80.     Given these and other material defects in the Disclosure Statement identified in the Disclosure Statement Objection, the Court cannot find that J&J solicited votes in compliance with sections 1125 and 1126, which also precludes the certification of the alleged vote.  *See* Fed. R. Bankr. P. 3018(b) (pre-filing solicitation must be "in compliance with § 1126 of the Code").

## III.    A Significant Portion of the Claimants Who Voted Hold Un-filed and Un-vetted Claims

81.     The next problem with the Motion is that it asks the Court to certify votes cast by holders of un-filed and un-vetted claims.   In most pre-packs, the debtor solicits votes from a defined universe of debt holders prior to the commencement of the case.   The debt at issue is not disputed, contingent, or unliquidated.   Allowance, therefore, is not an issue.

82.     This means that when such debt holders vote to accept a plan before the commencement of a case, the Court can count those votes as votes to accept the Plan after the commencement of the case so long as the Court finds that the other requirements of Bankruptcy Rule 3018(b) are satisfied.   J&J's problem, however, is that allowance here is a gating issue.

83.     When determining class acceptance, the Court can only count the votes of holders of "allowed" claims.[23]   But all talc claims are disputed.   J&J and the Debtor dispute liability.

---

[22]   *See* Oct. 21, 2024 Hr'g Tr. 165:23-166:3 ("As you know, we resolved about 95 percent, I think, of the mesothelioma claims that were pending.").

[23]   *See* 11 U.S.C. § 1126(a) ("The holder of a claim or interest **allowed** under section 502 of this title may

Certain claimants dispute the validity of talc claims held by other claimants. Since the Court has not set a deadline for filing claims, the universe of current claims is not defined. The overwhelming majority of claims for which votes were case have not been filed in this bankruptcy case and "deemed allowed."[24]

84.     Unvetted, un-filed claims, asserted by claimants who may not exist, and who may not have an illness that is linked to talc exposure (or may have no illness at all) do not count for the purpose of determining class acceptance. *See* 11 U.S.C. § 1126.

85.     Compliance with the Bankruptcy Code and the Bankruptcy Rules is important here given the lack of visibility into the pool of voters that the Debtor contends support the Plan.

86.     In the Disclosure Statement, the Debtor assert that "[a]s of the filing of the 2021 Chapter 11 Case, there were approximately **40,000** pending lawsuits asserting ovarian cancer claims and approximately 470 pending lawsuits asserting mesothelioma claims against LTL." Disclosure Statement at § 2.2(a) (emphasis added).

87.     There are **three** diseases that have historically given rise to a compensable talc claim: [1] epithelial ovarian cancer, [2] mesothelioma, and [3] lung cancer. Personal injury and wrongful death claims that do not allege these diseases are non-compensable, as evidenced by jury

---

accept or reject a plan.") (emphasis added); 11 U.S.C. § 1126(c) ("A class of claims has accepted a plan if such plan has been accepted by creditors … that hold at least two-thirds in amount and more than one-half in number of the **allowed** claims of such class held by creditors … that have accepted or rejected such plan.") (emphasis added).

[24]   11 U.S.C. § 502(a) ("A claim or interest, proof of which is filed under section 501 of this title, is deemed **allowed**, unless a party in interest … objects.") (emphasis added); Fed. R. Bankr. P. 3003(c)(2) ("any creditor who fails to [file a proof of claim within the time prescribed by subdivision (c)(3)] **shall not** be treated as a creditor with respect to such claim for the purposes of **voting** and distribution.") (emphasis added).

verdicts[25] and prepetition settlements.[26]  But the Debtor—as constructed by J&J—has no liability for talc claims involving mesothelioma or lung cancer.  *See* Plan at § 1.1.13.  That means that the only compensable claims in this case are talc claims that involve epithelial ovarian cancer.

88.     Anyone that did not die from or is not currently suffering from epithelial ovarian cancer could not assert a talc claim against the Debtor that could survive a dispositive motion. Such claims do not give rise to a "right to payment" that is "enforceable" under "applicable law." *See* 11 U.S.C. §§ 101(5) & 502(b).  If reflected in a proof of claim and subject to objection, such claims would be disallowed for voting and distribution purposes in this case.  *Id*.

89.     But herein lies a major red flag—J&J asserts that **93,522** claimants voted on its Plan.  *See* Dkt. No. 47 at 1060 of 1062.  But, again, according to the Disclosure Statement, "[a]s of the filing of the 2021 Chapter 11 Case, there were approximately 40,000 pending lawsuits asserting ovarian cancer claims … against LTL."  Disclosure Statement at § 2.2(a).

90.     The Disclosure Statement is inaccurate—there are unfiled cases that are legitimate ovarian cancer claims and there are a substantial number of filed cases that would likely not meet

---

[25]  *See*, *e.g.*, *In re Johnson & Johnson*, 509 F. Supp. 3d 116 (D.N.J. 2019) (finding that the plaintiffs' causation evidence linking exposure to J&J's talc products to ovarian cancer is sufficiently reliable and admissible); *Carl, et al. v. Johnson & Johnson*, 464 N.J. Super 466 (N.J. Super Ct. App. Div. 2020) (same); *Ingham v. Johnson & Johnson*, 608 S.W.3d 663 (Mo. Ct. App. 2020) (finding J&J liable for ovarian cancer claims); Cailey Gleeson, *Court Orders Johnson & Johnson and Kenvue to pay $45 million in Talcum Baby Powder Lawsuit*, Apr. 22, 2024, https://www.forbes.com/sites/caileygleeson/2024/04/20/court-orders-johnson--johnson-and-kenvue-to-pay-45-million-in-talcum-baby-powder-lawsuit/.  (Beville Decl. [Dkt. No. 42] at Ex. 35); Brendan Pierson, *J&J must pay $18.8 million to California Cancer Patient in Baby Powder Suit*, Reuters, July 18, 2023, https://www.reuters.com/legal/jj-must-pay-188-mln-california-cancer-patient-baby-powder-suit-2023-07-18/.  (Beville Decl. [Dkt. No. 42] at Ex. 36); Brendan Pierson, *J&J must pay $260 million in latest talc trial, Oregon jury says*, Reuters, June 4, 2024, https://www.reuters.com/legal/jj-must-pay-260-million-latest-talc-trial-oregon-jury-says-2024-06-04/.  (Beville Decl. [Dkt. No. 42] at Ex. 37); BeLynn Hollers, *South Carolina Jury Awards $63.4 Million to Johnson & Johnson Asbestos Victim*, Business Wire August 15, 2024, https://www.businesswire.com/news/home/20240815967067/en/South-Carolina-Jury-Awards-63.4-Million-to-Johnson-Johnson-Asbestos-Victim.  (Beville Decl. at Ex. 38).

[26]  *See* LTL 2.0 Jun. 28, 2023 Hr'g Tr. (Beville Decl. [Dkt. No. 42] at Ex. 2) at 111:13-111:17 ("Johnson and Johnson never knowingly paid on a claim for a non-ovarian gynecological cancer.").

the qualifying criteria.  However, taking the Disclosure Statement's **<u>40,000</u>** number at face value, this suggests that **<u>53,522</u>** claimants appeared since J&J's first manufactured bankruptcy case.

91.     What is the basis for these claims?  Who are these claimants?  What disease(s) do they claim to have?  What steps, if any, did the law firms that support J&J take to vet their clients?  Ovarian cancer is a rare disease and only a fraction of the women who are diagnosed with ovarian cancer each year claim to have regularly used J&J's talc products.  It is not plausible that there are over 93,000 claimants in this case whose votes should be counted.

92.     However, even putting this issue aside, it appears that the Supporting Law Firms voted tens of thousands of claims as ovarian cancer claims even though the claimants they represent do not have epithelial ovarian cancer.  This could be a function of the fact that certain types of ovarian cancer fall within the definition of a "Gynecological Claim."

93.     For example, mucinous ovarian cancer, borderline mucinous ovarian cancers, germ cell ovarian cancer, small cell ovarian cancer, and stromal ovarian cancer are all types of "ovarian cancer," but none of them have been scientifically linked to exposure to J&J's talc products.

94.     Alternatively, it may be that certain law firms claim that their clients have ovarian cancer when, in fact, such clients do not actually have ovarian cancer.  Given the information J&J has disclosed to date, it is not possible to vet the claimants and determine what disease, if any, they have.  Until this gating issues is resolved, the Court cannot count any votes cast to accept the Plan.

## IV.    J&J's Solicitation Procedures Do Not Afford <br> Claimants With the Right to Object to Claims for Voting Purposes

95.     Compliance with the Bankruptcy Code and the Bankruptcy Rules here is also a question of claimants' right to due process.  J&J's procedures make J&J the sole and absolute arbitrator of who votes and how votes are weighed.  By defining what constitutes a Channeled

Talc Personal Injury Claim, J&J decides who is eligible to vote on the Plan, and whether a claimant's vote is counted.  But this is not how the Code and the Rules work.

96.     Bankruptcy Rule 3003(c)(3) provides that the Court "**shall** fix" the time within which proofs of claim may be filed.  Fed. R. Bankr. P. 3003(c)(3) (emphasis added).

97.     Bankruptcy Rule 3003(c)(2) provides that any creditor whose claim (a) is not scheduled in a debtor's schedules, or (b) is scheduled as disputed, contingent, or unliquidated "**shall** file a proof of claim" by the bar date fixed by the Court.  *See* Fed. R. Bankr. P. 3002(c)(2) (same).  Rule 3003(c)(2) further provides that "any creditor who fails to do so **shall** not be treated as a creditor with respect to such claim for the purposes of voting and distribution."  *Id.* (same).

98.     When these Rules are followed, a "party in interest" is afforded the right to object to claims that are "unenforceable" against the debtor under "applicable law."  11 U.S.C. § 502.  The Code and the Rules afford women suffering from epithelial ovarian cancer with the right to object to the tens of thousands of new claims that materialized after J&J's first bankruptcy case on the grounds that they are unenforceable under applicable law.  *Id*.

99.     But this right cannot be exercised unless and until claimants file proofs of claim that can then be subject to objection.  The Code and the Rules require a process by which claims are vetted before votes on a plan are certified to ensure that the votes cast by each class member are representative of the economic interests of the class.

100.     In contrast, J&J's procedures are designed to deprive women of this basic right to due process and use the votes of claimants who may not exist or who hold claims that are non-compensable under applicable law to forever deprive women dying from epithelial ovarian cancer from having access to the civil justice system where they can appear, be heard, and seek just compensation from J&J and other non-debtor parties.

101.     If the Court is going to permit the Debtor to pursue a bankruptcy case that is an obvious and flagrant litigation tactic—and should be dismissed as such under *In re Antelope Technologies, Inc.*, 431 Fed. Appx. 272, 275 (5th Cir. June 24, 2011)—the Court, at a minimum, needs to ensure that an appropriate process is put in place to vet claims before any vote is certified.

## V.     J&J's Tabulation Procedures Are Unlawful

102.     The Motion also seeks a certification of the vote pursuant to J&J's tabulation procedures, which accord a value of $1.00 to each claim for voting purposes.  But determining an appropriate framework for valuing claims for voting purposes is also a gating issue that must be resolved before the Court can certify or approve any vote.

103.     Under section 1126(c) an impaired class is deemed to accept a plan only if it is approved by those creditors who "hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors."  11 U.S.C. § 1126(c).  Accordingly, consideration must be given to the amount (or value) of the claims held by the various groups of talc claims (or types of talc claims) as well as the number of creditors who support the plan.

104.     Equal weighting of claims, as J&J's tabulation procedures propose, is unjust.  To see how ridiculous J&J's tabulation procedures are, consider that it means that someone who has once powdered a baby's bum and has no illness or symptoms, but merely an alleged fear from the exposure is afforded equal voting power with a woman who trusted J&J's talc products as part of her personal care regime and is now dying of ovarian cancer.

105.     The solution, as set forth in the *Motion of the Coalition of Counsel for Justice for Talc Claimants for Entry of an Order (I) Authorizing an Estimation of Current Talc Claims for Voting Purposes, and (II) Establishing Procedures and Schedule for Estimation Proceedings* (Dkt.

No. 267), is for the Court to estimate talc claims for voting purposes before it attempts to certify or approve any vote on the Plan.

## VI.    **The Smith Firm's Master Ballot**

106.    Assuming that each of the foregoing disputes is resolved in the Debtor's favor—*i.e.*, the Debtor proves that J&J "transmitted" the Plan to substantially all talc claimants, that the Disclosure Statement contains "adequate information," that un-vetted and un-filed claims can be allowed and counted for the purpose of determining class acceptance, and that all talc claims can be accorded the same weight regardless of the alleged injury and merits of each claim—then the Debtor will still have to confront the Smith Firm's master ballot.  While discovery is ongoing, the following facts have already emerged.

107.    **First**, clients whose vote is reflected in Beasley Allen's master ballot signed retainer agreements with Beasley Allen and not the Smith Firm.  *See* Dkt. Nos. 399-407.  Most clients have never spoken to Mr. Smith, or any person related to the Smith Firm.  *Id.*  The Smith Firm is a stranger to them.  Beasley Allen is their counsel.

108.    **Second**, nearly all these clients voted to reject the Plan and authorized Beasley Allen to vote to reject the Plan on their behalf.  *See id.*  To this day, these clients oppose J&J's Plan.  *Id.*  They do not consent to having their legal, equitable, and Constitutional rights taken away from them by the Debtor, J&J, and this Bankruptcy Court.

109.    **Third**, these clients did not give the Smith Firm authority to change their votes from "reject" to "accept."  *Id.*  They did not sign any document giving Mr. Allen Smith or the Smith Firm such authority.  *Id.*

110.    **Fourth**, the Smith Firm changed the votes of nearly 12,000 claimants based on two days' (or less) negative notice.  *See* Dkt. No. 257-4 at ¶ 2; Dkt. No. 257-5 at ¶ 2; Dkt. No. 257-6

at ¶ 2.  This was improper and unethical.  Two days' (or less) negative notice was not adequate to obtain informed consent or modify a vote on the Plan.

111.    The foregoing is now established through declarations submitted by 100 women who have come forward in the past two weeks to speak out against J&J's, the Debtor's, and Epiq's misrepresentations regarding how they voted on the Plan.  Just as the truth about the presence of asbestos in J&J's talc products cannot be silenced or suppressed, neither can the truth about the vote.  Even after stuffing the ballot box with un-vetted claims, J&J still failed to obtain the affirmative support of over 75% of the claimants who voted on the Plan.

112.    Confronted with the fact that J&J's and the Debtor's representations that the Plan enjoys the support of the "overwhelming majority" of claimants is false, the Debtor offers various arguments and assertions to justify its conduct, none of which withstand scrutiny.

### A.    The Beasley Allen Master Ballot Was Not Defective

113.    As a threshold matter, before discussing the Smith Firm, the Debtor offers various justifications as to why it was entitled to reject the master ballot submitted by Beasley Allen.

114.    **First**, the Debtor asserts that Beasley Allen submitted a master ballot that represented that claimants who support the Plan voted to reject it.  Motion at ¶ 6.

115.    To support this assertion the Debtor points to "21 plaintiffs" who allegedly voted to accept the Plan and who also appeared on other master ballots, including the one submitted by Beasley Allen.  *Id*. at ¶¶ 26 & 46.  On this basis, the Debtor contends that it was justified in rejecting the vote of "*[e]very single client*" that appeared on Beasley Allen's master ballot.  *Id*.

116.    But in multiple instances Epiq resolved conflicting votes involving dual representation.  The issue of dual representation arises in every mass tort case involving tens of thousands of victims and hundreds of law firms.  And, except when it came to Beasley Allen, in

29

none of those situations did the Debtor reject every single vote reflected on a master ballot as a consequence.

117.    Under J&J's own procedures, when Epiq received a ballot from a claimant and a conflicting ballot from a representative, Epiq was required to count the vote cast by the claimant. *See* Tabulation Procedures at § 4.c.  And when Epiq received a ballot from a representative and a conflicting ballot from another representative, it was ***required*** to coordinate with the respective law firms to cure the discrepancy.  *Id.* at § 4.g.

118.    When confronted with this situation, a solution was to confer with the law firms that purported to represent these 21 plaintiffs.  But Epiq did not make Beasley Allen aware that duplicate votes had been submitted by Onder Law, and Onder Law did not make Beasley Allen aware that it had submitted votes on behalf of these 21 plaintiffs.  *See* Birchfield Decl. (**Exhibit A**) at ¶¶ 17-39.   Beasley Allen was not afforded an opportunity to explain the circumstances surrounding the votes cast by these plaintiffs and could have done so.  *See id.*

119.    Furthermore, two of these plaintiffs have signed affidavits stating that they wanted to reject the Plan and were confused by emails sent by Onder Law that tried to get them to sign affidavits saying that they support the bankruptcy.  *See* **Exhibit B** (Certification of ▮▮▮▮▮▮▮▮ ) & **Exhibit C** (Certification of ▮▮▮▮▮▮ ).

120.    There was no basis for J&J, the Debtor, and Epiq to disqualify Beasley Allen's entire master ballot.  The Debtor offers no explanation as to how it could count other master ballots where this same issue arose and, at the same time, take the position that every single vote reflected on Beasley Allen's master ballot had to be disqualified.

121.    Further, master ballots submitted by Supporting Law Firms that have not participated in a single talc-related lawsuit contained deficiencies that J&J ignored.  For example,

the master ballot submitted by the Watts Law Firm purported to record the vote of 17,426 clients, of which 17,420 allegedly voted to "accept" the Plan and 6 allegedly voted to "reject" the Plan. But some of Watts' clients are alleged to have mesothelioma—*i.e.*, a type of talc claim that was not assigned to Red River.

122.    The reason why the Debtor was perfectly willing to count other master ballots, even when facially defective, was because most of the votes reflected on those ballots were votes to accept the Plan submitted by the Supporting Law Firms.  The Debtor was only looking for a justification to disqualify votes cast to reject the Plan.

123.    **Second**, the Debtor asserts that Beasley Allen submitted votes against the Plan on behalf of approximately 5,000 claimants who assert non-ovarian, gynecological claims.  Motion at ¶ 7.  But nearly every master ballot included votes cast by claimants who assert non-ovarian, gynecological claims.  These were the voting rules established by J&J.  Watts alone submitted 6,150 votes on behalf of claimants asserting non-ovarian claims.  But, except when it came to Beasley Allen, in none of those situations did the Debtor reject every single vote reflected on a master ballot as a consequence of the fact that such master ballot included non-ovarian claims.

124.    The obvious reason why nearly every master ballot included votes cast by holders of non-ovarian, gynecological claims is because J&J defined the term "Channeled Talc Personal Injury Claims" in the Plan to include such claims and invited them to vote on the Plan.

125.    Under the Plan, the holders of these claims are impaired.  If future developments establish a link between exposure to J&J's talc products and these diseases (or those women later develop ovarian cancer, a disease for which they are still at risk if they were a regular user of talcum powder), then such holders would (absent the confirmation of the Plan) have the right to appear, to be heard, and to seek just compensation from J&J in the civil justice system.  J&J cannot

credibly complain about the holders of a non-ovarian, gynecological claim voting on its Plan when it expressly solicited their votes.

126. **Third**, the Debtor asserts that Beasley Allen submitted votes on behalf of clients who are deceased and for which the firm did not obtain authorization from an estate representative. Motion at ¶¶ 6, 27 & 47-49. But J&J's talc products cause fatal illnesses.

127. The reason why J&J is in this situation is because it knowingly sold Baby Powder for decades that contained asbestos. Asbestos causes fatal diseases, including ovarian cancer. J&J cannot credibly criticize Beasley Allen because some of its clients have died over the course of years of litigation with J&J—a company that has now commenced three fraudulent bankruptcy cases to impose lethal delay and avoid compensating women while they are still alive.

128. Moreover, Beasley Allen's cases complied with the procedures in the MDL to address the need to substitute parties in cases where the client had died. *See* Birchfield Decl. at ¶¶ 40-45. J&J points to no show cause orders in the MDL where Beasley Allen cases were due to be dismissed by lack of compliance with CMO 9 (though hundreds of cases involving other firms were subject to such orders).

129. But even putting this aside, the solution was for Epiq to contact Beasley Allen and notify the firm of the issue so that Beasley Allen could have been afforded an opportunity to cure any alleged deficiency. Where, as here, this alleged issue impacted at most 183 votes, it was inappropriate for J&J to have disregarded the vote of every single client that appeared on Beasley Allen's master ballot.

130. **Fourth**, the Debtor asserts that it had "reason to harbor suspicions" because Beasley Allen's master ballot included votes on behalf of claimants whose claims had already been dismissed in the tort system. Motion at ¶ 50. But dismissal does not extinguish a claim,

particularly if that dismissal is the subject of an appeal or without prejudice.  *See* Birchfield Decl. at ¶ 46.  Further, these claimants are still claimants entitled to vote under J&J's Plan definitions. *Id*.  And harboring suspicions is not grounds to disenfranchise 12,000 claimants.

131.    **Finally**, the Debtor asserts that Beasley Allen failed to obtain the "informed consent" of its clients to vote to reject the Plan.  Motion at ¶¶ 10 & 44.

132.    The Debtor bases this assertion the following statement:  Mr. Birchfield *allegedly* told Mr. Smith, who then *allegedly* told Mr. Kim, that Mr. Birchfield had failed to obtain the informed consent of claimants who appeared on the Beasley Allen master ballot.  *Id*. at ¶ 30 ("Smith also informed the Debtor that Birchfield had conceded to him that Birchfield had indeed not obtained the informed consent of claimants, as he certified in the Beasley Allen Master Ballot.") (citing to the First Day Decl. of Mr. Kim).  This is not only false, but it is also hearsay.

133.    Next, the Debtor invokes Comment 7 to Rule 1.0 of the ABA Model Rule of Professional Conduct, which provides:  "Obtaining informed consent will usually require an *affirmative* response by the client or other person.  In general, a lawyer may ***not*** assume consent from a client's or other person's *silence*.  Consent may be inferred, however, from the conduct of a client or other person who has ***reasonably adequate information*** about the matter."  *Id*. at ¶ 45, fn. 9 (emphasis added).

134.    This is where the rubber meets the road—this is a question about informed consent. Here, J&J created its own voting procedures.  No procedures were approved by any Court.  Thus, the rules that J&J ask the Court to apply are the rules that J&J wrote.  Per J&J, the master ballots and procedures governing their use that J&J adopted did not preclude the use of negative notice.[27]

---

[27]    *Compare In re Boy Scouts of America*, Case No. 20-10343 (LSS) (Bankr. D. Del. Sept. 30, 2021) (Dkt. No. 6438 at Ex. 1 (Solicitation Procedures) p. 3) ("a Firm **may not** rely on providing any of its Abuse Survivor Clients **negative notice** when completing the Master Ballot on behalf of any Abuse Survivor Client if such client does not affirmatively respond with an express answer for each applicable

135.    But negative notice is not a free pass.  The Model Rule cited by the Debtor does not foreclose the use of negative notice.  Under the Rule, "informed consent" may be inferred "from the conduct of a client or other person who has reasonably adequate information about the matter."  Further, as recognized by this Court's recent ruling that claimants who do not affirmatively opt out of a plan release in a chapter 11 plan can be deemed to consent when votes are solicited post-filing pursuant to a Court-approved disclosure statement, adequate notice as well as time to make an informed decision are paramount considerations.[28]  It follows that when master ballot procedures like the one adopted by J&J are used, each firm is still required to provide its clients with ***adequate information*** and ***sufficient time*** to make an informed decision.

136.    On the issue of ***adequate information***, it cannot be forgotten that the Plan is a forced settlement.  Again, there is nothing stopping J&J and the Plan supporters from settling tens of thousands of cases on economic terms on which they have already agreed outside of bankruptcy.

---

election.") (emphasis added); *with In re Red River Talc, LLC*, Case No. 24-90505 (CML) (Bankr. S.D. Tex.) (Master Ballot Procedures, Dkt. No. 257-3, Option A Certification) ("I have collected and recorded the vote of such Client through customary and accepted practices, or have obtained authority to procedurally cast such Client's vote.  I have complied with all terms, instructions, and conditions set forth in this Master Ballot and the Disclosure Statement.  Each such Client has indicated his or her informed consent with respect to such vote under applicable law.") *and In re PG&E Corp.*, Case No. 19-30088 (DM) (Bankr. N.D. Cal. Mar. 17, 2020) (Dkt. No. 6340 at ¶ 13.a) ("the Firm will collect and record the votes of its Fire Victim Clients through customary and accepted practices, or that it has obtained authority to procedurally cast each Fire Victim Clients' vote (provided that the Firm has complied with the voting procedures set forth herein and each Fire Victim Client has indicated an informed decision on such vote).").  J&J could have adopted master ballot procedures similar to those approved by the Court in *Boy Scouts*, which precluded negative notice.  But J&J did not do so.

[28]    *See* Memorandum Decision on Plan Confirmation, *In re Robertshaw US Holding Corp.*, Case No. 24-90052 (Bankr. S.D. Tex. Aug. 16, 2024) (Dkt. No. 959); *accord In re Energy & Expl. Partners, Inc.*, No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 21, 2016) (Docket No. 730) (approving third-party releases as consensual, over objection of the U.S. Trustee, in light of sufficient notice and opportunity to object); *In re Southcross Holdings, LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (Docket No. 191) (finding that the debtors correctly characterized a release as consensual because debtors provided extensive notice of plan and confirmation hearing and no party specifically objected to plan's release provisions).  It cannot be the case that negative notice is appropriate when a debtor wants to bind claimants to a plan release under Court-approved procedures, but negative notice is inappropriate when law firms that represent tort victims want to protect their clients' rights and protect them from being bound by an inadequate settlement.

The issue is that J&J could not weaponize those women's or their lawyer's choice to settle at this dollar amount against women unwilling to settle and bind them to *de minimis* settlement values approved by J&J.  Under these circumstances, the failure to vote against the Plan could result in claimants losing their rights through a bankruptcy case manufactured by a Fortune 50 company.

137.    On the issue of **sufficient time**, it cannot be forgotten that J&J determined the voting period.  In most mass tort cases, Courts typically provide claimants with at least eighty to one hundred- and seventy-days' notice.  *See* Dkt. No. 268 at ¶ 538 & fn. 124.  Given the scope of the Plan releases and channeling injunction and the creditor body at issue, J&J should have gone with a much longer voting period.  But J&J went with a shorter period.  J&J did not make its Plan public until June 4, 2024.  And J&J picked July 26, 2024 as the voting deadline.

138.    This effectively gave law firms whose clients oppose the Plan less than 60 days to review the Plan, the Disclosure Statement, and the Trust Distribution Procedures, attempt to determine if J&J's projected payments to victims are feasible (which they are not), and provide adequate information to their clients about a Plan the confirmation of which could result in claimants losing their legal, equitable, and Constitutional rights.

139.    Consistent with applicable ethical rules, law firms like Beasley Allen had an obligation to protect its clients' rights.  **For years**, these clients have worked with attorneys at Beasley Allen and regard the attorneys at Beasley Allen their chosen and trusted counsel. *See* Birchfield Decl. at ¶¶ 9-14; Dkt. Nos. 399-407.

140.    Unlike many of the Supporting Law Firms that have never filed a talc-related lawsuit before, firms like Beasley Allen have been litigating against J&J for years and have communicated with their clients during this time period.

141.   Throughout the course of this relationship, Beasley Allen provided its clients with information regarding their claims, J&J's bankruptcy cases, including this third bankruptcy, and the proposed Plan and Disclosure Statement.  *See* Birchfield Decl. at ¶¶ 19-21.  It is in the context of this relationship that Beasley Allen obtained the informed consent of its clients during the voting period established by J&J and accurately recorded their votes on a master ballot created by J&J that was submitted to J&J prior to the voting deadline set by J&J.  *Id*. at ¶¶ 15-16.

142.   Beasley Allen is not the villain.  There is no legitimate basis for the Debtor to contend that Beasley Allen's master ballot was false or is different from the other master ballots that J&J eagerly accepted and counted.  The Beasley Allen master ballot was not defective.

## B.   The Smith Firm Master Ballot Was Defective

143.   Having failed to offer any credible basis for rejecting the master ballot submitted by Beasley Allen, the Debtor shifts tactics and offers various justifications as to why it was entitled to accept the master ballot submitted by the Smith Firm.

144.   **First**, the Debtor asserts that the Smith Firm had an attorney-client relationship with "approximately 11,000 claimants" listed on the master ballot submitted by Beasley Allen.  Motion at ¶ 12.  The Debtor further asserts that the Smith Firm was an "authorized representative" to these 11,000 claimants.  *Id.* at ¶ 42.

145.   But the evidence offered to date does not support either assertion.  If the Smith Firm had an attorney-client relationship with these claimants, then why have so many women now come forward and testified that they have never spoken to Mr. Smith, or any person related to the Smith Firm?  Likewise, if the Smith Firm was acting pursuant to a power of attorney, then why has that document not been produced?  The obvious answer is that such document does not exist.[29]  The

---

[29]   In most ***Court***-approved solicitation procedures that permit a law firm to vote to "accept" or "reject" a plan on behalf of clients pursuant to a valid power of attorney, the law firm is required to provide that

Coalition has sought these documents in discovery.  Rather than produce them, the Smith Firm objected to the request for production.

146.    **Second**, the Debtor asserts that the Smith Firm did obtain the informed consent of its alleged clients to vote to accept the Plan and that the Smith Firm's master ballot is "valid and proper" under J&J's tabulation procedures.  Motion at ¶¶ 12 & 40.  The Debtor also asserts that Mr. Smith acted pursuant to "**valid powers of attorney** under the 'Option B Certification' alternative provided for in the Master Ballots."  Motion at ¶ 32 (emphasis added).

147.    Both assertions are false.  Indeed, the Debtor's word choice here is telling.

148.    The "Option B Certification" that the Debtor references in the Motion required the law firm to have "authority under **a power of attorney**" to vote to accept or reject the Plan.  *See* Dkt. No. 257-3 at p. 11 of 32 (emphasis added).

149.    But in the Motion, the Debtor states that the Smith Firm acted pursuant to valid **powers of attorney**, which language mirrors the language used in the Smith Firm's letter to Beasley Allen's clients (which may have been written by J&J) where the Smith Firm asserted the right to change votes based on his "**power as attorney** authorized to prosecute your case."  *See* Dkt. No. 257-4 at Ex. 1, p. 5; Dkt. No. 257-5 at Ex. 1, p. 4; Dkt. No. 257-6 at Ex. 1, p. 4.

150.    But "**powers of attorney**" and "**power as attorney**" are not the same thing as a "**power of attorney**."  A "power of attorney" is a legal document—*i.e.*, one that gives an attorney the authority to act on behalf of his or her client.  "Powers of attorney" and the "power of an

---

power of attorney to the solicitation agent.  *See, e.g.*, *Boy Scouts*, Case No. 20-10343 (LSS) (Bankr. D. Del. Sept. 30, 2021) (Dkt. No. 6438 at Ex. 1 (Solicitation Procedures) p. 3) (power of attorney must be provided "concurrently with the Master Ballot"); *PG&E Corp.*, Case No. 19-30088 (DM) (Bankr. N.D. Cal. Mar. 17, 2020) (Dkt. No. 6340 at ¶ 13.a) (valid power of attorney must be provided to the solicitation agent).  *J&J's* procedures, in contrast, contain no such requirement.

attorney to prosecute a case" are not legal documents.  The statement that Mr. Smith could change a client's vote based on his "power as attorney authorized to prosecute" a case is gibberish.

151.    There is no evidence that the Smith Firm ever provided J&J or Epiq with a "power of attorney" reflecting the right to change votes on behalf of any client.  The Smith Firm never obtained such authorization.  This means that there was no basis for J&J or Epiq to believe that he could change votes under the "Option B Certification."

152.    This means that the only way J&J or Epiq could treat the Smith Firm's master ballot as "valid and proper" is if they had evidence that he obtained the informed consent of nearly 12,000 claimants.[30]  But it is now a matter of public record that Mr. Smith changed nearly 12,000 votes to reject the Plan to votes to accept the Plan based on two days' (or less) negative notice.  *See* Dkt. No. 257-4 at ¶ 2 & Ex. 1; Dkt. No. 257-5 at ¶ 2 & Ex. 1; Dkt. No. 257-6 at ¶ 2 & Ex. 1.

153.    As the Debtor points out, "[i]n general, a lawyer may ***not*** assume consent from a client's or other person's ***silence***."  Motion at ¶ 45, fn. 9 (emphasis added).  But for the Debtor to contend, as it does, that the Smith Firm's master ballot is "valid and proper," it must believe that the Smith Firm obtained informed consent based on ***two days' negative notice***.  *Id.* at ¶ 40.

154.    On September 11, 2024, a few days after signing a Memorandum of Understanding with J&J, the Smith Firm sent a letter by e-mail and Federal Express to Beasley Allen's clients who had previously voted to reject the Plan and informed them that the Smith Firm had negotiated a settlement with J&J and that it intended to change their votes to "accept" unless they asked the

---

[30]    This is the Option A Certification under J&J's procedures, which provides:

With respect to each Client identified on the Master Ballot Spreadsheet for whom "<u>Option A Certification</u>" is selected, if any, such Client is represented by me, and I have collected and recorded the vote of such Client through customary and accepted practices, or have obtained authority to procedurally cast such Client's vote.  I have complied with all terms, instructions, and conditions set forth in this Master Ballot and the Disclosure Statement.  Each such Client has indicated his or her informed consent with respect to such vote under applicable law.

Smith Firm to not change their vote by September 13, 2024, *i.e.*, two days after the e-mail was sent to clients and less than one day after clients received the letter via Federal Express.[31]

155. **Two days?**  The Debtor's claim that it achieved an acceptance rate of over 75% depends on this Court finding that two days' (or less) negative notice was sufficient to obtain the informed consent of nearly 12,000 women.  What else is the Debtor supposed to do here other than protest loudly and hope that the Court turns a blind eye?  The aspersions cast by the Debtor on Beasley Allen are more a reflection of J&J's and the Smith Firm's own misconduct and the fact that they know that the Smith Firm did not act with client authority or informed consent.

156. There is no possible way that the Smith Firm could have obtained the informed consent of nearly 12,000 claimants between September 11, 2024, and September 13, 2024.  And the Smith Firm never had a power of attorney.  But to assume that J&J does not understand this is to miss the point of this show entirely.

157. **Finally**, the Debtor asserts that "substantial majority of the clients jointly represented by the Smith Firm and Beasley Allen have now voted to accept the Amended Plan." Motion at ¶ 13.  The Debtor freely admits that the Smith Firm master ballot was used to change votes from "reject" to "accept," and that the Debtor instructed Epiq to make this change before Epiq certified the vote.  *Id.* at ¶¶ 33-34.  On this basis, Epiq then determined that 83.4% of the holders of Channeled Talc Personal Injury Claims had voted to accept the Plan.  *Id.* at ¶ 34.

---

[31]   The Smith Firm contends that it extended the September 13, 2024 deadline to September 15, 2024 by noting such extension on a "voting website."  See Dkt. No. 306-4 at ¶ 23.  But there is no indication that this alleged extension was communicated to claimants via e-mail or otherwise.  However, whether the Smith Firm gave claimants two days' negative notice or four days negative notice is of no consequence because neither time period was adequate.  *See In re Southland Corp.*, 124 B.R. 211, 226-27 (Bankr. N.D. Tex. 1991) (finding that 13 days between solicitation materials and the deadline to vote on the plan was "unreasonably short").

158.     As Epiq's declaration shows, Epiq's decision to change 11,434 votes from "reject" to "accept," caused the acceptance rate, ***for the first time***, to exceed the 75% acceptance threshold. *See* Dkt. No. 257-2.  But for the Smith Firm, J&J could not have commenced its third fraudulent bankruptcy case to deprive women of their right to appear, to be heard, and to seek just compensation for their injuries.  Women whose voices J&J and the Smith Firm are trying to silence have now come forward to testify that they did not vote to accept the Plan.

159.     J&J had to know that it would never succeed in having this Court count the Smith Firm's master ballot.  The Debtor effectively concedes this issue in the Motion through its reference to Comment 7 to Rule 1.0 of the ABA Model Rule of Professional Conduct.  But J&J may not care what consequences Mr. Smith may face for his conduct.

160.     As Coalition explained in its motion to reinstate the votes improperly modified by the Smith Firm (*see* Dkt. No. 266), the Debtor may be able to achieve its goal here by knocking out the master ballot submitted by Beasley Allen.  J&J's objective here is to pick a fight, fling mud, and hope that the Court's response is to declare a plague on both houses.

161.     By simply eliminating the master ballot submitted by Beasley Allen, the Debtor can then argue that it just cleared the 75% acceptance threshold.  *See* Dkt. No. 266 at Ex. B.  Under J&J's tabulation procedures, if discrepancies in master ballots cannot be cured, then inconsistent votes appearing in each ballot will not be counted at all.  The Coalition submits that J&J's goal here is to disenfranchise the women who said "no."  Just like the goal of this bankruptcy case is to silence the women who are demanding justice.

**VII.**     **The Plan on Which J&J Solicited Votes Has Changed**

162.     If the Court finds that it can certify the vote, the Court must then address yet another question:  which plan did the claimants vote to approve?  The Plan on which J&J solicited votes

prior to the voting deadline (the "June 2024 Plan") and the Plan contemplated by MOU (the "Amended Plan") are not the same.

163.    According to the Smith Firm, the MOU "resulted in an updated version of the Plan that is significantly better" for the Smith Firm's alleged clients as "compared to the original proposed version of the Plan," which the Smith Firm did not support.  Dkt. No. 257-4 at Ex. 1.

164.    The MOU purports to shift $500 million from future claimants to current claimants (*see* MOU at § II.B.1) and purports to create a new $1.1 billion Individual Review Fund (*see* MOU at § II.D).  But the criteria that will be used to allocate funds to the beneficiaries of this fund have yet to be developed or disclosed to claimants.  The MOU, on its face, suggests that claimants in Class 4 will not be treated the same—some may receive a bonus, but some may not.  *Id.* at § II.D.

165.    The Debtor may argue that these modifications do not require a re-solicitation under Bankruptcy Rule 3019(a), which provides that a plan proponent may modify a chapter 11 plan after it has been accepted but prior to confirmation.  Rule 3019(a) states:

> If the court finds **after hearing on notice** to the trustee, any committee appointed under the Code, and any other entity designated by the court that the **proposed modification does not adversely change the treatment of the claim** of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

Fed. R. Bankr. P. 3019(a) (emphasis added).

166.    As a threshold matter, the Debtor has yet to move to have the votes that claimants cast to accept the June 2024 Plan to be deemed votes to accept the Amended Plan.  If the Debtor seeks this determination, the Debtor will likely argue that the proposed modifications, which provide bonus payments to some but not all claimants, do not adversely change the "treatment" of claims held by voters who previously voted to accept the June 2024 Plan.

167.    The Debtor could cast "treatment" in terms of whether any claimant is worse off under the Amended Plan as compared to the June 2024 Plan.  But that is not how treatment works under the Code.  In fact, making this argument suggests a section 1123(a)(4) violation.

168.    Section 1127(a) provides that the proponent of a plan on which votes have been solicited from creditors "may modify such plan at any time before confirmation," unless the proposed modification causes the plan (as modified) to fail to "meet the requirements of sections 1122 and 1123."  11 U.S.C. § 1127(a).  Section 1123(a)(4) mandates that each claim in a particular class receive the same treatment.  11 U.S.C. § 1123(a)(4).

169.    As the Circuit Court found in *In re AOV Industries, Inc.*, "the most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members."  792 F.2d 1140, 1152 (D.C. Cir. 1986).  Section 1123(a)(4) prevents a plan from discriminating within a class—*i.e.*, once claims are placed into a class, the plan must provide for the same payment percentage to members of that class.

170.    But the bonus awards contemplated under the MOU give rise to a situation where some claimants in Class 4 will enjoy a higher payment percentage (due to their bonus payment) than other claimants in Class 4 (namely, those who do not get a bonus payment).  To effectuate different treatment between those who benefit from the Individual Review Fund and those who do not, the Debtor would have to create a separate class for the favored sub-group and re-solicit votes.

171.    So how then can the Debtor confirm the Plan before the Court without re-doing the vote in this case?  The answer is that the MOU does not provide for any new consideration.  J&J did not actually agree to any modifications to the Plan.

172.    Reading the fine print in the MOU, none of the new consideration is real.  The $500 million transfer from future claimants to current claimants is contingent upon the approval of J&J's

Future Claimants' Representative.  MOU at § II.B & fn. 5.  There is no indication whatsoever that J&J's Future Claimants' Representative will sign off on this provision.

173.     Likewise, the $1.1 billion Individual Review Fund is contingent upon the approval of "J&J's bankruptcy counsel, Jones Day."  *Id.* at § II.A.1.d.  There is no indication that Jones Day has signed off on the Individual Review Fund or will do so, particularly if the introduction of bonus payments to some but not all claimants means that the Plan must be re-solicited.[32]

174.     Of course, if J&J had wanted the MOU to give rise to a real commitment, it could have simply asked its Future Claimants' Representative and bankruptcy counsel to have signed off at the time the MOU was executed.  But J&J did not do so.

175.     In fact, there is no provision in the MOU that requires J&J to pay any funds to any claimants absent the entry of a final, non-appealable order confirming the Plan and approving the *Purdue*-style releases contained therein that go well beyond relief that is available under section 524(g), which makes the entire settlement illusory.

176.     Even the provisions that, on their face, suggest that J&J will fund an out-of-bankruptcy settlement if the confirmation order is vacated on appeal are contingent upon the U.S. Trustee not objecting to the Plan releases.  *See* MOU at §§ II.F.4.c & II.G.3.  Predictably, the U.S. Trustee has already lodged that very objection to the Plan.  *See* Dkt. No. 299.  If the confirmation order is vacated on appeal, J&J has a complete and total walk away right.

177.     Of course, the Smith Firm failed to disclose these material facts in its September 11th letter to claimants.  Instead, the Smith Firm falsely asserted that it had negotiated

---

[32]   Even the $650 million fund for attorneys' fees is subject to the entry of a final, non-appealable order confirming J&J's desired Plan.  *Id.* at § II.C.2.b.  And J&J has no obligation to fund the reduced payment of $520 million under Section II.G.2.f of the MOU now that the U.S. Trustee has objected to the *Purdue*-style releases in the Plan.  *Id.* at §§ II.F.4.c & II.G.3.  If the Smith Firm's motivation was to secure funds for attorneys' fees, it likely failed to achieve even that objective.

for a "significantly better" plan.  Dkt. No. 257-4 at Ex. 1.  In reality, there is no indication that the enhancements touted by the Smith Firm as a reason to support J&J's Plan are real or are even likely to materialize.  But if this is not true, then J&J guaranteed that its Plan could not be confirmed (as modified) without a re-solicitation of votes.

## **CONCLUSION**

178.    The Court should deny the Motion and grant the Coalition such other and further relief as the Court deems just and proper.

Dated:  November 6, 2024                    Respectfully submitted,

**OTTERBOURG P.C.**

/s/ *Melanie L. Cyganowski*
Melanie L. Cyganowski (*pro hac vice*)
Adam C. Silverstein (*pro hac vice*)
Sunni P. Beville (*pro hac vice*)
Jennifer S. Feeney (*pro hac vice*)
230 Park Avenue
New York, NY 10169
Telephone:     (212) 661-9100
Facsimile:     (212) 682-6104
Email:          mcyganowski@otterbourg.com
                asilverstein@otterbourg.com
                sbeville@otterbourg.com
                jfeeney@otterbourg.com

-AND-

**BROWN RUDNICK LLP**

David J. Molton (*pro hac vice*)
Jeffrey L. Jonas (*pro hac vice*)
Eric R. Goodman (*pro hac vice*)
Gerard T. Cicero (*pro hac vice*)
Susan Sieger-Grimm (*pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone:     (212) 209-4800
Facsimile:     (212) 209-4801
Email:          dmolton@brownrudnick.com
                jjonas@brownrudnick.com

44

egoodman@brownrudnick.com
gcicero@brownrudnick.com
ssieger-grimm@brownrudnick.com

**CO-COUNSEL FOR THE COALITION OF
COUNSEL FOR JUSTICE FOR TALC
CLAIMANTS**

### **Certificate of Service**

The undersigned hereby certifies that, on the 6th day of November 2024, she caused a true and correct copy of the foregoing document to be served on all parties who have subscribed for electronic notice via the Court's CM-ECF Notification System.

*/s/ Susan Sieger Grimm*
Susan Sieger-Grimm