**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC LLC,[1] | Case No. 24-90505 (CML) |
| Debtor. | |

**DEBTOR'S OMNIBUS OBJECTION TO THE MOTIONS OF THE COALITION AND UNITED STATES TRUSTEE TO DISMISS THE CHAPTER 11 CASE**

(Related to Docket Nos. 44, 299, 302, 303, 308, 309, 375, 376, 378, and 388)

---

[1]     The last four digits of the Debtor's taxpayer identification number are 8508.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 7

      A.    Talcum Power Litigation ........................................................................ 7

      B.    The Costs and Burdens of the Talc Litigation ....................................... 8

      C.    The Prior LTL Cases .............................................................................. 9

      D.    Commencement of This Chapter 11 Case ............................................ 10

           1.    Continued Negotiations Lead to an Initial Plan ....................... 10

           2.    Negotiations Leading to the Amended Plan ............................. 11

           3.    The 2024 Prepetition Corporate Restructuring ........................ 12

ARGUMENT ................................................................................................................. 15

I.     MOVANTS MISSTATE THE "BAD FAITH" DISMISSAL STANDARD IN THE FIFTH CIRCUIT ................................................................................. 15

II.    RED RIVER HAS A VALID REORGANIZATIONAL PURPOSE AND IS NOT PURSUING THIS CASE TO "SOLELY BENEFIT J&J." ............................. 18

      A.    Red River's Filing of Bankruptcy to Resolve Its Mass Tort Liability Is a Valid Reorganizational Purpose. ......................................................... 19

      B.    Neither the Plan's Provisions on Non-Debtor Releases Nor Purdue In Any Way Support Movants' Assertions of Bad Faith. ................................ 21

      C.    This Prepackaged Case Seeks to Immediately Resolve, Not "Escape" or "Delay" Resolution of, Red River's Talc Liabilities. ......................... 22

      D.    Movants' Going Concern and Property Maximization Arguments Fail. .............. 24

           1.    The Debtor Has a Legitimate Going Concern. ........................ 24

           2.    The Debtor's Bankruptcy Proceeding Maximizes Value for Creditors. ................................................................................ 24

III.   DAY ONE ASSERTIONS THAT THE PLAN IS NOT CONFIRMABLE ARE NOT GROUNDS FOR DISMISSAL; IN ANY CASE, THE PLAN IS CONFIRMABLE AND SECTION 524(G) IS NOT UNCONSTITUTIONAL .............. 27

      A.    Red River is Likely To Achieve a Successful Reorganization Within a Reasonable Period of Time. ................................................................. 27

      B.    The Debtor Can Obtain a Section 524(g) Channeling Injunction as to J&J and Kenvue. ......................................................................................... 29

           1.    Purdue Does Not Impact the Availability of Third-Party Releases in Section 524(g) Asbestos Bankruptcies. ...................... 29

           2.    As Purdue Acknowledges, Third-Party Releases May Be Available in Full-Pay Plans. ................................................................ 33

# TABLE OF CONTENTS
## (continued)

|  |  |  | **Page** |
|---|---|---|---|
| | C. | None of Movants' Remaining Confirmation Objections Support Dismissal. | 33 |
| | D. | Section 524(g)'s Provisions on Third-Party Releases Are Constitutional. | 34 |
| IV. | | FINANCIAL DISTRESS IS NOT REQUIRED, BUT IS PRESENT IN ANY EVENT. | 40 |
| | A. | The Fifth Circuit Does Not Mandate Financial Distress As a Precondition to Seeking Bankruptcy Relief. | 41 |
| | B. | Red River Is in Financial Distress. | 45 |
| | C. | Neither J&J Nor Red River Committed "Fraud" or Engaged in "Fraudulent Transfers" To Manufacture Jurisdiction or Financial Distress. | 47 |
| V. | | DISMISSAL OF LTL'S PRIOR BANKRUPTCIES DOES NOT SUPPORT OR WARRANT DISMISSAL HERE. | 49 |
| | A. | Red River Is Not A "Serial Filer" And, In Any Event, Circumstances Have Materially Changed Since The Prior LTL Bankruptcies. | 49 |
| | B. | Preclusion Doctrines Do Not Support Dismissal of This Case. | 53 |
| | | 1. Claim Preclusion Does Not Apply | 54 |
| | | 2. Issue Preclusion Does Not Apply | 54 |
| VI. | | EVEN IF "CAUSE" EXISTED TO DISMISS THIS CASE, THE COURT SHOULD DENY THE DISMISSAL MOTION. | 57 |
| CONCLUSION | | | 58 |

## TABLE OF AUTHORITIES

**Page**

CASES

Amchem Prods., Inc. v. Windsor,
521 U.S. 591 (1997)..................................................................................................39

Callan v. Deutsche Bank Tr. Co. Am.,
11 F. Supp.3d 761 (S.D. Tex. 2014) ........................................................................42

Carolin Corp. v. Miller (In re Carolin Corp.),
886 F.2d 693 (4th Cir. 1989) ...................................................................................15

Dexon Computer, Inc. v. Cisco Sys's Inc.,
2023 WL 2941414 (E.D. Tex. Feb. 7, 2023) ...........................................................55

Duke Power Co. v. Carolina Env't Study Grp., Inc.,
438 U.S. 59 (1978)....................................................................................................39

FM Properties Operating Co. v. City of Austin,
93 F.3d 167 (5th Cir. 1996) .....................................................................................38

Gibbes v. Zimmerman,
290 U.S. 326 (1933)..................................................................................................40

Greenhouse v. MCG Capital Corp.,
392 F.3d 650 (4th Cir. 2004) ...................................................................................43

Hammond v. United States,
786 F.2d 8 (1st Cir. 1986).........................................................................................37

Harrington v. Purdue Pharma, L.P.,
144 S. Ct. 2071 (2024)........................................................................................ passim

Ileto v. Glock, Inc.,
565 F.3d 1126 (9th Cir. 2009) ..................................................................................39

In re 15375 Mem'l Corp. v. Bepco, L.P.,
589 F.3d 605 (3d Cir. 2009)................................................................................25, 26

In re 234-6 W. 22nd St. Corp.,
214 B.R. 751 (Bankr. S.D.N.Y. 1997)......................................................................52

# TABLE OF AUTHORITIES
(continued)

**PAGE**

In re Aldrich Pump LLC,
  2021 WL 3729335 (Bankr. W.D.N.C. Aug. 23, 2021)............................................................20

In re Aldrich Pump LLC,
  2023 WL 9016506 (Bankr. W.D.N.C. Dec. 28, 2023) ......................................................19, 24

In re Am. Capital Equip., LLC,
  688 F.3d 145 (3d Cir. 2012)...................................................................................................28

In re Antelope Techs., Inc.,
  2010 WL 104556 (Bankr. S.D. Tex. Jan. 7, 2010), aff'd, 2010 WL 2901017,
  aff'd, 431 F. App'x 272 (5th Cir. 2011) ................................................................................25

In re Antelope Techs., Inc.,
  2010 WL 2901017 (Bankr. S.D. Tex. July 21, 2010).......................................................25, 26

In re Antelope Techs., Inc., 431 F. App'x 272 (5th Cir. 2011) ......................................................25

In re Bestwall LLC,
  605 B.R. 43 (Bankr. W.D.N.C. 2019)..............................................................................19, 24, 45

In re Bestwall LLC,
  606 B.R. 243 (Bankr. W.D.N.C. 2019), aff'd, 2022 WL 67469 (W.D.N.C. Jan.
  6, 2022), aff'd, 71 F.4th 168 (4th Cir. 2023), cert. denied, 144 S. Ct. 2519
  (2024)......................................................................................................................................36

In re Bestwall LLC,
  71 F.4th 168 (4th Cir. 2023), cert. denied, 144 S. Ct. 2519 (2024).......................20, 22, 23, 48

In re Century/ML Cable Venture,
  294 B.R. 9 (Bankr. S.D.N.Y. 2003)........................................................................................27

In re City of Stockton,
  909 F.3d 1256 (9th Cir. 2018) ................................................................................................40

In re Clinton Centrifuge, Inc.,
  72 B.R. 900 (Bankr. E.D. Pa. 1987) .......................................................................................15

In re Combustion Eng'g, Inc.,
  391 F.3d 190 (3d Cir. 2004)........................................................................................31, 35, 36

In re Congoleum Corp.,
  414 B.R. 44 (D.N.J. 2009) ......................................................................................................29

# TABLE OF AUTHORITIES

(continued)

**PAGE**

In re Cont'l Airlines Corp.,
  38 B.R. 67 (Bankr. S.D. Tex. 1984) ...............................................................................16

In re Creekside Senior Apts., L.P.,
  489 B.R. 51 (B.A.P. 6th Cir. 2013)..................................................................................28

In re DBMP LLC,
  2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021)....................................................48

In re Dow Corning Corp.,
  No. 95-20512 (Bankr. E.D. Mich. June 1, 2004) [Dkt. 16713, 29457] ...........................44, 45

In re Fed.-Mogul Glob. Inc.,
  684 F.3d 355 (3d Cir. 2012)............................................................................................20

In re HONX, Inc..
  2022 WL 17984313 (Bankr. S.D. Tex. Dec. 28, 2022) ........................................... passim

In re HONX, Inc.,
  No. 22-90035 (Bankr. S.D. Tex. Feb. 16, 2024) [Dkt. 1332]..........................................21

In re Imerys Talc Am., Inc.,
  38 F.4th 361 (3d Cir. 2022) .............................................................................................36

In re Johns-Manville Corp.,
  36 B.R. 727 (Bankr. S.D.N.Y. 1984)..............................................................15, 20, 44

In re LTL Mgmt., LLC,
  637 B.R. 396 (Bankr. D.N.J. 2022) ...............................................................13, 23, 55

In re LTL Mgmt., LLC,
  638 B.R. 291 (Bankr. D.N.J. 2022) ................................................................................31

In re LTL Mgmt., LLC,
  64 F.4th 84 (3d Cir. 2023) ...................................................................................... passim

In re LTL Mgmt., LLC,
  652 B.R. 433 (Bankr. D.N.J. 2023) ......................................................................... passim

In re LTL Mgmt. LLC,
  No. 23-12825 (Bankr. D.N.J. Aug. 11, 2023) [Dkt. 1211].............................................53

**TABLE OF AUTHORITIES**

(continued)

PAGE

In re McCormick Road Assocs.,
   127 B.R. 410 (N.D. Ill. 1991) ...............................................................................52

In re Mid-Valley, Inc.,
   No. 03-35592 (Bankr. W.D. Pa. 2003) [Dkt. 4, 5, 48, 482].......................................42, 43, 46

In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.,
   876 F. Supp. 2d 616 (D. Md. 2012) .......................................................................43

In re Muralo Co., Inc.,
   301 B.R. 690 (Bankr. D.N.J. 2003) .......................................................................20

In re N. Am. Refractories Co.,
   2007 WL 7645287 (Bankr. W.D. Pa. Nov. 13, 2007) ............................................44

In re Quigley Co., Inc.,
   676 F.3d 45 (2d. Cir. 2012)...................................................................................32, 35

In re Reiman,
   20 F. Cas. 490 (S.D.N.Y. 1874)............................................................................38

In re SGL Carbon,
   200 F.3d 154 (3d Cir. 1999)..................................................................................20

In re State Park Bldg. Grp., Ltd.,
   316 B.R. 466 (Bankr. N.D. Tex. 2004)..................................................................15

In re Tehum Care Servs., Inc.,
   No. 23-90086 (Bankr. S.D. Tex. Apr. 15, 2024) [Dkt. 1513]............................23, 41

In re Treco,
   240 F.3d 148 (2d Cir. 2001)..................................................................................40

In re Triumph Christian Ctr, Inc.,
   493 B.R. 479 (Bankr. S.D. Tex. 2013) ..................................................................52

In re Trusted Net Media Holdings, LLC,
   550 F.3d 1035 (11th Cir. 2008) ............................................................................47

In re U.S. Brass Corp.,
   301 F.3d 296 (5th Cir. 2002) ................................................................................47

## TABLE OF AUTHORITIES
(continued)

**PAGE**

In re USG Corp.,
No. 01-2094 (Bankr. D. Del. Mar. 27, 2006) [Dkt. 10709].....................................................44

In re W.R. Grace & Co.,
729 F.3d 311 (3d Cir. 2013)....................................................................................36, 39

In re W.R. Grace & Co.,
No. 01-1139 (Bankr. D. Del. Feb. 21, 2011) [Dkt. 26368-1] ...................................................44

In re Whittaker, Clark, & Daniels,
663 B.R. 1 (Bankr. D.N.J. 2024) ........................................................................26, 27

In re Wood,
825 F.2d 90 (5th Cir. 1987) ..................................................................................47

In re Zamora-Quezada,
622 B.R. 865 (Bankr. S.D. Tex. 2017) .........................................................................24

Kane v. Johns-Manville Corp.,
843 F.2d 636 (2d Cir. 1988)....................................................................................42

Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc.,
575 F.2d 530 (5th Cir. 1978) ..................................................................................54

Keller v. Dravo Corp.,
441 F.2d 1239 (5th Cir. 1971) ..........................................................................39, 40

Kuehner v. Irving Trust Co.,
299 U.S. 445 (1937).............................................................................................38

Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (Matter of Little Creek
Dev. Co.),
779 F.2d 1068 (5th Cir. 1986) ..................................................................... passim

Louisville Joint Stock Land Bank v. Radford,
295 U.S. 555 (1935).........................................................................................38, 40

Matter of Elmwood Dev. Co.,
964 F.2d 508 (5th Cir. 1992) ...............................................................16, 41, 49, 52

Montana v. United States,
440 U.S. 147 (1979)..............................................................................................56

# TABLE OF AUTHORITIES
(continued)

**PAGE**

Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.,
571 F.3d 299 (3d Cir. 2009).................................................................................54, 55

Ortiz v. Fibreboard Corp.,
527 U.S. 815 (1999)....................................................................................................36

Osherow v. Ernst & Young LLP (In re Interlogic Trace, Inc.),
200 F.3d 382 (5th Cir. 2000) .....................................................................................54

R.F.C. v. Denver & R.G.W.R. Co.,
328 U.S. 495 (1946).....................................................................................................38

Society Nat'l Bank v. Barrett (In re Barrett),
964 F.2d 588 (6th Cir. 1992) ......................................................................................52

United States v. Rodgers,
461 U.S. 677 (1983)....................................................................................................40

Yates v. Mun. Mortg. & Equity, LLC,
744 F.3d 874 (4th Cir. 2014) .....................................................................................43

Zucker v. Rodriguez,
919 F.3d 649 (1st Cir. 2019)......................................................................................39

**STATUTES**

11 U.S.C. § 349(a) ............................................................................................................49

11 U.S.C. § 362(d) ............................................................................................................28

11 U.S.C. § 502................................................................................................................36

11 U.S.C. § 524(g) .................................................................................................. passim

11 U.S.C. § 548(a) ............................................................................................................49

11 U.S.C. § 1109(b)..........................................................................................................36

11 U.S.C. § 1112(b) ...........................................................................15, 27, 28, 57, 58

11 U.S.C. §§ 1121–1129..................................................................................................36

28 U.S.C. § 157(b) ............................................................................................................36

## TABLE OF AUTHORITIES
(continued)

PAGE

28 U.S.C. § 1334.................................................................................................48

28 U.S.C. § 1359.................................................................................................48

28 U.S.C. § 1411(a) ...........................................................................................36

28 U.S.C. § 2403.................................................................................................34

### OTHER AUTHORITIES

140 CONG. REC. S4523 (daily ed. Apr. 20, 1994) (statement of Sen. Graham) ...........................17

Douglas G. Baird & Thomas H. Jackson, *Cases, Problems, and Materials on Bankruptcy* (2d ed. 1990).................................................................................44

FED. R. BANKR. P. 9005.1 ...................................................................................34

FED. R. CIV. P. 5.1...............................................................................................34

Irwin A. Horowitz and Kenneth S. Bordens, *The Consolidation of Plaintiffs: The Effects of Number of Plaintiffs on Jurors' Liability Decisions, Damage Awards, and Cognitive Processing of Evidence,* 85 J. APPLIED PSYCHOL. 909 (2000).................................................................................................................8

Janet A. Flaccus, *Have Eight Circuits Shorted? Good Faith and Chapter 11 Bankruptcy Petitions*, 67 AM. BANKR. L. J. 401(1993) ...........................................15

REPORT OF THE COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES, H.R. Doc. No. 137, 93rd Cong., 1st Sess. (1973)....................................15

SERIAL FILING, 4 NORTON BANKR. L. & PRAC. 3d § 111:4 .........................................50

x

Red River Talc LLC ("Red River" or the "Debtor"), the debtor in the above-captioned case, files this omnibus objection ("Objection") to the *Motion of the Coalition of Counsel for Justice for Talc Claimants to Dismiss the Chapter 11 Case Pursuant to 11 U.S.C. § 1112(b)* [Dkt. 44] ("Coalition Motion"); the *Motion of the United States' Trustee to Dismiss Case Under 11 U.S.C. § 1112(b)* [Dkt. 299] ("UST Motion" and, with the Coalition Motion, the "Dismissal Motions"); the *Joinder of Claimants Represented by Barnes Law Group, LLC* [Dkts. 302, 303], the *Joinder of Claimants Represented by Goldstein Greco P.C.* [Dkts. 308, 309], the *Memorandum of Law Joining the Dismissal Motions* filed by Cohen, Placitella & Roth P.C. [Dkt. 375], and the *Joinders in the Dismissal Motions* filed by certain of J&J's insurers [Dkts. 376, 378, 388] (collectively, "Movants").  In support of this Objection, the Debtor:  (i) incorporates (a) the *Declaration of John K. Kim in Support of Chapter 11 Case and Certain First Day Pleadings* [Dkt. 17] (the "Kim Decl."); (b) the *Declaration of John K. Kim in Support of Debtor's Complaint for Declaratory and Injunctive Relief and Related Motion* [Adv. Dkt. 3; Adv. No. 24-03194] (the "Kim PI Decl."); and (c) the *Declaration of John K. Kim in Support of the Debtor's Opposition to the Motions to Transfer Venue* [Dkt. 184] (the "Kim Venue Decl."), and (ii) respectfully states as follows:

## PRELIMINARY STATEMENT[2]

The Dismissal Motions are long on rhetoric and hyperbole but short on real facts and relevant law.  They ask this Court to do something that, to Red River's knowledge, no court has ever done (nor likely has ever even been asked to do):  dismiss a chapter 11 case commenced only after 83% of impacted creditors voted, through a prepetition solicitation process, to approve a prepackaged plan of reorganization.  To be sure, Movants are attempting to challenge the

---

[2]    Capitalized terms used herein but not otherwise defined have the meanings given to them in the Factual Background section below.

legitimacy of that vote by alleging, **<u>without any support</u>**, that J&J and Red River "stuffed the ballot box" with purportedly illegitimate, "non-ovarian cancer" voting claims.  The irony is that the Coalition's leader, the Beasley Allen law firm, purported to vote more such "non-compensable" claims (in excess of 5,000 votes) than anyone else.  And the firm has certified that it represents the individuals holding these claims.  Query how Beasley Allen can represent clients whose claims it views as worthless and lacking any scientific support.

But it does not matter.  The vote from just the ovarian cancer claimants was essentially the same, with more than 82% of them voting in favor of the Plan.  <u>See</u> Kim Venue Decl. ¶18.  Movants are therefore left with little more than rhetoric, baseless accusations, and personal attacks.  <u>See</u> Coalition Mot. ¶ 184 ("What is troubling is J&J's lack of shame . . . Its disclosure statement is a farce"); <u>id.</u> ¶ 33 (comparing J&J to Bernie Madoff).

The Coalition makes it sound as if it is settled fact that JOHNSON'S® Baby Powder causes ovarian cancer.  The J&J corporate family has always disputed, and continues to dispute, that JOHNSON'S® Baby Powder, a household product for over 125 years, contained any asbestos or caused any disease.  The legitimate science is to the contrary.  The verdict history of Red River and its predecessors is also to the contrary.  In more than ten years of litigation, only one plaintiff verdict withstood appeal, and that was in a consolidated case with 22 plaintiffs—a case that should never have been allowed to proceed.

Nonetheless, Red River's Plan is offering claimants approximately $9 billion to resolve the issue, one of the largest mass tort settlements in the history of the United States.  The Coalition attacks this case as an attempt to cause "delay to underpay," a theme that permeates its motion more than a dozen times.  The assertion is baseless.  Red River did not file this case until it had the requisite votes to confirm its Plan.  Indeed, the Dismissal Motions read as if there was

no vote, no settlement with law firms representing tens of thousands of claimants, and no support from a proposed future claimants' representative. The Coalition largely ignores these facts because they do not fit the Coalition's venomous narrative.

There was no automatic stay until the Plan had already been approved by the requisite claimants pursuant to sections 1126 and 524(g) of the Bankruptcy Code. And, consistent with the Debtor's intent, this case is already on an expedited schedule with a confirmation hearing scheduled to occur on January 27, 2025, less than 90 days from now. The Debtor has further agreed, prior to confirmation, to start establishing the infrastructure of the proposed asbestos trust and the trust's review of talc claims so that, upon the effective date of the Plan, talc claims can be paid as promptly as possible.[3] If there is delay, it will be because Movants seem intent on objecting to everything in this case and otherwise elongating the process to avoid confirmation. Movants have already proposed a lengthy, and unnecessary, "estimation" process, a lengthy, and unnecessary, bar date process, and an unnecessary process to appoint a different future claimants' representative. Each of these proposed actions would cause the very delay the Coalition claims it desires to avoid.

And the allegation that the Debtor is seeking to "underpay" by imposing a "low ball" settlement on claimants is obviously false. The Plan was negotiated at arm's length over a lengthy period of time with a well advised Ad Hoc Committee of claimants' counsel made up of numerous law firms that represent tens of thousands of talc claimants (the "AHC"). In the final stages of negotiations, the Debtor agreed to pay an additional approximately $1.75 billion, taking

---

[3]     See Plan § 4.6 (noting that, prior to the effective date, the Debtor will seek entry of an order, and advance cash otherwise to be delivered to the talc personal injury trust, "in order to enable set-up and claims processing work to be undertaken in advance of the Effective Date, so as to allow the Talc Personal Injury Trust to make payments in respect of compensable Channeled Talc Personal Injury Claims as soon as possible after the Effective Date.").

its total obligations to nearly $9 billion on account of the talc litigation.  The amounts the proposed 524(g) trust will pay claimants far exceeds any amounts plaintiffs could expect to receive in the tort system.

Movants are left only with the baseless assertion that what is really going on here is some "ruse" perpetuated by J&J and Red River to file chapter 11 only to delay until what Movants assert is the inevitable failure of this case.  Coalition Mot. ¶ 8.  Movants suggest that the Debtor and J&J have spent tens of millions of dollars in professional fees (just the extensive prepetition noticing media plan for claimants by itself cost almost $10 million), countless management time, and other untold resources as some sort of diversion, even though during this entire period the Debtor was out of bankruptcy and, as a result, was fully subject to the tort system.  And somehow the Debtor has "pulled the wool over the eyes" of the rest of the talc claimants' bar, who have at all times been fully represented by bankruptcy counsel and other advisers, to have them and their clients support an approximately $9 billion plan that Movants baselessly assert is doomed to failure.  The suggestion is absurd.  The Debtor's Plan is fully confirmable and is supported by the requisite supermajority of claimants, as required by the Bankruptcy Code.

Movants' legal arguments fare no better.  Movants barely reference the relevant standards for dismissal, failing to even mention this Circuit's long-established "totality of the circumstances" standard.  Nor do they meaningfully discuss relevant decisions, such as Judge Isgur's decision in In re HONX, that provide guidance especially relevant here.  Ultimately, Movants advance four grounds for dismissal, none of which come close to meeting their burden.

*First*, ignoring that J&J has neither manufactured nor sold JOHNSON'S® Baby Powder for 45 years, Movants wrongly assert that this chapter 11 case is "solely" for the benefit of J&J.  But it is Red River, not J&J, that bears legal responsibility (and owes indemnification obligations

4

to J&J) for the talc-related claims that are the subject of this case.  The validity of seeking to consensually and efficiently resolve tens of thousands of asbestos-related claims through a section 524(g) bankruptcy is supported by ample precedent.  That is all the more true here, given that over 83% of claimants support the plan of reorganization.

*Second*, Movants' various day-one assertions that Red River cannot confirm a plan in a reasonable period of time—primarily based on the suggestion that the Plan cannot include a channeling injunction for J&J—find no support in the law.  The Supreme Court's recent decision in Purdue in no way precludes the third-party releases contained in the Plan.  Purdue expressly acknowledged that third-party releases are available in section 524(g) cases.  Movants' assertion that the Plan cannot channel the alleged "independent" liability of J&J ignores section 524(g)'s text (which specifically provides for release of a third-party's alleged "direct" liability), as well as the entirely overlapping nature of the claims asserted against the Debtor and J&J.  Movants also ignore that Purdue preserved the possibility of third-party releases in "full-pay" cases, which the Debtor will show to be the case here.

*Third*, Movants' contention that this case should be dismissed because Red River either lacks or "manufactured" financial distress collapses at its first step.  Financial distress is not a precondition to filing bankruptcy in the Fifth Circuit; accordingly, Red River had no reason to "manufacture" it.  There are numerous examples of cases where solvent entities, each of which had been defending and paying claims in the tort system without overt signs of financial distress, resolved mass tort liabilities through claimant-supported and court-approved bankruptcy trusts.

The assertion that Red River is not in financial distress sufficient to justify its bankruptcy petition is false in any event.  Any company already besieged by close to 100,000 talc claims (with more to come)—any one of which could lead to a verdict in the tens to hundreds of

5

millions, if not billions, of dollars—should be considered the epitome of financial distress, as counsel for the TCC has previously acknowledged in opposing dismissal of another section 524(g) bankruptcy.  The cost of defending against this tsunami of litigation has been massive, literally in the billions of dollars.  Currently, Red River has the resources, through its Funding Agreements and other available assets, to meet its expenses and any indemnity obligation up to the $9 billion amount agreed to in its Plan.  The Coalition's own motion suggests the Debtor's existing funding is insufficient, asserting that the Plan pays ovarian cancer claimants only "5%" on account of their claims.  Coalition Mot. ¶ 84.  While Red River disagrees, the Coalition's motion also asserts that Red River's talc liability approaches $200 billion.  Based on its stated position, the Coalition cannot credibly argue a lack of financial distress.

Nor did J&J or Red River "manufacture" subject-matter jurisdiction or financial distress by committing "fraud" or effectuating "fraudulent transfers," as the Coalition suggests.  The 2024 Prepetition Corporate Restructuring was pursued only after a successful vote on the Plan and it allocated Red River the funding necessary to effectuate the resolution supported by the requisite supermajority of claimants and the proposed future claimants' representative ("Proposed FCR").

*Fourth*, there is no factual or legal basis for Movants' claim that Red River is a "serial filer" or that dismissal of the prior LTL cases requires dismissal of this case on res judicata or collateral estoppel grounds.  As this Court has already recognized, Red River is a "clearly different debtor" from LTL, with different assets and liabilities.  The UST's claim that Red River "has substantially the same assets and liabilities as LTL," UST Mot. ¶ 45, is simply incorrect.

The Dismissal Motions should be denied and this case permitted to proceed towards confirmation.

## FACTUAL BACKGROUND[4]

### A.    Talcum Power Litigation

Red River sought bankruptcy protection to resolve tens of thousands of current and future ovarian and gynecological claims that, absent consensual resolution, would take decades to resolve.  Kim Decl. ¶ 51.  Cosmetic talc litigation against LTL, Old JJCI, and J&J focused primarily on JOHNSON'S® Baby Powder, with plaintiffs historically asserting two types of claims:  (a) claims alleging ovarian and other gynecological cancers and (b) claims alleging respiratory cancers or other asbestos-related diseases, i.e., mesothelioma and lung cancer claims.  Id. ¶ 52.  Based on the voting on the Plan, the Debtor currently faces over 93,000 ovarian and other gynecological cancer claims.[5]

While Movants proclaim that Red River is "prosecuting this case solely to benefit J&J," e.g., Coalition Mot. at 27, J&J has neither manufactured nor sold talc-containing products for over 45 years.  See Disc. Stmt. at 10-11; In re LTL Mgmt., LLC, 64 F.4th 84, 93 (3d Cir. 2023).  The talc-related liabilities that will be resolved by the Plan are asserted in virtually every case against both the Debtor, as successor in pertinent part to Old JJCI and LTL/LLT, and J&J.  Kim PI Decl. ¶ 32.  In many jurisdictions, the plaintiffs have sought to hold the Debtor (or its predecessors) and J&J jointly and severally liable for the same claims.  Id.  Notably, plaintiffs do not differentiate between talc-containing products sold (long-ago) by J&J and (more recently) by Old JJCI and do not allege that only talc-containing products sold by J&J caused injury.  Id.

---

[4]    A more fulsome recitation of Red River's history, including its predecessors' corporate history, talc litigation, and the prior bankruptcy cases can be found in the *Disclosure Statement for Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [Dkt. 25] (the "Disclosure Statement").  In addition, terms that are not otherwise defined herein have the meanings given to them in the Kim Declaration.

[5]    See *Declaration of Stephenie Kjontvedt of Epiq Corporate Restructuring, LLC, Regarding the Solicitation and Tabulation of Ballots Cast on the Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [Dkt. 47] (the "Kjontvedt Declaration").

The alleged claims against J&J and Old JJCI in the MDL, for example, are all identical—based on the same products, same alleged defect, and same alleged harm.  Id. ¶ 33.  The allegations are asserted with respect to all talc products, defined collectively.  Id.  Nor do the MDL plaintiffs make any effort to differentiate between J&J and the Debtor (again, as successor to Old JJCI and LTL/LLT), referring instead throughout the MDL Complaint to the two separate entities collectively as the "Johnson & Johnson Defendants."  Id. ¶ 34.

**B.      The Costs and Burdens of the Talc Litigation**

Although JOHNSON'S® Baby Powder has been safely used by hundreds of millions of people worldwide for over 125 years, on May 19, 2020, Old JJCI announced it would permanently discontinue its line of talc-based JOHNSON'S® Baby Powder in the U.S. and Canada.  Kim Decl. ¶ 59.  This decision was based on business considerations, including lack of sales due to misinformation about the safety of talc-based JOHNSON'S® Baby Powder.  Id.

Prior to the filing of the 2021 Chapter 11 Case, roughly 1,300 ovarian cancer cases were dismissed without payment, and Old JJCI achieved 16 key defense verdicts, including in four trials in 2021 alone.  Kim Decl. ¶ 60.  Old JJCI also succeeded in obtaining reversals of many plaintiff verdicts on appeal.  Id.  All of the ovarian cancer plaintiff verdicts to date have been reversed on appeal with the exception of one case known as Ingham.[6]  Id. ¶ 61.  Despite these results, Old JJCI was subject to a number of plaintiff verdicts involving unpredictable and wildly divergent compensatory and punitive damages awards.  Id.

---

[6]      Although the verdict in Ingham was reversed in part and reduced, the total damages award was still $2.243 billion.  The St. Louis, Missouri trial court had permitted the consolidation of 22 ovarian cancer plaintiffs, 17 of whom were nonresidents, for a single trial.  The jury awarded compensatory damages in the aggregate amount of $550 million and punitive damages in the aggregate amount $4.1 billion.  On appeal, the punitive damages award was later reduced to $1.6 billion.  The prejudicial effect of consolidated trials on defendants has been well documented.  See, e.g., Irwin A. Horowitz and Kenneth S. Bordens, *The Consolidation of Plaintiffs: The Effects of Number of Plaintiffs on Jurors' Liability Decisions, Damage Awards, and Cognitive Processing of Evidence,* 85 J. APPLIED PSYCHOL. 909 (2000) ("Jurors were less likely to entertain alternative constructions of evidence as the number of plaintiffs increased.").

Old JJCI had incurred nearly $1 billion in defending personal injury lawsuits relating to alleged talc exposure, nearly all of which was spent in only the five years prior to the first LTL bankruptcy case ("LTL I").  LTL, 64 F.4th at 94.  In the months prior to the filing of LTL I, Old JJCI was paying anywhere from $10 million to $20 million in defense costs on a monthly basis.  Id.  In addition to these costs, Old JJCI paid approximately $3.5 billion in indemnity costs in connection with settlements and verdicts.  Id.  The litigation expenses and aberrant verdicts resulting from that litigation eroded the entirety of Old JJCI's earnings and put it in a loss position in 2020, and the divergent verdicts also created substantial uncertainty and inhibited Old JJCI's ability to fully focus on its business operations.  Id. at 107.  The cosmetic talc litigation was anticipated to continue for decades more, as were the extraordinary costs of defending and resolving tens of thousands of expected claims.  Id. at 94.

C.      **The Prior LTL Cases**

After considering the cost, burden, uncertainty, and anticipated duration of this cosmetic talc litigation, Red River's predecessor, LTL Management LLC ("LTL") pursued two bankruptcy filings in an attempt to negotiate a global, equitable, and final resolution of all pending talc claims against it.  Disc. Stmt. at 1, 19-20.  LTL's bankruptcies were ultimately dismissed due to an alleged lack of "immediate" financial distress, a unique requirement imposed by the Third Circuit in LTL's first bankruptcy case.  Id. at 1-2, 21-24.

Notwithstanding the dismissal of LTL's second petition, the New Jersey Bankruptcy Court remained optimistic about the possibility of a global settlement, and "strongly encouraged" the parties to build on the "remarkable progress" towards a viable global settlement already achieved during the 2023 Chapter 11 Case due to the "dogged efforts" of the negotiating parties.  In re LTL Mgmt., LLC, 652 B.R. 433, 455 (Bankr. D.N.J. 2023).

### D.   Commencement of This Chapter 11 Case

#### 1.   *Continued Negotiations Lead to an Initial Plan*

The parties did, in fact, actively continue negotiations, leading to agreement on a plan of reorganization.  Kim Decl. ¶ 120.  This plan was published on June 3, 2024 (the "Initial Plan") and was the result of extensive negotiations, over the course of several months, among counsel representing the substantial majority of claimants asserting talc claims;[7] the Proposed FCR, and representatives of LLT and J&J.  Id. ¶¶ 117-21.  The Initial Plan provided for the establishment of a trust funded in the amount of approximately $8 billion that, if confirmed and consummated, would fully resolve the Debtor's liability for Channeled Talc Personal Injury Claims.  Disc. Stmt. at ii.

The Initial Plan differed materially from the LTL 2023 Plan, including with respect to the following factors:  (a) as a result of the 2024 Prepetition Corporate Restructuring, the Plan does not seek to resolve or affect mesothelioma or lung cancer claims, governmental claims, or Canadian claims; (b) a significant number of claims have been resolved by the Debtor under the terms of master settlement agreements, which, when combined with the elimination of mesothelioma, lung cancer, governmental, and Canadian claims from the Plan, has the net effect of increasing the value available to compensate those claims that will recover from the talc personal injury trust; and (c) the Plan accommodates the Imerys/Cyprus settlement, which is expected to result in enhanced recoveries for channeled talc personal injury claims in that case. Kim Decl. ¶¶ 10 n.6, 46, 76, 92.

Based on available data and claimant counsel representations, LLT anticipated that, under the Initial Plan, holders of pending claims that qualify for payment as ovarian cancer claims

---

[7]   Such counsel were initially members of the AHC, and later included other counsel that initially opposed the Initial Plan.

under the trust distribution procedures would receive an average recovery of between $50,000 and $200,000, with an average value between $75,000 and $150,000 being more likely. Disc. Stmt. at 4. These estimates do not take into consideration any additional recoveries that holders of channeled talc personal injury claims may receive in the event that the Imerys/Cyprus settlement is consummated. Id. In contrast, in the 17 ovarian cancer cases that proceeded to trial against the Debtor's predecessors, plaintiffs prevailed in only one; in all the other adjudicated cases claimants received nothing. Id. In addition, the historical per claimant recovery for ovarian cancer under settlements net of administrative costs was $50,000 to $80,000. Id.

### 2. Negotiations Leading to the Amended Plan

At the end of the solicitation period for the Initial Plan, various firms (including members of the Coalition) that had objected to the Initial Plan asked the Debtor to pause the count and certification of votes to provide more time to negotiate a resolution of the firms' objections. Kim Decl. ¶ 127. Red River agreed to do so, and over the course of the succeeding weeks, LLT and J&J made a series of offers proposing to contribute significant incremental consideration to reach an agreement. Id. Every offer was rejected. Id.

The Smith Firm then approached LLT and J&J. Kim Decl. ¶ 128. The Smith Firm had brought the first talc trial against the Company in 2013 and had, as part of the opposition group led by Beasley Allen, actively opposed the prior bankruptcy proposals. Id. The Smith Firm advised that it represented, through a joint venture agreement with Beasley Allen, approximately 11,000 claimants, almost all of whose claims had been listed as "no" votes in a master ballot submitted by Beasley Allen. Id. Although Birchfield certified in that master ballot that he was submitting the claimants' votes based on their "informed consent," the Smith Firm disclosed to LLT and J&J that Birchfield had not obtained such consent, a fact Birchfield had conceded to Allen Smith of the Smith Firm. Id.

11

LLT and J&J thereafter engaged in extensive negotiations with the Smith Firm to resolve the firm's objections to the Initial Plan. Id. ¶ 129. Following these negotiations, an agreement was reached with the Smith Firm and memorialized in a Memorandum of Understanding ("MOU"). Id. As a result of the MOU, which has been incorporated into an amended plan (the "Amended Plan" or "Plan") to the extent applicable, the substantial majority of the clients jointly represented by the Smith Firm and Beasley Allen have now voted to accept the Amended Plan. Id. ¶ 130. The Amended Plan is also supported by the AHC and the Proposed FCR, although the Proposed FCR has not yet approved the MOU. Id. ¶ 8.

Epiq tabulated over 93,000 votes and ultimately reported that an overwhelming majority, 83%, of all claimants had voted to accept the Plan.[8] Similar to the overall count, more than 82% of ovarian cancer claimants accepted the Plan. Kim Venue Decl. ¶ 18.

### 3.      The 2024 Prepetition Corporate Restructuring

During and subsequent to the prior LTL bankruptcies, it became clear that most ovarian and gynecological cancer claimants and their counsel supported a prompt, fair, and efficient resolution of their claims in bankruptcy, while other claimants (or, more likely, their counsel) holding mesothelioma or governmental claims, preferred to litigate or otherwise resolve their claims in other forums. Kim Decl. ¶ 35. To address these differing points of view and satisfy the ovarian and gynecological cancer claimants' desire to effectuate a smooth plan process, LLT contemplated undertaking a prepetition corporate restructuring, which was addressed as part of Plan negotiations with the AHC and Proposed FCR. Id. A description of the potential restructuring was also included in the Disclosure Statement sent to claimants during the solicitation process. See Disc. Stmt. § 4.2.

---

[8]      See Kjontvedt Decl.

On August 19, 2024, LLT engaged in the 2024 Prepetition Corporate Restructuring through a series of steps, including: (a) the conversion of Holdco from a New Jersey corporation to a Texas limited liability company named J&J Holdco (NA) LLC ("Holdco (Texas)"); (b) the merger of LLT with and into Holdco (Texas), with Holdco (Texas) as the surviving entity and LLT ceasing to exist; and (c) a divisional merger of Holdco (Texas) under Texas corporate statutes.  Kim Decl. ¶¶ 35-38.

As a result of the Prepetition Corporate Restructuring, which involved one Texas-based entity dividing into three Texas-based entities, Red River was formed as a Texas limited liability corporation and became responsible for talc claims that would be resolved pursuant to the Plan. Id. ¶¶ 35, 37.  Red River's two principal assets are:  (i) its wholly owned subsidiary, Royalty A&M LLC ("Royalty A&M"), which is a Texas limited liability corporation that owns a portfolio of royalty revenue streams, and (ii) two funding agreements, the Debtor Indemnity Cost Funding Agreement and the Debtor Expense Funding Agreement (together, the "Funding Agreements").  Id. ¶¶ 39, 45-47.

Red River's funding arrangements are different than LTL's funding arrangements in the prior bankruptcies.  At the time of LTL's first bankruptcy, LTL was party to a funding agreement (the "2021 Funding Agreement") with J&J and New Johnson and Johnson Consumer Inc. ("New JJCI") up to the then-estimated value of New JJCI, an estimated value of $61.5 billion.  See In re LTL Mgmt., LLC, 637 B.R. 396, 418 (Bankr. D.N.J. 2022); LTL, 64 F.4th at 95.

At the time of LTL's second bankruptcy ("LTL II"), LTL was party to a funding agreement (the "2023 Funding Agreement") with Johnson & Johnson HoldCo (NA) Inc. ("HoldCo"),[9] as well as a separate support agreement (the "J&J Support Agreement") with

---

[9]     In December 2022, New JJCI—which had continued Old JJCI's Consumer Health operations—changed its name to Johnson & Johnson HoldCo (NA) Inc.  See LTL, 652 B.R. at 438.  Thereafter, in early January

Holdco and J&J that provided for J&J's financial support upon confirmation of a plan in bankruptcy.  LTL, 652 B.R. at 440.  The 2023 Funding Agreement, like the 2021 Funding Agreement, provided financial support up to the value of Holdco, which the New Jersey Bankruptcy Court estimated to be worth between $22.3 billion (forced liquidation value) and $29.9 billion (going-concern value), plus billions in ongoing future dividends expected to flow to Holdco from its subsidiaries and indirect affiliates.  Id. at 446.  The J&J Support Agreement would provide support only upon confirmation of a plan proposed in LTL's second case and was limited to the amount of that plan ($8.9 billion on a net present value basis).  Id. at 440.

In this case, the Debtor Indemnity Cost Funding Agreement with New Holdco (Texas) provides funding to fund a Talc Personal Injury Trust under section 524(g) or, if the Plan does not become effective and the Chapter 11 Case is dismissed, to pay settlements or verdicts in the tort system, in both cases subject to the periodic funding limits established in the Plan (an aggregate amount approximating $9 billion).  See *Second Amended and Restated Indemnity Cost Funding Agreement* (attached as Annex E to the Kim Decl.); Disc. Stmt. at 39-40.  The Debtor Expense Funding Agreement provides funding for the cost of this Chapter 11 Case, as well as any attorney or expert fees and costs associated with defending the talc litigation in the tort system; it is not subject to any funding limits.  See *Second Amended and Restated Expense Funding Agreement* (attached as Annex G to the Kim Decl.); Disc. Stmt. at 40-41.

---

2023, HoldCo spun off its Consumer Health business assets to its parent entity, Janssen Pharmaceuticals, Inc.  Id.  The transfer was in connection with the long-contemplated spin-off of New JJCI's Consumer Health business as a new entity, to be called Kenvue, Inc., which was publicly announced in November 2021 and planned for months beforehand.  Id.  The New Jersey Bankruptcy Court found that the "evidence presented" showed "no relationship" between the spin-off and either bankruptcy.  Id.

14

**ARGUMENT**

**I.     MOVANTS MISSTATE THE "BAD FAITH" DISMISSAL STANDARD IN THE FIFTH CIRCUIT.**

Section 1112(b) of the Bankruptcy Code provides that, "on request of a party in interest," a bankruptcy court "shall" dismiss a chapter 11 bankruptcy case "for cause."  11 U.S.C. § 1112(b)(1).  While the Bankruptcy Code does not include a lack of good faith amongst the sixteen-item list of "causes" for which a bankruptcy case must be dismissed, see 11 U.S.C. § 1112(b)(4)(A)-(P), courts have nonetheless engrafted this requirement onto section 1112(b). Carolin Corp. v. Miller (In re Carolin Corp.), 886 F.2d 693, 698 (4th Cir. 1989).[10]  Even with the development of this judicially-created standard, however, courts have insisted that the "good faith" dismissal standard should be applied on a limited basis such that it does not upset the "delicate balance of interests fashioned by Congress under chapter 11."  In re Clinton Centrifuge, Inc., 72 B.R. 900, 905 (Bankr. E.D. Pa. 1987);  see also In re Johns-Manville Corp., 36 B.R. 727, 737 (Bankr. S.D.N.Y. 1984) (good faith standard should be applied on a limited basis). Specifically, the Fifth Circuit has noted that this requirement exists to "prevent[] abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes."  Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (Matter of Little Creek Dev. Co.), 779 F.2d 1068, 1072 (5th Cir. 1986); In re State Park Bldg. Grp., Ltd., 316 B.R. 466, 475-76 (Bankr. N.D. Tex. 2004) (requiring a finding of "particularly egregious" facts in order to establish bad faith and denying motion to dismiss where

---

10      Red River does not concede that the judicially-created good-faith requirement is supported in the law and preserves its right to argue to the contrary in any appeal.  See REPORT OF THE COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES, H.R. Doc. No. 137, 93rd Cong., 1st Sess. (1973) at 183 ("[T]he 'good faith' [filing] test is **eliminated**.") (emphasis added); Janet A. Flaccus, *Have Eight Circuits Shorted? Good Faith and Chapter 11 Bankruptcy Petitions*, 67 AM. BANKR. L. J. 401, 402-03 (1993) (discussing Bankruptcy Code's intentional removal of "good faith" requirement that existed in Bankruptcy Act of 1898).

15

movant failed to establish improper motive); In re Cont'l Airlines Corp., 38 B.R. 67, 71-72 (Bankr. S.D. Tex. 1984) (denying motion to dismiss where "there was no intent or motive to abuse the purpose of the Bankruptcy Code").

The Fifth Circuit has directed courts to apply a "totality of the circumstances" test in determining whether there is "cause" to dismiss a bankruptcy for an alleged lack of good faith. See id.  A debtor's good faith in filing its petition "depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities."  Id.  Courts must consider "the facts and circumstances germane to each particular case."  Matter of Elmwood Dev. Co., 964 F.2d 508, 510 (5th Cir. 1992).  The Fifth Circuit has further stated that good faith is based on "[a] collation of factors, rather than any single datum." Id. (citing Little Creek, 779 F.2d at 1072, 74).[11]  Thus, while a debtor's "financial realities" may be taken into account, they are not dispositive and would instead constitute one "datum" informing the court's analysis.

The most relevant interpretation of the Fifth Circuit's dismissal standard here is Judge Isgur's recent decision denying a motion to dismiss the asbestos chapter 11 case of in In re HONX, Inc..  2022 WL 17984313 (Bankr. S.D. Tex. Dec. 28, 2022).  There, the asbestos debtor, whose business activity "consist[ed] solely of defending itself against asbestos litigation" and faced over 1,000 asbestos claims that threatened to take decades to resolve, filed bankruptcy to "address and fairly resolve its alleged asbestos liabilities" under section 524(g).  Id. at *1.  The

---

[11]    For example, in Little Creek, the Fifth Circuit identified certain "recurring but non-exclusive patterns" that are the hallmark of "bad faith" bankruptcy filings, such as common elements where:  (a) "[t]he debtor has one asset, such as a tract of undeveloped or developed real property;" (b) "[t]he secured creditors' liens encumber this tract;" (c) "[t]here are generally no . . . available sources of income to sustain a plan of reorganization;" (d) "there are only a few, if any, unsecured creditors whose claims are relatively small;" and (e) "[t]he [debtor's] property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court."  Little Creek, 779 F.2d at 1073.

16

creditor's committee argued that the petition had been filed in bad faith because HONX only sought bankruptcy protection to benefit its parent company, Hess Corporation ("Hess"). Id. at *2.

Judge Isgur noted that the "[r]equirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes." Id. at *1 (citing Little Creek, 779 F.2d at 1072). The court ultimately held that "HONX did not file its petition in bad faith," reasoning:

> Congress recognized that while an asbestos bankruptcy differs from a 'classic' bankruptcy with an insolvent or near-insolvent debtor, it is still a forward-looking solution meant to treat fairly all parties in interest. That is the hallmark purpose of chapter 11. That is not a 'bad faith' motive.

Id. at *2; see also id. ("Congress wrote § 524(g) to codify what it described as a 'creative solution to help protect future asbestos claimants.'" (citing HOUSE REPORT (REFORM ACT OF 1994)); 140 CONG. REC. S4523 (daily ed. Apr. 20, 1994) (statement of Sen. Graham) (Congress created Section 524(g) so that "debtor[s] and third parties who are alleged to be liable for [] asbestos claims … [would] be encouraged to participate in a system that will maximize the assets available to pay asbestos claims, present and future, and provide for an equitable distribution and method of payment."). Given the similarities between HONX and Red River, which is also an asbestos debtor seeking bankruptcy protection to access the relief set forth in section 524(g), this interpretation of the flexible Little Creek standard is highly relevant here.

Movants bear the burden of establishing cause for dismissal. See HONX, 2022 WL 17984313, at *1 ("The movant bears the burden of showing cause exists to dismiss a debtors' [sic] chapter 11 case.") (citing In re Ford Steel, LLC, 629 B.R. 871, 879 (Bankr. S.D. Tex. 2021) ("The party seeking dismissal or conversion bears the burden of proving cause by a

17

preponderance of the evidence.")).  As the Fifth Circuit has stated, the movant must first establish a *prima facie* case that the debtor's conduct "rise[s] to the level of egregiousness necessary to conclude that the reorganization process is being perverted . . . ."  See In re Little Creek, 779 F.2d at 1073.  Only once such a showing has been made does the burden shift to the debtor to prove that the filing was made in good faith.

Movants collectively advance four interrelated bases for dismissal here.  *First*, they argue this case lacks a valid reorganization purpose and is being pursued solely for the benefit of J&J.  See, e.g., Coalition Mot. ¶¶ 97-138.  *Second*, they argue that the Debtor cannot effectuate or confirm a plan under section 524(g) providing a channeling injunction to J&J and Kenvue "within a reasonable time (or ever)" or, alternatively, that any such plan would render section 524(g) unconstitutional.  Id. ¶¶ 139-72; UST Mot. ¶¶ 64-71.  *Third*, Movants assert that Red River lacks the financial distress putatively required for it to seek bankruptcy in good faith or, alternatively, that any such distress was "self-inflicted" and "manufactured."  Coalition Mot. ¶¶ 173-86; UST Mot. ¶¶ 58-63.  *Fourth*, Movants assert that Red River is a "serial filer" and that dismissal of the prior LTL bankruptcies warrants dismissal of Red River's bankruptcy on preclusion grounds.  Coalition Mot. ¶ 173 n.51; UST Mot. ¶¶ 42-57.

Movants have failed to satisfy the requisite burden.  None of these arguments provide valid grounds for dismissal.

## II.    RED RIVER HAS A VALID REORGANIZATIONAL PURPOSE AND IS NOT PURSUING THIS CASE TO "SOLELY BENEFIT J&J."

Movants' various, overlapping arguments that this case lacks a valid reorganizational purpose, and that Red River is "prosecuting this case solely to benefit J&J," are meritless.

**A.      Red River's Filing of Bankruptcy to Resolve <u>Its</u> Mass Tort Liability Is a Valid Reorganizational Purpose.**

As explained above, and as was found in the prior LTL cases, J&J has not manufactured or sold JOHNSON'S® Baby Powder or Shower-to-Shower for over 45 years.  See <u>LTL</u>, 64 F.4th at 93.  Those products have been manufactured and sold by, and the assets and liabilities associated with those products have been transferred to, J&J subsidiary entities for decades.  See <u>id.</u>  Those liabilities and related indemnification obligations are now the responsibility of Red River.  Any alleged liability of J&J for these products is secondary, and not wholly separate from Red River's liability.  There is, accordingly, no basis in law or logic to suggest that Red River filed this case "solely to benefit J&J."  Red River filed this case to resolve liabilities for which **it** has primary and predominant liability.

Seeking a comprehensive resolution of thousands of unpredictable and seemingly unending mass tort claims—particularly for asbestos-related claims through section 524(g), a unique bankruptcy provision created by Congress—is a valid reorganizational purpose.  This is supported by ample precedent, including Judge Isgur's decision in <u>HONX</u>.  See <u>HONX</u>, 2022 WL 17984313, at *2 ("[W]hile an asbestos bankruptcy differs from a 'classic' bankruptcy with an insolvent or near-insolvent debtor, it is still a forward-looking solution meant to treat fairly all parties in interest.  That is the hallmark purpose of chapter 11.  That is not a 'bad faith' motive."); <u>In re Bestwall LLC</u>, 605 B.R. 43, 49 (Bankr. W.D.N.C. 2019) ("Attempting to resolve asbestos claims through 11 U.S.C. § 524(g) is a valid reorganizational purpose, and filing for Chapter 11, especially in the context of an asbestos or mass tort case, need not be due to insolvency."); <u>In re Aldrich Pump LLC</u>, 2023 WL 9016506, at *23 (Bankr. W.D.N.C. Dec. 28, 2023) ("Judge Beyer's <u>Bestwall</u> decision starts with a generally uncontroversial observation: 'attempting to resolve asbestos claims through 11 U.S.C. § 524(g) is a valid reorganizational

19

purpose.'"); Johns-Manville, 36 B.R. at 741 ("[S]imply because a company's economic pressures are tort-related in nature instead of more traditional financial business woes does not demonstrate an abuse of jurisdiction."); In re Muralo Co., Inc., 301 B.R 690, 697, 706 (Bankr. D.N.J. 2003) (finding debtor's "sudden high-risk exposure to thousands of seemingly random and unmanageable asbestos . . . cases" a "significant factor evidencing the good faith of Debtors' filings").[12]

Courts have further found that the bankruptcy process provides debtors **and claimants** with a far more effective, efficient, and predictable method of resolving mass tort claims. See, e.g., In re Bestwall LLC, 71 F.4th 168, 183 (4th Cir. 2023), cert. denied, 144 S. Ct. 2519, 2520 (2024) ("[B]ankruptcy procedures promote the equitable, streamlined, and timely resolution of claims in one central place compared to the state tort system, which can and has caused delays in getting payment for legitimate claimants."); In re Fed.-Mogul Glob. Inc., 684 F.3d 355, 359 (3d Cir. 2012) (noting bankruptcy has become "an attractive alternative to the tort system for corporations because it permits a global resolution and discharge of current and future liability, while claimants' interests are protected by the bankruptcy court's power to use future earnings to compensate similarly situated tort claimants equitably.") (citing S. Elizabeth Gibson, Fed. Judicial Ctr., *Judicial Management of Mass Tort Bankruptcy Cases* 1-2 (2005)); In re Aldrich Pump LLC, 2021 WL 3729335, at *37 (Bankr. W.D.N.C. Aug. 23, 2021) (noting a "successful reorganization . . . would promote Congress's particular goal in section 524(g) by establishing an asbestos trust that would efficiently and equitably resolve tens of thousands of asbestos claims").

---

[12]   See also In re SGL Carbon, 200 F.3d 154, 163-64, 169 (3d Cir. 1999) (distinguishing confined nature of litigation in SGL Carbon with the debtor's need in Johns-Manville, A.H. Robins, and Dow Corning to resolve thousands of mass tort claims) (citing Alan N. Resnick, *Bankruptcy as a Vehicle for Resolving Enterprise-Threatening Mass Tort Liability*, 148 U. Pa. L. Rev. 2045, 2050-51 (June 2000).

20

The valid bankruptcy purpose and the benefits to claimants is even more clear here, where counsel representing tens of thousands of talc claimants and the Proposed FCR participated in the negotiation of the Plan, 83% of claimants voted in favor of the Plan, and these parties support the use of this Chapter 11 Case to effectuate the Plan.  Only the UST, six Coalition member law firms, and two other firms have moved to dismiss the case.  Notably, the TCC has declined to either file or join the Dismissal Motions and has instead stated its desire to pursue a consensual resolution through this case.  See [Dkt. 346].

**B.      Neither the Plan's Provisions on Non-Debtor Releases Nor _Purdue_ In Any Way Support Movants' Assertions of Bad Faith.**

The fact that Red River's Plan provides for a channeling injunction that extends to a solvent non-debtor parent does not transform this into a bad-faith filing.  As discussed below, see Section III.B, such structures are typical in section 524(g) bankruptcies and are expressly sanctioned in section 524(g)'s text.  In any event, Movants' legally incorrect theories about the permissible scope of non-debtor releases under section 524(g) are irrelevant to the question of dismissal.  In HONX, for instance, the court found that the debtor's bankruptcy case was filed in good faith, even where the debtor suggested "using funding from its non-debtor parent, Hess, to achieve its goal of finally dealing with its asbestos-related liability" via a section 524(g) trust. 2022 WL 17984313, at *1-*2.[13]

Movants' assertion that the Supreme Court's decision in Harrington v. Purdue Pharma L.P. found that a debtor's efforts to obtain a release for a non-debtor party is an indication of a lack of good faith, Coalition Mot. ¶¶ 137-38, mischaracterizes that opinion.  The Purdue decision

---

[13]   On February 16, 2024, the district court entered an order confirming HONX's plan of reorganization, which involved the contribution of funding from Hess and the aforementioned resulting section 524(g) channeling injunction.  See _Findings of Fact, Conclusions of Law, and Order (I) Confirming the Further Modified First Amended Chapter 11 Plan of Reorganization of HONX, Inc. and (II) Granting Related Relief_, filed in In re HONX, Inc., No. 22-90035 (Bankr. S.D. Tex. Feb. 16, 2024) [Dkt. 1332].

21

had nothing to do with dismissal.  This is laid bare by the fact that the <u>Purdue</u> bankruptcy has not been dismissed and the fact that the words "good faith" and "bad faith" appear nowhere in the opinion.  Besides <u>Purdue</u>, Movants have cited no caselaw for the notion that seeking a non-debtor release demonstrates bad faith in the dismissal context.

### C.       This Prepackaged Case Seeks to Immediately Resolve, Not "Escape" or "Delay" Resolution of, Red River's Talc Liabilities.

The Coalition's suggestion that the goal of this case "is to use bankruptcy to impose delay" on claimants, Coalition Mot. ¶ 59, merits little by way of response.  This argument is directly contradictory to the very nature of a prepackaged bankruptcy, like this case, which is designed for **<u>expedited</u>** plan confirmation.  The Debtor's predecessor worked hand-in-hand with the AHC and the Proposed FCR for over a year to negotiate this Plan, **<u>while remaining in the tort system and subject to suit</u>**.  During this timeframe, the goal was to work collaboratively with current claimants and the Proposed FCR on a resolution that would obtain the requisite support, and to then pursue bankruptcy on an expedited timeline to effectuate a global settlement.  Filing for bankruptcy with both the overwhelming support of the affected tort claimants and a prepackaged Plan designed to implement this solution is about obtaining a prompt resolution, not causing delay.

Likewise, the several paragraphs at the beginning of the Coalition's motion that criticize the "Texas Two-Step Strategy," <u>id.</u> ¶¶ 19-28, and point to delays in other "two-step" cases,[14]

---

[14]       Red River rejects any suggestion that the alleged delays in other "two-step" cases are attributable to either the structure of those case or the conduct of the debtors in those cases.  Counsel for certain claimants have been sanctioned in one of those case for their deleterious conduct.  And the Fourth Circuit has specifically noted the delay tactics of the claimant representatives in that same case. <u>See</u> <u>Bestwall</u>, 71 F.4th at 183-84 (in response to claimant representatives' complaint about the four-year preliminary injunction process in the case, noting "the main interference with the timely resolution of the claims in Bestwall's bankruptcy proceeding appears to be Claimant Representatives' challenge to the preliminary injunction, thereby prolonging the bankruptcy process and preventing the claimants from obtaining prompt relief," further remarking that it "is not clear why Claimant Representatives' counsel have relentlessly attempted to circumvent the bankruptcy proceeding, but we note that aspirational greater fees that could be awarded to

have no relevance here.  Nothing about this prepackaged case concerns an alleged lack of "pressure to reach a fair and equitable deal" with claimants (Coalition Mot. ¶ 19), where claimants are supposedly "trapped in an interminable bankruptcy" and "force[d] . . . to accept whatever terms J&J dictates" (id. ¶ 20).  And to the extent the divisional merger preceding LTL's first case has any relevance here—it doesn't—Judge Kaplan expressly **rejected** (in findings undisturbed on appeal) the same arguments the Coalition repeats here.  See LTL, 637 B.R. at 422, 426 ("Here, Debtor did not undertake the corporate restructuring and bankruptcy filing as litigation tactics designed solely to gain a litigation advantage or hinder a plaintiff in any of the thousands of pending tort actions.").  Likewise, in the Tehum bankruptcy, this Court pointed to the existence of a chapter 11 plan and a 9019 motion in distinguishing that case from other divisional merger cases, ultimately asking:  "How does a Debtor working with a UCC in good faith get dismissed on facts like these?"  Apr. 11, 2024 Hr'g Tr. at 34:5-14, In re Tehum Care Servs., Inc., No. 23-90086 (Bankr. S.D. Tex. Apr. 15, 2024) [Dkt. 1513] (attached hereto as Exhibit A) ("Tehum Oral Ruling").[15]

And the Movants completely ignore the fact that claimants experience considerable, interminable delays in the tort system.  See Bestwall, 71 F.4th at 183 ("These bankruptcy procedures promote the equitable, streamlined, and timely resolution of claims in one central place compared to the state tort system, which can and has caused delays in getting payment for legitimate claimants.").

---

the claimants' counsel in the state-court proceedings is not a valid reason to object to the processing of the claims in the bankruptcy proceeding.").

[15]    For the Court's convenience, the Debtor has attached as exhibits to this Objection certain documents from bankruptcy cases where the docket has been closed and/or the documents are no readily longer accessible.

**D.      Movants' Going Concern and Property Maximization Arguments Fail.**

        *1.      The Debtor Has a Legitimate Going Concern.*

The bankruptcy court in HONX recently dismissed the notion that a going concern is relevant for a bad-faith dismissal analysis, noting "[t]here is no ongoing business requirement in the Code." HONX, 2022 WL 17984313, at *3 (citing Toibb v. Radloff, 501 U.S. 157, 166 (1991)).  Zamora-Quezada does not help the Coalition on this point.  There, the court denied a chapter 7 debtor's motion to voluntarily convert to chapter 11 because the debtor had engaged in a variety of improper post-petition conduct.  See In re Zamora-Quezada, 622 B.R. 865, 887 (Bankr. S.D. Tex. 2017).  It neither dismissed the case nor suggested a "going concern" requirement for debtors.  Id. at 886-87.

In any event, the Debtor is a going concern.  It is the parent and sole equity holder of Royalty A&M, which owns a portfolio of royalty revenue streams that generate substantial revenue.  See Disc. Stmt. at 27-28.  In addition, the Debtor has a business:  managing the substantial talc liabilities asserted against it.  See Aldrich, 2023 WL 9016506, at *28 ("[E]ach Debtor owns an operating subsidiary and has a business of sorts—managing the tens of thousands of asbestos litigation claims against them."); Bestwall, 605 B.R. at 50 ("The Committee argues that Bestwall cannot satisfy the ongoing business requirement because it is a holding company.  The Court disagrees.  Bestwall owns substantial operations through its non-debtor subsidiaries, and there is nothing novel about a holding company filing for Chapter 11 relief.").

        *2.      The Debtor's Bankruptcy Proceeding Maximizes Value for Creditors.*

The Coalition claims that this case does not maximize value for creditors but, rather, is a "litigation tactic designed to suppress the values of legitimate, compensable claims." Coalition Mot. ¶ 119.  This confuses an improper and unfair litigation advantage with what Red River

24

intends to do here:  implement a historic approximately $9 billion settlement for claimants pursuant to a prepackaged plan overwhelmingly accepted by those claimants.  If this case was about "suppressing" values, it would not have been approved by over 83% of claimants.[16]  The widespread support for the Plan, which includes a supermajority of current claimants, the AHC and the Proposed FCR, belies any notion that Red River or J&J is seeking to suppress values to claimants.

Rather than engage on the facts at issue here, the Coalition takes a multi-paragraph detour discussing two decisions, Antelope and 15375 Memorial, that bear no resemblance to this case. Coalition Mot. ¶ 103-117.  In Antelope, a "group of minority shareholders filed a derivative action against Antelope's controlling shareholders and others" for allegedly violating federal law.  431 F. App'x 272, 273 (5th Cir. 2011).  Shortly before the scheduled trial of that action, Antelope filed for bankruptcy.  The bankruptcy court found that the "petition was filed to gain an advantage in the shareholder litigation rather than for a reorganization" and that the companies' supposed need for reorganization was undercut by a two-year delay between when the company authorized filing and when it actually filed.  Id.  In addition, the debtor's plan proposed that "claims of equity shareholders such as [the plaintiffs in the derivative action] [would] be *canceled*."[17]  Red River's prepackaged filing has nothing to do with canceling, avoiding, or delaying legal claims, but is instead designed to promptly resolve claims.

---

[16]  The Coalition's argument that the only claimants who would find that this case maximizes value are "holders of non-compensable claims who are unlikely to see any recoveries in the tort system," Coalition Mot. ¶ 119, is belied by the fact that 82% of ovarian claimants (whose claims the Coalition says are compensable) voted to accept the Plan.  Kim Venue Decl. ¶ 18.

[17]  In re Antelope Techs., Inc., 2010 WL 2901017, at *8 (Bankr. S.D. Tex. July 21, 2010) (emphasis added); In re Antelope Techs., Inc., 2010 WL 104556, at *1 (Bankr. S.D. Tex. Jan. 7, 2010), aff'd, 2010 WL 2901017, aff'd, 431 F. App'x 272 (5th Cir. 2011).

The debtors in 15375 Memorial were "companies involved in oil and gas exploration" who, "[a]t the time of filing their bankruptcy petitions . . .  knew of only six litigations in which they could conceivably have been held liable for damages."  In re 15375 Mem'l Corp. v. Bepco, L.P., 589 F.3d 605, 609, 622 (3d Cir. 2009).  Of that litigation, one case (the "Tebow Action") was the "'principal factor' in the Debtors' decision to file."  Id. at 616.  The Third Circuit held that the filing had been in bad faith because it was a "litigation tactic to avoid liability in the Tebow Action"  Id. at 625.  Notably, the court observed that the debtors were not facing "risk of significant liability from a substantial number of litigations or claimants"—the situation here.  Id. at 622.  Moreover, like Antelope, certain of the claims against the debtors in 15375 Memorial (alter ego claims) would have essentially vanished in the bankruptcy.  Here, by contrast, the Plan seeks to resolve the Debtor's claims, not cancel them.

Further, the Coalition misunderstands what "maximizing value" means in the context of talc litigation, or mass torts in general.  As Judge Kaplan recently recognized in another talc litigation, maximizing value requires the court to evaluate "the risks, uncertainties, costs, and delays that accompany these litigations."  In re Whittaker, Clark, & Daniels, 663 B.R. 1, 29 (Bankr. D.N.J. 2024).  The court continued:  "Let's not ignore the obvious:  these Debtors have not operated in two decades and hundreds of claimants have already been waiting years and years to have their claims heard.  They are deserving of a fair and equitable recovery in the near term, without the risk and delays inherent in the tort system."  Id.  The same applies here.

Finally, the Coalition's disingenuous suggestion that no Plan that releases claims against solvent non-debtor affiliates could possibly maximize value for claimants, see Coalition Mot. ¶ 114, ignores common-sense settlement realities.  Without a final resolution of the talc claims against all J&J affiliates—which, again, all concern the same products and allegations—neither

the Debtor nor J&J would have any incentive to offer the historic $9 billion proposal currently on the table for claimants.  Cf. In re Whittaker, Clark, & Daniels, 663 B.R. at 29 ("[T]he Court is unpersuaded that the Tort Claimants' individual pursuit of these [successor liability] claims against non-debtor third parties truly would maximize value; and remains far less confident that such a path maximizes value for all claimants").

III.    **DAY ONE ASSERTIONS THAT THE PLAN IS NOT CONFIRMABLE ARE NOT GROUNDS FOR DISMISSAL; IN ANY CASE, THE PLAN IS CONFIRMABLE AND SECTION 524(G) IS NOT UNCONSTITUTIONAL.**

Movants' various confirmation-related arguments are premature and incorrect.  Red River can certainly confirm a prepackaged plan that is already supported by over 83% of claimants and the Proposed FCR within a reasonable time.  Consistent with the plain text of section 524(g), Red River's Plan can include a channeling injunction in favor of J&J and other J&J affiliates.  And section 524(g)'s provisions authorizing such an injunction are not unconstitutional.

A.    **Red River is Likely To Achieve a Successful Reorganization Within a Reasonable Period of Time.**

As an initial matter, the Coalition's assertion that Red River must show, at the outset of the case, that there is a "reasonable possibility" of a successful reorganization within a "reasonable time" to avoid dismissal, Coalition Mot. ¶¶ 139-41, is incorrect.  This is not an enumerated ground for dismissal under section 1112(b).  In fact, "[t]here is no requirement in the Bankruptcy Code that [a debtor] prove it can confirm a plan in order to file a petition."  In re Century/ML Cable Venture, 294 B.R. 9, 36 (Bankr. S.D.N.Y. 2003).  To the extent the Coalition maintains this ground falls under section 1112(b)(4)(J) (failure to file or confirm a plan within the time fixed by this title or by order of the court), Collier correctly observes that "[o]nly

mandatory deadlines set by the Code or by an order of the court provide the basis for invoking

1112(b)(4)(J) as a cause for a dismissal."  7 Collier on Bankruptcy P 1112.04(6)(J) (16th 2024).

Such a ground for dismissal makes sense in single-asset real estate bankruptcies, where it

is consistent with the text of section 362(d)(3).  See 11 U.S.C. § 362(d)(3)(A) (recognizing

grounds for relief from automatic stay where a single asset real estate debtor has not, within the

first 90 days of the bankruptcy case, "filed a plan of reorganization that has a reasonable

possibility of being confirmed within a reasonable time"); In re Creekside Senior Apts., L.P., 489

B.R. 51, 61-62 (B.A.P. 6th Cir. 2013) (recognizing that "[i]nherent in the concept of a reasonable

likelihood of rehabilitation for a single asset real estate debtor is 'that there must be a reasonable

possibility of a successful reorganization within a reasonable time.'") (quoting First Jersey Nat'l

Bank v. Brown (In re Brown), 951 F.2d 564, 572 (3d Cir. 1991)).  Thus, in such cases, the court

is asked to determine, early on, if the case will progress quickly enough to justify delaying

secured creditors' efforts to secure collateral.[18]

Nonetheless, Red River's case is likely to lead to a successful reorganization within a

reasonable time.  As noted, the prepackaged Plan had the support of the more than 83% of

claimants and the Proposed FCR when it was filed.  That support has only grown since then.  See

[Dkt. 328] (indicating the Morelli Law Firm submitted a revised master ballot changing 1,557

votes from rejecting to accepting the Plan).  Most recently, the TCC was optimistic enough that

---

[18]     The Coalition's citation to In re Am. Capital Equip., LLC, 688 F.3d 145, 161 (3d Cir. 2012), is inapposite.
As a threshold matter, "this case [wa]s not truly a 'mass-tort bankruptcy case,'" "bankruptcy was not
caused even in part by mass-tort personal injury claims," and the debtor sought to "settle[] asbestos claims
only in an attempt to access injured third parties' insurance recoveries. "  Id. at 162.  Further, the court
considered whether a plan had a reasonable possibility of success in the context of whether the plan was
feasible under section 1129(a)(11), not as a matter of dismissal under section 1112(b).  See id. at 156.  The
section of the decision cited by the Coalition concerns the bankruptcy court's decision to convert a Chapter
11 case to Chapter 7, which is not applicable here.

the parties could reach a "consensus and ultimate resolution" of this case that it asked for a 14-day stay of discovery to focus on negotiations.  See [Dkt. 346] ¶ 3.[19]

Additionally, a hearing on confirmation of the Plan has already been set.  It is scheduled on January 27, 2025, less than three months away.  These facts clearly establish a reasonable possibility of a successful reorganization in a reasonable time.

**B.      The Debtor Can Obtain a Section 524(g) Channeling Injunction as to J&J and Kenvue.**

There are at least two fundamental flaws in Movants' assertion that Red River's Plan is not confirmable because it provides for a channeling injunction for J&J or Kenvue.  *First*, unlike Purdue, this is an asbestos case governed by section 524(g), which Purdue expressly acknowledged allows for channeling injunctions in favor of third parties.  *Second*, this is a "full pay" Plan, which Purdue expressly acknowledges may provide for third-party releases.

> 1.      *Purdue Does Not Impact the Availability of Third-Party Releases in Section 524(g) Asbestos Bankruptcies.*

In Purdue, the Supreme Court observed the "notable exception"—section 524(g)—to its conclusion that the Bankruptcy Code does not otherwise permit third-party releases:

> For asbestos-related bankruptcies—and only for such bankruptcies—Congress has provided that, "[n]otwithstanding" the usual rule that a debtor's discharge does not affect the liabilities of others on that same debt, § 524(e), courts may issue "an injunction ... bar[ring] any action directed against a third party" under certain statutorily specified circumstances.  § 524(g)(4)(A)(ii).  That the

---

[19]      Furthermore, dismissal following denial of confirmation of a debtor's initial plans has been found to be an abuse of discretion.  In Congoleum, the New Jersey bankruptcy court denied confirmation of the debtors' **fourteenth** plan of reorganization that had been proposed in the **five-year** lifespan of that asbestos case. See In re Congoleum Corp., 414 B.R. 44, 47 (D.N.J. 2009).  After denying confirmation, the bankruptcy court dismissed the case.  Id.  The District Court reversed, finding that dismissal was an improper response to denying confirmation.  Id.  It reasoned that doing so was akin to "sanction[ing] the Plan Proponents for failing to produce a plan acceptable to [the bankruptcy court,]" and that instead, the bankruptcy court should have held an evidentiary hearing to "evaluat[e] whether dismissal would be in the best interests of [the debtor's] creditors or the [debtor]."  Id. at 61.

29

code **does** authorize courts to enjoin claims against third parties without their consent... .

Harrington v. Purdue Pharma, L.P., 144 S. Ct. 2071, 2085-86 (2024) (emphasis added).

In pertinent part, section 524(g) provides:

Notwithstanding the provisions of section 524(e), such an injunction may bar any action directed against a **third party** who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and **is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor** to the extent such alleged liability of such third party **arises by reason of--**

(I)  the third party's **ownership of a financial interest** in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;

(II)  the third party's **involvement in the management** of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

(III)  the third party's **provision of insurance** to the debtor or a related party; or

(IV)   the third party's **involvement in a transaction changing the corporate structure**, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to—

(aa)  involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or

(bb)  acquiring or selling a financial interest in an entity as part of such a transaction.[20]

11 U.S.C. § 524(g)(4)(A)(ii) (emphasis added).

As Red River will show in its confirmation briefing, the alleged liability of J&J and

Kenvue falls into several of the foregoing 524(g) statutory provisions, including subsections

---

[20]   Section 524(g)(4)(A)(iii) defines the term "related party" to mean (I) a past or present affiliate of the debtor; (II) a predecessor in interest of the debtor; or (III) any entity that owned a financial interest in – (aa) the debtor; (bb) a past or present affiliate of the debtor; or (cc) a predecessor in interest of the debtor.

(I) (ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor); (II) (involvement in the management of the debtor or a predecessor in interest of the debtor); and (IV) (involvement in a transaction changing the corporate structure).  Movants do not assert otherwise.

Rather, Movants maintain—incorrectly—that any talc liability of J&J is "independent" of the Debtor's liability.  But, again, the claims against J&J and Kenvue are the same claims that are pending against the Debtor.  The claims brought against J&J and Kenvue involve the same alleged asbestos-containing products, the same time periods, the same alleged injuries, and the same evidence as claims against the Debtor.  And, because the Debtor shares insurance coverage with J&J and owes indemnification obligations to J&J, any claim that is brought against J&J is, in reality, a claim against the Debtor.  Judge Kaplan found as much in the prior LTL bankruptcies, finding:

> Here, the Court finds that the nondebtor Protected Parties and Debtor enjoy such an identity of interests that a lawsuit asserting talc-related claims against the Protected Parties **is essentially a suit against Debtor**. . . . As an initial matter, the talc claims against the Protected Parties involve the **same products, same time periods, same alleged injuries, and same evidence** as claims against Debtor.

In re LTL Mgmt., LLC, 638 B.R. 291, 306 (Bankr. D.N.J. 2022) (emphasis added).

Ignoring these prior findings, the Coalition conjures up a kitchen sink of alleged liability theories that could be asserted against J&J and Kenvue that they suggest are "independent" from the claims pending against the Debtor.  See Coalition Mot. ¶¶ 65, 67 (listing "failure to warn," "breach of warranty," "civil conspiracy," "concert of action," "defective manufacture and design," and "successor liability").  But none of these legal theories suggest any liability that is "independent" or "wholly separate" of the claims pending against the Debtor.  In re Combustion Eng'g, Inc., 391 F.3d 190, 231, 235 (3d Cir. 2004), as amended (Feb. 23, 2005) (claims against

31

non-debtor that "arise from different products, involved different asbestos-containing materials, and were sold to different markets" could not be challenged under section 524(g)).  Unlike Combustion Engineering, cited by the Coalition, J&J's and Kenvue's alleged liability— regardless of legal theory—involves the same products, the same asbestos-containing materials, and the same markets as the claims against the Debtor, which is the party primarily responsible for the talc products at issue.  This is further proven by the text of section 524(g), which permits the issuance of a channeling injunction as to an entity that "is alleged to be **directly** or indirectly liable for the conduct of, claims against, or demands on the debtor."  11 U.S.C. § 524(g)(4)(A)(ii) (emphasis added).

The Second Circuit's decision in In re Quigley Co., Inc., 676 F.3d 45 (2d. Cir. 2012), cited by the Coalition, provides no grounds to prohibit a channeling injunction as to J&J or Kenvue.  Nowhere in that decision does the court suggest, unlike here, that the debtor expressly indemnified the non-debtor parent or affiliate with respect to the alleged parent or affiliate liability so that the claims against the debtor and the parent and affiliate would be the same. Moreover, the unique facts and law that governed the result in Quigley do not exist here. Quigley involved a very narrow type of "apparent manufacturer" theory under Pennsylvania law, not the panoply of theoretical claims against J&J and Kenvue that Movants conjure up in their motions.  See e.g., Coalition Mot. ¶¶ 65, 151.

The Coalition does not even identify an existing case that has advanced an apparent-manufacturer type claim against J&J or Kenvue comparable to the theory advanced in Quigley, and Red River is aware of none.  According to the Coalition, Quigley involved an allegation that Pfizer's logo appeared on Quigley's [the debtors'] asbestos-containing products. Coalition Mot. ¶ 145.  The "conduct" that the court found did not fall within section 524 was

32

Pfizer's permitting its name and logo to be used on the products of others that contained asbestos, which the court found fell outside section 524(g)'s statutory text.  Id. ¶ 149.  The Coalition's attempt to analogize the facts of Quigley to the facts here—asserting that "every bottle [of JOHNSON's ® Baby Powder] ever sold has included Johnson's name, log, and/or trademark—ignores that those bottles actually identified the J&J subsidiary that manufactured the product.  Quigley is inapposite.

> 2.      As Purdue Acknowledges, Third-Party Releases May Be Available in Full-Pay Plans.

As stated in the Disclosure Statement, this is a "full pay" case, meaning that talc claimants will be paid in full.  See Disc. Stmt. at 2.  Red River will demonstrate as much at the confirmation hearing.  The Supreme Court in Purdue noted that third-party releases may be available in such circumstances, noting:  "[n]or do we have occasion today to express a view on what qualifies as a consensual release or pass upon a plan that provides for the full satisfaction of claims against a third-party non debtor."  Purdue, 144 S.Ct. at 2087-88.  Accordingly, even if section 524(g) did not exist, Red River could support a channeling injunction as to the "Protected Parties," including J&J and Kenvue.

For both of these reasons, Movants' suggestion that the third-party releases render the Plan a "legal impossibility," Coalition Mot. ¶ 142, is incorrect.

**C.      None of Movants' Remaining Confirmation Objections Support Dismissal.**

The various other "problems" the Coalition alleges with this case—including allegations about "non-compensable claims" (Coalition Mot. ¶ 73); permitting every claim to vote at $1 (id. ¶¶ 74-82); placing ovarian cancer and other gynecological cancers into the same class (id. ¶¶ 83-86)—all present confirmation issues that not even the Coalition says support dismissal.

Red River will address the Coalition's confirmation challenges in separate briefing addressed to these issues.

### D.       Section 524(g)'s Provisions on Third-Party Releases Are Constitutional.

Over the course of 30 years since section 524(g)'s enactment in 1994, dozens of asbestos bankruptcies have been resolved by plans of reorganization that included third-party releases. Red River is aware of no decision—the Coalition certainly does not cite one—where a court has found section 524(g)'s third party release provisions unconstitutional.  The Coalition's constitutional challenge is both baseless and procedurally improper.

Parties cannot challenge the constitutionality of United States statutes without proper notice to the entities that passed such laws and those with responsibility to uphold such laws. Federal Rule of Civil Procedure 5.1, made applicable here through Bankruptcy Rule 9005.1, provides:

> (A) Notice by a Party.  A party that files a pleading, written motion, or other paper drawing into question the constitutionality of a federal or state statute must promptly:
>
>> (1) file a notice of constitutional question stating the question and identifying the paper that raises it, if:
>>
>>> (A) a federal statute is questioned and the parties do not include the United States, one of its agencies or one of its officers or employees in an official capacity . . .; and
>>
>> (2) Serve the notice and paper on the Attorney General of the United States if a federal statute is questioned . . . either by certified or registered mail or by sending it to the electronic address designated by the attorney general for this purpose.

FED. R. CIV. P. 5.1(a).  To Red River's knowledge, none of this has been done to date.  If it had, presumably the UST would have commented on the Coalition's position.  Similarly, Federal Rule 5.1(b) requires this Court to certify the constitutional challenge to the Attorney General of the United States in accordance with the provisions of 28 U.S.C. § 2403.

34

In any event, the constitutional challenge is frivolous.  At the most basic level, the Coalition's premise is that, if the Court determines that a channeling injunction protecting J&J **does** comply with the requirements of section 524(g)(4), it is unconstitutional.  Yet in the three decades since section 524(g) was enacted, no court has even suggested any aspect of it might be unconstitutional.  Indeed, the Coalition's proffered authority confirms that section 524(g)'s third-party release provisions are constitutional.  The Coalition repeatedly cites Purdue, yet fails to mention that the Supreme Court called out and endorsed section 524(g)(4), see supra at Section III.B, never hinting at constitutional concerns.  The Coalition's cited circuit-court cases under section 524(g) teach the same lesson.  In arguing that section 524(g) by its terms cannot encompass a channeling injunction for J&J, the Coalition devotes two pages to In re Quigley Co., 676 F.3d 45 (2d Cir. 2012).  Coalition Mot. ¶¶ 144-52.  But Quigley did not suggest that, if it read section 524(g)(4) to allow the injunction at issue, it would be unconstitutional or its reading would present a constitutional issue.  On the contrary, in assessing the injunction, the Second Circuit never mentioned due process, takings, or anything else under the Constitution, instead just focusing on the statutory text.  See Quigley, 676 F.3d at 58-62.  Similarly, Combustion Engineering, on which the Coalition offers a sentence (Coalition Mot. ¶ 152), turned on the court's view of "the plain language of the statute."  Combustion Eng'g, 391 F.3d at 235.  The Third Circuit too did not suggest a contrary reading would be unconstitutional or present a constitutional issue.  On the contrary, it praised § 524(g) as protecting future claimants "consistent with due process."  Id. at 234 & n.45.

As to due process, the Coalition appears to raise both "procedural" and "substantive" theories.  See Coalition Mot. ¶¶ 159-64, 167.  Neither theory has any legs here.  With respect to procedural due process, the Coalition ignores that bankruptcy in general and section 524(g) in

35

particular abound with protections for claimants, particularly tort claimants as here.  For example, it asserts a lack of "any meaningful form of notice" but does not explain who has not received notice or what additional notice is due.  Coalition Mot. ¶ 166.  As in any Chapter 11 case, an official committee will have a fiduciary duty to represent their interests pursuant to sections 1102 and 1103, and current claimants have a right to be heard, both in their own respect (as creditors) and through their official committee (see 11 U.S.C. § 1109(b)).  Valuation, voting, and confirmation are also laced with protections.  See, e.g., 11 U.S.C. §§ 502, 1121-1129.  And the Code protects the right to a jury trial for tort claims like those at issue here.  28 U.S.C. §§ 1411(a), 157(b)(5).  More generally, Ortiz v. Fibreboard Corp., which the Coalition cites (Coalition Mot. at 42 n.43), highlighted bankruptcy as a "special remedial scheme" that both operates separately from ordinary due-process principles and provides "protections for creditors."  527 U.S. 815, 846, 859 n.34 (1999).

Section 524(g) then adds to this, particularly with a view to protecting future claimants, who have "naturally conflicting interests" from and "natural adversity" to the current claimants whom the Coalition's members represent.  In re Imerys Talc Am., Inc., 38 F.4th 361, 366 (3d Cir. 2022).  As Combustion Engineering put it, section 524(g) includes provisions "specifically tailored" to protect the due process rights of claimants, including future claimants.  391 F.3d at 234 n.45; see also In re Bestwall LLC, 606 B.R. 243, 251 (Bankr. W.D.N.C. 2019), aff'd, 2022 WL 67469 (W.D.N.C. Jan. 6, 2022), aff'd, 71 F.4th 168 (4th Cir. 2023), cert. denied, 144 S. Ct. 2519 (2024).  If those provisions "are satisfied, present and future claims can be channeled to a § 524(g) trust **without violating due process**."  In re W.R. Grace & Co., 729 F.3d 311, 324 (3d Cir. 2013) (emphasis added).

36

Procedurally, these protections include appointing a representative for future claimants. Id. at 323; 11 U.S.C. § 524(g)(4)(B)(i). Section 524(g) also requires a supermajority 75% vote from current claimants rather than the normal majority in number requirement. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb). The confirmation process must make clear the terms of the intended injunction. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa). And the plan must be "issued or affirmed" by a "district court," not just a bankruptcy court. 11 U.S.C. § 524(g)(3)(A).

In addition, section 524(g) requires that the channeling injunction be found "fair and equitable" to future claimants (including "in light of the benefits provided, or to be provided, to" the trust by a protected "third party"), that it treat current and future claimants "in substantially the same manner," and that it be appropriately funded and structured to "value" and "pay" claims. 11 U.S.C. §§ 524(g)(2)(B)(i)(IV), --(2)(B)(ii)(V), & --(4)(B)(ii). The criteria for third-party protection are listed in detail. 11 U.S.C. § 524(g)(4)(A)(ii). And consistent with the general protections in the Code mentioned above, section 524(g) trusts always include—and the proposed plan here includes—an option for dissatisfied claimants to reject a trust's offer and proceed in the tort system (subject to limitations on recovery). So claimants are getting **at least** all the procedure that is constitutionally "due."[21]

The Coalition's argument under substantive due process is even weaker. The basic, generous rule is that government action "comports with substantive due process if the action is rationally related to a legitimate government interest" and not "clearly arbitrary and

---

[21]   The Coalition alludes to the right of access to courts and seems to recognize this as a species of procedural due process. Coalition Mot. at 42. That right is not violated here either. Unlike the typical access-to-courts case, "this case does not involve someone burdening or blocking plaintiff's right of access to the courts to seek enforcement of the law." Hammond v. United States, 786 F.2d 8, 13 (1st Cir. 1986). Rather, "[t]his is a matter of Congress altering her prior rights and remedies," on a private cause of action not reduced to judgment, to which claimants cannot object because "[t]here is no fundamental right to particular state-law tort claims." Id.

unreasonable." FM Properties Operating Co. v. City of Austin, 93 F.3d 167, 174 (5th Cir. 1996).

The Coalition invokes Kuehner v. Irving Trust Co., 299 U.S. 445 (1937), which is to the same

effect, simply asking whether the law at issue was "unreasonable and arbitrary." Id. at 452; id. at

454 ("arbitrary or unreasonable").  The Supreme Court there unanimously upheld a provision

that limited a landlord's recovery under a debtor's lease to three years' rent.  The Court

emphasized that the landlord was not losing any "lien" or other "property right in the debtor's

assets," or even any of its property interest in the leased property, id. at 451, 455; and that,

correspondingly, "every" bankruptcy law impairs contractual claims, so the question was really

one for the "wisdom" of Congress.  Id. at 452-53.[22]  The Court did say the impairment of a

contract should be "consonant with a fair, reasonable, and equitable distribution" of assets, but

by that (as the paragraph makes clear) was just restating that it must not be "unreasonable and

arbitrary," and the Court **upheld** the impairment there.  Kuehner, 299 U.S. at 452.[23]

The substitute remedy that section 524(g) provides is far from being arbitrary or

unreasonable.  The protections detailed above in discussing procedural due process at least

reasonably ensure against arbitrary results.  Chapter 11 in general and section 524(g) in particular

rationally advance the quite legitimate government interests of providing an asbestos debtor with

a fresh start, protecting third parties who assist in that fresh start, and equitably and fairly

---

[22]   It is not clear why the Coalition also cites R.F.C. v. Denver & R.G.W.R. Co., 328 U.S. 495 (1946), but it too upheld the law at issue, and in any event concerned the rights of secured creditors. See R.F.C., 328 U.S. at 533.

[23]   The Coalition in any event does not explain, much less with authority, what a lack of "fair, reasonable, and equitable" distribution would look like so as to be *unconstitutional* or, similarly, what it would mean for creditors to *unconstitutionally* fail to receive "the full value of the debtor-estate's non-exempt assets" and "share that value on a fair basis." Coalition Mot. at 43 (emphases omitted).  Courts have long rejected contentions that exemptions and distribution schemes are dictated by the Constitution rather than the wisdom of Congress. See, e.g., Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 586-87 (1935); In re Reiman, 20 F. Cas. 490, 493-97 (S.D.N.Y. 1874).  And Purdue, as already noted, was purely descriptive of historical bankruptcy laws, not purporting to articulate a constitutional rule constricting Congress's discretion. See Coalition Mot. at 43 & n.46.

38

resolving both "present and future asbestos-related claims." W.R. Grace, 729 F.3d at 315; cf. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 597 (1997) (describing "asbestos-litigation crisis").

These protections also foreclose the Coalition's hyperbolic, bald assertions that they will receive "literally nothing" for their claims or only "a tiny fraction of the value of their claims" (or, on the other hand, that funds will be unfairly paid to "holders of non-compensable claims"). Coalition Mot. at 43-44. Claims do not disappear; section 524(g) redirects or "channels" them to a trust. W.R. Grace, 729 F.3d at 315. This kind of remedy-substitution has been upheld in many contexts. See, e.g., Duke Power Co. v. Carolina Env't Study Grp., Inc., 438 U.S. 59, 89-91 (1978) (holding that "assurance of prompt and equitable compensation under a pre-structured and nationally applicable protective system" was "a fair and reasonable substitute for the uncertain recovery" from private entities); Keller v. Dravo Corp., 441 F.2d 1239, 1242 (5th Cir. 1971) (upholding replacement of personal-injury tort with worker's compensation scheme: "The abolition of non-vested rights is especially innocuous if, as here, one remedy is substituted for another."). And if the Coalition has valid concerns about such matters as valuation, it may pursue them **under the Code**. There is nothing arbitrary or unreasonable about this.

Finally, section 524(g) does not produce any unconstitutional takings of claimants' tort claims, for two independent reasons. First, although a cause of action is a "species of property," the Takings Clause protects only "'**vested** property rights,'" and "a party's property right in any cause of action does not vest until a final unreviewable judgment is obtained." Ileto v. Glock, Inc., 565 F.3d 1126, 1141 (9th Cir. 2009) (quoting Landgraf v. USI Film Prod., 511 U.S. 244, 266 (1994)); accord Zucker v. Rodriguez, 919 F.3d 649, 659 (1st Cir. 2019). In other words, for purposes of the Takings Clause, a claimant has no property right to any particular **rule** or

39

**remedy** prior to judgment.  Gibbes v. Zimmerman, 290 U.S. 326, 332 (1933) (A litigant "has no property, in the constitutional sense, in any particular form of remedy."); Keller, 441 F.2d at 1242 ("A person has no property, no vested interest, in any rule of the common law," unless a right created under such rule "has been perfected.").  All section 524(g) does is adjust the remedy.

Second, even if a cause of action were vested property, or had been reduced to judgment, there still would be no takings issue in bankruptcy.  To the extent the Takings Clause applies in bankruptcy, it prevents only "the taking of substantive rights in specific property," such as a mortgage lien, without just compensation.  Louisville Joint Stock Land Bank, 295 U.S. at 589-90.  "In other words, the creditor must have an '*in rem* right under nonbankruptcy law to look to specific items of property.'"  In re City of Stockton, 909 F.3d 1256, 1266 (9th Cir. 2018) (quoting 4 COLLIER ON BANKRUPTCY ¶ 506.03 (16th ed. 2017)).[24]  "If the purported property interest is, in reality, just a contractual or statutory right for monetary relief, then the debt can be adjusted in bankruptcy."  City of Stockton, 909 F.3d at 1266; see In re Treco, 240 F.3d 148, 161 (2d Cir. 2001) ("If the claim is unsecured, it is not 'property' for purposes of the Takings Clause.").  There is nothing unconstitutional about section 524(g).

## IV.   FINANCIAL DISTRESS IS NOT REQUIRED, BUT IS PRESENT IN ANY EVENT.

Movants' next argument—that Red River lacks financial distress or J&J "manufacture[d] jurisdiction or financial distress by committing fraud" (Coalition Mot. ¶ 175)—fails on multiple fronts.  *First*, some unarticulated level of financial distress is not a threshold requirement under the Fifth Circuit's "totality of circumstances" standard.  *Second*, even if it was, the tens of thousands of current and future talc claims, each of which could lead to verdicts in the tens to

---

[24]   Even for rights in specific property, a Takings Clause objection "could not be invoked on behalf of property interests that came into being **after** enactment of the provision."  United States v. Rodgers, 461 U.S. 677, 698 n.24 (1983) (emphasis added).

hundreds of millions of dollars, establish sufficient financial distress under any reasonable interpretation.  And, *third*, Red River did not commit "fraud" or engage in an "fraudulent transfer" in connection with the 2024 Prepetition Corporate Restructuring that created Red River.

### A.   The Fifth Circuit Does Not Mandate Financial Distress As a Precondition to Seeking Bankruptcy Relief.

While a debtor's "financial condition" may be relevant to a good-faith analysis, the Fifth Circuit employs the more holistic "totality of the circumstances" standard.  See Little Creek, 779 F.2d at 1072.  Good faith is based on "[a] collation of factors, rather than any single datum." Elmwood, 964 F.2d at 510.  Accordingly, as this Court has previously recognized, the "financial distress standard"—requiring some amount of financial distress as a prerequisite to filing for bankruptcy relief—"is not binding on this Court."  Tehum Oral Ruling Tr. at 28:23-25.  Movants do not cite a single case in the Fifth Circuit dismissing a bankruptcy case on the basis of an alleged lack of financial distress, and Red River is aware of none.

Further, Movants do not even argue that the Third Circuit's unique "imminent" or "immediate" financial distress standard applies in this Circuit.  Applying it to this section 524(g) case would run contrary to both the Fifth Circuit's "totality of the circumstances" standard and section 524(g).  Judge Isgur's language in HONX is once again instructive:

> Congress recognized that while an asbestos bankruptcy differs from a 'classic' bankruptcy with an insolvent or near insolvent debtor, it is still a forward-looking solution meant to treat fairly all parties in interest.  That is the hallmark purpose of chapter 11.  That is not a 'bad faith' motive.

In re HONX, 2022 WL 17984313, at *2.  Requiring an asbestos debtor to show "imminent" financial distress would conflict with the "forward-looking" purpose of section 524(g).  Indeed, "the impetus" of the Johns-Manville solution that spawned section 524(g) "was not a present inability to meet debts but rather the anticipation of massive personal injury liability in the

41

future."  Kane v. Johns-Manville Corp., 843 F.2d 636, 639 (2d Cir. 1988) (citing In re Johns-Manville, 36 B.R. at 745); see also HONX, 2022 WL 17984313, at *2 ("Congress wrote § 524(g) to codify what it described as a 'creative solution to help protect future asbestos claimants.'" (citing HOUSE REPORT (REFORM ACT OF 1994))).

There are numerous examples of cases where solvent entities, each of which had been defending and paying claims in the tort system without overt signs of "imminent" financial distress, resolved mass tort liabilities through claimant-supported and court-approved asbestos trusts established under section 524(g).  For example, In re Mid-Valley, Inc., No. 03-35592 (Bankr. W.D. Pa. 2003), involved eight debtors, all subsidiaries of Halliburton, that faced in excess of 240,000 pending and future asbestos claims.[25]  In their first day papers, the debtors stated that "[t]his is not a typical chapter 11 case and does not involve debtors in financial distress."  *Affidavit of Bruce A. Stanski in Support of Debtor's Chapter 11 Petitions and First Day Motions and Applications in Support of the Confirmation of the Debtors' Plan of Reorganization* at 3, In re Mid-Valley, Inc., No. 03-35592 (Bankr. W.D. Pa. Dec. 16, 2003) [Dkt. 5].[26]  They further acknowledged filing chapter 11 "to avail themselves of the protections under section 105 and 524(g) of the Bankruptcy Code and not due to any financial difficulties."  *Affidavit of Albert O. Cornelison in Support of Debtors' Chapter 11 Petitions and First Day*

---

[25]     See *Disclosure Statement for the Proposed Joint Prepackaged Plan of Reorganization for Mid-Valley Inc., DII Industries, LLC, Kellogg Brown & Root, Inc., KBR Technical Services, Inc., Kellogg Brown & Root Engineering Corp., Kellogg Brown & Root Engineering International Inc., (a Delaware corporation), Kellogg Brown & Root Engineering International, Inc. (A Panamanian corporation), and BPM Minerals, LLC Under Chapter 11 of the United States Bankruptcy Code* at 20-22, In re Mid-Valley, Inc., No. 03-35592 (Bankr. W.D. Pa. Dec. 16, 2003) [Dkt. 48] (the "Mid-Valley Disclosure Statement").  "A court may take judicial notice of documents filed in another court to establish the fact of such litigation and related filings."  Callan v. Deutsche Bank Tr. Co. Am., 11 F. Supp.3d 761, 765 n.2 (S.D. Tex. 2014).

[26]     The Mid-Valley Disclosure Statement showed $7.1 billion in assets and $5 billion in liabilities.  See Mid-Valley Disclosure Statement at D-3.

*Motions and Applications* at 10, <u>In re Mid-Valley, Inc.</u>, No. 03-35592 (Bankr. W.D. Pa. Dec. 16, 2003) [Dkt. 4].

Indeed, in <u>Mid-Valley</u>, counsel for the TCC here, Mr. Esserman, submitted a brief on behalf of certain claimants in opposition to a motion to dismiss filed by insurers.  Mr. Esserman stated that Mid-Valley's bankruptcy was "possessed of a clear reorganization purpose:  the invocation of 11 U.S.C. §§ 524(g) and 105(a) to ensure equitable treatment of present and future mass tort claimants and provide a mutually acceptable global resolution of crippling mass tort litigation."  *Response of Tort Victims Represented by Baron & Budd and Silber Pearlman to the Motions to Dismiss Filed by Various Insurers* at 25, <u>In re Mid-Valley, Inc.</u>, No. 03-35592 (Bankr. W.D. Pa. Jan. 29, 2004) [Dkt. 482] (the "<u>Mid-Valley Tort Victims' Response</u>"); <u>see</u> <u>also</u> <u>id.</u> at 3, 9 (stating section 524(g) was "designed for precisely" for the situation faced by the <u>Mid-Valley</u> debtors, noting they were "ideal candidates for § 524(g) protection" given their ability to "ensure both fair and equitable recovery for present and future claimants and the enduring financial viability of the reorganized debtor").

Another example is <u>In re North American Refractories Co.</u>, No. 02-20198 (Bankr. W.D. Pa. 2002) ("<u>NARCO</u>"), where Honeywell resolved its direct liability of up to 116,000 pending and future asbestos claims.  At the time, Honeywell reported assets of $24 billion and liabilities of $15 billion; its equity market capitalization was approximately $28 billion.[27]  Honeywell,

---

[27]   This reflects the share price of Honeywell on January 4, 2002 ($34.41) multiplied by the 814,966,481 of common shares issues and outstanding as of December 31, 2001.  <u>See</u> excerpt of Honeywell *2001 Form 10-K* at 26-28, attached hereto as <u>Exhibit B</u>; <u>see</u> <u>also</u> the stock chart published by Yahoo! Finance, which shows the closing price of Honeywell's stock on January 4, 2002, attached hereto as <u>Exhibit C</u>.  "Judicial notice is appropriate of the content of S.E.C. filings, to the extent that this establishes that the statements therein were made, and the fact that these documents were filed with the agency."  <u>In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.</u>, 876 F. Supp. 2d 616, 626 n.7 (D. Md. 2012), aff'd sub nom. <u>Yates v. Mun. Mortg. & Equity, LLC</u>, 744 F.3d 874 (4th Cir. 2014) (citation omitted).  Courts may also take judicial notice of stock prices.  <u>See Greenhouse v. MCG Capital Corp.</u>, 392 F.3d 650, 655 n.4 (4th Cir. 2004).

which had been sharing defense and indemnity costs with the debtor, facilitated the debtor's

bankruptcy filing and ultimately received a channeling injunction under section 524(g).  See In

re N. Am. Refractories Co., 2007 WL 7645287 at *2-3, *23 (Bankr. W.D. Pa. Nov. 13, 2007).

Johns-Manville was solvent when it filed bankruptcy and had been a beacon of corporate

success.[28]  USG Corporation filed bankruptcy to address its asbestos liabilities as a solvent

enterprise, and emerged from bankruptcy with an equity market capitalization of approximately

$4 billion.[29]  W.R. Grace & Co. emerged from its bankruptcy case with an equity market

capitalization of approximately $7.2 billion.[30]  Bankruptcy filings by solvent mass tort

defendants to address their liabilities expands beyond asbestos cases.  A.H. Robins Inc., which

faced substantial non-asbestos tort claims, involved a sale of the debtors pursuant to which

shareholders recovered approximately $700 million.[31]  Likewise, in the bankruptcy case of Dow

---

[28]   See In re Johns-Manville, 36 B.R. at 729 (noting that Johns-Manville was a highly successful enterprise that was listed on the Fortune 500, was "deemed a paradigm of success in corporate America by the financial community" and "Manville's filing for protection under Chapter 11 . . . was greeted with great surprise and consternation.").

[29]   See First Amended Joint Plan of Reorganization of USG Corporation and its Debtor Subsidiaries at 6, 24, In re USG Corp., No. 01-2094 (Bankr. D. Del. Mar. 27, 2006) [Dkt. 10709] (attached hereto as Exhibit D); USG Corporation June 2006 Form 10-Q for the quarterly period ended June 30, 2006 at 1 (disclosing 89,849,117 shares of common stock outstanding as of August 2, 2006) (attached hereto as Exhibit E).  USG stock closed at $45.87 per share on August 2, 2006.  See the stock chart published by Advanced Financial Network, which shows the closing price of USG Corp's stock on August 2, 2006, attached hereto as Exhibit F.

[30]   See First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of W.R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders as Modified through December 23, 2010, In re W.R. Grace & Co., No. 01-1139 (Bankr. D. Del. Feb. 21, 2011) [Dkt. 26368-1]; see also W.R. Grace & Co. Form 10-K for the fiscal period ended December 31, 2013 (disclosing 77,063,385 shares of Grace common stock outstanding as of January 31, 2014, approximately three days before the W.R. Grace plan became effective) (attached hereto as Exhibit G).  Grace stock closed at $94.32 per share on January 31, 2014.  See the stock chart published by Advanced Financial Network, which shows the closing price of W.R. Grace's stock on January 31, 2014, attached hereto as Exhibit H.

[31]   See Douglas G. Baird & Thomas H. Jackson, Cases, Problems, and Materials on Bankruptcy at 183 (2d ed. 1990) ("The [Robins] plan of reorganization approved in 1988 provided for setting up a fund with cash in an amount sufficient . . . to" (1) "equal or exceed" the court's estimation of the debtors' mass tort liability; (2) "pay[] in full . . . all other prepetition claimants;" and "leave[] . . . approximately $700 million of American Home Products common stock—for the shareholders.") (emphasis added).

44

Corning Corp., another non-asbestos mass tort defendant, the equity of the debtors was reinstated and such equity appeared to be worth hundreds of millions of dollars.[32]

Furthermore, to the extent Movants argue that the assets of J&J's broader corporate family have any bearing on dismissal (e.g., Coalition Mot. ¶ 184, stating "J&J has the resources to settle outside bankruptcy just as 3M did"), Red River could site innumerable examples—such as HONX, Mid-Valley, NARCO, Quigley, Pittsburgh Corning, Paddock Enterprises, Garlock Sealing Technologies, and Specialty Products—of confirmed section 524(g) plans of reorganization where solvent, non-debtor parent entities provided most, if not all, of the contributions to the asbestos trust.

### B.   Red River Is in Financial Distress.

Red River was in financial distress on the Petition Date.  Red River currently faces over 93,000 personal injury claims (with more to come in the future) alleging that talc-based products caused ovarian cancer and other gynecological disease.  Given that the cost to defend any ovarian cancer suit can be in the millions of dollars, it would cost billions of dollars to defend these claims.  Other courts have recognized that a significant volume of asbestos claims by itself can establish sufficient financial distress to justify filing bankruptcy.[33]  And, because of the sheer number of claims, Red River would likely have no choice but to settle many of them.  But being forced to settle cases, regardless of merit, should be considered the epitome of financial distress.

---

[32]   See *Amended Joint Plan of Reorganization* at 51, In re Dow Corning Corp., No. 95-20512 (Bankr. E.D. Mich. June 1, 2004) [Dkt. 29457] (providing that shareholders shall retain their interest in the reorganized debtor), (attached hereto as Exhibit I); *Amended Joint Disclosure Statement With Respect to Amended Joint Plan of Reorganization* at F-4, In re Dow Corning Corp., No. 95-20512 (Bankr. E.D. Mich. Feb. 4, 1999) [Dkt. 16713] (attached hereto as Exhibit J).

[33]   See Bestwall, 605 B.R. at 49 ("The volume of current asbestos claims that Bestwall faced as of the Petition Date, coupled with the projected number of claims to be filed through 2050 and beyond is sufficient financial distress for Bestwall to seek resolution under section 524(g) of the Bankruptcy Code.").

In addition to staggering legal costs, Red River faces lottery-like judgments on these talc claims in the tort system.  While all but one of the ovarian cancer plaintiff verdicts to date have been reversed on appeal, the verdict not overturned, Ingham, involved a verdict of **$2.243 billion**.  Accordingly, if even a small percentage of claims resulted in a plaintiff verdict that survived appeal, Red River could be subject to substantial judgments.  As Mr. Esserman recognized in Mid-Valley, "any one" of these claims "might lead to liability in the tens or even hundreds of millions of dollars, and which, in aggregate, could threaten the financial viability of even the healthiest company."  Mid-Valley Tort Victims' Response at 3.

Additionally, apart from baldly asserting that Red River "lacks genuine financial distress, just as LTL did," Coalition Mot. ¶¶ 4, 177, the Coalition does nothing to explain how or why Red River lacks financial distress.  It provides no discussion, for example, of Red River's respective assets and liabilities.  As noted above, effective on the bankruptcy filing, Red River was provided funding through the Indemnity Cost Funding Agreement, which provides funding to fund a Talc Personal Injury Trust under section 524(g) or, if the Plan does not become effective and the Chapter 11 Case is dismissed, to pay settlements or verdicts in the tort system. In both cases the funding available to Red River is limited to the periodic funding limits established in the Plan (an aggregate amount approximating $9 billion).  Red River would not have the wherewithal to pay verdicts or settlements that exceed that funding.

On this point, the Coalition's own assertions demonstrate that Red River is in financial distress.  It states that under the Plan, "talc claims involving ovarian cancer will receive an average recovery **of less than 5%**."  Coalition Mot. ¶ 84 (emphasis added).  While Red River disputes such speculative assertions, if, as Movants insist, the anticipated average recovery of

46

$125,000[34] is "less than 5%" of the typical value of an ovarian claim, this means that Movants' are valuing ovarian cancer claims at $2.5 million **each**. While it is not clear how many ovarian cancer current and future claims Movants think will exist, it is safe to assume it is high and that, as a result, Movants are implicitly asserting Red River's talc liability to be in the **hundreds of billions of dollars**, well in excess of the funding available to Red River.[35]

### C. Neither J&J Nor Red River Committed "Fraud" or Engaged in "Fraudulent Transfers" To Manufacture Jurisdiction or Financial Distress.

The Coalition claims that J&J "manufactured" subject-matter jurisdiction and financial distress by "committing fraud" through the 2024 Prepetition Corporate Restructuring that created Red River. Coalition Mot. ¶¶ 174-77, 183. The argument is misplaced for several reasons.

*First*, because financial distress is not a precondition for filing bankruptcy in this Circuit, Red River had no need to "manufacture" financial distress either to "manufacture" subject-matter jurisdiction or establish a valid reorganizational purpose for this bankruptcy.

*Second*, subject-matter jurisdiction concerns only the "statutorily conferred power of the court to hear a class of cases." See In re Trusted Net Media Holdings, LLC, 550 F.3d 1035, 1044 (11th Cir. 2008). Courts in the Fifth Circuit have continually found that "[t]he source of the bankruptcy court's jurisdiction is 28 U.S.C. §§ 1334 and 157." In re U.S. Brass Corp., 301 F.3d 296, 303 (5th Cir. 2002). In particular, the Fifth Circuit has maintained that, "[s]ection 1334 grants the federal district courts jurisdiction over four types of bankruptcy matters. . . . The first category refers to the bankruptcy petition itself." Id. at 303-04; see also In re Wood, 825 F.2d 90, 92 (5th Cir. 1987) ("The first category refers merely to the bankruptcy petition itself,

---

[34]   See Debtor's Stmt. at 8 (as defined below).

[35]   As set forth in the Preliminary Statement, just using the roughly $9 billion proposed for the asbestos trust, if that amount is only 5% recovery, the Coalition asserts that Red River's liability approaches $200 billion.

47

over which district courts (and their bankruptcy units) have original and exclusive jurisdiction"). As the Fifth Circuit has made clear, pursuant to section 1334(a) of title 28, the mere filing of a bankruptcy petition vests the bankruptcy court with jurisdiction.[36]

*Third*, J&J did not commit "fraud" or "fraudulently transfer" assets "on the eve of [Red River's] bankruptcy filing." Coalition Mot. ¶ 175. As noted in the *Debtor's Statement Regarding Filing of Chapter 11 Case*, LLT and Holdco engaged in the 2024 Prepetition Corporate Restructuring to address the different points of view of mesothelioma claimants (and their counsel) and ovarian/gynecological cancer clients on the a resolution of their claims. [Dkt. 3] at 5-6 (the "Debtor's Statement"). The vast majority of ovarian and gynecological cancer clients supported resolution of their claims through a bankruptcy plan, but would be concerned that such a proposed resolution could be jeopardized or delayed by opposition from claimants who felt otherwise. Id. Accordingly, LLT's ovarian and other gynecological cancer liability were separated into a new entity, Red River, which was provided funding sufficient to effectuate the prepackaged Plan. All of this was detailed in the Debtor's Disclosure Statement. There was no need to provide that entity with additional funding. Engaging in a restructuring to facilitate a resolution preferred by the vast majority of ovarian and gynecological cancer clients cannot fairly be characterized as a "fraud."

Nor is there any basis to characterize the 2024 Prepetition Corporate Restructuring as either an actual or constructive fraudulent transfer. As for actual fraudulent transfer, the 2024 Prepetition Corporate Restructuring was designed to facilitate a prepackaged Plan supported by

---

[36]   Furthermore, courts have also concluded that 28 U.S.C. § 1359, cited by the Coalition, is likely inapplicable to a bankruptcy petition because 28 U.S.C. § 1359 is generally reserved for diversity jurisdiction. See In re DBMP LLC, 2021 WL 3552350, at *20 (Bankr. W.D.N.C. Aug. 11, 2021) ("Section 1359 has been used almost exclusively to prevent gaming of federal courts' diversity jurisdiction. . . . [A] bankruptcy proceeding of course, is not a diversity action"; Bestwall, 71 F.4th at 181 (collecting cases where courts applied 28 U.S.C. § 1359 to diversity jurisdiction).

48

the vast majority of ovarian and gynecological claimants.  It serves to facilitate a prompt resolution of those liabilities, the opposite of any effort to "hinder, delay, or defraud" any current or future creditor.  E.g., 11 U.S.C. § 548(a)(1)(A).  As to constructive fraudulent transfer, the Coalition has made no showing that Red River was rendered insolvent or left with unreasonably small capital.  E.g., 11 U.S.C. § 548(a)(1)(B).  Red River was provided funding in an amount that the vast majority of implicated claimants have found sufficient to resolve the ovarian and other gynecological cancer liabilities allocated to it.

For all of these reasons, Movants' contention that this case should be rejected on financial-distress grounds should be rejected.

## V.       DISMISSAL OF LTL'S PRIOR BANKRUPTCIES DOES NOT SUPPORT OR WARRANT DISMISSAL HERE.

The UST claims, under two related theories, that dismissal of LTL's prior bankruptcies requires dismissal of this case.  *First*, the UST (and the Coalition, in a brief footnote) argues that Red River is a "serial filer" that cannot show "changed circumstances" sufficient to avoid dismissal of this case.  UST Mot. ¶¶ 42-45; Coalition Mot. ¶ 173 n.51.  *Second*, the UST maintains that prior findings that LTL lacked immediate financial distress has preclusive effect and requires dismissal of this case.  UST Mot. ¶¶ 48-57.  Neither theory is consistent with the indisputable facts or supported by the law.

### A.       Red River Is Not A "Serial Filer" And, In Any Event, Circumstances Have Materially Changed Since The Prior LTL Bankruptcies.

As the UST acknowledges, there is no *per se* rule against a debtor filing more than one petition for bankruptcy relief.  UST Mot. ¶ 43.  Section 349 expressly provides that "the dismissal of a case under this title" does not "prejudice the debtor with regard to the filing of a subsequent petition under this title. . . ."  11 U.S.C. § 349(a); see also Elmwood, 964 F.2d at 511 (the "fact that a debtor has previously petitioned for bankruptcy relief does not render a

49

subsequent Chapter 11 '*per se*' invalid"); SERIAL FILING, 4 NORTON BANKR. L. & PRAC. 3d §

111:4 ("nothing either in Chapter 11 or in any other chapter of the Bankruptcy Code . . .

expressly prohibits the filing of a Chapter 11 petition . . . [by] a debtor that had previously filed a

Chapter 11 petition").

Nonetheless, the UST's "serial filer" argument collapses at its first step. The argument

requires that the same debtor (or at least what is in substance the same debtor) has filed multiple

bankruptcy cases. While the UST characterizes Red River as a "nominally different debtor" and

this case as a "repackaged version of the two dismissed <u>LTL</u> cases," UST Mot. ¶ 42, this Court

has already recognized that Red River is a "clearly different debtor" from LTL.[37]

Consistent with the Court's finding, nor does the fact that Red River is LTL's successor

**<u>in part</u>** mean it is the same debtor as LTL. The UST's contention that Red River "has

substantially the same assets and liabilities as LTL," UST Mot. ¶ 45, is incorrect. Red River has

a different subset of liabilities than LTL had, as it was not allocated any of LTL's mesothelioma,

lung cancer, governmental, or Canadian claims but, instead, was allocated ovarian and other

gynecological claims. <u>See</u> <u>supra</u> at 10. And the UST also fundamentally misstates the funding

available under LTL's and Red River's respective funding arrangements. It contends, wholly

without support, that LTL's available funding under the 2023 Funding Agreement was $8.9

billion. UST Mot. ¶ 45. It then compares that $8.9 billion with the $7.9 billion allegedly

available under the 2024 Funding Agreement and then suggests, after reduction of $1.426 billion

in claims settled under Master Settlement Agreements, that Red River "is now arguably even **<u>less</u>**

financially distressed than was LTL in the 2023 Case." UST Mot. ¶ 45 (emphasis in original);

---

[37]    "There's no question Judge Kaplan is in my mind a brilliant judge and has an intimate and vast knowledge
of the prior [LTL] cases, but he also recognized that we have in this case clearly different debtors. We
have different parties involved, and I agree with Judge Kaplan. I know just as much – I know just as much
about this case and this plan as any other judge in the country." Oct. 10, 2024 Hr'g Tr. at 215:7-13.

see also id. ¶ 26.  But neither the $8.9 billion nor $7.9 billion figures provided by the UST are correct.

The funding available to LTL in LTL II was not $8.9 billion.  Rather, as discussed above, LTL's funding under the 2023 Funding Agreement with Holdco provided funding up to the value of Holdco (but limited to the amount of the talc claims), an amount Judge Kaplan estimated at $22.3 billion to $29.9 billion, plus additional amounts from future dividends expected to flow to Holdco.  See LTL, 652 B.R. at 446; supra at 13-14.  The $8.9 billion referenced by the UST refers to the funding available from J&J under the J&J Support Agreement (not the amount under the 2023 Funding Agreement with Holdco); funding under the former would be available only upon confirmation of a plan.  See id. at 440.[38]  Red River's Indemnity Cost Funding Agreement with New Holdco (Texas) provides funding to fund a trust, or to pay settlements or verdicts in the tort system, in both cases subject to the periodic funding limits established in the Plan—an aggregate amount approximating $9 billion.  See Second Amended and Restated Indemnity Cost Funding Agreement (attached as Annex E to the Kim Decl.); Disc. Stmt. at 39-40.[39]

In short, neither Red River's liabilities nor its assets are the same as LTL's.

---

[38]   The UST cites page 23 of the Disclosure Statement to support the (false) notion that the funding available to LTL through the 2023 Funding Agreement was $8.9 billion.  UST Mot. ¶ 26 (citing page 23 of the Disclosure Statement for the proposition that the $6.475 billion available (net present value basis) under "the 2024 Funding Agreement" "represents a reduction of approximately $2.425 in net present value compared to the funding that was available under the 2023 Funding Agreement").  Nothing on page 23 (or elsewhere in the Disclosure Statement) suggests the funding available under the 2023 Funding Agreement was $8.9 billion.  Moreover, the UST's suggestion that approximately $6.475 billion (net present value), or $7.9 billion (total value), is available under the 2024 Funding Agreement does not account for the $1.1 billion increase to the Trust, or differences in the timing of that funding, on account of the MOU.

[39]   Red River also has access to the Debtor Expense Funding Agreement, but it is limited to paying for the costs of this Chapter 11 Case and any defense-related costs associated with defending the talc litigation in the tort system.  See supra at 14; Disc. Stmt. at 40-41.

The cases cited by the UST for the notion that a debtor must show "unanticipated changed circumstances" to permit a successive filing—which involved new filings seeking to upend previously confirmed plans of reorganization—are similarly inapposite.  See In re Triumph Christian Ctr, Inc., 493 B.R. 479, 487 (Bankr. S.D. Tex. 2013) (analyzing whether the successive case would "constitute an impermissible attempt to modify a substantially consummated plan") (citing 11 U.S.C. § 1127(b)); Elmwood, 964 F.2d at 511 ("[W]e must consider whether the Elmwood II petition was an attempt to evade the Code's prohibition against modification of substantially consummated confirmed plans").  LTL never substantially consummated a plan of reorganization, nor even reached the solicitation or confirmation stages in its prior bankruptcies.

In addition, the good-faith requirement is itself "adequate protection from abusive serial filings."  For example, in Society Nat'l Bank v. Barrett (In re Barrett), 964 F.2d 588 (6th Cir. 1992), the court affirmed that the debtor filed in good faith, notwithstanding that its prior two petitions were dismissed for bad faith.  The court rejected a creditor's argument that the court should have more heavily weighted the debtors' "serial filings," holding that so "long as the court sufficiently considered [the debtor's] prior conduct under the totality of circumstances test, the exact manner in which the bankruptcy court weighed the prior conduct is irrelevant given the bankruptcy court's discretionary power in making a determination of good faith."  Id. at 592.

Courts have also held that changes in circumstances that improve the likelihood of a successful reorganization can justify a successive filing.  See, e.g., In re 234-6 W. 22nd St. Corp., 214 B.R. 751, 758 (Bankr. S.D.N.Y. 1997) ("[A] debtor whose case was previously dismissed must show that circumstances have improved sufficiently to support the possibility of reorganization."); In re McCormick Road Assocs., 127 B.R. 410, 412, 416-17 (N.D. Ill. 1991)

(requiring an "objectively reasonable likelihood of reorganization" following dismissal of previous case). Here, in addition to the fact that this bankruptcy was filed by a different debtor, other changed circumstances—including that the primary class of creditors is a distinct group of mass tort claimants, that the terms of the prepackaged plan are materially different from the plan proposed in LTL, and that the plan has been solicited and received sufficient acceptances to achieve confirmation—all further support the good faith of Red River's filing.

Finally, it bears noting that Red River did not file the instant bankruptcy petition until **406 days** after dismissal of LTL's second case. This is well beyond even the 180-day prohibition on refiling sought by the TCC in LTL's second bankruptcy (a request that Judge Kaplan rejected). See *Order (I) Dismissing Debtor's Chapter 11 Petition Pursuant to 11 U.S.C. § 1112(b); (II) Establishing Procedures with Respect to Requests for Compensation; and (III) Granting Related Relief* 1, In re LTL Mgmt. LLC, No. 23-12825 (Bankr. D.N.J. Aug. 11, 2023) [Dkt. 1211]. This only further undermines the UST's "serial filing" contention.

### B.      Preclusion Doctrines Do Not Support Dismissal of This Case.

The res judicata (claim preclusion) and collateral estoppel (issue preclusion) doctrines preclude re-litigation of the same claim or issue, involving the same party, where the same set of operative facts underly both the prior and current claim or issue. For a litany of reasons, many already addressed above, neither doctrine applies here. The dismissals of the prior LTL cases were fact-intensive determinations focused on the financial condition of LTL in 2021 and 2023. Neither considered Red River's financial condition, including its liabilities and assets, in 2024. Nor, contrary to the UST's claim, is the legal standard governing this Courts' determination of Red River's good faith the same as the legal standard applied in the prior LTL cases.

53

### 1.    *Claim Preclusion Does Not Apply*

Claim preclusion "treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the **same 'claim' or 'cause of action**.'"  Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc., 575 F.2d 530, 535-36 (5th Cir. 1978) (citations omitted) (emphasis added).  The UST nominally offers claim preclusion as a basis for dismissal, but effectively concedes it does not apply here.  UST Mot. ¶ 52 ("When some of the facts have changed and some have not, issue preclusion is the appropriate standard.").  The UST fails to explain how a chapter 11 petition would properly be considered a "cause of action" or "claim" over which claim preclusion might apply.  And even if bankruptcy cases could be considered "causes of action" or "claims," this bankruptcy is not the same "cause of action" or "claim" as LTL's prior bankruptcies.  As the UST rightly acknowledges, the requirement that two causes be the "same" turns on whether they involve the "same nucleus of operative facts."  Osherow v. Ernst & Young LLP (In re Interlogic Trace, Inc.), 200 F.3d 382, 386 (5th Cir. 2000); UST Mot. ¶ 47 ("common nucleus of facts").  Apart from stating the legal test for claim preclusion at a high level, the UST makes no effort to apply that test to the facts here, including whether this bankruptcy involves the "same nucleus of operative facts" as the prior LTL prior cases.

### 2.    *Issue Preclusion Does Not Apply*

Issue preclusion prevents a party from relitigating an issue already raised and decided in an earlier action if:  "(1) the issue decided in the prior case is identical to the one presented in the later case; (2) there was a final judgment on the merits in the prior action; (3) '[t]he party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to the prior action'; and (4) '[t]he party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action.'"  Nationwide Mut. Fire Ins. Co. v.

54

George V. Hamilton, Inc., 571 F.3d 299, 310 (3d Cir. 2009) (applying Pennsylvania and federal

preclusion law, and describing the two as "not inconsistent") (internal citations omitted);

For issue preclusion's first element—identity of the issues—to apply, the facts underlying

each dispute must be "identical."  Dexon Computer, Inc. v. Cisco Sys's Inc., 2023 WL 2941414,

at *14 (E.D. Tex. Feb. 7, 2023); see also Oct. 10, 2024 Hr'g Tr. at 203:19-23 ("Collateral

estoppel doesn't apply unless the facts and the legal standards used to assess those facts are the

same in both proceedings." (citing Financial Acquisition Partners LP v. Blackwell, 440 F.3d 278,

284 (5th Cir. 2006))).

For reasons already detailed above, there are no "identical" facts here.  The UST claims

that "issue preclusion applies to the Third Circuit's determination that LTL was not in financial

distress as well as to its broader holding that LTL lacked a valid bankruptcy purpose and that its

petition had not been filed in good faith."  UST Mot. ¶ 53.  To be clear, the dismissals of the

prior LTL cases were premised entirely on findings that LTL was not in "immediate" financial

distress.  Neither Judge Kaplan nor the Third Circuit questioned LTL's underlying motives; in

fact, Judge Kaplan extensively highlighted the benefits to claimants of resolving LTL's talc

liability through bankruptcy, as LTL had sought in this cases.[40]

As to the issue of financial distress, the UST inaccurately proclaims that "[a]ll the facts

relevant to the Third Circuit's decision are unchanged, other than the specific amount of funding

available under the Funding Agreement and the payment or settlement of certain claims (which,

as noted above, now even more strongly supports the Third Circuit's findings)."  UST Mot. ¶ 53.

As detailed above, however, the UST misstates the facts about Red River's and LTL's respective

---

[40]   See, e.g., LTL, 637 B.R. at 406-17; LTL, 64 F.4th at 93 ("Good intentions—such as to protect the J&J brand or comprehensively resolve litigation—do not suffice alone."); LTL, 652 B.R. at 442-43 ("The Court expressed its thoughts on this issue in its Opinion denying the Motions to Dismiss in the LTL 1.0 case. . . . This Court's views remain unchanged . . . .").

funding arrangements.  Supra at 13-14.  Montana v. United States, 440 U.S. 147, 159 (1979) ("[C]hanges in facts essential to the judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues.").  Perhaps in recognition of the highly fact-specific nature of the good-faith issue and the inapplicability of the preclusion doctrines, the LTL II ruling did not itself apply preclusion based on the decision in LTL I, and did not foreclose the possibility of a future filing.  And in concluding that LTL was not in sufficient "imminent" and "immediate" financial distress, Judge Kaplan ruled that LTL could not avail itself to Chapter 11 relief "**at this juncture**."  LTL, 652 B.R. at 448-49 (emphasis added).  And, again, Judge Kaplan denied requests from the TCC in LTL II to temporarily enjoin LTL from re-filing for bankruptcy.[41]

Furthermore, the difference in the legal standards used to assess Red River's and LTL's good faith defeats application of issue preclusion.  The UST appears to acknowledge as much.  See UST Mot. ¶ 50 ("Issue preclusion does not apply when a circuit split exists or when the highest court has not decided an important, novel issue.").  Movants' suggestion that the standards in the Fifth and Third Circuits for dismissal on grounds of bad faith are one and the same is not accurate.  As discussed above, in the Fifth Circuit "cause" to dismiss a Chapter 11 petition for a lack of good faith in filing is based on the "totality of the circumstances."  See supra at 16.   A lack of financial distress may inform this analysis, but, unlike in the Third Circuit, it is not a threshold requirement.  See id.

Apart from material differences between LTL and Red River's relative financial conditions, other differences pertinent to the Fifth Circuit's totality of circumstances standard

---

[41]    See LTL II, No. 23-12825, [Dkts.1171-1 (proposed dismissal order from the TCC which would bar refiling for a period of 180 days); 1173 (joinder to 180-day bar); 1170 (requesting a minimum of an 18-month filing bar); 1165 (requesting 3-year filing bar)].

56

abound.  Among other things, Red River filed for bankruptcy only after a substantial majority of its talc claimants voted in favor of the Plan.  While LTL filed a plan in its second bankruptcy case, no disclosure statement was ever approved, the plan was not solicited, and not a single claimant voted on LTL's plan.[42]  The Plan in Red River's case only affects ovarian and gynecological cancer claimants (a class of claimants who on the whole have long supported a bankruptcy resolution) and does not seek to resolve the claims of mesothelioma and lung cancer claimants (whose counsel have generally preferred to litigate and resolve their claims in the tort system).  And Red River's Plan offers different compensation.  While LTL's 2023 proposed plan offered $8.9 billion on a net present value to resolve all of the talc-related liabilities outlined above, the $9 billion proposed by the Amended Plan is solely for ovarian and gynecological claimants.  Moreover, Red River's Plan includes mechanisms for talc claimants to begin receiving compensation far quicker than under the plan filed in LTL, which Red River understands to be a critical issue for claimants.

For all these reasons, there is no basis to dismiss this case on claim preclusion or issue preclusion grounds.

## VI. EVEN IF "CAUSE" EXISTED TO DISMISS THIS CASE, THE COURT SHOULD DENY THE DISMISSAL MOTION.

Section 1112(b)(2) of the Bankruptcy Code precludes dismissal or conversion of a Chapter 11 case if "unusual circumstances" show that dismissal or conversion is not in the best interests of creditors and there is reasonable likelihood that a Chapter 11 plan will be confirmed within either a reasonable time or applicable statute deadlines.

---

[42]  There is a fundamental difference between proposing a plan and fully solicitating and receiving the requisite claimant support for a plan, a comparison akin to the difference between a debtor being in talks with a financier and actually striking the deal.

Here, the vast majority of claimants prefer the historic prepackaged Plan being offered by the Debtor.  There is a reasonable possibility that, eventually, **all** or virtually all claimants will support the plan.  It is difficult to imagine a more persuasive case for denying dismissal under section 1112(b)(2)'s "unusual circumstances" exception.

## **CONCLUSION**

For all of the foregoing reasons, the Court should reject the Dismissal Motions.

[*Remainder of Page Intentionally Left Blank*]

Dated:  November 6, 2024
Houston, Texas

Respectfully submitted,

*/s/ John F. Higgins*
John F. Higgins (TX 09597500)
M. Shane Johnson (TX 24083263)
Megan Young-John (TX 24088700)
James A. Keefe (TX 24122842)
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile:  (713) 228-1331
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
jkeefe@porterhedges.com

Gregory M. Gordon (TX 08435300)
Dan B. Prieto (TX 24048744)
Brad B. Erens (IL 06206864)
Amanda Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone:  (214) 220-3939
Facsimile:   (214) 969-5100
gmgordon@jonesday.com
dbprieto@jonesday.com
bberens@jonesday.com
asrush@jonesday.com

PROPOSED ATTORNEYS FOR DEBTOR

## Certificate of Service

I certify that on November 6, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtor's claims, noticing, and solicitation agent.

*/s/ John F. Higgins*
John F. Higgins

NAI-1541294001

59