**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RED RIVER TALC, LLC[1] | ) | Case No. 24-90505 (CML) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| | ) | |

**THE SLF CLAIMANTS' CORRECTED (I) OMNIBUS
OBJECTION TO THE COALITION VOTING
PLEADINGS AND CROSS-MOTION UNDER RULE 3018(A)
(II) OBJECTION TO THE MOTIONS TO DISMISS, AND (III) JOINDER TO CERTAIN
OF THE DEBTOR'S PLEADINGS, INCLUDING THE VOTING RESULTS MOTION**

**[Related to Dkt. Nos. 44, 257, 264, 265, 266, 267, 299, 305]**

---

[1]  The last four digits of the Debtor's federal tax identification number are 8508. The Debtor's address is 501 George Street, New Brunswick, NJ 08933.

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ................................................................................................................... 5

    *I.*    *SLF's Role in Talc Litigation* .................................................................. 5

    *II.*   *The July Master Ballots* ........................................................................ 6

    *III.*  *SLF Negotiates to Materially Improve the Plan* ..................................... 7

    *IV.*  *The Resolicitation Process* ..................................................................... 9

    *V.*   *The Coalition's Requested Relief Seeks to Disenfranchise its Own Clients* ........... 11

    *VI.*  *The Motions to Dismiss* ....................................................................... 13

ARGUMENT ...................................................................................................................... 13

    *I.*    *The Beasley Allen Ballot Cannot Be Reinstated* ..................................... 13

        *A.*   *The SLF Ballot Was Submitted in Accordance with the Tabulation Procedures* 14

        *B.*   *The SLF Master Ballot Was Not Submitted Based on Promises Outside of the Plan* ........... 15

        *C.*   *SLF Had Authority to Vote Via an Option B Certification and Obtained Client Consent for Votes Submitted under the Option A Certification* ........................ 16

        *D.*   *Reinstating the BA Master Ballot Would Disenfranchise the SLF Claimants* .... 18

    *II.*   *There is No Basis to Designate the SLF Master Ballot* ........................... 19

    *III.*  *The Court Should Grant SLF's Cross-Motion under Rule 3018(a), Insofar as Such a Cross-Motion is Necessary* ........................................................... 24

    *IV.*  *The Other Coalition Voting Motions Should Be Denied* ........................... 26

    *V.*   *The Motions to Dismiss Should Be Denied* ............................................. 28

CONCLUSION ................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
    359 B.R. 54 (Bankr. S.D.N.Y. 2006) ................................................................19, 23

*In re Allegheny Int'l, Inc.*,
    118 B.R. 282 (Bankr. W.D. Pa. 1990) ...........................................................................22

*In re American Solar King Corp.*,
    90 B.R. 808 (Bankr. W.D. Tex. 1980) ...........................................................................25

*In re Applegate Prop., Ltd.*,
    133 B.R. 827 (Bankr. W.D. Tex. 1991) .....................................................................21, 22

*In re Bourbon Saloon, Inc.*,
    No. 11-11518, 2012 WL 899282 (E.D. La. Mar. 14, 2012) ............................................24

*In re Cajun Elec. Power Coop., Inc.*,
    230 B.R. 715 (Bankr. M.D. La. 1999) ....................................................................24, 25

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
    860 F.2d 94 (3d Cir. 1988) ...........................................................................................23

*In re Cyprus Mines Corp.*,
    No. 21-10398 (Bankr. D. Del. May 3, 2021) [Dkt. No. 265] ..................................26

*In re Dow Corning Corp.*,
    244 B.R. 673 (Bankr. E.D. Mich. 1999) .......................................................................22

*In re Dune Deck Owners Corp.*,
    175 B.R. 839 (Bankr. S.D.N.Y. 1995) .....................................................................18, 22

*In re Durabla Mfg. Co.*,
    No. 09-14415 (Bankr. D. Del. May 25, 2012) [Dkt. No. 856] .............................27

*In re Duro Dyne Corp.*,
    No. 18-27963 (Bankr. D.N.J. Dec. 12, 2018) [Dkt. No. 331].................................27

*In re Fed. Support Co.*,
    859 F.2d 17 (4th Cir. 1988) ...........................................................................................19

*Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (In re Figter Ltd.)*,
    118 F.3d 635 (9th Cir. 1997) .....................................................................................19, 22

*In re Geo. V. Hamilton, Inc.*,
No. 15-23704 (Bankr. W.D. Pa. Jan. 12, 2016) [Dkt. No. 216] ...............................................27

*In re Gilbert*,
104 B.R. 206 (Bankr. W.D. Mo. 1989)...................................................................................22

*Harrington v. Purdue Pharma, L.P.*,
144 S. Ct. 2071 (2024) ...........................................................................................................29

*In re Holly Knoll P'ship*,
167 B.R. 381 (Bankr. E.D. Pa. 1994) .....................................................................................23

*In re Imerys Talc Am., Inc.*,
No. 19-10289 (LSS), 2021 WL 4786093 (Bankr. D. Del. Oct. 13, 2021).............................19

*In re Imerys Talc Am.*, No. 19-10289 (Bankr. Del. July 25, 2019) [Dkt. No. 881].....................27

*In re Landing Assocs., Ltd.*,
157 B.R. 791 (Bankr. W.D. Tex. 1993)..................................................................................22

*In re Machne Menachem, Inc.*,
233 F. App'x 119 (3d Cir. 2007) .....................................................................................21, 22

*In re MCorp Fin., Inc.*,
137 B.R. 237 (Bankr. S.D. Tex. 1992) .............................................................................14, 15

*In re Piece Goods Shops Co., L.P.*,
188 B.R. 778 (Bankr. M.D.N.C. 1995)...................................................................................14

*In re Southland Corp.*,
124 B.R. 211 (Bankr. N.D. Tex. 1991)..............................................................................14, 16

*Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.)*,
844 F.2d 1142 (5th Cir. 1988) ...............................................................................................24

*In re Tribune Media Co.*,
799 F.3d 272 (3d Cir. 2015)...................................................................................................29

*In re Wiston XXIV, Ltd. P'ship*,
153 B.R. 322 (Bankr. D. Kan. 1993) ......................................................................................22

*In re Yarway Corp.*,
No. 13-11025 (Bankr. D. Del. Jan. 12, 2015) [Dkt. No. 720] ...............................................27

*Zentek GBV Fund IV v. Vesper*,
19 F. App'x 238 (6th Cir. 2001)........................................................................................21, 22

**Statutes**

11 U.S.C. § 524(g) ................................................................................................28, 29

11 U.S.C. § 1126(e) .....................................................................................................18

11 U.S.C. § 1129(a)(10).............................................................................................23

**Rules**

Fed. R. Bankr. P. 3018(a) ................................................................... *passim*

Fed. R. Bankr. P. 3018(b) ...........................................................................................16

ABA Model Rules of Professional Conduct, Rule 1.0 ................................................17

TO THE HONORABLE CHRISTOPHER M. LOPEZ,
UNITED STATES BANKRUPTCY JUDGE:

The Smith Law Firm, PLLC ("**SLF**"), on behalf of the talc claimants it represents (the "**SLF Claimants**"), by and through the undersigned counsel, submits this (i) omnibus objection to the Coalition Voting Pleadings[2] and cross-motion under Rule 3018(a) (this "**Objection and Cross-Motion**"), (ii) omnibus objection to the Motions to Dismiss and joinder to the Debtor's objection to the same,[3] and (iii) joinder to the Debtor's Voting Results Motion and the Debtor's responses and objections to the Coalition Voting Pleadings.  In support of this Objection and Cross-Motion, SLF respectfully submits as follows:[4]

## PRELIMINARY STATEMENT

1.     The self-interested efforts of the Coalition to undermine the vote and dismiss the Chapter 11 Case are not supported by the facts or the law and therefore must be denied.  Despite the Coalition's repeated, divisive invective, the facts on the ground establish that (i) the vote was conducted in accordance with the Tabulation Procedures (defined below), (ii) SLF's participation

---

[2] The Coalition Voting Pleadings are the following: (i) *Objection of the Coalition of Counsel for Justice for Talc Claimants to Debtor's Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Epiq Corporate and Emergency Ex Parte Motion for the Entry of an Order Reconsidering and Vacating the Ex Parte Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC as Claims, Noticing and Solicitation Agent* [Dkt. No. 257] (the "**Reconsideration Request**"); (ii) *Motion of the Coalition of Counsel for Justice for Talc Claimants for Entry of an Order Designating Votes Pursuant to 11 U.S.C. § 1126(e)* [Dkt. No. 265] (the "**Designation Motion**"); (iii) *Motion of the Coalition of Counsel for Justice for Talc Claimants for Entry of an Order (I) Authorizing an Estimation of Current Talc Claims for Voting Purposes, and (II) Establishing Procedures and Schedule for Estimation Proceedings* [Dkt. No. 267] (the "**Estimation Motion**"); (iv) *Motion of the Coalition of Counsel for Justice for Talc Claimants for Entry of an Order Reinstating Votes Improperly Modified by The Smith Law Firm PLLC* [Dkt. No. 266] (the "**Reinstatement Motion**"); and (v) *Motion of the Coalition of Counsel for Justice for Talc Claimants for Entry of an Order (I) Establishing a Deadline for Filing Proofs of Claim, (II) Approving the Proposed Model Claim Form for Talc Personal Injury Claims and Related Procedures, and (III) Directing the Debtor to Provide Adequate Notice of the Deadline for Filing Proofs of Claim to all Talc Personal Injury Claimants* [Dkt. No. 264] (the '**Bar Date Motion**").

[3] The Motions to Dismiss are the (i) *Motion of the Coalition of Counsel for Justice for Talc Claimants to Dismiss the Chapter 11 Case Pursuant to 11 U.S.C. § 1112(b)* [Dkt. No. 244] (the "**Coalition MTD**"), and (ii) *Motion of the United States Trustee to Dismiss Case under 11 U.S.C. § 1112(b)* [Dkt. No. 299] (the "**U.S. Trustee MTD**").

[4] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Amended Plan [Dkt. No. 24].

in the vote was entirely in good faith and in accordance with its legal authority, and (iii) it was Coalition member Beasley Allen (not SLF) that violated the Tabulation Procedures and sought to thwart its own clients' effective representation in connection with the vote.  Adding insult to injury is the Coalition's latest suggestion that votes of all claimants with gynecological cancer should be designated and disregarded – despite Coalition firms purporting to represent more than 5,000 of those claimants.[5] The legal propriety of a law firm acting contrary to certain of its own clients' interests is highly suspect at best.  Equally troubling, however, is the conspicuous absence in all of the Coalition's filings of any real acknowledgement of what SLF was able to achieve for *all current claimants* in this case.

2.      Let there be no mistake:  the improvements negotiated by SLF were substantial, encompassing well over $1 billion in direct compensation for claimants plus additional concessions that will facilitate dollars-in-pockets for these claimants on a more expedited timeframe, including:

- The establishment of a **$1 billion** individual review fund to provide supplemental recoveries to the most injured talc claimants (MOU at 5);

- The potential reallocation of **$500 million** from future talc claimants to current direct talc claimants (MOU at 4);

- The establishment of an attorney fee fund in the amount of $650 million to be administered by a third party, which will provide for higher ***claimant*** recoveries than what would be achieved in the MDL (MOU at 4-5);

- The parties' agreement to start processing claims expeditiously, at J&J's expense (MOU at 6); and

- J&J's agreement to assist in negotiating a global medical lien resolution program with the Department of Justice (MOU at 11).

---

[5] SLF represents certain claimants with gynecological cancers and expressly disclaims the Coalition's efforts to designate the votes of those claimants on the Amended Plan and reserves all rights.

It was these **substantial concessions** by the Debtor and J&J, coupled with a desire by SLF to facilitate long-awaited recoveries for the talc victims in this case, that allowed SLF – which vocally opposed all prior proposed settlements – to recommend that its talc claimant clients vote in favor of the Plan.  Indeed, the efforts of SLF brought the total settlement dollars available to talc claimants to the historic amount of **over $9 billion**.

3.       Content to simply ignore these efforts or the idea that any claimant might voluntarily decide to support a $9 billion settlement plan, the self-styled "Coalition", comprising a few plaintiffs' law firms tries to deflect attention by purporting to cast SLF and its principal, Mr. Allen Smith, as bogeymen.  Based on that false portrayal, the Coalition filed multiple voting-related motions that, read together, demand that *every single "yes" vote should be disregarded and designated*, the SLF Master Ballot should be *disregarded and all votes (even votes directly cast by mutual Smith Law Firm/Beasley Allen clients) designated*, and the only votes that should be counted are those of the Coalition.  Unfortunately for the Coalition, this is not how voting works in a bankruptcy.

4.       In attempting to solve for their desired outcome, the Coalition makes a number of misguided and inaccurate factual and legal assertions.  In reality:

- SLF serves as co-counsel with Beasley Allen with respect to approximately 11,500 claimants in this Chapter 11 Case.  In accordance with engagement letters and the terms of the joint venture agreement with Beasley Allen, SLF had the *exact same authority* to cast votes on account of those claimants as Beasley Allen – and did so properly by indicating it was voting via Option B Certification its Master Ballot.

- SLF (unlike Beasley Allen) actually undertook a process to obtain informed consent votes from its clients. SLF actively informed its clients of material positive changes to the Plan, SLF recommended that its clients vote in favor, SLF extended the response deadline in the midst of the process, *and obtained responses from hundreds of claimants – **over 80% of which indicated their desire to support the Plan.*** Beasley Allen, in contrast, tried to thwart all of these efforts to inform claimants.

- As a result, the motion to "reinstate" the Beasley Allen Master Ballot simply cannot stand in its own right. Circumstances have changed; the Plan has improved materially, and disregarding the SLF Master Ballot would mean disregarding not just votes validly cast by power of attorney or otherwise by SLF, but votes directly cast by claimants based on the improvements in the MOU.

- There is no evidence to support the contention that J&J manipulated the voting result by offering to put SLF in charge of a $650 million attorney fee fund "in exchange" for SLF submitting a master ballot in favor of the Plan "without the[] informed consent" of the SLF Claimants. Reinstatement Motion ¶ 3. While the MOU creates a qualified settlement fund of $650 million to pay attorneys' fees (subject to numerous conditions), it does not "put SLF in charge" of that fund or the allocation of its contents. MOU at 4.[6] To the contrary, all the MOU does is establish an attorney fee fund, to be overseen by a retired federal judge, from which SLF and the members of the Coalition, among others, may seek awards from, subject to certain criteria.

- Finally, there is neither evidence nor any basis to suggest "bad faith" on the part of SLF in negotiating massive improvements to the terms of the Plan. Nor is there any evidence of ulterior motives – the improvements achieved redound to the benefit of all talc claimants.

5.     In short, while the Coalition purports to seek "justice", its efforts to date have only obstructed that very objective. The settlement improvements SLF achieved were substantial, and certainly support allowing for the modification of claimants' votes to accept a revised plan incorporating those settlements. The votes cast by SLF were made in accordance with the Tabulation Procedures, in good faith, and in accordance with the authority vested in SLF by its clients. Therefore, each of the Coalition's voting-related motions must be denied, and the Debtor's Voting Results Motion granted.

---

[6] As set forth in further detail herein. SLF disagrees with the Coalition's assessment of how the common benefit fund functions in the MDL and believes that establishment of the attorney fee fund will ensure higher claimant recoveries, as claimants will not have to bear the 8%-12% assessment that would otherwise go to the common benefit fund in the MDL out of their recoveries. Contrary to the Coalition's assertions, the amounts payable to the common benefit fund in the MDL do not come out of the attorney's contingency fee but are deducted as an expense from the claimant's direct recovery.

## BACKGROUND

I.      *SLF's Role in Talc Litigation*

6.      As set forth in the Declaration of R. Allen Smith, Jr. [Dkt. No. 306-4, Exh. D], dated as of September 16, 2024 (the "**Smith Declaration**"), SLF has played a leading role in the talc litigation against J&J.  Lead SLF attorney, R. Allen Smith, Jr., became the first attorney to obtain a plaintiff's verdict in talc personal injury litigation against J&J in 2013.  Smith Declaration ¶ 3.  In the intervening years, SLF has tried nine additional ovarian cancer cases against J&J (more than any other law firm), and has secured plaintiff verdicts in the hundreds of millions of dollars.  *Id.*

7.      In late 2013, SLF and Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. ("**Beasley Allen**"), along with another law firm (Porter & Malouf, P.A., or "**Porter Malouf**") entered into a joint-venture agreement relating to talc personal injury litigation against J&J (the "**JV Agreement**").  Smith Declaration ¶ 5.  The JV Agreement provided that SLF, Beasley Allen and Porter Malouf would "jointly represent all of [their] talcum powder clients," and would be jointly responsible for the work.  Smith Declaration ¶¶ 5-6.

8.      Under the terms of the JV Agreement, SLF and Porter Malouf continued to provide the information and expertise for all of the firms to jointly prosecute talc claims, including prior expert work and discovery.  Smith Declaration ¶ 8.  In return, Beasley Allen handled initial client intake and case screening and had general (but not exclusive) responsibility for client communications.  Smith Declaration ¶ 9.  This division of labor was beneficial because SLF, unlike Beasley Allen, is a relatively small law firm without the administrative resources to regularly communicate with tens of thousands of clients but SLF has the trial record to actually try the claims once they leave pre-trial proceedings in *In re: J&J Talcum Powder Products*

*Marketing, Sales Practices and Products Liability Litigation* (D.N.J.) (MDL No. 2738) (the "**MDL**").

9. After the JV Agreement was executed, approximately eleven thousand talc claimants became clients of the three firms. Smith Declaration ¶ 10. SLF also entered into co-counsel agreements with various other law firms in connection with the talc litigation against J&J, and has retained other law firms, including Golomb Legal, as local counsel in certain of the talc litigation. Smith Declaration ¶ 31.

*II.    The July Master Ballots*

10. On May 1, 2024, J&J announced that it would be seeking support for a prepackaged plan of reorganization to resolve certain of its talc liabilities. Johnson & Johnson, Current Report (Form 8-K) (May 1, 2024). Shortly thereafter, on June 3, 2024, J&J subsidiary LLT began to solicit votes to accept or reject the Initial Plan. *Declaration of John K. Kim in Support of Chapter 11 Case and Certain First Day Pleadings* [Dkt. No. 17] (the "**Kim Declaration**") ¶ 121. The solicitation procedures contemplated that law firms could submit master ballots on their clients' behalf in two ways: through an "Option A Certification" – indicating the firm had obtained informed consent from each client regarding its vote – or an "Option B Certification" – indicating the firm was relying on its authority to vote by virtue of a power of attorney. Smith Declaration ¶ 26.

11. The Initial Plan provided that the Debtor and J&J would fund a trust for the benefit of certain talc personal injury claimants with approximately $7.9 billion over 25 years. [Dkt. No. 25]. While the Initial Plan was an improvement over the plans that J&J subsidiary LTL had put forward in its bankruptcy proceedings, SLF continued to believe that the Initial Plan did not provide sufficient recoveries to SLF's clients (or to talc claimants generally) and agreed

with Beasley Allen's recommendation to the jointly-represented SLF Claimants that they reject the Initial Plan.  Smith Declaration ¶ 14.

12.     Beasley Allen submitted a master ballot to vote on the Initial Plan (the "**BA Master Ballot**").  *Id.*  In addition to submitting votes on behalf of the jointly-represented SLF Claimants, the BA Master Ballot indicated that Beasley Allen had obtained informed consent from each client regarding their vote (an Option A Certification), and that 11,434 claimants had voted to reject and 69 claimants to accept the Initial Plan.  Smith Declaration ¶ 15.

13.     But Beasley Allen's Option A Certification was improper.  Beasley Allen did not, in fact, obtain informed consent from each of the jointly-represented SLF Claimants.  Instead, Beasley Allen merely sent an email communication recommending that the claimants reject the Initial Plan, and advising that Beasley Allen would vote for them against the Initial Plan unless the claimants directed otherwise.[7]  Smith Declaration ¶¶ 14-15.  In doing so, Beasley Allen was presumably relying on its authority to vote on behalf of the jointly-represented SLF Claimants via power of attorney – an authority that SLF shares.  That power of attorney authority would have permitted Beasley Allen to vote pursuant to an Option B Certification, but not an Option A Certification.

*III.     SLF Negotiates to Materially Improve the Plan*

14.     Following voting on the Initial Plan, certain plaintiffs' firms that had opposed the Initial Plan asked the Debtor to delay its bankruptcy planning to allow for additional settlement negotiations.  Kim Declaration ¶ 127.  Negotiations between those opposing firms and the Debtor stalled, but SLF, in a good faith effort to see if a resolution could finally be reached,

---

[7] It remains unclear whether Beasley Allen actually reached out to all of its talc clients before submitting the BA Master Ballot.  Certain claimants have submitted declarations stating that they were never contacted by Beasley Allen and had voted to accept the Initial Plan, based on an informed consent vote, through their counsel of choice. [Dkt. No. 306-1, Exh. A].

picked up the negotiations with the Debtor's representatives on potential amendments to the Initial Plan to increase claimant support.  Smith Declaration ¶ 16-17.  SLF had a duty to the SLF Claimants to improve the Initial Plan if possible, and this undertaking was consistent with the terms of the JV Agreement and the SLF Claimants' engagement letters.  Smith Declaration ¶ 17.

15.     Following extensive negotiations with the Debtor's representatives, SLF was able to obtain material improvements to the Initial Plan.  Those material improvements were laid out in a memorandum of understanding between SLF and J&J (the "**MOU**") [Dkt. No. 17-1, Annex A], and include, among others, the following:

- Payment of an additional *$1.1 billion* under the Amended Plan to fund distributions to talc claimants subject to the Individual Review Process, which will provide additional compensation to those most harmed by the Debtor's products (including ovarian cancer claimants who have had cases pending for at least four years);

- Subject to agreement with the proposed Future Claimants' Representative, the reallocation of *$500 million* from Future Talc Claimants to Direct Talc Claimants, for a total up to *$1.6 billion increase* in funds available for Direct Talc Claimants;

- Creation of a *$650 million* attorney fee fund outside of the MDL (the "**Attorney Fee Fund**"), to be overseen by a retired federal judge, which will ensure that claimants' recoveries under the Plan are not subject to the MDL common benefit fund tax;[8]

- The Debtor's commitment that the proposed claims administrator, Archer, will begin reviewing and paying distributions on account of submitted talc

---

[8] SLF disagrees with the Coalition's argument, *see* Reinstatement Motion ¶ 23, concerning how the common benefit fund functions in the MDL and believes that the Attorney Fee Fund will ensure higher claimant recoveries, as claimants will not have to bear the 8%-12% assessment out of recoveries that would otherwise go to the common benefit fund in the MDL.  Contrary to the Coalition's assertions, the amounts payable to the common benefit fund in the MDL do not come out of attorney contingency fees but are deducted from claimants' recoveries.  For example, if a claimant receives $100 from J&J in the MDL, and has agreed to a 40% contingency fee with their counsel:  The typical terms of the client's engagement letter specify that all costs are deducted from the client recovery after calculation of the attorney's contingent fee.  Under the MDL common benefit fee order, that claimant's attorney would recover 40% of the $100 ($40), and the MDL common benefit fee of 8-12% of the total recovery would be deducted from the remaining $60, leaving the claimant with $48-$52.  Under the Plan, the common benefit fee would be satisfied from the Attorney Fee Fund, not the claimant's recovery.  As a result, the claimant would net 60% of their recovery, or $60 – a net increase from what they would recover in the MDL.  The only parties for whom this outcome is worse, ironically, are plaintiffs' firms that would otherwise recover more from the MDL common benefit fund than from the Attorney Fee Fund.

claims as soon as possible, including while Supreme Court appeals (if any) are pending;

- J&J's commitment to provide material settlement recoveries if the Chapter 11 Case is ultimately dismissed; and

- J&J's agreement to assist in negotiating a global lien resolution with the Department of Justice on behalf of CMS and private lien holders.

MOU; Kim Declaration ¶ 131. While the MOU and the Amended Plan are not perfect, and no amount of money will ever be able to remedy the harm to tens of thousands of women caused by the Debtor's products, the MOU provides certainty of recovery in the near term to talc claimants that simply does not (and cannot) exist outside of this Chapter 11 Case.

16.     As a result of the MOU's modifications to the Initial Plan, SLF recommended that the SLF Claimants support the Amended Plan. Smith Declaration ¶¶ 18-19. SLF was not alone in that decision; the Amended Plan is supported by tens of thousands of talc claimants, including those represented by the Ad Hoc Committee of Supporting Counsel. [Dkt. No. 182] ¶ 25.

*IV.     The Resolicitation Process*

17.     As many prior client communications to the jointly-represented SLF Claimants about the Initial Plan were coordinated through Beasley Allen, SLF asked Beasley Allen to work with SLF on a joint letter that could be sent to the jointly-represented SLF Claimants informing them of the terms of the MOU and explaining the pros and cons of the Amended Plan. Smith Declaration ¶ 20. This also would have helped to avoid confusion given the prior recommendations that SLF Claimants reject the Initial Plan. *Id*. In lieu of substantively responding to SLF or working on a joint letter that could lay out differing viewpoints on the Plan, Beasley Allen unilaterally sent a letter to the jointly-represented SLF Claimants on August 26, 2024, lambasting the Amended Plan and the MOU, and attaching an early draft of the MOU. Smith Declaration ¶ 21. The letter contained numerous references to Beasley Allen's "duties to

all claimants" (not just the SLF Claimants) and Beasley Allen's insistence that it would not leave behind the other law firms in the MDL.  *Id.*

18.     Given Beasley Allen's resistance to providing a balanced view of the MOU and to coordinating communications, SLF asked Beasley Allen for the latest contact information for each of the jointly-represented SLF Claimants so that SLF could send its own letter and recommendation.  Smith Declaration ¶ 22.  Beasley Allen refused, *id.*, ultimately forcing SLF to reverse-engineer client contact information from prior letters and emails sent by Beasley Allen, a process which took substantial time and resources to complete.   Smith Declaration ¶ 23. Contrary to the Coalition's assertions, it was a direct result of Beasley Allen's actions (or inaction) that reduced SLF Claimants' time to review and assess the MOU.

19.     On September 10 and 11, 2024, SLF transmitted its letter in support of the Amended Plan and MOU by email to the SLF Claimants for whom SLF had email addresses, and by FedEx overnight mail to others.[9]  Smith Declaration ¶ 23.  The letter explained the terms of the MOU, why SLF recommended acceptance of the Amended Plan, and that SLF would vote to accept the Amended Plan on SLF Claimants' behalf unless claimants contacted SLF (directly or through a website portal) and directed SLF to vote against by a date certain.  *Id.*

20.     At this point in mid-September 2024, the Debtor intended to file for bankruptcy imminently and incorporation of the terms of the MOU into the Amended Plan was contingent on receiving the SLF Claimants' support.  MOU at 3.  SLF thus set an initial deadline of September 13, 2024 for SLF Claimants to direct SLF to vote against the Plan.  Smith Declaration ¶ 23.  This deadline was extended to September 15 through a notice on the SLF Claimant

---

[9] The September 11, 2024 SLF letter was filed on the docket by the Coalition.  [Dkt. No. 257].  SLF reserves all rights as to whether such filing violated any attorney-client privilege.

website.  *Id.*  SLF accepted votes through the website, via phone and via email through September 15.  *Id.*

21.     Concurrently with SLF's efforts to get out the vote, Beasley Allen sent at least one letter to the SLF Claimants disclaiming SLF's involvement in representing the jointly-represented SLF Claimants or in prosecuting cases under the JV Agreement, attacking the MOU, and instructing the SLF Claimants to ignore SLF's letter.  Smith Declaration ¶ 24.  This communication was timed and intended to create confusion.  Nevertheless, hundreds of SLF Claimants reached out to SLF to direct SLF on how to vote on the Amended Plan.  Smith Declaration ¶ 34.  Those direct votes are reflected on a master ballot that SLF submitted (the "**SLF Master Ballot**") and were voted via the Option A Certification (for informed consent). On behalf of the remaining approximately 11,200 SLF Claimants, including claimants previously listed on the BA Master Ballot, previously listed on a ballot submitted by SLF's local counsel (Golomb Legal), and approximately 100 newly-retained clients, SLF voted to accept the Initial Plan as amended by the MOU, via an Option B Certification.  Smith Declaration ¶ 31-32.[10]  It is this SLF Master Ballot that the Reinstatement Motion now seeks to throw out, and replace with the long-outdated BA Master Ballot.

V.      *The Coalition's Requested Relief Seeks to Disenfranchise its Own Clients*

22.     Notwithstanding its self-proclaimed mission of "obtaining fair and equitable compensation for all ovarian cancer claimants," Dkt. No. 243 ¶ 1, the Coalition would, ironically, stymie ovarian cancer and other talc claimants from recovering on account of their claims.  That is, after all, exactly what the Coalition Voting Pleadings seek to do:

---

[10] The Coalition has filed declarations from three of the SLF Claimants included on the SLF Master Ballot who state they intended to vote to reject the Initial Plan, as reflected in the BA Master Ballot.  [Dkt. No. 257].  One of those claimants followed the procedures in the SLF September letter, and contacted SLF to direct SLF to reject the Initial Plan on her behalf.  That SLF Claimant is reflected as rejecting in the SLF Master Ballot.  The other two claimants never contacted SLF, and are accordingly reflected as accepting in the SLF Master Ballot.

- ***The Reinstatement Motion:*** Throw out the validly submitted SLF Master Ballot (which includes Option A votes submitted on behalf of ovarian cancer claimants), and reinstate the improperly submitted BA Master Ballot, disenfranchising the SLF Claimants in the process – particularly the SLF Claimants who did not have their votes reflected on the BA Master Ballot, and should have their voices heard.

- ***The Designation Motion:*** Ignore the votes of all claimants who voted in favor of the Initial Plan prepetition – including *any of the Coalition's own clients who voted to accept the Plan.* They are seeking to designate their own clients' votes that were cast, allegedly, with informed consent.

- ***The Reconsideration Request:*** Fire the Debtor's claims, solicitation and noticing agent because the Coalition is unhappy with the votes submitted in support of the Plan, for the same reasons that the Coalition seeks to designate the SLF Master Ballot and reinstate the BA Master Ballot.

- ***The Bar Date Motion and Estimation Motion:*** Set a deadline by which talc claimants must file proofs of claim so that the claims pool can be reduced to claimants suffering from ovarian cancer, as all other cancer claims, including gynecological cancer claims, are "non-compensable" under the Coalition's standards. Bar Date Motion ¶ 7. The Coalition's true aim is to set up a process whereby ovarian cancer claimants can object to the claims of other women with non-ovarian gynecological claims. Bar Date Motion ¶ 26. The Coalition also seeks to set up a time-consuming and expensive process whereby claims against the Debtor will be estimated so that the "proper weight" (Estimation Motion ¶ 40) can be accorded to each category of claims asserted against the Debtor; "proper weight" from the Coalition's perspective, meaning that non-ovarian cancer claims are discounted in the plan voting and distribution process. Are the Coalition's clients that are non-ovarian cancer claimants – of which there are many, including approximately 5,000 SLF claimants co-represented by Beasley Allen and SLF [Dkt. No. 305 ¶ 7] – aware that their counsel is seeking to set up a process whereby their claims can be prevented from voting and recovering under the Amended Plan, or at the very least, have their votes dramatically discounted?

23.    The Debtor has since filed its own motion about the prepetition voting results, the

*Debtor's Motion for Entry of an Order Confirming the Results of Voting on the Prepackaged Plan of Reorganization* [Dkt. No. 305] (the "**Debtor's Voting Results Motion**"), which seeks to validate the Epiq voting report, including the SLF Master Ballot on the grounds that the SLF

Master Ballot was permitted under the Tabulation Procedures.[11]  SLF supports the relief sought in the Debtor's Voting Results Motion and reserves the right to file a response in support of that Motion at the appropriate time.  As set forth in additional detail herein, to the extent that the Court finds that Rule 3018(a) requires Court approval for submission of the SLF Master Ballot and finds that the Debtor's Voting Results Motion does not adequately seek relief under Rule 3018(a), the SLF Claimants cross-move through this Objection and Cross-Motion for Court authorization, under Rule 3018(a), to submit the SLF Master Ballot.

*VI.*     *The Motions to Dismiss*

24.     The Coalition and the United States Trustee filed Motions to Dismiss the Chapter 11 Case, each of which asserts that the Debtor is not in financial distress and that no legitimate purpose exists for the Chapter 11 Case.  For the reasons set forth herein and in the Debtor's objection to the Motions to Dismiss, the Motions should be denied.

## ARGUMENT

*I.*     *The Beasley Allen Ballot Cannot Be Reinstated*

25.     The Coalition's baseless argument that the BA Master Ballot should be reinstated fails for many reasons.  The SLF Master Ballot was submitted in accordance with the Debtor's Tabulation Procedures.  Ample cause existed to change the votes included on the BA Master Ballot, and SLF submitted sufficient evidence of its authority to change such votes.  Further, the SLF Master Ballot was not submitted based on promises made to SLF or the SLF Claimants outside of the Plan, and SLF either already had or obtained the necessary client consents to

---

[11] "Tabulation Procedures" shall have the meaning ascribed to it in the *Debtor's Motion for Entry of an Order Approving (I) Adequacy of the Disclosure Statement, (II) Solicitation Packages and Procedures Employed for the Solicitation and Tabulation of Votes on the Debtor's Prepackaged Plan of Reorganization, and (III) Notice of Non-Voting Status* [Dkt. No. 46].

submit the SLF Master Ballot. Reinstating the BA Master Ballot would disenfranchise the SLF Claimants, including the hundreds of claimants who voted directly.

      *A.*     *The SLF Ballot Was Submitted in Accordance with the Tabulation Procedures*

      26.     The Debtor's Tabulation Procedures authorized the Debtor to extend the voting deadline. Tabulation Procedures 3(d), 4(d). That is exactly what happened. The voting deadline was first extended when the Coalition firms requested a pause in the vote tabulation to continue negotiations, and then again when SLF requested an extension of the voting deadline while it was negotiating the MOU. Debtor's Voting Results Motion ¶ 40 (collecting citations to Tabulation Procedures). Both of those extensions were permitted under the Tabulation Procedures, which provide the Debtor with flexibility to a determine "a later date" by which ballots may be received, particularly where conflicting master ballots were submitted. Tabulation Procedures 4(b), 4(d). The Tabulation Procedures further permitted claimants to change their votes in advance of the Voting Deadline, stating that "a properly completed superseding ballot . . . on or before the Voting Deadline will be presumed to have sufficient cause, within the meaning of Bankruptcy Rule 3018(a), to change or withdraw such claimant's . . . acceptance or rejection of the Plan." Tabulation Procedures 4(c). Further, even if the Voting Deadline had passed, Paragraph 4(b) of the Tabulation Procedures permitted the SLF Claimants to change their vote after the deadline if the Debtor recognized such vote change, Tabulation Procedures 4(b), which the Debtor did.

      27.     The Coalition cites a handful of cases ostensibly for the proposition that Rule 3018(a) requires court approval for changing a vote, Reinstatement Motion ¶¶ 38-40, but none of those cases involved prepetition solicitation and vote changes.[12] And indeed, how could it be

---

[12] *MCorp*, as noted below, concerned a request to change a vote postpetition, as a result of postpetition negotiations between the debtor and a creditor. 137 B.R. at 237-38. *In re Southland Corp.* did not concern a vote change at all,

required: before filing the petition, there was no bankruptcy court from which to seek authorization.

28.     To the extent that the Court finds that affirmative relief under Rule 3018 is required, the Debtor has sought that relief in its Voting Results Motion and, alternatively, SLF cross-moves for such authorization under Rule 3018(a) for which ample causes exists.  *See infra* (¶¶ 45-48).

> B.     *The SLF Master Ballot Was Not Submitted Based on Promises Outside of the Plan*

29.     Similarly baseless is the Coalition's assertion that SLF changed its clients' votes due to an alleged impermissible "promise outside of the plan" – namely, the Attorney Fee Fund – in purported violation of *In re MCorp Fin., Inc.,* 137 B.R. 237 (Bankr. S.D. Tex. 1992).  Reinstatement Motion ¶ 41.  First, unlike in *MCorp*, the Rule 3018(a) standard has been met.  The Amended Plan will provide $1.6 billion more for talc claimants than it did before, in addition to material non-economic benefits that will aid in expediting distributions to claimants; that easily alone establishes "cause" to permit vote changes.   Second, unlike *MCorp*, the modifications resulting in the change in vote were not based on changes to plan treatment solely for the specific claimant voting on the plan, *see MCorp.*, 137 B.R. at 237-38, but on improvements to plan treatment for *the entire class.*  Third, contrary to the Coalition's objection, the Attorney Fee Fund actually increases claimant recoveries under the Plan.

30.     The Attorney Fee Fund will benefit many plaintiffs' firms, not just SLF.  MOU § II.C.4-5.  A retired federal judge – not SLF – will control how the funds will be allocated.  *Id.*

---

but rather whether the debtor's prepetition solicitation process gave brokers sufficient time to transmit voting materials to beneficial holders.  124 B.R. 211, 227 (Bankr. N.D. Tex. 1991).  Finally, *In re Piece Goods Shops Co., L.P.* did not address a request for a vote change either, but merely the court noting in *dicta* that it would not consider a handful of amended ballots in determining the total accepting amount of votes in a particular class.  188 B.R. 778, 795 (Bankr. M.D.N.C. 1995).

Additionally, the Attorney Fee Fund is in lieu of a fee fund that *already exists:* the MDL common benefit fund. *Compare* MDL Dkt. No. 14741, Case Management Order No. 7(A) (establishing common benefit fund) *with* MOU § II.C (establishing Attorney Fee Fund). The Coalition's objections appear to stem from concerns about the differences in criteria between those two fee funds, and their concern that the ***Coalition law firms*** might now personally stand to recover less from the Attorney Fee Fund than from the MDL common benefit fund (where many of the Coalition firms sit on the plaintiffs' steering committee and stand to recover substantial amounts). Respectfully, this self-interested calculation by Coalition law firms is not an appropriate reason for those firms to oppose the Amended Plan ***on their clients' behalf***.

  C. *SLF Had Authority to Vote Via an Option B Certification and Obtained Client Consent for Votes Submitted under the Option A Certification*

  31. The Coalition's arguments that the SLF Claimants were provided insufficient notice to vote on the Amended Plan and that SLF's client communications were misleading are incorrect. Those arguments are further meaningless given that the SLF Master Ballot was submitted, in large part, with an Option B Certification.

  32. First, the Coalition conflates 3018(a) and 3018(b). The Coalition attempts to analogize to *Southland*, a 3018(b) case involving prepetition solicitation of beneficial securities holders through their brokers. Reinstatement Motion, ¶¶ 39-40 (citing *Southland*, 124 B.R. at 226-27). However, *Southland* addressed a dispute under Rule 3018(b) regarding whether the debtor's solicitation agent provided sufficient time for security holders to review and vote on a plan, and if the appropriate party voting was the beneficial holder of the security or the broker. 124 B.R. at 227. The relationship between a broker and a beneficial holder of a security is unlike the relationship between an attorney and their client. A broker does not have the authority to vote on the beneficial holder's behalf absent any direction, but an engagement letter may grant

the attorney the power to do just that.  Further, Rule 3018(b)'s proviso that "an unreasonably short time" to vote on the plan vitiates a prepetition vote applies *solely* to "an equity security holder or creditor whose security is based on a security of record" and not to other types of creditors, including tort claimants.  Bankr. R. 3018(b).

33.     The Coalition challenges whether the SLF Claimants gave informed consent on several other bases, including that the SLF Claimants had insufficient time to review the MOU. Reinstatement Motion ¶¶ 23, 40.  As an initial matter, SLF gave up to five days' notice – not two or less days, as Beasley Allen argues – because SLF extended the time within which claimants could vote.  Given the claimants' existing familiarity with the terms of the Initial Plan from numerous letters sent by Beasley Allen and SLF earlier in the summer, that amount of time was sufficient.  Moreover, Beasley Allen and the Coalition's complaints about the amount of time afforded to claimants to vote rings hollow because it was *Beasley Allen's* conduct that prevented SLF Claimants from receiving more time to review the terms of the MOU.  SLF endeavored to provide them additional time.  Beasley Allen prevented that from occurring by refusing to share contact information and refusing to pass on a joint letter.  Smith Declaration ¶ 20.

34.     Further, SLF received informed consent for the votes that it submitted using the Option A Certification.  The ABA model rules provide that  informed consent "denotes the agreement to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." MODEL RULES OF PROF'L CONDUCT r. 1.0 (AM. BAR ASS'N, 1983).  SLF provided its clients the basis to render informed consent, including by circulating a detailed letter explaining the benefits and risks of the Amended Plan, providing sufficient time to review said letter, and being available to answer any of its clients' questions regarding the letter.

17

SLF – unlike Beasley Allen – only voted via Option A Certification for those clients who actually responded prior to the deadline.  As a result, the SLF Master Ballot reflected an Option A (informed consent) Certification for the hundreds of claimants who contacted SLF before the deadline, and an Option B (power of attorney) Certification for all claimants who did not do so. Critically, informed consent was not required for votes submitted pursuant to an Option B Certification (i.e. for the majority of the votes included in the SLF Master Ballot).

35.     Contrary to the Coalition's assertions, Reinstatement Motion ¶¶ 23, 40, SLF's client communications did not fail to obtain "informed consent."  Notably, at no point does the Coalition accuse SLF of misconstruing the amount of aggregate direct funding available for claimants under the Amended Plan.  Rather, the Coalition's principal contention is that SLF "materially misrepresented" the terms of the Amended Plan or the MOU in SLF's description of the impact of the Attorney Fee Fund on claimant distributions.  Not so.  SLF's characterization of how the Attorney Fee Fund works was correct – and consistent with the Debtor's description as well.  *See* Debtor's Voting Results Motion ¶ 1, n.3; *supra* ¶ 15, n.8.

       *D.     Reinstating the BA Master Ballot Would Disenfranchise the SLF Claimants*

36.     The Court should not reinstate the BA Master Ballot because doing so would disenfranchise the hundreds of SLF Claimants whose votes were previously included in the BA Master Ballot that contacted SLF directly and instructed SLF to accept the Amended Plan on their behalf.  Smith Declaration ¶ 34.  Further, the votes of approximately 11,000 other SLF Claimants who were relying on SLF to accept the Plan on their behalf in accordance with SLF's communications would be disregarded.  Reinstating the BA Master Ballot (or designating it, the Coalition's requested alternative relief) would rob these claimants of their properly-exercised vote and should not be permitted.

*II.*     *There is No Basis to Designate the SLF Master Ballot*

37.     The Coalition has not met the standard for its requested alternative relief of designating the SLF Master Ballot.  Creditor votes may only be designated if the Court finds that such votes were cast or solicited in "bad faith." 11 U.S.C. § 1126(e).  That is not the case here. Typically, a creditor's vote will be designated if the vote was cast "to extract or extort a personal advantage not available to other creditors in its class" or to further "an 'ulterior motive,'" such as to obtain a benefit "that does not relate to its claim." *In re Dune Deck Owners Corp.*, 175 B.R. 839, 844 (Bankr. S.D.N.Y. 1995).  Other "badges" of bad faith warranting designation identified by courts include "creditor votes designed to (1) assume control of the debtor . . . (2) put the debtor out of business or otherwise gain a competitive advantage . . . (3) destroy the debtor out of pure malice. . . or (4) obtain benefits available under a private agreement with a third party which depends on the debtor's failure to reorganize." *Id.* at 844-45 (internal citations omitted).

38.     Vote designation has been described as a "drastic remedy," *In re Imerys Talc Am., Inc.*, No. 19-10289 (LSS), 2021 WL 4786093, at *16 (Bankr. D. Del. Oct. 13, 2021), and a "draconian measure," which should not be imposed absent the presence of "highly egregious conduct." *In re Adelphia Commc'ns Corp.*, 359 B.R. 54, 56-57 (Bankr. S.D.N.Y. 2006). Consequently, courts have consistently declined to designate the votes of creditors acting to maximize their recoveries, as "good faith in casting a vote does not require of the creditor a selfless disinterest." *In re Fed. Support Co.*, 859 F.2d 17, 19 (4th Cir. 1988); *see also Imerys*, 2021 WL 4786093, at *16 (holding that settlement negotiated by law firm "furthered the interests of its clients in maximizing their recoveries" and therefore did "not warrant the drastic remedy of disqualifying votes."); *Adelphia*, 359 B.R. at 62 (holding that plan provisions negotiated by creditors were "all variants of measures to advance one's interests in maximizing

recoveries under a reorganization plan, which have consistently been held to be acceptable exercises of creditor power" and "[are] not the type of conduct that warrants vote designation."); *Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (In re Figter Ltd.)*, 118 F.3d 635, 640 (9th Cir. 1997) (declining to designate creditor votes where creditor "acted in a good faith attempt to protect its interests.").

39.    SLF did not recommend that the SLF Claimants change their votes, nor did SLF cast the votes reflected in the Option B Certification portion of the SLF Master Ballot, to obtain some "personal advantage" not available to other talc claimants nor as the result of some ulterior motive unrelated to the SLF Claimants' talc claims against the estate, Reinstatement Motion ¶ 45.  Instead, SLF recommended that the SLF Claimants change their votes because SLF was able to secure an additional **$1.6 billion** – almost the entire amount offered to all talc claimants in LTL 1.0 – in funding for plan distributions.  Remarkably, the Coalition fails to mention this *at all* in its Reinstatement Motion.   In addition, SLF's recommendation was motivated by commitments obtained by SLF (i) from J&J that funding would be provided even if the Plan is not confirmed, (ii) that claims processing would be expedited, (iii) that J&J would help negotiate a lien resolution program (and with potential medical liens in the billions, this would provide significant value to all talc claimants), and (iv) to establish an attorney fee fund that would reduce the funds taken out of claimant distributions to cover attorneys' fees and costs.  All of these are modifications to the Initial Plan that *increase recoveries for talc claimants*, and therefore the SLF Claimants' vote in favor of the Plan based on these modifications was proper.

40.    In the face of the SLF Claimants' demonstrable good faith basis for voting to approve the Amended Plan, the Coalition requests to designate the votes of its own clients, primarily on the basis that the Debtor "purchased" the votes of the SLF Claimants by (i) putting

SLF "in charge" of the Attorney Fee Fund and (ii) agreeing to cease pursuit of discovery regarding SLF's litigation financing.[13]  These arguments are meritless.  The Coalition offers no support for the proposition that a creditor's vote in favor for a plan based, in part, on fully-disclosed, non-monetary terms in a plan modification is tantamount to "vote buying."  Indeed, in each of the cases cited by the Coalition where the court found impermissible "vote buying" had occurred, either the debtor or an insider of the debtor had *actually purchased* the claim of a creditor and, as a result, obtained the right to vote on behalf of that claim.[14]  This undisputedly did not occur here – the SLF Claimants continue to own their claims and voted those claims through the SLF Master Ballot.

41.    Likewise the Coalition's assertion that SLF's vote to accept the Amended Plan on behalf of SLF Claimants was "bought" because of alleged benefits to SLF quickly falls apart under any scrutiny.

42.    Under the MOU, SLF agreed to "engage the Hon. Glenn Norton," a retired federal judge, "to oversee all determinations regarding common benefit awards and to resolve any such disputes."  MOU § II.C.5.  Thus, SLF is not "in charge" of the Attorney Fee Fund – that will be left to Judge Norton, who will assess fee awards based on to-be-determined factors, including "a firm's role in actually trying cases, or contributing to trial work-up," as well as a firm's efforts to resolve talc claims.  *Id.*

---

[13] The Coalition also asserts that the SLF Claimants' votes should be designated because (i) SLF lacked authority or informed consent to vote on behalf of the SLF Claimants; and (ii) the Debtor did not solicit votes in good faith.  The Coalition's arguments regarding the lack of informed consent, Reinstatement Motion ¶ 47, are addressed above, and the Debtor's objection to the Reinstatement Motion addresses the Coalition's arguments regarding the sufficiency of the information provided in the Disclosure Statement, Reinstatement Motion ¶¶ 50-67.

[14] *See*, e.g., *In re Applegate Prop., Ltd.*, 133 B.R. 827, 834-36 (Bankr. W.D. Tex. 1991) (designating unsecured claims purchased by insider of the debtor to block competing plan proponent from confirming its plan); *Zentek GBV Fund IV v. Vesper*, 19 F. App'x 238, 246-47 (6th Cir. 2001) (designating claims purchased by debtor's owner to block confirmation of chapter 11 trustee's plan); *In re Machne Menachem, Inc.*, 233 F. App'x 119, 121-22 (3d Cir. 2007) (holding that plan did not satisfy 1129(a)(3) where son of debtor's principals purchased unsecured claims to allow debtor to reclassify them as insider claims to gerrymander vote).

43.     The Coalition's focus on the MOU's requirement that J&J cease discovery against SLF related to litigation financing, Reinstatement Motion ¶ 48, is similarly a red herring.  It is not surprising or nefarious that a defendant in litigation would stop pursuing aggressive discovery against a plaintiff when it reached a settlement with that plaintiff.  And the MDL docket reflects that notwithstanding the terms of the MOU, J&J is still affirmatively pursuing said discovery against both Beasley Allen *and SLF.  See* MDL [Dkt. No. 33306] (letter from J&J providing supplemental authority in support of their objection to the special master's order finding that J&J could not pursue discovery against Beasley Allen and SLF on litigation financing, stating that "the Court should compel the litigation funding discovery [against Beasley Allen and SLF] Defendants seek here.").[15]

44.     Further, none of the cases cited by the Coalition support the argument that the SLF Master Ballot should be designated.[16]  In the cases where the court actually made findings of "bad faith" warranting vote designation, these findings were supported by evidence that such votes (i) were cast to obtain advantages dependent on the debtor's ***failure to reorganize***;[17] (ii)

---

[15] SLF reserves all rights as to whether J&J has complied with the MOU on this point.

[16] Indeed, some of the cases cited by the Coalition do not even involve a motion to designate votes. *See In re Dow Corning Corp.*, 244 B.R. 673, 676-77 (Bankr. E.D. Mich. 1999) (holding that chapter 11 plan satisfied 1129(a)(3)'s "good faith" requirement); and *Machne Menachem, Inc.*, 233 F. App'x at 121-22 (holding that plan did not satisfy 1129(a)(3) where son of debtor's principals purchased unsecured claims to allow debtor to reclassify them as insider claims to gerrymander vote).

Others expressly decline to designate votes even in the face of *actual* vote buying and improper solicitation.  *See In re Landing Assocs., Ltd.*, 157 B.R. 791, 809 (Bankr. W.D. Tex. 1993) (declining to designate lender's votes in spite of evidence that lender purchased votes to prevent reorganization in order to obtain benefits under a third party agreement based on policy considerations); *Figter*, 118 F.3d at 640 (affirming bankruptcy court's denial of designation motion where lender purchased claims and voted against the plan to "protect its interests as [debtor's] major creditor."); *In re Gilbert*, 104 B.R. 206, 215 (Bankr. W.D. Mo. 1989) (holding that insider's technical violation of postpetition solicitation rules set forth in § 1125(b) did not warrant designation because insider did not act with malintent, and otherwise declining to designate claim purchased to further existing creditor's economic interest).

[17] *See In re Wiston XXIV, Ltd. P'ship*, 153 B.R. 322, 325-26 (Bankr. D. Kan. 1993) (designating creditor's "no" vote on debtor's plan procured through side agreement between creditor and debtor's lender); *Dune Deck,* 175 B.R. at 846-47 (holding evidentiary hearing was necessary to determine whether votes purchased by noteholder should be

were purchased by an insider of the debtor with the intent of ***blocking a competing plan***;[18] (iii) were made to ***block a plan*** without regard to whether the plan maximized recovery of the voting claim;[19] or (iv) were improperly solicited prior to the termination of exclusivity to ***block the debtor's plan*** by a creditor seeking to propose its own plan.[20]  None of these cases is applicable here, as the SLF Claimants' accepting vote was solicited in accordance with the rules and cast based on an agreement – which is fully embodied in the Amended Plan – that maximizes recovery for *all* talc claimants and ***furthers a consensual resolution of this case***.[21] The facts here thus fall well outside the standard for "bad faith" warranting designation set forth in the Coalition's own cases.  Indeed, the weaponization of claims to block a plan - even where it may maximize recovery on the voted claims – sounds far more akin to the Coalition's actions than SLF's.

---

designated where noteholder may have been motivated to vote against the plan by benefits it would reap under provisions in its assignment agreement with original note purchaser).

[18] *See Applegate*, 133 B.R. at 834-36 (designating unsecured claims purchased by insider of the debtor to block competing plan proponent from confirming its plan – "an obstructionist tactic done in contemplation of gaining an unfair advantage over other creditors."); *In re Allegheny Int'l, Inc.*, 118 B.R. 282, 289-90 (Bankr. W.D. Pa. 1990) (designating claims purchased by insider of the debtor where such claims had conflicting economic interests and were purchased solely to block the debtor's plan); *Zentek*, 19 F. App'x at 246-47 (designating claims purchased by debtor's owner to block confirmation of chapter 11 trustee's plan)

[19] *See Allegheny*, 118 B.R. at 290 (holding that creditor acted in bad faith and not to "further[] [its] own economic interests" where "the two classes in which [creditor] purchased claims have directly opposite interests with respect to the bank litigation.").

[20] *Century Glove, Inc. v. First Am Bank of N.Y.*, 860 F.2d 94, 97 (3d Cir. 1988) (holding that bankruptcy court's decision to designate votes of creditors influenced by improper solicitation by lender during the exclusivity period was interlocutory and thus declining to address the issue of designation on the merits).

[21] The only case cited by the Coalition where the Court designated votes of claims purchased with the intention of voting in favor of the plan is *In re Holly Knoll P'ship*, 167 B.R. 381 (Bankr. E.D. Pa. 1994).  There, the Court determined that the claim purchased by the Debtor's insider should be reclassified as an insider claim, and therefore not counted for purposes of § 1129(a)(10).  *Id.* at 388.  However, the Court notes in *dicta* that designation would be proper because the insider purchased the claim only after the debtor informed him that the plan could not otherwise be confirmed, and thus the insider was "acting to preserve financial advantages it would receive if the Plan was confirmed and it became Debtor's general partner" and not to maximize his recovery on account of the purchased claim. *Id.* at 388-89.  Thus, this case is distinguishable on the grounds that (i) the Debtor did not purchase and vote the SLF Claimants' claims; and (ii) the SLF Claimants voted to maximize their recovery on their claims.

45. Finally, it must be emphasized that "[t]he ability to vote on a reorganization plan is one of the most sacred entitlements that a creditor has in a chapter 11 case." *Adelphia Commc'ns Corp.*, 359 B.R. at 56. Designating the SLF Master Ballot would disenfranchise all of the SLF Claimants, and in particular, those that were voted with an Option A Certification on the SLF Master Ballot, or who retained SLF after the BA Master Ballot was submitted. Specifically as to the SLF Claimants with ovarian cancer (as those seem to be the only claimants that the Coalition thinks deserve recoveries or a voice), the SLF Master Ballot included hundreds of SLF Claimants with ovarian cancer who reached out to SLF to affirmatively direct SLF to accept the Plan on their behalf, and were accordingly reflected with an Option A Certification on the SLF Master Ballot.[22] These hundreds of ovarian cancer claimants joined hundreds of other talc claimants, as well as new SLF Claimants who retained SLF after the BA Master Ballot was submitted.[23] Designating the SLF Master Ballot would ensure that the voices of those claimants are never heard. This Court should not sanction this attempt by Beasley Allen – *co-counsel* to most of these women – to deprive these claimants of their ability to vote.

III. *The Court Should Grant SLF's Cross-Motion under Rule 3018(a), Insofar as Such a Cross-Motion is Necessary*

46. As noted above, the Tabulation Procedures provide that the standard for cause under Rule 3018(a) was satisfied, and the case law supports the same outcome.

47. Courts in the Fifth Circuit have consistently held that "subsequent negotiations between a plan proponent and the party seeking to change its ballot suffices as the required cause [under Rule 3018(a)]." *In re Cajun Elec. Power Coop., Inc.*, 230 B.R. 715, 744 (Bankr. M.D.

---

[22] Similarly, the Golomb Master Ballot included 15 SLF Claimants with ovarian cancer who affirmatively directed SLF to accept the Plan on their behalf through the SLF Master Ballot.

[23] Only 69 claimants accepted the Initial Plan on the BA Master Ballot – meaning that hundreds of additional **SLF Claimants** read the terms of the MOU and affirmatively decided to support it.

La. 1999); *Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.*, 844 F.2d 1142, 1163 (5th Cir. 1988) (finding that the Bankruptcy Court did not err in allowing a creditor to change its vote over the debtors' objection after the plan proponents had modified the plan to settle the creditors claim, stating that "to allow this kind of self-serving objection to upset resolution of a complicated bankruptcy would make a travesty of the entire bankruptcy process."); *In re Bourbon Saloon, Inc.*, No. 11-11518, 2012 WL 899282, *2 (E.D. La. Mar. 14, 2012) ("Fifth Circuit Case law suggests that negotiating with a creditor to achieve a consensual plan is an acceptable reason to allow a vote change.").

48.     As set forth extensively above, that is exactly what happened here: the SLF Claimants changed their vote after negotiating a settlement in furtherance of a consensual plan. And "what greater evidence of cause exists than where major parties in a chapter 11 proceeding negotiate a settlement of a highly complex litigation, thus helping to pave the way to a consensual plan?" *Cajun Elec.*, 230 B.R. at 744.

49.     The Coalition's insistence that the Court take a narrow reading of Rule 3018(a) should be rejected as inconsistent with how courts in this Circuit interpret the rule.  *See In re American Solar King Corp.*, 90 B.R. 808, 827 (Bankr. W.D. Tex. 1980) (finding that to foster the fundamental principles of Chapter 11, "Bankruptcy Rule 3018 must not be applied in a wooden, mechanical fashion, lest it serve only as a device to aid recalcitrant creditors in their quest to selfishly scuttle otherwise equitable reorganizations on a mere technicality.").

50.     To the extent the Court finds that affirmative relief under Rule 3018(a) is necessary and that the Debtor's Voting Results Motion does not adequately address this issue, SLF cross-moves for authorization to change the SLF Claimants' votes and submit the SLF Master Ballot.

IV.     *The Other Coalition Voting Motions Should Be Denied*

51.     As set forth in more detail in the Debtor's objections to the Bar Date Motion and the Estimation Motion, the relief sought in the other Coalition Voting Motions cannot be granted. Doing so would jeopardize the proposed confirmation timeline, burden the estate with unnecessary costs, and disenfranchise and confuse talc claimants.

52.     At the core of both motions is the premise that the Amended Plan must affirmatively distinguish between different types of talc personal injury claimants, including by separately classifying them, allowing their claims for voting and distribution purposes at different amounts, and setting up a process to disallow claims the Coalition views as "non-compensable," which includes claims represented by Coalition members.  Bar Date Motion ¶¶ 12-40; Estimation Motion ¶¶ 43-55.  Specifically, the Coalition argues that gynecological cancer claimants cannot recover under the Plan because no gynecological cancer claimant has ever recovered from J&J (either through trial or a public settlement).  Estimation Motion ¶ 48.  While the Coalition acknowledges that courts have found that a bar date is not actually required by the Bankruptcy Code, Bar Date Motion ¶ 92, they assert that one is required here because "[b]ar dates have been required in asbestos cases" and setting one would allow less weight to be provided to claims the Coalition views as non-compensable in the voting process.  Bar Date Motion ¶¶ 93-95.  These arguments are groundless.

53.     First, that no gynecological cancer claimants have yet succeeded at trial is irrelevant; tens of thousands of ovarian cancer and other cases remain pending.  The Debtor has deemed gynecological cancer claims – in addition to ovarian cancer claims – sufficiently compensable in the context of the Chapter 11 Case to provide them with distributions under the

Amended Plan. Which begs the question (again) – why is the Coalition trying to prevent *its own clients* from recovering under the Amended Plan?

54.     Second, a bar date is not required in this case or in all asbestos cases, as the Coalition's own pleading acknowledges. *See Bar Date Motion* ¶ 92, n.27 ("*See e.g., In re Congoleum Corp.,* No. 03-51524, 2008 WL 314699, at *3-4 (Bankr. D.N.J. Feb. 4, 2008) ("finding that Bankruptcy Rule 3003(c)(3) does not mandate setting a bar date and denying motion to set bar date for asbestos claims")).[24]   Notably, neither the *Imerys* nor *Cyprus* bankruptcy cases had bar dates for talc-related ovarian and non-ovarian cancer claims.

55.     At its core, the Coalition's argument is an objection to the Amended Plan on the grounds that the treatment of non-ovarian cancer claims under the Amended Plan and the proposed Trust Distribution Procedures is unfair and impermissible, and should be removed from the Amended Plan. The Coalition is welcome to object to the Amended Plan on that basis, and all Plan support parties will respond in turn, but it is inappropriate for the Coalition to attempt to collaterally attack the Amended Plan through the Bar Date and Estimation Motions. The Trust Distribution Procedures will govern treatment and allowance of all talc claims against the Debtor, as they do in *almost all mass tort cases*. To the extent the Coalition has concerns with

---

[24] In fact, many asbestos bankruptcy cases have not required bar dates to be set for personal injury claimants. *See, e.g.,* Order (I) Establishing Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof, *In re Cyprus Mines Corp.*, No. 21-10398 (Bankr. D. Del. May 3, 2021) [Dkt. No. 265] (exempting talc-related personal injury claims from bar date); Order (I) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim Other Than with Respect to Talc Personal Injury Claims and (II) Approving Form and Manner of Notice Thereof, *In re Imerys Talc America,* No. 19-10289 (Bankr. Del. July 25, 2019) [Dkt. No. 881] (same); Order Exempting Asbestos Claims and Demands from the January 8, 2019 Claims Bar Date, *In re Duro Dyne Corp.,* No. 18-27963 (Bankr. D.N.J. Dec. 12, 2018) [Dkt. No. 331] (exempting asbestos claims from bar date over objection of certain insurers); Order Granting Debtor's Motion for Reconsideration of Order Entered on December 3, 2015, *In re Geo. V. Hamilton, Inc.,* No. 15-23704 (Bankr. W.D. Pa. Jan. 12, 2016) [Dkt. No. 216] (same); Order Pursuant to Section 501 of the Bankruptcy Code, Bankruptcy Rules 2002(a), 3002, and 3003(c)(3), and Local Rule 2002-l(e) Establishing Bar Date for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof, *In re Yarway Corp.,* No. 13-11025 (Bankr. D. Del. Jan. 12, 2015) [Dkt. No. 720] (exempting talc-related personal injury claims from bar date); Second Amended Chapter 11 Plan of Reorganization, for Durabla Manufacturing Company and Durabla Canada Ltd., as Modified, *In re Durabla Mfg. Co.,* No. 09-14415 (Bankr. D. Del. May 25, 2012) [Dkt. No. 856] (same).

the proposed Trust Distribution Procedures, SLF encourages the Coalition to work with the Debtor and the other supporting parties on modifications to the Trust Distribution Procedures to resolve those concerns.

56.     Finally, what the Coalition fails to acknowledge in the Bar Date Motion and the Estimation Motion is that granting either of these motions would entirely derail the proposed confirmation timeline to which all parties in interest agreed.  [Dkt. No. 352].  In particular, the Bar Date Motion seeks to set a bar date of at least 150 days after the Debtor has completed a supplemental noticing program.  Bar Date Motion ¶ 77.  If the Bar Date Motion were granted at the January 25, 2025 hearing, and the Debtor completed a supplemental noticing program that very week, the bar date would not be until late June 2025 at the earliest.  The premise of the Coalition's argument is that a plan cannot be confirmed until *after* the bar date and *after* any claims objections are litigated, meaning that a confirmation hearing could not take place until July 2025 at the earliest (six months after the current confirmation hearing).

V.     *The Motions to Dismiss Should Be Denied*

57.     The Debtor will respond comprehensively to Motions to Dismiss, but several points are worthy of emphasis.

58.     *First*, the Motions to Dismiss proceed from the central premise that "[t]he case was not filed in good faith because it was filed solely for the benefit of J&J."  Coalition MTD ¶ 6; U.S. Trustee MTD ¶¶ 58-63.  This is patently incorrect, as evidenced by the extensive claimant support for the Plan.  Ironically, in purporting to speak for the victims, *see*, *e.g.,* Coalition MTD ¶ 186, the Coalition ignores the views of the many who have concluded that the current bankruptcy case represents their best path to a just recovery.

59.     *Second*, the Motions to Dismiss advance a series of arguments more properly directed at confirmation of the plan than dismissal of the case.  *See* Coalition MTD ¶¶ 120-138 (discussing the implications of *Harrington v. Purdue Pharma*) & ¶¶ 142-153 (discussing the unavailability of relief under section 524(g)) and U.S. Trustee MTD ¶¶ 64-71 (same).   In addition to being premature – akin to the sort of "patently unconfirmable" disclosure statement objection that is so routinely overruled – those arguments rely extensively on misplaced authority.

60.     The Supreme Court's recent decision in *Purdue* has almost no relevance to the Motions to Dismiss.   Despite the Coalition's hyperbolic claims that *Purdue* "controls" the outcome here, Coalition MTD ¶37, and "expressly" forbids the plan's release, Coalition MTD ¶ 5, *Purdue* had nothing at all to do with dismissal of a chapter 11 case.   If anything, *Purdue* confirms that there is ample opportunity to confirm a plan in these cases consistent with the Bankruptcy Code.   *Purdue* did nothing to undermine the viability of releases under section 524(g) of the Code – the section relied upon here.   *See Harrington v. Purdue Pharma, L.P.*, 144 S. Ct. 2071, 2085, 2104 n.5 (2024).   And *Purdue* was careful to note that its holding should not be construed to bar *consensual* releases—which of course remain a possibility here.   *See id.* at 2087 ("Nothing in what we have said should be construed to call into question *consensual* third-party releases….").[25]

61.     *Third*, the Coalition's focus on the allegedly fraudulent nature of the transactions that led to the Debtor's financial distress is puzzling.   If the Debtor is in financial distress due to the alleged mismanagement or misguided decision-making of its parent, then it hardly matters

---

[25] To be sure, the Coalition disputes the availability of section 524(g) relief, and no doubt cannot envision a plan that garners full consensus – but those objections only serve to highlight the prematurity of the Coalition's arguments in advance of confirmation.

that it might not have faced such distress absent such mismanagement. Indeed, a fraudulent transfer of the sort that the Coalition posits has happened here is quite often the *cause* of a bankruptcy, not a reason for dismissing it. *See, e.g., In re Tribune Media Co.*, 799 F.3d 272, 275 (3d Cir. 2015) (noting that leveraged buyout transaction, an alleged fraudulent transfer, left the debtor with a "precarious balance sheet" which ultimately led to debtor's bankruptcy filing). Perhaps mistakenly, if not presciently, the Coalition appears to acknowledge as much, observing that if the Debtor "take[s] the position that they finally did it: i.e., that they finally created a debtor that is in financial distress – then the obvious remedy is to unwind the fraudulent surrender of the Funding Agreement." Coalition MTD ¶ 178.[26]

62.     For these and other reasons set forth in the Debtor's objection, the Motions to Dismiss should be denied.

## CONCLUSION

63.     For the reasons set forth herein, the Coalition Voting Pleadings should be denied, and the Debtor's Voting Results Motion granted. Additionally, to the extent that the Court finds that relief under Rule 3018(a) is necessary to accept the SLF Master Ballot, the Cross Motion for Rule 3018(a) Approval should be granted.

64.     For the reasons set forth herein, the Motions to Dismiss should be denied.

65.     SLF and the SLF Claimants reserve all rights to supplement this Objection and Cross Motion and/or file additional responses to the Coalition Voting Pleadings and the Motions to Dismiss.

---

[26] Of course, the neither viability of any such claim, nor the standing to bring or settle it, is before the Court.

Dated:  November 6, 2024

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

Kenneth H. Eckstein (admitted *pro hac vice*)
Rachael L. Ringer (admitted *pro hac vice*)
P. Bradley O'Neill (admitted *pro hac vice*)
David E. Blabey, Jr. (admitted *pro hac vice*)
Megan M. Wasson (admitted *pro hac vice*)
1177 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000
E-mail:  keckstein@kramerlevin.com
rringer@kramerlevin.com
boneill@kramerlevin.com
dblabey@kramerlevin.com
mwasson@kramerlevin.com

and

**LOCKE LORD LLP**

/s/  *Elizabeth M. Guffy*
Elizabeth M. Guffy
Texas Bar Number 08592525
JPMorgan Chase Tower
600 Travis, Ste. 2800
Houston, TX 77002
Telephone: (713) 226-1507
Facsimile: (713) 223-3717
eguffy@lockelord.com

***Counsel to the SLF Claimants***

## Certificate of Service

I hereby certify that on November 6, 2024, a true and correct copy of the foregoing pleading was served electronically via the Court's ECF system on all parties registered to received such service.

*/s/ Elizabeth M. Guffy*
Elizabeth M. Guffy