**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| RED RIVER TALC, LLC | ) | Case No. 24-90505 (CML) |
|  | ) |  |
| Debtor.[1] | ) |  |
|  | ) |  |

**INSURERS' (A) OBJECTION TO APPROVAL OF
THE DISCLOSURE STATEMENT AND SOLICITATION PROCEDURES,
AND (B) PRELIMINARY OBJECTION TO CONFIRMATION OF THE PLAN**

---

[1] The last four digits of the Debtor's taxpayer identification number is 8508.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................... 4

I.      Insurance Policies Issued to J&J ................................................................. 4

II.     J&J and its Insurers are Litigating the NJ Coverage Action .................... 5

III.    Formation of LTL and Dismissal of LTL's Two Bankruptcy Cases .......... 7

        A.      J&J Reaches a Settlement with Imerys and Cyprus ..................... 9

IV.     J&J Refuses to Allow the Insurers to Participate in its Defense .......... 11

V.      LTL Engineers a Third Bankruptcy ......................................................... 12

VI.     OBJECTIONS TO APPROVAL OF THE DISCLOSURE STATEMENT AND
        SOLICITATION PROCEDURES ............................................................... 13

        A.      Legal Standard ............................................................................. 13

        B.      Insurers Have Standing Pursuant to Section 1109 of the Bankruptcy Code ......... 15

VII.    The Plan is Patently Unconfirmable ........................................................ 16

        A.      The Plan is Patently Unconfirmable and Not Proposed in Good Faith as
                the Plan Because It Pays Thousands of Invalid Claims ................ 16

        B.      The Plan is Patently Unconfirmable Because J&J May Have Bought the
                Votes Through Pre-Bankruptcy Settlements with Plaintiffs' Law Firms ........... 21

        C.      The Plan Violates Purdue Pharma, and the Channeling Injunction Exceeds
                the Scope of Section 524(g) ....................................................... 24

        D.      The Plan is Patently Unconfirmable Because Section  524(g) Relief is not
                Available to the Debtor and J&J in a Liquidation ....................... 27

        E.      The Plan is Patently Unconfirmable Because it Purports to Provides a
                Release to Middlesex and other Non-Contributing Parties .......... 29

        F.      The Plan is Patently Unconfirmable Because the Debtor Assigns the
                Rights to Make Claims Under Policies Without the Attendant Policy
                Obligations .................................................................................. 31

        G.      The Plan Contains Other Flaws .................................................... 33

        H.      The Disclosure Statement Does Not Provide Adequate Information ............... 34

                1.      The Disclosure Statement Should Not be Approved Because the Third
                        Filing Should be Dismissed as a Bad Faith Filing ............... 34

                2.      The Master Ballot Form Does Not Elicit Sufficient Information About
                        Whether Claimants Consented to their Purported Attorney's Vote on
                        the Plan ...................................................................... 36

                3.      The Disclosure Statement Does Not Explain the Debtor's Purported
                        Insurance Rights ........................................................... 37

I.     The Disclosure Statement Fails to Mention the Plan's Serious Infirmities .......... 39

J.     The Disclosure Statement Omits Necessary Documents ...................................... 39

VIII.   DEBTOR CAN RESOLVE THE INSURERS' OBJECTIONS ...................................... 40

CONCLUSION .................................................................................................................... 43

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*CCI Construction Co. v. Manufacturers and Traders Trust Co.*,
  128 F. App'x 273 (3d Cir. 2005) .................................................. 15

*Clarkson v. Cooke Sales & Serv. Co.*,
  767 F.2d 417 (8th Cir. 1985) ...................................................... 44

*Duff v. United States Trustee* (*In re California Fidelity, Inc.*),
  198 B.R. 567 (9th Cir. B.A.P. 1996) ........................................... 15

*Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J. V.*,
  209 F.3d 252 (3d Cir. 2000)........................................................ 35

*Grausz v. Sampson* (*In re Grausz*),
  63 F. App'x 647 (4th Cir. 2003) ................................................. 31

*Harrington v. Purdue Pharma*,
  144 S. Ct. 2071, 219 L. Ed. 2d 721 (2024) ................................ 26

*In re 1701 Commerce, LLC*,
  477 B.R. 652 (Bankr. N.D. Tex. 2012) ....................................... 38

*In re ACandS, Inc.*,
  311 B.R. 36 (Bankr. D. Del. 2004) ............................................. 18

*In re Am. Cap. Equip., Inc.*,
  405 B.R. 415 (Bankr. W.D. Pa. 2009), *aff'd*, 688 F.3d 145 (3d
  Cir. 2012) ................................................................................... 34

*In re Am. Cap. Equip., LLC*,
  688 F.3d 145 (3d Cir. 2012)............................................ 14, 15, 16, 18

*In re Am. Home Mortg. Holdings, Inc.*,
  402 B.R. 87 (Bankr. D. Del. 2009) ............................................. 36

*In re Applegate Prop., Ltd.*,
  133 B.R. 827 (Bankr. W.D. Tex. 1991) ...................................... 15

*In re Bellows*,
  554 B.R. 219 (Bankr. D. Alaska 2016) ....................................... 15

*In re Boy Scouts of Am.*,
  642 B.R. 504 (Bankr. D. Del. 2022) ........................................... 36

*In re Combustion Eng'g, Inc.*,
   391 F.3d 190 (3d Cir. 2004)....................................................................................... passim

*In re CRIIMI MAE, Inc.*,
   251 B.R. 796 (Bankr. D. Md. 2000) ................................................................................ 16

*In re Dow Corning Corp.*,
   198 B.R. 214 (Bankr. E.D. Mich. 1996) ........................................................................ 26

*In re Exide Holdings, Inc.*,
   Civ. No. 20-1402-RGA, 2021 WL 3145612 (D. Del. July 26,
   2021) ....................................................................................................................... 17, 20

*In re Flintkote Co.*,
   486 B.R. 99 (Bankr. D. Del. 2012) ................................................................................ 30

*In re G–I Holdings Inc.*,
   420 B.R. 216 (D.N.J. 2009) ........................................................................................... 33

*In re Global Indus. Techs.*,
   645 F.3d 201 (3d Cir. 2011)........................................................................................... 20

*In re Global Ocean Carriers, Ltd.*,
   251 B.R. 31 (Bankr. D. Del. 2000) ................................................................................ 43

*In re Humble Place Joint Venture*,
   936 F.2d 814 (5th Cir. 1991).......................................................................................... 38

*In re Imerys Talc Am., Inc.*,
   No. 19-10289 (LSS), 2021 WL 4786093 (Bankr. D. Del. Oct.
   13, 2021) ........................................................................................................................ 10

*In re Johns-Manville Corp.*,
   837 F.2d 89 (2d Cir. 1988)............................................................................................. 27

*In re Johnson & Johnson Talcum Powder Products Marketing,*
*Sales Practices and Products Litig.*,
   509 F. Supp. 3d 116 (D.N.J. 2020) ............................................................................... 19

*In re JSAA Realty, LLC*,
   No. 20-32504, 2022 WL 567730 (Bankr. N.D. Tex. Feb. 24,
   2022) .............................................................................................................................. 43

*In re Little Creek Dev. Co.*,
   779 F.2d 1068 (5th Cir. 1986)........................................................................................ 38

*In re Lloyd E. Mitchell, Inc.*,
No. 06-13250, 2012 WL 5988841 (Bankr. D. Md. Nov. 29,
2012) .......................................................................................................... 30

*In re LTL Mgm't LLC*,
637 B.R. 396 (Bankr. D.N.J. 2022) ........................................................... 8

*In re LTL Mgm't LLC*,
64 F.4th 84 (3d Cir. 2023) .......................................................................... 8

*In re LTL Mgm't LLC*,
652 B.R. 433 (Bankr. D.N.J. 2023) ........................................................... 9

*In re LTL Mgm't LLC*,
Nos. 23-2971 and 23-2972, 2024 WL 3540467 (3d Cir. July 25,
2024) (summary order) ......................................................................... 9, 38

*In re National Gypsum Co.*,
208 F.3d 498 (5th Cir. 2000)..................................................................... 35

*In re National Services Indus., Inc.*,
No. 12-12057 (Bankr. D. Del.), Docket Nos. 140, 353 (same) ............... 27

*In re Peanut Corp. of Am.*,
2009 WL 8757732 (Bankr. W.D. Va. 2009) (approving policy
buyback free and clear of interests of tort claimants) .............................. 27

*In re Quigley Co., Inc.*,
377 B.R. 110 (Bankr. S.D.N.Y. 2007) ...................................................... 16

*In re Quigley Co., Inc.*,
437 B.R. 102 (Bankr. S.D.N.Y. 2010) ................................... 23, 24, 25, 33

*In re Scioto Valley Mortgage Co.*,
88 B.R. 168(Bankr. S.D. Oh. 1988)......................................................... 44

*In re Sunland, Inc.*,
No. 13 13301, 2014 WL 7011747 (Bankr. D.N.M. Dec. 11,
2014) .......................................................................................................... 26

*In re SVB Fin. Gr'p*,
662 B.R 53 (Bankr. S.D.N.Y. 2024) ......................................................... 37

*In re Tex. Wyo. Drilling, Inc.*,
647 F.3d 547 (5th Cir. 2011)..................................................................... 14

*In re Thornhill Bros. Fitness, L.L.C.*,
85 F.4th 321 (5th Cir. 2023) ..................................................................... 35

*In re Tran*,
    369 B.R. 312 (S.D. Tex. 2007) ........................................................................... 19

*In re U.S. Brass Corp.*,
    194 B.R. 420 (Bankr. E.D. Tex. 1996) ............................................................... 16

*In re Um*,
    2015 WL 6684504 (Bankr. W.D. Wash., Sept. 30, 2015) ...................................... 31

*In re Valrico Square Ltd. P'ship*,
    113 B.R. 794 (Bankr. S.D. Fla. 1990) ................................................................ 16

*In re W.R. Grace & Co.*,
    729 F.3d 311 (3d Cir. 2013) ............................................................................... 33

*In re Western Asbestos Co.*,
    313 B.R. 832 (Bankr. N.D. Cal. 2003) ............................................................... 30

*Ryan Ops. G.P. v. Santiam-Midwest Lumber Co.*,
    81 F.3d 355 (3d Cir. 1996) ................................................................................. 14

*Spyglass Media Group, LLC v. Bruce Cohen Prods.*,
    997 F.3d 497 (3d Cir. 2021) ............................................................................... 35

*Truck Ins. Exch. v. Kaiser Gypsum Co.*,
    144 S. Ct. 1414 (2024) ....................................................................................... 16

*Westland Oil Dev. v. MCorp Mgmt. Solutions, Inc.*,
    157 B.R. 100 (Bankr. S.D. Tex. 1993) ............................................................... 14

**Statutes**

11 U.S.C. § 1109(b) ....................................................................................................... 16

11 U.S.C. § 1125(a) ....................................................................................................... 14

11 U.S.C. § 1126(e) ....................................................................................................... 24

11 U.S.C. § 1129(a)(1) ................................................................................................... 34

11 U.S.C. § 1129(a)(11) ................................................................................................. 44

11 U.S.C. § 1129(a)(3) .............................................................................. 17, 18, 24, 25

11 U.S.C. § 1129(a)(7) ................................................................................................... 43

11 U.S.C. § 502(b)(1) ..................................................................................................... 18

11 U.S.C. § 524(g) ................................................................................................... 3, 26

11 U.S.C. § 524(g)(4)(B)(ii) ................................................................................ 32

11 U.S.C. § 727(a)(1) ........................................................................................... 30

**Other Authorities**

140 Cong. Rec. S4521–01, S4523 (Apr. 20, 1994) (statement of
    Senator Heflin) ................................................................................................ 27

73 Am. Jur. 2d *Subrogation* § 1 (2024) ................................................... 36

Johnson & Johnson, Quarterly Report (Form 10-Q) (July 25, 2024) ........................................... 21

The undersigned insurers (collectively, the "Insurers"),[2] file this (A) objection ("Objection") to *Debtor's Motion for Entry of an Order Approving (I) Adequacy of Disclosure Statement, (II) Solicitation Packages and Procedures Employed for the Solicitation and Tabulation of Votes on the Debtor's Prepackaged Plan of Reorganization and (III) Notice of Non-Voting Status* [Docket No. 46] (the "Approval Motion") and (B) preliminary objection to confirmation of the *Amended Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [Docket No. 24] (the "Plan").[3]  In support of this Objection, the Insurers respectfully submit as follows:

## PRELIMINARY STATEMENT

1.     The Plan described in the Disclosure Statement is patently unconfirmable.  The Insurers do not believe the Plan can satisfy the applicable confirmation requirements of the Bankruptcy Code, and intend to demonstrate this to the Court in plan confirmation briefing and at the confirmation hearing.  The Insurers preview their arguments to this Court now as preliminary objections to confirmation of the Plan, and request that approval of the Disclosure Statement should be denied because the Plan is doomed to fail unless it is modified in material respects.

---

[2] The "Insurers" joining in these Objections are: ACE Property and Casualty Insurance Company (f/k/a CIGNA Property & Casualty Insurance Company), Affiliated FM Insurance Company, Century Indemnity Company, Central National Insurance Company of Omaha, Coaction Specialty Management Company, as managing general agent and attorney in fact, with respect to certain policies issued by Mutual Marine Office on behalf of Employers Mutual Casualty Company, Everest Reinsurance Company f/k/a Prudential Reinsurance Company, Federal Insurance Company, Great Northern Insurance Company, Munich Reinsurance America, Inc. f/k/a American Re-Insurance Company, Pacific Employers Insurance Company, Republic Indemnity Company of America, Sentry Insurance Company as assumptive reinsurer of Great Southwest Fire Insurance Company, Travelers Casualty and Surety Company (formerly known as The Aetna Casualty and Surety Company), The Travelers Indemnity Company, TIG Insurance Company, The North River Insurance Company, Westchester Fire Insurance Company and Westport Insurance Corporation f/k/a Puritan Insurance Corporation.

[3] The Insurers also join in the arguments contained in the U.S. Trustee's Consolidated Objection [Docket No. 395] as if fully set forth herein.

2.    That a number of plaintiffs' law firms and their clients have agreed to the financial incentives offered by Debtor and its affiliates does not, and cannot, overcome the serious infirmities outlined below.   J&J has made clear that it intends to saddle its insurers with responsibility to pay for the claims that are paid pursuant to this bankruptcy, and discovery is necessary (and is ongoing) to ensure that any confirmation hearing takes place on a full record that preserves the due process rights of all parties—particularly those that will be asked to pay for it.

3.    The Third Circuit has twice held that a J&J special purpose talc-liability subsidiary does not have the requisite financial distress to file for bankruptcy.  This time, J&J has decided to try its luck in a different jurisdiction and is trying to rush its prepackaged plan through, pointing to ginned-up support from illegitimate claimants and a questionable solicitation process.  This Court should not give its approval to J&J's approach.

4.    First, the Plan is unconfirmable because it was not proposed in good faith.  In addition to excluding insurers from all aspects of plan negotiations, J&J stuffed the ballot box with an as-yet-unknown number of meritless non-ovarian gynecological and other cancer claims (paying each claimant $1,500) that appear to have no scientific or evidentiary support and that J&J never previously paid in the tort system.  J&J apparently did so to garner sufficient votes for the Plan and gain broad § 524(g) injunctive relief.  Buying a channeling injunction for a highly solvent parent, while potentially attempting to saddle insurers with thousands of meritless claims, is not "good faith" under the Bankruptcy Code.  Further, J&J's pre-bankruptcy settlements with certain plaintiffs' law firms while soliciting the Plan may also indicate unlawful vote-buying to further rig the bankruptcy voting process in its favor.  Moreover, because claimants with prepetition settlements guaranteed by J&J have nothing to lose from the Plan, their votes are meaningless.

5.  Second, the Plan is unconfirmable because the releases contained therein do not comply with the Bankruptcy Code.  Among other things, J&J is trying to use the Plan's broad releases to end-run state-court litigation relating to the coverage obligations of J&J's captive insurer Middlesex, which issued billions of dollars of coverage to J&J and its affiliates for the underlying claims.  Further, the Supreme Court recently held that non-consensual third-party releases like those sought by J&J and others here are not permissible under the circumstances of this case.  Here, most ovarian cancer claims are based on claimants' assertion that their diseases were caused by talc, not asbestos.  And the Debtor is liquidating, not reorganizing, and therefore cannot make use of section 524(g).

6.  Third, when it comes to insurance issues, the Plan is completely muddled.  Most of the Insurers' policies were issued to J&J and certain of its subsidiaries decades ago.  It is far from clear what rights, if any, have been transferred to this Debtor.  In any event, even assuming the Debtor had rights under policies issued to J&J, the Plan purports to assign insurance rights to the Trust, yet gives the Debtor the exclusive right to pursue insurance claims—itself a confusing separation of the insurance policies' rights (*e.g.*, the right to make claims) from policy obligations (*e.g.*, the duty to cooperate in the defense of claims).

7.  To preempt an argument that J&J and the Debtor may raise, these are *not* issues that can only be decided in ancillary coverage litigation.  J&J and the insurers are litigating a declaratory judgment coverage action in New Jersey (the "NJ Coverage Action") over these and a litany of other issues.  While the Insurers agree the state court presiding over the NJ Coverage Action is the **only** appropriate forum to interpret the parties' rights and obligations under their state law insurance contracts, these problems addressed in this Objection go to the core of J&J's efforts to use the bankruptcy process to disadvantage its insurers.  J&J can easily resolve the Insurers'

objections by simply agreeing it will not seek to require its insurers to reimburse J&J for any payments made in connection with this bankruptcy. Indeed, the Plan is not dependent on recovery of any insurance proceeds, so J&J and its affiliates could easily renounce any claims against its insurers with respect to claim payments associated with this bankruptcy proceeding. In fact, J&J has already demanded billions of dollars in alleged coverage—far more than the combined limits of all the policies—based on J&J's pre-petition settlements and judgments.

8.     The Insurers reserve all rights to object to confirmation of the Plan and any other proceedings in this case, and to seek any and all discovery related to the Insurers' current or future objections. The Insurers further reserve all rights to object to any documents related to the proposed Plan that have not yet been made available to the Insurers, and to the provisions of the proposed Plan to the extent the Insurers are affected by the withheld documentation. The Insurers also reserve all rights to object to the Confirmation Order, a draft of which the Insurers also have not yet seen.

## **BACKGROUND**

### I.     **Insurance Policies Issued to J&J**

9.     Each of the Insurers issued or are alleged to have issued primary general liability and products liability policies, and excess indemnity (umbrella) and/or excess overlayer indemnity policies, to J&J between September 1957 and January 1986. The policies contain various terms, conditions, and exclusions that define the scope and limits of the applicable defense and indemnity rights and obligations arising from occurrences as defined in the policies.

10.     In 1970, J&J formed Middlesex as a captive insurance company. Middlesex issued numerous primary general and products liability coverage policies to J&J from 1973 through the present. Between 1973 and 1985, Middlesex issued numerous primary and excess policies to J&J with aggregate limits totaling over $138 million. Middlesex also issued billions of dollars in

coverage to J&J.  As the Debtor's predecessor LLT Management LLC (f/k/a LTL Management LLC) ("LTL" or "LLT") admitted, Middlesex "issued policies that cover J&J and the Debtor", and that "there is a dispute . . . regarding the applicability, extent of coverage and limits of the Middlesex policies, in particular with respect to the Middlesex policies."  *See In re LTL Management LLC*, No. 21-30589 (MBK) (the "2021 Case"), *Declaration of John K. Kim in Support of First Day Pleadings* [Docket No. 5] (the "2021 Kim Declaration") ¶ 51.  The insurers other insurers contest J&J's attempts to exclude these post-1985 Middlesex policies from responsibility for J&J's (or the Debtor's) talc liabilities—one of numerous issues in the pending coverage action (described further below).  In addition, in that action the insurers intend to contest the efforts, dating from as late as October 2018, of J&J and Middlesex (its wholly owned subsidiary) to retroactively extinguish potentially billions of dollars of Middlesex coverage, apparently in an effort to shift the costs of its talc liabilities to J&J's other insurers.

## II.    J&J and its Insurers are Litigating the NJ Coverage Action

11.    J&J, HoldCo (a holding company that formerly owned J&J's consumer health business before that business was spun-off to Kenvue), Middlesex, and dozens of insurers are litigating the NJ Coverage Action in New Jersey state court.  Broadly speaking, while the NJ Coverage Action involves a host of issues too numerous to describe here, there are two general categories of issues currently being litigated:  (1) defenses to coverage based on exclusions or other applicable law; and (2) trigger, apportionment and allocation of defense and indemnity costs among J&J, HoldCo, Middlesex, and the other insurers.

12.    Regarding the first broad category of issues, the insurers seek declarations that they are not liable for voluntary payments, pre-tender costs, punitive damages awards, damages arising from injuries that were expected or intended, talc claims that do not trigger policies, and claims

for which other exclusions and coverage defenses apply, including J&J's failure to cooperate with its insurers in defending against claims.

13.     The second category involves multiple complex issues concerning which claims potentially trigger the policies and how to allocate losses across various policies and policy years under New Jersey law.  Additionally, a key allocation issue is whether Middlesex (which, again, is J&J's captive insurer), still has coverage obligations along with the insurers that are not J&J captives, and whether J&J's efforts to absolve Middlesex from coverage once talc claims began to skyrocket (described above) were appropriate and should be given effect.

14.     Discovery in the NJ Coverage Action was proceeding apace prior to the filing of the 2021 Case and has continued following the dismissal of LLT's first two bankruptcy filings. The parties served and responded to extensive document requests and interrogatories and produced tens of millions of pages of documents, and the court appointed a Special Discovery Master to resolve any discovery disputes.  The current discovery plan contemplates that factual discovery will be completed by January 15, 2026.

15.     In January 2024, various insurers filed a motion for partial summary judgment on a discrete issue in the NJ Coverage Action.  Specifically, the insurers sought a ruling that J&J is not entitled to coverage for the judgments entered against J&J in a Missouri case (*Ingham*), in which the underlying plaintiffs were awarded billions of dollars in compensatory and punitive damages, because the verdict was based on findings that J&J expected or intended the plaintiffs' injuries and because punitive damages are not covered under J&J's policies.  The motion has been fully briefed and was argued in July 2024.  The matter remains under advisement.[4]

---

[4] The Debtor, J&J, and the Insurers have agreed that to the extent the automatic stay applies to the NJ Coverage Action (an issue on which the parties do not necessarily agree) the stay should be lifted so that the NJ Coverage Action can continue.  The parties have exchanged a draft stipulation to that effect and expect to submit it to the Court shortly.

### III.   Formation of LTL and Dismissal of LTL's Two Bankruptcy Cases

16.     In 2015, J&J Consumer Companies, a subsidiary of J&J, merged with an affiliate, which then merged into McNeil-PPC, Inc.  The resulting entity was renamed Johnson & Johnson Consumer Inc. (including all former names and historical forms, "Old JJCI").   2021 Kim Declaration ¶ 14.   On October 12, 2021, Old JJCI implemented a divisive merger under Texas law whereby Old JJCI ceased to exist and two new entities were created: LTL and "Johnson & Johnson Consumer Inc." ("New JJCI").  *Id.* ¶ 16.

17.     As a result of this corporate restructuring, LTL purportedly held certain of Old JJCI's assets, including its rights to make claims under insurance policies in which Old JJCI is an insured, additional insured, successor, beneficiary or otherwise, but solely to the extent such policies purportedly provide coverage for talc-related liabilities.  LTL was also responsible for the alleged talc-related liabilities of J&J and Old JJCI.  New JJCI purportedly holds all other assets of Old JJCI, including insurance policies in which Old JJCI has rights as an insured, additional insured, successor, beneficiary or otherwise, but with respect to claims for liabilities that are not talc-related.  New JJCI is solely responsible for all non-talc-related liabilities of Old JJCI.  *Id.*  In other words, as a result of the divisive merger, Old JJCI's rights and obligations under the insurance policies were allocated to New JJCI, other than the right to make claims for talc-related liabilities, which was allocated to LTL.  The policies themselves, however, remained with New JJCI.

18.     Another asset that LTL held as a result of the corporate restructuring was the rights under a Funding Agreement that obligated New JJCI and J&J to (a) satisfy LTL's talc-related liabilities and related expenses outside of bankruptcy and (b) in the event of a bankruptcy, pay administrative claims and provide the funding for a trust, in each case if LTL's other assets were insufficient, and subject to a cap equal to the value of New JJCI.  2021 Kim Decl. ¶¶ 26–27.  LTL's

payment right was absolute; the Funding Agreement was not a loan and did not have any repayment obligation. *Id.*

19.     LTL filed its first chapter 11 petition in the Western District of North Carolina, but the case was transferred to the District of New Jersey.  Various groups of talc claimants filed motions to dismiss the bankruptcy.  The bankruptcy court denied the motions to dismiss. *In re LTL Mgm't LLC*, 637 B.R. 396 (Bankr. D.N.J. 2022).  The Third Circuit, however, subsequently reversed, holding that the case should be dismissed because it was not filed in good faith. *In re LTL Mgm't LLC*, 64 F.4th 84, 101 (3d Cir. 2023).  The court reached that conclusion due to the Funding Agreement, which served as a "funding backstop, not unlike an ATM disguised as a contract," that LTL could draw on up to New JJCI's estimated value ($61.5 billion), with J&J (with well over $400 billion in equity value) on the hook for every penny. *Id.* at 109.[5]  After the Third Circuit denied a petition for rehearing *en banc*, the bankruptcy was dismissed on April 4, 2023. *See* 2021 Case, *Order Dismissing Debtor's Chapter 11 Case Pursuant to 11 U.S.C. 1112(b)* [Docket No. 3938] (Bankr. D.N.J. Apr. 4, 2023).

20.     Within hours after the dismissal of the bankruptcy, LTL filed a second chapter 11 petition, in New Jersey.  This time, LTL claimed that it had significant claimant support in hand for a proposed chapter 11 plan.  LTL also amended the Funding Agreement, removing J&J as an obligor, and entered into a new Support Agreement whereby J&J and HoldCo (formerly New JJCI) would fund LTL's new bankruptcy case.  Again, various groups of talc claimants, including the Official Committee of Talc Claimants and certain states, filed motions to dismiss the bankruptcy.  On August 11, 2023, the bankruptcy court granted the motions, finding that LTL's second petition

---

[5] The Third Circuit warned LTL that if it decided to "part with" the Funding Agreement in order to qualify for bankruptcy, that would likely constitute a fraudulent transfer under Section 548 of the Bankruptcy Code. *Id.*, 64 F.4th at 109 n.18.

was also not filed in good faith.  *In re LTL Mgm't LLC*, 652 B.R. 433 (Bankr. D.N.J. 2023).  The Third Circuit affirmed the bankruptcy court's decision, agreeing that not even the purported "significant plaintiff support for this LTL bankruptcy" could remedy LTL's lack of good faith.  *In re LTL Mgm't LLC*, Nos. 23-2971 and 23-2972, 2024 WL 3540467, at *4 (3d Cir. July 25, 2024) (summary order).  Despite the amendment to the Funding Agreement making only HoldCo (with just a $30 billion going concern value following the spinoff of a valuable business) an obligor, the court found that LTL was not in financial distress because the value of its payment right exceeded LTL's "worst-case" estimate for talc liabilities.  *Id.* at **2, 4.  The Insurers had no role in any of the negotiations during or following the first bankruptcy case that led to the second case.

### A.      J&J Reaches a Settlement with Imerys and Cyprus

21.      As described more fully in the Disclosure Statement (§ 2.6), two of J&J's talc suppliers—Imerys and Cyprus—filed for chapter 11 to manage their own talc liabilities in 2019 and 2021, respectively.  Imerys and Cyprus both asserted they had rights to contractual indemnification from J&J and/or Old JJCI, as well as rights under J&J's insurance policies.  J&J and Old JJCI contested these alleged contractual obligations and asserted their own indemnification rights against Imerys and Cyprus.  J&J and Old JJCI litigated various objections in the Imerys and Cyprus bankruptcies and objected to confirmation of the Imerys chapter 11 plan, while also exploring opportunities to settle J&J's own cases through the Imerys case.[6]  The Insurers had no role in negotiations with Imerys, Cyprus, or claimants related to J&J's attempt to settle its own claims through the Imerys bankruptcy.

---

[6] *See generally In re Imerys Talc Am., Inc., et al.*, No. 19-10289 (LSS) (Bankr. D. Del. Aug. 22, 2024), *Declaration of John K. Kim in Support of Joint Motion of the Imerys Debtors and the Cyprus Debtor for an Order (I) Approving the Settlement Agreement Between the Imerys Debtors, the Cyprus Debtor, Johnson & Johnson, and the Other Parties Thereto, and (II) Approving the Sale of Certain Rights* [Docket No. 6506].

22.     Between 2019 and 2021, Imerys proposed multiple plans and ultimately sought confirmation of their Ninth Amended Plan in 2021.  After a lengthy and flawed voting process, the Bankruptcy Court issued an opinion, holding that numerous votes that had been cast would not be counted due to various irregularities.  *In re Imerys Talc Am., Inc.*, No. 19-10289 (LSS), 2021 WL 4786093, at *12 (Bankr. D. Del. Oct. 13, 2021).  As a result, the Debtors failed to obtain the necessary votes for confirmation and did not proceed with a confirmation hearing.

23.     After that ruling, Imerys and Cyprus have engaged in years of negotiations, and their disclosure statements were approved earlier this week, along with solicitation procedures.[7] The Disclosure Statement here states that Imerys, Cyprus, and J&J had reached an agreement in principle which was "expected to increase recoveries to holders of Channeled Talc Personal Injury Claims."  Disclosure Statement at iv, § 1.1(a).  In July 2024, Imerys and Cyprus jointly filed a motion for an order approving a settlement with J&J, pursuant to which J&J (and affiliates) would pay at least $505 million to Imerys and/or Cyprus to be transferred to their § 524(g) trusts for the benefit of current and future ***Imerys and Cyprus*** talc claimants.  *See generally In re Imerys Talc Am., Inc. et al.*, No. 19-10289 (LSS) (Bankr. D. Del. July 13, 2024), *Joint Motion of the Imerys Debtors and the Cyprus Debtor for an Order (I) Approving the Settlement Agreement between the Imerys Debtors, the Cyprus Debtor, Johnson & Johnson, and the Other Parties Thereto, and (II) Approving the Sale of Certain Rights* [Docket No. 6376].  The judge presiding over both the Imerys and Cyprus cases last week entered an order approving the settlement.  [Imerys Docket No. 6715].

---

[7] *In re Imerys Talc Am., Inc.*, et al., No. 19-10289 (LSS) [Docket No. 6730] (Bankr. D. Del. Nov. 5, 2024), *In re Cyprus Mines Corp.*, No. 21-10398 (LSS) [Docket No. 2647] (Bankr. D. Del. Nov. 5, 2024).

IV.    **J&J Refuses to Allow the Insurers to Participate in its Defense**

24.    J&J's pattern of excluding insurers from participating in the defense of claims started long before LTL's two bankruptcy filings.  While J&J and Old JJCI faced over 1,300 ovarian cancer lawsuits by the end of 2015, it was not until July 2017 that J&J first provided insurers with notice of loss for claims arising from J&J's or Old JJCI's manufacture and sale of talc-containing products.  Although each policy has similar "cooperation" provisions entitling the insurers to, at a minimum, associate in the defense and control of any claim that involves, or reasonably appears to involve, the policies, J&J has consistently excluded the insurers from participating in settlement negotiations or otherwise meaningfully participating in its defense. Prior to the 2021 Case, J&J provided sporadic updates regarding its defense of talc claims.  When J&J sought to settle its own talc claims through the *Imerys* bankruptcy, it failed to appropriately inform any of the Insurers, nor did J&J inform or allow the insurers to participate in negotiations of the J&J-Imerys-Cyprus settlement reached in 2024.

25.    Even in connection with the various talc-related bankruptcy filings, the insurers were excluded from multi-party negotiations and mediation between J&J and claimants, and were otherwise prevented from participating in the defense of claims that J&J contends is the responsibility of the Insurers.  In point of fact:  during the first LTL bankruptcy in 2021, the insurers were initially excluded from mediation (despite repeated requests) and had to file a motion to be included as a mediation party.  But even after insurers' technical inclusion as a mediation party, the Insurers were not included as part of any discussions with claimants regarding talc claims.  Instead, the mediation with the insurers was limited to the ongoing coverage disputes.

26.    Likewise, the insurers were never meaningfully informed of the discussions and agreements that occurred in the lead up to the filing of the second LTL bankruptcy.  J&J and LTL did not timely inform the insurers that they were nearing an agreement on a chapter 11 plan, and

further, the insurers were not informed that LTL was planning on re-filing for bankruptcy with claimant settlements in-hand, until just before the second bankruptcy was commenced and publicly announced.

27.     The lead-up to the current Red River Talc bankruptcy was "déjà vu all over again."[8] Insurers were never meaningfully informed of, or involved in, the discussions or negotiations leading to the announcement and solicitation of the Plan, nor were they involved in any negotiations or provided any information about the billions of dollars in settlements with mesothelioma claimants that were publicly disclosed in connection with solicitation of the Plan. Following announcement of the Plan and public disclosure of the Plan and Disclosure Statement, J&J has *still* not substantively responded to the insurers' requests for more information about (i) the Plan, (ii) the prepetition settlements reached with certain ovarian and gynecological cancer claimants embodied in the Plan, or (iii) other settlements with mesothelioma claimants.  Instead, J&J has suggested that such requests should be addressed in the state-court coverage litigation.  At the same time, however, J&J has advised that it intends to (attempt to) compel its insurers to pay for the multi-billion dollar resolutions it agreed to both in and outside of bankruptcy, and has otherwise rejected the insurers' proposed modifications to the Disclosure Statement and Plan.

## V.     LTL Engineers a Third Bankruptcy

28.     On May 1, 2024, J&J issued a press release and filed an SEC Form 8-K announcing the current Red River Plan.  Disclosure Statement § 3.3.  Epiq issued a press release on June 10, 2024, announcing the start of solicitation, and establishing a July 26, 2024 deadline for votes to

---

[8] *Springboards to Educ. Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 748 (5th Cir. 2022) (citing quote attributed to Yogi Berra, former catcher for the New York Yankees).

accept or reject the Plan.  According to the Debtor, the prepetition FCR and the overwhelming majority of claimants support confirmation of the Plan.  Disclosure Statement § 3.2.

29.     Several prepetition transactions took place to effectuate the Plan, including two separate Texas divisional mergers, which have purportedly resulted in the Debtor's only liabilities being those liabilities of LLT related to all ovarian and other gynecological cancer claims. Importantly, however, the Disclosure Statement does not identify any basis (if any) to support the Debtor's contention that it has any rights in or under the insurance policies issued to J&J.  In connection with the Texas divisional merger undertaken prior to the 2021 Case, the policy rights held by Old JJCI, to the extent it was a named insured, were retained by New JJCI, while LTL was provided the right to proceeds that may be obtained under the policies.  None of the prepetition transactions are described as transferring rights under the policies themselves to LLT or the Debtor. Nonetheless, the Debtor purports to have insurance rights under J&J's policies, including those issued by the Insurers.

30.     According to the Disclosure Statement, because LTL will merge into Holdco (Texas) LLC, the Funding Agreement will "effectively terminate."  Disclosure Statement § 4.2(e). This is nothing more than a thinly-veiled attempt by J&J to use corporate gymnastics to extinguish the amended funding agreement—which was central to the Third Circuit's dismissal of the second LTL bankruptcy—to try and generate "financial distress" and cleanse this third bankruptcy filing from the tarnish of the prior two attempts.

## VI.    OBJECTIONS TO APPROVAL OF THE DISCLOSURE STATEMENT AND SOLICITATION PROCEDURES

### A.    Legal Standard

31.     Section 1125(b) of the Bankruptcy Code requires that a disclosure statement contain "adequate information," which is "information of a kind, and in sufficient detail . . . that

would enable a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a).  Providing adequate information in a disclosure statement is a central requirement of any chapter 11 case.  *See, e.g., In re Tex. Wyo. Drilling, Inc.*, 647 F.3d 547, 551 (5th                                        Cir.                                        2011)
 ("We observe that the disclosure statement is the primary notice mechanism informing a creditor's vote for or against a plan."); *Westland Oil Dev. v. MCorp Mgmt. Solutions, Inc.*, 157 B.R. 100, 102 (Bankr. S.D. Tex. 1993) (noting disclosure is the "pivotal" concept in bankruptcy cases); *Ryan Ops. G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996).  A plan proponent bears the burden of establishing that its disclosure statement contains adequate information.  *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012) ("The debtor has the burden of proving that a disclosure statement is adequate."); *In re Bellows*, 554 B.R. 219, 225 (Bankr. D. Alaska 2016) (same).  "[D]isclosure statements which are misleading, or which contain unexplained inconsistencies, should not be approved." *In re Applegate Prop., Ltd.*, 133 B.R. 827, 829 (Bankr. W.D. Tex. 1991).

32.     The purpose of a disclosure statement "is to give all creditors a source of information which allows them to make an informed choice regarding the approval or rejection of a plan." *Duff v. United States Trustee* (*In re California Fidelity, Inc.*), 198 B.R. 567, 571 (9th Cir. B.A.P. 1996).  A debtor's obligation to file a disclosure statement containing "candid disclosure" is a "pivotal" and "critical step" in a chapter 11 reorganization.  *CCI Construction Co. v. Manufacturers and Traders Trust Co.*, 128 F. App'x 273, 274 n.4 (3d Cir. 2005).

33.     It is well settled that a court should not approve a disclosure statement that describes a plan that is unconfirmable.  *See In re Am. Cap. Equip.*, 688 F.3d at 154–55 (noting that "if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may

- 14 -

consider and resolve that issue at the disclosure stage"); *In re U.S. Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996) ("Disapproval of the adequacy of a disclosure statement may sometimes be appropriate where it describes a plan of reorganization which is so fatally flawed that confirmation is impossible."); *In re Quigley Co., Inc.*, 377 B.R. 110, 115–16 (Bankr. S.D.N.Y. 2007) (same); *In re CRIIMI MAE, Inc.*, 251 B.R. 796, 799 (Bankr. D. Md. 2000) (same). Approving such a disclosure statement "is a waste of the time of the Court and the parties." *In re Valrico Square Ltd. P'ship*, 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990). A plan is "patently unconfirmable where (1) confirmation defects cannot be overcome by creditor voting results, and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing." *In re Am. Cap. Equip.*, 688 F.3d at 154–55.

**B.    Insurers Have Standing Pursuant to Section 1109 of the Bankruptcy Code**

34.    The Insurers indisputably have standing to object to approval of the Disclosure Statement and confirmation of the Plan. The Supreme Court unanimously held in *Truck Insurance* that, notwithstanding purported insurance neutrality provisions in a chapter 11 plan, insurers are parties in interest under section 1109(b) of the Bankruptcy Code with broad standing to object to plan confirmation. *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 144 S. Ct. 1414, 1427, 602 U.S. 268 (2024). "Where a proposed plan 'allows a party to put its hands into other people's pockets, the ones with the pockets are entitled to be fully heard and to have their legitimate objections addressed.'" *Id.* at 1426.

35.    J&J has already advised its insurers that it intends to attempt to require them to pay substantial sums under the Plan. Consequently, there is no doubt the Insurers are "part[ies] in

interest" and have standing to be heard on any issue, including to object to the Plan and Disclosure Statement that would be the operative documents affecting their rights.[9]

## VII.    The Plan is Patently Unconfirmable

36.    The Plan is patently unconfirmable for the many reasons described in the United States Trustee's Motion to Dismiss [Docket No. 299] and below.  The Court should, therefore, deny approval of the Disclosure Statement at this juncture to avoid a waste of judicial resources.

### A.    The Plan is Patently Unconfirmable and Not Proposed in Good Faith as the Plan Because It Pays Thousands of Invalid Claims

37.    Section 1129(a)(3) requires that a chapter 11 plan be "proposed in good faith." 11 U.S.C. § 1129(a)(3).  Courts evaluating "good faith" consider whether the plan "(1) fosters a result consistent with the Code's objectives, (2) the plan has been proposed with honesty and good intentions . . . and (3) there was fundamental fairness in dealing with the creditors." *In re Exide Holdings, Inc.*, Civ. No. 20-1402-RGA, 2021 WL 3145612, at *11 (D. Del. July 26, 2021) (quotation marks omitted).  A plan is ***not*** proposed in good faith if it is the product of—or allows for—collusion, which is: "'[a]n agreement to defraud another or to do or obtain something forbidden by law.'" *In re Am. Cap. Equip.*, 688 F.3d at 158 (quoting Black's Law Dictionary (9th ed. 2009)).

38.    In *American Capital Equipment*, the Third Circuit held that a plan in an asbestos mass-tort case was "patently unconfirmable" because it was not proposed in good faith under section 1129(a)(3).  688 F.3d at 161, 164.  In particular, the Third Circuit emphasized that (1) the plan provided for tort claims against the debtor to be paid by a trust funded by an assignment of

---

[9] The Supreme Court in *Truck Insurance* identified many ways in which a chapter 11 plan can negatively affect insurers, including:  (1) impairing an insurer's contractual right to control settlement or defend claims; (2) abrogating a contribution right against a co-insurer; (3) violating the debtor's duty to cooperate and assist with insurers; (4) inviting fraudulent claims; (5) allowing claims at amounts above their actual value; and (6) requiring little or no proof of injury for claimants to be paid.  *Truck Insurance*, 144 S. Ct. at 1426.

the debtor's rights to insurance and resolved according to procedures that gave the decision-makers "financial[] incentiv[es] to sabotage [the debtor's] own defense" and maximize the claims insurers would be asked to pay, and (2) the TDP would "severely limit[] or eliminat[e] Insurers' ability to take discovery, submit evidence, contest causation, [or] appeal a decision," and otherwise "strip[] Insurers of [their] procedural and substantive rights."  *Id.* at 158–60.[10]

39.     Likewise, here, the Plan is patently unconfirmable because certain alleged claim holders would never see a recovery in the tort system under non-bankruptcy law, yet the Debtor proposes to "gift" money to the holders of Gynecological Claims and Other Disease Talc Personal Injury Claims ($1,500 each).  By paying those claims, the Debtor is sabotaging its own defense against such claims.  Claims against the bankruptcy estate are disallowed if they are invalid under applicable state law.  11 U.S.C. § 502(b)(1); *In re Tran*, 369 B.R. 312, 318–19 (S.D. Tex. 2007).

40.     Claims that would be dismissed in the tort system because the claimant could not adduce any scientific proof of causation should be disallowed against the Debtor and not receive any recovery.  There is ***no proven causal link*** between J&J baby powder or talc and Gynecological Cancer (as defined in the Plan) or unspecified Other Diseases.  Indeed, in the J&J talc MDL, the court's 2020 *Daubert* ruling recognized that neither side attempted to prove a scientific link between talc and non-epithelial ovarian cancer—that is, Gynecological Cancer.  *See In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Litig.*, 509 F. Supp. 3d 116, 181 (D.N.J. 2020) ("The experts do not opine as to any link between talc use and any other genital cancer. Their findings are limited to epithelial ovarian cancer.").  In any event, J&J and

---

[10] *See also In re ACandS, Inc.*, 311 B.R. 36, 42-43 (Bankr. D. Del. 2004) (denying confirmation of plan under § 1129(a)(3) because plaintiffs' lawyers representing asbestos claimants drafted the plan and trust documents, chose the trustee, and "decided who was going to get what"; "[g]iven the unbridled dominance of the [plaintiffs' lawyers] in the debtor's affairs and actions … and the obvious self-dealing that resulted from control of the debtor, it is impossible to conclude that the plan was consistent with the objectives and purposes of the Bankruptcy Code").

LLT have recently filed renewed *Daubert* motions in the MDL seeking to exclude expert testimony asserting any link between talc and *any* ovarian cancer (whether defined as Ovarian Cancer or Gynecological Cancer in the Plan). *See In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, and Products Liability Litig.*, MDL No. 3:16-md-02738-MAS-RLS [Docket Nos. 32996, 33003–05, 33007–08, 33012–13] (D.N.J. July 23, 2024). And there is no *Daubert*-qualified evidence, jury verdicts, or settlement history that would support the payment of Other Disease Talc Personal Injury Claims.

41.     And yet, ***these same Gynecological Cancer claims appear to be the linchpin of the Debtor's bankruptcy strategy***. The fact is that the creation of this class is nothing more than a vote-buying scheme whereby J&J is agreeing to pay meritless claims (Gynecological Cancer claims and Other Disease Talc Personal Injury Claims) in order to stuff the ballot box. While it remains to be seen through discovery how many such claimants voted on the Plan prepetition, paying *any* otherwise-invalid claims to garner a release is not "consistent with the Code's objectives," is not "proposed with honesty and good intentions". *Exide Holdings*, 2021 WL 3145612, at *11. Such a tactic increases the amounts that insurers may have to pay and also deprives the insurers of the opportunity to vet any of the claims for validity. *Am. Cap. Equip.*, 668 F.3d at 158–60. Good faith, this is not.[11]

42.     Further, as mentioned previously, the Insurers were excluded from the negotiation and development of the Plan, to say nothing of the prior chapter 11 cases. When the Insurers asked for information to better understand and assess the new bankruptcy strategy, they were ignored until formal discovery was propounded. To the extent J&J intends to argue that the Insurers are

---

[11] The Plan also contemplates paying claims that are past their statute of limitation, which would not be compensable in the tort system. Paying non-compensable claims to garner support for a Plan is not good faith.

bound by the agreements reached here and should be required to pay for them, J&J's actions violated its insurance contracts and did not exhibit "fundamental fairness" in dealing with its insurers, and for that reason as well the Plan does not comport with good faith. *Exide Holdings*, 2021 WL 3145612, at *11.[12]

43.     J&J's effort to procure affirmative votes for the Debtor's Plan by paying $1,500 to each claimant exhibiting a disease for which no causal link can be drawn to J&J products likewise calls into question "the integrity of the bankruptcy proceeding." *In re Global Indus. Techs.*, 645 F.3d 201, 214 (3d Cir. 2011). In *Global Industrial Technologies*, the insurers made "nonfrivolous allegations of collusion" between the debtor and certain law firms, where they "set up a system in which [debtor] would pay for newly ginned-up silica claims in exchange for the asbestos claimants casting their votes in favor of the [debtor's] plan." *Id.* As the Third Circuit recognized, that allegation was "a profoundly serious charge" that "called into question" the "integrity of the bankruptcy proceeding." *Id.* Here, J&J's thinly-veiled effort to stuff the ballot box with Gynecological Cancer claimants is likewise suspect, and the Court should not approve a Disclosure Statement that concerns a Plan that threatens the integrity of the bankruptcy system.

44.     Even if the Court decides that J&J is within its rights to solicit and pay previously non-compensable claims, the voting power of such claimants should reflect the weakness of their claims and the differences in anticipated recovery between the Gynecological Cancer claims ($1,500) and Ovarian Cancer claims ($75,000–175,000; average of $125,000). Because holders of Gynecological Cancer claims are receiving just 1.2% of the average payout for an Ovarian

---

[12]   The extent to which J&J's conduct violated its cooperation obligations and other terms and conditions of the underlying insurance policies is an issue for the court in the NJ Coverage Action.

Cancer claim, their votes should likewise be worth 1.2% of the Ovarian Cancer votes (for purposes of the 75% requirement of section 524(g) and the 2/3[rd] in amount requirement of section 1126).

45.     In *Imerys* and *Cyprus*, the debtors initially proposed to value all claims at $1 for voting purposes, including mesothelioma and ovarian cancer claims—which had previously prevailed, at least against other defendants, in the tort system—as well as lung cancer and "other disease" claims (which had not).[13]  With respect to payment, the two types of claims were not treated equally: mesothelioma and ovarian cancer had scheduled values of up to $400,000 (depending on the severity of the disease), whereas lung cancer was capped at $20,000 and "other diseases" at $10,000, if paid at all.[14]

46.     After certain objectors highlighted that disparity and how it diluted the votes of acknowledged more valuable claims, the court—citing *In re Quigley*—ordered the debtors to adjust the voting value of mesothelioma and ovarian cancer claimants to reflect their higher distributions under the Plan. [15]  The *Imerys* and *Cyprus* debtors then modified the solicitation procedures to give mesothelioma and ovarian cancer votes more weight than lung cancer and other disease claims, in each case consistent with the average scheduled value for the respective diseases ($215,000 for mesothelioma and ovarian cancer, $15,000 for lung cancer, and $100 for other diseases).[16]

---

[13] *See* Disclosure Statement for Second Joint Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code, *In re Imerys Talc Am., Inc.*, et al., No. 19-10289 (LSS) [Docket No. 6695] (the "Imerys Prior DS") § 10.1 (Bankr. D. Del. Oct. 25, 2024); Disclosure Statement for the First Amended Plan of Reorganization of Cyprus Mines Corporation under Chapter 11 of the Bankruptcy Code, *In re Cyprus Mines Corp.*, No. 21-10398 (LSS) [Docket No. 2616] (the "Cyprus Prior DS"), § XI(A) (Bankr. D. Del. Oct. 25, 2024).

[14] *See* Imerys Prior DS § 2.1(b); Cyprus Prior DS § II(C)(1)(b).

[15] *See In re Quigley Co.*, 346 B.R. 647, 654–56 (Bankr. S.D.N.Y. 2006) (observing that "any estimation should ensure that the voting power is commensurate with the creditor's economic interest in the case" and estimating claims for voting purposes according to the values scheduled in the TDP).

[16] *See* Combined Solicitation Procedures attached as Exhibit 1 to the Orders approving the *Imerys* and *Cyprus* Disclosure Statements and Solicitation Procedures, *In re Imerys Talc Am., Inc.*, et al., No. 19-10289 (LSS) [Docket

47.     That same logic should hold true here.  J&J's lead settlement lawyer has admitted that J&J never knowingly settled any Gynecological Cancer claims outside of bankruptcy.[17] Perhaps in recognition of that, the Plan offers to pay $1,500 on account of such claims, which is between 0.85% and 2% of the average amount that epithelial ovarian cancer claimants will receive on account of their claims.  Given the lack of any scientific basis for these claims, their non-existent tort system track record, and the *de minimis* sum they will receive under the proposed Plan, the votes of Gynecological Cancer claimants should be severely discounted for all purposes in this case (if not outright invalidated).  Because the Plan is premised on these votes being counted in full, the Disclosure Statement should not be approved and the Plan should not be confirmed.

**B.      The Plan is Patently Unconfirmable Because J&J May Have Bought the Votes Through Pre-Bankruptcy Settlements with Plaintiffs' Law Firms**

48.     The Debtor was not allocated LLT's mesothelioma liabilities—instead, it was allocated only the liabilities related to ovarian and gynecological cancer.  Leading up to the solicitation of the Plan, J&J and LLT settled the vast majority of their mesothelioma claims through settlements with law firms.  *See* Johnson & Johnson, Quarterly Report (Form 10-Q) (July 25, 2024) ("The Company separately has resolved 95% of the mesothelioma lawsuits filed to date.").  LLT also entered into pre-petition settlements totaling approximately $1.426 billion with plaintiffs' law firms representing ovarian cancer and gynecological cancer claimants pursuant to undisclosed Master Settlement Agreements under which J&J was jointly liable.  Disclosure Statement § 3.1.

49.     The timing of those prepetition settlements and their potential effect on claimant votes calls into question whether J&J effectively paid off certain plaintiffs' law firms or claimants

---

No. 6730-1] § 4(b)(i) (Bankr. D. Del. Nov. 5, 2024), *In re Cyprus Mines Corp.*, No. 21-10398 (LSS) [Docket No. 2647-1] § 4(b)(i) (Bankr. D. Del. Nov. 5, 2024).

[17] *See In re LTL Management LLC*, No. 23-12825 (MBK) (Bankr. D.N.J.), June 28, 2023 Hr'g Tr. at 111:13–17 (testimony of Mr. Murdica), excerpt attached as <u>Exhibit 2</u> to Declaration of Sunni P. Beville [Docket No. 42], *In re Red River Talc LLC*, No. 24-90505 (CML) (Bankr. S.D. Tex. 2024).

in prepetition settlements to engineer a favorable vote in this case.  If that is indeed the case (an issue that will require discovery), the Plan is unconfirmable.  *See, e.g.*, *In re Quigley Co., Inc.*, 437 B.R. 102, 125–33 (Bankr. S.D.N.Y. 2010) (denying plan confirmation because votes that were procured by parent company's pre-petition settlement agreement were invalidated and not counted, and the plan was proposed in bad faith); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 241–47 (3d Cir. 2004) (pre-petition settlements with certain claimants violated "fundamental bankruptcy policy of equality of distribution among creditors" and due process).

50.     In *Quigley*, the debtor's parent company entered into pre-petition settlements with certain law firms (representing certain claimants), half of which would be paid only when the chapter 11 plan was confirmed by the district court.  *In re Quigley Co.*, 437 B.R. at 116.  The settling claimants retained a "stub claim" against Quigley and agreed to vote in favor of the plan and cooperate with Quigley in prosecuting the plan.  *Id.* at 117.  The bankruptcy court denied confirmation, holding that the plan was not "proposed in good faith" under section 1129(a)(3) because the settling law firms were motivated to vote in favor of the plan due to financial incentives under the pre-petition settlement agreements, and therefore the vote was "tainted." *Id.* at 129.  The bankruptcy court also invalidated (by "designation") the votes of the settling claimants, holding that they were not "procured in good faith" under section 1126(e).  *Id.* at 129–32.

51.     Similarly, in *Combustion Engineering*, the debtor reached pre-petition settlements with certain claimants, allowing them to recover from a $400 million trust while retaining a "stub claim" that they would use to vote on the chapter 11 plan.  *In re Combustion Eng'g*, 391 F.3d at 241–43.  The Third Circuit held that a chapter 11 plan premised on the majority vote of those claimants constituted voting manipulation and could not be confirmed under section 1129 of the Bankruptcy Code.  *Id.* at 243–44.  Paying certain claimants pre-petition in exchange for their vote

in a chapter 11 plan also constituted a "structural inadequacy" that implicated due process, and the plan was unconfirmable for that reason as well. *Id.* at 245.[18]

52.     As in *Quigley* and *Combustion Engineering*, J&J here appears to have used prepetition settlements with law firms representing ovarian cancer and gynecological claimants to buy enough votes to confirm a chapter 11 plan. That kind of vote-buying is not only bad faith (thereby making the Plan unconfirmable under section 1129(a)(3)), but it also violates the "fundamental bankruptcy policy of equality of distribution." The Insurers need further discovery—and the Debtor must disclose information—regarding the prepetition negotiation of the Plan and of the non-bankruptcy settlements to determine whether J&J purchased claimants' votes. If it did, as appears highly likely, the Plan would be patently unconfirmable.[19]

53.     Even if the Plan is not patently unconfirmable on vote-buying grounds, the claims that have already settled under a Master Settlement Agreement (and are guaranteed payment by J&J regardless of plan confirmation) should not be permitted to vote because those claimants have no economic stake in the Plan. In *Quigley*, the debtor's parent entered into settlement agreements with certain plaintiffs that effectively guaranteed 90% of the settlement amounts, leaving 10% of the settlement amounts to be asserted against the § 524(g) trust. *Quigley*, 437 B.R. at 115–18. The court held that because the settling plaintiffs' economic interest was only 10% of their claim (as the remaining 90% would be paid by the parent), their votes should only count as 10% of the other claimants' votes. *Id.* at 119.

---

[18] The Third Circuit also remanded for further consideration whether (as in *Quigley*) the chapter 11 plan violated section 1129(a)(3), requiring that a debtor propose a plan "in good faith and not by any means forbidden by law", and section 1126(e), pursuant to which a "bankruptcy court can designate the vote of any entity 'whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions' of the Bankruptcy Code." *Id.* at 247 & n.68.

[19] The pre-petition payments should also be pursued as avoidable preferences under chapter 5 of the Bankruptcy Code.

54.     Likewise here, claimants that have settled pursuant to Master Settlement Agreements should not be entitled to vote.  Although the Master Settlement Agreements are conspicuously absent from the factual record in this case—perhaps by design—it is clear from the Debtor's other filings that those settled claims are guaranteed by J&J, and should have even less economic interest than the *Quigley* settling claimants (who at least held a 10% stub claim). Because they have no economic interest in the Plan, these claimants' votes are meaningless and should be discounted.  This is a fatal flaw and should require non-approval of the Disclosure Statement should not be approved.

**C.     The Plan Violates Purdue Pharma, and the Channeling Injunction Exceeds the Scope of Section 524(g)**

55.     The Plan is also unconfirmable due to *Harrington v. Purdue Pharma*, 144 S. Ct. 2071, 219 L. Ed. 2d 721 (2024), where the Supreme Court recently held, in the context of a plan seeking to resolve mass opioid-related tort claims, that section 1123(b)(6) does not authorize non-consensual third-party releases as part of a plan absent specific statutory authority.  *Id.*, 219 L. Ed. 2d at 739–40.  The Supreme Court noted that when it comes to non-consensual third-party releases contained in a chapter 11 plan, in "***asbestos-related bankruptcies—and only for such bankruptcies***—Congress has . . . authorize[d] courts to enjoin claims against third parties without their consent."  *Id.* at 736–37 (citing 11 U.S.C. § 524(g)).[20]

---

[20] To be sure, there may be other provisions of the Bankruptcy Code that authorize protections to non-debtors, such as 11 U.S.C. § 363, without running afoul of *Purdue*.  For example, a bankruptcy court can certainly enter an order enjoining claims against insurers when insurance policies were purchased free and clear from a debtor.  *In re Sunland, Inc.*, No. 13 13301, 2014 WL 7011747, at *4 (Bankr. D.N.M. Dec. 11, 2014); *In re Dow Corning Corp.*, 198 B.R. 214, 238 (Bankr. E.D. Mich. 1996); *In re Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988); *see also In re Peanut Corp. of Am.*, 2009 WL 8757132, at *4 (Bankr. W.D. Va. 2009) (approving policy buyback free and clear of interests of tort claimants); *In re National Services Indus., Inc.*, No. 12-12057 (Bankr. D. Del.), Docket Nos. 140, 353 (same). Here, however, the Debtor's non-debtor affiliates seek protections and broad releases under Section 524(g) despite the fact that this is not a true "asbestos-related bankruptcy."

56. The Debtor, however, was not allocated liability by its predecessor for *any* mesothelioma claims, almost all of which arise from exposure to asbestos. Given that the overwhelming majority of ovarian cancer claimants have historically not alleged asbestos exposure as the cause of their disease,[21] and in any event, J&J has consistently denied the presence of asbestos and a causal link between its products and gynecological and ovarian cancers based on the alleged presence of asbestos, Debtor does not qualify for § 524(g) protection. Accordingly, its affiliates, including J&J, should not be able to receive the protection of nonconsensual third-party releases and channeling injunction. Further, while *Purdue Pharma* does not fully define the parameters of when non-consensual debtor release may be permissible (*e.g.*, under § 524(g), under other provisions of the code, such as § 363 in appropriate circumstances), the proposed Plan J&J envisions here clearly is indistinguishable from the type of non-consensual release prohibited by Purdue Pharma.

57. The relief that J&J is seeking from this bankruptcy mirrors the relief sought by the Sacklers in *Purdue Pharma*, relief that the Supreme Court ultimately rejected. In *Purdue Pharma*, members of the Sackler family were named defendants in hundreds of lawsuits, but they did not file for bankruptcy and did not make their assets available for creditors. *Id.* at 732. The Supreme Court held that the Sackler family could not use the bankruptcy filing of their subsidiary to engineer a non-consensual third-party release of all claims facing them. *Id.* at 739–40. Likewise here, despite being a named defendant in thousands of lawsuits, J&J did not file for bankruptcy. J&J cannot now seek to use its subsidiary's bankruptcy to achieve a global resolution of

---

[21] *See, e.g.*, Imerys Prior DS § 4.1(c) ("Historically, plaintiffs have asserted that talc itself causes ovarian cancer and have not asserted that talc contained in the baby powder was contaminated with trace amounts of asbestos. In 2017, however, some plaintiffs asserting [Ovarian Cancer] Claims began to allege that their personal injuries may also have been caused by trace asbestos contamination of the talc.").

*independent* talc liability that *it* faces as the Sacklers tried to do. The plan proposes to extend 524(g) protections beyond what the statute authorizes.

58.     Moreover, even assuming the Debtor and J&J may obtain limited protections under section 524(g), future claimants could easily plead around any such injunctive protections by disclaiming any allegations pertaining to asbestos, consistent with the vast majority of ovarian complaints filed to date.

This ability to plead around the injunctive provisions of the Plan and vastly overbroad release and injunctions threaten the Plan's viability and ability to satisfy the feasibility requirement of the Bankruptcy Code. At a minimum, these risks that the Plan may be unviable and infeasible should be disclosed in the Disclosure Statement—but they are not.

59.     Further, the Plan must be amended to ensure that non-debtors do not receive a broader release than explicitly statutorily authorized under § 524(g). Section 524(g) places strict limits on the types of claims that may be enjoined in an asbestos bankruptcy. One limitation is that a § 524(g) channeling injunction may be issued in favor of only certain non-debtor third parties who satisfy one of four statutory relationships:

> (I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;
> (II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party
> (III) the third party's provision of insurance to the debtor or a related party; or
> (IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party.

11 U.S.C. § 524(g)(4)(A)(ii)(I)–(IV); *see also In re Combustion Eng'g, Inc.*, 391 F.3d at 235 (describing the statutory relationship requirement).

60.     On its face, the Plan fails this test by offering the protection of the channeling injunction to a broad array of "Protected Parties," which includes many J&J affiliates and others. Of particular concern is the inclusion of Imerys and Cyprus and their respective affiliates in the definition of "Protected Parties" in the event that J&J's settlement with Imerys and Cyprus has not gone effective. *See* Plan § 1.1.118(f).  The Disclosure Statement does not explain how Imerys, Cyprus, and their affiliates fall into any of the four statutory relationships required by section 524(g), and Imerys and Cyprus clearly face substantial liability that led each of them to file their own chapter 11 bankruptcy cases and propose their own chapter 11 plans.  The Plan as currently proposed—which seeks to enjoin claims against Imerys, Cyprus, and other parties in a way that goes beyond the statutory authority of section 524(g)—is patently unconfirmable.

### D.    The Plan is Patently Unconfirmable Because Section  524(g) Relief is not Available to the Debtor and J&J in a Liquidation

61.     Under the Bankruptcy Code, a liquidating debtor (even in chapter 11) does not receive a discharge, and the ensuing 524(a)(2), (3) injunction, and therefore cannot receive a section 524(g) supplemental injunction for itself and other protected parties.  The Debtor has never been an operating business and is merely the product of a series of recent corporate machinations designed to ring-fence liabilities.  It has no ongoing business to protect and therefore is unable to qualify for a § 524(g) channeling injunction.

62.     Under section 1141(d)(3), a debtor does not receive a discharge when "(A) the plan provides for the liquidation of all or substantially all of the property of the estate [and] (B) the debtor does not engage in business after consummation of the plan.".  11 U.S.C. § 1141(d)(3); *see also* 11 U.S.C. § 727(a)(1) (corporate debtor does not receive a discharge injunction under chapter 7 of the Bankruptcy Code).  A § 524(g) channeling injunction for asbestos debtors **supplements** the § 524(a) injunction that effectuates the bankruptcy discharge; because a liquidating debtor does

not receive a discharge, by definition it cannot receive a § 524(g) injunction.  *See In re Flintkote Co.*, 486 B.R. 99, 129 (Bankr. D. Del. 2012) ("a bankruptcy court may issue a channeling injunction 'to supplement the injunctive effect of a discharge under this section.'  It follows then that there must be a discharge for the channeling injunction to 'supplement.'"), *aff'd*, 526 B.R. 515 (D. Del. 2014); *In re Western Asbestos Co.*, 313 B.R. 832, 854 (Bankr. N.D. Cal. 2003) (finding that a debtor, as a non- operating company, was not entitled to the protection of § 524(g) channeling injunction); *In re Lloyd E. Mitchell, Inc.*, No. 06-13250, 2012 WL 5988841, at **3 n. 6 (Bankr. D. Md. Nov. 29, 2012) ("LEM [the debtor] cannot satisfy what has been described as the 'ongoing business requirement' which is a predicate to the establishment of such a trust because LEM has no ongoing business.").

63.     This "ongoing business requirement" comports with the purpose of section 524(g). As Congress noted in enacting § 524(g), the intended purpose of the section was to allow *an otherwise viable business* to quantify, consolidate, and manage its debt so that it can satisfy its creditors to the maximum extent feasible, but without threatening its continued existence and the thousands of jobs that it provides.  *In re Combustion Eng'g*, 391 F.3d at 248 n.69, citing 140 Cong. Rec. S4521–01, S4523 (Apr. 20, 1994) (statement of Senator Heflin).

64.     Contrary to the Congressional record, the Debtor here came into existence **solely** for purposes of assuming liabilities and filing this chapter 11 case.  The Debtor has no operating business, and never has.  Although the Debtor was allocated in the divisional merger the equity interests in Royalty A&M (Disclosure Statement § 4.2(f)(1)(i)), which owns a portfolio of royalty revenue streams (*id.* § 4.1(a)), that is not the kind of "ongoing business" that section 524(g) contemplates.

65.     Even if earning a royalty stream could count as an "ongoing business", it is not a continuation of the legacy business that generated the talc liabilities (*i.e.,* production and sale of baby powder and other talc-containing products), and therefore does not satisfy the statutory requirement.   *Grausz v. Sampson* (*In re Grausz*), 63 F. App'x 647, 650 (4th Cir. 2003) (ongoing business requirement of § 1141(d)(3) refers "to the **continuation** of a **pre-petition** business"); *In re Um*, 2015 WL 6684504, at *7 (Bankr. W.D. Wash., Sept. 30, 2015)  ("Based on the legislative history and the cases most factually analogous to this case, the Court is persuaded that § 1141(d)(3)(B) refers to the **continuation** of a debtor's pre-petition business. . . .") (emphasis in original), *aff'd*, 2016 WL 7714141, at *4 (W.D. Wash. Aug. 18, 2016) (holding that "in the context of the bankruptcy code, the term 'business' in § 1141(d)(3)(B) means pre-petition business).

66.     Because the Debtor has no ongoing business, and therefore cannot receive a discharge under § 1141(d) or a supplemental § 524(g) injunction, the Plan is patently unconfirmable.

### E.     The Plan is Patently Unconfirmable Because it Purports to Provides a Release to Middlesex and other Non-Contributing Parties

67.     The Plan includes expansive third-party releases and a § 524(g) channeling injunction in favor of J&J and a long list of affiliates.   One of those affiliates is Middlesex Assurance Company Limited, which is J&J's captive insurer that issued insurance for billions of dollars in limits to J&J.   The quantum of liability that Middlesex may face is hotly disputed in the NJ Coverage Action.   Despite the ongoing litigation about liability, the Plan purports to extinguish claims against Middlesex, without any analysis or any contribution Middlesex may be making.   This unlawful attempt to free J&J's subsidiary from its liabilities renders the Plan patently unconfirmable.

68.     Section 524(g)(4)(B)(ii) provides that a channeling injunction may enjoin future demands against a debtor or third party that are "to be paid in whole or in party by a [524(g)] trust if, inter alia, such injunction "is **fair and equitable** with respect to the persons that might subsequently assert such demands, in light of the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors or such third party."  11 U.S.C. § 524(g)(4)(B)(ii) (emphasis added).  Any party to be protected by a § 524(g) injunction therefore must provide benefits to the trust sufficient to make the party's inclusion in the injunction fair and equitable.

69.     To determine whether a channeling injunction is "fair and equitable," courts compare the protected party's contribution to the trust to the liability exposure for which it is getting a release.  *In re W.R. Grace & Co.*, 729 F.3d 311, 330 (3d Cir. 2013) ("fair and equitable" requires an assessment of "the amount being contributed to the trust in comparison to the liability exposure of the protected parties"); *see also In re Quigley Co.*, 437 B.R. at 140 (denying plan confirmation in part because future demand holders would receive only about $147 million, whereas the value to the debtor of enjoining their claims was $613 million); *In re G–I Holdings Inc.*, 420 B.R. 216, 276 (D.N.J. 2009) (concluding that the "substantial contributions provided" to the trust made it fair to future claimants).

70.     Here, there is no indication that Middlesex is making **any** contribution to the trust.  Yet, it is receiving a gratuitous third-party release alongside the rest of J&J's affiliates.  Instead of litigating on the merits in the NJ Coverage Action, J&J is seeking an end-run around that coverage case by summarily pardoning Middlesex from any liabilities, seemingly for no consideration or inadequate consideration.  This is not merely an oversight; when Travelers alerted J&J to this concern and asked for Middlesex to be carved out of the third-party release, J&J refused to do so.  A Plan that **intentionally** seeks to end-run a pending state court lawsuit in an unlawful manner is

patently unconfirmable. *Cf. In re Encore Prop. Mgm't*, 585 B.R. 22, 31 (Bankr. W.D.N.Y. 2018) (chapter 11 case that attempted to end-run state court was filed in bad faith).

71.     In addition, the Plan provides that Imerys and Cyprus (and their respective affiliates) are "Protected Parties" under the Plan if J&J's settlement with Imerys and Cyprus does not become effective. Imerys and Cyprus face substantial talc liability which caused each of them to file chapter 11, and there is no indication that either of them is making any contribution to the trust. Including Imerys and Cyprus (and their respective affiliates) within the scope of the channeling injunction violates the "fair and equitable" requirement of section 524(g) and renders the Plan unconfirmable.

**F.     The Plan is Patently Unconfirmable Because the Debtor Assigns the Rights to Make Claims Under Policies Without the Attendant Policy Obligations**

72.     A plan cannot be confirmed if it does not "compl[y] with the applicable provisions of this title [11]" or if it is "proposed . . . by any means forbidden by law"—which includes state law. 11 U.S.C. § 1129(a)(1), (3); *see, e.g., In re Am. Cap. Equip., Inc.*, 405 B.R. 415, 423 (Bankr. W.D. Pa. 2009), *aff'd*, 688 F.3d 145 (3d Cir. 2012) (holding bankruptcy plan could not be confirmed because certain provisions were forbidden under Pennsylvania law).

73.     The Plan's treatment of insurance policies is unlawful. Under the Plan, the Reorganized Debtor transfers and assigns to the trust all of the "Talc Insurance Assets"; however the Reorganized Debtor, as subrogee of the trust, has the exclusive right to litigate and settle insurance coverage and then to collect any proceeds therefrom. Plan § 4.9.4(a)–(b). "Talc Insurance Assets" are limited to those that are owned by the Debtor, and do not include the insurance policies themselves. *See* Plan §§ 1.1.132–138. LTL, the Debtor's predecessor, was only allocated the right to make claims on insurance policies, and the Debtor was likewise allocated only the "rights to make claims under any and all insurance policies as to which Holdco (Texas)

- 31 -

LLC has rights to the extent such policies provide coverage with respect to the Debtor Talc Related Liabilities."  Disclosure Statement § 4(f)(1)(i).

74.     The Bankruptcy Code "provide[s] a bankruptcy trustee with the same rights and defenses" under a prepetition contract as those held by the debtor prior to bankruptcy. *In re Combustion Eng'g, Inc.*, 391 F.3d at 245 n.66.  Under this well-recognized principle, contractual rights cannot be assigned without their concomitant obligations, and bankruptcy courts regularly reject debtor efforts to rewrite insurance policy contractual terms.  *See, e.g.*, *In re Thornhill Bros. Fitness, L.L.C.*, 85 F.4th 321, 326 (5th Cir. 2023) ([A] debtor assuming an executory contract cannot separate the wheat from the chaff . . . [and] must assign the contract in whole, not in part."); *In re National Gypsum Co.*, 208 F.3d 498, 506 (5th Cir. 2000) ("Where the debtor assumes an executory contract, it must assume the entire contract, *cum onere* - the debtor accepts both the obligations and the benefits of the executory contract.").  This is true for both executory and non-executory contracts.  *Spyglass Media Group, LLC v. Bruce Cohen Prods.*, 997 F.3d 497, 505 (3d Cir. 2021); *Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J. V.*, 209 F.3d 252 (3d Cir. 2000) ; *In re Am. Home Mortg. Holdings, Inc.*, 402 B.R. 87, 98 (Bankr. D. Del. 2009) ("the *cum onere* principle applies equally to the transfer of rights and obligations under a non-executory contract").

75.     By assigning only the right to make claims under the policies to the trust, but not the policies themselves (to the extent the Debtor has any such rights), the Debtor is attempting to divide the benefit of the policies from J&J's bargained-for responsibilities, an impermissible separation that violates the *cum onere* principle.  This provision of the Plan cannot be approved, and because the Plan contains such a provision, it is patently unconfirmable.[22]

---

[22] By this objection, the Insurers do not concede that Debtor, Pecos River Talc LLC, or New Holdco (Texas) LLC have any rights under the policies.  None are named insureds under the relevant policies and none have sought coverage in connection with the pending NJ Coverage Action.  Moreover, it is not apparent whether any attempt was made in

### G.      The Plan Contains Other Flaws

76.      Although Section 9.1.3 of the Plan contains some anti-fraud provisions, given the high likelihood that claimants may assert meritless claims, those provisions should be supplemented.  For example, the court in *Boy Scouts* held that anti-fraud provisions should include language to the effect that the trust advisory committee may not have consent rights or veto rights with respect to the procedures, and that penalties may include prosecution of a claimant or attorneys for violation of 18 U.S.C. § 152.  *See In re Boy Scouts of Am.*, 642 B.R. 504, 645 (Bankr. D. Del. 2022).  To ensure compliance with the Bankruptcy Code, the Plan should be revised to include these and additional protections to guard against payment of fraudulent or meritless claims, which appear highly likely in the absence of such protections.

77.      The insurance entity injunction in section 11.3.2 of the Plan does not have a broad enough carveout to preserve the Insurers' rights and defenses.  Defensive setoff rights cannot be extinguished by a plan injunction.  *In re SVB Fin. Gr'p*, 662 B.R 53, 66–68 (Bankr. S.D.N.Y. 2024).  To ensure compliance with the Bankruptcy Code, the following language must be added to the Plan as section 11.3.2(c)(v), which is prefaced with "Notwithstanding anything to the contrary above, this Insurance Entity Injunction shall not enjoin . . ."

> (v) the rights of any Talc Insurance Company to assert any claim, debt, obligation, cause of action, or liability for payment to offset, set-off, recoup, allocate or apportion fault, liability, or damages, or seek judgment reduction or otherwise to defend against any Cause of Action or Claim brought by any Person.

Plan [Docket No. 24] at 81.

---

the divisional mergers to allocate the policies or policy rights to Debtor, Pecos River Talc LLC, or New Holdco (Texas) LLC.  Nonetheless, to the extent it may be determined that Debtor, Pecos River Talc LLC, or New Holdco (Texas) LLC has any such rights, as discussed above such rights cannot be assigned without the attendant contractual obligations.

### H.     The Disclosure Statement Does Not Provide Adequate Information

78.     In addition to the flaws described above that render the Plan patently unconfirmable and require the Court to deny approval of the Disclosure Statement, the Disclosure Statement itself does not provide adequate information as required by the Bankruptcy Code.

#### 1.     The Disclosure Statement Should Not be Approved Because the Third Filing Should be Dismissed as a Bad Faith Filing

79.     Approving the Disclosure Statement would engender a colossal waste of judicial time and resources because these chapter 11 cases should be dismissed.  As described above, the Third Circuit has twice held that the bankruptcy filings of entities created by J&J to segregate its talc liabilities were not in good faith because the entities were not in financial distress, since they had access to funding agreements well in excess of their projected liabilities.   In the second decision, the Third Circuit held that not even the purported "significant plaintiff support for this LTL bankruptcy" could remedy LTL's lack of good faith.  *In re LTL Mgm't LLC*, 2024 WL 3540467, at *4.

80.     The same fate awaits these chapter 11 cases.[23]  The Fifth Circuit has a similar "bad faith" standard to the Third Circuit, which does not require "subjective bad faith" to dismiss a case under section 1112(b).  *In re 1701 Commerce, LLC*, 477 B.R. 652, 657 n.17 (Bankr. N.D. Tex. 2012) (citing *In re Humble Place Joint Venture*, 936 F.2d 814, 817 (5th Cir. 1991)).   And the Third

---

[23] On an investor call, Erik Haas (J&J's Worldwide Vice President of Litigation) sought to distinguish this third bankruptcy filing on the basis of the prepackaged nature of this plan, the higher level of claimant support, and that the bankruptcy was ovarian-only.   Conference Call Transcript, Johnson & Johnson Announces Plan by its Subsidiary, LLT Management (May 1, 2024) (available at https://s203.q4cdn.com/636242992/files/doc_events/2024/05/final-jnj-usq_transcript_2024-05-01.pdf).  The Third Circuit explicitly noted that plaintiff support could not cure a lack of good faith, and the Bankruptcy Code's good faith requirement is equally applicable in prepackaged cases, no matter the diseases or claims at issue.  Furthermore, neither of these significant flaws were addressed in the Disclosure Statement. J&J neglected to mention that because J&J does not like the $30 billion funding agreement that led to LTL's bankruptcy being dismissed, J&J simply terminated it (taking away $22 billion from creditors).

Circuit pointed to Fifth Circuit and other appellate decisions that evaluate the debtor's financial condition as a component of the "bad faith" inquiry. *In re LTL Mgm't LLC*, 64 F.4th at 103 n.14 (citing *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986) ("Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities.")).

81.     In both of the Third Circuit's decisions dismissing LTL's two prior recent bankruptcy cases, the court held that LTL was not in financial distress because it had access to the Funding Agreement, which was worth more than LTL's anticipated future liabilities. According to the Disclosure Statement, because LTL will merge into Holdco (Texas) LLC, the Funding Agreement will "effectively terminate." Disclosure Statement § 4.2(e). Simply voluntarily eliminating a valuable source of funding cannot create financial distress. On its face, this has all of the hallmarks of a fraudulent transfer and cannot form the basis of a good-faith bankruptcy filing. LTL's creditors had access to approximately $30 billion of value under the amended Funding Agreement for the second bankruptcy petition (itself lower than the ~$60 billion of value under the initial Funding Agreement for the first LTL bankruptcy). On the eve of its third attempt at bankruptcy, J&J and its subsidiaries effectuated new corporate transactions that "effectively terminate" the creditors' rights to those payments. The Debtor's estate now owns this valuable avoidance action, with all of its attendant remedies for actual and constructive fraudulent transfer.

82.     The Disclosure Statement does not address any of these issues; instead, it simply tells creditors that they have lost access to $22 billion of value. Unlike the amendment to the Funding Agreement (which J&J asserted was appropriate under the doctrine of frustration of purpose), neither J&J nor the Debtor has even provided a pretextual justification for the elimination of $22 billion in value. Because this case is premised on a potential fraudulent transfer and the

Debtor, who has the benefit of a valuable avoidance action against J&J and its affiliates, is not in financial distress, the Disclosure Statement should not be approved.  At a minimum, the Court should require additional disclosures and a new solicitation.

> **2.     The Master Ballot Form Does Not Elicit Sufficient Information About Whether Claimants Consented to their Purported Attorney's Vote on the Plan**

83.     The Approval Motion also seeks approval of the solicitation procedures used by the Debtor's affiliates to solicit votes on the Plan.  Ascertaining exactly how each claimant voted on the Plan is crucial in this case: at every hearing since the first day of the case, the Debtor has touted the "overwhelming" support by creditors for J&J's bankruptcy strategy.  But the voting record here is controversial: the Coalition and the Debtor have collectively filed multiple motions asking the Court to confirm whose votes count, voluminous factual declarations about voting authority have been filed, and Beasley Allen and the Smith Law Firm have filed dueling lawsuits against each other in federal court related to voting issues in this case.

84.     As described above, the Debtor seeks to stuff the ballot box with claims that would receive no compensation in the tort system (and, accordingly, were never litigated by plaintiffs' law firms or settled by J&J).  But even if those claimants did merit a vote on the Plan, the Master Ballot does not provide the Court or the parties in interest with enough information to ascertain whether that claimant actually voted on the Plan.

85.     In the *Boy Scouts* proceeding, where voting issues were likewise contested, the solicitation procedures approved by the Court mandated several requirements in the Master Ballots to ensure that the debtors got the vote right.  In addition to requiring that firms submitting master ballots certify that they are voting on their clients' behalf (which the Master Ballots here require), the Boy Scouts master ballots required plaintiffs' law firms to submit a Rule 2019 statement listing (i) the facts and circumstances of the representation, (ii) the names, addresses, and claim numbers

of the claimants represented (subject to redaction of monetary terms and PII), and (iii) an exemplar engagement letter.[24]   Further, plaintiffs' law firms submitting a master ballot had to contemporaneously submit (if requested) the powers of attorney or written communication from each claimant authorizing the vote, and had to certify that it had met all applicable standards to achieve each voting client's informed consent to vote on the Plan.[25]   The bankruptcy court in *Imerys* and *Cyprus* ordered similar protections in those cases.  Given the well-known disputes in this case about voting, this Court should require Master Ballots to be supplemented with this information, and require the Debtor to re-solicit votes on the Plan and file these submissions.

### 3.    The Disclosure Statement Does Not Explain the Debtor's Purported Insurance Rights

86.    Under the Plan, the Reorganized Debtor transfers and assigns to the trust all of the "Talc Insurance Assets"; however, the Reorganized Debtor has the exclusive right to litigate and settle insurance coverage and then to collect any proceeds therefrom.  Plan § 4.9.4(a)–(b).  "Talc Insurance Assets" are limited to those that are owned by the Debtor, and do not include the insurance policies themselves.  *See* Plan §§ 1.1.132–138.  LTL, the Debtor's predecessor, was allocated only the right to *make claims* on insurance policies, and the Debtor was likewise allocated only the "rights to *make claims* under any and all insurance policies as to which Holdco (Texas) LLC has rights to the extent such policies provide coverage with respect to the Debtor Talc Related Liabilities."  Disclosure Statement § 4(f)(1)(i) (emphasis added).

---

[24] *See* Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief ¶ 29, *In re Boy Scouts of Am.*, No. 20-10343 [Docket No. 6438] (Bankr. D. Del. Sept. 30, 2021).

[25] *Id.* Ex. 2-5 (Form of Master Ballot for Class 8 Direct Abuse Claims); Ex. 11 (Abuse Claim Solicitation Notice and Abuse Survivor Plan Solicitation Directive).

87.     This description of insurance treatment is internally inconsistent and woefully inadequate.  On the one hand, the Debtor purports to assign and transfer to the trust the rights to make claims on insurance policies.  Therefore, the trust would seemingly be able to seek coverage for claims that *it* pays out to claimants.  But at the same time, the Reorganized Debtor is slated to pursue coverage from insurers, which would seemingly be to recover for *J&J's* contribution to the trust (and not for the trust's subsequent payment to claimants), neither of which would be permissible under the terms and conditions of the policies.  In another befuddling twist, the Reorganized Debtor is called the "subrogee" of the trust.   "Subrogation" is the right of one who has paid an obligation, which another should have paid, to pursue a claim for that obligation.  73 Am. Jur. 2d *Subrogation* § 1 (2024).  The Plan appears to be saying that the Debtor paid for the trust's obligations, and therefore is subrogated to the trust's rights against insurers.  However, these obligations are not the trust's obligations.  They are the Debtor's obligations, and the Debtor contributed money to the trust in order to create it, and then saddled the trust with the Debtor's obligations.  Therefore, subrogation is inapplicable to the Debtor's rights and the provision makes no sense.

88.     Moreover, there is no clear discussion in the Disclosure Statement regarding what rights, if any, Debtor has in or under the policies.  Specifically, there is no statement as to what insurance rights, if any, were allocated to Debtor in the various divisive merger transactions.

89.     Insurers and other parties in interest reading the Disclosure Statement are not provided with sufficient information to discern what potential coverage actions will be pursued and the nature of the losses or payments the Reorganized Debtor will seek indemnification for. This is crucial information for insurers to determine what payments need to be assessed, especially if the Reorganized Debtor submits a demand for indemnification for payments made to the trust

without any detail or supporting information.  Because the Disclosure Statement does not include such crucial information and the information provided is confusing and inconsistent, the Court should not approve the Disclosure Statement.

## I.      The Disclosure Statement Fails to Mention the Plan's Serious Infirmities

90.      As described above, the Plan is riddled with infirmities that make it patently unconfirmable.  The Disclosure Statement does not mention these deficiencies or inform creditors of the risks that these deficiencies pose to confirmation of the Plan.  For this additional reason, the Disclosure Statement does not contain adequate information and should not be approved.

## J.      The Disclosure Statement Omits Necessary Documents

91.      The Disclosure Statement does not contain a liquidation analysis or financial projections for the Debtors.  Therefore, the Disclosure Statement cannot be approved.

92.      A plan is confirmable only if the debtors have successfully shown that each creditor in an impaired class has either (i) accepted the plan, or (ii) will receive at least as much under the plan as that creditor would receive if a chapter 7 trustee were to liquidate and distribute all the debtor's assets. 11 U.S.C. § 1129(a)(7); *see In re Global Ocean Carriers, Ltd.*, 251 B.R. 31, 46 (Bankr. D. Del. 2000) (plan proponent bears burden of proof of demonstrating that the proposed plan satisfies Section 1129(a)(7)).  The "best interests" test is satisfied when the plan proponent demonstrates that its plan provides for a distribution to each individual dissenting creditor that is at least equal to what that creditor would receive in a hypothetical chapter 7 liquidation.  *In re JSAA Realty, LLC*, No. 20-32504, 2022 WL 567730, at *9 (Bankr. N.D. Tex. Feb. 24, 2022)

.

93.      To make the determination as to whether the Plan is in their best interests, parties need to be provided the Liquidation Analysis and any other relevant financial analysis well before a Disclosure Statement is used to solicit votes in favor of a plan. *See In re Scioto Valley Mortgage*

*Co.*, 88 B.R. 168, 170 (Bankr. S.D. Oh. 1988) (disclosure statement should include liquidation analysis). Because non-debtor third parties are being released, and other claims are being channeled to the Trust, information on those released parties must be included in any analysis. Absent that, the Disclosure Statement does not show that the creditors are receiving greater value under the proposed plan than they would under a chapter 7 liquidation.

94.     Furthermore, to obtain confirmation of the Plan, the proponents must demonstrate that it is feasible. 11 U.S.C. § 1129(a)(11). This requirement is imposed to preclude confirmation of an unrealistic and speculative plan of reorganization which is likely to be followed by further financial difficulties. *Clarkson v. Cooke Sales & Serv. Co.*, 767 F.2d 417 (8th Cir. 1985) (plan not feasible where no showing that the debtors' future operations can fund their plan).  Accordingly, information relating to the feasibility of the plan is of utmost importance to creditors when determining whether to accept or reject the plan.  The Disclosure Statement does not provide adequate information regarding feasibility of the Plan.  Therefore, parties who have already been solicited did not have adequate information with which to evaluate the feasibility of the Plan.

95.     In non-prepack cases, these exhibits must be attached to the disclosure statement before it is approved, so that they can review and evaluate the sufficiency of the documents.  This is a prepack in which solicitation has already taken place.  The fact that the Disclosure Statement that was used to solicit votes did not include these required exhibits means that the disclosure was inadequate.  The Court should therefore disapprove the Disclosure Statement, and order that these deficiencies (and all others) be remedied and that a new solicitation take place using the new disclosure statement.

## VIII.  DEBTOR CAN RESOLVE THE INSURERS' OBJECTIONS

96.     The Insurers' objections could be ameliorated if J&J and its affiliates explicitly agree (and memorialize in form and substance satisfactory to the Insurers) that neither they, nor

any Reorganized Debtor, Trust, or other party, will seek coverage for any settlements or payments in connection with the Plan or the bankruptcy, and, instead, that they will only seek coverage with respect to J&J's past settlements, judgments, and costs paid outside of bankruptcy, subject to any and all applicable coverage defenses as respects such claims.

97.     Similarly, the Plan should be clear that nothing in the Plan or in connection with this bankruptcy will operate to affect the Insurers' rights and obligations under the relevant insurance contracts.  The modifications to the insurance neutrality language reflected below are necessary:

> 10.3.3 <u>No Impairment of Rights or Obligations of Talc Insurance Companies</u>.
>
> (a) Except as provided in any Talc Insurance Settlement Agreement or in Section 11.2.1, nothing contained in the Plan, the Plan Documents, or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the rights or obligations of any Talc Insurance Company or the Debtor arising out of or under any Talc Insurance Policy. For all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Talc Insurance Policies or Talc Insurance Settlement Agreements shall control. For the avoidance of doubt, nothing contained in the Plan, the Plan Documents, or the Confirmation Order shall operate to require any Talc Insurance Company to indemnify or pay the liability of <u>the Debtor, the Talc Personal Injury Trust, or</u> any Protected Party <s>that it would not have been required to pay in the absence of the Plan</s>.  <u>No Person shall seek insurance coverage or any other payment from any Talc Insurance Company for amounts paid, valued, resolved or promised by the Debtor or the Talc Personal Injury Trust to holders of Claims pursuant to the Plan, the Trust Distribution Procedures, or otherwise.</u>
>
> (b) The Plan, the Plan Documents, the Confirmation Order, and all proceedings, determinations, and findings in, of, or by the Bankruptcy Court are neutral with respect to, and have no effect on, the rights, defenses, and obligations of the Debtor, the Talc Insurance Companies, and the Talc Personal Injury Trust under the

Talc Insurance Policies. Nothing in the Chapter 11 Case shall be construed otherwise or be used as evidence to support or suggest a construction to the contrary.

(c) In any dispute between J&J or any of its affiliates or the Talc Personal Injury Trust, on the one hand, and any Talc Insurance Company, on the other hand, including a coverage dispute, coverage litigation, any action to recover on any Talc Insurance Policies or otherwise, including the NJ Coverage Action, nothing in any (i) chapter 11 plan, (ii) trust distribution procedures (or valuation matrix or other valuation methodology in connection with the foregoing) (iii) agreement entered into by the Debtor arising out of or related to the foregoing, (iv) rulings or findings in connection with allowance of Talc Claims against the Debtor, estimation of the Debtor's liabilities, bellwether trials, or a court-appointed expert or panel, or (v) confirmation order or any other judgment, order, finding of fact, conclusion of law, determination, ruling or statement (written or oral) made or entered by the Bankruptcy Court or by any other court exercising jurisdiction over the Chapter 11 Case (including, without limitation, any judgment, order, writ or opinion entered on appeal from any of the foregoing) relating to either the liquidated value of any Talc Personal Injury Claim or the amount paid or promised or proposed to be paid by the Talc Personal Injury Trust on account of a Talc Personal Injury Claim, shall:

    (i)    be proffered as evidence in support of or as suggestive of any finding, conclusion, claim valuation, claim resolution, indemnity claim, or other determination;

    (ii)    be proffered as evidence, argued, relied on, cited, used, introduced, admitted, referenced, discussed, or otherwise disclosed to the judge, jury, arbitrator, or any other finder of fact or otherwise referred to or otherwise asserted to be relevant in any way to the determination of the liability (in the aggregate or otherwise) of the Debtor, its predecessors or successors or the alleged coverage obligation of a Talc Insurance Company for any past claims;

    (iii)    be proffered as evidence, argued, relied on, cited, used, or otherwise asserted to be relevant in any way to the liability or obligation of Debtor, its predecessors or successors, or a trust with respect to any past claims;

    (iv)    preclude, limit, or otherwise impair any defense asserted by any Talc Insurance Company, and all such defenses are reserved;

(v) have any collateral estoppel, waiver, estoppel, *res judicata*, or other effect regarding any insurance coverage obligations of the insurers under the terms and conditions of any Talc Insurance Policies;

(vi) constitute a trial or hearing on the merits or an adjudication or judgment, nor accelerate the obligations, if any, of any insurance company under its insurance policies; or

(vii) provide a basis for any Person to seek coverage under any Talc Insurance Policy.

10.3.4 Plan Not Binding on Talc Insurance Companies. ~~The Plan, the Plan Documents, and the Confirmation Order shall be binding on the Talc Insurance Companies; provided, however, that, except as provided in Section 10.3.6,~~ None of (a) the Bankruptcy Court's approval of the Plan or the Plan Documents, (b) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (c) any estimation or valuation of Talc Personal Injury Claims, either individually or in the aggregate (including any agreement as to the valuation of Talc Personal Injury Claims) in the Chapter 11 Case shall, with respect to any Talc Insurance Company, constitute a trial or hearing on the merits or an adjudication, judgment, finding, conclusion, or other determination, or be used as evidence of or suggestion regarding the rights and obligations of any Talc Insurance Company under any Talc Insurance Policy, the valuation of any claim, or used in any way in connection with litigation regarding the Talc Insurance Policies.

## **CONCLUSION**

98.     The Disclosure Statement is incomplete in fundamental respects and affirmatively confusing and misleading in other respects, and the Plan described in the Disclosure Statement is patently unconfirmable for several reasons.  The Insurers therefore urge the Court to not approve the Disclosure Statement because it fails to provide "adequate information" as required by section 1125(b) of the Bankruptcy Code and because the Plan is patently unconfirmable.  Since votes on the Plan were solicited using a disclosure statement that did not provide "adequate information," the Court should, unless it finds that the Plan is patently unconfirmable, order that the Disclosure

Statement be revised so that it meets the statutory requirements and that Debtor re-solicit votes on the Plan using the revised Disclose Statement.

Respectfully submitted this 7th day of November, 2024.

**GRAY REED**

By: */s/ Jason S. Brookner*
Jason S. Brookner
Texas Bar No. 24033684
Lydia R. Webb
Texas Bar No. 24083758
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:     (713) 986-7000
Facsimile:     (713) 986-7100
Email:          jbrookner@grayreed.com
                lwebb@grayreed.com

- and –

**SIMPSON THACHER & BARTLETT LLP**

Andrew T. Frankel (admitted *pro hac vice*)
Lynn K. Neuner (admitted *pro hac vice*)
Elisha D. Graff (admitted *pro hac vice*)
Jonathan Mitnick (admitted *pro hac vice*)
425 Lexington Avenue
New York, New York 10017
Telephone:     (212) 455-2000
Facsimile:     (212) 455-2502
Email:          afrankel@stblaw.com
                lneuner@stblaw.com
                egraff@stblaw.com
                jonathan.mitnick@stblaw.com

**COUNSEL TO TRAVELERS CASUALTY AND SURETY COMPANY (F/K/A THE AETNA CASUALTY AND SURETY COMPANY) AND THE TRAVELERS INDEMNITY COMPANY**

**PLEVIN & TURNER LLP**

By: */s/   Mark D. Plevin*
Mark D. Plevin (admitted *pro hac vice*)
580 California Street, Suite 1200
San Francisco, CA  94104
Telephone:     (202) 580-6640
Email:          mplevin@plevinturner.com

- and –

**PLEVIN & TURNER LLP**

Tacie H. Yoon (admitted *pro hac vice*)
Jordan A. Hess
1701 Pennsylvania Ave., N.W., Suite 200
Washington, D.C. 20006
Telephone:     (202) 580-6640
Email:          tyoon@plevinturner.com
                jhess@plevinturner.com

**COUNSEL TO CENTURY INDEMNITY COMPANY, FEDERAL INSURANCE COMPANY, CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA AND ACE PROPERTY AND CASUALTY INSURANCE COMPANY (F/K/A CIGNA PROPERTY & CASUALTY INSURANCE COMPANY), GREAT NORTHERN INSURANCE COMPANY, PACIFIC EMPLOYERS INSURANCE COMPANY, AND WESTCHESTER FIRE INSURANCE COMPANY**

**DUANE MORRIS, LLP**

By: */s/ Philip R. Matthews*
Philip R. Matthews (admitted *pro hac vice*)
Christine Cusick Ross
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105-1127
Telephone:      (415) 957-3000
Facsimile:      (415) 957-3001
E-mail:            prmatthews@duanemorris.com
                        ccross@duanemorris.com

**COUNSEL TO REPUBLIC INDEMNITY**
**COMPANY OF AMERICA**

**KENNEDYS CMK LLP**

By: */s/    Daisy Khambatta*
Daisy Khambatta
3821 Juniper Trace, Suite 101
Austin, Texas 78738
Telephone:      (512) 359-8821
Facsimile:      (512) 359-8830
Email: Daisy.Khambatta@kennedyslaw.com

- and –

**KENNEDYS CMK LLP**

Christopher R. Carroll
Heather E. Simpson
120 Mountain View Boulevard
Basking Ridge, NJ  07920
Telephone:      (908) 848-6300
Facsimile:      (908) 647-8390
Email: christopher.carroll@kennedyslaw.com
              heather.simpson@kennedyslaw.com

- and –

**IFRAH PLLC**
George R. Calhoun
1717 Pennsylvania Ave., NW, Ste 650
Washington, D.C. 20006
Telephone:      (202) 524-4147
Email:            george@ifrahlaw.com

**COUNSEL TO EVEREST REINSURANCE**
**COMPANY F/K/A PRUDENTIAL**
**REINSURANCE COMPANY, TIG**
**INSURANCE COMPANY AND THE**
**NORTH RIVER INSURANCE COMPANY**

**<u>Certificate of Service</u>**

I certify that on, November 7, 2024, I caused a copy of the foregoing document to be served by email on all parties registered to receive electronic service in this bankruptcy case.

*/s/ Jason S. Brookner*

Jason S. Brookner