**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC LLC,[1] | Case No. 24-90505 (CML) |
| Debtor. | |

**DEBTOR'S CONSOLIDATED REPLY IN SUPPORT OF**
**APPROVAL OF DISCLOSURE STATEMENT, SOLICITATION**
**PROCEDURES AND TABULATION OF THE VOTE ON THE**
**DEBTOR'S PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION**

(Related to Docket Nos. 46, 268, 305, 395, 421, 423, 452, 454)

---

[1]     The last four digits of the Debtor's taxpayer identification number are 8508.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

REPLY ..................................................................................................................... 8

I.     THE COURT SHOULD DISREGARD CONFIRMATION ARGUMENTS.................. 8

II.    THE DISCLOSURE STATEMENT PROVIDED ADEQUATE INFORMATION.................................................................................................... 9

    A.    Ample Information Regarding the Channeling of Claims and Its Effect ............. 9

    B.    The Information Regarding Ovarian Cancer Litigation History Was Accurate and Adequate. ....................................................................................... 11

    C.    Adequate Information Regarding Studies and Testing ........................................ 11

    D.    Adequate Information on Likely Recoveries ....................................................... 12

    E.    Adequate Information Regarding the Initial Plan's Supporters........................... 15

    F.    Adequate Information Regarding the Exclusion of Mesothelioma Claims ......... 16

    G.    Adequate Information Regarding Estate Causes of Action ................................. 17

    H.    Adequate Information Regarding the Debtor's Insurance Rights........................ 18

    I.    No Liquidation Analysis or Financial Projections Were Required ..................... 19

    J.    The Disclosure Statement's Reference to Section 105(a) of the Bankruptcy Code Was Not Misleading. ...................................................................................... 20

III.    THE SOLICITATION WAS APPROPRIATE AND COMPLIED WITH APPLICABLE LAW. ............................................................................................. 21

    A.    Nothing Prohibited LLT From Soliciting Votes On the Initial Plan on Behalf of Red River. ........................................................................................... 21

    B.    The Initial Plan Was Transmitted to, and Actual Notice of the Initial Plan and the Voting Deadline Was Provided to, Substantially All Known Claimants. .............................................................................................................. 22

    C.    Ample Time Was Provided for Claimants to Cast Their Votes to Accept or Reject the Initial Plan.......................................................................................... 25

    D.    The Supplemental Publication Notice Was Appropriate Under the Circumstances. ..................................................................................................... 26

    E.    The Form of Master Ballot Was Appropriate. ..................................................... 27

    F.    The Solicitation Procedures and Prepetition Solicitation Process Were Otherwise Appropriate.......................................................................................... 28

## TABLE OF CONTENTS
(continued)

**Page**

IV.   THE TABULATION OF VOTES WAS APPROPRIATE AND COMPLIED WITH APPLICABLE LAW. ............................................................. 29

    A.   $1.00 Voting Was Appropriate. ............................................... 30

    B.   No Claims Bar Date Is Required Merely to Allow Claimants to Vote. .............. 32

    C.   Holders of Gynecological Cancer Claims Were Appropriately Permitted to Vote. ...................................................................... 33

    D.   An Immaterial Number of Settled Claims Voted. .............................. 35

V.   THE VOTING RESULTS MOTION SHOULD BE APPROVED. ............................... 35

    A.   The Beasley Allen Master Ballot Was Defective. ............................. 35

        (i)   Negative Notice Is Not Informed Consent. ............................. 36

        (ii)   There Was No Dual Standard for Beasley Allen's Master Ballot. ......... 38

        (iii)   Votes Cast on Behalf of Deceased Claimants. .......................... 39

        (iv)   Votes Cast on Behalf of Dismissed Claimants ........................ 40

    B.   The Debtor Properly Recognized the Smith Firm's Master Ballot. ................ 40

VI.   RESOLICITATION IS NOT NECESSARY BECAUSE THE MODIFICATIONS TO THE PLAN ONLY IMPROVED THE POSITION OF VOTING CLAIMANTS. ........................................................................ 44

CONCLUSION ................................................................................ 45

## <u>TABLE OF AUTHORITIES</u>

**CASES**

<u>Bartenwerfer v. Buckley,</u>
598 U.S. 69 (2023)...................................................................................................... 21

<u>Century Glove, Inc. v. First Am. Bank of N.Y.,</u>
860 F.2d 94 (3d Cir. 1988)........................................................................................... 9

<u>Chemetron Corp. v. Jones,</u>
72 F.3d 341 (3d Cir. 1995)..................................................................................... 23, 24

<u>Harrington v. Purdue Pharma L.P.,</u>
144 S. Ct. 2071 (2024)................................................................................................ 20

<u>In re Allied Gaming Mgmt. Inc.,</u>
209 B.R. 201 (Bankr. W.D. La. 1997)......................................................................... 8

<u>In re Boy Scouts of Am.,</u>
No. 20-10343 (LSS) (Bankr. D. Del.)........................................................................ 30

<u>In re Crystal Oil,</u>
158 F.3d 291 (5th Cir. 1998) ...................................................................................... 24

<u>In re Dakota Rail, Inc.,</u>
104 B.R. 138 (Bankr. D. Minn. 1989) ...................................................................... 8, 9

<u>In re Duro Dyne Nat'l Corp.,</u>
No. 18-27963 (MBK) (Bankr. D.N.J.)........................................................................ 26

<u>In re Flintkote Co.,</u>
486 B.R. 99 (Bankr. D. Del. 2012) ............................................................................ 23

<u>In re  Flintkote Co.,</u>
No. 04-11300 (MFW) (Bankr. D. Del.)...................................................................... 27

<u>In re Garlock Sealing Techs. LLC,</u>
No. 10-31607 (Bankr. W.D.N.C.)............................................................................... 27

<u>In re Green,</u>
No. 14-11458, 2014 WL 3724986 (Bankr. W.D. La. July 23, 2014) .......................... 37

<u>In re Hofmann,</u>
248 B.R. 79 (Bankr. W.D. Tex. 2000)........................................................................ 21

In re HONX, Inc.,
No. 22-90035 (MI) (Bankr. S.D. Tex.) ................................................................ passim

In re Imerys Talc Am. Inc.,
No. 19-10289 (LSS) (Bankr. D. Del.) ................................................................. passim

In re Insys Therapeutics, Inc.,
No. 19-11292 (KG) (Bankr. D. Del.) .......................................................................... 26

In re Kaiser Gypsum Co.,
No. 16-31602 (JCW) (Bankr. W.D.N.C.) .................................................................... 27

In re Maremont Corp.,
No. 19-10118 (LSS) (Bankr. D. Del.) ............................................................. 12, 13, 28

In re Oakfabco, Inc.,
No. 15-27062 (JBS) (Bankr. N.D. Ill.) ....................................................................... 26

In re PG&E Corp.,
No. 19-30088 (JD) (Bankr. N.D. Cal.) ........................................................................ 30

In re Placid Oil Co.,
753 F.3d 151 (5th Cir. 2014) ............................................................................... 24, 25

In re Radco Props., Inc.,
402 B.R. 666 (Bankr. E.D.N.C. 2009) ......................................................................... 12

In re Shea, Ltd.,
545 B.R. 529 (Bankr. S.D. Tex. 2016) .......................................................................... 9

In re Specialty Prods. Holding Corp.,
No. 10-11780 (PJW) (Bankr. D. Del.) ................................................................. passim

In re the Budd Company,
No. 14-11873 (JBS) (Bankr. N.D. Ill.) ....................................................................... 30

In re TK Holdings Inc.,
No. 17-11375 (BLS) (Bankr. D. Del.) ......................................................................... 30

In re U.S. Brass Corp.,
194 B.R. 420 (Bankr. E.D. Tex. 1996) .......................................................................... 8

In re United Gilsonite Laboratories,
No. 11-02032 (RNO), (Bankr. M.D. Pa.) ............................................................... 28, 30

<u>In re USA Gymnastics</u>,
No. 18-09108 (RLM) (Bankr. S.D. Ind.) ................................................................. 30

<u>In re Wyly</u>,
553 B.R. 318, 332 (Bankr. N.D. Tex. 2016) ........................................................... 33

<u>In re Yarway Corp.</u>,
No. 13-11025 (BLS) (Bankr. D. Del.) ............................................................... 26, 28

<u>Johnson v. Home State Bank</u>,
501 U.S. 78, 111 S.Ct. 2150 (1991) ....................................................................... 33

<u>Kane v. Johns-Manville Corp.</u>,
843 F.2d 636, 646-48 (2d Cir. 1988) ..................................................................... 30

<u>Matter of Northwest Recreational Activities, Inc.</u>
8 B.R. 10 (Bankr. N.D. Ga. 1980) ............................................................................ 9

<u>United States v. Maturino</u>,
887 F.3d 716 (5th Cir. 2018) .................................................................................... 7

## STATUTES

11 U.S.C. § 101 ................................................................................................. 33, 40
11 U.S.C. § 105 ....................................................................................................... 20
11 U.S.C. § 502 ................................................................................................. 31, 33
11 U.S.C. § 524 ......................................................................................... 5, 20, 23
11 U.S.C. § 1126 ............................................................................................... 21, 31
11 U.S.C. § 1127 ..................................................................................................... 45
11 U.S.C. § 1129 ............................................................................................... 19, 20

## OTHER AUTHORITIES

MODEL RULES OF PROF'L CONDUCT 1.0 ................................................................... 37

## RULES

Fed. R. Bankr. P. 3018 ................................................................... 21, 22, 30, 43
Fed. R. Bankr. P. 3019 ........................................................................................... 45
Fed. R. Bankr. P. 9010 ........................................................................................... 28

Red River Talc LLC (the "Debtor"), the debtor in the above-captioned case (the "Chapter 11 Case"), files this consolidated reply in support of:  (i) the *Debtor's Motion for Entry of an Order Approving (I) Adequacy of Disclosure Statement, (II) Solicitation Packages and Procedures Employed for the Solicitation and Tabulation of Votes on the Debtor's Prepackaged Plan of Reorganization and (III) Notice of Non-Voting Status* [Dkt. 46] (the "Disclosure Statement Motion"); and (ii) the *Debtor's Motion for Entry of an Order Confirming the Results of Voting on the Prepackaged Plan of Reorganization* [Dkt. 305] (the "Voting Results Motion" and together with the Disclosure Statement Motion, the "Motions")[2] and in response to the following objections to the relief requested in the Motions (collectively with any related joinders,[3] the "Objections"):  (i) the objection to the Disclosure Statement Motion [Dkt. 268] (the "Coalition DS Objection"), filed by the Coalition of Counsel for Justice for Talc Claimants (the "Coalition"); (ii) the Coalition's objection to the Voting Results Motion [Dkt. 421] (the "Coalition Voting Objection"); (iii) the consolidated objection to the Disclosure Statement Motion and Voting Results Motion [Dkt. 395] (the "UST Objection"), filed by the United States Trustee for the Southern District of Texas (the "US Trustee"); and (iv) the objection of certain insurers (collectively, the "Insurers" and, collectively with the US Trustee and the Coalition, the "Objectors") to the Disclosure Statement Motion and preliminary confirmation objection [Dkt. 452] (the "Insurers' Objection").

## PRELIMINARY STATEMENT

1.      The solicitation of the Debtor's prepackaged plan of reorganization, as amended (the "Amended Plan"), demonstrated overwhelming support for the Amended Plan.

---

[2]      Capitalized terms used herein but not otherwise defined have the meanings given to them in the Disclosure Statement Motion or the Voting Results Motion, as applicable.

[3]      See Dkts. 423, 454.

In particular, the solicitation generated more than 93,000 tabulated votes and established that the Amended Plan was accepted by almost 78,000 current talc claimants representing over 83 % of those claimants.  The votes were cast by more than 200 plaintiff law firms using master ballots and by approximately 250 claimants not represented by counsel who submitted individual ballots.  Substantially all the votes included a disease type, with approximately 80% identifying their disease type as ovarian cancer.  More than 82% of the claimants who identified their disease type as ovarian cancer voted to accept the plan.

   2. The Motions seek approval of the process, procedures and documents used to achieve this successful solicitation, as well as the tabulated results of voting, as certified by Epiq Corporate Restructuring, LLC ("Epiq").  Four objections to the relief requested in the Motions were filed, including two by the Coalition.  Many of the same arguments asserted by the Coalition in its objections were also made in the array of motions (collectively, the "Coalition Voting Motions") it filed on October 15, 2024, contemporaneously with the Coalition DS Objection.[4]  Since the filing of these pleadings by the Coalition, the Official Committee of Talc Claimants, whose members include claimants represented by plaintiff law firms that were previously part of the Coalition, announced that it supports the relief requested in the Motions and will be filing objections to the Coalition Voting Motions.  See Dkt. 613 ¶ 10.

---

[4] The Coalition Voting Motions included motions for orders designating all votes cast to accept the Debtor's plan [Dkt. 265] (the "Designation Motion"), reinstating the excluded votes reflected on the master ballot of Beasley Allen ("Beasley Allen") [Dkt. 266] (the "Reinstatement Motion"), establishing a bar date for the filing of proofs of claims [Dkt. 264] (the "Bar Date Motion") and requiring estimation of claims and establishing procedures related thereto [Dkt. 267] (the "Estimation Motion").

 On November 6, 2024, the Debtor filed objections to the Designation Motion [Dkt. 428] and the Reinstatement Motion [Dkt. 430] (the "Reinstatement Objection"), as well as a joint objection to the Bar Date Motion and the Estimation Motion [Dkt. 432] (the "Bar Date/Estimation Objection").

*Coalition Objections*

3.     The first eighty pages of the Coalition DS Objection consist of a detailed restatement of the Coalition's complaints regarding this Chapter 11 Case, from the restructuring transactions that gave rise to the Debtor and its predecessors to the Coalition's views with respect to the merits of Ovarian Cancer claims.  In its exposition on the latter, the Coalition omits that:  (a) the question of whether Ovarian Cancer claims can even survive a Daubert challenge is the subject of renewed briefing in the MDL; and (b) there has been only one successful Ovarian Cancer case, the aberrant 2018 Ingham decision—discussed in the Disclosure Statement.  But, in any case, little, if any, of this lengthy diatribe has anything to do with the legal issues associated with approval of the Disclosure Statement and the Solicitation Procedures.

4.     About half of the Coalition DS Objection (and much of the other Objections) is devoted to premature confirmation arguments, mostly in support of the position that the Disclosure Statement should not be approved because the Amended Plan allegedly is patently unconfirmable.  But the intended purpose of the "patently unconfirmable" doctrine is to avoid the cost of soliciting a plan that is alleged to be doomed to failure.  Here, votes on the Initial Plan already have been solicited, and consideration of the Disclosure Statement will occur at the same time as confirmation of the Amended Plan.  As a result, the Debtor will not respond to the Objectors' confirmation arguments here, but will do so instead in its confirmation brief due on January 6, 2025, per the parties' agreed case management order [Dkt. 352] (the "Case Management Order").

5.     The Coalition's principal objection to the solicitation materials transmitted to claimants and their counsel is the alleged inadequacy of the information provided in the Disclosure Statement.  As the Coalition would have it, nothing short of a complete adoption of the Coalition's litigation position would have satisfied its requirements for adequate information.

But that is not appropriate or required. The solicitation materials were fair and reasonable for the reasons described below.

6.      Moreover, since 99.7% of voting claimants already were represented by counsel, and in many cases it was such counsel who voted the claims on behalf of the claimants, the crux of the Coalition's argument—that claimants were misled to believe their claims lacked merit—rings hollow. Clearly, counsel, having been involved in the talc litigation in many cases for more than a decade, already were well informed about the talc litigation, and claimants had access to their counsel in deciding how to vote on the Initial Plan.

7.      At the center of the Coalition's attack on the voting results is its attempt to draw a fictitious bright line between Ovarian Cancer claims—which the Coalition holds up as universally compensable—and Gynecological Cancer claims—which the Coalition treats as worthless. The Coalition never explains how its members can represent Gynecological Cancer clients and vote their claims at the same time it maintain these clients have no compensable claim. It also never explains why they would vote Gynecological Cancer claims against a plan that would provide them with a recovery. Despite this irreconcilable position, the Coalition uses this false dichotomy to allege ballot-stuffing by the Debtor and challenge the temporary allowance for voting purposes of all Channeled Talc Personal Injury Claims, including Gynecological Cancer claims, in the amount of $1.00. The Coalition proposes in its place proposes an impractical and time-consuming bar date and estimation process.

8.      The Debtor's $1.00 per vote approach, however, is typical in mass tort cases where all claims are disputed, unliquidated and contingent. Moreover, the claimants have already provided information regarding their alleged diseases under penalty of perjury based on available information. There is no reason to significantly delay this case to require claimants to

provide further information and then engage in an estimation of talc claimants for voting purposes, particularly since the trust to be established under the Amended Plan will process and pay claims.  Moreover,  the Coalition's approach would not alter the voting results because, as noted previously, 82% of the claims that identified themselves as Ovarian Cancer claims voted to accept the Amended Plan.

9.      Finally, the Coalition argues that Epiq should not have accepted the votes cast by the Smith Firm's master ballot and instead should have accepted the prior Beasley Allen master ballot.  According to the Coalition, the Debtor achieved more than 75% acceptance of its plan, as required by section 524(g) of the Bankruptcy Code, only by "switching" those votes. Although the Debtor disputes that the Initial Plan did not achieve the requisite 75% acceptance, whether it did or did not is irrelevant.  The Smith Firm's superseding master ballot cast votes on the Amended Plan, which included substantial incremental consideration and benefits for claimants as compared to the Initial Plan.  That reason alone justifies the decision to count the Smith Firm's ballot rather than the earlier, improperly submitted Beasley Allen ballot.

10.      The Smith Firm determined that the Amended Plan, as revised, was in the best interests of the firms' joint clients and submitted a superseding master ballot replacing substantially all of the votes cast on the Beasley Allen master ballot.  Unlike Beasley Allen, the Smith Firm certified that its authority to vote on behalf of each client derived from a power of attorney.  The Smith Firm also certified as to its reasons for submitting its master ballot in favor of the Amended Plan and its authority to do so.  The Debtor was authorized under its Tabulation Procedures to accept the Smith Firm's master ballot, and it instructed Epiq to do so.  As Epiq's representative, Stephenie Kjontvedt testified:  the Debtor "███████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ " Kjontvedt Dep. 113:16-

114:14.

      11.    Even if the Smith Firm had not submitted a superseding master ballot, the

Beasley Allen master ballot likely would have been disregarded in whole or in part.  As an initial

matter, the number of claims Beasley Allen voted did not correspond to the deposition testimony

of its principal, Mr. Birchfield.  As John Kim, the Debtor's Chief Legal Officer, testified:



Kim Dep. 85:23-86:13.

      12.    The Debtor also found suspicious Mr. Birchfield's certifications on the

Beasley Allen master ballot that the firm had sought and obtained the informed consent of all

11,500 claimants under the "Option A Certification."



Id. 206:3-7.  The Debtor's subsequent investigation revealed numerous examples where Beasley

Allen simply could not have obtained informed consent from certain clients; e.g., situations

where the asserted voting claimant was deceased.  In sum, the Debtor believes the Initial Plan in

fact achieved more than a 75% acceptance rate and, if needed, the Debtor would have taken

action to address these irregularities.  But that ultimately proved to be unnecessary due to the

submission of the Smith Firm's subsequent master ballot.

*US Trustee Objection*

13.     Aside from repeating certain of the arguments raised by the Coalition, the US Trustee contends that the Bankruptcy Code and the Bankruptcy Rules prohibited LLT from soliciting votes on the Initial Plan on behalf of the yet-to-be-formed Debtor.  "Text is the alpha and omega of the interpretive process[,]" however, and nothing in the statutory provisions that the US Trustee relies upon precludes the solicitation structure used here.  United States v. Maturino, 887 F.3d 716, 723 (5th Cir. 2018).  Moreover, in soliciting claimants' votes, the Disclosure Statement was clear that the Debtor would be formed to effectuate the Initial Plan. The US Trustee also argues that the successful solicitation of votes on the Initial Plan should be set aside because modifications to that plan reflected in the Amended Plan potentially could be detrimental to claimants.  None of the modifications reflected in the Amended Plan, however, materially and adversely affected the interests of claimants, as explained below.  To the contrary, the changes in the Amended Plan benefit claimants by, among other things, increasing funding to the Talc Personal Injury Trust and accelerating the effective date of the Amended Plan.

*Insurers' Objection*

14.     Substantially all the Insurers' Objection addresses confirmation of the Amended Plan.  In fact, only about seven pages of their close-to 45-page objection relate to issues relevant to the Motions.  Although not relevant for the purposes of the relief requested in the Motions, the Insurers apparently are dissatisfied with the insurance neutrality provisions included in the Amended Plan.  But that dispute can be addressed at confirmation, if not resolved beforehand.

## <u>REPLY</u>

### I.   THE COURT SHOULD DISREGARD CONFIRMATION ARGUMENTS.

15.     The Objections contain a litany of arguments that the Court should not approve the Disclosure Statement because it allegedly relates to a plan that is patently unconfirmable.  <u>See</u> Coalition DS Obj. 83-127; UST Obj. 15-16; Insurers' Obj. 16-33. "Disapproval of the adequacy of a disclosure statement may sometimes be appropriate where it describes a plan of reorganization which is so fatally flawed that confirmation is impossible." <u>In re U.S. Brass Corp.</u>, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996).  However, the policy underlying the patent unconfirmability principle is that "the estate should not be burdened (both in terms of time and expense) with going through the printing, mailing, noticing, balloting, and other exercises in the confirmation process where inability to attain confirmation is a *fait accompli.*"  <u>In re Allied Gaming Mgmt. Inc.</u> 209 B.R. 201, 202 (Bankr. W.D. La. 1997); <u>In re Dakota Rail, Inc.</u> 104 B.R. 138, 143 (Bankr. D. Minn. 1989) (where a plan is patently unconfirmable, the court has "an obligation not to subject the estate to the expense of soliciting votes and seeking confirmation of the plan; otherwise, confirmation issues are left for later consideration.").  Patent unconfirmability "is discretionary and must be used carefully so as not to convert the disclosure statement hearing into a confirmation hearing, and to insure that due process concerns are protected." <u>U.S. Brass</u>, 194 B.R. at 422.

16.     Patent unconfirmability has no application in a prepackaged case because the estate has already gone to the time and expense of solicitation before a petition for relief from the bankruptcy court is even filed.  Moreover, in this Chapter 11 Case, just like other prepackaged cases, the Court will consider approval of the Disclosure Statement at the hearing on confirmation of the Amended Plan.  For that reason, the Objectors cite no prepackaged case where patent unconfirmability has been invoked, and the Debtor is aware of none.

## II.       THE DISCLOSURE STATEMENT PROVIDED ADEQUATE INFORMATION.

17.       The Objectors make various arguments that the Disclosure Statement lacks adequate information.  The purpose of a disclosure statement is to provide material information that claimants affected by a proposed plan need in order to make an informed decision on whether to vote to accept or reject the plan.  See, e.g., Century Glove, Inc. v. First Am. Bank of N.Y. 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote."); In re Shea, Ltd. 545 B.R. 529, 538 n.6 (Bankr. S.D. Tex. 2016) ("The purpose of a disclosure statement is to provide adequate information to creditors in order to allow them to make informed judgments about the proposed plan.").  "The quality of the Disclosure Statement which will qualify as 'adequate information' will vary with the circumstances.  The kind and form of information is left to the judicial discretion of the court on a case by case basis." Matter of Northwest Recreational Activities, Inc. 8 B.R. 10, 11 (Bankr. N.D. Ga. 1980).  Every fact potentially relevant to a debtor is **not** required to be disclosed—that would be impossible and unreasonable.  "The statutory definition of 'adequate information' leaves the bankruptcy court wide discretion to determine on a case by case basis whether a disclosure statement contains adequate information, without burdensome, unnecessary, and cumbersome detail." Dakota Rail, 104 B.R. at 143 (referencing In re Texas Extrusion Corp. 844 F.2d 1142, 1157 (5th Cir.), cert. denied, 488 U.S. 926 (1988)).

### A.       Ample Information Regarding the Channeling of Claims and Its Effect

18.       The Coalition DS Objection "leads" (starting in paragraph 199) with the argument that the Disclosure Statement fails to provide clear information, not "buried in definitions or discussed obliquely," regarding the fact that, upon the Effective Date, holders of

Channeled Talc Personal Injury Claims will no longer be able to pursue the Debtor or any other

Protected Party, including J&J, in the tort system.  See Coalition DS Obj. ¶¶ 199-201; 303-05.

19.     The Coalition is wrong.  In fact, in the very first pages of the Disclosure

Statement, following a reference to the Initial Plan and Trust Distribution Procedures, the

Disclosure Statement provides:  "***Except as expressly provided therein, claimants will no longer***

***have any right to assert Channeled Talc Personal Injury Claims against the Debtor, J&J,***

***LLT, Holdco, or any other Protected Parties identified in the Plan.***"  Disclosure Statement,

Preliminary Statement, at v (emphasis added).  There is nothing oblique about this plain

statement nor is it buried anywhere.

20.     But that is not all.  In the same section, the Disclosure Statement makes

clear that:

> ***If the Plan is confirmed, claimants holding Channeled Talc***
> ***Personal Injury Claims would no longer be required, nor***
> ***generally permitted, to litigate their claims in the tort system.***
> Instead, claimants would submit their claims to the Talc Personal
> Injury Trust, which will process and determine the amount claimants
> will receive pursuant to procedures and subject to criteria set forth
> in the Plan.

Id. at iv (emphasis added).

21.     The Disclosure Statement continues that the Channeling Injunction will

"***permanently and forever stay, bar, and enjoin holders of Channeled Talc Personal Injury***

***Claims from taking any action for the purpose of directly or indirectly or derivatively***

***collecting, recovering, or receiving payment of, on, or with respect to any Channeled Talc***

***Personal Injury Claim against a Protected Party***."  Disclosure Statement § 1.1(d) (emphasis

added).  Finally, section 6.11 of the Disclosure Statement provides the complete text of the Initial

Plan's Channeling Injunction, together with the other injunctions and releases in bold text to be

reviewed by claimants or the counsel retained by them.

B.      **The Information Regarding Ovarian Cancer Litigation History Was Accurate and Adequate.**

22.     The Coalition argues that the Disclosure Statement lacks adequate information because it fails to provide accurate information about the Debtor and J&J's litigation history regarding Ovarian Cancer claims.  Coalition DS Obj. ¶ 307.  The particular statements that the Coalition takes issue with—for example the Disclosure Statement's description of the success rate of ovarian cancer trials—are accurate and not misleading.  The Disclosure Statement stated that "[i]n the 17 ovarian cancer trials that proceeded to verdict against the Company, plaintiffs prevailed in only one; all the other claimants received nothing."  E.g. Disclosure Statement, Preliminary Statement, at iii.  These statements are true.[5]

C.      **Adequate Information Regarding Studies and Testing**

23.     The Coalition presents a lengthy, distorted and wholly unnecessary account of its interpretation of the results of studies addressing potential causal links between ovarian cancer and the perineal use of talc in support of its argument that the Disclosure Statement lacked adequate information on that issue.  See Coalition DS Obj. ¶¶ 63-69, 205-219.

24.     The Debtor and J&J vehemently dispute the Coalition's account of the science allegedly supporting its members' arguments, which generally conflates inconsistent evidence of minimal association with causation sufficient to succeed in a cause of action.  The information provided in the Disclosure Statement is fair and accurate, and the Disclosure Statement could leave no reasonable reader in doubt that the scientific arguments supporting all

---

[5]     The Coalition's argument that the Disclosure Statement should have contained more information on the litigation history of mesothelioma cases makes little sense when mesothelioma claims were never allocated to the Debtor and are expressly excluded from the definition of Channeled Talc Personal Injury Claims under the Initial Plan and the Amended Plan.  See Coalition DS Obj. ¶¶ 18-19.¶

Channeled Talc Personal Injury Claims are hotly disputed.  Disclosure Statement § 2.2(a)-(d). This is sufficient for the purpose of soliciting votes on the Initial Plan.

25.     In addition, any realistic potential for confusion is greatly diminished because substantially all holders of Channeled Talc Personal Injury Claims have retained their own lawyers to whom solicitation materials were directed and who, in many cases, sent communications to clients reflecting their position on the terms of the Initial Plan.  Indeed, many of those firms had been in negotiations with J&J and the Debtor for months regarding the terms of the Initial Plan.  First Day Decl. ¶¶ 117-120, 126.  Thus, the vast majority of claimants based their voting decision on the advice of informed counsel and not solely on the contents of the Disclosure Statement.  Moreover, many counsel determined and cast their clients' votes themselves under applicable powers of attorney.  In such instances, there was limited potential for claimant confusion.

**D.     Adequate Information on Likely Recoveries**

26.     An important element of any disclosure statement is that it convey to creditors information relevant to their likely recoveries.  See, e.g., In re Radco Props, Inc. 402 B.R. 666, 683 (Bankr. E.D.N.C. 2009) ("A disclosure statement should provide the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution") (citing In re Ferretti, 128 B.R. 16, 19 (Bankr. D.N.H. 1991)).  In a mass tort case, this typically means that claimants be informed as to the details of trust distribution procedures that will be used to allow their claims post-confirmation.[6]  This has been

---

[6]     In re HONX, Inc., No. 22-90035 (MI) (Bankr. S.D. Tex. July 14, 2023) [Dkt. 886] (disclosure statement incorporating description of trust distribution procedures); In re Maremont Corp., No. 19-10118 (LSS) (Bankr. D. Del. Jan. 22, 2019) [Dkt. 10] (same); In re Imerys Talc Am. Inc., No. 19-10289 (LSS) (Bankr. D. Del. May 15, 2020) [Dkt. 1715] (same); In re Specialty Prods. Holding Corp., No. 10-11780 (PJW) (Bankr. D. Del. Sept. 26, 2014) [Dkt. 5026] (same).

determined by numerous courts to be sufficient information on claimant recoveries.[7]  Indeed, it is highly uncommon for disclosure statements in mass tort cases even to purport to give claimants a likely dollar range of recoveries.[8]

27.       But, in fact, unlike most other mass tort cases, the Disclosure Statement in this case did provide claimants with an estimate of the likely average recovery range on account of Ovarian Cancer Claims.[9]  And it compared that range to recoveries in the tort system. In particular, the Disclosure Statement provided that:

> [I]n the 17 ovarian cancer cases that proceeded to trial against the Company, plaintiffs prevailed in only one; in all the other adjudicated cases claimants received nothing.  In addition, the historical per claimant recovery for Ovarian Cancer under settlements with the Company net of administrative costs was $50,000 to $80,000.

Disclosure Statement § 1.1(c).

28.       With respect to expected recoveries under the Initial Plan, the Disclosure Statement provided:

> LLT anticipates that holders of pending claims that qualify for payment as Ovarian Cancer claims under the Trust Distribution Procedures will receive an average recovery of between $50,000 and $200,000, with an average value between $75,000 and $150,000 being more likely.  These estimates do not take into consideration any additional recoveries that holders of Channeled Talc Personal

---

[7]    In re HONX, Inc., No. 22-90035 (MI) (Bankr. S.D. Tex. July 14, 2023) [Dkt. 890] (order approving disclosure statement); In re Maremont Corp., No. 19-10118 (LSS) (Bankr. D. Del. Jan. 23, 2019) [Dkt. 30] (same); In re Imerys Talc Am. Inc., No. 19-10289 (LSS) (Bankr. D. Del. Jan. 27, 2021) [Dkt. 2863] (same); In re Specialty Prods. Holding Corp., No. 10-11780 (PJW) (Bankr. D. Del. Oct. 21, 2014) [Dkt. 5112] (same).

[8]    In re HONX, Inc., No. 22-90035 (MI) (Bankr. S.D. Tex. July 14, 2023) [Dkt. 886] (providing no estimated recoveries outside trust distribution procedures); In re Maremont Corp., No. 19-10118 (LSS) (Bankr. D. Del. Jan. 22, 2019) [Dkt. 10] (same); In re Imerys Talc Am. Inc., No. 19-10289 (LSS) (Bankr. D. Del. May 15, 2020) [Dkt. 1715] (same); In re Specialty Prods. Holding Corp., No. 10-11780 (PJW) (Bankr. D. Del. Sept. 26, 2014) [Dkt. 5026] (same).

[9]    The US Trustee argues that the information in the Disclosure Statement was inadequate because recoveries under the Trust Distribution Procedures rely upon "a complex points system" rather than fixed dollar values.  UST Obj. ¶ 18.  But the basis for the US Trustee's argument is unclear given that the Disclosure Statement itself gave estimated recoveries on Channeled Talc Personal Injury Claims in dollars.

Injury Claims may receive in the event that the Imerys/Cyprus
Settlement is consummated.

Id.

29.     The statements were further supplemented in the Disclosure Statement by

reference to the Trust Distribution Procedures:

> The recovery any claimant will receive under the Trust Distribution
> Procedures will depend on several factors, including the number of
> pending qualifying Ovarian Cancer claims, the number and timing
> of claimants that will file a qualifying Ovarian Cancer claim with
> the Talc Personal Injury Trust in the future, and the characteristics
> of those qualifying Ovarian Cancer claims.  The Trust Distribution
> Procedures address this uncertainty, in part, by implementing a point
> system to allocate the funds across claimants.   The Trust
> Distribution Procedures describe the adjustment factors that will be
> used to assign points in detail, including the amount by which the
> number of points increase or decrease depending on the valuation
> factor at issue.

Id.

30.     The Coalition argues that the estimated recovery information was

misleading because the Coalition apparently does not believe it.  See Coalition DS Obj. ¶¶ 228-

232, 308.  Nevertheless, the statements in the Disclosure Statement comparing expected

recoveries under the Initial Plan with those in the tort system were reasonable, good faith

estimates based upon the Debtor's analysis, as will be demonstrated at confirmation.

31.     The Coalition's counterarguments regarding expected recoveries are pure

speculation with no evidentiary support.  The Coalition claims without any evidence, that 4.6 to

4.8 million women would be eligible to file a Gynecological Cancer claim against the Talc

Personal Injury Trust and that at least 50% of them would do so.  Coalition DS Obj. ¶ 177.

According to the Coalition, this wave of claims would overwhelm the Talc Personal Injury Trust

and render the Debtor's recovery estimates for Ovarian Claims impossible to achieve.  As will be

demonstrated at confirmation, the Coalition exponentially overstates both (a) the prevalence of

talc use among the population of women suffering from Gynecological Cancers in the United States and (b) the likely percentage of such women who will file claims against the Talc Personal Injury Trust and be eligible for a recovery both currently and in the future.

### E.    Adequate Information Regarding the Initial Plan's Supporters

32.    Several Objectors raise arguments regarding the Initial Plan's supporters, including the AHC of Supporting Counsel and the FCR.  The Coalition argues that statements in the supporting letter from the AHC of Supporting Counsel that it supported the Initial Plan, and statements in the Disclosure Statement that the FCR supported the Plan, were *per se* misleading absent an explanation, in each case of:  (a) "the identities and qualifications of any medical experts, epidemiologists, or statisticians" those parties hired to conclude that they supported the Initial Plan; (b) a description of any baby powder testing they performed; (c) a summary of their reports; and (d) a description of the methodologies they employed.  Coalition DS Obj. ¶ 236. The Coalition cites no precedent for these alleged requirements.  Moreover, the extent to which the AHC of Supporting Counsel relied on the recovery estimates and projections used in the Disclosure Statement in arriving at its conclusion to support the Initial Plan is disclosed in its letter in support.  See AHC Letter in Support, 3-4.

33.    The US Trustee argues that the Disclosure Statement lacks adequate information regarding the Initial Plan's supporters because the Disclosure Statement failed to disclose that (a) certain members of the AHC of Supporting Counsel would be appointed as initial members of the Trust Advisory Committee and (b) the AHC of Supporting Counsel is receiving payment from J&J for the fees of its counsel.  UST Obj. ¶¶ 22-26.  The first point is wrong.  The Disclosure Statement clearly identifies the initial Talc Trust Advisory Committee Members as "the individuals identified as such in Exhibit H of the Plan," that is, the Trust Agreement.  The Trust Agreement was distributed with the Disclosure Statement on June 3, 2024

and amended in the Plan Supplement distributed on June 28, 2024.  The Trust Agreement clearly identifies the parties eligible to appoint initial Trust Advisory Committee Members and even identifies collectively which such members are "AHC Appointees."  See Am. Plan, Ex. H (Red River Talc Personal Injury Trust Agreement), § 5.1.

34.     As to the US Trustee's second point—J&J's payment of the fees of the AHC of Supporting Counsel's lawyers—the argument is apparently that any time a committee of creditors supports a plan, the debtor is required to expressly note that the Debtor's estate is paying the fees of the committee's professionals.  That is not the standard.  Further, the implication that the AHC of Supporting Counsel would support a multi-billion dollar plan because the Debtor is paying the fees of its counsel is, at best, misguided.

**F.     Adequate Information Regarding the Exclusion of Mesothelioma Claims**

35.     The US Trustee argues that since the Debtor received certain votes on the Initial Plan from mesothelioma claims, the Disclosure Statement should have contained inadequate information regarding the fact that mesothelioma claims were not allocated to the Debtor or subject to the Initial Plan.  UST Obj. 14.  Claims based on mesothelioma or lung cancer are not liabilities of the Debtor.  Thus, they are not channeled or impaired by the Amended Plan and were not eligible to vote on the Initial Plan.  The Debtor intends to seek to exclude the approximately 500 mesothelioma votes it received, which will have no material effect on the final tabulation.  But the fact that such votes were received does not mean that the information in the solicitation materials was inadequate.

36.     In any event, the Disclosure Statement is replete with references to the fact that mesothelioma liability would be allocated to Pecos River and was not affected by the Initial Plan.  See, e.g. Disclosure Statement, ii ("The Plan does not resolve and will not affect: (i) *Claims and demands alleging injury from mesothelioma or lung cancer*; (ii) Claims and

demands of governmental entities; and (iii) Canadian claims and demands.") (emphasis added);
id. at iii ("Unlike the prior plan, *the Plan does not seek to resolve or affect mesothelioma or
lung cancer claims*, governmental claims, or Canadian claims.") (emphasis added); id. at iv
("The Debtor . . . *would not be responsible for mesothelioma*, lung cancer, governmental, or
Canadian *claims and demands*.") (emphasis added); id. at 2 (same), 3 (same), 12 (same), 31
(Mesothelioma/Lung Cancer Talc Personal Injury Claims to be allocated to Pecos River), 38
(same).

37.     Moreover, the ballots made clear that mesothelioma was not a valid
disease type for purposes of voting.  See, e.g. Master Ballot, 2 (instruction to "select whether the
Channeled Talc Personal Injury Claim is based upon . . . an asserted disease type of Ovarian
Cancer, Gynecological Cancer, or another disease (*other than Mesothelioma or Lung Cancer*)
and, if another disease, specify that disease") (emphasis added).

### G.     Adequate Information Regarding Estate Causes of Action

38.     Contrary to the arguments of the Coalition and US Trustee, the Disclosure
Statement was not required to provide additional information on the Debtor's retention of causes
of action, in particular purported fraudulent conveyance and breach of fiduciary duty claims.
Coalition DS Obj. ¶ 312-13; UST Obj. ¶¶ 31-33.

39.     As a threshold matter, the Debtor does not believe that any such claims
would be colorable given the Debtor's solvency, thus extensive disclosure regarding such causes
of action was not required.  In fact, since the Coalition and the US Trustee have argued in this
case that the Debtor is not only solvent, but even lacks "financial distress",[10] it is hard to

---

[10]     See *Motion of the Coalition of Counsel for Justice for Talc Claimants to Dismiss the Chapter 11 Case
Pursuant to 11 U.S.C. § 1112(d)* [Dkt. 44], ¶ 175; see also *Motion of the United States Trustee to Dismiss
Case under 11 U.S.C. § 1112(B)* [Dkt. 299], ¶ 61 ("Regardless of whether the test is phrased as 'financial

understand how they could believe any viable fraudulent transfer claims would exist. The Debtor's evidence at confirmation will demonstrate that all holders of Channeled Talc Personal Injury Claims will be paid in full from the Talc Personal Injury Trust funded as necessary by the Indemnity Cost Funding Agreement, as described in the Disclosure Statement. See Disclosure Statement, § 4.2(f)(2). Where funding necessary to satisfy claimant recoveries in full is available, disclosure that does not include a discussion of potential estate causes of action is not inadequate since any potential proceeds therefrom would have no impact on claimant recoveries.

### H. Adequate Information Regarding the Debtor's Insurance Rights

40. The Insurers argue that the Disclosure Statement lacks adequate information regarding the assignment of Talc Insurance Assets to the Talc Personal Injury Trust under the Amended Plan because the Insurers dispute that such assets can be assigned while the Reorganized Debtor retains the right to pursue coverage from insurers. Insurers Obj. ¶¶ 86-89. But whether the Amended Plan can allocate Talc Insurance Assets to the Talc Personal Injury Trust in this manner (see id. ¶ 87 (criticizing the Amended Plan's description of the assignment of Talc Insurance Assets)), is not a questions of lack of disclosure, but rather is an issue of law to be addressed at confirmation.

41. The Insurers continue that the Disclosure Statement lacks adequate information regarding what insurance rights were allocated to the Debtor in the various divisional merger transactions. Id. ¶ 88. But the Disclosure Statement makes clear that all "rights to make claims under any and all insurance policies as to which Holdco (Texas) LLC has

---

distress' or 'financial difficulty,' the Debtor cannot meet this requirement, for the same reasons discussed in *LTL I*, *II*, and *III*.")

rights to the extent such policies provide coverage with respect to the Debtor Talc Related Liabilities" would be allocated to the Debtor in the Prepetition Corporate Restructuring. Disclosure Statement, § 4.2(f)(1)(i).  That is accurate and consistent with the previous restructuring, where all rights of Old JJCI to make claims with respect to the talc liabilities were allocated to LTL.

**I.      No Liquidation Analysis or Financial Projections Were Required**

42.      The Insurers argue that a liquidation analysis was necessary for the Disclosure Statement to demonstrate that claimants would receive no more in a hypothetical chapter 7 case than they will under the Initial Plan or the Amended Plan thereby satisfying the "best interests of creditors" test of section 1129(a)(7) of the Bankruptcy Code.  Insurers' Obj. ¶¶ 92-93.  But the Amended Plan provides for the payment in full of all claimants, as the Debtor's evidence at confirmation will demonstrate.  Since claimants are not entitled to obtain more than a full recovery, no liquidation analysis was necessary.  Moreover, the Debtor provided information as to how the Initial Plan meets the best interests of creditors test even though, under the circumstances, it was not required to do so.  See, e.g., Disclosure Statement, § 10.2(c).

43.      The inclusion of financial projections for the Reorganized Debtor in support of the feasibility of the Initial Plan also was not necessary (or even relevant) to the adequacy of information.  The Talc Personal Injury Trust established pursuant to the Amended Plan will be funded entirely by Cash Contributions from the Reorganized Debtor and the Talc PI Note.  But the source of funds for those Cash Contributions, once the Reorganized Debtor's cash balance is depleted, is Holdco pursuant to the Indemnity Cost Funding Agreement.  And all funding of contributions to the Talc Personal Injury Trust is guaranteed by J&J pursuant to the Cash Contributions Guarantee.  Thus, the financial projections of the Reorganized Debtor following confirmation of the Amended Plan are not relevant to claimants' assessment of the

-19-

recovery on their Channeled Talc Personal Injury Claims.  In connection with confirmation, the Debtor will establish that the Amended Plan satisfies the requirements of section 1129 of the Bankruptcy Code, including section 1129(a)(11).

**J.      The Disclosure Statement's Reference to Section 105(a) of the Bankruptcy Code Was Not Misleading.**

44.      The US Trustee argues that the decision of the Supreme Court of the United States (the "Supreme Court") in Harrington v. Purdue Pharma L.P., 144 S. Ct. 2071 (2024), which was issued three weeks after LLT's distribution of solicitation packages, rendered the Disclosure Statement's reference to a channeling injunction issued pursuant to "section 524(g), section 1123(b)(6), and/or section 105(a)" misleading, allegedly requiring supplementation because, in Purdue, the Supreme Court ruled that non-consensual third party releases are impermissible.  UST Obj. ¶ 15.  But the Supreme Court's ruling in Purdue does not prohibit channeling injunctions and related releases issued under section 524(g).  Purdue, 144 S.Ct. at 2085 ("[T]here is a notable exception to the code's general rules.  For asbestos-related bankruptcies . . . Congress has provided that, '[n]otwithstanding' the usual rule that a debtor's discharge does not affect the liabilities of others on that same debt, § 524(e), courts may issue 'an injunction ... bar[ring] any action directed against a third party' under certain statutorily specified circumstances.") (citing § 524(g)(4)(A)(ii)).  Nor does it apply to a case that involves the satisfaction in full of claims like this Chapter 11 Case.  Id. at 2088 ("Nor do we have occasion today to express a view on what qualifies as a consensual release or pass upon a plan that provides for the full satisfaction of claims against a third-party nondebtor.").

45.      In connection with confirmation, the Debtor will demonstrate that it is entitled to the channeling injunction and related releases provided for in the Amended Plan.

III.     **THE SOLICITATION WAS APPROPRIATE AND COMPLIED WITH APPLICABLE LAW.**

A.     **Nothing Prohibited LLT From Soliciting Votes On the Initial Plan on Behalf of Red River.**

46.     The US Trustee argues that section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018 do not permit the solicitation of a chapter 11 plan by a predecessor entity. UST Obj. 4-6.  The US Trustee does not quote any language of those provisions that it believes was violated because no such language exists.  See id.  Section 1126(b) and Bankruptcy Rule 3018 are written in the passive voice with respect to the identity of the entity soliciting acceptance of a chapter 11 plan.  See generally 11 U.S.C. § 1126(b); Fed. R. Bankr. P. 3018. And statutory language written in the passive voice generally indicates that no specific actor is contemplated.  See, e.g., In re Hofmann, 248 B.R. 79, 88 (Bankr. W.D. Tex. 2000) (stating, with respect to section 350(b):  "The statute is written in the passive voice, meaning that its use is not by its own terms limited to a specific player in the bankruptcy process."); see also Bartenwerfer v. Buckley, 598 U.S. 69, 72 (2023) (stating, with respect to section 523(a)(2)(A):  "Written in the passive voice, § 523(a)(2)(A) turns on how the money was obtained, not who committed fraud to obtain it.").  The US Trustee may simply have assumed that the solicitation by LLT on behalf of the Debtor must be noncompliant because the US Trustee has not encountered such a transaction previously.  But, as this Court recently remarked, "this case is different than others."  Nov. 12, 2024 Hr'g Tr. at 126:1.

47.     Here, the elimination of LLT before the Petition Date and the formation of the Debtor were expressly disclosed throughout the Disclosure Statement.  See, e.g., Disclosure Statement, §§ 4.2(a)-(h).  The claims that were allocated to the Debtor as Channeled Talc Personal Injury Claims in connection with the 2024 Corporate Restructuring were asserted against LLT prior to its elimination, and that too was disclosed in the Disclosure Statement.  See

id.  Nothing in the Bankruptcy Code or Bankruptcy Rules prohibits such a transaction, particularly—for purposes of solicitation—when the transaction is clearly disclosed in the applicable solicitation materials.  Thus, solicitation by LLT on behalf of the to-be-formed Debtor fully complied with the Bankruptcy Code and Bankruptcy Rules.

**B.**     **The Initial Plan Was Transmitted to, and Actual Notice of the Initial Plan and the Voting Deadline Was Provided to, Substantially All Known Claimants.**

48.     The Coalition argues that the Initial Plan was not transmitted to substantially all known holders of Channeled Talc Personal Injury Claims in Class 4, as required by Bankruptcy Rule 3018(b), and actual notice of the Initial Plan and the voting deadline was not provided to such claimants.  Coalition DS Obj. ¶¶ 531-40, 544-57; Coalition Voting Obj. ¶¶ 29-58.  By way of example, the Coalition argues that every individual who ever purchased a cosmetic talc product according to the customer lists of the Debtor's retailers was entitled to receive a solicitation package, whether or not they have ever asserted a talc claim against the Debtor or J&J or even manifested any injury or disease.  Coalition Voting Obj. ¶¶ 55-58.  According to the Coalition, these customers are known and ascertainable claimants, solely by virtue of their purchases and, as a result, were required to receive an actual copy of the solicitation materials for Bankruptcy Rule 3018(b) to be satisfied.  Id.  The Coalition's position is unfounded and contrary to decades of bankruptcy practice.

49.     Bankruptcy Rule 3018(b) required that a copy of the Initial Plan be transmitted to "substantially all" known holders of current impaired claims.  See Fed. R. Bankr. P. 3018(b).  In this case, LLT, on behalf of the Debtor, had a clear understanding of the universe of known creditors based, not just to the thousands of pending actions, but also the two prior chapter 11 cases.  LLT transmitted the Initial Plan to every claimant it was aware of, either directly or through such claimant's counsel, who had asserted a Channeled Talc Personal Injury

Claim against the Debtor or the other Protected Parties.  See Voting Decl. ¶ 9, Ex. 13.

Transmittal of solicitation packages through counsel also ensured that any other of such

counsel's clients who held, but had not yet asserted, a Channeled Talc Personal Injury Claim

against the Debtor or another Protected Party likewise received notice.

50.     The Coalition's notion that the Debtor was required to provide direct

notice to millions of people who have never asserted a Channeled Talc Personal Injury Claim is

contrary to law and practice.  And that leaves aside the practical impossibility of attempting to

obtain access to the customer lists of hundreds, if not thousands, of third-party retailers to

identify every individual who has ever purchased a bottle of JOHNSONS® Baby Powder.  At

bottom, the assertion confuses current and future claimants under section 524(g).  Prior use of a

cosmetic talc product may in the future result in a claim that could be submitted to the asbestos

trust to be formed under the Amended Plan.  But future claimants are not current creditors, and

future claimants are not entitled to actual notice.  See In re Flintkote Co., 486 B.R. 99, 128

(Bankr. D. Del. 2012) ("[A]n exposed asbestos creditor who has not yet manifested an injury is .

. . not a known creditor entitled to actual notice, and is one who is impossible to identify, such

that providing actual notice is, itself, impossible.").

51.     The authority the Coalition relies on refutes its own position.

In Chemetron Corp. v. Jones, 72 F.3d 341 (3d Cir. 1995), the Third Circuit provided illuminating

guidance—that the Coalition ignores—on what would constitute "reasonably diligent efforts" to

identify known creditors.  According to the Third Circuit, "a 'known' creditor is one whose

identity is either known or 'reasonably ascertainable by the debtor.' . . An 'unknown' creditor is

one whose interests are either conjectural or future or, although they could be discovered upon

investigation, do not in due course of business come to knowledge [of the debtor]."  Chemetron, 72 F.3d at 346-347 (internal citations and quotation marks omitted).

52.    With respect to the identification of known creditors, the Third Circuit continued that "[r]easonable diligence *does not require impracticable and extended searches* . . . in the name of due process . . .  *A debtor does not have a duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it.*"  Id. at 346 (internal citations omitted) (emphasis added).

53.    In contrast to the Coalition's suggestion, the Third Circuit noted that, "[t]he requisite search . . . focuses on the debtor's own books and records.  Efforts beyond a careful examination of these documents are generally not required."  Id. at 347.  Notably, the court rejected arguments for broader inquiry because—as here—the relevant claims were so speculative.  Id. at n.2.  The Third Circuit warned of "grave practical difficulties" of broad notice requirements:

> Such an investigation, which would be required by the bankruptcy court's finding that claimants are known creditors, clearly contradicts both the caselaw cited above and common sense.  *Debtors cannot be required to provide actual notice to anyone who potentially could have been affected by their actions; such a requirement would completely vitiate the important goal of prompt and effectual administration and settlement of debtors' estates*.

Id. at 348 (emphasis added).

54.    The Fifth Circuit has adopted the Third Circuit's decision in Chemetron.  See In re Placid Oil Co., 753 F.3d 151, 156 (5th Cir. 2014) ("claimants must be 'reasonably ascertainable, *not* reasonably foreseeable.'") (citing Chemetron, 72 F.3d at 344-45) (emphasis in original); see also In re Crystal Oil, 158 F.3d 291, 297 (5th Cir. 1998) (citing Chemetron with approval).  Moreover, the Fifth Circuit has clarified that, although "the law does not require that a creditor serve upon the debtor a formal complaint in order to make himself 'reasonably

ascertainable' or 'known' . . . **at a minimum, the debtor must possess 'specific information' about a manifested injury, to make the claim more than merely foreseeable**." <u>Placid Oil</u>, 753 F.3d at 155.

55.     Ultimately, the logic of the Coalition's position is that in every bankruptcy case, not just every mass tort bankruptcy case, the debtor is required to provide to every person with whom it has ever interacted.  A rent-a-car company would be required to notice every customer based on the possibility he or she could have a claim and is reasonably ascertainable. A hospital system would have to notice every patient it has served for the same reason.  The same would apply to an airline debtor as to its thousands of customers and to any retailer as to all of its customers.  As to mass tort debtors, every manufacturer would be required to notice, through third party customer lists not even in its possession, all customers who bought its product through third party retail chains presumably going back numerous years, as statutes of limitations likely would not apply unless the customer has manifested disease from the product. This is simply not the law, nor has it been the practice in bankruptcy for decades.

**C.     Ample Time Was Provided for Claimants to Cast Their Votes to Accept or Reject the Initial Plan.**

56.     Citing to cherry-picked examples of cases with longer voting periods, the Coalition argues in passing that LLT provided an unreasonably short period for claimants to vote.  <u>See</u> Coalition DS Obj. ¶ 537; Coalition Voting Obj. ¶ 137.  The 60-day solicitation period was ample, however, particularly in light of the fact that (a) no party is a stranger to this Chapter 11 Case, (b) substantially all known claimants are represented by counsel, (c) solicitation materials were distributed directly to and through counsel and (d) most law firms

submitted votes electronically using master ballots.  Moreover, the solicitation period provided

was consistent with or longer than those approved in many other mass tort cases.[11]

57.    LLT and J&J had been negotiating and litigating with counsel to the vast

majority of holders of Channeled Talc Personal Injury Claims during the months and years prior

to the solicitation, including in LTL's prior chapter 11 cases.  Moreover, over three months

before the voting deadline, on May 1, 2024, J&J publicly announced—and LLT posted—a

preliminary version of the Initial Plan for all parties to view.[12]  ***That same day***, Coalition

members appeared in the media attempting to undermine support for the Initial Plan.[13]

**D.    The Supplemental Publication Notice Was Appropriate Under the
Circumstances.**

58.    The Coalition's conclusory dismissal of LLT's publication notice program

as "propaganda pieces" offering a "false and misleading portrayal of the settlement" is itself false

and misleading.   See Coalition DS Obj. ¶¶ 558-561.  Dr. Wheatman of Signal Interactive Media,

LLC ("Signal") stated in her declaration in support of the Disclosure Statement Motion

---

[11]    See In re Imerys Talc Am. Inc. No. 19-10289 (LSS) (Bankr. D. Del. Jan. 27, 2021) [Dkt.  2863] (mass tort case approving 52-day solicitation period); In re Insys Therapeutics, Inc. No. 19-11292 (KG) (Bankr. D. Del. Dec. 4, 2019) [Docket No. 952] (mass tort case approving 28-day solicitation period); In re Oakfabco, Inc. No. 15-27062 (JBS) (Bankr. N.D. Ill. Jan. 15, 2019) [Dkt. 771] (asbestos-related case approving 42-day solicitation period); In re Yarway Corp. No. 13-11025 (BLS) (Bankr. D. Del. Jan. 27, 2015) [Dkt. 756] (asbestos-related case approving 46-day solicitation period); In re Duro Dyne Nat'l Corp. No. 18-27963 (MBK) (Bankr. D.N.J. Nov. 20, 2018) [Docket No. 287] (asbestos-related case approving 62-day solicitation period); In re Specialty Prods. Holding Corp. No. 10-11780 (PJW) (Bankr. D. Del. Oct. 21, 2014) [Docket No. 5112] (asbestos-related case approving 35-day solicitation period).

[12]    See *Johnson & Johnson Announces Plan by its Subsidiary, LLT Management LLC, to Resolve All Current and Future Ovarian Cancer Talc Claims Through a Consensual "Prepackaged" Reorganization*, May 1, 2024 available at https://www.jnj.com/media-center/press-releases/.

[13]    "Heavy-hitter mass tort law firms Levin Papantonio Rafferty . . . and Beasley Allen Law Firm issued a letter today to members of the legal community, warning them of the pitfalls of Johnson & Johnson's 'prepackaged' Chapter 11 proposal."  Press release, *Plaintiffs' Attorneys Blow the Whistle on J&J's Back-Door Bankruptcy Tactic in Talc/Ovarian Cancer Litigation* (May 1, 2024),  https://www.wric.com/ business/press-releases/ein-presswire/708112283; see also Press release, *Cheating Victims: J&J's Third Bankruptcy Attempt* (May 1, 2024), https://www.beasleyallen.com/article/cheating-victims-jjs-third-bankruptcy-attempt/

(the "Wheatman Declaration") that Signal developed the $9 million supplemental notice program with the specific objective of "provid[ing] fair and adequate notice of the Plan to potential Talc Claimants in the United States who are known and unknown to the Debtor."[14]  Dr. Wheatman testified that "[t]he information provided . . . was drafted to allow potential claimants to easily understand their legal rights and to understand the Plan and the voting deadline."  Wheatman Decl. ¶ 71.  The multilingual program reached approximately 95.8% of women over the age of 50 and is believed to have resulted in the highest number of hits to a dedicated, plain-language information page ever achieved in a mass tort bankruptcy.  Id. ¶¶ 68, 74.  There is no basis for the Coalition's criticism; publication notice was appropriate under the circumstances and is in line with other mass tort cases.[15]

### E. The Form of Master Ballot Was Appropriate.

59. The Insurers and Coalition argue that the master ballot should have required that law firms attach evidence of their authority to cast votes on behalf of claimants.  Insurers' Obj. ¶¶ 83-85; Coalition Voting Obj. n.29.  However, every law firm that submitted a master ballot was required to certify under penalty of perjury that it possessed authority to do so—whether having received the informed consent of each claimant or pursuant to a valid power

---

[14]  *Decl. of Shannon R. Wheatman, Ph. D. in Support of (I) Suppl. Notice Plan and (II) Report on Implementation of Suppl. Notice Plan* [Dkt. 48] (the "Wheatman Declaration"), ¶ 16.

[15]  See In re Kaiser Gypsum Co. No. 16-31602 (JCW) (Bankr. W.D.N.C. Oct. 23, 2019) [Dkts. 1267, 1875] (approving notice plan for unknown asbestos claimants that included publishing notice in numerous consumer print publications, along with banner advertisements on major online advertising networks and social media platforms); In re Garlock Sealing Techs. LLC, No. 10-31607 (Bankr. W.D.N.C. Apr. 10, 2015) [Dkts. 4387, 4542] (approving notice plan for unknown asbestos claimants that utilized printed publication notices in multiple consumer and legal publications and television advertisements, both tailored to reach the specific unknown claimants at hand); In re Flintkote Co. No. 04-11300 (MFW) (Bankr. D. Del. Feb. 17, 2015) [Dkts. 8710, 8768] (approving notice plan that included banner advertisement on popular internet sites, a nationwide distribution of a press release utilizing the internet, newspapers, radio and television and outreach to associations and unions that unknown claimants are likely to be members of); In re Specialty Prods. Holding Corp. No. 10-11780 (PJW) (Bankr. D. Del. Oct. 21, 2014) [Dkts. 5057-10, 5112] (approving notice plan that included a general publication notice in national newspapers and on the internet, a national press release and targeted mail outreach to relevant interested parties).

of attorney.  And every such law firm was informed that they may be required to provide documentary support for any such claim of authority.  <u>See</u> Master Ballot, 5.  Requiring law firms to submit what would have been tens of thousands of documents evidencing their authority to vote each claim submitted through master ballots would have been administratively burdensome, is not required by Bankruptcy Rule 9010(a) and is not typically required in many mass tort cases.[16]  Moreover, just as has already occurred during this Chapter 11 Case, the demand to produce client communications undoubtedly would have provoked claims of attorney-client privilege leading to Coalition allegations of vote-chilling.

**F.   The Solicitation Procedures and Prepetition Solicitation Process Were Otherwise Appropriate.**

60.   The Coalition makes the confusing argument that the Solicitation Procedures somehow precluded objections to claims for purposes of voting.  Coalition DS Obj. ¶¶ 492-93; Coalition Voting Obj. ¶¶ 95-101.  This, in spite of the fact that the Coalition itself has sought to designate the tabulated votes of, for example, the Smith Firm. <u>See</u> Reinstatement Mot., ¶¶ 44-67.  That relief is tantamount to disallowance for voting purposes, and nothing would have stopped the Coalition or any other party from seeking that relief instead.  There is no basis for the Coalition's suggestion that the Solicitation Procedures somehow barred any form of relief available under the Bankruptcy Code and Bankruptcy Rules.

---

[16]   <u>See</u> <u>In re HONX, Inc.</u>, No. 22-90035 (MI) (Bankr. S.D. Tex. July 14, 2023) [Dkt. 890], Schedule 5 (order approving master ballot where attorneys certified they had the authority to vote on behalf of their clients); <u>In re Maremont Corp.</u>, No. 19-10118 (LSS) (Bankr. D. Del. Jan. 22, 2019) [Dkt. 9], Exhibit B-2 (debtor's master ballot used in connection with prepetition solicitation requiring certification of attorney's authority); <u>In re Imerys Talc Am. Inc.</u>, No. 19-10289 (LSS) (Bankr. D. Del. Jan. 27, 2021) [Dkt. 2863-9], Exhibit 3-2 (order approving master ballot whereby attorneys certified they had the authority to vote on behalf of their clients); <u>In re Specialty Prods. Holding Corp.</u>, No. 10-11780 (PJW) (Bankr. D. Del. Oct. 21, 2014) [Dkt. 5112-1] (same); <u>In re Yarway Corp.</u>, No. 13-11025 (BLS), (Bankr. D. Del. Jan. 27, 2015) [Dkt. 756-2], Exhibit B-1 (same); <u>In re United Gilsonite Laboratories</u>, No. 11-02032 (RNO), (Bankr. M.D. Pa. Sept. 30, 2014) [Dkt. 2014], Exhibit 1-A (same).

61.     Ironically, the Coalition also criticizes the Solicitation Procedures for leaving the door open to law firms voting based on negative notice without obtaining their clients' informed consent or ensuring that they understood at any level what they were supporting.  Coalition DS Obj. ¶¶ 500-01.  But the Solicitation Procedures authorized law firms to cast their clients' votes *only* with either such clients' informed consent or via a valid power of attorney.  See Disclosure Statement, § 9.1 (describing bases for authority to cast master ballot votes).  Moreover, to submit a master ballot, the law firm was required to certify that it had provided the solicitation materials to every claimant identified therein.  See, e.g. Master Ballot, 2.  There is no evidence to support the Coalition's implication that the Debtor and its supporting law firms "[made] a mockery" of the informed consent requirements by relying upon negative notice.  To the contrary, the Debtor understands that all supporting law firms that cast master ballots did so with actual informed consent or pursuant to a power of attorney.  As more fully discussed below, it was only Beasley Allen that blurred the lines between the two by claiming it obtained informed consent from its clients when it did not do so.

## IV.    THE TABULATION OF VOTES WAS APPROPRIATE AND COMPLIED WITH APPLICABLE LAW.

62.     The Coalition argues that Epiq's certified tabulation should not be approved because, (a) not all Channeled Talc Personal Injury Claims should be counted and (b) the votes of holders of Channeled Talc Personal Injury Claims should be weighted differently based upon the alleged compensability of such claims in the tort system.  E.g., Coalition DS Obj. ¶¶ 502-530.  For the following reasons and those set forth in the Debtor's objections to the Coalition Voting Motions, the Debtor's tabulation of the results of voting was reasonable and appropriate and consistent with mass tort practice.

### A.      $1.00 Voting Was Appropriate.

63.      Pursuant to Bankruptcy Rule 3018(a), the Debtor treated Channeled Talc Personal Injury Claims in Class 4 as temporarily allowed in the amount of $1.00 per claimant for the purpose of voting on the Initial Plan, and the Debtor requested approval of that temporary allowance by the Disclosure Statement Motion.  See Disclosure Statement Mot. ¶¶ 53-56.  This approach eliminates the need to make a claim-by-claim or severity of disease-by-severity of disease determination across tens of thousands of claims, a process that would be complex, burdensome and impracticable under the circumstances.

64.      Courts presiding over numerous other mass tort bankruptcy cases have allowed tort claims in the amount of $1.00 for voting purposes.[17]  Given that all the claims are disputed and unliquidated, involve particularized facts and circumstances and in many cases have not been worked up by the claimant's counsel, it is not possible to know the extent to which any particular claimant has a qualifying claim or the likely amount of such claim.  Those determinations will be made at a later date by the Talc Personal Injury Trust pursuant to the Trust Distribution Procedures after the Amended Plan has been confirmed and the trust has been established.  Accordingly, under the circumstances of this case, treating the Channeled Talc Personal Injury Claims as allowed in the amount of $1.00 in the aggregate per claimant for the limited purpose of voting is entirely appropriate.

---

[17]      See, e.g., In re HONX, Inc., No. 22-90035 (MI) (Bankr. S.D. Tex. July 14, 2023) [Dkt. 890]; In re Boy Scouts of Am., No. 20-10343 (LSS) (Bankr. D. Del. Sept. 30, 2021) [Dkt. 6438]; In re Mallinckrodt PLC, No. 20-12522 (JTD) (Bankr. D. Del. June 17, 2021) [Dkt. 2911]; In re Imerys Talc Am. Inc., No. 19-10289 (LSS), (Bankr. D. Del. Jan. 27, 2021) [Dkt. 2863]; In re United Gilsonite Laboratories, No. 11-02032 (RNO), (Bankr. M.D. Pa. Sept. 30, 2014) [Dkt. 2014]; In re PG&E Corp., No. 19-30088 (JD) (Bankr. N.D. Cal. March 17, 2020) [Dkt. 6340]; In re TK Holdings Inc., No. 17-11375 (BLS) (Bankr. D. Del. Jan. 5, 2018) [Dkt. 1639]; In re USA Gymnastics, No. 18-09108 (RLM) (Bankr. S.D. Ind. Oct. 26, 2021) [Dkt. 1659]; In re the Budd Company, No. 14-11873 (JBS) (Bankr. N.D. Ill. May 6, 2016) [Dkt. 1811]; see also Kane v. Johns-Manville Corp. 843 F.2d 636, 646-48 (2d Cir. 1988).

65.     In addition, an analysis of the certified voting results demonstrated that "over 82% of ovarian cancer claimants—the Claims that the Coalition says are valid—voted to accept the Initial Plan." Supp. Kim Decl. ¶ 9(b).  As a result, to satisfy the two-thirds in amount requirement of section 1126(c) of the Bankruptcy Code, there is no need to determine the relative value of Ovarian Cancer claims and other claims in this Chapter 11 Case for voting purposes. Nor is doing so consistent with precedent in the mass tort context.  As is common in mass tort cases, the Debtor has proposed that all personal injury claims be valued at $1.00 for voting purposes only to take into account the unliquidated and disputed nature of all the talc personal injury claims.

66.     The Coalition ignores this approach, which has been utilized in numerous mass tort cases, and instead argues that the Court is required to engage in a lengthy and time consuming estimation process.  Coalition Voting Obj. ¶ 105.  But no estimation process is required under section 502(c) of the Bankruptcy Code, which mandates estimation only in circumstances where "fixing or liquidati[ng]" a claim is necessary for, but "would unduly delay[,] the administration of the case." 11 U.S.C. § 502(c).

67.     There is no need to "fix or liquidate" the talc claims for several reasons. That task will be performed post-confirmation by the Talc Personal Injury Trust utilizing trust distribution procedures that will be considered by the Court at the confirmation hearing. In addition, 82% of the claimants who identified themselves as holders of Ovarian Cancer claims voted in favor of the plan.  Thus, it is unlikely that a lengthy process to estimate who can vote and with what weighting would make any difference.  What is certain, however, is that estimation would cause material delay and defeat a fundamental goal of this prepackaged chapter 11 case:  to provide payments to claimants as promptly as possible.

**B.      No Claims Bar Date Is Required Merely to Allow Claimants to Vote.**

68.      The Coalition argues that a prepetition solicitation process was unavailable to LLT and the Debtor because, absent the postpetition setting of a bar date and the deemed allowance of all claims on that basis, no claimant has authority to vote.  Coalition DS Obj. ¶¶ 482-94.  The Coalition tries to distinguish this Chapter 11 Case from typical prepackaged funded-debt restructurings on the grounds that such debt is typically not scheduled as contingent, unliquidated or disputed.  Id. at 490.  But the allowance of claims for voting purposes in a prepackaged case has nothing to do with the debtor's schedules, which are rarely filed before confirmation.

69.      At the outset of this Chapter 11 Case, the Debtor filed a request to temporarily allow all Channeled Talc Personal Injury Claims for purposes of voting only.  See Disclosure Statement Motion, ¶¶ 53-56.  If approved, that request provides the basis for the temporary allowance of claims and the Court's recognition of the certified prepetition vote.

70.      The Coalition instead argues that only claimants who filed a proof of claim under penalty of perjury (or something similar) should be allowed to vote.  Coalition DS Obj. ¶ 491.  Any such rule would mean that no chapter 11 case could go to a plan vote without a pre-confirmation bar date, which is contrary to practice not only in prepackaged cases but in numerous other chapter 11 proceedings as well.  Each claimant or claimant's counsel certified under penalty of perjury on their ballot as to their reasonable belief that they hold the Channeled Talc Personal Injury Claim(s) described therein, among other things.  That certification was the functional equivalent of what the Coalition argues is required, and it supports the Debtor's request for temporary allowance of the claims for purposes of voting.  For these reasons and those more fully set forth in the Bar Date/Estimation Objection, ¶¶ 14-21, no claims bar date or estimation process is required or warranted.

### C.   Holders of Gynecological Cancer Claims Were Appropriately Permitted to Vote.

71.     An overriding theme pervading the Coalition's Objections is that the Debtor is purportedly attempting to strip holders of Ovarian Cancer claims of legal rights through the votes of holders of "non-compensable" Gynecological Cancer claims.  The backbone of this argument is that Gynecological Cancer claims are not claims because they are "unenforceable under applicable law" and would, if filed, be subject to disallowance under section 502(b)(1) of the Bankruptcy Code.  E.g., Coalition DS Obj. ¶¶ 25-26, 247-48, 482; Coalition Voting Obj. ¶¶ 81-94.  But, by that standard, the same is true from the Debtor's perspective for every Ovarian Cancer claim.  The Debtor disputes liability for all Channeled Talc Personal Injury Claims, whether arising from Ovarian Cancer, Gynecological Cancer or Other Disease Talc Personal Injury Claims.

72.     The fact that the validity of Gynecological Cancer claims is disputed does not mean that they are not "claims" entitled to vote on the Initial Plan.  Disputed claims can be "claims" under the Bankruptcy Code.  See 11 U.S.C. § 101(5) ("The term "claim" means— (A) right to payment, **whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent,** matured, unmatured, **disputed,** undisputed, legal, equitable, secured, or unsecured) (emphasis added); Johnson v. Home State Bank, 501 U.S. 78, 83, 111 S.Ct. 2150 (1991) (finding that "Congress intended this language to adopt the broadest available definition of 'claim.'"); In re Wyly, 553 B.R. 318, 332 (Bankr. N.D. Tex. 2016) (applying the broadest definition to claim, the court found that although a prepetition claim may be contingent upon the results of the pending appeal, it is still a claim under the Bankruptcy Code).

73.     The Coalition's position on the alleged lack of merit of Gynecological Cancer claims is simply not credible given the actions of its members.  The Coalition's lead

member, Beasley Allen, purported to vote almost 5,500 Gynecological Cancer claims against the Initial Plan.  See Supp. Voting Decl., Ex. A.  If the Coalition truly believes these claims are worthless, query how Beasley Allen: (a) can be acting in the best interests of these clients in voting their claims to reject a plan that provides them with a recovery; (b) could have obtained its clients' informed consent to reject the Initial Plan when, according to the Coalition, it is their only source of recovery; and (c) can represent these clients at all given its view that their claims are meritless and non-compensable.  The Coalition's position is wholly inconsistent with the actions of its members.

74.      While none of this matters since 82% of claimants that identified their disease as Ovarian Cancer in any event voted in favor of the Plan, Gynecological Claims are different than other potential disallowable talc claims against the Debtor.  The Debtor and J&J have settled Gynecological Cancer claims outside bankruptcy in exchange for monetary recoveries.  Kim Supp. Voting Decl. ¶ 11.  In addition, Gynecological Cancer claims have been asserted in litigation against the Debtor and J&J.  Id.  Approximately 3,000 self-identified Gynecological Cancer claims have been filed against the Debtor and J&J in ovarian talc actions, including by Beasley Allen and all of the other Coalition members aside from Levin Sedran & Berman, LLP.  Id.  These claimants allege that they have cancer and that their cancer was caused by talc products manufactured and sold by the Debtor's predecessors.  Id.[18]

---

[18]      By contrast, claims like "fear of cancer" have not been asserted in the MDL nor resolved in settlement. For that reason, the Trust Distribution Procedures initially accord no recovery to such claims.  See Disclosure Statement § 7.2(b)(2).  But also no such "fear of cancer" claims voted in connection with the Initial Plan.  Kim Supp. Voting Decl. ¶ 9(e).  Indeed, fewer than 1,800 claimants alleging Other Disease Talc Personal Injury Claims were tabulated out of roughly 93,500 tabulated votes, or roughly 2% of the total votes cast.  These Other Disease Talc Personal Injury Claims actually lowered the overall approval rating of the Initial Plan by a fraction of one percent, voting 69% in favor.  As such, their votes did not materially affect the voting results.

**D.   An Immaterial Number of Settled Claims Voted.**

75.    The Coalition also complains that any votes by holders of Channeled Talc

Personal Injury Claims who are clients of firms that have entered into master settlement

agreements (each, an "MSA") with the Debtor should also be designated.  Coalition DS Obj.

¶¶ 495-99.  But only about 300 clients of a single firm that is party to an MSA voted on the

Initial Plan.  Supp. Kim Decl. ¶ 12.  Accordingly, whether these claims are designated or not will

not have any material effect on the ultimate voting results in this case, where more than

93,500 claimants voted.[19]  Even if these votes were not counted, the overall acceptance rate for

the Amended Plan would drop by less than 0.1%.

## V.   THE VOTING RESULTS MOTION SHOULD BE APPROVED.

76.    The Debtor's Voting Results Motion requested the Court's approval of the

final tabulation of votes, as instructed by the Debtor and certified by Epiq.  See Voting Results

Mot. ¶ 17; see also Suppl. Kim Decl. [Dkt. 306]; Suppl. Voting Decl. [Dkt. 307].  The Coalition

challenges that requested relief on the basis that replacement of substantially all of the rejecting

votes reflected on Beasley Allen's master ballot with the accepting votes cast on the Smith

Firm's master ballot was improper because (a) the Beasley Allen master ballot allegedly was not

defective and (b) the Smith Firm's superseding master ballot was defective.  See Coalition

Voting Obj. ¶¶ 106-61.

**A.   The Beasley Allen Master Ballot Was Defective.**

77.    The Coalition's arguments that Beasley Allen's master ballot was proper

are wrong.  See Coalition Voting Obj., ¶¶ 113-42.  Had Beasley Allen's master ballot not been

---

[19]    It is the Debtor's understanding that, while those claims are potentially subject to resolution under an MSA, they had not yet been settled or released as of the voting record date.  Thus, it is possible these claims may never be resolved under an MSA.  Id.

superseded by the Smith Firm's master ballot, it would have been disregarded as invalid for various reasons.

> (i)   Negative Notice Is Not Informed Consent

78.   In submitting the Beasley Allen master ballot, Andy Birchfield certified under penalty of perjury that he had obtained the informed consent of 11,503 claimants pursuant to the Option A Certification.  See Suppl. Voting Decl., at Ex. A (Beasley Allen Ballot).  He cast zero votes under a power of attorney pursuant to the Option B Certification.  Id.  The Debtor was aware that Beasley Allen had approximately ███████████████████████████.  See Kim Dep. 86:2-3.  Yet its master ballot reflected more than twice that number of votes, and certified that informed consent had been obtained from every one of them.  These facts gave the Debtor immediate grounds for suspicion regarding the Beasley Allen master ballot.[20]  Upon further investigation, the Debtor determined that there were numerous reasons to conclude that Beasley Allen did not, in fact, obtain "informed consent" from its clients as the firm certified in support of its alleged authority to reject the Initial Plan on behalf of those clients.

79.   To date, Beasley Allen has failed to produce documentation supporting the informed consent it claims to have obtained for 11,500 claims.  The Debtor assumes, therefore, that Beasley Allen will claim that it somehow obtained informed consent through a negative-notice program to its clients.  While negative notice may supplement an otherwise authorized vote made pursuant to a power of attorney, as discussed below, it does not constitute

---

[20]   While one other law firm, AHC member OnderLaw, cast a similar number of Option A votes (10,929), the Debtor was in communication with the AHC and was informed that OnderLaw had indeed obtained an affirmative authorization from every such claimant, and OnderLaw also cast a further 1,216 votes under Option B, pursuant to applicable powers of attorney.  The same is true for all other AHC members that submitted material numbers of master ballot votes pursuant to an Option A certification.  As Beasley Allen certainly was also aware, the Initial Plan's supporters knew that negative notice is not informed consent.

informed consent.  Thus Beasley Allen lacked authority to vote on behalf of all such claimants who did not indicate their express consent.

80.     As an initial matter, the Master Ballot itself did not authorize negative notice.  The "Option A Certification," which Mr. Birchfield provided under penalty of perjury states that he had "collected and recorded" the vote of every claimant reflected on Beasley Allen's master ballot, or that he had "obtained authority" to cast each claimant's vote.  See Suppl. Voting Decl., Ex. A (Beasley Allen master ballot), 6.  In executing the master ballot, Mr. Birchfield further certified that each client reflected thereon had "indicated his or her informed consent" with respect to their vote.  Id.  There is nothing even arguably passive in these requirements that might allow a law firm certifying under Option A to assume it had the consent of clients who had provided no affirmative indication of it.

81.     In addition, as a matter of law, "'[i]nformed consent' denotes the agreement by a person to a proposed course of action after the lawyer has communicated adequate information and explanation about the material risks and reasonably available alternatives to the proposed course of conduct."  MODEL RULES OF PROF'L CONDUCT R. 1.0 (Terminology).  Absent some conduct on behalf of the client from which consent may be inferred, informed consent requires an "affirmative response the client."[21]  A lawyer cannot "assume consent from the client's or other person's silence."  Id.; see also In re Green, No. 14-11458, 2014 WL 3724986, at *4 (Bankr. W.D. La. July 23, 2014) (noting that the Fifth Circuit recognizes the Model Rules as the "national standard").  To the extent that Beasley Allen certified it possessed informed consent to vote on behalf of its clients, and that informed consent

---

[21]     See MODEL RULES OF PROF'L CONDUCT R. 1.0 (Terminology) – Comment 7 ("Obtaining informed consent will usually require an affirmative response by the client or other person.  In general, a lawyer may not assume consent from a client's or other person's silence.  Consent may be inferred, however, from the conduct of a client or other person who has reasonably adequate information about the matter. …").

was based only on negative notice, that certification was incorrect.  Nothing in the prepetition Solicitation Procedures changes that reality.[22]

> (ii)    *There Was No Dual Standard for Beasley Allen's Master Ballot.*

82.    The Coalition implies that the Debtor or Epiq applied a different standard to the tabulation of Beasley Allen's master ballot than other ballots.  See, e.g., Coalition Voting Obj. ¶¶ 115-25.  The Coalition argues, for example, that the 21 plaintiffs who voted in favor of the Initial Plan on the OnderLaw master ballot and certified that they never provided Beasley Allen with informed consent to reject the Initial Plan on its master ballot should have been subjected to the same conflicting-vote protocol as every other claimant.  Id. ¶¶ 114-20.

83.    They were.  The solicitation process gave rise to approximately 1,500 conflicting duplicative votes across the more-than 200 master ballots submitted.  All such claims were referred to J&J's resolution counsel, Jim Murdica of Barnes & Thornburg, for potential resolution, consistent with Epiq's responsibility under Section 4(g) of the Tabulation Procedures to use reasonable efforts to coordinate with counsel to resolve such discrepancies. While Epiq conceivably could have attempted to contact two or more law firms with respect to each such occurrence on a claimant-by-claimant basis, as the Coalition appears to suggest, LLT determined that such an effort would be impracticable and futile.  Instead, in light of the ongoing negotiations between the Company and objecting law firms, including Beasley Allen, the AHC of Supporting Counsel Members and others, LLT determined that referral of such inconsistent

---

[22]    Decisions of this Court and others approving consensual third party releases in chapter 11 plans based upon creditors' failure to return an opt-out notice to the estate are irrelevant to the application of negative notice here.  See Coalition Voting Obj. n. 28 (citing In re Robertshaw US Hldg. Corp. No. 24-90052 (CML) (Bankr. S.D. Tex. Aug. 16, 2024) and others).  There is a vast distinction between, on the one hand, a creditor granting through inaction releases of inchoate and undefined claims against debtor-related parties and, on the other hand, a claimant's law firm claiming it has informed consent to accept or reject a chapter 11 plan's treatment of its own client's claim based on the client's failure to respond to its mass mailing or email blast.

votes to Mr. Murdica for potential resolution in connection with contemplated firm-by-firm settlements was the only way of resolving any such conflicts as a practical matter. The 21 identified plaintiffs who certified that they never gave Beasley Allen informed consent to reject the Initial Plan on their behalf were included in that referral process.

84.     Epiq did not exclude the entire Beasley Allen master ballot solely on the basis of these 21 claimants, as the Coalition seems to allege.  Coalition Voting Obj. ¶ 120. Rather, if the Smith Firm had not submitted its proper and superseding master ballot with respect to substantially all of the votes on the Beasley Allen master ballot, the Debtor would have acted to exclude those votes based on the results of its investigation and the totality of evidence of Beasley Allen's improper voting practices.  Thus no dual standard applied, and Epic did not "file[] a false voting report" as the Coalition claims.  See Coalition DS Obj. § XIV.

(iii)     *Votes Cast on Behalf of Deceased Claimants*

85.     The Coalition admits that Beasley Allen claimed informed consent with respect to deceased claimants.  Coalition Voting Obj. ¶¶ 126-29; Ex. A ¶¶ 40-45.  According to the Coalition, however, the informed consent in issue allegedly was obtained from eligible representatives of the respective decedents' estates.  Id.  But, in every such case, Beasley Allen did not identify the estate of the decedent or any representative as the claimant on its master ballot.  Rather, Beasley Allen identified the decedent (and only the decedent) on its master ballot and certified it had obtained her informed consent.  Indeed, nowhere in its Objection does the Coalition state that such unidentified representatives even exist in every case.  See id.

86.     The Coalition's counterarguments on behalf of Beasley Allen undermine its own position.  The Coalition alleges that Beasley Allen has complied with the MDL court's orders regarding estate representatives, and that no Beasley Allen cases are subject to deficiency notices or show cause orders over the failure to file proper notices.  Coalition Voting Obj. ¶ 128;

Ex. A ¶ 45.  But in many such cases, that is precisely the Debtor's point.  For example, John Kim was aware "█████████████████████████████████████████████████████████████ ████████████████████████████████████████" Kim Dep. 149:20-24.  And Beasley Allen filed notices affirming it had been unable to identify an estate representative for hundreds of decedents.  See Voting Motion, ¶ 49; Supp. Kim Decl. ¶ 11.  Yet Beasley Allen nevertheless claimed on its master ballot to have somehow obtained the same decedent's informed consent to reject the Initial Plan.

<em>(iv)     Votes Cast on Behalf of Dismissed Claimants</em>

87.     The Coalition's final argument is that Beasley Allen appropriately cast votes on behalf of clients whose votes have been dismissed from the tort system.  Coalition Voting Obj. ¶ 130; Ex. A ¶ 46.  Beasley Allen claims that such dismissals must have been without prejudice or as a result of nonsuits.  Id.  That is not true in every case.  Based on its preliminary analysis, the Debtor has identified at least a dozen claimants voted by Beasley Allen whose claims were previously dismissed with prejudice in the tort system.[23]  Beasley Allen knew that these voters categorically have no "claim" within the meaning of section 101(5) of the Bankruptcy Code and no Channeled Talc Personal Injury Claim under the Initial Plan.  Yet Beasley Allen submitted their votes anyway.

**B.     The Debtor Properly Recognized the Smith Firm's Master Ballot.**

88.     The Coalition raises various arguments against Epiq's tabulation of the Smith Firm's superseding master ballot.  See Coalition Voting Obj., ¶¶ 143-61.  The Smith

---

[23]     The last names and case numbers of these example claimants are:  Addleman, 3:21-cv-02087 (D.N.J.); Barber, 3:21-cv-04209 (D.N.J.); Barber, 3:19-cv-18786 (D.N.J.); Centeno, 3:20-cv-14921 (D.N.J.); Coleman, 3:21-cv-06646 (D.N.J.); Cox, 3:21-cv-07117 (D.N.J.); Fox, Atl-L-002762-21 (N.J. Sup. Ct.); Gleba, 3:21-cv-01561 (D.N.J.); McCoy, 3:21-cv-05698 (D.N.J.); Mills, 3:17-cv-08090 (D.N.J.); Newton, 3:21-cv-03141 (D.N.J.); Norris, 3:21-cv-06652 (D.N.J.).

Firm's master ballot demonstrates that the Smith Firm—unlike Beasley Allen—submitted the vast majority of the votes on its master ballot pursuant to the "Option B Certification."  <u>See</u> Reinstatement Obj., Ex. C.  That is, the Smith Firm voted the claims of its clients pursuant to valid powers of attorney except to the extent its clients indicated their informed consent to accept or reject the Amended Plan (in which case such votes were submitted pursuant to the "Option A Certification").  <u>See id.</u>

89. The Coalition argues that the Smith Firm has not yet produced copies of documents providing the Smith Firm with power of attorney to vote the Channeled Talc Personal Injury Claims of the claims it voted.  Coalition Voting Obj. ¶¶ 144-45.  But, consistent with all other law firms submitting master ballots, Allen Smith, the Smith Firm's principal, certified that he possessed such authority to vote on behalf of the Smith Firm's clients.  <u>See</u> Reinstatement Obj., Ex. C.  Moreover, Mr. Smith submitted a separate declaration to the Debtor expressing his reasoning for submitting the superseding master ballot and further certifying as to his authority to vote on behalf of the claimants featured on the Smith Firm's master ballot. <u>See id.</u>, Ex. B ¶ 29

90. The Coalition alleges that the Debtor conspired to mislead the Court when it referred in the Voting Motion to the Smith Firm's "powers of attorney" as opposed to "power of attorney."  Coalition Voting Obj. ¶¶ 146-51.  The Debtor referred to the Smith Firm's "powers" of attorney in the plural on the simple assumption that the Smith Firm's authority to vote on behalf of thousands of claimants did not derive from a solitary document.  Based on Mr. Smith's certifications on the Smith Firm's master ballot and directly to the Debtor, the Debtor had every reason to believe that the Smith Firm possessed a valid power of attorney with respect to each Option B Certification vote the firm cast.

91.     Attempting to leverage its prior argument, the Coalition asserts that, because the Debtor allegedly knew the Smith Firm had no power of attorney for each claimant, the Debtor must have accepted all of the Smith Firm's Option B Certification votes based on Mr. Smith's alleged receipt of each claimant's informed consent.  Coalition Voting Obj. ¶ 151. But Mr. Smith—unlike Mr. Birchfield—did not claim informed consent.  Mr. Birchfield swore that he had obtained the informed consent of every claimant whose vote he cast, when all evidence suggests he had not.  Mr. Smith swore that he was voting pursuant to a valid power of attorney for each Option B Certification claimant.  Those specific certifications form the bases for each firm's claimed authority to assert its master ballot claim.  See Master Ballot § 3 (providing for separate certifications for each client with respect to whom the applicable law firm makes an Option A Certification, on the one hand, or an Option B Certification, on the other hand).

92.     In the context of the Smith Firm's master ballot, there is no basis for the Coalition's complaints about negative notice because the Smith Firm generally voted pursuant to applicable powers of attorney (except for all clients from whom it had received *actual* informed consent).  See Coalition Voting Obj. ¶¶ 152-56.  Any notice that the Smith Firm provided its clients of its intention to submit the master ballot on their behalf was supplemental to the authority the Smith Firm certified it already possessed to vote their claims and merely an accommodation.  Moreover, as the Smith Affidavit makes clear, Mr. Smith actually provided claimants with up to five days' notice of his intention to submit the superseding master ballot despite Beasley Allen's purposeful attempts to obstruct and frustrate Mr. Smith's efforts to provide that notice.  See id. ¶¶ 21-24

93.     The Coalition's final argument is that the Debtor and Epiq improperly accepted the Smith Firm's superseding master ballot with the endgame of striking both the Smith Firm and the now-inconsistent Beasley Allen master ballots pursuant to Section 4(g) of the Tabulation Procedures.  Coalition Voting Obj. ¶¶  157-61.  Section 4(g) provides that inconsistent votes among master ballots asserted by different law firms strike each other out to the extent the discrepancy is not resolved.  But, as both the Debtor and Epiq have repeatedly asserted, Section 4(g) was inapplicable to the Debtor's recognition, and Epiq's tabulation, of the Smith Firm's ballot.  See, e.g., Kjontvedt Dep. 221:12-17 ("████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████").  Section 4(g) does not address the circumstance where a law firm seeks to cast superseding votes with respect to claims previously voted by the firm's co-representative.  Instead, the provisions of the Tabulation Procedures applicable to acceptance of the Smith Firm master ballot are Sections 3(d) and 4(b) through (d) as more fully discussed in the Reinstatement Objection.  See Reinstatement Obj. ¶¶ 19-24.

94.     In addition to being consistent with the Tabulation Procedures, the Debtor's direction to Epiq to accept the Smith Firm's master ballot as superseding the Beasley Allen master ballot was entirely consistent with standards under Bankruptcy Rule 3018(a) for court approval of postpetition voting changes.  Specifically, there is no evidence that the Smith Firm acted with any improper motive, notwithstanding the Coalition's speculation to the contrary.  Rather, the evidence demonstrates that the Smith Firm submitted the superseding votes of claimants on its master ballot, following a negotiation that resulted in significant amendments to the Initial Plan that will bring enhanced and faster recoveries to claimants.

## VI.     RESOLICITATION IS NOT NECESSARY BECAUSE THE MODIFICATIONS TO THE PLAN ONLY IMPROVED THE POSITION OF VOTING CLAIMANTS.

95.     The Amended Plan is expected to increase average recoveries to Ovarian Cancer claimants.  Compare Disclosure Statement, § 1.1(c) (estimating recoveries of between $50,000 and $200,000, with an average value between $75,000 and $150,000 being more likely) with First Day Decl. ¶ 13 (estimating recoveries "of between $50,000 and $250,000, with the more likely average value being between $75,000 and $175,000").  Nevertheless, the US Trustee argues that certain subsequent modifications to the Initial Plan and the Trust Distribution Procedures following solicitation may have an adverse effect on claimants, requiring resolicitation.  UST Obj. ¶¶ 7-14.

96.     Citing to amendments to Section 8.5 of the Amended Plan, the US Trustee argues that, if the Debtor revokes or withdraws the Amended Plan before its substantial consummation, claimants that have executed Acceptance and Releases would be at risk of having irrevocably released their claims in return for no distribution.  Id. ¶ 8.  The US Trustee's position is not correct because no Acceptance and Release is effective until a claimant begins receiving distributions.[24]  Moreover, no claimant is required to submit her Acceptance and Release immediately or prior to the entry of a Final Order confirming the Amended Plan.  In fact, amendments to Section 7.2.2 of the Trust Distribution Procedures expressly provide that claimants may submit their Acceptance and Release through the date that is 180 days after the Confirmation Order becomes a Final Order.  Am. Plan, Ex. K (Trust Distribution Procedures) § 7.2.2.[25]

---

[24]     See, e.g., Confidential Memo. of Understanding & Agreement Regarding Talc Bankruptcy Plan Support [Dkt. 560-1], § II.G.1.c. (providing that the release given is "in exchange for receipt of any funds from the Trust").

[25]     The US Trustee also argues that the Amended Plan and revised Trust Distribution Procedures provide for a release that could apply to any talc products, whether or not manufactured by J&J or its affiliates.  Id. ¶ 11

97.     Finally, the Coalition and the US Trustee argue that certain placeholders currently found in the Trust Distribution Procedures regarding the criteria for compensable claims and certain medical criteria could, upon completion, cause a material and detrimental effect on claimants, requiring resolicitation.  Id. ¶ 9.  The Debtor expects to file further revised Trust Distribution Procedures eliminating all placeholders and, at confirmation, will demonstrate that the Amended Plan, as it may be further amended or supplemented, satisfies the requirements of section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019(a) such that resolicitation is not required.

## **CONCLUSION**

For all of the reasons set forth above, the Debtor respectfully requests that the Court overrule the Objections, approve the Motion and grant such further relief to the Debtor as the Court may deem proper.

*[Remainder of Page Intentionally Left Blank]*

---

(citing sections 7.2.1 and 7.2.2 of the Trust Distribution Procedures).  The Debtor intends to revise the Trust Distribution Procedures to address this issue.

Dated:  November 22, 2024
Houston, Texas

Respectfully submitted

*/s/ John F. Higgins*
John F. Higgins (TX 09597500)
M. Shane Johnson (TX 24083263)
Megan Young-John (TX 24088700)
James A. Keefe (TX 24122842)
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile:  (713) 228-1331
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
jkeefe@porterhedges.com

Gregory M. Gordon (TX 08435300)
Dan B. Prieto (TX 24048744)
Brad B. Erens (IL 06206864)
Amanda Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone:  (214) 220-3939
Facsimile:   (214) 969-5100
gmgordon@jonesday.com
dbprieto@jonesday.com
bberens@jonesday.com
asrush@jonesday.com

PROPOSED ATTORNEYS FOR DEBTOR

## **<u>Certificate of Service</u>**

I certify that on November 22, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtor's claims, noticing, and solicitation agent.

*/s/ John F. Higgins*
John F. Higgins

NAI-1541565502