# JONES DAY

2727 NORTH HARWOOD STREET • DALLAS, TEXAS 75201.1515

TELEPHONE: +1.214.220.3939 • JONESDAY.COM

Direct Number: +1.214.969.3759
gmgordon@jonesday.com

December 16, 2024

Honorable Christopher M. Lopez
U.S. Bankruptcy Judge
U.S. Bankruptcy Court for the Southern District of Texas
515 Rusk
Houston, TX 77002

      Re: *In re Red River Talc LLC*, Case No. 24-90505

Dear Judge Lopez:

      This letter responds to the Court's request at the December 10 status conference that interested parties provide an update on outstanding fact discovery issues and other matters that could impact the remaining schedule for this proceeding, as well as their views on the schedule itself. Despite the Coalition's ongoing efforts to delay and derail this case, the Court can and should maintain the existing consolidated hearing date of January 27, 2025.

## Background

      The Debtor seeks to move forward with the January 27 hearing as previously scheduled in order to secure as promptly as possible confirmation and payout of the unprecedented $10 billion settlement. The current schedule also is supported by the overwhelming number of claimants who support the Plan, which has increased from the 83% certified vote to an estimated 87% during the pendency of this case.[1] And, as the Court is aware, both the U.S. Trustee-appointed Talc Claimants Committee ("TCC") and the Future Claimants Representative ("FCR") also support the Plan, subject to narrow disagreements on the process for allocating payments that can be resolved at the January 27 hearing (or before by stipulation).

      The *only* party who has suggested adjourning the schedule is the self-styled Coalition of Counsel for Justice for Talc Claimants (the "Coalition"), now significantly diminished in size to just two plaintiff law firms—Beasley Allen and Anapol Weiss.[2] The two firms remaining in the Coalition should not be permitted to single-handedly derail progress and dictate an intentionally

---

[1] Even if all of the Beasley Allen and Smith Law Firm votes are excluded, or only the votes obtained by those firms by documented affirmative consent are credited, support for the Plan is still well above the 75% statutory threshold.

[2] Three of the original five original Coalition member firms, Ashcraft & Gerel, Burns Charest, and Levin Papantonio, no longer oppose the Plan.

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID
MELBOURNE • MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

Honorable Christopher M. Lopez
December 16, 2024
Page 2

delayed schedule in direct disregard of every other interested party, including the clearly stated will of the overwhelming majority of claimants.

This is particularly true because the record now affirms that the lead firm from this Opposition Duo—Beasley Allen—already has misrepresented the wishes of its clients. As the Debtor suspected all along and discovery confirmed, Beasley Allen attempted to subvert the Plan vote by submitting a master ballot that falsely certified pursuant to "Option A" that it had obtained "informed consent" to reject the Plan on behalf of approximately 11,500 women with valid claims. But in truth, and as conceded by Mr. Birchfield at his deposition, ███████ ███████████████████████████████████, let alone "informed consent," for Beasley Allen to submit votes on their behalf. Rather, Beasley Allen purported to vote on behalf of these claimants ███████████████████ which is decidedly not the requisite affirmative consent required by the plain text of Option A.³ Worse, Beasley Allen cast votes to reject the Plan that included both claimants of other counsel (who voted to accept the Plan) and deceased claimants for whom it did not have consent from any estate representative. Worse still, the Beasley Allen master ballot includes votes on behalf of 5,000 clients holding non-ovarian, other gynecological cancer claims, which Mr. Birchfield testified ███████████████████████████████ ███████████████████████████. Even more egregious, Beasley Allen voted—again, by ███████████—on behalf of those non-ovarian, other gynecological claimants to reject the Plan (and deprive the claimants a recovery in bankruptcy), while, as Mr. Birchfield admitted, ███████████████████████████████████████████████████████ ███████████████████████████████████. Put simply, Beasley Allen had a blatant conflict of interest with respect to these claimants that was presumably not disclosed, and, accordingly, the non-ovarian, other gynecological votes were neither cast with "informed consent" nor treated in a manner consistent with the firm's fiduciary duties to these women.⁴

---

³ As the Coalition's own ethics expert has opined, "informed consent" requires as a general rule an affirmative response. See Simon's N.Y. Rules of Prof. Conduct § 1.0:30; see also cmt. 7 to N.Y. Rule 1.0; Dkt. 707 at 7, 12.

⁴ The Debtor and J&J first learned of this conflict at Mr. Birchfield's deposition after the case was filed and therefore *could not have disclosed* this information in the official solicitation materials. That is why Beasley Allen had the duty to disclose the conflict in its own solicitation communications. See, e.g., Simon's N.Y. Rules of Prof. Conduct § 1.8:97 (explaining that, where a lawyer represents multiple clients in an aggregate settlement, "The only method that will satisfy the terms of Rule 1.8(g) [which requires "informed consent"] is a writing 'signed by the client'"). See also In re New York Diet Drug Litig., 2007 WL 969426, at *1 (Finding that where, as here, there is a conflict that exists between classes of claimants to a settlement, a law firm ha "a duty to disclose to its clients what the conflicting interests [are].").  When asked whether Beasley Allen has met its obligation to disclose the conflict in this matter, Mr. Birchfield refused to answer on privilege grounds. The Debtor intends to file a motion *in limine* to preclude Beasley Allen from asserting it made these requisite disclosures in its solicitation-related communications with its clients, yet another grounds for establishing the lack of informed consent.

On these facts alone it is clear that Beasley Allen has no legitimate right to speak on behalf of claimants and should have no influence on the schedule in these proceedings. Yet, Beasley Allen, with continued support from Anapol Weiss, has employed and continues to employ any "tool" available to delay, stall, and otherwise frustrate a fair and efficient resolution overwhelmingly supported by the women actually impacted by the long-running talcum powder litigation. These women have made it resoundingly clear they want this resolution, which, unlike the tort system, will timely and efficiently pay both their claims and those of other women like them. Regrettably, these two firms are continuing their efforts to impede progress in this case through stonewalling and gamesmanship with respect to discovery.

*First*, Beasley Allen still has not completed the disclosure of communications evidencing informed consent that it purportedly received from the claimants on whose behalf the firm voted to reject the Plan. These disclosures were requested seven weeks ago, on October 21. The Court ordered Beasley Allen to make a fulsome production of such communications over a month ago, on November 12. It did not. The Court thus reiterated its order on November 26. Beasley Allen again failed to comply. And on December 10, the Court ordered Beasley Allen to complete its production by December 13. *It has not*. As of the time of its update to the Court on Friday, the firm had only produced 500 or so documents on behalf of the ▮▮▮▮. Later that day, it made an additional production of texts, emails and similar materials bringing the total documents to roughly 1700, just over 50% of the materials ordered to be produced.[5] Significantly, these critical documents were stripped almost entirely of content and context through unsupportable redactions—including in many instances the date of the purported communication, portions of the critical sentence relaying instructions, the identity of the sender, and more—and were produced as hard copy PDFs, not in an electronic form that would include the metadata required for authentication and to assess their validity.

*Second*, Beasley Allen has failed to produce even redacted versions of each of the actual communications that the firm had with the approximately 11,500 clients that ▮▮▮▮ providing only exemplar communications that the firm

---

[5] Tellingly, in matching up the heavily redacted texts produced with the votes cast in Beasley Allen's master ballot, it was revealed that at least 25 of the claimants who indicated that they wished to *accept* the Plan in their text messages were nevertheless voted to *reject* the Plan by Beasley Allen. The Debtor uses the term "at least" because, as discussed more fully in the section regarding discovery, many of the text messages have been so heavily redacted, and contain so many irregularities, that they raise more questions than they answer, rendering the text messages both undecipherable and unreliable for their intended purpose (evidence of affirmative consent).

JONES DAY

Honorable Christopher M. Lopez
December 16, 2024
Page 4

presumably will allege were sent to each of its clients.  But that was not what this Court ordered. Moreover, ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ does not constitute "informed consent," and the Debtor is entitled to the actual communications required to verify which of the claimants' votes that Beasley Allen cast were tainted with this false certification.  According to Mr. Birchfield's own testimony, ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊.  Further, and more importantly, this information has been repeatedly ordered to be produced.

*Third*, Beasley Allen refuses to produce the information that would allow the Debtor to determine clearly and definitively whether any claimants for whom Beasley Allen cast votes in this matter were also voted by the firm in the Imerys bankruptcy, and whether those votes were consistent and/or even valid.  Again, Beasley Allen ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ and the Court has repeatedly ordered that it be produced.  But, even today, Beasley Allen simply chooses not to cooperate with legitimately requested and Court ordered discovery.[6]

In stark contrast, the Debtor and J&J have fully complied with their discovery obligations.  With respect to document discovery, the Debtor and J&J have collectively produced 30,495 new pages of documents in this case and re-produced another nearly 180,000 pages of documents previously produced in the prior LTL proceedings.  All without the need for the Coalition to file any motion to compel.  As to depositions, the Debtor and J&J made every single witness requested by the Coalition (Messrs. Kim, Wuesthoff, Dickinson, Haas, Murdica, and Lisman) available for deposition, without need for motions practice and on dates requested by the Coalition.  Nearly all of these depositions occurred before a single Coalition witness sat for deposition.  (By contrast, only one aggressively opposed and serially delayed deposition of a Coalition witness has been completed to date.)

The Debtor provides this context because the Coalition now seeks to be rewarded for its one-sided "delay and derail" efforts by having the Court continue the consolidated hearing for 45 days, moving it from the current January 27, 2025 date to mid-March 2025.  There should be no mistake about the Coalition's intentions:  It seeks more time for the singular purpose of allowing just two firms to continue their self-motivated and long running crusade to subvert the tremendous support which the Plan has garnered.  The Court should not countenance the Coalition's gamesmanship nor its ill-intended motives.

---

[6] The document production served by Richard Golomb of Anapol Weiss fares no better and remains inadequate for reasons specified below.

## Outstanding Fact Discovery Issues

As of the filing of this letter, significant discovery requested by the Debtor remains outstanding.

**Document Productions.** Since the Tuesday, December 10 hearing—where the Court admonished Beasley Allen for its delinquent productions and urged production in a more expeditious manner to be completed by Friday, December 13 (12/10 Hrg. Tr. at 30:11-32:23)—the firm has made three additional productions. The first consists of heavily redacted communications with 21 claimants concerning instructions on how to vote.

The second production, as described in item 6 of the status report filed by the firm (Dkt. 766), includes a "list of deceased clients and the names of her next of kin or personal representative with whom Beasley Allen communicates regarding the claims originally asserted by the decedents." Beasley Allen further states that it "expects to begin producing copies of fee agreements with these personal representatives and next of kin next week." The Debtor is disappointed to learn that Beasley Allen still has not even ***begun*** to produce what the Debtor actually requested—not a list of deceased claimants, but rather documents indicating the firm's right to cast votes on behalf of such claimants. The Debtor reserves its rights to assess the completeness of the production and request any further relief as appropriate.

The third production includes approximately 1,180 highly redacted texts, emails and read outs from voice recordings from clients allegedly indicating "yes" or "no" votes.

But even with these productions, as of the date of this letter, Beasley Allen's productions remain incomplete in at least the following significant respects:

- **Evidence of various claimants' affirmative communications concerning the vote.**

    o The firm has still only produced approximately 1,700 ███. The fact that ***all*** of the relevant material still has not been produced is inexcusable, given that the Court told Beasley Allen it would have to be produce more than a month ago at the November 12 hearing and Mr. Birchfield himself testified ███.
    See 11/12 Hr'g Tr. at 109:23-110:10; also id. at 72:19-73:14, 74:1-4, 79:2-13, 84:1-5, 84:17-25, 99:21-100:4, 108:2-13.

JONES DAY

Honorable Christopher M. Lopez
December 16, 2024
Page 6

- o  Beasley Allen's production of text messages where in claimants told the firm whether to accept or reject the Plan (item 5 of Beasley Allen's status report) are almost entirely redacted and devoid of context.  See Example attached hereto as Exhibit A.  In their current state, many (if not most) do not provide the Debtor or this Court with evidence of the affirmative directions provided by claimants, but rather raise even more questions.  By way of example:

    - Many of the emails and text messages exhibit no indication of when the response was received, as opposed to when a solicitation message was sent.  As such, there is no way to determine if the direction was issued before or after Beasley Allen cast its Master Ballot.  See Example attached hereto as Exhibit B.

    - Some text messages are entirely redacted and show no vote at all.  See Example attached hereto as Exhibit C.

    - Certain text messages were sent by someone other than the PDF labelled claimant name, with no explanation for who the responding individual is or why the individual has a right to vote on the claimant's behalf.  See Example attached as Exhibit D.

    - Some text messages include "changes" to the vote, without indication of who made the change, whether that person was entitled to make a change, or when the change occurred.  See Example attached as Exhibit E.

    - Many text messages are redacted in a manner that requires context – which is missing – to determine the intent of the claimant given the vague nature of the communication.  See Example attached as Exhibit F.

- o  Finally, as previously noted, in *at least* 25 instances Beasley Allen voted against the Plan when the client very clearly asked to vote in support.

- o  Given the ongoing and intentional delay in producing this critical documentary evidence—clearly orchestrated to facilitate the firm's pending request to delay the hearing—not to mention the excessive redactions rendering many of the documents unusable, Beasley Allen should be precluded from arguing that any more claimants than those

included in the small subset of claimants within the 1,700 text messages provided who (a) clearly gave their instruction *before* Beasley Allen cast its Master Ballot; (b) their text message was produced in a manner that provides enough context to decipher their true intention; and (c) the corresponding vote cast by Beasley Allen is in fact consistent with the instructions given within the text, can be counted as a claimant that the firm voted on the basis of affirmative consent.[7]

- **Evidence of** ▮▮▮▮. While Beasley Allen has provided a variety of redacted materials that contain indications of its ▮▮▮▮ solicitation program, with one exceedingly narrow exception, it still has not produced any evidence showing which of its approximately 11,500 putative clients received ▮▮▮▮ communications about the Plan.[8]  (12/10 Hr'g Tr. at 27:1-29:8).

- **Imerys "Cross Walk" Materials.** While Beasley Allen states it does not possess "any document" that would enable the Debtor to match claimants whom the firm voted in the Imerys bankruptcy with the votes it cast in this case (*i.e.*, a "cross-walk") (11/26 Hr'g Tr. at 24:23-25), that assertion is clearly misleading. Mr. Birchfield testified ▮▮▮▮▮▮▮▮.

The single document production made by Mr. Golomb of Anapol Weiss is likewise deficient. As of the date of this letter, the firm had only made a single production (on November 5) totaling 31 pages. It has steadfastly ignored the directions of the Court at the December 10 hearing.

**Protective Order.** The parties have stipulated and agreed to a draft Protective Order (attached hereto as <u>Exhibit G</u>), with the exception of one clause in paragraph J. In accordance with the Court's guidance during the October 27, 2024 hearing, and in the Debtor's continued efforts to protect the claimants by limiting the circulation of the Voting Tabulation Spreadsheet, the Debtor proposes that the PEO Professionals' group member that is granted access to the

---

[7] Even as to this small subset of claimants, the Debtor reserves the right to dispute whether the consent given was truly "informed."

[8] On December 11, Beasley Allen produced partially unredacted solicitation materials for 21 claimants which has allowed the Debtor to determine—just for these individuals (all of whom were clients of an AHC firm and voted in favor of the Plan)—what materials the particular claimant received.

Voting Tabulation Spreadsheet must be qualified and subject to treatment as an expert pursuant to Fed. R. Evid. 702.

**Travelers Casualty and Surety Company Motion to Compel.** On November 27, 2024, Travelers Casualty and Surety Company ("Travelers") filed a motion to compel (Dkt. 682) asking the Debtor and J&J to provide certain supplemental discovery responses. As explained in their Objection (Dkt. 692), the Debtor and J&J provided the supplemental response requested by Travelers—that, based on a reasonable search, the Debtor and J&J have no additional non-privileged documents responsive to the requests at issue that had not already been produced or identified for Travelers. Unsatisfied, Travelers raised for the first time in its Reply (Dkt. 733) a new demand asking the Court to totally disregard the mediation privilege and the common interest doctrine to permit Travelers broad access to protected communications between the Debtor, J&J, and claimants' counsel supporting the Plan. The Debtor and J&J intend to file a Sur-reply addressing Travelers' new arguments asserted for the first time in its Reply, explaining why the new argument are borderline frivolous and should be denied. This Court (along with many others) have recognized that mediation negotiations are confidential and properly shielded from discovery.[9] Likewise, the common interest doctrine extends to communications between debtors and parties that share a common legal interest in the successful formulation and confirmation of a plan.[10] The Debtor and J&J have not waived the privilege, nor have they "put at issue" the negotiations with claimants' counsel in such a manner to support disregarding the confidentiality of mediation. Contrary to Travelers' argument, it is the overwhelming support of the claimants and their counsel—which has been the subject of broad discovery already—that most clearly demonstrates the Plan has been proposed in good faith.

Nor should Travelers be permitted to misuse these proceedings to obtain leverage in its collateral litigation with the Debtor and J&J. The scope of Travelers and other insurers' obligations to pay for talc claims is at the heart of a separate insurance coverage action that has been pending in New Jersey state court for more than five years. In that coverage litigation and elsewhere, Travelers has taken the position that it is not obligated to provide the Debtor and J&J with any coverage whatsoever. While that is grossly incorrect, the coverage litigation will likely confirm that the applicable insurance coverage from Travelers and other insurers has already been substantially eroded by the Debtor and J&J's prepetition defense costs. Thus, at the end of the day, any potential contribution from Travelers to the Plan would likely be minimal, if anything at all. That Travelers now seeks to assert frivolous and unfounded arguments seeking

---

[9] See, e.g., Nov. 12 Hr'g Tr. at 87:13-20 ("If something was conducted in mediation, . . . – I'm not opening that door. I'm not interested in that. . . . I'm not opening up mediation doors . . ."); Dec. 10, 2024 Hr'g Tr. at 35:1-2 ("[I]t looks like they're asking for stuff from mediation and you're not going to get that either.").

[10] See, e.g., Nov. 12, 2024 Hr'g Tr. at 112:7-17.

to eviscerate well-established confidentiality protections and privileges only further highlights the tactical nature of the Motion and shifting requests for relief.

In that regard, the Debtor and J&J have this weekend filed a motion for leave to amend in order to file claims in the coverage litigation based on Travelers' misconduct in these proceedings, where it is taking every opportunity to obstruct and interfere with its insured's ability to consummate the resolution contemplated under the Plan and expose them to substantial additional liability in the tort system far in excess of any of the policy limits.

### Proposed Schedule

Although the Court's abatement of the CMO deadlines requires modifications to the interim deadlines established in the agreed CMO (Dkt. 352), there is no need to move the previously scheduled January 27, 2025 date for the consolidated hearing. Indeed, except for the Objecting Duo that remain as part of the Coalition, every interested party prefers to keep the January 27 date.[11] See Dec. 10, 2024 Hr'g Tr. at 14:22-15:3 (Debtor); Id. at 52:10-18 (TCC); Id. at 55:14-20 (AHC). And as discussed below, the recent amendments to the Plan, the ongoing fact discovery disputes, and the upcoming expert reports and discovery do not warrant moving the consolidated hearing date.

**Amended Plan.** The primary modifications reflected in the Second Amended Plan fall into three categories: (a) acceleration of the Plan's effective date; (b) acceleration of trust funding; and (c) procedures for identifying individual review criteria and conditions. As Coalition counsel conceded at the December 10 hearing, these changes were made to incorporate the terms of the TCC memorandum of understanding, which was filed with the Court almost a month ago. See Dec. 10, 2024 Hr'g Tr. at 59:4-5. The substance of the changes has been known to the parties for weeks and does not present fact issues that require discovery. Moreover, the primary terms of the Plan have fundamentally remained the same.

These Plan amendments have no impact on the Coalition's core objections to the Plan, which are the same objections these firms have asserted for the last four years in the prior two bankruptcies and in fact would assert in any mass tort bankruptcy. The objections present, at best, legal issues for confirmation. See Dkt. 425 at 27-34 (Debtor's omnibus opposition to motion to dismiss, identifying Coalition's various confirmation challenges). Nor do the recent Plan amendments impact the Coalition experts' predictable opinions. In fact, the Coalition has

---

[11] These two firms' desire for delay is remarkably ironic in light of their prior pleas to this Court across a number of hearings for a rocket-docket style schedule, tort system trial settings, and other expedited relief on the theory that the claimants should not be required to wait for relief.

**JONES DAY**

Honorable Christopher M. Lopez
December 16, 2024
Page 10

been entirely unable to explain how the Plan amendments affect its experts or its ability to meet the current, remaining CMO deadlines.

Put simply, the Coalition's attempt to leverage minor Plan amendments into a material delay in the case is baseless and should be rejected. Notably, the parties involved in the recent amendments—the TCC, the AHC, the Smith Law Firm, and the FCR—all have declined to use the recent amendments as an excuse to delay these proceedings.

**Outstanding Discovery Issues.** Likewise, neither the Coalition's prior delays in fact discovery nor its ongoing and self-imposed campaign to continue delaying fact discovery warrant moving the consolidated hearing. The outstanding fact discovery issues relate principally, if not entirely, to voting issues. The Coalition has failed to explain how these issues will in any way impact their experts' reports or analyses. To the contrary, the Coalition admits that, with this Court's timely guidance, fact discovery on voting-relating issues will soon be addressed (*see id.* at Dec. 10, 2024 Hr'g Tr. at 42:4-10) and a hearing on voting matters can and should proceed on January 27.[12]

In any event, as is customary, experts can supplement their reports or analyses with any late-arriving fact discovery that hypothetically could impact their opinions.

**Expert Reports and Depositions.** At Tuesday's conference, the Coalition pointed to the sheer number of disclosed experts (21) as a basis to move the January 27 consolidated hearing date. *See id.* at 60:4-24. This is not a basis to alter the date for several reasons. *First*, the parties disclosed their primary experts more than three weeks ago on November 22 and presumably had been working with their experts long before that. As noted, there has been no showing that the Plan amendments or delays in voting-related discovery in any way impact the Coalition's expert reports.

*Second*, five of the Coalition's seven affirmative experts—and, as a result, four of the Debtor's rebuttal experts— were identified as experts on medical, science, and regulatory issues

---

[12] The Coalition made this comment in support of its renewed effort to hold separate hearings on voting-related and confirmation/motion to dismiss-related issues, a request the Court has already rejected. As the Debtor has previously stated, there is no dispute that the factual issues identified in the Coalition's various voting-related motions overlap substantially with the fact-based challenges the Coalition has already told the Court it intends to make in opposing confirmation and moving to dismiss the case. *See*, *e.g.*, Coalition Motion to Dismiss (Dkt. 44) at ¶¶ 9-10, 47 (arguing Plan support comes primarily from votes on behalf of "non-compensable claims"); ¶¶ 74-78 (arguing Red River cannot meet § 524(g)'s confirmation requirement unless two-thirds in amount of claims in Class 4 have voted to accept the Plan); ¶¶ 83-86 (discussing impact of voting on section 1123(a)(4)'s "same treatment requirement"). There is no reason for the Court to change its preference to "take … up" the "voting issues" "in connection with a motion to dismiss or a motion to plan confirmation." Oct. 10, 2024 Hr'g Tr. at 223:19-224:1.

JONES DAY

Honorable Christopher M. Lopez
December 16, 2024
Page 11

that are irrelevant to the issues that need to be addressed at the consolidated hearing. No other party designated any affirmative expert on these issues (the Debtor identified experts on medical and science issues solely in response to the Coalition's disclosure). The parties can simply stipulate that there is a dispute between the parties on whether there is any scientifically valid evidence that Johnson's Baby Powder contained asbestos or is capable of causing ovarian or gynecological cancer. There is no reason for this Court to hold what would be tantamount to a multi-day *Daubert* hearing on these issues, and the Coalition has offered no explanation on how any ruling or findings by this Court on these long-disputed issues would impact whether the Plan is confirmable or whether its other motions should be granted.[13]

**Proposed Schedule.** Given the foregoing, the Debtor proposes the following minor adjustments to the remaining deadlines which, in turn, will facilitate the previously set January 27 hearing.

| Event | New Proposed Date | CMO Date |
|---|---|---|
| Initial Expert Reports | Fri, 12/20 | Fri, 12/6 |
| Fact Discovery Deadline | Tues, 12/24 | Wed, 11/27 |
| Plan Objections | Mon, 12/30 | Fri, 12/6 |
| Rebuttal Expert Reports | Mon, 1/6 | Fri, 12/13 |
| Expert Depositions | Mon, 1/6 – Fri, 1/17 | Mon, 12/16 – Fri, 12/31 |
| Debtor's Confirmation Brief | Mon, 1/20 | Mon, 1/6 |
| Pre-Trial Briefs | Wed, 1/22 | Fri, 1/10 |
| Consolidated Hearing | Mon, 1/27 | Mon, 1/27 |

The Debtor's proposed deadlines for fact discovery, experts, and plan objections are eminently reasonable. The Debtor's proposal extends the fact discovery period for a full month, an extension largely necessary to accommodate the Coalition's on-going delays.

As to experts, the parties disclosed their initial experts more than three weeks ago in anticipation of the original December 6 expert report deadline. The Debtor's proposal provides an additional two weeks from that deadline. Also, the CMO provided one week for parties to submit rebuttal expert reports. Because following that same timing in a revised schedule would be challenging given the holidays, the proposed schedule provides for a rebuttal report deadline of January 6, more than two-and-a-half weeks after the delivery of initial reports. As for expert depositions, the Debtor's proposal provides the same two-week period as the agreed CMO, though it is more generous because, unlike the agreed CMO, one of those weeks is not the week between Christmas and New Year's.

---

[13] The Debtor has moved to strike these experts through a separate filing (Dkt. 769).

JONES DAY

Honorable Christopher M. Lopez
December 16, 2024
Page 12

      With respect to plan objections, the CMO provided a deadline of December 6. As noted, the Debtor expects that most objections to confirmation will present legal issues. Further, the parties undoubtedly had substantially completed their briefing on objections before the December 6 deadline was stayed by the Court. Nonetheless, the Debtor's proposed schedule provides all parties until December 30 to file any objections to the Plan. If anyone is squeezed by the Debtor's proposed schedule, it is the Debtor, whose time to respond spans the New Year's holiday and would be cut from a month to three weeks.

      Finally, the Debtor's proposal eliminates pre-trial hearing response briefs, which the Debtor believes are unnecessary given the extent to which briefing to date in this proceeding, plus the briefing contemplated by this schedule, will have already framed the important issues for the Court.

      In conclusion, the Debtor respectfully requests that the Court order the Coalition to provide the discovery discussed herein and revise the CMO deadlines in a manner consistent with the foregoing proposal.

      The Debtor thanks the Court for its attention to the matters.

      Respectfully submitted,

      /s/ *Gregory M. Gordon*
      Gregory M. Gordon

cc: Counsel or Record