**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC, LLC[1] | Case No. 24-90505 (CML) |
| Debtor. | |

**SLF'S OBJECTION TO THE COALITION'S EMERGENCY MOTION AND
SUPPLEMENTAL EMERGENCY MOTION TO COMPEL TESTIMONY AND/OR
DOCUMENTS FROM ALLEN SMITH, JR. AND THE SMITH LAW FIRM**

[Related to Dkt. Nos. 657 and 755]

The Smith Law Firm, PLLC ("**SLF**"), on behalf of itself, the talc claimants it represents ("**SLF Claimants**"), and R. Allen Smith, Jr., respectfully submits this omnibus objection to the Coalition of Counsel for Justice for Talc Claimants' (the "**Coalition**") *Emergency Motion to Compel Testimony and Documents from Allen Smith, Jr. and the Smith Law Firm* [Dkt. No. 657] (the "**Testimony and Documents Motion**" or "**TDM**"), and *Supplemental Emergency Motion to Compel the Production of Documents from Allen Smith, Jr. and The Smith Law Firm* [Dkt. No. 755] (the "**Supplemental Motion**" or "**SM**").

**PRELIMINARY STATEMENT**

1.      Without a hint of irony, the Coalition uses the Testimony and Documents Motion to challenge Mr. Smith's assertions of the very same privileges and immunities from discovery that the Coalition, its member firms, and other deposition witnesses have repeatedly invoked in this Chapter 11 Case – and that the Court has upheld already.  Mr. Smith was (and remains) entitled

---

[1] The last four digits of the Debtor's federal tax identification number are 8508.  The Debtor's address is 501 George Street, New Brunswick, NJ 08933.

to assert these protections.  The Coalition plainly knows this.  That is why, on December 7, 2024, the Coalition offered to withdraw the Testimony and Documents Motion in exchange for some limited information.  Although SLF responded favorably the very next day about its willingness to provide the information (requesting only minimal clarification), the Coalition reneged.  In fact, SLF's counsel is still waiting for the return phone call that Coalition counsel committed to provide. Instead, the Coalition filed the Supplemental Motion claiming to have met and conferred about that motion's contents – a claim it has made repeatedly and, regrettably, inaccurately.

2.      To be sure, whether filed by the Coalition to try to gain leverage in its own discovery disputes with the Debtor and other parties, delay the current confirmation hearing date, or otherwise, neither motion has any merit.  The Coalition contends that the common interest privilege should not have been invoked at Mr. Smith's deposition because some communications between Mr. Smith and James Murdica, resolution counsel for Johnson and Johnson ("**J&J**") and the Debtor, pre-date the filing of this Chapter 11 Case.  But the Coalition acknowledges that Mr. Smith and Mr. Murdica negotiated a memorandum of understanding (the "**MOU**") with a pre-filing effective date.  TDM ¶ 14.  Courts have repeatedly held that common interest can form when a bankruptcy is looming, and that the common interest privilege takes hold as of the date co-interested parties settle on the material terms of any agreement upon which their common interest arises – meaning here, by ███████████████ (and, in all events, no later than the MOU's August 30 effective date).

3.      The Coalition's challenge to assertions of privilege over communications between Mr. Smith and Richard Golomb of Golomb Legal, P.C. ("**Golomb Legal**") are particularly specious.  Prior to and throughout the pendency of this Chapter 11 Case, Mr. Smith and Mr.

Golomb have *jointly represented* hundreds of talc claimants.  Discussions concerning the possible settlement of their shared clients' cases and related issues are unmistakably privileged.

4.    The Coalition's argument that communications between Mr. Smith and Mr. Murdica cannot be mediation privileged is likewise wrong on both the law and the facts.

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████  Moreover, various documents reflect that Mr. Smith and Mr. Murdica understood and expected their mediation communications about the MOU to be privileged to the fullest extent provided by law.

5.    Separate arguments advanced by the Coalition about its supposed need for testimony concerning Mr. Smith's financial condition and litigation funding fare no better. Tellingly, despite claiming that evidence of Mr. Smith's financial condition is now "critical" (TDM ¶ 10), *the Coalition did not serve a single document request on Mr. Smith or SLF (or the Debtor) calling for the production of any such financial information.*

6.    Moreover, just last month, in response to discovery *against* it, the Coalition took the position that documents and communications concerning third-party funding are *not relevant* to any party's claims or defenses and *disproportional* to the needs of this case.  At a November 12, 2024 hearing, the Court agreed, correctly observing that litigation funding does not reveal how or why an individual claimant voted to accept or reject the Debtor's proposed plan.  Having taken one position, the Coalition should not be allowed to adopt the inverse position to compel the same irrelevant disclosure from others.  (Nor should *the Coalition's* strategic reversal on this topic open the door to any discovery from *Mr. Smith*; his shield should not be taken away because the Coalition now wishes to wield a sword.)

7.     Indeed, the Coalition's attempts to sidestep contrary positions that it and its member firms have taken previously give the lie to the entire Testimony and Documents Motion.  In addition to resisting litigation funding discovery (both in this case and in talcum powder multidistrict litigation in New Jersey federal court (the "**MDL**")), the Coalition and its member firms clearly asserted common interest and mediation privileges in response to various document requests served on them.  And, at the November 12 hearing, the Court also recognized and upheld *those exact* privileges.  Those privileges and protections apply with equal force to Mr. Smith.

8.     Nor is there any reasoned basis on which to compel additional document production from Mr. Smith or SLF.  To the extent not protected by recognized privileges and actually relevant to this Chapter 11 Case, the "sufficient to show" documents that the Coalition seeks in the Testimony and Documents Motion (¶ 7) and the retainer agreements and power of attorney materials in SLF's possession that the Coalition seeks in the Supplemental Motion (¶¶ 14-17) have all been produced by SLF already.

## BACKGROUND

### Mr. Smith, SLF's Clients, and Co-Counsel

9.     Mr. Smith was the first attorney to file talc-based cancer claims against J&J and its affiliates, Dkt. No. 306-4 at ¶ 3 ███████████████████████

███████████████.  Before any other attorney, Mr. Smith followed the science, engaged experts, and, in 2013, became the first attorney to try and prevail on talc-based claims.  Dkt. No. 306-4 at ¶ 3.  Since then, he has been lead trial counsel in nine more ovarian cancer cases against J&J, securing hundreds of millions of dollars in verdicts.  *Id*.  Based on Mr. Smith's hard work and success, SLF is often retained to represent talc claimants directly, and Mr. Smith and his firm enjoy an attorney-client relationship and related privileges with each of the SLF Claimants.

10.     Over the years, Mr. Smith and SLF also have entered into joint venture agreements and co-counsel arrangements with other law firms to sign up and represent numerous additional talc claimants.  Most notably, more than a decade ago, SLF executed a joint venture agreement with the law firm of Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. ("**Beasley Allen**") to jointly represent talcum powder clients – totaling, as of today, more than 11,000, including several plaintiffs named in the MDL.  *Id*. ¶¶ 6, 10; Dkt. No. 631-2 at 204:4-20.  From time to time, SLF also hires "local counsel" – including Golomb Legal – to assist with SLF Claimants' claims.  *Id.* ¶ 31; Dkt. No. 631-2 at 114:7-9.  SLF's direct communications with its jointly represented clients are privileged, and SLF shares additional joint prosecution privileges with its co-counsel.

**Efforts to Settle Talc Claims:  Bankruptcy, Mediation, and the MOU**

11.     Since at least 2021, J&J has tried to resolve its and its affiliates' talc liabilities through bankruptcy.  Members of the MDL's plaintiffs' steering committee, including Beasley Allen attorneys, and Mr. Smith both have been active participants in complex mediation efforts to try to reach a resolution with J&J that could end talc-related disputes and facilitate meaningful recovery for their clients.  Dkt. No. 306-4 at ¶¶ 11-13.

12.     As relevant here, ███████████████████████████  the mediation agreement endorsed by the parties ███████████████████████  mandates broad confidentiality and privilege protections for mediation-related communications:  "To the fullest extent provided by law, all offers, promises, conduct and statements, whether oral or written, made in the course of mediation . . . are confidential.  To the fullest extent provided by law, such offers,

promises, conduct, and statements will not be disclosed to third parties and are privileged and inadmissible for any purpose, including impeachment[.]"[2]

13.     Andy Birchfield of Beasley Allen – Mr. Smith's principal contact for the joint venture – has been one of the lead negotiators for MDL leadership in mediation efforts ████████ ████████. Dkt. No. 306-4 at ¶ 16.  In the summer of 2024, however, Mr. Smith learned that the relationship between Mr. Birchfield and J&J had become so unproductive that settlement discussions were stalled.  *Id*. ¶¶ 16, 17; *see also* Dkt. No. 631-2 at 138:4-6.  Mr. Birchfield was placing the eggs of all of Beasley Allen's and SLF's many thousands of joint clients in a single litigation-based basket.

14.     Mr. Allen did not favor this unidirectional approach, a *status quo* that left his clients and other talc claimants (including many who want or need economic relief promptly) waiting many more years for a resolution, with no certainty of obtaining any recovery whatsoever. Accordingly, after opposing the Debtor's initial proposed plan in July 2024 because it did not provide sufficient compensation for his clients, Mr. Smith decided to involve himself in ongoing mediation efforts more directly.  Dkt. No. 306-4 at ¶ 17.

15.      Shortly thereafter, when discussions again stalled, Mr. Smith engaged in extensive negotiations with Mr. Murdica over what became the MOU.  Dkt. No. 306-4 at ¶¶ 16, 17. ████████

---

[2]   *See* sample Resolutions, LLC Mediation Agreement, available at https://resolutionsllc.com/wp-content/uploads/2024/05/Resolutions-LLC-Draft-Mediation-Agreement.pdf.



16.

.[3]

17.     The executed version of the MOU includes an August 30, 2024 effective date.  Dkt. No. 17-1 at § I.A.  The MOU reflects key improvements to the Debtor's initial proposed plan, and spells out how SLF, J&J, and the Debtor will work together to "facilitate[] the successful filing and confirmation of the Red River Talc LLC Chapter 11 bankruptcy."  *Id.* at Recitals and § II.A.

**Relevant Procedural History and Discovery to Date**

18.     On September 20, 2024, the Debtor commenced this Chapter 11 Case.  Dkt. No. 1.

19.     In October, the parties served documents production requests, including requests from the Coalition to Mr. Smith, and requests from the Debtor and SLF, respectively, to the Coalition, Beasley Allen, and Golomb Legal.  They also served written responses and objections to those production requests.  *See, e.g.*, Dkt. No. 368-3, Dkt. No. 445-1.

---

[3] A copy of this mediation and joint representation privileged email – which has not been produced but is, and always has been, equally available to the Coalition via Beasley Allen – can be provided for *in camera* review.

20.     In their objections to the requests, each of the Coalition, Beasley Allen, and Golomb Legal asserted common interest, joint prosecution, and mediation privileges.[4]  Each of the Coalition, Beasley Allen, and Golomb Legal also asserted that documents and communications relating to funding agreements and litigation financing were "not relevant to any party's claim or defense and proportional to the needs of the case."  *See, e.g.*, Dkt. No. 368-3 at 5, 21.

21.     On November 5, 2024, all parties, including SLF and the Coalition's member firms, produced non-privileged documents.  Consistent with their objections, the Coalition, Beasley Allen, and Golomb Legal (and the Coalition's other member firms, respectively) did *not* produce *any* (i) communications with Mr. Smith, Mr. Murdica, and/or ▆▆▆▆▆; (ii) litigation financing documents; or (iii) settlement valuations and related economic estimates.

22.     On November 12, 2024, the Court held a hearing and sustained the Coalition's and Beasley Allen's common interest and mediation privilege objections to, *inter alia*, the Debtor's discovery requests concerning mediation-related discussions.  *See* Dkt. No. 657-1 (11/12/24 Hr'g Tr.) at 112:6-23; Dkt. Nos. 368, 445, and 511.  The Court also separately (and repeatedly) questioned the relevance of litigation funding discovery before declining to compel any.  *See* Dkt.

---

[4] *See, e.g.*, Beasley Allen's objections, Dkt. No. 368-3 at 2 (General Objection No. 4:  "The Firm objects to the Requests to the extent they seek documents protected by joint prosecution, joint defense or common interest doctrine, mediation privilege, or other applicable privilege or protection"); *id.* at 21 (Response to Request No. 36: "The Request [for documents and communications with J&J and the Debtor and their representatives concerning mediation and resolution of talc claims] expressly seeks documents that, if they exist, are protected mediation-related communications and that may be protected by the attorney-client privilege, joint prosecution or common interest privilege, and work product doctrine."); *id.* at 22-23 (Response to Request Nos. 37 & 38:  "The Request[s for documents and communications between Beasley Allen and any other law firm or attorney from July 26, 2024 to today concerning mediation or resolution of Talc Claims, and/or for documents and communications with any other law firm concerning the common benefit fund to be established and any distributions from it] expressly seeks documents that, if they exist, are protected mediation-related communications and that may be protected by the attorney-client privilege, joint prosecution or common interest privilege, and work product doctrine.").  Each of the Coalition's other member firms interposed the exact same objections.  *See, e.g.*, Golomb Legal's objections at 2 (General Objection No. 4) and 19-20 (Response to Request Nos. 30-32) (annexed as Exhibit A); Levin Sedran & Berman, LLP' s objections at 2 (General Objection No. 4) and 18-19 (Response to Request Nos. 29-31) (annexed as Exhibit B); and Levin, Papantonio, Procter, Buchanan, O'Brien, Barr, Mougey, P.A.'s ("**Levin Papantonio**") objections at 2 (General Objection No. 4) and 19-20 (Response to Request Nos. 30-32) (annexed as Exhibit C).

No. 657-1 at 39:1-40:3 ("What's the relevance?"; "[W]hy is the litigation funding driving the issue [of how clients voted]?  In other words, what's the relevance of that?"; "[T]ell me why it's relevant in this case when we're trying to figure out who -- how someone voted."); *id.* at 109:8-9 ("you don't have to produce anything with respect to funding agreements"); and *id*. at 112:6 (as to any other documents and communications concerning third-party funding, "not yet").  The Court then directed the Coalition and Beasley Allen to either produce certain documents or submit them to the Court for *in camera* review by no later than November 15, 2024.

23.     On November 19, 2024, based on guidance the Court provided to all parties at the November 12 hearing, SLF voluntarily submitted several documents of its own to the Court for *in camera* review, and requested guidance as to what additional production or redaction would be appropriate.

24.     On December 6, 13, and 16, 2024, based on guidance the Court provided to all parties at a November 26 hearing, SLF produced additional documents responsive to the Coalition's requests.  SLF has now produced, *inter alia:*  copies of seven different forms of retainer agreement it and law firms with which it associates – other than Beasley Allen – use to represent SLF Claimants; specific retainer agreements and power of attorney documentation in SLF's possession for clients who SLF voted on its master ballot in September 2024 under Option B; specific retainer agreements for and identifying deceased SLF Claimants; redacted communications to and from SLF Claimants about voting that show or otherwise reflect their yes/no responses to SLF concerning the Debtor's revised plan in September 2024; and lists showing SLF Claimants who affirmatively responded to SLF and voted yes/no.

**Mr. Smith's Deposition**

25.     Mr. Smith was deposed on November 21, 2024.  In the course of 6 hours and 55 minutes of on-the-record testimony, he was questioned by Coalition counsel from Otterbourg P.C. *and* individual attorneys from the Coalition's member firms, including Mr. Golomb and Christopher Tisi of Levin Papantonio.

26.     Mr. Golomb and Mr. Tisi, in particular, posed numerous questions calling for disclosure of Mr. Smith's communications with Mr. Murdica during mediated efforts to reach settlement terms, and, then, subsequent to a meeting of the minds on the MOU's key terms, concerning the memorialization and implementation of the MOU. ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

27.     These privilege-crossing questions elicited objections and instructions not to answer. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████

28.     At deposition, Mr. Smith also objected and was instructed not to answer most substantive questions concerning litigation funding, since the Court had ruled that topic irrelevant (and thus not proper) already.  *Id*. at 146:10-150:2, 156:5-158:7, 159:4-14.  The questioning attorneys were unaware of the Court's remarks at the November 12 hearing or knowingly ignored them.  *See id.* at 152:13-16, 157:6-25.

**The Coalition's Failure to Meet and Confer On The Motions**

29.     In both the Testimony and Documents Motion and the Supplemental Motion, the Coalition represented that it met and conferred with counsel for Mr. Smith or used best efforts to resolve discovery disputes prior to seeking Court relief.  Unfortunately, as detailed below, it has not.  In fact, there have been precious few meet and confer sessions between SLF and the Coalition (notwithstanding the efforts of undersigned counsel), and none before motions were filed.

30.     In the Testimony and Documents Motion (¶ 45), the Coalition represented that it has "discussed" with counsel for Mr. Smith "the basis of counsel's objections."  This is inaccurate.  Apart from on-the-record exchanges during Mr. Smith's deposition, there have been no such discussions.  The Coalition also stated that it "requested a meeting with counsel in an effort to resolve these disputes."  *Id*.  But the Coalition has never requested a meeting to address any dispute concerning Mr. Smith's November 21 deposition testimony.[5]

31.     On Saturday, December 7, 2024, without addressing the substance of any dispute or requesting a meet and confer, and nearly two weeks after filing the Testimony and Documents Motion, Coalition counsel did make a written proposal to resolve it (annexed as Exhibit D).

---

[5] This remains true today despite undersigned counsel's November 25 email to the Court's case manager and Coalition counsel – after learning of the Motion and the Coalition's efforts to get it on the calendar for consideration at a hearing less than 24 hours after its filing – that "[t]he Coalition's attorneys have not even asked us to meet and confer" and that counsel for Mr. Smith and SLF wanted "an opportunity to confer with the Coalition," and despite undersigned counsel both calling and emailing Coalition counsel on the morning of November 26 to try to meet and confer about the Motion (or at least about a briefing schedule for it) prior to that day's Court hearing.

Specifically, the Coalition offered to withdrawal the Testimony and Documents Motion prior to the December 10 status conference with the Court in exchange for Mr. Smith and SLF committing to subsequently provide: (i) the date on which Mr. Smith signed and delivered the MOU to Mr. Murdica; (ii) the dates prior to signing on which Mr. Smith and Mr. Murdica negotiated the MOU; and (iii) the date on which SLF and SLF Claimants retained undersigned counsel.

32.    The very next day, undersigned counsel informed counsel for the Coalition that it viewed the proposal favorably but had some limited questions – specifically, (i) whether the proposal was also made on behalf of (and, thus, if accepted, would apply with equal force to) the Coalition's member firms, and (ii) whether it also would resolve, as against Mr. Smith, the Coalition's separate *Emergency Motion to Compel Discovery from Allen Smith, Jr., Anne Andrews, Mikal Watts, Adam Pulaski, Jim Onder, and Majed Nachawati* [Dkt. No. 568].[6]

33.    On December 9, 2024, having received no response, undersigned counsel called Coalition counsel, who requested more time to answer SLF's questions.  Coalition counsel said that it expected the proposed resolution to apply to the Coalition's member firms and to resolve both of the two then-pending discovery motions against Mr. Smith and SLF – provided that SLF still committed to produce documents the Court had directed it and others to produce at a November 26 hearing, to which undersigned counsel agreed.  Both sides expressed confidence that a resolution of these discovery disputes would and could soon be reached.  The ball was left in Coalition counsel's court.

34.    On December 10, 2024, the Court held a status conference.  As of the start of that conference, undersigned counsel had heard nothing further from the Coalition.  At the December

---

[6] On November 19, 2024, SLF filed an objection to this separate discovery motion.  Dkt. No. 577.  As detailed in that objection, the Coalition failed to meet and confer before filing that motion too.

10 conference, with respect to Testimony and Documents Motion, Coalition counsel told the Court as follows:  "We have some pending motions to compel as well.  We are trying to work them out and we're not there yet.  I need to spend a little bit more time with Mr. Smith's lawyers."  12/10/24 Hr'g Tr. 76:8-11.  Since that December 10 conference (and really since the December 9 phone call), undersigned counsel has still heard nothing from Coalition counsel.

35.     On December 12, 2024, without having said a word to Mr. Smith's and SLF's lawyers and shortly before midnight Central Time, the Coalition filed the Supplemental Motion – reneging on its prior proposal to resolve the Testimony and Documents Motion.   In the Supplemental Motion (¶ 21), the Coalition represented that, "Counsel to the Coalition and Smith have met and conferred several times in an effort to resolve these disputes but were unable to reach resolution."  Not so.  The parties did not meet and confer even a single time before the Coalition filed the Supplemental Motion.  Nor did the Coalition even request such a meet and confer – before or since filing the Supplemental Motion.

36.     Thus, the Coalition's various statements to this Court that the Supplemental Motion was filed "[d]espite best efforts to resolve discovery issues with The Smith Law Firm" (*id*. ¶ 5) and "[d]espite numerous meet and confers" (*id*. ¶ 20) are inaccurate.

## ARGUMENT

37.     Rule 30(c)(2) of the Federal Rules of Civil Procedure, made applicable by Rule 7030 of the Federal Rules of Bankruptcy Procedure, provides, in relevant part, that:  "A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)."

38.     During his November 21 deposition, Mr. Smith was instructed not to answer questions in two permissible situations:  first, "to preserve a privilege" – *i.e.*, to prevent the Coalition from invading common interest, mediation, or other joint representation and prosecution

privileges enjoyed by Mr. Smith and SLF – and, second, "to enforce a limitation ordered by the court" – *i.e.*, to respect lines the Court drew at the November 12 hearing about excluding litigation funding discovery and the applicability of various privileges.  The Coalition fails to show otherwise.  Accordingly, the Testimony and Documents Motion should be denied.

39.     In the Supplemental Motion, the Coalition fails to identify any document or category of document that, to the extent non-privileged and relevant to this Chapter 11 Case and in SLF's possession, SLF has not produced already.  Accordingly, the Supplemental Motion should also be denied.

A.     **Mr. Smith's Communications With Mr. Murdica and Others Are Common Interest Privileged and Protected From Disclosure.**

40.     The Coalition spends the bulk of the Testimony and Documents Motion (¶¶ 13-25) arguing that no common interest exists between either (i) Mr. Smith and Mr. Murdica (and J&J's and the Debtor's other representatives), or (ii) Mr. Smith and any other lawyer involved in this Chapter 11 Case.  But each argument the Coalition advances as to why falls flat.[7]

41.     First, the Coalition argues that no common interest with Mr. Murdica exists because the MOU's effective date is August 30 and this Chapter 11 Case was not filed until September 20, 2024.  TDM ¶ 14.  In other words, according to the Coalition, common interest privilege cannot exist until litigation is actually pending.  The Coalition is wrong on the facts and the law.

---

[7] The Coalition's reliance on Texas' rules of evidence (TDM ¶ 13) is misplaced.  Federal common law, not state law, applies to discovery sought in connection with contested matters in a federal bankruptcy proceeding.  *See, e.g., Willy v. Administrative Review Bd.*, 423 F.3d 483, 495 (5th Cir. 2005) ("questions of privilege that arise in the course of adjudication of federal rights are governed by the principles of the common law as they may be interpreted by the courts of the United States"); *In re Sanchez Energy Corp.*, 2022 WL 17586713, at *3 (Bankr. S.D. Tex. Dec. 12, 2022) (applying federal common law to discovery dispute).  Notably, federal law was applied in all but one of the common interest privilege cases the Coalition cites in the Testimony and Documents Motion (at ¶¶ 18-19), and that outlier is distinguishable because it involved claims asserted in an adversary proceeding solely under state law.  *See In re Rodriguez*, 2012 WL 3257889, at *1 (Bankr. S.D. Tex. Aug. 7, 2012).

14

42.     As a factual matter, the MOU addressed *existing* litigation, not only *contemplated* litigation.  Specifically, the MOU called for joint efforts to discontinue claims in the MDL and other talc litigation.  *See* Dkt. No. 17-1 at Recitals § D. and § II.A.1.e.  The Coalition's argument fails for this threshold reason.

43.     As a legal matter, the common interest privilege extends the attorney-client privilege to communications exchanged between *potential* co-parties to litigation and their counsel when there is "a palpable threat of litigation."  *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 711 (5th Cir. 2001).  An anticipated bankruptcy filing constitutes such a "litigation."  *In re Hardwood P-G, Inc.*, 403 B.R. 445, 462 (Bankr. W.D. Tex. 2009).  Common interest privilege also protects communications covered by the work product doctrine.  *See, e.g.*, *Ferko v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 219 F.R.D. 396, 401 (E.D. Tex. 2003); *Finalrod IP, LLC v. John Crane, Inc.*, 2019 WL 13074600, at *4 (W.D. Tex. Mar. 22, 2019).[8]

44.     Here, the MOU being finalized before this case was filed precludes neither the existence nor pre-filing applicability of the common interest privilege.  When key terms of the MOU were agreed on, there was plainly a "palpable threat" of bankruptcy sufficient to invoke the common interest privilege.  Even the MOU's Recitals expressly confirm that it was negotiated after J&J "proposed a Prepackaged Chapter 11 Plan of Reorganization of the Debtor" in order to "further facilitate[] the successful filing and confirmation of the Red River Talc LLC Chapter 11 bankruptcy."  Dkt. No. 17-1.

45.     Importantly, the common interest privilege applies to communications as of the date parties have "agreed upon [the] material terms of" the agreement from which their common

---

[8] Complete alignment of interest is not required.  "[R]ather the party asserting the privilege must simply demonstrate actual cooperation toward a common legal goal."  *Hardwood*, 403 B.R. at 460.  *Accord In re Tribune Co.*, 2011 WL 386827, at *4-5 (Bankr. D. Del. Feb. 3, 2011); *In re Leslie Controls, Inc.*, 437 B.R. 493, 502 (Bankr. D. Del. 2010); *In re Quigley Co., Inc.*, 2009 WL 9034027, at *3 (Bankr. S.D.N.Y. Apr. 24, 2009).

interest arose.  *Tribune*, 2011 WL 386827, at *5; *accord In re Imerys Talc Am., Inc.*, 2021 WL 12302368, at *5 (Bankr. D. Del. Feb. 23, 2021).  Some courts have even extended the privilege to communications occurring prior to that date of mutual understanding, if the disclosure was for the purpose of furthering the parties' common interest.  *See Hardwood*, 403 B.R. at 460 (common interest focuses on the "reason for disclosure," not just "when the document was created").

46.     Here, as noted  As such, the common interest privilege certainly covers communications between them that occurred on and after that date █████████████████████████████████.[9]

47.     Second, the Coalition claims that no common interest can exist because Mr. Smith was not represented by counsel during MOU negotiations.  TDM ¶ 15-16.  That makes no sense. Mr. Smith is a lawyer and, as the MOU expressly provides, Mr. Smith negotiated the MOU *for his talc claimant clients*, not on behalf of himself or his law firm.  *See* Dkt. No. 17-1 (defining "Supporting Counsel" as "The Smith Law Firm PLLC, acting on behalf of its 11,983 clients who assert Talc Claims").  There was no need for Mr. Smith to be separately represented.

48.     Third, the Coalition claims that Mr. Smith, on the one hand, and Mr. Murdica, J&J, and the Debtor, on the other hand, do not have a common interest because Mr. Smith was opposed to the Debtor's bankruptcy plans *before* MOU negotiations began.  TDM ¶ 22.  But Mr. Smith has not asserted any common interest with those parties *prior to* the ███████ date that agreement

---

[9] The Coalition seems to concede that the common interest privilege between Mr. Smith and J&J might have ripened on August 30, the effective date of the MOU.  *See* TDM at 6 (title of Argument Section I.A.).  For reasons noted above, the actual date was earlier, when key terms were agreed on.  But even if August 30 were the correct date, the communications between ████████ and August 30 would, alternatively, be mediation privileged, for reasons described below.

on the MOU's material terms was reached.  Rather, with respect to earlier communications, Mr.

Smith has asserted mediation privilege (discussed *infra*).[10]

49.     The Coalition's related claim that Mr. Smith lacks a "true legal common interest"

with the Debtor (and J&J) in resolving this bankruptcy case (*id*. ¶¶ 22-23) similarly misses the

mark.  All parties to the MOU (including Mr. Smith's clients) benefit from compliance with its

terms, and the MOU was plainly negotiated and executed to improve the Debtor's prospects of

successfully confirming a proposed plan that incorporated its terms – one that Mr. Smith concluded

would provide fair and reasonable compensation to SLF Claimants.  That is more than enough to

establish a common interest under relevant case law.  *See, e.g.*, *Hardwood*, 403 B.R. at 461

(common interest privilege covers communications between parties who have "agreed to join

forces for the ultimate purpose of confirming a liquidating plan of reorganization that recover[s]

and distribute[s] the debtors' assets").

**B.     Communications Between Mr. Smith and Mr. Golomb Are Also Protected.**

50.     The Coalition separately contends that no privilege exists between Mr. Smith and

Mr. Golomb.  TDM ¶¶ 26-28.  Here again, the Coalition is mistaken.

51.     The gist of the Coalition's argument (*id.* ¶ 27) is that because SLF currently

supports the plan and Golomb Legal currently opposes, no common interest can exist between

them.  But the privilege Mr. Smith and his counsel were protecting is not broken by mere

differences of opinion between Mr. Smith and Mr. Golomb – *i.e.*, it is broader than just common

interest.

---

[10] In arguing that communications between Mr. Smith and Mr. Murdica are not privileged because "counsel representing Mr. Murdica at his deposition did not object on common interest grounds to questions about the Smith MOU" (TDM ¶ 23), the Coalition conveniently ignores that Mr. Murdica's counsel did – appropriately – object to questions about MOU negotiations on *mediation privilege* grounds, ███████████████████████████████████████████████████████████████████████████████████████████████████.

52.     Specifically, communications between co-counsel in the furtherance of representing joint clients are entitled to protection from disclosure.  *See, e.g.*, *Mass Engineered Design, Inc. v. Ergotron, Inc.*, 2008 WL 11348359, at *4 (E.D. Tex. Oct. 14, 2008) ("communications . . . among firms representing the same client are protected by the attorney-client privilege"); *United States v. (Under Seal)*, 748 F.2d 871, 874 (4th Cir. 1984) (attorney-client privileged extends to protect communications "by the lawyer to his client, agents, or superiors or to other lawyers in the case of joint representation"); *Natta v. Zletz*, 418 F.2d 633, 637 n.3 (7th Cir. 1969) ("inter-attorney communications" are entitled to the same degree of protection from disclosure as attorney-client communications, because "[t]o hold otherwise merely penalizes those attorneys who write or consult with additional counsel representing the same client for the same purpose . . . [and] would make a mockery of both the privilege and the realities of current legal assistance"); *S. Scrap Material Co. v. Fleming*, 2003 WL 21474516, at *10 (E.D. La. June 18, 2003) (co-counsel letters were protected from disclosure by the work product doctrine).

53.     As Mr. Smith has explained, Mr. Golomb's firm "serves as local counsel" for SLF in certain talc litigation cases, and SLF regularly communicates with Mr. Golomb on issues affecting SLF Claimants.  Dkt. No. 306-4 at ¶ 31.  As co-counsel, Mr. Smith's and Mr. Golomb's communications with one another regarding vote and settlement issues implicate attorney-client and work product privileges, even if Mr. Smith and Mr. Golomb disagree.  It is on that basis that Mr. Smith was instructed not to answer certain questions – including several concerning discussions that occurred in summer 2024 when Mr. Smith and Mr. Golomb *both opposed* the Debtor's proposed plan.  That defending counsel at times used the words "common interest" instead of (or in addition to) "joint prosecution" and "joint representation" to invoke the underlying privileges does not render the communications with Mr. Golomb discoverable.

### C.     Mr. Smith Has Properly Asserted Mediation Privilege.

54.     The Coalition also contends in the Testimony and Documents Motion (at ¶¶ 29-33) that assertions of mediation privilege and related instructions not to answer at Mr. Smith's deposition were improper.  But Mr. Smith invoked mediation privilege when questions called for disclosure of the substance of his communications with Mr. Murdica during MOU negotiations – communications including information learned in the course of confidential mediation discussions facilitated by the mediator.  Mr. Smith's refusal to answer such questions was thus entirely proper under Rule 30(c)(2).

55.     As an initial matter, the Coalition's claim that the Fifth Circuit does not recognize a mediation privilege (*id*. ¶ 31) is puzzling given the Coalition's and its member firm Beasley Allen's own reliance on mediation privilege.  *See supra* at ¶ 20.  Moreover, although the Coalition fails to mention it, the Court already ruled against "getting into mediation" – meaning, the confidentiality of mediation-related documents should be respected.  Dkt. No. 657-1 at 112:6-15.

56.     Federal law on the subject is in accord.  *See, e.g.*, *In re Teligent, Inc.*, 640 F.3d 53, 57 (2d Cir. 2011) (protecting mediation communications absent "extraordinary circumstances"); *In re Residential Cap., LLC*, 536 B.R. 132, 148 (Bankr. S.D.N.Y. 2015) (same; "relevance is not the standard for jettisoning the mediation privilege"); *In re Wendy's Co. Shareholder Derivative Action*, 44 F.4th 527, 537 (6th Cir. 2022) ("federal law recognize[s] a privilege protecting communications made during mediation proceedings, to encourage candor between the negotiating parties"); *see also In re Anonymous*, 283 F.3d 627, 636 (4th Cir. 2002) (protecting confidential mediation communications promotes candor and effective negotiation, and prevents mediation "from being used as a discovery tool for creative attorneys").[11]

---

[11] The lone Fifth Circuit case the Coalition cites on mediation privilege (TDM ¶¶ 29, 31) – *In re Grand Jury Subpoena Dated Dec. 17, 1996*, 148 F.3d 487 (5th Cir. 1998) – did not foreclose recognition of mediation privilege.  Instead,

57.     Significantly, protection of mediation-related communications is *not* limited to communications to which the mediator was a party, and instead can apply to any communication (or document) having "a direct nexus to the mediation."   *Sandoz, Inc. v. United Therapeutics Corp.*, 2021 WL 5122069, at *3-4 (D.N.J. Nov. 2, 2021) ("discussions and communications" subsequent to mediation sessions were "part of the ongoing mediation process," and the "mere fact that the mediator was not copied on email communications between the parties during this time does not mean that those communications were not in furtherance of the mediation").   Moreover, an agreement affirming the confidentiality of mediation communications (and designations placed on documents) has been deemed indicative of whether mediating parties had a reasonable expectation of nondisclosure that should not be violated lightly. *See Wendy's Co.* 44 F.4th at 537.

58.     Communications between Mr. Smith and Mr. Murdica leading to execution of the MOU had a direct nexus to ongoing mediation.   Indeed, their communications were not only mediation-connected but regularly mediator-assisted. *See supra* at ¶¶ 11-15.   Documents produced in discovery further evidence that Mr. Smith and Mr. Murdica understood and expected their communications regarding the MOU to be privileged. ██████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████   And, as noted (*supra*, ¶ 12), ████████████ mediation agreement mandates that mediation documents and communications be fully and completely protected for all purposes, including impeachment.

---

the court merely held that, in the circumstances of that case, such a privilege would not be recognized, while acknowledging that "[c]onfidentiality is critical to the mediation process because it promotes the free flow of information that may result in the settlement of a dispute." *Id.* at 492.

59.     In light of the above, there is simply no basis to compel Mr. Smith to sit for another deposition to answer questions about settlement communications made as part of a mediation.[12]

**D.     Mr. Smith's Financial Condition Is Irrelevant.**

60.     The Coalition's request to compel Mr. Smith to answer questions about his financial condition at the time the MOU was finalized (TDM at 2) should also be rejected.  At his deposition, Mr. Smith was instructed not to answer questions that sought to explore litigation funding and his financial condition based on the Court's ruling that such information is irrelevant.

61.     Specifically, at the November 12 hearing, the Court heard the Debtor's motions to compel additional discovery *from* the Coalition and Beasley Allen.  *See* Dkt. Nos. 368 and 445. As relevant here, at issue was the Debtor's RFP No. 35 to Beasley Allen, seeking:  "All documents and communications relating to or reflecting receipt of or efforts to obtain third-party funding in anticipation of or in connection with the above-captioned action."  Beasley Allen had objected to that request on the ground that such information was not relevant to any party's claim or defense and disproportional to the needs of this case.

62.     During oral argument on the Debtor's motions, the Court signaled his agreement with the Coalition's irrelevance objection.  *See supra* at ¶ 22.  Then, when ruling from the bench, the Court walked through each request for production in dispute and sustained Beasley Allen's objection.  *See id*.  Mr. Smith was instructed not to answer questions about litigation funding at his deposition on this basis.  Dkt. No. 631-2 at 146:10-150:2, 156:5-158:7, 159:4-14.

63.     The Coalition's suggestion that "evidence of Mr. Smith's financial condition at the time the MOU was signed is critical to understanding Mr. Smith's motivation and his actions in

---

[12] The Court should give the back of the hand to the Coalition's suggestion that disclosure of MOU-related communications between Mr. Smith and Mr. Murdica should be compelled because it may reveal "Mr. Smith's bias and motive for his actions."  TDM ¶ 32.  Tellingly, the Coalition points to nothing in the discovery record to support that offensive allegation, and SLF submits that no support for it – beyond rank speculation – exists at all.

casting votes in this case" (TDM ¶ 10) is untenable for multiple other reasons too.  The notion that Mr. Smith negotiated and executed the MOU because he was under financial distress is based entirely on speculation; the Coalition did not serve a single document request on Mr. Smith or SLF (or the Debtor) calling for the production of any litigation funding or other financial information about Mr. Smith; and a Special Master Order in the MDL quashed discovery requests to Beasley Allen and SLF seeking similar litigation funding information.

64.     The Coalition's contention that Bankruptcy Rule 3018(a) somehow provides a hook for the relief it seeks (*id.* ¶¶ 34, 40) is also flawed.  The Coalition fails to cite a single case supporting the proposition that a lawyer or law firm's financial condition is relevant to whether its client's superseding vote was proper.   Instead, courts have overwhelmingly held that plan modifications arising from post-solicitation negotiations can demonstrate "cause" to change a vote under Rule 3018(a).  *See Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.*, 844 F.2d 1142, 1163 (5th Cir. 1988); *In re Cajun Elec. Power Coop., Inc.*, 230 B.R. 715, 744 (Bankr. M.D. La. 1999); *In re Bourbon Saloon, Inc.*, 2012 WL 899282, *2 (E.D. La. Mar. 14, 2012).  And that is precisely what occurred here.  Mr. Smith's negotiations with Mr. Murdica resulted in the MOU and material improvements to the Debtor's proposed plan, which, in turn, gave SLF Claimants "cause" to vote on new plan terms.

65.     The Coalition also argues that discovery into Mr. Smith's financial condition should be allowed because J&J put his purported "financial distress squarely at issue" when it sought financial discovery from SLF in the MDL.  TDM ¶ 39.  But what J&J pursued *in another case* does not determine what is relevant *in this Chapter 11 Case* or establish that *Mr. Smith* has put anything at issue here.  And, as the Coalition is well aware, J&J's subpoena to SLF in the other case was quashed by a Special Master Order.  Nor is there anything surprising about the MOU's

22

inclusion of a provision dropping J&J's pursuit of litigation financing discovery from Mr. Smith and SLF.  *See* Dkt. No. 17-1 at § II.K.  ███████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████

66.     If the Coalition "needs to know why Mr. Smith agreed to sign the MOU and vote the way that he did" (TDM ¶ 40), then all it needs to do is look at the key material improvements to the initial plan that Mr. Smith obtained via the MOU – including, *inter alia*, the payment of an additional $1.1 billion under the amended plan to fund distributions to talc claimants subject to an Individual Review Process, and the creation of a $650 million attorney fee fund outside of the MDL.  Either way, the Coalition should not get a free (and irrelevant) peek into Mr. Smith's finances, under Rule 3018(a) or otherwise.

**E.     There Is No Basis to Compel Mr. Smith or SLF to Produce Additional Documents.**

67.     In the Testimony and Documents Motion (at ¶¶ 42-44) and in the Supplemental Motion, the Coalition requests an order compelling Mr. Smith and SLF to produce – either to the Coalition or the Court – documents relevant to SLF's "authority, solicitation, recording, and voting of its clients' approval or disapproval of the bankruptcy plan."  These requests should be denied.

68.     As a threshold matter, as discussed above, the Coalition failed to meet and confer with SLF about this (or any other) relief it is requesting in either motion.  The Coalition's assertions that SLF "has refused to produce" these kinds of documents (TDM ¶ 43) or "not indicated it will promptly produce" them (SM ¶ 14) are incorrect.  In SLF's responses and objections to the Coalition's requests, SLF agreed to produce non-privileged documents and communications responsive to pertinent requests – to the extent non-privileged materials exist, are in SLF's possession, and could be located in a reasonable and proportionally appropriate search.

69.     In all events, however, the relief sought is moot.  On November 5, 2024, SLF produced non-privileged and responsive documents to the Coalition; and, on November 19, 2024, based on guidance the Court provided to all parties at the November 12 hearing, SLF voluntarily submitted potentially privileged, responsive documents to the Court for *in camera* review – including exemplar retainer agreements.  Then, on December 6, 13, and 16, 2024, based on guidance the Court provided to all parties at the November 26 hearing (and in response to new issues raised by the Coalition for the first time in the Supplemental Motion last week, without any attempt to first meet and confer), SLF produced yet additional non-privileged (or redacted) and responsive documents to the Coalition.

70.     Accordingly, all documents in SLF's possession, including retainer agreements and power of attorney documentation, concerning the specific categories of documents and specific SLF Claimants on whom the Coalition is purportedly focused (*see* TDM ¶ 7 and SM ¶¶ 14-17) – other than those the Court ruled on November 26 should not be produced because they implicate attorney-client privilege or other privileges and immunities that have not been waived – have now been produced.[13]

## <u>CONCLUSION</u>

71.     For the reasons set forth herein, SLF respectfully submits that both the Testimony and Documents Motion and the Supplemental Motion should be denied, and that the Court should grant to SLF and Mr. Smith such other and further relief as may be deemed proper.

*[Remainder of Page Intentionally Left Blank]*

---

[13] Incidentally, because the Coalition has now put at issue approximately 4,200 retainer agreements for joint SLF-Beasley Allen clients that are in Beasley Allen's possession (SM at 6 n.4), Beasley Allen must produce them.

Dated:  December 16, 2024

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

Kenneth H. Eckstein (admitted *pro hac vice*)
Rachael L. Ringer (admitted *pro hac vice*)
P. Bradley O'Neill (admitted *pro hac vice*)
Natan Hamerman (admitted *pro hac vice*)
Seth F. Schinfeld (admitted *pro hac vice*)
Megan M. Wasson (admitted *pro hac vice*)
1177 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000
keckstein@kramerlevin.com
rringer@kramerlevin.com
boneill@kramerlevin.com
nhamerman@kramerlevin.com
sschinfeld@kramerlevin.com
mwasson@kramerlevin.com

and

**LOCKE LORD LLP**

*/s/ Elizabeth M. Guffy* _____
Elizabeth M. Guffy
Texas Bar Number 08592525
JPMorgan Chase Tower
600 Travis, Ste. 2800
Houston, TX 77002
Telephone: (713) 226-1507
Facsimile: (713) 223-3717
eguffy@lockelord.com

***Counsel to SLF, SLF Claimants, and R. Allen Smith, Jr.***

**<u>Certificate of Service</u>**

I hereby certify that on December 16, 2024, a true and correct copy of the foregoing pleading was served electronically via the Court's ECF system on all parties registered to received such service.

*/s/ Elizabeth M. Guffy*
Elizabeth M. Guffy