**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 24-90505 |
| RED RIVER TALC, LLC | § | Chapter 11 |
| | § | |
| Debtor(s). | § | |

---

**UNITED STATES TRUSTEE'S OBJECTION TO**
**CONFIRMATION OF SECOND AMENDED PLAN OF REORGANIZATION**
**[ECF No. 722]**

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................... 3

OBJECTIONS TO CONFIRMATION ....................................................... 5

  A.  The Plan is Incomplete and Confirmation of the Plan Should be Denied. ....................... 6

  B.  The Plan Does Not Comply With The Applicable Provisions of the Bankruptcy Code.
    [11 U.S.C. § 1129(a)(1)] ......................................................................... 7

    i.  The Plan Contains Impermissible Nondebtor Releases .................................. 8

      (a)     Even if the Debtor is eligible for a section 524(g) injunction, the Nondebtor
      Releases are overbroad. ....................................................................... 12

      (b)     Under *Purdue*, the Nondebtor Releases may not be approved to the extent they are
      not authorized under section 524(g). ..................................................... 19

    ii.  The Plan Contains an Impermissible Exculpation Clause ............................. 22

    iii.  The Plan Violates Sections 1122(a) and 1123(a)(4) of the Bankruptcy Code Through Its
      Classification of Master Settlement Agreement Claimants ........................... 27

  C.  The Plan Proponents Have Not Complied With the Applicable Provisions of the
    Bankruptcy Code. [11 U.S.C. § 1129(a)(2)] .................................................. 30

  D.  The Plan Has Not Been Proposed in Good Faith. [11 U.S.C. § 1129(a)(3)] .................. 32

    i.  The Debtor Cannot Demonstrate a Legitimate Bankruptcy Purpose............................ 34

    ii.  J&J's Bankruptcy Strategy Is Inconsistent With the Goals of the Bankruptcy Code.... 40

    iii.  The Debtor's Case Was Filed in Bad Faith. ................................................ 42

    iv.  The Plan May Not Be Confirmed if the Court Finds That J&J or the Debtor Have
      Manipulated the Voting Process. ........................................................... 43

    v.  The Debtor's Arguments in Support of Good Faith Lack Merit. .................................. 45

  E.  The Plan Provides for Payments Not Subject to Review by the Court
    [11 U.S.C. § 1129(a)(4)] ......................................................................... 48

  F.  The Debtor Has Not Demonstrated That the Plan Satisfies the "Best Interests" Test
    [11 U.S.C. § 1129(a)(7)] ......................................................................... 49

  G.  The Debtor Cannot Demonstrate that Each Impaired Class Has Voted to Accept the Plan
    [11 U.S.C. § 1129(a)(8)] ......................................................................... 50

TO THE HONORABLE CHRISTOPHER M. LOPEZ,
U.S. BANKRUPTCY JUDGE:

Kevin M. Epstein, the United States Trustee for Region 7 (the "U.S. Trustee"), objects to

confirmation of the Second Amended Prepackaged Chapter 11 Plan filed on behalf of debtor Red

River Talc, LLC (the "Debtor") [ECF No. 722] (the "Plan"), and respectfully states:

## PRELIMINARY STATEMENT

1.      As the U.S. Trustee has argued in his pending motion to dismiss (the "Motion to

Dismiss") [ECF No. 299], this is a case that was filed in bad faith by a shell entity that has no

valid restructuring purpose or need for bankruptcy relief.  Rather, the principal objective of these

proceedings is to obtain a nonconsensual discharge of tort liabilities for the Debtor's ultimate

parent, the Johnson & Johnson Company ("J&J"), which has not sought bankruptcy relief, has

not subjected itself to the supervision of this Court, and has not made its full assets available to

creditors.

2.      This is not the first occasion on which J&J has sought to misuse the bankruptcy

system in this manner.  In 2021 and 2023, J&J caused chapter 11 petitions to be filed on behalf

of LTL Management, LLC ("LTL"), a predecessor entity of the Debtor, in an effort to resolve

the very same liabilities that are now at issue in this case.  Both *LTL* cases were eventually found

to have been filed in bad faith by the United States Court of Appeals for the Third Circuit and

dismissed on that basis.  *See In re LTL Mgmt., LLC,* 64 F.4th 84, 92 (3d Cir. 2023) (*"LTL I"*); *In

re LTL Mgmt.,* 2024 WL 3540467 (3rd Cir. July 25, 2024) (*"LTL II"*).  The result of this case

should be no different.  The relevant facts and the controlling legal principles of those cases

(notwithstanding the substitution of a reconstituted debtor entity and J&J's flight to a different

circuit) are for all relevant purposes the same here.  Like the *LTL* cases, this case should be dismissed for cause.[1]

3.      Even while the U.S. Trustee's Motion to Dismiss remains pending before the Court (along with other potentially dispositive motions filed by other parties in interest), the Debtor now seeks confirmation of the Plan.  But that Plan remains subject to ongoing negotiations and has already undergone multiple revisions since it was solicited to and voted on by creditors.  Even now, the Plan contains significant gaps, and notably fails to include any liquidation analysis, without which creditors could not have made an informed decision about whether to accept or reject.  Moreover, the Plan is not necessarily binding on its sponsor and principal funder, J&J, which will retain significant discretion to terminate its obligations even if the Plan is confirmed.  Until the Plan is finalized (and, if necessary, resolicited and accepted by creditors), there is nothing for the Court to confirm.  Accordingly, if the Court does not dismiss the case, it should defer confirmation until the Debtor has filed a further amended version of the Plan and all parties have been afforded an adequate opportunity to review and file responses to that version.

4.      If the Court does consider the Plan on its merits, it should deny confirmation on numerous grounds under section 1129 of the Bankruptcy Code.  Most significantly, the nonconsensual releases that would be required under the Plan are far broader than the narrow channeling injunctions that are available in asbestos cases under section 524(g) of the

---

[1] On November 6, 2024, objections to the U.S. Trustee's Motion to Dismiss were filed by the Debtor and certain law firms.  [ECF No. 425, 426, 435].  These objections are largely based on issues also raised in connection with confirmation of the Plan.  To avoid burdening the Court and parties with duplicative briefing, and as stated in the U.S. Trustee's Reply and Reservation of Rights in Support of his Motion to Dismiss [ECF No. __], the U.S. Trustee incorporates the arguments of this Objection as his reply in further support of the Motion to Dismiss.

Bankruptcy Code, and they are expressly prohibited under both longstanding Fifth Circuit precedent and the Supreme Court's recent decision in *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024).

5.      Nor are the proposed releases the only obstacle to confirmation.  The Plan was solicited prior to bankruptcy and without oversight by any court through a flawed process that has failed to provide creditors with the information required by the Bankruptcy Code.  The Debtor cannot demonstrate that its Plan has been validly accepted by creditors, due to the numerous irregularities in the prepetition vote overseen by J&J.  Finally, the same bad faith that warrants dismissal under section 1112(b) also prevents the court from approving the Plan under section 1129(a)(3).

## OBJECTIONS TO CONFIRMATION

6.      Section 1129(a) of the Bankruptcy Code provides that "[t]he court shall confirm a plan only if it complies with all" requirements of section 1129(a).  11 U.S.C. § 1129(a).  The Debtor, as plan proponent, bears the burden of proof with respect to the confirmation requirements by a preponderance of the evidence.  *Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1165 (5th Cir. 1993) (stating that "[t]he combination of legislative silence, Supreme Court holdings, and the structure of the Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown").

**A.      The Plan is Incomplete and Confirmation of the Plan Should be Denied.**

7.      Although designated as the Debtor's Second Amended Plan of Reorganization, the Plan remains a work in progress.[2]  Among other terms, the Plan provides that it may not be confirmed until it is acceptable to the Future Claims Representative ("FCR"), who has not yet assented to this version of the Plan.  *See* Plan § 8.1; December 10, 2024 Hearing Tr. [ECF No. 751] at 56-57 (statement by counsel for FCR that FCR "does not support the plan as it's currently written").  To date, no amended version of the Plan has been filed reflecting the resolution of any concerns of the FCR.

8.      The Plan also remains incomplete in several material respects, rendering it impossible for the U.S. Trustee and other parties to fully evaluate the Plan, and it is also impossible for the Court to make its required confirmation findings under section 1129 of the Bankruptcy Code.  The Debtor has yet to provide a liquidation analysis, without which the Court cannot make its required confirmation findings under section 1129(a)(7).  *See In re LATAM Airlines Grp. S.A.,* 55 F.4th 377, 389 n.9 (2d Cir. 2022) (noting that section 1129(a)(7) "essentially requires every plan proponent to perform a liquidation analysis of the estate") (internal quotation omitted).  Several critical economic terms of the proposed trust have not yet been determined, including the determination of the "Individual Review Criteria" that will be used to value claims, the terms of an "Extraordinary Injury Fund" that may be used to increase

---

[2] Prior to the Petition Date, Debtor solicited votes in support of a Prepackaged Chapter 11 Plan of Reorganization, originally dated June 3, 2024, later amended on June 28, 2024 (the "Solicited Plan").  [Dkt. 25].  On the Petition Date, Debtor filed an Amended Prepackaged Chapter 11 Plan of Reorganization (the "Amended Plan") [Dkt. 24] and a red-lined version showing changes made to the Solicited Plan.  [Dkt. 26].  The Second Amended and current version of the Plan was filed on December 9, 2024.  [Dkt. 722].

payments to certain claimants, and the cash equivalency values that will be used to calculate the actual compensation paid to claimants. *See* Trust Distribution Procedures ("TDP"), Plan Exhibit K, at §§ 4.6.5(B), (C), 7.1.2(A). The Plan is also conditioned on a series of side agreements between the Debtor or J&J and various creditors or law firms, including a "Common Benefit Fund" master settlement agreement and a "Private Resolution Process" master settlement agreement. Plan §§ 1.1.33, 1.1.118. The Plan does not disclose the proposed terms of these agreements, and it is unclear if those agreements have even been drafted or agreed to at this time. Absent this information,

9.      Nor would the Plan, even if confirmed, necessarily be binding on the Debtor and J&J. Under section 9.12 of the Plan, J&J and the Debtor have discretion to revoke the plan up to 170 days after confirmation if certain contingencies occur. These contingencies include the refusal of more than 5% of all claimants to execute a broad release in favor of various nondebtor parties, as well as the filing of an appeal to the Fifth Circuit by the U.S. Trustee or by "any association or organization advocating on behalf of attorneys who regularly represent personal injury claimants." Plan § 9.12. In addition, even after the occurrence of the effective date, J&J may terminate its obligations under the Plan upon an "Adverse Appellate Ruling," defined as any ruling by the Fifth Circuit or the Supreme Court that does not fully affirm the Plan. Plan §§ 1.1.9, 9.12. The ability to revoke the Plan is not reciprocal but may be exercised only by the Debtor and J&J in their sole discretion. Significantly, any releases granted to third parties in reliance on the Plan will remain binding even if the Debtor and J&J exercise their option to revoke the Plan. *See* Plan § 9.12.

      **B.**    **The Plan Does Not Comply With The Applicable Provisions of the Bankruptcy Code. [11 U.S.C. § 1129(a)(1)]**

10.     Under subsection (a)(1) of section 1129, the Court may only confirm the Plan if it determines that the Plan "complies with the applicable provisions of" the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). *See In re Lowenschuss,* 170 F.3d 923, 932 (9th Cir. 1999) (proposed plan that violated substantive provision of Bankruptcy Code could not be confirmed under section 1129(a)(1), "regardless of whether the plan was fair and reasonable"). In this case, the Plan violates the Bankruptcy Code because it includes: (i) an impermissible series of nondebtor releases; (ii) an overbroad exculpation provision; and (iii) a classification scheme that improperly combines settled and non-settled tort claimants into a single class.

### i.     The Plan Contains Impermissible Nondebtor Releases

11.     In *Purdue*, the Supreme Court held that bankruptcy courts lack authority to approve nonconsensual third-party releases. *Purdue*, 144 S. Ct. 2071, 2082–88. This rule is subject only to a single "notable exception" found in section 524(g) of the Bankruptcy Code—a provision which, as *Purdue* cautioned, is available for "asbestos-related bankruptcies—<u>and only for such bankruptcies</u>." *Id.* at 2085 (emphasis added).

12.     Like the plan that was disapproved by the Supreme Court in *Purdue*, the releases and injunctions in the Plan in this case would not only enjoin claims against the Debtor, but also claims against numerous entities that have not filed for bankruptcy, without regard to whether the affected claimants have consented, and without regard to whether those claims fall within the scope of section 524(g). Thus, the Plan will operate to discharge all talc-related claims against J&J and its affiliates (including claims for which J&J is independently liable), as well as claims against hundreds of unaffiliated retailers and professionals. In particular, the Plan sets forth three distinct nondebtor releases (the "<u>Nondebtor Releases</u>") that affect different—but partially overlapping—populations of claims, as follows:

13.     **Channeling Injunction.**  Section 11.3.1 of the Plan (the "Channeling Injunction") provides, in relevant part, that "the sole recourse of any holder of a Channeled Talc Personal Injury Claim against a Protected Party (on account of such Channeled Talc Personal Injury Claim) shall be to and against the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents."  In addition, "all holders of Channeled Talc Personal Injury Claims shall be permanently and forever stayed, restrained, barred, and enjoined from taking any action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment, satisfaction, or recovery of, on, or with respect to any Channeled Talc Personal Injury Claim against a Protected Party other than from the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents."  Plan § 11.3.1(a).

14.     The Plan defines "Channeled Talc Personal Injury Claims" as "all Talc Personal Injury Claims that are not Defense Cost Claims, including (a) Ovarian/Gynecological Talc Personal Injury Claims and (b) Other Disease Talc Personal Injury Claims."  Plan § 1.1.26. "Talc Personal Injury Claims," in turn, are defined to include any present or future claims involving any form of talc-related injury, including "emotional distress, fear of cancer, medical monitoring, or any other alleged personal injuries (whether physical, emotional, or otherwise)" that arise either from the Debtor's own acts and omissions, or from the acts of other parties for which the Debtor has agreed to indemnify or hold harmless that party.  *See* Plan §§ 1.1.152, 1.1.153.

15.     The "Protected Parties" against whom claims will be released under the Channeling Injunction include several hundred named entities that are listed on the schedules to the Plan, as well as any "Representatives" of the Debtor, J&J, or its affiliates.  *See* Plan § 1.1.121.  Among those who are expressly included as Protected Parties are J&J, its current

affiliates, its former affiliates, insurers who have settled with J&J and/or the Debtor, and various retailers who sold products manufactured by J&J and who may have contractual indemnification rights against J&J. *See* Plan § 1.1.121(e) and Schedules 1-3.

16.     The Plan also appears to include as a Protected Party any entity that would statutorily be eligible for the protection of an injunction under section 524(g) of the Bankruptcy Code. *See* Plan 1.1.121(i), 11 U.S.C. § 524(g)(4)(A)(ii).[3]  Subsection (i) is in addition to, and not a limitation of, the other categories of Protected Parties defined under the Plan.  Thus, a party that is separately listed as a Protected Party under subsections (a)-(h) will received the protection

---

[3] Section 1.1.118(i) of the Plan provides that a Protected Party includes any "Persons" whose alleged liability arises by reason of one or more of the following:

(i)     such Person's ownership of a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of a Debtor or Reorganized Debtor, or a predecessor in interest of a Debtor or Reorganized Debtor (including Old JJCI);

(ii)    such Person's involvement in the management of the Debtor or the Reorganized Debtor or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI);

(iii)   such Person's service as an officer, manager, or employee of the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), or a Person that owns or at any time has owned a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI); and

(iv)    such Person's involvement in a transaction changing the corporate structure (including the 2021 Corporate Restructuring and the Prepetition Corporate Restructuring), or in a loan or other financial transaction affecting the financial condition, of the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), or a Person that owns or at any time has owned a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), including (A) involvement in providing financing (debt or equity) or advice to a Person involved in such a transaction or (B) acquiring or selling a financial interest in any Person as a part of such transaction.

of the proposed Channeling Injunction, even if it does not meet the criteria of subsection (i) or section 524(g).

17.     **General Release.**  In addition to the Channeling Injunction, the Plan also includes a broad nonconsensual release applicable to all "Holders of Claims."  Plan § 11.2.2 (the "General Release").  Under that release, the "Released Parties" (defined as the Debtor, J&J, its affiliates, and their employees and professionals) will be released from all claims "in any way relating to… the Debtor (as it existed prior to or after the Petition Date)," specifically including claims that have been asserted against J&J, LTL, and various individuals based on actions taken before and during LTL's two bankruptcy cases.

18.     Claims that are the subject of the General Release are <u>not</u> channeled to the Talc Personal Injury Trust but are to be released for seemingly no consideration, apart from the "service of the Released Parties before and during the Chapter 11 Case."  The General Release is binding not only on talc claimants, but also on all other classes of creditors, including those that were not permitted to vote on the Solicited Plan.  The General Release is also subject to a gatekeeping provision, under which no "Person" (a defined term which is not limited to creditors or interest holders, but also includes individuals and entities who are not parties to this case) may pursue any claim against the Released Parties in any forum unless they have received prior approval from this Court.

19.     **TDP Release.**  The third principal nondebtor release is contained in the TDP that is incorporated as an exhibit to the Plan (the "TDP Release").  Under sections 7.2.1(A) and 8.1.3 of the TDP, any claimant wishing to have her claim paid by the Talc Personal Injury Trust must first execute an "Acceptance and Release" that includes a release of "all claims against the Debtor, the Reorganized Debtor, J&J, the other Debtor Corporate Parties, and the other Protected

Parties, to the extent any such claims arise from or are related to the alleged use of or other exposure to talc or talc-containing products" based on the pre-effective date actions of J&J or the Debtor, or any other entity that the Debtor has agreed to indemnify .  TDP § 7.2(1)(A).

20.      In summary, the scope of the principal Nondebtor Releases in the Plan can be compared as follows:

|  | **Channeling Injunction** | **General Release** | **TDP Release** |
|---|---|---|---|
| **Parties Released** | J&J, J&J affiliates, J&J representatives, settling insurers, indemnitees | J&J, J&J affiliates, J&J/Debtor professionals and employees | J&J, J&J affiliates, J&J representatives, settling insurers, indemnitees |
| **Claims Released** | Talc-related claims arising from actions of Debtor or from actions of any party to whom Debtor has agreed to provide indemnification | All claims in any way relating to Debtor (including claims based on corporate transactions before bankruptcy) | Talc-related claims arising from actions of Debtor or from actions of any party to whom Debtor has agreed to provide indemnification |
| **Claimants Affected by Release** | Holders of Channeled Talc Personal Injury Claims | All Persons | Holders of Channeled Talc Personal Injury Claims that seek payment from the Talc Personal Injury Trust |
| **Consent Required** | Nonconsensual | Nonconsensual | Required for any claimant in order to receive trust distribution |

**(a) Even if the Debtor is eligible for a section 524(g) injunction, the Nondebtor Releases are overbroad.**

21.      Although the Plan is based on section 524(g) of the Bankruptcy Code, *see* Plan § 11.3.1(a), the claims included in the proposed Nondebtor Releases are far broader than what may be authorized under that section, even assuming that the Debtor is able to meet the statutory

requirements for issuance of a section 524(g) injunction.[4]  *See generally Humana, Inc. v. Shrader & Assocs., LLP,* 584 B.R. 658, 667 (S.D. Tex. 2018) (noting "limited" nature of section 524(g) injunction).  The Nondebtor Releases exceed the scope of section 524(g) with respect to the following classes of third-party claims that are released or enjoined under the Plan:

22.    **Non-Channeled Claims.**  By its plain terms, a section 524(g) injunction may be used to channel claims to a trust established under a plan of reorganization, but it may not be used to extinguish claims outright or to enjoin claims that will not receive a distribution from the trust.  *See* 11 U.S.C. § 524(g)(1)(B) (injunction may be issued with respect to claims that are "to be paid <u>in whole or in part</u> by a trust") (emphasis added).  For this reason, section 524(g) provides no statutory support for the General Release, under which claims are released outright and are not channeled to or paid by the Talc PI Trust.  *See* Plan § 11.2.2.

23.    Similarly, the Channeling Injunction and the TDP Release are each overbroad because they are not limited to claims that will actually be paid by the Talc PI Trust.  In particular, the definition of "Channeled Talc Personal Injury Claims" includes not only the ovarian and gynecological cancer claims that are eligible for payment from the Talc PI Trust, but

---

[4] The Debtor bears the burden of demonstrating that it is eligible for an injunction under section 524(g).  *See In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003) (holding that debtor, as proponent of plan, bears burden of proving by a preponderance of the evidence that each element of section 524(g) has been satisfied.  Among other facts, the Debtor must establish that it is entitled to a discharge, *see* 11 U.S.C. § 524(g)(1)(A); that its liabilities are related to asbestos, *see* 11 U.S.C. § 524(g)(2)(B)(i)(I); that it is likely to be subject to substantial "future demands" that threaten its ability to deal equitably with claims and future demands, *see* 11 U.S.C. § 524(g)(2)(B)(ii); that at least 75 percent of claimants whose claims are to be addressed by the Talc PI Trust have voted in favor of the Plan, *see* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb); and that there is a "reasonable assurance" that the Talc PI Trust will be able to pay present and future claims in substantially the same manner, *see* 11 U.S.C. § 524(g)(2)(B)(ii)(V).  Each of these factors is subject to ongoing discovery, and the U.S. Trustee reserves his right to amend his objection regarding the availability of relief under section 524(g) based on the evidence presented at the confirmation hearing.

also all claims for other injuries (including non-cancer diseases and non-ovarian/gynecological cancers), which are not.  *See* Plan § 1.1.23.  And although the TDP Release is by definition applicable only to claimants who expect to receive a payment from the Talc PI Trust, the form of that release encompasses any talc-related claims that claimant might hold and is not limited to claims that are eligible for payment.  *See* TDP § 7.2(1)(A).  For these non-cancer claimants and others, the effect of the Plan is to permanently enjoin their claims against nondebtors without providing them any recovery from the Talc PI Trust in return.

24.     **Direct Claims.**  A channeling injunction under section 524(g) must be limited to claims that are derivative of the debtor's conduct and may not be used to release nondebtors of their own direct liability.  *See Humana,* 584 B.R. at 667; *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 233 (3d Cir. 2004) (holding that section 524(g) does "not authorize a channeling injunction over the independent, non-derivative third-party actions against non-debtors").

25.     In *Humana,* the United States District Court for the Southern District of Texas further noted that "[n]either contractual agreements nor statutory requirements that do not otherwise meet the requirements of § 524(g) can serve as the link in a chain connecting a third party's liability to an asbestos debtor for purposes of extending the channeling injunction to non-debtors."  *Humana,* 584 B.R. at 668.  Thus, a non-derivative claim that is based on the independent conduct of the nondebtor cannot be transformed into a direct claim simply because the debtor may have agreed to indemnify the nondebtor.  *Id.*; *see also In re Fed.-Mogul Glob. Inc.,* 411 B.R. 148, 166 (Bankr. D. Del. 2008) (holding that 524(g) did not authorize channeling of claim against nondebtor that debtor was obligated to indemnify); *In re W.R. Grace & Co.*, 475 B.R. 34, 99 (D. Del. 2012) (same).

26.     Contrary to the reasoning of *Humana*, the Channeling Injunction is expressly defined to include claims based on "the acts of other parties for which the Debtor has agreed to indemnify or hold harmless that party."  *See* Plan § 1.1.142.  The General Release and the TDP Release are even broader, enjoining all claims "in any way relating to" the Debtor or talc, a definition that would necessarily include non-derivative as well as derivative claims, in violation of section 524(g).  *See* Plan § 1.1.23.

27.     **Claims that do not arise by reason of one of the relationships specified in section 524(g)(4)(A)(ii).**  Another major limitation of section 524(g) is that claims against nondebtors may be channeled under that section only "to the extent such alleged liability of such third party arises by reason of" four specified relationships:

> (I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;
>
> (II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;
>
> (III) the third party's provision of insurance to the debtor or a related party; or
>
> (IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to—
>
>> (aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or
>>
>> (bb) acquiring or selling a financial interest in an entity as part of such transaction.

11 U.S.C. § 524(g)(4)(A)(ii).

28.     The limitations of section 524(g)(4)(A)(ii) are construed strictly.  *See Humana*, 584 B.R. at 658 (section 524(g) injunction did not protect firm that was "not alleged to have ever owned a financial interest in any of the debtors, to have provided insurance to them, to have engaged in management of any of the debtors, or to have entered into a transaction with any

debtors that altered their corporate structure"); *In re Pittsburgh Corning Corp.*, 453 B.R. 570,

599 (Bankr. W.D. Pa. 2011) (claims "that in no way involve the Debtor, per the language of 11

U.S.C. § 524(g)(4)(A)(ii)(I)-(IV), cannot and will not be channeled under the Channeling

Injunction").

29.     Furthermore, even if a nondebtor generally meets one of the criteria specified in

subsection (4)(A)(ii), the injunction must be limited to claims that arise "by reason of" that

relationship.  Thus, in *In re Quigley Co., Inc.*, 676 F.3d 45 (2d Cir. 2012), the Second Circuit

considered whether a section 524(g) injunction could be extended to claims that were brought

against Pfizer, the debtor's parent, based on an "apparent manufacturer" theory of liability.  *Id.* at

49.  Although Pfizer's relationship to the debtor was one of the relationships specified in

subsection (4)(A)(ii), the Second Circuit concluded that Pfizer's ownership of the debtor was

"legally irrelevant" to the merits of the apparent manufacturer claims, and that as a result, those

particular claims were outside the scope of the section 524(g) injunction.  *Id.* at 60; *see also*

*Humana*, 584 B.R. at 667-68 (citing *Quigley* with approval).

30.     For the same reasons, the Nondebtor Releases proposed in the Plan are overbroad.

None of those releases are limited to parties with the relationships to the Debtor that are

described in subsection (4)(A)(ii), and there is no requirement that the released claims must have

arisen as a legal consequence of those relationships.  In particular, as the District Court

recognized in *Humana*, there is no basis for the section 524(g) injunction to release the retailers

listed in schedule 3 to the Plan, who lack any relationship to the Debtor outside of their alleged

contractual indemnities.  And even with respect to J&J, the injunction is overbroad under

*Quigley* because it includes claims for which J&J's ownership of the Debtor is legally irrelevant.

In particular, the Nondebtor Releases would enjoin claims, like the apparent manufacturer claims

in *Quigley*, that are based on J&J's own actions.  And the Nondebtor Releases would also release

claims for talc products that were directly manufactured by J&J before 1978, when it first

transferred its baby powder operations to the subsidiary that would eventually become the

Debtor.  *See* Declaration of John K. Kim in Support of Chapter 11 Case and Certain First Day

Pleadings (the "Kim Decl.") at ¶¶ 20-21.  Those claims do not arise "by reason of" J&J's

ownership of the Debtor, because J&J's liability in those cases would be based on its own

operations, and not those of the Debtor's predecessors, and they cannot be made subject to the

channeling injunction.

31.     The Debtor urges the Court to adopt a different reading of section 524(g) and

suggests that a channeling injunction may be issued for any claim against a nondebtor that either

"involves the same products, the same asbestos-containing materials, and the same markets as

the claims against the Debtor," or for which "the debtor expressly indemnified the non-debtor

parent or affiliate with respect to the alleged parent or affiliate liability so that the claims against

the debtor and the parent and affiliate would be the same."  *See* Debtor's Omnibus Objection to

the Motions of the Coalition and the United States Trustee to Dismiss Chapter 11 Case [ECF No.

245] (the "MTD Obj.") at 32.  The Debtor's proposed test finds no support in the text of the

statute or any published decision.[5]  Had Congress intended the section 524(g) injunction to be

---

[5] Although the Debtor cites the Third Circuit's *Combustion Engineering* decision in support of
its proposed "same products" standard, the discussion quoted by the Debtor addressed the
question of whether the bankruptcy court could exercise "related to" jurisdiction over nondebtor
claims (which the Third Circuit answered in the negative in that case) and not the application of
section 524(g).  Otherwise, the only decision cited by the Debtor in support of its argument is a
bankruptcy court decision from LTL's first dismissed chapter 11 case.  *See In re LTL Mgmt.,
LLC*, 638 B.R. 291 (Bankr. D.N.J. 2022).  That decision, however, did not address the
requirements for confirmation under section 524(g) but involved a request for an extension of the
automatic stay to a nondebtor under 11 U.S.C. § 105(a).  *See id.* at 319.  And as discussed below,
the Supreme Court's decision in *Purdue* (issued two years after the bankruptcy court decision

triggered whenever a claim shared some factual nexus with a claim against the debtor, it could have said so.  It did not.  Debtor's proposed factual-nexus test would render Congress's detailed test in subsection (4)(A)(ii) redundant and unnecessary.  Nor can Debtor's proposed reading of section 524(g) be reconciled with the outcome of *Quigley*, among other decisions.

32.     The Debtor's theory that it may manufacture eligibility for a section 524(g) injunction through an indemnification agreement has also been consistently rejected by courts. *See Humana*, 548 B.R. at 668; *Fed.-Mogul*, 411 B.R. 148.  Nor would the extension of the channeling injunction to such parties be consistent with the framework of section 524(g).  As the *Federal-Mogul* court pointed out, the fact that a debtor owes indemnification to a third party does not mean that the third party has liability that is "derivative" of the debtor's; rather, it is the <u>debtor</u> whose liability becomes derivative of the third party's.  *Id*. at 166.  And by essentially authorizing the debtor to include any entity it chooses within the channeling injunction, simply by entering into a contract to that effect, the Debtor's proposed test would eviscerate the carefully crafted statutory limitations to section 524(g).

33.     In any case, the Plan does not satisfy even the Debtor's extra-statutory factual-nexus test.  As noted, all of the Nondebtor Releases are so broadly drafted that they will necessarily sweep in claims that do <u>not</u> involve the same evidence or facts against as claims against the Debtor, or for which the Debtor is not even secondarily liable through indemnification.  Although the Debtor does not appear to dispute that certain of these claims— including the specific kinds of claims that were at issue in *Quigley*—fall outside the scope of section 524(g), it suggests that any such claims would be unlikely to succeed on the merits.

---

cited by the Debtor), precludes reliance on section 105(a) as authority for issuance of a permanent nondebtor injunction.

MTD Obj. at 32.  But this argument misstates the question before this Court.  In approving the 524(g) injunction, the Court is not required to decide the merits of every possible claim that could be asserted against the Protected Parties.  Rather, the role of this Court is to ensure that the Plan only enjoins channeled claims—including any claims characterized by the Debtor as merely "theoretical"—to the extent authorized by the Bankruptcy Code.  And as even the Debtor's own arguments appear to concede, the Nondebtor Releases in the Plan are far broader than the injunction provided under section 524(g).

### (b) Under *Purdue*, the Nondebtor Releases may not be approved to the extent they are not authorized under section 524(g).

34.     Because section 524(g) is insufficient to authorize the full range of releases and injunctions sought under the Plan, the Debtor must look elsewhere for such authorization.  While the Plan cites sections 105(a) and 1123(b)(6) of the Bankruptcy Code as additional authority for the Nondebtor Releases, *see* Plan § 11.3, *Purdue* expressly rejects both of those sections as possible sources of authority.  *See Purdue,* 144 S.Ct. at 2082 n.2, 2083-84.  And because section 524(g) is the only recognized exception to the rule against nonconsensual nondebtor injunctions, under *Purdue,* such injunctions may be issued *only* to the extent authorized under that section. *Id.* at 2084.  That holding also accords with the longstanding precedent of the Fifth Circuit.  *See In re Pacific Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009) (observing that prior Fifth Circuit authority "seem[s] broadly to foreclose non-consensual non-debtor releases and permanent injunctions").

35.     The Debtor nevertheless asserts, without discussion, that its Plan falls within an exception to *Purdue* because this is a "full pay" case.  MTD Obj. at 33.  Although the *Purdue* court noted that it did not "have occasion today to express a view on what qualifies as a

consensual release or pass upon a plan that provides for the full satisfaction of claims against a third-party nondebtor," *Purdue*, 144 S. Ct. at 2088, neither *Purdue* nor any subsequent decision has attempted to define the meaning of "full satisfaction" within this context.  But whatever definition is used, the Plan here cannot be fairly described as providing creditors with "full satisfaction" of their claims against the Debtor nor their claims against the non-debtors that the Plan's injunctions and releases would protect.  Funding of the Talc PI Trust is capped, *see* Plan § 4.9.1(a), and claimants will have no recourse against J&J or other nondebtors if that funding is exhausted, as has not infrequently occurred with other large mass tort trusts.  Although the exact compensation that will be paid to many claimants remains uncertain, the Debtor estimates that most ovarian cancer claimants will receive between $50,000 and $200,000 on account of their claims against the Debtor—an amount far less than what some ovarian claimants have been awarded in the tort system.  *See* Disclosure Statement with Respect to Prepackaged Chapter 11 Plan of Debtor [ECF No. 25, Exhibit B] (the "Disclosure Statement") at 4, 56.  And as discussed above, other claimants (including those alleging non-cancer personal injuries) may have their claims against nondebtors enjoined despite receiving no distribution at all under the Plan.[6]

36.     Nor can the Nondebtor Releases be approved as "consensual" releases.  The Channeling Injunction and the General Release are both fully non-consensual.  Creditors'

---

[6] Even if the Plan did provide for "full satisfaction" of claims, *Purdue* does not hold that nondebtor releases would be appropriate.  Rather, any such releases would need to satisfy the broader requirements of *Purdue*, including its requirement that any injunction involving nondebtor liabilities be authorized by a specific section of the Bankruptcy Code.  *Purdue*, 144 S.Ct. at 2085.  And apart from section 524(g) (which, as discussed above, provides at best limited support for portions of the Nondebtor Releases), the Debtor has not identified any specific Bankruptcy Code provision that would authorize the Nondebtor Releases in the event certain claims were paid in full.

consent to the Channeling Injunction and the General Release has not been solicited, and creditors are bound even if they expressly object to them.

37.      The TDP Release is also not consensual because the TDP withholds distributions from claimants who decline to execute that release.  *See* TDP § 7.2.1(a) (any claimant requesting payment from Talc PI Trust "shall" execute release of nondebtor claims).  This coercion to sign the release means there is not valid consent.  *See, e.g., Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1230-31 (9th Cir. 2022) (if an offeree is penalized unless an "offer" is accepted, that "preclude[s] an inference of assent"); *United States v. Como*, 340 F.2d 891, 893 (2d Cir. 1965) ("A consent is not a voluntary one if it is the product of duress or coercion, actual or implicit."). There is no authority in the Bankruptcy Code to deny distributions based on a claimant's refusal to release non-debtors.

38.      Notably, the requirement that claimants execute the TDP Release applies both to claimants who accept their scheduled payments under the TDP as well as those who reject that offer and seek to liquidate their claims in the tort system.  In the latter case, the TDPs provide that claims that are liquidated in the tort system "shall be processed in the same manner as payments made to Direct Claimants who did not submit a Reconsideration Request," TDP § 6.1.3, including the requirement of an executed TDP Release.  *See Id.* § 7.2.1(A) (providing that Direct Claimants who accept offer of trust payment "shall properly complete and execute" TDP Release as a condition to receiving payment).  Thus, regardless of the procedure chosen by a claimant to liquidate her claim, the end result is the same: she will be unable to receive any payment from the Talc PI Trust (even after obtaining a judgment from a nonbankruptcy court) unless she first agrees to execute a release in favor of hundreds of nondebtor entities, the vast majority of whom will have made no contribution to the Plan.  A release that is obtained under

these conditions is improper and ineffective.  *See In re Specialty Equip. Companies, Inc.*, 3 F.3d

1043, 1047 (7th Cir. 1993) (noting that bankruptcy courts may approve consensual releases if

"non-coercive").

39.     For these reasons, to the extent the Nondebtor Releases fall outside the specific

statutory injunction authorized by section 524(g), they are prohibited under *Purdue*, and the

Court may not approve the Plan unless their effects are limited to claims that may be enjoined

and channeled under that section.  In particular, the Plan should not be confirmed unless the

General Release and the TDP Release are stricken in their entirety, and the definitions of

"Protected Party" and "Channeled Talc Personal Injury Claim" are amended to clarify that the

Channeling Injunction will apply only to claims that are derivative of the debtor's liability and

that are based on the grounds specified in section 524(g)(4)(A)(ii) of the Bankruptcy Code.

### ii.     The Plan Contains an Impermissible Exculpation Clause

40.     Section 11.4 of the Plan contains a broad exculpation provision, under which none

of the entities defined as "Exculpated Parties" shall "have or incur any liability to any Person for

any act or omission taken or to be taken, whether before, on, or after the Petition Date through

and including the Effective Date in connection with, arising out of, or in any way relating to"

various matters, including the conduct of this case and the corporate transactions undertaken by

J&J before and in connection with the earlier LTL cases, with the exception of liabilities that

result from "criminal acts, actual fraud, willful misconduct, or gross negligence."  Plan § 11.4.1.

But even for such excluded activities, section 11.4 of the Plan includes a gatekeeping provision,

under which the parties wishing to litigate a non-exculpated cause of action must first seek

authorization from this Court to prosecute their claim in another forum.  *See id.*

41.     The Plan defines "Exculpated Parties" as:

(a) the Debtor's officers and managers who served at any time, whether before, on, or after the Petition Date, prior to the Effective Date of the Plan (each solely in their capacity as such); (b) the Debtor; (c) the TCC and each of the members thereof, solely in his or her capacity as such; (d) the FCR, solely in her capacity as such; (e) the Retained Professionals; (f) solely as to conduct found by a court of competent jurisdiction to have been undertaken while acting as a fiduciary of the Debtor or the Estate, the employees of the Debtor or other individuals providing similar services to the Debtor (other than the Debtor's officers and managers), and the employees of the Retained Professionals, each solely in their capacities as such; and (g) counsel to the individual members of the TCC, each solely in their capacity as such."

Plan § 1.1.58.

42.     A second exculpation provision, which addresses the post-bankruptcy operations of the Talc Personal Injury Trust, is contained in section 4.17 of the Plan and provides that:

> None of the Protected Parties shall have or incur any liability to any Person for any act or omission taken or to be taken in connection with, arising out of, or in any way relating to the administration or operation of the Talc Personal Injury Trust, including: (a) the management of the assets of the Talc Personal Injury Trust; and (b) the processing, liquidation, and payment of Channeled Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents.

Plan § 4.17.

43.     To the extent that applicable law authorizes exculpation beyond 11 U.S.C. § 1125(e), the Plan's exculpation provisions are inconsistent with controlling law of the Fifth Circuit. As with third party releases, the Fifth Circuit has long held that section 524(e) of the Bankruptcy Code "categorically bars third-party exculpations," absent express authorization in the Bankruptcy Code. *In re Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 437 (5th Cir. 2022), *citing Pacific Lumber*, 584 F.3d at 252-53. *Highland* reasoned that, because the only applicable source of authority for exculpation is based on the limited judicial immunity of chapter 11 trustees and official committees, exculpation should be limited "to the debtor, the creditors' committee and its members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the trustees within the scope of their duties." *Highland Capital*, 48 F.4th at 437. Based on this standard, the Fifth Circuit held that the bankruptcy court erred by approving an exculpation clause that

protected, among others, the debtor's employees and CEO, the professionals of the debtor and the committee, and the "representatives" of those parties. *Id.*at 37-38; *see also In re Bouchard Transportation Co., Inc.,* No. BR 20-34682, 2023 WL 1797907, at *3 (S.D. Tex. Feb. 7, 2023) (noting that *Highland* establishes a "bright-line rule" regarding permissible scope of exculpation clause).

44.     In terms of the persons protected, both proposed exculpation clauses of the Plan are even broader than the exculpation clause struck down in *Highland.*  Not only does the Plan purport to exculpate the Debtor's employees, professionals, and representatives—all parties for whom *Highland* expressly rejected exculpation—but it also includes former employees, employees of professionals, and professionals of individual TCC members.  In addition, the trust-specific exculpation clause set forth in section 4.17 protects hundreds of "Protected Parties" listed in the Plan, many of whom have little or no connection to the Debtor or this case.  None of these parties are eligible for exculpation under Fifth Circuit law.

45.     The Plan's exculpation clauses are also not appropriately limited by time.  As numerous courts have held, exculpation may be granted only with respect to activities that occur between the petition date and the consummation of the plan.  *See, e.g., In re Mallinckrodt PLC,* 639 B.R. 837, 883 (Bank. D. Del. 2022) (exculpation "only extends to conduct that occurs between the Petition Date and the Effective Date."); *In re Fraser's Boiler Serv., Inc.*, 593 B.R. 636, 640 (Bankr. W.D. Wash. 2018) ("Exculpation clauses generally only exculpate those actions taken in connection with a bankruptcy case between the petition date and the effective date of the plan"); *In re Washington Mut., Inc.*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) (exculpation is to cover only "actions in the bankruptcy case"), *citing In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000).  Under the Plan, by contrast, the liability of the Exculpated

Parties will be limited or released for activities that occurred well before this case was filed or that may occur indefinitely into the future. In particular, the main exculpation clause purports to limit the liability of numerous parties for their alleged wrongdoing before and during the two prior *LTL* cases—bankruptcy cases that were conducted before a different judge, in a different jurisdiction, and (at least according to the Debtor) that involved a different debtor entity. [ECF No. 183 at 2, 30, 41]. Even if—contrary to precedent--the powers of exculpation were as broad as the Debtor seems to imagine, there is no logical reason why this Court should have exclusive oversight of past misconduct that took place before another bankruptcy judge.

46.     The section 4.17 exculpation clause is also overbroad (even if it were otherwise appropriate) because it does not state the correct standard of limited judicial immunity for estate and committee fiduciaries. In jurisdictions that have permitted exculpation clauses, courts have required those provisions to exclude claims based on, among other things, willful misconduct or gross negligence. *See PWS*, 228 F.3d at 246. Although the section 11.4 version of the exculpation clause includes a carve-out for "criminal acts, actual fraud, willful misconduct, or gross negligence," the section 4.17 exculpation does not. Because the Protected Parties cannot be exculpated for their willful misconduct, even if they were otherwise entitled to limited immunity, this provision is improper.

47.     The gatekeeping clause attached to the Plan's exculpation provision also exceeds the Court's authority because it purports to deprive other courts of jurisdiction to determine causes of action between nondebtors. The jurisdictional statute for bankruptcy provides district courts "original <u>but not exclusive</u> jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b) (emphasis added); *In re Brady, Texas, Mun. Gas Corp.*, 936 F.2d 212, 218 (5th Cir. 1991). Nothing in the Bankruptcy Code

precludes other courts from determining the meaning of documents or Bankruptcy Court orders to the extent they are relevant to some proceeding filed outside of bankruptcy court. Accordingly, the Bankruptcy Court cannot deprive other courts of competent jurisdiction to interpret the plan or confirmation order in order to determine whether a particular claim is barred. To do so would violate general principles of comity. *See China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 36 (2d Cir. 1987) ("When two sovereigns have concurrent *in personam* jurisdiction one court will ordinarily not interfere with or try to restrain proceedings before the other.")

48.     Although *Highland* recognized that gatekeeping provisions may be permissible under some circumstances, the rationale of that decision is not applicable to this case.  In approving a limited gatekeeping clause, the Fifth Circuit in *Highland* acknowledged the "unique" circumstances of that case, which involved a struggle for control between the current and former managers of the debtor, and where the gatekeeping order was also supported by specific findings regarding the vexatious and bad faith conduct of the party against whom it was principally directed.  *Highland*, 47 F.4th at 428.[7] Those unique circumstances are absent from this case; there is no apparent dispute between current and former management and Debtor has provided no evidence of vexatious litigants as support for the gatekeeping provision. Furthermore, in contrast to *Highland*, this case involves a post-bankruptcy trust that will operate for decades after the Plan is confirmed.  Rather than simply permitting parties to plead the exculpation clause as an affirmative defense in non-bankruptcy litigation, the Plan requires

---

[7] The Fifth Circuit has long recognized the inherent authority of courts "to impose a pre-filing injunction to deter vexatious, abusive, and harassing litigation."  *Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 187 (5th Cir. 2008) (citing cases).  Any such injunction, however, must be tailored to protect the "legitimate rights of litigants," *id.* at 190, and as such relief may be issued only where there is a record of abusive conduct by the enjoined litigant.  *See id.* at 191.

litigants to return to this Court for what will be in effect a mini-trial leading to an advisory opinion, which will also require parties and this Court to engage in the costly and burdensome process of reopening a long-closed bankruptcy case.  This procedure is burdensome, unnecessary, and appears to serve no purpose other than to provide a *de facto* release and exculpation to parties not entitled to such relief.  *See In re Gulf Coast Health Care, LLC*, No. 21-11336 (KBO) (Bankr. D. Del.), D.I. 1236, Transcript of May 4, 2022, Confirmation Hearing at 30:18-23 (noting that "the plan says what it says, and other courts should be entitled to exercise their authority to interpret it," and that "[i]mposing such a requirement could also impose an unnecessary administrative hurdle and cost the parties when these cases are closed").

### iii.  The Plan Violates Sections 1122(a) and 1123(a)(4) of the Bankruptcy Code Through Its Classification of Master Settlement Agreement Claimants

49.     The Disclosure Statement represents that prior to the Petition Date, LTL entered into a series of "Master Settlement Agreements" with an undisclosed number of firms representing more than 21,000 talc claimants (the "MSAs").[8]  *See* Discl. St. § 3.1.  Under the Plan, claimants who are represented by a firm that has signed an MSA have the option of collecting payment for their claim outside of bankruptcy, notwithstanding the Channeling Injunction and Nondebtor Releases, and the Plan will operate as an assumption of each MSA as an executory contract.  *See* Plan § 5.11.  Talc claimants eligible for payment under an MSA are

---

[8]  To date, the Debtor and J&J have not produced a copy of any MSA, nor have they identified the law firms with whom they have entered into MSAs.  However, the Debtor acknowledges that it has identified at least 300 votes that were cast on the plan on behalf of MSA-eligible claimants. *See* Supplemental Declaration of John K. Kim [ECF No. 433] at 12.

not separately classified, however, but appear to be defined as Class 4 claimants along with other non-MSA claimants for purposes of voting.

50. The Plan's failure to separately classify the MSA claimants violates section 1122 of the Bankruptcy Code. Under that section, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). As the Fifth Circuit has explained, this section requires that a class must consist of claims that "share common priority and rights against the debtor's estate." *In re Greystone III Joint Venture*, 995 F.2d 1274, 1278 (5th Cir. 1991). In addition, a classification scheme violates section 1122 if it has been gerrymandered in order to manipulate the voting on the plan. *In re Save Our Springs (S.O.S.) All., Inc.*, 632 F.3d 168, 174 (5th Cir. 2011).

51. Claimants who are subject to an MSA do not share "common priority and rights" with other Class 4 claimants. The assumption of the MSAs under the Plan transforms any claims arising under that agreement into administrative claims. *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 532 (1984). Because their priority is different, such claims may not be classified together with general unsecured claims. Rather, this priority and the right of each MSA claimant to look outside the Plan for payment means that it has "'a different stake in the future viability' of [the debtor] that may cause it to vote for reasons other than its economic interest in the claim." *Save Our Springs*, 632 F.3d at 174.

52. Moreover, it is not clear that MSA claimants are even creditors of the Debtor in any meaningful sense. Although they retain the ability to forgo their rights under the MSA and submit their claims to the Talc Personal Injury Trust instead, the Debtor offers no explanation for why any such claimant would ever actually elect to stand in the queue for a trust payment in lieu

of the immediate and certain compensation available to them under the MSA.  In this respect, the Debtor's strategy echoes the long-discredited tactic of creating "stub claims" in bankruptcy, under which the debtor withholds a minimal portion of its payment to claimants who settled before bankruptcy, for the sole purpose of ensuring that those settled claimants are treated as creditors (and eligible to vote) in the bankruptcy case.  *In re Combustion Eng'g, Inc.*, 391 F.3d at 245 (noting "problematic" use of stub claims to gerrymander voting class).  So too here. Because of their right to payment outside of bankruptcy, the MSA claimants do not depend on the Plan for payment and have no real stake in this chapter 11 case.  Instead, their nominal option to elect Plan treatment appears to serve no purpose other than generating additional votes in favor of the Plan and diluting the votes of other creditors who are not so privileged.

53.     Notwithstanding this, even if the Court was willing to conclude that the MSA and non-MSA talc claims are "substantially similar" as required by section 1122(a), the Plan would violate the Bankruptcy Code for another reason.  Under section 1123, a plan must provide the "same treatment for each claim or interest of a particular class."  11 U.S.C. § 1123(a)(4).  That requirement is most clearly violated when the members of the same class are paid a different recovery on their claims, but it also is violated where class members are required to tender "unequal consideration" for the same payment.  *In re AOV Indus., Inc.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986); *see also In re Serta Simmons Bedding, Inc.*, __ F.4th __, 2024 WL 5250365 at *23 (5th Cir. Dec. 31, 2024) (finding violation of equal treatment requirement where actual economic value of indemnity provided under plan "varied dramatically" between creditor groups).

54.     In this case, the Debtor has provided no information about the recoveries that will be paid to claimants under the MSAs and has not disclosed the claimants or firms that are

eligible for this treatment.  For this reason alone, Debtor cannot meet its burden to show that the Plan is nondiscriminatory.  But even apart from this, the Plan violates section 1123(a)(4) because it applies the Nondebtor Releases differently to MSA and non-MSA claimants.  In particular, MSA-eligible claimants are exempted from the General Release and the Channeling Injunction with respect to such claims, *see* Plan §§ 11.2.2; 11.3.1(b)(iii).  And because claimants paid under an MSA are not required to submit requests for payment from the Talc PI Trust, they are for all practical purposes also exempt from the TDP Release.  As a result, even if their recoveries from J&J and/or the Talc PI Trust are comparable, the non-MSA claimants are being forced to tender unequal consideration for those payments in the form of the Nondebtor Releases.

C. **The Plan Proponents Have Not Complied With the Applicable Provisions of the Bankruptcy Code. [11 U.S.C. § 1129(a)(2)]**

55.    Section 1129(a)(2) of the Bankruptcy Code requires the Court to find, prior to confirming a Plan, that the Debtor, as plan proponent (or LTL, as the entity that initially solicited the Plan), has "complie[d] with the applicable provisions of this title."  11 U.S.C. § 1129(a)(2).  As this Court has observed, "[a]mong those provisions are the compliance with the disclosure and solicitation requirements, which is the paradigmatic example of what Congress had in mind when it enacted § 1129(a)(2)."  *In re Pearl Res. LLC*, 622 B.R. 236, 259 (Bankr. S.D. Tex. 2020).

56.    On November 6, 2024, the U.S. Trustee filed an objection to the adequacy of the Disclosure Statement [ECF No. 395] and he reiterates and incorporates those arguments for purposes of this objection to plan confirmation.  In particular, the U.S. Trustee notes that, in addition to the other deficiencies in its disclosure and solicitation process, the Disclosure Statement lacks the most critical element of the information that should have been provided to creditors: apart from some unsubstantiated claims about the expected range of recoveries

(apparently based on a series of assumptions that are neither set forth nor explained), there is nothing in the Plan that will allow ovarian cancer claimants to determine the expected payment they are likely to receive under the Plan, or to fairly evaluate the contingencies that may affect that payment. *See In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) ("a proper disclosure statement must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution"). Unlike the gynecological cancer claimants who will be offered a flat payment under the TDP, ovarian cancer claimants will be paid under a "points system," in which the dollar value of each point is not static. The actual value of these points was not disclosed in the Debtor's solicitation materials and may not be established until after the deadline for the submission of trust claims. *See* TDP § 7.1.2(A) (providing "within thirty (30) days after the Claim Submission Deadline, and in any event prior to any distributions from the Trust, the Trustees, with the consent of the TAC and the FCR, shall establish an initial Cash Value of a Point").

57.     Moreover, because the funding of the Talc Personal Injury Trust is capped, the ovarian cancer claimants face a risk that their own recoveries will be reduced if the trust experiences a higher volume of claims than anticipated. This risk may be particularly heightened to the extent the Talc Personal Injury Trust lacks adequate safeguards to prevent the submission of fraudulent or otherwise non-meritorious claims. The Disclosure Statement contains no projections on the volume of claims that the Talc Personal Injury Trust is expected to receive and approve, nor does it otherwise explain the assumptions regarding the range of possible payments discussed in the Disclosure Statement. Without these explanations, creditors cannot make informed judgments on the Plan, as required under section 1125 of the Bankruptcy Code.

58.     The U.S. Trustee also objects to confirmation of the Plan under 11 U.S.C. § 1129(a)(2) because the Debtor has engaged in unauthorized post-petition solicitation of the Plan in violation of section 1125(b) of the Bankruptcy Code.  *See* 11 U.S.C. § 1125(b) (acceptance of plan "may not be solicited after the commencement of the case" unless a written disclosure statement has been approved by the court after notice and a hearing).  In particular, in addition to any discussions that may have occurred between the Debtor and various creditor representatives since the petition date in order to induce those creditors to change their votes, the U.S. Trustee understands that on or about December 19, 2024, an attorney representing the Debtor sent a mass email to various creditor attorneys highlighting purported improvements to the Plan, transmitting a statement by the Committee in support of the Plan, and providing instructions for those attorneys to change their clients' votes. *See* Exhibit A.  As courts have found under nearly identical circumstances, because no disclosure statement in connection with the Plan has been approved, such statements constitute improper postpetition solicitation.  *See In re California Fid., Inc.,* 198 B.R. 567, 573 (B.A.P. 9th Cir. 1996) (finding violation of section 1125(b) where debtor's principal sent communication to creditors prior to disclosure statement hearing that criticized competing plan and transmitted letter in support of debtor's plan by Creditors' Committee chairman).  The U.S. Trustee continues to investigate these matters and reserves the right to seek further relief as appropriate.

### D.     The Plan Has Not Been Proposed in Good Faith. [11 U.S.C. § 1129(a)(3)]

59.     The Court may not confirm a reorganization plan unless it "has been proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  Although good faith is generally determined under a "totality of the circumstances" test, *see In re T-H New Orleans Ltd. P'ship,* 116 F.3d 790, 802 (5th Cir. 1997), that test is principally focused on two

main inquiries: whether the debtor had a legitimate purpose in seeking bankruptcy protection, *see In re Sun Country Dev., Inc.,* 764 F.2d 406, 408 (5th Cir. 1985) (good faith requires "legitimate and honest purpose to reorganize"); and whether confirmation of the plan will be consistent with the goals of the Bankruptcy Code. *See In re Vill. at Camp Bowie I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013) (good faith test must be "mindful of the purposes underlying the Bankruptcy Code").[9]

60.     The Debtor cannot meet its burden to demonstrate good faith.  As argued in the U.S. Trustee's Motion to Dismiss, this chapter 11 case is designed to benefit J&J and not the Debtor, which is not in financial distress and has no separate need for reorganization relief.  Alternatively, to the extent the Court finds that the Debtor is in financial distress, any such distress was deliberately manufactured for the purposes of this bankruptcy case through a series of transfers that harmed the Debtor for the benefit of J&J, which will be absolved of any liability for those transactions if the Plan is confirmed.  Confirmation of any plan under these circumstances would not further the goals of the Bankruptcy Code.

---

[9] The test for good faith under section 1129(a)(3) overlaps to a considerable extent with the implicit requirement for good faith on a motion to convert or dismiss under section 1112, although there are important differences—most notably the burden of proof, which is borne by the plan proponent under 1129(a)(3).  *See T-H New Orleans,* 116 F.3d at 802.  As most courts have recognized, in any event, "the taint of a petition filed in bad faith must naturally extend to any subsequent reorganization proposal; thus, any proposal submitted by a debtor who filed his petition in bad faith would fail to meet section 1129's good faith requirement." *In re Nat. Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987); *see also Sun Country,* 764 F.2d at 408 (good faith test under section 1129(a)(3) includes "whether [the] petition for reorganization was filed in good faith").  And although issues regarding prepetition conduct are normally addressed in the first instance through a motion to dismiss under 1112(b) and not an objection to plan confirmation under section 1129(a)(3), *see In re Texas Extrusion Corp.*, 68 B.R. 712, 723 (N.D. Tex. 1986), it is appropriate for both forms of bad faith to be considered here, where the U.S. Trustee's motion to dismiss remains pending and a bad faith determination under section 1112(b) would moot the issue of plan confirmation.

###### i.    The Debtor Cannot Demonstrate a Legitimate Bankruptcy Purpose.

61.     Any discussion of good faith in the Debtor's proposed Plan must begin with the novel litigation strategy that this case represents.  J&J is among a number of recent mass tort defendants who have sought to cap or discharge their liability through a divisional merger under the Texas Business Organizations Code (the "TBOC"), under which a corporation "can undergo a corporate-mitosis where it splits into multiple successor corporations and apportion its assets and liabilities among its successors as it sees fit."  *Kelly v. Corizon Health Inc.*, No. 2:22-CV-10589, 2022 WL 16575763, at *1 (E.D. Mich. Nov. 1, 2022); TBOC §§ 10.001(a)-10.902.  For mass tort defendants, this is often done in order to isolate tort liabilities in a single subsidiary.  When the divisional merger is followed by a chapter 11 bankruptcy of the liability-bearing subsidiary, as is almost invariably the case, the resulting strategy has become known as the "Texas Two-Step."  *LTL I*, 64 F.4th at 96.

62.     The Texas divisional merger statute is not, however, a license for corporations to engage in fraudulent transfers.  The TBOC provides that any divisional merger is subject to existing rights under debtor and creditor law, which would include laws against fraud and fraudulent transfers.  *See* TBOC § 10.901 (providing that divisional merger does not abridge rights of creditors under existing law); *In re Aldrich Pump LLC*, No. 20-30608, 2023 WL 9016506, at *31 (Bankr. W.D.N.C. Dec. 28, 2023) ("[t]he applicable Texas merger statutes demand that no prejudice befall creditors of a corporation undergoing a divisional merger").  A corporation therefore cannot use a Texas divisional merger to create an entity that contains all of the liabilities and none of the assets of its predecessor, which would likely violate section 10.901 and render the transaction vulnerable to challenge as a fraudulent transfer.  *See In re DBMP LLC*, No. 20-30080, 2021 WL 3552350, at *26 (Bankr. W.D.N.C. Aug. 11, 2021) (discussing legislative history of TBOC).

63.     To avoid this problem, nearly all divisional mergers (including the ones at issue in this case) have included what one court has described as "an essential feature" of Texas Two-Step strategy: the funding agreement. *Aldrich Pump*, 2023 WL 9016506 at *7. The funding agreement typically is a contract between the liability-bearing company and its affiliates (either its parent or its asset-retaining merger twin) under which the affiliates promise to fund payment of litigation costs and judgments for the liability company, thus allowing the liability company to represent that it has the same ability to pay the claims of its creditors as did its predecessors. *See id.* And because the liability company will usually lack the cash flow or access to credit necessary to pay for a chapter 11 case, the funding agreement will usually also include a commitment by the affiliates to fund the administrative costs of a prospective bankruptcy and to contribute to the claims trust in that bankruptcy. *Id.* at *7, *10.

64.     This case is unusual among Texas Two-Step bankruptcies in one respect: the Debtor is the product of not one, but two separate Texas divisional mergers—the first in 2021, which caused LTL to assume the liabilities of J&J's former consumer division, and a second shortly before this case was filed, under which the Debtor was created out of LTL. *See* Kim Decl. ¶¶ 29, 35. In all other respects, this case follows the pattern described in *Aldrich Pump*: the Debtor was formed for no purpose other than to assume J&J's liabilities and file for bankruptcy, its principal asset is its right to seek funding from its affiliates, and the main objective of this case is to achieve a comprehensive resolution of J&J's talc liabilities through the Debtor, without the need for J&J itself to seek chapter 11 protection. *See id.* ¶ 137.

65.     The strategy of the Texas Two-Step has been criticized as an "elaborate loophole[]" that has enabled large corporate debtors to "pick and choose among the debt-discharging benefits of bankruptcy without having to subject themselves to its creditor-protecting

burdens." *In re Aearo Techs., LLC,* No. 22-2606, at 3-4 (7th Cir. Feb. 1, 2023), ECF No. 89; *see also In re Bestwall LLC*, 71 F.4th 168, 194–95 (4th Cir. 2023) (King, J., dissenting in part) (describing Texas Two-Step as "little more than a corporate shell game").

66.     To date, two courts have considered whether the strategy and structure of a Texas Two-Step bankruptcy is consistent with the good faith requirement of chapter 11.[10]  Both courts, for slightly different reasons, have concluded that such cases are not filed in good faith.  In each of the cases filed by the Debtor in its previous incarnation as LTL, the Third Circuit held that the Debtor's petition did not meet the implicit good faith requirement of section 1112(b) because it had not been filed for a valid bankruptcy purpose.  *LTL I,* 64 F.4th at 109; *LTL II,* 2024 WL 3540467 at *4.  In LTL's first case, the Third Circuit held that LTL's lack of a valid purpose was established by its absence of genuine financial distress, and that it lacked distress because the support provided to LTL by J&J—which it likened to an "ATM disguised as a contract"—was sufficient to meet LTL's financial needs outside of bankruptcy for the indefinite future.  *LTL I,* 64 F.4th at 109. In LTL's second bankruptcy case, the Third Circuit affirmed the bankruptcy court and dismissed LTL's second bankruptcy case, which was based on a modified version of the funding agreement, on those same grounds.  *LTL II,* 2024 WL 3540467 at *4.

---

[10] Although other bankruptcy cases have employed the Texas Two-Step or variations of it, *LTL* and *Aearo*—both of which involved motions to dismiss for cause under 11 U.S.C. § 1112(b)— are the only two decisions to have directly addressed good faith.  Three asbestos-related Texas Two-Step cases that pre-date *LTL* (*Bestwall*, *Aldrich Pump*, and *DMBP*) are currently pending in the Western District of North Carolina.  Although these cases have survived motions to dismiss, the bankruptcy courts in those cases were not required to consider good faith due to the Fourth Circuit's unique dismissal standard.  *See DBMP*, 2021 WL 3552350 at *37.  In an unpublished bench ruling, this Court also denied a motion to dismiss for bad faith in the Texas Two-Step case of *In re Tehum Care Services, Inc.*, No. 23-90086 (CML), but the Court did so primarily on the grounds of timeliness and emphasized that it was not issuing a ruling on whether the Texas Two-Step strategy was "good or bad."  Case No. 23-90086,3-1-24 Hr'g Tr. 79-80, 112-113; *see also* 3-27-24 Hr'g Tr. 513; 4-11-24 Hr'g Tr. 25.

67.     The United States Bankruptcy Court for the Southern District of Indiana reached the same result, under a different test, in a case filed by a subsidiary of 3M Corporation.  *See In re Aearo Techs. LLC*, No. 22-02890-JJG-11, 2023 WL 3938436, at *1 (Bankr. S.D. Ind. June 9, 2023).  Although *Aearo* was not a true Texas Two-Step case, because it involved an existing subsidiary rather than one that was created for the purpose of bankruptcy, the circumstances and strategy of that case were otherwise similar to this case.  Like this case, *Aearo* was the attempt of a large nondebtor corporation to shed its own tort liabilities (in that case, for defective military earplugs and respirators) by channeling those claims into a trust that would be created in the bankruptcy case of Aearo, its wholly owned subsidiary.  *See id.* at *5.  *Aearo* also used the device of a funding agreement, under which 3M would pay any obligations incurred by Aearo and would also pay the administrative costs of the bankruptcy case and provide funding for bankruptcy trust.  *See id.* at *5-6.

68.     Like the Third Circuit in *LTL*, the *Aearo* bankruptcy court held that the good faith inquiry depended on whether Aearo's case "serve[d] a valid restructuring purpose."  *Id.* at *17. However, the bankruptcy court declined to follow the "financial distress" standard applied by the Third Circuit and held that the more appropriate test was whether Aearo had a "need" for bankruptcy relief.  *Id.*  The bankruptcy court then found that Aearo had not shown a need for bankruptcy.  In part, this was due (as in *LTL*) to the existence of the funding agreement which, as the court found, made the pending tort litigation "irrelevant" to Aearo outside of bankruptcy.  *Id.* at *18.  But Aearo's need for bankruptcy was also negated by its very relationship with 3M. Although Aearo and 3M were co-defendants in the pending tort litigation, the evidence showed that in practice, Aearo was unaffected by this litigation since all costs and judgments were paid by 3M, and there was no evidence that 3M would attempt to shift those costs to Aearo in the

future. *Id.* at *17. And because 3M would almost assuredly continue to defend lawsuits outside of bankruptcy where it was jointly or solely liable, "there is no material value preserved, created, or lost outside of bankruptcy" for Aearo. *Id.* at *19. For these reasons, the court found that Aearo had no need for chapter 11 relief and ordered its case dismissed under section 1112(b). *See id.* at *22.

69.    In this case, the Debtor cannot establish a legitimate bankruptcy purpose under either the Third Circuit's "financial distress" test or *Aearo*'s "need" test. The bankruptcy court in LTL's second bankruptcy case found, and the Third Circuit affirmed, that LTL was not financially distressed as late as June 2023.[11] *In re LTL Mgmt., LLC*, 652 B.R. 433, 448 (Bankr. D.N.J.); *LTL II*, 2024 WL 3540467 at *4. And assuming that the 2024 divisional merger complied with the TBOC, that transaction could not have been used to create financial distress for either LTL or the Debtor, as divisional mergers may not abridge the rights of creditors. TBOC § 10.901; *In re Aldrich Pump LLC*, 2023 WL 9016506, at *31. But even though the

---

[11] Under the doctrine of issue preclusion, the Debtor cannot relitigate the bankruptcy court's determination that LTL was not financially distressed as late as July 2023. *See United States v. MONKEY*, 725 F.2d 1007, 1010 (5th Cir. 1984). The Debtor has suggested that the U.S. Trustee's reliance on issue preclusion here is improper, arguing that: (i) the motions to dismiss LTL's two bankruptcies were not a "claim" or "cause of action" to which issue preclusion can apply; (ii) the Debtor and LTL are distinct entities; and (iii) the financial circumstances of LTL and/or the Debtor have changed since 2023. None of these arguments have merit. The doctrine of issue preclusion is not limited to claims or causes of action in adversary proceedings, but may also arise from bankruptcy contested matters, including a motion to dismiss. *See In re Intelogic Trace, Inc.*, 200 F.3d 382, 390 (5th Cir. 2000) (holding that bankruptcy court's order in contested matter had res judicata effect). Issue preclusion is not limited to parties to the original proceeding but extends to parties who are in privity with the original litigants, and for this reason it is irrelevant whether LTL and the Debtor are technically the same entity (since even if not, the Debtor has succeeded to LTL's rights and is in privity with LTL). *See In re Vanguard Nat. Res., LLC*, 624 B.R. 400, 417 (Bankr. S.D. Tex. 2020). Finally, although the New Jersey court could not have made findings on 2024 events in 2023, the question of LTL's condition in 2023 is highly relevant to the question of the Debtor's current financial distress—and it is that issue to which the doctrine of issue preclusion applies.

Debtor asserts that it is now financially distressed, *see* MTD Obj. at 45-47, it does not otherwise explain how or when that alleged distress could have emerged. Although it now appears to be operating under a different funding agreement than the one available to LTL in its second case (an agreement which does not, however, appear to have ever been formally terminated), the Debtor does not allege that this agreement is insufficient to meet its needs, nor does it allege that it is now less able to satisfy the claims of its creditors than was LTL in 2023.

70.     Even apart from the Debtor's rights under its funding agreement, the course of dealing between J&J and its subsidiaries refutes any contention that the Debtor is now in financial distress or has a need for bankruptcy relief. During the year-long period between the dismissal of LTL's second case and the filing of this case, no automatic stay was in place with respect to lawsuits involving J&J's talc products. Whether through its existing funding agreement or otherwise, LTL continued to enjoy the full support of J&J during this period, and the Debtor has not alleged that LTL was unable to pay judgments or defense costs after its chapter 11 case was dismissed.

71.     Although the Debtor has now purportedly assumed LTL's liabilities, there is no evidence that J&J would manage the Debtor's litigation outside of bankruptcy any differently than it had done for LTL. Even without a funding agreement, there is little plausible reason for J&J to cut off its support to the Debtor and require it to defend and pay talc claims using its own resources. Such a strategy would do nothing to reduce J&J's own liability as a co-defendant, and it would also expose J&J to the very same prejudice (in the form of inconsistent judgments, exhaustion of insurance assets, and res judicata) that it alleged in its motion to extend the automatic stay to nondebtors in this case. *See* Debtor's Complaint for Declaratory and Injunctive Relief at ¶ 83 [ECF No. 40].

72.     The U.S. Trustee does not dispute that the filing of this case was in J&J's own interest—otherwise, it would hardly have orchestrated this strategy three times.  But the issue before the Court is not whether J&J had a valid purpose for this case, but whether the Debtor did. *See LTL I*, 64 F.4th at 107 (finding that bankruptcy court improperly considered LTL's nondebtor affiliate, and not LTL, as the "lodestar" of its financial distress analysis, and holding that "[t]his misdirection was legal error").  And the Debtor cannot show any such valid purpose of its own.  Absent bankruptcy, the Debtor could have relied on J&J's total support indefinitely—much as LTL did during the year before this case was filed.  And as the bankruptcy court found in LTL's second bankruptcy case, there is no meaningful risk that J&J's ability to fund that support will be exhausted.  *See LTL II*, 2024 WL 3540467 at *3.  The filing of this case, however, imposed new burdens and costs on the Debtor that did not exist outside of bankruptcy, and will effectively cap J&J's otherwise open-ended support.  In this light, the decision to seek chapter 11 protection was not only unnecessary from the Debtor's standpoint, but it likely represented a deterioration in its financial position and ability to pay its creditors' claims.  Under any possible standard, this case does not reflect a legitimate restructuring purpose for the Debtor and the Plan has not been filed in good faith.

### ii.     J&J's Bankruptcy Strategy Is Inconsistent With the Goals of the Bankruptcy Code.

73.     The Plan also fails to satisfy the other essential element of good faith under section 1129(a)(3) because the confirmation of the Plan would not advance the fundamental purposes of the Bankruptcy Code.  This is so for at least three reasons.  First, the Debtor is not the "honest but unfortunate" debtor whom the Bankruptcy Code was designed to protect, *see Grogan v. Garner*, 498 U.S. 279, 282, n.2 (1991), but is an entity that was created for the sole purpose of filing a chapter 11 petition and whose liabilities were deliberately assumed for the

purpose of discharging them in bankruptcy.  The Debtor has no employees, operations, or value

that will be preserved by filing these cases.  The goal of this case is not a fresh start for the

Debtor—which in any event has no business in need of any such relief—but rather appears to be

about generating settlement pressure in litigation involving a nondebtor.  This is an improper use

of the bankruptcy process.  *See In re Antelope Techs., Inc.,* 431 F. App'x 272, 275 (5th Cir. 2011)

(bankruptcy petition dismissed for bad faith where "the purpose of the petition was not primarily

to reorganize or respond to financial crisis but instead was to gain unfair advantage" in other

litigation).  "Chapter 11 was not designed for the purpose of protecting assets and interests of

non-debtor parties under the guise of a legitimate plan of reorganization."  *In re Davis Heritage

GP Holdings, LLC*, 443 B.R. 448, 462 (Bankr. N.D. Fla. 2011).

74.    Second, the Plan violates a fundamental policy of the Bankruptcy Code because

the true beneficiary of the Plan is not the Debtor or its creditors but nondebtor J&J, which will

enjoy an effective discharge of billions of dollars in tort liabilities.  But the bankruptcy discharge

is available only to a company that puts "virtually all its assets on the table for its creditors," *see

Purdue*, 144 S.Ct. at 2078, and J&J has not done so.  And by allowing J&J to reap the benefits of

bankruptcy, while shouldering none of the burdens, the Plan upsets the "simple bargain" between

debtors and creditors crafted by Congress in chapter 11.  *Id.*

75.    Third, the Plan uses the bankruptcy process to sanitize (or at the very least, to

prevent judicial scrutiny of) transactions that would otherwise be subject to challenge as

fraudulent transfers.  At a minimum, the internal corporate transactions orchestrated by J&J

between 2021 and 2024 had a significant effect on the Debtor's balance sheet.  To the extent that

those transactions caused the Debtor to become financially distressed or attempted to place assets

beyond the reach of their creditors, J&J and its officers would potentially face substantial

liability for fiduciary breaches and fraudulent transfers. *See In re Tronox*, 503 B.R. 239 (Bankr. S.D.N.Y. 2013) (discussing liability of parent company that wrongfully diverted assets of debtor-subsidiary prior to bankruptcy). Indeed, lawsuits against J&J and its representatives on exactly these theories were already pending prior to the filing of this case. *See* Kim Decl.¶ 75. Under the Plan, any such claims are subject to a broad release by the Debtor in exchange for unspecified consideration, without any showing or finding by the Court that such a release is reasonable compared to the value of the claims released. *See* Plan § 11.2.1. As the Fifth Circuit has recognized, however, seizing control over claims against insiders and affiliates is not a proper purpose of chapter 11. *See In re Brazos Emergency Physicians Ass'n*, 471 Fed. Appx. 393, 394 (5th Cir. June 22, 2012); *Antelope Techs.*, 431 Fed. Appx. at 275.

### iii. The Debtor's Case Was Filed in Bad Faith.

76. The Court may also infer bad faith based on the circumstances in which the Debtor's case was filed. In particular, the filing of a serial bankruptcy petition is a form of bad faith for purposes of section 1129(a)(3). *See In re McMahan,* 481 B.R. 901, 915 (Bankr. S.D. Tex. 2012) ("[b]y requiring good faith, the Code also prevents abusive serial filings"); *In re Elmwood Dev. Co.*, 964 F.2d 508, 511 (5th Cir. 1992). A court may also infer bad faith due to forum shopping. *See In re Sullivan*, 522 B.R. 604, 616 (B.A.P. 9th Cir. 2014) (noting that forum shopping is among "common indicators" of bad faith conduct); *In re Silberkraus,* 253 B.R. 890, 902 (Bankr. C.D. Cal. 2000), subsequently aff'd, 336 F.3d 864 (9th Cir. 2003) (finding bad faith under section 1129(a)(3) based, in part, on debtor's forum shopping). Like the *LTL* cases, this case was orchestrated by J&J for the primary benefit of J&J; this case involves the same liabilities and creditors that were present in *LTL*, and this case is based on the same strategy that LTL sought to pursue in its two dismissed chapter 11 cases. And although this Court previously

declined to transfer venue on that basis,[12] the filing of this case in Texas is forum-shopping

based on the Debtor's admitted desire to avoid unfavorable Third Circuit precedent in J&J's

home jurisdiction.  *See* Debtor's Opposition to the Motions to Transfer Venue at 27-28 [ECF No.

183] (arguing for superiority of Texas venue based on the alleged "minority dismissal standard in

the Third Circuit").  Both of these factors may be considered by the Court as part of its analysis

under a totality of the circumstances test.  *See In re Argus Grp. 1700, Inc.,* 206 B.R. 737, 751

(Bankr. E.D. Pa. 1996), *aff'd sub nom. Argus Grp. 1700, Inc. v. Steinman,* 206 B.R. 757 (E.D.

Pa. 1997) (including forum shopping among list of factors to be considered as part of bad faith

test); *In re Hurt*, 369 B.R. 274, 280 (Bankr. W.D. Va. 2007) (previous dismissed cases by debtor

considered as part of good faith test in chapter 13 case).

### iv. The Plan May Not Be Confirmed if the Court Finds That J&J or the Debtor Have Manipulated the Voting Process.

77.     The good faith requirement of section 1129(a)(3) also allows courts to police the

plan process by denying confirmation of plans that were approved through "chicanery."  *Vill. at

Camp Bowie I*, 710 F.3d at 248.  In particular, a plan is not proposed in good faith if the

proponent offers improper inducements to creditors who vote in favor of the plan or otherwise

manipulates the voting process.  *See In re Quigley Co., Inc.*, 437 B.R. 102, 132 (Bankr. S.D.N.Y.

2010).  In *Quigley*, the leading case on solicitation-related bad faith under section 1129(a)(3), the

debtor's parent, Pfizer, sought to achieve acceptance of the plan in an asbestos-related case by

---

[12] The Court did not rule on the parties' arguments regarding forum shopping at the venue hearing in this case but noted that those arguments would be considered instead in connection with dismissal and confirmation.  *See* Transcript of October 10, 2024 Hearing at 213 [ECF No. 284] ("I think I should consider [forum shopping] in connection with a motion to dismiss, which is already on file, and can be adjudicated by this Court, and also in the context of plan confirmation").

flooding the voting class with thousands of claimants that had settled with Pfizer before bankruptcy, but that held unsettled stub claims against Quigley that were unlikely to be eligible for any distribution from the proposed section 524(g) trust.  *Id.* at 128.  Pfizer also manipulated the voting process by offering a separate financial incentive to settling creditors, leading the court to comment that "[i]n a nutshell, Pfizer bought enough votes to assure that any plan would be accepted."  *Id.* at 127.  Based on these findings, the court concluded that the plan was based on a "tainted" voting process and could not be confirmed under section 1129(a)(3); for the same reasons, the court also granted a motion to designate the votes of settling claimants under section 1126(e) of the Bankruptcy Code.  *Id.* at 129, 132.

78.     In this case, critical facts about the Plan solicitation and voting process (including the actual outcome of that vote) remain in dispute and will be the subject of evidence to be presented at the confirmation hearing.  The U.S. Trustee notes, however, that many of the strategies employed by Pfizer in *Quigley*—including the solicitation of votes from claimants that had settled outside bankruptcy and the provision of additional financial benefits to settling claimholders and their counsel—are also present in this case.  *See* Discl. St. § 3.1 (discussing treatment of MSA claimants; Plan § 1.1.33 (referencing Common Benefit Fund MSA, under which J&J will contribute $650 million "for distribution to qualifying counsel on account of common benefit claims").  In addition, motions to designate the votes of certain claimants are already pending. *See* ECF No. 265.  As in *Quigley*, to the extent that the Court finds cause to designate votes under section 1126(e), or otherwise finds evidence of vote manipulation or improper solicitation, it should also find that the Plan was not filed in good faith under section 1129(a)(3) and cannot be confirmed.

###### v.    The Debtor's Arguments in Support of Good Faith Lack Merit.

79.    In its objection to the U.S. Trustee's Motion to Dismiss, the Debtor raises several arguments in support of good faith, none of which are persuasive.  The Debtor attempts to distinguish the *LTL* decisions by suggesting that the "financial distress" standard applied in that case has not been adopted by the Fifth Circuit, or that it is simply one of several factors to be considered under a "totality of the circumstances" test.  *See* MTD Obj. at 41.  But although no court within the Fifth Circuit has specifically adopted the Third Circuit's "financial distress" formula, Fifth Circuit courts have long recognized that a minimum, a debtor must be in "financial difficulty" or "financial crisis" to satisfy the requirement of good faith.  *See In re Ozcelebi,* 639 B.R. 365, 397 (Bankr. S.D. Tex. 2022) (holding that "[t]he primary purpose of the filing must be to reorganize or to respond to financial crisis"); *In re S. Healthcare Sys., Inc.,* No. 02-11621, 2003 WL 24027460, at *3 (Bankr. M.D. La. Jan. 6, 2003) ("the bankruptcy courts should be used only for truly reorganizing a debtor who is having financial difficulties"); *In re Roman Cath. Church of Archdiocese of New Orleans*, 632 B.R. 593, 600 (Bankr. E.D. La. 2021) ("financial difficulty" required for good faith).  This is the same test as the Third Circuit's "financial distress" standard, which is in turn derived from the general requirement (present under both Third and Fifth Circuit law) that a bankruptcy petition must be filed for a "valid bankruptcy purpose."  *LTL I,* 64 F.4th at 101; *In re Nat'l Rifle Ass'n of Am.,* 628 B.R. 262, 270–71 (Bankr. N.D. Tex. 2021) ("a Chapter 11 petition is not filed in good faith unless it serves a valid bankruptcy purpose").

80.    Alternatively, the Debtor distinguishes its case from *LTL* by suggesting that "neither Red River's liabilities nor its assets are the same as LTL's."  MTD Obj. at 51.  The Debtor bases this statement on a comparison between the amount currently available under the Debtor's Indemnity Cost Funding Agreement with a J&J affiliate ($9 billion) with the amount

that the New Jersey Bankruptcy Court estimated was available to LTL in 2023 (between $22.3 and $29.9 billion), or an amount two to three times what is allegedly available to the Debtor. *Id.* But the Debtor's argument here underscores rather than refutes the bad faith of this case.  In 2021, as the Third Circuit found, LTL had access to an "ATM disguised as a contract" that was sufficient to meet its needs outside of bankruptcy for the indefinite future. *LTL I,* 64 F.4th at 109.  If the Debtor, through whatever source, has access to the same support today, it is not in financial distress for the same reasons that LTL was not in financial distress.  If the Debtor no longer enjoys a similar level of support, the only reasonable conclusion is that J&J has successfully drained LTL (and later the Debtor) of a substantial portion of its resources through a series of self-dealing transfers, all for the purpose of creating a financially distressed, bankruptcy-eligible shell that would have far less available to pay its creditors than its predecessor.  This is precisely the abusive conduct that section 1129(a)(3) is intended to prevent. *See In re Geijsel*, 480 B.R. 238, 255 (Bankr. N.D. Tex. 2012).

81.     The Debtor also argues that its case was filed in good faith because it has the proper purpose of establishing a section 524(g) trust.  MTD Obj. at 19.  But section 524(g) is not by itself an end purpose of the Bankruptcy Code; rather, it is a tool provided by Congress that (if appropriate) may be used towards some other restructuring goal, such as the rehabilitation of a troubled business.  And like any tool, it is susceptible to abuse if used in bad faith. *See In re Team Sys. Int'l LLC*, 640 B.R. 296, 311 (Bankr. D. Del. 2022) (good faith requirement "is intended to ensure that the tools of the Bankruptcy Code are being used only as a means towards an appropriate end").  Thus, the mere fact that the Debtor is seeking relief under section 524(g) does not excuse this Court from its duty to examine the motivations for the Plan and the circumstances under which confirmation is being sought.

82.     Nor is it relevant here that, according to the Debtor, "the bankruptcy process provides debtors and claimants with a far more effective, efficient, and predictable method of resolving mass tort claims" than through litigation in the tort system.  MTD Obj. at 20.  As the Bankruptcy Court noted in the second *LTL* case, this policy argument, even if true, does not override the good faith requirements of the Bankruptcy Code.  *See In re LTL Mgmt., LLC*, 652 B.R. 433, 455 (Bankr. D.N.J. 2023) (holding that bankruptcy court was "obliged" to dismiss case for lack of good faith even though it agreed that plan had laid the "foundation for a fair, efficient, and expeditious settlement").  Nor does the Debtor explain why this Court is the <u>only</u> forum in which a fair settlement of J&J's tort liabilities can be negotiated.  Indeed, J&J and the Debtor are already parties to a collective proceeding involving talc liabilities—the MDL—and they offer no explanation of why a fair and efficient settlement could not also be reached in that proceeding.[13]

83.     The Debtor cites *In re HONX, Inc.*, No. 22-90035, 2022 WL 17984313 (Bankr. S.D. Tex. Dec. 28, 2022) and *In re Bestwall LLC*, 605 B.R. 43 (Bankr. W.D.N.C. 2019) as decisions in which similar chapter 11 cases have been found to have been filed in good faith. But both of those decisions are distinguishable from this case.  *HONX* was not a Texas Two-Step case, and the bankruptcy court emphasized that it was making no ruling on the propriety of

---

[13] The example of *Aearo* is instructive here.  Like J&J and the Debtor in this case, 3M and Aearo were already parties to an MDL proceeding at the time that Aearo entered bankruptcy.  Like the Debtor here, Aearo argued that bankruptcy offered the best if not the only opportunity for a comprehensive settlement of its tort liabilities.  *See* Informational Brief of Aearo Technologies LLC, *In re Aearo Technologies, LLC,* Case No. 22-02890 [Dkt. No. 12] (Bankr. S.D. Ind. July 26, 2022) ("Saddled with untested claims and tainted trial records, any reasonable and timely settlement within the MDL is virtually impossible.").  Less than three months after Aearo's case was dismissed, however, 3M and Aearo were able to reach a comprehensive settlement in the MDL that was accepted nearly unanimously by tort claimants.  *See* Reuters, *3M agrees to pay $6 billion in US military earplug lawsuit settlement* (Aug. 29, 2023 2:15 PM), https://www.reuters.com/legal/3m-co-agrees-pay-6-billion-earplug-lawsuit-settlement-2023-08-29/.

Texas Two-Step bankruptcies.  *HONX*, 2022 WL 17984313 at *2 ("the Court need not comment on divisive-merger bankruptcies here because HONX was not born of a divisive merger").  Instead, and in contrast to the Debtor here, "HONX engaged in its own business and accrued its own asbestos liabilities in the course of operating that business. It did not inherit or absorb Hess's liabilities, which exist separate and apart from those of HONX."  *Id.*

84.    *Bestwall* also fails to support the Debtor's arguments on good faith.  While the *Bestwall* Court denied a motion to dismiss a Texas Two-Step bankruptcy case under section 1112(b), it did so under the Fourth Circuit's uniquely stringent dismissal standard, under which a case may not be dismissed unless the movant demonstrates <u>both</u> subjective bad faith and objective futility.  *Bestwall*, 605 B.R. at 48 (*citing Carolin Corp. v. Miller,* 886 F.2d 693, 700-01 (4th Cir. 1989)).  Because the bankruptcy court found that the movants had not demonstrated objective futility, it denied the motion without reaching or even discussing the issue of bad faith.  *Bestwall*, 605 B.R. at 50-51.  Indeed, if this Court were to adopt the Debtor's arguments and conclude that a chapter 11 debtor can pursue a Texas Two-Step restructuring strategy without running afoul of the Bankruptcy Code's good faith requirements in sections 1112(b) and 1129(a)(3), it would become the first court ever to expressly hold so.

### E.    The Plan Provides for Payments Not Subject to Review by the Court [11 U.S.C. § 1129(a)(4)]

85.    Section 1129(a)(4) of the Bankruptcy Code requires the Court to find that all payments proposed to be made under the Plan by a plan proponent in connection with or incident to the case "has been approved of, or is subject to the approval of, the court as reasonable."  11 U.S.C. § 1129(a)(4).  *See In re Cajun Elec. Power Co-op., Inc.,* 150 F.3d 503, 514 (5th Cir. 1998) (noting that section 1129(a)(4) is "applicable to a broad array of payments not limited to those payable out of the bankruptcy estate").  Among other proposed payments, the second

amended version of the Plan contains a new provision under which J&J, the proponent of the Plan, will pay $650 million "for distribution to qualifying counsel on account of common benefit claims" under the proposed Common Benefit Fund MSA.  The Common Benefit Fund MSA does not appear to require approval by the Court.  Even if such approval were to be sought, it does not appear possible for the Court to approve such payments as reasonable because the terms and conditions of that agreement, the consideration being provided, and even the identities of the recipients have not been disclosed.  As a result, the Plan does not comply with section 1129(a)(4).

### F.      The Debtor Has Not Demonstrated That the Plan Satisfies the "Best Interests" Test [11 U.S.C. § 1129(a)(7)]

86.      The "best interests" test of section 1129(a)(7) requires that a plan must provide dissenting creditors at least as much as they would receive in a hypothetical chapter 7 liquidation of the debtor.  11 U.S.C. § 1129(a)(7).  In order to meets its burden of proof under this section, a debtor must provide the court and creditors with a liquidation analysis comparing the recoveries of creditors under the plan with their hypothetical recoveries in a liquidation.  *See In re Samurai Martial Sports, Inc.*, 644 B.R. 667, 693–94 (Bankr. S.D. Tex. 2022) (denying motion to modify plan where debtor had not provided updated liquidation analysis, even though no creditor had objected on that basis).

87.      In this case, the Debtor has not prepared a liquidation analysis in connection with the Plan.  Even if such a liquidation analysis is prepared before the confirmation hearing, that analysis would not be meaningful until the TDP is amended to set forth all information that will be required in order to project the recoveries for individual claimants, including the initial cash value of the points assigned, the complete review procedures that will be adopted, and the safeguards that will be adopted to prevent dilution of creditor recoveries through the payment of

non-meritorious claims.  As a result, the Plan in its current form does not satisfy section 1129(a)(7).

### G.    The Debtor Cannot Demonstrate that Each Impaired Class Has Voted to Accept the Plan [11 U.S.C. § 1129(a)(8)]

88.    Except in a cramdown plan (a form of relief the Debtor does not seek here), a plan may only be approved if every class of claims or interests is either unimpaired or has voted to accept the plan.  *See* 11 U.S.C. § 1129(a)(8).  In this case, the Court cannot make any findings as to whether the Plan has been accepted by the sole non-insider voting class, Class 4.  This is so for two reasons.  First, although the voting deadline set for the Plan occurred prior to the commencement of this case, the Debtor has continued to solicit changes of votes, and to negotiate changes to the Plan, up until the present.  As a result, there is no evidence that any majority of creditors have voted to approve the same plan at any point in time.  Second, as the record of this case reflects, there are material and substantial disputes concerning the tabulation methods employed by the Debtor, including its procedures for correcting or rejecting defective claims, resolving duplicative claims, and accepting or rejecting vote changes after the balloting deadline, and the Debtor's motion to certify the voting results of its prepetition solicitation is subject to a pending objection [ECF No. 419].  Further, while the Debtor's vote tabulation appears to be based in part on votes allegedly cast on behalf of individual creditors by their attorneys, such votes are not valid unless the Debtor presents evidence that those attorneys had a power of attorney or other authority to cast such votes.  *See* Fed.R.Bankr.P. 3018, *In re Southland Corp.*, 124 B.R. 211, 227 (Bankr. N.D. Tex. 1991).  For these reasons, the Court may not approve the Plan until these voting-related contested matters are resolved.

89.    For the reasons above, the Court should deny confirmation of the Plan and grant such other and further relief as it may deem just and proper.

Dated: January 24, 2025               Respectfully Submitted,

KEVIN M. EPSTEIN
UNITED STATES TRUSTEE

By:     /s/ *Jayson B. Ruff*
         Jayson B. Ruff
         Trial Attorney
         Michigan Bar No. P69893
         515 Rusk, Suite 3516
         Houston, Texas   77002
         (713) 718-4662
         jayson.b.ruff@usdoj.gov

         and

         Linda Richenderfer
         Trial Attorney
         United States Department of Justice
         Office of the United States Trustee
         J. Caleb Boggs Federal Building
         844 King Street, Suite 2207, Lockbox 35
         Wilmington, DE 19801
         (302) 573-6491 (Phone)
         linda.richenderfer@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by electronic means via ECF transmission to all Pacer System participants in these bankruptcy cases, on the 24th day of January 2025.

         /s/ *Jayson B. Ruff*
         Jayson B. Ruff