**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Red River Talc LLC, | Case No. 24-90505 (CML) |
| Debtor. | |

**UNITED STATES OF AMERICA'S OBJECTION TO THE SECOND AMENDED
PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF THE DEBTOR
[DOCKET NO. 722]**

The United States of America, on behalf of the United States Department of Health and

Human Services ("HHS"), including its component agency the Centers for Medicare & Medicaid

Services ("CMS"), and the United States Department of Veterans Affairs ("VA"), objects to the

*Second Amended Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [Docket No. 722]

("Plan").

This prepackaged bankruptcy plan was filed to resolve "current and future ovarian cancer

and other gynecological cancer claims pertaining to JOHSON'S® Baby Powder and Shower to

Shower," *Disclosure Statement for Prepackaged Chapter 11 Plan of Reorganization* at ii [Docket

No. 25-2] ("Disclosure Statement") – *i.e.*, the Channeled Talc Personal Injury Claims. HHS and

the VA have statutory rights to reimbursement of certain healthcare costs related to those claims.

To the extent, if any, that the Plan addresses these rights, the Plan classifies them as unimpaired

claims and states they will pass through confirmation unaffected by the bankruptcy. The United

States does not object to this treatment in this bankruptcy.

However, certain Plan provisions are inconsistent with this treatment. Aspects of Plan

Articles IV and XI purport to impermissibly discharge United States rights against the Debtor,

Reorganized Debtor, and nondebtor third parties, in violation of the Bankruptcy Code and federal

law. The same article also sets forth gatekeeping provisions that impair United States rights and are otherwise unlawful. Moreover, the Plan purports to compromise uncompromised claims or controversies, fails to preserve the United States' setoff and recoupment rights, provides an impermissible jurisdictional grant, and sets out improper immediate binding effect provisions. The United States objects to the Plan, and the Plan cannot be confirmed, to the extent these provisions alter the rights and interests of the United States or otherwise exceed the privileges afforded by the Bankruptcy Code or violate federal law.[1]

In support of this objection, the United States avers as follows:

## **BACKGROUND**

### A. The United States' Statutory Rights to Healthcare Reimbursement

1.      The United States is a creditor and party in interest in this case, as HHS and the VA have rights to reimbursement of certain healthcare costs related to the Channeled Talc Personal Injury Claims under the Medicare Secondary Payer statute, 42 U.S.C. § 1395y, and the Federal Medical Care Recovery Act, 42 U.S.C. § 2651, respectively (collectively, the "USG Claims").

2.      Medicare is a federal program administered by CMS that provides federally funded health insurance for the elderly and certain people with disabilities. The Medicare Secondary Payer statute, 42 U.S.C. § 1395y, is designed to "lower[] overall federal Medicare disbursements by requiring Medicare beneficiaries to exhaust" other healthcare coverage "before resorting to their Medicare coverage." *United States v. R.I. Insurers' Insolvency Fund*, 80 F.3d 616, 618 (1st Cir. 1996). To that end, the Medicare Secondary Payer statute prohibits Medicare from paying for an

---

[1] This brief addresses the United States' objections to the Plan stemming from the United States' statutory rights to reimbursement and police and regulatory powers. The United States Trustee also has filed an objection to the Plan on behalf of the United States that addresses other ways in which the Plan is unlawful. *See United States Trustee's Objection to Confirmation of Second Amended Plan of Reorganization* [Docket No. 980] ("U.S. Trustee Objection").

item or service when payment has been made, or can reasonably be expected to be made, by a primary payer (a "primary plan"), such as a group health plan or liability insurer (including a tortfeasor). *See* 42 U.S.C. § 1395y(b)(2)(A).

3.     If payment by the primary payer is delayed or disputed, Medicare may make conditional payments for covered items and services. *See* 42 U.S.C. § 1395y(b)(2)(B)(i). Primary payers must then reimburse Medicare when their responsibility for conditional payments is established by a judgment, compromise, or other means. *See* 42 U.S.C. § 1395y(b)(2)(B)(i)–(ii). Once a primary payer's responsibility has been established, any "entity that receives payment from [the] primary plan" is required to reimburse Medicare, including the Medicare beneficiary. 42 U.S.C. § 1395y(b)(2)(B)(ii).

4.     Any challenges to this statutory reimbursement requirement must proceed through the five-step administrative review process required by the Medicare Act before they can be brought in federal district court. *See* 42 U.S.C. §§ 405(b), 1395ff. Once eligible for district court relief, such challenges must be brought in a venue specified by statute. *See* 42 U.S.C. § 405(g)–(h) (incorporated into the Medicare statute through 42 U.S.C. §§ 1395ff(b)(1)(A), 1395ii). These channeling requirements are prerequisite to the Medicare Act's waiver of sovereign immunity for, and a district court's subject matter jurisdiction over, disputes arising under the Medicare Act. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) ("[T]he terms of [the United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit.") (internal quotations omitted).

5.     In the event the Medicare program is not reimbursed for conditional payments, the United States may bring a direct action against the primary payer – *e.g.*, the tortfeasor or tortfeasor's insurer – for reimbursement. 42 U.S.C. § 1395y(b)(2)(B)(iii); *see also* 42 C.F.R. §

411.24(e). The United States also may recover through subrogation to "any right under this subsection of an individual or any other entity to payment . . . under a primary plan." 42 U.S.C. § 1395y(b)(2)(B)(iv); *see also* 42 C.F.R. § 411.26. And the United States may bring an action to recover conditional payments against any entity that received payment from an entity responsible for primary payment. 42 U.S.C. § 1395y(b)(2)(B)(iii); *see also* 42 C.F.R. § 411.24(g).

6.     The Federal Medical Care Recovery Act, 42 U.S.C. §§ 2651–53, similarly empowers the United States to recover from a third party or its insurer the reasonable value of medical care furnished through or paid by federal programs in circumstances where the third party would be liable in tort for damages. 42 U.S.C. § 2651(a).

**B.  The Plan**

7.     On September 20, 2024, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code [Docket No. 1]. That same day, the Debtor filed the *Amended Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [Docket No. 24], as well as the solicitation documents that were provided on June 3, 2024, to certain claimants for plan voting purposes—the *Prepackaged Chapter 11 Plan of Reorganization of the Debtor* (amended on June 28, 2024) [Docket No. 25-1] and the Disclosure Statement.

8.     The Debtor filed its Schedules of Assets and Liabilities on October 25, 2024. *Global Notes & Statement of Limitations, Methodologies & Specific Disclosures regarding the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs* [Docket No. 331] ("Schedules").

9.     On December 9, 2024, the Debtor filed the Plan.

     i.     Treatment of the USG Claims

10.    None of the United States, HHS, CMS, or the VA is listed as a creditor on the Debtor's

Schedules, indicating the Debtor may not consider the USG Claims to be "claims" within the meaning of the Bankruptcy Code. *See generally* Schedules.

11.     To the extent, if any, that the Plan addresses the USG Claims, the USG Claims appear to be classified as Class 3 Unsecured Claims, as they do not fall within any other Impaired or Unimpaired class.

12.     The Plan's only two classes of Impaired claims consist of equity interests held by New Holdco (*i.e.*, Johnson & Johnson Holdco (NA) Inc.) and Channeled Talc Personal Injury Claims. Plan § 3.2. Channeled Talc Personal Injury Claims consist of claims for certain "alleged personal injuries." Plan §§ 1.1.26, 1.1.152. The USG Claims are statutory claims for healthcare reimbursement, not personal injury claims, and do not come within this definition.

13.     The Disclosure Statement supports this conclusion, as it specifically states up front that the "Plan does not resolve and will not affect" the "[c]laims and demands of governmental entities." Disclosure Statement at ii.

14.     The Plan's voting procedures also support this conclusion. Debtor's predecessor, LLT Management LLC, solicited the two Impaired classes prepetition to vote to accept or reject an earlier version of the now-twice-amended Plan.[2] *See generally Decl. of Stephenie Kjontvedt of Epiq Corp. Restructuring, LLC, Regarding the Solicitation and Tabulation of Ballots Cast on the Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [Docket No. 47] ("Solicitation Declaration"), Exs. 13–19. The United States was not solicited to vote on the prepackaged plan. *See generally* Solicitation Declaration.

15.     Because the USG Claims are not Channeled Talc Personal Injury Claims or New

---

[2] The United States cites certain other-party assertions in this brief solely for the purpose of this objection without acceding to their veracity or to their usefulness for any other purpose. The United States reserves the right to dispute such assertions as more facts become known.

Holdco's equity interests, the claims are Unimpaired. Among the four Unimpaired classes, the USG Claims are not Priority Non-Tax Claims, Secured Claims, or Intercompany Claims. *See* Plan § 3.2. The final Unimpaired class, Class 3, consists of Unsecured Claims, which are essentially defined as a catch-all to include any claims against the Debtor that are not elsewhere defined. *See* Plan § 1.1.173 (defining Unsecured Claim as a Claim against the Debtor that is not an Administrative Claim, a Channeled Talc Personal Injury Claim, a Cure Amount Claim, an Intercompany Claim, a Priority Non-Tax Claim, a Priority Tax Claim, or a Secured Claim). Unsecured Claims may be Non-Talc Claims (*i.e.*, "any Claim that is not a Talc Personal Injury Claim"). Plan §§ 1.1.103, 1.1.173; *see also id.* at § 1.1.53 (defining "Disputed" Non-Talc Claims as Non-Talc Claims that are "contingent or unliquidated"). Therefore, to the extent the USG Claims are addressed in the Plan, they are Unsecured Claims and Non-Talc Claims.

16.     According to the Plan, Unsecured Claims are Unimpaired and shall be Reinstated on the Effective Date. *See* Plan. § 3.2.3. Moreover, Non-Talc Claims (other than Administrative Claims and Claims arising from the rejection of Executory Contracts or Unexpired Leases) pass through the bankruptcy "as if the Chapter 11 Case had not been commenced," untouched by the Plan's distribution, proof of claim, or dispute resolution procedures. Plan §§ 6.1, 7.3.1.

ii.     Releases and Gatekeeping Provisions

17.     Plan Sections 4.7, 11.2.2, 11.2.3, 11.3.2, 11.4.1, and 11.4.2 set forth three different types of releases and injunctions that are relevant to this objection (collectively, the "Releases"), two of which contain gatekeeping provisions. These Releases are in addition to and separate from the discharge afforded Debtor under Bankruptcy Code §§ 524 and 1141(d)(1), *see* Plan § 11.1, and exculpation provided under Bankruptcy Code § 1125(e), *see* Plan § 11.4.1 ("Without limiting the generality of the foregoing, the Exculpated Parties shall be entitled to and granted the protections

and benefits of section 1125(e) of the Bankruptcy Code.").

> *a.  The Enterprise Releases and Enterprise Gatekeeping Provision*

18.     First, the releases and injunction set forth in Sections 11.2.2 and 11.2.3 (collectively, the "Enterprise Releases") provide extensive releases to all "Released Parties," including the Debtor, the Reorganized Debtor, and hundreds of non-debtor J&J affiliates and their personnel and representatives. The Enterprise Releases extinguish both claims of Releasing Claim Holders – *i.e.*, holders of Channeled Talc Personal Injury Claims – and claims that "any other Persons or parties claiming under or through the[] [Releasing Claim Holders] would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the holder of any Claim or Interest or other Person." Plan § 11.2.2; *see also* Plan §§ 1.1.109 (defining "Person" as including any "governmental unit"); 11.2.3 (enjoining the claims of "any Person" released under Plan Section 11.2.2).

19.     The Enterprise Releases extend to all claims and liabilities arising under any authority – including claims that are unknown, unforeseen, and do not presently exist – that "in any way relat[e] to, in whole or in part," sixteen sweeping categories. These categories range from the Debtor and Estate, to categories encompassing the divisional merger of Old JJCI and its aftermath (*e.g.*, the "2021 Corporate Restructuring," the "2023 Conversion," the 2021 and 2023 LTL bankruptcies, and "the sale or distribution of assets by Holdco in connection with the separation of J&J's consumer health business into a new company named Kenvue, Inc."), to broad catch-all categories (*e.g.*, "the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan").

20.     Although they exclude claims or causes of action relating to "a criminal act, actual fraud, gross negligence, or willful misconduct" from their scope, the Enterprise Releases contain a

gatekeeping provision ("Enterprise Gatekeeping Provision") that precludes any "Person, without regard to whether such Person is a Releasing Claim Holder," from "commenc[ing] or pursu[ing]" any such cause of action until this Court first determines that the cause of action is "colorable" and "specifically authoriz[es]" it. Plan § 11.2.2. The Enterprise Gatekeeping Provision additionally gives this Court "sole and exclusive jurisdiction to adjudicate the underlying" cause of action "to the fullest extent permitted by law." *Id.*

### b. *The Insurance Injunction*

21.     Second, Section 11.3.2 (the "Insurance Injunction") enjoins claims against any Talc Insurance Company, defined to include any insurance company, insurance broker, or "other Person" that may have liability under any insurance policy that covers the Debtor for Channeled Talc Personal Injury Claims. The Insurance Injunction acts on "all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert" any enjoined claim. The injunction bars any claim against any Talc Insurance Company "in any way relating to any Channeled Talc Personal Injury Claim," regardless of the authority under which the claim arises. Plan § 11.3.2(b).

### c. *The Management Releases and Management Gatekeeping Provision*

22.     Third, although styled as exculpation provisions, the releases and injunction in Sections 4.17, 11.4.1 and 11.4.2 (collectively, the "Management Releases") provide releases in gross excess of the exculpation provisions afforded by the Bankruptcy Code.

23.     First, Section 4.17 shields Protected Parties, which consists of a mob of entities, including but not limited to the Debtor and Reorganized Debtor and their Representatives, hundreds of non-debtor J&J affiliates, and approximately 150 third-party retailers or indemnified parties. *See* Plan § 1.1.121. These parties are shielded from liability to "any Person for any act or

omission taken or to be taken in connection with, arising out of, or in any way relating to the administration or operation of the Talc Personal Injury Trust," without exclusion. These protections go far beyond the limited trust-related protections provided by Bankruptcy Code § 524(g)(3).

24.    Second, Sections 11.4.1 and 11.4.2 extinguish claims held by "any Person" against the Exculpated Parties, including, for example, the Debtor, all of the Debtor's current and former officers and managers, the Official Committee of Talc Claimants and its members and counsel, the Future Claimants' Representative, and the Retained Professionals. Plan §§ 11.4.1, 11.4.2. The releases extend to transactions including, without limitation, this bankruptcy, the Plan, the August 19, 2024 divisional merger, negotiation of any settlements or compromises reflected in the Plan, and the management or operation of the Debtor. These releases are provided in addition to, and separate from, the typical protections provided by section 1125(e) of the Bankruptcy Code. *See* Plan § 11.4.1 ("Without limiting the generality of the foregoing, the Exculpated Parties shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.").

25.    Like the Enterprise Releases, Sections 11.4.1 and 11.4.2 (but not Section 4.17) exclude from their scope "liability that results primarily from . . . criminal acts, actual fraud, willful misconduct, or gross negligence." However, these provisions contain a gatekeeping condition ("Management Gatekeeping Provision") that precludes any "Person" from "commenc[ing] or pursu[ing]" any claim or cause of action that could result in such liability until this Court first determines that the claim or cause of action is "colorable" and "specifically authoriz[es]" it. Plan § 11.4.1. The Management Gatekeeping Provision additionally gives this Court "sole and exclusive jurisdiction to adjudicate the underlying" claim or cause of action "to the fullest extent permitted by law." *Id.*

**ARGUMENT**

26.     As described above, the Plan appears to classify the USG Claims for reimbursement as Class 3 Unsecured Claims, which are Unimpaired claims to be Reinstated on the Effective Date. *See* Plan §§ 1.1.123, 1.124 (referring to all Unsecured Claims as "Reinstated Non-Talc Claims"), 1.1.152, 1.1.171, 1.1.173, 3.2, 3.2.3, 6.1, 7.3.1. The United States does not object to the USG Claims passing through the bankruptcy "as if the Chapter 11 Case had not been commenced," Plan §§ 6.1, 7.3.1, consistent with the Disclosure Statement, *see* Disclosure Statement at ii, and the non-solicitation of the United States' vote to accept or reject the Plan, *see* 11 U.S.C. § 1126(f).

27.     But other Plan provisions appear to alter the USG Claims, resulting in their impairment under section 1124(1) of the Bankruptcy Code and consequently requiring Plan amendment and likely the solicitation of the United States. The United States therefore objects to every provision in the Plan that may alter United States' rights, exceeds the privileges afforded by the Bankruptcy Code, or violates other federal law.

28.     Specifically, as discussed below, the Plan cannot be confirmed because it: (1) discharges unimpaired, reinstated claims against the Debtor, (2) contains third-party releases that run afoul of *Purdue* and impermissibly impair USG Claims, (3) contains unlawful gatekeeping provisions, (4) purports to compromise uncompromised claims and claims belonging to non-debtors, (5) fails to preserve the United States' setoff and recoupment rights, (6) improperly retains exclusive jurisdiction to the Court, and (7) provides immediate and binding effect provisions that are inconsistent with the Federal Rules of Bankruptcy Procedure.

I.     **The Enterprise Releases and Management Releases impermissibly discharge unimpaired, reinstated claims against the Debtor.**

29.     The United States objects to the Enterprise Releases and Management Releases (Plan Sections 4.17, 11.2.2, 11.2.3, 11.4.1, and 11.4.2) to the extent they discharge rights, claims,

or interests of the United States against the Debtor or Reorganized Debtor in violation of sections 1124(1) and 1129(a)(8) of the Bankruptcy Code.

30.     As described above, the United States was not solicited to vote on the Plan, and none of the United States, HHS, CMS, or the VA are listed as creditors on the Debtor's schedules. The USG Claims are Non-Talc Claims classified as Class 3 Unsecured Claims, which are treated under the Plan as Unimpaired and Reinstated. Plan §§ 1.1.26, 1.1.53, 1.1.103, 1.1.123, 1.1.124, 1.152, 1.1.171, 1.1.173, 3.2, 3.2.3, 6.1. These claims are "not subject to any claims-resolution process in the Bankruptcy Court" and will be resolved "as if the Chapter 11 Case had not been commenced." Plan § 7.3.1. The Plan therefore represents that it does not alter any rights of the United States. *See* 11 U.S.C. §§ 1124(1), 1126(f). Accordingly, no USG Claims come within the scope of claims that are discharged under the Plan's Section 11.1 discharge provisions.

31.     The Plan nonetheless appears to improperly provide the Debtor and Reorganized Debtor such a discharge through its broad releases. Under the Enterprise Releases, described above, the Debtor and Reorganized Debtor are among the Released Parties absolved of claims and liabilities "in any way relating to, in whole or in part" sixteen wide-ranging categories, including without limitation the Debtor itself and "the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan."

32.     These releases extinguish not only the claims of Releasing Claim Holders – *i.e.*, holders of Channeled Talc Personal Injury Claims – but also claims that "any other Persons or parties claiming under or through the[] [Releasing Claim Holders] would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the holder of any Claim or Interest or other Person." Plan § 11.2.2. The Enterprise Releases therefore apparently discharge the Debtor and Reorganized Debtor from a universe of claims and liability belonging to

Persons other than holders of the Channeled Talc Personal Injury Claims, even though the Channeled Talc Personal Injury Claims and New Holdco's equity interests comprise the only Impaired classes in the Plan.

33.     Similarly, under the Management Releases, the Debtor and Reorganized Debtor are among the Protected Parties and Exculpated Parties released from liability "in any way relating to," among other things, the bankruptcy, the Plan, the August 19, 2024 divisional merger, the negotiation of any settlements or compromises reflected in the Plan, and the administration or operation of the Talc Personal Injury Trust. The Management Releases purportedly extinguish the Debtor's and Reorganized Debtor's liability to "any Person," thereby effectively providing the Debtor and Reorganized Debtor with a discharge of rights, claims, and interests belonging to members of Impaired and Unimpaired classes alike.

34.     To the extent, if any, that these provisions are broad enough to discharge the USG Claims, these provisions alter the USG Claims, rendering the claims Impaired and the Plan unconfirmable absent solicitation of the United States to vote to accept or reject the Plan. *See, e.g.*, 11 U.S.C. §§ 1124(1), 1126, 1129. The United States objects to the Enterprise Releases and Management Releases on these grounds.

## II.     The Releases are not authorized by the Bankruptcy Code and impermissibly impair the USG Claims.

35.     The United States also objects to the Enterprise Releases, Insurance Injunction, and Management Releases in Plan Sections 4.17, 11.2.2, 11.2.3, 11.3.2, 11.4.1, and 11.4.2 to the extent they release claims and rights against nondebtors. These nondebtor releases are not authorized under the Bankruptcy Code, as applied in *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), and impair the unimpaired USG Claims in violation of Bankruptcy Code sections 1124(a) and 1126.

A. **The Releases run afoul of *Purdue* as they are nonconsensual and not authorized by section 524(g).**

36.     The Supreme Court in *Purdue*, 603 U.S. at 217–24, made clear that nonconsensual third-party releases are not authorized under the Bankruptcy Code outside of the confines of section 524(g). *See also In re Robertshaw*, 662 B.R. 300, 322 (Bankr. S.D. Tex. 2024) (citing *In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995)). The Releases are nonconsensual and not authorized under section 524(g) of the Bankruptcy Code, and are therefore prohibited.

    i.     The Releases are nonconsensual.

37.     The Releases are patently nonconsensual, as holders of Impaired claims were not permitted to opt into or out of any of the Plan's releases and injunctions while voting.[3] *See, e.g.*, Solicitation Declaration, Ex. 8, Annex B (releases will apply "to each Channeled Talc Personal Injury Claim regardless of whether the holder of such claim votes and if such holder does vote, regardless of whether such holder votes to accept or to reject the plan"); *see also In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) ("[A] consensual release cannot be based solely on a vote in favor of a plan.").

38.     Moreover, parties in Unimpaired classes, like the United States, were not provided an opportunity to vote to accept or reject the Plan, let alone a procedure for consenting to the Plan's third-party releases. *See generally* Solicitation Declaration. Nor has the United States or any other creditor been asked to opt into or out of the releases and injunctions during the bankruptcy: no proof of claim form with consent provisions has been proposed or other consent mechanism

---

[3] The United States disagrees with the Court's holding in *In re Robertshaw*, 662 B.R. 300, 322 (Bankr. S.D. Tex. 2024), that opt-out procedures are sufficient to manifest consent. However, that disagreement is irrelevant here, as no claimants or parties in interest have been given an opportunity to opt out of the Releases.

requested or set.[4]

39.     Because no creditor or party in interest has been afforded an opportunity to opt into or out of the Enterprise Releases, Insurance Injunction, and Management Releases, these nondebtor releases are nonconsensual and are prohibited under *Purdue* unless they are authorized under section 524(g) of the Bankruptcy Code. And they are not.

> ii.     The Releases are not authorized under section 524(g).

40.     The structure of the Plan essentially concedes that the Releases are not authorized under section 524(g): a separate section within Article XI purportedly sets out the "Channeling Injunction" authorized by section 524(g), Plan § 11.3.1, while none of the Enterprise Releases, Insurance Injunction, or Management Releases cites section 524(g) as authority.

41.     Although the Insurance Injunction is placed in the same section as the "Channeling Injunction," the "Channeling Injunction" already includes as a "Protected Party" any "Settling Talc Insurance Companies" eligible for inclusion in a section 524(g) injunction. Plan §§ 1.1.121, 11.3.1. The Insurance Injunction itself, which applies more broadly than the "Channeling Injunction," therefore invokes only "the equitable jurisdiction and power of the Bankruptcy Court." Plan § 11.3.2. But the Court has no equitable power to extinguish nondebtors' claims against other nondebtors absent their consent or authority under section 524(g). *See Purdue*, 603 U.S. at 220–21 ("[A] bankruptcy court's powers are not limitless and do not endow it with the power to extinguish without their consent claims held by nondebtors (here, the opioid victims) against other nondebtors (here, the Sacklers)."). Nor can section 105(a)'s "necessary or

---

[4] Even if a proof of claim form had been proposed and bar date set, the Plan provides that most Reinstated classes need not file proofs of claim in the bankruptcy to preserve rights and claims. Plan § 7.3.1. Thus, if the releases apply to the Reinstated classes, some other consent mechanism would be needed.

appropriate" authority carry that weight, as section 105(a) is a "catchall" authority that is "constrained" by the meaning of the provisions it rides. *Id.* at 218–19. Here, section 105(a) is constrained by the specific requirements and limited scope of section 524(g). There thus should be no dispute that the Enterprise Releases, Insurance Injunction, or Management Releases are not authorized by section 524(g) and are therefore invalid under *Purdue*.

42.    A closer look at section 524(g) reveals why the Plan essentially concedes that the Releases, as applied to the United States as the holder of Unimpaired, Non-Talc Claims, do not satisfy that section. Section 524(g) authorizes bankruptcy courts to issue tailored third-party injunctions only if certain requirements are met, including the following three requirements:[5]

43.    <u>First</u>, the plan must place holders of the claims addressed by the trust in one or more separate classes entitled to vote on the plan. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb). A section 524(g) injunction therefore cannot bar the claims of unimpaired classes not solicited to vote.

44.    <u>Second</u>, the injunction may only extend to a "claim or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust described in paragraph (2)(B)(i)," 11 U.S.C. § 524(g)(1)(B) – *i.e.*, a claim or demand for "personal injury, wrongful death, or property-damage . . . seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos containing products," 11 U.S.C. § 524(g)(2)(B)(i)(I). Here, the injunction may

---

[5] This objection's silence on certain section 524(g) requirements is not, and should not be understood as, an admission that the Plan complies with them. This objection refutes any attempt to use section 524(g) to impair the USG Claims, without conceding that section 524(g) properly applies at all. The U.S. Trustee also objects that the Plan does not comport with section 524(g). *See* U.S. Trustee Objection ¶¶ 21–33. And the Debtor bears the burden of demonstrating that it is eligible for any injunction under section 524(g). *See In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003). Among other things, the United States is skeptical that the Debtor will show that, under section 524(g)(4)(B)(ii), a channeling injunction can "fair[ly] and equitabl[y]" spring from a trust that will be funded in large part by parent companies returning a fraction of the funds that they previously siphoned off of a debtor.

extend only to the Channeled Talc Personal Injury Claims, which do not include the USG Claims. Plan §§ 1.1.26, 1.1.152. Thus, the USG Claims and any other such claims or demands cannot be released through a section 524(g) injunction.

45.     And <u>third</u>, the injunction can only bar claims against a third party "to the extent such alleged liability of such third party arises by reason of" one or more specified relationships to the debtor. 11 U.S.C. § 524(g)(4)(A)(ii); *see, e.g.*, *In re Quigley Co.*, 676 F.3d 45, 62 (2d Cir. 2012); *In re Combustion Engineering, Inc.*, 391 F.3d 190, 234 (3d Cir. 2004). Thus, section 524(g) injunctions cannot bar claims against nondebtors that are based on the nondebtors' own, independent liability.

46.     Failure to comply with any one of these three section 524(g) dictates is fatal to a third-party injunction. None of the Enterprise Releases, Insurance Injunction, or Management Releases complies with any of these three dictates as to the Unimpaired USG Claims. Each is analyzed in turn below.

*a. The Enterprise Releases fail all three section 524(g) requirements.*

47.     The Enterprise Releases fail all three of the 524(g) requirements described above. First, the Enterprise Releases are not limited to holders of claims channeled to the Talc Personal Injury Trust who were entitled to vote on the Plan. The Enterprise Releases extinguish not only the claims of Releasing Claim Holders – *i.e.*, holders of Channeled Talc Personal Injury Claims – but also claims that "any other Persons or parties claiming under or through the[] [Releasing Claim Holders] would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the holder of any Claim or Interest or other Person." Plan § 11.2.2; *see also* Plan §§ 1.1.109 (defining "Person" as including any "governmental unit"); 11.2.3 (enjoining the claims of "any Person" released under Plan Section 11.2.2). The Enterprise Releases

therefore could release claims of Unimpaired classes that were not entitled to vote on the Plan, like the USG Claims, in violation of section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

48.     Further, the Enterprise Releases extend to sixteen sweeping categories of claims and demands that go well beyond (and do not even include) the Channeled Talc Personal Injury Claims. The Enterprise Releases would absolve the "Released Parties," including hundreds of non-debtor J&J affiliates and their personnel and representatives, of all claims and liabilities arising under any authority – including claims that are unknown, unforeseen, and do not presently exist – that "in any way relat[e] to, in whole or in part," categories ranging from the Debtor and Estate, to categories encompassing the divisional merger of Old JJCI and its aftermath (*e.g.*, the 2021 Corporate Restructuring, the 2023 Conversion, the 2021 and 2023 LTL bankruptcies, and "the sale or distribution of assets by Holdco in connection with the separation of J&J's consumer health business into a new company named Kenvue, Inc."), to broad catch-all categories (*e.g.*, "the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan"). The scope of the release is thus not tailored to the Channeled Talc Personal Injury Claims, which are the "personal injury, wrongful death, or property-damage" claims or demands that are "to be paid in whole or in part by" the Talc Personal Injury Trust, as required by sections 524(g)(1)(B) and 524(g)(2)(B)(i)(I).

49.     Moreover, the Enterprise Releases include no caveat that the hundreds of released non-debtor J&J affiliates or their personnel or representatives are released only "to the extent such alleged liability of such third party arises by reason of" any relationships to the debtor. 11 U.S.C. § 524(g)(4)(A)(ii). Instead, the Enterprise Releases absolve all Released Parties of all kinds of claims that "in any way relat[e] to, in whole or in part," to any of the sixteen categories, regardless of the basis for liability.

50.     The Enterprise Releases thus fail all three section 524(g) dictates and are invalid as applied to the USG Claims.

*b.   The Insurance Injunction fails all three section 524(g) requirements.*

51.     The Insurance Injunction likewise does not comply with any of these three section 524(g) requirements. First, the injunction is not limited to the parties who were entitled to vote on the Plan but acts on "all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert" any enjoined claim, in violation of section 524(g)(2)(B)(ii)(IV)(bb). *See* Plan § 11.3.2(b).

52.     Second, the injunction enjoins not only the Channeled Talc Personal Injury Claims but also any claim against any Talc Insurance Company "in any way relating to any Channeled Talc Personal Injury Claim," regardless of the authority under which the claim arises, in violation of section 524(g)(1)(B). *Id.*

53.     Third, the injunction bars such claims without regard to whether the Talc Insurance Company's liability arises by reason of its relationship with the Debtor or because of its own, independent liability, in violation of section 524(g)(4)(A)(ii).

*c.   The Management Releases fail all three section 524(g) requirements.*

54.     Finally, the Management Releases similarly run afoul of the same three section 524(g) requirements. First, the Management Releases make the Protected Parties and Exculpated Parties immune from liability "to any Person," not only holders of Channeled Talc Personal Injury Claims, in violation of section 524(g)(2)(B)(ii)(IV)(bb). Plan §§ 4.17, 11.4.1, 11.4.2.

55.     Second, the subject of the releases has nothing to do with the Channeled Talc Personal Injury Claims but extends to transactions including, without limitation, this bankruptcy, the Plan, the August 19, 2024 divisional merger, negotiation of any settlements or compromises

reflected in the Plan, and the management or operation of the Debtor, in violation of section 524(g)(1)(B). Although certain releases concern the management and operation of the Talc Personal Injury Trust, Plan § 4.17, those releases far exceed the limited and specific exculpation provided by Bankruptcy Code § 524(g)(3) for entities that become "a direct or indirect transferee of, or successor to any assets of, a debtor or trust that is the subject of the injunction" and entities that "make[] a loan to such a debtor or trust or to such a successor or transferee."

56.     And third, the Protected Parties and Exculpated Parties are released without regard to whether the released liability derives from the parties' relationship to the Debtor, in violation of section 524(g)(4)(A)(ii). In fact, most of the Protected Parties and Exculpated Parties do not even share the relationships with the Debtor enumerated under that section.[6]

57.     For all of these reasons, the United States objects to the Enterprise Releases, Insurance Injunction, and Management Releases set forth in Plan Sections 4.17, 11.2.2, 11.2.3, 11.3.2, 11.4.1, and 11.4.2 as providing nonconsensual nondebtor releases and injunctions that are not authorized by section 524(g) of the Bankruptcy Code, and therefore are prohibited under *Purdue*.

**B.  The Releases impermissibly impair USG Claims.**

58.     The Releases are also improper and cannot be confirmed to the extent they release claims against nondebtors because they impair the USG Claims, even though the Plan does not classify the United States as an Impaired creditor and Debtor never solicited the United States to accept or reject the Plan, as required by the Bankruptcy Code. *See, e.g.*, 11 U.S.C. §§ 1124(a),

---

[6] In contrast to this immense liability protection, Section 1125(e) of the Bankruptcy Code merely provides a "person that solicits acceptance or rejection of a plan" is "not liable, on account of such solicitation" for violation of any applicable law, rule, or regulation "governing solicitation of acceptance or rejection of a plan." The Plan nonetheless purports to exculpate a vast number of parties from liability, whether or not related to the solicitation or rejection of the Plan.

1126.

59.     As described above, the USG Claims are Unsecured Claims, which are Unimpaired and Reinstated under the Plan. Plan §§ 1.1.123, 1.124, 1.1.152, 1.1.171, 1.1.173, 3.2, 3.2.3, 6.1, 7.3.1.

60.     A claim or interest is only "unimpaired" if a plan "leaves unaltered the legal, equitable, and contractual rights" to which the claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1). A claim is "impaired" under the Bankruptcy Code even if the claim is "not significantly impaired." *In re Block Shim Dev. Co.-Irving*, 118 B.R. 450, 454 (N.D. Tex. 1990) (quotations omitted).

61.     To the extent the Releases apply to the USG Claims, the United States' rights with respect to the USG Claims will be extinguished, and thus altered and impaired.

62.     For example, the Insurance Injunction arguably, and impermissibly, would enjoin certain of HHS's Medicare Secondary Payer rights. As described above, the Medicare Secondary Payer statute makes liability insurers responsible for reimbursing Medicare for healthcare costs associated with covered liabilities. *See* 42 U.S.C. § 1395y(b)(2)(A)–(B). If Medicare is not reimbursed, the United States may bring a direct action against insurers for reimbursement. The Federal Medical Care Recovery Act similarly empowers the United States to recover healthcare costs from liability insurers. *See* 42 U.S.C. § 2651(a). The United States therefore appears to be among the "Persons that . . . may in the future hold or assert any claim, demand, or cause of action against any Talc Insurance Company . . . in any way relating to any Channeled Talc Personal Injury Claim" that are enjoined by the Insurance Injunction.

63.     Such abrogations of United States rights run afoul of the Bankruptcy Code. Section 1129(a)(8) of the Bankruptcy Code permits plan confirmation "only if . . . [w]ith respect to each

class of claims or interests . . . such class has accepted the plan; or . . . such class is not impaired under the plan." *Cf.* 11 U.S.C § 1126(f).[7] The Plan therefore cannot be confirmed without either amendment to exclude the United States from the scope of the Enterprise Releases, Insurance Injunction, and Management Releases or amendment to reflect the impairment of United States rights and solicitation of the United States to vote to accept or reject the Plan.

### III.    The Plan's gatekeeping provisions are unlawful.

64.    The United States further objects to the improper Enterprise Gatekeeping Provision and Management Gatekeeping Provision set forth in the Releases. *See* Plan §§ 11.2.2, 11.4.1. These provisions appear to force every Person, including the United States, who wishes to pursue any claim or cause of action against any released party relating to "a criminal act, actual fraud, gross negligence, or willful misconduct" to first come to this Bankruptcy Court—and only this Bankruptcy Court—for a determination of whether such claim or cause of action is a "colorable claim." *See id*. These provisions then call for the Bankruptcy Court to have "sole and exclusive jurisdiction to *adjudicate* the underlying colorable claim or cause of action." *Id.* (emphasis added).

65.    The released parties afforded this protection include the Reorganized Debtor, the Debtor Corporate Parties, the Representatives of the Debtor, the Released Parties, and the Exculpated Parties. By specifying that this Court shall "first" determine whether a claim or cause of action can proceed, the Plan's gatekeeping provisions effectively grant this Court exclusive jurisdiction to adjudicate the claim or cause of action before it can be "pursue[d]" in any fashion.

66.    The procedure proposed by the gatekeeping provision is unlawful. As a preliminary

---

[7] Such impairment is also inconsistent with Plan § 7.3.1, which provides that holders of Non-Talc Claims (other than Administrative Expense Claims and Claims arising from the rejection of Executory Contracts or Unexpired Leases) are not subject to the bankruptcy claims-resolution process and such claims will be resolved without reference to the bankruptcy.

matter, bankruptcy courts do not have jurisdiction over "criminal act[s]." *See* 28 U.S.C. § 1334(b) (conferring jurisdiction over "civil proceedings" arising under or in, or related to, bankruptcy cases); *see also, e.g.*, Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."). A Plan or federal court order cannot create jurisdiction over underlying claims that does not otherwise exist. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("Federal courts are courts of limited jurisdiction" having "only that power authorized by Constitution and statute, which is not to be expanded by judicial decree.").

67.     With respect to civil matters, granting a party a "release" gives the party an affirmative defense to a cause of action asserted in a court of law or other tribunal. Affirmative defenses cannot be adjudicated prior to the filing of the action to which they relate. Moreover, as to claims between nondebtors, there is no reason why the court in which the relevant action has been filed cannot determine whether the claim was released under the Plan.

68.     Unsurprisingly, a similar provision was rejected in *In re Gulf Coast Health Care, LLC*, where the court noted "the plan says what it says, and other courts should be entitled to exercise their authority to interpret it," and "[i]mposing such a requirement could also impose an unnecessary administrative hurdle and cost the parties when these cases are closed." *Gulf Coast Health Care, LLC*, No. 21-11336 (KBO) (Bankr. D. Del.), D.I. 1236, Transcript of May 4, 2022, Confirmation Hearing at 30:18-23.

69.     Although some courts have allowed gatekeeping provisions, they have done so in connection with plans that have narrowly tailored exculpation and injunctive provisions. *See, e.g.*, *In re Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 435, 438–39 (5th Cir. 2022). Here, there is no such tailoring – the Plan provides for merits determinations of claims excluded from the Plan's

Enterprise Releases and Management Releases, including claims against nondebtors, by the bankruptcy court, apparently in perpetuity. Such expansive gatekeeping provisions run afoul of bankruptcy courts' post-petition limited jurisdiction only "for matters pertaining to the implementation or execution of the plan." *In re Craig's Stores of Tex., Inc.*, 266 F.3d 388, 390 (5th Cir. 2001). Such gatekeeping functions may contravene federal jurisdictional statutes, *see, e.g.*, 42 U.S.C. §§ 405(h), 1395ii (claims arising under the Medicare statute "shall [not] be reviewed by any person, tribunal, or governmental agency except as herein provided"), and inappropriately restrict the United States' exercise of, for instance, its police and regulatory powers. The United States cannot be required by the Plan to first seek Bankruptcy Court permission to initiate, for example, an investigation or case against one of the myriad parties released by the Debtor.

70.     Worse, the Plan further grants the Bankruptcy Court, after performing this gatekeeping function, "sole and exclusive jurisdiction" to adjudicate the "colorable" claims. This goes too far even for courts that may authorize some form of limited gatekeeping function. *See, e.g.*, *Villegas v. Schmidt*, 788 F.3d 156, 158–59 (5th Cir. 2015) (recognizing *Stern v. Marshall*, 564 U.S. 462 (2011), limits claims over which bankruptcy courts have authority under the *Barton* doctrine). In light of the foregoing, the United States objects to the Enterprise Gatekeeping Provision and Management Gatekeeping Provision, which should be stricken in entirety from the Plan.

**IV.     The Plan wrongly purports to compromise uncompromised claims and claims belonging to non-debtors.**

71.     The United States objects to the Plan to the extent it purports to settle or compromise the USG Claims or any claims or controversies belonging to any party other than the Debtor or the estate.

72.     Plan Section 9.8 states that the "Plan, the other Plan Documents, and the

Confirmation Order shall constitute a good faith compromise and settlement of claims and controversies based on the unique circumstances of this Chapter 11 Case . . . ." (the "Compromise Provision"). The settled "claims and controversies" are not specified.

73.     To the extent this provision may be construed to apply to the claims and controversies of the United States, the United States objects and does not consent to the compromise or settlement of the USG Claims as part of this case.

74.     Moreover, the United States objects to the Compromise Provision to the extent it applies to claims and controversies belonging to any party other than Debtor or the Debtor's estate. Section 1123(b)(3)(A) of the Bankruptcy Code only permits a Chapter 11 plan to provide for "the settlement or adjustment of any claim or interest belonging to the Debtor or to the estate." Because the "claims and controversies" to which Plan § 9.8 applies are not specified, the statement may be broadly read to apply to all "claims and controversies" subject to the Plan's releases clauses, many of which do not concern "any claim or interest belonging to the Debtor or to the estate."

75.     The Bankruptcy Code does not provide the Debtor any basis for including such a "catch-all" settlement provision in the Plan. The claims and interests of creditors are governed by the distribution scheme in the Bankruptcy Code. Absent a true settlement reached through the consent of all interested parties, the Debtor should only receive the relief to which it is entitled under the Bankruptcy Code. By virtue of the Plan process, the United States does not waive sovereign immunity and does not consent to the compromise or settlement of any USG Claims through confirmation of the Plan.

### V.     The Plan fails to preserve the United States' setoff and recoupment rights.

76.     The United States objects to the Plan to the extent the Plan fails to preserve the United States' setoff and recoupment rights in violation of sections 553 and 1129(a)(1) of the

Bankruptcy Code.

77.     Under the Plan, the Debtor and Reorganized Debtor retain rights to assert setoff and recoupment. *See, e.g.*, Plan §§ 3.3, 6.11, 10.1.3. Yet, the Plan improperly enjoins Persons from asserting these same setoff and recoupment rights. *See id.* at §§ 11.2.2, 11.3.2(b)(iv).

78.     Like other creditors, the United States has the common law right to setoff mutual debts. "The government has the same right 'which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him.'" *United States v. Munsey Trust Co. of Washington, D.C.*, 332 U.S. 234, 239 (1947) (quoting *Gratiot v. United States*, 40 U.S. 336, 370 (1841)); *see also Amoco Prod. Co. v. Fry*, 118 F.3d 812, 817 (D.C. Cir. 1997). This right – "which is inherent in the federal government – is broad and 'exists independent of any statutory grant of authority to the executive branch.'" *Marre v. United States*, 117 F.3d 297, 302 (5th Cir. 1997) (quoting *United States v. Tafoya*, 803 F.2d 140, 141 (5th Cir. 1986)). Hence, the United States can setoff mutual prepetition debts and claims as well as post-petition debts and claims. *See Zions First Nat'l Bank, N.A. v. Christiansen Bros.* (*In re Davidson Lumber Sales, Inc.*), 66 F.3d 1560, 1569 (10th Cir. 1995); *Palm Beach County Bd. of Pub. Instruction* (*In re Alfar Dairy, Inc.*), 458 F.2d 1258, 1262 (5th Cir. 1972), cert. denied, 409 U.S. 1048 (1972); *Mohawk Indus., Inc. v. United States* (*In re Mohawk Indus., Inc.*), 82 B.R. 174, 178-79 (Bankr. D. Mass. 1987).

79.     The Plan impermissibly modifies these rights. Such modification is impermissible because Bankruptcy Code section 553 preserves the right of setoff in bankruptcy as it exists outside bankruptcy, *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995), neither expanding nor constricting it, *United States v. Maxwell*, 157 F.3d 1099, 1102 (7th Cir. 1998). "[T]he government of the United States suffers no special handicap under § 553 of the Bankruptcy Code" that alters

this principle. *Id.* at 1103.

80.     Moreover, because "[s]etoff occupie[s] a favored position in our history of jurisprudence," *Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1164 (2d Cir. 1979), courts do not interfere with its exercise absent "the most compelling circumstances." *Niagara Mohawk Power Corp. v. Utica Floor Maintenance, Inc.* (*In re Utica Floor Maintenance, Inc.*), 41 B.R. 941, 944 (N.D.N.Y. 1984); *see also New Jersey Nat'l Bank v. Gutterman* (*In re Applied Logic Corp.*), 576 F.2d 952, 957 (2d Cir. 1978) ("The rule allowing setoff . . . is not one that courts are free to ignore when they think application would be 'unjust.'").

81.     Compelling circumstances generally entail criminal conduct or fraud by the creditor. *See In re Whimsy, Inc.*, 221 B.R. 69, 74 (S.D.N.Y. 1998). No such compelling circumstances are present here, and accordingly, the Plan must provide for and preserve the federal government's setoff rights. Failure to do so is not only an impairment of the government's rights but it violates Bankruptcy Code § 1129(a)(1).

82.     Similarly, the Plan improperly fails to preserve recoupment rights of the United States. Recoupment is unaffected by discharge. *See In re Patterson*, 580 B.R. 283, 290 (Bankr. N.D. Ga. 2017); *Megafoods Stores, Inc. v. Flagstaff Realty Assocs.* (*In re Flagstaff Realty Assocs.*), 60 F.3d 1031, 1035-36 (3rd Cir. 1995) (holding that recoupment survives discharge following confirmation and implementation of chapter 11 plan even if creditor did not object to plan or seek a stay pending appeal); *see also Beaumont v. Dep't of Veteran Affairs* (*In re Beaumont*), 586 F.3d 776, 781 (10th Cir. 2009); *Saif Corp. v. Harmon* (*In re Harmon*), 188 B.R. 421, 425 (B.A.P. 9th Cir. 1995) ("Because recoupment only reduces a debt as opposed to constituting an independent basis for a debt, it is not a claim in bankruptcy, and is therefore unaffected by the debtor's discharge."); *Lunt v. Peoples Bank* (*In re Lunt*), 500 B.R. 9, 16 (D. Kan. 2013); *Mercy Hosp. of*

*Watertown v. New York*, 171 B.R. 490, 495 (N.D.N.Y. 1994); *Brown v. General Motors Corp.*, 152 B.R. 935, 938 (W.D. Wis. 1993) (holding right of recoupment not a claim or debt to be discharged in bankruptcy). For the same reasons as stated above with respect to setoff rights, the Plan provision enjoining creditors' recoupment rights is impermissible.

### VI.   The Plan improperly provides for the Bankruptcy Court to retain exclusive jurisdiction over all matters arising out of the case.

83.     In addition to the objectionable gatekeeping provisions discussed above, the United States objects to the Plan to the extent it purports to endow the Bankruptcy Court exclusive jurisdiction over all matters arising out of this case. *See* Plan §§ 12.1-12.2; *see also* 28 U.S.C. § 1334. While "the Bankruptcy Court plainly [may retain] jurisdiction to interpret and enforce its own prior orders," *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009), it may not divest other courts of their concurrent jurisdiction to interpret bankruptcy court orders.

84.     The bankruptcy court, as a unit of the district court, has "original but not exclusive jurisdiction." 28 U.S.C. § 1334(b); *see Stern v. Marshall*, 564 U.S. 462, 499 (2011); *In re Mystic Tank Lines Corp.*, 544 F.3d 524, 528-29 (3d Cir. 2008) ("No provision of the Bankruptcy Code requires the Bankruptcy Court to hear all 'related to' claims. . . . [T]he only aspect of the bankruptcy proceeding over which the district courts and their bankruptcy units have exclusive jurisdiction is 'the bankruptcy petition itself.'") (citing *In re Wood*, 825 F.2d 90, 92 (5th Cir.1987)); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 224-25 (3d Cir. 2004), *as amended* (Feb. 23, 2005) ("Section 105(a) permits a bankruptcy court to 'issue any order, process or judgment that is necessary or appropriate to carry out the provisions' of the Bankruptcy Code. But as the statute makes clear, § 105 does not provide an independent source of federal subject matter jurisdiction."); *In re Skyline Woods Country Club*, 636 F.3d 467, 471 (8th Cir. 2011); *Whitehouse v. LaRoche*, 277 F.3d 568, 576 (1st Cir. 2002).

85.     The Debtor seeks to have the Bankruptcy Court assert exclusive jurisdiction broadly "necessary to ensure that the purposes and intent of the Plan are carried out." Plan § 12.1. While the provisions in Sections 12.1 and 12.2 hedge on this issue by providing for co-exclusive jurisdiction with the District Court, to the extent the Bankruptcy Court is not permitted exclusive jurisdiction, Section 12.2 carves out of these jurisdiction provisions the "resolution of Talc Personal Injury Claims" which shall be governed by "Talc Personal Injury Trust Documents," including the Talc Personal Injury Trust Agreement ("Trust Agreement") and other, as yet unfiled documents. The Trust Agreement in turn provides for exclusive Bankruptcy Court jurisdiction over any disputes arising under the Trust Agreement or claim distribution procedures. Trust Agreement at 60. The United States objects to this improperly expansive provision of exclusion jurisdiction.

### VII.  The Plan's immediate binding effect provisions are inconsistent with the Federal Rules of Bankruptcy Procedure.

86.     The United States objects to the immediate binding effect of the Plan as inconsistent with applicable Bankruptcy Rules. The Plan provides that, "as of the Effective Date, the Plan, the Plan Documents, and the Confirmation Order shall be binding on . . . any and all holders of Claims against or Interests in the Debtor . . . , and any and all other Persons that are affected in any manner by the Plan." Plan § 10.8.

87.     The United States does not consent to the truncation of its statutory protections. This provision negatively affects the United States' appeal rights. If the Debtor consummates the Plan immediately after confirmation, the Debtor is effectively requesting that the Court shorten the time for appeal afforded by the federal bankruptcy rules.

88.     The United States objects to the request to shorten the 14-day stay imposed by Federal Rule of Bankruptcy Procedure 3020(e), which provides that "[a]n order confirming a plan

is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 3020(e). The Committee Notes explain that subsection (e) was "added to provide sufficient time for a party to request a stay pending appeal of an order confirming a plan under chapter 9 or chapter 11 of the Code before the plan is implemented and an appeal becomes moot." *Id.* The Debtor has presented no exigencies that would justify departing from the Rule's imposition of an automatic 14-day stay and impeding the ability to obtain appellate review. *See also* Fed. R. Bankr. P. 6004(h), 7062. Under the Debtor's proposed scheme, if the United States is unable immediately to obtain a hearing before the appropriate Court to seek a stay, its appeal may be contended to be moot. Particularly in light of the appellant being a government unit, with a chain of command to be consulted, this unilateral ability of the Debtor to shorten the stay period would be unfair and prejudicial to the United States.

## CONCLUSION

For the reasons stated above, to the extent the Plan alters the rights or interests of the United States, the United States respectfully requests that the Court deny confirmation of the Plan. If the Plan does not affect the rights or interests of the United States or otherwise bind the United States, the Plan must make that clear.

Dated: January 24, 2025                    Respectfully submitted,

                                           MICHAEL D. GRANSTON
                                           Deputy Assistant Attorney General

                                           BY: /s/ Bethany R. Theriot
                                               KIRK T. MANHARDT
                                               KEVIN VANLANDINGHAM
                                               LOUISA A. SOULARD
                                               BETHANY R. THERIOT
                                               D.C. Bar No. 1022065
                                               S.D. Tex. No. 3855138
                                               U.S. Department of Justice
                                               1100 L Street, NW, Room 7028
                                               Washington, D.C. 20005
                                               Tel: (202) 307-0244
                                               Fax: (202) 514-9163
                                               bethany.theriot@usdoj.gov

                                           *Attorneys for the United States of America*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 24, 2025, a true and correct copy of the foregoing was served upon all interested parties via CM/ECF notification system.

<u>/s/ Bethany R. Theriot        </u>