**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC LLC,[1] | Case No. 24-90505 (CML) |
| Debtor. | Related Dkt. No. 722 |

**OBJECTION OF THE COALITION OF COUNSEL FOR JUSTICE FOR TALC CLAIMANTS TO THE CONFIRMATION OF THE SECOND AMENDED PLAN OF REORGANIZATION**

---

[1]   The last four digits of the Debtor's federal tax identification number are 8508.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND .............................................................................................................. 8

I.   J&J's Multiple Corporate Restructurings For its Talc Liability ......................................... 8

II.  Events Following the Disposition of J&J's First Bad Faith Bankruptcy Filing, and Events
     Preceding, During and Terminating J&J's Second Bad Faith Bankruptcy ...................... 10

     A.   J&J Spins Off Old JJCI's "Productive Assets" to Kenvue, and Orchestrates LTL's
          Surrender of the 2021 Funding Agreement and Second Bankruptcy ........................ 10

     B.   No Longer on a Blank Slate, J&J's Second Bankruptcy Case Takes a Different
          Course than the First ...................................................................................... 12

III. Events and Circumstances Preceding J&J's Third Bad Faith Bankruptcy Filing ........... 13

     A.   J&J Seeks New Forum for a Third Bankruptcy .................................................... 13

     B.   J&J Solicits Votes on a 'Prepackaged' Plan and Initiates Another Corporate
          Restructuring ................................................................................................. 14

IV.  The Proposed Plan ...................................................................................................... 17

     A.   Classification of Claims ................................................................................... 17

     B.   The Talc Personal Injury Trust and the Channeling Injunction ............................... 19

     C.   Trust Distribution Procedures ........................................................................... 21

     D.   Illusory Nature of Plan Obligations ................................................................... 24

STANDARD OF REVIEW .............................................................................................. 26

ARGUMENT ................................................................................................................. 27

I.   The Plan Does Not Comply with the Text, Purpose, and History of § 524(g) ................. 27

     A.   Section 524(g) Was Enacted to Solve a Unique Problem......................................... 27

     B.   Confirmation Must Be Denied Because the Proposed Plan Does Not Create a Trust
          That Satisfies the Requirements and Purpose of §§ 524(g) and 1141(d) .................. 30

     C.   Confirmation Must Be Denied Because the Proposed Plan Impermissibly Releases
          Non-Debtor Third Parties Under § 524(g)............................................................ 38

II.  The Nonconsensual Releases in the Plan Are Not Otherwise Permissible....................... 46

     A.   Outside of § 524(g), Consent Is Required for a Third-Party Non-debtor Release ..... 46

     B.   There Is No Full-Pay Exception to Nonconsensual Third-Party Releases ................ 48

i

C.    The Plan Does Not Fully Compensate Ovarian Cancer Claims ................................ 48

D.    The Lack of Opt-Out Rights Means There Is No Consent ......................... 53

III.   The Plan Was Not Proposed in Good Faith Under § 1129(a)(3) ..................................... 54

A.    Good Faith Standards under §§ 1112 and 1129 ......................................... 54

B.    The Debtor's Filing Does Not Serve a Bankruptcy Purpose ...................................... 56

C.    The Manipulation of the Voting Process and Classification Scheme Were Solely Intended to Create the Appearance of an Impaired Accepting Class ......................... 57

D.    The Plan Provides for the Debtor and J&J's Ability to Walk Away From the Plan .. 60

IV.   The Debtor's Right to Revoke the Plan After Confirmation Violates §§ 1141 and 1144 61

V.    The Plan Violates §§ 1122(a) and 1123(a)(4) .................................................................. 62

A.    Ovarian Cancer Claims and Gynecological Claims Are Classified Together But Subject to Different Payment Procedures and Outcomes in Violation of § 1123(a)(4) ...................................................................................................................... 63

B.    Ovarian Cancer Claims and Gynecological Claims are Not Substantially Similar But Classified Together In Violation of § 1122 ............................................................. 66

C.    The Plan's Disparate Treatment of Indirect Personal Injury Claims Likewise Violates Either §§ 1123(a)(4) or §§ 1122(a) ...................................................................... 67

VI.   Having Put All Talc Claimants in the Same Class, The Plan Fails to Meet the Voting Thresholds Set by §§ 524(g) and 1126(c), Leaving the Plan Without a Valid Impaired Accepting Class ....................................................................................................... 68

A.    By Valuing Each Claim at $1 for Voting Purposes, the Plan Violates § 1126(c) ...... 68

B.    Because Firms Lacked Authority to Cast Ballots, Even If All Claims are Valued at $1 for Voting Purposes, the 75% Voting Threshold Required by § 524(g) Has Not Been Met ......................................................................................................................... 72

VII. The Plan Violates the Best Interests of Creditors Rule Under § 1129(a)(7) ................... 73

VIII. The Plan Is Not Feasible Under § 1129 ......................................................................... 75

IX.  The Plan on Which Votes Were Solicited Has Changed .................................................. 76

X.   If Section 524(g) Releases J&J and Kenvue of its Talc Liability, It Is Unconstitutional. 77

CONCLUSION ....................................................................................................................... 77

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Bank of Am. Nat'l Tr. and Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999) .................................................................................................. 73

*Bank of N.Y. Tr. Co., NA v. Unsecured Creditors Comm. (In re Pac. Lumber Co.)*,
  584 F.3d 229 (5th Cir. 2009) ............................................................................. 46, 47

*Cole v. Nabors Corp. Servs., Inc. (In re CJ Holding Co.)*,
  597 B.R. 597 (S.D. Tex. 2019) ................................................................................. 47

*Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co.)*,
  13 F.4th 279 (3d Cir. 2021) ...................................................................................... 39

*Deutsche Bank A.G. v. Metromedia Fiber Network, Inc.,*
  *(In re Metromedia Fiber Network, Inc.)*,
  416 F.3d 136, 142 (2d Cir. 2005) ............................................................................ 48

*Dev. Corp. v. La. Nat'l Bank*,
  881 F.2d 1346 (5th Cir. 1989) .................................................................................. 56

*Excluded Lenders v. Serta Simmons Bedding, L.L.C.*
  *(In re Serta Simmons Bedding, L.L.C.)*,
  2024 WL 5250365 (5th Cir. Dec. 31, 2024) ........................................................... 64

*Feld v. Zale Corp. (In re Zale Corp.)*,
  62 F.3d 746 (5th Cir. 1995) ............................................................................... 46, 47

*Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. (In re T-H New Orleans Ltd.)*,
  116 F.3d 790 (5th Cir. 1997) ............................................................................. 55, 75

*Grp. Of Vitro Noteholders v. Vitro, S.A.B. de CV (In re Vitro S.A.B. de CV)*,
  701 F.3d 1031 (5th Cir. 2012) ........................................................................... 46, 47

*Harrington v. Purdue Pharma*,
  603 U.S. 204 (2024) .......................................................................................... passim

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enter., Ltd., II)*,
  994 F.2d 1160 (5th Cir. 1993) .................................................................... 26, 67, 75

*Houston v. Edgeworth (In re Edgeworth)*,
  993 F.2d 51 (5th Cir. 1993) ...................................................................................... 46

*Humana, Inc. v. Shrader & Assocs., LLP,*
   584 B.R. 658 (S.D. Tex. 2018) .......................................................................... 29, 30, 38, 40

*In re Acequia, Inc.,*
   787 F.2d 1352 (9th Cir. 1986) .......................................................................................... 26

*In re Aldrich Pump LLC,*
   No. 20-30608, 2023 WL 9016506 (Bankr. W.D.N.C. Dec. 28, 2023) .................................... 77

*In re Antelope Techs.,*
   431 F. App'x 272 (5th Cir. 2011) ...................................................................................... 55

*In re Arnold,*
   No. 07-80636-G3-11, 2009 WL 1066140 (Bankr. S.D. Tex. Mar. 5, 2009) ........................... 26

*In re Bigler LP,*
   442 B.R. 537 (Bankr. S.D. Tex. 2024) ............................................................................... 47

*In re Boy Scouts of Am.,*
   650 B.R. 87 (D. Del. 2023) ............................................................................................... 54

*In re Brotby,*
   303 B.R. 177 (B.A.P. 9th Cir. 2003) .................................................................................. 56

*In re Cent. Med. Ctr., Inc.,*
   122 B.R. 568 (Bankr. E.D. Mo. 1990) ................................................................................ 63

*In re Cleveland Imaging & Surgical Hosp. L.L.C.,*
   Case No. 14-34974, 2022 WL 677459 (Bankr. S.D. Tex. March 7, 2022) ............................. 62

*In re Combustion Eng'g, Inc.,*
   391 F.3d 190 (3d Cir. 2004) ...................................................................................... passim

*In re Cypresswood Land Partners I,*
   409 B.R. 396 (Bankr. S.D. Tex. 2009) ............................................................................... 73

*In re Delta AG Grp.,*
   596 B.R. 186 (Bankr. W.D. La. 2019) ................................................................................ 55

*In re Ditech Holding Corp.,*
   606 B.R. 544 (Bankr. S.D.N.Y. 2019) ................................................................................ 73

*In re Double H Transp. LLC,*
   603 F. Supp. 3d 468 (W.D. Tex. 2022) .............................................................................. 55

*In re Dow Corning Corp.,*
   280 F.3d 648 (6th Cir. 2002) ............................................................................................ 63

*In re Emoral, Inc.*,
   740 F.3d 875 (3d Cir. 2014) ............................................................... 43

*In re Flintkote Co.*,
   486 B.R. 99 (Bankr. D. Del. 2012) ...................................... 32, 34, 36, 37

*In re Heritage Org., L.L.C.*,
   375 B.R. 230 (Bankr. N.D. Tex. 2007) ................................................ 67

*In re Holthoff*,
   58 B.R. 216 (Bankr. E.D. Ark. 1985) .................................................. 26

*In re Integrated Telecom Express, Inc.*,
   384 F.3d 108 (3d Cir. 2004) .......................................................... 55, 56

*In re J T Thorpe Co.*,
   308 B.R. 782 (Bankr. S.D. Tex. 2003) ................................................ 58

*In re Lloyd E. Mitchell*, *Inc.*,
   373 B.R. 416 (Bankr. D. Md. 2007) ................................................... 69

*In re Logan Place Props., Ltd.*,
   327 B.R. 811 (Bankr. S.D. Tex. 2005) ................................................ 62

*In re LTL Mgmt. LLC*,
   64 F.4th 84 (3d Cir. 2023) ...................................................... passim

*In re LTL Mgmt. LLC*,
   637 B.R. 396 (Bankr. D.N.J. 2022) ................................................. 9, 11

*In re LTL Mgmt. LLC*,
   652 B.R. 433 (Bankr. D.N.J. 2023*)* ......................................... 10, 12, 35

*In re LTL Mgmt. LLC*,
   2023 WL 2726441 (3d Cir. Mar. 31, 2023) ......................................... 10

*In re LTL Mgmt. LLC*,
   2024 WL 3540467 n.2 (3d Cir. July 25, 2024) ............................... 13, 35

*In re M.A.R. Designs & Constr., Inc.*,
   653 B.R. 843 (Bankr. S.D. Tex. 2023) ................................................ 55

*In re Mangia Pizza Invs., LP*,
   480 B.R. 669 (Bankr. W.D. Tex. 2012) ............................................... 63

*In re Master Mortg. Inv. Fund, Inc.*,
   168 B.R. 930 (Bankr. W.D. Mo. 1994) ............................................... 48

*In re Pittsburgh Corning Corp.*
    417 B.R. 289 (Bankr. W.D. Pa. 2006) ............................................................... 42, 43

*In re Pittsburgh Corning Corp.*,
    453 B.R. 570 (Bankr. W.D. Pa. 2011) .................................................................. 43

*In re Quigley Co.*,
    346 B.R. 647 (Bankr. S.D.N.Y. 2006) ...................................................... 69, 70, 72

*In re Quigley Co., Inc.*,
    437 B.R. 102 (Bankr. S.D.N.Y. 2010) ................................................ 36, 37, 73, 74

*In re Robertshaw U.S. Holding Corp.*,
    662 B.R. 300 (Bankr. S.D. Tex. 2024) ..................................................... 46, 53, 58

*In re Smallhold*,
    Case No. 24-10267 (CTG), 2024 WL 4296938 (Bankr. D. Del. Sept. 25, 2024) ................... 48

*In re Star Ambulance Serv., LLC*,
    540 B.R. 251 (Bankr. S.D. Tex. 2015) .................................................................. 63

*In re U.S. Truck*,
    800 F.2d 581 (6th Cir. 1986) ............................................................................ 67

*In re Vill. at Camp Bowie I, L.P.*,
    710 F.3d 239 (5th Cir. 2013) ............................................................................ 56

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012) ........................................................................ passim

*In re W.R. Grace & Co.*,
    729 F.3d 311 (3d Cir. 2013) ....................................................................... 63, 67

*In re Washington Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) .................................................................... 74

*In re Wool Growers Cent. Storage Co.*,
    371 B.R. 371 B.R. 768. (Bankr. N.D. Tex. 2007) .................................................... 47

*In re Zamora-Quezada*,
    622 B.R. 865 (Bankr. S.D. Tex. 2017) .................................................................. 55

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    843 F.2d 636 (2d Cir. 1988) ....................................................................... passim

*Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.)*,
    779 F.2d 1068 (5th Cir. 1986) .......................................................................... 37

*Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Co-op., Inc.)*,
   150 F.3d 503 (5th Cir. 1998) ................................................................ 63

*Menard-Sanford v. Mabey (In re A.H. Robins Co., Inc.)*,
   880 F.2d 694 (4th Cir. 1989) ................................................................ 69

*Mozingo v. Correct Manufacturing Corp.*,
   752 F.2d 168 (5th Cir. 1985) ................................................................ 43

*Opt-Out Lenders v. Millennium Lab Holdings II, LLC (In re Millennium Lab Holdings II, LLC)*,
   591 B.R. 559 (D. Del. 2018) ................................................................ 48

*Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*,
   995 F.2d 1274 (5th Cir. 1991) ................................................... 66, 67

*Quigley Co. v. Law Offices of Peter G. Angelos (In re Quigley Co.)*,
   676 F.3d 45 (2d Cir. 2012) ........................................................... 40, 41

*Save Our Springs (S.O.S.) Alliance, Inc. v. WSI (II)-COS, L.L.C.*
   *(In re Save Our Springs (S.O.S.) Alliance, Inc.)*,
   632 F.3d 168 (5th Cir. 2011) ...................................................... 75, 76

*Travelers Indem. Co. v. Bailey*,
   557 U.S. 137 (2009) ............................................................................ 39

*U.S. v. Sutton*,
   786 F.2d 1305 (5th Cir. 1986) ............................................................. 2

*W.R. Grace*,
   900 F.3d .......................................................................................... 39, 40

*Williams v. Hibernia Nat'l Bank (In re Williams)*,
   850 F.2d 250 (5th Cir. 1988) ............................................................. 26

**Statutes**

11 U.S.C. § 502(a) .................................................................................. 68

11 U.S.C. § 502(c) .................................................................................. 69

11 U.S.C. § 524 ...................................................................................... 39

11 U.S.C. § 524(e) ........................................................................... 46, 47

11 U.S.C. § 524(g) ....................................................................... passim

11 U.S.C. § 524(g)(1)(A) ...................................................................... 45

11 U.S.C. § 524(g)(2) ........................................................................... 30

11 U.S.C. § 524(g)(2)(B) ............................................................................................ 30, 34

11 U.S.C. § 524(g)(2)(B)(i) ........................................................................................ 31, 32

11 U.S.C. § 524(g)(2)(B)(i)(I) ......................................................................................... 32

11 U.S.C. § 524(g)(2)(B)(i)(II) ........................................................................................ 32

11 U.S.C. § 524(g)(2)(B)(ii)(III) ..................................................................................... 38

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) .............................................................................. 72

11 U.S.C. § 524(g)(4)(A)(ii) .................................................................................... passim

11 U.S.C. § 524(g)(4)(A)(ii)(I) ................................................................................. 39, 45

11 U.S.C. § 524(g)(4)(A)(ii)(II) ................................................................................ 39, 45

11 U.S.C. § 524(g)(4)(A)(ii)(III) .............................................................................. 39, 45

11 U.S.C. § 524(g)(4)(A)(ii)(IV) ............................................................................. 39, 45

11 U.S.C. § 727(a)(1) ........................................................................................................ 45

11 U.S.C. §1112(b) .............................................................................................................. 9

11 U.S.C. § 1122 ............................................................................................................... 66

11 U.S.C. § 1122(a) ................................................................................................... passim

11 U.S.C. § 1123 ............................................................................................................... 66

11 U.S.C. § 1123(a)(4) .............................................................................................. passim

11 U.S.C. § 1126 ............................................................................................................... 66

11 U.S.C. § 1126(c) ....................................................................................... 68, 70, 72, 73

11 U.S.C. § 1127(a) ........................................................................................................... 77

11 U.S.C. § 1129 ............................................................................................................... 26

11 U.S.C. § 1129(a) ........................................................................................................... 26

11 U.S.C. § 1129(a)(1) ...................................................................................................... 26

11 U.S.C. § 1129(a)(3) ................................................................................................. 54, 56

11 U.S.C. § 1129(a)(10) ............................................................................................... 56, 57

11 U.S.C. § 1129(a)(11) ........................................................................................... 75

11 U.S.C. § 1141(a) ................................................................................................... 61

11 U.S.C. § 1141(d) ............................................................................................. 30, 31

11 U.S.C. § 1141(d)(1) .............................................................................................. 45

11 U.S.C. § 1141(d)(3) .............................................................................................. 45

11 U.S.C. § 1144 ................................................................................................... 61, 62

28 U.S.C. § 1411 ....................................................................................................... 49

**Rules**

Fed. R. Bankr. P. 3002(a) .......................................................................................... 68

Fed. R. Bankr. P. 3018 ............................................................................................... 69

Fed. R. Bankr. P. 3018(a) .......................................................................................... 69

Fed. R. Bankr. P. 3019(a) .......................................................................................... 77

Federal Rule of Civil Procedure 60(d) ...................................................................... 62

The Coalition of Counsel for Justice for Talc Claimants (the "Coalition"), by and through its undersigned counsel, respectfully submits this Objection (the "Objection") to the *Second Amended Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [Dkt. No. 722], dated December 9, 2024 (the "Plan").[2]

### PRELIMINARY STATEMENT

The Debtor's proposed Plan is not confirmable under the Bankruptcy Code's plain text or under Supreme Court and Fifth Circuit precedent.  The fundamental problems with this Plan—especially after two bad faith dismissals in another Circuit—cannot be overcome by the zealotry of Johnson & Johnson ("J&J") and its passel of supporting plaintiffs' firms.  Indeed, because the Plan is so patently flawed, the Plan's pass-through funder and beneficiary, J&J, continues to insist on the inclusion of post-confirmation—and even *post-effective date*—"walk away" rights in the Plan in order to hedge against appellate risk (which is itself one of the defective features of the Plan).

The centerpiece of the Plan is the creation of a trust into which tens of thousands of current and future ovarian and gynecological cancer claims are to be channeled, with the goal of fully and finally resolving the billions of dollars of talcum powder liabilities faced by J&J, its current and former affiliates, and the retailers of its products.  Although the only entity J&J placed into chapter 11 is a made-for-bankruptcy entity (twice over) that did not even exist when the votes in favor of the Plan were cast, J&J also seeks a channeling injunction that would operate as a discharge of *all*

---

[2]   The Debtor has amended its supposedly "pre-packaged" plan twice, and on January 15, 2025 moved to extend the exclusivity period [Dkt. 937].  The Coalition reserves its right to supplement or amend this Objection to the extent that the Plan is further amended, and to further supplement or amend any argument or objection made herein in light of the upcoming Confirmation Hearing, including any pre- or post-hearing briefing submitted in connection with that proceeding.

non-mesothelioma, non-Canadian and non-governmental talc liabilities that it and hundreds of solvent non-debtors face—without the consent of *all* affected claimants.

To circumvent the Supreme Court's ruling in *Purdue* last year (and longer standing Fifth Circuit precedent) prohibiting nonconsensual third-party releases, the Debtor relies on § 524(g)[3] to force a settlement onto nonconsenting claimants.[4]  Yet, as reflected by its text, structure, and history, the purpose of § 524(g) is to afford companies with ongoing operations plagued by intractable asbestos liabilities a chance to reorganize by preserving their operating assets to pay such current and future liabilities.  But, as set forth below, J&J has essentially reorganized that subsidiary (and its successors) out of any legitimate need for or use of § 524(g) by executing multiple divisional mergers to slice off all the operating assets, as well as a good chunk of the talc liabilities (*e.g.*, mesothelioma and governmental talc liabilities), originally faced by its $60 billion manufacturing subsidiary.  The Plan cannot be confirmed because it does not comply with the text or purpose of § 524(g), and is otherwise unconfirmable under § 1129.  The lengthy list of fatal flaws, set out below without regard to priority or magnitude of importance, includes at least the following:

*First*, the Plan seeks to provide a sweeping injunction against tens of thousands of current and future claims for the benefit of scores of solvent third-parties without the consent of *all* claimants whose claims would be barred.  The proposed injunction exceeds the permitted bounds of § 524(g).  Congress enacted that section of the Code to assist financially struggling companies

---

[3]   All references to "§_" and to the "Code" or "Bankruptcy Code" are to title 11 of the United States Code unless otherwise indicated.

[4]   The Supreme Court affirmed the long-standing rule in the Fifth Circuit that non-consensual third-party releases are not permitted, and in doing so reiterated that § 105(a) is an enabling statute that only carries out "authorities expressly conferred elsewhere in the Code."  *Harrington v. Purdue Pharma*, 603 U.S. 204, 216, n.2 (2024); *see also U.S. v. Sutton*, 786 F.2d 1305 (5th Cir. 1986).  As such, § 105(a) cannot be used to expand the limits of the authority as set forth in the text of § 524(g).

to use their ongoing operations to fund long-term asbestos liability in the model of the *Johns-Manville* bankruptcy. Here, however, the Debtor is the hand-crafted product of a complex set of divisional mergers, beginning in 2021, that severed the then-manufacturer of the asbestos-laden product—Johnson & Johnson Consumer Inc. ("Old JJCI")—from the liabilities of that product. All the productive assets of Old JJCI now exist in two companies: the independent (former J&J affiliate) Kenvue, Inc. ("Kenvue") and a J&J subsidiary called New Holdco. The productive assets of those companies are not being used to fund the settlement trust created under § 524(g)(2)(B). Further, the Debtor—which did not exist when the Plan was voted on, and had not been named in a single lawsuit when this bankruptcy was filed—is not facing the kind of implacable asbestos liability that Congress designed § 524(g) to address. Nor would any § 524(g) trust created under the Plan be funded by securities or the equity in the operating assets that led to the asbestos liability in the first place—the centerpiece of the *Johns-Manville* reorganization model on which § 524(g) was created. Moreover, any suggestion that J&J or the successors to Old JJCI lack the financial wherewithal to treat future claimants fairly—the very concern that animated the *Johns-Manville* decision that led to the creation of § 524(g) in the first place—has not been shown, and flies in the face of J&J's ongoing AAA-credit rating.[5]

**Second**, the Debtor seeks to channel claims against hundreds of "Protected Parties" (largely J&J former and current corporate affiliates, and retailers of its talc products) under the guise of § 524(g) that are not appropriately claims against the estate. Rather, the channeled claims include direct claims against non-debtors. The channeling injunction afforded by § 524(g) was intended to, and on its face does, protect non-debtor third parties that may face liability "by reason of" certain enumerated relationships with the Debtor. 11 U.S.C. § 524(g)(4)(A)(ii). Here, the situation

---

[5] *See In re LTL Mgmt. LLC*, 64 F.4th 84, 104 (3d Cir. 2023) (discussing *Johns-Manville* and the need for financial distress in a bankruptcy by an earlier version of this Debtor).

is exactly reversed.  The *Debtor* faces liability because *J&J* used intra-company indemnities and the divisional mergers to saddle the Debtor with those liabilities of J&J, its operating subsidiaries and the retailers of J&J's talc products.  In other words, it is the *Debtor* that now faces claims "by reason of" its relationship with J&J and its current and former affiliates and contract parties.  As the Coalition established in separate briefing filed on December 20, 2024, J&J and Kenvue each have their own *direct* liability for their actions.[6]  The Plan seeks—but cannot—release these non-debtors of such claims under § 524(g).

*Third*, with § 524(g) unavailable, the Plan's non-consensual third party releases fail under *Purdue* and pre-existing Fifth Circuit law.  Long-standing Fifth Circuit law requires claimant consent for any non-debtor release, and offers no exception to this requirement—including any exception the Debtor may assert stemming from the Plan being "full-pay."  Such an exception has never been expressly recognized.  Even if it had, the Debtor's proposed Plan is not, in fact, a full-pay plan.  The Plan does not come close to satisfying in full the contingent, unliquidated claims of each of the tens of thousands of current and future ovarian and gynecological cancer victims required to release J&J and the other non-debtors.  Not only are all such claims channeled to a trust, but the Debtor's Plan requires that all ovarian and gynecologic talc claimants with such channeled claims must provide a full and final release to *non-debtor* J&J and others as a condition of payment from the Trust.  Payment of a claim conditioned on the receipt of a release—after confirmation of the plan—does not retroactively constitute consent for the releases that will already have been included in the confirmation order.

*Fourth*, the Plan was not proposed in good faith under § 1129, just as the bankruptcy itself was not filed in good faith, because it does not serve a legitimate bankruptcy purpose.  As the

---

[6]    Dkt. No. 120, Adv. Pro. No. 24-031794.

Coalition detailed in its motion to dismiss[7] (which will be tried in the same hearing as this confirmation objection), the Debtor is a made-for-bankruptcy entity with no meaningful assets, employees, or reorganizational purpose.  Two bankruptcies orchestrated by J&J to resolve the same liabilities, using a more robustly-funded, made-for-bankruptcy debtor (LTL), were found by the Third Circuit to have been filed in bad faith.  The Debtor came to Texas to avoid the rulings that governed it and its predecessor.  Moreover, the Debtor and its sponsor, J&J, in open recognition of the fatal flaws with its approach, have insisted on the inclusion of broad walkaway rights that would allow them to terminate the Plan without further order of the Court, *even after* the Plan were to go effective.  The fact that the Debtor and J&J require the ability to walk away from this Plan further demonstrates that there is no need for bankruptcy to address the liabilities, and nothing for this Plan to actually reorganize.  Additionally, the Debtor's manipulation of the pre-petition voting process, as well as the Plan's classification scheme that place disparate and differently valued claims together, but treat them the same for voting purposes, were solely intended to create the appearance of an impaired accepting class, irrespective of whether it served, or was consistent with, the interests of the claimants.

*Fifth*, any plan, like this one, that gives a debtor the ability to walk away after confirmation is illusory, running afoul of § 1141(a), which provides that a confirmed plan is binding on both the debtor and its creditors.  Moreover, the Debtor's walk-away right amounts to a post-confirmation revocation of any confirmation order, in violation of the limitations imposed on such revocation by § 1144.

*Sixth*, the Plan violates a central principle of bankruptcy—equal treatment for claimants—by treating talc claimants within the same class under wildly different compensation schemes.  One

---

[7]   Dkt. No. 44.

group—ovarian cancer claimants, who have valuable claims in litigation outside of bankruptcy—are given a complex "point system" where the submission is onerous and both the initial and final cash value of a point are unknown and uncertain at this time.  The Debtor claims these payouts will on average exceed $100,000 although that remains to be proven.   Another group—gynecological non-ovarian cancer claimants, whose claims have neither been litigated nor compensated (at least until planning for this bankruptcy was underway)—are given a cash award of $1,500.  Yet, still another group—indirect claimants—also will receive a full cash payment for their allowed claims.  Either these groups of claimants are being treated differently within the same class (violating § 1123(a)(4)), or they are really different classes of claims that have been lumped together into a single class in violation of § 1122.

*Seventh*, having placed these claims in the same class despite their disparate treatment, the Debtor's use of a "one dollar/one vote" valuation for voting purposes violates § 1126(c).  That provision requires the votes of two thirds of the total value of an impaired class for acceptance to be valid.  Valuing the contingent, unliquidated claims of ovarian and gynecologic claims equally when, under the Plan, ovarian claims are expected to receive magnitudes higher compensation than gynecologic claims threatens to conflate the Code's numerosity and value requirements for confirmation.  However, even if the Debtor's use of "one dollar/one vote" is accepted, once the voting irregularities that plagued the pre-petition solicitation process have been corrected, an insufficient number of claimants have accepted the Plan to meet § 524(g)'s heightened requirements applicable in this case.

*Eighth*, the Debtor cannot show that the Plan is in the best interests of creditors under § 1129(a)(7) because the claimants are being forced to give up valuable rights against solvent third

parties, which in a liquidation they would retain because § 524(g) and the corporate discharge would not apply.

*Ninth*, the Debtor cannot establish that the Plan is feasible, because it provides for an artificially fixed pot instead of J&J's hundreds of billions of dollars of equity to pay for decades of future litigation.  There is no guarantee that the Trust is sufficiently funded to pay the amounts to be distributed under the Trust Distribution Procedures (described below) to current and future claimants—or that the Cash Value of a Point will be anything close to what was advertised in the Disclosure Statement over the life of the Trust.  J&J has no written obligation to continue funding the Trust, making a future reorganization potentially necessary.

*Tenth*, the Plan—now through three iterations and counting—is not the same as the one that claimants voted on. Moreover, in contravention of § 1127(a), this iteration of the Plan is not consistent with §§ 1122 or 1123.  To the extent that the Plan constitutes a permissible modification at all, it must be resolicited.

*Eleventh*, even if the Court were to find that the § 524(g) injunction is warranted—and it is not—the Plan violates basic principles of constitutional due process because it imposes a mandatory no-opt-out bankruptcy plan in a case where there is not an insolvent or distressed debtor.

*      *      *

For all of these reasons, and those more fully set forth below, the Plan cannot be confirmed.

## BACKGROUND

### I.       J&J's Multiple Corporate Restructurings For its Talc Liability

J&J manufactured talc-based JOHNSON'S Baby Powder until 1979.[8]  Since then, it was produced by various J&J subsidiaries and ultimately by Old JJCI.[9]  In 2021, facing growing talc liability exposure, J&J devised a plan to separate its talc liability from its operating assets and force that entity into bankruptcy. "In a July 2021 email with a ratings agency, J&J's treasurer described a potential restructuring that would capture all asbestos liability in a subsidiary to be put into bankruptcy."[10]  Accordingly, in October 2021, J&J used Texas's divisional merger statute to split Old JJCI into two new Texas entities, a Texas limited liability company, LTL Management LLC ("LTL"), and a Texas corporation that was quickly renamed as Johnson & Johnson Consumer, Inc. ("New JJCI").[11]

New JJCI was allocated Old JJCI's "productive business assets,"[12] including an array of famous "cash-flowing" brands, like Tylenol, Band-Aid, and Listerine.[13]  In turn, LTL—which stands for "Legacy Talc Liabilities"—was shunted Old JJCI's talc-related liabilities.[14]  At the same time, LTL was given rights under a funding agreement (the "2021 Funding Agreement") with J&J and New JJCI.[15]  The 2021 Funding Agreement gave LTL the right, both outside and inside

---

[8]   *In re LTL Mgmt., LLC*, 64 F.4th 84, 93 (3d Cir. 2023).

[9]   *Id*.

[10]   *Id.* at 95.

[11]   *Id.* at 95-96 & n.3.

[12]   *Id.* at 97.

[13]   *Id.* at 92, 106.

[14]   *Id.* at 64 F.4th at 96.

[15]   *Id.* at 96.

bankruptcy, to demand cash from J&J and New JJCI up to New JJCI's value—an amount guaranteed by the agreement to be no less than $61.5 billion.[16]

Despite originally being organized as a Texas company, LTL was not directed to file its first bankruptcy case in Texas.  Instead, within hours of its formation, LTL converted from a Texas company to a North Carolina company (while New JJCI converted to a New Jersey corporation).  On October 14, 2021, LTL filed for bankruptcy protection under Chapter 11 in the Western District of North Carolina.[17]  The result of J&J's coupling the divisive merger of Old JJCI with the immediate bankruptcy filing of LTL was that only a single sub-class of Old JJCI's unsecured creditors—talc claimants—were forced into a bankruptcy proceeding, while all other of Old JJCI's unsecured creditors were unimpaired by, and remained outside of, bankruptcy, able to continue transacting with New JJCI in the ordinary course.[18]

The case did not last long in North Carolina, however. The North Carolina court transferred the case to the District of New Jersey, rejecting LTL's effort to "manufacture venue."[19]

J&J's goal of permanently resolving its talc liability through LTL's bankruptcy failed.  Although the bankruptcy court denied the motions of the official talc claimants committee and others to dismiss the bankruptcy under 11 U.S.C. §1112(b),[20] the Third Circuit accepted a direct appeal, reversed the bankruptcy court and dismissed the case as a bad faith filing.[21]

---

[16]   *Id.* at 96-97.

[17]   *Id.* at 97.

[18]   *Id.*

[19]   *Id.* at 97-98.

[20]   *In re LTL Mgmt. LLC*, 637 B.R. 396 (Bankr. D.N.J. 2022).

[21]   *LTL Mgmt. LLC,* 64 F.4th 84.  The Third Circuit did not decide the propriety of the bankruptcy court's extension of the automatic stay to non-debtors, because "[d]ismissing [the] case annuls the litigation stay ordered by the [bankruptcy] [c]ourt and makes moot the need to decide that issue."  *Id.* at 111.

The Third Circuit found that LTL could not show the "immediate" threat of "financial distress" necessary to establish that its petition "served a valid bankruptcy purpose and was filed in good faith."[22]  To the contrary, the record showed that "LTL, at the time of its filing, was highly solvent with access to cash to meet comfortably its liabilities as they came due for the foreseeable future."[23]  With the backstop of the $61.5 billion 2021 Funding Agreement, a virtual "ATM" for paying claims as they came due, LTL could pay any reasonable projection of its liabilities "without any disruption to its business or threat to its financial viability."[24]

The Third Circuit then denied LTL's petition for rehearing *en banc*.[25]  It also denied LTL's motion to stay the mandate, filing an amended opinion emphasizing that its ruling "comports with the theme LTL proclaimed in this case from day one: it can pay current and future talc claimants in full."[26]  On April 4, 2023, following issuance of the Third Circuit's mandate, LTL 1.0 was dismissed.[27]

## II.  Events Following the Disposition of J&J's First Bad Faith Bankruptcy Filing, and Events Preceding, During and Terminating J&J's Second Bad Faith Bankruptcy

### A.  J&J Spins Off Old JJCI's "Productive Assets" to Kenvue, and Orchestrates LTL's Surrender of the 2021 Funding Agreement and Second Bankruptcy

In December 2022, even before the Third Circuit had issued its landmark decision, New JJCI—which had been given all of Old JJCI's "productive assets" (aka, the consumer business assets) in the October 2021 divisive merger—changed its name to Johnson & Johnson Holdco

---

22   *Id.* at 110.

23   *Id.* at 109.

24   *Id*.

25   *See In re LTL Mgmt. LLC*, 652 B.R. 433, 439 (Bankr. D.N.J. 2023*)* ("The Debtor filed a petition for rehearing and rehearing en banc with the Third Circuit, which the Circuit denied on March 22, 2023.")*.

26   *In re LTL Mgmt. LLC*, 2023 WL 2726441 (3d Cir. Mar. 31, 2023).

27   Dkt. No. 3938 in *LTL I*, Case No. 21-30589 (MBK) (Bankr. D.N.J. Apr. 4, 2023) (Order of Dismissal), is attached as Exhibit 1 to the Declaration of Nicholas R. Lawson in Support of this Objection, filed contemporaneously herewith (the "Lawson Decl.")

(NA) Inc. ("Holdco").   In early January 2023, Holdco then transferred the consumer business assets to Holdco's parent company, Janssen Pharmaceuticals, Inc. ("Janssen").[28]   Janssen then transferred the assets to Kenvue, while that company also was a subsidiary of J&J.   Kenvue, in accordance with J&J's previously announced intent to spin off its Consumer Health business,[29] then spun off from J&J in an IPO.[30]   In May 2024, in a debt for equity swap, J&J sold all of its remaining Kenvue common stock and, as a result, J&J no longer owns any common shares of Kenvue.[31]

Further, without any advance notice, and while LTL and its principal asset (the 2021 Funding Agreement) remained under bankruptcy court supervision, LTL then terminated the entirety of the 2021 Funding Agreement, an agreement that the Third Circuit had described as a $61.5 billion "ATM disguised as a contract."[32]

In place of the jettisoned 2021 Funding Agreement, LTL adopted two new agreements—a new funding agreement (the "2023 Funding Agreement") and a bankruptcy support agreement (the "J&J Support Agreement").[33]   Unlike the 2021 Funding Agreement, which was backed by both New JJCI and J&J, the new agreement looked only to Holdco – now, worth only approximately

---

[28]   Lawson Decl., Exs. 2-3 (*LTL II* Main Case Dkt. No. 614 (Debtors' Omnibus Objection to Motions to Dismiss Chapter 11 Case)), at 8 and (*LTL 2.0 Adv. Pro.*, Dkt. No. 185 (Debtor's Reply in Support of Motion to (i) Extend and Modify the Preliminary Injunction Order and (ii) for Confirmation that Successor Liability Actions Are Subject to the Automatic Stay)), at ¶ 1.

[29]   Lawson Decl., Exs. 4-5 (J&J Form 8-K, November 15, 2021) and (J&J Press Release, dated November 12, 2021) ("On November 12, 2021, Johnson & Johnson (the 'Company') issued a press release announcing its intent to separate the Company's Consumer Health business").

[30]   Lawson Decl., Ex. 6 (Kenvue Form 10-Q, Aug. 2, 2023, at p.6) ("The registration statement related to the initial public offering of Kenvue's common shares was declared effective on May 3, 2023, and Kenvue's common shares began trading on the New York Stock Exchange under the ticker symbol "KVUE" on May 4, 2023 (the 'Kenvue IPO')").

[31]   Lawson Decl., Exs. 7-8 (J&J Form 10-Q Statement for the quarterly period ended June 30, 2024, dated July 25, 2024, at 15) and (Kenvue Inc. Form 10-Q Statement for the quarterly period ended June 30, 2024, dated August 6, 2024, at 11).

[32]   *LTL Mgmt.* LLC, 637 B.R. at 423.

[33]   *LTL Mgmt. LLC*, 64 F.4th at 110.

$30 billion after the Kenvue spin-off, instead of over $60 billion – for funding.[34]  As for the J&J

Support Agreement, it offered the *possibility* of funding from J&J, but subject to contingencies

such that it applied only in bankruptcy and only pursuant to a confirmed plan of reorganization

that met J&J's approval.  Those terms stood in stark contrast to the 2021 Funding Agreement,

which required J&J to provide funding both in and outside of bankruptcy.

On April 4, 2023, LTL filed for bankruptcy a second time.  This time, in New Jersey two

hours and eleven minutes after its first bankruptcy case was dismissed.

## B.   No Longer on a Blank Slate, J&J's Second Bankruptcy Case Takes a Different Course than the First

In light of the proceedings during the first bankruptcy, particularly the Third Circuit's

direct precedent, the bankruptcy court decided the motions to dismiss differently from those in the

prior bankruptcy case.  This time, the bankruptcy court granted the motions to dismiss.  The

bankruptcy court found that, under the Third Circuit precedent, "LTL [was] not sufficiently

financially distressed to avail itself of bankruptcy at this time," because "[t]he weight of the

evidence" showed that LTL 'does 'not have any likely need in the present or the near-term . . . to

exhaust its funding rights to pay talc liabilities.' "[35]   The bankruptcy court further found that

neither the claimed support of 60,000 claimants nor the court's own views as to "the best interests

of creditors" could alter the outcome, concluding that "'bad faith' cannot be cured or justified,"

not even with supposedly overwhelming creditor support.[36]  The bankruptcy court thus granted the

motions to dismiss and dismissed the bankruptcy case—less than three full months after its

commencement.[37]

---

[34]   Lawson Decl., Ex. 9 (*LTL II* Main Case Dkt. No. 4-5 (2023 Funding Agreement)).

[35]   *LTL Mgmt. LLC*, 652 B.R. at 448 (quoting *In re LTL Mgmt. LLC*, 64 F.4th at 108.))

[36]   *Id.* at 452.

[37]   *Id.* at 456.

On July 25, 2024, the Third Circuit affirmed the dismissal without argument. The Third Circuit found no error by the bankruptcy court in "not crediting LTL's speculation about potential massive verdicts" and by concluding "that in the worst-case scenario, LTL's assets exceed its liabilities." The Third Circuit concluded that the bankruptcy court correctly followed Third Circuit precedent.[38]

## III.   Events and Circumstances Preceding J&J's Third Bad Faith Bankruptcy Filing

### A.  J&J Seeks New Forum for a Third Bankruptcy

It did not take long after the bankruptcy court's dismissal of J&J's second bankruptcy attempt before it announced its intention to file yet a third bankruptcy. During its third quarter earnings call on October 17, 2023, J&J told analysts that "we're pursuing a consensual resolution of the talc claims through another bankruptcy," with "a vote expected in the next 6 months to determine whether the requisite supermajority of claimants support the plan."[39] JNJ told reporters it was "now exploring Texas as the venue for a potential third filing."[40]

In December 2023, LTL converted back from a North Carolina entity to a Texas entity[41] and changed its name from "LTL" to the anagram, "LLT."[42]

Meanwhile, J&J started to announce out-of-court settlements to resolve talc liabilities that J&J previously indicated could be resolved only through a bankruptcy filing. During an investor presentation on December 5, 2023, J&J told attendees that it had "made recent progress over the

---

[38]   *In re LTL Mgmt. LLC*, Nos. 23-2971 and 23-2972, 2024 WL 3540467, at *2 n.2 (3d Cir. July 25, 2024) ("Because [the Third Circuit] conclude[d] that LTL's bankruptcy petition fails for want of financial distress, [the court did] not consider Appellees' arguments that LTL's decision to amend the funding agreement in a way that sacrificed more than $30 billion of promised value and limited its recourse to J&J was in bad faith.").

[39]   Lawson Decl., Ex. 10 (Transcript, Q3 2023 Johnson & Johnson Earnings Call, on Oct. 17, 2023, at p. 10).

[40]   Lawson Decl., Ex. 11 ("Johnson & Johnson Considers Ditching Texas Two-Step for Third Talc Bankruptcy," *Wall Street Journal*, Oct. 20, 2023).

[41]   Lawson Decl., Ex. 12 (LTL Articles of Conversion to a Foreign Entity, dated Dec. 29, 2023).

[42]   Lawson Decl., Ex. 13 (Application for Reservation of an Entity Name, dated Dec. 19, 2023).

last few weeks in resolving a number and a series of large mesothelioma portfolios with the goal to facilitate our pursuit of a consensual prepackaged bankruptcy resolution."[43]  According to J&J, those settlements "resolved all but one of the cases that were on schedule for 2023 and significantly curtailed those for 2024."[44]  The following month, J&J disclosed that it also had "tentatively agreed to pay about $700 million to settle an investigation brought by more than 40 states into the marketing of its talcum-powder baby powder."[45]  The settlements of significant mesothelioma and governmental talc liabilities foreboded a third bankruptcy filing specifically targeting ovarian cancer claimants.

### B.  J&J Solicits Votes on a 'Prepackaged' Plan and Initiates Another Corporate Restructuring

On May 1, 2024, J&J made an official announcement that it would be embarking on a prepackaged bankruptcy strategy to resolve its talc products liabilities.  The announcement was extraordinary for a number of reasons.  First, J&J confirmed that its prepackaged bankruptcy strategy would not target all talc claims as in the past but rather, only a sub-class of talc claims, namely ovarian cancer claims.  J&J made clear that both "personal injury lawsuits relate[d] to mesothelioma" and "[s]tate consumer protection claims will also be addressed outside the Plan."[46]  Second, and in contrast to the typical pre-packaged bankruptcy reflecting an agreement amongst the debtor and a known and acknowledged capital structure to reorganize on universally agreed terms, here, J&J denied the existence of any valid claims against it and its subsidiaries.  Rather,

---

[43]  Lawson Decl., Ex. 14 (Transcript, Johnson & Johnson Enterprise Business Review, Dec. 5, 2023, at p. 53).

[44]  *Id.*

[45]  Lawson Decl., Ex. 15 ("Johnson & Johnson to Pay $700 Million to Settle Baby Powder Probe," *Wall Street Journal*, Jan. 23, 2024.

[46]  Lawson Decl., Exs. 16-17 (May 1, 2024 Conference Call Transcript Announcing Plan) and (Johnson & Johnson Press Release (Johnson & Johnson Announces Plan by Its Subsidiary, LLT Management LLC, to Resolve All Current and Future Ovarian Cancer Talc Claims Through a Consensual 'Prepackaged' Reorganization, dated May 1, 2024)).

J&J not only "reiterate[d] that *none* of the talc-related claims against it have merit," but then decried that all the claims are examples of "meritless litigation and extreme judgments obtained by the plaintiffs' bar through forum shopping, the distortion of scientific literature with junk science, and the unregulated and surreptitious financing of product litigation."[47]  Third, J&J confirmed the bankruptcy plan that it would be putting forward was intended to resolve *its* talc liabilities.  Its announcement emphasized as a bolded heading that "the Plan enables the *Company* [defined as J&J] to resolve *its* talc litigation."[48]

Beginning June 6, 2024, J&J sent out solicitation materials to law firms with a proposed disclosure statement and prepackaged plan of reorganization for the Debtor, which had not yet been formed.  The solicitation materials established a voting deadline of July 26, 2024 ("Voting Deadline") to vote to accept or reject the proposed plan.[49]  On August 19, 2024, more than a month after the Voting Deadline, J&J "elected" to undertake further corporate restructurings, including a second divisive merger, to create its new debtor entity.  As a result, Holdco became New Holdco (a New Jersey corporation) that wholly owns both the newly-created Debtor entity, Red River Talc (a Texas limited liability company) that holds the so-called gynecological cancer talc liabilities, and Pecos River Talc (a Texas limited liability company) ("PRT"), a newly formed entity that holds other talc liabilities, including mesothelioma and the claims of states' attorneys general.[50]

---

[47]  Lawson Decl., Ex. 17 (May 1, 2024 Press Release) (emphasis added).

[48]  *Id.* (emphasis added).

[49]  Lawson Decl., Ex. 16 (Transcript, Johnson & Johnson Announces Plan by its Subsidiary, LLT Management, Conference Call, May 1, 2024), p. 91.

[50]  *See Declaration of John K. Kim in Support of Chapter 11 case and Certain First Day Pleadings* ("Kim Decl."), ¶¶ 37-38, Dkt. No. 17.

Janssen Pharma owns 100% of the equity interests in New Holdco, and New Holdco owns 100% of the equity interests in each of the Debtor and PRT.[51]

Also prior to filing for bankruptcy, J&J entered into a *Confidential Memorandum of Understanding & Agreement Regarding Talc Bankruptcy Plan Support* (the "SLF MOU") with The Smith Law Firm PLLC ("SLF") and further amended the plan of reorganization that was originally distributed with the solicitation materials. The Amended Prepackaged Chapter 11 Plan of Reorganization of the Debtor, which purportedly reflected changes agreed to pursuant to the SLF MOU was filed along with the Debtor's petition on September 20, 2024, nearly two months after the Voting Deadline.[52] At the time of the bankruptcy filing, the Future Claims Representative (the "FCR") had not approved the SLF MOU.[53]

The Debtor, however, was not done amending its plan. During the case, the Debtor entered into a Memorandum of Understanding with the Official Committee of Talc Creditors (the "TCC MOU").[54] Following entry into the TCC MOU, the Debtor further amended its prepackaged plan of reorganization and, on December 9, 2024, the Debtor filed the Plan.[55] The FCR has not yet approved the Plan.[56]

---

[51] *See* Lawson Decl., Ex. 18 (Certificate of Merger of J&J HoldCo (NA) LLC filed on August 19, 2024 at Document No. 1394129700002).

[52] *Amended Prepackaged Chapter 11 Plan of Reorganization of Debtor*, Dkt. No. 24.

[53] *See* Kim Decl., ¶ 8, Dkt. No. 17.

[54] *See Notice of Official Committee of Talc Claimants Support for Plan,* dated November 15, 2024 & attached *Confidential Memorandum of Understanding & Agreement Regarding Talc Bankruptcy Plan Support*, Dkt. No. 560.

[55] *See* Plan, Dkt. No. 722.

[56] *See, e.g.*, Lawson Decl., Ex. 19 (Transcript of December 10, 2024 Hearing), at 57:18-20.

IV.    **The Proposed Plan**

The Debtor has indicated that further amendments may be made to the Plan.  The Coalition reserves all rights to amend or revise this Objection if and when the Plan is further amended. Descriptions and references below are to the Plan filed on December 9, 2024 [Dkt. No. 722].

A.  **Classification of Claims**

The plan classifies Priority Non-Tax Claims, Secured Claims, Unsecured Claims, Channeled Talc Personal Injury Claims, Intercompany Claims, and Equity Interests.[57]   The following is the proposed treatment for each class:

| Class | Designation | Treatment | Entitlement to Vote | Estimated Recovery |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | Reinstated |
| 3 | Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | Reinstated |
| 4 | Channeled Talc Personal Injury Claims | Impaired | Entitled to Vote to Accept or Reject | 100% |
| 5 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | Reinstated |
| 6 | Equity | Impaired | Not Entitled to Vote to Accept or Reject | Reinstated Subject to Talc PI Pledge |

Other than Equity, Class 4 Channeled Talc Personal Injury Claims are the only impaired class of creditors.  All other classes will either have their debts reinstated or satisfied in full. Pursuant to the Plan, all Talc Personal Injury Claims[58] will be channeled into a trust—the Trust Personal Injury Trust ("Trust").[59]   Talc Personal Injury Claims include "*any manner of alleged*

---

[57]   Plan, at Article III.

[58]   Plan, at §§ 1.1.152.  Capitalized terms not defined herein have the meanings ascribed to them in the Plan. Dkt. No. 722

[59]   Plan, at § 1.1.154.

*bodily injury*, death, sickness, disease, *emotional distress, fear of cancer*, medical monitoring, or any other alleged personal injuries (whether physical, emotional, or otherwise), directly or indirectly arising out of or in any way relating to the presence of or exposure to talc or talc-containing products," *except* claims for alleging "Mesothelioma or Lung Cancer," claims asserted by "any governmental unit," and claims alleging injury or death in Canada, as those claims were excluded from the Red River bankruptcy case and any liabilities related thereto became the responsibility of PRT.[60]

A subset of Talc Personal Injury Claims will be channeled into the Trust. A "Channeled Talc Personal Injury Claim" includes all Talc Personal Injury Claims that are not Defense Cost Claims, including (a) Ovarian/Gynecological Talc Personal Injury Claims and (b) Other Disease Talc Personal Injury Claims.[61] Claimants who submitted ballots—directly or through master ballots—were required to designate the type of disease from which the claimant suffers on their ballot—ovarian, gynecological or other. The overwhelming majority of disease type was either listed as ovarian or gynecological. The Channeled Talc Personal Injury Claims are further dissected into "Direct Talc Personal Injury Claims" and "Indirect Talc Personal Injury Claims."[62] An Indirect Talc Personal Injury Claim, generally speaking, "means a Talc Personal Injury Claim for contribution, reimbursement, subrogation or indemnity…whether contractual or implied by law."[63] While "Direct" and "Indirect" Talc Personal Injury Claims are placed in the same class, the Trust Distribution Procedures (described below) provide vastly disparate treatment for these two types of claims, as do gynecological claims as compared to ovarian claims.

---

[60]   Plan, at § 1.1.152 (emphasis added).

[61]   Plan, at §§ 1.1.26, 1.1.74, 1.1.106, 1.1.107.

[62]   Plan, at §§ 1.1.48, 1.1.87.

[63]   Plan, at § 1.1.87.

**B.   The Talc Personal Injury Trust and the Channeling Injunction**

The Trust will be funded with Cash Contributions from the Reorganized Debtor,[64] which are guaranteed by J&J and New Holdco.[65]   The Reorganized Debtor will receive the cash necessary to fund the Trust from New Holdco pursuant to the Indemnity Cost Funding Agreement.[66]   The exact timing and amount of the Cash Contributions to the Trust are set forth on Exhibit C to the Plan.  The contributions total $8.6 billion, as may be adjusted, scheduled to be paid in installments over 25 years.[67]   As part of the funding, the Reorganized Debtor is to deliver to the Trust a Talc PI Note in the principal amount of $388,000,000, which is payable on the later of (i) the seventh anniversary of the Petition Date or (ii) the first anniversary of the Effective Date.[68]   As security for the Talc PI Note, New Holdco will pledge to the Trust New Holdco's ownership interests in the Debtor ("Pledge Agreement"). [69]

The stated purpose of the Trust, created pursuant to section 524(g) of the Bankruptcy Code, is to assume all Channeled Talc Personal Injury Claims and to, among other things, "direct the processing, liquidation, and, if appropriate, payment of all compensable Channeled Talc Personal Injury Claims in accordance with the Plan, the Confirmation Order, and the Trust Documents." [70] The effect of the Trust is to channel all Talc Personal Injury Claims such that the only recourse

---

[64]   Plan, at §§ 1.1.24, 4.9.1(a) and (b).

[65]   Plan, at §§ 1.1.24, 4.9.1(c), Exs. C (Schedule of Payments) and I (Talc PI Note).

[66]   Plan, at §§ 1.1.86 (The "Indemnity Cost Funding Agreement" is the "Third Amended and Restated Funding Agreement, dated December 4, 2024, by and between New Holdco, as payor, and the Debtor, as payee, pursuant to which New Holdco is obligated to provide funds for the payment by the Debtor or Reorganized Debtor of, among other things, the Cash Contributions pursuant to the Plan").

[67]   Plan, at Ex C.

[68]   Plan, at §§ 1.1.159. 4.9.4.

[69]   Plan, at §§ 1.1.159. 4.9.4, Ex. J (Talc PI Pledge Agreement).

[70]   Plan, at § 4.2.

that claimants have against a "Protected Party" is against the Trust.[71]  On and after the Effective Date, all holders of Channeled Talc Personal Injury Claims will be "permanently and forever stayed, restrained, barred, and enjoined from taking any action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment, satisfaction, or recovery of, on, or with respect to any Channeled Personal Injury Claim against a Protected Party other than from the Trust."[72]

The hundreds of "Protected Parties" include (a) the Debtor and its Representatives; (b) the Reorganized Debtor and its Representatives; (c) the Debtor Corporate Parties (J&J and all of its current and former Affiliates, including a list of persons identified on Schedule 1 to the Plan) and their Respective Representatives; (d) the Settling Talc Insurance Companies; and (e) third-party retailers and other third-parties with to which the Debtor has purported contractual indemnification obligations and potentially the Imerys/Cyprus Parties.[73]

In addition to the channeling injunction channeling all Talc Personal Injury Claims to the Trust, thereby enjoining any actions against the Protected Parties, the Plan provides a broad release—stretching almost a single-spaced page and a half of the Plan—by all holders of claims against all "Release Parties."  Upon the Effective Date, holders of claims will be deemed to have irrevocably and forever released the "Release Parties"[74] from any and all claims, damages, rights, etc., whether

> liquidated or unliquidated, arising out of or in any way related to the Debtor … the 2021 Corporate Restructuring, the 2021 Chapter 11 Case, the 2023 Chapter 11 Case, the 2023 Conversion, the 2023 Funding Agreement Modifications, the

---

[71]  Plan, at § 11.3.1(a).

[72]  *Id.*

[73]  Plan, at §§ 1.1.46, 1.1.121.

[74]  The "Released Parties" means each of: (a) the Debtor; (b) the Reorganized Debtor; (c) the Debtor Corporate Parties; and (d) to the fullest extent permitted by applicable law, with respect to each of the foregoing Persons in clauses (a)-(c), each such Person's Representatives.  Plan, at § 1.1.126.

Prepetition Corporate Restructuring, the Estate, the Chapter 11 Case, … the restructuring of any Claim or Interest before or during the Chapter 11 Case, the sale or distribution of assets by Holdco in connection with the separation of J&J's consumer health business into a new company named Kenvue, Inc., the Love Proceeding, the Bynum Proceeding, the negotiation, formulation, preparation, or implementation of, or the solicitation of votes with respect to, the Plan, or any other act or omission related to the Disclosure Statement, the Plan, or any related agreement, instrument, or document or any of the foregoing.[75]

The Confirmation Order is to contain a permanent injunction enforcing the third-party release.[76]

### C. Trust Distribution Procedures

Together with the Plan, the Debtor filed proposed Trust Distribution Procedures for Red River Personal Injury Trust ("Trust Distribution Procedures"),[77] which set forth the mechanisms for submitting claims, reviewing and paying the Channeled Talc Personal Injury Claims. Any holder of a Channeled Talc Personal Injury Claim, whether or not they voted on the plan, can submit a claim to the Trust for review and potential payment.

#### 1.  Direct Claims

Under the Trust Distribution Procedures, holders of Direct Claims must submit a claims package of materials to the Trustee for review. The claim submission materials must be submitted to the Trust within 120 days of the Confirmation Date.[78] The Claims Administrator will then conduct a preliminary evaluation of the claim submission materials and, if the claim satisfies the preliminary evaluation criteria, will be routed for either an Expedited Review Process, an Individual Review Process or a Quickpay Review Process.[79] Each of these processes have different criteria for evaluation of the Direct Claim. The Expedited Review Process is only

---

[75]  Plan, at § 11.2.2.

[76]  Plan, at § 11.2.3.

[77]  Plan, at Ex. K (Trust Distribution Procedures).

[78]  Trust Distribution Procedures, at § 4.4.1.

[79]  Trust Distribution Procedures, at § 4.6.2.

available for "Ovarian Cancer Claims."[80]  Although the review processes for Expedited Review and Individual Review vary,[81] at the end of each, if deemed by the Trustee and the Claims Administrator to be an Allowed Claim, the Direct Claim will receive a point value, as opposed to a dollar value.  The point value to be ascribed to a Direct Claim that is evaluated under the Expedited or Individual Review Process is determined by a grid that accounts for multiple factors that both increase and decrease an individual's given point value.[82]  After applying the multiple factors and calculations set forth in the Trust Distribution Procedures—including a considerable amount of discretion afforded to the trustee[83]—the Direct Claimant is ascribed a "Final Scheduled Point Value."[84]

Payment to holders of Direct Claims that do not submit to the Quickpay Review Process is based upon the total points allocated to the claim.  The dollar value of a point is unknown and can vary over the life of the Trust.[85]  Within thirty days after the claims submission deadline and before any distributions are made, the Trustee, with the consent of the Trust Advisory Committee (the "TAC") and the FCR, will establish an initial Cash Value of a Point.[86]  The Trustee is to determine the Cash Value of a Point on several factors, including (i) the current estimates of the number, types and Final Scheduled Point Values for Existing Direct Claims, Future Direct Claims, and Indirect Claims, (ii) the value of assets available to the Trust, (iii) all anticipated administrative and legal expenses, which are the obligation of the Trust, and (iv) all other matters reasonably

---

[80]   Trust Distribution Procedures, at § 4.6.4(B).

[81]   Individual Review Claimants are also entitled to have their claims reviewed for entitlement to a share of amounts allocated for Extraordinary Injury.  *See* Trust Distribution Procedures, at § 4.6.5(C).

[82]   Trust Distribution Procedures, at § 5.3.

[83]   *See, e.g.* Trust Distribution Procedures, at §§ 5.3.2-5.3.5.

[84]   Trust Distribution Procedures, at §§ 5.3.5 and 5.4.

[85]   Trust Distribution Procedures, at § 7.1.2(A)

[86]   *Id.*

anticipated to affect the sufficiency of funds available to pay all Existing Direct and Future Direct Claims.[87]  In addition to annual adjustments for inflation, no less than annually, the Trustee is to review the then-applicable Cash Value of a Point to determine if it should be readjusted.[88]

By contrast, holders of Gynecological Claims (and other Direct Claimants that elect the QuickPay option) are only eligible to receive amounts based on the Quickpay Review Process and are not subject to the vagaries of the point system.  If the Quickpay Review Process results in an Allowed Claim, the Claimant shall receive $1,500 from the Trust.[89]

A Direct Claimant who decides to accept an offer of payment from the Trust based on the Allowed Claim Amount proposed by the Trustee, must agree to release all claims against the Debtor, the Reorganized Debtor, J&J, the other Debtor Corporate Parties, and other Protected Parties by completing and executing an "Acceptance and Release" and providing such Acceptance and Release to the Trustee before receiving any payment from the Trust.[90]

2.     Indirect Claims

Under the Trust Distribution Procedures, holders of Indirect Claims are treated differently than holders of Direct Claims and are not subject to a fluctuating and unknown point system.  Like Direct Claims, holders of Indirect Claims must submit their claims to the Trustee within 120-days of the Confirmation Date in accordance with procedures to be developed by the Trustee.  Unlike the Direct Claims, Indirect Claims that satisfy the Indirect Claim Criteria, will be reviewed by the Trustee and the Trustee will determine the amount necessary to pay the claim in full and if the

---

[87]   Trust Distribution Procedures, at § 7.1.2(A).

[88]   Trust Distribution Procedures, at § 7.1.2(A) and (B).

[89]   Trust Distribution Procedures, at § 5.5.

[90]   Trust Distribution Procedures, at § 7.2.1(A).

amount is accepted by the Indirect claimant and the claimant submits an Acceptance and Release, the claimant will receive a cash payment for the full value of the allowed claim.[91]

### D. Illusory Nature of Plan Obligations

The Plan has multiple mechanisms built in to allow J&J and the Debtor to walk-away from the Plan after confirmation—both before and after the Effective Date.  Under the Plan, even if this Court and the District Court approve the Plan and enter a Confirmation Order acceptable to the Debtor, J&J, the AHC of Supporting Counsel, the SLF, the TCC and the FCR, thereby triggering the "Confirmation Date," the Effective Date of the Plan will only occur upon the occurrence of one of the following events:

> (i) the Confirmation Order shall have become a Final Order; (ii) the Confirmation Order shall have been fully affirmed by the Fifth Circuit; or (iii) the Claims Submission Report (as such term is defined in the Trust Agreement) shall have been delivered to the Debtor and J&J within one hundred forty (140) days of the Confirmation Date, the Claims Submission Report so delivered shall indicate that at least ninety five percent (95%) of all holders of Existing Direct Claims who submitted their respective Existing Direct Claims to the Trust within one hundred twenty (120) of the Confirmation Date included a properly completed and executed Acceptance and Release as part of their submissions, and one hundred seventy (170) days shall have elapsed following the Confirmation Date.[92]

In other words, the Effective Date will not occur and the Debtor and  J&J can walk away from the confirmed Plan if either of the following events occur and are not waived:  (i) the Confirmation Order is appealed to the United States Court of Appeals for the Fifth Circuit (the "Fifth Circuit") *or* (ii) less than 95% of  Existing Direct Claims provide an Acceptance and Release to the Trust within 120 days of the Confirmation Date and 170-days have elapsed following the

---

[91]    Trust Distribution Procedures, at § 8.1.

[92]    Plan, at § 8.2(g).

Confirmation Date.[93]  Under the Trust Distribution Procedures, Existing Direct Claimants are not even required to provide an Acceptance and  Release with their claim submission materials.  They are only required to provide such Acceptance and Release upon acceptance of the Trustee's proposed resolution of the Direct Claim, thus decreasing the likelihood of garnering the requisite 95% within the first 120-days (the claims submission period).

If the conditions to the Effective Date do not occur (or are waived), then upon motion of the Debtor, the Confirmation Order shall be vacated by the Court.[94]  The Debtor (with the consent of J&J) also reserves the right to revoke the Plan and walk away from its obligations thereunder without the prior order of the Court, if on the earlier of (a) 170-days after the Confirmation Date and (b) the Effective Date, one of the following events occur: (i) the Claims Submission Report shows that less than 95% of holders of Existing Direct Claims included an executed Acceptance and Release with their claim submission materials to the Trustee within 120-days of the Confirmation Date or (ii) the United States Trustee or any association or organization advocating on behalf of attorneys who regularly represent personal injury claimants appeals the Confirmation Order to the Fifth Circuit.[95]  The Debtor also reserves the right in the Plan to, without any prior order of the Court, revoke the Plan at any time within 170-days of the Confirmation Order if the Effective Date has not yet occurred. [96]

---

[93]   The Claims Submission Report from the Trustee must be delivered to the Debtor within 140 days of the Confirmation Date.

[94]   Plan, at § 8.5.

[95]   Plan, at §§ 8.5, 9.12.

[96]   Plan, at § 9.12.

Finally, maintaining maximum flexibility, the Debtor (with the consent of J&J) can still elect to revoke or withdraw the Plan, without the prior order of the Court, even after the Effective Date if there is an Adverse Appellate Ruling.[97]

If the Confirmation Order is vacated, the Plan shall be null and void.[98]

## STANDARD OF REVIEW

Under § 1129(a)(1), the plan must comply with the applicable provisions of the Code.[99]  A debtor that invokes the protections of § 524(g) must satisfy its requirements in addition to those set forth in § 1129.  In the Fifth Circuit, the debtor bears the burden of proof on these issues.[100]

The Court has an independent duty to assure that all requirements for confirmation are met.[101]  Thus:

> A bankruptcy court "must hold an evidentiary hearing in ruling on confirmation." *In re Acequia, Inc.*, 787 F.2d 1352, 1358 (9th Cir. 1986). At this hearing, "[i]n addition to the consideration of objections raised by creditors, the [c]ourt has a mandatory independent duty to determine whether the plan has met all of the requirements necessary for confirmation."  *In re Holthoff*, 58 B.R. 216, 218 (Bankr. E.D. Ark. 1985).[102]

---

[97]   Plan, at §§ 8.5, 9.12.  An "Adverse Appellate Ruling" is (a) any order of the Fifth Circuit that does not fully affirm the Confirmation Order and is determined by the Debtor and J&J to be adverse to the purpose and intent of the Plan, or (b) a petition for certiorari is timely filed and granted by the United States Supreme Court (the "Supreme Court") and the Supreme Court does fully affirm the Confirmation Order and is determined by the Debtor and J&J to be adverse to the purpose and intent of the Plan.  *See* Plan, at § 1.1.9.

[98]   Plan, at § 8.5.

[99]   11 U.S.C. § 1129(a)(1).

[100]   *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enter., Ltd., II)*, 994 F.2d 1160, 1164-65 (5th Cir. 1993), *cert. den.*, 510 U.S. 992, 114 S. Ct. 550, 126 L.Ed.2d 451 (1993); *In re Arnold*, No. 07-80636-G3-11, 2009 WL 1066140, at *7 (Bankr. S.D. Tex. Mar. 5, 2009) ("The plan proponent has the burden of proof as to compliance with Section 1129(a) by a preponderance of the evidence.").

[101]   *Williams v. Hibernia Nat'l Bank (In re Williams)*, 850 F.2d 250, 253 (5th Cir. 1988).

[102]   *Id.* at 253.

**ARGUMENT**

I.      **The Plan Does Not Comply with the Text, Purpose, and History of § 524(g)**

   A.  **Section 524(g) Was Enacted to Solve a Unique Problem**

Section 524(g) of the Bankruptcy Code is modeled on a creative solution to a reorganizing debtor's ongoing asbestos liability that first emerged in the *Johns-Manville* case.[103]  Faced with a disease with a latency period of 30 years or more, the Johns-Manville Corporation had been named in 12,500 lawsuits at the time of its bankruptcy filing, and expected between 50,000 to 100,000 additional cases to be filed, with a total potential liability approaching $2 billion.[104]  Recognizing the significant impairments that bankruptcy would impose on future claimants, the bankruptcy court appointed a legal representative to act on behalf of such claimants.[105]  Interested parties negotiated for more than four years to establish a trust that would consist of the reorganized debtor's stock, a portion of future profits, and contributions from the debtor's insurers.[106]  Claimants and trust representatives exchanged a mandatory initial settlement offer, after which the claimant could elect to liquidate his or her claims through mediation, binding arbitration, or traditional tort litigation.[107]

The trust's purpose was "to provide a means of satisfying Manville's ongoing personal injury liability while allowing Manville to maximize its value by continuing as an ongoing concern."[108]  In keeping with this purpose, the bankruptcy court enjoined any present or future claims made against the reorganized debtor and other parties, including its insurers, and instead

---

[103]  *See* H.R. Rep. No. 103-835, at 40 (1994), 1994 U.S.C.C.A.N. 3340, 3348.

[104]  *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 639 (2d Cir. 1988).

[105]  *Id.*

[106]  *Id.* at 640.

[107]  *Id.*

[108]  *Id.*

channeled such claims to the Trust.[109]  "Asbestos claimants would have a stake in Johns-Manville's successful reorganization, because the company's success would increase both the value of the stock held by the trust and the company profits set aside for it."[110]

Despite being confirmed by the bankruptcy court and confirmed on appeal by the Second Circuit, lingering uncertainty regarding the viability of the injunction moved Congress to enshrine the *Johns-Manville* solution in § 524(g).[111]  Congress's intent in doing so was to "strengthen the . . . trust injunction mechanisms and to offer similar certitude to other asbestos trust/injunction mechanisms that meet the same kind of high standards with respect to regard to the rights of claimants, present and future[.]"[112]  For an injunction to bind future claimants, § 524(g) "requires that the trust operate in a structure and manner necessary to give reasonable assurance that the trust will value, and be able to pay, similar present and future claims in substantially the same manner."[113]

As enacted, § 524(g) permitted "any asbestos company facing a similarly overwhelming liability" to employ a channeling injunction resembling that in *Johns-Manville*, provided it meets the stringent requirements of the statute, modeled on the requirements in *Johns-Manville*.[114] Congress was specifically concerned that the "financial markets tend to discount the securities of the reorganized debtor," which was intended to remain a "viable operation."[115]  As Judge Lake explained in detail:

---

[109]  *Id.*

[110]  H.R. Rep. No. 103-845, at 40, 1994 U.S.C.C.A.N. at 3349.

[111]  *See id.*

[112]  *Id.* at 41.

[113]  *Id.*

[114]  *Id*.

[115]  140 Cong. Rec. S4521-01, S4523, 1994 WL 139961.

Channeling asbestos-related claims to a personal injury trust relieves the debtor of the uncertainty of future asbestos liabilities. This helps achieve the purpose of Chapter 11 by facilitating the reorganization and rehabilitation of the debtor as an economically viable entity. At the same time, the rehabilitation process served by the channeling injunction supports the equitable resolution of asbestos-related claims. In theory, a debtor emerging from a Chapter 11 reorganization as a going-concern cleansed of asbestos liability will provide the asbestos personal injury trust with an "evergreen" source of funding to pay future claims. This unique funding mechanism makes it possible for future asbestos claimants to obtain substantially similar recoveries as current claimants in a manner consistent with due process. To achieve this relief, a debtor must satisfy the prerequisites set forth in § 524(g) in addition to the standard plan confirmation requirements.[116]

For the myriad reasons set forth below, J&J two-stepped its way out of the need for, and any appropriate use of, § 524(g). It may have been—although it is a counter-factual that no one can know—that Old JJCI could have tried to avail itself of § 524(g) relief. Old JJCI could have attempted to reorganize in bankruptcy and to resolve its current and future talc liabilities through a trust funded with Old JJCI's equity and dividends.[117] But that was not what J&J did. Instead, it undertook a reorganization under Texas's divisional merger statute that severed talc liabilities from Old JJCI, assigned those liabilities to a shell company, and put that shell company into bankruptcy in bad faith. After two bad faith dismissals, J&J orchestrated another divisive merger that further severed talc liabilities. Having done so, in a clear effort to the game the system, J&J has divorced its subsidiary from the need, and proper use, of § 524(g).

---

[116] *Humana, Inc. v. Shrader & Assocs., LLP*, 584 B.R. 658, 667 (S.D. Tex. 2018) (quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 234 (3d Cir. 2004)). Although the Coalition reserves its argument that because this is effectively a chapter 33 by the same Debtor filed in this district to avoid the Third Circuit's decisions in *LTL I* and *LTL II*, and therefore those cases should continue to govern. The Coalition also notes that many of the asbestos cases generally have arisen in the Third Circuit, and therefore such cases are cited as persuasive authority as well.

[117] The Coalition does not concede that any such attempt by Old JJCI would have been proper.

## B. Confirmation Must Be Denied Because the Proposed Plan Does Not Create a Trust That Satisfies the Requirements and Purpose of §§ 524(g) and 1141(d)

Central to § 524(g) is the creation of a trust that resolves the asbestos claims against the Debtor that is funded by the productive assets of the Debtor, protected by the trust's ownership of the securities of the Debtor. Here, the trust is only funded with cash from New Holdco, and guaranteed by J&J, under a made-for-bankruptcy funding agreement and a made-for-bankruptcy Talc PI Note to make it appear as though the requirements of § 524(g)(2) are met. What is conspicuously missing from the Debtor's future funding source are the productive assets that led to the liability in the first place, which J&J has shielded from bankruptcy through successive intra-company transfers. Such a trust, as the Coalition will show, flies in the face of the text, structure and purpose of the statute.

### 1. Legal Standard Under §§ 524(g)(2)(B) and 1141(d)

Congress created § 524(g) to help reorganize companies with asbestos claims to channel such claims to a trust created under a confirmed plan. The trust mechanism permits the debtor to emerge from bankruptcy as an economically viable concern.[118] Section 524(g) provides, in relevant part, that a trust created pursuant to a plan of reorganization must:

> (I) assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

> (II) be funded in whole or in part by the [debtor's] securities . . . and by the obligation of such [debtor] to make future payments, including dividends;

---

[118]  *See generally Humana*, 584 B.R. at 666-67.

(III) ... own, or ... be entitled to own if specified contingencies occur, a majority of the voting shares of: (aa) each such debtor; (bb) the parent corporation of each such debtor; or (cc) a subsidiary of each such debtor that is also a debtor; and

(IV) is to use its assets or income to pay claims and demands.[119]

Further, as the Third Circuit (the only Circuit-level court to address § 524(g)'s requirements) recognized, the "implication of this requirement is that the reorganized debtor must be a going concern, such that it is able to make future payments into the trust to provide an "evergreen" funding source for future asbestos claimants."[120]  All three sponsors of the § 524(g) amendment—Senators Heflin, Graham, and Brown—recognized the need for the reorganized debtor to remain a viable operation and provide an ongoing source of payment for future asbestos claims, the proverbial "goose that lays the golden egg" in the words of two of the sponsoring Senators.[121]

Moreover, for a corporate debtor to receive a discharge under § 1141(d), the reorganized debtor must engage in business after consummation of the Plan, as the debtor would be denied a discharge under § 727(a) if this were a Chapter 7.  Reading §§ 1141(d) and 524(g) in conjunction, the Bankruptcy Court for the District of Delaware explained that the "statutes, read together,

---

[119]  11 U.S.C. § 524(g)(2)(B)(i); *see In re W.R. Grace & Co.*, 475 B.R. 34, 93–94 (D. Del. 2012) ("Only if a trust satisfies all four of these requirements will it be considered proper under the statute."), *aff'd*, 729 F.3d 332 (3d Cir. 2013).

[120]  *In re Combustion Eng'g, Inc.*, 391 F.3d at 248.

[121]  *See* 140 Cong. Rec. S4521-01, S4523, 1994 WL 139961 ("It will preserve the going concern value of those companies, thus providing a source of payment for those future claims. . . . The amendment recognizes the need to provide an on-going source of payment for future asbestos-products claims against a debtor within the fabric of a centralized claims mechanism." (statement of Senator Graham)); *id*. ("The underlying company funds the trust with securities and the company remains viable. Thus, the company continues to generate assets to pay claims today and into the future. In essence, the reorganized company becomes the goose that lays the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims." (statement of Senator Brown)); *id*. ("The injunction legislation would codify a court's existing authority to close that door by issuing a permanent injunction that channels claims to an independent trust funded by the securities and future earnings of the debtor. The reorganized company becomes the goose that lays the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims." (statement of Senator Heflin)).

suggest that when a plan provides for substantial liquidation, to qualify for a channeling injunction, the debtor must engage in business post-confirmation."[122]

### 2.   The Trust Does Not Satisfy the Plain Language of § 524(g)(2)(B)(i)

To start, when the bankruptcy petition was filed (*i.e.* "at the time of entry of the order for relief"), the then freshly-created Debtor was *not* "named as a defendant" in any pending litigation.[123]   Under the plain language of the statute, it is the Debtor itself that must face the asbestos liability pre-bankruptcy and therefore has the need to use § 524(g) to reorganize.[124]   Yet as a result of the various divisional mergers, the Debtor was *not* a "named defendant" in any personal injury (or other) lawsuits.   Hence under the plain text of § 524(g)(2)(B)(i)(I), the Debtor— by virtue of J&J's own multiple hand-crafted divisive mergers, does not qualify for relief via a trust under § 524(g).

Further, the Trust is not funded by the securities of the Debtor, as required under § 524(g)(2)(B)(i)(II).   The only possible "security" on which the Debtor might rely is the artificial $388 million "Talc PI Note," which is to be delivered to the Trust by the Reorganized Debtor and then secured by the Reorganized Debtor's parent's interest in the Reorganized Debtor.   But, even if that note were a "security" (and the Debtor would need to prove that it is), that "security" would cover a mere fraction of the total funding requirement of the Trust and would time out after seven years.   In other words, the Talc PI Note is mere window dressing.

Notably, payments under the Talc PI Note are not treated as a material term to the Plan.   In fact, the Plan expressly provides that a payment default under the Talc PI Note does *not* constitute

---

[122]   *In re Flintkote Co.*, 486 B.R. 99, 129 (Bankr. D. Del. 2012).

[123]   11 U.S.C. § 524(g)(2)(B)(i)(I).

[124]   *Id.*

a material breach of the Plan.[125]   In such event, the parties could simply look to J&J under its guarantee of the cash contributions to the Trust and/or seek to enforce the Talc PI Pledge Agreement.[126]   The Talc PI Note serves no purpose other than to attempt hyper-technical compliance with the statute's words.

The creation of the Talc PI Note subverts the entire purpose of the statute—which was to provide a trust with the securities of an actual reorganized debtor with operations to serve as the funding source for future claims.  Here, its only purpose is to obtain the channeling injunction, and then let the Plan be funded almost completely by other sources.

Finally, the Trust is also required to own, or be entitled to own upon certain contingencies, a majority of the shares of the Debtor (or its parent, or a co-Debtor subsidiary).  But by using the divisional mergers to create an entity that has no other purpose than to satisfy talc liabilities—as its directors have all testified at deposition—the Plan effectively reads that requirement out of the statute.  This requirement is intended to ensure that the Trust is able to access an evergreen funding source from a reorganized debtor with operations that can fund future liabilities.  The only event in which the Trust would ever own equity in the Debtor would be in the event of a default under the Talc PI Note, and remedies were exercised against the collateral pledge of equity.  But, given that J&J has guaranteed the funding of every penny into the Trust, any ownership of the Debtor's equity upon a contingency is illusory.  The Trustee will look to J&J, under its corporate guarantee, to ensure all funding of the Trust occurs.  The notion of a Trustee taking a pass on, or waiting to exercise, its right to call upon J&J's corporate guarantee (and, instead, to foreclose on an equity pledge provided with the Talc PI Note) is fantastical.  The hyper-technical structure proposed in

---

[125]   Plan, at § 4.9.2(c).

[126]   *Id.*

the Plan, without any underlying economic purpose, makes a mockery of the solution that Congress enacted in § 524(g)(2)(B).

        3.    <u>The Divisional Mergers Left the Debtor Without an Ongoing Business or The Possibility of Providing Evergreen Funding, Putting the Plan Out of Compliance with § 524(g)(2)(B) and Subverting the Congressional Purpose Behind Evergreen Asbestos Trusts</u>

Prior asbestos trusts under § 524(g) have recognized the need for the reorganized Debtor itself to maintain an ongoing business, even if that business has been restructured somewhat from its prepetition form.[127]

As late as October 2021, Old JJCI was a massive company in its own right, worth tens of billions of dollars, yet plagued—in J&J's view—with intractable, ongoing talc liabilities.[128] J&J did not, however, put Old JJCI and its assets and liabilities into bankruptcy.[129] Instead, as the Third Circuit in *LTL I* recognized, "J&J's stated goal was to isolate the talc liabilities in a new subsidiary so that entity could file for Chapter 11 without subjecting Old [JJCI's] entire operating enterprise to bankruptcy proceedings."[130] J&J accomplished this goal by first dividing Old JJCI into LTL (containing the liabilities) and New JJCI (containing the evergreen funding source). LTL was provided access to Old JJCI's productive assets through the original funding agreement.

---

[127] *See, e.g., W.R. Grace & Co.*, 475 B.R. at 93-94 (noting that the settlement trust "will own a majority share of Reorganized Grace"); *Flintkote Co.*, 486 B.R. at 134 (finding that the Debtor will "engage in business after consummation of the plan," including both real estate and consulting business). *Cf. Combustion Eng'g, Inc.*, 391 F.3d at 248 (finding that the Debtor's "post-confirmation business operations would be, at most, minimal. [The Debtor] would emerge from Chapter 11 with no employees, no products or services, and in a cash neutral position.").

[128] As the Coalition has argued in its Supplemental Brief Detailing Direct Claims Against Johnson & Johnson [Dkt.120, Adv. Proc. No. 24-03194] (the "<u>Supplemental Brief</u>"), and below, J&J remained independently liable alongside Old JJCI, and so remains alongside Red River.

[129] Whether Old JJCI would have been in sufficient financial distress to be eligible for bankruptcy is beyond the scope of this Objection.

[130] *LTL Mgmt.*, 64 F.4th at 93.

Yet after the Third Circuit found that LTL's first bankruptcy lacked a valid bankruptcy purpose, J&J began stripping back the assets available to fund the Old JJCI liabilities that eventually ended up in the Debtor.  First, even before the Third Circuit's ruling, J&J spun off Kenvue from New JJCI, the impact of which was substantially lessened by J&J's guarantee of the funding agreement.  After the Third Circuit's ruling, J&J amended the funding agreement to remove its backstop, but LTL still had access to over $30 billion of productive assets in New JJCI that had not been spun out into Kenvue.  While stripped down, those assets represented an evergreen funding source that was found by the New Jersey Bankruptcy Court and the Third Circuit to be able to meet the even the worst-case expected liabilities of LTL.[131]  And after that second bankruptcy was dismissed, J&J further reduced the productive assets available to fund these liabilities by merging LTL (renamed LLT) and what was left of New JCCI (renamed Holdco), and then dividing that entity into the Debtor, PRT, and New Holdco with an even further stripped-down funding agreement that severely limited the Debtor's access to Holdco's or any other entity's productive assets.

What remains is a made-for-bankruptcy special purpose vehicle that has no productive assets of its own, save for RAM, "a collection of bare rights to streams of payments cobbled together on the eve of bankruptcy."[132]  As the Coalition intends to demonstrate at trial, the J&J employees seconded to the Debtor admitted that the Debtor has no ongoing business operation other than to resolve talc liabilities, and that RAM's royalties are just income streams intended to create the façade of an actual business where none exists.[133]  And even if those royalties constituted

---

[131]  *LTL Mgmt.*, 2024 WL 3540467, at *4 (3d Cir. July 25, 2024); 652 B.R. 433, 447 (Bankr. D.N.J. 2023).  The Third Circuit did not determine whether the use of the divisive merger for the purpose of pursuing a bankruptcy filing is consistent with the Code's requirements.  It expressly reserved on that issue.  *LTL Mgmt.*, 64 F.4th at 111.

[132]  *LTL I*, 64 F.4th at 109.

[133]  *See* Kim Decl., ¶¶ 39-40, Dkt. No. 17.

an ongoing business (and the passive collections of royalty streams is not in alignment with the *Johns-Manville* model), it is undisputed that they are woefully insufficient to meet the liabilities of the Debtor—and they pale in comparison to the payments to the trust by Holdco and/or J&J. Under any circumstance, reliance on RAM as an evergreen funding source would result in a Plan that is not even remotely feasible and would likely require further reorganization or liquidation.[134]

Moreover, the fact that the proposed trust is funded by J&J's subsidiary, New Holdco, via the current operative funding agreement, and/or by J&J via its corporate guarantee, does not create "a sufficient and reliable pool of assets remains available to pay [the trust's] claims."[135]  While the Third Circuit recognized that claimants may be indifferent as to the funding source, "the fact that the Asbestos PI Trust is a closed fund [raises] a possible concern should it hold insufficient funds to pay all allowed claims against it."[136]

The Coalition is not arguing that any divisional merger in any asbestos case *a priori* deprives a debtor of access to § 524(g).  The question before the Court is whether the divisional mergers *preceding this case*, starting in 2021, that resulted in this Debtor, with the funding agreement and corporate guarantee operative *in this case*, have subverted the text, structure, and Congressional purpose underlying § 524(g)'s requirements.  The text of § 524(g)(2)(B) requires that the Debtor have been named in asbestos suits—but it was the Debtor's predecessors that were named, not the Debtor.  The structure of § 524(g)(2)(B) contemplates that the trust will be funded by obligations of the Debtor to make future payments including the dividends from an ongoing business—not a corporate parent that refuses to submit its productive assets to bankruptcy.  The

---

[134]  *See, e.g.*, *In re Flintkote*, 486 B.R. at 139 (discussing the feasibility requirement in order to obtain a discharge in a § 524(g) trust bankruptcy); *In re Quigley Co., Inc.*, 437 B.R. 102, 142 (Bankr. S.D.N.Y. 2010) (same).

[135]  *In re Combustion Eng'g, Inc.*, 391 F.3d at 248 n.70.

[136]  *Id.* (also noting that cancer claimants had not raised the issue below).

Congressional intent behind § 524(g) as expressed by all three sponsors in the Senate was to allow an operating reorganized debtor to be the proverbial goose that lays the golden egg and fund the trust over time—not to create a limited fund whose only funding source is a solvent non-debtor third party.

The text, structure, and Congressional purpose of § 524(g) all lead to the conclusion that what is required is an evergreen funding source by the operating company that had the liabilities at the outset, which Congress clearly contemplated would be the actual debtor.  By using the divisional merger statutes to siphon off the productive assets that otherwise would have been available to fund the asbestos trust in this case, J&J is seeking to achieve the benefits and finality of § 524(g), while depriving the claimants of a § 524(g) trust funded with the equity and earnings of old Holdco's (and Old JJCI's) various lucrative businesses that would have "provide[d] an on-going source of payment for future asbestos-products claims against a debtor within the fabric of a centralized claims mechanism."[137]

This Debtor, suffering from "new debtor syndrome," admits that it has no employees and no ongoing business.[138]  It has nothing whatsoever to reorganize and no hope of rehabilitation.  That is not how a § 524(g) trust is supposed to work—and the fact that the trust is a limited fund of J&J's own making (and which J&J makes no promises to replenish) gives rise to the concern that it will "hold insufficient funds to pay all allowed claims against it."[139]  As courts have noted, due to the long latency periods involved, asbestos trusts are required to last for decades.[140]  Because

---

[137]  *See* 140 Cong. Rec. S4521-01, S4523, 1994 WL 139961 (statement of Senator Graham).

[138]  *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1073 (5th Cir. 1986).

[139]  *Combustion Eng'g, Inc.*, 391 F.3d at 248 n.70.

[140]  *See Flintkote*, 486 B.R. at 130 (noting potential for forty-year asbestos trusts); *Quigley*, 437 B.R. at 141 (same).

the proposed trust at the center of the Plan does not satisfy the express requirements and underlying purpose of § 524(g) of the Code, this Plan cannot be confirmed.

        4.     <u>The Debtor Cannot Show That It Would Be Unable to Pay Futures Outside of Bankruptcy</u>

In addition to the above requirements, Congress also required that a debtor establish that "pursuit of such demands [the talc liabilities] outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands."[141] Here, there has been no showing—and given J&J's AAA-rating, even in the face of its talc liabilities, there can be no showing—that future demands will be any worse off outside of bankruptcy. Indeed, both LTL I and LTL II were dismissed for lack of financial distress—because there was no question that there was sufficient funding to pay future claims outside of bankruptcy.[142] To the extent there is any doubt (and there is not), such risk was artificially created by J&J. And, outside of bankruptcy without a channeling injunction, J&J would itself remain a defendant and be capable of satisfying future demands.

**C. Confirmation Must Be Denied Because the Proposed Plan Impermissibly Releases Non-Debtor Third Parties Under § 524(g)**

        1.     <u>Legal Standard Under § 524(g)(4)(A)(ii)</u>

As set forth above, Congress created § 524(g) to facilitate the reorganization of companies with intractable asbestos liabilities by channeling those claims to a trust under a confirmed plan, thereby allowing the debtor to emerge from bankruptcy as an economically viable concern.[143] In connection with such a trust, § 524(g)(4)(A)(ii) permits injunctions against third parties in certain narrowly defined situations. First, the third party must be "identifiable from the terms of such

---

[141]  11 U.S.C. § 524(g)(2)(B)(ii)(III).

[142]  *See, e.g.*, *LTL Mgmt.*, 64 F.4th at 109.

[143]  *See generally Humana*, 584 B.R. at 666-67.

injunction" and must be "alleged to be directly or indirectly liable for the conduct of, or claims against, or demands on the debtor."[144]  Second, the third party's aforementioned liability must "arise by reason of" four specific situations, including:

> (I)    the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;
>
> (II)   the third party's involvement in the management of the debtor or a predecessor in interest of the debtor. . .
>
> (III)  the third party's provision of insurance to the debtor or a related party; or
>
> (IV)   the third party's involvement in a transaction changing the corporate structure . . . of the debtor or a related party. . . .[145]

Courts designate these two requirements, respectively, as the "derivative liability" and "statutory relationship" requirements.[146]

The derivative liability requirement means that a third-party injunction under § 524(g) cannot prevent plaintiffs from seeking to hold a non-debtor third party accountable for its independent tortious conduct.[147]  While the fact that the third party has engaged in some wrongdoing does not necessarily make its tortious conduct independent of the debtor, neither does the fact that the debtor's product caused the injury always mean that the third party's liability is derivative.[148]

---

[144]   11 U.S.C. § 524(g)(4)(A)(ii).

[145]   11 U.S.C. § 524(g)(4)(A)(ii)(I)–(IV).

[146]   *See Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co.)*, 13 F.4th 279, 284 (3d Cir. 2021).

[147]   *See Combustion Eng'g*, 391 F.3d at 236 ("As both the plain language of the statute and its legislative history make clear, § 524(g) provides no specific authority to extend a channeling injunction to include third-party actions against non-debtors where the liability alleged is not derivative of the debtor."); *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 147 (2009) (§ 524 was "not intended to reach non-derivative claims").

[148]   *See W.R. Grace*, 900 F.3d at 136-37 (explaining that cases in which the debtor's product is incidental, such as where a piece of building material containing asbestos struck a pedestrian and caused injury, do not render the third party's conduct derivative of the debtor).

Instead, "[t]he proper inquiry is to review the law applicable to the claims being raised against the third party (and when necessary to interpret state law) to determine whether the third-party's liability is wholly separate from the debtor's liability or instead depends on it."[149]   A court must determine what the relevant law demands for liability to decide whether the third party's claims are derivative of claims against the debtor, but this determination does not require a court to delve into the merits of any claims; rather, courts take a plaintiff's allegations on their face.[150]

To meet the statutory relationship requirement, a third party must demonstrate that its liability arises "by reason of" four carefully defined relationships.[151]   Courts addressing this requirement have concluded that "by reason of" requires that the third party's liability must arise as the legal consequence of one of the four listed relationships, not that one of the four relationship was a but-for cause for the liability.[152]

For example, in *Quigley*, the Second Circuit determined that third party Pfizer's "apparent manufacturer liability" did not arise as a legal consequence of its ownership of the debtor.[153]   Though Pfizer's "name, logo, and trademark" appeared on the debtor's asbestos-containing product, the Second Circuit agreed with the district court that Pfizer's ownership interest in the

---

[149]   *Id.* at 137.

[150]   *Id.*

[151]   11 U.S.C. § 524(g)(4)(A)(ii)(I)–(IV).

[152]   *See Quigley Co. v. Law Offices of Peter G. Angelos (In re Quigley Co.)*, 676 F.3d 45, 60-62 (2d Cir. 2012) (explaining that the four identified situations correspond to relationships that may trigger legal liability and thus the liability must arise as a legal consequence of one of those situations); *Humana*, 584 B.R. at 667 (explaining that the "third party's alleged liability arises as a legal consequence of one of the four relationships between the debtor and the third party enumerated in 11 U.S.C. § 524(g)(4)(A)(ii).").

[153]   676 F.3d at 47, 62.

debtor was "legally irrelevant" to the claims at issue.[154]  Therefore, the Second Circuit concluded that the channeling injunction did not enjoin those claims.[155]

  2. <u>Johnson & Johnson Is Not Entitled to a Third-Party Release Under § 524(g) Because the Plan Improperly Shields It from its Independent Liability.</u>

  The Plan is not confirmable because, as presently formulated, it would improperly release J&J from claims that arise from its own independent tort liability.  After all, J&J created and manufactured talc-based Johnson's Baby Powder for generations before, by virtue of a corporate restructuring in 1979, the manufacture of the product transferred to Old JJCI.   But even after the restructuring in 1979, J&J continued to play unique roles in the manufacture, distribution, and advertising of talc-based products, and, as juries and courts on appeal have found, incurred separate liability for its role.[156]

  Section 524(g) requires *allegations* that the third party is "directly or indirectly liable for the conduct, claims against, or demands on, the debtor to the extent such alleged liability of such third party arises *by reason of*" the four specified situations involving the third party's relationship with the Debtor.[157]   Allegations raised against J&J include defective manufacture and design, negligent misrepresentation, fraud, violation of consumer protection laws, fraudulent concealment, and loss of consortium—for each of which J&J bears independent responsibility.  Indeed, juries have already found J&J liable independently from Old JJCI, New JJCI, and later LTL for its role in manufacturing, advertising, and distributing talc products.  Those allegations are not seeking to hold J&J liable *by reason of* any of the § 524(g)(4)(A)(ii) situations—or even by reason of the

---

[154]  *Id.* at 60-62.

[155]  *Id.* at 62.

[156]  The Coalition incorporates by reference as if set forth fully herein the facts and legal arguments set forth in its Supplemental Brief.

[157]  11 U.S.C. § 524(g)(4)(A)(ii) (emphasis added).

Debtor's relationship with J&J.  The Debtor has it backward—the entity with the primary liability in the MDL Complaint and many other lawsuits is J&J.  Only by virtue of a series of intra-company indemnity agreements, and two divisive mergers, is J&J able to argue that the Debtor is "responsible" for talc claims.  J&J does not need the protections of § 524(g) because *it* is being held responsible for the conduct of, claims against or demands on the Debtor—*it is the other way around*.

Despite these allegations and jury verdicts, the Plan does not exclude J&J's independent liability for its role in talc-based products.  Rather, the Plan defines "Channeled Talc Personal Injury Claims" as "*all* Talc Personal Injury Claims that are not Defense Cost Claims, including (a) Ovarian/ Gynecological Talc Personal Injury Claims and (b) Other Disease Talc Personal Injury Claims."[158]  Further, the definition of "Talc Personal Injury Claim" does not include any exclusions for claims that assert that a Protected Party is liable independently of the debtor.[159] Therefore, because the Plan improperly includes claims for which a Protected Party is (and repeatedly has been found to be) independently liable, it does not meet the requirements of § 524(g)(4)(A)(ii).

This overbreadth resembles, and even surpasses, that found to be impermissible in *In re Pittsburgh Corning Corp.*[160]  There, the court determined that the plan included "nonderivative, independent claims" of third parties "that have nothing to do with [the debtor]" and so refused to confirm the plan.[161]  The claims were defined as:

> Any Asbestos PI Trust Claims based on exposure to an asbestos containing
> product manufactured, marketed, sold or distributed by any [Debtor]

---

[158]   Plan, at § 1.1.26.

[159]   Plan, at § 1.1.147.

[160]   417 B.R. 289, 293, 310 (Bankr. W.D. Pa. 2006).

[161]   *Id.* at 312.

> Entity for which any [Debtor] Entity has direct or indirect liability. The [Debtor] Fund Claims do not include any claims for damages based on exposure to Unibestos or any other asbestos- containing product manufactured, marketed or sold by [a third party seeking to be released].[162]

Protected parties were defined to include two third parties and all their past, present, and future employees, consultants, attorneys, and others.[163]  Even though the plan in *Pittsburgh Corning* (unlike here) contained the appropriate statutory direct/indirect claim language, the court concluded that the language in the plan did not comport with the statute because it could conceivably include claims for which third parties were independently liable.[164]  Here, where the Plan does not even include the appropriate direct/indirect statutory language, the Plan is even more patently overbroad and impermissible.

3.    <u>Kenvue Is Not Entitled to a Third-Party Release Under § 524(g) Because It Is Directly Liable as a Successor to Old JJCI.</u>

Kenvue also is (and has been found to be) independently liable for talc-related claims under the equitable remedy of successor liability, and so may not be enjoined under § 524(g)(4)(A)(ii).  Successor liability is an equitable remedy or theory of liability that renders a successor liable "when the successor may be considered a mere continuation of the predecessor" or "when the transaction was fraudulent."[165]  Here, Kenvue can be considered a "mere continuation" of Old

---

[162]  *Id.*

[163]  *Id.*

[164]  *Id.*; *see also In re Pittsburgh Corning Corp.*, 453 B.R. 570, 594 (Bankr. W.D. Pa. 2011) (further explaining that the definition of "Asbestos Personal Injury Claim" is too broad because it includes independent claims).

[165]  *Mozingo v. Correct Manufacturing Corp.*, 752 F.2d 168, 174 (5th Cir. 1985); *see also In re Emoral, Inc.*, 740 F.3d 875, 879-80 (3d Cir. 2014) (noting the same under New Jersey law).

JJCI, or alternatively, party to a fraudulent transaction.  Recently, an Illinois jury found Kenvue responsible for 70% of the damages alleged based on this theory.[166]

Significantly, the Debtor and its predecessor, LTL, do not have claims against Kenvue based on the successor liability doctrine, because neither the Debtor nor LLT is or was a direct or indirect successor to Kenvue.  Rather, Kenvue is liable to claimants because it is the mere continuation of Old JJCI.  Therefore, Kenvue is independently liable and is not eligible for a third-party discharge under § 524(g)(4)(A)(ii).

Nor should it be surprising that § 524(g) does not shield all claims against J&J and Kenvue (which is not an affiliate of J&J or the Debtor).  Congress instituted § 524(g) after the trust and injunction in the *Johns-Manville* case, where the trust was funded partially with 80% of the reorganized debtor's stock.[167]  Thus, in *Johns-Manville*, the value of the reorganized debtor depended on being shielded from future asbestos liability.  Here, where neither J&J nor Kenvue is in financial distress, but where both are nonetheless attempting to shield themselves from any future asbestos liability, it is entirely expected that § 524(g) is a poor fit.

4.    Section 524(g) Provides No Basis for Releasing Retailers and Other Protected Parties From their Claims.

As explained, § 524(g) provides four relationships between a debtor and a third party pursuant to which asbestos claims against the third party may be enjoined.  The first subsection of the statute refers to situations in which the third party has an ownership interest in the debtor, a

---

[166]  *See* Forbes.com, *Court Orders Johnson & Johnson and Kenvue to Pay $45 Million in Talcum Baby Powder Lawsuit*, https://www.forbes.com/sites/caileygleeson/2024/04/20/court-orders-johnson--johnson-and-kenvue-to-pay-45-million-in-talcum-baby-powder-lawsuit/ (last visited January 24, 2025).

[167]  *See* H.R. Rep. No. 103-845, at 40.

past or present affiliate of the debtor, or a predecessor in interest of the debtor.[168]  None of the retailers or other Protected Parties are alleged to have any such interest.

The second subsection of the statute contemplates situations in which the third party was involved in the management of a debtor or a predecessor in interest of the debtor, or service as an officer, director, or employee of the debtor or a related party.[169]  Similarly, none of these apply to the Retailers or Protected Parties.

The third section does not apply because none of the retailers are alleged to have provided insurance to the Debtor or a related party.[170]  If anything, by seeking to indemnify the retailers, J&J is insuring them, not the other way around.

Finally, the fourth subsection covers circumstances in which the third party was involved in a transaction changing the debtor's corporate structure, or that of a related party, or was involved in a transaction affecting the financial condition of the debtor or a related party.  11 U.S.C. § 524(g)(4)(A)(ii)(IV).  This does not apply to any of the retailers sought to be protected under § 524(g).  By seeking to immunize thousands of Protected Parties, including the retailers, with absolutely zero basis in the text of § 524(g), the Plan is patently unconfirmable.[171]

---

[168]   11 U.S.C. § 524(g)(4)(A)(ii)(I).

[169]   11 U.S.C. § 524(g)(4)(A)(ii)(II).

[170]   11 U.S.C. § 524(g)(4)(A)(ii)(III).

[171]   Further, the Plan is unconfirmable because a channeling order and injunction under § 524(g)(1)(A) requires, inter alia, that the injunction issue in connection with an order "confirming a plan of reorganization." 11 U.S.C. § 524(g)(1)(A).  Chapter 11 draws a distinction between a plan of reorganization and a plan of liquidation. *See* 11 U.S.C. § 1141(d)(1).  When a corporate debtor is liquidated and ceases to engage in business, it does not reorganize and is not eligible for a discharge. *See* 11 U.S.C. § 1141(d)(3); 11 U.S.C. § 727(a)(1).

## II.   The Nonconsensual Releases in the Plan Are Not Otherwise Permissible

### A.   Outside of § 524(g), Consent Is Required for a Third-Party Non-debtor Release

For over thirty years, the Fifth Circuit has held that, under § 524(e), a discharge of the debtor affects only the debtor and not third parties.[172]   As such, binding Fifth Circuit precedent "foreclose[s] non-consensual non-debtor releases and permanent injunctions."[173]   In *Purdue*, the Supreme Court sided with the Fifth Circuit.[174]   The Court concluded that "nothing in [§ 1123] . . . authorizes a plan to extinguish claims against third parties . . . without the consent of the affected claimants[.]"[175]

Accordingly, outside the § 524(g) context (which itself does not permit the Plan for the reasons set forth above in Part I), the Fifth Circuit recognizes only *consensual* third-party releases.[176]   Thus, as this Court has recognized, the Supreme Court's holding in *Purdue*, that the Bankruptcy Code does not "authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants," did not change the law in this Circuit.[177]   Certainly, nothing in *Purdue* undermined or loosened the Fifth Circuit's absolute prohibition on non-consensual third-party releases, even in cases claimed to be "full-pay" cases.

---

[172]   *See Houston v. Edgeworth (In re Edgeworth)*, 993 F.2d 51, 53 (5th Cir. 1993) ("Section 524(e) specifies that the debt still exists and can be collected from any other entity that might be liable."); *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760 (5th Cir. 1995) (recognizing that, because § 524(e) prohibits non-debtors from being discharged, "we must overturn a § 105 injunction if it effectively discharges a nondebtor"); *Bank of N.Y. Tr. Co., NA v. Unsecured Creditors Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252-53 (5th Cir. 2009) (noting that "[t]he fresh start § 524(e) provides to debtors is not intended" to release non-debtors from negligent conduct).

[173]   *Ad Hoc. Grp. Of Vitro Noteholders v. Vitro, S.A.B. de CV (In re Vitro S.A.B. de CV)*, 701 F.3d 1031, 1061 (5th Cir. 2012) (quoting *In re Pac. Lumber*, 584 F.3d at 252).

[174]   603 U.S. 204 (2024).

[175]   603 U.S. at 216.

[176]   *See In re Robertshaw U.S. Holding Corp.*, 662 B.R. 300, 322 (Bankr. S.D. Tex. 2024) (citing *Zale Corp.*, 62 F.3d at 746; *In re Pac. Lumber Co.*, 584 F.3d at 299).

[177]   *See Robertshaw*, 662 B.R. at 322.

Thus, even though the Supreme Court noted in *Purdue* that it was not deciding the constitutionality of non-consensual third-party releases in the context of a full-payment plan,[178] this exception—which has never been recognized in this Circuit—does not apply here.[179]

Although the Fifth Circuit has not precisely defined what constitutes consent in this context, the commonly applied methods of obtaining consent were not employed—no ballot distributed in connection with the pre-petition solicitation process included the ability to opt in or out of the proposed releases. Alternatively, bankruptcy courts within the circuit have treated a claimant who challenged the plan and did not vote for it as not consenting to a release, while a claimant who voted in favor of the plan and received consideration for the release consented to it.[180] At a minimum, by moving to dismiss the above-captioned case,[181] objecting to the Debtor's Disclosure Statement,[182] and the Debtor's motion to confirm the results of voting,[183] as well as submitting Master Ballots that overwhelmingly voted against the Plan and by filing the instant objection to the proposed Plan and release, the clients of Coalition member firms have *not* consented to any release. Thus, under unambiguous Fifth Circuit precedent, the Court may not confirm the third-party release in the proposed Plan.

---

[178] *Purdue*, 603 U.S. at 226.

[179] *See* *Cole v. Nabors Corp. Servs., Inc. (In re CJ Holding Co.),* 597 B.R. 597, 608 (S.D. Tex. 2019) ("The Fifth Circuit has concluded that a bankruptcy court may not confirm a plan that provides 'non-consensual non-debtor releases.'") (quoting *Vitro S.A.B. de CV*, 701 F.3d at 1061-62) (further citation omitted); *see also In re Wool Growers Cent. Storage Co.*, 371 B.R. 371 B.R. 768, 776. (Bankr. N.D. Tex. 2007) ("The Fifth Circuit has held that a nondebtor release violates section 524(e) when the affected creditor timely objects to the provision.") (citing *Zale Corp.*, 62 F.3d at 761).

[180] *See CJ Holding Co.*, 597 B.R. at 608-09 (first citing *In re Pac. Lumber*, 584 F.3d at 236-39, then citing *In re Bigler LP*, 442 B.R. 537, 546 (Bankr. S.D. Tex. 2024)).

[181] Dkt. No. 44.

[182] Dkt. No. 268.

[183] Dkt. No. 421.

### B.  There Is No Full-Pay Exception to Nonconsensual Third-Party Releases

While the Fifth Circuit has never recognized supposedly "full payment" plans as an exception to the prohibition on non-consensual third-party bankruptcy releases, some courts had considered this before *Purdue* as *one factor* to be considered among others in whether to permit nonconsensual third-party releases in a plan.[184]

In *Purdue*, the Supreme Court explicitly reserved the question whether full-payment plans changed the analysis and outcome as to whether to permit nonconsensual third-party releases under a plan.[185]  Specifically, the Court observed: "Nor do we have occasion today to express a view on what qualifies as a consensual release or pass on a plan that provides for the full satisfaction of claims against a third-party nondebtor."[186]  It remains to be seen, post-*Purdue*, whether justifying non-consensual releases on the basis that claimants are fully paid "is even a thing."[187]  Even if the Plan did fully pay every one of the tens of thousands of contingent unliquidated tort claims against the non-debtors—something the Debtor cannot show—there is nothing in Fifth Circuit law that permits the Debtor to force those claimants to release non-debtors without each individual claimant's consent.

### C.  The Plan Does Not Fully Compensate Ovarian Cancer Claims

Even if the Court were to consider whether the proposed plan "fully" satisfies all claims (which is not required or suggested by Fifth Circuit precedent), and were to afford "full payment"

---

[184]  *See, e.g.*,  *Opt-Out Lenders v. Millennium Lab Holdings II, LLC (In re Millennium Lab Holdings II, LLC)*, 591 B.R. 559, 584 (D. Del. 2018) (identifying "'provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction'" as one of five factors to be considered) (quoting *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)), *aff'd*, 945 F.3d 126 (3d Cir. 2019). Even courts that considered these factors did not see them as "controlling" but rather as "helpful guideposts."  *Id.* (*citing Deutsche Bank A.G. v. Metromedia Fiber Network, Inc., (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d Cir. 2005)).

[185]  *See* 603 U.S. at 226.

[186]  *Id*.

[187]  *In re Smallhold*, Case No. 24-10267 (CTG), 2024 WL 4296938, at *14 (Bankr. D. Del. Sept. 25, 2024).

decisive weight, the Plan would *not* make tens of thousands of contingent unliquidated Ovarian Cancer Claims whole. **First**, the Plan relies exclusively on settlement values, without regard to actual damages awards (including the more than $2 billion award to 22 ovarian cancer claimants in *Ingham*) to determine "full pay." **Second**, the Plan (and the Debtor's expert report submitted in connection with Confirmation) overestimates average recoveries by seriously underestimating the number of ovarian and non-ovarian cancer claims and indirect talc claims. **Third**, by using a point system that is tied to the proposed Trust's available assets, the amount holder of Ovarian Cancer Claims will receive does not reflect the value of their claim, but rather whatever is available in the Trust.

       1.     <u>The Proposed Plan Relies on Settlement Values of Claims Instead of the Actual Damages Incurred by Ovarian Cancer Victims</u>

Class 4 Ovarian Cancer Claim holders in this case have contingent unliquidated claims, which in general are "personal injury or wrongful death tort claim[s]" that must be tried to a jury.[188] The Debtor, through its expert, Charles Mullin ("<u>Mullin</u>"), seeks to define "paid in full" as payments "██████████████████████████████████████████████████████" and ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████[189] Those settlement values reflect a substantial discount to the damages alleged by the average ovarian cancer victim (as will be established at the omnibus hearing), and therefore even under Debtor's expert's rubric, do not fully compensate Class 4 Ovarian Cancer Claims.

---

[188]  28 U.S.C. § 1411.

[189]  Lawson Decl., Ex. 20 (Expert Report of Charles Mullin, PhD, dated January 7, 2025), ¶ 7, ¶ 38, ¶ 57.

2.      The Proposed Plan Overestimates the Average Recovery of Ovarian Cancer Claimants and Seriously Underestimates the Number of Ovarian and Non-Ovarian Gynecological Cancer Claimants

Mullin's report assumes that Ovarian Cancer Claims will ████████████████ ████████████████████████████████ [190] However, the Coalition's expert, Yvette Austin ("Austin"), using the Debtor's own information, estimates in her report that in an *optimistic* scenario, using simplified assumptions designed to *overstate* the value received, that current Ovarian Cancer Claims would receive only an average of ████████ well below the lower end of the Debtor's estimate.[191]  Moreover, Mullin assumes that ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ Without an estimation of these expenses, the amount available to pay Ovarian Cancer Claims under the Trust is speculative.

Further, Mullin assumes that there are currently between ████████████ compensable Ovarian Cancer Claims and that pending ovarian cancer claimants will receive between ██████ ████████████████ These assumptions are likewise flawed.  Austin's report indicates that the number of currently pending Ovarian Cancer Claims could be ████████████ a number consistent with Mullin's report after the latter's ████████████████████████ Further, Mullin makes a number of untenable predictions, such as ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ But there is no reason to conclude that



---

[190]   Lawson Decl., Ex. 20 (Expert Report of Charles Mullin, PhD, dated January 7, 2025), ¶ 133.

[191]   Lawson Decl., Ex. 21 (Expert Report of Yvette R. Austin, dated January 7, 2025), ¶ 54.

50

the ███████████████████████████████████████████████████

████████████████████████████████

Besides underestimating future Ovarian Cancer Claims, the Debtor's supposed showing that the Plan is "full pay" is premised on an underestimate of the number of non-ovarian Gynecological Claims.  First, unlike Ovarian Cancer Claims, Gynecological Claims are relatively recent.  Second, there is a relatively low threshold to receive a payment for a Gynecological Claim under the Quickpay Review Process, which would likely lead to an increase in the number of filed claims.  Third, roughly four times as many women will be diagnosed with non-ovarian gynecological cancer as will be diagnosed with ovarian cancer according to estimated incidence rates for 2024.  As a result, these claims are likely to skyrocket in the future and further strain limited resources that would otherwise pay Ovarian Cancer Claims.  Because the Debtor's arguments in favor of the Plan seriously underestimate the number of ovarian and non-ovarian gynecological cancer claimants, does not even address Indirect Talc Personal Injury Claims, and overestimates the likely recovery for Ovarian Cancer Claims, the Plan does not provide full value to holders of Ovarian Cancer Claims.

3.  The Discretionary Points System Devised for Ovarian Cancer Claims Is Arbitrary and Reflects the Trust's Available Assets, Not the Value of Ovarian Tort Claims

The points system introduced only for ovarian cancer claimants is arbitrary and is designed to adjust the value of Ovarian Cancer Claims to the assets the Debtor allocates to pay those claims. Under the Plan, the expected recovery for a holder of an Ovarian Cancer Claim is based on the complex criteria established for the review of such claims under the Expedited Review Process or the Individual Review process.[192]  Both review processes apply multiple factors and assign points

---

[192]  *See* Trust Distribution Procedures, at § 5.3.1.

based on a review of those factors.  Ovarian Cancer Claims are the only claims denominated in points rather than dollars: non-ovarian Gynecological Claims are allocated a fixed amount of $1,500 if they qualify for payment under the Quickpay Review Process.[193]  Thus, ovarian cancer claimants disproportionately bear the risk that the Trust will not have sufficient assets to pay their claims.

This disproportionate risk is exacerbated by the value of these points, defined not in terms of the value of the claims but in terms of the Trust's assets.  The beginning value of a point is defined "conservatively" so that "[u]nder no circumstances shall the Trustee seek to set the Initial Cash Value of a Point such that it would result in the Trust having a present or projected negative balance at any time."[194]  The value of the point is reviewed at least annually and is likely to fluctuate over the course of the Trust.  When the value of a point is redetermined, the balance of the Trust's assets will be determined by the Reorganized Debtor's contributions to the Trust, any investment gains or losses on those assets, and distributions that have already occurred.  Thus, rather than the Trust's assets being adjusted to reflect the value of the claims against it, the Plan proposes the reverse: to value the ovarian cancer claims in terms of the assets available.  The inherent circularity is unmistakable.

Moreover, the points system is subject to the discretion of the Claims Administrator and the Trustee, which fact further reinforces the conclusion that the "value" ovarian cancer claimants will receive is what the Trust decides to pay.  For example, during the initial review process, a Claims Administrator assigns a claimant an initial point value for the first of the seven characteristics considered.  But this initial value is subject to reduction—never an increase—based

---

[193]  *Id.* § 5.5.2.

[194]  *Id.* § 7.1.2.

on consideration of each of the remaining factors employing undefined discretion.[195]  For example, based on "atypical perineal use," the point value could be reduced by as much as 100%, based on the Trustee's discretion with the consent of the TAC and FCR.[196]  Similarly, if the Trustee and other parties do not agree on any increase in points following the Individual Review Process, the Trustee has "sole discretion" to decide the amount of any increase in points for a claim, without any criteria to guide the Trustee.[197]  As the FCR's counsel correctly recognized, this is "a tremendous amount of discretion for one person that could lead to a significant difference in the amount awarded to any individual claimant."[198]  And this is after ovarian cancer claimants have paid $1,000 for individual review.[199]

In sum, even if the Court were to consider whether full-payment plans justify nonconsensual releases post-*Purdue*—not recognized in Fifth Circuit or any other precedent—the evidence shows that ovarian cancer claimants will receive nothing close to the full value of their claims.  On the contrary—the proposed Plan overestimates ovarian cancer claimants' likely recovery, underestimates the number of pending and future claimants, and cloaks ovarian cancer claimants' recovery in a discretionary, self-referential points system designed to minimize the value of their claims.

### D.  The Lack of Opt-Out Rights Means There Is No Consent

Consent requires, at a minimum, the opportunity to opt out.[200]  To the extent that the impacted claimants have not been provided the *specific* opportunity (in the ballot or otherwise) to

---

[195]  *See* Trust Distribution Procedures, at §§ 5.3.2-5.3.5.

[196]  *See id.* § 5.3.4(C).

[197]  *See id.* § 4.6.5(B).

[198]  Lawson Decl., Ex. 19 (Transcript of December 10, 2024 Hearing), 57:18-20.

[199]  *See id.* § 4.6.5(A).

[200]  *See Robertshaw*, 662 B.R. at 323 (permitting releases where creditors were able to opt out).

opt out of the releases (and the record is crystal clear claimants have not had that opportunity), no such release may be issued.[201]  As set forth above, the Plan channels *all* Direct and Indirect Talc Personal Injury Claims against the Debtor and Protected Parties into the Trust, and offers no opportunity for claimants to consent to the accompanying releases that would be imposed by virtue of the Plan being confirmed.

Though the Debtor is also requesting that claimants execute "voluntary" releases in the form of an "Acceptance and Release" in connection with their participation in the Trust, these cannot make the Plan's releases consensual retroactively.  Should the Plan be confirmed, the Plan's releases would be effective regardless of whether a claimant executes an Acceptance and Release. But even then, the releases sought through the Acceptance and Release submissions are not voluntary in any meaningful sense.  To the contrary, a claimant must execute the release to participate in recoveries under the Trust.  A Direct Claimant therefore has no choice but to execute the release to have any recovery on her claim.  The Plan therefore effectively eliminates consent by providing no meaningful opportunity for a claimant to opt out.

## III.   The Plan Was Not Proposed in Good Faith Under § 1129(a)(3)

### A.  Good Faith Standards under §§ 1112 and 1129

Section 1129(a)(3) requires that "a plan has been proposed in good faith and not by any means forbidden by law" to be confirmed.[202]  Similarly, § 1112 allows a court to convert or dismiss a Chapter 11 case for "cause," which courts have routinely interpreted to include a lack of good

---

[201]   *Cf. In re Boy Scouts of Am.*, 650 B.R. 87, 116-20 (D. Del. 2023) (concluding that bankruptcy court had not erred in finding that claimants would be paid in full based on testimony of valuation expert, as would be relevant to provision of "substantial consideration" in exchange for third-party release under the Third Circuit's then-release standard).

[202]   11 U.S.C. § 1129(a)(3).

faith in filing.[203]  The standards for determining good faith under § 1112 and § 1123(a)(4) overlap

significantly.  For example, one court concluded that a finding that a plan was not filed in good

faith "is also cause for conversion" under § 1112(b).[204]  In the context of a discussion of dismissal

for lack of good faith under § 1112, the *Delta AG Group* court cited *Matter of T-H New Orleans,*

*L.P.*,[205] a case considering whether a plan was proposed in good faith under § 1123(a)(4), for the

proposition that "a determination of 'cause' requires a consideration of the totality of

circumstances."[206]  As a result, a finding of prepetition bad faith weighs against plan confirmation

and proposing a plan in bad faith similarly weighs in favor of dismissal or conversion.

Other circuits have also recognized a relationship between the good faith standards in

§ 1123(a)(4) and § 1112.  For example, In *In re Integrated Telecom Express, Inc.*,[207] the Court

considered whether the bankruptcy petition of a financially sound debtor that filed for bankruptcy

solely to reduce a landlord's claim from $26 million to $4.3 million, and whose plan of liquidation

had been confirmed, was filed in good faith.[208]  The Third Circuit concluded that neither the

dissolution of the debtor nor the distribution of its assets to creditors was a valid bankruptcy

purpose.[209]  Rather, "[a]ntecedent to any such distribution is an inquiry whether the petition and

---

[203]  *See, e.g.*, *In re M.A.R. Designs & Constr., Inc.*, 653 B.R. 843, 855 (Bankr. S.D. Tex. 2023) ("Although section 1112(b)(4) does not specifically enumerate bad-faith conduct as cause for conversion, '[b]ankruptcy courts nevertheless routinely treat dismissal for . . . bad faith conduct as implicitly authorized by the words for cause.'") (quoting *In re Zamora-Quezada*, 622 B.R. 865, 879 (Bankr. S.D. Tex. 2017)) (further citation omitted)

[204]  *In re Double H Transp. LLC*, 603 F. Supp. 3d 468, 479 (W.D. Tex. 2022) (citing *In re Delta AG Grp.*, 596 B.R. 186, 194 (Bankr. W.D. La. 2019)).

[205]  *Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. (In re T-H New Orleans Ltd.)*, 116 F.3d 790, 801 (5th Cir. 1997)  116 F.3d 790, 802 (5th Cir. 1997).

[206]  596 B.R. at 194; *see also In re Antelope Techs.*, 431 F. App'x 272, 273-74 (5th Cir. 2011) (refusing to apply equitable mootness to a confirmed plan because the petition was not filed in good faith where the bankruptcy petition served as a tactic to gain control over claims against insiders).

[207]  384 F.3d 108 (3d Cir. 2004).

[208]  *Id.* at 116.

[209]  *Id.* at 126.

the plan are filed in good faith, i.e., whether they serve a valid bankruptcy purpose."[210]  Rewarding equity holders with company assets is not a goal of the Bankruptcy Code, nor can the Bankruptcy Code "be used to effectuate a liquidation that has no hope of maximizing the value of the company."[211]  Rather than taking advantage of some provision in the Bankruptcy Code, a would-be debtor "must seek to create or preserve some value that would otherwise be lost—not merely distributed to a different stakeholder—outside of bankruptcy."[212]

### B.  The Debtor's Filing Does Not Serve a Bankruptcy Purpose

The Debtor's filing this petition in bad faith thus strongly cautions against confirmation. The Fifth Circuit has clarified that, as with the filing of a bankruptcy petition, a plan must also serve a proper bankruptcy purpose.

> As we suggested in *Sandy Ridge* [*Dev. Corp. v. La. Nat'l Bank*, 881 F.2d 1346 (5th Cir. 1989)] a plan proponent's motives and methods for achieving compliance with the voting requirement of § 1129(a)(10) must be scrutinized, if at all, under the rubric of § 1129(a)(3), which imposes on a plan proponent a duty to propose its plan "in good faith and not by any means forbidden by law." Good faith should be evaluated "in light of the totality of the circumstances surrounding establishment of [the] plan," mindful of the purposes underlying the Bankruptcy Code. Generally, "[w]here [a] plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied.[213]

Not only did the Debtor file its bankruptcy petition in bad faith, but the Debtor has also proposed the Plan in bad faith.  First, the Plan does not maximize value for creditors but is instead

---

[210]  *Id.*

[211]  *Id.*

[212]  *Id.* at 129.  *See also In re Brotby*, 303 B.R. 177, 197-98 (B.A.P. 9th Cir. 2003) (determining that a debtor that accessed Chapter 11 "solely as a litigation tactic" may not have filed a plan in good faith under § 1123(a)(4) and remanding for further factual findings by the Bankruptcy Court).

[213]  *In re Vill. at Camp Bowie I, L.P.,* 710 F.3d 239, 247 (5th Cir. 2013) (footnotes and references omitted).  The Coalition incorporates by reference its arguments in support of its motion to dismiss [Dkt. No. 44].  Moreover, as detailed in the Coalition's arguments in support of its motion to transfer venue [Dkt. No. 43] and as will be shown at confirmation, the Debtor's intentional evasion of controlling law in the Court that has already spent years hearing Debtor's prior two bankruptcies further demonstrates its bad faith.

a litigation tactic designed to suppress the value of valid claims. As in *Antelope Technologies* and *Integrated Telecom Express*, the instant bankruptcy petition serves as a way for J&J and Kenvue to thwart legitimate tort claims based on their talc products. But whereas the claims in *Antelope Technologies* and *Integrated Telecom Express* belonged to the estate, here J&J seeks to control claims that do not belong to the estate, but instead represent independent claims from which J&J (and its current and former affiliates and other protected parties) nevertheless seek to be shielded. Nor is there any evidence suggesting that the Trust maximizes the assets available to talc claimants. In fact, the opposite is true—J&J and Kenvue have manufactured an arbitrary limit to their own liability to the detriment of such claimants.

Indeed, prior to filing the instant bankruptcy, and refusing to increase the amount to be paid to talc claimants in its prior bankruptcies, J&J insisted that it would not pay more. Yet, magically, ongoing negotiations with law firms caused that number to increase by over one billion dollars. There is no reason to think that the current limit represents the best value creditors can attain—especially where the current bankruptcy has been manufactured to limit such liability. Further, unlike the debtor in *Johns-Manville*, the Debtor here faces none of the burdens of bankruptcy— it is not an operating entity, has no vendors, lenders or equity interests to answer to, and has no productive assets that benefit from reorganization.

### C. The Manipulation of the Voting Process and Classification Scheme Were Solely Intended to Create the Appearance of an Impaired Accepting Class

As noted above, the specific means by which a debtor obtains an impaired accepting class in compliance with § 1129(a)(10) is also relevant to the good faith determination. A debtor's solicitation procedures and a plan's structure must reflect an intent to craft an "orderly process"

that "compensate[s] asbestos claims fairly,"[214] rather than an attempt at engineering an impaired accepting class.[215]  As the Coalition intends to demonstrate at trial, the specific circumstances of both the pre-petition voting process and the structure of the Plan itself can be explained only as the results of effort that prioritized meeting the voting threshold over any other concern.  As a result, the process and Plan itself cannot be deemed consistent with the aims of the Code.

First, the Debtor has placed two very different types of claims within Class 4—Ovarian Cancer Claims and Gynecological Claims.  As discussed below, the Debtor offers these two groups vastly different treatment for their claims, either violating § 1123(a)(4) (by providing similar claims dissimilar treatment) or § 1122(a) (by putting different claims in the same class).  Relevant here, the Debtor's disparate treatment of these claims betrays the fact that the Debtor does not view the claims as similar.  Putting the claims in different classes would therefore make sense, particularly if the Debtor intended to treat them dissimilarly.  To be sure, because of the differences between the claims themselves and in the treatment being offered to those claims, separate classification for the claims may well be justified,[216] if not mandated, under the Code.[217]  One might reasonably ask, then: for what purpose were these different claims with different treatment placed together?

Against this backdrop, it must also be noted that the Debtor provided a specific incentive to holders of Gynecological Claims that had, before the planning for this case, been withheld: a

---

[214]  *In re J T Thorpe Co.*, 308 B.R. 782, 787 (Bankr. S.D. Tex. 2003).

[215]  *See Robertshaw*, 662 B.R. at 318 (noting that classification under a plan "may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims").

[216]  As discussed below, only similarly situated claims can be classified together under § 1122(a).  However, similarly situated claims need not be classified together, provided that the separation of such claims is supported by a business justification.  *See Robertshaw*, 662 B.R. at 318.

[217]  Section § 1122, as discussed below, does not permit putting claims in a single class where they are not substantially similar.

promise of compensation, albeit modest, that could be obtained with minimal supporting documentation.

The Coalition submits that, in view of these facts, the Debtor's placement of all claims, ovarian and gynecological alike, is most coherently viewed, not as a way to afford a benefit to Class 4 claimants, but as affording a benefit to the Debtor—namely, a better opportunity of obtaining an accepting class though additional, incentivized members.   In other words, the Debtor's placement of Ovarian Cancer Claims and Gynecological Claims was based on prioritized obtaining an accepting class, rather than prioritizing equality among Class 4 claimants.

This conclusion is bolstered by the second structural issue with the Debtor's voting and solicitation process—the valuing of each claim, regardless of claim type, at one dollar.   As discussed below, this methodology violates § 1126 by undervaluing Ovarian Cancer Claims and overvaluing Gynecological Claims.   But even if this were not the case, the use of this valuation method is of a piece with the idea that the Debtor intended to use Gynecological Claims to bolster the support for its plan.   If these claims and Ovarian Cancer Claims were made equivalent in voting power, any support lacking among more valuable Ovarian Cancer Claims could be made up for by Gynecological Claims.

In response, the Debtor may well assert that its placement of all claimants in one class and with equal voting power could not have been manipulative, because it ultimately did not make a difference to the vote's outcome.   But the argument that manipulation was not ultimately necessary (which the Coalition refutes) does not disprove that manipulation was not the original intent. Moreover, as discussed below, the Debtor does not █████████████████████████████████ ████████████████████████████   and therefore cannot credibly state the its structure was ultimately inconsequential.   Indeed, the Debtor made no efforts to determine whether claimants'

votes were accurately cast and counted.  Accuracy was not what this process was designed to achieve.

In that regard, a third basis exists to glean the Debtor's aim to manufacture the appearance of an accepting class: its heavy scrutiny of "no" votes and limited (if any) scrutiny of "yes" votes. As the Coalition has detailed elsewhere and believes the evidence will show,[218] the Debtor put its thumb on the scale, and even disregarded its own procedures, in an effort to obtain "yes" votes. This much is demonstrated by the fact that it has raised a host of issues in an attempt to discredit the Beasley Allen firm's Master Ballot (with a majority "no" votes), but entirely ignored that the master ballot from SLF that it accepted (with a majority "yes" votes) would have the same, if not more, of those very issues.

Taken together, these facts evidence that the Debtor's voting process and plan prioritize meeting the voting threshold over any proper bankruptcy purpose, warranting rejection of the Plan.

### D.  The Plan Provides for the Debtor and J&J's Ability to Walk Away From the Plan

Further, the Debtor's and its sponsor's, J&J's, carefully-preserved ability to walk away from the Plan *even after* confirmation demonstrates that there is no need for bankruptcy and nothing to reorganize.  Specifically, § 9.12 of the Plan provides the conditions under which the Debtor, with J&J's "consent," are able to "withdraw" the plan after it has been confirmed, without further order from this Court.  The conditions include an appeal of any confirmation order by the United States Trustee or creditor group to the Fifth Circuit.  This walk-away right is an undeniable, implicit recognition of, and means of hedging against, strong Fifth Circuit precedent rejecting equitable mootness with respect to a bad faith bankruptcy.  Having already had two bankruptcy

---

[218]   The Coalition incorporates its motion to reinstate Beasley Allen's Master Ballot and the briefing in support thereof.  Dkt. Nos. 266, 626.

cases dismissed, J&J knows full well the risk that the Fifth Circuit will find this entire bankruptcy and Plan to have been filed in bad faith, and therefore dismiss the case, and there is nothing J&J can do to avoid that other than to give itself the pre-emptive right to walk away before the Fifth Circuit even rules.

## IV.     The Debtor's Right to Revoke the Plan After Confirmation Violates §§ 1141 and 1144

In addition to evidencing the lack of need for the bankruptcy and this Plan, the walk-away rights contained in the Plan also violate §§ 1141 and 1144.  Should the Debtor exercise its ability to withdraw the Plan under this provision, the Plan becomes "null and void."[219]  In effect, then, the Debtor's withdrawal of the Plan under this provision is equivalent to a revocation of a confirmation order.

Any plan that gives a debtor or its funder the ability to walk away after confirmation is illusory, running afoul of § 1141(a).  That section provides that a confirmed plan is binding on both the debtor and its creditors.[220]  Here, however, if any confirmation order is appealed to the Fifth Circuit—irrespective of the issue on appeal—the Debtor can relieve itself of its obligation to perform.  A chapter 11 plan is often said to be a contract between the reorganized debtor and its creditors.  Just as a contract that creates no obligation on one party to perform is illusory, so too is a plan that creates no obligation on a debtor.  Such a plan cannot be deemed consistent with § 1141(a)'s requirement.

Moreover, by allowing the Debtor to revoke the confirmation order unilaterally and on its own terms, the Plan violates § 1144.  Through that section, the Code offers one—and only one— avenue by which a confirmation order may be revoked:  after notice and a hearing, and after a

---

[219]   Plan, at § 9.12.

[220]   11 U.S.C. § 1141(a).

finding that the order was obtained by fraud.[221]   Because the Plan creates an exception to the express limitations on the scope of revocation imposed by § 1144, the Plan cannot be confirmed.

## V.      The Plan Violates §§ 1122(a) and 1123(a)(4)

The Plan either provides *different treatment* to substantially similar claims in the same class, violating § 1123(a)(4), or it has placed *different claims* in the same class, violating § 1122(a). Section 1122 allows a debtor to place claims in the same class only if the claims are "substantially similar" to one another.[222]   Section 1123(a)(4), in turn, requires that those substantially similar claims classified together receive the "same treatment."[223]

Here, the Plan places both "Ovarian Cancer Claims" and "Gynecological Claims" into a single class—Class 4.   Assuming that these claims are appropriately classified together because they are in fact "substantially similar," they must be subject to the same treatment.   They are not. Depending on whether a claim is an Ovarian Cancer Claim or Gynecological Claim, they are subject to entirely discrete payment processes—and, in turn, payment outcomes—despite being in the same class.   The Plan therefore violates § 1123(a)(4).   Alternatively, if this different treatment is somehow justified, it can only be because Ovarian Cancer Claims and Gynecological Claims are not, in fact, substantially similar.   In that case, § 1122(a) requires that the claims be separately

---

[221]  11 U.S.C. § 1144 ("On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud.");   *In re Logan Place Props., Ltd.*, 327 B.R. 811, 815 (Bankr. S.D. Tex. 2005) ("The language 'if and only if' was added to § 1144 in 1984 to emphasize fraud as the exclusive means for revocation . . . Nonetheless, Section 1144 was clear before the 1984 amendment, and seems only more obvious after the addition of 'if and only if.'   The Court finds that a revocation can only occur with a showing of fraud." (citations omitted)); *see also In re Cleveland Imaging & Surgical Hosp. L.L.C.*, Case No., 14-34974, 2022 WL 677459, at *3 (Bankr. S.D. Tex. March 7, 2022) (concluding that the requirements and limitations of § 1144 limit Federal Rule of Civil Procedure 60(d)'s application to confirmation orders).

[222]  11 U.S.C. § 1122(a).

[223]  11 U.S.C. § 1123(a)(4) (requiring that a plan "provide[s] the same treatment for each claim or interest of a particular class, unless the holder . . . agrees to a less favorable treatment").

classified.  Because they are not, the Plan violates § 1122(a).  This same issue also plagues the

Plan's disparate treatment of Indirect Talc Personal Injury Claims.

### A. Ovarian Cancer Claims and Gynecological Claims Are Classified Together But Subject to Different Payment Procedures and Outcomes in Violation of § 1123(a)(4)

Receiving the "same treatment" means that claimants within a single class all have the

"same opportunity" to recover.[224]  Having the same opportunity is a question of process.[225]  If a

debtor puts claim-holders in a single class, § 1123(a)(4) requires that those holder's respective

claims are satisfied on the same terms.[226]

Within the context of a § 524(g) trust, receiving the same treatment means that all claimants

are subject to the same claim review procedures.  In *W.R. Grace*, for example, all claim holders'

claims were valued and ultimately paid based on criteria established in a "claims matrix."[227]  The

matrix organized personal injury claims into separate, delineated categories of diseases related to

asbestos, and assigned a set amount of recovery to each claim.[228]  Though claimants' ultimate

distributions would vary depending on disease type and severity, because all claimants were able

---

[224]  *See In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013).

[225]  *See id.* ("[A] plan that 'subjects all members of the same class to the same process for claim payment' is 'sufficient to satisfy the requirements of Section 1123(a)(4)'") (quoting *In re Cent. Med. Ctr., Inc.*, 122 B.R. 568, 575 (Bankr. E.D. Mo. 1990)).

[226]  Payment terms may take on a number of different forms, depending on the plan in question.  *See, e.g.*, *In re Star Ambulance Serv., LLC*, 540 B.R. 251, 260 (Bankr. S.D. Tex. 2015) (disapproving of a plan in part because similarly situated creditors under § 1123(a)(4) received different terms of payouts and different interest rates); *In re Mangia Pizza Invs., LP*, 480 B.R. 669, 701-02 (Bankr. W.D. Tex. 2012) (bankruptcy plan that provided one party to provide new value to retain equity interest in the Debtor, but did not offer the same opportunity to another shareholder, violated § 1123(a)(4)); *In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002) (holding that disparate treatment of members of the same class by breast implant manufacturer's Chapter 11 plan, which accorded Canadian governmental payers far more effective recovery rights than the United States, violated the Bankruptcy Code's equal treatment requirement). *Cf. Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Co-op., Inc.)*, 150 F.3d 503, 518–19 (5th Cir. 1998) (holding that plan proponent's payments to only certain members of a class was permitted under § 1123(a)(4) because the payments were "reimbursement for plan and litigation expenses," not payments "made in satisfaction of the [members'] claims against [the debtor].").

[227]  475 B.R. at 92.

[228]  *Id.*

63

to value and receive distributions in accordance with the matrix, the Third Circuit concluded that all claims were afforded the same opportunity for payment, in satisfaction of § 1123(a)(4)'s requirements.[229]  In other words, "all claimants will follow the same track to recovery."[230]

Relying in part on the Third Circuit's reasoning in *W.R. Grace*, the Fifth Circuit recently reversed a confirmation order in *Serta Simmons Bedding*, concluding that the plan there afforded different treatment to creditors in violation of § 1123(a)(4).[231]  There, a plan afforded an indemnity to all members of certain classes, but whether that indemnity had any value depended on whether the members of those classes had participated in a pre-petition uptier transaction.[232]  The Fifth Circuit concluded that the procedure was equivalent only superficially—because it afforded an opportunity to recover additional value only to some claimants, but not others, and therefore necessarily resulted in substantially disparate outcomes, it could not constitute the "same treatment" within the meaning of § 1123(a)(4).[233]

That is also the case here.  The Debtor has placed all Talc Personal Injury Claims in Class 4.[234]  Talc Personal Injury Claims encompass a broad array of claims, covering *any* disease or illness (apart from mesothelioma) alleged to have been caused by exposure to talc-containing products.[235]  Even if it is assumed that all of these illnesses engender "substantially similar" claims such that they are appropriately classified together in Class 4 (as discussed below, they do not and are not), not all illnesses placed within that class are subject to the same payment terms.  Much to

---

[229]  *Id.* at 120-24.

[230]  *In re W.R. Grace*, 475 B.R. 34, 131 (D. Del. 2012), *aff'd*, 729 F.3d 311 (3d Cir. 2013).

[231]  *Excluded Lenders v. Serta Simmons Bedding, L.L.C. (In re Serta Simmons Bedding, L.L.C.)*, No. 23-20181, 2024 WL 5250365, at *23-24 (5th Cir. Dec. 31, 2024).

[232]  *Id.* at *23.

[233]  *Id.*

[234]  Plan, at § 3.2.4.

[235]  *See id.* § 1.1.152.

the contrary, under the proposed Trust Distribution Procedures governing distributions to Class 4, there are two fully discrete processes for payment of claims, offered based on whether a holder has an Ovarian Cancer Claim or a Gynecological Claim.[236]  Ovarian Cancer Claims, on the one hand, may elect one of two processes to receive a distribution.  As with the claimants in *W.R. Grace*, they may elect to have their claims subject to Expedited Review or Individual Review, which entails a lengthy, multi-prong valuation process.  Alternatively, they may elect a Quickpay option, entitling them to $1,500 as long as they can show regular talc use followed, after 10 years, by a diagnosis.[237]  On the other hand, holders of Gynecological Claims have only one available process for payment: the Quickpay option.[238]  Under the Trust Distribution Procedures, any Gynecological Claim, if allowed (*i.e.*, can show regular use and diagnosis), is automatically entitled to a sum certain $1,500.  Thus, by virtue of their disease type, holders of Gynecological Claims and Ovarian Cancer Claims do not "follow the same track to recovery," despite being in the same class.[239]  And as a result, the outcomes are necessarily different.  Gynecological Claims will get a set value that is in excess of the likely value of that claim.  For Ovarian Cancer Claims, holders must either opt for the Quickpay themselves, and receive far less than the likely value of their claim, or subject themselves to a point-system process with onerous filing requirements, subject to considerable discretion of the trustee, and that has no clear dollar value payout.  To the extent the Debtor maintains that these claims are substantially similar and therefore properly classified, it is not affording similar treatment to similar claims in violation of § 1123(a)(4).

---

[236]   *See* Trust Distribution Procedures, at Art. 5.

[237]   *See id.* Art. 4, § 5.5.1.

[238]   *Id.* § 5.5.2.

[239]   *Grace*, 475 B.R. at 131.

Finally, this issue is in no way cured because Class 4 may be deemed an accepting class. As an initial matter, and as discussed below, Class 4 cannot credibly be said to be an accepting class. But more importantly here, § 1123(a)(4) refers expressly to a claimant's "agreement" to receive different treatment. It does not refer to a class's or its members' "acceptance" of the plan.[240] A class may be deemed accepting even if holders within that class have not voted to accept the plan. Those dissenting holders cannot be said to have "agreed" to different treatment. For that same reason, no settlement between the Debtor and any plaintiffs' firm can constitute agreement of the affected claimants themselves. Despite any such settlement, not all affected claimants have given their agreement within the meaning of § 1123, no less their acceptance under § 1126.

### B. Ovarian Cancer Claims and Gynecological Claims are Not Substantially Similar But Classified Together In Violation of § 1122

Because they are classified together, Ovarian Cancer Claims and Gynecological Claims should be treated similarly. As discussed above, they are not. Even if this differential treatment were not a violation of § 1123(a)(4)—and it is—the differences in treatment indicate that Ovarian Cancer Claims and Gynecological Claims are different enough that they should not be classified together at all. Because they are, the Plan violates § 1122(a).

As noted above, claims can be classified together *only if* those claims are "substantially similar."[241] The Fifth Circuit has articulated that claims may be considered substantially similar when they "share common priority and rights against the debtor's estate."[242] Though, superficially, both Ovarian Cancer Claims and Gynecological Claims are both types of personal injury claims alleged to have arisen from talcum powder use, the Debtor's proposed treatment of the claims

---

[240] *See, e.g.*, 11 U.S.C. § 1126.

[241] 11 U.S.C. § 1122(a).

[242] *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1278 (5th Cir. 1991).

indicates that the rights these respective groups hold are not, in fact, the same.  To the contrary, the Debtor's vastly different treatment proposals suggest that, by the Debtor's own estimation, the rights of these respective claimant groups are, in fact, different.  Indeed, where such a substantial difference in recovery is proposed, the Third Circuit—which employs the same definition of "substantially similar"—has recognized that claimants are appropriately placed into different classes, making such different treatment permissible.[243]

As discussed above (in the context of good faith), that such different claims were placed into the same class makes sense only as a means to obtain an impaired accepting class.  "A debtor's motives must be scrutinized to prevent the possibility of vote manipulation."[244]  Where the only justification for placing Ovarian Cancer Claims and Gynecological Claims within the same class is to obtain acceptance of the class, if not a breach of the requirement of good faith, there exists a violation of § 1122(a).[245]

### C.   The Plan's Disparate Treatment of Indirect Personal Injury Claims Likewise Violates Either §§ 1123(a)(4) or §§ 1122(a)

Despite being grouped together within Class 4, Direct Personal Injury Claims and Indirect Personal Injury Claims are afforded entirely discrete recovery routes.  As discussed above, Indirect Claims that satisfy the Indirect Claim Criteria will be reviewed by the Trustee, who will then determine the amount necessary to pay the claim in full.  There is no overlap between this process and the point system that applies to direct Ovarian Cancer Claims or the Quickpay-only process for direct Gynecological Claims. A useful contrast to this arrangement is found in *W.R. Grace*.

---

[243]   *W.R. Grace¸* 729 F.3d at 329-30; *see also Briscoe Enters., Ltd., II*, 994 F.2d at 1167 (recognizing that a creditor with "a different stake in the future viability of the reorganized company and [had] alternative means at its disposal for protecting its claim" was properly placed in a separate class) (quoting *In re U.S. Truck*, 800 F.2d 581, 587 (6th Cir. 1986)).

[244]   *In re Heritage Org., L.L.C.*, 375 B.R. 230, 298 (Bankr. N.D. Tex. 2007).

[245]   *See Greystone*, 995 F.2d at 1278.

There, the Third Circuit concluded that indirect and direct claimants were afforded equivalent treatment where, apart from one preliminary, additional restriction imposed on indirect claimants, direct and indirect claimants otherwise followed the same individual review procedure.[246]  Here, however, there is no overlap at all.

Under these circumstances, the disparate treatment either constitutes different payment processes for similarly situated claimants, violating § 1123(a)(4), or demonstrates that these groups of claims are not substantially similar, making their placement together in Class 4 a violation of § 1122(a).

## VI. Having Put All Talc Claimants in the Same Class, The Plan Fails to Meet the Voting Thresholds Set by §§ 524(g) and 1126(c), Leaving the Plan Without a Valid Impaired Accepting Class

### A. By Valuing Each Claim at $1 for Voting Purposes, the Plan Violates § 1126(c)

Section 1126(c) sets forth the minimum voting thresholds for a class to have accepted a plan.  Relevant here, it requires accepting votes from holders of claims representing at least two thirds of the total *value* of allowed claims within the class.[247]  In the mass tort context, where entire classes of claims have either not yet been allowed or are otherwise contingent and unliquidated,[248] courts have nevertheless permitted those claims to be estimated pursuant to Bankruptcy Rule 3018

---

[246]  *W.R. Grace*, 729 F.3d at 329 ("In any event, the release provision does not limit a claimant's opportunity for recovery, as indirect claimants who are unable to obtain a release can still pursue their claims through the individual review process.").

[247]  11 U.S.C. § 1126(c).

[248]  Unless the debtor schedules a claim as undisputed, liquidated and non-contingent, a creditor must file a claim in order for it to be deemed "allowed." *See* Fed. R. Bankr. P. 3002(a); 11 U.S.C. § 502(a).

solely for the purpose of allowing the impacted claimants to vote.[249]  In some cases, the claims are estimated to have the same value, often $1.00.[250]

This is how the Debtor ran its pre-petition voting process, and what it seeks to have this Court validate retroactively now:  counting each creditor's claim—irrespective of disease type or severity, filing status, or any other criteria—at $1.00 for voting purposes.  It is by this method that the Debtor asserts to have gained the acceptance of over 80% of claimholders by head count *and* in aggregate value among Class 4.

While the Debtor's desired "one dollar/one vote" estimation approach has been used in other mass tort cases, it falls outside of the statutorily permitted scheme.[251]  To the extent that the procedure is permissible at all, courts have appropriately cautioned that it should only be used where it does not work to disenfranchise creditors or otherwise undermine their actual economic interests in the case.[252]  In that vein, two early uses of this estimation procedure, in *Johns Manville* and *A.H. Robins*, the one dollar/one vote procedure was deemed acceptable because the respective debtors obtained accepting votes from approximately 95% of the impacted class.[253]  With such overwhelming acceptance, the estimation method used would not have altered the outcome.  In

---

[249]  *See* Fed. R. Bankr. P. 3018 ("Notwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan."); *see In re Quigley Co.*, 346 B.R. 647, 653-54 (Bankr. S.D.N.Y. 2006).

[250]  *See, e.g., Quigley*, 346 B.R. at 654.

[251]  *Compare* 11 U.S.C. § 502(c) (permitting estimation of a contingent, unliquidated claim for allowance, without mention of voting) *with* Fed. R. Bankr. P. 3018(a) (allowing estimation solely for voting in the context of a filed objection).  *See also Quigley*, 346 B.R. at 654 (noting that "[t]he Bankruptcy Code and the Federal Bankruptcy Rules provide little guidance" on this issue).

[252]  *Id.* at 654 ("In the end, any estimation should ensure that the voting power is commensurate with the creditor's economic interests in the case."); *see also In re Lloyd E. Mitchell, Inc.*, 373 B.R. 416, 427 (Bankr. D. Md. 2007) ("Seriously-injured claimants object [in one dollar/one vote scenarios] because their claims are to be allowed for voting purposes in the same amount as claimants whose injuries have not yet manifested. In these types of plans, the 'one dollar/one vote' procedures are questionable.").

[253]  *See Menard-Sanford v. Mabey (In re A.H. Robins Co., Inc.)*, 880 F.2d 694, 698 (4th Cir. 1989); *Johns–Manville Corp.*, 843 F.2d at 641–647.

other words, it could not be said under those circumstances that holders of claims that, ultimately, were recognized to have greater value were disenfranchised by the voting process.[254]  The use of the procedures was therefore not disturbed on appeal.

Here, it cannot be said that the one dollar/one vote method does not work to disenfranchise Ovarian Cancer claimants.  First, while all of the claims within class four are contingent and unliquidated, the Debtor's own plan and distribution procedures demonstrate beyond cavil that such claimants have superior valued claims as compared to Gynecologic Cancer claims.  As discussed above, Gynecological Claims are treated under a separate procedure under the trust, as a result of which they are entitled to $1,500.  Meanwhile, although the Coalition disputes that it is possible to provide an accurate estimate of what Ovarian Cancer claimants will recover, the Debtor estimates in its disclosure statement that these claimants will recover, on average, between $75,000 and $175,000 each.[255]  It cannot be that ovarian cancer claimants represent interests *50 times greater* than those of gynecological claimants, but their voting power is equivalent in value.  To permit this would write § 1126(c)'s claim value requirements out of the Code altogether.

In the face of a material difference in claim values, the appropriate course of action to ensure that a vote does not disenfranchise voters would be to have claims vetted prior to allowing claimants to vote.  The Coalition submits that this should take the form of a bar date and estimation and has a pending motion before the Court seeking an order requiring such process.  However, even absent those procedures, a readily available—and easily employed—alternative exists.  In the *Imerys* case, the weight of a claimants' vote was based on the average value of that claim type

---

[254]  *See Quigley*, 346 B.R. at 654.

[255]  These estimates differ slightly from those offered by the Debtor's expert.

under the proposed distribution procedures.[256]  For example, an ovarian cancer claim was valued at $215,000, while a Lung Cancer claim was valued at $15,000.  *Id.*  Particularly in view of the Debtor's insistence that the treatment in the proposed plan is based on agreement with plaintiffs' firms, these values should be largely agreeable to participants.  There is no reason that the Debtor could not have utilized this system here.  It did not.

Second, at present, the actual breakdown of voting Ovarian Cancer claims to Gynecological Claims based on the Master Ballots is, at best, unreliable.  For example, the Pulaski firm voted on behalf of approximately ███████████ all of which were ██████████████████████ ██████████████[257]  Yet, despite ████████████████████████████████████████ ███████████████████████████████████████████████  Elsewhere, ██████████████████████ ██████████████████████████████[258]  Similarly, other firms' principals have indicated that they v██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████[259]  Even the Debtor's own expert speculates that ███████████████████████████████████████████████████████████ ██████████████████[260]

Ultimately, the Debtor has no sound basis to conclude that its use of "one dollar/one vote" has not worked to disenfranchise claimants with verifiable Ovarian Cancer Claims.  Despite placing a great deal of scrutiny on dissenting groups, it has done no analysis of the actual makeup of supporting firms' claims.  The Debtor's proclamations that the voting method would make no

---

[256] Lawson Decl., Ex. 23 (*In re Imerys*, Case No. 19-10289-LSS (Bankr. D. Del. Nov. 5, 2024), ECF No. 6730-1 (Solicitation Procedures)).

[257] Lawson Decl., Ex. 24 (Pulaski Depo. Tr.), 43-50.

[258] *Id.* at 59-64.

[259] *See, e.g.*, Lawson Decl., Ex. 25 (Watts Depo. Tr.), 87-88.

[260] Lawson Decl., Ex. 20 (Expert Report of Charles Mullin, PhD, dated January 7, 2025), ¶ 94.

difference because of the final tally therefore beg the question—the Debtor does not know the actual breakdown, and therefore can make no credible claim as to to as to what the final tally actually is.  It therefore cannot be said that use of the one dollar/one vote procedure has not worked to the claimants' disadvantage.  And, in all likelihood, it has.  As a result, use of this method means that there is no compliance with § 1126(c), and the Debtor has not obtaining an impaired accepting class under § 1129(a)(10).

### B. Because Firms Lacked Authority to Cast Ballots, Even If All Claims are Valued at $1 for Voting Purposes, the 75% Voting Threshold Required by § 524(g) Has Not Been Met

Even if the one dollar/one vote model is permissible under the circumstances, when submitted ballots are correctly counted, the 75% threshold required by § 524(g) has not been met. Ordinarily, an impaired class is deemed to accept based on "number" and "amount" thresholds: votes accepting the plan account for 50% of the class's members, and two-thirds of the class's aggregate claim value.[261]  When, as here, a plan also contains a § 524(g) channeling injunction, its proponent must meet a heightened "number" requirement: rather than 50%, the plan must be accepted by at least 75% of those voting if their claims will be addressed by the trust.[262]  According to EPIQ's voting data, the Plan meets the heightened number requirement because 77,992 out of 93,514 claimants—representing 83.4% of the class—voted to accept.[263]  As the Coalition has explained elsewhere, and will demonstrate at trial, this total does not account for pre-petition voting defects that impact *at least* ███ if not more, "yes" votes.  Because these votes were not properly cast, the Debtor cannot claim to have met § 524(g)'s threshold.

---

[261]  11 U.S.C. § 1126(c).

[262]  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb); *Quigley*, 346 B.R. at 653.

[263]  *See* Kjontvedt Supp. Decl., ECF No. 307.

There are at least two principal issues that, when corrected, place the Class 4 vote under 75%.[264]  First, the Debtor impermissibly "superseded" the Beasley Allen firm's master ballot with that of SLF's master ballot, switching over 11,000 votes from "no" to "yes."  This is the subject of the Coalition's reinstatement motion.[265]  As the Debtor itself acknowledges, ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████[266]

But the unauthorized "superseding" of the Beasley Allen master ballot is far from the only apparent defect.  At least one firm, the Watts Law Firm, accounting for ███████████ ████████████████████████████████████████████████  As a result, any "yes" votes that comprise this group cannot be considered validly cast and count toward the 75% threshold.

As a result of the foregoing, as well as other voting irregularities, the Debtor has not met the 75% threshold set by § 524(g), irrespective of the voting method used.

## VII.   The Plan Violates the Best Interests of Creditors Rule Under § 1129(a)(7)

Section 1129(a)(7) requires that each creditor has either accepted the plan or receive as much as the creditor would receive in a Chapter 7 liquidation.[267]  This provision is known as the "best interests of creditors test."[268]  Because the Plan proposes releasing third parties, this test requires that those third parties' assets be included in this calculation.[269]

---

[264]  To the extent that the Class 4 vote further falls below two thirds in number, then under the one dollar/one vote rubric, the vote would also fail § 1126(c) notwithstanding the higher 75% threshold in § 524(g).

[265]  Dkt. No. 266.

[266]  Lawson Decl., Ex. 22 (Expert Report of Andrew R. Evans, dated January 7, 2025), 9.

[267]  *In re Cypresswood Land Partners I*, 409 B.R. 396, 428 (Bankr. S.D. Tex. 2009).

[268]  *See id.* (citing *Bank of Am. Nat'l Tr. and Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 & n.13 (1999)).

[269]  *See Quigley*, 437 B.R. at 145-46 (concluding that claims that would be released under a Chapter 11 plan must be factored into the calculation of whether the best interests of the creditors test was satisfied); *accord In re Ditech Holding Corp.*, 606 B.R. 544, 609-15 (Bankr. S.D.N.Y. 2019) (following *Quigley* in determining that since consumer claims fit the definition of property, had value, and were "neither speculative nor incapable of

Here, confirmation of the Plan, with its attendant discharge of the Protected Parties, including J&J and Kenvue, would cause talc claimants to lose their rights to sue these parties. The loss of these rights must be factored into the test under § 1129(a)(7). Moreover, where a creditor would receive payment in full from the debtor or a co-obligor in a chapter 7 scenario, the dissenting creditor must receive full payment in chapter 11 for the codebtor to receive a release.[270]

As explained, but for the proposed releases, J&J and Kenvue would remain liable for talc personal injury claims. In a chapter 7 liquidation, those claimants would retain the right to sue those parties. These claims constitute property, have value, and are "neither speculative nor incapable of estimation."[271] Recall that the Mullins report identifies ███████████ ███████████████████████████████████████████ An *optimistic* scenario for ovarian cancer claimants is an average recovery of ██████ under the proposed Plan, with the actual recovery likely to be much lower. Thus, the Debtor has failed to carry its burden to prove that the proposed Plan meets the best interests of creditors test.

Moreover, both J&J and Kenvue would remain able to pay cancer claims related to past talc products as they come due. Because holders of Ovarian Cancer Claims may recover from these entities, the Debtor must show that talc tort claimants will receive the full value of their claims. *See id.* As discussed previously, this is not the case. First, the proposed Plan seriously underestimates the number of current and future talc claimants, which will lead to fewer available

---

estimation," they needed to be included in the best interests test); *In re Washington Mut., Inc.*, 442 B.R. 314, 359-60 (Bankr. D. Del. 2011) ("In a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation.").

[270] *See In re Quigley*, 437 B.R. at 145 (quoting Joshua M. Silverstein, *Hiding in Plain View: A Neglected Supreme Court Decision Resolves the Debate Over Non-Debtor Releases in Chapter 11 Reorganizations*, 23 EMORY BANKR. DEV. J. 13, 76-77 (2006)).

[271] *Id.*

resources for all talc claimants.  As a corollary, the proposed Plan also overestimates how much holders of Ovarian Cancer Claims will recover.  Second, and equally troubling, is the self-referential definition of the points used to determine the recovery on Ovarian Cancer Claims: the points are valued with reference to the remaining Trust assets, not the independent value of the claims.  And the Trust Distribution Procedures permit Claim Administrators and the Trustee a troubling degree of unchecked latitude in discounting the value of Ovarian Cancer Claims.  Consequently, talc claimants, especially ovarian cancer claimants, will not recover the full value of their claims under the Plan as they would under a chapter 7 liquidation, and so the proposed Plan fails the best interests of the creditors test under § 1127(a)(7).

## VIII.   The Plan Is Not Feasible Under § 1129

Section 1129(a)(11) requires that confirmation is not likely to be followed by an unplanned liquidation or the need for further reorganization—in other words, that the plan is feasible.[272] Within the Fifth Circuit, that feasibility may be demonstrated by a showing of "reasonable assurance" of successful completion of the plan upon emergence from bankruptcy.[273]  Because the Plan includes extensive walk-away rights for the Debtor—and its primary funder, J&J—there is no such assurance here.

The feasibility of the Debtor's plan is entirely dependent on the contributions it expects to receive from J&J and New Holdco.  The Debtor itself does not have sufficient assets on hand, nor any that might be generated from future operations, to fund the $8.6 billion in Cash Contributions

---

[272]   11 U.S.C. § 1129(a)(11); *Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. (In re T-H New Orleans Ltd.)*, 116 F.3d 790, 801 (5th Cir. 1997).

[273]   *See Save Our Springs (S.O.S.) Alliance, Inc. v. WSI (II)-COS, L.L.C. (In re Save Our Springs (S.O.S.) Alliance, Inc.)*, 632 F.3d 168, 172 (5th Cir. 2011) (quoting *Briscoe Enter., Ltd., II*, 994 F.2d at 1166).A six-factor test is often employed in assessing feasibility, though not all need be considered and, depending on the circumstances, only one may be of relevance.  *See S.O.S. Alliance*, 632 F.3d at 173 & n. 6 ("There is no requirement, however, that the court consider all six factors. That is particularly true where, as here, feasibility depends almost exclusively on the willingness of S.O.S.'s donors to give.").

contemplated by the Plan.  The anticipated Effective Date payment alone is $2.4 billion.[274]  Yet, according to the Debtor's November 2024 operating report, it held only approximately $11 million in cash on hand and total assets of about $1.6 billion.[275]  In other words, its currently available assets fall almost $1 billion short of what is required in *immediate* plan funding.  Without funding from J&J and New Holdco, not a single payment to the trust could be funded.  Any feasibility determination therefore must turn on the likelihood that the Debtor will obtain that funding.

However, as discussed above, the Plan affords the Debtor—and, with it, J&J—the ability to walk away from the Plan "at any time" between confirmation and the Effective Date without an order from this Court, for a host of reasons.[276]  Most notably, J&J may walk away if the United States Trustee or another claimant group appeals the confirmation order—an outcome that is likely to occur.  And once that likely event occurs, under the terms of the Plan, the Debtor—and with it, J&J's funding—are permitted to walk away at their discretion.  Meanwhile, J&J has provided no confirmation to date that it intends to proceed with the Plan or its funding obligations if and when that appeal comes to pass.  Under these circumstances, far from an obligation, the funding essential to the Plan amounts to little more than the speculative "voluntary donations" that the Fifth Circuit has rejected as insufficient to establish feasibility.[277]

## IX.    The Plan on Which Votes Were Solicited Has Changed

Section 1127(a) requires that plan proponents may modify a plan on which creditors have voted "at any time before confirmation," unless the modification causes the modified plan to fail

---

[274]  Plan, Ex. C.

[275]  Nov. 2024 MOR, Dkt. No. 838 at 2.

[276]  Plan, at § 9.12.

[277]  *See S.O.S. Alliance*, 632 F.3d 173-74.

to meet the requirements of §§ 1122 and 1123.[278]  As explained, § 1123(a)(4) forbids treating class members differently—which the MOU, through its bonus payments to some, but not all, members of Class 4—has already violated.  Therefore, even if the Debtor moved to have the votes that claimants (or their lawyers) cast to accept the previous plan be deemed votes to support the Plan, Bankruptcy Rule 3019(a) would not permit this to occur.  Bankruptcy Rule 3019(a) requires the court to determine that "the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification."[279]  As a result, the Plan must be resolicited.

## X.      If Section 524(g) Releases J&J and Kenvue of its Talc Liability, It Is Unconstitutional

As explained in the Coalition's motion to dismiss and incorporated by reference here, depriving the talc claimants of the value of their claims would be a violation of due process, because their rights to fair, equitable and reasonable distribution of the Debtor's assets would be denied.[280]  As the Bankruptcy Court in a North Carolina asbestos case remarked, "a 'no-opt-out' bankruptcy plan and trust is entirely appropriate for an insolvent or even a distressed debtor.  However, under *Ortiz* and for solvent and non-distressed debtors, a plan/trust which does not permit creditors to 'opt out' and return to the tort system for their jury trials may cause an unconstitutional impairment of the claimants' due process and jury trial rights."[281]

### CONCLUSION

The Court should decline to confirm the Plan and should award the Coalition such additional relief as the Court deems just and proper.

---

[278]   11 U.S.C. § 1127(a).

[279]   Fed. R. Bankr. P. 3019(a).

[280]   Dkt. No. 44 ¶¶ 157-172; ECF 268 ¶¶ 360-75.

[281]   *In re Aldrich Pump LLC*, No. 20-30608, 2023 WL 9016506, at *19–21 (Bankr. W.D.N.C. Dec. 28, 2023).

Dated:  January 24, 2025                    Respectfully submitted,

**LAWSON & MOSHENBERG PLLC**

/s/ *Nicholas R. Lawson*
Nicholas R. Lawson
Texas Bar No. 24083367
Avi Moshenberg
Texas Bar No. 24083532
801 Travis Street Suite 2101 #838
Houston, TX 77002
Telephone:   (832) 280-5670
Nick.Lawson@lmbusinesslaw.com
Avi.Moshenberg@lmbusinesslaw.com

- AND -

**OTTERBOURG P.C.**
Melanie L. Cyganowski (*pro hac vice*)
Adam C. Silverstein (*pro hac vice*)
Sunni P. Beville (*pro hac vice*)
David A. Castleman (*pro hac vice*)
Jennifer S. Feeney (*pro hac vice*)
230 Park Avenue
New York, NY 10169
Telephone:     (212) 661-9100
Facsimile:      (212) 682-6104
mcyganowski@otterbourg.com
asilverstein@otterbourg.com
sbeville@otterbourg.com
dcastleman@otterbourg.com
jfeeney@otterbourg.com

- AND -

**BAILEY & GLASSER LLP**
Brian A. Glasser (*pro hac vice*)
Thomas B. Bennett (*pro hac vice*)
David L. Selby II (*pro hac vice*)
Jonathan Gold (*pro hac vice*)
1055 Thomas Jefferson Street, NW, Suite 540
Washington, DC 20007
Telephone:     (202) 463-2101
Facsimile:      (202) 463-2103
bglasser@baileyglasser.com
tbennett@baileyglasser.com
dselby@baileyglasser.com

jgold@baileyglasser.com

Katherine E Charonko (*pro hac vice*)
209 Capitol Street
Charleston WV 25301
Tel: (304) 345-6555
Fax: (304) 342-1110
kcharonko@baileyglasser.com

Elizabeth L. Stryker (*pro hac vice*)
94 Long Street Suite 200
Westover WV 26501
Tel: (304) 594-0087
estryker@baileyglasser.com


*Co-Counsel for the Coalition of Counsel for Justice for Talc Claimants*


## CERTIFICATE OF SERVICE

I certify that on January 24, 2025, I caused a true and correct copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/Nicholas R. Lawson*
Nicholas R. Lawson