**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC LLC,[1] | Case No. 24-90505 (CML) |
| Debtor. | |

**DEBTOR'S MEMORANDUM OF LAW IN SUPPORT**
**OF CONFIRMATION OF THE SECOND AMENDED PREPACKAGED**
**CHAPTER 11 PLAN OF REORGANIZATION OF RED RIVER TALC LLC**

(Related to Dkt. 722)

---

[1] The last four digits of the Debtor's taxpayer identification number are 8508. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ................................................................................. 1

II.    BACKGROUND AND OVERVIEW OF THE PLAN .......................................... 5

  A.   The Debtor's Predecessors and Related Restructurings ........................... 5

  B.   Health and Medical Safety Decisions Were Made By Old JJCI ..................... 10

  C.   The 2021 Corporate Restructuring ......................................................... 11

  D.   New JJCI/Holdco and Kenvue .................................................................. 12

  E.   LTL's Chapter 11 Cases ......................................................................... 13

  F.   The Prepetition Corporate Restructuring .............................................. 16

  G.   The Debtor ............................................................................................. 18

  H.   Financing Arrangements ........................................................................ 19

  I.   Overview of the Debtor's Talc Liability ................................................... 22

  J.   Certain Settlements ............................................................................... 32

  K.   Retailers and Third-Party Indemnification ........................................... 32

  L.   Imerys/Cyprus Settlement Agreement ................................................... 35

  M.   The Debtor's Insurance Coverage and Related Litigation ...................... 38

  N.   Prepetition Negotiations with Claimant Representatives ....................... 41

  O.   Solicitation of the Initial Plan .............................................................. 42

  P.   A Small Number of Conflicted Firms Oppose the Initial Plan ................ 47

  Q.   Beasley Allen Submits an Invalid Master Ballot ................................... 49

  R.   Extension of Voting Deadline to Permit Negotiations to Continue............ 51

  S.   Voting Results ....................................................................................... 54

  T.   Filing of Chapter 11 Case, Postpetition Negotiations and the TCC MOU ...... 55

  U.   Overview of the Treatment of Stakeholders ........................................... 59

III.   MODIFICATIONS TO THE PLAN AND PROPOSED RESOLUTIONS TO
       OBJECTIONS.......................................................................................... 59

  A.   Certain of the Objections Filed by the U.S. Trustee .............................. 62

  B.   Certain of the Objections Filed by the United States of America.............. 62

  C.   Certain of the Objections Filed by the Insurers ................................... 62

  D.   The Objection by Truck Insurance Exchange ......................................... 65

  E.   The Objections by Indirect Claimants ................................................... 65

IV.    THE PLAN MEETS EACH REQUIREMENT FOR CONFIRMATION UNDER
       SECTION 1129 OF THE BANKRUPTCY CODE AND THE OBJECTIONS ASSERTED
       WITH RESPECT TO SECTION 1129 SHOULD BE OVERRULED ...................... 67

  A.   Section 1129(a)(1) — The Plan Complies with  the Applicable Provisions of the
       Bankruptcy Code .................................................................................. 67

1.   Classification of Claims and Interests.............................................................. 68

2.   Mandatory Contents of the Plan .......................................................................... 75

3.   Discretionary Contents of the Plan ..................................................................... 82

B.   Section 1129(a)(2) — The Proponents of the Plan  Have Complied with the Applicable Provisions of Title 11 .............................................................................................. 84

C.   Section 1129(a)(3) — The Plan Has Been Proposed in Good Faith................................. 87

1.   The Plan Has a Valid Bankruptcy Purpose and More Than a Reasonable Chance of Success .................................................................................................................. 89

2.   The 1129(a)(3) Objections Are Unsupported Both Legally and Factually.................. 93

D.   Section 1129(a)(4) — All Payments To Be Made by the Debtor in Connection With the Reorganization Case Are Subject to Court Approval ........................................................ 108

E.   Section 1129(a)(5) — The Plan Discloses All Required Information Regarding Post-Confirmation Management and Insiders.................................................................................... 110

F.   Section 1129(a)(6) — The Plan Does Not Provide  for Any Rate Change Subject to Regulatory Approval................................................................................................................... 111

G.   Section 1129(a)(7) — The Plan Is in the Best Interests of Creditors ............................. 111

1.   No Individual Claimant Has Shown The Best Interests Test Is Not Satisfied As to Its Specific Claim....................................................................................................... 112

2.   Under the Plan, Claimants Will Receive Well in Excess of What They Would Receive in a Chapter 7 Liquidation ..................................................................................... 113

H.   Section 1129(a)(8) — The Plan Has Been Accepted by the Requisite Classes of Claims and Interests ................................................................................................................................ 122

1.   Challenges to the Value of Claims for Voting Purposes Fail ..................................... 123

2.   There is No Need for a Bar Date in this Prepackaged Case ....................................... 126

3.   The Votes of Claimants Represented By Law Firms that Entered Into the TCC MOU Should Not Be Disregarded .................................................................................... 126

4.   Resolicitation Is Unnecessary and the Voting Procedures Were Appropriate .......... 127

I.   Section 1129(a)(9) — The Plan Provides for the Payment of Priority Claims............... 131

J.   Section 1129(a)(10) — The Plan Has Been Accepted by at Least One Impaired, Non-Insider Class.............................................................................................................................. 132

K.   Section 1129(a)(11) — The Plan Is Feasible ................................................................. 133

L.   Section 1129(a)(12) — The Plan Provides for the Payment of Fees.............................. 136

M.   Sections 1129(a)(13) to 1129(a)(16) — Inapplicable to the Plan ................................. 136

N.   Section 1129(d) — The Plan's Purpose Is Consistent with  the Bankruptcy Code........ 136

V.   THE ASSUMPTION, ASSUMPTION AND ASSIGNMENT OR  REJECTION OF EXECUTORY CONTRACTS AND  UNEXPIRED LEASES UNDER THE PLAN SHOULD BE APPROVED ................................................................................................................. 137

VI.    THE PLAN'S DEBTOR RELEASE, EXCULPATION AND INJUNCTION
PROVISIONS ARE APPROPRIATE AND COMPLY WITH THE BANKRUPTCY CODE. 138

A.    The Debtor Release is Appropriate and Complies with the Bankruptcy Code.............. 139

B.    The Exculpation Provision Is Appropriate and Complies with the Bankruptcy Code and
Fifth Circuit Law................................................................................................................ 144

C.    The "Gatekeeping" Clauses Are Appropriate and Comply with Fifth Circuit Law ....... 149

D.    The Injunction Provisions Are Appropriate and Comply with the Bankruptcy Code .... 153

VII.    THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 524(G) OF THE
BANKRUPTCY CODE, AND THE OBJECTIONS ASSERTED WITH RESPECT TO
SECTION 524(G) SHOULD BE OVERRULED....................................................................... 154

A.    The Debtor is Entitled to a Discharge and Supplemental Discharge.............................. 154

B.    The Talc Personal Injury Trust Satisfies the Structure and Funding Requirements of
Section 524(g)(2)(B)(i) of the Bankruptcy Code.................................................................... 159

1.    The Plan Satisfies Section 524(g)(2)(B)(i)(I) ........................................................... 159

2.    The Plan Satisfies Section 524(g)(2)(B)(i)(II)........................................................... 162

3.    The Plan Satisfies Section 524(g)(2)(B)(i)(III)........................................................... 164

4.    The Plan Satisfies Section 524(g)(2)(B)(i)(IV) .......................................................... 166

C.    The Debtor's History, the Nature of Talc-Related Litigation and the Facts of the Chapter
11 Case Support the Findings  Required for Issuance of the Channeling Injunction ............. 166

1.    The Plan Satisfies Section 524(g)(2)(B)(ii)(I) ........................................................... 166

2.    The Plan Satisfies Section 524(g)(2)(B)(ii)(II)........................................................... 167

3.    The Plan Satisfies Section 524(g)(2)(B)(ii)(III) ......................................................... 167

4.    The Plan Satisfies Section 524(g)(2)(B)(ii)(IV) ......................................................... 170

5.    The Plan Satisfies Section 524(g)(2)(B)(ii)(V)........................................................... 171

D.    The Court May Approve the Plan Provisions as to the Protected Parties....................... 172

E.    The Channeling Injunction Applies to the Protected Parties Pursuant to Section
524(g)(4)(A)(ii)..................................................................................................................... 175

1.    J&J ............................................................................................................................. 175

2.    Affiliates of J&J and the Debtor ............................................................................... 189

3.    Kenvue ...................................................................................................................... 193

4.    The Retailers ............................................................................................................. 196

F.    The Third Party Release in Section 11.2.2 of the Plan Also is Permissible
Notwithstanding Purdue....................................................................................................... 197

1.    The Plan Pays Channeled Talc Personal Injury Claims in Full ................................. 198

2.    Since Talc Claims Are Being Paid in Full, They Can Be Released Under the One-
Satisfaction Rule ............................................................................................................. 199

G.    The Court Also Has Ample Authority to Issue the Channeling Injunction As to All Protected Parties Pursuant to the All Writs Act .................................................................. 204

H.    The Court Has Appointed a Legal Representative to Protect the Rights of Persons Who Might Subsequently Assert Demands ...................................................................................... 213

I.    Entry of the Channeling Injunction Is Fair and  Equitable With Respect to Future Claimants ............................................................................................................................ 213

VIII.    REPLY TO OTHER OBJECTIONS TO THE PLAN .................................................... 217

A.    The Coalition's Other Objections to Confirmation of the Plan ...................................... 217

    1.    The Coalition Alleges the Plan is Unconstitutional .................................................. 218

    2.    The Coalition Alleges the Plan Violates the Absolute Priority Rule ......................... 223

    3.    The Coalition Alleges the Plan Violates Sections 1141(a) and 1144 ........................ 224

B.    The U.S. Trustee's Objection that the Plan is Incomplete ............................................. 227

C.    The Insurers' Other Objections to Confirmation of the Plan .......................................... 228

    1.    The Insurers May Not Raise Objections Premised on Other Parties' Rights and Interests ........................................................................................................................ 228

    2.    Neither the Prepetition Corporate Restructuring Nor the Plan Sever Insurance Rights from Their Attendant Obligations; the Plan is Insurance Neutral ...................................... 231

    3.    The Debtor's Assignment of the Talc Insurance Assets to the Talc Personal Injury Trust Is Permissible under the Bankruptcy Code and Applicable Law .............................. 238

    4.    The Plan and Trust Distribution Procedures Do Not Abrogate Any Rights of the Insurers to Participate in the Defense, Investigation or Settlement of Talc Personal Injury Claims ..................................................................................................................... 244

D.    The United States' Objections to Confirmation of the Plan. ........................................... 249

    1.    The United States Does Not Hold a Claim Against the Debtor and, Even If It Did, Such Claim Is a Class 4 Channeled Talc Personal Injury Claim .................................................. 249

    2.    The United States' Objection to the Plan's Failure to Preserve Its Alleged Setoff and Recoupment Rights Should be Rejected ............................................................................. 256

    3.    The United States' Objection to the Court's Retention of Jurisdiction to Matters Arising Out of the Chapter 11 Case ................................................................................... 257

    4.    The United States' Objection to the Request to Shorten the 14-Day Stay Imposed By Bankruptcy Rule 3020 .................................................................................................... 258

IX.    CONCLUSION ............................................................................................................... 259

## TABLE OF AUTHORITIES

Page

CASES

Acequia, Inc. v. Clinton (In re Acequia, Inc.),
  787 F.2d 1352 (9th Cir. 1986) .......................................................................75, 82

Adelphia Recovery Tr. v. Bank of Am., N.A.,
  390 B.R. 80 (S.D.N.Y. 2008)................................................................................142

Allied Tech., Inc. v. R.B. Brunemann & Sons, Inc.,
  25 B.R. 484 (Bankr. S.D. Ohio 1982)..................................................................138

Atlanta Int'l Ins. Co. v. Johnson & Johnson,
  2024 N.J. Super. Unpub. LEXIS 3302 (N.J. Sup. Ct. Dec. 18, 2024)....................40

Babineaux v. Wells Fargo Bank, N.A.,
  2023 WL 9508094 (S.D. Tex. 2023) ....................................................................209

Battle v. Liberty Nat'l Life Ins. Co.,
  877 F.2d 877 (11th Cir. 1989) .............................................................................209

Bio-Med. Applications of Tenn., Inc. v. Cent. States Se. & Sw. Areas Health and
  Welfare Fund,
  656 F.3d 277 (6th Cir. 2011) ...............................................................................251

Bob Meyer Cmtys., Inc. v. Ohio Cas. Ins. Co.,
  2020 WL 5887025 (N.J. Super. Ct. App. Div. Oct. 5, 2020) ...............................247

Borman's, Inc. v. Allied Supermarkets, Inc.,
  706 F.2d 187 (6th Cir. 1983) ...............................................................................138

Bowers v. Camden Fire Ins. Ass'n,
  237 A.2d 857 (N.J. 1968)......................................................................................248

Burd v. Sussex Mut Ins. Co.,
  267 A.2d 7 (N.J. 1970)..................................................................................246, 247

Carlough v. Amchem Prods., Inc.,
  10 F.3d 189 (3d Cir. 1993)...................................................................................208

Coats, Rose, Yale, Ryman & Lee, P.C. v. Navigators Specialty Ins. Co.,
　　830 F. Supp. 2d 216 (N.D. Tex. 2011), aff'd, 489 F. App'x 769 (5th Cir.
　　2012) ............................................................................................................246

Cont'l Cas. Co. v. N. Am. Capacity Ins. Co.,
　　683 F.3d 79 (5th Cir. 2012) .........................................................................243

Eichenholtz v. Brennan,
　　52 F.3d 478 (3d Cir. 1995)...........................................................................200

Excluded Lenders v. Serta Simmons Bedding, L.L.C. (In re Serta Simmons
　　Bedding, L.L.C.),
　　125 F.4th 555 (5th Cir. 2025) .........................................................................77

Faulkner v. Kornman (In re The Heritage Org., L.L.C.),
　　413 B.R. 438 (Bankr. N.D. Tex. 2009).........................................................201

Feld v. Zale Corp.,
　　62 F.3d 746 (5th Cir. 1995) ..........................................................................202

Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans
　　Ltd. P'ship),
　　116 F.3d 790 (5th Cir. 1997) ..........................................................88, 93, 133

G-I Holdings, Inc. v. Those Parties Listed on Ex. A (In re G-I Holdings, Inc.),
　　313 B.R. 612 (Bankr. D.N.J. 2004) ..............................................................156

Gasperini v. Ctr. for Humans., Inc.,
　　518 U.S. 415 (1996)......................................................................................220

Givaudan Fragrances Corp. v. Aetna Cas. & Sur. Co.,
　　151 A.3d 576 (N.J. 2017)......................................................................242, 243

Glover v. Liggett Grp., Inc.,
　　459 F.3d 1304 (11th Cir. 2006) ....................................................................252

Griggs v. Bertram,
　　443 A.2d 163 (N.J. 1982)......................................................................246, 247

Grp. of Institutional Inv'rs v. Chi., M., St. P., & P.R. Co.,
　　318 U.S. 523 (1943).......................................................................................137

Harrington v. Purdue Pharma L.P.,
　　603 U.S. 204 (2024)............................................................................... passim

Humana, Inc. v. Shrader & Assocs., LLP,
    584 B.R. 658 (S.D. Tex. 2018) ...................................................................................178

In re 4 W. Holdings, Inc.,
    593 B.R. 448 (Bankr. N.D. Tex. 2018)..........................................................................60

In re A.P.I. Inc.,
    331 B.R. 828 (Bankr. D. Minn. 2005) ...............................................229, 230, 231

In re ABB Lummus Glob. Inc.,
    2006 WL 2052409 (Bankr. D. Del. June 29, 2006)............................................165

In re Abengoa Bioenergy Biomass of Kan., LLC,
    2018 WL 2138620 (Bankr. D. Kan. May 7, 2018).............................................245

In re ACandS, Inc.,
    311 B.R. 36 (Bankr. D. Del. 2004) ..............................................................243, 245

In re Aearo Techs. LLC,
    2023 WL 3938436 (Bankr. S.D. Ind. June 9, 2023) ...........................................99

In re Airadigm Commc'n, Inc.,
    519 F.3d 640 (7th Cir. 2008) ...................................................................................201

In re Aldrich Pump LLC,
    2021 WL 3729335 (Bankr. W.D.N.C. Aug. 23, 2021)....................91, 98, 169, 221

In re Aldrich Pump LLC,
    2023 WL 9016506 (Bankr. W.D.N.C. Dec. 28, 2023) ..................................97, 221

In re Aldrich Pump LLC,
    No. 20-30608 (Bankr. W.D.N.C.)............................................................................97

In re Am. Honda Motor Co., Inc. Dealership Rel. Litig.,
    315 F.3d 417 (4th Cir. 2003) ..................................................................................208

In re Armstrong World Indus., Inc.,
    348 B.R. 136 (D. Del. 2006).........................................................69, 74, 190, 217

In re ASARCO LLC,
    420 B.R. 314 (S.D. Tex. 2009) .................................................................................88

In re ASARCO LLC,
    No. 05-21207 (Bankr. S.D. Tex.)...........................................................................128

In re Asbestos Claims Mgmt. Corp.,
    2003 Bankr. LEXIS 429 (Bankr. N.D. Tex. 2003), aff'd, In re Asbestos
    Claims Mgmt. Corp., 294 B.R. 663 (N.D. Tex. 2003) ........................................................181

In re Asbestos Sch. Litig.,
    1991 WL 61156 (E.D. Pa. Apr. 16, 1991) .............................................................................208

In re Babcock & Wilcox Co.,
    2004 WL 4945985 (Bankr. E.D. La. Nov. 9, 2004) vacated on other grounds,
    2005 WL 4982364 (E.D. La. Dec. 28, 2005)..........................................................................243

In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.),
    770 F.2d 328 (2d Cir. 1985)...........................................................................................206, 209

In re Belk, Inc.,
    No. 21-30630 (Bankr. S.D. Tex.)...........................................................................................147

In re Bestwall LLC,
    605 B.R. 43 (Bankr. W.D.N.C. 2019)...................................................................89, 97, 103

In re Bestwall LLC,
    71 F.4th 168 (4th Cir. 2023), cert. denied, 144 S. Ct. 2519 (2024)................................91, 169

In re Bestwall LLC,
    No. 17-31795 (Bankr. W.D.N.C.)............................................................................................97

In re Boy Scouts of Am.,
    2023 WL 2891519 (D. Del. Apr. 11, 2023)..........................................................................240

In re Boy Scouts of Am.,
    642 B.R. 504 (Bankr. D. Del. 2022) ...................................................................114, 121, 242

In re Boy Scouts of Am.,
    650 B.R. 87 (D. Del. 2023) ............................................................................................ passim

In re Boy Scouts of Am.,
    No. 20-10343 (Bankr. D. Del.) ..............................................................................................123

In re The Budd Co.,
    No. 14-11873 (Bankr. N.D. Ill.)..............................................................................................123

In re Burns & Roe Enters., Inc.,
    2009 WL 438694 (D.N.J. Feb. 23, 2009) ..............................................................................165

In re Cal. Fid., Inc.,
198 B.R. 567 (B.A.P. 9th Cir. 1996)......................................................................86, 87

In re Canion,
196 F.3d 579 (5th Cir. 1999) ...................................................................................206

In re Cellular Info. Sys., Inc.,
171 B.R. 926 (Bankr. S.D.N.Y. 1994) .....................................................................133

In re Celotex Corp.,
289 B.R. 460 (Bankr. M.D. Fla. 2003) ....................................................................253

In re Chemtura Corp.,
439 B.R. 561 (Bankr. S.D.N.Y. 2010)......................................................................144

In re CiCi's Holdings, Inc.,
2021 WL 819330 (Bankr. N.D. Tex. Mar. 3, 2021) ........................................140, 147

In re Cleveland Imaging & Surgical Hosp., L.L.C.,
2022 WL 677459 (Bankr. S.D. Tex. Mar. 7, 2022).........................................226, 227

In re Combustion Eng'g, Inc.,
391 F.3d (3d Cir. 2004).....................................................................157, 178, 203

In re Congoleum Corp.,
2008 WL 4186899 (Bankr. D.N.J. Sept. 2, 2008) ..........................................244, 245

In re Congoleum Corp.,
2009 WL 499262 (Bankr. D.N.J. Feb. 26, 2009)......................................................106

In re Congoleum Corp.,
362 B.R. 167 (Bankr. D.N.J. 2007) ..........................................................................213

In re Congoleum Corp.,
426 F.3d 675 (3d Cir. 2005).....................................................................................106

In re Corrugated Container Antitrust Litig.,
659 F.2d 1332 (5th Cir. Unit A Oct. 1981)......................................................209, 210

In re Cypresswood Land Partners, I,
409 B.R. 396 (Bankr. S.D. Tex. 2009) ......................................................................84

In re Cyprus Mines Corp.,
No. 21-10398 (Bankr. D. Del.) ..................................................................................36

In re Dana Corp.,
    412 B.R. 53 (S.D.N.Y. 2008) ................................................................................76

In re Diamond Sports Grp., LLC,
    No. 23-90116 (Bankr. S.D. Tex.) .........................................................................152

In re Diet Drugs,
    282 F.3d 220 (3d Cir. 2002) ...............................................................................208

In re Dow Corning,
    237 B.R. 380 (Bankr. E.D. Mich. 1999) ...............................................................121

In re Dow Corning Corp.,
    211 B.R. 545 (Bankr. E.D. Mich. 1997) ...............................................................123

In re Dow Corning Corp.,
    244 B.R. 705 (Bankr. E.D. Mich. 1999), aff'd, 255 B.R. 445 (E.D. Mich.
    2000), aff'd and remanded, 280 F.3d 648 (6th Cir. 2002) ....................................253

In re Drexel Burnham Lambert Grp. Inc.,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) ...................................................................133

In re Drexel Burnham Lambert Grp. Inc.,
    148 B.R. 982 (Bankr. S.D.N.Y. 1992) ...................................................................254

In re Duro Dyne Nat'l Corp.,
    18-27963 (Bankr. D.N.J.) ..................................................................128, 219, 240

In re Duro Dyne Nat'l Corp.,
    2020 WL 6270691 (D.N.J. Oct. 23, 2020) ...........................................................165

In re Eagle-Picher Indus., Inc.,
    144 B.R. 765 (Bankr. S.D. Ohio 1992), aff'd, 164 B.R. 265 (S.D. Ohio 1994) ...................253

In re Eagle-Picher Indus., Inc.,
    203 B.R. 256 (Bankr. S.D. Ohio 1996) .............................................................68, 91

In re Emergency Room Mobile Servs., L.L.C.,
    529 B.R. 676 (N.D. Tex. 2015) ............................................................................229

In re Energy Future Holdings Corp.,
    949 F.3d 806 (3d Cir. 2020) ...............................................................................204

In re Fed.-Mogul Glob. Inc.,
    684 F.3d 355 (3d Cir. 2012) ........................................................................... passim

In re Flintkote Co.,
    486 B.R. 99 (Bankr. D. Del. 2012) ...................................................................158

In re Fraser's Boiler Serv., Inc.,
    2019 WL 1099713 (W.D. Wash. Mar. 8, 2019) ...................................................146

In re Fundamental Long Term Care, Inc.,
    873 F.3d 1325 (11th Cir. 2017) ...........................................................210, 211, 212

In re Future Energy Corp.,
    83 B.R. 470 (Bankr. S.D. Ohio 1988) ...................................................................87

In re G-I Holdings Inc.,
    420 B.R. 216 (D.N.J. 2009) ........................................................................69, 72

In re Garlock Sealing Techs., LLC,
    2017 WL 2539412 (W.D.N.C. June 12, 2017) ...............................................95, 165

In re Garlock Sealing Techs., LLC,
    No. 10-31607 (Bankr. W.D.N.C. May 24, 2017) ...................................................90

In re Gen. Homes Corp.,
    134 B.R. 853 (Bankr. S.D. Tex. 1991) ...............................................................140

In re Gibson,
    308 B.R. 763 (Bankr. N.D. Tex. 2002) ...............................................................257

In re Glob. Indus. Techs., Inc.,
    2013 WL 587366 (Bankr. W.D. Pa. Feb. 13, 2013) .......................................69, 106

In re Global Indus. Techs., Inc.,
    645 F.3d 201 (3d Cir. 2011) ..............................................................................201

In re Haymond,
    638 B.R. 853 (Bankr. S.D. Tex. 2022) ...............................................................254

In re Heritage Org., L.L.C.
    376 B.R. 783 (Bankr. N.D. Tex. 2007) .................................................................87

In re Highland Cap. Mgmt., L.P.,
    No. 19-34054 (Bankr. N.D. Tex.) .......................................................................151

In re HONX, Inc.,
  2022 WL 17984313 (Bankr. S.D. Tex. Dec. 28, 2022) .................................................89, 100

In re HONX Inc.,
  No. 22-90035 (Bankr. S.D. Tex.)........................................................................ passim

In re Imerys Talc Am. Inc.,
  No. 19-10289 (Bankr. D. Del.) ...............................................................................36

In re Imerys Talc Am. Inc.,
  No. 24-1232 (D. Del.)............................................................................................37

In re Insys Therapeutics, Inc.,
  No. 19-11292 (Bankr. D. Del.) .............................................................................240

In re Intrum AB,
  No. 24-90575 (Bankr. S.D. Tex.)...........................................................................98

In re Invacare Corp.,
  No. 23-90068 (Bankr. S.D. Tex.).........................................................................258

In re J T Thorpe Co.,
  308 B.R. 782 (Bankr. S.D. Tex. 2003) ............................................................ passim

In re Johns-Manville Corp.,
  27 F. 3d 48 (2d Cir. 1994)...................................................................................208

In re Johns-Manville Corp.,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986), rev'd in part on other grounds, 78 B.R.
  407 (S.D.N.Y. 1987), aff'd, Kane v. John-Manville Corp.,
  843 F.2d 636 (2d Cir. 1988)..................................................................108, 123, 133

In re Johnson & Johnson Talcum Powder Products Mktg., Sales Practices and
  Products Litig.,
  No. 3:16-md-02738 (MAS) (RLS) (D.N.J.) .........................................................1, 25

In re Joint E. & S. Dist. Asbestos Litig.,
  120 B.R. 648 ........................................................................................................208

In re Joint E. & S. Dist. Asbestos Litig.,
  134 F.R.D. 32 (E.D.N.Y. 1990) ...........................................................................208

In re Kaiser Aluminum Corp.,
  2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006) ..................................................214

In re Kaiser Gypsum Co. Inc.,
  No. 16-31602 (Bankr. W.D.N.C.) ............................................................190

In re Keck, Mahin & Cate,
  241 B.R. 583 (Bankr. N.D. Ill. 1998) .....................................................112

In re Lease Oil Antitrust Litig. (No. II),
  48 F. Supp. 2d 699 (S.D. Tex. 1998) ......................................................209

In re Leslie Controls, Inc.,
  2010 WL 4386935 (Bankr. D. Del. Oct. 28, 2010) .................................214

In re Leslie Controls, Inc.,
  2011 WL 1901547 (Bankr. D. Del. Jan. 18, 2011), aff'd, 2011 WL 1226402
  (D. Del. Mar. 25, 2011).............................................................................165

In re Leslie Controls, Inc.,
  No. 10-12199 (Bankr. D. Del.) .................................................................163

In re Leslie Fay Companies, Inc.,
  207 B.R. 764 (Bankr. S.D.N.Y. 1997).....................................................112

In re Lloyd E. Mitchell, Inc.,
  373 B.R. 416 (Bankr. D. Md. 2007) .........................................................128

In re Logan Place Properties, Ltd.,
  327 B.R. 811 (Bankr. S.D. Tex. 2005) .............................................226, 227

In re LTL Mgmt, LLC,
  637 B.R. 396 (Bankr. D.N.J. 2022) ...........................................91, 94, 98

In re LTL Mgmt., LLC,
  638 B.R. 291 (Bankr. D.N.J. 2022) ...........................160, 176, 187, 188

In re LTL Mgmt. LLC,
  64 F.4th 84 (3d Cir. 2023) ...............................................................14, 99

In re LTL Mgmt. LLC,
  652 B.R. 433 (Bankr. D.N.J. 2023) .................................................15, 16, 41

In re LTL Mgmt. LLC,
  No. 21-30589 (Bankr. W.D.N.C.)........................................................10, 13

In re LTL Mgmt. LLC,
   No. 23-12825 (Bankr. D.N.J.) ................................................................3, 15

In re Mallinckrodt PLC,
   639 B.R. 837 (Bank. D. Del. 2022) ...............................................146

In re Mallinckrodt PLC,
   No. 20-12522 (Bankr. D. Del.) ...........................................................123

In re Maremont Corp.,
   601 B.R. 1 (Bankr. D. Del. 2019) ...............................128, 171, 214, 217

In re Maremont Corp.,
   No. 19-10118 (Bankr. D. Del.) ...........................................................69

In re Martin,
   66 B.R. 921 (Bankr. D. Mont. 1986) ..................................................132

In re Mid-Valley, Inc.,
   No. 03-35592 (Bankr. W.D. Pa.) ......................................................156

In re Mkt. Square Inn, Inc.,
   978 F.2d 116 (3d Cir. 1992) ............................................................137

In re N. Am. Refractories Co.,
   No. 02-20198 (Bankr. W.D. Pa.) ......................................................188

In re New Life Adult Med. Day Care Ctr., Inc.,
   2014 WL 6851258 (Bankr. D.N.J. Dec. 3, 2014) ...............................142

In re Oakfabco, Inc.,
   No. 15-27062 (Bankr. N.D. Ill.) .......................................................128

In re Pac. Lumber Co.,
   584 F.3d 229 (5th Cir. 2009) ...............................................145, 202, 203

In re Paddock Enters., LLC,
   2022 WL 1746652 (Bankr. D. Del. May 31, 2022) ...................... passim

In re Paddock Enters., LLC,
   No. 20-10028 (Bankr. D. Del. May 26, 2022) ............................ passim

In re Pearl Res. LLC,
   622 B.R. 236 (Bankr. S.D. Tex. 2020) ..........................................84, 93

In re PG&E Corp.,
   No. 19-30088 (Bankr. N.D. Cal.)......................................................................123, 128

In re Pisces Energy LLC,
   2009 WL 7227880 (Bankr. S.D. Tex. Dec. 21, 2009) ...........................................138

In re Pittsburgh Corning Corp.,
   2013 WL 2299620 (Bankr. W.D. Pa. May 24, 2013), aff'd and adopted sub
   nom. Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp.,
   518 B.R. 307 (W.D. Pa. 2014) .................................................................70, 191, 214

In re Pittsburgh Corning Corp.,
   417 B.R. 289 (Bankr. W.D. Pa. 2006) ....................................................................178

In re Plant Insulation Co.,
   469 B.R. 843 (Bankr. N.D. Cal. 2012) ...................................................................121

In re Purdue Pharma L.P.,
   633 B.R. 53 (Bankr. S.D.N.Y. 2021)...............................................................120, 121

In re Quigley Co.,
   346 B.R. 647 (Bankr. S.D.N.Y. 2006)............................................................123, 127

In re Quigley Co.,
   377 B.R. 110 (Bankr. S.D.N.Y. 2007)......................................................76, 105, 106

In re Quigley Co.,
   391 B.R. 695 (Bankr. S.D.N.Y. 2008) ....................................................................229

In re Quigley Co.,
   676 F.3d 45 (2d Cir. 2012)......................................................................185, 186, 187

In re Quigley Co., Inc.,
   437 B.R. 102 (Bankr. S.D.N.Y. 2010)............................................................105, 157

In re Rash,
   90 F.3d 1036 (5th Cir. 1996), rev'd on other grounds, Assocs. Commercial
   Corp. v. Rash, 520 U.S. 953 (1997).......................................................................184

In re Robertshaw US Holding Corp.,
   662 B.R. 300 (Bankr. S.D. Tex. 2024) .................................................67, 140, 141

In re Robertshaw US Holding Corp.,
   No. 24-90052 (Bankr. S.D. Tex.)...........................................................................148

In re Roman Catholic Diocese of Syracuse,
    2024 WL 5054809 (Bankr. N.D.N.Y. Dec. 9, 2024)....................................................229, 230

In re Samurai Martial Sports,
    644 B.R. 667 (Bankr. S.D. Tex. 2022) ...................................................................................112

In re San Jacinto Glass Indus., Inc.,
    93 B.R. 934 (Bankr. S.D. Tex. 1988) ...................................................................................201

In re Seaside Eng'g & Surveying, Inc.,
    780 F.3d 1070 (11th Cir. 2015) ...........................................................................................201

In re Sheridan Holding Co. II, LLC,
    No. 19-35198 (Bankr. S.D. Tex.)..........................................................................................147

In re Sherwood Square Assocs.,
    107 B.R. 872 (Bankr. D. Md. 1989) .....................................................................................110

In re Specialty Prods. Holding Corp.,
    No. 10-11780 (Bankr. D. Del.) .............................................................................................155

In re Strategic Materials, Inc.,
    No. 23-90907 (Bankr. S.D. Tex.)..........................................................................................152

In re Swan Transp., Co.,
    No. 01-11690 (Bankr. D. Del.) .............................................................................................155

In re Taco Bueno Rests., Inc.,
    2018 WL 6720774 (Bankr. N.D. Tex. Dec. 20, 2018) .........................................................147

In re Talc Based Powder Prods.,
    MCL No. 300 (N.J. Sup. Ct. Oct. 20, 2015) ...........................................................................24

In re Tehum Care Servs., Inc.,
    No. 23-90086 (Bankr. S.D. Tex.)............................................................................................94

In re Texaco Inc.,
    84 B.R. 893 (Bankr. S.D.N.Y. 1988).....................................................................................110

In re TK Holdings Inc.,
    No. 17-11375 (Bankr. D. Del.) ......................................................................................123, 240

In re Toy & Sports Warehouse, Inc.,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984).........................................................................68, 84, 122

In re Trinity Family Practice & Urgent Care PLLC,
  661 B.R. 793, 814-15 ...........................................................................................103

In re TXNB Internal Case,
  483 F.3d 292 (5th Cir. 2007) ..............................................................................206

In re United Gilsonite Laboratories,
  No. 11-02032 (Bankr. M.D. Pa.) .........................................................................123

In re USA Gymnastics,
  No. 18-09108 (Bankr. S.D. Ind.) .........................................................................123

In re USG Corp.,
  No. 01-2094 (Bankr. D. Del.) ..............................................................................163

In re Uwimana,
  284 B.R. 218 (D. Md. 2002) ...............................................................................201

In re Village at Camp Bowie I, L.P.,
  710 F.3d 239 (5th Cir. 2013) ..............................................................................184

In re Vitro Asset Corp.,
  2013 WL 6044453 (Bankr. N.D. Tex. Nov. 14, 2013) ...........................................68

In re VROOM, Inc.,
  No. 24-90571 (Bankr. S.D. Tex.).........................................................................148

In re W.E. Parks Lumber Co.,
  19 B.R. 285 (Bankr. W.D. La. 1982) ...................................................................110

In re W.R. Grace & Co.,
  446 B.R. 96 (Bankr. D. Del. 2011), aff'd, 468 B.R. 81 (D. Del. 2012)............................74, 92

In re W.R. Grace & Co.,
  475 B.R. 34 (D. Del. 2012) ............................................................................ passim

In re W.R. Grace & Co.,
  729 F.3d 311 (3d Cir. 2013).......................................................................... passim

In re W.R. Grace & Co,
  900 F.3d 126 (3d. Cir. 2018)...............................................................................178

In re Wash. Mut., Inc.,
  442 B.R. 314 (Bankr. D. Del. 2011) ..............................................................92, 146

In re Wedtech Corp.,
    87 B.R. 279 (Bankr. S.D.N.Y. 1988)........................................................253

In re Wesco Aircraft Holdings, Inc.,
    No. 23-90611 (Bankr. S.D. Tex.)............................................................148

In re Whittaker, Clark, and Daniels,
    663 B.R. 1 (Bankr. D.N.J. 2024) ............................................................169

In re Wool Growers Cent. Storage Co.,
    371 B.R. 768 (Bankr. N.D. Tex. 2007)..........................................202, 203

In re Wyly,
    553 B.R. 318 (Bankr. N.D. Tex. 2016)....................................................104

In re Yarway Corp.,
    No. 13-11025 (Bankr. D. Del.) ...............................................................128

Ingham et al. v. Johnson & Johnson et al.,
    No. 1522-CC10417-01 (St. Louis Cir.) ..................................................187

Ingham v. Johnson & Johnson,
    608 S.W.3d 663 (Mo. Ct. App. 2020)......................................................31

Ingham v. Johnson & Johnson,
    No. 1522-CC10417, Circuit Court of the City of St. Louis,....................11

IRS v. Luongo (In the Matter of Luongo),
    259 F.3d 323 (5th Cir. 2001) .................................................................256

Irving Tanning Co. v. Me. Superintendent of Ins.,
    496 B.R. 644 (1st Cir. B.A.P. 2013)......................................................241

J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.,
    58 N.Y.S.3d 38 (N.Y. App. Div. 2017) .................................................246

Johnson v. Home State Bank,
    501 U.S. 78 (1991)................................................................................104

Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.),
    843 F.2d 636 (2d Cir. 1988)..............................................68, 123, 124, 181

L.C.S., Inc. v. Lexington Ins. Co.,
    853 A.2d 974 (N.J. Super. Ct. App. Div. 2004)....................................247

Lexmark Int'l, Inc. v. Static Control Components, Inc.,
    572 U.S. 111 (2014).................................................................................228

Liberty Mut. Ins. Co. v. Gunderson,
    387 Fed. App'x 480 (5th Cir. 2010) ......................................................209

Loper Bright Enters. v. Raimondo,
    144 S.Ct. 2244 (2024)..............................................................................184

Lovejoy v. Murray,
    70 U.S. 1 (1865).......................................................................................199

Lynch v. Johns-Manville Sales Corp.,
    710 F.2d 1194 (6th Cir. 1983) ................................................................182

Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Co-Op, Inc.),
    150 F.3d 503 (5th Cir. 1998) .........................................................108, 109

Matter of Briscoe Enters., Ltd., II,
    994 F.2d 1160 (5th Cir. 1993) ..................................................................93

Matter of Carroll,
    850 F.3d 811 (5th Cir. 2017) ..................................................................209

Matter of Commonwealth Oil Ref. Co., Inc.,
    805 F.2d 1175 (5th Cir. 1986) ................................................................205

Matter of Highland Capital Mgmt.,
    48 F.4th 419 (5th Cir. 2022) ...............................................145, 151, 158

Matter of Little Creek Dev. Co.,
    779 F.2d 1068 (5th Cir. 1986) ..................................................................98

McCormick v. Bane One Leasing Corp. (In re McCormick),
    49 F.3d 1524 (11th Cir. 1995) ..................................................................88

Menard-Sanford v. Mabey (In re A.H. Robins, Co.),
    880 F.2d 694 (4th Cir. 1989), cert. denied, 493 U.S. 959 (1989)..................123, 199

Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp.,
    518 B.R. 307 (W.D. Pa. 2014)................................................................190

N. Cty. Mut. Ins. Co. v. Davalos,
    140 S.W.3d 685 (Tex. 2004)...................................................................246

Nalle v. Hale,
  2023 Tex. App. LEXIS 1864 (Tex. App. Mar. 23, 2023)......................................................200

Newby v. Enron Corp.,
  302 F.3d 295 (5th Cir. 2002) ...........................................................................................206, 210

Newby v. Enron Corp.,
  338 F.3d 467 (5th Cir. 2003) ...........................................................................................206, 210

Next Level Commc'ns LP v. DSC Commc'ns Corp.,
  179 F.3d 244 (5th Cir. 1999) ...........................................................................................200, 207

NL Indus., Inc. v. Commercial Union Ins. Co.,
  828 F. Supp. 1154 (D.N.J. 1993), as amended (Sept. 24, 1993)...........................................246

NLRB v. Bildisco & Bildisco,
  465 U.S. 513 (1984).................................................................................................................137

NLRB v. Bildisco & Bildisco (In re Bildisco),
  682 F.2d 72 (3d Cir. 1982), aff'd, 465 U.S. 513 (1984).........................................................138

OneBeacon Am. Ins. Co. v. A.P.I., Inc.,
  2006 WL 1473004 (D. Minn. May 25, 2006).........................................................................242

Ortiz v. Fibreboard,
  527 U.S. 815 (1999).........................................................................................................221, 222

Owens-Ill., Inc. v. United Ins. Co.,
  650 A.2d 974 (N.J. 1994).........................................................................................................247

Pitts v. Unarco Indus., Inc.,
  698 F.2d 313 (7th Cir. 1983) ...................................................................................................182

Prudential Ins. Co. of Am. v. Monnier (In re Monnier Bros.),
  755 F.2d 1336 (8th Cir. 1985) .................................................................................................133

Rawlins v. Kan.,
  714 F.3d 1189 (10th Cir. 2013) ...............................................................................................207

Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am.,
  323 A.2d 495 (N.J. 1974)........................................................................................................248

Singer v. Olympia Brewing Co.,
  878 F.2d 596 (2d Cir. 1989).....................................................................................................199

SL Indus., Inc. v. Am. Motorists Ins. Co.,
607 A.2d 1266 (N.J. 1992) ...................................................................................246

Stott v. Capital Fin. Servs., Inc.,
277 F.R.D. 316 (N.D. Tex. 2011) .................................................................205, 209

Superior MRI Servs. v. Alliance HealthCare Servs.,
778 F.3d 502 (5th Cir. 2015) ...............................................................................228

T.L. James & Co. v. Statham,
558 S.W.2d 865 (Tex. 1977)................................................................................200

Taransky v. Sec'y of U.S. Dep'tof Health & Human Servs.,
760 F.3d 307 (3d Cir. 2014)................................................................................251

Teas v. Twentieth Century-Fox Film Corp.,
413 F.2d 1263 (5th Cir. 1969) .............................................................................205

Thibodeaux v. Fibreboard Corp.,
706 F.2d 728 (5th Cir. 1983) ...............................................................................200

Thorogood v. Sears, Roebuck & Co.,
627 F.3d 289 (7th Cir. 2010) ...............................................................................209

Truck Ins. Exch. v. Kaiser Gypsum Co.,
602 U.S. 268 (2024)....................................................................................228, 229

Tull v. U.S.,
481 U.S. 412 (1987)....................................................................................219, 220

U.S. v. New York Tel. Co.,
434 U.S. 159 (1977)............................................................................................205

United States ex rel. United States Postal Serv. v. Dewey Freight Sys., Inc.,
31 F.3d 620 (8th Cir. 1994) .................................................................................201

Wedgeworth v. Fibreboard Corp.,
706 F.2d 541 (5th Cir. 1983) ...............................................................................182

**STATUTES**

18 U.S.C.A. § 1956(c)(4) ...................................................................................196

11 U.S.C.

   § 101 .................................................................................................. passim
   § 362 ......................................................................................................99
   § 365 ...............................................................................................83, 137
   § 502 .................................................................................................. passim
   § 503 ....................................................................................................131
   § 507 ......................................................................................70, 118, 131
   § 524(g) .............................................................................................. passim
   § 550 ....................................................................................................201
   § 553 ...............................................................................................256, 257
   § 704 ....................................................................................................118
   § 1102 ....................................................................................................56
   § 1103 ...................................................................................................145
   § 1114 ...................................................................................................136
   § 1122 .................................................................................................. passim
   § 1125 .................................................................................................. passim
   § 1123 .................................................................................................. passim
   § 1126 .......................................................................................54, 84, 122
   § 1127 ....................................................................................................59
   § 1129 .................................................................................................. passim
   § 1141 .................................................................................................. passim
   § 1144 ...............................................................................................226, 227
   § 1190 ...................................................................................................112

28 U.S.C.

   § 157(b) ................................................................................................223
   § 1334(b) ..............................................................................................205
   § 1411 ...............................................................................................219, 223
   § 1651 .................................................................................................. passim
   § 1930 ...................................................................................................136
   § 2283 ...................................................................................................211
   § 2403 ...................................................................................................218

42 U.S.C. § 1395y ...........................................................................................251

Pub. L. No. 103-394
   § 111(b) (Oct. 22, 1994) ...............................................................204, 212

Tex. Bus. Orgs. Code Ann.
§ 10.008(a) ...............................................................................................231

Tex. Civ. Prac. & Rem. Code
§ 82.002(a) ...............................................................................................177

**OTHER AUTHORITIES**

16 C.F.R. § 500.5 ...........................................................................................185

31 C.F.R. § 597.308 .......................................................................................196

42 C.F.R. § 411.24 .....................................................................................passim

42 C.F.R. § 411.37 .........................................................................................250

138 Cong. Rec. S8335-36 (daily ed. June 17, 1992) ....................................180

66 Fed. Reg. 35437 .........................................................................................249

7C Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure
§ 1958 (3d ed. 2024) ................................................................................160

Anthony J. Casey & Joshua C. Macey, *In Defense of Chapter 11 for Mass Torts*,
90 U. Chi. L. Rev. 973, 984 (2023) ..........................................................94

Christopher Klein *et al.*, *Principles of Preclusion and Estoppel in Bankruptcy
Cases*, 79 AM. BANKR. L.J. 839, 840 (2005)...........................................201

H.R. Rep. No. 95-595 (1977).................................................................68, 84

S. Rep. No. 95-989 (1978)......................................................................68, 84

Restatement (Second) of Torts § 885 .............................................................199

Restatement (Second) of Torts § 886B ...........................................................177

Restatement (Third) of Torts § 22 ..................................................................177

**RULES**

Fed. R. Bankr. P. 3017.............................................................................54, 84

Fed. R. Bankr. P. 3018.....................................................................54, 84, 123

Fed. R. Bankr. P. 3019 ................................................................................................59, 60, 62

Fed. R. Bankr. P. 3020 ................................................................................................258

Fed. R. Bankr. P. 9005.1 .............................................................................................218

Fed. R. Bankr. P. 9019 ................................................................................................140

Fed. R. Civ. P. 5.1 .......................................................................................................218

Fed. R. Civ. P. 19 ........................................................................................................182

Fed. R. Civ. P. 23 ........................................................................................................221

Fed. R. Civ. P. 25(c) ...........................................................................................159, 160

Fed. R. Civ. P. 30(b)(6) ................................................................................................13

Fed. R. Civ. P. 60(b) ...........................................................................................226, 227

Fed. R. Evid. 702 ..........................................................................................................25

Red River Talc LLC ("Red River" or the "Debtor") submits this Memorandum of Law:
(a) in support of confirmation of the *Second Amended Prepackaged Chapter 11 Plan of
Reorganization of the Debtor* [Dkt. 722] (as it may be further modified, the "Plan"),[2] pursuant to
sections 524(g) and 1129 of title 11 of the United States Code (the "Bankruptcy Code") and
(b) in reply to objections to the Plan (collectively, the "Objections" and the parties thereto
collectively, the "Objectors"), which objections are listed in the attached Exhibit A.

## I.  PRELIMINARY STATEMENT

The Plan, which proposes to fund a trust with $9 billion for the payment of current and
future Ovarian Cancer and other Gynecological Cancer claims, embodies one of the largest mass
tort settlements in the history of the United States, and in fact is the largest asbestos settlement in
U.S. history.  It has been the subject of many mediations conducted by multiple mediators over
the past three years, and has been extensively negotiated at arm's length with numerous plaintiff
firms representing the substantial majority of claimants, as well as with a legal representative
acting on behalf of future claimants.  The Plan proposes to pay this historic amount, plus J&J has
separately agreed to contribute $650 million to a qualified settlement fund for the payment of
common benefit fees, which would be due if the settlement had been reached in the federal talc
multi-district litigation (the "MDL").[3]  This even though, unlike most other bankruptcy
resolutions of its kind, (a) general causation remains hotly disputed and (b) plaintiffs, in more
than 10 years of litigation, have obtained only one verdict that has survived appeal.

---

[2]      Capitalized terms not otherwise defined herein have the meanings given to them in the Plan.  The Debtor
will be filing a further amended version of the Plan in advance of the confirmation hearing to reflect the
modifications described herein, and will also file a redline to the Plan for ease of review by the Court and
the parties.

[3]      In re Johnson & Johnson Talcum Powder Products Mktg., Sales Practices and Products Litig., No. 3:16-md-
02738 (MAS) (RLS) (D.N.J.).

The Talc Personal Injury Trust to be established under the Plan is designed to pay claimants much more efficiently and faster than has occurred in the tort system, and to pay similarly situated claimants equivalent amounts.  This is in sharp contrast to the tort system where the vast bulk of claimants have received nothing (while one consolidated group of plaintiffs received hundreds of millions of dollars), and the timeframe for trial is years if not decades away (if ever).

The Plan is supported by the Official Committee of Talc Claimants (the "Committee"), the Ad Hoc Committee of Supporting Counsel (the "AHC") and the legal representative for future claimants (the "FCR"), subject to the resolution of certain process issues.  Most importantly, the Plan has received overwhelming support from current claimants.  Over 83% of the over 93,000 claimants who voted on the Plan voted to accept the Plan.  Although the voting results and the solicitation agent have been the subject of a variety of attacks, under every conceivable resolution of those attacks (with one minor exception), more than 75% of the claimants accepted the Plan, as required by section 524(g) of the Bankruptcy Code.  And that one minor exception would require a determination that every vote of The Smith Law Firm PLLC (the "Smith Firm") must be replaced by every vote of Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. ("Beasley Allen"), including the approximately 5,500 gynecological cancer claims that Beasley Allen voted to reject the Plan without disclosing to those claimants (its clients) that, in direct conflict with their interests, it was taking the position that the claims were non-compensable in both the tort system and in the bankruptcy case.  For many reasons, including Beasley Allen's failure to disclose this conflict with respect to the gynecological cancer claims that comprised approximately half of Beasley Allen's total ballot, there is no basis to make that determination.

Although the Objections to the Plan raise a multitude of issues and aggregate hundreds of pages, there are only three main Objectors or groups of Objectors:

- The so-called "Coalition," which appears to now consist of only two law firms out of the approximately 200 plaintiff firms involved in this case. The Coalition firms have asserted until just recently that they were unwilling to agree to any resolution in bankruptcy and their opposition appears motivated by an economic conflict based on their (but not their clients') entitlement to common benefit fees in the MDL, which are ordinarily not payable in bankruptcy.

- The Office of the United States Trustee (the "U.S. Trustee"), an entity with no economic stake in this case that has been appearing primarily through its office in New Jersey and largely acting in lockstep with the Coalition.[4]

- Various insurers, which appear to be using their objections as a means to advance their positions in ongoing coverage litigation against the Debtor and J&J; the Plan does not alter but instead fully preserves their rights.

The Debtor believes it has proposed modifications to the Plan that resolve many of the other Objections that have been lodged against the Plan, and is working with the FCR, the Committee, the AHC and the Smith Firm to attempt to resolve the FCR's concerns regarding the Plan.

The Plan has been proposed in good faith. It reflects extensive input from claimant representatives, is supported by all the primary creditor constituencies and has been accepted by the requisite supermajority of current claimants. The prepetition divisional merger was carried out under Texas law with the support of the AHC to facilitate confirmation of the Plan. No court has held that the use of a divisional merger reflects bad faith or is otherwise improper. The disclosure statement and solicitation procedures were reviewed and approved by the AHC. And,

---

[4]     The U.S. Trustee was so closely aligned with plaintiff firms on the official committee of talc claimants in the 2023 Chapter 11 Case (defined herein) that counsel for the committee took the position that it shared a common interest with the U.S. Trustee. See In re LTL Mgmt. LLC, No. 23-12825 (MBK) (Bankr. D.N.J. May 1, 2023), Dkt. 376 (letter to the New Jersey bankruptcy court stating that counsel to the committee, during his deposition and following instructions from counsel, "repeatedly refused to answer questions about his communications with the [U.S.] Trustee based on an alleged common-interest with the [U.S.] Trustee" and citing to relevant deposition excerpts).

as shown below, the Plan meets all the requirements of sections 1129 and 524(g) of the Bankruptcy Code.

This is a full pay case. That conclusion is supported by expert testimony the Debtor will present at trial. Indeed, on average, claimants will receive approximately **two times** what they might receive in the tort system. That conclusion is also supported by the fact that the vast majority of plaintiff firms have agreed to the settlement, an unlikely result if the firms did not believe the settlement paid their clients in full. That the Debtor has sufficient funds to pay talc claims in full is not bad faith; to the contrary, it shows good faith. Many solvent companies have used chapter 11 to resolve mass tort claims. The full-pay nature of the Plan also dispels any notion that the Supreme Court's decision in Purdue[5] has any bearing on confirmation. That decision "important[ly]," declined to "pass upon a plan that provides for the full satisfaction of claims against a third-party nondebtor." Id. at 226.

Although the Coalition argues in its objection that this bankruptcy case is an "existential" threat to the purposes of the Bankruptcy Code and section 524(g), that section 524(g) is unconstitutional and that the Plan fails "numerous" provisions of sections 1129(a) and 524(g), apparently all those concerns go away if the Debtor and J&J agree to pay more money. In its recent objection to the Debtor's request to extend exclusivity, the Coalition for the first time states that it is not opposed to the bankruptcy if the Debtor agrees to "reasonable" terms, which include a demand for more money.[6] The Coalition's newly found position on this case belies the credibility of almost the entirety of its Objection.

---

[5]     Harrington v. Purdue Pharma L.P., 603 U.S. 204 (2024).

[6]     See Dkt. 1040 ¶ 18 ("The Coalition firms were and are willing to support a bankruptcy resolution but only if the Debtor agrees to reasonable terms necessary to protect their clients' interests in a confirmable plan."); id. ¶ 19 ("The Coalition's objection is not to the use of bankruptcy to resolve mass tort liabilities per se.") (emphasis in original).

The Debtor respectfully submits that the Plan should be confirmed.

## II.      BACKGROUND AND OVERVIEW OF THE PLAN[7]

### A.      The Debtor's Predecessors and Related Restructurings[8]

The Debtor traces its roots back to Johnson & Johnson Baby Products Company ("J&J Baby Products"), a New Jersey company incorporated in 1970 as a wholly owned subsidiary of Johnson & Johnson ("J&J").[9]  J&J, a New Jersey company incorporated in 1887, first began selling JOHNSON'S® Baby Powder in 1894, launching its baby care line of products.  In 1972, J&J established a formal operating division for its baby products business, which included JOHNSON'S® Baby Powder (the "Baby Division").

In the 1970s, J&J determined to decentralize its operations as a part of a growth and innovation strategy.  In connection with decentralization, J&J converted into a holding company, and certain J&J subsidiaries received all assets and operational responsibilities, and assumed all liabilities associated with, designated operating divisions of J&J.  The purpose of decentralization was to drive creativity and productivity by giving each company autonomy to make decisions without unnecessary constraints.  J&J's contemporaneous public U.S. Securities and Exchange Commission disclosures, and board meeting minutes, emphasize the importance of J&J's decentralization strategy to its businesses.

---

[7]      The Debtor believes that most of the facts set forth herein are uncontroverted and has included citations to various declarations and documents filed in, as well as depositions conducted in connection with, the chapter 11 case.  The Debtor will submit evidence establishing these facts, including those contained in declarations, documents and deposition transcripts, at the confirmation hearing.

[8]      The following is discussed in further detail in the *Decl. of John K. Kim in Supp. of Chapter 11 Case and Certain First Day Pleadings* [Dkt. 17] (the "First Day Declaration") ¶¶ 18-28 and the *Decl. of John K. Kim in Supp. of Debtor's Compl. for Declaratory and Injunctive Relief and Related Mot.* [Adv. Pro. No. 24-3194, Adv. Dkt. 3] (the "Kim PI Declaration") ¶¶ 17-30.

[9]      The Debtor's ultimate parent company, J&J, is a holding company that through its operating subsidiaries conducts business in virtually all countries in the world, focused primarily on products related to human health and well-being.  J&J is a global innovator and leader in public health and has been at the forefront of healthcare innovation for over 130 years.  That innovation includes novel oncology, immunology and cardiology products.

In 1978, consistent with J&J's determination to decentralize its business, J&J transferred all its assets and liabilities associated with the Baby Division to J&J Baby Products.  See Nov. 15, 2024 John K. Kim Dep. (the "Kim Dep."), 308:6-11.  This was part of a larger restructuring of J&J that included the transfer of assets and liabilities of seven principal operating divisions to wholly owned subsidiaries.  Contemporaneous board minutes confirm that:

> **[T]he incorporation of seven principal operating divisions of Johnson & Johnson effective January 1, 1979 as wholly-owned subsidiaries** . . . will be accomplished by a transfer of assets from the divisions to the corporations respectively which **will also assume the liabilities of the divisions** respectively . . . .  In keeping with Johnson & Johnson's long standing policy of decentralization of corporate business, and in light of substantial potential state tax savings, as well as additional legal considerations, the matter has been approved by the Executive Committee in June 1978 and reported to the Board on July 1978.

Dec. 12, 1978 Board of Directors Meeting Minutes at 2-3 (emphasis added).[10]

To effectuate the transaction, J&J and J&J Baby Products entered into an *Agreement for Transfer of Assets and Bill of Sale*, effective January 1, 1979 (the "1979 Agreement"),[11] pursuant to which J&J transferred all assets and liabilities associated with the Baby Division to J&J Baby Products.  The 1979 Agreement provides that J&J Baby Products assumed all liabilities of every kind and description associated with the Baby Division and indemnified J&J for such liabilities.  See Kim Dep. 308:6-11.  In particular:

> . . . Subsidiary agrees to assume . . . **all the indebtedness, liabilities and obligations of every kind and description which are allocated on the books or records of J&J as pertaining to its BABY Division** and the Subsidiary hereby covenants and agrees with J&J that the **Subsidiary will forever . . . indemnify and save**

---

[10]     A copy of the Dec. 12, 1978 Board of Directors Meeting Minutes was attached as Exhibit 4 to the Kim PI Declaration.

[11]     A copy of the 1979 Agreement was attached as Annex B to the First Day Declaration.

> **harmless J&J against all the indebtedness, liabilities and obligations aforesaid hereby assumed** . . . .
>
> . . .the covenants and agreements herein contained shall inure to the benefit of and shall bind the respective parties hereto and their respective successors and assigns.

1979 Agreement §§ 4-5 (emphasis added); accord id. § 1 ("J&J . . . does grant, bargain, sell, assign, alien, remise, release, convey, transfer, set over and confirm, unto the Subsidiary, its successors and assigns, forever, all the businesses, franchises, properties and assets . . . which are now allocated on its books or records of J&J to its Baby Division . . .").

The 1979 Agreement also provided J&J Baby Products with an irrevocable power of attorney to substitute itself "**for J&J and in its [J&J's] name and stead** . . . **on behalf of and for the benefit of the Subsidiary**" to, among other things, "**defend and compromise any and all actions,** suits or proceedings in respect of any said Properties"—defined as the Baby Division's "businesses, franchises, properties and assets." Id. §§ 1.iv, 2; see also Kim Dep. 310:9-311:10.

Following the 1979 Agreement, J&J no longer manufactured or sold baby products, including JOHNSON'S® Baby Powder. See Kim Dep. 308:2-5. Thus, in 1979, J&J Baby Products became the real party in interest for all actions, suits or proceedings relating to the talc products previously sold by J&J or in any way arising out of the talc business that had been transferred by J&J to J&J Baby Products.

In 1981, J&J Baby Products transferred all its assets, except those assets allocated to its diaper programs, to Omni Education Corporation ("Omni"), a wholly owned subsidiary of J&J Baby Products. See Kim PI Decl., Ex. 6 (Johnson & Johnson Baby Products Company Action Authorized by Unanimous Consent of Shareholder in Lieu of a Special Meeting of Shareholder, dated July 12, 1981). In turn, Omni assumed all liabilities of J&J Baby Products except those

liabilities related to its diaper program, and agreed to indemnify J&J Baby Products against all assumed liabilities.  Id. § 4.  Immediately following the transaction, J&J Baby Products merged into another subsidiary of J&J and was renamed Personal Products Company, and Omni changed its name to Johnson & Johnson Baby Products Company.  In 1989, Personal Products Company changed its name to McNeil-PPC, Inc.

In 1988, Johnson & Johnson Baby Products Company transferred all its assets in respect of its baby products business to Johnson & Johnson Dental Products Company, which assumed all of the liabilities of, and agreed to indemnify Johnson & Johnson Baby Products Company and was renamed Johnson & Johnson Consumer Products, Inc.  See Kim PI Decl., Ex. 7 (Agreement for Transfer of Assets and Bill of Sale by and between Johnson & Johnson Baby Products Company and Johnson & Johnson Dental Products Company, dated January 3, 1988).

In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to Johnson and Johnson Consumer Companies, Inc. ("J&J Consumer Companies").  See Kim PI Decl., Ex. 8 (Certificate of Amendment to the Certificate of Incorporation of Johnson & Johnson Consumer Products, Inc., dated July 1, 1997).  In 2015, J&J Consumer Companies merged with and into an affiliate, which then merged into McNeil-PPC, Inc.  The resulting entity was renamed Johnson & Johnson Consumer Inc. (including all former names and historical forms, "Old JJCI").[12]

Following these intercompany transactions, Old JJCI became responsible for all claims alleging that JOHNSON'S® Baby Powder and other talc-containing products cause cancer or

---

[12]     This transaction is reflected in the *Certificate of Merger of Johnson & Johnson Consumer Companies, Inc. With and Into Johnson & Johnson Consumer Companies, LLC*, dated June 23, 2015, and the *Certificate of Merger of Neutrogena, LLC, Johnson & Johnson Consumer Companies, LLC, and Johnson & Johnson Sales and Logistics Company, LLC With and Into McNeil-PPC, Inc.*, dated June 15, 2015, copies of which are attached as Exhibits 11 and 10, respectively, to the Kim PI Declaration.

-8-

other diseases.  Old JJCI also was obligated to indemnify J&J for all claims relating to the talc products.  <u>See</u>, <u>e.g.</u>, Kim Dep. 313:22-314:7.

Similar to JOHNSON'S® Baby Powder, Old JJCI also became responsible for all claims alleging that Shower to Shower products, which contained talc, caused cancer or other diseases. Prior to the institution of the 1970s decentralization policy, Shower to Shower products were marketed by a division of J&J, the Johnson & Johnson Domestic Operating Company division. Consistent with J&J's decentralization efforts and its transition to a holding company, effective January 1, 1978, J&J transferred all assets and liabilities related to Shower to Shower products to Personal Products Company, a wholly owned subsidiary of J&J, and Personal Products Company thereafter assumed operational responsibility for the Shower to Shower products.  Contemporary internal documents confirm the transfer of both J&J's Shower to Shower assets and liabilities:

> As we discussed, **Personal Products Company will take full responsibility for SHOWER TO SHOWER\*** on January 1, 1978. During January, I will take the necessary steps to register with FDA and our Consumer Affairs Department will be taking over the complaint handling.

Oct. 31, 1977 internal Personal Products Company letter (emphasis added).[13]

Contemporaneous public filings by J&J confirm that Personal Products Company in fact took responsibility for the Shower to Shower products.  <u>See</u> Kim PI Decl., Ex. 14 (1977 Annual Report of J&J, dated January 1, 1978).  Personal Products Company was primarily focused on feminine hygiene products.  In addition to Shower to Shower products, Personal Products Company was also responsible for MODESS, Stayfree, Sure & Natural brands of sanitary napkins, Carefree Panty Shields and Coets brand cosmetic squares.  Internal accounting records

---

[13]    A copy of the Oct. 31, 1977 internal Personal Products Company letter was attached as Exhibit 12 to the Kim PI Declaration.

for year-end December 31, 1978, show that expenses associated with the Shower to Shower products were recorded on the books of Personal Products Company.  <u>See</u> Kim PI Decl., Ex. 16.

The operational responsibilities, liabilities and assets related to Shower to Shower products were transferred from Personal Products Company to Johnson & Johnson Baby Products Company by early 1987.

In 2012, Old JJCI sold the assets and liabilities related to certain products, including the Shower to Shower products, to Valeant Pharmaceuticals International, Inc. ("<u>Valeant</u>"). Thereafter, in 2019, Old JJCI and Valeant (now known as Bausch Health Companies Inc. ("<u>Bausch</u>")) entered into an indemnification agreement.  <u>See</u> Kim PI Decl., Ex. 19.  Pursuant to that indemnification agreement, Old JJCI agreed to indemnify Valeant for any liability arising from Shower to Shower products and for certain other regulatory actions arising out of the manufacture, use or sale of Shower to Shower products, as set forth more fully in the agreement.

**B.      Health and Medical Safety Decisions Were Made By Old JJCI[14]**

Old JJCI was responsible for the safety of JOHNSON'S® Baby Powder and Shower to Shower products when it was the manufacturer thereof.  Old JJCI's former Chief Medical Officer, Dr. Edwin Kuffner, confirmed in the 2021 Chapter 11 Case (as defined below) that "I have ultimate responsibility for the safety of the products within [Old JJCI].  That lies with me." <u>See</u> Kim PI Decl., Ex. 20 (excerpts of Kuffner testimony from <u>In re LTL Mgmt. LLC</u>, No. 21-30589 (JCW) (Bankr. W.D.N.C.), Nov. 5, 2021 Hr'g Tr. 374:13-376:8); Kim PI Decl., Ex. 21 (J&J Medical Safety Standard, dated Jan. 1, 2014) §1 ("Each sector within Johnson & Johnson . . . shall establish policies and process that adhere to the . . . Safety Standard").

---

[14]      The following is discussed in the Kim PI Declaration ¶ 31.

This has been confirmed by the Chief Medical Officer of J&J, Dr. Joanne Waldstreicher, who has testified in the talc products liability litigation that decisions about the safety of talc products were made by the safety and medical officers at Old JJCI, not those at J&J.  See Kim PI Decl., Ex. 22 (excerpts of Waldstreicher testimony from Ingham v. Johnson & Johnson, No. 1522-CC10417, Circuit Court of the City of St. Louis, State of Missouri, April 19, 2017 Dep. Tr. 14:15-15:9; 60:15-62:1; 92:5-94:7; 102:5-103:6; 168:2-17; 171:7-172:17; 182:6-18; 192:3-11; 212:21-213:11, and Leavitt v. Johnson & Johnson, RGI 7882401, Superior Court of California, County of Alameda, Sept. 14, 2018 Dep. Tr. 131:8-133:9).  Dr. Waldstreicher further testified that Old JJCI's safety officers were responsible for reviewing and approving J&J's public statements about the safety of talc products before the statements were released to the public.  Id.  Likewise, the Chief Safety Officer of Old JJCI, Dr. Susan Nicholson, has testified that she was responsible for the medical oversight of the consumer products, including JOHNSON'S® Baby Powder, and that her team evaluated the safety of any product Old JJCI made.  See Kim PI Decl., Ex. 23 (excerpts of Nicholson testimony from Prudencio v. Johnson & Johnson, RG20061303, Superior Court of the State of California, County of Alameda, Jun. 4, 2021 Dep. Tr. 706:14-707:23).

C.     **The 2021 Corporate Restructuring[15]**

In 2021, Old JJCI implemented a corporate restructuring (the "2021 Corporate Restructuring"), which was completed on October 12, 2021.  The 2021 Corporate Restructuring was effectuated through a series of steps, including a divisional merger under the Texas Business Organizations Code (the "TBOC").  As a result of that restructuring, two new entities were

---

[15]     The 2021 Corporate Restructuring and related matters are discussed in greater detail in section 2.7 of the *Disclosure Statement for Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [Dkt. 25-2] (the "Disclosure Statement") and in pages 9-10 of the First Day Declaration.

created:  (a) Johnson & Johnson Consumer, Inc. ("New JJCI"); and (b) LTL Management LLC ("LTL").  LTL was allocated certain of Old JJCI's assets and became solely responsible for Old JJCI's liabilities arising from talc-related claims against it (other than claims for which the exclusive remedy is provided under a workers' compensation statute or similar laws), and the defense of those claims.  New JJCI was allocated all other assets of Old JJCI and became solely responsible for all other liabilities of Old JJCI.

###### D.       New JJCI/Holdco and Kenvue

New JJCI's business following the 2021 Corporate Restructuring included the manufacture and sale of a broad range of products used in the baby care, beauty, oral care, wound care and women's health care fields, as well as over-the-counter pharmaceutical products (collectively, the "Consumer Business").

In November 2021, J&J announced its plans to accelerate innovation, serve patients and consumers and unlock value through the separation of the Consumer Business.  See Kim PI Decl., Ex. 38 (J&J press release dated Nov. 12, 2021).

Thereafter, in December 2022, New JJCI changed its name to Johnson & Johnson Holdco (NA) Inc. ("Holdco"), and in early January 2023, Holdco transferred its Consumer Business assets to its parent entity.  Consistent with J&J's November 2021 announcement, in August 2023, J&J reported that the Consumer Business had been separated into Kenvue Inc. ("Kenvue"), a new company in which J&J initially retained a 9.5% interest.  See Nov. 21, 2024 Adam Lisman Dep. 84:17-21.  The separation of the Consumer Business was long planned and had been publicly announced by J&J almost two years previously.

Despite the fact that none of Kenvue, its subsidiary J&J Inc., New JJCI, Holdco or any other entity that held the Consumer Business following the 2021 Corporate Restructuring manufactured, distributed, marketed or sold talc products of any kind in the United States,

claimants have continued to sue these entities for talc-related claims.  See Nov. 22, 2024 Pinto
Adhola (Kenvue Rule 30(b)(6)) Dep. (the "Adhola Dep."), 55:17-25; Nov. 22, 2024 Justin
Lindenmayer (Kenvue Rule 30(b)(6)) Dep. 111:23-112:9, 113:9-114:6.  As of November 2024,
Kenvue had been named in approximately 21,000 actions asserting Channeled Talc Personal
Injury Claims.

      As part of the separation, the parties entered into a Separation Agreement dated as of
May 3, 2023.[16]  Pursuant to the Separation Agreement, J&J agreed to indemnify Kenvue for,
among other things "all direct, derivative or other Liabilities of LTL Management LLC," which
was the talc liability allocated to LTL pursuant to the 2021 Corporate Restructuring.  See Second
Kim PI Decl., Ex. D (Separation Agreement) §§ 1.01 (definitions of "J&J Retained Liabilities"
and "J&J Liabilities"), 6.03 (requiring J&J to indemnify Kenvue for, among other things, all
"J&J Liabilities"); see also Adhola Dep. 26:7-12, 26:25-27:15, 28:5-12, 30:21-33:14, 38:18-24.
In turn, the Debtor, pursuant to the 2021 Corporate Restructuring and the Prepetition Corporate
Restructuring (defined below), is obligated to indemnify J&J for LTL's talc liability.  Thus, to the
extent claims with respect to LTL's (and now the Debtor's) talc liability are asserted against
Kenvue, J&J initially is obligated to indemnify Kenvue, and then the Debtor is obligated to
indemnify J&J.

      **E.**    **LTL's Chapter 11 Cases**[17]

      After the completion of the 2021 Corporate Restructuring, LTL commenced a chapter 11
case in the Western District of North Carolina on October 14, 2021, In re LTL Mgmt. LLC,

---

[16]    A copy of the Separation Agreement was attached as Exhibit D to the *Second Decl. of John K. Kim in Supp.
of Debtor's Compl. for Declaratory and Injunctive Relief and Related Mot.* [Adv. Pro. No. 24-3194, Adv.
Dkt. 84] (the "Second Kim PI Declaration").

[17]    LTL's Chapter 11 Cases and related matters are discussed in greater detail in sections 2.8, 2.9 and 2.10 of
the Disclosure Statement and in pages 38-46 of the First Day Declaration.

No. 21-30589, which case ultimately was transferred to the District of New Jersey (the "2021 Chapter 11 Case").  See Kim Dep. 13:20-24; Nov. 14, 2024 Robert Wuesthoff Dep. (the "Wuesthoff Dep."), 48:20-49:5.  Various parties, including the official committee, the U.S. Trustee in New Jersey and plaintiff law firms, filed motions to dismiss the case.  The New Jersey bankruptcy court denied the motions—it found that filing a chapter 11 case with the goal of addressing current and future personal injury talc claims to preserve corporate value is unquestionably a proper purpose under the Bankruptcy Code and, further, the prospect of continued, costly talc-related litigation supported the need to consider a bankruptcy filing.  See 2021 Chapter 11 Case, Dkt. 1572.  The Third Circuit, however, later reversed, directing the New Jersey bankruptcy court to dismiss the 2021 Chapter 11 Case on the basis that LTL lacked imminent financial distress.  While the Third Circuit panel recognized that LTL "inherited massive liabilities" and faced "thousands" of future claims, it found LTL held "reliable" funding rights from "highly creditworthy counterparties."  In re LTL Mgmt. LLC, 64 F.4th 84, 106, 109 (3d Cir. 2023).  The Third Circuit panel acknowledged the "apparent irony" that, by providing the funding backstop to ensure LTL's ability to fund a chapter 11 plan, J&J had made LTL too financially robust for chapter 11.  Id. at 110-11.  The 2021 Chapter 11 Case was dismissed on April 4, 2023 and formally closed on August 29, 2024.  See 2021 Chapter 11 Case, Dkts. 3938, 3998; see also Wuesthoff Dep. 49:6-9.

Following the Third Circuit's decision to dismiss the 2021 Chapter 11 Case, and with the assistance of two mediators and the encouragement of the New Jersey bankruptcy court, negotiations continued between LTL, J&J and various plaintiff law firms.  Those negotiations ultimately culminated in plan support agreements with counsel to thousands of claimants on a broad outline of terms for a plan of reorganization, including financial terms, that, if confirmed

-14-

and consummated, would fully resolve all the Debtor's liability for talc-related claims.  In light

of this support, LTL commenced a second chapter 11 case on April 4, 2023 in the District of New

Jersey, In re LTL Mgmt. LLC, No. 23-12825 (the "2023 Chapter 11 Case" and, together with the

2021 Chapter 11 Case, the "LTL Chapter 11 Cases").  See Wuesthoff Dep. 49:10-14.

The official committee, the New Jersey U.S. Trustee and certain other plaintiff law firms

moved to dismiss the 2023 Chapter 11 Case.  Based on "the evidentiary record fixed at trial," the

New Jersey bankruptcy court felt "constrained" to dismiss the 2023 Chapter 11 Case on the basis

that the record did "not establish sufficient 'imminent' or 'immediate' financial distress to satisfy

the criteria enunciated by the Third Circuit."  See In re LTL Mgmt. LLC, 652 B.R. 433, 436

(Bankr. D.N.J. 2023).  The New Jersey bankruptcy court recognized that the Third Circuit's

novel requirement of "immediate," "imminent" and "apparent" financial distress could be

viewed "as being somewhat at odds with a pro-active approach to trouble," prohibiting a putative

debtor from seeking bankruptcy relief until it "sees flames."  Id. at 444.  The New Jersey

bankruptcy court further recognized that a "wait and see approach," from a financial

restructuring perspective, "often gives rise to serious risks and increased costs that may threaten

the viability of the business."  Id.  In addition, the New Jersey bankruptcy court found that there

was "nothing speculative about the fact [LTL] faces substantial liability," even if the eventual

cost to defend and resolve talc claims was unknown.  Id. at 444-45.  Yet, "[g]iven the Circuit's

focus on immediacy and certainty," the New Jersey bankruptcy court "abide[d] by" the Third

Circuit's opinion and concluded that LTL lacked sufficient financial distress to avail itself of

bankruptcy relief "at this time."  Id. at 446, 448.  The New Jersey bankruptcy judge, however,

lauded the "remarkable progress" the parties had made toward a "viable global settlement" that is

"fair, efficient and expeditious," and he "strongly encouraged" the parties to continue to "pursue

a global resolution" through a chapter 11 plan "in a context other than this current bankruptcy case." Id. at 455.  The 2023 Chapter 11 Case was dismissed on August 11, 2023 and formally closed on January 6, 2025.  See 2023 Chapter 11 Case, Dkts. 1211, 1951; see also Wuesthoff Dep. 49:15-18.

In December 2023, LTL changed its state of formation to Texas and its name to LLT Management LLC ("LLT").  See Kim Dep. 14:12-15; Wuesthoff Dep. 52:23-53:8.

F.      The Prepetition Corporate Restructuring[18]

In 2024, LLT implemented a corporate restructuring (the "Prepetition Corporate Restructuring"), which was completed on August 19, 2024.

The Prepetition Corporate Restructuring was integral to the Plan and critical to its expeditious implementation.  As evidenced by the results of the solicitation, the substantial majority of ovarian and gynecological cancer claimants want to resolve their claims in bankruptcy pursuant to a plan of reorganization that will establish a trust to promptly and efficiently satisfy their claims.  Other claimants, including mesothelioma claimants and governmental entities, however, preferred to litigate or otherwise resolve their claims in other forums.  To address these differing points of view and alleviate the ovarian and gynecological cancer claimants' concern that the Plan could be jeopardized or delayed by claimants who oppose a bankruptcy resolution, LLT engaged in the Prepetition Corporate Restructuring, the primary purpose of which was to separate the liability for ovarian and gynecological cancer claims from other talc-related claims.  See Wuesthoff Dep. 98:16-99:7; 101:8-12.  This was accomplished by allocating all Channeled Talc Personal Injury Claims to the Debtor, and

---

[18]      The Prepetition Corporate Restructuring and related matters are discussed in greater detail in section 4.2 of the Disclosure Statement and in pages 10-19 of the First Day Declaration.

allocating mesothelioma, governmental unit and certain other claims to Pecos River Talc LLC ("Pecos River"). See Nov. 25, 2024 Erik Haas Dep. (the "Haas Dep."), 74:8-22; see also Kim Dep. 18:9-24; Nov. 19, 2024 Richard Dickinson Dep. (the "Dickinson Dep."), 51:3-7; Wuesthoff Dep. 98:16-99:7. As a result of this restructuring, which was disclosed in the Disclosure Statement, claimant groups that wished to pursue their claims outside of bankruptcy could continue to do so, while ovarian and gynecological cancer claimants, who support the Plan, could resolve their claims through this chapter 11 case.

The restructuring was implemented through a series of steps, including: (a) the conversion of Holdco from a New Jersey corporation to a Texas limited liability and a change of its name to J&J Holdco (NA) LLC ("Holdco (Texas)"); (b) the merger of LLT with and into Holdco (Texas), with Holdco (Texas) as the surviving entity; and (c) the divisional merger of Holdco (Texas) under the TBOC. As a result of that restructuring: Holdco (Texas) ceased to exist and three new Texas limited liability companies were created: (a) the Debtor; (b) Pecos River; and (c) New Holdco (Texas) LLC. See Kim Dep. 14:2-15:12; Dickinson Dep. 116:21-25.

Through the Prepetition Corporate Restructuring, (a) the Debtor was allocated certain assets and became solely responsible for the talc-related liabilities of LLT that will be resolved by the Plan (the "Debtor Talc Related Liabilities"), see Kim Dep. 17:7-21; (b) Pecos River was allocated certain assets and was allocated any talc-related personal injury claim of LLT (i) that alleges that the relevant injured or deceased individual was exposed to talc or a product or material containing talc, as applicable, in Canada or resided in Canada at the time such direct talc personal injury claim is filed, or was brought, threatened, or pursued in any court in Canada; (ii) asserted or assertable by or on behalf of any governmental unit under any federal, state, international or foreign consumer or employee protection rule, statute, or regulation; (iii) any

direct talc personal injury claim that alleges that the relevant injured or deceased individual developed mesothelioma or lung cancer (and not ovarian cancer, gynecological cancer, or any other disease) in connection with such individual's use of talc or a product or material containing talc; and (iv) any indirect talc personal injury claims in respect of any of the foregoing (with the exception of such indirect claims held by the Imerys/Cyprus Parties); and (c) New Holdco (Texas) LLC was allocated all other liabilities and assets.  <u>See</u> Kim Dep. 18:17-24; Wuesthoff Dep. 98:16-99:7.  After the divisional merger, New Holdco (Texas) LLC merged with and into New Intermediate Holding Corp., which was the survivor entity and was renamed Johnson & Johnson Holdco (NA) Inc. ("<u>New Holdco</u>").[19]  <u>See</u> Kim Dep. 15:7-12.

### G.     The Debtor

The Debtor is responsible for all Channeled Talc Personal Injury Claims and was formed to effectuate the terms of the Plan.  <u>See</u> Dickinson Dep. 23:20-24:2; Wuesthoff Dep. 14:11-19, 102:8-12.  The Debtor also oversees the operations of its wholly-owned subsidiary, Royalty A&M LLC ("<u>Royalty A&M</u>"), a Texas limited liability company.  <u>See</u> Haas Dep. 189:18-23; Wuesthoff Dep. 14:20-22.

Royalty A&M owns a portfolio of royalty revenue streams, including royalty revenue streams based on third-party sales of LACTAID®, MYLANTA® / MYLICON®, ROGAINE®, and TENA® products as well as certain products marketed by CLOROX®, ECOLAB®, ESSITY®, and SPARTAN®.  <u>See</u> Dickinson Dep. 19:3-10; Wuesthoff Dep. 14:23-15:11.  This portfolio includes a synthetic royalty arrangement in Texas with Kiron Capital LLC, a private equity firm, through its indirect subsidiary Confidas Health System.  <u>See</u> Dickinson Dep. 19:11-

---

[19]     Additional information regarding New Holdco is provided in section 4.2 of the Disclosure Statement and in pages 13-14 of the First Day Declaration.

16; Wuesthoff Dep. 15:12-18.  Royalty A&M reviews profitable royalty opportunities in the healthcare industry and seeks to grow its business by reinvesting the income from existing royalty revenue streams into both the acquisition of additional external royalty revenue streams, financings to third parties secured by similar royalty streams, and synthetic royalty investments secured by similar future royalty streams.  See Dickinson Dep. 19:17-20.

As of September 29, 2024, Royalty A&M reported approximately $358 million in assets.  See *Periodic Report Regarding Value, Operations, and Profitability of Entities in Which the Debtor's Estate Holds a Substantial or Controlling Interest*, Dkt. 326 at 4.  On a quarterly basis, Royalty A&M brings in roughly "$25 million" in royalty revenue and, on an annual basis, "slightly less" than $100 million.  See Dickinson Dep. 21:10-19.

### H.    Financing Arrangements

The Debtor is party to two funding agreements, which were key components of the Prepetition Corporate Restructuring and became effective immediately upon the commencement of this chapter 11 case.  See Kim Dep. 38:13-22.  These funding agreements provide funding to the Debtor for use by the Debtor to:  (a) fund the Talc Personal Injury Trust or, if the Plan does not become effective and this chapter 11 case is dismissed, pay Debtor Talc Related Liabilities established by judgment of a court of competent jurisdiction or a final settlement, including under any master settlement agreement (such agreement, the "Indemnity Funding Agreement");  and (b) pay any and all costs and expenses of the Debtor incurred during the pendency of this chapter 11 case, including the cost of administering it, as well as certain other costs and expenses, including costs and expenses after the chapter 11 case has been closed or, if applicable, dismissed, as well as other distributions or cash payments to be made by the Debtor pursuant to the Plan (other than contributions to the Talc Personal Injury Trust) (such agreement, the "Expense Funding Agreement" and together with the Indemnity Funding Agreement, the "2024

Funding Agreements").[20]  See also Wuesthoff Dep. 42:4-11.  Certain key provisions of the 2024

Funding Agreements are described below:[21]

      **1.**    **<u>Indemnity Funding Agreement</u>**.  Pursuant to the Indemnity Funding

Agreement, New Holdco is obligated to provide funding (as needed) subject to the following

limits:

      **a.**    $2,487,500,000 in the aggregate prior to the first anniversary of the Petition Date (defined below), as applicable;

      **b.**    $4,975,000,000 in the aggregate prior to the second anniversary of the Petition Date, as applicable;

      **c.**    $6,575,000,000 in the aggregate prior to the third anniversary of the Petition Date, as applicable;

      **d.**    $7,363,000,000 in the aggregate prior to the seventh anniversary of the Petition Date, as applicable;

      **e.**    $7,363,000,000 in the aggregate prior to the 12th anniversary of the Petition Date, as applicable;

      **f.**    $7,751,000,000 in the aggregate prior to the 17th anniversary of the Petition Date, as applicable;

      **g.**    $8,134,000,000 in the aggregate prior to the 22nd anniversary of the Petition Date, as applicable;

      **h.**    $8,517,000,000 in the aggregate prior to the 25th anniversary of the Petition Date, as applicable; or

      **i.**    $8,998,000,000 in the aggregate on or after the 25th anniversary of the Petition Date, as applicable.

---

[20]    Copies of the 2024 Funding Agreements were attached to the First Day Declaration as Annexes E and G. Thereafter, the Indemnity Funding Agreement was further amended to reflect changes to the funding limits set forth in Schedule 3 prompted by the TCC MOU (defined herein).  The further amended Indemnity Funding Agreement will be filed in advance of the confirmation hearing scheduled.

[21]    The descriptions of the 2024 Funding Agreements herein are qualified in their entirety by the terms of the 2024 Funding Agreements, and in the event of any inconsistency between the descriptions herein and the terms of the 2024 Funding Agreements, the 2024 Funding Agreements govern.

Funding to be used by the Debtor to pay Debtor Talc Related Liabilities under any master settlement agreement would not be subject to, and would not count against, such funding limits. If the Plan becomes effective, the foregoing funding amounts would be increased by the cumulative amount of interest accrued in accordance with the terms of the Plan on amounts delivered or to be delivered to the Talc Personal Injury Trust pursuant to the Plan.

        2.      **Expense Funding Agreement**.  Pursuant to the Expense Funding Agreement, New Holdco is obligated to provide funding (as needed) to the Debtor for use by the Debtor to, among other things:  (a) pay any and all costs and expenses of the Debtor incurred during the pendency of this chapter 11 case, including the costs of administering the chapter 11 case; (b) pay any and all costs and expenses of the Debtor incurred in the normal course at any time after the chapter 11 case has been closed or, if applicable, dismissed, including, in the case of dismissal, any attorneys' or experts' fees and expenses, and other ancillary costs and expenses, of the payee under the Expense Funding Agreement associated with the defense or settlement of any actual or threatened litigation or appeals in connection with Debtor Talc Related Liabilities; (c) pay any and all distributions or cash payments to be made by the Debtor pursuant to the Plan (other than contributions to the Talc Personal Injury Trust ), whether to be made during the pendency of the chapter 11 case or at any time after the chapter 11 case has been closed; and (d) maintain funding of at least $5,000,000.  Unlike its obligations under the Indemnity Funding Agreement, New Holdco's funding obligations under the Expense Funding Agreement are not subject to any funding limits.  Funding is not available under the Expense Funding Agreement for the payment of Debtor Talc Related Liabilities contemplated to be funded under the Indemnity Funding Agreement, and vice versa.

## I.        Overview of the Debtor's Talc Liability[22]

This chapter 11 case was precipitated by the filing of thousands of cosmetic talc lawsuits against LLT, Old JJCI and J&J, focused primarily on JOHNSON'S® Baby Powder.  The Debtor believes that these claims, which alleged that JOHNSON'S® Baby Powder contains asbestos, have no valid scientific basis, as Old JJCI's talc products never contained asbestos, and the safety of cosmetic-grade talc has been confirmed by dozens of peer-reviewed studies and multiple regulatory and scientific bodies for decades.  See Kim Dep. 353:3-13; Haas Dep. 102:9-15. Nevertheless, the number of claims continued to increase, and the Debtor anticipates that, absent a chapter 11 resolution, the litigation and its associated burdens would continue for decades more.

### Decades of Studies

Questions regarding whether JOHNSON'S® Baby Powder contained asbestos and whether use of cosmetic talcum powder could cause ovarian cancer were raised as early as the 1970s and 1980s, respectively.  Such allegations have been investigated by the Food & Drug Administration (the "FDA"), among others, who found them to be unsupported by fact or science.

Over the past four decades, at least 33 case-control studies that examined a potential association between perineal talc use and ovarian cancer have been published.  While the case-control studies are inconsistent as to the finding of a statistically significant positive association, not one of the authors of the case-control studies that reported an "association" took the position that its findings establish causation.

---

[22]    The Debtor's talc liability, including information regarding the Debtor's views on the cosmetic talc litigation and its associated cost and burdens, are discussed in greater detail in sections 2.2, 2.3 and 2.4 of the Disclosure Statement and in pages 20-29 of the First Day Declaration.

To date, the FDA has not concluded, based on its review of the scientific literature, that there is a causal relationship between talc and ovarian cancer, and it has not recommended that consumers generally avoid talcum powder products.  Other public health authorities that have evaluated the scientific literature relating to talc also have not concluded that the existing evidence demonstrates that perineal exposure to talc causes ovarian cancer.[23]

### Cosmetic Talc Litigation

Prior to 2010, only a small number of isolated cases involving cosmetic talc had been filed against Old JJCI and J&J.  These cases alleged a range of claims, including talcosis due to substantial misuse of JOHNSON'S® Baby Powder, mesothelioma, dermatitis and rashes.  The number of claims began to increase significantly after the Berg (2013) and Fox (2016) trials.  Berg v. Johnson & Johnson, filed in December 2009, was the first case alleging that ovarian cancer was caused by genital exposure to Old JJCI's cosmetic talc-based products.  The jury found for the plaintiff, but awarded no damages.  By the end of 2015, there were over 1,300 ovarian cancer lawsuits filed against Old JJCI and J&J.

In February 2016, the first St. Louis, Missouri ovarian cancer case, Fox, went to trial.  The jury awarded the plaintiff $72 million dollars.  While ultimately overturned on appeal, the verdict sparked interest on the part of plaintiff lawyers.  Five more cases were tried in that venue

---

[23]     On July 5, 2024, the International Agency for Research on Cancer ("IARC") reclassified talc as "probably carcinogenic."  Press Release No. 352, Int'l Agency for Research on Cancer, IARC Monographs Evaluate the Carcinogenicity of Talc and Acrylonitrile (July 5, 2024) (the "IARC Press Release").  However, like other studies, the IARC Press Release acknowledges that this designation was not based on causal findings and that cancer risks may vary depending on the extent and type of use. See IARC Press Release at 4.  Furthermore, based on the information published in connection with the announcement, the decision to reclassify was not based on new or novel science and the Debtor therefore believes the IARC's decision to reclassify is materially flawed for numerous reasons.  Indeed, the classification of talc as "probably carcinogenic" mirrors the classification for consumption of red meat by IARC.  See Press Release No. 240, IARC, IARC Monographs Evaluate Consumption of Red Meat and Processed Meat (Oct. 26, 2015) (classifying "the consumption of red meat as probably carcinogenic to humans (Group 2A), based on limited evidence that the consumption of red meat causes cancer in humans and strong mechanistic evidence supporting a carcinogenic effect") (emphasis omitted).

over the next year and a half, resulting in plaintiff verdicts totaling more than $235 million (in addition to a defense verdict and a mistrial).  All of those plaintiff verdicts subsequently were reversed on appeal.

On May 19, 2015, the defendants in the talcum powder products cases currently pending in Atlantic and Bergen counties in New Jersey submitted an application for centralized management of the cases.  At the time of the application, there were 103 pending cases in New Jersey involving claims of more than 156 plaintiffs.  The Supreme Court of New Jersey entered an order dated October 20, 2015 designating the cases as part of a multicounty litigation in Atlantic County, styled In re Talc Based Powder Prods., MCL No. 300 (N.J. Sup. Ct. Oct. 20, 2015) (the "MCL"), for centralized case management purposes.  The MCL remains pending. Many of the counsel involved in the MCL have sought to amend their complaints or have filed new complaints asserting asbestos allegations.  See, e.g., Adv. Pro. No. 24-3194, Adv. Dkt. 121, Ex. C (the "MCL Complaint") ¶ 2 (alleging that "Johnson & Johnson's and its corporate subsidiaries' asbestos-containing talc products" injured the plaintiffs).

On October 4, 2016, the United States Judicial Panel on Multidistrict Litigation ordered that pending and future personal injury or wrongful death actions in federal courts alleging that plaintiffs or their decedents developed ovarian cancer from the use of JOHNSON'S® Baby Powder and Shower to Shower body powder be transferred and centralized in the New Jersey District Court in the MDL.  In addition to individual actions pending in federal district courts around the country, two consumer class actions alleging that JOHNSON'S® Baby Powder and Shower to Shower body powder products were marketed for use without disclosure of talc's allegedly carcinogenic properties were included in the MDL.

After the creation of the MDL, Judge Wolfson, to whom the MDL was assigned, ordered a hearing at which all parties could present their summary views of the medical and scientific issues related to the MDL, as well as evidence as to whether talc-based body powder products could cause or contribute to ovarian cancer.  That hearing was held on January 26, 2017.  Judge Wolfson subsequently ordered full briefing by the parties on the threshold Daubert issue of whether reliable and sufficient scientific and medical evidence exists on the issue of causation. Judge Wolfson set an evidentiary hearing on that issue that ran from July 22 to July 31, 2019, with plaintiffs presenting five witnesses and J&J presenting three witnesses.  At the conclusion of the hearing, the Judge requested final Daubert briefing from all parties which was submitted on October 7, 2019.  On April 27, 2020, Judge Wolfson rendered her Daubert decision on the opinions offered by these witnesses, granting in part and denying in part J&J's motion to exclude opinions of plaintiffs' five witnesses and denying plaintiffs' motion to exclude the opinions of J&J's three experts.  See In re Johnson & Johnson Talcum Powder Products Mktg., Sales Practices and Products Litig., No. 3:16-md-02738 (MAS) (RLS) (D.N.J. April 27, 2020), Dkt. 13186.

Following Judge Wolfson's retirement in January 2023, on January 31, 2023, the MDL was reassigned to Judge Michael Shipp.  On March 27, 2024, over objection from the plaintiffs' steering committee in the MDL (the "Plaintiffs' Steering Committee"), the MDL court ruled that given the emergence of new and highly relevant science, recent changes to Federal Rule of Evidence 702 and certain limitations of the previous Daubert order, the court would hear new, full scale Daubert expert challenges.  The Debtor filed six separate Daubert motions in the MDL that implicate every expert witness put forward by the Plaintiffs' Steering Committee on multiple grounds.  Briefing on the Daubert issues was completed on August 22, 2024.

On August 14, 2023, the Plaintiffs' Steering Committee in the MDL moved to amend the master long form complaint in that matter to include additional defendants, including Kenvue, as well as additional discussion regarding the other carcinogenic constituents in talcum powder, including talc fibers and asbestos.  See Second Kim PI Decl., Ex. E at 9-11 (*Pl.'s Renewed Mot. for Leave to File a Second Am. Master Long Form Compl.*) (the "Motion to Amend");[24] see, e.g., MDL Proposed Am. Compl. ¶ 40 ("Each and every one of the J&J's corporate entities . . . were at all times material to this case aware that raw talc ingredient and/or resulting talc-based PRODUCTS contained asbestos"); id. ¶ 41 ("Old JJCI and its predecessors milled, manufactured, labeled, sold, supplied, distributed, and/or marketed asbestos-containing PRODUCTS to which Plaintiff was exposed."); id. ¶ 76 ("During all relevant times, Johnson's Baby Powder® was composed primarily of talc along with other constituent elements found in talc such as asbestos, fibrous talc, and heavy metals . . ., and fragrance chemicals."); id. ¶ 79 ("During all relevant times, Shower to Shower was composed of talc and cornstarch, along with other constituent elements found in talc such as asbestos, fibrous talc, and heavy metals . . ., and fragrance chemicals.").[25]  In total, the proposed second amended complaint included over 150 new paragraphs dedicated to asbestos-related allegations.  See generally MDL Proposed Am.

---

[24]     The Motion to Amend asked that the requested amendments automatically apply to all previously filed short-form complaints in the MDL, and attached a proposed second amended master long form complaint as Exhibit A (the "MDL Proposed Amended Complaint").  See Second Kim PI Decl., Ex. E.

[25]     See also id. ¶ 122 ("The PRODUCTS contain platy talc, fibrous talc (talc fibers or asbestiform talc), asbestos, heavy metals, and fragrance chemicals, and Defendants failed to warn the public, including Plaintiffs, about the fact that the PRODUCTS contained such carcinogenic substances."); id. ¶ 137 ("All of these testing laboratories found asbestos minerals both in the source talc ore and Johnson & Johnson's cosmetic talc products"); id. ¶ 174 ("millions of people, including babies, were unwittingly and needlessly exposed to asbestos."); id. ¶ 208 ("Defendants engaged in wrongful conduct and were negligent and created a dangerous and unreasonable risk of harm to others, including Plaintiffs, by mining, milling, processing, supplying, distributing, designing, manufacturing, and selling talcum powder products which contained asbestos and fibrous talc, which Defendants knew or should have known were dangerous and posed substantial risks of harm to others, including Plaintiffs.")

Compl.  Before the Petition Date, the special master in the MDL granted the Motion to Amend, and an appeal is pending on grounds unrelated to the asbestos-related amendments.

### Costs and Burdens of Cosmetic Talc Litigation

On May 19, 2020, Old JJCI announced it would permanently discontinue its line of talc-based JOHNSON'S® Baby Powder in the U.S. and Canada and, on August 11, 2022, the company announced the discontinuation of such sales globally.[26]  These decisions were based on business considerations, including lack of sales due to misinformation about the safety of talc-based JOHNSON'S® Baby Powder.

Prior to the filing of the 2021 Chapter 11 Case, roughly 1,300 ovarian cancer and over 250 mesothelioma cases were dismissed without payment, and Old JJCI achieved 16 defense verdicts, including in four trials in 2021 alone.  Old JJCI also obtained reversals on appeal of every plaintiff verdict except one although the plaintiff verdicts involved wildly divergent compensatory and punitive damages awards.  See Haas Dep. 252:9-18.

The one ovarian cancer plaintiff verdict that survived appeal was in a case known as Ingham.  See Kim Dep. 354:8-10.  Although the verdict in Ingham was reversed in part and reduced, the total damages award was still $2.243 billion.  The St. Louis, Missouri trial court had permitted the consolidation of 22 ovarian cancer plaintiffs, 17 of whom were nonresidents, for a single trial.  The jury found defendants Old JJCI and J&J liable for every claim.  The jury awarded compensatory damages in the aggregate amount of $550 million and punitive damages in the aggregate amount of $4.1 billion.  On appeal, the punitive damages award was reduced to $1.6 billion.

---

[26]     See *Johnson & Johnson Consumer Health to Transition Global Baby Powder Portfolio to Cornstarch*, (Aug. 11, 2022), https://www.factsabouttalc.com/_document/johnson-johnson-consumer-health-totransition-global-baby-powder-portfolio-to-cornstarch?id=00000182-8df9-d979-a797-edfb15d40000.

Prior to the commencement of the 2021 Chapter 11 Case, Old JJCI incurred nearly $1 billion defending personal injury lawsuits relating to alleged talc exposure, nearly all of which was spent in only the five-year period prior to the 2021 Chapter 11 Case.  During that time, Old JJCI was paying anywhere from $10 million to $20 million in defense costs per month.  In addition to these costs, Old JJCI paid approximately $3.5 billion in indemnity costs in connection with settlements and verdicts.

The cosmetic talc litigation was anticipated to continue for decades and grow, as were the extraordinary costs of defending and resolving tens of thousands of expected claims.  Indeed, plaintiff experts had begun to allege extended latency periods for ovarian cancer allegedly caused by asbestos exposure.

At the time of the filing of the 2021 Chapter 11 Case on October 14, 2021, there were approximately 40,000 ovarian and other gynecological cancer cases pending against LTL, including approximately 36,000 cases pending in the MDL and more than 3,800 cases in multiple state court jurisdictions across the country.  See Haas Dep. 242:17-22.  As of June 3, 2024, based on available information, the number of filed and unfiled current claims against LLT had increased to approximately 85,000.  See Kim Dep. 118:8-18.  As of the Petition Date, there were over 60,000 plaintiffs asserting ovarian or other gynecological cancer claims against the Debtor in jurisdictions across the country, including more than 57,000 plaintiffs with claims pending in the MDL, over 2,800 plaintiffs with claims pending in the MCL and over 2,200 with claims pending in individual actions around the United States.  See Kim Dep. 109:6-11, 123:12-124:25.

Notwithstanding numerous statements by the Coalition[27] and the Insurers in the chapter 11 case that Gynecological Cancer claims have no value in the tort system, approximately 3,000 self-identified Gynecological Cancer claims (and potentially many more) have been asserted against the Debtor and J&J in ovarian talc actions in the tort system, including by Beasley Allen and four of the five other original members of the Coalition.  See *Supp. Decl. of John K. Kim in Supp. of the Debtor's Objs. to the Coalition's (I) Designation Mot., (II) Reinstatement Mot. and (III) Estimation and Bar Date Mots.* [Dkt. 433] (the "Kim Objection Declaration") ¶ 11.  In addition, more than 80 firms submitted master ballots featuring Gynecological Cancer claims, reflecting votes for and against the *Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [Dkt. 25-1] (the "Initial Plan").  Id. ¶ 9.

***The Channeled Talc Personal Injury Claims Asserted Against the Debtor and J&J Are the Same***

Even though J&J has not manufactured or sold talc-containing products for over 45 years, the Channeled Talc Personal Injury Claims are asserted in virtually every case against both the Debtor (as successor to Old JJCI and LLT) and J&J.  In many jurisdictions, the plaintiffs have sought to hold the Debtor and J&J jointly and severally liable for the Channeled Talc Personal Injury Claims.  The plaintiffs rarely, if ever, attempt to differentiate between talc containing products sold by J&J and Old JJCI and have never alleged that only the talc products sold by J&J (and not Old JJCI) caused a plaintiff's injury.

---

[27]     See, e.g., Dkt. 268 (the "Coalition DS Objection") at 4 (Coalition describing non-ovarian gynecological cancer claims as "non-compensable" claims); Dkt. 452 (the "Insurers DS Objection") at 17 (insurer asserting that holders of Gynecological Claims and Other Disease Talc Personal Injury Claims "would never see a recovery in the tort system under non-bankruptcy law"); Dkts. 988 (redacted), 990 (sealed) (together, the "Coalition Plan Objection") at 6 (Coalition noting that gynecological non-ovarian cancer claims have neither been litigated nor compensated in the tort system).

The alleged claims against J&J and the Debtor in the MDL, for example, are all identical—based on the same products, the same defect and the same alleged harm. The allegations are asserted with respect to all talc products, which are defined collectively. Neither do the MDL plaintiffs make any effort to differentiate between J&J and the Debtor (again, as successor to Old JJCI and LLT), referring instead throughout the first amended complaint in the MDL to the entities collectively as the "Johnson & Johnson Defendants." See Adv. Pro. No. 24-3194, Adv. Dkt. 121, Ex. A (the "MDL Complaint") ¶ 8. The MDL Complaint asserts a total of 16 counts against the "Johnson & Johnson Defendants" collectively, never once distinguishing between J&J and Old JJCI with respect to any count.[28] The MDL Proposed Amended Complaint, approval of which is subject to appeal, separates each count by defendant while expanding the pool of named defendants to include LTL, New JJCI, Janssen Pharmaceuticals, Inc. ("Janssen") and Kenvue, in each case individually and as successor to: (a) Old JJCI; or (b) with respect to Janssen and Kenvue, Old JJCI and New JJCI. See MDL Proposed Am. Compl. But the MDL Proposed Amended Complaint makes no changes to the conflation of allegations as between J&J and the Debtor's predecessors (LTL in the proposed second amended complaint) because substantially every theory of liability is still asserted in identical language against both.

The conflation of claims and allegations against J&J and the Debtor's predecessors is by no means limited to the MDL. The MCL Complaint that Coalition member Golomb Legal filed on July 2, 2024, in the MCL, which is applicable to all Golomb Legal's MCL cases, alleges that

---

[28]    The counts are:  (1) failure to warn, (2) defective manufacture and design, (3) breach of express warranties, (4) breach of implied warranty of merchantability, (5) breach of implied warranty of fitness for a particular purpose, (6) negligence, (7) negligent misrepresentation, (8) fraud, (9) violation of consumer protection laws, (10) fraudulent concealment, (11) civil conspiracy, (12) loss of consortium, (13) punitive damages, (14) discovery rule and tolling, (15) wrongful death and (16) survival action. See MDL Compl. ¶¶ 57-258.

"Johnson & Johnson's and its corporate subsidiaries' asbestos-containing talc products" injured the plaintiffs.  See MCL Compl. ¶ 2.  It defines "Defendants" as "J&J, Kenvue, Janssen, Holdco, JJCI 2, JJCI 3, and the John Doe parties, either or both in its own right or as a corporate successor to an entity or person whose acts, omissions, undertakings, or activities are attributed to it by contract or operation of law."  See id. ¶ 19.  Having treated all the J&J-related defendants collectively in their definition of "Defendants," the plaintiffs use it liberally throughout the MCL complaint without regard to specific entity.  The plaintiffs make broad generalized allegations throughout the MCL complaint against the Defendants collectively, never distinguishing J&J, Old JJCI or any other entity with specificity.[29]  Similar examples of treating the entities collectively are widespread and routine practice throughout the pending actions asserting Channeled Talc Personal Injury Claims,[30] and courts presiding over Channeled Talc Personal Injury Claims have likewise treated both J&J and the Debtor's predecessors as the same for evidentiary purposes.

---

[29]    See id. ¶ 94 ("Defendants failed to warn the public"); id. ¶¶ 105-23 ("Evidence of Asbestos in Defendants' Products"); id. ¶ 137 ("Defendants made and published representations claiming their testing method was adequate"); id. ¶ 141 ("Defendants, collectively by their agreement and conspiracy, controlled industry standards regarding the testing, manufacture, sale, distribution and use of talcum powder PRODUCTS"); id. ¶ 142 ("Defendants, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in the data and embarked upon a plan of deception intended to deprive the public at large"); id. ¶ 143 ("Defendants conspired and/or acted in conceit with each other and/or with other entities through agreement and consciously parallel behavior"); id. ¶ 158 ("Defendants engaged in wrongful conduct and were negligent and created a dangerous and unreasonable risk of harm to others, including Plaintiff, by mining, milling, processing, supplying, distributing, designing, manufacturing, and selling talcum powder products which contained asbestos and fibrous talc, which Defendants knew or should have known were dangerous and posed substantial risks of harm to others, including Plaintiff").

[30]    In Ingham, for example, plaintiffs asserted all allegations against "the Johnson & Johnson Defendants." See Adv. Pro. No. 24-3194, Adv. Dkt. 121, Ex. D (Ingham complaint) ¶¶ 105-15, 124-59.  The jury in Ingham awarded identical compensatory damages against each entity, making no distinction between them. And the differing punitive damages awards were justified based on the different net worth of J&J and Old JJCI, not on any difference in theories of liability or different conduct of the entities.  Even the Missouri Court of Appeals conflated the entities by attributing conduct to Old JJCI, as one of the "Defendants" before it even existed.  See Ingham v. Johnson & Johnson, 608 S.W.3d 663, 715-719 (Mo. Ct. App. 2020) ("In a 1969 memorandum, Defendants acknowledged their Products contained tremolite asbestos and asbestos could be dangerous.").

### J.      Certain Settlements

Since 2020, Old JJCI and more recently LLT have reached resolutions with several

plaintiff law firms representing Ovarian Cancer and Gynecological Cancer claims, settling

approximately 21,700 Ovarian Cancer and Gynecological Cancer claims for a total of

approximately $1.426 billion, at an average of approximately $65,600 per qualifying claim,

pursuant to master settlement agreements ("MSA").  See, e.g., *Expert Report of Charles H.*

*Mullin, PhD* (Jan. 7, 2025) (the "Mullin Report") ¶¶ 38 ████████████████████████

████████████████████████████████████████████████████████

████████████████████, 55-63, Fig. 9.  Allocation of settlement values

among all but about 30 of the claimants was or will be established by a neutral third-party special

master, based on criteria either similar to or the same as those set forth in the Trust Distribution

Procedures attached as Exhibit K to the Plan.  Typically, an MSA includes releases for numerous

Protected Parties, including talc suppliers and retailers.  The Debtor understands that certain

holders of Channeled Talc Personal Injury Claims are clients of law firms with prepetition

MSAs, but their claims have not yet been settled or resolved pursuant to the terms of an MSA.

### K.      Retailers and Third-Party Indemnification[31]

Old JJCI and LLT had relationships with various retailers who sold Old JJCI's

talc-containing products (collectively, the "Retailers").  Old JJCI agreed to indemnify the

Retailers for claims related to the sale of Old JJCI's talc-containing products, and these

contractual indemnities were allocated to LLT in the 2021 Corporate Restructuring.  Following

the 2021 Corporate Restructuring, LLT entered into indemnification agreements with various

---

[31]      The Debtor's relationships with retailers and contractual third-parties are discussed in greater detail in
section 2.5 of the Disclosure Statement, in pages 29-32 of the First Day Declaration, in pages 17-20 of the
Kim PI Declaration and in pages 3-4 of the Second Kim PI Declaration.

Retailers.  Except as described below with respect to Tender Agreements (defined below), all such contractual indemnities with Retailers were allocated to the Debtor in the Prepetition Corporate Restructuring.  As part of the Prepetition Corporate Restructuring, Pecos River agreed to indemnify the Debtor from and against any indemnification claims asserted against the Debtor in respect of liabilities allocated to Pecos River.

Claims asserted against the Retailers for their sale of Old JJCI products are virtually identical to the claims asserted against Old JJCI and LLT, and to the extent in respect of the Debtor Talc Related Liabilities, the Debtor.  Old JJCI and LLT periodically accepted from the Retailers tenders of talc-related claims related to the sale of its products.  When a Retailer was sued on a claim related to Old JJCI's talc-containing products, the Retailer would notify Old JJCI, LLT and the Debtor by submitting a tender request.  Old JJCI, LLT and/or the Debtor would then determine whether to accept the Retailer's tender of its defense and indemnify the Retailer pursuant to a tender agreement (each, a "<u>Tender Agreement</u>").[32]  Since the commencement of the talc-related litigation, Old JJCI and LLT have agreed to indemnify and assume the defense of more than 1,180 talc-related claims against the Retailers pursuant to Tender Agreements.  Tender Agreements in respect of the Debtor Talc Related Liabilities were allocated to the Debtor in the Prepetition Corporate Restructuring.[33]  In addition to documented indemnification obligations, the Debtor believes that it has, or may be asserted to have, indemnification obligations with respect to the Retailers under applicable state law.

---

[32]     An excerpt of tender requests and indemnification agreements relating to certain Retailers is attached as Exhibit B to the Second Kim PI Declaration, and certain tender requests are attached as Exhibit C to the Second Kim PI Declaration.

[33]     Likewise, Tender Agreements in respect of liabilities allocated to Pecos River were allocated to Pecos River.

In addition, Old JJCI agreed to indemnify certain other transaction counterparties for liability arising from talc-containing products sold by Old JJCI.  For example, in 2005, Old JJCI entered into an asset purchase agreement with Pharma Tech Industries, Inc. ("PTI" and subsequently PTI Royston, LLC) pursuant to which Old JJCI sold a manufacturing plant (where various products, including certain talc-containing products, were bottled) to PTI, which continued to operate the facility and manufacture certain talc products until early 2020.  See Kim PI Decl., Ex. 37.  In connection with the asset sale, Old JJCI and PTI entered into a manufacturing and supply agreement, which was subsequently amended and restated.  Under the manufacturing and supply agreement, Old JJCI agreed to indemnify, and did indemnify, PTI and its affiliates for certain claims related to talc products.  The claims against PTI are generally identical to and based on the claims against Old JJCI, LLT and to the extent in respect of Debtor Talc Related Liabilities, the Debtor.

Further, as noted above, pursuant to an indemnification agreement, Old JJCI agreed to indemnify Valeant (now Bausch) and its affiliates (including Bausch Health Americas, Inc. f/k/a Valeant Pharmaceuticals International and Bausch Health US, LLC f/k/a Valeant Pharmaceuticals North America LLC f/k/a Valeant Pharmaceuticals North America) for personal injury and products liability actions arising from alleged exposure to Shower to Shower products and for certain other regulatory actions arising out of the manufacture, use or sale of Shower to Shower products, as set forth more fully in the agreement.[34]  The claims against Valeant (now Bausch) are generally identical to the claims asserted against Old JJCI, LLT and to the extent in respect of Debtor Talc Related Liabilities, the Debtor.

---

[34]     Shower to Shower products sold in the U.S. and Canada no longer include talc.  Like JOHNSON'S® Baby Powder, Johnson's Medicated Powder sold in the U.S. and Canada no longer contains talc as of 2020.

Like the contractual indemnities of retailers described above, these contractual indemnities of transaction counterparties also were allocated to the Debtor in the Prepetition Corporate Restructuring, and Pecos River likewise agreed to indemnify the Debtor from and against any indemnification claims asserted against the Debtor in respect of liabilities allocated to Pecos River.

### L.   Imerys/Cyprus Settlement Agreement[35]

***Background***

In 1989, J&J sold its talc mining business to Cyprus pursuant to a stock purchase agreement under which J&J sold all the stock of Windsor Minerals Inc. ("Windsor") to Cyprus. Historically, Windsor served as J&J and Old JJCI's sole supplier of talc used in products manufactured and sold by Old JJCI.  From 1989 to 2011, Old JJCI entered into certain agreements (the "Imerys/Cyprus Agreements") to purchase talc from Windsor and certain other Imerys/Cyprus Parties.  Windsor is now Imerys Talc Vermont, Inc.  Certain of the Imerys/Cyprus Agreements included indemnity provisions, with some running in favor of the applicable Imerys/Cyprus Parties and others running in favor of Old JJCI.

The Imerys/Cyprus Parties asserted claims against certain J&J parties for indemnification under the Imerys/Cyprus Agreements.  For nearly four years prior to the date the Imerys debtors filed for bankruptcy, Imerys and the J&J parties engaged in negotiations to resolve disputes related to Old JJCI and J&J's alleged indemnification rights and obligations, which involved complicated issues of allocation, purported "gap years" not covered by contractual indemnity, cross-claims for indemnification between the parties and coverage under the Imerys/Cyprus

---

[35]   The following is a summary of the Imerys/Cyprus Settlement Agreement and related matters that are discussed in detail in sections 2.6 and 3.4 of the Disclosure Statement and in pages 32-36 of the First Day Declaration.

Agreements.  During this period, the parties engaged in multiple discussions, including in in-person meetings and mediation sessions, to resolve these issues.

In addition, the J&J parties and the Imerys/Cyprus Parties disagreed about the right of the Imerys/Cyprus Parties to the proceeds of certain insurance policies that were issued to the J&J parties.

### The Imerys and Cyprus Bankruptcy Cases

In February 2019, certain of the Imerys/Cyprus Parties—Imerys Talc America, Inc. and two of its affiliates, Imerys Talc Vermont, Inc. and Imerys Talc Canada, Inc. (collectively, "Imerys")—filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Imerys Bankruptcy").[36]  In that case, Imerys has contended that (a) it has claims against Old JJCI and J&J for indemnification under certain of the Imerys/Cyprus Agreements and (b) it is entitled to proceeds of certain of J&J's insurance policies.  These claims are alleged to be in the billions of dollars.

Various disputes have arisen in the Imerys Bankruptcy regarding indemnification rights and obligations, including in two adversary proceedings[37] and in proofs of claim filed by the J&J parties.  The J&J parties also have asserted certain reservations and objections to, and opposed, confirmation of the Imerys/Cyprus debtors' previously proposed plans of reorganization and the accompanying trust distribution procedures.

---

[36]     See In re Imerys Talc Am. Inc., No. 19-10289-LSS (Bankr. D. Del. Feb. 13, 2019).  Cyprus filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Delaware Bankruptcy Court on February 11, 2021.  See In re Cyprus Mines Corp., No. 21-10398 (LSS) (Bankr. D. Del. Feb. 11, 2021).

[37]     See Cyprus Mines Corp. v. Imerys Talc Am. Inc., Adv. Pro. No. 20-50626 (LSS) (Bankr. D. Del. Jun. 15, 2020); Imerys Talc Am. Inc. v. Johnson & Johnson, Adv. Pro. No. 21-51006 (LSS) (Bankr. D. Del. July 27, 2021).

*Imerys/Cyprus Settlement Agreement*

Beginning in early 2024, the J&J parties, the Imerys/Cyprus Parties and the future claimants' representatives and tort claimants' committees appointed in the Imerys/Cyprus debtors' respective chapter 11 cases engaged in extensive, good faith negotiations over the course of months for the purpose of resolving disputes regarding the parties' indemnification and insurance rights and obligations, as well as the J&J parties' objections to the Imerys/Cyprus debtors' previously proposed plans of reorganization.  After months of negotiations, the parties reached agreement on the terms of the Imerys/Cyprus Settlement Agreement, which they entered into on July 13, 2024 and which resolves the parties' disputes in full.[38]

On October 31, 2024, the Delaware Bankruptcy Court entered orders approving the Imerys/Cyprus Settlement Agreement.  See Imerys, Dkt. 6715; Cyprus, Dkt. 2634.  On November 7, 2024, certain insurance companies that had objected to the approval of the Settlement Agreement filed an appeal of the approval order with the United States District Court for the District of Delaware.  See Imerys, Dkt. 6748; Cyprus, Dkt. 2658.  Both the Delaware Bankruptcy Court and the Delaware district court denied the insurers' motion to stay certain parts of the Imerys/Cyprus Settlement Agreement pending resolution of the appeal.  See Imerys, Dkt. 6965; Cyprus, Dkt. 2831; In re Imerys Talc Am. Inc., No. 24-1232 (TLA) (D. Del. Feb. 3, 2025), Dkt. 13.  The appeal to the Delaware district court remains pending.

The Imerys/Cyprus Settlement Agreement contemplates, among other things:  (a) a settlement payment from the Debtor or J&J in the aggregate amount of $225 million; (b) a

---

[38]    A copy of the Imerys/Cyprus Settlement Agreement is attached as Exhibit A to a notice of filing the settlement agreement in the Imerys Bankruptcy.  See *Notice of Filing of (A) Am. and Restated Settlement Agreement Between the Imerys Debtors, the Cyprus Debtor, Johnson & Johnson, and the Other Parties Thereto, and (B) Revised Proposed Order (I) Approving the Am. and Restated Settlement Agreement Between the Imerys Debtors, the Cyprus Debtor, Johnson & Johnson, and the Other Parties Thereto, and (II) Approving the Sale of Certain Rights*, Imerys, Dkt. 6573.

contribution of the first $200 million and 50% of the next $160 million of insurance proceeds recovered under certain of J&J's insurance policies (subject to an aggregate capped guarantee of $280 million and certain other limitations); and (c) payment of certain other insurance proceeds.[39]  In sum, the Imerys/Cyprus Settlement Agreement will yield settlement proceeds to the Imerys and Cyprus estates of at least $505 million for the benefit of current and future talc claimants no later than December 31, 2025.

On February 7, 2025, the Imerys/Cyprus Settlement Agreement went effective pursuant to its terms and triggered the Debtor's and J&J's obligation to make the above-mentioned payments.  See *Notice of Effectiveness of Am. and Restated Settlement Agreement* [Dkt. 1065]. The releases under the Imerys/Cyprus Settlement Agreement will become effective upon the payment of (a) the initial payment by the Debtor or J&J and (b) certain insurance proceeds that may have been received.  The Imerys/Cyprus Settlement Agreement does not prohibit talc claimants from pursuing claims, if any, against the Debtor or J&J.  The settlement, once consummated, will result in additional recoveries to holders of the Channeled Talc Personal Injury Claims that also have asserted or could assert claims against one or more of the Imerys/Cyprus Parties.

### M. The Debtor's Insurance Coverage and Related Litigation[40]

The Debtor believes it has insurance coverage for its talc-related liability.  See Kim Dep. 347:3-20.  In particular, the Debtor has access to certain primary and excess liability insurance

---

[39]   The description of the Imerys/Cyprus Settlement Agreement herein is qualified in its entirety by the terms of the Imerys/Cyprus Settlement Agreement and, in the event of any inconsistency between the description herein and the terms of the Imerys/Cyprus Settlement Agreement, the Imerys/Cyprus Settlement Agreement governs.

[40]   The Debtor's insurance coverage and related matters are discussed in greater detail in section 4.1(b)(4) of the Disclosure Statement, in pages 36-38 of the First Day Declaration and in pages 14-17 of the Kim PI Declaration.

policies that cover, among other things, defense and/or indemnity costs related to talc bodily injury claims, subject to the terms of the policies.[41]  The currently available limits of solvent primary and excess insurance policies issued to J&J by third-party insurers that potentially cover talc-related liabilities total approximately $1.25 billion.

Prior to the 2021 Chapter 11 Case, J&J and Old JJCI tendered talc-related claims to their third-party insurers.  To date, none of those insurers has acknowledged its coverage obligations, defended Old JJCI, LLT or J&J, paid any costs of defense, or indemnified J&J, Old JJCI or LLT for settlements or judgments (although certain insurers have entered into confidential settlement agreements with LLT and J&J to resolve their coverage obligations).  Instead, the third-party insurers have asserted coverage defenses.

In May 2019, certain of the Debtor's third-party insurers filed a lawsuit against Old JJCI and J&J, and their captive insurance affiliate, Middlesex Insurance Company ("Middlesex"), in the Superior Court of Middlesex County (Docket No. MID-L-003563-19 (N.J. Super. L. Div.)) (the "NJ Coverage Action"), seeking a declaratory judgment regarding the parties' respective obligations under the insurance policies including, in particular, the plaintiff insurers' duties to pay defense and indemnity costs to, among other things, Old JJCI.  The plaintiff insurers filed a Second Amended Complaint on June 22, 2020.  J&J, Old JJCI and Middlesex filed answers to the Second Amended Complaint on July 31, 2020, and asserted counterclaims, as well as cross-claims against certain defendants.  Aetna Casualty and Surety Company ("Travelers")[42] and

---

[41]    The policies that cover the Debtor were issued to J&J as the named insured.  Those policies cover the period when Old JJCI was operated as a business unit or division of J&J, as well as during the period when Old JJCI was a subsidiary of J&J.

[42]    Aetna Casualty and Surety Company is now part of Travelers Insurance Company.

certain other defendant insurers filed cross-claims against J&J, Old JJCI and Middlesex, to which J&J, Old JJCI and Middlesex responded later in 2020.

A few months prior to the Debtor's filing of the chapter 11 case, Travelers moved for partial summary judgment in the NJ Coverage Action with respect to Ingham.  On December 18, 2024, the Superior Court of Middlesex County entered an order granting partial summary judgment for Travelers, declaring that Travelers had no obligation to indemnify J&J, Old JJCI and Middlesex for payment of the judgments entered against them in Ingham.  See Atlanta Int'l Ins. Co. v. Johnson & Johnson, 2024 N.J. Super. Unpub. LEXIS 3302, at *2 (N.J. Sup. Ct. Dec. 18, 2024).  In so doing, the coverage court ruled that "J&J expected or intended the Ingham Plaintiffs' injuries," and "Travelers has no obligation to indemnify J&J" for payment of the Ingham judgments.  Id. at **78-79.  A motion for reconsideration of this ruling has been filed. The NJ Coverage Action, otherwise, remains pending.

After arm's-length negotiations between the Debtor and certain of the third-party insurers, in May and August 2024, the parties entered into confidential settlement agreements and releases whereby certain insurers agreed to pay certain confidential amounts to J&J to purchase all of J&J's and LLT's right, title and interest in and to the policies free and clear of any interest of any person.  See Kim Dep. 128:24-129:24.  Upon the receipt of the confidential amounts from those certain insurers as set forth in each of the settlement agreements, the applicable parties have agreed to release each other from and against all:  (a) liability for certain talc personal injury claims; (b) claims relating to the policies, including any claims arising from any of J&J's and LLT's actual or alleged obligations to actual or alleged indemnitees and distributors; and (c) extra-contractual claims.  One condition to certain of the settlement agreements is that the Plan be consistent with their terms.  Further, within seven days after the

effective date of the settlement agreements, the settling insurers and J&J are required to file a stipulation for the dismissal of their claims.

### N.    Prepetition Negotiations with Claimant Representatives[43]

At the conclusion of the 2023 Chapter 11 Case, the New Jersey bankruptcy judge lauded the "remarkable progress" the parties had made toward a "viable global settlement" that is "fair, efficient and expeditious," and he "strongly encouraged" the parties to continue to "pursue a global resolution" through a chapter 11 plan "in a context other than this current bankruptcy case." See LTL, 652 B.R. at 455.  That is exactly what the parties did.

In particular, LLT engaged in negotiations with counsel representing the substantial majority of claimants asserting ovarian cancer-related talc claims, which counsel are members of the AHC.  See Kim Dep. 29:15-30:25; Dickinson Dep. 40:16-41:4; Wuesthoff Dep. 52:8-11; see also Dkt. 857, Ex. A (Jan. 26, 2024 reimbursement agreement between LLT and AHC whereby LLT agreed to pay all reasonable and documented fees and out-of-pocket expenses incurred by the AHC in negotiating a global settlement of all present and future talc claims).  These negotiations spanned several months and ultimately included the prepetition legal representative for future talc claimants (the "Prepetition FCR"), Ms. Randi S. Ellis, and her professionals.  See, e.g., Dkt. 318, Ex. B (Oct. 18, 2023 agreement between LLT and the Prepetition FCR whereby LLT agreed to pay all reasonable and documented fees and out-of-pocket expenses incurred by the Prepetition FCR and her professionals in connection with her role as such).  LLT determined that Ms. Ellis' knowledge and experience made her ideally suited to serve as the Prepetition FCR in connection with a potential prepackaged plan of reorganization for LLT.  Ms. Ellis agreed to

---

[43]    The prepetition negotiations regarding the Plan and related matters are discussed in greater detail in Article III of the Disclosure Statement and in pages 46-55 of the First Day Declaration.

serve as the Prepetition FCR.  In that role, Ms. Ellis retained various professionals to assist her in exercising her fiduciary duties, namely counsel, an estimation expert and a financial advisor.

Thereafter, LLT, J&J, the AHC, the Prepetition FCR and their respective professionals continued negotiations on issues related to the Plan and the talc litigation.  LLT responded to various information requests and addressed input from the AHC and Ms. Ellis and their respective counsel on the terms of the Plan, including the proposed Talc Personal Injury Trust Agreement and Trust Distribution Procedures.  These efforts ultimately culminated in the formulation and later the solicitation of the Initial Plan, supported by both the AHC, representing the substantial majority of claimants asserting Ovarian Cancer and other claims related to Gynecological Cancer, and the Prepetition FCR.

The Initial Plan proposed to establish the Talc Personal Injury Trust to promptly process and pay Channeled Talc Personal Injury Claims.  The Talc Personal Injury Trust would have been funded by a stream of payments payable over 25 years with a net present value of $6.475 billion.  See Disclosure Statement § 1.1(a).

### O.    Solicitation of the Initial Plan

On May 1, 2024, J&J announced that an agreement had been reached on the proposed Initial Plan "for the comprehensive and final resolution of all current and future claims related to ovarian cancer arising from cosmetic talc litigation" against the company.[44]  In addition, J&J reported solicitation of the Initial Plan would occur on a prepackaged basis before the commencement of any chapter 11 case.  See id.

---

[44]     See *Johnson & Johnson Announces Plan by its Subsidiary, LLT Management LLC, to Resolve All Current and Future Ovarian Cancer Talc Claims Through a Consensual "Prepackaged" Reorganization* (May 1, 2024), https://www.investor.jnj.com/news/default.aspx.

An eight-week period for holders of Channeled Talc Personal Injury Claims to vote on the Initial Plan (the "Solicitation Period") began on June 3, 2024 (the "Solicitation Date") and concluded on July 26, 2024 (the "Voting Deadline"). Although the Initial Plan includes six classes of Claims and Interests,[45] only holders of Channeled Talc Personal Injury Claims in Class 4 and Equity Interests in the Debtor in Class 6 are Impaired and, thus, were entitled to vote to accept or reject the Initial Plan. Holders of Claims in Classes 1, 2, 3 and 5 were Unimpaired and not entitled to vote and, therefore, were presumed to accept the Initial Plan.

***Distribution of Solicitation Packages and Plan Supplement***

As set forth in more detail in the *Debtor's Motion for Entry of an Order Approving (I) Adequacy of Disclosure Statement, (II) Solicitation Packages and Procedures Employed for the Solicitation and Tabulation of Votes on the Debtor's Prepackaged Plan of Reorganization and (III) Notice of Non-Voting Status* [Dkt. 46] (the "DS Approval and Solicitation Procedures Motion"), beginning on the Solicitation Date, LLT, on behalf of the Debtor and through Epiq Corporate Restructuring, LLC (the "Epiq") as solicitation agent distributed certain solicitation materials (the "Solicitation Package") to the holders of Channeled Talc Personal Injury Claims or their counsel, if known.[46] Each Solicitation Package included: (a) a cover letter describing the contents of the Solicitation Package, (b) the Disclosure Statement with all exhibits, including the Initial Plan and its exhibits, (c) a copy of the appropriate ballot, voting instructions and uniform tabulation procedures (the "Tabulation Procedures"), (d) if applicable, a pre-addressed, postage prepaid return envelope for completed ballots and (e) letters from LLT and the AHC recommending acceptance of the Initial Plan. See *Decl. of Stephenie Kjontvedt of Epiq*

---

[45]    The classes of Claims and Interests in the Initial Plan are the same as the classes of Claims and Interests in the Plan.

[46]    The Solicitation Date of June 3, 2024 was also the voting record date. See Disclosure Statement § 9.1.

*Corporate Restructuring, LLC, Regarding the Solicitation and Tabulation of Ballots Cast on the Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [Dkt. 47] (the "Initial Voting Declaration") ¶ 8.  A total of 692 Solicitation Packages were sent to plaintiff law firms and nine more were sent to individual claimants for whom the Debtor had no record of any counsel.  See id. ¶ 9.  Law firms receiving a Solicitation Package were permitted to request that Epiq distribute copies of the solicitation materials (with or without a ballot) to their clients.  See *Master Ballot for Counsel to Holders of Channeled Talc Personal Injury Claims Voting on Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [Dkt. 47-2] (the "Master Ballot") at 3.  In total, Epiq distributed a further 58,376 Solicitation Packages to individual claimants in response to requests from law firms and individuals.  See Initial Voting Decl. ¶ 11.

In accordance with the solicitation procedures described in the Disclosure Statement, law firms were permitted either to request that individual ballots be sent to their clients to be returned directly to Epiq or else to submit their clients' votes via a Master Ballot.  See Disclosure Statement, Art. IX.  The Solicitation Packages distributed to law firms included a form Master Ballot and template exhibit.  Each Master Ballot included instructions concerning how to complete the ballot or, in the alternative, the process for requesting that Epiq send individual ballots to the firm's clients.  Id. at 5-8.  Individual claimants could return their ballots via mail or through Epiq's internet-based balloting portal.  Initial Voting Decl., Ex. 1.  Law firms submitting Master Ballots were required to use the balloting portal.  Master Ballot at 6-7.  Both the individual and Master Ballots included questions regarding the type of disease asserted by the applicable claimants and their alleged use of one or more talc-containing products formulated, manufactured, distributed, and/or sold by the Debtor and/or any Debtor Corporate Party.  See id.

at 2; *Direct Ballot for Holders of Channeled Talc Personal Injury Claims Voting on Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [Dkt. 47-8] (the "Direct Ballot") at 2-3.

The ballots also required that the executing party make certain certifications under penalty of perjury. Master Ballot at 3-4; Direct Ballot at 3-4. Individual claimants certified, for example, that they had (a) received the Solicitation Package, (b) a reasonable belief that they hold a Channeled Talc Personal Injury Claim and (c) a reasonable belief that the information they provided was accurate. Direct Ballot at 3-4. Law firms submitting Master Ballots were also required to certify as to their authority to vote on behalf of their clients. Master Ballot at 3. With respect to each such client, the executing attorney was required to certify whether it had: (a) "collected and recorded the vote of such Client . . . or . . . obtained authority to procedurally cast such Client's vote" and received "such Client's informed consent with respect to such vote" (the "Option A Certification"); or (b) "the authority under a power of attorney to vote . . . on behalf of such Client's Channeled Talc Personal Injury Claim" (the "Option B Certification"). See id.; see also Kim Dep. 185:10-13.

In addition, on September 17, 2024, Epiq provided a Solicitation Package with a ballot to New Holdco.

On June 28, 2024, four weeks before the Voting Deadline, Epiq served the Notice of Plan Supplement (the "Plan Supplement") on all claimant firms known to represent holders of Channeled Talc Personal Injury Claims and more than 57,000 individual claimants. See Initial Voting Decl. ¶ 9. The Plan Supplement contained: (a) a copy of the Cooperation Agreement (Exhibit E to the Initial Plan); (b) the Debtor's Retained Rights of Action (Exhibit F to the Initial Plan); (c) redlined changed pages showing revisions made to the Initial Plan; (d) redlined changed pages showing revisions made to the Talc Personal Injury Trust Agreement (Exhibit H

to the Initial Plan); (e) redlined changed pages showing changes made to the Trust Distribution Procedures (Exhibit K to the Initial Plan); (f) redlined changed pages showing changes made to the Schedule of Debtor Corporate Parties (Schedule 1 to the Initial Plan).

***The Disclosure Statement***

The Disclosure Statement included in the Solicitation Packages provided claimants with material information they required to make an informed decision on whether to vote to accept or reject the Initial Plan.  For example, the Disclosure Statement included information regarding: (a) the estimated range of recoveries in dollars for claimants by disease type; (b) the classification of claims and interests under the Initial Plan; (c) the effect of the Channeling Injunction and the assets that would be contributed to the Talc Personal Injury Trust; (d) the corporate and litigation history of the Debtor and its predecessors; (e) the then-anticipated Prepetition Corporate Restructuring; (f) the chapter 11 case; (g) the Initial Plan and Trust Distribution Procedures; (h) the solicitation and tabulation procedures, including the Debtor's request that each disputed, contingent and unliquidated Channeled Talc Personal Injury Claim be estimated in the amount of $1.00 solely for purposes of voting on the Initial Plan; (i) various risk factors; (j) the Initial Plan's release, injunction and exculpation provisions in bold, capitalized font; and (k) the federal income tax consequences of the Initial Plan.  See Disclosure Statement, Art. I-XI.

***The Supplemental Notice Program***

In addition to the service of the Solicitation Packages and the Plan Supplement, LLT disseminated notice of the solicitation of votes on the Initial Plan in connection with a potential bankruptcy filing through various media sources pursuant to a supplemental notice plan that was developed by Signal Interactive Media LLC, as described in the DS Approval and Solicitation

Procedures Motion and the *Declaration of Shannon R. Wheatman, Ph.D. in Support of (I) Supplemental Notice Plan and (II) Report on Implementation of Supplemental Notice Plan* [Dkt. 48]. The supplemental notice plan cost approximately $9 million. See id. ¶ 5. It was multi-faceted, and consisted of advertising via radio, newspapers, consumer magazines, television, internet banners, paid internet search listings and social media. Id. ¶ 31. The campaign ran from June 10, 2024 to July 12, 2024, which was two weeks prior to the claimant voting deadline. Id. ¶¶ 34, 39, 50, 54, 65. The supplemental notice plan was used to ensure the broadest, yet most targeted and efficient, publication-noticing program practicable—it provided notice in English and Spanish, reaching an estimated 95.8% of women 50 years of age and older (representing 83.9% of all holders of Channeled Talc Personal Injury Claims). See id. ¶¶ 22, 74.

### P.        A Small Number of Conflicted Firms Oppose the Initial Plan[47]

The period for holders of Channeled Talc Personal Injury Claims to vote on the Initial Plan concluded on July 26, 2024.[48] Substantial support for the Initial Plan had been achieved notwithstanding an all-out, multi-front attack launched by a small coterie of economically-conflicted plaintiff firms; an attack designed to subvert the vote and thwart any consensual bankruptcy resolution. The firms maintain leadership positions in the MDL and, in those roles, stand to recover for themselves (but not their clients) up to 12% of the aggregate amount of any resolution in the MDL (in addition to their contingency fee). See *Case Management Order No. 7(A)*, MDL No. 16-02738, Dkt 14741 (the "MDL Common Benefit Order").

---

[47]    The opposition of a small number of conflicted firms is described in greater detail in pages 48-50 of the First Day Declaration.

[48]    Ballots from holders of Equity Interests in the Debtor in Class 6 were required to be received by September 19, 2024, at 4:00 p.m. (prevailing Central Time).

The Coalition's membership has dwindled through the course of this chapter 11 case, and it is now, the Debtor understands, reduced to two firms, Beasley Allen and Golomb Legal, P.C. Beasley Allen partner Andy Birchfield has been the most vocal opponent of any resolution in bankruptcy, steadfastly maintaining—until recently—that he would not support any such resolution regardless of its terms or the level of support received from the claimants and their law firms. These firms and, in particular, Beasley Allen have employed a variety of "scorched earth" tactics to derail a consensual bankruptcy resolution since the first bankruptcy filing, including misleading media blitzes, frivolous lawsuits and repeated mischaracterizations of the terms of the Plan. They have done so notwithstanding that none of these firms has ever secured any recovery for their clients outside of bankruptcy, either through a successful verdict or by settlement. See Haas Dep. 252:9-18; Nov. 21, 2024 Andrew Birchfield Dep. (the "Birchfield Dep.") 18:18-25.

Mr. Birchfield testified in a deposition taken in the 2023 Chapter 11 Case that, if the LLT bankruptcy resolution went forward, the Plaintiffs' Steering Committee, of which Beasley Allen is a member, stood to lose the ability to control a share of the trust funding through the MDL common benefit fund. See 2023 Chapter 11 Case, Apr. 17, 2023 Andrew Birchfield Dep. 18:8-25. Pursuant to the MDL Common Benefit Order, 8% to 12% of gross talc settlement amounts for clients of participating counsel must be deposited into the common benefit fund, and that money is then to be allocated to the firms that performed common benefit work. See MDL Common Benefit Order. As a result, with respect to the approximately $9 billion proposed trust funding in the Plan, Beasley Allen could lose its share of hundreds of millions of dollars that would go into the common benefit fund had that money been part of a settlement in the MDL. 2023 Chapter 11 Case, Apr. 17, 2023 Birchfield Dep. 21:7-13. And these common benefit fund

payments would be on top of the 40% contingency fee that the firm charges its clients directly. Id. at 28:9-11.

These same counsel also spearheaded a public smear campaign designed to deprive the talc claimants of the opportunity to determine for themselves whether to accept the Initial Plan. This campaign has relied on both direct media blitzes in opposition to the plan, as well as negative "headlines" manufactured by these firms based on their own aggressive litigation tactics. This two-pronged approach allowed Beasley Allen and others to continuously push an anti-plan narrative throughout the solicitation process.[49]

### Q.      Beasley Allen Submits an Invalid Master Ballot[50]

On the Voting Deadline, Beasley Allen submitted a Master Ballot voting the claims of over 11,000 clients. See *Suppl. Decl. of Stephenie Kjontvedt of Epiq Corporation Restructuring, LLC Regarding the Solicitation and Tabulation of Ballots Cast on the Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [Dkt. 307] (the "Supplemental Voting Declaration" and, together with the Initial Voting Declaration, the "Voting Declarations"), Ex. A (Beasley Allen Master Ballot) at 7. Beasley Allen's Master Ballot was immediately suspicious to the Debtor.

---

[49]    See, e.g., Press Release, Business Wire, *Lawyers for Ovarian Cancer Victims Urge NO Vote on J&J's Latest Bankruptcy Plan* (July 22, 2024), https://www.businesswire.com/news/home/20240722309512/en/Lawyers-for-Ovarian-Cancer-Victims-Urge-NO-Vote-on-JJ%E2%80%99s-Latest-Bankruptcy-Plan; Press Release, Bailey Glasser LLP, *Motion for Temporary Restraining Order Filed in Lawsuit Against Johnson & Johnson* (June 12, 2024), https://www.baileyglasser.com/news-motion-for-temporary-restraining-order-filed-in-suit-against-johnson-and-johnson; Press Release, Levin Papantonio, *Plaintiffs in J&J Talc Cancer Litigation File Class Action Complaint for Fraudulent Conveyance* (May 22, 2024), https://levinlaw.com/newsroom/talc-cancer-plaintiffs-file-class-action-complaint-against-johnson-and-johnson-for-fraudulent-conveyance/.

[50]    The Beasley Allen Master Ballot is discussed in further detail in the *Debtor's Obj. to Mot. of the Coalition of Counsel for Justice for Talc Claimants for Entry of an Order Reinstating Votes Improperly Modified by The Smith Law Firm PLLC* [Dkt. 430] and the *Suppl. Decl. of John K. Kim In Supp. of the Debtor's Mot. for Entry of an Order Confirming the Results of Voting on the Prepackaged Plan of Reorganization* [Dkt. 306] (the "Kim Voting Declaration").

By executing the ballot and selecting the Option A Certification, Beasley Allen lawyer, Andy Birchfield, certified under penalty of perjury that he had collected and recorded the votes of every one of the over 11,000 clients with their express informed consent to oppose the Initial Plan.  See First Day Decl. ¶ 128.  It quickly became apparent that this certification was false, however, as examples arose of Beasley Allen submitting rejecting votes on behalf of claimants who had given their affirmative informed consent to other firms to accept the Initial Plan.  See, e.g., Kim Voting Decl., Ex. A (claimant affidavits affirming that Beasley Allen did not obtain their informed consent).  Beasley Allen also voted approximately 5,500 Gynecological Cancer claims (approximately half of its total ballot) to reject the Initial Plan, notwithstanding the firm's position that such claims have no value in bankruptcy or in the tort system but are to receive a recovery under the Plan.  See Kim Obj. Decl. ¶ 9; Birchfield Dep. 188:6-14 ("A. In the bankruptcy proceedings and in the -- and in the public, you know, we -- we and me personally have taken the position that other gynecological claims -- cervical cancer, uterine cancer claims -- are not supported by the science.  They would be, in our view, they would be deemed, you know, noncompensable in the tort system."); id. at 181:25-182:4 ("They have not -- they have not sustained a legally cognizable injury that would allow us to file a claim in the tort system.").  The Debtor questioned how Beasley Allen could possibly have (a) acted in what it believed to be the best interests of those clients in rejecting the Initial Plan on their behalf and (b) obtained their informed consent to reject the Initial Plan when—according to Beasley Allen, at least—the Initial Plan provided their only avenue to any recovery in any forum.

Further investigation revealed additional evidence of irregularities in Beasley Allen's Master Ballot, such as claimants whose claims had been dismissed in the tort system, yet who purportedly chose to reject the possibility of obtaining a recovery under the Initial Plan.  Other

claimants identified on the ballot were deceased, with no appointed estate representative.  See Kim Voting Decl., Exs. B and C.  Yet Mr. Birchfield certified he had collected and recorded their affirmative vote to reject the Initial Plan.  Eventually, in discovery, Mr. Birchfield would admit that he had actually collected and recorded the votes of fewer than 3,000 of the more than 11,000 claimants identified on his Master Ballot.  See Birchfield Dep. 153:13-15 ("[I]t's my understanding that we had, you know, direct feedback, direct response from approximately 3,000 clients"); Dec. 17, 2024 Hr'g Tr. 67:16-68:10 (Ms. O'Dell confirming to the Court that Beasley Allen is in possession of only "a little less" than "approximately 3,000" responsive communications from clients); Nov. 21, 2024 R. Allen Smith, Jr. Dep. (the "Smith Dep."), 415:6-17, 455:5-11.  The Beasley Allen Master Ballot was invalid and would have been disregarded had it not been superseded by the Master Ballot of the Smith Firm, its joint venture partner.  See Smith Dep. 121:15-122:12.

### R.     Extension of Voting Deadline to Permit Negotiations to Continue[51]

At the end of the Solicitation Period and while tabulation was underway, law firms that continued to object to the Initial Plan asked the Debtor to delay its bankruptcy filing to afford the parties additional time to negotiate a resolution of their objections.  See Haas Dep. 126:25-129:5. The Debtor agreed, and over the course of the succeeding weeks, the Debtor and J&J made a series of offers proposing to contribute significant incremental consideration to reach an accord. Every offer was rejected, however, and the impasse between the parties continued until the Smith Firm approached the Debtor and J&J.  See Haas Dep. 126:25-129:5; Wuesthoff Dep. 37:15-20. The Smith Firm had brought the first talc trial against the company in 2013 and had, as part of

---

[51]     The extension of the Voting Deadline to permit continued negotiations, the Smith MOU (defined herein) and related matters are described in greater detail in pages 50-54 of the First Day Declaration.

the opposition group led by Beasley Allen, actively opposed LLT's prior bankruptcy proposals. The Smith Firm advised that it represented, mostly through a joint venture agreement with Beasley Allen, approximately 11,000 claimants, almost all of whose claims had been listed as "no" votes in Beasley Allen's Master Ballot.

The Debtor and J&J engaged in extensive negotiations with the Smith Firm to resolve the firm's objections to the Initial Plan. After these further negotiations, an agreement was reached with the Smith Firm and memorialized in a *Confidential Memorandum of Understanding & Agreement Regarding Talc Bankruptcy Plan Support* (the "Smith MOU"),[52] which is incorporated to the extent relevant into the Plan. See Kim Dep. 271:16-25; Wuesthoff Dep. 38:5-11. The Smith MOU provides, among other things and subject to specified terms and conditions, that (a) the Debtor will pay an additional $1.1 billion under the Plan to the Talc Personal Injury Trust to fund talc claims subject to the individual review process described under the Trust Distribution Procedures, see Smith MOU § II.D, (b) J&J will contribute $650 million outside the Plan into a qualified settlement fund for use in resolving any common benefit fund claims arising from the MDL (the "Common Benefit QSF"), see id. § II.C, and (c) expedited payments will be made to certain claimants from the Talc Personal Injury Trust even before all potential appeals of any order confirming the Plan are exhausted. See id. § II.G.1 (providing for funding of the Talc Personal Injury Trust upon the United States Court of Appeals for the Fifth Circuit's (the "Fifth Circuit") affirmance of the order confirming the Plan); see also Kim Dep. 219:17-220:11; Wuesthoff Dep. 38:17-24.

---

[52]    A copy of the Smith MOU is attached as Annex A to the First Day Declaration. The description of the Smith MOU herein is qualified in its entirety by the terms of the Smith MOU, and in the event of any inconsistency between the description herein and the terms of the Smith MOU, the Smith MOU governs.

The Smith MOU also provided that, in the event the U.S. Supreme Court reversed the Fifth Circuit's affirmance of the order confirming the Plan, or otherwise issued any ruling that affirmed any challenge to the Plan or that undermined the ability to resolve the talc claims through the chapter 11 bankruptcy process, then the Debtor and J&J had the discretion of, among other things, electing to continue to process talc claims pursuant to a qualified settlement fund. Id. § II.G.1.  And, in the event the Fifth Circuit vacated the order confirming the Plan, the Smith MOU provided that the Debtor would, among other things, convert the Plan into a private resolution program.  Id. § II.G.2.

In exchange for these material concessions for the benefit of talc claimants, including funding the Talc Personal Injury Trust prior to the Confirmation Order becoming a final non-appealable order, the Debtor and J&J negotiated the right to revoke the Plan after confirmation if certain events occurred, specifically:  (a) fewer than 95% of the Smith Firm's claimants submitted their claims and releases to the Talc Personal Injury Trust; (b) fewer than 95% of all claimants submitted their claims and releases to the Talc Personal Injury Trust; or (c) certain parties objected to the Plan, including appealing the order confirming the Plan to the Fifth Circuit.  See Smith MOU § II.F.  The Debtor and J&J were willing to be bound to an out-of-court private resolution, but only if there was sufficient claimant support in advance.

As a result of this agreement, the Smith Firm submitted a Master Ballot under its authority as counsel to the clients jointly represented by itself and Beasley Allen.  Pursuant to that ballot the substantial majority of the Smith Firm's clients voted to accept the Plan.  The Debtor consented to an extension of the voting deadline to accept the Smith Firm's Master Ballot in accordance with its authority under the Tabulation Procedures, and the Smith Firm's Master Ballot superseded the earlier ballot submitted by Beasley Allen as to their jointly represented

clients.  See Birchfield Dep. 140:12-14 ("Did you understand that J&J, the Debtor, and LTL had the authority to extend the voting deadline at their discretion?  . . . I read that there may be – that they may – the Debtor may have the discretion to extend the voting deadline."); see also Smith Dep. 115:13-21; 443:25-444:16.

### S.    Voting Results[53]

As attested to in the Voting Declarations, Epiq completed its tabulation of votes to accept or reject the Initial Plan from holders of Channeled Talc Personal Injury Claims and Equity Interests in the Debtor prior to the Petition Date in accordance with sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.  The prepetition solicitation process resulted in a total of 93,522 valid votes on the Initial Plan and acceptance of the Initial Plan, as amended by the Plan, by 83.4% of voting holders of Channeled Talc Personal Injury Claims in Class 4, as well as 100% of Equity Interests in the Debtor in Class 6.  See Initial Voting Decl., Ex. 20; Supp. Voting Decl. ¶ 6; see also Haas Dep. 78:3-9.  The voting results ████████████ ███████████████████████████████.  See Expert Report of Andrew R. Evans, CFA (Jan. 7, 2025) (the "Evans Report") ¶¶ 21, 27.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████.  See id. ¶¶ 41-42 ████████████████

█████████████████████████████████████████; id. ¶ 44

████████████████████████████████████████████

---

[53]    The results of the vote are described in greater detail in the Voting Declarations.



█████████████████ ; id. ¶ 52 ███████████

██████████████████████████████████

█████████████ ; id. ¶¶ 71-78 ███████████

██████████████████████████████████

██████████ ; id. ¶¶ 84-91 ████████████

███████████████████████████ .

███████████████████████████████████

███████████████████████████ . *See also Expert Rebuttal Report of Andrew R. Evans, CFA* (Jan. 28, 2025) (the "Evans Rebuttal Report") ¶ 18 ██████████████

██████████████████████████████████

█████████████████████ ; id. ¶¶ 21-24 ████████

██████████████████████████████████

████████████████████ ; id. ¶ 29 ████████████

██████████████████████████████████

███████████████████████ .

## T.   Filing of Chapter 11 Case, Postpetition Negotiations and the TCC MOU

On September 20, 2024 (the "Petition Date"), the Debtor commenced this reorganization case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

Upon the filing of the chapter 11 case, certain parties, including the Coalition, certain Insurers,[54] and the U.S. Trustee objected to virtually all the relief sought by the Debtor in this

---

[54]   Travelers Casualty and Surety Company (formerly known as The Aetna Casualty and Surety Company), The Travelers Indemnity Company, Affiliated FM Insurance Company, First State Insurance Company, Hartford Accident and Indemnity Company, Liberty Mutual Insurance Company, Republic Indemnity Company of America, Sentry Insurance Company as assumptive reinsurer of Great Southwest Fire Insurance Company, ACE Property & Casualty Company (as successor in interest to Central National Insurance Company of Omaha, now known as Oakwood Insurance Company, for policies issued through Cravens, Dargan & Company, Pacific Coast, its managing General Agent), Century Indemnity Company

chapter 11 case, sought to transfer venue, sought the dismissal of the case and filed various motions attacking the prepetition solicitation process. The parties subsequently negotiated and the Court entered the Agreed Case Management Order [Dkt. 352] (as amended by the Court in an oral ruling at the December 17, 2024 hearing, the "CMO") to govern certain of the disputes, including regarding the appointment of the FCR in the chapter 11 case, dismissal of the chapter 11 case, voting and confirmation of the Plan.

On October 22, 2024, the U.S. Trustee appointed the Committee [Dkt. 313], pursuant to section 1102 of the Bankruptcy Code. As of the date of its constitution, the Committee was nearly evenly divided between parties who supported the Plan and parties who either opposed or had significant reservations with respect to the Plan. After its appointment, the Committee engaged in discussions with the AHC, the Debtor and J&J regarding the Plan. On November 15, 2024, the Debtor filed the *Notice of Official Committee of Talc Claimant's Support for Amended Plan* [Dkt. 560], which provided notice that the Debtor, J&J and the Committee had entered into a *Memorandum of Understanding & Agreement Regarding Talc Bankruptcy Plan Support* pursuant to which the Committee agreed to support the Plan (the "TCC MOU"). See also Kim Dep. 252:6-7; 254:4-256:20; Nov. 23, 2024 James Murdica Dep. 127:6-13, 199:9-14. On November 21, 2024, the Committee filed its own statement in support of the chapter 11 case, the Plan and the Plan process [Dkt. 613]. In its statement, the Committee stated that the enhancements contained in the TCC MOU "materially expedite recoveries for talc injury victims

---

(as successor in interest to Insurance Company of North America), Great Northern Insurance Company; Pacific Employers Insurance Company, Westchester Fire Insurance Company (as successor by novation to Industrial Indemnity Company), Allstate Insurance Company, solely as successor in interest to Northbrook Excess & Surplus Insurance Company, formerly Northbrook Insurance Company, TIG Insurance Company, The North River Insurance Company, Everest Reinsurance Company, Employers Insurance Company of Wausau (f/k/a Employers Insurance of Wausau a Mutual Company, f/k/a Employers Mutual Liability Insurance Company of Wisconsin) and National Casualty Company (collectively, the "Insurers").

and their estates, resolve significant concerns regarding trust administration, and help to ensure finality to the very long road to justice for tens of thousands of talc claimants." Id. ¶ 8.

The TCC MOU[55] provided certain additional material benefits for talc claimants, including providing for (a) the Plan to become effective on an even earlier timeframe notwithstanding appeals from the order confirming the Plan to the Fifth Circuit, see TCC MOU § II.F.4, and (b) the acceleration of certain cash contributions to the Talc Personal Injury Trust, which would allow for payments to claimants to be expedited.  See id. § II.G.1 (providing for funding to the Talc Personal Injury Trust upon occurrence of the Effective Date, which would occur on the earlier of the Fifth Circuit affirming the order confirming the Plan or the date 95% of claimants submitted releases to the Talc Personal Injury Trust in accordance with the terms of the TCC MOU).  The TCC MOU also provided that the composition of the initial Talc Trust Advisory Committee would be modified so that there was an even split between the MDL leadership and members from the AHC, as requested by those constituencies.  See id. § II.H.[56]

Similar to the Smith MOU, the TCC MOU provided that, in the event the U.S. Supreme Court reversed the Fifth Circuit's affirmance of the order confirming the Plan, or otherwise issued a ruling that affirmed any challenge to the Plan or that undermined the Debtor's ability to resolve the talc claims through the chapter 11 bankruptcy process, then the Debtor and J&J had the discretion, among other things, of electing to continue to process talc claims pursuant to a qualified settlement fund.  Id. § II.G.1.  And, in the event the Fifth Circuit vacated the order

---

[55]    The description of the TCC MOU herein is qualified in its entirety by the terms of the TCC MOU, and in the event of any inconsistency between the description herein and the terms of the TCC MOU, the TCC MOU governs.

[56]    Previously, the initial Talc Trust Advisory Committee consisted of either nine members if no official committee of talc claimants was appointed or 11 members if an official committee was appointed.  In either case, nine of the members of the Talc Trust Advisory Committee would come from the AHC and include the Smith Firm.

confirming the Plan, the TCC MOU also provided that the Debtor would, among other things, convert the Plan into a private resolution program.  Id. § II.G.2.

The TCC MOU further required the commencement of funding by the Debtor prior to the Confirmation Order becoming a final non-appealable order, and limited the ability of the Debtor and J&J to revoke the Plan to only two circumstances:  where (a) fewer than 95% of all claimants submit their claims and releases to the Talc Personal Injury Trust within 120 days after confirmation of the Plan and (b) certain parties appeal the order confirming the Plan to the Fifth Circuit.

The Debtor, together with the Committee, the AHC, the Smith Firm and the FCR, subsequently amended the Plan to incorporate the TCC MOU as applicable, which Plan was filed on December 9, 2024.  Apart from incorporating the Smith MOU and TCC MOU as applicable, the Plan also reflected additional negotiated modifications, including providing that the terms of the Private Resolution Process MSA and Common Benefit Fund MSA would be agreed to prior to confirmation of the Plan.

Through the Private Resolution Process MSA, which was addressed in both the Smith MOU and the TCC MOU, a private resolution process would be established for current claimants outside of bankruptcy in certain specified circumstances if the Plan were overturned on appeal. Because this private resolution would be limited to the current claimants, the economics of the settlement were adjusted accordingly.  And, through the Common Benefit Fund MSA, which again was addressed in both the Smith MOU and the TCC MOU, the Common Benefit QSF would be established outside of the Plan if certain conditions are satisfied, including that the MDL Common Benefit Order is withdrawn with prejudice.  The Common Benefit Fund MSA contemplates that the qualified settlement fund established thereunder would be administered by

a special master, who will determine whether any plaintiff law firm is entitled to a distribution on account of common benefit claims. Any member of the plaintiffs' bar would be able to make a claim against the Common Benefit QSF, including those who voted against the Plan.

On October 23, 2024, the Debtor filed its *Motion for an Order Appointing Randi S. Ellis as Legal Representative for Future Talc Claimants* [Dkt. 318]. On November 13, 2024, following a hearing on the motion, the Court entered an order granting the motion [Dkt. 529] and appointing Ms. Ellis as the FCR.[57] The FCR objected to certain process orientated and related modifications to the Plan and the Trust Distribution Procedures as a result of either the Smith MOU or the TCC MOU. See Dkt. 1014. The Debtor is working with the FCR, the Committee, the AHC and the Smith Firm to address these concerns. The Debtor understands the FCR is otherwise supportive of confirmation of the Plan.

### U.    Overview of the Treatment of Stakeholders

All Allowed Claims are unimpaired by the Plan with the exception of Class 4 Channeled Talc Personal Injury Claims, which, are impaired; Class 6 Equity Interests are also an impaired Class under the Plan. All Channeled Talc Personal Injury Claims will be resolved and paid in full pursuant to the terms of the Talc Personal Injury Trust Agreement and the Trust Distribution Procedures. A supermajority of Class 4 claimants voted in favor of the Plan.

### III.    MODIFICATIONS TO THE PLAN AND PROPOSED RESOLUTIONS TO OBJECTIONS

Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation so long as the modified plan satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code. See 11 U.S.C. § 1127(a). Bankruptcy

---

[57]    Certain of the Insurers and the Coalition appealed this order on November 25 and 26, 2024, respectively. See Dkts. 666, 673.

Rule 3019(a) provides that modifications to a plan after a plan has been accepted will be deemed accepted by all creditors and equity security holders who (a) accepted the modifications in writing or (b) previously accepted the plan if the court finds, after notice and a hearing, that the proposed modifications do "not adversely change the treatment" of the claim of any creditor or interest of any equity security holder.  Feb. R. Bankr. P. 3019.  Courts consistently have held that a proposed modification to a previously accepted plan will be deemed accepted if the modification is not material or does not adversely affect the way creditors and stakeholders are treated.  See, e.g., In re 4 W. Holdings, Inc., 593 B.R. 448, 455 (Bankr. N.D. Tex. 2018) (finding that amended plan treated creditors' claim more favorably than original plan, which creditor voted to accept and therefore deeming creditor to have accepted the amended plan).[58]

Since solicitation of the Initial Plan, the Debtor has made modifications to the Initial Plan and subsequent iterations of the Plan, in its continuing discussions with parties in interest (including the Committee, the FCR, the AHC and the Smith Firm) and in response to formal and informal objections that it has received.  The modifications are either immaterial or are material but improve claimants' treatment, and thus, in either case, comply with section 1127 and Bankruptcy Rule 3019.  None of those changes adversely affects the rights of any holder of a Channeled Talc Personal Injury Claim that voted to accept the Initial Plan.

These modifications, among others, (a) called for an additional $1.1 billion in funding for Channeled Talc Personal Injury Claims evaluated by the Talc Personal Injury Trust under the Individual Review Process (as defined in the Trust Distribution Procedures), (b) required that the Talc Personal Injury Trust be established on the first business day following confirmation of the

---

[58]     The Coalition maintains that votes on the Initial Plan cannot be deemed votes on the Plan given the various changes to the Initial Plan.  See Coalition Plan Obj. at 77.  But the Debtor submits that the modifications to the Plan since solicitation of the Initial Plan satisfy the requirements of section 1127 and Bankruptcy Rule 3019, and will seek a ruling to that effect at the consolidated hearing.

Plan to allow for expedited claims processing and payments to claimants, (c) provided for the Plan to become effective on an earlier timeframe notwithstanding appeals from the order confirming the Plan to the Fifth Circuit, which, again, would allow for payments to claimants to be expedited, (d) accelerated the timing of cash contributions to the trust to provide further assurance that all claimants, whether current or future, will be fully compensated in a timely manner, (e) modified the composition of the initial Talc Advisory Committee to provide that approximately half of its membership would come from the MDL leadership and the other half from the AHC (as requested by those constituencies) and (f) mandated that the terms of the Private Resolution Process MSA and Common Benefit Fund MSA be agreed upon prior to confirmation of the Plan.[59]   The Debtor submits that all these modifications improved, and did not adversely change, the rights of any holder of a Channeled Talc Personal Injury Claim.

Other modifications, particularly those in response to objections to the Plan are simply not material.[60]   These changes are largely focused on resolving objections to the Plan and clarifying language to confirm that certain parties' rights are not inadvertently impacted by the Plan.  The Debtor will be filing a further amended version of the Plan in advance of the confirmation hearing to reflect the modifications described herein, and will also file a redline to the Plan for ease of review by the Court and the parties.

---

[59]     A further description of the Private Resolution Process MSA, the Common Benefit Fund MSA and other changes to the Plan resulting from the Smith MOU and TCC MOU is set forth in Parts II.R and II.T supra. The Coalition's description of the global agreement among the parties as "an undeniable, implicit recognition of, and means of hedging against, strong Fifth Circuit precedent" and that the Plan is thus "illusory," Coalition Plan Obj. at 60-61, is simply wrong.

[60]     The Debtor will be updating Schedule 2 to the Plan to address corrections to corporate names and successor entities in order to ensure that all of the Imerys/Cyprus Parties are listed therein, as well as updating Schedule 3 to the Plan as discussed herein. The Debtor believes that the revisions to Schedule 2 and Schedule 3 are immaterial as the entities that will be added to each Schedule were intended to be included in the previous schedules and are necessary to ensure that no parties' rights are inadvertently impacted.

Finally, as set forth below, the Plan continues to comply with the requirements of sections 1122 and 1123 of the Bankruptcy Code. Accordingly, no further solicitation or disclosure is required and the modifications satisfy the requirements of section 1127 and Bankruptcy Rule 3019.

### A.    Certain of the Objections Filed by the U.S. Trustee

To resolve certain of the objections raised by the U.S. Trustee [Dkt. 980] (the "UST Objection") with respect to the exculpation provisions in the Plan, the Debtor has agreed to (a) limit the definition of the Exculpated Parties in the Plan to (i) the Debtor, (ii) the Committee and each of the members thereof, solely in his or her capacity as such and (iii) the FCR, solely in her capacity as such and (b) to remove the exculpation provision previously included in section 4.17 of the Plan.

### B.    Certain of the Objections Filed by the United States of America

To resolve certain of the objections raised by the United States of America, on behalf of the United States Department of Health and Human Services ("HHS"), including its component agency the Centers for Medicare & Medicaid Services ("CMS"), and the United States Department of Veterans Affairs (the "VA" and together with HHS and CMS, the "USG Claimants" or the "United States") [Dkt. 984] (the "US Objection"), the Debtor has agreed to remove the "Good Faith Compromise and Settlement" provision previously contained in section 9.8 of the Plan.

### C.    Certain of the Objections Filed by the Insurers

To resolve certain of the objections raised by the Insurers,[61] the Debtor has made various modifications to the Plan. First, the Debtor has added section 10.3.3(c) to the Plan as well as a

---

[61]    See Dkt. 981 (the "Travelers Objection"); Dkt. 975 (the "Century Objection"); Dkt. 973 (the "Allstate Objection").

definition for Talc Insurance Company Defensive Rights to eliminate any doubt as to whether the

Plan could limit the Insurers' defensive setoff and recoupment rights (Travelers Obj. ¶¶ 35-38;

Century Obj. ¶¶ 23-24; Allstate Obj ¶ 15), which section provides as follows:

> Without limiting the generality of the foregoing provisions of this Section 10.3.3, nothing in the Plan, Confirmation Order, or any other supplements or orders in connection therewith (i) will release, bar, enjoin, impair, alter, modify, amend, limit, prohibit, restrict, reduce, improve, or enhance, or constitute an admission as to the viability of, any of the Talc Insurance Company Defensive Rights[62] under applicable non-bankruptcy law, (ii) shall preclude, operate to impair, or have the effect of impairing any Talc Insurance Company from asserting in any proceeding any and all Talc Insurance Company Defensive Rights that they have or may have under applicable law, (iii) shall be deemed to waive any of the Talc Insurance Company Defensive Rights, or (iv) may be used as evidence of any determination regarding any of the Talc Insurance Company Defensive Rights. Talc Insurance Company Defensive Rights may be used to offset, set-off, recoup, allocate or apportion fault, liability, or damages, or seek judgment reduction or otherwise to defend against any claim or cause of action brought by any Person against a Talc Insurance Company in whole or in part based on any talc or talc-containing product or material. For the avoidance of doubt, notwithstanding anything to the contrary contained in this Section 10.3, Talc Insurance Company Defensive Rights may not be used to seek (A) any affirmative monetary recovery from any Protected Party or any asset of any Protected Party on account of any claim or cause of action released pursuant to Article XI or on account of any Claim against the Debtor or Reorganized Debtor or (B) any affirmative recovery from the Talc Personal Injury Trust or any asset of the Talc Personal Injury Trust.

---

[62]     "**<u>Talc Insurance Company Defensive Rights</u>**" means any and all rights and defenses of setoff, recoupment, allocation or apportionment of fault and judgment reduction, apportionment of damages, mechanisms or rights similar to the foregoing, and any steps necessary to assert the foregoing, in each case solely to reduce the liability, judgment, obligation, or fault of the applicable Talc Insurance Company to any Person that asserts any claim or cause of action against the Talc Insurance Company based in whole or in part on any talc or talc-containing product or material.  For the avoidance of doubt, Talc Insurance Company Defensive Rights include all rights of a Talc Insurance Company, based on the conduct or alleged conduct of the Debtor, to judgment setoff, allocation or apportionment of fault and judgment reduction, apportionment of damages, any other defenses, affirmative defenses, or judgment reduction mechanisms or rights similar to the foregoing, and any steps necessary to assert the foregoing, in each case solely to reduce the liability, judgment, obligation, or fault, even where the Talc Insurance Company does not have a Claim against the Debtor.

Second, the Debtor has modified the definition of "Talc Insurance Policy" to address the Insurers' objections relating to the Plan's potential preclusive effect on the Insurers' assertion of claims against their reinsurers.  See Century Obj. ¶ 8; Travelers Obj. ¶ 10; Allstate ¶ 7.  The final sentence of this definition now provides as follows:

> For the avoidance of doubt, Talc Insurance Policies shall not include any reinsurance policy obtained by and for the benefit of a Talc Insurance Company with respect to such Talc Insurance Company's obligations under any Talc Insurance Policy issued by such Talc Insurance Company.

Third, the Debtor has revised the definition of "Contribution Claim" to address Century's objection, see Century Obj. ¶ 27, that the definition of Contribution Claim encompasses Insurers' claims relating to their payment of losses on behalf of the Debtor but could be read to exclude similar claims relating to payment of defense costs.  The defined term now states as follows:

> "**Contribution Claim**" means any and all rights of a Talc Insurance Company that is not a Settling Talc Insurance Company, whether legal, equitable, contractual, or otherwise, of contribution, indemnity, reimbursement, subrogation, or other similar claims directly or indirectly arising out of or in any way relating to such insurer's payment of loss or defense costs on behalf of the Debtor in connection with any Channeled Talc Personal Injury Claim.

Fourth, the Debtor has clarified that the Reorganized Debtor, as the subrogee of the Talc Personal Injury Trust, shall have the same obligations, if any, arising out of or under a Talc Insurance Policy that the Debtor had before the Petition Date in section 10.3.2(c) and that the Plan does not impair the rights, defenses or obligations of the Reorganized Debtor, as the subrogee of the Talc Personal Injury Trust in sections 10.3.3(a) and (b).

Finally, the Debtor has modified section 11.3.2(c)(iv) of the Plan to read as follows and added section 11.3.2(c)(v):

> (iv)     the rights of any Talc Insurance Company to assert any claim, debt, obligation, cause of action, or liability for payment or Talc Insurance Company Defensive Rights against any other Talc

Insurance Company that is not a Settling Talc Insurance Company (including, notwithstanding anything to the contrary contained in Section 11.3.1, Middlesex Assurance Company Limited), or as otherwise specifically provided in any Talc Insurance Settlement Agreement; or

(v)    the right of any Talc Insurance Company to exercise any Talc Insurance Company Defensive Rights, to the extent permitted under applicable law, against the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its subrogee) or any co-insured of the Debtor as to any obligation on account of a Talc Personal Injury Claim that has been or could have been asserted against the Debtor, the Reorganized Debtor, or any co-insured of the Debtor but for the Injunctions, subject to the right of the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its subrogee) or any co-insured of the Debtor to dispute the ability of a Talc Insurance Company to exercise such Talc Insurance Company Defensive Rights pursuant to the applicable Talc Insurance Policy or related agreement or any applicable law.

The Debtor believes that the above modifications fully resolve the Insurers objections on these points.

### D.    The Objection By Truck Insurance Exchange

The Debtor is working with the parties to address the objection filed by Truck Insurance Exchange [Dkt. 983] (the "Truck Objection"), including consideration of potential proposed language to address the Truck Objection.

### E.    The Objections by Indirect Claimants

The Debtor received various informal objections to the Plan by certain retailers holding Indirect Talc Personal Injury Claims regarding the preservation of potential defensive rights and insurance interests.[63]  To resolve those informal objections, the Debtor has added a new

---

[63]    Certain retailers filed a reservation of rights with respect to the Plan.  See Dkt. 1067.  The reservation of rights included an objection to the Plan to the extent such retailers are not Protected Parties but, as acknowledged by the retailers, the objection raises hypothetical issues that are implicated only if the Plan is modified.  See id. ¶ 25 n.14.

section 10.9 (Retailer Matters) and certain related definitions, as follow below, regarding these defensive rights and insurance interests and certain related definitions to the Plan.

10.9.1 Preservation of Retailer Defensive Rights. Nothing in the Plan, Confirmation Order, or any other supplements or orders in connection therewith (a) will release, bar, enjoin, impair, alter, modify, amend, limit, prohibit, restrict, reduce, improve, or enhance any of the Retailer Defensive Rights[64] as such rights exist or might in the future exist under applicable non-bankruptcy law; (b) shall preclude, operate to impair, or have the effect of impairing any party from asserting in any proceeding any and all Retailer Defensive Rights that they have or may have under applicable law; (c) shall be deemed to waive any of the Retailer Defensive Rights; or (d) may be used as evidence of any determination regarding any of the Retailer Defensive Rights. Under no circumstances shall any Person be permitted to assert issue preclusion or claim preclusion, waiver, estoppel, or consent in response to the assertion of any Retailer Defensive Rights.

10.9.2 Permissible Uses for Retailer Defensive Rights. Retailer Defensive Rights (a) may be used to offset, set-off, recoup, allocate or apportion fault, liability, or damages, or seek judgment reduction or otherwise to defend against any cause of action or Claim brought by any Person against any party holding valid Retailer Defensive Rights based in whole or in part on actions underlying Talc Personal Injury Claims; and (b) shall in no case be used to seek any affirmative monetary recovery from any Protected Party or any asset of any Protected Party on account of (i) Channeled Talc Personal Injury Claim or (ii) any Claim or cause of action released pursuant to the Plan.

10.9.3 Preservation of Interests in Insurance. Notwithstanding anything to the contrary contained in the Plan, (a) any transfer of the Talc Insurance Assets shall not affect, expand, or diminish in any

---

[64]   "**Retailer Defensive Rights**" means any and all direct, or indirect, rights, remedies, protections, immunities, objections, defenses, assertions, claims, causes of action, and, in each case, of any kind, character, or nature, whether legal, equitable, or contractual, contingent or noncontingent, liquidated or unliquidated, disputed or undisputed, including all rights, remedies, defenses, assertions, and claims against liability, rights to setoff, offset, recoupment, counterclaims, cross-claims, rights to allocation or apportionment of fault and judgment reduction, apportionment of damages, any other defenses, affirmative defenses, or judgment reduction mechanisms or rights similar to the foregoing, and any steps necessary to assert the foregoing, in each case, solely to reduce the liability, judgment, obligation or fault to any other Person that asserts any Claim or cause of action based in whole or in part on actions underlying Talc Personal Injury Claims.

way any direct interests or rights any Retailer[65] has or may in the future have to pursue insurance coverage under or insurance recoveries from any Talc Insurance Policy as additional or named insureds or co-insureds and (b) no such direct interests or rights, if any, are being released.

The Debtor understands that these modifications resolve the informal objections to the Plan by these retailers.

## IV. THE PLAN MEETS EACH REQUIREMENT FOR CONFIRMATION UNDER SECTION 1129 OF THE BANKRUPTCY CODE AND THE OBJECTIONS ASSERTED WITH RESPECT TO SECTION 1129 SHOULD BE OVERRULED

To confirm the Plan, the Court must find that both the Plan and the Debtor are in compliance with each of the requirements of section 1129(a) of the Bankruptcy Code.  See In re Robertshaw US Holding Corp., 662 B.R. 300, 319 (Bankr. S.D. Tex. 2024) ("Section 1129(a) of the Bankruptcy Code says that a bankruptcy court shall confirm a plan only if all the requirements under subsection (a) are met.").  As set forth below, both the Plan and the Debtor meet all the requirements of section 1129(a) of the Bankruptcy Code and, therefore, the Plan should be confirmed.

### A. Section 1129(a)(1) — The Plan Complies with the Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code provides that a plan of reorganization may be confirmed only if "[t]he plan complies with the applicable provisions of this title."  11 U.S.C.

---

[65]     "**Retailer**" means third-party retailer that sold Old JJCI's talc-containing products, including, as applicable, any of the following: (a) CVS Health Corporation and its past and present Affiliates, including CVS Pharmacy, Inc., Connecticut CVS Pharmacy, L.L.C., Longs Drug Stores, L.L.C., Longs Drug Stores California, L.L.C., Sav-On Drugs, Inc., Sav-On Drug Stores, Inc., Eckerd Corporation, Eckerd Corporation of Florida, Inc. and Osco Drugstores; (b) Walgreen Company and its past and present Affiliates, including Bond Drug Company of Illinois, Duane Reade, Duane Reade, Inc., Happy Harry's Inc, Walgreen Arizona Drug Co., Walgreens Boots Alliance, Inc., Walgreen Eastern Co., Inc., Walgreen Louisiana Co., Inc., and Walgreen of Hawaii, LLC; and (c) Walmart Inc. and its past and present Affiliates, including Wal-Mart Stores, Inc., Wal-Mart Associates, Inc., Wal-Mart Stores East, LP, Wal-Mart Stores Arkansas, LLC, Wal-Mart Louisiana, LLC, Wal-Mart Stores Texas, LLC, Sam's East, Inc., Sam's West, Inc., Wal-Mart Real Estate Business Trust, Sam's Real Estate Business Trust, Wal-Mart Realty Company, Wal-Mart TRS, LLC, and Sam's TRS, LLC.  The Debtor will be updating Schedule 3 to the Plan to reflect these retailers, as well as to address corrections to corporate names and successor entities.

§ 1129(a)(1); In re Eagle-Picher Indus., Inc., 203 B.R. 256, 270-73 (Bankr. S.D. Ohio 1996)

(examining each requirement of chapter 11 to demonstrate that section 1129(a)(1) was satisfied);

In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) ("[I]n order for a

plan of reorganization to pass muster . . . it must comply with all the requirements of

Chapter 11….").

      The legislative history of section 1129(a)(1) indicates that the primary focus of this

requirement is to ensure that the Plan complies with sections 1122 and 1123 of the Bankruptcy

Code, which govern classification of claims and interests and the contents of a plan, respectively.

See S. Rep. No. 95-989, at 125-26 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5912-13;

H.R. Rep. No. 95-595, at 412 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6368; see also

Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 648-49 (2d Cir. 1988)

(holding that legislative history indicates that section 1129(a)(1) was intended to require

compliance with sections 1122 and 1123).

## 1.     Classification of Claims and Interests

      Section 1122 of the Bankruptcy Code provides that the claims or interests within a given

class must be "substantially similar" to the other claims or interests in that class:

> (a) Except as provided in subsection (b) of this section, a plan may
> place a claim or an interest in a particular class only if such claim or
> interest is substantially similar to the other claims or interests of
> such class.
>
> (b) A plan may designate a separate class of claims consisting only
> of every unsecured claim that is less than or reduced to an amount
> that the court approves as reasonable and necessary for
> administrative convenience.

11 U.S.C. § 1122; see also In re Vitro Asset Corp., 2013 WL 6044453, at *5 (Bankr. N.D. Tex.

Nov. 14, 2013) ("[A] plan may provide for multiple classes of claims or interests so long as each

claim or interest within a class is substantially similar to other claims or interests in that class.").

Notably, section 524(g) bankruptcy plans almost always classify all asbestos-related claims in a single class regardless of alleged disease.  See, e.g., In re HONX Inc., No. 22-90035 (MI) (Bankr. S.D. Tex. Feb. 16, 2024), Dkt. 1332 ¶ 40 (confirming plan with all asbestos claims in a single class regardless of alleged diseases, which diseases included mesothelioma, lung cancer, other cancers, severe asbestosis and non-malignant asbestos-related diseases); In re Paddock Enters., LLC, 2022 WL 1746652, at *10 (Bankr. D. Del. May 31, 2022) (same); In re Maremont Corp., No. 19-10118 (KJC) (Bankr. D. Del. May 17, 2019), Dkt. 241 at 25 (confirming plan with all asbestos claims in a single class regardless of alleged diseases, which diseases included mesothelioma, lung cancer, other cancers and severe asbestosis); In re Glob. Indus. Techs., Inc., 2013 WL 587366, at *26 (Bankr. W.D. Pa. Feb. 13, 2013) (confirming plan with (a) all asbestos claims in a single class regardless of alleged diseases, which diseases included mesothelioma, lung cancer, other cancer, sever asbestosis, asbestosis/pleural disease and other asbestos disease, and (b) a separate class for silica claims regardless of alleged disease, which diseases included complex silicosis, lung cancer, severe silicosis and silicosis); In re G-I Holdings Inc., 420 B.R. 216, 258, 273 (D.N.J. 2009) (confirming plan with all asbestos claims in a single class regardless of alleged diseases, which diseases included mesothelioma, lung cancer, other cancers, severe asbestosis asbestosis/pleural disease and other asbestos disease).

Section 524(g) cases also almost always classify direct and indirect asbestos-related claims, including indemnification claims, in a single class.  See, e.g., In re W.R. Grace & Co., 729 F.3d 311, 326 (3d Cir. 2013) (finding that plan reasonably classified asbestos tort claims and asbestos-related indemnification claims in a single class because the debtor's liability for the indemnification claims depended solely on its asbestos-related activities); In re Armstrong World Indus., Inc., 348 B.R. 136, 159-60 (D. Del. 2006) (concluding that because all of the asbestos

personal injury claims in the class, related, directly or indirectly, to the debtor's "liability for asbestos-related personal injury and wrongful death claims," a "reasonable basis exists for the classification" of those claims "together in a single class"); In re Pittsburgh Corning Corp., 2013 WL 2299620, at *37, *66-67 (Bankr. W.D. Pa. May 24, 2013), aff'd and adopted sub nom. Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp., 518 B.R. 307 (W.D. Pa. 2014) (holding that direct asbestos personal injury claims were substantially similar to indirect asbestos claims because both categories were "unsecured, nonpriority claims arising from personal injury caused by exposure to asbestos or asbestos-containing products").

The number of Classes in the Plan reflects the diverse characteristics of those Claims and Interests, and the legal rights under the Bankruptcy Code of each of the holders of Claims or Interests within a particular Class are substantially similar to other holders of Claims or Interests within that Class.[66] Due to their entitlement to priority status under section 507 of the Bankruptcy Code, Priority Claims have been separately classified in Class 1. Based on their secured status, Secured Claims have been separately classified in Class 2. Channeled Talc Personal Injury Claims have been separately classified in Class 4 due to the distinctive bases for such Claims and the fact that, unlike all other Classes of Claims, Channeled Talc Personal Injury Claims are impaired. Moreover, due to their unique nature and issues specific to them, Class 5 Intercompany Claims have been classified separately from the Class 3 General Unsecured Claims. Finally, the Interests in the Debtor have been separately classified to reflect their status as Interests.

---

[66]   In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified.

Both the U.S. Trustee and the Coalition assert the Plan violates section 1122(a) and object to the Debtor's classification of all Channeled Talc Personal Injury Claims in Class 4 (Channeled Talc Personal Injury Claims), albeit for different reasons.  The U.S. Trustee asserts that the Plan violates section 1122(a) because Class 4 includes claimants that are clients of law firms with prepetition MSAs and, as a result, such claimants are not substantially similar to other holders of Channeled Talc Personal Injury Claims.  See UST Obj. ¶¶ 49-52.  The Debtor, however, included holders of Channeled Talc Personal Injury Claims potentially subject to an MSA in Class 4 because their claims have not yet been settled or resolved pursuant to the terms of an MSA.  See Kim Obj. Decl. ¶ 12.  As a result, it is possible that such claims may never be resolved under an MSA.  Rather, such claims would be subject to review and compensation by the Talc Personal Injury Trust pursuant to the Trust Distribution Procedures like all other Channeled Talc Personal Injury Claims.  These circumstances are plainly different from the "stub claim" scenario raised by the U.S. Trustee.  See UST Obj. ¶¶ 51-52.

Further, the U.S. Trustee's accusation that the right of each "MSA claimant" to look outside the Plan for payment means that such claimants were included to gerrymander the vote, see UST Obj. ¶¶ 51-52, disregards that, as disclosed by the Debtor, only about 300 clients of a single firm that is a party to an MSA voted on the Initial Plan.  Accordingly, these claims did not have a material effect on the ultimate voting result in this chapter 11 case and therefore could not have gerrymandered the vote.  See Dkt. 428 (Debtor's Obj. to Coalition Mot. to Designate Votes), ¶¶ 6, 21; Kim Obj. Decl. ¶ 21.

The Coalition, on the other hand, objects to (a) the classification of Ovarian Cancer and Gynecological Cancer claims together in Class 4 and (b) the classification of Direct Talc Personal Injury Claims and Indirect Talc Personal Injury Claims in Class 4.  See Coalition DS

Obj. ¶¶ 441-44;[67] Coalition Plan Obj. at 66-68.  But the Coalition ignores the abundance of

section 524(g) precedent to the contrary on both points and the fact that these claims all relate to

the same underlying liability.  See supra at 69 (collection of section 524(g) cases classifying all

asbestos-related claims—regardless of disease and whether the claim is direct or indirect—in one

class).

The Coalition's main objection is based on a fictitious bright line drawn between Ovarian

Cancer claims—which the Coalition holds up as universally compensable—and Gynecological

Cancer claims—which the Coalition argues are worthless (even though the constituent law firms

represent holders of such claims and, indeed, voted those claims on the Plan (albeit to reject it)).

See Coalition DS Obj. ¶¶ 441-44; Coalition Plan Obj. at 5-6.  Though the Coalition trumpets the

viability of Ovarian Cancer claims, the question of whether Ovarian Cancer claims can even

survive a Daubert challenge is the subject of renewed briefing in the MDL and there has been

only one successful Ovarian Cancer case, the aberrant Ingham decision in a 22-plaintiff

consolidated case.  Regardless, the strength of a claim is not determinative for classification

purposes.  See G-I Holdings, 420 B.R. at 258 (stating that "it is also clear that even though some

class members may have stronger claims, or stronger defenses than others, they may be classified

together so long as their claims are substantially similar and their treatment is approximately

equal.") (internal quotation marks omitted).

Moreover, the Coalition's specious assertion that the Debtor's motives in classifying all

Channeled Talc Personal Injury Claims in a single class was to manufacture a successful vote,

see Coalition Plan Obj. at 59-60, 67, is belied by the voting results.  As Mr. Evans explains in his

---

[67]     The Coalition cites various cases in support of its position that the alleged differences in legal rights
between ovarian and gynecological claimants mandate separate classification.  See Coalition DS Obj. ¶ 443
n.103.  Those cases, however, all involved classification of a section 1111(b) unsecured deficiency claim
separate from general unsecured creditors because a section 1111(b) claim exists only in chapter 11.

expert report, 

Finally, the Coalition's attempt to manufacture a difference between Ovarian Cancer and Gynecological Cancer claims sufficient to mandate separate classification based on the amount recoverable under the Trust Distribution Procedures, see Coalition Plan Obj. at 66-67, conflates the substantially similar requirement under section 1122 with the equal treatment requirement under section 1123(a)(4).  As set forth below, the Plan satisfies the equal treatment requirement under section 1123(a)(4).  And, importantly, the Coalition ignores that, in W.R. Grace, which is

cited as support for its position, the Third Circuit affirmed the district court's confirmation of a section 524(g) plan that grouped all asbestos claims—which were entitled to differing values under the applicable trust distribution procedures—in a single class.  See W.R. Grace, 729 F.3d at 326; Coalition Plan Obj. at 67-68; see also In re W.R. Grace & Co., 446 B.R. 96, 112 (Bankr. D. Del. 2011) ("There is no reason to separately classify each level of personal injury claim to be administered through the Trust.  The Trust accounts for these distinctions and payments differ, depending on the disease level established by the claimants."), aff'd, 468 B.R. 81, 155-56 (D. Del. 2012).

Courts have found that a plan satisfies section 1122 where a "reasonable basis" exists for the debtor's proposed classification structure and the claims or interests within each particular class are substantially similar.  See Armstrong World Indus., 348 B.R. at 159.  Here, the Debtor's classification of all Channeled Talc Personal Injury Claims in a single class was reasonable and appropriate because the Channeled Talc Personal Injury Claims are substantially similar:   (a) the Debtor disputes liability for all Channeled Talc Personal Injury Claims, whether arising from Ovarian Cancer, Gynecological Cancer or other alleged diseases; (b) all Channeled Talc Personal Injury Claims share a common priority—they are either unsecured personal injury claims or unsecured indirect claims arising as a result of such personal injury claims; (c) all Channeled Talc Personal Injury Claims arise from alleged exposure to the Debtor's predecessor's talc products; and (d) all Channeled Talc Personal Injury Claims are impaired under the Plan.

The Debtor's classification in the Plan, including of all Channeled Talc Personal Injury Claims in Class 4 (regardless of disease and whether an indirect or direct claim), therefore complies with section 524(g) precedent and section 1122 of the Bankruptcy Code.

## 2.     **Mandatory Contents of the Plan**

Section 1123(a) of the Bankruptcy Code identifies seven requirements for the contents of a plan of reorganization.  Specifically, this section requires that a plan:  (a) designate classes of claims and interests; (b) specify unimpaired classes of claims and interests; (c) specify treatment of impaired classes of claims and interests; (d) provide for equality of treatment within each class; (e) provide adequate means for the plan's implementation; (f) provide for the prohibition of nonvoting equity securities and provide an appropriate distribution of voting power among the classes of securities; and (g) contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors.  See 11 U.S.C. § 1123(a).  In analyzing a plan's provisions with respect to the selection of officers and directors, a court is to consider "the shareholders' interest in participating in the corporation, the desire to preserve the debtor's reorganization, and the overall fairness of the provisions." Acequia, Inc. v. Clinton (In re Acequia, Inc.), 787 F.2d 1352, 1362 (9th Cir. 1986).

The Plan fully complies with each requirement of section 1123(a) described above.  As previously noted with respect to the Plan's compliance with section 1122, Article III of the Plan designates six separate Classes of Claims and Interests, as required by section 1123(a)(1) of the Bankruptcy Code.  Section 3.2 of the Plan specifies that Classes 1, 2, 3, and 5 are not impaired under the Plan, as required by section 1123(a)(2) of the Bankruptcy Code.  Section 3.2 of the Plan specifies that Claims in Class 4 and Interests in Class 6 are impaired and describes the treatment of such Claims and Interests in accordance with section 1123(a)(3) of the Bankruptcy Code.  Further, as required by section 1123(a)(4) of the Bankruptcy Code, the treatment of each Claim or Interest within a Class is the same as the treatment of each other Claim or Interest in

such Class, unless the holder of a Claim or Interest has agreed to less favorable treatment on account of its Claim or Interest.

Both the Coalition and the U.S. Trustee assert that the Plan violates section 1123(a)(4) and, again, they do so for different reasons. The Coalition argues that (a) the different payment terms for Ovarian Cancer and Gynecological Cancer claims pursuant to the Trust Distribution Procedures result in inferior recoveries for ovarian claimants, (b) the lack of a similar process for indirect and direct claims constitutes disparate treatment and (c) the plan changes required by the Smith MOU results in "bonus payments to some, but not all, members of Class 4." See Coalition DS Obj. ¶¶ 445-464; Coalition Plan Obj. at 63-66, 67-68, 76-77. The U.S. Trustee asserts that "non-MSA claimants are being forced to tender unequal consideration for payments" under the Plan. See UST Obj. ¶¶ 53-54.

The Coalition starts by acknowledging that "[r]eceiving the 'same treatment' means that claimants within a single class all have the 'same opportunity' to recover." See Coalition Plan Obj. at 63; see also W.R. Grace, 729 F.3d at 327 ("What matters, then, is not that claimants recover the same amount but that they have equal opportunity to recover on their claims."); In re Dana Corp., 412 B.R. 53, 62 (S.D.N.Y. 2008) ("The key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity."). But it then incorrectly asserts that having claims channeled to the Talc Personal Injury Trust for determination pursuant to the Trust Distribution Procedures does not constitute the same treatment because the payment terms differ for Ovarian Cancer or Gynecological Cancer claims. See Coalition Plan Obj. at 63-66.

Section 1123(a)(4) "does not require precise equality, only approximate equality." See In re Quigley Co., 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007). The Plan satisfies

section 1123(a)(4) because it provides 

See Mullin Report ¶ 26.

See id. ¶ 28; id. ¶ 28 n.39

.

Id. ¶ 33.  If an Ovarian Cancer claimant does not wish to proceed with either expedited or individual review, the claimant can chose the same "quick pay" option that Gynecological Cancer claims receive under the Trust Distribution Procedures.[68]

That Ovarian Cancer and Gynecological Cancer claims are afforded different payment terms under the Plan is not violative of section 1123(a)(4).  Unlike in Excluded Lenders v. Serta Simmons Bedding, L.L.C. (In re Serta Simmons Bedding, L.L.C.), 125 F.4th 555, 591-93 (5th Cir. 2025), where only certain lenders benefitted from the grant of an indemnity, all Channeled Talc Personal Injury Claims, if allowed by the Talc Personal Injury Trust, benefit from the trust. The differences between Ovarian Cancer and Gynecological Cancer claims are not as a result of unequal treatment as a legal matter, but the disease at issue.  See W.R. Grace, 729 F.3d at 330 (acknowledging that "the expedited review process treats claims differently based on the particular disease at issue").  These "substantive distinctions among claims are valid bases for potential differences in the amount of recovery."  Id.  They do not necessitate separate

---

[68]     If an Ovarian Cancer claimant is not satisfied with the Talc Personal Injury Trust's settlement offer, the claimant can proceed to mediation, and, if still unsatisfied after mediation, the claimant can pursue her claims in the tort system against the Talc Personal Injury Trust.  See Trust Distribution Procedures, Art. 6.

classification nor suggest unequal treatment, as shown by the confirmed section 524(g) cases classifying all asbestos claims into one class regardless of disease.  See supra at 69.  All those cases involved plans of reorganization that channeled all asbestos-related claims to a trust for payment in differing amounts based on the different diseases alleged.

In any event, contrary to the Coalition's contention that "[c]laimants asserting Ovarian Claims will receive an inferior recovery relative to claimants asserting Gynecological Claims," Coalition DS Obj. ¶ 455; see also Coalition Plan Obj. at 65, all Channeled Talc Personal Injury Claims are paid in full pursuant to the Trust Distribution Procedures.  See Mullin Report ¶ 136

███████████████████████████████████████████████████████████

███████████████████████████████; id. ¶ 148 ██████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████; see also Rebuttal Expert Report of Charles H. Mullin, PhD (Jan. 28, 2025) (the "Mullin Rebuttal Report") ¶¶ 90-95 ████████

███████████████████████████████████████████████████████.

Similarly, the Coalition's assertion that the lack of a similar process for Indirect Talc Personal Injury Claims and Direct Personal Injury Claims constitutes disparate treatment, see Coalition Plan Obj. at 67-68, ignores that, both indirect and direct claims are channeled to the Talc Personal Injury Trust to be paid in full pursuant to the Trust Distribution Procedures.  See Trust Distribution Procedures § 8.1.2 ("If, in undertaking such review and evaluation, the Trustee determines . . . that an Indirect Claim satisfies the Indirect Claim Review Criteria, then . . . the

Trustee . . . shall determine the Allowed Claim Amount of such Allowed Claim, which shall be the amount necessary to pay such Allowed Claim in full.").

Further, the Coalition's assertion that the Smith MOU results in "bonus payments to some, but not all, members of Class 4," see Coalition Plan Obj. at 76-77, ignores the plain language of the Trust Distribution Procedures.  The Trust Distribution Procedures require the Talc Personal Injury Trust, and more specifically the Talc Trustee, to "treat **similar** Direct Claims in **substantially the same manner**."  See Trust Distribution Procedures § 7.6.2; see also id. §§ 7.1.1, 7.1.2(A) and (B) (the mandate of the Talc Personal Injury Trust is to ensure "substantially equitable treatment," and valuation and payment "in substantially the same manner," of "all similar Existing Claims and Future Claims"); see also Mullin Rebuttal Report ¶¶ 55-57 ███████████████████████████████████████████ ██████████████████████████████████.

Accordingly, all Ovarian Cancer claimants can request review of their claims pursuant to the Trust Distribution Procedure's individual review process.  See Trust Distribution Procedures § 4.6.5 ("The Individual Review Process is available for any Direct Claimant who (i) elects to have her Direct Claim evaluated under the Individual Review Process on her Claim Submission Form and (ii) pays to the Trust a one-time, non-refundable administrative fee in the amount of one thousand dollars and zero cents ($1,000.00) with her Claim Submission Form.").  Such a process provides for additional payments from the Extraordinary Injury Fund, the factors for which will be determined by fiduciaries to claimants.  Ultimately, it is the claimant's factual situation that will determine the amount that is paid by the Talc Personal Injury Trust.  See also W.R. Grace, 729 F.3d at 330 ("The Crown is therefore correct that the provision treats certain claims differently than others, but it does so based on the claimant's particular factual situation,

in much the same way that the expedited review process treats claims differently based on the particular disease at issue.").

Finally, the U.S. Trustee argues that the Plan violates section 1123(a)(4) because "non-MSA claimants are being forced to tender unequal consideration for payments" because the releases contained in the Plan allegedly apply "differently to MSA and non-MSA claimants." See UST Obj. ¶¶ 53-54.  As stated above, the Debtor included holders of Channeled Talc Personal Injury Claims potentially subject to an MSA in Class 4 because their claims have not yet been settled or resolved pursuant to the terms of an MSA.  See Kim Obj. Decl. ¶ 12.  It is possible that such claims may never be resolved under an MSA, but would be subject to review and compensation by the Talc Personal Injury Trust pursuant to the Trust Distribution Procedures like all other Channeled Talc Personal Injury Claims, and thus would also be subject to the same releases.

To the extent an MSA claimant proceeds under an MSA, the U.S. Trustee ignores the practical reality that they will be subject to the releases set forth in such MSA.  As provided in the Acceptance and Release, such releases are actually more expansive than the releases under the Plan.  See Dkt. 856-6, Ex. F, Acceptance and Release at 3 (differing definition of Protected Parties depending on whether Plan is effective or Private Resolution Process MSA is implemented); see also Mullin Report ¶ 133 n.192 ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████.  For these reasons, the Plan satisfies section 1123(a)(4), and the Coalition's and the U.S. Trustee's objections should be overruled.

In accordance with the requirements of section 1123(a)(5) of the Bankruptcy Code, Articles IV and IX of the Plan, the Trust Distribution Procedures established pursuant to the Plan and various other provisions of the Plan provide adequate means for the Plan's implementation. Specifically, the Plan provides for: (a) the creation of, and transfer of certain assets to, the Talc Personal Injury Trust under Article IV of the Plan; (b) the appointment of the Talc Trustee under section 4.3 of the Plan; (c) the funding of the Talc Personal Injury Trust under section 4.9 of the Plan; (d) direction to comply with QSF regulations under section 4.14 of the Plan; (e) adoption of the Amended Articles of Organization and the Amended Operating Agreement under section 9.3 of the Plan; (f) sufficient cash to make the Distributions under Article VI of the Plan; and (g) the authorization to execute various documents and to enter into various transactions to effectuate the Plan under Article IX of the Plan. In addition to these core transactions, the Plan sets forth the other critical mechanics of the Debtor's emergence, such as the vesting of estate assets in the Reorganized Debtor, the assumption or rejection of Executory Contracts and Unexpired Leases and the settlement of Claims and Interests. Accordingly, the Plan, together with the other Plan Documents, provides adequate means for implementation of the Plan in accordance with section 1123(a)(5).

Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities. In accordance with that requirement, section 9.3 of the Plan provides that the Amended Articles of Organization and the Amended Operating Agreement will prohibit the issuance of nonvoting equity securities as required by section 1123(a).

Finally, section 1123(a)(7) of the Bankruptcy Code requires that a plan of reorganization "contain only provisions that are consistent with the interests of creditors and equity security

holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan . . . ."  11 U.S.C. § 1123(a)(7).  This provision is supplemented by section 1129(a)(5) of the Bankruptcy Code, which directs courts to scrutinize the methods by which the reorganized corporation's management is to be chosen in order to provide adequate representation of those whose investments are involved in the reorganization—i.e., creditors and equity holders.  See 7 Collier on Bankruptcy ¶ 1123.01[7] (16th ed. rev. 2024); see also Acequia, 787 F.2d at 1361-62.  The Plan complies with section 1123(a)(7) and ensures that the selection of the officers and directors of the Reorganized Debtor is consistent with the interests of creditors and equity security holders and with public policy.  Section 9.6.2 of the Plan provides that the initial officers and managers of the Reorganized Debtor will consist of the officers and managers of the Debtor in office on the Effective Date.  The Plan's provisions with respect to the selection of directors and officers are consistent with the interests of creditors and public policy.

### 3.   Discretionary Contents of the Plan

Section 1123(b) of the Bankruptcy Code identifies various discretionary provisions that may be included in a plan of reorganization but are not required.  For example, a plan may impair or leave unimpaired any class of claims or interests and provide for the assumption or rejection of executory contracts and unexpired leases.  11 U.S.C. § 1123(b)(l)-(2).  A plan also may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3).  Finally, a plan may "modify the rights of holders of secured claims . . . or . . . unsecured claims, or leave unaffected the rights of holders of any class of claims" and may "include any other appropriate provision not inconsistent with the applicable provisions of [title 11]."  11 U.S.C. § 1123(b)(5)-(6).

As described above, the Plan provides for the impairment of Classes 4 and 6, while leaving all other Classes of Claims unimpaired.  The Plan thus modifies the rights of the holders of certain Claims and Interests, and leaves the rights of others unaffected.  See Plan, Art. III.  In particular, the Channeled Talc Personal Injury Claims in Class 4 will be channeled to the Talc Personal Injury Trust for resolution, as set forth in the Talc Personal Injury Trust Agreement and the Trust Distribution Procedures.  See Plan § 3.2.4.  The Plan also provides for (a) the assumption, assumption and assignment or rejection of executory contracts and unexpired leases to which the Debtor is a party in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code (see Plan, Art. V); and (b) the retention and enforcement of certain claims by the Debtor (see Plan § 10.1.1).

Finally, in accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes numerous other provisions necessary for its implementation, which are consistent with the Bankruptcy Code, including:  (a) Article IV of the Plan providing for (i) the creation of the Talc Personal Injury Trust and (ii) the appointment of the Talc Trustee; (b) Article VI of the Plan governing Distributions on account of Non-Talc Claims; (c) Article VII of the Plan establishing procedures for resolving Disputed Non-Talc Claims and making Distributions on account of such Disputed Non-Talc Claims once resolved; (d) Article XI of the Plan regarding certain releases to and from the Debtor and other parties in interest, as well as exculpation and injunction provisions prohibiting parties from pursuing claims and causes of action released under the Plan;[69] and (e) Article XII of the Plan regarding retention of jurisdiction by the Bankruptcy Court over certain matters after the Effective Date.

---

[69] The Plan's exculpation, injunction and release provisions are addressed further in Parts VI and VII.D-G. herein.

Accordingly, the Plan fully complies with the applicable provisions of the Bankruptcy Code and, therefore, meets the requirements of section 1129(a)(l) of the Bankruptcy Code.

**B.      Section 1129(a)(2) — The Proponents of the Plan
         Have Complied with the Applicable Provisions of Title 11**

Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a plan comply with applicable provisions of the Bankruptcy Code.  The legislative history to section 1129(a)(2) indicates that the principal purpose of this section is to ensure compliance with the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code.  See S. Rep. No. 95-989, at 126 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5912 ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); H.R. Rep. No. 95-595, at 412 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6368; see also In re Pearl Res. LLC, 622 B.R. 236, 259 (Bankr. S.D. Tex. 2020) (describing "compliance with the disclosure and solicitation requirements" as "the paradigmatic example of what Congress had in mind when it enacted § 1129(a)(2)"); In re Cypresswood Land Partners, I, 409 B.R. 396, 424 (Bankr. S.D. Tex. 2009) ("Bankruptcy courts limit their inquiry under § 1129(a)(2) to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of § 1125."); Toy & Sports Warehouse, 37 B.R. at 149.  As set forth in the DS Approval and Solicitation Procedures Motion, the reply in support of the DS Approval and Solicitation Procedures Motion [Dkt. 634] (the "Solicitation Procedures Reply"), and the to be filed Pretrial Brief, the Debtor has complied with the applicable provisions of the Bankruptcy Code, including the provisions of section 1125 regarding disclosure and plan solicitation and Bankruptcy Rules 3017 and 3018.

Specifically, the Debtor has complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, the Bankruptcy Rules, the Local Rules and applicable

non-bankruptcy rules and regulations in transmitting the Solicitation Packages and in soliciting and tabulating votes to accept or reject the Plan prior to the Petition Date.  The Debtor, with the assistance of professionals, expended a significant amount of time and effort preparing the Disclosure Statement and sought and received comments thereon from the Prepetition FCR and the AHC.  Moreover, the Disclosure Statement contains all of the information typically considered by bankruptcy courts as providing adequate disclosure.

The U.S. Trustee reasserts its argument that the Disclosure Statement did not provide adequate information—and therefore section 1129(a)(2) is not satisfied—because the Disclosure Statement did not specify (a) the actual initial Cash Value of a Point upon which distribution amounts for holders of Allowed Ovarian Cancer Channeled Talc Personal Injury Claims would be based and (b) the projected volume of Ovarian Cancer claims.  UST Obj. ¶¶ 56-57.  The basis for the U.S. Trustee's argument is unclear given that the purpose of such information would presumably have been to allow claimants to calculate an estimated recovery range in dollars, which the Disclosure Statement already provided them.  See Disclosure Statement § 1.1(c) (providing in part that "LLT anticipates that holders of pending claims that qualify for payment as Ovarian Cancer claims under the Trust Distribution Procedures will receive an average recovery of between $50,000 and $200,000, with an average value between $75,000 and $150,000 being more likely.").

The Disclosure Statement exceeds the standard for adequate information.  As previously explained in the Solicitation Procedures Reply, estimated recovery information in mass tort chapter 11 cases typically involves informing claimants about trust distribution procedures that will be applied to their claims post-confirmation.  See Solicitation Procedures Reply ¶ 26 (collecting cases).  It is uncommon for disclosure statements in such cases to provide a likely

dollar range of recoveries as the Debtor did here.  See id.  In his expert report, Charles Mullin,

PhD of Bates White, LLC, provides ████████████████████████████████████

████████████████. See Mullin Report ¶ 15 ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████. Dr. Mullin's expert and rebuttal reports provide extensive detail on the

facts and assumptions underlying his conclusions, which the U.S. Trustee is free to challenge in

connection with confirmation.  But that level of detail was not required in the Disclosure

Statement and would not have been helpful to claimants reviewing it.

        The U.S. Trustee's allegation that the Debtor engaged in improper postpetition

solicitation in violation of section 1125(b) is also incorrect.  See UST Obj. ¶ 58.  The U.S.

Trustee raises this concern in connection with a December 19, 2024 letter sent by James

Murdica, J&J's resolution counsel, to all plaintiff law firms representing talc Ovarian Cancer and

Gynecological Cancer claimants.  The letter provided law firms with (a) information on how to

change their clients' prior votes in response to various inquiries Mr. Murdica had received,

(b) copies of the Smith MOU, the TCC MOU and the Committee's statement regarding its

support for the Plan that it filed in the chapter 11 case as well as an excerpt from the Committee's

statement describing improvements made to the Plan since the chapter 11 case was filed.  See id.

Ex. A.

        Mr. Murdica's communication was not an unauthorized solicitation, and California

Fidelity, the authority that the U.S. Trustee relies upon as "nearly identical," is readily

distinguishable.  Id. ¶ 58.  California Fidelity was not a prepackaged case and involved an award

of sanctions against a debtor's president because he sent letters to creditors soliciting rejection of

the chapter 11 trustee's plan before solicitation had even commenced.  See In re Cal. Fid., Inc.,

198 B.R. 567, 571 (B.A.P. 9th Cir. 1996).  In contrast, here, Mr. Murdica's letter did not attempt

to solicit votes.  Indeed, it was sent well after the Voting Deadline.  Instead, in response to

various inquiries from plaintiff law firms, it provided general information on the process for

changing votes.  In addition, Mr. Murdica's letter was sent to counsel, not to claimants

themselves.  Otherwise, the letter contained information about the status of the chapter 11 case,

including the Committee's support of the Plan, and did not include a new solicitation, as the U.S.

Trustee's own authority recognizes.  See In re Heritage Org., L.L.C. 376 B.R. 783, 792 (Bankr.

N.D. Tex. 2007) ("[T]he Court would align itself with those courts that have concluded that the

term 'solicitation' as used in § 1125 should be viewed 'very narrowly to refer only to a specific

request for an official vote either accepting or rejecting a plan of reorganization.'"); accord Cal.

Fid., 198 B.R. at 571-72 ("The term solicitation as used in § 1125(b) has been narrowly

interpreted to mean nothing short of a 'specific request for an official vote.'") (citation omitted).

Accordingly, the Plan meets the requirements of section 1129(a)(2) of the Bankruptcy

Code and the U.S. Trustee's objections should be overruled.

### C.      Section 1129(a)(3) — The Plan Has Been Proposed in Good Faith

Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization be

"proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).[70]

This good faith inquiry in the Fifth Circuit generally considers whether the debtor has a

legitimate, honest bankruptcy purpose and whether confirmation of the plan has a reasonable

---

[70]      While the Debtor bears the burden of demonstrating that the Plan complies with section 1129(a)(3), "an
objecting party is required to do more than merely raise an objection.  Some evidence in support of the
objection must be adduced, or, if the objection is premised upon purely legal grounds, persuasive authority
must be offered to support the objection."  See In re Future Energy Corp., 83 B.R. 470, 482 n.21 (Bankr.
S.D. Ohio 1988).  As a result, certain section 1129(a)(3) objections that fail to provide any support should
be disregarded as insufficiently pled.  See, e.g., Dkt. 987 ¶ 1 (Barnes Law Group asserting in one sentence,
without detail, that section 1129(a)(3) is not satisfied); Dkt. 985 (the "Everest Objection") (asserting
without elaboration that the Plan "was not filed in good faith").

chance of success.  See UST Obj. ¶ 59 (citing Brite v. Sun Country Dev., Inc. (In re Sun Country

Dev., Inc.), 764 F.2d 406, 408 (5th Cir. 1985)); Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd.

P'ship (In re T-H New Orleans Ltd. P'ship), 116 F.3d 790, 802 (5th Cir. 1997)); Coalition Plan

Obj. at 55-56.[71]  The requirement of good faith must be viewed in light of the totality of the

circumstances surrounding the formulation of a chapter 11 plan, mindful of the purposes

underlying the Bankruptcy Code.  See In re ASARCO LLC, 420 B.R. 314, 331 (S.D. Tex. 2009)

("[T]his Court finds that the Bankruptcy Court properly applied the good faith standard, which

requires that 'there is a reasonable likelihood that the plan will achieve a result consistent with

the objectives and purposes of the Bankruptcy Code.'").

As a result, the section 1129(a)(3) standard traditionally focuses on post-petition events

related to the Plan and the specifics of the Plan itself.  See McCormick v. Bane One Leasing

Corp. (In re McCormick), 49 F.3d 1524, 1526 (11th Cir. 1995) ("The **focus of a court's inquiry**

**is the plan itself**, and courts must look to the totality of the circumstances surrounding the

plan . . . keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable

opportunity to make a fresh start.") (emphasis added).  In contrast, section 1112(b) focuses more

squarely on the circumstances surrounding the filing of the bankruptcy petition, which can

include prepetition actions.  While the Debtor acknowledges that there might be some potential

for overlap, particularly given the prepackaged nature of this case, different sections of the

Bankruptcy Code require a distinct focus, particularly where this Court has made no factual

---

[71]     There is some variance between Objectors' proffered standard for a section 1129(a)(3) analysis, but with
the exception of Travelers' "fundamental fairness" consideration (discussed in note 106 infra) the standards
generally appear to align with the above.  See UST Obj. ¶ 59 (legitimate purpose in seeking bankruptcy
protection and plan confirmation will be consistent with goals of Bankruptcy Code); Travelers Obj. ¶ 39
(plan fosters result consistent with code objectives and plan was proposed with honesty and good
intentions); Coalition Plan Obj. at 54-56 (proper bankruptcy purpose).

findings regarding bad faith to date.[72]  Furthermore, the remedies triggered by a bad faith filing under section 1112(b)—dismissal of the case—versus a finding of lack of good faith under section 1129(a)(3)—denial of confirmation—reinforce the notion that the statutes are not interchangeable.

1.      **The Plan Has a Valid Bankruptcy Purpose and More Than a Reasonable Chance of Success**

The Debtor proposed the Plan and filed the chapter 11 case with the legitimate purpose of providing a fair and equitable resolution of the Channeled Talc Personal Injury Claims and maximizing value for the talc claimants through the largest asbestos settlement in history.  This result was envisioned by section 524(g) of the Bankruptcy Code, which specifically provides for the establishment of a trust to process and resolve the type of claims at issue here.

As multiple courts have recognized, including in cases involving solvent debtors, seeking a comprehensive resolution of thousands of unliquidated, disputed, unpredictable and ongoing mass tort claims—particularly asbestos-related claims proposed to be resolved through section 524(g)—is a valid reorganizational purpose.  See In re Bestwall LLC, 605 B.R. 43, 49 (Bankr. W.D.N.C. 2019) ("Attempting to resolve asbestos claims through 11 U.S.C. § 524(g) is a valid reorganizational purpose, and filing for Chapter 11, especially in the context of an asbestos or mass tort case, need not be due to insolvency."); In re HONX, Inc., 2022 WL 17984313, at *2 (Bankr. S.D. Tex. Dec. 28, 2022) ("[W]hile an asbestos bankruptcy differs from a 'classic' bankruptcy with an insolvent or near-insolvent debtor, it is still a forward-looking solution meant

---

[72]      The U.S. Trustee cites to several cases for the proposition that the "taint" of a bad faith petition is necessarily relevant for purposes of a section 1129(a)(3) analysis.  UST Obj. ¶ 59 n.9.  However, in this case, there has been no such finding of bad faith against the Debtor relating to section 1112(b), its petition or otherwise.

to treat fairly all parties in interest. That is the hallmark purpose of chapter 11. That is not a 'bad

faith' motive.").

And that valid bankruptcy purpose establishes good faith in the section 1129(a)(3)

context.  See, e.g., In re J T Thorpe Co., 308 B.R. 782, 787 (Bankr. S.D. Tex. 2003) ("The Debtor

filed this Chapter 11 Case and Plan with the legitimate and honest purpose of developing an

orderly process, utilizing Section 524(g) of the Bankruptcy Code, to compensate legitimate

Asbestos Claimants fairly, while preserving the Debtor's business.  As such, the Plan satisfies 11

U.S.C. § 1129(a)(3)"); HONX, Dkt. 1332 ¶ 72 (finding that Section 524(g) plan satisfied

section 1129(a)(3) and noting that the full record of the chapter 11 case "demonstrates that the

Plan has been proposed with the legitimate purpose of forming and establishing the Asbestos

Trust pursuant to section 524(g) of the Bankruptcy Code to process and pay Asbestos Claims

pursuant to the Asbestos Trust Agreement and Asbestos Trust Distribution Procedures.").[73]

Relatedly, courts have also recognized that the bankruptcy process provides both debtors and

claimants with a more efficient, equitable pathway for providing recoveries to mass tort

claimants.  See In re Fed.-Mogul Glob. Inc., 684 F.3d 355, 362 (3d Cir. 2012) ("[Asbestos] trusts

appear to have fulfilled Congress's expectation that they would serve the interests of both current

and future asbestos claimants and corporations saddled with asbestos liability.  In particular,

observers have noted the trusts' effectiveness in remedying some of the intractable pathologies of

asbestos litigation, especially given the continued lack of a viable alternative providing a just and

---

[73]     See also In re Paddock Enters., LLC, No. 20-10028 (Bankr. D. Del. May 26, 2022), Dkt. 1406 ¶ 91 (same
for solvent debtor created through a process analogous to a divisional merger); In re Garlock Sealing Techs.,
LLC, No. 10-31607 (Bankr. W.D.N.C. May 24, 2017), Dkt. 5972 ¶ 111 (finding, including for solvent non-
debtor parent (see Part IV.C.2(c) infra), that section 524(g) plan satisfied section 1129(a)(3) and noting that
such plan was "designed to achieve a fair and equitable treatment of all creditor Claims and Demands and
is consistent with the purposes of the Bankruptcy Code.").

comprehensive resolution.  Empirical research suggests the trusts considerably reduce

transaction costs and attorneys' fees over comparable rates in the tort system.").[74]

    This valid and well-recognized bankruptcy purpose, and the benefits that a section 524(g)

trust would provide claimants, are further evidenced by the fact that the Plan has received the

approval of counsel representing tens of thousands of claimants, in addition to the Committee

and the FCR (subject to certain adjustments).  In fact, the Debtor filed for bankruptcy only **after**

extensive negotiations with claimants culminated in a Plan that, when solicited, received

overwhelming claimant support.

    The Plan and the instruments, agreements and documents necessary to implement and

consummate the Plan, including the Talc Personal Injury Trust Documents, were negotiated in

good-faith and at arm's-length among the AHC, the FCR, the Smith Firm, the Debtor (and its

predecessor) and J&J.[75]  Thereafter, the treatment of current and future claimants under the Plan

and the related documents was improved as a result of continued good-faith, arms'-length

negotiations with the AHC, the FCR, the Smith Firm, the Committee, the Debtor, J&J and

numerous other parties.  See Eagle-Picher, 203 B.R. at 274 (finding that a plan of reorganization

---

[74]    See also In re Bestwall LLC, 71 F.4th 168, 183 (4th Cir. 2023), cert. denied, 144 S. Ct. 2519 (2024)
("[B]ankruptcy procedures promote the equitable, streamlined, and timely resolution of claims in one
central place compared to the state tort system, which can and has caused delays in getting payment for
legitimate claimants."); In re LTL Mgmt., LLC, 637 B.R. 396, 410, 414 (Bankr. D.N.J. 2022) ("[T]his Court
regards the chapter 11 process as a meaningful opportunity for justice, which can produce comprehensive,
equitable, and timely recoveries for injured parties."); In re Aldrich Pump LLC, 2021 WL 3729335, at *37
(Bankr. W.D.N.C. Aug. 23, 2021) (noting a "successful reorganization . . . would promote Congress's
particular goal in section 524(g) by establishing an asbestos trust that would efficiently and equitably
resolve tens of thousands of asbestos claims").

[75]    Certain Insurers assert that the Debtor cannot prove good faith because it has "refused to disclose any
relevant communications" regarding the Plan and, thus, is now precluded from proffering evidence of the
good faith, arm's-length negotiations that culminated in the formation of the Plan.  See Travelers Obj.
¶ 57.  However, the Debtor has disclosed a wide variety of communications (including over 30,495 pages
of documents) and there have been numerous (over twelve) depositions taken regarding the negotiation of
the Plan.  The Debtor is not obligated to produce additional, privileged documents or communications to
establish good faith, nor is the Debtor relying on such privileged information to demonstrate that
section 1129(a)(3) is satisfied.

was proposed in good faith when, among other things, it was based on extensive arm's-length negotiations among the plan proponents and other parties in interest).[76]

As a result of these extensive discussions, the Plan reflects a consensual resolution of the Debtor's talc liabilities and maximizes the value of assets available to satisfy claims by providing for the distribution of significant value to claimants via a Congressionally authorized section 524(g) trust.  The good faith of this Plan is further evidenced by the fact that certain parties that originally opposed the Plan now support it, and that this is the largest asbestos settlement in history even though, unlike almost all other bankruptcy settlements, the Debtor disputes that its predecessors' products caused cancer.  Finally, the Debtor's good faith again is underscored by the overwhelming support of the Plan by holders of Channeled Talc Personal Injury Claims.  See Initial Voting Decl., Ex. 20 (reflecting that, of the 93,522 accepted votes on the Initial Plan, 83.4%, or 77,998, voted to accept the Plan); see also Evans Report ¶¶ 41-42

███████████████████████████████████████████████████████

███████████████.[77]

In view of this extensive support for the Plan, the Plan also has more than a reasonable chance of success.[78]  The Plan proposes to pay all qualifying claims in full, and the Debtor has adequate funding to provide the requisite funding to the Talc Personal Injury Trust.

---

[76]    Despite the involvement of these various key parties, certain Insurers allege the Plan was not proposed in good faith because they were excluded from Plan negotiations.  See Travelers Obj. ¶¶ 57, 60.  These Insurers disregard that, first, the Plan has no impact on their rights, defenses or obligations, see Plan § 10.3.3, and second, the Debtor has been and continues to engage in settlement negotiations with various of its insurers.  Moreover, the Bankruptcy Code does not require that all creditors, much less parties whose rights are not impacted by the plan, participate in plan negotiations.  See W.R. Grace, 446 B.R. at 104 n.5 ("There is no requirement in the Bankruptcy Code that all creditors participate in plan negotiations."); see also In re Wash. Mut., Inc., 442 B.R. 314, 364 (Bankr. D. Del. 2011) (holding that the fact that the debtor's equity committee did not participate in plan negotiations was not enough to constitute a lack of good faith under § 1129(a)(3)).

[77]    See also Part II.S.

[78]    Denial of confirmation on the basis that a plan has not been proposed in good faith typically only occurs in a cram down scenario, and almost never occurs where all impaired classes have voted to accept the plan.

-92-

Finally, the Plan is not proposed by any means prohibited by law.  The Plan and its provisions are consistent with sections 105, 524(g), 1122, 1123 and 1129, as well as the related Bankruptcy Rules.  Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code have been fully satisfied.

### 2.    The 1129(a)(3) Objections Are <u>Unsupported Both Legally and Factually</u>

The Coalition and the U.S. Trustee in large part merely rehash (in some instances, verbatim) their good faith arguments from their earlier dismissal motions.[79]  Because the Debtor has already responded to these allegations in its *Omnibus Objection to the Motions of the Coalition and the United States Trustee to Dismiss the Chapter 11 Case* [Dkt. 425] (the "<u>Dismissal Objection</u>"), the Debtor provides only summary responses to previously raised arguments and more fully responds to new arguments below.  The Debtor incorporates in full its response to Objectors' good faith dismissal arguments, as laid out in the Dismissal Objection.

### a.    The Prepetition Corporate Restructuring <br> Does Not Establish Bad Faith

The Coalition and the U.S. Trustee point to the Prepetition Corporate Restructuring as indicative of the Debtor's alleged bad faith.[80]  However, that restructuring was executed pursuant to the TBOC using a legal mechanism that has been on the books for over 30 years and is not

---

Notably, even in a cramdown scenario, good faith is typically found except in extreme situations.  See <u>T-H New Orleans</u>, 116 F.3d at 802 ("[a] debtor's plan may satisfy the good faith requirement even though the plan may not be one which the creditors would themselves design."); <u>Matter of Briscoe Enters., Ltd., II</u>, 994 F.2d 1160, 1167 (5th Cir. 1993) (recognizing that "[a] plan may not be the one that the creditors would themselves design and may indeed not be confirmed and yet still pass the good faith requirement."); <u>Pearl Res.</u>, 622 B.R. at 260 (same).

[79]    <u>Compare</u> Dkt. 44 (the "<u>Coalition Dismissal Motion</u>") ¶¶ 100-19 <u>with</u> Coalition DS Obj. ¶¶ 379-99 and Coalition Plan Obj. § III.B (lack of a valid bankruptcy purpose); Dkt. 299 ("<u>UST Dismissal Motion</u>") ¶¶ 43-44 <u>with</u> UST Obj. ¶ 76 (serial filing as indicating bad faith); Coalition Plan Obj. § I.A <u>with</u> Coalition Dismissal Mot. ¶¶ 100-01 (lack of going concern).

[80]    <u>See</u> UST Obj. ¶¶ 61-75 (citing the use of a divisional merger as evidence of bad faith); Coalition Dismissal Mot. ¶ 128 (same); UST Dismissal Mot. at 2 (same).

unique to Texas.[81]   And bankruptcies of entities that have used similar prepetition restructurings have resulted in consensual, confirmed section 524(g) plans.  See LTL, 637 B.R. at 424 (discussing cases).[82]

### (i)       The Garlock and Paddock Examples

Two recent examples are the Garlock chapter 11 case in the Western District of North Carolina and the Paddock chapter 11 case in Delaware.  In Garlock, through a modified plan of reorganization supplementing the initial Garlock plan, Coltec (Garlock's equity owner) separately resolved some 25,000 pending and future asbestos claims alleging direct liability against Coltec and/or its operating divisions.[83]   Coltec reported over $1.4 billion in assets and $738 million in liabilities and was plainly solvent.  Coltec Disclosure Statement. at 21-22. Coltec did not file its entire business for chapter 11.  Instead, Coltec merged into OldCo, LLC, a new, wholly owned indirect subsidiary of EnPro (Coltec's equity owner), with OldCo then distributing substantially all of its assets to a NewCo, retaining only its asbestos liabilities, certain insurance rights, and the assets of a small consulting business.  Id. at 31-43. Then, OldCo filed for bankruptcy.  NewCo agreed to contribute $30 million to fund OldCo's initial payment to an asbestos trust and entered into a "Keepwell" agreement with OldCo, through which NewCo committed to make further contributions to OldCo as necessary in connection with the

---

[81]       Arizona, Delaware, and Pennsylvania all have laws allowing similar corporate restructurings.  See Anthony J. Casey & Joshua C. Macey, In Defense of Chapter 11 for Mass Torts, 90 U. Chi. L. Rev. 973, 984 (2023) (citing 29 ARIZ. REV. STAT. §§ 29-2601 et seq.; DEL. CODE ANN. tit. 6 §§ 18-217(l)(8) and §18-217(o); 15 PA. CONS. STAT. §§ 361-268).

[82]       In fact, this Court recently considered a divisional merger case and did not find that good faith was lacking in the context of a motion to dismiss.  See In re Tehum Care Servs., Inc., No. 23-90086 (CML) (Bankr. S.D. Tex.), Dkt. 1513, Apr. 11, 2024 Hr'g Tr. 34:5-14 (attached to Dismissal Obj. as Exhibit A) ("This Debtor has been trying to cut deals for months.  This is not a case that should be dismissed as a bad-faith filing. How does a Debtor working with a UCC in good faith get dismissed on facts like these?").

[83]       See Disclosure Statement for Modified Joint Plan of Reorganization of Garlock Sealing Technologies LLC, et al. and OldCo, LLC, Proposed Successor by Merger to Coltec Industries Inc., In re OldCo, LLC, No. 17-30140 (JCW) (Bankr. W.D.N.C. Jan. 30, 2017), Dkt. 28 (the "Coltec Disclosure Statement") at 26-31.

bankruptcy.  Id.  The Keepwell agreement is analogous to the Funding Agreements here.  After Coltec's restructuring and OldCo's filing, the bankruptcy court approved the Garlock-Coltec plan of reorganization, with the support of the claimant representatives, with a channeling injunction extending to claims against NewCo.[84]

In Paddock, just prior to the chapter 11 filing of Paddock Enterprises, LLC ("Paddock"), Paddock's predecessor, Owens-Illinois, Inc. ("Old Owens-Illinois"), a publicly traded holding company and mass tort asbestos defendant, effectuated a corporate restructuring.[85]  First, Old Owens-Illinois formed a subsidiary ("New Owens-Illinois").  Paddock Decl. ¶ 25.  New Owens-Illinois in turn formed Paddock as its subsidiary.  Id.  Then, Old Owens-Illinois merged into Paddock, with Paddock as the surviving entity.  Id.  New Owens-Illinois became a publicly traded holding company and the stockholders of Old Owens-Illinois became stockholders of New Owens-Illinois.  Id.

Pursuant to the restructuring, Paddock became the owner of Owens-Illinois Group, Inc. ("O-I Group"), which in turn held all of the other subsidiaries of Old Owens-Illinois.  Id. ¶¶ 25-26.  Paddock then distributed all of its shares in O-I Group to New Owens-Illinois, and New Owens-Illinois and Paddock entered into a support agreement (the "Paddock Support Agreement") designed to ensure Paddock remained solvent.  Id. ¶ 28.  The Paddock Support Agreement required New Owens-Illinois to provide Paddock with funding for certain permitted uses, including the costs of managing and paying asbestos claims.  Id.  After the transactions, Paddock filed for chapter 11 looking very much like the Debtor in this case, with a support agreement that provided access to funding sufficient to satisfy Paddock's asbestos liability from

---

[84]   In re Garlock Sealing Techs. LLC, 2017 WL 2539412, at *3, 30-31 (W.D.N.C. June 12, 2017).

[85]   See Decl. of David J. Gordon, President and Chief Restructuring Officer of the Debtor, in Supp. of Chapter 11 Petition and First Day Pleadings, Paddock, Dkt. 2 (the "Paddock Declaration") ¶¶ 24-26.

non-debtor funds as necessary.[86]  Ultimately, with the support of the plaintiffs' bar, Paddock

confirmed a chapter 11 plan with an asbestos trust in the amount of $610 million that was funded

almost exclusively by New Owens-Illinois, the non-debtor, indirect parent of Paddock.[87]  New

Owens-Illinois at the time of Paddock's emergence from chapter 11, had an equity market

capitalization of approximately $2.2 billion.[88]

> **(ii)      The U.S. Trustee's Assertion That Only
> <u>LTL</u> and <u>Aearo</u> Have Ruled on the Propriety
> of a Divisional Merger Is Incorrect**

Despite these examples, which demonstrate that bankruptcies with similar prepetition

restructurings (including with similar funding agreements and contributing non-debtors) have

resulted not in bad faith dismissal, but confirmed section 524(g) plans, the Coalition and the U.S.

Trustee nonetheless insist that the "Texas Two-Step" is indicative of bad faith.[89]  The U.S.

Trustee in fact erroneously asserts that <u>Aearo</u> and <u>LTL</u> are the only two instances where a court

has ruled on the Texas Two-Step.  <u>See</u> UST Obj. ¶ 66.  This statement is belied by a neighboring

footnote, where the U.S. Trustee takes great pains to attempt to distinguish various other cases

where courts declined to dismiss Texas Two-Step bankruptcies.  <u>See</u> UST Obj. ¶ 66 n.10.  The

reality is that the bankruptcy courts in both <u>Bestwall</u> and <u>Aldrich</u> denied multiple motions to

---

[86]     Unlike the 2024 Funding Agreements in this case, the obligation of the non-debtors to fund asbestos liabilities was expressly subject to Paddock's board's approval of the <u>Paddock</u> plan of reorganization.  <u>See</u> Paddock Decl., Ex. B, Support Agreement at 4-5.

[87]     <u>See</u> <i>Disclosure Statement for First Am. Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code</i>, <u>Paddock</u>, Dkt. 1220 at vi (stating that Paddock's trust was to be funded with assets worth $610 million, $601.5 million of which was to come from cash contributions from New Owens Illinois and other non-debtor affiliates).

[88]     <u>See</u> O-I Glass, Inc., Quarterly Report for Quarter Ending June 30, 2022 (Form 10-Q) at 1 (Aug. 3, 2022) (disclosing 155,716,434 shares of outstanding common stock as of June 30, 2022).  O-I Glass Inc. stock closed at $14.00 per share on June 30, 2022.  <u>See</u> <i>O-I Glass, Inc.</i>, https://www.nyse.com/quote/XNYS:OI (last visited Feb. 3, 2025).  Eight days later, Paddock's plan went effective, and Paddock's trust became operational.  <u>See</u> <i>Notice of Effective Date</i>, <u>Paddock</u>, Dkt. 1506 at 1.

[89]     <u>See</u> <u>note</u> 81, <u>supra</u>.

dismiss Texas Two-Step bankruptcies based on similar bad faith arguments relating to the divisional mergers that occurred in those cases.[90]  To insinuate that these holdings are somehow not relevant to the good faith analysis in this case is misguided.  Indeed, in its opinion denying the first motion to dismiss the case (four have been filed; all have been denied), the court in Bestwall found that, among other things, "[a]ttempting to resolve asbestos claims through Section 524(g) was a valid bankruptcy purpose" and filing for chapter 11, especially in the asbestos or mass tort context, does not require insolvency but, nonetheless, the debtor was in financial distress due to the thousands of asbestos claims pending against it.  See 605 B.R. at 49.  The Bestwall court also noted that the debtor had the ability to establish a section 524(g) trust by virtue of its substantial assets and "[m]ost importantly, Bestwall has the full ability to meet all of its obligations (whatever they may be) through its assets and New GP's assets, which are available through the Funding Agreement."  Id.  The court in Aldrich, in denying motions to dismiss, declined to rule on financial distress (noting it was not part of the Fourth Circuit's dismissal standard) but echoed the Bestwall court's recognition that attempting to resolve asbestos claims pursuant to section 524(g) is a valid reorganizational purpose and filing for chapter 11 in an asbestos or mass tort case need not be due to insolvency.  See In re Aldrich Pump LLC, 2023 WL 9016506, at *21-24 (Bankr. W.D.N.C. Dec. 28, 2023).  The Aldrich court also noted that it could not find the case to be filed in bad faith where, among other things, Aldrich had a proposed plan supported by the legal representative for future claimants and had

---

[90]        See *Official Committee Mot. to Dismiss*, In re Aldrich Pump LLC, No. 20-30608 (Bankr. W.D.N.C. May 15, 2023), Dkt. 1756 at 37 ("The Corporate Restructuring and Follow-On Bankruptcies Have Unduly Prejudiced Asbestos Claimants and Are Intended to Coerce Claimants into an Unfavorable Resolution of the Asbestos Liabilities"); *Official Committee Mot. to Dismiss*, In re Bestwall LLC, No. 17-31795 (Bankr. W.D.N.C. Aug. 15, 2018), Dkt. 495 at 1-2 ("The Debtor's bankruptcy proceeding is little more than a bad-faith litigation tactic as evidenced by its gerrymandering of assets and liabilities pursuant to a unique . . . provision of Texas corporate law.").

the ability to fund that plan via a contribution from non-debtor affiliates.  Id. at *29, *32.[91]  As demonstrated by the findings in those cases, and contrary to the U.S. Trustee's assertion, the courts in Bestwall and Aldrich have analyzed Texas Two-Step bankruptcies predicated upon similar facts, and declined to dismiss the cases multiple times.

The U.S. Trustee's assertion that these cases are not relevant because they are from different circuits with different controlling dismissal standards is ironic, since the U.S. Trustee essentially advocates for this Court to disregard the application of the good faith requirement in the Fourth Circuit while simultaneously emphasizing that, instead, the court should give weight to two other out of Circuit precedents, LTL and Aearo.  The U.S. Trustee cannot have it both ways.  Additionally, the U.S. Trustee's description of LTL ignores that the LTL bankruptcy court explicitly considered, and rejected, the Coalition's and the U.S. Trustee's theory that use of a divisional merger prepetition constituted bad faith and the Third Circuit did not disturb that finding.[92]  As such, the Third Circuit is consistent on the divisional merger issue with rulings from within the Fourth Circuit, but, unlike the Third Circuit, the Fifth Circuit does not employ a "financial distress" requirement.  See generally Matter of Little Creek Dev. Co., 779 F.2d 1068 (5th Cir. 1986).[93]

---

[91]  The court in Aldrich also explicitly rejected the argument that objective futility exists due to the lack of a business to rehabilitate.  Id. at *28-29 (citing HONX, 2022 WL 17984313, at *2-3).

[92]  See LTL, 637 B.R. at 422, 426 ("Here, Debtor did not undertake the corporate restructuring and bankruptcy filing as litigation tactics designed solely to gain a litigation advantage or hinder a plaintiff in any of the thousands of pending tort actions.").  The New Jersey bankruptcy court instead acknowledged the rational, common-sense reasons why Old JJCI engaged in a divisional merger prior to LTL's bankruptcy: "Why," the Court stated, "is it necessary to place at risk the livelihoods of employees, suppliers, distributors, vendors, landlords, retailers—just to name a few innocent third parties—due to the dramatically increased costs and risks associated with all chapter 11 filings, when there is no palpable benefits to those suffering and their families?"  Id. at 425.

[93]  See also In re Intrum AB, No. 24-90575 (CML) (Bankr. S.D. Tex.), Dkt. 275, Dec. 31, 2024 Hr'g Tr. 18:12-19:15 ("[I]nsolvency is not a requirement to be a debtor under the Bankruptcy Code . . . the express financial distress standard in LTL is not binding on this Court, but I think it could be a factor as part of the Little Creek on-the-spot evaluation. . . ."); Tehum, Dkt. 1513, Apr. 11, 2024 Hr'g Tr. 28:23-29:3 (attached to Dismissal Obj. as Exhibit A) ("The financial distress standard is not binding on this Court.  And again,

The U.S. Trustee's summaries of <u>LTL</u> and <u>Aearo</u> improperly attempt to turn those courts' lack of immediate financial distress findings into a condemnation of divisional mergers. The Third Circuit in <u>LTL</u> dismissed that case because of the debtor's lack of immediate financial distress (under a new Third Circuit standard that required such distress)[94] and the bankruptcy court in <u>Aearo</u> dismissed that case after making findings regarding Aearo's financial health.[95] Neither case was dismissed because of the use of a divisional merger. Indeed, as the U.S. Trustee acknowledges, <u>Aearo</u> did not even involve a divisional merger. <u>See</u> <u>Aearo</u>, 2023 WL 3938436, at *20 (distinguishing Aearo's bankruptcy case from divisional merger cases). Further, with respect to <u>LTL</u>, "undoing" the divisional merger and requiring that Old JJCI file for bankruptcy would have surely resulted in similar allegations from claimants that Old JJCI was too solvent for bankruptcy, meaning that the divisional merger itself is not the issue.

The Coalition posits that perhaps Old JJCI should have filed for bankruptcy rather than undergoing a divisional merger and having LTL file the 2021 Chapter 11 Case.[96] But in that circumstance, the talc claimants would have been in no different of a position. The talc claims would still have been stayed by 11 U.S.C. § 362(a) and no additional assets would have been available to fund a section 524(g) trust. A filing by Old JJCI, however, would have been vastly more complicated, expensive, and time consuming for all involved, including the court, yet the sole issue in the case—the amount necessary to fund a plan to pay current and future talc claims—would have been exactly the same. This so-called "operational" filing by Old JJCI, therefore, would have benefitted no one.

---

insolvency's not a requirement to be a Chapter 11 Debtor. I do think it could be a factor to consider as part of the <u>Little Creek</u>, on-the-spot evaluation though.").

[94]   <u>See</u> <u>LTL</u>, 64 F.4th at 100-04.

[95]   <u>See</u> <u>In re Aearo Techs. LLC</u>, 2023 WL 3938436, at *18-20 (Bankr. S.D. Ind. June 9, 2023).

[96]   <u>See</u> Coalition Plan Obj. at 29 ("Old JJCI could have attempted to reorganize in bankruptcy").

### b. The "Sole" Purpose of the Plan is Not "to Benefit J&J;" Instead, the Plan Provides Full Pay to Claimants

The U.S. Trustee and the Coalition assert that the Debtor lacks a valid reorganizational purpose because the bankruptcy is solely about obtaining benefits for non-debtors, including J&J.[97] Their argument ignores that representatives for claimants have negotiated the largest asbestos settlement in history, approximately $9 billion, which is guaranteed by J&J; it ignores that the Debtor contests the validity of the talc claims and has successfully defeated all the lawsuits that have proceeded to trial except one; and it ignores that claimants will receive payments in full under the Plan in a much faster, efficient and equitable manner than any recovery they might receive in the tort system, where, to date, the vast majority of them have either suffered years of delay or received nothing.  Indeed, on average, claimants will receive approximately **two times** what they might receive in the tort system.

The Coalition's assertions that the Debtor cannot satisfy an alleged going concern requirement or show that the bankruptcy will maximize value[98] have been previously rebutted in the Dismissal Objection and belied by the Plan's indisputable benefits to and support from claimants.  First, "[t]here is no ongoing business requirement in the Code," HONX, 2022 WL 17984313, at *3 (citation omitted), and, even if there is, the Debtor satisfies it because it has a significant operating subsidiary, Royalty A&M, and is in the business of managing the tens of thousands of talc claims asserted against it.[99]  Further, the Plan maximizes value by channeling all claims to a trust that is structured to efficiently and effectively process and pay claims at substantially less cost as compared to litigation in the tort system.  Rather than suppressing

---

[97]    See Coalition Plan Obj. at 2; UST Obj. ¶¶ 60, 65, 74; UST Dismissal Mot. at 2.

[98]    See Coalition Dismissal Mot. ¶¶ 102-05 and Coalition Plan Obj. § III.B (the plan does not maximize value to creditors); Coalition Plan Obj. at 27-28 and Coalition Dismissal Mot. ¶¶ 100-01 (lack of going concern).

[99]    See Dismissal Obj. at 24.

value, as argued by the Coalition, the Plan preserves and maximizes value, which is evidenced by the widespread support it has garnered from claimants and claimant representatives.  The certainty and efficiency of payments by the trust contrasts starkly with the cost, risks and uncertainties of litigating claims in the tort system.

> ### c.  Financial Distress Is Not The Standard in This Circuit But Nonetheless Exists In This Case

Travelers also asserts that the Debtor's alleged lack of financial distress demonstrates bad faith.  See Travelers Obj. ¶¶ 42-44.  As previously described in the Dismissal Objection, and as acknowledged by the U.S. Trustee,[100] financial distress is not the standard for a section 1112(b) dismissal of a case in the Fifth Circuit, and Travelers has cited no statutory authority or caselaw for the proposition that section 1129(a)(3) contains any such requirement either.

Furthermore, there are numerous examples of solvent entities, each of which had been defending and paying claims in the tort system without overt signs of "imminent" financial distress, resolving mass tort liabilities through claimant-supported and court-approved asbestos trusts.  See Dismissal Obj. at 42-45 (citing In re Mid-Valley, Inc., In re North Am. Refractories Co., In re USG Corp., In re W.R. Grace & Co., and A.H. Robins Inc.).  In addition, several subsidiary (and often special purpose) debtors with substantial asbestos liability that were part of a solvent corporate family have filed for chapter 11 to effectuate a section 524(g) resolution where all, or substantially all, of the funding for the asbestos trust came from the non-debtor corporate parent.  Examples include the following:

---

[100]   UST Obj. ¶ 79 ("[N]o court within the Fifth Circuit has specifically adopted the Third Circuit's 'financial distress formula[.]'").

| Case | Parent Company | Case Number/Jurisdiction | Approximate Equity Value of Parent Company at time of Chapter 11 Filing |
|---|---|---|---|
| *In re Pittsburgh Corning Corp.* | PPG Industries, Inc. and Corning, Inc. | 00-22876 (Banker. W.D. Pa.) | **$4.5 billion (PPG)** <br><br> **$18.5 billion (Corning)** |
| *In re North Am. Refractories Corp.* | Honeywell International, Inc.[101] | 02-20198 (Bankr. W.D. Pa.) | **$27 billion** |
| *In re Mid-Valley, Inc.* | Halliburton, Inc. | 03-35592 (Bankr. W.D. Pa.) | **$13 billion (at exit)** |
| *In re Quigley Co. Inc.* | Pfizer, Inc. | 04-15739 (Bankr. S.D.N.Y) | **$232 billion** |
| *In re TH Agric. & Nutrition, LLC* | Koninklijke Philips N.V. | 08-14692 (Bankr. S.D.N.Y.) | **$18 billion** |
| *In re Specialty Products Holding Corp.* | RPM International | 10-11780-JKF (Bankr. D. Del.) | **$7.2 billion[102]** |
| *In re Yarway Corp.* | Tyco International | 13-11025 (Bankr. D. Del.) | **$15 billion** |

It is also notable that neither Travelers nor any other Objector has explained exactly how or why the Debtor lacks financial distress.[103] That may be because the Debtor undoubtedly is—it faced over 93,000 personal injury claims, in addition to the prospect of having to litigate talc

---

[101]   Honeywell was formerly a parent of North American Refractories Corporation and became the main funding source for the NARCO bankruptcy case.

[102]   Valuation is as of confirmation of the chapter 11 plan.

[103]   Indeed, certain of the Objectors' assertions support the conclusion that the Debtor is in financial distress. For example, in its objection, the U.S. Trustee argues that the Debtor is attempting to "sanitize . . . transactions that would otherwise be subject to challenge as fraudulent transfers." UST Obj. ¶ 75. If the Debtor is not in financial distress, there would be no basis to assert that a fraudulent transfer occurred. In addition, as noted in the Dismissal Objection, the Coalition has also asserted estimated ovarian values that would push Red River's talc liability to nearly $200 billion, which would clearly establish financial distress. *See* Dismissal Obj. at 6, 46-47 (citing Coalition Dismissal Mot. ¶ 84).

claims for years into the future.  This overwhelming number of claims, coupled with the

substantial cost and uncertainty of litigation, establishes financial distress, particularly in view of

the lottery-like results that could occur in the tort system.[104]

> ### d.      Solicitation Was Proper and Executed in Good Faith[105]

As to voting, Travelers argues that the Plan is not proposed in good faith because it

allegedly is premised on a vote-buying scheme premised on payments to Gynecological Cancer

claims, which Travelers characterizes as "non-compensable."  See Travelers Obj. ¶¶ 45-56.  But

the Debtor's effort to settle all its talc liability, including Gynecological Cancer claims, reflects

only its good faith and proper goal of resolving all current and future talc claims in this

chapter 11 case.

Plaintiff firms routinely are retained by and represent holders of Gynecological Cancer

claims, as evidenced by the fact that more than 80 firms submitted Master Ballots listing

Gynecological Cancer claims voting for and against the Initial Plan.  Kim Obj. Decl. ¶ 9.  And

approximately 3,000 self-identified Gynecological Cancer claims (and potentially many more)

have been asserted against the Debtor and J&J in ovarian talc actions in the tort system,

including by Beasley Allen and four of the five other original members of the Coalition.  Id. ¶ 11.

These claimants allege that they have cancer and that their cancer was caused by talc products

---

[104]     See Bestwall, 605 B.R. at 49 ("The volume of current asbestos claims that Bestwall faced as of the Petition
Date, coupled with the projected number of claims to be filed through 2050 and beyond is sufficient
financial distress for Bestwall to seek resolution under section 524(g) of the Bankruptcy Code."); see
discussion in Part II.I.

[105]     Travelers, and only Travelers, proposes an additional consideration—supposed "fundamental fairness" as it
relates to the Debtor's plan solicitation process.  Travelers Obj. at 27-28.  However, fundamental fairness
has not been recognized in the Fifth Circuit as a standard under 1129(a)(3) in the manner proposed by
Travelers.  The sole case that Travelers relies upon for its fundamental fairness standard (and the sole case
that appears to have considered this factor in the Fifth Circuit) is In re Trinity Family Practice & Urgent
Care PLLC, which was a non-mass tort, subchapter V case that did not pay claimants in full.  661 B.R. 793,
814-15 (Bankr. W.D. Tex. 2024).  Nonetheless, to the extent the Court considers this standard relevant, the
Debtor asserts that the Plan negotiation and solicitation process detailed in Parts II.N-II.T was
fundamentally fair.

manufactured and sold by the Debtor's predecessors.  Id.  These are the same allegations that Ovarian Cancer claimants make.  Id.  A claimant's reduced likelihood of success in prosecuting a Gynecological Cancer claim—relative to the somewhat greater but limited chance of success for an Ovarian Cancer claim—is reflected in their respective recovery ranges under the Trust Distribution Procedures.

Travelers' statement that "[t]here is no proven causal link between J&J baby powder or talc and Gynecological Cancer or Other Diseases" misses the point.  Travelers Obj. ¶ 48.  The Debtor disputes general and specific causation as to all ovarian and gynecological cancers and, as Travelers knows, J&J recently filed renewed Daubert motions in the MDL seeking to exclude alleged expert testimony asserting any basis for causation.  Id. at 49.  The fact that the Debtor disputes causation does not mean these claims are not considered "claims" within the meaning of the Bankruptcy Code.[106]  The Debtor disputes liability for all Channeled Talc Personal Injury Claims, whether arising from Ovarian Cancer, Gynecological Cancer or Other Disease. Nonetheless, all Channeled Talc Personal Injury Claims present trial risk and are expensive and time-consuming to litigate, and the Debtor is entitled to seek to resolve all these claims pursuant to a section 524(g) plan of reorganization.[107]

Moreover, the evidence will show that ███████████████████████████████
███████████████████████████████████████████████████████████

---

[106]  See 11 U.S.C. § 101(5) ("The term 'claim' means— (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured"); Johnson v. Home State Bank, 501 U.S. 78, 83 (1991) (finding that "Congress intended [] this language to adopt the broadest available definition of 'claim.'"); In re Wyly, 553 B.R. 318, 332 (Bankr. N.D. Tex. 2016) (applying the broadest definition of claim, the court found that although a prepetition claim may be contingent upon the results of the pending appeal, it is still a claim under the Bankruptcy Code).

[107]  See Mullin Report ¶¶ 11 n.11, 142-48 ███████████████████████████████
███████████████████████████

████████████. See supra Part II.S; Evans Rebuttal Report ¶¶ 18, 22 ████████████

████████████████████████████████████████████████████.

Thus, there is no evidence that the Plan was premised upon any vote-buying scheme and no evidence that the inclusion of Gynecological Claims in the Plan impacted the vote in any respect.

The U.S. Trustee also asserts that voting issues prevent the Plan from satisfying section 1129(a)(3). The U.S. Trustee argues that, "to the extent that the Court finds cause to designate votes under section 1126(e), or otherwise finds evidence of vote manipulation or improper solicitation, it should also find that the Plan was not filed in good faith under section 1129(a)(3)." UST Obj. ¶ 78. Relying on In re Quigley Co., Inc., 437 B.R. 102 (Bankr. S.D.N.Y. 2010), the U.S. Trustee suggests that the Debtor manipulated the voting by (a) soliciting the votes of claimants who had already settled with the Debtor pursuant to the prepetition MSAs discussed supra Part II.J and in section 3.1 of the Disclosure Statement and (b) offering improper financial benefits to claimholders and their counsel through the $650 million Common Benefit QSF discussed supra Parts II.R and II.T, and in section 1.1.33 of the Plan. Id. ¶ 77.

But this case is distinguishable from Quigley in all relevant respects. In Quigley, the court found that the debtor and its parent, Pfizer, purposely flooded the vote with 10% stub claims held by claimants that settled with Pfizer prepetition and who were to receive additional incentives in exchange for a successful vote. 437 B.R. 128-29. That effort elevated acceptance of the plan from approximately 66% in number and amount to approximately 87% in number and 82% in amount. See id. at 123, 128.[108]

---

[108]    Certain Insurers also cite to Congoleum and Global Industrial as cases where alleged vote buying resulted in bad faith findings. See Travelers Obj. at 28-29. However, neither case supports that point. The issue in Congoleum stemmed from a conflict of interest where, among other things, the debtor's special insurance counsel's status as co-counsel with a plaintiff's firm prevented such counsel "from being completely loyal

There is no similar manipulation here, and no stub claims were retained by claimants whose law firms entered into prepetition MSAs.  Rather, clients of law firms that are party to a prepetition MSA were permitted to vote because their claims will initially be channeled to the Talc Personal Injury Trust.  Indeed, not all such claims will be resolved under an assumed prepetition MSA.  Accordingly, such claimants' claims are impaired, and they were properly permitted to vote.  In addition, only approximately 300 such claimants actually voted—a fraction of one percent of the almost 100,000 votes cast.  Their ballots, therefore, had no material impact on the outcome of voting.

Similarly, the potential $650 million Common Benefit QSF that would be formed outside of the Plan if certain conditions are satisfied is not a targeted inducement to settling counsel but rather available to any member of the plaintiffs' bar, including those who voted against the Plan.  See TCC MOU § II.C (providing for the Common Benefit QSF).  It will be administered by a neutral special master.  The fund is intended to eliminate any risk that potential common benefit fund obligations arising under the MDL Common Benefit Order would be payable from Talc Personal Injury Trust assets or recoveries of MDL claimants.  See id.  Thus, rather than evidencing any bad faith effort to manipulate the vote to support the Plan, the Common Benefit QSF demonstrates good faith because it provides an additional benefit to claimants and would be available to all plaintiff law firms, including those that oppose the Plan.

---

to **Congoleum's** interests."  In re Congoleum Corp., 426 F.3d 675, 693 (3d Cir. 2005).  In addition, when Congoleum was dismissed (following the failure of the 24th proposed plan), it was dismissed pursuant to sections 1112(b)(1) and 1121(b)(5), not section 1129(a)(3).  See In re Congoleum Corp., 2009 WL 499262, at *2, *13 (Bankr. D.N.J. Feb. 26, 2009).  As for Global Industrial, the plan was indeed remanded based on insurers' allegation of collusion but, upon remand, "no party in interest was able to identify any such facts and this Court has discovered no facts," and the Court concluded that "negotiations between the Debtors and counsel for silica claimants were conducted in good faith."  Glob. Indus, 2013 WL 587366, at *29.

  **e.**  **J&J's Walkaway Rights Are Negotiated Contract Rights**

  The Coalition asserts that the Debtor's and J&J's ability to "walk away" from the Plan demonstrates bad faith.  <u>See</u> Coalition Plan Obj. at 60-61.  However, as discussed in Part VIII.A.3, the Debtor's and J&J's ability to walk away from the Plan was a carefully negotiated provision designed to ensure that claimants would receive compensation as quickly and efficiently as possible.  Moreover, this provision was negotiated at arm's-length with the Smith Firm, the Committee and the AHC and has their support.

  **f.**  **Remaining Allegations of Bad Faith Already Have Been Refuted By Court Rulings**

  The U.S. Trustee also repeats, without support, its previous accusations regarding forum shopping and serial bankruptcy filings.  As to forum shopping, as the U.S. Trustee acknowledges, this Court has previously denied motions to transfer venue.  <u>See</u> UST Obj. ¶ 76; Dkt. 245 (Order Denying Mots. to Transfer Venue).  The U.S. Trustee asserts that nonetheless, its renewed forum shopping accusations should be considered here in the context of plan confirmation.  But the U.S. Trustee's allegations are the same as before, the facts relevant to forum shopping have not changed and there is thus no reason to revisit the Court's prior venue ruling.

  As to the serial bankruptcy filing assertion, as previously detailed in the Dismissal Objection, this case involves a different debtor, different creditors and different circumstances than the LTL filings.  Further, while the notion of serial filings, where applicable, may be relevant in a section 1112(b) context, the U.S. Trustee provides no support for the proposition that serial filings are relevant in a section 1129(a)(3) context where, among other things, all voting classes have accepted the plan.

**D.      Section 1129(a)(4) — All Payments To Be Made by the Debtor in Connection With the Reorganization Case Are Subject to Court Approval**

Section 1129(a)(4) of the Bankruptcy Code requires that:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4).  In essence, this subsection requires that any and all fees promised or received in connection with, or in contemplation of, a chapter 11 case must be disclosed and subject to the court's review.  See In re Johns-Manville Corp., 68 B.R. 618, 623 (Bankr. S.D.N.Y. 1986), rev'd in part on other grounds, 78 B.R. 407 (S.D.N.Y. 1987), aff'd, Kane v. John-Manville Corp., 843 F.2d 636 (2d Cir. 1988).  The Fifth Circuit has held this is a "relatively open-ended standard"—whether a payment is reasonable will "clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate."  Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Co-Op, Inc.), 150 F.3d 503, 517 (5th Cir. 1998).

In accordance with section 1129(a)(4) of the Bankruptcy Code, all fees to which parties may be entitled in connection with this chapter 11 case, including Professionals' Fee Claims, are subject to the approval of the Court.  Section 2.2 of the Plan provides for the payment of professionals' Fee Claims and makes all such payments subject to Court approval and the standards of the Bankruptcy Code.  The Court has authorized the interim payment of the fees and expenses incurred by Professionals in connection with the chapter 11 case.  See *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Retained*

*Professionals* [Dkt. 521]. All such fees and expenses, however, remain subject to final review for reasonableness by the Court. Finally, Article XII of the Plan provides that the Court will retain jurisdiction after the Effective Date to hear and determine all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan.

The U.S. Trustee asserts that the Plan violates section 1129(a)(4) because it provides that J&J will pay amounts to counsel for talc claimants under the Common Benefit Fund MSA without Court approval. See UST Obj. ¶ 85. But the U.S. Trustee's premise is incorrect—J&J is not a plan proponent, and therefore does not fall under the statutory language.

In addition, the establishment of a Common Benefit QSF would not be pursuant to the Plan but instead would be pursuant to a separate Common Benefit Fund MSA outside of the Plan if certain conditions are satisfied, including that the MDL Common Benefit Order is withdrawn with prejudice. The Common Benefit Fund MSA contemplates that the qualified settlement fund established thereunder would be administered by a special master, who will determine whether any plaintiff law firm is entitled to a distribution on account of common benefit claims. And, unlike in Cajun Electric, where the Fifth Circuit found that the payments for "fees and expenses incurred by the Members Committee in connection with the confirmation and adversary proceeding" were payments in connection with the bankruptcy case subject to section 1129(a)(4), see 150 F.3d at 514, the payments under the Common Benefit Fund MSA would address common benefit claims in connection with services provided in the MDL.

Most importantly, the payments would not come from assets of the Debtor. Instead, J&J would fund the qualified settlement fund, which would ensure that funding for the Talc Personal Injury Trust (and the ultimate amount received by a holder of an allowed Channeled Talc

Personal Injury Claim) would not be reduced by any common benefit obligations that would otherwise be potentially due pursuant to the MDL Common Benefit Order.

Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code and the U.S. Trustee's objection should be overruled.

### E. Section 1129(a)(5) — The Plan Discloses All Required Information Regarding Post-Confirmation Management and Insiders

Section 1129(a)(5) of the Bankruptcy Code provides that a plan of reorganization may be confirmed only if the proponent discloses the identity of those individuals who will serve as management of the reorganized debtor, the identity of any insider to be employed or retained by the reorganized debtor and the compensation proposed to be paid to such insider.  In addition, under section 1129(a)(5)(A)(ii), the appointment or continuation in office of existing management must be consistent with the interests of creditors, equity security holders and public policy.

In determining whether the post-confirmation management of a debtor is consistent with the interests of creditors, equity security holders and public policy, a court must consider proposed management's competence, discretion, experience and affiliation with entities having interests adverse to the debtor.  See In re W.E. Parks Lumber Co., 19 B.R. 285, 292 (Bankr. W.D. La. 1982) (a court should consider whether "the initial management and board of directors of the reorganized corporation will be sufficiently independent and free from conflicts and the potential of post-reorganization litigation so as to serve all creditors and interested parties on an even and loyal basis" (emphasis omitted)).  In general, however, "[t]he [d]ebtor should have first choice of its management, unless compelling cause to the contrary exists . . . ."  In re Sherwood Square Assocs., 107 B.R. 872, 878 (Bankr. D. Md. 1989).  The case law also is clear that a plan may contemplate the retention of the debtor's existing directors and officers.  See, e.g., In re Texaco

Inc., 84 B.R. 893, 908 (Bankr. S.D.N.Y. 1988) (holding that section 1129(a)(5) was satisfied where notice was provided that the debtor's existing directors and officers would continue to serve in office after plan confirmation).

The Debtor has fully satisfied the requirements of section 1129(a)(5) by disclosing all necessary information regarding the Reorganized Debtor's proposed officers and managers, each of whom is highly qualified and experienced.  See Disclosure Statement § 6.9(f)(2); Plan § 9.6.2 (providing that the initial officers and managers of Reorganized Debtor shall be the officers and managers of the Debtor on the Effective Date).

In sum, the appointment of the proposed directors and officers is consistent with public policy and the interests of the holders of Claims and Interests because the management team and directors are well-positioned to serve adequately the interests of all parties.  Accordingly, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

### F. Section 1129(a)(6) — The Plan Does Not Provide for Any Rate Change Subject to Regulatory Approval

Section 1129(a)(6) of the Bankruptcy Code is not applicable here because the Debtor's businesses do not involve the establishment of rates over which any regulatory commission has jurisdiction or will have jurisdiction after confirmation.  11 U.S.C. § 1129(a)(6).

### G. Section 1129(a)(7) — The Plan Is in the Best Interests of Creditors

The "best interests of creditors" test is set forth in section 1129(a)(7) of the Bankruptcy Code.  This test requires that, with respect to each impaired class of claims or interests, each holder of such claim or interest:  (a) has accepted the plan or (b) will receive or retain property of

a value not less than what such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code (the "Best Interests Test").[109]

### 1.  No Individual Claimant Has Shown The Best Interests Test Is Not Satisfied As to Its Specific Claim

In analyzing the application of the Best Interests Test to a debtor's chapter 11 plan of reorganization, courts have recognized that "[t]he 'best interests' test applies to individual creditors holding impaired claims."  In re Keck, Mahin & Cate, 241 B.R. 583, 590 (Bankr. N.D. Ill. 1998) (quoting Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 440 n.13 (1999)); see also 7 Collier on Bankruptcy ¶ 1129.02(7)(b) ("1129(a)(7) operates on the individual creditor or interest holder level.").[110]  Claimants who object to plan confirmation pursuant to section 1129(a)(7) based on their individualized recoveries must demonstrate that they are entitled to recover more through a chapter 7 liquidation than they would under a plan. See Keck, 241 B.R. at 590-91 (denying lone objecting claimant's assertion that debtor's plan failed the Best Interests Test because claimant failed to establish that he would receive more under a liquidation than from the plan).

Here, no objecting party has alleged that the Best Interests Test is not satisfied as to a specific, individual creditor.  Instead, these Best Interests Test objections only provide generalized assertions as to the entire talc claim class or entire broad groups of claimants.  See Coalition Plan Obj. at 74-75; Coalition DS Obj. ¶¶ 478-79.  Such non-specific objections related

---

[109]   Contrary to the U.S. Trustee's objection (UST Obj. ¶ 86), a liquidation analysis is not required in order to satisfy the Best Interests Test.  The sole case cited by the U.S. Trustee for this proposition, In re Samurai Martial Sports, 644 B.R. 667 (Bankr. S.D. Tex. 2022), was a subchapter V case, which is subject to an explicit liquidation analysis requirement.  See 11 U.S.C. § 1190(1)(B) ("A plan filed under this subchapter shall include . . . a liquidation analysis").  There is no such Bankruptcy Code requirement in a non-subchapter V case.

[110]   See also In re Leslie Fay Companies, Inc., 207 B.R. 764, 787 (Bankr. S.D.N.Y. 1997) ("The best interests tests [sic] concerns individual creditors and equity holders rather than classes of claims or interests.").

to the Best Interests Test are not sufficient to demonstrate that the Best Interests Test has not been satisfied.

### 2. Under the Plan, Claimants Will Receive Well in Excess of What They Would Receive in a Chapter 7 Liquidation

Both the: (a) markedly higher recoveries for claimants via the Talc Personal Injury Trust compared to the tort system and (b) risks inherent in the chapter 7 process demonstrate that the Plan provides recoveries to claimants that are well in excess of what they would receive in chapter 7.

### a. Under the Plan, Claimants Will Receive an Average Recovery Twice as Large as They Would Receive in the Tort System

Holders of Channeled Talc Personal Injury Claims that qualify for payment under the Trust Distribution Procedures will recover in full under the Plan. As the Mullin Report establishes, the Plan funding:



See Mullin Report ¶ 11. Based on these numbers, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. See Mullin Report ¶ 136 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇ Moreover, these projected recoveries through tort system settlements are likely overstated because, at least with respect to claims pending in the MDL, a portion of the recoveries would be diverted to payment of a common benefit fund. In contrast, the Common

Benefit QSF, which the Debtor has made a condition to confirmation of the Plan, proposes to eliminate the impact of any common benefit obligation.[111]

Accordingly, because the recovery that Channeled Talc Personal Injury Claims receive from the Talc Personal Injury Trust would exceed the recoveries that they would receive through tort system resolutions, the Plan provides full payment of Channeled Talc Personal Injury Claims. See id. ██████████████████████████████████████. And, as discussed in Part VII.F, claimants are not entitled to collect more than "full payment" on account of their claims. As a result, it is incontrovertible that, by providing full payment, the Plan satisfies the Best Interests Test because claimants are not entitled to collect more than the full amount of their claims. Thus, claimants could never recover less through the Plan than they would in chapter 7. Indeed, at least one court has held that, where claimants will be paid in full under the Plan, "the Plan, **by definition**, meets the best interest test as to [those] claimants." See, e.g., In re Boy Scouts of Am., 642 B.R. 504, 666 (Bankr. D. Del. 2022) (emphasis added), supplemented, 2022 WL 20541782 (Bankr. D. Del. Sept. 8, 2022), aff'd, 650 B.R. 87 (D. Del. 2023) appeal docketed, No. 23-1673 (3d Cir. Apr. 12, 2023).

Claimants, on an individual basis, also will recover via the Talc Personal Injury Trust in excess of their expected recovery in the tort system via settlement. Not only will the typical claimant ██████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████ See Mullin Report ¶ 136 ███

---

[111]   See Mullin Report ¶ 134 █████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████. This differentiation permits claimants with respectively higher, or lower, value claims to have the amount they would receive pursuant to the Trust Distribution Procedures adjusted in accordance with that value on an individualized basis. These adjustment factors in the Trust Distribution Procedures, in fact, were essentially used wholesale in the Debtor's latest large inventory settlement agreed to prior to the Petition Date. See id. ████████████████████████████████████████████████████████████

███████████████████████████████. Employing the same adjustment factors ensures that the values Channeled Talc Personal Injury Claims will receive through the Trust Distribution Procedures are calculated in the same way those values would be calculated in a tort system settlement.

In addition, individual Gynecological Cancer claims also will recover in full under the Plan. The $1,500 recovery for each Gynecological Cancer claim ██████████████████████

█████████████████████████████████████████████████████████████████[112]

and there have been numerous arguments by the Coalition and Insurers that these claims in any case should have no value in the tort system.[113]

---

[112] Id. ¶ 148 ███████████████████████████████████████

██████████████████████████.

[113] See e.g., Coalition DS Obj. ¶ 10 (Coalition describing non-ovarian gynecological cancer claims as "non-compensable" claims); Insurers DS Obj. ¶ 39 (insurer asserting that holders of Gynecological Claims and Other Disease Talc Personal Injury Claims "would never see a recovery in the tort system under non-bankruptcy law"); Coalition Plan Obj. at 6 (Coalition noting that gynecological non-ovarian cancer claims have neither been litigated nor compensated in the tort system).

b.  **Risks Present in a Chapter 7 Liquidation Would Result in Reduced and Delayed Recoveries for Claimants**

(i)  **Trust Payments Will Involve Fewer Risks and Inefficiencies Than Payment Via Chapter 7**

The Talc Personal Injury Trust that would be created by the Plan provides for access to equitable recoveries and sufficient funding to ensure that all claimants, including future claimants, receive full payment from the Talc Personal Injury Trust.[114]  In addition, the Talc Personal Injury Trust also provides for varying methods of expedient review that will ensure a significantly more efficient payment of claims compared to what would occur in chapter 7.  See Trust Distribution Procedures § 4.6 (providing three different review procedures for Channeled Talc Personal Injury Claims:  Expedited Review, Individual Review and Quickpay Review). Further, the Talc Personal Injury Trust will have specific procedures in place to begin making payments quickly post-confirmation.[115]  In that regard, the Debtor has requested relief from this Court to commence and fund an early claims process and retain ARCHER Systems, LLC to administer that process, which will involve developing and implementing systems necessary to facilitate claims review and early claims processing.  See Dkt. 856 (Debtor's Mot. to Establish Early Claims Processing).  This process will position the trust to make distributions as soon as possible after the effective date of the Plan.[116]

---

[114]  See Talc Personal Injury Trust Agreement, Ex. H at 3 ("The purpose of the Talc Trust is to assume all liabilities, obligations, and responsibilities for all Talc Claims and, among other things, to:  (i) preserve, hold, manage, and maximize the assets of the Talc Trust . . .").

[115]  The Talc Personal Injury Trust can begin making payments once it sets the Initial Cash Value of a Point, which, pursuant to the Trust Distribution Procedures, shall be set between 120 and 150 days after the Effective Date of the Plan.  See Trust Distribution Procedures §§ 4.4.1, 7.1.2 (requiring trustee to establish an initial Cash Value of a Point within thirty (30) days after the "Claim Submission Deadline," which is the "date that is one hundred twenty (120) days after the Confirmation Date.").

[116]  Consistent with §§ 7.1.2 and 4.4.1 of the Trust Distribution Procedures, after the initial 120 day Claims Submission Deadline passes, the determination as to when the Talc Personal Injury Trust will commence payments will be determined by the ability of the trustee, the Talc Trust Advisory Committee and the FCR to agree upon the "Cash Value of a Point," with payments commencing no later than 150 days after the Effective Date of the Plan.

Conversely, as discussed in Part IV.G.2(b)(ii) <u>infra</u>, payment of claims via a chapter 7 liquidation process would result in significant risks, costs, and inefficiencies.  In fact, courts have specifically considered, in the context of the Best Interests Test, the increased risk that tort claimants may face in a chapter 7 liquidation as compared to a section 524(g) trust.  For example, in <u>Paddock</u>, a case involving a similar, prepetition corporate restructuring, the bankruptcy court found that the Best Interests Test was satisfied where liquidation under chapter 7 would involve increased uncertainty and "significant cost and expense."  <u>Paddock</u>, 2022 WL 1746652, at *19.

Similarly, the United States District Court for the District of Delaware upheld the bankruptcy court's conclusion that the Best Interests Test was satisfied in the solvent asbestos case of <u>In re W.R. Grace & Co.</u> because a chapter 7 liquidation introduced uncertain and complex issues.  475 B.R. 34, 142 (D. Del. 2012).  The district court declined to consider arguments that claimants could recover more through jury trials and settlements in the tort system than under a chapter 7 liquidation, finding that the claimants "fail to take into account the practical implications of what Chapter 7 liquidation would entail in this case."  <u>Id.</u> at 143-45. The district court noted that the potential chapter 7 liquidation, and the tort system, did not have a way of accounting for the numerous future claims that <u>W.R. Grace</u> would likely face and "a Chapter 7 liquidation would need to be held open for a seemingly indefinite amount of time while all personal injury claimants pursued jury trials and settlements in the tort system."  <u>Id.</u>[117] Alternatively, "[t]he Joint Plan accounts for this uncertainty in its proposed structure and guarantees all claimants—both current and future—some degree of recovery."  <u>Id.</u> at 144.  In

---

[117]    "Such a process would result in inevitable delay and disparate—or, even worse, unavailable—recovery amongst personal injury claimants. Such uncertainty is certainly not within the creditors' best interests."  <u>Id.</u>

summary, the court noted that "it is evident to the Court that the guaranteed certainty of the Chapter 11 Joint Plan, as opposed to the high degree of uncertainty in a hypothetical Chapter 7 proceeding, is in the creditors best interest," and affirmed the bankruptcy court's finding that the W.R. Grace plan satisfied the Best Interests Test.  Id. at 143-45.

**(ii)**     **Administering Claims Via a Chapter 7 Liquidation Would Create Increased Delay and Expense, Ultimately Resulting in Reduced Recoveries as Compared to Payment Via the Trust**

As recognized by the court in W.R. Grace, a chapter 7 trustee would not be able to distribute payments to claimants as quickly or efficiently as the Talc Personal Injury Trust.  This delay and uncertainty would result in reduced recoveries for claimants.  As a preliminary matter, the trustee in a chapter 7 liquidation, as part of the liquidation and distribution process, would be required to reduce all assets of the Debtor's estate to cash and would also be required to liquidate the estate's liabilities, including the administrative expenses from the preceding chapter 11 case, as well as for the chapter 7 proceeding.  See 11 U.S.C. §§ 704(a)(1) (providing that the trustee must "collect and reduce to money the property of the estate"), 726 (detailing estate distribution procedures, which are subject to payment in the order outlined in section 507).

Notably, liquidation of the Debtor's assets in the chapter 7 context would be complicated by the fact that, in a chapter 7 liquidation, the arrangements that would have funded the Talc Personal Injury Trust pursuant to the Plan are not available.  The "Permitted Funding Uses" in the Indemnity Funding Agreement are limited to "the funding of any amounts to satisfy [the Debtor] Talc Related Liabilities in connection with the funding of one or more trusts for the benefit of existing and future claimants **created pursuant to the Bankruptcy Plan**" and "the funding of any amounts to satisfy the [Debtor] Talc Related Liabilities established by a judgment of a court of competent jurisdiction . . . or final settlement thereof . . . if the Bankruptcy Plan

-118-

does not become effective and the Bankruptcy Case is dismissed." See Indemnity Funding Agreement at 5.  Accordingly, the Debtor would not have any funding agreement available to compensate Channeled Talc Personal Injury Claims in a chapter 7 bankruptcy case.

This lack of funding for talc claims in the chapter 7 context, paired with the presence of such funding in the chapter 11 or non-bankruptcy context, means that a trustee in a chapter 7 liquidation would likely bring fraudulent transfer causes of action to recover those assets for the benefit of the estate.  Pursuing this litigation to a resolution would jeopardize and, at a minimum, significantly delay claimant recoveries since, while the litigation was pending, no funding would be available for claimant recoveries.

Not only would resolution of these fraudulent transfer causes of action delay recoveries to claimants but, in connection with such litigation, in order to assess whether a fraudulent transfer occurred and how much funding should be recouped to the estate, this litigation would also have to determine the extent of the Debtor's liability for talc-related claims.  The pursuit of this process could result in a determination that the Debtor has no liability for talc claims, or that such liability is smaller than the amount the Debtor has agreed to pay pursuant to the Plan. Either outcome creates a risk, in the chapter 7 context, that would lead to reduced recoveries for claimants.

Further, even in a circumstance where the fraudulent transfer litigation is successful and recovers assets for the estate sufficient to cover the determined liability, the trustee would next have to evaluate and determine how to compensate talc claims.  This process would be complicated by the fact that the trustee would not be able to access the variety of congressionally-crafted remedies provided for in section 524(g) of the Bankruptcy Code, including the section 524(g) channeling injunction.  Without the section 524(g) injunction, which

channels future claimants to the trust, it is unclear how the trustee would be able to allocate distributions in a manner that ensures sufficient funding remains available for future claimants, and that the funding is adequate to provide for similar, equitable recoveries.  While the trustee may be able to administer its own trust, the creation of this trust process outside of section 524(g) mechanisms, particularly in light of the uncertain number of future claimants and ultimate duration of the trust, would create additional administrative inefficiencies, uncertainties, and costs.

Given all of these complexities in the chapter 7 context, which would result in delay, additional expense and the risk of reduced recoveries, as compared to the Talc Personal Injury Trust's efficient, expedited process for full payment of claims, the Plan ensures that holders of Channeled Talc Personal Injury Claims will receive property with a value not less than the amount such holders would receive in a chapter 7 liquidation, in satisfaction of section 1129(a)(7).

The Coalition argues that claimants' prospective recoveries against third parties must be considered in the context of the Best Interests Test.  See Coalition Plan Obj. at 73.  For support, the Coalition cites Quigley and Ditech, ignoring more recent bankruptcy and district court mass tort opinions from within the same jurisdictions that address this very issue.  More specifically, bankruptcy courts from both the Southern District of New York and the District of Delaware declined to incorporate prospective third party recoveries in the Best Interests Test, opting to reject the approach taken in Quigley and Ditech in favor of a plain reading of section 1129(a)(7). See In re Purdue Pharma L.P., 633 B.R. 53, 110-112 (Bankr. S.D.N.Y. 2021) (noting that plain language of section 1129(a)(7) does not require analysis of claimant's rights against third

parties);[118] <u>Boy Scouts of Am.</u>, 642 B.R. at 663 (same); <u>see also</u> <u>In re Boy Scouts of Am.</u>, 650

B.R. 87, 160 (D. Del. 2023) (solely citing <u>Quigley</u> and <u>Ditech</u> while discussing, but declining to

follow, the "few cases" that opted to consider third party claims).  This exclusion of third party

recoveries aligns with the holdings in other mass tort cases, where courts similarly excluded third

party recoveries from the Best Interests Test.  <u>See</u> <u>e.g.</u>, <u>W.R. Grace</u>, 475 B.R. at 149-50

(concluding that the best interest test considers only the amount that claimants would obtain from

the estates in a hypothetical chapter 7 liquidation, not the amount claimants would allegedly

recover from the estates' insurers).[119]

Furthermore, any prospective additional recoveries from third parties are irrelevant

because the Plan provides for the payment in full of the claims of the talc claimants.  In those

circumstances, as discussed in Part VII.F, there is no need and, indeed, no basis for any

additional recovery from third parties.  <u>See</u> <u>Boy Scouts of Am.</u>, 650 B.R. at 160-61 ("Regardless

of whether claims against third parties are included in the best interest test, the Bankruptcy

Court's determination that the holders of Abuse Claims will likely be paid in full necessarily

shows that the Plan, by definition, meets the best interest test as to claimants.").

---

[118]     <u>Purdue</u>, 633 B.R. at 110 ("[T]he comparison required by section 1129(a)(7) apparently is between the
amount that the objecting creditor would receive under the plan on account of its claim and what it would
'so' receive -- that is, also on account of its claim against the debtor" in a hypothetical chapter 7 scenario). It would
not, therefore, require analysis of the claimant's rights against third parties.").

[119]     <u>In re Plant Insulation Co.</u>, 469 B.R. 843, 887 (Bankr. N.D. Cal. 2012) (explaining that the "most natural
interpretation of section 1129(a)(7) is that it addresses only the amount the dissenting creditor would
receive or retain on its claim against the debtor" in a hypothetical chapter 7 scenario); <u>In re Dow Corning</u>,
237 B.R. 380, 411 (Bankr. E.D. Mich. 1999) (holding that the best interest test examines only the dividend
the creditor would receive from the chapter 7 trustee—and only that amount—for comparison with the
dividend available under the plan and observing that courts applying the nearly identical test under chapter
13 "uniformly hold that amounts obtainable from other sources, such as guarantors, are irrelevant" to the
inquiry).

### H.      Section 1129(a)(8) — The Plan Has Been Accepted by the Requisite Classes of Claims and Interests

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests under a plan has either accepted the plan or is not impaired under the plan.  Under section 1126(f) of the Bankruptcy Code, a class of claims or interests that is not impaired under a plan is "conclusively presumed" to have accepted the plan and need not be further examined under section 1129(a)(8).  11 U.S.C. § 1126(f); see also Toy & Sports Warehouse, 37 B.R. at 150.

Acceptance of a plan of reorganization by an impaired class of claims or interests is determined by reference to section 1126, which identifies the members of a class that may vote on a plan and the number and amount of votes necessary for the acceptance of a plan by a class of claims or interests, and section 524(g), which specifies the number of votes necessary for the acceptance of a plan by a class of asbestos-related claims where the plan contemplates the entry of a channeling injunction with respect to such claims and related future demands.  In particular: (a) section 1126 provides that a plan is accepted (i) by a class of impaired claims if the class members accepting hold at least two-thirds in amount and more than one-half in number of the claims held by the class members that have cast votes on the plan and (ii) by a class of impaired interests if the class members accepting hold at least two-thirds in amount of the interests held by the class members that have cast votes on the plan; and (b) section 524(g) provides that, as part of confirmation, a plan must designate a separate class of claims to be addressed by a 524(g) trust and be accepted by at least 75 percent of those voting in such class.  Under section 1126(g) of the Bankruptcy Code, however, impaired classes that neither receive nor retain property under the plan are deemed to have rejected the plan.

Applying these standards here demonstrates that the Plan complies with section 1129(a)(8) for all Classes established by the Plan.  Specifically, Classes 4 and 6 have

accepted the Plan.  See Voting Declarations.  All other Classes are unimpaired under the Plan and, therefore, are deemed to have accepted the Plan.  Nonetheless, the Objectors raise a litany of arguments aimed at challenging the vote.  The Court should overrule all of these objections.

### 1.   Challenges to the Value of Claims for Voting Purposes Fail

The Coalition and Travelers challenge the Debtor's request pursuant to Bankruptcy Rule 3018 to assign a value of $1.00 to each Channeled Talc Personal Injury Claim solely for purposes of voting.  Courts presiding over numerous mass tort bankruptcy cases have allowed claims in the amount of $1.00 for voting purposes.[120]  In such cases, it is often not possible to know the extent to which any particular claimant has a qualifying claim or the likely amount of that claim because substantially all claims are disputed and unliquidated, and the supporting records may not yet have been obtained or disclosed by counsel.

Courts generally agree that estimating mass tort claims for purposes of voting in the amount of $1.00 is efficient and appropriate, particularly where it is clear that attempting to assign estimated values on a claim-by-claim or disease-by-disease basis would not change the outcome of the vote.  See, e.g., In re Quigley Co., 346 B.R. 647, 654 (Bankr. S.D.N.Y. 2006) ("$1.00 per vote method can be used when support is overwhelming and a different voting method will not change the result."); In re Dow Corning Corp., 211 B.R. 545, 573 (Bankr. E.D. Mich. 1997) ("Only if the outcome of the '2/3 by amount' vote is unclear will it be necessary to embark upon this burdensome task" of estimating unliquidated tort claims); see also Menard-

---

[120]    See, e.g., HONX, Dkt. 890; In re Boy Scouts of Am., No. 20-10343 (LSS) (Bankr. D. Del. Sept. 30, 2021), Dkt. 6438; In re Mallinckrodt PLC, No. 20-12522 (JTD) (Bankr. D. Del. June 17, 2021), Dkt. 2911; In re United Gilsonite Laboratories, No. 11-02032 (RNO) (Bankr. M.D. Pa. Sept. 30, 2014), Dkt. 2014; In re PG&E Corp., No. 19-30088 (JD) (Bankr. N.D. Cal. March 17, 2020), Dkt. 6340; In re TK Holdings Inc., No. 17-11375 (BLS) (Bankr. D. Del. Jan. 5, 2018), Dkt. 1639; In re USA Gymnastics, No. 18-09108 (RLM) (Bankr. S.D. Ind. Oct. 26, 2021), Dkt. 1659; In re The Budd Co., No. 14-11873 (JBS) (Bankr. N.D. Ill. May 6, 2016), Dkt. 1811; see also Johns-Manville, 843 F.2d at 646-48.

-123-

Sanford v. Mabey (In re A.H. Robins, Co.), 880 F.2d 694, 698 (4th Cir. 1989), cert. denied, 493 U.S. 959 (1989) ("We do not decide whether the district court's voting procedure violated § 1126(c) because, in view of the outcome of the vote, the challenged procedure was at most harmless error."); Johns-Manville, 843 F.2d at 646-47 (same).  Here, the outcome of the vote is already known, and it is also already known that estimating claims in varying amounts will not change the outcome.  As a result, there is no reason to deviate from $1.00 voting.

The Debtor's expert regarding voting issues, Andrew R. Evans, CFA of Bates White,



.  See Evans Report ¶ 42.  In light of the pending challenges to the voting tabulation,

Id. ¶ 31, Fig. 3.

Mr. Evans also conducted an analysis

[121]  Evans Rebuttal Report ¶ 18.

---

[121]     Because section 524(g) contains only a "headcount" requirement that 75% in number of voting claimants accept the Plan, the relative amount of claims is not relevant to that requirement.  See 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) (requiring that channeled class "is established and votes, by at least 75 percent of those voting, in favor of the plan").

████████████████████████████████████████████████████████

Id. ¶ 22.

The Coalition and Travelers note that the Delaware bankruptcy court assigned claims values for voting purposes based on asserted disease types in the Imerys talc cases. See Coalition Plan Obj. at 70-71; Travelers Obj. ¶¶ 82-86. But the court in Imerys was prospectively considering whether the amounts would affect the outcome. See Imerys, Dkt. 6711, Oct. 29, 2024 Hr'g Tr. 41:24-42:1 ("Basically, was there any harm, did it matter, okay? Once we have the vote, maybe it doesn't matter; we don't have to be concerned about it."). Here, the opposite is true. Solicitation is already complete and, based on the results, it is clear that assigning varying voting amounts to claims based on any reasonable process would have no effect on the outcome.[122]

The Coalition and Travelers argue that deposition testimony from members of the AHC, including, in particular, Mr. Pulaski of Pulaski Kherkher, PLLC, indicates that some disease-type designations on Master Ballots may not be accurate. See Coalition Plan Obj. at 71; Travelers Obj. ¶¶ 87-89. Although such inaccuracies may exist, nothing in the record indicates that Plan supporters disclosed the wrong disease type at a greater rate than those objecting to the Plan, and certainly not at any rate sufficient to affect the outcome of voting.[123] Moreover, Mr. Evans'

---

[122] While Travelers attempts to characterize as inconsistent J&J's arguments for the assignment of differing voting amounts in the Imerys cases in 2021, the arguments are, in fact, entirely consistent. See Travelers Obj. ¶ 86 (citing J&J's and Old JJCI's omnibus reply in support of motion to designate certain votes, Imerys, Dkt. 4102). In Imerys, J&J was concerned that permitting the vote of a party with no legitimate economic interest in the case to stand would reverse the outcome of the vote. See id. ¶ 20 ("Allowing Bevan to control over 20% of the vote under these circumstances and cause a Plan that would otherwise fail to proceed to a confirmation hearing, would negatively impact the franchise in this case."). Here, for the reasons stated, attempting to assign claim values to the vote will have no effect on the outcome.

[123] In addition, contrary to the Coalition's argument, Dr. Mullin's commentary ████████████████ ████████████████████████████████████████████████ . See Coalition Plan Obj. at 71.

analysis ███████████████████████████████████████████████████████

███████████████████████████████████████████. Evans Rebuttal

Report ¶ 22.  Accordingly, ███████████████████, Class 4 has accepted the Plan in

number and amount sufficient to satisfy sections 524(g) and 1126(c) of the Bankruptcy Code and

the weighting of votes by disease type and estimated recoveries is unnecessary.

### 2.     There is No Need for a Bar Date in this Prepackaged Case

The Coalition returns to its argument that the Court should establish a bar date and

conduct an estimation proceeding with respect to at least categories of claims to determine

proper voting amounts.  Coalition Plan Obj. at 70.  But implementing such a process merely to

conduct a vote is unnecessary given the voting results and would result in significant and

unnecessary delay in confirmation of the Plan.  In addition, inaccuracies and information gaps in

the documentation received would inevitably remain.  See Imerys, Dkt. 6711, Oct. 29, 2024 Hr'g

Tr. 40:15-24 ("if we were to establish a bar date . . . I would still have to estimate for voting

purposes those claims.  So, I think we would be in the same place.  Perhaps people would have a

little bit more information . . . but we would still have to estimate the claims.").  For all of the

reasons previously set forth by the Debtor in its objection [Dkt. 432] to the Coalition's bar date

motion, establishing a bar date is not necessary and would only delay for no legitimate purpose

resolution of this chapter 11 case.

### 3.     The Votes of Claimants Represented By Law Firms that Entered Into the TCC MOU Should Not Be Disregarded

Travelers argues for the first time that the votes of claimants represented by law firms

that entered into the TCC MOU should be disregarded because such claimants allegedly have no

economic interest in the outcome of this chapter 11 case.  Travelers Obj. ¶¶ 91-92.  Analogizing

to the disallowance of the previously settled portions of claims for voting purposes in Quigley,

Travelers argues that the commitment of such firms to participate in an alternative private resolution process set forth in the TCC MOU in the event the Plan is not confirmed eliminates their clients' financial stake in the outcome of this case.  Id. (citing Quigley, 346 B.R. at 654-57).  The situation here is the reverse of that in Quigley, however.  In Quigley, the claimants at issue settled their claims and received a 50% payment from Pfizer, the debtor's parent, with the remainder to be paid, again by Pfizer and not by the trust, following the effective date of the plan.  See Quigley, 346 B.R. at 650-51.  Pursuant to the settlements, the claimants would retain only 10% of their claims against the debtor, if the plan was confirmed.  See id.  As to the 90% payable by Pfizer, therefore, the court ruled that the claimants lacked an economic interest in the case and discounted their votes accordingly.  See id. at 658.

Here, the applicable talc claimants retain their full economic interest in their claims against the Debtor.  Upon confirmation, 100% of the affected claimants' Channeled Talc Personal Injury Claims will be channeled to the Talc Personal Injury Trust for resolution pursuant to the Trust Distribution Procedures, like every other talc claimant.  The private resolution process agreed to pursuant to the TCC MOU is a contingency that establishes an alternative path for resolving all current talc claims in the event the Plan is confirmed but ultimately not consummated pursuant to its terms.  Quigley is thus clearly distinguishable and provides no basis to disregard the claims of individuals whose attorneys entered into the TCC MOU.

### 4.   Resolicitation Is Unnecessary and the Voting Procedures Were Appropriate

Travelers argues that the Court should not resolve the pending disputes over Master Ballot voting and should instead order resolicitation of claimants via direct ballot only.  Travelers Obj. ¶¶ 78, 93-103.  Travelers challenges the authority of supporting law firms that submitted

Master Ballots pursuant to the "Option B Certification," arguing that the Court should refrain from making any determinations in that regard.  Id. ¶ 97.  The approach recommended by Travelers, if widely adopted, would make the use of master ballots in mass tort cases impracticable because any after-the-fact challenge to counsel's voting authority would invalidate the entire solicitation.  The use of master ballots and the solicitation of claimants through their counsel serves a valuable purpose and is typical in mass tort cases.[124]  Without them, the voices of literally thousands of claimants might not be heard—disenfranchising them from a process that requires supermajority consent.  No purpose other than delay would be served by declining to decide issues of master ballot voting authority.

The Debtor's and the AHC's expert, Mr. Edgar Gentle, a special master and court-appointed neutral, reviewed engagement letters of the AHC member firms and confirmed that they provided counsel with the authority and the duty to vote on behalf of their clients under Option B.  *Expert Report of Mr. Edgar Gentle for the Ad Hoc Committee of Supporting Counsel* (Jan. 7, 2025) (the "Gentle AHC Expert Report"), ¶¶ 9, 44-45.  Mr. Gentle determined that, while there were variations in the language among the various forms of engagement letters, each of them provided the applicable member firm with client authority and also imposed a corresponding ethical duty to maximize recoveries for their clients, including by voting on their clients' behalf in support of the Plan.  Id.; see also Nov. 12, 2024 Mikal Watts Dep. (the "Watts Dep."), 208:10-23.  That authority and duty derives from the firms' strong conviction that the

---

[124]    See, e.g., Imerys, Dkt. 6730 (approving use of master ballots and solicitation of claimants' votes through their counsel); HONX, Dkt. 890 (same); In re ASARCO LLC, No. 05-21207 (Bankr. S.D. Tex. July 2, 2009), Dkt. 11884 (same); In re Maremont Corp., 601 B.R. 1 (Bankr. D. Del. 2019) (same); PG&E Corp., Dkt. 6340 (permitting noticing to claimants through their counsel); Boy Scouts of Am., Dkt. 6438 (same); Imerys, Dkt. 2863 (same); In re Oakfabco, Inc., No. 15-27062 (JBS) (Bankr. N.D. Ill. Jan. 15, 2019), Dkt. 771 (same); In re Duro Dyne, 18-27963 (MBK) (Bankr. D.N.J. Nov. 20, 2018), Dkt. 287 (same); In re Yarway Corp., No. 13-11025 (BLS) (Bankr. D. Del. Jan. 27, 2015), Dkt. 756 (same); see also In re Lloyd E. Mitchell, Inc., 373 B.R. 416, 426 (Bankr. D. Md. 2007) ("The use of master ballots in mass tort cases is a long-standing procedural mechanism that has been employed almost as a matter of course.").

Plan "provided an opportunity for their clients to receive a fair and timely resolution of their ovarian cancer and gynecological cancer claims" in comparison to the claimants' alternatives in the tort system.  Gentle AHC Expert Report ¶¶ 9, 44-45.

Travelers argues that certain firms that voted pursuant to their powers of attorney under the "Option B Certification" did so improperly because they provided negative notice to their clients of their intent to do so.  Travelers Obj. ¶¶ 99, 103.  But supporting firms that properly voted under the Option B Certification already possessed not merely the authority, but the duty, to cast votes on behalf of their clients, irrespective of any negative notice provided to their clients.  Gentle AHC Expert Report ¶¶ 43-44 (opining that where AHC member firms received no response from clients, they had a duty to vote on their behalf to preserve the rights of such non-responding clients pursuant to the ethical rules guiding lawyers; citing ABA Model Rules 1.2, 1.3 and commentary thereto); see also Watts Dep. 208:17-23; 210:8-17; 212:22-213:8.

The arguments regarding negative notice betray Travelers' true agenda in demanding resolicitation—to disrupt and delay confirmation of this chapter 11 case.  Although Travelers attacks the votes submitted by the Plan's supporters who voted under the Option B Certification, it ignores that Beasley Allen's Master Ballot under the "Option A Certification" was patently invalid.  Discovery has confirmed that Beasley Allen relied on negative notice with respect to the vast majority of its clients notwithstanding that it had certified that it had received and recorded their affirmative responses.  See Birchfield Dep. 153:13-15 ("[I]t's my understanding that we had, you know, direct feedback, direct response from approximately 3,000 clients"); Dec. 17, 2024 Hr'g Tr. 67:16-68:10 (Ms. O'Dell confirming to the Court that Beasley Allen is in possession of only "a little less" than "approximately 3,000" responsive communications from clients); Smith Dep. 415:6-17.  Thus, although Beasley Allen apparently received affirmative

responses from only 3,000 clients, it falsely certified that it had collected and recorded the informed consent of all approximately 11,000 claimants listed in its Master Ballot.[125]  See Smith Dep. 455:5-11.  The Beasley Allen Master Ballot was invalid and would have been disregarded had it not been superseded by the Master Ballot of the Smith Firm, its co-counsel.  See Smith Dep. 121:15-122:12.

Travelers' arguments regarding the Debtor's treatment of the Beasley Allen and Smith Firm Master Ballots rely on a section of the Tabulation Procedures that applies in situations where inconsistent Master Ballots were received from two firms **separately** claiming to represent the same claimant.  In that situation, the Tabulation Procedures provide that the Master Ballots are conflicting, and both will be disregarded, if the inconsistency is not resolved.  See Master Ballot, Annex C (Tabulation Procedures) § 4(g).  In contrast, in a situation where clients are **jointly** represented by counsel, absent an agreement otherwise, both counsel are authorized to act on behalf of the client, just as if they were two different lawyers from the same firm.  Birchfield Dep. 87:11-13 ("[T]he joint venture agreement does not give Beasley Allen unilateral decision-making authority").  That is exactly what occurred with respect to the Smith Firm's Master Ballot.  The Smith Firm indicated to the Debtor that it wished to cast a ballot accepting the Plan, as amended, on behalf of its joint clients, and the Tabulation Procedures provided the Debtor with the authority to extend the voting deadline for the Smith Firm and accept the superseding ballot, which it did.  See Birchfield Dep. 140:12-14 ("[D]id you understand that J&J,

---

[125]     Travelers complains that OnderLaw voted on behalf of deceased claimants in a misguided effort to undermine one of the Debtor's objections to the Beasley Allen Master Ballot.  Travelers Obj. ¶ 103.  The Debtor's concern with Beasley Allen's Master Ballot was, among other things, that Mr. Birchfield certified he had collected and recorded the vote of deceased claimants who had no estate representative appointed; an impossibility.  Nothing in the record indicates that Mr. Onder did the same.  Similarly, the Smith Firm voted under Option B pursuant to its power of attorney, not Option A, so Travelers' argument that a dual standard applied to the Debtor's review of the Smith Firm Master Ballot is incorrect.

the Debtor, and LTL had the authority to extend the voting deadline at their discretion?  . . . I read that there may be – that they may – the Debtor may have the discretion to extend the voting deadline."); <u>see also</u> Smith Dep. 115:13-21; 443:25-444:16.

For all the foregoing reasons, these objections should be overruled and the Court should find the Plan complies with section 1129(a)(8) for all Classes established thereunder.

## I.     Section 1129(a)(9) — The Plan Provides for the Payment of Priority Claims

Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, unless otherwise agreed by the holder, holders of claims of a kind specified in section 507(a)(l) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive cash equal to the allowed amount of such claims on the effective date of the plan.  Section 1129(a)(9)(B) of the Bankruptcy Code allows deferred cash payments for certain kinds of employee claims.  In addition, section 1129(a)(9)(C) of the Bankruptcy Code provides for the payment of tax priority claims in cash in regular installments.

Section 2.1 of the Plan provides that, subject to a bar date and unless otherwise agreed by the holder of an Administrative Claim and the Debtor or Reorganized Debtor, each holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Allowed Administrative Claim, cash equal to the unpaid portion of such Allowed Administrative Claim as soon as reasonably practicable after either:  (a) the Effective Date; or (b) if the Administrative Claim is not Allowed as of the Effective Date, the date on which such Administrative Claim becomes Allowed.  In addition, Allowed Administrative Claims representing liabilities incurred on or after the Petition Date in the ordinary course of business by the Debtor shall be paid by the Debtor or

the Reorganized Debtor, as the case may be, in accordance with the terms and conditions of the particular transactions and agreements relating to such liabilities without any further action by the holders of such Administrative Claims or further approval of the Court.

Further, section 2.4 of the Plan provides that, unless otherwise agreed to by the holder of a Priority Tax Claim, as soon as reasonably practicable after the Effective Date or the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Allowed Priority Tax Claim will receive cash equal to the amount of such Allowed Priority Tax Claims, plus Postpetition Interest, if any.  Finally, section 3.2.l of the Plan provides that Priority Non-Tax Claims against the Debtor (which include Claims entitled to priority other than Administrative Claims and Priority Tax Claims) will receive, as soon as reasonably practicable after the Effective Date or the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, cash equal to the amount of such Allowed Priority Non-Tax Claims, plus Postpetition Interest thereon, unless the holder of such Allowed Priority Non-Tax Claim agrees to less favorable treatment.  Accordingly, the Plan satisfies the requirements set forth in section 1129(a)(9) of the Bankruptcy Code with respect to the payment of Priority Claims.

### J.     Section 1129(a)(10) — The Plan Has Been Accepted by at Least One Impaired, Non-Insider Class

Section 1129(a)(10) of the Bankruptcy Code provides that:

> If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

11 U.S.C. § 1129(a)(10); see also In re Martin, 66 B.R. 921, 924 (Bankr. D. Mont. 1986) (holding that acceptance by three classes of impaired creditors, exclusive of insiders, satisfied requirement of section 1129(a)(10)).  The Plan satisfies this requirement.  As indicated in the Voting Declarations and the Pretrial Brief, as well as herein, Class 4 has accepted the Plan, and

no "insider," as such term is defined in section 101(31) of the Bankruptcy Code, voted in Class 4.

### K.      Section 1129(a)(11) — The Plan Is Feasible

Pursuant to section 1129(a)(11) of the Bankruptcy Code, a plan of reorganization may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). One commentator has stated that this section "requires courts to scrutinize carefully the plan to determine whether it offers a reasonable prospect of success and is workable." 7 Collier on Bankruptcy ¶ 1129.02[11] (16th ed. rev. 2024); accord In re Cellular Info. Sys., Inc., 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994); Johns-Manville, 68 B.R. at 635.

Section 1129(a)(11), however, does not require a guarantee of the plan's success; rather, to satisfy this standard, the Fifth Circuit (and others) has held that a plan need only have a "reasonable probability of success." T-H New Orleans, 116 F.3d at 801; see also Prudential Ins. Co. of Am. v. Monnier (In re Monnier Bros.), 755 F.2d 1336, 1341 (8th Cir. 1985) ("Success need not be guaranteed."); In re Drexel Burnham Lambert Grp. Inc., 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed.") (citation omitted).

The Debtor's Plan is feasible. First, the Indemnity Funding Agreement is a fully enforceable contractual agreement, under which the Debtor will be entitled to collect as needed approximately $9 billion plus interest over twenty-five years from New Holdco to fund payments to the Talc Personal Injury Trust. See Indemnity Funding Agreement at 4 ("Permitted Funding Use means each of the following: (a) the funding of any amounts to satisfy the [Debtor] Talc Related Liabilities in connection with the funding of one or more trusts for the benefit of existing

and future claimants."); Plan § 4.9.1(a) ("The Reorganized Debtor shall deliver, or cause to be delivered, to the Talc Personal Injury Trust Cash Contributions in accordance with Exhibit C"). And, consistent with the terms of the Trust Distribution Procedures, claimants will be able to assert Channeled Talc Personal Injury Claims against the Talc Personal Injury Trust and collect payment in full on account of their Channeled Talc Personal Injury Claims.  See Trust Distribution Procedures § 1.1 ("These TDP have been adopted pursuant to the Plan and Trust Agreement and are intended to provide reasonable assurance that the Trust will evaluate, value, and pay similar Channeled Talc Personal Injury Claims in substantially the same manner, and otherwise comply with the requirements of a trust set forth in section 524(g) of the Bankruptcy Code.").

Moreover, the Plan establishes sufficient mechanisms to ensure that the Talc Personal Injury Trust will be entitled to receive the full value of these distributions.  This includes the Cash Contributions Guarantee, through which J&J and New Holdco have guaranteed "the full and timely delivery of each Cash Contribution to the Talc Personal Injury Trust . . . to the extent such Cash Contribution is required to be made . . ."  See Plan, Ex. D (Cash Contributions Guarantee).  Additionally, the Talc Personal Injury Trust also will be entitled to receive the Talc PI Note, which provides $388,000,000 to the Talc Personal Injury Trust on a nonrecourse basis, and which note is secured by the Talc PI Pledge Agreement.  See Plan, Ex. I (Talc PI Noted). Further, the Trust Distribution Procedures and Talc Personal Injury Trust Agreement also contain adequate safeguards to ensure that sufficient funds are available to pay future claimants as well. See, e.g., Trust Distribution Procedures § 7.1.2; Plan, Ex. H (Talc Personal Injury Trust Agreement) § 2.2(f) (authorizing the Trustee, with the consent of the Trust Advisory Committee and FCR, to revise the terms of the Trust Distribution Procedures as necessary).  The Talc

Personal Injury Trust, therefore, will have access to sufficient funding to pay all of its obligations.

Finally, because the Channeling Injunction, pursuant to section 524(g), will channel all Channeled Talc Personal Injury Claims to the Talc Personal Injury Trust, it is unlikely that the Reorganized Debtor will be forced to liquidate or undergo further reorganization. As the evidence will establish, through the Expense Funding Agreement and the Debtor's subsidiary, Royalty A&M, the Debtor will have sufficient resources to satisfy, as applicable, any Non-Talc Claims.

Notwithstanding all of the above, the Coalition asserts that that Plan is not feasible because of the "extensive walk-away rights for the Debtor—and its primary funder, J&J," which provide no assurance that funding will be available for the Plan and the establishment of the Talc Personal Injury Trust. See Coalition Plan Obj. at 75-76. But the Coalition's objections to the walkaway rights, which are addressed in Part VIII.A.3 below, do not go to whether the Plan is feasible—it clearly is.[126] The walkaway rights have nothing to do with a determination that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . ." See 11 U.S.C. § 1129(a)(11). Further, contractually enforceable agreements, including the 2024 Funding Agreements, are far different from a pledge from a potential donor cited by the Coalition. See Coalition Plan Obj. at 75 (citing In re Save Our Springs (S.O.S.) Alliance, Inc., 632 F.3d 168, 171-74 (5th Cir. 2011)).

At bottom, the evidence will show that: (a) the Plan provides a feasible means of completing the Debtor's reorganization; and (b) the Reorganized Debtor will have more than

---

[126]    In fact, the Debtor's exercise of the walkaway rights prior to the Plan's Effective Date would result in the Plan being "null and void," similar to the Debtor's withdrawal of the Plan for nonoccurrence of a condition precedent. See Plan § 9.12. This possibility of a contingent hypothetical, prior to the Effective Date, cannot be used, ex ante, to find that the Plan, once effective, is not feasible.

sufficient funds to satisfy its obligations under the Plan.  Accordingly, the Plan satisfies the feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

**L.       Section 1129(a)(12) — The Plan Provides for the Payment of Fees**

Section 1129(a)(12) of the Bankruptcy Code requires that "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan." 11 U.S.C. § 1129(a)(12).  The Plan complies with section 1129(a)(12) by providing that all fees payable pursuant to 28 U.S.C. § 1930 will be paid on or before the Effective Date.  See Plan § 2.3.

**M.       Sections 1129(a)(13) to 1129(a)(16) — Inapplicable to the Plan**

A number of the Bankruptcy Code's confirmation requirements are inapplicable to the Plan.  Section 1129(a)(13) of the Bankruptcy Code is not applicable because the Debtor does not maintain any retiree benefits, as defined in section 1114 of the Bankruptcy Code. Section 1129(a)(14) of the Bankruptcy Code does not apply because the Debtor is not subject to any domestic support obligations.  Section 1129(a)(15) of the Bankruptcy Code is inapplicable because the Debtor is not an "individual" as defined in the Bankruptcy Code.  Finally, section 1129(a)(16) of the Bankruptcy Code is inapplicable because the Plan does not provide for any property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

**N.       Section 1129(d) — The Plan's Purpose Is Consistent with the Bankruptcy Code**

Section 1129(d) of the Bankruptcy Code provides that a court may not confirm a plan if the principal purpose of the plan is to avoid taxes or the application of section 5 of the Securities Act of 1933.  The Plan meets these requirements because the principal purpose of the Plan is not

avoidance of taxes or avoidance of the requirements of section 5 of the Securities Act of 1933, but instead is to fairly and equitably resolve current and future talc claims.  No governmental agency or other entity has lodged an objection based on section 1129(d).

## V.    THE ASSUMPTION, ASSUMPTION AND ASSIGNMENT OR REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER THE PLAN SHOULD BE APPROVED

Section 1123(b)(2) permits a plan to provide for the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases, subject to section 365. Section 5.1 of the Plan provides that, except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the Debtor or the Reorganized Debtor shall assume the Executory Contracts and Unexpired Leases other than those listed on Exhibit L to the Plan.  The Debtor reserves the right, however, at any time prior to the Effective Date, to amend Exhibit L to delete or add any Executory Contract or Unexpired Lease to Exhibit L thus providing for its assumption or rejection under the Plan.

Section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease."  11 U.S.C. § 365(a).  Courts routinely approve motions to assume, assume and assign or reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment.  See, e.g., NLRB v. Bildisco & Bildisco, 465 U.S. 513, 525-27 (1984); Grp. of Institutional Inv'rs v. Chi., M., St. P., & P.R. Co., 318 U.S. 523, 550 (1943); In re Mkt. Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (the "resolution of th[e] issue of assumption or rejection will be a matter of business judgment by the bankruptcy court").

The "business judgment" test is not a strict standard; it merely requires a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the

debtor's estate.  See In re Pisces Energy LLC, 2009 WL 7227880, at *6 (Bankr. S.D. Tex.

Dec. 21, 2009) ("Courts apply the 'business judgment test,' which requires a showing that the

proposed course of action will be advantageous to the estate and the decision be based on sound

business judgment."); see also Allied Tech., Inc. v. R.B. Brunemann & Sons, Inc., 25 B.R. 484,

495 (Bankr. S.D. Ohio 1982) ("As long as assumption of a lease appears to enhance a debtor's

estate, Court approval of a debtor in possession's decision to assume the lease should only be

withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the

provisions of the Bankruptcy Code…."); Borman's, Inc. v. Allied Supermarkets, Inc., 706 F.2d

187, 189 (6th Cir. 1983); NLRB v. Bildisco & Bildisco (In re Bildisco), 682 F.2d 72, 79 (3d Cir.

1982), aff'd, 465 U.S. 513 (1984).  Because the Debtor has reviewed its Executory Contracts and

Unexpired Leases and made the determination, in its sound business judgment, to assume the

contracts and leases, except as may otherwise be listed on Exhibit L to the Plan, the assumption,

assumption and assignment and rejection of executory contracts proposed by the Plan should be

approved.

## VI.   THE PLAN'S DEBTOR RELEASE, EXCULPATION AND INJUNCTION PROVISIONS ARE APPROPRIATE AND COMPLY WITH THE BANKRUPTCY CODE

As noted above, the Bankruptcy Code identifies various additional provisions that may be

incorporated into a chapter 11 plan, including "any other appropriate provision not inconsistent

with the applicable provisions of this title."  11 U.S.C. § 1123(b)(1)-(6).  Among other

discretionary provisions, the Plan contains releases by the Debtor, an exculpation provision and

injunction provisions (including a discharge injunction and injunctions related to releases and

exculpation), certain of which provisions also include a "gatekeeping" clause.  See Plan Art. XI.[127]

These provisions of the Plan are necessary and integral components of the Debtor's formulation and implementation of the Plan and comply with the Bankruptcy Code and Fifth Circuit law.  The releases by the Debtor are in exchange for, and are supported by, fair and sufficient consideration provided by the parties receiving such releases, are a good faith settlement and compromise of the claims released and are in the best interests of the Debtor, its creditors and the Estate.  Importantly, the releases by the Debtor, as well as the exculpation and injunction provisions, were all disclosed and explained in the Disclosure Statement and the Plan, and the Plan has been negotiated extensively and at arm's-length with the Committee, the AHC, the Smith Firm and the FCR.  Thereafter, the exculpation provisions were modified in response to objections received from U.S. Trustee, among others, as described above.  Accordingly, for these reasons and for the reasons set forth below, the releases by the Debtor, the exculpation provision and the injunction provisions in the Plan should be approved.

### A.    The Debtor Release is Appropriate and Complies with the Bankruptcy Code

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, a plan may "provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate." 11 U.S.C.§ 1123(b)(3)(A).  Section 11.2.1 of the Plan sets forth the releases by the Debtor and its Estate (the "Debtor Release").  The Debtor Release releases the Reorganized Debtor, the Debtor Corporate Parties (including J&J) and the respective Representatives of the Debtor, the Reorganized Debtor and the Debtor Corporate Parties, from any and all claims and actions

---

[127]    The Third Party Release (defined herein) and the Channeling Injunction (see Plan §§ 11.2.2, 11.3.1) are addressed in Parts VII.D-VII.G.  The Insurance Entity Injunction (see Plan § 11.3.2) is addressed in Part VIII.C.

regarding, among other things, the 2021 Corporate Restructuring, the 2021 Chapter 11 Case, the 2023 Chapter 11 Case, the 2023 Funding Agreement Modifications, the Prepetition Corporate Restructuring, the separation of the Consumer Business to Kenvue, the Love Proceeding, the Bynum Proceeding and the negotiation, formulation, preparation, or implementation of, or the solicitation of votes with respect to the Plan or any other act or omission related to the Disclosure Statement, the Plan or any related agreement or document.  See Plan §§ 1.1.126, 11.2.1.  The Debtor Release does not include any claim or action determined by a Final Order of the Court or any other court of competent jurisdiction to have constituted a criminal act, actual fraud, gross negligence or willful misconduct.  See Plan § 11.2.1.[128]

Claims belonging to a debtor are property of the debtor's estate and may properly be released as part of a settlement, including pursuant to a plan of reorganization, as an exercise of a debtor's sound business judgment.  See In re Gen. Homes Corp., 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991) ("The court concludes that such a release is within the discretion of the Debtor."); see also In re CiCi's Holdings, Inc., 2021 WL 819330, at *8 (Bankr. N.D. Tex. Mar. 3, 2021) ("In accordance with section 1123(b)(3)(A) of the Bankruptcy Code, the releases of claims and Causes of Action by the Debtors described in [the Plan] represent a valid exercise of the Debtors' business judgment under Bankruptcy Rule 9019.").  The legal test is the same one used to consider settlements under Bankruptcy Rule 9019.  See Robertshaw, 662 B.R. at 314.  "That is whether the settlement is fair, equitable, and in the best interest of the estate."  Id. (citing Official Comm. of Unsecured Creditors v. Moeller (In re Age Ref., Inc.), 801 F.3d 530, 540 (5th Cir. 2015)).

---

[128]    The foregoing descriptions are meant as a summary of the operative Plan provision only.  To the extent there is any conflict between the foregoing summary and the Debtor Release contained in section 11.2.1 of the Plan, the Plan shall control.

In determining whether a settlement is fair and equitable, the Fifth Circuit applies a three-part test: (a) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (b) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (c) all other factors bearing on the wisdom of the compromise, including (i) the best interests of creditors, with proper deference to their reasonable views and (ii) the extent to which the settlement is truly the product of arm's-length bargaining, and not of fraud or collusion. Id. "Great judicial deference is given to the [debtor's] exercise of business judgement." Id. (citing to GBL Holding Co. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.), 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005)). As a result, "approval of a settlement agreement is a matter within the sound discretion of the bankruptcy court." Id. (citation omitted).

The Debtor Release easily meets the applicable standard because it is fair, reasonable and in the best interest of the Debtor's Estate. The parties being released have been vital to the Debtor's reorganization, the formulation of the Plan and the prosecution of this chapter 11 case, including confirmation of the Plan. The Debtor Release is (a) fair and reasonable to parties in interest, given the approximately $9 billion in funding proposed in the Plan to pay holders of Channeled Talc Personal Injury Claims in full; (b) an essential means of implementing the Plan; (c) an integral element of the settlements embodied in the Plan; (d) beneficial to, and in the best interests of, the Debtor, the Estate and the Debtor' creditors; and (e) critical to the overall objectives of the Plan to finally resolve all claims among or against the parties in interest in the chapter 11 case with respect to the Channeled Talc Personal Injury Claims. Notably, the Committee, the AHC, the Smith Firm and the FCR have agreed to support the Plan, which provides for the Debtor Release, and the holders of Channeled Talc Personal Injury Claims have

voted in favor of the Plan.  Of the Objectors, only the Coalition objects to the Debtor Release.
See Coalition DS Obj. ¶¶ 471-77.

Contrary to the Coalition's unsupported argument that the "transaction that led to the creation of Red River was a blatant and obvious fraudulent transfer," Coalition DS Obj. ¶ 471, the probability of success in litigation with respect to claims the Debtor may have against the parties being released is non-existent.  So too are the benefits of pursuing litigation in light of the agreement embodied in the Plan, where talc claimants will be paid in full and other creditors are otherwise Unimpaired under the Plan.  This is especially so because the Debtor would be unable to plead that any of the alleged transactions at issue rendered the Debtor or its predecessors unable to pay the talc claims allocated to them, leaving the Debtor without standing to assert claims that would be meritless in any event.  See, e.g., Adelphia Recovery Tr. v. Bank of Am., N.A., 390 B.R. 80, 96-97 (S.D.N.Y. 2008) (finding no standing on a fraudulent-transfer claim where creditors would not benefit from any recovery); In re New Life Adult Med. Day Care Ctr., Inc., 2014 WL 6851258, at *6 (Bankr. D.N.J. Dec. 3, 2014) (granting summary judgment on fraudulent-transfer action under Bankruptcy Code because creditors would be paid in full).  The Coalition's focus on alleged fraudulent transfers arising from prior funding agreements and the 2021 Corporate Restructuring is baseless given findings by the Third Circuit and later the New Jersey bankruptcy judge in the LTL Chapter 11 Cases that LTL was not in financial distress.  Those claims, therefore, would be similarly meritless.  See Coalition DS Obj. ¶ 472.

The Coalition asserts that the Court should also consider "the paramount interest of creditors with proper deference to their reasonable views," Coalition DS Obj. ¶ 473, and deny the settlement because of the Coalition's views on this chapter 11 case, the Debtor and J&J.  But the vast majority of the claimants and their representatives in fact support the Debtor Release,

including the Committee, the AHC, the Smith Firm and the FCR.  They and other key parties were involved in the negotiation process that led to the broad support for the Plan.  In particular, the agreement embodied in the Plan was negotiated by sophisticated parties and counsel, including months of negotiations among the Debtor and the various parties involved in the Plan.  Moreover, the Coalition's allegation that the Debtor and J&J have "cut[] a deal with law firms that represent holders of Gynecological Claims hoping to enrich themselves at the expense of women who have Ovarian Cancer," Coalition DS Obj. ¶ 476, ignores the widespread support for the Plan from claimants with ovarian cancer.  See Evans Report ¶¶ 41-42 ██████████████

███████████████████████████████████████████; id. ¶¶ 71-78 ██████████████████████████████████████

████████████████████████████████████████. The Coalition's minority views, which are clouded by its members' financial conflicts and disregard the interests of Gynecological Cancer claimants these firms represent, should be given no deference.

Finally, the Debtor Release is an essential quid pro quo for the Released Parties' contributions to, and support of, the Debtor's Plan.  The Coalition's objections to the Debtor Release repeat the allegations in its motion to dismiss this case and other pleadings, see Coalition DS Obj. ¶¶ 474-77, but ignore the approximately $9 billion in funding for the Talc Personal Injury Trust to pay in full the Channeled Talc Personal Injury Claims.

In sum, the Debtor Release is fair, equitable and in the best interest of the Estates, is justified under the controlling Fifth Circuit standard and should be approved.

## B.     The Exculpation Provision Is Appropriate and Complies with the Bankruptcy Code and Fifth Circuit Law

Section 11.4.1 of the Plan provides that the Exculpated Parties[129] shall have no liability to any Person for any act or omission taken or to be taken before, on, or after the Petition Date through and including the Effective Date in connection with (a) the Prepetition Corporate Restructuring or the chapter 11 case, (b) the negotiation, formulation and preparation of the Plan and the other Plan Documents (including the Disclosure Statement), (c) the pursuit of confirmation of the Plan (including the solicitation of votes with respect to the Plan), (d) the administration, consummation and implementation of the Plan or the property to be distributed under the Plan or the Trust Distribution Procedures or (e) the management or operation of the Debtor (the "Exculpation Provision").  See Plan § 11.4.1.  The Exculpation Provision expressly does not exculpate the Exculpated Parties for acts or omissions that are determined in a Final Order to have constituted criminal acts, actual fraud, willful misconduct or gross negligence.[130] Finally, the Exculpation Provision provides that the Exculpated Parties shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.[131]

The inclusion of plan exculpation provisions is essential to ensure that capable individuals are willing to manage and assist a debtor in the chapter 11 context.  See In re Chemtura Corp., 439 B.R. 561, 610 (Bankr. S.D.N.Y. 2010) (recognizing that "exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often

---

[129]    As stated above, in response to the UST Objection, the Exculpated Parties under the Plan will be modified to include only (a) the Debtor, (b) the Committee and each of the members thereof, solely in his or her capacity as such and (c) the FCR, solely in her capacity as such.  In addition, the Debtor will also remove the exculpation provision that was in section 4.17 from the Plan.  The Debtor believes these modifications resolve the UST Objection on these points.  See UST Obj. ¶¶ 44, 46.

[130]    The foregoing description is a summary of the operative Plan provisions only.  To the extent there is any conflict between the foregoing summary and the provisions of the Plan, the Plan shall control.

[131]    Section 1125(e) provides a limitation of liability for all plan process participants, not just estate fiduciaries, who act in good faith in connection with the plan process.  See 11 U.S.C. § 1125(e).

-144-

blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decisionmakers in the chapter 11 case").  And the Exculpation Provision and Exculpated Parties definition, as modified, are consistent with the Bankruptcy Code, the Fifth Circuit's Highland Capital and Pacific Lumber decisions and other recent plans confirmed in this Circuit.

In Highland Capital and Pacific Lumber, the Fifth Circuit made clear that the bankruptcy court has the power to exculpate the debtor, as well as official committees and their members for conduct within the scope of their duties (i.e., excluding acts of willfulness and gross negligence). See Matter of Highland Capital Mgmt., 48 F.4th 419, 437-38 (5th Cir. 2022) (holding exculpation limited to "the debtor, the creditors' committee and its members for conduct within the scope of their duties . . . and the trustees within the scope of their duties); In re Pac. Lumber Co., 584 F.3d 229, 253 (5th Cir. 2009) ("We agree, however, with courts that have held that 11 U.S.C. § 1103(c), which lists the creditors' committee's powers, implies committee members have qualified immunity for actions within the scope of their duties.").  As fiduciaries, the Debtor and the Committee have played significant roles in the chapter 11 case and in connection with the preparation of the Plan and the pursuit of confirmation of the Plan.[132]  In section 524(g) cases, similar justification exists for extending exculpation to the court-appointed legal representative for future claimants.  Like the Debtor and the Committee, the FCR also has played a significant role in the chapter 11 case as representative of the interests of future claimants. Accordingly, courts in this jurisdiction have confirmed plans that include future claimants'

---

[132]    The United States' objection to the inclusion of the Debtor as an Exculpated Party, US Obj. ¶ 33, disregards the Debtor is a fiduciary to the Estate and is appropriately included in accordance with Fifth Circuit law.

representatives as exculpated parties.  See, e.g., HONX, Dkt. 1332 ¶ 139 (confirming plan with future claimants' representative in that case as an exculpated party).

The U.S. Trustee objects to the Exculpation Provision because it is "not appropriately limited by time" and it "purports to limit the liability of numerous parties for their alleged wrongdoing before and during the two prior LTL cases."  See UST Obj. ¶ 45.  Because this is a prepackaged chapter 11 case, the Exculpation Provision is appropriately tailored to reflect the prepetition negotiation and solicitation of the Plan.  Part of those prepetition negotiations concerned the Prepetition Corporate Restructuring.  Indeed, the Disclosure Statement disclosed (a) that the Prepetition Corporate Restructuring would take place upon a successful vote on the Initial Plan and (b) the process for the Prepetition Corporate Restructuring itself and the Initial Plan expressly contemplated the occurrence of the Prepetition Corporate Restructuring.  See Disclosure Statement at iii-iv, § 4.2.  The U.S. Trustee's incorrect assertion that the Exculpation Provision extends to the LTL Chapter 11 Cases and related conduct disregards that the terms of the Initial Plan were negotiated after dismissal of the LTL Chapter 11 Cases.  See supra Part II.N.  By its own terms, therefore, the Exculpation Provision does not extend to actions in connection with the LTL Chapter 11 Cases.

In addition, none of the cases cited by the U.S. Trustee involved a prepackaged chapter 11 case.  See In re Mallinckrodt PLC, 639 B.R. 837 (Bank. D. Del. 2022) (chapter 11 case involving certain prepetition negotiations with substantial postpetition negotiations prior to filing and solicitation of plan); In re Fraser's Boiler Serv., Inc., 2019 WL 1099713, at *1 (W.D. Wash. Mar. 8, 2019) (filing by defunct company to effectuate a sale free and clear of claims related to certain insurance policies, as well as to enjoin such claims); In re Washington Mut.,

Inc., 442 B.R. 314 (Bankr. D. Del. 2011) (denying confirmation of plan in chapter 11 case filed after bank failure in 2008).

Rather, the U.S. Trustee disregards the ample prepackaged case precedent in this District and the Northern District providing exculpation for prepetition matters similar to the Exculpation Provision.  See, e.g., In re Belk, Inc., No. 21-30630 (MI) (Bankr. S.D. Tex.), Dkt. 60, Ex. A, Art. VIII § E (prepackaged case where exculpation provision extended to, among other things, "the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the Disclosure Statement, the New Credit Facilities, the New ABL Facility, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document . . . relating to any of the foregoing, created or entered into in connection with the RSA, the Disclosure Statement, the New Credit Facilities, the New ABL Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases"); In re Sheridan Holding Co. II, LLC, No. 19-35198 (MI) (Bankr. S.D. Tex. Nov. 10, 2019), Dkt. 228, Ex. A, Art IX § E (prepackaged case where exculpation provision extended to, among other things, "the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document . . . created or entered into before or during the Chapter 11 Cases"); Cici's Holdings, 2021 WL 819330, at *10 (prepackaged case where exculpation provision extended to, among other things, "the Debtors' in- or out-of-court restructuring efforts, . . . the Prepetition Credit Agreement, . . . the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the RSA and related prepetition transactions"); In re Taco Bueno Rests., Inc., 2018 WL 6720774, at *67 (Bankr. N.D. Tex. Dec. 20, 2018) (prepackaged case where exculpation

-147-

provision extended to, among other things, "the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, . . . the solicitation of votes with respect to this Plan, or any Restructuring Transaction").

Similarly, the United States' attempt to create an issue out of the fact that the Exculpation Provision applies to make the Exculpated Parties immune from "any person," US Obj. ¶¶ 54, 57, disregards that such provisions must apply broadly in order to achieve the intended effect. Precedent in this District supports such a broad application.  See In re VROOM, Inc., No. 24-90571 (CML) (Bankr. S.D. Tex. Jan. 8, 2025), Dkt. 122, Ex. A, Art. X § E ("[T]he Exculpated Party shall neither have nor incur any liability to any Person or Entity for any claims"); In re Wesco Aircraft Holdings, Inc., No. 23-90611 (MI) (Bankr. S.D. Tex. Dec. 27, 2024), Dkt. 2528, Ex. A, Art. VIII § F ("The exculpation provisions set forth in this Article VIII.F are binding on all Persons and Entities, and are enforceable through the injunction provisions set forth below at Article VIII.G."); In re Robertshaw US Holding Corp., No. 24-90052 (CML) (Bankr. S.D. Tex. Aug. 16, 2024), Dkt. 960, Ex. A, Art. X § D ("[T]he Exculpated Parties shall neither have nor incur any liability to any Person or entity for any claims . . .").

Contrary to the United States' objection, US Obj. ¶¶ 55-57, nothing in the Bankruptcy Code requires an exculpation provision to be tied to claims that are channeled pursuant to a section 524(g) channeling injunction.  If the United States were correct, exculpation provisions would not be allowed in non-section 524(g) cases—this is clearly not the case.  The United States points to no statute or precedent to support its position.  Indeed, in a section 524(g) case in this District, the court approved an exculpation provision that extended to claims beyond those

that were channeled pursuant to section 524(g).  See <u>HONX</u>, Dkt. 1332, Ex. A, Art. VIII § F (section 524(g) case where exculpation provision extended to, among other things, "the Chapter 11 Case, the Debtor, the formulation, preparation, dissemination, or negotiation of the Asbestos Trust Documents, the Plan, the Disclosure Statement, Filing of the Chapter 11 Case, pursuit of Confirmation, Consummation, or administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement").

The Exculpation Provision, including the protections under section 1125(e) of the Bankruptcy Code, are the product of arm's-length negotiations and are critical components of the Plan.  The Exculpated Parties have preserved value for the benefit of all parties in interest and were integral to the negotiation of and pursuit of confirmation of the Plan.  Therefore, the Exculpation Provision complies with the Bankruptcy Code and Fifth Circuit precedent and should be approved.

### C.    The "Gatekeeping" Clauses Are Appropriate and Comply with Fifth Circuit Law

The Debtor Release, the Exculpation Provision and Third-Party Release in the Plan all include gatekeeping clauses that provide that no Person may commence or pursue any claim or cause of action seeking to impose on any Released Party or Exculpated Party liability for any act or omission that results primarily from such Released Party's or Exculpated Party's criminal acts, actual fraud, willful misconduct, or gross negligence without the Court (i) first determining, after notice and hearing, that such claim or cause of action represents a colorable claim and (ii) specifically authorizing such Person to bring such claim or cause of action, and to the fullest extent permitted by law, the Bankruptcy Court shall have sole and exclusive jurisdiction to

adjudicate the underlying colorable claim or cause of action.  See, e.g., Plan §§ 11.2.1, 11.2.2, 11.4.1.

Both the U.S. Trustee and the United States question the need for gatekeeping clauses in this case, with the U.S. Trustee in particular attempting to cabin the Fifth Circuit's direction in Highland to only cases involving "dispute[s] between current and former management" or "vexatious litigants."  See UST Obj. ¶¶ 47-48; US Obj. ¶¶ 67-68.[133]  This chapter 11 case, however, is as, if not more, litigious than Highland.  The day this case was filed, the U.S. Trustee moved to transfer the case, see Dkt. 35, and the next day, the Coalition moved to transfer and to dismiss the case, see Dkts. 43, 44.  That same day, the Coalition also sought to establish a process to appoint a future claimants' representative, see Dkts. 45, 51, notwithstanding that the role of the Prepetition FCR and the Debtor's intent to move to appoint her in the chapter 11 case had been previously disclosed in the Disclosure Statement and Initial Plan.  Less than a month after the filing of this **prepackaged** chapter 11 case, the Coalition filed a motion to vacate Epiq's retention, an objection to the Disclosure Statement and the solicitation procedures, a motion to designate all the votes on the Initial Plan, a motion to reinstate the Beasley Allen Master Ballot, a motion to authorize an estimation of claims and a motion to establish a bar date.  See Dkts. 257, 264-268.  And throughout, the rhetoric from minority opposing parties in this case has been heavily charged, with the Coalition, in particular, attempting to discredit every good faith effort of the Debtor.  For certain opposing parties, their dispute is not with discrete Plan provisions.  Rather, they harbor a fundamental disdain for this chapter 11 case and want the Plan to fail.  Certain opposing parties likewise have a financial incentive to see the Plan fail.  These

---

[133]    Both the U.S. Trustee and the United States point to the decision in Gulf Coast as an example of a court rejecting a gatekeeping provision.  See UST Obj. ¶ 48; US Obj. ¶ 68.  Gulf Coast, however, predated Highland, is not controlling in this Circuit and did not involve a prepackaged chapter 11 case that has been heavily litigated.

sentiments and the strategies they inspire pose a real threat to the Debtor's successful reorganization and implementation of the Plan.  Under these circumstances, a limited added layer of protection against unnecessary litigation is appropriate.  With the Debtor's modifications to the Plan to resolve objections to the definition of Exculpated Parties, see supra Part III.A, the Debtor believes the gatekeeping clauses are narrowly and appropriately tailored to permit the Court to "screen and prevent bad-faith litigation," Highland, 48 F.4th at 435, in this case.

This is especially so because the gatekeeping clauses in these provisions are consistent with Fifth Circuit law.  In Highland, the Fifth Circuit stated that "[c]ourts have long recognized bankruptcy courts can perform a gatekeeping function."  48 F.4th at 439.  Based on this precedent, the Fifth Circuit found that it "need not evaluate whether the bankruptcy court would have jurisdiction under every conceivable claim falling under the widest interpretation of the gatekeeper provision" and left that determination to "the bankruptcy court in the first instance." Id.  Accordingly, the gatekeeping clauses in the Plan are styled after those in Highland and provide that the Court, if presented with a colorable claim, will, in the first instance, have the ability to determine its jurisdiction and to exercise that jurisdiction only "to the fullest extent permitted by law."  See, e.g., Plan §§ 11.2.1, 11.2.2, 11.4.1.[134]

---

[134]   See, e.g., In re Highland Cap. Mgmt., L.P., No. 19-34054 (SGJ) (Bankr. N.D. Tex. Feb. 22, 2021), Dkt. 1943, Ex. A, Art. IX § F ("Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim . . . .  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action."); id., Dkt. 3672 at 19 (memorandum opinion and order providing "that one change be made to the Plan to conform it to the mandate of the Fifth Circuit:  revise the definition of 'Exculpated Parties' as proposed in the Motion and no more").

The U.S. Trustee's and United States' objection to the jurisdictional language of the clauses disregard that the gatekeeping clause does not confer jurisdiction on the Court—it only permits the Court to exercise jurisdiction to the extent it is authorized by law.  See UST. Obj ¶ 47; US Obj. ¶¶ 66, 70.  For this reason, the United States' argument that the gatekeeping clauses are unlawful because bankruptcy courts do not have jurisdiction over criminal acts, US Obj. ¶ 66, puts the cart before the horse—the Court has not asserted jurisdiction to adjudicate matters regarding any criminal acts.  Nor is the Court addressing the merits of any underlying claims, US Obj ¶ 69, in the first instance—merely whether such claim is colorable.  See, e.g., Plan § 11.4.1 ("determining, after notice and hearing, that such claim or cause of action represents a colorable claim").

Further, the gatekeeping clauses in the Plan mirror provisions in prior chapter 11 plans that have been confirmed in this District.  See, e.g., In re Diamond Sports Grp., LLC, No. 23-90116 (CML) (Bankr. S.D. Tex. Nov. 14, 2024), Dkt. 2671, Ex. 1, Art. VIII § F (in gatekeeping provision that applied to debtor releases and releases, providing that bankruptcy court will "have sole and exclusive jurisdiction to determine whether a claim or Cause of Action is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable claim or Cause of Action."); In re Strategic Materials, Inc., No. 23-90907 (CML) (Bankr. S.D. Tex. Jan. 10, 2024), Dkt. 187, Ex. A, Art. VIII § H (in gatekeeping provision that applied to debtor releases, releases and exculpation, providing bankruptcy court "shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and, only to the extent legally permissible and as provided for in Article XI, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action."); Wesco Aircraft, Dkt. 2528, Ex. A, Art. VIII § G (in gatekeeping provision that applied to debtor releases, releases and

exculpation, providing bankruptcy court "shall have sole and exclusive jurisdiction to determine whether any such Claim, Interest, debt, obligation, or Cause of Action is colorable and, only to the extent legally permissible and as provided for in Article XI, shall have jurisdiction to adjudicate such underlying colorable Claim, Interest, debt, obligation, or Cause of Action").

And the United States' and the U.S. Trustee's objections that, the gatekeeping clauses are inappropriate because they apply to any "Person," UST Obj. ¶ 18; US Obj. ¶¶ 20, 25, 64, again disregard that such provisions are commonly drafted broadly in order to ensure that the debtor, other estate fiduciaries and released parties are not targeted with unnecessary litigation.  See, e.g., Wesco Aircraft, Dkt. 2528, Ex. A, Art. VIII § G ("[N]o Entity or Person may commence . . ."); Strategic Materials, Dkt. 187, Ex. A, Art. VIII § H ("[N]o Entity or person may commence . . .").

Accordingly, the gatekeeping clauses in the Plan comply with Fifth Circuit law and are necessary and appropriate under the circumstances of this chapter 11 case.

### D.     The Injunction Provisions Are Appropriate and Comply with the Bankruptcy Code

The injunction provisions set forth in sections 11.1.2, 11.2.3 and 11.4.2 of the Plan (collectively, the "Injunction Provisions") implement the Plan's discharge, release and exculpation provisions by permanently enjoining all Persons from commencing or prosecuting any claim or action against the Released Parties or the Exculpated Parties discharged, released, exculpated or settled under the Plan.  See Plan §§ 11.1.2, 11.2.3, 11.4.2.  The Injunction Provisions enforce the discharge, release and exculpation provisions that are critical to the Plan. In addition, the Plan includes the Channeling Injunction for Channeled Talc Personal Injury Claims and the related Insurance Entity Injunction, as further described in Parts VII.D-G and VIII.C.  Accordingly, to the extent the Bankruptcy Court finds that the Plan's exculpation and

release provisions are appropriate, the Debtor respectfully requests that the Bankruptcy Court

approve the Injunction Provisions.

## VII.    THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 524(G) OF THE BANKRUPTCY CODE, AND THE OBJECTIONS ASSERTED WITH RESPECT TO SECTION 524(G) SHOULD BE OVERRULED

Section 524(g)(l)(A) of the Bankruptcy Code provides that

> [a]fter notice and hearing, a court that enters an order confirming a plan of reorganization under chapter 11 may issue, in connection with such order, an injunction in accordance with this subsection to supplement the injunctive effect of a discharge under this section.

11 U.S.C. § 524(g)(l)(A).  For the reasons set forth herein, the Plan and the Talc Personal Injury

Trust established thereunder satisfy all the requirements of section 524(g), and the Court should

enter an order confirming the Plan and issuing the requested Channeling Injunction.[135]

### A.    The Debtor is Entitled to a Discharge and Supplemental Discharge

Section 524(g)(l)(A) authorizes an injunction to supplement the discharge provided by

that section.  Pursuant to section 1141(d)(3) of the Bankruptcy Code,

> [t]he confirmation of a plan does not discharge a debtor if – (A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan; and (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

11 U.S.C. § 1141(d)(3).  Here, the Debtor is entitled to a discharge under section 1141 of the

Bankruptcy Code and to supplement that discharge in accordance with section 524(g).  The

Coalition and certain of the Insurers, however, argue that the Debtor is a corporate shell that is

---

[135]    The U.S. Trustee did not address any of the section 524(g) related requirements, apart from the release of third-parties, in its objection.  See UST Obj. ¶ 21 n.4 ("Each of these [section 524(g)] factors is subject to ongoing discovery, and the U.S. Trustee reserves his right to amend his objection regarding the availability of relief under section 524(g) based on the evidence presented at the confirmation hearing.").  Although the Debtor believes the U.S. Trustee's reservation is improper, for the reasons set forth herein, any objections the U.S. Trustee may belatedly raise regarding the satisfaction of section 524(g) should be overruled.

liquidating and has no business to reorganize.  See, e.g., Coalition DS Obj. ¶¶ 348-350; Coalition

Plan Obj. at 30-32, 34-38; Insurers DS Obj. ¶¶ 61-66; Travelers Obj. ¶¶ 67-77; Everest Obj. at 1.

Nothing in the Bankruptcy Code precludes a debtor whose business is to manage mass-

tort liabilities and which has an operating subsidiary from accessing relief thereunder.  Courts

have confirmed section 524(g) plans in chapter 11 cases where the debtor had minimal business

activity post-reorganization or where the debtor was a holding company with a non-debtor

operating subsidiary.  See, e.g., HONX, Dkt. 1332 at 9, 62 (confirming section 524(g) plan

where the debtor ceased operations in 1998 and was "a non-operating entity without any

employees, whose primary activity is defending against asbestos and other litigation related to its

prior ownership and operation(s)"); Paddock, 2022 WL 1746652, at *25-26 (confirming

section 524(g) plan where the debtor's operations consisted of (a) managing legacy

environmental and asbestos liabilities, (b) owning and managing real property and collecting

rents on a 15-year lease of that property and (iii) owning and managing a non-debtor operating

subsidiary that managed commercial properties subject to long-term, tiple net leases with certain

fast-food restaurants); In re Specialty Prods. Holding Corp., No. 10-11780 (JKF) (Bankr. D. Del.

Dec. 11, 2014), Dkt. 5262 (confirming joint plan of reorganization where one debtor was a

holding company that owned an interest in a nonoperating co-debtor as well as six operating

non-debtor subsidiaries, and two debtors had no business operations but would enter into leases

on or before the effective date of the plan pursuant to which they would lease real property from

their non-debtor ultimate parent and re-lease the property to an operating affiliate at a profit);

In re Swan Transp., Co., No. 01-11690 (BLS) (Bankr. D. Del. Jul. 21, 2003), Dkt. 452

(confirming section 524(g) plan providing for discharge of the debtor despite the fact that the

debtor had "not conducted any operations or owned any assets, other than various insurance policies issued to [the debtor] and other related entities").

The Coalition and certain Insurers also take issue with the prior corporate restructurings that resulted in the creation of the Debtor.  See Coalition Plan Obj. at 34-38; Insurers' DS Obj. ¶ 61; Travelers Obj. ¶ 68.  But they ignore that other debtors have engaged in similar corporate restructuring prior to filing for chapter 11 to address their mass tort liabilities.  For example, in Paddock, the debtor underwent a similar restructuring in advance of filing under Delaware law.  See Paddock, 2022 WL 1746652, at *5; see supra Part IV.C.2(a)(i).  The debtor in Paddock had minimal business activities, consisting of (a) certain real property that Paddock had acquired from an affiliate prior to its petition date and then leased back to the same affiliate and (b) an operating subsidiary that had leases with fast-food restaurants.  Id. at *25-26; see also Paddock, Dkt. 1356 ¶ 5.  The bankruptcy court confirmed the debtor's section 524(g) plan granting the debtor a discharge and supplemental injunction.  See Paddock, 2022 WL 1746652, at *30.  Similar outcomes have occurred in other mass-tort bankruptcies that involved prepetition corporate transactions and confirmed section 524(g) plans.  See In re Mid-Valley, Inc., No. 03-35592 (Bankr. W.D. Pa. July 16, 2004), Dkt. 1692 at 5-7 (debtor underwent several restructurings in the years preceding the bankruptcy, including the formation of two of the debtors); G-I Holdings, Inc. v. Those Parties Listed on Ex. A (In re G-I Holdings, Inc.), 313 B.R. 612, 621 (Bankr. D.N.J. 2004) (debtor filed for bankruptcy soon after becoming successor-in-interest to entity with over 100,000 pending asbestos-related lawsuits).[136]

---

[136]   The Coalition's suggestion that the divisional merger "siphon[ed] off the productive assets that otherwise would have been available to fund the asbestos trust in this case" disregards the approximately $9 billion in funding that is readily available pursuant to the Plan.  See Coalition Plan Obj. at 37.  There is no lack of funding for the Talc Personal Injury Trust.

The alleged "ongoing business" requirement is simply judicial gloss based on the Third Circuit's opinion in Combustion Engineering.[137]  The true focus of the inquiry is whether the reorganized debtor could "make future payment into the trust."  Combustion Eng'g, 391 F.3d at 248.  Correspondingly, at least one court has indicated that, to the extent such "ongoing business" requirement exists, it should be interpreted narrowly to avoid duplicating the requirements of section 1129(a)(11) of the Bankruptcy Code.  See Quigley, 437 B.R. at 141 (noting that a "broad interpretation that imposes an ongoing business requirement could transform the funding requirement into a feasibility test" and focusing narrowly on whether the debtor generally could "make payments into the future").  As set forth in more detail below, the Plan, the Indemnity Funding Agreement and the guarantee of the Cash Contributions satisfy that requirement.

Even if an "ongoing business" requirement existed, which it does not, the Debtor would satisfy it.  The Debtor's business is similar to that of the debtor in HONX—to manage its talc liabilities.  See HONX, Dkt. 1332 at 9.  Like Paddock, the Debtor also has a non-debtor operating subsidiary—Royalty A&M—that will continue to operate following confirmation of the Plan with the Reorganized Debtor as its direct parent.  As of September 29, 2024, Royalty A&M reported approximately $358 million in assets.  See Periodic Report Regarding Value, Operations, and Profitability of Entities in Which the Debtor's Estate Holds a Substantial or Controlling Interest, Dkt. 326 at 4.  Since its establishment in 2021, Royalty A&M has owned a portfolio of royalty revenue streams based on third-party sales of certain Kenvue products and it has reinvested its income in the acquisition of additional royalty revenue streams with respect to

---

[137]    In re Combustion Eng'g, Inc., 391 F.3d, 190, 248 (3d Cir. 2004), cited by the Coalition, Coalition Plan Obj. at 31, suggests, in dicta, that an ongoing business/going concern requirement exists.  Combustion, 391 F.3d at 248.  The court ultimately held, however, that the objecting insurers did not have standing to raise the issue and declined to rule on it.

certain Aspetix products and Kiron Capital.  See Dickinson Dep. 19:3-20.  On a quarterly basis, Royalty A&M brings in roughly "$25 million" in royalty revenue and, on an annual basis, "slightly less than $100 million."  See id. 21:10-19.

The Insurers take issue with the Debtor's and Royalty A&M's business and allege that Royalty A&M "may have zero net tangible assets in six years."  See Travelers Obj. ¶¶ 72-77; see also Insurer DS Obj. ¶¶ 64-65.  As recognized by the Fifth Circuit, however, there is no need for Royalty A&M to continue in business in perpetuity—"even a temporary continuation of business after a plan's confirmation is sufficient to discharge a Chapter 11 debtor's debt."  See Highland, 48 F.4th at 433.  The fact that Royalty A&M has royalty revenues for years to come is plainly sufficient.  See id. (citing to T-H New Orleans, 116 F.3d at 804 n.15 (recognizing a debtor's "conducting business for two years following Plan confirmation satisfies § 1141(d)(3)(B)")) (citation omitted).

Furthermore, the Insurers' assertions regarding the extent of the Debtor's business and that the ongoing business allegedly must be a continuation of the prepetition business have been refuted by the Insurers' own cited section 524(g) case—making any analogies to cases interpreting the Internal Revenue Code unnecessary.  See In re Flintkote Co., 486 B.R. 99, 131 (Bankr. D. Del. 2012) ("Nothing in § 524(g) plainly and unambiguously requires a debtor to continue in a pre-petition business, let alone a viable pre-petition business. . . .  In light of the many express requirements laid out in § 524(g), the Court finds that had Congress intended § 524(g) to require a debtor to operate a viable, ongoing, pre-petition business, it would have included statutory language to that effect in § 524(g)(2)(B) . . . .  Even if the Court were to give weight to the legislative history behind § 524(g), the history does not contain this requirement. The House Committee Report discussing § 524(g) states that '[t]he asbestos trust/injunction

mechanism established in the bill is available for use by any asbestos company facing a similarly overwhelming liability.'") (citations omitted).

Accordingly, to the extent an ongoing business requirement exists, the Debtor satisfies such requirement and is entitled to a discharge and supplemental channeling injunction pursuant to sections 524(g) and 1141.

### B.     The Talc Personal Injury Trust Satisfies the Structure and Funding Requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code

To obtain an injunction, the trust to which such claims and demands are channeled must meet the structure and funding requirements of section 524(g)(2)(B)(i) of the Bankruptcy Code. As described below, the Talc Personal Injury Trust comports with those requirements.

### 1.      The Plan Satisfies Section 524(g)(2)(B)(i)(I)

Section 524(g)(2)(B)(i)(I) of the Bankruptcy Code requires that a trust

> is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.

11 U.S.C. § 524(g)(2)(B)(i)(I).  Here, the Talc Personal Injury Trust satisfies this requirement.

Prior to the Petition Date, the Debtor's predecessors, Old JJCI and LLT, were named as defendants in tens of thousands of talc-related cases in which the claimants alleged the talc was contaminated with asbestos and caused their ovarian or gynecological cancers.  As a result of the 2021 Corporate Restructuring, by which Old JJCI ceased to exist, and the Prepetition Corporate Restructuring, by which LLT ceased to exist, the Debtor was (a) allocated responsibility for the talc-related cases asserting claims addressed pursuant to the Plan and (b) automatically substituted for its predecessor into those cases pursuant to Rule 25(c) of the Federal Rules of Civil Procedure (the "Civil Rules").

Civil Rule 25(c) "does not require that anything be done after an interest has been transferred.  The action may be continued by or against the original party, and the judgment will be binding on the successor in interest even though the successor is not named."  7C Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 1958 (3d ed. 2024); see In re LTL Mgmt., LLC, 638 B.R. 291, 320 n.11 (Bankr. D.N.J. 2022) ("[T]he Original TCC's position ignores the fact that LTL assumed the liabilities of Old JJCI—who was the named defendant in personal injury lawsuits—and that Old JJCI ceased to exist.  Thus, Debtor/LTL as successor is substituted under Fed. R. Civ. P. 25(c).").  Accordingly, the Debtor as a successor is named as a defendant in tens of thousands of talc-related cases.  The Coalition's objection ignores the impact of the Civil Rules and should thus be overruled.  See Coalition Plan Obj. at 32.

Certain Insurers allege that the relief sought pursuant to the Plan is not permissible because the Debtor disputes the presence of asbestos in the talc-containing products and, according to these Insurers, most Ovarian Cancer claims are based on claimants' assertions that their diseases were caused by talc, not asbestos.  See Travelers Obj. ¶ 66; Insurers DS Obj. ¶ 56; Century Obj. ¶ 33.  These Insurers, however, ignore the plain language of the statute, which only requires that damages be "**allegedly** caused by the presence of, or exposure to, asbestos or asbestos-containing products."  11 U.S.C. § 524(g)(2)(B)(i)(I).  It is irrelevant for statutory purposes whether the Debtor disputes either the presence of asbestos in the talc-based products it is responsible for, or any causal link between those products and ovarian and gynecological cancers (both of which it does).  The inquiry, rather, is focused on the allegations and their implication of asbestos or asbestos-containing products.  Those allegations are based on not just on talc, but asbestos in the talc-based products the Debtor is responsible for.

No counsel for any talc claimant—including the Coalition, who has otherwise objected strenuously to the Plan—raised this objection. Nor could they, as counsel have been moving to incorporate asbestos allegations in their pleadings to the extent not already included in them. In the MDL, the Plaintiffs' Steering Committee filed its Motion to Amend,[138] which sought leave to file the MDL Proposed Amended Complaint that included over 150 new paragraphs dedicated to asbestos-related allegations, and asked that the requested amendments automatically apply to all short-form complaints previously filed in the MDL. See Mot. to Amend; MDL Proposed Am. Compl.; see also *Expert Report of Marc C. Scarcella, M.A., Evaluation of Red River Talc LLC Bankruptcy Plan of Reorganization* ¶ 11 ███████████████████████████████ ███████████████████████████████████████. Before the Petition Date, the special master in the MDL granted the Motion to Amend, and an appeal is pending on grounds unrelated to the asbestos-related amendments. A similar pattern has occurred in the MCL where counsel have amended their complaints or filed new complaints asserting asbestos allegations. See, e.g., MCL Complaint ¶ 2 (alleging that "Johnson & Johnson's and its corporate subsidiaries' asbestos-containing talc products" injured the plaintiffs). As demonstrated by the pleadings in the MDL and the MCL, the Channeled Talc Personal Injury Claims are, in fact, asbestos-related claims.

Further, if these Insurers' arguments were accepted, a holder of a Channeled Talc Personal Injury Claim would be able to strategically plead around the section 524(g) channeling injunction by simply omitting any reference to asbestos—even though the claimant would be alleged to have suffered a similar injury arising from the same talc-based products (which are alleged by other plaintiffs to have been contaminated with asbestos) and the same conduct

---

[138]     The Motion to Amend was signed by Beasley Allen.

involving the same parties (the Protected Parties).  This would defeat a fundamental purpose of section 524(g), which is to promote the equitable resolution of asbestos-related claims, and should not be condoned.  See W.R. Grace, 475 B.R. at 111 (albeit in addressing direct and indirect claims, finding that the purpose of section 524(g) "can only be achieved" if both types of claims, which "arise out of the same nucleus of conduct," are enjoined).

Because the Talc Personal Injury Trust will assume the liabilities of the Debtor that is named as a defendant in tens of thousands of cases asserting personal injury or wrongful death claims arising from the presence of, or exposure to, asbestos or asbestos-containing products, section 524(g)(2)(B)(i)(I) is satisfied.

### 2.    The Plan Satisfies Section 524(g)(2)(B)(i)(II)

The Plan also satisfies section 524(g)(2)(B)(i)(II) of the Bankruptcy Code, which requires that the trust

> be funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends.

11 U.S.C. § 524(g)(2)(B)(i)(II).  The Plan satisfies this requirement by providing that the Talc Personal Injury Trust will be funded in part by the Talc PI Note.  See Plan § 4.9.2.  Pursuant to section 101(49) of the Bankruptcy Code, a "security" includes, among other things, a note.  The Talc PI Note requires the Reorganized Debtor to make a payment of $388 million on the later of (a) the seventh anniversary of the Petition Date and (b) the first anniversary of the Effective Date.  This obligation is secured by the pledge of 100% of the equity of the Reorganized Debtor.  Accordingly, the issuance of the Talc PI Note, under which the Debtor is an obligor, plainly satisfies the requirement under section 524(g)(2)(B)(i)(II) that the Talc Personal Injury Trust be funded "in part by the securities of 1 or more debtors and by the obligation of such debtor or debtors to make future payments, including dividends."

The Coalition takes issue with the "artificial" Talc PI Note—which, as set forth above, is a "security" pursuant to the Bankruptcy Code. See Coalition Plan Obj. at 32-33. With no citations to any section 524(g) precedent, the Coalition asserts the Talc PI Note "would only fund a fraction of the total funding requirement of the Trust" and "subverts the entire purpose of the statute." Coalition Plan Obj. at 32. The Coalition ignores, however, the multiple section 524(g) plans that have been confirmed with similar—if not identical—funding provisions. See Paddock, 2022 WL 1746652, at *23 (confirming plan that provided for asbestos trust to be funded with "in addition to $601.5 million in Cash" from the debtor's non-debtor parent, a "$8.5 million Payment Note, a security of the Debtor . . ."); In re Leslie Controls, Inc., No. 10-12199 (CSS) (Bankr. D. Del. Jan. 18, 2011), Dkt. 505 §§ 1.93, 1.94, 9.3(h), (i) (plan providing for among other things, $74 million in cash and proposing to satisfy section 524(g)(2)(B)(i)(II), in part, through the contribution of a $1 million promissory note) and Leslie Controls, Dkt. 503 § U.3 (concluding that plan complies with section 524(g)(2)(B)(i)(II) of the Bankruptcy Code and confirming plan); In re USG Corp., No. 01-2094 (JKF) (Bankr. D. Del. June 15, 2006), Dkt. 11687 at 29 ("Asbestos Personal Injury Trust will be funded by securities issued by the Reorganized Debtors in the form of the Note and the Contingent Payment Note"); J T Thorpe, 308 B.R. at 788-89 (finding that the "[p]lan complies with Section 524(g)(2)(B)(i)" when trust is "to be funded in part by a Promissory Note for $2.3 million" and "in part by proceeds received pursuant to the terms of the Asbestos Insurance Action Recoveries, the Asbestos In-Place Insurance Coverage, the Asbestos Insurance Settlement Agreements, and by the Asbestos Insurance Policies").

The confirmation of various section 524(g) plans with similar funding provisions as those provided for in the Plan, as well as other provisions providing for the bulk of funding to be

provided on the effective date of the plan of reorganization, demonstrates that the primary purpose of the statute is to ensure that funds are available to compensate both those claimants with present claims as well as those with future claims against the debtor for asbestos-related claims. See, e.g., HONX, Dkt. 1332 at 45, Ex. A at 8, 23-25 (confirming plan that provided for total trust funding of up to $190 million, with a payment of $130 million to be paid by non-debtor parent company on the effective date). Here, the Debtor, through the Talc PI Note and the Indemnity Funding Agreement, is fully able to make future payments to the Talc Personal Injury Trust, which will pay all current and future claimants. The Talc Personal Injury Trust satisfies this requirement.

### 3.      The Plan Satisfies Section 524(g)(2)(B)(i)(III)

The Plan also satisfies section 524(g)(2)(B)(i)(III)'s "ownership requirement"—i.e., that the Talc Personal Injury Trust

> is to own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of— (aa) each such debtor; (bb) the parent corporation of each such debtor; or (cc) a subsidiary of each such debtor that is also a debtor . . .

11 U.S.C. § 524(g)(2)(b)(i)(III). In particular, section 4.9.2 of the Plan provides that, upon the Effective Date, the Talc Personal Injury Trust will receive the Talc PI Pledge Agreement (Exhibit J to the Plan) as security for the Talc PI Note (Exhibit I to the Plan). According to the terms of the Talc PI Pledge Agreement and the Talc PI Note, in the event of a default on the Talc PI Note, which is in the principal sum of $388,000,000, the Talc Personal Injury Trust shall be entitled to receive all of the equity interests in the Reorganized Debtor. See Talc PI Note §§ 2, 5; Talc PI Pledge Agreement §§ 1.3, 2.1, Art. V.

As with the Talc PI Note, the Coalition takes issue with the Talc PI Pledge and asserts that the Plan makes a "mockery" of section 524(g). See Coalition Plan Obj. at 33-34. But again,

the Coalition cites to no section 524(g) case to support its singular focus on a "reorganized debtor with operations." Id. The Coalition's position has been rebuffed by multiple courts having found similar contingent note provisions sufficient to satisfy section 524(g). See, e.g., Paddock, 2022 WL 1746652, at *23 (court recommended confirmation of plan that provided 100% of the equity interests in the reorganized debtor to the asbestos claims trust upon the debtor's default on a $8.5 million payment note); In re Leslie Controls, Inc., 2011 WL 1901547, at *13 (Bankr. D. Del. Jan. 18, 2011) (confirming a plan where the trust received a promissory note from the reorganized debtor and a pledge from the parent whereby the parent granted a security interest in 100% of the outstanding voting shares of the reorganized debtor as security for the promissory note), aff'd, 2011 WL 1226402 (D. Del. Mar. 25, 2011); J.T. Thorpe, 308 B.R. at 789 (finding that chapter 11 plan satisfied section 524(g) where parent pledged all of its interest in the reorganized debtor to secure a note given to asbestos claims trust).[139]

Notwithstanding the Coalition's rhetoric to the contrary, the Plan's structure complies with the plain language of section 524(g)(2)(B)(i)(III) and operates to ensure that the Talc Personal Injury Trust is appropriately funded.

---

[139]   See also In re Duro Dyne Nat'l Corp., 2020 WL 6270691, at *36, *54  (D.N.J. Oct. 23, 2020) (Bankr. D.N.J. July 16, 2019) (district court approved and adopted bankruptcy court's recommendation to confirm plan that provided 50.1% of the voting stock of the reorganized debtor to the trust in the event that the reorganized debtor defaulted on a $13.5 million dollar note); Garlock Sealing Techs., 2017 WL 2539412, at *20 (confirming plan where the trust received a possessory lien on 50.1% of the debtors' securities and the plan provided that ownership of those interests would pass to the trust upon an event of default); In re Burns & Roe Enters., Inc., 2009 WL 438694, at *31-32 (D.N.J. Feb. 23, 2009) (confirming plan where the trust received a promissory note that was secured by the pledge of 51% of the voting shares of the debtors' parent company and the trust was entitled to foreclose on the shares upon the occurrence of an event of default); In re ABB Lummus Glob. Inc., 2006 WL 2052409, at *6 (Bankr. D. Del. June 29, 2006) (confirming plan where trust received note that was convertible into 51% of the shares of the company upon default).

### 4.      The Plan Satisfies Section 524(g)(2)(B)(i)(IV)

Finally, section 524(g)(2)(B)(i)(IV) requires an asbestos trust "to use its assets or income to pay claims and demands."  11 U.S.C. § 524(g)(2)(B)(i)(IV).  Here, the Talc Personal Injury Trust will assume the liability and responsibility for all Channeled Talc Personal Injury Claims (see Plan § 4.8) and will use its assets, which will include the Cash Contributions and the Talc PI Note to pay and satisfy Channeled Talc Personal Injury Claims and Demands in accordance with the Plan, the Trust Distribution Procedures and the Confirmation Order (see id. § 4.2), thus satisfying the requirements of section 524(g)(2)(B)(i)(IV).

### C.      The Debtor's History, the Nature of Talc-Related Litigation and the Facts of the Chapter 11 Case Support the Findings Required for Issuance of the Channeling Injunction

Section 524(g)(2)(B)(ii) of the Bankruptcy Code requires the Court to make certain factual findings to support the issuance of a channeling injunction under section 524(g)(1)(A). As set forth herein, the Debtor's history, the nature of talc-related litigation and the facts of this chapter 11 case all support the findings required for the issuance of the Channeling Injunction under section 524(g)(l)(A) of the Bankruptcy Code.

### 1.      The Plan Satisfies Section 524(g)(2)(B)(ii)(I)

To support entry of a channeling injunction under section 524(g)(l)(A), a court must find that

> the debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction.

11 U.S.C. § 524(g)(2)(B)(ii)(I).  The Debtor's history and the nature of the talc-related litigation against it and its predecessors support this finding.  See supra Part II.I.  As of the Petition Date, the Debtor and its predecessors had been named in more than 60,000 talc-related personal injury actions alleging ovarian or gynecological cancers, with the number of current claims as of June

-166-

2024, both filed and unfiled, being approximately 85,000.  See also Mullin Report ¶¶ 42-43, 142.

Further, over 93,000 claimants voted on the Plan, asserting they hold Channeled Talc Personal

Injury Claims.  Accordingly, based on the substantial number of talc-related personal injury

lawsuits that were filed in the past and were continuing to be filed prior to Petition Date, as well

as the substantial number of unfiled talc-related personal injury claims that the Debtor was aware

of, the Debtor would likely be subject to substantial future demands for payment arising from the

same or similar conduct or events that gave rise to the Channeled Talc Personal Injury Claims

and section 524(g)(2)(B)(ii)(I) is satisfied.

### 2. The Plan Satisfies Section 524(g)(2)(B)(ii)(II)

Section 524(g)(2)(B)(ii)(II) of the Bankruptcy Code requires a court to find that "the

actual amounts, numbers, and timing of such future demands cannot be determined."  11 U.S.C.

§ 524(g)(2)(B)(ii)(II).  The Debtor is unable to predict the amounts, numbers and timing of future

demands in respect of alleged talc-related personal injuries.  See also Mullin Report ¶ 20 ███

████████████████████████████████████████; id. ¶ 78 ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████.  Accordingly, this

finding is likewise satisfied.

### 3. The Plan Satisfies Section 524(g)(2)(B)(ii)(III)

Section 524(g)(2)(B)(ii)(III) of the Bankruptcy Code requires a finding that

> pursuit of such demands outside the procedures prescribed by such
> plan is likely to threaten the plan's purpose to deal equitably with
> claims and future demands.

11 U.S.C. § 524(g)(2)(B)(ii)(III).  The purpose of the Plan is, among other things, to create a

trust to fairly and equitably resolve all of the Channeled Talc Personal Injury Claims pursuant to

section 524(g).  See First Day Decl. ¶¶ 134-39.  Pursuit of claims outside of the Plan, and instead in the tort system, or pursuit of current claims under the Plan and future claims outside the Plan in the tort system, would threaten the purpose of the Plan to resolve such current and future claims equitably and substantially equivalently.  Without the Plan, holders of Channeled Talc Personal Injury Claims, particularly future claimants, likely face years of costly and time-consuming litigation that would delay their recoveries.  Further, at the end of litigation in the tort system, many claimants may receive nothing.  See First Day Decl. ¶ 61 (providing that "all of the ovarian cancer plaintiff verdicts to date have been reversed on appeal with the exception of one case known as Ingham").  Instead, under the Plan, Channeled Talc Personal Injury Claims with similar characteristics will receive the same treatment in accordance with the Trust Distribution Procedures.  Without the Plan, current and future claimants would be subject to inconsistent awards and disparate recoveries.  Thus, the requirements of section 524(g)(2)(B)(ii)(III) are met.

The Coalition argues that this requirement has not been satisfied because there has been no showing that future claimants would be "worse off outside of bankruptcy."  See Coalition Plan Obj. at 38.  However, on average, claimants will receive **double** the amount via the Plan they could reasonably expect to recover from settlements in the tort system.  See Mullin Report ¶ 136 ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████.  This dovetails with the reality, detailed above and recognized by numerous courts, that there are substantial risks and delays attendant to pursuing asbestos claims in the tort system.  These dynamics would disadvantage both current and future claimants as compared to the distribution process provided for in the Trust Distribution Procedures.  While the Coalition notes that claimants would have the ability to pursue non-debtor J&J for recoveries in the tort

system, litigation against J&J still carries the same attendant uncertainty, delay and risk of no recovery as tort system litigation against the Debtor.  See In re Whittaker, Clark, and Daniels, 663 B.R. 1, 29 (Bankr. D.N.J. 2024) (responding to future claimants' representative's policy argument regarding the pursuit of recoveries against non-debtor by noting that, "[i]ndeed, the FCR focuses solely on the solvent financial condition of the non-debtor entities in support of this argument.  This narrow focus disregards the risks, uncertainties, costs, and delays that accompany these litigations.").[140]  In fact, courts have recognized that a trust is a more efficient, equitable solution for resolution of mass tort claims.  See, e.g., Fed.-Mogul, 684 F.3d at 359 (noting bankruptcy has become "an attractive alternative to the tort system for corporations because it permits a global resolution and discharge of current and future liability, while claimants' interests are protected by the bankruptcy court's power to use future earnings to compensate similarly situated tort claimants equitably.") (citation omitted).[141]

At its core, the Coalition's objection incorrectly asserts that it is impossible for a solvent asbestos debtor to satisfy this section 524(g) requirement.  See Coalition Plan Obj. at 38 (noting that given J&J's solvency "there can be no showing – that future demands will be any worse outside of bankruptcy").  This improperly reads an insolvency requirement into section 524(g) that does not exist, as is evidenced by both the numerous highly solvent debtors and debtors with highly solvent corporate parents, that have confirmed plans pursuant to section 524(g), including, among others, HONX, Mid-Valley, NARCO, Quigley, Pittsburgh Corning, Paddock Enterprises

---

[140]     See also id. (further noting that "hundreds of claimants have already been waiting years and years to have their claims heard.  They are deserving of a fair and equitable recovery in the near term, without the risk and delays inherent in the tort system").

[141]     See also Bestwall, 71 F.4th at 183 ("[B]ankruptcy procedures promote the equitable, streamlined, and timely resolution of claims in one central place compared to the state tort system, which can and has caused delays in getting payment for legitimate claimants."); Aldrich Pump, 2021 WL 3729335, at *37 (a "successful reorganization . . . would promote Congress's particular goal in section 524(g) by establishing an asbestos trust that would efficiently and equitably resolve tens of thousands of asbestos claims").

and <u>Garlock</u>.  A chart providing information on these bankruptcies is set forth in Part IV.C.2(c).

In each of these cases, which all resulted in confirmed section 524(g) plans, the courts

necessarily found that section 524(g)(2)(B)(ii)(III) was satisfied.  The same result should be

obtained here.

A section 524(g) trust provides certainty, efficiency and the prospect of equitable

payments for current and future claimants, as opposed to the variability, delay and risk inherent

in the tort system.  Section 524(g)(2)(B)(ii)(III) is satisfied.

### 4.    <u>The Plan Satisfies Section 524(g)(2)(B)(ii)(IV)</u>

Section 524(g)(2)(B)(ii)(IV) of the Bankruptcy Code requires a court to find that,

> as part of the process of seeking confirmation of such plan—(aa) the
> terms of the injunction proposed to be issued under paragraph
> (1)(A), including any provisions barring actions against third parties
> pursuant to paragraph (4)(A), are set out in such plan and in any
> disclosure statement supporting the plan . . . .

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa).  A court must also find that

> a separate class or classes of the claimants whose claims are to be
> addressed by a trust described in clause (i) is established and votes,
> by at least 75 percent of those voting, in favor of the plan.

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).  As part of the Plan confirmation process, the Debtor

included the terms of the Channeling Injunction, including provisions therein barring actions

against any Protected Party, in conspicuous language in both the Plan and the Disclosure

Statement.  <u>See</u> Plan § 11.3; Disclosure Statement § 6.11.  The Debtor also designated Class 4

under the Plan for all Channeled Talc Personal Injury Claims.  <u>See</u> Plan § 3.2.4; Disclosure

Statement § 6.2(d).  The voting claimants in Class 4 accepted the Plan as required by

section 524(g).  <u>See</u> Voting Declarations; <u>see</u> <u>supra</u> Part II.S.

### 5.    **The Plan Satisfies Section 524(g)(2)(B)(ii)(V)**

Finally, section 524(g)(2)(B)(ii)(V) of the Bankruptcy Code requires a court to find that:

> the trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.

11 U.S.C. § 524(g)(2)(B)(ii)(V).  Courts tend to find that a plan of reorganization that contemplates reasonable trust distribution procedures will generally satisfy section 524(g)(2)(B)(ii)(V) without much controversy.  See Maremont, 601 B.R. at 31 ("[A]ll Asbestos Personal Injury Claims shall be determined and paid pursuant to the terms of the Asbestos Personal Injury Trust Agreement and the TDP.  Pursuant to such documents . . . the Asbestos Personal Injury Trust will operate through mechanisms such as structured periodic, or supplemental payments, pro rata distributions, matrices. . . [t]herefore, the Plan complies with section 524(g)(2)(B)(ii)(V)."); Paddock, 2022 WL 1746652, at *24 ("Pursuant to: (a) the Asbestos Trust Distribution Procedures; (b) court order; or (c) otherwise, the Asbestos Trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions . . . .  See 11 U.S.C. § 524(g)(2)(B)(ii)(V).").

Here, the Talc Personal Injury Trust will pay Channeled Talc Personal Injury Claims in accordance with the Trust Distribution Procedures.  See Plan §§ 4.2, 4.7.  First, the Trust Distribution Procedures contain a sophisticated payment structure that takes characteristics beyond disease type and general qualification criteria into account.  This structure ███████ ████████████████████████████████████████████████████  See Mullin Report ¶ 150.  Second, the Trust Distribution Procedures include ███████████████ ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████    See Mullin Report ¶¶ 151-60.  This system provides reasonable

assurance that the Talc Personal Injury Trust will value, and be in a financial position to pay,

present Channeled Talc Personal Injury Claims and future demands that involve similar claims in

substantially the same manner.  See, e.g., Trust Distribution Procedures §§ 7.1.1 (allowing for

redetermination of cash value of a point due to the uncertainty of the total number of claims to be

submitted to the Talc Personal Injury Trust), 7.1.2 (outlining point valuation system and allowing

for supplemental payments), 7.6.2 (granting Trustee discretion to vary order and amounts of

payments).[142]  The Plan and the Trust Distribution Procedures contemplated therein satisfy the

requirements in section 524(g)(2)(B)(ii)(V).

## D.    The Court May Approve the Plan Provisions as to the Protected Parties

The Plan provides for the application of the Channeling Injunction to various "Protected

Parties," who are defined in Article I of the Plan.  In addition, section 11.2.2 of the Plan provides

that holders of Channeled Talc Personal Injury Claims release certain "Released Parties"

(defined in Article I to include the Debtor, the Reorganized Debtor, various non-debtor parties

affiliated with the Debtor and, to the fullest extent permitted by law, Representatives of each of

the foregoing) with respect to certain matters related to the Debtor and the estate (the "Third

Party Release").[143]  The Third Party Release does not include any claim or action determined by

---

[142]    See also Mullin Report ¶ 21 ████████████████████████████████████████████
████████████████████████████████████████████████████████

[143]    The foregoing descriptions are meant as a summary of the operative Plan provision only.  To the extent
there is any conflict between the foregoing summary and the Third Party Release contained in
section 11.2.2 of the Plan, the Plan shall control.

a Final Order of the Court or any other court of competent jurisdiction to have constituted a criminal act, actual fraud, gross negligence, or willful misconduct.[144]  The Third Party Release reinforces the Channeling Injunction as to the Protected Parties that the release covers.  All parties covered by the Third Party Release are Protected Parties.[145]  The Third Party Release also reinforces the Debtor Release by ensuring that holders of Channeled Talc Personal Injury Claims do not commence litigation against the Released Parties on account of claims that were property of the Debtor's estate and properly released under the Plan.

Section 524(g)(4)(A)(ii) provides that a channeling injunction entered pursuant to section 524(g)(1)(A):

> may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be **directly** or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of—
>
> (I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;
>
> (II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;
>
> (III) the third party's provision of insurance to the debtor or a related party; or
>
> (IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party . . .

---

[144]   The Third Party Release also contains a "gatekeeping" provision, which is addressed in Part VI.C, <u>supra</u>.  Importantly, the Third Party Release expressly provides that it does not release (a) the rights of holders of Master Settlement Agreement Claims with respect to settlement of their claims under the Master Settlement Agreements; (b) the rights of holders of Judgment Claims to seek to enforce and collect on the judgments on which such Judgment Claims are based; and (c) any Person from any of its obligations under any Funding Agreement, the Cash Contributions Guarantee or any other Plan Document.  <u>See</u> Plan § 11.2.2.

[145]   However, not all Protected Parties are covered by the Third Party Release.  In particular, various retailers of the Debtor are not covered.

11 U.S.C. § 524(g)(4)(A)(ii) (emphasis added).[146]

Various Objections allege that:  (i) J&J; (ii) various affiliates of J&J and the Debtor; (iii) Kenvue; and (iv) various Retailers who distributed the Debtor's products are not eligible to be Protected Parties because they fall outside of the provisions of section 524(g)(4)(A)(ii).[147] These Objections further argue that if section 524(g) is not available, there is no other avenue to obtain Protected Party status for such entities because the decision in Purdue, supposedly "changed everything" for third party releases and injunctions outside of section 524(g).[148]

For the reasons detailed below, the Protected Parties are eligible for that status under section 524(g)(4)(A)(ii), which is worded **broadly** to cover a variety of parties[149] based on a myriad of different types of past relationships or transactions with the debtor (or its predecessors).[150]  Purdue explicitly acknowledged that asbestos debtors like the Debtor are entitled to special protection under section 524(g).  Moreover, the Purdue Court emphasized that "[a]s important as the question we decide today are ones we do not," including whether a debtor may be entitled to a non-consensual injunction under certain circumstances outside of section 524(g)—such as under a plan that fully satisfies third-party claims.  Purdue, 603 U.S. at 226 ("Nor do we have occasion today to . . .  pass upon a plan that provides for the full satisfaction of claims against a third-party nondebtor.").  Application of section 524(g)(4)(A)(ii)

---

[146]    Section 524(g)(4)(A)(iii) defines the term "related party" to include, among other entities, affiliates and predecessors as to the debtor.

[147]    See Coalition DS Obj. § II.A.2-4; Dkt. 972 (the "Nesko Objection") ¶¶ 7-14; UST Obj. ¶¶ 27-34; Travelers Obj. ¶ 62-63; Coalition Plan Obj. § I.C.  Alternatively, the Coalition asserts that if J&J or Kenvue are eligible under section 524(g)(4)(A)(iii), then the statute is unconstitutional.  See Coalition DS Obj. § II.A.8; Coalition Plan Obj. § X.  The Debtor briefly responds to this assertion in Part VIII.A.1 and also incorporates its full response from the Dismissal Objection as to why section 524(g)(4)(A)(iii) is not unconstitutional.  See Dismissal Obj. § III.D.

[148]    See note 204, infra.

[149]    See discussion, infra regarding the first part of section 524(g)(4)(A)(ii).

[150]    See discussion, infra regarding the second part of section 524(g)(4)(A)(ii).

-174-

to third parties should be uncontroversial here because claimants are receiving full payment of their claims.  The claimants will have no talc claims against any third parties that require satisfaction because they will be paid in full by the Talc Personal Injury Trust on account of their single indivisible injuries.  The Channeling Injunction ensures this single satisfaction of talc claims by preventing, for instance, attempts by certain claimants to obtain more than full payment for their respective injuries, as well as harassment of the third parties after confirmation of the Plan, both of which inevitably would entangle the Talc Personal Injury Trust.[151]

Finally, even if section 524(g) did not apply, this Court also has ample authority to issue the Channeling Injunction as to all Protected Parties pursuant to the All Writs Act, 28 U.S.C. § 1651.

### E.    The Channeling Injunction Applies to the Protected Parties Pursuant to Section 524(g)(4)(A)(ii)

#### 1.    J&J

Relevant to the discussion of Protected Party status for J&J is that its asserted liability tends to be divided into two parts.  Prior to the 1979 Agreement, J&J was the manufacturer of Johnson's Baby Powder.[152]  After the 1979 Agreement, J&J only owned the separate legal entities that manufactured the product.[153]  Various Objections assert that J&J nonetheless could be liable for products manufactured after the 1979 Agreement based on its alleged marketing of

---

[151]    The Talc Personal Injury Trust indemnifies the Protected Parties.  See Plan § 4.16.  Even if it did not, the trust still would be interested in litigation against third parties.  First, it would want to know if claims against the trust were paid elsewhere to avoid making a double payment.  In addition, the trust would be interested where, for instance, the third parties could claim indemnity or reimbursement back against the trust.  Even if the third party did not have the ability to claim back against the trust, the Talc Personal Injury Trust would be interested because the litigation could involve the resolution of disputed legal and factual issues that could impact the trust's litigation of claims that opt-out under the Trust Distribution Procedures.

[152]    Likewise, prior to a 1978 agreement similarly transferring the Shower to Shower assets to a company that ultimately became Old JJCI, J&J was the manufacturer of that product.

[153]    After the 1978 agreement, J&J only owned entities that manufactured Shower to Shower.

the products or "safety decisions" that it supposedly made with respect to the products.[154]  As previously discussed, J&J denies it has any such marketing or safety decision liability.

### a.        The First Part of Section 524(g)(4)(A)(ii)

Some Objectors assert that the Channeling Injunction cannot apply to J&J under section 524(g)(4)(A)(ii) because the alleged pre-1979 manufacturing liability and post-1979 marketing/safety decision liability constitute "independent" liabilities of J&J that are not "derivative" of the Debtor's liability.[155]  But in so arguing, these Objectors use words, such as "independent" and "derivative," that are not in the statute.  The actual statutory language of section 524(g)(4)(A)(ii), by contrast, provides that the Channeling Injunction can apply to a non-debtor that, among other things, is "**<u>directly</u>**" liable for claims against or conduct of the Debtor.  There is no exception in the statutory language for "independent" or "non-derivative" liability, whatever those terms may mean, as long as J&J is alleged to be liable for claims against or conduct of the Debtor.

As detailed herein (<u>supra</u>, Part II.I), and has been found by other courts, the claims against the Debtor and J&J are the exact same claims, involving the exact same products, time periods and alleged injuries.[156]  In the tort system, J&J and the Debtor were sued without differentiation, with the allegations against each being essentially identical.[157]  But even if that

---

[154]     <u>See</u>, <u>e.g.</u>, Coalition DS Obj. § II.A.2; Coalition Plan Obj. § I.C.2.

[155]     <u>See</u> UST Obj. ¶ 30; Coalition DS Obj. § II.A.2; Coalition Plan Obj. § I.C.2.

[156]     <u>See</u> <u>LTL</u>, 638 B.R. at 306 ("As an initial matter, the talc claims against the Protected Parties involve the same products, same time periods, same alleged injuries, and same evidence as claims against Debtor."); <u>In re LTL Mgmt. LLC</u>, Adv. Pro. No. 21-03032 (JCW) (Bankr. W.D.N.C. Nov. 15, 2021), Adv. Dkt. 102 (enjoining the prosecution of claims against J&J and numerous other affiliates because the "Enjoined Talc Claims by the [claimants] against the Protected Parties are inherently intertwined with talc-related claims against the Debtor . . . and those actions or claims are 'against the debtor' or seek 'to recover a claim against the debtor.'") (citing 11 U.S.C. § 362(d)).

[157]     For example, the MDL complaint defined J&J and Old JJCI together as the "Johnson & Johnson Defendants."  MDL Compl. at 8.  Furthermore, every count separately asserted against J&J in the MDL Proposed Amended Complaint is identical to the count asserted against LTL.  MDL Proposed Am. Compl.

were not the case, by virtue of the 1979 Agreement, **all of the pre-1979 liability** of J&J is also the liability of the Debtor because in the 1979 Agreement the Debtor assumed the liability and indemnified J&J for it.  And any alleged liability of J&J **arising after the 1979 Agreement** also is the liability of the Debtor, because the Debtor has the liability as the manufacturer of the product during that time and because the Debtor likely has indemnification or contribution obligations to J&J for any such talc liability.[158]

So the first part of section 524(g)(4)(A)(ii) is plainly satisfied.  J&J is alleged to be "directly or indirectly liable for the conduct of, claims against, or demands on" the Debtor arising during all relevant periods.  What the first part of section 524(g)(4)(A)(ii) requires is an overlap between the non-debtor's liability and that of the Debtor, which makes sense.  In point of fact, there is complete overlap because the claims against the Debtor and J&J are fundamentally the same.  It is not clear whether a bankruptcy court could exercise subject-matter jurisdiction to affect claims against a non-debtor third party that are unrelated to the debtor, or why Congress would want it to have the power to do so.  J&J may be alleged to be "directly" liable, such as by virtue of manufacturing the product, or "indirectly" liable, such as by virtue of allegedly making safety or marketing decisions with respect to the manufacturing of the product by its subsidiaries.

---

A more detailed discussion of the overlap between claims asserted against J&J and the Debtor, both in the MDL and generally in the tort system, can be found in Part II.I herein.

[158]   Indemnification is evidenced by the course of conduct and dealings between J&J and its affiliates.  See Part II.A supra.  See also Restatement (Second) of Torts § 886B (Am. Law Inst., 1979) (establishing obligation to indemnify party that is held vicariously liable for the conduct of the indemnitor); Restatement (Third) of Torts § 22 (Am. Law Inst., 2000) (same).  Furthermore, as J&J is facing allegations of strict product liability, see Adv. Pro. No. 24-3194, Adv. Dkt. 120 ¶ 36 (summarizing allegations that J&J is strictly liable, "irrespective of its level of care" for "J&J's own role in the sale" of the talc-containing products), J&J would, should such claims prove successful, be entitled to common law indemnification against the Debtor for the same reasons that the Retailers are so entitled.  See n. 184 infra; see e.g., Tex. Civ. Prac. & Rem. Code § 82.002(a) (state statute providing that manufactures "shall" indemnify sellers for losses arising out of products liability actions).  Finally, at the very least J&J may have contribution claims against the Debtor to the extent that J&J is alleged to have post-1979 liability, during which time the Debtor has primary liability for talc products.

But, in either case, the alleged liability completely overlaps the Debtor's liability, which involves the same products and the same injury.

The out of Circuit case law cited by various Objectors is not to the contrary.[159] Ultimately, those cases stand for the proposition that section 524(g)(4)(A)(ii) does not apply where the liability of the non-debtor and the debtor are "wholly separate," for example, by virtue of claims against the third party being solely tied to a distinct, non-debtor product.[160]  In this case, the liability of J&J and the Debtor is not "wholly separate" but instead is the exact same liability based on the same products, the same time periods, and the same injuries.

### b.       The Second Part of Section 524(g)(4)(A)(ii)

Notwithstanding the foregoing, certain Objectors argue the Channeling Injunction cannot apply to J&J because it supposedly cannot satisfy **any** of the four prongs of the remainder of section 524(g)(4)(A)(ii), the satisfaction of any **one** of which is sufficient for Protected Party status.[161]  Again, these Objectors base their arguments on the assertion that J&J has "independent" liability.[162]  But, as detailed above, the word "independent" is not used anywhere

---

[159]    See UST Obj. ¶¶ 28-29 (citing In re Pittsburgh Corning Corp., 453 B.R. 570, 599 (Bankr. W.D. Pa. 2011)); Travelers Obj. ¶¶ 62-63 (citing Combustion Eng'g, 391 F.3d at 235); US Obj. ¶ 45 (citing In re Quigley Co., 676 F.3d 45, 62 (2d Cir. 2012) and Combustion Eng'g, 391 F.3d at 234)); Coalition Plan Obj. at 39-40 (citing In re W.R. Grace & Co, 900 F.3d 126, 136 (3d. Cir. 2018), Combustion Eng'g, 391 F.3d at 236, and Quigley, 676 F.3d at 60-62).

[160]    See W.R. Grace, 900 F.3d at 136 (section 524(g) does not permit the extension of a channeling injunction to "liability wholly separate from any liability involving the debtor."); Combustion Eng'g, 391 F.3d at 235 (same); see also In re Pittsburgh Corning Corp., 417 B.R. 289, 290-91 (Bankr. W.D. Pa. 2006) (section 524(g) channeling injunction does not extend to claims against third parties based on exposure to non-debtor products).

[161]    The U.S. Trustee in so arguing repeatedly cites Humana, Inc. v. Shrader & Assocs., LLP, 584 B.R. 658, 667 (S.D. Tex. 2018).  See UST Obj., passim.  In that case, a law firm received funds from a section 524(g) asbestos trust for its representation of an asbestos claimant against the trust.  Certain entities under ERISA and a health plan sued the firm, seeking reimbursement of the plaintiff's health care costs that they had paid.  The firm argued it was a protected party under section 524(g)(4)(A)(ii) even though it was not named in the section 524(g) plan as such, nor could it be, as it had no relationship with the debtor.  This non-bankruptcy case has, as a result, no bearing on the Court's determination of whether parties legally or factually related to the Debtor can be Protected Parties under the Plan.

[162]    Coalition DS Obj. § II.A.2; UST Obj. ¶¶ 24-30; Coalition Plan Obj. at 41-43.

in the statute, which instead allows a channeling injunction to apply to the **<u>direct</u>** liability of a non-debtor.

Certain Objectors then state that J&J is not liable **<u>to the plaintiffs</u>** based on any of the four prongs in the second part of section 524(g)(4)(A)(ii), but instead is liable "based on its own actions" because it manufactured the product itself pre-1979, and allegedly made various marketing and safety decisions post-1979.[163]  But Objectors again are misconstruing the statute in a misguided, atextual attempt to inappropriately narrow its scope.  Under their approach, a non-debtor potentially could never satisfy the requirements of section 524(g)(4)(A)(ii), as asserted liability of the third party to the plaintiffs would always be based on some action, or failure to act, by the third party.  As an example, even though J&J's alleged safety decisions clearly would have been made based on its "involvement in the management of the debtor" (the second prong in section 524(g)(4)(A)(ii)(II)), various Objectors' position is that such actions do not fit the statute because they are J&J's "own independent" acts.

Ultimately, these Objectors' approach to the second part of section 524(g)(4)(A)(ii) is misplaced because they are asking the wrong questions.  The statute does not ask why a non-debtor is alleged to be liable **<u>to the plaintiffs</u>**, or whether the non-debtor's liability is based on its "own acts" (which will always be the case).  Those questions have no bearing on why Congress would want to exclude the liability of a third party under section 524(g)(4)(A)(ii), notwithstanding an overlap of that liability with the debtor.  Instead, the central question is how does the alleged liability of the non-debtor and the debtor overlap?  In the words of the second part of section 524(g)(4)(A)(ii), how did it come to pass, <u>i.e.</u> how did it "arise," that the non-debtor has "such alleged liability," <u>i.e.</u> liability that is also the liability of the debtor?

---

[163]        Coalition DS Obj. § II.A.2; UST Obj. ¶¶ 24-30; Coalition Plan Obj. § I.C.2.

Any other reading of section 524(g)(4)(A)(ii) would simply disregard other provisions of the statute.  For example, under these Objectors' approach, management of the debtor could never be a basis to protect a third party since management actions could always be alleged to be the third party's "own acts" and the reason the non-debtor was liable to the plaintiffs.  Further, anytime the non-debtor is alleged to be "directly" liable to the plaintiffs based on the non-debtor's "own acts," these Objectors would argue that the third party could not be protected, thereby reading the word "directly" out of the first part of section 524(g)(4)(A)(ii).  Ownership of the debtor, by itself, should never be enough for a third party to be liable to asbestos claimants against a debtor.  Instead, actions by the third party would be needed to assert viable piercing or alter ego theories.  But these, again, would be the third party's "own acts" according to these Objectors, thereby also reading the "ownership" prong out of section 524(g)(4)(A)(ii).

In all cases, a non-debtor would be alleged to be liable to the plaintiffs as a result of its actions and, based on the first part of section 524(g)(4)(A)(ii), the liability of the non-debtor and the debtor will overlap.  But if the debtor and the non-debtor are unrelated (for instance, if there is no nexus between them), then there is no reason to bar claims of the debtor's asbestos claimants against the non-debtor, even if the debtor's liability may overlap with that of the non-debtor.  As explained below, applying the statute in that situation would, among other things, risk potential unequal treatment of a debtor's asbestos creditors.

As a result, the language in the second part of section 524(g)(4)(A)(ii) reads, by virtue of its reference to numerous situations, broadly[164] to cover a variety of parties that, based on a myriad of different types of past relationships or transactions with the debtor or its predecessors,

---

[164]    See 138 Cong. Rec. S8335-36 (daily ed. June 17, 1992) (statement of Sen. Sanford) ("We in Congress must make it clear to the bankruptcy bench that they have the widest degree of latitude in crafting responsible reorganizations that fit the specific needs of each case.").

may have come to have overlapping liability with the debtor.  In re Asbestos Claims Mgmt. Corp., 2003 Bankr. LEXIS 429, at *137-38 (Bankr. N.D. Tex. 2003), aff'd, In re Asbestos Claims Mgmt. Corp., 294 B.R. 663 (N.D. Tex. 2003) ("In addition to the protection afforded the debtor or transferees or successors of the debtor under the plan, [section] 524(g)(4) sets forth the broad categories of third parties who, if alleged to be directly or indirectly liable for asbestos claims, may be beneficiaries of a supplemental injunction.").

While broad, section 524(g)(4)(a)(ii) does, for example, omit one key type of entity that might be responsible for plaintiffs' claims against a debtor—unrelated co-defendants in the tort system.  While, in many jurisdictions, such co-defendants can have joint and several liability with the debtor in an asbestos lawsuit even though the co-defendants and the debtor sold separate products, the four prongs of section 524(g)(4)(a)(ii) do not pick up this overlapping liability.  And this makes sense given the law that existed as to such co-defendants at the time section 524(g) was enacted in 1994.

After the first major asbestos defendants, such as Unarco Industries, Inc. and especially Johns-Manville Corporation, filed for chapter 11 in the early 1980s, co-defendants sought rulings that the automatic stay in the debtors' bankruptcy cases stayed (or should be extended to stay) the entirety of plaintiff's claims against them, which were included in the same complaints filed jointly against the debtor and numerous other defendants.[165]  The bankruptcy court in Manville rejected these efforts (id.),[166] and the Circuit courts that addressed the issue, including the Fifth

---

[165]    Johns-Manville Corp., 26 B.R. 405, 407 (Bankr. S.D.N.Y. 1983), aff'd sub nom. In re Johns-Manville Corp., 40 B.R. 219 (S.D.N.Y. 1984) (noting that Armstrong World Industries, Inc., Pittsburgh Corning Corporation, Garlock Sealing Technologies, Inc., Eagle-Picher Industries, Inc, GAF Corporation, Keene Corporation, H.K. Porter Company, Inc., the Celotex Corporation and Fiberboard Corporation sought such relief).

[166]    However, the bankruptcy court did, and subsequent bankruptcy courts over 40 years almost universally have, applied or extended the stay and enjoined actions against related third parties who might be alleged to be liable for the same products as the debtor, as the Debtor seeks here under section 524(g)(4)(A)(ii).

Circuit, were uniform in reaching the same result. Williford & Armstrong World Indus., 715 F.2d 124 (4th Cir. 1983); Wedgeworth v. Fibreboard Corp., 706 F.2d 541 (5th Cir. 1983); Lynch v. Johns-Manville Sales Corp., 710 F.2d 1194, 1196 (6th Cir. 1983); Pitts v. Unarco Indus., Inc., 698 F.2d 313, 314 (7th Cir. 1983). As a result, consistent with this legal background that existed when section 524(g)(4)(A)(ii) was enacted, the statute does not permit a channeling injunction to cover unrelated co-defendants, even though they might be responsible for claims against or conduct of a debtor.[167]

This result makes particular sense not only because the courts had previously determined that such unrelated co-defendants were not entitled to use a debtor's bankruptcy to stay actions against themselves, but also because applying section 524(g)(4)(A)(ii) to the unrelated co-defendants would run afoul of equality of treatment of a debtor's asbestos creditors. Because of the varying number of defendants identified in each specific asbestos case, staying actions against unrelated co-defendants would have a different effect on each plaintiff because the portion of all such defendants' liability to that of the debtor differs in each case.

However, where the alleged acts of a co-defendant create liability to all of the debtor's asbestos creditors, such as where there are piercing or successor liability allegations, or where (as here) there are allegations that the third party made safety, marketing, or other decisions as to the debtor's products, all of the debtor's asbestos claimants are affected in the same manner by enjoining actions against those third parties. In that situation, the claimant class would presumably want section 524(g)(4)(A)(ii) to apply because otherwise potentially thousands of

---

[167] The co-defendants of Johns-Manville further argued that a stay extended to them under Fed. R. Civ. P. 19 because Johns-Manville was an "indispensable party" to the underlying tort suits. Lynch, 710 F.2d at 1199. The Sixth Circuit declined to extend a stay because "the complaints at bar allege . . . exposure to **products of both** the solvent co-defendants and Unarco and/or J-M, the Chapter 11 debtors are joint tortfeasors and accordingly not indispensable." Id. (emphasis added).

third parties would assert indirect claims (liquidated in the tort system) back against the trust based on prepetition contractual or common law indemnities or other rights of reimbursement thereby defeating the purpose of the trust to treat all claimants equitably and control globally the resolution of all current and future asbestos claims.  Even absent indemnities or a right of reimbursement, as noted above (note 159, _supra_), where the claims against third parties involved the debtor's products, the litigation against third parties outside the trust could generate factual and legal determinations that would affect the trust's resolution of issues with claimants inside the trust but without the trust's involvement (thereby potentially forcing the trust to be involved and defeating in large part the purpose of the trust).[168]  But concerns regarding unequal treatment of individual asbestos claimants is not implicated.

Here, the claimant class has, through its representatives and their votes, determined that it makes sense to extend the Channeling Injunction to the Protected Parties, including J&J.  And no Objector has asserted that it is being treated differently than the class as a whole as a result of section 524(g)(4)(A)(ii) applying to J&J.[169]

The Objectors have not cited any reason why section 524(g)(4)(A)(ii) should not apply to give the class of asbestos creditors maximum flexibility to address asbestos liability of third parties that overlaps with that of a debtor and the debtor's products.  Instead, these Objectors, as part of their myriad efforts to attempt **to defeat the bankruptcy**, seek to greatly narrow section 524(g)(4)(A)(ii), contrary to its language, by positing the wrong questions as to what the statute's

---

[168]    And, in this particular case, where the Talc Personal Injury Trust is paying talc claims in full, the trust would need and want to know whether claimants may have been paid by a third party so as to not pay such claimants more than in full.

[169]    Instead, the Coalition is on record repeatedly stating—until recently—that it opposes the bankruptcy and it is using its objection to the third party injunction as part of its multi-front effort to derail the case.  The same is true for the U.S. Trustee, who in addition has no economic stake in the dispute.  And the Insurers are objecting to the Channeling Injunction as part of their overall strategy to leverage concessions in the coverage litigation pending outside of the bankruptcy.

language requires (they ask, for instance, is the third party's liability "independent?").  The Fifth

Circuit has not hesitated to follow the language of the Bankruptcy Code to make sure that the

right question is addressed in a bankruptcy dispute.  In re Village at Camp Bowie I, L.P., 710

F.3d 239, 246-248 (5th Cir. 2013) (proper question on confirmation of plan is good faith not

"artificial impairment" because nothing in the text of the Bankruptcy Code provides for the

latter; court therefore refused to deem a claim unimpaired for purposes of § 1129(a)(10) even

though it plainly qualifies as impaired under § 1124); In re Rash, 90 F.3d 1036, 1043 (5th Cir.

1996) (question posed by the language of section 506(a) of the Bankruptcy Code is not "the

value of the collateral," but rather "the value of the creditor's interest in the estate's interest in

such property"), rev'd on other grounds, Assocs. Commercial Corp. v. Rash, 520 U.S. 953

(1997).[170]  The Court here should follow these decisions of the Fifth Circuit, adhere to the

statutory language and reject Objectors' position.

### c.      Application of 524(g)(4)(A)(ii) to J&J

### (i)      Alleged Post-1979 Agreement Liability

The Channeling Injunction can apply to post-1979 liability, which would be considered

"indirect" liability within the meaning of the statute, under subsections 524(g)(4)(A)(ii)(I)

(ownership of a financial interest) and 524(g)(4)(A)(ii)(II) (management).

### (a)      Section 524(g)(4)(A)(ii)(I)

Various Objectors have alleged that J&J may have liability for talc claims against the

Debtor by reason of its alleged marketing or safety decisions as to the Debtor's talc products.

The Debtor and J&J dispute that, but even if true, J&J would have made those decisions as the

---

[170]      See also Loper Bright Enters. v. Raimondo, 144 S.Ct. 2244 (2024) (courts are not required to give
deference to an administrative agency's interpretation of a statute under the Administrative Procedures Act
("APA") because such deference is not found in the text of the APA).

owner of the Debtor's predecessors, potentially based on agreements or a course of dealing with respect to licensing, marketing or similar matters.

The fundamental reason that J&J could have liability that overlaps with that of the Debtor is because J&J owned financial interests in predecessors of the Debtor as contemplated by section 524(g)(4)(A)(ii)(I).  The Coalition appears to assert that section 524(g)(4)(A)(ii)(I) is not available to J&J based on Quigley, 676 F.3d at 45.[171]  However, Quigley is both factually and legally distinct from this case.

As an initial matter, the "apparent manufacturer" claims in Quigley were based on a distinct Pennsylvania statute.  Not only have no similar allegations been brought against J&J under that statute, the Debtor is not aware of **_any_** "apparent manufacturer" claims that have been asserted against J&J to date.  The Coalition makes much of the parent's logo placement on the bottles in question in Quigley, but here, in compliance with federal consumer regulations, every bottle of talc that has been produced by a J&J affiliate identified the J&J subsidiary that manufactured it.[172]  Furthermore, J&J likely is owed indemnity pursuant to common law, or at least contribution, a distinguishing fact not referenced in Quigley that further underscores how these claims fall within the scope of section 524(g).  In short, the scenario posed in Quigley is not present here (as evidenced by the lack of any similar allegations to date), and thus Quigley provides no basis to conclude that the actual claims asserted against J&J, which relate to its ownership of a financial interest in its affiliates, fall outside the scope of section 524(g).

---

[171]    Coalition DS Obj. at 83-87; Coalition Plan Obj. at 40-41.

[172]    See e.g., 16 C.F.R. § 500.5(a) ("The label of a consumer commodity shall specify conspicuously the name and place of business of the manufacturer"); 16 C.F.R. § 500.5(b) ("The requirement for declaration of the manufacturer, packer, or distributor shall in the case of a corporation be deemed to be satisfied only by the actual corporate name, which may be preceded or followed by the name of the particular division of the corporation.").

In any event, the court in <u>Quigley</u> was clear that it was not establishing a <u>per se</u> rule that "legal" rather than "factual" causation was necessary to satisfy the prongs set forth in the second part of section 524(g)(4)(A)(ii), but instead indicated that it was speculating that this was generally the case.[173]   The decision, of course, is out of Circuit precedent not binding here and, if literally applied as the Coalition suggests, would contravene section 524(g)(4)(A)(ii),[174] for the reasons discussed above, in a situation where the liability of the debtor and the third party are for the same products and the same injury, and where the debtor also has indemnity or similar reimbursement obligations to the third party.[175]

**(b)      Section 524(g)(4)(A)(ii)(II)**

Pursuant to section 524(g)(4)(A)(ii)(II), the Channeling Injunction can apply to post-1979 Agreement liability alleged against J&J because marketing and safety decisions with respect to the talc products of the Debtor's predecessors would be examples of management-type actions within the purview of this subsection.  Of note, it appears the management prong of section 524(g)(4)(A)(ii)(II) was not argued in <u>Quigley</u>, another distinction between that and this

---

[173]      <u>Quigley</u>, 676 F.3d at 61 ("This circumstance does not conclusively establish that § 524(g)(4)(A)(ii)'s channeling authority is limited to situations in which the third party's relationship with the debtor is legally relevant to its purported liability, so that a bankruptcy court is not authorized to bar litigation when the relationship is merely a 'but for' cause of the alleged liability").

[174]      A holding that "legal" rather than "factual" causation always is required under section 524(g)(4)(A)(ii) would not only be based on pure speculation as to what Congress may have intended, but is contrary to the language of the statute, which does not in any way so limit the application of section 524(g)(4)(A)(ii).  The employment litigation example the <u>Quigley</u> court gives to support its ruling under the facts of that case is very different from the facts here and would never justify relief under section 524(g)(3) in that circumstance (the bankruptcy court always having discretion not to approve the relief even if, technically, it might arguably fit the statute).  Finally, as described herein as to Kenvue, the piercing and successor liability claims to which the <u>Quigley</u> court seemed to state was the focus of section 524(g)(4)(A)(ii) are almost always claims that exclusively belong to the debtor in chapter 11, who therefore can release those claims without the application of section 524(g)(4)(A)(ii).  So the situations to which <u>Quigley</u> seems to focus would render that section meaningless.

[175]      Further, here Objectors seek to exclude from the application of section 524(g)(4)(A)(ii) the **<u>entirety</u>** of potential post-1979 claims against J&J, rather than a very limited set of claims (that an Objector actually represents), as was at issue in <u>Quigley</u>.

-186-

case. Nonetheless in its discussion of the meaning of that section, the Quigley court stated that, if piercing type allegations are asserted against a third party, those allegations likely would satisfy the management prong of the statute.[176] These types of allegations have been asserted against J&J with respect to post-1979 liability.[177]

### (ii)  Alleged Pre-1979 Agreement Liability

The Channeling Injunction can apply to pre-1979 Agreement liability, which would be considered "direct" liability within the meaning of the statute, under subsections 524(g)(4)(A)(ii)(I) (ownership of a financial interest); 524(g)(4)(A)(ii)(II) (management); and 524(g)(4)(A)(ii)(IV) (involvement in a transaction changing corporate structure or a financial transaction affecting financial condition).

Pursuant to the plain terms of the 1979 Agreement, and as determined by Judge Whitley and Judge Kaplan,[178] Old JJCI assumed all liabilities associated with J&J's Baby Products Division. While the Coalition argues that the talc-related liabilities could not have been transferred because they were not "on the books and records" at the time of the 1979 Agreement,[179] courts have interpreted the broad language of the 1979 Agreement to include

---

[176]   Quigley, 676 F.3d at 60, n.18.

[177]   See MDL Proposed Am. Compl. ¶ 16 ("New JJCI, LTL, and Janssen are and have been at all relevant times wholly owned subsidiaries of [] Johnson & Johnson, under the complete dominion and control of [] Johnson & Johnson"); Fifth Am. Pet. ¶ 44, Ingham et al. v. Johnson & Johnson et al., No. 1522-CC10417-01 (St. Louis Cir. May, 22, 2018) (J&J "exercised an unusually high degree of control over [New JJCI], particularly with the manufacturing, marketing, testing, promoting, selling and/or distribution of the [talc products]").

[178]   See In re LTL Mgmt. LLC, Adv. Pro. No. 21-03032 (JCW) (Bankr. W.D.N.C.), Nov. 10, 2021 Hr'g Tr. 138:13-17 (Judge Whitley:  "I believe under the circumstances that the language used effectively means that what we had was an assumption of all of the liabilities of the debtor and that is broad enough to cover future product liability claims."); LTL, 638 B.R. at 311 ("Thus, in 1979, J&J Baby Products became the real party in interest for all actions, suits or proceedings relating to the talc previously sold by J&J or in any way arising out of the talc business that was being transferred.").

[179]   See Coalition Plan Obj. § I.B.3 n.128 (citing to Adv. Pro. No. 24-3194, Adv. Dkt. 120 ¶ 20).

contingent product liability claims, even absent any specific reference to such claims.[180]  This interpretation is also consistent with the fundamental purpose of the decentralization J&J was undertaking, in addition to the parties' course of performance post-execution, which courts have agreed evidenced the parties' intent to transfer all talc liabilities to Old JJCI.

### (a)    Section 524(g)(4)(A)(ii)(I)

Section 524(g)(4)(A)(ii)(I) applies to any pre-1979 Agreement liability of J&J because J&J would have that liability as a result of owning a financial interest in the Baby Division prior to its separation from J&J as part of the 1979 Agreement.  The Baby Division is the predecessor of the Debtor, having manufactured talc containing products prior to the transfer of the business to Old JJCI in the 1979 Agreement.  Section 524(g)(4)(A)(ii)(I) does not use the words "ownership of the debtor or a predecessor."  Instead, it used the broader language:  "ownership of a **<u>financial interest</u>** in" such entities.  This further reinforces that the subsection is not limited to parent/subsidiary relationships, but is expansive enough to include a corporation's financial interest in its assets, divisions, and product lines.[181]

### (b)    Section 524(g)(4)(A)(ii)(II)

The Channeling Injunction can likewise apply to any pre-1979 Agreement liability for the same reasons section 524(g)(4)(A)(ii)(I) applies.  J&J's liability results from its management of the Baby Division, a predecessor of the Debtor.

---

[180]    See LTL, 638 B.R. at 311 (discussing and citing cases).

[181]    In re N. Am. Refractories Co., No. 02-20198 (TPA) (Bankr. W.D. Pa. Nov. 13, 2007), Dkt. 5507, Ex. 1 ¶¶ 329(b)(1), (2) (finding non-debtor Honeywell, parent of corporate family, was eligible for channeling injunction even though its predecessor manufactured the product, as claims against Honeywell and debtor (NARCO) were so intertwined that "for all intents and purposes, any asbestos claim against Honeywell or against NARCO is equally a claim against the other entity," and reasoning that "[a]s it relates to NARCO Asbestos Trust Claims and NARCO Asbestos Demands, Honeywell (as the party from whom NARCO assumed liabilities) is the Debtor's predecessor-in-interest and, therefore, is eligible to be included amount the beneficiaries of the NARCO Channeling Injunction proposed by the NARCO Plan").

(c)      **Section 524(g)(4)(A)(ii)(IV)**

Finally, the Channeling Injunction can apply to pre-1979 Agreement liability under section 524(g)(4)(A)(ii)(IV).  But for the 1979 Agreement, the Debtor would have no pre-1979 Agreement liability, so J&J's liability would not overlap with the Debtor.  In the 1979 Agreement, the Debtor assumed the pre-1979 Agreement liability and indemnified J&J for the same, thereby creating a complete overlap.  And, the 1979 Agreement clearly satisfies the language of section 524(g)(4)(A)(ii)(IV) because it was a "transaction changing the corporate structure."  Pursuant to the 1979 Agreement, and consistent with J&J's policy of decentralizing its business, J&J transferred all its assets and liabilities associated with the Baby Division to a separate entity—J&J Baby Products, thereby effecting a change in corporate structure.  Section 524(g)(4)(A)(ii)(IV) is also satisfied by the 1979 Agreement because the transfer of assets and liabilities, including talc liability, necessarily "affected the financial condition" of, ultimately, the Debtor and, certainly, related parties.

2.      **Affiliates of J&J and the Debtor**

One category of Protected Parties under the Plan is the "Debtor Corporate Parties," which generally comprise current and former affiliates[182] of J&J and/or the Debtor and who are listed in Schedule 1 to the Plan.  While the Coalition complains about the length of Schedule 1 and broadly assert that the inclusion of these parties has "absolutely zero basis in the text of § 524(g),"[183] they miss the fundamental point of including all of these entities as Protected Parties.  Section 524(g)(4)(A)(ii) permits a channeling injunction to apply to an entity that is not

---

[182]   Because the Imerys/Cyprus Settlement Agreement has gone effective, the issue of whether Imerys and Cyprus are Protected Parties is no longer relevant.

[183]   See Coalition Plan Obj. at 45.

specifically named but instead is part of an "identifiable group."[184]  As a result, the Plan could

have simply listed "all current or former affiliates of the Debtor and/or J&J" as Protected

Parties.[185]  The Plan instead includes the specific names of these entities, to the extent known, so

that in the future should one of them be sued it is clear that the entity is a Protected Party.  It is

commonplace in section 524(g) plans to have lengthy affiliate Protected Party lists.[186]  The fact

that Schedule 1 is long is not a basis to conclude the affiliate cannot be covered under

section 524(g)(4)(A)(ii).

Furthermore, to the extent the Coalition is asserting that certain proposed Protected Party

affiliates are not eligible to be Protected Parties because they have not to date been alleged to be

liable or sued for talc claims against the Debtor, the Coalition misreads the statute.

Section 524(g)(4)(A)(ii) does not contain this requirement.[187]  Instead, section 524(g)(4)(A)(ii)

merely requires that the third party could be alleged to be liable or sued in the future.

It would not make sense that section 524(g)(4)(A)(ii) allows an identifiable group of

entities to be protected parties, without naming them specifically, but then also requires that each

entity has been sued individually before plan confirmation.  Plaintiffs cannot sue "an identifiable

group" of entities without naming them specifically (as long as they are known).  So any

---

[184]    See 11 U.S.C. § 524(g)(4)(A)(ii) (a 524(g) "injunction may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group)").

[185]    Armstrong World Indus., 348 B.R. at 153 (confirming plan which plainly included "any Affiliate" of the debtor as a channeling injunction protected party).

[186]    See Paddock, Dkt. 1406 (channeling injunction covering at least **280** affiliates); In re Kaiser Gypsum Co. Inc., No. 16-31602 (JCW) (Bankr. W.D.N.C. Jul. 28, 2021), Dkt. 2746 § VII.B.2; Dkt. 2481, Ex. I.A. 108 to Ex. A (channeling injunction covering at least **1,100** affiliates); Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp., 518 B.R. 307, 328 (W.D. Pa. 2014) (channeling injunction covering at least **300** affiliates).

[187]    The ability to create categories, or "identifiable groups," of third parties is explicitly written into section 524(g).  This ability to name protected parties in groups, in addition to the large lists of protected parties in previously confirmed asbestos bankruptcies (see note 187, supra), demonstrates that each party in the group does not have to have been affirmatively sued in order to qualify for section 524(g) relief.

-190-

interpretation that requires every protected party to have been sued or alleged to be liable would be inconsistent with the concept that the injunction can apply to an "identifiable group."

Further, there is no harm in applying a channeling injunction to entities that may be sued only in the future for claims against a debtor if the entity otherwise satisfies section 524(g)(4)(A)(ii).  If those entities are not sued later, then no plaintiff has been deprived of anything.  If they are sued later for claims against the debtor, the trust is protected against indirect claims that are liquidated outside of the trust and the central goal of the debtor's plan–the assurance of equitable treatment to claimants–is preserved.  And this prevents plaintiffs from pursuing the same claims against other entities later; as a result, the applicability of section 524(g) is determined not by how or when plaintiffs plead their cases in the tort system, but rather the relief needed to ensure a comprehensive resolution of liability related to a debtor.  See In re Pittsburgh Corning, 2013 WL 2299620, at *25 (recommending confirmation of a section 524(g) plan and related channeling injunction that protected over 200 affiliates, and noting that it is "important to prevent evasion of the Asbestos Permanent Channeling Injunction through artful pleading").

Finally, presumably Objectors would question how could it be known whether an entity not yet sued would be alleged to be liable for claims against the debtor based on one of the four prongs of the second part of section 524(g)(4)(A)(ii)?  But just raising that question proves the point that section 524(g)(4)(A)(ii) is a broad and flexible statute intended to cover a myriad of entities liable for the claims against the debtor under a myriad of circumstances.  Since the statute permits an "identifiable group" of entities, without them being named individually, to be eligible for a channeling injunction, it stands to reason that such entities would be eligible for

protected party status as long as it is apparent that any future suit would be on the basis of one of the factors listed in section 524(g)(4)(A)(ii).

Many of the current and former affiliates of the Debtor and J&J never manufactured talc-containing baby power, nor any other product alleged to cause ovarian cancer. As a result, any overlap between the liability of the Debtor and of such entity would have to be on the basis of a least one, if not several, of the factors listed in the second part of section 524(g)(4)(A)(ii). As current or former affiliates, these entities could, for instance, potentially be sued for piercing or alter ego, or for successor liability. If the suit were for piercing/alter ego or successor liability, it is certain to include allegations regarding ownership of a financial interest in the Debtor or a predecessor (§ 524(g)(4)(A)(ii)(I)), management of the entities (§ 524(g)(4)(A)(ii)(II)), or a transaction changing the corporate structure of the entities or a financial transaction affecting the financial condition of such entities (§ 524(g)(4)(A)(ii)(IV)). Again, the breadth of the language and scope of section 524(g)(4)(A)(ii) makes clear Congress's intent that the statute pick up most liability that overlaps with the Debtor's liability. The Channeling Injunction properly applies to the various current and former affiliates listed as Protected Parties on Schedule 1 to the Plan.

In addition, as described below with respect to Kenvue, alter ego and successor liability claims, once a chapter 11 case is commenced, belong to the Debtor. Here, under the Plan these claims against affiliate are released by the Debtor. Thus, the Channeling Injunction backs up the Debtor Release to ensure no entity sues a party who has been released under the Plan, a construct that exists throughout the Plan.[188] Further, as noted previously, since this is a full pay case, there will be no viable claims against the affiliates, as the Debtor will have paid the claims of the plaintiffs in full under the Plan.

---

[188]    See Plan § 1.1.125 (definition of "Release Injunction.").

### 3.    <u>Kenvue</u>[189]

Certain Objectors separately object to the Channeling Injunction applying to Kenvue, arguing that Kenvue has potential successor liability.[190]  The liability for which Kenvue is allegedly the successor is liability for the manufacture of talc-containing products in the United States, which liability now rests in the Debtor.[191]  Kenvue never manufactured talc-containing products in the United States, as the Debtor's predecessor stopped including talc in its product in the United States in 2020 (when Kenvue did not yet exist) and only later, in 2023**,** transferred manufacturing operations to Kenvue.

As set forth in Part II.A, <u>supra</u>, the alleged talc liability originally was in Old JJCI, which manufactured the product after the 1979 Agreement.  In the 2021 Corporate Restructuring, all talc liability was allocated only to LTL, as LTL indemnified J&J and all J&J affiliates for talc liability, and Old JJCI ceased to exist.  Thus, at the time of the later 2023 "spin off" transaction when New JJCI transferred certain operations to Kenvue, New JJCI, an entity created in the 2021 Corporate Restructuring, had no pre-divisional merger talc liability and had no post-divisional merger talc liability, since it never manufactured talc-containing baby powder in the United States (talc having been removed from the product in 2020).  In the spinoff transaction, J&J indemnified Kenvue for all claims related to the prior talc-containing products.  And, in the later **2024** Prepetition Corporate Restructuring, LLT's relevant talc liability, including its indemnification of J&J, all J&J affiliates, and J&J's indemnification of Kenvue, was allocated

---

[189]     <u>See</u> <u>supra</u> Part II.D.

[190]     <u>See</u> Coalition DS Obj. § II.A.3; Nesko Obj. ¶¶ 9-11; Coalition Plan Obj. § I.C.3, <u>see</u> <u>also</u> Adv. Pro. No. 24-3194, Adv. Dkts. 15, 129.

[191]     Both Kenvue and the Debtor dispute that any successor liability exists for reasons set forth in briefing before this Court in the automatic stay adversary proceeding.  <u>See</u> Adv. Pro. No. 24-3194, Adv. Dkts. 82, 133.

solely to the Debtor, and LTL ceased to exist.  Under section 4.16 of the Plan, the Talc Personal Injury Trust also indemnifies Kenvue from, among other things, "any and all claims, demands . . . losses . . . (including attorneys' fees), and other charges whatsoever suffered or incurred by it subsequent to the Effective Date arising out of or in any way relating to any Channeled Talc Personal Injury Claim."

As explained in detail in prior pleadings the Debtor filed in the automatic stay adversary proceeding (Adv. No. 24-3194),[192] which the Debtor incorporates herein, all claims seeking to hold a third party liable as a successor for liability against the Debtor became property of the Debtor.[193]  Further, upon the commencement of the chapter 11 case, as a matter of bankruptcy law, all successor liability claims became the exclusive property of the Debtor's estate.[194]

Under section 11.2.1 of the Plan, the Debtor will release all successor liability claims against Kenvue.[195]  Therefore like the Channeling Injunction for the J&J affiliates, which (similar to Kenvue), if sued, likely would be sued on the basis of successor liability or piercing or alter ego (all of which will be released by the Debtor under section 11.2.1), the Channeling

---

[192]  See Adv. Pro. No. 24-3194, Adv. Dkt. 2 § II (detailing at length the Debtor's inheritance of all channeled talc-related assets and liabilities); Adv. Pro. No. 24-3194, Adv. Dkt. 82 §§ I.A.i, I.B.iii (same); see also Second Kim PI Decl., Ex. G (Plan of Divisional Merger, Schedule 5(b)(i)) (listing Red River talc-related assets and liabilities).

[193]  See Second Kim PI Decl., Ex. G (Plan of Divisional Merger, Schedule 5(b)(i)) (listing Red River Assets ███████████████████████████

[194]  In the adversary proceeding, certain parties argued that the Debtor did not own the successor liability claims because Kenvue is a successor to New JJCI not the Debtor.  Adv. Pro. No. 24-3194, Adv. Dkts. 120, 129.  But, successor liability, as its name makes clear, seeks to hold a third party responsible for the liabilities of the debtor.  The reason that state law gives the successor liability claim to the Debtor (and the Bankruptcy Code thereby gives it exclusively to the Debtor's estate) is "to promote equity and avoid unfairness" among the debtor's creditors by allowing the debtor to bring the claim on behalf of all the creditors.  See Adv. Pro. No. 24-3194, Adv. Dkt. 82 ¶ 65 (citing In re Emoral Inc., 740 F.3d 875, 881 (3d Cir. 2014)).  This purpose does not change based on whether the third party succeeded to the Debtor's assets or the assets of some other party.

[195]  See Plan § 11.2.1 (Debtor and its estate release, among others, the "Debtor Corporate Parties" (which, based on Schedule 1 to the Plan, includes Kenvue) in connection with various matters, including the transactions that created Kenvue and the transfer of New JJCI's assets to it).

Injunction for Kenvue backs up and enforces the release of Kenvue.  As it does with respect to other Protected Parties, the Channeling Injunction ensures that all such claims (which are claims against the Debtor) will be channeled to, and processed and paid, by the trust.

The Channeling Injunction can apply to Kenvue under section 524(g)(4)(A)(ii)(IV) (here Kenvue's involvement in a transaction changing the corporate structure of a "related party" or a financial transaction affecting the financial condition of such "related party") for essentially the same reasons it can apply to J&J with respect to J&J's alleged pre-1979 Agreement liability.  If Kenvue were to have successor liability for the talc liability of the Debtor (which it does not), it would be because it obtained the baby powder assets formerly owned by Old JJCI and New JJCI. Kenvue obtained those assets through a transaction whereby J&J separated into two independent companies:  J&J and Kenvue, and Kenvue received the Consumer Business assets formerly held indirectly by J&J.[196]  This transaction clearly changed the corporate structure of New JJCI and also was a financial transaction affecting the financial condition of New JJCI.  In fact, claimants made this argument in the 2023 Chapter 11 Case, complaining that the transaction deprived New JJCI of over $30 billion of value to backstop its funding agreement with LTL.[197]  In addition, since as part of the spin off, J&J agreed to indemnify Kenvue for existing talc liability and LTL agreed to indemnify J&J for that indemnity liability, this transaction also affected the financial condition of both a predecessor of the Debtor (LTL) and an affiliate of the Debtor (J&J) as contemplated by section 524(g)(4)(A)(ii)(IV).

---

[196]     See Second Kim PI Decl. ¶ 8.  Following the separation, J&J divested all shares of Kenvue common stock as part of a debt-for-equity exchange.  Id.

[197]     2023 Chapter 11 Case, Dkt. 79 at 6.

### 4.    **The Retailers**

Finally, certain Objectors generically assert that the Channeling Injunction cannot apply to the Retailers under section 524(g)(4)(A)(ii).[198]  But, the injunction applies to the Retailers under 524(g)(4)(A)(ii)(IV) based on their involvement in financial transactions affecting the financial condition of a predecessor of the Debtor.  The Retailers are being sued because they distributed the Debtor's predecessor's talc-containing products.  See First Day Decl. ¶ 78[199]  By definition, every Retailer entered into a financial transaction to distribute these products, typically a sale or distribution contract.[200]  These transactions also by definition affected the financial condition of the Debtor's predecessor by creating an asset of the predecessor (the contract) and revenue for the predecessor from the sale of the product to the Retailer.  Many, if not substantially all, of these contracts or agreements also contained an indemnity running in favor of the Retailer, thereby further affecting the financial condition of the predecessor. See First Day Decl. ¶¶ 77-79; Kim PI Decl. ¶¶ 46-51, Ex. 31-34.[201]

The Retailers are the one set of Protected Parties that are not affiliates or related parties to the Debtor.  But, unlike unrelated co-defendants who are responsible for their own products and

---

[198]    See UST Obj. ¶ 30; Coalition DS Obj. § II.A.4; Coalition Plan Obj. § I.C.4.

[199]    While not every Retailer may have been sued to date, for the reasons set forth in Part VII.E.2, supra as to the Affiliates, the Channeling Injunction applies to all of the Retailers, whether sued to date or not.  Like the Affiliates, the Retailers could be covered by section 524(g)(4)(A)(ii) as part of an "identifiable group," but, among other things, listing them individually avoids potential later litigation over whether they are included in the injunction across tens of thousands of claims.

[200]    While "financial transaction" is not defined in the Bankruptcy Code, numerous other federal statutes define the term as involving the transfer or movement of funds and/or the transfer of value.  See, e.g., 31 C.F.R. § 597.308 ("financial transaction" as "a transaction **involving the transfer or movement of funds**, whether by wire or other means"); 18 U.S.C.A. § 1956(c)(4) ("[T]he term 'financial transaction' means (A) a transaction which in any way or degree affects interstate or foreign commerce (i) **involving the movement of funds by wire or other means**. . . .") (emphasis added).

[201]    As noted therein, even in the limited circumstances where a contractual indemnity may not exist, it is likely that a common law indemnity would be owed by the Debtor to the Retailer in any event.  See Kim PI Decl. ¶ 46; Adv. Pro. No. 24-3194, Adv. Dkt. 2 at 26 n.15.

are, as a result, not intended to be covered by section 524(g)(4)(A)(ii) (as described in Part VII.E.1(b), <u>supra</u>), the Retailers here are alleged to be liable only for the Debtor's products.  As a result, they are covered by section 524(g)(4)(A)(ii).  If litigation against the Retailers over the same products and the same injuries were to proceed after confirmation of the Plan, especially given their indemnities from the Debtor, the Talc Personal Injury Trust's ability to provide equitable treatment to claimants would be lost, thereby defeating one of the fundamental goals of this bankruptcy case.  Potentially thousands of claims against the Retailers could be decided separately from the Trust Distribution Procedures.  As a result, the resulting indirect claims against the Talc Personal Injury Trust (based on the indemnities) would be determined in the tort system and likely in amounts that vary materially from the amounts payable under the Trust Distribution Procedures.[202]  The effectiveness of the channeling of claims to the trust would be jeopardized.  Again, the claimant class should want, and by its vote made clear it does want, to apply the Channeling Injunction to the Retailers so that the Talc Personal Injury can operate as the parties intend.  And, as is the case with respect to other Protected Parties, since this is a full pay case, extension of the Channeling Injunction to the Retailers should be uncontroversial because all claims will have been fully satisfied by the Talc Personal Injury Trust.

F.    **The Third Party Release in Section 11.2.2 of the Plan Also is Permissible Notwithstanding <u>Purdue</u>**

As part of their position that the Plan is unconfirmable because section 524(g)(4)(A)(ii) is not available to the Protected Parties, certain Objectors assert that there is no other avenue for the Debtor to obtain equivalent relief as to the Protected Parties because <u>Purdue</u> "changed

---

[202]    Again, factual disputes regarding the plaintiff's claim would have been decided without the Talc Personal Injury Trust, even though the trust bears ultimate responsibility for that claim, either directly or by way of indemnity to the Retailer.

everything" on third party releases.[203]  But, in fact, <u>Purdue</u> changed nothing for a full pay case such as this.  The Supreme Court emphasized that "[a]s important as the question we decide today are the ones we do not."  <u>Purdue</u>, 603 U.S. at 226.  The Supreme Court qualified its holding by declining to "pass upon a plan that provides for the **<u>full satisfaction</u>** of claims against a third-party non-debtor."  <u>Id.</u> (emphasis added).[204]

    1.    **The Plan Pays Channeled Talc Personal Injury Claims in Full**

As described at length in the Mullin Report, the Talc Personal Injury Trust will pay the Channeled Talc Personal Injury Claims ████████████████████████████████████ █████████████████████████.[205]  In fact, while the Mullin Report provides ████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████.[206]  Further, the Mullin Report demonstrates ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████

---

[203]    <u>See</u>, <u>e.g.</u>, Adv. Pro. No. 24-3194, Adv. Dkt. 10 § II.A.

[204]    Objectors also assert that the third party releases contemplated under the Plan are broader than the scope of the section 524(g) channeling injunction.  <u>See</u> US Obj. ¶¶ 48-49; UST Obj. ¶¶ 18, 21-22.  The Debtor disputes this assertion because the claims that would be released under the Third Party Releases fall within the broad scope of relief contemplated by section 524(g).  Further, to the extent this Court finds that certain claims do not fit within the scope of the Channeling Injunction, the Debtor, as detailed herein, maintains that the release of such claims is nonetheless appropriate under applicable law because the Plan will pay all such claims in full.

[205]    <u>See</u> Mullin Report at 27-31, 68-70.

[206]    See id. at 70 ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████.

███████████████.[207]  In fact, ████████████████████████████████

████████████████████████████.[208]

### 2. Since Talc Claims Are Being Paid in Full, They Can Be Released Under the One-Satisfaction Rule

Purdue's reference to plans that provide for the "full satisfaction" of third-party claims

invokes the "one-satisfaction rule"—a common-law doctrine of torts that limits a plaintiff's

recovery against multiple defendants alleged to be liable for a single indivisible injury. The rule

provides that a plaintiff who has received full satisfaction of its claim from one tortfeasor cannot

recover additional damages for the same injury from remaining tortfeasors. See, e.g., Singer v.

Olympia Brewing Co., 878 F.2d 596, 600 (2d Cir. 1989).[209]  This commonsense rule has long

been a fixture in the United States, where courts have applied it for centuries to bar recovery in

excess of a plaintiff's claim.[210]  See Lovejoy v. Murray, 70 U.S. 1, 11-18 (1865) (detailing the

history of the one-satisfaction rule and holding that "when the plaintiff has accepted satisfaction

---



[207]   Id. at 31
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

[208]   See id. at 70
███████████████████████████████████████████
███████████████████████████████████████████

[209]   See Restatement (Second) of Torts § 885 Cmt. e (Am, L. Inst. 1979) ("Payments made by one of the tortfeasors on account of the tort either before or after judgment, diminish the claim of an injured person against all other responsible for the same harm. . . . If the payment is made as full satisfaction for a specified item of damage, the claim against the others is terminated with respect to that item.").

[210]   In addition to the one satisfaction rule, the Third Party Release is supported by analogy to the doctrine of marshalling. In A.H. Robins, the Fourth Circuit applied that doctrine to authorize third-party releases that prevented personal injury claimants, which would likely recover in full under the plan, from pursuing various non-debtors outside of the plan. 880 F.2d at 701. In so holding, the Fourth Circuit found that the "ancient but very much alive doctrine of marshalling of assets" supported its conclusion, noting that "a creditor has no right to choose which of two funds will pay his claim." Id.

in full for the injury done him, from whatever source it may come, he is so far affected in equity and good conscience, that the law will not permit him to recover again for the same damages.").[211]

The one-satisfaction rule is accepted by the Fifth Circuit and courts in Texas.  The Fifth Circuit has stated "it appears that Texas law regards the one satisfaction rule as general and controlling, applicable in all circumstances, and so fundamental as to override any other principle conflicting with it."  See Thibodeaux v. Fibreboard Corp., 706 F.2d 728, 729-30 (5th Cir. 1983) (applying one-satisfaction rule in an asbestos case to prevent plaintiff from recovering from additional joint tortfeasor); Next Level Commc'ns LP v. DSC Commc'ns Corp., 179 F.3d 244, 250-52 (5th Cir. 1999) (affirming injunction that barred claimant from bringing additional suit against different defendants on ground that claimant had already been "made whole"); see also T.L. James & Co. v. Statham, 558 S.W.2d 865, 869 (Tex. 1977); Nalle v. Hale, 2023 Tex. App. LEXIS 1864 (Tex. App. Mar. 23, 2023).

As a result, under the one-satisfaction rule, the Third Party Release should be approved not only because Purdue does not bar that result, but because it is fully justified given that the Channeled Personal Injury Talc Claims will have been fully satisfied under the Plan.  The Third Party Release, like the Channeling Injunction, simply affirms and supports full payment by mirroring and implementing the one-satisfaction rule.  Absent the release, the Talc Personal

---

[211]  The common-law prohibition on multiple recoveries for one injury is analogous to a "bar order" in partial settlements.  Bar orders enjoin non-settling co-defendants from asserting indemnity or contribution claims against settling defendants where the latter have **partially** satisfied a plaintiff's claim by paying their proportionate share of liability.  See Eichenholtz v. Brennan, 52 F.3d 478, 481 (3d Cir. 1995).  Otherwise, defendants "buy little peace through settlement."  Id. at 486.  Similarly, if liability for a plaintiff's single indivisible injury is fully satisfied, all other co-liable parties are entitled to protection from further attempted enforcement by the plaintiff.

Injury Trust could be negatively affected for all of the same reasons that apply if the Channeling Injunction were also not in place.  See, Part VII.D, supra.[212]

Bankruptcy courts routinely apply common-law equitable principles, including recoupment, the informal proof of claim doctrine, marshaling, and the doctrines of preclusion and estoppel.[213]  Indeed, section 550(d) of the Bankruptcy Code confirms Congress' intent that bankruptcy courts should apply the one-satisfaction rule by providing that a "[t]he trustee is entitled to only a single satisfaction" under section 550(a), which precludes double recovery or a windfall by enabling recovery of an avoided transfer from any entity referenced in section 550(a), subject to section 550(d)'s prohibition on multiple recoveries.  See, e.g., Faulkner v. Kornman (In re The Heritage Org., L.L.C.), 413 B.R. 438, 498 (Bankr. N.D. Tex. 2009) (holding that a trustee was entitled to recover a voidable transfer from an initial transferee and a subsequent transferee, subject to section 550(d), which "of course . . . only permits the Trustee a single satisfaction.").

Objections from the U.S. Trustee and HHS that the Third Party Release impermissibly extends beyond claims to be channeled to and paid by the Talc Personal Injury Trust ignore

---

[212]    Further, the facts of this case align with factors considered by various Circuits as to whether to approve a third party release prior to Purdue, even where the debtor was not paying claims in full.  See In re Seaside Eng'g & Surveying, Inc., 780 F.3d 1070, 1079 (11th Cir. 2015); In re Global Indus. Techs., Inc., 645 F.3d 201, 206 (3d Cir. 2011); In re Airadigm Commc'n, Inc., 519 F.3d 640, 656 (7th Cir. 2008).  Here, among other things, there is substantial support for the Plan, the claims against the non-debtors are really claims against the Debtor (as the claims and products are exactly the same), and the non-debtors have contributed substantial assets to the reorganization.

[213]    See also, e.g., United States ex rel. United States Postal Serv. v. Dewey Freight Sys., Inc., 31 F.3d 620, 622-23 (8th Cir. 1994) (characterizing recoupment as "an equitable principle that allows a creditor in bankruptcy to show that . . . he or she is not liable in full for the [debtor's] claim") (internal quotations omitted); In re Uwimana, 284 B.R. 218, 220 (D. Md. 2002) (endorsing the equitable common-law "informal proof of claim doctrine"); In re San Jacinto Glass Indus., Inc., 93 B.R. 934, 937 (Bankr. S.D. Tex. 1988) (observing that "[m]arshaling of assets originated as a common law doctrine and enjoys continued vitality" in bankruptcy); Christopher Klein *et al.*, *Principles of Preclusion and Estoppel in Bankruptcy Cases*, 79 AM. BANKR. L.J. 839, 840 (2005) ("[T]he Bankruptcy Code silently presumes the continuing applicability of common law doctrines of preclusion and estoppel and mentions them only where modifying one of these rules.").

reality.  See UST Obj. ¶¶ 18, 21-22; US Obj. ¶ 48.  All holders of Channeled Talc Personal Injury Claims will be fully compensated for their talc claims against the Debtor.  Given their alleged single indivisible injuries, these holders have not—nor could they—assert any further claims against the Released Parties that would not be duplicative of their Channeled Talc Personal Injury Claims.  Similarly, the Third Party Release releases the same parties with respect to the same matters subject to the Debtor Release.  See Plan §§ 11.2.1, 11.2.2.  To the extent they are property of the Debtor's estate, holders of Channeled Talc Personal Injury Claims have no right to assert claims with respect to these matters against the Released Parties.  See Part VI.A. Nevertheless, history has shown that claimants or, more likely, their counsel, will adjust their litigation strategy to improve their opportunity to collect on a claim.  Thus, the Third Party Release reinforces the protection afforded by the Channeling Injunction and Debtor Release to ensure that the Debtor's successful reorganization is not derailed by frivolous litigation.  The Debtor submits that this added layer of protection is appropriate under the circumstances.

Finally, while the Coalition asserts that the Fifth Circuit has "traditionally been hostile" to third party releases, none of the cases they cite fully prohibit such a release in a chapter 11 case.[214]  Zale indicated that third party releases can apply in cases such as this where claims are channeled to a fund.[215]  Likewise, in Pacific Lumber, the Fifth Circuit noted that third party

---

[214]    See Coalition DS Obj. at 83 (citing Pac. Lumber, 584 F.3d at 229; In re Coho Res., Inc., 345 F.3d 338, 342 (5th Cir. 2003); Hall v. Nat'l Gypsum Co., 105 F.3d 225, 229 (5th Cir. 1997); Feld v. Zale Corp., 62 F.3d 746 (5th Cir. 1995); Matter of Edgeworth, 993 F.2d 51, 53-54 (5th Cir. 1993)).  However, Coho Resources, National Gypsum, and Edgeworth simply state that under section 524(e) a release of a debtor does not release a non-debtor.  Pacific Lumber addresses exculpation provisions of a plan, not third party releases. 584 F.3d at 251-52.

[215]    See Zale, 62 F.3d at 760-62 (finding that permanent injunctions entered by other courts were upheld because "while the injunction permanently enjoined the lawsuits, it also channeled those claims to allow recovery from separate assets . . ."); see also In re Wool Growers Cent. Storage Co., 371 B.R. 768, 777-78 (Bankr. N.D. Tex. 2007) (same).  Wool Growers is also instructive in that the court recognized that though section 524(e) does not sanction a third-party discharge, it also "does not explicitly prohibit a third-party discharge."  Wool Growers, 371 B.R. at 777.  The court went on to apply to the facts of that case the Master Mortgage factors applied by other courts in evaluating non-consensual non-debtor releases.  Id. at 777-78.

releases are typical in mass tort cases such as this.[216]  Further, none of the case law from or

within the Fifth Circuit addresses the propriety of a third party release in a full pay case.  The

Court can and should approve the Third Party Release in this case.[217]

Certain Objectors rely significantly on Combustion Engineering (although often not as to

the Third Party Release).  In that case, the court found that entities who had asbestos liability

wholly separate from the debtor, for which the debtor had no responsibility, could not obtain a

channeling injunction under section 105(a) in connection with the debtor's section 524(g) plan.

Combustion Eng'g, 391 F.3d at 227-28.  The debtor sought a "105(a) channeling injunction"

because it was a condition to an entity in the corporate family making a contribution to the

debtor's plan and argued that such an injunction was "essential" to its reorganization.

Combustion Engineering is clearly distinguishable from the facts of this case.  There, the

debtor's and the non-debtor's liability did not overlap, so even the first part of

section 524(g)(4)(A)(ii) was not satisfied.  The complete lack of overlap was a significant aspect

of the court's decision.[218]  In addition, the Third Party Release is not an injunction under

section 105(a), as was the issue in Combustion.  Finally, Combustion was not a full pay case

---

The court determined that four of the five Master Mortgage factors were satisfied, the fifth being "full or almost full payment of the affected claims," which the court found "critical for approval" in that case.  Id. at 778.  The court concluded that "[a] release that, in effect, channels the creditors' recovery to a source other than the debtor, may indeed satisfy this fifth factor, but such a channeling release has not been proposed here."  Id.  These facts are starkly different from this case where the Plan proposes to channel all Channeled Talc Personal Injury Claims to the Talc Personal Injury Trust for payment in full.

[216]   Pac. Lumber, 584 F.3d at 252 ("In fact, the Bankruptcy Code now permits bankruptcy courts to enjoin third-party asbestos claims under certain circumstances, 11 U.S.C. § 524(g), which suggests non-debtor releases are most appropriate as a method to channel mass claims toward a specific pool of assets.").

[217]   To the extent Objectors may argue that the Court requires an operative statutory hook, rather than simply relying on the long-standing and universally accepted one-satisfaction rule (as it routinely relies on other common-law doctrines in other circumstances), to approve the Third Party Release, at least section 1123(b)(6) applies.  Unlike Purdue, the Third Party Release here does affect the relationship between the Debtor and its creditors, as it supports and enforces the Debtor's full payment of the talc claims.

[218]   Combustion Eng'g, 391 F.3d at 237-38.

where the injunction simply enforced full satisfaction of claims against the non-debtor.  Like

Quigley, Combustion should not be used expansively without reference to its facts.  This is even

more the case than Quigley since section 524(g) was enacted with a Rule of Construction

expressly stating that the statute was not intended to "modify, impair, or supersede" any other

existing authority that bankruptcy courts possess to "issue injunctions in connection with an

order confirming a plan of reorganization."[219]  In short, Congress expressly left open ways to

address mass torts in bankruptcy outside of section 524(g).

### G.    The Court Also Has Ample Authority to Issue the Channeling Injunction As to All Protected Parties Pursuant to the All Writs Act

Finally, even if it were argued that (a) even in a full pay case like this, Purdue still

requires "statutory hooks" to protect the Protected Parties under the Plan and (b) such "hooks"

do not exist in the Bankruptcy Code, this Court has ample authority to issue the Channeling

Injunction as to all Protected Parties pursuant to the All Writs Act.  The Coalition itself sets up

the issue on the very first page of its initial 150 page objection to the Plan, the disclosure

statement, and related voting procedures.  There, the Coalition states:

> We begin with the words of the United States Supreme Court: "**Confining ourselves to the question presented**, we hold **only that the bankruptcy code** does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants."

Coalition DS Obj. ¶ 2 (citing Purdue, 603 U.S. at 227) (emphasis added).  The Supreme Court in

Purdue was presented with a narrow question and ruled only on that question—does a provision

of the Bankruptcy Code permit a non-consensual third party release and injunction?  The

---

[219]    See Pub. L. No. 103-394, § 111(b) (Oct. 22, 1994).  In fact, the Third Circuit after Combustion Engineering approved a non-section 524(g) resolution of asbestos claims in the chapter 11 case of In re Energy Future Holdings Corp., 949 F.3d 806 (3d Cir. 2020) (affirming confirmation of plan of reorganization that resolved asbestos claims through a bar date and discharge as opposed to section 524(g)).

Supreme Court ruled that it could find no such provision in the Bankruptcy Code.  The Supreme

Court was not presented with the question of whether a bankruptcy court could authorize such a

release or injunction under a statute **outside the Bankruptcy Code**, and, as a result, did not rule

on that question.  A bankruptcy court has authority under the All Writs Act, and there is ample

justification to approve the Channeling Injunction under that statute in this case.

      The All Writs Act is a nearly 250-year-old statutory source of power, available to all

federal courts created by an act of Congress, that allows those courts to fashion injunctive relief

as is necessary or appropriate to enforce their jurisdiction.  The Act provides:  "[t]he Supreme

Court and all courts established by Act of Congress may issue all writs necessary or appropriate

in aid of their respective jurisdictions and agreeable to the usages and principles of law."

28 U.S.C. § 1651.  Clearly, the District Court, which will be the court issuing the confirmation

order in this case, is a court established by an Act of Congress.[220]  Bankruptcy courts also are

courts established by an Act of Congress authorized to grant relief under the All Writs Act.[221]

      This Court has the requisite initial jurisdiction to issue the Channeling Injunction as to all

Protected Parties "in aid of" its initial jurisdiction.  This Court's jurisdiction is established by 28

U.S.C. § 1334(b), which gives the Court jurisdiction over, among other things, all civil

proceedings "related to" this chapter 11 case.  In the Fifth Circuit, a proceeding is "related to" a

case under the Bankruptcy Code if "the outcome of that proceeding could **conceivably** have **any**

---

[220]    Teas v. Twentieth Century-Fox Film Corp., 413 F.2d 1263, 1266-67 (5th Cir. 1969) (noting that the All Writs Act expressly confers district courts with authority to issue injunctions); Stott v. Capital Fin. Servs., Inc., 277 F.R.D. 316, 337 (N.D. Tex. 2011) (same); see also U.S. v. New York Tel. Co., 434 U.S. 159, 172 (1977) ("This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained").

[221]    See, e.g., Matter of Commonwealth Oil Ref. Co., Inc., 805 F.2d 1175, 1188 n.16 (5th Cir. 1986) ("The bankruptcy courts are brought within the scope of the All Writs Statute, 28 U.S.C. 1651 (1970), and are given the powers of a court of law, equity, and admiralty.").

**effect** on the estate being administered in bankruptcy."[222]  This standard is exceedingly broad: "certainty is unnecessary; an action is 'related to' bankruptcy if the outcome could alter, positively or negatively, the debtor's rights to liabilities, options, or freedom of action or could influence the administration of the bankruptcy estate."[223]  Here, addressing the claimants' claims against the Protected Parties will have much more than a "conceivable effect" on the bankruptcy estate.  Those claims would have a direct effect on the bankruptcy case for all of the reasons set forth above (see, VII.D, supra).[224]  Further, an injunction enjoining those claims is critical to, and a precondition of, confirmation of the Debtor's Plan and the historic $9 billion talc settlement contained therein.

An injunction pursuant to the All Writs Act must be "necessary or appropriate" in aid of such jurisdiction.  See 28 U.S.C. § 1651.  This requirement is satisfied here.  Courts have found that an injunction under the All Writs Act is necessary where the action to be enjoined "threatened to dispose of property that formed the basis for federal in rem jurisdiction or where the state proceeding threatened the continuing superintendence by a federal court."  See Newby v. Enron Corp., 302 F.3d 295, 298 (5th Cir. 2002); see also Newby v. Enron Corp., 338 F.3d 467, 474 (5th Cir. 2003) (same); In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.), 770 F.2d 328, 336 (2d Cir. 1985) (injunction preventing parallel litigation while multidistrict litigation settlements were pending was necessary where additional litigation "threatened to frustrate proceedings in a federal action of substantial scope.").  Here, the

---

[222]    In re Canion, 196 F.3d 579, 587 (5th Cir. 1999) ("[T]he law is well established in this Circuit, as in others, that, when testing 'related to' jurisdiction, an effect is not required to a certainty.  Rather jurisdiction will attach on a finding of any conceivable effect.") (emphasis omitted).

[223]    In re TXNB Internal Case, 483 F.3d 292, 298 (5th Cir. 2007).

[224]    Such risks include, among other things, depletion of the trust on account of the trust's indemnification of such Protected Parties, in addition to the impact that litigation of disputed facts and legal issues against those third parties could have on the trust's disputed obligations to other claimants.

injunction is necessary both to protect against interference with the Court's jurisdiction over the pending settlement contemplated in the Plan and to protect the property of the Debtor that will be allocated to the Talc Personal Injury Trust for the benefit of claimants.

Here, it is fully appropriate to issue the Channeling Injunction under the All Writs Act. Given that this is a full pay case, issuance of the injunction would ensure that Protected Parties are not subject to litigation by claimants whose claims have already been satisfied in full. In aid of its jurisdiction to approve the Plan and enforce its terms, the Court is more than justified to enjoin actions against third parties that should have no further liability on account of the actions being enjoined. In fact, the Fifth Circuit has affirmed the issuance of an injunction under the All Writs Act to prohibit additional recoveries where a plaintiff has already recovered in full. See Next Level Commc'ns, 179 F.3d at 254 (affirming permanent injunctive relief under the All Writs Act against plaintiff that had previously been "made whole" by damages award).[225]

Indeed, even absent full pay, the Court would have ample justification in aid of its jurisdiction to issue a channeling injunction in order to effectuate the global embodied in the Plan. Courts have used the All Writs Act to issue injunctions in mass tort, class action and similar cases for decades. These injunctions permitted the courts both to foster and effectuate global settlements in those cases, and also to ultimately enforce those settlements on a permanent basis once they had been approved by the court. Courts issued injunctions under the All Writs Act in asbestos-related class actions themselves starting by at least the early 1990s. For

---

[225] The last portion of the text of the All Writs Act also requires that the injunction be "agreeable to the usages and principles of law." See 28 U.S.C. § 1651. This consideration requires a review of the proposed writ to determine whether its proposed issuance aligns with how it has been used in the common law. See Rawlins v. Kan., 714 F.3d 1189, 1195-97 (10th Cir. 2013) (analyzing the common law scope of the writ of coram nobis and determining that third prong of All Writs Act was violated where incorrect court issued writ in question). This requirement is satisfied here, where, as discussed herein, there are ample examples of injunctions being issued by bankruptcy courts and district courts under the All Writs Act.

example, the Third Circuit in 1993 upheld the district court's issuance of an injunction under the All Writs Act enjoining state proceedings that would result in a "detrimental effect upon the district court's ability to effectuate the settlement of this complex and far-reaching matter."  See Carlough v. Amchem Prods., Inc., 10 F.3d 189, 203 (3d Cir. 1993) (noting that "[o]ur sister circuits have also identified impending and finalized settlements in federal actions as justifying 'necessary in aid of jurisdiction' injunctions of duplicative state actions.").[226]

At that time, the All Writs Act already had been used in other class actions for the same purposes,[227] and courts continued to utilize the Act in this fashion in mass tort cases and non-mass tort class actions in later decades.  For example, in In re Diet Drugs, 282 F.3d 220, 238 (3d Cir. 2002), the Third Circuit affirmed the multidistrict litigation court's issuance of an injunction against state court proceedings filed before the multidistrict litigation was formed, because the proceedings in question "so interfere[] with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case."  Id. at 238 (citing Atl. Coast Line R.R. Co. v. Bhd. Of Locomotive Eng'rs, 398 U.S. 281, 295 (1970)); see also In re Am. Honda Motor Co., Inc. Dealership Rel. Litig., 315 F.3d 417, 438 (4th Cir.

---

[226]    See also In re Asbestos Sch. Litig., 1991 WL 61156, at *4 (E.D. Pa. Apr. 16, 1991) (entering an injunction under the All Writs Act in an asbestos federal class action case that barred prosecution of state court claims); In re Joint E. & S. Dist. Asbestos Litig., 134 F.R.D. 32, 37 (E.D.N.Y. 1990) (holding in a federal asbestos class action that "[t]he All-Writs Act empowers a federal court to issue an injunction against actions in state court 'even before a federal judgment is reached.'"); In re Joint E. & S. Dist. Asbestos Litig., 120 B.R. 648, 655 (E.D.N.Y. 1990 (holding in an asbestos federal class action that an injunction under the All Writs Act appropriately enjoins state court proceedings where the injunction "allows the court to protects its settlement efforts").

[227]    The Second Circuit specifically noted in 1994 that "[t]he authority of a district court to protect its jurisdiction is recognized by the All Writs Act, 28 U.S.C. § 1651 (1988), and the use of such authority has been specifically approved in the context of the conduct of complex litigation."  See In re Johns-Manville Corp., 27 F. 3d 48, 49 (2d Cir. 1994) (affirming using of All Writs Act injunction to stay litigation in the post-confirmation asbestos trust context).

2003) (affirming district court's issuance of a permanent injunction under the All Writs Act to "prevent direct frustration" of the district court's class action settlement order).[228]

In fact, one of the earliest uses of the All Writs Act in the class action context was in the Fifth Circuit in the case of In re Corrugated Container Antitrust Litig., 659 F.2d 1332, 1335 (5th Cir. Unit A Oct. 1981).[229]  In Corrugated Container, the Fifth Circuit found that certain plaintiffs had brought actions alleging the same claims in state court against the same defendants as had been brought in a federal antitrust class action while that case was pending.  Id. at 1333-34.  The district court enjoined the parties from "pursuing any claims relating to this class action in any court other than the United States District Court in Texas."  Id. at 1333.  The Fifth Circuit affirmed the district court's injunction.  The Fifth Circuit found that the district court's entry of the injunction was in aid of its jurisdiction, and that the injunction was "necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case."  Id. at 1134 (quoting Atl. Coast Line R.R. Co., 398 U.S. at 295).  More specifically, the Fifth Circuit found that the antitrust case had "required a great deal of the district court's time and necessitates its

---

[228]   See also Baldwin-United, 770 F.2d at 338-39 (finding that courts were authorized to enter injunctions under the All Writs Act "to prevent third parties from thwarting the court's ability to reach and resolve the merits of the federal suit before it" and recognizing that courts have broad authority under the All Writs Act "to protect its ability to render a binding judgment"); Battle v. Liberty Nat'l Life Ins. Co., 877 F.2d 877, 880-83 (11th Cir. 1989) (affirming district court's order enjoining state law claims under the All Writs Act where such claims were substantially similar to claims previously resolved through federal class action proceeding); In re Lease Oil Antitrust Litig. (No. II), 48 F. Supp. 2d 699, 705-07 (S.D. Tex. 1998) (entering an injunction that barred parties from entering into a settlement that would release federal antitrust claims being litigated in the federal class action without prior court approval); Thorogood v. Sears, Roebuck & Co., 627 F.3d 289 (7th Cir. 2010) (affirming issuance of All Writs Act injunction to bar litigation in class action context).

[229]   Courts in the Fifth Circuit have also issued recent injunctions in similar contexts pursuant to the All Writs Act.  See Stott, 277 F.R.D. at 337 (enjoining competing litigation and arbitration in order to preserve the court's jurisdiction over pending class action settlement); Liberty Mut. Ins. Co. v. Gunderson, 387 Fed. App'x 480, 485-87 (5th Cir. 2010) (affirming district court's order permanently enjoining litigants from prosecuting actions in both state and federal court relating to claims already resolved in district court); see also Babineaux v. Wells Fargo Bank, N.A., 2023 WL 9508094 (S.D. Tex. 2023); Matter of Carroll, 850 F.3d 811 (5th Cir. 2017); additional cases also cited in note 229, supra.

ability to maintain a flexible approach in resolving the various claims of the many parties." Id. at 1334-35. As a result, the Fifth Circuit concluded that entry of the injunction to enjoin state court litigation was permitted and appropriate under the All Writs Act.[230]

Another example of the use of the All Writs Act in a case like this comes from the Eleventh Circuit's decision in the bankruptcy case of In re Fundamental Long Term Care, Inc., 873 F.3d 1325 (11th Cir. 2017). In that case, the Eleventh Circuit held that the bankruptcy court properly relied upon the All Writs Act when it enjoined personal injury/mass tort claimants from bringing suits against a non-debtor third party. The debtors and their principals were accused of carrying out a fraudulent scheme wherein they transferred various assets from debtor retirement home entities, who faced significant wrongful death claims stemming from their operations. Id. at 1330-32. The estates of several individuals who died while in the care of the retirement homes and had obtained judgments totaling in excess of $1 billion dollars against the entities (the "FLTC Claimants"), discovered the scheme and filed an involuntary chapter 7 petition. Id. at 1332.

Once the bankruptcy case was initiated, the FLTC Claimants filed a complaint alleging a variety of claims, including successor liability, piercing the corporate veil, actual and constructive fraudulent transfers, and breach of fiduciary duty, against the debtors, their principals, and one of the primary investors in the debtors ("Schron"), all of whom moved to dismiss the actions. Id. at 1332-33. The bankruptcy court denied the motions to dismiss with respect to certain of the claims brought against the debtors and their principals, but granted the

---

[230]    The Fifth Circuit also affirmed the use of All Writs Act injunctions at least twice in the Enron case, which similarly dealt with complex and far-ranging litigation culminating both in a bankruptcy filing and a parallel multidistrict litigation. See Newby, 302 F.3d at 300; Newby, 338 F.3d at 469. Both of these opinions demonstrate Fifth Circuit recognition that an All Writs injunction is proper where it would enjoin state court litigation that could jeopardize the centralized resolution of claims.

motions to dismiss as to claims asserted against Schron.  Id.   Ultimately, the litigation resulted in a settlement between the FLTC Claimants and the debtors and their principals.  Id. at 1334.  A condition of the settlement was that a permanent injunction be issued to enjoin claims against Schron.  Id.  The FLTC Claimants appealed the injunction to the United States District Court for the Middle District of Florida, which affirmed.  Id. The FLTC Claimants appealed to the Eleventh Circuit.  Id.

The Eleventh Circuit noted that a court's authority to grant a permanent injunction under the All Writs Act is limited by the Anti-Injunction Act, which provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except [1] as expressly authorized by Act of Congress, or [2] where necessary in aid of its jurisdiction, or [3] to protect or effectuate its judgments."  28 U.S.C. § 2283; see also Fundamental, 873 F.3d at 1338.  The Eleventh Circuit found that the second exception, that a permanent injunction is "necessary in aid of [the federal court's jurisdiction]" extended to bar claims against Schron. Fundamental, 873 F.3d at 1340.  The Circuit found that "proceedings that threaten to make complex multidistrict litigation unmanageable may be enjoined in aid of the court's jurisdiction." Id. at 1339.  In particular, the Eleventh Circuit pointed to its previous decision in Battle, where it held that, after resolution of a complex and lengthy class-action, a district court properly enjoined a subsequent state-court lawsuit that involved claims substantially similar to the claims resolved in the class action.  Id. at 1339-40.  The Eleventh Circuit in Battle found that the injunction in that case was justified because "any future state-court judgment would destroy the settlement the parties had reached and nullify the court's work in refining its Final Judgment . . ." Id. at 1340.  In Fundamental, since, among other things, the settlement between the FLTC Claimants and the debtor/principals was conditioned on the issuance of the permanent injunction

for Schron, the bankruptcy court had the power to issue the injunction under the All Writs Act.
Id. at 1339-40.

The Channeling Injunction here also is a condition to, and protects, the global settlement embodied in the Debtor's $9 billion Plan.  Given that no claimant should have a viable claim against a Protected Party, all such claims having been paid in full under the Plan, the Channeling Injunction can also be issued under the All Writs Act.

Section 524(g) itself also supports the issuance of the Channeling Injunction under the All Writs Act.  Again, Congress included a Rule of Construction in the public law that established section 524(g), which provides that nothing in section 524(g) "shall be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization."  Pub. L. No. 103-394, § 111(b) (Oct. 22, 1994).  As a result, Congress took special precautions when it enacted section 524(g) to ensure that it was clear that section 524(g) was a "safe harbor" provision.  If a party satisfied its provisions, it was eligible to obtain a third party channeling injunction per its terms.  But section 524(g) was not intended to be the exclusive means to obtain such an injunction, and Congress was in no way superseding any authority a bankruptcy court already had to issue an injunction.  The All Writs Act, as discussed above, was a pre-existing authority.[231]

For all these reasons, the Court has ample authority to issue the Channeling Injunction under the All Writs Act.

---

[231]    Any other argument would give an asbestos debtor **less** ability to obtain a third party injunction under the All Writs Act than a non-asbestos debtor, contrary to any intent of Congress in enacting section 524(g) as set forth in the Rule of Construction, including that section 524(g) not only did not "supersede" pre-existing bankruptcy court authority, but also did not "modify" or "impair" that authority in any way.

### H. The Court Has Appointed a Legal Representative to Protect the Rights of Persons Who Might Subsequently Assert Demands

Section 524(g)(4)(B)(i) provides that a channeling injunction will be valid and enforceable with respect to future demands only if

> as part of the proceedings leading to issuance of such injunction, the court appoints a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands of such kind.

11 U.S.C. § 524(g)(4)(B)(i). During the proceedings leading to the issuance of the Channeling Injunction, the Court appointed Randi S. Ellis as the FCR for the purpose of protecting the rights of persons that might subsequently assert Demands against the Debtor. See Dkt. 529. As a result, the requirements of section 524(g)(4)(B)(i) of the Bankruptcy Code are met here.

### I. Entry of the Channeling Injunction Is Fair and Equitable With Respect to Future Claimants

Section 524(g)(4)(B)(ii) of the Bankruptcy Code requires a court to determine that entry of the channeling injunction, and the protection from liability that is afforded to the parties named therein:

> is fair and equitable with respect to the persons that might subsequently assert such demands, in light of the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors or such third party.

11 U.S.C. § 524(g)(4)(B)(ii). The application of "fair and equitable" in the context of section 524(g) remains somewhat unclear, as "courts have yet to define what 'fair and equitable' means in the § 524(g) context." In re Congoleum Corp., 362 B.R. 167, 179 (Bankr. D.N.J. 2007). However, most courts engaging with the standard weigh the financial contributions to the trust in making their determination under section 524(g)(4)(B)(ii). See id. at 180 ("A review of

the case law suggests that finding that an injunction is fair and equitable is closely tied to the value being contributed to the plan.").[232]

In the mass tort context, courts also frequently consider the future claimants' representatives' support of a plan as further, and often significant, evidence that section 524(g)(4)(B)(ii) is met.  See, e.g., Maremont, 601 B.R. at 32 (noting the "substantial assets" the protected parties were contributing to the plan, and that the future claimants' representative supported the plan, in finding the standard met); In re Leslie Controls, Inc., 2010 WL 4386935, at *13 (Bankr. D. Del. Oct. 28, 2010) (noting the protected parties' substantial contribution and the future claimants' representative's support in finding the requirement met, without further discussion); Pittsburgh Corning, 2013 WL 2299620, at *22 (similar).

Here, the Plan provides for a trust to be funded with approximately $9 billion payable over 25 years, which funding constitutes one of the largest settlements ever reached in a mass tort product liability case, including cases where, unlike here, the alleged liability was not disputed by the company.  See Plan, Ex. C (Cash Contributions).  The principal source of cash necessary for these Cash Contributions will be the Debtor's cash balances and amounts received pursuant to the Indemnity Funding Agreement, as well as the Talc PI Note.  These amounts will be paid by the Debtor on behalf of all Protected Parties.  See Plan §§ 4.9.1, 4.9.2.  Importantly, the Cash Contributions are guaranteed to their full extent by J&J and New Holdco, see Plan

---

[232]    In re Kaiser Aluminum Corp., 2006 WL 616243, at *17 (Bankr. D. Del. Feb. 6, 2006) (finding that "[i]n light of the substantial contributions to be made to the Asbestos PI Trust on behalf of the Protected Parties," which included $13 million and 94% of the shares of the reorganized debtor, "entry of the Asbestos PI Channeling Injunction, and the naming of the Protected Parties therein, is fair and equitable with respect to persons that might subsequently assert future asbestos-related Demands."); J T Thorpe, 308 B.R. at 790 (holding that in "light of the benefits provided, or to be provided, to the Successor Trust by or on behalf of the Released Parties and the Protected Parties, the extension of the Discharge Injunction, the Supplemental Injunction, and the Third Party Injunction to those parties is fair and equitable with respect to Entities that might subsequently assert Asbestos Claims or Demands against the Released Parties and/or Protected Parties.").

§ 4.9.1, id. Ex. D (Cash Contributions Guarantee), and the Talc PI Note is secured by the Talc PI Pledge Agreement entered into by New Holdco.  See Plan § 4.9.2.  In light of these substantial contributions, to effectuate the settlement and to ensure the settlement is not adversely impacted by potential indirect claims, the Plan provides for an injunction that channels all Channeled Talc Personal Injury Claims to the Talc Personal Injury Trust (and away from the Debtor and the Protected Parties, including J&J).[233]

The scope of the proposed injunction under the Plan is fair and equitable with respect to current claimants and future demand holders because of the substantial value being contributed to the Talc Personal Injury Trust—approximately $9 billion.  The Debtor submits that this amount is not only sufficient to ensure the fair and equitable treatment of current and future claims, but will ensure all claimants are paid in full, in fact providing qualified Ovarian Cancer claimants with nearly double what they otherwise would have received in a tort system settlement.  Since the historic $9 billion that will be contributed to the Talc Personal Injury Trust will permit payment in full, "fair and equitable" under section 524(g)(4)(B)(ii) by definition is satisfied.  In addition, the FCR has indicated her support for the funding amounts in the Plan.[234]

It should be noted that each Protected Party is not required by law to make an independent contribution to the Talc Personal Injury Trust in order for the Court to find that the

---

[233]    The Protected Parties include, among others:  (a) the Debtor and its Representatives; (b) the Reorganized Debtor and its Representatives; (c) the Debtor Corporate Parties listed on Schedule 1 to the Plan, including J&J and New Holdco, and their respective Representatives; (d) the Settling Talc Insurance Companies; (e) retailers and parties contractually indemnified by the Debtor listed on Schedule 3 to the Plan; and (f) under certain circumstances, the Imerys/Cyprus Parties listed on Schedule 2 to the Plan.  See Plan § 1.1.121.

[234]    The FCR supported the proposed Plan prior to the most recent $1.1 billion in "supplemental" funding contributed to the Plan by virtue of the Smith MOU.  See FCR Obj. at 1.  Any current opposition by the FCR to the Plan, if not resolved prior to the confirmation hearing, will likely be centered around certain logistics related to trust administration and the allocation of this "supplemental" funding, not the adequacy of the funding itself.  Id.

Channeling Injunction is fair and equitable.  Whether the protection granted to non-debtors is fair and equitable is judged "in light of the benefits provided, or to be provided, to [the] trust **on behalf of** such debtor or debtors or such third party."  11 U.S.C. § 524(g)(4)(B)(ii) (emphasis added); see also W.R. Grace, 475 B.R. at 101-03 (citing cases recognizing that "contributions to the trust can be made by the debtor or third parties themselves, or, alternatively, on behalf of the parties protected by the injunction" and stating that "as long as a party has contributed reasonable value to the reorganization plan, whether through its own direct contribution or by those made indirectly on its behalf by another party, then it is fair and equitable to future claimants for that party to receive the injunctive protection afforded by § 524(g)") (emphasis in original).

Various Objections assert that neither Kenvue[235] nor Middlesex[236] is entitled to receive the benefits of the Channeling Injunction pursuant to section 524(g) since each will not contribute any funds to the Talc Personal Injury Trust.  In particular, certain Insurers contend, generally, that in order for Middlesex to receive the benefits of a channeling injunction, the court must compare "[Middlesex's] contribution to the trust to the liability exposure for which it is receiving a release."[237]  Likewise, an individual claimant has objected to Kenvue receiving the benefits of the channeling injunction on the same grounds.[238]

---

[235]    See Nesko Obj. ¶¶ 6-7.

[236]    See Insurers DS Obj. ¶¶ 67-70; Allstate Obj. ¶¶ 13-14; Century Obj. ¶¶ 19-21; Travelers Obj. ¶¶ 30-34.

[237]    Travelers Obj. ¶ 30; see also Century Obj. ¶ 21 ("Releasing Middlesex from its liability without any demonstration of consideration of contribution fails the fair and equitable test."); Allstate Obj. ¶ 14 (same).

[238]    See Nesko Obj. ¶ 6 (the fair and equitable requirement of section 524(g)(4) "requires consideration of the 'amount being contributed to the trust in comparison to the liability exposure of the parties'").

The Objections are wholly inconsistent with both the plain language of section 524(g)(4)(B)(ii)[239] and, as discussed above, the ample case law that holds that a section 524(g) channeling injunction can be extended to third parties where a contribution to the trust is made on their behalf.  See W.R. Grace, 729 F.3d at 331 ("Under [the section 524(g)(4)(B)(ii) standard], channeling injunctions have generally been considered 'fair and equitable' to future claimants when the trust contribution that will be available to those claimants bears some relationship to the estimated value to the debtor of enjoining their claims.").[240]  As detailed above, the Plan, which will satisfy all current and future claims in full, plainly satisfies that burden.

## VIII.   REPLY TO OTHER OBJECTIONS TO THE PLAN

### A.   The Coalition's Other Objections to Confirmation of the Plan

In addition to the Coalition's objections to the Plan's compliance with sections 1129 and 524(g), the Coalition raises various other objections focused on the Plan's alleged

---

[239]   See 11 U.S.C. § 524(g)(4)(B)(ii) (requiring a court to determine that "before entering the order confirming such plan, that identifying such debtor or debtors, or such third party (by name or as part of an identifiable group), in such injunction with respect to such demands for purposes of this subparagraph is fair and equitable with respect to the persons that might subsequently assert such demands, in light of the benefits provided, or to be provided, to such trust **on behalf of such debtor or debtors or such third party**").

[240]   See Armstrong, 348 B.R. at 156 ("In light of the benefits provided, or to be provided, to the Asbestos PI Trust on behalf of each PI Protected Party, the Asbestos PI Permanent Channeling Injunction is fair and equitable with respect to the persons that might subsequently assert Asbestos Personal Injury Claims against any PI Protected Party."); J T Thorpe, 308 B.R. at 790 ("In light of the benefits provided, or to be provided, to the Successor Trust by or on behalf of the Released Parties and the Protected Parties, the extension of the Discharge Injunction, the Supplemental Injunction, and the Third Party Injunction to those parties is fair and equitable with respect to Entities that might subsequently assert Asbestos Claims or Demands against the Released Parties and/or Protected Parties."); W.R. Grace, 475 B.R. at 102 (recognizing that "Federal courts within the Third Circuit have repeatedly recognized that []contributions to the trust can be made by the debtor or third parties themselves, or alternatively, on behalf of the parties protected by the injunction"); Maremont, 601 B.R. at 32 ("The Debtors and Meritor, on behalf of themselves and other Protected Parties, are contributing substantial assets to the Asbestos Personal injury Trust. . . . In light of the substantial contribution provided, or to be provided, to the Asbestos Personal Injury Trust and/or the Reorganized Debtors by or on behalf of each current and future Protected Party, the Asbestos Personal Injury Channeling Injunction is fair and equitable to all creditors and future Demand Holders.  Thus, the Plan complies with section 524(g)(4)(B)(ii)").

unconstitutionality and its failure to satisfy irrelevant Bankruptcy Code provisions.  Each of these objections fails and the Plan should be confirmed.

1.     **The Coalition Alleges the Plan is Unconstitutional**

The Coalition raises three "constitutional" objections to confirmation of the Plan.  As an initial matter, the Coalition has, yet again, failed to follow the proper procedures for challenging the constitutionality of a United States statute.  Under Civil Rule 5.1, made applicable through Bankruptcy Rule 9005.1, a party that is questioning the constitutionality of a federal statute must: "(1) file a notice of constitutional question stating the question and identifying the paper that raises it" and "(2) serve the notice and paper on the Attorney General of the United States."  To the Debtor's knowledge, the Coalition has again failed to comply with this requirement, despite the Debtor's prior emphasis on this point in the Debtor's objection to the motions to dismiss this chapter 11 case.  See Dismissal Obj. at 34.[241]

In addition to this procedural infirmity, each of the Coalition's constitutional arguments has no basis.  First, the Coalition repeats, verbatim, the constitutional argument originally raised in its dismissal motion.  Compare Coalition DS Obj. ¶¶ 358-75 with Coalition Dismissal Mot. ¶¶ 155-72.  This argument, at a high level, appears to assert that "Section 524(g) is Unconstitutional If It Permits the J&J Discharge."  See Coalition DS Obj. at 95; Coalition Plan Obj. at 77 (including Kenvue).  The Debtor has already comprehensively responded to this argument in its Dismissal Objection (at 34-40) and, for the sake of brevity, incorporates that argument again here.  In short, as discussed in the Dismissal Objection, there are myriad protections built into both the chapter 11 process, and section 524(g) itself, that ensure adequate

---

[241]     To the extent this Court deems it relevant, 28 U.S.C. § 2403(a) also requires that in any action wherein "the constitutionality of any Act of Congress affecting the public interest is drawn in question, the court shall certify such fact to the Attorney General."

due process for claimants.  Further, over 30 years of confirmed section 524(g) plans that include

third party releases, paired with the fact that the Coalition's own precedent confirms the

constitutionality of section 524(g)'s third party releases, belie the validity of this constitutional

argument.

The Coalition's second constitutional argument appears to assert that the Plan "violates

the Seventh Amendment and 28 U.S.C. § 1411" because the Plan would prevent claimants from

suing J&J in the tort system and recovering the full amount of any trial verdict.  See Coalition

DS Obj.¶¶ 435-440; Nesko Obj. ¶ 22.  As a preliminary matter, however, the Trust Distribution

Procedures provides for a litigation opt-out, which would permit claimants to pursue a jury trial

in the tort system.  See Trust Distribution Procedures § 6.1.3 (noting that claimants "shall retain

the right to institute a lawsuit in the tort system").  This protection is a common feature of

section 524(g) plans, and is intended to preserve claimants' Seventh Amendment rights.[242]  In

fact, the Coalition's own objection appears to recognize that the Trust Distribution Procedures

provision protects jury trial rights.  See Coalition DS Obj. ¶ 438 (noting that claimants can

"exercise his or her right to a jury trial under the TDPs.").  Thus, there is no dispute that

claimants have the right to a jury trial under the Plan.

To the extent that the Coalition argues claimants' jury trial rights are violated because

claims that are channeled to the trust retain a right to a jury trial but are still subject to the

payment provisions of the Trust Distribution Procedures, the Coalition misconstrues the Seventh

Amendment.  There is "no evidence that the Framers meant to extend the right to a jury to the

remedy phase of a civil trial."  Tull v. U.S., 481 U.S. 412, 426 n. 9 (1987).  Therefore, both

---

[242]     See Paddock, Dkt. 1406-1, Asbestos Trust Distribution Procedures § 5.11 (noting that claimants retain the
right to institute a lawsuit in the tort system); Duro Dyne, Dkt. 729-6, Trust Distribution Procedures at 43
(claimants, after non-binding arbitration and other prerequisites "may file a lawsuit against" the trust);
Specialty Prods., Dkt. 2669-1, Ex. I.A.13 at 3-4 (same).

bankruptcy and non-bankruptcy law are replete with limitations on plaintiffs' monetary recoveries that do not implicate the Seventh Amendment.  Outside of the bankruptcy context, Congress itself may fix civil penalties and delegate penalty determinations to trial judges.  Id. at 426-27.  Likewise, a plaintiff's right to a trial by jury is not violated where, post-trial, a verdict is limited or reduced because it is "excessive" or "against the weight of the evidence."  Gasperini v. Ctr. for Humans., Inc., 518 U.S. 415, 433-35 (1996).

A bankruptcy court may also limit potential plaintiff recoveries without violating jury trial rights, as noted by the court in W.R. Grace & Co. when it faced arguments identical to those now advanced by the Coalition.  See 475 B.R. at 167.  In that section 524(g) case, the confirmed bankruptcy plan included trust distribution procedures that similarly allowed for an opt-out jury trial mechanism.  Id.  Claimants argued that the plan nonetheless violated their Seventh Amendment rights because potential recoveries via tort litigation were "limited to the lesser of the amount of the jury verdict or the Maximum Value established by the TDP."  Id.  The district court plainly stated that the "general view of the federal courts, however, is that the **measuring** of damages by a jury constitutes a matter of 'practice' rather than of 'right,' and that there 'is no violation of the constitutional guarantee of a jury trial in the **limitation** of the amount of damages.'"  Id. at 169 (emphasis in original).[243]  The court noted numerous situations where caps on jury verdicts were permissible under the Seventh Amendment, id. at 169-71 nn.145-48, and concluded that a trust distribution procedure jury-verdict-cap in a section 524(g) plan was a legitimate "implementation of a legislative policy" and "accordingly constitutionally sound on Seventh Amendment grounds."  Id. at 170-71.

---

[243]     The W.R. Grace court further noted that "[w]hile a damage cap might raise a constitutional red flag if its fixed sum is so low as to be arbitrary or irrational, this would implicate due process concerns rather than the Seventh Amendment."  Id. at 171 n.148.

There is nothing unconstitutional about the Plan, which, once confirmed, would preserve claimants' Seventh Amendment rights via a litigation opt-out and permissibly cap claimant recoveries under section 524(g).

The Coalition's third constitutional argument contends that a "no-opt-out" bankruptcy plan would impair claimants' due process and jury trial rights in violation of <u>Ortiz v. Fibreboard</u>, 527 U.S. 815 (1999).  <u>See</u> Coalition Plan Obj. at 77; <u>see</u> <u>also</u> Nesko Obj. ¶ 21.  The Coalition relies upon a recent opinion from the <u>Aldrich Pump</u> bankruptcy case for supposed support. However, that language is plainly <u>dicta</u>—neither <u>Ortiz</u> nor the question of opt-outs was briefed or at issue in the underlying motion to dismiss, as is underscored by the fact that the <u>Aldrich</u> court, on the same page cited by the Coalition, notes that these issues were not presently before it.[244] Ironically, what the <u>Aldrich</u> court was ruling on in that opinion was the validity of a similarly solvent Texas Two-Step bankruptcy case, which it declined to dismiss.[245]

In addition, the Supreme Court's holding in <u>Ortiz</u> does not support a conclusion that it is unconstitutional for solvent or non-distressed debtors in bankruptcy to establish a no-opt-out trust.  Rather, <u>Ortiz</u> was confined to resolving a narrow issue of statutory interpretation concerning the requirements for the certification of a class action under Civil Rule 23(b)(1)(B). <u>See</u> <u>Ortiz</u>, 527 U.S. at 830 ("The nub of this case is the certification of the class under Rule 23(b)(1)(B) on a limited fund rationale.").  The constitutionality of no-opt-out settlements in class actions involving limited funds was not raised or addressed by the Supreme Court.  In fact, the only mention of constitutionality in the entire opinion is the Supreme Court's reference to

---

[244]    <u>See</u> <u>Aldrich Pump</u>, 2023 WL 9016506, at *21.

[245]    The <u>Aldrich</u> court declined to dismiss the debtors' bankruptcy case after concluding both that there was no constitutional requirement that a debtor be in financial distress to access chapter 11 of the bankruptcy code and that the Texas Two-Step cases were not filed in bad faith under the controlling Fourth Circuit dismissal standard.  <u>Id.</u> at *33.

constitutional avoidance, the principle by which a court avoids interpretating the Constitution unless it is absolutely necessary, which in and of itself further demonstrates that the Ortiz opinion does not have constitutional implications.  See id. at 845.

While the case was narrowly focused on statutory interpretation, it is also notable that the Supreme Court in Ortiz explicitly recognized that Congress specifically authorized the channeling of future asbestos claims through a section 524(g) trust.  Id. at 860 n.34 ("Congress … amended the Bankruptcy Code to enable a debtor in a Chapter 11 reorganization in certain circumstances to establish a trust toward which the debtor may channel future asbestos-related liability, see 11 U.S.C. §§ 524(g), (h)").  The Supreme Court also emphasized the distinctions between class actions and mass tort settlements under the Bankruptcy Code and highlighted that instead wholesale approval of class action settlements would threaten undermining "the protections for creditors built into the Bankruptcy Code."  Id.  These statements support a conclusion that the Supreme Court understood not only the differences between class action and bankruptcy resolution of asbestos liabilities, but also recognized that section 524(g) is a unique, congressionally-authorized carveout that sets out a specific process and its own requirements for channeling of future claims in the asbestos bankruptcy context.

These bankruptcy and section 524(g) requirements and procedures ensure that claimants due process and jury trial rights are protected.  As discussed in the Dismissal Objection and highlighted above, this includes, as to section 524(g):  requiring the formation of an official committee, which has a fiduciary duty to represent the interests of all claimants holding Channeled Talc Personal Injury Claims; requiring the appointment of a future claimants' representative, who has a fiduciary duty to represent the interests of future claimants; and requiring 75% approval by asbestos claimants to obtain plan confirmation.  The Bankruptcy

Code's valuation, voting, and confirmation process also contains numerous additional protections for claimants.  See 11 U.S.C. §§ 502, 1121-1129.  And, the U.S. Code protects the right to a jury trial for tort claims.  28 U.S.C. §§ 1411(a), 157(b)(5).

Finally, it is worth noting that the Coalition's assertion that no-opt-out plans are only constitutional for insolvent debtors would mean that no solvent debtor could ever confirm a section 524(g) plan or trust.  As detailed in Part IV.C.2(c), multiple solvent asbestos debtors, and asbestos debtors that are part of highly solvent corporate families, have confirmed section 524(g) plans.

### 2.    The Coalition Alleges the Plan Violates the Absolute Priority Rule

The Coalition asserts that the Plan violates the absolute priority rule because the Reorganized Debtor would retain "substantial value" by virtue of its retention of certain "Retained Rights of Action," which include fraudulent transfer and breach of fiduciary duty claims.  See Coalition DS Obj. ¶¶ 465-468.  The Coalition provides no relevant caselaw or facts to support this assertion,[246] and courts have confirmed plans where the reorganized debtor retains these causes of action in asbestos cases.[247]

More importantly, the Coalition's argument ignores a fundamental tenet of the absolute priority rule.  As the Coalition correctly notes, "[w]hen **an impaired class rejects a plan**, the Debtor cannot retain property of any value unless it can demonstrate that the holders of claims in such class will be paid in full."  Coalition DS Obj. ¶ 468 (citing 11 U.S.C. § 1129(b)(2)(B)) (emphasis added).  As set forth in the Plan, the only impaired creditor class is Class 4, Channeled

---

[246]    The two cases offered by the Coalition, Matter of Foster and Fabricators, are wholly unrelated to plan confirmation, the absolute priority rule or post-confirmation retention of causes of action.

[247]    See Paddock, 2022 WL 1746652, at *9, Ex. A, Art. IX.9.3 (confirming asbestos plan where Reorganized Debtor retains similar causes of action); HONX, Dkt. 1332, Ex. A, Art. IV.R (same).

-223-

Talc Personal Injury Claims.  See Plan § 3.2.  And, as set forth in the Voting Declarations, 83.4%

of that class has voted in favor of the Plan, which constitutes class acceptance.  See Initial Voting

Decl., Ex. 20; Supp. Voting Decl. ¶ 6.[248]  Thus, there is no impaired, **rejecting** class and,

correspondingly, no violation of the absolute priority rule.

### 3.    The Coalition Alleges the Plan Violates Sections 1141(a) and 1144

The Coalition asserts that the Plan violates section 1141 because "[a]ny plan that gives a

debtor or its funder the ability to walk away after confirmation is illusory."  See Coalition Plan

Obj. at 61; see also UST Obj. ¶ 9 ("Nor would the Plan, even if confirmed, necessarily be

binding on the Debtor and J&J.").  But neither the Plan nor the funding proposed for the Plan is

illusory.  Rather, the walkaway right is akin to a condition precedent to the Effective Date and

the ability to revoke the Plan arises only if there is an Adverse Appellate Ruling.  For the Debtor

to be able to exercise its rights pursuant to section 9.12 of the Plan, the Plan must have been

confirmed.

The Coalition casts aspersions regarding these rights, but ignores that they are the result

of extensive negotiations with the AHC, the Smith Firm and the Committee.  Those negotiations

ultimately resulted in the Debtor and J&J agreeing to an earlier Effective Date of the Plan, as

well as accelerated funding of the Talc Personal Injury Trust, prior to the Confirmation Order

becoming a final non-appealable order.  See, e.g., Smith MOU §§ II.F, II.G (detailing initial

walkaway rights and providing for funding of Talc Personal Injury Trust upon affirmance of the

Confirmation Order by the Fifth Circuit); TCC MOU §§ II.F, II.G (detailing walkaway rights and

providing for funding of Talc Personal Injury Trust upon the earlier of (a) affirmance of the

---

[248]    To the extent the Coalition's absolute priority argument is predicated upon questioning the results of
solicitation, the Debtor strongly disputes that assertion.  A more fulsome discussion of the solicitation
process, and objections thereto, appears in Parts IV.B and IV.H.

Confirmation Order by the Fifth Circuit and (b) the date that at least 95% of claimants submit releases to the Talc Personal Injury Trust); Plan §§ 8.2 (providing for the Plan to go effective upon, among other things, the Confirmation Order having become a Final Confirmation Order— which would be true even if the Confirmation Order is appealed to the Fifth Circuit or a petition for certiorari is filed with the Supreme Court), 9.12 (detailing walk-away rights). The Debtor and J&J agreed to accept the risk of funding the Talc Personal Injury Trust prior to affirmance of the Confirmation Order on appeal, which would provide the holders of Channeled Talc Personal Injury Claims the ability to recover on their claims sooner than they otherwise would have.

In exchange, the Debtor has the ability to walk away prior to the Effective Date if the conditions in section 9.12 of the Plan are met—(a) fewer than 95% of holders of Channeled Talc Personal Injury Claims submit their claims to the Talc Personal Injury Trust and execute an Acceptance and Release within the time period provided in the Plan or (b) certain parties appeal the order confirming the Plan to the Fifth Circuit. See Plan § 9.12. This is in effect a condition precedent to the Effective Date, which was agreed to by the representatives for the substantial majority of talc claimants. The Plan also provides that the Confirmation Order may be revoked if, after the Effective Date, there is an Adverse Appellate Ruling. See Plan § 9.12. An Adverse Appellate Ruling generally means either the Fifth Circuit or the Supreme Court issues a ruling that "does not fully affirm" the Confirmation Order and the Debtor (or the Reorganized Debtor) and J&J determine that the ruling is "adverse to the intents, purposes, or effects of the Plan or Confirmation Order." See Plan § 1.1.9. The Debtor has modified the Plan to require that any determination by the Debtor (or the Reorganized Debtor) and J&J regarding whether an Adverse Appellate Ruling has occurred be made in good faith, which will allow, to the extent necessary, the Court to examine whether the revocation right was properly exercised. As a result, there is

no real argument that section 1141 is implicated.  The Debtor is bound pursuant to the terms of the Plan.

The Coalition's assertion that the Plan violates section 1144 because of the possibility of revocation similarly fails.  See Coalition Plan Obj. at 61-62.  By its own terms, section 1144 is only applicable post-confirmation.  It provides that "[o]n request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke [the] order if and only if [the] order was procured by fraud." 11 U.S.C. § 1144.  Section 1144 is not implicated by the revocation provision, which itself is subject to approval by the Court (through confirmation of the Plan) after notice and a hearing. See 8 Collier on Bankruptcy ¶ 1144.02 (16th 2024) (purpose behind section 1144 is to bolster "the policy of finality with respect to chapter 11 plans" because of the "need for parties to be able to rely on the finality of plans in conducting business and in dealing with the reorganized debtor.").

The Coalition's cases, Logan Place and Cleveland Imaging, only reinforce that section 1144 is not implicated by section 9.12 and, instead, becomes effective following entry of a confirmation order.  In both cases, the movants filed a motion, pursuant to Civil Rule 60(b), to essentially revoke the as-entered confirmation order.  See In re Logan Place Properties, Ltd., 327 B.R. 811, 812 (Bankr. S.D. Tex. 2005) (involving motion, pursuant to Civil Rule 60(b), for relief based on mutual mistake, seeking to amend the plan to reflect an increased value for the single real-estate asset in the case); In re Cleveland Imaging & Surgical Hosp., L.L.C., 2022 WL 677459, *1 (Bankr. S.D. Tex. Mar. 7, 2022) (involving motion filed after the time period set forth in section 1144, pursuant to Civil Rule 60(b), to revoke the confirmation order based on allegations of "massive fraud").  In both cases, the bankruptcy court declined to grant the relief,

finding that Civil Rule 60(b) could not trump the requirements of section 1144 for revocation of a confirmation order.  <u>Logan Place</u>, 327 B.R. at 814-15; <u>Cleveland Imaging</u>, 2022 WL 677459, at *3.  Neither case involved a plan provision that was negotiated prior to confirmation by the debtor and key parties in the case and approved by the bankruptcy court following notice and a hearing.  The Plan, accordingly, does not violate either section 1141 or 1144.

**B.      The U.S. Trustee's Objection that the Plan is Incomplete**

The U.S. Trustee asserts that confirmation of the Plan should be denied because the "Plan remains a work in progress."  <u>See</u> UST Obj. ¶ 7.  However, the Plan, with the proposed modifications, is final—it is not incomplete in "material" respects.  <u>See</u> UST Obj. ¶ 8.  And, as stated above, the U.S. Trustee's suggestion that a liquidation analysis is required for the Court to find section 1129(a)(7) is satisfied is not found in the Bankruptcy Code and ignores the facts and circumstances of this case.  Finally, the Private Resolution Process MSA and the Common Benefit Fund MSA, although listed as conditions precedent to confirmation, are not part of the Plan.  To the extent those documents are not in a position to be executed by confirmation of the Plan, this condition to confirmation may be waived.  <u>See</u> Plan § 8.3.

The U.S. Trustee also argues, like the Coalition, that the Plan is not binding on the Debtor and J&J because of the walkaway right.  <u>See</u> UST Obj. ¶ 9.  But, as discussed above, this is incorrect.  For the Debtor to be able to exercise its walkaway right pursuant to the terms of the Plan, it must be bound to the Plan.  The U.S. Trustee also misstates the effect of a release pursuant to the Acceptance and Release delivered to the Talc Personal Injury Trust following confirmation.  The Acceptance and Release will not result in the release of any compensable Channeled Talc Personal Injury Claim until the holder thereof accepts an offer for payment of his or her Channeled Talc Personal Injury Claim and actually receives some or all of that payment. The U.S. Trustee's objections should be overruled.

C.      **The Insurers' Other Objections to Confirmation of the Plan**

1.      **The Insurers May Not Raise Objections**
        **Premised on Other Parties' Rights and Interests**

Although the Insurers are parties in interest and thus have statutory standing to generally participate in this chapter 11 case, it does not follow that in doing so they may raise the rights and interests of third parties or object based on provisions that are not protecting their interests. Much of their array of arguments against confirmation is of this sort, and the Court should disregard those arguments.

Under section 1109(b), a "party in interest . . . may raise and may appear and be heard on any issue in a case under this chapter."  That means a party in interest "should have an opportunity . . . to participate in the adjudication of any issue that may ultimately shape the disposition of his or her interest."  Truck Ins. Exch. v. Kaiser Gypsum Co., 602 U.S. 268, 277-78 (2024) (quoting 7 Collier on Bankruptcy ¶ 1109.01 (16th ed. 2023)).  In Truck, the Supreme Court held that an insurer is a party in interest when it has "financial responsibility for bankruptcy claims."  Id. at 285.  But section 1109(b) grants such insurers "neither a vote nor a veto; it simply provides them a voice in the proceedings."  Id. at 272.

And that general "voice" remains subject to background requirements, not only, of course, Article III constitutional standing but also the general prohibition on third-party standing and the related "zone of interests" rule.  The Fifth Circuit has "long applied" the "require[ment] that a plaintiff generally must assert his own legal rights and interests" as well as the "requirement" that an objector raise issues that "fall within the zone of interests protected by the law invoked."  Superior MRI Servs. v. Alliance HealthCare Servs., 778 F.3d 502, 504, 506 (5th Cir. 2015) (internal quotation marks omitted); see also Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 111, 127 n.3 (2014) (recognizing longstanding "limitations on third-

-228-

party standing" as well as zone-of-interests requirement, and explaining latter as a rule of statutory construction).  These limitations are "especially important in bankruptcy proceedings which often involve numerous parties who may seek to assert the rights of third parties for their own benefit."  In re Emergency Room Mobile Servs., L.L.C., 529 B.R. 676, 685 (N.D. Tex. 2015).  So a party in interest "must still satisfy the general requirements of the standing doctrine" and, in particular, "cannot assert third party rights defensively to defeat confirmation even if confirmation would directly and adversely affect its own rights."  In re Quigley Co., 391 B.R. 695, 703, 705 (Bankr. S.D.N.Y. 2008) (internal quotation marks omitted).  "Instead, the objecting party can only challenge the parts of the plan that directly implicate its own rights and interests." Id.  A party may be a "real party in interest and have standing in one respect while [it] may lack standing in another respect."  In re A.P.I. Inc., 331 B.R. 828, 857 (Bankr. D. Minn. 2005).

Truck, in simply answering whether an insurer was a party in interest at all, did not address, much less reject, these requirements.  If anything, by quoting the settled understanding reflected in Collier—that a party in interest may "participate in the adjudication of any issue that may ultimately shape the disposition **of his or her interest**"—the Supreme Court reinforced them.  Truck, 602 U.S. at 277-78 (emphasis added).  Which is exactly what a bankruptcy court in New York recently concluded:  "[N]either § 1109(b) nor the Truck holding satisfies or replaces constitutional and prudential standing requirements."  In re Roman Catholic Diocese of Syracuse, 2024 WL 5054809, at *3 (Bankr. N.D.N.Y. Dec. 9, 2024); see id. at *5 (quoting Truck's quotation of Collier).  Truck did not expressly or implicitly determine that a party in interest also is excused from satisfying background requirements, and to hold that the Supreme Court somehow silently rejected those requirements would "upend decades of firmly binding

precedent, contrary to the Supreme Court's direction." Id. at *4 (citing Agostini v. Felton, 521 U.S. 203, 237-38 (1997)).

The A.P.I. case shows how these principles operate in the context of insurer objections to confirmation. It too was a prepackaged asbestos bankruptcy. The debtor's insurers objected to confirmation on numerous grounds, including (a) the plan's classification of asbestos claims; (b) the timing of distributions to current and future claimants; (c) whether the prepetition solicitation of acceptances satisfied Bankruptcy Code requirements; (d) the plan's proposed release of estate of causes of action; and (e) whether the plan satisfied the security-interest requirement of section 524(g)(2)(B). 331 B.R. at 861-67. As to these, the court concluded that the objecting insurers lacked constitutional standing, prudential standing, or both, and that they thus would "not be heard in objection to confirmation of the Debtor's plan on those matters." Id. at 867.

Here, like in A.P.I., the Insurers' "self-professed right to defeat confirmation by any basis whatsoever," including "because they oppose **other** aspects of the plan that do touch their contractual relationships with the Debtor, is nothing more than" an inappropriate "'generalized grievance.'" Id. at 860 (emphasis in original). The Insurers, if they even have constitutional standing, are at least raising objections based on provisions of the Bankruptcy Code that are not protecting their interests (so the Insurers are outside the provisions' zone of interests) and, instead, involve the rights and interests of third parties, particularly claimants, who are present and represented in their own right (so the Insurers are violating the limitations on third-party standing). Thus, as in A.P.I., the Insurers lack authority to prosecute many of their wide-ranging battery of objections to the Plan, including: (a) whether the Protected Parties satisfy the statutory-relationship test under section 524(g); (b) whether the Plan enjoins claims and demands

that do not arise from exposure to asbestos; (c) whether the Debtor satisfies the ongoing-business requirement of section 524(g); (d) whether the prepetition solicitation was flawed; (e) whether the voting power of creditors holding claims for injuries from Ovarian Cancer, Gynecological Cancer and Other Disease should be revised to reflect anticipated recoveries from the Talc Personal Injury Trust; (f) whether the votes of claimants whose attorneys signed the TCC MOU should be disregarded; and (g) whether the Plan should be resolicited.  Here too, the Insurers do not "enjoy the right to object to any provision of the Debtor's plan or any aspect of its proposed reorganization, on any substantive ground whatsoever, whether the provision or aspect would affect them in the consummation or not." <u>A.P.I.</u>, 331 B.R. at 859.

Below, the Debtor addresses each objection as to which the Insurers at least arguably have a right to object.  Because the Objectors largely raised the other objections advanced by the Insurers, the Debtor has addressed those objections elsewhere in this Memorandum of Law.

**2.      Neither the Prepetition Corporate Restructuring Nor the Plan Sever Insurance Rights from Their <u>Attendant Obligations; the Plan is Insurance Neutral</u>**

The Insurers erroneously state that the Debtor "purports to have severed" its insurance rights from their attendant obligations.  <u>See</u> Travelers Obj. ¶¶11-15; Century Obj. ¶¶ 9-12.  This is untrue.[249]  No aspect of the Prepetition Corporate Restructuring severed insurance rights from

---

[249]     The Insurers also appear to argue that the Debtor "purports to have severed its insurance rights from the Talc Insurance Policies.  <u>See</u>, <u>e.g.</u>, Travelers Obj. ¶ 1; Century Obj. ¶ 9.  As set forth herein, no rights (or obligations) were severed from the Talc Insurance Policies.  Rather, certain rights and obligations under the Talc Insurance Policies were allocated to the Debtor pursuant to the Prepetition Corporate Restructuring; the Talc Insurance Policies remain fully intact and were not assigned to the Debtor.  If the Insurers believe that the divisional merger somehow failed to allocate insurance rights to the Debtor notwithstanding Texas law and the terms of the plan of merger, they have failed to identify any authority to support that contention—indeed, there is no such authority.  <u>See</u> Tex. Bus. Orgs. Code Ann. § 10.008(a) (providing that, "[w]hen a merger takes effect," "all rights, title, and interests to all . . . property owned by each organization that is a party to the merger" and "all liabilities and obligations" of each such organization is allocated to "one or more of the surviving or new organizations in the manner provided by the plan of merger without . . . any transfer or assignment having occurred").

-231-

obligations.  Pursuant to the Prepetition Corporate Restructuring, the Debtor was allocated, among

its other assets,

> rights to make claims under any and all insurance policies as to
> which its predecessor in interest has rights as an insured, additional
> insured, successor, beneficiary or otherwise, solely to the extent
> such policies afford coverage or a right to coverage for Red River
> Talc Related Liabilities[250] (the "Red River Talc Related Insurance
> Assets"), as well as all rights to any proceeds recovered in respect
> of Talc Related Liabilities prior to the Effective Time under any and
> all insurance policies that afforded the Debtor's predecessor-in-
> interest rights as an insured, additional insured, successor,
> beneficiary or otherwise.

Schedule 5(b)(i) to Plan of Divisional Merger.[251]  Similarly, the Debtor was allocated all

"Liabilities . . . based upon, arising out of, with respect to or by reason of the . . . Red River Talc

Related Insurance Assets."  Schedule 5(c)(i)(1)(d) to Plan of Divisional Merger.  Accordingly,

both the Debtor's insurance rights and any attendant obligations were allocated to the Debtor

pursuant to the Prepetition Corporate Restructuring.  There was no "prepetition bifurcation of

rights from obligations under the Talc Insurance Policies" nor was the Prepetition Corporate

Restructuring "defective."  Travelers Obj. ¶ 15 & n.8.

　　　　Likewise, the Plan does not attempt to bifurcate or sever the Debtor's insurance rights from

any attendant obligations.   As an initial matter, debtors in bankruptcy "routinely assign their

insurance policy **interests** to a settlement trust."  Boy Scouts of Am., 650 B.R. at 144 (emphasis

added) (citing cases).  Here, as set forth below, the Insurers have failed to identify any authority

---

[250]　　See Second Kim PI Decl., Ex. G (Plan of Divisional Merger, schedule § 5(c)(i)) (allocating to the Debtor all liabilities listed or described on Schedule 5(c)(i) (the "Red River Liabilities")).  Red River Liabilities include all Talc Related Liabilities other than Canadian Talc Personal Injury Claims, Governmental Action Claims, Mesothelioma/Lung Cancer Talc Personal Injury Claims, and Indirect Talc Personal Injury Claims related to the foregoing (each of which was allocated to PRT), as well as all liabilities based upon, arising out of, with respect to or by reason of the Red River Talc Related Insurance Asset (as defined herein).  Id.

[251]　　See Second Kim PI Decl., Ex. G (Plan of Divisional Merger, Sch. § 5(b)(i)) (allocating to and vesting in the Debtor all rights, title and interests to all property listed or described on Schedule 5(b)(i) (the "Red River Assets")).

prohibiting the Debtor from assigning the Talc Insurance Assets to the Talc Personal Injury Trust.

See id.  Nor have they identified any provision of the Plan or Trust Distribution Procedures that would abrogate the Insurers' rights or the Debtor's obligations under the Talc Insurance Policies.

See id.  To the contrary, as discussed below, the Plan contains robust protections of the Insurers' rights under the Talc Insurance Policies and applicable law.[252]

For example, the Plan, as further modified (see supra Part III.C), provides, in pertinent part, that

> . . . nothing contained in the Plan, the Plan Documents, or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the rights or obligations of any Talc Insurance Company, the Debtor, the Talc Personal Injury Trust, or the Reorganized Debtor, as subrogee of the Talc Personal Injury Trust, arising out of or under any Talc Insurance Policy.

Plan § 10.3.3(a).[253]  The Plan, as further modified (see supra Part III.C), further provides that

> [t]he Plan, the Plan Documents, the Confirmation Order, and all proceedings, determinations, and findings in, of, or by the Bankruptcy Court are neutral with respect to, and have no effect on, the rights, defenses, and obligations of the Debtor, the Talc

---

[252]   The Insurers are **not**, however, exempt from the binding effect of the Plan as a general matter.  See Plan § 10.3.4 (providing that the Plan, Plan Documents, and Confirmation Order shall be binding on the Talc Insurance Companies, subject to specified coverage-related exceptions).  Moreover, the Plan prohibits the Talc Insurance Companies from arguing as a coverage defense that the transfer and assignment of the Talc Insurance Assets to the Talc Personal Injury Trust does not comply with the Bankruptcy Code and provides that principles of res judicata and collateral estoppel shall be applied against Talc Insurance Companies with respect to issues that are "actually litigated" in connection with or related to objections to Plan confirmation.  Id. §§ 8.1(e)(xx), 10.3.6.

[253]   Century's proposed revision to section 10.3.3(a), which would provide that Talc Insurance Companies are not obligated "to defend or pay defense costs in any litigation against any Protected Party," Century Obj. ¶ 28, is not acceptable because, as written, it would purport to relieve Talc Insurance Companies from:  (a) the obligation to defend themselves against counterclaims or cross-claims asserted by J&J and its co-defendants in the NJ Coverage Action and (b) the obligation to cover defense of the talc claims, as determined in the NJ Coverage Action.  If the intent of Century's proposed change is to provide that Talc Insurance Companies not be required to pay defense costs of Protected Parties in litigation between Talc Insurance Companies and Protected Parties, the change is inappropriate.  The Plan does not purport to modify the rights or obligations of the Insurers or insureds, including any obligation of the Talc Insurance Companies to pay defense costs.  Nor has Century identified any basis for it to be relieved of any obligations it has to pay defense costs under its policies.

> Insurance Companies, the Talc Personal Injury Trust, and the Reorganized Debtor, as subrogee of the Talc Personal Injury Trust under the Talc Insurance Policies.  Nothing in the Chapter 11 Case shall be construed otherwise or be used as evidence to support or suggest a construction to the contrary.[254]

Id. § 10.3.3(b).  These provisions, together with various other protective provisions in the Plan and Trust Distribution Procedures,[255] protect the Insurers' rights and establish that the obligations of the Debtor, the Talc Personal Injury Trust and the Reorganized Debtor under the Talc Insurance Policies will not change as a result of the Plan.

In wrongly arguing that the Debtor's insurance rights were or will be severed from any insurance obligations (they were not nor will they be), the Insurers argue that the Debtor is obligated to "permit its insurer to control or participate in the defense or settlement of claims." See Travelers Obj. ¶¶ 11, 13; Century Obj. ¶¶ 9-10.  As set forth below, none of the terms of the Plan or Trust Distribution Procedures modifies—let alone abrogates—the Insurers' rights under the policies and applicable law, and bankruptcy courts in mass-tort chapter 11 cases have consistently rejected the Insurers' argument.

---

[254]  To further clarify its neutral effect on the Insurers, the third amended Plan to be filed in advance of the confirmation hearing reflects the addition of the reference to the Reorganized Debtor's rights, defenses and obligations as the subrogee of the Talc Personal Injury Trust in Sections 10.3.3(a) and (b).

[255]  See also, e.g., id. § 9.9 (providing that the resolution of Channeled Talc Personal Injury Claims is subject to "the right of any Talc Insurance Company to raise any valid Talc Insurer Coverage Defense in response to any claim, cause of action, or right asserted by the Talc Personal Injury Trust"); id. § 10.3.4 (providing that neither the Plan, Confirmation Order, any findings or conclusions, nor any estimation or valuation of Talc Personal Injury Claims shall "with respect to any Talc Insurance Company, constitute a trial or hearing on the merits or an adjudication, judgment, finding, conclusion, or other determination, or be used as evidence of or suggestion regarding the rights and obligations of any Talc Insurance Company under any Talc Insurance Policy"); id. § 12.2(q) (providing that any post-confirmation orders "shall not impair any Talc Insurer Coverage Defense or the rights, claims, or defenses, if any, of any Talc Insurance Company"); id. § 12.4 (providing that nothing in the Plan shall limit the assertion, applicability, or effect of any Talc Insurer Coverage Defense; Trust Distribution Procedures § 10.1 (providing that "the Trust's determination to pay or not to pay any claim shall not be binding on, or have any res judicata, collateral, or other preclusive effect in any lawsuit or other proceeding against, the Debtor, the Reorganized Debtor, J&J, the other Debtor Corporate Parties, the other Protected Parties, or any other person or entity other than the Trust.").

The Insurers also argue that the Debtor cannot limit or extinguish recoupment rights.  See Travelers Obj. ¶ 14; Century Obj. ¶ 11.  To eliminate any doubt as to whether the Plan could limit the Insurers' defensive setoff and recoupment rights (Travelers Obj. ¶¶ 35-38; Century Obj. ¶¶ 23-24; Allstate Obj. ¶ 15), as discussed above, see supra Part III.C, the Debtor will be adding section 10.3.3(c) to the Plan and will be modifying the definition of "Talc Insurance Policy" to address the Insurers' objections relating to the Plan's potential preclusive effect on the Insurers' assertion of claims against their reinsurers.  See Century Obj. ¶ 8; Travelers Obj. ¶ 10; Allstate Obj. ¶ 7.

Additionally, the Insurers make much of the Plan releases applicable to the Debtor's non-debtor affiliate, Middlesex.  See, e.g., Travelers Obj. § III; Century Obj. § III.  As an initial matter, the Debtor agrees with the Insurers that any determination regarding Middlesex's coverage obligations, if any, is not a determination for this Court.[256]  Additionally, the Insurers ignore that the Plan expressly provides that the Insurance Entity Injunction will not enjoin the "rights of any Talc Insurance Company to assert any claim, debt, obligation, cause of action, or liability for payment against any other Talc Insurance Company that is not a Settling Talc Insurance Company, or as otherwise specifically provided in any Talc Insurance Settlement Agreement."  Plan § 11.3.2(c)(iv).  Middlesex is a Talc Insurance Company that is not a Settling Talc Insurance Company.  Accordingly, the Insurers' rights to assert claims against it are not enjoined.  However, as discussed above, see supra Part III.C, the Debtor will be adding clarifying language to make clear that the Channeling Injunction applicable to Middlesex does not impact these rights.

---

[256]    The Debtor disputes the various allegations made by the Insurers with respect to Middlesex, and it is the Debtor's position that Middlesex has no further coverage responsibility for the talc claims.

Travelers claims, almost in passing, that the Plan enjoins insurers from pursuing any claim for contribution against Settling Insurers.  Travelers Obj. ¶ 10.  But, as Travelers acknowledges, section 11.3.1(g) of the Plan preserves the Insurers' ability to obtain an affirmative recovery from the Talc Personal Injury Trust on account of contribution claims that, but for the Insurance Entity Injunction, could be asserted against Settling Talc Insurance Companies.  Travelers Obj. ¶ 10 n.7.

Specifically, "[i]f a Talc Insurance Company that is not a Settling Talc Insurance Company asserts that it has Contribution Claims against a Settling Talc Insurance Company," it may pursue such Contribution Claims "as a defense **or counterclaim**" in any Talc Insurance Action—including in the NJ Coverage Action—and the Reorganized Debtor, as subrogee of the Talc Personal Injury Trust with the exclusive right to pursue and resolve any Talc Insurance Action, may assert the legal or equitable rights (if any) of the Settling Talc Insurance Company. See Plan § 11.3.1(g) (emphasis added).  It would contravene the settlements between the Debtor and the Settling Talc Insurance Companies and undermine the Channeling Injunction if the Plan were to permit the Settling Talc Insurance Companies—as Protected Parties—to be directly sued for claims that relate to the Talc Personal Injury Claims.  Further, Insurers can affirmatively recover from the Talc Personal Injury Trust.  See Plan § 11.3.1(g) ("to the extent such Contribution Claims are determined to be valid, the liability (if any) of such Talc Insurance Company to the Talc Personal Injury Trust shall be reduced by the amount of such Contribution Claims.").  The cash being contributed to the Talc Personal Injury Trust is more than adequate to protects the Insurers on account of any Contribution Claims against Settling Talc Insurance Companies.

Finally, the Insurers broadly assert that the "fabric of the Plan is designed to increase the quantum of liability borne by the Insurers in violation of the Bankruptcy Code and applicable law." Travelers Obj. ¶ 5.  For the reasons set forth above, the Insurers' assertions regarding the Plan's releases in this regard are without merit.  See supra Parts VII.D-VII.G.  The Insurers' assertions regarding the assignment of Talc Insurance Assets are likewise without merit as set forth below.  See infra Part VIII.C.3.

To the extent the Insurers contend that the Plan increases the quantum of their liability due to the prospective payment of $1,500 to each qualifying holder of a Talc Personal Injury Claim relating to Gynecological Cancer, see Travelers Obj. ¶ 45 (arguing that the Plan would "pay[] potentially tens of thousands of claims that are otherwise non-compensable and would never see a recovery in the tort system under non-bankruptcy law"); id. ¶ 48 ("There is no proven causal link between J&J baby powder of talc and Gynecological Cancer or Other Diseases."), the Debtor disagrees.  As Dr. Mullin opines in his expert report, the Talc Personal Injury Trust's contemplated payments to holders of Gynecological Cancer claims 

Mullin Report ¶ 11 n.11.

Id. ¶ 142.

Id. ¶¶ 133, 137.  The aggregate remaining limits of solvent primary and excess Talc Insurance Policies issued to J&J by third-party insurers are less than $1.5 billion. Should the Insurers acknowledge (or be directed by court order to comply with) their respective

coverage obligations for the talc claims, the limits available under those policies will have been depleted by prepetition judgments, settlements and litigation costs.  It is all but assured that any amounts that the Insurers may in the future be required to pay in connection with the Plan will total a mere fraction of the total value of the payments under the Plan.  Regardless, the Plan fully preserves the Insurers' rights and defenses with respect to the Talc Insurance Policies, and this ultimately is a coverage issue that is not before this Court.

### 3.  The Debtor's Assignment of the Talc Insurance Assets to the Talc Personal Injury Trust Is Permissible <u>Under the Bankruptcy Code and Applicable Law</u>

The Insurers also erroneously argue that the Plan should not be confirmed because it violates the anti-assignment provisions of the Talc Insurance Policies.  Travelers Obj. ¶¶ 16-22.[257]  The Insurers argue that section 1123 of the Bankruptcy Code does not preempt New Jersey state law (which governs the policies) or the policy terms because the Plan's insurance provisions "widely depart[]" from applicable precedent.  Id. ¶ 18.  They claim that the Plan effects a "synthetic assignment" of insurance rights back to the Reorganized Debtor designed to

---

[257]   The Insurers incorrectly allege that "[t]he Debtor is not a named insured under the relevant policies, and has not sought coverage in connection with the pending NJ Coverage Action."  Travelers Obj. ¶ 19 n.10.  But a cursory review of a sample of relevant Talc Insurance Policies reveals ███████████████████████

████████  See, e.g., Westchester Fire Ins. Co., as successor by novation to Industrial Indemnity Co., Policy No. JE 884-2682 (1/1/1984-1/1/1985), Bates No. LTL 0010187 ███████████████████████

████████████████████████████; The Aetna Casualty and Surety Company, Policy No. 38XN07SCA (1/1/73-1/1/74), Bates No. LTL 0000317 ███████████████████████████████████████████████████

████████████████████████████████████████  The Aetna Casualty and Surety Company, Policy No. 38LC4798, Bates No. LTL0003468 ███████████████████████████████████████████████.  The Insurers cannot seriously dispute that the Debtor, as a subsidiary of J&J, is insured within the broad scope of this definition.  Moreover, Old JJCI did seek to vindicate its coverage rights in the NJ Coverage Action, and the Debtor is Old JJCI's successor-in-interest by merger with respect to Talc Insurance Assets.

"tactically benefit[] the J&J Defendants and the Debtor in non-bankruptcy litigation."  Id. ¶¶ 18, 20.  This argument is meritless, and the Debtor's assignment of the Talc Insurance Rights to the Talc Personal Injury Trust and related Plan provisions should be approved.

The Insurers mischaracterize the effect of the Plan provisions that transfer to the Talc Personal Injury Trust the Debtor's rights, actions and recoveries under the Talc Insurance Policies.  The Plan is not intended to—and does not—"somehow enhance the Reorganized Debtor's rights" under the policies.  See id. ¶ 21; Century Obj. ¶ 8.  Rather, the Plan is designed to ensure that the Talc Personal Injury Trust, its subrogee, the Reorganized Debtor (which, together with J&J and Holdco, will contribute approximately $9 billion to the Talc Personal Injury Trust), and the Reorganized Debtor's co-insureds under the policies retain precisely the same rights to coverage for talc claims that they had before the Petition Date.  The assignment of the Talc Insurance Assets to the Talc Personal Injury Trust ensures that those assets are not separated from the liabilities to which they relate—that is, it ensures that the Debtor's talc insurance coverage and talc liabilities remain with the same legal entity.  The subrogation of the Reorganized Debtor to the Talc Personal Injury Trust with respect to insurance rights, including the right to pursue insurance coverage, recoveries and pursue any insurance settlements, see Plan § 4.9.4(b), was a point negotiated among the parties based on a number of considerations, including the substantial cash contributions being made under the Plan.  That the Reorganized Debtor will pursue such rights in no way harms Insurers.  Instead, it further demonstrates that the Plan will place the Insurers in the same position they were in prior to the filing of this chapter 11 case.

Section 1123(a)(5) of the Bankruptcy Code preempts restrictions on assignment of an insurance policy under applicable state law.  11 U.S.C. § 1123(a)(5)(B).  The Insurers

acknowledge the preemptive effect of section 1123(a)(5) as a general matter.  Travelers Obj. ¶ 18

(citing <u>Federal-Mogul</u> for the proposition that anti-assignment provisions were preempted).

Nevertheless, the Insurers take the position that, because the Plan does not propose to allow the

Talc Personal Injury Trust to monetize and retain the economic benefits of the Talc Insurance

Assets to fund part of claimants' recoveries, the assignment "falls outside the limited scope of

section 1123."  <u>Id.</u> ¶ 20.  This position is meritless.  <u>Federal-Mogul</u> stands for the

straightforward proposition that preemption under section 1123(a) of the Bankruptcy Code is

"broad enough to encompass the anti-assignment provisions of insurance policies that purport to

bar transfer to a § 524(g) trust."  <u>Fed.-Mogul</u>, 684 F.3d at 374.  "The purpose of this provision is

to prevent creditors and others from employing a debtor's bankruptcy filing to diminish

post-filing contractual rights."  <u>Id.</u> at 378.  Consistent with the holding in <u>Federal-Mogul</u>,

numerous mass-tort cases have confirmed plans that assign to a post-confirmation trust rights

under insurance policies containing anti-assignment provisions.[258]

     Here, the transfer of the Talc Insurance Assets to the Talc Personal Injury Trust and

subrogation of the Reorganized Debtor to the Talc Personal Injury Trust's rights was agreed to by

the parties following extensive negotiations regarding the terms of the Plan.  This structure

preserves the Talc Insurance Assets[259] while also affording claimants cash funding rather than

---

[258]     <u>See, e.g.</u>, <u>In re Boy Scouts of Am.</u>, 2023 WL 2891519, *3-4 (D. Del. Apr. 11, 2023) (observing that the bankruptcy court had determined that "[t]he Plan's transfer of rights under BSA Insurance Policies . . . is authorized and permissible notwithstanding any terms of any policies or provisions of applicable law that are argued to prohibit the assignment or transfer of such rights" and that appellant insurers had "identified no authority that stands for the proposition that interests under their policies could not be assigned"); <u>In re Insys Therapeutics, Inc.</u>, No. 19-11292 (KG) (Bankr. D. Del. Jan. 16, 2020), Dkt. 1115 (confirming chapter 11 plan where debtors' insurance rights and policies were assigned to a trust and any anti-assignment contractual provisions were preempted); <u>In re TK Holdings Inc.</u>, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 20, 2018), Dkt. 2116 (same); <u>Duro Dyne</u>, Dkt. 1332 (same); <u>Leslie Controls</u>, Dkt. 382 (same).

[259]     The Debtor understands that insurers have asserted and may assert that the Talc Personal Injury Trust's assumption of exclusive responsibility for Talc Personal Injury Claims without a corresponding assignment to the Talc Personal Injury Trust of the relevant insurance assets could have given rise to a defense to coverage for talc claims.  Although the Debtor disputes the assertion of such a defense, the Debtor

disputed insurance coverage rights (which will be pursued by the Reorganized Debtor).  The Insurers should not now be permitted to seek to utilize the Debtor's bankruptcy filing to diminish the Talc Insurance Assets to their own benefit—the Insurers can have no other legitimate basis for complaining that the Reorganized Debtor, the very entity that held the Talc Insurance Assets prior to the filing of the chapter 11 case, and not the Talc Personal Injury Trust, will have the right to, among other things, pursue the pending coverage litigation.

The Insurers similarly argue that the Debtor's assignment of the Talc Insurance Assets to the Talc Personal Injury Trust and the Reorganized Debtor's subrogation to the Talc Personal Injury Trust's attendant rights and obligations is "wholly unnecessary" and therefore "falls outside the limited scope" of preemption of applicable state law under section 1123.  Travelers Obj. ¶ 20.  But the Debtor satisfies the standard articulated in the sole case cited by the Insurers for the proposition that the scope of preemption under section 1123(a) is limited to "required" means of implementation.  See id. ¶ 20 n.11.  Specifically, in Irving Tanning, the First Circuit Bankruptcy Appellate Panel recognized that section 1123(a) "evinces clear congressional intent for a preemptive scope that includes the transactions listed under § 1123(a)(5) as 'adequate means' for the plan's implementation."  Irving Tanning Co. v. Me. Superintendent of Ins., 496 B.R. 644, 662 (1st Cir. B.A.P. 2013).  The Irving Tanning court observed that the primary limitation on the preemptive scope of section 1123(a)(5) is that it encompasses only what is "sufficient to implement the plan, equal to what is required, but also not more than is required."  Id. at 664.  Thus, "[t]he requirement of adequacy denies preemptive effect . . . to those [means for implementation] that are superfluous or unnecessary."  Id.

---

determined, consistent with its obligation to maximize the value of its estate, that the assignment of the Talc Insurance Assets to the Talc Personal Injury Trust was necessary and appropriate under the circumstances.

Here, the Debtor's assignment of the Talc Insurance Assets is neither superfluous nor unnecessary.  As noted above, the Debtor determined to assign the Talc Insurance Assets to the Talc Personal Injury Trust to avoid potential arguments by Insurers, which the Debtor disputes, that separating the Talc Insurance Assets from the Talc Personal Injury Claims could give rise to a coverage defense.  Moreover, contrary to the Insurers' arguments, the existence of the savings clause in section 4.9.4(d) of the Plan, which would become operative if the assignment of the Talc Insurance Assets is determined to be invalid, does not render the assignment provisions of the Plan unnecessary.  See, e.g., Boy Scouts of Am., 642 B.R. at 613-15 (rejecting plan opponents' argument that the existence of an alternative "toggle plan" meant that the releases and injunctions in the plan before the court were unnecessary).

Not only is the Debtor's assignment of the Talc Insurance Assets to the Talc Personal Injury Trust permissible under section 1123(a)(5), it also is appropriate under applicable insurance law.  The vast majority of courts nationwide have ruled that anti-assignment clauses are not implicated where the events giving rise to a loss have already occurred.  This is because such a transfer of insurance rights merely changes the identity of the insured as opposed to changing the insurer's risk.[260]  Accordingly, the New Jersey Supreme Court has held that

> [a]n anti-assignment clause is not a barrier to the post-loss assignment of a claim. The better rule is the generally recognized majority rule on that issue. Simply stated, that general rule recognizes that anti-assignment clauses in insurance contracts

---

[260]    See, e.g., Fed.-Mogul Glob., 684 F.3d at 379 ("[A]fter events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity.") (quoting 3 Couch on Ins. § 35.8 (3d ed. 2011); see also OneBeacon Am. Ins. Co. v. A.P.I., Inc., 2006 WL 1473004 at *2-3 (D. Minn. May 25, 2006) (noting general consensus among courts that assignment of loss does not expand insurer's risk; simply allows change in identity to "reconnect the policy's coverage to the insured loss"); Givaudan Fragrances Corp. v. Aetna Cas. & Sur. Co., 151 A.3d 576, 590-91 (N.J. 2017) (rejecting insurers' arguments that an assignment had increased their liability, because "after the events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity") (internal quotation marks omitted).

"apply only to assignments before loss, and do not prevent an assignment after loss."

Givaudan Fragrances, 151 A.3d at 590-91 (quoting 3 Couch on Ins. § 35.8).[261] Under occurrence-based polices (like the policies here) the "loss event" is the "relevant event giving rise to coverage" rather than "the entry of a judgment fixing the amount of damage for that loss." Id. at 591. Thus, if an assignment is made after the relevant policy periods and the "loss event occurred during the policy periods," the insurers' risk of exposure is fixed, and anti-assignment provisions do not apply. Id. at 591-92.

Restrictions on assignment in insurance policies are designed "to protect the insurer against the possibility of increased risks attached to a change in the identity of the insured **if the policy were assigned before the insured-against loss had occurred.**" In re Babcock & Wilcox Co., 2004 WL 4945985, at *15 (Bankr. E.D. La. Nov. 9, 2004) vacated on other grounds, 2005 WL 4982364 (E.D. La. Dec. 28, 2005) (emphasis added). Case law is clear that no material increase in an insurer's risk is present where the events giving rise to a loss have already occurred. See, e.g., Cont'l Cas. Co. v. N. Am. Capacity Ins. Co., 683 F.3d 79, 91 n.7 (5th Cir. 2012) (observing that "[i]f an insured assigns a right under a policy after a loss occurs, it does not in any fashion increase the risk to an insurer") (internal quotations omitted); Fed.-Mogul, 684 F.3d at 379 ("[A]fter events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity.") (quoting 3 Couch on Ins. § 35.8); In re ACandS, Inc., 311 B.R. 36, 41 (Bankr. D. Del. 2004) (ruling that policies may be assigned to a personal injury trust because loss giving rise to liability had already accrued).

---

[261]   The Insurers' arguments here are the very same arguments that the Givaudan Fragrances court rejected. Indeed, several of the Insurers here were defendants in Givaudan Fragrances (e.g., Allstate, TIG and Travelers).

Here, the Debtor's assignment of the Talc Insurance Assets to the Talc Personal Injury Trust does not breach any anti-assignment provision in the Insurers' polices because the Talc Insurance Policies issued by the Insurers only cover losses relating to talc product use arising before 1986. As a result, the losses that correspond to the Insurers' policies occurred, at the latest, nearly 40 years ago, enabling the Debtor to freely assign the Talc Insurance Assets to the Talc Personal Injury Trust (and the Reorganized Debtor, in turn, to be subrogated to the Talc Personal Injury Trust's rights in the policies).[262]

### 4. The Plan and Trust Distribution Procedures Do Not Abrogate Any Rights of the Insurers to Participate in the Defense, Investigation or Settlement of Talc Personal Injury Claims

The Insurers also erroneously argue that the Plan and Trust Distribution Procedures abrogate their rights to control or participate in the defense, investigation and settlement of Talc Personal Injury Claims. See Travelers Obj. ¶¶ 4-5, 13; Century Obj. ¶¶ 8-10. None of the terms of the Plan or Trust Distribution Procedures modifies—let alone abrogates—the Insurers' rights under the policies and applicable law, and bankruptcy courts in mass-tort chapter 11 cases have consistently rejected the Insurers' argument.

In Congoleum, for example, the bankruptcy court faced a similar objection from the debtors' insurers, who argued that by channeling the asbestos-related personal injury claims to a post-confirmation trust, the plan impermissibly eliminated their right to object to claims. In re Congoleum Corp., 2008 WL 4186899 (Bankr. D.N.J. Sept. 2, 2008). The court overruled the

---

[262] The policy terms themselves contemplate this potential outcome, █████████████████████████ ████████████ See, e.g., Westchester Fire Ins. Co., as successor by novation to Industrial Indemnity Co., Policy No. JE 884-2682 (1/1/1984-1/1/1985), Bates No. LTL 0010187 ████████████████████ █████████████████████████████████████████████████████████ These provisions would be rendered illusory if an insurer only would pay liability of a bankrupt insured if that insured did not avail itself of the tools of bankruptcy.

insurers' objection, reasoning that allowing the insurers to object to the channeled personal injury claims would undermine the purpose of the channeling injunction and circumvent trust mechanisms.  Id. at *9; see also ACandS, 311 B.R. at 42 (rejecting insurer's argument that the plan violated the Bankruptcy Code by limiting its rights to object to claims channeled to the personal injury trust); In re Abengoa Bioenergy Biomass of Kan., LLC, 2018 WL 2138620, at *2-3 (Bankr. D. Kan. May 7, 2018) (holding that it was appropriate to vest the rights to object to claims exclusively in a trustee and bar other parties in interest from objecting to channeled claims).

Here, too, allowing the Insurers to control or participate in the Talc Personal Injury Trust's review and adjudication of Talc Personal Injury Claims would undermine the injunctions and circumvent the Trust Distribution Procedures.  As discussed herein, many other mass-tort cases have confirmed plans that exclusively vest in the post-confirmation trust the right to review and allow or disallow claims.  Indeed, the Insurers' expert witness, Mr. Babbe, failed to identify a single case where an insurer was afforded the right to control or participate in the defense, investigation or settlement of claims channeled to a post-confirmation trust.

In any event, although it is a coverage issue that this Court need not determine and is not being asked to determine, the Debtor submits that the Insurers do not have the right to control the resolution of claims here given their denial of coverage.  Under applicable state law, an insurer's right to control the defense of lawsuits against its insured typically exists only where the insurer unequivocally accepts its obligation to pay the resulting settlements—which has not occurred here—and not where an insurer has denied coverage, reserved its right to deny coverage,

abandoned its insured or engaged in other conduct giving rise to a conflict of interest with its policyholder.[263]

In the normal course (and subject to the policy language), insurance companies possess the right to control a claim against an insured and deter the insured from taking action that will interfere with the insurer's right to control the defense.  See Griggs v. Bertram, 443 A.2d 163, 170 (N.J. 1982); SL Indus., Inc. v. Am. Motorists Ins. Co., 607 A.2d 1266, 1272-73 (N.J. 1992). But, pursuant to applicable New Jersey law, an insurer forfeits that right when the insurer has not acknowledged coverage (including where, for example, an insurer has simply reserved its rights) or where there is a conflict of interest between the insurer and the insured.  If the trial of the underlying claim "will leave the question of coverage unresolved so that the insured may later be called upon to pay," or "if the case may be so defended by a carrier as to prejudice the insured thereafter upon the issue of coverage," the insurer "should not be permitted to control the defense." Burd, 267 A.2d at 10.[264]

---

[263]    See, e.g., J.P. Morgan Sec. Inc. v. Vigilant Ins. Co., 58 N.Y.S.3d 38, 39-40 (N.Y. App. Div. 2017) (holding that an insurer waived consent rights by unreasonably delaying in dealing with plaintiffs' claims and indicating intent to deny coverage); 1 Insurance Claims and Disputes § 3:9 (6th ed. 2021) ("If . . . the insured settles a case for a sum that the insurance company would have been obligated to pay in settlement, the company is not prejudiced by the unauthorized settlement"); see also 14A Couch on Ins. § 203:41 (3d ed. 2021) ("When an insurer wrongfully refuses to settle a claim or refuses to defend the insured altogether, the insured, without the insurer's consent, is free to negotiate a settlement with the claimant. . . . The insurer may be liable for the entire settlement amount, including amounts in excess of policy limits, based upon its wrongful refusal to settle."); NL Indus., Inc. v. Commercial Union Ins. Co., 828 F. Supp. 1154, 1165 (D.N.J. 1993), as amended (Sept. 24, 1993) ("An insurer loses its right to control the insured's defense, however, if a conflict of interest is present," including "'if the case may be so defended by a carrier as to prejudice the insured thereafter upon the issue of coverage . . .'" (quoting Burd v. Sussex Mut. Ins. Co., 267 A.2d 7, 10 (N.J. 1970))); Coats, Rose, Yale, Ryman & Lee, P.C. v. Navigators Specialty Ins. Co., 830 F. Supp. 2d 216, 219 (N.D. Tex. 2011), aff'd, 489 F. App'x 769 (5th Cir. 2012) ("Under certain circumstances, however, an insurer may not insist upon its contractual right to control the defense," including where the insurers' actions create a "potential conflict of interest" (internal quotation marks omitted); N. Cty. Mut. Ins. Co. v. Davalos, 140 S.W.3d 685, 688 (Tex. 2004) ("[A]n insurer's right of control generally includes the authority to make defense decisions as if it were the client 'where no conflict of interest exists'") (quoting State Farm Mut. Auto. Ins. Co. v. Traver, 980 S.W.2d 625, 627 (Tex. 1998)).

[264]    For example, a conflict frequently arises where the underlying claim asserts both negligent and intentional conduct.  The Supreme Court of New Jersey has explained that interests conflict, and an insurer must yield control of the defense to the insured, where both the insurer and the insured "want [the underlying claim] to fail," but "the insured would want the basis to be negligence whereas the carrier would profit if the basis

It is also settled under New Jersey law that an insurer forfeits its right to participate in the investigation, defense, or settlement of a claim where it actively denies coverage and the insurer's denial causes the insured to defend itself against claims covered by an insured's policy, ultimately forcing the insured to settle those claims without the assistance of the insurer. Griggs, 443 A.2d 173-74. At that point, the insurer becomes liable for the settlement amount up to policy limits. Bob Meyer Cmtys., Inc. v. Ohio Cas. Ins. Co., 2020 WL 5887025, at *4 (N.J. Super. Ct. App. Div. Oct. 5, 2020); see also Owens-Ill., Inc. v. United Ins. Co., 650 A.2d 974, 994 (N.J. 1994) (holding that an insurer that "refused to involve themselves in the defense of the claims as presented" must be "bound by the facts set forth in the plaintiff's own records with respect to the dates of exposure and with respect to the amounts of settlements and defense costs"). Indeed, where an insurer denies coverage and refuses to participate in the good-faith resolution of a claim, and the insurer's refusal requires an insured to defend and settle a claim without assistance, "there can be no re-litigation of those settled claims." Owens-Ill., 650 A.2d 995.

Here, the Insurers' coverage defenses also give rise to conflicts that entitle the insured to control its own defense. The Insurers have asserted in the NJ Coverage Action that they have no obligation to cover underlying talc claims on a variety of grounds, including to the extent defendants expected or intended the talc claimants' injuries. This legal position gives rise to precisely the type of conflict the New Jersey Supreme Court identified in Burd, in which the court concluded that the insurer had no right to control the defense. The Insurers' reliance on the

---

was an intentional injury within the policy exclusion [for intentional conduct]." Burd, 267 A.2d at 10 ("If [the underlying] plaintiff pressed his claim of negligence, the coverage issue would remain open, for the carrier could hardly insist the injuries were intentionally inflicted. Willfulness is not a defense to a charge of negligence. And if [the underlying] plaintiff sought a judgment for intentional hurt, the carrier could not be expected to resist that basis of liability with the fervor or fidelity of an advocate selected by the insured."); see also L.C.S., Inc. v. Lexington Ins. Co., 853 A.2d 974, 982 (N.J. Super. Ct. App. Div. 2004) (explaining that insurer is "placed in a conflict position with its insured" where the insurer can "not defend [the underlying] action with complete devotion to the insured's interest").

"expected/intended" defense is just one of many defenses the Insurers have asserted and are actively pursuing in the NJ Coverage Action.  Just months before the Debtor's chapter 11 filing, Travelers moved for summary judgment establishing that it owed no coverage for losses related to the judgments entered in Ingham v. Johnson & Johnson on the basis that defendants expected or intended the Ingham claimants' injuries.  See supra Part II.M.

The Insurers have also generally denied coverage for losses arising from talc claims.  In 2019, after J&J and Old JJCI made demands on the Insurers for coverage for talc claims, certain of the Insurers filed the NJ Coverage Action seeking a declaration that they do not owe any coverage relating to the talc claims.  In that action, the Insurers have asserted claims or cross-claims seeking declarations of no coverage.  Most recently, on October 18, 2024, certain Insurers filed a reservation of rights in the Debtor's adversary proceeding [Adv. Pro. No. 24-3194, Adv. Dkt. 42] (the "Reservation of Rights").  In the Reservation of Rights, certain Insurers stated that "[n]either Travelers nor any of the other Insurers agree[s] that the policies issued to J&J provide coverage" for any payments made by J&J, the Debtor, or a trust established in the chapter 11 case, or for the billions of dollars of payments made by J&J prior to the chapter 11 case.  See Reservation of Rights ¶ 2.

The Insurers have also forfeited their rights to control or participate in the defense, investigation and settlement of Talc Personal Injury Claims by acting in bad faith.  Insurers exercising rights of control or participation must protect their insured's interests in doing so. Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 323 A.2d 495 (N.J. 1974) (holding that, when exercising a right to control the defense, the insurer owes the insured a fiduciary duty of good faith to attempt to resolve underlying claims in a way that protects the insured's interests and puts the insured's interests on equal footing with its own); Bowers v. Camden Fire Ins. Ass'n,

237 A.2d 857, 866 (N.J. 1968) (noting that insurers have a "fiduciary obligations which is inherent in the duty to act in good faith in the matter of settlement of claims against" the policyholder).  Here, the Insurers are doing the opposite of what <u>Rova Farms</u> requires by actively working to subvert the settlement embodied in the Plan and obtain an order dismissing the chapter 11 case.[265]  These concerted efforts evidence the Insurers' bad faith and deprive the Insurers of any rights of control or participation that they might otherwise have had under the policies.

The Plan expressly and robustly preserves the Insurers' coverage defenses and rights. They are entitled to nothing more.

### D.       The United States' Objections to Confirmation of the Plan.

#### 1.       The United States Does Not Hold a Claim Against the Debtor and, Even If It Did, Such Claim Is a <u>Class 4 Channeled Talc Personal Injury Claim</u>

With respect to alleged tortfeasors, the Medicare Secondary Payer provision ("<u>MSP</u>") of the Medicare Act of 1980, 42 U.S.C. § 1395y(b) determines how a settlement, judgment or award is allocated between the Medicare beneficiary claimant and the United States government. CMS'[266] own regulations provide that:  (a) an alleged tortfeasor is not required to reimburse CMS unless a beneficiary fails to reimburse CMS for 60 days after receiving a settlement, judgment or award payment[267]; and (b) the CMS cannot recover more than the amount of the

---

[265]       Examples are numerous.  <u>See</u>, <u>e.g.</u>, Insurers' Joinder to UST Dismissal Mot. [Dkt. 378]; *Obj. of Century and Certain Other Insurers to Debtor's Mot. for an Order Appointing Randi S. Ellis as Legal Representative for Future Claimants* [Dkt. 456]; Insurers DS Obj.

[266]       The Secretary of the HHS has delegated its relevant authority under the MSP to CMS.  <u>See</u> 66 Fed. Reg. 35437 (July 5, 2001).

[267]       "If the beneficiary . . .  receives a primary payment [<u>i.e.</u>, a settlement, judgment or award], the beneficiary . . . must reimburse Medicare within 60 days."  42 C.F.R. § 411.24(h).  "If Medicare is not reimbursed as required by paragraph (h) of this section, the primary payer must reimburse Medicare even though it has already reimbursed the beneficiary or other party."  <u>Id.</u> § 411.24(i)(1).

relevant settlement, judgement or award.[268]  Thus, the United States cannot have a claim under the MSP unless and until there is a settlement, judgment or award and the Medicare beneficiary fails to comply with its obligation to reimburse CMS for any conditional payments.

Based on the United States' own interpretation of the MSP, the USG Claimants are not creditors of the Debtor and do not hold any claims against the Debtor.

Even if the USG Claimants are found to hold claims against the Debtor, these claims would be, at best, contingent claims for reimbursement and automatically disallowed under section 502(e)(1)(B) of the Bankruptcy Code.  The contingency of the USG Claimants' alleged claims with respect to each Medicare beneficiary would only be eliminated upon satisfaction of two conditions:  (a) the beneficiary receives a payment on account of its claims against the Debtor, which will not occur until after the Effective Date of the Plan and establishment of the Talc Personal Injury Trust and (b) that beneficiary fails to reimburse Medicare with the proceeds the beneficiary receives.  Notwithstanding this, were the Court to find that the USG Claimants have claims against the Debtor that are not automatically disallowed, such claims would be Channeled Talc Personal Injury Claims.  As a result, whether the USG Claimants are found to have no claims or Class 4 Channeled Talc Personal Injury Claims, the vast majority of the US Objection, including regarding releases (US Obj. ¶¶ 29-34), the Insurance Injunction (US Obj. ¶¶ 51-53, 62) and setoff and recoupment (US Obj. ¶¶ 76-82), falls away.

---

[268]    "If CMS seeks recovery from the primary payer, in accordance with § 411.24(i), the recovery amount will be no greater than the amount determined under paragraph (c) or (d) or (e) of this section."  42 C.F.R. § 411.37(b).  Subsection (d) applies when "Medicare payments equal or exceed the judgment or settlement amount" and provides that "[i]f Medicare payments equal or exceed the judgment or settlement amount, the recovery amount is the total judgment or settlement payment minus the total procurement costs."  Id. § 411.37(d).

**a.      The United States Does Not Hold a Claim Against the Debtor**

The United States asserts that it is a creditor and party in interest in this chapter 11 case because the USG Claimants have rights of reimbursement for certain healthcare costs related to Channeled Talc Personal Injury Claims under the MSP.  US Obj. ¶ 1.  The United States acknowledges that its right to reimbursement from the Debtor only arises when the United States has made a conditional payment to a Medicare beneficiary and the Debtor has a "demonstrated responsibility"[269] for the liability, i.e., when a Medicare beneficiary receives a settlement, judgment or award from the Debtor, while it is a Medicare beneficiary.  See id. ¶¶ 3, 5; see also Taransky v. Sec'y of U.S. Dep't of Health & Human Servs., 760 F.3d 307, 314-15 (3d Cir. 2014) (holding that HHS could seek reimbursement from beneficiary because the settlement demonstrated the tortfeasor's responsibility); Bio-Medical Applications of Tenn., 656 F.3d at 294 ("The proper scope of the 'demonstrated responsibility' provision, therefore, is to limit the class of alleged tortfeasors whom Medicare can sue for reimbursement:  those who have already been adjudged liable (or have entered into a settlement, etc.) for causing harm that led to Medicare

---

[269]    See 42 U.S.C. § 1395y(b)(2)(B)(ii) ("[A] primary plan, and an entity that receives payment from a primary plan, shall reimburse the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service **if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service**.") (emphasis added); id. ("A primary plan's responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means.").

The MSP defines "primary plan" to mean, among other things not relevant here, a "liability insurance policy or plan (including a self-insured plan)."  42 U.S.C. § 1395y(b)(2)(A).  The MSP further provides that "[a]n entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance, or otherwise) in whole or in part."  Id.  These provisions make a tortfeasor a "primary plan" when a Medicare beneficiary either settles with or receives an award or judgment against the tortfeasor on account of injuries or harm that the Medicare beneficiary sustained.  See, e.g., Bio-Med. Applications of Tenn., Inc. v. Cent. States Se. & Sw. Areas Health and Welfare Fund, 656 F.3d 277, 288-90 (6th Cir. 2011) (explaining Congress added the "demonstrated responsibility" and "deemed" language to overrule decisions of the federal court holding tortfeasors were not self-insured plans, including the Fifth Circuit's decision in Thompson v. Goetzmann, 337 F.3d 489 (5th Cir. 2003) (en banc)).

expenses."); <u>Glover v. Liggett Grp., Inc.</u>, 459 F.3d 1304, 1309 (11th Cir. 2006) ("Until

Defendants' responsibility to pay for a Medicare beneficiary's expenses has been demonstrated

(for example, by a judgment), Defendants' obligation to reimburse Medicare does not exist under

the relevant provisions.").  Under the Plan, any determination with respect to a Medicare

beneficiary's Channeled Talc Personal Injury Claim will be made by the Talc Personal Injury

Trust following the Effective Date.  As a result, claims of the United States would only arise after

the effectiveness of the Plan and may only be asserted against the Medicare beneficiary receiving

payment or the Talc Personal Injury Trust if the beneficiary fails to reimburse CMS from the

trust proceeds.  <u>See</u> 42 C.F.R. §§ 411.24(h) & (i)(1).

> **b.      Even If USG Claimants Have Claims, They Are Automatically Disallowed Under Section 502(e) of the Bankruptcy Code**

Even if the Court were to determine that the United States has a claim against the Debtor,

the claim would be a contingent claim that is disallowed under section 502(e) of the Bankruptcy

Code, which states:

> (1) Notwithstanding subsections (a), (b), and (c) of this section and paragraph (2) of this subsection, the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that—
>
> (A) such creditor's claim against the estate is disallowed;
>
> (B) **such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution**; or
>
> (C) such entity asserts a right of subrogation to the rights of such creditor under section 509 of this title.

11 U.S.C. § 502(e)(1) (emphasis added).  A claim is "disallowed under § 502(e)(1)(B) if (1) the

claim is for reimbursement or contribution; (2) the claim is asserted by an entity co-liable with

the debtor on a primary creditor's claim; and (3) the claim is contingent as of the time of

disallowance."  In re Eagle-Picher Indus., Inc., 144 B.R. 765, 768 (Bankr. S.D. Ohio 1992),

aff'd, 164 B.R. 265 (S.D. Ohio 1994) (internal citations omitted).  The USG Claimants' claims

fit squarely within section 502(e)(1)(B) and satisfy each of the statutory requirements.

First, the USG Claimants' claims are claims for reimbursement or contribution.  As the

USG Claimants repeatedly asserts in their objection, they have, at best, "rights to reimbursement

of certain healthcare costs related to Channeled Talc Personal Injury Claims."  US Obj. ¶ 1.

Claims for payments made and costs incurred are payments for reimbursement.  See In re

Celotex Corp., 289 B.R. 460, 466 (Bankr. M.D. Fla. 2003) ("the 'reimbursement or contribution'

language also found in § 502(e)(1) encompasses every possible right to compensation for paying

the debt of another . . ."); In re Wedtech Corp., 87 B.R. 279, 287 (Bankr. S.D.N.Y. 1988) ("The

use of the word 'reimbursement' in the statute cannot be viewed as accidental.  It is a broad word

which encompasses whatever claims a codebtor has which entitle him to be made whole for

monies he has expended on account of a debt for which he and the debtor are both liable.").  It is

evident that any claims the USG Claimants have satisfy this requirement.

Second, the USG Claimants are "liable with the debtor" on the claims asserted by the

holders of Channeled Talc Personal Injury Claims.  The USG Claimants have a statutory duty to

pay for covered medical expenses of Medicare beneficiaries.  If the Debtor caused harm to

claimants, the Debtor too would have a duty to compensate claimants for their medical expenses.

As a result, the Debtor and the USG Claimants would be considered to be co-liable for purposes

of section 502(e)(1).  See, e.g., In re Dow Corning Corp., 244 B.R. 705, 715 (Bankr. E.D. Mich.

1999), aff'd, 255 B.R. 445 (E.D. Mich. 2000), aff'd and remanded, 280 F.3d 648 (6th Cir. 2002)

("The Government acknowledges that, pursuant to a mandate in federal law, it is obligated to pay

for or provide medical care to federal beneficiaries.  As a result, it is ipso facto liable to these

federal beneficiaries to pay for or provide such medical treatment.  At the same time, if the Debtor is the party that caused the harm necessitating the medical treatment provided or paid for by the United States, it, too, is liable to the federal beneficiary for this same medical treatment. The Debtor and the Government are, therefore, both potentially liable to the federal beneficiaries for the same injuries.  Hence, the Government is clearly 'an entity that is liable with the [D]ebtor' with respect to the claims of breast-implant claimants.").

Lastly, any claims that the USG Claimants may have are contingent.  "The Fifth Circuit has stated that a contingent claim is one where liability of 'the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event and such future occurrence was within the actual or presumed contemplation of the parties at the time the original relationship of the parties was created.'"  In re Haymond, 638 B.R. 853, 868-69 (Bankr. S.D. Tex. 2022).  As discussed above, the USG Claimants may only pursue the Debtor once the Debtor has a "demonstrated responsibility" for the liability.  In other words, the USG Claimants' claims are contingent because they can only recover from the Debtor once one of their beneficiaries recovers from the Debtor.  Cf. In re Drexel Burnham Lambert Grp. Inc., 148 B.R. 982, 987 (Bankr. S.D.N.Y. 1992) ("[l]iability has not been determined in the underlying suit against the Claimants who are 'liable with' Drexel, and payment has not been made to the plaintiff in the underlying action.  Nor has there been any payment based on a settlement.  Thus, the claim is contingent.").  Moreover, the beneficiary has an obligation to reimburse the USG Claimants within 60 days of receiving a recovery payment.  See 42 C.F.R. § 411.24(h).  CMS only seeks recovery from a primary plan if the beneficiary fails to satisfy this reimbursement obligation.  See id. § 411.24(i)(1).  Thus, any claims of the USG Claimants against the Debtor are at best contingent and should be disallowed under section 502(e).

      **c.**     **Were the USG Claimants Found to Have Claims Against the Debtor, Those Claims Would Be Class 4 Channeled Talc Personal Injury Claims**

Even were the USG Claimants to have claims against the Debtor that are not automatically disallowed, their claims are Class 4 Channeled Talc Personal Injury Claims, not Class 3 General Unsecured Claims.  The USG Claimants assert that they have "rights to reimbursement of certain healthcare costs related to Channeled Talc Personal Injury Claims." US Obj. ¶ 1.  The USG Claimants wrongly assert that, because their claims "are statutory claims for healthcare reimbursement, not personal injury claims," their claims do not come within the definition of "Channeled Talc Personal Injury Claim," id. ¶ 12, and to the extent addressed by the Plan, are Class 3 Unsecured Claims.  Id. ¶ 15.

The Plan defines Class 4 "Channeled Talc Personal Injury Claims" as "all Talc Personal Injury Claims," subject to certain exclusions not relevant here.  Plan § 1.1.26.  "Talc Personal Injury Claims" are, in relevant part, "any claim . . . against the Debtor. . . , whether known or unknown, including with respect to any manner of alleged bodily injury, death, sickness, disease, emotional distress, fear of cancer, medical monitoring, or any other alleged personal injuries (whether physical, emotional, or otherwise), directly or indirectly arising out of or in any way relating to the presence of or exposure to talc or talc-containing products."  Id. § 1.1.152.  An "Indirect Talc Personal Injury Claim" is a "Talc Personal Injury Claim for contribution, **reimbursement**, **subrogation**, or indemnity (as those terms are defined by applicable non-bankruptcy law of the relevant jurisdiction), **whether contractual or implied by law** . . . ."  Id. § 1.1.87 (emphasis added).[270]

---

[270]    The Barnes Law Group similarly asserts, with no support, that medical liens are Class 3 claims.  See Dkt. 987 ¶ 5.  But any medical liens would be Class 4 Channeled Talc Personal Injury Claims for the same reason the United States' claims would be Class 4 Channeled Talc Personal Injury Claims.

To the extent the USG Claimants have claims against the Debtor that are not automatically disallowed, those claims would be Indirect Talc Personal Injury Claims that will be channeled to the Talc Personal Injury Trust pursuant to the Plan.  Thus, any objections by the USG Claimants relating to their status as Class 3 claimants are unfounded.

### 2. The United States' Objection to the Plan's Failure to Preserve Its Alleged Setoff and Recoupment Rights Should be Rejected

The United States objects to the Plan "to the extent the Plan fails to preserve the United States' setoff and recoupment rights in violation of sections 553 and 1129(a)(1) of the Bankruptcy Code."  US Obj. ¶¶ 76-77 (citing Plan §§ 11.2.2, 11.3.2(b)(iv)).  Section 1129(a)(1) of the Bankruptcy Code provides that a plan of reorganization may be confirmed only if "[t]he plan complies with the applicable provisions of this title."  11 U.S.C. § 1129(a)(1).  To establish a valid right of setoff under section 553 of the Bankruptcy Code, the United States must prove: (i) a debt owed by the United States to the Debtor which arose prior to the commencement of the bankruptcy case; (ii) a claim of the United States against the Debtor which arose prior to the commencement of the bankruptcy case; and (iii) the debt and the claim must be mutual obligations.  See 11 U.S.C. § 553(a); IRS v. Luongo (In the Matter of Luongo), 259 F.3d 323, 334 (5th Cir. 2001).  Setoff may not be exercised with respect to a claim against the Debtor that is disallowed.  See 11 U.S.C. § 553(a)(1).

As to the first element, the United States has not identified a debt owed by the United States to the Debtor that arose prior to the commencement of the chapter 11 case.  For the reasons set forth above, the United States also cannot establish the second element—a claim against the Debtor that arose prior to the Petition Date and that is not disallowed.  Claims of the United States would only arise after the effectiveness of the Plan (when individual claims are determined by the Talc Personal Injury Trust) and may only be asserted against the Talc Personal

Injury Trust or the Medicare beneficiary receiving payment or the Talc Personal Injury Trust if the beneficiary fails to reimburse CMS from the trust proceeds.  See 42 C.F.R. §§ 411.24(h) & (i)(1); Trust Distribution Procedures § 7.3 (providing that all medical liens shall be paid from amounts that otherwise would be paid by the Talc Personal Injury Trust to the claimant); see also In re Gibson, 308 B.R. 763, 766 (Bankr. N.D. Tex. 2002) (a debt arises prepetition only when all the events necessary for liability occurred prepetition).  To the extent the Court nonetheless finds that a prepetition claim against the Debtor exists, such claim should be automatically disallowed pursuant to section 502(e) of the Bankruptcy Code and would therefore not be eligible for setoff. See 11 U.S.C. § 553(a)(1).

In sum, the United States does not have any setoff rights against the Debtor with respect to a Channeled Talc Personal Injury Claim.  Those rights will exist solely in relation to the Talc Personal Injury Trust, and the United States may not assert them against the Debtor, the Reorganized Debtor, J&J or any other Protected Party.  See 11 U.S.C. § 553(a)(1).

### 3.    The United States' Objection to the Court's Retention of Jurisdiction to Matters Arising Out of the Chapter 11 Case

The United States objects to the Plan "to the extent it purports to endow the Bankruptcy Court exclusive jurisdiction over all matters arising out of this case."  US Obj. ¶ 83 (citing Plan §§ 12.1-12.2).  But even the United States has to acknowledge that the provisions "hedge on this issue by providing for co-exclusive jurisdiction with the District Court."  Id. ¶ 85.  Indeed, the provisions provide that the Bankruptcy Court shall retain "exclusive jurisdiction" as permissible and, "to the extent not permitted, non-exclusive jurisdiction."  Plan §§ 12.1-12.2.  Thus, the United States has no legitimate basis to object to these provisions.

These provisions are in accord with the Bankruptcy Code and precedent in this Circuit. See VROOM, Dkt. 122, Ex. A, Art. XI ("[T]he Bankruptcy Court shall, on and after the Effective

Date, retain exclusive jurisdiction over the Chapter 11 Case and all Entities with respect to all matters arising out of or related to the Chapter 11 Case, the Debtor and this Plan as legally permissible . . ."); <u>Wesco Aircraft</u>, Dkt. 2528, Ex. A, Art. XI ("[T]he Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter  11 Cases and the Plan . . ."); <u>Robertshaw</u>, Dkt. 960, Ex. A, Art. XI ("[T]he Bankruptcy Court will, on and after the Effective Date, retain exclusive jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as legally permissible . . ."); <u>In re Invacare Corp.</u>, No. 23-90068 (CML) (Bankr. S.D. Tex. Apr. 28, 2023), Dkt. 522. Ex. A, Art. XI ("[T]he Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan . . .").  And the carve out for the resolution of Talc Personal Injury Claims to be governed in accordance with the Talc Personal Injury Trust Documents is not unusual in section 524(g) plans.  <u>See</u>, <u>e.g.</u>, <u>Paddock</u>, 2022 WL 1746652, at *93 ("Notwithstanding anything in this Section 12.1 to the contrary, the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures shall govern the satisfaction of Asbestos Claims and the forum in which Asbestos Claims shall be determined.").  The objection should be overruled.

### 4.     The United States' Objection to the Request to Shorten the 14-Day Stay Imposed By Bankruptcy Rule 3020

The United States objects to the "request to shorten the 14-day stay imposed by" Bankruptcy Rule 3020(e).  US Obj. ¶¶ 86-88.  But the Debtor has not requested relief from Bankruptcy Rule 3020(e) from this Court for the immediate effectiveness of the Confirmation Order.  Section 10.8 of the Plan governs the binding effect of the Plan "as of the Effective Date," not as of the date the Confirmation Order is entered.  <u>See</u> Plan § 10.8.  The Court should disregard the United States' objection.

## IX.     CONCLUSION

For the reasons set forth in this Memorandum of Law and in other pleadings that have addressed these issues, the Debtor submits that the Plan, as modified by the modifications, fully satisfies all applicable requirements of the Bankruptcy Code and should be confirmed by the Court.

*[Remainder of Page Intentionally Left Blank]*

Dated:  February 10, 2025
Houston, Texas

Respectfully submitted,

*/s/ John F. Higgins*
John F. Higgins (TX 09597500)
M. Shane Johnson (TX 24083263)
Megan Young-John (TX 24088700)
James A. Keefe (TX 24122842)
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile:  (713) 228-1331
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
jkeefe@porterhedges.com

Gregory M. Gordon (TX 08435300)
Dan B. Prieto (TX 24048744)
Amanda Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone:  (214) 220-3939
Facsimile:   (214) 969-5100
gmgordon@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com

- and –

Brad B. Erens (IL 06206864)
Caitlin K. Cahow (IL 6317676)
(Admitted *pro hac vice*)
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, Illinois 60606
Telephone:  (312) 782-3939
Facsimile:   (312) 782-8585
bberens@jonesday.com
ccahow@jonesday.com

PROPOSED ATTORNEYS FOR DEBTOR

-260-

**<u>Certificate of Service</u>**

I certify that on February 10, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtor's claims, noticing and solicitation agent.

*/s/ John F. Higgins*
John F. Higgins