**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC LLC,[1] | Case No. 24-90505 (CML) |
| Debtor. |  |

**PRE-TRIAL BRIEF OF THE COALITION OF COUNSEL**
**FOR JUSTICE FOR TALC CLAIMANTS**

---

[1]    The last four digits of the Debtor's federal tax identification number are 8508.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ......................................................................................................................... 5

   I.   THIS CASE SHOULD BE DISMISSED AS A BAD FAITH FILING ............................ 5

  II.   THE PLAN CANNOT BE CONFIRMED ........................................................ 8

 III.   THE PRE-PETITION SOLICITATION AND TABULATION PROCESS WAS
       FLAWED AND UNRELIABLE .................................................................... 11

     A.   The Totality of the Vote Should Be Disregarded ...................................... 11

     B.   The Court Should Reject Certification of Votes Cast Without Authority, Placing the
         Debtor Under 75% Acceptance for Class 4 ............................................... 17

     C.   Any Resolicitation Must Entail A Bar Date and Estimation ...................................... 19

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Committee* (*In re Pac. Lumber Co.*),
584 F.3d 229 (5th Cir. 2009) ...................................................................................... 9

*Cole v. Nabors Corp. Servs., Inc. (In re CJ Holding Co.)*,
597 B.R. 597 (S.D. Tex. 2019) .................................................................................. 9

*Feld v. Zale Corp. (In re Zale Corp.)*,
62 F.3d 746 (5th Cir. 1995) ...................................................................................... 9

*Grp. Of Vitro Noteholders v. Vitro, S.A.B. de CV (In re Vitro S.A.B. de CV)*,
701 F.3d 1031 (5th Cir. 2012) .................................................................................. 9

*In re Antelope Techs., Inc.*,
431 Fed. App'x 272 (5th Cir. 2011) .......................................................................... 7

*In re Antelope Techs., Inc.*,
No. 07-31159-H3-11, 2010 WL 2901017 (S.D. Tex. July 21, 2010) ......................... 8

*In re Arnold*,
No. 07-80636-G3-11, 2009 WL 1066140 (Bankr. S.D. Tex. Mar. 5, 2009) ............. 8

*In re Brazos Emergency Physicians Ass'n*,
471 Fed. App'x 393 (5th Cir. 2012) .......................................................................... 7

*In re Briscoe Enters., Ltd. II*,
994 F.2d 1160 (5th Cir. 1993) ............................................................................. 8, 10

*In re Combustion Engineering*,
391 F.3d 190 (3d Cir. 2004) ..................................................................................... 15

*In re Congoleum Corp.*,
No. 03-51524 (Bankr. D.N.J. July 26, 2004) ........................................................... 15

*In re Imerys Talc Am., Inc.*,
Case No. 19-10289 (LSS), 2021 WL 4786093 (Bankr. D. Del. Oct. 13, 2021) ....... 15

*In re LTL Mgmt. LLC (LTL Mgmt. LLC v. those Parties Listed on Appendix A to Complaint)*
("*LTL I*"), 64 F.4th 84 (3d Cir. 2023)................................................................... 6, 7

*In re Robertshaw U.S. Holding Corp.*,
662 B.R. 300 (Bankr. S.D. Tex. 2024) ...................................................................... 9

*In re Wool Growers Cent. Storage Co.*,
   371 B.R. 768 (Bankr. N.D. Tex. 2007) .......................................................................... 9

*Investors Group, LLC v. Pottorff*,
   518 B.R. 380 (N.D. Tex. 2014) ................................................................................... 7

*Matter of Little Creek Dev. Co.*,
   779 F.2d 1068 (5th Cir. 1986) ................................................................................... 7

*Save Our Springs (S.O.S.) Alliance, Inc. v. WSI (II)-COS, L.L.C. (In re Save Our Springs (S.O.S.) Alliance, Inc.)*, 632 F.3d 168 (5th Cir. 2011) ........................................................... 10

## Statutes

11 U.S.C. § 1129(a)(1) ................................................................................................. 8

11 U.S.C. § 524(g) ...................................................................................................... 9

The Coalition of Counsel for Justice for Talc Claimants (the "Coalition"), by and through its undersigned counsel, respectfully submits this pre-trial brief in connection with the upcoming consolidated hearing commencing on February 18, 2025 (the "Consolidated Hearing") to consider several motions of the Coalition and Red River Talc LLC (the "Debtor" or "Red River"), among others.[2]

## PRELIMINARY STATEMENT

During the Consolidated Hearing, the Court will receive evidence and hear argument on motions from the Debtor, the Coalition, and others (including certain TCC members) going back to this case's inception.  The evidence will demonstrate why dismissal is required under 11 U.S.C. § 1112.  Even if the Court does not dismiss this bankruptcy, that and other evidence will demonstrate why Debtor's Second Amended Plan (the "Plan")[3] is unconfirmable under 11 U.S.C. §§ 1129, 524(g), and other applicable law.  Finally, even if the Court finds that the Plan is otherwise confirmable, re-solicitation under the Court's supervision is necessary (whether on the current plan or a new plan, and with a revised disclosure statement), including the implementation of a bar date and an estimation of claims for voting purposes.

This bankruptcy is yet another attempt in J&J's ongoing bad faith effort to resolve its talc liabilities through the filing of a made-for-bankruptcy subsidiary.  The Coalition will demonstrate that this case—a third attempt in the last three years in three different courts to resolve J&J's talc liabilities—should be dismissed as a bad-faith filing under Fifth Circuit precedent.  As detailed in the Coalition's motion to dismiss, there is no proper bankruptcy purpose to this supposed reorganization, and nothing the Debtor attempts to achieve through its proposed Plan is consistent

---

[2]    A table of the pending motions and objections is attached hereto as **Exhibit A**.

[3]    Capitalized terms used but not defined herein have the meaning ascribed in the Plan.

with the Bankruptcy Code's plain text. The bankruptcy filing in this jurisdiction, after two dismissals in the Third Circuit, with no change in circumstances other than those manufactured by J&J, also flies in the face of finality, and is the kind of bad faith, serial litigation that courts (in this and other contexts) have been unwilling to tolerate. The Debtor's bad faith behavior, moreover, is not excused based on the supposed "historic" nature of the proposed trust funding or "overwhelming support" the Debtor claims to have. The case should therefore be dismissed.

If this case is not dismissed, which it should be, then confirmation of the Debtor's Plan must be denied. The Plan fails for the reasons outlined in the Coalition's Objection to Confirmation of Plan [Dkt. No. 988] (the "Coalition Plan Objection"), including that it uses § 524(g) to achieve sweeping releases of dozens of solvent non-debtors after J&J used successive Texas divisional mergers to strip away all productive assets from the Debtor while assigning it talc liabilities.

Separately, and at a minimum, the Plan fails because the Debtor's pre-petition solicitation process was deficient, preventing certification of the vote in its entirety or at least preventing the Debtor from obtaining the necessary 75% support it needs under §§ 524(g) and 1126. Specifically, the Plan fails because:

> (1) the votes submitted via master ballot by certain AHC law firms were voted based upon purported powers of attorney to cast votes on behalf of such clients, but the Coalition will demonstrate that such powers of attorney did not in fact exist for several of these firms and, therefore, the votes must be disregarded, resulting in a sub-75% acceptance result; and

> (2) even if the improperly cast votes are not disregarded, the Beasley Allen votes must be reinstated and the Smith Law Firm's ballot, for which the firm lacked a power of attorney to cast votes, should be disregarded, similarly resulting in a sub-75% acceptance result.

Moreover, the Coalition will demonstrate that the pre-petition solicitation and voting process was so rife with irregularities and inconsistent treatment of different law firms and the claimants they represent that it cannot be said that the vote accurately reflects the claimants' voices.

This issue is relevant to each pending motion before the Court. These irregularities further demonstrate the Debtor's bad faith, warranting dismissal or denial of confirmation. At a minimum, however, it requires resolicitation of votes through a process approved by this Court with clear instructions and consistent treatment of all votes. Indeed, given the moving target that has been the Debtor's proposed plan and votes coming in at different times and based on different proposed plans, it is only fair that claimants be allowed to vote on the current iteration of the Debtor's plan. Ideally, whatever that iteration may be, the plan sent out for solicitation must cure the infirmities here and be accompanied by an accurate and complete disclosure statement.

If a re-solicitation is warranted, whether with or without considering the balance of the §§ 1129 and 524(g) requirements, the Coalition will demonstrate why, before resoliciting, it is necessary to establish a bar date and estimation process. Only with a fuller understanding of the number of claims that may recover from the trust, and the nature of the claims—the highly compensable Ovarian Cancer Claims or the considerably less compensable Gynecological Claims—can this Court give appropriate weight to each type of claim for voting purposes. Moreover, claimants will be better able to make an informed decision regarding the plan as those two data points—the number and nature of claims—will aid in determining what creditors will receive from the trust. That data will allow the claim pool to be defined and assist in modeling projected recoveries.

Finally, not one issue before this Court turns on the Debtor's repeated, false accusation that Beasley Allen or any other firm is "conflicted" because it did not recommend the proposed Plan to clients with Gynecological Claims. This is a meritless accusation masquerading as a relevant argument. The claim is not based on any fact, is irrelevant to any pending motion, and depends

on accepting the self-serving notion that recommending the proposed Plan is not only warranted,[4] but is an *ethical obligation*.  This is, and can only be, untrue.  Under the Plan, a claimant who accepts $1,500 is not getting "free money" where they are otherwise entitled to none, as the Debtor suggests.[5]  Rather, accepting $1,500 could mean giving up a host of rights against J&J and other so-called "Protected Parties," while simultaneously foreclosing any possibility that, should a claimant's illness become (or in fact now be)[6] ovarian cancer, they might be entitled to a more substantial recovery.  A claimant would reasonably take a small risk now (foregoing $1,500) to prevent a greater risk (giving up a potentially more robust recovery) in the future.[7]  Put simply, the Debtor's accusation is misguided and ignores the very real consequences of the Plan and the sweeping releases it contains.

Yet, as with many accusations, this one contains an admission: the Debtor thinks that those who believe they are suffering from Gynecological Cancer are positioned such that they *must* support the Plan.  J&J has treated this plight as an opportunity.  While J&J had previously all but ignored these claimants,[8] it has now put them on equal footing with Ovarian Cancer Claims for voting purposes.[9]  Because J&J believed claimants with Gynecological Cancer *must* vote yes, it

---

[4]   It is not.  As the Coalition will demonstrate, this is a facially deficient Plan under the Bankruptcy Code.  As it was drafted at solicitation, and is now drafted at the time of this brief, it does not warrant support.  And indeed, no amount of support can make the Plan permissible.

[5]   With that said, the Coalition (of which BA is a part, but not the whole) has not said publicly anything that differs ████████████████████████████████████████████████████████████████████████████████████

[6]   As the evidence will show, no party—including the Debtor—knows the actual breakdown of disease types.  Some claimants may not know which disease they have, or may receive a different diagnosis down the road.  Indeed, the Debtor's arguments depend on this uncertainty to establish feasibility.

[7]   It is the same logic that supports purchasing insurance.  A small loss is incurred now (in the form of a premium) to prevent a larger loss later.

[8]   Indeed, going back to the 2021 LTL bankruptcy, such claims were not even mentioned by the Debtor.  *See, e.g.*, Decl. of John K. Kim in Support of First Day Pleadings, Case No. 21-30589 (MBK) (LTL 1.0), Dkt. No. 5 (discussing ovarian cancer and mesothelioma without a single reference to other gynecological cancers).

[9]   But even with this effort to gerrymander its Plan's class structure, the Plan still did not meet the required voting threshold at the July 26, 2024 voting deadline.  This is because the Plan is flawed.

follows that J&J saw an opportunity to bolster the Class 4 acceptance rate by placing these claimants, without distinction, alongside Ovarian Cancer Claims.  The Debtor cannot offer any other credible explanation for this voting structure.[10]  On that basis, as well as the others discussed here and at trial, the Debtor's case and plan must be rejected as not being in good faith.

**ARGUMENT**

At the Consolidated Hearing, the Coalition will present documents and witnesses supporting each of its pleadings filed in connection with its requests for dismissal of the case, objection to confirmation, and objection to the voting and solicitation procedures (collectively, the "Coalition Pleadings").[11]

## I.    THIS CASE SHOULD BE DISMISSED AS A BAD FAITH FILING

For the reasons stated in the Coalition's Motion to Dismiss [Dkt. No. 44] (the "Motion to Dismiss") and the Coalition's Reply in Support [Dkt. No. 624] (the "Reply in Support"),[12] which will be supported by the evidence presented and argued during the Consolidated Hearing, this third attempt at bankruptcy must meet the same fate as the prior two—dismissal for lack of good faith. The following summarizes the Coalition's arguments in its Motion to Dismiss and Reply in

---

[10]   The Debtor may say that it ultimately did not make a difference.  This claim is not credible.  The Debtor does not know the true number of Ovarian Cancer Claims and Gynecological Claims, and indeed maintains that the numbers submitted to the trust *will* differ from the voting totals.  The numbers cannot be treated as both reliable and unreliable when it is convenient for the Debtor.  But even if these totals were reliable (they are not), that it was not ultimately necessary to gerrymander does nothing to address whether that was the intent in the first place.

[11]   As reflected in Exhibit A, the Coalition has filed motions in connection with the Consolidated Hearing at Dkt. Nos. 44 (Motion to Dismiss), 257 (Motion to Vacate Appointment of Epiq as Solicitation Agent), 264 (Motion to Set Bar Date), 265 (Motion to Designate Votes), 266 (Motion to Reinstate Votes Filed by Coalition Firms), 267 (Motion to Establish Estimation Process), and numerous objections to the relief requested by the Debtor.

[12]   The Reply in Support provides further support for the Motion to Dismiss and responds to (i) the Debtor's Omnibus Objection to the Motions of the Coalition and the United States Trustee to Dismiss Chapter 11 Case [Dkt. No. 425]; (2) the Omnibus Objection of the Ad Hoc Committee of Supporting Counsel to Motions to Dismiss [Dkt. No. 426]; and (3) the Objection of the SLF Claimants (i) Omnibus Objection to the Coalition Voting Pleadings and Cross-Motion under Rule 3018(a) (ii) Objection to the Motions to Dismiss, and (iii) Joinder to Certain of the Debtors Pleadings, Including the Voting Results Motion [Dkt. No. 434].

5

Support to preview for the Court what the Coalition intends to establish at the Consolidated Hearing.

First, the Debtor may have a different name, but it cannot hide from the fact that, together with its predecessor, it is a serial filer. This is J&J's third attempt to resolve its talc liabilities in the bankruptcy of a newly-formed subsidiary, this time by running from Third Circuit precedent and seeking to obtain a different result here. The evidence at the Consolidated Hearing will establish that this Debtor *is* LTL, only with a different name and a smaller subset of the *same* liabilities that LTL was originally assigned. And like LTL, Red River has no business to reorganize, no employees to protect, and was created solely to resolve the same talc liabilities that J&J, through LTL, previously sought to resolve. As described in the Coalition's Reply in Support,[13] the Third Circuit has already found that even *greater* liabilities than those assigned to Red River do not create financial distress, finding that the Debtor's predecessor "did not have any likely need in the present or the near-term, or even in the long term, to exhaust its funding rights to pay talc liabilities."[14] While the magnitude of those liabilities has since been reduced, given J&J's orchestration of a second divisive merger that separated out mesothelioma, Canadian, and state attorneys general claims,[15] as was true of LTL, Red River still has funding from New Holdco (the successor to Old Holdco and New JJCI) under a funding agreement that provides funding in or out of bankruptcy.[16]

This Court should enforce the Third Circuit's decision in LTL 1.0 (as followed by the Bankruptcy Court and affirmed by the Third Circuit in LTL 2.0) to dismiss this case. But, even if

---

[13]   *See* Coalition Reply in Support at ¶ 9.

[14]   *In re LTL Mgmt. LLC (LTL Mgmt. LLC v. those Parties Listed on Appendix A to Complaint)* ("*LTL I*"), 64 F.4th 84, 108 (3d Cir. 2023).

[15]   *See* Coalition Initial Statement at ¶ 34.

[16]   *See* Coalition Reply in Support at ¶ 9.

the Court does not believe that it is bound by those decisions, Fifth Circuit case law demands the same result—this case should be dismissed because the Debtor still lacks financial distress or any legitimate reorganizational need necessary to satisfy the Fifth Circuit's good faith requirement. In fact, in the Third Circuit's decision dismissing LTL 1.0, the court relied on the leading case from the Fifth Circuit to discuss bad faith filings—*Matter of Little Creek Development Co.*[17]—in finding that the Debtor lacked the financial distress required to avail itself of the Bankruptcy Code's protections.

Second, this case is the situation the Fifth Circuit warned of in *Little Creek* when it described the "new debtor syndrome" and why such debtors do not belong in bankruptcy. The only difference between Red River and *Little Creek*'s debtor is the magnitude of the liabilities. The premise for why certain debtors, like Red River here, do not belong in bankruptcy is the same. As Red River's corporate documents and so-called "employees" (who are just seconded J&J personnel) will establish, Red River was created on the eve of bankruptcy solely to resolve J&J's talc liabilities. Red River has no other debts to restructure, no business to reorganize, and no employees to protect. It is a shell created through multiple non-bankruptcy restructurings and machinations to force a settlement on unwilling claimants, all while depriving them of their right to a jury trial.

Third, the use of this bankruptcy as a litigation tactic is grounds for finding bad faith.[18] The Coalition will establish at trial how this entire bankruptcy process, beginning in 2021, was

---

[17] *See LTL I,* 64 F.4th at 103 n. 14 (citing *Matter of Little Creek Dev. Co.,* 779 F.2d 1068 (5th Cir. 1986)).

[18] Since *Little Creek,* the Fifth Circuit and district courts in Texas have been uniformly hostile to attempts to use chapter 11 as a litigation tactic. *See In re Brazos Emergency Physicians Ass'n,* 471 Fed. App'x 393, 394 (5th Cir. 2012) (affirming dismissal of chapter 11 case filed to "gain control" over "state-court claims"); *In re Antelope Techs., Inc.,* 431 Fed. App'x 272, 275 (5th Cir. 2011) (affirming dismissal of chapter 11 case filed to "gain unfair advantage" in state court litigation); *Investors Group, LLC v. Pottorff,* 518 B.R. 380, 384 (N.D. Tex. 2014) (affirming dismissal of chapter 11 case where case was filed "as a litigation tactic" and finding that filing for bankruptcy to gain a litigation advantage "on its own" is sufficient to warrant dismissal); *In re Antelope Techs.,*

7

simply a tactic designed to halt ongoing litigation around the country and force a discounted settlement on claimants. And the Plan on its own terms demonstrates why it is unnecessary: the Plan contemplates that, should it fail or be appealed to the Fifth Circuit, an out-of-bankruptcy resolution on nearly the same terms may arise.[19]  Contrary to the Debtor's rally cry, a settlement outside of bankruptcy (like the Aearo multi-district litigation settlement reached after that bankruptcy case was dismissed) places the parties on an equal playing field and allows for fairer terms and quicker payments without unilaterally denying claimants their right to a jury trial.

Even if the Debtor here did have financial distress, which it does not, that distress is manufactured. It cannot be that a parent company is able to create an entity eligible for a bankruptcy—from which the parent will be the primary beneficiary—by simply assigning the parent's liabilities and a single, limited fund with stripped-down funding arrangements.

## II.    THE PLAN CANNOT BE CONFIRMED

Even if the case is not dismissed, the Plan cannot be confirmed. Under § 1129(a)(1), the plan must comply with the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). A debtor that invokes § 524(g)'s protections must satisfy its requirements in addition to those in § 1129. *See* 11 U.S.C. § 524(g). In the Fifth Circuit, the debtor bears the burden of proof on these issues. *See In re Briscoe Enters., Ltd. II*, 994 F.2d 1160, 1164-65 (5th Cir. 1993), *cert. den.*, 510 U.S. 992 (1993); *In re Arnold*, No. 07-80636-G3-11, 2009 WL 1066140, at *7 (Bankr. S.D. Tex. Mar. 5, 2009) ("The plan proponent has the burden of proof as to compliance with Section 1129(a) by a preponderance of the evidence."). The Debtor cannot satisfy its burden under §§ 1129 and 524(g).

---

*Inc.*, No. 07-31159-H3-11, 2010 WL 2901017, at *4 (S.D. Tex. July 21, 2010) (chapter 11 case properly dismissed where it was filed to "gain unfair advantage" is state court litigation).

[19]   *See* Plan at § 1.1.118. In its confirmation brief, the Debtor admits that it is willing to settle outside bankruptcy so long as a sufficient number of current claimants agree. Dkt. No. 1076, at 53 ("The Debtor and J&J were willing to be bound to an out-of-court private resolution, but only if there was sufficient claimant support in advance.").

While the Coalition will not repeat its Confirmation Objection here, the Plan suffers from many infirmities, including:

- **The Plan Does Not Satisfy § 524(g).**  As set forth more fully in the Confirmation Objection, J&J restructured itself outside the purview of §524(g) resulting in a proposed Trust that does not satisfy the plain language of § 524(g) and improperly offers injunctive protections against third parties on account of their own direct liability, far exceeding the bounds of § 524(g).[20]

- **The Plan Is Not a Full Pay Plan.**  The Debtor argues that the (unreliable) range of recoveries described in the Disclosure Statement provides claimants with *more* than what they may recover in the tort system.  The Debtor's attempt to characterize the Plan as "full pay" does nothing to justify or cure the Plan's numerous deficiencies.  Moreover, the Coalition will prove that the stated recovery ranges are misleading.  But even if these ranges were reliable, the Debtor's definition of "full pay" does not pass muster.  The Debtor argues that a case is "full pay" as long as claimants are getting at least the average settlement values as reflected in J&J's own pre-petition settlements.  Yet, through successive bankruptcies, J&J has denied claimants the right to a jury trial, in which the actual value of their claims could be tested.  Rather than use these values, the Debtor instead uses self-serving statistics to measure projected recoveries from the trust, which recoveries are necessarily capped as a result of the single pot of funding— all as set by the Debtor and J&J.  This dynamic has allowed J&J and the Debtor to unilaterally determine what constitutes "full pay," and then rely on that in an attempt to justify its Plan's provisions.

- **The Plan Includes Impermissible Releases.**  The Fifth Circuit recognizes only *consensual* third-party releases.[21]  In addition to the overbroad channeling injunction sought under § 524(g), the Plan contains an extensive release provision that grants injunctive relief against a multitude of non-debtor third parties.  The voting ballot included no opt-out or opt-in mechanism.  Moreover, to receive any payments under the Plan, the Trust Distribution Procedures require claimants to submit an Acceptance and Release form which includes a full release of J&J and all other Protected Parties, thus forcing a "belt and suspenders" release upon claimants should the Plan, if confirmed, be overturned on appeal.

---

[20]   The Coalition incorporates by reference herein its *Supplemental Brief Detailing Direct Claims against Johnson & Johnson* [Adv. Pro. No. 24-03194, Dkt No. 120] (the "Supplemental Direct Claims Brief") addressing J&J's direct liability that cannot be released under §§ 105, 524 or 1129.

[21]   *See In re Robertshaw U.S. Holding Corp.*, 662 B.R. 300, 322 (Bankr. S.D. Tex. 2024) (citing *Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Committee (In re Pac. Lumber Co.)*, 584 F.3d 229, 299 (5th Cir. 2009));*see also Cole v. Nabors Corp. Servs., Inc. (In re CJ Holding Co.)*, 597 B.R. 597, 608 (S.D. Tex. 2019) ("The Fifth Circuit has concluded that a bankruptcy court may not confirm a plan that provides 'non-consensual non-debtor releases.'") (quoting *Grp. Of Vitro Noteholders v. Vitro, S.A.B. de CV (In re Vitro S.A.B. de CV)*, 701 F.3d 1031, 1061-62 (5th Cir. 2012); *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 776 (Bankr. N.D. Tex. 2007) ("The Fifth Circuit has held that a nondebtor release violates section 524(e) when the affected creditor timely objects to the provision.") (citing *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 761 (5th Cir. 1995)).

- **The Plan Misclassifies Ovarian Cancer Claims and Gynecological Claims.** The Debtor has placed these two claim types in one class, treating them identically for voting, but offering them distinct treatment. While it may be common to offer a "quick pay" option to claimants, it is *not* common to limit one subset of claimants to a quick pay, while others are subject to a grid. That is the case here. This structure was apparently employed to obtain an impaired accepting class. But even if this is not the case, the classification violates §§ 1122(a) or 1123(a)(4).

- **The Revocable Plan Is Not Feasible.** Within the Fifth Circuit, feasibility under § 1129 may be shown with a "reasonable assurance" of successful completion of the plan upon emergence from bankruptcy.[22] Because the Plan includes extensive walk-away rights for the Debtor—and its primary funder, J&J—there is no assurance that the Plan, even if confirmed, will be funded.[23] Under these circumstances, far from an obligation, the funding essential to the Plan amounts to little more than the speculative "voluntary donations" the Fifth Circuit has rejected as insufficient to establish feasibility.[24] With feasibility of the Plan hinging on J&J's walk-away rights, claimants may recover *nothing* under a confirmed Plan. Moreover, the Debtor and J&J's right to revoke the Plan after Confirmation violates §§ 1141(a) and 1144.

- **Potential Recoveries Are Speculative and Inequitable.** Currently, the Plan does not specify how much of the fund would be allocated to current versus future victims, or how much will be available to ovarian cancer claims under the claims-review process. The Plan is a pot plan, with no stated allocation among claimants. The Plan does not provide what compensation may be received by current or future claimants, or how much may be paid to ovarian claimants as compared to non-ovarian cancer claimants. With no allocation, and immense discretion afforded to the Debtor, J&J and the Trustee, there is no assurance, certainly no evidence, of equitable treatment of claimants under the Plan as required under § 1129.

- **No Treatment for Medical Liens.** Medical liens could substantially erode claimant recoveries and significantly delay client payments. The Plan lacks a lien resolution protocol that would permit talc claimants reasonable certainty of the amount, and timing, of payments.

- **Properly Selected Claims Administrator.** In the Plan, J&J has selected a Claims Administrator that is exceedingly costly, has ties to J&J, and has limited experience with asbestos trusts. Selecting an independent Claims Administrator should be subject

---

[22]   *See Save Our Springs (S.O.S.) Alliance, Inc. v. WSI (II)-COS, L.L.C. (In re Save Our Springs (S.O.S.) Alliance, Inc.)*, 632 F.3d 168, 172 (5th Cir. 2011) (quoting *Briscoe Enter., Ltd., II*, 994 F.2d at 1166). A six-factor test is often employed in assessing feasibility, though not all need be considered, and, depending on the circumstances, only one may be of relevance. *See S.O.S. Alliance*, 632 F.3d at 173 & n. 6 ("There is no requirement, however, that the court consider all six factors. That is particularly true where, as here, feasibility depends almost exclusively on the willingness of S.O.S.'s donors to give.").

[23]   Plan at § 9.12. For example, the Debtor and J&J may walk-away from the Plan if the U.S. Trustee or another claimant group appeals an order confirming the Plan.

[24]   *See S.O.S. Alliance*, 632 F.3d 173-74.

to a competitive bidding and vetting process and selected by the Trust Advisory Committee, rather than by J&J.

- **Opt-Out Rights.** Tort claimants have a constitutional right to be heard at trial. The Plan should allow unfettered opt-out rights for those who either want their day in court regardless of the compensation, or who are unsatisfied with the settlement value offered by the bankruptcy trust. The "entry fees" required for judicial access in Section 6.1.3 of the Trust Distribution Procedures are unconstitutional infringements on the claimants' 7th and 14th Amendment rights to jury access and due process.

- **Plan Modifications Were Improper.** The Initial Plan voted on by claimants was contractually modified by the Smith MOU and the TCC MOU, with some, but not all, modifications set forth in the MOUs reflected in the Amended Plan presently before the Court. Certain of the proposed terms are not reflected in the Amended Plan (*e.g.*, full terms of the TCC MOU are not included in the Amended Plan). Creditors whose votes were "deemed" switched by operation of the MOU, had no notice of the proposed changes and many were adversely impacted by the modifications.

- **The Plan Does Not Satisfy § 1129.** For all the reasons set forth above, and in the Confirmation Objection and the Supplemental Direct Claims Brief, the Plan does not satisfy the Bankruptcy Code and cannot be confirmed.

## III. THE PRE-PETITION SOLICITATION AND TABULATION PROCESS WAS FLAWED AND UNRELIABLE

### A. The Totality of the Vote Should Be Disregarded

The evidence at trial will show that the Debtor's pre-petition solicitation process was fatally flawed, both in design and execution. One design flaw is central to the Coalition's Confirmation Objection—namely, the Debtor classified Ovarian Cancer Claims and Gynecological Claims together, with equal voting power, for the sole purpose of obtaining an impaired accepting class. But when the Debtor nevertheless failed to obtain 75% acceptance by the voting deadline, the Debtor—through its predecessor and J&J—delayed certification and engaged in a series of actions specifically targeting rejecting votes and ignoring deficiencies in accepting votes, all to change the outcome of the vote. These actions undermined the neutrality and fairness of the pre-petition solicitation process. In conjunction with a misleading disclosure statement, loosely applied solicitation procedures, and continuously changing plan terms and "MOUs" that may or may not

11

be reflected in the amended plans, the process, through the most charitable lens, could be described as confusing for those claimants whose votes were, in theory, being solicited.

These efforts to manipulate the vote's outcome, most of which occurred pre-petition, form another basis for dismissal under § 1112(b). But they also support either (i) denying the Debtor's motion to certify the pre-petition vote (on which the Debtor has the burden) or (ii) granting the Coalition's Motion to designate all votes as rejecting the Plan under § 1126(e) (on which the Coalition has the burden). Either scenario warrants denying confirmation for failure to meet §§ 1126 and 524(g)'s requirements or, at a minimum, re-solicitation.

### 1. Debtor Disregarded Its Own Procedures to Single Out Certain "No" Votes, Favor "Yes" Votes

On its own established voting deadline of July 26, 2024, the Debtor had not obtained the requisite 75% support of the claimants within Class 4. Almost immediately, J&J sought out the master ballots of six firms. Five of these firms were identified has having deficient ballots, which J&J would allow the firms to correct. The sixth firm was Beasley Allen ("BA"), none, or virtually none, of whose votes were identified by the solicitation and voting agent as deficient.

Nonetheless, J&J homed in on this one specific master ballot, by this one specific law firm, to change the results of 11,500 votes against the Plan. Now, after the fact, in bankruptcy, J&J has seized on a relative handful of issues—a small fraction of the over 11,500 votes contained in that ballot—which the Debtor has cited as a refrain through this case and will undoubtedly present to the Court at trial. But what the Debtor now argues, to the extent it is accurate at all, is not unique to this one firm, and all of the supposed flaws supposedly were overlooked when the Debtor accepted votes from the same claimants when they were switched to "yes." In the end, all that was unique to the BA master ballot was the level of scrutiny by J&J.

The record will show at trial that any issue identified by the Debtor with respect to BA's master ballot is in fact an issue found in almost all ballots submitted, but that was routinely overlooked by the Debtor's predecessors when those issues applied to "yes" votes:

1. **Deceased Claimants.** Virtually all firms voted on behalf of deceased claimants— █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████ But because these were "yes" votes, these issues were ignored.

2. **Dual Representations.**  The issue of dual representations—when one claimant retains two firms—is not unique. ████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████ Despite the admitted ubiquity of the issue, and considerable duplication throughout the full population of master ballot votes cast ████████████████████████████ ████████████████████████████████ the Debtor has curiously only raised concerns with respect to BA.

3. **Scrutiny of Informed Consent.**  The Debtor has asserted that BA, having relied on "negative notice" to vote on behalf of its clients, lacked informed consent.  The Coalition vehemently disputes this, but, even taking the claim at face value, ██████ █. As the Coalition will demonstrate, while BA adequately informed its clients, many other firms did not, and cast ballots on their clients' behalf without any notice or authority.  Indeed, ████████████████████████████████████████████ ██████████████████████████████████████████████ On this reading, the Master Ballot certification that expressly required firms to have "a power of attorney," instead means that all that was needed is "power *as* attorney."

This double standard plagued the entire pre-petition solicitation process.  "Yes" votes were accepted as correct, and "no" votes—particularly those of BA—received heightened scrutiny— not by the solicitation agent, but by J&J alone.  But, as the Coalition will show, this issue was no more apparent than with the "superseding" ballot cast by the Smith Law Firm ("<u>Smith Law Firm</u>"). The Smith Law Firm cast a master ballot on behalf of the same clients that were a part of BA's master ballot.  Of over 11,000 votes included on the original BA master ballot, only ███████

13

██████████████████████████████████.  The master ballots are virtually identical; all that differed was that the Smith Law Firm's votes were "yes" votes and were mostly cast by supposed "power of attorney."  Yet, the Smith Law Firm's ballot has not received any scrutiny, despite being in conflict with the solicitation procedures and despite the clients who voted having the same issues that J&J now claims were disqualifying when BA cast their votes as "no."

Moreover, the flaws of this process will also be shown by whom J&J *did* speak with, and whom it did *not*.  The Debtor's outreach to the Smith Law Firm alone raises suspicion.  J&J had for years, both before and during the prior two bankruptcy attempts, dealt with BA as part of MDL leadership.  It did not deal with the Smith Law Firm, which was, until this case, a stranger to the bankruptcies.  J&J courted the Smith Law Firm's support in exchange for promises to cease J&J's own litigation efforts against the Smith Law Firm (*e.g.*, seeking discovery on the Smith Law Firm's (according to J&J) hundreds of millions of dollars of litigation financing) and for favored treatment under the Plan (*e.g.,* control of the Common Benefit Fund MSA and a seat on the Trust Advisory Committee).  J&J's efforts were not a good faith effort to resolve certain client claims—they were a work-around for BA's and its clients' objections to the Plan.[25]

J&J could not have accomplished this without EPIQ, its chosen claims agent.  As will be demonstrated at the Consolidated Hearing, EPIQ failed independently investigate when confronted with abnormalities and divergences from the voting procedures.  For example, ████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████.  Similarly,

---

[25]   But even considering the additional funding added to the Plan after these discussions, none of the terms cured its fundamental flaws, all of which will delay payment to creditors even if the Plan were otherwise confirmable.

████████████████████████████████████████████████████████

████████████████████████████████████

### 2. Voting Procedures (and Disregard Thereof), Amendments to Plan Without Notice, Insufficient Disclosure, Fostered Confusion

Several other features of the solicitation process, working in tandem, undermine the fairness of the pre-petition solicitation process.

*First*, though the Debtor set out two methods for voting—deemed "Option A" and "Option B"—these voting methods were utilized differently by different parties, and enforced differently by the Debtor depending on how the party in question had voted its clients. Specifically, "Option A" permitted voting on behalf of clients who had given "informed consent" to their counsel. By contrast, "Option B" permitted firms to vote on behalf of clients for whom they possessed "a power of attorney." Firms differed on whether Option A required an express client response before a master ballot could be submitted. ████████████████████████████████████████████

████████████████████████████████████████ Only one firm—BA—received pushback on its use of negative notice. Firms also differed on whether Option B required a valid power of attorney. Some did possess a power of attorney specific to bankruptcy and only voted for those clients. Other firms possessed no power of attorney, or no power of attorney that authorized them to vote on the Plan and effectively settle their clients' claims—but still voted under Option B. Though the Debtor's solicitation procedures expressly state that "a power of attorney" is required for Option B, the Debtor will insist that one is not required.[26]

---

[26] In similar circumstances, a "power of attorney" specific to voting in a bankruptcy case has been required. *In re Imerys Talc Am., Inc.*, Case No. 19-10289 (LSS), 2021 WL 4786093, at *9 (Bankr. D. Del. Oct. 13, 2021) (rejecting 15,719 votes where attorney relied "on a one page general 'Attorney Agreement' which provides that Mr. Bevan can vote on behalf of his client in a bankruptcy case filed by any debtor."). *Cf. In re Combustion Engineering*, 391 F.3d 190, 245 n. 66 (3d Cir. 2004) ("Where the voting process is managed almost entirely by proxy, it is reasonable to require a valid power of attorney for each ballot to ensure claimants are properly informed about the plan and that their votes are valid."); *In re Congoleum Corp.*, No. 03-51524 (Bankr. D.N.J. July 26, 2004), Transcript of Hearing, Dkt. No. 1090 at 52-53 ("I want to emphasize, the power of attorney must

*Second*, after voting concluded, the plan was amended after discussions between J&J and the Smith Law Firm, essentially a stranger to the process until then.  But more importantly, because these discussions occurred pre-petition and outside court supervision, claimants were not made aware of the discussions at all, and certainly not afforded the opportunity to reconsider their votes. In fact, these changes, made by a non-binding MOU, were not acceptable to all. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Moreover, the FCR, although not having a vote, specifically noted her objection to certain of the terms in the Smith MOU, even though the Disclosure Statement sent with the solicitation materials on the initial Plan stated that the FCR supported the plan.  Further changes were in fact negotiated with other law firms on a post-petition basis.  Some, but not all, of those changes were reflected in the Plan.  Notwithstanding the Coalition's efforts to reach a consensual resolution, the Coalition understands that J&J has continued to engage TCC members and another amended plan will be filed soon.  The Coalition is not aware of what terms the further amended plan may include (other than what the Debtor disclosed in its confirmation brief) or whether it may materially or adversely impact any claimants.

*Third*, the disclosure statement sent in connection with the pre-solicitation process contains false and misleading statements on what science and juries across the country have concluded with respect to J&J's talc products causing ovarian cancer.  The disclosure statement omits any discussion regarding scientific data supporting a link between talc-product usage and ovarian cancer, and falsely states that its talc products were "free of asbestos."  The disclosure statement also presented a false choice to claimants—that they could accept the plan as is, or have no

---

be bankruptcy specific. If it merely refers to the personal injury case, it is not enough. Authority to take action on a client's behalf in a personal injury case is not sufficient to give authority to vote on that client's behalf in the bankruptcy case.").  The debtor chose to include this provision in its procedures. It should not be permitted to back-track now because the requirement is no longer convenient.

opportunity to resolve their claims.  This "binary decision" concept is refuted by the multiple amendments *since* the disclosure statement, with each new plan being touted by the Debtor as being better for claimants than the last.  Yet, this has not prevented the Debtor from relying on the concept to pressure firms to cast accepting votes on behalf of their clients, or from accusing firms of violating their ethical duties merely because they have not voted in support.

**B.      The Court Should Reject Certification of Votes Cast Without Authority, Placing the Debtor Under 75% Acceptance for Class 4**

Even if the Debtor's conduct during solicitation were not enough to reject certification of that process, the results still cannot be certified as presented.  Various firms that cast master ballots, ███████████████, did so without requisite authority.  As a result, these ballots should be disregarded, whether under the Debtor's own solicitation procedures or under § 1126(e) as covered in the Coalition's designation motion. The same problem underlies the "superseding" ballot cast by the Smith Law Firm. These votes too should be rejected, and the original mater ballot cast by BA reinstated.

In turn, if any combination of these votes is disregarded, the Debtor cannot satisfy its burden of plan acceptance requirements under § 1129 or § 524(g). Confirmation should be denied.

**1.      Specific Power of Attorney Required to Vote on Plan**

Though the Debtor's own solicitation procedures required that firms obtain "informed consent" or possess a "power of attorney," ███████████████ cast master ballots with a substantial number of claims that were based on a "power of attorney" that they did not in fact possess. This is true of *at least* the following firms:



██████████████████████████████████████

████████████████████████████

In total, ████████████████████████ *without authority* and, in some cases, without informing clients that votes were being cast on their behalf.  These votes cannot be counted.  Without counting these unauthorized votes, the Debtor cannot satisfy the 75% threshold required for its § 524(g)-based plan.[27]

## 2.    BA Votes Must Be Reinstated

The Debtor's certification motion depends on accepting a "superseding" ballot from the Smith Law Firm, that purports to replace the master ballot cast by BA and Golomb Legal on behalf of virtually the same clients.  As an initial matter, the Debtor's basis for accepting this superseding ballot contradicts its own procedures.  Internally, J&J and LLT, which controlled the pre-petition voting process, ████████████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████[28]

Nothing in this provision authorizes the Smith Law Firm's superseding ballot.  To the contrary, it should *prohibit* that very switch.  The BA master ballot was not submitted by power of attorney—which neither BA nor the Smith Law Firm possessed—and, in switching the votes, the Smith Law Firm did not obtain express consent from the majority of the claimants it purported

---

[27] This is true even if the votes subject to the Debtor's two pending 3018 motions are considered. Nevertheless, there is no reason to count those votes.  The Morelli Firm████████████████████████████ and Summers & Johnson has offered no evidence to assess the basis for their change of votes.  While the Debtor's exper██████ █████████████████████████████████

[28] RedRiver-0010878.

to vote for.  To the contrary, it cast the ballots by negative notice, just as BA had done.  But while BA, over the course of almost two months, provided the plan and disclosure statement to its clients, made contact on multiple occasions via letter and email, held town halls, and then informed its clients that it would vote "no" unless it heard otherwise, the Smith Law Firm switched the same votes on only two days' negative notice pursuant to a single correspondence.  It cannot be, as the Debtor will attempt to argue, that BA's master ballot—despite substantial and repeated outreach— is insufficient because it used negative notice, while a firm that makes little to no contact with clients, and not only votes on their behalf, but changes votes already submitted, based on a power of attorney *it does not possess*, is somehow sufficient.

Ultimately, the Coalition will demonstrate at trial that the BA master ballot was entitled to acceptance under the Debtor's procedures, and that no good-faith basis existed to permit a superseding ballot for those same clients.

### C.    Any Resolicitation Must Entail A Bar Date and Estimation

If the Debtor's pre-petition solicitation process is rejected, the Plan should be rejected too. Or the Court should order re-solicitation of a modified plan that addresses the Plan's infirmities. Any re-solicitation process must be aided by a bar date and process for estimating claims for voting purposes.  This is the relief the Coalitions seeks in its bar date and estimation motions.

Apart from the procedural defects discussed above, the pre-petition solicitation process was deficient because it did not differentiate between claim types or meaningfully verify them during solicitation.  The result of this indifference is that the vote tally does not accurately reflect the number of Ovarian Cancer Claims and Gynecological Claims.  This issue is one that the Debtor has, and will at trial, admit.  Indeed, it will be a feature of the Debtor's case.  Its expert, █████

██████████████████████████████████████████████████

██████████████████████████████████████.

Put differently, the Debtor's solicitation process not only permits an inaccurate tally, but *invites* it.  Such a procedure cannot be validly employed (again).  Rather, the only way to obtain an accurate vote, that is true to the wishes of the claimants voting, is by beginning the process anew with a bar date and estimation process.

## CONCLUSION

For the reasons set forth in the Coalition Pleadings, and as will be supported during the Consolidated Hearing and in post-trial briefing, the Coalition respectfully urges the Court to dismiss this case or otherwise deny confirmation of the Plan.  In the event the Court determines not to dismiss the case, the Coalition asserts the Plan must be modified to address its deficiencies, and then resolicited under a Court-supervised process, including the establishment of a bar date and implementation of an estimation process for voting purposes.

Dated:  February 13, 2025               Respectfully submitted,

**LAWSON & MOSHENBERG PLLC**

/s/ *Nicholas R. Lawson*
Nicholas R. Lawson
Texas Bar No. 24083367
Avi Moshenberg
Texas Bar No. 24083532
801 Travis Street Suite 2101 #838
Houston, TX 77002
Telephone:   (832) 280-5670
Nick.Lawson@lmbusinesslaw.com
Avi.Moshenberg@lmbusinesslaw.com

- AND -

**OTTERBOURG P.C.**
Melanie L. Cyganowski (*pro hac vice*)
Adam C. Silverstein (*pro hac vice*)
Sunni P. Beville (*pro hac vice*)
David A. Castleman (*pro hac vice*)
Jennifer S. Feeney (*pro hac vice*)

20

230 Park Avenue
New York, NY 10169
Telephone:      (212) 661-9100
Facsimile:      (212) 682-6104
mcyganowski@otterbourg.com
asilverstein@otterbourg.com
sbeville@otterbourg.com
dcastleman@otterbourg.com
jfeeney@otterbourg.com

- AND -

**BAILEY & GLASSER LLP**
Brian A. Glasser (*pro hac vice*)
Thomas B. Bennett (*pro hac vice*)
David L. Selby II (*pro hac vice*)
Jonathan Gold (*pro hac vice*)
1055 Thomas Jefferson Street, NW, Suite 540
Washington, DC 20007
Telephone:      (202) 463-2101
Facsimile:       (202) 463-2103
bglasser@baileyglasser.com
tbennett@baileyglasser.com
dselby@baileyglasser.com
jgold@baileyglasser.com

Katherine E Charonko (*pro hac vice*)
209 Capitol Street
Charleston WV 25301
Tel: (304) 345-6555
Fax: (304) 342-1110
kcharonko@baileyglasser.com

Elizabeth L. Stryker (*pro hac vice*)
94 Long Street Suite 200
Westover WV 26501
Tel: (304) 594-0087
estryker@baileyglasser.com

*Co-Counsel for the Coalition of Counsel for Justice
for Talc Claimants*

21

## **CERTIFICATE OF SERVICE**

I certify that on February 13, 2025, I caused a true and correct copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

_/s/Nicholas R. Lawson_
Nicholas R. Lawson