# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC LLC,[1] | Case No. 24-90505 (CML) |
| Debtors. | |

## AD HOC COMMITTEE OF SUPPORTING COUNSEL'S MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF DEBTOR'S SECOND AMENDED PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION

---

[1] The last four digits of the Debtor's taxpayer identification number are 8508. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

# TABLE OF CONTENTS

BACKGROUND AND PRELIMARY STATEMENT.................................................................... 1

ARGUMENT ..................................................................................................................... 7

   A.  This Plan was Filed in Good Faith and For a Legitimate Bankruptcy Purpose................. 7

   B.  This Plan was Prosecuted in Good Faith ........................................................... 13

   C.  AHC Firms Had Authority to Vote for All Clients.......................................... 16

         a.  The Law Firms are Agents of their Client Principals and May Vote on the Plan for their Clients. ................................................................................ 16

         b.  Law Firms Are Agents For Their Clients --Bankruptcy Rule 9010(C) Explicitly Provides That No Power Of Attorney Is Required For A Client's Agent To Vote On A Plan. ........................................................... 22

         c.  Voting On Behalf of Their Clients Fulfilled a Duty of the AHC Attorneys. ..................................................................................................... 24

         d.  The AHC Attorneys Not Only Had the Duty To Vote For Their Clients, They Also Had The Authority To Vote For Their Clients........................ 27

         e.  Here, The Ad Hoc Committee's Clients Were Provided With Abundant Communications And Disclosures Regarding The Plan And Voting On The Plan. .................................................................................................. 29

   D.  The Plan Meets the Best Interest of the Creditors' Test ..................................... 30

CONCLUSION.................................................................................................................... 31

# TABLE OF AUTHORITIES

Page(s)

Cases

*A–COS Leasing Corp. v. Wheless*,
   422 F.2d 522 ................................................................................................................ 14
*Augustson v. Linea Aerea Nacional-Chile S.A.*,
   76 F.3d 658 (5th Cir. 1996) ......................................................................................... 16
*Berwin v. Nat'l R.R. Passenger Corp.*,
   152 F.3d 917 (2d. Cir. 1998) ....................................................................................... 29
*Blanton v. Womancare, Inc.*,
   38 Cal. 3d 396 (1985) ............................................................................................ 17, 19
*Chaney v. United States*,
   45 Fed.Cl. 309 (1999) .................................................................................................. 24
*Domenech v. Integration Corp.*,
   187 D.P.R. 595 (2013) ................................................................................................. 17
*Fidelity Assur. Assoc. v. Sims*,
   318 U.S. 608, 63 S.Ct. 807, 87 L.Ed. 1032 (1943) .................................................... 13
*Gavenda*,
   705 S.W.2d ................................................................................................................... 19
*Hallock et al. v. State of New York et al.*,
   474 N.E.2d 1178 (N.Y. 1984) ...................................................................................... 29
*Harrington v. Purdue Pharma L.P.*,
   603 U.S. 204 (2024) ..................................................................................................... 25
*In re Bestwall LLC*,
   605 B.R. 43 (Bankr. W.D.N.C. 2019) .......................................................................... 12
*In re Boy Scouts of America and Delaware BSA, LLC*,
   650 B.R. 87 (D. Del. 2023) .......................................................................................... 25
*In re Combustion Engineering*,
   391 F.3d 190 (3d Cir. 2004) ................................................................................... 21, 22
*In re DePugh*,
   409 B.R. 84 .................................................................................................................. 16
*In re Dow Corning Corp.*,
   211 B.R. 545 (Bankr. E.D. Mich. 1997) ...................................................................... 25
*In re Gremillion*,
   547 B.R. 196 (Bankr. E.D. La. 2016) ............................................................................ 9
*In re HONX, Inc.*, Case No. 22-90035,
   2022 WL 17984313 (Bankr. S.D. Tex. Dec. 28, 2022) ........................................... 8, 12
*In re Johns-Manville Corp.*,
   36 B.R. 727 (Bankr. S.D.N.Y. 1984) ........................................................................... 12
In re Keck, Mahin & Cate,
   241 B.R. 583 ................................................................................................................ 31
*In re Little Creek Dev. Co.*,
   779 F.2d 1068 (5th Cir. 1986) .................................................................................. 9, 14

*In re LTL Management,* LLC,
  652 B.R. 433 (Bankr. D. N.J. 2023) .............................................................. 10, 11
*In re LTL MGMT. LLC*,
  64 F.4th 84 .............................................................................................................. 4
*In re LTL Mgmt., LLC*,
  637 B.R. 396 (Bankr. D.N.J. 2022) .................................................................... 12
*In re Lucas*,
  94 P.3d 477 (Cal. 2004) ....................................................................................... 28
In re Multiut Corp.,
  449 B.R. 323 (2011) ............................................................................................. 30
*In re North American Health Care, Inc.*,
  544 B.R. 684 (Bankr. C.D. Cal. 2016) ............................................................... 25
*In re Parson*,
  632 B.R. 613 (Bankr. N.D. Tex. 2021) ................................................................ 9
*In re Roman Catholic Church of Archdiocese of New Orleans*,
  632 B.R. 593 ........................................................................................................... 9
*In re Semco Manf. Co., Inc.*,
  649 B.R. 155 (Bankr. S.D. Tex. 2023) ............................................................. 9, 10
*In re StatePark Bldg. Grp., Ltd.*,
  316 B.R. 466 (Bankr. N.D. Tex. 2004) ................................................................ 11
*In re Wooten*,
  633 B.R. 475 (Bankr. N.D. Miss. 2021) ................................................................ 9
*Ingram v. Lupo*,
  726 S.W.2d 791 (Mo. Ct. App. 1987) ................................................................. 17
*J.K. v. UMS-Wright Corp.*,
  7 So.3d 300 (Ala. 2000) ...................................................................................... 28
*Macke Laundry Serv. Ltd. P'ship v. Jetz Serv. Co.*,
  931 S.W.2d 166 (Mo. Ct. App. 1996) ............................................................ 16, 20
*Mitchum v. Hudgens*,
  533 So.2d 194 (Ala. 1988) ................................................................................... 28
*People v. Gilbert*,
  25 Cal. 2d 422 (1944) .......................................................................................... 16
*Perosi v. LiGreci*,
  98 A.D.3d 230 (2012) ..................................................................................... 17, 20
*Staton Techiya, LLC v. Samsung Electronics Co., Ltd*,
  2024 WL 4850513 (E.D. Tex. May 9, 2024) ...................................................... 21
*Texas Employers Ins. Ass'n v. Wermske*,
  349 S.W.2d 90 (Tex. 1961) .................................................................................. 16
*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ............................................................................... 24
*Tres Tech Corp. v. Carefusion Corp*.,
  2014 WL 2438374 (N.D. Tex. May 29, 2014) ................................................... 17
*Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker*,
  56 A.D.3d 1 (N.Y. App. Div. 2008) .................................................................... 20

Statutes

28 U.S.C. §459 or §953 ................................................................................ 23
Ala. Code §34-3-21 ..................................................................................... 28
Section 524(g) of the Bankruptcy Code...................................................... Passim
U.S.C.A. § 1129(a)(7) ................................................................................. 30

Rules

California Rules of Professional Conduct, Rule 1.2 .................................... 17
Fed. R. Bankr. P. 9010(c) ........................................................................... 23
New York Rules of Professional Conduct, Rule 1.2 ................................... 17
Tex. Disciplinary R. Prof. Cond. 1.01 ....................................................... 27
Texas Disciplinary Rules of Professional Conduct, Rule 1.02.................... 17

Other Authorities

22-90035,
    2022 WL 1798313, at *2 (Bankr. S.D. Tex. Dec. 28, 2022)................... 9
E.D.,
    La. 2021 ................................................................................................. 9

The Ad Hoc Committee of Supporting Counsel (the "AHC"), by and through its counsel, Parkins & Rubio LLP, hereby submits this Memorandum of Law in Support of Confirmation of the *Second Amended Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [Docket No. 722] (the "Plan").

## BACKGROUND AND PRELIMINARY STATEMENT

1.       On June 5, 2024 Red River Talc, LLC (the "Debtor") began solicitation of a prepackaged Chapter 11 plan filed pursuant to Section 524(g) of the Bankruptcy Code (the "Bankruptcy Code"). The Plan provided for the largest financial resolution of mass tort claims in a bankruptcy case with approximately $9.75 billion dedicated to pay present and future ovarian and gynecologic cancer claims.

2.       Solicitation of the Plan votes was a success with more than 80% of the talc claimants solicited voting in favor of the Plan. *See Suppl. Decl. of Stephenie Kjontvedt of Epiq Corporation Restructuring, LLC Regarding the Solicitation and Tabulation of Ballots Cast on the Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [Dkt. 307]. Thereafter, on September 20, 2024, the Debtor filed the Plan and its Disclosure Statement seeking Confirmation of the Plan. *Notice of Filing of Solicitation Versions of the Prepackaged Chapter 11 Plan of the Debtor and Related Disclosure Statement. Filed by Red River Talc LLC* [Dkt. 25].

3.       Objections to the Plan and numerous motions to dismiss the case and for other relief were filed.[2] Despite these objections, the Debtor and Johson & Johnson continued to negotiate

---

[2]      Motions to Dismiss (with Dkt number) were filed by:  Creditor Coalition of Counsel for Justice for Talc Claimants (Dkt. No. 44), United States Trustee (Dkt. No. 299), Century Indemnity (Dkt. No. 388), various parties filed Joinders to the UST's and the Coalition's Motions to Dismiss; Motions to Transfer Venue (with Dkt. Number) were filed by:  Creditor Coalition of Counsel for Justice for Talc Claimants (Dkt. No. 43), United States Trustee (Dkt. No. 139),   Objections to the Plan (with Dkt number) were filed by:  Kevin Nesko (Dkt. No. 972), Ace Property & Casualty Co., et al. (Dkt. No. 975) The United States Trustee (Dkt. No. 980), Certain Insurers (Dkt. No. 981), Truck Insurance Exchange (Dkt. No. 983), U.S. Department of Health & Human Services (Dkt. No. 984), TIG Insurance Co., et al. (Dkt. No. 985), Barnes Law Group, LLC (Dkt. No. 987), The Coalition of Counsel for Justice

with claimant groups resulting in enormous financial and structural enhancements to the Plan for talc claimants. The enhancements since inception include an additional $1.1 billion available to talc claimants for an individual review fund; a $650 million common benefit fund for lawyers who provided demonstrable services to bring about resolution (not to be taxed against the trust); increased expedited payments from the trust to claimants; a non-bankruptcy master settlement agreement funded by Johnson & Johnson ("J&J") to talc claimants if the plan is overturned on appeal (commonly referred to as the "Deal No Matter What"); and timing on the J&J walk away rights. Today, as a result of post-solicitation negotiations resulting in increased funding by J&J of $1.75 billion, the economics of the Plan provide for $9.75 billion versus $8 billion when the Plan was solicited in June of 2024.

4.      The Ad Hoc Committee of Supporting Counsel, a committee of 18 law firms formed to advance the interest of their many thousands of talc claimants, has been instrumental in negotiations with the Debtor, J&J and other parties. The AHC represents the vast majority of talc claimants asserting claims against the Debtor. After the implementation of a new divisional merger under Texas law, Debtor filed the prepackaged Plan of reorganization pursuant to Section 524(g) of the Bankruptcy Code negotiated with and supported by the AHC.

5.      The history of talc litigation against J&J by ovarian cancer claimants has a been long, expensive, intense, and difficult one for claimants. The first lawsuit to allege that genital exposure to talc caused ovarian cancer was filed in 2009. Thereafter, lawsuit filings continued. J&J has commented that by January 2020, J&J and its affiliates were receiving approximately one talc lawsuit every hour on the hour. In December 2018, a multi-plaintiff trial regarding ovarian

---

for Talc Claimants (Dkt. No. 988), Randi S. Ellis as the FCR (Dkt. No. 1014), Personal Care Products Council (Dkt. No. 1066), various parties filed Joinders to the Objections filed by the UST and the Coalition.

Cancer claims based on talc resulted in a $4.69 Billion dollar verdict on behalf of 22 plaintiffs. The total damages were reduced on appeal to $2.343 billion. No other talc trial has resulted in one dollar of recovery to ovarian cancer claimants since 2009.

6.      At the time of the first LTL bankruptcy filing in 2021, approximately 1,300 ovarian cases had been dismissed without payment and the relevant J&J affiliates achieved 16 defense verdicts. In addition, J&J affiliates obtained a reversal on every plaintiff verdict except the one noted above. Despite these recent successes by J&J, difficult and expensive talc litigation would continue against J&J for decades to come, at an incredible cost and with highly uncertain results for talc ovarian claimants.

7.      The LTL I and LTL II bankruptcies arose from J&J's efforts to globally and finally resolve its, and its affiliates, talc-related litigation through Chapter 11 cases filed to comply with Section 524(g) of the Bankruptcy Code.

8.       Facing over 38,000 lawsuits alleging that its talc-based products caused ovarian cancer and mesothelioma, in 2021 J&J implemented a divisional merger under Texas law, transferring its talc liabilities to LTL Management LLC ("LTL"). LTL subsequently filed for bankruptcy in October 2021 (LTL I), aiming to establish a 524(g) trust to channel all claims and to compensate claimants in a structured and equitable manner.

9.      Despite an initial ruling upholding the bankruptcy by the bankruptcy court in Trenton, in January of 2023 the U.S. Court of Appeals for the Third Circuit vacated that bankruptcy court order and ruled that the case must be dismissed for bad faith, ruling that LTL was not in imminent financial distress to support a good faith bankruptcy filing. The court held that LTL's access to J&J's $61 billion funding agreement undermined the necessity of bankruptcy protection. The Third Circuit acknowledged the irony that adequate funding to ensure LTL's ability to fund

the Chapter 11 plan was the cause of its failure. *In re LTL Mgmt. LLC*, 64 F.4th 84, 110-111 (3rd Cir.(N.J.) Mar. 31, 2023).

10.     Immediately following the bankruptcy court order of dismissal of LTL I, J&J caused there to be a second bankruptcy filing-by LTL Management, LLC on April 4, 2023 (LTL II), this time with a $8.9 billion funding commitment to pay current and future talc claimants. *See In re LTL Mgmt. LLC* Case No. 23-12825 (Bankr. D.N.J.). Through LTL II, J&J sought to resolve talc claims through a global partially negotiated settlement mechanism, supported by a significant portion of talc claimants. However, in July 2023, the U.S. Bankruptcy Court for the District of New Jersey dismissed LTL II.  Now bound by the most recent Third Circuit precedent of LTL I, the Third Circuit dismissed LTL II finding a lack of imminent financial distress lack of financial distress. The bankruptcy court (Judge Kaplan) was clear that it felt constrained to dismiss the case because of the Third Circuit's rigid standard of "immediate" and "apparent" financial distress. *Id.* However, in his ruling, Judge Kaplan acknowledged the progress made and significant benefits of a global resolution. *Id.* He strongly encouraged all parties to continue negotiate toward a final comprehensive settlement. *Id.*

11.     This Red River Talc prepackaged bankruptcy case builds upon lessons learned from LTL I and LTL II, incorporating significant negotiated financial commitment to pay talc claimants, and addressing legal concerns raised in prior cases. Unlike its predecessors, Red River Talc's prepackaged case was developed through broad claimant support, and a successful pre-filing vote solicitation of a plan that would ensure a fully funded, efficient, equitable, and final resolution to the long-standing talc litigation for ovarian and gynecological cancer victims-and for the Debtor, J&J and J&J affiliates.

4

12.     In this Memorandum, the AHC will address the following discrete important issues in support of the Debtor's case and Plan confirmation: (a) the Plan was filed in Good Faith; (b) the case prosecution was in good faith; (c) AHC Firms had the authority to vote for all clients on the Plan; and (d) the Plan is in the best interest of the creditors.

13.     *First,* the resounding voice of over 80% of the women in Class 4 who voted in favor of the Chapter 11 Plan is strong evidence of a good faith filing.[3] The evidence shows that the Debtor sought bankruptcy protection in an effort to resolve tens of thousands of ovarian and gynecological claims that were languishing in the tort system. In the tort system the claimants have experienced decades long delay with no end in sight.  In addition, ovarian cancer tort plaintiffs have fared poorly in the tort system, having their cases dismissed and their increasingly rare trial victories overturned on appeal.[4]  Extensive negotiations took place leading up to the vote on the chapter 11 plan and have continued to present day with counsel who represent the majority of the claimants in the case.[5] The bankruptcy filing was not an attempt to delay creditors or avoid legitimate obligations, but rather the most appropriate legal avenue for Debtors to reorganize and offer timely payments to claimants.[6]  This Plan was filed in good faith and should be confirmed by the court.

14.     *Second,* evidence confirming that this case has been prosecuted in good faith is abundant.  Reason would dictate that the inclusion of an additional $1.1 billion in payments under

---

[3] *See* Suppl. Decl. of Stephenie Kjontvedt of Epiq Corporation Restructuring, LLC Regarding the Solicitation and Tabulation of Ballots Cast on the Prepackaged Chapter 11 Plan of Reorganization of the Debtor [Dkt. No. 307] (the "Supp. Voting Decl.") ¶6; see also Haas Dep. 78:3-9.

[4] *See* Haas Dep. 252:9-18.

[5] *See* Kim Dep. 29:15-30:25, 128:24-129:24; Dickinson Dep. 40:16-41:4; Wuesthoff Dep. 52:8-11; Haas Dep. 126:25-129:5.

[6] The following is discussed in further detail in the *Decl. of John K. Kim in Supp. of Chapter 11 Case and Certain First Day Pleadings* [Dkt. 17] (the "First Day Declaration").

the Plan to the Talc Personal Injury Trust is evidence of good faith prosecution.  Further, the Debtor has made significant modifications to the Plan to improve the position of the talc claimants including improving the timeliness of payments under the trust, an additional $650 million to a qualified settlement fund for the payment of common benefit fees, agreement to pay certain expenses set forth in detail below and term known as a "Deal No Matter What" intended to provide protection to claimants in the event this Plan is overturned on appeal.  This Plan easily meets and exceeds the standard for good faith prosecution and should be confirmed.

15.    *Third,* the votes cast by the AHC firms via Master Ballot under Certification B were valid and appropriately cast.  The principal-agent relationships between the clients and their respective law firms, standing alone, is a sufficient and independent reason for this Court to accept each and every ballot cast by the law firms on behalf of their clients-presuming there is evidence of notice to the client and a finding of good faith. The actions of the AHC law firms go well beyond the contractual duty established by the fiduciary relationship.

16.    *Fourth,* this Plan meets the Best Interest of the Creditors test set forth in 1129(a)(7) and no individual claimant has suggested otherwise. Based on expert analysis claimants will receive substantially more under the Chapter 11 plan as compared to the speculative tort system that moves at a snail's pace.  This process allows for recovery on a paid-in-full basis based on a standardized point system which is fairer and more equitable than a tort system where claimants and defendants face unknowns such as jury temperament and the persuasiveness of legal counsel. Finally, this Plan has been designed to pay claimants timely and maintain funds for future claimants where a Chapter 7 liquidation would be wrought with uncertainties, complex issues and delays.

## ARGUMENT

**A.  This Plan was Filed in Good Faith and For a Legitimate Bankruptcy Purpose**

17.     Talc claimants have aggressively tried to recover on their cancer claims against J&J and related entities for more than the past decade. Except for a single substantial judgement against J&J withstanding appeal, talc claimants with ovarian cancer most recently have been unsuccessful in the court room against J&J and/or its affiliates.

18.     Repeated trial losses, a decade passing without recovery for talc victims, and two enormously expensive, time consuming and unsuccessful Chapter 11 bankruptcies funded by J&J taught the key players-plaintiff lawyers and J&J the hard earner bitter-sweet lesson: that a fully negotiated, fully voted final effort to resolve talc claims through a pre-packed Section 524(g) reorganization plan made common sense.

19.     After the LTL II Chapter 11 case was dismissed by Judge Kaplan in August of 2023, representatives of the AHC and J&J renewed intense arm's length negotiations to reach a global resolution of ovarian and gynecological cancer claims against J&J.

20.     Those negotiations were successful. Agreement was reached for the resolution of those cancers claims with J&J funding a prepacked bankruptcy plan in an agreed amount representing the largest ever fully funded mass tort resolution embodied in a Chapter 11 bankruptcy in the United States.  The Plan was voted on and filed in good faith and for a legitimate bankruptcy purpose-the final resolution of talc claims through the statutorily prescribed vehicle of a Section 524(g) Chapter 11 plan.

21.     Opponents of the Plan allege that this Chapter 11 Case was filed in bad faith. Their arguments fail and should be rejected by this court. The significant acceptance rate of this Plan by over 80% of talc claimants is compelling evidence that the case and pre-packaged plan were filed in utmost good faith embodying the results of extensive arms-length negotiations between the

AHC, the Debtor, J&J , the Smith Law Firm and others.[7]  Rather than benefitting J&J, or creating some amorphous vehicle to enable J&J to evade liability, the 524(g) Plan benefits both current and future talc claimants with over $9 billion to be funded by J&J. Further, this Chapter 11 Case enables the talc claimants to resolve their claims in a single forum and promotes fairness as between the talc claimants.

22.    Congress enacted 11 U.S.C. § 524(g) to provide a statutory vehicle for the comprehensive resolution for a multitude of unmanageable asbestos claims that were overwhelming the state and federal court system.  A plan filed pursuant to Section 524(g) and funded with $9 billion has a *per se* valid bankruptcy purpose and is a good faith bankruptcy filing. Section 524(g) allows for the legitimate creation of a trust to channel all present and future asbestos related talc claims to the trust, insulating the Debtor and others prescribed by statute to be free of present and future talc liability. *See In re HONX, Inc.*, Case No. 22-90035, 2022 WL 17984313, at *2 (Bankr. S.D. Tex. Dec. 28, 2022).  In *HONX,* Judge Isgur's ruling reaffirmed the principle that the debtor could utilize the statutory framework of Section 524(g) to address mass tort claims, such as asbestos, finding the process valid when the debtor showed good faith and that the reorganization process was crucial for the survival of the business. *Id.*  Judge Isgur's decisions on this matter helped shape the ongoing precedent for 524(g), reinforcing the balance between debtor's rights to reorganize and creditors' rights to fair treatment. *Id.*

23.    In the Fifth Circuit the bankruptcy court's determination of whether this pre-packed bankruptcy case was filed in good faith requires the court to consider the totality of the circumstances surrounding the case filing and avoiding reliance on "any single datum."  *In re Little*

---

[7] *See* Suppl. Decl. of Stephenie Kjontvedt of Epiq Corporation Restructuring, LLC Regarding the Solicitation and Tabulation of Ballots Cast on the Prepackaged Chapter 11 Plan of Reorganization of the Debtor [Dkt. No. 307] (the "Supp. Voting Decl.") ¶6; see also Haas Dep. 78:3-9. Stating that over 83% of voting claimants affirmed the plan.

*Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986); *In re Honx, Inc.*, No. 22-90035, 2022 WL 1798313, at *2 (Bankr. S.D. Tex. Dec. 28, 2022) (draws a distinction between asbestos bankruptcies and other bankruptcies). To find a lack of good faith, a court conducts an "on-the-spot evaluation of the debtor's financial condition, its motives, and the financial realities." *See Little Creek,* at 1071-72.

24.     Courts within the Fifth Circuit have set forth certain non-exclusive factors that are the hallmarks of a "bad faith" bankruptcy filing. Such factors include (1) lack of a valid reorganizational purpose, *In re Roman Catholic Church of Archdiocese of New Orleans*, 632 B.R. 593, 599-600 (Bankr. E.D. La. 2021) (filing merely for tactical litigation advantage afforded by the automatic stay is not a valid purpose); (2) bad conduct by debtor in prior cases, *In re Wooten*, 633 B.R. 475 (Bankr. N.D. Miss. 2021) (serial filings, failure to disclose information, and failure to make plan payments are bad faith factors); (3) filing on the eve of a trial or foreclosure, *In re Semco Manf. Co., Inc.*, 649 B.R. 155, 163 (Bankr. S.D. Tex. 2023); (4) misrepresentations in the petition or plan, or other deception, *In re Parson*, 632 B.R. 613, 626 (Bankr. N.D. Tex. 2021); (5) objective futility of the reorganization process, *In re Gremillion*, 547 B.R. 196, 198 (Bankr. E.D. La. 2016) (examine whether filing was frivolous with no realistic chance of reorganization); and (6) failure to promptly file schedules and other required documents, *In re Semco Manf. Co., Inc.*, 649 B.R. at 163.

25.     Here practically every aspect of the case filing and Plan show good faith. The Chapter 11 Plan is a result of years of hard-fought litigation leading to arm's length negotiations resulting in a workable compromise approved by over 83% of the claimants.[8] The AHC has

---

[8]    *See* Haas Dep. 78:3-9; Supp. Voting Decl. ¶6. *Declaration of Stephanie Kjontvedt of Epiq Corporate Restructuring, LLC, Regarding the Solicitation and Tabulation of Ballots Case on the Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [ECF Dkt. No. 47], Ex. 20.

worked with LTL-Red River and J&J for years to reach a negotiated closure of this mass tort and financial crisis. Countless hours of hard-fought, arm's length negotiations finally resulted in a workable compromise that addresses the interests of talc claimants, protects their interests and provides them with the opportunity to recover a negotiated payment on their claims through the $9 billion of J&J funding available through this Plan. This is strong evidence that the Plan does not only benefit J&J or the Debtor.

26.     As Judge Kaplan commented in his opinion dismissing the 2023 Chapter 11 Case, there had been "no developments since LTL 1.0 that have abated the Court's concerns or resolved the problems of the extensive tort-claim backlog," and the

> glacial pace coupled with the undeniable surge in the number of new actions means that the vast majority of claimants will not get the opportunity to seek recovery for years to come, if ever. The sluggish speed of the tort system—which plaintiffs' attorneys repeatedly acknowledged during trial—continues to trouble this Court. Further, when a claimant finally gets to trial, that opportunity comes with a very meaningful risk of a defendant's verdict.[9]

In fact, Judge Kaplan noted that it had "been the near decade of frustration, delay, and widely disparate results in the tort system which prompted certain AHC counsel to seek a consensual resolution with J&J's settlement counsel."[10]  Such observations refute the existence of any real "opportunity to litigate" and buttress the AHC's good faith arguments.

27.     With regard to the Debtor's motive in filing this case, a debtor's motive in filing a petition is relevant, but not determinative, to a bad faith determination.  *See, e.g.*; *In re StatePark Bldg. Grp., Ltd.,* 316 B.R. 466, 475-76 (Bankr. N.D. Tex. 2004) (It takes "particularly egregious" facts to establish bad faith.).

---

[9]     *In re LTL Management,* LLC, 652 B.R. 433, 449-50 (Bankr. D. N.J. 2023).

[10]    *Id.* at 450.

28.     In this case, the Debtor's and J&J's motives are legitimate as evidenced by the funding of $9 billion to implement a hard fought-long in coming-negotiated resolution of present and future talc liability.  This Chapter 11 Case was filed, and has been prosecuted, to fairly resolve, on a final basis, alleged talc liabilities in an effective, efficient and equitable forum so as to provide substantial and expedited compensation to present talc claimants and funding to future talc claimants when they manifest disease in the years to come.[11] The overwhelming support of the talc claimants for the Plan, and "taking into account the excessive cost, burden, uncertainty and anticipated decades-long duration of the talc litigation,[12] the Debtor and the talc claimants made the reasonable decision that the Plan presents the best opportunity to comprehensively resolve all current and future ovarian cancer and gynecological cancer claims against it, and the "only pathway through which the Debtor, J&J, and the claimants can effectuate the agreement through confirming and implementing the Plan that has been so painstakingly negotiated.[13]

29.     In bankruptcies involving asbestos-related tort claims, the chapter 11 process offers "a meaningful opportunity for justice, which can produce comprehensive, equitable, and timely recoveries for injured parties."  *In re LTL Mgmt., LLC,* 637 B.R. 396, 414 (Bankr. D.N.J. 2022) ("There is nothing to fear in the migration of tort litigation out of the tort system and into the bankruptcy system. . . . The bankruptcy courts offer a unique opportunity to compel the participation of all parties in interest . . . in a single forum with an aim of reaching a viable and fair settlement.").

---

[11] The following is discussed in further detail in the First Day Declaration.

[12]  *Id.*

[13] *Id* at ¶ 137.

30.     Filing a chapter 11 case "with the express aim of addressing the present and future liabilities associated with ongoing global personal injury claims to preserve corporate value is unquestionably" a valid reorganizational purpose under the Bankruptcy Code.  *Id.* at 407-08.

31.     In the months leading up to the filing of the 2021 Chapter 11 Case of LTL, affiliates of J&J were paying between $10 million to $20 million in legal defence costs on a monthly basis.[14] Clearly this was unsustainable.  To top it off, the Plaintiffs won no money in these lawsuits.  Here, the "Debtor's efforts to address the financially draining mass tort exposure through a bankruptcy is wholly consistent with the aims of the Bankruptcy Code." *See  LTL Mgmt.,* 637 B.R. at 408.

32.     Courts in the Fifth Circuit, and throughout the nation regard efforts to resolve an untenable amount of mass tort liability as a valid restructuring purpose in good faith.  *See, e.g., In re Bestwall LLC,* 605 B.R. 43, 49 (Bankr. W.D.N.C. 2019); *In re Johns-Manville Corp.,* 36 B.R. 727 (Bankr. S.D.N.Y. 1984).    It is not surprising that maximizing property available to creditors is a valid reorganizational purpose.  *See In re Honx, Inc.*, No. 22-90035, 2022 WL 17984313, at *2 n. 1 (Bankr. S.D. Tex. Dec. 28, 2022) (use of section 524(g) was not a bad faith delay tactic but demonstrated "intent to provide efficient and fair compensation for all meritorious claims, while maximizing assets available . . . [and] avoiding the overwhelming" costs and delay in mass tort litigation).  Plan opponents can make no legitimate averment that the Debtor lacked financial when decades of litigation past and future, constitutes sufficient financial distress to file bankruptcy.

33.     The opponents of the Plan ignore that the Plan provides for the largest asbestos resolutions ever, with approximately $9 billion, guaranteed by J&J.  They also ignore that the Debtor, J&J and J&J affiliates have routinely won in the talc tort lawsuits, and that, under the Plan,

---

[14] *Id* at ¶62.

claimants will receive payments in a rapid, efficient, and equitable manner—a vastly superior outcome, in the aggregate, than the slow and uncertain tort system would provide.

34.     The case with its Plan is a good deal for the Talc Claimants, and by no mean goes only to benefit J&J.  The Plan provides in excel of $9 billion to current and future talc claimants— all funded by J&J.  More than 83% of talc claimants voted in favor of the Plan, leaving a vocal minority in opposition.  This outvoted minority should not be afforded the ability to derail a historic compromise that provides an opportunity for the Debtor, funded by J&J, to finally compensate talc claims, with a negotiated fair and equitable recovery in a very short time period as compared to staying the tort system.

**B.  This Plan was Prosecuted in Good Faith**

35.     Not only was this bankruptcy case filed in good faith, it has also been prosecuted in good faith.  This is well evidenced by the Smith Memorandum of Understanding and the Official Tort Claimants Committee of Unsecured Creditors (the "TCC") Memorandum of Understanding, both of which indicate that the Debtor has met and exceeded its obligation to honestly and diligently pursue reorganization effort without using the bankruptcy process for improper purposes.

36.     Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy cases.  *See, e.g., Fidelity Assur. Assoc. v. Sims,* 318 U.S. 608, 621, 63 S.Ct. 807, 813– 14, 87 L.Ed. 1032 (1943); *A–COS Leasing Corp. v. Wheless,* 422 F.2d 522, 523–25 & n. 1 (5th Cir.1970).  Such a standard furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy. *In re Little Creek Development Co.,* 779 F.2d 1068 (5th Cir. 1986).

37.     At the end of the solicitation period for the Plan, certain firms requested that the Debtor delay its bankruptcy filing for the purpose of further negotiation to try to enhance recovery for the talc claimants.[15] Those negotiations were successful. First, the Smith Law Firm negotiated substantial financial enhancements with the Debtor and J&J, which were memorialized in a document referred to as the Smith Memorandum of Understanding (the "Smith MOU").[16] The Smith MOU provides, subject to specific terms and conditions, as follows:

- The establishment of an additional **$1.1 billion** individual review fund to provide supplemental recoveries to the most injured talc claimants (Smith MOU at 5);

- The potential reallocation of **$500 million** from future talc claimants to current direct talc claimants (Smith MOU at 4);

- The establishment of a new common benefit fund in the amount of **$650 million** to be administered by a third party. This common benefit fund will be funded by J&J and will not be taxed against the claimants recoveries that would be achieved in the MDL (Smith MOU at 4-5);

- J&Js agreement to pay the costs associated with Archer Systems review of Supporting Counsel's claimants to begin within 60 days after the filings. (Smith MOU at 6); and

- J&J's agreement to assist in negotiating a global medical lien resolution program with the Department of Justice (Smith MOU at 11).

- An agreement that should the U.S. Supreme court reverse the Fifth Circuit's affirmance of the Plan, then the Debtor and J&J have the discretion to elect to continue the settlement process through a qualified settlement fund. Further, should the Fifth Circuit vacate an order confirming the Plan, the Debtor will convert the Plan into a private resolution program.

- In return for these negotiated enhancements, the Smith Law Firm will change votes for which it has authority from "No" to "Yes".

---

[15] First Day Declaration ¶127.

[16] The Smith MOU is attached as Annex A to the First Day Declaration and is incorporated into the Plan. The provisions of the Smtih MOU requires the approval of the FCR and the Ad Hoc Committee.   See Kim Dep. 271:16-25; Wuesthoff Dep. 38:5-11.

38.     These negotiations after the vote solicitation but before plan filing brought the total funds available to talc claimants to over **$9 billion.**   Such significant post-solicitation concessions and huge funding for talc claimants by the Debtor and J&J leads to the conclusion that this case has been prosecuted in good faith.

39.     After the Smith MOU was executed, the TCC and the Smith Law Firm engaged in another round of negotiations with the Debtor and J&J.  The result of these negotiations was a new-superseding memorandum of understanding which became effective November 14, 2024 (the "TCC MOU").[17]  The TCC MOU is a memorialization of support for the Plan by the TCC.[18]  The TCC was appointed on October 22, 2024, and included both Plan proponents and Plan opponents. The Debtor, J&J, the TCC, and the AHC negotiated at length regarding the Plan and such negotiations resulted in an agreement expressed in the TCC MOU.[19]  The TCC MOU materially expedites recoveries for talc injury victims and their estates, resolves significant concerns regarding trust administration and ensures finality.  From a material standpoint the TCC MOU provides for an earlier Plan effective date not withstanding appeals from order confirming the Plan to the Fifth Circuit and the acceleration of certain cash contributions to the Talc Personal Injury Trust allowing expedited payment of claims.  Throughout the prosecution of this case there has been a consistent trend of compromise and increased funding by J&J which has consistently and significantly enhanced the value of the Plan to the benefit of the talc claimants.  It is abundantly clear that the Debtor, with J&J support, has prosecuted this case with legitimate purpose and additional funding to creditors.

---

[17] *Confidential Memorandum of Understanding & Agreement Regarding Talc Bankruptcy Plan Support* [Dkt 560]

[18] *Id.*

[19] Murdica Dep. 127:6-13, 199:9-14; Kim Dep. 252:6-7, 254:4-256:20,

### C.  AHC Firms Had Authority to Vote for All Clients

40.    Certain opponents of the Plan have alleged that one or more of the AHC's member-law firms lacked authority to vote on behalf of their creditor-claimants.  For the reasons, arguments, and authorities set forth herein, such allegations should be rejected.

41.    The AHC law firms have the authority to vote the Plan on behalf of their clients either:  (i) as a matter of applicable law as an agent of their client by virtue of the attorney-client relationship created by engagement letters, (ii) by express authority in the engagement letters, and/or (iii) by implied authority under applicable law.

### a.  The Law Firms are Agents of their Client Principals and May Vote on the Plan for their Clients.

42.    As a threshold matter, the law is clear, including the law of the states of the AHC law firms, that retained attorneys are agents of their respective clients.  *See e.g.*, *Augustson v. Linea Aerea Nacional-Chile S.A.*, 76 F.3d 658, 665 (5th Cir. 1996) ("[A] lawyer is an agent of his client.") citing *Texas Employers Ins. Ass'n v. Wermske*, 349 S.W.2d 90, 93 (Tex. 1961); *In re DePugh*, 409 B.R. 84, 107 n. 13 (Bankr. S.D. Tex. 2009) (noting that a debtor is bound by the acts of his lawyer-agent.).  *People v. Gilbert*, 25 Cal. 2d 422, 443 (1944) (It is long-standing California law that an attorney is an agent of his client.); *Macke Laundry Serv. Ltd. P'ship v. Jetz Serv. Co.*, 931 S.W.2d 166, 176 (Mo. Ct. App. 1996) (As an agent of the client, an attorney acts as the client's alter ego and not for the attorney personally*.); Domenech v. Integration Corp.*, 187 D.P.R. 595 (2013) (An "attorney or other agent" of a stockholder may inspect corporate books and records).[20]  There is nothing whatsoever controversial about this position.  *See id*.; *People v. Betillo*, 279 N.Y.S.2d (Sup. Ct. 1967) (under New York law, an attorney is expected to follow the client's instructions and carry

---

[20]    *See also* NEW YORK RULES OF PROFESSIONAL CONDUCT, RULE 1.2; MISSOURI RULES OF PROFESSIONAL CONDUCT, SECTION 4.1.2, COMMENT [1]; CALIFORNIA RULES OF PROFESSIONAL CONDUCT, RULE 1.2; TEXAS DISCIPLINARY RULES OF PROFESSIONAL CONDUCT, RULE 1.02, n.1.

out agreements on behalf of the client, reinforcing the agency relationship). Indeed, a client-attorney engagement is the very archetype of a principal-agent relationship. *See Ingram v. Lupo*, 726 S.W.2d 791, 794 (Mo. Ct. App. 1987) (An attorney is the agent of his client.); *Tres Tech Corp. v. Carefusion Corp.*, No. 3-13-CV-4033-K, 2014 WL 2438374 (N.D. Tex. May 29, 2014) (The defendant's lead attorney "is clearly an agent of [Defendant].").

43.     As a matter of law, attorneys retained by clients pursuant to an engagement letter are agents of their clients for the subject matter of the engagement agreement being the scope of the professional principal and agent relationship. *Blanton v. Womancare, Inc.*, 38 Cal. 3d 396, 403 (1985) ("the attorney-client relationship, insofar as it concerns the authority of the attorney to bind his client by agreement or stipulation, is governed by the principles of agency."); *Perosi v. LiGreci*, 98 A.D.3d 230, 237 (2012) (under New York law, the scope of an attorney's authority as an agent is generally limited only by the boundaries of the principal-agency relationship.). The acts of attorneys are the acts of the client's agent and bind the client. *See e.g.*, *AGS Investigative Servs., Inc. v. Sharma*, 3950 N.Y.S.2d 529, 530 (App. Term 2012) (An attorney acts as an agent for their client, and the client, as principal, is liable for contracts entered into on their behalf by the attorney acting as the client's authorized agent.).

44.     In this bankruptcy case, all the AHC law firms at issue engaged their clients pursuant to their respective engagement agreements. Certain relevant language from engagement letters of AHC law firms, each of which represents multiple thousands of Talc Claimants, is shown below:

- Watts Guerra, LLP:  "THE FIRMS' AUTHORITY...to represent me in all claims, suits, or other matters arising out of and resulting from personal injuries suffered by me or decedent related to use Johnson & Johnson's Talcum Powder, and against any

designer, maker, distributor, and/or seller of such product(s)…. Client fully authorizes and directs "the firms" to manage and handle any claims as they deem proper and to investigate and prosecute them, with or without filing a lawsuit, in any manner they deem advisable.  Client authorizes the Firms to deliver in my name any and all notices, receipts, authorizations, releases, pleadings and any other documents proper in and to the handline of my claims.  Client authorizes the Firms to use their professional judgment and any relevant documents, records, or other information that the Firms deem necessary to proper representation of Client."

- Andrews & Thornton, AAL, AAC: "Client hereby retains the Firms to represent Client in connection with Client's claims for damages arising out of Johnson & Johnson talcum powder against certain responsible parties…"

- Fears Nachawati, PLLC: "...to represent him/her for damages arising out of a Personal Injury Claim(s) and or Product Liability Claim(s) arising from the use of Talcum Powder including Wrongful Death Claim(s).... against certain parties who may be liable; and whereas Attorneys agree to represent client...." "Further, Client empowers Attorneys to take all steps in said matter deemed by Attorneys to be advisable, including but not limited to effectuating a compromise, institute legal proceedings and to take any other appropriate steps."

- Onder Law, LLC:  "The undersigned hereby agree(s) to employee ONDER LAW, LLC, and _____ as attorneys-at-law to represent the undersigned in all claims for damages arising out of the use of Talcum Powder."

- Pulaski Kherkher, PLLC:    "I_____ hereby constitute, appoint and employee, the law firm of Pulaski Kherkher, PLLC, hereinafter the "Attorneys" as

my attorneys at law and in fact, to investigate, prepare and prosecute any claim or suit for personal injuries, suffered by the below mentioned client…"  "Client hereby retains the Attorneys to represent him/her in connection with his/her personal injury claim against all responsible parties including, but not limited to manufacturers and distributors, arising out of use and/or exposure to talcum powder."

45.     The remainder of the AHC law firms' engagement agreements are substantially the same in relevant part.  Such engagement agreements establish clear bases for the client-attorney / principal-agent relationship between the AHC law firms and their clients.  As agents for their clients (who are the principals), absent specific language in their engagement agreements forbidding certain acts by the AHC law firm, the AHC law firms (as agents) may bind their clients to decisions, contracts, agreements, or votes.  *See e.g.*, *Gavenda*, 705 S.W.2d at 693 (an attorney's acts and omissions within the scope of his authority are regarded as the client's acts); *Blanton v. Womancare, Inc.,* 696 P.2d 645 (the attorney-client relationship, insofar as it concerns the authority of the attorney to bind his client by agreement or stipulation, is governed by the principles of agency); *Macke Laundry Serv. Ltd.*, 931 S.W.2d at 176 (as an agent of the client, an attorney acts as the client's alter ego and not for the attorney personally).  The scope of an attorney's authority as an agent is generally limited only by the boundaries of the principal-agency relationship.  *Perosi v. LiGreci*, 98 A.D.3d 230.

46.     The AHC law firms' engagement agreements do not have any language prohibiting any of the law firms (agents) from voting on the Plan in the manner in which such law firm believes will best further the interests of its client/principal.  There are no carve-outs that impact the lawyers ability to vote for their clients in the engagement agreements limiting the AHC law firms from acting in a manner that furthers the best interests of their clients/principals.  *See id*.

There are no restrictions on the AHC law firms pursuing their clients' bankruptcy claims, including without limitation voting.  In the absence of any such voting prohibitions, the AHC law firms may, in fact they <u>must</u>, vote their clients' ballots in a manner that furthers the clients' best interests, and thereby fulfill their duties to represent their clients.  *See Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker*, 56 A.D.3d 1, 8-9 (N.Y. App. Div. 2008) ("[T]he attorney-client relationship is both contractual and inherently fiduciary.").

47.     Judge Hale, an expert for plan opponents, also opined that the Beasley Allen law firm voted on behalf of their clients to reject the Plan based on authority granted in their attorney engagement letters.  According to Judge Hale, the attorney engagement letters and extensive communication established the authority of the Beasley Allen law firm to vote on behalf of their clients under Certification A.  Hale Dep. 161:17-166:6.  Such authority under the attorney engagement letters for attorneys to vote either "yes" or "no" on the plan for all claimant-clients, at least under Certification A is established if adequate disclosures, communications, and negative notice is provided.  Hale Dep. 165:7-166:6.  The Beasley Allen firm sent negative notice to their clients, advising their clients that if they failed to vote themselves, then the Beasley Allen firm would vote for them against the Plan.  Many of the Class 4 Talc Claimants were given negative notice by their AHC law firms—that if the individual claimants did not submit a vote, their attorneys would vote in favor of the Plan on their behalf.

48.     Hence, under the opinion of plan opponent's expert, Judge Hale, Beasley Allen firm had authority to vote No under Certification A for clients who did not submit a ballot.  See Hale Dep. 165:7-166:6, 179:13-180:15.  Likewise, the AHC law firms, under Judge Hale's opinion and testimony, who acted in parallel with Beasley Allen with their client had authority to vote "yes" on the Plan under Certification A for 100% of their clients who did not submit ballots.  Hale Dep.

20

165:7-166:6, 179:13-180:15.  Surely a court should not disenfranchise thousands of AHC talc victim claimants from their Yes vote made through their lawyer who had the authority to vote Yes on all of their claims.

49.     Therefore, the principal-agent relationships between the clients and their respective Law Firms, standing alone, is a sufficient and independent reason for this Court to accept each and every ballot cast by the law firms on behalf of their clients.  To rule otherwise may risk causing a breach of duties by the attorney to the client—the highest fiduciary relationship recognized by law.  *E.g., Staton Techiya, LLC v. Samsung Electronics Co., Ltd*, F.Supp.3d, 2024 WL 4850513 (E.D. Tex. May 9, 2024) (The relationship between an attorney and client is a fiduciary relationship of the very highest character.").

50.     A number of objectors to the Plan attempt to 'hang their hats' on a footnote in an out-of-circuit case discussed in the January 28, 2025 rebuttal report of retired judge Hale—*In re Combustion Engineering*, 391 F.3d 190 (3d Cir. 2004).  In *Combustion Engineering*, the court stated "[W]here the voting process is managed almost entirely by proxy, it is reasonable to require a valid power of attorney for each ballot to ensure claimants are properly informed about the plan and that their votes are valid."  *Id*. at n. 66.  However, Judge Hale's report omits mentioning relevant and pertinent language in the master ballots used in the *Combustion Engineering* case. Indeed, before his deposition, Judge Hale never found or studied this ballot.  The Combustion Engineering master ballots provided, in relevant part:

> "Item 1.  <u>Certification of Authority to Vote</u>.  The undersigned certifies that, as of the date hereof, the undersigned is acting under a proxy or a power of attorney, or other written evidence of agency granted by the holder(s) of Asbestos PI Trust Claim(s) identified below, and accordingly has full power and authority to vote to accept or reject the Plan on behalf of such holder(s) of Asbestos PI Trust Claim(s).  A copy of such written proxy, power of attorney, or other

> written evidence of agency for each holder of a Asbestos PI Trust
> Claim identified below is enclosed with this Master Ballot."

*In re Combustion Engineering, Inc.*, United States Bankruptcy Court, District of Delaware, Case No. 03-10495-KG ECF/Docket No. 5-2, Page 3 of 3, filed 2-18-03.

38.     Thus, in *Combustion Engineering*, voting authority was evidenced by a power of attorney, or other written evidence of agency, granted by the claimants to their respective attorneys. *See id*.   Not only was the term "power of attorney" being used generically by the *Combustion Engineering* court, but the master ballot in said case shows that a power of attorney, at its core, is one form of written document evidencing agency, and that it is such agency that grants to the attorneys authority to vote for their clients.   *Id*.   As described above, the AHC law firms are clearly agents of their respective clients with regard to all aspects of representing their clients in this bankruptcy case on talc claims, including the ability to vote for their clients on the Plan.

39.     Comparisons have also been made to a settlement, yet in this case, a vote on the Plan is not a client agreeing to a settlement of her claim.   Rather, the Plan is more akin to a ticket into the room to work out a settlement of the claim with the Trustee of the asbestos trust created by the Plan.   No claim has been settled or resolved by a vote in of the Plan.   If the Plan is confirmed, the claimant will file for resolution of the claim.

**b.   Law Firms Are Agents For Their Clients --Bankruptcy Rule 9010(c) Explicitly Provides That No Power of Attorney Is Required For A Client's Agent To Vote On a Plan.**

39.     Further, the language of rule 9010(c) of the Federal Rules of Bankrutpcy Procedures (the "Bankrutpcy Rules") explicitly states that no separate power of attorney is required for the law firms to vote on a bankruptcy plan on behalf of their clients.   In relevant part, Bankruptcy Rule 9010 provides:

> (c) The authority of an agent, attorney-in-fact, or proxy to represent
> a creditor—for any purpose other than executing and filing a proof

of claim or accepting or rejecting a plan—must be evidenced by a power of attorney that substantially confirms to the appropriate version of Form 411.  A power of attorney must be acknowledged before:

> (1) an officer listed in 28 U.S.C. §459 or §953 or in Rule 9012; or

> (2) a person authorized to administer oaths under the state law where the oath is administered.

Fed. R. Bankr. P. 9010(c).

40.     Bankruptcy Rule 9010(c) requires a power of attorney when an agent (such as an attorney) represents a creditor for any purpose <u>other than</u> executing and filing a proof of claim or <u>accepting or rejecting a plan</u>.  *Id.*  At issue is the AHC law firms' ability to vote on behalf of talc claimants to accept or reject the Plan—which is expressly addressed by Bankrutpcy Rule 9010(c) — and under Rule 9010(c), the AHC law firms were not required to obtain a power of attorney to vote on the Plan for their clients.  *Id.*  If a power of attorney were required to vote to accept or reject the plan, then the drafters of these bankruptcy rules (overseen by the United States Supreme Court[21]) would not have carved this out of the actions requiring a power of attorney.  When a rule explicitly lists certain items for a carve-out, but omits others, a sensible explanation is that the omitted items were meant to be excluded.  Any plain reading of the rule would lead the reader to conclude that Congress intended to carve out voting on plans from the actions an attorney (or other agent) needed a power of attorney for in bankruptcy.  *See Chaney v. United States*, 45 Fed.Cl. 309, 316 (1999) (courts should not interpret statutes in a way that renders other provisions of the same statute inconsistent, meaningless or superfluous); *Texas v. United States*, 809 F.3d 134, 182, n.180

---

[21]     See Forewod to Fed. R. Bankr. P. (2024) ("The rules have been promulgated and amended by the  United States Supreme Court pursuant to law, and further amended by Acts of Congress.").

(5th Cir. 2015) (the "*expressio unius est exclusio alterius*" canon of construction holds that "to express or include one thing implies the exclusion of the other, or of the alternative.").

### c. **Voting On Behalf of Their Clients Fulfilled a Duty of the AHC Attorneys.**

41.     The practical realities of mass tort cases, including bankruptcy cases, sometimes require bankruptcy attorneys to act for, including to vote for, their clients to fulfill ethical duties to their clients.  Lawyers representing clients cannot be divorced from their ethical, fiduciary, and agent duties to their clients in this bankruptcy case.  The AHC firms' attorneys could not permit their clients to be disenfranchised from recovery under the Plan.  If the clients did not cast votes, counsel would have an ethical duty to pursue the best interest of their client and vote for them if they fail to respond.  See ABA Model Rule 1.3.  In this circumstance, that entails casting votes in favor of the Plan, on behalf of any clients that did not themselves vote, if their lawyer believes such a vote is in their clients' best interests.  Here, with regard to the AHC lawyers identified, such votes cast by them for clients were done after transmittal and disclosure of voting, solicitation material, plus many repeated communications to their respective clients requesting them to vote in favor of the Plan.

42.     An attorney in a mass tort bankruptcy must consider:  (i) the extreme difficulty in historically obtaining final judgments and actual payments to the victims in the tort system from Johnson & Johnson for talc-related liabilities and (ii) the years that the victims have waited for a trial opportunity let alone a recovery on account of their claims in the tort system compared to the certainty of receiving a negotiated range of compensation in a timely manner under the proposed plan.  *See In re Dow Corning Corp*., 211 B.R. 545 (Bankr. E.D. Mich. 1997); *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024); *In re North American Health Care, Inc*., 544 B.R. 684 (Bankr. C.D. Cal. 2016); *In re Boy Scouts of America and Delaware BSA, LLC*, 650 B.R. 87 (D. Del. 2023).

43.    In class actions, it is generally appropriate to apply an imputed consent standard allowing attorneys to act in the best interests of their clients without obtaining affirmative informed consent from each claimant.  Edgar Gentle Report ¶30.  Such standard ensures that claimant's interests are adequately protected, particularly in situations where individual responses from all claimants may not be feasible.  *Id*.  Typically, mechanisms are put in place permitting attorneys to vote on behalf of their clients when the clients did not respond.  Edgar Gentle Report ¶30 n. 13.

44.    The engagement letters used by the AHC firms reveal a common mandate for the firms to represent their clients to seek maximum recovery for their clients' ovarian and gynecological cancer claims against J&J and its affiliates. Where there are differences in the language contained in the engagement letters used by the AHC member firms, there is no disparity regarding the ethical duty of the law firms to maximize recovery for their clients along with either specific or implicit authority to vote for the Plan in order to give their clients the opportunity to participate in, and consent to, the historical settlement provided for under the Plan, and not lose the opportunity for the clients to do so.

45.    The AHC member firms casting votes on behalf of their clients in favor of the Plan under Certification B fulfilled a duty to act for their clients, because it was necessary to protect their clients' rights from losing an opportunity to participate in the historic settlement provided by the Plan.  ABA Model Rule 1.3 ("A lawyer shall act with reasonable diligence and promptness in representing a client.").  ABA Model Rule 1.3 requires the zealous pursuit of claims on a Client's behalf, with such a pursuit possibly being foiled absent an affirmative vote. *See id.*

46.    Comment 1 to ABA Model Rule 1.3 provides: "[1] A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer, and take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor.

A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf.  A lawyer is not bound, however, to press for every advantage that might be realized for a client. For example, a lawyer may have authority to exercise professional discretion in determining the means by which a matter should be pursued. See ABA Model Rule 1.2. The lawyer's duty to act with reasonable diligence does not require the use of offensive tactics or preclude the treating of all persons involved in the legal process with courtesy and respect."

47.    Comment to Ala. R. Prof. Cond. 1.3 similarly provides: "A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer, and may take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor. A lawyer should act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf. However, a lawyer is not bound to press for every advantage that might be realized for a client. A lawyer has professional discretion in determining the means by which a matter should be pursued. See Rule 1.2."

48.    Substantially identical provisions are found in the ethics rules of other states. Cal. R. Prof. Cond. 1.3 provides: "(a) A lawyer shall not intentionally, repeatedly, recklessly, or with gross negligence fail to act with reasonable diligence in representing a client. (b) For the purposes of this rule, "reasonable diligence" shall mean that a lawyer acts with commitment and dedication to the interests of the client and does not neglect or disregard, or unduly delay a legal matter entrusted to the lawyer."

49.    Comment 1 to N.Y. R. Prof. Cond. 1.3 provides: "[1] A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer, and take whatever lawful and ethical measures are required to vindicate a client's cause or

endeavor. A lawyer must also act with commitment and dedication to the interests of the client and in advocacy upon the client's behalf.  A lawyer is not bound, however, to press for every advantage that might be realized for a client. For example, a lawyer may have authority to exercise professional discretion in determining the means by which a matter should be pursued. *See* Rule 1.2. Notwithstanding the foregoing, the lawyer should not use offensive tactics or fail to treat all persons involved in the legal process with courtesy and respect."

50.     Comment 6 to Tex. Disciplinary R. Prof. Cond. 1.01 provides: "Having accepted employment, a lawyer should act with competence, commitment and dedication to the interest of the client and with zeal in advocacy upon the client's behalf. A lawyer should feel a moral or professional obligation to pursue a matter on behalf of a client with reasonable diligence and promptness despite opposition, obstruction or personal inconvenience to the lawyer."

### d. The AHC Attorneys Not Only Had the Duty To Vote For Their Clients, They Also Had The Authority To Vote For Their Clients.

51.     The various AHC firm engagement letters provide the law firms with express or implied authority necessary to fulfill their duty to their clients.  Specifically, this authority allows the law firms to cast ballots for their clients in favor of the Plan under Certification B. Such action satisfies the duties to the law firm, as discussed above, and best ensures their clients' ability to later knowingly participate in the settlement afforded by the Plan. Without this action to vote to approve the Plan, their clients' best "rights" to recover against Johnson & Johnson and Red River Talc may be lost, leaving them with no recovery in the tort system.  *See also* ABA Model Rule 1.2(a), discussing the following best tactics and strategies to pursue a client's claims, which provides: "[a] lawyer may take such action on behalf of the client as it is impliedly authorized to carry out the representation."

27

52.    Courts in Alabama have interpreted the authority of attorneys in cases as, "an attorney of record is presumed to have his client's authority to compromise and settle litigation…" *J.K. v. UMS-Wright Corp. et al*, 7 So.3d 300, 307 (Ala. 2000); see also Ala. Code §34-3-21.   However, this presumption does not create the implied or inherent authority to compromise and settle a matter, because express authority from the client is required.  *Mitchum v. Hudgens*, 533 So.2d 194, 199 (Ala. 1988).  Voting on the Plan puts the client in a position to participate in the settlement under the TDPs.

53.    California's rules on authority seem to follow closely the ABA model rules, stating, "A lawyer retained to represent a client is authorized to act on behalf of the client, such as in procedural matters and in making certain tactical decisions."  See Cal. R. Prof. Cond. 1.2 comment 1.  However, these actions by counsel must still be subject to "meaningful scrutiny."  *In re Lucas*, 94 P.3d 477, 502 (Cal. 2004).

54.    New York's rules on authority state, "A lawyer may exercise professional judgment to waive or fail to assert a right or position of the client, or accede to reasonable requests of opposing counsel, when doing so does not prejudice the rights of the client."  N.Y.R. Prof. Cond. 1.2(e).   "From the nature of the attorney-client relationship itself, an attorney derives authority to manage the conduct of litigation on behalf of a client, including authority to make certain procedural or tactical decisions."  *Hallock et al. v. State of New York et al.*, 474 N.E.2d 1178, 1181 (N.Y. 1984).   "Under New York law, an attorney who lacks actual authority may bind her client to a stipulation, including a settlement, if the attorney has apparent authority."  *Berwin v. Nat'l R.R. Passenger Corp.*, 152 F.3d 917, 917 (2d. Cir. 1998) (Summary Order).  This can be conferred by the client's "words or conduct."  *Id*.

55. Texas, like the ABA rules, confers a broad discretion for attorneys regarding the client representation, "Both the lawyer and the client have authority and responsibility in the objectives and means of representation." Tex. Dis. Rules of Prof. Conduct 1.02 comment 1. The comments further state that the lawyer assumes the "responsibility for the means by which the client's objectives are achieved." *Id*. "The lawyer has very broad discretion to determine technical and legal tactics." *Id*.

56. Moreover, an attorney may sign and submit a proof of claim on behalf of his or her client and waive the client's Seventh Amendment Constitutional rights. *See* Official Bankrutpcy Form 10. If an attorney can waive the fundamental Constitutional rights of the client, by signing and filing a proof of claim with no power of attorney required, then surely an attorney can vote for a bankruptcy plan on behalf of his or her client.

### e. Here, The Ad Hoc Committee's Clients Were Provided With Abundant Communications And Disclosures Regarding The Plan And Voting On The Plan.

57. This is not a case in which the AHC firm's clients lacked notice of the vote or how to vote. Nor was this a case in which proper disclosures were not sent to such clients. Rather, the AHC firm's clients received abundant communications regarding the voting procedures.

58. In the vote solicitation process, the clients of the AHC member law firms all received numerous communications from their firms or from Epiq, the Debtor's noticing agent, including without limitation the Plan and the Disclosure Statement, the AHC's and the Debtor's respective letters in support of the Plan, and recommendations, reminders, and requests that the clients vote in favor of the Plan.[22] Further, nearly all the AHC firms provided negative notice

---

[22] These AHC intends to introduce numerous samples of such communications from the AHC firms to their respective clients at the Plan confirmation hearing.

language to their clients—indicating that absent affirmative client instruction to the contrary, the firm would be casting a ballot for the Plan on behalf of the client.

**D. The Plan Meets the Best Interest of the Creditors' Test**

59.     The "best interests of creditors" test for confirming a Chapter 11 plan is codified in 11 U.S.C.A. § 1129(a)(7). This test requires that each holder of a claim or interest in an impaired class must either accept the plan or receive or retain property under the plan that has a value, as of the effective date of the plan, at least equal to what the holder would receive if the debtor were liquidated under Chapter 7 on that date. *In re Multiut Corp.*, 449 B.R. 323 (Bankr. N.D. Ill. 2011). The Debtor has the burden of showing that the best interest test has been met. *Id*. Claimants who object to plan confirmation through section 1129(a)(7) based on personal recoveries must claim that they will recover more through a chapter 7 liquidation and must consider all benefits received in the Plan that increase the value of what the class is getting. *In re Keck, Mahin & Cate*, 241 B.R. 583, 590 (Bankr. N.D. Ill. 1999).  No individual claimant has stated that the Plan does not meet the best interest of the creditors test.

60.     Further, based upon recent history, tort claimants are likely to receive significantly more through the Plan's Trust Distributions Procedures than through the tort system and the relevant payment will be much more timely thanks to additional concessions made by the Debtor and J&J during late stage negotiations.

61.     The Debtor's expert estimates that, on average, ovarian cancer Claimants will receive substantially more through the Channeling Trust as compared to the tort system. In addition, because this system is based on points related to various factors it is a more fair and reliable system that a tort system that faces endless delays and widely varying jury verdicts.

62.     Not only does this Plan provide more value that the tort system for ovarian cancer claimants, it also provides better value for gynecological cancer claimants. The Coalition and Insurers have argued at every turn for the failure of this Plan and have stated on numerous occasions, including before this Court, that gynecological cancer claims have no value in the tort system.  That said, approximately 3,000 gynecological cancer claims have been asserted against the Debtor and J&J in the tort system.  Despite statements that gynecological claims have no value in the tort system, Beasley Allen voted approximately 5,500 gynecological cancer claims and has filed certain gynecological claims. Kim Declaration, Docket No. 433, ¶ 9.  Accordingly, the offer of $1,500 per gynecological claim is a better than what is being received in the tort system and is consistent with the legitimate bankruptcy purpose of this Debtor in resolving gynecological and ovarian cancer related claims.

63.     Finally, the Chapter 11 bankruptcy provides more certainty and less delay than a chapter 7 liquidation.  It should also be noted that a Chapter 7 has no means of providing for future claimants.

## **CONCLUSION**

64.     The confirmation of the Plan is not only appropriate under the Bankruptcy Code but is also the most equitable and effective means of finally resolving the talc-related litigation.

65.      The overwhelming support of more than 80% of talc claimants provides irrefutable evidence of good faith.  The Debtor's filing was not a litigation tactic to delay or hinder creditors, but a legitimate reorganization effort designed to resolve thousands of cancer claims that have languished in the tort system for over a decade.  Unlike the tort system—where claimants face uncertainty, delay, and disparate trial outcomes—this Plan provides a fair, predictable, and equitable resolution for all claimants.

66.     The Bankruptcy Code explicitly permits the use of Section 524(g) trusts for the resolution of asbestos-related mass tort claims, and this Plan follows that structure, ensuring full and fair payment to those affected.  Opponents of the Plan rely on flawed arguments that ignore the substantial improvements and financial enhancements achieved through extensive, arm's-length negotiations between the Debtor, J&J, the AHC, the TCC and the Smith Law Firm.  This Plan is not a bad faith filing, nor does it solely benefit J&J.  Instead, it represents a hard-fought, negotiated resolution that maximizes claimant recoveries while ensuring finality and fairness.

67.     From the moment this case was filed, the Debtor has acted transparently, diligently, and in good faith to negotiate a resolution that maximizes value for current and future claimants. The record unequivocally shows that the Debtor engaged in extensive negotiations, including the agreements reflected in the Smith MOU and the TCC MOU, which significantly improved the economic terms of the Plan for claimants.

68.     These negotiations resulted in:

- An additional $1.1 billion in Individual Review Fund payments, ensuring enhanced recoveries for the most severely injured claimants.

- A $650 million Common Benefit Fund, paid by J&J, that compensates attorneys for their efforts in achieving a global resolution.

- The "Deal No Matter What" provision, which guarantees settlement funds even if the Plan is overturned on appeal.

- Accelerated funding of the Talc Personal Injury Trust, ensuring that claimants will receive their recoveries as quickly as possible.

69.     A case prosecuted in bad faith would not have resulted in such substantial enhancements for claimants. The Debtor's conduct clearly meets—and exceeds—the good faith prosecution standard under applicable law.

70.     Opponents of the Plan have attempted to manufacture a voting controversy by claiming that AHC firms lacked the authority to vote on behalf of their clients.  This argument is

legally and factually incorrect. Under well-established agency principles, attorneys act as agents for their clients and have the authority to vote on matters related to bankruptcy reorganization.

71.     Moreover, Bankruptcy Rule 9010(c) explicitly allows attorneys to act on behalf of their clients without requiring a separate power of attorney for plan voting. The engagement agreements between the AHC firms and their clients provide clear authorization to represent their clients' interests, which includes casting votes in favor of the Plan.

72.     The *Combustion Engineering* case cited by opponents is inapplicable, as that case involved a different procedural framework and expressly allowed voting authority to be established through agency principles—which is precisely what occurred here. Further, clients were given multiple opportunities to opt out, were provided with extensive disclosures, and received clear and ongoing communication regarding the Plan vote.

73.     The AHC firms acted within their ethical and legal obligations, ensuring their clients had the best opportunity to participate in the settlement. Any attempt to invalidate these votes disregards well-established agency law and would unjustly disenfranchise thousands of claimants who stand to benefit from this Plan.

74.     The best interest of creditors test under Section 1129(a)(7) requires that claimants receive at least as much as they would in a Chapter 7 liquidation. The evidence will demonstrate that claimants will receive substantially more under the Plan than they would in any alternative scenario, including the tort system.

75.     The Plan ensures timely, fair, and equitable distribution of funds, while the tort system offers nothing but delays, uncertainty, and highly variable trial outcomes.

76.     The opponents' argument that claimants could recover more through litigation is purely speculative.  As Judge Kaplan noted in dismissing the LTL II case, the tort system is utterly

incapable of delivering timely and fair compensation to talc claimants. The Plan removes these risks, guaranteeing timely payments while preserving funds for future claimants—a protection that would not exist in a chapter 7 liquidation.

77.     This historic plan — one of the largest mass tort resolutions in history—was only possible due to the relentless negotiations and good faith efforts of the Debtor, J&J, the AHC, the TCC and the Smith Law Firm.  To allow a small group of objectors to derail this Plan would be not only legally unsound but fundamentally unjust.

78.     The overwhelming majority of claimants support this Plan because it provides certainty, fairness, and immediate financial relief—something the tort system has categorically failed to do. The alternative—continued litigation—would result in years, if not decades, of uncertainty, risk, and delayed justice for victims who deserve compensation now.

WHWEERFOR, for the foregoing reasons, the Court should confirm the Plan and provide such further relief that is just and proper.

> */s/ Lenard M. Parkins*
> **PARKINS & RUBIO LLP**
> Lenard M. Parkins (TX Bar No. 15518200)
> Charles M. Rubio (TX Bar No. 24083768)
> Great Jones Building
> 708 Main Street, 10th Floor
> Houston, TX 77002
> Telephone: (713) 715-1660
> Email:   lparkins@parkinsrubio.com
>                 crubio@parkinsrubio.com
>
> ***Counsel to the Ad Hoc Committee of Supporting Counsel***