**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC LLC,[1] | Case No. 24-90505 (CML) |
| Debtor. | |

---

## DEBTOR'S PRETRIAL BRIEF

---

[1] The last four digits of the Debtor's taxpayer identification number are 8508. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

NAI-1542918500

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................. 1

RELEVANT FACTS ............................................................................... 7

I.     HISTORIC TALC LITIGATION .................................................... 8

    A.     Ovarian Cancer Litigation................................................ 8

    B.     Gynecological Cancer Litigation ..................................... 10

II.    FILING OF LTL BANKRUPTCY CASES ..................................... 12

    A.     The Burden of Talc Litigation on Old JJCI ...................... 12

    B.     LTL's 2021 Chapter 11 Case ........................................... 13

    C.     Mediation Commences in LTL's 2021 Chapter 11 Case.... 14

    D.     Mediation Continues in LTL's 2023 Chapter 11 Case. ...... 15

    E.     Bankruptcy Court Encourages Parties to Continue Resolution Efforts
        Through Another Bankruptcy ............................................ 16

III.   PREPETITION NEGOTIATIONS WITH CLAIMANT REPRESENTATIVES .......... 17

    A.     Development of the Initial Plan ........................................ 17

    B.     The Imerys/Cyprus Settlement ........................................ 20

IV.    SOLICITATION OF THE INITIAL PLAN ...................................... 21

    A.     Distribution of Solicitation Packages................................ 22

    B.     The Supplemental Notice Program ................................... 22

    C.     The Disclosure Statement ................................................ 24

    D.     Direct and Master Ballot Voting....................................... 25

    E.     Counter-Solicitation Campaign by Small Number of Objecting Firms.............. 26

V.     THE PREPETITION CORPORATE RESTRUCTURING............................. 28

VI.    NEGOTIATIONS CONTINUE WITH OBJECTING LAW FIRMS ............. 30

    A.     Claimants Reach Out to LLT and J&J Following the Voting Deadline............. 30

    B.     Developments After August 23, 2024 ............................... 33

    C.     Beasley Allen Obstructed the Smith Firm's Efforts to Communicate the
        Benefits of the Revised Plan to Their Joint Clients. ........................... 35

    D.     The Smith Firm's Superseding Master Ballot ................................ 36

VII.   VOTING RESULTS ................................................................... 38

    A.     Over 83% of Claimants Support the Plan. ........................ 38

**TABLE OF CONTENTS**

(continued)

Page

B. Under Virtually Every Conceivable Scenario for Considering or Challenging the Vote, the Results Exceed the 75 Percent Threshold..................38

VIII. BEASLEY ALLEN SUBMITS AN INVALID MASTER BALLOT............................41

A. Mr. Birchfield Falsely Certified That Beasley Allen Had Collected and Recorded the Informed Consent of Clients to Cast Over 8,000 Votes. ..............41

B. Claimants Were Not Informed About Beasley Allen's Conflicting Positions On Gynecological Cancer Claims........................................................43

C. Claimants Were Not Informed That Beasley Allen Has Not Recovered a Dime in the Tort System. ...................................................................................44

D. The Debtor's Expert Confirms the Beasley Allen Ballot Was Defective...........45

1. Informed Consent Requires an Affirmative Response. .........................45

2. The Failure to Disclose Conflicting Interests Negates Informed Consent. ................................................................................................46

3. The Failure to Disclose Lack of Success in the Tort System Negates Informed Consent......................................................................47

4. The Coalition's Rebuttal Expert Fails to Refute Mr. Gentle's Conclusions................................................................................................47

IX. THE VOTES OF THE PLAN'S SUPPORTERS WERE VALIDLY CAST.................50

A. AHC Members and the Smith Firm Properly Used the Option A Certification to Reflect Actual Responses Received from Clients. .....................50

B. AHC Members and the Smith Firm Voted Properly Under the Option B Certification. ........................................................................................................51

X. THE CHAPTER 11 FILING AND THE OBJECTORS' RESPONSE ..........................54

A. Appointment of the Committee and the TCC MOU.............................................56

B. Law Firms Seek Authority to Change Their Clients' Votes to Accept the Plan, as Amended. ...............................................................................................58

XI. THE TALC PERSONAL INJURY TRUST WILL PAY HOLDERS OF CHANNELED TALC PERSONAL INJURY CLAIMS IN FULL. ...............................59

SUMMARY OF ARGUMENTS.................................................................................................62

I. THE MOTIONS TO DISMISS SHOULD BE DENIED. ..............................................62

A. The Bad Faith Dismissal Standard in the Fifth Circuit.......................................62

B. The Debtor Has a Valid Reorganizational Purpose and Is Not Pursuing This Case Solely to Benefit J&J. ..........................................................................63

# TABLE OF CONTENTS
## (continued)

Page

1.    The Debtor's Bankruptcy Filing to Resolve Its Own Mass Tort Liability Is a Valid Reorganizational Purpose. ........................ 63

2.    Neither the Plan's Provisions on Non-Debtor Releases Nor Purdue in Any Way Support Movants' Assertion of Bad Faith........................... 65

3.    This Prepackaged Case Seeks to Immediately Resolve, Not "Escape" or "Delay" Resolution of, the Debtor's Talc Liabilities. ......... 65

4.    Movants' Going Concern and Property Maximization Arguments Fail. ............................................................................................ 66

C.    Financial Distress Is Not Required, But Is Present In Any Event. .................... 67

1.    The Fifth Circuit Does Not Mandate Financial Distress As a Precondition to Seeking Bankruptcy Relief........................................... 67

2.    The Debtor Is in Financial Distress. ...................................................... 68

3.    Neither J&J Nor the Debtor Committed "Fraud" or Engaged in "Fraudulent Transfers" to Manufacture Jurisdiction or Financial Distress........................................................................................... 68

D.    Dismissal of LLT's Bankruptcies Does Not Support or Warrant Dismissal of this Chapter 11 Case. ............................................................................... 69

1.    The Debtor Is Not a "Serial Filer" and, in Any Event, Circumstances Have Materially Changed Since the Prior Bankruptcies. ...................................................................................... 69

2.    Preclusion Doctrines Do Not Support Dismissal of This Case................ 70

E.    Even If "Cause" Existed to Dismiss This Case, the Court Should Deny the Dismissal Motions. .............................................................................. 71

II.    THE DISCLOSURE STATEMENT AND SOLICITATION PROCEDURES MOTION SHOULD BE APPROVED. ........................................................................ 71

A.    Approval of Adequacy of Information in the Disclosure Statement .................. 71

1.    Adequate Information Was Provided on Estimated Recoveries.............. 74

2.    Information on Litigation History and Science Was Accurate and Not Misleading........................................................................................ 75

B.    The Solicitation Procedures Were Appropriate, and Solicitation was Conducted in a Reasonable and Appropriate Manner. .......................................... 76

1.    Voting Record Dates................................................................................ 76

2.    Contents of the Solicitation Packages..................................................... 77

3.    Distribution of Solicitation Packages..................................................... 78

NAI-1542918500

# TABLE OF CONTENTS
(continued)

**Page**

|     |     |     |     |     |
|-----|-----|-----|-----|-----|
|     |     | 4.  | Solicitation Through Counsel was Appropriate | 79 |
|     |     | 5.  | The Forms of Ballot | 80 |
|     |     | 6.  | The Master Ballot and Direct Ballot Solicitation Methods for Clients of Plaintiff Firms | 81 |
|     |     | 7.  | The Supplemental Notice Program | 82 |
|     |     | 8.  | Ample Time Was Provided for Claimants to Cast Their Votes to Accept or Reject the Initial Plan. | 83 |
| III. |    | THE VOTE TABULATION SHOULD BE APPROVED. | | 84 |
|     | A. | Approval of the Voting Results | | 84 |
|     |     | 1.  | The Debtor Appropriately Allowed Gynecological Cancer Claims to Vote | 85 |
|     |     | 2.  | Talc Personal Injury Claims Should Be Allowed in the Amount of $1.00 Per Claimant Solely for Voting Purposes. | 87 |
|     |     | 3.  | Epiq's Tabulation Was Correct | 90 |
|     |     | 4.  | The Beasley Allen Vote Was Invalid | 92 |
|     | B. | The Motions to Change Votes Should be Granted. | | 93 |
|     | C. | Denial of the Coalition's Voting Motions. | | 94 |
|     |     | 1.  | The Designation Motion Should Be Denied. | 94 |
|     |     | 2.  | The Reinstatement Motion Should Be Denied. | 96 |
|     |     | 3.  | The Estimation Motion and the Bar Date Motion Should Be Denied. | 97 |

NAI-1542918500

## TABLE OF AUTHORITIES

Page

CASES

Carolin Corp. v. Miller (In re Carolin Corp.),
  886 F.2d 693 (4th Cir. 1989) .................................................................................62

Century Glove, Inc. v. First Am. Bank of N.Y.
  860 F.2d 94 (3d Cir. 1988).....................................................................................73

Eubanks v. F.D.I.C..,
  977 F.2d 166 (5th Cir. 1992) .................................................................................72

Harrington v. Purdue Pharma L.P.,
  603 U.S. 204 (2024).............................................................................................65

In re 234-6 W. 22nd St. Corp.,
  214 B.R. 751 (Bankr. S.D.N.Y. 1997)...................................................................70

In re Aldrich Pump LLC,
  2021 WL 3729335 (Bankr. W.D.N.C. Aug. 23, 2021)............................................64

In re Aldrich Pump LLC,
  2023 WL 9016506 (Bankr. W.D.N.C. Dec. 28, 2023) ............................................64

In re Asarco LLC,
  No. 05-21207 (Bankr. S.D. Tex.)...........................................................................82

In re Bestwall LLC,
  605 B.R. 43 (Bankr. W.D.N.C. 2019).....................................................................64

In re Bestwall LLC,
  71 F.4th 168 (4th Cir. 2023), cert denied, 144 S.Ct. 2519 (2024)..........................64

In re Boy Scouts of Am.,
  No. 20-10343 (LSS) (Bankr. D. Del.)..........................................................82, 83, 87

In re Bressler,
  2021 WL 126184 (Bankr. S.D. Tex. Jan. 13, 2021) ...............................................49

In re the Budd Company,
  No. 14-11873 (JBS) (Bankr. N.D. Ill.) ...................................................................87

-v-

In re Cajun Elec. Power Co-op., Inc.,
   230 B.R. 715 (Bankr. M.D. La. 1999) ......................................................................93

In re CGE Shattuck, LLC.,
   No. 99-12287-JMD, 2000 WL 33679416 (Bankr. D.N.H. Nov. 28, 2000)............................94

In re Clinton Centrifuge, Inc.,
   72 B.R. 900 (Bankr. E.D. Pa. 1987) ........................................................................62

In re Combustion Engineering, Inc.,
   391 F.3d 190 (3d. Cir. 2004)................................................................................53

In re Congoleum Corp.,
   No. 03-51524 (KCF), 2004 WL 2339762 (Bankr. D.N.J. Oct. 5, 2004) .................................53

In re Cyprus Mines Corporation,
   No. 21-10398 (LSS) (Bankr. D. Del.).........................................................20, 90, 98

In re Dakota Rail, Inc.,
   104 B.R. 138 (Bankr. D. Minn. 1989) .......................................................................73

In re Dernick,
   624 B.R. 799 (Bankr. S.D. Tex. 2020) .....................................................................95

In re Diamond Sports Grp., LLC,
   No. 23-90116 (CML) (Bankr. S.D. Tex.) ...................................................................77

In re Diamondback Indus., Inc.,
   No. 20-41504 (ELM) (Bankr. N.D. Tex.)...................................................................77

In re Diocese of Camden,
   No. 20-21257 (Bankr. D.N.J.)..............................................................................83

In re Dougherty's Holdings, Inc.,
   No. 19-32841 (HDH) (Bankr. N.D. Tex.)...................................................................77

In re Dow Corning Corp.,
   211 B.R. 545 (Bankr. E.D. Mich. 1997).....................................................................88

In re Duro Dyne,
   No. 18-27963 (MBK) (Bankr. D.N.J.)...........................................................82, 83, 84

In re Fed-Mogul Glob. Inc.,
   684 F.3d 355 (3d Cir. 2012)................................................................................64

In re Flintkote Co.,
486 B.R. 99 (Bankr. D. Del. 2012) ..........................................................................80

In re the Flintkote Co.,
No. 04-11300 (MFW) (Bankr. D. Del. Feb. 17, 2015) ............................................23

In re Garlock Sealing Techs. LLC,
No. 10-31607 (Bankr. W.D.N.C. Apr. 10, 2015) ....................................................23

In re Green,
No. 14-11458, 2014 WL 3724986 (Bankr. W.D. La. July 23, 2014) ......................92

In re Heritage Org., L.L.C.,
376 B.R. 783 (Bankr. N.D. Tex. 2007).............................................................94, 95

In re HONX, Inc.,
2022 WL 17984313 (Bankr. S.D. Tex. Dec. 28, 2022) ...............................63, 64, 66

In re HONX, Inc.,
No. 22-90035 (MI) (Bankr. S.D. Tex.) ..............................................................82, 87

In re Hot'z Power Wash, Inc.,
655 B.R. 107 (Bankr. S.D. Tex. 2023) ....................................................................49

In re Imerys Talc Am., Inc.,
No. 19-10289 (LSS) (Bankr. D. Del.).............................................................. passim

In re Imerys Talc Am., Inc.,
No. 19-10289 (LSS), 2021 WL 4786093 (Bankr. D. Del. Oct. 13, 2021).........53, 93

In re Instant Brands Acquisition Holdings, Inc.,
No. 23-90716 (MI) (Bankr. S.D. Tex.) ....................................................................77

In re Insys Therapeutics, Inc.,
No. 19-11292 (Bankr. D. Del.) .........................................................................83, 84

In re Johns-Manville Corp.,
36 B.R. 727 (Bankr. S.D.N.Y. 1984).................................................................62, 64

In re Johns-Manville Corp.,
843 F.2d 636 (2d Cir. 1987)...............................................................................87, 88

In re Kaiser Gypsum Co.,
No. 16-31602 (JCW) (Bankr. W.D.N.C.) ................................................................23

In re Landing Assocs., Ltd.,
    157 B.R. 791 (Bankr. W.D. Tex. 1993)....................................................................95

In re LTL Mgmt., LLC,
    637 B.R. 396 (Bankr. D.N.J. 2022) ............................................................12, 13, 14

In re LTL Mgmt. LLC,
    64 F.4th 84 (3d Cir. 2023) ........................................................................................14

In re LTL Mgmt. LLC,
    652 B.R. 433 (Bankr. D.N.J. 2023) ..........................................................................16

In re LTL Mgmt. LLC,
    No. 21-30589 (Bankr. D.N.J.).................................................................................14

In re LTL Mgmt. LLC,
    No. 23-12825 (Bankr. D.N.J.)...........................................................................15, 55

In re Madison Square Boys and Girls Club,
    No. 22-10910 (Bankr. S.D.N.Y.) ..............................................................................83

In re Mallinckrodt PLC,
    No. 20-12522 (JTD) (Bankr. D. Del.).......................................................................87

In re Mangia Pizza Invs., LP,
    480 B.R. 669 (Bankr. W.D. Tex. 2012)....................................................................94

In re Maremont Corp.,
    601 B.R. 1 (Bankr. D. Del. 2019) .............................................................................82

In re McCormick Road Assocs.,
    127 B.R. 410 (N.D. Ill. 1991) ...................................................................................70

In re MCorp Fin., Inc.,
    137 B.R. 237 (Bankr. S.D. Tex. 1992) .....................................................................93

In re MPM Silicones, LLC,
    No. 14-22503, 2014 WL 4637175 (Bankr. S.D.N.Y. Sept. 17, 2014)..............93, 94

In re Muralo Co., Inc.,
    301 B.R. 690 (Bankr. D.N.J. 2003) ..........................................................................64

In re Oakfabco, Inc.,
    No. 15-27062 (JBS) (Bankr. N.D. Ill.) .........................................................82, 83, 84

NAI-1542918500

In re PG&E Corp.,
    No. 19-30088 (DM) (Bankr. N.D. Cal.) ......................................................................82, 83, 87

In re PHI, Inc.,
    No. 19-30923 (HDH) (Bankr. N.D. Tex.)...................................................................................77

In re Quigley Co.,
    346 B.R. 647 (Bankr. S.D.N.Y. 2006).....................................................................................88

In re Robertshaw U.S. Hldg. Corp.,
    662 B.R. 300 (Bankr. S.D. Tex. 2024) ...................................................................................48

In re Robertshaw US Holding Corp.,
    No. 24-90052 (CML) (Bankr. S.D. Tex.) ...............................................................................77

In re Save Our Springs (S.O.S.) All., Inc.,
    388 B.R. 202 (Bankr. W.D. Tex. 2008)..................................................................................95

In re Shea, Ltd.
    545 B.R. 529 (Bankr. S.D. Tex. 2016) ...................................................................................73

In re Specialty Prods. Holding Corp.,
    No. 10-11780 (PJW) (Bankr. D. Del. Oct. 21, 2014) ...................................................23, 83, 84

In re State Park Bldg. Grp., Ltd.,
    316 B.R. 475–76 (Bankr. N.D. Tex. 2004)..............................................................................63

In re Tehum Care Servs., Inc.,
    No. 23-90086 (Bankr. S.D. Tex.)............................................................................................63

In re TK Holdings Inc.
    No. 17-11375 (Bankr. D. Del.) ........................................................................................83, 87

In re Trusted Net Media Holdings, LLC,
    550 F.3d 1035 (11th Cir. 2008) ..............................................................................................69

In re U.S. Brass Corp.,
    301 F.3d 296 (5th Cir. 2002) ..................................................................................................69

In re United Gilsonite Laboratories,
    No. 11-02032 (RNO), (Bankr. M.D. Pa.) ...............................................................................87

In re USA Gymnastics,
    No. 18-09108 (RLM) (Bankr. S.D. Ind.) ...............................................................................87

NAI-1542918500

In re Whittaker, Clark, & Daniels,
    663 B.R. 1 (Bankr. D.N.J. 2024) ............................................................67

In re Wyly,
    553 B.R. 318 (Bankr. N.D. Tex. 2016)....................................................87

In re Yarway Corp.,
    No. 13-11025 (BLS) (Bankr. D. Del.) .......................................82, 83, 84

Johnson v. Home State Bank,
    501 U.S. 78, 111 S.Ct. 2150 (1991)........................................................87

Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (Matter of Little Creek
    Dev. Co.),
    779 F.2d 1068 (5th Cir. 1986) ..........................................................63, 67

Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop.),
    150 F.3d 503 (5th Cir. 1998) ..................................................................72

Matter of Elmwood Dev. Co.,
    964 F.2d 508 (5th Cir. 1992) ............................................................67, 70

Matter of Nw. Recreational Activities, Inc.,
    8 B.R. 10 (Bankr. N.D. Ga. 1980) ..........................................................73

Menard–Sanford v. Mabey (In re A.H. Robins, Co.),
    880 F.2d 694 (4th Cir.) ............................................................................88

Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.),
    844 F.2d 1142 (5th Cir. 1988) ................................................................72

Town of Belleair, Fla. v. Groves,
    132 F.2d 542 (5th Cir. 1942) ..................................................................95

NAI-1542918500

**STATUTES**

11 U.S.C.

§ 101 ..............................................................................................................86
§ 105 ..............................................................................................................85
§ 349 ..............................................................................................................69
§ 502 ..............................................................................................................95
§ 524 ...................................................................................................... passim
§ 1102 ............................................................................................................56
§ 1112 .....................................................................................................62, 71
§ 1125 .................................................................................................71, 72, 79
§ 1126 ....................................................................................................passim
§ 1129 ..................................................................................................6, 7, 85

28 U.S.C.

§ 157 ..............................................................................................................69
§ 1334 ............................................................................................................69

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 2019 ...............................................................................15, 53

Fed. R. Bankr. P. 3016 .....................................................................................74

Fed. R. Bankr. P. 3017 ...........................................................................77, 79, 80

Fed. R. Bankr. P. 3018 ............................................................................ passim

Model Rule of Prof'l Conduct, R. 1.0 ................................................................45

Model Rule of Prof'l Conduct, R. 1.4 ................................................................36

Model Rules of Prof'l Conduct, R. 1.0 ..............................................................92

REPORT OF THE COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES,
H.R. Doc. No. 137, 93rd .............................................................................62

S. Rep. No. 95-989 (1978) S. Rep. No. 95-989, at 121 (1978), as reprinted in 1978
U.S.C.C.A.N, 5787, 5907 ...........................................................................72

NAI-1542918500

Red River Talc LLC (the "<u>Debtor</u>") submits this Pretrial Brief in support of the relief it seeks at the forthcoming combined hearing (the "<u>Combined Hearing</u>"), including, among other relief:  (a) denial of the pending motions to dismiss the above-captioned chapter 11 case (this "<u>Chapter 11 Case</u>"); (b) approval of the adequacy of the Debtor's disclosure statement (the "<u>Disclosure Statement</u>") and the procedures employed for the solicitation and tabulation of votes on the Prepackaged Chapter 11 Plan of Reorganization of the Debtor (the "<u>Initial Plan</u>" and, as amended, the "<u>Plan</u>");[2] and (c) confirmation of the Plan.

## PRELIMINARY STATEMENT

At the Combined Hearing, the Debtor will seek confirmation of the Plan, among other relief.  The Plan was supported by over ***83%*** of claimants (out of over 93,000 who voted on the Plan) as of the commencement of this Chapter 11 Case on September 20, 2024 (the "<u>Petition Date</u>").  Since that date, support for the Plan has only increased, with pending requests from counsel for over 1,600 claimants to change their votes from rejecting to accepting the Plan, as well as additional expected vote changes from firms who have signed agreements to support the Plan.[3]  In addition to the vast majority of claimants, confirmation of the Plan is supported by:  the Official Committee of Talc Claimants appointed in this case (the "<u>Committee</u>"); plaintiff firms that represent the accepting current claimants, including the Ad Hoc Committee of Supporting Counsel (the "<u>AHC</u>"); and Randi S. Ellis, the Court-appointed representative for future claimants (the "<u>FCR</u>"), among others.  This broad-based support for the Plan is not surprising given that claimants are projected to recover approximately ***twice as much*** as they would receive on their claims in the tort system.

---

[2]     Capitalized terms not otherwise defined herein have the meanings given to them in the Plan.

[3]     <u>See</u> Dkts. 328, 731.

The Plan proposes to establish the Talc Personal Injury Trust to process and pay "Channeled Talc Personal Injury Claims," which generally include all claims and demands asserted against the Debtor, J&J or any other Protected Party alleging injury from ovarian cancer and other gynecological cancers.[4]  The Talc Personal Injury Trust will be funded by a stream of payments over 25 years in the nominal aggregate amount of approximately $9 billion. Additionally, the Plan includes a commitment by J&J to separately pay into a qualified settlement fund an additional $650 million to resolve—for the benefit of the claimants—the contingent common benefit claims asserted by counsel in leadership positions in the talc multi-district litigation (the "MDL"), which otherwise would have been levied against the claimants' recoveries.

This proposed level of funding for the Plan constitutes one of the largest mass tort settlements in the history of the United States, and in fact is the largest asbestos settlement in United States history.  It has been the subject of mediation conducted by multiple mediators over the past three years, and has been extensively negotiated at arm's length with numerous plaintiff firms representing the substantial majority of claimants as well as with the FCR.  The Debtor and J&J have agreed to pay this historic amount, totaling approximately $10 billion, which is $1.75 billion more than proposed in the Initial Plan, even though, unlike most other bankruptcy resolutions of its kind, the Debtor and J&J:  (a) dispute that the products at issue caused injury and (b) suffered only one plaintiff verdict that survived appeal in more than ten years of litigation

---

[4]      The Plan does not resolve and will not affect (a) claims and demands alleging injury from mesothelioma or lung cancer, (b) claims and demands of governmental entities and (c) Canadian claims and demands, which were not allocated to the Debtor in the Prepetition Corporate Restructuring (as defined herein).  All holders of claims against the Debtor other than Channeled Talc Personal Injury Claims will be unimpaired by the Plan because the Plan does not modify their legal, equitable or contractual rights, other than by curing defaults and reinstating maturities.

(and the counsel who secured that verdict later settled his other claimants' claims for an amount far less than claimants stand to recover under the Plan).

The talc claims against the Debtor and J&J have no valid scientific basis. Johnson's Baby Powder and Shower to Shower products never contained asbestos, and the safety of cosmetic-grade talc has been confirmed by dozens of peer-reviewed studies and multiple regulatory and scientific bodies for decades. Nevertheless, the number of talc claims had inundated the Debtor's predecessors and J&J, burdening them with substantial and increasing defense costs and subjecting them to the continued possibility—as happened in the <u>Ingham</u>[5] case—of a lottery-like verdict. Indeed, the cost of defending and paying talc claims, by itself, caused the income of the former Johnson & Johnson Consumer, Inc. ("<u>Old JJCI</u>"),[6] to swing from a $2.1 billion profit in 2019 to a $1.1 billion loss in 2020.[7]

Old JJCI could have availed itself of chapter 11 at that time. But doing so would have placed at risk viable non-talc operations and affected the interests of myriad other parties unrelated to those operations—and for no reason and with no benefit to talc claimants. Accordingly, Old JJCI undertook a divisional merger to isolate the talc liability in the Debtor's predecessor, LTL Management LLC ("<u>LTL</u>") (later known as LLT Management LLC ("<u>LLT</u>")), secured funding from its affiliate to provide the talc claimants with more financial support than was previously available, and, in October 2021, LTL, which had been formed in the divisional

---

[5]     Twenty-two plaintiffs obtained a verdict of $4.69 billion that, although reduced in appeal, still resulted in a $2.25 billion judgment.

[6]     Old JJCI was a predecessor to the Debtor that, at that time was responsible for the talc claims.

[7]     During the five-year period preceding the filing of the 2021 Chapter 11 Case, Old JJCI paid between $10 million and $20 million in defense costs per month. Old JJCI also paid approximately $3.5 billion in indemnity costs in connection with settlements and verdicts. Talc-related costs consumed 34% of Old JJCI's total sales and 50% of its gross profit.

merger, commenced a chapter 11 reorganization to obtain an efficient and equitable resolution of all future talc claims.

But the claimants never were afforded the opportunity to vote on a plan of reorganization in that chapter 11 case.  A group of plaintiff firms that included the Beasley Allen Law Firm ("Beasley Allen") opposed the bankruptcy, repeatedly asserting that they would never consent to any bankruptcy resolution of their talc claims.  Based on motions to dismiss they and others filed, the case was later dismissed at the direction of the Third Circuit Court of Appeals.  In a decision in which the court described its own ruling as "ironic," the Third Circuit reversed the ruling of Judge Kaplan, concluding that the case was a bad faith filing because LTL, by virtue of the funding capability it had been provided in connection with the divisional merger, was not in imminent financial distress.

After LTL reached an agreement with plaintiff firms representing the majority of claimants, it filed for a chapter 11 reorganization a second time.  But the claimants again never were given the opportunity to vote on a plan—this time one that had been agreed to by multiple plaintiff firms representing tens of thousands of claimants.  Plaintiff firms (including Beasley Allen), representing a minority of the claimants in the case again moved to dismiss, and Judge Kaplan, constrained by the opinion of the Third Circuit in the first bankruptcy, dismissed the case due to an absence of imminent financial distress.  Judge Kaplan, however, expressly encouraged LTL and the claimant representatives to continue to pursue a consensual resolution in a different court.

LTL and counsel for claimants who supported a resolution in bankruptcy continued to negotiate and reached agreement on a plan.  They also agreed to pursue the plan on a prepackaged basis so the claimants could first be afforded the opportunity to vote whether to

accept the proposed plan—which they did by overwhelming numbers.  Only then, and after a

second divisional merger undertaken to facilitate the plan, did the Debtor commence this

Chapter 11 Case on the Petition Date.

A small group of objecting plaintiff firms, self-servingly called the Coalition for Justice

for Talc Claimants (the "Coalition") and led by Beasley Allen, has opposed virtually every aspect

of the bankruptcy case.  Although the Coalition had only six members as of the Petition Date, its

support apparently has dwindled to just two firms now:  Beasley Allen and Golomb Legal. P.C.

("Golomb Legal").  For reference, based on master ballots submitted in connection with

solicitation, approximately 200 plaintiff firms represent claimants in this case.

The Coalition has been on the offensive since the commencement of this case,

immediately moving to transfer venue and dismiss this case.  Further efforts followed to derail

resolution of this Chapter 11 Case, including among others, requests to designate all votes in

favor of the Plan, to reinstate the invalid Beasley Allen master ballot and to initiate burdensome,

time-consuming and unnecessary bar-date and estimation processes.  The Coalition also

challenged the appointment of the FCR, the retention of Epiq Corporate Restructuring, LLC

("Epiq") as the Debtor's solicitation agent, the retention of the Debtor's professionals and

numerous other aspects of this case.  The Coalition and Beasley Allen steadfastly maintained that

they would not support any bankruptcy resolution regardless of its terms or the level of support

received from the claimants and their respective law firms.  Only now, on the eve of trial, have

they publicly revealed a purported willingness to settle:  "The Coalition's objection is not to the

use of bankruptcy to resolve mass tort liabilities *per se*"; and "[t]he Coalition firms were and are

willing to support a bankruptcy resolution but only if the Debtor agrees to reasonable

terms . . . ."[8]  That revelation undermines the credibility of many if not all of the arguments the Coalition has advanced against the Plan and this case.

In the end, whether this case should be allowed to proceed and the Plan should be confirmed will turn on whether this case has a proper purpose, whether the Plan has been proposed in good faith, whether the Plan has been accepted by the requisite percentage of votes, and whether the other requirements of sections 1129 and 524(g) of title 11 of the United States Code (the "Bankruptcy Code") have been satisfied.  The size of the settlement embodied in the Plan is unprecedented; the claimant support is overwhelming.  Even if the outcome could be impacted by the votes Beasley Allen cast on behalf of its purported clients (it cannot), Beasley Allen's master ballot should be rejected.  *First*, as Beasley Allen's lead partner Andy Birchfield conceded at deposition, Beasley Allen voted to reject the Plan on behalf of thousands of non-ovarian gynecological claimants whose claims he testified were not accrued, were non-compensable and were not allowable.  *Second*, Mr. Birchfield admitted that, contrary to his Master Ballot certification under penalty of perjury, he did not obtain the informed consent of 8,500 claimants, but instead voted their claims by negative notice.  *Third*, and worse still, Mr. Birchfield testified that he voted on behalf of those gynecological non-ovarian claims to reject the Plan (depriving them of any recovery in bankruptcy if the requisite vote was not obtained) while advocating that they are not entitled to any recovery in the tort system (depriving them of any recovery outside of bankruptcy) and should not be entitled to vote in this case.  In an aggregate mass tort resolution like this, each counsel is under a duty to act in the best interests of

---

[8]     *The Coalition Of Counsel for Justice for Talc Claimants' Objection to Debtor's Motion to Extend the Exclusivity Period* [Dkt. 1040] ¶¶ 18-19.

its clients—but Beasley Allen acted in a manner calculated to deprive thousands of claimants (its own clients) of any recovery at all.

A chapter 11 reorganization is in the best interest of all parties.  Absent a chapter 11 resolution, the talc litigation would continue for decades, at great expense to the Debtor but with no benefit to claimants.  In contrast, the proposed resolution offers claimants an efficient, equitable and certain pathway to promptly resolve their claims and receive a recovery.  Only through bankruptcy can the claimants and the Debtor achieve a permanent resolution of both the massive number of current ovarian and gynecological cancer claims as well as all projected future claims in a manner that is fair and equitable to all parties.

This bankruptcy case provides the only pathway for the Debtor, J&J and the claimants to effectuate the agreement they painstakingly negotiated and memorialized in the Plan. The Debtor submits that the Plan satisfies all applicable requirements of the Bankruptcy Code, including sections 1129 and 524(g), and is in the best interests of all parties, including the claimants alleged to be represented by the opposition group.  That the vast majority of claimants agree is evidenced by the vote as well as the support of the Committee, the AHC and the approval of the FCR.  The Debtor respectfully submits that the Plan should be confirmed.[9]

---

[9]     On February 10, 2025, the Debtor filed the *Debtor's Memorandum of Law in Support of Confirmation of the Second Amended Prepackaged Chapter 11 Plan of Reorganization of Red River Talc LLC* [Dkt. 1075] (the "Confirmation Brief"), which the Debtor intended would serve as its pretrial brief with respect to confirmation issues.  A primary purpose of this Pretrial Brief is to summarize the facts relevant to the other relief to be considered by the Court at the Combined Hearing.  While this brief cites extensively to declarations, deposition testimony and other documents, the Debtor will establish the factual record in support of its requested relief at the Combined Hearing.

-7-

**RELEVANT FACTS**

I.     **HISTORIC TALC LITIGATION**

A.     **Ovarian Cancer Litigation**[10]

Only a small number of isolated cases involving cosmetic talc had ever been filed against Old JJCI and J&J before 2010.  Those cases alleged a range of claims, including talcosis due to substantial misuse of JOHNSON'S® Baby Powder ("Johnson's Baby Powder"), mesothelioma, dermatitis and rashes.  The number of claims began to increase significantly after the Berg (2013) and Fox (2016) trials.  Berg v. Johnson & Johnson, filed in December 2009, was the first case alleging ovarian cancer as a result of genital exposure to Old JJCI's cosmetic talc-based products.  The jury found for the plaintiff, but awarded no damages.  By the end of 2015, there were over 1,300 ovarian cancer lawsuits filed against Old JJCI and J&J.  Fox, the first St. Louis, Missouri ovarian cancer case, went to trial in February 2016.  The jury awarded the plaintiff $72 million dollars.  While ultimately overturned on appeal, the verdict sparked interest on the part of plaintiff lawyers.  Five more cases were tried in that venue over the next year and a half, resulting in plaintiff verdicts totaling more than $235 million dollars (in addition to a defense verdict and a mistrial).  All of those plaintiff verdicts subsequently were reversed on appeal.

The plaintiff lawyers at the vanguard of talc litigation against J&J and Old JJCI included Allen Smith of the Smith Law Firm (the "Smith Firm"), Anne Andrews of Andrews & Thornton and Jim Onder of OnderLaw.  The principal plaintiff firms objecting to confirmation of the Plan, Beasley Allen and Golomb Legal, were not involved.  Andy Birchfield of Beasley Allen and Richard Golomb of Golomb Legal have never tried an ovarian cancer talc case and have never

---

[10]     See *Declaration of John K. Kim in Support of Chapter 11 Case and Certain First Day Pleadings* [Dkt. 17] (the "First Day Declaration") ¶¶  57-72.

recovered a dime from J&J, the Debtor or its predecessors for their clients, whether through a judgment or settlement of a talc claim.[11]

By 2015, the centralization of talc cases was underway.  In May of that year, defendants submitted an application for centralized management of 103 pending cases in New Jersey, involving claims of more than 156 plaintiffs.  The Supreme Court of New Jersey responded by designating the cases as part of a multicounty litigation in Atlantic County, New Jersey (the "MCL").  The MCL remains pending.

In 2016, the United States Judicial Panel on Multidistrict Litigation ordered that pending and future personal injury or wrongful death actions in federal courts alleging that plaintiffs or their decedents developed ovarian cancer from the use of Johnson's Baby Powder and Shower to Shower body powder be transferred and centralized in the MDL pending in the New Jersey District Court.[12]

All of the ovarian cancer plaintiff verdicts to date have been reversed on appeal with the exception of one case known as Ingham.  Although the verdict in Ingham was reversed in part and reduced, the total damages award was still $2.69 billion.  In that case, the St. Louis, Missouri trial court had permitted the consolidation of 22 ovarian cancer plaintiffs, 17 of whom were nonresidents, for a single trial.  The jury found defendants Old JJCI and J&J liable for every claim, awarding compensatory damages in the aggregate amount of $550 million and punitive damages in the aggregate amount $4.1 billion.  On appeal, the punitive damages award was later reduced to $1.6 billion.

---

[11]   See Nov. 21, 2024 Andy Birchfield Dep. (the "Birchfield Dep."), 19:20 ("A. I have not tried a talc case."); Dec. 23, 2024 Richard Golomb Dep. (the "Golomb Dep."), 63:6-9 ("Q. … You have not tried a talc case as first-chair trial lawyer in your career, correct?  A. I have not.").

[12]   In addition to individual actions, two consumer class actions alleging that Johnson's Baby Powder and Shower to Shower were marketed for use without disclosure of talc's allegedly carcinogenic properties were included in the MDL.

To this day, the <u>Ingham</u> verdict remains the only adverse ovarian cancer verdict maintained—at least in part—through appeal.  In contrast to the lottery-like result in <u>Ingham</u>, none of the plaintiff firms objecting to confirmation of the Plan has recovered a dime for their clients in the tort system, whether by maintaining a judgment through appeal or by securing a settlement from J&J or the Debtor's predecessors.  Nevertheless, as of the commencement of this Chapter 11 Case, over 60,000 plaintiffs were asserting ovarian or other gynecological cancer claims against the Debtor in jurisdictions across the country, including more than 57,000 plaintiffs with claims pending in the MDL, over 2,800 plaintiffs with claims pending in the MCL and over 2,200 with claims pending in individual actions around the United States.[13]  Over 93,000 claimants, either directly or through counsel, voted on the Initial Plan.[14]

## B.    Gynecological Cancer Litigation

At the recent hearing on January 16, 2025, counsel representing the Coalition and its members claimed in response to the Court's questions that there is no scientific basis for gynecological cancer talc claims and that the Coalition's members had not filed gynecological cancer claims in court.  Counsel to the Coalition, for example, claimed that his understanding was "there is no filed-in-court case for a gynecological claim by anybody in the Coalition."[15]  He further assured the Court that "the Coalition members have definitely told clients who have gynecological claims that they have no scientific basis for those claims right now."[16]  Counsel to Golomb Legal claimed that "the history of the gynecological cases is there's no such thing."[17]

---

[13]     <u>See</u> Nov. 15, 2024 John Kim Dep. (the "<u>Kim Dep.</u>"), 109:6-11; 123:12-124:25.

[14]     <u>See</u> *Supplemental Declaration of Stephenie Kjontvedt of Epiq Corporate Restructuring, LLC Regarding the Solicitation and Tabulation of Ballots Cast on the Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [Dkt. 307] (the "<u>Supplemental Voting Declaration</u>") ¶ 6.

[15]     Jan. 16, 2025 Hr'g Tr. at 24:13-15 (statements of Mr. Glasser).

[16]     <u>Id.</u> at 25:2-5.

[17]     <u>Id.</u> at 37:23-24 (statements of Mr. Golomb).

-10-

He asserted that "the first time that there was such [a] thing as a gynecological cancer case" was when it was "made up out of whole cloth" by J&J conspiring with the AHC between January and April 2023.[18]  Counsel to Beasley Allen admitted that Beasley Allen had filed gynecological cancer cases "because of statute of limitations reasons" but denied that Beasley Allen had ever argued in court, or would ever argue in court, that gynecological cancers "are associated with genital talc use."[19]

Those representations of the Coalition and its members are demonstrably false.  There are currently over 1,000 gynecological cancer claims pending in the MDL and MCL.  And that number likely dramatically understates the total of pending gynecological cancer claims because plaintiff profile forms (which would identify disease type) are available for only approximately two-thirds of the plaintiffs in those proceedings.  To the Debtor's knowledge, Beasley Allen filed its first gynecological cancer talc claim in the MDL in 2015.  In 2018, Beasley Allen submitted over 3,800 votes on behalf of such claims in the Imerys bankruptcy.  Moreover, Beasley Allen contradicts its own statute-of-limitations justification by simultaneously taking the position that statutes of limitations do not run on gynecological cancer claims because they lack any scientific basis.[20]  For its part, Golomb Legal has filed gynecological cancer claims in the MCL, and one such gynecological cancer claim was even selected as a bellwether case in that proceeding.

As Mr. Golomb's statements made clear, these representations from the Coalition and its members were made in an effort to weave a false narrative for the Court.  That narrative suggests

---

[18]    Id. at 38:7-11.

[19]    Id. at 40:13, 40:22-41:1 (statements of Ms. O'Dell).

[20]    See Birchfield Dep., 185:10-23 ("A. I don't consider any of the claims that we voted to be time barred. Q. Because they haven't yet experienced an injury that you would say is compensable? … A. They have not yet sustained an injury that would support us filing a lawsuit in the tort system.  Q. So in your view the claim is yet to accrue?  A. Yes.").

a conspiracy between J&J and the AHC members to recruit legions of non-compensable gynecological cancer claimants and stuff the ballot box with their accepting votes in support of the Plan, drowning out the rejecting voices of ovarian cancer claimants.  Not only is this story untrue as a matter of historical fact, but the populations of ovarian cancer and gynecological cancer claimants voted overwhelmingly in support of the Plan in almost the same proportions, as described below.

## II.    FILING OF LTL BANKRUPTCY CASES

### A.    The Burden of Talc Litigation on Old JJCI

The rapid increase in talc-related litigation imposed a heavy financial burden on Old JJCI.  For the period from January 2020 through October 2021, when Old JJCI's successor, LTL, commenced its first chapter 11 case, Old JJCI was served on average with one or more ovarian cancer complaints every hour of every day, every single day of the week.[21]  "In the seven quarters of operations preceding the bankruptcy filing, the talc litigation led to financial statement charges totaling $5.6 billion and cash payments totaling $3.6 billion."[22]  Talc litigation charges accounted for 51% of sales, while actual talc litigation payments amounted to 122% of the pre-tax cashflows estimated to be generated by operations.[23]  "Old JJCI's income before tax for the business segment dropped from a $2.1 billion profit in 2019 to a $1.1 billion loss in 2020."[24]

---

[21]    See In re LTL Mgmt., LLC, 637 B.R. 396, 401 (Bankr. D.N.J. 2022), rev'd and remanded, 64 F.4th 84 (3d Cir. 2023).

[22]    Id.

[23]    Id.

[24]    Id.

NAI-1542918500

Old JJCI could itself have obtained chapter 11 relief.  But a chapter 11 filing by Old JJCI would not have served the interests of Old JJCI, the customers and suppliers of its non-talc operations or even talc claimants.  As the New Jersey bankruptcy court later questioned:

> Why is it necessary to place at risk the livelihoods of employees, suppliers, distributors, vendors, landlords, retailers—just to name a few innocent third parties—due to the dramatically increased costs and risks associated with all chapter 11 filings, when there is no palpable benefits to those suffering and their families?[25]

To address Old JJCI's talc liability while simultaneously preserving its viable non-talc operations and providing claimants with greater recourse, therefore, Old JJCI engaged in a series of transactions involving a divisional merger under Texas law (the "2021 Corporate Restructuring").  As a result of the 2021 Corporate Restructuring, Old JJCI ceased to exist, and two new companies were created:  LTL and Johnson & Johnson Consumer Inc. ("New JJCI").[26] The purpose of the restructuring was to globally and equitably resolve talc-related claims through a chapter 11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding.[27]  As a result of the restructuring, LTL was allocated substantially all of Old JJCI's talc-related liability and received rights under a funding agreement, pursuant to which New JJCI and J&J were obligated to pay costs and expenses of LTL during its chapter 11 case, including amounts necessary to fund a trust for the payment of claims, among other things.[28]

## B.    LTL's 2021 Chapter 11 Case

Consistent with the purpose of the 2021 Corporate Restructuring, promptly following its consummation, on October 14, 2021, LTL commenced a chapter 11 case in the Western District

---

[25]   Id. at 425.

[26]   Id. at 401.

[27]   Id. at 402.

[28]   Id.  New JJCI's and J&J's obligations arose only to the extent the assets of LTL were insufficient to fund such amounts and were capped at the value of New JJCI. Id.

NAI-1542918500

of North Carolina (the "2021 Chapter 11 Case").[29]  Thereafter, the 2021 Chapter 11 Case was transferred to the District of New Jersey.  Various parties filed motions to dismiss the case. The New Jersey bankruptcy court denied the motions, finding that filing a chapter 11 case with the goal of addressing current and future personal injury talc claims "to preserve corporate value is unquestionably a proper purpose under the Bankruptcy Code" and, further, the prospect of continued, costly talc-related litigation supported the need to consider a bankruptcy filing.[30] The Third Circuit, however, reversed, directing the New Jersey bankruptcy court to dismiss the 2021 Chapter 11 Case on the basis that LTL lacked imminent financial distress.[31]  Although the Third Circuit panel recognized that LTL "inherited massive liabilities" and faced "thousands" of future claims, it found LTL held "reliable" funding rights from "highly creditworthy counterparties."[32]  The Third Circuit panel acknowledged the "apparent irony" that, by providing the funding backstop to ensure LTL's ability to fund a chapter 11 plan, J&J had made LTL too financially robust for chapter 11.[33]  The 2021 Chapter 11 Case was dismissed on April 4, 2023 and formally closed on August 29, 2024.[34]

### C.  Mediation Commences in LTL's 2021 Chapter 11 Case

On March 18, 2022, the New Jersey bankruptcy court appointed Hon. Joel Schneider (Ret.) and Gary Russo as co-mediators in the 2021 Chapter 11 Case with authority to mediate a comprehensive resolution of issues related to talc personal injury claims against LTL's estate.[35]

---

[29]   In re LTL Mgmt. LLC, No. 21-30589 (Bankr. D.N.J.) (the "2021 Chapter 11 Case").

[30]   LTL Mgmt., 637 B.R. at 408.

[31]   In re LTL Mgmt. LLC, 64 F.4th 84, 106, 109 (3d Cir. 2023).

[32]   Id.

[33]   Id. at 110-11.

[34]   See 2021 Chapter 11 Case, Dkts. 3938, 3998.

[35]   See 2021 Chapter 11 Case, Dkt. 1780.  The New Jersey bankruptcy court amended its mediation order on May 16, 2022 [2021 Chapter 11 Case, Dkt. 2300] and, on May 27, 2022, appointed Hon. Donald H.

Throughout the 2021 Chapter 11 Case, LTL participated in mediation with the Debtor's key constituencies to negotiate a potential consensual resolution of the case.  Despite their efforts, however, no agreement was reached prior to the Third Circuit's decision requiring dismissal of the 2021 Chapter 11 Case.

Following the Third Circuit's decision, negotiations continued between LTL, J&J and various plaintiff law firms with the assistance of the court-appointed mediators and the encouragement of the New Jersey bankruptcy court.  Those negotiations ultimately culminated in plan support agreements with counsel to thousands of claimants on a broad outline of terms for a plan of reorganization, including financial terms, that, if confirmed and consummated, would fully resolve all the Debtor's liability for talc-related claims.

### D.    Mediation Continues in LTL's 2023 Chapter 11 Case.

In light of the widespread support LTL had gathered on the terms of a chapter 11 plan of reorganization, LTL commenced a second chapter 11 case in the New Jersey bankruptcy court on April 4, 2023 (the "2023 Chapter 11 Case").[36]  Reports that the New Jersey bankruptcy court required to be filed in the 2023 Chapter 11 Case under Rule 2019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") indicated that approximately 70% of claimants supported the proposed resolution at that time.[37]  Nevertheless, once again, various parties moved to dismiss the 2023 Chapter 11 Case.  Based on "the evidentiary record fixed at trial," the New Jersey bankruptcy court felt "constrained" to dismiss the 2023 Chapter 11 Case on the basis that the record did "not establish sufficient 'imminent' or 'immediate' financial distress to satisfy

---

Steckroth (Ret.) as co-mediator with respect to consumer protection claims held by the states [2021 Chapter 11 Case, Dkt. 2370].

[36]    In re LTL Mgmt. LLC, No. 23-12825 (Bankr. D.N.J.).

[37]    In re LTL Mgmt. LLC, No. 23-12825 (Bankr. D.N.J.) [Dkts. 470, 807] (Bankruptcy Rule 2019 disclosures of the AHC indicating that its members collectively represented more than 58,000 claimants).

-15-

the criteria enunciated by the Third Circuit."[38]  The New Jersey bankruptcy court recognized that the Third Circuit's novel requirement of "immediate," "imminent" and "apparent" financial distress could be viewed "as being somewhat at odds with a pro-active approach to trouble," prohibiting a putative debtor from seeking bankruptcy relief until it "sees flames."[39]  In addition, the New Jersey bankruptcy court found that there was "nothing speculative about the fact [LTL] faces substantial liability," even if the eventual cost to defend and resolve talc claims was unknown.[40]  Yet, "[g]iven the Circuit's focus on immediacy and certainty," the New Jersey bankruptcy court "abide[d] by" the Third Circuit's opinion and concluded that LTL lacked sufficient financial distress to avail itself of bankruptcy relief "at this time."[41]

**E.     Bankruptcy Court Encourages Parties to Continue Resolution Efforts Through Another Bankruptcy**

Notwithstanding the New Jersey bankruptcy court's ruling that it was required to dismiss the 2023 Chapter 11 Case under the standard established by the Third Circuit, the court once again lauded the "remarkable progress" the parties had made toward a "viable global settlement" that is "fair, efficient and expeditious," and Judge Kaplan "strongly encouraged" the parties to continue to "pursue a global resolution" through a chapter 11 plan "in a context other than this current bankruptcy case."[42]  That is exactly what the parties did.

During the 2023 Chapter 11 Case, it had become clear to LTL and J&J that the substantial majority of ovarian and gynecological cancer claimants desired a bankruptcy resolution of their

---

[38]     See In re LTL Mgmt. LLC, 652 B.R. 433, 436 (Bankr. D.N.J. 2023).

[39]     Id. at 444.  The New Jersey bankruptcy court further recognized that a "wait and see approach," from a financial restructuring perspective, "often gives rise to serious risks and increased costs that may threaten the viability of the business."  Id.

[40]     Id. at 444-45.

[41]     Id. at 446, 448.

[42]     Id. at 455.  The 2023 Chapter 11 Case was dismissed on August 11, 2023 and formally closed on January 6, 2025.  See 2023 Chapter 11 Case, Dkts. 1211, 1951.

claims that would result in the establishment of a trust to promptly and cost effectively pay their claims.[43]  To maximize that majority following dismissal of the 2023 Chapter 11 Case, LTL and J&J entered into an inventory settlement with Arnold and Itkin LLP.  Since 2020, LTL had reached resolutions with several plaintiff law firms representing ovarian cancer and gynecological cancer claims.[44]  It pursued that approach following dismissal of the 2023 Chapter 11 Case.  The Arnold and Itkin settlement, together with the other settlements since 2020, reduced the total number of ovarian and gynecological cancer talc claimants by approximately 21,700 for an average recovery of approximately $65,600 per claim, which was less than the estimated average recoveries under the Initial Plan, as discussed below.[45]

## III.   PREPETITION NEGOTIATIONS WITH CLAIMANT REPRESENTATIVES

### A.   Development of the Initial Plan

After LTL's 2023 Chapter 11 Case was dismissed, the members of the AHC engaged with LTL and J&J once again regarding a potential resolution of their claims.[46]  Negotiations with the AHC spanned several months and eventually incorporated Ms. Ellis, who had been the court-appointed FCR in LTL's bankruptcy cases, and who has since been appointed as FCR in this Chapter 11 Case.[47]  In connection with the negotiations, LTL responded to various information requests and addressed input from the AHC and Ms. Ellis and their respective counsel on the proposed terms of the Plan, including the proposed Talc Personal Injury Trust

---

[43]     See Wuesthoff Dep., 54:5-19.

[44]     See First Day Decl. ¶ 76; Disclosure Statement, § 3.1.

[45]     See id.

[46]     See Kim Dep., 29:15-30:15; Nov. 19, 2024 Richard Dickinson Dep. (the "Dickinson Dep."), 40:16-41:4; Nov. 14, 2024 Robert Wuesthoff Dep. (the "Wuesthoff Dep."), 52:8-11.

[47]     See, e.g., Debtor's Motion for an Order Appointing Randi S. Ellis as Legal Representative for Future Talc Claimants [Dkt. 318] (the "FCR Appointment Motion"), Ex. B; Order Appointing Randi S. Ellis as Legal Representative for Future Talc Claimants [Dkt. 529] (the "FCR Appointment Order").

NAI-1542918500

Agreement and Trust Distribution Procedures.[48]  These efforts culminated in the Initial Plan.[49]

The Initial Plan was supported by the AHC (representing the majority of claimants asserting

ovarian cancer-related and other claims related to gynecological cancers) as well as the FCR as

providing for the fair and reasonable treatment of their respective constituencies' claims.[50]

Support for the Initial Plan included support for a prepetition restructuring of LLT

following solicitation of the Initial Plan (the "Prepetition Corporate Restructuring"),[51] which

would be implemented through a Texas divisional merger and result in the formation of the

Debtor.  Although the vast majority of remaining ovarian cancer and non-ovarian gynecological

cancer claimants supported resolution of their claims through the establishment of a trust, other

claimants, including mesothelioma and lung cancer claimants and governmental entities—who

collectively hold claims in numbers dwarfed by the pending ovarian and gynecological cancer

claims—preferred to litigate or otherwise resolve their claims in other forums.[52]

LTL and J&J thus developed the Prepetition Corporate Restructuring to alleviate the

ovarian and gynecological cancer claimants' concern that a bankruptcy resolution could be

jeopardized or delayed by opposing claimant groups.[53]  The Prepetition Corporate Restructuring

would be accomplished by allocating:  (a) certain talc claims—including primarily ovarian and

gynecological cancer claims—to the Debtor; and (b) other talc claims—including primarily

---

[48]     First Day Decl. ¶¶ 118-119.

[49]     Id. at ¶ 120.

[50]     See Omnibus Objection of the Ad Hoc Committee of Supporting Counsel to Motions to Dismiss [Dkt. 426],
         ¶¶ 3, 5; see also First Day Decl. ¶ 8.

[51]     In December 2023, LTL changed its state of formation to Texas and its name to LLT Management, LLC.
         See Kim Dep., 14:12-15; Wuesthoff Dep., 52:23-53:8.

[52]     See First Day Decl. ¶ 35.

[53]     Id.

-18-

mesothelioma, lung cancer, governmental unit and Canadian claims to another newly created entity, Pecos River Talc LLC ("Pecos River").[54]

The Initial Plan proposed to establish the Talc Personal Injury Trust to promptly process and pay Channeled Talc Personal Injury Claims. The Initial Plan contained Trust Distribution Procedures that set forth in detail the methodology for processing and evaluating claims. These procedures use characteristics relevant to the valuation of similar talc claims in the tort system and were the product of extensive, arm's-length negotiations with claimant representatives. Unlike the results claimants have experienced in the tort system, holders of the Channeled Talc Personal Injury Claims who meet the requisite criteria under the Trust Distribution Procedures would receive substantial recoveries from the trust. Based on available data as well as information provided by plaintiffs' counsel, the Debtor anticipated that holders of pending Ovarian Cancer claims that qualify for payment under the Trust Distribution Procedures established for the Initial Plan would receive an average recovery of between $50,000 and $200,000, with the more likely average value being between $75,000 and $150,000.[55] These projected recoveries would substantially exceed settlements the Debtor and J&J paid to Ovarian Cancer claimants prepetition, which, net of administrative costs, ranged from $50,000 to $80,000.[56] As contemplated under the Initial Plan, the Talc Personal Injury Trust would be funded by a stream of payments payable over 25 years with a net present value of $6.475 billion.[57]

---

[54]   See Kim Dep., 18:17-24; see also Dickinson Dep., 51:3-7, 118:2-4; Wuesthoff Dep., 98:22-99:4; 125:12-23; 138:19-24.

[55]   See Disclosure Statement § 1.1(c).

[56]   See id.

[57]   See id. at § 1.1(a).

NAI-1542918500

B.       The Imerys/Cyprus Settlement

In parallel to formulation of the Initial Plan, LLT and J&J successfully negotiated a settlement with representatives of (a) Imerys Talc America, Inc. and its affiliated debtors (collectively, "Imerys"), (b) Cyprus Mines Corporation ("Cyprus") and its parent and (c) the future claimants' representatives and tort claimants' committees appointed in the Imerys/Cyprus debtors' respective chapter 11 cases, which are pending in the United States Bankruptcy Court for the District of Delaware.[58]  The purpose of the settlement, among other things, was to resolve any indemnification or other similar liability of LLT and J&J to the Imerys/Cyprus debtors in respect of talc claims asserted against them related to the talc-containing products of LLT and its predecessors.  Upon consummation, the Imerys/Cyprus settlement will:  (a) yield settlement proceeds to the Imerys/Cyprus debtors' estates of at least $505 million for the benefit of current and future talc claimants no later than December 31, 2025, according to the Imerys/Cyprus debtors; and, as a result, (b) provide enhanced recoveries to holders of the Channeled Talc Personal Injury Claims in this Chapter 11 Case that also have asserted or could assert claims against one or more of the applicable Imerys/Cyprus parties.[59]  Moreover, in addition to facilitating the resolution of this Chapter 11 Case, the Imerys/Cyprus settlement will pave the way for the Imerys/Cyprus debtors to successfully resolve their chapter 11 cases, certain of

---

[58]     In re Imerys Talc Am., Inc., No. 19-10289 (LSS) (Bankr. D. Del.); In re Cyprus Mines Corporation, No. 21-10398 (LSS) (Bankr. D. Del.).

[59]     See Joint Motion of the Imerys Debtors and the Cyprus Debtor for an Order (I) Approving the Settlement Agreement Between the Imerys Debtors, the Cyprus Debtor, Johnson & Johnson, and the Other Parties Thereto, and (II) Approving the Sale of Certain Rights, In re Imerys Talc Am., Inc., No. 19-10289 (LSS) (Bankr. D. Del. July 13, 2024) [Dkt. 6376] ¶ 3.

NAI-1542918500

which have been pending since 2019.[60]  The Delaware bankruptcy court approved the

Imerys/Cyprus settlement on October 31, 2024,[61] and the settlement has now become effective.[62]

## IV.   SOLICITATION OF THE INITIAL PLAN

On May 1, 2024, J&J announced the proposed Initial Plan "for the comprehensive and

final resolution of all current and future claims related to ovarian cancer arising from cosmetic

talc litigation" against the Company.[63]  J&J's announcement previewed that solicitation of

support for the Initial Plan would occur on a prepackaged basis before the commencement of any

chapter 11 case.[64]  An eight-week period for holders of Channeled Talc Personal Injury Claims to

vote on the Initial Plan began on June 3, 2024 and concluded on July 26, 2024.[65]  Although there

are six classes of Claims and Interests under the Initial Plan,[66] only holders of Channeled Talc

Personal Injury Claims in Class 4 and Equity Interests in the Debtor in Class 6 are impaired and,

thus, were entitled to vote to accept or reject the Initial Plan.[67]

---

[60]    See id.; see also First Day Decl. ¶ 84.

[61]    See Order (I) Approving the Amended and Restated Settlement Agreement Between the Imerys Debtors, the Cyprus Debtor, Johnson & Johnson, and the Other Parties Thereto, and (II) Approving the Sale of Certain Rights, In re Imerys Talc Am., Inc., No. 19-10289 (LSS) (Bankr. D. Del. Oct. 31, 2024) [Dkt. 6715].

[62]    See Notice of Effectiveness of Amended and Restated Settlement Agreement [Dkt. 1065].

[63]    See Johnson & Johnson Announces Plan by its Subsidiary, LLT Management LLC, to Resolve All Current and Future Ovarian Cancer Talc Claims Through a Consensual "Prepackaged" Reorganization, May 1, 2024, available at https://www.investor.jnj.com/news/news-details/2024/Johnson--Johnson-Announces-Plan-by-its-Subsidiary-LLT-Management-LLC-to-Resolve-All-Current-and-Future-Ovarian-Cancer-Talc-Claims-Through-a-Consensual-Prepackaged-Reorganization/default.aspx.

[64]    See id.

[65]    A voting deadline of September 19, 2024, at 4:00 p.m. (prevailing Central Time) was established for any ballot from the sole holder of Equity Interests in the Debtor in Class 6.  See Declaration of Stephenie Kjontvedt of Epiq Corporate Restructuring, LLC, Regarding the Solicitation and Tabulation of Ballots Cast on the Prepackaged Chapter 11 Plan of Reorganization of the Debtor [Dkt. 47] (the "Initial Voting Declaration" and, together with the Supplemental Voting Declaration, the "Voting Declarations") ¶ 15.

[66]    The classes of Claims and Interests in the Initial Plan are the same as the classes of Claims and Interests in the Plan.  See Disclosure Statement § 1.2.

[67]    See id.

A.      **Distribution of Solicitation Packages**

Beginning on June 3, 2024, LLT—on behalf of the Debtor and through Epiq as solicitation agent—distributed solicitation materials to the holders of Channeled Talc Personal Injury Claims or their counsel, if known.[68]  Each solicitation package included:  (a) a cover letter describing the contents of the solicitation package; (b) the Disclosure Statement with its exhibits, including the Initial Plan; (c) a copy of the appropriate ballot, voting instructions and Tabulation Procedures; (d) letters from the AHC and LLT recommending acceptance of the Initial Plan; and (e) a pre-addressed, postage prepaid return available, if applicable.[69]  A total of 692 solicitation packages were sent to plaintiff law firms and nine more to individual claimants for whom the Debtor had no record of any counsel.[70]  Law firms receiving a solicitation package were permitted to request that Epiq distribute copies of the solicitation materials (with or without a ballot) to their clients.[71]  In total, Epiq distributed a further 58,376 solicitation packages to individual claimants in response to requests from law firms and individuals.[72]

B.      **The Supplemental Notice Program**

In addition to the service of solicitation packages, LLT disseminated notice of the solicitation of votes on the Initial Plan through various media sources pursuant to a supplemental notice program developed by Dr. Shannon Wheatman of Signal Interactive Media LLC

---

[68]      June 3, 2024 was also the voting record date for holders of Channeled Talc Personal Injury Claims.  See Disclosure Statement § 9.1.

[69]      See Initial Voting Decl. ¶ 8.

[70]      See id. at ¶ 9.

[71]      See Master Ballot for Counsel to Holders of Channeled Talc Personal Injury Claims Voting on Prepackaged Chapter 11 Plan of Reorganization of the Debtor [Dkt. 47-2] (the "Master Ballot"), 3.

[72]      Initial Voting Decl. ¶ 11.  In addition, on June 28, 2024, Epiq served the Plan Supplement on 57,610 parties.  Id. at ¶ 9.

-22-

("Signal").[73]  The campaign cost approximately $9 million, ran from June 10 to July 12, 2024, and consisted of advertising via radio, newspapers, consumer magazines, television, internet banners, paid internet search listings and social media.[74]  The campaign provided notice in English and Spanish, reaching an estimated 95.8% of women 50 years of age and older and 85.3% of women 18 years of age and older.[75]  The Supplemental Notice Program was intended to ensure the broadest, yet most targeted and efficient, publication-noticing program practicable, and is consistent with noticing plans that have been approved by courts in other chapter 11 cases involving large numbers of claimants.[76]

The Coalition, through the expert report of Todd B. Hilsee, is challenging the sufficiency of the Debtor's Supplemental Notice Program.[77]  In her rebuttal report, Dr. Wheatman explains the information conveyed pursuant to the Supplemental Noticing Program was accurate and not misleading, as Mr. Hilsee argues.[78]  In addition, she refutes Mr. Hilsee's baseless and repeated assumption that the Supplemental Notice Program was developed by the Debtor or J&J, and not

---

[73]     See generally *Declaration of Shannon R. Wheatman, Ph.D. in Support of (I) Supplemental Notice Plan and (II) Report on Implementation of Supplemental Notice Plan* [Dkt. 48] (the "Wheatman Declaration").

[74]     See id. at ¶¶ 5, 31-56.

[75]     See id. at ¶ 61.

[76]     See id. at ¶ 73; see also In re Kaiser Gypsum Co., No. 16-31602 (JCW) (Bankr. W.D.N.C. Oct. 23, 2019) [Dkts. 1267, 1875] (approving notice plan for unknown asbestos claimants that included publishing notice in numerous consumer print publications, along with banner advertisements on major online advertising networks and social media platforms); In re Garlock Sealing Techs. LLC, No. 10-31607 (Bankr. W.D.N.C. Apr. 10, 2015) [Dkts. 4387, 4542] (approving notice plan for unknown asbestos claimants that utilized printed publication notices in multiple consumer and legal publications and television advertisements, both tailored to reach the specific unknown claimants at hand); In re the Flintkote Co., No. 04-11300 (MFW) (Bankr. D. Del. Feb. 17, 2015) [Dkts. 8710, 8768] (approving notice plan that included banner advertisement on popular internet sites, a nationwide distribution of a press release utilizing the internet, newspapers, radio and television and outreach to associations and unions that unknown claimants are likely to be members of); In re Specialty Prods. Holding Corp., No. 10-11780 (PJW) (Bankr. D. Del. Oct. 21, 2014) [Dkts. 5057-10, 5112] (approving notice plan that included a general publication notice in national newspapers and on the internet, a national press release and targeted mail outreach to relevant interested parties).

[77]     *Expert Report of Todd B. Hilsee* (Jan. 7, 2025) (the "Hilsee Report").

[78]     *Rebuttal Expert Report of Dr. Shannon Wheatman* (Jan. 28, 2025) (the "Wheatman Report") ¶ 22.

NAI-1542918500

Signal.[79]  In fact, the program was designed by Signal and reflected Dr. Wheatman's advice, as a leading expert in the field.[80]

There is also no basis for Mr. Hilsee's arguments that the Supplemental Notice Program provided inadequate information, including with respect to estimated claimant recoveries.[81] Adequate information was provided in the Disclosure Statement, which was among the materials to which the Supplemental Notice Program directed the public.[82]  The notices employed for the Supplemental Notice Program "provided clear, concise summaries of the Plan's key terms while directing claimants to the solicitation package for more detailed information."[83]  They "presented neutral information about the Plan, outlining its benefits, eligibility criteria, and potential outcomes.  They avoided bias, offering a fair representation of material facts to empower claimants to make informed decisions."[84]  As such, there is no basis for Mr. Hilsee's contrary assertions.

### C.    The Disclosure Statement

The Disclosure Statement included in the solicitation packages provided claimants with material information they required to make an informed decision on whether to vote to accept or reject the Initial Plan.  For example, the Disclosure Statement included information regarding: (a) the classification of claims and interests under the Initial Plan; (b) the estimated range of recoveries in dollars for claimants by disease type; (c) the effect of the Channeling Injunction and the assets that would be contributed to the Talc Personal Injury Trust; (d) the corporate and

---

[79]     Hilsee Report ¶¶ 13, 14, 20, 22(a)(iii); Wheatman Report ¶ 47.

[80]     Wheatman Report ¶¶ 47-48.

[81]     Hilsee Report ¶¶ 26, 30-39.

[82]     Wheatman Report ¶¶ 36-46.

[83]     Id. at ¶ 42.

[84]     Id.

NAI-1542918500

litigation history of the Debtor and its predecessors; (e) the then-anticipated Prepetition

Corporate Restructuring; (f) the Chapter 11 Case; (g) the Initial Plan and Trust Distribution

Procedures; (h) the solicitation and tabulation procedures, including the Debtor's request that

each disputed, contingent and unliquidated Channeled Talc Personal Injury Claim be estimated in

the amount of $1.00 solely for purposes of voting on the Initial Plan; (i) various risk factors;

(j) the Initial Plan's release, injunction and exculpation provisions in bold, capitalized font; and

(k) the federal income tax consequences of the Initial Plan.[85]

### D.    Direct and Master Ballot Voting

In accordance with the solicitation procedures described in the Disclosure Statement, law

firms were permitted either to request that individual ballots be sent to their clients to be returned

directly to Epiq or else to submit their clients' votes via master ballots.[86]  The solicitation

packages distributed to law firms included a master ballot and template exhibit.[87]  Each master

ballot included instructions concerning how to complete the ballot or, in the alternative, the

process for requesting that Epiq send individual ballots to the firm's clients.[88]  Individual

claimants could return their ballots via mail or using Epiq's internet-based balloting portal

(the "E-Ballot Portal").[89]  Law firms submitting master ballots were required to use the E-Ballot

Portal.[90]  Both the individual and master ballots included appropriate questions regarding the

type of disease asserted by the applicable claimants and their alleged use of one or more talc-

---

[85]     See Disclosure Statement, Art. I-XI.

[86]     See id. at Art. IX.

[87]     Master Ballot, 4.

[88]     Initial Voting Decl., Ex. 1.

[89]     Id.

[90]     Master Ballot, 3.

NAI-1542918500

containing products formulated, manufactured, distributed, and/or sold by the Debtor and/or any Debtor Corporate Party.[91]

The ballots also required that the executing party make certain certifications under penalty of perjury.[92]  Individual claimants certified, for example, that they had (a) received the solicitation package, (b) a reasonable belief that they hold a Channeled Talc Personal Injury Claim and (c) a reasonable belief that the information they provided was accurate.[93] Additionally, law firms submitting master ballots were required to certify as to their authority to vote on behalf of their clients.[94]  With respect to each such client, the executing attorney certified whether the firm had:  (a) "collected and recorded the vote of such Client . . . or . . . obtained authority to procedurally cast such Client's vote" and received "such Client's informed consent with respect to such vote" (the "Option A Certification"); or (b) "the authority under a power of attorney to vote … on behalf of such Client's Channeled Talc Personal Injury Claim" (the "Option B Certification").[95]

### E.  Counter-Solicitation Campaign by Small Number of Objecting Firms

Despite the Initial Plan's clear benefits for claimants, a small number of law firms, led by Beasley Allen, opposed any bankruptcy resolution of the talc claims.  Beasley Allen partner Andy Birchfield has been the most vocal opponent of any resolution in bankruptcy, steadfastly maintaining—until recently—that he would not support any bankruptcy settlement regardless of its terms or the level of support received from the claimants and their law firms.

---

[91]     Id. at 6; *Direct Ballot for Holders of Channeled Talc Personal Injury Claims Voting on Prepackaged Chapter 11 Plan of Reorganization of the Debtor* [Dkt. 47-8] (the "Direct Ballot"), 6-7.

[92]     Master Ballot, 7-8; Direct Ballot, 7-8.

[93]     Direct Ballot, 7-8.

[94]     Master Ballot, 7.

[95]     See id.; see also Kim Dep., 185:10-13.

During the eight-week solicitation period, Beasley Allen alone sent seven or eight mass mailings to its clients regarding the Initial Plan.[96]  That mail campaign was supported by virtual town hall meetings, email blasts, texts and phone calls.[97]  In addition, on July 15, 2024, just 11 days before the voting deadline, Mr. Birchfield and Mike Papantonio of former Coalition member, Levin Papantonio Proctor Buchanan O'Brien Barr Mougey P.A., sent an open letter via email blast to "a significant amount of the mass tort plaintiffs' bar" attempting to name and shame every law firm that had determined that supporting the Initial Plan was in the best interests of its clients.[98]  In so doing, they suggested that such firms' "chosen profession should involve selling used cars or penny stocks."[99]  Mr. Birchfield and Mr. Papantonio went so far as to publish videos drumming up support for their fight against a successful claimant vote and disparaging this Court.[100]  These actions and statements lay bare the surrounding circumstances during the period when the Initial Plan was being solicited and the information that was being put in front of claimants.

Mr. Birchfield testified that, if the LLT bankruptcy resolution went forward, the MDL steering committee, of which Beasley Allen is a member, stood to lose the ability to control a

---

[96]     Birchfield Dep., 30:6-15 ("Q. How many … solicitations did you send out to your claimants relating to the proposed plan by Red River from May 1st through July 26, 2024?  A. If you're talking about letters that were sent out by Beasley Allen to all of our claimants, then that would be, I believe, seven or eight claimants letters.").

[97]     Id. at 30:16-31:6 ("Q. Did you communicate with your clients relating to the solicitation, the proposed plan, in any means other than by letter?  A. Yes.  … Through … virtual town hall … meetings, … through e-mail and text, through phone calls.").

[98]     Id. at 232:11-14 ("A. We sent out this e-mail and we listed those who had … lent their support to J&J bankruptcy.").

[99]     Id. at 233:6-11 ("Q. Mr. Birchfield, do you view 'perhaps their chosen profession should involve selling used cars and penny stocks' to be a flattering statement?  A. No, I don't consider it to be a flattering statement.").

[100]    Id. at 236:19-20 (purpose of posting video referring to, among other things, "horrible reputation because of the indictments" of "bankruptcy process in Texas" was to "raise attention to what was going on").

NAI-1542918500

share of the trust funding through the MDL common benefit fund.[101]  Pursuant to the MDL's case management order, 8% to 12% of gross talc settlement amounts for clients of participating counsel must be deposited into the common benefit fund, and that money is then to be allocated to the firms that performed common benefit work.[102]  Importantly, these common benefit fund payments are on top of the contingency fee that Beasley Allen charges its clients directly.  As a result, with respect to the approximately $9 billion proposed trust funding in the Plan, Beasley Allen could lose its share of hundreds of millions of dollars that would go into the common benefit fund, if that money were part of a settlement in the MDL.[103]

## V.  THE PREPETITION CORPORATE RESTRUCTURING

As of July 26, 2024, and before Epiq had conducted its deduplication review and elimination of defective ballots, Epiq had received ballots reflecting a total of 97,633 Class 4 votes.[104]  More than 70% of those votes had been cast in favor of the Initial Plan.[105]  That total included almost 11,500 votes cast to reject the Initial Plan on a master ballot submitted by Beasley Allen, which was immediately suspicious to LLT and J&J.  The preliminary results of voting, together with the LLT's and J&J's suspicions regarding Beasley Allen's 11,500 rejecting votes, convinced LLT and J&J that overwhelming support existed for the Plan, and they would have ample votes to confirm it.  LLT and J&J thus decided that they should proceed with the Prepetition Corporate Restructuring while the tabulation process was underway in preparation for a chapter 11 filing.

---

[101]    See Birchfield Dep., 103:3-106:5.

[102]    See Case Management Order No. 7(A), MDL No. 16-02738 [Dkt 14741].

[103]    Birchfield Dep., 103:24-106:5.

[104]    See Supp. Voting Decl. ¶ 6.

[105]    See id. at  ¶¶ 5, 10.

The Prepetition Corporate Restructuring was completed on August 19, 2024.[106]  It was implemented through a series of steps, including:  (a) the conversion of LLT's parent, Johnson & Johnson Holdco (NA) Inc., from a New Jersey corporation to a Texas limited liability and a change of its name to J&J Holdco (NA) LLC ("Holdco (Texas)"); (b) the merger of LLT with and into Holdco (Texas), with Holdco (Texas) as the surviving entity; and (c) the divisional merger of Holdco (Texas) under Texas law.[107]  As a result of that restructuring Holdco (Texas) ceased to exist and three new Texas limited liability companies were created:  (a) the Debtor; (b) Pecos River; and (c) New Holdco (Texas) LLC.[108]

The Debtor is responsible for all Channeled Talc Personal Injury Claims and was formed to effectuate the terms of the Plan.[109]  The Debtor also oversees the operations of its wholly-owned subsidiary, Royalty A&M LLC ("Royalty A&M"), a Texas limited liability company.[110]  Royalty A&M owns a portfolio of royalty revenue streams, including royalty revenue streams based on third-party sales of LACTAID®, MYLANTA® / MYLICON®, ROGAINE®, and TENA® products as well as certain products marketed by CLOROX®, ECOLAB®, ESSITY®, and SPARTAN®.[111]

The Debtor is party to two funding agreements, which were key components of the Prepetition Corporate Restructuring and became effective immediately upon the commencement of this Chapter 11 Case.[112]  Under one of these agreements (the "Indemnity Funding

---

[106]   See Dickinson Dep., 101:14-102:7; Wuesthoff Dep., 124:4-6.

[107]   See Dickinson Dep., 115:17-119:6.

[108]   See Kim Dep., 332:22-4; Dickinson Dep., 116:21-25.

[109]   See Dickinson Dep., 23:20-24:2; 48:24-49:3; Wuesthoff Dep., 102:8-12.

[110]   See Dickinson Dep., 11:15-17; Wuesthoff Dep., 14:20-22.

[111]   See First Day Decl. ¶ 39.

[112]   See Kim Dep., 38:13-22; Dickinson Dep., 104:23-25; Wuesthoff Dep., 42:4-11; 82:16-20.

NAI-1542918500

Agreement"), funding is available to the Debtor in the amount necessary to provide funding to the Talc Personal Injury Trust or, if the Plan does not become effective under certain circumstances, to pay Debtor Talc Related Liabilities established by judgment of a court of competent jurisdiction or a final settlement and, in any case, to pay Debtor Talc Related Liabilities established under any Master Settlement Agreement.[113]  Under the other agreement (the "Expense Funding Agreement"), New Holdco is obligated to provide funding to the Debtor to pay any and all costs and expenses of the Debtor incurred during the pendency of this Chapter 11 Case, including the cost of administering it, as well as certain other costs and expenses such as costs and expenses after the Chapter 11 Case has been closed or, if applicable, dismissed, as well as other distributions or cash payments to be made by the Debtor pursuant to the Plan (other than contributions to the Talc Personal Injury Trust).[114]  The Expense Funding Agreement is not subject to any funding limits.

## VI.    NEGOTIATIONS CONTINUE WITH OBJECTING LAW FIRMS

### A.    Claimants Reach Out to LLT and J&J Following the Voting Deadline.

LLT was aware that the process for tabulating votes on the Initial Plan would take several weeks given the need to verify each ballot and identify duplicate votes and defects among the more than 90,000 submissions.  From the outset, therefore, LLT and J&J targeted August 23, 2024 as the date by which the tabulation would be completed and the Debtor would be prepared to commence this Chapter 11 Case.[115]

---

[113]    See First Day Decl., Ex. E (Indemnity Funding Agreement).

[114]    See id. at Ex. G (Expense Funding Agreement).

[115]    See Haas Dep., 128:6-12 ("[W]e were targeting August 23rd, because that was the date we had previously announced that -- votes would come in the 26th, we figured it would take about till August 23rd that they would be able to reconcile everything in the regular course"); see also Murdica_RRT_00000087-88 (August 21, 2024 email from Richard Golomb of Golomb Legal to Jim Murdica referencing potential filing on "Friday [August 23, 2024] or before").

-30-

Immediately following the solicitation period on July 27, 2024, as tabulation of the vote was getting underway, Mikal Watts of AHC member Watts Law Firm LLP contacted J&J and proposed further negotiations among the Debtor, J&J and law firms that continued to object to the Plan.[116]  Further mediation in the interests of potentially achieving near unanimous support for the Plan was proposed.  All sides agreed that LLT had authority to extend the voting deadline for the parties under the plain terms of the solicitation procedures, as Mr. Birchfield conceded at his deposition,[117] and that it would do so as to those parties to allow for additional negotiations to proceed.[118]

An initial, two-day mediation pursuant to claimant counsels' request occurred on August 2-3, 2024 and involved Beasley Allen and Golomb Legal, among others.[119]  During that session, the parties developed the terms of a settlement that was memorialized in a memorandum of understanding, the material terms of which later became the basis for the amended Plan.

---

[116]   See Nov. 23, 2024 James Murdica Dep. (the "Murdica Dep."), 30:7-17 (recounting July 27, 2024 telephone conversation with Mikal Watts where Watts prevailed on "the Debtor and J&J to meet with Andy [Birchfield] and the other opposition to try to come up with a deal before the vote was certified so that we could file bankruptcy with unanimous support."); Haas Dep., 127:16-23 ("A. And when the votes came in on July 26th … within days, we heard from the objecting plaintiff law firms … that they were interested in mediation and further discussions.").

[117]   See, e.g., Birchfield Dep., 140:12-14 ("A. I read that … the Debtor may have the discretion to extend the voting deadline."); see also Master Ballot, 3 (fixing the Voting Deadline "[u]nless such time is extended by LLT . . ."); id. at 10 (stating that votes will not be counted if received after the voting deadline "and such Voting Deadline is not extended by LLT or the Debtor, as applicable"); id. at 21 (stating that any ballot received after the Voting Deadline would not be counted "unless LLT has granted an extension of the Voting Deadline with respect to such ballot.").

[118]   See Haas Dep., 194:8-15 ("A.  The initial deadline was July 26th of 2024.  The master ballot and materials in connection with the solicitation made clear that we have the discretion to extend the deadline out to LLT, the Debtor and J&J … and we did so in order to accommodate the negotiations."); see also id. at 133:3-10 ("A. . . .We had agreed to extend the voting deadline at – until the 23rd at the request of the plaintiff law firms.  We were willing to extend it to another point, but only to a certain point.  So in the end, it was my determination that September 20th was a date to be filed.").

[119]   Murdica Dep., 31:13-19 ("A. … It was primarily Andy Birchfield and people from Papantonio's office, Golomb, Warren Burns ultimately that we met with.  Q. All right.  That's a meeting that you had, I guess, on August 2nd in New York?  A. I believe it was August 1st and August 2nd …"); id. at 233:10-12 ("Q.  Well, this meeting occurred August 2nd and 3rd, right?  A. That particular one did, yes.").

NAI-1542918500

The memorandum of understanding called for J&J's and the Debtor's provision of an additional $1.75 billion to obtain a full and final resolution of all Channeled Talc Personal Injury Claims. The proposed $1.75 billion in additional consideration consists of: (a) $1.1 billion to be paid into the Talc Personal Injury Trust pursuant to the Plan and (b) an additional $650 million to be paid by J&J outside the Plan to resolve the contingent common benefit claims asserted by MDL leadership, thereby further maximizing claimant recoveries.

Discussions among the parties continued following the initial mediation session.[120] As the previously announced August 23 date approached, the objecting law firms, which included Beasley Allen and Golomb Legal (as well as the Smith Firm and other firms that have since agreed to support the Plan) requested more time.[121] J&J agreed but insisted on updating the public regarding the timing of the voting extension.[122] Acknowledging that requirement, on August 21, 2024, Richard Golomb sent an email to Jim Murdica offering to "work with you on a statement of why you're not filing Friday or before."[123] Thereafter, on August 23, J&J issued its press release titled "An Update on Plan Certification Timeline,"[124] which provided as follows:

> [P]laintiffs' attorneys who have opposed the plan reached out to engage in negotiations with the Company. ***These lawyers***, who attest that they represent the majority of claimants who oppose the Plan, ***requested that the claims administrator pause the Plan's***

---

[120]   Haas Dep., 127:23-128:16 ("Those discussions continued in parallel. So the terms of the deal were being worked out. . . . And right as we were getting up to August 23rd, we had mediated earlier, we had a mutual resolution. The Smith Firm, the other firms were working in parallel."); Murdica Dep., at 53:4-17 (discussing ongoing negotiations "[d]uring the period August 5 through August 23rd").

[121]   See Haas Dep., 128:16-22 ("And August 23rd, the Coalition with Beasley Allen reached out and said we would like to continue negotiations, can we make clear that the deadline for certification will not be set and will not end before those discussions continue").

[122]   Id. at 301:16-20 ("Q. [T]he statement was to pause while negotiations were continuing? A. Yeah. And that's exactly why we put out a statement on August 23rd.").

[123]   Murdica_RRT_00000087-88 (August 21, 2024 email from Richard Golomb of Golomb Legal to Jim Murdica).

[124]   Press Release, *An Update on Plan Certification Timeline*, Aug. 23, 2024, available at https://www.factsabouttalc.com/_document/an-update-on-plan-certification-timeline?id=00000191-7fb8-d2de-a5d3-7fbbe6720000.

***certification***.  This will allow these plaintiffs' attorneys time to speak to their claimants to now consider supporting the Plan.  ***We have agreed to a short extension of the certification timeline to accommodate this request***.[125]

Consistent with the August 23, 2024 press release, on that day, counsel to the Debtor instructed Epiq to freeze the tabulation process while negotiations were ongoing.[126]

### B.    Developments After August 23, 2024

Notwithstanding that Beasley Allen and Golomb Legal had negotiated the terms of the memorandum of understanding providing for an addition $1.75 billion in consideration to support the Plan, they refused to execute the agreement after August 23, 2024.  The impasse among the parties continued until the Smith Firm approached the Debtor and J&J separately.[127] The Smith Firm is a joint venture partner with Beasley Allen for substantially all of Beasley Allen's 11,500 voting clients, and also co-counsel with Golomb Legal for several hundred of its voting clients.[128]  Allen Smith was one of the first lawyers to bring talc litigation against J&J and Old JJCI over a decade ago.[129]  He had been involved in negotiations with J&J and LLT prior to solicitation of the Initial Plan, and he had supported Beasley Allen's and Golomb Legal's rejection of the Initial Plan on behalf of his clients.[130]  Mr. Smith believed that Beasley Allen and Golomb Legal should not have rejected the Debtor and J&J's additional $1.75 billion offer, which he believed to be in the best interests of the Smith Firm's clients.[131]

---

[125]     Id. (emphasis added).

[126]     See RedRiver-0009240 (August 23, 2024 email from Debtor's counsel instructing Epiq to "take no further action toward finalizing tabulation until you receive further instruction from us").

[127]     See generally Haas Dep., 126:25-129:5.

[128]     *Declaration of R. Allen Smith, Jr.* [Dkt. 306-4], ¶ 5-10.

[129]     Id. at ¶ 3 ("I am the first attorney to file a case. . . alleging that J&J's talcum powder-based products caused ovarian cancer.").

[130]     Id. at ¶ 13-14.

[131]     Id. at ¶ 17.

NAI-1542918500

Mr. Smith thus approached the Debtor and J&J to continue negotiations. Those negotiations resulted in the parties' entry into a memorandum of understanding (the "Smith MOU").[132] The Smith MOU reflected and expanded upon the terms of the Debtor and J&J's prior memorandum of understanding with objecting firms that afforded substantial incremental consideration for claimants, including (a) the additional $1.1 billion to be paid to the Talc Personal Injury Trust to fund talc claims subject to the individual review process, (b) the contribution from J&J in the amount of $650 million outside of the Plan into a qualified settlement fund for use in resolving any common benefit fund claims arising from the MDL and (c) expedited payments to certain claimants from the Talc Personal Injury Trust even before all potential appeals of any order confirming the Plan are exhausted.[133] On September 4, 2024, after reaching agreement with Mr. Smith on the terms of the Smith MOU, J&J issued another press release clarifying for the public the status of negotiations and the timeline for finalizing the vote count:

> *As reported in late August, the Company paused the count* and certification of votes on the Plan *at the request of counsel at plaintiff law firms who had initially stated their opposition to the Plan.* These counsel, who included Allen Smith, sought additional time to negotiate a resolution of their objections. The negotiations culminated in an agreement by Smith to recommend the Plan to his clients in exchange for the Company's agreement to convey additional monetary and non-monetary benefits for all talc claimants in a confirmed Plan. The new terms benefit all talc claimants and will be made public when the vote is certified. Taking into account these new developments, *the Company expects the final count and certification of the Plan to be completed later this month.*[134]

---

132    Id. at ¶ 18.

133    See Murdica Dep., 80:5-9; 103:16-19; 224:14-225:10; Kim Dep., 219:17-220:11; Wuesthoff Dep., 38:17-24.

134    Press Release, *Plan for Talc Resolution Receives Additional Support From Plaintiff Law Firm That Represents Approximately 12,000 Claimants*, Sept. 4, 2024, available at https://www.factsabouttalc.com/_

### C.    Beasley Allen Obstructed the Smith Firm's Efforts to Communicate the Benefits of the Revised Plan to Their Joint Clients.

Beasley Allen obstructed Mr. Smith's efforts to communicate with their joint clients to convey to them his belief that the Plan, as amended consistent with the Smith MOU, was in their best interests.  While Beasley Allen was generally responsible for client contact under the parties' joint venture agreement, the Smith Firm was also authorized to contact their joint clients.[135] For weeks prior to September 11, 2024, Mr. Smith had been proposing to Mr. Birchfield that they send a joint communication to their shared clients conveying their differing views on acceptance of the Plan, as amended.[136]  Mr. Birchfield refused to send the joint letter.[137]  Mr. Birchfield also refused to provide Mr. Smith with an updated client contact list to allow Mr. Smith to contact their clients directly.[138]  In place of the Smith Firm's requested joint letter, Beasley Allen eventually sent out a letter unilaterally recommending against Mr. Smith's view.[139]  As a result of Beasley Allen's stonewalling, on September 10 and 11, 2024, Mr. Smith used the best contact information available to him to reach out to his joint clients to recommend that they vote in favor

---

document/plan-for-talc-resolution-receives-additional-support-from-plaintiff-law-firm-that-represents-approximately-12-000-claimants?id=00000191-bea8-d9bc-afb9-fffbda8c0000.

[135]    Birchfield Dep., 81:9-17 ("A. I don't think that there's anything in the joint venture agreement that would -- that would have precluded, you know, the Smith Law Firm or Allen Smith from contacting, you know, clients in general.").

[136]    Nov. 21, 2024 R. Allen Smith, Jr. Deposition (the "Smith Dep."), 182:12-18 ("A. … I had been trying for weeks and weeks to prevent exactly what happened.  I reached out to Beasley Allen, specifically to Andy Birchfield and said, 'We jointly represent these clients.  We have two differing opinions, and reasonable people can have two differing opinions about something.  Let's send out a single communication.  You can do the pros; I can do the cons.'").

[137]    Birchfield Dep., 248:12-18 ("Q. Mr. Smith repeatedly asked you to communicate jointly because you have a joint representation -- to communicate jointly with your clients and you refused, right?  A. I did decline to send a joint letter with Mr. Smith.").

[138]    Id. at 249:6-10 ("Q. He asked you for a contact list?  A. He did ask for a contact list.  Q. You refused?  A. I did not provide him with a contact list in response to his request.").

[139]    Smith Dep., 182:19-24 ("A. … I asked them to do this jointly to prevent the things that you're asking me. And that was never responded to.  And instead, Beasley Allen sent out a unilateral letter just -- with just the cons and nothing else.").

-35-

NAI-1542918500

of the Plan, as amended.[140]  The Debtor's expert, Mr. Gentle, concluded that Mr. Birchfield's

failure to respond to, and interference with, Mr. Smith's efforts to communicate his views

regarding the Plan with their joint clients was inconsistent with Model Rule of Professional

Conduct 1.4 and state analogs because both Mr. Smith and Mr. Birchfield had an obligation to

ensure that their joint clients were informed about material developments related to their

claims.[141]

>        **D.      The Smith Firm's Superseding Master Ballot**

Having entered into the Smith MOU, the Smith Firm submitted a master ballot under its

authority as counsel to the clients jointly represented by itself and Beasley Allen or Golomb

Legal, as applicable.[142]  Pursuant to that ballot, the substantial majority of the Smith Firm's

clients voted to accept the Plan.  Like substantially all law firms other than Beasley Allen and

Golomb Legal, Mr. Smith understood that voting with "informed consent" under the Option A

Certification required firms to "have somebody physically . . . call in, e-mail in, write in, go to a

portal and affirmatively vote."[143]  Mr. Smith also understood that he was authorized to vote on

behalf of the Smith Firm's joint clients pursuant to the Option B Certification under the authority

provided the Smith Firm in applicable engagement letters.[144]  This authority derives from "the

general authority" in the agreements "to prosecute the cases" of clients as the Smith Firm "saw

---

[140]      Id. at 59:23-60:4 ("A. On September 10th and 11th, as I stated here in my declaration, I used the best
contact information available to me and my firm and sent letters and e-mails to our talc clients
recommending the vote on the revised plan.").

[141]      *Expert Report of Mr. Edgar Gentle for the Debtor* (Jan. 7, 2025) (the "Gentle Debtor Report"), ¶¶ 54-62.

[142]      See First Day Decl. ¶ 130.

[143]      Smith Dep., 107:21-24.

[144]      Id. at 112:17-22 ("A. … I was familiar with the engagement letters that Beasley Allen signed our clients up
on.  I was comfortable that it gave us the power of attorney in this situation."); id. at 122:24-123:3 ("A.
There was a power of attorney section. I read it and I was comfortable with a general responsibility to do
what I did.").

fit in their best interest."[145]  In fact, with respect to the clients with whom the Smith Firm and

Golomb Legal have a co-counsel relationship, Mr. Golomb had assured himself that the Smith

Firm's power of attorney authority was satisfactory before agreeing to vote on the Smith Firm's

behalf in Golomb Legal's original master ballot.[146]

The Debtor was authorized to accept the Smith Firm's master ballot under several

provisions of the Tabulation Procedures.  The Smith Firm's master ballot was received on

September 16, 2024, before the voting deadline, as extended by the Debtor, and was the

last-executed valid ballot with respect to the claimants identified thereon.  The ballot was thus

timely and constituted a proper superseding ballot changing the votes of the applicable clients on

the Plan pursuant to Paragraph 4(c) of the Tabulation Procedures.[147]  In addition, the Smith

Firm's master ballot was valid under Paragraph 4(d) of the Tabulation Procedures.[148]  Because

the Smith Firm and Beasley Allen are party to a joint venture agreement, the firms jointly were

the "authorized representative" for their shared clients and were each entitled to submit a

superseding master ballot by the voting deadline "or such later date as may be agreed by LLT or

---

[145]    Id. at 125:17-19.

[146]    Golomb Dep., 44:18-22 (stating that he voted "at the request of two referral lawyers," including the Smith Firm "after a conversation that I had with them to assure me that they had sufficient power of attorney to meet Option B."); id. at 45:10-13 (Mr. Golomb confirming that he "talked to them to assure" himself "that they had the authority to vote under Option B").

[147]    Tabulation Procedures, ¶ 4(c) ("[a]ny holder of a Channeled Talc Personal Injury Claim who submits a *properly completed superseding ballot or withdrawal of a ballot on or before the Voting Deadline* will be presumed to have sufficient cause, within the meaning of Bankruptcy Rule 3018(a), *to change* or withdraw *such claimant's or interest holder's acceptance or rejection of the Plan*.") (emphasis added).

[148]    Id. at ¶ 4(d) ("[i]f the Solicitation Agent receives more than one ballot from the same holder of a Channeled Talc Personal Injury Claim *(or from the same authorized representative representing the same holder of a Channeled Talc Personal Injury Claim)* for the same Channeled Talc Personal Injury Claim, in the absence of contrary information establishing which ballot is valid as of the Voting Deadline *(or such later date as may be agreed by LLT or the Debtor)*, the last-executed, otherwise valid ballot that is received before the Voting Deadline shall be the ballot that is counted.  Multiple Master Ballots may be completed and delivered to the Solicitation Agent.") (emphasis added).

NAI-1542918500

the Debtor."[149]  Moreover, Paragraph 4(b) of the Tabulation Procedures authorized the Debtor to recognize vote changes even after the voting deadline.[150]  In accordance with its authority under the Tabulation Procedures, the Debtor thus agreed to recognize the Smith Firm's master ballot and instructed Epiq to tabulate the ballot as superseding the earlier ballots submitted by Beasley Allen and Golomb Legal as to their jointly represented clients.

## VII.   VOTING RESULTS[151]

### A.   Over 83% of Claimants Support the Plan.

Epiq incorporated the Smith Firm's master ballot into its tabulation in accordance with the Debtor's instructions and finalized its tally of the vote, allocating a claim amount of $1.00 per claim solely for purposes of voting.[152]  As attested to in the Voting Declarations, the prepetition solicitation process resulted in a total of 93,522 counted votes on the Plan and acceptance of the Plan by 83.4% of voting holders of Channeled Talc Personal Injury Claims in Class 4, as well as 100% of Equity Interests in the Debtor in Class 6.[153]

### B.   Under Virtually Every Conceivable Scenario for Considering or Challenging the Vote, the Results Exceed the 75 Percent Threshold.

The voting results reported by Epiq, including acceptance of the Plan by 83.4% of voting holders of Channeled Talc Personal Injury Claims, were replicated by the Debtor's expert on voting issues, Andrew R. Evans, CFA of Bates White.[154]  Mr. Evans' affirmative report confirmed that, based upon the certified disclosures in submitted ballots, ███████ of claimants

---

[149]    Id.

[150]    See Tabulation Procedures, § 4(b).

[151]    The results of the vote are described in greater detail in the Supplemental Voting Declaration.

[152]    Supp. Voting Decl. ¶ 17.

[153]    Id. at ¶ 6.

[154]    See Expert Report of Andrew R. Evans, CFA (Jan. 7, 2025) (the "Evans Report") ¶¶ 21, 27.

NAI-1542918500

disclosing Ovarian Cancer as their disease type voted in support of the Plan.[155]  In light of pending requests by previously objecting firms to change the votes of their clients and the challenges to the voting tabulation, Mr. Evans made certain adjustments to Epiq's reported results and analyzed the percentage of Ovarian Cancer votes across ▇▇ different scenarios. Mr. Evans determined that, in all such scenarios, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇[156]  The results of Mr. Evans' analysis of Ovarian Cancer votes are reproduced below.[157]



In response, the Coalition's proposed expert, Yvette R. Austin, opines that the Debtor should have weighted Ovarian Cancer claims ▇▇▇▇ greater than Gynecological Cancer claims.[158]  Although Ms. Austin proposed a weighted tabulation in her report, she did not provide

---

155   See id. at ¶ 42.

156   Id. at ¶ 31.

157   Id. at Fig. 3.  Considering all votes, not just Ovarian Cancer votes, Mr. Evans' analysis yielded just ▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇ examined where the vote fell below 75% (at ▇▇▇▇ ).  See id. at Fig. 2.

158   Expert Report of Yvette R. Austin (Jan. 7, 2025) (the "Austin Report") ¶ 63 ▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

the results of her proposal.  In response, Mr. Evans conducted an analysis of the tabulation weighted as Ms. Austin suggested.  Applying Ms. Austin's proposed ███████ weighting for Ovarian Cancer claims, Mr. Evans determined that the outcome of the weighted vote would be ████████████ in amount in favor of the Plan, far above section 1126(c)'s requirement of two-thirds in amount of voting claims.[159]  Mr. Evans then applied this weighting across the ████ potential scenarios and determined that, █████████████, the acceptance amount after weighting exceeded 75%, as reproduced below.[160]



Moreover, further down-weighting of Gynecological Cancer claims below ████ of the value of Ovarian Cancer claims would also not affect the outcome of the vote.[161]

---

[159]   *Expert Rebuttal Report of Andrew R. Evans, CFA* (Jan. 28, 2025) (the "Evans Rebuttal Report") ¶ 18. Because section 524(g) contains only a "headcount" requirement that 75% in number of voting claimants accept the Plan, the relative amount of claims is not relevant to that requirement.  See 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) (requiring that channeled class "is established and votes, by at least 75 percent of those voting, in favor of the plan").

[160]   Evans Rebuttal Report ¶ 22, Fig. 2.  Mr. Evans also confirmed that the apparent over-identification of Channeled Talc Personal Injury Claims as arising from Ovarian Cancer by one AHC member, Pulaski Kherkher, ███████.  See id.

[161]   Id. at ¶ 25.

-40-

The report of Marc C. Scarcella, M.A., the proposed expert of certain insurers, stated that non-ovarian Gynecological Cancer claims have "██████████████" and noted that large numbers of votes are from ballots cast by certain supporting law firms that did not file prepetition tort claims.  In response, Mr. Evans noted that even discounting Gynecological Cancer claims to zero dollars in amount ████████████████████.  In addition, it would have been ████████████████████████████
████████████████████████.[162]

## VIII.   BEASLEY ALLEN SUBMITS AN INVALID MASTER BALLOT

Beasley Allen submitted its master ballot on July 26, 2024, voting the claims of approximately 11,500 clients.[163]  That master ballot was invalid.

### A.   Mr. Birchfield Falsely Certified That Beasley Allen Had Collected and Recorded the Informed Consent of Clients to Cast Over 8,000 Votes.

Mr. Birchfield certified that Beasley Allen had collected and recorded the votes of approximately 11,500 clients when, in fact, it had received a response from fewer than 3,000 of them.[164]  In so doing, Beasley Allen was not attempting to rely on any power-of-attorney authority.[165]  Mr. Birchfield admitted that the only available basis for a law firm's authority to vote under the Option A Certification was by recording and submitting the client's informed

---

[162]   Id. at ¶¶ 32-26.

[163]   See Suppl. Voting Decl., Ex. A (the "Beasley Allen Master Ballot"), 5, 8.

[164]   Birchfield Dep., 153:5-15 ("Q. … How many claimants did you vote based upon feedback that was actually recorded?  … A. I cannot give you … a specific number, … sitting here today, but it's my understanding that we had, you know, direct feedback, direct response from approximately 3,000 clients."); Dec. 17, 2024 Hrg. Tr. at 67:16-68:10 (Ms. O'Dell confirming to the Court that Beasley Allen is in possession of only "a little less" than "approximately 3,000" responsive communications from clients).

[165]   Id. at 139:20-140:2 ("Q. … You didn't rely upon the power of attorney to vote under Option A, correct?  A. We didn't -- we did not rely … on any power of attorney in any of our fee contracts to make a decision on behalf of a client whether to vote in favor or against the plan.").

consent to vote on their behalf.[166]  Nevertheless, Mr. Birchfield relied on the Option A Certification's requirement that the applicable firm has "obtained authority to procedurally cast" client votes for his authorization to cast the votes of over 8,000 clients without collecting and recording their votes with their informed consent.[167]  But the requirement to obtain authority to procedurally cast votes is itself modified by (a) the certification's requirement to obtain informed consent[168] and (b) multiple instructions to collect and record client votes if using the Option A Certification.[169]  Beasley Allen's co-counsel, Allen Smith of the Smith Firm, was aware, "based on the communication [he] received and [was] copied on from Beasley Allen in their original vote back in July, that it wasn't done the right way."[170]  He assumed that Mr. Birchfield's selection of the Option A Certification must have been a scrivener's error because he "didn't understand or appreciate any other reasonable explanation."[171]

Beasley Allen was not alone in falsely certifying that it had collected and recorded the votes of its clients with their informed consent.  Richard Golomb of Golomb Legal, the other remaining member of the Coalition, apparently did likewise, although Mr. Golomb's statements regarding his authority under the Option A Certification were inconsistent.  In his deposition, Mr. Golomb stated that he collected and recorded the votes of claimants, as required to be

---

[166]    Id. at 164:8-14 ("Q. … the text provides you can either give power of attorney, Option B, or vote by recording and submitting based upon client's informed consent, Option A.  Correct?  A. Correct.").

[167]    See id. at 130:23-131:6 ("Q: … You understood based upon your close scrutiny and review of the master ballot that in order to vote under Option A, one had to collect and record in order to produce the informed consent of the claimants, correct?  A:  Yes, we had – we had to have informed consent.").

[168]    See Master Ballot, 7.

[169]    See id. at 7, 9-10.

[170]    Smith Dep., 83:15-19.

[171]    Id. at 98:4-6

authorized under the Option A Certification.[172]  But then he admitted that Golomb Legal had not received responses from its clients to collect and record their votes.[173]  At that point, Mr. Golomb refused to answer further questions on the topic.[174]

      **B.**    **Claimants Were Not Informed About Beasley Allen's Conflicting Positions On Gynecological Cancer Claims.**

Mr. Birchfield's certification that thousands of clients holding Gynecological Cancer claims were informed before Beasley Allen cast their votes rejecting the Initial Plan was counterfactual, as discovery confirmed.  Mr. Birchfield admitted that Beasley Allen's rejecting master ballot included votes cast on behalf of approximately 5,000 Gynecological Cancer claims.[175]  He also acknowledged his own and Beasley Allen's position "in the bankruptcy proceedings . . . and in the public" that "other gynecological claims—cervical cancer, uterine cancer claims—are not supported by the science."[176]  Such claims, in the view of Mr. Birchfield and Beasley Allen, are "noncompensable in the tort system."[177]  Despite Mr. Birchfield's unequivocal position that Gynecological Cancer claims are worthless, Mr. Birchfield declined to answer whether he informed Beasley Allen's Gynecological Cancer clients that he was asserting

---

[172]    Golomb Dep., 33:7-11 ("Q. … We agreed that you collected and recorded the votes of your Option A claimants pursuant to these instructions, correct?  A. Correct.").

[173]    Id. at 34:2-6 ("Q. Okay. Did you have contact -- bilateral contact where you actually interfaced with the client in some way for all of your Option A votes?  A. No.").

[174]    Id. at 34:19-21.

[175]    Birchfield Dep., 181:2-8 ("A. So we filed -- rough numbers, we filed votes or cast votes on behalf of approximately, you know, 62, 63, you know, hundred ovarian cancer claimants. And it would be approximately 5,000 claims that are -- that would be what the plan refers to as other gynecological claims.").

[176]    Id. at 188:6-12 ("A. In the bankruptcy proceedings and in the -- and in the public, you know, we -- we and me personally have taken the position that other gynecological claims -- cervical cancer, uterine cancer claims -- are not supported by the science.").

[177]    Id. at 188:12-14 ("A. They would be, in our view, they would be deemed, you know, noncompensable in the tort system."); id. at 181:25-182:4 ("A. They have not -- they have not sustained a legally cognizable injury that would allow us to file a claim in the tort system.").

that their claims are worthless outside of this Chapter 11 Case before voting to reject the Initial

Plan on their behalf.[178]  Beasley Allen's 5,000 clients holding Gynecological Cancer claims

could not have been informed that, if their ballots carried the vote, they would be forgoing any

possibility of recovery.  The conflict is irreconcilable.

### C.    Claimants Were Not Informed That Beasley Allen Has Not Recovered a Dime in the Tort System.

Mr. Birchfield has never tried a talc case.[179]  And Beasley Allen has not recovered a dime

for any claimant in any of the 15 talc cases it has tried over the past 11 years.[180]  The same is true

of Mr. Golomb.[181]  In the 15 months between dismissal of LTL's second chapter 11 case and the

Petition Date, Beasley Allen tried just two of its thousands of pending cases.[182]  Neither case was

successful.[183]  Although Beasley Allen is primary settlement and negotiating counsel in the

MDL, it has never received a settlement offer from J&J or the Debtor outside of bankruptcy.[184]

J&J, the Debtor and their affiliates have been clear that they will settle with Beasley Allen only

---

[178]    Id. at 186:11-24.  The inconsistency of Beasley Allen's position is further highlighted by Mr. Birchfield's admission that Beasley Allen screens clients based on disease type before accepting them.  See id. at 121:16-122:6 ("Q. Does Beasley Allen screen out any type of claim on the basis of the disease type, diagnosis, or harm alleged? … A. I can answer affirmatively, we do … consider injury as a matter of screening criteria.").

[179]    Id. at 19:20 ("A. I have not tried a talc case.").

[180]    Id. at 18:18-25 ("Q. … [I]n those 15 cases that Beasley Allen has tried over the course of the last 11 years, Beasley Allen has not recovered a dime for its clients in those cases; is that correct? … A.  In those 15 cases, that is true.").

[181]    Golomb Dep., 63:6-9 ("Q. … You have not tried a talc case as first-chair trial lawyer in your career, correct?  A. I have not.").

[182]    Birchfield Dep., 23:24-24:12 ("Q. … In the over a year and three months since LTL 2 was dismissed in July of 2023, how many ovarian talc cases have you tried?  A. Two.  Q. Just two.  Your firm participated in those two trials, correct?  A. We did.  Q. Neither one of them resulted in any recovery for the talc claimants, correct?  A.  That's true.").

[183]    Id.

[184]    Id. at 26:12-20 ("Q. … In the four years that you indicated that you are primary settlement and negotiating counsel for the ovarian talc claimants, it's fair to say that you have not received an offer for settlement from Johnson & Johnson or any of the Debtors to resolve the talc litigation outside of bankruptcy?  A. That's true.").

NAI-1542918500

in bankruptcy.[185]  Mr. Birchfield refused to answer when asked whether he informed his clients

that he had never recovered a dime on account of talc claims in the tort system before submitting

their votes to reject the Initial Plan.[186]

     **D.**     **The Debtor's Expert Confirms the Beasley Allen Ballot Was Defective.**

          *1.*     *Informed Consent Requires an Affirmative Response.*

Mr. Edgar Gentle, a special master and court-appointed neutral, reviewed the actions of

Beasley Allen and Golomb Legal in casting their master ballot votes under the Option A

Certification.  Mr. Gentle concluded that these firms' presumption of affirmative consent to reject

the Initial Plan from a lack of client response—including with respect to more than 8,000

Beasley Allen clients—failed to satisfy the informed-consent standard supporting an Option A

vote.[187]  As a result, Beasley Allen's and Golomb Legal's master ballots were supported by a

false certification and were invalid.

The comments to ABA Model Rule of Professional Conduct 1.0 are clear that

"[o]btaining informed consent will usually require an ***affirmative*** response by the client or other

person.  In general, a lawyer may not assume consent from a client's or other person's

silence."[188]  According to Mr. Gentle, "as under the Model Rules, the Master Ballot requires

'informed consent' be 'indicated' by clients, and 'collected' by counsel of record in a customary

---

[185]    Id. at 26:21-27:3 ("Q. And, in fact, representatives of Johnson & Johnson, the Debtors, and their affiliates have repeatedly told you that under no circumstances would they agree to a mass tort settlement outside of bankruptcy?  A. That has been repeated.").

[186]    Id. at 27:15-28:25.

[187]    Gentle Debtor Report ¶ 23 ("relying on a Claimant's failure to respond to solicitation correspondence … is not sufficient for counsel to certify an individual claimant's vote under Option A").

[188]    Id. at ¶ 28 (emphasis in report).

manner.  Unlike voting under Option B, which does not require a client response, Option A requires that clients affirmatively respond to cast their votes."[189]

       2.     *The Failure to Disclose Conflicting Interests Negates Informed Consent.*

Even in circumstances where a client's consent may be inferred from its conduct (or inaction), consent cannot be inferred when counsel has failed to disclose conflicts with respect to its recommendations.[190]  Here, where Beasley Allen and Golomb Legal stand to profit from any common benefit fund award in the MDL, an affirmative response from their clients was required.  As discussed above, the conflict is particularly acute where, as here, Beasley Allen has advocated against the ability of holders of Gynecological Cancer claims to recover in the tort system before casting votes rejecting their alternative—the Initial Plan—on their behalf.  As stated in the Gentle Debtor Report,

> [i]n these proceedings, Beasley Allen has ***affirmatively taken a position that is directly adverse to the interests of its non-ovarian clients*** by
>
> > (1) ***publicly arguing that their claims are worthless***, and that they should not be entitled to recover anything in the tort system,
> >
> > (2) voting their claims by "negative notice" to reject the Plan, thereby ***advocating against their ability to recover anything under the Plan*** in bankruptcy, and
> >
> > (3) advocating against their rights to participate in these proceedings or vote on the Plan at all.[191]

---

[189]    Id. at ¶ 29.

[190]    Id. at ¶ 39.

[191]    Id. at ¶ 70 (emphasis added).

-46-

> 3. *The Failure to Disclose Lack of Success in the Tort System Negates Informed Consent.*

To be informed, a client is also entitled to receive information on "the advantages and disadvantages of continuing to litigate, and material information concerning alternatives to resolving the claims."[192]   In that regard, there is no evidence that Beasley Allen or Golomb Legal informed clients that neither firm has ever recovered any money for talc claimants in the tort system via judgment or settlement and, in Beasley Allen's case, that it has not maintained a verdict in any of the 15 cases it has tried in the last 11 years.[193]   As such, the clients were not "informed" sufficient to give their informed consent to reject the Initial Plan.

> 4. *The Coalition's Rebuttal Expert Fails to Refute Mr. Gentle's Conclusions.*

Harlin DeWayne Hale, the Coalition's proposed rebuttal expert, does not dispute that Beasley Allen failed to collect and record an affirmative response from over 8,000 clients.[194]   Instead, he offers a strained reading of the master ballot, concluding that counsel was not required to receive "an affirmative response" to demonstrate authority to vote under the Option A Certification based on the master ballot's requirement that counsel "have obtained procedural authority to case such Client's vote."[195]   But that provision does not relieve counsel of the obligation under the certification to obtain their clients' informed consent.  Moreover, the master ballot repeatedly instructs law firms soliciting votes from their clients to "collect and record" such votes, which is inconsistent with not requiring any affirmative response.[196]

---

192   <u>Id.</u> at ¶ 46.

193   <u>Id.</u> at ¶ 51.

194   *Rebuttal Expert Report of Harlin DeWayne Hale* (Jan. 28, 2025) (the "<u>Hale Rebuttal Report</u>"), 9.

195   <u>Id.</u>

196   <u>See</u> Master Ballot, 7, 9.

-47-

Judge Hale was deposed on February 11, 2025.  During his deposition, Judge Hale admitted that in developing his opinions, he relied nearly exclusively on legal research and plain language interpretation.[197]  Judge Hale did not analyze the "substance" of any communications from the Coalition that would inform the meaning of "informed consent" under his purported interpretation and only reviewed a handful of the hundreds of engagement letters that bear directly on his "power of attorney" analysis.[198]  Judge Hale also conceded that Beasley Allen had a troubling conflict regarding its clients with non-ovarian cancer.  Specifically, Judge Hale agreed that Beasley Allen had a duty to tell those clients that Beasley Allen believes their claims are "worthless" in the tort system, and that he saw no evidence showing Beasley Allen disclosed this troubling conflict.[199]  With respect to industry practices, Judge Hale admitted that he lacks any professional experience regarding the meaning of "informed consent" or "power of attorney" in the context of a mass torts bankruptcy because he never oversaw mass tort bankruptcies as a judge, was never involved in mass torts bankruptcies as a practitioner, and had never seen a Master Ballot in a mass torts bankruptcy prior to his involvement in this case.[200]

In his report, Judge Hale improperly analogizes to this Court's decision in In re Robertshaw U.S. Hldg. Corp., 662 B.R. 300 (Bankr. S.D. Tex. 2024) and others where a creditor's consent to provide a release to third parties under a chapter 11 plan is inferred from

---

[197]    Feb. 11, 2025 Harlin DeWayne Hale Dep., 16:10-20 (agreeing that legal research and analysis forms the basis of his opinions); id. at 44:18-23 (agreeing that in developing his opinions he used the same methodology as he would in "writing a legal judicial opinion").

[198]    Id. at 58:16-24 (explaining that he did not review the substance of communications between Coalition attorneys and clients with regard to his "informed consent" analysis); id. at 59:20-60:9 (same); id. at 24:6-14 (noting that he only reviewed "sample" engagement letters and did not "go[] through each one" to determine whether "Power of Attorney as contemplated under Option B" was given).

[199]    Id. at 136:14-25.

[200]    Id. at 8:12-9:9.

NAI-1542918500

their failure to opt out.[201]  Such cases are irrelevant to the question of whether a law firm possesses the informed consent of its clients to vote on a chapter 11 plan.  There is a sharp distinction between a creditor granting through inaction a release of inchoate and undefined claims under a Plan against debtor-related parties and a law firm alleging it has obtained it's client's informed consent to act on their behalf.  Rather, standards of ethical conduct governing what is, and what is not, informed consent are relevant, as Mr. Gentle noted.[202]  Indeed, In re Hot'z Power Wash, Inc., 655 B.R. 107, 113 (Bankr. S.D. Tex. 2023), expressly rejected the use of "opt-out" provisions on ballots during a vote on plan approval.  There, the debtor used a disclaimer that read: "If you do not vote, you will be deemed to have accepted the Plan."  Id. at 114.  Judge Rodriguez declined to count any such "deemed" votes, citing the court's prior decision in In re Bressler, 2021 WL 126184, at *1 (Bankr. S.D. Tex. Jan. 13, 2021), that "failure to cast a written vote constitutes neither acceptance nor rejection of the plan."  Hot'z Power Wash is much more analogous to the situation at bar than Robertshaw and similar cases, and it is fundamentally at odds with the Coalition's theory that negative notice can satisfy an Option A Certification.

Judge Hale confuses the adequacy of the information the Debtor provided in the Disclosure Statement regarding the terms of the Plan—which he does not dispute—with one issue on which he purports to opine.[203]  That issue is whether Beasley Allen properly informed its Gynecological Cancer clients before casting their votes to reject the Initial Plan, which, according to Beasley Allen's own position, is their only avenue to any monetary recovery.  Judge Hale offers no opinion on that irreconcilable conflict highlighted by Mr. Gentle.

---

| | |
|---|---|
| 201 | Hale Rebuttal Report, 8. |
| 202 | Gentle Debtor Report ¶¶ 27-29. |
| 203 | Hale Rebuttal Report, 14. |

IX.     **THE VOTES OF THE PLAN'S SUPPORTERS WERE VALIDLY CAST.**

Unlike Beasley Allen, the members of the AHC and the Smith Firm acted in accordance with the solicitation procedures and applicable law in preparing and submitting their master ballots and certifying as to their authority to do so.

A.      **AHC Members and the Smith Firm Properly Used the Option A Certification to Reflect Actual Responses Received from Clients.**

In contrast to the members of the Coalition, the deposition testimony of AHC members demonstrated that they, like the Smith Firm, used the Option A Certification to cast client votes appropriately in accordance with actual responses they received from such clients.  Jim Onder of OnderLaw, for example, had solicitation packages sent by Epiq to all of his clients.[204]  OnderLaw separately sent its clients individual ballots for execution evidencing its collection and recording of their informed consent.[205]  Upon OnderLaw's receipt of an executed individual ballot from a client, OnderLaw considered that it had collected and recorded that client's informed consent to vote on the Initial Plan under the Option A Certification.[206]  All other votes OnderLaw cast were pursuant to a power of attorney under the Option B Certification.[207]

Adam Pulaski of Pulaski Kherkher, PLLC ("Pulaski Kherkher") also had Epiq send solicitation packages with a cover letter, following up with e-mails, telephone calls, texts and

---

[204]    Nov. 26, 2024 Jim Onder Dep. (the "Onder Dep."), 40:17-24 ("A. … The bottom line is, when -- when the Epiq package came out, we were asked, do you want Epiq to send out the plan to everyone?  I wanted no dispute whatsoever as to whether I send out the plan.  So I had them send out the plan to everybody.").

[205]    OnderLaw added a separate power of attorney to the individual ballot.  Id. at 45:4-12, 60:10-19 (discussing addition of power of attorney language to client ballots).  OnderLaw was entitled to do that because it was using the ballot to collect its clients' informed consent before voting on the Initial Plan using the master ballot.

[206]    Id. at 41:16-17 (stating that OnderLaw would take a signed ballot, "compile it and vote it under that category A of votes").

[207]    Id. at 65:21-66:4 ("Q. … Did you cast any ballots for clients who did not fill out the -- the exhibit we had on the screen just a few minutes ago?  A. Yes.  Q. And on what basis did you cast those ballots?  A. I had a Power of Attorney for them.").

hard-copy letters.[208]  Mr. Pulaski certified as to Option A authority only with respect to the "group of clients that affirmatively contacted [Pulaski Kherkher], or cast a vote, and said that they were voting 'yes'."[209]  Anne Andrews of Andrews & Thornton and Mikal Watts of Watts Law Firm likewise agreed that the Option A Certification required counsel to collect and record responses from clients.[210]  "Option A is those [votes] that were cast and voted affirmatively by our clients."[211]

### B.       AHC Members and the Smith Firm Voted Properly Under the Option B Certification.

AHC members, like the Smith Firm, cast votes in support of the Initial Plan under the Option B Certification pursuant to bankruptcy-specific written powers of attorney and/or their express or implied authority and duty to their clients under the terms of their engagement letters. Mr. Onder took a highly "conservative stance,"[212] refraining from voting the claims of 8,000 to 10,000 clients from whom he had not received an express, written power of attorney.[213]  He did not cast votes under the Option B Certification on behalf of such clients out of an abundance of caution because, at the time, he was not 100% certain that he had authority to vote on a bankruptcy plan under the general authority provided by his engagement letters.[214]

---

[208]    Dec. 9, 2024 Adam Pulaski Dep. (the "Pulaski Dep.") 65:12-19.

[209]    Id. at 42:21-23.

[210]    Dec. 16, 2024 Anne Andrews Dep. (the "Andrews Dep."), 107:7-10 ("Option A is the actual vote that we received from the client on the ballot.  And Option B is under the power of attorney."); Nov. 12, 2024 Mikal Watts Dep. (the "Watts Dep."), 208:5-9 ("Q. And Option A you have the authority to cast the vote based on informed consent, correct?  A. In effect, an individual vote, yes.").

[211]    Pulaski Dep., 42:10-11.

[212]    Onder Dep., 159:22.

[213]    Id. at 62:14-19.

[214]    Id. at 70:21-71:3 ("A. … I didn't have that block of Power of Attorney points.  I had my basic contract, which I think that's a legal conclusion on whether or not that was sufficient, but I did not vote those people if it was just based on my contract, without the Power of Attorney language."); id. at 159:17-22 ("A. … I was not willing to take any risk whatsoever.  I know I had the largest docket.  I know that my docket was

Andrews & Thornton's engagement letters provide the firm with authority to sign documents on a client's behalf, particularly after attempts are made to contact the client.[215] Ms. Andrews noted in her deposition that the voting of a bankruptcy claim is distinct from "settling a case in the traditional way" in the tort system.[216]  Rather, Ms. Andrews "followed the mandate of [her] clients to present their claim in a bankruptcy in their best interest that they engaged [her] to do so."[217]  Ms. Andrews confirmed that "consent is found in [her] agreement either tacitly or implicitly by the agreement you have with the client to protect their interest and the imperative that you have by [her] engagement."[218]  Similarly, Mikal Watts' authority to vote under the Option B Certification arose from the terms of his engagement letter and Watts Law Firm's subsequent affirmative disclosures to its clients including "the communication of intent to vote if there was not a 'no'" from the client.[219]

Mr. Gentle reviewed engagement letters between AHC members and their clients and confirmed that they provided counsel with the authority and duty to vote on behalf of their clients under Option B.[220]  Mr. Gentle determined that, although there were variations in the language among the engagement letters, each of them provided the applicable member firm with not just a power of attorney but also a corresponding ethical duty to maximize recoveries for their clients, including by voting on their clients' behalf in support of the Plan.[221]  That authority

---

going to be attacked no matter how I voted.  So I took the absolute, absolute, absolute most conservative stance in my voting.").

[215]   Andrews Dep., 118:9-16.

[216]   Id. at 120:12-13.

[217]   Id. at 123:17-20.

[218]   Id. at 101:19-23.

[219]   Watts Dep., 208:17-23.

[220]   Gentle Debtor Report ¶¶ 9, 44-45.

[221]   Id.

and duty on the part of each law firm derives from their firm conviction that the Plan "provided an opportunity for their clients to receive a fair and timely resolution of their ovarian cancer and gynecological cancer claims" in comparison to the claimants' alternatives in the tort system.[222]

In rebuttal, Judge Hale offered a legal opinion that a power of attorney requires the existence of a separate written instrument in the context of voting on a prepackaged chapter 11 plan. But none of the authority he cites addresses the issue on which he opines. The Delaware bankruptcy court in the Imerys cases, for example, disallowed over 15,000 votes not because the attorney's power of attorney was insufficient, as Judge Hale suggests, but because the clients did not have claims.[223] And the New Jersey bankruptcy court in Congoleum was explaining the importance of a sample of actual powers of attorney over an exemplar in the context of statements under Bankruptcy Rule 2019.[224] It says nothing about whether, as Mr. Gentle opines, the AHC members' engagement letters provide them with express or implied authority to cast ballots. Judge Hale is wrong in suggesting that the Third Circuit in Combustion Engineering "required more" than an implied power of attorney.[225] It took no position at all on what was required, stating merely that it was "reasonable" in that case for the Debtor to have required that every ballot be accompanied by a power of attorney.[226] The other cases that Judge Hale cites

---

[222]   Id.

[223]   In re Imerys Talc Am., Inc., No. 19-10289 (LSS), 2021 WL 4786093, at *11 (Bankr. D. Del. Oct. 13, 2021) ("the evidence raises significant questions as to whether any of Bevan & Associates' clients have a claim against any [d]ebtor . . . a lawyer filing a [m]aster [b]allot still has the obligation to ensure that he only votes on behalf of clients who have a claim against [d]ebtors").

[224]   See In re Congoleum Corp., No. 03-51524 (KCF), 2004 WL 2339762, at *4 (Bankr. D.N.J. Oct. 5, 2004).

[225]   Hale Rebuttal Rep., 17.

[226]   See In re Combustion Engineering, Inc., 391 F.3d 190, n.66 (3d. Cir. 2004).

NAI-1542918500

refer to a lawyer's authority to settle a case on behalf of a client, not to vote on a chapter 11 plan of reorganization; the concepts are not analogous.[227]

## X.      THE CHAPTER 11 FILING AND THE OBJECTORS' RESPONSE

Having obtained overwhelming support for the Plan from holders of Channeled Talc Personal Injury Claims, the Debtor commenced this Chapter 11 Case on September 20, 2024 to pursue confirmation of the Plan.  The holdout objectors were ready.  Immediately on the Petition Date, the Office of the United States Trustee for Regions 3 and 9 (the "U.S. Trustee") filed a motion on the docket of LTL's 2023 Chapter 11 Case—which at that time had been dismissed for over a year—requesting that the New Jersey bankruptcy court transfer venue of this Chapter 11 Case to New Jersey.[228]  The following day, the Coalition, which at that time consisted of Beasley Allen and five other firms,[229] filed their motions in this Chapter 11 Case to challenge venue in this Court [Dkt. 43] and to dismiss the case [Dkt. 44] (the "Coalition Motion to Dismiss").  Five days later, the U.S. Trustee filed another motion to transfer venue, this time in this Court [Dkt. 137], and, on October 21, 2024, the U.S. Trustee filed its own motion to dismiss [Dkt. 299] (collectively with the Coalition Motion to Dismiss and all related joinders, the "Motions to Dismiss").

---

[227]    Hale Rebuttal Report, 9 (citing Levy v. Superior Ct., 10 Cal. 4th 578, 583, 896 P.2d 171, 174 (1995) (knowledge and express consent needed for settlement because it "ends the lawsuit"); Turner v. Burlington Northern R. Co., 771 F.2d 341, 345 (8th Cir. 1985) ("final disposition of … client's case" requires express authority) (internal citation omitted); Mandell & Wright v. Thomas, 441 S.W.2d 841 (Tex. 1969) (an attorney's contract amounting to a power of attorney is valid in the absence of fraud")).

[228]    See Motion of the United States Trustee for an Order Pursuant to Fed. R. Bankr. P. 1014(b) Transferring Venue of Subsequently Filed Case to the District of New Jersey, In re LTL Mgmt. LLC, No. 23-12825 [Dkt. 1856-4] (Bankr. D.N.J. Sept. 20, 2024).

[229]    The Coalition's membership has dwindled since the Petition Date.  Although the Coalition no longer identifies its members on the pleadings it files, the Debtor understands that it currently consists of only Beasley Allen and Golomb Legal.

NAI-1542918500

The New Jersey bankruptcy court promptly denied the U.S. Trustee's motion in LTL's previously dismissed bankruptcy case, reasoning that "while the Court has observed the law of the case doctrine and applied it in previous cases, I don't think it's appropriate in different cases. And we have here clearly different debtors, and we have different parties involved here."[230] Then, following a hearing held on October 10, 2024, this Court entered an order [Dkt. 245] denying the venue transfer motions that were pending here for the reasons stated at the hearing, including that the interests of justice and the preference of a significant number of creditors who support the Chapter 11 Case being maintained in this District.[231]

In connection with the Imerys/Cyprus settlement, the Debtor had agreed not to schedule an objection deadline with respect to confirmation of the Plan until a successful vote had been certified in the Imerys/Cyprus cases. In light of that commitment, the Debtor did not immediately seek a hearing on confirmation of the Plan. Instead, the day after the Petition Date, the Debtor filed a motion[232] (the "Disclosure Statement and Solicitation Procedures Motion") seeking approval of the Disclosure Statement and solicitation procedures to bring forward issues adjacent to confirmation. Thereafter, on October 21, 2024, the Debtor filed a motion[233] (the "Vote Confirmation Motion") seeking the Court's approval of the results of prepetition voting on the Plan, as reported by Epiq.

The objectors' assault on this Chapter 11 Case continued. The Coalition filed a blizzard of pleadings that attacked the outcome of voting on the Plan, including objections to (a) the

---

[230] Tr. of Sept. 24, 2024 Hr'g at 42:4-8, In re LTL Mgmt. LLC, No. 23-12825 (Bankr. D.N.J.).

[231] Tr. of Oct. 10, 2024 Hr'g at 211:24-212:3.

[232] *Debtor's Motion for Entry of an Order Approving  (I) Adequacy of Disclosure Statement, (II) Solicitation Packages and Procedures Employed for the Solicitation and Tabulation of Votes on the Debtor's Prepackaged Plan of Reorganization and (III) Notice Of Non-Voting Status* [Dkt. 46].

[233] *Debtor's Motion for Entry of an Order Confirming the Results of Voting on the Prepackaged Plan of Reorganization* [Dkt. 305].

-55-

Disclosure Statement and Solicitation Procedures Motion [Dkt. 268] and (b) the Vote

Confirmation Motion [Dkt. 421] as well as motions (collectively, the "Coalition Voting

Motions") demanding (a) the designation of all votes cast in support of the Plan [Dkt. 265]

(the "Designation Motion"), (b) the reinstatement of the Beasley Allen master ballot [Dkt. 266]

(the "Reinstatement Motion"), (c) estimation of all claims for the purpose of determining the

amount in which they should vote [Dkt. 267] (the "Estimation Motion") and (d) the fixing of a

bar date for claimants to file proofs of claim for use in estimating voting claim values [Dkt. 264]

(the "Bar Date Motion").

Among other obstructions, the objectors also contested the Debtor's request[234] to appoint

Ms. Ellis as FCR in this Chapter 11 Case, proposing instead their own time-consuming and

unnecessary process to find an alternative.[235]  Those requests were denied.  Ms. Ellis was and

remains the most qualified person for the role of FCR and had initially been hand-selected in

LLT's bankruptcy cases by many of the same firms that opposed her appointment in this

Chapter 11 Case.  On November 13, 2024, the Court entered its order appointing Ms. Ellis as

FCR.[236]

### A.        Appointment of the Committee and the TCC MOU

On October 22, 2024, the U.S. Trustee appointed the Committee [Dkt. 313], pursuant to

section 1102 of the Bankruptcy Code.  As of the date of its constitution, the Committee was

nearly evenly divided between creditors represented by counsel who supported the Plan, and

creditors represented by counsel who either opposed or had significant reservations with respect

---

[234]        See FCR Appointment Motion.

[235]        See objections to the FCR Appointment Motion of certain insurers [Dkt. 456], the U.S. Trustee [Dkt. 480], Beasley Allen [Dkt. 482] and the Coalition [Dkt. 483].

[236]        See FCR Appointment Order.

to the Plan.  The Committee engaged in discussions with its various members, as well as with the AHC, the Debtor and J&J.[237]  On November 15, 2024, the Debtor filed a notice [Dkt. 560] announcing that the Debtor, J&J and the Committee had entered into a *Confidential Memorandum of Understanding & Agreement Regarding Talc Bankruptcy Plan Support* [Dkt. 560-1] (the "TCC MOU") pursuant to which the Committee agreed to support the Plan.[238] The Committee subsequently filed its statement in support of the Chapter 11 Case, the Plan and the Plan process on November 21, 2024.[239]  In its statement in support, the Committee stated that the enhancements contained in the TCC MOU "materially expedite recoveries for talc injury victims and their estates, resolve significant concerns regarding trust administration, and help to ensure finality to the very long road to justice for tens of thousands of talc claimants."

Thereafter, the Debtor, together with the Committee, the AHC, the Smith Firm and the FCR, amended the Plan to incorporate applicable provisions of the TCC MOU, which Plan was filed on December 9, 2024 [Dkt. 722].[240]  Apart from incorporating the TCC MOU, the amendments to the Plan also reflected additional negotiated modifications, including to governance procedures for the Talc Personal Injury Trust.  The Plan modifications provide for, among other things:  (a) the Plan to become effective on an earlier timeframe notwithstanding any potential appeals from the order confirming the Plan to the United States Court of Appeals for the Fifth Circuit (the "Fifth Circuit") and (b) certain cash contributions to the Talc Personal Injury Trust to be accelerated, which allows for payments to claimants to be expedited.

---

[237]     See *Statement of the Official Committee of Talc Claimants in Support of the Debtor's Chapter 11 Cases, Forthcoming Amended Plan and Plan Process* [Dkt. 613] (the "Committee Statement") ¶ 6.

[238]     See Kim Dep., 252:6-7; 254:4-256:20.

[239]     See Committee Statement.

[240]     See Murdica Dep., 127:6-128:7; 199:9-14; 309:23-310:2.

-57-

**B.      Law Firms Seek Authority to Change Their Clients' Votes to Accept the Plan, as Amended.**

Momentum continued to gather in support of the Plan.  On October 24, 2024, the Morelli Law Firm PLLC (the "Morelli Firm") delivered a replacement master ballot to Epiq[241] requesting to switch 1,557 of the 1,598 rejecting votes it cast by the Voting Deadline to votes accepting the Plan.[242]  The Debtor supported the Morelli Firm's request and agreed to file a motion on its behalf seeking authority for the Morelli Firm to change its clients' votes as reflected in the replacement master ballot.[243]  Mr. Morelli informed the Debtor that his request was based upon his belief that accepting the Plan, as amended, was in the best interests of his clients.[244] The Coalition deposed Mr. Morelli on January 23, 2025, where he again explained that he sought to change the votes "in the best interest of [his] clients"[245] and because he "was really trying to do what [he] thought was right under [his] fiduciary duty" to them.[246]

The Morelli Firm was not alone.  On December 6, 2024, Summers & Johnson, P.C. ("Summers & Johnson") submitted a replacement master ballot requesting that 29 of 33 rejecting votes on Summers & Johnson's original master ballot be changed to accepting votes.  Once again, the Debtor filed a motion [Dkt. 731], at Summers & Johnson's request, seeking authority

---

[241]     Epiq is restricted from performing solicitation, balloting or tabulation services under the terms of the agreed case management order entered on October 30, 2024 [Dkt. 352].  At the Debtor's request, Epiq provided a form of ballot to the Morelli Firm, Summers & Johnson and to several other firms that have expressed interest in changing their votes and responded to various information requests regarding the tabulation from the Debtor's professionals.  The Debtor understands that Epiq has received such ballots as they have been returned and has processed them into a separate provisional database pending further orders of the Court.

[242]     See *Debtor's Motion for Entry of an Order Permitting Clients of Morelli Law Firm, PLLC to Change Their Votes* [Dkt. 328], ¶ 11.

[243]     Id. at ¶ 12.

[244]     See *Declaration of Benedict P. Morelli* [Dkt. 734], ¶¶ 9-10.

[245]     Jan. 23, 2025 Benedict P. Morelli Dep. (the "Morelli Dep."), 16:17-18.

[246]     Morelli Dep., 74:7-9.

for Summers & Johnson to change its clients' votes.  On December 30, 2024, the Coalition filed

a limited objection [Dkt. 865] to the motion, which remains pending.

## XI.   THE TALC PERSONAL INJURY TRUST WILL PAY HOLDERS OF CHANNELED TALC PERSONAL INJURY CLAIMS IN FULL.

The Talc Personal Injury Trust to be established by the Plan and administered in

accordance with the Trust Distribution Procedures will pay all Channeled Talc Personal Injury

Claims in full.  The expert report of Charles Mullin, PhD of Bates White, LLC ("Bates White")

confirms that the funding to be provided the Talc Personal Injury Trust under the Plan "█████

████████████████████████████████████████████████████████████████

█████████████████████"[247]  In light of the fact that █████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████"[248]

Based on these numbers, Dr. Mullin projected that claimants will recover approximately

twice as much from the Talc Personal Injury Trust as they would have received in the tort

system.[249]  Moreover, projected recoveries through tort system settlements are overstated

because a portion of tort system recoveries likely would be diverted to payment of a common

benefit fund.  In contrast, J&J's establishment outside the Plan of the $650 million common

---

[247]   Mullin Report ¶ 11.

[248]   Id.

[249]   See id. at ¶ 136 ████████████████████████████████████████████
████████████████████.

benefit qualified settlement fund, which the Debtor has made as a condition to confirmation of the Plan, proposes to eliminate the impact of any common benefit obligation.[250]

Dr. Mullin's rebuttal report refutes the contrary opinions of the objectors' proposed experts, Ms. Austin for the Coalition and Mr. Scarcella and Emily Goswami CIH on behalf of certain objecting insurers, which "████████████████████████████████████████" using data, in the case of Ms. Austin, "████████████████" to count the number of pending claims.[251]

The FCR's expert report, Dr. Hal J. Singer, largely adopted Dr. Mullin's analysis, and takes issue only with Dr. Mullin's estimate of the "████████████████████████████████

---

[250] See id. at ¶ 134 ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████ (internal citations omitted).

[251] *Rebuttal Expert Report of Charles H. Mullin, PhD* (Jan. 28, 2025) (the "Mullin Rebuttal Report") ¶¶ 3-4. Ms. Austin's failure to remove thousands of duplicates is just the beginning of several glaring errors in her analysis. For example, rather than considering analogous qualification rates from other talc- or asbestos-related settlements and bankruptcy trusts (as Dr. Mullin did), Ms. Austin relies exclusively on master ballot indications of claimant diagnosis and talc first use information, which she misleading characterizes in her reports as "████████" on what "████████████████████████████████." *Austin Report* ¶ 52; *Expert Rebuttal Report of Yvette R. Austin* (Jan. 28, 2025) ¶¶ 67-69. The information upon which Ms. Austin based her report is unreliable and meaningless as a measure of compensability. See Mullin Rebuttal Report ¶¶ 81-89. Many of the largest plaintiff firms simply indicated "yes" to every question on the master ballot for every one (or nearly every one) of the hundreds or thousands of claimants on their master ballots. Ms. Austin's analysis accepts these infeasible responses as a 100% qualification rate for those firms. Other firms did not complete these fields in the master ballot, resulting in qualifications rates near 0% according to her analysis. In her deposition, all Ms. Austin could offer was that she was looking at qualification rates only "████████████," as if to suggest that a reliable opinion can be formed by combining several unrealistic data points of different types. Feb. 7, 2025 Yvette Austin Dep. (the "Austin Dep."), 299:24-300:5. Ms. Austin also ignored testimony from multiple plaintiff firms that only a portion of only about half of their self-identified ovarian cancer claims would qualify, substantially lower than Ms. Austin's "compensability" rate of ████%. Similar flaws abound in her report, including (but certainly not limited to) an entirely unsubstantiated (and misleading) opinion that ████████████████████████████████ ████████████████████████████████████████ (an estimate not at all informed by the historical costs, which are minimal); ████████████████████████; and ████████████████████████████ ████████████████████████████████████████████

████ ”[252]  Even using various aggressive, unrealistic assumptions—including the assumption

that "████████████████████████████" (even those who inaccurately claim they meet

the Plan's four-year use and ten-year minimum latency requirements) will file a claim with the

trust—consideration of Dr. Singer's estimate of the maximum feasible upper bound of future

claims has little impact on the "████████████████████████" for ovarian claimants

estimated by Dr. Mullin.[253]  Dr. Singer's estimate of $████ is very similar to Dr. Mullin's

estimate of $████.[254]  Dr. Singer's report is clear that consideration of his "████████

████" of the upper bound of future claims "████████████████████████"[255]

## SUMMARY OF ARGUMENTS

The following sections summarize, respectively, the Debtor's arguments set forth in full

elsewhere in support of (a) denial of the Motions to Dismiss, (b) approval of the Disclosure

Statement and Solicitation Procedures Motion and (c) confirmation of the results of voting on the

Plan, as reported by Epiq.  The following sections are intended only as a summary for the

convenience of the Court.  In each case, the Debtor refers the Court and parties in interest to the

Debtor's briefing filed in connection with the applicable requested relief, as identified below.

---

[252]     *Expert Report of Hal J. Singer, Ph.D.* (Jan. 28, 2025) (the "Singer Report"), ¶ 25.

[253]     Id. at ¶¶ 43, 55.

[254]     See id. at ¶ 55; Mullin Report ¶ 11.

[255]     Singer Report ¶ 55.

I.      **THE MOTIONS TO DISMISS SHOULD BE DENIED.**[256]

    A.      **The Bad Faith Dismissal Standard in the Fifth Circuit.**

By the Motions to Dismiss, the Coalition and US Trustee seek dismissal of this

Chapter 11 Case on the basis that the Debtor allegedly filed it in bad faith.[257]  Section 1112(b) of

the Bankruptcy Code provides that, "on request of a party in interest," a bankruptcy court

"shall . . . dismiss a [chapter 11 bankruptcy] case" for cause.[258]  Although, the Bankruptcy Code

does not include lack of good faith in its sixteen-item list of "causes" for which a bankruptcy

case must be dismissed,[259] courts have nonetheless engrafted a good faith requirement into

section 1112(b).[260]  Even with the establishment of this judicially created standard, however,

courts have maintained that the "good faith" dismissal standard should be applied on a limited

basis such that it does not upset the "delicate balance of interests fashioned by Congress under

chapter 11."[261]  And the Fifth Circuit, specifically, has emphasized that the "good faith"

requirement exists to "prevent[] abuse of the bankruptcy process by debtors whose overriding

---

[256]    This section is intended to summarize the arguments set forth in the *Debtor's Omnibus Objection to the Motions of the Coalition and United States Trustee to Dismiss the Chapter 11 Case* [Dkt. 425] (the "MTD Objection") and, to the extent applicable, the Confirmation Brief.  Reference is made to the MTD Objection and Confirmation Brief for such arguments.

[257]    See *Motion of the Coalition of Counsel for Justice for Talc Claimants to Dismiss the Chapter 11 Case Pursuant to 11 U.S.C. § 1112(b)* [Dkt. 44]; see also *Motion of the United States' Trustee to Dismiss Case Under 11 U.S.C. § 1112(b)* [Dkt. 299].

[258]    11 U.S.C. § 1112(b)(1).

[259]    See 11 U.S.C. § 1112(b)(4)(A)-(P).

[260]    See Carolin Corp. v. Miller (In re Carolin Corp.), 886 F.2d 693, 698 (4th Cir. 1989).  The Debtor does not concede that the judicially created good-faith requirement is supported in the law and preserves its right to argue to the contrary in any appeal.  See REPORT OF THE COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES, H.R. Doc. No. 137, 93rd Cong., 1st Sess. (1973) at 18 ("[T]he 'good faith' [filing test] is *eliminated*.") (emphasis added).

[261]    In re Clinton Centrifuge, Inc., 72 B.R. 900, 905 (Bankr. E.D. Pa. 1987); see also In re Johns-Manville Corp., 36 B.R. 727, 737 (Bankr. S.D.N.Y. 1984) (good faith standard should be applied on limited basis).

motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes.[262]

In addressing the "bad faith" dismissal standard, the Fifth Circuit has instructed courts to apply a "totality of the circumstances" test in determining whether "cause" exists warranting dismissal of a bankruptcy case.[263]  A debtor's good faith in filing its petition "depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives and the local financial realities."[264]  And, the party moving for dismissal bears the burden of establishing cause for dismissal.[265]  To establish that cause exists, a moving party must set forth a *prima facie* case that the debtor's conduct "rise[s] to the level of egregiousness necessary to conclude that the reorganization process is being perverted.[266]  The movants fall woefully short of establishing such a *prima facie* case for dismissal here.

### B. The Debtor Has a Valid Reorganizational Purpose and Is Not Pursuing This Case Solely to Benefit J&J.

#### 1. *The Debtor's Bankruptcy Filing to Resolve Its Own Mass Tort Liability Is a Valid Reorganizational Purpose.*

The Debtor's bankruptcy filing to address the substantial number of Channeled Talc Personal Injury Claims asserted against it is a valid reorganizational purpose.  Seeking a comprehensive resolution of thousands of unliquidated, disputed and seemingly unending mass

---

[262]  Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (Matter of Little Creek Dev. Co.), 779 F.2d 1068, 1072 (5th Cir. 1986); In re State Park Bldg. Grp., Ltd., 316 B.R. 475–76 (Bankr. N.D. Tex. 2004).

[263]  Little Creek, 779 F.3d at 1072.

[264]  Id.

[265]  See In re HONX, Inc., 2022 WL 17984313, at *1 (Bankr. S.D. Tex. Dec. 28, 2022) ("The movant bears the burden of showing cause exists to dismiss a debtor's [sic] chapter 11 case.") (citing In re Ford Steel, LLC, 629 B.R. 871, 879 (Bankr. S.D. Tex. 2021)); Apr. 11, 2024 Hr'g Tr. at 29:4-22, In re Tehum Care Servs., Inc., No. 23-90086 (Bankr. S.D. Tex. Apr. 15, 2024) [Dkt. 1513] (the "Tehum Oral Ruling") (describing the "burden-shifting framework" under which a "party-in-interest has to establish cause").

[266]  Little Creek, 779 F.3d at 1073.

NAI-1542918500

tort claims—particularly for asbestos-related claims through section 524(g), a unique bankruptcy provision created by Congress—is a valid reorganizational purpose.  This is supported by ample precedent, including Judge Isgur's recent decision in <u>HONX</u>.[267] Courts have also found that the resolution of mass tort claims in bankruptcy provides debtors and claimants with a far more effective, efficient and certain means of resolving mass tort claims.[268]

      Here, the Debtor is responsible for all the liabilities and related indemnification obligations stemming from the manufacturing and sale of Johnson's Baby Powder and Shower-to-Shower.  These products have been manufactured and sold by, and the assets and liabilities associated with those products have been transferred to, J&J subsidiary-entities for decades, and any alleged liability of J&J for these products is secondary, and not wholly separate from the Debtor's liability.  As a result, the Debtor shoulders the primary liability for the thousands of current and future asbestos-related talc claims for which it seeks a comprehensive resolution.

---

[267]    See <u>HONX, Inc.</u>, 2022 WL 17984313, at *2 ("[W]hile an asbestos bankruptcy differs from a 'classic' bankruptcy with an insolvent or near-insolvent debtor, it is still a forward looking solution meant to treat fairly all parties in interest.  That is the hallmark purpose of chapter 11.  That is not a 'bad faith' motive."); <u>In re Bestwall LLC</u>, 605 B.R. 43, 49 (Bankr. W.D.N.C. 2019) ("Attempting to resolve asbestos claims through 11 U.S.C. § 524(g) is a valid reorganizational purpose, and filing for Chapter 11, especially in the context of an asbestos or mass tort case, need not be due to insolvency."); <u>In re Aldrich Pump LLC</u>, 2023 WL 9016506, at *23 (Bankr. W.D.N.C. Dec. 28, 2023) ("Judge Beyer's <u>Bestwall</u> decision starts with a generally uncontroversial observation:  'attempting to resolve asbestos claims through 11 U.S.C. § 524(g) is a valid reorganizational purpose.'"); <u>Johns-Manville</u>, 36 B.R. at 741 ("[S]imply because a company's economic pressures are tort-related in nature instead of more traditional financial business woes does not demonstrate an absence of jurisdiction."); <u>In re Muralo Co., Inc.</u>, 301 B.R. 690, 697 (Bankr. D.N.J. 2003) (finding debtor's "sudden high-risk exposure to thousands of seemingly random and unmanageable asbestos . . . cases" a "significant factor evidencing the good faith of Debtors' filings.")

[268]    See, e.g., <u>In re Bestwall LLC</u>, 71 F.4th 168, 183 (4th Cir. 2023), <u>cert denied</u>, 144 S.Ct. 2519, 2520 (2024) ("[B]ankruptcy procedures promote the equitable, streamlined, and timely resolution of claims in one central place compared to the state tort system, which can and has caused delaying in getting payment for legitimate claimants."); <u>In re Fed-Mogul Glob. Inc.</u>, 684 F.3d 355, 359 (3d Cir. 2012) (noting bankruptcy has become "an attractive alternative to the tort system for corporations because it permits a global resolution and discharge of current and future liability, while claimants' interests are protected by the bankruptcy court's power to use future earnings to compensate similarly situated tort claimants equitably."); <u>In re Aldrich Pump LLC</u>, 2021 WL 3729335, at *37 (Bankr. W.D.N.C. Aug. 23, 2021) (noting a "successful reorganization . . . would promote Congress's particular goal in section 524(g) by establishing an asbestos trust that would efficiently and equitably resolve tens of thousands of asbestos claims.")

NAI-1542918500

And the Debtor's goal in seeking to resolve this liability is a legitimate bankruptcy purpose. Furthermore, the legitimacy of the Debtor's bankruptcy purpose and the benefits that claimants will receive through the Plan are also supported by the fact that counsel representing tens of thousands of talc claimants and the proposed FCR participated in the negotiation of and approve the Plan and more than 83% of claimants voted in favor of the Plan.  These parties all support the use of the Chapter 11 Case to resolve the Debtor's channeled talc liabilities.

> 2.     *Neither the Plan's Provisions on Non-Debtor Releases Nor <u>Purdue</u> in Any Way Support Movants' Assertion of Bad Faith.*

The extension of a channeling injunction to the Debtor's solvent non-debtor parent does not transform this Chapter 11 Case into a bad-faith filing.  Indeed, such structures are typical in section 524(g) bankruptcies and are expressly sanctioned by the plain language of section 524(g). Additionally, nothing in the Supreme Court's recent decision in <u>Harrington v. Purdue Pharma L.P.</u> supports a contrary proposition even if this were not a section 524(g) case.  That point is demonstrated by the fact that the <u>Purdue</u> bankruptcy case has not been dismissed, and that any discussion of either "good faith" or "bad faith" is noticeably absent from the Supreme Court's opinion.[269]

> 3.     *This Prepackaged Case Seeks to Immediately Resolve, Not "Escape" or "Delay" Resolution of, the Debtor's Talc Liabilities.*

The Debtor's chapter 11 case was prepackaged.  It was filed to promptly and consensually resolve its talc liabilities, not to escape them or delay their resolution.  The Debtor opted for a prepackaged bankruptcy structure for the express purpose of conducting a prepetition vote to establish claimant approval of the proposed resolution to be followed by an expedited confirmation process.  Indeed, LLT and J&J worked hand-in-hand with the FCR and the AHC for

---

[269]     <u>See</u> <u>Harrington v. Purdue Pharma L.P.</u>, 603 U.S. 204 (2024).

over a year to negotiate this Plan, while remaining in the tort system and subject to suit.  During

that period, LLT's goal was to develop a resolution that would secure the requisite support, and

to then pursue bankruptcy on an expedited timeline to effectuate a global settlement.  Far from

evading liability or causing delay, the Debtor filed for bankruptcy with overwhelming support to

implement a prompt resolution; nothing in the Debtor's motives or conduct justifies dismissal of

this Chapter 11 Case.[270]

> 4. *Movants' Going Concern and Property Maximization Arguments Fail.*

> a. <u>The Debtor Is a Going Concern.</u>

Whether a debtor is a legitimate going concern is not relevant to the determination of

whether a case should be dismissed as a "bad faith" filing in the Fifth Circuit.  In fact, in a recent

ruling, the bankruptcy court in <u>HONX</u> found that "[t]here is no ongoing business requirement in

the Code."[271]  Nonetheless, the Debtor is a going concern with a legitimate ongoing business.

The Debtor is the parent and sole equity holder of Royalty A&M, which owns a portfolio of

royalty revenue streams that generate substantial revenue.  Furthermore, the Debtor maintains its

own business: managing the substantial talc liabilities asserted against it.  As such, any argument

that the Debtor's case should be dismissed because it is not a legitimate going concern fails.

> b. <u>The Debtor's Bankruptcy Proceeding Maximizes Value for Creditors.</u>

The Debtor's bankruptcy filing also seeks to maximize value for creditors.  This is

evident through the proposed $9 billion settlement for claimants that the Debtor has proposed

through its prepackaged plan, which has been overwhelmingly supported by those claimants.

---

[270]    Indeed, as this Court has previously recognized, "How does a Debtor working with a UCC in good faith get dismissed on facts like these?"  Tehum Oral Ruling at 34:13–14.

[271]    <u>HONX</u>, 2022 WL 17984313, at *3 (citing <u>Toibb v. Radloff</u>, 501 U.S. 157, 166 (1991)).

NAI-1542918500

Indeed, the widespread support for the Plan demonstrates that claimants agree that it provides the optimal outcome for claimants.  This beneficial outcome contrasts starkly with those in the tort system.  As Judge Kaplan recognized in another talc case, maximizing value requires the court to evaluate "the risks, uncertainties, costs, and delays that accompany these litigations."[272]  Rather than subjecting talc claimants to years of delay and uncertainty as to whether they will actually recover on account of their talc claims, the Debtor's Plan will provide efficient, guaranteed recoveries for claimants at substantially higher values than claimants would otherwise likely recover in the tort system.

### C.      Financial Distress Is Not Required, But Is Present In Any Event.

Assertions that the Debtor's bankruptcy case should be dismissed for lack of financial distress misconstrue both the law in the Fifth Circuit and the facts of this Chapter 11 Case. As such, arguments advancing these theories fail.

### 1.      The Fifth Circuit Does Not Mandate Financial Distress As a Precondition to Seeking Bankruptcy Relief.

Although a debtor's "financial condition" may be relevant to a good-faith analysis, the Fifth Circuit employs the more holistic "totality of the circumstances" standard.[273] The employment of this standard requires courts to determine good faith based on "[a] collection of factors, rather than any single datum."[274]  And, as this Court has previously recognized, "[t]he financial distress standard," that is, requiring some amount of financial distress as a prerequisite to filing for bankruptcy relief, "is not binding on this Court."[275]  Moreover, numerous examples exist where solvent entities, each of which had been defending and paying claims in the tort

---

[272]      In re Whittaker, Clark, & Daniels, 663 B.R. 1, 29 (Bankr. D.N.J. 2024).

[273]      See Little Creek, 779 F.2d at 1072.

[274]      Matter of Elmwood Dev. Co., 964 F.2d 508, 510 (5th Cir. 1992)

[275]      Tehum Oral Ruling at 28:23-25.

NAI-1542918500

system without overt signs of "imminent" financial distress, resolved mass tort liabilities through claimant-supported and court-approved asbestos trusts established under section 524(g).[276] Accordingly, the Debtor need not establish that it is in financial distress to justify this Chapter 11 Case that seeks to establish an asbestos trust under section 524(g).

 2.      *The Debtor Is in Financial Distress.*

Even if the Fifth Circuit, and section 524(g), required that a debtor be experiencing financial distress to access bankruptcy relief, the Debtor was in fact in financial distress on the Petition Date. Indeed, the Debtor currently faces over 93,000 personal injury claims (with more to come in the future) alleging that talc-based products caused ovarian cancer and other gynecological cancers. It would cost billions of dollars to defend these cases, and because of the sheer number of claims, the Debtor would likely have no choice but to settle many of them. The Debtor also faces the ever-present possibility of lottery-like verdicts in the tort system. For example, as described above, the Debtor sustained a multi-billion verdict in the Ingham case. Accordingly, even if a small percentage of claims resulted in a plaintiff verdict that survived appeal, the Debtor could be subject to substantial judgments, and the Debtor's financial distress as of the Petition Date cannot reasonably be disputed.

 3.      *Neither J&J Nor the Debtor Committed "Fraud" or Engaged in "Fraudulent Transfers" to Manufacture Jurisdiction or Financial Distress.*

The Debtor's financial distress was not "manufactured" and it is not the result of fraud. The Debtor had no need to "manufacture" financial distress to establish subject matter jurisdiction or a valid reorganizational purpose because, as discussed above, financial distress is not a precondition for filing bankruptcy in this Circuit and seeking to resolve tens of thousands

---

[276] See MTD Obj. at 42-45 (discussing cases).

of mass tort claims is unequivocally a valid reorganizational purpose.  Moreover, whether the

Debtor was in financial distress has no bearing on subject matter jurisdiction because subject

matter jurisdiction concerns only "the statutorily conferred power of the court to hear a class of

cases."[277]  Courts in the Fifth Circuit have continually found that bankruptcy courts derive

subject matter jurisdiction from both 28 U.S.C. §§ 1334 and 157, finding that "section 1334

grants the federal district courts jurisdiction over four types of bankruptcy matters. . . . The first

category refers to the bankruptcy petition itself."[278]

> **D.**     **Dismissal of LTL's Bankruptcies Does Not Support or Warrant Dismissal of this Chapter 11 Case.**

The dismissal of LTL's bankruptcies does not support or require the dismissal of this

Chapter 11 Case.  Specifically, the Debtor, a distinct entity, is not a "serial filer" and, in any

event, could show ample "changed circumstances" sufficient to avoid dismissal of this case.

Additionally, the prior findings that LTL lacked immediate financial distress have no preclusive

effect requiring dismissal of this Chapter 11 Case.

> *1.     The Debtor Is Not a "Serial Filer" and, in Any Event, Circumstances Have Materially Changed Since the Prior Bankruptcies.*

The Debtor is not LTL and has not previously filed a chapter 11 case; it is not a serial

filer.  Even if it were, the Bankruptcy Code expressly contemplates the possibility of a debtor

filing a new petition for relief following dismissal.  Section 349 provides that "the dismissal of a

case under this title" does not "prejudice the debtor with regard to the filing of a subsequent

petition under this title . . . ."[279]  If the Debtor and LTL were the same entity, which they are not,

the filing of this Chapter 11 Case would still be permissible under the Bankruptcy Code.

---

[277]      See In re Trusted Net Media Holdings, LLC, 550 F.3d 1035, 1044 (11th Cir. 2008).

[278]      In re U.S. Brass Corp., 301 F.3d 296, 303–04 (5th Cir. 2002).

[279]      11 U.S.C. § 349(a).

-69-

Where a debtor immediately files a new case after dismissal, some courts have required that the debtor establish "changed circumstances" to avoid a second dismissal. Such a requirement typically has been imposed, however, only where the refiling amounts to an effort to modify an existing, substantially consummated chapter 11 plan.[280] And some courts have held that changes in circumstance that improve the likelihood of a successful reorganization justify a refiling.[281] In any event, the requirement applies only to refilings by the same entity.

No such prohibition against successive filings applies to the Debtor. The Debtor is not LTL. LTL never substantially consummated a plan of reorganization, nor even reached the solicitation or confirmation stages in its prior bankruptcies. Even if—solely for the sake of argument—the Debtor and LTL were the same entity, LTL experienced sufficient changed circumstances following dismissal of its second chapter 11 case to support maintaining this case. Those changed circumstances include, for example, (a) a different class of creditors comprising a distinct group of mass tort claimants, (b) materially different terms of the proposed resolution and (c) the prepetition solicitation and approval of the Plan by the overwhelming majority of talc claimants. Finally, the Debtor's bankruptcy petition was filed *406 days* after the dismissal of LTL's second bankruptcy case, which further undermines any contention that this Chapter 11 Case is a serial filing.

###### 2. *Precluding Doctrines Do Not Support Dismissal of This Case.*

Neither the doctrine of res judicata (claim preclusion) nor the doctrine of collateral estoppel (issue preclusion) applies in this case. Primarily, these doctrines are not applicable here

---

[280] Elmwood, 964 F.2d at 511 ("[W]e must consider whether the Elmwood II petition was an attempt to evade the Code's prohibition against modification of substantially consummated confirmed plans.").

[281] See In re 234-6 W. 22nd St. Corp., 214 B.R. 751, 758 (Bankr. S.D.N.Y. 1997) ("[A] debtor whose case was previously dismissed must show that circumstances have improved sufficiently to support the possibility of reorganization."); In re McCormick Road Assocs., 127 B.R. 410, 412, 416–17 (N.D. Ill. 1991) (requiring "an objectively reasonable likelihood of reorganization" following dismissal of previous case).

because the dismissals of the prior LTL cases were fact-intensive determinations focused on the

financial conditions in 2021 and 2023 of a different entity.  Neither determination considered the

Debtor's financial condition, much less its financial condition as of the Petition Date.  Moreover,

as discussed above, the legal standard that this Court applies to determine whether the Debtor's

case was filed in good faith is distinct from the standard applied by the New Jersey bankruptcy

court in dismissing LTL's second chapter 11 case.

> **E.      Even If "Cause" Existed to Dismiss This Case, the Court Should Deny the Dismissal Motions.**

Finally, section 1112(b)(2) of the Bankruptcy Code precludes dismissal or conversion of a

Chapter 11 case if "unusual circumstances" show that dismissal or conversion is not in the best

interests of creditors and there is a reasonable likelihood that a chapter 11 plan will be confirmed

within either a reasonable time or applicable statutory deadlines.[282]  Here, the vast majority of

claimants prefer the historic prepackaged Plan being offered by the Debtor.  The Plan is

supported by the Committee, the AHC and the FCR.  There is a reasonable possibility that,

eventually ***all*** or virtually all claimants will support the plan.  It is difficult to imagine a more

persuasive case for denying dismissal under section 1112(b)(2)'s "unusual circumstances"

exception.

## II.     THE DISCLOSURE STATEMENT AND SOLICITATION PROCEDURES MOTION SHOULD BE APPROVED.[283]

> ### A.      Approval of Adequacy of Information in the Disclosure Statement

Section 1125(g) of the Bankruptcy Code permits a debtor to solicit acceptance or

rejection of a plan from a holder of a claim or interest prior to the commencement of a chapter 11

---

[282]       See 11 U.S.C. § 1112(b)(2).

[283]       This section is intended to summarize certain arguments set forth in the Disclosure Statement and Solicitation Procedures Motion, the *Debtor's Consolidated Reply in Support of Approval of Disclosure Statement, Solicitation  Procedures and Tabulation of the Vote on the Debtor's Prepackaged Chapter 11*

case, if such solicitation otherwise complies with applicable non-bankruptcy law.  11 U.S.C.

§ 1125(g).  Additionally, section 1126(b) deems a holder of a claim or interest that has accepted

or rejected the plan prior to the commencement of a chapter 11 case to have accepted or rejected

the plan, as applicable, without need for a court-approved disclosure statement, if:  (a) the

solicitation complied with applicable non-bankruptcy law, including generally applicable federal

and state securities laws or regulations, or (b) if no such laws exist, the solicited holders received

"adequate information" within the meaning of section 1125(a) of the Bankruptcy Code.[284]

There is no applicable non-bankruptcy law that governs LLT's prepetition solicitation of

votes to accept or reject the Initial Plan on behalf of the Debtor.  To be approved, therefore, the

holders of claims and interests entitled to vote on the Initial Plan must have been provided with

"adequate information," as defined in section 1125(a).[285]  A court has broad discretion in

determining what constitutes "adequate information" for the purpose of section 1125.[286]

A court's determination of the adequacy of information in a disclosure statement must occur on a

case-by-case basis, focusing on the unique facts and circumstances of each case.[287]

---

*Plan of Reorganization* [Dkt. 634] (the "Disclosure Statement and Solicitation Procedures Reply") and, to the extent applicable, the Confirmation Brief.  Reference is made to the Disclosure Statement and Solicitation Procedures Motion, Disclosure Statement and Solicitation Procedures Reply and Confirmation Brief for such arguments.

[284]   11 U.S.C. § 1126(b).

[285]   11 U.S.C. § 1126(b)(2).

[286]   See, e.g., Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop.), 150 F.3d 503, 518 (5th Cir. 1998) ("[I]n determining what constitutes 'adequate information' with respect to a particular disclosure statement, 'both the kind and form of information are left essentially to the judicial discretion of the court . . . the information required will necessarily be governed by the circumstances of the case.'") (quoting S. Rep. No. 95- 989, at 121 (1978)), cert. denied, 119 S. Ct. 2019 (1999); Eubanks v. F.D.I.C.., 977 F.2d 166, 169 n.2 (5th Cir. 1992) ("A determination as to the adequacy of the contents of a disclosure statement necessarily depends upon the facts and circumstances of each case."); Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.), 844 F.2d 1142, 1157 (5th Cir. 1988), cert. denied, 488 U.S. 926 (1988) (what constitutes adequate information is "subjective," "made on a case-by-case basis" and "largely in the discretion of the bankruptcy court").

[287]   See S. Rep. No. 95-989, at 121 (1978), as reprinted in 1978 U.S.C.C.A.N, 5787, 5907 (stating that "the information required will necessarily be governed by the circumstances of the case.").

The purpose of a disclosure statement is to provide material information that claimants affected by a proposed plan need to make an informed decision on whether to vote to accept or reject the plan.[288]  "The quality of the Disclosure Statement which will qualify as 'adequate information' will vary with the circumstances. The kind and form of information is left to the judicial discretion of the court on a case by case basis."[289]  Every fact potentially relevant to a debtor is not required to be disclosed.  "The statutory definition of 'adequate information' leaves the bankruptcy court wide discretion to determine on a case by case basis whether a disclosure statement contains adequate information, without burdensome, unnecessary, and cumbersome detail."[290]

Here, the Disclosure Statement contains ample information for holders of Class 4 Channeled Talc Personal Injury Claims and Class 6 Equity Interests in the Debtor—the only voting classes—to make an informed decision about the Initial Plan.  That information includes the following, among other things:  (a) the range of expected recoveries in dollars for claimants by disease type; (b) the classification of claims and interests under the Initial Plan; (c) the effect of the Channeling Injunction and the assets that would be contributed to the Talc Personal Injury Trust; (d) the corporate and litigation history of the Debtor and its predecessors; (e) the then-anticipated Prepetition Corporate Restructuring; (f) the Chapter 11 Case; (g) the Initial Plan and Trust Distribution Procedures; (h) the solicitation and tabulation procedures, including the

---

[288]    See, e.g., Century Glove, Inc. v. First Am. Bank of N.Y. 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote."); In re Shea, Ltd. 545 B.R. 529, 538 n.6 (Bankr. S.D. Tex. 2016) ("The purpose of a disclosure statement is to provide adequate information to creditors in order to allow them to make informed judgments about the proposed plan.").

[289]    Matter of Nw. Recreational Activities, Inc., 8 B.R. 10, 11 (Bankr. N.D. Ga. 1980).

[290]    In re Dakota Rail, Inc., 104 B.R. 138, 143 (Bankr. D. Minn. 1989) (referencing Tex. Extrusion Corp. 844 F.2d at 1157).

NAI-1542918500

Debtor's request that each disputed, contingent and unliquidated Channeled Talc Personal Injury

Claim be estimated in the amount of $1.00 solely for purposes of voting on the Initial Plan;

(i) various risk factors; (j) the Initial Plan's release, injunction and exculpation provisions in

bold, capitalized font; and (k) the federal income tax consequences of the Initial Plan.[291]

In addition, in accordance with Bankruptcy Rule 3016(c), section 6.11 of the Disclosure

Statement describes in bold type the injunction, exculpation and release provisions contained in

Article XI of the Initial Plan, which, together with the Notice of Non-Voting Status, provides

sufficient notice thereof to all holders of Claims and Interests and other parties in interest.[292]

        1.     *Adequate Information Was Provided on Estimated Recoveries.*

An important element of any disclosure statement is that it convey to creditors

information relevant to their likely recoveries.   In a mass tort case, this typically means that

claimants be informed as to the details of trust distribution procedures that will be used to allow

their claims post-confirmation.  This has been determined by numerous courts to be sufficient

information on claimant recoveries.  Indeed, it is highly uncommon for disclosure statements in

mass tort cases even to purport to give claimants a likely dollar range of recoveries.  However,

the Disclosure Statement did provide claimants with an estimate of the likely average recovery

range on account of Ovarian Cancer claims.  And it compared that range to recoveries in the tort

system.

The Disclosure Statement provided that holders of pending Ovarian Cancer claims that

qualify for payment under the Trust Distribution Procedures would receive an average recovery

of between $50,000 and $200,000, with the more likely average value being between $75,000

---

[291]    See Disclosure Statement, Art. I-XI.

[292]    See Disclosure Statement, § 6.11.

and \$150,000.[293]  Comparing those estimated recoveries to likely outcomes in the tort system,

the Disclosure Statement provided that the historical per claimant recovery for Ovarian Cancer

claims was \$50,000 to \$80,000.[294]  Moreover, the Disclosure Statement stated accurately that, in

the 17 ovarian cancer trials that proceeded to verdict against the Debtor and J&J in the tort

system, plaintiffs prevailed in only one; all the other claimants received nothing.[295]

The statements in the Disclosure Statement comparing expected recoveries under the

Initial Plan with those in the tort system were reasonable, good faith estimates based upon the

Debtor's analysis.  Moreover, the estimated amounts at the time of solicitation are consistent

with Dr. Mullin's findings in his January 7, 2025 expert report.[296]  The information provided in

the Disclosure Statement is sufficiently detailed and contains adequate information to allow

Holders of Claims in the Voting Classes to make an informed decision regarding whether to vote

to accept or reject the Initial Plan.

>    2.    *Information on Litigation History and Science Was Accurate and Not Misleading.*

The information provided in the Disclosure Statement is fair and accurate, and the

Disclosure Statement could leave no reasonable reader in doubt that the arguments supporting all

Channeled Talc Personal Injury Claims are hotly disputed.[297]  This is sufficient for the purpose of

soliciting votes on the Initial Plan.

Any realistic potential for confusion regarding information contained in the Disclosure

Statement was minimal because substantially all holders of Channeled Talc Personal Injury

---

293    Id. § 1.1(c).

294    Id.

295    Id.

296    Compare id. with Mullin Report ¶ 11.

297    Disclosure Statement § 2.2(a)-(d).

NAI-1542918500

Claims retained their own lawyers to whom solicitation materials were directed.  Moreover, the Disclosure Statement did not exist in a vacuum.  During the solicitation period, objecting law firms were engaged in a counter-solicitation and media assault involving virtual town hall meetings, email blasts, texts, phone calls and videos, not just to their own clients but to the public at large.[298]  Moreover, many law firms determined and cast their clients' votes themselves under applicable powers of attorney (or, in the case of Beasley Allen, based on the false certification that it had received and recorded its clients' votes).  Thus, the vast majority of claimants based their voting decision on the advice of informed counsel and not solely on the contents of the Disclosure Statement and other solicitation materials.

### B.   The Solicitation Procedures Were Appropriate, and Solicitation was Conducted in a Reasonable and Appropriate Manner.

#### 1.   *Voting Record Dates*

Bankruptcy Rule 3018(b) provides, in relevant part, that, in the context of a prepetition solicitation, the holders of record of the applicable claims against and interests in a debtor entitled to receive ballots and related solicitation materials are to be determined "on the date specified in the solicitation."[299]  Here, the Disclosure Statement and the ballots complied with Bankruptcy Rule 3018(b) and clearly identified June 3, 2024, the date that solicitation commenced, as the record date for holders of Channeled Talc Personal Injury Claims.[300] In addition, the Disclosure Statement provided that, following the Debtor's formation pursuant to the Prepetition Corporate Restructuring, the Debtor would distribute a ballot to each holder of an

---

[298]   See supra § I.E.; see also Birchfield Dep., 30:16-31:6 ("Q. Did you communicate with your clients relating to the solicitation, the proposed plan, in any means other than by letter?  A. Yes.  … Through … virtual town hall … meetings, … through e-mail and text, through phone calls.").

[299]   Fed. R. Bankr. P. 3018(b).

[300]   See, e.g., Disclosure Statement § 9.1; see also Initial Voting Decl., ¶ 6.

-76-

Equity Interest in the Debtor as of the appropriate record date.[301]  The solicitation package

provided to Johnson & Johnson Holdco (NA) Inc., the sole holder of Equity Interests in the

Debtor, clearly identified September 17, 2024 as the equity record date.

2.      *Contents of the Solicitation Packages*

Bankruptcy Rule 3017(d) specifies the materials that must be provided to holders of

claims and interests for the purpose of soliciting their votes to accept or reject a chapter 11 plan

(including, among other things, a plan, disclosure statement, notice of the applicable voting

deadline and a ballot, as applicable).[302]  Consistent with Bankruptcy Rule 3017(d), the

solicitation package consisted of:  (a) a cover letter; (b) the Disclosure Statement; (c) a copy of

the appropriate ballot and corresponding instructions; (d) if applicable, a pre-addressed, postage

prepaid return envelope; and (e) letters recommending acceptance of the Initial Plan from each of

LLT and the AHC.[303]

As a cost-saving measure, Solicitation Packages included a flash drive containing

electronic copies of certain documents contained therein.[304]  The distribution of solicitation

materials using flash drives is common in this jurisdiction and others,[305] and the printed materials

provided instructions for any party that preferred to receive any of the materials in paper format

---

[301]    Disclosure Statement § 9.1.

[302]    Fed. R. Bankr. P. 3017(d).

[303]    See Initial Voting Decl. ¶ 8.

[304]    See id.

[305]    See, e.g., In re Robertshaw US Holding Corp., No. 24-90052 (CML) (Bankr. S.D. Tex. June 21, 2024)
        [Dkt. 676] (permitting solicitation package to be distributed using flash drive); In re Diamond Sports Grp.,
        LLC, No. 23-90116 (CML) (Bankr. S.D. Tex. Apr. 17, 2024) [Dkt. 1977] (same); In re Instant Brands
        Acquisition Holdings, Inc., No. 23-90716 (MI) (Bankr. S.D. Tex. Jan. 11, 2024) [Dkt. 924] (approving
        distribution of solicitation packages through electronic means); In re Diamondback Indus., Inc., No. 20-
        41504 (ELM) (Bankr. N.D. Tex. Oct. 21, 2020) [Dkt. 575-1] (permitting solicitation package to be
        distributed via USB Flash Drive); In re Dougherty's Holdings, Inc., No. 19-32841 (HDH) (Bankr. N.D.
        Tex. Feb. 14, 2020) [Dkt. 165] (same); In re PHI, Inc., No. 19-30923 (HDH) (Bankr. N.D. Tex. June 24,
        2019) [Dkt. 718] (same).

NAI-1542918500

could contact Epiq and request paper copies free of charge.  Claimants were also directed to a website maintained by Epiq for more information (the "Document Website").  Copies of the Disclosure Statement, Initial Plan and related exhibits were also available free of charge on the Document Website throughout the solicitation period.[306]

### 3.    Distribution of Solicitation Packages

Beginning on June 3, 2024, Epiq distributed solicitation packages, including an appropriate form of ballot, to the holders of Channeled Talc Personal Injury Claims.[307] In particular Epiq distributed:  (a) packages containing master ballots to all known counsel representing holders of Channeled Talc Injury Claims; and (b) packages containing individual ballots to (i) all known holders of Channeled Talc Personal Injury Claims without counsel and (ii) all known holders of Channeled Indirect Talc Personal Injury Claims.[308]

Thereafter, Epiq distributed more than 58,000 additional solicitation packages pursuant to requests from claimants or their counsel, including as provided for in the instructions to the Master Ballot.[309]  In addition, on September 17, 2024, Epiq provided a solicitation package with a ballot to New Holdco, as the sole holder of all Equity Interests in the Debtor.[310]  On June 28, 2024, four weeks before the Voting Deadline, Epiq served a plan supplement on all plaintiff firms and more than 57,000 individual claimants, containing copies of various exhibits to the Initial Plan and ministerial revisions to the Initial Plan itself.[311]

---

[306]   See, e.g., Direct Ballot, 2.

[307]   On November 15, 2024 Epiq served a notice of non-voting status on each holder of an unimpaired claim. See Certificate of Service [Dkt. 569].

[308]   See Initial Voting Decl. ¶ 9.

[309]   Id. ¶ 10-11.

[310]   See id. ¶ 12.

[311]   Id. ¶ 9(d).

Epiq completed soliciting votes to accept or reject the Initial Plan prior to the Petition Date in accordance with sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.[312]  The prepetition solicitation process resulted in a total of 93,522 recorded votes on the Plan and acceptance of the Plan by 83.4% of voting holders of Channeled Talc Personal Injury Claims in Class 4, as well as 100% of Equity Interests in the Debtor in Class 7.[313]

### 4.    Solicitation Through Counsel was Appropriate.

For a prepetition acceptance or rejection of a chapter 11 plan to be valid, Bankruptcy Rule 3018(b) requires that (a) the plan be "transmitted to substantially all creditors and equity security holders of the same class," (b) a reasonable amount of time be "prescribed for such creditors and equity security holders to accept or reject the plan" and (c) the solicitation be "in compliance with § 1126 of the [Bankruptcy] Code."[314]

The distribution of the solicitation packages according to the solicitation procedures described above, together with the Supplemental Notice Program, provided adequate notice of the Initial Plan and the Voting Deadline to all known holders of Channeled Talc Personal Injury Claims or their counsel and to substantially all unknown potential claimants and therefore ensured that substantially all claimants in Class 4 received notice of the Initial Plan and the ability to submit their votes by the Voting Deadline.  The Debtor transmitted the solicitation packages to all known holders of Channeled Talc Personal Injury Claims, either directly or through their counsel.

---

[312]    See Initial Voting Decl. ¶ 10-12.

[313]    See Initial Voting Decl., Ex. 20 (Tabulation Summary).

[314]    Fed. R. Bankr. P. 3018(b).

NAI-1542918500

LLT, on behalf of the Debtor, had a clear understanding of the universe of known creditors.  That understanding was based, not just on the thousands of pending actions, but also LLT's two prior chapter 11 cases.  LLT transmitted the Initial Plan to every claimant it was aware of, either directly or through such claimant's counsel, who had asserted a Channeled Talc Personal Injury Claim against the Debtor or the other Protected Parties.[315]  Transmittal of solicitation packages through counsel also ensured that any other of such counsel's clients who held, but had not yet asserted, a Channeled Talc Personal Injury Claim against the Debtor or another Protected Party likewise received notice.  Future claimants are not known creditors and were not entitled to actual notice.[316]

> 5.      *The Forms of Ballot*

Bankruptcy Rule 3017(d) requires that debtors mail a form of ballot to "creditors and equity security holders entitled to vote on the plan."  Fed. R. Bankr. P. 3017(d).  Epiq distributed ballots to holders of Claims and Interests in voting classes substantially in the forms attached to the Initial Voting Declaration.[317]  The forms of ballot were based on Official Form No. 314, but were modified to address the particular aspects of this Chapter 11 Case and to include certain information that LLT, on behalf of the Debtor, believed to be relevant and appropriate for holders of Claims and Interests in the voting classes to consider.

The forms of ballot contained appropriate certifications consistent with ballots used in other mass tort chapter 11 cases.  Master ballots, in particular, included certifications concerning the applicable firm's:  (a) solicitation, collection, recording and submission of votes of holders of

---

[315]    See Initial Voting Decl. ¶ 9, Ex. 13.

[316]    See In re Flintkote Co., 486 B.R. 99, 128 (Bankr. D. Del. 2012) ("[A]n exposed asbestos creditor who has not yet manifested an injury is . . . not a known creditor entitled to actual notice, and is one who is impossible to identify, such that providing actual notice is, itself, impossible.").

[317]    See Initial Voting Decl., Exs. 9, 12; Master Ballot; Direct Ballot.

NAI-1542918500

Channeled Talc Personal Injury Claims (or the exercising of a valid power of attorney to vote on behalf of such holders); and (b) reasonable belief as to the validity of the Channeled Talc Personal Injury Claims asserted therein.  In addition, both the individual and master ballots included appropriate questions regarding the type of disease asserted by the applicable claimants and their alleged use of one or more talc-containing products formulated, manufactured, distributed, and/or sold by the Debtor and/or any Debtor Corporate Party.[318]

6.     *The Master Ballot and Direct Ballot Solicitation Methods for Clients of Plaintiff Firms*

The solicitation packages distributed to law firms included a master ballot and template exhibit.  Each master ballot included instructions concerning how to complete the ballot on behalf of the firm's clients or, in the alternative, the process for requesting that individual ballots be sent to such clients.[319]  Law firms that desired for their clients to receive individual ballots were required to request, by no later than June 20, 2024, that Epiq either distribute solicitation packages with ballots to such clients or provide the law firm with any requested solicitation packages and ballots to distribute themselves.[320]  In addition, law firms electing to have individual ballots sent to their clients were required to submit a list containing the name and last four digits of the social security number or date of birth and personal home address of each such client.[321]

Law firms could vote by master ballot if they certified that they (a) had collected and recorded the votes of their clients with such clients' informed consent under applicable law or

---

[318]     See Master Ballot, 7; Direct Ballot, 6-8.

[319]     See Master Ballot, 9-12.

[320]     Id.

[321]     See id. at 9.

(b) were voting on behalf of their clients pursuant to applicable powers of attorney.[322]  Law firms were also required to certify that they had either (a) provided a solicitation package to each client or (b) requested that Epiq serve solicitation packages on such Clients.[323]

Epiq served solicitation packages in accordance with law firms' requests.[324]  If a law firm did not contact Epiq by June 20, 2024, with instructions that Epiq solicit the votes of the firm's clients using individual ballots, the law firm was deemed to have agreed to record and submit votes on the Initial Plan by master ballot.[325]  The noticing of claimants through their counsel and the authorized voting on a plan of reorganization through such counsel are both conventional practices in mass tort chapter 11 cases and should be approved here.[326]

### 7.    The Supplemental Notice Program

In addition to the service of the solicitation packages described above, LLT disseminated notice of the solicitation of votes on the Initial Plan in connection with a potential bankruptcy filing through various media sources pursuant to the Supplemental Notice Program that was developed by Signal, as described in the Wheatman Declaration.

---

[322]    See id.

[323]    See id. at 7.

[324]    Initial Voting Decl. ¶ 10-11.

[325]    See Master Ballot, 9.

[326]    See, e.g., In re Honx, Inc., No. 22-90035 (MI) (Bankr. S.D. Tex. July 14, 2023) [Dkt. 890] (approving prepetition solicitation of claimants' votes through their counsel); In re Asarco LLC, No. 05-21207 (Bankr. S.D. Tex. July 2, 2009) [Dkt. 11884] (same); In re Maremont Corp., 601 B.R. 1 (Bankr. D. Del. 2019) (same); In re PG&E Corp., No. 19-30088 (DM) (Bankr. N.D. Cal. Mar. 17, 2020) [Dkt. 6340] (permitting noticing to claimants through their counsel); In re Boy Scouts of Am., No. 20-10343 (LSS) (Bankr. D. Del. Sept. 30, 2021) [Dkt. 6438] (same); In re Imerys Talc Am., Inc., No. 19-10289 (LSS) (Bankr. D. Del. Jan. 27, 2021) [Dkt. 2863] (same); In re Oakfabco, Inc., No. 15-27062 (JBS) (Bankr. N.D. Ill. Jan. 15, 2019) [Dkt. 771] (same); In re Duro Dyne, No. 18-27963 (MBK) (Bankr. D.N.J. Nov. 20, 2018) [Dkt. 287] (same); In re Yarway Corp., No. 13-11025 (BLS) (Bankr. D. Del. Jan. 27, 2015) [Dkt. 756] (same).

8.    *Ample Time Was Provided for Claimants to Cast Their Votes to Accept or Reject the Initial Plan.*

Each of the ballots, the voting instructions therein, the Disclosure Statement and the Supplemental Notice Program adequately informed each holder of a Channeled Talc Personal Injury Claim or their counsel of record that votes were required to be received by Epiq on or before the Voting Deadline to be counted, which was eight weeks after the commencement of solicitation.  The Supplemental Notice Program provided potential unknown claimants with at least two weeks and potentially up to seven weeks to submit a vote by the Voting Deadline. The eight-week period afforded holders of Channeled Talc Personal Injury Claims to submit a vote on the Initial Plan, and the four-week period after service of the plan supplement, were reasonable and appropriate under the circumstances of this Chapter 11 Case and consistent with or greater than the voting periods that have been approved in other mass tort cases.[327]

In addition, the distribution of a solicitation package to New Holdco, as the sole holder of all Equity Interests in the Debtor constituted adequate notice of the Plan and the applicable voting deadline.  The ballot and the voting instructions therein adequately informed New Holdco that votes were required to be received by Epiq on or before September 19, 2024, and New Holdco indeed voted in favor of the Plan by that date.

---

[327]    See, e.g., In re Insys Therapeutics, Inc., No. 19-11292 (Bankr. D. Del. Dec. 4, 2019) [Dkt. 952] (mass tort case approving 28-day solicitation period); In re Oakfabco, Inc., No. 15-27062 (Bankr. N.D. Ill. Jan. 15, 2019) [Dkt. 771] (asbestos-related case approving 42-day solicitation period); In re Duro Dyne, No. 18-27963 (Bankr. D.N.J. Nov. 20, 2018) [Dkt. 287] (asbestos-related case approving 62-day solicitation period); In re Yarway Corp., No. 13-11025 (Bankr. D. Del. Jan. 27, 2015) [Dkt. 756] (asbestos-related case approving 46-day solicitation period); In re Specialty Prods. Holding Corp., No. 10-11780 (Bankr. D. Del. Oct. 21, 2014) [Dkt. 5112] (asbestos-related case approving 35-day solicitation period); In re Diocese of Camden, No. 20-21257 (Bankr. D.N.J. April 6, 2022) [Dkt. 1447] (mass tort case approving 33-day solicitation period); In re Madison Square Boys and Girls Club, No. 22-10910 (Bankr. S.D.N.Y Apr. 28, 2023) [Dkt. 461] (mass tort case approving 41-day solicitation period); In re Imerys Talc Am., Inc., No. 19-10289 (Bankr. D. Del. Jan. 27, 2021)  [Dkt. 2863] (mass tort case approving 52-day solicitation period); In re PG&E Corp., No. 19-30088 (Bankr. N.D. Cal. Mar. 17, 2020)  [Dkt. 6340] (mass tort case approving 45-day solicitation period); In re Boy Scouts of Am., No. 20-10343 (Bankr. D. Del. Sep. 30, 2021) [Dkt. 6438] (mass tort case approving 60-day solicitation period); and In re TK Holdings Inc. No. 17-11375 (Bankr. D. Del. Jan. 5, 2018) [Dkt. 1639] (mass tort case approving 28-day solicitation period).

-83-

The eight-week solicitation period was ample particularly in light of the fact that:  (a) no party is a stranger to this Chapter 11 Case, (b) substantially all known claimants are represented by counsel, (c) solicitation materials were distributed directly to and through counsel and (d) most law firms submitted votes electronically using master ballots.  Moreover, the solicitation period provided was consistent with or longer than those approved in many other mass tort cases.[328]  The solicitation procedures afforded all known and unknown claimants with a full and fair opportunity to accept or reject the Initial Plan by the Voting Deadline and provided them with adequate information to make an informed decision in doing so.

## III.    THE VOTE TABULATION SHOULD BE APPROVED.[329]

### A.    Approval of the Voting Results

As explained above, the Debtor filed the Vote Confirmation Motion (and the Disclosure Statement and Solicitation Procedures Motion) to present for the Court's consideration certain issues critical to Plan confirmation while awaiting certification of the vote in the Imerys/Cyprus cases.[330]  The relief requested by the Vote Confirmation Motion thus mirrors certain confirmation requirements, including that:  (a) under section 1129, "[w]ith respect to each class of claims and interests—(A) such class has accepted the plan; or (B) such class is not impaired under the

---

[328]   See In re Imerys Talc Am. Inc. No. 19-10289 (LSS) (Bankr. D. Del. Jan. 27, 2021) [Dkt.  2863] (mass tort case approving 52-day solicitation period); In re Insys Therapeutics, Inc. No. 19-11292 (KG) (Bankr. D. Del. Dec. 4, 2019) [Dkt. 952] (mass tort case approving 28-day solicitation period); In re Oakfabco, Inc. No. 15-27062 (JBS) (Bankr. N.D. Ill. Jan. 15, 2019) [Dkt. 771] (asbestos-related case approving 42-day solicitation period); In re Yarway Corp. No. 13-11025 (BLS) (Bankr. D. Del. Jan. 27, 2015) [Dkt. 756] (asbestos-related case approving 46-day solicitation period); In re Duro Dyne Nat'l Corp. No. 18-27963 (MBK) (Bankr. D.N.J. Nov. 20, 2018) [Dkt. 287] (asbestos-related case approving 62-day solicitation period); In re Specialty Prods. Holding Corp. No. 10-11780 (PJW) (Bankr. D. Del. Oct. 21, 2014) [Dkt. 5112] (asbestos-related case approving 35-day solicitation period).

[329]   This section is intended to summarize certain arguments set forth in the Disclosure Statement and Solicitation Procedures Motion, the Vote Confirmation Motion, the Disclosure Statement and Solicitation Procedures Reply and the Debtor's objections to the Coalition Voting Motions [Dkts. 428, 430, 432], as well as, to the extent applicable, the Confirmation Brief.  Reference is made to those filings for a complete discussion of such arguments.

[330]   See supra § III.B.

plan;"[331] and (b) under section 524(g), "a separate class or classes of the claimants whose claims are to be addressed by [such] a trust . . . is established and votes, by at least 75 percent of those voting, in favor of the plan."[332]

By the Vote Confirmation Motion, the Debtor requested, pursuant to sections 105(a), 1126 of the Bankruptcy Code, that the Court confirm the results of voting, as reported by Epiq. Those results were that 83.40% of votes (77,998 of 93,522) cast by or on behalf of holders of Channeled Talc Personal Injury Claims voted to accept the Plan.[333]

      *1.*    *The Debtor Appropriately Allowed Gynecological Cancer Claims to Vote.*

There is no basis for allegations that the Debtor "stuffed the ballot box" with noncompensable Gynecological Cancer claims held by members of the AHC to obtain the support of 75% of claimants, as required by section 524(g) of the Bankruptcy Code. Gynecological Cancer claims have been filed against the Debtor or its predecessors since 2015. Available records in the MDL and MCL indicate that at least 1,000 Gynecological Cancer claims have been asserted in those proceedings alone. Moreover, that number likely understates the total number of pending Gynecological Cancer claims because plaintiff profile forms have been disclosed for only approximately two-thirds of the plaintiffs in those cases. Beasley Allen itself has asserted Gynecological Cancer claims in the MDL beginning in 2015, and voted approximately 3,800 of those claims in the Imerys bankruptcy in 2018. Golomb Legal has filed

---

[331]    11 U.S.C. § 1129(a)(8). In addition, section 1126(c) of the Bankruptcy Code provides that "[a] class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class . . . ." 11 U.S.C. § 1126(c).

[332]    11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

[333]    See Suppl. Voting Decl., ¶ 6. In addition the sole holder of Equity Interests in the Debtor also voted to accept the Plan. See id.

Gynecological Cancer claims in the MCL, and one such claim was selected as a bellwether case in that proceeding.

As explained above, claimants who identified themselves as holding Ovarian Cancer claims voted overwhelmingly to accept the Plan in approximately the same proportion (approximately 82%) as holders of Channeled Talc Personal Injury Claims generally (approximately 83%).[334]  Thus, even if only Ovarian Cancer claims had been permitted to vote on the Plan, the outcome would have been the same.

The Debtor believes that **all** Channeled Talc Personal Injury Claims, including Ovarian Cancer claims and Gynecological Cancer claims, have no scientific basis, and the Debtor disputes the merits of all such claims.[335]  But numerous Gynecological Cancer claims have been asserted in the tort system, including by Beasley Allen.  Moreover, more than 80 plaintiff firms filed master ballots voting Gynecological Cancer claims and Other Disease Talc Personal Injury Claims.[336]  And Beasley Allen alone voted on behalf of more than 5,000 such claimants.[337]

The fact that the validity of Gynecological Cancer claims is disputed does not mean that they are not "claims" entitled to vote on the Initial Plan.  Disputed claims can be "claims" under the Bankruptcy Code.  See 11 U.S.C. § 101(5) ("The term "claim" means—(A) right to payment, **whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent,** matured, unmatured, **disputed,** undisputed, legal, equitable, secured, or unsecured) (emphasis

---

[334]    See Evans Report, ¶ 42.

[335]    See *Supplemental Declaration of John K. Kim in Support of the Debtor's Objections to the Coalition's (I) Designation Motion, (II) Reinstatement Motion and (III) Estimation and Bar Date Motions* [Dkt. 433] (the "Supplemental Kim Declaration") ¶ 11.

[336]    Id. at ¶ 9.

[337]    Birchfield Dep., 181:2-8 (conceding Beasley Allen voted "approximately 5,000" Gynecological Cancer claims).

added).[338]  Indeed, it is a rare instance in which any mass tort defendant ***admits*** the validity of personal injury claims, whether resolving them through or outside of bankruptcy.  But the fact is that these claims have been asserted against the Debtor and must be addressed for the Debtor to fully resolve its talc claims.

> 2. *Talc Personal Injury Claims Should Be Allowed in the Amount of $1.00 Per Claimant Solely for Voting Purposes.*

Section 1126(c) of the Bankruptcy Code provides in part that "[a] class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . ."[339]  In addition, section 524(g) of the Bankruptcy Code requires that "as part of the process of seeking confirmation of such plan [the court must determine that] a separate class or classes of claimants whose claims are to be addressed by a trust described in [section 524(g)(2)(B)(i)] is established and votes, by at least 75 percent of those voting, in favor of the plan."[340]

Courts presiding over numerous mass tort bankruptcy cases have allowed claims in the amount of $1.00 for voting purposes.[341]  In such cases, it is often not possible to know the extent

---

[338]    Johnson v. Home State Bank, 501 U.S. 78, 83, 111 S.Ct. 2150 (1991) (finding that "Congress intended by this language to adopt the broadest available definition of 'claim.'"); In re Wyly, 553 B.R. 318, 332 (Bankr. N.D. Tex. 2016) (applying the broadest definition to claim, the court found that although a prepetition claim may be contingent upon the results of the pending appeal, it is still a claim under the Bankruptcy Code).

[339]    11 U.S.C. § 1126(c).

[340]    11 U.S.C. § 524(g)(2)(B)(ii)(IV).

[341]    See, e.g., In re HONX, Inc., No. 22-90035 (MI) (Bankr. S.D. Tex. July 14, 2023) [Dkt. 890]; In re Boy Scouts of Am., No. 20-10343 (LSS) (Bankr. D. Del. Sept. 30, 2021) [Dkt. 6438]; In re Mallinckrodt PLC, No. 20-12522 (JTD) (Bankr. D. Del. June 17, 2021) [Dkt. 2911]; In re United Gilsonite Laboratories, No. 11-02032 (RNO), (Bankr. M.D. Pa. Sept. 30, 2014) [Dkt. 2014]; In re PG&E Corp., No. 19-30088 (JD) (Bankr. N.D. Cal. March 17, 2020) [Dkt. 6340]; In re TK Holdings Inc., No. 17-11375 (BLS) (Bankr. D. Del. Jan. 5, 2018) [Dkt. 1639]; In re USA Gymnastics, No. 18-09108 (RLM) (Bankr. S.D. Ind. Oct. 26, 2021) [Dkt. 1659]; In re the Budd Company, No. 14-11873 (JBS) (Bankr. N.D. Ill. May 6, 2016) [Dkt. 1811]; see also In re Johns-Manville Corp., 843 F.2d 636, 646-48 (2d Cir. 1987).

NAI-1542918500

to which any particular claimant has a qualifying claim or the likely amount of that claim because substantially all claims are disputed and unliquidated, and the supporting records may not yet have been obtained or disclosed by counsel.  Moreover, allowing Channeled Talc Personal Injury Claims in the amount of $1.00 in the aggregate per claimant for purposes of voting eliminates the need to make any individual or class-wide determination, whether by estimation or otherwise, regarding the amount of Channeled Talc Personal Injury Claims, a process that would be complex, burdensome, and impracticable under the circumstances.

The proposed allowance of Channeled Talc Personal Injury Claims in the amount of $1.00 each solely for voting purposes preserves claimants' rights to vote on the Initial Plan while reflecting that their claims are unliquidated in a way that gives adequate consideration to the particular circumstances of the Chapter 11 Case, reflects a fair and appropriate scheme for voting on the Initial Plan and is consistent with similar chapter 11 cases.

Courts generally agree that estimating mass tort claims for purposes of voting in the amount of $1.00 is efficient and appropriate, particularly where it is clear that attempting to assign estimated values on a claim-by-claim or disease-by-disease basis would not change the outcome of the vote.[342]  Here, the outcome of the vote is already known, as discussed above, and it is already known that estimating claims in varying amounts will not change the outcome, so there is no reason to deviate from $1.00 voting.

---

[342]   See, e.g., In re Quigley Co., 346 B.R. 647, 654 (Bankr. S.D.N.Y. 2006) ("$1.00 per vote method can be used when support is overwhelming and a different voting method will not change the result."); In re Dow Corning Corp., 211 B.R. 545, 573 (Bankr. E.D. Mich. 1997) ("Only if the outcome of the '2/3 by amount' vote is unclear will it be necessary to embark upon this burdensome task" of estimating unliquidated tort claims); see also Menard–Sanford v. Mabey (In re A.H. Robins, Co.), 880 F.2d 694, 698 (4th Cir.), cert. denied, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989) ("We do not decide whether the district court's voting procedure violated § 1126(c) because, in view of the outcome of the vote, the challenged procedure was at most harmless error."); Kane v. Johns–Manville Corp. (In re Johns–Manville Corp.), 843 F.2d 636, 647 (2d Cir. 1988) (same).

NAI-1542918500

Andrew Evans, the Debtor's expert regarding voting issues, confirmed in his affirmative report that, based upon the certified disclosures in submitted ballots, over ███% of claimants disclosing Ovarian Cancer as their disease type voted in support of the Plan.[343]  In light of the pending challenges to the voting tabulation, Mr. Evans also analyzed the percentage of Ovarian Cancer votes across seven different scenarios concerning how the Court might ultimately decide to count the votes submitted in the largely overlapping Beasley Allen and Smith Firm master ballots, determining that in all such scenarios "████████████████████████████ ████████████████████████████."[344]

Thereafter, Mr. Evans conducted further analysis using the vote weighting proposed by the Coalition's own expert, Yvette R. Austin, which confirmed that weighting the claims would ████████████████████.  Applying a weighting that valued Ovarian Cancer claims at ██████ the amount of non-Ovarian Cancer claims, as proposed by Ms. Austin, Mr. Evans determined that the outcome of the weighted vote would be ████████% in amount in favor of the Plan, far above section 1126(c)'s requirement of 66% in amount of voting claims.[345] Mr. Evans then applied this weighting across the seven potential scenarios and determined that, ████████████, the acceptance amount after weighting exceeded 75%.[346]

Several objectors to confirmation of the Plan note that the Delaware bankruptcy court assigned claims values for voting purposes based on asserted disease types in the <u>Imerys</u> talc cases.[347]  But the court in <u>Imerys</u> was prospectively considering whether the amounts would

---

[343]     <u>See</u> Evans Report ¶ 42.

[344]     <u>Id.</u> ¶ 31.

[345]     Evans Rebuttal Report ¶ 18.

[346]     <u>Id.</u> ¶ 22.

[347]     <u>See</u> *Objection of the Coalition of Counsel for Justice for Talc Claimants to the Confirmation of the Second Amended Plan of Reorganization* [Dkt. 988] (the "<u>Coalition Plan Objection</u>"), at 70-71; *Certain Insurers'*

affect the outcome.[348]  Here, the opposite is true.  Solicitation is already complete and, based on the results, it is clear that assigning varying voting amounts to claims based on any reasonable process would have no effect on the outcome.

In their confirmation objections, the Coalition and Travelers also argue that deposition testimony from members of the AHC, including, in particular, Mr. Pulaski of Pulaski Kherkher, indicates that some disease-type designations on master ballots may not be accurate.[349]  Although such inaccuracies may exist, nothing in the record indicates that Plan supporters disclosed the wrong disease type at a greater rate than those objecting to the Plan, and certainly not at any rate sufficient to affect the outcome of voting.[350]  Moreover, Mr. Evans' analysis confirmed that, even after adopting the Coalition's assumptions with respect to Pulaski Kherkher's ballot, the weighted vote ██████████████████████.[351]  Accordingly, under all reasonable scenarios, Class 4 would have has accepted the Plan in number and amount sufficient to satisfy sections 524(g) and 1126(c) of the Bankruptcy Code, and the weighting of votes by disease type or estimated recoveries in any amount other than $1.00 is unnecessary.

        3.    *Epiq's Tabulation Was Correct.*

For all of the reasons set forth above, and as demonstrated by the deposition testimony of the AHC's members and Mr. Smith as well as Mr. Gentle's expert report, the Plan's supporters

---

*Objection to Confirmation of the Plan* [Dkt. 981] (the "Travelers Objection"),  ¶¶ 82-86, filed by Travelers Indemnity Company and certain other insurers (collectively, "Travelers").

[348]   See In re Imerys Talc Am., Inc., No. 19-10289 (LSS) and In re Cyprus Mines Corp., No. 21-10398 (LSS), Oct. 29, 2024 Hr'g Tr. 41:24-42:1 ("Basically, was there any harm, did it matter, okay?  Once we have the vote, maybe it doesn't matter; we don't have to be concerned about it.").

[349]   See Coalition Plan Obj., 71; Travelers Obj. ¶¶ 87-89.

[350]   In addition, contrary to the Coalition's argument, Dr. Mullin's commentary in analyzing expected recoveries under the Plan that ███████████████ does not indicate that such claims are incorrectly asserted as Ovarian Cancer claims.  See Coalition Plan Obj. at 71.

[351]   Evans Rebuttal Report ¶ 22.

possessed proper authority to vote pursuant to both the Option A Certification and the Option B Certification, as applicable.[352]

The Smith Firm's master ballot was timely and constituted a properly completely superseding ballot changing the votes of the applicable clients on the Plan pursuant to Paragraph 4(c) of the Tabulation Procedures.[353]  In addition, the Smith Firm's master ballot was valid under Paragraph 4(d) of the Tabulation Procedures.[354]  Because the Smith Firm was a party to joint venture agreement with Beasley Allen, it was the same authorized representative to the same clients listed on the Smith Firm's master ballot.  Furthermore, the Smith Firm's master ballot was received on September 16, 2024, before the voting deadline (as extended by the Debtor), and was the last-executed valid ballot.  Thus, Epiq was required to count the votes contained in the Smith Firm's master ballot under the Tabulation Procedures.

Finally, even if the voting deadline had not been extended, the Smith Firm's Master Ballot was valid under Paragraph 4(b) of the Tabulation Procedures.  Pursuant to Paragraph 4(b), a claimant may change their votes after the voting deadline but only if LLT or the Debtor recognized such change of vote.[355]  Here, the Smith Firm provided a declaration to the Debtor stating that Mr. Smith was voting in favor of the Plan because he believed it to be in the best

---

[352]  See supra § IX.A.

[353]  Tabulation Procedures, ¶ 4(c) ("[a]ny holder of a Channeled Talc Personal Injury Claim who submits a *properly completed superseding ballot or withdrawal of a ballot on or before the Voting Deadline* will be presumed to have sufficient cause, within the meaning of Bankruptcy Rule 3018(a), *to change* or withdraw *such claimant's or interest holder's acceptance or rejection of the Plan*.") (emphasis added).

[354]  Id. at ¶ 4(d) ("[i]f the Solicitation Agent receives more than one ballot from the same holder of a Channeled Talc Personal Injury Claim *(or from the same authorized representative representing the same holder of a Channeled Talc Personal Injury Claim)* for the same Channeled Talc Personal Injury Claim, in the absence of contrary information establishing which ballot is valid as of the Voting Deadline *(or such later date as may be agreed by LLT or the Debtor)*, the last-executed, otherwise valid ballot that is received before the Voting Deadline shall be the ballot that is counted.  Multiple Master Ballots may be completed and delivered to the Solicitation Agent.") (emphasis added).

[355]  See Tabulation Procedures, § 4(b).

interests of his clients and certifying as to his authority to vote on their behalf.[356]  The Debtor determined that it would recognize the replacement master ballot, accepted it and directed Epiq to incorporate it into its tabulation results.[357]

### 4. The Beasley Allen Vote Was Invalid.

Because the Smith Firm's master ballot was valid, it superseded the same votes cast by Beasley Allen's master ballot.  But even if it had not been superseded, Beasley Allen's master ballot would not have been accepted because it was supported by a false certification.

As discussed above, Beasley Allen did not "collect and record" the "informed consent" to vote on behalf of 8,000 clients.  "'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks and reasonably available alternatives to the proposed course of conduct."[358]  Absent some conduct on behalf of the client from which consent may be inferred, informed requires an "affirmative response the client."[359]  A lawyer cannot "assume consent from the client's or other person's silence."[360]  Moreover, any "consent" Beasley Allen purports to have obtained from its clients to reject the Plan cannot have been "informed" given, among other things, Beasley Allen's position, which was likely never conveyed to its clients, that Gynecological Cancer claims have no value in or outside this Chapter 11 Case.

---

356     See Suppl. Kim Decl. ¶ 17; id. Ex. D.

357     Id. at ¶ 18.

358     Model Rules of Prof'l Conduct, R. 1.0 (Terminology).

359     See id. at Comment 7 ("Obtaining informed consent will usually require an affirmative response by the client or other person.  In general, a lawyer may not assume consent from a client's or other person's silence.  Consent may be inferred, however, from the conduct of a client or other person who has reasonably adequate information about the matter . . . .").

360     Id.; see also In re Green, No. 14-11458, 2014 WL 3724986, at *4 (Bankr. W.D. La. July 23, 2014) (noting that the Fifth Circuit recognizes the Model Rules as the "national standard").

### B.    The Motions to Change Votes Should be Granted.

Bankruptcy Rule 3018(a) provides in relevant part that "[f]or cause shown, the court after notice and hearing may permit a creditor or equity security holder to change or withdraw an acceptance or rejection."[361]  Neither the Bankruptcy Code nor the Bankruptcy Rules define "cause," and it is "up to judges to determine 'cause' based on the context and to grant or deny a motion in their discretion."[362]  Cause to change a vote on a chapter 11 plan must involve "more than a mere change of heart."[363]  Nevertheless, "[t]he test for determining whether cause has been shown should not be a difficult one to meet.  As long as the reason for the vote change is not tainted, the change of vote should usually be permitted.  The court must ensure only that the change is not improperly motivated."[364]

"Cause" is exemplified by motivations that further the Bankruptcy Code's goal of a consensual process.  Fifth Circuit courts have found that "subsequent negotiations between the plan proponent and the party seeking to change its ballot suffices as the required cause" under Bankruptcy Rule 3018(a).[365]  "The goal after all is consensual plans."[366]  "Based upon the policy

---

[361]    Fed. R. Bankr. P. 3018(a).

[362]    In re Imerys Talc Am., Inc. No. 19-10289 (LSS), 2021 WL 4786093, *7 (Bankr. D. Del. Oct. 13, 2021) (citing In re MPM Silicones, LLC, No. 14-22503, 2014 WL 4637175, *5 (Bankr. S.D.N.Y. Sept. 17, 2014) and In re J.C. Householder Land Trust # 1, 502 B.R. 602, 605–606 (Bankr. M.D. Fla. 2013)).

[363]    MPM Silicones, 2014 WL 4637175, *3 (quoting In re Windmill Durango Office, LLC, 481 B.R. 51, 66 (B.A.P. 9th Cir. 2012)).

[364]    In re MCorp Fin., Inc., 137 B.R. 237, 238 (Bankr. S.D. Tex. 1992) (quoting 8 Collier on Bankruptcy, ¶ 3018.03[4] (15th ed. 1991)); see also Imerys Talc, 2021 WL 4786093, at *6 ("The overarching concern underlying Rule 3018 is that any vote change not be 'improperly motivated' . . . .").

[365]    In re Cajun Elec. Power Co-op., Inc., 230 B.R. 715, 744 (Bankr. M.D. La. 1999) (citing In re Texas Extrusion Corp., 844 F.2d 1142 (5th Cir. 1988), and In re Am. Solar King, 90 B.R. 808 (Bankr. W.D. Tex. 1988)).

[366]    Cajun Elec. 230 B.R. at 744 (quoting Am. Solar King, 90 B.R. at 825). "Such being the goal, what greater evidence of cause exists than where major parties in a chapter 11 proceeding negotiate a settlement of highly complex litigation, thus helping to pave the way to a consensual plan?" Cajun Elec., 230 B.R. at 744.  "[W]here the plan proponent does not oppose the vote being changed, the courts generally support the change over the objection of a still-dissenting creditor, in furtherance of the courts' and the Code's policy in

NAI-1542918500

of encouraging consensual plans in Chapter 11 cases," beneficial plan modifications that lead a claimant to reconsider their original rejecting vote establish cause.[367]

According to Morelli Law and Summers & Johnson, certain of the firms' respective clients seek to change their votes following communications with counsel based on the improvements contained in the Amended Plan and the terms of the MOU.  Morelli Law and Summers & Johnson have also advised the Debtor that they believe the changes made to the Plan and the MOU are in the best interests of their clients.  Because the Amended Plan and the MOU materially benefit their clients and those individuals wish to change their votes, cause exists to permit these changed votes as reflected in the amended ballots of Morelli and Summers & Johnson.  The Debtor does not oppose these changes in votes and these claimants should be permitted to change their votes.

## C.   Denial of the Coalition's Voting Motions.

### 1.   The Designation Motion Should Be Denied.

By the Designation Motion, the Coalition requested that the Court designate every vote in favor of the Plan.  "[B]ankruptcy courts should employ § 1126(e) designation sparingly."[368] "Designation of a creditor's vote is a drastic remedy, and, as a result, designation of votes is the exception, not the rule."[369]  Thus, "[t]he party seeking to have a ballot disallowed has a heavy

---

favor of consensual negotiation of Chapter 11 plans."  MPM Silicones, 2014 WL 4637175, *3 (citing In re Dow Corning Corp., 237 B.R. 374, 378-79 (Bankr. E.D. Mich. 1999)).

[367]   In re CGE Shattuck, LLC., No. 99-12287-JMD, 2000 WL 33679416, at *3 (Bankr. D.N.H. Nov. 28, 2000) (authorizing creditor to reconsider his original vote based on plan modification made after the voting deadline that did not adversely affect any party).

[368]   In re Mangia Pizza Invs., LP, 480 B.R. 669, 683 (Bankr. W.D. Tex. 2012) (quoting In re DBSD N. Am., Inc., 634 F.3d 79, 101 (2d Cir. 2011)).

[369]   In re Heritage Org., L.L.C., 376 B.R. 783, 794 (Bankr. N.D. Tex. 2007) (quoting In re Adelphia Communications Corp., 359 B.R. 54, 61 (Bankr. S.D.N.Y. 2006)).

-94-

burden of proof."[370]  Courts agree that "[m]ere self-interest on behalf of the creditor, such as attempting to obtain the best recovery possible on its claim, does not rise to the level of bad faith."[371]  "It is for [the claimant] . . . and [the claimant] alone, to decide what is in its economic interest."[372]

Nevertheless, "[a] creditor may not cast his vote for an ulterior purpose and expect to have it counted.  Ulterior motives have been held to include 'pure malice, strikes and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a competing business.'"[373]  In addition, exceptional circumstances that may warrant designation of a creditor's vote include where specific creditors receive "substantial inducements" outside the chapter 11 plan in exchange for their support.[374]

In support of designation, the Coalition primarily argues that holders of Gynecological Cancer claims are not creditors because Gynecological Cancer claims lack valid scientific support and, thus, are "unenforceable under applicable law" and would, if filed, be subject to disallowance under section 502(b)(1) of the Bankruptcy Code.[375]  Additionally, the Coalition's argument that the Debtor and J&J bought votes relies on the disingenuous assertion that Gynecological Cancer claims that they themselves (and others) asserted in the tort system have

---

[370]   Id.

[371]   In re Dernick, 624 B.R. 799, 808 (Bankr. S.D. Tex. 2020); see also In re Save Our Springs (S.O.S.) All., Inc., 388 B.R. 202, 231 (Bankr. W.D. Tex. 2008), aff'd sub nom. In re Save Our Springs All., Inc., No. A-08-CA-727 LY, 2009 WL 8637183 (W.D. Tex. Sept. 29, 2009), aff'd sub nom. In re Save Our Springs (S.O.S.) All., Inc., 632 F.3d 168 (5th Cir. 2011) ("self-interest is not bad faith"); In re Landing Assocs., Ltd., 157 B.R. 791, 803 (Bankr. W.D. Tex. 1993) ("Mere selfishness does not rise to the level of bad faith, however, and self-dealing and good faith are not mutually exclusive.").

[372]   Save Our Springs, 388 B.R. at 231; see also Landing Assocs., 157 B.R. at 803 ("each creditor is expected to cast his vote 'in accordance with his perception of his own self-interest").

[373]   Save Our Springs, 388 B.R. at 230.

[374]   See, e.g., Town of Belleair, Fla. v. Groves, 132 F.2d 542, 543 (5th Cir. 1942).

[375]   Designation Mot. ¶ 57.

-95-

no value and depends on the flawed reasoning that resolving those claims is of no benefit to the Debtor. As discussed above, the fact that the validity of Gynecological Cancer claims is disputed does not mean that they are not "claims" entitled to vote on the Initial Plan.

The Coalition's conclusory arguments that all claimants who voted in favor of the Initial Plan had an ulterior motive because they somehow are not voting in their own interests fails. Absent evidence of bad faith, there is no basis to designate votes. The Plan received the support of the overwhelming majority of holders of Channeled Talc Personal Injury Claims, including Ovarian Cancer claims. These claimants did not act in bad faith by voting to accept the Initial Plan, and the Debtor did not engage in bad faith by soliciting their votes. The Designation Motion should be denied.

2.    *The Reinstatement Motion Should Be Denied.*

The Reinstatement Motion asks the Court to disregard the Smith Firm's ballot and reinstate the Beasley Allen Ballot. Discovery has demonstrated, however, that the Beasley Allen master ballot contained false certifications by Mr. Birchfield that he had sought and obtained the informed consent of the joint clients of Beasley Allen and the Smith Firm to cast 11,434 rejecting votes against the Initial Plan. As such, even if Beasley Allen's master ballot had not been superseded, it would not have been accepted because it was improper. Only the Smith Firm (and not Beasley Allen) provided a certification of appropriate authority to vote the firms' joint clients. Thus, there was no valid ballot to modify or change, and the Court should deny the Coalition's request to "reinstate" a ballot that was not valid in the first place.

Had the Beasley Allen master ballot been submitted with proper authority, the Debtor would still have been authorized to accept the Smith Firm's superseding master ballot.

NAI-1542918500

The Debtor possessed authority under the tabulation procedures to extend the voting deadline with respect to the Smith Firm or to recognize vote changes after the voting deadline.

Here, for the reasons set forth above, the Debtor's direction to Epiq to accept the Smith Firm's master ballot as superseding the Beasley Allen master ballot was consistent with the Tabulation Procedures.  There is no evidence that the Smith Firm acted with any improper motive, notwithstanding the Coalition's speculation to the contrary.  Rather, the evidence demonstrates that the Smith Firm submitted the superseding votes of claimants on its master ballot, following a negotiation that resulted in significant amendments to the Initial Plan that will bring enhanced and faster recoveries to claimants.

        *3.     The Estimation Motion and the Bar Date Motion Should Be Denied.*

Although establishing a bar date or authorizing an estimation of claims (not simply for voting purposes but for liability purposes) may be utilized by parties or the court to drive a case toward consensus and assist the parties in formulating a plan of reorganization, such steps are not necessary where, as here, a plan has been filed, which is supported by the vast majority of claimants who have already cast their votes, and its confirmation is being heard in a matter of days.  Establishing a bar date or commencing a voting estimation process would only cause delay to the detriment of all claimants.

The certified voting results and Mr. Evans' analysis demonstrate that, under any reasonable scenario, ███████████████████████████████████████████ — the Claims that the Coalition says are valid—voted to accept the Plan.[376]  As a result, there is no need to determine, or estimate, the relative value of Ovarian Cancer claims and other claims in the case for voting purposes.

---

[376]     <u>See</u> Evans Report ¶ 42.

NAI-1542918500

Establishing a bar date and conducting an estimation proceeding merely to conduct a vote is unnecessary given the voting results.  Moreover, any such process would result in a significant and unnecessary delay in confirmation of the Plan.  In addition, inaccuracies and information gaps in the documentation received would inevitably remain.[377]  Thus, the Estimation Motion and Bar Date Motion should be denied.

## **CONCLUSION**

For the reasons set forth herein, the Debtor submits that (a) the Disclosure Statement and Solicitation Procedures Motion should be approved, (b) the results of the prepetition vote accepting the Plan, as reported by Epiq, should be approved and (c) the Plan should be confirmed.

*[Remainder of Page Intentionally Left Blank]*

---

[377]    See In re Imerys Talc Am., Inc., No. 19-10289 (LSS) and In re Cyprus Mines Corp., No. 21-10398 (LSS), Oct. 29, 2024 Hr'g Tr. 40:15-24 ("if we were to establish a bar date . . . I would still have to estimate for voting purposes those claims.  So, I think we would be in the same place.  Perhaps people would have a little bit more information . . . but we would still have to estimate the claims.").

NAI-1542918500

Dated:  February 13, 2025
Houston, Texas

Respectfully submitted,

*/s/ John F. Higgins*
John F. Higgins (TX 09597500)
M. Shane Johnson (TX 24083263)
Megan Young-John (TX 24088700)
James A. Keefe (TX 24122842)
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile:  (713) 228-1331
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
jkeefe@porterhedges.com

Gregory M. Gordon (TX 08435300)
Dan B. Prieto (TX 24048744)
Brad B. Erens (IL 06206864)
Amanda Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone:  (214) 220-3939
Facsimile:   (214) 969-5100
gmgordon@jonesday.com
dbprieto@jonesday.com
bberens@jonesday.com
asrush@jonesday.com

PROPOSED ATTORNEYS FOR DEBTOR

## Certificate of Service

I certify that on February 13, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtor's claims, noticing and solicitation agent.

*/s/ John F. Higgins*
John F. Higgins

-99-

NAI-1542918500