**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RED RIVER TALC, LLC[1] | ) | Case No. 24-90505 (CML) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| | ) | |

**THE SLF CLAIMANTS' (I) OMNIBUS REPLY IN SUPPORT**
**OF THE DEBTOR'S SECOND AMENDED PLAN AND (II) PRE-TRIAL BRIEF**

**[Related to Dkt. No. 722]**

---

[1] The last four digits of the Debtor's federal tax identification number are 8508. The Debtor's address is 501 George Street, New Brunswick, NJ 08933.

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ............................................................................................................... 3

I.    *SLF Pioneers Talc Litigation against J&J* ........................................................ 3

II.    *Prior J&J Bankruptcies* ................................................................................... 5

III.    *The Debtor's Initial Plan and the Voting Process* ............................................ 6

IV.    *The SLF MOU* ................................................................................................ 7

V.    *Soliciting Votes on the Debtor's Revised Plan* ................................................. 9

VI.    *September 2024 Voting on the Debtor's Revised Plan* ...................................... 10

VII.    *The TCC MOU and Continued Improvements to the Amended Plan* .................. 11

ARGUMENT ................................................................................................................. 12

I.    *The Amended Plan Satisfies the Requirements of Section 1129(a)(3)* ................. 12

A.    *The Amended Plan Serves a Legitimate Bankruptcy Purpose* ............................ 13

B.    *The Amended Plan was Negotiated and Solicited in Good Faith* .......................... 17

II.    *The Plan Does Not Need to be Resolicited* ...................................................... 21

III.    *The Voting-Related Objections Should be Overruled* ........................................ 23

A.    *The SLF Ballot Was Submitted in Accordance with the Tabulation Procedures* ................................................................................................. 24

B.    *SLF's Option A Votes Were Properly Certified* ................................................. 25

C.    *SLF's Option B Votes Were Properly Certified* ................................................. 26

D.    *The BA Master Ballot Cannot be Reinstated* .................................................... 29

CONCLUSION ............................................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Am. Solar King Corp.*,
  90 B.R. 808 (Bankr. W.D. Tex. 1988)..........................................................................21, 23

*Amgen Inc. v. Hargan*,
  285 F. Supp. 3d 351 (D.D.C. 2018) ......................................................................................17

*In re ASARCO LLC*,
  420 B.R. 314 (S.D. Tex. 2009) ..............................................................................................15

*In re Ballard*,
  No. I-87-00718, 1987 WL 191320 (Bankr. N.D. Cal. Apr. 30, 1987) .............................27, 28

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'Ship*,
  526 U.S. 434 (1999)................................................................................................................13

*Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*,
  764 F.2d 406 (5th Cir. 1985) .................................................................................................13

*Carlton v. Ala. Dairy Queen, Inc.*,
  529 So. 2d 921 (Ala. 1988)....................................................................................................29

*CHS, Inc. v. Plaquemines Holdings, LLC*,
  735 F.3d 231 (5th Cir. 2013) .................................................................................................15

*In re Congoleum Corp.*,
  No. 03-51524, 2009 WL 499262 (Bankr. D.N.J. Feb. 26, 2009) ...........................................17

*In re Congoleum Corp.*,
  414 B.R. 44 (D.N.J. 2009) .....................................................................................................17

*Coleman v. ANMP (In re Dexter Distrib. Corp.)*,
  No. CV 09-1099-PHX-JAT, 2009 WL 2154538 (D. Ariz. July 14, 2009)..............................14

*Faulkner v. AimBank (In re Reagor-Dykes Motors, LP)*
  No. 18-50214-RLJ-11, 2021 WL 1219537 (Bankr. N.D. Tex. Mar. 30, 2021)......................21

*Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship* (*In re T-H New Orleans Ltd. P'Ship*),
  116 F.3d 790 (5th Cir. 1997) .................................................................................................12

*In re Gen. Homes Corp., FGMC, Inc.*,
  134 B.R. 853 (Bankr. S.D. Tex. 1991) ...................................................................................13

*In re Glob. Indus. Techs., Inc.,*
  645 F.3d 201 (3d Cir. 2011) ..................................................................17

*In re Greenwood Point, LP,*
  445 B.R. 885 (Bankr. S.D. Ind. 2011) ...................................................22

*Hults v. Tillman,*
  480 So. 2d 1134 (Miss. 1985) ................................................................29

*In re J T Thorpe Co.,*
  308 B.R. 782 (Bankr. S.D. Tex. 2003) ...................................................14

*Keppner v. Gulf Shores, Inc.,*
  462 So. 2d 719 (Miss. 1985) ..................................................................29

*In re Matthews,*
  516 B.R. 99 (Bankr. N.D. Tex. 2014) ....................................................28

*In re MCorp Fin., Inc.,* 137 B.R. 237 (Bankr. S.D. Tex. 1992) ...................25

*In re Piece Goods Shops Co., L.P.,* 188 B.R. 778, 795 (Bankr. M.D.N.C. 1995) .......................25

*In re Quigley Co.,*
  437 B.R. 102 (Bankr. S.D.N.Y. 2010) ...................................................20

*Rivercity v. Herpel (In re Jackson Brewing Co.),* 624 F.2d 599, 602 (5th Cir.
  1980) ......................................................................................................16

*Ronit, Inc. v. Stemson Corp. (In re Block Shim Dev. Co.-Irving),*
  939 F.2d 289 (5th Cir. 1991) .................................................................17

*In re Southland Corp.,* 124 B.R. 211, 227 (Bankr. N.D. Tex. 1991) ............25

*Texas Extrusion Corp. v. Palmer, Palmer & Coffee (In re Texas Extrusion Corp.),*
  68 B.R. 712 (N.D. Tex. 1986), *aff'd,* 844 F.2d 1142 (5th Cir. 1988) .....................13

*Toibb v. Radloff,*
  501 U.S. 157 (1991) .........................................................................13, 15

*United States v. Spurlin,*
  664 F.3d 954 (5th Cir. 2011) .................................................................28

*W. Real Estate Equities v. Vill. at Camp Bowie I, L.P. (In re Vill. at Camp Bowie
  I, L.P.),*
  710 F.3d 239 (5th Cir. 2013) .................................................................19

*In re Walker,*
  628 B.R. 9 (Bankr. E.D. Pa. 2021) .........................................................14

**Statutes**

11 U.S.C. § 109 ................................................................................................15

11 U.S.C. § 1129(a)(3) ................................................................................ *passim*

11 U.S.C. § 1129(b)(1) ......................................................................................17

Ala. Code § 10A-8A-8.01 (2023) ....................................................................29

Miss. Code Ann. § 79-13-801 ..........................................................................29

**Other Authorities**

Fed. R. Bankr. P. 3018(a) ...........................................................................24, 25

Fed. R. Bankr. P. 3019(a) .................................................................................23

Fed. R. Bankr. P. 9019(c) .................................................................................27

H.R. Rep. No. 130-835 (1994)..........................................................................13

The Smith Law Firm, PLLC ("**SLF**"), on behalf of the Talc Personal Injury Claimants it represents (the "**SLF Claimants**"), by and through the undersigned counsel, submits this omnibus reply (the "**Reply**") (i) in support of the Debtor's Second Amended Plan [Dkt. No. 722] (as may be further amended, the "**Amended Plan**")[2] (ii) in response to (a) *United States Trustee's Objection to Confirmation of Second Amended Plan of Reorganization* [Dkt. No. 980] (the "**UST Objection**"), (b) *Certain Insurers' Objection to Confirmation of the Plan* [Dkt. No. 981] (the "**Certain Insurers Objection**"), and (c) *Coalition of Counsel for Talc Claimants' Objection to the Plan* [Dkt. Nos. 988, 990] (the "**Coalition Objection**," and together with the UST Objection, and the Certain Insurers Objection, the "**Objections**"), and (d) any joinders to the foregoing Objections to the extent that the same arguments are raised therein, and (iii) as a joinder to the Debtor's brief in support of confirmation (the "**Debtor's Brief**") [Dkt. Nos. 1075, 1076]. In support of this Reply, SLF respectfully submits as follows:[3]

## PRELIMINARY STATEMENT

1.     The Amended Plan should be confirmed, and the ancillary motions (including the motions to dismiss) filed by the Coalition and the U.S. Trustee should be denied.[4]   For more than fifteen years, SLF principal, R. Allen Smith, Jr., has relentlessly pursued J&J on behalf of women suffering from ovarian and other gynecological cancers due to genital talc use.   His work

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Amended Plan [Dkt. No. 722]. The solicitation version of the Debtor's plan is referred to herein as the "**Initial Plan**" (and together with the Amended Plan, the "**Plan**").

[3] SLF also incorporates by reference herein all arguments made by SLF and the SLF Claimants in previously-filed pleadings on the Amended Plan and the voting process. Dkt. Nos. 194, 435, 642.

[4] The Amended Plan is in the process of being further revised to reflect all of the terms of the SLF MOU and the TCC MOU . Provided that the Amended Plan accurately includes those terms, SLF is supportive of confirmation of the Amended Plan. SLF reserves all rights to the extent that the Amended Plan does not incorporate the terms of the SLF MOU.

pioneering talc litigation against J&J – together with the immeasurable sacrifices made by his clients – brought J&J to the negotiating table, and, now, to the precipice of a historic settlement structure to be implemented through the Amended Plan.  That Amended Plan, as modified to appropriately reflect the MOUs negotiated by SLF and the TCC, will provide a nearly unprecedented **$9 billion** to fund claimant recoveries, and enjoys the support of the vast majority of the true parties-in-interest in these Chapter 11 Cases: women suffering from ovarian and other gynecological cancers.

2.      The objecting parties are limited, and none of the objections have any merit.  On the one hand, objections lodged by parties without any actual direct claims against the Debtor, including the U.S. Trustee and the Certain Insurers, fail because the Amended Plan  (i) does not discriminate against any group or category of claimants, (ii) was proposed in good faith, and (iii) is supported by more than 75% of voting claimants, and fully satisfies the requirements of the Bankruptcy Code and section 524(g).  On the other hand, objections lodged by the Coalition are nothing more than a transparent attempt to hold out for *a little more*.  In doing so, the Coalition threatens to unravel the entirety of the settlement – sending claimants back into a world where in the best case scenario they do not see recoveries for a matter of years, and in the worst case scenario see no recoveries, ever.  Neither scenario is in the best interests of the claimants.

3.      As part of their relentless assault against the Debtor and the Amended Plan, the Coalition has collaterally attacked SLF, arguing that SLF was not entitled to vote on behalf of the SLF Claimants, and that prepetition agreements between the Coalition members and SLF, and/or between SLF and the SLF Claimants, should be ignored or invalidated.  Again, these aspersions fall flat.  After negotiating for more than one billion dollars in additional consideration for all claimants, SLF sought input from its joint clients on their views of an amended plan that was

materially improved from the one for which their votes were cast months earlier.  And hundreds of women responded affirmatively supporting the Amended Plan.  That plan has now improved even more through the efforts of the TCC, and its already overwhelming support has only grown over the course of this bankruptcy.  As a result, the desired outcome of the Coalition – to blindly replace the SLF Master Ballot with an outdated BA Master Ballot, voted in non-compliance with the voting procedures, on a materially worse plan – is belied by facts and logic.  The time has come to cease the relentless litigation of the past several years and to finally permit recoveries to flow to the claimants who so richly deserve them.

4.      For the reasons set forth herein and in the Debtor's Brief, the Amended Plan should be confirmed, and the motions to dismiss and Coalition Voting Motions denied.

## **BACKGROUND**

5.      A comprehensive overview of the facts relevant to confirmation of the Amended Plan has been set forth in the Debtor's Brief.  This Reply focuses on facts specific to the role of SLF and the SLF Claimants in this bankruptcy case.

*I.      SLF Pioneers Talc Litigation against J&J*

6.      SLF has played a lead role in talc litigation against J&J.  SLF's founder and principal attorney, R. Allen Smith, Jr. ("**Mr. Smith**"), was the first attorney to file and successfully try talc ovarian cancer claims against J&J.  *See* Declaration of R. Allen Smith, Jr. [Dkt. No. 306-4] (the "**Smith Decl.**") ¶ 3.  In the early 2000s, Mr. Smith learned of the link between genital use of talcum powder and ovarian cancer.  In 2009, after spending years digesting scientific studies and consulting with medical experts, Mr. Smith filed a federal lawsuit against J&J in South Dakota, accusing it of failing to warn Deane Berg and other women diagnosed with ovarian cancer of risks associated with the use of talcum powder products.

7. In October 2013, following a two-week trial, the jury in Ms. Berg's case found J&J liable on negligence claims.

8. In December 2013, on the heels of winning Ms. Berg's case, Mr. Smith approached the law firm of Beasley, Allen, Crow, Methvin, Porter & Miles, P.C. ("**Beasley Allen**") to discuss a potential joint venture for talcum powder litigation against J&J. SLF already had built a significant roster of talc claimants but wanted the administrative resources and support staff of a larger firm. Beasley Allen wanted to have access to, among other things, Mr. Smith's lucrative talc docket, his extensive know-how and work-product, and his trial skill.

9. After further discussion, the parties entered into a joint venture agreement, which remains in full force and effect and, provides that the two firms "will jointly represent all of our talcum powder clients." *See* SLF0004127 (the "**JV Agreement**").

10. The JV Agreement expressly acknowledges SLF's prior work on and investment in talcum powder litigation, including SLF's retention and development of exclusive *Daubert*-qualified experts, and success in obtaining discovery from J&J. As Beasley Allen put it, "you have already retained the best experts, conducted discovery which yielded documents that will be difficult (if not impossible) to retrieve a second time around, and gotten a partially favorable verdict." JV Agreement at 1.

11. To justify Beasley Allen's equal share of the upside under the JV Agreement (in view of the access it was receiving to, among other things, the large discovery record, Mr. Smith's extensive analysis of that record, the medical literature, fully vetted and qualified expert witnesses, and other claims-related information and resources that SLF had and was continuing to develop), Beasley Allen and its support personnel were tasked with general responsibility for the initial client relation steps of "handl[ing] initial [client] intake, obtaining necessary authorizations, information,

pathology, and medical records to appropriately screen each case," and "all client contact."  *Id*. Nothing in the JV Agreement gave Beasley Allen exclusive authority to contact or advise the joint venture clients on matters of settlement and trial strategy or otherwise.  To the contrary, the same paragraph of the JV Agreement made clear that the firms "will be jointly responsible for prosecuting the cases and will work together in that regard." *Id*.

12.     In 2016, many pending ovarian cancer talcum powder lawsuits against J&J were consolidated for pretrial purposes in multidistrict litigation in federal court in New Jersey (the "**MDL**").  When that happened, Beasley Allen and SLF agreed that Beasley Allen would perform the majority of the work for the joint venture in the MDL, while SLF remained focused on state court litigation.  To date, there have been no trials in the MDL, nor any settlements between J&J and any of the joint venture's clients represented in the MDL.

13.     By contrast, since obtaining a favorable verdict in Ms. Berg's case more than a decade ago, SLF has helped secure hundreds of millions of dollars in talcum powder litigation verdicts and settlements against J&J.  In 2016-2017 alone, in the span of about eighteen months, SLF led five trials and obtained more than $700 million in verdicts against J&J.  In connection with those trials, SLF served as the main point of contact for clients and their families in fact-gathering and preparation to testify.  Regrettably, those verdicts were overturned on appeal on jurisdictional grounds.  Mr. Smith also recently obtained a $75 million settlement from J&J in favor of the Mississippi Attorney General.

II.     *Prior J&J Bankruptcies*

14.     J&J has been trying for several years to resolve its talc liabilities through bankruptcy.  In October 2021, a J&J affiliate named LTL Management, LLC ("**LTL**") filed for

Chapter 11 protection to resolve its talc liabilities.  SLF, Beasley Allen, and many other law firms

opposed LTL's filing.  That bankruptcy case was ultimately dismissed.

15.     Soon thereafter, LTL filed a second Chapter 11 case, this time citing an agreement

with and support from numerous plaintiffs' firms to resolve all pending and future talc litigation.

SLF, Beasley Allen, and many law firms again opposed.  LTL's second bankruptcy was ultimately

dismissed too.

III.    *The Debtor's Initial Plan and the Voting Process*

16.     In May 2024, LTL (by then, renamed LLT Management, LLC), on behalf of the

Debtor, proposed a prepackaged plan to resolve all ovarian cancer and non-ovarian gynecological

cancer talcum powder litigation against J&J and associated current and potential liabilities.  The

terms of compensation and mechanics in that original Plan still fell short, and neither Beasley

Allen nor SLF supported it.  When the Debtor solicited votes on the Initial Plan, Mr. Smith and

Beasley Allen agreed that they should recommend that their joint clients reject it.  In June and July

2024, Beasley Allen sent letters to that effect to SLF Claimants.  *See, e.g.*, BA00001346.

17.     In the communication it drafted, Beasley Allen told SLF Claimants that it would

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████     *Id*.  SLF had agreed that Beasley Allen would

handle the administrative task of compiling and submitting a master ballot for the joint clients it

manages.

18.     The solicitation package for the Debtor's prepackaged Initial Plan instructed that

each master ballot submitted must be signed and certified.  More specifically, with respect to each

client identified on any spreadsheet accompanying a master ballot, the submitting attorney had to

select and certify either that (i) the "vote of such Client" was "collected and recorded" "through customary and accepted practices" or that "authority to procedurally cast such Client's vote" has been obtained ("**Option A Certification**"), or (ii) the attorney has "the authority under a power of attorney to vote to accept or reject the Initial Plan on behalf of such Client" ("**Option B Certification**").

19.     In late July 2024, Beasley Allen submitted a master ballot for SLF Claimants (the "**BA Master Ballot**"), in which it cast each vote via Option A Certification.  The BA Master Ballot included 69 votes to accept the Debtor's Initial Plan, and 11,434 votes to reject it.  ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

20.     Votes for hundreds of joint clients managed by SLF were cast on the Debtor's Initial Plan on a separate master ballot submitted by Golomb Legal, P.C. ("**Golomb Legal**"), a firm SLF employed as "local counsel" from time to time, including for state court actions in New Jersey.  All SLF-managed joint clients who voted via Golomb Legal were, at SLF's direction, voted pursuant to Option B Certification.[5]

*IV.     The SLF MOU*

21.     In recent years, there have been complex mediation efforts to attempt to resolve J&J's talc liabilities.  Andy Birchfield of Beasley Allen has been one of the lead negotiators for MDL leadership in that mediation.  Last summer, however, the relationship between Mr. Birchfield and J&J became fraught and settlement discussions between them stalled.  Mr. Smith worried that this would leave the SLF Claimants (including many who are suffering and eager for prompt

---

[5] Although, in general, Beasley Allen manages most of the joint-venture clients, several hundred are managed by SLF.

economic relief) waiting many more years for a resolution, with no certainty of obtaining any recovery. Accordingly, despite continuing to oppose the Debtor's inadequate Initial Plan, Mr. Smith engaged in more direct mediation efforts.

22.     In June 2024, Mr. Smith facilitated a mediation session between Mr. Birchfield and J&J's and the Debtor's resolution counsel James Murdica, along with Mr. Smith and the mediator, Fouad Kurdi of Resolutions LLC. That meeting led to subsequent mediation sessions among Mr. Kurdi, MDL leadership, Mr. Murdica, and others, but negotiations between Mr. Birchfield and Mr. Murdica soon stalled again. At that point, Mr. Smith and Mr. Murdica engaged in direct arms'-length negotiations.

23.     Those negotiations resulted in an agreement, memorialized in a *Confidential Memorandum of Understanding & Agreement Regarding Talc Bankruptcy Plan Support*. Dkt. No. 17-1 (the "**SLF MOU**"). The SLF MOU materially improved the terms of the Debtor's initial Plan, increasing the economic consideration set forth in the Initial Plan (bringing total trust contributions to more than $9 billion), in addition to other concessions by J&J to augment and expedite distributions to claimants:

- Contribution of an additional $1.1 billion for supplemental recoveries to talc claimants who, among other things, have had ovarian cancer cases pending for at least four years (MOU at 5);

- Establishment of a $650 million attorney fee fund, which would enable direct recoveries to claimants to be higher than what would be achieved in the MDL (*id*. at 4-5);

- An agreement to start processing claims expeditiously, at J&J's expense (*id*. at 6);

- A commitment that J&J will provide material settlement recoveries even if the Debtor's Chapter 11 Case is ultimately dismissed (*id*. at 7-10); and

- J&J's agreement to assist in negotiating a global medical lien resolution program with the U.S. Department of Justice (*id*. at 11).

V.      *Soliciting Votes on the Debtor's Revised Plan*

24.     On August 23, 2024, Mr. Smith sent the then-current draft of the SLF MOU to Mr. Birchfield, and encouraged him to support a revised Plan incorporating the terms of the MOU. Smith Decl. ¶ 20.  Mr. Smith offered to work with Mr. Birchfield on a new joint communication to their common clients summarizing the changes to the Initial Plan, to minimize possible confusion.  In the event Beasley Allen opposed the expected revised Plan, Mr. Smith wanted to ensure that clients received a balanced perspective on the Debtor's new, economically enhanced proposal.

25.     Instead, on August 26, 2024, without consulting Mr. Smith, Beasley Allen sent a letter to the joint clients lambasting the SLF MOU.  *Id.* ¶ 21.  In the letter, Beasley Allen insisted that it would "not leave any firms behind who have stood with [MDL leadership] against the J&J bankruptcy efforts" and references supposed "duties to *all* claimants" – versus Beasley Allen's actual direct ethical duty to the *jointly represented* clients.  *See* Smith Decl. ¶ 21; Dkt. No. 257-4.

26.     In the days that followed, Beasley Allen repeatedly rebuffed SLF's requests to send a combined, even-handed communiqué to the joint clients, in which each firm could share its respective views.  Beasley Allen likewise refused to provide current client contact information that SLF could use to send the joint clients Mr. Smith's view of the Debtor's revised Plan.  Mr. Birchfield even threatened untold consequences, up to potentially even terminating the JV Agreement, if SLF contacted clients and encouraged them to support the MOU-revised Plan.  Smith Decl. ¶ 22.

27.     To be clear, SLF already had contact information in hand for most of the joint clients; it managed hundreds of the clients directly and was copied on or forwarded communications that Beasley Allen sent to the others.  But requiring SLF's small staff to compile all information from different documents into a useful mail merge format, and confirm the accuracy of the available

information, would waste time and resources, particularly when Beasley Allen could share that information with the push of a button.

28.     Notwithstanding Beasley Allen's efforts to prevent or delay SLF from communicating with the joint clients and threats to Mr. Smith, on September 11, 2024, SLF, using the best available contact information, sent letters and emails to its talc clients recommending that they vote to support the Debtor's revised Plan.  *See* Dkt. No. 257-4.  Before doing so, Mr. Smith continued to try to persuade Mr. Birchfield to send a new letter to the joint clients either with SLF or for SLF; Mr. Smith even offered a draft for Mr. Birchfield to review and approve, but he refused.

29.     In addition to summarizing the terms of the MOU and the basis for SLF's recommendation to SLF Claimants to vote in favor of the Debtor's revised Plan, SLF's September 11 correspondence gave the joint clients an easy way to cast their votes affirmatively, by visiting a weblink that SLF created for that purpose (http://talc.smith-law.org/vote).  Smith Decl. ¶ 23.

30.     SLF Claimants were asked to indicate how they wished to vote by September 13, 2024, and advised that if they chose not to vote on their own by then, SLF would submit a vote on their behalf accepting the updated Plan. When SLF was notified by shipping carriers that delivery of certain hard-copy mailed packages had been delayed due to inclement weather, SLF extended the voting deadline for all clients to September 15, 2024 at 12:00 p.m. Central Time.  *Id.*

VI.     *September 2024 Voting on the Debtor's Revised Plan*

31.     On September 16, 2024, SLF submitted a master ballot reflecting votes it had solicited from the SLF Claimants on the Debtor's revised Plan (the "**SLF Master Ballot**") – the first ballot from any plaintiffs' firm reflecting votes on that new and improved Plan.  *Id.* ¶ 30.  The SLF Master Ballot included 11,886 votes to accept the MOU-revised Plan and 169 votes to reject it.  That total vote count of 12,055 included votes for:  (i) 11,481 joint clients who also appeared

on the BA Master Ballot and were managed primarily by Beasley Allen; (ii) 483 SLF-managed joint clients whose votes were previously cast on Golomb Legal's master ballot; and (iii) another 91 SLF-managed joint clients who became clients shortly before or after solicitation of votes on the Debtor's Initial Plan began. *Id.* ¶¶ 30-33.

32.     For the SLF Master Ballot, SLF used both Option A Certification and Option B Certification – unlike Beasley Allen, whose master ballot exclusively employed Option A Certification.  SLF selected Option A Certification for the 879 clients who responded to SLF's communication in September 2024 and affirmatively voted "yes" or "no" on the Debtor's MOU-revised Plan via the weblink, by phone, and/or by email. *Id.*  SLF selected Option B Certification for the remaining 11,176 SLF Claimants on the SLF Master Ballot. *Id.*

VII.    *The TCC MOU and Continued Improvements to the Amended Plan*

33.     The terms of the Amended Plan have continued to improve since SLF submitted the SLF Master Ballot in September 2024, as a result of ongoing mediated negotiations between representatives of J&J, the Debtor, and numerous other parties-in-interest, including, without limitation, the Official Committee of Talc Claimants ("**TCC**") in this Chapter 11 Case.

34.     In November 2024, using the SLF MOU as a critical foundation and springboard, the TCC negotiated additional amendments to the Debtor's revised Plan.  These amendments, detailed in a new MOU (the "**TCC MOU**"), include, among other things, the acceleration of the Amended Plan's Effective Date, acceleration of trust funding, less conditionality for funding outside of the bankruptcy case, and the narrowing of J&J's walkaway rights. *See* Dkt. No. 560-1. While the TCC MOU includes provisions designed to improve treatment of Talc Personal Injury Claimants, the economic consideration provided was largely the same as  that provided for in the SLF MOU.

35.     In addition to the changes negotiated for as part of the TCC MOU, the Amended Plan and Talc Personal Injury Trust Documents have further evolved (and are continuing to be refined) to address concerns raised by SLF and other interested parties.  While the factors for recovering from both the Supplemental Review Fund and the Common Benefit Fund have not yet been disclosed, both sets of factors have been negotiated by sophisticated plaintiffs' counsel representing a majority of the Talc Personal Injury Claimants, including members of the Ad Hoc Committee, the TCC, SLF, and others, including counsel to claimants that have opposed the Plan. The factors will maximize recoveries for Talc Personal Injury Claimants, and appropriately compensate their counsel.  Notably, despite baseless assertions by various objecting parties, neither set of factors inures disproportionately to the SLF Claimants nor to SLF.

## **ARGUMENT**

36.     This Reply incorporates by reference the arguments made by the SLF Claimants in their previous submissions regarding the Amended Plan and voting process, [Dkt. Nos. 192, 435, 642].

*I.     The Amended Plan Satisfies the Requirements of Section 1129(a)(3)*

37.     Section 1129(a)(3) of the Bankruptcy Code requires, as a condition to confirmation, that the plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  Good faith is evaluated "in light of the totality of the circumstances surrounding establishment of [the] Chapter 11 plan." *Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship* (*In re T-H New Orleans Ltd. P'Ship*), 116 F.3d 790, 802 (5th Cir. 1997).  "Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied." *Brite v. Sun Country Dev., Inc.* (*In re Sun Country Dev., Inc.*), 764 F.2d 406, 408 (5th Cir. 1985).  In arguing that the Amended Plan fails to meet this standard, the Objectors principally assert that the Amended Plan (1) does

not serve a legitimate bankruptcy purpose, and (2) was not negotiated or solicited in good faith. Each of these arguments fails.[6]

### A.   The Amended Plan Serves a Legitimate Bankruptcy Purpose

38.   As the Supreme Court has repeatedly recognized, "maximizing property available to satisfy creditors" is a central objective of the Bankruptcy Code. *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 435 (1999); *Toibb v. Radloff*, 501 U.S. 157, 163 (1991) (same). The Amended Plan serves this purpose by effectuating a historic settlement that will provide fair and timely compensation to Talc Personal Injury Claimants through payments to a section 524(g) trust, allowing those claimants to finally recover on account of their claims against the Debtor and J&J. This, in fact, is precisely what section 524(g) was designed to accomplish. *See* H.R. Rep. No. 130-835, at 40-41 (1994) (describing provision's history and operation, and noting that the "asbestos trust/injunction mechanism established in the bill is available for use by any asbestos company facing a similarly overwhelming liability"). It is thus no wonder that this Court has expressly held that "developing an orderly process, utilizing section 524(g) of the Bankruptcy Code, to compensate legitimate Asbestos Claimants fairly, while preserving the [underlying] business" – as the Debtor and J&J intend to do here – is a "legitimate and honest purpose" that satisfies 1129(a)(3). *In re J T Thorpe Co.*, 308 B.R. 782, 787 (Bankr. S.D. Tex. 2003).

---

[6] The U.S. Trustee (the "**UST**") wrongly asserts that the "good faith" inquiry under section 1129(a)(3) focuses on "whether the debtor had a legitimate purpose in seeking bankruptcy protection." UST Obj. ¶ 59; *see also id.* ¶ 66 (conflating dismissal and confirmation standards). In fact, the case the UST cites says nothing about the debtor's purpose in *seeking bankruptcy protection*, but rather focuses (as one would expect) on the purpose of the *plan*. *See Sun Country Development.*, 764 F.2d at 408 ("Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied."). Indeed, "[t]he test for good faith is not based on what the plan proponents' behavior prior to petition was," it "is only based on the Plan itself and its acceptance." *Texas Extrusion Corp. v. Palmer, Palmer & Coffee* (*In re Texas Extrusion Corp.*), 68 B.R. 712, 723 (N.D. Tex. 1986) (cited in footnote 9 of the UST Objection); *see also In re Gen. Homes Corp. FGMC, Inc.*, 134 B.R. 853, 862 (Bankr. S.D. Tex. 1991) (same).

39.     The objectors have no real answer to this simple truth.  The UST principally rehashes its arguments for dismissal of the bankruptcy *case* (a separate inquiry), focusing myopically on what the Plan means for J&J, while ignoring the substantial benefits to *creditors*. The Coalition asks the Court to employ an impossibly lofty standard under which a plan can never be approved unless it is the best possible outcome for every affected claimant.  And the Certain Insurers layer on a vague "fairness" objection with dubious factual and legal underpinnings.  None of the Objectors establishes a valid "bankruptcy purpose" objection:

40.     ***First***, there is no truth to the UST's assertion that the "true beneficiary of the Plan is not the Debtor or its creditors but nondebtor J&J."  UST Obj. ¶ 74; *see also id*. ¶ 60 (asserting that "case is designed to benefit J&J and not the debtor.").  This argument callously ignores the views of the thousands of creditors – personal injury victims who have waited years for redress – who strongly and vocally support the Plan.  The UST, with no economic or personal stake in the outcome of this case, should not be heard to speak for creditors on this issue when they have spoken for themselves.  Their overwhelming support for the Amended Plan is itself evidence of the Plan's good faith.  *See In re Walker*, 628 B.R. 9, 18 (Bankr. E.D. Pa. 2021) ("When the affected creditors support confirmation of a plan, the court generally should be circumspect about overriding the expressed will of the voting creditors based on the good faith requirement of 11 U.S.C. § 1129(a)(3)."); *Coleman v. ANMP (In re Dexter Distrib. Corp.)*, No. CV 09-1099-PHX-JAT, 2009 WL 2154538 at *2 (D. Ariz. July 14, 2009) (citing, in good faith inquiry, "overwhelming[] support[] by the creditors of the estate").

41.     ***Second***, whether the goal of this case is or is not a fresh start and whether the Debtor is or is not an "honest and unfortunate debtor," (see UST Obj. ¶ 73), is irrelevant.  A "fresh start," to be sure, is the goal of some bankruptcies.  But Congress did not have a "single purpose in

enacting Chapter 11," *Toibb*, 526 U.S. at 163, and of course there are many Chapter 11 bankruptcies that do not result in a typical "fresh start." *See, e.g.*, *CHS, Inc. v. Plaquemines Holdings, LLC*, 735 F.3d 231, 238 (5th Cir. 2013) ("Chapter 11 of the Bankruptcy Code permits a debtor to reorganize or liquidate all or substantially all of its assets."). By the same token, a debtor need not be "honest" or "unfortunate" to qualify for chapter 11. Cf. 11 U.S.C. § 109 (defining who may be a debtor); *see also, e.g.*, *In re ASARCO LLC*, 420 B.R. 314, 332 (S.D. Tex. 2009) (confirming plan over good faith objection notwithstanding allegations of prepetition "misconduct," which the "Court agrees was not model corporate behavior").

42.     ***Third***, there is no merit to arguments that the Amended Plan does not maximize value for Talc Personal Injury Claimants. The Amended Plan embodies the terms of a historic settlement, perhaps the highest in history for asbestos-related injuries. The Coalition asserts that a better deal could be had if the Court were to reject the current settlement, Coalition Obj. at 57, but this is sheer speculation. If the Court were to reject the settlement, it is just as likely that J&J would take its chances in the tort system, further delaying (if not vitiating) recoveries to claimants. Perhaps more to the point, neither section 1129(a)(3) nor Bankruptcy Rule 9019 nor anything else in the Bankruptcy Code requires that a proposed settlement represent the best possible available deal. Such a standard would be impossible to satisfy, effectively foreclosing approval of any non-unanimous settlement by empowering any holdout to argue – as the Coalition does here – that if the Court would just reject the latest settlement, a better one would be forthcoming. No court has ever adopted this view of "good faith." The Coalition firms' insistence that recoveries outside of bankruptcy will exceed recoveries under the Plan is belied, in part, by the member firms' own experience in the tort system. November 21, 2024 Andrew Birchfield Dep. 18:18-25 ███████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████

43.    ***Fourth***, the Amended Plan's proposal to pay Gynecological Cancer Claims $1,500 does not result in the allowance of "non-compensable" claims in violation of the Code, as the Certain Insurers suggest.  The Certain Insurers base their characterization of the claims as "non-compensable" not on any court ruling, but on the Debtor's stated position in the MDL.  *See* Certain Insurers' Obj. ¶¶ 45-51.  But a defendant's refusal to concede its own liability for personal injury claims in a multidistrict litigation is hardly proof that such claims are worthless.  Indeed, the Certain Insurers admit that the Debtor took the same position with respect to *all* of the talc claims at issue here, "whether it be ovarian, uterine or cervical," *id*. ¶ 55, yet the Insurers don't contend that the ovarian claims are "non-compensable."  In any event, tens of thousands of Gynecological Cancer Claims remain pending, and the Debtor's determination that providing some modest amount of compensation to those claimants was preferable to litigating the claims to verdict is not at odds with the purpose of the Bankruptcy Code.  The Bankruptcy Code favors settlements, not litigation for its own sake.  *See, e.g.*, *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (noting that "compromises are a normal part of the process of reorganization, oftentimes desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated and costly") (cleaned up, with citations omitted).

44.    ***Fifth***, section 1129(a)(3) does not impose an amorphous and unwritten "fairness" standard as the Certain Insurers contend[7] – but in any event, the Plan is fair.  The Certain Insurers

---

[7] The plain language of section 1129(a)(3) says nothing about "fairness" (in contrast to other sections of the Bankruptcy Code that do, *see, e.g.*, 11 U.S.C. § 1129(b)(1)).  Certain Insurers locate their supposed fairness requirement in the Fifth Circuit's decision in *Ronit, Inc. v. Stemson Corp. (In re Block Shim Dev. Co.-Irving)*, 939 F.2d 289, 292 (5th Cir. 1991) (cited at ¶ 58 of the Certain Insurers' Objection), but that reading is strained, at best.  In fact, what *Block Shim* said – in passing – was that "a plan must fairly achieve a result consistent with the Code." *Block Shim*, 939 F.2d at 292.  The word "fairly," in this context, could mean "in a fair way," as Insurers suggest, but could just as easily mean something like "reasonably well."  *See Amgen Inc. v. Hargan*, 285 F. Supp. 3d 351, 368-69 (D.

cite *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201 (3d Cir. 2011), in support of their assertion that the Debtor improperly colluded with the Ad Hoc Committee.  But in that case, the debtors solicited votes from counsel for claimants in *another company's bankruptcy*.  *Id*. at 206.  Here, there is no allegation, much less evidence, that the Debtor looked outside of the existing pool of claimants and counsel to manufacture "yes" votes.  And, while the Certain Insurers rely on the bankruptcy court's decision to dismiss the case in *In re Congoleum Corp.*, No. 03-51524, 2009 WL 499262 at *2, *13 (Bankr. D.N.J. Feb. 26, 2009) (Certain Insurers' Obj. ¶ 61), the Certain Insurers fail to note that the District Court reversed the bankruptcy court, finding that the bankruptcy judge "effectively sanctioned the Plan Proponents for failing to produce a plan acceptable to her, instead of evaluating whether dismissal would be in the best interests of Congoleum's creditors or the Company."  *In re Congoleum Corp.*, 414 B.R. 44, 61 (D.N.J. 2009).

      B.     *The Amended Plan was Negotiated and Solicited in Good Faith*

     45.     In addition to serving a legitimate bankruptcy purpose, the Amended Plan was negotiated and solicited in good faith.  SLF and Mr. Smith have been tirelessly prosecuting talc claims for more than fifteen years.  *See supra* ¶¶ 6-13.  When mediated negotiations between J&J and SLF's co-counsel (and various other plaintiffs' firms) stalled, Mr. Smith engaged in good faith, arms'-length negotiations with J&J resulting in material improvements to the Debtor's Initial Plan, including an additional ***$1.1 billion*** for Talc Personal Injury Claimants.  *See supra* ¶¶ 21-24; Dkt. No. 435 ¶¶ 11, 14-16.  The evidence will show that these negotiations, together with the solicitation and voting on the Debtor's plan, were characterized by good faith on the part of the Debtor and claimants alike.  The Objectors arguments to the contrary each fail.

---

D.C. 2018) (concluding that statutory phrase "fairly respond" was "inherently ambiguous" since "fairly" could mean either (1) "moderately," "passably," or "reasonably well", or (2) "in a fair manner").

46.     *First*, there is no substance to the argument that the plan is the result of "chicanery," "vote-buying," or "improper inducements to creditors."  UST Obj. ¶ 77; Certain Insurers' Obj. ¶ 52; Coalition Obj. at 57-60.  The provisions challenged by the Objectors do not result in unfair treatment or constitute impermissible "vote buying."

47.     For example, the Insurers argue that the additional $1.1 billion to be allocated toward the Supplemental Review Fund will be "captured by plaintiffs' firms that are 'in the know'" because the Trust Distribution Procedures require the Talc Trustee to take into account "whether a Claimant had retained counsel prior to October 14, 2021" in awarding funds through the Individual Review Process.  *See* Certain Insurers' Obj. ¶ 52.  As noted above, the factors that will be used for the Supplemental Review Fund have been negotiated with representatives of substantially all of the Talc Personal Injury Claimants in this bankruptcy case – and reflect, at a minimum, extensive discussions with counsel for claimants that have opposed the Plan about the propriety of each of the factors.  Those factors have been developed by sophisticated counsel with substantial experience litigating these exact claims, and, more importantly, by counsel representing a broad group of claimants – both those who have been litigating for years and those who have not yet filed complaints in the tort system.  The factors are fair, balanced, and not unduly skewed towards any particular group of claimants, including the SLF Claimants.  Further, the factors are just that –factors for the Talc Trustee to consider and apply in their discretion.  But more to the point: the fact that *one* factor for the Talc Trustee to consider in determining whether to provide supplemental awards is the length of time a particular claimant has been in litigation against J&J does not mean that the Certain Insurers' arguments of vote-buying have any merit; it is but one datapoint for the Trustee to consider in implementing the Supplemental Review Fund.

48.    The UST further suggests that establishment of the Common Benefit Fund is evidence of impermissible vote buying through "provision of additional financial benefits to settlements claimholders and their counsel," UST Obj. ¶ 78, but awards from the Common Benefit Fund will be overseen by a neutral third party – not any one of the plaintiffs' firms – who will assess awards based on to-be-determined factors.  SLF MOU § II.C.  Further, the Common Benefit Fund is in lieu of a fee fund that *already exists:* the MDL common benefit fund. *Compare* MDL Dkt. No. 14741, Case Management Order No. 7(A) (establishing common benefit fund) *with* SLF MOU § II.C (establishing Common Benefit Fund).

49.    ***Second***, the Amended Plan's classification scheme – in which all personal injury claims, including Gynecological Cancer Claims, are placed together – does not evidence bad faith. Even if the Debtor *had* attempted to "manufacture" an impaired consenting class (and it did not), the Fifth Circuit has squarely rejected the argument that vote manipulation "constitutes bad faith as a matter of law," noting that this argument "has no basis in the code or our precedents."  *W. Real Estate Equities v. Vill. at Camp Bowie I, L.P. (In re Vill. at Camp Bowie I, L.P.*), 710 F.3d 239, 247 (5th Cir. 2013) (addressing artificial impairment).  In any event, the classification scheme had no effect on the Plan's acceptance.  As the Debtor's expert, Andrew Evans has shown, ████

████████████████████████████████████████████████

████████████████████  Evans Report (Debtor) p. 5-7.

50.    ***Third***, the UST's strained analogy to *Quigley* is misplaced.  In *Quigley*, plaintiffs' firms representing tort claimants entered into prepetition settlement agreements with the debtor's parent company, under which the settling claimants (and the settling claimants only) would recover more quickly than other creditors under the plan.  *In re Quigley Co.* 437 B.R. 102, 111, 115-17 (Bankr. S.D.N.Y. 2010).  As a result, the court concluded that the parent "wrongfully manipulated"

the process through these settlements to assure plan confirmation – noting that the disparity in voting results between settling and non-settling claimants reflected improper "financial incentive under the [] Settlement Agreements." *Id*. at 126-29.

51. The UST falsely suggests that J&J similarly "solicit[ed] . . . votes from claimants that had settled outside bankruptcy" and provided "additional financial benefits to settling claimholders and their counsel." UST Obj. ¶ 78. But here, unlike in *Quigley*, no *claimants* eligible to vote have "settled" their claims "outside of bankruptcy" and creditor distributions will not be funded with payments outside of the Amended Plan. Instead, certain of the supporting parties entered into prepetition settlement agreements – neither unusual nor controversial – setting forth the terms under which the supporting parties would vote to accept the Debtor's plan. And those terms would inure to the benefit of *all* claimants, not solely the supporting parties.

52. For example, the SLF MOU provided that the Debtor and J&J would fund an additional $1.1 billion under the Amended Plan. That $1.1 billion does not inure solely to the benefit of the SLF Claimants, but to all similarly situated Talc Personal Injury Claimants, whether represented by SLF or not. Likewise, the Common Benefit Fund provided for in the SLF MOU will inure to the benefit of counsel to all Talc Personal Injury Claimants, and similar to the MDL common benefit fund, will entail a neutral third-party reviewing fee applications and applying a non-exclusive list of factors to evaluate those applications. In short, neither of these constructs provides a financial benefit available only to Plan supporters. Thus, *Quigley* is inapplicable.

53. ***Finally***, the Debtor's supposed "heavy scrutiny" of "no" votes and "limited" scrutiny of "yes" votes – even if true – proves nothing other than the Debtor's desire to see its plan confirmed. For a debtor to zealously advocate for confirmation of its plan is neither vote manipulation nor bad faith. Further, and as noted in more detail in the Debtors' Brief, the issues

identified by the Debtor as to the BA Master Ballot – *i.e.*, that its Option A votes are largely unsupported by affirmative responses from clients – do not affect the SLF Master Ballot, as SLF used Option A certification only for clients who affirmatively responded instructed SLF on how they wished to vote.

II.       *The Plan Does Not Need to be Resolicited*

54.       The Coalition argues that the Debtor's Amended Plan must be resolicited because it has changed over time. Coalition Obj. at 76-77.  Tellingly, however, the Coalition appears willing to drop its demand for resolicitation if the BA Master Ballot is reinstated. *See Id*. at 73; Dkt. No. 266. Thus, the Coalition is not actually arguing that the Plan's changes require resolicitation, but instead using this argument as a disguise for their true agenda – obtaining leverage over the Debtor's bankruptcy case and J&J.

55.       Regardless of the Coalition's actual motivations, recent Plan modifications, including those based on the SLF MOU, have only *improved* the treatment of claimants under the Amended Plan.  It is well-settled that plan modifications require resolicitation only when the modifications "materially and adversely" change a claimant's treatment.  *See, e.g.*, *Faulkner v. AimBank (In re Reagor-Dykes Motors)*, LP, No. 18-50214-RLJ-11, 2021 WL 1219537, at *6 (Bankr. N.D. Tex. Mar. 30, 2021) (proponent of modified plan must resolicit votes only when "modifications materially and adversely affect the treatment of a creditor who voted in favor of the plan"); *In re Am. Solar King Corp*., 90 B.R. 808, 823-25 (Bankr. W.D. Tex. 1988) ("Further disclosure occurs only when and to the extent . . . the modification materially and adversely impacts parties who previously voted for the plan.").  Modifications that are immaterial or only *improve* creditor treatment do *not* require further disclosure and resolicitation.  *See In re*

*Greenwood Point, LP*, 445 B.R. 885, 920 (Bankr. S.D. Ind. 2011) (plan modifications that improved treatment of claims did not require further disclosure or resolicitation).

56.     The Coalition cannot credibly argue that the modifications made to the Initial Plan "materially and adversely" change claimant treatment.  To the contrary, the modifications resulting from settlements reached pursuant to the SLF MOU and the TCC MOU emerged from extensive negotiations and materially *improve* the treatment of talc claims.  These modifications include increasing the trust contributions by $1.1 billion, establishing the $650 million Common Benefit Fund, accelerating cash contributions to the Talc Personal Injury Trust, and providing for a comprehensive and guaranteed resolution of talc claims outside of bankruptcy in the event that the Talc Personal Injury Trust is dissolved.  Together, these modifications increase recoveries and provide enhanced certainty for Talc Personal Injury Claimants – many of whom have been waiting years to recover on account of their injuries.

57.     For similar reasons, the modifications to the Trust Distribution Procedures to provide for enhanced payments to certain claimants through the Supplemental Review Fund do not require resolicitation. The Supplemental Review Fund *adds* $1.1 billion for Talc Personal Injury Claimants, creating a new and additional bucket of cash recoveries for those claimants that are able to establish a basis for enhanced recoveries through a list of heavily negotiated factors reflecting the input and experience of counsel that have been litigating these cases for over a decade; it does not reallocate funds previously available to all claimants or in any other way affect or dilute claimant recoveries.

58.     Nor is there any merit to the UST's argument that the Amended Plan cannot be confirmed because there "is no evidence that any majority of creditors have voted to approve the same plan at any point in time." UST Obj. ¶ 88.  The Bankruptcy Code does not require that all

creditors vote on the same version of a plan.  Plans, especially in complex cases, are often modified and enhanced prior to confirmation, with the goal of parties reaching consensus.  In fact, this is precisely why Bankruptcy Rule 3019(a) allows a court to attribute prior acceptances to an amended plan where the modification "does not adversely change" a claimant's treatment.  *See* Bankr. Rule 3019(a); *see also In re Am. Solar King Corp.*, 90 B.R. at 825-26  ("The goal after all is consensual plans.  Every time a plan has to be re-solicited, the risk that consensus will be lost is increased dramatically. Requiring such a formalistic step . . .  heightens the risk of plan failure without satisfying any countervailing public policy.").

59.     The Amended Plan has the overwhelming support of Talc Personal Injury Claimants, and as discussed above, modifications made to the Amended Plan have only improved the treatment of Talc Personal Injury Claimants.  All parties have had ample notice and opportunity to review and object to the Amended Plan, and to change their votes, which many did as a result of the material improvements.  A requirement that all creditors vote on the same version of the same plan is not only unsupported by the Bankruptcy Code, but also would directly undercut the core bankruptcy goal of forging consensual plans.

*III.*     *The Voting-Related Objections Should be Overruled*

60.     Objections to the validity and full counting of SLF's Master Ballot should also be rejected.  *See*, e.g., UST Obj. ¶ 88; Certain Insurers' Obj. ¶¶ 87, 93-104; Coalition Obj. at 60, 72-73; *see also* Dkt. Nos. 257, 265, 266 (the "**Coalition Voting Motions**").

61.     As set forth in the Debtor's Brief, the Debtor's expert reports, and as will be shown at the Confirmation Hearing, more than 75% of Talc Personal Injury Claimants support the Amended Plan.  The supporting claimants properly include the SLF Claimants, because (i) the

SLF Master Ballot was submitted in accordance with the Tabulation Procedures and (ii) SLF had the appropriate authority to vote on behalf of the SLF Claimants.

       A.      *The SLF Ballot Was Submitted in Accordance with the Tabulation Procedures*

      62.     None of the Objectors makes a cogent argument that the SLF Master Ballot failed to comply with the Tabulation Procedures.  For instance, it is irrelevant that SLF submitted its ballot in September 2024 rather than July 2024.  The Tabulation Procedures authorized the Debtor to extend the voting deadline, and it did so.  Tabulation Procedures 3(d), 4(d).  The voting deadline was extended when the Coalition firms requested a pause in the vote tabulation over the summer to continue negotiations.  Dkt. No. 305 ("**Debtors' Voting Results Motion**") ¶ 40 (collecting citations to Tabulation Procedures); November 15, 2024 John Kim Dep. 180:7-20; 197:5-17.  The Tabulation Procedures permitted this extension, and gave the Debtor flexibility to a determine "a later date" by which ballots could be received.  Tabulation Procedures 4(b), 4(d).  The Tabulation Procedures also permitted claimants to modify their votes in advance of the Voting Deadline, stating that "a properly completed superseding ballot . . . on or before the Voting Deadline will be presumed to have sufficient cause, within the meaning of Bankruptcy Rule 3018(a), to change or withdraw such claimant's . . . acceptance or rejection of the Plan."  Tabulation Procedures 4(c).  Finally, even if the Voting Deadline had passed, Paragraph 4(b) of the Tabulation Procedures permitted the SLF Claimants to change their vote after the deadline if the Debtor recognized such vote change, Tabulation Procedures 4(b), which the Debtor did.

      63.     The Coalition argues that, notwithstanding the plain text of the Tabulation Procedures, SLF was required to file a Rule 3018(a) motion and obtain court approval before submitting the SLF Master Ballot to "supersede" the prior BA Master Ballot.  Dkt. No. 266 ¶¶ 38-40.  Unsurprisingly, none of the cases that the Coalition cites for this proposition involved

*prepetition* solicitation and vote changes.[8]  Here, before the petition date, there was no bankruptcy court from which to seek authorization.  Additionally, to the extent the Court finds that affirmative relief under Rule 3018 is required, the Debtor sought that relief in its Voting Results Motion and SLF has cross-moved for such authorization under Rule 3018(a).  Dkt. No. 435.

64.     At bottom, however, the issue of the SLF Master Ballot "superseding" or "changing" the BA Master Ballot is a red herring.  The BA Master Ballot reflected votes on a plan that offered substantially less value.  No one else – not Beasley Allen, not Golomb Legal – has ever submitted or sought to submit votes on behalf of claimants *on any plan that incorporates the terms of the SLF MOU*, or on the further improved Amended Plan that the Debtor is now seeking to confirm.

  B.     *SLF's Option A Votes Were Properly Certified*

65.     The SLF Master Ballot reflects the votes of 879 SLF Claimants who directly contacted SLF and affirmatively voted on the MOU-revised Plan. Smith Declaration ¶ 30.  710 of these claimants instructed SLF to vote yes on the Amended Plan.  *Id.*  These Option A votes should be counted regardless of any (misplaced) disputes concerning SLF's authority to vote on behalf of claimants who did not affirmatively tell SLF how to vote on the Amended Plan (the Option B issue, discussed below).  That is exactly what Option A was intended to be used for, and any other outcome would disregard the expressed intent of these voting claimants.

66.     The Coalition has previously argued that SLF's Option A votes were improper because the SLF Claimants allegedly lacked sufficient notice to exercise informed consent in

---

[8] *In re MCorp Fin., Inc.*, 137 B.R. 237-38 (Bankr. S.D. Tex. 1992) concerned a request to change a vote postpetition, as a result of postpetition negotiations between the debtor and a creditor.  *In re Southland Corp.* did not concern a vote change at all, but rather whether the debtor's prepetition solicitation process gave brokers sufficient time to transmit voting materials to beneficial holders.  124 B.R. 211, 227 (Bankr. N.D. Tex. 1991).  Finally, *In re Piece Goods Shops Co., L.P.* also did not address a request for a vote change; the court merely noted in *dicta* that it would not consider a handful of amended ballots in determining the total accepting amount of votes in a particular class.  188 B.R. 778, 795 (Bankr. M.D.N.C. 1995).

voting on the Amended Plan.  *See* Dkt. No. 266 ¶¶ 23, 40.  As an initial matter, SLF provided up to five days' notice (not the two days' notice the Coalition claims).  Given the claimants' existing familiarity with the terms of the Initial Plan from numerous letters sent by Beasley Allen and SLF earlier in the summer, that amount of time was sufficient for the claimants to review the terms of the Amended Plan and provide their informed consent.  Regardless, even two days' notice would have been sufficient under the circumstances.  ███████████████████████  And the fact that SLF *actually received* responses from many claimants completely undercuts these arguments. Moreover, Beasley Allen and the Coalition's complaints about the amount of time afforded to claimants to vote rings hollow because it was *Beasley Allen's* conduct in refusing to cooperate on joint mailings or otherwise provide access to its mailing address database that prevented SLF Claimants from receiving more time to review the terms of the MOU.  *See supra* at ¶¶ 24-30.

### C.   SLF's Option B Votes Were Properly Certified

67.     Acting in its clients' best interests, SLF also properly certified votes under Option B for clients who did not affirmatively respond to its September 11 letter.  The terms of the JV Agreement and of clients' engagement letters granted SLF authority to do so.  The Objectors allege no valid basis to challenge SLF's authority to cast and certify votes under Option B.

68.     The Objectors contend that a formal "power of attorney" is required to vote on the Plan under Option B, and that a vote on the Plan is tantamount to a settlement with the Debtor. This is incorrect.  An Option B certification is a vote on a plan, and nothing more, and the Bankruptcy Rules confirm that a formal power of attorney is not needed to accept or reject a plan. *See* Fed. R. Bankr. P. 9019(c).  By accepting the Amended Plan, a Talc Personal Injury Claimant does not liquidate or fix their claim.  They opt into a settlement structure under which, if the Plan

is confirmed, the claimant will have multiple different paths to liquidate their claim: the Quickpay Option, the Expedited Review Option, the Individual Review Option, and opting-out to litigate in the tort system. If the claimant receives an offer from the Talc Personal Injury Trust under the Expedited Review Option or the Individual Review Option and does not agree with that offer but does not want to opt-out and litigate, they can still pursue an appeal process within the Trust. In short, once channeled to the Trust, Talc Personal Injury Claimants will have a variety of ways to crystallize their claim, and nothing is predetermined or settled by voting in favor of the Amended Plan.[9]

69.     Even if the Court were to find that express written authority of the sort found in a separate power of attorney instrument were necessary to cast a vote under Option B, SLF's authority is established by the JV Agreement and client engagement letters. For example, forms of engagement letter that Beasley Allen uses with joint clients expressly state ███████████ ████████████████████████████████████████████████████████████████████ ████████████████. The Fifth Circuit has held that an agent may act in a bankruptcy on behalf of its principal pursuant to a general power of attorney where "there is enough evidence . . . . to infer ratification." *United States v. Spurlin*, 664 F.3d 954, 960 (5th Cir. 2011).

70.     In *Spurlin*, the Fifth Circuit endorsed *In re Ballard*, No. I-87-00718, 1987 WL 191320, at *1 (Bankr. N.D. Cal. Apr. 30, 1987) – where the bankruptcy court held that the debtor's wife could file bankruptcy on behalf of her husband via a power of attorney, that did "not specifically mention bankruptcy," unless, after receiving notice, the husband "notifies the clerk in writing that the filing was without the scope of the power of attorney." *Id*.; *see also Spurlin*, 644

---

[9] The Coalition does not appear to contend that actions short of settlement require a power of attorney, nor could they. Lawyers do not need a formal "power of attorney" to take normal steps, short of final resolution of a claimant's claim, to advance the interests of clients in negotiation or litigation.

F.3d at 959 ("*Ballard* allows the holder of the power of attorney to declare bankruptcy but prevents abuse by requiring the debtor to be informed and dismissing if the debtor feels bankruptcy is improper.  This gives the holder of the power of attorney flexibility to protect and manage that person's assets, while including a failsafe to prevent abuse.").  The Fifth Circuit, like the bankruptcy court in *Ballard*, relied on the bankruptcy court's equitable powers, as opposed to state law, as the source of authority to recognize the agent's powers pursuant to the general power of attorney.  *Id.* at 959-60; *Ballard*, 1987 WL 191320, at *1; *see also In re Matthews*, 516 B.R. 99, 103 (Bankr. N.D. Tex. 2014) ("The Fifth Circuit in *Spurlin* did not mention the relevance of state law with regard to the use of powers of attorney in bankruptcy.").

71.     Here, the Court is bound by *Spurlin* to recognize SLF's authority under the JV Agreement client engagement letters.  As noted above, many forms of engagement letters ██████ ████████████████████████████████████████████████ and, pursuant to the JV Agreement, Beasley Allen and SLF "jointly represent all of [their] talcum powder clients." *See* JV Agreement at 2.

72.     Any even suggestion by the Coalition that the authority granted to SLF is invalid because the JV Agreement is no longer in effect is without merit.  *See* Dkt. No. 257 ¶ 16; Dkt. No. 268 ¶ 270; Dkt. No. 628 ¶ 16.  Notably, regardless of whether the JV Agreement is governed by the law of Alabama (where Beasley Allen is located) or Mississippi (where SLF is located), the circumstances in which a joint venture can be terminated have not been met here.[10]  For example,

---

[10]  Under both Alabama and Mississippi law, termination of a joint venture requires  "the consent of all partners to dissolve . . . or the expiration of the term or the completion of the undertaking; . . . [or] on application by a partner, the entry of an order by a court of competent jurisdiction dissolving the partnership on the grounds that it is not reasonably practicable to carry on the partnership's business or not for profit activity in conformity with the partnership agreement."  Ala. Code § 10A-8A-8.01 (2023); *see also* Miss. Code Ann. § 79-13-801 (providing similar grounds for termination); *Carlton v. Alabama Dairy Queen, Inc.*, 529 So. 2d 921, 922 (Ala. 1988) (holding joint ventures are governed by the law of partnerships); *Hults v. Tillman*, 480 So. 2d 1134, 1144-45 (Miss. 1985) (same).

in neither jurisdiction is the filing of a lawsuit alleging breach of contract a basis for termination of a joint venture created for "the completion of a particular undertaking," such as the talc litigation at issue here.  *See* Ala. Code § 10A-8A-8.01 (2023); Miss. Code Ann. § 79-13-801; *see also Keppner v. Gulf Shores, Inc.*, 462 So. 2d 719, 723–24 (Miss. 1985) (sale of an interest in a joint venture, whether transferred through bankruptcy or directly by the owner, is not a cause for automatic termination of a joint venture).

<strong>D.</strong>   <em>The BA Master Ballot Cannot be Reinstated</em>

73.    Concurrently with demanding that the Amended Plan be resolicited, the Coalition simultaneously argues that the BA Master Ballot be reinstated and the SLF Master Ballot disregarded in full.[11]  This is the wrong outcome, and would disenfranchise the many hundreds of SLF Claimants who affirmatively instructed SLF to accept the Amended Plan on their behalf.  It also entirely disregards that that the BA Master Ballot was submitted on a different Plan that provided $1 billion *less* in recoveries for claimants, among other materially worse provisions for claimants. Smith Decl. ¶ 34.

74.    The Coalition's argument for reinstating the BA Master Ballot also fails to account for the fact that, Beasley Allen (taking positions that are questionable at best under the Model Rules of Professional Conduct) cast a ballot that included votes of claimants it now argues deserve no recovery.  More specifically, the Coalition has argued numerous times that the votes of non-ovarian gynecological cancer claims have no value and should be disallowed.  *See* Dkt. No. 265 ¶¶ 57-58; November 21, 2024 Andrew Birchfield Dep. 180:24-182:4, 186:5-192:15.  Yet, the BA

---

[11] The Insurers assert that the Court should disregard the votes of claimants represented by SLF and other firms that entered into the TCC MOU because such claimants supposedly lack an economic interest in the case.  *See* Certain Insurers' Obj. ¶¶ 91-92.  The Court should reject this argument as untimely, as the agreed deadline to submit voting-related motions expired nearly four months ago. *See* Dkt. No. 352 ¶ 16.  In addition, the Insurers' untimely attempt to disenfranchise the SLF Claimants fails on the merits as set forth in the Debtor's Brief.  *See* Debtor's Brief p. 126-27.

Master Ballot cast votes on behalf of 5,500 of these very claimants.  *See* Supplemental Declaration of John K. Kim [Dkt. No. 433] ¶ 9.  These contrary actions cannot be reconciled, and the Coalition has provided no plausible explanation for how it can argue for the reinstatement of the BA Master Ballot, which includes the votes of claimants it asserts should recover nothing under the Amended Plan.

75.     Reinstating the BA Master Ballot would also unfairly discount the votes of other SLF Claimants who did not affirmatively respond to SLF in September because they understood that SLF would vote to accept the Plan absent instructions to the contrary.  Reinstating the BA Master Ballot (or designating the SLF Master Ballot, the Coalition's requested alternative relief) would rob these claimants of their properly-exercised vote, is entirely inconsistent with the law, and should not be permitted.

76.     With respect to SLF Claimants with ovarian cancer in particular (as those seem to be the only claimants whose voice the Coalition thinks should be heard or who deserve recoveries), the SLF Master Ballot includes hundreds who reached out to SLF to affirmatively direct SLF to accept the Plan on their behalf, and were accordingly certified via Option A on the SLF Master Ballot.  Designating the SLF Master Ballot would ensure that the voices of those claimants are never heard.  Only 69 claimants accepted the Initial Plan on the BA Master Ballot – meaning that hundreds of *additional* SLF Claimants decided to support the Amended Plan *after learning the terms of the MOU, even though they were informed that their other attorneys at Beasley Allen opposed*.  This Court should not sanction this attempt by Beasley Allen – co-counsel to these women – to deprive these claimants of their ability to vote.

77.     On top of all of this, Beasley Allen purported to have the actual informed consent from each of the more than 11,000 SLF Claimants included in its Master Ballot when, in fact, it

did not. Debtor's Brief at 49-51. Instead, what Beasley Allen did was follow procedures potentially appropriate for an Option B certification, while representing that it had actually obtained informed consent. As a result, the "Beasley Allen Master Ballot was invalid and would have been disregarded had it not been superseded by the Master Ballot of the Smith Firm." Debtor's Brief at 51. That means the SLF Master Ballot is the *only properly submitted ballot* reflecting the voices of the SLF Claimants.

78. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████ None of those alleged votes should be counted – or used to replace any votes on the SLF Master Ballot – because all of these votes were on the materially worse Initial Plan, and have been superseded by votes on the Amended Plan. On that basis alone, the SLF Master Ballot must stand.

79. Assuming that, for the reasons set forth above, the BA Master Ballot is not reinstated in full and the SLF Master Ballot is not entirely disregarded, every other conceivable outcome – even ones that exclude the properly submitted Option B votes on the SLF Master Ballot – results in more than 75% of Talc Personal Injury Claimants supporting the Plan. *See* Evans Report § 1.D(21). Thus the Coalition's attempts to dissect the SLF Master Ballot are ultimately irrelevant to the fundamental question of whether the Amended Plan has sufficient support to justify a section 524(g) injunction – which it undisputedly does.

## CONCLUSION

80. For the reasons set forth herein, the Plan Objections should be overruled, and the Plan confirmed. The SLF Claimants and other Talc Personal Injury Claimants have waited long enough for recompense from J&J and the Debtor. They should not be forced to wait any longer.

Dated:  February 13, 2025

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

Kenneth H. Eckstein (admitted *pro hac vice*)
Rachael L. Ringer (admitted *pro hac vice*)
David E. Blabey, Jr. (admitted *pro hac* vice)
Natan Hamerman (admitted *pro hac vice*)
Megan M. Wasson (admitted *pro hac vice*)
1177 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000
keckstein@kramerlevin.com
rringer@kramerlevin.com
dblabey@kramerlevin.com
nhamerman@kramerlevin.com
sschinfeld@kramerlevin.com
mwasson@kramerlevin.com

and

**TROUTMAN PEPPER LOCKE LLP**

*/s/ Elizabeth M. Guffy* _____
Elizabeth M. Guffy
Texas Bar Number 08592525
JPMorgan Chase Tower
600 Travis, Ste. 2800
Houston, TX 77002
Telephone: (713) 226-1507
Facsimile: (713) 223-3717
eguffy@troutman.com

***Counsel to the SLF Claimants***

## <u>Certificate of Service</u>

I hereby certify that on February 13, 2025, a true and correct copy of the foregoing pleading was served electronically via the Court's ECF system on all parties registered to received such service.

*/s/ Elizabeth M. Guffy*
Elizabeth M. Guffy