```
1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
2                          HOUSTON DIVISION

3   RED RIVER TALC LLC,          )  CASE NO:  24-90505
                                 )
4                                )  Houston, Texas
                                 )
5             Debtor.            )  FRIDAY,
                                 )  February 28, 2025
6   -----------------------------)  AM to PM

7

8                             TRIAL

9         BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE
10

11  APPEARANCES:

12  For Coalition:          ELIZABETH STRYKER
                            Bailey & Glasser LLP
13                          209 Capital Street
                            Charleston, WV 25301
14
                            ADAM SILVERSTEIN
15                          Otterbourg PC
                            230 Park Avenue
16                          New York, NY 10169

17
    For U.S. Trustee:       LINDA RICHENDERFER
18                          SPENCER EZELL
                            JAYSON B. RUFF
19                          Office of the United States Trustee
                            900 Market Street
20                          Philadelphia, PA 19107

21
    For TCC:                KRIS HANSEN
22                          Paul Hastings LLP
                            600 Travis Street
23                          58th Floor
                            Houston, TX 77002
24

25
```

```
 1                              DAVID MOLTON
                                Brown Rudnick LLP
 2                              Seven Times Square
                                New York, NY 10036
 3
                                SANDER L. ESSERMAN
 4                              Stutzman Bromberg Esserman & Plifka
                                2323 Bryan Street
 5                              Ste 2200
                                Dallas, TX 75201
 6

 7   For Randi Ellis:         NANCY DAVIS
                                Bracewell LLP
 8                              711 Louisiana St
                                Ste2300
 9                              Houston, TX 77002

10
     For U.S. DoJ:            BETHANY THERIOT
11                              U.S. DoJ - Civil Division
                                P.O. Box 875
12                              Ben Franklin Station
                                Washington, D.C. 20044-0875
13

14   For Smith Law Firm:      RACHAEL RINGER
                                NATAN HAMERMAN
15                              Kramer Levin Naftalis & Frankel LLP
                                1177 6th Ave.
16                              New York, NY 10036

17
     For Ad Hoc Committee of Supporting Counsel:
18                              LENARD M. PARKINS
                                Parkins & Rubio LLP
19                              Great Jones Building
                                708 Main Street
20                              Ste 10th Floor
                                Houston, TX 77002
21

22   For Travelers:           LYNN NEUNER
                                Simpson, Thatcher & Bartlett LLP
23                              425 Lexington Avenue
                                New York, NY 10017
24

25
```

```
 1   For Debtor:              ALLISON BROWN
                              Skadden Arps Slate Meagher & Flom
 2                            One Manhattan West
                              New York, NY 10001
 3
                              GREGORY GORDON
 4                            Jones Day
                              2727 North Harwood Street
 5                            Suite 500
                              Dallas, TX 75201
 6

 7   For Interested Parties:  E.F ANTHONY MERCHANT
                              STEVEN ROXBOROUGH
 8                            Merchant law Group
                              304, 15127 100 Ave #304/3
 9                            Surrey, BC V3R 0N9, Canada

10                            ROY E. BARNES
                              Barnes Law Group
11                            31 Atlanta Street
                              Marietta, Georgia 30060
12
                              CHRIS PLACITELLA
13                            Cohen, Placitella & Roth P.C.
                              127 Maple Ave.
14                            Red Bank, NJ 07701

15                            ANDY BIRCHFIELD
                              Beasley Allen et al
16                            218 Commerce Street
                              Montgomery, AL 36104
17

18   Court Reporter:          YESENIA LILA

19   Courtroom Deputy:        YESENIA LILA

20   Transcribed by:          Veritext Legal Solutions
                              330 Old Country Road, Suite 300
21                            Mineola, NY 11501
                              Tel: 800-727-6396
22

23

24   Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
25
```

1          <u>HOUSTON, TEXAS; FRIDAY, FEBRUARY 28, 2025</u>

2                        (Call to Order)

3          THE COURT:  Good morning.  This is Judge Lopez.

4    Today is February 28th, at 10 a.m.  I'm going to call case

5    number 24-90505, Red River Talc, here on various motions,

6    plan confirmation, various related motions, and a motion to

7    dismiss.  And so we're here on the final day.  Again, my

8    thanks and appreciation to everyone.

9          Ms. Brown, good morning.

10         MS. BROWN:  Good morning, Your Honor.  One just

11   quick housekeeping matter.  We are in agreement with the

12   other side that we will finalize the deposition designation

13   discussions, and get that submitted on the record on

14   Wednesday, and the same would be true for the exhibit list.

15   So we're essentially just doing cleanup and finalization

16   over the last -- the next couple of days, and we will commit

17   to have that done and on the docket by Wednesday.

18         THE COURT:  Perfect.  Thank you very much.

19         MS. BROWN:  Thank you.

20         MR. SILVERSTEIN:  That's correct, Your Honor.  And

21   just to be clear, we're not thinking of adding any

22   additional documents to the record.  It's really just

23   cleaning up to make sure the master exhibit list matches

24   what we've moved into evidence.  Thank you, Your Honor.

25         THE COURT:  Thank you.

1            MS. BROWN:  Exactly.  Just sort of a double check.

2            THE COURT:  All right.  Just please circulate it

3    to related parties.  I take it you're going to make sure the

4    U.S.  Trustee sees a copy of what you -- before it gets

5    filed, so when I see it, it's the -- I know that it's

6    (indiscernible).

7            MS. BROWN:  Of course.  Sure.

8            MS. RICHENDERFER:  Right.

9            MR. SILVERSTEIN:  Absolutely, Your Honor.

10           THE COURT:  Thank you.

11           Ms. Richenderfer?

12           MS. RICHENDERFER:  Thank you, Your Honor.  Linda

13   Richenderfer, Office of the United States Trustee.  And in

14   that process, I hope to just be able to discuss any of those

15   confidentiality issues.  You remember on the first day, we

16   decided we would wait and see what came in, and redactions,

17   and things of that nature.

18           THE COURT:  Yep.

19           MS. RICHENDERFER:  So this will give us time to be

20   able to review those things also.

21           THE COURT:  Got it, yeah.  And if there's any

22   dispute about that stuff, let's just pick an off-docket day

23   and we can take it up in terms of -- In other words, the

24   list will be the list, but what we unseal will be a kind of

25   a -- We'll pick a time, in a separate hearing in another

1    day, and we'll kind of just take them up.  But they're still

2    in the record.  The question is are they going to be sealed

3    or unsealed?

4              MS. RICHENDERFER:  Exactly, Your Honor.  That

5    would be the only question.  And I think based on what I've

6    been seeing, I think there will be a limited number I need

7    to speak to other attorneys about.  And that includes all

8    the attorneys --

9              THE COURT:  Thank you.

10             MS. RICHENDERFER:   -- who made presentations, and

11   hopefully, we can reach some sort of an agreement, so that

12   the record has, you know, the transparency and the public

13   access that is necessary, but also, at the same time

14   respects confidentiality, and especially the personal

15   information regarding the claimants.  I'm very concerned

16   about that.  Thank you, Your Honor.

17             THE COURT:  Yeah, no, absolutely.  No, no, no,

18   it's a big concern, obviously, for a bunch of different

19   reasons.

20             One question that I have for the parties, and I

21   don't know if it's in the record or not, but I would -- We

22   started going through kind of the -- obviously, kind of re-

23   reviewing all the master ballots that are there, and started

24   going through the CDs that I know have been admitted, kind

25   of the backup to the master ballots.  Is there somewhere in

1    the record kind of, just not counting excluded votes, just

2    the actual final vote tally that breaks it out by voting

3    party?  I've got the total votes, and the master ballot kind

4    of says yes and nos, but it doesn't tell me A and B.  And I

5    went to the backup master ballot, but there's not like, a

6    final row.

7            And what I'm concerned about is that, you know,

8    Lopez math is going to mess this up, and then -- You know, I

9    would want to just be accurate.  If it's somewhere, where

10   Nachawati, you know, voted X number of votes, X A and B, the

11   B votes -- We obviously have the testimony.  I'm thinking

12   about just holistically, for the ones that are there, as I

13   consider the motions to switch and what people did, just if

14   it was somewhere -- And if it's not, then that would be

15   helpful for me.

16           MS. BROWN:  Sure.

17           THE COURT:  But going through kind of whatever

18   Epiq reported, that's what it is, and know -- not counting

19   the switch, so then I can kind of see it.  Because like, for

20   example, Morelli wants to switch, and I just want to know,

21   you know, kind of what he did, and if he's changing kind of

22   the A to a B or B to an A, if there's any of any of that I

23   just want to know just kind of raw data.

24           Ms. Stryker?

25           MS. STRYKER:  Yes, Your Honor.  Elizabeth Stryker,

1    Bailey Glasser.

2           So that information is contained on the Epiq

3    spreadsheet.  It's too large to file on the docket because

4    it is in Excel.  We've shown it several times during

5    (indiscernible)

6           THE COURT:  Right.

7           MS. STRYKER:  But we could give it to the court on

8    a CD or a flash drive, whatever the Court would prefer.

9           THE COURT:  Whatever is easiest, that everybody

10   can agree upon, then I'm okay with it.  I don't want to

11   create work for anyone, I just -- You don't want me adding

12   up stuff on the back end, and stuff like that.

13          MS. STRYKER:  And then, the Morelli switch that

14   Your Honor was referring to, that is on an additional

15   spreadsheet that was the Evans back up materials, which was

16   a trial exhibit, and we can also submit that to your Court

17   on the same material.

18          THE COURT:  If the parties are okay with me having

19   it.  I don't want to -- If there's disagreement whether I

20   should be able to have it, I don't want to get into it.  But

21   I just, I've got the testimony from the ones that we've got,

22   and it's just easier to just have it in one place that I

23   know that we're not doing Excel math.

24          MS. BROWN:  That was exactly what I was going to

25   suggest, Your Honor.  The Evans report, and the Evans backup

1    data gives it in the form you're looking for, what was A,

2    what was B, because that was his analysis.  So --

3              THE COURT:  Can we label that as a trial exhibit,

4    then, I think is what you're saying, and just get it to me

5    in whatever form makes the most sense?

6              MS. STRYKER:  It is.  It is already a trial

7    exhibit, Your Honor.

8              THE COURT:  Ah.  Even better.

9              MS. BROWN:  Yeah, we can get you the number.  It's

10   in, yeah.

11             THE COURT:  Can you tell me what trial exhibit it

12   is before we leave today?

13             MS. BROWN:  Yes.

14             MS. STRYKER:  Yes, totally.  Of course.

15             MS. BROWN:  Thank you.

16             THE COURT:  Perfect.  Thank you.

17             MS. STRYKER:  Thank you.

18             THE COURT:  Miss -- good morning.

19             MS. NEUNER:  Your Honor, very quickly, I just

20   would like to talk about the scheduling for today.  So there

21   are a number of additional parties who I know the Court

22   wants to accommodate, and what I'm going to hand up is just

23   a schedule which is the base minimum.

24             THE COURT:  Okay.

25             MS. NEUNER:  I'll pass it to you folks, and here

1    it is for Your Honor, and your law clerk.

2           Your Honor, this is just helping you figure out

3    the number of parties who want to be heard.  As we

4    understand it, the plan proponents will include the Debtor,

5    the TCC, the AHC, the Smith Law Firm.  There's also the FCR

6    who wants to be heard from, and the Retailers who want to be

7    heard from.  Switching over, Ms. Theriot is here.  We will -

8    - For the U.S. Department of Justice.

9           THE COURT:  Oh, yes.  Yeah.

10          MS. NEUNER:  We have agreed to have her go first,

11   and she is prepared to do that.  We'll then follow with The

12   Coalition, the U.S. trustee, the Insurers.

13          There are additional parties that would like to be

14   heard.  Beasley Allen, Barnes Law Group, Cohen & Placitella,

15   the gentleman from Canada who wanted to be heard, and the

16   PCPC.  Recall the letter that we had submitted to the Court,

17   identified core parties, and we had talked about each of

18   them having 45 minutes as a baseline.  I totally understand

19   the Debtor has reserved more time that was not utilized

20   during witness examinations.  I'm only putting this to you,

21   Your Honor, for the math of it all, because if you do 45

22   minutes for each of the top four parties, and I'm not saying

23   each will take that --

24          THE COURT:  Right.

25          MS. NEUNER:  But then you do the math for the DOJ,

1     plus the other three who are at 45 minutes, it takes up 5.5.

2     I think we'll have seven hours on the clock.  This is all

3     manageable, but I am mindful that you will want to leave

4     time for the other individuals, and I'm also mindful that

5     the Debtor wants more of the time.  So maybe they've worked

6     it out within that three hours, I just don't want any of us

7     to get short when it arrives at 6:00 for you.

8          THE COURT:  No, no -- no, I got it.  That makes

9     sense.

10         MR. GORDON:  Your Honor, Greg Gordon on behalf of

11    the Debtor.  We hadn't seen this before, at least I haven't,

12    and we don't agree with this.  I mean, we have about four-

13    and-a-half hours left, and she's trying to make this look as

14    if our time allotments are around the same on both sides.

15         So I would ask -- I know we have to be mindful of

16    time, but to say we have to shrink our side down to three

17    hours, and a little more seems -- inappropriate.

18         THE COURT:  Well, my thought is let's just start,

19    and -- But everybody's going to be heard today.

20         MR. GORDON:  Thank you, Your Honor.

21         THE COURT:  But I'm going to give the -- I know

22    how to do this.  Let's just -- I think what makes sense is

23    just to let's get started, let's work until about noon, and

24    then take a break, start at 1:00, and then let's just keep

25    going.  And then we'll be mindful in terms of time, and for

1    the other side to kind of go.

2            So I'd like to, if we can, before we break for

3    lunch, and even if we've gone -- went past, a little bit

4    past noon, I think the DOJ just told me they needed a few

5    minutes, and the Canadian gentleman, I'd like to see if we

6    can just get them, so they're not sitting around 'til --

7            MR. GORDON:  Right.  And we have no issue with

8    that, Your Honor.

9            THE COURT:  Okay.  But we'll fit that in.

10           So let me first ask the basic question, can I

11   close the evidentiary record, subject to the depo

12   designations and discussions in terms of where we are?

13           MS. BROWN:  I think from our perspective, that

14   would be correct, Your Honor.  The process, though, that's

15   going on is it's possible that an exhibit was used in court

16   during an examination, and for some reason didn't make it

17   onto the list.  And so that, we're not going to add new

18   stuff that wasn't used during the trial, but that kind of

19   cleanup is the only thing that I think all parties think it

20   needs to remain open for.

21           THE COURT:  Okay.  No, but I -- That's fair.

22           MS. NEUNER:  And the deposition designations count

23   as evidence.

24           THE COURT:  Depo designations (indiscernible)

25           MS. BROWN:  Sure.

1          MS. NEUNER:  So I think it would be to, like, next

2    Wednesday, and then we close.

3          THE COURT:  Got it.  So nothing new.

4          MS. BROWN:  Correct.

5          THE COURT:  Fair game if it was used, and if

6    somebody wants to talk about it, if there's agreement -- Not

7    to change any of the rulings that we've made in terms of --

8    I know there were some trial exhibits that were marked as

9    trial exhibits, but didn't come in.  I don't want to retread

10   any of that.  I'm just thinking of --

11         MS. BROWN:  Right, Your Honor.  And I think where

12   we are on that is PowerPoints could be marked, even if they

13   weren't marked, as a demonstrative trial exhibit.  It won't

14   go into substantive evidence for the course consideration,

15   but will be part of a record.

16         THE COURT:  No issues about that.  No issues about

17   that.

18         MS. BROWN:  Okay.  Got it.

19         THE COURT:  What I want filed for me, for my

20   purposes, is, you know, the evidence.  The evidence.  And

21   I've got the record, and I've got copies of the PowerPoints,

22   and the demonstratives that people had.

23         MS. BROWN:  Sure.

24         THE COURT:  But the evidence, that I know that if

25   I look and I cite to this doc, everybody agrees that I could

1  have looked at it and cited it for the truth of the matter

2  asserted in the doc.

3          MS. BROWN:  Right.

4          THE COURT:  Okay?

5          MR. SILVERSTEIN:  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MR. SILVERSTEIN:  Adam Silverstein of Otterbourg,

8  for The Coalition.

9          Just one matter connected to the record, which is

10  we've been operating with the good graces of Evolution,

11  preparing these daily transcripts, and I think that all of

12  us today are going to be utilizing the unofficial

13  transcripts.  We have ordered official transcripts, only one

14  or two have come.  So for purposes of today, and maybe, you

15  know, until we get official transcripts, we're going to be

16  relying on the Evolution unofficial transcripts.  And I'm

17  not sure if the Court has those, whether we should be

18  sending those to the Court, whether the Court wants to wait

19  for the official transcripts?

20          THE COURT:  I, my -- The official is what I'm

21  going to wait on.

22          MR. SILVERSTEIN:  Okay.

23          THE COURT:  I'm going to wait on the official to

24  go there.  But remember, I've got audio, so I can do -- I'm

25  still going to be working there.  But it has been -- That's

1    what I was told when I was a baby in judge school, that I

2    should follow the official stuff, and -- I miss the

3    unofficial stuff because it was easier, but I'm going to

4    wait for the official.  The official will come within the

5    week.

6              MR. SILVERSTEIN:  All right.  But for purposes of

7    today, I think everybody who's worked on DECCS can feel

8    comfortable that utilizing the Evolution testimony is

9    acceptable.

10             THE COURT:  I think that's fair.  I mean, once

11   you've got the official, if we have some additional clean

12   up, I'm not going to jam anyone.

13             MR. SILVERSTEIN:  Thank you, Your Honor.

14             THE COURT:  I just want to make sure that, you

15   know, there's no new doc, or that we're retreading if

16   something wasn't admitted, and the record shows that I ruled

17   that it wasn't admitted, that we're not kind of having

18   fights about that stuff.  That's all I mean.  Okay?

19             Okay.  Let me -- let me just ask, who wants to go

20   first?  Ah, Mr. Hansen, good morning.

21             MR. HANSEN:  Good morning, Your Honor.  Kris

22   Hansen, with Paul Hastings, on behalf of the official

23   Committee of Tort Claimants.  Your Honor, I'm joined today

24   by David Molton of Brown Rudnick, Sander Esserman from the

25   Stutzman Bromberg firm, and other members of our respective

1    firms as co-counsel to the Official Committee.

2          You haven't heard from us in two weeks, Your

3    Honor.  Let me start by explaining to you briefly who the

4    TCC is, and why we waited until now to make our voice known

5    with respect to confirmation.  Your Honor, the TCC is

6    comprised of 11 members, nine women in various stages of

7    their lives that have been deeply impacted by ovarian

8    cancer, one man who lost his beloved wife to ovarian cancer,

9    and a representative for Blue Cross and Blue Shield of

10   Massachusetts.  The Committee embodies the very people for

11   whom this bankruptcy case was filed, victims of ovarian and

12   other gynecologic cancers caused by exposure to J&J's talcum

13   powder.

14         They take their fiduciary duty to all of these

15   claimants very seriously.  They have listened intently to

16   this trial.  They have shared their personal experiences of

17   pain and suffering, and fear and frustration.  They have

18   asked countless questions, and provided us with a

19   perspective on this case that is truly unique among the

20   parties, that of a group of cancer victims struggling with

21   the knowledge that no amount of money is enough to replace a

22   life of pain and suffering, or a life itself, but also

23   knowing that the alternative to this case is the desert of

24   the tort system, where justice has evaded almost every

25   victim for more than a decade, while cases pile up and make

1    it nearly impossible for more than a handful of claimants to

2    experience their own day in court each year with absolutely

3    no certainty of outcome.

4           Your Honor, the TCC members wanted to hear the

5    evidence.  They wanted to hear from the witnesses.  We had a

6    statement on file from November.  I'll talk about that

7    later, with respect to the TCC MOU.  But to date, in

8    connection with confirmation, the members themselves wanted

9    to hear what happened at this trial before they made their

10   voice known.  And like I said, every day they listened.  And

11   I know Ms. Richenderfer asked you a question, or asked a

12   question at one point in the trial, whether or not Counsel

13   met with the members without the members representatives

14   present.  The answer to that is yes, we've done that

15   repeatedly, many, many hours with Mr. Molton and myself, and

16   the members of the Committee answering their questions, and

17   going over and reviewing the evidence every day.

18          We didn't submit a pre-trial brief.  I recognize

19   that post-trial briefs are not coming in.  We will file a

20   joinder so that we are part of the record in connection with

21   anything that may come from here, and I don't want anyone to

22   take offense at that.  But again, we ask everyone to respect

23   the fact that the TCC members themselves wanted to

24   understand what was happening here at the trial before

25   making their decisions.

```
 1              Turning back to the members, Your Honor, among
 2    them are three who served on the Official Committee in LTL
 3    I, and two who served on the Official Committee in LTL II,
 4    as well as three whose lawyers served on the Ad Hoc
 5    Committee in LTL II.  Of the 10 members impacted by ovarian
 6    cancer, five were generally, previously aligned with the Ad
 7    Hoc Committee, and its stalwart support for the plan, and
 8    five were previously aligned with The Coalition, and its
 9    staunch opposition to the filing of this case.  The history
10    that these members bring to the TCC are on the one side
11    having driven the dismissal of LTL I and LTL II, and of
12    starting out in this case seeking its dismissal, and on the
13    other side having spent almost the last two years
14    negotiating a better and better plan that puts nearly $10
15    billion in trust for the benefit of ovarian cancer, and
16    other gynecologic cancer victims.
17              After having done their work evaluating the
18    evidence, and spending many hours on the committee calls
19    that I just described, alone with Mr. Molton and myself, and
20    separately with their counsel, and separately with all of us
21    together, the TCC members have voted to support confirmation
22    of the plan premised upon the changes that the Debtor has
23    agreed to, and which we are in the process of documenting,
24    which include simply reverting to the language in Section
25    8.1g of the Second Amended Plan, where the master settlement
```

1    agreements which govern the critical out-of-court deal be

2    executed by all parties thereto prior to the plan being

3    confirmed, and clarifications to ensure the continuity of

4    claimant treatment from the plan trust to the qualified

5    settlement fund in the event that the out-of-court

6    settlement becomes effective.

7          Your Honor, the support that the TCC provides is a

8    reflection of the evolution of negotiations from LTL II, and

9    in the lead-in and aftermath of the current Red River

10   filing.  The LTL II plan was essentially a $6.5 billion pot

11   for the claims of ovarian and other gynecologic cancers, as

12   well as those of States' Attorney General.  While the plan

13   enjoyed the support of the Ad Hoc Committee and supporting

14   counsel, which I represented with Mr. Parkins, we were

15   constantly trying to improve that plan by requiring the

16   separation of state claims, and to advance the effective

17   date of the plan to an earlier time.

18         After LTL II's dismissal, as I noted for the Court

19   here in September when arguing the venue motion, which seems

20   like an awfully long time ago to everyone, the Ad Hoc

21   Committee went back to work to determine if there was a way

22   to try again with a better plan and a better process.  As

23   you've heard, the first Red River plan eliminated the state

24   claims, which were settled privately, and it also separated

25   the mesothelioma claims into a separate company where they

1    were dealt with privately to avoid the difficulty of

2    combining the two main claim types in one case.  At the

3    outset, the Red River plan otherwise picked up where the LTL

4    II plan left off.  But through the negotiations that you've

5    heard about, it has been dramatically improved.

6            Let's start with the Smith MOU.  And Your Honor,

7    just to pause, I don't have a slide deck.  And as much as I

8    have had ELMO envy the entire two weeks when I'm sitting in

9    the back of the courtroom, I'm not going to use it today,

10   either.  But when we look at the Smith MOU and we think

11   about the significant improvements to the plan that were

12   created by it, we really have to pause for a moment and go

13   through them.  And again, it doesn't matter so much who was

14   behind it.  The reality is what's important about it is the

15   benefits that it offered.

16           So first, we had an additional $1.1 billion fund

17   for the more serious ovarian cancer claims.  Second, we had

18   a $650 million fund for payment of common benefit amounts to

19   lawyers for victims whose distributions in a settlement

20   otherwise would have been surcharged by the State Court

21   common benefit fund, or the Federal Court common benefit

22   fund in the MDL.  There's been a lot said about that.

23   There's been aspersions cast on that $650 million common

24   benefit fund, as if it's just some type of a payoff to the

25   lawyers.  But the testimony was clear that if a common

1   benefit is assessed in an MDL process, there is a surcharge

2   or a tax charged to the recoveries to victims.  By utilizing

3   the $650 million common benefit fund here, that's not the

4   case, so it is an improvement on the recovery to victims

5   through this plan.

6          In addition, Your Honor, the Smith MOU brought

7   forth the critical out-of-court deal architecture.  And it

8   also brought forth the important concept of early claims

9   administration, so that awards for claimants could be

10  expedited once the plan was effective, and the trust was

11  funded.  The out-of-court architecture can't be understated.

12  It's not an option for you, Your Honor.  It's not an option

13  to say, well, today if I don't confirm the plan, you guys

14  can go jump into that deal.  It kicks in in the event that

15  you and the District Court confirm the plan, but the Fifth

16  Circuit reverses.  So what it does is it provides a safety

17  net for claimants to know that this isn't going to go on

18  forever.  Because that's been the fear of the victims.

19  That's what we've heard.  You know, we heard Mr. Birchfield

20  say, when?  We hear that from our clients too, because this

21  has been an incredibly long process.

22          The Smith MOU also eliminated the risk of prior

23  settled claims coming back into the Trust.  That was very

24  important.  You've heard about other settlements that have

25  taken place in other places, and you don't want those claims

1    getting essentially a double payment by coming back and

2    saying, well, it's a bankruptcy trust for all claimants, I

3    need eligibility.  And it also advanced the effective date

4    to the date that the Fifth Circuit affirmed the confirmation

5    order when it was previously in LTL II, the entry of a final

6    and non-appealable order.  After its formation, the TCC went

7    immediately to work, through the mediator and with the

8    Debtors, to negotiate amendments to the Smith MOU to make

9    the plan even better.

10            First, the TCC MOU creates the potential for a

11   dramatically earlier effective date, and it advances the

12   payment of funds into the Trust after the effective date.

13   While not a lot of time was spent on it during this trial, I

14   want to highlight the timing benefit.  The effective date,

15   which again, under the LTL II plan was not going to be until

16   the entry of the final non-appealable order, and under the

17   Smith MOU was not until the affirmance of a confirmation

18   order by the Fifth Circuit, can now be as soon as 170 days

19   after entry of the confirmation order by the District Court.

20   This not only advances the potential effective date by

21   years, it is also not dependent upon the entry of an

22   Appellate Court order.  The importance of this cannot be

23   understated, Your Honor.  So literally within six months of

24   entry of an order confirming the plan, the plan has the

25   potential to go effective, and for funding to come in.

1          Second, the TCC MOU accelerated the timing of

2     payments to the Trust, with the first $2.4875 billion at 175

3     days after the effective date, and subsequent payments keyed

4     off of the petition date, such that by the second

5     anniversary of the petition date, the Trust would have more

6     than $6.5 billion in funding, and by the third anniversary

7     it would be nearly $7 billion.  Funding quickly, with a

8     shorter path to the effective date means faster payments to

9     claimants, especially when the claimants have the right to

10    submit their claims for review now.

11         A lot has been made about, well, why is Archer

12    doing its work now, what's going on with Archer?  The

13    reality is people negotiated for that.  It's in the Smith

14    MOU, it's in the TCC MOU.  There's nothing untoward about

15    it.  It's a great advantage to the claimants.  It allows the

16    claimants to submit their materials to the administrator,

17    and for the administrator to start doing its work all at the

18    expense of the Debtor, without being taxed against the Trust

19    proceeds, so that when the effective date happens, and when

20    the funding of the plan occurs, claimants can get paid

21    faster.  These things all work together.

22         And while much has been made, Your Honor, about

23    not guaranteeing the recoveries provided for current

24    claimants that were set forth in the Smith and TCC MOUs due

25    primarily to concerns expressed by the future claims

1    representative who has said she needs to do her work once

2    claims are submitted to the trust, and until that time she

3    can't really weigh in on what the split is for payment

4    between currents and futures, if you look at Dr. Mullin's

5    analysis, which the TCC found particularly credible, it

6    demonstrates that the value allocation for current claimants

7    is aligned with the $4.975 billion amount contained in both

8    of those MOUs.

9              THE COURT:  So how do I think about that?  That's

10   a good question.  Right?  The Smith MOU has that number, and

11   then Mullin has that number.  Right?  Did Mullin back into

12   that number?

13             MR. HANSEN:  He didn't, actually, Your Honor.

14   Mullin has slightly different numbers.  Mullin --

15             THE COURT:  (indiscernible) number though, right?

16             MR. HANSEN:  It's close.  It's close, Your Honor.

17   It's -- If you -- From the Mullin perspective, he has,

18   essentially at the low end of his likely range, $4.9

19   billion, and he has about $5.376 billion to pending claims

20   in his $120,000 point estimate case.  So I don't believe for

21   a minute that he backed into that.

22             THE COURT:  No, I think he did his work.  It's

23   just I know that the Smith MOU came in, and then the numbers

24   kind of aligned.  I just figured I'd ask The Committee, as

25   long as The Committee is comfortable.

```
 1            MR. HANSEN:  Yeah, of course, Your Honor.  Of

 2    course.  We're comfortable with that.  Because remember,

 3    initially, the negotiations were around $4.475 billion from

 4    a baseline allocation --

 5            THE COURT:  Mm-hmm.  And then you're adding an

 6    extra (indiscernible)

 7            MR. HANSEN:  And then it was add $500 million to

 8    it.  So that was the product of a negotiation that took it

 9    to $4.975.  But remember, you heard testimony from each of

10    the Counsel for a lot of claimants.  You had Mr. Watts, you

11    had Ms. Andrews, you had Mr. Onder, you know, you had Mr.

12    Pulaski -- Each of those witnesses talked about what they

13    believed the ovarian cancer count would be, and in large

14    measure, when you look at the split between currents and

15    futures, it is highly dependent upon the amount of current

16    ovarian cancer claims that exist.  And so each of them, and

17    you know, you heard it from Mr. Smith as well, they're

18    extremely sophisticated in trying to understand what that

19    count is, and when you look at the numbers, what the value

20    would be.

21            One thing that was critically important to the TCC

22    as well is the addition of the $1.1 billion independent

23    review fund, or special fund, which is for the more serious

24    ovarian cancer claims.  And so from The Committee's

25    perspective, there's a definite potential, based upon the
```

1    severity of an illness and other factors that are

2    considered, that those claimants can receive in excess of

3    what the average is.  And remember, Dr. Mullins was talking

4    about an average.

5           But as I expressed to you, Your Honor, at the

6    start of this, even within our own committee, everyone is an

7    individual, and everyone brings that illness to the Trust.

8    And they substantiate that with medical evidence, etc.,

9    pathology reports, and it's the job of the Claims

10   Administrator and the Trustee to work through that in

11   determining what the award is.  And in large measure, if

12   you're past stage 1 from an ovarian cancer perspective, you

13   can be considered in the review fund, and then there will be

14   other factors that are considered to go from there.

15          So no, the TCC doesn't believe that Mullins backed

16   into the number.  Candidly, the TCC believes that Mullins

17   evidence is pretty powerful, and demonstrates a

18   cohesiveness, if you will, between that which was negotiated

19   on the basis of what all the lawyers thought would be there,

20   and ultimately what Dr. Mullins believes will be there

21   through his own calculus.

22          Another really important component of the plan,

23   that was negotiated over a longer period of time is that on

24   top of the recoveries here for victims that are under the

25   plan, they can also recover in the Imerys case.  And you

1    know, there was this question of, well, if J&J is funding

2    into the Imerys case, why should they pay twice?  Because

3    the same victim can essentially submit their claims in both

4    cases.  But they can, and they will get paid in both.  We're

5    obviously not here discussing Imerys, but I wanted to make

6    it clear to the Court that that's an opportunity.

7            THE COURT:  Well, it's helpful to know that the

8    Imerys deal is still on the table.  One could have read some

9    of the MOUs to suggest that the time had -- the clock had

10   run, the time had expired on it going effective, and so, you

11   know, therefore it was in the MOU, but the time had run on

12   it.  So it's comforting to hear that someone could recover

13   under the plan, and still has kind of the Imerys potential

14   upside.

15           MR. HANSEN:  Yeah, it's a great point, Your Honor,

16   and one I wanted to address as well, which is from a plan --

17   We have multiple documents trying to get to the plan.  And

18   you know, you have plan support agreements, you have MOUs,

19   you know, the Court is obviously familiar with the idea of a

20   restructuring support agreement, or a plan support agreement

21   creating the out-of-court foundation for the in-court

22   process.  So there were a lot of questions about, are they

23   still effective?  Like, were the CPs met, you know, do they

24   have to honor the deal?  Those kinds of things.

25           And it's somewhat humorous from a favorite movie

1    of mine that we've all said, are they rules or are they

2    guidelines?  They're a little bit more like guidelines, and

3    basically, people have been operating in good faith pursuant

4    to those terms.  And so when dates have passed with respect

5    to, you know, entry of an order approving the Imerys and

6    Cyprus plan, for example, right, and the settlement that's

7    embodied therein, or other time periods that Your Honor

8    noted specifically with Mr. Smith, even though those dates

9    have passed, all the sides have honored the agreements that

10   were embodied in those documents, which are now set forth in

11   the plan before the court.  And so there's no gotchas that

12   are coming on that.

13           And from The Committee's perspective, that's why

14   it was so critical for me to set out at the outset here that

15   our support is conditioned upon getting this MSA execution

16   right back, because the master settlement agreement is the

17   document that -- there are two of them, one of them governs

18   the out-of-court deal, the other one governs the $650

19   million common benefit fund.  And the import of those is

20   that they are private settlement agreements that kick in at

21   the point at which we hope never happens, but the Fifth

22   Circuit reverses.  And in that event, you can't have a

23   gotcha in those documents.  And so we had to have a

24   conditioned precedent to confirmation that those documents

25   were, in fact, executed by the parties that need to sign

1    them.  And that was agreed to.

2           And that's why it's so critical to us, because

3    it's kind of this, you know, as you know, and we've seen

4    this many, many times in cases, even the restructuring

5    support agreements and plan support agreements that back

6    larger pre-negotiated deals in the non-mass tort space,

7    things get changed afterwards as well.  And people say,

8    well, what happened?  And the answer is, all of this is an

9    evolution.  You had a bedrock, it allowed you to go out and

10   solicit votes, it evolved, and here we are.  And you really

11   don't have anything different here.

12          Which takes me to the next section of my closing,

13   Your Honor.  I want to talk about why I believe this case is

14   on solid footing.  So the ever-improving set of plan terms

15   that expedite the payment of awards to claimants, and ensure

16   continuity of that payment, even if there is a later adverse

17   court ruling, are literally the foundation of the plan.

18   When compared to what Mr. Onder and other witnesses

19   testified to as 12 years of no recovery in the tort system,

20   and an ever-increasing string of losses on verdict or on

21   appeal from cases that do proceed to trial, the plan is the

22   far better alternative.  And along with the efforts of so

23   many involved in the case to negotiate its terms, and the

24   number of claims voted on the plan prior to its filing, it

25   is abundantly clear that the plan was filed in good faith.

1          Your Honor asked about the good faith standards

2     yesterday, and the TCC believes that the Fifth Circuit's

3     Little Creek factors are the appropriate ones by which to

4     evaluate good faith, and the good faith nature of the filing

5     and the plan, and not the Third Circuit's sole focus on

6     imminent financial distress.  The Little Creek factors are

7     far more holistic, and unlike the Third Circuit's ruling,

8     don't ignore the fact that thousands of complex Chapter 11

9     cases, including innumerable mass tort cases, have filed for

10    bankruptcy to effectuate a reorganization, or to establish a

11    trust to pay claimants without any imminent financial

12    distress.  The distress may be on the horizon, but typically

13    if you bring a pre-negotiated case to a Bankruptcy Court,

14    it's not literally on the brink of falling apart.  People

15    come together rationally, they negotiate a plan, and they

16    file the case.

17         As you know, Your Honor, Section 524(g,) you've

18    said it yourself, was established by Congress in the wake of

19    Johns-Manville, and the ability to utilize its special

20    protections for the benefit of mass tort victims is entirely

21    justifiable, and further demonstrates good faith.  And here

22    we believe that the Little Creek factors are easily

23    satisfied by the nature of the case itself.  It was

24    negotiated principally amongst lawyers representing the vast

25    majority of claimants in these cases, for the benefit of

1    those claimants, it was voted on prior to the filing.  So

2    when we look at the question of a valid bankruptcy purpose,

3    or whether a tactical advantage was sought by the Debtor,

4    and whether the motivation behind the filing was

5    appropriate, the TCC believes that the case passes with

6    flying colors, from the Little Creek perspective.

7            With respect to voting, Your Honor, this case,

8    unlike other mass tort bankruptcies, is pretty novel through

9    the use of its pre-petition solicitation.  I think as you

10   know, one of the things that plagues most mass tort cases is

11   they spend a really long time in bankruptcy.  After years of

12   working through the LTL I and LTL II cases, the Ad Hoc

13   Committee and Johnson & Johnson sought to bring a pre-pack

14   to this Court for the purpose of expediting the cases, and

15   again, I know you're hearing this thematically, but getting

16   money in the hands of victims faster.  That's what this case

17   is about.  That's why the TCC is in support of it.

18           We're going to leave the Beasley Allen and Smith

19   voting issues for other parties to discuss, and for the

20   Court to evaluate.  But from the TCC's perspective, the

21   votes satisfy the confirmation threshold no matter which way

22   you look at them.  Most importantly to the TCC, as we

23   listened to the evidence, and as we looked at the numbers

24   and reviewed them with the members, are the Option A and

25   direct votes.  Those votes are the ones that were cast by

1    the claimants themselves.  So they either cast them

2    directly, or they communicated them to their counsel, and

3    their counsel included them on their ballot as Option A, and

4    then they submitted them to Epiq.  Those votes are the ones

5    that we're focusing on.  So regardless of what you decide

6    with respect to Beasley Allen and Smith and the Option B

7    votes, and I'll come back to the Option B votes, the Option

8    A votes are the standard bearer of the voice of the victims.

9             THE COURT:  So let me give you an example of one

10   that's -- Someone sent out a notice and said, you've got 12

11   hours, and if not, I'm going to vote.  What do I do with

12   that?  Right? We're talking about cancer victims.  Right?

13   So we're talking about someone can have a bad day, they may

14   not have checked their email that day --

15            MR. HANSEN:  Yep.  So that --

16            THE COURT:  Is that an A?

17            MR. HANSEN:  No, I think that's going to be a B,

18   if that lawyer votes for that claimant, because that lawyer

19   is exercising their power to vote on that claimant's behalf

20   because they didn't hear back from that claimant, because

21   the claimant hasn't responded.  The As are the ones that you

22   receive from the claimant.

23            Let me take you through this for a sec, because

24   it's --

25            THE COURT:  No, no, no, I agree.  I just think

1    there are some in the testimony, and someone can clarify for

2    me, where some folks kind of did the if I don't hear from

3    you, I'm going to vote this way, and they voted A.

4              MR. HANSEN:  Of course.  Yep.

5              THE COURT:  And so to me, throwing this out there

6    because I want the folks behind me to kind of hear me, what

7    was the difference between A and B, in effect?  Right?

8    That's the real kind of question that we're going to have to

9    deal with.  And I get your point that I could -- Say what

10   you want about B, but there are people who voted yes, and

11   they are As, and they heard from their lawyers, asked,

12   solicited, and there are folks, there are people, there are

13   plenty of people who said, I want in.

14             MR. HANSEN:  Correct.  So the number of positive

15   votes that were recorded as As, that should have been Bs is

16   very small.  The number of negative votes that were recorded

17   as As that should have been Bs is very high.  When you look

18   at the Evans testimony, and you look at his charts, you can

19   see that even including all of them, so let's include for a

20   minute the excess votes, the things that should have been Bs

21   but that were recorded as As, we have almost 45,000

22   responses, and we are in excess of 75%.  And that count

23   includes, remember -- I'm going to give you the specific

24   numbers, because this is important.  I know you have them,

25   but it's important to review them.

1            THE COURT:  Well, I have them somewhere.

2            MR. HANSEN:  So remember that in the all votes

3    Option A category, we have 35,358 to accept, and we had

4    9,613 votes to reject, for a total of 44,971, so nearly

5    45,000 votes, which was a 78.6% in favor vote.  However,

6    those 9,613 rejects include the nearly 8,500 negative votes

7    that were cast by Beasley Allen.  When Mr. Birchfield was

8    asked the question, did you affirmatively hear from those

9    clients, his answer was no, I communicated their silence

10   into a vote.  So the TCC's perspective on that is that even

11   if you include those votes as Option A, which we don't

12   believe they should be, but even if you include them, you're

13   still at 78.6% in favor, and you are at nearly 45,000

14   voices.  If you back them out, and again there are some that

15   came in as positives on the A side, it is not nearly that

16   size from a dramatic perspective, you're effectively at

17   35,000 accepting votes, and 1,000 rejecting votes.

18           So when you look at Option A, now if you take it

19   down another level, and you look at Option A only from an

20   ovarian cancer perspective, because there's been an

21   allegation that we've got ballot stuffing, and gynecologic

22   claims are non-justiciable in the tort system, and so

23   therefore they shouldn't be entitled to vote --

24           We all, by the way, can I just pause on that for a

25   second, we all know this is bankruptcy.  The definition of

1   claim is incredibly broad, and as you, and I, and everyone

2   else in this courtroom knows, it is designed to gather all

3   claims against the Debtor, and that is why these claims are

4   included.  And if you look at, and the benefit of a 524(g)

5   channeling injunction is to move all claims to a trust, and

6   to protect all parties from future lawsuit, you're trying to

7   resolve this all at once.  In the absence of resolving it

8   all at once, it really doesn't have the benefit of what it

9   was intended for.

10          So when you go even to just the ovarian cancer

11  vote count on an Option A basis, we're at 29,904 accepting,

12  8,141 rejecting, a total of 38,000, and again, we're at

13  78.6% in favor.  And again, that's going to include, to your

14  point, more Option A negative votes that should have been

15  Option Bs than As.  And I think you'll find, as you sift

16  through this, I don't envy you, there's a lot of data here,

17  but as you sift through this, Your Honor, I think you will

18  find that those are the votes of the victims, and those are

19  overwhelmingly in support of the plan.  And it is really

20  indicative of the measure of support that the plan has, and

21  it's also indicative, on a broader basis, of the

22  effectiveness of the notice.

23          Because if you think about that, right, you've

24  heard testimony from people who said -- Like, we can take

25  Mr. Pulaski, I went out every day with thousands of phone

1    calls, I had call centers, we did texts, we did emails, and

2    you know, he disclaimed it himself, but he was proclaimed by

3    Mr. Watts as being extremely tech savvy, and he's saying,

4    like, it's just not easy to get everyone to respond in a

5    mass tort context.  And this case is not unique in that way.

6              THE COURT:  No.

7              MR. HANSEN:  And so when you move past the Option

8    A votes, you then have to go to the Option B votes.  And you

9    had made a good point yesterday about not disenfranchising

10   anyone from a voting perspective in connection with the

11   case, and really being mindful that if a vote was cast, you

12   generally do want to respect, you know, that vote.  When you

13   go into the Option B votes, they largely reflect the Option

14   A votes.  And from the TCC's perspective, we believe they

15   were properly cast.

16              First, we believe that the master ballot here,

17   like in other cases, points to the general authority to act

18   on behalf of a client by a lawyer, which is what many of the

19   lawyers did here when voting claims for their clients in the

20   absence of the specific vote from them.  And it's important

21   to note that each witness called to testify in connection

22   with the Option B votes demonstrated the effort that they

23   went to in order to obtain the direct client vote.  They

24   reached out over email, they sent texts, they made phone

25   calls, they provided online videos, they used call centers,

 1    they hosted town halls, and they all testified that they

 2    felt comfortable casting the vote of their non-responsive

 3    clients under their authority as their counsel.  Some firms

 4    admittedly had better, and I'm going to put this one in

 5    quotes, "power of attorney language" in their engagement

 6    letters, and some were actually retained specifically with

 7    respect to the bankruptcy proceeding itself.  But all had

 8    various forms of the general authorization that allow

 9    lawyers to make decisions for their clients, and that's what

10    they did.

11         You asked specifically about Mr. Watts, Ms.

12    Andrews, and Mr. Pulaski.  The TCC believes that the votes

13    submitted by each under Option B were valid.  First, there

14    are allegations that they were just out there trolling and

15    aggregating claims to submit in this case for personal gain,

16    and that they really hadn't been representing their clients.

17    That isn't right.  And personally, I think it's an offensive

18    allegation.  The facts are clear that Mr. Watts' clients

19    were retained prior to the filing of LTL II.  LTL II played

20    out in the summer of 2023.  And that Ms. Andrews and Mr.

21    Pulaski have had their clients for years.  Now obviously, as

22    these cases were building through the bankruptcy system, and

23    they were building on their way here through attorney

24    advertising and other means, people are collecting more

25    cases.  They're being contacted by clients, they're looking

1    for clients.  It's how the business kind of works within the

2    mass tort space, and so their client lists were growing.

3    But when you look back at it, there's nothing wrong with

4    that.

5         The false narrative is that insufficient notice

6    was provided to their clients, and that's the second one.

7    So the first one is, well, are they really their clients,

8    and when did they show up?  And the second false narrative

9    is, well, insufficient notice was given to them with respect

10   to their ability to vote, and they just, they kind of like,

11   did that so they could sweep the vote and put it in.  And we

12   don't believe that's true.  In Mr. Watts' case, he was put

13   in a pretty tough spot by Epiq, and he did the best he could

14   to contact his clients before exercising his voting

15   authority.

16        And there's nothing wrong, by the way, because

17   this was another aspersion that was cast in the case, which

18   is you encouraged your clients to vote for this plan, didn't

19   you?  Well, that's their right.  They represent their

20   clients.  You asked Mr. Birchfield a really interesting

21   question, which was, this is a unique area of the law.  You

22   have thousands and thousands of clients.  How do you counsel

23   them?  Maybe one of them wants to take the payment because

24   they just want to be done with this.  Maybe they want to

25   take the payment because sadly, they know they're going to

1    pass, and they want to give something to their heirs.  But

2    maybe someone on the other end of the spectrum is angry, and

3    they don't want to settle no matter what.  How do you handle

4    that?  You know, and his response was, our advice is our

5    advice.  If our clients don't like the advice that we're

6    giving them, they're obviously free to retain another firm.

7         And so there's nothing wrong with a lawyer telling

8    their client, I believe this is in your best interest, and I

9    believe you should vote for it.  And we all had a bit of a

10   chuckle at Mr. Watts' videos, but what he was trying to do

11   was, in a really short period of time, find the most

12   effective way to communicate with his clients.  And what's

13   interesting is he testified that it was the fact that the

14   ballot was screwed up for them.  Not that they didn't know

15   the case was being filed, not that they didn't know the plan

16   was coming on, it was the question of being able to return

17   the vote.  And so you have to really peel the layers away on

18   Watts to look and see, okay, wait a minute.  This isn't like

19   he gave his clients two days notice, and then he took -- you

20   know, he cast their ballot, and off they went.

21        And you heard something similar from the other

22   witnesses.  Like Ms. Andrews testified that they made this

23   tremendous effort to contact their clients, and she

24   actually, her firm actually received a fairly large amount,

25   like 43%, you know, direct votes from their claimants.  And

1   she testified too, that that even informed her better on how

2   she could vote from the ones that she hadn't heard from.

3   She has this, you know, like, 99% vote in favor percentage

4   that comes in from the clients who are affirmatively

5   responding to their outreach, and so it makes her feel even

6   more comfortable in exercising her authority as a lawyer, to

7   vote on behalf of those that she hadn't heard from.

8          And what is really interesting is none of them

9   said that the general notice that was provided was

10  insufficient.  This is all efforts that they made on top of

11  the general notice that was put out from the Debtor to

12  collect the votes.  And what's really interesting is they

13  all testified that in the seven months since those votes

14  were collected, no one has contacted them and asked them to

15  change their vote.  And you know, granted maybe they're not

16  paying attention, but I think based upon what we hear from

17  the victims on the TCC, they're paying attention.  People

18  are intently focused on this case.  And so at the end of the

19  day, they all had comfort that they were acting in the best

20  interests of their clients.

21         From an ethical perspective, this is an important

22  point, and it was an area that Your Honor probed quite a

23  bit., all the witnesses were consistent that they were not

24  entering into a settlement for their client by voting on the

25  plan for that client.  And the TCC agrees with that

1    position.  Settlement, or a compromise of a claim in this

2    case occurs at the time that the claimant is presented with

3    an offer from the Trust with respect to their claim, and

4    elects whether to take that, whether to appeal or mediate

5    it, or whether to go litigate it in the tort system.  Right?

6    That's the moment at time that the claim is truly settled,

7    in terms of because it's -- The Trust will essentially reach

8    out to the claimant after submission of the claim, through

9    the Claims Administrator and say I have your claim, it's

10   been evaluated, here is the settlement award that we would

11   like to offer you.

12            THE COURT:  What's your understanding if an

13   ovarian cancer claimant, a current says no, I want to take

14   my chances in the tort system.  What does that look like?

15   What does that lawsuit look like?  That's what I'm trying to

16   get a sense of.  And this isn't, like -- there's no deep

17   meaning about it.  I'm just literally just trying to get a

18   sense of what you're -- since you represent the TCC, and

19   you've got real folks there, what does that look like, if

20   someone wants to go out there and settle, or wants to go out

21   there in the tort system?  What does the tort system look

22   like in that scenario?

23            MR. HANSEN:  So this is what we refer to as the

24   opt-out issue, and the opt-out problem.  Let's assume for a

25   second that we had no restrictions with respect to opting

1     out.  If anybody wanted to opt out, go to the tort system,

2     get their judgment, come back, and then that judgment

3     equates to their claim, which they can submit against the

4     trust -- Just stay with me on this one for a moment, because

5     it's an issue that's been heavily negotiated.  If that is

6     the potential that could occur, in essence, the claimant is

7     litigating against the Trust as a Defendant, but the Trust

8     needs access to, obviously, all of the information from, you

9     know, the JJCI, etc., to be able to defend the claim.

10           THE COURT:  Right.

11           MR. HANSEN:  So there's a logistical issue there,

12     but let's assume we get past that.  Obviously, you have the

13     problem that you currently have in the tort system, which is

14     it's only a couple of cases, you know, it's a handful, like

15     10 cases a year is what was testified to.  Right?  So you're

16     not going to get that many cases that are rolling through.

17     From the administration of the Trust's perspective, it has

18     to create reserves now for an unknown system that's

19     occurring outside of the trust.  Right?  Because if it doles

20     out its money, but then people come back with huge claims

21     from the tort system, it's not going to have money to pay

22     them.  And so obviously, that would be a failed trust, and

23     that's something that, you know, we don't want to have

24     happen.

25               In addition to that, right, there is a bit of

1    gamesmanship that can be applied through the opt out

2    mechanism, where a lawyer can essentially say to the Trust,

3    I'm an opt out claimant, I'm going to take them to the tort

4    system.  You sure you don't want to give me a higher award,

5    right?

6               And so when you factor in, you know -- And again,

7    like, it's leverage, from a negotiating perspective.  And so

8    when you factor all of that in, the way that this plan works

9    is you do have a right to opt out, you do have a right to

10   litigate, but you are capped effectively at three times the

11   award that is offered to you by the Trustee, from the Trust.

12   So it is a discouragement to go into the tort system to

13   litigate, but that discouragement exists for a valid reason.

14   Because if you didn't have that discouragement, you

15   basically could create a dynamic where you could slow down

16   dramatically, or -- I guess it wouldn't be as much slowing

17   down, but you would reduce the percentage distributions to

18   claimants who chose to have their claims administered by the

19   Trust. because the Trust would have to be dealing with the

20   potential for reserves coming in from the tort system on an

21   unlimited basis.

22              So that's -- when you think about the opt out, you

23   know, that's kind of the give and take.  And so where we

24   landed from a negotiating perspective is this three times.

25   And you heard, Mr. Smith even testified about it.  He said,

1    listen, again, if it's the person that you refer to, Your

2    Honor, who says I just want my day in court, that is this is

3    less for me about the dollars in my pocket and more about

4    proving the point that I have been injured by exposure to

5    this company's talcum powder, and I want a just verdict in

6    my favor, right, and maybe I'll roll those dice sort of to

7    get my three times recovery, they have that right.  They can

8    go do that.  But it's not as easy, you know, in terms of

9    recovery.

10          Your Honor also asked a question about the vote

11    change motion.  Everyone over here is saying Hansen said he

12    was only going to be 20 minutes, and I'm going on a lot

13    longer --

14          THE COURT:  No, well, Lopez has, you know, added

15    to this, so I apologize.

16          MR. HANSEN:  But you asked the question about the

17    vote change motions.  From our perspective, if a lawyer had

18    valid authority to be able to vote his or her claims

19    initially, then they have valid authority to be able to

20    change those votes.  And the changing of the votes is

21    interesting, because while people say, hey, you know, they

22    shouldn't be allowed to do it, I mean, the code -- the call

23    is under the rules with respect to a vote change is pretty

24    low threshold, and in large measure, these claimants are

25    saying, well, I've seen the improvements that have been

1    occurring in connection with the plan, and I'd like to

2    change my vote to support it.

3           And what's interesting about that, too, is that

4    that kind of complies with 3019, when you think about

5    modifications of a plan, and not having to go re-solicit

6    that plan.  Right?  Like, if a plan, and how many times do

7    we see, you know, first amended, second amended, third

8    amended, you know, fourth joint co-amended, right, like, you

9    watch the evolution of a plan in a case where you're holding

10   the vote because it's getting better.  And so in essence,

11   people who are seeking to change their votes in large

12   measure have said so because they believe that the plan

13   provides the best alternative, and they want to change their

14   votes, and the TCC's view on that one is they should be

15   respected, and they should be counted.

16          So when you are looking at, you know, the vote

17   percentages, we believe that we've already passed the 75%

18   threshold necessary for confirmation.  But when you analyze

19   the vote changes as they're coming in, that number just

20   keeps getting higher.  And again, going back to Option A,

21   where you remove effectively the votes that were mistakenly

22   there, and not Option Bs, you're getting really -- you're

23   just vectoring in on the same number.  Right?  Like, when

24   you count all those votes, and look at it, wow, this is kind

25   of coming up the same way.

 1          Your Honor, with respect to the Trustee, Mr.

 2     Kurdi, you asked about his qualifications, and independence

 3     in serving as the Trustee on the Plan Trust.

 4          THE COURT:  Again, I didn't mean to imply anything

 5     negative.  I just wanted to hear from someone -- you know, I

 6     wanted to hear from, quite frankly, I'm happy it's you

 7     that's going to comment on it, I wanted to hear from what

 8     the TCC thought about that.

 9          MR. HANSEN:  Yeah, we appreciate that.  And so

10     that's why I wanted to address it for you, Your Honor.

11          So the TCC believes that Mr. Kurdi is well

12     qualified for the job.  We don't think he needs a co-

13     trustee.  And we don't think he has any conflicts that would

14     prevent him from serving in the role.  On a personal note,

15     I've gotten to know him over the course of the last year-

16     plus, and through an awful lot of mediation sessions in this

17     case, and I believe I speak for everybody here when I say

18     that he's tireless, he's honest, and he's fair.  And like a

19     good mediator, he's always trying to see if he can find a

20     solution, and he is never telling anybody that they're wrong

21     in their view, he's always just encouraging people to

22     understand the other views that everyone has.  And it's

23     unfortunate for all of us that we haven't found a way to

24     stand before Your Honor with a full consensus to the plan,

25     but that is what it is.

1              And Mr. Kurdi's assistance was instrumental in

2     bringing about the agreement, I mentioned this before,

3     between the Debtor and the TCC, that's embodied in the TCC

4     MOU.  And again, like, the benefits of that can't be

5     understated.  We're pulling the potential effective date out

6     to within six months of the affirmance by the District Court

7     of the confirmation order, as opposed to Fifth Circuit

8     having to affirm the plan, or prior to that, a final non-

9     appealable order which might be, you know, the United States

10    Supreme Court.

11             So I would say that the other thing about Mr.

12    Kurdi is because of the level of work he's done, and how in

13    the weeds he's been in these documents, you're not going to

14    find anybody, from a trustee perspective, who is more

15    familiar with the plan, the TDPs, the trust agreement, the

16    evolving MSAs, and with the people who may serve in the role

17    as the Trust Advisory Committee.  And it's good that he

18    knows all of them, because obviously, everybody will -- you

19    know, it's human nature to use your influence from where you

20    sit, and he'd be best to be able to deal with that.

21             So the TCC sees absolutely no bias that could be

22    attributed to Mr. Kurdi from his mediation role.  We view

23    his experience with the parties, and familiarity with the

24    case as benefits that he'll bring to his role as trustee.

25    And we also see no reason for co-trustees.  Mr. Kurdi is

1    more than capable of working with the Claims Administrator,

2    and functioning in the trustee role.  He has experience in

3    big cases like the Takata airbag cases, and simply because

4    certain other mass tort or resolution trusts have two

5    trustees, a lot of them have one.  There's no reason to

6    deploy a second trustee.  And candidly, we believe that

7    sometimes when you have co-anythings, there's a risk of

8    either inconsistent results, unless they have to approve

9    each other's work, and then you could have inefficiency.  So

10   from the TCC's perspective, we're comfortable on that front,

11   Your Honor.

12        So in closing, as I noted at the outset, the TCC

13   came into this case equally divided between supporting and

14   opposing the plan, and it was aligned largely with either

15   the Ad Hoc Committee or The Coalition's view.  For the TCC

16   to have arrived at a place of support for the plan says a

17   lot about why the plan should be confirmed.  The TCC's

18   position also aligns with the votes of the tens of thousands

19   of cancer victims cast in this case.  At the end of the day,

20   Your Honor, this case is about compensation for cancer

21   victims who have suffered mentally and physically for far

22   too long without recourse to the party that they believed

23   caused their illness.

24        Believe me when I tell you that the emotion that

25   Mr. Molton and I have experienced in talking with the

```
 1    members of the TCC is palpable, and it is painful.  Each has
 2    their own story about how their lives were impacted by this
 3    disease, and one of them lost their wife.  You cannot
 4    understand the magnitude of their suffering.  And as I said
 5    at the outset, this plan will never compensate all the
 6    victims for all of their loss, but it is the best
 7    alternative that's available to them.  It is with that best
 8    for most mentality, and with the victims at the center of
 9    all of this that the TCC asks the Court to find that the
10    case and the plan were filed in good faith, that the
11    Disclosure Statement contained adequate information, that
12    the votes were cat in good faith, and in compliance with the
13    voting procedures, and ultimately, that you confirm this
14    plan, and you speed recoveries to these victims, and help
15    them financially, but that you also help them to achieve
16    closure.
17              Thank you, Your Honor.
18              THE COURT:  Thank you very much.
19              MS. DAVIS:  Good morning, Your Honor.  Nancy
20    Davis, on behalf of Randi Ellis, the legal representative
21    for future talc claimants.
22              THE COURT:  Good morning.
23              MS. DAVIS:  Good morning.  To be as helpful to the
24    Court as possible, I would like to start with the question
25    that you asked yesterday, that related to future claimants.
```

1          THE COURT:  Which one?

2          MS. DAVIS:  There were several.  There were

3    several.  But one that we focused on that relates to

4    recoveries for future claimants.

5          THE COURT:  Ah.

6          MS. DAVIS:  So you asked, what happens if the

7    Trust is created, the Trustee starts giving out multiplier

8    awards?  What happens to the futures, how do we know that

9    the money is going to be there for them?  So it's a little

10   clunky, but I did want to walk the Court through the

11   provisions of the plan that explain how this is going to

12   work out.

13         So to get an increased award -- And by the way, I

14   have the plan, and it's tabbed.  So if you'd like me to put

15   the language up, I can do that, but I do have the citations

16   to the language that I'll walk the Court through.

17         THE COURT:  Slides are just fine.  Thank you.

18         MS. DAVIS:  Okay.  All right.

19         So "To get an increased award, a claimant has to

20   request individual review.  The claimant must then satisfy

21   the individual review criteria, which are in Section

22   4.6.5(b,)  and if the claimant does satisfy that criteria,

23   then it will be valued according to Section 5.4."  In

24   Section 5.4.2, "The Trustee can apply a multiplier, not to

25   exceed three times, as the Trustee shall determine in his

1    sole discretion."  But then if we keep reading down in that

2    paragraph, it says "The Trustee shall take into

3    consideration factors to be decided by several parties,

4    including the FCR, subject to 3.1.4."  3.1.4 was a very

5    important provision.  It took a lot of negotiation to get

6    there.  That provision is titled "Independent Review," and

7    it identifies that there remain several open IR matters.

8    And that's basically that there are matters that are still

9    subject to being mutual agreed by several -- mutually agreed

10    by several parties including the FCR, and among those

11    matters are individual review criteria, the factors for

12    determining the final schedule point value under individual

13    review, as well as how those factors will be applied.

14         So practically speaking, if the plan is confirmed,

15    there will be a claim submission deadline that is 120 days

16    after the confirmation date.  Between confirmation and that

17    claim submission deadline, the parties will try to agree

18    upon the criteria, and how they will apply.  And if we can't

19    get to agreement, we'll be back here before the Court --

20         THE COURT:  Which is why I'm asking all these

21    questions now (indiscernible) tee the issue up.  Got it.

22         MS. DAVIS:  Right, right.  But we think it's very

23    important that the FCR is involved in setting those

24    criteria, and specifically, how they will apply.  And then,

25    in either case, we will get to resolution on what the

1    criteria are either because the Court decides, or because
2    the parties decide, and those criteria will have the --
3    Let's see, let me go back.  So we'll have 120 days after the
4    confirmation date, everyone will submit their information.
5    Once we have the information on the pending claims, we will
6    be able to evaluate those claims, and determine what makes a
7    claim extraordinary, and what factors ought to be considered
8    for extraordinary claims.  That information will also inform
9    setting the initial cash value of a point.
10            So it really all comes back to initial cash value
11    of a point, and the Trustee and the FCR and the other
12    parties involved in that determination are going to have to
13    consider the fact that there is a multiplier.  There is a
14    possibility for a multiplier.  They have to think about who
15    might get it, and how many people might get it, both present
16    and future.  So in setting that initial cash value of a
17    point, they're going to have to account for that multiplier,
18    and the possibility of increased awards.  So unfortunately,
19    it all comes back to setting the initial cash value of a
20    point.  But as we explained as part of our evidence in this
21    case, we think that this plan has very good protections for
22    future claimants in setting the initial cash value of a
23    point.  It's required to be set conservatively, and of
24    course, the FCR is part of the process of setting it.
25            So I did want to just bring up a couple of points

1    in closing.  First, the Court heard some different testimony

2    about payments from the Trust, how much will go to present

3    claimants, how much will go to future claimants?  And that

4    concept has been referred to as allocation.  The Court heard

5    evidence that there was a presumed allocation in the Smith

6    MOU, another presumed allocation in the TCC MOU.  There was

7    testimony from the supporting lawyers.  Some of them thought

8    that money was allocated, some of them thought we were

9    working towards a goal on that.  And we understand that the

10   lawyers who represent the current claimants want an

11   allocation for their clients, they believe that that is best

12   for their clients.  But it is not best for the futures, and

13   Ms. Ellis has been very steadfast on that point.  She

14   testified that she was crystal clear with the parties that

15   she has never wavered in her commitment that there should be

16   no allocation, and because there is no allocation in the

17   plan, that's a huge part of why Ms. Ellis can support it.

18          There will be real information about who is before

19   the Court, who is making a claim, how many points they will

20   get, and what their situation is.  And the FCR believes that

21   once we have that real data, 120 days after the confirmation

22   date, it's not a long time.  Once we have real information,

23   that's the right moment to start making decisions about

24   money that goes out the door.

25          I know the Court has heard a lot from us about the

 1    initial cash value of a point, but I did just want to

 2    emphasize here in closing, that's really the most important

 3    protection for the future claimants.  And the text of the

 4    Trust documents says it must be set conservatively.  Dr.

 5    Singer testified about what one should consider when making

 6    that determination.  He said we shouldn't start from where

 7    we think we're going to get at the end of the day, we should

 8    start from the upper bound, the worst case scenario.  And we

 9    think that that's exactly right.  And if we do that, we can

10    ensure that the Trust will operate consistently with 524(g.)

11    Dr. Singer explained that the TDPs as a rule set provide for

12    non-discrimination in value, and then because they require

13    setting the initial cash value of a point conservatively,

14    the TDPs and the Trust documents provide for non-

15    discrimination in payments.

16          The Trust -- I'm sorry, the FCR maintains her

17    objection that the Trust ought to have two trustees.  This

18    has been described as a historic settlement.  It's a huge

19    trust fund, and every major decision requires the Trustee.

20    The only evidence the Court heard on the number of trustees

21    was from Ms. Ellis, and she testified that in her own

22    experience as a trustee, having multiple trustees on the

23    National Opioid Fee Panel leads to better decision making,

24    because each trustee brings a different perspective.  She

25    also testified that having multiple trustees doesn't slow

1    things down, and it works efficiently.  Although Mr. Hansen

2    explained that the TCC doesn't see any reason to have more

3    than one, there isn't any evidence that having more than one

4    would be a detriment to the Trust.  The only evidence is

5    that it might benefit the Trust.  And I mentioned in opening

6    that we looked at the trusts who have funding over $1

7    billion, and almost all of them have two or more trustees.

8    We also looked at the sophisticated trusts that Dr. Mullin

9    put up on the screen.  They were the ones that had the cash

10   value of a point going up over time.  The Western Asbestos

11   Settlement Trust has two trustees, the J.T. Thorpe Asbestos

12   Settlement Trust has two trustees, the Thorpe Insulation

13   Trust has two trustees, and the Plant Insulation Company

14   Asbestos Settlement Trust also has two trustees, and none of

15   those trusts is nearly as large as this one.  So we think

16   appointing two trustees under these circumstances makes a

17   lot of sense.  If the Court does permit multiple trustees,

18   we have some resumes that we can discuss with the parties,

19   and hopefully work towards agreement on who might be an

20   additional trustee.

21          So subject to the FCR's objection, she does

22   support confirmation of a third amended plan.

23          THE COURT:  Thank you very much.

24          MS. BROWN:  Your Honor, I think we're next in the

25   lineup.  Mr. Gordon and I are going to split it, and mine is

1    expected to be about 40 minutes to 45 minutes.  I just want

2    to make sure that works with timing?

3              THE COURT:  Mm-hmm.

4              MS. BROWN:  Okay.  Thank you.

5              May we have the PowerPoint?  And can I turn this

6    at all?  No.  It's okay, I'll just come to the middle.

7    Thanks.

8              THE COURT:  Well, at your own risk.

9              MS. BROWN:  Yeah, I'm going to move myself, not

10   this.  May I proceed, Your Honor?

11             THE COURT:  Yes.  Thank you.

12             MS. BROWN:  All right.  As I mentioned, similar to

13   opening, Mr. Gordon and I will split.  I'm going to review

14   the factual evidence of how we got here, and Mr. Gordon will

15   talk more about the legal implications of the evidence

16   that's come forward.  We'll start with what the Court has

17   heard is overwhelming support for a no-doubt historic $10

18   billion plan.  We heard first thing this morning the plan

19   now enjoys, again, the commitment of the Official Committee

20   of Talc Claimants, of course the Ad Hoc Committee who you've

21   heard from throughout the trial, the FCR who testified, and

22   perhaps most importantly, the overwhelming majority of the

23   claimants themselves.  And of course on that score, Your

24   Honor, the first issue is how should the Court look at this

25   vote?  And you heard a lot of testimony about it.  And I

1   would submit to Your Honor, consistent with the Court's

2   statements yesterday, this Court can and should count every

3   vote, every vote that was cast, and every vote that is

4   pending before the Court that's subject of a motion.  And

5   when you do that, when you put aside the issue with Beasley

6   Allen and Smith, the vote is over 75%.

7          So here, Your Honor, is what we are looking at,

8   every vote that has been cast or pending before the Court.

9   And in the first scenario, because what the Court will

10  grapple with is what do I do where I have conflicting Smith

11  and Beasley Allen votes?  And here is why it doesn't matter.

12  If we can't every vote cast and every vote that's pending

13  before the Court, and we take the entire Beasley Allen

14  ballot, all of it, negative notice, affirmative votes,

15  everything, and we only override a Beasley Allen vote if a

16  Smith vote came in from a claimant herself, there is an

17  affirmative response from that claimant, and we just sort of

18  put to the side the negative notice, where it's 76.6%.  And

19  you see in that gray shaded area, that's where the Beasley

20  Allen negative notice votes are.  And so it almost doesn't

21  matter, Your Honor, in terms of surpassing the threshold.

22  You could count those negative notice votes as no, even

23  though they didn't have evidence of informed consent, and we

24  would still be above 75%.

25          What if you do the flip of that?  So we started,

1    Your Honor, just a second ago saying count everything that's

2    come in and pending, and count the Beasley Allen vote.

3    Well, what if you did everything that came in and is

4    pending, and instead you count the Smith vote, and you only

5    override where Beasley Allen had those 3,000 votes with, you

6    know, some kind of consent from the claimants?  You do that,

7    you would think it should be exactly the same, but it's

8    actually not because not every vote is one for one.  But you

9    get essentially the same, you get 76%.  And again, you're

10   sort of holding in abeyance in the gray area the smith

11   Option B votes, here is sort of Smith voting on behalf of

12   people for whom he did not hear from.

13        So sort of either way you look at it, the state of

14   affairs right now, Your Honor, is that we are at more than

15   75%.  You could also look at it by saying, I'm not going to

16   count anything from Allen Smith.  I'm just going to look at

17   the vote as it came in on July 26th, and I'm only going to

18   count the Beasley Allen votes where he had evidence of

19   affirmed consent, of affirmative consent, and that would

20   have been, Your Honor, approximately 3,000.  And if you put

21   to the side his negative notice votes, which certainly were

22   not properly cast under Option A, now you're at 78.5%.  And

23   this, again, you're not even touching any of the Smith votes

24   here, including those that came, about 800 of them, Judge,

25   came directly from claimants.  Any way you look at this, if

1    you are counting every vote and any pending motion before

2    the Court, we are above, and well above 75%.

3         Mr. Hansen spoke this morning about what I think

4    is the best evidence we have, the hardest and the clearest

5    evidence of the will of the women and the men on behalf of

6    women who voted here.  Let's just look at the direct votes,

7    and the Option A with evidence votes.  And all of this, Your

8    Honor, you'll recall was testified to you by Mr. Evans, and

9    his report is in evidence, and the supporting data is in

10   evidence as well.  But what if we just look at cases where

11   there was a direct ballot that didn't go through a lawyer,

12   it went directly to Epiq.  And what if we look at Option A

13   votes where we have something in discovery, a phone log, an

14   email, a survey that was filled out by the client so we know

15   directly from the client how she wanted to vote.  When we do

16   that, we're almost at 90%.  And this is not an insignificant

17   number of votes, it's well over 30,000 votes.

18        And as Mr. Hansen mentioned, what gives you

19   comfort, what should give the Court comfort on the Option B

20   votes is that they match.  Where claimants, where lawyers

21   voted both Option A and Option B, we see overwhelming

22   percentages of support on Option A.  We see numbers like 98%

23   of people who came in with their actual write-in ballots are

24   Option A.  And Anne Andrews for example, she votes 10,000

25   votes.  5,000, she has actual information from the clients,

1    5,000, she votes Option B.  Every single one of those 5,000

2    clients she heard from except 19 voted in favor of the plan.

3    And you'll recall her testimony, Your Honor, was that gave

4    her even more comfort when she voted under Option B, that

5    she was indeed voting the way the clients themselves wanted,

6    because she heard from them.  You heard that her eBallot

7    system, she probably has one of the most sophisticated

8    ballot systems, was flooded, and it was flooded very

9    quickly, and 5,000 people got right in touch with Anne

10   Andrews and said, yes, this is compensation, this is a plan

11   we want.  Only 19 people said no.

12          You heard the same from Mr. Onder.  I mean, again,

13   Mr. Onder had over 10,000 people who themselves wrote in.

14   You'll remember, Judge, they put up the actual survey, there

15   was a way for claimants to engage in the process.  And Mr.

16   Onder, like many of the AHC witnesses, testified about the

17   ongoing, continuous communications.  You heard Mr. Pulaski,

18   when he looked at just the affirmative votes, 98.5% or 99%

19   of clients who responded to him directly, these are his

20   Option A votes were in favor of the plan.  There's no

21   question, when you look at people we directly heard from,

22   their support was overwhelming.

23          Let's talk a little bit about the Option B votes

24   Your Honor.  Every single lawyer who testified here from the

25   AHC, and Mr. Smith, told you that they believe they have the

1    authority to vote under Option B.  And these are folks who

2    have been in the mass tort world for a very long time.  This

3    is not the first time that they have taken action on behalf

4    of clients in this type of a context.  Ms. Andrews told you

5    about her extensive bankruptcy experience, how she has

6    engagement letters that are made directly for bankruptcy

7    representation.  And all of these lawyers, many of them who

8    consulted professionals to double-check on their obligation

9    and their duty to exercise their authority to vote.

10             THE COURT:  Let me ask you a question.  Say a

11   plaintiff's lawyer has, obviously, a standard engagement

12   letter with a basic -- let's just call it the power of

13   attorney.  So let's put Ms. Andrews a little bit to the

14   side.  It's a little different.  But let's use Smith's or

15   Watts', or Pulaski's.  Anyway, it's kind of that the

16   language is similar, in a sense.  They send out a notice,

17   and then say if I don't hear from you in two weeks, let's

18   just give it -- I'm going to vote yes.  Do they vote under

19   Option A or Option B, or do they do they get to choose?

20             MS. BROWN:  I think they vote under Option B, Your

21   Honor.  Option A, when we look at the master ballot, makes

22   clear that a client has to indicate his or her informed

23   consent, and that once that's done, the lawyer has to

24   collect and record that.  That is something tangible from

25   the client.  That is a phone log, an email, an eBalloting

```
 1   system.  That's Option A.  Option B is I'm your lawyer.  I
 2   have an engagement letter with you to represent you, and use
 3   all of my powers to act in your best interest, that this
 4   engagement letter gives me the power as your attorney to do.
 5   Right?  But I also have the ethical obligation to do that.
 6            THE COURT:  So --
 7            MS. BROWN:  So to answer your question, if you
 8   send out a communication to your clients, you give them two
 9   weeks to consider the information you're giving them, and
10   you say, if I don't hear back, I will vote for you to accept
11   this plan.  As long as you have informed those clients, if
12   you have any conflicts, if there's a conflict they need to
13   be aware of, you have the authority to vote under Option B.
14            THE COURT:  Okay.
15            MS. BROWN:  And I think that was the consistent
16   testimony you got from each of these individuals.
17            THE COURT:  But they also felt like they had an
18   ethical duty to vote in someone's favor.
19            MS. BROWN:  Yes, sir.
20            THE COURT:  How do I weigh that with someone just
21   not wanting to vote?  How do we take someone who says --
22   Like, there's plenty of people in Chapter 11 cases, you just
23   don't hear from them, and they don't, they just don't -- You
24   get something in the mail, and I don't want to vote.  Right?
25            MS. BROWN:  Mm-hmm.
```

```
 1            THE COURT:  What do we do with those?

 2            MS. BROWN:  Well, I think in this instance, Your

 3   Honor, they don't have to participate in the plan.  If what

 4   you're suggesting is they're a client who doesn't want to be

 5   a part of this, you know, this is I think where we get to,

 6   this isn't a settlement offer.  Right?  They were --

 7            THE COURT:  But the other side is going to tell

 8   me, right, well, no punitives, capped it three times -- the

 9   plan called it a settlement until the third.  Smith called

10   it a settlement -- Smith called it a new plan.  And Smith

11   used the word settle everywhere, so did everybody else.  Why

12   aren't we talking about what settlement really means?  Id

13   settlement -- What does settlement mean to you all?  That's

14   the question.  I'm putting you through a different process,

15   it could be considered a settlement.  Ending the current

16   litigation that you've got could also be considered a

17   settlement.  How should I think of the word settlement?

18            That's a good question that I think -- I think

19   with Mr. Gordon, I'll get into kind of planning stuff.  But

20   for you, you know, who kind of tried these cases, what does

21   the word settlement mean in this context?  Is it putting you

22   through a different process, but you're going to get an

23   offer there, and you can accept it, and then you can kind of

24   go out into the tort system, you know, maybe not with all

25   the bells and whistles that you could potentially get?  Or
```

1    does settlement mean the litigation that you're currently in

2    I've effectively ended, and by the way, here are a bunch of

3    releases that you've signed on to, too.

4              MS. BROWN:  Right.

5              THE COURT:  How should I think about it?

6              MS. BROWN:  I think you have to think about it

7    differently, and I think that's how the evidence came in,

8    Your Honor.  I think the evidence was crystal clear from

9    everyone who testified.  And I would point the Court to one

10   of the Beasley Allen engagement letters that we used with

11   one of the witnesses, that set forth in the mass tort

12   context, in my world, how these things happen.  Right?

13             THE COURT:  That's what I want to figure out.

14             MS. BROWN:  Exactly.  And I think the term that

15   the engagement letter used was settlement matrix, which I

16   think is how you can sort of think about a vote on this

17   plan.  It was an offer -- it was an offer for a matrix for a

18   process, for a way to potentially get to a place where you

19   would settle your claim.  They are distinct, and every one

20   of these lawyers who testified said this was not a

21   settlement offer as we know it in the mass tort context.

22   Because that is different, and if I'm going to accept

23   $100,000 for my client's claim, I need her to say that

24   that's okay.  That is very different than agreeing to a

25   matrix, or an offer, or a process by which ultimately, that

1    client can decide whether she wants to say yea or nay to a

2    settlement offer.

3          THE COURT:  But the other side, when they get up

4    here, is they're going to tell me, yeah, but what if I

5    wanted to sue Red River, and -- I don't want to say any

6    names, let's just call them Retailer.

7          MS. BROWN:  Mm-hmm.

8          THE COURT:  Can't sue Retailer anymore.  Did you

9    settle my claim with Retailer?

10         MS. BROWN:  By voting on the plan?

11         THE COURT:  Right.  Because essentially, now --

12    Well, how do I think about that?  That's what they're going

13    to say, right?  It's a settlement.  Right?  Because you're

14    now giving up certain litigation rights, you can't sue

15    Retailer anymore.  I don't want to say any specific names.

16         MS. BROWN:  Right.

17         THE COURT:  I think it would be inappropriate.

18    But is that -- Did we settle your potential -- the full

19    panoply of your potential litigation rights?  Or did we put

20    you in a situation where you're still not settling, I'm

21    getting you kind of what you were going to get, but boy, a

22    heck of a lot quicker?

23         MS. BROWN:  Yeah.

24         THE COURT:  Because the Plaintiffs' lawyers, the

25    question I've got for them is, you know, it's really nice to

1    think that you're going to settle this stuff, but people

2    don't have to settle.  They can continue to do this for the

3    next 100 years.

4              MS. BROWN:  Well, and then we'll get to in the

5    slide deck, Your Honor, I mean, that was the testimony of

6    Mr. Birchfield.  He analogized this to the tobacco

7    litigation waiting forty years.  And I think the testimony

8    has been clear from the J&J and the Red River folks, the

9    settlement outside of bankruptcy is not on the table here.

10             So to answer your question, Your Honor, I do think

11   it is back to the same matrix.  It is the same distinction.

12   These are offers, this is a rubric, this is a framework

13   where these lawyers, with their authority under the

14   engagement letters, with the authority they have through

15   repeated communications with their clients, with their

16   ethical obligation to act in these clients' best interests,

17   they have the ability to vote on a plan, to agree to a

18   settlement matrix, in my world.  And then when we get an

19   offer, then when we need you to sign a release and accept a

20   certain amount of money, now I need your affirmative consent

21   because that's a settlement.  So I think it's the same.  I

22   think it's the same, and I think that engagement letter

23   gives you the framework of how we think about it.

24             THE COURT:  Thank you.

25             MS. BROWN:  And it's consistent with the testimony

1    of all of these AHC members, and of course, Mr. Smith as

2    well.

3              We talked -- Does Your Honor have any more

4    questions on that, or should I keep going?

5              THE COURT:  No, no, no, this was helpful.

6              MS. BROWN:  Okay.  Thank you, Your Honor.

7              Mr. Watts, both Mr. Watts and Ms. Andrews talked

8    about meeting with Mr. Gentle.  I understand the Court's not

9    considering his expert report, but --

10             THE COURT:  We can talk to him, and I think it's

11   fair.

12             MS. BROWN:  Sure.  As a factual matter, he

13   provided, and I think it came in through testimony of

14   multiple witnesses, these lawyers do believe they are

15   ethically obligated to make sure they are not missing an

16   opportunity to act in the best interest of their clients.

17   They feel bound to do that, and the testimony reflects that.

18             We heard about -- And here we're talking about

19   Option B, Your Honor, and here is another way we know that

20   these lawyers are acting in their clients' best interests.

21   It's the repeated communication that they have with their

22   clients.  You heard Mr. Watts changing his shirt 14 times,

23   and making the video to reach out to 17,000 people.  You

24   heard about, really, an elaborate eBalloting system that

25   Anne Andrews has, her texts, her phone calls, every effort

1    she made to get the word out.  And same with Mr. Pulaski,

2    thousands of calls, texts, or emails giving them notice

3    continuously and systematically.  All of these are in

4    evidence, Your Honor.  We saw some of the actual texts, and

5    the actual outreach that went via text, via email, with Mr.

6    Onder, via letter.  I think Mr. Parkins reviewed that in the

7    testimony.

8            And ultimately, even Mr. Birchfield, who voted

9    under Option A, even Mr. Birchfield said, look, if you're a

10   lawyer, if you have communication with your client, you have

11   the authority to vote on behalf of your client.  Now, you

12   have to do that correctly under this master ballot.  But

13   being a lawyer for a client, having a representation

14   arrangement where you are empowered to act in their best

15   interest, communicating with the client and keeping them up

16   to date on what's on the table, even Mr. Birchfield would

17   say -- gave every lawyer who voted the authority to do that.

18   Now, these lawyers did it properly under Option B.  We'll

19   talk in a minute about what the problem with Mr.

20   Birchfield's vote was.

21           THE COURT:  Do you have a copy of your

22   presentation, by the way?

23           MS. BROWN:  Yes.  I'm sorry, Your Honor, I do.

24           THE COURT:  No, no, no worries.

25           MS. BROWN:  Can I hand it up?

```
 1              THE COURT:  Yeah, absolutely.  I just, I like
 2    taking little notes here and there.
 3              MS. BROWN:  May I approach, Your Honor?
 4              THE COURT:  Yes, please.  Thank you.
 5              MS. BROWN:  (indiscernible)
 6              THE COURT:  No.  Thank you.  Thank you.
 7              MS. BROWN:  May I proceed, Your Honor?
 8              THE COURT:  Please, thank you.  I apologize.
 9              MS. BROWN:  Yeah, no, not at all.  Thank you.
10              And so, Your Honor, as we were discussing, and the
11    testimony revealed, it wasn't just that these lawyers
12    testified, they believed they had an obligation under their
13    engagement letter, but it was also a duty, as for example an
14    ethical duty, as Mr. Pulaski testified to.  Mr. Onder told
15    you, "I don't want to wrongfully disenfranchise my clients,"
16    and that really is the problem that lies there.  If they
17    don't vote on this matrix, on this opportunity, on this
18    plan, they may be giving up the client's opportunity to
19    ultimately say yea or nay to a settlement offer.
20              And tellingly, and Mr. Hansen importantly
21    referenced this this morning, Ms. Andrews told you 5,000
22    people said yes to her.  She voted for 5,000 others, and no
23    one has come back to her and said hey, I disagree with what
24    you did.  It's evidence that she was voting in the way her
25    clients would have.
```

1            And I think the other thing, as the Court thinks

2    about it, Your Honor, everybody testified, we tried to get

3    Option A.  Right?  Like, that is where we want to start.  We

4    want to hear back from the clients.  But this is a time-

5    sensitive operation, and so if we don't, if we are not able

6    to, if we get to a point where the deadline is coming and we

7    haven't heard, we feel obliged to act on their behalf.  We

8    are duty-bound, and we have an obligation.

9            You heard extensively, Your Honor, that the tort

10    system, particularly in this litigation that's been going on

11    since 2013, is not a viable option.  You heard from Mr.

12    Birchfield that his firm, who really, and they say it on

13    their website, are leading the charge in this litigation,

14    they haven't recovered anything for their clients in the

15    tort system.  Fifteen trials since 2013, no recovery for a

16    plaintiff.  Two trials just in between LTL II and this case

17    filing, no recovery.  And you heard from Mr. Onder that time

18    is of the essence when you are dealing with cancer, when you

19    are dealing with families that may not have that much time,

20    and that his clients want and need a prompt and expeditious

21    resolution.  The tort system has shown us that is not the

22    way to get a prompt and expeditious resolution.

23            At the of filing here, there were 60,000 pending

24    cases.  Only 17 of those cases had made it before a jury

25    since 2013.  You heard when Mr. Kim testified it is very

1    aggressive, and I can tell you this, to try 10 jury trials

2    in year.  That is a lot to get in front of a jury, just

3    given the system.  But even if you did, getting all of those

4    cases would take thousands and thousands of years.  It is

5    not a practical way to resolve.

6            THE COURT:  Silly question -- This is not

7    evidence, and just out of curiosity, I've always wanted to

8    ask you, how long is a trial?

9            MS. BROWN:  Great question.

10           THE COURT:  (indiscernible) just on average, and

11   just back of the envelope.

12           MS. BROWN:  Yeah.  So if you're in State Court,

13   particularly in California, you would probably have a six-

14   week trial.  It usually takes, like, two weeks to pick a

15   jury, and then evidence will go on four to six weeks on top

16   of that.  If you are in Federal Court, you probably can try

17   the case in under three weeks.

18           One exception is State Courts in South Carolina.

19   There is one judge there we appeared before who will try a

20   very, very short State Court case.  But on average, the

21   divide is State Court cases are significantly longer,

22   Federal Court cases are shorter.

23           THE COURT:  Thank you.

24           MS. BROWN:  Yep.

25           This is what we were talking about earlier, Your

1    Honor, is that Mr. Birchfield analyzed -- analogized this to

2    the tobacco litigation, and said, well, you know, if you

3    just wait long enough, eventually you'll be able to settle.

4    Mr. Smith recoiled in that being seen as something positive,

5    and talked about the harm that has been caused to his

6    clients even in the four years that we have moved through

7    LTL I, LTL II, and now Red River.

8            You heard testimony from Mr. Kim, and we'll

9    explain in a second why, this is not a mass tort that can

10   settle outside of bankruptcy.  This is not an injury that is

11   finite.  These asbestos-related injuries that are being

12   alleged here have incredible long latency periods.  And what

13   that means, as the Court well knows, is that we will face

14   cases for 10, 20, 30, 40, maybe even 50 years, and as the

15   Court knows, our Civil justice system can't deal with an

16   injury that hasn't arisen yet.  There is no way to resolve

17   that.

18           Mr. Haas' testimony will be submitted to the Court

19   via deposition designations, and he reiterated, this case

20   will never, ever settle outside of bankruptcy.  In fact, Mr.

21   Pulaski said he's been asking us for seven years to do that,

22   and it has not happened.  Mr. Kim talked about finality, and

23   finality being an important part of settlement, and how you

24   can't get that in the MDL because there's no mechanism to

25   deal with future claimants in a multi-district litigation.

1    And that's a big part of an asbestos-related latent disease

2    like ovarian cancer or gynecological cancer.

3            Mr. Smith was very candid about the challenges

4    that plaintiff's lawyers are facing, and are increasingly

5    facing in the tort system.  As the Court heard, and this

6    order is in evidence, the MDL Court in New Jersey, based on

7    the -- I won't call them changes to 702, but the

8    underscoring of the Court's gatekeeping authority under 702,

9    and the emergence of new science allowed that court to say,

10   you know what, we need to revisit these Daubert challenges.

11   And Mr. Smith told you what a risk that is from a

12   plaintiff's lawyer's perspective, because that, I think as

13   he says, could take all their chips off the table, and they

14   could get nothing.  If these experts are excluded, and we

15   know it, Mr. Watts and I are involved in it, it happened in

16   the Tylenol litigation, if all of the experts are excluded,

17   you're done.  Your case, right?  And Mr. Smith talked about

18   these issues, and how, you know, the Trial Courts, it's

19   tough in front of a jury, but this pending Daubert decision

20   makes things even more difficult.

21           Mr. Onder, where we've seen a number of these

22   defense verdicts in the City of St. Louis, talked about how

23   the trial record is just not favorable to plaintiffs.

24   There's no place for plaintiffs in the tort system, as Ms.

25   Andrews said.  The absolute best option for plaintiffs,

1   according to all of the witnesses you heard from, Your

2   Honor, is a bankruptcy resolution.

3          Let's talk a little bit about the solicitation

4   process.  The Court well knows that the parties were

5   encouraged to continue negotiations after Judge Kaplan

6   dismissed LTL II.  And certainly, we did that over the

7   course of what amounted to about 14 months.  On May 1st, we

8   announced an intention to solicit this plan, after a lot of

9   really good negotiation with the Ad Hoc Committee, and made

10  the timeline pretty clear, that the initial deadline would

11  be the end of July, and that we anticipated it would be a

12  couple of weeks to tabulate before we got to a final number.

13  The Ad Hoc Committee's letter in support of the plan

14  underscores extensive negotiations on all aspects of the

15  plan, including, and you heard testimony about this, the Ad

16  Hoc's desire to be in Texas, the Ad Hoc's desire that the

17  mesothelioma and the AG and the Canadian claims would

18  somehow not be part of this.  That's where the divisional

19  merger came in.

20         And you heard about things like the disclosure

21  statement and the master ballot.  I mean, to think, Your

22  Honor, about how The Coalition wants you to interpret this

23  master ballot is nonsensical when you think about the fact

24  that AHC members were involved in the disclosure statement

25  and the master ballot.  Why would you agree to a master

1    ballot that doesn't give you the authority to vote for your

2    clients?  It doesn't make any sense, and could not have been

3    the intent of the people who were involved in this drafting

4    process.

5              Mr. Watts said he helped negotiate the disclosure

6    statement.  The idea that these folks who are suing us in

7    the tort system are not familiar with the claims being

8    alleged, and could not advise their clients appropriately is

9    not a credible argument.  Mr. Watts told you he was

10   involved.  And you heard from Ms. Wheatman about a

11   widespread notice program.  And frankly, this is a

12   supplemental notice program trying to reach folks who don't

13   have counsel, and we know from testimony that was only 0.3%

14   of the people who voted here.  So this is sort of a bells

15   and whistles type of program, because mostly everyone who

16   voted here was represented by counsel.  Nevertheless, the

17   stats are very impressive of the supplemental program.  It

18   cost $9 million, and it reached sort of a unique number of

19   visitors, 1.2 unique visitors to the website.

20             We heard some strange testimony from Mr. Hilsee,

21   Your Honor, talking about how words like "plan" and

22   "bankruptcy" were problematic in the notice.  The Court

23   obviously will weigh the credibility of that testimony.  He

24   said the thing to do is just kind of put the position of the

25   other side out there, and let the claimants figure out what

1    makes sense, and he appeared not to realize that that was

2    actually basic information on page two of the notice itself.

3    I think, to be candid, Your Honor, I think the expert

4    testimony and the allegations that this was not a sufficient

5    disclosure are simply just not credible.  Ninety-nine point

6    seven percent of these folks were represented by counsel.

7    Everything you heard from Dr. Kessler is in the MDL

8    complaint.  These folks are well aware of what the

9    allegations in this case are.

10           And in part that's true because since 2013, this

11   is a tort with heavy, heavy mass tort advertising.  And as a

12   result, we have reached, over the course of the last decade-

13   plus, almost all of the folks who have claims, and they are

14   almost all signed up with lawyers who represent them, and

15   are aware of the claims, are aware of the TDPs, are able to

16   calculate individual recoveries.  These are folks who have

17   counsel.

18           We heard the disclosure statement, of course,

19   gives a range of recoveries.  You heard testimony that that

20   range of recovery is almost double what had been provided in

21   the settlements in the tort system.  Of course this is

22   significant when you consider Mark Lanier settled his cases,

23   the only lawyer to get a verdict, and it was an enormous

24   one.  Jury came back with $4.6 billion in that case, Your

25   Honor.  So to have a historical settlement history that

1    included his inventory says a lot, not just about the value

2    the plan is providing, but about the weakness of these cases

3    in the tort system.  And Mr. Onder told the Court what the

4    Court knows, which is that sophisticated lawyers in this

5    mass tort representing their claimants, one, have been

6    heavily involved in negotiating the TDPs, and are certainly

7    capable, and have and do calculate the range of recovery so

8    they can advise their claimants accordingly.

9            You heard from Mr. Singer that at the end of the

10   day, he's pretty much there.  I think he said there's not a

11   lot of daylight between him and Dr. Mullin.  He came in to

12   testify, and understandably so, about a worst-case scenario

13   analysis that even he doesn't think is going to happen.  And

14   the Court well knows the only real factor that drives the

15   distance between Ms. Austin's numbers and everybody else's

16   numbers is that she's using an estimate of claims that is

17   untethered to any fact or evidence when you look at a graph

18   like this.  The Coalition themselves, in pleadings before

19   the Court, estimates 40,000 ovarian cancer compensable

20   claims.  Every single plaintiff lawyer who testified

21   estimated around 40,000 claims.  Dr. Mullin uses a likely

22   number of claims at 40,000.  And for some reason, Ms. Austin

23   is totally off the grid at 70,000, and that just drives the

24   difference in her numbers.

25           Lots of discussions about liens, Your Honor,

1    throughout the case.  But the folks who have been on the

2    front line of settling these for decades, nobody is more

3    experienced at that than Mr. Murdica.  He testified that

4    they settle for a fraction of what the liens are.

5            THE COURT:  How do I think about the lien

6    question?  This is more just clarification.  There was some

7    testimony, if I remember correctly, let's just call it the

8    Itkin Settlement, that they're still dealing -- or maybe it

9    was the Lanier Settlement.

10           MS. BROWN:  It was Lanier.  It was Lanier.

11           THE COURT:  It was Lanier, that was still dealing

12   with liens, and the concept of getting money in people's

13   hands quickly.  How do I weigh kind of the fact that in a

14   kind of a major settlement, people are still dealing with

15   the lien issue for years as opposed to kind of what may be

16   coming here?  Just your thoughts about -- You know, I mean,

17   I know someone's going to tell me it's not going to be any

18   faster.  They're still waiting, even when they settled, and

19   this was years ago, and had the deal with Lanier.  Most of

20   them are in Houston, so (indiscernible)

21           MS. BROWN:  Two things I would point the Court to.

22   Because when that testimony came in, my ears perked up, and

23   I went back and I looked at Mr. Murdica's testimony.  And I

24   can't recall, Your Honor, who that testimony came in from,

25   but I went back to Mr. Murdica's testimony, and his

1    testimony is that the lien, the linear liens are resolved,

2    and they have been paid out.  So I'm not sure if it was a

3    rumor that got lost in translation, but the testimony I

4    would point the Court to is Mr. Murdica, they are -- it's

5    been resolved, they are getting paid.

6         And the other thing I would say for Mr. Murdica's

7    testimony is that he had reached a lien deal in some of the

8    -- or a tentative lien deal in some of the earlier

9    negotiations, LTL I and LTL II.  And so he is confident that

10   he is very close, and would be able to do something similar

11   here.  So I think, one, the facts on that testimony that

12   caught my ear as well, Judge, is just not right.  And

13   second, I think Mr. Murdica has made enormous progress

14   already, and we can expect a quick resolution here.  And in

15   fact, you heard testimony both from Mr. Onder and Ms. Ellis,

16   very experienced in negotiating and settling mass torts,

17   both of them, that they never get paid in full, that they

18   always settle for a very, very small fraction, and both have

19   experience doing it, and doing it as quickly as possible.

20   So I think that's something that's been put out there as an

21   impediment that the facts really just don't support.

22        Let's talk now, Your Honor, quickly about Mr.

23   Birchfield's effort to thwart this vote.  So the timeline of

24   certification is announced on May 1st.  We indicate the

25   deadline, the initial deadline will be the 26th of July, and

```
1    that we likely will be able to have a tabulation by the end
2    of August.  Immediately, like that press release, Your
3    Honor, was 6 a.m., immediately Beasley Allen issues this
4    press release, talking about how this is going to be a bad
5    faith bankruptcy, all the votes will be found fraudulent and
6    in bad faith, and J&J is going to stuff the ballot box.
7    This happened from day one, and you saw numerous public
8    statements and press releases with this type of language.
9    The company is afraid of legitimate voting, they're going to
10   stuff the ballot box, this is an abusive tactic.  You saw
11   all of these mass tort made perfect, you know, blasts that
12   talked about shaming people who were in support of the
13   bankruptcy.  You learned about this J&J is weighting --
14            THE COURT:  I'll tell you something that I noticed
15   as well when I was going through this at some really late
16   hour, is that Beasley Allen uses the word "sick."
17            MS. BROWN:  Yeah.  Yes.
18            THE COURT:  And so I thought -- I'm not sure I --
19   you know, I think when we think about Mr. Hilsee's -- I
20   just, I wanted to flag this for questions for if people want
21   to talk to me about Hilsee, you know, Beasley Allen uses the
22   word "sick," they didn't use --
23            MS. BROWN:  Cancer.
24            THE COURT:  Cancer.
25            MS. BROWN:  Agreed, Your Honor.
```

1           THE COURT:  I'm not saying in every one, but in

2    some of these, they use the word sick as opposed to cancer,

3    and so I didn't -- just, I don't know what to do with people

4    who tell me that, you know, the fact that one was used as

5    opposed to the other.  Just pointing that out.  That wasn't

6    for you, that was more for when we talk about folks who want

7    to attack --

8           MS. BROWN:  But I think it underscores the

9    credibility of the testimony.  I mean, certainly when you

10   have the word "sick," and under that you have gynecologic

11   and ovarian cancer, no one is confused.  I mean, it's just

12   not a credible position.  And I agree with Your Honor that

13   when Beasley Allen and others talk about this litigation

14   that's been going on for over a decade, cancer is not a term

15   that is always used.

16          You saw these types of email blasts that they were

17   going to firmly declare that they would never, ever, ever,

18   not now, not ever negotiate in bankruptcy, and then they

19   did, true to form, Your Honor, engage in an effort to try

20   and cast invalid votes in an effort to defeat the plan.

21          And here's how it happened, Your Honor.  They --

22   Andy Birchfield testified that these gynecologic claims,

23   almost all of them unfiled, he does not believe that he

24   voted here, and does not believe they are compensable or

25   allowable.  I mean, you heard kind of startling testimony

1    from lawyers who have signed up these clients, who have

2    filed under Rule 11 these complaints in the MDL in New

3    Jersey, you heard them in this case stand up and say, I

4    don't think there's a shred of scientific merit to these

5    claims.

6            THE COURT:  How do I weigh that with -- And

7    certainly I don't disagree with the statements that you made

8    from a factual matter, that this is what -- With, you know,

9    maybe Birchfield was just saying I've got a -- I have a duty

10   to vote these claims in a similar way, as others felt like

11   they had a duty to have their clients participate in the

12   system.  Even though I may disagree with what it is, I've

13   got it in ethical duty to go vote.

14           MS. BROWN:  I would suggest to the Court he

15   violated an ethical duty, because he had a conflict that

16   those other lawyers that you're referencing, Your Honor,

17   didn't.  And the conflict was that he was, outside of

18   bankruptcy, not advocating for payment.  I mean, he was

19   saying these are worthless claims outside of bankruptcy.

20   And then inside of bankruptcy, he votes to reject

21   compensation, with no evidence in this record that those

22   claimants were informed of this conflict, that your lawyer

23   on the outside is not going to get you any money on this

24   case, and your lawyer on the inside is rejecting money

25   that's being offered to you on this case.  We don't have any

1    evidence because he wouldn't answer the questions, that he

2    informed his gynecological cancer clients and said, ma'am, I

3    am not going to get you money in the tort system because

4    your claim is worthless.  But in the bankruptcy, I'm going

5    to vote to reject $1,500.  Are you okay with that?  That's

6    what he was ethically required to do, and there is not a

7    shred of evidence in the record that he did it, and that's

8    why he's about on these 5,000 gynecological cancer claims

9    are different than anybody else who is voting on behalf of

10   their client.

11              THE COURT:  Did he have an ethical duty to do it

12   if this wasn't a settlement?

13              MS. BROWN:  Well, you always have an ethical

14   obligation to inform, Your Honor.  You always have to

15   provide the information.  Right?  And the ethical rules,

16   actually, as it relates to having a conflict, say if you

17   have a conflict, not only do you have to inform, you need a

18   waiver in writing.  So he not only has a basic ethical

19   obligation to keep his clients informed that everybody has

20   no matter what, but because he has this conflict, I'm not

21   going to get you money, and I'm going to turn down money

22   being offered here, he's got to tell his clients that, and

23   get something back that says, I'm okay with that.  And there

24   is not a shred of evidence in this record he did it, and

25   that is problematic as to these votes.

1           And he did that knowingly, Your Honor.  Nobody was
2   embarrassed or ashamed to come in here and tell you they
3   filed claims in the MDL that they think are completely
4   worthless.  I mean, this was done on purpose, and it's
5   wildly inappropriate.  There is no evidence that he received
6   consent from 8,500 clients, and we went through this, Your
7   Honor, Option A requires that.  This is where the client,
8   you see in the last sentence, has to indicate his or her
9   informed consent, and the lawyer has to collect and record
10   that consent.  And remarkably, for these 8,500 people, so he
11   votes about 11,500, Your Honor, for 3,000 of them in
12   discovery, we have some response, an email, a phone log,
13   some evidence that they indicated how they wanted to vote.
14   For 8,500 people, he told us, what did he collect, he
15   collected silence.  That's what he voted.  He had nothing.
16   He collected silence, and said it was informed consent.  And
17   he has a conflict, as we just went through, with these
18   folks.  As I said, Your Honor, and he testified here in
19   court, on one hand he's saying that these are not
20   meritorious claims in the tort system, and on the other
21   hand, he's rejecting compensation in the bankruptcy, without
22   any evidence that any of these folks knew about it.
23           And perhaps best evidence of the shenanigans that
24   are going on here is this changing story with respect to
25   these gynecological claims.  First, they filed them under

1    Rule 11, they sue us in the tort system on these claims.

2    Then they come to your court, and they say, oh, they're

3    worthless, I mean, you know, just we would never stand up in

4    court, and -- you have a complaint on file.  And then they

5    said, well, we had to do it because the statute of

6    limitations, we just had to protect the rights, and then

7    they come up with a whole new theory here in this bankruptcy

8    trial that, oh, they're secret medical monitoring claims,

9    that we had to vote this way otherwise we would lose some

10   kind of right.  None of this is true, it's completely

11   changing, and importantly, there's no evidence their clients

12   knew.  And he was instructed not to answer these questions

13   in his deposition, Your Honor, and when I asked him again on

14   the stand, he asserted the same privilege.  So where does

15   that leave us?  That leaves the Court with no evidence of

16   what is absolutely required to have voted those claims under

17   Option A, particularly where there's a conflict, as there no

18   doubt is.

19         You heard testimony, Your Honor, that we

20   immediately recognized these votes as problematic, that

21   there was some kind of a red flag, because we knew, based on

22   testimony from LTL I and LTL II, that they only had about

23   6,000 filed claims.  So immediately, when 11,000 claims come

24   in that we know aren't filed, and if they were in existence,

25   we knew they were time barred, it immediately sets off red

1    flags.  And Mr. Kim testified about that, they were all

2    Option A, they were a large number of claims that were

3    inconsistent with prior deposition testimony.  Mr. Murdica

4    testified about doing a check of these, where there were

5    dual representations between Beasley Allen and Onder, and

6    when they checked in with those clients, they heard that

7    those clients said they had never been talked to by anybody

8    from Beasley Allen.

9         At some point, and you looked at some of the Epiq

10   emails, and we'll talk about them in a second, there was no

11   doubt an effort to get the ballot, to look into it, to

12   figure out what was going on.  But what you heard about in

13   this trial is that at some point, those efforts become

14   overtaken by negotiations that Mr. Birchfield and Mr. Golomb

15   and others are a part of.  So there is sort of a parallel

16   investigation into what's going on with these votes.  You

17   saw those Epiq emails, and there are negotiations of which

18   Mr. Murdica, Mr. Birchfield, Mr. Golomb are a big part of.

19        You heard about an extensive negotiation that took

20   place in New York on the second and the third, and you heard

21   that the idea, the genesis of what we now call the Smith

22   MOU, the $650 million common benefit, the $1.1 billion

23   individual review fund, it was Mr. Birchfield's idea.  It

24   actually came from Mr. Birchfield.  And when he took the

25   stand, he said, well, J&J was insisting on this extra money,

1    and insisting it just go to me.  And that doesn't make any

2    sense.  Why would we offer $1.75 billion and say it can only

3    go to Beazley Allen clients?  And Mr. Smith told you that

4    was absurd.  It was Mr. Birchfield who was trying to

5    negotiate preferential treatment for his clients, and it was

6    Mr. Smith who said that doesn't make any sense, no one's

7    ever going to agree to that.  We need to make this extra

8    money available to everyone, which it of course now is.

9            You heard, and you saw the email from Mr. Golomb,

10    that as these negotiations went on, it became clear that we

11    were going to need to extend the deadline for certification

12    in an effort, really at the request of these folks, to try

13    and reach a resolution.  And so on August 23rd, and this is

14    in evidence, the plaintiffs' attorneys who opposed the plan

15    reached out and asked, and we agreed to a short extension to

16    certify the vote, to accommodate efforts to try and make

17    this a plan that had the most amount of support as we could

18    possibly get.

19            Mr. Smith testified, and it's the truth, Your

20    Honor, that he had been in the background, negotiating with

21    Mr. Murdica for a very long time.  This was a case I was set

22    to try, and I know that he was on the front line of this

23    Mississippi AG case, Your Honor, negotiating that with Mr.

24    Murdica in parallel to staying abreast of the developments

25    in the bankruptcy.  And so he steps in in August, when it

1    becomes clear that having asked for this preferential

2    treatment for the Beasley Allen clients, this MOU was not

3    going to get signed by Mr. Birchfield, it's Mr. Smith who

4    steps in and tries to bring it over the finish line.  You

5    heard, and I know the Court had some important questions

6    about this, how did he get in touch with his clients to get

7    his September 11th letter out, telling them about this

8    additional consideration.

9         You heard testimony both from Mr. Birchfield and

10   Mr. Smith, that Mr. Birchfield said I'm not giving you the

11   list.  You heard that Mr. Birchfield sued Mr. Smith, and the

12   two were not communicating.  But here's what we know about

13   Mr. Smith's ability to get the information nonetheless.  So

14   Mr. Smith testified he had to, as the Court pointed out,

15   reverse engineer this.  Mr. Birchfield said he could have,

16   because he was copied on all of the client correspondence.

17   Mr. Smith said it would have been a lot easier if they gave

18   us the Excel, but I did, I eventually got it together.  It

19   caused a delay, but I eventually got it together, to get

20   this client contact.  He said he was able to email it out,

21   and there were only a few people for whom he didn't have an

22   email, that he had to FedEx.

23        And so the testimony, Your Honor, on the question

24   that you asked, was that even though he had to do it the

25   hard way and the long way, and it took an extra two days, he

1     was provided with everyone's email address, and where he

2     didn't have an email, he sent out the FedEx.  As the Court

3     knows, he ultimately, having done that, was able to file a

4     master ballot of the superseding votes.

5          What did we hear from The Coalition?  It was the

6     kitchen sink that we previewed in opening, about all the

7     reasons that what went on here was somebody else's fault.

8     First, we heard more about J&J stuffing the ballot box, when

9     it was The Coalition that had filed these cases in the tort

10    system as early as 2015.  Mr. Birchfield maintained in his

11    testimony that he continues to have gynecological cancers on

12    file.  And critically, when you think about all these ballot

13    stuffing allegations, it's The Coalition who voted the most

14    percentage of votes that were gynecological cancer votes.

15    So it's sort of an absurd argument, Your Honor, when you

16    look at the actual data on the percentage of parties, and

17    what percentage of their claims were gynecological.  They

18    have almost double everybody else.

19         Next, we heard, well, the deadline shouldn't have

20    been extended.  But as the Court has already directed us to

21    under 4(d,) absolutely this can be extended.  LTL has

22    granted an extension.  This is not only in this portion of

23    the ballot, but it's in a number of places.  Mr. Birchfield

24    agreed, and Ms. Kjontvedt importantly said it's pretty

25    common that the Debtor would extend, and that makes sense

1    because you're trying to get as much support as you can.

2    And so of course the procedures give you the ability to do

3    that, and of course it's common standard practice that it's

4    done.

5          Real quick, just to review how we got to the

6    extension, Your Honor, it's the negotiations that continue

7    after the initial deadline.  It's the New York mediation

8    that's ongoing with Mr. Birchfield, and the objectors.

9    There's an agreement that we're going to, you know, make a

10   press statement about the extension.  There is the ultimate

11   press statement that says we've agreed to a short extension.

12   Mr. Murdica told you that would have been an instruction

13   from Jones Day to Epiq, and of course you saw those emails

14   that did, in fact, substantiate that we anticipate there's

15   going to be a revised master ballot, and you need to stop

16   the finalizing of the tabulation, we are going to extend.

17   That, of course, happened, Your Honor.  The MOU gave Mr.

18   Smith until September 16th.  He told you about an internal

19   voting deadline he had of the 13th, which he then extended

20   to the 15th, in line with the MOU's deadline.  And then you

21   saw the contemporaneous Epiq emails, indicating that we

22   anticipated that vote would be coming from Smith, which it

23   of course did on September 16th.

24         They claim the Smith vote is improper.  Here is

25   where I meant to point to 4(d,) but as Your Honor knows, the

1    superseding vote section of the master ballot would allow

2    the last executed valid ballot that's received before the

3    deadline, which could be extended to be counted.  The other

4    side will of course point to this portion of 4(d,) that it

5    has to come from the same authorized representative.  But as

6    the Court well knows, both of these lawyers were authorized

7    representatives, under their joint venture agreement by

8    which they were jointly responsible for prosecuting the

9    cases, jointly representing all of the talcum powder

10   clients.  And now, even as far -- and now we're after the

11   vote.  This is as far as when the lawsuit gets filed by Mr.

12   Birchfield, he agrees that they are jointly responsible,

13   that the joint venture agreement is in effect.

14            Finally, we heard it throughout the trial, why is

15   everyone, you know, unfairly picking on Mr. Birchfield?  But

16   you saw the emails, they raised red flags as soon as they

17   came in.  You had 11,500 affirmative votes, Mr. Prieto

18   asking all of his claims?  And you saw, and this is in

19   evidence, Your Honor, as a composite exhibit of all of the

20   Epiq emails, but you see an effort to kind of get a hold of

21   the votes as they're coming in.  We're asking not just for

22   the Beasley Allen spreadsheet, but for five firms with large

23   numbers of defective entries right away.  All of this is

24   consistent with what Epiq testified you would do following a

25   vote, and it makes a whole lot of sense as you're dealing

1    with almost 100,000 votes.

2            One quick thing, Your Honor, I want to mention

3    before I end, and I know Mr. Gordon will speak more about

4    this, but there is deposition testimony that will come

5    before the Court regarding Kenvue.

6            THE COURT:  Okay.

7            MS. BROWN:  Mr. Lindenmayer is the Director of

8    Brand Protection for the Americas, and he is unequivocal

9    that Kenvue never sold Johnson's Baby Powder with talc in

10   Canada or the United States.  And that makes sense because

11   Kenvue didn't come into existence until 2023, and baby

12   powder with talc was discontinued in the United States in

13   2020.  This isn't even possible, that the company would have

14   taken it over.

15           But he talked about his efforts to stop the very

16   thing that Mr. Placitella showed us, which is the gray

17   market sales, or the illegal sales in this country of

18   product that is either completely counterfeit, completely

19   not even any kind of talcum powder product, or just being

20   made abroad and brought into this country.  And we had a

21   very dramatic unveiling of a Walmart box, and Your Honor

22   will recall, we put the baby powder up on the ELMO, and of

23   course it was manufactured outside of the country.  This is

24   not an authorized Kenvue product that was ever sold in this

25   country, and you'll read in the depositions the efforts

1    Kenvue goes through to make sure that they stop these

2    unauthorized websites and sales, and things like that.

3            On the Kenvue point, you heard -- And I think,

4    really, Mr. Placitella's engagement in this process should

5    give you no doubt that if Kenvue is not a protected party,

6    this entire litigation is going to go on under the name of

7    Kenvue.  No question.  There has been a motion to add them

8    to the MDL complaint, Mr. Placitella is pursuing Kenvue all

9    over the United States of America.  If they are not a

10   protected party, as they should be based on the

11   indemnification, and based on the fact that they never sold

12   this product, we will have a cosmetic talc litigation in

13   another name, no question.

14           Finally, Your Honor, as we spoke about in opening,

15   this is a historic $10 billion plan.  The Court is well

16   aware of the significance of the plan, the largest asbestos

17   settlement in history.  Everyone is on board and supportive

18   of this, Your Honor, the Ad Hoc, the Smith, the FCR, the

19   TCC.  All of this support continues to grow.  You have

20   motions before you, Your Honor, of additional votes, of

21   people changing votes.  The support has continued to grow

22   just even in the few months we have been before Your Honor.

23   The only folks who are objecting, and we're down to two,

24   Beasley, Allen and Golomb, Your Honor.  They are on an

25   island.  They are not representative of the overwhelming

1    majority of what the women who voted on this plan want.  And

2    when they started this case, they gave you a speech about

3    trusting the process.  But what this Court should do is

4    allow this Court to process the Trust, and to get the $10

5    billion out to these claimants, to give resolution, and to

6    allow this historic settlement to go through.

7            Thank you, Your Honor.

8            THE COURT:  Thank you very much.  Let me just ask

9    if there is a representative of DOJ that's in the courtroom.

10   Are you here?  Before we break for lunch, I know that you

11   were -- I want to make sure that you have the opportunity.

12   If you're ready to go, I would be more than happy to hear

13   you at this time.

14           MS. THERIOT:  Thank you, Your Honor.  Bethany

15   Theriot, for the United States.  I am ready to go.  I also

16   can be here until 4:30 -- I appreciate it.

17           THE COURT:  Let's go.

18           MS. THERIOT:  Okay.  As I mentioned, Your Honor,

19   Bethany Theriot for the United States, on behalf of the

20   Department of Health and Human Services and Veterans

21   Affairs.  And I do just really want to thank Your Honor for

22   carving out 15 minutes for me today.  I really appreciate

23   it.  I've worked really hard to get my comments into the 15

24   minutes.  I'm going to try to cover a lot of ground, so I

25   appreciate your indulging me, and the court reporters

1    indulging me, as I talk very quickly.

2           The Department of Health and Human Services and

3    the Department of Veterans Affairs have claims for

4    reimbursement of healthcare costs related to the talc claims

5    in this case.  HHS' claims arise under the Medicare

6    Secondary Payer Statute.  That statute does essentially what

7    it says it does, it makes Medicare secondary to other

8    insurers, and so the statute prohibits Medicare from paying

9    healthcare costs if a primary plan is responsible for

10   payment.  If the primary plan's payment will be delayed,

11   Medicare may, but is not required to conditionally pay for

12   the healthcare costs, if the payment is conditioned on

13   reimbursement by the primary plan.  The primary plan has to

14   reimburse Medicare when the plan's responsibility for those

15   costs is established.  And here, Your Honor, the Debtor's

16   responsibility for the costs would be established at plan

17   confirmation, if Your Honor confirms the plan.

18          If Medicare is not reimbursed, the statute has two

19   provisions allowing the United States to pursue essentially

20   every party who touches the money owed on a beneficiary's

21   claim.  First, the United States can bring suit against the

22   primary plan itself.  Here, as I've already mentioned, that

23   could include the Debtor, it could include the Debtor's

24   liability insurers, it may also potentially include Johnson

25   & Johnson as essentially a liability insurer under the

1    funding agreements, and also, it could potentially include

2    the Trust.  If the United States is not reimbursed, not only

3    can the United States seek the money itself from a primary

4    plan, it also can seek double damages.  Second, the United

5    States also is authorized to bring suit against any person

6    or entity that has received payment or the proceeds of

7    payment from a primary payer for healthcare reimbursement.

8    Here that could include the Trust, it could include

9    beneficiaries, attorneys, and the beneficiaries themselves.

10          The VA's claims arise under a separate federal

11   statute, that's the Federal Medical Cost Recovery Act, and

12   that similarly authorizes recovery of healthcare costs in

13   the circumstances specified in that statute.

14          I don't envy the task ahead of Your Honor.  I know

15   it's been a really busy two weeks.  I know there are a lot

16   of complicated, complex issues in this case, and there has

17   been a ton of evidence.  And as Your Honor is considering

18   the plan in this case, I just ask you to really keep in mind

19   that the U.S. claims and objections are unique to all of the

20   other claims and objections that you've been hearing about

21   in this case, and that's so for a couple of reasons.

22          First, the U.S. claims just are not the talc

23   claims specifically that this bankruptcy is designed to

24   address.  Instead, as discussed in our brief, the U.S.

25   claims are Class 3 unsecured claims under the plan, which

1    are supposed to be treated as unimpaired pass-through

2    claims.  Second, because the United States has not been

3    involved in any dispute with Johnson & Johnson or the Debtor

4    up to this point, there is no basis for treating the United

5    States as a vexatious litigant.  I'm going to talk a little

6    bit about why both of those points are important in the

7    context of specific arguments and objections.

8            As Your Honor knows, the United States brief

9    raising objections to confirmation is at docket 984.  As

10   discussed in our brief, and as I just mentioned, we believe

11   our claims are Class 3 unsecured claims, which are

12   purportedly unimpaired and unaffected by the plan's

13   provisions.  But certain plan provisions appear to be broad

14   enough to affect government rights, and for that reason, our

15   brief raises a number of specific objections to the plan in

16   an effort to clarify the plan's impact on U.S. rights.  Two

17   of our objections have been addressed by the third amended

18   plan.  We objected to the compromise provision at Section

19   9.8.  That's been removed from the third amended plan.  We

20   also objected to the exculpation clauses at Sections 4.17

21   and 11.4, 4.17 has been removed from the plan, and 11.4 has

22   been narrowed, which we appreciate.  That said, we continue

23   to maintain the remaining objections in our brief.  I'm not

24   going to have time to discuss all of them today, and so I do

25   refer Your Honor to our brief on any of the objections.

```
 1              In responding to our objections, instead of
 2     clarifying the plan's treatment of our claims, the Debtors
 3     confirmation brief raises two new issues that just further
 4     muddy the waters with respect to how U.S. claims are
 5     treated.  And I want to first talk about how -- about those
 6     two new issues that the Debtor has raised, and then I'll
 7     turn briefly to addressing a few of Debtors responses to our
 8     objections.
 9              First, instead of confirming that the U.S. claims
10     are Class 3 unsecured claims, the Debtor suggests two new,
11     and essentially opposite ways for treating U.S. claims.
12     Either the claims are post-petition claims that are not
13     bound by the plan at all, or they are channeled talc
14     personal injury claims, given the most restrictive treatment
15     under the plan.  The Debtor first suggests that the United
16     States claims are post-petition claims based on when the
17     claims accrue.  Now, the Debtor is wrong about when they
18     accrue.  The Debtor suggests they don't accrue until a
19     beneficiary fails to reimburse Medicare.  As I've just
20     discussed, the United States will have statutory rights to
21     reimbursement from the Debtor at plan confirmation, when
22     Debtor's responsibility for the cost is established.
23     Regardless, we agree either way, that's post-petition.  So
24     if Your Honor would like to treat U.S. claims as post-
25     petition claims, that's fine with the United States.  We
```

1    just ask that it be made clear in the confirmation order

2    that U.S. -- excuse me, that the plan is not binding on U.S.

3    claims or interests under Code Section 1141(a.)  We think

4    it's really important that that be very clear in the

5    confirmation order, because we asked Debtor's counsel for a

6    carve-out essentially to that effect, and they refused to

7    give it to us.

8            If the United States claims are not post-petition

9    claims, then the Debtor argues that the claims must be

10   channeled talc personal injury claims.  That is a big leap

11   from one extreme to another, and it doesn't make sense, for

12   the reasons discussed in the United States brief.  For one

13   thing, the Disclosure Statement specifically states on the

14   first page that the plan does not resolve, and will not

15   affect the claims and demands of governmental entities.

16           THE COURT:  It also means you're subject to the

17   releases.

18           MS. THERIOT:  It would mean that.  That's correct.

19   And as I said, that's contrary to other assertions in the

20   Disclosure Statement, and the remainder of the plan

21   documents.  So the Disclosure Statement specifically states

22   that the plan does not resolve, and will not affect the

23   claims and demands of governmental entities.  That's at

24   Docket 25-2, at (ii.)  That is a plain statement the plan

25   does not affect our rights.  For another, the United States

1    was not solicited to vote on the plan, and is not listed as
2    a Creditor on Debtor schedules.  This despite the fact that
3    I think I heard Jim Murdica testify that he and I have been
4    in contact about the claims for years, since the Debtor's
5    first bankruptcy -- or the Debtor's predecessor's first
6    bankruptcy, so the United States was not given the process
7    or protections during the plan solicitation process that it
8    would have been given had it actually been a holder of a
9    channeled talc personal injury claim

10            Also the Trust distribution procedures
11    specifically clarify that medical liens are not indirect
12    claims, and that's at Docket 1171-3, Section 7.3.  At best,
13    the Debtor's effort now, at confirmation, to classify our
14    claims as channeled talc personal injury claims is a post
15    hoc attempt to severely restrict U.S. rights at the 11th
16    hour, and we ask the Court to reject it and treat our claims
17    either as post-petition claims, or as Class 3 unsecured
18    claims on the plan.

19            THE COURT:  Well, I guess what I need to do is
20    just ask Mr. Gordon how the -- and he'll do it in this
21    presentation, I'm sure, how your claim is classified.  If
22    it's a post-petition claim, then -- in other words, I can't
23    call it.  They're going to have to tell me how they
24    classified it under the plan, and if it's post-petition,
25    then it's post-petition, if it's Class 3, they will tell me

1    it's Class 3, if it's Class 4, they will tell me it's Class

2    4, and we'll go from there.  And I just think we just need

3    just clarity more so than anything else.  Because then it

4    will answer other questions, once the Debtor tells me how

5    your claims are classified, and then I can -- then I

6    understand it better.

7             And I get the point though.  Right?  You think

8    you're in -- you think you're Class 3.

9             MS. THERIOT:  And not only just because we think

10   that, we --

11            THE COURT:  Well, let me ask you this.  I guess

12   the better way of asking is, how do you think your claims

13   are classified?  Do you think the government's claims, all

14   of them are Class 3?  Do you think there could be some Class

15   3, and post-petition claims?  Do you think that they're

16   Class 4?  How do you think your claims are classified?

17            MS. THERIOT:  So we think that all of them are

18   Class 3 unsecured claims, for the reasons stated in our

19   objection.

20            THE COURT:  In your brief.  Okay.  Okay, okay.  I

21   just wanted to make sure on the record, just so I have

22   clarity.  Thank you.

23            MS. THERIOT:  Right.  And Your Honor, just to your

24   point that you'll ask Mr. Gordon how they think our claims

25   are classified, they have stated in their response that they

1   view our claims as potentially being channeled talc personal

2   injury claims.  And again, Your Honor, even to the extent

3   that Mr. Gordon says that again today, I just resist that as

4   an eleventh hour attempt to essentially reclassify our

5   claims after having not given us the opportunity to vote

6   during the solicitation process.

7           The second new argument raised by Debtor is that

8   the U.S. claims should be disallowed as contingent claims of

9   a co-Debtor under Code Section 502(e)(1)(b.)  That section,

10  as Your Honor knows, requires the Court to disallow a claim

11  for reimbursement by an entity co-liable with the Debtor to

12  the extent that such claim is contingent as of the time of

13  disallowance or allowance.  It doesn't apply here for a

14  number of reasons.  I'm just going to address two of them.

15  First, the timing is all wrong.  That section only applies

16  if the claim is contingent as of the time of allowance or

17  disallowance of such claims.  We're not in an allowance and

18  disallowance process right now, we're in the plan

19  confirmation process.  And moreover, as I mentioned already,

20  if the plan is confirmed, the United States claims will

21  become fixed, at which point the claims expressly are not

22  disallowed, under Section 502(e)(2.)

23          Second, the United States claim is not contingent,

24  as meant in that section.  Debtor relies on In re Haman for

25  its definition of contingent, but that case concerned

1    involuntary bankruptcy.  The better authority here is In re

2    Tri-Union Development Corp, in which Judge Isker explained

3    the contingent in this context means that the co-Debtor has

4    not yet paid the Creditor.  In other words, the Creditor's

5    claim is unfunded with respect to both co-Debtors, and

6    that's at 314(b)(r)611, at 616-17.  Here, the government

7    claims are not contingent in that sense because the

8    government has paid medical costs, and so the claims are

9    only contingent in the sense that Debtors responsibility for

10   those costs has not yet been established.

11           For both of these reasons, we ask the Court to

12   reject Debtor's argument that U.S. claims should be

13   disallowed at this point.

14           Next, with my -- I hopefully have a few remaining

15   minutes --

16           THE COURT:  Yeah, I want you to finish.  Go ahead.

17           MS. THERIOT:  Okay.  I appreciate that, Your

18   Honor.

19           THE COURT:  No, no, no.  I'm not here to jam you.

20   Go ahead.

21           MS. THERIOT:  Okay.  Well, I'm very mindful.  I

22   know there are a lot of people who want to speak.

23           But I do just want to briefly respond to Debtor's

24   arguments about two of the objections to particular plan

25   provisions in our brief, and those are objections concerning

1    the plan's third-party releases and injunctions, and the

2    plan's gatekeeping provisions.  The United States has

3    objected to the non-consensual third-party releases and

4    injunctions in Plan Sections 11.2.2, 11.2.3, and 11.3.2 as

5    unauthorized by Code Section 524(g,) and is violating the

6    code to the extent they impair U.S. rights.  The Debtor

7    attempts to justify the releases on two grounds, but both

8    grounds fail when it comes to the United States.

9            First, the Debtor argues the third-party releases

10   are needed to prevent frivolous litigation by creditors who

11   are fully paid under the plan.  That argument doesn't

12   factually apply to Class 3 unsecured claims, which are

13   supposed to be unimpaired claims that pass through the

14   bankruptcy.  That being said, the United States is hopeful

15   here that it will be reimbursed by the Trust if the plan is

16   confirmed.  And if that happens, if the United States is

17   fully reimbursed by the Trust, then the United States will

18   not have claims that it needs to bring in court, that could

19   be brought in court.  If the United States is fully paid, we

20   won't have claims to bring in court.  Until that happens,

21   though -- or excuse me.  As I mentioned at the beginning,

22   the United States isn't a vexatious litigant, so there's no

23   reason to treat us like a vexatious litigant once our claims

24   are fully paid.

25           Until the United States is fully paid, any third-

1   party release improperly impairs U.S. rights.  Contrary to

2   the Debtor's assertion in its brief, it's not just the Trust

3   and beneficiaries who are liable under the Medicare

4   Secondary Payer Statute.  As I mentioned before, the United

5   States has rights against a number of entities under the

6   statute.  And if Medicare is not reimbursed, not only can

7   the United States seek money, the money itself from the

8   primary plans, it also can seek double damages.  So the

9   third-party releases may impair U.S.  rights against some

10   parties, contrary to the United States treatment as a holder

11   of unimpaired claims, and the releases are unwarranted.

12          Second, the Debtor argues the third-party releases

13   are authorized by the All Writs Act.  In the bankruptcy

14   context, the All Writs Act overlaps Section 105(a) of the

15   Code.  As this Court recognized in In Re Guidry, Section

16   105(a) and the All Writs Act authorized Bankruptcy Courts to

17   issue appropriate orders in aid of their jurisdiction.

18   That's at 354(b)(r) 824-828, note 1.  The Debtor admits the

19   releases here are not authorized by the code, including

20   Section 105(a,) but the Debtor fails to explain where the

21   daylight is between 105(a) and the All Writs Act that would

22   give them authority to do something under the All Writs Act

23   that they don't have authority to do under 105(a.)  At

24   bottom, it's just an attempt to do an end run around Purdue

25   and Fifth Circuit precedent disapproving non-consensual

1    releases, and the effort should be rejected.

2            Last, Your Honor, I just want to address the

3    United States' objection to the gatekeeping provisions at

4    Plan Sections 11.2.2 and 11.4.1.  They require any person to

5    bring certain claims or causes of action before Your Honor

6    for a determination as to whether the claims are colorable

7    before those claims can be brought and in court.  The Debtor

8    has three responses to this.  Again, they all fail when it

9    comes to the United States.

10           First, the Debtor argues that the Court deciding

11   whether a claim is colorable is not a merits determination.

12   That is clearly incorrect.  It is, at the very least, a Rule

13   12(b)6 determination, which has long been established to be

14   a determination on the merits under the federal rules of

15   civil procedure, and I refer Your Honor to Hitt v. City of

16   Pasadena, 561 F.2d 606, at 608.  Second, the Debtor argues

17   in accordance with Hyland that the Court need not evaluate

18   pre-confirmation whether this Court would have jurisdiction

19   over every conceivable claim falling under the widest

20   interpretation of the gatekeeping provision.  That argument

21   is a red herring with respect to the United States

22   objections because this plan's gatekeeping provisions

23   attempt to give this Court authority over criminal claims

24   and causes of action, which are prima facie not within the

25   Court's jurisdiction.  For the reasons stated in our brief,

1    a gatekeeping provision cannot give the Court authority over

2    claims that are clearly not within the Court's jurisdiction.

3              Third, the Debtor argues the gatekeeping

4    provisions are needed and are proper under Hyland because of

5    the risk of vexatious litigation.  Again, Your Honor, there

6    is no reason to treat the United States as a vexatious

7    litigant.  We've not had a dispute --

8              THE COURT:  I got that.  But I mean, putting aside

9    the (indiscernible) and obviously, you're not a vexatious

10   litigant today, right, there's no -- I have no evidence of

11   anything there, but there is a concept of, you know, there's

12   going to be an injunction, right, in the discharge.  If the

13   plan is confirmed, then there is going to be a channeling

14   injunction, and -- You know, there's a risk with big cases

15   that people don't understand kind of what really just

16   happened, and so, you know, they start suing the Debtors in

17   multiple different locations.  And the way I understand it,

18   the way I think about Hyland is, like, before you start

19   doing that kind of stuff, and then running potential -- you

20   know, bringing in sanctions, and doing all that kind of

21   stuff, why don't we just come here, and then I can determine

22   whether that's subject to the discharge or not, before

23   someone has to go spend money litigating somewhere else.

24   Right?

25              So clearly, it's not a -- I automatically have

1    jurisdiction over anyone's claims.  It's to say, and I'll

2    put the government to the side, let's just say someone is

3    subject to the channeling injunction, and it's clear,

4    there's no question about it, but then, you know, someone

5    starts a lawsuit in South Carolina or something, you know?

6    Does the Debtor have to then go defend that, and then go

7    hand, you know, a judge, a State Court judge in South

8    Carolina, you know, all of the paper that comes along with a

9    bankruptcy confirmation?  Or can they come here, and then

10   have me tell somebody, yep, that's subject to the discharge,

11   or not?

12          So I agree with you to the extent you're saying,

13   you know, does that automatically give me jurisdiction to

14   resolve a dispute that may not be subject to a discharge

15   injunction.  But I think the intention of it, if I

16   understand it correctly, and I'm putting aside all the other

17   argument, I'm just talking about the gatekeeping because

18   it's a broader concept, the way I think about the gatekeeper

19   is I kind of just make an on the spot call.  Maybe not on

20   the spot-spot, but like a determination I know what that

21   discharge injunction does, is it subject to it or not?  And

22   if it's not, then I've got zero jurisdiction to stop it.  If

23   it does, then I've got to write an order saying I think it's

24   subject, and then people have whatever rights they have.

25          That's the way I think about it.  In other words,

1    I'm not -- I don't assert jurisdiction.  I may not resolve

2    the underlying dispute, because it's either discharged and

3    subject to the channeling injunction, which does a bunch of

4    other procedures, or I don't have to -- well, it's not

5    subject to the channeling injunction, this is something

6    completely different, and you're off to whatever court

7    you're off to of your choosing --

8              MS. THERIOT:  So I think, Your Honor, if that's

9    your --

10             THE COURT:   -- of your choosing, but and under

11   applicable law.

12             MS. THERIOT:  Yeah, I think if that's your

13   understanding, then I think actually, the gatekeeping

14   provisions requiring the Court to decide whether the claim

15   is colorable is problematic as a whole.  Because it sounds

16   to me like what you're saying is you view the gatekeeping

17   function as essentially, being a determination with respect

18   to the scope of the injunction, not with respect to the

19   merits of the claim.

20             THE COURT:  Now, but in other words, if your claim

21   is colorable, I've got to kind of -- I think it requires

22   some of that.  I've got to understand what you're alleging,

23   and then whether it falls within this 524, or just -- well,

24   either regular 524, or the 524(g) special injunction.

25   There's going to have to be some kind of on the spot

1    determination.

2         So if somebody files a State Court lawsuit, I'll

3    just use that, right, I've got to know what you're alleging,

4    and then kind of how it, you know -- you know, that one, I'm

5    reading what you wrote, and I know what you're asking for,

6    and that's covered.  Or nope, not covering, you can go.

7         MS. THERIOT:  Sure, Your Honor.  So I do think,

8    you know, under Hyland, Your Honor, Hyland does permit

9    gatekeeping provisions in the circumstances set out in that

10   decision, and we're not quibbling with that.  I do think

11   part of the premise of Hyland, though, is that when a claim

12   does come into your court, you do have a duty to determine

13   your own jurisdiction, to hear the argument at all before

14   deciding even whether it falls within or outside of the

15   channeling injunction.  And I think what I'm saying --

16        THE COURT:  I'm saying but that is my

17   jurisdiction, to make the call.  That's what I think Hyland

18   tells me I can do.  Like, I have -- I get to make the call,

19   whether that's subject to the injunction or not.  That's --

20   But I don't get to, like, decide the underlying merits.  I

21   get to look at what's colorable in the sense of determining

22   what you're asking for, and if it's subject to the

23   injunction or not.  I get to make that gatekeeping call, and

24   if I find that it's subject -- it's discharged, then it

25   doesn't give someone the right to then go file that State

1    Court lawsuit, and -- you know?  In other words, that's a

2    lot of lawsuits that we're talking about, in a lot of

3    different places, that could arise in different states.  And

4    I think keeping it all in one place, with a judge who knows

5    it, and then giving people whatever rights they have, if

6    somebody disagrees with it -- is the way I think about

7    Hyland.  And certainly, people can tell me differently, but

8    I think that's -- Like, I think it's a gatekeeper.  It's not

9    a, you know, a keeper.  There's a gate.

10              MS. THERIOT:  I hear you, Your Honor.  I think --

11              THE COURT:  Right, and I know we can agree or

12    disagree, but I don't think you would -- Your point is, I

13    get the government's point is, look, even if we come back

14    here, I may tell you you have no jurisdiction to even

15    consider what we're doing, and I can give you statutes that

16    I think work or not work, and I think you have the right to

17    make the argument.

18              MS. THERIOT:  Well, and let me just add, you know,

19    of course I represent the United States, and we also have,

20    of course, police and regulatory powers.

21              THE COURT:  Absolutely.

22              MS. THERIOT:  And I just want to go back to this

23    particular gatekeeping provisions subsumption, subsuming of

24    criminal matters as well.  So I hear what you're saying,

25    Your Honor, but I do think when it comes to criminal

1    matters, that --

2              THE COURT:  I guess what we're saying is we have a

3    conversation.  You come here, and you can either tell me if

4    you don have jurisdiction, and I've got another statute that

5    supersedes you, or what's going on, and we've got a new plan

6    with a discharge, and then someone can come in, anyone,

7    right, can come in, and we can have a conversation about

8    whether I'm -- You know, this is 28 USC 959(b) is where I

9    think you're going, and you know, with the police and

10   regulatory powers, or something else.  But I think that's --

11             In other words, we have the conversation at some

12   point, and you have -- and everybody's rights are what they

13   are, and I'm not here to tell you you don't have the right,

14   the government doesn't have the right to come in and tell me

15   28 USC 959(b.)  I have thoughts on those as well, but I

16   think -- Or criminal matters.  I think we bring in, and we

17   have the conversation about the statutes, and then you can -

18   - you know, we make a determination from a gatekeeping

19   function, and I think whatever rights you have, I mean, you

20   have.  I'm not here to predetermine what they are.  I just

21   know that there's a provision out there that is really --

22   its really trying to just make sure that there's a court

23   that can enforce any discharge that is provided by this

24   Court, whether it's just regular 524(g) or a release, a

25   third-party release, someone agrees to it, that they're

1    subject to it.

2            So I don't think we're in rabid disagreement with

3    the position that you're taking.  I just think, and all I'm

4    saying is I think if I do confirm the plan, someone has to

5    come here, and the Debtor doesn't have to kind of start

6    chasing you, wherever you file something.  They can come to

7    this Court, and ask for a determination about that.  That's

8    what I think they can do.

9            MS. THERIOT:  I hear you.  I mean, I think, based

10   on what you're saying, it's possible you and I disagree

11   about this, which I think is very unfortunate for me, given

12   our relative positions.  But I do think --

13           THE COURT:  Wait, wait, so let me ask you this.

14   So you think the government -- If I confirm the plan, and

15   524 says what it says, do you think the government on any

16   matter can just file a lawsuit let's just say in D.C., and

17   the Debtor doesn't have the right to come here and say I

18   think it's subject to the discharge?

19           MS. THERIOT:  No, Your Honor, I'm talking

20   specifically now about criminal -- criminal acts.  And I do

21   not think, and with apologies to Your Honor, I do not think

22   that the Court can require United States prosecutors to come

23   to this court -- Under 1334, I don't think that this Court

24   can require United States prosecutors to come to this court

25   for a determination about the scope of the third-party

1    injunction and a bankruptcy plan before they can prosecute

2    cases.  So that is what I'm saying.  I don't think that the

3    carve-out can --

4            THE COURT:  I don't have any -- in other words, I

5    don't have any evidence, and no one has even mentioned the

6    word criminal in two weeks --

7            MS. THERIOT:  Right.

8            THE COURT:   -- and 70 -- well, 71 hours of trial

9    or something, no one's mentioned -- well, 65 or something,

10   you know, a bunch of trial.  But I don't know if you're

11   right or you're wrong, but I don't -- But in other words,

12   but I think one can have that conversation and still have

13   the gatekeeping injunction, you know?  I don't want to --

14   Maybe if I do confirm the plan, I think we can have a

15   conversation about what that looks like in a criminal

16   context, and I think we can have a conversation about it.

17   But I don't think -- What you filed the brief on were, like,

18   liens.  Right?  So I think I can do it on the liens.

19           MS. THERIOT:  Okay.  I appreciate it, Your Honor.

20   I do really appreciate your time.  I know it's been a busy

21   couple of weeks.  Unless Your Honor has any additional

22   questions for me, I would just refer you to our brief for

23   reference.

24           THE COURT:  No, no, and I'll take it all into

25   consideration.  Right?  I'm not making any calls today.  I'm

1    going to go back and I'm going to study the briefs, and I'm

2    going to go back and study the law, and I will, you know,

3    I'll reach a decision based upon my -- you know?  So I

4    appreciate the conversation.  It's been helpful.  Thank you.

5              MS. THERIOT:  Thank you, Your Honor.

6              THE COURT:  There's a gentleman from Canada.  Are

7    you on the line?  I think if we can do that, then we can

8    break for lunch.  The gentleman from Canada who said three

9    minutes, and I'm going to hold you to that.

10             Hold on a second.  If you can hit five-star, I

11   will unmute your line.  Just give me one moment.  This is on

12   my end, I'm just finding you.  Oh, there you are.  Even has

13   the Canadian flag on my end, too (indiscernible)

14             MR. ROXBOROUGH:  Hello, Justice.  My name is

15   Steven Roxborough, I am the junior lawyer with Mr. Merchant,

16   who you're referring to, who was here Tuesday.  He was

17   anticipating making his submissions after the lunch break,

18   if that's okay with you?

19             THE COURT:  Not a problem.  Not a problem.  Not a

20   problem, we can do it after lunch.

21             MR. ROXBOROUGH:  Perfect.  Yeah, he will be here

22   after lunch, and he will keep it brief then.

23             THE COURT:  You got it.  Thank you so much.  I

24   appreciate it.

25             MR. ROXBOROUGH:  Thank you.

1          THE COURT:  All right.  Why don't we break for

2    lunch?  In terms of -- Well, before we do, in terms of

3    timing, what I'm going to say is I'm going to hear from

4    everybody, and give everyone their time.  So if that means

5    that my courtroom deputy has got to go home, and we all stay

6    here, I'll keep the AC going, and we won't leave until we

7    hear from everyone.  It's not an invitation to intentionally

8    go long, and we can still talk about that, but I'm not --

9    I'm not jamming anyone on these important issues.  And if

10   you've got two-and-a-half-hours, and we've got to go past

11   6:00 or whatever, you know, we're just going to do it until

12   we finish today.  So we'll keep going.  Thank you.

13          COURTROOM:  Thank you, Your Honor.

14          THE COURT:  Oh, how long are we going to be?

15   That's a better question.  Do you think -- Can we start back

16   up at 1:15?

17          COURTROOM:  Yes.

18          THE COURT:  Okay.  let's do that.  Thank you.

19          (Brief recess.)

20          (Back on the record.)

21          THE COURT:  All right.  Good afternoon.  This is

22   Judge Lopez, I'm turning on my camera, and we are back on

23   the record in Red River.

24          Are my friends from Canada ready to speak?  If you

25   are, please hit five-star, and I will unmute your line.  If

1   you are on the line, please hit five-star, and I will unmute

2   your line.  If you are -- All right.  Where is my -- Mr.

3   Merchant?

4           MR. MERCHANT:  Yes.  Can you hear me, Judge?

5           THE COURT:  Just fine.  Good afternoon.

6           MR. MERCHANT:  Good afternoon.  Thank you for

7   receiving me.  I am a member of the Arizona State Bar since

8   1987, and three law societies in Canada, and in 1997 was

9   appointed to King's Counsel.  Merchant Law has been

10  appointed as class counsel by way of a certified class

11  proceeding that covers all of Canada.  The population of

12  Canada is 41 million, one-eighth of the population of the

13  United States.  By court appointment, we represent a huge

14  number of claimants.

15          At first blush, Judge, you might think that

16  Canadians who have claims would be indifferent to the

17  resolution of the claims in the United States.  The Canadian

18  claims, as a certified class action, are not a part of the

19  bankruptcy proceedings.  However, it will not reasonably be

20  possible to conclude, and potentially settle the Canadian

21  and international claims until the American claims are

22  concluded, and in the result, we support this proposed

23  settlement.

24          Opponents of a resolution can always come forward,

25  and say there is the potential for more.  The problem with

1    that is delay and uncertainty.  In my respectful submission,

2    Canadians and Americans will benefit by putting this behind

3    them.  This is a good conclusion.  We support the plan.

4    Thank you again for hearing me.  And I was well within my

5    three minutes.

6            THE COURT:  Thank you very much.  Thank you very

7    much for taking the time to participate in this proceeding.

8    Thank you very much.

9            MR. MERCHANT:  Thank you, Judge.

10           THE COURT:  Okay.  Mr. Gordon, good afternoon.

11           MR. GORDON:  Good afternoon, Your Honor.  Greg

12   Gordon, on behalf of the Debtor.

13           I thought maybe what I should do is address the

14   comments of the U.S. counsel right off the bat, if that's

15   okay?  Just to --

16           THE COURT:  Absolutely.

17           MR. GORDON:  Because that's the most recent issue

18   that was brought to the Court's attention.

19           And we fundamentally disagree in almost all

20   respects with the U.S.'s position here, and I certainly feel

21   like, based on what I heard today, that maybe we have to

22   spend more time with the counsel for the U.S., and we'll try

23   to talk these issues through and see if we can come up with

24   more common ground between us.  But you would ask us to come

25   up and say is this a Class 3 claim, a Class 4 claim?  I

1     think fundamentally, our position is there is no claim.

2     They don't have a claim.  Their claim only arises at the

3     time that if the plan is confirmed, the Trust is up and

4     running, and an amount is actually paid to the claimant,

5     then their claim arises at that time.  And it would have to

6     be addressed by the Trust at that time.  That's what the

7     plan contemplates, it's ultimately the responsibility of the

8     Trust.

9            Now, we have other arguments we've made in the

10    brief, you know, if it could possibly become a claim, what

11    would happen to it.  But fundamentally, from our

12    perspective, at this moment in time, there is no claim, and

13    there will not be a claim that arises until such time as a

14    settlement payment is received by a claimant under the plan.

15           THE COURT:  Got it.  Thank you.

16           MR. GORDON:  Thank you, Your Honor.  Your Honor, I

17    have a slide deck too, and it's going to look a little

18    different than Ms. Brown's slide deck.  It's going to

19    reflect, I think, the different personalities that we have.

20    So mine's going to be much brighter, and more vibrant, and

21    energetic than hers.  Just so you know.

22           THE COURT:  Here you go.

23           MR. GORDON:  And Your Honor, I do have a copy

24    (indiscernible) for the court.

25           THE COURT:  The would be great.  Thank you.

1          MR. GORDON:  May I approach?

2          THE COURT:  Yes, please.  Thank you.

3          MR. GORDON:  So Your Honor, what I'm going to try

4     to do is provide our perspective on all the legal issues

5     that relate to the factual story that you heard from Ms.

6     Brown, and you can see the order in which we're planning to

7     take them up.  You know, it seems to us that the

8     solicitation process is at the top of the pyramid here, but

9     I think it's important for me to provide our perspective on

10    this, which I don't think you've heard quite yet.  And I

11    will tell you now, some of this stuff I'll breeze through

12    fairly quickly, because Ms. Brown covered it.  But I know

13    Your Honor will do this anyway, but I would encourage you to

14    interrupt me at any time to ask questions, because I don't

15    want to be laboring on on issues that you feel you don't

16    need any further -- you don't need to hear any further from

17    us.

18         So just to cover some basics here, the

19    solicitation process basically contemplated that the

20    solicitation agent could accept a certified vote in three

21    different ways.  It could come in by a direct ballot, it

22    could come in through informed consent from counsel for the

23    plaintiff pursuant to Option A, or it could come through a

24    power of attorney, again through counsel, under Option B.

25    And where we start in thinking through the law, and Your

1    Honor made a lot of good comments about this yesterday, and

2    it sounds like you've really taken a deep dive into this,

3    but where we start is with the idea that a certification in

4    a ballot is presumptively valid.  And I think you heard Ms.

5    Kjontvedt pretty much say the same thing, as she examined

6    the ballots as well.

7            And I think the cases are fairly uniform on this,

8    and it's particularly, I think, appropriate to take the

9    position they're presumptively valid in a situation where

10   there was a certification under penalty of perjury, as there

11   was here, in both Option A and Option B.  And I'm not really

12   going to spend any time on this.  Your Honor is well

13   familiar with the Option A certification, well familiar with

14   the Option B certification.

15           Although let me pause.

16           So one of the things, Your Honor, that occurred to

17   me over the last few days, and this is to try to give you

18   our perspective on this Option B process, and I wanted to do

19   this because I think issues have been raised that suggest

20   that we have to look very carefully at the language, and

21   with precision determine what was intended and the like, and

22   do kind of like a contract interpretation process.  But if

23   you step back and think about it, or as I think about it,

24   these were our procedures.  These were the Debtors

25   procedures, and our intent, and I'm going to show you a

1    couple things, was that when we talked about a power of

2    attorney under Option B, we were talking about a lowercase

3    power of attorney.

4            That's the way we understood it, and I think it's

5    important to think about this in the context of the case.

6    We have not taken the position with any party, either

7    parties, accepting or rejecting the plan, that we would not

8    accept a ballot on the basis that counsel did not submit a

9    durable or special Power of Attorney.  We've never taken

10   that position.  We've never taken the position that we can

11   disenfranchise claimants on the basis that they did not have

12   a durable Power of Attorney, or an uppercase Power of

13   Attorney.

14           And as I thought about it, the issue is only

15   coming up because The Coalition is trying to use our

16   procedures against us, and against claimants, to say that

17   based on the way you wrote your procedures, you had no right

18   to accept these ballots.  You should not have allowed

19   ballots to come in under Option B without a power of

20   attorney.  That's never been our position,  we've never

21   taken that position with anyone else.  And so to me, it's

22   just sort of important to understand our perspective on

23   that.  That's just never been our perspective, that that

24   would be required.  We could clearly --

25           And I heard Your Honor yesterday say you'd viewed

1    ballots in many cases, and you're going to see that, you

2    know, we drew on some of the forms of ballot in putting this

3    ballot together.  But at the end of the day, you can do all

4    of that, but I think what matters is what did we intend, and

5    how have we used -- you know, how did the process run, and

6    you know, how did we apply the requirements under Option B?

7    And the evidence from my perspective is clear, we never used

8    it to say you don't have a proper Power of Attorney, and

9    therefore we're rejecting your votes.  Smith and Beasley

10   Allen is a totally different situation, which I'll cover.

11   But as an overall matter, I just wanted to provide Your

12   Honor with that perspective.

13          So coming back to Option A, and again, I'm not

14   going to spend much time on this, there's many places we

15   think in the ballot that made clear that something was

16   required, that was much more than silence.  We didn't view

17   this as permitting negative notice.  You had to provide

18   evidence, you had to collect and record, and that sort of

19   thing.  And this slide again, just sort of laying out other

20   aspects of the documents, or really the master ballot, with

21   a similar concept.  Again, I'm going to go over this very

22   quickly because Ms. Brown covered it.  I think we know what

23   the ethical rules are that relate to informed consent, and

24   to me, they're very clear that consent by silence is not

25   informed consent.

1              THE COURT:  Can I just get this out here?  I think

2    Robert Shaw is different than all of these cases, than the

3    case that we have now.  I do.  I think -- and I'll let

4    people argue differently.  But to me, there's a difference

5    when I send a ballot, in my mind, to -- I'm making up a

6    name, Jane Doe.  Jane Doe votes on the plan, doesn't check

7    the box that says if you opt out of this, if you check this

8    box, you don't have to pay attention to it.  You don't even

9    have to understand it, you can just check this box, and

10   you're not subject to these releases, and Jane Doe sends

11   that ballot back directly.  I see a difference between that.

12   That's Robert Shaw.

13             MR. GORDON:  Yeah.

14             THE COURT:  Right?  That's opt out.  That's the

15   whole opt out/opt in debate.  That's a whole different

16   (indiscernible)

17             MR. GORDON:  Right.

18             THE COURT:  I think that's different than someone

19   under an Option B saying, I really don't even have to talk

20   to you, I'm going to vote this way for you, and this is what

21   you're going to be bound by.  You know, the concept of

22   informed consent coming directly from the individual is one

23   concept to me on a direct ballot, as opposed to an Option B,

24   where someone may have voted and just said, I don't -- you

25   know, I already have the power to do so, so therefore, I

1    don't need to directly hear from the Creditor.  Right?  I

2    just view them differently in the context of the concept of

3    informed consent.

4          So I don't think Robert Shaw -- People can

5    certainly, if this was a different case, and people can

6    argue, opt out, opt in, and you know, the regular stuff that

7    goes on that we deal with, that we talk about all the time

8    in these courts, and Diamond Sports and other cases, that's

9    a different deal than, to me, than an authorized rep saying

10   it.

11         MR. GORDON:  Right.  (indiscernible)

12         THE COURT:  So anyway, I'm not saying anybody

13   agrees or disagrees with it, but I know Robert Shaw has been

14   mentioned in briefing.

15         MR. GORDON:  Yeah.

16         THE COURT:  I don't think Robert Shaw applies.

17   But I'm going to let someone tell me otherwise.  And to me,

18   I think Option A uses the words "record," "collect,"

19   "indicate," right?  The word "indicate," by indicating,

20   right, which is an active transitive verb, you know, you get

21   real words there, and to me, then you have to get into the

22   difference between A and B conceptually.  But I'm going to

23   let people argue otherwise, to say --

24         MR. GORDON:  Right.

25         THE COURT:  You know, because theoretically, if I

```
 1    sent out an email and said, if I don't hear from you in X
 2    number of days, then I'm going to vote your way, right, if I
 3    had kind of a general power of attorney, then I can probably
 4    vote A or B.  Like, there's no difference.  I can choose,
 5    because I theoretically have them conceptually.  If A and B
 6    -- if A means I can just vote without kind of hearing from
 7    the person, then I can probably do A or B, and either one
 8    would work, and there has to be a difference between A and B
 9    conceptually in my mind.
10              MR. GORDON:  Yeah.
11              THE COURT:  And I know that there are arguments to
12    say B, well, B has got to mean a piece of paper, right?
13    You've got to hear from them, and that means a piece of
14    paper, and people can argue it.  What I'm just making is, in
15    my mind, the distinction between a case that I had where we
16    didn't have the concept of authorized reps and lawyers
17    voting for people.  We were hearing directly from the
18    claimants.  And we're not talking about direct ballot fights
19    here, we're talking about kind of master ballots.  And I
20    just view them conceptually different, and if somebody wants
21    to disagree with it, now's the time to kind of air it out.
22    But I view Robert Shaw as kind of different.  But I know
23    people are going to cite it, because I wrote it.
24              MR. GORDON:  Sure.
25              THE COURT:  So I git it.  I get the concept.
```

```
 1              MR. GORDON:  Right.

 2              THE COURT:  So anyway, that's my --

 3              MR. GORDON:  No, I appreciate that.

 4              THE COURT:  It has nothing to do with what you're

 5    talking about, but I just, I throw it out there just as I --

 6    That's all.

 7              MR. GORDON:  No, it is relevant to what I was

 8    talking about, and you're going to see in a minute, it's the

 9    way we viewed Option B.  Look, you have the authority --

10    From our perspective, it's a question of whether you have

11    the authority.  We're asking you to certify to that under

12    penalty of perjury, and if that's what you did, that's a

13    presumptively valid vote.  That's the way we treated it.

14    Option A, we had a different point of view, as Your Honor

15    knows, which is it said informed consent.  It said collect

16    and record.  And that's why, as you heard when the Beasley

17    Allen vote came in, that's why people were asking questions,

18    how could this have happened?  How could he have Option A

19    votes?  How does he even have that many votes?  Because we

20    had understood he had about half that number.  And that's

21    why, you know, there was such focus on the Beasley Allen

22    vote right out of the box.

23              THE COURT:  (indiscernible)

24              MR. GORDON:  And of course, again, I think we've

25    covered this.  You know, he used he used the phrase that,
```

1    you know, "I collected silence," and that seems to us

2    completely contrary to what the model rule would say.

3           Okay.  So a little more on the Option B.  And

4    again, I won't spend a lot on this, but you know, we used

5    models for the ballot, and one of them was Boy Scouts, a

6    recent case.  And if you look at the ballot in Boy Scouts,

7    it's very similar, and so I'll come back to that in a

8    second.  But we thought what we were doing, because we've

9    done this before, was consistent with the way balloting

10   works in mass tort cases, where you expect the lawyers to do

11   master ballots.

12          THE COURT:  It was a little different in Imerys,

13   wasn't it, though?  I mean, I think Mr. Bevis had a

14   different -- had a different experience in front of Judge

15   Silverstein on (indiscernible)

16          MR. GORDON:  It was done -- yeah, it was Judge

17   Silverstein, and it was done somewhat difference --

18   different in that case.  I wasn't involved in that case, I'm

19   familiar with it, I hadn't seen it done that way before.

20   And again, from a legal perspective, we started at rule

21   3018(c,) which only requires that the ballot be signed by a

22   creditor or an authorized agent.  There's no law that we're

23   aware of that requires there to be an uppercase Power of

24   Attorney with respect to a ballot.

25          THE COURT:  Yeah, the issue for me with B, and I'm

1    just going to put it out there, is the code -- It's what I'm

2    thinking about, the Bankruptcy Code requires solicitation to

3    the person, the creditor, right?  The creditor's got to get

4    the document, and the credit -- and the 1125 says you've got

5    to provide adequate information to allow that creditor to

6    make an informed decision whether to vote or not to vote.

7    Right?

8            MR. GORDON:  Right.

9            THE COURT:  The concern, and you can hear the

10   tension in kind of the -- in what Judge Silverstein was

11   saying, you know, so we're going to send a document.  In the

12   code, Congress says you've got to send it to them, but then

13   someone doesn't actually have to hear from them, they can

14   just vote the way they want.  Right?  And so it creates this

15   kind of conceptual issue.  And so the concept of the power

16   of attorney kind of says, well, you've given me the right to

17   go do this, but at the same time, I got it, there's this

18   tension -- you know, it's going to create a real problem if

19   Debtors all of a sudden, you know, have to delay a vote in a

20   20,000 person case, you know, to now start to start going

21   and asking everyone to then start -- let me do this analysis

22   before -- You would have a real tenuous solicitation

23   process.  But there's this tension between the creditor

24   voting, and someone voting for the creditor, and so that's

25   why --

1           I don't think Evans gives me what I'm looking for,

2      by the way.  I think Evans -- not the information, the

3      breakdown that I'm looking for.  And master ballot says

4      Evans voted, I'm making up -- Nacahwati voted, I'm making up

5      a number, 5,000 votes, 2,500 were A, 2,500 were B, Alstock

6      voted, 3,000, 1,500 A, 1,500 B -- I couldn't find it, if

7      that's what -- But that's what I'm kind of after, just

8      because I've got motions to flip, and I've got to make sure

9      that someone isn't wanting to do a B to an A or an A to a B,

10     and at least I just got to think about that so that I

11     understand it.  The party's can think about whether I should

12     get it or not, or any of that nature.  But that's what I had

13     in mind.  But keep --

14           MR. GORDON:  (indiscernible)

15           THE COURT:  It's this tension.  I agree with you,

16     the Debtor was never required to do it.  It's a master

17     ballot.  Right?  It is different, but -- It's that tension

18     that I am focused on here.

19           The concern that I have, and I know the Debtor

20     shares it, and I know everyone shares it, right, is you

21     know, is the actual voice of the person with the creditor

22     who has a claim, which is, you know, a contingent right to

23     payment, right, and contingent, unliquidated are all these

24     folks, right to payment, have we heard what they want?

25     That's the tension that's in A.  And so, you know, either

1   I've got to hear from you, or you've got to tell me,

2   somebody's got to tell me that they had the right to go do

3   it.  And I got it, I'm going to have to kind of go through

4   each one, each power of attorney, and determine.  I think

5   Onder is a little different than the others.  And I know

6   they may work, they may not work.  But that's the tension

7   that I'm thinking about, am I hearing who Congress said I

8   need to hear, the code says you've got to hear from?

9           And I know you know this, and I'm talking way too

10  much now, but the voice of the creditor is so important that

11  it -- right?  It is Debtors propose -- I know you know this,

12  I'm just saying this out loud because I know people are

13  listening.  Debtors propose plans, but it's the creditor

14  vote that binds the plan.  It is what makes it go.  And if

15  you had an impaired unaccepting class, it is an impaired

16  accepting class that can then, right, cram the plan down on

17  them, and so hearing the voice of those people is incredibly

18  important.

19          But I don't think (indiscernible) I don't think

20  you have to convince me that Watts thought what he was doing

21  was right (indiscernible) you know, that --

22          These folks who testified, I think they thought

23  what they did, Andrews, I think they thought what they were

24  doing was right.  I didn't -- and somebody can point it out

25  to me, I haven't seen any evidence in the record of -- you

```
1    know?  And I'm talking about the AAC members here.  And I
2    got it, I'm putting Smith and Beasley Allen in a different
3    bucket, because I know those are going to hotly contest it.
4    But I'm talking about your Watts, your Andrews, Pulaski.  I
5    didn't see anything in the record where someone showed me
6    that there was ill intent in how they voted.  Some of them
7    were put in tight spots.  Some of them were -- you know,
8    Watts was in a really tricky situation where he's, you know,
9    I've got 16,000 folks, and you know, what do I do now, kind
10   of a situation.  And I am sympathetic to that, and I don't
11   think a lawyer trying to protect their client's interest,
12   whether you could do it or not is one thing, but whether you
13   had ill intent in exercising what you thought was your duty,
14   I think the code gives me the right to just say, well, I'm
15   just not going to -- I think the code gives me rights to do
16   certain things.  But I don't see anything that they did that
17   was wrong, so you don't have to convince me on that.
18             MR. GORDON:  Yeah.
19             THE COURT:  I'll let someone try to convince me
20   that -- you know.  And again, I'll put Smith and Beasley
21   Allen in another bracket, not because I think they did
22   anything wrong, but I know that there's going to be a fight
23   between those two, and I'll let the parties go at it on
24   that.
25             But anyway, I'll stay quiet.
```

1          MR. GORDON:  I appreciate those comments.  And I

2    would just say, Your Honor, in terms of the tension that

3    you're identifying, I think there's a lot of evidence in the

4    record to get you pretty comfortable on that, because there

5    is a ton of notice in this case.  There was a lot of

6    evidence about what these law firms did to communicate with

7    their clients, and it's clear from the record that the large

8    majority of these women were represented by firms, and

9    they've been represented by these firms in many cases for a

10   number of years.  And so I would think as you look at this

11   and start to think about it, that you would draw some

12   comfort from that, and the fact that no one came in after

13   the fact and said, you voted my claim in a way I didn't

14   want.

15          As I understand it, because I've been doing this

16   mass tort work for a long time, these claimants, in almost

17   every case, they do what their lawyer recommends.  That's

18   why they've hired the lawyer, they have the relationship

19   with the lawyer.  And you're hearing from these lawyers, and

20   you know, they're representing the best interests of these

21   clients I think as best as they can.  But there's a lot of

22   evidence in the record, of course the evidence on the

23   noticing and everything else, I think, to give you comfort

24   that although you're right, I want to make sure the voice of

25   the claimants has been heard, that there's a lot of evidence

1    that suggests that it has, even though the votes came in

2    through a master ballot.

3             And I would just say too, you know, it's

4    unfortunate about where we are on the Option B.  You know,

5    if you were to adopt the Beasley Allen position

6    fundamentally, it would disenfranchise a whole lot of people

7    because now you're saying after the fact that the voting

8    couldn't have been done the way it was.  And you know, from

9    our perspective, that should never happen.  We've been

10   trying for years, as Your Honor knows, through these

11   bankruptcies to actually get to a vote, to allow the women's

12   voices to be heard.  We couldn't get there in LTL I, we got

13   closer in LTL II.  We wanted the opportunity, we couldn't

14   get there.  And so the third time we decided, well, there's

15   only one way to ensure we can do it, which is to do the

16   solicitation before we go in.  And you know, that's been our

17   focus since 2021, I would say.

18            I think we've covered this -- well, let me go

19   back, if I can go back.  This is just the Boy Scouts

20   language.  It's very similar.  It sounds like Your Honor

21   looked at this already, but it's very similar to the

22   language in ours.

23            THE COURT:  And just so you know, I know I said I

24   looked at a lot of master ballots, but before I made the

25   decision about excluding (indiscernible) the two experts on

1    voting -- And I wanted to get comfortable that this was --

2    that what we were really talking about were bankruptcy

3    master ballots.  And I know people can take different

4    positions as to whether I should have allowed it or not, so

5    I just went out and got myself comfortable that whether in a

6    mass tort context, or if we were just dealing with

7    traditional master ballots where you've got, you know,

8    someone held in street name only, and you've got to try to

9    go back under and send it to -- that really, what we were

10   talking about were bankruptcy issues that I felt comfortable

11   that I could decide, without thinking about this through a

12   different lens.  That to me, this was a bankruptcy master

13   ballot that is used -- And obviously, mass torts make you

14   think differently about them.  But when I told you I

15   reviewed, it wasn't because -- It was just to get

16   comfortable that I wasn't -- that I was  thinking about this

17   the right way, before I told two really important people

18   that they didn't need to come to Houston.

19              MR. GORDON:  Right.  Understood.

20              THE COURT:  Anyway --

21              MR. GORDON:  And I should go back for a second.

22   You know, on the thought that you should derive a lot of

23   comfort as to the way things went down, I think you can also

24   derive that from the voting results, which as you know

25   showed the direct ballots voting heavily in favor of the

 1    plan, and if you take the direct ballots, plus the Option As

 2    that had the evidence of informed consent very heavily in

 3    support as well.  And that's in a context where there was a

 4    lot of negative press out there, and website statements and

 5    the like telling people they should never, ever do a deal

 6    with J&J.  So from my perspective, there's a lot of reasons

 7    to feel comfortable that the right people actually had the

 8    opportunity, and their voices have been heard in connection

 9    with the vote.

10         So what's interesting in Boy Scouts, I just want

11    to come back to this, is the fact that in that case, a

12    condition to submitting a vote was that the firms that had

13    many clients filed 2019 statements.  And those are available

14    on the docket, and we were able to take a look at those from

15    the docket, and you can see that 16 of the 17 ones that we

16    could find, the firm who voted under Option B had no power

17    of attorney.  So for what that's worth.

18         THE COURT:  Mm-hmm.

19         MR. GORDON:  And we also, we know that Beasley

20    Allen voted claims in that case, and here is an excerpt from

21    a Beasley Allen retention agreement from that case.  And

22    again, this would have been attached to their 2019

23    statement.  So you can see in this case, they didn't have a

24    capital P, capital A Power of Attorney.

25         I put this slide up only to reinforce what I said

1    before.  I didn't want you to have to take my word for it

2    that, you know, we were always thinking about this as a

3    lower P, lower A power of attorney, because this came into

4    the record through cross-examination of Ms. Kjontvedt, and

5    you can see the reaction from Mr. Merritt, "No, there's no

6    such form as you indicate."  I think it reinforces what I'm

7    saying.

8              And then, of course, we had the testimony from Mr.

9    Smith, who talked about it, that he wasn't thinking of it in

10   terms of a capital P, capital A.  Very similar from Mr.

11   Watts as well, what he said about Option B.  And more from

12   Mr. Watts, he used the capital P, capital A reference as

13   well.  In fact, he even referred to 910(c.)  It sounded like

14   he had done some research.

15             THE COURT:  Yeah (indiscernible)

16             MR. GORDON:  I asked him if he wanted to be a

17   bankruptcy lawyer, but he just looked at me kind of funny,

18   and walked away.  And then similar with Anne Andrews as

19   well.

20             So it seemed like, other than with respect to, you

21   know, Beasley Allen and perhaps the Golomb Firm, we were

22   kind of in sync on this with the Plaintiffs' bar.  This is

23   the way they've done it in other cases.  We had in mind what

24   we were thinking, it seemed to be consistent with the way

25   they were responding as well.  And Mr. Pulaski, also

1    similar.

2            I want to go fast, because I want to be respectful

3    of people's time, but again please stop me.

4            Again this is just the rule itself, which I

5    touched on before, the authorized agent language.  The 2019

6    language I thought was interesting is a bit of an analog.

7    It just refers to authorization.  And then, this is a point.

8    We put this in because you raised it specifically when

9    witnesses were on the stand, you know, the question of why

10   is it -- and you raised it this morning, why is this not a

11   settlement?  And so I did want you to see what Judge

12   Silverstein had to say about this.  I think it's similar to

13   what you heard from some of the witnesses in the case.  She

14   concluded a plan is not a settlement, it establishes a

15   process.

16           And you know, Your Honor, as I thought about it,

17   there's a whole string of events that have to occur, if you

18   think about it, before a claimant's actually in a position

19   to receive a settlement award from the Trust.  You have to

20   vote.  Then the question is, is the plan accepted or

21   rejected?  If it's accepted, is the plan confirmed or not

22   confirmed?  You submit a claim, there's a resolution process

23   that's complicated, with different tiers, you know, quick

24   pay, individual review, extraordinary review, and then

25   there's like, dispute resolution, there's the opt out, it's

 1    all sorts of things.  So it's really just kind of the first

 2    step in the process.

 3            And I'm not a tort lawyer, others can say, but I

 4    think it works the same way with MSAs, and the master

 5    settlement agreements in the tort system.  I don't think the

 6    firms view those as settlements either, until the point in

 7    time when it comes time to actually deal with an individual

 8    claimant's claim, and that individual is being asked to get

 9    a release.  And here, there's no release until you get to

10    the last stage of the process, no effective release until

11    you actually have money.

12            And here are some of the snippets of testimonies

13    that Allen Smith had to say.  It was a settlement structure,

14    that's the way he looked at it, not an individual

15    settlement.  Mr. Pulaski said the same thing, although you

16    caught him on it, the language in his email wasn't as clear

17    as it could have been, I think he used the phrase

18    "settlement."

19            Okay.  So this, actually, I think I'm just going

20    to breeze through this, unless you want to hear -- You said

21    yesterday what your position was on that.

22            THE COURT:  Yeah, you can grant extensions.  I'm

23    not -- that's good.

24            MR. GORDON:  Okay.  And then of course the 4(b,)

25    (c,) and (d,) and we obviously heard what you said about

```
 1    4(d.)  Well, I think you said yesterday, if I heard you
 2    correctly, you thought we were misreading all of these.
 3              THE COURT:  No, I thought you were misreading C.
 4              MR. GORDON:  Okay.
 5              THE COURT:  Because it was the testimony that
 6    somehow, C was about two competing master ballots, and I
 7    read C as a holder who submits a properly (indiscernible)
 8    ballot.  I think to me, I think that's where, when I read B
 9    and C, I think the way I was reading this was if they hold
10    it -- When people were using C, and I think Merritt used C
11    when he wrote Kjontvedt --
12              MR. GORDON:  Yeah, he actually used B.  Kjontvedt
13    said she was using C.
14              THE COURT:  Oh.  That was the disconnect that I
15    had.  That's all I needed.
16              MR. GORDON:  Yeah.
17              THE COURT:  That's where I got it.  That's where I
18    -- I knew it was -- That makes sense to me.
19              MR. GORDON:  Yeah.  and I think from our
20    perspective, or at least from my perspective, both C and D
21    seem to apply.  I think B, you can make an argument it may
22    be harder.  C, I guess the issue would be if you have a
23    concern about that, it doesn't refer to an authorized
24    representative.
25              THE COURT:  That's where I was going.  And that's
```

1   why I thought C didn't apply to the situation that one was

2   talking about between Smith and Beasley Allen, because that,

3   to me, seemed to think about an individual holder, that

4   they're dealing with that, whether they could withdraw or do

5   something there.

6           MR. GORDON:  Right.  But the master ballot is on

7   behalf of the individual holder.  So to me, that's why I

8   interpreted that it could apply.  But if authorized

9   representative is the issue, then I think you have 4(d,) and

10  that would seem to clearly address that (indiscernible)

11          THE COURT:  How do you deal with the argument from

12  the same?  How do I interpret the word "same?"  I know what

13  the argument is going to be, is that they're not the same.

14          MR. GORDON:  Based on the fact that they were

15  members of a joint venture, they were co-counsel.

16          THE COURT:  So same in that concept, the --

17          MR. GORDON:  Right.  So different firms, but they

18  both were authorized to submit votes on behalf of their

19  clients.  And what this basically says, if you get two like

20  this, it's the last executed otherwise valid ballot that

21  counts.

22          THE COURT:  What happens if I just got a motion to

23  change votes, what do I do if Beasley Allen submits one

24  today?

25          MR. GORDON:  You reject it, of course.

1   (indiscernible) Well, I mean at this point now, we're well

2   past the deadline, and like --

3             THE COURT:  What do I do with the one that's on

4   file now?

5             MR. GORDON:  The ones that are on file?

6             THE COURT:  I think I just got one yesterday.

7             MR. GORDON:  Well, actually I'm going to cover

8   that in the slide deck.

9             THE COURT:  Ah.

10            MR. GORDON:  But that can only be done with Your

11  Honor's approval, and I'm going to lay out for you, I think

12  there's a couple of reasons in each case why you should do

13  that.

14            THE COURT:  Okay.

15            MR. GORDON:  And you know, I assume Beasley Allen

16  could file something, and ask for Your Honor's

17  (indiscernible)

18            THE COURT:  Yeah, but that's not an encouragement.

19  I'm just trying to deal with the authorized representatives.

20  The record is closed.  I'm not going to --

21            MR. GORDON:  Okay.  I'm not going to fight you on

22  that.

23            And then you referenced, I think, 4(g) yesterday,

24  and this, to us, doesn't exactly apply.  But what's

25  important about this one, I think, is if you thought it did

1   apply, it seems to me at the end of the day, you're just

2   going to end up canceling out the votes.

3          THE COURT:  The question I had was whether in this

4   context -- There was a question of dupes that come up, and

5   the process that was run for the dupes.  I just thought this

6   would have applied in those situations where some have

7   appeared, and I think Evans showed me that there were some

8   instances where, like, they were on three or four different

9   names.  I thought it was Epiq's role to then, I think under

10  this, to exercise some reasonable effort to try to go figure

11  out what that was, and I was trying to just hear from the

12  witness kind of what you do in these cases, what did you do

13  in these instances?  And that's where I was going.

14         But I got it.  If they're not consistent, then

15  none, but if the discrepancy could be cured, I suspect, you

16  know, normally, normal voting stuff, you try to go figure

17  that stuff out, and try to get clarity.

18         MR. GORDON:  Well, I know that, and again, I think

19  I can give you some comfort on that.  I know that Epiq did a

20  deduplication process when it did the vote counting, and

21  Bates White did their own analysis of the data, and you saw

22  that they came up with the same result when they also did

23  it.

24         THE COURT:  Mm-hmm.  That's where I was going.  I

25  was just trying to make sure that I understood.

1              MR. GORDON:  Okay.  But that's, you know, that's

2    where you would end up here, if you thought this applied.

3    Presumably, the votes that actually were actual direct

4    votes, you would leave those in, and otherwise you just say

5    the two law firms are hopelessly conflicted, just cancel out

6    the rest.  We're not advocating for that --

7              THE COURT:  No, I got it.

8              MR. GORDON:   -- because I appreciate Your Honors'

9    comments yesterday, you don't really want to disenfranchise

10   anyone, and we feel the same way, again other than this

11   Beasley-Smith issue, which is the same individuals, but a

12   matter of how you count.

13             Okay.  So these are a few slides on the pending

14   motions that you have in front of you.  The first is Mr.

15   Onders' motion, asking you to permit him to vote an

16   additional 5,600 votes.  From our perspective, there's two

17   reasons, or two bases for you to grant the motion.  One is

18   that under 3D, we have -- the Debtor has the ability to

19   extend the deadline for individual ballots, or specific

20   ballots.  You know, we're willing to do that, subject to

21   Your Honor's approval.  And the other thing is we think it

22   could be done under standards of excusable neglect, if you

23   just take the position we can't extend the deadline.

24             THE COURT:  (indiscernible) argument, yeah

25   (indiscernible)

```
 1              MR. GORDON:  Right.  And you heard his testimony
 2    about it, and what happened, and it seems to me he meets the
 3    standards for excusable neglect.
 4              And then you have the two motions that were filed
 5    to change votes.  This is Morelli, and the Summers & Johnson
 6    firm.  And you know, this is kind of similar again from our
 7    perspective, that we have the ability to extend the
 8    deadline, if Your Honor is willing to allow us to do that.
 9    Or you can rule under Rule 3018(a)(3,) that's after notice
10    in a hearing and for cause, you can permit that to happen.
11    We think it's pretty routine to allow parties to change
12    votes, particularly in an environment where the goal of
13    Chapter 11 is consensus.  And as you know, the plan has
14    changed materially for the better for the claimants over the
15    course of the case, and as a result, these law firms want to
16    change their votes, and vote in favor of the plan.  And so
17    we think for many reasons, that authority should be given
18    under Rule 3018.
19              I'm not going to spend a lot of time on these.
20    But we went back over the last couple days to kind of reset
21    ourselves, because obviously we're well down the road, and
22    there were a lot of motions that were filed, but you may
23    recall there were two motions in particular filed by The
24    Coalition.  One was a motion to basically designate all
25    these acceptances, and the other was to reinstate the
```

1    Beasley Allen motion.  And what struck me, when I went back

2    and looked at the allegations, the primary allegations

3    underpinning these motions, they've all been disproved in

4    the hearing.

5         And so you see things like, they said most of the

6    support for the plan comes from holders of non-compensable

7    talc claims.  Those are the gynecological claims.  We know

8    now that that's not true.  We know the voting rates were

9    about the same.  The sort of flood the ballot box, that

10   point was made.  The argument was made it's bad faith for a

11   holder of a non-compensable claim to appear in a bankruptcy

12   case, and of course, we've learned that The Coalition firms

13   submitted more of these types of claims than anyone.  So if

14   you go back and kind of reset, you can see that the things

15   they were saying had occurred, they have not been able to

16   prove, and the record belies those assertions.

17        And this is a similar situation with The

18   Coalition's motion to reinstate.  Here, there were

19   accusations against the Smith firm, statements that

20   basically, J&J bought off the Smith firm through that $650

21   million common benefit fund.  As you know now from the

22   evidence, that was never the case.  In the Smith MOU, the

23   allocation of that fund was to be determined by an

24   independent, a retired judge, Glenn Norton.  They said in

25   that pleading that the common benefit tax never applies to

1   the fees -- or I'm sorry, to the recoveries of claimants.

2   We know now that's not true from the testimony as well, and

3   you can just kind of go down the allegations that were made

4   in these motions.

5           On the question of good faith, we obviously have

6   the Little Creek case, which Your Honor is much more

7   familiar with than I am, although unfortunately, I was

8   around when that case came out.

9           THE COURT:  Didn't want to say that.

10          MR. GORDON:  And Your Honor obviously knows what

11  that case says, as well as anybody.  I did want to remind

12  Your Honor, though, it's kind of interesting, because we've

13  been arguing these issues in different courts around the

14  country, and you're a textualist, and it's always been

15  interesting to me, there's no support in the Bankruptcy Code

16  to even do this.  And the only reason I point it out is not

17  to say that you should ignore Fifth Circuit authority,

18  obviously, but it's to say that it seems to us, because this

19  is a judicial gloss on a statute where this concept isn't

20  there, that it really should be applied narrowly.  So that

21  was the reason I put it in there.  And Little Creek,

22  obviously, it sort of tells you generally what to look for,

23  but it doesn't give a whole lot more guidance than that.  So

24  just something we wanted to point out to Your Honor.

25          THE COURT:  And the only purpose, I think --

1    Obviously, I have to take Little Creek seriously.

2          MR. GORDON:  Sure.

3          THE COURT:  I know that there's always been a way

4    to dismiss -- or not make light of Little Creek because it

5    dealt with a single asset real estate case.  But I think the

6    emanating principles are what I am bound to take seriously,

7    and apply the law to the facts.  So the factors that maybe

8    that Judge Jones, when she was writing it, was considering

9    in the context of a single asset real estate case, you know,

10   may not apply in every case, but the totality of the

11   circumstances, and kind of what to look for, and you know,

12   the on the spot evaluation of the Debtor, I think I have to

13   take that into consideration as that's the oath that I took,

14   and I'm duty-bound to follow it.  So I understand the point.

15         MR. GORDON:  Yeah.  Again, just for some context.

16         So again, because we've been arguing this in

17   various cases, I think for the most part, courts have

18   recognized that going into bankruptcy for the purpose of

19   resolving asbestos liability is a valid purpose.  We've seen

20   that in a number of cases.  And in this case, I would think

21   honestly, it's not really a close call.  And I say that

22   because this is a pre-packaged case, so we handled this case

23   differently.

24         THE COURT:  How did you find out about that?  I

25   didn't know if people read transcripts or not.  You got

```
 1    Interim in there.  That's impressive.  I couldn't remember
 2    the case myself when I said it, but that's where I got it
 3    from.  But go ahead.
 4         MR. GORDON:  Well, I hope the quote is accurate
 5    (indiscernible)
 6         THE COURT:  The quote is accurate.
 7         MR. GORDON:  [03:30:07.711] So we went in, you
 8    know, we did the process, we had the support of, I don't
 9    know, you know, 16, 17 or more law firms, with tens of
10    thousands of claimants.  You know, the vote confirmed the
11    support we thought we had.  And you mentioned yesterday, you
12    should be looking at the post-petition period as well, which
13    we totally agree with, is there anything we've done post
14    petition that would suggest bad faith?  And I would say to
15    Your Honor, because you've sat through many hearings, you've
16    seen the progress we've made, there's no indication of that.
17    If anything, it's the opposite.  This Debtor and J&J have
18    continued to negotiate with people, they've continue to
19    improve the terms the plan to build consensus.  We're
20    very disappointed we don't have full consensus.  We tried
21    really hard to get to that point, we just haven't been able
22    to do it.
23         But you've seen, through the motions that we just
24    discussed and otherwise, you know, the support from Mr.
25    Hansen, and the TCC, that support has continued to grow.
```

```
1    I'm going to come back, the plan pays in full, and we think

2    there's huge benefits for the claimants.  You know, we

3    recognize the hardships they suffer from, but you know, the

4    alternative from our perspective for a claimant is pretty

5    bleak.  It's bleak for us, but it's bleak for the claimants,

6    in our view, as well.

7         We don't believe that this concept of imminent

8    financial distress is required, nor should it be adopted.

9    And I would say anyway, Your Honor, that there is evidence,

10   and plenty of evidence on this record that there is

11   financial distress here, if Your Honor did think that was

12   something that had to be addressed.  And The Coalition

13   itself, you know, on the one hand they say you're not

14   financially distressed, but on the other hand they throw out

15   these gigantic numbers of the liability, and you've heard it

16   from Mr. Birchfield multiple times this trust isn't big

17   enough, it doesn't pay people enough.  From my perspective,

18   there's no question about that.

19        And you know, we kind of took you back a little

20   bit in the hearing to the situation before the first LTL

21   bankruptcy filing, what old JJCI was facing in the tort

22   system, and the costs, as you can see, were monumental.  And

23   again, this sort of inconsistency, financial distress, not

24   in financial distress, you can see what they said in their

25   estimation motion, the women are only going to get
```

1    recoveries of pennies on the dollar.  The plan won't come

2    close to satisfying in full these claims.

3            THE COURT:  What's your response to the statement

4    that the Debtor manufactured -- or that Johnson & Johnson

5    essentially manufactured the financial distress by entering

6    into a new but lower funding agreement?  What's the response

7    to that?

8            MR. GORDON:  I have a lot of responses to that.

9            THE COURT:  If it's in the deck, I know it's

10   coming.  I just know that that's an argument and I'd rather

11   ask you now than kind of bring it back up, and all that

12   stuff.

13           MR. GORDON:  Well, it's coming up in two slides.

14   I'm happy to take it on now.

15           THE COURT:  No, no, no, no, no.  We can take it

16   up.

17           And the other question is, the disclosure

18   statement said the parties weren't going to start the case

19   until there were 75%.  Right?  And so that's going to be the

20   argument, right, whether Smith kind of got thrown in there

21   to get you over the 75% so that you could start the case.

22   Those are the two kind of arguments that I know that are

23   coming your way, and I just want to make sure that

24   (indiscernible)

25           MR. GORDON:  Yeah.  And I'm not even sure why that

1   argument is relevant anymore based on where we are now, but

2   I'll be happy to tackle that one.

3          THE COURT:  Well, I think it goes to -- Because

4   I'm not sure whether Smith knew what Smith was doing.  In

5   the sense of Smith got on the stand and says -- Smith was

6   advocating for a new plan.  And he thinks it's a new plan,

7   but everybody's telling me it's a switched vote.  So is it a

8   switched vote, or is he voting on a new -- did he pitch a

9   new plan?  And maybe he just thinks -- maybe they're the

10   same things, but he's thinking that they're different.

11          MR. GORDON:  Yeah, well, he -- I think the

12   evidence reflected, he basically picked up on negotiations

13   that had progressed significantly with Mr. Birchfield, and

14   Mr. Golomb, and others involved, and we couldn't get there

15   with Mr. Birchfield and Mr. Golomb.  We thought we had a

16   deal, we didn't have a deal, and he picked it up at that

17   point.  And so, I mean, everyone understood, and I think

18   including Mr. Smith.  And I don't remember his testimony

19   exactly, but that was a continuation of the plan,

20   improvements to the plan.

21          And the other thing I wanted to say to Your Honor,

22   to just to be clear about this, we never accepted the notion

23   that we didn't have 75%.  You know, I know the other side

24   said this a gazillion times, and they questioned Ms.

25   Kjontvedt about it.  But the reason I say that is because we

1    knew from the beginning there was something seriously wrong

2    with the Birchfield ballot.

3         THE COURT:  Right.

4         MR. GORDON:  It was more than double the claims

5    that we ever heard he had, all those gynecological claims,

6    the Option A, thousands of -- how could you get, like, 100%

7    informed consent votes?  Things like that.  So we always

8    thought that the question was, though -- and so we were

9    investigating that.  And then the question would become, are

10   we comfortable enough, we have the 75$ and going, we have to

11   bring the issue to Your Honor about what to do?  And instead

12   what happened, because the negotiations came to fruition

13   when Mr. Smith stepped in, it mooted all that.  And so the

14   investigation that we were conducting at that point, we

15   said, you know, it doesn't matter anymore, we've got to let

16   that go.

17        THE COURT:  How do I deal with the Smith -- I'm

18   just thinking about the arguments that are coming.  Someone

19   gave Smith, like, two business days notice to get this stuff

20   out.  Right?  Like, how come Smith couldn't get a week?  How

21   come creditor's voters couldn't get seven to ten days?

22   There was no looming --

23        You know, usually bankruptcy cases are triggered

24   by, you know, the deal is up, and someone can come snatch it

25   up, either get a hold of a bank account, or exercise

1    remedies, judicial remedies.  Here, there was no what
2    normally triggers a bankruptcy case, it's just Johnson &
3    Johnson and Red River decided to give someone 48 hours to go
4    switch 11,000 votes.  And so how come we couldn't give more
5    time to hear the voices of these individuals?  Maybe Smith -
6    - You know, why did Smith get -- you know, I don't
7    understand that, and I don't understand, like, why Watts
8    didn't get more time, especially if the ballots didn't go
9    out.
10           It's the procedural stuff that I just want to --
11   And I don't think the record really answers the question,
12   but it's the question that just lingers in my mind, like,
13   you know, why were these folks jammed?
14           MR. GORDON:  Well, I think in my mind, there were
15   two reasons.  One is these negotiations had been continuing
16   over a very long period of time.  You did hear that,
17   multiple mediators, on and off, on and off.  And at some
18   point, you know, the company has to say we've got to either
19   get this done by this point, or it's just off.  Because
20   otherwise you end up negotiating forever.  That's the way
21   these things work, and you just can't get to an end.
22           THE COURT:  No, agreed.  I agree.
23           MR. GORDON:  So that was reason number one.
24   Reason number two, which is probably more important, is J&J
25   is a public company.  J&J had offered to pay another $1.7

1  billion.  It has financial reporting requirements, there was

2  a need to book a reserve, and there were time constraints in

3  connection with that, so there was pressure to do that.  We

4  wanted to file a lot earlier than we did, but it took time

5  not only to get the agreement, but then to forge the

6  agreement in the form of those MOUs, which are fairly

7  complicated documents, even though they're term sheets.

8        MR. HAAS:  (indiscernible)

9        MR. GORDON:  Mr. Haas wants me to be more specific

10 about the financial reporting.  We're coming up to a quarter

11 end --

12       THE COURT:  It's not in the record though.  Right?

13 So I can't -- I get it.

14       MR. GORDON:  But I want to be honest, and answer

15 your question.

16       THE COURT:  No, no, I appreciate it.

17       MR. GORDON:  Okay.  So again, in terms of this

18 point of financial distress, you heard what Ms. Austin said

19 on the stand about the $10 billion of liability based on

20 estimates that were done back in LTL II, which we had never

21 seen before.

22       You heard testimony from Mr. Lisman, the Assistant

23 Corporate Controller at J&J.  I think that this testimony is

24 important for a couple of reasons.  But I think it was clear

25 from his testimony that the responsibility for talc costs

1    lay at the feet of Old JJCI initially, where the consumer

2    health business was, and then to LTL, and then to Red River.

3    And that's where it is today, at Red River.  And you know,

4    they basically were charged back to JJCI, based on the

5    nature of the agreements, and this was referring to the

6    indemnification agreements, and the legal call by the legal

7    teams.  In other words, he would have a discussion with the

8    legal teams about whether it related to an indemnification

9    payment or not.

10           And you may recall this slide that we went through

11   with Mr. Lisman.  This was from the SAP ledger data.  And

12   again, this is important for two reasons.  One, it shows

13   that although the money was initially paid out of the

14   pooling account, or the cash pooling account at J&J, this

15   was for the Ingham verdict, that money was charged back to

16   JJCI.  So it's important that just it reflects what Mr.

17   Lisman testified to, and also shows the magnitude of the

18   hits on the operating performance of Old JJCI.

19           THE COURT:  I have a contemporaneous document

20   explaining it.  Yeah.

21           MR. GORDON:  Right.  And then, this was a

22   demonstrative we put together with Mr. Lisman just to show

23   the impact of the litigation, the talc litigation on Old

24   JJCI.  And you recall that from 2020 to 2021, that business

25   swung from about, I think, if I can remember right, a $2

1    billion profit to a $1 billion loss, or thereabouts.  And

2    you know, we showed this graphic just to give you an idea

3    how these talc payments compared to some of the standard

4    accounting metrics, or financial metrics you would look for

5    in a company, just to show the financial distress of Old

6    JJCI.  And of course, you had Mr. Kim testifying about the

7    size of the payments.  He was focused on just how much it

8    would cost just to defend the cases, given the sheer number

9    of cases that were pending against the company.

10              This slide, Your Honor, we included because you

11    raised the question yesterday, and I wasn't exactly sure of

12    the context of how should you look at the argument of

13    whether J&J and Red River are interchangeable, I think, or

14    one and the same.  You said something like that.

15              THE COURT:  Mm-hmm.

16              MR. GORDON:  And we've heard this all along

17    throughout this litigation.  The claimants, when they make

18    their arguments, they always refer to J&J, and they like to

19    point out that this is an abuse of the bankruptcy because

20    J&J has this AAA credit rating, and it's, you know, a $400

21    billion market cap or whatever.  And we've always said,

22    well, that's interesting, but it's kind of irrelevant,

23    because it's a corporate enterprise, it has a corporate

24    structure.  And those arguments were made to Judge Kaplan in

25    LTL, and you can see where he came out on that.  You know,

1    these are corporations, there's no legal duty.

2           And then, Your Honor has been asking for a while

3    on Divisional Merger, the Texas Divisional Merger statute.

4    And again I wasn't sure exactly what you were focused on,

5    but I thought I'd give you a little background, and tell me

6    to stop if this is too much.

7           THE COURT:  Well, no, no, I don't -- I'm very

8    familiar with the Texas Divisional Merger statute, a little

9    bit -- I'm familiar with the Arizona one, I know it really

10   well.  A little bit less familiar, but I know how Delaware

11   works as well.  Yeah.

12          MR. GORDON:  Okay.  That's unfortunate, because

13   this is sort of an Ali Brown slide.  It's a nice purple --

14          MS. BROWN:  You still get credit.

15          MR. GORDON:  Oh, wow, yeah, it's -- I don't know

16   what that was.

17          THE COURT:  I wanted to take your -- with respect

18   to Divisional Merger, just whether that use of the

19   Divisional Merger in this case kind of means cause to

20   dismiss for lack of good faith.  That was not so much kind

21   of how it worked, but just from a -- I take it that's what

22   the Office of the United States Trustee is arguing, and I

23   wanted to hear your perspective on it.

24          MR. GORDON:  Yeah, so we've heard these arguments

25   from the beginning.  And actually, these next two slides, I

1    was just intending to show you what Judge Kaplan had to say

2    about this.  He didn't see anything wrong with it, and the

3    Third Circuit didn't indicate any issue with it.

4         But what happened in this case, and this is all in

5    the record, is that we've been working really hard to get

6    deals with the firms on all the talc liability.  And again,

7    we wanted to get to a vote.  Let's have the women and the

8    men vote on these issues with respect to mesothelioma, with

9    respect to everything.  And there just came a time where it

10   was clear that the mesothelioma firms were dead set against

11   the bankruptcy, but the ovarian firms, they were interested

12   in the bankruptcy.  They thought this resolution would make

13   sense.

14        And so as we were progressing in the negotiations,

15   and talking about another bankruptcy, and trying to get them

16   comfortable that this was a feasible option in light of the

17   fact that we had lost in two bankruptcies already, you know,

18   one of the parts of that was to say, well look, we'll take -

19   - we'll just focus on the ovarian claims and the

20   gynecological claims, and we'll put these other claims to

21   the side.  And so you have the comfort that we're not going

22   to be bogged down like we were in the other two cases with

23   all these objections from the mesothelioma bar.  So the idea

24   was just to focus on the liability that we and the

25   plaintiffs together were interested in resolving in a

1    bankruptcy case.  So to me, that's not manufacturing

2    financial distress.  And it's hard for them to argue that

3    anyway, because they're saying we're not in financial

4    distress.

5           So we did that Divisional Merger.  We did it in a

6    way that in my view, and our view fully protected the

7    interests of the claimants, because we put funding

8    agreements into place.  We set them up, after we had

9    progressed in the deal to the point that we knew pretty much

10   what the financial requirements were going to be, although

11   it will move up and down based on amendments to the plan, as

12   it did when the plan amount was increased by $1.7 billion.

13          So from our perspective, this benefited everybody.

14   It increased the likelihood of success of the bankruptcy

15   case, it protected the interests of the claimants by

16   ensuring that there were sufficient funds there, and it

17   allowed the company to sort of limit, to a certain extent,

18   the amount of the operations that would be exposed to a

19   bankruptcy, which wouldn't really help anybody.  I mean, any

20   step that was taken that would potentially reduce the value

21   of the business wouldn't help anyone.  And so from my

22   perspective, it was done in a way to actually assure that we

23   had sufficient financial wherewithal to do this, and to do

24   it in a way that the claimants wanted us to do.

25          Again, this is from Judge Kaplan.  I just put up a

1    couple slides here just to -- again, because you were asking

2    these questions.  So this was the grid we had on the first

3    funding agreement in 2021, and as Your Honor knows, what the

4    Third Circuit really focused in on was the funding backstop

5    that came from J&J.

6              THE COURT:  I got it, yeah.

7              MR. GORDON:  They said we provided too much

8    financial support.

9              And then, here's this one, and this one I should

10   pause for a second.  On this one, we actually took LTL and

11   merged it back into the hold co-entity, and then separated

12   it into three, and the idea fundamentally was let's just

13   kind of start over again.  So let's basically reverse it,

14   and start over again, and then we'll split in a way that

15   seems to be acceptable to everyone, and that's what we did.

16             And these next, there's only about three or four

17   slides, the reason I have these in here is that this has

18   been done before.

19             THE COURT:  Right.

20             MR. GORDON:  You know, There was a very big hue

21   and cry when the first one of these was done, as if it had

22   never happened.  But it had been done in the Garlock case,

23   with Coltec parent, and this was all done with the support

24   of the Asbestos Claimants Committee in that case, and the

25   Future Claimants Representative.  We literally did the same

1    thing, but not through a divisional merger.  And you can see

2    comments that were made in the Disclosure Statement there

3    pretty much saying what we've been saying with respect to

4    ours.  And then Your Honor is familiar with the Paddock

5    case, probably the Owens, Illinois restructuring.  This

6    again was not a divisional merger, but same idea.

7    Fortunately for them, they could do a holding company

8    reorganization, because the assets were already separated,

9    and so they did some things to provide some further

10   separation.

11         What's important, though, in both these cases is

12   that they both resulted in confirmed plans that were

13   supported by both the current claimants and the future

14   claimants.  And again, some similar comments from the Chief

15   Restructuring Officer who is not related to me, just to make

16   clear.

17         THE COURT:  I would have saw him in a pinstripe

18   suit, I would have doubted you.

19         MR. GORDON:  Okay.  I'll have to remember next

20   time not to wear a pinstripe suit.

21         THE COURT:  No, no, no, it's fantastic.  Stop.

22         MR. GORDON:  Yes, I do have one.  I do.

23         So I'm not going to spend much time on this.

24   There have obviously been arguments about collateral stop,

25   but we've laid this all out in the briefing.

1              The payment in full, this was primarily Dr.

2     Mullin, Dr. Singer as well.  I'm not going to spend a lot of

3     time on this, unless Your Honor has questions.  You know, we

4     went through this in a lot of detail, maybe too much detail

5     from Your Honor's perspective, but I wanted to do that in

6     part because a lot of work went into the report that he did.

7     And I've worked with Dr. Mullin for a really long time, and

8     he's at the forefront of the field on this, in my view.

9              This is just a chart that sort of looks at both

10    Dr. Mullin and Dr. Singer in comparison.  And Dr. Singer,

11    although he lined up as a rebuttal witness, he largely was

12    not a rebuttal witness, you know, other than his worst case

13    scenario.  And I think he was pretty clear in saying, I felt

14    I needed to put it in there for purposes of setting the

15    initial cash value of a point, but otherwise, I don't really

16    expect that to happen.  And I wouldn't expect that to

17    happen, because literally, he had a 100% propensity to sue,

18    which as Dr. Mullin said, has never happened.  In fact, he

19    said the highest in his experience, you may recall, was with

20    mesothelioma.  And then he also assumed that every single

21    woman who would not qualify for payment would qualify for

22    payment.  So even though you had to have at least four years

23    of exposure to the product, he was basically assuming that

24    they would all say they had that, even though they were

25    coming up in years later where you couldn't possibly,

1    truthfully make statements like that.  So it's an ultra,

2    ultra conservative projection.

3          And then Ms. Austin.  As Your Honor knows, there

4    are many, many disagreements between Dr. Mullin and Ms.

5    Austin.  I think the most fundamental one was that she just

6    didn't deduplicate her data.  She acknowledged that she

7    pulled data from a whole bunch of different sources, and

8    then basically added it up and got to a number.  And you may

9    remember the graph, I mean, her claims count was off the

10   charts.  And you did say something earlier about Dr. Mullin

11   backing into the data.

12         THE COURT:  I was going to -- I'm trying to pre --

13   just throwing out arguments (indiscernible)

14         MR. GORDON:  No, no, I appreciate it.

15         THE COURT:  Just to make sure.  Because one could

16   see a similarity between the Smith MOU number and what Dr.

17   Mullin reached.  I've got to tell you, I found Dr. Mullin

18   incredibly credible, but I want to just clarify and throw it

19   out there.

20         Now certainly, and I'm going to let the other

21   parties tell me why they think Austin is right, but I

22   thought Austin was credible as well, they just disagree.

23   And people can disagree about whether the deduplication

24   issue -- But I just wanted to throw it out there.

25         MR. GORDON:  Yeah.  Well, on deduplication, to me,

1   it's sort of hard to argue that one.  We showed you two

2   examples where she counted (indiscernible)

3            THE COURT:  That's just an analytical difference.

4            MR. GORDON:  Right (indiscernible)

5            THE COURT:  But you know, two intelligent people,

6   with just an analytical difference.  Right.

7            MR. GORDON:  Right.  But it makes a big difference

8   in the claims (indiscernible)

9            THE COURT:  Oh, absolutely.  No, no, no question

10  about it.

11           MR. GORDON:  And then the way she qualified

12  claims, as well.  She took the voting data, you may

13  remember, and she just said I'm looking at the boxes you

14  checked, and if you checked those boxes, I'm counting you as

15  qualified.  If you didn't, I didn't.  With Mr. Watts, she

16  just said, okay, none of his count.  I mean, there was no

17  real analysis.  Like, Dr. Mullin was the only person, or the

18  only expert who actually modeled the information.

19           But on the backing in, we provided all the detail,

20  the other side had all the backup.  There was no backing

21  into that.  And in fact, Dr. Mullin drew comfort from the

22  fact that when he came up with his numbers, and he had his

23  ranges, and he looked at his midpoints, he saw that he was

24  pretty close to what the Plaintiffs' lawyers who know this

25  litigation back and forth, what their views were.  Now,

1    there's no guarantee as to how close you're going to get to

2    that, but there's a lot of reasons I think for everyone to

3    get comfortable that those estimates are probably pretty

4    close, because you know, there was a fair amount of

5    uniformity.

6            And then there were disagreements on the indirect

7    talc claims, and I'll come back to that.  But Dr. Mullin

8    just assumed that when you've got a channeling injunction,

9    or you're asking for a channeling injunction, excuse me,

10   that should cut them all off.  And she said, well, yeah, I

11   saw you had a channeling injunction, but I think it's going

12   to cost $1 to $3 billion just to come into Bankruptcy Court

13   to say you've got to -- If they don't drop it otherwise,

14   you've got to drop that action.  That, to us, was just pure

15   speculation.

16           Okay.  So we'll get to the channeling injunction.

17   This sort of lays out the basics of our argument, which I

18   think Your Honor knows what the basics of the argument is at

19   this point.  We wanted to give you -- Actually, this one is

20   maybe -- okay.  We wanted to give you the Purdue cite, just

21   because you're a textualist, and the Supreme Court was

22   saying in Purdue, I think this is probably clear, you've got

23   to interpret things in context, in light of the surrounding

24   context.

25           So let me start first with at the highest level,

1   which is really, what is the purpose of the channeling

2   injunction under 524(g)?  And we think the key language is

3   in the paragraph that precedes the four different

4   circumstances, and the key language is that it applies to a

5   non-Debtor that is alleged to be directly or indirectly

6   liable for claims against the Debtor.  And our reading on

7   that is you're talking about situations where the claims at

8   bottom are the same claims.  And we used the phrase in the

9   subheading overlap, do they overlap, or are they the same

10  claims?  And the reason that makes sense is because the

11  whole trust structure wouldn't work if you left open the

12  possibility that claimants with the same claims could sue

13  somebody outside of the injunction who in turn would then

14  have the ability to come back against the Trust.  Because

15  then, the claims aren't being processed through the grid,

16  and the ADR process and the like in the TDP.  Instead,

17  they're out in the tort system, there's the potential again

18  for lottery-like verdicts, and they could settle at whatever

19  amounts they want to settle, they're going to assert their

20  defense costs, and the whole sort of fundamental premise of

21  the Trust is upended at that point, I would say.

22          You've heard people make arguments about

23  independent liability, you've got to have derivative

24  liability, and all I would say to Your Honor is those words

25  don't appear in the text.  The Third Circuit cases are big

1    on derivative liability.  That, to me, is not the right way

2    to look at it.  So the way we think about it is, when you

3    look at those four relationship tests, you're really

4    thinking about whether there's overlapping liability with

5    the Debtor.  So I think there's, like, three groups of

6    protected parties I need to focus on -- or proposed

7    protected parties.  One is J&J, and J&J splits into two

8    parts, pre-'79 and post-'79.

9            THE COURT:  Okay.

10           MR. GORDON:  And I'm focused on 1979 because

11   that's when the transaction occurred where J&J

12   decentralized, and moved all its business operations into

13   subsidiaries, including its Baby Products division.  And

14   when you look at this, and I'll probably go through these

15   fairly quickly, unless Your Honor has questions, because

16   this is highly technical, we would say this fits under the

17   ownership of a financial interest prong.  Because as a

18   result of that transaction, as Your Honor knows, the

19   liability for these product claims was assumed by that

20   subsidiary, which is a predecessor of Red River.  Since

21   then, all claims that have been paid for talc liability have

22   been pushed down the enterprise to that entity, like you saw

23   through the testimony of Mr. Lisman, and they're the exact

24   same claims.  And we didn't put it all here, but you know,

25   it's in the record.

1          In the MDL complaint, J&J, JJCI, LTL, they're all

2    used interchangeably.  They're basically always referred to

3    as, collectively, J&J.  In the tort system, it's pretty much

4    the same.  Now, you're going to hear lawyers stand up and

5    say, no, there's independent liability, because J&J is doing

6    this or doing that, which I'm going to address.  But to me

7    what's important to keep in mind whenever they say that is

8    underneath those allegations is the fact that the underlying

9    claim is exactly the same.  It's the same plaintiff, it's

10   the same product, it's the same period of time, it's the

11   same injury, and it's the same damages.  The only thing

12   that's different is on top, the legal theory is different.

13          I have a cite to the NARCO case in here just

14   because that's an interesting case where that court, I think

15   this was Judge Fitzgerald's, focused specifically on the

16   intertwined nature of the claims.  Very different from

17   Combustion Engineering, and you're going to hear about that

18   case too.  You have the subsidiaries, different products,

19   completely different.  These are the same products, the same

20   plaintiff, same injury.

21          There's an argument as well in pre-'79 under the

22   management prong.  This is the second prong.  Again, unless

23   Your Honor wants me to, I won't spend a lot of time on this.

24          THE COURT:  I'm familiar with the statute.

25          MR. GORDON:  Okay.  And then, same under the

1    financial transaction prong.

2           And then post, it's pretty much the same thing,

3    you know, working your way through.  And a lot of these get

4    into things like alter ego, piercing the corporate veil, and

5    that sort of thing, and when you're talking post-'79, that's

6    invariably what you're talking about.  Again, they're going

7    to come up here and say, well it's because J&J was making

8    safety decisions on behalf of Old JJCI, which isn't even

9    supported by the record.  But they'll say that.  But at the

10   end of the day, that goes to ownership of that interest, it

11   goes to management of that interest, and it's picked up by

12   524(g) in any event.

13          And again, you can see some of the allegations

14   from the MDL.  Well, this is from the amended complaint.

15   New JJCI, LTL, and Janssen are and have been at all relevant

16   times wholly owned subsidiaries of J&J under the complete

17   dominion and control of J&J.  A similar finding in Ingham --

18   or allegation in Ingham.

19          The affiliates, I don't think these are so

20   controversial here, other than the fact that J&J has got a

21   number of affiliates.  We did tailor down the list, as Your

22   Honor knows, and just focused on affiliates that had been

23   named, I think, in the litigation, as I recall.  But to me,

24   that's an identifiable group.  They're obvious targets for,

25   again, alter ego type claims, successor claims and the like,

1    so we've included those.

2            Then Kenvue.  I know we haven't been able to

3    persuade Your Honor on this so far, but in my mind, Kenvue

4    is no different from the others.  It hasn't manufactured

5    talc-based baby care products or Shower to Shower in the

6    U.S.  It never has.  The business was spun out of Old JJCI,

7    the product had been discontinued three years before that

8    happened.  So the only basis for a claim against Kenvue is a

9    successor liability type claim, you know, whatever the

10   argument would be.  And I'll show you in a second, those

11   claims clearly fall under 524(g.)  But again, if you step

12   back and think about it, these are claims where a party is

13   alleging that you are responsible for the fact that LTL or

14   Old JJCI was selling talc-based baby powder products, and I

15   was injured by that.  That's the exact same claims that are

16   being channeled to the Trust.  And if they're not channeled

17   here with respect to Kenvue, again the fundamental premise

18   of the Trust is not going to work.

19           And of course, because these are successor

20   liability claims, in addition to 524(g,) we have the

21   argument that these are property of the Estate hat could be

22   (indiscernible)

23           THE COURT:  It's the old derivative liability --

24           MR. GORDON:  Right.  Yeah.

25           THE COURT:   -- property of the estate arguments

1   that would be settled.

2          MR. GORDON:  Correct.  You're ahead of me as

3   usual., Your Honor.

4          THE COURT:  No, no, no.  I got it.

5          MR. GORDON:  And then, this one fits under, from a

6   524(g) perspective, this liability fits under that fourth

7   relationship prong as well.  Because if you think about it,

8   the liability arises by reason of the spinoff transaction.

9   That's why they're being sued.  It's like you heard Mr.

10  Placitella say it a couple of times, it's a continuation of

11  a business line, or a business.  Well, that's both our

12  claim, or the state claim, and also it clearly, in our view,

13  falls within 524(g).  But again, from our perspective, this

14  is a necessary -- this was negotiated, the claimants know

15  this is necessary to make this work, and we would

16  respectfully ask that you include Kenvue in the list.

17          And I'll go past this.  This is just to illustrate

18  the fact that claims are the same.

19          Retailers, it's really a similar story with them.

20  Maybe, you know, it's a very strong story, I think, under

21  the prong, again number four, that picks up financial

22  transactions that the financial condition of the Debtor's

23  predecessor.  So think about this.  How does a consumer

24  healthcare products company operate its business if it can't

25  sell its products?  I mean, these are critical contracts.

1    This is how the product is distributed.  These Retailers are

2    being sued not because they did anything to the product,

3    they're being sued for the sole reason that they sold this

4    product, which the Plaintiffs are alleging was a dangerous

5    product, and of course we deny.  And so again, this squarely

6    fits into 524(g,) and would be an enormous -- this would

7    enormously upend the Trust and the settlement unless these

8    parties are protected.

9             THE COURT:  What is the financial condition --

10    what is the financial transaction?  Are we talking about the

11    indemnity?

12             MR. GORDON:  The contract itself.

13             THE COURT:  The contract --

14             MR. GORDON:  Well, it's both, really.  It's --

15             THE COURT:  When you say the contract, that's

16    maybe the -- I apologize.

17             MR. GORDON:  I'm sorry, I wasn't clear.  It's the

18    sale contract, or distribution contract, and there's an

19    indemnity that comes back as well.

20             THE COURT:  So if someone sues a retailer, and

21    says, you know, you failed to warn me about this product,

22    how does that fall under the --

23             MR. GORDON:  If it's the same underlying claim,

24    that would be channeled.

25             THE COURT:  But it's not.  It's saying you,

1    retailer, sold me some stuff, and you knew it was bad.  I'm

2    making stuff up because I can't find anything in the -- I

3    don't know if there's an exhibit with an actual complaint in

4    the -- if someone can point it out to me, if it's in one of

5    the 56 pages.  Obviously I haven't memorized them.  So I've

6    just got to kind of rationalize thinking about kind of the

7    bounds.  The argument goes you sold me something, and you

8    didn't warn me, but there was all this stuff, all these ads

9    going out there, about saying that you did something bad.

10   I'm in Ms. Brown's world.  But I'm just trying to think

11   about, you know, where someone sees that, and they're not

12   saying you have an indemnity, they're just saying you sold

13   me some stuff, and you shouldn't have sold it to me, but you

14   knew it was bad and you didn't care.  Or I'm making a

15   plaintiff lawyer lingo here.

16            MR. GORDON:  Right.  No, I appreciate it.

17            THE COURT:  So how does -- that's what I'm trying

18   to -- I'm trying to hone down what's the financial

19   transaction that we're honing in on?  Just so that I -- I'm

20   not saying I agree or disagree with you, I'm just trying to

21   just get a sense.  I get the indemnity part.  There's an

22   underlying indemnity, and quite frankly, it's a liability

23   that goes back to Old JJCI, which is why they're doing --

24   And I understand, and I want to be really clear that for the

25   J&J folks who are here, I understand that the deal

1    conceptually is one of finality.  Right?  They're not

2    putting up, you know, $10 million -- excuse me, $10 billion,

3    they're not putting up $10B to kind of, you know, carve 25%

4    of this, and then, you know, we keep it going.  You know,

5    it's got to deal with the currents, it's got to deal with

6    the futures.  That is there to try to put money in people's

7    pockets, but the goal is finality.  And I understand that,

8    and that's why you don't have to convince me about the --

9    kind of whether the gyno should be compensated or not for

10   $1,500.  People can argue it, but it's a -- that's a

11   litigation decision.  That's a settlement.  That's the, you

12   know, someone spilled coffee on their lap, and I've got a

13   claim no matter whether I like it or not.  It's a one-time,

14   one-time deal.

15            MR. GORDON:  So our response to that, Your Honor,

16   is if you think about it again, this is the same thing that

17   I was trying to articulate before, which is at bottom, it's

18   still just a product liability claim.  You've come up with a

19   different legal theory, but ultimately --

20            THE COURT:  I don't know if it's -- Again, I'm --

21            MR. GORDON:  No, no, I appreciate it.  You're

22   making me think about this.

23            But ultimately, it's a product liability claim

24   brought by the same plaintiff, with the same injury, the

25   same damages.  And that's what -- that claim should go

1   against the Trust.  There's been a fund set up for every

2   individual who suffered an injury from these products, and

3   you know, if that's not enjoined, then they're going to be

4   free to go outside to these retailers.  These retailers are

5   buying these products, and they're basically saying to the

6   manufacturers, it's your responsibility if this is a

7   dangerous product, it's not ours.  And so enterprising

8   plaintiff firms can always come up with a theory, but at the

9   end of the day, it's the same.

10          THE COURT:  So your argument is whether it was

11  sold through the retailer, the underlying claim that one has

12  is through talc, and the talc is -- we're still talking

13  about the product.

14          MR. GORDON:  Correct.

15          THE COURT:  Got it.

16          MR. GORDON:  And on the indemnity, just to be

17  clear about it, there's contractual indemnities and common

18  law indemnity, and again, it's because if we sold, if we

19  allegedly sold a dangerous product, that's on us, and the

20  indemnity just comes right back.

21          THE COURT:  Got it.

22          MR. GORDON:  The claim comes right back.

23          THE COURT:  Got it.

24          MR. GORDON:  And I just put this slide up.  Your

25  Honor may have seen this, this came in quite a while ago,

1    but three of the larger retailers actually filed a

2    reservation of rights, and I think one of their counsel is

3    here today, prior to the hearing, expressing their concern

4    about this and their position, which pretty much articulates

5    our position.

6            THE COURT:  Mullin talked about it too

7    (indiscernible)

8            MR. GORDON:  He did.  He did.  He did.  Yeah, I

9    asked him that question because I wanted the record to be

10   clear that he's assuming that these protected parties are in

11   place.  That's why he assumed, basically, no indirect

12   personal injury claims.

13           THE COURT:  Yeah, yeah.  That's how you get the

14   full pay.

15           MR. GORDON:  Exactly.  Exactly.

16           THE COURT:  Yeah.

17           THE COURT:  Your Honor, I think I'm overstaying my

18   welcome here.

19           THE COURT:  No, no, no, no, no, take your time.

20   I'm -- This is fun.

21           MR. GORDON:  I feel good.  I think I've had more

22   time than Ms. Brown now.

23           Okay.  And this is just some of the testimony from

24   Dr. Mullin you just alluded to.  This is what you just

25   referred to, Your Honor.

1          Okay.  We have the third party releases.  We put

2     this in here because you mentioned it yesterday, and this

3     gets into a couple of additional arguments that we were

4     going to make.  And these are all laid out in our brief, so

5     again, it sounds like you're very familiar with our briefs.

6     But this takes us into Purdue, and the fact that Purdue

7     didn't cover -- they said we're not expressing a view on a

8     plan where there's payment in full.  And of course we've

9     talked not only about that, but that sort of translates into

10    the one satisfaction rule, which we cited a bunch of cases

11    to Your Honor, from both the Circuit and Texas Courts about

12    that.  And again, just a little more information on the

13    arguments that we made.

14         The Thibodeau case, you know, a case where they --

15    I can't remember which company it was, but took the

16    position, you, plaintiff, can't sue me because you've

17    already been satisfied in full.  And the Court said that's

18    right, you can't get a portion of the recovery from that

19    entity because you have been paid in full.

20         THE COURT:  Mm-hmm.

21         MR. GORDON:  This provides a little more detail on

22    the releases.  Maybe I should skip ahead.

23         So you had asked yesterday the extent to which or

24    the relationship between the releases and the channeling

25    injunction, and how do these interact.  And this was our

1    effort to kind of on one slide, summarize for you how they

2    do.  I mean, they reinforce, you know, the -- these releases

3    reinforce the asbestos aspects of the plan, the channeling

4    injunction, and the like, but they go beyond that as well.

5    As Your Honor knows better than I do, they're pretty common

6    in these plans.  And again, we've briefed all this, so I

7    don't want to belabor it.

8         All Writs Act.  Now, who would have thought I'd be

9    in Bankruptcy Court arguing All Writs Act?  So --

10        THE COURT:  Here's a good question for you, and I

11   just want to make sure that I get the scope of it before we

12   kind of get into the Alt Writs Act.

13        MR. GORDON:  Okay.

14        THE COURT:  And I'll explore with you two

15   concepts.  One is, you can take them up as you want, they're

16   kind of different sides of looking at the same coin.  I

17   don't even know if that phrase makes sense.  But I'm giving

18   you two different related scenarios.  One is this current

19   plan has folks who voted no.  Right?

20        MR. GORDON:  Right.

21        THE COURT:  So we have an impaired class where a

22   creditor voted no.  Are they bound by the third-party

23   releases even under the full pay?  That's one scenario.

24        MR. GORDON:  Yes.  Our position is yes.

25        THE COURT:  Two, you have a pre-pack where the

1    trade is unimpaired, so they don't vote.  Is there a need

2    even for an opt in or an opt out if they're -- right?  We

3    know what they're going to get paid, they're owed a $1,000

4    under a contract.  Is there even a need for an opt in or an

5    opt out, if I accept your position on this?

6              MR. GORDON:  Yeah, our position would be no.

7              THE COURT:  Okay.

8              MR. GORDON:  Under -- Because it's payment in

9    full, there would be no ability, or should be no ability for

10   any of those claimants to pursue a recovery from anyone

11   else, because they've been paid in full.  It's single

12   satisfaction, they should be done.

13             And the All Writs Act is interesting --

14             THE COURT:  What if I extended it?  What if I

15   extended it and said, now, I don't know, you may be having a

16   tort against Retailer.  You can just sue them.  Now, I got

17   it's the same product, but it's a different cause of action.

18   It's just the tort, it's not wrongful death, or dealing with

19   manufacturing.  It's just you failed to warn.  I'm making up

20   a tort here.  I'm not making up a tort, but I'm coming up

21   with a theory of liability.  Single satisfaction -- single

22   satisfaction for what claim?  What's the claim that is being

23   satisfied in full?

24             MR. GORDON:  It's the underlying claim, the claim

25   for damages to compensate that individual for an injury.

```
 1              THE COURT:  Related to the talc?
 2              MR. GORDON:  Correct.  Correct.
 3              THE COURT:  What if I want to sue someone for
 4    punitives for -- you didn't warn me, you know, failure to
 5    put notice on your -- you know, in your store, that kind of
 6    stuff that plaintiff lawyers -- torts.
 7              MR. GORDON:  Same response, Your Honor.  That has
 8    to be released and channeled,  because otherwise, none of
 9    this will ever work.  And the way I've always thought about
10    punitives, you, it comes up from time to time in these
11    cases, but from my perspective, bankruptcy's not about
12    punishing the company that's in bankruptcy, it's about
13    compensating individuals who are owed, you know, on a claim.
14              So again, I'm going to go through this very
15    quickly, because it's briefed.  When we first talked about
16    this, this seemed like a stretch, and I was curious as to
17    whether this argument had been advanced in Purdue.  And I'm
18    told that it was in the briefs, but it wasn't argued.
19              THE COURT:  In the briefs, but not argued.
20              MR. GORDON:  Yeah.  But it was interesting, and I
21    imagine Your Honor's been through it, but when I went back
22    through it and revisited the cases, they are surprisingly on
23    point.  In a situation like this, where you have what is
24    basically a settlement, and this relates more to the --
25    Well, no, it relates both to Bankruptcy Court and District
```

1    Court, where you have a settlement that has basically been

2    approved by a Federal Court, and there are efforts going on

3    outside of the Court that could potentially upset that

4    settlement.

5            So the reason we thought it worthwhile to put this

6    in was that if Your Honor has any concerns that you can't

7    get there completely under 524(g), you can't get there

8    completely under full pay, and you feel like there are some

9    openings available that could undercut the settlement that

10   you think is in the best interest of the parties, it seems

11   to me this gives you a potential way to solve that problem.

12           THE COURT:  How do I deal with -- I think it's

13   footnote two in the Purdue decision that cites kind of what

14   the Fifth Circuit had said in Yaquinto, and I know that it

15   was cited, you know, that you can't use 105, you know, which

16   is essentially the statutory authority that one would have

17   to enact this, that you can't -- It's got to be in

18   furtherance of another provision of the code.  Can I use 105

19   and the All Writs Act to get there, or -- right?  Because

20   all these cases are kind of pre-Purdue, but Purdue kind of

21   put in a footnote what Circuit Courts were already kind of

22   going towards, which is you can't use 105 to kind of -- as

23   an equitable remedy, more of a statutory remedy that kind of

24   allows you to kind of enhance, or get to the goal of

25   something expressed in the code.

1              So how does the All Writs Act -- how do I think

2      about the All Writs Act in light of Purdue?  I know it

3      wasn't argued, but it's a -- and I know you're going there,

4      so how do I -- What's my statutory authority?  Is it the All

5      Writs Act?

6              MR. GORDON:  Yeah, I mean, there's two answers I

7      think I have to that question, Your Honor.  One is it's not

8      really a 105 question, because as I read the cases, they're

9      largely cases where the Courts are saying, I need to do this

10     in aid of my own jurisdiction.  And it's outside of the

11     Bankruptcy Code, I need to do this in aid of my

12     jurisdiction.  And I have my jurisdiction to do all these

13     things that make this plan ultimately possible, and to

14     provide what these women want, but I'm going outside of the

15     Bankruptcy Code in aid of my jurisdiction to enjoin, you

16     know, whatever aspect of this you can't get comfortable with

17     if you feel that way, in furtherance of your own

18     jurisdiction.  So it's outside of the Bankruptcy Code.  It's

19     not -- I've heard people equate it to 105.  From my

20     perspective, it's really not.  It's outside of that.  It's a

21     District Court remedy primarily, but it's been utilized by

22     Bankruptcy Courts as well.

23             THE COURT:  Understood, understood.  Thank you.  I

24     was just trying to -- For me, the question was more to just

25     kind of crystallize the position.

1           MR. GORDON:  Yeah.

2           THE COURT:  Thank you.

3           MR. GORDON:  I'll just skip through this.  I'm

4     just going to skip through this.  We obviously wanted to

5     address the Disclosure Statement, and we think the record's

6     very clear on this, that the disclosure was adequate.

7     Again, happy to stop at any point, if Your Honor wants more.

8           I didn't know, Your Honor had raised some

9     questions about the walk away rights, and I didn't want to

10    leave the podium today if you had any uncertain as to how

11    that works, because a lot of allegations have been made

12    about what these are, and what they're not.  You know, it

13    shows that J&J is not committed to the plan, it makes it --

14    it's not a real bankruptcy, or it shows that we can settle

15    outside.  So I wanted to address it for a few minutes if you

16    want me to, but I'm happy to move on.

17          THE COURT:  No, no, I understand the argument.

18          MR. GORDON:  Okay.

19          THE COURT:  I threw it out there because I know

20    people -- The argument has been, you know, you don't need to

21    approve this plan, Your Honor.  They already have a separate

22    deal.  Why don't we just go and cut the separate deal?  Let

23    them go cut the separate deal --

24          MR. GORDON:  And it's not nearly as good of a

25    deal, either for the claimants or the company, because from

1   the company's perspective, it does not address future

2   claims.

3          THE COURT:  Right.

4          MR. GORDON:  It is a different deal.  It's too

5   bad, it's the one slide that I had that looked like an Ali

6   Brown slide.

7          MS. BROWN:  (indiscernible)

8          MR. GORDON:  I just put this in here, Your Honor,

9   because we heard you on the ambiguity.  When you first said

10  it, I didn't track it, but we went back and looked, and

11  you're exactly right.  We talked to all the other parties,

12  and everybody agrees, if Your Honor thinks this worked --

13  that this would fix the ambiguity that you raised in this

14  language.  And this is a situation where a direct claimant

15  fails to submit a claim by the 120-day deadline.

16         THE COURT:  I just wanted to make sure that, you

17  know, in 20 --

18         MR. GORDON:  No, thank you for raising it.  Yeah.

19  We appreciate it.

20         THE COURT:  Well --

21         MR. GORDON:  I think this argument has kind of

22  been eliminated at this point, because I think we've

23  clarified for Your Honor that there was no gag order or

24  poison pill.  This was a provision that dealt with the

25  primary party's consent rights.  And you've seen it in other

1    plans.  That's not an unusual provision.  In fact, we had

2    one from the Diamond Sports case as well.  And another one.

3         And I had a couple slides on the private

4    resolution process, if you want a little further detail on

5    the walkway -- But I'll move on.

6         THE COURT:  No -- no, no.  Go to Travelers.

7         MR. GORDON:  Oh, Travelers.  Okay.  So we honestly

8    don't think Travelers even should have been here.  They have

9    a coverage, they're involved in a coverage action against

10   the company, they've taken the position that they have no

11   coverage obligation at all, and that's being litigated.  Yet

12   they came into this court to basically make a variety of

13   arguments, and take up a lot of court time taking positions

14   on issues that have nothing to do with the Insurer, in our

15   view, and that was regrettable.

16        But the first response to them is that -- And

17   their witness, Mr. Babbe, tried as well as he could, the

18   plan fully preserves their rights with one exception.

19   That's why I want to go through that.  And the only

20   exception is the fact that under 1123(a,) we've assigned the

21   Debtors existing insurance rights to the Trust.  And as Your

22   Honor probably knows, we have to do that because the

23   insurance rights have to follow the liability, have to

24   follow the claims.  But we've done it in a way that

25   preserves all their rights.  And this is a bankruptcy issue,

1    by the way.  If they have a problem with this provision,

2    they can raise it here, and Your Honor can decide whether,

3    under the Bankruptcy Code you have the authority to do this.

4            And there was one case cited at the bottom, but it

5    was Federal Mogul, but there's a variety of cases that

6    support that point of view.  You remember, Mr. Babbe, he

7    couldn't quantify any increase in their risk.  He

8    acknowledged the Insurers had denied coverage, he

9    acknowledged the New Jersey court will determine allocation

10   of liability and the like, right down the line.

11           And then, this plan has literally gold-plated

12   neutrality language.  And we actually tried to highlight the

13   language, to show the key language, but you end up

14   highlighting the entire paragraphs.  And you can just take a

15   quick look at this.  I know Your Honor has already been

16   through this.  But nothing contained in the plan shall in

17   any way operate to impair, blah, blah, blah, or modify the

18   rights or obligations of any talc insurance company.  All

19   the findings and the proceedings -- it's all neutral, with

20   respect to rights, defenses, and obligations of the talc

21   insurance companies.  Nothing in the plan, confirmation

22   order, or any supplement shall release, shall preclude,

23   shall be deemed away, may be used as evidence against the

24   talc insurance companies.  You heard Mr. Babbe say on the

25   stand, well, it doesn't protect us against reinsurers.  They

1    made that point, and we added a provision that expressly

2    addresses -- or we thought fully addressed their concern

3    about reinsurance.

4              So in a nutshell, Your Honor, it was regrettable

5    to us that they are here.  All these issues, I mean, all the

6    questions that were asked about was there any Insurer

7    present at the meeting, was there Insurer involved in the

8    negotiations, that's all relevant to issues in the coverage

9    litigation.  And for an Insurer to come into a bankruptcy

10   case with its insured, and argue to the Court that a plan

11   should be denied seems to me raises pretty serious issues to

12   be addressed in the coverage litigation.

13             I've already addressed the government claims, so

14   let me just conclude finally.  So -- And I'm sorry, Your

15   Honor, it's gone on this long.

16             THE COURT:  No, no, no, I think the time was

17   important, and necessary.  Thank you very much.

18             MR. GORDON:  So I'll just try to go through these

19   quickly, because I wanted to remind Your Honor of all the

20   motions that are part of this proceeding.

21             So you have the motions to dismiss.  These are the

22   headline reasons why we think they should be denied.  You

23   have the bar date motion which included an estimation

24   request.  We think that should be denied for these two

25   primary reasons.  You have the various voting motions, and

1    there were three of them, two by The Coalition, and one by

2    us.  I've talked about those already.  You have the

3    Disclosure Statement, and the solicitation procedures that

4    we're asking you to approve, and then the motion to change

5    the votes.  And ultimately, we think the plan should be

6    confirmed.  I mean, this is an historic settlement, a huge

7    amount of money.  It was reached after painstaking,

8    extremely difficult arms-length negotiations, with multiple

9    parties, through more than one bankruptcy case, with

10   multiple mediators.  In the end, we were able to do what we

11   were hoping to do, which was to give the women and the men -

12   - or give the women, primarily, a chance to be heard as to

13   whether they wanted this settlement, and we think they have

14   been heard, this is what they want.

15          And this plan will assure them equitable

16   treatment.  It will assure them that their claims will be

17   processed and paid much more quickly.  It will give them

18   certainty about what they will get, and it's just, this is a

19   great result for everyone, and we would ask Your Honor to

20   confirm the plan.

21          THE COURT:  Thank you very much.

22          Let me just ask, I want to give our Court

23   Reporter, and everyone else who may need a short break, a

24   break.  Is there someone who just thinks they just need a

25   few minutes to address the Court, you know, just a short

1    five-minute statement?  If everyone's got long statements,

2    we can just take a short break.  But I didn't know if there

3    was someone out there who just needed a few minutes to

4    address the Court.  I think we just -- Mr. Silverstein?

5              MR. SILVERSTEIN:  No, not me.

6              THE COURT:  No, no, no, I know not you.

7              MR. SILVERSTEIN:  But I would appreciate, given

8    the hour, if we could have some sense as to how much longer

9    the planned proponents expected to be arguing.

10             THE COURT:  Oh, that's right.  Yeah.

11             MR. SILVERSTEIN:  We have the Smith Firm, and the

12   Ad Hoc Committee.

13             MS. RINGER:  Can you hear me?

14             THE COURT:  Yes, we can.

15             MS. RINGER:  Your Honor, this is Rachael Ringer

16   from Kramer Levin, and I think we probably have between -- I

17   would say about 30 minutes, depending on how much we can

18   focus on some of the issues that have already been covered

19   by the other plan proponents.  Obviously, we want to answer

20   Your Honor's questions on the perspective of the Smith Law

21   ballot.

22             THE COURT:  Okay.  (indiscernible)

23             MR. PARKINS:  Your Honor, Lenard Parkins, with the

24   Ad Hoc Committee.  Probably 20 to 25 minutes.

25             THE COURT:  Okay.  Why don't we take a five-minute

1    -- whey don't we take about a five-minute break?  I will

2    tell you, I'm going to go get AC for us in the afternoon.

3    My goal today, folks, is to not -- I held folks here 'til

4    one time really, really late, and I'm trying not to do that

5    this time.  I don't want to break the record.  I want to I

6    want folks to go home at a decent hour, so --

7             MR. SILVERSTEIN:  I'm sorry, Your Honor, just one

8    more thing before we break.  I believe that Counsel should -

9    -

10            THE COURT:  Hold on, folks.

11            MR. SILVERSTEIN:  I apologize.

12            THE COURT:  No, no.  Folks, we're still in court.

13            MR. SILVERSTEIN:  I believe that Counsel for

14   Retailers also intends to address the Court, and I'm

15   assuming it's not going to be brief, because nobody said

16   anything.  So it would be helpful to understand how much

17   time (indiscernible)

18            THE COURT:  Can Counsel for Retailers provide us a

19   time estimate?

20            [04:26:01.055] ATTORNEY:  Your Honor, we have

21   nothing to say, unless you have questions for us.

22            MR. SILVERSTEIN:  Oh, okay.

23            THE COURT:  No.  Thank you.

24            MR. SILVERSTEIN:  All right.  Thank you.

25            THE COURT:  Thank you.  Let's take a five-minute

1    break.

2           (Brief recess.)

3           (Back on the record.)

4           THE COURT:  Okay.  We are back on the record in

5    Red River Talc.  Thank you.

6           Okay.

7           MR. HAMERMAN:  May I begin?

8           THE COURT:  Yes, please.

9           MR. HAMERMAN:  Thank you.  Natan Hamerman, from

10   Kramer Levin Naftalis & Frankel.  We want to thank the Court

11   Chamber as a team, and really, all parties for hearing from

12   us throughout the case, and throughout the trial.

13          Your Honor, Allen Smith, the Smith Law Firm, and

14   the claimants it represents support confirmation of the

15   plan.  The evidence squarely favors confirmation.  I'm going

16   to present a very brief summary of the evidence, a lot of

17   the material we were going to cover is already covered, that

18   relates specifically to Mr. Smith, and then my partner,

19   Rachael Ringer, is going to discuss how those facts support

20   findings of good faith and compliance with the Bankruptcy

21   Code.

22          THE COURT:  Okay.

23          MR. HAMERMAN:  She's also going to respond to some

24   of the arguments made about Mr. Smith by the plan opponents,

25   and we're each going to try to respond to the questions Your

1    Honor posed yesterday, and throughout today.

2         Allen Smith developed and prosecuted the very

3    first baby powder case starting in the early 2000s, and

4    approximately 20 years later, he helped secure, together

5    with others, a nearly $10 billion resolution for his 12,000

6    clients, and all other similarly situated women, and their

7    families.  In the years in between, Mr. Smith was leading

8    the charge, trying cases, working with and counseling

9    clients, deposing experts, and keeping apprised on the

10   status of negotiations with Johnson & Johnson, and that's

11   really where I'd like to start.

12        The testimony established that in the spring and

13   summer of 2024, Mr. Smith became more involved in

14   negotiations.  He did this because of concerns about the

15   negotiation position of his joint venture partner, Andy

16   Birchfield of Beasley Allen.

17        And Your Honor, since this is the first time I'm

18   mentioning Mr. Birchfield, I want to pause in response to a

19   remark you made yesterday, and say that our comments today,

20   while critical of Mr. Birchfield, are not intended to cast

21   aspersions about him or his firm.  Our comments are merely

22   intended to underscore why Mr. Smith's state of mind, what

23   Mr. Smith's state of mind was, why he did what he did, why

24   he believed he needed to do what he did, and to show Mr.

25   Smith's good faith.

1              So in the spring of 2024, Johnson & Johnson

2    announced its intent to file a third bankruptcy, and many of

3    the leading attorneys in the Plaintiffs' bar were

4    negotiating with Johnson & Johnson, and have reported and

5    testified that Johnson & Johnson was much more willing to

6    negotiate than in prior bankruptcies.  Mr. Birchfield,

7    however, was not among those attorneys.  He was deeply

8    opposed to negotiations with J&J for any resolution within

9    the bankruptcy.  Mr. Smith became increasingly concerned

10   that this approach was risky, particularly as J&J announced

11   an original Red River plan that Mr. Smith did not support

12   because he believed it did not provide sufficient

13   compensation to his clients.  In June, Mr. Smith pushed Mr.

14   Birchfield and Mr. Murdica to meet, but nothing really came

15   of it, and by the end of July, the worst-case scenario was

16   potentially coming to pass.  J&J and Red River were saying

17   they had 75% support for the deal that was not supported by

18   Mr. Birchfield and Mr. Smith, and Mr. Birchfield was

19   continuing to be an impediment to a better deal.

20             Mr. Birchfield remained philosophically opposed to

21   a deal in bankruptcy with J&J, and though he claims in early

22   August to have crossed the Rubicon to being willing to

23   discuss a bankruptcy-based deal, his own testimony shows

24   that that was not really the case.  He was negotiating a

25   proposal that would benefit select firms, only the firms

1   that had stood with him as bankruptcy opponents.

2           THE COURT:  So let me tell you, so what?  Why do I

3   care?  Like, from the perspective of I see plenty of cases

4   where people come in and say, I'm not doing a deal no matter

5   what, you're not going to do this to me in a case, I'm not -

6   - I don't care, no matter what happens, probably weekly.

7           MR. HAMERMAN:  And that's okay.  But the purpose

8   of mentioning it is to say that it influenced Mr. Smith.

9   Mr. Birchfield didn't need to agree with Mr. Smith.  They

10  could have had an honest business disagreement, and done

11  what Mr. Smith wanted to do all along, once, as the

12  testimony establishes later, once the deal was done, which

13  is communicate with their clients jointly and say, your

14  lawyers disagree.  But that's not what Mr. Birchfield did.

15  Instead, he continued to act as an impediment to a deal

16  getting done, and therefore, Mr. Smith felt that he needed

17  to jump in to continue the negotiations without Mr.

18  Birchfield.

19          In fact, Mr. Birchfield said he wasn't even going

20  to take the Memorandum of Understanding that was in the

21  process of trying to be negotiated, he wasn't even going to

22  hold it in his hand.  So here you have Johnson & Johnson on

23  the precipice.  It says it already had 75%, others said they

24  didn't have 75%, and Mr. Smith feels the need to jump in and

25  participate in the negotiations, which is exactly what he

1    did.  And at bottom, Your Honor, motives completely aside,

2    Mr. Birchfield didn't do the deal, and Mr. Smith did.  Mr.

3    Smith was unwilling to risk a bad recovery for his clients,

4    and decided to try to reach and improve on the deal that his

5    JV partner had been unable to conclude.  And Mr. Smith

6    succeeded.  A deal in principle was reached somewhere around

7    August 22nd, 23rd, and the final MOU was signed on August

8    30th.  I'm going to skip over all the terms of the MOU

9    because it was discussed earlier today.

10          As this was occurring, Your Honor, on August 23rd,

11   Mr. Smith sent the near final MOU to Mr. Birchfield, and the

12   testimony establishes that Mr. Smith asked Mr. Birchfield to

13   join the deal.  But if Mr. Birchfield would not join the

14   deal, Mr. Smith suggested a joint communication to their

15   clients, as we were just talking about.  Mr. Birchfield

16   didn't respond, and sent his own August 26th communication,

17   which is not in the record.  Your Honor may recall we asked

18   for that letter to be disclosed, and the Court instructed us

19   on November 26th not to produce it, not to produce any

20   Beasley Allen communications.

21          But even without the August 26th letter formally

22   in the record, the testimony about it establishes, among

23   other things, that the near final MOU that had been annexed

24   to the August 26th letter contained all of the key economic

25   terms, and that the clients received that MOU because, as I

1    said, it was annexed to that letter.  Over the coming days,

2    Mr. Smith continued to encourage Mr. Birchfield to put

3    professional differences aside, and communicate jointly with

4    their clients, and in the absence of that, he asked for the

5    updated client information so he could contact them more

6    easily.  Beasley Allen tried to put up roadblocks, however,

7    to prevent Mr. Smith from communicating, and Mr. Birchfield

8    himself openly acknowledges this.

9           Mr. Birchfield knew at the time that Mr. Smith

10   intended to ask the clients to vote.  That was in the MOU.

11   Mr. Murdica told him as much.  And Judge, we submit that Mr.

12   Birchfield was very nervous about those votes.  He was

13   nervous about letting the women decide.  And he made oblique

14   threats to Mr. Smith's law license, and he started a lawsuit

15   against him.  Mr. Smith would not stand down.  You heard his

16   testimony, "Beasley Allen can sue me 10 times more.  They

17   can try to run me over in the car as I go out of this

18   courthouse, but no one is going to stop me ever, ever, ever

19   from communicating with my clients, and fulfilling my

20   fiduciary and ethical duty to them."

21          On September 11th, Mr. Smith sent his letter to

22   the clients, giving a lot of information about the MOU's

23   terms, and how that would improve the plan.  Your Honor, I

24   want to answer one of your questions from yesterday here,

25   which is how many clients received the September 11th

1    letter?  And the answer that's in the record is over here, I

2    think it's part of the same quote that Ms. Brown showed, but

3    what it says is he reverse engineered it, "We sent this

4    letter out via email, and we had the email on nearly

5    everyone."  So it was nearly everyone, that's the answer

6    that's in the record.  The rest got it by FedEx.  I'll tell

7    you outside of the record, Mr. Smith's office has told me

8    that they reverse engineered addresses for all but two of

9    the clients that had received the August 26th letter.

10          Based on all of that, Mr. Smith received 879

11   Option A votes, 710 in favor, 169 opposed, which was roughly

12   an 81% approval rate, even though Beasley Allen was opposed,

13   wrote to the clients expressing their disapproval, and Allen

14   Smith openly revealed Beasley Allen's disapproval in his

15   September 11th letter as well.

16          These Option A votes, Your Honor, Ms. Ringer will

17   get into this more, but they're utterly unassailable.  They

18   do not implicate the power of attorney issues at all, and we

19   see client satisfaction with the deal, and we heard

20   testimony about that as well.

21          And with that, let me turn to Option B authority.

22   Much of this has been covered as well, so I'm going to

23   continue to move quickly.  You know our position on that,

24   it's that there was a valid joint venture agreement with

25   Beasley Allen, pursuant to which Beasley Allen and Smith

1    jointly represent, and have joint responsibility and duties

2    to their clients.  Although Mr. Birchfield questioned the

3    ongoing validity of that joint venture in his testimony,

4    that position lacks merit.  Ms. Brown put up the quote from

5    the complaint, that it's a binding and valid contract.  We

6    also had testimony from Mr. Smith, he had never received a

7    termination notice, there is no termination provision, and

8    he continued to receive communications.  All of this

9    indicates an ongoing joint venture relationship.  Your Honor

10   has of course seen many engagement letters.  These ones

11   contain power of attorney language.  Beasley Allen contends

12   that some 4,000 of their engagement letters don't have this

13   language.  Well, that admits that somewhere around 8,000 do,

14   in fact, have the limited power of attorney language.  And

15   of course, there's other useful language in many of the

16   engagement letters, including authority to act to prosecute

17   the client's claims, the acknowledgement that additional

18   lawyers will be engaged, and that such lawyers have equal

19   authority.

20          THE COURT:  How do I deal with the allegation that

21   Smith changed actual no votes from clients?

22          MR. HAMERMAN:  So we will certainly both get into

23   that, but I think the answer to that question is that the no

24   votes were on a plan that had not yet been improved.

25          THE COURT:  So do you think this is a new plan?

1          MR. HAMERMAN:  I think it is a plan that was in

2     the process of being updated.

3          THE COURT:  No, I want you to answer my -- But do

4     you think Smith was soliciting a new plan?

5          MR. HAMERMAN:  I think Smith was soliciting a plan

6     that was in the process of being updated.  Yes, it was a new

7     plan.  We will talk about how it got incorporated into the

8     actual words of a new plan in September.  When he sent out

9     his letter on September 11th, there had not yet been a

10    document called "Plan" that was sent around.

11         THE COURT:  So was he switching the votes, or was

12    he providing votes on a new plan?

13         MR. HAMERMAN:  I think the answer is the latter,

14    he was providing votes on a new plan, on a superseding plan.

15         THE COURT:  Okay.

16         MR. HAMERMAN:  Of course, Your Honor, the clients

17    were repeatedly informed that Smith was their lawyer by

18    Beasley Allen himself -- themselves, who copied Mr. Smith on

19    all communications, and Mr. Smith testified to his and his

20    office's own extensive client communications and counseling.

21         Now, Mr. Gordon mentioned that the Debtor's

22    position about their own interpretation of the rules should

23    be given some weight.  It's not just Mr. Gordon's statement,

24    Mr. Kim actually testified to this.  He said that they did

25    not believe that they needed a power of attorney document.

1    Other attorneys testified, as you heard, that they all had

2    the same position, and Ms. Ringer will speak about all of

3    this a little bit more.

4            Based on that, the Court has received in evidence

5    the Smith master ballot, which contains 12,055 votes, 11,886

6    in favor, of which 710 were Option A, and 11,176 were Option

7    B, 169 votes against were Option A.

8            THE COURT:  Okay, so that is what I'm looking for,

9    what you're pointing at as the Smith master ballot votes A,

10   B?

11           MR. HAMERMAN:  The A and B is in the transcript,

12   and we've given you the quote over here.  Again, this is the

13   unofficial site, but Mr. Smith testified to it.

14           THE COURT:  No, no, no, you're right.  I'm just

15   saying that that's the -- What I have in mind is something

16   that kind of gives me that breakdown, and I think this is

17   incredibly helpful.  So I know you're citing to 1157.17.

18   What is that?  Do you know what that is?  Oh, that's the

19   master ballot itself -- no, no.  1157.27 is the master

20   ballot, if I remember correctly.

21           MR. HAMERMAN:  This is the table there was

22   attached -- spreadsheet that had all sorts of groupings of

23   the different votes, which shows in an Excel Option A,

24   Option B (indiscernible)

25           THE COURT:  Ah, yes, yes, yes.

1           MR. HAMERMAN:  That's that painfully -- that

2     painful document.

3           THE COURT:  No, no, I -- That's incredibly

4     helpful.  Thank you.

5           MR. HAMERMAN:  And with that summary, Your Honor,

6     I'm to turn it over to Ms. Ringer.

7           THE COURT:  Okay.  Thank you.

8           MR. HAMERMAN:  Thank you.

9           MS. RINGER:  Your Honor, I'm going to leave it to

10    somebody else to click the clicker for me, because I will

11    forget to do it, and we'll end up on this slide for the rest

12    of my remarks.

13          Your Honor, for the record, Rachael Ringer from

14    Kramer Levin, on behalf of the Smith Law Firm Claimants.

15          So Your Honor, what I thought would be helpful,

16    just given everything that you've heard already, is

17    basically to set up what I was planning to cover, and then

18    to the extent you want me to breeze through some of it

19    because you've heard enough on it already, I can do that.

20    Or I can just kind of march through what I was planning.

21    Okay. I'll take the thumbs up.

22          THE COURT:  (indiscernible)

23          MS. RINGER:  Okay.  So I do want to come back to

24    the vote, and the voting issues, but in looking at this case

25    writ large, I do think it is important to start with the

1    fundamental component of confirmation, which is whether this

2    plan was proposed in good faith.  Here, I think you've heard

3    from the Debtor, you've heard actually from Mr. Hansen as

4    well that the case was filed, and the plan was really

5    negotiated and proposed in good faith.  And one of the

6    components of good faith is creditor support for the plan.

7    The case law is clear that overwhelming creditor support

8    confirms good faith.  But I think here, the question of good

9    faith goes not just to creditor support, but to what are we

10   looking at for claimants here?

11        THE COURT:  Are you referring to the good faith

12   for purposes of 1112 --

13        MS. RINGER:  1129(a)(3.)

14        THE COURT:  For 1129(a)(3) purposes.  Perfect.

15   Thank you.

16        MS. RINGER:  Correct.  Correct.

17        And what the parties here actually, I think,

18   uniformly agree on is that while all of the plaintiff

19   lawyers I think have testified that no amount of

20   compensation is ever going to be enough, the testimony is

21   consistent that what is being offered under this plan is

22   something that exceeds what could be achieved in the tort

23   system.  And I think that some of the objectors have really

24   contended that the only beneficiary of the plan is Johnson &

25   Johnson through the channeling injunction.  I would resist

1    that.  I think that the claimants actually benefit through

2    the efficient claims resolution and distribution process

3    that this plan implements.

4            Dr. Mullin testified that the plan provides

5    recoveries that are double those in the tort system.  That

6    was corroborated by Mr. Kim and Mr. Onder and Ms. Andrews,

7    and even Mr. Birchfield himself, who admitted that his

8    clients have not recovered in the tort system to date, and

9    he believes that non-ovarian gynecological claims are not

10   actually entitled to anything in the tort system.  And

11   really, everyone other than Mr. Birchfield has agreed

12   through their testimony that litigating for decades while

13   claimants are dying is not a fair and efficient resolution

14   of these claims, is not the right result for these

15   claimants.

16           Mr. Birchfield, as you heard from Ms. Brown, did

17   testify -- or did tout, I'm sorry, the tobacco settlements.

18   Obviously, you heard the testimony from Mr. Smith on that.

19   You know, he said in 40 years he hopes to still be here, and

20   he doesn't have ovarian cancer.  He said that type of

21   thinking to him is just really unacceptable, and it is what

22   was really fueling his desire to try and come up with the

23   right resolution here.

24           So when we look at the creditor support for the

25   plan, I think that there -- I was hearing Your Honor in the

1    colloquy with Mr. Gordon, what snapshots do I look at?  And

2    I think that to look at the vote, I'm going to borrow Mr.

3    Smith's sports metaphor, let's look at it in terms of

4    quarters.  Right?  You've got the first quarter, which is

5    the initial voting deadline, July of 2024.  You've got

6    halftime, the petition date, and then you've got today, and

7    I would call today the end of the fourth quarter.  And I

8    think that what is -- I understand why Your Honor wants to

9    look at halftime, because from the Disclosure Statement

10   perspective, they said that they needed 75% of the vote in

11   order to get into bankruptcies.  The question is, do they

12   have it?  The company has testified, and you heard the

13   testimony from Mr. Murdica and others, that they thought

14   that they had the vote on July 26.  And what you heard from

15   Mr. Smith is that he's hearing that, too, and he's concerned

16   that if he doesn't do anything, and he doesn't improve this

17   plan that he does not support at that time, his claimants,

18   along with all the other claimants, are going to get

19   something less than what --

20         THE COURT:  Just to be fair, I think they thought

21   they had the 75%, but then the Beasley Allen ballot came in,

22   and then Epiq show them that they were at 70%.  Right?  And

23   so I think they thought they were going to get to 75%, and

24   that's the way it was going to go, but then -- I'm just

25   trying to, I don't disagree with that Mr. Murdica said, that

1    they thought they were at 75%, but then they thought that

2    there were some voting irregularities, and that's why they

3    started pulling the Beasley-Allen vote, and that's when they

4    made the allegation that there's -- you know, this guy's

5    voting 3,000 more claims than we think he even thinks he

6    has, and that kind of thing.  So I just want to make sure

7    that we're being -- That's my understanding.

8            MS. RINGER:  Correct.  Correct, Your Honor.  I

9    think from the company's perspective, the position that they

10   have taken, and the position that their witnesses have taken

11   is that even though there was, you know, this allegation

12   around the 71%, from their perspective, because of the

13   irregularities in the Beasley Allen ballot, and maybe some

14   others, they actually thought that they did have the vote.

15   And that certainly was what Mr. Smith was understanding, or

16   led to believe, and that is why, over the period from let's

17   call it the end of July through the end of August, he felt

18   it was imperative to try and negotiate for those

19   improvements before he could recommend to his clients that

20   they should support the deal.

21           So then let's look at the petition date.  Right?

22   And I think that, you know, Mr. Smith kept calling this

23   halftime, and I think that that's an appropriate way to look

24   at it, because I think as you start fast forwarding to

25   today, and you heard Mr. Gordon say this too, I think that

1    the support really has become overwhelming, and you know,

2    there's motions even being filed this morning, trying to

3    continue to garner additional support for the plan.  But

4    there's been a lot of focus on, you know, how the Smith and

5    Beasley Allen ballots really reconcile into this number that

6    you've heard in the voting certification, this 83.4%.  So

7    what I wanted to do for the Court is really take Your Honor

8    through it step by step, how, from our perspective, a Smith

9    ballot was cast appropriately, and should be counted in

10   full.

11             THE COURT:  Okay.

12             MS. RINGER:  But then I also want to take Your

13   Honor through a couple of alternative scenarios, so that you

14   can get comfort that, really, regardless of how you crunch

15   the math on this, understanding that we need to deal with

16   the question of making sure that we don't disenfranchise any

17   voters under any conceivable set of circumstances, they were

18   above 75% at halftime.

19             So Mr. Hamerman went through the evidence on Mr.

20   Smith's authority.  I'm not going to rehash that here,

21   unless Your Honor has specific questions.  But I do want to

22   go to some of the questions you've had around solicitation,

23   and was Mr. Smith soliciting a new plan, an improved plan,

24   an amended plan?  I think Mr. Smith testified he's not a

25   bankruptcy expert, I think he fully admitted that.  I think

1      from, you know, bankruptcy parlance, we refer to things as

2      amended plans as pre-existing plans get improved over time.

3              I think the evidence here of what happened is

4      there was a plan that existed, it existed and it was voted

5      on in July.  Mr. Smith then negotiated a whole host of

6      improvements, some of which were embodied in the plan

7      itself, some of which, as you've heard, have come and are

8      triggered depending on things that happen in the bankruptcy,

9      in the deal no matter what, the safety net, and those were

10     all to be incorporated in an amended plan.  Now, that

11     amended plan would reflect all of these improvements, and it

12     was those improvements that he took to his clients in call

13     it end of August, early September period.  And the letter

14     that he sent out to his clients specifically said, these are

15     the improvements that I've been able to negotiate, and they

16     are going to be embedded in an amended plan.

17             And as I look at the Bankruptcy Code, and in

18     particular Section 1126(b,) it says, "In a pre-pack,

19     creditors' pre-petition votes are deemed to apply to the

20     bankruptcy plan once the case is filed, so long as

21     solicitation complies with 1125, and all the other

22     provisions of the code are met."  So those votes that were

23     cast, that he solicited through -- really on behalf of the

24     company, he wasn't soliciting a new plan by himself, are

25     deemed to apply to the plan once the bankruptcy case gets

1  filed.  And on the petition date, the Debtor filed a plan,

2  and that plan reflected the terms, really the improved

3  economic terms of the Smith MOU.  And I think that Mr. Kim's

4  first day declaration in paragraph 130 actually said that

5  specifically.

6        So I'm going to kind of walk through 1125(a,) and

7  then get into how it complies with the tabulation

8  procedures.  But the first question really in order to get

9  the benefit of 1126(b) is was the information adequate under

10  1125(a,)  and the answer here is yes.  The claimants here --

11  And some of the background is important not just for whether

12  the information was sufficient and adequate, but also to the

13  question of timing, which we'll get to.  But each of the

14  items that Mr. Smith identified in his letter were

15  ultimately incorporated into the plan, where they were

16  applicable to be in the plan.

17        And then you also heard a lot of questions, really

18  of various witnesses, about the current and future

19  allocation.  I know Mr. Hansen talked a little bit about

20  this this morning as well.  I do want to make two quick

21  points on this.  First, Mr. Smith himself testified that

22  this provision was ultimately aspirational, and for that

23  reason, that provision actually was not included in his

24  September 11th letter.  He was not touting this improvement

25  as a basis for these claimants to vote on the amended plan

1    or the updated plan, I think is exactly what he called it in

2    his letter.  And then you also heard Mr. Hansen kind of take

3    the Court through the testimony that came out from Dr.

4    Mullin and Dr. Singer about where the allocation is expected

5    to come out, potentially, you know, proving the point that

6    the aspirations may ultimately come to fruition.

7            So now we've got adequate information under 1125,

8    the next question is was the ballot properly submitted under

9    the rules, and here we go to 3018(b.)  And what 3018(b) says

10   is, "Votes will apply if the plan was properly submitted to

11   substantially all of the creditors, and creditors had

12   sufficient time to vote."

13           Mr. Hamerman took you through some of the

14   additional information on how Mr. Smith was able to get this

15   out to creditors.  You heard his testimony on this point, so

16   I think that that one is really satisfied.  The second

17   question, then, is did the claimants have sufficient time?

18   And I personally have been listening closely to Your Honor

19   on this point, and I know that you've had a lot of questions

20   of various people about, really, this issue, and the timing

21   that Mr. Smith was ultimately able to give to his claimants.

22           THE COURT:  Mm-hmm.

23           MS. RINGER:  He did testify that he wanted to give

24   them more time, I think he used the words "unfortunate," but

25   ultimately was not able to do so.  And I think that it is

1    unfortunate that you've got The Coalition on the one hand

2    taking issue with the timing and the submission of this

3    ballot, when --

4           THE COURT:  I think it's the two business days

5    issue.  Right?

6           MS. RINGER:  Correct.  Correct.  I want to get to

7    that.  So the question is, was it really two business days?

8    And if so, was it sufficient?  And I think that here you've

9    got a timeline that shows you this is not a circumstance

10   where on September 11th, these claimants are for the first

11   time hearing about the plan from front to back.  Right?  I

12   think Mr. Birchfield testified about all of the

13   communications that had been ongoing, leading up to the July

14   26th vote, and then you you've heard that Mr. Smith sent Mr.

15   Birchfield the MOU in August.  Mr. Birchfield then

16   unilaterally sent that MOU out to the clients in August.  So

17   we're now at the end of August.  Roll forward two weeks.

18   The claimants have had this for two weeks.  I think in --

19   we've got the testimony, that the Birchfield letter tells

20   the clients that they're going to be asked to vote on this,

21   and if they looked at the MOU, it's I think the very first

22   operative provision is that Mr. Smith is going to go out and

23   ask folks to vote on these improvements.

24           So yes, you get to September 11th, you've heard

25   all the testimony about the roadblocks that created the

1    delay in getting there, but on September 11th, he sends out

2    his letter to claimants, tells the clients the pros on this,

3    and gives them initially 'til that Friday, September 13th.

4    Because of weather issues, he actually extends that date to

5    September 15th, and then ultimately, submits a ballot on the

6    16th.  But so again, it wasn't just two days with these

7    improvements.  The letter was actually fairly easy to read,

8    and pretty clear about the improvements just as a baseline,

9    but they had had months of communications about kind of the

10   base of the plan, and then really, over the two weeks before

11   that letter even went out, they had at least some notice

12   that there were potentially going to be changes, and that

13   they were going to be asked to vote on them.

14        THE COURT:  Do you think Mr. Smith thought it was

15   a settlement?

16        MS. RINGER:  I think Mr. Smith does not -- I think

17   his testimony was very clear on this, he does not think it

18   is a settlement of the claimants' claims.  Right?  This is -

19   - And I think that part of the issue here, and you've heard

20   a lot of different perspectives on this, from the company's

21   perspective, this is addressing their liability with respect

22   to talc claims writ large.  And so from that perspective, I

23   think it is easy to use the term "settlement."  But I think

24   from the claimants' perspective, it is clear that it is not

25   a settlement of their individual claims, and Mr. Smith

1    testified about this.  He testified about the opt out, and

2    about the process that claimants need to go through in order

3    to actually submit their claims to the Trust.  They have an

4    opportunity to review whatever comes back from the Trustee

5    at that point as a proposed settlement of their claims, and

6    if they don't like it, they have options, and they can

7    pursue those options.  He testified about all of that.

8            And I think that Ms. Brown actually put up the

9    engagement letter that showed the difference between a

10   settlement matrix, which I think actually was a word that

11   Mr. Smith used as well, versus individual settlements of

12   claims, which he admitted fully those need individual

13   claimant support.

14           So I think on this point, I just want to make two

15   other quick points on this.  The objectors have really only

16   cited one case on this issue, and I think that's because

17   there's not a lot of case law on this issue, and that case

18   is Southland.  But that case is really factually very

19   different than what we have here.  First, that case is from

20   1991.  Your Honor, I won't tell you how old I was in 1991,

21   but I can assure you it was a very different time in terms

22   of how communications happened.  Obviously, at that point,

23   the communications were only happening by mail.

24           Now you've got a bunch of testimony over the last

25   few weeks that communications with clients are happening by

1    email, by phone, by text, and then also by mail, and you've

2    got people voting on web portals.  It's a lot faster for

3    folks to be able to kind of log on, and submit their vote.

4    And I think that the kind of underscore of whether this was

5    really enough time is the response that Mr. Smith got.

6    Right?  It wasn't as if he just got 10 people who responded.

7    He got 879 affirmative responses to this outreach.  And this

8    was notwithstanding all of the inter-attorney fights that

9    were going on, and as he testified, you know, the threats to

10    him and the like.  He got almost 900 claimants to respond

11    even over the limited period of time that he was ultimately

12    able to afford them.  And frankly, none of them have come --

13    You don't have a line of 11,000 people out the door saying

14    that they've had issues about what Mr. Smith did with their

15    votes through this process.

16         So then, the last step really brings us to the

17    tabulation procedures.  I heard Your Honor a little bit on

18    Section 4(c,) I do think this actually applies to claimants

19    voting through a master ballot, because claimants,

20    particularly those that get voted under Option A, those are

21    votes on behalf of holders, so I think that those votes can

22    be superseded.

23         And I kind of want to revisit the hypothetical

24    that you threw out to Mr. Gordon a couple minutes ago, this

25    was, you know, why can't Beasley Allen come in right now and

1    file their own motion to amend the votes back to reject?

2    That just is not the way the Bankruptcy Code works, so --

3    and it just, it's not feasible.  Right?  So under 3018, you

4    have to establish cause to change your vote.  Right?  So Mr.

5    Birchfield would have to come in and establish cause to

6    change his vote from what is currently existing -- or his

7    claimants' vote, which is what is currently existing as --

8    except for the most part, with the exception of those Option

9    A's that voted to reject, which were all registered on Mr.

10   Smith's ballot, and he would have to satisfy the standard

11   for cause.  But you've got case law, including MCorp, which

12   the objectors actually cite, that says you can't come in and

13   satisfy 3018 if you have some suspicious purpose for

14   changing your vote, or if it's a self-interest to change

15   when you've got a plan that hasn't changed from when that

16   new vote has been registered.

17         Here, the plan has improved since Mr. Smith's

18   ballot was lodged, and what the Bankruptcy Code says is that

19   yes votes get carried forward when a plan is improved.

20         MS. RINGER:  But I was contemplating the

21   situation, you know, and again, it's way too late for this,

22   but just the situation with Beasley Allen during the case,

23   what if they'd just, you know, wrote another email, blasted

24   it out and said, now I'm going to give you 48 hours, let me

25   tell you how bad the plan is.  I know Smith told you all

1   this stuff, let me tell you what I really think.  And then

2   they come back in and they ask to switch the votes, and say,

3   no, I got -- I now can switch the votes back, and here's the

4   cause.  I now heard from the 11,000 people, and 5,000 of

5   them changed their vote -- you know, that kind of stuff.  So

6   that's the situation.  Like, at some point does it -- does

7   the Bankruptcy Code make the music stop, or do we -- You

8   know, where do I draw the line between these motions to

9   change votes, which have been common in bankruptcy.  Right?

10         MS. RINGER:  Correct.  The purpose of bankruptcy

11   is to foster additional consensus.  So I think having folks

12   come in and want to change previous no votes to yes votes is

13   very common, you're right.  I think that having folks come

14   in and try and change yes votes to no is very uncommon.  And

15   so I think satisfying cause in that circumstance would be

16   extremely difficult, particularly after a voting deadline

17   has actually passed.

18         And yes, there is a voting deadline.  It is within

19   the Debtor's discretion to extend it.  And usually, Debtors

20   extend it in order to foster that additional consensus, and

21   certainly, under this hypothetical, that would not be what

22   is happening.

23         So just, I think that that ultimately gets us to,

24   if you follow the Bankruptcy Code, you follow the tabulation

25   procedures, Mr. Smith passed his ballot appropriately.  He

1    had appropriate authority for doing so, and on that basis,

2    the Smith ballot should stand.  And really, the vote at that

3    point can be certified, halftime, you've made your 75%.

4    Obviously, in the six months that have ensued since, the

5    support has grown, and I think that that gives Your Honor

6    confidence that this plan actually has the support of the

7    claimants, the voice of these women is in favor of this

8    plan.

9          But even if you still have concerns, the

10   tabulation procedures and the Debtor's expert address these

11   concerns, and still give you confidence that both at

12   halftime and today, you can confirm the plan.

13         4(g) of the tabulation procedures says that if

14   there's disputes in master ballots that can't be reconciled,

15   the conflicting votes just aren't counted.  Right? And so

16   that doesn't mean disregard the votes entirely, that means

17   disregard conflicting votes.  And I think here, under any

18   appropriate reading of this, you wouldn't discount the --

19   Let me back up for a second.  What Beasley Allen has said to

20   date is take the Smith ballot, throw it out, replace it with

21   the Beasley Allen ballot in its entirety.  Ignore the fact

22   that 879 claimants responded affirmatively in September, 710

23   of which said, yes, I want to vote in favor of the plan.

24   That doesn't work.  Right?

25         But what does work is -- and what works just from

1    a mathematical perspective is if you look at a scenario,

2    which Mr. Evans ran, if you look at a scenario where you

3    just accept Mr. Smith's Option A votes, and the Option A

4    votes from the Beasley Allen ballot where they have actually

5    produced evidence that they had responses, and you, in

6    accordance with 4(g,) disregard the other conflicting votes,

7    that result is 82% in favor of the plan.

8         THE COURT:  How should I think about the letter

9    that never got opened by Epiq?

10        MS. RINGER:  The letter -- Oh, oh, the letter that

11   never got opened by Epiq.  I mean, I think that you heard

12   the testimony that really, had the letter been opened, it

13   would have ended up going to Jones Day to give guidance to

14   Epiq as to how to deal with that.  But ultimately, let's

15   assume for these purposes that Epiq couldn't reconcile the

16   vote.  What the tabulations procedures say is in that

17   circumstance, you disregard the conflicting votes.  So I

18   think that the evidence says whether or not that email was

19   opened or not is a little bit beside the point.

20        THE COURT:  You think so?

21        MS. RINGER:  I think that you've heard the

22   testimony that it was unfortunate.  But I think at the end

23   of the day, it's probably fair to assume that there was

24   going to be kind of, you know, disputes among those votes in

25   a scenario where you're not counting the Smith ballot in its

1    entirety.  Right?  I continue to think, and we submit that

2    the Smith ballot should be counted in its entirety, because

3    it was fair, and submitted appropriately.

4         THE COURT:  I don't disagree with you.  I'd just

5    note that I don't know if it's beside the point that a

6    claims agent didn't catch a letter.  And the answer I got

7    was because there's 100 emails.  I think --

8         MS. RINGER:  Fair enough, Your Honor.  And I was

9    not trying to be glib, I was just --

10        THE COURT:  I know you're not.  I'm just saying I

11   think during the case, 100 emails is considered new to most

12   of you.

13        MS. RINGER:  I think I made that comment,

14   actually, to one of my colleagues.

15        But I think that notwithstanding that, ultimately,

16   because this is at bottom a math exercise, regardless of

17   whether that email was seen or not, the math still works.

18        THE COURT:  Your point is the solicitation

19   procedures can still answer the question.

20        MS. RINGER:  Correct.  Absolutely.

21        THE COURT:  Got.  That's a good point.

22        MS. RINGER:  So you see up here, you know, these

23   scenarios where you kind of take the -- you take the, let's

24   call them the affirmative response Beasley Allen Option A,

25   understanding that they voted everything Option A, and you

1    take the Smith Option A, and you've got -- you're above 75%

2    really in every scenario.  But then let's go one step

3    further.  Right?  Because you've got, again as I said, kind

4    of backing up what Beasley Allen is asking you to do, and

5    what The Coalition is asking you to do is just replace the

6    Smith ballot with the Beasley Allen ballot in its entirety,

7    and I think the reason for that is because the math suggests

8    if you do that blindly, you end up at 74.9%.  But Mr. Evans'

9    report actually says in that scenario, it disregards the

10   affirmative Option A votes that were cast by Mr. Smith.  And

11   I think the testimony was, how much do you need -- 74.9% is

12   so close.  Right?  How much do you need in order to get over

13   75%?  He said just a couple hundred.

14           We said, let's do the math, and so we did do the

15   math.  And if you take the total voting to accept or reject,

16   and I'm taking all votes, not just the ovarian cancer votes,

17   and you try and figure out what 75% of that is, that's

18   69,282.  You reduce that, you reduce what you've got voting

19   to accept there, and you come up with, you just need 120

20   additional votes in order to get above that 75% threshold.

21   As I said, the Smith ballot Option A had 710 votes in favor.

22   And even if you dupe out the 69 votes in favor that were in

23   that Beasley Allen ballot, so now you've got 600, let's call

24   it 640 just for easy math, 640 is obviously much greater

25   than 120, and so you're over 75% even if you take the worst

1    case scenario.

2              I'm just skipping ahead a little bit.  So then

3    ultimately, and unless Your Honor has any other questions on

4    this, I think you see how it really applies across the

5    board.  I did want to take a moment and just address a

6    couple of the arguments about Mr. Smith, and about what --

7    you know, the circumstances of him entering into the MOU,

8    because I think it's important for the record.  And I also

9    want to dispel with the suggestion that his votes should be

10   designated under 1126(e.)  The case law on designation of

11   votes is pretty stark.  The courts require egregious facts

12   to designate votes.  I think there is absolutely nothing in

13   the evidence that would support that here.  But I do want to

14   kind of tick through each of the items, and point Your Honor

15   to what the evidence actually says about these things in

16   order to give you comfort that designation is not

17   appropriate here.

18             So first, the common benefit fund.  I think there

19   was a lot of insinuation that Mr. Smith was somehow in

20   charge of this fund.  The language of the MOU says

21   otherwise.  He also testified that he never thought that he

22   had control over this.  He had -- In his MOU, the special

23   master was going to be retired Judge Norton.  Then, as the

24   TCC took his MOU and improved upon it, that provision

25   changed to Mr. Kurdi.  It's not, Mr. Smith, I think you

1    heard the testimony from Johnson & Johnson, they were not

2    thinking that he was going to somehow be in charge of this

3    fee fund.

4            And I think that you've also heard a lot of

5    evidence in the record, and you heard a little bit from Mr.

6    Gordon as well, that at a minimum, there's a dispute about

7    how the MDL case management order works.  And so while there

8    was some insinuations that this provision was not actually

9    something that benefits the claimants, there is, I think

10   certainly at a minimum, arguments that claimants would still

11   be subject to that common benefit tax in certain

12   circumstances.  And so kind of taking that dispute out of

13   the MDL, and just saying no matter what your engagement

14   letter says, no matter what CMS 7 says, we're just

15   eliminating that dispute.  This money is going to be set

16   aside for call it common benefit fees, and you're just

17   eliminating that tax entirely, whether it applies in part,

18   in whole, writ large.

19           Then, there was some discussion about whether Mr.

20   Smith controlled the IRF, and the IRF factors.  I think that

21   the testimony on this was actually quite the opposite.

22   There was testimony about what folks, in particular Beasley

23   Allen, that were part of those early August negotiations,

24   what they wanted with respect to the IRF.  And ultimately,

25   where things came down was that, first, Mr. Smith was not in

1    control of these factors.  Yes, there was one item in the

2    Smith MOU that was supposed to be part of a non-exclusive

3    list of factors for consideration within the discretion of

4    the Trustee.  Obviously, that term also changed in

5    connection with the TCC MOU, and is now you see it in the

6    TDPs and the Trust agreement, that it is subject to

7    negotiation with the Trustee, the TCC, the FCR, and the Ad

8    Hoc Committee.  So there is going to be consensus, or an

9    avenue to come back to Your Honor, if consensus can't be

10   reached, to come up with the right list of factors for the

11   Trustee to analyze in connection with making IRF awards.

12           I do just want to pause for a second, because I

13   mentioned Mr. Kurdi in connection with the common benefit

14   fund and the IRF factors.  I was planning to address Mr.

15   Kurdi a bit, although I think Mr. Hansen did it pretty well.

16   And so I won't say anything else on that, other than to say

17   that I agree with his comments.

18           The last two issues were, again, there was some

19   insinuation that Mr. Smith controls the TAC.  If Your Honor

20   looks at the TDPs, Mr. Smith is one of 17 TAC members, so

21   he's just one of many voices on a TAC, and it is pretty

22   unremarkable for someone with a large group of creditors,

23   and a seat at the table in these negotiations to negotiate

24   for a seat on a multi-party TAC.

25           And then the last issue was, again, some

1     insinuations about him signing on to the MOU to end

2     discovery.  I think that the record is also clear on this,

3     and what he testified was, you know, once parties settle

4     litigation, they usually stop seeking discovery from each

5     other.  J&J had already lost a discovery fight, so the idea

6     that this would be an agreement to "put swords down," I

7     think is the language that he used, is pretty unremarkable,

8     particularly in a bankruptcy setting.  The Coalition also

9     tried to make insinuations about Mr. Smith's motives based

10    on questions around litigation funding.  The testimony from

11    Mr. Smith and Mr. Murdica on this was clear, no litigation

12    funding influenced decisions to reject the plan in July, or

13    to accept the plan, or really influenced any decisions about

14    the plan at all.  That's what the testimony shows.

15            So at bottom, our position is that there's no

16    basis to designate Mr. Smith's votes.  The Smith master

17    ballot was submitted appropriately in compliance with the

18    Bankruptcy Code, the rules, and the tabulation procedures,

19    and should be counted.  But again, Your Honor can take

20    comfort that the math supports really any set of

21    circumstances that you might otherwise try and apply in

22    order to get yourself comfortable that votes are not being

23    discounted in a way that would be unfair to the claimants

24    who really want their voice to be heard.  Mr. Smith

25    testified very clearly that it's his perspective that he's

1    trying to give these women a voice, and that's really what

2    he was trying to do through his participation in this

3    process overall.

4              You know, I think that it is, just bringing it

5    back to where Mr. Hamerman started, it is hard to believe

6    that, you know, a Sunday lunch with his dad would lead Mr.

7    Smith on a 20-year foray into this tort, and fighting for

8    recovery to kind of bring about change.  He obviously did

9    that by changing Johnson & Johnson's practices, taking

10   dangerous product off the shelves, and now really, were on

11   the precipice of a $10 billion trust to fund compensation

12   for these women.  Ultimately, Your Honor, I think the

13   testimony is clear that it is time for these recoveries to

14   start flowing, and the plan to be confirmed.

15             THE COURT:  Thank you very much.

16             MS. RINGER:  Thank you.

17             MR. PARKINS:  Good afternoon, Your Honor.  Lenard

18   Parkins, for the Ad Hoc Committee of Supporting Counsel.

19             I had a lot to say starting this morning, and as I

20   went through my notes, I was checking off what has already

21   been said, and I don't like redundancies, and don't like to

22   waste time for the Court or others.  But I do want to say to

23   start that I think this plan should be confirmed.  I think

24   it was filed in good faith.  I participated in this case

25   since Charlotte, and I have seen the changes.  Whether it's

1    Mr. Hansen's evolution, or whether it's my metamorphosis,

2    what has happened here has been dramatic in favor of the

3    claimants, and the temper and the balance is that Johnson &

4    Johnson wants finality, and finality costs $10 billion in

5    this circumstance, and the claimants want to get paid.

6          These claimants are sick ladies, with ovarian

7    cancer and gynecologic cancer.  They haven't won any trials

8    in the tort system.  They're not going to go to trial

9    quickly.  The gynecologic cancers end up in what's been

10   called by many of the lawyers who testified, inventory.

11   When are they going to get tried?  They're not going to have

12   any value in the tort system unless they're part of a master

13   settlement agreement, which might happen sometime in the

14   future for values which have been testified to be very low.

15         The opposition here, The Coalition, has not

16   delivered in the courtroom, and they have not delivered in

17   the boardroom for a deal.  So what we have here is a

18   proposal put before the Creditors for a deal for $10 billion

19   for finality for Johnson & Johnson, and finally, some

20   compensation to the cancer victims that have waited now 12

21   years.  When I started this case it was 9 1/2 years.  Now 12

22   years to get compensated.

23         I do want to talk a bit on a few topics.  Number

24   one, I hate to go back, but I sort of start at the

25   beginning, is, you know, is there adequate disclosure,

1    adequate information under 1125?  I hate to start at sort of

2    the beginning, but I think it's a predicate for confirming

3    plans.  Has there been adequate information given, and I

4    think the answer is yes.  If you look at the first six pages

5    of the Disclosure Statement document, the solicitation

6    letter from the company, the solicitation letter that went

7    out from the Ad Hoc Committee, it says exactly what the

8    circumstance is for these ladies to vote on.  We've got

9    nothing in the tort system, nothing in the boardroom, and

10   now there's a, at the time of solicitation, an $8 billion

11   offer and resolution through a trust to be determined after

12   the plan is confirmed, as a solicitor claims to the Trust.

13          One of the things you've asked everybody, you've

14   asked all the AHC witnesses is, is this a settlement?  Is

15   the voting on the plan a settlement?  Well, if any of these

16   ladies vote on a plan and get a dollar by virtue of

17   confirming the plan, the answer is it might be, but they

18   don't get a dime.  They get an entree into filing a claim

19   with a trust to determine whether or not they have a

20   compensable claim, and how much.  I think it's very

21   important that a settlement brings money to clients, and

22   confirmation of this plan brings not a dollar to any of the

23   victims.  It is just an entree to the room with a trust.

24   And I think that has been the consistent testimony of every

25   one of the clients, my clients from the AHC that has

1    testified, and Mr. Smith, and there is no controverting

2    evidence about how the Plaintiffs' bar on this side of the

3    table views it, including Johnson & Johnson also, and the

4    Debtor.

5           Law in the Fifth Circuit, you have wide discretion

6    under the case law in the Fifth Circuit to determine what's

7    adequate disclosure in the case.  I think when you read the

8    six pages, the first six pages of the Disclosure Statement,

9    and the solicitation materials, you will see it is adequate,

10   because the target group are sick cancer victims, who don't

11   have -- They are not looking to invest in the future of a

12   company, and swapping their debt for equity.  They are not

13   taking property in lieu of debt.  They're trying to get

14   compensated for the sickness they suffer caused by, they

15   believe, a talc manufactured and sold by Johnson & Johnson.

16   So this is not a difficult question.

17          The vote, I want to talk about the vote.  The AHC

18   represents approximately 75,000 claimants, 18 firms, and

19   there are just two firms, really, opposing this transaction

20   now.  But 18 of the leading talc firms support this

21   proposal, and they represent about 75,000 claimants.  If you

22   look at the A votes, we've gone through this, A votes, B

23   votes, the A votes are overwhelming that came in.  The

24   individual votes, whether it's individual votes received, or

25   votes told to the law firms to vote for them directly by the

1    clients, A votes, overwhelming, 97% or greater.  Yes, the B

2    votes, obviously, yes, almost 100% with respect to the B

3    votes.  So what do the lawyers have here when they voted?

4    And the B vote is obviously a hot issue.  You mentioned it

5    yesterday, and it remains a hot issue today, and it's

6    unresolved.

7            When you have A votes from a client, take Anne

8    Andrews, for example, she had half of her votes, A votes,

9    5,000.  A lot of people don't like to use the word proxy,

10   but it is certainly a measuring stick to determine what the

11   profile of your clients is when you have 50%, 99% of which

12   vote yes on A votes.

13           An important thing to remember here, which I think

14   everyone has forgotten, and we put it in evidence, and it's

15   important that we did, but why we put it into evidence is

16   that the issue of the relationship between the lawyers

17   speaking for their clients, the women here, has been

18   important from LTL I, LTL II, through Red River.  And in

19   fact, Mr. Watts testified that Judge Kaplan entered an order

20   requiring the AHC in LTL II to send out a letter, and that

21   is Exhibit 1153-56 that is in evidence.  And Judge Kaplan

22   was concerned that as a result of what happened in Imerys,

23   that the individual clients know that the lawyers at the AHC

24   were representing their interests, were supporting the plan,

25   had filed a plan support agreement to be sure that their

```
 1   clients were engaged.  Because the clients are the issue.
 2   The victims are the issue.  Your Honor has noted it from the
 3   beginning, what's the voice of the victims?  What's the
 4   voice of the women here?  Judge Kaplan recognized it, and
 5   the relationship in the mandate to be sure that the victims
 6   were in tune, and up to speed with what was going on started
 7   in Judge Kaplan's court in LTL II.
 8           Now I wouldn't bet on what Judge Silverstein would
 9   do in certain circumstances, but I bet if she heard the
10   testimony of the AHC lawyers here in the last week, her
11   ruling in Imerys would not have been the same.  These
12   lawyers care about their clients, they communicate with
13   their clients, hundreds of phone calls with their clients to
14   keep them up to speed, and to keep them engaged.  The
15   evidence was carefully put on with respect to every one of
16   the AHC lawyers that testified.  Number one, did the client
17   get the solicitation materials?  Point number one.
18           Point number two, how did that happen?  Whether by
19   call or email to Epiq to send the solicitation materials, or
20   whether the firm was going to do it.  The next step, the
21   evidence showed, was if the firm was going to do it, links
22   to the solicitation materials sent out by the firm to ensure
23   100% of the clients received those solicitation materials,
24   including the additional materials from the law firm.  And
25   after that, repeated communications.  You heard from Mr.
```

1   Pulaski, hundreds of phone calls.  You heard from Anne

2   Andrews, repeated communications.  You heard from Onder --

3   Watts, I even showed you the one Watts communication when he

4   was trying to get communication to his clients, when the

5   ballots didn't go out with the solicitation materials.  But

6   even Mr. Watts and Mrs. Watts' clients got the solicitation

7   materials, so it was the issue of not getting the ballot.

8          All these lawyers had authority to vote.  These

9   lawyers are agents under State Law.  We've briefed this in

10  our preliminary brief before, they're agents for their

11  clients.  They're fiduciaries, they have to take care of

12  these clients.  And Anne Andrews showed the relationship of

13  lawyers in a mass tort situation where women are seriously

14  ill, they rely on their lawyers to take care of their

15  interests.  And one of the interests was not to let these

16  women be disenfranchised from the opportunity to participate

17  in getting some money, finally, under this plan of

18  reorganization.  They all had authority to vote, they all

19  had authority to vote B, and they did what they needed to

20  do.

21          Now I want to talk about Mr. Watts.  Mr. Watts is

22  in a unique situation.  Mr. Watts --

23          THE COURT:  Do you think he was put in a tight

24  spot, and tried to do what he could?

25          MR. PARKINS:  Right.  Mr. Watts was in a tight

```
 1    spot.  He tried to do what's good.  He, along with all of
 2    these lawyers, sent out negative notice either a couple
 3    days, or a day before the voting deadline.  Because one of
 4    the important things, and every one of these lawyers, Mr.
 5    Onder, who had maybe better language than others in their
 6    engagement letter, to everybody else, the important thing
 7    was every one of these lawyers wanted their individual
 8    clients to vote for this plan.  Yea or nay, they wanted to
 9    hear what the individual clients wanted to vote.  They
10    tried, it didn't work out, because circumstances with mass
11    tort situations are, your clients may not respond.
12            Like you said, Your Honor, they may be having a
13    bad day.  A lot of them may be having a bad week.  They're
14    sick.  They shouldn't be disenfranchised.  And the voice of
15    these clients is heard, the voice of the woman is heard
16    because the relationship that you heard about was different
17    than the relationship that Judge Silverstein heard about in
18    Imerys.  You heard a tight relationship, a close
19    relationship, repeated communications, direct assurance that
20    they got the solicitation materials, and requests to vote
21    repeatedly until the day came when they either had to vote,
22    or lose the opportunity to try to put their vote forward so
23    they could get the opportunity to participate in this plan.
24    And that's not wrong, it is legitimate, and they have the
25    power to do it.  And they shouldn't be disenfranchised
```

1   because I view, like you, a vote is pretty sacred in a

2   Chapter 11 case, and it shouldn't be taken away when there

3   is clearly authority to vote.

4          The last thing I want to talk about is good faith,

5   bad faith, depending on when you look at the burden in the

6   Fifth Circuit, that the movements on a motion to dismiss for

7   bad faith, I have the initial burden to pretty much show a

8   prima facie case of bad faith.  I hate to say it, but when

9   Little Creek came out, I called the judge and talked to

10  Judge Jones, and said, "Interesting decision, Judge."

11  Because it was a case predicated on a, you know, a single

12  asset real estate case being filed before bankruptcy, and

13  that was the predicate facts.

14         But you're right, the overarching meaning of

15  Little Creek is, is there a legitimate purpose?  Are you

16  abusing the system?  Are you using the bankruptcy system for

17  the right purposes here?

18         Now, as I say, whether it's evolution or

19  metamorphosis, what happened in Charlotte, in my view, was

20  not a good purpose for using the bankruptcy system.  What

21  happened since the dismissal of the first LTL bankruptcy

22  case has changed the dynamic between the parties here.  You

23  have the party who has the money, who has been victorious in

24  litigation, okay, willing to compromise, to bring finality.

25  And you have the lawyers who have tried to bring success to

1    their clients, and have been unsuccessful in the tort

2    system, and unsuccessful up to recently to negotiate an

3    acceptable deal engaging in dialogue.

4           Paying sick people for asbestos damage claims is

5    not a bad bankruptcy motive.  That's a good motive.  Using

6    524(g,) a prescribed section of the Bankruptcy Code to

7    accomplish these payments, and to afford the people that are

8    proponents of the plan the attributes of Section 524(g) is

9    not a bad motive.  The fact that this is a third bankruptcy,

10   the Court is aware of the circumstances.  The first two

11   bankruptcies were dismissed because the standard in the

12   Third Circuit was, you know, no immediate financial

13   distress.

14          THE COURT:  (indiscernible)

15          MR. PARKINS:  Okay.  That's not the standard here.

16   The standard is totality of the circumstances.  Financial

17   distress, financial condition may be one of the

18   circumstances, but all the other circumstances here weigh in

19   favor of good faith.  And good faith means this case

20   shouldn't be dismissed.  And if 1129 is satisfied, and the

21   purposes of using 524(g) are legitimate, in paying asbestos

22   claimants that will not get paid outside a 524(g)

23   settlement, I suggest that the Court cannot find possibly

24   that this case is filed in bad faith, and I think this case

25   should be confirmed.

1           THE COURT:  Mr. Parkins, thank you.  I just have

2    one question for you.

3           MR. PARKINS:  Sure.

4           THE COURT:  By the way, I went back and looked in

5    my preparation over the past couple of months.  I know you

6    were in National Gypsum, speaking of 1990 cases --

7           MR. PARKINS:  No, I don't want to talk about that.

8           THE COURT:  They put $347 million in a trust at

9    that time.

10          MR. PARKINS:  Yeah.

11          THE COURT:  So times have changed.

12          You obviously know our District, as well as Mr.

13   Gordon and others.  Do you think the consensual -- so you

14   think the release works, the third-party release works in

15   this District?

16          MR. PARKINS:  Yes.

17          THE COURT:  Tell me why.

18          MR. PARKINS:  Well, the third-party releases, and

19   beyond what 524(g), Ito be clear, beyond what 524(g) --

20          THE COURT:  Yeah, beyond 524(g.)  Not the

21   channeling injunction, just the regular third-party release.

22          MR. PARKINS:  The release that's given at the time

23   of submission of the ballot, I mean the application to the

24   trust?

25          THE COURT:  Mm-hmm.

1              MR. PARKINS:  I think it does, and I'll tell you

2       why.  I think that release is predicated on the deal no

3       matter what.  And if I understand your question correctly,

4       the deal no matter what, is a huge plus part of the

5       negotiations of the parties, because I can tell you that Mr.

6       Onder and all these other lawyers wanted to have a safety

7       net in the event bankruptcy failed years ago.  And the deal

8       no matter what brings that to the table.

9              Now, the submission of a release as part of filing

10      a claim assures Johnson & Johnson, with close to the

11      finality it would get under 524(g,) except that it doesn't

12      cover futures, it runs the risk of futures, and it also,

13      therefore, makes available, presumably, I think under the

14      document, the $4.975, and 80% of the $1.1, and 80% of the

15      $650 million, with Johnson & Johnson not getting protection

16      for future claims.

17             So I think the release works because it's for new

18      consideration, with new consideration being given here., a

19      deal outside of bankruptcy that they don't have to do, that

20      they are prepared to do, and they are prepared to fund in

21      exchange for getting a release, which is not as good as

22      524(g).  So I think, yes, the release works.

23             Anything else, Judge?

24             THE COURT:  No.

25             MR. PARKINS:  Okay.

1        THE COURT:  I was going to ask you about

2   Continental, but I'll save it for another day.

3        Okay.  Is there anyone else who supports the plan,

4   that wishes to be heard.  And I'm just going to check the

5   phone line now.  Okay.  Why don't we start from parties who

6   oppose?

7        MR. SILVERSTEIN:  Good afternoon, Your Honor.

8   Adam Silverstein of Otterbourg PC, for The Coalition.  We

9   have a deck as well.  May I hand it to the Court?

10       THE COURT:  Yes, thank you.

11       MR. SILVERSTEIN:  I also have an offering.  At

12   this point in the day, 4:00, a Red Bull?

13       THE COURT:  No, I'm fine.  Thank you.

14       MR. SILVERSTEIN:  Okay.

15       THE COURT:  Thank you.

16       MR. SILVERSTEIN:  Your Honor, first off, on behalf

17   of my firm, my co-counsel, Bailey & Glasser, and Lawson &

18   Moshenberg, and on behalf of our clients, we want to thank

19   the Court, and all of the Court's staff for your long hours,

20   your attention, your patience, and your good spirits.  For

21   those of us representing The Coalition, or on The Coalition,

22   we've been away from our families and our offices for over

23   two weeks, and the one constant that we've had is coming to

24   court, to this courtroom every day.  So we very much

25   appreciate the Court's extended hospitality, and hope that

1    we were the kind of guests that get invited back.

2          What I want to do, Your Honor, is start with a

3    roadmap, so the Court understands where -- how I'd like to

4    spend our time together.  I'm going to try to do it in the

5    45 minutes that we've been allocated.  I want to start with

6    some very brief introductory remarks, and then jump into the

7    bankruptcy issues, starting with voting, then planned

8    confirmation, and good faith.  I'm going to try to confine

9    myself to about 10 minutes on the voting issues.  I want to

10   spend most of my time on confirmation issues, about 20

11   minutes, and then about 10 minutes on good faith, and then

12   the wrap-up.  For each of these substantive areas, I'm going

13   to start with The Coalition's request for a remedy, and then

14   explain why we think it's supported by what the Court has

15   heard over the past two weeks.

16         I said in my opening that the reason we're here is

17   just Johnson & Johnson doesn't trust the process.  They've

18   had their thumb on the scale of the process this entire way,

19   and I think that's what the evidence has shown these past

20   two weeks.  Instead of putting Johnson & Johnson Consumer

21   Inc, the entity that they claimed originally had the talcum

22   powder liabilities that required a bankruptcy filing, the

23   company has made one bad decision after another, and that's

24   led to this untenable position of asking the Court to close

25   its eyes to Johnson & Johnson's serial bad faith filings

1    that have worn down women over the past four years, who have

2    racked up tens of, or hundreds of thousands of dollars in

3    medical bills, trying to beat a pernicious cancer they

4    allege was caused by Johnson's Baby Powder, if they were

5    fortunate enough to survive, its creation of yet another

6    made-for bankruptcy entity, and solicitation of votes for

7    yet a third bankruptcy based on misleading and deceptive

8    promises, and blood sport vote switching, and it's

9    proffering of a bankruptcy plan that breaks the rules.

10           And if the Supreme Court's Purdue decision teaches

11    us anything beyond its narrow holding regarding the lack of

12    authority in the Bankruptcy Code for non-consensual third-

13    party releases, it's that a multi-billion dollar settlement

14    incorporated into a plan that has overwhelming support still

15    has to satisfy the Bankruptcy Code.  And that's what I'm

16    going to get into today.  It does not.  The vote should not

17    be certified, the plan should not be confirmed, and the case

18    should be dismissed.

19           I think the evidence also shows over the past two

20    weeks that the company's campaign to demonize our clients

21    for the past four years is morally corrupt.  The Court has

22    gotten to see our clients over the past two weeks.  All they

23    want, all they've ever wanted is fair compensation for their

24    clients, and the ability to answer the fundamental questions

25    that their clients have of how much money should I expect to

1   receive, when should I expect to receive it, and how much

2   money will be left after medical liens are paid.  For

3   months, our clients have been accused of having a conflict,

4   and of being unethical for recommending that their

5   gynecological cancer claimants vote against the plan.  And

6   then, we heard from the FCR, under oath, who is an attorney

7   who has represented or interfaced with victims of injured

8   clients for her entire professional career, and she said,

9   and we'll put it up on slide 4, that she would not recommend

10  any gynecological client of hers take the deal.  So where's

11  the conflict?  That the FCR agrees that this is not, $1,500

12  is not a good deal for gynecological cancer claimants, who

13  have an increased incidence over the general population of

14  one day experiencing and suffering from ovarian cancer.

15          And we also heard that our clients are self-

16  interested, they negotiated for themselves common benefit

17  funds, and some very rich individual review criteria --

18  review fund, and what we have in the record, Your Honor, is

19  a contemporaneous letter from Mr. Smith, dated September

20  11th, where he writes, "Unlike Beasley Allen in the August

21  26th, 2024 letter, in which they promised to uphold our

22  duties to all claimants," and then he lauds Beasley Allen's

23  commitments to all claimants, which he says is admirable.

24  It doesn't reconcile, Your Honor, that our clients would

25  negotiate for common benefit funds for themselves, and then

1    negotiate $1.1 billion for their clients, and then Mr. Smith

2    turns around and criticizes them for looking out for all

3    claimants.  It doesn't add up.  And during my remarks today,

4    I'm going to assume for purposes of today that all of the

5    law firms were acting in the best interest of their clients.

6    What I know for sure is that the record shows that that's

7    what our clients were doing.

8              I want to start with voting.  On this record, The

9    Coalition submits the Court should not certify the vote.

10   The voices of the women should be heard with a

11   resolicitation, and a direct vote, a direct weighted vote.

12   And at a minimum, if the lawyers are going to vote by master

13   ballot, the voting and tabulation procedures need to be

14   clear, and consistently and fairly enforced under the

15   supervision of the Court.  And that's if the Court does not

16   dismiss the case.  I want to make that clear.  The Court

17   should order a bar date so we know the universe of

18   claimants, and have better information as to their injuries

19   so that we don't have what Your Honor described as two

20   credible experts, Dr. Mullin and Ms. Austin, disagreeing

21   about what the universe of ovarian cancer claimants are,

22   which is critical to determining their compensation under a

23   point system.  And we should have an estimation procedure to

24   weight the votes based on the expected economic recovery of

25   the claimants, distinguishing ovarian cancer claimants and

1    gynecological claimants.  And maybe that process is as

2    simple as looking at how they're treated under the plan, in

3    terms of $1,500 versus this average of $120,000 per claim

4    that the Debtors have touted.

5         But in either event, there should be some

6    weighting so that when the voices of the women are heard,

7    the voices of those women who are most impacted in terms of

8    their injuries are heard, and their voices come through loud

9    and clear.

10        We also need a proper Disclosure Statement, Your

11   Honor, that informs the claimants what they reasonably can

12   expect to receive if the plan is approved based on their age

13   and stage.  That's nowhere to be determined.  We'll look at

14   his testimony, but Dr. Mullin said that averages are

15   meaningless, and that figuring out what a client is going to

16   get is something that nobody should try at home.  That's not

17   what people who are voting should be getting in their

18   Disclosure Statement.

19        THE COURT:  How do I reconcile that with this

20   case, where at least it's 99% of the folks that are

21   represented by law firms, can't they turn to their own

22   lawyer and say kind of this is what you do, you kind of

23   figure this stuff out.  Here are the ranges, how much --

24   what does it look like I'm going to get under the plan?

25   What's your response to that argument?  Which is different

1    than if we were sending it to 100,000 folks who are just

2    reading it on their own, what the U.S. Trustee likes to call

3    the mom and pop folks, who are kind of getting it -- These

4    are mom and pop folks who are represented by really

5    sophisticated folks.

6         MR. SILVERSTEIN:  My response is that the Code

7    doesn't delegate to agents of voters the decision, and the

8    entitlement to adequate disclosure.  And the definition of

9    adequate disclosure under 1123 does take into account that

10   the hypothetical investor has access to additional

11   information, but it doesn't supplant the entitlement

12   information.  What it's basically saying is maybe you don't

13   need every piece of information.  You're presumed to have

14   access to additional information to supplement what's in the

15   Disclosure Statement, but it's not a delegation to somebody

16   else to review the information, and advise you based on it.

17        And something as fundamental as, where would I

18   fall on a matrix?  I'm a woman who's 40 years old with stage

19   3 cancer.  What should I reasonably expect?  I understand

20   it's not a guarantee, but what can I reasonably expect?  I'm

21   a 70-year-old woman with stage 1 cancer, what can I

22   reasonably expect?  Nobody can figure that out from the

23   plan. Dr. Mullin has said that.

24        Dr. Singer has said, we can't -- in order to treat

25   future claimants non-discriminatorily, we need to wait for

```
 1    initial cash value of a point to be determined.  We don't
 2    know until the initial cash value of a point is determined,
 3    after confirmation.  That's when we'll know, you know,
 4    whether this is actually going to be non-discriminatory to
 5    futures, or not.  How is any woman who is voting, any man,
 6    anybody who is standing in the shoes of somebody who is
 7    having this awful disease, supposed to decide whether this
 8    plan works for them or not?
 9            And Your Honor asked, you know, very good
10    questions throughout, one of them directed to Mr.
11    Birchfield, about with so many clients, how do you decide?
12    How do you decide the advice you give to so many clients who
13    may have differing interests and differing motivations,
14    differing economic backgrounds?  That's for them to decide.
15    And I think on the record that has been before the Court,
16    the best way, the only way to know what the women here was
17    is to have a vote that provides them with the information,
18    and have them answer it directly.  So we are submitting,
19    Your Honor, that there should be a resolicitation of the
20    vote.
21            We heard from Ms. Kjontvedt, who's a veteran in
22    this area, and I mispronounced her name, Ms. Kjontvedt,
23    she's a veteran in this area.  The goal is to treat voters
24    consistently, fairly, and impartially.  That wasn't done
25    here.  And the Debtor can't have it both ways, where they're
```

1    asking the Court to presume conclusively that the AHC

2    member's votes should be counted based on the certification,

3    but Beasley Allen's votes and maybe Smith's votes are

4    subject to scrutiny.  There's a record here, and

5    presumptions don't work anymore.  The Court has evidence,

6    and the Court has what the certifications were, and the

7    Court can determine whether the certifications were valid or

8    not.

9          Ms. Brown said, well, it doesn't matter, because

10   if you look at all these alternative scenarios, you get to

11   75%.  Your Honor, this was a pre-pack.  The vote was done on

12   July 26th.  The votes were counted and tabulated, and now

13   the Debtor is coming in, and asking the Court to endorse

14   what was done outside of the supervision of the Court.  The

15   Court's not supposed to have to do a scenario analysis to

16   determine whether the vote was done properly.  It was

17   supposed to have been done properly.  It wasn't.  The remedy

18   is that we need a new vote, and the women should vote

19   directly.

20          And this is without regard to any one particular

21   law firm's integrity, or lack of integrity.  What we saw

22   over the past two weeks is Mr. Watts voted 17,000 votes by

23   power of attorney.  As Your Honor has pointed out, he

24   indicated he was in a jam by the Solicitation Agent.  But he

25   could have gotten an extension.  In fact, my recollection is

1   his testimony was that he raised the issue with Mr. Murdica,

2   and he was told, well, you know, get your votes in, do it by

3   power -- by Option B.  His engagement letter does not by any

4   stretch of the word include a power of attorney.  That's

5   17,000 votes, Your Honor, where no woman's voice was heard,

6   other than -- other than Mr. Watts.  He voted 500

7   mesothelioma claims that weren't permitted to vote.  You had

8   Ms. Andrews vote over 5,000 votes by certifying she had a

9   power of attorney --

10          THE COURT:  Wow.  That was someone whose line I

11  unmuted, and then must have put on some Air Pods, that put

12  you on speaker.  I apologize (indiscernible)

13          MR. SILVERSTEIN:  No, not at all.  Nobody ever

14  likes to hear their voice.

15          THE COURT:  I was going to say, the PowerPoint did

16  that? (indiscernible)

17          Can I just -- I just want to say something.

18          MR. SILVERSTEIN:  Sure.  Yes.

19          THE COURT:  Then I want you to continue.  I also

20  want to -- I know much has been, you know, kind of said

21  about the claims agent, and what happened.  And you can

22  address this at whatever point you have.  It's a thought

23  that I also wanted to communicate.  I don't see bad faith on

24  behalf of them, and I want you to tell me if I -- where I go

25  wrong.  In terms of, like, I don't see -- You know, I see

```
 1    them, you know, they contacted Debtors' counsel, and

 2    Debtors' counsel said, you know, look, I think we can do

 3    this (indiscernible) switch the vote, and they did it.  I

 4    don't see bad faith on their behalf, and I want you to --

 5    Because I know one of the things I also have to consider is

 6    the kind of reconsideration of Epiq at some point, unless I

 7    dismiss the case.

 8         But where did -- You know, certainly, you know, I

 9    think it's clear, I'm not too thrilled about certain parts,

10    but I don't think anyone is, quite frankly.  But I don't

11    think -- I don't think anybody thinks they're bad people.

12    And I don't think that they're not capable, or up to the

13    task of doing it.  Those are really, like, really skilled

14    professionals over there, and I don't want kind of words to

15    have a lingering effect, you know, as we go on.

16         But I want you to tell me -- I got it, you don't

17    want me to verify what they did, but at the same time, I

18    know I have to address whether I should -- they did anything

19    that merits, like, you know, just disqualifying them, or not

20    counting them in here.

21         But I want to make sure that if you disagree with

22    that, then I want you to -- I'll give you as much time as

23    you want, and I want somebody to tell me if the evidence

24    points in a different direction.

25         MR. SILVERSTEIN:  I don't want to characterize any
```

1    individual or a company.  Ms. Kjontvedt seems like an honest

2    and good person, and I'm not going to say that she did

3    anything venal.  What I would say is, and what I'm hoping to

4    do today is focus on the process.

5             THE COURT:  Uh-huh.

6             MR. SILVERSTEIN:  The process was not in good

7    faith, I'll say that.  I think that there were very

8    significant -- more than mishaps.  I mean, we have Mr. Watt

9    saying that the website was not user-friendly, and he had to

10   send out videos to give instructions how to use it.  We had

11   I believe Ms. Wheatman reflecting during her testimony that

12   there was -- that the website wasn't even seeming to be

13   functioning during some period of the solicitation.  And we

14   have, more importantly, I think the concerns that Dr. Hilsee

15   raised about, you know, how independent really are these

16   solicitation agents?

17            And so what I heard Ms. Kjontvedt say, and I

18   believe it's in the record, is that she was basically just

19   following the directions of the Debtor.  And that's not what

20   the process is supposed to be.  She acknowledged on the one

21   hand that we're supposed to be, and we strive to be

22   independent agents of the Court, we strive to be impartial,

23   fair, to follow the written procedures.  That didn't happen

24   here.  So I don't want to refer to Epiq per se, or Ms.

25   Kjontvedt as bad faith.  I think there were serious lapses

1    here that are bad faith, that do rise to the level of, you

2    know, the absence of good faith that justifies designating

3    the votes, and having a re-vote.  But I'm not going to stand

4    here and say Epiq is a bad actor, Ms. Kjontvedt is a bad

5    actor.  I'm not prepared to do that.  I'll let the Court,

6    you know, draw whatever conclusions it want from the

7    records.

8            THE COURT:  Okay.

9            MR. SILVERSTEIN:  Where I left off before that

10   question was just talking about Ms. Andrews.  She referred

11   to, you know, utilizing the power to -- which was in her

12   engagement letter, to basically sign a document.  She said

13   under the exigent circumstances of the vote, that that

14   entitled her to cast a vote for clients.  What was the

15   exigent circumstances?  I mean, she had -- There was a

16   solicitation period that the Debtor had Ms. Kjontvedt say

17   was, you know, more than adequate, seven weeks.  And now Ms.

18   Andrews is saying that there were exigent circumstances that

19   required her to exercise, and to step -- exercise some

20   unwritten power of attorney, and to, you know, cast the vote

21   for 5,000 of her clients.  You had Mr. Onder interpreting

22   the power of attorney certification as requiring something

23   to the level of an actual written, formal power of attorney,

24   and then you had Mr. Pulaski say, all you needed to really

25   do was be an attorney, representing a client, that that was

1    sufficient.

2         This was a chaotic process.  It wasn't

3    consistently enforced.  And that's not what the Court should

4    be endorsing, we submit, in a pre-pack.

5         Continuing with now addressing Beasley Allen, I

6    mean, I didn't address this with Miss -- referring to Epiq,

7    I should have, obviously the letter that came in from, you

8    know, somebody up filing a master, submitting a master

9    ballot on behalf of over 11,000 claims.  They send a letter

10   at the end of August that gets received, and it says we're

11   concerned about our votes.  Don't change these votes, you

12   don't have the authority to do it, and it sits there,

13   unread, until after the vote is certified.  And then, when

14   Ms. Kjontvedt finally saw it, she said I was taken aback.  I

15   was upset.  That's not the kind of vote that the Court

16   should be certifying, under the circumstances.

17        THE COURT:  I mean, I will tell you, and just to

18   kind of play devil's advocate a little bit here, like, the

19   Debtor didn't know about that.  I don't have any evidence

20   that the Debtor knew about that letter.  So I don't know if

21   I -- I got it, and you know I take it seriously, that the

22   letter wasn't given to them.  But why should I hold a Debtor

23   accountable for something, that -- If they would have gotten

24   the letter, and then, you know, told them to sit on it or

25   something, I think that's a different story.  But I'm

```
1   wrestling to figure out what to do with the -- with what
2   happened with the letter.  I don't think it's fair to blame
3   the Debtor, or to make it count against the Debtor in a
4   negative way because they never saw it, so they never got a
5   chance to react to it.
6           MR. SILVERSTEIN:  I'm not blaming the Debtor for
7   Epiq's failure to address the letter.  I think that there's
8   -- Any reasonable inference from the record is that whatever
9   was in that letter, the Debtor knew.  The Debtor knew that
10  Beasley Allen didn't want their votes changed.  That's not -
11  - The Debtor knew that when they went to Mr. Smith, who had
12  never settled an MDL, who had never been involved in a
13  bankruptcy, who had no bankruptcy counsel, that when they
14  went to him, and that was after they weren't able to procure
15  my --  my clients agreement to, you know, what they said
16  was what they thought was a deal, they knew that Beasley
17  Allen what wasn't authorizing, you know, Mr. Smith to now
18  change the vote.
19          So to me, the issue of the Debtor's, you know,
20  good faith with regard to the Smith vote, it's really not
21  related to the letter, because they knew all the substance
22  in there, even if they didn't have the letter.
23          The superseding of the vote is not -- was not
24  permitted under any reading of any of the written
25  procedures.  I've been through them many times 4(b), 4(c),
```

1    4(d), 4(g.)  I don't see that any of them authorized Epiq to

2    supersede a ballot.  And more than that, Your Honor, I think

3    I just heard Mr. Hamerman say that in fact, there was a

4    superseding plan that Mr. Smith had clients vote on on two

5    days negative notice.  And when he was making that comment,

6    I went and I pulled up Rule 3018, and this seems like a

7    3018(b)(2) issue.  This seems like a defective solicitation.

8    If you take the Smith -- If you take Mr. Smith at his word

9    about what he told clients, that he was asking them to vote

10   on an amended plan, and you would take Mr. Smith's counsel -

11   -

12            I didn't mean to just call out anybody by name.

13            But if you take Mr. Smith's counsel at their word,

14   you have a situation where prior to the petition date, some

15   group of holders was voting on something different than what

16   everybody else voted on, and on a two days notice.  So

17   there's any number of reasons why the Smith vote, the Smith

18   change of vote, whether it's a vote on a superseding plan,

19   or whether it was a superseding ballot with regard to the

20   prior vote, wither way, it's not something that The

21   Coalition believes the Court has any basis to endorse.

22            This was anything but a fair and consistent and

23   impartial voting process.  It's the opposite of the clean

24   vote that Ms. Kjontvedt strived for.  And as I mentioned, I

25   think the record reflects that it was a results-oriented

1    vote.  I mean, you're hearing that Beasley Allen's master

2    ballot raised red flags because there were 11,000 Option A

3    votes, and yet we heard that Mr. Onder had 12,000 Option A

4    votes, and that that didn't raise any red flags.  You had

5    Mr. Pulaski submit a master ballot that had 100% ovarian

6    cancer claimants, that did not raise any red flags.

7            You had -- You have this position that the Debtor

8    is taking that in order to satisfy Option A, informed

9    consent, you needed an affirmative response.  And we can

10   talk about how to interpret Option A, but the problem is

11   that at the same time the Debtor is seeking to change the

12   votes of Mr. Morelli.  And if we can go to slide 111, I

13   don't think the Court has seen this before, Mr. Morelli's

14   testimony, which the Court will be seeing, but Mr. Morelli

15   was asked, "Did you communicate with your clients before

16   switching the votes?"  "Answer:  No."  So you have no

17   communication whatsoever, let alone an affirmative response.

18   And the Debtor wants those votes to be counted as yes votes,

19   and the Beasley Allen votes to be stricken or disregarded

20   because in the Debtor's view, it was on negative consent.

21   It doesn't add up.  And this is not how the Bankruptcy Code,

22   and its rules work with result-oriented, the ends justify

23   the means process.  That's the opposite of what the majority

24   in Purdue spoke about.

25           In terms of informed consent, I understand Your

1    Honor's view with regard to Your Honor's own decision in

2    Robert Shaw.  I would say this, that first off, that there

3    were more than just the Beasley Allen firm that interpreted

4    the ballots as requiring negative notice.  I think Mr.

5    Pulaski had negative notice signs on his correspondence that

6    went out to his clients.  And if you, you know, think of it,

7    if you think of Option B the way the Debtor is proposing,

8    there's really not even a reason to have an Option A.  I

9    mean, why would you even need to do getting informed consent

10   if all you needed was to just be able to use your power as

11   an attorney to vote for your clients?  It doesn't really

12   make any sense.

13           But in terms of Robert Shaw, you know, informed

14   consent is not defined in the certification.  It's not a

15   clear concept.  It certainly doesn't -- It certainly doesn't

16   reference any ethical rules.  You know, there's a dictionary

17   definition of informed consent, and basically what it comes

18   down to is there needs to be consent, and it needs to be

19   informed.  And at least as far as in the bankruptcy context,

20   Robert Shaw is one example of that consent can be inferred

21   when you're dealing with, you know, a bankruptcy process, at

22   least in the context of third-party releases.

23           And so I think it's helpful in understanding what

24   informed consent means in the context of a bankruptcy vote.

25   Because you had, you know, you had Mr. Birchfield explain

1    the process, explain that the system was set up to assure

2    clients over and over again this is our recommendation, we

3    want to hear from you, but if you don't want to reach out to

4    us, we're going to assume you're accepting our

5    recommendation.  So we agree that with the Court that the

6    votes are voices, and as mentioned, I think the evidence

7    shows that what we've heard is the voices of the lawyers.

8           If the Court is going to try to salvage, through

9    some scenario analysis or otherwise, the votes that were

10   taken on July 26th, and that subsequently have come in, then

11   we do believe that the Smith vote, superseding vote or

12   conflicting vote, or however the Court wants to look at it,

13   under the written procedures, it did not effectuate a change

14   of vote, and it should be disregarded.  And we also submit

15   that the Court has a record now of engagement letters from

16   AHC members, and the Court can determine, you know, which of

17   those has bankruptcy powers of attorney.  But the far better

18   result that we believe is a court-supervised process, where

19   the rules are clear and consistently enforced.  And that's,

20   of course, only if the Court doesn't dismiss the case, which

21   we believe the Court should.

22          THE COURT:  Let me ask you, and you may get to it

23   the deck, I just don't forget.  You know, Evans is telling

24   me no matter how you want to slice it, they're at 75%,

25   unless I take the position that I accept Beasley Allen, and

1    don't count Smith for any reason.  Right?  That kind of gets

2    you back -- and I don't consider any of the kind of post-

3    petition requests for changes.  How do I -- What's your

4    response to, you know, Evans sliced the vote in a bunch of

5    different ways, and said, look, if you're going to call it

6    fairly, you can look at it this way, you can look at it this

7    way, we can count just As, we can just look at ovarians if

8    you want to -- what's your response to that?  And then I

9    want to ask you about kind of what to do with the

10   gynecological claims, but that'll be kind of the next

11   question.

12           MR. SILVERSTEIN:  Sure.  I hate repeating myself,

13   but --

14           THE COURT:  I asked you, so it's all right.

15           MR. SILVERSTEIN:  We don't believe it's for the

16   Court to do a scenario analysis, to determine whether the

17   vote should be certified.  And the analysis that Mr. Evans

18   did was based on scenarios that the Debtor gave Mr. Evans to

19   perform, and they did not include if the Court were to find

20   that Mr. Watts, as well intentioned as it may have been,

21   voted 17,000 votes without power of attorney, or Ms.

22   Andrews, as well-intention as she may have been, voted 5,000

23   votes by power of attorney that she didn't have, or Mr.

24   Pulaski voted 5,000 votes by power of attorney that he

25   didn't have.  None of that was taken into account.  So I

1    don't believe that the Court can rely on what the analysis

2    that Mr. Evans performed, and I don't believe that's the

3    role of the Court in a pre-pack, is to do a scenario

4    analysis to determine, well, if I look at it this way, or I

5    look at it that way, or I look at it this way, after the

6    fact, I can now, you know, justify a vote that on its face

7    wasn't done properly.

8            MS. RINGER:  I'm not just talking about justifying

9    the vote.  And I get your point, but at some point, the Code

10   gives me the ability or the authority to designate certain

11   votes, and to not count them.  But I agree with Ms. Ringer,

12   and this is kind of what makes this case interesting, is

13   that usually is reserved for kind of bad stuff and bad

14   actors.  And so how do you -- I think one can look at the

15   vote in a bunch of different ways, and I'm not suggesting

16   which way I'd go.  Quite frankly, that would be foolish of

17   me.  I need to sit back, and really think about everything.

18   But one can look at it and say, you didn't play by the

19   rules.  Right?  The procedures say X, and so, you know --

20   and that could cut both ways.  And there's another way to

21   say, no, we're going to count everything, but now I'm going

22   to kind of do a post-petition analysis under 1126, and say,

23   I don't like -- you know, this doesn't work, I don't think

24   you had authority to do it.  Which way are you asking me to

25   look at it?

1          MR. SILVERSTEIN:  Well, let me come out and be

2     direct about this.  We said Johnson & Johnson didn't trust

3     the process, and that was a process-oriented non-ad hominem

4     way of describing what transpired.  But the evidence showed

5     that this was a blood sport.  I mean, you have a situation -

6     - you had Ms. Kjontvedt say in thirty years, she's never

7     seen one law firm switch the votes of another law firm by

8     master ballot.  It's just never done.

9          And we understand that Debtors, you know, try to

10     get to their thresholds for bringing a case, and that when

11     they're not there, they go back to the negotiating table,

12     and try to negotiate.  But that's not what happened here.

13     This was an end run around dealing with Beasley Allen, and

14     they went to somebody -- you know, they went to Mr. Smith,

15     who had, the records showed, financial, you know, issues,

16     who had no experience in this matter, and basically, they

17     had him just step in and sign on to an MOU that, quite

18     honestly, promised an allocation of future, you know,

19     current futures split, that the testimony I heard from Ms.

20     Ellis was that Mr. Murdica knew was never going to be

21     delivered, because Ms. Ellis was being clear that she hadn't

22     agreed to the split, and would never agree to it.

23          THE COURT:  Why does it matter whether he was

24     sophisticated in bankruptcy settlement matters?  Why does

25     that -- right?  That can't be the standard, because that

1   knocks out -- You know, the Southern District of Texas gets

2   all these, you know, gets a lot of cases, but 99% of what I

3   do, you know, well, 90% of what I do, you know, ain't this.

4   It's the 10% that gets the news, but the 90% is -- you know,

5   it's got to work for that, too.  So the standard can't be

6   sophisticated bankruptcy person gets to settle.  Even in

7   large cases.  I mean, 9019s get signed all the time by

8   parties who are, you know, not sophisticated in bankruptcy

9   settlements.  I don't want to say that they're not

10  sophisticated, because again, I've taken the public

11  position, and I know you're not too, that moms and pops are

12  super smart too, and I don't like when they get cast as not

13  sophisticated.  I'm not suggesting it here, I'm just stating

14  a clarifying point.

15          MR. SILVERSTEIN:  Right.  What I would say is

16  under these circumstances, I'm not suggesting that everybody

17  who acts in Bankruptcy Court needs sophisticated bankruptcy

18  counsel.  I'm saying in these circumstances, where I think

19  the testimony was clear that the Debtor believed it reached

20  a dead end in getting the votes it needed to get over 75%

21  with the party who cast the votes, the only party who's, you

22  know, in all -- in LTL I and LTL II they recognized as being

23  one of the largest attorneys of holder -- representing

24  holders of claims, you know, not Mr. Smith, and then they

25  went and did an end run around, I think just the facts and

1    the circumstances here suggest that this was a deliberate

2    effort to get to a result in a way that was not -- that was

3    not kosher.

4         THE COURT:  Let me ask you, what's wrong with

5    going to Smith?  Right?  Like, Beasley Allen, let's assume

6    the fact is they're never settling.  But co-counsel's out

7    there.  Right?  Happens all the time.  Sometimes you -- I

8    can't tell you I've seen a switch of a vote, but I can tell

9    you sometimes, you know, primary counsel is acting, but you

10   may call local, right, or sort of call the other lawyer and

11   say, you know, hey, why can't we get this done?  Can you

12   talk to your folks?  And you know, you have access to the

13   client, can we get a deal done?  Right?  What makes this

14   different than that?

15        MR. SILVERSTEIN:  I don't think there's anything

16   inherently wrong with contacting another lawyer.  I think,

17   again, going to the facts and circumstances here, and it's

18   one thing that I omitted to say before about the Smith vote,

19   which was that it was by power of attorney, and that brings

20   me to the joint venture agreement.

21        A power of attorney is a personal delegation of

22   rights that one person gives to another to basically act on

23   their behalf, and it's not delegable.  So if Beasley Allen

24   entered into engagement letters, even if they gave Beasley

25   Allen limited powers of attorney that somehow justified

1    Beasley Allen voted for them, that's not something that by

2    joint venture Beasley Allen can now, you know, without the

3    clients authority now convey to Mr. Smith, and give him the

4    right to cast the vote.

5           So taking all the facts and circumstances, the

6    fact that, you know, this was an end run, that Mr. Smith

7    wasn't given any extension to do this right, to try to work

8    out disagreements with Mr. Birchfield, that it was done on

9    such short notice, just consistently with an effort to just

10   get to the 75%, to get this filed.  And maybe one day it

11   would have been, and maybe if it was done the right way it

12   could have been, but that's not what happened.  And so I'm

13   asking the Court to draw inferences from the totality of the

14   evidence about what the conduct was here.  I see it one way,

15   it'll be for the Court -- Again, I don't --

16          THE COURT:  (indiscernible)

17          MR. SILVERSTEIN:  I think it's process-oriented

18   rather than -- I don't think the Court needs to come out and

19   call anybody a bad actor, I think the process was bad.

20          THE COURT:  How do you want me to consider now the

21   additional parties who want me to switch their vote.  Right?

22   Like, now they're on board.  They saw the new deal, and they

23   like the additional money, the additional process.  How

24   should I view those votes, as I consider plan confirmation?

25          MR. SILVERSTEIN:  Well, again, our request to the

1    Court is that there be a new vote, and they would be

2    included, and their clients would be included.  We saw Mr.

3    Morelli's testimony, he switched votes without even

4    discussing it with his client, which is not consistent with,

5    you know, the certification.  We don't have any information

6    about Summers & Johnson.  I think the motion was filed by

7    the Debtor, without any declaration.  We have no information

8    there.  I know something was filed this morning.  I haven't

9    had a chance to look at it, I don't even know what the

10   circumstances are.

11           But you know, if the Court were to accept some

12   number of votes that were taken, you know, there's Rule

13   3018, and we'll have to -- the Court will have to follow the

14   procedures.  But I'm not in a position to, you know, speak

15   about each individual firm's change of votes, because this

16   has been so fast moving, and I haven't really had a chance -

17   - we haven't had a discovery on some of these votes.  Which

18   the one we do have is Mr. Morelli, and that seems clear that

19   that's not consistent with what the rules say.

20           I want to just talk about the Disclosure

21   Statement, Your Honor.  I'm going to ask Mr. Marbut to just

22   put up slide 39, which was Dr. Mullin's testimony.  And you

23   know, here he's saying that the average is kind of a

24   meaningless average, and he's talking about the averages

25   that were, you know, that were put in the Disclosure

1    Statement.  So the Disclosure Statement should provide

2    information to clients without a guarantee, but to give them

3    sufficient information to understand, based on their age and

4    stage, where they fall in the grid, and what they can

5    reasonably expect.  Otherwise, it's sort of a blind vote,

6    and it really is just delegating it to your attorneys.  I

7    mean, it's one thing to say clients follow their lawyer's

8    advice, but that's their choice.  They should have the

9    information to make the choice as to whether to follow the

10   advice or not, not just blindly follow it because they don't

11   have sufficient information.

12           And as I mentioned, Mr. Mullin also said, "I mean,

13   the average is kind of a meaningless average."  That's up

14   there.  He also said, "Don't try this at home," something to

15   that effect, to clients.

16           With regard to Section 4.4.1, this is another

17   significant issue, and I think it goes to the gynecological

18   cancer questions that the Court might have.  But the Debtor

19   is now saying that what they really meant in the TDPs was

20   not that if you submit a claim for $1,500 as a quick pay, as

21   a gynecological cancer claimant, you're not barred from

22   later submitting a claim as an ovarian cancer claimant down

23   the road, that you're not otherwise barred from seeking

24   compensation.  But people already made decisions based on

25   advice they got that, that based on the clear language in

1    the TDP said that if you have a gynecologic cancer claim,

2    and you take a quick pay, you are sacrificing any ability to

3    then come back to the Trust and file a claim as an ovarian

4    cancer claimant.  And Ms. Ellis said that if she was

5    representing clients, she would recommend against that.  So

6    we have plain language that would tell lawyers how to advise

7    their client in one way, and now, you know, with a pen,

8    we're going to now change that and now say, well, it doesn't

9    really matter what the advice was that was given before, you

10   know, we'll just count the votes as they are.  That doesn't

11   work.

12         I want to turn to confirmation, unless the Court

13   has more questions about voting.

14         THE COURT:  No questions.  Thank you.

15         MR. SILVERSTEIN:  And I've exceeded my 10 minutes,

16   and I apologize.  I'm going to just try to get through this.

17   But I think this is really the meat of what I want to

18   address, and it's obviously important because we're here in

19   part on a confirmation hearing.  So if the Court doesn't

20   dismiss the case, The Coalition submits the plan should not

21   be confirmed.  And the first reason is we haven't found

22   evidence to support all of the 1129 factors.  And I haven't

23   heard Debtors counsel go through the 1129 factors, and show

24   how the evidence supported all of them.  And I understand

25   it's, you know, mind-numbing testimony, it's mind-numbing

1    argument, it's technical, but it's a technical statute that

2    needs to be satisfied.  There's no confirmation order, and

3    the Court's going to at some point get a confirmation order

4    with, you know, tens of pages of findings of fact that the

5    Court is going to have to make, and with regard to all of

6    these elements, we haven't been able to find what's in the

7    record that supports them.

8         And so the ones that we highlight in particular

9    are A5, A6.  A5 in particular, this is the subject of some

10   discussion today, about Mr. Kurdi.  And again, this is not

11   in any way to single him out, but I didn't see anything in

12   the record that provides any information in the record about

13   his affiliations, his compensation.  Same for the TAC

14   members.  A-6, we didn't believe that there was disclosure.

15   We didn't see a liquidation analysis required under A7.  And

16   I know that they'll say full pay, and we'll talk about that

17   separately, and then A12.  So we didn't see any evidence

18   that meets these factors.  There may be others.  And maybe

19   it's there, but you know, it's not really for the Court and

20   for the Creditors to have to go fishing through thousands of

21   pages to try to find, you know, the needle in the haystack

22   as to whether the requirements have been met.

23        I now want to turn to I think maybe one of the

24   most interesting and important questions the Court's going

25   to have to address, which is the 524(g) release, and the

1   524(g) channeling injunction.  And our position in a

2   nutshell, and I'm going to walk the Court through it, is

3   that Johnson and Johnson essentially two-stepped its way out

4   of entitlement to use 524(g.)  And that's as a matter of

5   text, that's a matter of the purpose of the statute, and the

6   concepts behind it, and that's a matter of legislative

7   history, and I'm going to walk the Court through each of

8   those things.

9          What the Debtor is doing, and I heard Mr. Gordon,

10  you know, quite clearly suggest this to the Court, is that

11  524(g) is essentially A.H. Robbins in the form of a release

12  or a channeling injunction.  It's not.  The Court has said

13  many times, the text is the alpha, and I want to look at the

14  text.  Let's look at the text of 524(g.)  And I agree with

15  Mr. Gordon that the first part of it, before you get to the

16  factors that are the relationships with the Debtor, or the

17  third party I should say, are the critical part, because I

18  don't think you even get to the sub-factors.

19         So 524(g), Section 2 says -- sorry,

20  524(g)(4)(a)(ii) says, "Notwithstanding the provisions of

21  Section 524(e,) so notwithstanding that the discharge is

22  limited to the Debtor, such an injunction may bar any action

23  directed against a third party who is identifiable from the

24  terms of such injunction by name, or as part of an

25  identifiable group, and is alleged to be directly or

1    indirectly liable for the conduct of claims against or

2    demands on the Debtor, to the extent such alleged liability

3    of such party arises by reason of."  And then the very next

4    sub-factor talks about the Debtor, a past or present

5    affiliate of the Debtor, or a predecessor in interest of the

6    Debtor.  So in the text of 524(g,) the Debtor means Red

7    River.  It doesn't mean LTL, it doesn't mean JJCI.  Those

8    are the past or present affiliates, in the case of JJC --

9    Well, actually, they're both predecessors in interest.  But

10   Johnson & Johnson is a past or present affiliate of Red

11   River.  That's not what Section 524(g)(4)(a)(ii) --

12           And so what I think would be helpful is to

13   actually put the names of the parties in the code, in the

14   statute, so we see what the consequences are.  So that's the

15   second slide.  And what it shows is if you put in the actual

16   parties that are referred to in the plain text, it says,

17   "Notwithstanding the provisions of Section 524(e,) such an

18   injunction may bar any action directed against Johnson &

19   Johnson, Kenvue, the retailers, who is identifiable from the

20   terms of such injunction by name, or as part of an

21   identifiable group, and is alleged to be directly or

22   indirectly liable for the conduct of claims against, or

23   demands of Red River.  To the extent that such alleged

24   liability of Johnson & Johnson, Kenvue, or the retailers

25   arises by reason of -- " and then there is these sub-

1    factors.

2                Not a single claim brought against Johnson &

3    Johnson, Kenvue, or the Retailers is alleged to have

4    anything to do with Red River, which didn't even exist at

5    the time these claims were all brought, and no claim ever in

6    the future against Johnson & Johnson, Kenvue, or the

7    Retailers is ever going to be based on anything that that

8    relates to Kenvue -- I'm sorry anything that relates to Red

9    River.

10               If you change the words, and if you substitute in,

11    which you can't because it's not the Debtor, if you change

12    the words to Johnson & Johnson Consumer, Inc., which they

13    might have done, then maybe the claims against Johnson &

14    Johnson arguably were claims that were brought against the

15    parent that you could say might be based on claims against,

16    demands of, or conduct of JJCI.  But that's not what they

17    did.  They did a two-step.  They created a new Debtor.  They

18    solicited a plan before the Debtor even existed, and not a

19    single claim could possibly be based on any conduct of

20    claims against, or demands on Red River.  It just doesn't

21    fit.  And so --

22               THE COURT:  How do I think about the Divisional

23    Merger statute that says that when you split from one into

24    two, that essentially, all liabilities that flow from that

25    one entity kind of automatically, as a matter of law -- So

1    it almost kind of --

2              MR. SILVERSTEIN:  Great question.

3              THE COURT:  -- for lawsuit purposes, you know,

4    like, someone doesn't have to then go sue, kind of amend

5    their complaint, is almost as if the entity existed and it

6    kind of continued to flow.

7              MR. SILVERSTEIN:  Well, great question, and we

8    actually thought about that, as you would expect, before.

9              I mean, first off, the text -- the divisional

10   merger makes JJCI the original divisive merger candidate,

11   and then LTL the second divisive merger candidate.  It makes

12   them predecessors in interest.  Those are the plain words.

13   I mean, we're looking at the plain words, we're looking at

14   the text.  We're looking at the alpha and the omega.  So Red

15   River, we're talking about the Debtor here.  That's what

16   524(g) is.

17             Now conceptually, the reason this doesn't work is

18   -- And can we go to slide 74, please?  Maybe it's not slide

19   74.  It's the one that's the --

20             THE COURT:  Your argument, if I -- and I just make

21   sure that I'm following it, your argument is that kind of

22   J&J may fall as a "related party," so it can't be the

23   Debtor?

24             MR. SILVERSTEIN:  Well, neither can LTL or Old

25   JJCI.  And here's the concept, Your Honor.  The two-step

1    essentially takes entities upstream, and then sends the

2    liabilities downstream.  And so, you know, J&J had

3    liabilities that by indemnity it sent to JJCI.  By divisive

4    merger, they got sent to LTL.  And then by divisive merger

5    again, they got sent to Red River.  What 524(g) does is

6    protect the upstream company, the parent or the affiliate.

7    And so what's happening with this taking a two-step and

8    marrying it to 524(g) is you have liabilities that start

9    with J&J, and then get shoved to JJCI, down to LTL, down to

10   Red River, and now they want to use 524(g) to basically

11   protect J&J from the liabilities where they started.  Red

12   River is just in the circle, but no claim that's ever been

13   brought against Johnson & Johnson, Kenvue, or any of the

14   retailers is based on anything having to do with Red River.

15          And so it's both a matter of the plain text, it's

16   a matter of the concept of looking at what the Texas two-

17   step is, and then looking at 524(g,) and what that's about,

18   and then it's looking at the legislative history.  So

19   524(g,) I think the Court is full aware, was based on the

20   Johns-Manville model, in which -- And you can just read the

21   Code, and you can see that what Section 524(g) is doing is

22   trying to rehabilitate a company that otherwise, an

23   operating company that otherwise is generating revenues,

24   that is suffering from, you know, a drag with asbestos

25   liabilities.  And it's basically saying, look, this company

1    -- this company has to deal with current and future asbestos

2    liabilities, and so what we're going to do is we're going to

3    basically create a trust, and we're going to put the

4    liabilities into the trust, but we're going to have an

5    evergreen funding source.  We're going to have operations,

6    and we're going to have dividends that fund the trust.

7          And so the asbestos claimants are basically, you

8    know, sort of partners now in a sense with the operating

9    company, because now the operating company is able to

10   operate without the drag of asbestos liabilities.  Because

11   of that, that kicks off funding that now compensates the

12   asbestos claimants.

13         And that's not happening with a two-step.  There's

14   no need for that.  They've basically -- The two-step

15   essentially isolates the liabilities from the entity with

16   them, so there's no need for a trust to do this.  And in

17   fact, when you look at the requirements of Section 524(g,)

18   including, you know, that the Debtor not be named as a

19   defendant in any lawsuit, again, the Debtor is Red River.

20   The Debtor was not named.  Mr. Kim testified to this at one

21   of the early hearings, the Debtor was never named in any

22   lawsuit before the petition was filed.

23         THE COURT:  Okay, let's go back a few slides.

24   Let's go to the language of the text, and tell me how J&J

25   doesn't fit into it.  Let's just, we'll start with an easy

1    one.

2             MR. SILVERSTEIN:  Yeah, let's go.

3             THE COURT:  Maybe slide 62.

4             MR. SILVERSTEIN:  Sure.

5             THE COURT:  Walk me through it.

6             MR. SILVERSTEIN:  Okay.  So to start.

7             THE COURT:  J&J isn't in there.  I just want to

8    (indiscernible)

9             MR. SILVERSTEIN:  Understood.

10            THE COURT:  I think I follow the argument, but I

11   want to make sure that I understand it textually.

12            MR. SILVERSTEIN:  So you don't get to the subparts

13   under the plain text unless the claims are alleged to be

14   directly or indirectly liable for the conduct claims

15   against, or demands on the Debtor, Red River.  So --

16            THE COURT:  So 524, "Such an injunction may bar an

17   action directed against -- " let's just say, J&J, right, who

18   would be the third party here.  But --

19            MR. SILVERSTEIN:  I'm sorry, can we just go back,

20   just to the (indiscernible)

21            THE COURT:  Yeah, that's a better --

22            MR. SILVERSTEIN:   -- just so that we can put the

23   words in.  Or maybe we have that.  Do we have the words in?

24   Because we substituted the words in here as well, Your

25   Honor.

1               But essentially, it would be --

2               THE COURT:  Oh, you're talking about slide 64.

3               MR. SILVERSTEIN:  Right, slide 64.  Right.

4               So because none of these claims are alleged to be

5    directly or indirectly liable, Johnson & Johnson, Kenvue, or

6    the Retailers aren't alleged to be directly or indirectly

7    liable for the conduct of Red River.  And we don't have to

8    find out what the claims arise from, because they're not

9    claims that are for the conduct of claims against, or

10   demands of Red River.  But if the Court were to go --

11              THE COURT:  No, no, no.  I'm just saying, so the

12   Debtor will argue that J&J is someone, at least in the

13   lawsuits as alleged, people are alleging you are the same

14   thing, so you are either directly or indirectly liable for

15   let's just call it a claim against or a demand on Red River.

16   You sold a product at a certain time, and you hold the

17   liability for that product.  Right?  And for Kenvue, they're

18   going to argue Kenvue had, you know -- how does the -- you

19   know, the injunction has got to protect Kenvue, because

20   Kenvue is kind of not really selling this stuff, they're

21   trying to stop people from doing it.  And so, you know,

22   Placitella and others are, you know, in Jersey, trying to

23   sue Kenvue because, you know, because they can order stuff,

24   but the don't really care where it came from, they just want

25   to say it was them, and that costs money.  So how do you --

1    What's the argument?  Like, that's a claim against the

2    Debtor --

3            MR. SILVERSTEIN:  It's not.  It's not, Your Honor,

4    respectfully.  It's (indiscernible) Section 524(g.)  The

5    claim is not against the Debtor.  Nobody's suing Johnson --

6    These aren't claims against the Debtor.  Red River didn't

7    even exist.  It's based on conduct --

8            THE COURT:  But LTL did.  Right?  Or the entity

9    that does not exist.

10           MR. SILVERSTEIN:  But that's -- You're saying in

11   effect, LTL is the Debtor.  And the statute distinguishes

12   predecessors in interest, in the very next sentence of

13   524(g) -- LTL isn't Red River for purposes of 524(g,) and

14   neither is JJCI.  And so my point --

15           THE COURT:  Are they, as a matter of law, are they

16   considered a predecessor in interest under Texas law?  In

17   other words --

18           MR. SILVERSTEIN:  We're talking about 524(g).

19           THE COURT:  Right, but that's what I'm saying.

20   But if 524 -- If Texas law says you're the same thing, so --

21   Let me come up with an example.  I'm not getting a good

22   answer.  I think I know where you're going, but I just want

23   to see -- I want to kind of spend some time and play with

24   this.

25           So we're in Texas, so I'll give you a Texas

1   example.  If someone -- if there's a rancher out there on

2   the land, and they've got, you know, a herd of cattle, and

3   it grows, and they grow some corn out there as well, right,

4   and so they realize that they've got to kind of divide this

5   thing, and so they have one ranching business, and they

6   divide it into kind of Lopez Ranching and Lopez Farming,

7   right?  One entity became Lopez Ranching and Lopez Farming.

8   Right?  It's the same -- Under Texas law, all the

9   liabilities that went with the ranching business under

10  Lopez, you know, the whole Lopez kind of went with this

11  entity, and it's the same entity.  If I had gotten sued, my

12  company had gotten sued, it's the same thing under Texas

13  law.

14          Is that considered a predecessor in interest?

15          MR. SILVERSTEIN:  I think it is, and I think

16  that's been the Debtor's position.

17          I mean, Your Honor, I would have a real difficult

18  time reconciling that for purposes of 524(g,) Red River is

19  LTL, but for purposes of bad faith, and for purposes of

20  whether that LTL -- whether Red River is bound by the Third

21  Circuit decision under res judicata, it's not.  I can't put

22  those together and make them work.

23          So it's a predecessor in interest.  I'm willing to

24  take, you know, the Texas two-step as what it says, which is

25  you have a company, it merges out of existence, you now have

1    a successor.  You have a successor, and under 524(g,) the

2    words don't work.  And again, I don't think the Debtor can

3    have it both ways, that for 524(g) Debtor means LTL, but for

4    purposes of whether this case is a third filing barred by,

5    you know, basically the Third Circuit, that it can be a

6    separate company.

7           But just going on to the additional subfactors,

8    Your Honor, if you ever were to get there, and I

9    respectfully submit that the language doesn't allow that,

10   but if you were to get to the sub-factors, and you were to

11   use the words again, what you find from the cases -- And

12   again, none of them deal with a two-step.  So Grace,

13   Combustion Engineering, they talk about -- Quigley, they

14   talk about 524(g) in the scope of the release, but not in

15   this situation.  And so when you get to the sub-factors,

16   it's basically that there has to be some legal -- That the

17   claims, if they were to arise from the conduct of claims

18   against, or demands or claims on the Debtor, there has to be

19   by reason of some legal relationship.

20          And so certainly, there's no basis for the

21   Retailers, I think there's no basis for Kenvue here.  The

22   successor liability claims against Kenvue are based under

23   New Jersey law.  And it's not a matter of derivative

24   liability under New Jersey law, it's a matter of just

25   allocation of risk going from whoever has the product line,

1    in order to make sure that people are protected, whoever has

2    the product line, the risk is allocated to that party.  It

3    has nothing to do with, you know, the transfer, or not

4    having assets anymore, and now you have to go look to the

5    successor.

6          And then, you know, Johnson & Johnson, we've had

7    testimony from Dr. Wolf, and -- I'm sorry, from Dr. Kessler,

8    and the Court has heard Mr. Birchfield talk about the direct

9    liability claims about when Johnson & Johnson was

10    manufacturing the product prior to 1979.  So those claims

11    don't arise by, even if you were to substitute in JJCI or

12    LTL or Debtor in the clause, it doesn't protect -- those

13    claims don't get channeled.  So we don't think --

14          And again, it's not -- I don't think any tears

15    should be shed for Johnson & Johnson that they made their

16    own choices, and decided to do two successive two-steps that

17    now don't qualify them for 524(g.)  That's just too bad.  I

18    mean, but I don't think the statute does it.  They could

19    have filed JJCI in bankruptcy, and maybe they would have

20    qualified, because maybe that would have been a Manville

21    situation.  But the fact that they did the two-steps, that's

22    their choices, and now it doesn't square with the text.

23          I want to now turn to some other subjects.  I want

24    to talk about disparate treatment, because I think we have a

25    Serta problem here, and I think that's another significant

1    issue that the Court has to deal with.

2            MS. RINGER:  Not yet.  But no, I think you know I

3    got Serta as well, so I know it's coming at some point.

4            MR. SILVERSTEIN:  Yeah.  So I was planning to deal

5    with it now (indiscernible)

6            THE COURT:  I meant, like, not yet in this case.

7            MR. SILVERSTEIN:  Oh, well, I guess.  But if the

8    Court -- It could create a Serta problem in this way.  You

9    have ovarian cancer claimants and gynecologic cancer

10   claimants classified in the same class, and you have ovarian

11   cancer claimants being put through a grid where they have

12   the option of being put through the grid, or the quick pay.

13   And the gynecologic cancer claimants are only being put

14   through the quick pay.  They're not put through any matrix,

15   they're not put through any grid.  And at least all of the

16   mass tort claims, all of the mass tort trusts that we've

17   seen, there is a quick pay option, but everybody gets put

18   through the grid.  So there's no disparate treatment where

19   one set of injured parties is only being put into a quick

20   pay, as opposed to everybody having the option of being put

21   through the grid, or accepting a quick pay.  So there's

22   disparate treatment there.  That's Section 5.5 of the TDPs.

23           There's also disparate but to go to the tort out.

24   So ovarian cancer claimants can seek to opt not to pursue --

25   not to accept the award, but to go to the tort system and

1    bring a claim against the Trust for up to three times the

2    amount of the award that they were offered.  Gynecologic

3    cancer claimants don't get that option.  So that's Section

4    6.1.3.

5              And then there's an inflation adjustment that

6    ovarian cancer claimants get, that gynecologic cancer

7    claimants don't.  So gynecologic cancer claimants, somebody

8    who submits a claim in 2060, they're getting $1,500 in 2025

9    dollars, they're getting the same amount as somebody in

10   2025, whereas the ovarian cancer claimants, this is Section

11   7.1.2, are getting an inflation adjustment.  And so we made

12   a chart, Your Honor, just reflecting all the different ways

13   in which the ovarian cancer claims and the gynecologic

14   cancer claimants are treated disparately within the same

15   class.

16             And we also haven't heard, I guess talking about,

17   you know, the 1129 factors, why -- how the classification

18   came to be the way it is, why these claimants are all put in

19   one claim with gynecological -- you know, why the impaired

20   class is --

21             THE COURT:  But isn't the answer because

22   everybody, including your clients, thinks it's worth zero,

23   and it's junk science, and no one thinks about it, and

24   people put experts up telling me that it's not worth

25   anything?

1           MR. SILVERSTEIN:  They're not --

2           THE COURT:  I'm wrestling with the kind of two

3    sides of the coin.  You're saying, well, no one's putting

4    them up, they're not subject to an inflation adjustment, but

5    quite frankly, they should be worth zero at the same time

6    because they're junk science, and this was the ballot

7    stuffing stuff, and Johnson & Johnson made it up.  And I

8    don't know how to reconcile the two concepts.  I understand

9    the legal argument, but your side is also saying it's worth

10   zero.  So (indiscernible)

11          MR. SILVERSTEIN:  I don't think -- I don't think

12   our clients are saying they're worth zero in the sense of

13   this.

14          THE COURT:  Well, I know one that does.

15          MR. SILVERSTEIN:  The gynecological claims are not

16   compensable.  We understand that.  The problem that our

17   clients have is that their clients who have gynecological

18   cancer claims, and who qualify for treatment under this plan

19   have sufficient exposure to Johnson & Johnson talcum powder

20   that they are at an increased incidence of one day getting

21   ovarian cancer.  And so that's the recommendation for voting

22   no.  So yes, they have no -- These claims don't have value

23   as gynecological cancer claims, but these women are at risk

24   of getting ovarian cancer, and so they're being put into

25   this opposition of having to choose, either take the layup

1    of $1,500 because, you know, your claims are worth zero, but

2    then you're forfeiting if you get ovarian cancer, where you

3    God forbid, you know, have to deal with treatment, and tens

4    of thousands, or hundreds of thousands of medical bills --

5             THE COURT:  The Debtor will tell me that's got

6    fixed now.

7             MR. SILVERSTEIN:  It's a bit late for that.  But I

8    will say this, Your Honor, because this is a segue to

9    another point related to this, which is that -- which is

10   that even if you do the fix that the Debtor suggests, these

11   gynecologic cancer claimants are put in this untenable

12   position of having to choose between taking $1,500, or not

13   taking it and waiting around to see if they get ovarian

14   cancer, and deciding, you know, in the future whether

15   they're going to make -- you know, going to submit a claim

16   down the road.

17            So they can either take the $1,500, and be

18   potentially at risk of not having a claim, or they can not

19   take the $1,500, and wait to see, like Mr. Watts was saying,

20   well, you know, just become a future ovarian cancer

21   claimant.  That's not fair and equitable, it's not in the

22   best -- It fails the best interest test, that if you take

23   $1,500 that you now are giving a release for, you know, a

24   potential future ovarian cancer claim.  And in a

25   liquidation, in a Chapter 7 liquidation, if you got the

1    $1,500 for these worthless claims, you would not be given a

2    release, so if you got ovarian cancer in the future, you

3    would be able to bring a claim.

4            And the fix is, again, after recommendations went

5    out to clients on how to vote, there's a lot of fixes that

6    need to be done with this plan, but I don't think that they

7    can now, you know, after they're done, and after the votes

8    are in, change the rules in a significant way.

9            A couple of other confirmation points.  I'm

10   calling it the confirm first, and ask questions later

11   dynamic that's at play here.  So instead of doing the work

12   to get agreement on the things that need to get agreed to in

13   terms of, you know, fundamental economics about the criteria

14   under the individual review fund, and about, basically, the

15   initial cash value of the point, or the future, present, you

16   know, split, we have Dr. Singer saying that there can be no

17   conclusion that the plan is non-discriminatory until the

18   initial cash value of a point is decided, and that's not

19   decided until after the plan is confirmed.  And if we don't

20   have agreement, we come back to the Court, and then we ask

21   the Court to set the initial cash value of the point.

22           And so what are we having, a second confirmation

23   hearing after the first confirmation hearing to decide what

24   the plan terms are?  And who has standing to appear there?

25   Who has standing to appear?  And what's the standard that

1    the Court is using to now decide these fundamental issues

2    after confirmation that bear on whether the plan should have

3    been confirmed in the first place?  And that's true of the

4    treatment of future claimants, it's true of the individual

5    review criteria.  And again, this is sort of a level of

6    funkiness that we don't think works for purposes of 1129.

7         Just one additional point is feasibility.  So with

8    regard to feasibility, since Dr. Singer says you can't

9    really know whether the future claimants are going to be

10   getting, you know, what they deserve, and there's going to

11   be enough money unless you -- until you decide what the

12   initial cash value of the point is, and you don't decide

13   that until after plan confirmation, then they haven't shown

14   that there's going to be sufficient funds for future

15   claimants at this point.  And just saying, well, the plan

16   says that, you know, it's going to be set conservatively,

17   that doesn't meet their burden.

18        The other aspect is the walk away rights.  So

19   there's walkaway rights now that give the Debtor the ability

20   post-confirmation to walk away from the plan based on an

21   adverse appellate ruling, and that's defined to include

22   basically, anything other than, you know, full affirmance of

23   confirmation.  So if there's any aspect that the Fifth

24   Circuit disagrees with, then that's, you know, sufficient

25   for the Debtor to walk away.  And given the Debtor's --

1    given the history here of these talcum powder bankruptcies,

2    now this being the third, I think there's, you know, more

3    than sufficient basis to believe that a fourth or fifth or

4    sixth filing is more than likely if their walk away rights

5    are exercised.

6         Final subject is good faith, which covers a number

7    of areas for us.  We invoked good faith in the context of

8    1123(e,) with regard to designation of the votes, we invoked

9    it with regard to proposing the plan, and then with regard

10   to the filing of the case.  And the remedy that we seek is

11   that the Court should designate all the votes as no, and we

12   should have a re-solicitation.  The plan should be not

13   confirmed, because it wasn't proposed in good faith, and the

14   case should be dismissed.  And I want to start with

15   dismissal, and then address the plan, and then end with

16   voting.

17        If this were an individual Chapter 11 filer who

18   had been dismissed from filing twice in another jurisdiction

19   for bad faith, and then, you know, either cloned him or

20   herself, or transferred his or her assets to a spouse, and

21   then had the spouse file for bankruptcy, the assets and

22   liabilities, and then have the spouse file for bankruptcy,

23   we wouldn't be her,  talking about this.  And I respectfully

24   submit that, you know, one of the most credit-worthy

25   companies or entities, governmental or non-governmental in

1     the world, shouldn't be treated any differently.

2             There's a record, there's a clear record, there's

3     two decisions that went up on appeal in the Third Circuit,

4     dismissing Johnson & Johnson's efforts to resolve its talcum

5     powder liabilities in a bankruptcy.  This is the third time.

6     And all that's happened is we started with a funding

7     agreement for the first one to justify that, you know, that

8     creditors wouldn't be harmed by giving it funding up to the

9     value of the original Johnson & Johnson Consumer, Inc, $60

10    billion.  And then LTL II started with, well, the $60

11    billion funding agreement disappeared and was terminated,

12    and we ended up with a $30 billion funding agreement.  And

13    the Court found that that was well more than enough to pay

14    claims into the future, and that this was -- There was no

15    valid bankruptcy purpose for filing these bankruptcies.

16            And now we have a third bankruptcy, this is slide

17    87, a third bankruptcy where once again, you know, the

18    funding has disappeared, and what we ended up with is an

19    entity that didn't even exist when the vote was solicited.

20    Then it was created, it was given billions of dollars of

21    liabilities, it was given no funding unless and until it

22    filed for bankruptcy.  The funding agreement is effective if

23    the case is dismissed out of bankruptcy, but it never would

24    have gone into effect unless Red River filed for bankruptcy.

25    So we have a clear record where you have Johnson & Johnson

1    creating an entity, downsizing its funding, manufacturing

2    the circumstances, and giving this entity no choice.  I

3    mean, it was allocated billions of dollars of liabilities,

4    and zero funding to pay them unless it filed for bankruptcy.

5            So respectfully, Your Honor has asked what do I do

6    with LTL I and LTL II?  Well, we think the Debtor is bound

7    by LTL I and LTL II as a matter of res judicata.  But if the

8    Debtor wasn't bound, and the Court was looking at this, I

9    believe that the LTL decisions are fully consonant with

10   Little Creek.  I mean, Little Creek is the granddaddy or

11   grandmama of the good faith standard, the modern good faith

12   standard.  I mean, it basically talks about the good faith

13   standard being cause, under 111-12(b) in order to do two

14   things.  One, to prevent bankruptcy -- abuse of the

15   bankruptcy system, and the second is to preserve the

16   jurisdictional integrity of the Bankruptcy Court.

17           And the suggestion that you can just manufacture

18   your way into bankruptcy, and now they want to use the All

19   Writs Act?  They want to get into bankruptcy, and have the

20   Court use the All Writs Act, based on the jurisdiction that

21   they created to stop lawsuits across the country against

22   non-Debtors?  I mean, talk about preserving the

23   jurisdictional integrity of the Bankruptcy Court.  This is

24   basically, you know, basically saying a Bankruptcy Court can

25   have jurisdiction over lawsuits filed against Debtors or

1    non-Debtors all across the country, permanently, you know,

2    enjoining them and releasing them because a company worth

3    $400 billion, and that kicks off $13 billion a year in

4    dividends decided to manufacture circumstances where this

5    entity had no business other than to file for bankruptcy,

6    and then to seek, you know, protection for the parent

7    company.

8            And the only response to it is, well, creditors

9    want it.  We have, you know, plan support agreements with

10   law firms that have recommended to their clients that they

11   do this -- and that doesn't cut it.  That's not a basis for,

12   you know, expanding the powers of the Bankruptcy Court, you

13   know, limitlessly in this way that they're asking.

14           THE COURT:  How do I reconcile what you're saying

15   with what you told me on the first day, that people are

16   dying?  And the evidence is that, you know, ten trials a

17   year -- How do I reconcile with saying there are a bunch of

18   people who voted in favor of this plan?  Why can't we give

19   them some relief?  I got it, you know, the Code, it's got to

20   satisfy the code, and if it doesn't satisfy the Code, it

21   doesn't satisfy the Code.  But there's this, you know,

22   argument that somehow what's being done is improper, or for

23   an improper purpose.  But what if a bunch of people just

24   really want it?

25           And I know the U.S. Trustee's position is, you

1  know, they'll take a different position on this, but how do

2  I reconcile the two, you know, like real life is happening

3  every day here in a time that it all ends?

4       MR. SILVERSTEIN:  It is, and I don't want to

5  minimize that.  These -- it's hard.  And I think the

6  Plaintiffs' law firms struggle with it, and I think, you

7  know, as I said, I accept that the law firms are acting in

8  the best -- what they believe is the best interest of their

9  clients.

10      I think these are hard issues, Your Honor.  It's

11  hard in these circumstances to understand what such a large

12  size of population, you know, really wants and is entitled

13  to.  But again, I go back to the majority in Purdue saying

14  that bankruptcy isn't a collective action solution looking

15  for a problem.  And so there's a problem here.  There's no

16  doubt a problem with talcum powder.  Liabilities are a

17  significant problem, having a significant issue on a lot of

18  people's lives.  I acknowledge that, and it's hard.

19      What I would say to the Court is that it's not for

20  the Court to step in and try to solve that problem unless

21  there really is a good faith basis to be in bankruptcy.

22  Because otherwise, Your Honor, that's a justification that

23  can be used in many ways, for many reasons, and what you're

24  going to end up with is this blurring, a complete blurring

25  of the line between, you know, what is our court system and

1   what is our bankruptcy system, if you can just manufacture

2   the circumstances in order to get into bankruptcy, to use

3   the tools of bankruptcy.

4            And I argued the motion to dismiss in Arrow, and

5   what I said to the Court then and what I would say to the

6   Court now is that, you know, bankruptcy is a powerful

7   system, and it has a lot of powerful tools, and I likened it

8   to pulling a fire alarm.  I mean, when you pull a fire

9   alarm, it launches into action the fire engines and the fire

10  hoses, and people come and storm into buildings and run up.

11  But if it's a false alarm, then it's not justified.  And so

12  the false alarm analogy here is really about, like, are the

13  conditions for filing for bankruptcy justified here?

14           And it's not about saving lives of women.  That's

15  not, respectfully, the role of the Bankruptcy Court.  The

16  role of the Bankruptcy Court is to provide a financial

17  solution to companies facing the kinds of problems that

18  Bankruptcy Courts face on a daily basis.  And so that's not

19  the situation here.  As laudable -- I mean, I'll credit the

20  goal of getting billions of dollars into the hands of

21  clients.  I don't fault anybody who wants that.  But what I

22  would suggest is that it's really an overstepping of the,

23  respectfully, of the Court's jurisdictional bounds in this

24  case, especially following the two bad faith dismissals.

25           And I would just say, Your Honor, that what became

1    apparent to me, listening to the proceedings, was that, you

2    know, the effort to sort of serve the interests of Johnson &

3    Johnson continues today.  I mean, I watched the cross-

4    examinations of Dr. Kessler and Dr. Wolf, and you know, Dr.

5    Kessler -- I understand our client put Dr. Kessler on.  I

6    acknowledge that.  But there was a cross-examination by a

7    Debtor for nearly an hour about Johnson & Johnson's

8    documents from the 1970s.  Why would Red River care about

9    what Johnson & Johnson had in its documents in the 1970s?

10   This is clearly just an effort to protect and preserve the

11   liabilities of Johnson & Johnson.

12          So in conclusion, Your Honor, we do ask the Court

13   to trust the process, to follow the virtuous process set out

14   in the Bankruptcy Code and Fifth Circuit law, and that

15   eventually will lead to a virtuous result.  We submit the

16   Court need not -- we need not try to struggle with how do I

17   get billions of dollars into the hands of women.  The Court

18   should respectfully interpret the Code, and enforce the law,

19   and everything else will fall into place eventually, just

20   like all of these mass tort liabilities do.  I mean, I'm not

21   aware of any mass tort that went on for 6,000 years of

22   litigation.

23          As I mentioned, I was privileged to do the opening

24   and closing in the Arrow motion to dismiss.  I know what

25   happened there.  We have a framework already in the master

1    settlement agreement that exists already here, and you know,

2    obviously it's speculation, but I don't think we can assume

3    that this is a binary choice of either we stretch the

4    jurisdictional integrity of the Bankruptcy Court, and try to

5    find a solution here, or you know, there's 6,000 years of

6    litigation.  We know that Johnson & Johnson had been telling

7    Plaintiffs' lawyers in LTL II that $6.45 billion was the

8    last penny that they would ever put on the table, and then

9    we know that when this case was solicited, they were saying

10   that $8.9 billion was the last penny put on the table, and

11   now there's $10 billion put on the table, and there's no

12   obligation of Johnson & Johnson to pay any more, and maybe

13   they won't.  We don't know.  But I think this is what the

14   majority in Purdue, during the argument, was saying, which

15   is, look, the Sacklers are putting billions of dollars on

16   the table, but we've got to apply the Code.  And who knows?

17   Maybe they'll come back with more.  We just don't know

18   what's going to happen.

19            So I would ask the Court to trust the process,

20   dismiss the case.  If the Court doesn't dismiss it, deny

21   certification of the vote, and certainly don't confirm the

22   plan.

23            And we thank the Court so very much for all of

24   your attention today, and for the entirety of the case.

25   Thank you very much for this time.

1            THE COURT:  Thank you very much.

2            Do you need a break?  Why don't we take a five-

3    minute break?  But before we do, who's -- just a lineup in

4    terms of who's next.  Ms. Richenderfer, you're going to go

5    next, and then Ms. Neuner, you're going to go?  And then Mr.

6    Birchfield, and Mr. Placitella?  Is there anyone else?  Oh,

7    ECPC, I won't forget about you.  Yes, anyone else?

8            MR. BARNES:  Roy Barnes.

9            THE COURT:  Mr. Barnes, how much -- I'm just

10   getting a time estimate, how much time do you think you're

11   going to need?

12           MR. BARNES:  Well, you and I talk slow, but I

13   think 15 minutes will take care of it.

14           THE COURT:  That's just fine.

15           [07:11:30.071] ATTORNEY:  Your Honor --

16           [07:11:29.713] ATTORNEY:  Why don't we talk during

17   the break, because perhaps --

18           THE COURT:  No, I'm not trying to slow anyone

19   down.  I just want to make sure that we have the opportunity

20   to go -- And folks can talk about the order as well.

21           Thank you very much.  Let's take a break.

22           (Brief recess.)

23           (Back on the record.)

24           THE COURT:  Ms. Richenderfer, I want to give

25   everyone a few minutes to get in.

1                    [07:19:06.807] ATTORNEY:  I called for our team,

2       Your Honor.

3                    THE COURT:  No, no, no worries.  Take your time.

4       No, I'm --

5                    MS. RICHENDERFER:  Your Honor, this will go really

6       fast without --

7                    [07:19:36.529] ATTORNEY:  Sorry, Your Honor.

8                    THE COURT:  No, no, no worries.  No worries.

9                    So we've got Ms. Richenderfer, Ms. Neuner, you're

10      going to go.  And then, after that, we've got folks out

11      there.  I was hoping we could start with Governor Barnes,

12      and then we can just kind of work our way from there.

13                   MS. RICHENDERFER:  Yeah, Your Honor, I asked him,

14      and he's already changed his flight until tomorrow morning.

15      Otherwise, if he needed to catch a flight, I was going to

16      offer.

17                   THE COURT:  Oh.

18                   MS. RICHENDERFER:  But he's already changed his

19      flight, so -- His flight would have been at 6:00, so --

20                   THE COURT:  Oh.

21                   MS. RICHENDERFER:  Yeah.  So he's going tomorrow

22      morning.

23                   THE COURT:  Okay.  Ms. Richenderfer --

24                   MS. RICHENDERFER:  Okay.  Thank you.

25                   Almost good evening, Your Honor, I guess depending

1    on if we use 5:00 or 6:00.  Linda Richenderfer, from the

2    Office of the United States Trustee.

3            I asked the members of my team, because there's

4    only two others, to come up and join me tonight.  You know

5    Mr. Ruff, and behind him is Mr. Ezell, who unfortunately, we

6    had certain witnesses that Mr. Ezell was going to do, and

7    they turned out to be moved off of the list.  So but I thank

8    them for their help, and for the Court's indulgences.  I

9    never once have felt like a visitor here, which may be good

10   or bad, I don't know.

11           So Your Honor, I figured out a way to address my

12   continual problem of lack of a PowerPoint, because I'm going

13   to borrow some of the PowerPoint slides Your Honor has

14   already seen today and use them as my speaking points.

15           THE COURT:  All right.

16           MS. RICHENDERFER:  Okay.  So if I could have

17   access to the ELMO, Your Honor?  That -- oh, the light's a

18   little bright there.  But that was one of the PowerPoints

19   used by the Debtors, no viable alternative in the tort

20   system.  Your Honor, I don't mean to sound harsh, but that's

21   not the problem of the Bankruptcy Court.  Mr. Silverstein

22   borrowed one of the things I did during LTL II in my closing

23   remarks, where I held up a copy of the Bankruptcy Code and

24   said, just a reminder to everyone, this is a court of

25   limited jurisdiction, and these are the rules of the road,

1    the Code, the rules, and the opinions that interpret them.

2    And that is the system that you have to work within if you

3    want to come in the doors of this courtroom.

4         And I'll start with one of Your Honor's end

5    questions with Mr. Silverstein, and I will jump around a

6    little bit because I want to address a lot of the things

7    Your Honor has asked about today.  Your Honor, I am not

8    apart from the system.  I have been involved in doing all of

9    the interviews for the TCCs.  So I have interviewed a lot of

10   women, and also a lot of estate representatives, children,

11   spouses.  And not that I have them as my clients, but I just

12   wanted the Court to appreciate and understand we're not

13   divorced from the human element here.  But the Code and the

14   U.S. Trustee's Office are not the ones that put them into

15   this situation.  We're not the ones that back in 2021 said,

16   oh, instead of even putting JJCI in, let's go do Texas

17   divisional mergers, let's go into Bankruptcy Court.

18        Nobody created the situation but the people who

19   decided that back in the fall of 2021, and went through the

20   Courtroom doors in North Carolina.  And the judge there

21   said, why are you here?  I'm going to send you to New Jersey

22   or to Delaware, because Delaware already had the Imerys

23   case.  Still there, been going strong since 2019, and

24   hopefully this April, maybe a plan will get confirmed.

25   We'll see.

```
 1              But Your Honor, this is the position they've been
 2    put in.  And the Debtor, with a lot of firepower backing it
 3    up, and extremely, extremely talented, smart litigators,
 4    tort litigators, bankruptcy litigators, bankruptcy
 5    transactional lawyers is what I call the other side, the
 6    people to put together the plans, and figure out the money
 7    portion of it, you couldn't get better talent, Your Honor.
 8    You may not have seen the bills yet in this case because at
 9    this point in time, they were only proposed, Jones Day is
10    only proposed counsel.  Kirkland & Ellis just filed its
11    retention application over the last couple of days.  All of
12    the TCC attorneys are proposed counsel, because we did file
13    an omnibus objection to their retention for many reasons.
14              But I have seen the bills, and I've seen the bills
15    in LTL I and I've seen the bills in LTL II, and I know what
16    the numbers are.  And what this Court has to grapple with,
17    you need to look to the Debtor.  And the Debtor came here
18    today, and never once mentioned what the findings are that
19    have to be made by this Court in order to confirm this plan.
20    There's been no discussion or deep analysis of that.  So if
21    there is something that this Court needs to struggle with,
22    with all due respect, Your Honor, I don't see it as the
23    problem of The Coalition, I see it as the problem of the
24    people that decided this was the way, because they don't
25    believe there's a viable alternative in the tort system.
```

```
 1              I don't understand that statement either, because
 2    we've heard how many -- about the MOUs -- I'm sorry the MSAs
 3    that got filed, that got done.  Excuse me, not filed.  And
 4    so there is an alternative.  And there's the mesothelioma
 5    settlements, there's estate settlements.  They want to talk
 6    to all of the lien holders, and then we have Arnold & Itkin,
 7    and we also have the Lanier MSAs.  There's a way to do it.
 8    They may not want to do it that way, but there is a way to
 9    do it.  And if they don't want to do it the way that they
10    have done in so many instances, then it doesn't mean they
11    have the right to come here if they don't meet the
12    qualifications to be in this Court.
13              So Your Honor, I'm going to primarily address the
14    motion to dismiss standards, and then also the vote.  I'll
15    talk a little bit about confirmation, but it's the U.S.
16    Trustee's position in general that we don't get there
17    because of the first two issues.  So we have here, you
18    mentioned yesterday, you know, Fifth Circuit law, is it
19    really that different from the Third Circuit law?  And to
20    give a little introduction here, I'm going to go through a
21    few of the facts, and then go through the case law for the
22    Court.  We've been doing this since 2021.  Everybody's been
23    talking about this.  And it's not involved in Purdue, but of
24    course we've all read so much about it, it's a little bit
25    like the Sacklers sitting in the background saying, we want
```

1    this done, but don't come look at us.  We want the releases,

2    we'll give you money up to a point, but don't come -- We're

3    not going to go into bankruptcy, we're not going to open up

4    the books, we're not going to let everybody know what we

5    have.  The analogy is striking, Your Honor.

6              A couple of times during the testimony, it struck

7    me that witnesses were asked, well, let's just start with

8    Red River.  And instead, we had Mr. Kim going back to the

9    beginning, we had Mr. Onder going back to the beginning.

10   And that's the context in which we need to consider,

11   respectfully, I think, Your Honor, the motions to dismiss.

12             So let's look at the case law.  Little Creek.

13   Don't need to go through all the different factors.  You

14   know the citation to it, I'm sure, much better than even I

15   do.  But one of the things, when I reread the Third

16   Circuit's opinion in LTL I, in footnote 14, when it's

17   talking about good faith, the first case it cites to is

18   Little Creek.  The Third Circuit believed that it was

19   following, or it looked to as definitive authority on the

20   issue, the Fifth Circuit's opinion in Little Creek.  And

21   good faith depends on the Bankruptcy Court's evaluation of

22   the Debtor's financial condition, the motives, and I'll

23   admit, Your Honor, I struggle with this one, the local

24   financial realities, one I've never fully understood or

25   appreciated, and I've read many of the other Fifth Circuit,

1    and also Southern District and Northern District cases, and

2    I see it all the time, but I've never seen anybody parse it

3    out.

4              So we have the Elmwood Development case also came

5    along in 1992, another Fifth Circuit case, and again said

6    good faith is an objective standard.  I know in their

7    response to the motion to dismiss, I saw the Debtors cite to

8    some of the decisions from the Fourth Circuit, or decisions

9    from the North Carolina court.  Big difference in the

10   standard.  That is what distinguishes this case from

11   Bestwood and the other ones.  And that's why, respectfully,

12   I believe this case was first filed in North Carolina, but

13   it came up to the Third Circuit.  And in the Elmwood

14   Development case, the Fifth Circuit stated, "Good faith rule

15   is engineered to prevent abusive manipulation of the

16   Bankruptcy Code."

17             I'll go forward a couple more decades.  I'm just

18   hitting upon some highlights here, Your Honor.  The NRA case

19   out of the Northern District of Texas.  One of my good

20   friends in the U.S. Trustee's Office in Wilmington was

21   brought in to assist with that one, so I'm very familiar

22   with the back and forth.  In fact, she was on the Imerys

23   case with me, so I learned an awful lot about the NRA case.

24   And you know, we looked there, and they talk about the prima

25   facie case, and then the burden shifts.  And I would submit,

1    Your Honor, and I'll go through the facts, the reasons why I

2    think the prima facie showing has been made here is to shift

3    the burden to the Debtor, to show good faith.  And the NRA

4    court found it's not good faith if you don't serve a valid

5    bankruptcy purpose.  Why was the case filed?  When was it

6    decided to file?  You look at the totality of the

7    circumstances.

8         And I know I inevitably say this wrong, this name

9    wrong, but HONX, not HONX, as I've been reminded, the 2022

10   opinion out of the Southern District of Texas, it wasn't a

11   two-step case, that's for sure.  But tat's a very important

12   issue here, Your Honor, HONX had its own direct liabilities.

13   It was receiving money from its parent company, but it had

14   its own direct distinct liabilities.  If we go back through

15   the list, Red River hasn't, LLT hasn't, no matter which

16   state they've been incorporated in, and LTL did not have its

17   own direct liabilities.  We have to go way back the chain to

18   JJCI in September 2021 to find the last entity that had its

19   own direct liabilities, and one could argue whether or not

20   its direct liabilities went back to the beginning of the

21   Baby Powder or not, because in order to do that, you have to

22   look at the contract by which the indemnification was

23   allegedly taken over by JJCI, not only for going forward,

24   but also for going backwards.

25         And I'll add to the list, Your Honor, LTL 2023,

1   Third Circuit, and its words are so, so telling for this

2   case, "Good intentions are not enough." A litigation, a

3   resolution of a litigation is not enough.  Now, of course in

4   LTL I, there was no plan.  LTL II had a plan that was never

5   solicited.  It was out there, and in fact much like in this

6   case, right in the middle of the motion to dismiss hearing,

7   it got revised, and an amended one was filed, and we were

8   all scurrying around, trying to get up to speed to question

9   witnesses on the stand.  In this case, we had the third

10  amended plan that was filed the night before we started this

11  trial.  But in LTL II, just because people were supporting

12  the plan, Judge Kaplan's like, that's not reason to let this

13  go forward.  We have to look at the Bankruptcy Code.  And

14  he, himself in that situation said, I have to look to what

15  the Third Circuit said in LTL I.  And Your Honor, I would

16  submit that what the Third Circuit did in LTL I was using

17  standards that go all the way back to Little Creek, to come

18  out of this Fifth Circuit.

19          There is no need to rehabilitate Red River.  It's

20  the same entity.  The only way it's different is that

21  they've shrunk the liabilities.  They said, okay, we'll put

22  everything else over here, they've shrunk the liabilities.

23  But interestingly, and I'll get into some testimony

24  citations in a minute, while they shrunk the liabilities

25  that Red River is holding, the amount of money that's going

1    to go into the Trust has grown from that, which Judge Kaplan

2    had in front of him in LTL II.  And we had a very

3    interesting exchange with Mr. Kim when he was on the stand,

4    when people were questioning him about the funding

5    agreements.  And he kept arguing with people, and he was

6    saying, no, the agreement wasn't worth $60 billion, the

7    first funding agreement in LTL I.  It was only worth up to

8    the value of the liabilities.  There was a cap.  But that

9    wasn't the value of the agreement.  The value of the

10   agreement was the amount of the liabilities.  LTL II, same

11   thing.  It wasn't $30 billion, that was the cap.  It's the

12   value of the liabilities.  And in Red River, what do we

13   have?  We have a third amended funding agreement, the value

14   of which is up to the value of the liabilities to be covered

15   by the trust that is being established.

16        So --

17        THE COURT:  So do you think the standard for me is

18   -- Obviously, I think it's Little Creek, totality of the

19   circumstances.

20        MS. RICHENDERFER:  Yes, Your Honor.

21        THE COURT:  How do I weigh valid bankruptcy

22   purpose, and you know, the buzzwords that you hear for the

23   other cases, imminent financial distress, is coming out of

24   it.  How do I -- What does the U.S. Trustee think about how

25   do I weigh all that?

```
 1              MS. RICHENDERFER:  I think that one of the things
 2    in totality of circumstance is we have to pay attention to,
 3    respectfully, is where did this entity come from?  Why does
 4    it exist?  Well, when the plan was solicited, it didn't
 5    exist.  It was, okay, if we get to 75%, we'll create this
 6    company, and we'll take this big rat's nest of liabilities
 7    that we took from JJCI, and put into LTL, and we're going to
 8    parse it out, and we're going to give part of it to Pecos
 9    River, and we're going to give part of it to Red River.  And
10    I think that they're putting the rabbit in the hat.  We're
11    going to create a company just to have these liabilities,
12    and we're going to give it enough funding so we can cover
13    those liabilities.  And we're going to advertise we have a
14    full paid plan, because we think that's a way to get around
15    Purdue.
16              Well, if it's a full paid plan, and you've got two
17    different funding agreements, the indemnification agreement
18    that puts the money into the Trust, and the expense
19    agreement, I think is the name of it, that puts the money
20    into the case, to cover the costs of the case, and I don't
21    believe there is a cap on that.  I might be mistaken. But we
22    haven't really hit it yet because we have so many
23    professionals who have not yet been officially retained by
24    the Court, it's -- you are going to constantly come out even
25    at the end.  So where was the financial distress that Red
```

1    River is suffering from?  Its attorneys are going to get

2    paid, because J&J, or J&J Holdco, or Holdco, New Holdco,

3    whatever, is going to have the funds at the ready.

4            And I was going to try to map this out, but it was

5    a little difficult.  But I went back and I looked at Mr.

6    Kim's first day declaration, where there's this big, long

7    paragraph about all of the assets that Holdco has.  Holdco,

8    the one that's on the funding agreement.  A lot of foreign

9    entities, which is one of the reasons why I was having

10   trouble getting down.  I was trying to come up with a

11   shortcut way of describing it for the Court.  But Holdco has

12   the funds.  And Holdco is the one that is standing behind

13   the funding agreement.  Not very much different from J&J and

14   JJCI jointly and separately standing behind the funding

15   agreement in LTL I.

16           And every time, and you've heard this before,

17   every time there's been a stumble in the negotiations, more

18   money has come up.  More money's been put on the table, get

19   around this hurdle, get around that hurdle.  And again, if

20   it's a full pay plan, and I'm not saying, Your Honor, that

21   the U.S. Trustee's Office necessarily agrees it is, I'm

22   using the Debtor's terminology, if it's a full pay plan,

23   then that means where is the financial distress?  If these

24   people are getting what they're supposed to get, full pay --

25   Now, it's hard to imagine it's full pay because you've got

1    unliquidated claims here.  But that is the way.  I mean,

2    that's Dr. Mullin through and through, full pay, full pay.

3            And what's interesting, Your Honor, is I was

4    trying to figure out in LTL I and LTL II, we were looking,

5    we had mesos and had also the OCs, and so we were looking at

6    the litigation history, for people to try to determine what

7    was the value of the claims, how much should they get paid.

8    Here, new paradigm, and it's a paradigm that was created by

9    J&J itself.  It went out and it did MSAs with Lanier, it did

10   two of those, and it did one with Arnold & Itkin.  I will

11   tell you that Arnold & Itkin were quite forceful, and was

12   quite the presence in both LTL I and LTL II, because they

13   had excellent bankruptcy counsel from Wilmington, Delaware

14   representing them, and they were a roadblock.  And so, you

15   know, with all due respect to Mr. Itkin, I think that, you

16   know, there was also something going on in the Bankruptcy

17   Court, too.

18           And so they do a deal, they do deals with Arnold &

19   Itkin and Lanier.  I know there's a couple more, Your Honor,

20   and they had a list up at one point in time.  I don't

21   remember all the names, because they were smaller amounts,

22   and firms I haven't dealt with directly.  But they did that,

23   and then they say, okay, here is the marketplace.  We just

24   defined the marketplace for you, look at what it's worth in

25   this marketplace.  So just assume that Mr. Lanier got the

1    best deal, and just assume that Mr. Itkin got the best deal.

2    And even though there's I think testimony that goes both

3    ways to whether any of that money has yet filtered down to

4    any of their clients, we created this marketplace, that's

5    what we're using, and that's how we're doing this as a full

6    pay plan.

7            And one thing I found as I was pouring through the

8    third amendment plan prior to Ms. Ellis being on the stand,

9    there is a provision in there that if somebody who is

10   covered, who is represented by one of those firms, who has

11   an MSA, if they are not getting paid under the MSA, they can

12   come into this process.  They can file a claim with this

13   trust.  I don't know how many of them will or won't, but

14   they have the ability, if you look at the TDPs, and I hope

15   you're not going to ask me, I will find it for you, though I

16   didn't write it down, but it is there, that they can come

17   into this system.

18           So we have the birth of Red River in 2024, and a

19   couple of things were happening.  On March 27th, 2024, we've

20   heard about this a lot, the MDL Court says it wants to hear

21   Daubert challenges.  Okay?  So then on May 1st, and again

22   I'm borrowing one of the sheets -- I don't remember who used

23   this one.  It might have been the Debtor.  But this comes

24   from a document -- Excuse me, Your Honor.  It is 1187-17,

25   and this is May 1st.

1          And Mr. Haas from J&J, who has been here for this

2    trial, made an announcement.  And he talks about how the

3    Daubert motion was ordered by the Court.  I'm going to

4    paraphrase, Your Honor, in the interest of time.  It's there

5    for everyone to see.  Moving papers submitted in July,

6    opposition in August, and he goes on to talk about the

7    three-month solicitation period, and we will know right

8    about the time the opposition papers are filed in the

9    Daubert motion where we stand with respect to the vote.  And

10   I'm not the one that highlighted this, but I would have

11   highlighted the last sentence, Your Honor, which says, "And

12   therefore, we will be able to make an educated determination

13   as to what is the best pathway forward for both claimants

14   and for us." And that's Mr. Haas speaking in his capacity --

15   oh, his title is not on here.  But we have heard he's head

16   of litigation for J&J.  And he says "us."  Claimants

17   granted, but also "us."

18          So then, you move forward June 3rd, they start the

19   solicitation process.  I don't know if the Third Circuit

20   knew what was going on or not, but the voting deadline is

21   July 26th, and the Third Circuit opinion comes out July

22   25th, without argument, which I had bet a lot of people was

23   going to happen, and the Third Circuit says on July 25th,

24   yes, Judge Kaplan, you applied what we said the first time

25   around correctly.  And one of the things that I found, and

1    this is actually from LTL I, is that on the idea that

2    divisional mergers attacks have been rejected, you know, J&J

3    is using language that's from Judge Kaplan's opinion in LTL

4    I.  And yes, the Third Circuit did not directly address

5    divisional mergers, but I just found it amusing that they

6    were going back to that opinion, which the Third Circuit

7    overturned, for support of the idea that divisional mergers

8    are not being -- I'm sorry, that attacks have been rejected.

9          And you asked before a question about whether

10   divisional mergers are per se bad.  I forget which term you

11   used.  Your Honor, no.  Again, totality of circumstances.

12   How is it used here?  What is it accomplishing?  Maybe some

13   court one day in the future will decide that they're all

14   bad, but that's not the reason why we are here, in front of

15   Your Honor, saying this case should be dismissed.  We're

16   here because we're saying this one is bad, not that they're

17   all bad.

18         And they use the concept of a divisional merger,

19   again, to solicit for a non-existing company, which I think,

20   Your Honor, really throws into question the whole

21   confirmation and Disclosure Statement process, because yes,

22   pre-petition -- I mean pre-packs all the time.  I've dealt

23   with several in my career with the U.S. Trustee's Office,

24   which has only been eight years.  But at the same time, I

25   don't think I've ever seen one for a company that doesn't

1    exist.  It's like they're sending out a feeler, let's see

2    what happens, let's just try this.  We got kicked out of

3    Jersey twice, let's try this.  Let's do another divisional

4    merger, but we're not going to do it until we know that we

5    got the vote.  In the meantime, we're going to rely on

6    Daubert, and we're going to see what happens, what shakes

7    out.

8              And so they thought they had the 75% vote I guess

9    on August 19th, when Red River was formed.  There's been

10   conflicting testimony about whether or not they did or

11   didn't have 75%.  I know that Mr. Murdica, if I recall

12   correctly, believes they did, but I think that involves

13   taking out some of the Beasley Allen votes.  I remember the

14   testimony, though, of Epiq, and you know, Ms. Kjontvedt

15   says, I consider myself to be an agent -- you know, I'm

16   here, I'm an agent of the Court, you know?  We take our

17   responsibilities seriously.  And she's the one that says,

18   no, it wasn't 75%.  She says it was 71.29% at that point in

19   time, before the Smith ballots come in.

20             So the negotiations for the plan were done by LLT

21   -- or I should say, were done by J&J.  Because remember, I

22   asked Mr. Kim, and he wasn't really involved.  He was the

23   Chief Legal Officer, he wasn't involved.  They were done by

24   Jones Day, Mr. Murdica's name keeps getting mentioned on

25   occasion, somebody talks about having a conversation with

1    Mr. Haas, and Mr. Kim testified he would take it back to the
2    board when it was to a point that he thought they needed to
3    get involved with it.  But it's not Mr. Kim who's in that
4    room.  And which then raises the question, of course, what
5    is Red River formed to do?  And Mr. Kim told us that it is
6    there to manage the talc liabilities.

7            Well, they were being managed just fine back when
8    it was JJCI, and then LTL, and then LLT.  And under this
9    plan, there will be no more talc liabilities, if it is
10   confirmed, there will be no more talc liabilities to manage.
11   So it basically was formed to bring the talc liabilities
12   into the Bankruptcy Court, because if the plan is confirmed,
13   they get shifted over to the Trust.  So then I guess Red
14   River is just there to collect the, I always -- the RAMs,
15   the monies that have been burned off by RAM, through its
16   collection of, I'm going to turn to Mr. Ruff for a moment,
17   excuse me, Your Honor -- royalties.  I always get stuck on
18   that one for some reason.  I don't know why.

19           And Mr. Kim even told us that most of the J&J
20   subsidiaries don't have Chief Legal Officers, but this one
21   did.  From the very beginning, LTL did.  So there was some
22   importance that was put into this process, that was being
23   worked out behind the scenes by J&J, and it's never more
24   evident than when we get to Red River.  LTL I, LTL II, not
25   as evident.  What went on between LTL II that got us here

1  today with Red River, very evident.

2        So -- okay here.  One of the other telling things,

3  Your Honor, is I know that we were here -- Well, I first

4  argued the issue in front of Judge Kaplan, because the case

5  was still open.  LTL II was not closed closed when this case

6  was filed.  And then we came to Your Honor, and we argued

7  about venue, and the day after we finished that argument and

8  Your Honor ruled, Red River files a motion with the U.S.

9  Supreme Court to ask for additional time to file a writ of

10 certiorari on behalf of LLT as an outgrowth of the Third

11 Circuit affirming Judge Kaplan's opinion.  And you can't do

12 that unless you're the same entity.  They cited a rule, and

13 unfortunately, I did not bring with me a copy of the

14 document.  And I know that it's attached because you had The

15 Coalition come back to Your Honor, and ask about

16 reconsideration of that.  Because there has been a

17 representation, I mean, they're telling the U.S. Supreme

18 Court, hey, we are the same, and we are asking you to give

19 us more time so we can consider whether or not we're going

20 to file a writ of certiorari in order to try to be heard

21 before this Court.

22        So just to sort of end on the motion to dismiss, I

23 don't think the standards applied by the Fifth and Third

24 Circuit are different.  The Third Circuit just had a factual

25 scenario in front of it that just happens to look an awful

1   lot like this one, and it applied the factors.  And it

2   stopped because it got to a point where it was like, wait a

3   minute, do we need to go further?  Look at this, there is no

4   sign of financial distress.  And where is the bankruptcy

5   purpose?

6           And so Your Honor, I respectfully suggest that you

7   need to look at the lack of a valid reorganizational purpose

8   here.  This cannot be confirmed because they solicited a

9   plan that had 524(g) provisions in it and third-party

10  releases that are no longer allowed under the Supreme

11  Court's rulings in Purdue.  There's no lack of financial

12  distress.  To the extent there is any, it was manufactured

13  because they got rid of the second funding agreement through

14  having LLT merged into what was then the Holdco that was the

15  other party to the funding agreement with LLT.  At then, at

16  that point, Mr. Kim's first day declaration tells us that

17  then the funding agreement no longer exists because there's

18  been a merger between the party that was doing the funding

19  and the party that was receiving the funding, and that is

20  how they wiped out funding agreement number two, and then

21  they have to create funding agreement number three.

22          So I think, Your Honor, at the end of the day I'm

23  trying to see -- I'm going to try to skip ahead a little

24  bit, Your Honor, because I know it's late, others want to

25  speak, and I don't want to be redundant.  But I don't know

1    if Your Honor has any questions for me on the question of

2    the factors.  I don't think it's that involved of an

3    analysis, Your Honor, quite honestly, you know?  And I do

4    think that in our objection to confirmation, one of my other

5    team members did an excellent job at laying out all of the

6    reasons, and why we think that there is plenty of Fifth

7    Circuit support for the fact that this is a bad faith

8    filing.  Settling tort claims is not a recognized bankruptcy

9    goal.  Can it happen in the Bankruptcy Court?  Undoubtedly.

10   Happens all the time.  Can litigation be the reason why a

11   company ends up in bankruptcy?  Again, happens all the time.

12          That's not the reason why Red River is in this

13   Bankruptcy Court.  Red River is here so J&J and all the

14   many, many, many entities that are listed are covered by not

15   only injunctions, but also releases, so that they are

16   protected moving forward.

17          Your Honor, I'm going to shift now to the vote, if

18   that's okay, because the vote is another area where the U.S.

19   Trustee -- I said to you during the opening argument, Your

20   Honor, that this would become, that this might become the

21   poster child for how not to do a pre-petition solicitation

22   when you're not dealing with sophisticated financial

23   entities, which is usually the situation in the pre-packs

24   that I'm familiar with.  And I think that the evidence has

25   shown, you've asked an awful lot of people about bad faith,

1   good faith, well, you know, people with the best of

2   intentions can make mistakes.  And when you pile enough of

3   them up on top of each other, you've got to sit back and

4   you've got to say to yourself, what's really going on here?

5   Can we feel comfortable that this vote, this solicitation

6   was done in the manner in which it should have been done?

7           And I'm going to find one of my other -- one of

8   the ones that -- okay, now I can't find my cheat sheet.  I

9   had a cheat sheet here, Your Honor, that just set out sort

10  of when you're doing voting in a pre-pack, how it has to be

11  done -- Ah, here it is.  I have to use Mr. Ezell's handouts

12  that he helped me with here.

13          So Section 1126, Acceptance of Plan.  And it says

14  it must deem to have been accepted if, one, the solicitation

15  was in compliance with any applicable non-bankruptcy law or

16  regulation governing the adequacy of disclosures in

17  connection with the solicitation, or two, if there is not

18  any such law, rule, or regulation, such acceptance or

19  rejection was solicited after disclosure to such holders of

20  adequate information as defined in 1125(a) of this title.

21  And Your Honor, the Disclosure Statement standard is the

22  same, regardless of whether people are represented by

23  counsel or not.  Does the U.S. Trustee take particular

24  interest if it's got the mom and pop shops that we want to

25  make sure get it, that they get the ballots?  Of course.  Of

1    course.

2            But we also had J&J spend $8 million on a program

3    that was put together by Dr. Wheatman to try to get what

4    I'll call the mom and pop claimant out there, who wasn't

5    represented by counsel.  And there was a reason for that,

6    because they wanted to bring in -- and the goal was

7    admirable, bring in as many votes as possible.  And they say

8    the lack thereof is proof that the real people were covered

9    by the attorneys who were the major movers and shakers here.

10   Your Honor, I would offer up another possible explanation.

11   Maybe that just meant that they didn't get everything in

12   front of the right people.  We did not present any expert

13   testimony.  I did hear the testimony, though, of Dr. Hilsee,

14   and I don't know.  Maybe it just wasn't enough to grab the

15   attention of all the other people out there who didn't yet

16   have an attorney.

17           But when you asked Mr. Gordon, he stated that they

18   worked off of the ballot that was used in Boy Scouts.  And

19   again, I'm using Debtor's document that they put up on the

20   screen for you, and where I want to focus on is it is

21   partially highlighted here, but in that case, Judge

22   Silverstein said to them, "The firm shall supply the power

23   of attorney concurrently with the master ballot and exhibit

24   that provided the firm with the authorization to act on

25   behalf of such abuse survivor clients."  So I would submit,

```
1    Your Honor, that there was an important piece of information
2    that wasn't requested here, if indeed the Debtor wants to
3    rely on the fact that they think that they followed the
4    ballot that was used in Boy Scouts, because they didn't.
5    That requirement was put in there because Judge Silverstein
6    was very worried about what would happen with all of the
7    Option B votes.
8            So I'm going to go through a couple of the members
9    of the AHC who were on the stand, Your Honor, all of whom I
10   -- They were acting, they believed, in the best interest of
11   their clients.  But that doesn't mean that they met the
12   bankruptcy standards with respect to the solicitation
13   process, or with respect to advising their clients.
14           We have Ms. Andrews.  She testified about how she
15   went and she engaged clients for the specific purpose of
16   representing them in the bankruptcy.  And it's limited even
17   to the Red River bankruptcy.  And when she was asked if she
18   saw a distinction between signing a client's name on a
19   document, and casting a ballot on their behalf, I would ask
20   Your Honor to take a look at that testimony.  I don't think
21   we ever got an answer out of her on that one.  And she's
22   relying on language that was in her form engagement letter,
23   and this is part of document 1155-41, and it's in paragraph
24   12, which was the power of attorney to sign for client.  And
25   this talks about in situations where it's necessary to
```

1    protect the client's rights from a deadline and she needs a

2    signature, the client authorizes the firm to sign a document

3    on the client's behalf.

4            Your Honor, with all due respect, I think signing

5    a document is a lot different than casting a vote, and

6    particularly if you are a gynecological claimant.  Because

7    there is only one amount that you are allowed.  There is no

8    settlement matrix.  You get $1,500.  Still not clear,

9    because we did not hear it explained today, whether or not

10   the current gynecological claimants can sit back and rest

11   assured they can just wait, and if they develop ovarian

12   cancer later on, they can come to the Trust.  We don't know

13   if that's what's going on with that language.  I heard

14   nothing.  But that gynecological cancer claimant has one

15   number, and one number alone that they can receive.  They

16   still have to file an opt in, and they also have to sign a

17   third-party release form, but the amount is set in stone.  I

18   don't know what else they can do.

19           And Ms. Andrews was working under the assumption

20   that the OCs -- I'm sorry, that the gynecological claimants

21   could just wait and see what happens, and then come into the

22   Trust.  And Ms. Ellis at first said, oh no, they can't do

23   it, and she wouldn't advise the client to do it, and then

24   she changed later on her testimony and said, oh, no, I think

25   that they can do it.  Well, I don't think, Your Honor, that

1    Ms. Ellis is going to be the final arbiter of that.  It's

2    going to be the Trustee, which I'll digress here for a

3    minute.

4            I think it was during opening when I brought up

5    the idea of the Trustee, and his current work as mediator.

6    I think that Your Honor asked me a question about how or why

7    he was a mediator, or you asked somebody about it, and we

8    all thought that his work was done pre-petition.  Well, Your

9    Honor, he's been here.  He's been negotiating.  What TCC

10   counsel got up and talked about today, there's mediation

11   that's going on in your case, and there's been no request

12   and there's been no court order.  Now, I don't know how this

13   Court handles it.  I know what would happen in Delaware, so

14   I'll be honest on that one.  But I do know that he is acting

15   as a mediator during the pendency of this case, and there

16   has been nothing filed with this Court on that point.

17           And you asked the question of one of the people

18   who preceded me about, well, what does this mean?  Well,

19   from the description we've had from everybody, there were

20   some tumultuous discussions that went on, some

21   relationships, and I don't know if they've been broken, but

22   they've been in some way perhaps a little harmed, and the

23   mediator's role was to get the votes, was to get a plan, was

24   to get this result.  And so Your Honor, I don't know the

25   mediator.  I've never met him.  But I do know that -- I

1    think there are questions that need to be asked to make sure

2    that, especially if he's the only trustee.  We need somebody

3    that we know is going to be totally neutral when people come

4    in front of him.  Because there's a lot of issues that will

5    get decided down the road, that determine the amounts the

6    claimants receive.

7          And you know, Your Honor, I liken it to the idea

8    that, you know, when you have a bench trial, the judge

9    doesn't serve as your mediator.  You go get somebody else

10   off of the bench to help with the mediation portion of it.

11   Because it's not good for the person who is going to make

12   the determination to see how the sausage gets made, perhaps,

13   and sees all the back and forth, and the deals that are

14   being made, and the positions that are being taken.  Well,

15   Mr. Kurdi has been through all of that already, and now

16   we're going to put him in the position comparable to a

17   judge, of making these decisions, and making these decisions

18   on his own, with no other trustee.  I don't know why $10

19   billion, I don't know if that's the right number because I'm

20   not quite sure how we get it up to $10 billion, but not only

21   is Mr. Kurdi going to oversee this Trust, he's also the

22   person that's going to make the determination under the

23   common benefit fund.  A lot of the law firms that you've

24   heard about that have been having disagreements with each

25   other are the ones that are going to make application to

1    receive funds under that fund.

2         And to pick up on something that Mr. Silverstein

3    said, in a lot of ways, this is the plan that is still in

4    the condition precedence stage.  We don't have a

5    confirmation order.  I don't think I've ever gone to a

6    confirmation hearing without having a proposed confirmation

7    order that the Court can consider, and that I can argue

8    against or in favor of.  In addition, it's very clear in the

9    plan that the common benefit MSA is supposed to be filed on

10   the docket before the plan can be confirmed.  We don't have

11   that.  Also, the Private Resolution MSA is supposed to be

12   filed on the docket before the plan can be confirmed, and we

13   don't have that.

14        And I will be honest with Your Honor, and I know I

15   am moving ahead to my third subject here, but I am still

16   very confused, I will admit, as to whether or not we are

17   getting a fourth amended plan.  Because I listened to the

18   discussion, and Your Honor, I will say this with all due

19   respect, it did get down to testimony from proposed counsel

20   for the TCC this morning, and I am not quite sure what got

21   resolved.  Because if the Smith MOU and the TCC MOU are

22   being incorporated into the plan, that includes the breakout

23   between current and future -- that has all the money, I'm

24   sorry, going to the current claimants.  Ans the FCR has been

25   adamant, and should be, that okay, where are the funds for

1    my people then?

2          And so I'm really not sure what Your Honor is

3    being asked to confirm.  Because we can't have the Smith

4    MOU, the TCC MOU be totally incorporated into a plan, and

5    also still have the FCR's support of the plan. And I have

6    asked -- I'm not aware of any case where a situation like

7    this that went forward for confirmation. when you didn't

8    have an FCR that was 110% behind the plan, especially when

9    it comes to something like this.

10         And in reviewing some of the objections last

11   night, Your Honor, one of the things that came to my

12   attention, and again this was something that was created by

13   my team member here, this is footnote 4 from the SLF

14   claimant's omnibus reply in support of the second amended

15   plan.  And it says, "The amended plan is in the process of

16   being further revised to reflect all the terms," all the

17   terms, "of the SLF MOU and the TCC MOU.  Provided that the

18   amended plan accurately includes those terms, SLF is

19   supportive of confirmation of the amended plan.  SLF

20   reserves all rights to the extent the amended plan does not

21   incorporate the terms of the SLF MOU." So Your Honor, I

22   don't know what everyone is supporting.  I don't know what

23   changes are going to come because of mediation efforts, and

24   I don't know what's going to be in the confirmation order.

25   So unfortunately, I'd hate to think this, that we just

1    wasted our time, but I don't know what's on the table right

2    now.

3                I'll go back real briefly, Your Honor, to Mr.

4    Watts.  When Mr. Watts entered LTL II, he became an

5    important player in the eyes of the Debtor and J&J.  You

6    know, there is testimony regarding the amount of money that

7    he paid to obtain his claims, and he's moving forward with

8    these claims, and I find it impossible to believe that if he

9    asked for more time, he wouldn't have gotten it.  Because

10   what he did was a disservice, respectfully, to his clients.

11   Okay, he thought he had the ability to vote them under

12   Option B, and this is a question Your Honor asked, if you

13   have that ability, do you really have to wait?  Yes, Your

14   Honor, you do, especially if you're going to come into this

15   court and tell you that -- I forget what percentage we're up

16   to now that the Debtor is representing to the Court, 95% of

17   the claimants?  Well, no, Your Honor, we don't have 95% of

18   the claimants.  We might have claimants and attorneys who

19   represent 95% of the claimants.

20               But with Mr. Watts, I understand the predicament

21   he found himself in.  And the way out of that predicament

22   was to call up Mr. Murdica and say, I need more time.

23   Listen, Epiq didn't do their job.  Again, I'm not saying

24   they had faith, but it was a failing of Epiq that led him to

25   the position where he couldn't wait to get back the votes.

1    So we had a two week period of time, and he was getting

2    ready to go to the Olympics, he told us, and so what did he

3    do?  He ended up having to vote under Option B.  And I

4    believe that Mr. Watts testified, at page 1079, that he did

5    not ask Mr. Murdica to extend the voting deadline.  Instead,

6    it was suggested that he use Option B.

7            So due respect, I don't think his clients had the

8    proper amount of time.  If somebody comes into a court and

9    says, oh, Your Honor, we're going to have the votes in two

10   weeks, the U.S. Trustee's Office would object.  And the Epiq

11   representative said this was a seven-week solicitation

12   process.  She thought that that was sufficient, and that

13   that was called for in this situation.  But it wasn't seven

14   weeks for Mr. Watts' clients.

15           THE COURT:  Ms.  Richenderfer, I'm going to give

16   you another four minutes.  I've got to honor the chess

17   clock.

18           MS. RICHENDERFER:  Okay.  All right.  Okay.  I am

19   sorry, Your Honor.

20           And I have to address, you know, the elephant in

21   the room, and I'm not going to -- I don't know, between Mr.

22   Birchfield and Mr. Smith, I'm not going there.  All I know

23   is this, Your Honor.  Two-day turnaround to vote?  That's no

24   vote.  And Mr. Smith thought he was soliciting a new plan.

25   We heard that from his counsel today, both of them.  Both of

1    his attorneys stood up and said it was a new plan.  And if

2    it's a new plan, that September 11th letter is not a

3    Disclosure Statement.

4         THE COURT:  One of the attorneys said it, to be

5    fair.  I don't think both of them said it.  I don't think

6    Ms. Ringer said it.  But --

7         MS. RICHENDERFER:  I think I was shocked, Your

8    Honor, that they both said it, but the record will -- But

9    regardless, Your Honor, at least one of them said it, maybe

10   two.  But that September 11th letter was not a Disclosure

11   Statement.  And two days?  And Mr. Smith told us that it

12   only took him two days to backtrack and figure out how we

13   could get all of the claims.  Even if he had sent it out on

14   August 30th, the day he signed the MOU, that's two weeks,

15   and that includes the Labor Day weekend.  That's not

16   sufficient time.  The U.S. Trustee's Office would have been

17   up in arms.

18        And the red flags that led to looking at the

19   Beasley ballot, and I'm not saying it shouldn't have been

20   looked at, there are a lot more red flags.  I mean, Mr.

21   Pulaski didn't even realize he voted everyone as an ovarian

22   cancer claimant until he was told that during his deposition

23   by counsel for The Coalition.  How could that escape

24   everyone's attention?  I don't know, but that's a problem

25   with the process.  Again, I'm not saying anybody

```
 1   intentionally did it, but if you're going to look for red
 2   flags, that's a red flag in this case.
 3            So Your Honor, I think that at the end of the day,
 4   this case was filed in bad faith.  And if the Court does not
 5   believe that that is the proper conclusion, then I think,
 6   Your Honor, I would strongly, strongly urge the Court to
 7   consider resolicitation of the plan.  There are just too
 8   many misses that occurred here for such an important
 9   situation as we have here.  We do not -- we want to give the
10   women the full vote, and there were too many attorneys
11   holding large numbers of votes, who for whatever reason
12   didn't have the time to do so.
13            Thank you, Your Honor.
14            THE COURT:  Thank you.
15            I'll have Ms. Neuner now, and then I'll hear from
16   Governor Barnes after, and we're done.
17            MS. NEUNER:  Your Honor, could we have the tech on
18   this table?
19            THE COURT:  Sure.
20            MS. NEUNER:  Thank you very much.  Your Honor, may
21   I approach to pass up the PowerPoint to you and your clerk?
22            THE COURT:  Yep.  Yes, thank you.
23            MS. NEUNER:  Good evening, Your Honor.  Lynn
24   Neuner, of Simpson Thatcher & Bartlett, on behalf of
25   Travelers.
```

1           Your Honor, on behalf of Travelers, and also the

2      combined Simpson Thatcher-Gray Reed team, we greatly thank

3      the Court, and the connected professionals and staff who

4      have been working so hard over the last two weeks, and we

5      appreciate being here in this proceeding.

6           Let me get straight to it.  Your Honor, we believe

7      there are four issues for the Court to focus on from our

8      perspective, whether the Insurer's rights have been

9      violated, whether the plan has been proposed in good faith,

10     whether there has been an improper use of 524(g) here, and

11     whether the solicitation process has been flawed.  Our goal

12     is not to be repetitive, and we're going to take some of

13     this at a jog-through-the-net pace.

14          Your Honor, the timeline that we put up at the

15     opening we've revised to customize to the evidence in the

16     case.  What we can see is that in early 2024, last year,

17     various Plaintiffs' firms signed up early plan support

18     agreements.  J&J announced the prepackaged plan on May 1st,

19     and the voting began June 6th.  The voting deadline was

20     meant to be July 26th.  At that point, as we saw from the

21     evidence, Epiq sent Jones Day a preliminary voting tally,

22     showing 71.1%.  The 75% threshold had not been met.

23          Immediately action ensues.  There's a meeting

24     among Mr. Murdica, Mr. Birchfield, and Smith.  That's in New

25     York.  We've heard about that.  After that, what we end up

 1    learning is Mr. Birchfield has walked away, and Mr. Smith

 2    has stayed engaged.  Mr. Smith, in his declaration filed

 3    with this Court, stated that he reached the material terms

 4    in principle for the MOU on August 22 and 23.  However, he

 5    did not sign up the agreement then.  There was another

 6    further meeting with Mr. Birchfield involved, this time in

 7    New York, and that was not successful.  Consequently, Mr.

 8    Smith signs, or has the MOU become effective as of August

 9    30.

10         We then move into September.  There is another

11    meeting in Pensacola.  This is the one that was contrived by

12    artifice, we heard.  That involves Mr. Murdica, Mr.

13    Birchfield, and Mr. Smith.  It does not lead to a consensual

14    resolution.  The next day, Beasley Allen sues Mr. Smith, and

15    the day after, September 11th, Mr. Smith sends the letter to

16    the clients that he shared with Beasley Allen.  The deadline

17    was originally September 13th.  There was a hurricane.  Mr.

18    Smith extended it until that Sunday, September 15th at noon.

19    He cast his ballot on September 16th, changing Beasley

20    Allen's votes from reject to accept.

21         On September 19th, three days later, we have Epiq

22    giving the voting tally, now showing 83% approval.  That's

23    on a Thursday.  On Friday, J&J pulls the trigger, Red River

24    files for bankruptcy.  We learned from Ms. Ellis that that

25    morning, she stated firmly that she would not agree to the

1    $5 billion allocation to Presence, or to the Smith MOU

2    factor that appeared to favor current claims, or early

3    filers for individual review funds.  Those terms were not in

4    the plan that was filed on September 20.

5           Turning to our first issue, Your Honor, we contend

6    that the plan in fact violates the insurer's rights, and we

7    would also state, Your Honor, that we have standing under

8    the Truck Insurance Exchange case out of the Supreme Court

9    from 2024, saying that when bankruptcy plans impact and

10   impair insurer' rights, they have the opportunity to be

11   heard on all issues in the bankruptcy case.

12          Travelers is yes, disappointed with Mr. Gordon's

13   comments that they do not want us here, and they find our

14   presence to be regrettable.  We hope that the Court does not

15   find our presence to be regrettable here.

16          In terms of the travelers J&J relationship, the

17   talc claims themselves started in 2009, and we heard that

18   from Mr. Kim.  But J&J did not provide any notice to

19   Travelers, what we call in the insurance world a tender of

20   claims, until 2017.  So there was eight years of handling

21   these claims on their own.  Travelers actually spent time

22   analyzing this, and sent out this letter.  And Your Honor,

23   these letters are all in evidence, in the record, in May

24   2018, offering to contribute to the defense of J&J in the

25   tort system.  But J&J wrote back a month later, saying they

1    didn't want Travelers participating in the defense.  They

2    said, instead, we perceive that you've given us an election,

3    and we elect to defend ourselves, and we'll seek

4    reimbursement afterwards.

5         Travelers the next year offered up renowned

6    defense counsel, John Kurowski, for defense assistance.  We

7    said on Travelers' dime, we'll pay for him, but we'd like

8    him to affiliate in the defense.  He could be a valuable

9    resource.  J&J rejected Mr. Kurowski's assistance, and you

10   heard Mr. Kim saying they didn't want him there.

11        In 2020, Travelers wrote J&J a letter, saying

12   you're boxing us out of settlement negotiations, including

13   those leading to the bankruptcy.  You haven't given us an

14   opportunity to participate, you're not giving us advance

15   notice, you're not giving us, or respecting our right to

16   approve settlements.  J&J proceeded on its own course,

17   controlling its own defense.

18        Now, you heard that there is a New Jersey coverage

19   action, and you heard that Travelers denied coverage across

20   the board.  Your Honor, there is one document and evidence

21   on that.  I welcome you to read it, because when you do, you

22   will see it is an interesting document that says there are

23   certain uncovered elements to the J&J claim.  For example,

24   pretender costs.  That's what you saw Mr. Kim be questioned

25   about.  That there's no coverage for.  Other items, like

1    punitive damages.  In fact, Judge Wolinetz just ruled that

2    there is not coverage for the punitive damages Ingham

3    verdict.  That's the $2.2 billion verdict that was just

4    decided in December, no coverage.

5            But what you'll see, if you look at this, is that

6    there's a very nuanced approach by Travelers.  And this

7    pleading is from 2020, which says, "To the extent there are

8    uncovered elements, we do not think there is coverage.  To

9    the extent there are covered elements, we think there should

10   be a proper allocation under New Jersey allocation law." So

11   I think with all respect, one needs to read this through the

12   eyes of an insurance attorney to see that it is a nuanced,

13   careful approach toward the coverage situation.

14           Now let's move on.  Mr. Kim has stated that he

15   actually thinks that the insurer's limits will be exhausted

16   by other matters.  We know about the meso settlements, for

17   example, and the Lanier, the Arnold's & Itkin settlements.

18   Those are all outside this bankruptcy.

19           So we have been saying to the J&J team, why don't

20   you just take us out?  Why don't you just say you don't need

21   to seek coverage for this Red River bankruptcy plan because

22   we can have New Jersey discussions about the other items?

23   And My partner, Mr. Russell, asked Mr. Kim on the stand, and

24   he said, no, we're not willing to do that.  We want to

25   reserve all our rights.  They can.  That's fair, they can

1    reserve their rights.  But when they put us into the mix,

2    and implicate us, then you have to look at the entire

3    policy, and all of the cooperation and obligations that go

4    with that.

5           So let's turn to those, and I'm going to again be

6    fast.  This is just an example of the duty to defend

7    language from an early policy, and the language saying that

8    you cannot assign interest under the policy unless the

9    insurer consents to that.

10           Now, one of our essential criticisms here is that

11    the plan itself is paying claims that are meritless.  And

12    then, we will be asked on the backside to pay $9 billion for

13    those meritless claims.  We don't seek any coverage

14    determinations here, but we also, we don't want to be

15    prejudiced, and that's what we think the plan does.  Here,

16    J&J has told the whole world they think that these claims

17    are meritless, and they've also told all of us here that

18    these talc claims will be paid more here under the plan than

19    in the tort system.  In fact, we know that Dr. Mullin said

20    that they will be paid two times more here than in the tort

21    system.

22           If you look at an illustrative payout, and these

23    have assumptions which I put into the footnotes, and I get

24    that folks can say don't choose the mid-range, but what we

25    did was choose the mid-range from Dr. Mullin's report, and

1    this chart shows that if you look at the total payouts under

2    the plan, it would be $10.65 billion.  And you can net

3    present value that back down to $8, but the point is that's

4    a lot of money for claims that are not being paid in the

5    tort system.

6         The next slide, Your Honor, shows the funding

7    schedule, so you can see the payments that J&J will be

8    making, that it will then be asking us to reimburse.  And

9    when J&J was defeating -- was defending these claims in the

10   tort system, it was successful.  And in the tort system, we

11   heard from the Debtor in opening that it was doing quite

12   well, other than the Lanier-Ingham matter, it was at a zero

13   payout.  And here, it's now up to $10 billion.

14        You heard Mr. Kim say they will never settle in

15   the tort system, and you have heard both Mr. Kim and

16   Plaintiffs' attorneys saying, why can't this be achieved in

17   the tort system?  And the whole problem is the future

18   claimants.  So they could do a meso-type settlement, but

19   they want closure on the futures.

20        Your Honor, that gets to our central theme, that

21   this is really financial statement engineering.  And J&J

22   wants certainty with respect to its talc liabilities.  Here,

23   if it does the plan, it can quantify it, it can cap it, it's

24   not going to be more than the $9 billion, and it can then

25   communicate with the market that it's taken a one-time hit,

1    yes, but it's moving on without this overhang on its stock,

2    and without uncertainty of Lanier-type verdicts in the

3    future.

4            A corporate entity could say this is a wise way to

5    expend our resources.  Rather than paying out over time, we

6    will accelerate it, and do it all in a one-time hit, but

7    that is not how insurance works.  So you have to include us,

8    you have to have us be part of the conversation, and let us

9    all come to a discussion about whether this is a reasonable

10   way to handle the claims.  None of that happened.

11           When we look at the assignment issue, we went

12   through this slide in the opening, there is an effort to

13   assign rights in the policies to Old JJCI down to new JJCI

14   through each of the shell entities that have been created.

15   Now there are allegedly rights at the Red River entity,

16   they're being assigned to the Trust.  It's all a

17   manufactured set of transfers, because then the Trust sends

18   back subrogation rights, and the new world order is that Red

19   River can sue the insurers.

20           Now interestingly, there is no limitation on that

21   Red River future assertion of insurance rights.  So we've

22   heard from the other side that everything's going to be

23   taken care of in New Jersey, don't worry about it,

24   allocation law will take care of all of this.  We don't even

25   know where Red River intends to sue us.  In the insurance

1    world, there are pro-rata states like New Jersey, there are

2    all-sum states like California.  And in an all-some state,

3    the policyholder can pick whatever year it wants, shoot up

4    that year, and it is up to those insurers to go out and seek

5    affirmative contribution claims from their co-insurers, or

6    in this situation, also including a captive insurer.  The

7    point is we don't have any protection there.

8                So let's move on.  These rights to payment would

9    go to J&J, Red River itself, other settling insurers, and

10   potentially reinsurers, which are not part of the

11   allocation, Your Honor, but on the back end of

12   reconciliation, if there is reinsurance.  We put together

13   the plan provisions here.  I'm not going to spend a lot of

14   time on it.  We think that all of those are impaired, and

15   that's problematic.  We are not allowed to do affirmative

16   recovery.  The most they've tried to create is a fiction

17   that we can get a reconciliation through an allocation

18   scheme.  But again, we don't know what type of allocation

19   scheme we're going to get in the future.

20               We also heard that the insurers should just get

21   off the stage.  They shouldn't be here, they should sit down

22   and be quiet, because the whole plan is insurance-neutral.

23   Now, I'll show you two pieces of language from the plan that

24   you did not see during the Debtors presentation.

25               What you saw is sort of the happy talk that

1    nothing here is impairing the insurance rights.  But if you

2    look at 10.3.6, you see a plan provision where the Debtor,

3    J&J, wants to say any item that's been litigated here in

4    Bankruptcy Court could be subject to res judicata, or

5    collateral estoppel in the future.  And then, the one that

6    is just undeniably an infringement of the Insurer's rights

7    is the assignment language in 8.1.  And we see it very

8    clearly here, as we did in the opening, the last subpart,

9    (ii), states that, "Any defense that the transfer and

10   assignment of these insurance assets by the reorganized

11   Debtor to the Trust is prohibited by any talc insurance

12   policy is not allowed, and it cannot be asserted."  So you

13   can have ephemeral language that this document doesn't hurt

14   you, but when you look at the provision that's going to be

15   in the future confirmation order, which again we don't have,

16   it's going to say --

17             AUTOMATED:  (indiscernible) will end this

18   conference in five minutes.  To extend this call for one

19   hour, please enter the Moderator PIN -- Your conference has

20   been extended for 60 minutes.

21             THE COURT:  I apologize.

22             MS. NEUNER:  No worries.  Thank you, Your Honor.

23             That confirmation order will ask you to say these

24   plans are -- these policies and insurance rights are

25   irretrievably assigned, and there is nothing the insurers

1    can do about that in the future.

2          Okay.  I told you about the inhibition on the

3    Insurer's rights to seek affirmative recovery.  This slide

4    gives you the plan language so that you can track it when

5    you are looking at this.

6          Your Honor, I'll move along with some alacrity

7    here to the good faith.  Our central contention is that the

8    Insurers were excluded.  We're the poor penguins on the left

9    who have been cut off from the mediation and the settlement.

10   It's been clear through every witness who has asked that

11   Travelers was not involved, the Insurers were not involved.

12   We heard this from Mr. Murdica, Mr. Smith, Mr. Kim, that

13   Travelers, and the other insurers were not invited to

14   participate.  Mr. Watts said, no, the Insurers, Travelers

15   was not included, and Mr. Pulaski says the Insurers were not

16   present at any of the negotiations.  When we asked

17   afterwards in discovery, can we please have the documents

18   regarding the negotiations, we were given the Heisman.  They

19   said, no way, no how, there's mediation privilege, there's

20   common interest privilege, we're not sharing any of the

21   communications with you.

22          Now on the other side, we have J&J saying these

23   claims have no merit.  And we've covered some of this, but

24   now we have it from testimony that Mr. Kim, Mr. Murdica, Mr.

25   Watts, all saying the talc claims, the cancer claims do not

1    have merit, and J&J was not treating them as compensable.

2    We have Mr. Haas saying in his deposition that these claims

3    are all junk science-based mass tort litigation, and we saw

4    in the Disclosure Statement the company's belief that there

5    is no scientific basis, that talc products never contained

6    asbestos, and the safety of these products has been

7    confirmed for decades.  Dr. Mullin, as we said, stated in

8    testimony, and he had before, that on average, the ovarian

9    cancer claimant who qualifies is receiving twice the amount

10   of compensation.

11          So let's also turn under good faith to the issue

12   of financial distress.  Mr. Wuesthoff did not come to

13   testify, and we have agreed to put in testimony by

14   designations what he said during his deposition is that the

15   value of the liabilities for Red River doing sort of that on

16   the spot analysis under Little Creek is equal.  The value of

17   the liabilities is equal to the value of the settlement

18   that's been reached, which is fully funded by J&J.  And then

19   there was an astute question.  Someone asked him, based on

20   what we've just been through, is it your testimony that Red

21   River has more assets than liabilities?  And he says by a

22   marginal small amount.  And the questioner states by at

23   least $400 million, right?  And the answer is yes, if we

24   liquidated RAM, because he testified earlier that the

25   enterprise value of RAM was $350 to $400.

1          Now Red River doesn't operate like a real company.

2    We have the CFO, the CLO, and the President all saying it's

3    a royalty business, it never marketed or manufactured baby

4    powder, it doesn't have any suppliers, it doesn't have any

5    vendors, it doesn't distribute anything.  All three

6    employees are seconded from J&J, and they are getting paid

7    by J&J services, and they're essentially advancing the J&J

8    agenda.  We also know that all of their legal fees are

9    funded.  They have two different funding agreements.  One is

10   for indemnity, which is the $9 billion, and the other is for

11   expenses, everything associated with this bankruptcy

12   process.

13          J&J itself we heard is thriving.  Mr. Lisman was

14   very proud of the financial performance, and he advised us

15   all the market cap was $350 billion.  It's actually $375.

16   Share price is up.  Mr. Lisman said Red River is fully

17   funded by J&J, and it's never been his experience that J&J

18   failed to pay a debt when it became due, and that includes

19   the amounts that will be due to Red River and Pecos River.

20          If you look at the prevailing law, Your Honor, and

21   I'm going to do this slide and the next in conjunction, we

22   have the LTL precedents, which you're well aware of, and

23   we've tried to discuss how those two precedents interweave

24   with Little Creek.  Little Creek is the seminal case here in

25   the Fifth Circuit, and I would say, Your Honor, that it was

1    expanded upon in financial securities assurance.

2    Essentially, you're looking at the totality of the

3    circumstances.  What I would say is when you look up at the

4    Little Creek quote, you see one of those circumstances is

5    the Debtor's financial condition, which I think then allows

6    you to go back and pick up the LTL and LTL II as guidance,

7    not controlling, but guiding precedence on how to think

8    about that financial condition.  And the Third Circuit would

9    say if there's direct access to J&J's exceptionally strong

10   balance sheet, there's no imminent financial distress.

11            Your Honor, let's move on very quickly here to

12   524(g.)  Our worldview, and you've seen this before, is that

13   only those statutorily enumerated entities are allowed to

14   get the broad channeling protection.  And what we have here

15   is a many-headed hydra.  In Greek mythology, it was nine-

16   headed snake.  Here, there are 700 protected parties, and it

17   is not clear to us that they each of these fit within the

18   enumerated relationships in this statute.  There's also the

19   situation that 524(g) only applies to asbestos-related

20   claims, and we've had testimony over and over that there's

21   no asbestos in the products, and there's also testimony from

22   Mr. Scarcella that many of the complaints in the MDL did not

23   allege asbestos to be in the talc.  And so if there's not

24   asbestos that's fundamentally driving all of the claims,

25   there's a question about whether 524(g) really applies.

1          The last piece of 524(g) is ongoing business.  So

2     truly, 524(g) was meant to create a safe haven for a

3     business that was struggling because of asbestos-related

4     liabilities related to historic operations, and to see if

5     there could be a channeling injunction, and an opportunity

6     for them to reorganize.  But what we know here is Red River

7     never sold talc powder, and RAM is just running in royalty

8     stream.  So there's no ongoing business that needs to be

9     reorganized, rehabilitated, and allowed to flourish going

10    forward.  The Debtor's RAM assets are nominal, and they are

11    unrelated to the real pre-petition business.

12         Last point, Your Honor.  The plan, in our

13    worldview, needs to be re-solicited.  There are just too

14    many issues, too many stains on this record for you to feel

15    comfortable issuing the confirmation order, in our view.

16    We've been talking a lot about Option B, and we referred to

17    it as the elephant in the room, but then one of the AHC

18    members said, no, let's talk about it as the hippo in the

19    room.  The central problem on Option B is whether there's a

20    valid power of attorney.  Now, being linguists, as we all

21    are, and looking at the language on the page, the master

22    ballot really does call for a valid power of attorney.  And

23    it requires the attorney to certify under penalty of perjury

24    that he or she has it, and can provide evidence of it,

25    which, you know, is what we just saw evidence of in

1    Delaware, in Boy Scouts.

2          Now, if you look at the Option B votes, and Your

3    Honor, this is a slide we put together which shows Option B

4    votes by highest down the rank order -- And by the way, I

5    will tell you, if you were looking for a quick fix on

6    finding out among the AHC, and the other three central

7    supporting plaintiffs who are beyond AHC, in our pretrial

8    submission for Travelers, Charts 4(a) and (b,) it has all

9    those numbers for you.  And that's taken directly from the

10   Epiq database.  All we did was take out the ones that Epiq

11   excluded, so it was real votes.  This is sort of an excerpt

12   of that, if you will, reordered.  And we put our own

13   characterization on it, so you can take this as you will,

14   but what we focused on, and we were literal about this, is

15   the power of attorney language there.  And it isn't for

16   Watts.  And for the Smith Law Firm, you have to look, there

17   are multiple retention letters, but our analysis shows that

18   there was no power of attorney language for over 4,000, and

19   that's actually testimony from Mr. Birchfield.  And for

20   others, there is a limited power of attorney to sign

21   documents, or endorse checks.  We would say that is very

22   different from the power to value, negotiate, and vote on a

23   bankruptcy claim.

24          The Andrews & Thornton had a limited power to sign

25   documents, and we had that discussion with Ms. Andrews, that

1    you witnessed.  The Pulaski Firm has no power of attorney

2    language, but I'm going to highlight that he felt that the

3    word "empower" was there, and so that one you have to think

4    about fairly.  Mr. Nachawati only had the limited power of

5    attorney to sign documents.  You then get into three that I

6    would say require a closer call.  The Miller Law Firm

7    doesn't have power of attorney language appearing, but it

8    did provide the right to vote on the client's behalf in any

9    bankruptcy plan.  So he might not have had the talismanic

10   language, but I would say that he could feel comfortable

11   with casting the vote.  The Napoli Firm had a limited power

12   of attorney to settle and negotiate, and so again doesn't

13   have power of attorney language, but I think that's a pretty

14   strong delegated power.  Onder you heard about, he only cast

15   originally the Option B election for 1,200 votes roughly.

16   He had the durable Power of Attorney.  And he thought it was

17   the gold standard, he followed the gold standard.  If

18   everyone followed that gold standard, we wouldn't be having

19   this discussion.

20          You then come to the latter three.  Aylstock

21   requires, again, a closer examination, because there was a

22   limited power of attorney to vote for a bankruptcy plan for

23   85.  On the other hand, there's 880 where the only power of

24   attorney language relates to requesting medical records, and

25   signing checks.  Last two, Your Honor, McDonald Worley had a

1    limited power to sign documents.  And we've highlighted a

2    few of these firms that specifically had no settlement

3    without client approval language, and that's the same

4    situation that we have for Johnson Law Group, their

5    settlement authority had an exception for aggregate

6    settlements.

7            Okay.  That's a little bit of a cheat sheet, but

8    you will all make your own decisions.

9            For Mr. Onder, we just talked about this, he

10   thought the Imerys bankruptcy was a good, strong guidance,

11   and he put in the durable Power of Attorney.  What's

12   interesting is that no one else did.  And I don't know why

13   they wouldn't, especially someone like Ms. Andrews, whose

14   only role is to basically file claims in the bankruptcy

15   process, and she said she took on many of her claims after

16   July 28th, so she knew the standard from Imerys.  So be it.

17           We put here for Your Honor and your clerks samples

18   of the power of attorney language.  We've just gone through

19   that, and I think you can -- you also recall it from the

20   testimony.

21           Now we get to the quagmire of Option B, Option A

22   as between Birchfield and Smith.  So Mr. Birchfield came and

23   said he read his retention letters, and he didn't think it

24   amounted to a power of attorney.  He said for 4,000, this is

25   the cite for it, there is no power of attorney at all.  For

1    others, it was limited.  So he concludes he can't go with

2    Option B, he uses Option A.  We'll come to the Option A

3    language in one second.  Mr. Smith, same exact language,

4    concludes he can go with Option B, but he admits, I give him

5    credit, under cross-examination he said, I did not have a

6    durable Power of Attorney for all of my clients.  I believe

7    that I have a power as attorney.  Those are two different

8    items, and if we're going to follow the words on the page

9    and enforce them, they have two different meanings.

10           Now let's talk about Option A for one moment,

11   because the premise was that it would be a signification

12   from the client of the client's election.  So you have the

13   words "collected," "recorded," and "indicated."  I actually

14   understand where it could be confusing, because right after

15   the "collected and recorded," you have the, "or have

16   obtained authority to procedurally cast such client's vote."

17   And I saw the Debtors' references to other parts of the

18   master ballot.  I think if you were doing a totality

19   reading, you'd probably come out saying I need to have,

20   like, a recorded collected indication.  But if you just read

21   that, you might say I have obtained authority procedurally

22   to cast their vote, if you thought you had a relationship

23   under your retention letter.

24           So the funny thing as well is that when you look

25   at the Debtor's position, they were hands-off, and we heard

1    that as well.  So I give credit for the candid admission,

2    they didn't think it was their job.  Mr. Murdica said, I'm

3    not the power of attorney police, and Mr. Merritt put it

4    very clearly, the certification is asking if the firm has a

5    valid power of attorney, not providing a power of attorney.

6    Again, different from the Boy Scout ballot that we saw.

7            Now, if we look at the next slide, Your Honor,

8    this is not meant to be any sort of tally, or designation of

9    votes, or disregard of votes, it's just meant to highlight

10   for you and your law clerks the impact of this issue.  So if

11   you take the ones that I called into question through our

12   prior review, and you just tallied them up, you'd get to

13   roughly 41,500, and that means about 44% of the B vote is

14   being impacted.  It's a data point to consider.

15           One point we heard from the attorneys is, don't

16   hold me accountable here because it wasn't a settlement.

17   Now, we heard from them in their testimony, but their

18   solicitation letters had different language.  The

19   solicitation letters for Mr. Smith were saying, "I'm very

20   excited, this is a new settlement opportunity," Mr. Pulaski,

21   "Urgent settlement offer," and Ms. Andrews, "An historic $8

22   billion settlement."

23           What did the claimants think?  Here's just two

24   samples from that compendium of 500 from Mr. Smith.  First,

25   claimant saying, "I vote yes to the updated settlement."

1    Another one, "I would like to vote yes to settle."

2           Now, the master ballot itself, and we went through

3    this with Ms. Andrews, states, "I acknowledge a vote to

4    accept the plan constitutes acceptance of the treatment."

5    So what does it mean to accept treatment?  Is it actually

6    money for release?  Or is it just an initial threshold, as

7    some of our friends on the other side of the aisle say?  The

8    treatment under the plan for ovarian can range.  We know

9    that from all the testimony.  For gynecological, it's not

10   ranging, it's $1,500, so that's looking a lot more like a

11   set amount.  Other diseases, max at $1,000, so I mean, I

12   suppose it's a range, from $0 to $1,000.  It's crystal clear

13   you have to give a release if you're participating.

14          And you know, there's one sort of interesting

15   point about the Smith MOU.  Remember that he had sort of

16   this accelerated start, and he was proud of it, and they

17   were going to have the Archer Firm, and claimants were going

18   to start submitting?  If you look at the last sentence of

19   that paragraph, for any claimant who wants to do an early

20   submission you have to give an irrevocable non-plan release

21   against everybody, and that means you're in.  So you know,

22   the Plaintiffs' attorneys can say this is sort of like a

23   grid, it's sort of like a matrix.  You don't have to

24   participate if you don't, but the vote says you are

25   accepting the treatment.  And as you pointed out earlier

1    today, that means you're forever giving up unfettered

2    litigation rights, and you know that there are restrictions

3    on the "litigation opt out right."

4            Did the Plaintiffs' attorneys understand the plan?

5    What we now see is probably not for gynecological.  So Mr.

6    Watts came and said, you know, my rebuttal essentially to

7    Andy Birchfield is if you don't like this deal for

8    gynecologicals, just keep them out, see if they get an

9    ovarian, and then come back in later.  What we ultimately, I

10   think, came to all agree together by looking at the words on

11   the page is that a gynecological, under the plan language

12   that existed last night at midnight, but not today, so I'll

13   come to that in one second, the plan language that existed

14   before would have caused a waiver if the gynecological did

15   not submit her claim within 120 days of the plan going

16   effective.

17           So we heard about a fix today.  And then you could

18   say, well, hey, bankruptcy plans all the time improve terms,

19   and we still allow the prior vote of yes to be okay.  But

20   then you have to think, is it really an improvement?  Is it?

21   Because if you were Mr. Watts' client, you might have

22   thought that you could take the money now, and come back

23   later.  Or not Mr. Watts'.  If he said, hey if you don't

24   want it, stay out.  But others might have thought you can

25   get your $1,500 now and in the future.  If you develop a

1    diagnosis for ovarian, you can come back a second time.  So

2    actually, the new language would make the plan worse, for

3    someone who thought they had two different ways to recover.

4            Let's talk about that reopening of the vote.  We

5    did this calendar, and it's really meant as an aid for you

6    all as you're thinking about the analysis, because it

7    provides the dates as taken from the record.  Obviously,

8    what we saw was Mr. Smith did not get out his letter until

9    the 11th.  He gave people two days, until a Friday, he

10   extended it 'til Sunday at noon, he cast the vote on the

11   Monday.  The funny thing is that it wasn't really an

12   extension, because what we know from Mr. Smith is that he

13   wasn't changing the votes on an old plan, he was crystal

14   clear, he was voting on a new plan, the new improved plan

15   that he created.  And he held it up to Your Honor, he's like

16   it's the old plan, and it's the Smith MOU.  Doesn't exist

17   yet, but that's what I voted on.  We saw his voting ballot

18   for individual clients.  It said, "Yes, I vote for the

19   updated plan."  He used updated plan, new plan, amended

20   plan, revised plan.  All four came out of his mouth.

21           The problem is that's a re-solicitation in the

22   same class on different terms, and only 13% had the capacity

23   to do that.  And it was problematic.  So I would submit,

24   Your Honor, that you actually don't know what his clients

25   voted on, because the "second piece of the updated plan" is

1    a redline Smith MOU that Mr. Birchfield had allegedly sent

2    out the prior week.  It's not in the record, so this Court

3    doesn't really know what it said.  The disparate

4    information, we showed you an example of someone of the

5    Smith clients asked for the Smith MOU, he gets it, but no

6    one else does.  Although, maybe if someone else asked for

7    it, they would get it.  But that means we don't know.  It's

8    a very short time to vote.

9          You brought out the Imerys contingency, and Ms.

10   Richenderfer brought out the 95% contingency.  There was no

11   information to the clients that, A, Mr. Smith had to deliver

12   95%, or B, if the Imerys-Cyprus didn't go effective, the

13   whole deal could crater.  As we learned, it didn't go

14   effective by the deadline, and the Smith MOU, but apparently

15   we're still going forward.

16         There are other problems in terms of information,

17   like the $650 million being characterized as a tax to

18   claimants that they should be so happy that they're relieved

19   of.  That's a bit of a stretch.  And then what we find out

20   is that ultimately, the Smith MOU terms were not all

21   included in the second amended plan that was filed on

22   September 9th, and it's still not included now.

23         The tabulation procedures we heard testimony on,

24   and Your Honor, I would submit we can dispense with the (b)

25   and the (c,) just go straight to (d,) it's the most apt.

1    And ultimately, the issue there is is there now a new ballot

2    from the same authorized representative?  We heard the

3    response being both of these gentlemen share a joint venture

4    agreement, it's A-okay.  That is kind of hard to swallow

5    because different people have different mindsets in their

6    different firms.  But really, ultimately it was Ms.

7    Kjontvedt  who just, again, to her credit, candidly admitted

8    it's a different authorized representative.

9           We know from 1125(c) that the same "Disclosure

10   Statement" shall be transmitted to each holder of the claim,

11   and here we've got the preferred class of Smith clients

12   getting a separate exclusive voting period with different

13   terms than the remainder 87%.  Ms. Kjontvedt  said she's

14   never seen a law firm change the vote of another law firm in

15   all of her years.

16          And then, to the scenario analysis, as Mr.

17   Silverstein said, the Ginsu knives had to be here because of

18   Mr. Brookner.  But what she, again, Ms. Kjontvedt  said was,

19   to her credit, if you didn't have the Smith ballot, the vote

20   would have stayed at 71%, and she said yes.

21          From our perspective, there were multiple errors

22   and problems with the solicitation.  We went through the

23   Epiq mess on the email, the information dissemination being

24   biased from Dr. Hilsee's perspective.  Mr. Pulaski admitted

25   that they just messed up with respect to submission of the

```
 1   vote, and that has to do with him putting it into the A
 2   column versus the B.  There's the problem with Mr.
 3   Seldenridge saying it was a scrivener's error -- Oh, I take
 4   it back.  Mr. Seldenridge is the one who put all of his
 5   votes in A, but he ultimately thought they should be in B.
 6   Mr. Pulaski is the one who said every single client is an
 7   ovarian, and that's not accurate, and he said my group just
 8   screwed up.  Ms. Andrews admitted she didn't have medical
 9   records for half of her clients -- and that's not
10   dissimilar.  Again, we have a chart in our pretrial
11   submission tallying up similar type of evidence for both
12   deceased clients for whom the firms didn't have adequate
13   representational documents, and diagnosis support
14   certifications where the firms didn't have adequate
15   supporting medical records.
16         The bottom line is that there are multiple errors.
17   Maybe one, by itself wouldn't be a problem, but when you
18   amalgamate all of them together, it feels like a very messy
19   situation that could be corrected through a re-solicitation.
20         We'll go to the common benefit fund.  This, I
21   think there's been just a little bit of confusion on in the
22   record.  Mr. Murdica I think gave the best testimony on it.
23   When he had his declaration, he said, there's a tension,
24   because objectors from the MDL leadership have an economic
25   disincentive to resolve their claims in bankruptcy because
```

1   they'd be forfeiting the MDL common benefit fund.  Now, is

2   it truly forfeited, or could it be resurrected?  So he said

3   there was no common benefit contemplated, and you see that

4   in the early plan documents, and if not, there were now.

5   Now we don't need it because of the $650 fund outside

6   bankruptcy, but the original plan document said maybe you

7   could, if the FCR and the TAC all agreed to it.

8           But his point of view was my understanding at the

9   time was they'd have to go get an order from the District

10  Court in the MDL, hope that a bankruptcy judge or a trustee

11  of a trust and approved plan would let the lawyers take

12  money for the common benefit, which seemed unlikely.  So

13  this uncommon benefit is $650 million that would go solely

14  to the lawyers.

15          Overseeing all of this is Mr. Kurdi, who didn't

16  come here, we didn't have evidence.  We heard a little bit

17  of live testimony from the lawyer's lectern today.  But the

18  fact of the matter is he's served as principal mediator, and

19  continued to serve, as Ms. Richenderfer noted.  He is the

20  master of the common benefit fund, and he's the sole talc

21  trustee, which Ms. Ellis has said she has a significant

22  problem with.

23          If you look at an illustrative payout analysis,

24  and again, I accept that people can say the assumptions are

25  wrong, and they're going to the high side, because we took

1    all of the claims that were voted and paid them out under

2    the values of $125,000, $1,500, and $1,000, you see an

3    extraordinary payment of $7.6, and the contingency fee being

4    $2.5.  This is basically for the lead 21 firms supporting

5    the plan.  Add on top the $650 million of the qualified

6    settlement fund, and we're talking a lot of dollars.  And I

7    had used a conservative estimate of 33%, but we heard

8    testimony from both Anne Andrews that her contingency goes

9    into the 40%s, and Daniel Thornburg says he goes up to 45%.

10          Your Honor, we ultimately submit the plan should

11   not be confirmed for the reasons stated here, which

12   summarize our overall points.  We think that the law and the

13   evidence that you've been hearing for the last two weeks do

14   require rejection of the plan.

15          I would like to just end, Your Honor, with where I

16   started (indiscernible) which is a thank you to everyone

17   involved.  And very quickly, the top ten things that we

18   learned is that some of the men here are very dapper

19   dressers.  All credit to Ms. Brown, she has endless energy.

20   Mr. Perkins, we were happy to celebrate your birthday with

21   you.  But ultimately, what I'd say is we appreciate all of

22   the hardworking professionals like Rebecca here, who has

23   been typing continuously, and Melinda on every other day.

24          Your Honor, thank you very much.  We appreciate

25   your time.

1          THE COURT:  Thank you very much.  Thank you very

2     much.

3          (indiscernible) Let's go with Barnes, and then

4     we'll take five minutes, and then we'll finish out. I want

5     to give the Court -- it should be like, 15 minutes, each.

6          MR. BARNES:  Your Honor, I've not been here except

7     today.  I've been on trial on a little case.  But I will

8     contribute to cushions for the hard seats that are in the

9     courtroom, and so if you want to pass the plate at the end

10    of this trial, I'll be glad to contribute.

11         Now Your Honor, I don't represent thousands of

12    clients.  I don't represent all the folks that are really in

13    this room.  I represent 50 -- well there's 37 in State

14    Court, 12 in the MDL, and there are three cases that we've

15    not been able to file because of the stays and bankruptcy.

16    We had over -- We didn't buy cases, as I've heard.  I didn't

17    know you could do that, even though I've been practicing law

18    for 53 years.  But we had over 1,200 inquiries in our old

19    firm.  We screened them.  If you had BRCA2, if you had

20    smoked and the BRCA2 gene, if you had smoked in the last ten

21    years, or you had a history of ovarian cancer, we didn't

22    even take the information.  The cases got down -- or the

23    type of cancer, the type of ovarian cancer that you had.

24    Cases got down to about 300 to 350, and we spent $1 million

25    to get all the medical records, and had them evaluated,

1    summarized, and we ended up filing about 50 cases.

2         And those people want a jury drawn, as the old

3    English said, drawn tried and true to decide their cases.

4    Will we win them all?  No, we will not.  We'll win 60% of

5    them.  But in all cases, you get the vagaries of a jury, and

6    everything else.  It takes the cases, and 60% is about what

7    you'll do.

8         I represent folks like Alfreida Webb, who's a

9    schoolteacher, an African-American woman, taught school for

10   45 years.  And she died from ovarian cancer over a three-

11   year period, and she suffered greatly.

12        I represent a woman by the name of Cheryl Archer,

13   and I would have finished her case if it had not been for

14   this bankruptcy.  We were ready to try it.

15        I represent somebody that was a -- and still do,

16   2/3rds of our clients, by the way, have died through all of

17   this delay -- I represent a lady named Nancy Hicks.  Nancy

18   is on the TCC.  She survived.  She survived.  She's one of

19   the few that survived.  And she wanted me to tell you that

20   she's not speaking on behalf, and I'm not speaking on behalf

21   of the TCC, but for her individually, she votes no very

22   emphatically.

23        Now, I want to talk about just a minute, and what

24   I'm asking you to do is dismiss the case.  And I understand

25   this totality of circumstances, and all of these things that

1    these fine lawyers have been hired -- I was just looking,

2    and trying to add up how much per hour has been spent here

3    in the last two weeks.  But I think the case ought to be

4    dismissed because of several things.

5         One is, and I hate to say this, but you've seen

6    the worst in the practice of law on both sides here.

7    Johnson & Johnson has acted in bad faith.  I mean, the

8    distinguished Counsel for Travelers I believe summarized it

9    the best.  They go around the country, they've missed twice

10   in the Third Circuit, well, we'll try the Fifth.  Is the

11   Seventh the next, or the Ninth?  If that's not bad faith, I

12   don't know what it is.

13        I'll tell you what.  Let's go up to the District

14   Court.  You impanel 12 jurors, let them hear the facts, and

15   determine whether it's bad faith or not.  And I know I've

16   made that argument in Bankruptcy Court.  I do go to

17   Bankruptcy Court every once in a while.  It's generally with

18   somebody trying to re-assume a pickup truck that's been beat

19   up.  But I told Judge Bonapfel one time, Paul Bonapfel, who

20   is a great guy, and got a great sense of humor.  They've got

21   a jury box there in the courtroom, and I said, "Judge, I'll

22   tell you what -- " We got talking about a case, and how much

23   was owed and all this stuff, I said, "Just let me have a

24   jury over there."  And Judge Bonapfel said, "Mr. Barnes,

25   that jury box has been there for 15 years, and there's never

1    been one juror in it."  He said, "We don't try jury trials

2    in Bankruptcy Court."  He said, "You go back there and

3    settle this case."

4            Well, Alfreida and Cheryl and Nancy Hicks deserved

5    to have a jury tell them.  Alfreida's case, I tried it, and

6    I lost it.  I won't get into the details.  The judge granted

7    a new trial.  You know what?  She granted the new trial on?

8    The evidence.  The verdict was strongly against the

9    evidence.  And you know, I've heard, I believe my

10   distinguished Counsel from Travelers said it too, I've heard

11   Johnson & Johnson for ten years says there's no asbestos.

12   Of course, it's how you define asbestos.  But there's no

13   asbestos in here.  And then they're in here in court,

14   saying, listen, we want the results of the Asbestos Act

15   that's special, just for asbestos cases.  So I don't think

16   there's any question about the bad faith of Johnson &

17   Johnson.

18           But let me tell you something on the other side,

19   too.  I don't like lawyers that have cases that all they

20   have in their files is a name and a contract.  And they

21   don't intend to try the case, or to prepare it.  They hope

22   to come to a place just like this, so they can make a deal

23   with Mr. Kim.  Let's make a deal.  And you know, if you've

24   got enough of them, you know, you make money.

25           Now, am I saying those are corrupt lawyers?  Well,

1    I might say that the next big mass tort case is going to be
2    all these lawyers that didn't communicate with their
3    clients, and there was a valid case there, and they sold it
4    for $50,000 or $70,000.  But here's the point about that.
5    They don't know who their clients are.  They're voting for
6    folks that they never heard of, except they know it's on a
7    list somewhere.  That's not right.  And what that does is it
8    diminishes the money for the big cases, the valid cases, the
9    suffering cases, the death cases.  That's what that does.
10   And I will tell you that's not right.
11        The most common question that I have from my
12   clients, we have conference calls -- As I've told you, two-
13   thirds of them are dead, but we have conference calls where
14   we report on what's going on on a regular basis.  And when
15   this bankruptcy was filed, the most common question I had
16   is, how can they do this?  And you know, in a time and a
17   place where there is great, great concern about the
18   integrity of courts, and all institutions, from the Church,
19   to Congress, to legislators and everything else, if I can't
20   describe it to a client who asks that question, I would
21   suggest to you there may be something wrong with it, because
22   I can't come up with a valid answer.  They don't understand
23   524(g,) and how a company that's one of the largest in the
24   world, making billions of dollars a year can go bankrupt.
25        So -- And then I've heard about this opt out, oh,

1    you can go to the tort system.  What?  That's ridiculous.

2    I've also heard you get three times the top.  I can't find

3    that in the plan.  Now, maybe somebody can show it to me,

4    but I've heard it talked about today.  But three times the

5    top, well, you can't try one of these cases for that, with

6    all the experts.  That's non-existent.  I mean, you know,

7    you're just going to have to take the licks.

8              Well, I'll just leave it with you on this.  At the

9    end of this, if this plan is confirmed, there's going to be

10   two happy groups, Johnson & Johnson, and lawyers that have

11   bought cases by the thousands and never even knew their

12   client.  And they'll meet out at the country club, and from

13   those funny little glasses that you drink martinis from,

14   they'll toast each other.  But what am I going to tell the

15   daughters of Alfreida Webb, or the son of Cheryl Archer, or

16   Nancy Hicks.

17             Thank you.

18             THE COURT:  Thank you very much.

19             MR. BOUTWELL:  Your Honor?

20             THE COURT:  Yes?

21             MR. BOUTWELL:  Can I have one minute?

22             THE COURT:  Just one minute.  I'll give you one

23   minute.

24             MR. BOUTWELL:  My wife was a victim.  One of the

25   last things she told me, she was begging to die

1   (indiscernible)for months.  I prayed to this court that they

2   would find this unfair and inequitable.  That's about all I

3   can say.  It was the hardest thing I've ever done in my

4   life, and it broke me financially and mentally.  I had to

5   sell my house after she passed away.  Fixed it up, sold it,

6   paid off the mortgage and stuff where I borrowed money to

7   keep things going.  Cashed in a retirement plan, a local

8   retirement plan, paid the taxes on it, and the early

9   withdrawal penalties.  The things that these poor women that

10  don't have -- I had means.  I was lucky.  I had insurance, I

11  had a cancer policy, but I had to make those payments, too,

12  when I was not working, and taking care of my wife.

13          This money that they have offered there is just

14  totally unfair, I can tell you.  And these poor people, that

15  was way more -- way less fortunate than myself, they didn't

16  have any assets.  And they're going to offer them a slap in

17  the face.  I don't need the money.  I've (indiscernible) I

18  don't need it.  And it's been -- She died in 2016, and I've

19  been going through this whole thing.  And I'll go through it

20  'til the day I die, if that's what it takes.

21          Thank you for hearing me.

22          THE COURT:  Can you tell me your name, and your

23  wife's name?

24          MR. BOUTWELL:  My name is Lonnie Boutwell.  My

25  wife was Reta Boutwell, spelled with an E, R-E-T-A.

```
 1                  THE COURT:  Thank you very much.

 2                  MR. BOUTWELL:  Thank you for hearing me.

 3                  THE COURT:  Who else wishes to address the Court

 4     today?  I know -- I've got to give the Court Reporter I

 5     guess a five-minute break.  But who else?  I know Mr.

 6     Birchfield, and Mr. Placitella -- Is there anyone else?

 7                  (indiscernible) how long will you, just a --

 8                  ATTORNEY:  (indiscernible)

 9                  THE COURT:  All righty.  Folks, we're going to

10     give every -- we're been going for a while, and

11     (indiscernible) I'm going to give you five, I'm going to

12     give everyone else ten, and we're going to call it a night.

13     Let's just take five minutes.  I've just got to give the

14     Court Reporter a few breaks, and then we'll keep going.

15                  Thank you

16                  (Brief recess.)

17                  (Back on the record.)

18                  THE COURT: All righty.  Mr. Placitella --

19                  MR. PLACITELLA:  (indiscernible)

20                  THE COURT:  You -- Right table.  You've got it.

21     Oh, you want the podium, though.  Yeah.  Why don't I stop

22     touching buttons, is what you're saying.

23                  MR. PLACITELLA:  Your Honor, I'm going to just

24     hand this up, but I have an abbreviated --

25                  THE COURT:  Okay.  Thank you (indiscernible)
```

1              MR. PLACITELLA:  What I've done is every slide has

2      an exhibit, the exhibit number, the number for the Docket,

3      and the Joint Exhibit number, so the Court can look at it

4      later, and I'll try to be very brief here.

5              THE COURT:  Okay.

6              MR. PLACITELLA:  There's a bridge too far, and I

7      only want to concentrate on two issues quickly, liens, and

8      giving an unlawful release to a party that doesn't deserve

9      it.

10             So the average medical lien, according to the

11     testimony,, was $200,000.  That's with the $220,000.  I take

12     that number and I put it in this chart, and what the average

13     recovery is, and the average recovery is, according to Mr.

14     Lisman even, $120,000.  If you use the attorney fee, and you

15     assume a 20% or 30% lien compromise, on the low end, a woman

16     ends up with $22,500, and according to Mr. Lisman's numbers,

17     she ends up with $36,000.

18             At the same time, Kenvue makes no contribution.

19     And I just want to correct one thing about Kenvue.  Kenvue

20     is just not some successor company that took over a product

21     line, they are the tortfeasor.  They were the company who

22     manufactured the baby powder.  They say it in their

23     testimony, they say it in their public filings, they say it

24     on their products, they say it on their website that they

25     are the exact same company.  They say on their public

 1   filings that they are the same company that's won and lost

 2   jury trials.  They are not hiding that they're the same

 3   company.  They manufactured the product.  They just took the

 4   whole thing, and moved it over and changed the sign.  They

 5   actually put in their financial statements that they paid

 6   the Ingham verdict, and that they will continue, they know

 7   they're going to continue to be sued because they made the

 8   decision to keep selling baby powder after the separation.

 9           And yes, they manufactured it overseas, but they

10   knew it was coming into the United States.  And if I had the

11   time, and I'll hand up the actual PDF so you can click on

12   the links yourself and watch the videos, but they knew and

13   know that this product is still being sold in the United

14   States.  When you go to their website, all you have to do is

15   click through.  They say that their authorized dealers are

16   Walmart and Target.  And when you click on their website,

17   and you go to Walmart and Target, you buy the baby powder

18   right off of their website.  It starts with their website,

19   and they bring you right through to Walmart.

20           And so, you know, a lot of people made fun.  They

21   giggled a little bit when I pulled the bottle out, and Mr.

22   Kim says, well, that's in a different language.  He forgot

23   to say, by the way, that it starts out in English.  But the

24   whole point was, yes, it's manufactured overseas, but why

25   did they put the bottle in English?  Because they knew it

1    was going to be sold in the United States and other English-

2    speaking countries.

3         And they told you to read the deposition of Mr.

4    Lindemayer.  Here's what happened to Mr. Lindemayer's

5    deposition.  We got there, we were told as soon as we got

6    there that he's got to be gone in two hours, and then he

7    produced over a thousand pages of documents, and he was

8    asked questions, oh, what did you do?  You don't sell that

9    stuff anymore, do you?  Oh, no, no we're really good.  But

10   when we actually got the documents, and got a chance to look

11   at them after Mr. Lindemayer left for his birthday party, we

12   saw that the very companies that they authorized on their

13   own website we're still selling Johnson's Baby Powder by the

14   thousands.  And that's in the documents.  And in their own

15   (indiscernible) their own S1 statement says we know, by the

16   way, we know that there's going to be unauthorized online

17   sellers, and there's nothing we can --

18        AUTOMATED:  (indiscernible) will end this

19   conference in five minutes.  To extend this call for one

20   hour, please the Moderator PIN now.  Invalid host code --

21   now -- Invalid host code.  Invalid host code.  Invalid

22   option.  Invalid option.

23        THE COURT:  (indiscernible)  All right.  I'm just

24   going to hang up the line.  We're going to keep going.  Go

25   ahead.  I apologize.

1          MR. PLACITELLA:  I know everyone's making their

2     (indiscernible)

3          THE COURT:  Well, it'll hang up on its own, and

4     we'll just keep going.  We'll do it.  Let's keep going.

5          MR. PLACITELLA:  They know, when they say a gray

6     market, they put in their own documents that they knew that

7     those products were being sold legally, and they couldn't do

8     anything about it.  They knew they couldn't prevent the

9     resale.  And then they had what they call unauthorized

10    retailers, eBay, Facebook, distribution centers all over the

11    United States.  And you know what?  They say they tried so

12    hard.  If you look at the documents, they said they have a

13    3% enforcement rate to try to stop it.  No recall.

14         And what do they say?  And the Court can look at

15    this when the court has time, they say, we know, in their

16    own financial statements, we know we are going to be sued in

17    the United States for products that have been manufactured

18    overseas.  We know that's going to happen.

19         So this bankruptcy has nothing to do with Kenvue.

20    They're not the successor to Red River.  They have no

21    property interest.  They have no shared insurance.  They're

22    not even in the same cases, they're not diverting any

23    assets, there's no indemnification agreement between them.

24    There's no claims asserted against each other, one has no

25    impact on the other.  And at the end of the day, and you'll

1   see multiple slides, the end of the day, Johnson & Johnson

2   is paying.  They're going to pay if there's a judgment

3   against Kenvue, or there's a judgment against Red River.

4   There is no risk here that a case tried against Red River is

5   going to in any way impact this Debtor at all.  And there

6   are multiple, multiple examples of that.

7           And lastly, let me just finish with PCPC.  And

8   maybe it's not important anymore, because we now know that

9   they told you, or Mr. Kim told you that PCPC is not a

10  protected party.  They don't request any stay, they've never

11  been a member, and the fact that they put them in, the

12  release and the MOU, I guess that doesn't matter anymore

13  because what they told you after they agreed to take it out

14  of the TCC MOU is that we're done.  So I hope it doesn't

15  resurface.  And what I'm asking the Court is if we get to

16  that point, if we get to that point, look at the release

17  carefully because that's the ultimate document.  Are they

18  going to try to put PCPC back in?

19          And then a concern with the release, Your Honor,

20  is I don't know how people make decisions, but a concern

21  with the release is, are people really going to have to

22  sign?  Do they really have to sign away their rights against

23  PCPC and other non-protected parties in order to have their

24  claim evaluated in the Bankruptcy Court?  Is that what's

25  going on?  So that's a question that I think the Court has

1    to resolve.

2          So at the end of the day, and I know it's late,

3    and I did 20 minutes and seven minutes, at the end of the

4    day, this case has been difficult in many respects.  You

5    know, we struggle with the issue of the Seventh Amendment.  I

6    was very worried about the accusations that were going to be

7    leveled against lawyers who believe in what they're doing,

8    and what they've dedicated their life to.  And I have to

9    give the Court great credit, and I'm grateful that you

10   didn't let that happen, that you kept a tone here that could

11   have totally gotten out of control, and it didn't.

12         It was a little different before we came here, but

13   I'm grateful that you brought that balance back here, and

14   maybe that will give us a chance to talk.  Because Mr.

15   Nesko, he's not against a plan.  He would like to see a

16   plan, but he wants to see a plan where there is some level

17   of certainty about what he's going to get.  He's $400,000

18   out of pocket, and multiple hundreds of thousands of dollars

19   in debt to his insurance companies, like many other people.

20   So we need to come up with a plan that handles the liens,

21   that gives people real compensation.  Because if we don't

22   handle the liens but we're going to give -- hand you a pass,

23   that's not justice.  And I think I got a pretty good sense

24   of this Court sitting here for the last two weeks, and I

25   know this Court takes very, very seriously the issue of a

1    just result, and doing the right thing, and I'm confident

2    that you'll do it now.

3              Thank you.

4              THE COURT:  Thank you very much.  Mr. Birchfield?

5              Good evening, sir.

6              MR. BIRCHFIELD:  Good evening, Judge Lopez.  Andy

7    Birchfield, with Beasley Allen.  And I thank you for giving

8    me 10 minutes.  I know it's a long day, I know you've been

9    here, it's been a long two weeks.  And all the things that

10   have been -- all the things that have been said about me and

11   Beasley Allen, there's no way that I can address that in 10

12   minutes.  I'm going to do the best that I can on the key

13   issues.

14             Let me start -- let me just start by saying the

15   reason, the reason that I'm standing here, the reason that

16   Beasley Allen is continuing to oppose the J&J's bankruptcy

17   plan is because it does not provide fair compensation to the

18   victims.  That is it.  That's the only reason that we're

19   continuing to take the arrows and the shots because --

20             THE COURT:  Hold on a second, Mr. Birchfield.  I

21   want you to go -- The line, I don't want you to do -- I want

22   you to stay right there.  I just want to, I want to dial in.

23   I feel like the public needs to just hear everything, and a

24   bunch of folks -- And I want to just give this one more

25   shot.  Let's see if we can get the line on and go, and then

1    we'll just turn it on and go.

2              Okay.  Keep going, Mr. Birchfield.  I apologize.

3              MR. BIRCHFIELD:  Your Honor, the reason that we're

4    fighting on is because this plan, and any bankruptcy plan

5    that J&J has put forward to date does not provide reasonable

6    compensation for the victims.

7              At the beginning of this trial, in the opening, I

8    talked to you about Tamara Newsome, I talked to you about

9    Alicia Landrum, and we represent a significant number of

10   clients.  You heard Governor Barnes speak about his clients,

11   you heard Lonnie Boutwell.  I do not represent, our firm

12   does not represent Lonnie Boutwell, but he has been here

13   every day, all day, for these trials.  That is the reason

14   that we take, that we take the shots and we press on.

15             Let me address just a couple of things that you

16   raised in your questions yesterday, and then I'm going to

17   use the rest of my time to address the other issues, and try

18   to provide, you know, context.  But one of the things that

19   you asked, the first question that you asked was, you know,

20   did Mr. Smith, did he have all of the information to reverse

21   engineer?  And he did, and we provided him with a copy of

22   every letter in a drop box up until the time of the August

23   26th letter.  So he testified, he testified that he did.

24   His counsel said today that they were able to get that for

25   all but two, and that is consistent, that's consistent with

1     my understanding and my testimony.

2          The second issue that you raised that I want to

3     address, and that is you asked for feedback regarding Mr.

4     Fouad Kurdi, who was proposed as a trustee, and has served

5     as a mediator.  And I would say that, I mean, Mr. Kurdi,

6     when his name was first put in the Trust document, you know,

7     he spoke to Counsel that represent Plaintiffs, and he said

8     at any point if we do not have confidence in him, if we have

9     any doubt about his independence or his impartiality, we let

10    him know, and he would withdraw his name.  So Mr. Kurdi has

11    worked, he has worked with the parties throughout this

12    litigation, and he knows the details, he knows the ins and

13    outs.  I do think that that brings an asset to the process.

14    I do think I agree with Ms. Randi Ellis, I agree with Mr.

15    Richenderfer that there is wisdom in having more than one

16    trustee, but I do not have any doubts or qualms about Mr.

17    Kurdi's impartiality or independence.

18         Your Honor, I want to -- I know you have, you've

19    raised -- you've raised issues about the -- about what's

20    going on, and the statements that are made back and forth

21    between Plaintiffs' lawyers, and I want to address that.

22    Your Honor, I want to go back to October, October of 2023.

23    So we had worked through LTL I, we had mediations, we had

24    tried to resolve it, we could not get to a place that

25    provided reasonable compensation to the claimants, couldn't

1    get reasonable terms, and LTL I was dismissed.  LTL II was

2    filed two hours later.  LTL II had been dismissed in August

3    of 2023.  In October of 2023, Mr. Haas announces to the

4    world and investors that they are going to prepare for their

5    third bankruptcy.  In December of 2023, they filed motions

6    to disqualify me and Beasley Allen, to keep us from

7    representing our clients.  They filed it in the MDL, and

8    they filed it in State Court.  On May 1st, Mr. Haas and J&J,

9    their CFO had their investor call, and they announced that

10   they were going to file the second one.

11          Ms. Brown used that announcement at the beginning

12   of -- or in the middle of her presentation, but I want to

13   address just the last part, and I want to address this in

14   the context of the power of attorney.  Because their

15   position that they're taking now about Option B is just for

16   lawyers, lawyers to vote.  If you're a lawyer, you don't

17   have to have power of attorney.  But this does provide

18   context.

19          So the last question that was addressed by Mr.

20   Haas was, okay, you've tried this twice, why will this --

21   why do we think this will succeed the next time?  Here's his

22   answer.  "Yes, great question to end on.  So the primary

23   opponent to resolving anything in a bankruptcy is the

24   individual I just referenced.  It's Beasley Allen Firm, and

25   in particular Andy Birchfield who has opposed any resolution

1  through bankruptcy."  Then he goes on to say, he says,

2  "First of all, it is the vote that will dictate the

3  claimants' get to speak, the claimants' voices get to be

4  heard.  And that's the major distinction here, and if the

5  votes are greater than 75%, it doesn't matter that he

6  perhaps persuades his own clients not to vote in favor of

7  it.  And by the way, he doesn't get a vote.  His claimants

8  do.  So I would say that I would expect his claimants to

9  take this deal because it's a good deal in any event.  But

10  regardless, it is the vote that matters at the end of the

11  day."

12        He goes on to say that, "And that's one

13  significant reason why I don't think it's going to matter.

14  The other significant reason is there's a really good chance

15  that he won't be around for much longer representing his

16  claimants."  And then, the last portion of his statement

17  there, he says, "And the process we are following is much

18  more stringent, and much more compliant with the Code than

19  your typical process.  So I feel very strongly that there

20  will be no legitimate basis for objecting to this process

21  because in the end, it's the claimants.  We let the

22  claimants vote, let the claimants decide if they choose.  It

23  is in their best interest, it should be confirmed."

24        That is completely counter to the position that

25  they are taking here, that power of attorney does not

1    matter, that's just the lawyers getting to vote.  That's the

2    -- You saw it from Ms. Neuner, in her slide presentation

3    about how many of the Ad Hoc Committee members voted by

4    power of attorney, and they talked about a capital P and a

5    capital A, and Your Honor, we had worked very carefully.  We

6    knew, we knew when we cast this vote that we were going to

7    be attacked.  We knew that everything was going to be

8    scrutinized.  We worked with ethics experts, we worked with

9    bankruptcy experts, and bankruptcy counsel.  I never heard

10   anything about a capital P or a capital A.  It was power of

11   attorney.

12          And that's what Ms. Richenderfer showed in Judge

13   Silverstein's, in her order in the Boy Scouts.  There was no

14   capital P or capital A there.

15          All that to say, you know, we informed our

16   clients.  We gave our clients informed consent, and then we

17   voted on their behalf.  I believe everything that had been

18   said, everything that had been said about this proposal was

19   presenting it as a settlement.

20          I understand my time is about up, Your Honor.

21          Everything had been presented as a settlement

22   until Mr. Gentle recognizes, hey, that's a problem.  If

23   lawyers are committing their clients to a settlement without

24   talking to them, then it changes.

25          I want to address in my last few seconds the issue

1    of the conflict that has been -- that I have been charged

2    with, and Beasley Allen has been charged with, and that is

3    the gynecological claims.  First they say, okay, it's a red

4    flag.  There was no red flag.  Mr. Haas took my deposition

5    in LTL III, he asked about the number of claimants we had,

6    we told him -- I told him under oath we had over 11,000

7    claimants at that time.  And then, and that we had over

8    5,000 client's cases on file at that time.  Seeing 11,000

9    clients, that was no red flag.  That's a pretext.  But they

10    say -- Here's the here's the key point, they say that it's a

11    conflict because we voted on behalf of gynecological claims,

12    and they tell the Court that we failed to disclose to our

13    clients that we were publicly saying those claims are

14    worthless, they have no merit in the tort system.  They say

15    we failed to disclose, we failed to inform our clients.

16          The absence of evidence is not evidence of

17    absence.  So how can they say that?  How can they make that

18    claim?  Because we take seriously, we take seriously the

19    attorney-client privilege, and we would not waive it We

20    can't waive it.  It's our client's to waive.  It's been

21    waived a lot in here by a lot of counsel, but we couldn't do

22    that.  But Your Honor, you ordered us to produce our

23    letters, all of our client letters during the solicitation

24    period to you in camera.  We provided letters to you, and we

25    did separate letters to gynecological cancer claimants.  For

1    them to make this claim, for them to come in and say that we

2    did not inform clients, we did not inform our clients, is

3    false, Your Honor.  It's a false charge.

4         Let me close with this.  We are committed to our

5    clients and we have negotiated, we have been in mediation,

6    and we have been in a place where we have had to stand firm

7    against this plan because it does not provide reasonable

8    compensation to the claimants.  And J&J should not be able

9    to coerce claimants into a plan that does not -- when they

10   do not have financial distress, the totality of

11   circumstances do not warrant them being in bankruptcy.

12        I know my time's up, and there are a lot of things

13   that I would love to address.  They're just wrong on the

14   common benefit, they're wrong on how that is used, they're

15   wrong in saying that that comes from the client's share.

16   They are using that as a wedge.  You can look at my

17   testimony, and I urge you, there's been a lot of talk about

18   it, check the law.  You cannot take, you cannot take -- you

19   can't increase the attorney's fees in a contract.  The

20   courts are not going to do that.  It's wrong.

21        So I know I don't have time to address any more

22   issues.

23        THE COURT:  I'll give you two minutes on the

24   common benefit.  I just wanted to -- I know that's a big

25   issue for you, so I'll give you two minutes to explain it.

1          MR. BIRCHFIELD:  Your Honor, common benefit?

2          THE COURT:  I gave Smith 30 minutes, that's what

3    I'm saying -- and I cut you short.  So I'm going to give you

4    a few minutes to walk through.  I know that's a big issue

5    for you.

6          MR. BIRCHFIELD:  So on common benefit, first they

7    say that it's not available in bankruptcy.  That's not true.

8    I had taken the position, our firm had taken the position

9    through all of these discussions, because it's a wedge

10   issue.  Lawyers that gather a lot of cases and don't do the

11   work on the MDL, they don't want to pay.  They don't want it

12   coming out of their attorneys fees.  It's a wedge issue.  We

13   had always taken the position we will not, we're not going

14   to let common benefit stand in the way of a reasonable deal

15   for the client.  Common benefit will take care of itself at

16   the end.  That had always been our position.

17         But you've heard a lot of testimony here about

18   this $650 million fund, that that's saving client money.

19   It's not.  You do not take common benefit fees out of the

20   client's share.  There is usually in the MDL it's 10% and 2%

21   or 6% and 2%, 2% for the expenses, whatever the legitimate

22   expenses are at the end of the day, that can be deducted

23   from the client's share.  But the fees, the attorney's fees

24   never comes out, never comes out of the client's share, it

25   only comes out of the attorney's.  So using it in the way

1   that they have used it here is just to drive a wedge, to try

2   to paint a picture that this is some huge benefit to the

3   clients.  It's not.

4          It does help, it does help the Trust.  That's

5   fine.  But it's never been our issue.  And the claim, the

6   claim that we were negotiating for the individual review

7   fund just for ourselves is flat wrong.  That was not our

8   proposal.  That was the Debtor's proposal.  We have always -

9   - In fact, I've taken criticism from Mr. Smith about not

10  leaving other behind.

11         Your Honor, look.  I know that there's been a lot

12  of aspersions cast, and this has -- The dialogue, the tone

13  of the letters back and forth, that's not something I have

14  ever wanted.  But we were put in a place where we were

15  fighting for the lives of our clients, their litigation

16  lives, and it was a desperate situation.  We have fought

17  through two bankruptcies, now we're in the third.  And so,

18  yes, it did get -- the language got more heated than I would

19  have ever liked.  But it was because we are committed to our

20  clients.

21         Thank you, Your Honor.

22         THE COURT:  Thank you very much.

23         MS. BROWN:  Your Honor, just real quick for the

24  record, I didn't want to interrupt, but much of what Mr.

25  Birchfield just said is not evidence in the record, and I

1    would object to that.  I understand the Court is just

2    hearing argument --

3              THE COURT:  Just closing -- just closing argument.

4              MS. BROWN:   -- and in fact, most of it is

5    contradicted by what is in the record.  So just, I just want

6    to put an objection on the record for that.

7              THE COURT:  Closing argument.

8              MS. BROWN:  Yep.  Thank you.

9              THE COURT:  Thank you.

10             MR. BIRCHFIELD:  Your Honor, I know it's late, but

11   if you have any questions for me, I will answer any question

12   that I can.

13             THE COURT:  I'm good.  Thank you.

14             Let me hear from my final person, PCPC.  Good

15   evening.

16             ATTORNEY:  Good evening, Your Honor.  And did I

17   understand you were going to give us five minutes?

18             THE COURT:  Yeah.

19             ATTORNEY:  Okay.  I'm going to be very brief.

20             Your Honor, when we started this hearing, I

21   explained PCPC's position regarding its treatment under the

22   plan, and at that point, I pointed out that the Debtor

23   hadn't yet taken a position.  It hadn't filed a response to

24   PCPC's objection, and it didn't address it in the

25   confirmation brief.  We did hear a response from the Debtor

1    during the trial, and basically, we understand what happened

2    was the Debtor, for whatever reason, determined that it has

3    liability to the retailers, but it doesn't have liability to

4    PCPC.

5          I would submit that that's improper under

6    1123(a)(4) because we are not in the claims allowance

7    process.  It is a very separate and distinct process from

8    the proposal of a plan, which is what we're dealing with.

9    And in the treatment of claims, I think the law is very

10   clear that you've got to treat parties within the same class

11   exactly, or substantially the same, and that's not what you

12   have here.

13         And I think Serta came up earlier, and I think

14   Serta is responsive to this issue here.  Basically, in

15   Serta,, and I know the Court is familiar, but I think it's

16   important to just recap briefly, that Serta found that

17   providing a benefit to some members of a class but not to

18   the others violates 1123(a)(4,)  and that's what you have

19   here.  Now, in Serta, it was a settlement indemnity.  Here

20   it's protection under -- as a protected party under the

21   plan.  And so you heard Dr. Mullins --

22         THE COURT:  Let me ask you a question.  PCPR --

23   PCPC, excuse me, how would you classify them under the plan

24   at all?  Do they have a claim?

25         ATTORNEY:  They do have a claim, Your Honor.  They

1   have a claim for indemnity, contribution, and --

2            THE COURT:  Against Red River?

3            ATTORNEY:  Yes, Your Honor.  As the Debtor even

4   explained and acknowledged, that all claims, all talc

5   related claims have been channeled -- I'm sorry, excuse me,

6   have become the responsibility of Red River through all the

7   transactions that the Debtor undertook.

8            THE COURT:  What class do you think PCPC falls

9   under?

10           ATTORNEY:  So PCPC falls under two classes.  It

11  would be Class 3 for the defense costs that it's entitled to

12  reimbursement for, and Class 4 as an indirect claimant,

13  because it is entitled to indemnification or contribution.

14           THE COURT:  But if you were in Class 4, you would

15  have gotten a ballot, so --

16           ATTORNEY:  We didn't, and that's also problematic.

17           THE COURT:  Okay.

18           ATTORNEY:  So, and what we heard from Dr. Mullin,

19  Your Honor, and I just want to address that briefly, is that

20  the plan that the Debtor claims is full pay is only full pay

21  because the Debtor has made this determination without going

22  through the claims allowance process, that it's going to

23  channel and give protected party status to the retailers,

24  but not to PCPC.  So basically, no one in Class 4 is ever

25  going to have a claim that's compensable.  And we know

1    that's not true, because if PCPC is not on the protected

2    party list, and it has a claim, then that claim should be

3    reimbursed.  But the Debtor has made absolutely no provision

4    under the plan to pay indirect claimants, because it

5    believes it's taking care of all the claims that it's

6    responsible for by putting the retailers on the protected

7    parties list, and just basically disallowing PCPC's claim,

8    even though PCPC, nor the retailers for that matter, have

9    filed a proof of claim to justify their indemnification

10   claims, Your Honor.

11            THE COURT:  Understood.

12            ATTORNEY:  Thank you, Your Honor.

13            THE COURT:  Thank you.  Thank you, everyone, for

14   your time.  The Court will take this matter under

15   advisement.  Safe travels back to wherever you're going.

16   Thank you very much.

17            If you have -- Mr. Rankin, I think you have your

18   hand up.  I was going to say I have another plan

19   confirmation on Monday, but I'm free up on -- If you want to

20   leave stuff, is what I'm saying, and just kind of put it to

21   the side, and you have somebody coming in on Monday, they're

22   more than welcome to come.  Just have them come around 2:30.

23   I'll hopefully be done around that time.

24            MR. GORDON:  Could I ask a question, Your Honor?

25            MS. RINGER:  Yes, Mr. Gordon.

1          MR. GORDON:  So (indiscernible)

2          THE COURT:  Hold on a second, folks in the back.

3          MR. GORDON:  I think you had said at the outset of

4    the trial that you had decided there would be no post-trial

5    briefs.  We had talked earlier with Your Honor about

6    proposed findings in fact and conclusions of law, so I

7    wanted to be sure I understood.  Did you mean it covers

8    both?

9          THE COURT:  It covers everything.

10         MR. GORDON:  Okay.

11         THE COURT:  It covers everything.

12         MR. GORDON:  And then, if it would be the case

13   that you would confirm the plan, do you have thoughts about

14   how we would handle the confirmation order?

15         THE COURT:  Yeah, I think -- Let me get the

16   decision out, and then we'll -- I'll probably call a hearing

17   a few days after that, and we'll huddle up.

18         MR. GORDON:  And last thing.  On behalf of the

19   Debtor, on behalf of J&J, we very much appreciate all the

20   time you spent, and appreciate your staff as well.  It's

21   just really appreciated (indiscernible)

22         THE COURT:  No, thank you.

23         MR. GORDON:  And your remarks have been amazing.

24         THE COURT:  Thank you very much.

25         ATTORNEY:  Your Honor --

```
1                THE COURT:  Yes.

2                ATTORNEY:  At the beginning of the hearing, you

3    asked for a couple of docket references for the Epiq

4    spreadsheet.

5                THE COURT:  Ah, yes.

6                ATTORNEY:  Yes.  So I have those for you.

7                THE COURT:  All right.  (indiscernible) No, I was

8    going to say if you've got them, I'm good.

9                ATTORNEY:  Okay.  So for the Epiq spreadsheet,

10   that Docket reference is 1200-75.  And the Morelli

11   spreadsheet regarding the vote change was Trial Exhibit 12,

12   on day five.  It doesn't have a docket number yet because

13   it's a native form spreadsheet, but we can get it to you.

14               THE COURT:  Okay.  Thank you very much.

15               ATTORNEY:  Yes.  Thank you, Your Honor.

16               THE COURT:  Thank you, everyone.

17               ATTORNEY:  Thank you, Your Honor.

18

19               (Proceedings adjourned.)

20

21

22

23

24

25
```

1                        CERTIFICATION

2

3

4      I certify that the foregoing is a correct transcript from

5      the electronic sound recording of the proceedings in the

6      above-entitled matter.

7

8

9

10

11     Lindsay Peacock

12

13

14

15

16

17

18

19     Veritext Legal Solutions

20     330 Old Country Road

21     Suite 300

22     Mineola, NY 11501

23

24

25     Date:  March 4, 2025