## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC LLC,[1] | Case No. 24-90505 (CML) |
| Former Debtor. |  |

## RED RIVER TALC LLC'S OBJECTION TO
## BROWN RUDNICK LLP'S FINAL FEE APPLICATION
### (Related to Docket No. 1444)

Red River Talc LLC ("Red River"), the former debtor in the above-captioned dismissed chapter 11 case, files this objection (the "Objection") to the *Final Fee Application of Brown Rudnick LLP as Co-Counsel to the Official Committee of Talc Claimants for the Period from November 18, 2024 Through and Including March 31, 2025* [Dkt. 1444] (the "Application"). In support of this Objection, Red River respectfully states as follows:

### PRELIMINARY STATEMENT

1. The Application filed by Brown Rudnick LLP ("Brown Rudnick") should be denied because Brown Rudnick's retention by the former, now dissolved Official Committee of Talc Claimants (the "TCC") has not been and cannot now be approved, particularly through the efforts of Brown Rudnick, which lacks standing to seek its own retention.[2] Additionally,

---

[1]   The last four digits of Red River's taxpayer identification number are 8508. Red River's address is 501 George Street, New Brunswick, New Jersey 08933.

[2]   Under section 1103(a) of the Bankruptcy Code, the power to employ counsel belongs only to the "committee." And under section 330(a), only a professional that has actually been employed under section 1103 (or section 327) has any right to seek payment. At best, Brown Rudnick provided its services to the TCC as a "gratuitous volunteer," well aware of objections to its retention and the lack of any order under section 1103. See In re Coleman, 655 B.R. 441, 456-57 (Bankr. N.D. Miss. 2023) ("an attorney . . . without court approval . . . is simply considered a volunteer if that attorney seeks payment from the bankruptcy estate"); Matter of Singson, 41 F.3d 316, 319 (7th Cir. 1994) (prior approval "wards off 'volunteers' attracted to the kitty"); 3 Collier on Bankruptcy P 327.03 (16th 2025) (counsel providing services without prior approval "may be considered an officious intermeddler or a gratuitous volunteer"). Brown Rudnick does not gain a right to payment because it "chose to take a calculated risk and continue

even if Brown Rudnick's retention by a client that no longer exists could now be approved, its services far exceeded the scope of its purported representation and were unnecessary, inappropriate and duplicative of the services provided by the TCC's primary bankruptcy counsel.[3]

2.    Brown Rudnick began its involvement in the Red River case by representing a set of plaintiff law firms, led by Beasley Allen, that vehemently opposed any bankruptcy resolution of the talcum powder-related personal injury claims.  On behalf of the Coalition of Counsel for Justice for Talc Claimants (the "Coalition"), Brown Rudnick attacked the bankruptcy on multiple fronts, immediately moving to dismiss the case, challenging the solicitation of and voting on the prepackaged plan, and objecting to the confirmability of the plan through various pleadings.

3.    But Red River's prepackaged case enjoyed substantial support, including—critically—by the TCC, which issued a statement on November 21, 2024 supporting the plan and announcing it would oppose the Coalition's efforts.  This was in marked contrast to what had occurred in the LTL I and LTL II chapter 11 cases, where the official committees had, like the Brown Rudnick-led Coalition, opposed those chapter 11 cases.

4.    This did not dissuade Brown Rudnick from its goal of representing the TCC.  Brown Rudnick had already invested millions in uncompensated attorney time representing the Coalition.  Keen on continuing to procure the millions of dollars previously collected in these talcum-powder bankruptcies—but ignoring patent and indisputable conflicts of interest between the TCC and the Coalition—Brown Rudnick dropped the Coalition

---

employment absent necessary authorization."  In re Interwest Bus. Equip., Inc., 23 F.3d 311, 318 (10th Cir. 1994).

[3]    See also Retention Obj. (defined below), 18-21, 22-24.

NAI-5004291139

representation like a hot potato and devised a new, novel role for itself for the estate-funded

TCC.  It persuaded the TCC to hire two lead bankruptcy counsel, itself and Paul Hastings LLP

("Paul Hastings") (which had represented the ad hoc committee supporting the plan), the putative

goal being that notwithstanding its positional and other conflicts Brown Rudnick's connections

to the Coalition could help "bridge the gap" between those that supported and those that opposed

the plan.  With a foot in the TCC door, Brown Rudnick's representation ballooned.  In fact,

Brown Rudnick billed millions of dollars in fees having nothing to do with the stated limited

purpose of its retention, including at least $2 million on the same litigation matters it pursued on

behalf of the Coalition.

       5.     As primary counsel for the Coalition in Red River's chapter 11 case,

Brown Rudnick previously asserted positions diametrically opposed to those of the TCC, which,

shortly after its formation, voted to **support** the plan and the chapter 11 case.  As examples,

Brown Rudnick, as counsel for the Coalition, had opposed confirmation of the plan supported by

the TCC, asserting it was "not confirmable."  Sept. 23, 2024 Hr'g Tr. 33:19-34:5 (Mr. Molton of

Brown Rudnick speaking); see also Dkt. 895, at 2.  Brown Rudnick had vigorously argued for

the "immediate" dismissal of the chapter 11 case—calling it "doomed to failure," a "disservice to

cancer victims" and a "litigation tactic to extinguish fundamental legal rights."  Sept. 23, 2024

Hr'g Tr. 33:19-34:5 (Mr. Molton of Brown Rudnick speaking); Dkt. 268 ¶ 31.  But **two days**

**after** the TCC determined to support the plan by entering into a memorandum of understanding

with Red River, see Dkt. 560, Brown Rudnick suddenly dropped its representation of the

Coalition to seek retention by the TCC notwithstanding its previous staunch opposition to the

plan and the chapter 11 case.  Although the amount was not divulged in the TCC's application to

retain Brown Rudnick, Brown Rudnick has subsequently revealed that current and former members of the Coalition owe it over $5 million for its services to them.  Dkt. 1443, at 2.

6.     Brown Rudnick attempts to gloss over this obvious conflict by focusing on inapposite issues.  For example, it claims it was permissible to abruptly change sides because the Bankruptcy Code does not prohibit concurrent representations of creditors and official committees, much less a former representation of creditors.  See Reply (defined below), 7.  It also makes the obvious but irrelevant point that counsel to a creditors' committee often takes positions adverse to a debtor.  See id.  But these arguments ignore the primary issue raised by their attempt to switch sides and represent the TCC:  Brown Rudnick represented a group of **claimants**, who owe Brown Rudnick a substantial sum and who took, and continued to take, positions in the Red River case directly contrary to those taken by its proposed new client, the TCC, **in the very same case**.  As a result, Brown Rudnick's retention by the TCC is prohibited by the Bankruptcy Code and applicable ethical rules.

7.     As an initial matter, as explained in Red River's objection to the retention of Brown Rudnick and certain other professionals [Dkt. 895] (the "Retention Objection"), Brown Rudnick is not disinterested.  Because of its representation of the Coalition and the substantial amounts owed by it to Brown Rudnick as a result of that representation, Brown Rudnick simply could not offer unbiased and impartial advice to the TCC on any of the key substantive matters in the chapter 11 case.  See, e.g., Retention Obj., 10-15.  By directly opposing the Coalition and the very pleadings and strategy as to which Brown Rudnick was seeking compensation from the Coalition, Brown Rudnick risked non-payment of the over $5 million it was apparently owed for those services.

-4-

8.      Brown Rudnick's retention also cannot be approved under applicable ethical rules.  When a lawyer is faced with representations of clients with divergent interests—especially in connection with substantially related matters as is the case here—it "may not drop one client like a 'hot potato' in order to avoid a conflict with another, more remunerative client." Santacroce v. Neff, 134 F. Supp. 2d 366, 370 (D.N.J. 2001).  But that is precisely what Brown Rudnick did.  After certain members of the Coalition were selected to serve on the TCC, Brown Rudnick abandoned its representation of the Coalition for a new engagement by the TCC, which was then and continued to be adverse to the Coalition on literally every issue presented by the Coalition's multi-front opposition to the plan and the bankruptcy.  It was clear from the start that the interest of its potential new client, the TCC, materially diverged from the interest of its purported former client, the Coalition, and would require the firm to take diametrically opposed positions before the same court in the same case on issues critical to the bankruptcy.

9.      "A lawyer's withdrawal from representing a client only renders the client a former client when:  (1) it occurs at a time when the lawyer and the client had contemplated the end of the representation; **and** (2) the lawyer's primary motivation for terminating the relationship was not his desire to represent the new client."  ValuePart, Inc. vs. Clements, 2006 WL 2252541, at *2 (N.D. Ill. Aug. 2, 2006) (citing ABA Lawyers' Manual on Professional Conduct § 51:218 (2006) (emphasis added).  This rule reflects lawyers' strong duty of loyalty to their clients and prohibits lawyers from dropping a client for another to enhance the lawyers' own pecuniary interest.  See id.; Santacroce, 134 F. Supp. 2d at 370.  Here, there is no basis to believe that the Coalition, in the middle of hard-fought litigation, would have agreed that its primary counsel could abandon its representation of the Coalition to represent a different client on the opposite side of the very same litigation in the very same bankruptcy case.

-5-

10.     In addition, Brown Rudnick's termination of its representation of the Coalition enabled it to seek an engagement by a new client—the TCC—whose professional fees and expenses would be borne by a chapter 11 debtor that Brown Rudnick claimed "lack[ed] genuine financial distress," Dkt. 44 ¶ 4, while repeatedly acknowledging the financial strength of Johnson & Johnson.[4]  Under the circumstances, Brown Rudnick's efforts to drop the Coalition as a client should be disregarded, and the Coalition should be treated as a current client of Brown Rudnick for ethical and conflict purposes.

11.     Brown Rudnick was precluded from simultaneously representing opposing parties in the chapter 11 case.  See Texas Disciplinary Rules of Professional Conduct (the "Texas Professional Rules") 1.06.  It was precluded under Texas ethical rules irrespective of any purported consent by the purported former client, particularly since Brown Rudnick could not have "reasonably believe[d] the representation of each client [would] not be materially affected." See Texas Professional Rule 1.06(c).  Representing clients with diametrically opposed interests in the same bankruptcy case, as happened here, would obviously materially affect both representations.

12.     In addition, even if the Coalition is treated as a "former" client, Brown Rudnick did not comply with Texas ethical rules that prohibit representation of a client in the same or substantially-related matter in which that client's interests are materially adverse to the former client's, unless the former client gives written consent fully informed of the issues. Brown Rudnick alleges it received a waiver from the Coalition, but no copy of it has been

---

[4]     See Sept. 23, 2024 Hr'g Tr. 41:5-12 (Mr. Molton of Brown Rudnick speaking for the Coalition) ("Your Honor, this case is nothing more than a quest to achieve something unachievable, i.e., a bankruptcy discharge of one of the most solvent companies in America who is not filing for bankruptcy.  It is the latest manifestation of a Fortune 500 company's litigation tactic.").

provided to Red River, despite Red River's requests,[5] or to the Court.  In any event, why would the Coalition willingly agree to permit its primary counsel to represent an opposing party in the midst of a heavily contested chapter 11 case if the Coalition was fully apprised of all the issues— particularly given that Brown Rudnick must have been in possession of the Coalition's key strategic and confidential information, which it could use against the Coalition when it advised the TCC on the very same issues or in mediation?

13.     Brown Rudnick alleges that the Coalition firms executed waivers after receiving full disclosure of information "adequate for each member to make an informed decision."  Dkt. 1443, at 2.  But, without copies of the waivers and disclosure of the information allegedly shared with the Coalition, it is impossible to assess whether Brown Rudnick complied with applicable ethical requirements.  Regardless, even if consent was provided, Brown Rudnick's conflicts still disabled Brown Rudnick from representing the TCC, a fiduciary charged with representing **all** creditors.  A lack of disinterestedness simply cannot be waived in a chapter 11 case.  Moreover, any consent by the Coalition, which sought to dismiss the case and block confirmation of the plan, could not authorize an estate fiduciary like the TCC to retain conflicted counsel in a chapter 11 case.

14.     Brown Rudnick also asserts, for the first time in its reply in support of its retention application [Dkt. 1447] (the "Reply"), that the TCC determined that Paul Hastings would "lead" the TCC's consideration of or response to any motions filed by the Coalition prior to Brown Rudnick's withdrawal as Coalition counsel.  Reply, 7.  But this, at best, reveals that Brown Rudnick had a conflict.  And it shows that the TCC had no need for Brown Rudnick

---

[5]     On October 2, 2025, Red River served discovery requests on Brown Rudnick in an effort to assess this and other factual issues related to Brown Rudnick's proposed retention by the TCC.

because (a) the entire prepackaged chapter 11 case was focused on the issues raised by the Coalition's motions authored by Brown Rudnick, including voting, plan confirmation and dismissal issues, and (b) the TCC had engaged Paul Hastings as primary bankruptcy counsel.

15.     The purpose of Red River's chapter 11 case was to seek confirmation of a prepackaged plan of reorganization—a plan the TCC determined to support.  The two-week combined hearing centered around Red River's effort to achieve confirmation of that plan and defend against the Coalition's efforts, all of which initially were implemented through Brown Rudnick, to dismiss the case, contest the voting results and block confirmation of the plan. Brown Rudnick simply could not effectively represent the TCC in these matters in a manner consistent with the TCC's limitation.  Tellingly, no Brown Rudnick attorney on behalf of the TCC presented at trial (or even a hearing, except for an introductory presentation in November 2024), asked a question at a deposition, or, to the extent Red River can ascertain from Brown Rudnick's vague time records, was responsible for drafting any substantive (non-administrative) pleading filed by the TCC.

16.     Apart from these patent conflicts, there was no need or basis to retain—in the "spirt of compromise"—both Brown Rudnick and Paul Hastings as lead bankruptcy counsel to perform the same services.  Brown Rudnick has provided no legal or other basis for it to serve as a quasi-mediator to "bridge the gap" between plan supporters and objectors, the sole basis for its retention advanced in its Reply.  Nor, given its conflicts and access to confidential and privileged information from opposing sides, was the firm fit to serve in such a role.  Even if one accepted the novel basis of Brown Rudnick's quasi-mediator retention, most of the time it incurred had nothing to do with that role.

NAI-5004291139

17.     Brown Rudnick's fees and expenses were unnecessary, excessive and did not benefit the TCC or the estate.  More than half of its time—at least $2.3 million—was spent observing the contested matters it initiated on behalf of the Coalition, but that the TCC was on record **opposing**.  Nearly a third of Brown Rudnick's requested fees relate to attendance at hearings and depositions (usually with multiple attendees) related to these contested matters, even though Paul Hastings was tasked with addressing the issues raised at them, and Brown Rudnick did not participate in any meaningful way in those hearings or depositions.  These services are entirely inconsistent with the limitation on Brown Rudnick's retention imposed by the TCC and directly implicate the conflict.  Given the TCC's support of the plan, its access to its primary bankruptcy counsel (Paul Hastings) and the fact that Brown Rudnick could not lead any consideration of the key substantive matters at issue at the combined hearing, these services by Brown Rudnick were inappropriate and unnecessary.

18.     Brown Rudnick also incurred substantial amounts in connection with mediation and the plan of reorganization.  It was especially inappropriate for Brown Rudnick to attend and participate in mediation sessions involving the Coalition and the TCC, which had opposing views of the case and the plan.  Brown Rudnick possessed confidential and privileged information from its representation of the Coalition; it could not unlearn that information in any mediation or other settlement meeting on the plan.  Similarly, Brown Rudnick should not have been spending any time assessing the plan.  It was not supposed to do so given the TCC's direction, and Paul Hastings could (and did) provide these very same services to the TCC.  And, of course, it would have been entirely improper for Brown Rudnick to provide services to a subset of the TCC that were adverse to the TCC as a whole.  If Brown Rudnick wished to do that, it could (and should) have continued its representation of the Coalition.

-9-

19.     Moreover, Brown Rudnick spent over 250 hours meeting and communicating with TCC members, including through <u>daily</u> committee updates, at a cost of over $400,000.  Given the limitations imposed by the TCC on Brown Rudnick's role, as well as Paul Hastings' attendance at some or all of these same meetings,[6] the time spent by Brown Rudnick communicating with the TCC was unnecessary and of no benefit to the TCC or the estate.

20.     Finally, Brown Rudnick's Application is replete with instances of block billing, lumping, and vague billing entries, including significant time attributed to internal communications or meetings where attendees are not specified, rendering it impossible for the Court to scrutinize the reasonableness of the time expended.  In short, the Application confirms that Red River's previously expressed concerns regarding Brown Rudnick's retention were entirely warranted.  The Application should be denied because Brown Rudnick should not be retained.  And, even if Brown Rudnick is retained, Brown Rudnick's compensation request should be denied because Brown Rudnick was not disinterested and did not, nor could it, provide any services to the TCC that were not (a) subject to the TCC's own limitation and/or (b) unnecessary and duplicative of services provided by Paul Hastings.[7]

21.     For the reasons set forth herein, the Application should be denied.

---

[6]     Brown Rudnick's invoices frequently do not specifically identify meeting attendees.

[7]     The Application also is replete with numerous instances of block billing, lumped time entries, vague time descriptions, and billing by transient timekeepers, all of which violate billing guidelines established by the United States Trustee.

**OBJECTION**

I.     **The Application Should Be Denied**

     A.     **Brown Rudnick's Retention Should Not Be Approved Because it Violated the Bankruptcy Code and Applicable State Ethical Rules**

        22.     For the reasons set forth in the Retention Objection, Brown Rudnick's retention should be denied.  Brown Rudnick could not offer impartial, unbiased and disinterested advice to the TCC on any of the key substantive matters in the chapter 11 case.  See, e.g., Retention Obj., 10-15.  Additionally, for the first time following dismissal of the case, Brown Rudnick revealed that current and former members of the Coalition owed it (and may continue to owe it) over $5 million in respect of its representation.  See Dkt. 1443, at 2.  How could Brown Rudnick impartially and vigorously represent the TCC given its prior representation of the Coalition and the substantial amounts Coalition members owed it?  It could not.  Brown Rudnick held an adverse interest and is not disinterested.  See id. at 10-11, 14-15.[8]  And, critically, that lack of disinterestedness cannot be cured by consent or waiver.  See id. at 15.  Given its lack of disinterestedness, the retention of Brown Rudnick was not in the best interest of the estate because it was not entitled to reimbursement of its fees and expenses for work performed for the TCC.  See id. at 17-18.

        23.     Similarly, Brown Rudnick cannot be retained because its proposed retention does not comply with applicable state ethical rules.  Retained professionals must comply with professional ethical standards in addition to the requirements of the Bankruptcy

---

[8]     See also William Kohn, Michael P. Shuster & Lee D. Power, Ethics Panel: Multi-Jurisdiction Bankruptcy Practice & the Interface with State Ethics Laws, 041802 ABI-CLE 461 (April 18-21, 2002) ("Part (E) of the definition in Section 101 is commonly referred to as the 'catch-all clause' and certain courts have found that it is 'sufficiently broad to include any professional with an 'interest or relationship that would even faintly color the independence and impartial attitude required by the Code.'") (quoting Kravit, Gass & Weber, S.C. v. Michel (In re Crivello), 134 F.3d 831, 835 (7th Cir. 1998); In re BH&P, Inc., 949 F.2d 1300, 1308 (3d Cir. 1991)).

NAI-5004291139

Code.  See In re Congoleum Corp., 426 F.3d 675, 688 (3d Cir. 2005); Retention Obj., 15-16.

Indeed, the Court has a "duty to root out, condemn and initiate appropriate disciplinary measures

against a . . . lawyer for unprofessional conduct of which [it has] become aware." Santacroce,

134 F. Supp. 2d at 369 (internal citations omitted).  Consistent with that obligation, there are

hundreds of reported decisions related to an analysis of ethical standards involving the retention

of professionals in bankruptcy cases.  See Marcia L. Goldstein, Michele J. Meises & Arielle

Lenza, Ethical Issues in Chapter 11 Cases, in Chapter 11 Business Reorganizations, ALI-ABA

Course of Study, SS029 ALI-ABA 341, 343 (Apr. 28-29, 2011); John T. Cross, Conflicts of

Interest in Bankruptcy Representation, 1 J. Bankr. L. & Prac. 233, 233 (March/April 1992)

(commenting that a "surprising number of judicial decisions in bankruptcy deal, in whole or in

part with claims that one or more of the attorneys was representing conflicting interests," noting

the "alarming … percentage of cases in which courts have found a conflict," and observing

"[m]any well-regarding attorneys have been disqualified from representation and/or sanctioned

for becoming involved in a conflicting representation").  As more than one court has recognized,

the "[r]ules governing professional conduct are often viewed as even more necessary and

applicable in bankruptcy cases than in other contexts."  In re Meridian Auto. Sys.-Composite

Operations, Inc., 340 B.R. 740, 750 (Bankr. D. Del. 2006) (quoting Congoleum, 426 F.3d at

686).

        24.    Brown Rudnick, faced with competing, adverse representations, could not,

consistent with its ethical obligations, simply drop the Coalition "like a hot potato in order to

treat it as though it were a former client for the purpose of resolving a conflict of interest

dispute." ValuePart, 2006 WL 2252541, at *2.  Nor could it drop the Coalition because it

perceived the TCC representation to be more lucrative.  See, e.g., Santacroce, 134 F. Supp. 2d at

370; <u>Alex Munoz Gen. Cont., Inc. v. MC3D, Inc.</u>, 1998 WL 831806, *3 (N.D. Ill. Nov. 25, 1998) (holding law firm "cannot drop [its client] like a 'hot potato' merely because it wishes to represent a more lucrative client against a less lucrative one."). "Such behavior is unethical as it violates attorneys' duty of loyalty." <u>Int'l Longshoremen's Ass'n, Local Union 1332 v. Int'l Longshoremen's Assoc.</u>, 909 F.Supp. 287, 293 (E.D. Pa. 1995). "Loyalty is an essential element in the lawyer's relationship to a client." Texas Professional Rule 1.06, Cmt. 1, Loyalty to a Client. And, "[l]oyalty to a client is impaired . . . in any situation when a lawyer may not be able to consider, recommend or carry out an appropriate course of action for one client because of the lawyer's own interests or responsibilities to others." Texas Professional Rule 1.06, Cmt. 4, Conflict with Lawyer's Own Interests.

25.     That is precisely what Brown Rudnick did. When the opportunity arose to represent another client, funded by the estate, Brown Rudnick elected to terminate its representation of the Coalition. In its view, that resolved the conflict. But, "[a] lawyer's withdrawal from representing a client only renders the client a former client when: (1) it occurs at a time when the lawyer and the client had contemplated the end of the representation; **and** (2) the lawyer's primary motivation for terminating the relationship was not his desire to represent the new client." <u>ValuePart</u>, 2006 WL 2252541, at *2 (citing ABA Lawyers' Manual on Professional Conduct § 51:218 (2006)) (emphasis added).

26.     Nothing in the record establishes that the Coalition contemplated Brown Rudnick's representation would end in the middle of litigation Brown Rudnick was spearheading. The record does demonstrate, however, that Brown Rudnick purported to terminate its representation of the Coalition **solely** to represent a new client, whose professional fees and expenses would be borne by the chapter 11 estate. Indeed, although the amount of the

-13-

fees was not disclosed in the application to retain Brown Rudnick, it is now clear that current and former members of the Coalition owed Brown Rudnick in excess of $5 million, demonstrating a self-interested, financial motive for Brown Rudnick's decision.  Accordingly, the Coalition should be treated as a current client of Brown Rudnick for ethical and conflict purposes.  See, e.g., ValuePart, 2006 WL 2252541, at *2 (treating purportedly former client as current client subject to simultaneous adverse client representation ethical rules when, among other things, lawyer dropped client solely to represent new client); Santacroce, 134 F. Supp. 2d at 370 (holding that more lenient ethical rules applicable to former client adversities did not apply, in part, because lawyer dropped client in order to pursue a more lucrative representation opposing client).

27.     Brown Rudnick could not represent opposing parties in the chapter 11 case.  See Texas Professional Rules 1.06.  This is so under the Texas ethical rules despite any purported consent received from the client, particularly since Brown Rudnick could not have "reasonably believe[d] the representation of each client will not be materially affected."  See Texas Professional Rule 1.06(c).  Courts use an "objective standard" in evaluating if a "reasonable lawyer" would find either representation materially affected.  See In re Enron Corp. Sec., Derivative & ERISA Litig., 235 F. Supp. 2d 549, 668 n.103 (S.D. Tex. 2002). Representing clients with directly opposed views in the same litigation and in the same bankruptcy case, as happened here, would unequivocally materially affect the representations.

28.     In addition, even if the Coalition is treated as a "former" client, Brown Rudnick failed to comply with Texas ethical rules, which prohibit representation of a client in the same or substantially-related matter in which that client's interests are materially adverse to the former client's, without the former client's written consent after having been fully informed of

the issues.  Model Rule 1.9 of the Model Rules of Professional Conduct, adopted in Texas Rule 1.09, serves "three distinct purposes":  (1) to prevent "the potential that a former client's confidences and secrets may be used against him"; (2) to "maintain[] . . . public confidence in the integrity of the bar"; and (3) "importantly, *a client has a right to expect the loyalty of his attorney in the matter for which he is retained*."  <u>Meridian Auto.</u>, 340 B.R. at 747 (emphasis in original) (quoting <u>In re Corn Derivatives Antitrust Litig.</u>, 748 F.2d 157, 162 (3d Cir. 1984)).

29.     Brown Rudnick alleges it received a waiver from the Coalition after the Coalition firms received full disclosure of information "adequate for each member to make an informed decision."  Dkt. 1443, at 2.  But a copy of the waiver has not been provided to Red River, despite Red River's requests.  Undoubtedly, Brown Rudnick was in possession of the Coalition's key strategic and confidential information.  It is exceedingly difficult to imagine that the Coalition, having been properly apprised of all the issues, would have willingly agreed to waive Brown Rudnick's conflicts to permit it to represent an opposing party in the very same litigation in the very same  chapter 11 case.  In short, Brown Rudnick has not met its burden of proving full disclosure and appropriate consent.  <u>See</u> <u>El Camino Res., Ltd. v. Huntington Nat. Bank</u>, 623 F. Supp. 2d 863, 879 (W.D. Mich. 2007) (attorney "has the burden of proving full disclosure and of establishing the fact and scope of consent").

30.     Regardless, even if the Coalition consented to its counsel advocating against it, Brown Rudnick's lack of disinterestedness could not be waived by the TCC.  <u>See</u> Retention Obj., 15.  The TCC was a fiduciary charged with representing all creditors, and its counsel were required not only to meet the standards applicable to professionals outside of bankruptcy, but also the rigorous standards for retention applicable under the Bankruptcy Code.  As the court in <u>Roman Catholic Church for Archdioceses of New Orleans</u> explained:

NAI-5004291139

> Unsecured creditors' committees and their professionals and agents
> play as large a part in the success or failure of any restructuring case
> as that of debtors and secured creditors.  But the bankruptcy process
> as it was intended to function under the Bankruptcy Code quickly
> falls apart when courts cannot depend on the integrity, ethics, and
> honesty of litigants and professionals who have accepted roles of
> great responsibility and trust.

2022 WL 7204872, at *2 (Bankr. E.D. La. Oct. 11, 2022), aff'd sub nom. In re Roman Cath.

Church of Archdiocese of New Orleans, 678 F. Supp. 3d 797 (E.D. La. 2023); see also In re

Grant Broad. of Phila., Inc., 71 B.R. 655, 661-62 (noting members of creditors' committee have

fiduciary duties to "all creditors" and their professionals "'must have undivided loyalty to those

whom they represent without any conflict of interest'" (quoting In re Mesta Mach. Co., 67 B.R.

151, 156-57 (Bankr. W.D. Pa. 1986)) (emphasis in original).

      31.    Brown Rudnick unconvincingly argues that there was no conflict because

the Coalition's and the TCC's interests in achieving a settlement were "substantially aligned."

Reply, 10.  This is not true.  The Coalition, in pleadings filed by Brown Rudnick, argued that the

chapter 11 case should be dismissed and opposed confirmation of the plan, which was supported

by the TCC.  In fact, on the eve of the confirmation hearing, the Coalition reiterated its

objections to the chapter 11 case, voting process and plan and confirmed that the Coalition

desired a settlement of its member's claims **outside of bankruptcy**.  See Dkt. 1106.  In contrast,

the TCC favored a bankruptcy resolution and expressly stated it opposed the various motions that

the Coalition filed.  Dkt. 613 ¶ 10 ("[T]he TCC expects to file pleadings objecting to the relief

sought in the Opposition Motions and to support confirmation of the forthcoming amended

Plan.").  Even if the Coalition ever was willing to accept a bankruptcy resolution, it rejected the

financial and other terms of the plan, which were acceptable to the TCC.  At best, the TCC and

the Coalition were billions of dollars apart.  That is not "substantial alignment."

32.     Even if Brown Rudnick was not on opposite sides of the same litigation,
Brown Rudnick could not act as a broker in any negotiations between the Coalition and the TCC.
If it could, then a firm could simultaneously represent the plaintiff and defendant in settlement
negotiations in the same lawsuit on the basis that both parties wanted to settle.  It obviously
could not.  And Brown Rudnick must have possessed confidential information from its
representation of the Coalition, information it could not unlearn.  Brown Rudnick could not
simply fire the Coalition to engage in settlement negotiations on behalf of a new, potentially
more lucrative client on the opposite side of those same negotiations.  See In re Plant Insulation
Co., 414 B.R. 646, 652  (Bankr. N.D. Cal. 2009) (when former and current representation are
substantially related, "it is presumed that the attorney had access to confidential information
during the first representation, and disqualification of the attorney from the second representation
is mandatory").  The risks of disclosing client confidences and complications caused by mixed
loyalties are particularly problematic in the context of settlement discussions.  Indeed, one court
has remarked that these risks are "particularly relevant [when] the parties are currently embroiled
in intense negotiations about the Debtors' plan of reorganization." Meridian Auto., 340 B.R. at
748.

33.     Brown Rudnick also argues that its role was limited, "[i]n an abundance of
caution," by the TCC, such that Paul Hastings was tasked with leading consideration of or
response to any pleadings filed by the Coalition before Brown Rudnick withdrew from its
representation of the Coalition.  Reply, 14.  Although this limitation was not previously
disclosed, it only underscores that Brown Rudnick in fact had a conflict.  Moreover, because of
the breadth of the Coalition's opposition to the plan and the bankruptcy case, application of the
limitation in reality resulted in no meaningful or substantive role for Brown Rudnick.

NAI-5004291139

34.     Finally, Brown Rudnick had a disabling positional conflict as a result of positions it had taken against the bankruptcy and plan as counsel for the Coalition.  While "[a] lawyer may represent parties having antagonistic positions on a legal question that has arisen in different cases," it may not do so "if either client would be adversely affected."  Texas Professional Rules 1.06, Comment 10; see also id. ABA Rule 1.7 Conflict of Interest: Current Clients, Comment 24 (stating positional conflict exists "if there is a significant risk that a lawyer's action on behalf of one client will materially limit the lawyer's effectiveness in representing another client in a different case," noting relevant factors include "where the cases are pending, whether the issue is substantive or procedural, the temporal relationship between the matters, the significance of the issue to the immediate and long-term interests of the clients involved and the clients' reasonable expectations in retaining the lawyer").

35.     As detailed in Red River's notice of opposition to prospective retention of counsel for the TCC [Dkt. 677] (the "Notice of Opposition") and Retention Objection, Brown Rudnick took positions on behalf of the Coalition that were diametrically opposed to the TCC's support of the bankruptcy and plan.  The positions were made before the same Court, in the same matter, within days of Brown Rudnick's proposed retention by the TCC, and would plainly impact the effectiveness of that representation.  It would be difficult to construct a clearer case of a positional conflict.

36.     With Paul Hastings already representing the TCC as primary bankruptcy counsel and the TCC's limitation effectively leaving Brown Rudnick with no meaningful role, Brown Rudnick should have declined the representation.  See Goldstein, Meises & Lenza, Ethical Issues, at 6 (quoting a New York City bar opinion determining that "a representation may be limited to eliminate adversity, as long as the lawyer's continuing representation of the client is

-18-

not so restricted that it renders her counsel inadequate"). Instead, it incurred over $4 million in fees and nearly $80,000 in expenses performing services for which Paul Hastings was acting as lead counsel and on which Brown Rudnick was hopelessly conflicted.

**B.      Brown Rudnick's Putative "Bridge-the-Gap" Retention Served No Valid Purpose**

37.      Brown Rudnick offers a single reason why the Court should take the unusual step[9] of approving two, primary bankruptcy counsel for the TCC, one of which had serious conflicts:  given its "past representations" of the official committees in the LTL I and LTL II cases, and of the Coalition in Red River's chapter 11 case, Brown Rudnick was "uniquely qualified to bridge the gap between the supporters of [Red River's] plan and those who did not support it."  Dkt. 1442 ¶ 2.  Apart from this novel, "peacemaker" role that Brown Rudnick evidently proposed for itself, the firm offers no reason to justify the over $4 million of fees and costs it billed to the estate.  Moreover, Brown Rudnick's "bridge-the-gap" justification for its retention fails for multiple reasons.

38.      <u>First</u>, Brown Rudnick cites no authority in any bankruptcy case to support the argument that it is appropriate to retain an additional, lead bankruptcy counsel so it may act as a quasi-mediator—much less in a prepackaged chapter 11 case where all the estate representatives already supported the plan.  Instead, citing plainly inapposite and general principles, Brown Rudnick warns that the Court must give "meticulous deference" to the TCC's choice of counsel.  Dkt. 1442 ¶¶ 10, 24.  While Red River does not dispute that general concept, the hardly unsurprising fact that an official committee might be persuaded—"in the spirit of

---

[9]      <u>See</u>, <u>e.g.</u>, <u>In re Sw. Food Distribs. LLC</u>, 561 F.3d 1106, 1110-12 (10th Cir. 2009) ("The legislative history for § 1103 "indicates the need for close scrutiny of ... [the] employment [of more than one attorney.] . . . '[C]ause must be shown to depart from the normal standard.'") (quoting <u>In re The Bible Speaks</u>, 67 B.R. 426 (Bankr. D. Mass. 1986); H.R.Rep. No. 595, 95th Cong., 1st Sess. 402 (1977), reprinted in U.S. Code Cong. & Admin. News 1978, pp. 5787, 6358).

NAI-5004291139

compromise" (id. ¶ 11)—to seek to retain multiple firms paid by Red River does nothing to support Brown Rudnick's retention or application for payment here. None of Brown Rudnick's "choice of counsel" cases (see id. ¶¶ 10, 24) involves a bankruptcy committee's desire to retain multiple, lead counsel in the same role.[10] Likewise, none involve the mediator-like role envisioned for Brown Rudnick here. See Sw. Food Distribs., 561 F.3d at 1110-12 (denying creditors' committee application to retain multiple counsel, noting "[w]hile the right to select counsel of one's own choice is an undeniable right afforded to participants in bankruptcy, that right is not without boundaries").

39.     Second, even if the concept of a committee retaining a firm to serve in Brown's Rudnick's alleged "peacemaker" role was appropriate, Brown Rudnick was disqualified from serving in it. Brown Rudnick claims it was "uniquely qualified" for such a role given its past retentions as committee counsel in LTL I and LTL II and its representation of the Coalition in this case. Dkt. 1442 ¶¶ 2, 11. Apart from the fact that it previously represented clients vehemently opposed to any bankruptcy resolution of the talc claims, left unsaid is how those past representations would assist in building consensus. The only "unique" thing about Brown Rudnick pertinent to its supposed role was the confidential and privileged knowledge it obtained while representing the official committees in LTL I and LTL II and the Coalition in opposing LTL's and Red River's efforts to achieve a global resolution of the talc claims. But, as noted, Brown Rudnick was not permitted to use the confidential and privileged information it obtained

---

[10]     In In re Nat. Century Fin. Enters., Inc., 298 B.R. 118, 123 (Bankr. S.D. Ohio 2003), the court approved the creditors' committee's retention of local counsel to assist national counsel. The court, however, reiterated its "concerns of unnecessary duplication of professional services and retention of professionals" and "caution[ed]" local counsel and "other professionals involved that it will continue to review all subsequent professional fee applications and employment applications with these same concerns in mind." Id. at 124. Here, Red River has not objected to the fee applications filed by the TCC's local counsel. In In re MMA L. Firm, PLLC, 660 B.R. 128 (Bankr. S.D. Tex. 2024), cited by Brown Rudnick, the court disqualified the creditors' committee's choice of counsel due to that counsel's communications with a prior prospective client. See id. at 136-38.

from those representations, together with confidential and privileged information from its new client (the TCC), to try to broker a deal.

40. <u>Third</u>, any suggestion in Brown Rudnick's pleadings that its retention could—or did—serve to "bridge-the-gap" of a "nearly evenly divided" TCC is not supported by the record. In its attempt to minimize the clear conflict between the TCC's public support for, and the Coalition's opposition to, the plan, Brown Rudnick contends the TCC "was comprised of five claimants who voted against [Red River's] proposed plan and five claimants who voted for the proposed plan." Dkt. 1442 ¶ 26. It then contends that "Brown Rudnick was in the best position to bridge any gaps between various creditor parties and guide the [TCC] in reaching a fully consensual plan." <u>Id.</u>; <u>see also</u> <u>id.</u> ¶ 11 (claiming TCC chose Brown Rudnick to assist in "bringing together historically divergent interests among the embers of the [TCC] to pursue a common settlement").

41. In fact, the record reflects that the TCC was "nearly equally divided" "[a]s of the formation of the [TCC]" (<u>id.</u> ¶ 11) on October 22, 2024, a month before Brown Rudnick's proposed retention by the TCC on November 18, 2024. Dkt. 613 ¶ 4 (TCC Nov. 21, 2024 statement). The TCC statement explains how the TCC "then set out to negotiate with [Red River] and Johnson & Johnson to improve the Plan and the plan and claims resolution process and limit the conditionality of the safety net of a reduced recovery deal in the unfortunate event that the Chapter 11 Case is dismissed as a result of an adverse appellate ruling." <u>Id.</u> at ¶ 5. "After weeks of intense negotiation," the "TCC accomplished its initial goal" and reached agreement with Red River and Johnson & Johnson "as reflected in the revised Memorandum of Understanding" (what become known as the "<u>Committee MOU</u>") filed by Red River on November 15, 2024 [Dkt. 560]. To the extent Brown Rudnick had any role in those negotiations

-21-

and entry into the Committee MOU, it did so as counsel to the Coalition; these events provide no contemporaneous or even after-the-fact support for Brown Rudnick's retention.

42. From the outset of its proposed retention through the remainder of the case, there was simply no meaningful role for Brown Rudnick to play on behalf of the TCC and no justification for the over $4 million it billed to the TCC and the estate.

## II. The Application Should Be Denied Even If Brown Rudnick Is Retained

### A. Brown Rudnick Is Not Disinterested

43. Even if Brown Rudnick is retained, the Application should be denied because Brown Rudnick was not disinterested for the reasons set forth above and therefore is not entitled to compensation pursuant to section 328 of the Bankruptcy Code. See 11 U.S.C. § 328(c) ("[T]he court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section . . . 1103 of this title if, at any time during such professional person's employment . . . such professional person is not a disinterested person. . . ."); see also Retention Obj., 16-17.

### B. Brown Rudnick's Services Were Improper, Unnecessary and Duplicative

44. Additionally, Brown Rudnick did not, nor could it, provide any services to the TCC that were not (a) subject to the TCC's own limitation and/or (b) entirely unnecessary and duplicative of services provided by Paul Hastings. Section 330 of the Bankruptcy Code governs awards of compensation and reimbursement of expenses for work performed on behalf of the estate. 11 U.S.C. § 330. Awards for compensation are limited to "actual, necessary services." 11 U.S.C. 330(a)(1)(A). Courts may not grant "compensation for (i) unnecessary duplication of services; or (ii) services that were not (I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case." 11 U.S.C. § 330(a)(4)(A).

NAI-5004291139

45.     To determine reasonableness, § 330(a)(3) of the Bankruptcy Code instructs that:

> the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
>
> (a) the time spent on such services;
>
> (b) the rates charged for such services;
>
> (c) whether the services were necessary to the administration of, or beneficial at the time at which such services were rendered toward the completion of, a case under this title;
>
> (d) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed;
>
> (e) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> (f) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

46.     Bankruptcy courts have "an independent duty to review fee applications, notwithstanding the absence of objections by the United States trustee, creditors, or any other interested party." In re Gobert, 2006 WL 3526775, at *4 (Bankr. S.D. Tex. Dec. 4, 2006) (referencing In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833 (3d Cir. 1994)).  A court cannot allow compensation for "(i) unnecessary duplication of services; or (ii) services that were not (I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case" pursuant to 11 U.S.C. § 330(a)(4)(A).  11 U.S.C. § 330(a)(4)(A);  In re Collida, 270 B.R. 209, 212 (Bankr. S.D. Tex. 2001) ("In the bankruptcy context, the judge must also consider whether the bankruptcy assets were administered as economically as possible and whether any of

-23-

the services rendered were duplicative or non-legal."); In re DeMarco, 2016 WL 899915, at *2 (Bankr. D.N.J. Feb. 9, 2016) (noting that "[t]he [Bankruptcy] Code expressly forbids compensation of unnecessarily duplicative services" and finding sufficient evidence to show that there were unnecessary duplicative services performed by attorneys); In re Hosp. Partners of Am., Inc., 597 B.R. 763, 766 (Bankr. D. Del. 2019) (noting that the "shall not" language in section 330(a)(4)(A) "limits" the court's discretion to award compensation); see also Busy Beaver, 19 F.3d at 856 (attorneys are obligated to exercise same billing judgment as nonbankruptcy attorneys and to write off unproductive or duplicative services); In re Digerati Techs., Inc., 537 B.R. 317, 331 (Bankr. S.D. Tex. 2015) (noting that the court must determine whether the services were objectively reasonable at the time they were performed).

47.     In the Fifth Circuit, the prevailing method for weighing the reasonableness of fees pursuant to section 330 of the Bankruptcy Code is the "lodestar" method.  Asarco, L.L.C. v. Jordan Hyden Womble Culbreth & Holzer, P.C. (In re Asarco, L.L.C.), 751 F.3d 291, 295 (5th Cir. 2014); In re Anloc, LLC, 2021 WL 5441076, at *3 (Bankr. S.D. Tex. Nov. 18, 2021); In re Skyport Glob. Commc'ns, Inc., 450 B.R. 637, 647 (Bankr. S.D. Tex. 2011).  The lodestar amount "is equal to the number of hours reasonably expended multiplied by the prevailing hourly rate in the community for similar work."  In re Pilgrim's Pride Corp., 690 F.3d 650, 655 (5th Cir. 2012) (internal citations omitted).  After making the lodestar calculation, bankruptcy courts have the discretion to adjust the lodestar upwards or downwards to reflect their consideration of the factors contained in section 330 and the Johnson factors.  Id. at 656.  The Johnson factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee

> is fixed or contingent; (7) time limitations imposed by the client or
> other circumstances; (8) the amount involved and the results
> obtained; (9) the experience, reputation, and ability of the attorneys;
> (10) the "undesirability" of the case; (11) the nature and length of
> the professional relationship with the client; and (12) awards in
> similar cases.

Johnson v. Ga. Highway Express, Inc., 488 F.2d 714, 717–19 (5th Cir. 1974).  The failure to

exercise appropriate billing judgment is addressed by reducing the fee award by a percentage

reduction.  In re Golden State Holdings, Inc., 2018 WL 6584900, at *6 (Bankr. S.D. Tex. Dec.

12, 2018).

48.     The applicant bears the burden of proving that it its fees were reasonable

and necessary.  Digerati Techs., 537 B.R. at 328; see also In re King, 546 B.R. 682, 712 (Bankr.

S.D. Tex. 2016) ("The applicant bears the burden of proof in a fee application case ... [and that]

[t]he reviewing court should not venture guesses nor undertake extensive investigation to justify

a fee for an attorney [ ] who has not done so himself." (citing Matter of Evangeline Refin. Co.,

890 F.2d 1312, 1326 (5th Cir. 1989)).  This burden is not to be taken lightly.  In re Wyche, 425

B.R. 779, 792 (Bankr. E.D. Va. 2010) (citations omitted); see also In re Spanjer Bros., Inc., 191

B.R. 738, 747 (Bankr. N.D. Ill. 1996).

49.     To satisfy its burden, an applicant must justify its charges with detailed,

specific, itemized documentation.  In re Baker, 374 B.R. 489, 494 (Bankr. E.D.N.Y. 2007); In re

Bennett Funding Grp., 213 B.R. 234, 244 (Bankr. N.D.N.Y. 1997).  Time records must be

detailed enough to enable a court to determine whether the attorneys are claiming compensation

for hours that are "redundant, excessive, or otherwise unnecessary."  See, e.g., Bennett Funding,

213 B.R. at 241 (citing Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)); see also In re Recycling

Indus., Inc., 243 B.R. 396, 401 (Bankr. D. Colo. 2000).  Further, while overstaffing and failure to

exercise billing judgment in and of themselves warrant reduction of fees, overstaffing a file often

-25-

also results in obvious duplication of time entries and reductions on that front as well.  Preston

Expl. Co., LP v. GSP, LLC, 2013 WL 3229678, at *9 (S.D. Tex. June 25, 2013).

50.     Courts within this jurisdiction have routinely disallowed fees that show an

unnecessary duplication of work, excessive work, and entries that were vague or redundant.  See

e.g., In re Mata, 2020 WL 6370347 (Bankr. S.D. Tex. Oct. 29, 2020) (reducing fees by 25% for

excessive billing); In re Cole, 2020 WL 4577236 (Bankr. S.D. Tex. Jul. 20, 2020) (applying a

25% reduction to time entries reflecting unnecessary duplication, excessive work or vague and

redundant descriptions, and a 20% reduction to entries for interoffice communications that are

vague or unreasonable); In re Lopez, 576 B.R. 84 (Bankr. S.D. Tex. 2017) (reducing fees by

20% for lumped billing and 20% for interoffice communications).

> **a.      At Least $2.3 Million of Brown Rudnick's Billings Concerned
> Litigation-Related Work That Far Exceeded the Stated
> Limited Purpose of Its Retention**

51.     Even if the Court were to accept Brown Rudnick's novel "peacemaker"

role—and Brown Rudnick's fitness to fill it—the firm's fees for work as TCC counsel far

exceeded this limited scope.  The Application includes the following chart categorizing Brown

Rudnick's nearly $4.3 million of legal fees into distinct "Matter Names."

| Matter No. | Matter Name | Fees | Costs | Total |
|---|---|---|---|---|
| 041043.0001 | CASE ADMINISTRATION/DISBURSEMENTS | 37,147.00 | 79,417.50 | 116,564.50 |
| 041043.0005 | MEETINGS OF AND COMMUNICATIONS WITH COMMITTEE/CREDITORS [B150] | 405,708.50 | 0.00 | 405,708.50 |
| 041043.0006 | MEETINGS OF AND COMMUNICATIONS WITH CO-COUNSEL | 40,291.00 | 0.00 | 40,291.00 |
| 041043.0007 | COMMITTEE GOVERNANCE AND ORGANIZATIONAL MATTERS | 26,899.00 | 0.00 | 26,899.00 |
| 041043.0008 | FEE/EMPLOYMENT APPLICATIONS [B160] | 106,651.00 | 0.00 | 106,651.00 |
| 041043.0009 | FEE/EMPLOYMENT OBJECTIONS [B170] | 115,446.00 | 0.00 | 115,446.00 |
| 041043.0010 | CONTESTED MATTERS/LITIGATION (GENERAL) [B190] | 1,494,291.50 | 0.00 | 1,494,291.50 |
| 041043.0011 | NON-WORKING TRAVEL @ 50% [B195] | 168,382.50 | 0.00 | 168,382.50 |
| 041043.0013 | CLAIMS ADMINISTRATION AND OBJECTIONS [B310] | 12,311.00 | 0.00 | 12,311.00 |
| 041043.0014 | PLAN AND DISCLOSURE STATEMENT [B320] | 657,833.50 | 0.00 | 657,833.50 |
| 041043.0015 | MEDIATION/SETTLEMENT [L160] | 365,112.00 | 0.00 | 365,112.00 |
| 041043.0016 | COURT ATTENDANCE [L450] | 832,993.50 | 0.00 | 832,993.50 |
| 041043.0017 | INJUNCTION LITIGATION IN ADVERSARY 23-01092 AND RELATED APPEALS | 15,183.50 | 0.00 | 15,183.50 |
| 041043.0018 | DISMISSAL/TRUSTEE/EXAMINER MATTERS | 19,150.50 | 0.00 | 19,150.50 |
| | **Total** | **4,297,400.50** | **79,417.50** | **4,376,818.00** |

| | | |
|---|---|---|
| Total Current Fees | | $4,297,400.50 |
| Total Current Costs | | $79,417.50 |
| **Total Invoice** | | **$4,376,818.00** |

52.     The vast majority of Brown Rudnick's legal fees relate to matters falling outside the putative "bridge-the-gap" purpose advanced to justify Brown Rudnick's retention as a second, primary bankruptcy counsel.  Even if one accepted the legitimacy of Brown Rudnick's work in that area—which Red River opposes for the reasons discussed above—only about $1 million of Brown Rudnick's fees (those included within the "Plan and Disclosure Statement" and "Mediation/Settlement" categories) fell within that role.  With no one policing the scope of its work, Brown Rudnick's work ballooned into a number of other matters, including litigation-focused matters where the firm was plainly conflicted due to its work for the Coalition.

53.     Brown Rudnick incurred $1,494,291.50 million in the Matter Name described as "Contested Matters/Litigation (General)"—by far its largest category of services—

and another $832,993.50 in the "Court Attendance" Matter Name.  The time entries in the Court Attendance category show that this work also related to litigation-related activities, such as attendance at hearings relating to "discovery motions," "discovery disputes," the preliminary injunction proceeding, "common interest issues," expert reports on voting and disclosure statement issues, and (most materially) attendance at the two-week confirmation hearing which, again, was dominated by litigation of motions Brown Rudnick filed on behalf of the Coalition.  All of these litigation-focused fees—totaling $2,327,285—are objectionable for at least three overarching reasons.

54.     <u>First,</u> Brown Rudnick's litigation-related work was rife with conflicts.  The $2,327,285 in fees related to the very motions that Brown Rudnick authored on behalf the Coalition.  These motions included the Coalition's motion to dismiss [Dkt. 44]; objection to the adequacy of Debtor's disclosure statement and solicitation and tabulation of votes [Dkt. 268]; motion to designate votes on the plan [Dkt. 265]; motion to reinstate votes improperly modified by the Smith Law Firm [Dkt. 266]; motion for a bar date [Dkt. 264]; and motion authorizing estimation [Dkt. 267] (collectively, the "<u>Opposition Motions</u>").  <u>See</u> Notice of Opposition, at 2-3.

55.     In its November 21, 2024 statement declaring support for the plan, the TCC stated that it "expects to file pleadings **objecting to** the relief sought in the Opposition Motions …."  Dkt. 613 ¶ 10 (emphasis added).  The multiple conflicts between the TCC and the Coalition—and the patent positional conflicts faced by Brown Rudnick—are no more apparent than with respect to the Opposition Motions.  Simply put, Brown Rudnick had no business billing time to the TCC (and, *a fortiori*, the estate) in connection with the contested proceedings it initiated while counsel for the Coalition.

56.     <u>Second</u>, presumably due to those obvious conflicts, Brown Rudnick's litigation-related work fell outside the scope of its retention by the TCC.  In a declaration filed in support of Brown Rudnick's retention, the TCC's co-chairs described the respective roles of their proposed counsel as follows:

> Each of the firms the TCC has proposed to retain serves a distinct purpose from the others.  The TCC has tasked SBEP with undertaking the lead role on administrative matters and day-to-day matters of the TCC.  The TCC has tasked Brown Rudnick and Paul Hastings with cooperatively providing lead legal services with respect to all bankruptcy matters, including negotiation, plan, and exit strategy.  The TCC has tasked Susman Godfrey and McKool Smith with cooperatively providing litigation support as necessary and directed by the TCC.

Dkt. 805-3 ¶ 7.

57.     Brown Rudnick's billings on litigation-related activities fell outside its role on "bankruptcy matters, including negotiation, plan, and exit strategy" and went far beyond the "bridge-the-gap" justification for its retention advanced by Brown Rudnick itself.  Dkt. 1442.  The co-chairs' declaration indicates that the litigation work would be done by other firms, namely Susman Godfrey and McKool Smith.  The substantial time spent on litigation services belies Brown Rudnick's efforts to describe (and justify) its representation as conciliatory and consensus building.

58.     <u>Third</u>, apart from merely observing the adjudication of the various Opposition Motions through discovery, pleadings, hearings, and the two-week confirmation trial, Brown Rudnick simply had no defined or useful role on the litigation-related matters.  Despite its substantial hearing and deposition attendance, no Brown Rudnick attorney on behalf of the TCC presented at trial (or a hearing, except for the introductory presentation), asked a question at a deposition, or, to the extent Red River can ascertain from their time records which are generally vague, was responsible for drafting any substantive pleading filed by the TCC.  In short, Brown

-29-

Rudnick billed at least $2.3 million to the TCC and the estate for the privilege of spectating at hearings and depositions in litigation it commenced. No rational paying client would ever sanction such waste.

        **b.**    **Brown Rudnick's Services Were Undeniably Duplicative of Paul Hastings'**

59.    Brown Rudnick's services were almost entirely duplicative of services already provided by Paul Hastings, which is unsurprising since the TCC explicitly sought to retain both firms to perform the same scope of services: "providing lead legal services with respect to all bankruptcy matters, including negotiation, plan, and exit strategy." Dkt. 805-3 ¶ 7 (TCC co-chairs' declaration). While the TCC co-chairs indicated that they "believe[d] that Brown Rudnick and other Proposed TCC Counsel have established an appropriate system to avoid duplication of work and services for the TCC," id. ¶ 8, no such system has ever been described and there is no evidence any system was ever deployed or followed. Nor is there any indication that the TCC actually "review[ed] all applications for compensation submitted by Brown Rudnick to ensure that Brown Rudnick's fees and costs are appropriate in scope and amount, and that there has been no unnecessary duplication of work among Proposed TCC Counsel." Id. ¶ 11.

60.    Instead, both Brown Rudnick and Paul Hastings attended the same hearings and depositions; reviewed the same pleadings, documents, and expert reports; counseled on the same plan amendments; attended the same mediation sessions; and attended and provided advice at the same committee meetings.

61.     For example, Brown Rudnick seeks compensation of over $750,000 for
hearing attendance and over $300,000 for deposition attendance alone.[11]  With respect to hearing
attendance, multiple Brown Rudnick timekeepers (and multiple Paul Hastings timekeepers) were
present at every hearing, as shown below.

| Hearing Date | Brown Rudnick Professionals Timekeepers in Attendance | Hours Billed to Hearing Attendance[12] | Paul Hastings Professionals Timekeepers in Attendance |
|---|---|---|---|
| 11/26/24 | 7 | 7.80 | 11 |
| 12/02/24 | 5 | 7.10 | 11 |
| 12/10/24 | 6 | 9.20 | 7 |
| 12/17/24 | 5 | 17.80 | 11 |
| 12/27/24 | 5 | 4.90 | 8 |
| 01/16/25 | 6 | 8.10 | 10 |
| 1/31/25 | 3 | 3.20 | 9 |
| 02/12/25 | 4 | 3.50 | 8 |
| 02/18/25 | 7 | 47.70 | 10 |
| 02/19/25 | 7 | 41.90 | 9 |
| 02/20/25 | 6 | 44.60 | 10 |
| 02/21/25 | 6 | 32.20 | 9 |
| 02/24/25 | 6 | 37.30 | 10 |
| 02/25/25 | 6 | 35.30 | 9 |
| 02/26/25 | 4 | 32.20 | 9 |
| 02/27/25 | 4 | 25.70 | 9 |
| 02/28/25 | 5 | 44.30 | 9 |

---

[11]     Certain entries referring to hearing and deposition attendance were lumped with other tasks.  The total of the entries including lumped amounts is approximately $380,000 for depositions and $775,000 for hearings.

[12]     Several timekeepers lumped their time entries for hearing preparation and attendance into one entry. General issues with Brown Rudnick's block billing and vague time entries are addressed below. Regardless, "[a]ny uncertainties due to poor record keeping are resolved against the applicant."  In re 530 W. 28th St., L.P., 2009 WL 4893287, at *8 (Bankr. S.D.N.Y. Dec. 11, 2009) (citing In re Poseidon Pools of Am., 216 B.R. 98, 100-01 (E.D.N.Y. 1997)).

62.     Similarly, three or more Brown Rudnick timekeepers attended many of the

depositions, at almost all of which Paul Hastings attorneys were also present, as shown below.

| Date | Deponent | Brown Rudnick Professionals Timekeepers in Attendance[13] | Paul Hastings Professionals Timekeepers in Attendance |
|------|----------|-----------------------------------------------------------|-------------------------------------------------------|
| 11/19/24 | Dickinson | 1 | 2 |
| 11/21/24 | Birchfield | 3 | 6 |
| 11/21/24 | Smith | 3 | 2 |
| 11/21/24 | Lisman | 2 | 1 |
| 11/22/24 | Kenvue | 3 | 4 |
| 11/23/24 | Murdica | 2 | 5 |
| 11/25/24 | Haas | 6 | 7 |
| 11/26/24 | Onder | 5 | 8 |
| 12/09/24 | Pulaski | 4 | 3 |
| 12/09/24 | Nachawati | 5 | 3 |
| 12/10/24 | Papantonio | 3 | 4 |
| 12/16/24 | Andrews | 7 | 6 |
| 12/23/24 | Golomb | 7 | 6 |
| 01/23/25 | Morelli | 2 | 8 |
| 01/31/25 | Hilsee | 1 | 3 |
| 02/03/25 | Mullin | 5 | 3 |
| 02/03/25 | Stubbs | 1 | 1 |
| 02/04/25 | Adham | 1 | 1 |
| 02/04/25 | LaPalo | 0 | 2 |
| 02/04/25 | Babbe | 2 | 2 |
| 02/04/25 | Scarcella | 3 | 1 |
| 02/04/25 | Gentle | 3 | 2 |
| 02/05/25 | Goswami | 1 | 0 |

---

[13]     There may have been additional Brown Rudnick professionals present at a deposition, but Red River cannot confirm because Brown Rudnick's billing records are vague on days when multiple depositions occurred.

| Date | Deponent | Brown Rudnick Professionals Timekeepers in Attendance[13] | Paul Hastings Professionals Timekeepers in Attendance |
|---|---|---|---|
| 02/05/25 | Seldomridge | 1 | 3 |
| 02/05/25 | Wolf | 0 | 2 |
| 02/06/25 | Evans | 4 | 2 |
| 02/07/25 | Kessler | 1 | 2 |
| 02/07/25 | Wheatman | 3 | 0 |
| 02/07/25 | Powley | 1 | 0 |
| 02/07/25 | Austin | 3 | 6 |
| 02/11/25 | Hale | 0 | 3 |
| 02/12/25 | Thornburg | 1 | 0 |
| 02/12/25 | Singer | 4 | 2 |
| 02/12/25 | Erikson | 1 | 2 |

63.     Despite its substantial hearing and deposition attendance, no Brown Rudnick attorney on behalf of the TCC presented at trial (or a hearing, except for the introductory presentation), asked a question at a deposition, or, to the extent Red River can ascertain from Brown Rudnick's time records, which are generally vague, was responsible for drafting any non-administrative pleading filed by the TCC.  Brown Rudnick also seeks nearly $170,000 for non-working travel—and this is at the required 50% reduced rate.  In total, Brown Rudnick seeks over $1.2 million for this time—which was unnecessary given the TCC-directed limitation on Brown Rudnick's role and the overlap with the services provided by Paul Hastings.

64.     Brown Rudnick also spent over 250 hours meeting and communicating with claimants, including through daily TCC updates, at a cost of over $400,000.  Given the limitations imposed by the TCC on Brown Rudnick's role as well as Paul Hastings' attendance at some or all of these meetings, the time spent by Brown Rudnick communicating with the TCC and preparing for those communications was likewise unnecessary.

NAI-5004291139

65.     Additionally, there was no benefit to the TCC or the estate in having a conflicted Brown Rudnick attend mediation sessions, at a cost of approximately $365,000, not including related expenses, involving current and purportedly former clients that had opposing views on both the case and the plan.  Similarly, given its representation of the Coalition and the limitation imposed by the TCC, Brown Rudnick could not effectively provide any substantive services to the TCC with respect to the plan, let alone $650,000 in services for which Brown Rudnick seeks compensation.

66.     None of the services provided by Brown Rudnick was necessary or appropriate given that Paul Hastings, not Brown Rudnick, was charged with advising the TCC on virtually every substantive matter to be addressed in the case.  Paul Hastings could (and did) provide all the services the TCC needed with respect to litigation, the plan and mediation.  Not only was Brown Rudnick conflicted, its services were not needed by the TCC.

67.     In sum, the Application confirms that Brown Rudnick should not be retained, and regardless of whether or not it is retained, the Application should be denied in its entirety because Brown Rudnick is not disinterested and it did not, nor could it, provide any services to the TCC that were either not (a) subject to the TCC's limitation or (b) entirely unnecessary and duplicative of services provided by Paul Hastings.

### c.     Multiple Attendees

68.     Even assuming some services by Brown Rudnick were appropriate (they were not), Brown Rudnick's time records reveal that an excessive number of Brown Rudnick professionals were present at multiple conference calls and meetings.  While it may be appropriate to have multiple professionals attend some meetings, conferences, hearings or other events, the applicant bears the burden to justify overlapping staffing and to identify each participant's role.  See, e.g., In re Brous, 370 B.R. 563, 575 (Bankr. S.D.N.Y. 2007); see also In

NAI-5004291139

re Kohl, 421 B.R. 115, 128 (Bankr. S.D.N.Y. 2009) ("[T]he applicant must give an adequate

explanation for more than a single attorney charging for internal meetings . . . .  An applicant can

meet this standard by identifying the other participants and explaining the nature and purpose of

the meeting."); In re Fleming Cos., Inc., 304 B.R. 85, 91 (Bankr. D. Del. 2003) (reducing fees

where professional failed to adequately demonstrate that each attorney present at hearing

contributed to the hearing in a meaningful way).

69.     In addition to the multiple attendees at hearings, trial and depositions

referenced above, multiple Brown Rudnick professionals attended committee meetings, internal

strategy sessions, calls with co-counsel and mediation sessions at a cost to the estate of

approximately $400,000.[14]  For example, four Brown Rudnick professionals attended a

mediation session without any explanation as to why so many professionals were necessary.

70.     Entries that appear to demonstrate excessive attendance by Brown

Rudnick professionals are detailed in Exhibit A attached hereto.[15]

> **d.     Brown Rudnick Professionals Should Not Be Compensated for Unnecessary or Incorrectly Invoiced Fees Incurred After the Combined Hearing**

71.     Between March 3, 2025 and March 31, 2025, an associate billed

approximately $9,232.00 to the estate for drafting "daily committee update."  There was no

reason for Brown Rudnick to draft daily committee updates following the combined hearing.  In

addition, Brown Rudnick's professionals billed for activities that do not appear to have been

---

[14]     This figure does not account for the participation of multiple attorneys at hearings, trial and depositions.

[15]     Because attendees frequently are not identified in Brown Rudnick's invoices, Red River could not always determine with certainty the extent to which various timekeepers were in fact attending the same call or meeting.

NAI-5004291139

related to Red River.  For example, on March 3, after the conclusion of the combined hearing, a partner billed the estate to "listen to closings."  <u>See</u> Application, 170.

72.     Examples of time records reflecting unnecessary or seemingly incorrectly invoiced fees incurred after the combined hearing are attached as <u>Exhibit B</u> hereto.

### e.     Brown Rudnick's Invoices Are Replete with Block Billing, Lumping and Vague Time Entries

73.     The Application has a significant number of time entries that reflect "block billing" or "lumping" and contain vague descriptions of the work performed.  A professional is required to bill each task separately, and billing records must clearly identify each discrete task performed and the precise amount of time spent.  <u>In re Hight</u>, 393 B.R. 484, 506 (Bankr. S.D. Tex. 2008) ("[A]ny billing records provided with an application should clearly identify each discrete task billed, indicate the date the task was performed, the precise amount of time spent . . . , who performed the task, their level of experience and that person's hourly rate.") (internal citations omitted); <u>see</u> <u>also</u> <u>Baker</u>, 374 B.R. at 494; <u>In re Fibermark, Inc.</u>, 349 B.R. 385, 395 (Bankr. D. Vt. 2006).  This permits a court to scrutinize the reasonableness of the time expended and allows the professionals to avoid the temptation to inflate the actual time spent by grouping multiple tasks together and camouflaging the true length of an individual task.  <u>See</u> <u>Molefi v. Oppenheimer Tr.</u>, 2007 WL 538547, at *7 (E.D.N.Y. Feb. 15, 2007).[16]

74.     Likewise, time entries must provide a description sufficient to ascertain the discrete task each professional performed.  Entries that contain vague characterizations of the

---

[16]     The United States Trustee's large case guidelines address block billing and lumping. "*Block billing or lumping*: Whether the entries in the application are recorded in increments of .1 of an hour and whether discrete tasks are recorded separately.  The United States Trustee will object to block billing or lumping." Appendix B—*Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under United States Code by Attorneys in Larger Chapter 11 Cases*, 78 Fed. Reg. 36250 (June 17, 2013) (the "<u>U.S. Trustee Guidelines</u>").

services performed, such as "emails re disputes," "attention to"[17] and "numerous calls and emails" fail to adequately describe the services provided and are routinely disallowed.  See Digerati Techs., Inc., 537 B.R. at 333 ("Time entries that do not provide sufficient detail to determine whether the services described are compensable may be disallowed due to vagueness."); see also Malden Mills Indus., 281 B.R. 493, 498 (Bankr. D. Mass. 2002).  A timekeeper fails to sustain his or her burden of proving that his or her fees are reasonable when a timekeeper block bills or utilizes vague time entries.  See Anloc, 2021 WL 5441076, at *7; In re Brous, 370 B.R. at 576.

75.     Brown Rudnick's Application is replete with instances of block billing, lumping, and vague billing entries, including significant time attributed to internal communications or meetings where attendees are not specified.

76.     These vague entries include an entry on **September 21, 2024** in which a partner billed for "conference call with co-counsel regarding case status."  Not only is this entry impermissibly vague, it predates the formation of the TCC by approximately one month and Brown Rudnick's engagement by the TCC by nearly two months.

**f.      Improper Rate Increases**

77.     The U.S. Trustee Guidelines provide that the United States Trustee may object to a fee application if an applicant fails to justify any rate increases as reasonable.[18]  "Rate increases" exclude annual "step increases," which step increases are based on compensation awarded to attorneys in the ordinary course due to advancing seniority and promotion.  Rate

---

[17]     The United States Trustee may object to vague or repetitive entries that are otherwise unjustified.  Phrases like 'attention to' or 'review file,' without greater specificity or more detail, are generally insufficient."  Id. at B.h.i.

[18]     Id. at B.2.d.

increases require specific disclosure and explanation as to why such increase is reasonable.  Rate increases should not be characterized as "step increases" in order to "thwart meaningful disclosure or billing discipline."[19]  Firms that do not distinguish between step increases and other rate increases must disclose and justify all increases.[20]

78.     The hourly rate for one Brown Rudnick professional was increased three times during the chapter 11 case, including twice after January 2025.[21]  While a single annual rate adjustment may be a reasonable "step increase," multiple increases within such a short timeframe suggest a rate increase that, without further disclosure and justification as to reasonableness, is not appropriate.

### g.     Excessive Expenses

79.     To be reimbursed expenses must be "actual" and "necessary." 11 U.S.C. § 330(a)(1)(B).  "This provision reflects Congress' intent to protect the estate from excessive and unreasonable expenditures."  Fleming Cos., 304 B.R. at 99.  Examples of excessive or otherwise unreasonable expenses for which Brown Rudnick seeks reimbursement are provided in Exhibit C attached hereto.

80.     As stated above, Brown Rudnick's request for expense reimbursement should be denied because Brown Rudnick should not be retained.  However, even if Brown Rudnick is retained, its expenses should not be reimbursed because they were incurred in support of unnecessary, inappropriate and duplicative services.[22]

---

[19]     Id. at B.2.d n.2

[20]     Id.

[21]     See Application, Ex. D.  For example, Application at 61 (showing 2024 hourly rate of $1,200); Id. at 66 (showing January 2025 hourly rate of $1,290); Id. at 68 (showing February 2025 hourly rate of $1,610).

[22]     The U.S. Trustee Guidelines also address "[c]ontents of application for reimbursement of reasonable, actual, and necessary expenses."  Each expense should include:  amount, description and pertinent detail, date incurred, who incurred the expense and reason for the expense.  See U.S. Trustee Guidelines C.13.

NAI-5004291139

81.     Brown Rudnick's travel-related expenses, including meals, airfare and related fees, hotels and ground transportation, in particular, were both excessive and unnecessary.  For example, Brown Rudnick's professionals spent over $5,000 on meals while traveling, many of which are not attributed to any attorneys or are only attributed to a single attorney.  Of the approximately $5,000 in meal expenses, Brown Rudnick seeks reimbursement of $1,813.57 for meals attributed to a single attorney (with no indication of other attendees), and a number of the meals were $100 or more with some as high as $400.

82.     Additionally, Brown Rudnick seeks reimbursement for nearly $28,000 in airfare expenses, with many flights from Newark to Houston costing close to or exceeding $1,000 roundtrip, when the average cost of roundtrip airfare from Newark to Houston typically is $500 or less.  Indeed, on February 21, it appears that Brown Rudnick attorneys (the invoices do not identify who incurred the expenses) charged for two separate airfares from Houston to Newark—one nearly $800 and the other approximately $200.  Brown Rudnick also seeks reimbursement of over $10,000 (slightly over a third of their total requested airfare expense) for one attorney's airfare during the period of the combined hearing.  And the expenses are not detailed, preventing assessment of the propriety of individual fares based on, for example, departure and arrival cities or class of airfare).

83.     In addition, Brown Rudnick seeks reimbursement for travel that appears unrelated to Red River's chapter 11 case.  For example, Brown Rudnick seeks reimbursement for travel between Cleveland and New York (roundtrip) ($628.94) on January 14, 2025; from Charleston to Charlotte to Cleveland on February 14, 2025 ($163.18);[23] from Newark to Atlanta

---

[23]     Brown Rudnick separately seeks reimbursement for airfare from Cleveland to Washington, D.C. on the same day ($163.18).

($363.48) on February 14, 2025; between Cleveland and Washington D.C. (roundtrip) on February 14, 2025; between Cleveland and New York (roundtrip), on March 9, 2025 ($184.48); from Houston to Cleveland on March 3, 2025 ($134) and from Houston to Cleveland (roundtrip) on March 1, 2025 ($538.97).

84.     Brown Rudnick's professionals have also impermissibly requested reimbursement for personal items and non-essential expenses.  For example, one partner has requested reimbursement of $59.75 for a wall charger while another has requested $50.00 for a hotel lounge fee.

85.     Finally, Brown Rudnick is seeking reimbursement for expenses that were incurred before Brown Rudnick withdrew from representing the Coalition and commenced services for the TCC.  For example, Brown Rudnick seeks reimbursement of $232.42 for travel through Elite Limousine Plus, Inc. for two trips, one occurring on October 21, 2024 and the other occurring on October 22, 2024.  It also seeks reimbursement of $1,623.94 in Grubhub expenses incurred on October 28, 2024.  Finally, Brown Rudnick seeks reimbursement of nearly $1,350 for Westlaw research-related expenses that appear to have been incurred on November 13 and 14.  All of these expenses were incurred before Brown Rudnick withdrew from its representation of the Coalition.

## **CONCLUSION**

For the reasons set forth above, Red River respectfully requests that the Court (i) enter the order substantially in the form attached hereto denying the Application; and (ii) grant such other and further relief to Red River as the Court may deem just and proper.

[*Remainder of Page Intentionally Left Blank*]

Dated:  October 10, 2025
Houston, Texas

Respectfully submitted,

*/s/ John F. Higgins*
John F. Higgins (TX 09597500)
M. Shane Johnson (TX 24083263)
Megan Young-John (TX 24088700)
James A. Keefe (TX 24122842)
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile:  (713) 228-1331
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
jkeefe@porterhedges.com

Gregory M. Gordon (TX 08435300)
Dan B. Prieto (TX 24048744)
David S. Torborg (DC 475598) (*pro hac vice*)
Amanda Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone:  (214) 220-3939
Facsimile:   (214) 969-5100
gmgordon@jonesday.com
dbprieto@jonesday.com
bberens@jonesday.com
asrush@jonesday.com

ATTORNEYS FOR RED RIVER
TALC LLC

## Certificate of Service

I certify that on October 10, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*
John F. Higgins

NAI-5004291139