**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| RED RIVER TALC, LLC,[1] | Case No. 24-90505 (CML) |
| Debtor. |  |

**RESPONSE OF BROWN RUDNICK LLP TO RED RIVER TALC LLC'S**
**OBJECTION TO BROWN RUDNICK LLP'S FINAL FEE APPLICATION**

(Related to Docket Nos. 1444 and 1493)

Brown Rudnick LLP ("Brown Rudnick"), proposed co-counsel to the Official Committee of

Talc Claimants (the "Committee") in the above-captioned chapter 11 case, hereby submits this

response (the "Response") in further support of the *Final Fee Application of Brown Rudnick LLP as*

*Co-Counsel to the Official Committee of Talc Claimants for the Period from November 18, 2024*

*Through and Including March 31, 2025* [Dkt. No. 1444] (the "Fee Application") and in response to

*Red River Talc LLC's Objection to Brown Rudnick LLP's Final Fee Application* [Dkt. No. 1493]

(the "Fee Objection"), and respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.      The Committee selected Brown Rudnick as its co-lead[2] counsel in part because Brown

Rudnick's prior representations made it uniquely qualified to facilitate discussions and negotiations

between the supporters and opponents of the Debtor's plan.  This made sense because the Committee

---

[1]    The last four digits of the debtor's federal tax identification number are 8508.  The Debtor's mailing
address is 501 George Street, New Brunswick, NJ 08933.

[2]    The Debtor, contrary to the Committee's designation of Brown Rudnick and Paul Hastings LLP ("Paul
Hastings") as co-counsel to the Committee, refers to Paul Hastings as "lead counsel" for the Committee,
ignoring the fact that Paul Hastings itself recognized Brown Rudnick as co-counsel.  *See, e.g.*, Nov. 26,
2024 Hr'g. Tr. at 10:14-16 ("The roles that we all share are that Brown Rudnick and Paul Hastings are co-
lead counsel to the creditors committee."); Nov. 26, 2024 Hr'g. Tr. at 14:12-14 ("I'll give Mr. Molton at
Brown Rudnick an opportunity to address the Court as well since we serve as co-counsel.")

itself was comprised of members who opposed the plan, including two who were clients of former members of the Coalition of Counsel for Justice for Talc Claimants (the "Coalition"), as well as members who were clients of members of the Ad Hoc Committee of Supporting Counsel (the "AHC"), which supported the plan and executed plan support agreements.

2.      Johnson & Johnson ("J&J") may have preferred that the Committee retain Paul Hastings—counsel to the AHC since before the second LTL bankruptcy—as its sole bankruptcy counsel given the role the AHC played in the negotiations over the Debtor's plan, but the choice of counsel was a decision for the Committee to make.

3.      The Committee chose to retain Brown Rudnick and Paul Hastings as co-lead counsel. This decision reflected the Committee's interest is having balanced guidance consistent with the Committee's fiduciary duty to represent the interests of all creditors holding talc claims in this case.

4.      The Committee timely filed its application to approve Brown Rudnick's retention. Brown Rudnick attempted to set a hearing on its retention application.  *See* Dkt. No. 805 (the "Retention Application").  Brown Rudnick's retention by the Committee did not violate the Bankruptcy Code or ethical rules.  The Committee's employment of Brown Rudnick as co-lead counsel served a valid purpose.  Brown Rudnick is disinterested, and its services to the Committee were proper and were not unnecessary or duplicative.  The Debtor's objection should be overruled.

## RESPONSE

## I.    The Debtor's Objections to Brown Rudnick's Fee Application Should Be Overruled

5.      The Debtor devotes much of its objection to re-hashing its arguments against Brown Rudnick's retention.[3]  The Debtor's allegations are unsubstantiated and should have been raised in

---

[3]     *See Debtor's Omnibus Objection to the Official Committee of Talc Claimants' Applications to Retain Certain Law Firms* [Dkt. No. 895] (the "Retention Objection").

the Retention Objection.  For the reasons set forth in the Committee's response (*see* Dkt. No. 1447, the "<u>Retention Response</u>"), Brown Rudnick's retention and Fee Application should be approved.

**A.    Brown Rudnick Has Standing to Continue Pursuit of Its Retention and the Post-Dismissal Timing of the Hearing Does not Bar It From Seeking Compensation**

6.    The Debtor's opening argument against both Brown Rudnick's retention and its application for compensation—that Brown Rudnick has no standing to pursue such relief—flouts this Court's explicit finding that there is no "legal basis to deny considering pending retention applications and, if approved, final fee applications." *Order Regarding Retention and Final Fee Applications* [Dkt. No. 1484] (the "<u>Post-Dismissal Retention and Fee Order</u>") .

7.    Citing section 1103(a) of the Bankruptcy Code, the Debtor alleges that Brown Rudnick cannot be retained because Brown Rudnick lacks standing to seek its own retention (this argument, and all of the Debtor's elucidations regarding it, would equally apply to Paul Hastings here, but the Debtor has not objected to Paul Hastings' retention).  *See* Fee Objection at ¶ 1, n. 2.  Putting aside the law-of-the-case established in the Post-Dismissal Retention and Fee Order, it was the Committee, in compliance with section 1103(a), that moved to retain Brown Rudnick as co-lead bankruptcy counsel. Nothing in section 1103(a) disqualifies the Retention Application filed by the Committee simply because this Court did not hear it—through no fault of the Committee or Brown Rudnick—prior to the Court's dismissal of the case.  The Debtor fails to address, much less refute, the clear law-of-the-case establishing Brown Rudnick's standing to prosecute these applications.

8.    The Debtor asserts that Brown Rudnick provided its services to the TCC as a "gratuitous volunteer."  Fee Objection at n.2.  But the two cases the Debtor cites to support this contention do not support the Debtor's argument.  *Id*.

9.    **Coleman**.  The first case, *In re Coleman*, concerned retention and fee applications filed by a firm *after* the chapter 11 case of the debtor that the firm purported to represent was converted to a chapter 7 case.  655 B.R. 441, 443–45 (Bankr. N.D. Miss. 2023).  In *Coleman*, the

debtor obtained court approval for the lawyer who had filed its chapter 11 petition. *Id*. at 443-444. The debtor also disclosed that it had paid a $25,000 prepetition retainer to a second law firm that assisted it with property sales before and after the chapter 11 case was filed. *Id*. After conversion and without seeking court approval for its retention during the chapter 11 case, the second firm that handled the property sales filed its retention and fee applications, claiming it had served as co-counsel for the debtor during the chapter 11 case. *Id*. at 445.

10.     Here, the Committee timely filed the Retention Application for Brown Rudnick on December 18, 2024, more than three months ***before*** the case was dismissed. The Court postponed setting a hearing date for Brown Rudnick's Retention Application. This is not a situation where an official committee or its chosen counsel failed to act timely.

11.     **Singson**. In the second case, *Matter of Singson*, the Court had appointed a chapter 7 trustee with the power to act as his own attorney. 41 F.3d 316, 318 (7th Cir. 1994). The trustee sought and obtained court approval to employ another law firm as special counsel for the purpose of opposing the debtor's attempt to exclude pension assets from the bankruptcy estate. *Id*.

12.     The trustee and special counsel, however, treated the order as authorizing special counsel to act as general counsel for the estate. *Id*. In response to the U.S. Trustee's objection to special counsel's fees beyond the pension asset matter, the trustee sought to have the Court retroactively approve special counsel's role as general counsel. *Id*.

13.     Here, Brown Rudnick was not employed as special counsel. And there is no request to retroactively expand the scope of Brown Rudnick's representation of the Committee. Moreover, the Debtor cannot credibly claim that it lacked notice of the Committee's intention to retain Brown

Rudnick as co-lead counsel, as the Debtor's counsel made it clear to the Court that the Debtor was plotting against Brown Rudnick's retention even before the Retention Application was filed.[4]

14.     It is worth noting that, like the retentions of Brown Rudnick and the other proposed Committee professionals, the Court did not approve the Debtor's retention of Jones Day or the Committee's retention of Paul Hastings during the chapter 11 case.  By the Debtor's own logic, Jones Day and Paul Hastings both acted as gratuitous volunteers and, therefore, cannot be retained or compensated for their work by the Debtor's estate.  But, tellingly, the Debtor has not suggested that Jones Day or Paul Hastings were acting as a gratuitous volunteers.

### B.     Brown Rudnick's Retention Did Not Violate the Bankruptcy Code or Applicable State Ethical Rules

15.     The Debtor's Fee Objection repeats the Debtor's unsubstantiated allegations in the Retention Objection that Brown Rudnick's prior representation of the Coalition meant that it held an interest adverse to the Committee, that Brown Rudnick was not disinterested, and that such purported lack of disinterestedness cannot be cured by consent or waiver.  *See* Fee Objection at ¶ 22.

16.     The Committee refuted such allegations in its Retention Response.  Contrary to the Debtor's allegations, Brown Rudnick's prior representation of the Coalition and the fact that certain Coalition law firms owed Brown Rudnick fees did not create an adverse interest.

17.     The Committee was appointed to represent the interests of all talc claimants, and as was clear from before this case was commenced, there was a vocal group of talc claimants who opposed the Debtor's plan, including some of the members the United States Trustee appointed to the Committee.  Chief among the concerns raised by the Coalition from this chapter 11 case's inception was that the discharge or release that the Debtor sought for J&J and numerous other entities was

---

4     *See* Nov. 26, 2024 Hr'g. Tr. at 16:18-24 ("And I would say further that it has a particular concern with the Brown Rudnick firm representing it, particularly given the -- you know, the remarks and the positions that the Brown Rudnick firm took on behalf of the Coalition.  So I did want to say that, for the record, that, you know, the debtor would intend to object to Brown Rudnick's retention, in particular.").

outside the scope of section 524(g).  This made the Debtor's and J&J's proposed settlement illusory since J&J never agreed to fund absent a complete discharge of its and others' independent talc liability.

18.     The talc claimants were not united in support of or opposition to the Debtor's plan. Even those who favored a settlement could not rationally support a bankruptcy process that would never result in settlement payments being made.  It was not in the talc claimants' interest to be denied compensation for years while J&J tried to accomplish a legally impossible objective.

> **i.      The Committee's Retention of Brown**
> **Rudnick Is Not Prohibited by the Bankruptcy Code**

19.     The Committee's retention of Brown Rudnick is not prohibited by the Bankruptcy Code.  Section 1103 states that "[r]epresentation of one or more creditors of the same class represented by the committee shall not per se constitute the representation of an adverse interest." 11 U.S.C. §1103(b).  Notwithstanding that the Bankruptcy Code provides that even *concurrent* representation of a creditor within the class represented by a committee should not be presumed to be adverse to the committee, the Debtor continues to argue that Brown Rudnick's *past* representation of clients that took positions adverse *to the Debtor* before the Committee existed should impute adversity to the Committee on Brown Rudnick.

20.     Further, section 1103(b) is not violated if a law firm represents an entity with an adverse interest in a matter that *pre-dates* the law firm's representation of the Committee.  *See In re Enron Corp.*, No. 02 Civ. 5638 (BSJ), 2003 WL 223455, at *7 (S.D.N.Y. Feb. 3, 2003).

21.     While the Coalition advanced positions adverse to the Debtor prior to Brown Rudnick's withdrawal as counsel to the Coalition, the Coalition did not take any positions adverse *to the Committee* during that time.  In fact, the last time Mr. Molton of Brown Rudnick addressed the Court on behalf of the *Coalition*, it was *in support* of the first motion filed by the *Committee*. *See* Oct. 30, 2024 Hr'g. Tr. at 21:23-22:15.  Further, and as explained in the Retention Response, the

Coalition's interest in reaching a consensual settlement in this case was substantially aligned with the Committee's interests throughout the case, as evidenced by the parties' participations in mediated negotiations in an effort to reach a consensus.

22.     Brown Rudnick is also "disinterested" as defined in section 101(14) of the Bankruptcy Code.  Section 101(14) is concerned with a lack of disinterestedness as a result of a professional's "direct or indirect relationship to, connection with, or interest in, *the debtor*." 11 U.S.C. § 101(14)(C) (emphasis added).  Here, there is no such connection—Brown Rudnick's loyalty to the Committee *rather than to the Debtor* has never been questioned.  While a disqualifying lack of disinterestedness could result from a professional being owed compensation from the Debtor, it could not be a result of being owed compensation by a group that represented a significant number of the Committee's constituents.

23.     The legal fees and expenses due Brown Rudnick by the Coalition for previous work do not create an adverse interest or prevent Brown Rudnick from being disinterested or impartially and vigorously representing the Committee.   Generally, an "adverse interest" takes the form of a competing economic interest tending to diminish estate values or to create a potential or actual dispute in which the estate is a rival claimant.  *See In re TWI International, Inc. v. Vanguard Oil and Service Co.,* 162 B.R. 672, 675 (S.D.N.Y.1994).  But Brown Rudnick was not a rival claimant.

24.     To state the obvious:  Brown Rudnick was not a creditor of the Debtor.  Payment of Brown Rudnick's past fees by the Coalition pursuant to the engagement letter executed by Coalition members would not divert funds that would otherwise be available to the Debtor to pay other creditors, nor would it diminish the Debtor's estate in any way.

### ii.     The Committee's Retention of Brown Rudnick Does Not Violate Any Ethical Rules

25.     The Debtor's allegations that Brown Rudnick's retention does not comply with applicable state ethical rules are similarly unavailing.  *See* Fee Objection at ¶ 22.  The Debtor

repeatedly references the "hot potato" doctrine to characterize Brown Rudnick's retention—*id.* at ¶¶ 4, 8 & 24—but Brown Rudnick's retention does not implicate this doctrine.

26.     In *Santacroce v. Neff*, the Court held that "[a]n attorney may not drop one client like a 'hot potato' in order to avoid a conflict with another, more remunerative client."  134 F. Supp. 2d 366, 370 (D.N.J. 2001).  Similarly, in *ValuePart, Inc. v. Clements*, the Court held that "[w]hen a lawyer or law firm suddenly finds itself in a situation of simultaneously representing clients who either are presently adverse or are on the verge of becoming adverse, it may not simply to drop one client 'like a hot potato' in order to treat it as though it were a former client for the purpose of resolving a conflict of interest dispute."  No. 06 C 2709, 2006 WL 2252541, at *2 (N.D. Ill. Aug. 2, 2006).

27.     The Debtor asserts that Brown Rudnick dropped the Coalition "for the purpose of resolving a conflict of interest dispute" or "because it perceived the TCC representation to be more lucrative."  *See* Fee Objection at ¶ 24.  But Brown Rudnick did not "drop" the Coalition.

28.     As discussed in the Retention Application, the Coalition engaged Brown Rudnick with the explicit expectation and understanding that Brown Rudnick's representation would run through the formation of an official committee in this case.  *See* Retention Application at ¶ 19.

29.     Contrary to the Debtor's allegation that "[n]othing in the record establishes that the Coalition contemplated Brown Rudnick's representation would end in the middle of litigation Brown Rudnick was spearheading," *see* Fee Objection at ¶ 26, the timing of the termination of Brown Rudnick's engagement as Coalition counsel was consistent with the written, documented expectations of all parties to the Coalition's engagement of Brown Rudnick, as disclosed.  *See* Retention Application at ¶ 19.

30.     The Debtor also states, without any basis in fact, that "**two days** after the TCC determined to support the plan by entering into a memorandum of understanding with the Debtor, *see* Dkt. No. 560, Brown Rudnick suddenly dropped its representation of the Coalition to seek

retention by the TCC notwithstanding its previous staunch opposition to the plan and the chapter 11 case." Fee Objection at 3 (emphasis in original).

31.     But, as noted above, the Coalition expected Brown Rudnick to seek representation of an official committee this case.  Moreover, contrary to the Debtor's made-up facts, the Committee notified Brown Rudnick on November 14, 2024—a day *before* the Debtor filed the Memorandum of Understanding—that the Committee wanted to retain Brown Rudnick and Paul Hastings as co-counsel.  Obviously, this had no impact whatsoever on the Committee's decision to retain Brown Rudnick as the selection process began before the Debtor's November 15, 2024 filing of the Memorandum of Understanding.

32.     The Debtor's citation to Texas Professional Rule 1.06 is also inapposite, *see* Fee Objection at ¶ 27, because Brown Rudnick did not represent "opposing parties" in the chapter 11 case.  Nor were the interests of the Coalition, Brown Rudnick's *former* client, materially adverse to the interests of the Committee, as explained in detail in the Retention Response.

33.     The Debtor questions whether Brown Rudnick actually received a waiver from the Coalition, *see* Fee Objection at ¶ 29, notwithstanding that Brown Rudnick previously submitted a sworn declaration stating that "[a]ll members of the Coalition as of the Petition Date have consented to Brown Rudnick's engagement by the TCC and have agreed in writing to waive any potential conflicts that could arise as a result of Brown Rudnick's representations of the TCC."[5]

34.     The existence of such waivers is undisputed.  Brown Rudnick produced copies of the executed waivers in response to the Debtor's October 2, 2025 document requests.  The Committee evaluated the potential conflict issue raised by Brown Rudnick's retention and was satisfied that Brown Rudnick does not hold any interest adverse to the Committee.

---

[5]     *See Declaration of Susan Sieger-Grimm in Support of Application for Order Authorizing the Employment and Retention of Brown Rudnick LLP as Co-Counsel for the Official Committee of Talc Claimants Nunc Pro Tunc to November 18, 2024* [Dkt. 805-2] (the "Sieger-Grimm Declaration") at ¶ 13.

35.     Contrary to the Debtor's allegation, the decision to task Paul Hastings with leading consideration of, or response to, any Coalition pleadings filed before Brown Rudnick withdrew from its representation of the Coalition does not show that Brown Rudnick had a conflict. *See* Fee Objection at ¶ 33. Rather, as explained in the Retention Response, this decision was made in an abundance of caution and to avoid even the appearance of impropriety. Retention Response at 7, 14.

36.     Moreover, any conflict caused by Brown Rudnick's opposition to such Coalition pleadings would have been as to the Coalition, and any such conflict was waived by all firms that were members of the Coalition as of the Petition Date.

37.     It is worth noting that the Debtor has not raised any concerns regarding Paul Hastings' representation of the Committee given Paul Hastings' role in negotiating various aspects of the Debtor's plan as AHC counsel in the months leading up to the bankruptcy filing.

38.     Paul Hastings, as AHC counsel, had the opportunity to urge J&J to propose a chapter 11 plan that did not include non-consensual third-party releases, and to advise the AHC of the risks of supporting a settlement that was contingent upon this Court's approval of releases that were, as this Court ruled in its dismissal opinion and order, well beyond the scope of section 524(g). After the bankruptcy case was filed, Paul Hastings left the AHC and was retained by the Committee. Yet, at no point has the Debtor suggested that Paul Hastings' representation of the AHC and clear alignment with J&J's plan structure meant that Paul Hastings could not provide effective representation to the Committee.

### C.     Brown Rudnick's Retention Served a Valid Purpose

39.     As noted above, the Debtor's repeated statement that Paul Hastings was "primary" or "lead" counsel to the Committee (*see* Fee Objection at ¶¶ 1, 14, 17 & 36) is inaccurate. As the Co-Chairs made clear, the Committee "tasked Brown Rudnick and Paul Hastings with ***cooperatively***

providing lead legal services with respect to *all* bankruptcy matters, including negotiation, plan, and exit strategy." *See* Dkt. No. 805-3 (the "Co-Chair Declaration") at ¶ 7 (emphasis added).

40.     The Debtor uses this false characterization as the foundation for its argument that Brown Rudnick served as an "additional" but unnecessary lead bankruptcy counsel.  Fee Objection at ¶ 38.  Again, the Committee tasked Brown Rudnick and Paul Hastings with cooperatively providing lead legal services with respect to all bankruptcy matters.  *See* Co-Chair Declaration at ¶ 7.

41.     The Committee members were represented individually by counsel who came from the AHC (represented by Paul Hastings), and the Coalition (represented by Brown Rudnick and Otterbourg), and included several members of the official committees appointed in LTL I and LTL II (represented by Brown Rudnick and Otterbourg).  The Committee ensured that the interests of all its constituents were represented by retaining Brown Rudnick and Paul Hastings to jointly advise it.

42.     The Debtor's derisive allegation that "[t]he only thing 'unique' about Brown Rudnick pertinent to its supposed role was the confidential and privileged knowledge it obtained while representing the official committees in LTL I and LTL II and the Coalition in opposing LTL's and Red River's efforts to achieve a global resolution of the talc claims" is false.  Fee Objection at ¶ 39.

43.     Brown Rudnick is one of very few firms with a deep bankruptcy bench that is focused, first and foremost, on official committee engagements and has extensive mass tort bankruptcy experience, including a proven record of success, particularly in complicated cases with divided committees.  *See* Sieger-Grimm Declaration at ¶¶ 4 & 6.

44.     Nor is there anything supporting the Debtor's insinuations that Brown Rudnick somehow duped the Committee into agreeing to retain Brown Rudnick as co-counsel to the Committee.  *See*, *e.g.*, Fee Objection at ¶ 4 (alleging Brown Rudnick "persuaded the TCC to hire two lead bankruptcy counsel, itself and Paul Hastings LLP").

45. To the contrary, the Co-Chairs' declarations in support of the Retention Application explain why they chose to Brown Rudnick. *See* Co-Chair Declaration at ¶ 6 (stating that "Brown Rudnick is particularly well qualified to represent the TCC as co-bankruptcy counsel in this Chapter 11 case" because it is "especially familiar with the background of this case, the various interests at play, and the potential legal issues that may arise within this case," it "has become familiar with the TCC and the TCC's goals," and it has "extensive experience representing committees in mass tort bankruptcy cases and corporate reorganizations, both out-of-court and under Chapter 11 of the Bankruptcy Code.").

46. More importantly, the Debtor's statement wrongly implies that the Committee members—many of whom served on official committees in two prior related cases—are anything other than some of the strongest, most principled women and men who could be appointed to the Committee. Or perhaps the Debtor meant to imply that the Office of the United States Trustee failed to properly appoint Committee members capable of independent thought. In either case, such an allegation is unfounded and improper.

47. The Debtor also fails to coherently argue that Brown Rudnick did nothing to bridge the gap between those supporting the plan and those against the plan. *See* Fee Objection at ¶ 37. Contrary to the Debtor's unfounded allegations, Brown Rudnick played an instrumental role in assisting the Committee through its continued efforts to broker a fully consensual deal among the Debtor and all talc claimants in this case (notwithstanding that the Debtor appears to simply ignore the fact that a fully consensual plan was in the best interest of the estate). Much of Brown Rudnick's work was focused on efforts to reach a resolution by way of negotiation and mediation with the Coalition and seeking the incorporation of the TCC Term Sheet and all of its provisions into the plan, consistent with the Committee's Memorandum of Understanding with the Debtor.

48.     This included efforts to progress the "deal no matter what," which would serve as a mechanism to ensure the effectiveness of a settlement if a confirmation order was overturned on appeal (on the grounds of overly broad and improper section 524(g) release, for instance).

49.     Brown Rudnick's continued efforts on these fronts were entirely necessary, as the status of the Committee's support for the plan remained contingent upon certain conditions being met through the time closing statements were made at the confirmation hearing.

50.     The Committee did not take a position—much to J&J's dismay—at the opening of the combined hearing.  When the Committee announced its position at the last day of the confirmation hearing, counsel made it clear that that the Committee's support for the plan was caveated by the condition that the TCC Term Sheet provisions, including all aspects and protections of the "deal no matter what," would be incorporated into the plan.[6]  But the Debtor never provided the Committee a plan that adequately incorporated the required provisions from the TCC Term Sheet.  The Debtor cannot fault Brown Rudnick for this outcome.

## II.     Brown Rudnick's Fee Application Should Be Approved

### A.     Brown Rudnick Is Disinterested

51.     The Debtor argues that even if Brown Rudnick is retained, the Fee Application should be denied on the grounds that Brown Rudnick is not disinterested.  *See* Fee Objection at ¶ 43.  For the reasons stated herein and in the Committee's Retention Response, Brown Rudnick is disinterested.

---

[6]     *See* Feb. 28, 2025 Hr'g. Tr. at 3782:4-21 ("the TCC members have voted to support confirmation of the Plan premised upon the changes that the Debtor has agreed to, and which we are in the process of documenting, which include simply, reverting to the language in section 8.1(g) of the Second Amended Plan, where the Master Settlement Agreements which govern the critical out-of-court deal be executed by all parties thereto prior to the Plan being confirmed, and clarifications to ensure the continuity of claimant treatment from the Plan Trust to the qualified settlement fund in the event that the out-of-court settlement becomes effective.").

B.     **Brown Rudnick's Services Were**
       **Proper and Were Not Unnecessary or Duplicative**

52.    The services provided by Brown Rudnick were, at the time rendered, necessary, reasonable, and proper, and should be allowed in the requested amounts under the standards customarily applied to fee awards under section 330 of the Bankruptcy Code.

53.    The Debtor makes numerous allegations with respect to the services provided by Brown Rudnick and the corresponding fees, but these allegations are not based on genuine concerns. Were the concerns raised by the Debtor genuine, the Fee Objection would seek reductions of Brown Rudnick's fees (or, as is customary, the Debtor would have sought to negotiate such consensual reductions with Brown Rudnick, rather than rebuffing Brown Rudnick's attempts to reach a consensual resolution). Instead, the concerns raised by the Debtor serve only as further pretext for the Debtor's retributive objective: outright denial of the Fee Application.

        i.     **Brown Rudnick's Billing Concerning Litigation-Related**
               **Work Was Entirely Proper and Within the Purpose of Its Retention**

54.    The Debtor criticizes the fees that Brown Rudnick incurred in providing services that purportedly "fell outside the scope of its retention by the TCC." Fee Objection at ¶ 56.

55.    The thrust of this argument appears to be that because "Brown Rudnick was 'uniquely qualified to bridge the gap between the supporters of [Red River's] plan and those who did not support it[]' Dkt. 1442 ¶ 2," Brown Rudnick was thus only permitted to provide services of an extremely "limited scope"—namely, services strictly within the categories of "Plan and Disclosure Statement" and "Mediation/Settlement." *See* Fee Objection at ¶¶ 37-51.

56.    As the Debtor itself acknowledges, however, the Committee "tasked Brown Rudnick and Paul Hastings with cooperatively providing lead legal services with respect to all bankruptcy matters, including negotiation, plan, and exit strategy." *See* Fee Objection at ¶ 56; Co-Chair Declaration at ¶ 7. In a litigious case involving numerous contested matters, including contested

matters relating to the plan, such matters are necessarily intertwined with matters concerning the plan, negotiation, and the case as a whole and cannot neatly be cabined off. Brown Rudnick's legal fees, including fees falling into categories outside of the two categories that the Debtor has unilaterally deemed permissible, are entirely proper and within the scope of Brown Rudnick's retention.

57.     Oddly, the Fee Objection criticizes Brown Rudnick for not asking questions at the depositions that its attorneys attended on behalf of the Committee. *See* Fee Objection at ¶ 58. Of course, if Brown Rudnick attorneys had asked questions at depositions, the Fee Objection would have undoubtedly criticized Brown Rudnick for providing services outside its purported "limited scope." *See id*. at ¶ 51. Notably, Paul Hastings did not ask any questions at any of the depositions either.

58.     The Committee did not authorize its co-bankruptcy counsel to take an active role in the depositions. Rather, it divided the task of attending and summarizing for the Committee the many depositions scheduled prior to the combined hearing so that co-counsel could fulfill necessary task of reporting to the Committee with respect to those depositions.

### ii.      Brown Rudnick's Services Were Not Duplicative of Paul Hastings' Services

59.     The Fee Objection alleges that "Brown Rudnick's services were almost entirely duplicative of services already provided by Paul Hastings." Fee Objection at 30.

60.     Putting aside the Debtor's conspicuous decision to object solely to Brown Rudnick's Fee Application based on this alleged duplication, Brown Rudnick's services were not duplicative of services "already" provided by Paul Hastings.

61.     **First**, as set forth in the Retention Application, Brown Rudnick "coordinate[d] workstreams to maximize efficiency and [made] every effort to avoid unnecessary duplication of services in doing so," and instituted a "multi-step system for efficiency purposes and in order to avoid unnecessary duplication of services." *See* Retention Application at 4.

62.     For instance, Brown Rudnick and Paul Hastings divided coverage of the depositions to determine which firm would be responsible for drafting and circulating to the Committee a summary of each deposition.  Similarly, Brown Rudnick and Paul Hastings split the responsibility of drafting and circulating to the Committee a summary of each expert report.

63.     **Second**, to the extent there was duplication of services, such duplication was necessary and warranted under the circumstances.  The Committee "tasked Brown Rudnick and Paul Hastings with *cooperatively* providing lead legal services with respect to *all* bankruptcy matters, including negotiation, plan, and exit strategy."  Co-Chair Declaration at ¶ 7 (emphasis added).

64.     The Committee made this decision for good reason.  The Committee was appointed to represent the interests of all creditors who hold talc claims in this case, an enormous constituency of diverse creditors.  In its *Statement of the Official Committee of Talc Claimants in Support of the Debtor's Chapter 11 Cases, Forthcoming Amended Plan and Plan Process* [Dkt. No. 613] (the "Committee Stmt."), the Committee recognized that "[a]s of the date of its constitution, the Committee was nearly evenly divided between creditors represented by counsel who supported the Plan, and creditors represented by counsel who either opposed or had significant reservations with respect to the Plan."  Committee Stmt. ¶ 4.

65.     As a result, "[i]n the spirit of compromise among its diverse membership, the Committee has retained both Paul Hastings LLP, former co-counsel to the AHC, and Brown Rudnick LLP, former co-counsel to the Coalition, as its primary co-counsel."  Committee Stmt. n.2.

66.     The Committee chose Brown Rudnick in recognition of Brown Rudnick's past representations in order to assist in the Committee in reaching its ultimate goal of "bringing together historically divergent interests among the members of the Committee to pursue a common settlement" and "reaching a consensus view among its members to improve the Debtor's Plan for the benefit of all talc claimants."  *See* Committee Stmt. ¶ 4.

16

67.     In other words, the Committee believed it was necessary to have a balanced representation and advice stream.  That necessarily meant that attorneys from both Brown Rudnick and Paul Hastings needed to have a full understanding of case developments and needed to be present at critical meetings, hearings, and depositions.

**C.      The Debtor's Focus on Multiple Attendees Is Misplaced**

68.     The Fee Objection's allegation that "an excessive number of Brown Rudnick professionals were present at multiple conference calls and meetings," Fee Objection at ¶ 68, once again raises the question as to why the Debtor objected solely to Brown Rudnick's Fee Application.

69.     The Debtor's own tables tracking attendance at hearings and depositions, assuming they are accurate, show that with respect to the majority of hearings and depositions, there were more Paul Hastings attorneys in attendance than Brown Rudnick attorneys.  *See* Fee Objection at ¶¶ 61-62. Yet the Debtor is objecting only to Brown Rudnick's Fee Application.  The Debtor's purported concern here is a pretext for its objective of seeking denial of Brown Rudnick's Fee Application.

**D.      Brown Rudnick's Fees Incurred After the Combined Hearing Were Proper**

70.     The Debtor takes issue with the fact that Brown Rudnick drafted "daily committee updates" between March 3, 2025 and March 31, 2025, alleging there was no reason for such updates following the combined hearing.  Fee Objection at ¶ 71.

71.     First, the frequency or extent to which the Committee and its counsel decide to communicate is not up to the Debtor.  Second, just because the combined hearing had concluded did not obviate the need for case status reports, recommendations, or other communications.  Committee members were concerned about the outcome of the confirmation hearing and the implications on their own claims and those of other talc claimants whose interests they represented.

17

### E.     The Debtor's Purported Issues with Certain Time Entries Do Not Support Wholesale Denial of Brown Rudnick's Fee Application

72.     The Fee Application alleges that Brown Rudnick's Fee Application includes time entries reflecting "block billing," "lumping," and "vague descriptions."  Fee Application at ¶ 73.

73.     These allegations do not appear to be based on any genuine concern with respect to the propriety of Brown Rudnick's time entries, and the Debtor does not seek any reduction of Brown Rudnick's fees in connection with these alleged time entry issues.  Rather, the Debtor appears to make these allegations solely in support of its request for denial of Brown Rudnick's Fee Application.  To the extent there is *any* merit to these allegations, which are not sufficiently substantiated, they would still not serve as a proper basis for wholesale denial of the Fee Application.

### F.     Brown Rudnick's Rate Increases Were Proper

74.     The Debtor focuses on one Brown Rudnick attorney whose rate was increased twice during the case and alleges that these increases were inappropriate absent further disclosure and justification.  However, the flagged rate increases were consistent with the disclosures in Brown Rudnick's Retention Application and the supporting declaration.

75.     Brown Rudnick disclosed that "[i]n the normal course of its business, Brown Rudnick revises its billing rates on an annual basis" and "[t]he review and rate increases are based upon increases within each attorney's and paraprofessional's current level of seniority."  *See* Sieger-Grimm Declaration at ¶ 23, n. 3.

76.     As part of the Retention Application, Brown Rudnick also disclosed the ranges for both its calendar year 2024 hourly rates and its calendar year 2025 hourly rates (effective January 1, 2025).  *See id.* at ¶ 22.  In 2024, the attorney in question held the position of counsel and had an hourly rate of $1,200.  In January 2025, the attorney still held the position of counsel and had a revised hourly rate of $1,290.  Later in 2025, the attorney was elevated to the position of partner and accordingly had a further revised hourly rate of $1,610.  These rate increases were entirely proper.

G.        **Brown Rudnick's Expenses Were Reasonable**

77.       Brown Rudnick's expenses were actual, necessary, and reasonable. The Debtor argues that even if Brown Rudnick is retained, the Court should take the draconian measure of denying, in whole, Brown Rudnick's expenses based on the Debtor's allegation that such expenses were incurred in support of unnecessary, inappropriate, and duplicative services. Fee Objection at ¶ 80.

78.       As set forth above, Brown Rudnick's services to the Committee were necessary, appropriate, and not unnecessarily duplicative. The Debtor specifically identifies six flights to or from Cleveland as being "unrelated" to the Case, Fee Objection at ¶ 83, but they were in fact case-related flights taken by a key Brown Rudnick partner, who resides in Cleveland, Ohio.

79.       Moreover, to the extent the Debtor wanted further detail or clarification with respect to Brown Rudnick's expenses, it could have requested from Brown Rudnick such detail or clarification. Brown Rudnick's total requested expenses of $79,417.50 are reasonable and are, in fact, a *fraction* of Paul Hastings' total requested expenses of $459.923.44, to which the Debtor conspicuously has no objection.

III.    **The Fee Objection Is an Attempt to Shift Blame and Gain a Windfall**

80.       As the Court well-knows, this case is J&J's third failed bankruptcy. J&J harbors resentment toward Brown Rudnick, which represented official committees in each one of its failed bankruptcy cases.

81.       This is evident from the fact that the Debtor has now agreed to pay the fees and expenses of the Debtor's professionals, the FCR's professionals, the AHC's counsel (Parkins Rubio), Paul Hastings[7] (Committee counsel), the Smith Law Firm (Kramer Levin and Troutman Pepper Locke), and Stutzman, Bromberg, Esserman & Plifka (Committee counsel).

---

[7]      Subject only to the Court's approval of Committee's retention of Paul Hastings as co-lead counsel.

82.     But Brown Rudnick is not the reason for J&J's defeats, especially in this case, where the Court determined that "Red River's chapter 11 plan cannot be confirmed as constructed." *Memorandum Decision and Order* [Dkt. No. 1424] at 3.

83.     In both the Retention Objection and the Fee Objection, the Debtor argues that the oft-repeated "overwhelming support" for its plan made Brown Rudnick, whose former clients opposed its plan, unfit to serve as Committee counsel and undeserving of compensation. Unfortunately, the Debtor failed to recognize that it had overwhelming support among talc claimants for a ***settlement***.

84.     Brown Rudnick's work with the Coalition before the petition date and its efforts during mediation between the Committee and the Coalition, among other parties, showed that talc claimants shared a goal with J&J: ending the fighting and settling talc claims. Even the plan opponents conceded that they did not oppose a settlement, but such a settlement could not be contingent upon this Court's approval of *Purdue*-releases in the aftermath of the Supreme Court's ruling in *Purdue*.

85.     As the Committee's co-counsel, Brown Rudnick championed a "deal no matter what" that could bring disparate parties together to achieve common goals. This work was not only valuable, but it could have saved the case had J&J put its resentment for certain parties and counsel aside.

86.     The Court did not dismiss this case because the Committee engaged Brown Rudnick. The fundamental problem was J&J's insistence on tying any settlement to a plan that "contains impermissible nonconsensual third-party releases." *See* Memorandum Decision and Order at 4.

87.     Had the Debtor been willing to lay down its sword and work with Brown Rudnick, it might have achieved a different result. *See, e.g., In re Tehum Care Services, Inc.*, Case No. 23-90086 (Bankr. S.D. Tex.). That J&J and the Debtor chose not to do so does not warrant the denial of the Committee's retention of Brown Rudnick or Brown Rudnick's fees and expenses. This is especially true in this case, as such denials would reward the Debtor with a windfall in the amount of professional

fees it would avoid paying and would condone the Debtor's decision to selectively pay only those professionals it chose in this case.

## CONCLUSION

WHEREFORE, Brown Rudnick respectfully requests that the Court (i) overrule the Objection, (ii) grant the Fee Application, (iii) enter the proposed order annexed to the Fee Application as **Exhibit B**, approving the allowance of requested fees and reimbursements and authorizing and directing the Debtor to immediately pay such fees and reimbursements to Brown Rudnick, and (iv) grant such other and further relief as the Court deems just and proper.

Dated: October 19, 2025

Respectfully submitted,

**BROWN RUDNICK, LLP**

*/s/ David J. Molton*
_____
David J. Molton (pro hac vice)
Jeffrey L. Jonas (pro hac vice)
Eric R. Goodman (pro hac vice)
Susan Sieger-Grimm (pro hac vice)
Seven Times Square
New York, NY 10036
Telephone:   (212) 209-4800
dmolton@brownrudnick.com
jjonas@brownrudnick.com
egoodman@brownrudnick.com
ssieger-grimm@brownrudnick.com

## Certificate of Service

I certify that on October 19, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Eric R. Goodman*
_____
Eric R. Goodman